# EXHIBIT 182

Appx. 02978



**DATE:**     May 28, 2019

**TO:**       The Board of Trustees (the "Board") of Highland Global Allocation Fund (the "Fund")

**FROM:**     Highland Capital Management Fund Advisors, L.P. ("HCMFA" or the "Adviser")

**RE:**       Resolution of the Fund's Net Asset Value ("NAV") Error

---

This memorandum summarizes the final resolution of the Fund's NAV error related to its TerreStar Corporation ("TerreStar") equity holding. In connection with the Fund's conversion from an open-end fund to a closed-end fund (the "Conversion") on February 13, 2019, the Office of the Chief Accountant ("OCA") of the SEC reviewed the Adviser's fair valuation of TerreStar equity, in particular the application of Financial Accounting Standards Board Accounting Standards Update 2011-4, Topic 820, Fair Value Measurement ("ASC 820") to two transactions in TerreStar equity that occurred in March 2018 (the "March Transactions"). The OCA provided its feedback during an exit call on February 8, 2019 and subsequently confirmed no comments to the Adviser's confirmation of understanding letter on February 14, 2019.

The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value. As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly." The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value. The "orderly" determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "NAV Error").

After incorporation of the updated valuation into the Fund's NAV, the gross NAV Error, excluding interest, the advisory fee rebate, and processing costs, amounted to approximately $6.1 million of loss to the Fund and approximately $1.4 million of losses to Shareholders (a total loss of approximately $7.5 million) over the period between March 18, 2018 and January 19, 2019 (the "NAV Restatement Period").

The Fund was made whole through a $5,186,496 payment on February 15, 2019, and a $2,398,842 payment on May 2, 2019. A detailed breakdown of the NAV Error and the make whole payments is set forth below. Shareholder reprocessing and reimbursement are in progress with the Fund's prior transfer agent, DST Systems, Inc. (as transfer agent to the open-end fund), and given detailed omnibus account information has not yet been obtained the estimated make whole payments are subject to change. A representative of the Adviser will provide the Board with an update on the process during the May 28, 2019 Board meeting.

<u>NAV Error Breakdown and Make Whole Payments</u>

| | Transaction Date(s) | Loss to Fund | Estimated Loss to Shareholders[3] | Totals |
|---|---|---|---|---|
| Estimated Net Loss | 3/14/18 thru 1/7/19 | (6,068,851) | (1,373,272) | (7,442,123) |
| Processing, Fees, Interest | 3/14/18 thru 1/7/19 | (375,000) | - | (375,000) |
| Insurance Proceeds | 2/15/2019 | 3,566,248 | 1,373,272 | 4,939,520 |
| Insurance deductible paid by Adviser | 2/15/2019 | 246,976 | - | 246,976 |
| Management fee offset | 4/1/2019 | 47,000 | - | 47,000 |
| Additional payment from Adviser | 5/2/2019 | 2,339,627[2] | - | 2,339,627 |
| Reimbursement of Processing costs from Adviser | -[1] | 244,000 | - | 244,000 |
| Total | | - | - | - |

**Supplemental Numerical Update**

| | | | | |
|---|---|---|---|---|
| Additional estimated loss to fund and shareholders | 1/8/19 thru 1/28/19 [5] | (19,789) | | |
| Additional processing, management fees, and interest | Note 4 | (39,426) | | |
| Additional payment from Adviser | 5/2/2019 | 59,215 | | |

| | | | | |
|---|---|---|---|---|
| **Total additional payment from Adviser [6]** | **5/2/2019** | **2,398,842** | | |

**Notes**

1 - Expected to be incurred thru 12/31/19, and will be reimbursed by Adviser as incurred. To date no invoices have been billed or paid, but upon receipt of a future invoice, the Adviser will promptly pay.

2 - Includes $2,255,628 of previously outstanding balance, and $84,000 of interest calculated through 1/7/19, which was the "as of date" used for the calculations in the OCA submission.

3 - Represents the estimated losses to shareholder subscribing into the fund during the NAV Restatement Period and estimated losses to be determined after reprocessing individual capital activity that was held in Omnibus accounts.

4 - Proposal from service provider was higher than original estimate, and includes interest thru date of final payment made by Adviser.

5 - This includes the calculations subsequent to 1/7/19 (which was the "as of date" used for the calculations in the OCA submission) "through date" 1/28/19, which the final date in which the revised mark was fully reflected in the NAV.

6 - Includes $2,339,627 and $59,215 of Additional payments from Adviser

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-18    Filed 12/07/23    Page 4 of 200    PageID 24216
Appendix Page 1072 of 474    Page 4 of 200

# EXHIBIT 183

# INTENTIONALLY

# OMITTED

# EXHIBIT 184

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | Chapter 11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | Adversary No. 21-03003 |
| | § | |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT JAMES DONDERO'S RULE 26 INITIAL DISCLOSURES

TO:    Plaintiff Highland Capital Management, L.P., by and through its attorneys of record, John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067.

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, made applicable to this proceeding through Rule 7026 of the Federal Rules of Bankruptcy Procedure, Defendant James

Dondero ("Dondero" or "Defendant") makes the following initial disclosures to Plaintiff Highland

Capital Management, L.P. ("Plaintiff" or "Debtor").[1]

**1.      The names, and, if known, the addresses, and telephone numbers of individuals likely to have discoverable information, along with the subjects of that information are listed below.   Defendant reserves the right to amend and/or supplement these disclosures.**

**ANSWER:**

**James D. Dondero**
c/o D. Michael Lynn
Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
*Attorneys for Defendant*

Dondero may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the terms of the promissory notes, the drafting and execution of the notes, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the purpose and intent of the notes, the Debtor's prior use of forgivable loans, and Dondero's compensation from the Debtor during his employment.

**Highland Capital Management, L.P. and certain of its current employees**
c/o John Morris
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
*Attorneys for Plaintiff*

Debtor and certain of its current employees, including potentially Thomas Surgent, David Klos, and Kristen Hendrix, may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and Dondero's defenses to the allegations in the complaint, including the circumstances surrounding the execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions

---

[1] Defendant makes these disclosures subject in all respects to his Motion for Withdrawal of the Reference [Adv. Dkt. No. 21] and the Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint [Adv. Dkt. No. 22] filed on April 15, 2021. Defendant does not waive, but instead hereby preserves, his right to a jury trial and all rights and requests for relief asserted in the motions. Defendant does not consent to the Bankruptcy Court determining this proceeding or entering final orders or judgments in this proceeding. Instead, Defendant requests that the reference be withdrawn and that the District Court adjudicate this proceeding.

subsequent, the Debtor's prior use of forgivable loans, and Dondero's compensation from the Debtor during his employment.


**Brian Collins, former employee of the Debtor**
Tel: 213-550-4538

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.


**Amy Theriot, former employee of the Debtor**
Tel: 214-893-5352

As a former employee, she may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.


**Mark Okada, former employee of the Debtor**
Tel: 975-989-1000

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.


**Scott Ellington, former employee of the Debtor**
c/o Frances Smith
Ross & Smith PC
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution

of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Frank Waterhouse, former employee of the Debtor**
c/o Frances Smith
Ross & Smith PC
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

As a former employee, he may have knowledge regarding the promissory notes, the circumstances surrounding the execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**John Honis, employee of Rand Advisors**
Tel: 214-335-7969

As an employee of Rand Advisors, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Jack Yang, former employee of the Debtor**
Tel: 646-387-2351

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Paul Adkins, former employee of the Debtor**
Tel: +65 9728 0599

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Pat Daugherty, former employee of the Debtor**
c/o Jason Kathman
Spencer Fane LLP
2200 Ross Avenue, Suite 4800
Dallas, TX 75201

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Tim Lawler, former employee of the Debtor**
Tel: 847-305-3013

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable
loans.


**Appu Mundassery, former employee of the Debtor**

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable
loans.


**Mike Hurley, former employee of the Debtor**
Tel: 775-750-8921

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable
loans.

**Gibran Mahmud, former employee of the Debtor**
Tel: 972-740-0018

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable
loans.


2.      A copy or a description by category and location, of all documents, electronically stored

information, and tangible things that the disclosing party has in its possession, custody, or control

and may use to support its claims or defenses.

**ANSWER: Defendant may have documents and communications related to the following
matters in his possession, custody, or control that he may use to support his claims or
defenses. The inclusion of a general category of documents below does not mean that specific
documents necessarily exist or that Defendant has such documents in his possession, custody,
or control.**

1.  Documents and communications related to the allegations in the complaint and Dondero's defenses to the allegations in the complaint, including, without limitation, documents related to the terms of the promissory notes, the drafting and execution of the notes, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the purpose and intent of the notes, the Debtor's prior use of forgivable loans, and Dondero's compensation from the Debtor during his employment.

2.  Documents related to Dondero's personal tax returns.

3.  Documents related to tax loan(s) made by the Debtor to Dondero and such tax amounts incurred related to federal partnership tax.

4.  Documents and/or communications related to Dondero's compensation during his employment at Highland.

5.  Any and all pleadings filed in this matter and the main bankruptcy case.

3.  A computation of each category of damages claimed by the disclosing party, who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

**ANSWER:**

Defendant is not seeking actual damages at this time.

4.  For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**ANSWER:**

No such insurance agreements known.

<u>**Reservation of Rights**</u>

Defendant makes these disclosures subject in all respects to his Motion for Withdrawal of the Reference [Adv. Dkt. No. 21] and Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint [Adv. Dkt. No. 22] filed on April 15, 2021. Defendant does not waive, but hereby preserves, his right to a jury trial and all additional rights and relief available as asserted in the motions.

The Defendant's investigation is ongoing, and he reserves the right to further amend, modify and/or supplement these initial disclosures as provided in Federal Rule of Civil Procedure 26(e) if warranted and to the extent additional disclosures are not mooted or made redundant by information made known during the discovery process or in writing. In addition, the Defendant makes these initial disclosures without waiving but expressly preserving: (a) his right to a jury trial; (b) his right to have this proceeding determined by the District Court; (c) his right to object to the entry of any final orders or final judgments by the Bankruptcy Court in this proceeding; (d) the right to object to any discovery requests or to the admissibility of evidence on the grounds of privilege, work product, relevance, materiality, or any other proper ground; and (e) the right to object to the use of any information provided in or derived from these initial disclosures for any purpose in this action.

Dated: April 15, 2021                              Respectfully submitted,

                                                   */s/ Bryan C. Assink*
                                                   D. Michael Lynn
                                                   State Bar I.D. No. 12736500
                                                   John Y. Bonds, III
                                                   State Bar I.D. No. 02589100
                                                   Clay M. Taylor
                                                   State Bar I.D. No. 24033261
                                                   Bryan C. Assink
                                                   State Bar I.D. No. 24089009
                                                   BONDS ELLIS EPPICH SCHAFER JONES LLP
                                                   420 Throckmorton Street, Suite 1000
                                                   Fort Worth, Texas 76102
                                                   (817) 405-6900 telephone
                                                   (817) 405-6902 facsimile
                                                   Email: michael.lynn@bondsellis.com
                                                   Email: john@bondsellis.com
                                                   Email: clay.taylor@bondsellis.com
                                                   Email: bryan.assink@bondsellis.com

                                                   ATTORNEYS FOR DEFENDANT JAMES
                                                   DONDERO

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on April 15, 2021, a true and correct copy of the foregoing Rule 26 initial disclosure was served via email on counsel for the Plaintiff as listed below.

Jeff Pomerantz
Ira Kharasch
John Morris
Greg Demo
Hayley Winograd
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

                                                   */s/ Bryan C. Assink*
                                                   Bryan C. Assink

# EXHIBIT 185

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 174-4    Filed 02/24/22    Page 15 of 200    PageID 24227
Case 21-03004-sgj Doc 84 Filed 11/30/21    Entered 11/30/21 17:53:40    Page 1 of 7
Docket #0084 Date Filed: 11/30/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § | 21-03004-sgj |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | |
| Defendant. | § § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Cresce

### PLAINTIFF'S THIRD AMENDED NOTICE OF RULE 30(B)(6) DEPOSITION
### TO HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Highland Capital Management, L.P., the plaintiff in the above-referenced adversary proceeding in the above-captioned chapter 11 case, shall take the deposition of Highland Capital Management Fund Advisors, L.P. ("HCMFA") by the person(s) most qualified to testify on HCMFA's behalf with respect to the topics described in **Exhibit A** attached hereto on **December 1, 2021, commencing at 10:00 a.m. Central Time** or at such other day and time as the Plaintiff may agree in writing.  The deposition will be taken under oath before a notary public or other person authorized by law to administer oaths and will be visually recorded by video or otherwise.

The deposition will be taken remotely via an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition and by use of Interactive Realtime.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated:  November 30, 2021.                     **PACHULSKI STANG ZIEHL & JONES LLP**

                                               */s/ John A. Morris*
                                               Jeffrey N. Pomerantz (CA Bar No.143717)
                                               Ira D. Kharasch (CA Bar No. 109084)
                                               John A. Morris (NY Bar No. 2405397)
                                               Gregory V. Demo (NY Bar No. 5371992)
                                               10100 Santa Monica Blvd., 13th Floor
                                               Los Angeles, CA 90067
                                               Telephone: (310) 277-6910
                                               Facsimile: (310) 201-0760
                                               E-mail:     jpomerantz@pszjlaw.com
                                                           ikharasch@pszjlaw.com
                                                           jmorris@pszjlaw.com
                                                           gdemo@pszjlaw.com

                                               -and-


                                               **HAYWARD PLLC**

                                               Melissa S. Hayward
                                               Texas Bar No. 24044908
                                               MHayward@HaywardFirm.com
                                               Zachery Z. Annable
                                               Texas Bar No. 24053075
                                               ZAnnable@HaywardFirm.com
                                               10501 N. Central Expy, Ste. 106
                                               Dallas, Texas 75231
                                               Tel: (972) 755-7100
                                               Fax: (972) 755-7110

                                               *Counsel for Highland Capital Management, L.P.*

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1 Filed 03/24/7 Appendix Part 4 Page 4 of 7 Page 18 of 200   PageID 24230
Case 21-03004-sgj Doc 84 Filed 11/30/21   Entered 11/30/21 17:53:40   Page 4 of 7

**EXHIBIT A**

**DEFINITIONS**

1.      "Amended Answer" means *Defendant's Amended Answer* lodged in the above-referenced adversary proceeding at Docket No. 48.

2.      "Bankruptcy Case" refers to the above-referenced bankruptcy case styled as *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11.

3.      "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, text messages, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

4.      "Concerning" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

5.      "Discovery Requests" means (i) the *Debtor's First Requests for Admission Directed to Highland Capital Management Fund Advisors, L.P.*, (ii) the *Debtor's First Request for Production of Documents Directed to Highland Capital Management Fund Advisors, L.P.*, and (iii) the *Debtor's First Interrogatories Directed to Highland Capital Management Fund Advisors, L.P.*

6.      "Document" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made.  This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 4-13 Page 19 of 200    PageID 24231
Appendix Part 4 Page 232 of 474
Case 21-03004-sgj  Doc 84  Filed 11/30/21    Entered 11/30/21 17:53:40    Page 5 of 7

intangible thing or item that contains any information.  Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

7.      "Exhibits" refers to each of the documents identified as Exhibits 28-66 on *Debtor's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 25, 2021* lodged in the above-referenced adversary proceeding at Docket No. 35.

8.      "HGAF" shall have the meaning ascribed to that term in paragraph 38 of the Amended Answer.

9.      "Highland" means Highland Capital Management, L.P.

10.      "Insurance Claim" means any claim that You filed for insurance coverage Concerning the NAV Error.

11.      "Motion to Amend" means *Defendant's Motion for Leave to Amend Answer* lodged in the above-referenced adversary proceeding at Docket No. 32.

12.      "NAV Error" means the error made in calculating the net asset value of the equity interests HGAF held in TerreStar that were sold in March 2018.

13.      "Notes" shall have the meaning ascribed to that term in paragraph 15 of the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* lodged in the above-referenced adversary proceeding at Docket No. 1.

14.      "Original Answer" means *Defendant's Original Answer* lodged in the above-referenced adversary proceeding at Docket No. 6.

15.      "Retail Board" means any board of trustees or directors of any fund to which You provide advisory services.

16.      "Sauter Declaration" means the *Declaration of Dennis C. Sauter, Jr.* lodged in the above-referenced adversary proceeding at Docket No. 32-1.

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Appendix Part 4   Page 233 of 474   Page 20 of 200   PageID 24232
Case 21-03004-sgj Doc 84 Filed 11/30/21   Entered 11/30/21 17:53:40   Page 6 of 7

17.    "You" or "Your" means Highland Capital Management Fund Advisors, L.P., and anyone authorized to act on its behalf.

**Rule 30(b)6) Topics**

**Topic No. 1:**

Your Original Answer.

**Topic No. 2:**

Your Amended Answer

**Topic No. 3:**

Each Affirmative Defense asserted in Your Amended Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense. *See* Answer ¶¶ 38-47.

**Topic No. 4:**

The Notes, including but not limited to (a) the negotiation of the Notes, (b) the terms of the Notes, (c) Communications Concerning the Notes, (d) any payments of principal or interest made by You or on Your behalf with respect to the Notes, (e) the use of the proceeds of the Notes, (f) Your communications with Your outside auditors Concerning the Notes and the obligations thereunder, and (g) any agreements Concerning the Notes.

**Topic No. 5:**

The Exhibits.

**Topic No. 6:**

The Motion to Amend.

**Topic No. 7:**

The Sauter Declaration.

**Topic No. 8:**

3

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1 Page 4 Filed 03/24/22   Page 21 of 200   PageID 24233
Case 21-03004-sgj Doc 84 Filed 11/30/21   Entered 11/30/21 17:53:40   Page 7 of 7

Any Insurance Claim that You filed, including but not limited to: (a) any proceeds You received on account of any Insurance Claim; (b) any deductible paid by You in connection with any Insurance Claim; (c) the date You received any insurance proceeds on account of any Insurance Claim; (d) the use of the proceeds from any Insurance Claim; and (e) any Communications with any insurance carrier that processed any Insurance Claim.

**Topic No. 9**:

Any "consent fee" paid by You in April or May 2019, including the amount, date of payment, and source of funding for any such "consent fee."

**Topic No. 10**:

Your accounting for (a) the $2.4 million transferred from Highland to You on May 2, 2019, and (b) the $5 million transferred from Highland to You on May 3, 2019.

**Topic No. 11**:

Communications in 2020 with any Retail Board concerning any amounts due and owing by You to Highland, including but not limited to the disclosures You made to any Retail Board in October 2020.

**Topic No. 12**:

All Communications that You made in the Bankruptcy Case Concerning the Notes, including in any pleading, court filing, or argument.

**Topic No. 13**:

The identity (including the title or position) of each of Your officer(s), director(s), direct and indirect owner(s), and employee(s) for the period January 1, 2018 through the present.

**Topic No. 14**:

Your responses to the Discovery Requests.

DOCS_NY:44191.6 36027/003

**Appx. 02998**

# EXHIBIT 186

# INTENTIONALLY

# OMITTED

# EXHIBIT 187

# INTENTIONALLY

# OMITTED

# EXHIBIT 188

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 186 Appendix 1 Filed 03/30/24    Page 25 of 200    PageID 24237
Case 21-03003-sgj Doc 11-1 Filed 03/30/21    Entered 03/30/21 11:24:52    Page 2 of 2

| | |
|---|---|
| **From:** | David Klos <DKlos@HighlandCapital.com> |
| **Sent:** | Friday, February 02, 2018 2:16 PM |
| **To:** | Corporate Accounting |
| **Cc:** | Melissa Schroth |
| **Subject:** | $3.825mm to Jim |

Blair,
Please set up $3.825mm to go to Jim this afternoon. Frank has approved.

Drew, this is a new loan.


**DAVID KLOS |** CONTROLLER



300 Crescent Court | Suite 700 | Dallas, Texas 75201
C: 214.674.2926 | O: 972.419.4478 | F: 972.628.4147
dklos@highlandcapital.com | www.highlandcapital.com

**Appx. 03002**

# EXHIBIT 189

From: wiremail@bbvacompass.com <wiremail@bbvacompass.com>
Sent: Friday, February 2, 2018 1:35 PM
To: Corporate Accounting <CorporateAccounting@hcmlp.com>
Subject: Compass Bank [Texas Bank Outgoing] Message ID:180202133456H400 Advice Code:TxBkOut

Compass Bank Wire Transfer Dept.
701 S 32nd Street
Birmingham, AL  35233

Outgoing Wire - Advice of Debit

Date: 2018-02-02 00:00:00            Wire Create Time 13:34:57

    Account #        :
    Account Name    :  HIGHLAND CAPITAL MANAGEMENT LP
    Amount          :  $3,825,000.00
    GFX Reference     :  180202133456H400
    Receiving Bank  :  311973208
    Recv BK Name      :  NEXBANK SSB

    Originator        :  HIGHLAND CAPITAL MANAGEMENT LP

    Beneficiary      :  James Dondero
    Bene Acct #      :  ███884

Beneficiary Info (OBI):
2/2/2018 Loan

Reference for Beneficiary (RFB):

FED Reference Number (IMAD):
20180202F2QCZ60C002532

**Appx. 03004**

# EXHIBIT 190

Appx. 03005

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-1   Filed 09/22/24   Page 29 of 200   PageID 24241
Case 21-03003-sgj Doc 11-4 Filed 03/30/21   Entered 03/30/21 11:24:52   Page 2 of 2

**From:** Blair Hillis <BHillis@HighlandCapital.com>
**Sent:** Wednesday, August 01, 2018 1:12 PM
**To:** David Klos; Corporate Accounting
**Cc:** Melissa Schroth
**Subject:** RE: $2.5mm loan to Dondero

Funds have been transferred to Jim's account. Thanks!

Kind Regards,
Blair Roeber

---

**From:** David Klos
**Sent:** Wednesday, August 1, 2018 10:47 AM
**To:** Corporate Accounting
**Cc:** Melissa Schroth
**Subject:** $2.5mm loan to Dondero

Jim has authorized a $2.5mm loan from HCMLP to Dondero.

Blair, can you please set up this wire today?
Drew, can you please draw up loan docs for execution?

**DAVID KLOS |** CONTROLLER



300 Crescent Court | Suite 700 | Dallas, Texas 75201
C: 214.674.2926 | O: 972.419.4478 | F: 972.628.4147
dklos@highlandcapital.com | www.highlandcapital.com

**Appx. 03006**

# EXHIBIT 191

Appx. 03007

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Friday, October 15, 2021 1:23 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; 'ddraper@hellerdraper.com' <ddraper@hellerdraper.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Berghman, Thomas (tberghman@munsch.com) <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Douglas Draper <ddraper@hellerdraper.com>; elmsd@gtlaw.com
**Subject:** RE: HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

John:

Defendants have the following objections to your corporate representative topics:

<u>NexPoint, HCMS and HCRE</u>

Topic 1: Your answer.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Subject to these objections, Defendants will provide a witness on this topic.

Topic 2: Each Affirmative Defense asserted in Your Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Subject to these objections, Defendants will provide a witness on this topic.

Topic 3: The Note, including but not limited to (a) the negotiation of the Note, (b) the terms of the Note, (c) Communications Concerning the Note, (d) any payments of principal or interest made by You or on Your behalf with respect to the Note; (e) the use of the proceeds of the Note, (f) Your communications with Your outside auditors Concerning the Note and the obligations thereunder, and (g) all agreements Concerning the Note.

Defendants object to the portion of this topic seeking information related to the use of the proceeds of the Note because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendants will provide a witness on this topic.

Topic 4: Your responses to the Discovery Requests.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Defendants incorporate all objections made in their discovery responses.  Subject to these objections, Defendants will provide a witness on this topic.

<u>Dugaboy</u>

Topic 2: Your authority to enter into the Alleged Agreement.

Defendant objects to this topic to the extent that it seeks privileged information and seeks legal conclusions. Subject to these objections, Defendant will provide a witness on this topic.

Topic 3: Ownership, beneficial ownership, and control of The Dugaboy Investment Trust.

Defendant objects to this topic because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant will provide a witness on this topic.

Topics 4-8:  Other agreements other than the agreements at issue in these proceedings.

Defendant object to these topics because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant will provide a witness on these topics.

Topic 9: Your responses to the Discovery Requests.

Defendant objects to this topic because it is vague and not specific enough to allow Defendant to adequately prepare a witness. Defendant incorporates all objections made in its discovery responses.  Subject to these objections, Defendant will provide a witness on this topic.


**Michael P. Aigen**
Partner

STINSON LLP

3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201  \  Bio

**STINSON.COM**

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, October 12, 2021 5:50 PM
**To:** Aigen, Michael P. <michael.aigen@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; 'ddraper@hellerdraper.com' <ddraper@hellerdraper.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Berghman, Thomas (tberghman@munsch.com) <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>
**Subject:** HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

Michael:

HCMLP has the following objections to the attached Rule 30(b)(6) notice:

**HCMLP objects to Topic No. 2**  (a) to the extent it calls for HCMLP to tender a witness to testify with precision to all principal, interest, and fees due under each Note that is the subject of the Complaints, and on the grounds that (b) HCMLP provided calculations of damages in its demand and default letters as well as its Complaints, (c) the categories of damages are all (i) unpaid principal, (ii) accrued but unpaid interest, and (iii) costs of collection, including reasonable attorneys' fees (the "Damages"), (d) based on the Notes and the documents produced proving HCMLP's costs of collection (which will be

supplemented from time to time to account for additional costs), the Defendants are just as easily capable of calculating the Damages at any moment in time as HCMLP, (e) it is unreasonable to expect any witness to specifically recall the precise Damages due under each Note, particularly when such Damages continue to increase every day.

Subject to those objections, HCMLP will tender a witness prepared to testify on Topic No. 2.

**HCMLP objects to Topic No. 4** on the grounds that (a) the phrase "involved in" is vague and ambiguous, and (b) it assumes that any of the Notes were subject to "negotiations."

Subject to those objections, HCMLP will tender a witness prepared to testify as to the identify of individuals it knows were involved in communications related to the execution and/or terms of the notes.

**HCMLP objects to Topic No. 7** on the grounds that (a) it seeks "facts" that are solely within the Defendants' knowledge, and that (b) Defendants' defenses and affirmative defenses have materially changed over time, and are otherwise ambiguous or not specifically set forth in the Answers.

Subject to that objection, HCMLP will tender a witness prepared to testify as to facts that it knows of that relate to or concern the defenses and affirmative defenses specifically proffered by any of the Defendants.

**HCMLP objects to Topics No. 9** on the grounds that (a) there is no time limitation, (b) the existence and terms of all affiliate loans, including all issues concerning forgiveness and forbearance, are set forth in detail in each of HCMLP's audited financial statements for each year from 2008 through 2018 (including the sections concerning "Subsequent Events"), and HCMLP specifically refers Defendants to those audited financial statements, and (c) it is unreasonable to expect any witness to specifically recall the identity of all affiliated borrowers, and the amounts, dates, and terms of all loans made to affiliated borrowers, including whether, when, and to what extent any such affiliated loans were forgiven.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topics No. 10** on the grounds that (a) there is no time limitation, (b) the existence and terms of all affiliate loans, including all issues concerning forgiveness and forbearance, are set forth in detail in each of HCMLP's audited financial statements for each year from 2008 through 2018 (including the sections concerning "Subsequent Events"), and HCMLP specifically refers Defendants to those audited financial statements, and (c) it is unreasonable to expect any witness to specifically recall the identity of all affiliated borrowers, and the amounts, dates, and terms of all loans made to affiliated borrowers, including whether, when, and to what extent any such affiliated loans were forgiven.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topics No. 11** on the grounds that (a) there is no time limitation, (b) documents concerning Mr. Dondero's compensation for the period 2016 through 2020 (the "Compensation Documents") have been or will be produced and HCMLP specifically refers Defendants to the Compensation Documents, and (c) it is unreasonable to expect any witness to specifically recall the specific amounts and components of Mr. Dondero's compensation from 2016 and 2020.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topic No. 12** on the grounds that it is (a) overly broad, unduly burdensome, and not relevant to the claims or defenses in this adversary proceeding, and (b) none of the Defendants who served the attached Rule 30(b)(6) notice is or was a party to a Shared Services Agreement with HCMLP.

Based on the forgoing, HCMLP will not proffer a witness to testify as to Topic No. 12.

**HCMLP objects to Topic Nos. 13, 14, 15, 16, and 17** to the extent those topics assume that HCMLP had any contractual or legal duty or obligation to take or refrain from taking the actions described therein.

Subject to those objections, and any additional objections referred to below, HCMLP will tender a witness prepared to testify on Topics 13, 14, 15, 16, and 17.

**HCMLP objects to Topic No. 14** on the ground that the phrase "may have previously had any role" is speculative, vague, and ambiguous.

Subject to that objection, HCMLP will tender a witness prepared to testify as to those referenced employees who actually  processed, made, facilitated or coordinated such payments, if any.

**HCMLP objects to Topic No. 15** on the grounds that the phrase (a) "[a]ny communications or instructions that may have been given" is speculative, vague, and ambiguous, and (b) there is no time limitation.

Subject to those objections, HCMLP will tender a witness prepared to testify as to communications or instructions that were actually given from 2018 to the present, if any.

---

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Thursday, October 07, 2021 2:49 PM
**To:** Rukavina, Davor <drukavina@munsch.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Vasek, Julian <jvasek@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: NexPoint Notice of 30(b)(6) to Debtor

Please see attached notice for the Seery/30B6 deposition.

**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201  \ Bio

**STINSON.COM**
This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information.  If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**From:** Rukavina, Davor <drukavina@munsch.com>
**Sent:** Thursday, October 7, 2021 11:42 AM
**To:** 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Vasek, Julian <jvasek@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R.

Winograd <hwinograd@pszjlaw.com>
**Subject:** NexPoint Notice of 30(b)(6) to Debtor

**External Email – Use Caution**

Counsel, please see attached notice.

Thank you


**Davor Rukavina, Esq.**

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800 / Dallas, Texas 75201-6659

Direct: +1.214.855.7587 / drukavina@munsch.com / munsch.com


Notice: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

# EXHIBIT 192

Appx. 03013

1       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2            DALLAS DIVISION

3  In re:                )Chapter 11
                         )
4  HIGHLAND CAPITAL MANAGEMENT, LP, )
                       )Case No.
5      Debtor.         )19-34054-SGJ-11
                       )
6  HIGHLAND CAPITAL MANAGEMENT, LP, )
                       )
7      Plaintiff,      )
                       )
8  vs.             )Advisory Proceeding No.
                      )21-03004
9  NEXPOINT ADVISORS, LP; JAMES    )
  DONDERO; NANCY DONDERO; and THE )
10  DUGABOY INVESTMENT TRUST,    )
                       )
11      Defendants.      )

12
       **********************************
13         REMOTE DEPOSITION OF
            DUSTIN NORRIS
14          December 1, 2021
       **********************************

15

16      DUSTIN NORRIS, produced as a witness at the

17  instance of the Highland Capital Management, was

18  duly sworn and deposed in the above-styled and

19  numbered cause on December 1, 2021, from

20  10:01 a.m. CST to 3:25 p.m. CST, stenographically

21  reported, pursuant to the Federal Rules of Civil

22  Procedure and the provisions stated on the record.

23  Job Number:   203362
  Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24          Texas CSR 9306
          California CSR 14407
25          Illinois CSR 084.004659

Page 2

1          A P P E A R A N C E S
2    (all attendees appearing via remote videoconference)
3
4    REPRESENTING HIGHLAND CAPITAL MANAGEMENT, LP:
5     John Morris, Esq.
      Hayley Winograd, Esq.
6    PACHULSKI STANG ZIEHL & JONES LLP
      780 Third Avenue
7    New York City, New York  10017
8
9
10   REPRESENTING NEXPOINT ADVISORS, LP:
11    Davor Rukavina, Esq.
      MUNSCH HARDT KOPF & HARR, PC
12    500 North Akard Street
      Dallas, Texas  75201
13
14
15   REPRESENTING JAMES DONDERO, NANCY DONDERO, HCRE,
      and HCMS:
16
      Michael Aigen, Esq.
17    STINSON LLP
      3102 Oak Lawn Avenue
18    Dallas, Texas  75219
19
20
21   ALSO PRESENT:
22    La Asia Canty, Paralegal,
      Pachulski Stang Ziehl & Jones
23
24
25

Page 3

1                INDEX
                                    PAGE
2
3    EXAMINATION BY MR. MORRIS.................. 5
4
5
6              EXHIBITS
7    NUMBER        DESCRIPTION              PAGE
8    Exhibit 185   Plaintiff's Third Amended Notice of
9                  Rule 30(b)(6) Deposition to
10                 Highland Capital Management Fund
11                 Advisors............................ 7
12
13
14         PREVIOUSLY MARKED EXHIBITS
15   NUMBER        DESCRIPTION              PAGE
16   Exhibit 1     Complaint for (I) Breach of
17                 Contract and (II) Turnover of
18                 Property of the Debtor's Estate...... 38
19   Exhibit 5     Defendant's Original Answer.......... 29
20   Exhibit 13    Defendant's Amended Answer........... 158
21   Exhibit 36    Email Chain; Bates D-HCMFA290880
22                 through 290883...................... 87
23
24
25

Page 4

1          PREVIOUSLY MARKED EXHIBITS
2    NUMBER        DESCRIPTION              PAGE
3    Exhibit 45    Highland Capital Management Fund
4                  Advisors, LP, Consolidated
5                  Financial Statements and
6                  Supplemental Information, 12/31/19;
7                  Bates D-CNL-002273 through 002296..... 46
8    Exhibit 59    Supplemental 15(c) Info Request;
9                  Bates HCMFAS 000025 through 000031.... 71
10   Exhibit 147   BBVA Compass Bank Statement, Date
11                 Ending 5/31/19  (no Bates range)..... 51
12   Exhibit 182   Memo Dated 5/28/19 (no Bates range).. 119
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1              PROCEEDINGS
2          (On the record at 10:01 a.m. CST)
3          (Witness duly sworn.)
4              DUSTIN NORRIS,
5    being first duly sworn, testified as follows:
6              EXAMINATION
7    BY MR. MORRIS:
8    Q    Good morning, Mr. Norris.  As you may
9    recall, my name is John Morris.  I'm an attorney
10   at Pachulski Stang Ziehl & Jones, and we're
11   counsel to the reorganized debtor known as
12   Highland Capital Management, LP, and we're here
13   for your deposition today.
14         Do you understand that?
15   A    Yes, sir.
16   Q    And do you understand that you're being
17   deposed today in your capacity as what's called a
18   Rule 30(b)(6) witness on behalf of Highland
19   Capital Management Fund Advisors, LP?
20   A    I do.
21   Q    Can we refer to Highland Capital
22   Management Fund Advisors, LP, as "HCMFA"?
23   A    Yes, that works.
24   Q    And can we refer to Highland Capital
25   Management, LP, as either "Highland" or "HCMLP"?

Page 6

Dustin Norris

1
2   A    Yes.
3   Q    Okay.  Are you aware that your answers
4   today will bind HCMFA?
5   A    Generally, yes.
6   Q    Okay.  Have you seen the notice that was
7   served by Highland on HCMFA in connection with
8   this deposition?
9   A    I have.
10   Q    Okay.  I've -- I've examined you before;
11   right?
12   A    Yes.
13   Q    Okay.  So the rules are the exact same,
14   and they are very simple.  If I ask a question, I
15   would ask you to refrain from answering until I've
16   completed my question; is that fair?
17   A    Yes, it is.  Thank you.
18   Q    And if I begin a question or respond
19   before you've completed your answer, will you let
20   me know that?
21   A    Yes.
22   Q    We're going to be putting documents up on
23   the screen from time to time today.  If at any
24   time you believe you need to see other portions of
25   the document in order to give complete and

Page 7

Dustin Norris

1
2   accurate answers, will you let me know that?
3   A    Yes.
4   Q    If you need a break at any time, will you
5   let me know that as well?
6   A    I will.
7   Q    Okay.
8        MR. MORRIS:  I would ask my
9   colleague, Ms. Canty, to put up on the
10   screen the Rule 30(b)(6) deposition
11   notice.
12        (Norris Exhibit 185 marked.)
13        (Reporter discussion off the record.)
14        MR. MORRIS:  Okay.  Asia, what
15   exhibit number should we put on this
16   document?
17        MS. CANTY:  185.
18        MR. MORRIS:  Okay.  Davor and
19   Michael, this will be Exhibit 185.
20        And if we can scroll down and show
21   it to Mr. Norris.
22   BY MR. MORRIS:
23   Q    Do you see that this is the plaintiff's
24   third amended notice of deposition for today?
25        MR. RUKAVINA:  And just so you

Page 8

Dustin Norris

1
2   know, John and Dustin, I did not send this
3   to you, Dustin.  All that it does is
4   changes the time of today's deposition.
5   It's identical to the last one that you
6   did get.
7        THE WITNESS:  Okay.  And I have the
8   last one here with me as well.
9   BY MR. MORRIS:
10   Q    Okay.  So there's no -- I'll represent to
11   you that there's no difference between the one
12   that's on the screen and the one you have except
13   that the one on the screen says "Third Amended
14   Notice," and it was scheduled for 9:00 today.
15   It's scheduled for 10:00 today, the -- the time
16   that we're beginning.
17        Do you have any other documents in
18   front of you other than the deposition notice?
19   A    I do.
20   Q    What -- what other documents do you have
21   before you?
22   A    Yeah.  I have the original complaint I
23   believe it's called -- forgive me if I call them
24   the wrong items --
25   Q    Uh-huh.

Page 9

Dustin Norris

1
2   A    -- but the original complaint from HCMLP.
3   I have the original answer response from HCMFA.  I
4   have the amended response.  I have the declaration
5   from Mr. Sauter.  I have copies of the promissory
6   notes.  I have the shared services agreement.  I
7   have a -- incumbency certificates, which will help
8   me respond to one of your questions in the
9   30(b)(6) notice.  And I have a board to the
10   memo [sic] regarding NAV error, and I have the
11   "Defendant's Second Motion for Leave to Amend
12   Answer and Brief in Support Thereof" that was
13   filed yesterday.
14        So a number of documents that -- and I
15   also have up on my screen your exhibits that I
16   believe we'll be going through in one of the --
17   let me check here -- Topic Number 5.  So I have
18   open, you know, a 650-page document that was filed
19   in Docket 35 on May 24th, I believe, is the
20   correct document.  So those are the materials that
21   I have.
22   Q    Excellent.  I appreciate that.
23        So you've seen -- you've seen at least
24   the plaintiff's second amended notice of
25   Rule 30(b)(6) deposition before today.  Do I have

Page 10

Dustin Norris

1
2  that right?
3  A    That's correct.
4  Q    And you have that with you; right?
5  A    I do.
6  Q    Okay.  Are you prepared to testify on
7  behalf of HCMFA today on -- in connection with
8  each of the topics in the deposition notice?
9  A    Yes, I am.
10  Q    All right.
11      MR. MORRIS:  Let's just, for the
12      record, scroll down to make sure that the
13      topics are the same as the -- the one that
14      Mr. Norris has in front of him.
15  BY MR. MORRIS:
16  Q    Do you see the first five topics on the
17  screen?
18  A    I do.
19  Q    All right.  Can you confirm that they're
20  the same topics that you have in the second
21  amended notice of deposition?
22  A    Yes.  I'm looking now.
23      Yes, they all are the same.
24  Q    Okay.  And if we can continue to scroll
25  down, you see Topics 6, 7, and 8 up on the screen,

Page 11

Dustin Norris

1
2  and 9.  Are they the same as what you have?
3  A    Can you scroll down for 9?
4  A    Uh-huh.
5  A    They look to be the same, yes.
6  Q    Okay.  And let's just look at the last
7  few.  How about 10 through 14?  Are they the same
8  as the topics that are in your second amended
9  notice?
10  A    They look to be the same, yes.
11  Q    Okay.  And did you do anything to prepare
12  for today's deposition?
13  A    I did.
14  Q    What did you do?
15  A    I reviewed all of the pleadings.  I
16  reviewed all of the -- the documents that were, I
17  believe, responsive to -- to help me to respond to
18  this, look through your exhibits.  I had met with
19  Mr. Rukavina as counsel.  I met and spoke with
20  Mr. Dondero.  I spoke with Jason Post.
21      I spoke with -- I reviewed my
22  documents internally and emails, things that I
23  might have had, confirmed with our IT group that
24  they have provided all documents responsive to
25  your discovery requests.

Page 12

Dustin Norris

1
2      I reviewed the depositions of
3  Mr. Seery, of Frank Waterhouse, Dave Klos, and
4  Kristin Hendrix.  I met in person and by Zoom with
5  Mr. Rukavina over the last few weeks, and -- so
6  that -- that's the general -- you know, there may
7  have been other things, but that's the general
8  overview of the things that I did --
9  Q    I appreciate --
10  A    -- to understand the company's position.
11  Q    I appreciate that.
12      So just focusing in on the people that
13  you spoke with in connection with your
14  preparation, one was Davor; right?
15  A    Correct.
16      And I -- I may have -- I don't know if
17  I said it or not, but DC Sauter as well I also
18  spoke with.
19  Q    Okay.  So the other people are DC Sauter,
20  Jason Post, and Mr. Dondero.  Do I have that
21  right?
22  A    Correct.
23  Q    Did you speak with Frank Waterhouse at
24  all?
25  A    No, I did not.

Page 13

Dustin Norris

1
2  Q    Is there any particular reason you didn't
3  speak with Mr. Waterhouse?
4  A    Yes.
5  Q    And what -- why didn't you speak with
6  Mr. Waterhouse?
7  A    My -- my -- yeah, sorry.
8      My understanding is his counsel did
9  not allow us to speak with him regarding this,
10  because HCMLP had sued him for various things, and
11  so we weren't allowed to talk with him.
12      You'll -- you'll note that DC, earlier
13  on, had spoken to him.  I believe that was back in
14  April, if you look back and I'd refer you to
15  Mr. Sauter's declaration.  But in preparation for
16  this, we did not speak with him.  We needed to
17  wait for his deposition based on his attorney's
18  instructions.
19  Q    How many times did you speak with
20  Mr. Dondero about today's deposition?
21  A    Multiple times over the last few weeks.
22  Q    And was Mr. Rukavina present for those
23  discussions?
24  A    He was not.
25  Q    Can you tell me what you discussed with

**Page 14**

Dustin Norris

1 Mr. Dondero about today's deposition?

2 A    Yeah.  Discussed with him general view of

3 the company from his perspective.  We discussed

4 particularly around -- and we'll get into more

5 details on this -- but around the purpose and

6 transfer of cash, the seven-and-a-half million

7 dollars.  And I guess there were two transactions.

8       Discussed with him what he remembered

9 in discussions with Frank Waterhouse when he

10 instructed him to transfer the cash, and any

11 recollection he had regarding the notes or the --

12 the -- the promissory notes.

13      And so those were the general topics.

14      And we did talk about --

15 Q    Did Mr. --

16 A    Sorry.  Go ahead.

17 Q    Yeah, I don't mean to step on your words.

18 A    No, no.

19      We talked about the NAV error, we

20 talked about responsibility for the NAV error and

21 those aspects as well.

22 Q    Did -- did Mr. Dondero tell you when he

23 first learned of the existence of the notes?

24 A    No.

**Page 15**

Dustin Norris

1 Q    Did you ask him in connection with your

2 preparation for today's deposition?

3 A    What I did ask, I asked him -- I said,

4 "Did you tell Frank Waterhouse that there should

5 be -- that this should be a loan?"

6       And his response was, "No, that I

7 never told Frank it should be a loan, and Frank

8 never asked if it should be a loan."  And that the

9 intent -- and the reason for the transfer was

10 compensation for the NAV error.

11      And so that was -- he did not know --

12 and if I -- if I remember correctly, looking at

13 his deposition, I believe he did not know about

14 the notes at that time and found out about them

15 much later.

16 Q    I know, and I'm trying to understand from

17 you if you can tell me, as HCMFA's 30(b)(6)

18 representative, whether you can share with me when

19 Mr. Dondero first learned of the existence of the

20 notes.

21 A    It -- it would have been -- I believe, if

22 my understanding is correct, it would have been

23 after they were demanded.

24 Q    After they were?

**Page 16**

Dustin Norris

1 A    Demanded.

2 Q    Okay.  How about your conversations with

3 Mr. Post?  Did the subject of when he learned

4 about the existence of the notes come up?

5 A    No.  That was not -- a discussion with

6 Jason Post -- Post -- talking with Jason was more

7 around the NAV error, the events surrounding the

8 NAV error, facts and circumstances around the NAV

9 error.

10 Q    Okay.  And were your discussions with

11 Mr. Sauter limited to the investigation that he

12 undertook earlier this year that's reflected in

13 his declaration?

14 A    I would say it's not limited to that.

15 Q    What other topics did you discuss with

16 Mr. Sauter beyond the investigation that he

17 undertook that's reflected in his declaration?

18      MR. RUKAVINA:  And I would just

19 caution you, Dustin, that to the extent

20 that you and Mr. Sauter discussed factual

21 matters, that's fair game.

22      But as far as if you discussed

23 litigation strategy, that's not fair game.

24 So be careful with your answer, please,

**Page 17**

Dustin Norris

1 and tell Mr. Morris what you can and can't

2 answer.

3      THE WITNESS:  Yeah.

4      So early on with Mr. Sauter,

5 discussions were around if I had any

6 knowledge of the note, if he had any

7 knowledge of the note, trying to discover

8 what the notes were, what they were

9 related to, and neither of us had

10 knowledge related to notes.

11      And then discussions around more

12 generally -- I'm trying to think back.

13 There were many discussions with

14 Mr. Sauter on the topic.

15      General facts and circumstances of

16 what he was learning from his

17 investigation in which -- all of which I

18 would refer you to his declaration.

19      And then subsequent, talking with

20 him regarding the -- I'm trying to

21 recollect the -- the key components.

22      But it was general overview of --

23 of the notes and NAV error and the

24 process.  He wasn't here during much of

Page 18

```
1              Dustin Norris
2     that time period or involved, and so we
3     were talking together based on what he was
4     doing.
5  BY MR. MORRIS:
6     Q    Who are you employed by today?
7     A    NexPoint Advisors.
8     Q    Do you hold any position or title with
9  HCMFA?
10    A    I do.
11    Q    And what's your position or title with
12 HCMFA?
13    A    Executive vice president is my officer
14 role.
15    Q    And when did you become an officer of
16 HCMFA?
17    A    So I – I was originally secretary – and
18 I can't remember if I was assistant secretary, but
19 I've been involved with HCMFA since 2012. I don't
20 know if I was added as an assistant secretary at
21 that time; but for many – for several years, I've
22 been an officer of HCMFA.
23    Q    And you were an officer in 2018 and 2019;
24 is that right?
25    A    Correct. I was secretary in 2018, and –
```

Page 19

```
1              Dustin Norris
2  I'm looking at the incumbency certificates here –
3  and in 2019 in April became executive vice
4  president. So from January to – January 2018 to
5  April 2019, I was secretary and then became
6  executive vice president.
7     Q    When did you first learn of the existence
8  of the notes?
9     A    So it was after they were demanded, and it
10 was – so I believe the demand came in in early
11 2020 – 2021. So January-ish 2021.
12    Q    Do you have any role or any title with any
13 of the funds that are managed by either NexPoint
14 or HCMFA?
15    A    I do.
16    Q    Can you describe those roles or titles for
17 me, please?
18    A    Yeah. I'm – I'm the executive vice
19 president of the funds, and my role more broadly
20 is I am the head of distribution and chief product
21 strategist. And so in that role, I lead the sales
22 and business development and marketing for the
23 funds, more broadly.
24    Q    And what is your title with NexPoint
25 Advisors, LP?
```

Page 20

```
1              Dustin Norris
2     A    I am executive vice president in the
3  officer capacity, and my role is – as an employee
4  is head of distribution and chief product
5  strategist.
6     Q    Okay. So just to summarize, you're the
7  executive vice president of NexPoint Advisors, LP;
8  correct?
9     A    Correct.
10    Q    And that's an officer position; correct?
11    A    It is.
12    Q    And when did you attain that title?
13    A    Probably – I don't have the incumbency
14 certificates, but it was probably the same time as
15 HCMFA.
16    Q    Is it fair to say that it was sometime
17 before January 1st, 2018?
18    A    No.
19    Q    Can you give me an estimate of when that
20 was? Feel free –
21    A    Yeah. The time- – the timeline for HCMFA
22 was April 2019. I was secretary before that, and
23 I don't recall if NexPoint Advisors changed at the
24 same time.
25    Q    Okay. Can I refer to HCMFA and NexPoint
```

Page 21

```
1              Dustin Norris
2  Advisors, LP, together as "the advisers"?
3     A    That's fine.
4     Q    Okay. So is it fair to say that you were
5  the executive vice president, which was an officer
6  position, for each of the advisers as of April
7  2019?
8     A    Yes.
9     Q    Okay. And –
10    A    I believe that's correct.
11    Q    And you also serve as the executive vice
12 president of the funds that each of the advisers
13 manages. Do I have that right?
14    A    Yes. Currently.
15    Q    And have you held the –
16    A    Yes, currently.
17    Q    And when did you become the executive vice
18 president of the funds?
19    A    I don't remember the exact date, if that
20 was around the same time, but I was the secretary
21 before that and assistant secretary before that,
22 dating back to 2012.
23    Q    So you've been – is it fair to say that
24 you've been an officer of the funds managed by the
25 advisers since at least 2013?
```

| Page 22 | Page 23 |
|---|---|
| Dustin Norris | Dustin Norris |
| 1 | 1 |
| 2   A    I believe so.  I'd have to go back and | 2   identity of officers, directors, and employees of |
| 3   look for sure, but I believe.  There may have been | 3   HCMFA? |
| 4   periods of time where I was not, but yes. | 4   A    Uh-huh. |
| 5   Q    Okay.  Were any of those periods of time | 5   Q    Do you want to take a look at that topic |
| 6   when you were not, at any point since 2018 to the | 6   on the document that you have in front of you? |
| 7   present? | 7   A    Yes. |
| 8   A    I don't believe so. | 8   Q    Okay. |
| 9   Q    Okay.  So to the best of your | 9   A    That is – which topic? |
| 10   recollection, you've served as an executive vice | 10   Q    13. |
| 11   president of each of the funds managed by the | 11   A    13, yes. |
| 12   advisers since at least the beginning of 2018; is | 12   Q    Okay.  So let's focus on 13 for a moment. |
| 13   that fair? | 13      Can you – can you identify for me |
| 14   A    No.  That's – that's different than my | 14   HCMFA's officers from January 1st, 2018, to the |
| 15   prior testimony that – I was secretary until | 15   present – |
| 16   April – | 16   A    Yes. |
| 17   Q    I apologize.  Let me restate the question. | 17   Q    – including names and titles? |
| 18      You've been an officer of – of the | 18   A    Yes. |
| 19   funds managed by the advisers on a continuous | 19   Q    Okay. |
| 20   basis since at least the beginning of 2018; fair? | 20   A    So from January 1st, 2018 – and I don't |
| 21   A    I believe that's correct, yes. | 21   have – I – I'm assuming that the dates that I |
| 22   Q    Thank you for the question – for – for | 22   have on the incumbency certificates are complete, |
| 23   the correction. | 23   but I'm not certain, and – if there was one in |
| 24      So as I think you pointed out earlier, | 24   between, but I'm assuming this is – that the |
| 25   one of the topics on the 30(b)(6) notice is the | 25   dates I have changing is – is effective when they |

| Page 24 | Page 25 |
|---|---|
| Dustin Norris | Dustin Norris |
| 1 | 1 |
| 2   changed. | 2   Q    Okay. |
| 3      But Brad Ross was president of HCMFA | 3   A    And February 18th, 2021, Dustin Norris, |
| 4   from January 1st, 2018, until, I believe, | 4   executive vice president; Frank Waterhouse, |
| 5   February 2018 – sorry – yeah, until | 5   treasurer; Brian Mitts, assistant treasurer; David |
| 6   February 2018. | 6   Willmore, secretary.  So Lauren Thedford, no |
| 7      In that same time period, Brad Ross, | 7   longer secretary. |
| 8   president; Trey Parker, executive vice president; | 8   Q    And have there been any changes since |
| 9   Frank Waterhouse, treasurer; Dustin Norris, | 9   February 2021? |
| 10   secretary. | 10   A    Yes.  You have April 8, 2021, Dustin |
| 11      And effective 26th of February – | 11   Norris, executive vice president; Frank Waterhouse, |
| 12   Q    I apologize.  What is Mr. Parker's title? | 12   treasurer; Will Mabry, assistant treasurer; and |
| 13   A    Executive vice president. | 13   Stephanie Vitiello, secretary. |
| 14   Q    Thank you. | 14      Again, I – I don't have – this is |
| 15   A    And beginning February 26th, 2018, Trey | 15   based on what was provided to me with effective |
| 16   Parker, executive vice president; Frank | 16   dates.  I don't know if there was any that were |
| 17   Waterhouse, treasurer; and Dustin Norris, | 17   missing, if that's complete, but I – I believe |
| 18   secretary; and no longer president, Brad Ross. | 18   those are accurate. |
| 19   There's no president on the lineup. | 19   Q    Is it fair to say that you're relying on |
| 20      So continuing on, April 11th, 2019, | 20   exclusively on the incumbency certificates to |
| 21   Dustin Norris, executive vice president; Frank | 21   identify the officers of HCMFA since January 1st, |
| 22   Waterhouse, treasurer; Lauren Thedford, secretary. | 22   2018? |
| 23   Q    And Trey Parker was no longer an officer | 23   A    For this purpose, yes. |
| 24   as of that time? | 24   Q    Do you have any other information that you |
| 25   A    He was no longer an officer. | 25   can share with me regarding the identity of any |

Page 26

```
1              Dustin Norris
2    officers of HCMFA since January 1st, 2018?
3    A    I don't, no.
4    Q    Okay.  Can you identify for me HCMFA's
5    direct and indirect owners since January 1st,
6    2018?
7    A    I can, yes.  Generally Jim Dondero and
8    Mark Okada are the indirect owners through trusts.
9    They own approximately two-thirds, Jim Dondero, a
10   little less than a third, Mark Okada, with a
11   general partner that is -- that owns 1 percent.
12   Q    And who is the general partner?
13   A    It's a Strand entity that I believe is
14   owned 100 percent by Mr. Dondero.
15   Q    So Mr. Dondero controls the general
16   partner --
17   A    Right.
18   Q    -- of HCMFA?
19   A    Correct, and owns approximately two-thirds
20   of the equity.
21   Q    And is that a controlling interest to the
22   best of your knowledge?
23   A    Yes, I believe so.
24   Q    Okay.  Does HCMFA have any directors?
25   A    It does not.  It has a sole director
```

Page 27

```
1    through the general partners.  So HCMFA does
2    not -- Strand -- whatever the Strand entity does,
3    Jim Dondero is the sole director.
4    Q    Okay.  And what about employees?  Does
5    HCMFA have any employees?
6    A    It does have some front-office employees,
7    trading professionals.
8    Q    Are there any employees who perform any
9    services other than trading services?
10   A    Trading in front-office investment
11   analysts, portfolio managers, generally that's
12   been the structure with HCMFA, is they held --
13   they had employees that performed front-office
14   functions, and we, as I believe you're aware,
15   outsourced the back-office accounting, compliance,
16   and legal services to Highland Capital Management,
17   LP, during this time period.
18   Q    Let's go to Topic Number 12.
19   A    Okay.
20   Q    And Topic Number 12 asks for a witness who
21   can testify as to all communications that HCMFA
22   "made in the bankruptcy case concerning the notes,
23   including any pleadings, court filing, or
24   argument."
```

Page 28

```
1              Dustin Norris
2    Do you see that?
3    A    I do.
4    Q    Are you prepared to answer questions on
5    that topic?
6    A    I am.
7    Q    All right.  You're aware that obviously
8    Highland has commenced an adversary proceeding
9    against HCMFA to collect on two promissory notes;
10   right?
11   A    I am, yes, and I believe this right here
12   is the complaint filed January 22nd.
13   Q    Okay.  And you're aware that the notes
14   that are the subject of the lawsuit were dated
15   May 2nd and May 3rd, 2019, respectively; right?
16   A    Sorry.  Can you repeat that?
17   Q    You're aware that the notes that are the
18   subject of the lawsuit are dated May 2nd and
19   May 3rd, 2019, respectively; correct?
20   A    Yes.  The notes that are attached to the
21   complaint, May 2nd and May 3rd.
22   Q    Okay.  And can we refer to those two
23   notes -- those two promissory notes for the rest
24   of this deposition collectively as "the notes"?
25   A    Yes.
```

Page 29

```
1              Dustin Norris
2    Q    Okay.  And you're aware that after
3    Highland commenced this action, HCMFA filed its
4    original answer; correct?
5    A    That's correct.
6    Q    Okay.  And Topic Number 1 on your list, in
7    fact, is the answer, correct, the original answer?
8    A    That's correct.  It's Topic Number 1.
9         MR. MORRIS:  Okay.  Can we put
10   Deposition Exhibit 5 up on the screen?
11   We're going to look at the original
12   answer.
13        (Exhibit 5 tendered.)
14   BY MR. MORRIS:
15   Q    And, again, feel free to let me know if
16   there's any portion of this document that you need
17   to see.  But looking at the first page -- and
18   perhaps we can continue to scroll through it -- is
19   this the original answer that was filed on behalf
20   of HCMFA on March 1st, 2021?
21   A    I'll take your representation that it is.
22   It looks to be, yeah.
23   Q    Okay.
24   A    I was not involved in the filing of it,
25   but...
```

**Page 30**

Dustin Norris

2  Q    Okay. Is the copy that you have with you
3  dated March 1st, 2021?
4  A    Yes, it is.
5  Q    And if you can turn to Page 6 of 7, does
6  it appear to be the exact same as what appears on
7  the screen, showing the March 1st, 2021, date?
8  A    It does.
9  Q    And do you refer to the March 1st, 2021,
10  date, as "the answer date"?
11  A    Yes.
12  Q    Okay. HCMFA did not assert any
13  affirmative defenses in this pleading; correct?
14  A    That's my understanding.
15  Q    Okay. And HCMFA had full access to you as
16  of March 1st, 2021; correct?
17  A    Yes.
18  Q    And HCMFA had full access to Mr. Dondero
19  as of March 1st, 2021; correct?
20  A    In the term "full access," they could have
21  talked to him, yes.
22  Q    Right. And there was no restriction from
23  the bankruptcy court or otherwise on HCMFA's
24  ability to communicate with Mr. Dondero that you
25  know of; correct?

**Page 31**

Dustin Norris

2  A    None that I know of.
3  Q    And there was no restriction or limitation
4  on HCMFA's ability to speak with you at or prior
5  to March 1st, 2021; correct?
6  A    That's correct.
7  Q    How about Ms. Thedford? Are you aware of
8  any restriction or limitation on HCMFA's ability
9  to speak with her prior to March 1st, 2021?
10  A    Yes.
11  Q    Okay. And what restriction was that?
12  A    Yeah. So she was part of the Highland
13  legal team. She was an employee of HCMLP. And
14  during this time period, we had outsourced our
15  legal and compliance functions to them. And if --
16  I would refer you to Mr. Sauter's declaration and
17  the attachments and schedules. There's a very
18  strict direction from Mr. Seery that
19  individuals -- particularly on the legal team --
20  could not work on anything that would be inimical
21  to the debtor.
22  Q    Okay.
23  A    And so Ms. Thedford, on multiple
24  occasions, told us she was unable to work on
25  things, and that began back in fall of 2000- --

**Page 32**

Dustin Norris

2  fall of 2020 -- late summer 2020, actually. And
3  so she was not accessible for things like this.
4  Q    How about Mr. Post? Do you know who
5  Mr. Post was employed by in 2018 and 2019?
6  A    2018 and '19, he was employed by Highland
7  Capital Management, LP.
8  Q    Do you know whether, in your conversations
9  with him, does he have any personal knowledge
10  regarding the NAV error?
11  A    Yes.
12  Q    Was he involved in any of the issues
13  surrounding the NAV error?
14  A    He was knowledgeable -- as he was
15  chief -- chief compliance officer of the retail
16  advisers at that time, and interacted with the
17  HCMLP employees and the board regarding the NAV
18  error, he also -- in your schedules, you'll notice
19  in one of the memos, he participated in calls with
20  the SEC, and so he was -- he was involved in the
21  process of the NAV error and understood and worked
22  with the other HCMLP employees, which naturally
23  they would. We had outsourced valuation services
24  to HCMLP. We had outsourced legal and compliance
25  to HCMLP, and as such, that was all part of what

**Page 33**

Dustin Norris

2  they were working on.
3  Q    Did -- did -- were there any restrictions
4  or limitations on HCMFA's ability to speak with
5  Mr. Post prior to March 1st, 2021?
6  A    So once -- so Jason -- one important
7  component here is Jason Post did leave the debtor,
8  and working with Mr. Seery, I believe, to then
9  leave and become an employee of NexPoint Advisors,
10  and that was at the request of our retail board,
11  as there were restrictions on Mr. Post at that
12  time.
13  And as chief compliance officer of the
14  funds, the board had become very uncomfortable
15  that they had restrictions on Mr. Post. And so it
16  was in everybody's interest to allow him to become
17  an employee of NexPoint Advisors, and so that was
18  late 2020, I believe. I don't know the exact
19  date. And at that time, there were certain things
20  that Jason was able to then help the adviser with,
21  but there were still restrictions. And he had
22  limited access to his prior data. He left the
23  debtor, but he didn't have -- I believe he had
24  restrictions on what he could access in the
25  information.

Page 34

Dustin Norris

1
2  Q    Okay.  But it is fair to say that between
3  January 21st, 2021, the day that the complaint was
4  filed, and March 1st, 2021, the date that HCMFA
5  filed its original answer, HCMFA had complete and
6  unfettered access to you, to Mr. Dondero, and
7  Mr. Post; correct?
8  A    Again, the complete and unfettered access
9  on the Jason Post aspect, they could have talked
10  to him.  I'm not sure if there were any other
11  restrictions related to what he had or information
12  he had or based on his prior role of the debtor,
13  he was restricted on what he could or couldn't
14  talk about, if he had any lease agreement.  I'm
15  not certain on that.  But, yes, we could talk
16  to – or HCMFA could talk to Mr. Post.
17  Q    Okay.  And the topics that you just raised
18  are speculation on your part; correct?
19  A    It is.
20  Q    You're not aware of any restriction of –
21  you don't have any knowledge of any restriction or
22  limitation placed on HCMFA in respect of its
23  ability to communicate with Mr. Post between
24  January 21st, 2021, and March 1st, 2021; correct?
25  A    Based on my personal knowledge, no.  There

Page 35

Dustin Norris

1
2  could have been something, but –
3  Q    Okay.  I'm just asking about your
4  knowledge, not what could have been.
5       All right.  So we're going to use
6  March 1st, 2021, as the answer date.
7       Are you aware of any document that
8  HCMFA filed with the bankruptcy court prior to the
9  answer date that concerns or relates in any way to
10  the notes?
11  A    I'm thinking if I'm aware.
12       Not that I'm aware of.
13  Q    Are you aware – withdrawn.
14       Do you know what a "pleading" is, if I
15  use that phrase?
16  A    I believe so.  These are the answers that
17  we gave.  The first answer, the amended answer,
18  and the second amended answer, that – I believe
19  those are the two pleadings.  Is that correct?
20  Q    You know what?  I think my first question
21  was broad enough, because I just used the word
22  "document," so I'm going to let that sit.
23       Are you aware of any argument that
24  anybody ever made on behalf of HCMFA prior to the
25  answer date that concerned or related to any of

Page 36

Dustin Norris

1
2  the notes?
3  A    And you mean an argument to the Court?
4  Q    Yes.
5  A    Not that I'm aware of.
6  Q    Okay.  Are you aware of any statement of
7  any kind that was made to the bankruptcy court
8  prior to the answer date that concerned or related
9  in any way to the notes?
10  A    Not that I can remember.  But there's
11  obviously been a lot of documents with the Court,
12  but not that I'm aware of.
13  Q    Right.  But you – did you do anything to
14  prepare yourself to answer questions on Topic 12?
15  A    Yes.
16  Q    And do you believe that you're able to
17  competently answer my questions relating to
18  Topic 12 as HCMFA's 30(b)(6) witness?
19  A    I am.  But I guess in this regard you're
20  asking to my knowledge.  And so, I guess, that –
21  are you asking my personal knowledge or as my
22  knowledge as a representative of the company?
23  Q    All right.  I appreciate that.
24       I am only examining you today in your
25  capacity as a 30(b)(6) witness.

Page 37

Dustin Norris

1
2  A    Okay.  That makes sense.  Okay.
3  Q    And so if I use the phrase "you," just as
4  we did in the deposition notice, I'm really
5  referring to HCMFA; is that fair?
6  A    That's fair.
7  Q    Okay.  So let me just ask the questions
8  again with that clarification.
9       Are you aware, in your capacity as the
10  30(b)(6) witness today, of any document that was
11  ever filed on behalf of HCMFA prior to the answer
12  date that concerns or relates to the notes?
13  A    No.
14  Q    Are you aware, in your capacity as the
15  HCMFA 30(b)(6) witness, of any argument that was
16  ever made to the Court prior to the answer date
17  that concerns or relates in any way to the notes?
18  A    No.
19  Q    Are you aware of – again, when I use the
20  phrase "you," I'm referring to HCMFA, just to
21  shorten these questions a little bit.
22       Are you aware of any statement that
23  was ever made on your behalf to the bankruptcy
24  court prior to the answer date that concerns or
25  relates in any way to the notes?

Page 38

Dustin Norris

1
2  A   Not that I recall.
3  Q   Okay. When did HCMFA first learn of the
4  existence of the notes?
5  A   So HCMFA's position is that they learned
6  of them when they were demanded, or after they
7  were demanded. I don't even know that when we
8  received -- or who they were sent to, but it was
9  after they were demanded.
10 Q   Okay. And do you recall when they were
11 demanded?
12 A   I don't have the exact date. If you could
13 remind me or show a document, that might be
14 helpful. I don't know if you have the demand, or
15 if that's one of the documents, but I don't
16 remember the specific date.
17     MR. MORRIS: Can we put Exhibit 1
18 up on the screen?
19     It's actually the complaint -- the
20 original complaint, sir.
21     (Exhibit 1 tendered.)
22 BY MR. MORRIS:
23 Q   If you go to Exhibit 3, do you see there's
24 a demand letter there?
25 A   Yes.

Page 39

Dustin Norris

1
2  Q   And you've seen that before; right?
3  A   I have.
4  Q   Okay. And are you -- do you see that it
5  was sent to Mr. Waterhouse?
6  A   Yes.
7  Q   And Mr. Waterhouse was the treasurer of
8  HCMFA on December 3rd, 2020; correct?
9  A   Correct.
10 Q   Okay. So is it fair to say that HCMFA
11 knew of the existence of the notes on
12 December 3rd, 2020?
13 A   It's safe to say that Frank Waterhouse
14 received this. I'm not sure the date exactly
15 when -- when the company became aware. Frank,
16 yes, is an officer. He's also -- the irony here,
17 he's CFO of the debtor who is demanding this, so
18 he's demanding it from himself. I know it's
19 coming from -- from who is sending it, but at this
20 time, I don't know when Mr. Dondero or other
21 officers became aware of it. Sometime after
22 December 3rd.
23 Q   Okay. Do you know if HCMFA ever responded
24 to this demand letter prior to the time the
25 complaint was filed on January 21st, 2021?

Page 40

Dustin Norris

1
2  A   I don't believe they did.
3  Q   So it's fair to say that nobody on behalf
4  of HCMFA ever told any representative of Highland
5  that it was previously unaware of the existence of
6  the notes?
7  A   Sorry. Can you repeat that one more time?
8  Q   HCMFA never responded to this letter prior
9  to the commencement of the lawsuit; right?
10 A   Not to my knowledge, didn't respond to
11 HCMLP on this.
12 Q   Is there a reason why they didn't reach
13 out to Highland to let Highland know that it
14 disputed the existence of these notes?
15 A   I don't know if there's a reason, but I do
16 know, during this time period, you'll recall,
17 December and January, leading up to the actual
18 demand -- or the initial complaint, there was a
19 lot going on. We were almost in daily depositions
20 and court hearings. There was a hearing
21 injunction handed out against Jim. There was a
22 restraining order. There -- TRO. There were
23 lawsuits against the advisers. And so there was a
24 lot going on, and I think this was put back in the
25 priority line.

Page 41

Dustin Norris

1
2      Again, all of the compliance and legal
3  functions at this time, December 2020, were being
4  outsourced to HCMLP, and we were told they were
5  unable to help with anything that was inimical to
6  the debtor. And so there were no employees of
7  HCMFA that were legal compliance professionals,
8  and so this -- this was -- I guess -- this is my
9  speculation -- was put in the back of the line, or
10 further back from the actual litigation that they
11 were defending or working against the daily
12 depositions and coordinating.
13 Q   Do you have any reason to believe, as you
14 sit here right now, that Mr. Waterhouse did not
15 receive this demand letter on or about
16 December 3rd, 2020?
17 A   I don't know. I don't have any reason to
18 believe that, but I don't know.
19 Q   Okay.
20 A   And I don't recall what he testified to in
21 regard to receiving the demand, but we see here it
22 was sent to him. We can assume it got sent to
23 him.
24 Q   Okay. Let me ask the question again, and
25 I would appreciate you listening carefully to my

Page 42

1          Dustin Norris
2  question.
3          As HCMFA's 30(b)(6) witness today,
4  does HCMFA contend that this letter was not
5  received by Mr. Waterhouse on or about
6  December 3rd, 2020?
7          MR. RUKAVINA:  Well, that's not our
8      contention.  We agree that it was received
9      on or about that date.
10         MR. MORRIS:  Okay.
11         THE WITNESS:  Yeah.  That's –
12     yeah.
13  BY MR. MORRIS:
14  Q     Okay.  HCMFA actually knew about the notes
15  just weeks after they were signed; correct?
16         MR. RUKAVINA:  Objection; form.
17         THE WITNESS:  So the debtor
18     employees who created the notes knew about
19     them, but it was not knowledge of HCMFA.
20     Those were all Highland Capital
21     Management, LP, employees.
22  BY MR. MORRIS:
23  Q     So it's your testimony that HCMFA had no
24  knowledge of the existence of the notes in
25  June 2019; is that correct?

Page 43

1          Dustin Norris
2  A     June 2019.
3          Correct.
4  Q     As the executive vice president of HCMFA,
5  have you ever reviewed HCMFA's audited financial
6  statements?
7  A     I have not.
8  Q     Is there anybody on behalf of HCMFA who is
9  charged with the responsibility of reading HCMFA's
10  audited financial statements?
11  A     Yeah.  We – again, the key here is we
12  outsourced finance, accounting, back-office
13  functions.  It includes financial statement
14  preparation.  The treasurer of HCMFA is an HCMLP
15  employee, Frank Waterhouse, at that time, and at
16  all times that we're talking about.  And so with
17  we – and Frank is a professional, and his team
18  are professionals, right?  We outsource to an
19  accounting group to prepare and oversee, work with
20  the auditors in preparation of those financials.
21  And so they were tasked with that.  And we relied
22  on them.  And there was not a specialist during
23  this time period that did that.
24  Q     Does Frank Waterhouse have any
25  responsibility, as the treasurer of HCMFA, to make

Page 44

1          Dustin Norris
2  sure that HCMFA's audited financial statements are
3  true, accurate, and reliable?
4  A     Him and his team, yeah.  We actually –
5  that's what we rely on them for.
6  Q     And did you rely on him not only in his
7  capacity as an employee of Highland, but in his
8  capacity as the treasurer of HCMFA?
9  A     Yeah, he was – let's take the first –
10  as a – in his capacity under the shared services
11  agreement, okay, doing accounting, books and
12  records, audited – audit support, yes, we relied
13  on him in that capacity.  And he also, as an HCMLP
14  employee, served as a treasurer of HCMFA.  In that
15  role, we would expect him to oversee the
16  financials.
17         MR. MORRIS:  Okay.  And move to
18     strike.
19  BY MR. MORRIS:
20  Q     And I'm going to ask you very
21  specifically:  As HCMFA's representative today,
22  did Frank Waterhouse have a duty as the treasurer
23  of HCMFA to make sure that HCMFA's audited
24  financial statements were true and accurate?
25  A     That – very specific from the treasurer

Page 45

1          Dustin Norris
2  role, I would say the treasurer role was to
3  oversee the financial aspects of the advisers.
4  Q     And was one of those aspects HCMFA's
5  audited financial statements?
6  A     As – yeah.  And he was – again, I'll
7  reiterate, he was the CFO of Highland who was
8  tasked with creating the financial statements for
9  the advisers.
10         MR. MORRIS:  Okay.  I'm again going
11     to move to strike.
12  BY MR. MORRIS:
13  Q     I'm not asking about his role as CFO of
14  Highland.  I'm limiting it strictly to his role as
15  the treasurer of HCMFA.
16  A     And I don't have –
17  Q     Did Frank – let me ask my question.
18         Is any officer of HCMFA responsible
19  for making sure that HCMFA's audited financial
20  statements are true and accurate?
21  A     I don't know, but I would assume – and I
22  don't want to make assumptions here as the
23  representative – but I would assume that the
24  treasurer would have that role.
25  Q     Okay.  And what is your assumption based

Page 46

1           Dustin Norris
2  on?
3     A    Based on the understanding of what a
4  treasurer role would be.  But I – I don't have
5  any – I don't have any knowledge, I'm not
6  representing that we have any roles and
7  responsibilities or defined procedures that the
8  treasurer does this, that, or the other.
9     Q    Okay.  Have you – as you sit here right
10 now, have you ever seen HCMFA's audited financial
11 statements for the period ending December 31st,
12 2018?
13    A    I saw them in the materials that were
14 provided in your schedules, I believe.
15    Q    Okay.  Let's –
16    A    That was the first time.
17    Q    Let's take a quick look at it.
18         MR. MORRIS:  If we could put up on
19    the screen the document that's been marked
20    Exhibit 45.
21         (Exhibit 45 tendered.)
22 BY MR. MORRIS:
23    Q    Okay.  And do you see that this is the
24 first page of HCMFA's audited financial statements
25 for the period ending December 31st, 2018?

Page 47

1           Dustin Norris
2     A    I do.
3         MR. MORRIS:  Okay.  And if we could
4    just scroll, I think, to the third page.
5  BY MR. MORRIS:
6     Q    Do you see that it's signed by
7  PricewaterhouseCoopers on June 3rd, 2019?
8     A    I see that the audit opinion is signed by
9  them, yes.
10    Q    Correct.  And – and you're aware that
11 PricewaterhouseCoopers was the outside auditor
12 retained by HCMFA to conduct the audit of HCMFA's
13 financial statements; correct?
14    A    Given that they gave an opinion, yes.
15    Q    Okay.  And you have no reason to believe
16 that the document that's up on the screen is
17 anything other than HCMFA's audited financial
18 statements for the period ending December 31st,
19 2018, do you?
20         And we're happy – I'm happy to scroll
21 through whatever you need to see.
22    A    Yeah.  And there they're distinguishing –
23 you have an audit opinion and having audited
24 financials, I assume that you have all that is
25 here.  You showed me the first page of the

Page 48

1           Dustin Norris
2  financials, which –
3     Q    Yeah.  Yeah.  Let's –
4     A    So I'm assuming that's the –
5     Q    Let's scroll down just a little bit.
6         You can see that the next page is
7  HCMFA's balance sheet.  Do you see that?
8     A    I do.
9     Q    Okay.
10        MR. MORRIS:  Can we go to
11   "Subsequent Events"?  I think it's
12   Page 17.
13 BY MR. MORRIS:
14    Q    Have you seen this page of HCMFA's audited
15 financial statements before?
16    A    Just in preparation for this.
17    Q    Do you understand that in the "Subsequent
18 Events" section, the notes are described in the
19 audited financial statements?
20    A    There is a reference to promissory notes
21 in aggregate of $7.4 million, yes.
22    Q    And those are the two notes that Highland
23 is suing on; correct?
24    A    I would assume that's the case, because
25 the dollar amounts line up.  But I don't have the

Page 49

1           Dustin Norris
2  backup, but I would assume that's the case.
3     Q    And not only do the dollar amounts line
4  up, but do you see that the statement in
5  "Subsequent Events" specifically identifies the
6  notes as having been issued in the year 2019?
7     A    Yes.
8     Q    And are you aware of any notes that
9  anybody in the world contends were signed by HCMFA
10 between January 1st, 2019, and June 3rd, 2019,
11 other than the two notes that Highland is suing
12 on?
13    A    No.
14    Q    Okay.  So can you conclude, as HCMFA's
15 30(b)(6) witness, that the notes that are
16 described in the subsequent events are the very
17 notes that are the subject of the pending lawsuit?
18    A    That appears to be the case.
19    Q    Okay.  And so it's also fair to say, then,
20 that HCMFA does not dispute that its own audited
21 financial statements that were the subject of a
22 June 3rd, 2019, opinion by PricewaterhouseCoopers
23 disclosed the existence of the notes at issue;
24 correct?
25    A    No.  We don't dispute that that was

Page 50

Dustin Norris

1 included in the financial statements. You know,
2 I – I think we're going to get into it in our
3 affirmative defenses, but we dispute that the
4 notes were actually valid notes, and we would say
5 that this was an error. These should not have
6 been included, but were included in good faith by
7 the accounting team who thought that they were
8 valid notes.
9 Q    Okay.
10 A    So –
11       MR. MORRIS: I move to strike
12    everything other than the first portion of
13    your answer that was responsive to my
14    question.
15 BY MR. MORRIS:
16 Q    HCMFA does not dispute that it received
17 $2.4 million from Highland on May 2nd, does it?
18 A    No.
19 Q    HCMFA does not dispute that it received
20 $5 million on May 3rd, 2019, does it?
21 A    No.
22 Q    Let's just confirm that, if we can.
23       MR. MORRIS: Can we put on the
24    screen a document that's been marked as

Page 51

Dustin Norris

1       Exhibit 147?
2       (Exhibit 147 tendered.)
3 BY MR. MORRIS:
4 Q    Okay. Do you see that this is – or at
5 least this appears to be a bank account statement?
6 A    Yes. BBVA Compass is a bank, so I'll take
7 your representation it's a statement.
8       MR. MORRIS: All right. And if we
9    can just scroll down.
10       All right. Stop right there.
11 BY MR. MORRIS:
12 Q    Do you see that there's a reference on
13 May 2nd to a 2.4-million-dollar transfer?
14 A    I do.
15 Q    Okay. And is that consistent with your
16 testimony just now that on May 2nd, Highland
17 transferred $2.4 million to HCMFA?
18 A    That's correct.
19 Q    And lower on the page, the statement shows
20 a transfer of $5 million on May 3rd; correct?
21 A    Yes.
22 Q    And that's the payment that HCMFA
23 acknowledged – acknowledges receiving from
24 Highland on that day; correct?

Page 52

Dustin Norris

1 A    Is this HCMFA's bank statement or is this
2 HCMLP's?
3 Q    No. It's HCMLP's.
4 A    Okay. It just says "Highland Capital
5 Management," and I'm assuming it lines up – I'm
6 assuming this is the transfer, but –
7 Q    Okay.
8 A    – I can't confirm an entity. But we're
9 not denying that there was cash received those
10 dates from HCMLP.
11 Q    Okay. And are you aware –
12       MR. MORRIS: We can take this down
13    now.
14 BY MR. MORRIS:
15 Q    Do you recall that Topic Number 10 asks
16 for a witness who can testify about the accounting
17 of these transfers?
18 A    Uh-huh. Yup.
19 Q    Are you prepared to testify on Topic
20 Number 10?
21 A    Yes.
22 Q    Can you tell me how HCMFA accounted for
23 these payments on its books and records?
24 A    I can, yeah.

Page 53

Dustin Norris

1       So my understanding of the company's
2 position is that – and – and it may be helpful
3 to provide some additional color leading up to the
4 accounting. I don't know if we want to address
5 that later in our affirmative defenses, if you
6 have a preference there.
7 Q    I'd just like you to – maybe it's my
8 question, but I just want you to focus on my
9 question.
10 A    Uh-huh.
11 Q    And that is: First, do you know how HCMFA
12 accounted for these two payments in its books and
13 records?
14 A    Yeah. So the HCMLP employees who were
15 tasked with creating books and records of the
16 adviser, the accounting team recorded, we – we –
17 our position is that is an incorrect recording of
18 a payable to HCMLP. And so there was a payable
19 booked on the balance sheet of HCMFA by the HCMLP
20 accounting team.
21       MR. MORRIS: Okay. I'm going to
22    move to strike.
23 BY MR. MORRIS:
24 Q    I – I'd appreciate not having the

**Page 54**

1                    Dustin Norris
2  commentary.  Your counsel can ask those questions
3  or if it's responsive to a question.  I'm just
4  asking a very simple question.
5   A    Yup.
6   Q    How – how did HCMFA record these payments
7  on its books and records?
8   A    Yeah.  My understanding is they recorded a
9  payable to HCMLP, a liability.
10  Q    And do you know when HCMFA first
11  discovered that the payments were booked on its
12  books and records as a liability?
13  A    Our position is that that was revealed
14  through after the – sorry – after the demand.
15  And as we began to get additional information –
16  particularly, and I would refer you to
17  Mr. Sauter's declaration, our amended response,
18  and our second amended response that was filed
19  yesterday regarding each of those time periods.
20  But it was after the demand we found out how it
21  was booked.
22  Q    Okay.  So just to simplify this:  HCMFA's
23  books and records recorded the transfers on
24  May 2nd and May 3rd as liabilities from HCMFA to
25  Highland; correct?

**Page 55**

1                    Dustin Norris
2   A    So my understanding is the audited
3  financials recorded in a subsequent event – you
4  showed me that – they recorded a subsequent
5  event.  The balance sheet as of 12/31/2018 wasn't
6  amended because it was a subsequent event.  But on
7  their books and records at that time, or
8  subsequent to that, they recorded a liability.
9   Q    And – and do you know if that liability
10  was recorded contemporaneously in May of 2019?
11  A    I don't know.
12  Q    But it's – it's HCMFA's position that,
13  notwithstanding the recording of the liability on
14  it's books and records, that HCMFA didn't learn of
15  that fact until after the demand letter was sent
16  in December of 2020.
17      Do I have that right?
18  A    Correct.
19  Q    Okay.  Have there been any changes in
20  HCMFA's books and records since it learned of the
21  promise – of the existence of the promise –
22  withdrawn.
23      Has – has HCMFA changed its books and
24  records after learning that the payments were
25  recorded as liabilities?

**Page 56**

1                    Dustin Norris
2   A    I'm not aware of how it's been treated
3  since then.
4   Q    Okay.
5      MR. RUKAVINA:  And, John, no
6  urgency, but find some time in the near
7  future for the restroom break.  The
8  morning coffee is working its magic.
9      MR. MORRIS:  Happy to do it right
10  now, Davor.
11      THE WITNESS:  I can use that, too.
12  I'm almost through my water bottle.
13      MR. MORRIS:  All right.  So, look,
14  it's 12:05.  Let's just come back at 12:15
15  or 11:15.
16      THE WITNESS:  Thank you.
17      MR. MORRIS:  Thanks so much.
18  (Recess from 11:05 a.m. to 11:16 a.m. CST)
19  BY MR. MORRIS:
20  Q    To the best of your knowledge, has HCMFA
21  ever changed its books and records in order to
22  reverse the booking of the payments that were made
23  by Highland in May from liabilities to something
24  else?
25  A    I'm not aware of how the accounting

**Page 57**

1                    Dustin Norris
2  entries have been done since then, but – yeah,
3  I'm not aware.
4   Q    Okay.  But you'll – you'll agree that the
5  accounting for these two payments was among the
6  30(b)(6) topics, correct, Number 11 – Number 10?
7   A    Yes.
8   Q    And as the 30(b)(6) witness for HCMFA, can
9  you confirm that, to the best of your knowledge,
10  those payments were booked as liabilities and the
11  booking of those payments as – as liabilities has
12  not changed?
13  A    To the best of my knowledge, they were
14  booked as liabilities, and I don't know how they
15  have been treated.  There's not been a year-end
16  audit for 2021, and I'm sure the accountants and
17  auditors will determine based on current facts and
18  circumstances how those will be reported.
19  Q    Okay.  But as of today, you have no
20  knowledge that the booking of those payments as
21  liabilities has ever been changed; correct?
22  A    Those – there's no financial statements
23  that are prepared, I believe, intra-year, during
24  the year, for audited purposes.  And so, you know,
25  that – that would be, I'm sure, determined based

Dustin Norris

1    on any audit needs.
2
3    Q    Does HCMFA maintain an accounts payable
4    ledger?
5    A    I'm sure it does.
6    Q    Did you do anything to try to ascertain
7    whether or not these notes appear as liabilities
8    on the accounts payable ledger?
9    A    As current accounts payable ledger?
10   Q    Yeah.
11   A    No.
12   Q    Did you -- other than the audited
13   financial statements, did you take any steps to
14   ascertain how these payments were recorded in
15   HCMFA's books and records, or is -- or is it only
16   on the audited financial statements?
17   A    So at the time that they were recorded, we
18   know they were recorded as liabilities on the
19   books and records.
20   Q    And when you say that it was recorded as a
21   liability in the books and records, where in the
22   books and records was it recorded as a liability?
23   A    Meaning on the balance sheet?
24   Q    Okay.  So the balance sheet is one place;
25   is that right?

Dustin Norris

1
2    A    Yes.  We record liabilities on the balance
3    sheet.
4    Q    Okay.  Did HCMFA complete its audit for
5    2019?
6    A    I don't -- not that I'm aware of.  I don't
7    believe they had an audit for 2019.
8    Q    Okay.  Now, HCMFA contends that the
9    payments were -- should not have been booked as a
10   loan because they were supposed to be compensation
11   for the error that Highland made in connection
12   with the NAV error; correct?
13   A    Correct.
14   Q    Okay.  Did HCMFA ever issue an invoice or
15   a bill of any kind to Highland?
16   A    Not that I'm aware of.
17   Q    Okay.  Is there anything in HCMFA's books
18   and records that reflects its position that the
19   payments should not have been billed as
20   liabilities, but they should have been billed as
21   income?
22   A    As compensation?
23   Q    Yeah.
24   A    Yes.
25       Anything in their records?

Dustin Norris

1
2    Q    Yes.
3    A    I -- I would refer you to the testimony of
4    Mr. Dondero and Mr. Waterhouse, who both testified
5    to this; Mr. Dondero that it was compensation, and
6    that Frank testified in his deposition that he
7    don't -- didn't remember Mr. Dondero saying it was
8    a loan, and that Mr. Dondero told him to get the
9    money from Highland.  And so it's -- it's -- that
10   is on the record and in the record.
11       But in HCMFA's other records, we have
12   the president of HCMLP, Jim Dondero, who made that
13   transfer and has said that that is for
14   compensation.
15       So there is -- but there is -- I
16   wouldn't -- I would be surprised to see some kind
17   of a settlement agreement or invoice with -- to
18   affiliates.
19       MR. MORRIS:  Okay.  I move to
20   strike.
21   BY MR. MORRIS:
22   Q    And my answer -- my question is really
23   simple.
24       Is there anything in HCMFA's books and
25   records that reflects its position that these

Dustin Norris

1
2    payments were supposed to be made as compensation
3    rather than in the form of loans?
4    A    I -- I would say that the pleadings are a
5    part of our books and records now.  I would say
6    depositions.  And within that, it is well
7    documented.
8    Q    Okay.  Let me ask a different question
9    then.
10       Remember we were using the answer date
11   as being March 1st, 2021.
12   A    Correct.
13   Q    Is there anything in HCMFA's books and
14   records that was created prior to March 1st, 2021,
15   that corroborates HCMFA's position that the
16   payments were intended to be compensation and not
17   in the form of a loan?
18   A    Yeah, and I would, again, refer you to
19   DC's -- what do you call it -- declaration.  That
20   prior to that, we didn't have access to -- to,
21   largely, our books and records as that was
22   outsourced to Highland Capital Management, LP, and
23   to their employees, legal, compliance, and
24   accounting.  So our position is we did not have
25   anything at that point related to this agreement.

Page 62

1          Dustin Norris
2          MR. MORRIS:  Okay.  I move to
3    strike.
4    BY MR. MORRIS:
5    Q     And listen carefully to my question.
6          Is HCMFA aware of anything that was
7    created prior to the answer date that corroborates
8    its position today that the payments were intended
9    to be treated as compensation rather than a loan?
10   A     I – I think as far as books and records
11   go, we have NAV error memos, we have communication
12   with the SEC.  Right?
13         There's – there is a lot of
14   information related to the services that were
15   performed under the shared services agreement,
16   were for valuation purposes that Highland had
17   created and was responsible for the valuation
18   process, and that is a host of documents that are
19   in the record, yes.
20         MR. MORRIS:  Okay.  I – I move to
21   strike.
22   BY MR. MORRIS:
23   Q     I'm asking about accounting.  Maybe it's
24   my fault.  Okay?  I'll – I'll take responsibility
25   for this.  I'm asking as a matter of accounting.

Page 63

1    I'm still on 30(b)(6) Topic Number 10.
2          Is there anything in HCMFA's books and
3    records that was created before the answer date
4    that shows that the payment should have been
5    accounted for as compensation rather than as a
6    loan?
7    A     As far as an accounting record, I wouldn't
8    expect there to be, because the accountant
9    function was outsourced to HCMLP, and – and I
10   would refer you to our latest response and our
11   amended response of – of what was discovered and
12   found throughout the process here.
13         The accountants recorded a liability
14   and they thought it should be liability.  And so,
15   no, there wasn't anything, to my knowledge, prior
16   to that that was in the accounting books and
17   records.  And I – you know, I'm not surprised
18   there wasn't, because of the facts that you'll –
19   you'll see in our amended answers.
20   Q     Okay.  Do you know whether, if it was
21   intended to be compensation, that HCMFA's income
22   statement should have shown the inflow of the
23   $7.4 million?
24   A     I don't know how it would be reported for

Page 64

1    accounting purposes.  I – I do have an accounting
2    background, but I haven't done accounting in a
3    long time.  And I'm not an expert in adviser
4    financial statements.  So I would say I don't
5    have – and I guess – I guess that – stepping
6    back and answering on behalf of the company here,
7    I don't have a knowledge of how that would be
8    recorded for income statement purposes.
9    Q     Okay.
10   A     But it would – it would be compensation
11   that would be reported –
12   Q     Okay.
13   A     – somewhere in the financial statements.
14   Q     So it's your testimony today, as HCMFA's
15   30(b)(6) witness, that HCMFA was unaware that its
16   audited financial statements disclosed these notes
17   until after the lawsuit was commenced.
18         Do I have that right?
19   A     That's correct.
20   Q     And it's your position today, as HCMFA's
21   30(b)(6) witness, that HCMFA was unaware that the
22   payments that were made by Highland was booked as
23   liabilities until sometime after the lawsuit was
24   commenced; correct?

Page 65

1          Dustin Norris
2    A     Yes, that's correct.  The accounting
3    function was outsourced to HCMLP.
4    Q     Okay.  And there's – was there anybody –
5    was there any officer of HCMFA who had
6    responsibility for reviewing HCMFA's balance
7    sheet?
8    A     I believe I already answered this earlier.
9    Q     I actually asked the question on the
10   audited financial statements.
11   A     Okay.
12   Q     Now I'm going to ask specifically.  Is
13   there anybody who served as an officer of HCMFA
14   who had the responsibility of making sure that
15   HCMFA's balance sheets were true and accurate?
16   A     Yes.  So Frank Waterhouse and his team,
17   Frank was the named treasurer of HCMFA, and his
18   role at HCMLP, as a service provider, would have
19   had that responsibility along with his team.
20   Q     Okay.  Let's go to the next topic,
21   Topic 11.  Do you see Topic 11 refers to
22   "communications in 2020 with any retail board –
23   A     Yes.
24   Q     – concerning the amounts due and owing to
25   Highland"?

Page 66

Dustin Norris

1
2  A    Yes, I do.
3  Q    Okay.  HCMFA is a financial advisory firm;
4  correct?
5  A    It is.
6  Q    And it provides advisory services to
7  certain funds; correct?
8  A    It does.
9  Q    And those advisory services are provided
10  pursuant to written agreements; correct?
11  A    They are.
12  Q    And those agreements are subject to annual
13  review; correct?
14  A    They are.
15  Q    And those agreements the principal source
16  of HCMFA's revenue?
17  A    Yes, I believe so.
18  Q    Okay.  It's among the most important
19  contracts HCMFA has; correct?
20  A    Yes.
21  Q    In fact, it's the reason for HCMFA's
22  existence, is that fair, is to serve the funds?
23  A    Largely, yes.
24  Q    And the funds are managed by boards;
25  correct?

Page 67

Dustin Norris

1
2  A    Correct.
3  Q    And can we refer to the boards that manage
4  the funds that are served by the advisers as "the
5  retail board"?
6  A    Yes.
7  Q    Okay.  Did you participate -- are you
8  aware that in the fall of 2020 the retail board
9  conducted a review in connection with the
10  determination as to whether or not to renew
11  HCMFA's contracts?
12  A    I am aware, yes.
13  Q    Did you participate in that process?
14  A    I did, in some -- in some parts, yes.
15  Q    What parts did you participate in?
16  A    Yeah, so I attended the board meetings in
17  relation to -- we call this the 15(c) analysis.
18  And so it's Section 15(c) of the 1940 Act requires
19  the board to determine and renew the contracts on
20  an annual basis.  And so they look at a number of
21  factors.  And there's, I believe, certain case law
22  that dictates the things that they should look at:
23  Quality of services, performance, fees.
24         And so my aspect -- the biggest part
25  of my contribution is to talk about the

Page 68

Dustin Norris

1
2  performance of the funds, how they performed
3  during the year.  We hire an outside third party
4  to come in and talk about performance and fees.  I
5  help provide insight, talk about -- as I oversee
6  the sales and business development of the firm, I
7  talk about inflows and outflows, which help --
8  helps impact the economies of scale funds.  We
9  have certain funds that are shrinking, some that
10  are growing.  So talking about future, talking
11  about mergers, talking about different aspects of
12  that.
13         And so my -- mine is more of the sales
14  business development function and regarding the
15  services.  One of the things that we do as the
16  adviser is we, again -- they have to determine
17  that the quality of services we're providing are
18  sufficient, and so they have to get comfortable
19  with the various functions.
20  Q    Okay.  Who else on behalf of HCMFA
21  participated in the 15(c) analysis that you've
22  just described?
23  A    Yeah, so as -- again, going back to the
24  shared services agreement, I point you to the
25  services that are provided by HCMLP.  In large

Page 69

Dustin Norris

1
2  part, this process is managed and run by the HCMLP
3  employees as part of that shared services.  Legal
4  and compliance help draft the memos.  They are --
5  Q    And I'm going to interrupt you, and I
6  really apologize for doing that.  I'm not asking
7  about HCMLP.
8  A    Yeah.
9  Q    These are -- these are HCMFA's contracts;
10  correct?
11  A    They are.
12  Q    And they're the most important contracts
13  that HCMFA has; correct?
14  A    Correct.
15  Q    Okay.  So who -- which officers of HCMFA
16  are involved in the 15(c) analysis?
17  A    Yeah, one -- going back to -- to clarify
18  on your -- you know, this is the most important
19  thing, you know, that we have, it is, and as such
20  we have -- a lot of those functions, and to talk
21  about HCMFA's role, we have front-office
22  investment professionals who join those meetings
23  to talk about the funds and performance.  The
24  aspects of the adviser that we provide and source
25  is the management of the funds:  The performance,

Page 70

```
            Dustin Norris
1
2   the investment selection.  And then we bring in
3   HCMLP to provide the various other services.  And
4   so they are a huge part of that.  To say that —
5   yeah, it's not — they are legal, compliance,
6   accounting, finance, back office, settlement.
7   Those are all functions that they're providing.
8   Q    I know — I appreciate that they're
9   functions that they play under the shared services
10  agreement.
11  A    Yup.
12  Q    Let me — let me move on.
13  A    Okay.  Go ahead.
14  Q    In October 2020, HCMFA informed the retail
15  board that HCMFA was obligated to pay Highland the
16  outstanding principal amount due under the notes;
17  correct?
18       MR. RUKAVINA:  Objection; form.
19       THE WITNESS:  Yeah, the
20    obligated — I would — sorry.  Can you
21    ask the question again?
22  BY MR. MORRIS:
23  Q    Sure.
24       In October 2020, HCMFA informed the
25  retail board of the existence of the notes;
```

Page 71

```
            Dustin Norris
1
2   correct?
3   A    Not that I'm aware of.  If you have
4   something you could — you know, a document or
5   something that you're thinking of?
6   Q    So you participated in the 15(c) process,
7   and you have no knowledge of HCMFA informing the
8   retail board of the existence of the notes?
9   A    Of these notes?  No.  And I would say that
10  there was a question from the retail board posed
11  to the advisers, which we passed along to HCMLP,
12  which included Lauren Thedford as an HCMLP
13  employee and Frank Waterhouse, is:  Were there any
14  liabilities to — owed to Highland?
15  Q    So let's take a look — I'm sorry.  Go
16  ahead.
17  A    No, go ahead.
18  Q    I was going to say, let's take a look at
19  that.
20       MR. MORRIS:  So if we could put up
21    on the screen Exhibit 59.
22       (Exhibit 59 tendered.)
23  BY MR. MORRIS:
24  Q    Have you seen this document before, sir?
25  A    I have.
```

Page 72

```
            Dustin Norris
1
2   Q    And this is the report that the advisers
3   gave to the retail board in October 2020 as part
4   of the 15(c) analysis; correct?
5   A    Yes, working closely with HCMLP in the
6   accounting, compliance, and legal function did
7   draft this.
8   Q    Okay.  And who — who on behalf of the
9   advisers authorized the sending of this memo?
10  A    I don't know that there's a formal
11  authorization.  Lauren Thedford, who was the
12  secretary of the advisers and an HCMLP employee,
13  helped prepare the memo along with the rest of the
14  legal and compliance team.  Thomas Surgent was
15  probably involved.
16       MR. MORRIS:  Okay.  I'm going to
17    move to strike.
18  BY MR. MORRIS:
19  Q    I don't want to know who was probably
20  involved.  I actually asked a very specific
21  question, and if you don't know, please just say
22  you don't know.
23       Who on behalf of the advisers
24  authorized the sending of this memo to the retail
25  board?
```

Page 73

```
            Dustin Norris
1
2   A    I don't know.
3   Q    Did anybody on behalf of the advisers ever
4   suggest that this memo was wrong or inaccurate in
5   any way to the best of your knowledge?
6   A    At that time?  Is that what you mean?
7   Q    Yes.
8   A    No, not — not to my knowledge.
9   Q    Okay.  When did you see this memo for the
10  first time?
11  A    I may have been copied on it at the time.
12  I don't remember if I read it, but I did review
13  it — and actually, I didn't review the whole
14  memo.  I reviewed the one email that was related
15  to the note payable in this.  So I don't know that
16  I read the whole memo.
17  Q    So — so —
18       MR. MORRIS:  Can we see how long
19    the memo is?
20  BY MR. MORRIS:
21  Q    So it's two pages, and it's got some
22  charts; is that fair?
23  A    That's fair.
24  Q    And in October 2020, you were the
25  executive vice president of every single entity
```

Page 74

Dustin Norris

1    that this email is being sent to and from;
2    correct?
3    A    I'm looking at the entities.
4          I'm executive vice president of most
5    of the entities.
6    Q    Okay.  You're the executive vice president
7    of each of the entities that are sending this
8    memo; correct?
9    A    No.  Not NexPoint Securities.
10   Q    I appreciate that.  Thank you for the
11   clarification.
12         Did you review this before it was
13   sent?
14   A    I don't remember.
15   Q    Did you take any steps to make sure that
16   it was accurate?
17   A    Probably not.  And that wouldn't have been
18   my function.  We had a legal and compliance team
19   that was – through the shared services agreement
20   that prepared memos.  This is going to the board.
21   That would have all obviously gone through legal
22   and compliance.  It wouldn't have been my
23   function.
24   Q    Did anybody who served as an officer or

Page 75

Dustin Norris

1    employee of HCMFA have any responsibility to make
2    sure that this memo was true and accurate before
3    it was sent to the retail board?
4    A    Lauren Thedford was the secretary of the
5    advisers and the funds, and I believe this has to
6    do with – and depending on the material, I think
7    this has to do with the note, and other things.
8    So the finance team, Frank Waterhouse and his team
9    at HCMLP, would have been supplying those answers.
10   Q    Okay.  And why do you keep saying Frank
11   Waterhouse at HCMLP instead of Frank Waterhouse as
12   the treasurer of the entity that's sending this
13   memo?
14   A    Because Frank was the CFO of Highland who
15   was responsible for the accounting, finance,
16   back-office functions of these funds.  And the
17   answer – the adviser did not have that
18   information, and intentionally hired HCMLP to
19   provide that function.  And so that is how it was
20   viewed.  Those were HCMLP employees, and that was
21   under the shared services agreement.
22   Q    Is it your testimony as the HCMFA 30(b)(6)
23   witness that Frank Waterhouse did not have any
24   responsibility in his capacity as the treasurer of

Page 76

Dustin Norris

1    HCMFA to make sure that this report was true and
2    accurate before it was sent to the retail board?
3    A    I don't know of any function or
4    requirement of his role as treasurer of HCMFA that
5    he was responsible for reviewing 15(c) memos prior
6    to going to the board.
7    Q    And other than Lauren Thedford, you can't
8    identify any officer or employee of HCMFA who had
9    any responsibility to make sure that this report
10   was true and accurate before it was sent; is that
11   correct?
12   A    No.  And I can't – and I would, again, go
13   back to legal.  And this is a memo that is going
14   to the board and would be a legal and compliance
15   function that would have been provided services by
16   HCMLP.  And that was always the case.  Those
17   employees, for years, have provided the
18   legal/compliance support of memos of the 15(c)
19   process and the support for everything that went
20   into it.
21         MR. MORRIS:  Okay.  Move to strike.
22   BY MR. MORRIS:
23   Q    Do you know if Jim Dondero reviewed this
24   before it was sent?

Page 77

Dustin Norris

1    A    I don't know for sure, but I highly doubt.
2    He was never, to my knowledge, involved in
3    drafting or reviewing 15(c) memos.
4    Q    Okay.  You'll agree that this memo was
5    sent by the advisers in response to the retail
6    board's questions; correct?
7    A    Correct.
8    Q    And you'll agree –
9    A    And actually, let me – let me correct
10   that.
11         It was from the advisers.  I believe
12   that HCMLP employees sent it, getting back to –
13   it was sent by – technicality, but I believe
14   Lauren Thedford would have sent this.
15   Q    And why do you say that she sent it in her
16   capacity as an HCMLP employee rather than as the
17   secretary of the entity that's actually the author
18   of the memo?
19   A    Because that was the function that they
20   were providing as part of the shared services
21   agreement.  And I – yeah.  That was what – she's
22   part of the legal team at HCMLP, and that was the
23   service she was providing.  We didn't have a legal
24   and compliance function at HCMFA.

Page 78

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | Q    Okay. |
| 3 |       MR. MORRIS:  Can we scroll down to |
| 4 |    Question 2, please? |
| 5 | BY MR. MORRIS: |
| 6 | Q    Have you seen Question 2 before? |
| 7 | A    Yes. |
| 8 | Q    Do you have an understanding of what was |
| 9 | being requested by the retail board in Question |
| 10 | Number 2? |
| 11 | A    Yes.  They are asking for amounts |
| 12 | currently payable or due in the future to HCMLP by |
| 13 | HCMFA or NexPoint Advisors. |
| 14 | Q    And -- and did the advisers report to the |
| 15 | retail board in October 2020 that, quote, |
| 16 | "$12,286,000 remains outstanding to HCMLP from |
| 17 | HCMFA"? |
| 18 | A    It says it right there.  That's in the |
| 19 | memo. |
| 20 | Q    Okay. |
| 21 | A    And I would note that came from Frank |
| 22 | Waterhouse and his team, that information, the |
| 23 | accounting department at HCMLP. |
| 24 |       MR. MORRIS:  Okay.  I move to |
| 25 |    strike everything after the portion of |

Page 79

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | your answer that was responsive to my |
| 3 | question. |
| 4 | BY MR. MORRIS: |
| 5 | Q    As HCMFA's 30(b)(6) witness today, have |
| 6 | you done anything to determine whether or not the |
| 7 | $12.286 million number includes the principal |
| 8 | amount of the notes? |
| 9 | A    Looking at it, we can't tell.  Because it |
| 10 | doesn't line up exactly with those notes.  There |
| 11 | were other notes that had been recorded in the |
| 12 | books for several years before.  And if you add |
| 13 | those two together, it doesn't add up.  So it's |
| 14 | not clear. |
| 15 | Q    Did you read the testimony of Mr. Klos and |
| 16 | Ms. Hendrix?  I think you said you did; right? |
| 17 | A    I did. |
| 18 | Q    Did you read the portion of their |
| 19 | testimony where they said that this number |
| 20 | includes the notes as well as certain other |
| 21 | amounts that were due and owing to certain |
| 22 | Highland affiliates? |
| 23 | A    I did -- I didn't read every single line, |
| 24 | and there were, between the two of them -- I don't |
| 25 | know -- 600 pages.  So if it's in there and you |

Page 80

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | can point to it, then I can take your |
| 3 | representation.  But I don't remember that. |
| 4 | Q    All right.  So did anybody acting on |
| 5 | behalf of HCMFA -- withdrawn. |
| 6 |       Did any officer of -- or employee of |
| 7 | HCMFA do anything to make sure the information in |
| 8 | this response was true and accurate before it was |
| 9 | sent to the retail board? |
| 10 | A    We received it from the individuals |
| 11 | responsible.  And there was no -- you know, there |
| 12 | was no reason to doubt that it was incorrect. |
| 13 | Right?  These were professionals.  We were relying |
| 14 | on them.  This is Frank Waterhouse, Dave Klos, |
| 15 | Kristen.  We anticipated this would be accurate. |
| 16 | Q    Okay.  You anticipated it.  But it's your |
| 17 | testimony that no officer or employee of HCMFA did |
| 18 | anything independently to make sure that it was |
| 19 | accurate; that they completely and 100 percent |
| 20 | just deferred and relied on somebody else under a |
| 21 | contract? |
| 22 | A    Frank Waterhouse was the treasurer.  You |
| 23 | said any -- any officer.  He was -- in his role, |
| 24 | he provided this information.  And I don't know |
| 25 | his extent of how he looked into it, but if you |

Page 81

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | look at the email chain, it didn't look too |
| 3 | extensive.  And if you even look at this, he's |
| 4 | saying that the earliest the note between HCMLP |
| 5 | and HCMFA can come due is May 21st.  He himself |
| 6 | seems to be confused here, because as we found out |
| 7 | through discovery and in the testimony of what has |
| 8 | come out, there was an agreement -- that was a |
| 9 | separate agreement.  That wasn't related to the |
| 10 | notes at issue in this case. |
| 11 |       And so I don't know the extent that |
| 12 | was gone into this, but it -- it -- there's |
| 13 | confusion even in the response. |
| 14 |       MR. MORRIS:  Okay.  I move to |
| 15 |    strike. |
| 16 | BY MR. MORRIS: |
| 17 | Q    Again, I was just asking about the |
| 18 | identity of anybody who was charged with the |
| 19 | responsibility of making sure that this was true |
| 20 | and accurate. |
| 21 |       Is there any officer or employee of |
| 22 | HCMFA who was charged with the responsibility of |
| 23 | making sure this response was true and accurate? |
| 24 | A    Yeah.  It was sent to -- the request went |
| 25 | to Frank Waterhouse because he and his team would |

Page 82

Dustin Norris

1  have this information.  That's -- that's where we
2  would get this information.
3
4  Q    Okay.  Thank you.
5       MR. RUKAVINA:  Hey, John, let me
6  just interject for a little.  Let's go off
7  the record for just a minute.
8       (Discussion off the record.)
9  BY MR. MORRIS:
10  Q    Do you know, as HCMFA's 30(b)(6)
11  representative, whether the $12.286 million
12  includes the $7.5 million -- withdrawn.
13       Do you know if the 12. -- withdrawn.
14       As HCMFA's 30(b)(6) witness, do you
15  know whether the $12.286 million referenced in
16  Response Number 2 includes the $7.4 million in
17  principal amount on the notes?
18  A    I don't.
19  Q    Okay.  Did you do anything to try to
20  answer that question before appearing for today's
21  deposition?
22  A    Yeah.  We discussed this with counsel.  We
23  don't have underlying backup.  We couldn't talk to
24  Frank Waterhouse on this in preparation, but the
25  numbers just don't match up to principal amounts

Page 83

Dustin Norris

1  and what is owing.  We don't have information on
2  the other notes.  So discussed it with counsel,
3  but I -- we don't have any backup to support or --
4  Q    Did you make -- did you make any attempt
5  to speak with Ms. Thedford?
6  A    No, I didn't.  And she wouldn't have that
7  information.  She's an attorney who was involved
8  in the legal field, and she's no longer employed
9  there or at Skyview.
10       MR. MORRIS:  I move to strike.
11  BY MR. MORRIS:
12  Q    Okay.  And so you don't know what the
13  component parts of this $12.286 million number
14  are; correct?
15  A    I don't.
16  Q    Okay.  Do you see the last sentence of
17  this response that says, quote:  "The adviser
18  notes that both entities have the full faith and
19  support of Jim Dondero," close quote?
20  A    I do.
21  Q    Do you know what that means?
22  A    Other than what Frank Waterhouse
23  testified -- and I, again, refer you to his
24  deposition -- that -- I believe that wording came
25

Page 84

Dustin Norris

1  from him, and he emailed that.  So I would refer
2  you to his testimony.
3  Q    Well, as the 30(b)(6) witness, you were
4  asked to be prepared about communications to the
5  retail board; correct?
6  A    Yes.
7  Q    Okay.  Did you do anything to try to
8  figure out what that sentence meant -- that
9  sentence meant, other than reading Frank
10  Waterhouse's deposition transcript?
11  A    Knowing that it came from Frank, and Frank
12  elaborated, I didn't do any additional research.
13  Q    Did you ask Mr. Dondero if he was aware
14  that that statement was included in the report to
15  the retail board?
16  A    I did not.
17  Q    Do you know why this statement was
18  included in the report to the retail board?
19  A    I could speculate, but I don't know
20  specifically.
21  Q    Do you know if Mr. Dondero authorized the
22  advisers to inform the retail board, in October
23  of 2020, that the advisers had the full faith and
24  support of Mr. Dondero?
25

Page 85

Dustin Norris

1  A    I'm not aware, and if you look at Frank's
2  testimony, I believe he testified that he -- he
3  didn't have that authority either, but I'm not
4  sure.  I would refer you to his -- I don't have
5  any other knowledge.
6  Q    Okay.  So it's HCMFA's position that the
7  statement in the last sentence of Response
8  Number 2 was unauthorized.  Do I have that
9  correctly?
10  A    I don't know that we're taking that
11  position either way.  It wasn't something
12  that -- that we're -- was even part of the -- our
13  arguments.
14  Q    I'm not asking if it's part of your
15  arguments.  I'm just asking you, as a factual
16  matter, does HCMFA contend that sentence was
17  included without authorization?
18  A    I don't have the knowledge of that.
19  That's -- I'm not going to contend that.
20  Q    Okay.
21  A    It may have been.  I don't know.
22  Q    Okay.  So this letter was sent over a year
23  ago.  Do I have that right?
24  A    What's the date on it?
25

Page 86

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | MR. MORRIS: If we can go back to |
| 3 | the top. |
| 4 | THE WITNESS: Yup. |
| 5 | BY MR. MORRIS: |
| 6 | Q    Okay. Has -- have the advisers ever told |
| 7 | the retail board that the response to Question |
| 8 | Number 2 was inaccurate in any way? |
| 9 | A    Specifically saying, "Hey, let me tell you |
| 10 | this memo, Question 2, let me go back, it was |
| 11 | inaccurate," no, that was never a specific |
| 12 | disclosure of the retail board. |
| 13 | However, the retail board is aware of |
| 14 | all of the facts and circumstances surrounding the |
| 15 | notes, and so they're aware of our position. |
| 16 | They're aware of -- they've been demanded. |
| 17 | There's been a lawsuit involved on both notes. |
| 18 | And -- and -- but, no, this specific |
| 19 | Number 2 is incorrect, no. But they're aware of |
| 20 | our position and what we found out since then. |
| 21 | Q    Okay. Earlier in 2020, before this memo |
| 22 | was sent to the retail board, HCMFA had provided |
| 23 | to the retail board its financial statements for |
| 24 | the period ending June 30, 2020; correct? |
| 25 | A    I believe that's typical in our August |

Page 87

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | meeting as part of the 15(c) process, but -- I |
| 3 | don't know if you have that in hand, but I believe |
| 4 | that was supplied. I'm not certain. Sometimes it |
| 5 | was 12/31 balance sheets, sometimes it was a |
| 6 | June 30th balance sheet. |
| 7 | Q    Okay. Can we -- are you aware -- have you |
| 8 | seen an email exchange that preceded the -- the |
| 9 | finalization of this memo to the retail board? |
| 10 | A    I believe it was part of your exhibits. |
| 11 | Q    All right. |
| 12 | MR. MORRIS: So let's put that up |
| 13 | on the screen, Exhibit 36. |
| 14 | (Exhibit 36 tendered.) |
| 15 | BY MR. MORRIS: |
| 16 | Q    So is this the document that you've seen |
| 17 | before? |
| 18 | A    Yes. |
| 19 | Q    Okay. |
| 20 | MR. MORRIS: And can we start at |
| 21 | the bottom of the document? |
| 22 | BY MR. MORRIS: |
| 23 | Q    Okay. And do you know who Stacy from |
| 24 | Blank Rome is? |
| 25 | A    I do. |

Page 88

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | Q    And who is that? |
| 3 | A    She is independent counsel for the retail |
| 4 | board, the independent directors. |
| 5 | Q    And did she provide to the people on this |
| 6 | email string certain questions that the retail |
| 7 | board had in connection with its annual 15(c) |
| 8 | review? |
| 9 | A    Yes. These were follow-up requests. So |
| 10 | they have a memo that she provides early on with |
| 11 | an extensive list of questions, and these were the |
| 12 | follow-up questions from the board. |
| 13 | Q    Okay. And so it was sent to you, |
| 14 | actually; correct? |
| 15 | A    To me and Lauren. |
| 16 | MR. MORRIS: Can we scroll up a |
| 17 | little bit, please? Keep going. |
| 18 | BY MR. MORRIS: |
| 19 | Q    And then Lauren forwards it to certain |
| 20 | people, including you; correct? |
| 21 | A    She forwards it to Thomas and copies me. |
| 22 | Q    Uh-huh. And -- and she includes the |
| 23 | questions that are being asked by the retail |
| 24 | board; correct? |
| 25 | A    I don't know if -- I don't know if that's |

Page 89

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | all of them. I don't know if you have the memo. |
| 3 | If you represent that is all the questions, |
| 4 | then -- |
| 5 | Q    Yeah. |
| 6 | A    -- then I'll take that representation, |
| 7 | but -- |
| 8 | Q    And -- and Question Number 2 is the same |
| 9 | Question Number 2 that we just looked at in the |
| 10 | report that was given to the retail board; |
| 11 | correct? |
| 12 | A    I don't know if it's exact, but -- I don't |
| 13 | know if you want to pull that up. |
| 14 | Q    Don't you have a copy of it with you right |
| 15 | there? |
| 16 | A    I don't know if I have a copy of that. |
| 17 | Oh, I have the exhibits. What exhibit was that? |
| 18 | I have it in PDF. |
| 19 | Q    Yeah, that's -- that was 59. |
| 20 | A    I'm scrolling. There are 650 pages here. |
| 21 | Sorry. Which exhibit again? |
| 22 | Q    You know, let's just move on. |
| 23 | Is it fair to say that Ms. Thedford |
| 24 | forwarded to Mr. Surgent, you, and others, |
| 25 | questions that had been presented by Stacy, the |

Page 90

```
1              Dustin Norris
2  retail board's outside counsel?
3  A    Just one correction there.  She forwarded
4  it to Mr. Surgent and copied me.
5  Q    Fair enough.
6  A    I'm not on the "To" line.  That would
7  be –
8         MR. MORRIS:  Let's scroll down,
9   please.  Let's scroll.
10 BY MR. MORRIS:
11 Q    And then – and then she forwards it
12 further to Mr. Waterhouse, Mr. Klos, and
13 Ms. Hendrix.
14       Do you see that?
15 A    I do.
16 Q    And you're still copied on it; correct?
17 A    I am.
18 Q    And do you see that she's asking Frank,
19 Mr. Klos, and Kristin to respond to Question
20 Number 2 that concerns material outstanding
21 amounts currently payable or due in the future to
22 Highland or its affiliates by either of the
23 advisers?
24 A    Yes, it – HCMLP will take that as a typo.
25 But yes.  And that would be standard.  Lauren
```

Page 91

```
1              Dustin Norris
2  would go to them as the source for that
3  information.
4  Q    Okay.
5         MR. MORRIS:  And let's scroll up
6   and see the response.
7  BY MR. MORRIS:
8  Q    And do you see Mr. Waterhouse responded
9  with one word:  "Yes"?
10 A    Yes, I see that.
11 Q    And then Ms. Thedford asked if
12 Mr. Waterhouse could provide the amounts.
13       Do you see that?
14 A    I do.
15 Q    And you're still copied on this email
16 chain; correct?
17 A    I am.
18 Q    So –
19 A    Which, again, is not unusual to copy me on
20 some things I wish they wouldn't.  But I was
21 copied on board items fairly regularly.
22       MR. MORRIS:  Okay.  I move to
23   strike.
24 BY MR. MORRIS:
25 Q    I appreciate your wishes, but the question
```

Page 92

```
1              Dustin Norris
2  was simply whether or not, you know, you would
3  acknowledge that you were copied on this email.
4  A    Yup, that's my email.
5  Q    Okay.  And let's see what the next
6  response is.
7         And do you see Mr. Waterhouse
8  responds – can you read Mr. Waterhouse's
9  response?
10 A    I can.  He said:  "It's on the balance
11 sheet that was provided the board as part of the
12 15(c) materials."
13 Q    Okay.  So everybody to whom Mr. Waterhouse
14 has sent – withdrawn.
15       So you don't dispute, as HCMFA's
16 30(b)(6) witness, that Mr. Waterhouse informed all
17 of the recipients of his email on Tuesday,
18 October 6th, 2020, at 6:05 p.m. that the answer to
19 the retail board's Question Number 2 could be
20 found in HCMFA's balance sheet; correct?
21 A    Correct.
22 Q    Okay.  Let's go –
23 A    Actually, can you go back down to the
24 answer – the exact question?
25 Q    Of course.
```

Page 93

```
1              Dustin Norris
2        Okay.
3  A    "Are there material outstanding amounts
4  currently payable or due to the future by HCMLP to
5  HCMFA" – yeah – "or any other affiliate?"
6        Okay.
7  Q    Having read that, does that change your
8  answer at all?
9  A    And so – go back to your original
10 question on whether his –
11 Q    Right.  So Mr. –
12       MR. MORRIS:  Can we scroll back up
13   to Mr. Waterhouse's response?
14 BY MR. MORRIS:
15 Q    Thank you for your patience, Mr. Norris.
16 A    Uh-huh.
17 Q    You'll see that Mr. Waterhouse responds at
18 6:05 p.m. on October 6th, and my question is a
19 simple one:  Does HCMFA dispute that in
20 Mr. Waterhouse's email that he is telling the
21 recipients that the answer to the retail board's
22 Question Number 2 can be found in HCMFA's balance
23 sheet?
24 A    I would say the answer – his – his
25 response is the answer to the retail board is not
```

Page 94

Dustin Norris

1 completely accurate, because there was – there's
2 not enough there to be responsive. I think what
3 he's saying here is to Lauren, "Hey, it's on the
4 balance sheet. Can you look at it and figure it
5 out?"
6
7           And I – I think they go back and
8 forth, "Well, can you give us more information?"
9 And so it's – this is not responsive to the
10 question and isn't what was provided to the board,
11 but that's –
12 Q     Well, let – let's see what Ms. Thedford
13 does. Ms. Thedford's the lawyer; right?
14 A     She is.
15 Q     Yeah. But she's also the secretary of
16 HCMFA; correct?
17 A     At this time, I believe so, yes.
18 Q     And you wouldn't dispute that she is
19 taking the lead on formulating the advisers'
20 response to the retail board; correct?
21 A     I would not dispute that.
22 Q     Okay. And do you see that she reports to
23 you and everybody else in her email that she has
24 taken information from the 6/30 financials?
25 A     Yes, I see the below from the 6/30

Page 95

Dustin Norris

1 financials. And, again, to correct to me, I'm
2 CC'd. It's a nuance, but she's representing to
3 Frank and Dave and Kristin and a CC to me.
4 Q     Okay. Does HCMFA acknowledge that the
5 information contained in the October 23rd, 2020,
6 report to the retail board with respect to
7 Question Number 2 was derived from HCMFA's
8 June 30th, 2020, financials?
9 A     Sorry. One more time?
10 Q     Will you agree, as HCMFA's 30(b)(6)
11 witness, that the information provided to the
12 retail board in October 2020 in response to
13 Question Number 2 was taken directly from HCMFA's
14 financial statements for the period ending
15 June 30th, 2020?
16 A     Yeah. The unaudited financials, yes.
17 Q     Okay. And so – so as HCMFA's 30(b)(6)
18 witness, you will agree that the $12,286,000
19 figure that was included in the former response to
20 the retail board was obtained from HCMFA's
21 unaudited financial statements for the period
22 ending June 30th, 2020; correct?
23 A     It appears that way.
24
25           And I – I think – and, again, we're

Page 96

Dustin Norris

1 looking at a draft answer here. I don't have the
2 final answer. But it looks as work product that
3 she's pulling numbers from the unaudited balance
4 sheet and plugging them in here.
5 Q     Okay. And we can look at the final if you
6 want, but that $12,286,000 number that was due to
7 HCMLP as of June 30th 2020, that's the exact
8 figure that was given to the retail board in the
9 final report; correct?
10 A     "Final report," meaning the final memo –
11 final memos?
12 Q     Yes.
13 A     Yes. Yes, I believe so.
14 Q     Okay.
15           MR. MORRIS: Can you scroll back up
16       to the last email?
17 BY MR. MORRIS:
18 Q     So this is Mr. Waterhouse's response to
19 Ms. Thedford. And, again, Mr. Waterhouse is
20 Highland's CFO and the advisers' treasurer;
21 correct?
22 A     Correct.
23 Q     And at this time, Ms. Thedford is an
24 attorney at Highland, but she also serves as the

Page 97

Dustin Norris

1 secretary for the advisers; correct?
2 A     That's correct.
3 Q     And you are the executive vice president
4 for the advisers; correct?
5 A     As of this date, yes.
6 Q     And you had no position with Highland;
7 correct?
8 A     At this time?
9 Q     Correct.
10 A     No position with Highland, no.
11 Q     Okay. How about Mr. Post? Had he
12 transitioned from Highland to the advisers as of
13 October 6th?
14 A     I don't believe so.
15 Q     Okay. It happened in October, though;
16 right?
17 A     I – I don't know.
18 Q     Okay.
19 A     Late October/November. It was late in the
20 year.
21 Q     Okay. And do you know if anybody ever
22 told Mr. Waterhouse in October 2020 that there was
23 any aspect of his email that was incorrect?
24 A     Not at that time, no, that I'm – not that

Page 98

Dustin Norris

1      I'm aware of.
2
3      Q      Okay.
4      A      And – and would we have reason to doubt
5      him?  This – he was the source of the
6      information.
7      Q      Okay.  And do you see that the last
8      sentence of his email actually refers to the last
9      sentence of Response Number 2 that was given to
10     the retail board later in October 2020?
11     A      I do.
12     Q      Did you ever ask Mr. Waterhouse anything
13     about that last sentence?
14     A      I don't believe so.
15     Q      Do you see that he says, quote:  "The
16     response should include, as I covered in the board
17     meeting, that both entities have the full faith
18     and backing from Jim Dondero, and to my knowledge
19     that hasn't changed"?
20            Do you see that?
21     A      I do.
22     Q      Do you know what board meeting he's
23     referring to?
24     A      "The response should include, as I covered
25     in the board meeting, that both entities have a

Page 99

Dustin Norris

2      full faith and backing."
3             So I don't know the exact board
4      meeting.  However, we do have an August board
5      meeting related to 15(c).  There's typically an
6      in-person or telephonic meeting in August, and
7      then there's a September board meeting that is
8      devoted almost exclusively to the 15(c) process.
9             And after that, there is follow-up
10     meetings – multiple sometimes, particularly in
11     2020 during the bankruptcy proceedings that –
12     where the board was getting comfortable.  So it
13     would have been one of those meetings, but I don't
14     know which one.
15     Q      And – and did you personally participate
16     in a board meeting where Mr. Waterhouse covered
17     the topic of the advisers having the full faith
18     and backing from Mr. Dondero?
19     A      I – I probably would have been in most or
20     all of those board meetings, but I don't remember
21     that specifically.
22     Q      Okay.  Do you know – do you know whether
23     anybody who's copied on this email ever questioned
24     any aspect of the last sentence of
25     Mr. Waterhouse's email at any time prior to the

Page 100

Dustin Norris

2      sending of the final memo on October 23rd?
3      A      Not that I'm aware of.
4      Q      You didn't; isn't that right?
5      A      I don't know that I read it, but I didn't
6      question it.  If I – I either didn't read it or I
7      didn't question it.
8      Q      Okay.  So you have no recollection of ever
9      asking Mr. Waterhouse what he meant by the last
10     sentence of this email; correct?
11     A      No, I have no recollection.
12     Q      And you have no recollection of any
13     recipient of this email asking Mr. Waterhouse what
14     he meant by that last sentence; correct?
15     A      I don't remember.
16     Q      And you never told Mr. Waterhouse that you
17     had no knowledge of him having covered this issue
18     before the board?
19     A      You're wondering if I ever told him I had
20     no knowledge?
21     Q      Yeah.
22     A      No, I never talked to him about that.
23     Q      And to the best of your knowledge, no
24     recipient of this email ever challenged
25     Mr. Waterhouse's statement in this last sentence;

Page 101

Dustin Norris

2      correct?
3      A      I don't know what the conversations were
4      had between the others, but I have no knowledge of
5      that.
6      Q      Okay.
7      A      And – and you've got – sorry.  Go ahead.
8      Q      This email string is – is an email string
9      devoted for the sole purpose of addressing
10     questions posed by the retail board in connection
11     with the 15(c) review; correct?
12     A      I believe so.
13     Q      Okay.  Have you ever seen HCMFA's
14     unaudited financial statements for June 30th,
15     2020?
16     A      Yes.
17     Q      And do you know if those audited –
18     unaudited financial statements included the
19     amounts due and payable under the notes?
20     A      I – I think that – I – I don't
21     remember, but I think our position is it's
22     unclear, because the amounts don't agree to
23     the – again, we have prior notes, we have these
24     notes.  The amounts don't line up.
25            So it's – it's – the underlying

Page 102

Dustin Norris

2  backing is not provided. There's no footnotes.
3  It's just a number that says due to HCMLP.
4  Q   Do you know -- do you know -- do you have
5  any recollection as to the totality of HCMFA's
6  liabilities as of June 30th, 2020?
7  A   Including this note? Or just this note?
8  Q   All -- all liabilities. What's the bottom
9  of the balance sheet?
10  A   I don't know. Do you have it? Do you
11  want to pull it up?
12  Q   I don't.
13  A   Yeah, I don't remember.
14      MR. RUKAVINA: Hey, John, it's
15  approaching 12:15. Just whenever, you
16  know --
17      MR. MORRIS: Yeah. You know what?
18  I was just about to change topics, so this
19  is a good time.
20      MR. RUKAVINA: Okay.
21      MR. MORRIS: Why don't we stop
22  here, and we'll come back at the top of
23  the hour.
24      MR. RUKAVINA: Excellent. Thank
25  you.

Page 103

Dustin Norris

2      (Recess from 12:11 p.m. to 1:06 p.m. CST)
3  BY MR. MORRIS:
4  Q   Mr. Norris, Topic Number 9 relates to
5  consent fees.
6      Do you understand that?
7  A   I do.
8  Q   Do you have an understanding of what a
9  "consent fee" is?
10  A   I do.
11  Q   Did you do anything to prepare for this
12  particular topic?
13  A   I did.
14  Q   What did you do to prepare for this topic?
15  A   I discussed the consent fee with
16  Mr. Dondero, with Mr. Rukavina, and with
17  Mr. Sauter.
18  Q   Okay. Mr. Sauter has no personal
19  knowledge of any consent fee that was paid in the
20  spring of 2019; correct?
21  A   No.
22  Q   Okay. What's your understanding of what a
23  "consent fee" is?
24  A   Generally or the specific consent fee
25  in -- that --

Page 104

Dustin Norris

2  Q   Let's start generally.
3  A   Yeah. So a "consent fee" is a fee paid to
4  a -- paid to someone who's agreeing to amend terms
5  or change the structure of the -- of a document or
6  a loan. In -- in bank loan world, or loan world,
7  if you are going to amend or extend or change the
8  terms, typically there was a consent fee paid to
9  those willing to consent.
10      Those that have voted or consented
11  receive a fee.
12  Q   Okay. And did HCMFA pay any consent fees
13  in or around April or May 2019?
14  A   It began to pay consent fees in May
15  of 2019, I believe.
16  Q   Okay. Are you looking at something as you
17  prepare your answer?
18  A   Yeah. I'm looking at Topic Number 9 that
19  says consent fee in April or May 2019.
20  Q   Okay. Thank you so much.
21      And -- and I think you testified that
22  they began paying consent fees at around that
23  time?
24  A   That's right.
25  Q   What do you mean by that?

Page 105

Dustin Norris

2  A   Yeah. So the consent fee was related to
3  the global allocation fund that converted from an
4  open-end fund to a closed-end fund, and there was
5  a 3 percent fee that would be paid to investors
6  that, one, consented to the conversion from an
7  open-end fund to a closed-end fund, but also held
8  their investment through the conversion.
9      The conversion was finalized in
10  February of 2019, and the consent fee was an
11  operational challenge because you had to determine
12  who the investors were that voted yes and that
13  held on to the conversion.
14      So with that, the -- the amounts that
15  were paid, there was an operational challenge to
16  determine who -- who needed to be paid, and so
17  they were deposited and then paid out over a
18  couple-month period.
19  Q   And who made the decision to pay the
20  consent fee?
21  A   So the consent fee was a collaborative
22  decision of senior management. Jim Dondero and
23  myself were involved in the decision, the
24  discussion -- and it was a novel idea in terms
25  of converting from an open-end fund to a

Page 106

Dustin Norris

1    closed-end fund, and it was submitted to
2    investors. It went through SEC review as a proxy
3    statement, and it went out to shareholders who
4    needed to vote for the proposal.
5    Q    And who paid the consent fee? HCMFA?
6    A    My understanding is HCMFA as the adviser
7    of the global allocation fund paid the consent fee
8    to investors.
9    Q    And whose idea was it to seek consent to
10   change from an open fund to a closed-end fund?
11   A    I – I would say it was collaborative of
12   senior management. Jim Dondero, myself, legal
13   compliance was involved. It was, you know, Mark
14   Okada, who was a partner at the time. There was a
15   lot of discussion involved.
16   Q    And when the decision was made to seek
17   consent to change from an open-end fund to a
18   closed-end fund, did HCMFA understand that there
19   would be costs, fees, and expenses associated with
20   that decision?
21   A    Being cost fees as in the consent fee?
22   Q    Correct.
23   A    Yes.
24   Q    And did it undertake any analysis to

Page 107

Dustin Norris

1    determine what the likely total fee would be?
2    A    Yeah. I'm sure they did.
3    Q    Do you know what the total fee
4    paid – what the total consent fee paid was?
5    A    I don't have the exact amount, but it was
6    over $5 million.
7    Q    Okay. And over what period of time were
8    the consent fees paid?
9    A    I know they were paid in May and June, and
10   there may be a portion that were paid thereafter,
11   but at least May and June of 2019. There were
12   certain broker-dealers that reported later, and
13   when those were reported and verified, they were
14   paid out. I don't remember the final date of the
15   last distribution.
16   Q    Okay. And forgive me. It's not my
17   business. But were the consent fees paid to the
18   fund's shareholders?
19   A    They were paid to the shareholders.
20   That's correct.
21   Q    Okay.
22   A    That's consented. The shareholders had to
23   vote, and they had to be a shareholder on
24   conversion date.

Page 108

Dustin Norris

1    Q    Okay. And the decision to seek and obtain
2    consent, was that a voluntary decision by HCMFA?
3    A    To seek consent to move to a closed-end
4    fund?
5    Q    Yes. That's not something that any
6    regulator required, was it?
7    A    No.
8    Q    It's not something that any rule or
9    anybody mandated; correct?
10   A    Not that I believe.
11   Q    Okay. How did HCMFA fund the payment of
12   the total consent fee of over $5 million?
13   A    Yeah, from cash that it had on the balance
14   sheet.
15   Q    And where did it get the cash that was on
16   the balance sheet?
17   A    The cash came from the transaction that we
18   discussed earlier – and you showed the capital
19   coming in from Highland – which was compensation
20   for the NAV error.
21   Q    So it used the money that it received in
22   the transfers that we talked about to pay the
23   consent fee. Do I have that right? Or at least
24   some of it?

Page 109

Dustin Norris

1    A    Yes.
2    Q    And, in fact, it used approximately
3    $5 million of the moneys paid in May 2019 to pay
4    the consent fee of approximately $5 million; is
5    that fair?
6    A    At least $5 million.
7    Q    Okay. Do you know the exact number?
8    A    Of the consent fee?
9    Q    Withdrawn.
10        Do you have a better or more precise
11   estimate of the total consent fee other than
12   $5 million?
13   A    It was over $5 million. I don't remember
14   the exact amount, whether it was 5.6 or 5.2 –
15   Q    All right.
16   A    – because it was paid over time.
17   Q    Let's talk about the TerreStar valuation
18   issue for a few minutes, if we can.
19   A    Okay.
20   Q    Just generally, in 2018/2019, HCMFA spent
21   a fair amount of time addressing the consequences
22   of a valuation error concerning TerreStar. Do I
23   have that right?
24   A    There was a lot in there, but there was,

Page 110

```
1           Dustin Norris
2  during that time, a lot of discussions with
3  TerreStar over the concerns of a valuation error
4  in 2018 and '19.
5  Q     And did it ultimately turn out that there
6  was a valuation error involving TerreStar?
7  A     There was.
8  Q     Okay.  And had HCMFA retained Houlihan
9  Lokey in connection with doing the TerreStar
10 valuation?
11 A     Houlihan Lokey was involved in the
12 valuation, yes.
13 Q     And who retained Houlihan Lokey?
14 A     I don't know.
15 Q     As you sit right now, you can't tell
16 me who retained Houlihan Lokey?
17 A     I don't know if it was HCMLP or HCMFA
18 or -- I don't know.
19 Q     Okay.  Are you familiar with the firm
20 Houlihan Lokey?
21 A     I am.
22 Q     And do you know what services they
23 provided in connection with the TerreStar
24 valuation?
25 A     I do.
```

Page 111

```
1           Dustin Norris
2  Q     Can you describe for me the services that
3  were provided by Houlihan Lokey in connection with
4  the TerreStar --
5  A     And I would say I do generally.  I was not
6  involved in the individual details.  That was all
7  the HCMLP employees.
8       So all of the Highland employees that
9  were involved in the shared services agreement,
10 the valuation committee, valuation services were
11 the responsibility of HCMLP.  Key inputs were
12 provided by HCMLP.  Key estimates and
13 interpretations to Houlihan, and they used their
14 models to calculate a valuation that was then
15 approved by the valuation committee at HCMLP.
16      And so that's my general understanding
17 of the valuation process.
18 Q     Do you know how much Houlihan Lokey was
19 paid for its work?
20 A     I don't.
21 Q     Do you know if there's an engagement
22 letter pursuant to which Houlihan Lokey provided
23 these services?
24 A     I'm not aware.
25 Q     Would you dispute that HCMFA is the entity
```

Page 112

```
1           Dustin Norris
2  that retained Houlihan Lokey?
3  A     I don't know.
4  Q     Would you agree that Houlihan Lokey is
5  fairly described as an independent third-party
6  valuation consultant?
7  A     Yes, generally.
8  Q     Okay.  And do you know when Houlihan Lokey
9  was retained?
10 A     I don't.
11 Q     Houlihan Lokey's retention was approved by
12 the retail board, wasn't it?
13 A     I'm not sure.
14 Q     Have you ever seen any of the work product
15 of Houlihan Lokey in connection with the TerreStar
16 valuation?
17 A     Yeah.  I remember seeing the valuation
18 model.
19 Q     So Houlihan Lokey did prepare the
20 valuation model that is the subject of the
21 TerreStar valuation issue; is that fair?
22 A     Working very closely with the HCMLP
23 employees with the inputs, yes.
24 Q     Did HCMFA rely on the Houlihan Lokey
25 valuation model?
```

Page 113

```
1           Dustin Norris
2  A     I'm not sure.
3  Q     Does HCMFA contend that Houlihan Lokey
4  made any mistakes in connection with its valuation
5  services?
6  A     I'm not sure.
7  Q     Does HCMFA have a position as to whether
8  or not Houlihan Lokey made any mistakes in any of
9  the services that it performed in connection with
10 the TerreStar valuation?
11 A     I think they don't have details and would
12 retain their rights to understand what their role
13 and -- sorry.  What was the original question?
14 Q     Just whether HCMFA has a position as to
15 whether or not Houlihan Lokey made any mistakes in
16 the work that it did in connection with the
17 TerreStar valuation?
18 A     Yeah.  I think they're retaining their
19 rights to understand that better.
20 Q     Is there any agreement with Houlihan Lokey
21 that would give HCMFA the time to do that?  Is
22 there a tolling agreement or anything like that?
23 A     Not that I'm aware of.
24 Q     Is HCMFA undertaking any analysis to
25 determine whether or not Houlihan Lokey made any
```

Page 114

Dustin Norris

1  mistakes in connection with the work that it did
2  on the TerreStar valuation?
3  A    Sorry.  One more time.
4  Q    Is HCMFA undertaking any analysis or
5  investigation to try to determine whether Houlihan
6  Lokey made any mistakes?
7  A    There are -- I don't know.  I don't know.
8  Q    You have no knowledge, as you sit here
9  today, as to whether HCMFA is undertaking any
10 analysis or investigation to try to determine
11 whether Houlihan Lokey did anything wrong in
12 connection with its valuation services; correct?
13 A    And I wasn't prepared -- I don't think
14 this is one of the topics -- you know, Houlihan
15 Lokey's, you know, involvement, and so I wasn't
16 prepared to answer that one.
17 Q    Okay.  Well, the defense -- HCMFA's
18 defense is that Highland is responsible for the
19 TerreStar valuation issue; correct?
20 A    Yes.
21 Q    And there's no question that Houlihan
22 Lokey provided services in connection with that
23 valuation; correct?
24 A    Correct.

Page 115

Dustin Norris

1  Q    But HCMFA has not undertaken any analysis
2  or investigation, to the best of your knowledge,
3  to try to determine if Houlihan Lokey was the
4  responsible party; fair?
5  A    We don't know if there is a contract or
6  not.  At this point, we're talking about the
7  defense of Highland's responsibility.  There's no
8  question they were responsible for the valuations.
9  They were outsource provider of the valuation
10 committee.  Every individual working and
11 coordinating with Houlihan Lokey was an HCMFA
12 employee.  All the data and information that was
13 provided to them came from HCMLP.  There's no
14 question that Highland was responsible for the NAV
15 error.  No one ever questioned that.  That was
16 always known.  It was all the employees that were
17 involved.
18       MR. RUKAVINA:  John, I'll just
19 reiterate that we did not understand your
20 topics to include Houlihan Lokey.  If you
21 need more information about that or if we
22 need to have a supplemental deposition,
23 that's fine.  But this is just not
24 something that we reasonably anticipated

Page 116

Dustin Norris

1  you asking about.
2       MR. MORRIS:  I think it's -- I
3  think I have the answer that I need and
4  that the executive vice president and
5  30(b)(6) witness has no knowledge of any
6  investigation or analysis that has been
7  undertaken by HCMFA to try to even
8  determine whether Houlihan Lokey is at
9  fault.
10 BY MR. MORRIS:
11 Q    Do I have that right, Mr. Norris?
12       MR. RUKAVINA:  Well, I will just
13 object that that was not your prior
14 question.
15       MR. MORRIS:  All right.  Well,
16 that's my question now.
17 BY MR. MORRIS:
18 Q    Is that correct, Mr. Norris?
19 A    I know there's been discussion with
20 counsel.
21       MR. RUKAVINA:  Well, I will
22 represent to you that we have looked for a
23 Houlihan Lokey contract and have not been
24 able to find one.  Otherwise, we would

Page 117

Dustin Norris

1  have produced it to you.  So if you have
2  anything like that, we'd love to see it.
3  We do not even know whether we had a
4  contract with Houlihan Lokey or not.  So
5  we'll try to find you information, John.
6  We just -- we just don't have it.
7       MR. MORRIS:  We'll get to that in a
8  moment.
9  BY MR. MORRIS:
10 Q    Has HCMFA -- withdrawn.
11       Has HCMFA ever told Houlihan Lokey
12 that it believed it made any mistake or error of
13 any kind in connection with its work on the
14 TerreStar valuation?
15 A    Again, I -- this is not a topic that we
16 reviewed, so I don't know.
17 Q    Okay.  You're not aware of anything today;
18 correct?
19 A    Again, the employees working with Houlihan
20 Lokey were the HCMLP employees.  So I don't know
21 if the debtor employees have that conversation,
22 but --
23       MR. MORRIS:  Yeah, I'm going to
24 move to strike.

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Filed 08/24/... Page 67 of 200    PageID 24279
Appendix Part 4    Page 68 of 474    Page 67 of 200

Page 118

Dustin Norris

1
2  BY MR. MORRIS:
3  Q    And I'm asking about HCMFA.
4         Did -- has HCMFA ever informed
5  Houlihan Lokey that HCMFA believes that Houlihan
6  Lokey made a mistake or error in the work that it
7  did?
8  A    There were ongoing discussions extensively
9  throughout this with Houlihan Lokey and the debtor
10 employees regarding the error and what the causes
11 were. It was extensive discussions.
12        MR. MORRIS: Okay. Move to strike.
13 BY MR. MORRIS:
14 Q    Has HCMFA ever told Houlihan Lokey that
15 HCMFA believes that Houlihan Lokey made a mistake
16 or an error in connection with its valuation
17 services?
18 A    It may have, but I'm not aware.
19 Q    Thank you.
20        Are you familiar with the report that
21 HCMFA prepared and sent to the Global Allocation
22 Fund concerning the TerreStar valuation issues?
23 A    They sent to the fund?
24 Q    Uh-huh.
25 A    What do you mean "they sent to the fund"?

Page 119

Dustin Norris

1
2  Q    They sent to the board of the fund?
3  A    Oh, the board of the fund.
4         There were a number of memos and
5  presentations. If you have one you want to pull
6  up, you can -- we can refer to it.
7  Q    Sure.
8         MR. MORRIS: Let's put up what
9  we've marked as Exhibit 182.
10        (Exhibit 182 tendered.)
11 BY MR. MORRIS:
12 Q    And while we're doing that, have you ever
13 seen a single document anywhere at any time in
14 which any representative of HCMFA took Highland to
15 task for the work that it did in connection with
16 the TerreStar valuation?
17 A    "Took them to task"? Define "take them to
18 task."
19 Q    Told them that they were the source and
20 cause of the NAV error.
21 A    The irony of all of the reporting to the
22 board, all of the valuation knowledge was from
23 HCMLP's employees. We -- we outsourced that to
24 them. There was -- there was no question that
25 they were at fault, and that's -- every employee

Page 120

Dustin Norris

1
2  involved was an HCMLP employee.
3         MR. MORRIS: I move to strike.
4  BY MR. MORRIS:
5  Q    And I'm going to ask you, sir, to listen
6  carefully to my question.
7         Have you ever seen a document that
8  HCMFA sent to Highland in which HCMFA accused
9  Highland of being the cause of the NAV error?
10 A    I have not.
11 Q    Thank you.
12        Do you see the document that's on the
13 screen?
14 A    I do.
15 Q    Before I get to that, so the NAV error
16 occurred sometime prior to May 2019; correct?
17 A    Beginning -- I don't know the specific
18 dates. I believe it began in May of 2019 --
19 sorry. May 2019 --
20 Q    That's when it ended; right?
21 A    What's that?
22 Q    That's when it ended; right? That's --
23 A    Yeah, it was before May 2019.
24 Q    Okay. So during the entire time that the
25 TerreStar NAV error was being discussed and

Page 121

Dustin Norris

1
2  analyzed and debated and communications with the
3  SEC, during that entire period, Jim Dondero was in
4  control of both HCMFA and Highland; correct?
5  A    Yes, I believe so.
6  Q    Okay. Can you identify any employee of
7  Highland who was fired as a result of any of the
8  mistakes that were made in connection with the
9  TerreStar valuation?
10 A    No.
11 Q    Can you identify --
12 A    Not that I can remember.
13 Q    Can you identify any steps that
14 Mr. Dondero took against any employee who was
15 allegedly involved in the NAV error?
16 A    That would have been an HCMLP matter. I
17 don't have any knowledge of HCMLP's hiring or
18 firing practices.
19 Q    So at no time did anybody ever tell
20 you that any disciplinary measures were imposed
21 upon any Highland employee as a result of the NAV
22 error that Highland allegedly caused; correct?
23 A    Any firing practice? Is that what you
24 said?
25 Q    Disciplinary. Firing. Anything.

Page 122

Dustin Norris

1    A    There was a remediation process that had
2    to go into effect, which was improvement of
3    controls, and they maybe even hired additional
4    people. But it was – and I don't – I'm not
5    aware of any disciplinary, but there could have
6    been.
7    Q    Okay. But that would just be speculation
8    on your part; correct?
9    A    Yeah.
10    Q    So have you seen the document that's up on
11    the screen?
12    A    I have.
13    Q    Did you read it before it was sent?
14    A    I don't think so.
15    Q    Did anybody – did any officer or employee
16    take responsibility for making sure that –
17    withdrawn.
18        What is this document?
19    A    It is titled "Resolution of the Funds Net
20    Asset Value Error."
21    Q    And was – is it your understanding that
22    the purpose of this document was to enable HCMFA
23    to explain to the Global Allocation Fund how the
24    resolution of the NAV error was being conducted?

Page 123

Dustin Norris

1    A    Not to the Global Allocation Fund. This
2    is a memo to the board.
3    Q    Thank you for the clarification.
4        Subject to that clarification, is my
5    description otherwise correct?
6    A    I believe so. There had been a number of
7    communications with the board, and this is the
8    resolution of the whole process, or most of the
9    process.
10    Q    This was a pretty big issue for HCMFA,
11    wasn't it?
12    A    There was a lot of people involved. It
13    was – there was a lot of involvement from –
14    mostly Highland Capital Management, LP, employees,
15    but it was – there was a lot involved.
16    Q    And who – what outside counsel was
17    retained?
18    A    Adviser counsel is counsel – is – I
19    believe it was K&L Gates for HCMFA.
20    Q    And who was Highland's counsel?
21    A    I don't know.
22    Q    Do you know if Highland had counsel?
23    A    I don't know.
24    Q    Do you –

Page 124

Dustin Norris

1    A    I know they had counsel they referred to
2    for SEC matters, and I don't know if they utilized
3    them here or not. They were all Highland
4    employees that worked on this. So I'm sure you
5    probably have that in your records.
6    Q    Sir, can you identify any outside counsel
7    that was retained by Highland to advise it in
8    connection with the TerreStar valuation issues
9    that were the subject of an SEC investigation?
10    A    I have – I have no knowledge of that.
11    Q    Okay. Did you see this memo that's up on
12    the screen that's been marked as Exhibit 182 prior
13    to the time that it was sent?
14    A    I don't recall.
15    Q    The NAV error was the subject of an SEC
16    investigation; correct?
17    A    Correct.
18    Q    Do you know if HCMFA ever told the SEC
19    orally, in writing, or otherwise that Highland
20    Capital Management, LP, was the cause of the NAV
21    error?
22    A    Not that I'm aware of, but they were
23    concerned about the ultimate correction of the NAV
24    error. I don't think they were concerned about

Page 125

Dustin Norris

1    the responsible party.
2        But I would say every single person
3    that interacted with the SEC, I believe, were
4    HCMLP employees. We can see that on the other
5    memo that they have to the SEC following up on a
6    call; all HCMLP employees. So whether they told
7    them or not, they were all HCMLP employees.
8        MR. MORRIS: Okay. Move to strike
9    after the very first portion of the answer
10    that was responsive.
11    BY MR. MORRIS:
12    Q    Did anybody – did any officer or employee
13    of HCMFA ever inform the SEC that Highland Capital
14    Management, LP, was the responsible party for the
15    NAV error?
16    A    Specifically, not that I'm aware of.
17    Q    Okay. Was any HCMFA officer or employee
18    responsible for making sure that the memorandum up
19    on the screen that's been marked as 182 was true
20    and accurate before it was sent to the board of
21    the Highland Global Allocation Fund?
22    A    I don't know that there is a – there's a
23    specific requirement of an officer to verify the
24    accuracy.

Page 126

Dustin Norris

1
2   Q      Okay.  But my question was a little bit
3   broader, and that was whether there was any
4   officer or employee who was given the
5   responsibility of making sure this document was
6   true and accurate before it was sent to the board
7   of the GAF.
8   A      I don't even know who drafted this.  It
9   would have come from Highland's compliance legal
10  and accounting team with all the expertise around
11  the NAV error and all of those that were involved.
12  Q      So did you see this document at or around
13  the time it was sent to the GAF board?
14  A      I probably did.
15  Q      Do you recall telling anybody at that time
16  that you believed there were any errors in the
17  document?
18  A      I think, as I testified before, I
19  don't -- I don't remember reading.  But I
20  didn't -- I didn't say there were errors in the
21  document, no.
22  Q      Prior to the answer date of March 1st,
23  2021, did anybody acting on behalf of HCMFA ever
24  tell anybody in the world at any time that there
25  was any error in this memorandum?

Page 127

Dustin Norris

1
2   A      Not that I'm aware of.
3   Q      Did HCMFA send this memorandum --
4   withdrawn.
5          Did HCMFA intend this -- withdrawn.
6          Did HCMFA expect the GAF board to rely
7   on this memorandum?
8   A      I don't know what the intention was.
9   Q      You don't know what HCMFA's intention was
10  in sending this memorandum?
11  A      If it's addressed to the board, it could
12  be to educate.  But I'm sure that the board
13  would -- would rely on or expect that that memo
14  would be accurate.
15  Q      Okay.  And this is dated after all of the
16  payments have been made that we've been talking
17  about, the May 2nd and the May 3rd payments;
18  correct?
19  A      Correct.
20  Q      Take a look at the second paragraph.
21  A      Yup.
22  Q      Do you see the first sentence refers to
23  two initial determinations that were made by the
24  adviser and Houlihan Lokey?
25  A      Sorry.  Which part?  Just the first

Page 128

Dustin Norris

1
2   sentence of the second paragraph?
3   Q      Yeah.  First of all, do you see that the
4   second paragraph refers to the adviser and
5   Houlihan Lokey?
6   A      It does.
7   Q      And do you see that the reference to
8   Houlihan Lokey includes a reference to Houlihan
9   Lokey having been approved by the board?
10  A      Yes.
11  Q      And do you understand that that means the
12  board of GAF?
13  A      Yes.
14  Q      Does that refresh your recollection that
15  the GAF board approved of the retention of
16  Houlihan Lokey as an independent third-party
17  expert valuation consultant?
18  A      It doesn't refresh my recollection, but it
19  says it there.  I don't know that I have a
20  document saying they -- I haven't seen the
21  approval, the agreement.
22  Q      But you don't dispute that this memo was
23  sent to the GAF board on or about May 28th, 2019;
24  correct?
25  A      Correct.

Page 129

Dustin Norris

1
2   Q      Okay.  And HCMFA told the GAF board at
3   that time that HCMFA and Houlihan Lokey, quote,
4   "initially determined that the March transactions
5   were non-orderly and should be given zero
6   weighting for purposes of fair value."
7          Is that correct?
8   A      The HCMLP, as part of the valuation -- or
9   as the outsource valuation provider, were the
10  employees that made that determination.  The
11  adviser ultimately has the responsibility, but it
12  was outsourced.  And those were HCMLP employees,
13  along with Houlihan Lokey, that determined the
14  March transactions were non-orderly.
15          MR. MORRIS:  I'm going to move to
16  strike.
17  BY MR. MORRIS:
18  Q      And I'm going to ask you to listen
19  carefully to my question.
20          I'm asking you what HCMFA told the GAF
21  board.  Did HCMFA tell the GAF board on May 28th,
22  2019, that HCMFA and Houlihan Lokey, quote,
23  "initially determined that the March transactions
24  were non-orderly and should be given zero
25  weighting for purposes of determining fair value."

Page 130

1           Dustin Norris
2      Is that correct?
3   A      The -- in the memo, it says that on this
4   date, there were many other conversations probably
5   around this date and on this date discussing the
6   determinations and non-orderly and that it was the
7   HCMLP employees, and the board knew that.  They
8   were very aware that it was the -- the valuation
9   control environment of HCMLP that determined these
10  were non-orderly transactions.
11  Q      So this -- so this report is inaccurate,
12  according to you?
13  A      No.  There's -- there's just -- your
14  question was did they tell the board.  There is a
15  lot that we told the board outside of this memo.
16  This memo does say advised from Houlihan Lokey.
17  The adviser is ultimately responsible.  But there
18  was a lot of communication with the board --
19  Q      Okay.
20  A      -- around this, that they knew exactly who
21  was responsible for valuation as the board
22  determining that these were market transactions
23  and orderly or non-orderly.
24  Q      Okay.  I want to focus on this memo,
25  because this is the one that I have.  And you'll

Page 131

1           Dustin Norris
2   agree with me that there's no reference to
3   Highland Capital Management, LP, anywhere in this
4   report; correct?
5   A      No, there's not, but the board knew that
6   HCMLP was preparing the valuations.
7      MR. MORRIS:  All right.  I move to
8   strike after the word "no."
9   BY MR. MORRIS:
10  Q      And it was the determination concerning
11  whether or not it was orderly or non-orderly, and
12  whether or not to use zero weighting that were the
13  two causes of the NAV error; correct?
14  A      Those were key portions.
15  Q      In the last sentence, in fact, that's the
16  only portions; isn't that fair?
17  A      "Initially determined" -- well, it doesn't
18  say that there's not other factors.  They're the
19  only ones mentioned.
20  Q      Let me -- let me -- let me read the last
21  sentence.
22      Quote:  "The orderly determination and
23  adoption of the weighted fair value methodology
24  resulted in NAV errors in the fund," and that's
25  what it's defining as the NAV error.

Page 132

1           Dustin Norris
2      Have I read that correctly?
3   A      You did.
4   Q      And so would you agree with me, as HCMFA's
5   30(b)(6) witness, that on May 28th, 2019, HCMFA
6   told the GAF board that the two causes of the NAV
7   error were the orderly determination and the
8   adoption of the weighted fair value methodology --
9   fair value -- fair valuation methodology?
10  A      Those were -- it doesn't say those are
11  exclusively the only factors, but those are
12  mentioned here.
13  Q      It says those two factors resulted in the
14  NAV error; correct?
15  A      Those -- no, it didn't say "the NAV
16  error."  It said "in NAV errors."
17  Q      Which it's defining as the NAV error;
18  correct?
19  A      Defines as "the NAV error."
20  Q      Okay.  Does HCMFA contend that there's
21  anything in this paragraph that is inaccurate?
22  A      Again, I -- I don't know that Houlihan
23  Lokey was approved by the board, but I don't know
24  of any other contention.
25  Q      Okay.  And you don't -- and HCMFA doesn't

Page 133

1           Dustin Norris
2   dispute that Houlihan Lokey was approved by the
3   board.  You're just telling me that, as you sit
4   here today, that's the one fact that you've not
5   been able to confirm; is that fair?
6   A      As far as I know, yeah.
7   Q      Okay.  Let's go on to the next paragraph.
8      MR. MORRIS:  If we could just
9   scroll up a little bit.
10  BY MR. MORRIS:
11  Q      I'm going to try and summarize here, but
12  if you don't think it's a fair summary, of course
13  I would encourage you to let me know.
14      Is it fair to say that, as a general
15  matter, the next paragraph describes a total loss
16  from the NAV error as being approximately
17  $7.5 million?
18  A      Yeah, including processing costs and
19  rebates and offsets, yes.
20  Q      Right.  That's what the parenthetical
21  says, a total loss --
22  A      Yup.
23  Q      -- of approximately $7.5 million?
24  A      Correct.
25  Q      And the next paragraph states that that

Page 134

1    Dustin Norris
2  loss was funded with two payments.  Do I have that
3  correct in the first sentence?
4  A    Correct.
5  Q    Okay.  Did HCMFA pay approximately
6  $5.186 million on or around February 15, 2019, in
7  connection with the NAV error?
8  A    I believe so.
9       And if we go to the next page, it has
10  dates and payments.  I think it's represented
11  there.
12  Q    Okay.  Where did HCMFA get the money to
13  make that payment?
14  A    A combination of insurance proceeds and
15  cash that it had.  And, again, that's detailed, I
16  believe, on the next page.
17  Q    HCMFA contends that the $7.4 million
18  transferred by Highland to HCMFA was mistakenly
19  recorded as a loan; correct?
20  A    There's – there's two different amounts
21  that we contend were recorded as a note, a
22  combined 7.4 million, yes.
23  Q    Okay.  And HCMFA contends that the
24  $7.4 million in payments was not to be a loan, but
25  was supposed to be compensation for Highland's

Page 135

1    Dustin Norris
2  negligent valuation services in connection with
3  the NAV error; correct?
4  A    Sorry.  One more time.
5  Q    HCMFA contends that the $7.4 million in
6  payments was supposed to be compensation resulting
7  from Highland's negligent valuation services;
8  correct?
9  A    Yes, subject to all of our defenses that
10  we've laid out in our pleadings.
11  Q    Okay.  When did HCMFA reach the conclusion
12  that Highland was the cause of the NAV error?
13  A    The – there was never – I don't think
14  there was ever a question.  It was always known
15  that HCMLP employees were the ones creating the
16  valuation, overseeing the valuation, working with
17  the value – you know, everything that was done
18  was outsourced to HCMLP.
19       And so it was discussed with the
20  board.  It was discussed in-depth internally.  The
21  employees were all HCMLP employees.  So I can't
22  pinpoint a date, but there – was a known
23  factor that HCMLP was responsible.
24       MR. MORRIS:  Okay.  I move to
25  strike.

Page 136

1    Dustin Norris
2  BY MR. MORRIS:
3  Q    The only thing I'm asking you for is a
4  date.  And if you don't know, the answer is "I
5  don't know."  So let me try one more time.
6       Do you know when HCMFA first
7  determined that Highland was negligent?
8  A    I don't know the first date.
9  Q    Do you know if it was in 2018 or 2019?
10  A    I don't know.
11  Q    Do you know when the NAV error first –
12  was first identified?
13  A    I believe the NAV error was determined in
14  early 2019.
15  Q    Was it before or after – I mean, the –
16  the NAV error must have been identified before
17  February 15, 2019; correct?
18  A    Correct.
19  Q    Okay.
20  A    Well, I should say whether there – I
21  don't know.  I don't remember – we'll have to
22  look through the documents – what the actual –
23  you know, you're saying before February 15th.  Yes,
24  that's when the paid insurance proceeds came in.
25  So yes.

Page 137

1    Dustin Norris
2  Q    No question – no question that HCMFA knew
3  before February 15, 2019, that there was a NAV
4  error; correct?
5  A    Correct.
6  Q    No question that HCMFA knew before
7  February 15, 2019, that the NAV error was caused
8  by Highland; correct?
9  A    Yeah.  Like I said, it was always known
10  that these were Highland employees that were
11  outsourced through the valuation, and they were
12  the ones at fault.
13  Q    Okay.  Do you know if – if HCMFA ever
14  demanded compensation from Highland for any errors
15  or mistakes it may have made in connection with
16  the TerreStar valuation?
17  A    Yeah.  Mr. Dondero told Frank to make the
18  payments to compensate for the NAV error.
19  Q    And did he do that in his capacity as the
20  person in control of HCMFA, or did he do that in
21  his capacity as the person in control of Highland?
22  A    I would imagine it would have been both.
23  Further supported, he transferred money – of his
24  own money to HCMLP to then pay HCMFA.  And so
25  he – yes, he was on both sides of it, but he had

Page 138

Dustin Norris

1    the authority on both sides to make that decision.
2    Q    Okay.  And so Mr. Dondero reached an
3    agreement with himself pursuant to which HCMFA
4    demanded and Highland agreed to pay the
5    $7.4 million as a consequence of Highland's
6    negligent conduct in the performance of its
7    valuation services.  Do I have that right?
8    A    Sounds like there's a legal determination
9    there that needs to be made.  I --
10   Q    It's a factual one, I promise.
11   A    Entering -- whether entering into an
12   agreement or not, I -- that seems like a legal
13   determination.  But maybe ask the question again.
14   Q    Did somebody on behalf of Highland agree
15   to pay HCMFA $7.4 million in order to compensate
16   HCMFA for Highland's negligent services in
17   connection with the TerreStar valuation?
18   A    Yes.  Mr. Dondero.
19   Q    Thank you.
20        Is there any document anywhere that
21   you have ever seen that reflects Highland's
22   agreement to pay $7.4 million as compensation to
23   HCMFA?
24   A    I haven't seen a settlement agreement or

Page 139

Dustin Norris

1    an agreement to that effect, no.
2    Q    You haven't seen anything; correct?
3    A    No.
4    Q    Have you looked?
5    A    We have.  I actually wouldn't be
6    surprised -- I would be surprised to see one.  And
7    it's -- my understanding is -- and the company's
8    position is that there doesn't need to be an
9    agreement.  Right?  We --
10   Q    I'm not asking -- I'm going to interrupt
11   you again.  I'm not asking you --
12        MR. RUKAVINA:  Well, John --
13        MR. MORRIS:  -- anything like that.
14   I need him to answer my questions or we're
15   going to be here all night.
16        MR. RUKAVINA:  John, hold on.
17   BY MR. MORRIS:
18   Q    Have you ever -- have you ever seen
19   anything --
20        MR. RUKAVINA:  John, hold on.  Hold
21   on.
22        MR. MORRIS:  No, no.  Davor,
23   please -- please --
24        MR. RUKAVINA:  John, it is not our

Page 140

Dustin Norris

1    position -- it is not -- it is our
2    position that there is no settlement
3    agreement.
4        MR. MORRIS:  Thank you very much.
5    BY MR. MORRIS:
6    Q    Is it your position that there is any
7    document of any kind that reflects Highland's
8    agreement to pay $7.4 million as compensation?
9    A    No.  Subject to our defenses, but there's
10   none.
11   Q    Did Mr. Dondero tell Mr. Waterhouse that
12   the money that he was asking to be transferred
13   from Highland to HCMFA be transferred as
14   compensation for the NAV error?
15   A    Our position is that this was compensation
16   for the NAV error, and that was discussed.
17   Mr. Dondero told Frank.  And I believe Frank even
18   testified to that, and Mr. Dondero testified to
19   that in their depositions.
20   Q    Okay.  Now, you said that the February
21   payment of over $5 million was funded through
22   insurance proceeds and cash.
23        Do I have that right?
24   A    Yes.

Page 141

Dustin Norris

1    Q    And the cash portion was really just the
2    deductible?
3    A    If you want to go to Page 2, we can look
4    at the details.
5    Q    Sure.  Sure.
6    A    I don't have it all by memory.
7    Q    That's fair.
8        MR. MORRIS:  Let's go to the next
9    page.
10   BY MR. MORRIS:
11   Q    Looking at this, do the third and fourth
12   lines refresh your recollection --
13   A    Yes.
14   Q    -- that the February payment was funded
15   through insurance proceeds and an insurance
16   deductible paid by the adviser?
17   A    Yes, I believe that's correct.
18   Q    Okay.  And Topic Number 8 on the 30(b)(6)
19   notice relates to the insurance claim; right?
20   A    Uh-huh.
21   Q    Okay.  Did you do anything to familiarize
22   yourself with the insurance claim?
23   A    I did.
24   Q    And what did you do to familiarize

Page 142

1           Dustin Norris
2   yourself with the insurance claim?
3   A    I discussed with DC and Davor the
4   company's position on the insurance claim.
5   Q    Okay. I don't want to know what the
6   company's position is. I want to know what the
7   facts are.
8           Did you learn any facts in connection
9   with your diligence and your preparation to answer
10  topic – questions on Topic Number 8?
11  A    Yeah. The HCMFA policy was – was – the
12  HCMFA – HCMFA had an insurance policy with ICI
13  Mutual; and based on the NAV error, the policy
14  was – I don't know what the word is – was used
15  to seek reimbursement for the NAV error.
16  Q    Okay. So –
17       (Reporter discussion off the record.)
18  BY MR. MORRIS:
19  Q    So did HCMFA file a claim for insurance
20  coverage with ICI Mutual in connection with the
21  NAV error?
22  A    The HCMLP employees, I believe, through
23  Frank Waterhouse and his team, did that. They –
24  they managed the insurance as part of the shared
25  services agreement, and they filed with the

Page 143

1           Dustin Norris
2   insurance company –
3   Q    And – and the filing –
4   A    – on behalf of HCMFA.
5   Q    And the filing that was made, was that a
6   claim that was made on behalf of HCMFA?
7   A    I believe so, yes.
8   Q    And did HCMFA authorize the filing of that
9   claim?
10  A    Our position is that that – that is a
11  valid claim from HCMFA.
12  Q    All right. Did HCMFA authorize the filing
13  of the insurance claim?
14  A    I – I don't know.
15  Q    Did – has HCMFA ever told anybody at any
16  time that the insurance claim was not authorized
17  by HCMFA?
18  A    No.
19  Q    And HCMFA received almost $5 million on
20  account of the claim; right?
21  A    Correct.
22  Q    And HCMFA wanted to recover on its
23  insurance claim; correct?
24  A    Yes.
25  Q    Did the claim – was the claim made in

Page 144

1           Dustin Norris
2   writing?
3   A    I believe so.
4   Q    Have you seen the claim?
5   A    I don't – I don't recall seeing the
6   claim.
7   Q    In connection with the defense of this
8   lawsuit and the preparation, have you made any
9   efforts to identify the actual claim that was
10  filed on behalf of HCMFA?
11       MR. RUKAVINA: Let me interject –
12       let – let me interject. And we can talk
13       about this offline. We searched for that
14       and could not find it. We suspect it
15       might be in HCMLP's legal documents that
16       we don't have access to, but we have and
17       we continue to actively search for the
18       claim itself. We have not been able to
19       find it.
20  BY MR. MORRIS:
21  Q    Does HCMFA use an insurance broker?
22  A    I don't believe so for this. I think it's
23  directly with ICI Mutual. And it – we – there's
24  no broker, but it goes through HCMLP's employees.
25  Frank Waterhouse would have been the one probably

Page 145

1           Dustin Norris
2   interacting with ICI Mutual.
3   Q    HCMFA and HCMLP broke up at the end of
4   February; is that fair?
5   A    That's correct.
6   Q    At any time since the end of February, has
7   HCMFA made any effort to obtain any information
8   concerning this insurance claim from ICI Mutual?
9   A    I don't know where we got the source of –
10  of the documents, but there – there was – they
11  were searching for the ICI documents. I don't
12  know if it came from ICI or another source.
13  Q    Anybody –
14  A    I don't –
15  Q    Anybody from HCMFA reach out to ICI Mutual
16  for information relating to this insurance claim
17  at any time?
18  A    I don't – not that I'm aware of.
19  Q    Okay.
20  A    They may have, but I don't know.
21  Q    Do you know when the claim was filed?
22  A    I don't. I – I don't. I – I think it
23  may have been late 2018, but I'm not sure.
24  Q    And at the time HCMFA filed the claim for
25  insurance, it had already formed the opinion that

Page 146

1          Dustin Norris
2   Highland Capital Management, LP, was the
3   responsible party; correct?
4   A     I believe so, yes.
5   Q      Did HCMFA tell the insurance company that
6   Highland Capital Management was the responsible
7   party?
8   A     I'm not sure. Again, this was Highland
9   employees that filled out the materials and was
10  working with ICI. So I don't know if your
11  employees notified them.
12  Q      So the total estimated loss was
13  approximately $7.5 million; right? That's the top
14  number on the right?
15  A     Yes.
16  Q      Okay. And roughly two-thirds of that was
17  financed through insurance proceeds that were
18  received in February of 2019; correct?
19  A     Correct.
20  Q      And thereafter, it's HCMFA's contention
21  that Highland paid it another $7.4 million for
22  purposes of providing compensation in connection
23  with its negligent work on the – on the TerreStar
24  valuation error; correct?
25  A     Yes, that's correct. And that lines up,

Page 147

2   7.4 million, with the net – net loss that's shown
3   there, estimated loss.
4   Q      Right. So it's fair to say, then, from –
5   that it's HCMFA's position that it received
6   $7.4 million from Highland as compensation, and
7   approximately $5 million from the insurance
8   carrier as compensation for total receipts of
9   $12.4 million in connection with the NAV star –
10  with the TerreStar valuation error?
11  A     Correct.
12  Q      Okay. Why would H- – why does HCMFA
13  contend that its entitled to $12.4 million from
14  Highland and the insurance company when the total
15  loss was only $7.4 million?
16  A     Yeah, it's – it's our position that the
17  collateral – and I'm not an attorney. But
18  understanding our position here, that under Texas
19  law, the collateral source rule would permit you
20  to recover value from the insurance company and to
21  the individual or the – the company that created
22  the – or caused you harm.
23  Q      So you're – would you agree that HCMFA
24  has profited by about $5 million as a result of
25  the NAV error under that theory?

Page 148

1          Dustin Norris
2   A     I – I don't know that – how the theory
3   relates to profits, but we've – we've paid – and
4   say, "What's the logic for this?" We paid in
5   insurance premiums for years, significant
6   insurance premiums. And so there's been a loss
7   for years and years for the insurance, and then
8   we're now hitting that insurance to say there's a
9   gain of $5 million, whatever number you threw out.
10  I would disagree with that.
11         But, yes, there was proceeds of
12  12-and-a-half million, but we've been paying in
13  insurance proceeds or premiums for a long time.
14  We're going to continue, and likely, I would
15  imagine, those premiums will go up because of the
16  claim.
17         So I – I'm, again, not a lawyer. I
18  don't understand all the reasons why it's
19  permitted. But our position is that the
20  collateral source rule under Texas law permits you
21  to receive from the insurance – your insurance
22  provider and from the party that did you harm.
23  And as you said, here we believe it's negligence.
24  It may be breach of contract, but we believe it's
25  negligence.

Page 149

1          Dustin Norris
2   Q      Okay. I just want to make this really
3   clean.
4         The estimated net loss from the NAV
5   error is $7.442 million; correct?
6   A     The estimated loss from the NAV error,
7   yes.
8   Q      Okay. And notwithstanding that HCMFA
9   believed that Highland was the responsible party,
10  HCMFA, nevertheless, filed a claim for insurance
11  coverage with ICI Mutual; correct?
12  A     That's correct.
13  Q      And ICI Mutual paid almost $5 million in
14  connection with that claim; correct?
15  A     Correct.
16  Q      And in addition to that almost $5 million,
17  it's HCMFA's position that it received and was
18  entitled to receive an additional $7.4 million
19  from Highland as compensation for its error;
20  correct?
21  A     Correct.
22  Q      So that notwithstanding the fact that the
23  estimated net loss was $7.44 million, HCMFA
24  received and contends that it's entitled to keep
25  $12.4 million; correct?

Page 150

```
1              Dustin Norris
2   A    That's correct, subject to our defenses.
3   Q    Okay.  Did -- has -- has HCMFA ever
4   informed ICI Mutual that it received $7.4 million
5   from Highland on account of the NAV error?
6   A    Not that I'm aware of.
7   Q    Has HCMFA ever told ICI Mutual that
8   Highland was at fault?
9   A    Again, I think I already answered that.  I
10  don't know.  Communication with ICI was done by
11  the HCMLP employees as part of the shared services
12  agreement, and I'm not sure if they communicated
13  that.
14          MR. MORRIS:  Okay.  I move to
15  strike.
16  BY MR. MORRIS:
17  Q    I just -- I'm just asking for your
18  knowledge, not speculation.
19          Do you have any knowledge that anyone
20  on behalf of HCMFA ever informed ICI Mutual that
21  Highland was the cause of the NAV error?
22  A    I have no knowledge.
23          MR. MORRIS:  Let's take a short
24  break.  The time now is 3:06 -- or 2:06.
25  Let's just come back at 3:20.
```

Page 151

```
1              Dustin Norris
2          (Recess from 2:07 p.m. to 2:21 p.m. CST)
3   BY MR. MORRIS:
4   Q    So we were talking a bit about the
5   insurance payment that was received in February
6   of 2019.  Do you remember that?
7   A    Yes.
8   Q    And there was a claim that was filed on
9   behalf of HCMFA that resulted in that insurance
10  proceed payment; correct?
11  A    Correct.
12  Q    And do you recall if that insurance claim
13  was filed in 2018 or 2019?
14  A    I don't recall, but I believe it was late
15  2018.  But I don't know.
16  Q    Yeah.
17  A    And as we testified, we don't have that
18  claim.  We've searched for it.  It's probably on
19  your server, as I -- Frank Waterhouse and his team
20  would have submitted that.
21  Q    Yeah.  But you haven't made any effort to
22  get it from the carrier; right?
23  A    No, not that I know of.
24  Q    Okay.  And would you agree with me that
25  it's probably extremely unlikely that an insurance
```

Page 152

```
1              Dustin Norris
2   carrier would have processed a claim of that
3   magnitude in six weeks?
4   A    Yes.
5   specialize in -- sorry.  I'll step back.
6          I have no knowledge of how quick
7   carriers make these claims --
8   Q    All right.  Do you know --
9   A    Other than hail on my house -- hail damage
10  on my roof, I don't have personal knowledge of
11  insurance claims.
12          MR. MORRIS:  You know, I apologize,
13  but can I ask Ms. Canty to put back up on
14  the screen that last exhibit that we had?
15  I don't have the exhibit number.
16          All right.  And go to the prior
17  page.  And go to the bottom of that page.
18  BY MR. MORRIS:
19  Q    So we've put back up on the screen, I
20  think --
21          MS. CANTY:  182.
22          MR. MORRIS:  182.
23  BY MR. MORRIS:
24  Q    All right.  And do you see in the next to
25  the last paragraph, Mr. Norris, there's a
```

Page 153

```
1              Dustin Norris
2   reference to a period from March 18, 2018, to
3   January 19, 2019?
4   A    Yes.
5   Q    That's what they've defined as the NAV
6   restatement period.  Do you see that?
7   A    Yes, I do.
8   Q    Okay.  Looking at that period, does that
9   refresh your recollection at all as to when in
10  2018 HCMFA first learned about the NAV error?
11  A    No, because that was -- that was the
12  period of time when the market -- the off-market
13  or on-market transactions happened, March 18th.
14  Q    Okay.
15  A    It was sometime in between that they found
16  out that there was an error.
17  Q    Okay.  And do you know if it was the first
18  half of 2018 or the second half?
19  A    The midyear audits of some of our funds, I
20  believe, is when it first came up.
21  Q    And --
22  A    So 6/30 audits that were due 60 days
23  later.  So second half -- I believe second half of
24  2018.
25  Q    So is it fair to say sometime in August or
```

Page 154

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | September is when HCMFA first learned about it? |
| 3 | A    About -- define "it."  Is that the NAV |
| 4 | error. |
| 5 | Q    I apologize.  Let me ask the question |
| 6 | again. |
| 7 | Is it fair to say, based on the timing |
| 8 | of the audit, 60 days after June 30th would take |
| 9 | us to approximately August 31st; right? |
| 10 | A    It does. |
| 11 | Q    And so is it fair to say, then, that HCMFA |
| 12 | first learned about the NAV error sometime in |
| 13 | August of 2018 while it was preparing the |
| 14 | financials for the period ending June 30th? |
| 15 | A    No.  I don't think there was a |
| 16 | determination of whether there was a NAV error or |
| 17 | not at that point.  I think the reason they have |
| 18 | going all the way to January 19 -- 2019 is it |
| 19 | wasn't determined -- finalized if there is an |
| 20 | error or not. |
| 21 | There was a lot of discussion with the |
| 22 | SEC and auditors over whether there was or wasn't |
| 23 | an error, what the amount was, what the proper |
| 24 | valuation should be.  There was consultation with |
| 25 | the SEC, and that process lasted, I believe, |

Page 155

| | |
|---|---|
| 1 | several weeks, if not months. |
| 2 | So that is not when they found out |
| 3 | about a NAV error, but the questions over |
| 4 | valuation, yes. |
| 5 | Q    Okay.  So then let me state the question |
| 6 | differently then. |
| 7 | Is it fair to say that HCMFA first |
| 8 | learned in or about August 2018 of the valuation |
| 9 | issues? |
| 10 | A    The "about" is key here.  I don't know the |
| 11 | specific date, but around that time or earlier -- |
| 12 | Q    Okay. |
| 13 | A    -- or later.  On or around that time. |
| 14 | Q    And did HCMFA conclude, at the same time |
| 15 | it learned of the valuation issues, that HCMFA was |
| 16 | the responsible party?  Or was there a gap between |
| 17 | learning about the valuation issues and making the |
| 18 | determination that Highland was the responsible |
| 19 | party? |
| 20 | A    Yeah, first you said HCMFA was the |
| 21 | responsible party, and then you said Highland. |
| 22 | Q    I apologize.  Let me try and restate that. |
| 23 | Did HCMFA conclude that Highland was |
| 24 | the responsible party at or around the same time |
| 25 | |

Page 156

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | that it learned of the valuation issues, or was |
| 3 | there a period during which it knew about the |
| 4 | valuation issues, but not -- had not yet formed |
| 5 | the conclusion that Highland was the responsible |
| 6 | party? |
| 7 | A    From the beginning, everybody knew who the |
| 8 | responsible party was for the valuation.  Those |
| 9 | reporting the issues, those responding to |
| 10 | auditors, those responding to SEC and the board |
| 11 | were all HCMLP employees from the beginning.  But |
| 12 | I don't have a specific date. |
| 13 | Again, as you look here, it doesn't |
| 14 | say when the NAV error was determined, but from |
| 15 | the beginning, it was the knowledge that HCMLP was |
| 16 | responsible for the valuations. |
| 17 | Q    Okay.  Do you know when HCMFA first |
| 18 | determined that the estimated loss was |
| 19 | approximately $7.4 million? |
| 20 | A    I don't, no.  I don't have specifics, but |
| 21 | it was after there was a determination there was |
| 22 | actually a NAV error.  And it may be in some of |
| 23 | the documents that you have.  I believe it may be |
| 24 | in, you know, a memo to the board or the SEC, but |
| 25 | I don't know offhand. |

Page 157

| | |
|---|---|
| 1 | Dustin Norris |
| 2 | Q    Do you know when there was a determination |
| 3 | that there was a NAV error? |
| 4 | A    I don't know the specific time, no. |
| 5 | Q    Do you know if it was in 2019 or 2018? |
| 6 | A    I don't remember. |
| 7 | Q    Is it fair to say that it was before |
| 8 | May of 2019? |
| 9 | A    That there was a determination there was a |
| 10 | NAV error?  Yes. |
| 11 | Q    And is it fair to say that HCMFA had |
| 12 | concluded that the loss of that NAV error was |
| 13 | going to be more than a million dollars prior to |
| 14 | May 2019? |
| 15 | A    More than a million?  Probably -- yes. |
| 16 | Q    Okay.  Is there a reason that HCMFA waited |
| 17 | until May to have Highland pay it for the |
| 18 | compensation? |
| 19 | A    I think that the whole process -- as you |
| 20 | see, the resolution memo is in May to the board. |
| 21 | That was the conclusion of the overall process. |
| 22 | So our stance would be that that was when it was |
| 23 | the right time and everything was -- the right |
| 24 | time to be sent. |
| 25 | MR. MORRIS:  Okay.  Can we put up |

Page 158

```
1              Dustin Norris
2    on the screen a document that's been
3    marked as, I think, as Exhibit 13?  I
4    don't know if you're able to get that,
5    La Asia.
6         MS. CANTY:  Yup, I got it.
7         MR. MORRIS:  Thank you.
8         (Exhibit 13 tendered.)
9    BY MR. MORRIS:
10   Q    Are you aware, sir, that there came a
11   point in time when HCMFA amended its answer?
12   A    Yes.
13   Q    And I think topic –
14   A    Topic 2 is our amended answer.
15   Q    Okay.  So that's the document that's in
16   front of you?
17   A    Yes.
18   Q    And you've seen that before; correct?
19   A    Yes.
20   Q    Okay.
21        MR. MORRIS:  Can we turn to Page 5
22   of 9, please?
23        And if we can scroll to the bottom.
24   BY MR. MORRIS:
25   Q    These are HCMFA's affirmative defenses; is
```

Page 159

```
1              Dustin Norris
2    that right?
3    A    On the second amended answer, yes.
4    Q    Yes.
5    A    I'm sorry.  The first amended answer, yes.
6    Q    And as of today, is it your understanding
7    that this is HCMFA's operative pleading?
8    A    No.
9    Q    Has it been amended after this time?
10   A    Yeah, we –
11        MR. RUKAVINA:  Well, he doesn't
12   know what "operative pleading" means.
13        THE WITNESS:  Oh.
14        MR. RUKAVINA:  Yes, it is our
15   operative pleading, Dustin.
16        THE WITNESS:  It is our operative
17   pleading then.
18   BY MR. MORRIS:
19   Q    And I didn't mean to trick you.  I
20   apologize.  I just meant to say that this has not
21   been amended as of today; correct?
22   A    We filed a – wait.  Let me see what it's
23   called.
24   Q    You filed a motion for permission to amend
25   it further –
```

Page 160

```
1              Dustin Norris
2    A    Yes.
3    Q    – but that motion hasn't been granted;
4    right?
5    A    To my understanding, no.
6    Q    Okay.  And you understand that your – the
7    answer that's up on the screen can't be amended
8    unless the Court grants the motion; right?
9    A    I – if you tell me that that's the
10   process, I'll take that for what it's worth.  I'm
11   not an attorney.  I don't know the process.
12   Q    Okay.  So let's just look at this
13   document.
14        Is it fair to say that Paragraph 38
15   through 45 deals with –
16   A    I'm going to grab the –
17   Q    Yeah.
18   A    – thing here so I can see it on my desk,
19   too.
20   Q    Sure.
21   A    Okay.
22        38?
23   Q    Right.
24   A    Okay.
25   Q    Now – actually, a little background.
```

Page 161

```
1              Dustin Norris
2         This amended complaint was prepared
3    after DC Sauter conducted an investigation
4    concerning the circumstances surrounding the two
5    notes that Highland was suing on; right?
6    A    Yes.  My understanding is it is after
7    he – so background, when he – we filed our
8    initial response, we didn't have access to the
9    HCMLP employees during that time period.  They
10   were not permitted to talk to us about things like
11   this.  And so he did the best he could to prepare
12   a response.  But once they were mostly all fired
13   by HCMLP and formed their own company called
14   Skyview, he was able to talk to them on
15   particulars.  As you note in his – his statement,
16   he was able to talk to Frank Waterhouse, where he
17   wasn't before, on this topic.
18   Q    Right.  So by the time this document has
19   been prepared, HCMFA had copies of the notes that
20   Highland was suing on for six months; right?
21   Because the lawsuit was commenced in January, and
22   the notes were attached as exhibits to the
23   complaint; right?
24   A    Yes.  This is July 6th this is filed.
25   Q    Right.  Okay.  So this is filed almost six
```

Page 162

Dustin Norris

1    months after the complaint is filed; right?
2    A    More like a five-month -- five months and
3    a week, but yeah.
4    Q    All right.  I won't quarrel with you.
5    A    Or five and a half -- five and a half
6    months, yeah.
7    Q    Okay.
8    A    Whether you consider that --
9    Q    Okay.
10    A    -- six full months or not.
11    Q    So --
12    A    We know the dates January 22nd and
13    July 6th.
14    Q    Okay.  So for that entire time period of
15    time, there's no dispute that HCMFA had in its
16    possession copies of the notes that Highland was
17    suing on; correct?
18    A    I'm looking at the original -- you said
19    they were attached, but I --
20    Q    Yeah.
21    A    If you want to show me the original notes
22    on the original filing.
23    Q    Well, I asked you to look at the original
24    complaint.  I think -- was the original complaint

Page 163

Dustin Norris

1    Topic Number 1?  No.  It's just the answer.
2        In looking at the answer, did you look
3    at the original complaint?
4    A    Yes.
5    Q    Do you recall seeing that the notes were
6    attached to the original complaint?
7    A    I looked at thousands of pages in
8    preparation, so I just -- I could take your word
9    for it if you say it's in there, or if you want to
10    show it to me, we can look at it.
11        MR. RUKAVINA:  They are, Dustin.
12    They are.
13        MR. MORRIS:  Yeah.  I think you'll
14    have to take my word for it.  Thank you,
15    Davor, for confirming my word.
16    BY MR. MORRIS:
17    Q    So let me just try this again to make it
18    clean.
19        Based on my representation, that
20    Mr. Rukavina has agreed with, that the notes that
21    Highland are suing on were attached to its
22    complaint in January, you would agree with me that
23    HCMFA had the notes in its possession from at
24    least the time the complaint was filed until the

Page 164

Dustin Norris

1    time HCMFA filed this amended answer on July 6th;
2    correct?
3    A    Yes.
4    Q    And this amended answer was filed because
5    HCMFA had a -- had previously made a motion to the
6    Court for leave to amend its answer; correct?
7        MR. RUKAVINA:  That's correct,
8    Dustin.
9        He wouldn't know about that, but
10    that's all correct.
11    BY MR. MORRIS:
12    Q    Okay.  Well, you're familiar with the
13    Sauter declaration; right?
14    A    I am.
15    Q    And the Sauter declaration purports to
16    describe an investigation that Mr. Sauter
17    undertook to determine the circumstances
18    surrounding the notes; is that fair?
19    A    I don't know if I'd characterize it
20    investigation, but he was tasked with -- and I've
21    got it right here.  I would refer you to the
22    agreement on -- or his -- to his declaration on --
23    Q    How would you -- how would you
24    characterize the work that he did?  An

Page 165

Dustin Norris

1    investigation?  An analysis?  What word do
2    you -- would you use?  Due diligence?  How would
3    you characterize the work that Mr. Sauter did
4    that's set forth in his declaration?
5    A    I -- I'm looking here.  I want to see how
6    he characterizes it.
7        I think he does a very good job of
8    explaining.
9        My investigation would be of the
10    following.  So he calls it an investigation.
11    Q    Okay.  So HCMFA would agree that after
12    Mr. Waterhouse left the employ of Highland, that
13    DC Sauter conducted an investigation into the
14    circumstances surrounding the notes that Highland
15    was suing on; correct?
16    A    Correct.
17    Q    And as part of that investigation, he
18    spoke with Mr. Waterhouse; correct?
19    A    Yes.
20    Q    And as part of that investigation, he
21    spoke with Mr. Dondero; correct?
22    A    I believe so, but let me -- let me confirm
23    in his statement.
24        Because I believe in -- yeah.

Page 166

```
1                Dustin Norris
2   Q    Is that correct, that he spoke with
3   Mr. Dondero in connection with his investigation?
4   A    I'm -- I'm seeing what he rep'ed to in his
5   statement.
6   Q    And does his statement say that? I don't
7   have it in front of me.
8   A    I don't know. That's what I'm looking at.
9   Q    And you don't know, independently of the
10  document, whether Mr. Sauter spoke with
11  Mr. Dondero as part of his investigation?
12  A    I know he did. I know he talked
13  throughout from when we received the original
14  complaint on. I just -- you're asking about the
15  time frame between filing the original filing.
16  And I think he may have spoken with him before
17  that, too, but I -- I just want to take a...
18       So at the time -- this is on
19  March 1st, filed the defendant's original answer.
20  At that -- at the time the debtor filed a
21  complaint, I promptly undertook an internal review
22  of the background facts concerning the notes. I
23  had no knowledge of them since I had not been
24  employed by HCMFA. And a few employees of HCMLP
25  had no knowledge of notes. I also discussed the
```

Page 167

```
1   notes of James Dondero, formerly the CEO of the
2   debtor, Mr. Dondero.
3        So this is March 1st when that first
4   filing was made. So he did speak with Mr. Dondero
5   prior, and then I believe the source of the
6   additional information was being able to speak
7   with Frank Waterhouse and Will Mabry.
8   Q    Okay. And is it fair to say that the
9   amended complaint is based on Mr. Sauter's
10  investigation?
11  A    Yes, I believe so.
12  Q    Yeah.
13  A    Yes.
14  Q    That's why HCMFA amended its complaint.
15  It's because Mr. Sauter had undertaken this
16  investigation, and he learned what he believed
17  were relevant facts, and those facts are described
18  in his declaration, and they formed the basis of
19  the affirmative defenses that we're looking at now
20  in the amended answer; fair?
21  A    Let me pull up the amended answer just
22  to --
23  Q    It's up on the screen, but if you have a
24  hard copy, that's fine.
```

Page 168

```
1                Dustin Norris
2   A    Yeah. I have a hard copy here, although I
3   may have mixed my documents.
4        Yeah, it was based on additional facts
5   that weren't available at the time of the original
6   response.
7   Q    Okay. And is it fair to say that
8   Paragraphs 38 through 45 relate to the affirmative
9   defense that Highland was responsible for the NAV
10  error, and the $7.4 million payment was intended
11  to be compensation for Highland's negligent work?
12  A    Sorry. Can you ask that one more time?
13  There was a couple parts there.
14  Q    No problem.
15       Is it fair to say that
16  Paragraphs 35 -- withdrawn.
17       Is it fair to say that Paragraphs 38
18  to 45 relate to HCMFA's affirmative defense that
19  the $7.4 million that was transferred from
20  Highland to HCMFA in May 2019 was intended to be
21  compensation for Highland's negligent work in
22  connection with the NAV error and not in the form
23  of a loan?
24  A    You said 38 to 42?
25  Q    38 to 45.
```

Page 169

```
1                Dustin Norris
2   A    38 to 45.
3        Yeah, it -- the NAV error items are
4   included in there as one of our defenses.
5   Q    Right.
6   A    43 and 44 and 45 discuss additional
7   defenses related to the note and who may or may
8   not have signed the note and who had authority to
9   sign the note.
10  Q    Okay.
11       MR. MORRIS: Can you -- can we turn
12  to Paragraph 42?
13       THE WITNESS: Yes.
14  BY MR. MORRIS:
15  Q    Do you see the first four -- first few
16  words in Paragraph 42 are, quote: "The defendant
17  accepted responsibility for the NAV error"?
18  A    Yes.
19  Q    Okay. "Defendant" there refers to
20  Highland Capital Management, LP; correct?
21  A    No. I believe --
22  Q    Oh, I apologize. I apologize.
23  A    Thank you.
24  Q    It's HCMFA; right?
25  A    HCMFA.
```

Page 170

Dustin Norris

1
2  Q     Okay.  And is -- did -- did HCMFA accept
3  responsibility for the NAV error?
4  A     They did.  They -- they are the adviser,
5  and there's already -- in the next sentence, HCMLP
6  then accepted that they had a contract with and
7  accepted responsibility.
8  Q     Okay.  And so when did the plaintiff
9  accept responsibility for having caused the NAV
10 error?
11 A     Again, going back to -- this was always
12 known and communicated that it was HCMLP
13 employees.  It was the valuation services they
14 were performing.  The legal and compliance team
15 was all outsourced in the shared services
16 agreement.
17          And that was -- again, there's not a
18 singular determination; but Jim Dondero, as
19 president, I would say effectuated that with the
20 payment of the NAV -- for the NAV error.
21 Q     So you can't tell me when the plaintiff
22 accepted responsibility for having caused the NAV
23 error; correct?
24 A     Not a specific date.
25 Q     Okay.  And it's HCMFA's position that Jim

Page 171

Dustin Norris

1
2  Dondero, in his capacity as the president of
3  Highland Capital Management, LP, accepted
4  responsibility on behalf of Highland Capital
5  Management, LP, for having caused the NAV error?
6  A     He, and in addition all of the employees
7  involved.  Right?  The valuation team members,
8  Frank Waterhouse was CFO, Dave Klos overseeing the
9  valuation process, they were all Highland
10 employees, and Jim Dondero as well as president
11 recognized that based on all the communications
12 and conversations they would have had.
13          MR. MORRIS:  Okay.  I'm going to --
14          I'm going to move to strike.
15 BY MR. MORRIS:
16 Q     And I'm going to ask you to listen
17 carefully to my question.
18          Who had the authority to accept, on
19 behalf of plaintiff, the responsibility for having
20 caused the NAV error?
21 A     Ultimately Jim Dondero, as president here,
22 had that authority.
23 Q     Okay.  And then it says, quote:  "The
24 plaintiff ultimately, whether through insurance or
25 its own funds, compensated the defendant."

Page 172

Dustin Norris

1
2          Do you see that?
3  A     Yes.
4  Q     Is that statement accurate?
5          MR. RUKAVINA:  I'll object to
6      vagueness, given the different points in
7      time.
8  BY MR. MORRIS:
9  Q     Does HCMFA believe that that statement is
10 accurate today?
11 A     We know now.  It's come out in discovery
12 that -- and it was represented that Mr. Dondero
13 transferred money to Highland who transferred it
14 to HCMFA.  And I don't know -- and it says "or,"
15 "or its own funds."  So it's accurate whether
16 through insurance or its own funds.
17          But at the time of this writing, we
18 didn't have all the details and have firmed up
19 those details, and I would refer you to
20 depositions and the pleadings and our additional
21 statement regarding cash and movement.
22 Q     Did Highland file an insurance claim, to
23 the best of your knowledge?
24 A     Not that I know of.
25 Q     Did you ever ask anybody, in preparation

Page 173

Dustin Norris

1
2  for today's deposition, about that sentence in
3  Paragraph 42 and whether or not Highland had ever
4  filed an insurance claim?
5  A     I didn't ask about that sentence, but we
6  did discuss whether Highland had filed an
7  insurance claim.  And to our knowledge, we don't
8  know that they have.  And I, again, ask you as their
9  attorney.  That would be a question for you.
10 Q     Well, with all due respect, you have
11 complete and unfettered access to the former
12 president and CFO of Highland; correct?
13 A     I do, but -- I'm sorry.  You said
14 president and CEO?
15 Q     The former president and CFO.
16 A     President and -- I don't have unfettered
17 access to the former CFO.
18          MR. RUKAVINA:  I'll -- I'll object
19      to that.  We have been prohibited by
20      Waterhouse's attorney from discussing the
21      matter with him.
22 BY MR. MORRIS:
23 Q     You're -- you're not allowed -- did -- did
24 you -- did HCMFA ask Mr. Waterhouse at any time
25 whether Highland had filed an insurance claim?

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-9    Filed 01/09/24    Page 81 of 200    PageID 24293
Appendix Part 4    Page 82 of 474    Page 81 of 200

Page 174

1        Dustin Norris
2   A    Not -- that I know of.  However, we've
3   been not permitted to talk to him related to this,
4   based on his attorney.  So --
5   Q    Well, when did --
6   A    We never really discussed -- go ahead.
7   Q    I'm sorry.
8   A    Go ahead.  You were --
9   Q    I was just going to ask:  When did that
10  prohibition go into effect?
11       MR. RUKAVINA:  John, the witness
12  wouldn't know that.  It's about three
13  months ago that the lady from Baker
14  McKenzie, Deb -- I don't know her last
15  name -- got angry at me because I tried to
16  talk to Frank and she said, "Absolutely
17  not.  You're forbidden, and you're
18  violating your ethical rules if you do."
19       MR. MORRIS:  So sometime in
20  September?
21       MR. RUKAVINA:  I would say August
22  or September.
23       MR. MORRIS:  Okay.
24  BY MR. MORRIS:
25  Q    But sometime -- but you had -- HCMFA had

Page 175

1        Dustin Norris
2   complete, unfettered access to Mr. Waterhouse from
3   the time he left Highland in early March 2021
4   until at least the end of July 2021; right?
5   A    Yeah.  And I would add a point to
6   Mr. Sauter's declaration and our pleadings and the
7   depositions for the various details of what we've
8   discovered since.  However, the unfettered access
9   was also inhibited -- or -- or Mr. Sauter
10  represented this.  There was a lot going on in
11  March, April, May of 2021.
12  Q    Yeah.
13  A    And we were trying to lift out an entire
14  business and keep everything afloat, and -- as
15  you're very aware.  And so there was a lot going
16  on.
17  Q    Right.  Right.
18       Do you see -- can we go to
19  Paragraph 43, please?
20  A    Yes.
21       MR. MORRIS:  If we could just
22  scroll down to Paragraph 43, please.
23  Thank you.
24  BY MR. MORRIS:
25  Q    Now, again, this amended complaint is

Page 176

1        Dustin Norris
2   filed is July 2006; correct?
3   A    July 6th, not July 2006.
4   Q    I apologize.  Let me ask the question
5   again.
6        This amended answer was filed on
7   July 6th, 2021; correct?
8   A    Correct.
9   Q    And it was filed after Mr. Sauter
10  conducted his investigation to determine the
11  circumstances surrounding the note; correct?
12  A    Uh-huh, correct.
13  Q    And it was filed after HCMFA had had
14  its possession since January copies of the notes
15  that Highland was suing on; correct?
16  A    Correct.
17  Q    And it was filed at a time before any
18  limitation or prohibition was placed on HCMFA's
19  ability to communicate with Mr. Waterhouse since
20  the time he had left Highland; correct?
21  A    Sorry.  You want to repeat the first part
22  of that?
23  Q    Sure.
24       It was filed at a time after
25  Mr. Waterhouse left the employ of Highland but

Page 177

1        Dustin Norris
2   before there was any limitation or restriction
3   imposed on HCMFA's ability to communicate with
4   Mr. Waterhouse?
5   A    Yes.  Once he left in March of 2021 is
6   when that happened.  And, again, in March, we
7   were, on both sides, the creation of Skyview, as
8   well as our employees, trying as -- doing
9   everything we could do to transition the
10  businesses and services.  And so that was an
11  important time.
12       MR. MORRIS:  Okay.  Move to strike.
13  BY MR. MORRIS:
14  Q    I just want to confirm that HCMFA had
15  unfettered access to Mr. Waterhouse between the
16  time he left Highland and the time this amended
17  answer was filed in July.
18  A    We had access to him to ask him what we
19  needed.  Unfettered in the sense of, "Hey, we can
20  access you whenever we need," no, because there
21  was a lot involved in launching and -- launching
22  of Skyview and creating all the services needed
23  for our funds since we -- HCMLP is sharing
24  services provided --
25  Q    Does Mr. Sauter have a role with HCMFA?

Page 178

Dustin Norris

1    
2    A    I don't believe so.
3    Q    Do you know who authorized him to conduct
4    this investigation?
5    A    Yeah.  It would have been management,
6    Mr. Dondero, and probably our outside counsel.  At
7    the time, we had been utilizing Highland's
8    services as legal services, all the way up until
9    the end of February.
10        There were legal and compliance
11    services that were part of the shared services
12    agreement.  There was an entire legal team, entire
13    team of litigators who were unable to work on
14    this.
15        Mr. Sauter was a real estate attorney
16    for us, and he picked up the slack and was
17    assigned by Mr. Dondero to help in these causes
18    working with outside counsel, because HCMLP was
19    not providing or no longer able to provide those
20    legal services based on their – their view, even
21    though they were contracted to do those.
22    Q    That contract ended at the end of
23    February; isn't that right?
24    A    That's correct.
25    Q    And with the exception of a couple of

Page 179

Dustin Norris

1    
2    people, Highland's legal team migrated to Skyview
3    in early 2021; is that fair?
4    A    Yes.
5    Q    Okay.  And among the people who migrated
6    were Stephanie Vitiello; correct?
7    A    Yes.
8    Q    And Isaac Leventon; correct?
9    A    Correct.
10    Q    And he's the chief litigation guy at
11    Highland prior to the bankruptcy; right?
12    A    I – I don't know if that was Isaac or if
13    it was Scott Ellington.  I don't know.
14    Q    And Scott – Scott Ellington also
15    migrated; right?
16    A    Correct.
17    Q    So you had access to those folks for the
18    first six months of 2021; right?
19    A    No.  I would – our position is that those
20    individuals were unable to work on – even though
21    they had left, they were unable to work on
22    something of this nature.
23        I – I believe there was also a
24    preliminary injunction still in place where Jim or
25    his employees could not talk to Scott or Isaac.  I

Page 180

Dustin Norris

1    
2    don't remember all the specific details, but the
3    legal team at Highland – or at Skyview was not
4    working on this.
5    Q    Okay.
6    A    It was probably professional – I don't
7    know the standards, but they were unable to work
8    on – on this.
9    Q    All right.  But you would agree that at
10    the time HCMFA asked the court for permission to
11    amend its answer, it did so based on Mr. Sauter's
12    investigation; correct?
13    A    Yes, and I would caveat that subject to
14    our – our pleadings.
15    Q    Right.  And I think I moved to strike your
16    earlier answer, so let me try and ask the question
17    again.
18        Did Mr. Dondero authorize Mr. Sauter
19    to conduct the investigation?
20    A    I don't have specific knowledge of that.
21    Q    All right.  I think you used the phrase
22    "management."  Did management authorize Mr. Sauter
23    to conduct this investigation on behalf of HCMFA?
24    A    I don't know specifically who – who would
25    have asked him to do the – Jim and – Jim Dondero

Page 181

Dustin Norris

1    
2    asked him to help with the – the legal items, and
3    stepped in and help in the absence of HCMLP's
4    help.
5    Q    Okay.  And based on that investigation
6    looking at Paragraph 43, HCMFA took the position,
7    quote:  "Waterhouse signed the two promissory
8    notes the subject of the complaint," close quote;
9    correct?
10    A    That's right.  It's our position that
11    at – and I'd refer you to our amended pleading
12    with additional information, but it's – it's our
13    position that Mr. Waterhouse saw the notes, was
14    confronted, discussed with DC and said, "Look,
15    that's my signature.  I signed them."
16    Q    Okay.  So that's – and it was on the
17    basis of Mr. Waterhouse's conversation with
18    Mr. Sauter that HCMFA wrote that sentence; is that
19    fair?
20    A    I believe so.  And I would refer you to
21    Mr. Sauter's declaration as well, which goes into
22    details on that.
23    Q    And Mr. Sauter specifically said that
24    Mr. Waterhouse signed the notes; correct?
25    A    We can look at Mr. Sauter's declaration.

Page 182

Dustin Norris

1  I – I believe he said he was – Mr. Waterhouse
2  told him he signed, but –
3
4  Q    Right. And, in fact, HCMFA's position
5  throughout this entire case was that
6  Mr. Waterhouse signed the notes, but he did so by
7  mistake and without authority; correct?
8  A    That's right. And if you look at the
9  depositions, he testified of that, that he didn't
10  remember signing them, and he didn't have a
11  recollection, and Mr. Dondero never told him to
12  sign it, and he never asked him whether – or
13  he – Mr. Dondero told him never – told him
14  shouldn't be – didn't – Mr. Dondero didn't tell
15  him it was a note, and he never asked if it should
16  be a note.
17       With this – this amended pleading,
18  the thought was he mistakenly thought it was a
19  note, because that was the practice for other
20  notes or other – other transfers of this
21  nature – not of this nature, but other transfers
22  between companies, and so he had papered it up as
23  a note.
24       But if you look at the depositions,
25  you'll see that additional details came out that

Page 183

Dustin Norris

1
2  he told his controller, Mr. Klos, to transfer the
3  funds, and Mr. Klos then turned around and asked
4  Kristin to paper it up as a note, and to transfer
5  the cash. And Ms. Hendrix – Kristin Hendrix then
6  added Mr. Waterhouse's JPEG signature to the Word
7  document, which then was filed away.
8       So we – we, through the process of
9  depositions and discovery, were able to find more
10  information that Frank Waterhouse did not
11  remember. He didn't remember signing but said his
12  signature on there, so he must have signed it.
13       MR. MORRIS:  All right. I move to
14    strike. My question is really, really
15    simple.
16  BY MR. MORRIS:
17  Q    Up until the time that you filed the
18  motion last night, HCMFA's publicly stated
19  position has always been that Frank Waterhouse
20  signed the notes, and that he did so by mistake
21  and without authority; correct?
22  A    Correct. It says it here:
23  "Mr. Waterhouse made a mistake in preparing and
24  signing the notes for the defendant."
25  Q    Okay. Good enough.

Page 184

Dustin Norris

1
2  A    And then it says: "Upon information" –
3  Q    That's –
4  A    – "and belief, Waterhouse was not aware
5  that the payment from the plaintiff to defendant
6  were to compensate the defendant for the NAV
7  error."
8  Q    I'm sorry. Where are you reading from?
9  Oh, that's 44?
10  A    That's in number 44.
11  Q    Okay.
12  A    Yeah. "Waterhouse made a mistake in
13  preparing and signing the notes for the
14  defendant."
15  Q    Right. Okay.
16  A    But, again, I'll refer you to the
17  depositions and the evidence –
18       MR. MORRIS:  Move to strike. It's
19    not responsive to my question.
20  BY MR. MORRIS:
21  Q    Do you see in Paragraph 47 there's a
22  reference to "lack of consideration"?
23  A    Yes.
24  Q    Okay. What does that mean?
25  A    My understanding is that there was no

Page 185

Dustin Norris

1
2  consideration. We – there were notes, but there
3  was no payment for those notes. The payment was
4  for compensation related to the NAV error, so
5  there was no payment – no compensation for
6  notes that had been drafted.
7  Q    Okay. And the next defense there in
8  Paragraph 47 is "mutual mistake."
9       Do you see that?
10  A    Correct.
11  Q    Do you have any facts that support that,
12  that the mistake was mutual?
13  A    Yeah. I – I would look to the
14  depositions. And if you go to the testimony of
15  Frank and Jim Dondero and David Klos and Kristin,
16  it was a clear path and a clear record of mutual
17  mistake.
18       Jim told Frank to transfer the money
19  for the NAV error. Frank then goes, tells
20  Mr. Klos, the controller, to go and transfer the
21  money, who tells Kristin to transfer the money –
22  or to make the transfer and to paper it up.
23  Kristin then papers it up, following the process
24  that she's always followed or she said she's
25  followed for many other notes.

Page 186

| | Dustin Norris |
|---|---|
| 1 | |
| 2 | She lacked the authority to do so. |
| 3 | Mr. Klos lacked the authority.  Mr. Waterhouse was |
| 4 | never told to make a note, and so the note itself |
| 5 | is drafted by an accountant without authority to |
| 6 | do so with a maker and a counterparty that is on |
| 7 | both sides of this, representing supposedly both |
| 8 | sides. |
| 9 | And our position is that the maker of |
| 10 | this -- even if you look at the document, Frank |
| 11 | Waterhouse signs as maker, not as his position. |
| 12 | He's signing as the maker. |
| 13 | And so there's various aspects of this |
| 14 | that had errors on both sides, the -- the position |
| 15 | of HCMFA where they thought they had authority and |
| 16 | the position of HCMLP. |
| 17 | Q    Anything else, sir? |
| 18 | A    I -- I would refer you to the -- again, |
| 19 | the depositions and our pleadings.  But there's -- |
| 20 | there's a host of support there. |
| 21 | Q    Other than the deposition transcripts and |
| 22 | the -- and HCMFA's pleadings, are you aware of any |
| 23 | document anywhere in the world that corroborates |
| 24 | the defense of mutual mistake? |
| 25 | A    Other than the documents, the pleadings, |

Page 187

| | Dustin Norris |
|---|---|
| 1 | and any schedules and other forms that are filed |
| 2 | with the court, there's -- there's plenty there. |
| 3 | Q    Okay.  What schedules are you referring |
| 4 | to? |
| 5 | A    I would say all of your supporting |
| 6 | schedules, all of your documentation, the notes |
| 7 | themselves, the -- the Word documents that we |
| 8 | received as well in discovery that have the |
| 9 | metadata showing that Kristin Hendrix applied |
| 10 | Frank Waterhouse's JPEG signature. |
| 11 | Q    Okay. |
| 12 | A    All of those items as well as, again, |
| 13 | depositions all -- of all those individuals. |
| 14 | Q    So -- so I just want to make sure that I |
| 15 | have this clear. |
| 16 | So you've got the JPEG documents. |
| 17 | You've got the deposition transcripts.  You know |
| 18 | what?  Let me restate the question. |
| 19 | You've identified the JPEG documents. |
| 20 | Other than the JPEG documents, are you aware of |
| 21 | any document in the world that was created before |
| 22 | the answer date that supports or corroborates the |
| 23 | defense of mutual mistake? |
| 24 | A    I'm -- again, I -- I'd point to the -- |
| 25 | |

Page 188

| | Dustin Norris |
|---|---|
| 1 | let -- let me take a look here again. |
| 2 | Q    What is it you're looking at? |
| 3 | A    This is the amended complaint. |
| 4 | Q    Okay. |
| 5 | A    Which paragraph was that again? |
| 6 | Q    It's 47. |
| 7 | A    47. |
| 8 | Q    Yeah.  There's -- it's a -- there's -- |
| 9 | A    Mutual mistake. |
| 10 | Q    -- one of the defenses there.  It's up on |
| 11 | the screen. |
| 12 | A    Yeah. |
| 13 | Q    There's "mutual mistake," and I just want |
| 14 | you to identify for me every document that HCMFA |
| 15 | is aware of that was created before the answer |
| 16 | date of March 1st, 2001 [sic], other than the JPEG |
| 17 | documents -- |
| 18 | A    I would -- I would refer you to -- |
| 19 | Q    -- that support or corroborate -- that |
| 20 | support or corroborate the defense of mutual |
| 21 | mistake? |
| 22 | A    Yeah.  And I'd also point you to DC |
| 23 | Sauter's declaration. |
| 24 | Q    Okay.  That wasn't created before the |

Page 189

| | Dustin Norris |
|---|---|
| 1 | answer date; correct? |
| 2 | A    Well, you're saying -- you -- it was |
| 3 | before the answer date. |
| 4 | Q    Pardon me? |
| 5 | A    The answer date being when we did the |
| 6 | amended answer? |
| 7 | Q    No.  Let me ask the question again. |
| 8 | A    Yes, please.  Sorry. |
| 9 | Q    Can you identify any document in the |
| 10 | world, other than the JPEG documents, that support |
| 11 | or corroborate the defense of mutual mistake that |
| 12 | was created before March 1st, 2021? |
| 13 | A    I got you. |
| 14 | The JPEG documents is the Word |
| 15 | documents with the metadata. |
| 16 | Q    Correct. |
| 17 | A    There were emails that went between the |
| 18 | accounting team on how to paper it up.  That is in |
| 19 | your -- your documentation as well, and I would |
| 20 | say any other document that's in the court |
| 21 | filings. |
| 22 | Q    Can you identify them?  That's kind of -- |
| 23 | that's not really helpful to me. |
| 24 | A    Yeah.  I -- there's the -- there's an |

Page 190

1         Dustin Norris
2  email – and this was used in depositions.
3  There's an email that went – was David Klos
4  instructing the group – or instructing Kristin to
5  send the cash and to record a note.
6  Q    And you believe that – and it's HCMFA's
7  contention that that document supports their
8  position of mutual mistake.  Do I have that right?
9  A    Again, I'm not an attorney, so tying the
10 definition as little M, little M, I'm going to
11 have to say I don't know.
12 Q    Okay.  Other than the emails, the two
13 emails that you referenced and the JPEG documents,
14 can you identify any other document created before
15 May 1st – March 1st, 2021, that supports or
16 corroborates the defense of mutual mistake?
17 A    There may be a document.  I – I don't
18 know.
19 Q    Okay.
20 A    And, again, as you've seen, there's a lot
21 of stuff that's come out in discovery, and it's
22 important that testimony of – of those witnesses
23 is taken into account.
24        MR. MORRIS:  Okay.  Move to strike
25     the last portion of that answer.

Page 191

1         Dustin Norris
2        Let's take a short break.  I may be
3  done.  It's 4:09.  Can we just come back
4  in six minutes?
5        THE WITNESS:  Yes.  Thank you.
6        MR. RUKAVINA:  Sure.
7        MR. MORRIS:  Thank you.
8        (Recess from 3:09 p.m. to 3:19 p.m. CST)
9  BY MR. MORRIS:
10 Q    Just a couple more questions, Mr. Norris.
11       If you can take a look again at
12 Paragraph 47 of the amended answer.
13 A    Yes.
14 Q    Do you see there's also a reference to,
15 quote, "the lack of authority from the defendant
16 to Waterhouse," close quote?
17 A    Yes.
18 Q    HCMFA does not dispute that Mr. Waterhouse
19 was an officer of HCMFA in May of 2019, does it?
20 A    No, we don't dispute that.
21 Q    And HCMFA doesn't dispute that
22 Mr. Waterhouse, in fact, served as the treasurer
23 of HCMFA in May 2019; correct?
24 A    We don't, no.
25 Q    Okay.  Is the sole basis for the assertion

Page 192

1         Dustin Norris
2  that Mr. Waterhouse lacked authority was that
3  Mr. Dondero did not specifically approve it?
4  A    By nature, just the size of this note and
5  the nature of it would have required Mr. Dondero's
6  authority.  And both Mr. Waterhouse and
7  Mr. Dondero testified to that in their deposition.
8  So I'd refer you to that.  They both testified he
9  did not have the authority.
10       MR. MORRIS:  I'm not sure that he
11    did, so I'm going to move to strike.  The
12    testimony will be what the testimony will
13    be, not your characterization of it.
14 BY MR. MORRIS:
15 Q    But what about the size of the notes
16 causes HCMFA to contend that Mr. Waterhouse didn't
17 have authority?
18 A    A seven and a half million dollar note is
19 large enough to rise that Jim Dondero would have,
20 in any instance, authorized or needed to authorize
21 this, and he did not.
22 Q    And is that because a $7.4 million note is
23 a substantial obligation for HCMFA?
24 A    You know, substantial – define
25 "substantial."  It's sizeable.  Right?  It's seven

Page 193

1         Dustin Norris
2  and a half million dollars.  Overall from the
3  operating business, it was meaningful.  But seven
4  and a half million dollars in any entity would
5  have required Jim Dondero's approval.
6  Q    And so can you explain to me why, if it
7  would have required his approval, nobody at HCMFA
8  noticed that it was carried on HCMFA's books and
9  records as a liability since May of 2019?
10 A    Yeah.  I think it's a simple mistake.
11 There were other notes of a similar nature in
12 size.  And as Mr. Dondero testified, he wasn't
13 reviewing these regularly, the balance sheet.
14 Frank Waterhouse was.  The accounting team was.
15 And so the HCMFA side, there was other notes of
16 similar size and nature.  It didn't occur to them
17 that there was new notes.  The accounting team, as
18 we've – which is our position, created the notes,
19 added the signature of Mr. Waterhouse, and then
20 they continued to record those as liabilities on
21 the balance sheet.  And –
22 Q    Is –
23 A    – that was – you had – and, again, I'd
24 refer you to our pleadings and our amended
25 pleadings and the recent pleading yesterday that

Page 194

Dustin Norris

1
2  we discovered in the discovery process.  But
3  Kristin Hendrix and Dave Klos and Frank Waterhouse
4  made it very clear what the process -- and I would
5  say why -- in answer to your question, it was
6  probably a little sloppy.  It may have cut
7  corners.  They should have received Mr. Dondero's
8  authorization, and they didn't.  And so
9  that's -- that's our position.
10  Q    Does --
11  A    And I would say these are all
12  professionals.  These are good people.  I don't
13  think they were dishonest.  I think they made a
14  mistake.  Professionals make mistakes, but this
15  was a costly mistake.
16  Q    Did -- does -- does HCMFA contest that
17  Frank Waterhouse knew, on May 2nd and May 3rd,
18  2019, that the corporate accounting group was
19  going to paper these transactions as loans?
20  A    Again, I would refer you to the actual
21  depositions and pleadings -- and our pleadings.
22  But our position is -- sorry.  One more time, do
23  you want to ask the question?
24  Q    Yeah.  I think you need to -- I want to
25  try to finish up, and I really appreciate your

Page 195

Dustin Norris

1
2  patience.
3       MR. RUKAVINA:  And I'll just say,
4  John, that was a bit of a confusing
5  question.
6       MR. MORRIS:  Okay.  And that's
7  fair.  Let me try again.
8  BY MR. MORRIS:
9  Q    Does HCMFA contest that Frank Waterhouse
10  knew, on May 2nd and May 3rd, 2019, that the
11  corporate accounting group was going to paper the
12  transfers from Highland as loans?
13  A    Did we contest that he knew that?
14  Q    Correct.
15  A    I think his testimony speaks -- I'll refer
16  you to his testimony.  I think he testified that
17  he didn't know, right?  He didn't know that
18  they -- yes, he was copied on an email, but he
19  didn't have any recollection that they were
20  papered up as a loan.
21  Q    Okay.  And on the basis of that testimony,
22  does HCMFA now contend that Mr. Waterhouse didn't
23  know, in May of 2019, that these transfers were
24  papered as loans?
25  A    I would say that's part of it.  I would,

Page 196

Dustin Norris

1
2  again, refer you to all the pleadings, our
3  pleadings and depositions that -- of these
4  individuals.  There's -- there's a lot of support
5  there.
6  Q    Right.
7       Have you seen the emails from May 2nd
8  and May 3rd?
9  A    I can't remember if they were included in
10  your exhibits, but I know they were discussed in
11  detail in the depositions from Dave Klos and
12  Kristin and Frank.
13  Q    Right.  Okay.
14       MR. MORRIS:  I have no further
15  questions.  This is not particularly
16  helpful.  Thanks.
17       MR. RUKAVINA:  Okay.  I'll reserve
18  questions.  Thank you.
19       MR. MORRIS:  Okay.  Thanks a lot.
20       MR. RUKAVINA:  Thank you.
21       (Off the record at 3:25 p.m. CST)
22
23
24
25

Page 197

1       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2            DALLAS DIVISION
3  In re:              )Chapter 11
                        )
4  HIGHLAND CAPITAL MANAGEMENT, LP, )
                        )Case No.
5       Debtor.         )19-34054-SGJ-11
   _____)
6  HIGHLAND CAPITAL MANAGEMENT, LP, )
                        )
7       Plaintiff,      )
                        )
8  vs.                  )Advisory Proceeding No.
                        )21-03004
9  NEXPOINT ADVISORS, LP; JAMES    )
   DONDERO; NANCY DONDERO; and THE )
10 DUGABOY INVESTMENT TRUST,       )
                        )
11      Defendants.     )
12
        REPORTER'S CERTIFICATION
13      REMOTE DEPOSITION OF
           DUSTIN NORRIS
14        December 1, 2021
15      I, Rebecca A. Graziano, Certified Shorthand
16  Reporter in and for the State of Texas, hereby
17  certify to the following:
18      That the witness, DUSTIN NORRIS, was duly
19  sworn and that the transcript of the oral
20  deposition is a true record of the testimony given
21  by the witness;
22      I further certify that pursuant to FRCP Rule
23  30(f)(1) that the signature of the deponent --
24  ____ was requested by the deponent or a
25  party before the completion of the deposition and

Page 198

1  returned within 30 days from date of receipt of
2  the transcript.  If returned, the attached Changes
3  and Signature Page contains any changes and the
4  reasons therefor.
5       _____ was not requested by the deponent or a
6  party before the completion of the deposition.
7       I further certify that I am neither attorney
8  nor counsel for, related to, nor employed by any
9  of the parties to the action in which this
10  testimony was taken.
11      Further, I am not a relative or employee of
12  any attorney of record in this cause, nor do I
13  have a financial interest in the action.
14      Subscribed and sworn to on this 1st day of
15  December, 2021.
16
17
18
19
20      _____
         Rebecca A. Graziano, CSR, RMR, CRR
21       Texas CSR 9306
         Expiration:  07/31/22
22       California CSR 14407
         Expiration:  09/30/22
23       Illinois CSR 084.004659
         Expiration: 05/31/23
24
25

Page 199

1            ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads    Should Read  Reason
6  ___ ___ _____  _____  _____
7  ___ ___ _____  _____  _____
8  ___ ___ _____  _____  _____
9  ___ ___ _____  _____  _____
10 ___ ___ _____  _____  _____
11 ___ ___ _____  _____  _____
12 ___ ___ _____  _____  _____
13 ___ ___ _____  _____  _____
14 ___ ___ _____  _____  _____
15 ___ ___ _____  _____  _____
16 ___ ___ _____  _____  _____
17 ___ ___ _____  _____  _____
18 ___ ___ _____  _____  _____
19 ___ ___ _____  _____  _____
20
21       _____
22           Signature of Deponent
   SUBSCRIBED AND SWORN BEFORE ME
23 THIS _____ DAY OF _____, 2021.
24 _____
25 (Notary Public)  MY COMMISSION EXPIRES:_____

Index: $12,286,000..7.4

**$**

**$12,286,000** 78:16
95:19 96:7

**$12.286** 79:7 82:11,
15 83:14

**$12.4** 147:9,13
149:25

**$2.4** 50:18 51:18

**$5** 50:21 51:21 107:7
108:13 109:4,5,7,13,
14 140:22 143:19
147:7,24 148:9
149:13,16

**$5.186** 134:6

**$7.4** 48:21 63:24
82:16 134:17,24
135:5 138:6,16,23
140:9 146:21 147:6,
15 149:18 150:4
156:19 168:10,19
192:22

**$7.44** 149:23

**$7.442** 149:5

**$7.5** 82:12 133:17,23
146:13

---

**1**

**1** 26:11 29:6,8 38:17,
21 163:2

**10** 11:7 52:16,21 57:6
63:2

**100** 26:14 80:19

**10:00** 8:15

**10:01** 5:2

**11** 57:6 65:21

**11:05** 56:18

**11:15** 56:15

**11:16** 56:18

**11th** 24:20

**12** 27:19,21 36:14,18
82:13

**12-and-a-half**
148:12

**12/31** 87:5

**12/31/2018** 55:5

**12:05** 56:14

**12:11** 103:2

**12:15** 56:14 102:15

**13** 23:10,11,12 158:3,
8

**14** 11:7

**147** 51:2,3

**15** 134:6 136:17
137:3,7

**15(c)** 67:17,18 68:21
69:16 71:6 72:4 76:6,
19 77:4 87:2 88:7
92:12 99:5,8 101:11

**15th** 136:23

**17** 48:12

**18** 153:2

**182** 119:9,10 124:13
125:20 152:21,22

**185** 7:12,17,19

**18th** 25:3 153:13

**19** 32:6 110:4 153:3
154:18

**1940** 67:18

**1:06** 103:2

**1st** 20:17 23:14,20
24:4 25:21 26:2,5
29:20 30:3,7,9,16,19
31:5,9 33:5 34:4,24
35:6 49:10 61:11,14
126:22 166:19 167:4
188:17 189:13
190:15

---

**2**

**2** 78:4,6,10 82:16 85:9
86:8,10,19 89:8,9
90:20 92:19 93:22
95:8,14 98:9 141:4
158:14

**12-and-a-half**
148:12

**2.4-million-dollar**
51:14

**2000-** 31:25

**2001** 188:17

**2006** 176:2,3

**2012** 18:19 21:22

**2013** 21:25

**2018** 18:23,25 19:4
20:17 22:6,12,20
23:14,20 24:4,5,6,15
25:22 26:2,6 32:5,6
46:12,25 47:19 110:4
136:9 145:23 151:13,
15 153:2,10,18,24
154:13 155:9 157:5

**2018/2019** 109:21

**2019** 18:23 19:3,5
20:22 21:7 24:20
28:15,19 32:5 42:25
43:2 47:7 49:6,10,22
50:21 55:10 59:5,7
103:20 104:13,15,19
105:10 107:12 109:4
120:16,18,19,23
128:23 129:22 132:5
134:6 136:9,14,17
137:3,7 146:18
151:6,13 153:3
154:18 157:5,8,14
168:20 191:19,23
193:9 194:18 195:10,
23

**2020** 19:11 32:2
33:18 39:8,12 41:3,
16 42:6 55:16 65:22
67:8 70:14,24 72:3
73:24 78:15 84:24
86:21,24 92:18 95:6,
9,13,16,23 96:8
97:23 98:10 99:11
101:15 102:6

**2021** 19:11 25:3,9,10
29:20 30:3,7,9,16,19
31:5,9 33:5 34:3,4,24
35:6 39:25 57:16
61:11,14 126:23
175:3,4,11 176:7
177:5 179:3,18
189:13 190:15

**21st** 34:3,24 39:25

**81:5**

**22nd** 28:12 162:13

**23rd** 95:6 100:2

**24th** 9:19

**26th** 24:11,15

**28th** 128:23 129:21
132:5

**2:06** 150:24

**2:07** 151:2

**2:21** 151:2

**2nd** 28:15,18,21
50:18 51:14,17 54:24
127:17 194:17
195:10 196:7

---

**3**

**3** 38:23 105:5

**30** 86:24

**30(b)(6)** 5:18 7:10
9:9,25 15:18 22:25
36:18,25 37:10,15
42:3 49:15 57:6,8
63:2 64:16,22 75:23
79:5 82:10,14 84:4
92:16 95:11,18 116:6
132:5 141:19

**30th** 87:6 95:9,16,23
96:8 101:14 102:6
154:8,14

**31st** 46:11,25 47:18
154:9

**35** 9:19 168:16

**36** 87:13,14

**38** 160:14,22 168:8,
17,24,25 169:2

**3:06** 150:24

**3:09** 191:8

**3:19** 191:8

**3:20** 150:25

**3:25** 196:21

**3rd** 28:15,19,21 39:8,
12,22 41:16 42:6
47:7 49:10,22 50:21

**51:21 54:24 127:17
194:17 195:10 196:8**

---

**4**

**42** 168:24 169:12,16
173:3

**43** 169:6 175:19,22
181:6

**44** 169:6 184:9,10

**45** 46:20,21 160:15
168:8,18,25 169:2,6

**47** 184:21 185:8
188:7,8 191:12

**4:09** 191:3

---

**5**

**5** 9:17 29:10,13
158:21

**5.2** 109:15

**5.6** 109:15

**59** 71:21,22 89:19

---

**6**

**6** 10:25 30:5

**6/30** 94:24,25 153:22

**60** 153:22 154:8

**600** 79:25

**650** 89:20

**650-page** 9:18

**6:05** 92:18 93:18

**6th** 92:18 93:18 97:14
161:24 162:14 164:2
176:3,7

---

**7**

**7** 10:25 30:5

**7.4** 134:22 147:2

**8**

**8** 10:25 25:10 141:19
142:10

**9**

**9** 11:2,3 103:4 104:18
158:22

**9:00** 8:14

**A**

**a.m.** 5:2 56:18

**ability** 30:24 31:4,8
33:4 34:23 176:19
177:3

**absence** 181:3

**Absolutely** 174:16

**accept** 170:2,9
171:18

**accepted** 169:17
170:6,7,22 171:3

**access** 30:15,18,20
33:22,24 34:6,8
61:20 144:16 161:8
173:11,17 175:2,8
177:15,18,20 179:17

**accessible** 32:3

**account** 51:6 143:20
150:5 190:23

**accountant** 63:9
186:5

**accountants** 57:16
63:14

**accounted** 52:23
53:13 63:6

**accounting** 27:16
43:12,19 44:11 50:8
52:17 53:5,17,21
56:25 57:5 61:24
62:23,25 63:8,17
64:2,3 65:2 70:6 72:6
75:16 78:23 126:10
189:19 193:14,17
194:18 195:11

**accounts** 58:3,8,9

**accuracy** 125:25

**accurate** 7:2 25:18
44:3,24 45:20 65:15
74:17 75:3 76:3,11
80:8,15,19 81:20,23
94:2 125:21 126:6
127:14 172:4,10,15

**accused** 120:8

**acknowledge** 92:3
95:5

**acknowledged**
51:24

**acknowledges**
51:24

**Act** 67:18

**acting** 80:4 126:23

**action** 29:3

**actively** 144:17

**actual** 40:17 41:10
136:22 144:9 194:20

**add** 79:12,13 175:5

**added** 18:20 183:6
193:19

**addition** 149:16
171:6

**additional** 53:4
54:15 84:13 122:4
149:18 167:7 168:4
169:6 172:20 181:12
182:25

**address** 53:5

**addressed** 127:11

**addressing** 101:9
109:22

**adoption** 131:23
132:8

**adversary** 28:8

**advise** 124:8

**advised** 130:16

**adviser** 33:20 53:17
64:4 68:16 69:24
75:18 83:18 106:7
123:19 127:24 128:4

**advisers** 21:2,6,12,
25 22:12,19 32:16
40:23 45:3,9 67:4
71:11 72:2,9,12,23
73:3 75:6 77:6,12
78:14 84:23,24 86:6
90:23 97:2,5,13
99:17

**advisers'** 94:19
96:21

**Advisors** 5:19,22
18:7 19:25 20:7,23
21:2 33:9,17 78:13

**advisory** 66:3,6,9

**affiliate** 93:5

**affiliates** 60:18 79:22
90:22

**affirmative** 30:13
50:4 53:6 158:25
167:20 168:8,18

**afloat** 175:14

**aggregate** 48:21

**agree** 42:8 57:4 77:5,
9 95:11,19 101:22
112:4 131:2 132:4
138:15 147:23
151:24 163:23
165:12 180:9

**agreed** 138:5 163:21

**agreeing** 104:4

**agreement** 9:6 34:14
44:11 60:17 61:25
62:15 68:24 70:10
74:20 75:22 77:22
81:8,9 111:9 113:20,
22 128:21 138:4,13,
23,25 139:2,10
140:4,9 142:25
150:12 164:23
170:16 178:12

**agreements** 66:10,
12,15

**ahead** 14:17 70:13
71:16,17 101:7
174:6,8

**allegedly** 121:15,22

**allocation** 105:3
106:8 118:21 122:24
123:2 125:22

**allowed** 13:11
173:23

**amend** 9:11 104:4,7
159:24 164:7 180:11

**amended** 7:24 8:13
9:4,24 10:21 11:8
35:17,18 54:17,18
55:6 63:12,20
158:11,14 159:3,5,9,
21 160:7 161:2
164:2,5 167:10,15,
21,22 175:25 176:6
177:16 181:11
182:17 188:4 189:7
191:12 193:24

**amount** 70:16 79:8
82:17 107:6 109:15,
22 154:23

**amounts** 48:25 49:3
65:24 78:11 79:21
82:25 90:21 91:12
93:3 101:19,22,24
105:14 134:20

**analysis** 67:17 68:21
69:16 72:4 106:25
113:24 114:5,11
115:2 116:7 165:2

**analysts** 27:12

**analyzed** 121:2

**angry** 174:15

**annual** 66:12 67:20
88:7

**answering** 6:15 64:7

**answers** 6:3 7:2
35:16 63:20 75:10

**anticipated** 80:15,16
115:25

**apologize** 22:17
24:12 69:6 152:12
154:5 155:23 159:20
169:22 176:4

**appearing** 82:20

**appears** 30:6 49:18

51:6 95:24

**applied** 187:10

**approaching** 102:15

**approval** 128:21
193:5,7

**approve** 192:3

**approved** 111:15
112:11 128:9,15
132:23 133:2

**approximately** 26:9,
19 109:3,5 133:16,23
134:5 146:13 147:7
154:9 156:19

**April** 13:14 19:3,5
20:22 21:6 22:16
24:20 25:10 104:13,
19 175:11

**argument** 27:25
35:23 36:3 37:15

**arguments** 85:14,16

**ascertain** 58:6,14

**Asia** 7:14 158:5

**asks** 27:21 52:16

**aspect** 34:9 67:24
97:24 99:24

**aspects** 14:22 45:3,4
68:11 69:24 186:13

**assert** 30:12

**assertion** 191:25

**Asset** 122:21

**assigned** 178:17

**assistant** 18:18,20
21:21 25:5,12

**assume** 41:22 45:21,
23 47:24 48:24 49:2

**assuming** 23:21,24
48:4 52:6,7

**assumption** 45:25

**assumptions** 45:22

**attached** 28:20
161:22 162:20 163:7,
22

Index: attachments..challenged

**attachments** 31:17

**attain** 20:12

**attempt** 83:5

**attended** 67:16

**attorney** 5:9 83:8
96:25 147:17 160:11
173:9,20 174:4
178:15 190:9

**attorney's** 13:17

**audit** 44:12 47:8,12,
23 57:16 58:2 59:4,7
154:8

**audited** 43:5,10 44:2,
12,23 45:5,19 46:10,
24 47:17,23 48:14,19
49:20 55:2 57:24
58:12,16 64:17 65:10
101:17

**auditor** 47:11

**auditors** 43:20 57:17
154:22 156:10

**audits** 153:19,22

**August** 86:25 99:4,6
153:25 154:9,13
155:9 174:21

**author** 77:18

**authority** 85:4 138:2
169:8 171:18,22
182:7 183:21 186:2,
3,5,15 191:15 192:2,
6,9,17

**authorization** 72:11
85:18 194:8

**authorize** 143:8,12
180:18,22 192:20

**authorized** 72:9,24
84:22 143:16 178:3
192:20

**aware** 6:3 27:15
28:7,13,17 29:2 31:7
34:20 35:7,11,12,13,
23 36:5,6,12 37:9,14,
19,22 39:15,21 47:10
49:8 52:12 56:2,25
57:3 59:6,16 62:6
67:8,12 71:3 84:14
85:2 86:13,15,16,19

87:7 98:2 100:3
111:24 113:23
117:18 118:18 122:6
124:23 125:17 127:2
130:8 145:18 150:6
158:10 175:15 184:4
186:22 187:21
188:16

---

**B**

**back** 13:13,14 17:13
21:22 22:2 31:25
40:24 41:9,10 56:14
64:7 68:23 69:17
70:6 76:14 77:13
86:2,10 92:23 93:9,
12 94:7 96:16 102:22
150:25 152:5,13,19
170:11 191:3

**back-office** 27:16
43:12 75:17

**background** 64:3
160:25 161:7 166:22

**backing** 98:18 99:2,
18 102:2

**backup** 49:2 82:23
83:4

**Baker** 174:13

**balance** 48:7 53:20
55:5 58:23,24 59:2
65:6,15 87:5,6 92:10,
20 93:22 94:5 96:4
102:9 108:14,17
193:13,21

**bank** 51:6,7 52:2
104:6

**bankruptcy** 27:23
30:23 35:8 36:7
37:23 99:11 179:11

**based** 13:17 18:3
25:15 34:12,25 45:25
46:3 57:17,25 142:13
154:7 163:20 167:10
168:4 171:11 174:4
178:20 180:11 181:5

**basis** 22:20 67:20
167:19 181:17
191:25 195:21

**BBVA** 51:7

**began** 31:25 54:15
104:14,22 120:18

**begin** 6:18

**beginning** 8:16
22:12,20 24:15
120:17 156:7,11,15

**behalf** 5:18 10:7
29:19 35:24 37:11,23
40:3 43:8 64:7 68:20
72:8,23 73:3 80:5
126:23 138:15 143:4,
6 144:10 150:20
151:9 171:4,19
180:23

**belief** 184:4

**believed** 117:13
126:16 149:9 167:17

**believes** 118:5,15

**big** 123:11

**biggest** 67:24

**bill** 59:15

**billed** 59:19,20

**bind** 6:4

**bit** 37:21 48:5 88:17
126:2 133:9 151:4
195:4

**Blank** 87:24

**board** 9:9 32:17
33:10,14 65:22 67:5,
8,16,19 70:15,25
71:8,10 72:3,25
74:21 75:4 76:3,7,15
78:9,15 80:9 84:6,16,
19,23 86:7,12,13,22,
23 87:9 88:4,7,12,24
89:10 91:21 92:11
93:25 94:10,20 95:7,
13,21 96:9 98:10,16,
22,25 99:3,4,7,12,16,
20 100:18 101:10
112:12 119:2,3,22
123:3,8 125:21
126:6,13 127:6,11,12
128:9,12,15,23
129:2,21 130:7,14,
15,18,21 131:5
132:6,23 133:3

135:20 156:10,24
157:20

**board's** 77:7 90:2
92:19 93:21

**boards** 66:24 67:3

**booked** 53:20 54:11,
21 57:10,14 59:9
64:23

**booking** 56:22
57:11,20

**books** 44:11 52:24
53:13,16 54:7,12,23
55:7,14,20,23 56:21
58:15,19,21,22 59:17
60:24 61:5,13,21
62:10 63:3,17 79:12
193:8

**bottle** 56:12

**bottom** 87:21 102:8
152:17 158:23

**Brad** 24:3,7,18

**breach** 148:24

**break** 7:4 56:7
150:24 191:2

**Brian** 25:5

**bring** 70:2

**broad** 35:21

**broader** 126:3

**broadly** 19:19,23

**broke** 145:3

**broker** 144:21,24

**broker-dealers**
107:13

**business** 19:22
68:6,14 107:18
175:14 193:3

**businesses** 177:10

---

**C**

**calculate** 111:14

**call** 8:23 61:19 67:17
125:7

**called** 5:17 8:23
159:23 161:13

**calls** 32:19 165:11

**Canty** 7:9,17 152:13,
21 158:6

**capacity** 5:17 20:3
36:25 37:9,14 44:7,8,
10,13 75:25 77:17
137:19,21 171:2

**capital** 5:12,19,21,24
27:17 32:7 42:20
52:5 61:22 108:19
123:15 124:21
125:14 131:3 146:2,6
169:20 171:3,4

**careful** 16:25

**carefully** 41:25 62:5
120:6 129:19 171:17

**carried** 193:8

**carrier** 147:8 151:22
152:2

**carriers** 152:7

**case** 27:23 48:24
49:2,18 67:21 76:17
81:10 182:5

**cash** 14:7,11 52:10
108:14,16,18 134:15
140:23 141:2 172:21
183:5 190:5

**caused** 121:22 137:7
147:22 170:9,22
171:5,20

**caution** 16:20

**caveat** 180:13

**CC'D** 95:3

**CEO** 167:2 173:14

**certificates** 9:7 19:2
20:14 23:22 25:20

**CFO** 39:17 45:7,13
75:15 96:21 171:8
173:12,15,17

**chain** 81:2 91:16

**challenge** 105:11,15

**challenged** 100:24

Index: change..correct

**change** 93:7 102:18 104:5,7 106:11,18

**changed** 20:23 24:2 55:23 56:21 57:12,21 98:19

**changing** 23:25

**characterization** 192:13

**characterize** 164:20,25 165:4

**characterizes** 165:7

**charged** 43:9 81:18, 22

**charts** 73:22

**check** 9:17

**chief** 19:20 20:4 32:15 33:13 179:10

**circumstances** 16:9 17:16 57:18 86:14 161:4 164:18 165:15 176:11

**claim** 141:20,23 142:2,4,19 143:6,9, 11,13,16,20,23,25 144:4,6,9,18 145:8, 16,21,24 148:16 149:10,14 151:8,12, 18 152:2 172:22 173:4,7,25

**claims** 152:7,11

**clarification** 37:8 74:12 123:4,5

**clarify** 69:17

**clean** 149:3 163:19

**clear** 79:14 185:16 187:16 194:4

**close** 83:20 181:8 191:16

**closed-end** 105:4,7 106:2,11,19 108:4

**closely** 72:5 112:22

**coffee** 56:8

**collaborative** 105:21 106:12

**collateral** 147:17,19 148:20

**colleague** 7:9

**collect** 28:9

**collectively** 28:24

**color** 53:4

**combination** 134:14

**combined** 134:22

**comfortable** 68:18 99:12

**commenced** 28:8 29:3 64:18,25 161:21

**commencement** 40:9

**commentary** 54:2

**committee** 111:10, 15 115:11

**communicate** 30:24 34:23 176:19 177:3

**communicated** 150:12 170:12

**communication** 62:11 130:18 150:10

**communications** 27:22 65:22 84:5 121:2 123:8 171:11

**companies** 182:22

**company** 14:4 36:22 39:15 64:7 143:2 146:5 147:14,20,21 161:13

**company's** 12:10 53:2 139:8 142:4,6

**Compass** 51:7

**compensate** 137:18 138:16 184:6

**compensated** 171:25

**compensation** 15:11 59:10,22 60:5, 14 61:2,16 62:9 63:6, 22 64:11 108:20 134:25 135:6 137:14 138:23 140:9,15,16

**complaint** 8:22 9:2 28:12,21 34:3 38:19, 20 39:25 40:18 161:2,23 162:2,25 163:4,7,23,25 166:14,21 167:10,15 175:25 181:8 188:4

**complete** 6:25 23:22 25:17 34:5,8 59:4 173:11 175:2

**completed** 6:16,19

**completely** 80:19 94:2

**compliance** 27:16 31:15 32:15,24 33:13 41:2,7 61:23 69:4 70:5 72:6,14 74:19, 23 76:15 77:25 106:14 126:9 170:14 178:10

**component** 33:7 83:14

**components** 17:22

**concerned** 35:25 36:8 124:24,25

**concerns** 35:9 37:12,17,24 90:20 110:3

**conclude** 49:14 155:15,24

**concluded** 157:12

**conclusion** 135:11 156:5 157:21

**conduct** 47:12 138:7 178:3 180:19,23

**conducted** 67:9 122:25 161:3 165:14 176:10

**confirm** 10:19 50:23 52:9 57:9 133:5 165:23 177:14

**confirmed** 11:23

**confirming** 163:16

**confronted** 181:14

**confused** 81:6

**confusing** 195:4

**confusion** 81:13

**connection** 6:7 10:7 12:13 15:2 59:11 67:9 88:7 101:10 110:9,23 111:3 112:15 113:4,9,16 114:2,13,23 117:14 118:16 119:15 121:8 124:9 134:7 135:2 137:15 138:18 142:8, 20 144:7 146:22 147:9 149:14 166:3 168:22

**consent** 103:5,9,15, 19,23,24 104:3,8,9, 12,14,19,22 105:2, 10,20,21 106:6,8,10, 18,22 107:5,9,18 108:3,4,13,24 109:5, 9,12

**consented** 104:10 105:6 107:23

**consequence** 138:6

**consequences** 109:22

**consideration** 184:22 185:2

**consistent** 51:16

**consultant** 112:6 128:17

**consultation** 154:24

**contained** 95:6

**contemporaneousl y** 55:10

**contend** 42:4 85:17, 20 113:3 132:20 134:21 147:13 192:16 195:22

**contends** 49:9 59:8 134:17,23 135:5 149:24

**contention** 42:8 132:24 146:20 190:7

**contest** 194:16 195:9,13

**continue** 10:24 29:18 144:17 148:14

**continued** 193:20

**continuing** 24:20

**continuous** 22:19

**contract** 80:21 115:6 116:24 117:5 148:24 170:6 178:22

**contracted** 178:21

**contracts** 66:19 67:11,19 69:9,12

**contribution** 67:25

**control** 121:4 130:9 137:20,21

**controller** 183:2 185:20

**controlling** 26:21

**controls** 26:15 122:4

**conversation** 117:22 181:17

**conversations** 16:3 32:8 101:3 130:4 171:12

**conversion** 105:6,8, 9,13 107:25

**converted** 105:3

**converting** 105:25

**coordinating** 41:12 115:12

**copied** 73:11 90:4,16 91:15,21 92:3 99:23 195:18

**copies** 9:5 88:21 161:19 162:17 176:14

**copy** 30:2 89:14,16 91:19 167:25 168:2

**corners** 194:7

**corporate** 194:18 195:11

**correct** 9:20 10:3

12:15,22 15:23 18:25
20:8,9,10 21:10
22:21 26:19 28:19
29:4,5,7,8 30:13,16,
19,25 31:5,6 34:7,18,
24 35:19 39:8,9
42:15,25 43:3 47:10,
13 48:23 49:24
51:19,21,25 54:25
55:18 57:6,21 59:12,
13 61:12 64:20,25
65:2 66:4,7,10,13,19,
25 67:2 69:10,13,14
70:17 71:2 72:4 74:3,
9 76:12 77:7,8,10
83:15 84:6 86:24
88:14,20,24 89:11
90:16 91:16 92:20,21
94:16,20 95:2,23
96:10,22,23 97:2,3,5,
8,10 100:10,14
101:2,11 103:20
106:23 107:21
108:10 114:13,20,24,
25 116:19 117:19
120:16 121:4,22
122:9 123:6 124:17,
18 127:18,19 128:24,
25 129:7 130:2
131:4,13 132:14,18
133:24 134:3,4,19
135:3,8 136:17,18
137:4,5,8 139:3
141:18 143:21,23
145:5 146:3,18,19,
24,25 147:11 149:5,
11,12,14,15,20,21,25
150:2 151:10,11
158:18 159:21
162:18 164:3,7,8,11
165:16,17,19,22
166:2 169:20 170:23
173:12 176:2,7,8,11,
12,15,16,20 178:24
179:6,8,9,16 180:12
181:9,24 182:7
183:21,22 185:10
189:2,17 191:23
195:14

**correction** 22:23
90:3 124:24

**correctly** 15:13
85:10 132:2

**corroborate** 188:20,

21 189:12

**corroborates** 61:15
62:7 186:23 187:23
190:16

**cost** 106:22

**costly** 194:15

**costs** 106:20 133:18

**counsel** 5:11 11:19
13:8 54:2 82:22 83:3
88:3 90:2 116:21
123:17,19,21,23
124:2,7 178:6,18

**counterparty** 186:6

**couple** 168:13
178:25 191:10

**couple-month**
105:18

**court** 27:24 30:23
35:8 36:3,7,11 37:16,
24 40:20 160:8 164:7
180:10 187:3 189:21

**coverage** 142:20
149:11

**covered** 98:16,24
99:16 100:17

**created** 42:18 61:14
62:7,17 63:4 147:21
187:22 188:16,25
189:13 190:14
193:18

**creating** 45:8 53:16
135:15 177:22

**creation** 177:7

**CST** 5:2 56:18 103:2
151:2 191:8 196:21

**current** 57:17 58:9

**cut** 194:6

**D**

**daily** 40:19 41:11

**damage** 152:9

**data** 33:22 115:13

**date** 21:19 30:7,10
33:19 34:4 35:6,9,25

36:8 37:12,16,24
38:12,16 39:14 42:9
61:10 62:7 63:4
85:25 97:6 107:15,25
126:22 130:4,5
135:22 136:4,8
155:12 156:12
170:24 187:23
188:17 189:2,4,6

**dated** 28:14,18 30:3
127:15

**dates** 23:21,25 25:16
52:11 120:18 134:10
162:13

**dating** 21:22

**Dave** 12:3 80:14 95:4
171:8 194:3 196:11

**David** 25:5 185:15
190:3

**Davor** 7:18 12:14
56:10 139:23 142:3
163:16

**day** 34:3 51:25

**days** 153:22 154:8

**DC** 12:17,19 13:12
142:3 161:3 165:14
181:14 188:23

**DC's** 61:19

**deals** 160:15

**Deb** 174:14

**debated** 121:2

**debtor** 5:11 31:21
33:7,23 34:12 39:17
41:6 42:17 117:22
118:9 166:20 167:3

**December** 39:8,12,
22 40:17 41:3,16
42:6 46:11,25 47:18
55:16

**decision** 105:19,22,
23 106:17,21 108:2,3
138:2

**declaration** 9:4
13:15 16:14,18 17:19
31:16 54:17 61:19
164:14,16,23 165:5
167:19 175:6 181:21,

25 188:24

**deductible** 141:3,17

**defendant** 169:16,19
171:25 183:24 184:5,
6,14 191:15

**defendant's** 9:11
166:19

**defending** 41:11

**defense** 114:18,19
115:8 144:7 168:9,18
185:7 186:24 187:24
188:21 189:12
190:16

**defenses** 30:13 50:4
53:6 135:9 140:10
150:2 158:25 167:20
169:4,7 188:11

**deferred** 80:20

**define** 119:17 154:3
192:24

**defined** 46:7 153:5

**Defines** 132:19

**defining** 131:25
132:17

**definition** 190:10

**demand** 19:10
38:14,24 39:24 40:18
41:15,21 54:14,20
55:15

**demanded** 15:24
16:2 19:9 38:6,7,9,11
86:16 137:14 138:5

**demanding** 39:17,
18

**denying** 52:10

**department** 78:23

**depending** 75:7

**deposed** 5:17

**deposited** 105:17

**deposition** 5:13 6:8
7:10,24 8:4,18 9:25
10:8,21 11:12 13:17,
20 14:2 15:3,14
28:24 29:10 37:4
60:6 82:21 83:25

25 188:24

**depositions** 12:2
40:19 41:12 61:6
140:20 172:20 175:7
182:9,24 183:9
184:17 185:14
186:19 187:14 190:2
194:21 196:3,11

**derived** 95:8

**describe** 19:16
111:2 164:17

**describes** 133:15

**description** 123:6

**desk** 160:18

**detail** 196:11

**detailed** 134:15

**details** 14:6 111:6
113:11 141:5 172:18,
19 175:7 180:2
181:22 182:25

**determination**
67:10 129:10 131:10,
22 132:7 138:9,14
154:16 155:19
156:21 157:2,9
170:18

**determinations**
127:23 130:6

**determine** 57:17
67:19 68:16 79:6
105:11,16 107:2
113:25 114:6,11
115:4 116:9 164:18
176:10

**determined** 57:25
129:4,13,23 130:9
131:17 136:7,13
154:19 156:14,18

**determining** 129:25
130:22

**development** 19:22
68:6,14

**devoted** 99:8 101:9

**dictates** 67:22

**difference** 8:11

84:11 115:23 173:2
186:21 187:18 192:7

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 26-1   Filed 06/30/22   Page 93 of 200   PageID 24305
Appendix Part 4   Page 3064 of 474

Index: differently..entire

**differently** 155:7

**diligence** 142:9
165:3

**direct** 26:5

**direction** 31:18

**directly** 95:14 144:23

**director** 26:25 27:4

**directors** 23:2 26:24
88:4

**disagree** 148:10

**disciplinary** 121:20,
25 122:6

**disclosed** 49:23
64:17

**disclosure** 86:12

**discover** 17:8

**discovered** 54:11
63:12 175:8 194:2

**discovery** 11:25
81:7 172:11 183:9
187:9 190:21 194:2

**discuss** 16:16 169:6
173:6

**discussed** 13:25
14:3,4,9 16:21,23
82:22 83:3 103:15
108:19 120:25
135:19,20 140:17
142:3 166:25 174:6
181:14 196:10

**discussing** 130:5
173:20

**discussion** 7:13
16:6 82:8 105:24
106:16 116:20
142:17 154:21

**discussions** 13:23
14:10 16:11 17:6,12,
14 110:2 118:8,11

**dishonest** 194:13

**dispute** 49:20,25
50:4,17,20 92:15
93:19 94:18,21
111:25 128:22 133:2
162:16 191:18,20,21

**disputed** 40:14

**distinguishing**
47:22

**distribution** 19:20
20:4 107:16

**Docket** 9:19

**document** 6:25 7:16
9:18,20 23:6 29:16
35:7,22 37:10 38:13
46:19 47:16 50:25
71:4,24 87:16,21
104:5 119:13 120:7,
12 122:11,19,23
126:5,12,17,21
128:20 138:21 140:8
158:2,15 160:13
161:18 166:10 183:7
186:10,23 187:22
188:15 189:10,21
190:7,14,17

**documentation**
187:7 189:20

**documented** 61:7

**documents** 6:22
8:17,20 9:14 11:16,
22,24 36:11 38:15
62:18 136:22 144:15
145:10,11 156:23
168:3 186:25 187:8,
17,20,21 188:18
189:11,15,16 190:13

**dollar** 48:25 49:3
192:18

**dollars** 14:8 157:13
193:2,4

**Dondero** 11:20
12:20 13:20 14:2,23
15:20 26:7,9,14,15
27:4 30:18,24 34:6
39:20 60:4,5,7,8,12
76:24 83:20 84:14,
22,25 98:18 99:18
103:16 105:22
106:13 121:3,14
137:17 138:3,19
140:12,18,19 165:22
166:3,11 167:2,3,5
170:18 171:2,10,21
172:12 178:6,17
180:18,25 182:11,13,
14 185:15 192:3,7,19

193:12

**Dondero's** 192:5
193:5 194:7

**doubt** 77:2 80:12
98:4

**draft** 69:4 72:7 96:2

**drafted** 126:8 185:6
186:5

**drafting** 77:4

**due** 65:24 70:16
78:12 79:21 81:5
90:21 93:4 96:7
101:19 102:3 153:22
165:3 173:10

**duly** 5:3,5

**Dustin** 5:4 6:1 7:1
8:1,2,3 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1,20 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1,9,17,21
25:1,3,10 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1

136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1,15
160:1 161:1 162:1
163:1,12 164:1,9
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1

**duty** 44:22

**E**

**earlier** 13:12 16:13
22:24 65:8 86:21
108:19 155:12
180:16

**earliest** 81:4

**early** 17:5 19:10
88:10 136:14 175:3
179:3

**economies** 68:8

**educate** 127:12

**effect** 122:3 139:2
174:10

**effective** 23:25 24:11
25:15

**effectuated** 170:19

**effort** 145:7 151:21

**efforts** 144:9

**elaborated** 84:13

**Ellington** 179:13,14

**email** 73:14 74:2 81:2
87:8 88:6 91:15 92:3,
4,17 93:20 94:23
96:17 97:24 98:8

99:23,25 100:10,13,
24 101:8 190:2,3
195:18

**emailed** 84:2

**emails** 11:22 189:18
190:12,13 196:7

**employ** 165:13
176:25

**employed** 18:6 32:5,
6 83:9 166:24

**employee** 20:3
31:13 33:9,17 43:15
44:7,14 71:13 72:12
75:2 76:9 77:17 80:6,
17 81:21 115:13
119:25 120:2 121:6,
14,21 122:16 125:13,
18 126:4

**employees** 23:2
27:5,6,7,9,14 32:17,
22 41:6 42:18,21
53:15 61:23 69:3
75:21 76:18 77:13
111:7,8 112:23
115:17 117:20,21,22
118:10 119:23
123:15 124:5 125:5,
7,8 129:10,12 130:7
135:15,21 137:10
142:22 144:24 146:9,
11 150:11 156:11
161:9 166:24 170:13
171:6,10 177:8
179:25

**enable** 122:23

**encourage** 133:13

**end** 145:3,6 175:4
178:9,22

**ended** 120:20,22
178:22

**ending** 46:11,25
47:18 86:24 95:15,23
154:14

**engagement** 111:21

**entering** 138:12

**entire** 120:24 121:3
162:15 175:13
178:12 182:5

**entities** 74:4,6,8
83:19 98:17,25

**entitled** 147:13
149:18,24

**entity** 26:13 27:3
52:9 73:25 75:13
77:18 111:25 193:4

**entries** 57:2

**environment** 130:9

**equity** 26:20

**error** 9:10 14:20,21
15:11 16:8,9,10
17:24 32:10,13,18,21
50:6 59:11,12 62:11
108:21 109:23 110:3,
6 115:16 117:13
118:6,10,16 119:20
120:9,15,25 121:15,
22 122:21,25 124:16,
22,25 125:16 126:11,
25 131:13,25 132:7,
14,16,17,19 133:16
134:7 135:3,12
136:11,13,16 137:4,
7,18 140:15,17
142:13,15,21 146:24
147:10,25 149:5,6,19
150:5,21 153:10,16
154:4,12,16,20,23
155:4 156:14,22
157:3,10,12 168:10,
22 169:3,17 170:3,
10,20,23 171:5,20
184:7 185:4,19

**errors** 126:16,20
131:24 132:16
137:14 186:14

**estate** 178:15

**estimate** 20:19
109:12

**estimated** 146:12
147:3 149:4,6,23
156:18

**estimates** 111:12

**ethical** 174:18

**event** 55:3,5,6

**events** 16:8 48:11,18
49:5,16

**everybody's** 33:16

**evidence** 184:17

**exact** 6:13 21:19 30:6
33:18 38:12 89:12
92:24 96:8 99:3
107:6 109:8,15

**EXAMINATION** 5:6

**examined** 6:10

**examining** 36:24

**Excellent** 9:22
102:24

**exception** 178:25

**exchange** 87:8

**exclusively** 25:20
99:8 132:11

**executive** 18:13
19:3,6,18 20:2,7
21:5,11,17 22:10
24:8,13,16,21 25:4,
11 43:4 73:25 74:5,7
97:4 116:5

**exhibit** 7:12,15,19
29:10,13 38:17,21,23
46:20,21 51:2,3
71:21,22 87:13,14
89:17,21 119:9,10
124:13 152:14,15
158:3,8

**exhibits** 9:15 11:18
87:10 89:17 161:22
196:10

**existence** 14:24
15:20 16:5 19:7 38:4
39:11 40:5,14 42:24
49:23 55:21 66:22
70:25 71:8

**expect** 44:15 63:9
127:6,13

**expedited** 152:4

**expenses** 106:20

**expert** 64:4 128:17

**expertise** 126:10

**explain** 122:24 193:6

**explaining** 165:9

**extend** 104:7

**extensive** 81:3 88:11
118:11

**extensively** 118:8

**extent** 16:20 80:25
81:11

**extremely** 151:25

### F

**fact** 29:7 55:15 66:21
109:3 131:15 133:4
149:22 182:4 191:22

**factor** 135:23

**factors** 67:21 131:18
132:11,13

**facts** 16:9 17:16
57:17 63:19 86:14
142:7,8 166:22
167:18 168:4 185:11

**factual** 16:21 85:16
138:11

**fair** 6:16 16:22,24
20:16 21:4,23 22:13,
20 25:19 34:2 37:5,6
39:10 40:3 49:19
66:22 73:22,23 89:23
90:5 109:6,22 112:21
115:5 129:6,25
131:16,23 132:8,9
133:5,12,14 141:8
145:4 147:4 153:25
154:7,11 155:8
157:7,11 160:14
164:19 167:9,21
168:7,15,17 179:3
181:19 195:7

**fairly** 91:21 112:5

**faith** 50:7 83:19
84:24 98:17 99:2,17

**fall** 31:25 32:2 67:8

**familiar** 110:19
118:20 164:13

**familiarize** 141:22,
25

**fault** 62:24 116:10
119:25 137:12 150:8

**February** 24:5,6,11,

15 25:3,9 105:10
134:6 136:17,23
137:3,7 140:21
141:15 145:4,6
146:18 151:5 178:9,
23

**fee** 103:9,15,19,23,24
104:3,8,11,19 105:2,
5,10,20,21 106:6,8,
22 107:2,4,5 108:13,
24 109:5,9,12

**feel** 20:20 29:15

**fees** 67:23 68:4 103:5
104:12,14,22 106:20,
22 107:9,18

**field** 83:9

**figure** 84:9 94:5
95:20 96:9

**file** 142:19 172:22

**filed** 9:13,18 28:12
29:3,19 34:4,5 35:8
37:11 39:25 54:18
142:25 144:10
145:21,24 149:10
151:8,13 159:22,24
161:7,24,25 162:2
163:25 164:2,5
166:19,20 173:4,6,25
176:2,6,9,13,17,24
177:17 183:7,17
187:2

**filing** 27:24 29:24
143:3,5,8,12 162:23
166:15 167:5

**filings** 189:22

**filled** 146:9

**final** 96:3,6,10,11,12
100:2 107:15

**finalization** 87:9

**finalized** 105:9
154:19

**finance** 43:12 70:6
75:9,16

**financed** 146:17

**financial** 43:5,10,13
44:2,24 45:3,5,8,19
46:10,24 47:13,17
48:15,19 49:21 50:2

**financials** 43:20
44:16 47:24 48:2
55:3 94:24 95:2,9,17
154:14

**find** 56:6 116:25
117:6 144:14,19
183:9

**fine** 21:3 115:24
167:25

**finish** 194:25

**fired** 121:7 161:12

**firing** 121:18,23,25

**firm** 66:3 68:6 110:19

**firmed** 172:18

**five-month** 162:3

**focus** 23:12 53:9
130:24

**focusing** 12:12

**folks** 179:17

**follow-up** 88:9,12
99:9

**footnotes** 102:2

**forbidden** 174:17

**forgive** 8:23 107:17

**form** 42:16 61:3,17
70:18 168:22

**formal** 72:10

**formed** 145:25 156:4
161:13 167:19

**forms** 187:2

**formulating** 94:19

**forwarded** 89:24
90:3

**forwards** 88:19,21
90:11

**found** 15:15 54:20
63:13 81:6 86:20
92:20 93:22 153:15
155:3

Index: fourth..Highland

**fourth** 141:12

**frame** 166:15

**Frank** 12:3,23 14:10
15:5,8 24:9,16,21
25:4,11 39:13,15
43:15,17,24 44:22
45:17 60:6 65:16,17
71:13 75:9,11,12,15,
24 78:21 80:14,22
81:25 82:24 83:23
84:10,12 90:18 95:4
137:17 140:18
142:23 144:25
151:19 161:16 167:8
171:8 174:16 183:10,
19 185:15,18,19
186:10 187:11
193:14 194:3,17
195:9 196:12

**Frank's** 85:2

**free** 20:20 29:15

**front** 8:18 10:14 23:6
158:16 166:7

**front-office** 27:7,11,
14 69:21

**full** 30:15,18,20 83:19
84:24 98:17 99:2,17
162:11

**function** 63:10 65:3
68:14 72:6 74:19,24
75:20 76:4,16 77:20,
25

**functions** 27:15
31:15 41:3 43:13
68:19 69:20 70:7,9
75:17

**fund** 5:19,22 105:3,4,
7,25 106:2,8,11,18,
19 108:5,12 118:22,
23,25 119:2,3 122:24
123:2 125:22 131:24

**fund's** 107:19

**funded** 134:2 140:22
141:15

**funds** 19:13,19,23
21:12,18,24 22:11,19
33:14 66:7,22,24
67:4 68:2,8,9 69:23,
25 75:6,17 122:20

153:19 171:25
172:15,16 177:23
183:3

**future** 56:7 68:10
78:12 90:21 93:4

———

**G**

**GAF** 126:7,13 127:6
128:12,15,23 129:2,
20,21 132:6

**gain** 148:9

**game** 16:22,24

**gap** 155:17

**Gates** 123:20

**gave** 35:17 47:14
72:3

**general** 12:6,7 14:3,
14 17:16,23 26:11,
12,15 27:2 111:16
133:14

**generally** 6:5 17:13
26:7 27:12 103:24
104:2 109:21 111:5
112:7

**give** 6:25 20:19 94:8
113:21

**global** 105:3 106:8
118:21 122:24 123:2
125:22

**good** 5:8 50:7 102:19
165:8 183:25 194:12

**grab** 160:16

**granted** 160:3

**grants** 160:8

**group** 11:23 43:19
190:4 194:18 195:11

**growing** 68:10

**guess** 14:8 36:19,20
41:8 64:6

**guy** 179:10

———

**H**

**H-** 147:12

**hail** 152:9

**half** 153:18,23 162:6
192:18 193:2,4

**hand** 87:3

**handed** 40:21

**happened** 97:16
153:13 177:6

**happy** 47:20 56:9

**hard** 167:25 168:2

**harm** 147:22 148:22

**HCMFA** 5:22 6:4,7
9:3 10:7 18:9,12,16,
19,22 19:14 20:15,
21,25 23:3 24:3
25:21 26:2,18,24
27:2,6,13,22 28:9
29:3,20 30:12,15,18
34:4,5,16,22 35:8,24
37:5,11,15,20 38:3
39:8,10,23 40:4,8
41:7 42:4,14,19,23
43:4,8,14,25 44:8,14,
23 45:15,18 47:12
49:9,20 50:17,20
51:18,23 52:23
53:12,20 54:6,10,24
55:14,23 56:20 57:8
58:3 59:4,8,14 62:6
64:16,22 65:5,13,17
66:3,19 68:20 69:13,
15 70:14,15,24 71:7
75:2,23 76:2,5,9
77:25 78:13,17 80:5,
7,17 81:5,22 85:17
86:22 93:5,19 94:16
95:5 104:12 106:6,7,
19 108:3,12 109:21
110:8,17 111:25
112:24 113:3,7,14,
21,24 114:5,10
115:2,12 116:8
117:11,12 118:3,4,5,
14,15,21 119:14
120:8 121:4 122:23
123:11,20 124:19
125:14,18 126:23
127:3,5,6 129:2,3,20,
21,22 132:5,20,25
134:5,12,17,18,23
135:5,11 136:6
137:2,6,13,20,24
138:4,16,17,24

140:14 142:11,12,19
143:4,6,8,11,12,15,
17,19,22 144:10,21
145:3,7,15,24 146:5
147:12,23 149:8,10,
23 150:3,7,20 151:9
153:10 154:2,11
155:8,15,16,21,24
156:17 157:11,16
158:11 161:19
162:16 163:24 164:2,
6 165:12 166:24
167:15 168:20
169:24,25 170:2
172:9,14 173:24
174:25 176:13
177:14,25 180:10,23
181:6,18 186:15
188:15 191:18,19,21,
23 192:16,23 193:7,
15 194:16 195:9,22

**HCMFA's** 15:18
23:14 26:4 30:23
31:4,8 33:4 36:18
38:5 42:3 43:5,9
44:2,21,23 45:4,19
46:10,24 47:12,17
48:7,14 49:14 52:2
54:22 55:12,20 58:15
59:17 60:11,24
61:13,15 63:3,22
64:15,21 65:6,15
66:16,21 67:11 69:9,
21 79:5 82:10,14
85:7 92:15,20 93:22
95:8,11,14,18,21
101:13 102:5 114:18
127:9 132:4 146:20
147:5 149:17 158:25
159:7 168:18 170:25
176:18 177:3 182:4
183:18 186:22 190:6
193:8

**HCMLP** 5:25 9:2
13:10 31:13 32:17,
22,24,25 40:11 41:4
43:14 44:13 52:11
53:15,19,20 54:9
60:12 63:10 65:3,18
68:25 69:2,7 70:3
71:11,12 72:5,12
75:10,12,19,21 76:17
77:13,17,23 78:12,
16,23 81:4 90:24
93:4 96:8 102:3

110:17 111:7,11,12,
15 112:22 115:14
117:21 120:2 121:16
125:5,7,8 129:8,12
130:7,9 131:6
135:15,18,21,23
137:24 142:22 145:3
150:11 156:11,15
161:9,13 166:24
170:5,12 177:23
178:18 186:16

**HCMLP's** 52:3,4
119:23 121:17
144:15,24 181:3

**head** 19:20 20:4

**hearing** 40:20

**hearings** 40:20

**held** 21:15 27:13
105:7,13

**helped** 72:13

**helpful** 38:14 53:3
189:24 196:16

**helps** 68:8

**Hendrix** 12:4 79:16
90:13 183:5 187:10
194:3

**Hey** 82:5 86:9 94:4
102:14 177:19

**Highland** 5:12,18,21,
24,25 6:7 27:17 28:8
29:3 31:12 32:6 40:4,
13 42:20 44:7 45:7,
14 48:22 49:11 50:18
51:17,25 52:5 54:25
56:23 59:11,15 60:9
61:22 62:16 64:23
65:25 70:15 71:14
75:15 79:22 90:22
96:25 97:7,11,13
108:20 111:8 114:19
115:15 119:14 120:8,
9 121:4,7,21,22
123:15,23 124:8,20
125:14,22 131:3
134:18 135:12 136:7
137:8,10,14,21
138:5,15 140:14
146:2,6,8,21 147:6,
14 149:9,19 150:5,8,
21 155:19,22,24

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 26-18 Filed 03/24/21    Page 96 of 200    PageID 24308

Index: Highland's..June

156:5 157:17 161:5,
20 162:17 163:22
165:13,15 168:9,20
169:20 171:3,4,9
172:13,22 173:3,6,
12,25 175:3 176:15,
20,25 177:16 179:11
180:3 195:12

**Highland's** 96:21
115:8 123:21 126:9
134:25 135:7 138:6,
17,22 140:8 168:11,
21 178:7 179:2

**highly** 77:2

**hire** 68:3

**hired** 75:19 122:4

**hiring** 121:17

**hitting** 148:8

**hold** 18:8 139:17,21

**host** 62:18 186:20

**Houlihan** 110:8,11,
13,16,20 111:3,13,
18,22 112:2,4,8,11,
15,19,24 113:3,8,15,
20,25 114:6,12,15,22
115:4,12,21 116:9,24
117:5,12,20 118:5,9,
14,15 127:24 128:5,
8,16 129:3,13,22
130:16 132:22 133:2

**hour** 102:23

**house** 152:9

**huge** 70:4

**I**

**ICI** 142:12,20 144:23
145:2,8,11,12,15
146:10 149:11,13
150:4,7,10,20

**idea** 105:24 106:10

**identical** 8:5

**identified** 136:12,16
187:20

**identifies** 49:5

**identify** 23:13 25:21

26:4 76:9 121:6,11,
13 124:7 144:9
188:15 189:10,23
190:14

**identity** 23:2 25:25
81:18

**imagine** 137:22
148:15

**impact** 68:8

**important** 33:6
66:18 69:12,18
177:11 190:22

**imposed** 121:20
177:3

**improvement** 122:3

**in-depth** 135:20

**in-person** 99:6

**inaccurate** 73:4
86:8,11 130:11
132:21

**include** 98:16,24
115:21

**included** 50:2,7
71:12 84:15,19 85:18
95:20 101:18 169:4
196:9

**includes** 43:13 79:7,
20 82:12,16 88:22
128:8

**including** 23:17
27:24 88:20 102:7
133:18

**income** 59:21 63:22
64:9

**incorrect** 53:18
80:12 86:19 97:24

**incumbency** 9:7
19:2 20:13 23:22
25:20

**independent** 88:3,4
112:5 128:16

**independently**
80:18 166:9

**indirect** 26:5,8

**individual** 111:6
115:11 147:21

**individuals** 31:19
80:10 179:20 187:14
196:4

**inflow** 63:23

**inflows** 68:7

**inform** 84:23 125:14

**information** 25:24
33:25 34:11 54:15
62:14 75:19 78:22
80:7,24 82:2,3 83:2,8
91:3 94:8,24 95:6,12
98:6 115:13,22 117:6
145:7,16 167:7
181:12 183:10 184:2

**informed** 70:14,24
92:16 118:4 150:4,20

**informing** 71:7

**inhibited** 175:9

**inimical** 31:20 41:5

**initial** 40:18 127:23
161:8

**initially** 129:4,23
131:17

**injunction** 40:21
179:24

**inputs** 111:11 112:23

**insight** 68:5

**instance** 192:20

**instructed** 14:11

**instructing** 190:4

**instructions** 13:18

**insurance** 134:14
136:24 140:23
141:16,20,23 142:2,
4,12,19,24 143:2,13,
16,23 144:21 145:8,
16,25 146:5,17
147:7,14,20 148:5,6,
7,8,13,21 149:10
151:5,9,12,25 152:11
171:24 172:16,22
173:4,7,25

**intend** 127:5

**intended** 61:16 62:8
63:22 168:10,20

**intent** 15:10

**intention** 127:8,9

**intentionally** 75:19

**interacted** 32:16
125:4

**interacting** 145:2

**interest** 26:21 33:16

**interject** 82:6
144:11,12

**internal** 166:21

**internally** 11:22
135:20

**interpretations**
111:13

**interrupt** 69:5
139:11

**intra-year** 57:23

**investigation** 16:12,
17 17:18 114:6,11
115:3 116:7 124:10,
17 161:3 164:17,21
165:2,10,11,14,18,21
166:3,11 167:11,17
176:10 178:4 180:12,
19,23 181:5

**investment** 27:11
69:22 70:2 105:8

**investors** 105:5,12
106:3,9

**invoice** 59:14 60:17

**involved** 18:2,19
29:24 32:12,20 69:16
72:15,20 77:3 83:8
86:17 105:23 106:14,
16 110:11 111:6,9
115:18 120:2 121:15
123:13,16 126:11
171:7 177:21

**involvement** 114:16
123:14

**involving** 110:6

**irony** 39:16 119:21

**Isaac** 179:8,12,25

**issue** 49:23 59:14
81:10 100:17 109:19

112:21 114:20
123:11

**issued** 49:6

**issues** 32:12 118:22
124:9 155:10,16,18
156:2,4,9

**items** 8:24 91:21
169:3 181:2 187:13

**J**

**James** 167:2

**January** 19:4 20:17
23:14,20 24:4 25:21
26:2,5 28:12 34:3,24
39:25 40:17 49:10
153:3 154:18 161:21
162:13 163:23
176:14

**January-ish** 19:11

**Jason** 11:20 12:20
16:7 33:6,7,20 34:9

**Jim** 26:7,9 27:4 40:21
60:12 76:24 83:20
98:18 105:22 106:13
121:3 170:18,25
171:10,21 179:24
180:25 185:15,18
192:19 193:5

**job** 165:8

**John** 5:9 8:2 56:5
82:5 102:14 115:19
117:6 139:13,17,21,
25 174:11 195:4

**join** 69:22

**Jones** 5:10

**JPEG** 183:6 187:11,
17,20,21 188:17
189:11,15 190:13

**July** 161:24 162:14
164:2 175:4 176:2,3,
7 177:17

**June** 42:25 43:2 47:7
49:10,22 86:24 87:6
95:9,16,23 96:8
101:14 102:6 107:10,
12 154:8,14

**K**

**K&l** 123:20

**key** 17:22 43:11
111:11,12 131:14
155:11

**kind** 36:7 59:15 60:16
117:14 140:8 189:23

**Klos** 12:3 79:15
80:14 90:12,19 171:8
183:2,3 185:15,20
186:3 190:3 194:3
196:11

**knew** 39:11 42:14,18
130:7,20 131:5
137:2,6 156:3,7
194:17 195:10,13

**Knowing** 84:12

**knowledge** 17:7,8,
11 26:22 32:9 34:21,
25 35:4 36:20,21,22
40:10 42:19,24 46:5
56:20 57:9,13,20
63:16 64:8,17 73:5,
8 77:3 85:6,19 98:18
100:17,20,23 101:4
103:19 114:9 115:3
116:6 119:22 121:17
124:11 150:18,19,22
152:6,10 156:15
166:23,25 172:23
173:7 180:20

**knowledgeable**
32:14

**Kristen** 80:15

**Kristin** 12:4 90:19
95:4 183:4,5 185:15,
21,23 187:10 190:4
194:3 196:12

**L**

**La** 158:5

**lack** 184:22 191:15

**lacked** 186:2,3 192:2

**lady** 174:13

**laid** 135:10

**large** 68:25 192:19

**largely** 61:21 66:23

**lasted** 154:25

**late** 32:2 33:18 97:20
145:23 151:14

**latest** 63:11

**launching** 177:21

**Lauren** 24:22 25:6
71:12 72:11 75:5
76:8 77:15 88:15,19
90:25 94:4

**law** 67:21 147:19
148:20

**lawsuit** 28:14,18
40:9 49:17 64:18,24
86:17 144:8 161:21

**lawsuits** 40:23

**lawyer** 94:13 148:17

**lead** 19:21 94:19

**leading** 40:17 53:4

**learn** 19:7 38:3 55:14
142:8

**learned** 14:24 15:20
16:4 38:5 55:20
153:10 154:2,12
155:9,16 156:2
167:17

**learning** 17:17 55:24
155:18

**lease** 34:14

**leave** 9:11 33:7,9
164:7

**ledger** 58:4,8,9

**left** 33:22 165:13
175:3 176:20,25
177:5,16 179:21

**legal** 27:17 31:13,15,
19 32:24 41:2,7
61:23 69:3 70:5 72:6,
14 74:19,22 76:14,15
77:23,24 83:9 106:13
126:9 138:9,13
144:15 170:14 178:8,
10,12,20 179:2 180:3
181:2

**legal/compliance**
76:19

**letter** 38:24 39:24
40:8 41:15 42:4
55:15 85:23 111:22

**Leventon** 179:8

**liabilities** 54:24
55:25 56:23 57:10,
11,14,21 58:7,18
59:2,20 64:24 71:14
102:6,8 193:20

**liability** 54:9,12 55:8,
9,13 58:21,22 63:14,
15 193:9

**lift** 175:13

**limitation** 31:3,8
34:22 176:18 177:2

**limitations** 33:4

**limited** 16:12,15
33:22

**limiting** 45:14

**lines** 52:6 141:13
146:25

**lineup** 24:19

**list** 29:6 88:11

**listen** 62:5 120:5
129:18 171:16

**listening** 41:25

**litigation** 16:24
41:10 179:10

**litigators** 178:13

**loan** 15:6,8,9 59:10
60:8 61:17 62:9 63:7
104:6 134:19,24
168:23 195:20

**loans** 61:3 194:19
195:12,24

**logic** 148:4

**Lokey** 110:9,11,13,
16,20 111:3,18,22
112:2,4,8,15,19,24
113:3,8,15,20,25
114:7,12,23 115:4,
12,21 116:9,24
117:5,12,21 118:5,6,
9,14,15 127:24

**128:**5,8,9,16 129:3,
13,22 130:16 132:23
133:2

**Lokey's** 112:11
114:16

**long** 64:4 73:18
148:13

**longer** 24:18,23,25
25:7 83:9 178:19

**looked** 80:25 89:9
116:23 139:5 163:8

**loss** 133:15,21 134:2
146:12 147:2,3,15
148:6 149:4,6,23
156:18 157:12

**lot** 36:11 40:19,24
62:13 69:20 106:16
109:25 110:2 123:13,
14,16 130:15,18
154:21 175:10,15
177:21 190:20 196:4,
19

**love** 117:3

**lower** 51:20

**LP** 5:12,19,22,25
19:25 20:7 21:2
27:18 32:7 42:21
61:22 123:15 124:21
125:15 131:3 146:2
169:20 171:3,5

**M**

**Mabry** 25:12 167:8

**made** 27:23 35:24
36:7 37:16,23 56:22
59:11 60:12 61:2
64:23 105:19 106:17
113:4,8,15,25 114:7
117:13 118:6,15
121:8 127:16,23
129:10 137:15
138:10 143:5,6,25
144:8 145:7 151:21
164:6 167:5 183:23
184:12 194:4,13

**magic** 56:8

**magnitude** 152:3

**maintain** 58:3

**make** 10:12 43:25
44:23 45:22 74:16
75:2 76:2,10 80:7,18
83:5 134:13 137:17
138:2 149:2 152:7
163:18 185:22 186:4
187:15 194:14

**maker** 186:6,9,11,12

**makes** 37:2

**making** 45:19 65:14
81:19,23 122:17
125:19 126:5 155:18

**manage** 67:3

**managed** 19:13
21:24 22:11,19 66:24
69:2 142:24

**management** 5:12,
19,22,25 27:17 32:7
42:21 52:6 61:22
69:25 105:22 106:13
123:15 124:21
125:15 131:3 146:2,6
169:20 171:3,5 178:5
180:22

**managers** 27:12

**manages** 21:13

**mandated** 108:10

**March** 29:20 30:3,7,
9,16,19 31:5,9 33:5
34:4,24 35:6 61:11,
14 126:22 129:4,14,
23 153:2,13 166:19
167:4 175:3,11
177:5,6 188:17
189:13 190:15

**Mark** 26:8,10 106:14

**marked** 7:12 46:19
50:25 119:9 124:13
125:20 158:3

**market** 130:22
153:12

**marketing** 19:22

**match** 82:25

**material** 75:7 90:20
93:3

**materials** 9:20 46:13 92:12 146:9

**matter** 62:25 85:17 121:16 133:15 173:21

**matters** 16:22 124:3

**Mckenzie** 174:14

**meaning** 58:23 96:11

**meaningful** 193:3

**means** 83:22 128:11 159:12

**meant** 84:9,10 100:9, 14 159:20

**measures** 121:20

**meeting** 87:2 98:17, 22,25 99:4,5,6,7,16

**meetings** 67:16 69:22 99:10,13,20

**members** 171:7

**memo** 9:10 72:9,13, 24 73:4,9,14,16,19 74:9 75:3,14 76:14 77:5,19 78:19 86:10, 21 87:9 88:10 89:2 96:11 100:2 123:3 124:12 125:6 127:13 128:22 130:3,15,16, 24 156:24 157:20

**memorandum** 125:19 126:25 127:3, 7,10

**memory** 141:7

**memos** 32:19 62:11 69:4 74:21 76:6,19 77:4 96:12 119:4

**mentioned** 131:19 132:12

**mergers** 68:11

**met** 11:18,19 12:4

**metadata** 187:10 189:16

**methodology** 131:23 132:8,9

**Michael** 7:19

**midyear** 153:19

**migrated** 179:2,5,15

**million** 14:7 48:21 50:18,21 51:18,21 63:24 79:7 82:11,12, 15,16 83:14 107:7 108:13 109:4,5,7,13, 14 133:17,23 134:6, 17,22,24 135:5 138:6,16,23 140:9,22 143:19 146:13,21 147:2,6,7,9,13,15,24 148:9,12 149:5,13, 16,18,23,25 150:4 156:19 157:13,15 168:10,19 192:18,22 193:2,4

**mine** 68:13

**minute** 82:7

**minutes** 109:19 191:4

**missing** 25:17

**mistake** 117:13 118:6,15 182:7 183:20,23 184:12 185:8,12,17 186:24 187:24 188:10,14,22 189:12 190:8,16 193:10 194:14,15

**mistakenly** 134:18 182:18

**mistakes** 113:4,8,15 114:2,7 121:8 137:15 194:14

**Mitts** 25:5

**mixed** 168:3

**model** 112:18,20,25

**models** 111:14

**moment** 23:12 117:9

**money** 60:9 108:22 134:12 137:23,24 140:13 172:13 185:18,21

**moneys** 109:4

**months** 155:2 161:20 162:2,3,7,11 174:13 179:18

**morning** 5:8 56:8

**Morris** 5:7,9 7:8,14, 18,22 8:9 10:11,15 17:2 18:5 29:9,14 38:17,22 42:10,13,22 44:17,19 45:10,12 46:18,22 47:3,5 48:10,13 50:12,16,24 51:4,9,12 52:13,15 53:22,24 56:9,13,17, 19 60:19,21 62:2,4, 20,22 70:22 71:20,23 72:16,18 73:18,20 76:22,23 78:3,5,24 79:4 81:14,16 82:9 83:11,12 86:2,5 87:12,15,20,22 88:16,18 90:8,10 91:5,7,22,24 93:12, 14 96:16,18 102:17, 21 103:3 116:3,11, 16,18 117:8,10,24 118:2,12,13 119:8,11 120:3,4 125:9,12 129:15,17 131:7,9 133:8,10 135:24 136:2 139:14,18,23 140:5,6 141:9,11 142:18 144:20 150:14,16,23 151:3 152:12,18,22,23 157:25 158:7,9,21,24 159:18 163:14,17 164:12 169:11,14 171:13,15 172:8 173:22 174:19,23,24 175:21,24 177:12,13 183:13,16 184:18,20 190:24 191:7,9 192:10,14 195:6,8 196:14,19

**motion** 9:11 159:24 160:3,8 164:6 183:18

**move** 44:17 45:11 50:12 53:23 60:19 62:2,20 70:12 72:17 76:22 78:24 81:14 83:11 89:22 91:22 108:4 117:25 118:12 120:3 125:9 129:15 131:7 135:24 150:14 171:14 177:12 183:13 184:18 190:24 192:11

**moved** 180:15

**movement** 172:21

**multiple** 13:21 31:23 99:10

**mutual** 142:13,20 144:23 145:2,8,15 149:11,13 150:4,7,20 185:8,12,16 186:24 187:24 188:10,14,21 189:12 190:8,16

**N**

**named** 65:17

**names** 23:17

**naturally** 32:22

**nature** 179:22 182:21 192:4,5 193:11,16

**NAV** 9:10 14:20,21 15:11 16:8,9 17:24 32:10,13,17,21 59:12 62:11 108:21 115:15 119:20 120:9,15,25 121:15,21 122:25 124:16,21,24 125:16 126:11 131:13,24,25 132:6,14,15,16,17,19 133:16 134:7 135:3, 12 136:11,13,16 137:3,7,18 140:15,17 142:13,15,21 147:9, 25 149:4,6 150:5,21 153:5,10 154:3,12,16 155:4 156:14,22 157:3,10,12 168:9,22 169:3,17 170:3,9,20, 22 171:5,20 184:6 185:4,19

**needed** 13:16 105:16 106:5 177:19,22 192:20

**negligence** 148:23, 25

**negligent** 135:2,7 136:7 138:7,17 146:23 168:11,21

**net** 122:20 147:2 149:4,23

**Nexpoint** 18:7 19:13, 24 20:7,23,25 33:9, 17 74:10 78:13

**night** 139:16 183:18

**non-orderly** 129:5, 14,24 130:6,10,23 131:11

**norris** 5:4,8 6:1 7:1, 12,21 8:1 9:1 10:1,14 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,9,17,21 25:1,3,11 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,15 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1,4 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1, 12,19 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1,25 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1

164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1,10 192:1 193:1
194:1 195:1 196:1

**note** 13:12 17:7,8
73:15 75:8 78:21
81:4 102:7 134:21
161:15 169:7,8,9
176:11 182:15,16,19,
23 183:4 186:4 190:5
192:4,18,22

**notes** 9:6 14:12,13,
24 15:15,21 16:5
17:9,11,24 19:8
27:23 28:9,13,17,20,
23,24 35:10 36:2,9
37:12,17,25 38:4
39:11 40:6,14 42:14,
18,24 48:18,20,22
49:6,8,11,15,17,23
50:5,9 58:7 64:17
70:16,25 71:8,9 79:8,
10,11,20 81:10 82:17
83:3,19 86:15,17
101:19,23,24 161:5,
19,22 162:17,22
163:6,21,24 164:19
165:15 166:22,25
167:2 176:14 181:8,
13,24 182:6,20
183:20,24 184:13
185:2,3,6,25 187:7
192:15 193:11,15,17,
18

**notice** 6:6 7:11,24
8:14,18 9:9,24 10:8,
21 11:9 22:25 32:18
37:4 141:20

**noticed** 193:8

**notified** 146:11

**notwithstanding**
55:13 149:8,22

**nuance** 95:3

**number** 7:15 9:14,17
27:19,21 29:6,8

52:16,21 57:6 63:2
67:20 78:10 79:7,19
82:16 83:14 85:9
86:8,19 89:8,9 90:20
92:19 93:22 95:8,14
96:7 98:9 102:3
103:4 104:18 109:8
119:4 123:7 141:19
142:10 146:14 148:9
152:15 163:2 184:10

**numbers** 82:25 96:4

---

## O

**object** 116:14 172:5
173:18

**Objection** 42:16
70:18

**obligated** 70:15,20

**obligation** 192:23

**obtain** 108:2 145:7

**obtained** 95:21

**occasions** 31:24

**occur** 193:16

**occurred** 120:16

**October** 70:14,24
72:3 73:24 78:15
84:23 92:18 93:18
95:6,13 97:14,16,23
98:10 100:2

**October/november**
97:20

**off-market** 153:12

**offhand** 156:25

**office** 70:6

**officer** 18:13,15,22,
23 20:3,10 21:5,24
22:18 24:23,25 32:15
33:13 39:16 45:18
65:5,13 74:25 76:9
80:6,17,23 81:21
122:16 125:13,18,24
126:4 191:19

**officers** 23:2,14
25:21 26:2 39:21
69:15

**offline** 144:13

**offsets** 133:19

**Okada** 26:8,10
106:15

**on-market** 153:13

**ongoing** 118:8

**open** 9:18 106:11

**open-end** 105:4,7,25
106:18

**operating** 193:3

**operational** 105:11,
15

**operative** 159:7,12,
15,16

**opinion** 47:8,14,23
49:22 145:25

**orally** 124:20

**order** 6:25 40:22
56:21 138:16

**orderly** 130:23
131:11,22 132:7

**original** 8:22 9:2,3
29:4,7,11,19 34:5
38:20 93:9 113:13
162:19,22,23,24,25
163:4,7 166:13,15,19
168:5

**originally** 18:17

**outflows** 68:7

**outsource** 43:18
115:10 129:9

**outsourced** 27:16
31:14 32:23,24 41:4
43:12 61:22 63:10
65:3 119:23 129:12
135:18 137:11
170:15

**outstanding** 70:16
78:16 90:20 93:3

**oversee** 43:19 44:15
45:3 68:5

**overseeing** 135:16
171:8

**overview** 12:8 17:23

**owed** 71:14

**owing** 65:24 79:21
83:2

**owned** 26:14

**owners** 26:5,8

**owns** 26:11,19

---

## P

**p.m.** 92:18 93:18
103:2 151:2 191:8
196:21

**Pachulski** 5:10

**pages** 73:21 79:25
89:20 163:8

**paid** 103:19 104:3,4,8
105:5,15,16,17
106:6,8 107:5,9,10,
11,15,18,20 109:4,17
111:19 136:24
141:17 146:21 148:3,
4 149:13

**paper** 183:4 185:22
189:19 194:19
195:11

**papered** 182:22
195:20,24

**papers** 185:23

**paragraph** 127:20
128:2,4 132:21
133:7,15,25 152:25
160:14 169:12,16
173:3 175:19,22
181:6 184:21 185:8
188:6 191:12

**Paragraphs** 168:8,
16,17

**Pardon** 189:5

**parenthetical**
133:20

**Parker** 24:8,16,23

**Parker's** 24:12

**part** 31:12 32:25
34:18 61:5 67:24
69:2,3 70:4 72:3
77:21,23 85:13,15

**owed** 71:14

**owing** 65:24 79:21
83:2

**owned** 26:14

**owners** 26:5,8

**owns** 26:11,19

87:2,10 92:11 122:9
127:25 129:8 142:24
150:11 165:18,21
166:11 176:21
178:11 195:25

**participate** 67:7,13,
15 99:15

**participated** 32:19
68:21 71:6

**particulars** 161:15

**partner** 26:11,12,16
106:15

**partners** 27:2

**parts** 67:14,15 83:14
168:13

**party** 68:3 115:5
125:2,15 146:3,7
148:22 149:9 155:17,
20,22,25 156:6,8

**passed** 71:11

**path** 185:16

**patience** 93:15 195:2

**pay** 70:15 104:12,14
105:19 108:23 109:4
134:5 137:24 138:5,
16,23 140:9 157:17

**payable** 53:19 54:9
58:3,8,9 73:15 78:12
90:21 93:4 101:19

**paying** 104:22
148:12

**payment** 51:23 63:5
108:12 134:13
140:22 141:15 151:5,
10 168:10 170:20
184:5 185:3,5

**payments** 52:24
53:13 54:6,11 55:24
56:22 57:5,10,11,20
58:14 59:9,19 61:2,
16 62:8 64:23
127:16,17 134:2,10,
24 135:6 137:18

**PDF** 89:18

**pending** 49:17

**people** 12:12,19
88:5,20 122:5 123:13

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 09/24/24 Page 100 of 200   PageID 24312
Appendix Part 4 Page 134 of 474

Index: percent..question

179:2,5 194:12

**percent** 26:11,14
80:19 105:5

**perform** 27:9

**performance** 67:23
68:2,4 69:23,25
138:7

**performed** 27:14
62:15 68:2 113:9

**performing** 170:14

**period** 18:2 24:7
27:18 31:14 40:16
43:23 46:11,25 47:18
86:24 95:15,22
105:18 107:8 121:3
153:2,6,8,12 154:14
156:3 161:9 162:15

**periods** 22:4,5 54:19

**permission** 159:24
180:10

**permit** 147:19

**permits** 148:20

**permitted** 148:19
161:10 174:3

**person** 12:4 125:3
137:20,21

**personal** 32:9 34:25
36:21 103:18 152:10

**personally** 99:15

**perspective** 14:4

**phrase** 35:15 37:3,20
180:21

**picked** 178:16

**pinpoint** 135:22

**place** 58:24 179:24

**plaintiff** 170:8,21
171:19,24 184:5

**plaintiff's** 7:23 9:24

**play** 70:9

**pleading** 30:13
35:14 159:7,12,15,17
181:11 182:17
193:25

**pleadings** 11:15
27:24 35:19 61:4
135:10 172:20 175:6
180:14 186:19,22,25
193:24,25 194:21
196:2,3

**plenty** 187:3

**plugging** 96:5

**point** 22:6 61:25
68:24 80:2 115:7
154:17 158:11 175:5
187:25 188:23

**pointed** 22:24

**points** 172:6

**policy** 142:11,12,13

**portfolio** 27:12

**portion** 29:16 50:13
78:25 79:18 107:11
125:10 141:2 190:25

**portions** 6:24
131:14,16

**posed** 71:10 101:10

**position** 12:10 18:8,
11 20:10 21:6 38:5
53:3,18 54:13 55:12
59:18 60:25 61:15,24
62:8 64:21 85:7,12
86:15,20 97:7,11
101:21 113:7,14
139:9 140:2,3,7,16
142:4,6 143:10
147:5,16,18 148:19
149:17 170:25
179:19 181:6,10,13
182:4 183:19 186:9,
11,14,16 190:8
193:18 194:9,22

**possession** 162:17
163:24 176:14

**Post** 11:20 12:20
16:4,7 32:4,5 33:5,7,
11,15 34:7,9,16,23
97:12

**practice** 121:23
182:19

**practices** 121:18

**preceded** 87:8

**precise** 109:11

**preference** 53:7

**preliminary** 179:24

**premiums** 148:5,6,
13,15

**preparation** 12:14
13:15 15:3 43:14,20
48:16 82:24 142:9
144:8 163:9 172:25

**prepare** 11:11 36:14
43:19 72:13 103:11,
14 104:17 112:19
161:11

**prepared** 10:6 28:4
52:20 57:23 74:21
84:5 114:14,17
118:21 161:2,19

**preparing** 131:6
154:13 183:23
184:13

**present** 13:22 22:7
23:15

**presentations** 119:5

**presented** 89:25

**president** 18:13
19:4,6,19 20:2,7
21:5,12,18 22:11
24:3,8,13,16,18,19,
21 25:4,11 43:4
60:12 73:25 74:5,7
97:4 116:5 170:19
171:2,10,21 173:12,
14,15,16

**pretty** 123:11

**previously** 40:5
164:6

**Pricewaterhouseco
opers** 47:7,11 49:22

**principal** 66:15
70:16 79:7 82:17,25

**prior** 22:15 31:4,9
33:5,22 34:12 35:8,
24 36:8 37:11,16,24
39:24 40:8 61:14,20
62:7 63:16 76:6
99:25 101:23 116:14
120:16 124:13
126:22 152:16

157:13 167:6 179:11

**priority** 40:25

**problem** 168:14

**procedures** 46:7

**proceed** 151:10

**proceeding** 28:8

**proceedings** 5:1
99:11

**proceeds** 134:14
136:24 140:23
141:16 146:17
148:11,13

**process** 17:25 32:21
62:18 63:13 67:13
69:2 71:6 76:20 87:2
99:8 111:17 122:2
123:9,10 154:25
157:19,21 160:10,11
171:9 183:8 185:23
194:2,4

**processed** 152:2

**processing** 133:18

**produced** 117:2

**product** 19:20 20:4
96:3 112:14

**professional** 43:17
180:6

**professionals** 27:8
41:7 43:18 69:22
80:13 194:12,14

**profited** 147:24

**profits** 148:3

**prohibited** 173:19

**prohibition** 174:10
176:18

**promise** 55:21
138:11

**promissory** 9:5
14:13 28:9,23 48:20
181:7

**promptly** 166:21

**proper** 154:23

**proposal** 106:5

**provide** 53:4 68:5
69:24 70:3 75:20
88:5 91:12 178:19

**provided** 11:24
25:15 46:14 66:9
68:25 76:16,18 80:24
86:22 92:11 94:10
95:12 102:2 110:23
111:3,12,22 114:23
115:14 177:24

**provider** 65:18
115:10 129:9 148:22

**providing** 68:17 70:7
77:21,24 146:22
178:19

**proxy** 106:3

**publicly** 183:18

**pull** 89:13 102:11
119:5 167:22

**pulling** 96:4

**purports** 164:16

**purpose** 14:6 25:23
101:9 122:23

**purposes** 57:24
62:16 64:2,9 129:6,
25 146:22

**pursuant** 66:10
111:22 138:4

**put** 7:9,15 29:9 38:17
40:24 41:9 46:18
50:24 71:20 87:12
119:8 152:13,19
157:25

**putting** 6:22

---

**Q**

**quality** 67:23 68:17

**quarrel** 162:5

**question** 6:14,16,18
22:17,22 35:20 41:24
42:2 45:17 50:15
53:9,10 54:3,4 60:22
61:8 62:5 65:9 70:21
71:10 72:21 78:4,6,9
79:3 82:20 86:7,10
89:8,9 90:19 91:25

92:19,24 93:10,18,22
94:10 95:8,14 100:6,
7 113:13 114:22
115:9,15 116:15,17
119:24 120:6 126:2
129:19 130:14
135:14 137:2,6
138:14 154:5 155:6
171:17 173:9 176:4
180:16 183:14
184:19 187:19 189:8
194:5,23 195:5

**questioned** 99:23
115:16

**questions** 9:8 28:4
36:14,17 37:7,21
54:2 77:7 88:6,11,12,
23 89:3,25 101:10
139:15 142:10 155:4
191:10 196:15,18

**quick** 46:17 152:6

**quote** 78:15 83:18,20
98:15 129:3,22
131:22 169:16
171:23 181:7,8
191:15,16

---

**R**

**raised** 34:17

**reach** 40:12 135:11
145:15

**reached** 138:3

**read** 73:12,16 79:15,
18,23 92:8 93:7
100:5,6 122:14
131:20 132:2

**reading** 43:9 84:10
126:19 184:8

**real** 178:15

**reason** 13:2 15:10
40:12,15 41:13,17
47:15 66:21 80:12
98:4 154:17 157:16

**reasons** 148:18

**rebates** 133:19

**recall** 5:9 20:23 38:2,
10 40:16 41:20 52:16

---

124:15 126:15 144:5
151:12,14 163:6

**receipts** 147:8

**receive** 41:15 104:11
148:21 149:18

**received** 38:8 39:14
42:5,8 50:17,20
52:10 80:10 108:22
143:19 146:18 147:5
149:17,24 150:4
151:5 166:13 187:9
194:7

**receiving** 41:21
51:24

**recent** 193:25

**recess** 56:18 103:2
151:2 191:8

**recipient** 100:13,24

**recipients** 92:17
93:21

**recognized** 171:11

**recollect** 17:22

**recollection** 14:12
22:10 100:8,11,12
102:5 128:14,18
141:13 153:9 182:11
195:19

**record** 5:2 7:13
10:12 54:6 59:2
60:10 62:19 63:8
82:7,8 142:17 185:16
190:5 193:20 196:21

**recorded** 53:17 54:8,
23 55:3,4,8,10,25
58:14,17,18,20,22
63:14 64:9 79:11
134:19,21

**recording** 53:18
55:13

**records** 44:12 52:24
53:14,16 54:7,12,23
55:7,14,20,24 56:21
58:15,19,21,22
59:18,25 60:11,25
61:5,14,21 62:10
63:4,18 124:6 193:9

**recover** 143:22
147:20

---

**refer** 5:21,24 13:14
17:19 20:25 28:22
30:9 31:16 54:16
60:3 61:18 63:11
67:3 83:24 84:2 85:5
119:6 164:22 172:19
181:11,20 184:16
186:18 188:19 192:8
193:24 194:20
195:15 196:2

**reference** 48:20
51:13 128:7,8 131:2
153:2 184:22 191:14

**referenced** 82:15
190:13

**referred** 124:2

**referring** 37:5,20
98:23 187:4

**refers** 65:21 98:8
127:22 128:4 169:19

**reflected** 16:13,18

**reflects** 59:18 60:25
138:22 140:8

**refrain** 6:15

**refresh** 128:14,18
141:13 153:9

**regard** 36:19 41:21

**regularly** 91:21
193:13

**regulator** 108:7

**reimbursement**
142:15

**reiterate** 45:7 115:20

**relate** 168:8,18

**related** 17:10,11
34:11 35:25 36:8
61:25 62:14 73:14
81:9 99:5 105:2
169:7 174:3 185:4

**relates** 35:9 37:12,
17,25 103:4 141:20
148:3

**relating** 36:17
145:16

**relation** 67:17

---

**relevant** 167:18

**reliable** 44:3

**relied** 43:21 44:12
80:20

**rely** 44:5,6 112:24
127:6,13

**relying** 25:19 80:13

**remains** 78:16

**remediation** 122:2

**remember** 15:13
18:18 21:19 36:10
38:16 60:7 61:10
73:12 74:15 80:3
99:20 100:15 101:21
102:13 107:15
109:14 112:17
121:12 126:19
136:21 151:6 157:6
180:2 182:10 183:11
196:9

**remembered** 14:9

**remind** 38:13

**renew** 67:10,19

**reorganized** 5:11

**rep'ed** 166:4

**repeat** 28:16 40:7
176:21

**report** 72:2 76:2,10
78:14 84:15,19 89:10
95:7 96:10,11 118:20
130:11 131:4

**reported** 57:18 63:25
64:12 107:13,14

**reporter** 7:13 142:17

**reporting** 119:21
156:9

**reports** 94:22

**represent** 8:10 89:3
116:23

**representation**
29:21 51:8 80:3 89:6
163:20

**representative**
15:19 36:22 40:4
44:21 45:23 82:11

---

119:14

**represented** 134:10
172:12 175:10

**representing** 46:6
95:3 186:7

**request** 33:10 81:24

**requested** 78:9

**requests** 11:25 88:9

**required** 108:7 192:5
193:5,7

**requirement** 76:5
125:24

**requires** 67:18

**research** 84:13

**reserve** 196:17

**resolution** 122:20,
25 123:9 157:20

**respect** 34:22 95:7
173:10

**respond** 6:18 9:8
11:17 40:10 90:19

**responded** 39:23
40:8 91:8

**responding** 156:9,
10

**responds** 92:8 93:17

**response** 9:3,4 15:7
54:17,18 63:11,12
77:6 80:8 81:13,23
82:16 83:18 85:8
86:7 91:6 92:6,9
93:13,25 94:20
95:13,20 96:19 98:9,
16,24 161:8,12 168:6

**responsibilities**
46:7

**responsibility** 14:21
43:9,25 62:24 65:6,
14,19 75:2,25 76:10
81:19,22 111:11
115:8 122:17 126:5
129:11 169:17 170:3,
7,9,22 171:4,19

**responsible** 45:18
62:17 75:16 76:6
80:11 114:19 115:5,

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 09/15/4 of 472e 102 of 200    PageID 24314

Index: responsive..simple

9,15 125:2,15,19
130:17,21 135:23
146:3,6 149:9
155:17,19,22,25
156:5,8,16 168:9

**responsive** 11:17,24
50:14 54:3 79:2 94:3,
9 125:11 184:19

**rest** 28:23 72:13

**restate** 22:17 155:23
187:19

**restatement** 153:6

**restraining** 40:22

**restricted** 34:13

**restriction** 30:22
31:3,8,11 34:20,21
177:2

**restrictions** 33:3,11,
15,21,24 34:11

**restroom** 56:7

**result** 121:7,21
147:24

**resulted** 131:24
132:13 151:9

**resulting** 135:6

**retail** 32:15 33:10
65:22 67:5,8 70:14,
25 71:8,10 72:3,24
75:4 76:3 77:6 78:9,
15 80:9 84:6,16,19,
23 86:7,12,13,22,23
87:9 88:3,6,23 89:10
90:2 92:19 93:21,25
94:20 95:7,13,21
96:9 98:10 101:10
112:12

**retain** 113:12

**retained** 47:12
110:8,13,16 112:2,9
123:18 124:8

**retaining** 113:18

**retention** 112:11
128:15

**revealed** 54:13

**revenue** 66:16

**reverse** 56:22

**review** 66:13 67:9
73:12,13 74:13 88:8
101:11 106:3 166:21

**reviewed** 11:15,16,
21 12:2 43:5 73:14
76:24 117:17

**reviewing** 65:6 76:6
77:4 193:13

**rights** 113:12,19

**rise** 192:19

**role** 18:14 19:12,19,
21 20:3 34:12 44:15
45:2,13,14,24 46:4
65:18 69:21 76:5
80:23 113:12 177:25

**roles** 19:16 46:6

**Rome** 87:24

**roof** 152:10

**Ross** 24:3,7,18

**roughly** 146:16

**Rukavina** 7:25 11:19
12:5 13:22 16:19
42:7,16 56:5 70:18
82:5 102:14,20,24
103:16 115:19
116:13,22 139:13,17,
21,25 144:11 159:11,
14 163:12,21 164:8
172:5 173:18 174:11,
21 191:6 195:3
196:17,20

**rule** 5:18 7:10 9:25
108:9 147:19 148:20

**rules** 6:13 174:18

**run** 69:2

---

**S**

---

**safe** 39:13

**sales** 19:21 68:6,13

**Sauter** 9:5 12:17,19
16:12,17,21 17:5,15
103:17,18 161:3
164:14,16,17 165:4,
14 166:10 167:16

175:9 176:9 177:25
178:15 180:18,22
181:18,23

**Sauter's** 13:15 31:16
54:17 167:10 175:6
180:11 181:21,25
188:24

**scale** 68:8

**scheduled** 8:14,15

**schedules** 31:17
32:18 46:14 187:2,4,
7

**Scott** 179:13,14,25

**screen** 6:23 7:10
8:12,13 9:15 10:17,
25 29:10 30:7 38:18
46:19 47:16 50:25
71:21 87:13 120:13
122:12 124:13
125:20 152:14,19
158:2 160:7 167:24
188:12

**scroll** 7:20 10:12,24
11:3 29:18 47:4,20
48:5 51:10 78:3
88:16 90:8,9 91:5
93:12 96:16 133:9
158:23 175:22

**scrolling** 89:20

**search** 144:17

**searched** 144:13
151:18

**searching** 145:11

**SEC** 32:20 62:12
106:3 121:3 124:3,
10,16,19 125:4,6,14
154:22,25 156:10,24

**secretary** 18:17,18,
20,25 19:5 20:22
21:20,21 22:15
24:10,18,22 25:6,7,
13 72:12 75:5 77:18
94:15 97:2

**section** 48:18 67:18

**Securities** 74:10

**seek** 106:10,17
108:2,4 142:15

**Seery** 12:3 31:18
33:8

**selection** 70:2

**send** 8:2 127:3 190:5

**sending** 39:19 72:9,
24 74:8 75:13 100:2
127:10

**senior** 105:22 106:13

**sense** 37:2 177:19

**sentence** 83:17
84:9,10 85:8,17 98:8,
9,13 99:24 100:10,
14,25 127:22 128:2
131:15,21 134:3
170:5 173:2,5 181:18

**separate** 81:9

**September** 99:7
154:2 174:20,22

**serve** 21:11 66:22

**served** 6:7 22:10
44:14 65:13 67:4
74:25 191:22

**server** 151:19

**serves** 96:25

**service** 65:18 77:24

**services** 9:6 27:10,
17 32:23 44:10
62:14,15 66:6,9
67:23 68:15,17,24,25
69:3 70:3,9 74:20
75:22 76:16 77:21
110:22 111:2,9,10,23
113:5,9 114:13,23
118:17 135:2,7
138:8,17 142:25
150:11 170:13,15
177:10,22,24 178:8,
11,20

**set** 165:5

**settlement** 60:17
70:6 138:25 140:3

**seven-and-a-half**
14:7

**share** 15:19 25:25

**shared** 9:6 44:10
62:15 68:24 69:3

70:9 74:20 75:22
77:21 111:9 142:24
150:11 170:15
178:11

**shareholder** 107:24

**shareholders** 106:4
107:19,20,23

**sharing** 177:23

**sheet** 48:7 53:20
55:5 58:23,24 59:3
65:7 87:6 92:11,20
93:23 94:5 96:5
102:9 108:15,17
193:13,21

**sheets** 65:15 87:5

**short** 150:23 191:2

**shorten** 37:21

**show** 7:20 38:13
162:22 163:11

**showed** 47:25 55:4
108:19

**showing** 30:7 187:10

**shown** 63:23 147:2

**shows** 51:20 63:5

**shrinking** 68:9

**sic** 9:10 188:17

**side** 193:15

**sides** 137:25 138:2
177:7 186:7,8,14

**sign** 169:9 182:12

**signature** 181:15
183:6,12 187:11
193:19

**signed** 42:15 47:6,8
49:9 169:8 181:7,15,
24 182:3,6 183:12,20

**significant** 148:5

**signing** 182:10
183:11,24 184:13
186:12

**signs** 186:11

**similar** 193:11,16

**simple** 6:14 54:4

Index: simplify..Thereof

60:23 93:19 183:15
193:10

**simplify** 54:22

**simply** 92:2

**single** 73:25 79:23
119:13 125:3

**singular** 170:18

**sir** 5:15 38:20 71:24
120:5 124:7 158:10
186:17

**sit** 35:22 41:14 46:9
110:15 114:9 133:3

**size** 192:4,15 193:12,
16

**sizeable** 192:25

**Skyview** 83:10
161:14 177:7,22
179:2 180:3

**slack** 178:16

**sloppy** 194:6

**sole** 26:25 27:4 101:9
191:25

**Sounds** 138:9

**source** 66:15 69:24
91:2 98:5 119:19
145:9,12 147:19
148:20 167:6

**speak** 12:23 13:3,5,
9,16,19 31:4,9 33:4
83:6 167:5,7

**speaks** 195:15

**specialist** 43:22

**specialize** 152:5

**specific** 38:16 44:25
72:20 86:11,18
103:24 120:17
125:24 155:12
156:12 157:4 170:24
180:2,20

**specifically** 44:21
49:5 65:12 84:21
86:9 99:21 125:17
180:24 181:23 192:3

**specifics** 156:20

**speculate** 84:20

**speculation** 34:18
41:9 122:8 150:18

**spent** 109:21

**spoke** 11:19,20,21
12:13,18 165:19,22
166:2,10

**spoken** 13:13 166:16

**spring** 103:20

**Stacy** 87:23 89:25

**stance** 157:22

**standard** 90:25

**standards** 180:7

**Stang** 5:10

**star** 147:9

**start** 87:20 104:2

**state** 155:6

**stated** 183:18

**statement** 36:6
37:22 43:13 49:4
51:6,8,20 52:2 63:23
64:9 84:15,18 85:8
100:25 106:4 161:15
165:24 166:5,6
172:4,9,21

**statements** 43:6,10
44:2,24 45:5,8,20
46:11,24 47:13,18
48:15,19 49:21 50:2
57:22 58:13,16 64:5,
14,17 65:10 86:23
95:15,22 101:14,18

**states** 133:25

**step** 14:18 152:5

**Stephanie** 25:13
179:6

**stepped** 181:3

**stepping** 64:6

**steps** 58:13 74:16
121:13

**stop** 51:11 102:21

**Strand** 26:13 27:3

**strategist** 19:21 20:5

**strategy** 16:24

**strict** 31:18

**strictly** 45:14

**strike** 44:18 45:11
50:12 53:23 60:20
62:3,21 72:17 76:22
78:25 81:15 83:11
91:23 117:25 118:12
120:3 125:9 129:16
131:8 135:25 150:15
171:14 177:12
180:15 183:14
184:18 190:24
192:11

**string** 88:6 101:8

**structure** 27:13
104:5

**stuff** 190:21

**subject** 16:4 28:14,
18 49:17,21 66:12
112:20 123:5 124:10,
16 135:9 140:10
150:2 180:13 181:8

**submitted** 106:2
151:20

**subsequent** 17:20
48:11,17 49:5,16
55:3,4,6,8

**substantial** 192:23,
24,25

**sued** 13:10

**sufficient** 68:18

**suggest** 73:4

**suing** 48:23 49:11
161:5,20 162:18
163:22 165:16
176:15

**summarize** 20:6
133:11

**summary** 133:12

**summer** 32:2

**supplemental**
115:23

**supplied** 87:4

**supplying** 75:10

**support** 9:12 44:12
76:19,20 83:4,20
84:25 185:11 186:20
188:20,21 189:11
196:4

**supported** 137:23

**supporting** 187:6

**supports** 187:23
190:7,15

**supposed** 59:10
61:2 134:25 135:6

**supposedly** 186:7

**Surgent** 72:14 89:24
90:4

**surprised** 60:16
63:18 139:7

**surrounding** 16:8
32:13 86:14 161:4
164:19 165:15
176:11

**suspect** 144:14

**sworn** 5:3,5

---

## T

**taking** 85:11 94:19

**talk** 13:11 14:15
34:14,15,16 67:25
68:4,5,7 69:20,23
82:23 109:18 144:12
161:10,14,16 174:3,
16 179:25

**talked** 14:20,21
30:21 34:9 100:22
108:23 166:12

**talking** 16:7 17:20
18:3 43:16 68:10,11
115:7 127:16 151:4

**task** 119:15,17,18

**tasked** 43:21 45:8
53:16 164:21

**team** 31:13,19 43:17
44:4 50:8 53:17,21
65:16,19 72:14 74:19
75:9 77:23 78:22

**81**:25 126:10 142:23
151:19 170:14 171:7
178:12,13 179:2
180:3 189:19 193:14,
17

**technicality** 77:14

**telephonic** 99:6

**telling** 93:20 126:15
133:3

**tells** 185:19,21

**tendered** 29:13
38:21 46:21 51:3
71:22 87:14 119:10
158:8

**term** 30:20

**terms** 104:4,8 105:24

**Terrestar** 109:18,23
110:3,6,9,23 111:4
112:15,21 113:10,17
114:3,20 117:15
118:22 119:16
120:25 121:9 124:9
137:16 138:18
146:23 147:10

**testified** 5:5 41:20
60:4,6 83:24 85:3
104:21 126:18
140:19 151:17 182:9
192:7,8 193:12
195:16

**testify** 10:6 27:22
52:17,20

**testimony** 22:15
42:23 51:17 60:3
64:15 75:23 79:15,19
80:17 81:7 84:3 85:3
185:14 190:22
192:12 195:15,16,21

**Texas** 147:18 148:20

**Thedford** 24:22 25:6
31:7,23 71:12 72:11
75:5 76:8 77:15 83:6
89:23 91:11 94:12
96:20,24

**Thedford's** 94:13

**theory** 147:25 148:2

**Thereof** 9:12

Index: thing..wait

**thing** 69:19 136:3 160:18

**things** 11:22 12:7,8 13:10 31:25 32:3 33:19 67:22 68:15 75:8 91:20 161:10

**thinking** 35:11 71:5

**third-party** 112:5 128:16

**Thomas** 72:14 88:21

**thought** 50:8 63:15 182:18 186:15

**thousands** 163:8

**threw** 148:9

**time** 6:23,24 7:4 8:4, 15 15:15 18:2,21 20:14,24 21:20 22:4, 5 24:7,24 27:18 31:14 32:16 33:12,19 39:20,24 40:7,16 41:3 43:15,23 46:16 54:19 55:7 56:6 58:17 64:4 73:6,10, 11 94:17 95:10 96:24 97:9,25 99:25 102:19 104:23 106:15 107:8 109:17,22 110:2 113:21 114:4 119:13 120:24 121:19 124:14 126:13,15,24 129:3 135:4 136:5 143:16 145:6,17,24 148:13 150:24 153:12 155:12,14,15, 25 157:4,23,24 158:11 159:9 161:9, 18 162:15,16 163:25 164:2 166:15,18,20 168:5,12 172:7,17 173:24 175:3 176:17, 20,24 177:11,16 178:7 180:10 183:17 194:22

**time-** 20:21

**timeline** 20:21

**times** 13:19,21 43:16

**timing** 154:7

**title** 18:8,11 19:12,24 20:12 24:12

**titled** 122:20

**titles** 19:16 23:17

**today** 5:13,17 6:4,23 7:24 8:14,15 9:25 10:7 18:6 36:24 37:10 42:3 44:21 57:19 62:8 64:15,21 79:5 114:10 117:18 133:4 159:6,21 172:10

**today's** 8:4 11:12 13:20 14:2 15:3 82:20 173:2

**told** 15:8 31:24 40:4 41:4 60:8 86:6 97:23 100:16,19 117:12 118:14 119:19 124:19 125:7 129:2, 20 130:15 132:6 137:17 140:18 143:15 150:7 182:3, 11,13 183:2 185:18 186:4

**tolling** 113:22

**top** 86:3 102:22 146:13

**topic** 9:17 17:15 23:5,9 27:19,21 28:5 29:6,8 36:14,18 52:16,20 63:2 65:20, 21 99:17 103:4,12,14 104:18 117:16 141:19 142:10 158:13,14 161:17 163:2

**topics** 10:8,13,16,20, 25 11:8 14:14 16:16 22:25 34:17 57:6 102:18 114:15 115:21

**total** 107:2,4,5 108:13 109:12 133:15,21 146:12 147:8,14

**totality** 102:5

**trading** 27:8,10,11

**transaction** 108:18

**transactions** 14:8 129:4,14,23 130:10,

22 153:13 194:19

**transcript** 84:11

**transcripts** 186:21 187:18

**transfer** 14:7,11 15:10 51:14,21 52:7 60:13 183:2,4 185:18,20,21,22

**transferred** 51:18 134:18 137:23 140:13,14 168:19 172:13

**transfers** 52:18 54:23 108:23 182:20, 21 195:12,23

**transition** 177:9

**transitioned** 97:13

**treasurer** 24:9,17,22 25:5,12 39:7 43:14, 25 44:8,14,22,25 45:2,15,24 46:4,8 65:17 75:13,25 76:5 80:22 96:21 191:22

**treated** 56:2 57:15 62:9

**Trey** 24:8,15,23

**trick** 159:19

**TRO** 40:22

**true** 44:3,24 45:20 65:15 75:3 76:2,11 80:8 81:19,23 125:20 126:6

**trusts** 26:8

**Tuesday** 92:17

**turn** 30:5 110:5 158:21 169:11

**turned** 183:3

**two-thirds** 26:9,19 146:16

**tying** 190:9

**typical** 86:25

**typically** 99:5 104:8

**typo** 90:24

**U**

**Uh-huh** 8:25 11:4 23:4 52:19 53:11 88:22 93:16 118:24 141:21 176:12

**ultimate** 124:24

**ultimately** 110:5 129:11 130:17 171:21,24

**unable** 31:24 41:5 178:13 179:20,21 180:7

**unaudited** 95:17,22 96:4 101:14,18

**unauthorized** 85:9

**unaware** 40:5 64:16, 22

**unclear** 101:22

**uncomfortable** 33:14

**underlying** 82:23 101:25

**understand** 5:14,16 12:10 15:17 48:17 103:6 106:19 113:12, 19 115:20 128:11 148:18 160:6

**understanding** 13:8 15:23 30:14 46:3 53:2 54:8 55:2 78:8 103:8,22 106:7 111:16 122:22 139:8 147:18 159:6 160:5 161:6 184:25

**understood** 32:21

**undertake** 106:25

**undertaken** 115:2 116:8 167:16

**undertaking** 113:24 114:5,10

**undertook** 16:13,18 164:18 166:21

**unfettered** 34:6,8 173:11,16 175:2,8 177:15,19

**unusual** 91:19

**urgency** 56:6

**utilized** 124:3

**utilizing** 178:7

**V**

**vagueness** 172:6

**valid** 50:5,9 143:11

**valuation** 32:23 62:16,17 109:18,23 110:3,6,10,12,24 111:10,14,15,17 112:6,16,17,20,21,25 113:4,10,17 114:3, 13,20,24 115:10 117:15 118:16,22 119:16,22 121:9 124:9 128:17 129:8,9 130:8,21 132:9 135:2,7,16 137:11,16 138:8,18 146:24 147:10 154:24 155:5, 9,16,18 156:2,4,8 170:13 171:7,9

**valuations** 115:9 131:6 156:16

**verified** 107:14

**verify** 125:24

**vice** 18:13 19:3,6,18 20:2,7 21:5,11,17 22:10 24:8,13,16,21 25:4 43:4 73:25 74:5, 7 97:4 116:5

**view** 14:3 178:20

**viewed** 75:21

**violating** 174:18

**Vitiello** 25:13 179:6

**voluntary** 108:3

**vote** 106:5 107:24

**voted** 104:10 105:12

**W**

**wait** 13:17 159:22

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-8 Part 4    Filed 09/01/24    Page 105 of 200    PageID 24317

Index: waited..Zoom

**waited** 157:16

**wanted** 143:22

**water** 56:12

**Waterhouse** 12:3,23
13:3,6 14:10 15:5
24:9,17,22 25:4,11
39:5,7,13 41:14 42:5
43:15,24 44:22 60:4
65:16 71:13 75:9,12,
24 78:22 80:14,22
81:25 82:24 83:23
90:12 91:8,12 92:7,
13,16 93:17 96:20
97:23 98:12 99:16
100:9,13,16 140:12
142:23 144:25
151:19 161:16
165:13,19 167:8
171:8 173:24 175:2
176:19,25 177:4,15
181:7,13,24 182:2,6
183:10,19,23 184:4,
12 186:3,11 191:16,
18,22 192:2,6,16
193:14,19 194:3,17
195:9,22

**Waterhouse's** 84:11
92:8 93:13,20 96:19
99:25 100:25 173:20
181:17 183:6 187:11

**week** 162:4

**weeks** 12:5 13:21
42:15 152:3 155:2

**weighted** 131:23
132:8

**weighting** 129:6,25
131:12

**Willmore** 25:6

**wishes** 91:25

**withdrawn** 35:13
55:22 80:5 82:12,13
92:14 109:10 117:11
122:18 127:4,5
168:16

**witnesses** 190:22

**wondering** 100:19

**word** 35:21 91:9
131:8 142:14 163:9,
15,16 165:2 183:6

187:8 189:15

**wording** 83:25

**words** 14:18 169:16

**work** 31:20,24 43:19
96:3 111:19 112:14
113:16 114:2 117:14
118:6 119:15 146:23
164:25 165:4 168:11,
21 178:13 179:20,21
180:7

**worked** 32:21 124:5

**working** 33:2,8
41:11 56:8 72:5
112:22 115:11
117:20 135:16
146:10 178:18 180:4

**works** 5:23

**world** 49:9 104:6
126:24 186:23
187:22 189:11

**worth** 160:10

**writing** 124:20 144:2
172:17

**written** 66:10

**wrong** 8:24 73:4
114:12

**wrote** 181:18

--------

**Y**

--------

**year** 16:13 49:6 57:24
68:3 85:23 97:21

**year-end** 57:15

**years** 18:21 76:18
79:12 148:5,7

**yesterday** 9:13
54:19 193:25

**Yup** 52:19 54:5 70:11
86:4 92:4 127:21
133:22 158:6

--------

**Z**

--------

**Ziehl** 5:10

**Zoom** 12:4

# EXHIBIT 193

Appx. 03083

Page 1

1     IN THE UNITED STATES BANKRUPTCY COURT

2        FOR THE NORTHERN DISTRICT OF TEXAS

3            DALLAS DIVISION

4
     IN RE:              ) Chapter 11
5    HIGHLAND CAPITAL        ) Case No.
     MANAGEMENT, LP,         ) 19-34054-
6        Debtor.      ) sgj11
     -------------------------  )
7    HIGHLAND CAPITAL         )
     MANAGEMENT, LP,         ) Adversary
8                 ) Proceeding
         Plaintiff,    ) No.
9                 ) 21-03004
      vs.            )
10                 )
     HIGHLAND CAPITAL         )
11   MANAGEMENT FUND ADVISORS,   )
     LP,             )
12                 )
         Defendant.     )
13   -------------------------  )

14

15

16

17    REMOTE ZOOM DEPOSITION OF DENNIS C. SAUTER

18        Wednesday, November 17, 2021

19

20

21

22

23   Reported by:

24   Stacey L. Daywalt

25   JOB NO. 202810

Page 2

```
1
2
3              Wednesday, November 17, 2021
4              1:08 p.m.
5
6
7         Remote Zoom Deposition of DENNIS C.
8    SAUTER, held before Stacey L. Daywalt, a Court
9    Reporter and Notary Public of the District of
10   Columbia.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1    A P P E A R A N C E S :
2    (All appearances via remote Zoom)
3
4         PACHULSKI STANG ZIEHL & JONES
5         Attorneys for Plaintiff
6              780 Third Avenue
7              New York, New York 10017
8         BY:   JOHN MORRIS, ESQ.
9
10        MUNSCH HARDT KOPF & HARR
11        Attorneys for Defendant
12             500 North Akard Street
13             Dallas, Texas 75201
14        BY:   DAVOR RUKAVINA, ESQ.
15
16        STINSON LLP
17        Attorneys for James Dondero and Nancy
18   Dondero
19             3102 Oak Lawn Avenue
20             Dallas, Texas 75219
21        BY:   MICHAEL AIGEN, ESQ.
22
23   ALSO PRESENT:
24
25             LA ASIA CANTY
```

Page 4

```
                D. Sauter
1
2    DENNIS C. SAUTER,
3         called as a witness, having been
4    duly sworn by a Notary Public, was examined and
5    testified as follows:
6
7    EXAMINATION BY
8    MR. MORRIS:
9        Q.   Can you please state your name for
10   the record.
11       A.   Dennis Sauter.
12       Q.   Good afternoon, Mr. Sauter.  My name
13   is John Morris.  I'm an attorney at Pachulski
14   Stang Ziehl & Jones.  We are counsel to the
15   reorganized Highland Capital Management, LP.
16       Are you aware of that?
17       A.   Yes, sir.
18       Q.   Okay.  And we're here for your
19   deposition today.  Correct?
20       A.   Yes, sir.
21       Q.   And I've examined you previously.
22   Is that right?
23       A.   I don't believe so.
24       Q.   Okay.  Have you ever been deposed
25   before?
```

Page 5

```
                D. Sauter
1
2        A.   I don't think so.
3        Q.   Okay.  So very simple ground rules.
4        I'm going to ask you a series of
5    questions, and it's important that you allow me
6    to finish my question before you begin the
7    answer.
8        Is that fair?
9        A.   Yes, sir.
10       Q.   And I will certainly attempt to do
11   the same for you and -- insofar as I will
12   attempt to allow you to finish your answer
13   before I begin my question.
14       But if I fail to do that, will you
15   let me know?
16       A.   I will.
17       Q.   If there's anything that I ask you
18   that you don't understand, will you let me know
19   that?
20       A.   I will.
21       Q.   If you want to take a break at any
22   time, just let me know and I'll try to
23   accommodate you.  I'd only ask that you don't
24   ask for a break while a question is pending.
25       Is that fair?
```

Page 6

D. Sauter

1
2    A.    That's fair.
3    Q.    Okay.  Do you have a license to
4    practice law, sir?
5    A.    I do.
6    Q.    In what states are you admitted to
7    practice?
8    A.    Just Texas.
9    Q.    When did you obtain your license?
10    A.    November of 2001.
11    Q.    And did you graduate from law
12    school?
13    A.    I did.
14    Q.    Where did you graduate from law
15    school?
16    A.    Southern Methodist University.
17    Q.    And can you describe for me your
18    employment history from the time you graduated
19    law school until today.
20    A.    Sure.
21        Out of law school I began at a firm
22    called Winstead Sechrest & Minick.  And I was
23    there just till tax day, so April 15 of 2002,
24    when my group moved to a firm at the time that
25    was called Godwin Gruber.  I was at Godwin

Page 7

D. Sauter

1
2    Gruber until 2006.
3        And I went in-house with a
4    development firm called St. Ives Realty.  I was
5    there until 2009.
6        And in 2009, I went back to work
7    with the group I'd worked with before but now
8    it was called Langley Weinstein.  I was with
9    Langley Weinstein until December 31 of '13.
10        And in 2014, I started at Wick
11    Phillips Gould & Martin, and I was at Wick
12    Phillips until February of 2020 when I began at
13    Nexpoint.
14    Q.    And while you were at Nexpoint -- I
15    mean, withdrawn.
16        While you were at Wick Phillips, did
17    you provide services to Highland or any of its
18    affiliates?
19    A.    I provided services primarily to
20    Nexpoint advisors and its wholly owned
21    subsidiaries.
22        I did have occasion to do a couple
23    of discrete engagements for -- I think they
24    were CLOs but managed by Highland.
25    Q.    Prior to the time that you joined

Page 8

D. Sauter

1
2    Nexpoint, did you have any particular expertise
3    in a specified area of the law?
4    A.    For about the last ten years, real
5    estate.
6        It was, before that, kind of a
7    hybrid of construction related litigation,
8    landlord-tenant disputes, you know,
9    foreclosures.  It was all real estate related
10    litigation and then real estate transactional
11    work.
12    Q.    How did you come to become employed
13    by Nexpoint?
14    A.    I had worked with the folks here at
15    Nexpoint for my entire tenure at Wick Phillips,
16    and they gave me an offer and I accepted.
17    Q.    What offer did they give you?  What
18    position?
19    A.    I was hired to be general counsel of
20    real estate.
21    Q.    Are you still the general counsel of
22    real estate?
23    A.    I'm now the general counsel of
24    Nexpoint.
25    Q.    When did you become the general

Page 9

D. Sauter

1
2    counsel of Nexpoint?
3    A.    I don't recall exactly, but I would
4    say April or May of this year.
5    Q.    All right.  So from approximately
6    February of 2020 until approximately April of
7    2021, you were the general counsel of real
8    estate, and since approximately April of 2021
9    you were -- you have been the general counsel
10    of Nexpoint.
11        Do I have that right?
12    A.    Correct.
13    Q.    Was there a general counsel of
14    Nexpoint during the time you served as general
15    counsel of real estate?
16    A.    There was not.
17        Generally the way things worked is
18    Scott Ellington was general counsel at Highland
19    Capital, and most of the legal department
20    reported to him.  I was the one attorney that
21    was not under him.
22        So no, there was not.
23    Q.    Okay.  To whom do you report today?
24    A.    Matt McGraner.
25    Q.    And what is Mr. McGraner's title?

Page 10

D. Sauter

1
2    A.    I believe it's managing director.
3    Q.    When did you begin reporting to
4 Mr. McGraner?
5    A.    The day I was hired.
6    Q.    What are your duties and
7 responsibilities today as the general counsel
8 of Nexpoint?
9    A.    A lot different than I anticipated
10 when I came on.
11    Q.    Fair.
12    A.    It's a little bit of everything.  I
13 get lots of questions from lots of different
14 people.
15         As you can imagine, there's been
16 quite a shuffle with the Skyview formation,
17 people leaving, people staying, and so, you
18 know, it's been fairly fluid.  So I try to
19 handle whatever somebody brings me.
20    Q.    In your capacity as general counsel,
21 do you have any responsibility for overseeing
22 Nexpoint's litigation matters?
23    A.    I do.
24    Q.    Okay.  And do you have
25 responsibility for overseeing Nexpoint's

Page 11

D. Sauter

1
2 defense of the lawsuit that Highland has
3 commenced against it?
4         MR. RUKAVINA:  Allow me to interject
5 just a little bit here, John.
6         You subpoenaed Mr. Sauter in the
7 HCMFA lawsuit.
8         Why are you asking him all about
9 this Nexpoint?
10         MR. MORRIS:  Just because he told me
11 that's where he works.
12         MR. RUKAVINA:  Yeah, that's fine.
13         I mean, I'm not trying to be rude.
14 Just –
15         MR. MORRIS:  I appreciate that.
16         MR. RUKAVINA:  – if you're –
17         (Simultaneous crosstalk.)
18         MR. MORRIS:  Duly noted.  Thank you,
19 Davor.
20         THE REPORTER:  Please watch the
21 overlap of talking.  Thank you.
22 BY MR. MORRIS:
23    Q.    Mr. Sauter, Mr. Rukavina brings up a
24 good point.
25         Are you also the general counsel of

Page 12

D. Sauter

1
2 Highland Capital Management Fund Advisors, LLP?
3    A.    I'm not.
4    Q.    You are not?
5    A.    I'm not the general counsel of
6 Highland Capital Management Fund Advisors.
7    Q.    Okay.  Can we refer to that entity
8 as HCMFA today?
9    A.    Yes, sir.
10    Q.    Do you have any title or role with
11 HCMFA today?
12    A.    I don't have any official capacity
13 with HCMFA, although I do perform work from
14 time to time for HCMFA.
15    Q.    Okay.  Does HCMFA have a general
16 counsel, to the best of your knowledge?
17    A.    It does not.
18    Q.    Does HCMFA have any officers today,
19 to the best of your knowledge?
20    A.    It does, but I'm not sure I can name
21 them off to you.
22    Q.    Okay.  What services do you provide
23 to HCMFA?
24    A.    Again, like other affiliated
25 entities, when it has legal needs that meet my

Page 13

D. Sauter

1
2 expertise, people bring it to me and I work on
3 it.
4    Q.    And what's an "affiliated entity" in
5 the way that you've used that term?
6    A.    I generally refer to HCMFA, Nexpoint
7 Advisors and the wholly owned subsidiaries of
8 Nexpoint Advisors as the affiliated entities.
9         HCMFA also owns Nexpoint Securities,
10 which is the broker dealer, and so I do work
11 with those folks from time to time as well.
12    Q.    Is there a source of affiliation
13 between Nexpoint and HCMFA?
14    A.    Yes, Mr. Dondero.
15    Q.    And he controls them both to the
16 best of your knowledge.  Is that right?
17    A.    I – I guess it depends on how you
18 define "control."
19         But yes, he is a controlling person
20 of Nexpoint Advisors, and yes, for all intents
21 and purposes, he's the controlling person of
22 HCMFA.
23    Q.    Okay.  And can we refer to HCMFA and
24 Nexpoint Advisors, LP together as "the
25 advisors"?

Page 14

D. Sauter

1
2    A.    That's fine.
3    Q.    The advisors are each advisory
4    firms.  Is that right?
5    A.    Correct.
6    Q.    And each of them provide advisory
7    services to certain funds.  Is that correct?
8    A.    Correct.
9    Q.    Okay.  Do you hold any titles with
10    any of the funds that are advised by either of
11    the advisors?
12    A.    Yes, I am general counsel for
13    Nexpoint Residential Trust and I'm general
14    counsel of Nexpoint Real Estate Finance.
15    Q.    Any others?
16    A.    No, sir.
17    Q.    Okay.  Do you have –
18    A.    Wait.  Wait.  Let me clarify.
19        I think I am general counsel of
20    Nexpoint Real Estate Advisors, and I may be
21    general counsel of each of them.  I think there
22    are nine in total.
23    Q.    Okay.  And are each of them separate
24    funds?
25    A.    Each of the advisors are – manage a

Page 15

D. Sauter

1
2    discrete business line.  They're separate
3    entities, but not necessarily funds.
4    Q.    And are each of them owned
5    indirectly or directly by Nexpoint Advisors,
6    LP?
7    A.    Yes, sir.
8    Q.    Okay.
9        When did you first meet Mr. Dondero?
10    A.    I don't recall.
11        I think I met him once at an event
12    that I was invited to years ago, maybe 2017.
13    Q.    Do you know if he holds a title at
14    HCMFA?
15    A.    I don't believe he does.
16    Q.    How about Nexpoint?  Does he hold a
17    title at Nexpoint?
18    A.    Yes, he's the president.
19    Q.    And even though he doesn't hold a
20    title at HCMFA, it's your understanding that he
21    controls HCMFA.  Is that right?
22    A.    I don't know that I would say that.
23        And again, I would need to look at
24    the organizational documents.
25    Q.    Well, as – withdrawn.

Page 16

D. Sauter

1
2        Do you know if Mr. Dondero serves as
3    the portfolio manager for any of the funds to
4    which the advisors provide advisory services?
5    A.    He does.
6        I don't know which ones.
7    Q.    We're going to talk in a little
8    while about a TerreStar NAV issue.
9        MR. MORRIS:  And Stacey, that's all
10    caps N-A-V, and it's T-E-R-R-A-S-T-A-R [sic].
11    Q.    We're going to talk a little bit
12    about a TerreStar NAV issue.
13        Are you generally familiar with
14    that?
15    A.    Generally.
16    Q.    Okay.  And is it your understanding
17    that that NAV issue, that TerreStar NAV issue,
18    related to certain equity positions that were
19    held by certain funds managed by HCMFA?
20    A.    Yes, I think it was – Global
21    Allocation Fund is the one that was
22    particularly the insured.
23    Q.    And can we refer to that as GAF?
24    A.    Yes, sir.
25    Q.    Do you know who the portfolio

Page 17

D. Sauter

1
2    manager of GAF was in 2019?
3    A.    I do not.
4    Q.    Do you know if it was Mr. Dondero?
5    A.    I do not.
6    Q.    In the course of your investigation,
7    did you ever ask who the portfolio manager of
8    GAF was?
9    A.    I did not.
10    Q.    Do you know Frank Waterhouse?
11    A.    I do.
12    Q.    When did you first meet
13    Mr. Waterhouse?
14    A.    I think I met him just before I came
15    on.  It would have been maybe December of 2019.
16    Q.    Okay.  Do you know if Mr. Waterhouse
17    holds any titles with either of the advisors?
18    A.    I believe so, but I'm not exactly
19    sure.
20        MR. RUKAVINA:  I'm going to object
21    to vague or form there.
22        What time are you specifying,
23    Mr. Morris?
24        MR. MORRIS:  I appreciate that.  Let
25    me restate the question.

**Page 18**

D. Sauter

1          D. Sauter
2 BY MR. MORRIS:
3    Q.   Mr. Sauter, do you know if
4 Mr. Waterhouse held any position with either of
5 the advisors at any time in 2019?
6    A.   I believe he did, but I -- I would
7 say it was probably treasurer and CFO, but I'm
8 speculating.
9    Q.   In the course of your investigation,
10 did you try to determine what title
11 Mr. Waterhouse held with HCMFA?
12    A.   I have not.
13    Q.   Have you ever tried to determine
14 what title Mr. Waterhouse held at HCMFA at any
15 time?
16    A.   At one point I knew what it is.  I
17 just can't recall.
18    Q.   Okay.  Does -- do you know if
19 Mr. Waterhouse holds a position with HCMFA
20 today?
21    A.   I believe he does.
22    Q.   Do you have any understanding as to
23 what that position is?
24    A.   Again, I think it's CFO and/or
25 treasurer.  That's consistent, I think.

**Page 19**

D. Sauter

1          D. Sauter
2    Q.   Do you have any understanding as to
3 when Mr. Waterhouse became the treasurer and/or
4 the CFO of HCMFA?
5    A.   I do not.
6    Q.   Do you know if Mr. Waterhouse holds
7 any positions with any of the funds that are
8 advised by either of the advisors?
9    A.   I believe he -- I'm speculating.  I
10 don't know for certain.
11    Q.   During the course of your -- you
12 conducted an investigation around the TerreStar
13 NAV issue.  Right?
14    A.   Correct.
15    Q.   Okay.  During the course of your
16 investigation, did you ever try to determine
17 whether Mr. Waterhouse served in any capacity
18 with any of the funds that are managed by
19 HCMFA?
20    A.   Whether he -- yes.
21    Q.   And what did you -- what information
22 did you learn in the course of your
23 investigation on that issue?
24    A.   My understanding is that the
25 valuation team was a subset of the group that

**Page 20**

D. Sauter

1          D. Sauter
2 Mr. Waterhouse ran.
3    Q.   Right.
4    I'm asking you specifically about
5 whether he held positions at any of the funds.
6    Did you understand that when I asked
7 my question?
8    A.   I don't know whether he held any
9 position with the funds.
10    Q.   Okay.  And during your
11 investigation, did you make any effort to try
12 to determine whether he held any positions with
13 GAF?
14    Let's be very specific.
15    A.   I don't recall.
16    Q.   Do you know a gentleman named Will
17 Mabry?
18    A.   I do.
19    Q.   And do you know if Mr. Mabry was
20 ever employed by either of the advisors?
21    A.   I don't know who employed Mr. Mabry.
22    Q.   Do you know if he was ever employed
23 by Highland Capital Management, LP?
24    A.   I would suspect that he was employed
25 by Highland Capital Management, LP.

**Page 21**

D. Sauter

1          D. Sauter
2    Q.   Okay.  And what's the basis for that
3 speculation?
4    A.   Because he's at Skyview, and I think
5 all of the employees that were at Nexpoint
6 Advisors or HCMFA remained where they were.
7    Q.   Do you know what position he held at
8 Highland in 2019, if any?
9    A.   I don't know.
10    Q.   Do you know anything about
11 Mr. Mabry's skills or expertise, if any?
12    A.   Other than I believe he was the
13 assistant treasurer at GAF and he was on the
14 valuation team as well.
15    Q.   So your understanding is he was the
16 assistant treasurer of the fund that we have
17 defined as GAF.
18    Do I have that right?
19    A.   That's my understanding.
20    Q.   Okay.  And what's the basis for that
21 understanding?
22    A.   That's just what I recall.
23    Q.   Okay.  To the best of your
24 knowledge, does he have an accounting
25 background?

Page 22

1                    D. Sauter
2      A.   I don't know.
3      Q.   And is it your understanding that he
4   was part of a valuation team?
5           I think you used that term.
6      A.   Yes, I believe he was.
7      Q.   Okay.  And what's the basis for that
8   understanding on your part?
9      A.   Discussions that I've had with Frank
10  and his knowledge of the TerreStar NAV error.
11     Q.   Did Mr. Mabry tell you that he was
12  part of the valuation team?
13     A.   I don't recall.
14     Q.   Did you ask him?
15     A.   I don't recall.
16     Q.   Do you know if Mr. Mabry played any
17  role in any aspect of the TerreStar
18  investigation that was conducted by the SEC?
19     A.   I don't know.
20     Q.   Did you ask Mr. Mabry if he played
21  any role in connection with the SEC
22  investigation?
23     A.   I did not.
24     Q.   Do you know if Mr. Mabry played any
25  role in formulating HCMFA's response to the

Page 23

1                    D. Sauter
2   SEC?
3      A.   I do not.
4      Q.   Did you ask him?
5      A.   I don't recall.
6      Q.   Do you know when he left Highland?
7      A.   I think he was terminated with the
8   other employees.
9      Q.   You submitted a declaration in
10  connection with the adversary proceeding that
11  Highland commenced against the HCMFA.
12          Do I have that right?
13     A.   Yes, sir.
14     Q.   All right.  Let's take a look at
15  that, if we can put that up on the screen.
16          So from time to time, my assistant
17  Ms. Canty is going to put some documents up on
18  the screen, Mr. Sauter.  And it's very
19  important that you understand that I will give
20  you every opportunity that you believe you need
21  in order to read the document.
22          You know, if there's something
23  that I put up there that you want to see more
24  of, just let me know and we'll just scroll
25  around.  Okay?

Page 24

1                    D. Sauter
2      A.   Okay.
3           (Exhibit 181, Declaration of Dennis
4   C. Sauter, Jr., previously marked for
5   identification.)
6      Q.   Okay.  Do you see the first page of
7   this document states that it's your
8   declaration?
9      A.   I do.
10     Q.   And if we can go to the signature
11  line, please.
12          And that's your signature there,
13  sir?
14     A.   It is.
15     Q.   And did you sign this on or about
16  May 21st, 2021?
17     A.   Yes, sir.
18     Q.   Do you remember the purpose of this
19  declaration?
20     A.   It was requesting to file an amended
21  answer.
22     Q.   Okay.  Is it fair to say that your
23  declaration sets forth the factual basis for
24  the proposed amendment?
25     A.   Yes.

Page 25

1                    D. Sauter
2      Q.   And is it fair to say that your
3   declaration describes the investigation that
4   you did initially after the complaint was filed
5   and then basically a second phase of the
6   investigation after Mr. Waterhouse and
7   Mr. Mabry migrated from Highland?
8      A.   Yes.
9      Q.   Okay.  So the purpose of your
10  investigation was to understand the origin of
11  two promissory notes.  Right?
12     A.   Yes, sir.
13     Q.   Okay.  I just want to go through to
14  the notes to make sure that the record is clear
15  that we're talking about the same thing.
16          There are certain documents that
17  we've used in other depositions so they've been
18  premarked, and I'd ask Ms. Canty to put up the
19  document that's already been marked as
20  Exhibit 54.
21          MS. CANTY:  Okay.  John, do you want
22  to let the court reporter know this current one
23  is 181, premarked 181, this declaration.
24          MR. MORRIS:  Okay.  Fine.
25          (Exhibit 54, E-mail chain with

Page 26

D. Sauter

1
2    attachment dated 5/2/19, D-CNL003777-779,
3    previously marked for identification.)
4        Q.    So if could just scroll down a
5    little bit.
6            Do you see there's -- do you see
7    it's -- there's an e-mail from David Klos dated
8    May 2nd?
9        A.    Yes.
10       Q.    Do you know who Mr. Klos is?
11       A.    I do.
12       Q.    And who do you understand Mr. Klos
13   to be?  What role did he play in May of 2019?
14       A.    I don't know.
15           I know he worked under Frank.
16       Q.    He worked out of -- do you see
17   there's an e-mail to a corporate accounting
18   group?
19       A.    Yes.
20       Q.    Have you ever sent or received an
21   e-mail from a Highland corporate accounting
22   e-mail chain called the corporate accounting
23   group?
24       A.    I've never sent an e-mail from the
25   corporate accounting group.

Page 27

D. Sauter

1
2        I can't recall receiving one from
3    them either.
4        Q.    Do you see that in this e-mail
5    Mr. Klos asks to have $2.4 million transferred
6    from HCMLP to HCMFA?
7        A.    I do.
8        Q.    And do you see that he states:
9    "This is a new interco loan"?
10       A.    I do.
11       Q.    And if we can see the response
12   above, do you see how Ms. -- do you know
13   Kristin Hendrix?
14       A.    I do.
15       Q.    And who is Ms. Hendrix, to the best
16   of your knowledge.
17       A.    I believe she worked under Mr. Klos.
18       Q.    And do you see that she wrote to
19   someone named Blair and attached a copy of a
20   note?
21       A.    Yes.
22       Q.    Okay.
23       A.    That's what it says.
24       Q.    And can we go to the next page,
25   please.

Page 28

D. Sauter

1
2        And do you see that this is a
3    promissory note for $2.4 million dated May 2,
4    2019?
5        A.    I do.
6        Q.    Okay.  And can we go to the
7    signature line.
8            Do you see Mr. Waterhouse's
9    signature?
10           Do you see Mr. Waterhouse's
11   signature, sir?
12       A.    I can't verify whether that's his
13   signature, but I'll take your word for it.
14       Q.    Okay.  Can you go to the top of the
15   note, please.
16           Do you see that the maker is defined
17   to be Highland Capital Management Fund
18   Advisors, LP?
19       A.    I do see that that's what it says on
20   the first page.
21       Q.    Okay.  And this is one of the two
22   notes that was the source of your
23   investigation.  Right?  This was one of the two
24   notes that you were investigating the origins
25   of?

Page 29

D. Sauter

1
2        A.    Yes.
3        Q.    Okay.  Let's look at the next note,
4    please.
5            (Exhibit 57, Promissory Note dated
6    5/3/19, D-CNL003764-65, previously marked for
7    identification.)
8            Do you see this is a note for
9    $5 million and it's dated the next day,
10   May 3rd, 2019?
11       A.    I see that.
12       Q.    Do you see that it's -- it also
13   defines as the maker Highland Capital
14   Management Fund Advisors, LP?
15       A.    That's what it says on the first
16   page, yes.
17       Q.    Okay.  And if we can go to the
18   signature line.
19           Again, does that appear to be
20   Mr. Waterhouse's signature?
21       A.    Again, I can't verify whether that's
22   Mr. Waterhouse's signature or not.
23           But it does say that the maker is
24   Frank Waterhouse, not Highland Capital
25   Management Fund Advisors.

Page 30

D. Sauter

2 Q. I understand.

3 But the definition of "maker" is

4 above. Correct?

5 A. I wouldn't – that's not how I would

6 draft a promissory note.

7 Q. I didn't ask you how you would draft

8 it.

9 I'm just asking you whether, having

10 just looked at the document and as a lawyer

11 admitted to practice law, would you agree

12 that the term "maker" is a defined term in this

13 document?

14 MR. RUKAVINA: I'll just object to

15 form here and also that this witness has not

16 been called as an expert, even though he's a

17 lawyer.

18 So I'll just preserve that for the

19 record.

20 MR. MORRIS: Fair. That's fine.

21 THE WITNESS: I would agree that

22 "maker" is defined on the first page, but that

23 would be an improper signature block, if it was

24 intended to be Highland Capital Management Fund

25 Advisors.

Page 31

D. Sauter

2 BY MR. MORRIS:

3 Q. All right. We're going to refer to

4 these two notes collectively as "the notes."

5 Is that okay?

6 A. That's fine.

7 Q. And these are the two notes that you

8 were investigating. Right?

9 A. Yes.

10 Q. And it's your understanding that

11 these are the two notes that Highland Capital

12 Management is suing to collect on. Right?

13 A. Yes.

14 Q. Okay. According to your

15 declaration, if we can go to Paragraph 13, if

16 we can put that back up on the screen, as part

17 of the initial investigation – withdrawn.

18 I'm going to use the phrase "initial

19 investigation" to mean the investigation that

20 you conducted between the time the complaint

21 was filed and the time that HCMFA filed its

22 original answer on March 1st.

23 Is that okay?

24 A. Sure.

25 Q. And during that initial

Page 32

D. Sauter

2 investigation, you spoke with Jim Dondero.

3 Correct?

4 A. I did.

5 Q. Okay. And according to

6 Paragraph 13, he couldn't recall the genesis of

7 the notes. Is that right?

8 A. That's correct.

9 Q. Did you show him the notes?

10 A. I don't recall.

11 Q. Did you tell him that the notes were

12 dated May 2nd and May 3rd, 2019?

13 A. I don't recall that either.

14 Q. Did you do anything to try to

15 refresh his recollection about the timing of

16 the notes?

17 A. I'm sure I did.

18 But I don't recall that conversation

19 in any detail as I'm sitting here today.

20 Q. Did you tell him the principal

21 amount of the notes?

22 A. Yes.

23 Q. And even though you told him the

24 principal amount of the notes, he still had no

25 recollection as to what they related to. Is

Page 33

D. Sauter

2 that right?

3 A. He couldn't recall the genesis,

4 correct.

5 Q. Did he have any recollection at all

6 as to what the notes related to?

7 A. I don't – I don't believe so,

8 because if he had, then I would have been able

9 to pin it down further.

10 Q. How many conversations did you have

11 with Mr. Dondero as part of your initial

12 investigation?

13 A. I don't recall.

14 Two, three.

15 Q. Was there anybody present other than

16 the two of you?

17 A. Again, I don't recall.

18 Q. Do you recall if they took place on

19 the phone or were they in person?

20 A. It would have been in person.

21 Q. And why do you say it would have

22 been in person?

23 A. Well, now that you say that, no, it

24 probably wasn't in person because he would not

25 have been in the office at that time.

Page 34

D. Sauter

1    D. Sauter
2        There was obviously a lot of things
3    going on at this point.  Mr. Dondero had been
4    evicted from the building, and so that made –
5    I shouldn't say evicted.  He'd been kicked out
6    by the debtor, and so that made our
7    communications a little more difficult.
8        So I would have spoken with him on
9    the phone because I did not go over to the
10   NexBank office very often.
11   Q.   Paragraph 13 says that you also
12   spoke with "the few employees of HCMFA."
13       Do you see that in the middle of the
14   paragraph?
15   A.   Yes.
16   Q.   Can you identify the other CMFA
17   employees that you spoke with as part of your
18   initial investigation?
19   A.   I would have spoken with Dustin
20   Norris and –
21   Q.   Do you recall speaking – I
22   apologize for interrupting.
23       Go ahead.
24   A.   And so he wasn't an HCMFA employee,
25   but Jason Post.

Page 35

D. Sauter

1    D. Sauter
2    Q.   Do you have a recollection of
3    speaking to Mr. Norris, or are you just
4    surmising that you probably did?
5    A.   I'm surmising that I probably would
6    have.
7        There was a lot, again, that was
8    happening.  I didn't have the historical
9    knowledge of these things, and so I talked with
10   Mr. Post and Mr. Norris daily about everything
11   that was going on just to get some background
12   on all of the moving parts.
13   Q.   Okay.  Do you know if Mr. Norris
14   held any position with HCMFA in 2019?
15   A.   I don't – I don't know for certain.
16   I believe he did.
17       I can't recall what his position
18   would have been.
19   Q.   Does he have a position with HCMFA
20   today, to the best of your knowledge?
21   A.   I believe he does.
22   Q.   And what do you understand his
23   position to be?
24   A.   I would say vice president.
25   Q.   Do you know when he became vice

Page 36

D. Sauter

1    D. Sauter
2    president of HCMFA?
3    A.   I do not.
4    Q.   Do you know if he was vice president
5    of HCMFA in October 2020?
6    A.   I do not.
7    Q.   Do you know if Mr. Norris holds any
8    positions with DAF – I'm sorry.
9        Do you know if Mr. Norris holds any
10   positions with GAF?
11   A.   I don't know.
12   Q.   How about Mr. Post?  Do you know if
13   Mr. Post held any positions with HCMFA in 2019?
14   A.   I don't.
15   Q.   Do you know if he holds any
16   positions with HCMFA today?
17   A.   He does not.
18   Q.   Is Mr. Post a compliance officer, to
19   the best of your knowledge?
20   A.   He was.
21       He left a week ago to take another
22   job.
23   Q.   So he was – and who did he – for
24   whom did he serve as the chief compliance
25   officer until a week ago?

Page 37

D. Sauter

1    D. Sauter
2    A.   He was chief compliance officer for
3    Nexpoint Advisors.
4        He may have been the chief
5    compliance officer for HCMFA as well.
6    Q.   Okay.
7    A.   And if I had to guess, he would have
8    had those same positions back in 2019 –
9    Q.   Okay.
10   A.   – because Thomas Surgent was the
11   chief compliance officer for HCMLP and Jason
12   worked under him.
13       And I think that started sometime in
14   2014, maybe earlier.
15   Q.   And did Mr. Norris and Mr. Post tell
16   you during your initial investigation that they
17   had no knowledge of the notes?
18   A.   Yeah, generally I don't think that
19   they were aware of the notes, or I should say
20   they weren't aware of the genesis of the notes.
21   Q.   Were they aware of the existence of
22   the notes?
23   A.   They were.
24   Q.   Did they tell you when they had
25   learned of the existence of the notes?

Page 38

D. Sauter

1      D. Sauter
2    A.   I think it's something that I raised
3  to them because I didn't know where the notes
4  had come from.
5    Q.   Right.
6      And they told you that they were
7  aware of the notes but they didn't know the
8  genesis of them?
9    A.   I don't recall whether they were
10  aware of the notes before I asked about them.
11    Q.   Did you ask them if they were aware
12  of the notes prior to the time you showed it to
13  them?
14    A.   I would have asked them what the
15  notes were about.
16    Q.   I don't want to know what you would
17  have done.
18      I know this is hard, Mr. Sauter.
19  I'm really just asking you to search your
20  memory.
21      Do you recall asking them whether
22  they were aware of the existence of the notes
23  prior to your conversation with them?
24    A.   I don't recall if I asked whether
25  they were aware of the existence of the notes

Page 39

D. Sauter

1  prior to my conversation with them.
2    Q.   Now, Paragraph 13 says that
3  Mr. Dondero could not recall the genesis of the
4  notes.
5      Do you see that?
6    A.   Yes.
7    Q.   Did Mr. Dondero indicate to you that
8  he was aware of the existence of the notes even
9  though he couldn't recall the genesis of the
10  notes?
11    A.   That's not how I would characterize
12  it, but...
13    Q.   How would you characterize it?
14    A.   He suggested that I talk to
15  Mr. Waterhouse.
16    Q.   Did you ask Mr. Dondero when he
17  first learned of the existence of the notes?
18    A.   No.
19    Q.   Did he say to you anything that
20  caused you to believe that he was unaware of
21  the existence of the notes prior to the
22  commencement of the lawsuit?
23    A.   No.
24      I guess let me clarify.

Page 40

D. Sauter

1      D. Sauter
2  He didn't make any comments that
3  made me think one way or the other.
4    Q.   And you didn't ask.
5      Is that fair?
6    A.   Correct, I did not ask.
7    Q.   So you had no information as to
8  whether or not Mr. Dondero actually knew of the
9  existence of the notes prior to the
10  commencement of the lawsuit.
11      Is that fair?
12    A.   Correct.
13    Q.   Okay.  Paragraph 13 also states that
14  you reviewed limited books and records of
15  HCMFA.
16      Do you see that?
17    A.   Yes.
18    Q.   Okay.  What books and records did
19  you review as part of your initial
20  investigation?
21    A.   I don't recall exactly what I looked
22  at or for.
23      I literally had to just go onto the
24  system and try to find anything that related to
25  the notes so I could try to find out what they

Page 41

D. Sauter

1      D. Sauter
2  were.
3    Q.   Did you make any effort to try to
4  determine whether HCMFA had accounted for the
5  notes in its books and records?
6    A.   I did not.
7    Q.   Do you know today whether HCMFA ever
8  accounted for the notes in its books and
9  records?
10    A.   I don't know.
11    Q.   Have you ever reviewed HCMFA's
12  balance sheets?
13    A.   I think I have, but I don't – I
14  can't recall exactly when.
15    Q.   Did you ever make any effort to
16  determine whether HCMFA carried these notes on
17  its balance sheet as liabilities?
18    A.   I did not.
19    Q.   Do you know if HCMFA ever requested
20  an extension of time to respond to the
21  complaint?
22    A.   I don't know, but I would assume so.
23    Q.   Okay.  Do you have any knowledge of
24  HCMFA having done so?
25    A.   No.

Page 42

D. Sauter

1          D. Sauter
2     Q.    Okay.  Do you know if -- prior to
3  the time it filed its original answer, whether
4  HCMFA ever asked HCMLP to provide any documents
5  in connection with the adversary proceeding?
6     A.    Say that again.
7     Q.    Sure.
8          So HCMFA filed its answer on
9  March 1st, according to Paragraph 12.
10         Do I have that right?
11    A.    I believe that's right.
12    Q.    Okay.  Do you know if HCMFA ever
13  asked Highland for any documents before it
14  filed its answer?
15    A.    I don't recall.
16    Q.    So at the time HCMFA filed its
17  answer, Mr. Dondero couldn't recall the genesis
18  of the notes.  Correct?
19    A.    That's right.
20    Q.    And neither Mr. Post nor Mr. Norris
21  could recall the genesis of the notes.
22  Correct?
23    A.    Correct.
24    Q.    And HCMFA had limited access to
25  books and records.  Correct?

Page 43

D. Sauter

1          D. Sauter
2     A.    Correct.
3     Q.    And HCMFA had no access to the
4  debtor's employees who had provided services to
5  HCMFA under shared services agreements.
6  Correct?
7     A.    I think our view was it was
8  potentially improper to reach out to those
9  employees on a matter that was adverse to
10  HCMLP, and so we refrained from doing so.
11    Q.    Okay.  And so under those
12  circumstances, HCMFA nevertheless filed an
13  answer that asserted no affirmative defenses.
14  Correct?
15    A.    Yes.
16    Q.    But this situation changed in
17  mid-April 2001.  Correct?
18    A.    Yes.
19    Q.    If we can scroll down to
20  Paragraph 19.
21         (Discussion was held off the
22  record.)
23    Q.    So in April 2001, the situation
24  changed because Mr. Waterhouse and other former
25  employees of Highland had migrated over to

Page 44

D. Sauter

1          D. Sauter
2  Skyview so that you had access to them.  Is
3  that right?
4     A.    Correct.
5     Q.    And that's when you conducted the
6  second phase of your investigation.  Correct?
7     A.    Yes.
8     Q.    And you'll see at the end of Page 4
9  you reference that the debtor had provided
10  access to HCMFA of much of its books and
11  records.
12         Do I have that right?
13    A.    Yes.
14    Q.    Okay.  And what books and records
15  did Highland provide between March 1st and
16  mid-April when you conducted the second phase
17  of your investigation?
18         Are there any particular books and
19  records that you're referring to in that
20  sentence?
21    A.    I can't recall exactly what it was.
22         There was a process that we were
23  going through that I think -- if you'll recall,
24  that we went back and forth on obtaining access
25  to books and records, submitting written

Page 45

D. Sauter

1          D. Sauter
2  requests, and those were either granted or
3  denied.  And so there were a litany of
4  documents that were sent over.
5     Q.    Can you identify any documents that
6  you reviewed as part of either the initial
7  investigation or the follow-up investigation in
8  April 2021?
9     A.    Yes.
10         I would have reviewed documents
11  related to the TerreStar NAV error.
12    Q.    And can you describe what those
13  documents are.
14    A.    Memos.
15    Q.    Okay.  Do you recall how many memos
16  you reviewed that concerned the TerreStar NAV
17  issue?
18    A.    I want to say that there were three,
19  four or five, something along those lines.
20         I think there was a memo that was
21  submitted to the board and then maybe some
22  communications with the SEC.
23    Q.    And is it your testimony that HCMFA
24  did not have those memos until after March 1st,
25  2021?

Page 46

D. Sauter

1   A.   I don't know whether we had access
2   to those memos, but I didn't -- I wasn't able
3   to speak to Frank Waterhouse, and so I didn't
4   know to look for them.
5        Q.   And neither Mr. Dondero nor
6   Mr. Norris nor Mr. Post thought to inform you
7   about the NAV star error [sic] because they had
8   no idea what the notes related to.  Correct?
9        A.   That's my recollection.  That's
10  correct.
11       Q.   Okay.  Other than the three to five
12  memos that you've just described, are there any
13  other documents that you recall reviewing as
14  part of your investigation?
15       A.   No.
16       Q.   Do you know to whom the memos that
17  you've just described were addressed?
18            Who were they sent to?
19       A.   I believe there was one that was
20  sent to the board.
21            And then the others, I think, were
22  just either internal communications or
23  communications with the SEC.
24       Q.   Can we scroll down to Paragraph 22,

Page 47

D. Sauter

1   please.
2        Actually, look at Paragraph 21
3   first.
4        According to Paragraph 21, as part
5   of the second phase of your investigation, you
6   spoke with Mr. Waterhouse and Mr. Mabry.
7   Correct?
8        A.   Yes.
9        Q.   Did you speak with anybody else as
10  part of the second phase of your investigation?
11       A.   Yes, I would have spoken with Jason
12  Post and Dustin Norris.
13       Q.   And is it fair to say based on the
14  second phase of your -- withdrawn.
15            Is it fair to say that your
16  conclusions that resulted from the second phase
17  of your investigation are set forth in
18  Paragraph 22?
19       A.   (Reviewing document.)
20            I wouldn't say all of my
21  conclusions.  But yes, that's some of them.
22       Q.   Okay.  Is it fair to say that, based
23  on the second phase of your investigation, you
24  concluded, among other things, "that the notes

Page 48

D. Sauter

1   were signed by mistake by Waterhouse without
2   authority from HCMFA"?
3        A.   Yes.
4        Q.   Okay.  Let's talk about your
5   discussions with Mr. Waterhouse as part of your
6   investigation.
7        How many times did you speak with
8   him?
9        A.   Probably three.
10       Q.   And was anybody else present for any
11  of the three conversations?
12       A.   I don't recall.  I don't think so.
13       Q.   Did you take any notes of your
14  conversations with Mr. Waterhouse?
15       A.   I don't recall.
16       Q.   Do you recall whether you sent
17  anybody any e-mails summarizing your
18  conversations with Mr. Waterhouse?
19       A.   I don't recall.
20       Q.   Did the three conversations take
21  place in person, on the phone or some mix
22  thereof?
23       A.   I think it would have been a mix
24  thereof.

Page 49

D. Sauter

1        Q.   Do you recall which of the three
2   conversations was the longest, which was the
3   shortest?
4        I just want to get a sense of how
5   much time you spent with Mr. Waterhouse.
6        A.   I don't, because again, there was
7   lots going on.
8        The first one was in the conference
9   room on the 11th floor at NexBank.  The second
10  one was in his office.  And I think the third
11  was on a phone call.
12       Q.   Did any of them last more than ten
13  minutes?
14       A.   I can't say for certain.
15            I would think so, but...
16       Q.   Okay.  Did you show Mr. Waterhouse
17  either of the notes as part of either of these
18  three interviews?
19       A.   I don't recall if I did.
20            But he knew -- he knew the notes.
21       Q.   And what did he say to you that led
22  you to believe that he knew the notes?
23       A.   Because he was aware of the notes.
24            I...

Page 50

D. Sauter

1
2    Q.   Did he tell the circumstances
3    surrounding the execution of the notes?
4    A.   Yes.
5    Q.   What did he tell you?
6    A.   He said those notes were executed in
7    connection with the TerreStar NAV error.
8    Q.   During your discussions with
9    Mr. Waterhouse, did he ever deny signing the
10   notes?
11   A.   No.
12   Q.   He never told you that he was
13   unaware of the existence of the notes, did he?
14   A.   No.
15   Q.   In fact, before signing your
16   declaration, you believed Mr. Waterhouse in
17   fact had signed the notes.  Correct?
18   A.   Yes.
19   Q.   And that's why in Paragraph 22 you
20   specifically wrote that the notes were signed
21   by mistake by Waterhouse.  Right?
22   A.   Yes.
23   Q.   And you understood at the time you
24   signed your declaration that Mr. Waterhouse had
25   signed the notes at a time when he was HCMFA's

Page 51

D. Sauter

1
2    chief financial officer.  Correct?
3    A.   I don't think I said that, but that
4    would have been my assumption.
5    Q.   Okay.  I think if we can -- give me
6    just one moment.  I think I...
7         Can we go to Paragraph 29, please.
8         You'll see, according to your
9    declaration, it says:  "Returning to the notes,
10   Waterhouse was the chief financial officer of
11   both the debtor and the HCMFA during the above
12   events and at the time he signed the above."
13        Have I read that correctly?
14   A.   You did.
15   Q.   Does that refresh your recollection
16   that at the time you signed this declaration
17   you believed that Mr. Waterhouse was HCMFA's
18   CFO at the time he signed the notes?
19   A.   It does.
20   Q.   Okay.  During your investigation did
21   Mr. Waterhouse ever tell you that he signed the
22   notes by mistake?
23   A.   No.
24   Q.   Did you ever ask Mr. Waterhouse
25   during your investigation whether he signed the

Page 52

D. Sauter

1
2    notes by mistake?
3    A.   I guess I'd like to clarify that
4    response, if I may.
5    Q.   Go right ahead.
6    A.   I asked Mr. Waterhouse why he would
7    have signed it -- the notes in his personal
8    capacity.
9         And his response was, I don't know,
10   I didn't prepare them.
11        So I don't know if that gives you
12   the answer you're looking for, but there was
13   some confusion about the execution of those
14   notes.
15   Q.   Okay.  Did he say anything else
16   that -- on the topic of whether signing the
17   notes was a mistake?
18   A.   No.
19   Q.   Okay.  Your declaration doesn't
20   disclose what you just described for me.
21   Correct?
22   A.   Not in those exact words, no.
23   Q.   Is there anything in your
24   declaration that suggests that Mr. Waterhouse
25   hadn't signed the notes?

Page 53

D. Sauter

1
2    A.   I don't think there's anything else
3    in my declaration from --
4    Q.   Okay.  There's nothing --
5        (Simultaneous crosstalk.)
6    Q.   I apologize.
7    A.   -- from May that would suggest that
8    Mr. Waterhouse didn't sign the notes.
9    Q.   There's nothing in here, in your
10   declaration, that states that Mr. Waterhouse
11   admitted that he made a mistake in signing the
12   notes.  Correct?
13   A.   Correct.
14   Q.   There's nothing in your declaration
15   that suggests that Mr. Waterhouse in fact did
16   not sign or did not authorize the signing of
17   his signature to these notes.  Correct?
18   A.   Correct, because he told me he did.
19   Q.   Okay.  And Mr. -- he told you that
20   he had signed the notes.  Correct?
21   A.   Yes.
22        He said that he didn't use his
23   electronic signature then, and if his signature
24   was on them, it would have been his.
25   Q.   Okay.  Mr. Waterhouse never filed

Page 54

D. Sauter

1 his own declaration in support of HCMFA's
2 motion for leave to amend their answer.
3 Correct?
4 A. Correct.
5 Q. During your investigation did you
6 ask Mr. Waterhouse if he had authority to sign
7 the notes?
8 A. Probably not in those exact words.
9 Q. Okay. Did you ask him in form or
10 substance whether he was authorized to sign the
11 notes?
12 A. Yes.
13 Q. And what did he say?
14 A. I think he – well, his response was
15 if he signed them, he was authorized to sign
16 them.
17 Q. Okay. And Mr. Waterhouse never told
18 you that he signed the notes without authority.
19 Correct?
20 A. He told me that – I asked him if
21 Mr. Dondero had approved the notes.
22 And I don't think he could recall.
23 Q. Okay. Did Mr. Waterhouse ever tell
24 you that he signed the notes without authority?

Page 55

D. Sauter

1 A. No.
2 Q. Okay. Your declaration certainly
3 doesn't say that Mr. Waterhouse admitted
4 signing the notes without authority. Correct?
5 A. Correct.
6 Q. Mr. Waterhouse never filed a
7 declaration in this case stating that he had
8 filed the notes without authority. Correct?
9 A. Correct.
10 Q. Are you aware that Mr. Waterhouse
11 was deposed in this case?
12 A. I'm – yes, I'm aware.
13 Q. Have you reviewed his deposition
14 transcript?
15 A. I have not.
16 Q. Has his testimony been described for
17 you by anybody?
18 MR. RUKAVINA: And I'll just caution
19 you, Mr. Sauter. You know, I think that's a
20 yes or no answer, but don't go into the
21 substance of any discussions with me.
22 THE WITNESS: Yes. Okay.
23 Yes.

Page 56

D. Sauter

1 BY MR. MORRIS:
2 Q. All right. Are you aware that he
3 testified that nobody has ever told him that he
4 made a mistake in signing the notes?
5 MR. RUKAVINA: Objection, form.
6 THE WITNESS: I'm not.
7 Q. Are you aware of anybody in the
8 world ever telling Mr. Waterhouse that he made
9 a mistake in signing the notes?
10 A. Yes.
11 Q. And who told him that?
12 A. Me.
13 Q. And when did you tell him that?
14 A. When we had this discussion.
15 Q. Okay. So it's your testimony that
16 you actually told Mr. Waterhouse that he made a
17 mistake in signing the notes. Right?
18 A. I asked him who had approved these
19 notes and what was the process.
20 And he said he couldn't give me any
21 process. He said the money was transferred,
22 and so we signed the notes.
23 Q. Okay. But did you tell him that he
24 made a mistake?

Page 57

D. Sauter

1 A. I think I implied it.
2 Q. Do you have a recollection of
3 actually telling him that he made a mistake?
4 A. That would be my recollection.
5 Obviously he disagrees with it.
6 Q. Do you know if any – and on what
7 basis did you conclude that he made a mistake?
8 A. Withdrawn.
9 You have no personal knowledge of
10 anything that happened in connection with the
11 TerreStar valuation issue. Correct?
12 A. I was not personally involved in the
13 TerreStar valuation issue, correct.
14 Q. You weren't involved in any of the
15 decisions that were made in connection with the
16 TerreStar valuation. Correct?
17 A. Correct.
18 Q. You weren't made – you weren't
19 involved and had no responsibility for HCMFA's
20 response to the SEC. Correct?
21 A. Correct.
22 Q. You had no responsibility or
23 involvement in the decision as to how HCMFA was
24 going to fund the losses to the GAF. Correct?

Page 58

D. Sauter

2  A.  Correct.

3  Q.  You had no responsibility or
4  involvement in how HCMFA reported to GAF.
5  Correct?

6  A.  Correct.

7  Q.  But nevertheless, despite having no
8  personal knowledge of those issues, you told
9  Mr. Waterhouse or implied to Mr. Waterhouse
10  that he made a mistake in executing the notes.
11  Correct?

12  A.  Correct.

13  Q.  What did Mr. Waterhouse say in
14  response?

15  A.  Not much.  He just disagreed.

16  Q.  Did he just say, I disagree, and
17  that's it or did he actually -- do you recall
18  anything specific that he said?

19  A.  I think I've already testified he
20  said, we transferred the money, so I executed
21  the notes.  HCMFA didn't have the money to pay
22  GAF, and so we transferred it from HCMLP and I
23  executed the notes.

24  Q.  Okay.  Your declaration doesn't
25  attribute any specific statements to

Page 59

D. Sauter

2  Mr. Waterhouse, does it?

3  A.  It does not.

4  Q.  In fact, your declaration is just --
5  withdrawn.

6  If we can go to Paragraph 30.

7  Take a look at Paragraph 30.  We'll
8  kind of parse it through.

9  The first sentence says:  "It
10  appears clear that Mr. Waterhouse made a
11  mistake."

12  Do you see that?

13  A.  Yes.

14  Q.  But again, Mr. Waterhouse never
15  admitted to making a mistake.  Correct?

16  A.  Correct.

17  Q.  And this is your -- this is a
18  conclusion that you're reaching in May of 2021,
19  more than two years after the fact.  Correct?

20  A.  Based upon my review of the
21  documents and my discussions with Mr. Post and
22  Mr. Norris.

23  Q.  Did you ever have any discussions
24  with Mr. Dondero in May of 2021 as you were
25  preparing this document?

Page 60

D. Sauter

2  A.  Did I have any discussions with him
3  about this?

4  Q.  I apologize.  That was a bad
5  question.

6  Did you discuss in May of 2021 the
7  issues concerning the notes with Mr. Dondero,
8  or was that just part of the initial
9  investigation?

10  A.  I don't recall.

11  Q.  And then a couple of lines down, you
12  say -- you wrote:  "It appears that
13  Mr. Waterhouse assumed incorrectly that the
14  funds being paid by the debtor were a loan to
15  HCMFA."

16  Do you see that?

17  A.  Yes.

18  Q.  Did you ask Mr. Waterhouse if he
19  actually made the assumption that you're
20  attributing to him?

21  A.  Yes.

22  Q.  And did he ever admit that the
23  assumption was incorrect?

24  A.  He did not admit that the assumption
25  was incorrect.

Page 61

D. Sauter

2  Q.  Okay.  Again, that's your own
3  conclusion.  Is that fair?

4  A.  That's correct.

5  Q.  And then you continue on and you
6  write:  "Third" -- withdrawn.

7  You write:  "Third, it therefore
8  appears that Mr. Waterhouse prepared the notes
9  for some internal accounting or other purpose
10  but without there being actual consideration
11  for the notes and without any intention on the
12  part of the debtor and HCMFA that there be
13  notes or that there be a loan transaction."

14  Have I read that correctly?

15  A.  Yes.

16  Q.  So did Mr. Waterhouse tell you that
17  he prepared the notes for some internal
18  accounting or other purpose?

19  A.  Yes.

20  Q.  And did he tell you what the purpose
21  of the notes was?

22  A.  Yes.

23  He said if he transferred money he
24  had to have a note to go with it.

25  Q.  You state in your declaration:

Page 62

D. Sauter

1    "There was no" -- withdrawn.
2        You state in your declaration that
3    there was no "intention on the part of the
4    debtor and HCMFA that there be notes or that
5    there be a loan transaction."
6        Do you see that?
7    A.    Yes.
8    Q.    What's the basis for --
9        MR. RUKAVINA:  Object to the form.
10    I apologize.  I apologize, John.
11    I apologize, DC.
12    I'll just object to the form.
13    That's not what this says.
14        Go ahead.
15        MR. MORRIS:  Well, then let me
16    restate it if I read it incorrectly.
17    BY MR. MORRIS:
18    Q.    Mr. Sauter, does the last sentence
19    of your Paragraph 30 state, among other things,
20    that the notes were prepared "without any
21    intention on the part of the debtor and HCMFA
22    that there be notes or that there be a loan
23    transaction"?
24    A.    Yes.

Page 63

D. Sauter

1    Q.    What's the basis for your sworn
2    statement concerning the debtor's intentions?
3        MR. RUKAVINA:  Again, I'll object.
4        Just so that we're clear, Mr. Sauter
5    says "it appears that."  He does not say it is
6    a fact.  He says "it appears that."  There is a
7    distinction there.
8        MR. MORRIS:  Okay.  You've got your
9    objection.
10    BY MR. MORRIS:
11    Q.    What's the basis for your statement
12    that it appeared the debtor had no intention
13    that there would be notes or that there would
14    be a loan transaction?
15    A.    If you're talking about a
16    $7.4 million obligation, I would assume that
17    there would be a process internally on who was
18    responsible for the payment of the fees for
19    the -- or the expenses for the NAV error.
20        Based upon my discussions with Frank
21    Waterhouse, there was no process or the legal
22    department was not involved in making a
23    determination as to whether there should be
24    notes.  It was merely a ministerial act that

Page 64

D. Sauter

1    accounting performed when they transferred the
2    funds to pay GAF.
3    Q.    Is it your testimony as the general
4    counsel of Nexpoint that the law department or
5    the legal department is involved in every note
6    that's executed by one of the Highland
7    affiliates?
8        MR. RUKAVINA:  Object to the form.
9        THE WITNESS:  I can't answer that.
10    Q.    Okay.  So other than the fact that
11    it didn't go past the legal department, do you
12    have any other basis for your statement that it
13    appears that the debtor had no intention that
14    there would be notes?
15    A.    Yes, there's an internal NAV error
16    correction policy that obligates the
17    responsible party to pay for it.
18        In this case it was HCMLP that made
19    the NAV error.
20    Q.    There's a policy that you're
21    referring to?
22    A.    Yes.
23    Q.    And do you know when that policy was
24    adopted?

Page 65

D. Sauter

1    A.    I don't know for certain.
2        But I know there was a policy in
3    place as of 2018.
4    Q.    Okay.  Other than the policy, have
5    you ever seen any memo written -- withdrawn.
6        Have you ever seen any document in
7    the world that states that HCMLP is responsible
8    for the TerreStar NAV error?
9    A.    I would say the memos that
10    acknowledged that there was a mistake.
11    Q.    And is it your recollection that the
12    memos specifically say that HCMLP was
13    responsible for the mistake?
14    A.    No, because the memos were vis-à-vis
15    HCMFA and GAF.
16    Q.    Okay.  So let me ask you the
17    question again.
18        During the course of your two
19    investigations, did you ever see a document
20    that stated that HCMLP was responsible for the
21    TerreStar NAV error?
22    A.    I don't recall.
23    Q.    You don't recall seeing one.  Is
24    that correct?

Page 66

D. Sauter

1    A.   That's correct.
2    Q.   Okay.
3    A.   Can we take a quick break?
4    Q.   Yeah, now would be perfectly fine.
5         Give me just one second before we go
6    off the record.
7         So it's 2:15 local time.  Can we
8    limit it to ten minutes, Mr. Sauter?
9    A.   Yeah, that would be fine.
10   Q.   Okay.  And I would ask that you're
11   still under oath, and I would ask that you not
12   speak with counsel or communicate with anybody
13   about the substance of your deposition.
14        Is that fair?
15        MR. RUKAVINA:  Don't answer that
16   question, Mr. Sauter.
17        The law is what it is, and we're not
18   going to agree to something (audio issue) than
19   the law requires.
20        MR. MORRIS:  Well, then I'm not
21   going to take a break.  How about that?
22        Let's keep going.
23        MR. RUKAVINA:  No, we're taking a
24   break and I'm going to the restroom.

Page 67

D. Sauter

1    MR. MORRIS:  We're not taking a
2    break, bud.  I'm not –
3    (Simultaneous crosstalk.)
4    MR. RUKAVINA:  We'll be back in ten
5    minutes.
6    MR. MORRIS:  Hey, Davor, I'm going
7    to ask your client a question.  Okay?
8    (Simultaneous crosstalk.)
9    MR. RUKAVINA:  – but we're not –
10   I'm sorry.
11        You can ask him afterwards who he's
12   talked to and about what, but you don't get to
13   tell him that he can't talk to anyone.
14        So let's go take a piss break and be
15   back in nine minutes.
16        MR. MORRIS:  Put that on the record.
17        (Recess was taken from 2:17 p.m. to
18   2:28 p.m.)
19   BY MR. MORRIS:
20   Q.   Are you ready to proceed, Mr.
21   Sauter?
22   A.   I am.
23   Q.   During the break did you speak to
24   anybody about the substance of your testimony?

Page 68

D. Sauter

1    A.   I did not.
2    Q.   Okay.  Did you communicate with
3    anybody about the substance of your testimony?
4    A.   I did not.
5    Q.   I want to stick with the focus on
6    the debtor's intent as stated in Paragraph 30.
7         Before you prepared your
8    declaration, did you spend any time reviewing
9    any of the debtor's bankruptcy filings?
10   A.   Yes.
11   Q.   And are you aware that throughout
12   the bankruptcy the debtor disclosed these notes
13   as assets of the estate?
14   A.   Yes.
15   Q.   And what documents did you review
16   that led you to conclude that the debtor was
17   disclosing the notes as assets of the estate?
18   Do you recall?
19   A.   I mean, I would have known it from
20   the schedules.  I would have known it from your
21   complaint.
22   Q.   Okay.  So you reviewed the debtor's
23   schedules of assets and liabilities prior to
24   the time you signed your declaration.  Is that

Page 69

D. Sauter

1    right?
2    A.   Well, I didn't review them in
3    connection with my preparation of the
4    declaration, but yes, I had reviewed them.
5    Q.   And in reviewing them, did you learn
6    that the debtor had in fact carried the notes
7    as assets on its balance sheet or on its
8    schedules of assets and liabilities?
9    MR. RUKAVINA:  I'm going to object
10   to the form.
11        THE WITNESS:  I was aware that the
12   debtor sought to collect on the note from
13   HCMFA, the notes.
14   BY MR. MORRIS:
15   Q.   Are you aware that Mr. Dondero was
16   in control of Highland Capital Management, LP
17   from at least the date of the bankruptcy filing
18   in October 2019 through around January 9th,
19   2020?
20   A.   Yes.
21   Q.   Okay.  Are you aware that, while
22   Mr. Dondero was in control of the debtor during
23   that period, that Highland filed statements of
24   financial affairs and schedules of assets?

Page 70

D. Sauter

1  
2    A.    Generally, I guess, yes.

3        But I'm not aware of a particular

4    document called statement of financial affairs.

5    Q.    Are you aware that while Mr. Dondero

6    was in control of Highland during the

7    bankruptcy, the debtor filed documents stating

8    that the notes were assets of the estate?

9    A.    I was not.

10    Q.    Okay.  Did you ever, as part of your

11    investigation, try to see how the debtor

12    treated the notes in its court filings?

13    A.    I did not, beyond the filing of the

14    complaint.

15    Q.    So you never had a conversation with

16    anybody – withdrawn.

17        Did you ever ask Mr. Waterhouse how

18    the debtor treated the notes in its books and

19    records?

20    A.    No.

21    Q.    Did you ever ask Mr. Waterhouse how

22    HCMFA treated the notes in its books and

23    records?

24    A.    No.

25    Q.    Have you been following developments

Page 71

D. Sauter

1  
2    in this particular adversary proceeding?

3    A.    Yes.

4    Q.    Are you aware that both HCMFA and

5    Highland disclosed the existence of the notes

6    to their outside auditors within 30 days of

7    their execution?

8        MR. RUKAVINA:  Objection, form.

9        THE WITNESS:  Yes.

10        And it's my understanding that's why

11    the notes were prepared.

12    Q.    And what's that understanding based

13    on?

14        MR. RUKAVINA:  And now, Mr. Sauter,

15    let's be very careful here.

16        Please answer only if it's based on

17    factual information that a nonlawyer told you.

18        THE WITNESS:  Yeah.  I believe

19    Mr. Waterhouse told me that he needed a note to

20    document the transfer of funds.

21    BY MR. MORRIS:

22    Q.    Okay.  But I asked you a different

23    question, and that's simply whether or not

24    you're aware as you sit here today whether

25    HCMFA and Highland disclosed the existence of

Page 72

D. Sauter

1  
2    the notes to the outside auditors.

3        MR. RUKAVINA:  I'll object again.

4        THE WITNESS:  Yes, I am aware.

5    Q.    Have you ever seen HCMFA's audited

6    financial statements?

7    A.    I don't recall.

8        I think you asked me that earlier.

9    And I may have seen them, but I don't recall

10    specifically.

11    Q.    Do you recall looking at the audited

12    financial statements as part of your

13    investigation?

14    A.    No.

15    Q.    Let's put up HCMFA's audited

16    financial statements for the period ending

17    December 31st, 2018.  And it's previously been

18    marked as Deposition Exhibit 45.

19        (Exhibit 45, Consolidated Financial

20    Statements and Supplemental Information

21    December 31, 2018, D-CNL002273-296, previously

22    marked for identification.)

23    Q.    Do you see the first page there?

24        This is the HCMFA consolidated

25    financial statements for the period ending

Page 73

D. Sauter

1  
2    December 31st, 2018.

3        Do you see that?

4    A.    I do.

5    Q.    And I think you said you may have

6    seen it before.

7        Did I get that wrong?

8    A.    I said I may have.

9        In looking at this, I don't think

10    I've ever seen this document.

11    Q.    Okay.  Can we just go to the third

12    page and see the date.

13        Do you see that this is the report

14    of the independent auditors

15    PricewaterhouseCoopers?

16    A.    Yes.

17    Q.    And you do see it's dated June 3rd,

18    2019?

19    A.    Yes.

20    Q.    And do you understand that this

21    document was prepared by HCMFA's outside

22    auditors prior to Highland's bankruptcy filing?

23    A.    That's what it purports to be.

24    Q.    Okay.  And it also purports to have

25    been prepared prior to the commencement of the

Page 74

D. Sauter

1    adversary proceeding as you understand the
2    timing.  Correct?
3
4    A.   Yep.
5    Q.   Let's go to Page 17, please.
6         Do you see there's a section in the
7    audited financial statements called Subsequent
8    Events?
9    A.   Yep.
10   Q.   Do you have any understanding as to
11   what a Subsequent Events section is in audited
12   financial statements?
13   A.   Yes.
14   Q.   What's your understanding of what
15   that section is supposed to include?
16   A.   It's intended to pick up events that
17   occurred after the date of the financials but
18   prior to the date the financials are
19   executed – or issued.
20   Q.   And do you see in the second
21   paragraph there's a description of the two
22   notes?
23   A.   Yes.
24   Q.   Okay.  You were not aware that the
25   two notes were included in HCMFA's audited

Page 75

D. Sauter

1    financial statements for -- as subsequent
2    events at the time you executed your
3    declaration.  Correct?
4
5    A.   Correct.
6    Q.   Now that you know that, do you think
7    HCMFA made a mistake in including these notes
8    in the audited financial statements, or does it
9    cause you to reconsider your conclusion that
10   the issuance of the notes was a mistake?
11        MR. RUKAVINA:  I'll object to that
12   question based on form.
13        THE WITNESS:  You're asking me for
14   my legal conclusion?
15   Q.   No, I'm not actually, but it
16   probably wasn't a great question.
17        So your conclusion was that the
18   execution of the notes was a mistake.  Correct?
19   A.   Yes.
20   Q.   But HCMFA is reporting the notes as
21   part of its audited financial statements.
22   Correct?
23   A.   Yes.
24   Q.   And do you understand that these
25   financial statements have been audited by

Page 76

D. Sauter

1    independent – an independent outside firm
2    called PricewaterhouseCoopers?
3    A.   I assume they're audited financials.
4         And yes, what you've shown me, it
5    appears as though they were prepared by
6    PricewaterhouseCoopers.
7    Q.   Okay.  Would you agree with me that
8    it's inconsistent that the notes can't be both
9    a mistake and be reported as valid obligations
10   in the audited financial statements?
11        MR. RUKAVINA:  I'll object.
12        This witness is not an expert.  He
13   has no personal knowledge.  This is well
14   outside the scope of his factual investigation
15   in May of 2021.
16   BY MR. MORRIS:
17   Q.   You can answer, sir.
18   A.   I would agree that the two
19   statements are at odds with one another.
20   Q.   Okay.  So I'm just asking you
21   whether – now that you know that HCMFA
22   included these in the audited financial
23   statements, does that cause you to question at
24   all your conclusion that the execution of the

Page 77

D. Sauter

1    notes was a mistake?
2
3        MR. RUKAVINA:  I'll again object.
4        This witness is not an expert.  He's
5    not going to be a trial expert.  And a motion
6    to amend has already been agreed upon and ruled
7    upon.
8    BY MR. MORRIS:
9    Q.   You can answer, sir.
10   A.   I would say that the audited
11   financials were prepared by
12   PricewaterhouseCoopers with input from the
13   accounting team.
14        And as I stated previously, I think
15   there was an -- a breakdown in the process that
16   should have occurred, and had others looked at
17   this, they wouldn't have come to the same
18   conclusion.
19   Q.   So do you believe, based on the
20   investigation that you did, that a second
21   mistake occurred not only in signing the notes
22   but including them in the audited financial
23   statements?
24        MR. RUKAVINA:  Again, I'll object.
25        This witness is not an expert.  He

Page 78

D. Sauter

1  has no personal knowledge.
2         THE WITNESS:  Yeah, I can't tell you
3  whether that's a mistake.
4         My experience is that generally
5  accounting folks internally said that.
6         So if the accounting folks made a
7  determination that the notes should be included
8  as a subsequent event, then the auditors would
9  include it as a subsequent event.
10 BY MR. MORRIS:
11    Q.   Okay.  Do you know, is there anybody
12 at HCMFA who's responsible for overseeing the
13 preparation of the audited financial
14 statements?
15    A.   I think Mr. Waterhouse.
16    Q.   When did you first learn that the
17 notes had been included in the financial
18 statements?
19       Are you learning that for the first
20 time right now or did you know that before
21 today?
22    A.   I think I heard that a couple weeks
23 ago.
24       MR. RUKAVINA:  Let's be careful here
25

Page 79

D. Sauter

1  again, Mr. Sauter, to exclude our
2  communications, please.
3         THE WITNESS:  Okay.
4    Q.   Do you know if HCMFA ever reached
5  out to PricewaterhouseCoopers to inform them
6  that their audited financial statements were
7  incorrect?
8    A.   I don't know.
9    Q.   Do you know whether the debtor
10 included reference to the notes in its audited
11 financial statements?
12    A.   I don't.
13    Q.   Let's go back to your declaration,
14 please, Paragraph 28.
15       Okay.  So Paragraph 28 says:  "The
16 debtor accepted responsibility to HCMFA for
17 having caused the NAV error, and the debtor
18 ultimately, whether through insurance or its
19 own funds, compensated HCMFA for the above
20 payments."
21       Have I read that correctly?
22    A.   Correct.
23    Q.   Paragraph 28 doesn't cite any source
24 for that statement.  Right?
25

Page 80

D. Sauter

1    A.   Correct.
2    Q.   Okay.  You don't attribute that
3  statement to any particular person.  Correct?
4    A.   That's correct.
5    Q.   What is the basis for your statement
6  that the debtor accepted responsibility to
7  HCMFA?
8    A.   It would be that the debtor's
9  employees who performed the valuation function
10 acknowledged that they had made a mistake.
11    Q.   And who are those employees?
12    A.   Well, ultimately I don't know
13 exactly who it was that came to that
14 determination, but I think it was Frank
15 Waterhouse and Thomas Surgent.
16    Q.   Did you ever interview Mr. Surgent
17 as part of your investigation?
18    A.   No, I was prohibited from speaking
19 with him.
20    Q.   So you're not aware of
21 Mr. Waterhouse ever saying that the debtor
22 accepted responsibility – withdrawn.
23       You're not aware of Mr. Surgent –
24 withdrawn.
25

Page 81

D. Sauter

1    A.   You have no personal knowledge that
2  Mr. Surgent accepted, on behalf of the debtor,
3  responsibility for the NAV error.  Correct?
4    A.   I have no personal knowledge of
5  that, correct.
6    Q.   Okay.  And did Mr. Waterhouse tell
7  you that the debtor accepted responsibility to
8  HCMFA for having caused the NAV error?
9    A.   I think Mr. Waterhouse said that the
10 HCMLP employees who formed the valuation
11 committee ultimately concluded that they had
12 made a mistake and they needed to accept that.
13    Q.   Okay.  It doesn't say that in your
14 declaration, does it?
15    A.   Doesn't say what?
16    Q.   That Mr. Waterhouse told you that.
17    A.   No.
18    Q.   In fact, is there any particular
19 reason why you didn't share that with the
20 court?
21    A.   No.
22    Q.   Is there anything in writing that
23 you've ever seen which states that the debtor
24 accepts responsibility to HCMFA for having
25

Page 82

1            D. Sauter
2  caused the NAV error?
3      A.   Other than what I've identified, no.
4      Q.   And what you've identified is that
5  policy.  Is that right?
6      A.   There's a policy and the
7  acknowledgment that the NAV error was made by
8  the HCMLP employees who were on the valuation
9  committee.
10     Q.   Okay.  You're aware that shortly
11  after HCMFA paid the $7.4 million to the fund,
12  HCMFA sent the fund a written report.  Is that
13  right?
14     A.   Yes.
15     Q.   Let's take a look at that, if we can
16  put that on the screen.
17          MS. CANTY:  Sorry, John, you went
18  out for a second.
19          Can you say that again.
20          MR. MORRIS:  Yeah.
21          If you could, I think -- I think I
22  had it listed as Exhibit 37, but it's one of
23  the new ones.  It's the memo, I think, from
24  HCMFA to the funds.
25          MS. CANTY:  Got it.

Page 83

1            D. Sauter
2          (Exhibit 182, Memo dated 5/28/19,
3  previously marked for identification.)
4  BY MR. MORRIS:
5      Q.   Is this one of the memos that -- and
6  again, Mr. Sauter, if you need to see more of
7  it, just let me know.
8          But is this one of the memos that
9  you saw as part of your investigation?
10     A.   I believe so.
11     Q.   Okay.  And do you understand that
12  this is a memo from HCMFA to the board of the
13  Highland Global Allocation Fund?
14     A.   Yes.
15     Q.   And this is where HCMFA describes
16  for the board the resolution of the NAV error.
17  Correct?
18     A.   Correct.
19     Q.   Okay.  And did you discuss this memo
20  with anybody as part of your investigation?
21     A.   I mean, other than reviewing it, no.
22     Q.   So -- and how did you obtain a copy
23  of it?
24     A.   Mr. Post.
25     Q.   So Mr. Post gave it to you.

Page 84

1            D. Sauter
2          But you didn't speak with him about
3  it in substance.  Correct?
4      A.   I mean, I spoke to him about the
5  transaction and the mistake.
6          I did the same thing with Dustin
7  Norris.
8      Q.   Okay.  But you didn't speak with
9  anybody about the substance of this memo.
10  Correct?
11     A.   Correct.
12     Q.   Okay.  And -- but you did see this
13  memo before you signed your declaration.
14  Correct?
15     A.   Yes.
16     Q.   Okay.  And do you have an
17  understanding of what this memo is?
18     A.   Yeah.
19          I'd like to take a -- I'd like to
20  see the memo in full.
21     Q.   Sure.  Take your time.
22          So just tell Ms. Canty when you want
23  to see more and then she'll scroll.
24          Okay.  Stop right there.
25     A.   (Reviewing document.)

Page 85

1            D. Sauter
2          Yes.  Okay.
3      Q.   So then the second page is this NAV
4  error breakdown.
5          Do you see that?
6      A.   Yes.
7      Q.   All right.  We'll come to that, but
8  let's go back to the first page.
9          Have you taken a look at the second
10  paragraph there that begins:  "The advisor and
11  Houlihan Lokey, an independent third party
12  expert valuation consultant approved by the
13  board," have you read that paragraph?
14     A.   Yes.
15     Q.   Okay.  To the best of your
16  knowledge, did HCMFA accurately define "NAV
17  error" for the board in that paragraph?
18          MR. RUKAVINA:  Objection --
19          THE WITNESS:  As far as I know, yes.
20          MR. RUKAVINA:  This witness is not
21  an expert and has no personal knowledge.
22     Q.   Do you have any reason to believe
23  that HCMFA did not accurately describe for the
24  board the definition of "NAV error"?
25     A.   No.

Page 86

D. Sauter

1
2   Q.   Do you have any reason to believe –
3   take a look at the last sentence.
4        "The orderly determination and
5   adoption of the weighted fair valuation
6   methodology resulted in NAV errors in the
7   fund."
8        Do you see that?
9   A.   Yes.
10  Q.   And that's what's being defined as
11  the NAV error.  Correct?
12  A.   Yes.
13  Q.   Do you have any reason to believe
14  that that sentence is false or misleading in
15  any way?
16  A.   I do not.
17  Q.   Nothing you uncovered during your
18  investigation caused you to believe that that
19  sentence was false or misleading in any way.
20  Correct?
21  A.   No.
22  Q.   Okay.  And the advisor was the
23  entity that made the orderly determination.
24  Correct?
25  A.   That's what this memo says.

Page 87

D. Sauter

1
2   Q.   Okay.  Who's Houlihan Lokey?  Do you
3   know who Houlihan Lokey is?
4   A.   It's a third party valuation firm.
5   Q.   Do they have a good reputation?
6   A.   Yes.
7   Q.   And did they do the valuation of
8   TerreStar?
9   A.   That's my understanding.
10  Q.   Okay.  And were they retained by the
11  advisor or by HCMLP?
12  A.   I don't know.
13  Q.   Did you ever ask anybody who hired
14  Houlihan Lokey?
15  A.   I did not.
16  Q.   Do you know whether HCMFA utilizes
17  Houlihan Lokey's valuation services in the
18  ordinary course of its business?
19  A.   I don't know.
20      I know that Houlihan Lokey has been
21  utilized by either HCMLP, HCMFA or Nexpoint
22  Advisors in the past.
23  Q.   And to the best of your knowledge,
24  has – have those entities continued to use
25  Houlihan Lokey even after May 2019?

Page 88

D. Sauter

1
2   A.   I – I don't know.
3   Q.   Do you know whether anybody ever
4   suggested that Houlihan Lokey was responsible
5   for the valuation error?
6   A.   I don't.
7   Q.   Did you ever ask anybody if Houlihan
8   Lokey was responsible for the valuation error?
9   A.   No.
10  Q.   Do you know if – to the best of
11  your knowledge, this memo was given to the
12  board by HCMFA.  Correct?
13  A.   Yes.
14  Q.   Did – having reviewed the memo, is
15  there anything that you're aware of in this
16  memo where HCMFA tells the board that HCMLP is
17  responsible for the NAV error?
18  A.   No.
19      And I don't think that they would.
20  It would be irrelevant.
21      MR. MORRIS:  I move to strike the
22  latter portion of the answer.
23  Q.   Let's take a look at the bottom
24  paragraph there.
25      Do you see that there's a reference

Page 89

D. Sauter

1
2   to two different payments?
3   A.   Yes.
4   Q.   A payment of approximately
5   $5.2 million was made on February 15th, 2019,
6   and a second payment of approximately
7   $2.4 million was made on May 2nd.
8        Do I have that right?
9   A.   Yes.
10  Q.   Do you know what the source of
11  funding was for the first payment?
12  A.   I do not.
13  Q.   Did you ever ask anybody how
14  HCMFA – withdrawn.
15      Did you ever ask anybody what the
16  source of HCMFA's funding was to make the
17  payment on February 15th, 2019?
18  A.   Say that again.
19  Q.   Did you ever ask anybody what the
20  source of HCMFA's capital was to make that
21  payment on February 15th?
22  A.   I was told that it was a transfer
23  from HCMLP.
24  Q.   You were told that the transfer from
25  HCMLP was made in February of 2019?

Page 90

```
1                 D. Sauter
2      A.   Yes.
3      Q.   Who told you that?
4      A.   Mr. Waterhouse.
5      Q.   Okay.  Do you know what the source
6   was -- hold on one second.
7           And do you know what the source of
8   the second payment was, that $2.4 million on
9   May 2nd, 2019?
10      A.   HCMLP.
11      Q.   Now, we saw earlier that one of the
12  notes was for $2.4 million on May 2nd.
13           Do you recall that?
14      A.   Yes.  Yes.
15      Q.   Okay.  So is it fair -- did you
16  conclude as part of your investigation that at
17  least the amount and the date of the payment
18  matched the amount and the date of the note?
19      A.   I did on the second note, yes.
20      Q.   Okay.  But the -- neither the amount
21  nor the date of the first payment matched the
22  amount or the date of the second note.
23  Correct?
24      A.   That's correct.
25      Q.   Let's take a look at the second
```

Page 91

```
1                 D. Sauter
2   page.
3           Have you seen this before?
4      A.   I have.
5      Q.   Did you ever have any discussions
6   with anybody at any time during your
7   investigation about this page?
8      A.   I did at some point, and I don't
9   recall exactly when.
10      Q.   Okay.
11      A.   But probably it may have been after
12  the declaration.
13      Q.   Okay.  Do you understand that the
14  first -- I think it's a row -- shows that the
15  total estimated net loss resulting from the NAV
16  error was approximately $7.44 million?
17      A.   Yes, I see that.
18      Q.   Okay.  And do you understand that
19  this chart depicts the sources that are going
20  to be called upon to fund the $7.44 million
21  payment from HCMFA to the fund?
22      A.   I -- yes, I understand that now.
23      Q.   And do you understand that
24  approximately $5 million was going to be funded
25  through insurance proceeds?
```

Page 92

```
1                 D. Sauter
2      A.   That's what it appears to show.
3      Q.   And during your investigation, were
4   you aware that HCMFA had obtained almost
5   $5 million in connection with the NAV error
6   that it was using to fund the payment to GAF?
7      A.   I subsequently learned that, yes.
8      Q.   And were you aware prior to the time
9   that you signed your declaration -- I apologize
10  if I asked this before -- withdrawn.
11           Were you aware of the almost
12  $5 million in insurance proceeds that was --
13  that were obtained by HCMFA before you signed
14  your declaration?
15      A.   I was not.
16      Q.   So that's new information for you
17  since the time you signed your declaration?
18      A.   Yes.
19      Q.   Okay.  Were you aware at the time
20  you signed your declaration that HCMFA had paid
21  an insurance deductible of almost $250,000?
22      A.   I was not.
23      Q.   Is it your understanding that after
24  the sources described in the top portion of
25  this page, that the total amount needed by the
```

Page 93

```
1                 D. Sauter
2   advisor to make GAF whole was approximately
3   $2.4 million?
4           That's the 2,398,842 number there.
5      A.   I've not done the math.
6      Q.   Well, that number there matches the
7   number in the bottom paragraph of the first
8   page, if we can scroll back up.
9      A.   Yeah.  No, I understand.
10      Q.   Okay.  So that's the total payment
11  that was made on May 2nd, 2019, according to
12  this memo?
13      A.   That's total payment made to GAF.
14           What I'm unclear about is that it's
15  the total amount out of pocket from the
16  advisor, which may be different, but...
17      Q.   Do you know what the total out of
18  pocket was from the advisor?
19      A.   I don't.
20           (Simultaneous crosstalk.)
21           THE WITNESS:  -- what's listed here.
22      Q.   And do you understand that a total
23  of $7.44 million was paid by HCMFA to GAF?
24      A.   I do.
25      Q.   Okay.  And do you have any reason to
```

Page 94

1            D. Sauter
2  believe that the source of the funding is
3  anything other than what's set forth on this
4  page?
5      A.  I don't.
6      Q.  And the $2.4 million, that's the
7  $2.4 million that HCMFA obtained from Highland
8  on May 2nd. Correct?
9          MR. RUKAVINA: Objection.
10         The witness is not qualified to
11 answer that.
12     Q.  During the course of your
13 investigation, did you learn that Highland
14 transferred $2.4 million to HCMFA on May 2nd,
15 2019 so that it could pay GAF?
16     A.  That's what I was told.
17     Q.  Okay. Is it your conclusion that
18 Highland was responsible for the $7.44 million
19 estimated net loss resulting from the NAV
20 error?
21         MR. RUKAVINA: Objection.
22         This witness is not an expert, and
23 he has no personal knowledge.
24         THE WITNESS: Yes, I believe that
25 that's accurate.

Page 95

1            D. Sauter
2  BY MR. MORRIS:
3      Q.  And that's because you believe the
4  notes were executed by mistake. Correct?
5      A.  I believe that Highland made the NAV
6  error and was responsible for making GAF whole,
7  albeit vis-à-vis HCMFA, its advisor.
8      Q.  Okay. So because Highland created
9  the NAV error, your understanding based on your
10 discussions with Mr. Post and Mr. Norris is
11 that Highland paid the $7.4 million to HCMFA
12 not as a loan but as compensation for the error
13 that it made.
14         Do I have that right?
15     A.  That would not be based on my
16 discussions with Mr. Post and Mr. Norris.
17         But yes, your conclusion is
18 accurate.
19     Q.  Okay. And let's be really clear
20 what the conclusion is.
21         It's your conclusion that because
22 Highland was negligent in making the NAV error,
23 that when it paid $7.4 million to HCMFA on
24 May 2nd and May 3rd, 2019, it did so as
25 compensation for its negligent conduct and not

Page 96

1            D. Sauter
2  as a loan. Correct?
3      A.  I didn't say negligent, and I don't
4  know that I can make that conclusion.
5          But it should have been indemnity
6  and reimbursement for the error that Highland
7  created.
8      Q.  Okay. Can you tell me why HCMFA
9  took $5 million from an insurance company at
10 the same time it was being made whole by
11 Highland?
12         MR. RUKAVINA: I'll instruct you not
13 to answer that.
14         That is attorney client privileged
15 and work product.
16     Q.  Sir, as part of your investigation,
17 did you make any assessment as to why HCMFA
18 accepted $5 million in proceed -- in insurance
19 proceeds at the same time it believed that the
20 $7.4 million was being paid by Highland as
21 compensation?
22         MR. RUKAVINA: Just want to make
23 sure, Mr. Sauter, you understand that counsel
24 is asking about your investigation in May of
25 this year as referenced in your declaration and

Page 97

1            D. Sauter
2  not the investigation generally.
3          THE WITNESS: Yes.
4          And as I said, the May declaration,
5  I was unaware of the $5 million in insurance
6  payments.
7  BY MR. MORRIS:
8      Q.  Now that you're aware of it, does it
9  cause you to question your conclusion that the
10 payment made by Highland in May of 2019 was
11 compensation and not a loan?
12         MR. RUKAVINA: I instruct you not to
13 answer that, Mr. Sauter.
14         MR. MORRIS: On what basis? That
15 you don't like the question?
16         MR. RUKAVINA: No.
17         Let's be professional here, John. I
18 don't know why you've got to get --
19         (Simultaneous crosstalk.)
20         MR. MORRIS: I don't understand.
21 It's a --
22         MR. RUKAVINA: No, you -- the way --
23         MR. MORRIS: It's an investigation.
24 He made a conclusion in the investigation.
25         He's now learned a new fact. I'm

Page 98

D. Sauter

1        D. Sauter
2   allowed to ask him if it changes his
3   conclusion.
4        MR. RUKAVINA:  Let me just explain
5   what I understand, what's going on here.
6        He undertook an evidentiary and
7   factual conclusion, which is fair game for you
8   to ask about.  Pardon me.
9        He's told you that he didn't know
10  about this.  His declaration says -- I'm
11  paraphrasing -- it appears that there was a
12  mistake.
13       He has never claimed to have
14  personal knowledge.  He has never claimed to be
15  an expert.  He is not going to be a trial
16  witness.  He has never testified and is not
17  testifying today that there was a mistake.
18       But most importantly, and why I'm
19  instructing him not to answer, is because the
20  issue of how this payment relates to the
21  insurance payable, which again arose after his
22  declaration is something that he and I have
23  discussed and is my work product.  That is not
24  a part of his factual investigation.
25       So I am instructing him not to

Page 99

D. Sauter

1        D. Sauter
2   answer.  There's no point in you and I arguing
3   about it now.
4        If you feel my objection is
5   inappropriate, then you have your rights
6   intact.
7        MR. MORRIS:  All right.  I'm going
8   to continue to ask questions.
9   BY MR. MORRIS:
10       Q.   Sir, you had this document before
11  you signed your declaration.  Correct?
12       A.   I did.
13       Q.   Okay.  And your conclusion was that
14  because Highland made the NAV mistake, the
15  $7.4 million payment was supposed to be
16  compensation and not in the form of a loan.
17  Correct?
18       MR. RUKAVINA:  Objection, form.
19       THE WITNESS:  Correct.
20       Q.   Okay.  And now the document that you
21  had before you signed your declaration
22  discloses that HCMFA received almost $5 million
23  as part of the insurance proceeds in connection
24  with the NAV error.  Correct?
25       A.   Yes.

Page 100

D. Sauter

1        D. Sauter
2        Q.   Okay.  Does that cause you to change
3   the conclusion that you reached as set forth in
4   your declaration?
5        A.   I don't know enough about the
6   insurance proceeds, the insurance policy and
7   what transpired at the time to make that
8   determination.
9        Q.   Do you know if HCMFA has ever
10  informed the insurance carrier that HCMLP was
11  responsible for the NAV error?
12       A.   I do not.
13       Q.   Did you ever ask anybody?
14       A.   I did not.
15       Q.   As part of your investigation, did
16  you try to determine whether HCMFA ever told
17  the insurance company that HCMLP was
18  responsible for the NAV error?
19       A.   I think I already said I wasn't
20  aware of the insurance proceeds at the time of
21  my declaration.
22       Q.   Has HCMFA returned all or any
23  portion of the insurance proceeds to the
24  carrier?
25       A.   I wouldn't know.

Page 101

D. Sauter

1        D. Sauter
2        Q.   Have you ever asked anybody?
3        A.   No.
4        MR. RUKAVINA:  You've got to wait a
5   second, Mr. Sauter, before answering.
6        Go ahead.
7        Q.   During the course of your
8   investigation, did anybody tell you that on
9   May 3rd, 2019, HCMFA needed another $5 million?
10       A.   Not during the course of my initial
11  investigation.
12       Q.   Are you aware of that today?
13       A.   I am, yes.
14       Q.   Okay.  And do you understand that
15  that $5 million was needed in order for HCMFA
16  to pay what's called a consent fee?
17       MR. RUKAVINA:  I'm going to object.
18       And I'm going to instruct the
19  witness not to answer.
20       Again, this is attorney-client
21  privilege and work product.
22       He learned about all of this well
23  after his investigation and well after his
24  declaration.
25       MR. MORRIS:  These are facts.

Page 102

D. Sauter

1
2        I don't get it.  These are facts.
3   And I'm not limited to his declaration.  He's
4   here under a subpoena.  I can ask him whatever
5   I want factually.
6        I don't understand, Davor.
7        MR. RUKAVINA:  Well, there's three
8   things.
9        You're generally right, you can ask
10  him whatever you want factually.  I'm not
11  saying that he -- I haven't prevented you from
12  asking factually.  That's issue one.
13        Issue two, he's not a trial witness.
14  His role is limited to the motion to amend,
15  which was granted by consent.
16        And issue three, the question you're
17  asking him right now, if he has any knowledge,
18  he can have only through discussions with me
19  and things he's learned through me in this
20  litigation.  He's told you he did not know
21  about this during his investigation.
22        So I'm going to stick by my
23  instruction not to answer that, Mr. Sauter.
24        MR. MORRIS:  And I'm going to tell
25  you he is a trial witness.  I will certainly be

Page 103

D. Sauter

1
2   calling him at trial because he conducted an
3   investigation.
4        And I don't think that I need to
5   stop asking questions as of the date of his
6   declaration.  I'm asking purely factual
7   questions.
8        So you know, if you want to continue
9   to direct him not to answer, we'll deal with
10  it, but I'm going to continue to ask him
11  factual questions.
12        MR. RUKAVINA:  To me, this is --
13        (Simultaneous crosstalk.)
14  BY MR. MORRIS:
15   Q.   Mr. Sauter, do you understand that
16  the $5 million was needed by HCMFA on May 3rd,
17  2019 to pay a consent fee?
18        MR. RUKAVINA:  I'm going to instruct
19  you not to answer that, Mr. Sauter.
20   Q.   Are you going to follow your
21  counsel's instructions?
22   A.   I am.
23   Q.   Do you know what a consent fee is,
24  sir?
25   A.   I don't.

Page 104

D. Sauter

1
2   Q.   Did you ever have -- withdrawn.
3        Did anybody ever tell you that
4   Highland was responsible for any consent fee
5   that HCMFA paid?
6        MR. RUKAVINA:  You're instructed not
7   to answer that to the extent that whoever told
8   you that would be an attorney.
9   BY MR. MORRIS:
10   Q.   Okay.  Did anybody other than an
11  attorney ever tell you that Highland was
12  responsible for any consent fee ever paid by
13  HCMFA?
14   A.   That Highland was responsible for
15  paying a consent fee?
16   Q.   That Highland was responsible for
17  any consent fee that was paid by HCMFA.
18   A.   I don't believe so.
19   Q.   During your discussions as part of
20  your investigation with Mr. Norris and Mr. Post
21  and Mr. Dondero and Mr. Waterhouse, did anybody
22  tell you why Highland paid HCMFA $5 million on
23  May 3rd, 2019?
24   A.   Yes.
25   Q.   And why did -- what did they tell

Page 105

D. Sauter

1
2   you?
3   A.   It was payment for a consent fee.
4   Q.   All right.  Okay.
5        And who told you that?
6   A.   Mr. Norris.
7   Q.   And did Mr. Norris tell you that
8   Highland had any responsibility for the payment
9   of that consent fee by HCMFA?
10   A.   I don't know that we got into that.
11   Q.   Okay.  Did anybody else tell you
12  that the May 3rd, 2019 $5 million payment was
13  made so that HCMFA could pay the consent fee?
14        MR. RUKAVINA:  Again, I'll instruct
15  you not to answer to the extent you learned
16  anything from an attorney.
17        THE WITNESS:  I don't believe so.
18   Q.   Okay.  Did you speak with
19  Mr. Waterhouse about the $5 million consent fee
20  that Mr. Norris mentioned to you?
21   A.   I have not spoken with
22  Mr. Waterhouse for quite some time about this,
23  since he's represented by counsel.
24   A.   No.
25        But as part of your investigation,

Page 106

D. Sauter

1    after you learned from Mr. Norris that the
2    $5 million was paid so that HCMFA could pay the
3    consent fee, did you follow up with
4    Mr. Waterhouse at all?
5        A.    I didn't know about the consent fee
6    at the time of my investigation.
7        Q.    Okay.  When did Mr. Norris tell you
8    about the consent fee?
9        A.    Probably within the last six weeks.
10       Q.    And does learning about the consent
11   fee from Mr. Norris cause you to question your
12   conclusion that the $7.4 million was paid by
13   Highland to HCMFA on account of the mistake
14   that Highland made on the NAV error?
15            MR. RUKAVINA:  I'll again object
16   that this witness is not an expert and he has
17   no personal knowledge.
18       Q.    You can answer, sir.
19       A.    I wasn't aware of the consent fee.
20            I don't know much about the consent
21   fee.  I don't know what it is, who paid it, why
22   they paid it, what the consideration was for
23   it.
24            So I'm not prepared to answer that.

Page 107

D. Sauter

1        Q.    Okay.  Let's go back to your
2    declaration, please, Paragraph 31.
3            Is it fair to summarize this
4    paragraph as saying that because HCMFA and the
5    debtor had executed that acknowledgment, that
6    it would have been illogical for Highland to
7    lend HCMFA $7.4 million in May 2021?
8        A.    Yes.
9        Q.    Okay.  And what was the source of
10   your information for Paragraph 31?
11       A.    I'm not sure I follow.
12       Q.    So you've got the acknowledgment
13   that you attached as Exhibit 4.  Correct?
14       A.    Yes.
15       Q.    Did you discuss with anybody during
16   your investigation any of the facts or
17   conclusions that are set forth in Paragraph 31
18   or did you -- or is it based just on your
19   review of Exhibit 4?
20       A.    Based on my review.
21       Q.    Okay.  Are you aware that in
22   May 2019, Mr. Dondero contemporaneously and
23   personally paid Highland exactly $7.4 million
24   that was owed by Mr. Dondero to Highland under

Page 108

D. Sauter

1    a promissory note where he was the maker?
2        A.    I was not.
3        Q.    Nobody told you that as part of your
4    investigation, that the way Highland was able
5    to transfer the $7.4 million to HCMFA was to
6    get that money from Mr. Dondero on account of a
7    note that he signed?
8        A.    No one told me that.
9        Q.    You're hearing that for the first
10   time today?
11       A.    I am.
12       Q.    If Mr. Dondero paid down
13   $7.4 million in obligations that he owed to
14   Highland, would it change your view that it was
15   illogical for Highland to loan that money to
16   HCMFA in May of 2019?
17       A.    Again, without seeing the documents
18   and the timing and the details of the
19   transaction, I can't answer that.
20       Q.    Okay.  Now, the advisors have
21   contracts with the funds they advise.  Correct?
22       A.    Advisory agreements, yes.
23       Q.    And those advisory agreements are
24   subject to annual renewal.  Correct?

Page 109

D. Sauter

1        A.    Yes.
2        Q.    As Nexpoint's general counsel, did
3    you participate in the annual renewal process
4    in the fall of 2020?
5        A.    I would have participated in the
6    process, but only with respect to NXRT,
7    Nexpoint Residential Trust and Nexpoint Real
8    Estate Finance.
9        Q.    I see.
10       A.    I had some limited involvement in
11   the 15(c) process with respect to Nexpoint's
12   strategic opportunities fund, but very limited.
13       Q.    Do you know who the representative
14   was for HCMFA who was responsible for the 15(c)
15   annual renewal process in the fall of 2020?
16       A.    I don't.
17            I can speculate, and I would assume
18   it's Mr. -- a combination of Mr. Norris and
19   Mr. Sella (phonetic).
20       Q.    And why do you speculate that it's a
21   combination of them?
22       A.    Because they were actively involved
23   in the process just from conversations I had
24   with them.

Page 110

D. Sauter

1
2   Q.  Okay.  Have you ever seen any of the
3   reports that the advisors sent to the retail
4   board in connection with the 15(c) annual
5   review?
6       MR. RUKAVINA:  Now, this one,
7   Mr. Sauter, I am going to instruct you not to
8   answer.
9       MR. MORRIS:  Have you ever seen the
10  document?  That's what, you're going to
11  instruct him not to --
12      MR. RUKAVINA:  Don't answer that.
13  Don't answer that.  That relates to discovery
14  and work product privilege.
15      The document was produced to you.
16  Mr. Sauter helped me find that document.  Other
17  than that, nothing about that document and his
18  knowledge is fair game.
19      MR. MORRIS:  Well, I'm going to ask
20  my questions, and you can keep directing him
21  not to answer.
22  BY MR. MORRIS:
23      Q.  Mr. Sauter, have you ever seen any
24  of the reports that were issued by the advisors
25  to the funds?

Page 111

D. Sauter

1
2       A.  Could you clarify the question.
3       Q.  Sure.
4           Have you ever seen any of the
5   reports that were issued by the advisors to the
6   retail board in the fall of 2020 in connection
7   with the 15(c) review?
8       MR. RUKAVINA:  Mr. Sauter, I'm
9   instructing you not to answer that if your
10  answer involves working with me in this
11  adversary proceeding.
12      If you saw it otherwise as part of
13  business operation, that's fine.
14      THE WITNESS:  In the fall of 2020, I
15  would have had -- I would not have been
16  involved and I would not have seen anything
17  sent to the board.
18  BY MR. MORRIS:
19      Q.  All right.  Well, let's put it up on
20  the screen.  It's, I think, a document that was
21  previously marked as Deposition Exhibit 59.
22      (Exhibit 59, Memo dated 10/23/20,
23  HCMFAS 000025-031, marked for identification.)
24      Q.  Have you ever seen this document
25  before, sir?

Page 112

D. Sauter

1
2       A.  Could you scroll down.
3       Q.  Sure.
4       A.  (Reviewing document.)
5       Q.  We can keep going.
6       A.  All right.
7           What's the date on this?
8       Q.  October 23rd, 2020.
9       A.  I honestly don't think I would have
10  been involved in that or seen that.
11      Q.  Okay.  Did you ever ask anybody as
12  part of your investigation -- withdrawn.
13      Are you aware that the advisors were
14  asked to provide information to the retail
15  board as to the obligations that it owed to
16  Highland and its affiliates in connection with
17  the 15(c) annual review?
18      A.  I was not.
19      Q.  So is it fair to say that you never
20  saw this document as part of your
21  investigation?
22      A.  I don't think so.
23      Q.  Is it fair to say that nobody ever
24  told you about the advisors' responses to the
25  retail board in connection with the 15(c)

Page 113

D. Sauter

1
2   review in October of 2020?
3       A.  I think that's accurate.
4       MR. MORRIS:  We're going to do the
5   30(b)(6) deposition on December 1st?
6       MR. RUKAVINA:  I think I'm waiting
7   for you to confirm.
8       I think that's what --
9       MR. MORRIS:  Let's confirm that
10  right now.
11      I'll send you an e-mail, but I
12  just...
13      MR. RUKAVINA:  Okay.  10 a.m.,
14  Dallas?
15      MR. MORRIS:  Yeah, that sounds fair.
16  BY MR. MORRIS:
17      Q.  All right.  Let's go back to your
18  declaration, please, Paragraph 32.
19      I'm almost done, sir.
20      So you state, among other things,
21  that -- and I'm paraphrasing.  Let me know if
22  I -- if this is fair -- that as a result of
23  your investigation in April of 2019, HCMFA now
24  believes that it has affirmative defenses to
25  the notes that includes the defense of mutual

Page 114

D. Sauter

1  mistake.
2      Do I have that right?
3  A.  Yes.
4  Q.  Okay.  What does "mutual" -- excuse
5  me -- what does "mutual mistake" mean?
6      MR. RUKAVINA:  Are you asking for
7  his legal opinion or how he used it in this
8  declaration?
9      MR. MORRIS:  Only how he used it in
10  the declaration.
11     THE WITNESS:  Well, wouldn't that be
12  a legal conclusion because it's an affirmative
13  defense?
14  BY MR. MORRIS:
15  Q.  Well, I don't know.  It's in your
16  declaration.  I'm just asking you what you
17  meant when you used the phrase -- withdrawn.
18     Let me ask a better question.  Maybe
19  it's my fault.
20     Mr. Sauter, what did you mean when
21  you used the phrase "mutual mistake"?
22  A.  What I meant is that there was no
23  analysis or consideration of what had
24  transpired and who is legally responsible for

Page 115

D. Sauter

1  the payments to the fund.
2      A transfer was made.  A note was
3  executed without any analysis.
4  Q.  And do you have anything else to add
5  to that?
6  A.  I don't think so.
7  Q.  Okay.  You also say that the notes
8  are void for lack of consideration.
9      Do I have that right?
10  A.  Yes.
11  Q.  You don't dispute that Highland paid
12  HCMFA $2.4 million on May 2nd, 2019.  Correct?
13  A.  No.
14  Q.  And you don't dispute that Highland
15  paid HCMFA $5 million on May 3rd, 2019.
16  Correct?
17  A.  I mean, I believe that's right.
18  That's what I've been told.
19     So yeah, I don't dispute that.
20  Q.  Your reference to "a lack of
21  consideration" means only that, in your
22  opinion, the money should not have been
23  transferred in the form of a loan.
24     Do I have that right?

Page 116

D. Sauter

1  A.  You do.
2  Q.  It does not mean that HCMFA did not
3  receive an amount of money exactly equal to the
4  principal amount of the notes.  Correct?
5  A.  Based upon what I've been told,
6  correct.
7  Q.  Okay.  You also write here that
8  Mr. Waterhouse did not "have proper authority
9  to sign the notes."
10     Do I have that right?
11  A.  Yes.
12  Q.  What does "proper" -- what did you
13  mean by the phrase "proper authority"?
14  A.  I mean going through the process of
15  what I would expect to see in making a loan of
16  $7.4 million.
17  Q.  So that's just your own subjective
18  view.
19     Is that fair?
20  A.  No.
21     I mean, I think there's a legal
22  basis for that, so yeah.
23  Q.  What's your legal basis for that?
24  A.  There is a process to go through in

Page 117

D. Sauter

1  papering a transaction like a $7.4 million
2  loan.  And my understanding of the process, as
3  described to me by Frank Waterhouse, was not
4  the proper process.
5  Q.  Is there a policy or a law that
6  requires a particular process to be followed
7  that you're aware of?
8  A.  What I would expect is
9  communications among the various parties that
10  are involved and agreement that this should be
11  a loan rather than just transferring money and
12  sign a note.
13  Q.  You knew when you signed this
14  declaration that Mr. Waterhouse in fact was an
15  officer of HCMFA at the time his signature was
16  put on the notes.  Correct?
17  A.  Yes.
18  Q.  And is it your view that an officer
19  is not authorized to execute notes on behalf of
20  the company for which he or she works for?
21  A.  I think every company has
22  limitations on authority.
23  Q.  And what limits are you aware of on
24  Mr. Waterhouse -- withdrawn.

Page 118

```
1                D. Sauter
2         What limits are you aware of that
3    existed on Mr. Waterhouse's authority to sign
4    notes on behalf of HCMFA in May of 2019?
5         A.   I don't know what the HCMFA -- what
6    the partnership agreement says, or I should say
7    the general partnership agreement says.
8         But what I would expect is the full
9    participation of legal, accounting and then
10   perhaps Mr. Dondero.
11        Q.   Do you know if Mr. Waterhouse has
12   ever signed any other notes on behalf of HCMFA
13   or any other affiliated entity?
14        A.   I'm sure he has.
15        Q.   Did you do -- as part of your
16   investigation, before reaching your conclusion
17   that Mr. Waterhouse didn't have proper
18   authority, did you try to determine whether in
19   fact he had previously issued notes on behalf
20   of HCMFA or other affiliates?
21        A.   I can't answer your question without
22   knowing the facts surrounding the execution of
23   any particular note.
24        I mean, I think it matters the
25   amount of the note, the term of the note.
```

Page 119

```
1                D. Sauter
2    There's a number of factors that come into it.
3         Q.   But you didn't --
4         A.   So --
5         Q.   But you made no inquiry as to any of
6    those issues.  Correct?
7         A.   I made an inquiry of Mr. Waterhouse
8    as it relates to this transaction.
9         Q.   Okay.  And again, Mr. Waterhouse did
10   not admit that he was not authorized to sign
11   these notes.  Correct?
12        A.   Sorry.  He did not admit that he was
13   not authorized to sign the notes, correct.
14        Q.   Okay.
15        MR. MORRIS:  Let's just take a
16   five-minute break.  I may be done.
17        It's 4:28.  Let's just come back at
18   4:35 so I can take a break.
19        (Recess was taken from 3:29 p.m. to
20   3:37 p.m.)
21        MR. MORRIS:  Mr. Sauter, I greatly
22   appreciate your time and attention today.  I
23   have no further questions.
24        THE WITNESS:  Okay.
25        MR. RUKAVINA:  I'll pass the
```

Page 120

```
1                D. Sauter
2    witness, save my questions till trial.  Thank
3    you.
4         MR. MORRIS:  Thank you, sir.  Have a
5    good day.
6         MR. RUKAVINA:  Madam Reporter, just
7    before we're done, just to confirm, the witness
8    does want his 30 days to read and review, so
9    please send the transcript to me with exhibits.
10        THE REPORTER:  And Michael, do you
11   need a copy?
12        MR. AIGEN:  Yeah, we'll order one,
13   just regular time.  Doesn't need to be
14   expedited.
15        (Time Noted:  3:38 p.m.)
16
17        _____
18
19             DENNIS C. SAUTER
20
21   Subscribed and sworn to before me
22   this        day of          2021.
23
24   _____
25   Notary Public
```

Page 121

```
1    District of Columbia, to wit:
2         I, Stacey L. Daywalt, a Notary
3    Public of the District of Columbia, do hereby
4    certify that the within-named witness remotely
5    appeared before me at the time and place herein
6    set out, and after having been duly sworn by
7    me, according to law, was examined by Counsel.
8         I further certify that the
9    examination was recorded stenographically by me
10   and this transcript is a true record of the
11   proceedings.
12        I further certify that I am not of
13   counsel to any of the parties, nor an employee
14   of counsel, nor related to any of the parties,
15   nor in any way interested in the outcome of
16   this action.
17        As witness my hand and Notarial Seal
18   this 17th day of November, 2021.
19
20
21   _____
22   Stacey L. Daywalt, Notary Public
23   My Commission Expires:  4/14/2026
24
25
```

Page 122

1    --------------------I N D E X-----------------
2
     WITNESS            EXAMINATION BY      PAGE
3
4    DENNIS C. SAUTER   BY MR. MORRIS        4
5
     --------------------EXHIBITS--------------------
6
7    PREVIOUSLY MARKED EXHIBITS       PAGE  LINE
8    Exhibit 181
     Declaration of Dennis C. Sauter,
9    Jr.                      24   3
10   Exhibit 54
     E-mail chain with attachment dated
11   5/2/19
     D-CNL003777-779          25   25
12
     Exhibit 57
13   Promissory Note dated 5/3/19
     D-CNL003764-65           29   5
14
     Exhibit 45
15   Consolidated Financial Statements
     and Supplemental Information
16   December 31, 2018
     D-CNL002273-296          72   19
17
     Exhibit 182
18   Memo dated 5/28/19       83   2
19   Exhibit 59
     Memo dated 10/23/20
20   HCMFAS 000025-031        111  22
21
22
23
24
25

Page 123

1    NAME OF CASE:
2    DATE OF DEPOSITION:
3    NAME OF WITNESS:
4    Reason Codes:
5       1. To clarify the record.
6       2. To conform to the facts.
7       3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25          _____

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176 Part 4 Filed 09/15/24 of 472 Page 139 of 200   PageID 24351

Index: $2.4..annual

## $

**$2.4** 27:5 28:3 89:7 90:8,12 93:3 94:6,7, 14 115:13

**$250,000** 92:21

**$5** 29:9 91:24 92:5,12 96:9,18 97:5 99:22 101:9,15 103:16 104:22 105:12,19 106:3 115:16

**$5.2** 89:5

**$7.4** 63:17 82:11 95:11,23 96:20 99:15 106:13 107:8,24 108:6,14 116:17 117:2

**$7.44** 91:16,20 93:23 94:18

## 0

**000025-031** 111:23

## 1

**10** 113:13

**10/23/20** 111:22

**11th** 49:10

**12** 42:9

**13** 7:9 31:15 32:6 34:11 39:3 40:13

**15** 6:23

**15(c)** 109:12,15 110:4 111:7 112:17, 25

**15th** 89:5,17,21

**17** 74:5

**181** 24:3 25:23

**182** 83:2

**19** 43:20

**1st** 31:22 42:9 44:15 45:24 113:5

## 2

**2** 28:3

**2,398,842** 93:4

**2001** 6:10 43:17,23

**2002** 6:23

**2006** 7:2

**2009** 7:5,6

**2014** 7:10 37:14

**2017** 15:12

**2018** 65:4 72:17,21 73:2

**2019** 17:2,15 18:5 21:8 26:13 28:4 29:10 32:12 35:14 36:13 37:8 69:19 73:18 87:25 89:5,17, 25 90:9 93:11 94:15 95:24 97:10 101:9 103:17 104:23 105:12 107:23 108:17 113:23 115:13,16 118:4

**2020** 7:12 9:6 36:5 69:20 109:5,16 111:6,14 112:8 113:2

**2021** 9:7,8 24:16 45:8,25 59:18,24 60:6 76:16 107:8 120:22

**21** 47:3,5

**21st** 24:16

**22** 46:25 47:19 50:19

**23rd** 112:8

**28** 79:15,16,24

**29** 51:7

**2:15** 66:8

**2:17** 67:18

**2:28** 67:19

**2nd** 26:8 32:12 89:7 90:9,12 93:11 94:8, 14 95:24 115:13

## 3

**30** 59:6,7 62:20 68:7 71:6 120:8

**30(b)(6)** 113:5

**31** 7:9 72:21 107:3, 11,18

**31st** 72:17 73:2

**32** 113:18

**37** 82:22

**3:29** 119:19

**3:37** 119:20

**3:38** 120:15

**3rd** 29:10 32:12 73:17 95:24 101:9 103:16 104:23 105:12 115:16

## 4

**4** 44:8 107:14,20

**45** 72:18,19

**4:28** 119:17

**4:35** 119:18

## 5

**5/2/19** 26:2

**5/28/19** 83:2

**5/3/19** 29:6

**54** 25:20,25

**57** 29:5

**59** 111:21,22

## 9

**9th** 69:19

## A

**a.m.** 113:13

**accept** 81:13

**accepted** 8:16 79:17 80:7,23 81:3,8 96:18

**accepts** 81:25

**access** 42:24 43:3 44:2,10,24 46:2

**accommodate** 5:23

**account** 106:14 108:7

**accounted** 41:4,8

**accounting** 21:24 26:17,21,22,25 61:9, 18 64:2 77:13 78:6,7 118:9

**accurate** 94:25 95:18 113:3

**accurately** 85:16,23

**acknowledged** 65:11 80:11

**acknowledgment** 82:7 107:6,13

**act** 63:25

**actively** 109:23

**actual** 61:10

**add** 115:5

**addressed** 46:18

**admit** 60:22,24 119:10,12

**admitted** 6:6 30:11 53:11 55:4 59:15

**adopted** 64:25

**adoption** 86:5

**adversary** 23:10 42:5 71:2 74:2 111:11

**adverse** 43:9

**advise** 108:22

**advised** 14:10 19:8

**advisor** 85:10 86:22 87:11 93:2,16,18 95:7

**advisors** 7:20 12:2,6 13:7,8,20,24,25 14:3, 11,20,25 15:5 16:4

**17:17 18:5 19:8 20:20 21:6 28:18 29:14,25 30:25 37:3 87:22 108:21 110:3, 24 111:5 112:13

**advisors'** 112:24

**advisory** 14:3,6 16:4 108:23,24

**affairs** 69:25 70:4

**affiliated** 12:24 13:4, 8 118:13

**affiliates** 7:18 64:8 112:16 118:20

**affiliation** 13:12

**affirmative** 43:13 113:24 114:13

**afternoon** 4:12

**agree** 30:11,21 66:19 76:8,19

**agreed** 77:6

**agreement** 117:11 118:6,7

**agreements** 43:5 108:23,24

**ahead** 34:23 52:5 62:15 101:6

**AIGEN** 120:12

**albeit** 95:7

**Allocation** 16:21 83:13

**allowed** 98:2

**amend** 54:3 77:6 102:14

**amended** 24:20

**amendment** 24:24

**amount** 32:21,24 90:17,18,20,22 92:25 93:15 116:4,5 118:25

**analysis** 114:24 115:4

**and/or** 18:24 19:3

**annual** 108:25 109:4, 16 110:4 112:17

**answering** 101:5

**anticipated** 10:9

**apologize** 34:22 53:6 60:4 62:11,12 92:9

**appeared** 63:13

**appears** 59:10 60:12 61:8 63:6,7 64:14 76:6 92:2 98:11

**approved** 54:22 56:19 85:12

**approximately** 9:5, 6,8 89:4,6 91:16,24 93:2

**April** 6:23 9:4,6,8 43:23 45:8 113:23

**area** 8:3

**arguing** 99:2

**arose** 98:21

**asks** 27:5

**aspect** 22:17

**asserted** 43:13

**assessment** 96:17

**assets** 68:14,18,24 69:8,9,25 70:8

**assistant** 21:13,16 23:16

**assume** 41:22 63:17 76:4 109:18

**assumed** 60:13

**assumption** 51:4 60:19,23,24

**attached** 27:19 107:14

**attachment** 26:2

**attempt** 5:10,12

**attention** 119:22

**attorney** 4:13 9:20 96:14 104:8,11 105:16

**attorney-client** 101:20

**attribute** 58:25 80:3

**attributing** 60:20

**audio** 66:19

**audited** 72:5,11,15 74:7,11,25 75:8,21, 25 76:4,11,23 77:10, 22 78:14 79:7,11

**auditors** 71:6 72:2 73:14,22 78:9

**authority** 48:3 54:7, 19,25 55:5,9 116:9, 14 117:23 118:3,18

**authorize** 53:16

**authorized** 54:11,16 117:20 119:10,13

**aware** 4:16 37:19,20, 21 38:7,10,11,22,25 39:9 49:24 55:11,13 56:3,8 68:12 69:12, 16,22 70:3,5 71:4,24 72:4 74:24 80:21,24 82:10 88:15 92:4,8, 11,19 97:8 100:20 101:12 106:20 107:22 112:13 117:8, 24 118:2

**B**

**back** 7:6 31:16 37:8 44:24 67:5,16 79:14 85:8 93:8 107:2 113:17 119:17

**background** 21:25 35:11

**bad** 60:4

**balance** 41:12,17 69:8

**bankruptcy** 68:10, 13 69:18 70:7 73:22

**based** 47:14,23 59:20 63:21 71:12,16 75:12 77:19 95:9,15 107:19,21 116:6

**basically** 25:5

**basis** 21:2,20 22:7 24:23 57:8 62:9 63:2,

12 64:13 80:6 97:14 116:23,24

**began** 6:21 7:12

**begin** 5:6,13 10:3

**begins** 85:10

**behalf** 81:3 117:20 118:4,12,19

**believed** 50:16 51:17 96:19

**believes** 113:24

**bit** 10:12 11:5 16:11 26:5

**Blair** 27:19

**block** 30:23

**board** 45:21 46:21 83:12,16 85:13,17,24 88:12,16 110:4 111:6,17 112:15,25

**books** 40:14,18 41:5, 8 42:25 44:10,14,18, 25 70:18,22

**bottom** 88:23 93:7

**break** 5:21,24 66:4, 22,25 67:3,15,24 119:16,18

**breakdown** 77:15 85:4

**bring** 13:2

**brings** 10:19 11:23

**broker** 13:10

**bud** 67:3

**building** 34:4

**business** 15:2 87:18 111:13

**C**

**call** 49:12

**called** 4:3 6:22,25 7:4,8 26:22 30:16 70:4 74:7 76:3 91:20 101:16

**calling** 103:2

**Canty** 23:17 25:18,21 82:17,25 84:22

**capacity** 10:20 12:12 19:17 52:8

**capital** 4:15 9:19 12:2,6 20:23,25 28:17 29:13,24 30:24 31:11 69:17 89:20

**caps** 16:10

**careful** 71:15 78:25

**carried** 41:16 69:7

**carrier** 100:10,24

**case** 55:8,12 64:19

**caused** 39:21 79:18 81:9 82:2 86:18

**caution** 55:19

**CFO** 18:7,24 19:4 51:18

**chain** 25:25 26:22

**change** 100:2 108:15

**changed** 43:16,24

**characterize** 39:12, 14

**chart** 91:19

**chief** 36:24 37:2,4,11 51:2,10

**circumstances** 43:12 50:2

**cite** 79:24

**claimed** 98:13,14

**clarify** 14:18 39:25 52:3 111:2

**clear** 25:14 59:10 63:5 95:19

**client** 67:8 96:14

**CLOS** 7:24

**CMFA** 34:16

**collect** 31:12 69:13

**collectively** 31:4

**combination** 109:19,22

**commenced** 11:3 23:11

**commencement** 39:23 40:10 73:25

**comments** 40:2

**committee** 81:12 82:9

**communicate** 66:13 68:3

**communications** 34:7 45:22 46:23,24 79:3 117:10

**company** 96:9 100:17 117:21,22

**compensated** 79:20

**compensation** 95:12,25 96:21 97:11 99:16

**complaint** 25:4 31:20 41:21 68:22 70:14

**compliance** 36:18, 24 37:2,5,11

**concerned** 45:16

**conclude** 57:8 68:17 90:16

**concluded** 47:25 81:12

**conclusion** 59:18 61:3 75:9,14,17 76:25 77:18 94:17 95:17,20,21 96:4 97:9,24 98:3,7 99:13 100:3 106:13 114:13 118:16

**conclusions** 47:17, 22 107:18

**conduct** 95:25

**conducted** 19:12 22:18 31:20 44:5,16 103:2

**conference** 49:9

**confirm** 113:7,9 120:7

**confusion** 52:13

Index: connection..duties

**connection** 22:21 23:10 42:5 50:7 57:11,16 69:4 92:5 99:23 110:4 111:6 112:16,25

**consent** 101:16 102:15 103:17,23 104:4,12,15,17 105:3,9,13,19 106:4, 6,9,11,20,21

**consideration** 61:10 106:23 114:24 115:9, 22

**consistent** 18:25

**consolidated** 72:19, 24

**construction** 8:7

**consultant** 85:12

**contemporaneously** 107:23

**continue** 61:5 99:8 103:8,10

**continued** 87:24

**contracts** 108:22

**control** 13:18 69:17, 23 70:6

**controlling** 13:19,21

**controls** 13:15 15:21

**conversation** 32:18 38:23 39:2 70:15

**conversations** 33:10 48:12,15,19,21 49:3 109:24

**copy** 27:19 83:22 120:11

**corporate** 26:17,21, 22,25

**correct** 4:19 9:12 14:5,7,8 19:14 30:4 32:3,8 33:4 40:6,12 42:18,22,23,25 43:2, 6,14,17 44:4,6 46:9, 11 47:8 50:17 51:2 52:21 53:12,13,17, 18,20 54:4,5,20 55:5, 6,9,10 57:12,14,17,

18,21,22,25 58:2,5,6, 11,12 59:15,16,19 61:4 65:25 66:2 74:3 75:4,5,18,22 79:23 80:2,4,5 81:4,6 83:17,18 84:3,10,11, 14 86:11,20,24 88:12 90:23,24 94:8 95:4 96:2 99:11,17,19,24 107:14 108:22,25 115:13,17 116:5,7 117:17 119:6,11,13

**correction** 64:17

**correctly** 51:13 61:14 79:22

**counsel** 4:14 8:19, 21,23 9:2,7,9,13,15, 18 10:7,20 11:25 12:5,16 14:12,14,19, 21 64:5 66:13 96:23 105:23 109:3

**counsel's** 103:21

**couple** 7:22 60:11 78:23

**court** 25:22 70:12 81:21

**created** 95:8 96:7

**crosstalk** 11:17 53:5 67:4,9 93:20 97:19 103:13

**current** 25:22

### D

**D-CNL002273-296** 72:21

**D-CNL003764-65** 29:6

**D-CNL003777-779** 26:2

**DAF** 36:8

**daily** 35:10

**Dallas** 113:14

**date** 69:18 73:12 74:17,18 90:17,18, 21,22 103:5 112:7

**dated** 26:2,7 28:3 29:5,9 32:12 73:17 83:2 111:22

**David** 26:7

**Davor** 11:19 67:7 102:6

**day** 6:23 10:5 29:9 120:5,22

**days** 71:6 120:8

**DC** 62:12

**deal** 103:9

**dealer** 13:10

**debtor** 34:6 44:9 51:11 60:14 61:12 62:5,22 63:13 64:14 68:13,17 69:7,13,23 70:7,11,18 79:10,17, 18 80:7,22 81:3,8,24 107:6

**debtor's** 43:4 63:3 68:7,10,23 80:9

**December** 7:9 17:15 72:17,21 73:2 113:5

**decision** 57:24

**decisions** 57:16

**declaration** 23:9 24:3,8,19,23 25:3,23 31:15 50:16,24 51:9, 16 52:19,24 53:3,10, 14 54:2 55:3,8 58:24 59:4 61:25 62:3 68:9, 25 69:5 75:4 79:14 81:15 84:13 91:12 92:9,14,17,20 96:25 97:4 98:10,22 99:11, 21 100:4,21 101:24 102:3 103:6 107:3 113:18 114:9,11,17 117:15

**deductible** 92:21

**defense** 11:2 113:25 114:14

**defenses** 43:13 113:24

**define** 13:18 85:16

**defined** 21:17 28:16 30:12,22 86:10

**defines** 29:13

**definition** 30:3 85:24

**denied** 45:3

**Dennis** 4:11 24:3 120:19

**deny** 50:9

**department** 9:19 63:23 64:5,6,12

**depends** 13:17

**depicts** 91:19

**deposed** 4:24 55:12

**deposition** 4:19 55:14 66:14 72:18 111:21 113:5

**depositions** 25:17

**describe** 6:17 45:12 85:23

**describes** 25:3 83:15

**description** 74:21

**detail** 32:19

**details** 108:19

**determination** 63:24 78:8 80:3 86:4,23 100:8

**determine** 18:10,13 19:16 20:12 41:4,16 100:16 118:18

**development** 7:4

**developments** 70:25

**difficult** 34:7

**direct** 103:9

**directing** 110:20

**directly** 15:5

**director** 10:2

**disagree** 58:16

**disagreed** 58:15

**disagrees** 57:6

**disclose** 52:20

**disclosed** 68:13 71:5,25

**discloses** 99:22

**disclosing** 68:18

**discovery** 110:13

**discrete** 7:23 15:2

**discuss** 60:6 83:19 107:16

**discussed** 98:23

**discussion** 43:21 56:15

**discussions** 22:9 48:6 50:8 55:22 59:21,23 60:2 63:21 91:5 95:10,16 102:18 104:19

**dispute** 115:12,15,20

**disputes** 8:8

**distinction** 63:8

**document** 23:21 24:7 25:19 30:10,13 47:20 59:25 65:7,20 70:4 71:20 73:10,21 84:25 99:10,20 110:10,15,16,17 111:20,24 112:4,20

**documents** 15:24 23:17 25:16 42:4,13 45:4,5,10,13 46:14 59:21 68:16 70:7 108:18

**Dondero** 13:14 15:9 16:2 17:4 32:2 33:11 34:3 39:4,8,17 40:8 42:17 46:6 54:22 59:24 60:7 69:16,23 70:5 104:21 107:23, 25 108:7,13 118:10

**draft** 30:6,7

**duly** 4:4 11:18

**Dustin** 34:19 47:13 84:6

**duties** 10:6

Index: e-mail..group

## E

**e-mail** 25:25 26:7,17, 21,22,24 27:4 113:11

**e-mails** 48:18

**earlier** 37:14 72:8 90:11

**effort** 20:11 41:3,15

**electronic** 53:23

**Ellington** 9:18

**employed** 8:12 20:20,21,22,24

**employee** 34:24

**employees** 21:5 23:8 34:12,17 43:4,9, 25 80:10,12 81:11 82:8

**employment** 6:18

**end** 44:8

**ending** 72:16,25

**engagements** 7:23

**entire** 8:15

**entities** 12:25 13:8 15:3 87:24

**entity** 12:7 13:4 86:23 118:13

**equal** 116:4

**equity** 16:18

**error** 22:10 45:11 46:8 50:7 63:20 64:16,20 65:9,22 79:18 81:4,9 82:2,7 83:16 85:4,17,24 86:11 88:5,8,17 91:16 92:5 94:20 95:6,9,12,22 96:6 99:24 100:11,18 106:15

**errors** 86:6

**estate** 8:5,9,10,20,22 9:8,15 14:14,20 68:14,18 70:8 109:9

**estimated** 91:15 94:19

## F

**event** 15:11 78:9,10

**events** 51:12 74:8, 11,16 75:3

**evicted** 34:4,5

**evidentiary** 98:6

**exact** 52:22 54:9

**EXAMINATION** 4:7

**examined** 4:4,21

**exclude** 79:2

**excuse** 114:5

**execute** 117:20

**executed** 50:6 58:20,23 64:7 74:19 75:3 95:4 107:6 115:4

**executing** 58:10

**execution** 50:3 52:13 71:7 75:18 76:25 118:22

**exhibit** 24:3 25:20,25 29:5 72:18,19 82:22 83:2 107:14,20 111:21,22

**exhibits** 120:9

**existed** 118:3

**existence** 37:21,25 38:22,25 39:9,18,22 40:9 50:13 71:5,25

**expect** 116:16 117:9 118:8

**expedited** 120:14

**expenses** 63:20

**experience** 78:5

**expert** 30:16 76:13 77:4,5,25 85:12,21 94:22 98:15 106:17

**expertise** 8:2 13:2 21:11

**explain** 98:4

**extension** 41:20

**extent** 104:7 105:15

## F

16,19,25 74:7,12 75:2,8,21,25 76:11, 23 77:22 78:14,18 79:7,12

**financials** 74:17,18 76:4 77:11

**find** 40:24,25 110:16

**fine** 11:12 14:2 25:24 30:20 31:6 66:5,10 111:13

**finish** 5:6,12

**firm** 6:21,24 7:4 76:2 87:4

**firms** 14:4

**five-minute** 119:16

**floor** 49:10

**fluid** 10:18

**focus** 68:6

**folks** 8:14 13:11 78:6,7

**follow** 103:20 106:4 107:12

**follow-up** 45:7

**foreclosures** 8:9

**form** 17:21 30:15 54:10 56:6 62:10,13 64:9 69:11 71:8 75:12 99:16,18 115:24

**formation** 10:16

**formed** 81:11

**formulating** 22:25

**Frank** 17:10 22:9 26:15 29:24 46:4 63:21 80:15 117:4

**full** 84:20 118:8

**function** 80:10

**fund** 12:2,6 16:21 21:16 28:17 29:14,25 30:24 57:25 82:11,12 83:13 86:7 91:20,21 92:6 109:13 115:2

**funded** 91:24

## F

**fact** 50:15,17 53:15 59:4,19 63:7 64:11 69:7 81:19 97:25 117:15 118:19

**factors** 119:2

**facts** 101:25 102:2 107:17 118:22

**factual** 24:23 71:17 76:15 98:7,24 103:6, 11

**factually** 102:5,10,12

**fail** 5:14

**fair** 5:8,25 6:2 10:11 24:22 25:2 30:20 40:5,11 47:14,16,23 61:3 66:15 86:5 90:15 98:7 107:4 110:18 112:19,23 113:15,22 116:20

**fairly** 10:18

**fall** 109:5,16 111:6,14

**false** 86:14,19

**familiar** 16:13

**fault** 114:20

**February** 7:12 9:6 89:5,17,21,25

**fee** 101:16 103:17,23 104:4,12,15,17 105:3,9,13,19 106:4, 6,9,12,20,22

**feel** 99:4

**fees** 63:19

**file** 24:20

**filed** 25:4 31:21 42:3, 8,14,16 43:12 53:25 55:7,9 69:24 70:7

**filing** 69:18 70:13 73:22

**filings** 68:10 70:12

**Finance** 14:14 109:9

**financial** 51:2,10 69:25 70:4 72:6,12,

## F

**funding** 89:11,16 94:2

**funds** 14:7,10,24 15:3 16:3,19 19:7,18 20:5,9 60:14 64:3 71:20 79:20 82:24 108:22 110:25

## G

**GAF** 16:23 17:2,8 20:13 21:13,17 36:10 57:25 58:4,22 64:3 65:16 92:6 93:2,13, 23 94:15 95:6

**game** 98:7 110:18

**gave** 8:16 83:25

**general** 8:19,21,23, 25 9:7,9,13,14,18 10:7,20 11:25 12:5, 15 14:12,13,19,21 64:4 109:3 118:7

**generally** 9:17 13:6 16:13,15 37:18 70:2 78:5 97:2 102:9

**genesis** 32:6 33:3 37:20 38:8 39:4,10 42:17,21

**gentleman** 20:16

**give** 8:17 23:19 51:5 56:21 66:6

**Global** 16:20 83:13

**Godwin** 6:25

**good** 4:12 11:24 87:5 120:5

**Gould** 7:11

**graduate** 6:11,14

**graduated** 6:18

**granted** 45:2 102:15

**great** 75:16

**greatly** 119:21

**ground** 5:3

**group** 6:24 7:7 19:25 26:18,23,25

Index: Gruber..knowing

**Gruber** 6:25 7:2

**guess** 13:17 37:7
39:25 52:3 70:2

**H**

**handle** 10:19

**happened** 57:11

**happening** 35:8

**hard** 38:18

**HCMFA** 11:7 12:8,
11,13,14,15,18,23
13:6,9,13,22,23
15:14,20,21 16:19
18:11,14,19 19:4,19
21:6 23:11 27:6
31:21 34:12,24
35:14,19 36:2,5,13,
16 37:5 40:15 41:4,7,
16,19,24 42:4,8,12,
16,24 43:3,5,12
44:10 45:23 48:3
51:11 57:24 58:4,21
60:15 61:12 62:5,22
65:16 69:14 70:22
71:4,25 72:24 75:7,
20 76:22 78:13 79:5,
17,20 80:8 81:9,25
82:11,12,24 83:12,15
85:16,23 87:16,21
88:12,16 89:14 91:21
92:4,13,20 93:23
94:7,14 95:7,11,23
96:8,17 99:22 100:9,
16,22 101:9,15
103:16 104:5,13,17,
22 105:9,13 106:3,14
107:5,8 108:6,17
109:15 113:23
115:13,16 116:3
117:16 118:4,5,12,20

**HCMFA's** 22:25
41:11 50:25 51:17
54:2 57:20 72:5,15
73:21 74:25 89:16,20

**HCMFAS** 111:23

**HCMLP** 27:6 37:11
42:4 43:10 58:22
64:19 65:8,13,21
81:11 82:8 87:11,21
88:16 89:23,25 90:10

100:10,17

**heard** 78:23

**hearing** 108:10

**held** 16:19 18:4,11,14
20:5,8,12 21:7 35:14
36:13 43:21

**helped** 110:16

**Hendrix** 27:13,15

**Hey** 67:7

**Highland** 4:15 7:17,
24 9:18 11:2 12:2,6
20:23,25 21:8 23:6,
11 25:7 26:21 28:17
29:13,24 30:24 31:11
42:13 43:25 44:15
64:7 69:17,24 70:6
71:5,25 83:13 94:7,
13,18 95:5,8,11,22
96:6,11,20 97:10
99:14 104:4,11,14,
16,22 105:8 106:14,
15 107:7,24,25
108:5,15,16 112:16
115:12,15

**Highland's** 73:22

**hired** 8:19 10:5 87:13

**historical** 35:8

**history** 6:18

**hold** 14:9 15:16,19
90:6

**holds** 15:13 17:17
18:19 19:6 36:7,9,15

**honestly** 112:9

**Houlihan** 85:11 87:2,
3,14,17,20,25 88:4,7

**hybrid** 8:7

**I**

**idea** 46:9

**identification** 24:5
26:3 29:7 72:22 83:3
111:23

**identified** 82:3,4

**identify** 34:16 45:5

**illogical** 107:7
108:16

**imagine** 10:15

**implied** 57:2 58:9

**important** 5:5 23:19

**importantly** 98:18

**improper** 30:23 43:8

**in-house** 7:3

**inappropriate** 99:5

**include** 74:15 78:10

**included** 74:25
76:23 78:8,18 79:11

**includes** 113:25

**including** 75:7 77:22

**inconsistent** 76:9

**incorrect** 60:23,25
79:8

**incorrectly** 60:13
62:17

**indemnity** 96:5

**independent** 73:14
76:2 85:11

**indirectly** 15:5

**inform** 46:7 79:6

**information** 19:21
40:7 71:17 72:20
92:16 107:11 112:14

**informed** 100:10

**initial** 31:17,18,25
33:11 34:18 37:16
40:19 45:6 60:8
101:10

**initially** 25:4

**input** 77:12

**inquiry** 119:5,7

**instruct** 96:12 97:12
101:18 103:18
105:14 110:7,11

**instructed** 104:6

**instructing** 98:19,25
111:9

**instruction** 102:23

**instructions** 103:21

**insurance** 79:19
91:25 92:12,21 96:9,
18 97:5 98:21 99:23
100:6,10,17,20,23

**insured** 16:22

**intact** 99:6

**intended** 30:24
74:16

**intent** 68:7

**intention** 61:11 62:4,
22 63:13 64:14

**intentions** 63:3

**intents** 13:20

**interco** 27:9

**interject** 11:4

**internal** 46:23 61:9,
17 64:16

**internally** 63:18 78:6

**interrupting** 34:22

**interview** 80:17

**interviews** 49:19

**investigating** 28:24
31:8

**investigation** 17:6
18:9 19:12,16,23
20:11 22:18,22 25:3,
6,10 28:23 31:17,19
32:2 33:12 34:18
37:16 40:20 44:6,17
45:7 46:15 47:6,11,
18,24 48:7 51:20,25
54:6 60:9 70:11
72:13 76:15 77:20
80:18 83:9,20 86:18
90:16 91:7 92:3
94:13 96:16,24 97:2,
23,24 98:24 100:15
101:8,11,23 102:21
103:3 104:20 105:25
106:7 107:17 108:5
112:12,21 113:23
118:16

**investigations**
65:20

**invited** 15:12

**involved** 57:13,15,20
63:23 64:6 109:23
111:16 112:10
117:11

**involvement** 57:24
58:4 109:11

**involves** 111:10

**irrelevant** 88:20

**issuance** 75:10

**issue** 16:8,12,17
19:13,23 45:17
57:12,14 66:19 98:20
102:12,13,16

**issued** 74:19 110:24
111:5 118:19

**issues** 58:8 60:7
119:6

**Ives** 7:4

**J**

**January** 69:19

**Jason** 34:25 37:11
47:12

**Jim** 32:2

**job** 36:22

**John** 4:13 11:5 25:21
62:11 82:17 97:17

**joined** 7:25

**Jones** 4:14

**Jr** 24:4

**June** 73:17

**K**

**kicked** 34:5

**kind** 8:6 59:8

**Klos** 26:7,10,12 27:5,
17

**knew** 18:16 40:8
49:21,23 117:14

**knowing** 118:22

**knowledge** 12:16,19
13:16 21:24 22:10
27:16 35:9,20 36:19
37:17 41:23 57:10
58:8 76:14 78:2 81:2,
5 85:16,21 87:23
88:11 94:23 98:14
102:17 106:18
110:18

**Kristin** 27:13

**L**

**lack** 115:9,21

**landlord-tenant** 8:8

**Langley** 7:8,9

**law** 6:4,11,14,19,21
8:3 30:11 64:5 66:18,
20 117:6

**lawsuit** 11:2,7 39:23
40:10

**lawyer** 30:10,17

**learn** 19:22 69:6
78:17 94:13

**learned** 37:25 39:18
92:7 97:25 101:22
102:19 105:15 106:2

**learning** 78:20
106:11

**leave** 54:3

**leaving** 10:17

**led** 49:22 68:17

**left** 23:6 36:21

**legal** 9:19 12:25
63:22 64:6,12 75:14
114:8,13 116:22,24
118:9

**legally** 114:25

**lend** 107:8

**liabilities** 41:17
68:24 69:9

**license** 6:3,9

**limit** 66:9

**limitations** 117:23

**limited** 40:14 42:24
102:3,14 109:11,13

**limits** 117:24 118:2

**lines** 45:19 60:11

**listed** 82:22 93:21

**litany** 45:3

**literally** 40:23

**litigation** 8:7,10
10:22 102:20

**LLP** 12:2

**loan** 27:9 60:14 61:13
62:6,23 63:15 95:12
96:2 97:11 99:16
108:16 115:24
116:16 117:3,12

**local** 66:8

**Lokey** 85:11 87:2,3,
14,20,25 88:4,8

**Lokey's** 87:17

**longest** 49:3

**looked** 30:10 40:21
77:16

**loss** 91:15 94:19

**losses** 57:25

**lot** 10:9 34:2 35:7

**lots** 10:13 49:8

**LP** 4:15 13:24 15:6
20:23,25 28:18 29:14
69:17

**M**

**Mabry** 20:17,19,21
22:11,16,20,24 25:7
47:7

**Mabry's** 21:11

**Madam** 120:6

**made** 34:4,6 40:3
53:11 56:5,9,17,25
57:4,8,16,19 58:10
59:10 60:19 64:19
75:7 78:7 80:11
81:13 82:7 86:23
89:5,7,25 93:11,13

95:5,13 96:10 97:10,
24 99:14 105:13
106:15 115:3 119:5,7

**make** 20:11 25:14
40:2 41:3,15 89:16,
20 93:2 96:4,17,22
100:7

**maker** 28:16 29:13,
23 30:3,12,22 108:2

**making** 59:15 63:23
95:6,22 116:16

**manage** 14:25

**managed** 7:24 16:19
19:18

**Management** 4:15
12:2,6 20:23,25
28:17 29:14,25 30:24
31:12 69:17

**manager** 16:3 17:2,7

**managing** 10:2

**March** 31:22 42:9
44:15 45:24

**marked** 24:4 25:19
26:3 29:6 72:18,22
83:3 111:21,23

**Martin** 7:11

**matched** 90:18,21

**matches** 93:6

**math** 93:5

**Matt** 9:24

**matter** 43:9

**matters** 10:22
118:24

**Mcgraner** 9:24 10:4

**Mcgraner's** 9:25

**means** 115:22

**meant** 114:18,23

**meet** 12:25 15:9
17:12

**memo** 45:20 65:6
82:23 83:2,12,19
84:9,13,17,20 86:25
88:11,14,16 93:12
111:22

**memory** 38:20

**memos** 45:14,15,24
46:3,13,17 65:10,13,
15 83:5,8

**mentioned** 105:20

**met** 15:11 17:14

**Methodist** 6:16

**methodology** 86:6

**Michael** 120:10

**mid-april** 43:17
44:16

**middle** 34:13

**migrated** 25:7 43:25

**million** 27:5 28:3
29:9 63:17 82:11
89:5,7 90:8,12 91:16,
20,24 92:5,12 93:3,
23 94:6,7,14,18
95:11,23 96:9,18,20
97:5 99:15,22 101:9,
15 103:16 104:22
105:12,19 106:3,13
107:8,24 108:6,14
115:13,16 116:17
117:2

**Minick** 6:22

**ministerial** 63:25

**minutes** 49:14 66:9
67:6,16

**misleading** 86:14,19

**mistake** 48:2 50:21
51:22 52:2,17 53:11
56:5,10,18,25 57:4,8
58:10 59:11,15
65:11,14 75:7,10,18
76:10 77:2,21 78:4
80:11 81:13 84:5
95:4 98:12,17 99:14
106:14 114:2,6,22

**mix** 48:22,24

**moment** 51:6

**money** 56:22 58:20,
21 61:23 108:7,16
115:23 116:4 117:12

**Morris** 4:8,13 11:10,
15,18,22 16:9 17:23,

24 18:2 25:24 30:20
31:2 56:2 62:16,18
63:9,11 66:21 67:2,7,
17,20 69:15 71:21
76:17 77:8 78:11
82:20 83:4 88:21
95:2 97:7,14,20,23
99:7,9 101:25 102:24
103:14 104:9 110:9,
19,22 111:18 113:4,
9,15,16 114:10,15
119:15,21 120:4

**motion** 54:3 77:5
102:14

**move** 88:21

**moved** 6:24

**moving** 35:12

**mutual** 113:25 114:5,
6,22

**N**

**N-A-V** 16:10

**named** 20:16 27:19

**NAV** 16:8,12,17
19:13 22:10 45:11,16
46:8 50:7 63:20
64:16,20 65:9,22
79:18 81:4,9 82:2,7
83:16 85:3,16,24
86:6,11 88:17 91:15
92:5 94:19 95:5,9,22
99:14,24 100:11,18
106:15

**necessarily** 15:3

**needed** 71:19 81:13
92:25 101:9,15
103:16

**negligent** 95:22,25
96:3

**net** 91:15 94:19

**Nexbank** 34:10
49:10

**Nexpoint** 7:13,14,20
8:2,13,15,24 9:2,10,
14 10:8 11:9 13:6,8,
9,13,20,24 14:13,14,
20 15:5,16,17 21:5

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 02/25/24    Page 145 of 200    PageID 24357

Index: Nexpoint's..prepare

37:3 64:5 87:21
109:8

**Nexpoint's** 10:22,25
109:3,12

**nonlawyer** 71:17

**Norris** 34:20 35:3,10,
13 36:7,9 37:15
42:20 46:7 47:13
59:22 84:7 95:10,16
104:20 105:6,7,20
106:2,8,12 109:19

**Notary** 4:4 120:25

**note** 27:20 28:3,15
29:3,5,8 30:6 61:24
64:6 69:13 71:19
90:18,19,22 108:2,8
115:3 117:13 118:23,
25

**noted** 11:18 120:15

**notes** 25:11,14
28:22,24 31:4,7,11
32:7,9,11,16,21,24
33:6 37:17,19,20,22,
25 38:3,7,10,12,15,
22,25 39:5,9,11,18,
22 40:9,25 41:5,8,16
42:18,21 46:9 47:25
48:14 49:18,21,23,24
50:3,6,10,13,17,20,
25 51:9,12,18,22
52:2,7,14,17,25 53:8,
12,17,20 54:8,12,19,
22,25 55:5,9 56:5,10,
18,20,23 58:10,21,23
60:7 61:8,11,13,17,
21 62:5,21,23 63:14,
25 64:15 68:13,18
69:7,14 70:8,12,18,
22 71:5,11 72:2
74:22,25 75:7,10,18,
20 76:9 77:2,21 78:8,
18 79:11 90:12 95:4
113:25 115:8 116:5,
10 117:17,20 118:4,
12,19 119:11,13

**November** 6:10

**number** 93:4,6,7
119:2

**NXRT** 109:7

### O

**oath** 66:12

**object** 17:20 30:14
62:10,13 63:4 64:9
69:10 72:3 75:11
76:12 77:3,24 101:17
106:16

**objection** 56:6 63:10
71:8 85:18 94:9,21
99:4,18

**obligates** 64:17

**obligation** 63:17

**obligations** 76:10
108:14 112:15

**obtain** 6:9 83:22

**obtained** 92:4,13
94:7

**obtaining** 44:24

**occasion** 7:22

**occurred** 74:17
77:16,21

**October** 36:5 69:19
112:8 113:2

**odds** 76:20

**offer** 8:16,17

**office** 33:25 34:10
49:11

**officer** 36:18,25 37:2,
5,11 51:2,10 117:16,
19

**officers** 12:18

**official** 12:12

**operation** 111:13

**opinion** 114:8
115:23

**opportunities**
109:13

**opportunity** 23:20

**order** 23:21 101:15
120:12

**orderly** 86:4,23

**ordinary** 87:18

**organizational**
15:24

**origin** 25:10

**original** 31:22 42:3

**origins** 28:24

**overlap** 11:21

**overseeing** 10:21,25
78:13

**owed** 107:25 108:14
112:15

**owned** 7:20 13:7
15:4

**owns** 13:9

### P

**p.m.** 67:18,19 119:19,
20 120:15

**Pachulski** 4:13

**paid** 60:14 82:11
92:20 93:23 95:11,23
96:20 104:5,12,17,22
106:3,13,22,23
107:24 108:13
115:12,16

**papering** 117:2

**paragraph** 31:15
32:6 34:11,14 39:3
40:13 42:9 43:20
46:25 47:3,5,19
50:19 51:7 59:6,7
62:20 68:7 74:21
79:15,16,24 85:10,
13,17 88:24 93:7
107:3,5,11,18 113:18

**paraphrasing** 98:11
113:21

**Pardon** 98:8

**parse** 59:8

**part** 22:4,8,12 31:16
33:11 34:17 40:19
45:6 46:15 47:5,11
48:6 49:18 60:8
61:12 62:4,22 70:10
72:12 75:21 80:18

83:9,20 90:16 96:16
98:24 99:23 100:15
104:19 105:25 108:4
111:12 112:12,20
118:15

**participate** 109:4

**participated** 109:6

**participation** 118:9

**parties** 117:10

**partnership** 118:6,7

**parts** 35:12

**party** 64:18 85:11
87:4

**pass** 119:25

**past** 64:12 87:22

**pay** 58:21 64:3,18
94:15 101:16 103:17
105:13 106:3

**payable** 98:21

**paying** 104:15

**payment** 63:19 89:4,
6,11,17,21 90:8,17,
21 91:21 92:6 93:10,
13 97:10 98:20 99:15
105:3,8,12

**payments** 79:21
89:2 97:6 115:2

**pending** 5:24

**people** 10:14,17 13:2

**perfectly** 66:5

**perform** 12:13

**performed** 64:2
80:10

**period** 69:24 72:16,
25

**person** 13:19,21
33:19,20,22,24 48:22
80:4

**personal** 52:7 57:10
58:8 76:14 78:2 81:2,
5 85:21 94:23 98:14
106:18

**personally** 57:13
107:24

**phase** 25:5 44:6,16
47:6,11,15,17,24

**Phillips** 7:11,12,16
8:15

**phone** 33:19 34:9
48:22 49:12

**phonetic** 109:20

**phrase** 31:18 114:18,
22 116:14

**pick** 74:16

**pin** 33:9

**piss** 67:15

**place** 33:18 48:22
65:4

**play** 26:13

**played** 22:16,20,24

**pocket** 93:15,18

**point** 11:24 18:16
34:3 91:8 99:2

**policy** 64:17,21,24
65:3,5 82:5,6 100:6
117:6

**portfolio** 16:3,25
17:7

**portion** 88:22 92:24
100:23

**position** 8:18 18:4,
19,23 20:9 21:7
35:14,17,19,23

**positions** 16:18 19:7
20:5,12 36:8,10,13,
16 37:8

**Post** 34:25 35:10
36:12,13,18 37:15
42:20 46:7 47:13
59:21 83:24,25
95:10,16 104:20

**potentially** 43:8

**practice** 6:4,7 30:11

**premarked** 25:18,23

**preparation** 69:4
78:14

**prepare** 52:10

**prepared** 61:8,17
62:21 68:8 71:11
73:21,25 76:6 77:11
106:25

**preparing** 59:25

**present** 33:15 48:11

**preserve** 30:18

**president** 15:18
35:24 36:2,4

**prevented** 102:11

**previously** 4:21 24:4
26:3 29:6 72:17,21
77:14 83:3 111:21
118:19

**Pricewaterhouseco
opers** 73:15 76:3,7
77:12 79:6

**primarily** 7:19

**principal** 32:20,24
116:5

**prior** 7:25 38:12,23
39:2,22 40:9 42:2
68:24 73:22,25 74:18
92:8

**privilege** 101:21
110:14

**privileged** 96:14

**proceed** 67:21 96:18

**proceeding** 23:10
42:5 71:2 74:2
111:11

**proceeds** 91:25
92:12 96:19 99:23
100:6,20,23

**process** 44:22
56:20,22 63:18,22
77:15 109:4,7,12,16,
24 116:15,25 117:3,
5,7

**produced** 110:15

**product** 96:15 98:23
101:21 110:14

**professional** 97:17

**prohibited** 80:19

**promissory** 25:11
28:3 29:5 30:6 108:2

**proper** 116:9,13,14
117:5 118:17

**proposed** 24:24

**provide** 7:17 12:22
14:6 16:4 42:4 44:15
112:14

**provided** 7:19 43:4
44:9

**Public** 4:4 120:25

**purely** 103:6

**purports** 73:23,24

**purpose** 24:18 25:9
61:9,18,20

**purposes** 13:21

**put** 23:15,17,23 25:18
31:16 67:17 72:15
82:16 111:19 117:17

──────────

**Q**

**qualified** 94:10

**question** 5:6,13,24
17:25 20:7 60:5
65:18 66:17 67:8
71:23 75:12,16 76:24
97:9,15 102:16
106:12 111:2 114:19
118:21

**questions** 5:5 10:13
99:8 103:5,7,11
110:20 119:23 120:2

**quick** 66:4

──────────

**R**

**raised** 38:2

**ran** 20:2

**reach** 43:8

**reached** 79:5 100:3

**reaching** 59:18
118:16

**read** 23:21 51:13
61:14 62:17 79:22

85:13 120:8

**ready** 67:21

**real** 8:4,9,10,20,22
9:7,15 14:14,20
109:8

**Realty** 7:4

**reason** 81:20 85:22
86:2,13 93:25

**recall** 9:3 15:10
18:17 20:15 21:22
22:13,15 23:5 27:2
32:6,10,13,18 33:3,
13,17,18 34:21 35:17
38:9,21,24 39:4,10
40:21 41:14 42:15,
17,21 44:21,23 45:15
46:14 48:13,16,17,20
49:2,20 54:23 58:17
60:10 65:23,24 68:19
72:7,9,11 90:13 91:9

**receive** 116:4

**received** 26:20 99:22

**receiving** 27:2

**recess** 67:18 119:19

**recollection** 32:15,
25 33:5 35:2 46:10
51:15 57:3,5 65:12

**reconsider** 75:9

**record** 4:10 25:14
30:19 43:22 66:7
67:17

**records** 40:14,18
41:5,9 42:25 44:11,
14,19,25 70:19,23

**refer** 12:7 13:6,23
16:23 31:3

**reference** 44:9 79:11
88:25 115:21

**referenced** 96:25

**referring** 44:19
64:22

**refrained** 43:10

**refresh** 32:15 51:15

**regular** 120:13

**reimbursement**

96:6

**related** 8:7,9 16:18
32:25 33:6 40:24
45:11 46:9

**relates** 98:20 110:13
119:8

**remained** 21:6

**remember** 24:18

**renewal** 108:25
109:4,16

**reorganized** 4:15

**report** 9:23 73:13
82:12

**reported** 9:20 58:4
76:10

**reporter** 11:20 25:22
120:6,10

**reporting** 10:3 75:20

**reports** 110:3,24
111:5

**representative**
109:14

**represented** 105:23

**reputation** 87:5

**requested** 41:19

**requesting** 24:20

**requests** 45:2

**requires** 66:20 117:7

**Residential** 14:13
109:8

**resolution** 83:16

**respect** 109:7,12

**respond** 41:20

**response** 22:25
27:11 52:4,9 54:15
57:21 58:14

**responses** 112:24

**responsibilities**
10:7

**responsibility**
10:21,25 57:20,23
58:3 79:17 80:7,23

81:4,8,25 105:8

**responsible** 63:19
64:18 65:8,14,21
78:13 88:4,8,17
94:18 95:6 100:11,18
104:4,12,14,16
109:15 114:25

**restate** 17:25 62:17

**restroom** 66:25

**result** 113:22

**resulted** 47:17 86:6

**resulting** 91:15
94:19

**retail** 110:3 111:6
112:14,25

**retained** 87:10

**returned** 100:22

**Returning** 51:9

**review** 40:19 59:20
68:16 69:3 107:20,21
110:5 111:7 112:17
113:2 120:8

**reviewed** 40:14
41:11 45:6,10,16
55:14 68:23 69:5
88:14

**reviewing** 46:14
47:20 68:9 69:6
84:23 84:25 112:4

**rights** 99:5

**role** 12:10 22:17,21,
25 26:13 102:14

**room** 49:10

**row** 91:14

**rude** 11:13

**Rukavina** 11:4,12,
16,23 17:20 30:14
55:19 56:6 62:10
63:4 64:9 66:16,24
67:5,10 69:10 71:8,
14 72:3 75:11 76:12
77:3,24 78:25 85:18,
20 94:9,21 96:12,22
97:12,16,22 98:4
99:18 101:4,17 102:7
103:12,18 104:6

Index: ruled..T-E-R-R-A-S-T-A-R

105:14 106:16 110:6, 12 111:8 113:6,13 114:7 119:25 120:6

**ruled** 77:6

**rules** 5:3

---

**S**

**Sauter** 4:1,11,12 5:1 6:1 7:1 8:1 9:1 10:1 11:1,6,23 12:1 13:1 14:1 15:1 16:1 17:1 18:1,3 19:1 20:1 21:1 22:1 23:1,18 24:1,4 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1,18 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1, 20 56:1 57:1 58:1 59:1 60:1 61:1 62:1, 19 63:1,5 64:1 65:1 66:1,9,17 67:1,22 68:1 69:1 70:1 71:1, 14 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,2 80:1 81:1 82:1 83:1,6 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1,23 97:1,13 98:1 99:1 100:1 101:1,5 102:1,23 103:1,15,19 104:1 105:1 106:1 107:1 108:1 109:1 110:1,7, 16,23 111:1,8 112:1 113:1 114:1,21 115:1 116:1 117:1 118:1 119:1,21 120:1,19

**save** 120:2

**schedules** 68:21,24 69:9,25

**school** 6:12,15,19,21

**scope** 76:15

**Scott** 9:18

**screen** 23:15,18 31:16 82:16 111:20

**scroll** 23:24 26:4 43:19 46:25 84:23 93:8 112:2

**search** 38:19

**SEC** 22:18,21 23:2 45:22 46:24 57:21

**Sechrest** 6:22

**section** 74:6,11,15

**Securities** 13:9

**Sella** 109:20

**send** 113:11 120:9

**sense** 49:5

**sentence** 44:20 59:9 62:19 86:3,14,19

**separate** 14:23 15:2

**series** 5:4

**serve** 36:24

**served** 9:14 19:17

**serves** 16:2

**services** 7:17,19 12:22 14:7 16:4 43:4, 5 87:17

**set** 47:18 94:3 100:3 107:18

**sets** 24:23

**share** 81:20

**shared** 43:5

**she'll** 84:23

**sheet** 41:17 69:8

**sheets** 41:12

**shortest** 49:4

**shortly** 82:10

**show** 32:9 49:17 92:2

**showed** 38:12

**shown** 76:5

**shows** 91:14

**shuffle** 10:16

**sic** 16:10 46:8

**sign** 24:15 53:8,16 54:7,11,16 116:10

117:13 118:3 119:10, 13

**signature** 24:10,12 28:7,9,11,13 29:18, 20,22 30:23 53:17,23 117:16

**signed** 48:2 50:17, 20,24,25 51:12,16, 18,21,25 52:7,25 53:20 54:16,19,25 56:23 68:25 84:13 92:9,13,17,20 99:11, 21 108:8 117:14 118:12

**signing** 50:9,15 52:16 53:11,16 55:5 56:5,10,18 77:21

**simple** 5:3

**simply** 71:23

**simultaneous** 11:17 53:5 67:4,9 93:20 97:19 103:13

**sir** 4:17,20 5:9 6:4 12:9 14:16 15:7 16:24 23:13 24:13,17 25:12 28:11 76:18 77:9 96:16 99:10 103:24 106:19 111:25 113:19 120:4

**sit** 71:24

**sitting** 32:19

**situation** 43:16,23

**skills** 21:11

**Skyview** 10:16 21:4 44:2

**sought** 69:13

**sounds** 113:15

**source** 13:12 28:22 79:24 89:10,16,20 90:5,7 94:2 107:10

**sources** 91:19 92:24

**Southern** 6:16

**speak** 46:4 47:10 48:8 66:13 67:24 84:2,8 105:18

**speaking** 34:21 35:3

80:19

**specific** 20:14 58:18, 25

**specifically** 20:4 50:20 65:13 72:10

**speculate** 109:18,21

**speculating** 18:8 19:9

**speculation** 21:3

**spend** 68:9

**spent** 49:6

**spoke** 32:2 34:12,17 47:7 84:4

**spoken** 34:8,19 47:12 105:21

**St** 7:4

**Stacey** 16:9

**Stang** 4:14

**star** 46:8

**started** 7:10 37:13

**state** 4:9 61:25 62:3, 20 113:20

**stated** 65:21 68:7 77:14

**statement** 63:3,12 64:13 70:4 79:25 80:4,6

**statements** 58:25 69:24 72:6,12,16,20, 25 74:7,12 75:2,8,21, 25 76:11,20,24 77:23 78:15,19 79:7,12

**states** 6:6 24:7 27:8 40:13 53:10 65:8 81:24

**stating** 55:8 70:7

**staying** 10:17

**stick** 68:6 102:22

**stop** 84:24 103:5

**strategic** 109:13

**strike** 88:21

**subject** 108:25

**subjective** 116:13

**submitted** 23:9 45:21

**submitting** 44:25

**subpoena** 102:4

**subpoenaed** 11:6

**Subscribed** 120:21

**subsequent** 74:7,11 75:2 78:9,10

**subsequently** 92:7

**subset** 19:25

**subsidiaries** 7:21 13:7

**substance** 54:11 55:22 66:14 67:25 68:4 84:3,9

**suggest** 53:7

**suggested** 39:15 88:4

**suggests** 52:24 53:15

**suing** 31:12

**summarize** 107:4

**summarizing** 48:18

**Supplemental** 72:20

**support** 54:2

**supposed** 74:15 99:15

**Surgent** 37:10 80:16, 17,24 81:3

**surmising** 35:4,5

**surrounding** 50:3 118:22

**suspect** 20:24

**sworn** 4:4 63:2 120:21

**system** 40:24

---

**T**

**T-E-R-R-A-S-T-A-R** 16:10

Index: taking..Ziehl

**taking** 66:24 67:2

**talk** 16:7,11 39:15
48:5 67:14

**talked** 35:9 67:13

**talking** 11:21 25:15
63:16

**tax** 6:23

**team** 19:25 21:14
22:4,12 77:13

**telling** 56:9 57:4

**tells** 88:16

**ten** 8:4 49:13 66:9
67:5

**tenure** 8:15

**term** 13:5 22:5 30:12
118:25

**terminated** 23:7

**Terrestar** 16:8,12,17
19:12 22:10,17
45:11,16 50:7 57:12,
14,17 65:9,22 87:8

**testified** 4:5 56:4
58:19 98:16

**testifying** 98:17

**testimony** 45:23
55:17 56:16 64:4
67:25 68:4

**Texas** 6:8

**thereof** 48:23,25

**thing** 25:15 84:6

**things** 9:17 34:2 35:9
47:25 62:20 102:8,19
113:20

**Thomas** 37:10 80:16

**thought** 46:7

**till** 6:23 120:2

**time** 5:22 6:18,24
7:25 9:14 12:14
13:11 17:22 18:5,15
23:16 31:20,21 33:25
38:12 41:20 42:3,16
49:6 50:23,25 51:12,
16,18 66:8 68:9,25
75:3 78:21 84:21

**91**:6 92:8,17,19
96:10,19 100:7,20
105:22 106:7 108:11
117:16 119:22
120:13,15

**times** 48:8

**timing** 32:15 74:3
108:19

**title** 9:25 12:10 15:13,
17,20 18:10,14

**titles** 14:9 17:17

**today** 4:19 6:19 9:23
10:7 12:8,11,18
18:20 32:19 35:20
36:16 41:7 71:24
78:22 98:17 101:12
108:11 119:22

**told** 11:10 32:23 38:6
50:12 53:18,19
54:18,21 56:4,12,17
58:8 71:17,19 81:17
89:22,24 90:3 94:16
98:9 100:16 102:20
104:7 105:5 108:4,9
112:24 115:19 116:6

**top** 28:14 92:24

**topic** `52:16`

**total** 14:22 91:15
92:25 93:10,13,15,
17,22

**transaction** 61:13
62:6,24 63:15 84:5
108:20 117:2 119:8

**transactional** 8:10

**transcript** 55:15
120:9

**transfer** 71:20 89:22,
24 108:6 115:3

**transferred** 27:5
56:22 58:20,22 61:23
64:2 94:14 115:24

**transferring** 117:12

**transpired** 100:7
114:25

**treasurer** 18:7,25
19:3 21:13,16

**treated** 70:12,18,22

**trial** 77:5 98:15
102:13,25 103:2
120:2

**Trust** 14:13 109:8

---

**U**

**ultimately** 79:19
80:13 81:12

**unaware** 39:21 50:13
97:5

**unclear** 93:14

**uncovered** 86:17

**understand** 5:18
20:6 23:19 25:10
26:12 30:2 35:22
73:20 74:2 75:24
83:11 91:13,18,22,23
93:9,22 96:23 97:20
98:5 101:14 102:6
103:15

**understanding**
15:20 16:16 18:22
19:2,24 21:15,19,21
22:3,8 31:10 71:10,
12 74:10,14 84:17
87:9 92:23 95:9
117:3

**understood** 50:23

**undertook** 98:6

**University** 6:16

**utilized** 87:21

**utilizes** 87:16

---

**V**

**vague** 17:21

**valid** 76:10

**valuation** 19:25
21:14 22:4,12 57:12,
14,17 80:10 81:11
82:8 85:12 86:5 87:4,
7,17 88:5,8

**verify** 28:12 29:21

**vice** 35:24,25 36:4

**view** 43:7 108:15
116:19 117:19

**vis-à-vis** 65:15 95:7

**void** 115:9

---

**W**

**wait** 14:18 101:4

**waiting** 113:6

**watch** 11:20

**Waterhouse** 17:10,
13,16 18:4,11,14,19
19:3,6,17 20:2 25:6
29:24 39:16 43:24
46:4 47:7 48:2,6,15,
19 49:6,17 50:9,16,
21,24 51:10,17,21,24
52:6,24 53:8,10,15,
25 54:7,18,24 55:4,7,
11 56:9,17 58:9,13
59:2,10,14 60:13,18
61:8,16 63:22 70:17,
21 71:19 78:16
80:16,22 81:7,10,17
90:4 104:21 105:19,
22 106:5 116:9
117:4,15,25 118:11,
17 119:7,9

**Waterhouse's** 28:8,
10 29:20,22 118:3

**week** 36:21,25

**weeks** 78:23 106:10

**weighted** 86:5

**Weinstein** 7:8,9

**wholly** 7:20 13:7

**Wick** 7:10,11,16 8:15

**Winstead** 6:22

**withdrawn** 7:15
15:25 31:17 47:15
57:9 59:5 61:6 62:2
65:6 70:16 80:23,25
89:14 92:10 104:2
112:12 114:18
117:25

**word** 28:13

**words** 52:22 54:9

**work** 7:6 8:11 12:13
13:2,10 96:15 98:23
101:21 110:14

**worked** 7:7 8:14 9:17
26:15,16 27:17 37:12

**working** 111:10

**works** 11:11 117:21

**world** 56:9 65:8

**write** 61:6,7 116:8

**writing** 81:23

**written** 44:25 65:6
82:12

**wrong** 73:7

**wrote** 27:18 50:20
60:12

---

**Y**

**year** 9:4 96:25

**years** 8:4 15:12
59:19

---

**Z**

**Ziehl** 4:14

# EXHIBIT 194

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Part 4   Page 09634 of 472   Page 150 of 200   PageID 24362

1 (Pages 1 to 4)

**Kristin Hendrix - October 27, 2021**

---

**1**

```
1          IN THE UNITED STATES BANKRUPTCY COURT
2          FOR THE NORTHERN DISTRICT OF TEXAS
3                   DALLAS DIVISION
4                      --o0o--
5
6  HIGHLAND CAPITAL MANAGEMENT,      )
   L.P.,                            )
7                                   )
            Plaintiff,              )
8                                   )
        vs.                         )  No. 21-03004-sgj
9                                   )
   HIGHLAND CAPITAL MANAGEMENT FUND )
10 ADVISORS, L.P.,                  )
                                    )
11          Defendants.             )
12 _____
13               DEPOSITION OF
14               KRISTIN HENDRIX
15               October 27, 2021
16 _____
17
18          DEPOSITION OF KRISTIN HENDRIX, produced as a
19 witness, duly sworn by me via videoconference at the
20 instance of the DEFENDANTS, was taken in the
21 above-styled and numbered cause on October 27, 2021,
22 from 10:11 A.M. to 1:19 P.M., before BRANDON D. COMBS,
23 CSR, RPR, in and for the State of Texas, reported by
24 computerized machine shorthand, at 500 North Akard
25 Street, 38th Floor, Dallas, Texas.
```

---

**2**

```
1                  APPEARANCES
2
3          MUNSCH, HARDT, KOPF & HARR, PC, 500 North
4  Akard Street, Suite 3800, Dallas, TX 75201, represented
5  by DAVOR RUKAVINA, Attorney at Law, appeared as counsel
6  on behalf of the Defendants.
7          Email: drukavina@munsch.com
8
9
10         PACHULSKI, STANG, ZIEHL & JONES, 780 Third
11 Avenue, 34th Floor, New York, NY 10017-2024, represented
12 by JOHN A. MORRIS, Attorney at Law, appeared as counsel
13 on behalf of the Plaintiff.
14         Email: jmorris@pszjlaw.com
15
16
17         STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,
18 Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney
19 at Law, appeared via videoconference as counsel on
20 behalf of the Defendants Jim Dondero, HCMS and HCRE
21 Partners.
22         Email: michael.aigen@stinson.com
23
24
25
```

---

**3**

```
1                      INDEX
2                                                    PAGE
3  Examination by MR. RUKAVINA                          6
4  Examination by MR. AIGEN                            94
5  Further Examination by MR. RUKAVINA                110
6  Examination by MR. MORRIS                          111
7
8  EXHIBITS                                          PAGE
9
10 Exhibit 1    Promissory Note, 5M, May 3            30
11
12 Exhibit 2    Promissory Note, 2.4M, May 2          30
13
14 Exhibit 3    Email from David Klos, May 2, 2019,   31
15              HCMLP to HCMFA loan
16
17 Exhibit 4    Promissory Note, 5M, May 3            42
18
19 Exhibit 5    Promissory Note, 2.4M, May 2          42
20
21 Exhibit 6    Promissory Note, 5M, May 3            43
22
23 Exhibit 7    Promissory Note, 2.4M, May 2          43
24
25 Exhibit 8    Info, HCMF loan 05.03.2019            56
```

---

**4**

```
1  Exhibit 9   Info, HCMF loan 05.02.2019          56
2
3  Exhibit 10  Email from Scott Ellington, Dec 2,  59
4              2020, HCM - HCMFA financial
5              statements
6
7  Exhibit 11  Email from John Morris to           62
8              James Seery, Jan 6, 2021,
9              HCM information request
10
11 Exhibit 12  Letter, Dec 3, 2020, Demand on      65
12              Promissory Notes
13
14 Exhibit 13  Promissory Note, $30,746,812.33,    72
15              May 31
16
17 Exhibit 14  NPA $30.7M                          76
18
19 Exhibit 15  HCMLP Notes Receivable              83
20
21 Exhibit 16  Email from Frank Waterhouse to      85
22              Lauren Thedford, Oct 6, 2020, 15(c)
23              follow-up
24
25
```

---

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 09/14/24    Page 151 of 200    PageID 24363
Appendix Part 4 Page 3644 of 472

2 (Pages 5 to 8)

Kristin Hendrix - October 27, 2021

---

5

1  Exhibit 17  Email from James Seery to            88
2            James Dondero, Jan 7, 2021, demand
3            on promissory note
4
5  Exhibit 18  Email from Kristin Hendrix, Jan 12,    90
6            2021, NexPoint Note to HCMLP
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

6

1            KRISTIN HENDRIX,
2     having been first duly sworn, testified as follows:
3            EXAMINATION
4     Q.  (BY MR. RUKAVINA)  Good morning.  If you'll
5  state your name.
6     A.  Kristin Hendrix.
7     Q.  We're doing this both ways.  You're on the
8  Zoom remotely and they can see you, but I would ask
9  that you and I maintain eye contact.  Of course, if
10  someone is asking you on the Zoom, then maintain
11  contact with them, if that's okay with you.
12     A.  Sure.
13     Q.  Have you been deposed before?
14     A.  No.
15     Q.  So I'm sure your counsel explained to you,
16  but very quickly, you understand that you're testifying
17  under oath and penalty of perjury as though you were in
18  a court of law?
19     A.  Yes.
20     Q.  And you understand my job is to ask clear
21  questions that you understand?
22     A.  Yes.
23     Q.  And if for whatever reason you don't
24  understand my questions, please let me know or ask me
25  to rephrase; otherwise, I'm going to assume that you

---

7

1  understood my question; okay?
2     A.  Yeah.
3            MR. MORRIS:  Objection.
4     Q.  (BY MR. RUKAVINA)  Sometimes Counsel will
5  make objections.  Unless he instructs you not to
6  answer, you're still required to answer my questions.
7     A.  Okay.
8     Q.  Now, in preparation for this deposition, did
9  you read the deposition transcript or any part of it of
10  Frank Waterhouse?
11     A.  I did not.
12     Q.  Did anyone provide you a synopsis or summary
13  of it?
14     A.  Maybe a few bits and pieces, but...
15            MR. RUKAVINA:  Off the record for a second.
16            (Off the record.)
17     Q.  (BY MR. RUKAVINA)  What do you mean bits and
18  pieces?
19     A.  I don't recall anything specific that was
20  said, other than it was very long.
21     Q.  Did you talk to Frank Waterhouse about it?
22     A.  Did not.
23     Q.  Other than Highland's legal counsel, did you
24  talk to anyone else about -- or -- strike that.
25            Other than Highland's legal counsel, did you

---

8

1  talk to anyone about Frank Waterhouse's deposition from
2  last week?
3     A.  I did not.
4     Q.  Did you review -- strike that.
5            Did you see any of the video of
6  Mr. Waterhouse's deposition?
7     A.  Nope.
8     Q.  Same questions now for Mr. Seery, S-e-e-r-y.
9            Did you read any portion or the whole of
10  Mr. Seery's deposition from last week?
11     A.  I did not.
12     Q.  See any of the video?
13     A.  No.
14     Q.  Did you see any synopsis or summary of his
15  deposition?
16     A.  No.
17     Q.  Did you talk to him about his deposition?
18     A.  I did not.
19     Q.  Other than talking to Highland's counsel, did
20  you talk to anyone about Mr. Seery's deposition?
21     A.  No.
22     Q.  Other than talking to Highland's counsel, did
23  you talk to anyone about your deposition today?
24     A.  Just John Morris and Dave Klos.
25     Q.  When did you talk to Mr. Klos, K-l-o-s?

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176 Part File Page 09654 of 472   Page 152 of 200   PageID 24364

3 (Pages 9 to 12)

Kristin Hendrix - October 27, 2021

**9**

1    A.  First time about this was last Friday.  And
2  then again Monday this week.  And yesterday.  And this
3  morning.
4    Q.  Friday was there any lawyer present during
5  your discussion with Mr. Klos?
6    A.  Yes, every time Mr. Morris was present.
7    MR. RUKAVINA:  Is it your position that those
8  four discussions would be privileged, Counsel?
9    MR. MORRIS:  Yes.
10    MR. RUKAVINA:  Then we'll move on.
11    Q.  (BY MR. RUKAVINA) So we've established the
12  four times you talked to Mr. Klos with counsel present.
13  Did you do anything else related to or in preparation
14  for today's deposition?
15    A.  Yes, probably went through and reviewed some
16  emails, documentation that I may have had that I need
17  to refresh memory on.
18    Q.  These documents and emails that you might
19  have reviewed, did you supplementally provide them to
20  counsel or anyone else?
21    A.  Yes.
22    Q.  This would have been in the last week or
23  10 days?
24    A.  Yes.
25    Q.  Prior to the last week or 10 days, are you

**10**

1  aware that my office served requests for production on
2  Highland?
3    A.  Yes.
4    Q.  And did you do anything prior to the last
5  week or 10 days to try to search both your personal
6  records and corporate records for any responsive
7  documents?
8    A.  Not that I recall.
9    Q.  Is that something that you understand legal
10  counsel was charged with?
11    A.  Yes.
12    Q.  Let's go briefly now about your background,
13  please.
14    Where do you live?
15    A.  I live in Denton, Texas.
16    Q.  And what is your date of birth, please?
17    A.  January 26, 1982.
18    Q.  And walk me through your educational
19  background, starting with any postsecondary, if any,
20  schooling or college or anything like that.
21    A.  Sure.  Graduated in 2004 from the University
22  of North Texas with a degree in finance.  Went on to
23  get my MBA from SMU in 2009.  And then went further and
24  got my CPA license I believe in 2015.
25    Q.  In the state of Texas?

**11**

1    A.  Yes.
2    Q.  And has your CPA license been current since
3  then?
4    A.  Sure has.
5    Q.  Have you faced any kind of disciplinary
6  action as a CPA?
7    A.  I have not.
8    Q.  Now, please walk me through your work
9  history.  Let's say starting with after you graduated
10  college.
11    A.  Sure.  December of 2005, which was shortly --
12  sorry, 2004, shortly after I graduated from
13  North Texas, I started at Highland.  It was my first
14  real job out of college.  I have been there ever since,
15  almost 17 years now.
16    Have worked in the corporate accounting
17  department the entire time.  Started off as the AP
18  associate, and worked my way up over the years and
19  currently am the controller.
20    Q.  So even when you were getting your MBA and
21  CPA you were employed by Highland?
22    A.  Yes.
23    Q.  Impressive.  You're the controller today you
24  mentioned?
25    A.  Yes.

**12**

1    Q.  That's -- when did you become the controller,
2  sometime February or March of this year?
3    A.  Yes.
4    Q.  Before you became the controller, what was
5  your role at Highland?
6    A.  Right before that I was assistant controller.
7  That was I believe April of 2020.  Before that, the
8  senior accounting manager, and I held that position for
9  years.
10    Q.  So in May of 2019 would you have been the
11  senior -- you said senior account?
12    A.  Senior accounting manager I believe was my
13  title.
14    Q.  And would that have been your title in May of
15  2017?
16    A.  Yes, I believe so.
17    Q.  And let's focus now on May 2019 as the senior
18  accounting manager.  How would you describe your role
19  at Highland in May of 2019?  What were your duties?
20    A.  Sure.  I helped with treasury management
21  function, cash forecasts and things like that.  And
22  oversaw the financial reporting from the last batch of
23  AP all the way to financials and reporting on
24  audits.
25    Q.  Who did you report to in May of 2019?

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 03/04/24 Page 153 of 200   PageID 24365

4 (Pages 13 to 16)

Kristin Hendrix - October 27, 2021

---

**13**

1   A.  David Klos.
2   Q.  What was Mr. Klos' title to your
3   understanding back then?
4   A.  I believe he was the controller.
5   Q.  And do you have an understanding as to who
6   Mr. Klos reported to back then?
7   A.  Yes, Frank Waterhouse.
8   Q.  Frank Waterhouse.  Who was he in May of 2019?
9   A.  The CFO.
10  Q.  Is Mr. Klos still with Highland today?
11  A.  He is.
12  Q.  What is his role now?
13  A.  He's now CFO.
14  Q.  You mentioned treasury management as of 2019,
15  May.  What do you mean by treasury management?  What is
16  that?
17  A.  Generally speaking, we -- it's not just me as
18  one person.  We have checks and balances.
19      My team would be in charge of sending out
20  payments, reconciling bank statements, making sure
21  money is in the right accounts, creating cash forecasts
22  and reporting on those every week with the CFO and
23  oftentimes the CEO.
24      Generally that's everything that fell under
25  the umbrella.

---

**14**

1   Q.  And would your description of treasury
2   management be the same for the December 2020 period?
3   A.  Yes.
4   Q.  Who at Highland or which group at Highland in
5   December of 2020 would have been responsible for noting
6   that there are certain bills that need to be paid in
7   the near or subsequent future.
8       By way of, let's say, accounts payable or
9   promissory notes or taxes or anything like that?
10  A.  Can you repeat your question.
11  Q.  Sure.  So obviously, Highland was a pretty
12  sophisticated business; correct?
13  A.  Yeah.
14      MR. MORRIS:  Objection to the form.
15  Q.  (BY MR. RUKAVINA)  And had various accounts
16  payable; right?
17  A.  Yes.
18  Q.  And it had maybe, let's just say, certain
19  note obligations that it had to pay from time to time;
20  correct?
21      MR. MORRIS:  Objection to the form of the
22  question.  Do you mean Highland Capital?
23      MR. RUKAVINA:  I mean Highland Capital
24  Management; correct, I'm sorry.  The debtor.
25  Q.  (BY MR. RUKAVINA)  Can we say the debtor?

---

**15**

1   A.  Yes, you can say the debtor.
2   Q.  So when I say the debtor and you say the
3   debtor we understand each other to mean Highland
4   Capital Management, comma, LP; correct?
5   A.  Correct.
6   Q.  I apologize.  In the December 2020 period, I
7   would imagine that the debtor had its own -- that
8   was -- strike that.
9       We'll cut to the chase.
10      In December of 2020, the debtor was providing
11  services to various other entities affiliated with
12  Mr. Dondero; correct?
13  A.  Correct.
14  Q.  That would have included NexPoint Advisors,
15  LP?
16  A.  Correct.
17  Q.  And you're aware that NexPoint Advisors was
18  the obligor on at least one promissory note to the
19  debtor; correct?
20  A.  Correct.
21  Q.  And did the debtor in December 2020 provide
22  so-called treasury management services to NexPoint
23  Advisors?
24      MR. MORRIS:  Objection to the form of the
25  question.

---

**16**

1       THE WITNESS:  Yes.
2   Q.  (BY MR. RUKAVINA)  As part of that, in
3   December 2020, would it have been employees of the
4   debtor that would have scheduled for potential payment,
5   subject to approval by NexPoint, NexPoint's future
6   obligations as they were coming due?
7   A.  Yes, we would have scheduled, only with
8   approval.
9   Q.  And would that have included NexPoint's
10  obligations on the promissory note to Highland?
11  A.  Yes.
12  Q.  Back to your background briefly.
13      Do you have any legal training at all?
14  A.  I do not.
15  Q.  Do you have any courses, have you taken any
16  courses in drafting promissory notes?
17  A.  No.
18  Q.  Do you believe that your expertise as a
19  certified public accountant gives you any greater
20  qualification than anyone else to prepare a promissory
21  note?
22      MR. MORRIS:  Objection to the form of the
23  question.
24      THE WITNESS:  No.
25  Q.  (BY MR. RUKAVINA)  Have you ever prepared or

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Part 4   Filed 03/03/674 of 472   Page 154 of 200   PageID 24366

5 (Pages 17 to 20)

Kristin Hendrix - October 27, 2021

---

**17**

1 drafted a promissory note?
2    A.  That term is probably used loosely.  I have
3 not completely drafted a promissory note from scratch,
4 no.
5    Q.  And we'll go into the details.  Fair to say
6 that you have taken a form promissory note and revised
7 it?
8    A.  Absolutely.
9    Q.  Was this part of your job in May of 2019 at
10 Highland?
11    A.  Yes.
12    Q.  Going back to the May 2019 time frame, were
13 you part of a particular group at Highland, like
14 accounting or legal or compliance?
15    A.  Yes, corporate accounting.
16    Q.  Corporate accounting.  That's what you
17 described before about treasury management and
18 projections and forecasts?
19    A.  Yes.
20    Q.  In May of 2019, was it the practice at
21 Highland that corporate accounting would be responsible
22 for drafting intercompany promissory notes?
23    A.  Not necessarily drafting, but updating a
24 draft that had been previously produced and provided by
25 our legal team, yes.

---

**18**

1    Q.  And Highland in May -- the debtor in May of
2 2019 did have a legal department?
3    A.  Yes.
4    Q.  Kind of like the corporate accounting, there
5 was a separate legal department; correct?
6    A.  Correct.
7    Q.  And who would have been in charge of that
8 department in May of 2019?
9    A.  Scott Ellington, E-l-l-i-n-g-t-o-n.
10    Q.  In May of 2019 or by May of 2019 was there
11 any practice at Highland as to whether its legal
12 department would be involved with the drafting or
13 execution of any intercompany promissory notes?
14        MR. MORRIS:  Objection to the form of the
15 question.
16        THE WITNESS:  It depends on the note.
17    Q.  (BY MR. RUKAVINA)  What did it depend on?
18    A.  Our typical practice is if we have a loan
19 with certain affiliates that it's a demand note.  We
20 have a template that we have used for years that was
21 created by either our internal legal team or an outside
22 law firm, I'm not sure which.
23        The typical practice is always updating a few
24 things on that template, getting it executed, and
25 filing it in our audit folders.

---

**19**

1    Q.  By updating, what do you mean?
2    A.  There's a few things that would need
3 updating, the date.
4    Q.  Maker?
5    A.  Maker.
6    Q.  Amount?
7    A.  The dollar amount, the interest rate.
8    Q.  And is it your testimony that the corporate
9 accounting group would do these things on its own
10 without necessarily the involvement of the legal group?
11        MR. MORRIS:  Objection to the form of the
12 question.
13        THE WITNESS:  Generally, yes.
14    Q.  (BY MR. RUKAVINA)  Do you have any memory in
15 or before May of 2019 if the corporate -- I'm sorry, if
16 the legal group became involved in drafting or
17 executing any prior intercompany promissory notes?
18    A.  Yes.
19    Q.  Explain to me what you remember about that.
20    A.  I do know that they were involved with
21 drafting restructured notes.  So taking demand notes
22 and turning them into a 30-year amort note.
23        That was in 2017.  I know for sure that they
24 were involved in that because it was something
25 different.  We weren't just updating a demand note.

---

**20**

1    Q.  Is it your testimony that to the best of your
2 recollection by May of 2019 and in May of 2019 it would
3 have been the corporate accounting group that would
4 have handled routine intercompany demand notes?
5    A.  Yes.
6    Q.  And you can think of more than one instance
7 on which that happened?
8    A.  Yes.
9    Q.  And this is not a memory test, but going back
10 in time can you try to give an estimate of what year
11 that first started happening, that the corporate
12 accounting would handle the drafting or execution of
13 intercompany demand notes?
14    A.  As far as I can remember.
15    Q.  Is it your testimony that as -- maybe even
16 going back as far as 2005 there were intercompany
17 demand notes?
18    A.  Yes.
19    Q.  I don't know how to ask this question, but
20 was this a significant thing in corporate accounting or
21 just another routine deal when you handled demand
22 notes?
23        MR. MORRIS:  Objection to the form of the
24 question.
25        THE WITNESS:  This is a routine job duty that

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 03/84/22   Page 155 of 200   PageID 24367

6 (Pages 21 to 24)

Kristin Hendrix - October 27, 2021

**21**

1 we routinely did.
2    Q.  (BY MR. RUKAVINA) Between 2005 and 2019, do
3 you remember any maker on these intercompany demand
4 notes actually being required to pay a demand note, in
5 other words, Highland making demand?
6    A.  Not that I can specifically recall.
7    Q.  Do you have any recollection as to what
8 happened to these intercompany demand notes over the
9 years between 2005 and 2019?
10    A.  Yeah.  Typically anytime specifically Jim
11 Dondero would need to move money between related
12 parties, he would pay down -- when I say him, he would
13 have us in corporate accounting move money around, pay
14 off notes, reissue new notes somewhere else.
15       So a way to move money around between his
16 entities.
17    Q.  So let's use just hypotheticals here so that
18 I'm not trying to pin you down to any specific fact.
19       But between 2005 and 2019, is it fair to say
20 that if some Dondero entity that's not the debtor
21 needed money and the debtor had money, then Dondero
22 would have the debtor lend money to that entity on a
23 demand note basis?
24    A.  So long as they have the cash available to do
25 so.

**22**

1    Q.  "They" being the debtor?
2    A.  Debtor, yes.
3    Q.  And is it fair to say, then, again
4 hypothetically without any specifics, that if the
5 debtor maybe from time to time needed money and one of
6 these other entities had cash, then Dondero would cause
7 that other entity to pay down the demand note?
8    MR. MORRIS:  Objection to the form of the
9 question.
10    THE WITNESS:  Can you repeat that.
11    Q.  (BY MR. RUKAVINA) Sure.  So I think you
12 mentioned that from time to time these entities would
13 pay down these demand notes?
14    A.  To the debtor?
15    Q.  To the debtor.
16    A.  Yes.
17    Q.  And is that, hypothetically again, is that
18 because on occasion the debtor might have needed cash
19 and these entities had the cash, so Dondero would have
20 them pay back the note?
21    MR. MORRIS:  Objection to the form of the
22 question.
23    THE WITNESS:  Yes, that could be a reason.
24    Q.  (BY MR. RUKAVINA) Can you think of any other
25 reason in those 14 years?

**23**

1    A.  If the debtor needed cash to lend to another
2 entity.
3    Q.  I see.  So again, it's all one big happy
4 family, and whoever needed cash, the cash moved around;
5 correct?
6    A.  Correct.
7    Q.  Was it Mr. Dondero that basically was the
8 only deciding person in each instance that you're aware
9 of in those 14 years as to when a note would be made or
10 repaid?
11    A.  I can't answer specifically to that.  Most of
12 my direction came from our CFO at the time,
13 Frank Waterhouse.  So what conversations he would have
14 with Jim Dondero, I can't answer to that.  But I would
15 suspect so, yes.
16    Q.  And in May of 2019 or by May of 2019, did you
17 communicate personally, by email or telephone, in
18 person, periodically with Jim Dondero?
19    A.  I can't say periodically, no.
20    Q.  Well, I'm not trying to put words in your
21 mouth.  Is it fair to say that you kind of -- your
22 communications stopped with Mr. Waterhouse and
23 Waterhouse communicated with Dondero, as opposed to you
24 regularly communicating with Dondero?
25    A.  That's typical, yes.

**24**

1    Q.  Can you think of any instances in which
2 Mr. Dondero gave you any instructions or you came to
3 him seeking any instructions, without some intermediary
4 between the two of you?
5    A.  No, usually Frank was present.
6    Q.  Would you categorize Mr. Waterhouse as kind
7 of guarding with jealousy his access to Mr. Dondero?
8    MR. MORRIS:  Objection to the form of the
9 question.
10    THE WITNESS:  No.
11    Q.  (BY MR. RUKAVINA) What kind of boss was he
12 in May of 2019?  Was he laid back, or was he a jerk?
13 Was he demanding?  How would you characterize him in
14 May of 2019?
15    MR. MORRIS:  Objection to the form of the
16 question.
17    THE WITNESS:  I would say he was a good boss.
18    Q.  (BY MR. RUKAVINA) You think he was competent
19 as far as his job went?
20    A.  Yes, very competent.
21    Q.  Do you think he was competent as far as his
22 job went in December of 2020?
23    A.  Yes.
24    Q.  January 2021?
25    A.  Yes.

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 06/09/24   Page 156 of 200   PageID 24368
Appendix Part 4 Page 3624 of 472

7 (Pages 25 to 28)

Kristin Hendrix - October 27, 2021

**25**

1    Q.  Was he patient and understanding as a boss?
2    A.  Yes.
3    Q.  Okay.  Was he ever condescending or rude to
4  anyone in your presence?
5    A.  No.
6    Q.  So you're the controller today at Highland,
7  the debtor, the reorganized debtor; right?
8    A.  Yes.
9    Q.  And who do you report to?  You mentioned
10  Mr. Klos is the CFO?
11    A.  Yes.
12    Q.  And do you also report to Mr. Seery?
13    A.  Yes, I think everybody does.
14    Q.  And I don't need to know details, but I take
15  it you're on a salary from reorganized Highland?
16    A.  Yes.
17    Q.  Is any part of your compensation merit or
18  bonus based?
19    A.  It could potentially be.
20    Q.  Have you had any discussions with Mr. Seery
21  or Mr. Klos about some sort of bonus compensation?
22    A.  Yes.
23    Q.  Has anything been agreed to?
24    A.  Yes.
25    Q.  And again, I don't need to know the exact

**26**

1  numbers.  What would your bonus compensation consist
2  of?  How would it be decided?
3    A.  It's actually -- was decided when I agreed to
4  stay on the Highland team back in February 2021, so
5  it's in my employment agreement.
6    Q.  So what's your bonus compensation?
7    A.  I'm not sure I understand what you're asking.
8    Q.  So is the bonus discretionary on the part of
9  Highland?
10    A.  No, it's a set amount.
11    Q.  And what triggers it or governs the set
12  amount?
13    A.  Just it gets paid out on a certain date of
14  the year.  It's very straightforward, set out in my
15  employment agreement.
16    Q.  Is it irrespective of the performance of the
17  reorganized debtor?
18    A.  Yes.
19    Q.  So why do you call it a bonus instead of base
20  compensation?
21    A.  That's what it's called in my agreement.
22    Q.  So your base compensation and your bonus,
23  it's your testimony, you're going to earn it
24  irrespective of whether reorganized Highland does good
25  or bad with respect to its profitability?

**27**

1    A.  Correct.
2    Q.  And how Highland, reorganized Highland
3  collects these promissory notes is going to play no
4  part in your base and bonus compensation to your
5  understanding; is that correct?
6    A.  To my knowledge, yes.
7    Q.  So you have no direct or indirect stake in
8  the outcome of these litigations?
9    A.  No.
10    Q.  And you understand that I represent HCMFA and
11  NexPoint?
12    A.  Yes.
13    Q.  And these court reporters are not familiar
14  with some of our terminology.  NAP [verbatim], if we
15  say that, that means NexPoint; right?
16    A.  Uh-huh.
17    Q.  You have to say yes or no.
18    A.  Yes, NPA, NexPoint.
19    Q.  NPA.  And when we say NexPoint, you and I are
20  meaning NexPoint Advisors, LP; right?
21    A.  Yes.
22    Q.  And when we say HCMFA, we're meaning Highland
23  Capital Management Fund Advisors, LP, yes?
24    A.  Yes.
25    Q.  What is your understanding of the two

**28**

1  lawsuits, the one against HCMFA and the one against
2  NexPoint, that you're being deposed on today?
3        MR. MORRIS:  Objection to the form of the
4  question.
5    Q.  (BY MR. RUKAVINA)  Who is suing who and for
6  what?
7    A.  I don't know all the details.
8    Q.  So we've established that you've discussed
9  these lawsuits in the last week or a little bit more
10  with legal counsel.  I don't want to talk about that.
11        Prior to these recent discussions, did you
12  have any discussions with anyone at Highland about its
13  lawsuits against HCMFA and NexPoint on promissory
14  notes?
15    A.  Repeat that again.
16    Q.  Sure.  So remember we're excluding the recent
17  discussions in the last week or 10 days with counsel;
18  right?
19    A.  Okay.
20    Q.  Are you aware that in January of 2021 the
21  debtor sued NexPoint to collect on a promissory note?
22    A.  I'm aware that demand notices were sent.
23    Q.  So until recently you weren't aware that a
24  lawsuit had been filed?
25    A.  There's a lot of lawsuits filed.  I can't

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 03/07/24   Page 157 of 200   PageID 24369

**8 (Pages 29 to 32)**

Kristin Hendrix - October 27, 2021

---

**29**

1 keep track of what is what or what we're talking about
2 at certain times.
3    Q.  But you have no distinct memory of that?
4    A.  Correct.
5    Q.  And same question for the lawsuit that the
6 debtor filed against HCMFA in January.
7        Do you have any specific memory of that
8 lawsuit having been filed?
9    A.  Not specifically.
10   Q.  You mentioned that you're aware that on or
11 before January 2021, demand letters had been sent?
12   A.  Yes.
13   Q.  Did you play any role in either drafting
14 those demand letters or the decision to send them?
15   A.  No.
16   Q.  So going back to my question about these
17 lawsuits, do you have any memory of anyone asking
18 you -- again, excluding the last week or two.
19       Do you have any memory of anyone asking you
20 to do anything with respect to either or both of these
21 lawsuits?
22   A.  No.
23   Q.  You have no memory of Mr. Waterhouse,
24 Mr. Klos, Mr. Surgent, or Mr. Seery asking for any
25 background information or your input at all on these

---

**30**

1 two lawsuits?
2       MR. MORRIS:  Better not have been --
3       THE WITNESS:  No.
4    Q.  (BY MR. RUKAVINA)  Who did I say?  Did I
5 misspeak?  Okay.
6       Now we're going to have some exhibits here.
7       And do you have the labels?
8       Let's take a minute break off the record.
9       (Off the record.)
10   Q.  (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
11 provide to you a promissory note in the original
12 principal amount of $5 million from HCMFA.  This is the
13 PDF version of this as filed with the Court for
14 collection.  It's going to be Exhibit 1.
15       (Whereupon, Exhibit 1 was marked for
16       identification.)
17   Q.  (BY MR. RUKAVINA)  Before you look at
18 Exhibit 1, I'm going to do the same thing for
19 Exhibit 2, which is a promissory note from HCMFA for
20 $2.4 million, dated May 2, 2019.
21       (Whereupon, Exhibit 2 was marked for
22       identification.)
23   Q.  (BY MR. RUKAVINA)  Again, Ms. Hendrix, these
24 are the PDF versions of these notes as filed with the
25 Court.  Sitting here today, do you remember anything

---

**31**

1 about either or both of these two promissory notes?
2    A.  Sure, yes.
3    Q.  What do you remember?
4    A.  I remember seeing them because I've recently
5 looked at them.  I see them all the time in our loan
6 tracking spreadsheets.  My team would have been
7 responsible for the whole process that I explained
8 before when it comes to a promissory note.
9    Q.  And --
10       MR. MORRIS:  Are you finished?
11       THE WITNESS:  Yes.
12   Q.  (BY MR. RUKAVINA)  And we have an email here
13 that might give some more context to that if I can find
14 it here.
15       This will be Exhibit 3.  This is an email
16 from David Klos to corporate accounting dated May 2,
17 2019.
18       (Whereupon, Exhibit 3 was marked for
19       identification.)
20   Q.  (BY MR. RUKAVINA)  Do you see this email,
21 ma'am?
22   A.  Yes.
23   Q.  Okay.  Corporate accounting, would that email
24 group have included you?
25   A.  Yes.

---

**32**

1    Q.  And this email says, Kristin, can you or
2 Hayley.  Do you think that Kristin was you?
3    A.  I do.
4    Q.  Do you remember receiving this email?
5    A.  Not explicitly.
6    Q.  So it says Blair.  Who would Blair be?
7    A.  Blair was our AP associate.
8    Q.  What is her last name?
9    A.  At this time it would have been Roeber,
10 R-o-e-b-e-r.
11   Q.  Okay.  And did it subsequently change?
12   A.  Yes, it's now Hillis, H-i-l-l-i-s.
13   Q.  Please send $2.4 million from HCMLP to HCMFA.
14 This is a new interco loan.  Kristin, can you or Hayley
15 please prep a note for execution.  I'll have further
16 instructions later today, but please process this
17 payment as soon as possible.
18       Did I read that correctly?
19   A.  Yes.
20   Q.  Do you have any memory of whether this email
21 relates to Exhibit 2, the $2.4 million promissory note?
22   A.  It seems like it does, same date, same
23 amount.
24   Q.  Do you have any memory, or in reviewing your
25 files did you see any similar email or document that

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 01/09/24   Page 158 of 200   PageID 24370

9 (Pages 33 to 36)

Kristin Hendrix - October 27, 2021

---

33

1  would have related to Exhibit 1, the $5 million
2  promissory note?
3      A.  Yes.  I believe there's another email for
4  that one.
5      Q.  And do you believe that you provided that to
6  counsel?
7      A.  Yes.
8      Q.  Recently or some time ago?
9      A.  Well, I don't think I provided it, so I'm not
10 sure when they got it.  I know it has been provided.
11     Q.  You know that it has?
12     A.  Uh-huh.
13     Q.  How do you know?
14     A.  Because I've seen it.
15     Q.  In the production that was produced to me?
16     A.  Yes.
17     Q.  And also from a David Klos?
18     A.  This one, or on the -- when I say this one,
19 on the $2.4 million or the 5-?
20     Q.  On the $5 million note.
21     A.  I'm not sure.
22     Q.  Okay.  Let me make sure I understand you
23 correctly.
24         Sitting here today you believe that there is
25 another email referencing the $5 million loan that has

---

34

1  been produced to my office?
2      A.  Yes.  I believe so.
3      Q.  Okay.  And going off memory, did it kind of
4  say the same thing as this Exhibit 3 except that it
5  referenced $5 million?
6      MR. MORRIS:  Objection to the form of the
7  question.
8      THE WITNESS:  Generally, should have said the
9  similar situation, yeah.
10     Q.  (BY MR. RUKAVINA)  So Mr. Klos says, this is
11 a new interco loan, for Exhibit 3.  Other than what he
12 told you, that this is an intercompany loan, did anyone
13 else tell you or did you have any other information on
14 May 2, 2019 that this was a loan?
15     A.  I don't specifically recall these
16 conversations, but I can tell you our normal practice
17 would be we would either likely be in a cash meeting --
18 and I say "we."  Would have been myself, Dave Klos,
19 Frank Waterhouse, potentially even Jim Dondero.
20         But I don't recall conversations on this
21 specific date.  But general practice is we would talk
22 about it.
23         Oftentimes, Frank would either call Dave or I
24 or stop by and tell us that, we need to send money to
25 an affiliate, paper up a new loan, let's get a wire out

---

35

1  the door, is typically how this works.
2      Q.  Is the answer generally the same for the
3  $5 million note?
4      A.  Yes.
5      Q.  So is it fair to say that typically,
6  obviously not every time, but typically your corporate
7  accounting group when it would see intercompany
8  transfers in large amounts would believe that they were
9  loans?
10     MR. MORRIS:  Objection to the form of the
11 question.
12     THE WITNESS:  Typically they were loans.
13 There's not really another way to get money from one
14 entity to another.  And if they were papered as a loan,
15 that means we were told to set it up that way.
16     Q.  (BY MR. RUKAVINA)  What do you mean papered
17 as a loan?  Aren't you papering it as a loan when
18 someone makes the promissory note?
19     A.  Yes, because we're told by somebody to do
20 that.
21     Q.  And in this instance, Mr. Klos on Exhibit 3
22 told the group that this was a loan; right?
23     A.  Correct.  But he would have spoken with
24 Frank Waterhouse or Jim Dondero prior to that, before
25 telling anybody to do that.

---

36

1      Q.  Okay.  And do you have any knowledge that he
2  did speak to Mr. Waterhouse or Mr. Dondero before
3  sending this email?
4      A.  Again, I don't have specific knowledge on the
5  exact conversations, but that's always how it has
6  worked.
7      Q.  That's how it was for 14 or 15 years;
8  correct?
9      A.  Yes.
10     Q.  But you're logically assuming that it
11 happened here.  You don't know that it happened here;
12 correct?
13     MR. MORRIS:  Objection to the form of the
14 question.
15     THE WITNESS:  I would have to be fairly
16 certain that it did, even though I can't recall
17 specific conversations.
18     Q.  (BY MR. RUKAVINA)  Did you ask Mr. Klos about
19 who told him that this is a new intercompany loan on
20 Exhibit 3?
21     A.  No.  It's quite possible I was involved in
22 the conversation.  I reported to him.  I wouldn't
23 question his authority.
24     Q.  Did you ask Mr. Klos who told him that the
25 $5 million deal was also an intercompany loan?

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4   Filed 03/27/24   Page 159 of 200   PageID 24371

**10 (Pages 37 to 40)**

Kristin Hendrix - October 27, 2021

---

**37**

1    A.  I did not ask that specific question that I
2    can recall.
3    Q.  Did you ask Mr. Waterhouse whether either of
4    these transactions were loans?
5    A.  I'm sure Mr. Waterhouse is the one that told
6    us they were loans.  We wouldn't just paper up a loan,
7    send money out and call it a loan and account for it
8    that way, unless somebody specifically told us.
9    Q.  Do you have any memory of Mr. Waterhouse
10   orally or in writing or email or in any way, shape, or
11   form on or about May 2 or 3, 2019 telling you that the
12   2.4 million or $5 million transfers were intercompany
13   loans?
14   A.  No specific knowledge of exact conversations,
15   but I'm certain that those conversations were had
16   because that's the only way that we would have papered
17   up a loan, sent money out as a loan, had them on our
18   financials for two years.
19   Q.  So you're saying that this email, Exhibit 3,
20   from Mr. Klos was not enough, that there would have
21   been other things that happened to make you and other
22   people in your group confident that these were loans?
23   A.  Yes.
24   Q.  And these other things would have been in
25   person or by email?

---

**38**

1    A.  Most likely in person via phone call.
2    Q.  Okay.  So again, you have no specific memory
3    of it, but based on the 14-year pattern and conduct you
4    believe that you would have discussed these two
5    transfers with Mr. Waterhouse and he would have told
6    you these are loans?
7        MR. MORRIS:  Objection to the form of the
8    question.
9        THE WITNESS:  Correct.
10   Q.  (BY MR. RUKAVINA)  And then would he have
11   told you to take care of the promissory notes, or was
12   that Mr. Klos here in Exhibit 3?
13   A.  It could have been both.  It's clearly Dave
14   in this email, but Frank could have also said that to
15   me.
16   Q.  Now, do you -- strike that.
17       In May of 2019, did you know or were you told
18   why these $7.4 million were being transferred from the
19   debtor to HCMFA?
20   A.  Yes.  I do have recollection that -- I do
21   know that there were two big events in May 2019.
22   2.4 million was related to a TerreStar NAV error, with
23   one of the funds advised by HCMFA.  That's Global
24   Allocation Fund.
25       Similar with the $5 million loan.  There was

---

**39**

1    a consent fee that the advisor of the Global Allocation
2    Fund had promised to pay to shareholders of that fund,
3    and it was in the amount of $5 million roughly.
4        So both of these loans were for those
5    purposes respectfully.
6    Q.  And were you in May of 2019 also aware that
7    in addition to the $2.4 million, there was another more
8    than $5 million paid to that fund by HCMFA's insurer as
9    compensation for the NAV error?
10   A.  By the insurance company, yes.
11   Q.  So the $7.4 million, you understood then was
12   a loan as opposed to compensation to HCMFA?
13   A.  Yes.
14   Q.  Okay.  Did you understand in May of 2019 that
15   it had been the debtor and its valuation team that
16   caused that NAV error?
17       MR. MORRIS:  Objection to the form of the
18   question.
19       THE WITNESS:  I can't answer that.  I was not
20   involved with the activities leading up to the NAV
21   error.
22   Q.  (BY MR. RUKAVINA)  How do you know that the
23   $7.4 million were being transferred for the NAV error
24   and consent fee?
25   A.  Because I do know about both of those

---

**40**

1    instances and I do know that HCMFA needed to pay these
2    dollar amounts for both of those.
3    Q.  And you knew that in May of 2019?
4    A.  Yes.
5    Q.  How did you know that in May of 2019?
6    A.  It was lots of discussions had been going on
7    around both of these issues for months.  These weren't
8    surprises to anybody.
9    Q.  So although you weren't involved directly
10   with the NAV error issues, it was more or less common
11   knowledge in your accounting group?
12   A.  Correct.
13   Q.  Do you have any knowledge at all as to
14   whether Mr. Dondero decided to transfer these
15   $7.4 million not as a loan, but to compensate HCMFA for
16   the debtor's alleged liability?
17   A.  Have not heard of that.
18   Q.  Ever?
19   A.  Never.
20   Q.  But you also never heard Mr. Dondero say that
21   these $7.4 million were a loan; correct?
22   A.  That was not told to me directly.
23   Q.  Again, you're logically assuming that based
24   on many instances of intercompany transfers in the
25   14 years prior to that?

---

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 09/22/2 of 4 Page 160 of 200    PageID 24372

**11 (Pages 41 to 44)**

Kristin Hendrix - October 27, 2021

---

**41**

1    MR. MORRIS:  Objection to the form of the
2  question.  Mischaracterizes the testimony.
3    THE WITNESS:  Correct.
4    Q.  (BY MR. RUKAVINA)  I think you answered
5  correct?
6    A.  Correct.
7    Q.  And you mentioned that after these notes, you
8  saw them on internal financials and that reinforces
9  your view that these were loans?
10   A.  Correct.
11   Q.  But as of May 2 and 3, 2019, no one had told
12  you directly that these are loans?
13   MR. MORRIS:  Objection to the form of the
14  question.  It's in writing.
15   THE WITNESS:  That's not what I'm saying at
16  all.
17   Q.  (BY MR. RUKAVINA)  Other than Mr. Klos' email
18  or emails, no one told you on May 2 or May 3, 2019 that
19  you remember today that these were loans?
20   A.  It quite possibly could have been told to me
21  in addition to this email.
22   Q.  I understand.  You just have no memory of
23  that today; correct?
24   A.  Correct.
25   Q.  Is there anything that you can think of

---

**42**

1  sitting here today to refresh your memory on that
2  point?
3    A.  I do not think so.  I'm sure there was
4  conversation that unfortunately would not be in an
5  email.
6    Q.  Now, we have the Word documents, the Word
7  version of these two promissory notes, and you're going
8  to have rely on me that I printed these out as
9  Mr. Morris sent to me.  If I'm misleading you on that,
10  then I'm in trouble and your answers don't count.
11   So please assume that I didn't doctor these
12  and that I printed them out as they were prepared to
13  me; okay?
14   A.  Yes.
15   Q.  So Exhibit 4 will be the $5 million note and
16  Exhibit 5 will be the 2.4 million.
17   (Whereupon, Exhibits 4 & 5 were marked for
18   identification.)
19   Q.  (BY MR. RUKAVINA)  Before I ask about 4 and
20  5, to be fair to you and refresh your memory, I'm going
21  to provide you printouts of the metadata, metadata --
22  I'm not sure how to better say that -- for both notes.
23   And again I'm representing to you that I
24  printed out the metadata without doctoring it, so
25  please assume that's true, and if it's not, your

---

**43**

1  answers don't count and I'm in trouble.
2    6 will be the $5 million note, and 7 will be
3  the $2.4 million note.
4    (Whereupon, Exhibits 6 & 7 were marked for
5   identification.)
6    Q.  (BY MR. RUKAVINA)  Okay.  So Exhibit 4 and 5
7  are the Word documents.  Do you have any memory of you
8  doing anything with respect to these two Word
9  documents?
10   A.  I don't have specific memory, but generally
11  speaking, it was my job to update promissory note
12  templates and create promissory notes.
13   Q.  So do you believe that -- we discussed
14  earlier that your group would have used a template and
15  that it would have made changes reflecting the maker,
16  amount, date, interest rate.
17   Do you believe you were the one with respect
18  to 4 and 5 that updated that template to create 4
19  and 5?
20   A.  I'm sure that I was, yes.
21   Q.  Well, Exhibit 6 -- do you know what metadata
22  is?
23   A.  Sort of.
24   Q.  What's your understanding of what metadata
25  is?

---

**44**

1    A.  Just in context from speaking on it recently,
2  it's going to tell you who made changes to the
3  documents, is what I would assume.
4    MR. RUKAVINA:  Go off the record for one
5  second.
6    (Off the record.)
7    Q.  (BY MR. RUKAVINA)  So a little bit of error
8  on my part.  We'll have some more metadata, but we can
9  still talk about 6 and 7.
10   It says the author JFORSHEE, J-F-O-R-S-H-E-E.
11  Do you recall or do you know who that person was?
12   A.  I recognize the name, and it makes sense.
13  This says Strasburger is the company.  I think he was
14  one of the lawyers that we had used at some point in
15  time.
16   Q.  Strasburger is a law firm?
17   A.  Yes.
18   Q.  And then it says, so Exhibit 6 created May 3,
19  Exhibit 7 created May 2, modified, accessed.  Does that
20  to the best of your understanding comport with when
21  Exhibits 4 and 5 were actually created?
22   A.  Can you repeat that.
23   Q.  Yeah.  We'll wait for the rest of the
24  metadata.  But let's go back to 4 and 5.
25   In and by May 2019 I think you mentioned that

---

**Dickman Davenport, Inc**
214.855.5100    www.dickmandavenport.com    800.445.9548

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-2 Part 4 Filed 09/14/22   Page 161 of 200   PageID 24373

**12 (Pages 45 to 48)**

Kristin Hendrix - October 27, 2021

---

**45**

1 it was your job to, I think you said update promissory
2 notes?
3          MR. MORRIS:  Objection to the form of the
4 question.
5     Q.  (BY MR. RUKAVINA)  Let me take that question
6 back.
7          You testified earlier that your group would
8 have taken a template and used it to create or prepare
9 a new promissory note; right?
10     A.  Right.
11     Q.  How would you call that process?  What word
12 would you use for that process?
13     A.  Let's call it papering the loan.
14     Q.  In May of 2019, was it your job to paper the
15 loan?
16     A.  Yes.
17     Q.  Would anyone else at the corporate accounting
18 group have been responsible to paper a loan?
19     A.  At that time, I don't think so.  I think I
20 was the one doing it.
21     Q.  I think you mentioned that you think you
22 papered the loan, respecting Exhibits 4 and 5; correct?
23     A.  Correct.
24     Q.  You have no distinct present memory of
25 papering 4 and 5; correct?

---

**46**

1     A.  Correct.
2     Q.  Can you think of anyone else at the corporate
3 accounting group that would have papered 4 and 5?
4          MR. MORRIS:  Objection to the form of the
5 question.
6          THE WITNESS:  The only other person that
7 could have would either be Dave Klos or Hayley Eliason.
8     Q.  (BY MR. RUKAVINA)  What was Hayley's role in
9 May of 2019?
10     A.  She was the accountant.  I can't recall her
11 specific title.
12     Q.  Now, in May of 2019 when you papered a loan,
13 would you have consulted with either internal or
14 external legal before finishing that loan or presenting
15 it for signature or anything else?
16     A.  Not if it was just our standard demand note
17 that we already had a template on.
18     Q.  So would it have been your general course in
19 May of 2019, if you prepared Exhibits 4 and 5, not to
20 seek advice from internal or legal before proceeding
21 with these notes?
22     A.  With these two specific notes?
23     Q.  Yes.
24     A.  Yes.
25     Q.  If we flip the page, I'll represent to you

---

**47**

1 that Mr. Waterhouse's signature there appears on the
2 Word document as an image.
3     A.  Uh-huh.
4     Q.  Do you have any memory of whether there was
5 an image that someone would have affixed of
6 Mr. Waterhouse's signature to promissory notes?
7     A.  Yes.  We typically always -- he was
8 completely fine with having documentations -- sorry,
9 having documents signed or executed with his
10 e-signature.
11     Q.  Would these pictures of his signature have
12 been his e-signature in May of 2019?
13     A.  Yes.
14     Q.  So let's just clarify that because I don't
15 want there to be any confusion.
16          I know there's some computer programs out
17 there that are restrictive and have passwords before
18 any signature is printed.  And then there's some people
19 that use a stamp or an image; right?
20          MR. MORRIS:  Objection to the form of the
21 question.
22     Q.  (BY MR. RUKAVINA)  Are you following me?
23     A.  I follow you.
24     Q.  In May of 2019, did Mr. Waterhouse have any
25 specific program that would have to -- you would have

---

**48**

1 to go through before it would spit out his e-signature,
2 or was he fine with you and his staff using an image
3 like this?
4     A.  He was fine with using his e-signature, and
5 what is on these documents was that exact e-signature.
6 So I don't know if he had -- I don't know how it was
7 created originally.
8     Q.  The e-signature?
9     A.  E-signature.
10     Q.  Do you have any memory with respect to
11 Exhibits 4 and 5 of getting Mr. Waterhouse's specific
12 approval to use his e-signature?
13     A.  I don't have exact specific memory, same as
14 conversations on these loans.  But he would have had to
15 approve this loan in the dollar amount, the day.
16          He would have been the one directing us to
17 create these loans.  In past practice he has always
18 approved using his e-signature to execute documents.
19     Q.  How would he have approved Exhibits 4 and 5?
20 By that, I mean by email or memorandum?  How would he
21 have approved it in May of 2019?
22          MR. MORRIS:  Objection to the form of the
23 question.
24          THE WITNESS:  I would assume that, as I've
25 stated previously, these directions were coming

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Page 09754 of 472   Page 162 of 200   PageID 24374

**13 (Pages 49 to 52)**

Kristin Hendrix - October 27, 2021

**49**

1 directly from him to paper a loan. These changes that
2 are made are only to the dollar amount. Interest rate
3 is pulled right off the IRS website.
4         That is his approval to paper a loan and in
5 fact execute or approve the loan.
6     **Q. (BY MR. RUKAVINA)  In May of 2019, would**
7 **Mr. Waterhouse -- what was his practice as far as using**
8 **an ink signature on documents as opposed to an**
9 **e-signature?  Did he have a practice?**
10     **MR. MORRIS:**  Objection to the form of the
11 question.
12         THE WITNESS:  He has never specifically said,
13 on certain documents I would like to ink it with my
14 signature.  Probably at this time, 99 percent of the
15 stuff my team got his signature on was his e-signature.
16 I think it just depended on the group and what it was.
17     **Q. (BY MR. RUKAVINA)  So how would he authorize**
18 **you or your team to use his e-signature for any given**
19 **document in May of 2019?**
20     **MR. MORRIS:**  Objection to the form of the
21 question.
22         THE WITNESS:  Through the conversations that
23 would have been had before these emails went out saying
24 paper loan.
25     **Q. (BY MR. RUKAVINA)  And -- okay.  So, and**

**50**

1 **after his e-signature was used either on these notes or**
2 **other documents in May of 2019, would you have brought**
3 **the documents back to him for any kind of verification?**
4     **MR. MORRIS:**  Objection to the form of the
5 question.
6         THE WITNESS:  Probably not.  These are all
7 very standard.  We've papered hundreds of loans.  So I
8 think he trusted that we can handle updating a date and
9 a dollar amount on these loan templates.
10     **Q. (BY MR. RUKAVINA)  Do you know or believe, or**
11 **your recent review of documents, did it reveal an email**
12 **from Mr. Waterhouse to you specifically authorizing his**
13 **e-signature on Exhibits 4 and/or 5?**
14     **A.  Not that I recall seeing, no.**
15     **Q.  Sitting here today, do you have any memory of**
16 **Mr. Waterhouse orally or otherwise specifically**
17 **authorizing you to affix his e-signature to Exhibits 4**
18 **and/or 5?**
19     **A.  Specifically on these loans, no, I don't**
20 **recall those conversations.  But, again, our practice**
21 **has always been we have this discussion, he's under the**
22 **understanding that we're going to paper the loans, he's**
23 **always comfortable with using his e-signature.**
24         **This is not something me or my team would**
25 **have done without that authority and approval from him.**

**51**

1     **Q.  But you have no memory of that authority or**
2 **approval, specifically for 4 and 5?**
3         **MR. MORRIS:**  Objection.  Asked and answered
4 about five times.
5         THE WITNESS:  Same as my answer I just gave.
6     **Q. (BY MR. RUKAVINA)  And I think you mentioned**
7 **that in your years at Highland your team papered**
8 **hundreds of loans?**
9     **A.  Yeah.**
10     **Q.  In your time at Highland, is it your**
11 **testimony that the accounting -- corporate accounting**
12 **department never made a mistake with respect to**
13 **anything that it did?**
14         **MR. MORRIS:**  Objection to the form of the
15 question.
16         THE WITNESS:  No, I did not say that.
17     **Q. (BY MR. RUKAVINA)  Do you recall any mistakes**
18 **in your time at the corporate accounting group at**
19 **Highland that had been made, any significant mistakes?**
20         **MR. MORRIS:**  Objection to the form of the
21 question.
22         THE WITNESS:  Significant mistakes, not that
23 I can recall.
24     **Q. (BY MR. RUKAVINA)  No accounts payable**
25 **mistakenly paid?**

**52**

1     MR. MORRIS:  Objection to the form of the
2 question.
3         THE WITNESS:  I cannot specifically answer
4 that question with 17 years of work to recall, sorry.
5     MR. RUKAVINA:  Just take a quick break.  If
6 you need a restroom -- off the record.
7         (Off the record.)
8     **Q. (BY MR. RUKAVINA)  Going back to Exhibits 4**
9 **and 5.**
10         **Mr. Waterhouse signed these promissory notes.**
11 **Is there any particular reason why he signed them as**
12 **opposed to Dondero or someone else?**
13     **A.  No particular reason.  He's an officer for**
14 **both companies.  He's a signatory.**
15     **Q.  Who decided, to your knowledge,**
16 **that he would be the one signing the notes, these two**
17 **notes?**
18     **A.  I don't know who would have decided that, but**
19 **typically if Frank specifically wanted Jim Dondero to**
20 **sign it, he would say, take it to Jim to sign.**
21     **Q.  Do you have a recollection of**
22 **Mr. Dondero -- strike that.**
23         **Do you have a recollection of Mr. Waterhouse**
24 **signing other promissory notes?**
25     **A.  Yes.  I know for sure he has signed other**

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176 Part File Page 163 of 200    PageID 24375

**14 (Pages 53 to 56)**

Kristin Hendrix - October 27, 2021

---

**53**

1 promissory notes. I can't tell you explicitly which
2 ones.
3      (Off the record.)
4      Q.  (BY MR. RUKAVINA)  Are you saying that in May
5 of 2019 -- strike that.
6      By May of 2019, was it not the standard
7 practice at the debtor that Mr. Dondero would sign
8 intercompany promissory notes?
9      MR. MORRIS:  Objection to the form of the
10 question.
11      THE WITNESS:  No, that's not standard
12 practice.  Just needed to be somebody -- somebody who
13 is a signer for the entity on the incumbency
14 certificate.
15      Q.  (BY MR. RUKAVINA)  Was there a standard
16 practice, or did you just describe the standard
17 practice that it was someone on the incumbency
18 certificate?
19      A.  That's correct, somebody on the incumbency
20 certificate.  Frank is a great prospect to sign, with
21 giving direction to set loans up, send money out.  Why
22 wouldn't he sign it.
23      Q.  Do you have any memory sitting here today of
24 Mr. Waterhouse telling you or agreeing that he would be
25 signing these two promissory notes for HCMFA?

---

**54**

1      A.  Not specifically, but he didn't need to tell
2 me.  He typically would tell me if he wanted Jim to
3 sign them.
4      Q.  Sitting here today, do you have any memory of
5 giving Mr. Waterhouse these two promissory notes after
6 they were prepared?
7      A.  I specifically don't remember walking into
8 his office and providing it to him, but he could have
9 found it on our shared drive if he wanted to.
10      Q.  Do you have any memory or in your recent
11 review of documents did you see any email to the effect
12 of you sending either or both of these promissory notes
13 to Mr. Waterhouse after they were papered up?
14      A.  I don't have any specific recollection,
15 again, but he had access to look at them.
16      Q.  On the shared drive?
17      A.  Yes.
18      Q.  In May -- I'm going to ask this question
19 multiple different ways, so let's start with kind of
20 the general.
21      In May or by May of 2019, was there a
22 repository, electronic or paper, where the debtor kept
23 original promissory notes that were owed -- where money
24 was owed to it?
25      A.  Original meaning paper?

---

**55**

1      Q.  Well, let's go back a little bit in time.
2      Would you agree that at some point prior to
3 2019 the standard course was that paper notes were ink
4 signed?
5      MR. MORRIS:  Objection to the form of the
6 question.
7      THE WITNESS:  I could not tell you
8 specifically when notes were or were not ink signed.
9      Q.  (BY MR. RUKAVINA)  Was there any repository,
10 to the best of your recollection, as of May 2019 where
11 any ink-signed original promissory notes were kept by
12 the debtor?
13      A.  No.  We always would scan them in, save them
14 on our shared drive.  Never had paper copies.
15      Q.  So that's -- fixing to ask that question
16 next.
17      So Exhibits 4 and 5, would they even have
18 been printed after they were papered up?
19      MR. MORRIS:  Objection to the form of the
20 question.
21      THE WITNESS:  Possibly.  Somebody could have
22 printed them.
23      Q.  (BY MR. RUKAVINA)  Do you remember printing
24 Exhibits 4 or 5 sitting here today?
25      A.  I don't recall printing them myself, no.

---

**56**

1      Q.  Would there have been a reason to print them
2 out if, as you said, the notes were stored
3 electronically?
4      MR. MORRIS:  Objection to the form of the
5 question.
6      THE WITNESS:  There could be a reason.  I
7 don't recall that I for any reason printed these
8 particular notes.
9      Q.  (BY MR. RUKAVINA)  So as of May 2019, is it
10 your testimony that notes that were papered up by the
11 corporate accounting group would have been saved
12 electronically on the system and not kept by way of
13 paper copies in some file?
14      A.  Correct.  That's right.
15      Q.  This is additional metadata.  And you
16 understand I have a bit of an accent.
17      What are we on?
18      (Off the record.)
19      Q.  (BY MR. RUKAVINA)  Ms. Hendrix, Exhibit 8 is
20 going to be additional metadata for the May 3, 2019,
21 note that we've been looking at, and Exhibit 9 will be
22 the same thing for the May 2 note that we've been
23 looking at.
24      That's 8.  That's 9.
25      (Whereupon, Exhibits 8 & 9 were marked for

---

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part File Page 09724 of 472 Page 164 of 200    PageID 24376

**15 (Pages 57 to 60)**

Kristin Hendrix - October 27, 2021

---

**57**

1        identification.)
2        Q.  (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
3   represent to you again that my office has faithfully
4   printed this metadata out without doctoring or changing
5   anything, and I ask you to assume that.  If I'm wrong
6   on that, then your answers don't count.
7        Ma'am, as I look at these two documents, it
8   says last modified by Kristin Hendrix.
9        Do you see that?
10       A.  Yes.
11       Q.  And that would have -- that could have only
12  been you; correct, in that department?
13       A.  I hope so, yes.
14       Q.  Seeing these two documents, can you agree
15  with me now that it was in fact you that papered up
16  Exhibits 4 and 5?
17       MR. MORRIS:  Objection.  Asked and answered.
18       THE WITNESS:  I would assume so since my name
19  is on it, yes.
20       Q.  (BY MR. RUKAVINA)  Both of these documents
21  say last printed -- I'm sorry.  If you see related
22  dates, it says last printed May 2, 2019, 11:27 A.M.  Do
23  you have any memory or any understanding as to why that
24  date would be there or what last printed might mean?
25       A.  I don't know why it says last printed the day

---

**58**

1   before it was created.  That doesn't make any sense.  I
2   have no idea.
3        Unless, the only thing I could think of is if
4   we changed this template.  When I say "this," the
5   $2.4 million loan, which was papered on the 2nd, and
6   then used it for the next day for the template to
7   update the date, possibly.  I have no idea.
8        Q.  Well, it may be -- and I understand that you
9   don't have any memory; we're speculating a little bit.
10       It may be, looking at Exhibits 8 and 9, that
11  the $2.4 million note was printed on May 2, and then
12  after having been used as the template for the
13  $5 million note, the $5 million note would not have
14  been printed.
15       Does that sound possible?
16       MR. MORRIS:  Objection to the form of the
17  question.
18       THE WITNESS:  Sure, it could be possible.
19       Q.  (BY MR. RUKAVINA)  But you don't have any
20  memory either way?
21       A.  No.  And when these were printed they're
22  printed to PDF, I believe, is probably what that means.
23       Q.  Okay.
24       We're going to switch gears a little bit now,
25  if you want to make a pile of those exhibits.

---

**59**

1   Obviously, you're welcome to use them anytime you need
2   to, but I think we're done with those notes.
3        Going to hand you what we're going to mark as
4   Exhibit 10, which is an email chain produced by the
5   debtor.
6        And I don't know how anyone on the video will
7   see it.  I apologize.  I'll have to send it to you
8   later.
9        (Whereupon, Exhibit 10 was marked for
10       identification.)
11       Q.  (BY MR. RUKAVINA)  Now, if you start with
12  this email chain, it starts on November 19, 2020 from
13  Jack Donohue to you, copying Mr. Seery and various
14  others.
15       Do you see that?
16       A.  Yes.
17       Q.  And Mr. Donohue is asking you to provide him
18  the financial records of HCMFA due to the funds owed
19  the debtor.
20       Do you see that?
21       A.  Yes.
22       Q.  Do you recall that email from Mr. Donohue to
23  you?
24       A.  Yes.
25       Q.  Do you recall any context or subsequent

---

**60**

1   discussions or how that email came to be, or do you
2   just recall getting that email?
3        A.  I just recall getting the email.
4        Q.  You write back, hi Jack, Scott Ellington is
5   going to follow up with the board on this request.
6        Do you see that?
7        A.  Yes.
8        Q.  Do you recall why you told Jack that
9   Mr. Ellington was going to follow up?
10       A.  From what I recall, I had asked Frank
11  Waterhouse if it was okay to send these financials
12  over, and he wanted me to check with Scott Ellington
13  and that was Scott's response.
14       Q.  And did he tell you why he wanted you to
15  check with Scott Ellington?
16       A.  Just to make sure that there were no issues
17  with sending them over.
18       Q.  Mr. Seery writes back, can I get this ASAP.
19  HCMFA is way overdue.
20       Do you see that?
21       A.  Yes.
22       Q.  And Mr. Seery writes again, it's about a week
23  later, and he says, this is an explicit direction from
24  me as CEO of HCMLP.  But it looks like you are the
25  recipient of that December 2 email; correct?

---

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 09/27/24    Page 165 of 200    PageID 24377

**16 (Pages 61 to 64)**

Kristin Hendrix - October 27, 2021

---

**61**

1    A.  Yes.
2    Q.  Do you remember him sending you that email
3  and copying those people?
4    A.  Yes.
5    Q.  Do you remember anything happening in that
6  week between his November 25 and December 2 email along
7  the same discussion lines?
8    A.  I don't remember anything.  I think I was
9  probably left out of any discussions, and if there were
10  any, it was with Scott Ellington and whomever he had
11  discussions with.
12    Q.  Then subsequent, on December 2, Mr. Seery
13  writes, all, Scott and I have spoken and agree that the
14  information should be provided to James immediately.
15       Would that have been James Romey, do you
16  think?
17    A.  Yes.
18    Q.  And who was James Romey?
19    A.  He also worked for DSI.
20    Q.  And then he writes, Kristin, please proceed
21  with James.  If anyone has any questions or issues,
22  please call me.
23       Do you see that?
24    A.  Yes.
25    Q.  Did you proceed with James Romey?

**62**

1    A.  I further made sure that Scott was okay, to
2  confirm.  He said yes, please do, and I did send them
3  to James Romey.
4    Q.  So Mr. Seery has some of it in this email
5  chain, but do you have any understanding as to why
6  either DSI or Mr. Seery in November of 2020 was asking
7  for the financial records of HCMFA?
8    A.  I do not, other than what's in this email.
9    Q.  Did you discuss with either DSI or Mr. Seery
10  or Mr. Waterhouse in November or December 2020 whether
11  the demand notes from HCMFA should be demanded, should
12  be called?
13    A.  I did not have discussions.
14    Q.  Next exhibit is Exhibit 11.  This is another
15  email chain.
16       And I apologize to the folks on the video.
17  I'll have to get it to you during some break.
18    MR. MORRIS:  Hold on one second.
19    MR. RUKAVINA:  Sure.  Off the record.
20    (Off the record.)
21    (Whereupon, Exhibit 11 was marked for
22    identification.)
23    Q.  (BY MR. RUKAVINA)  Exhibit 11, Ms. Hendrix,
24  if you'll go to the beginning of this email chain, is
25  an email on January 6, 2021, again from Mr. Donohue to

**63**

1  you, copying Waterhouse, Seery, a bunch of others.
2       Where he says, at the direction of Jim Seery,
3  please provide DSI with the requested information for
4  each entity below.
5       And you'll see the entity includes both of my
6  clients, NexPoint Advisors and HCMFA.  And the
7  information includes bank statements, income
8  statements, balance sheets, cash flows.
9       Do you see that?
10    A.  Yes.
11    Q.  Do you recall this email?
12    A.  Vaguely, yes.
13    Q.  Did you have any concerns when you received
14  this email?
15    A.  Concerns about the email, no.  I probably
16  checked with -- I would have checked with Frank to make
17  sure it was okay to send this first.
18    Q.  Frank Waterhouse?
19    A.  Yes.
20    Q.  Do you have any understanding as to why
21  Mr. Donohue requested bank statements, income
22  statements, balance sheets for NexPoint and/or HCMFA?
23    A.  I do not.
24    Q.  Did he or anyone at DSI tell you why they
25  were requesting that?

**64**

1    A.  Not that I can recall.
2    Q.  If we go forward in time, you'll see that
3  Mr. Waterhouse is writing back to Mr. Donohue.  And
4  then Mr. Seery interjects and says, these are HCMLP
5  business records.  Please provide them as requested by
6  Jack ASAP.
7       Do you see that?
8    A.  Yes.
9    Q.  And it looks like you were not privy to
10  subsequent communications that Frank and Jim were
11  talking back and forth about this.  You were not privy
12  to those, like you weren't blind copied or anything to
13  your recollection?
14    A.  No.
15    Q.  Did you in fact on or after January 6, 2021,
16  provide Mr. Donohue or anyone on his team the
17  information that he had requested as it relates to
18  NexPoint and/or HCMFA?
19    A.  Without going back to check, I couldn't
20  answer yes or no for certain.
21    Q.  So I think you mentioned when you received
22  the email from Mr. Donohue you would have checked with
23  Frank.  And what do you remember asking Frank or
24  checking with him about?
25    A.  I don't remember asking him specifically.  In

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 09/24/24   Page 166 of 200   PageID 24378

**17 (Pages 65 to 68)**

Kristin Hendrix - October 27, 2021

---

**65**

1  fact, it's possible that Frank just responded on his
2  own here to Jack. Again, would have been a
3  conversation that I can't specifically recall.
4      Q.  Sure. And you don't specifically remember
5  today providing Mr. Donohue any of that information;
6  right?
7      A.  Right.
8      Q.  You don't specifically remember today having
9  a discussion with Mr. Donohue or Seery or anyone else
10 at or about that time as to why they were wanting this
11 information?
12     A.  Correct.
13     Q.  Exhibit 12, Ms. Hendrix, is going to be the
14 December 3, 2020, letter by which Highland called the
15 notes.
16     MR. MORRIS:  Objection to the form of the
17 question if there was one.
18     (Whereupon, Exhibit 12 was marked for
19     identification.)
20     Q.  (BY MR. RUKAVINA)  Are you familiar with
21 Exhibit 12, Ms. Hendrix?
22     A.  No, I haven't seen this.
23     Q.  Prior to today, you don't remember seeing
24 this?
25     A.  No.

---

**66**

1      Q.  I think you're answering no?
2      A.  No, sorry, no.
3      Q.  On or before December 3, 2020, did anyone
4  discuss with you whether Highland should call the
5  demand notes that were outstanding by HCMFA?
6      A.  No.
7      Q.  Do you recall in December 2020 any discussion
8  with anyone at the debtor about the NexPoint
9  $30.7 million term note?
10     A.  Repeat your question again, please.
11     Q.  Sure. So you're familiar, and we'll talk
12 about it in some detail, with the NexPoint
13 $30.7 million note?
14     A.  Yes.
15     Q.  And again, we'll talk about it, but at that
16 point in time that was a term note; correct?
17     A.  Correct.
18     Q.  Do you remember in the December 2020 or
19 November 2020 time frame discussing with anyone at the
20 debtor the status of that NexPoint note?
21     A.  Yes, we would have discussed this on a weekly
22 basis in our cash meetings that we would have had, as
23 identifying that there are payments due on these loans
24 in December.
25     Q.  What weekly cash meetings are you referring

---

**67**

1  to?
2      A.  We had a standing weekly cash meeting with
3  Frank Waterhouse, myself, Jim Seery. I can't recall
4  everyone on it. Some of the DSI folks. We go through
5  cash forecasts. It's a 13-week cash forecast. We go
6  through it every week.
7      It's just to lay out incoming and outgoing
8  payments that are forecasted, of which these term loans
9  were in those forecasts, so they were discussed.
10     Q.  And Mr. Morris produced some of those to me
11 this morning. I haven't had time to go through them.
12     But it is your recollection in November and
13 December of 2020 the fact of the NexPoint term note
14 being out there was known to Mr. Seery?
15     A.  Yes.
16     Q.  And the fact of an upcoming December 31,
17 2020, payment was known to Mr. Seery?
18     A.  Yes.
19     Q.  So with that background, in November and
20 December of 2020, do you remember discussing with
21 anyone anything to the effect of, oh, it really would
22 be better if NexPoint defaulted on that note so we
23 could call it?
24     A.  No.
25     Q.  Did Mr. Seery ever state to you anything in

---

**68**

1  November or December of 2020 about how the debtor might
2  monetize that NexPoint note?
3      A.  No.
4      Q.  Did he discuss with you any potential sale of
5  that promissory note?
6      A.  No.
7      Q.  Did DSI ever discuss with you in November or
8  December 2020 any potential sale of that note?
9      A.  No.
10     Q.  Or how to monetize that note?
11     A.  No.
12     Q.  So -- well, strike that.
13     Did Mr. Seery or anyone at DSI, or anyone at
14 all, in November or December of 2020 state any words to
15 you to the effect that they were hoping that NexPoint
16 would default on that note?
17     A.  Never.
18     Q.  Or that it would be in the debtor's interest
19 for NexPoint to default on that note?
20     A.  No.
21     Q.  In November or December of 2020, do you
22 recall having any discussions with Mr. Seery or anyone
23 at DSI as to the collectibility of that note? And by
24 that I mean whether NexPoint can pay the note?
25     A.  I don't specifically recall. It most likely

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 03/04/24   Page 167 of 200   PageID 24379

**18 (Pages 69 to 72)**

Kristin Hendrix - October 27, 2021

---

**69**

1 came up in cash conversations.
2    Q. I think you were assistant controller back
3 then?
4    A. Yes.
5    Q. Would a discussion of a borrower's ability to
6 repay have been something within your general sphere of
7 responsibility in that time frame?
8      MR. MORRIS: Objection to the form of the
9 question.
10      THE WITNESS: It depends on who the borrower
11 is, and at that time we did -- we had knowledge over
12 that information, so yes.
13    Q. (BY MR. RUKAVINA) Well, you've seen some
14 instructions or requests from Mr. Seery to you and DSI
15 to you for financial information of NexPoint and HCMFA.
16 We've gone through those documents; right?
17    A. Yes.
18    Q. Does that refresh your memory that there was
19 any internal discussion that you were privy to about
20 the ability of HCMFA and/or NexPoint to pay these
21 notes?
22    A. I don't recall that specifically being asked.
23 It could have.
24    Q. Did you ever at any point in time have any
25 employment or officer or any title or role with

---

**70**

1 NexPoint Advisors, LP?
2    A. No.
3    Q. Were you ever the controller or assistant
4 controller for NexPoint Advisors LP?
5    A. No.
6    Q. Did you ever at any point in time have any
7 employment, officer or any title or role at HCMFA?
8    A. No.
9    Q. Were you ever the controller or assistant
10 controller of HCMFA?
11    A. No.
12    Q. So you might have indirectly provided
13 services to those two as part of shared services, but
14 never directly; is that fair?
15      MR. MORRIS: Objection to the form of the
16 question.
17      THE WITNESS: When you say never directly,
18 meaning I was not employed by those entities?
19    Q. (BY MR. RUKAVINA) Correct.
20    A. That's correct.
21    Q. Do you have any understanding -- first of
22 all, NexPoint did not make a payment on December 31,
23 2020; correct?
24    A. Correct.
25    Q. Okay. Do you have any understanding of why

---

**71**

1 not?
2    A. Yes.
3    Q. What's your understanding?
4    A. Either November 30 or December 1, 2020, I
5 received a phone call from Frank Waterhouse that said,
6 no payments are going from any of the Advisors to
7 Highland.
8    Q. Can you be more specific with what he said?
9    A. That's what he said.
10    Q. So he said no payments from the Advisors to
11 Highland?
12    A. Yes.
13    Q. Did he reference the promissory note
14 expressly?
15    A. No.
16    Q. But no payments means?
17    A. Nothing.
18    Q. That would logically in your mind include the
19 promissory note?
20    A. Yes.
21    Q. Did you ask him why?
22    A. No.
23    Q. Did he tell you why?
24    A. No.
25    Q. Did you, prior to January 1, 2021, did you

---

**72**

1 hear from anyone as to why Mr. Waterhouse gave that
2 instruction?
3    A. Not that I recall.
4    Q. Did you, after that November 30 or December 1
5 phone call, did you follow up with him or anyone else
6 about the upcoming note payment?
7    A. I didn't have any reason to.
8    Q. I'm going to -- let me find you a document
9 for a moment.
10      Just so the record is complete, let's include
11 this promissory note. It's going to be Exhibit 13.
12 This is the NexPoint promissory note.
13      (Whereupon, Exhibit 13 was marked for
14      identification.)
15    Q. (BY MR. RUKAVINA) I take it you've seen this
16 promissory note, Exhibit 13?
17    A. Yes.
18    Q. And I think you testified about this before,
19 but just to summarize to save time.
20      This would have been a note that you would
21 not have papered but would have gone through legal
22 because it was a roll-up. Is that generally accurate?
23    A. Yes.
24    Q. And do you have any memory at all of having
25 anything to do with papering up this loan?

---

Kristin Hendrix - October 27, 2021

---

**73**

1     A. Not that I recall.
2     Q. Would you have had, after 2017 and before
3  2021, any role with respect to any payments or upcoming
4  payments on this note, any role at all?
5     A. Yes.
6     Q. What would have been your role or roles?
7     A. That would have been taking direction from
8  Frank Waterhouse or possibly Jim Dondero saying, go
9  ahead and make these payments that are due on these
10  term notes.
11     Q. Would you have recorded on any books or
12  records payments that actually were made?
13     A. Not me personally.
14     Q. Who would have?
15     A. Our accountant, which could have been one of
16  two different people, depending on the time frame.
17     Q. Would you have had any role with respect to
18  recording those payments or is that just something that
19  your group would have done?
20     MR. MORRIS: Objection to the form of the
21  question.
22     THE WITNESS: I would not have had a role.
23  My group would have.
24     Q. (BY MR. RUKAVINA) What about calculating
25  amortization and/or interest payments that are due or

---

**74**

1  upcoming? Who would have done that, you or someone
2  else?
3     A. Our accountant.
4     Q. Do you have any memory of doing that?
5     MR. MORRIS: Objection to the form of the
6  question.
7     THE WITNESS: Not during 2017 through 2019.
8     Q. (BY MR. RUKAVINA) What about 2020?
9     A. No.
10     Q. Going back to that November 30 or December 1
11  telephone call, do you recall who initiated the call?
12     A. To me?
13     Q. The one between you and Mr. Waterhouse.
14     A. Frank called me.
15     Q. Frank called you.
16     And was it just to discuss -- or just to give
17  you that instruction, no payments from the Advisors, or
18  was there other things discussed?
19     A. I could not tell you if something else was
20  discussed on that phone call.
21     Q. Do you remember if it was a long phone call
22  or short?
23     A. Couldn't tell you.
24     Q. Do you remember where you were when he called
25  you?

---

**75**

1     A. At my house.
2     Q. Did you answer on a cell phone or landline?
3     A. My cell phone.
4     Q. Is there any chance in hell that your cell
5  phone would still have a record of that phone call,
6  like what time it was and how long it lasted?
7     MR. MORRIS: Objection to the form of the
8  question.
9     Q. (BY MR. RUKAVINA) I apologize for using
10  hell.
11     MR. MORRIS: And to foundation.
12     THE WITNESS: I have no idea.
13     Q. (BY MR. RUKAVINA) Do you have your cell
14  phone with you right now?
15     A. In the other room.
16     Q. I might ask you during the break to just --
17  we'll take a short break before I'm done, and I'll ask
18  you if you've had a chance to look for November and
19  December 2020 phone logs between you and
20  Mr. Waterhouse. I would ask you to do that, please.
21     A. Sure.
22     Q. And I apologize, I think you said you thought
23  it was a short telephone call?
24     A. I have no idea.
25     Q. Did the telephone call or Mr. Waterhouse's

---

**76**

1  instructions surprise you in any way?
2     A. Nothing surprises me anymore, so no.
3     Q. Did it surprise you back in November or
4  December of 2020?
5     A. No.
6     Q. Did it pique your curiosity?
7     A. Nope.
8     Q. Just another instruction from your boss?
9     A. Yep.
10     Q. Exhibit 14 is going to be a document that
11  we're not sure what it is and we're not sure who
12  prepared it. It appears to be a ledger of charges
13  against and payments on this promissory note.
14     I'm just saying that so the people on the
15  phone know what it is, but you don't have to take what
16  I said as correct.
17     (Whereupon, Exhibit 14 was marked for
18  identification.)
19     Q. (BY MR. RUKAVINA) So Ms. Hendrix, Exhibit 14
20  was produced by the debtor. And I'm going to ask you,
21  do you know what this is or have you seen it before?
22  Can you help us state what it is?
23     A. This looks like it is an amortization
24  schedule of the NexPoint Advisors term loan.
25     Q. Would this have been something that it

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Part 4   Page 169 of 200   PageID 24381
Appendix Part 4   Filed 06/08/24   Page 169 of 200   PageID 24381

20 (Pages 77 to 80)

Kristin Hendrix - October 27, 2021

---

**77**

1  appears to you would have been maintained internally by
2  the debtor, or does it look like it might have been
3  prepared by DSI or someone else for some other reason?
4      A. It looks like the debtor's amortization
5  schedule that they kept.
6      Q. Did the debtor keep an amortization schedule
7  for the NexPoint promissory note, to your knowledge?
8      A. Yes.
9      Q. Did the debtor keep amortization schedules
10 for other term promissory notes?
11     A. Yes.
12     Q. In what format, like Excel spreadsheets or
13 Word documents? What is your recollection for NexPoint
14 specifically?
15     A. Excel.
16     Q. Would that have been on the shared system or
17 something?
18     A. Yes.
19     Q. And who would have been responsible on an
20 ongoing basis to update the NexPoint amortization
21 schedule?
22        MR. MORRIS: Objection to the form of the
23 question.
24        THE WITNESS: Depends on what time you're
25 asking.

---

**78**

1      Q. (BY MR. RUKAVINA) Let's talk about the year
2  of 2020.
3      A. That would have been Hayley Eliason, our
4  accountant at that time.
5      Q. What about the year 2019?
6      A. Still Hayley.
7        MR. RUKAVINA: I'm going to just ask, to
8  preserve the record, Mr. Morris, if he hasn't already,
9  to produce any such Excel spreadsheet in the native
10 form.
11     Q. (BY MR. RUKAVINA) If we look at this,
12 Ms. Hendrix -- and I'm a little confused as to what
13 these entries mean. Maybe you could help me. But
14 columns that say interest paid, principal paid, total
15 paid, do you know what those columns mean?
16     A. Exactly as they state. These are interest
17 and principal payments made on the date that's listed,
18 and then you've got a total.
19     Q. And then they're in brackets because they're
20 negative numbers?
21     A. Correct.
22     Q. So here's what I'm not understanding. Go to
23 the second page.
24        You see there's an entry under interest paid
25 12/30/29 [verbatim] that says negative 530,000 and

---

**79**

1  change but it doesn't use brackets?
2      A. It's a negative number. It's just a
3  formatting issue.
4      Q. What about also on that same page in the
5  other column, principal paid, 5/31/2020, it's a
6  positive number, 575,550.
7        MR. MORRIS: Where are you?
8        MR. RUKAVINA: On page 2 of this exhibit.
9        MR. MORRIS: What date?
10       MR. RUKAVINA: May 31, 2020. And it's the
11 column over, principal paid. It's a positive number,
12 575,000 and change.
13       MR. MORRIS: Got it, thank you.
14     Q. (BY MR. RUKAVINA) Do you see that,
15 Ms. Hendrix?
16     A. Yes.
17     Q. Do you have an understanding of why that
18 number would be positive?
19     A. Actually, I think this looks like an entry to
20 me where the interest is what we call picking. So on
21 the anniversary date of this loan, which is May, from
22 what I can tell, the accrued interest total, which is
23 that 575-, is being rolled into principal.
24        That's what I can tell from looking at it.
25     Q. Okay. Do you have any understanding as to

---

**80**

1  why that would have been done or why that would have
2  been done on that day?
3        MR. MORRIS: Objection to the form of the
4  question.
5        THE WITNESS: Because that's the anniversary
6  date of the loan. I would assume that that's how the
7  loan is written.
8      Q. (BY MR. RUKAVINA) And I think that that
9  Section 1 of the promissory note does say, the unpaid
10 principal balance of this note from time to time
11 outstanding shall bear interest.
12     At the rate of 6 percent per annum from the
13 date hereof until maturity date, compounded annually on
14 the anniversary of the date of this note.
15     Do you see that?
16       MR. MORRIS: Objection to the form of the
17 question.
18       THE WITNESS: Yeah, I see that.
19     Q. (BY MR. RUKAVINA) Assuming that this is the
20 correct amortization schedule for the NexPoint note,
21 and that the numbers in here are correct, if you look
22 at the second page under the column total paid there
23 are a number of entries for 2019.
24     Do you see that, the far right column?
25     A. At the top, yes.

---

Kristin Hendrix - October 27, 2021

**81**

1    Q.  For example, 1.3 million, 2.1 million,
2  1.3 million.
3        Do you see that?
4    A.  Yes.
5    Q.  Assuming that that's correct, do you have any
6  memory or understanding whether in the year 2019, or
7  why NexPoint was making these payments on this
8  promissory note?
9    A.  Without going back and reading through emails
10  I can only assume that, from looking at this, Highland,
11  the debtor, would have needed cash, and so this is one
12  way of getting cash to the debtor.
13    Q.  This is kind of like what we discussed in the
14  beginning, that Mr. Dondero on a cash needed basis
15  would just transfer money between entities?
16    A.  Yes.
17    Q.  Do you have any memory in the first half of
18  2019 whether Highland, the debtor, had any particular
19  need for cash money at that time?
20    A.  We generally always had a need for cash, so
21  yes.
22    Q.  And so if NexPoint was transferring money
23  back to Highland on this note because Highland needed
24  the money, would those have been recorded as
25  prepayments by the debtor?

**82**

1        MR. MORRIS:  Objection to the form of the
2  question.
3        THE WITNESS:  Yes.
4    Q.  (BY MR. RUKAVINA)  Sitting here today, do you
5  have any reason to believe based on the formatting or
6  anything on Exhibit 14 that it's not the amortization
7  schedule as it was maintained by the debtor?
8    A.  I don't have any reason to not believe that
9  it was.
10    Q.  Going to show you a few documents that I'm
11  hopefully going to burn through, but you're certainly
12  entitled to take all the time that you need.
13        So first is going to be a document that
14  Mr. Morris produced this morning.  It's not Bates
15  labeled.  I don't know why.
16        MR. MORRIS:  As I said in my email, my
17  paralegal is sick and so I wanted you to have the
18  documents.  We'll Bates stamp them later, but we have a
19  written record from my email of what we produced to
20  you.
21        MR. RUKAVINA:  You're assuming that I read my
22  emails.
23        MR. MORRIS:  Sorry about that.  I confess,
24  sometimes I don't as well.
25    Q.  (BY MR. RUKAVINA)  So I'm going to hand you

**83**

1  Exhibit 15 and I'm going to represent to you that it's
2  the email that Mr. Morris sent to me today and I've not
3  doctored it in any way.
4        (Whereupon, Exhibit 15 was marked for
5        identification.)
6        MR. MORRIS:  Do you have the email that it
7  was attached to?
8        MR. RUKAVINA:  Somewhere.  I can find it at a
9  break.
10        MR. MORRIS:  I'll let the witness testify.
11  This was attached to an email.  Not my email, but
12  another email.  But I'll let the witness testify.
13        MR. RUKAVINA:  Off the record.
14        (Off the record.)
15    Q.  (BY MR. RUKAVINA)  So you have Exhibit 15.
16        And during the break we established, I don't
17  have a copy of it right now, but you sent Exhibit 15 on
18  August 29, 2020, to Mr. Dondero by email, copying
19  Mr. Waterhouse, as well as a couple of other
20  attachments; is that correct?
21    A.  Correct.
22    Q.  Do you recall what prompted you to send that
23  email and this attachment?
24    A.  Yes.
25    Q.  What?

**84**

1    A.  Frank Waterhouse called me on August 29, and
2  requested that I do so.
3    Q.  Did he tell you why?
4    A.  From what I recall, this was a time when Jim
5  was trying to come up with his bargain or pop land,
6  whatever he referenced it as.  This was all information
7  that Frank said he wanted.
8    Q.  Okay.  So going back to Exhibit 15, what I'm
9  interested in is NexPoint Advisors, the 23,846,000 and
10  change number.
11        Do you see that?
12    A.  Yes.
13    Q.  Where did that number -- or where did this
14  Exhibit 15 come from, if you understand my question?
15    A.  Sure.  These numbers should all be balances
16  off of the corresponding notes that each entity owed to
17  the debtor.
18    Q.  Did you or someone prepare Exhibit 15
19  specifically for that email?  Or was Exhibit 15 already
20  existing somewhere on the system?
21    A.  I believe that we prepared it specifically
22  for this request.
23    Q.  Do you recall who?
24    A.  It was either myself or our accountant.  I
25  don't recall who put it together.

Kristin Hendrix - October 27, 2021

---

**85**

1    Q.  Okay.  And where would that 23 million and
2  change number for NexPoint have come from, an
3  amortization schedule?
4    A.  Yes.
5    Q.  And what about Highland Capital Management
6  Fund Advisors?  You see $10.5 million and change demand
7  on Exhibit 15?
8    A.  Yes.
9    Q.  Where would that $10.5 million number have
10  come from, do you remember?
11    A.  The same.  It would have come off of the
12  amortization schedules for all of their notes.
13    Q.  How was there an amortization schedule for a
14  demand note?
15    A.  Because it's accruing interest.
16    Q.  So sitting here today, you expect there would
17  be some amortization schedule like Exhibit 14 but for
18  HCMFA?
19    A.  Yes.
20    Q.  Now we're going to have an exhibit [verbatim]
21  chain that's going to be marked as Exhibit 16.
22    (Whereupon, Exhibit 16 was marked for
23    identification.)
24    MR. RUKAVINA:  For the folks on the video,
25  Exhibit 16 is the email chain that Mr. Morris used last

---

**86**

1  week regarding the Section 15(c) document.
2    Q.  (BY MR. RUKAVINA)  Are you familiar with this
3  Exhibit 16 email chain, Ms. Hendrix?
4    A.  Yes.
5    Q.  Why are you familiar with it?
6    A.  Well, I'm copied on it, and I saw it
7  yesterday.
8    Q.  Do you have any memory -- well, that's a
9  stupid question.  But prior to yesterday, did you have
10  any memory of this?
11    A.  Yes.
12    Q.  And do you recall the context or the purpose
13  of this exhibit, or this email chain?
14    A.  From what I remember this is the time where
15  information was being prepared for the retail board to
16  re-up the debtor's shared services.
17    Q.  So, here -- you're certainly welcome to read
18  it in its entirety and if you feel like you want to or
19  need to, that's fine.  But I only have one question.
20  Well, one question with two subparts.
21    I'm looking at Ms. Lauren Thedford's,
22  T-h-e-d-f-o-r-d's, email October 6, 2000 [verbatim]
23  where she says, I see the below from the 6/30
24  financials.  NPA, due to HCMLP and affiliates as of
25  June 30, 2020.

---

**87**

1    Do you see that, ma'am?
2    A.  Yes.
3    Q.  23 million 683?
4    A.  Yes.
5    Q.  And you see, HCMFA due to HCMLP as of
6  June 30, 2020, 12,286,000?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    Q.  (BY MR. RUKAVINA)  Strike that.
10    It says 12,286.  What do you take that 12,286
11  to mean?
12    A.  I think that's a typo and it should have
13  said -- well, there's several things wrong with this,
14  from looking at it.
15    She left off three zeros on the end of it.
16  Should have said 12,286,000.  Secondly, that amount is
17  our due to affiliates on HCMFA's books, not just due to
18  HCMLP.
19    Q.  That was going to be my question, why that
20  12,286,000 number didn't jive with the 10,530,000
21  number on Exhibit 15?
22    A.  Yes, there's another loan due to a different
23  affiliate.
24    Q.  So that $12,286,000 amount doesn't mean that
25  it's all due to Highland; is that correct?

---

**88**

1    A.  Correct.
2    Q.  Exhibit 17 is going to be the January 7, 2021
3  notice from the debtor to NexPoint about the default.
4    (Whereupon, Exhibit 17 was marked for
5    identification.)
6    Q.  (BY MR. RUKAVINA)  You've been handed
7  Exhibit 17.  Have you seen this document before?
8    A.  Not that I believe.
9    Q.  And I think we've asked this before, but just
10  to clarify.
11    Did anyone at the debtor, including Mr. Seery
12  or DSI, discuss with you after December 31, 2020 that
13  the payment had not been made and what, if anything,
14  the debtor should do about that?
15    MR. MORRIS:  Objection to the form of the
16  question.
17    THE WITNESS:  I can't recall specific
18  conversations that may or may not have been had around
19  that topic.
20    Q.  (BY MR. RUKAVINA)  Would -- so back then you
21  were the assistant controller, on January 7; right?
22    A.  Yes.
23    Q.  Do you think that back then Mr. Seery or DSI
24  would have sought your advice or input as to what they
25  should do about the missed payment?

---

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 03/04/24    Page 172 of 200    PageID 24384

23 (Pages 89 to 92)

Kristin Hendrix - October 27, 2021

---

**89**

1    A.  No.
2        MR. MORRIS:  Objection to the form of the
3    question.
4        THE WITNESS:  No.
5    Q.  (BY MR. RUKAVINA)  That would have been
6    outside of your purview?
7    A.  Yes.
8    Q.  And you see in this notice in the middle, it
9    says an amount due as of January 8 in the $24,471,000
10   range.
11       Do you see that?
12   A.  Yes.
13   Q.  Do you have any idea, I take it you don't,
14   where that number came from?
15       MR. MORRIS:  Objection to the form of the
16   question.
17       THE WITNESS:  I don't know who provided that
18   number or where it came from.
19   Q.  (BY MR. RUKAVINA)  Do you have any
20   understanding as to why that number is higher than the
21   number on Exhibit 15?
22   A.  My guess would be that Exhibit 15 is just
23   principal balances.
24   Q.  Okay.
25       Exhibit 18, please.

---

**90**

1        (Whereupon, Exhibit 18 was marked for
2        identification.)
3    Q.  (BY MR. RUKAVINA)  Exhibit 18, Ms. Hendrix,
4    is an email chain between you and Mr. Waterhouse on
5    January 12, 2021.  Do you remember this email chain?
6    A.  No.
7    Q.  Do you remember on January 12 Mr. Waterhouse
8    emailing you, asking when the last amort payment due
9    and what the amount was for NexPoint?
10   A.  No.
11   Q.  When was the last time -- well, strike that.
12       Do you remember ever seeing this email
13   between then and today?
14   A.  No.
15   Q.  Do you have any present memory of any
16   communications with Mr. Waterhouse on or about
17   January 12, 2021 regarding the NexPoint default or
18   note?
19   A.  Not specific, no.
20   Q.  Any general memory?
21   A.  Not that I can pinpoint, no.
22   Q.  Were you aware that on or about January 14
23   NexPoint transferred about $1.4 million and change to
24   the debtor?
25   A.  Yes.

---

**91**

1    Q.  Were you aware of it then?
2    A.  Was I aware of what?
3    Q.  That transfer of $1.4 million and change.
4    A.  On January 14?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Did you facilitate that transfer?
8    A.  Yes.
9    Q.  Who told you to make that transfer?
10   A.  Frank Waterhouse.
11   Q.  Did he tell you why?
12   A.  Nope.
13   Q.  He just said make the transfer?
14   A.  Yes.
15   Q.  Did he tell you that it was on account of the
16   NexPoint note?
17   A.  Yes.
18   Q.  Did he tell you how to, if at all, to credit
19   that note for that amount?
20   A.  No.
21   Q.  Sitting here today, you have no memory other
22   than that Frank Waterhouse told you to transfer some
23   $1.4 million on the NexPoint note?
24   A.  Right.
25   Q.  And do you recall, was that oral or written

---

**92**

1    or how would that have been?
2    A.  That was a phone call.
3    Q.  Do you recall who initiated the phone call?
4    A.  Frank called me.
5    Q.  Was that the only topic discussed in that
6    phone call to your memory?
7    A.  Yes.
8    Q.  Did you ask him why the payment or
9    anything -- did you ask him anything at all?
10   A.  No.
11   Q.  And after you made the payment -- or I'm
12   sorry, after you caused the payment to be made, did you
13   take any further steps with respect to the NexPoint
14   note?
15   A.  I forwarded the payment confirmation, showing
16   that the money was sent from NexPoint Advisors to
17   Highland, forwarded that payment confirmation from the
18   bank to Jack Donohue at DSI, letting him know.
19   Q.  Did you let Mr. Donohue or anyone at DSI know
20   about the transfer before the transfer was made?
21   A.  No.
22   Q.  And you sent that by email to Mr. Donohue?
23   A.  Yes.
24   Q.  Did Mr. Donohue thereafter have any
25   discussion with you about that in any way?

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-3   Filed 02/06/24   Page 173 of 200   PageID 24385

24 (Pages 93 to 96)

Kristin Hendrix - October 27, 2021

**93**

1    A.  I have no idea.
2    Q.  He didn't ask what this was for or anything
3  like that?
4    A.  He may have asked what the amount
5  represented.  I can't specifically recall.  But it's
6  possible.
7    Q.  Okay.  Do you recall any discussion about
8  that time, January 14, with Mr. Donohue or
9  Mr. Waterhouse or anyone as to whether that payment
10  would in any way relieve NexPoint of the default or
11  would not relieve NexPoint of the default?
12    A.  No.
13    Q.  Ms. Hendrix, I believe that I am done.  I
14  would like you, however, because it's important, to
15  check your phone.  Would you like a short, five-minute
16  restroom break and just check --
17    A.  Yeah, and I might need help figuring out how
18  to do that.
19    Q.  I'm not saying that it's possible, but I'm
20  going to ask you on the record to look for that
21  November 30 or December 1, 2020 phone call.
22    MR. MORRIS:  We're happy to do that.
23    Q.  (BY MR. RUKAVINA)  But what I would like if
24  you find it, I would like you to tell me the time, the
25  date and the length of that call.

**94**

1    A.  Okay.
2    Q.  Thank you.
3    We'll be back in five minutes.
4    (Off the record.)
5    Q.  (BY MR. RUKAVINA)  Ms. Hendrix, during the
6  break did you look at your phone?
7    A.  I did.
8    Q.  Did you find anything?
9    A.  Sadly, it only goes back to October 5 of
10  2021.
11    Q.  Not surprised.  Thank you.
12    Have I been courteous to you today?
13    A.  Yes.
14    MR. RUKAVINA:  I pass the witness.
15    MR. MORRIS:  Thank you.
16    MR. AIGEN:  Are we ready to move forward?
17    MR. MORRIS:  Yes.  You're a little dark
18  there.
19    MR. RUKAVINA:  Can we increase the volume on
20  that thing?
21    (Off the record.)
22    EXAMINATION
23    Q.  (BY MR. AIGEN)  Good afternoon, Ms. Hendrix.
24  My name is Michael Aigen.  I represent Mr. Dondero,
25  HCMS and HCRE Partners in several of the adversary

**95**

1  proceedings today.
2    I'm going to try to ask you some questions
3  about these adversary proceedings.  I'll try to make it
4  as quick as possible so we don't keep you here.
5    You understand that you're still under oath;
6  is that correct?
7    A.  Correct.
8    Q.  First topic I want to ask you about is one of
9  the defenses in this case related to an oral agreement.
10  Let me start off with this question.
11    Are you aware that some of the defendants in
12  these adversary proceedings have raised a defense that
13  there was a subsequent oral agreement allowing the
14  notes at issue to be potentially forgiven if certain
15  events occurred?
16    A.  I've recently been made aware that this came
17  up, yes.
18    Q.  When you say recently, approximately when?
19    A.  Within the last week.
20    Q.  And where did you learn that from?
21    A.  In my speakings with John Morris just
22  preparing for today.
23    MR. AIGEN:  And John, I'm going to assume
24  that those conversations are privileged?
25    MR. MORRIS:  That's a very fair assumption.

**96**

1    Q.  (BY MR. AIGEN)  Other than the conversation
2  you just referred to with Mr. Morris, have you ever had
3  any other conversations with anyone about this alleged
4  oral agreement that Defendants are contending occurred?
5    A.  No.
6    Q.  So prior to that conversation with Mr. Morris
7  you weren't even aware of this alleged defense related
8  to an oral agreement.  Is that fair to say?
9    A.  That's right.
10    Q.  This is a similar question but slightly
11  different, just to sort of finish this topic.  I'm not
12  asking about this oral agreement as a defense, I'm just
13  asking more generally.
14    Other than this conversation, were you aware
15  generally of any conversations that anyone had where
16  the notes at issue might be forgiven if certain events
17  occurred?
18    MR. MORRIS:  Objection to the form of the
19  question.
20    THE WITNESS:  No.
21    Q.  (BY MR. AIGEN)  Is it fair to say that you
22  haven't had any conversations about this subsequent
23  oral agreement with anyone other than Mr. Morris?
24    A.  That's fair.
25    Q.  You never discussed it with Mr. Seery?

Kristin Hendrix - October 27, 2021

97

1    A.   No.
2    Q.   Never discussed it with Mr. Klos?
3    A.   No.  Well, sorry, Mr. Klos was present when
4  John and I talked about it.  But that's it.
5    Q.   Have you ever made any investigation or
6  effort in order to determine if this oral agreement
7  actually occurred?
8    A.   No.
9    Q.   If there was such an oral agreement to
10 potentially forgive the notes, do you believe that you
11 would have known about such an oral agreement as part
12 of your duties and responsibilities?
13   A.   Yes, I would hope so.
14   Q.   Why do you say that?
15   A.   That's something that should be disclosed in
16 audited financial statements, and me and my team are
17 responsible for preparing those financial statements
18 and presenting them to the auditors as fair and
19 accurate.
20   Q.   And is it fair to say that this oral
21 agreement should have been disclosed to PwC if it was
22 determined that it was material?
23   A.   Yes.
24   Q.   And have you done any sort of analysis to
25 determine whether the oral agreement at issue here

98

1  would have been material for purposes of a PwC audit?
2    A.   I've not done any work, just finding out
3  about it, but from what it sounds like, it would be
4  material.
5    Q.   That's your opinion, that it would have been
6  material; is that fair to say?
7    A.   Fair.
8    Q.   Have you had any discussions with anyone else
9  about whether the oral agreement would have been
10 material?
11   A.   No.
12   Q.   Changing topics a little bit here, are you
13 aware --
14      (Off the record.)
15   Q.   (BY MR. AIGEN)  Are you aware that a few of
16 the loans at issue here, specifically related to HCMS
17 and HCRE, were term loans as opposed to demand loans?
18   A.   Yes.
19   Q.   And are you aware that for those particular
20 loans, there were payments that were supposed to be
21 made but weren't on December 31, 2020?
22   A.   Yes.
23   Q.   Do you have any understanding as to why those
24 payments weren't made with respect to the HCMS and HCRE
25 term loans on December 31, 2020?

99

1    A.   Yes.
2    Q.   Can you tell me why?
3    A.   Sure.  It goes along with the same statement
4  as HCMFA and NPA and the phone call that I got from
5  Frank Waterhouse saying there's no payments coming from
6  any of the affiliates to the debtor.
7    Q.   I may have written that down wrong when you
8  talked about that before, but I believe your earlier
9  testimony when you described that conversation was that
10 there was no more payments coming from the Advisors,
11 not affiliates.
12      Let me ask you then, what was the
13 conversation?  Was it no more payments from affiliates
14 or Advisors?
15   A.   It could have been either.  I probably did
16 say Advisors.  But regardless, those payments would
17 have been directed to me to be made, either by Frank
18 Waterhouse or Jim Dondero.
19      And I would assume that nobody directed me to
20 make those payments because we weren't making any
21 payments from Jim's related parties.  I don't know for
22 a fact, but that's what I would assume.  Those were all
23 under the same umbrella.
24   Q.   And again, let's back up a second.
25      When you refer to Advisors, fair to say that

100

1  that does not include HCMS and HCRE; is that correct?
2    A.   When I say Advisors, I am referring to HCMFA
3  and NPA.
4    Q.   And when you use the term "affiliates,"
5  you're referring to all four; is that correct?
6    A.   Correct.
7    Q.   Just want to make sure we're on the same
8  page.
9      When you answered the previous question you
10 started to get into assumptions and things like that.
11 Let me start off with what your specific recollection
12 of that phone call was.  Tell me as best as you can
13 what you remember Frank telling you?
14   A.   I remember it as being no payments from the
15 Advisors to the debtor.
16   Q.   So you don't remember the instruction being,
17 don't make payments from the affiliates.  It was, don't
18 make payments from the Advisors; is that correct?
19   A.   Correct.
20   Q.   So is it fair to say that you don't remember
21 any instructions telling you not to make any payments
22 from HCMS or HCRE?
23   A.   That's fair.
24   Q.   So if that is the case, why weren't payments
25 made from HCMS or HCRE for December 31, 2020, payment?

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-3 Part 4 Filed 09/08/22    Page 175 of 200    PageID 24387
Appendix Part 4 Page 3834 of 472

26 (Pages 101 to 104)

Kristin Hendrix - October 27, 2021

**101**

1    A.  Sure.  Typically what would have happened is
2  Frank would be talking to Jim Dondero about making
3  these payments and getting his approval to do so,
4  because Jim Dondero is, you know, directing payments
5  out of these entities.
6        I have never -- had never been given the
7  direction to effectuate those payments by anybody.
8    Q.  Is it fair to say, then, that you're not
9  aware of any instructions from anyone saying that the
10  HCMS and HCRE payments should not be made on
11  December 31, 2020?
12    A.  That's fair.
13    Q.  So the reason the payments weren't made is
14  because you never got an affirmative instruction to
15  actually make that payment; is that correct?
16    A.  Correct.
17    Q.  And you're not aware of Mr. Dondero
18  instructing anyone that HCMS and HCRE should not have
19  made the December 31, 2020, payments; is that correct?
20    A.  I'm not aware personally, no.  Correct.
21    Q.  You say personally.  In any way are you aware
22  of such a specific instruction?
23    A.  No.
24    Q.  If that payment was to be made, who at the
25  debtor would have been responsible for making those

**102**

1  payments on behalf of HCMS and HCRE?
2        MR. MORRIS:  Objection to the form of the
3  question.
4        THE WITNESS:  The corporate accounting team.
5    Q.  (BY MR. AIGEN)  And that included you?
6    A.  Yes.
7    Q.  And in December of 2020, were you aware that
8  those payments were due on December 31, 2020?
9    A.  Yes.
10    Q.  Did you make any attempts or efforts to
11  determine whether Mr. Dondero wanted those payments to
12  be made?
13    A.  I did not, no.
14    Q.  Why not?
15    A.  That would have been something that Frank
16  Waterhouse would have done directly with Jim Dondero
17  himself.
18    Q.  Did you have any conversations with anyone
19  about whether the December 31 payments for HCMS and
20  HCRE would be made in December of 2020?
21    A.  Not that I can recall.
22    Q.  And you didn't think it was your
23  responsibility to check on those payments and find out
24  if they should have been made?
25    A.  Right, correct.

**103**

1    Q.  And is that because it's only your job to
2  make payments that you're told to specifically make; is
3  that correct?
4    A.  Yes, in this case, that is correct.
5    Q.  Is it fair to say then that as part of your
6  job responsibilities you've never made a payment to
7  anyone without being specifically told by Mr. Dondero
8  and Mr. Waterhouse?
9    A.  Sorry, say that again.
10    Q.  As part of your job responsibilities, have
11  you ever made a payment to anyone without the specific
12  instruction of Mr. Waterhouse or Mr. Dondero?
13        MR. MORRIS:  Objection to the form of the
14  question.
15        THE WITNESS:  Yes, we make payments all the
16  time.
17    Q.  (BY MR. AIGEN)  So why is this different in
18  that this payment was not made without the specific
19  instructions from Mr. Waterhouse and Mr. Dondero, even
20  though you believed the payment was due on December 31,
21  2020?
22    A.  The difference between making a loan payment
23  and making normal course -- or sorry, normal, ordinary
24  course, you know, overhead expense payments is that
25  something like that is not necessarily what we would

**104**

1  take to Jim Dondero to approve.
2        He doesn't have time to approve every single
3  overhead payment that we're making out of every single
4  entity.  That's what Frank is for.
5        Something that's once a year that's more
6  material in amount, such as a loan payment, that is
7  something that needs to get approved by Jim Dondero.
8    Q.  You say needs to get approved.  What's your
9  basis for that, something in a policy manual, something
10  someone told you?
11    A.  It's a policy that my team followed.  I don't
12  think that it's written in an actual manual anywhere,
13  but anything that's not ordinary course needs to get
14  approved by Jim Dondero.
15    Q.  Is that something that's written in a policy
16  anywhere?
17    A.  Not that I know of.
18    Q.  Were you ever told that payments in the
19  ordinary course can be made without Mr. Dondero's
20  approval but loan payments cannot?
21    A.  Yes, I do recall years ago that Frank and I,
22  possibly Jim, this was years ago, had a conversation
23  that anything ordinary course is up to Frank to
24  approve.  And this is, quite frankly, up to Frank.
25        Whatever he felt Jim needed to sign off on,

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176 Part 4 Filed 08/24/23   Page 176 of 200   PageID 24388

27 (Pages 105 to 108)

Kristin Hendrix - October 27, 2021

**105**

1 that's what Jim would sign off on. This was not my
2 responsibility to make that decision.
3    Q. And in December -- prior to the December 31,
4 2020, due date you didn't have any conversations with
5 anyone about whether this -- these payments that were
6 due should be made; is that correct?
7    A. Correct.
8    Q. And you didn't try to check with anyone to
9 see whether anyone wanted these payments to be made; is
10 that correct?
11    A. Correct.
12    Q. Subsequent to the payment being missed, did
13 you ever have any conversations with anyone about why
14 the payment was not made?
15    A. Not that I recall.
16    Q. So is it fair to say that sitting here today
17 you have no idea why the payments were not made for
18 HCMS and HCRE on December 31, 2020?
19        MR. MORRIS: Objection to the form of the
20 question.
21        THE WITNESS: I don't have any specific
22 evidence telling me why they weren't. I can make
23 assumptions but that's not going to help.
24    Q. (BY MR. AIGEN) Well, did you ever have any
25 conversations with anyone about why those payments were

**106**

1 not made?
2    A. No.
3    Q. You have no idea why they weren't made other
4 than just speculation; is that fair to say?
5    A. Correct.
6        MR. MORRIS: Objection. Asked and answered.
7        THE WITNESS: Correct.
8    Q. (BY MR. AIGEN) And are you aware that with
9 respect to those two loans, some payments were actually
10 made in the next month, in January of 2021?
11    A. Yes.
12    Q. What role, if any, did you have with respect
13 to those payments?
14    A. Frank Waterhouse would call me and tell me to
15 have my team effectuate a wire.
16    Q. And you say would call you. Do you remember
17 this conversation or are you just assuming it occurred?
18        MR. MORRIS: Objection to the form of the
19 question.
20        THE WITNESS: If we sent a payment out, Frank
21 would have told me to do it. I would not have done it
22 on my own.
23    Q. (BY MR. AIGEN) Sitting here today, do you
24 have a specific recollection of the conversation where
25 someone told you to make the January 2021 payments?

**107**

1    A. I can't tell you the exact date, but, yes, I
2 do have a recollection of Frank calling or emailing me
3 to have, I believe it was the HCRE wire sent out for
4 their payment.
5    Q. What about the HCMS payment?
6    A. I don't recall that one as much.
7    Q. Other than the payment being made, do you
8 have any recollection of any other conversations about
9 why the payment was being made?
10    A. No.
11    Q. Are you aware of any conversations that
12 anyone had regarding whether these payments would
13 deaccelerate loans?
14    A. No.
15    Q. Is that something you would normally be part
16 of, conversations like that?
17    A. No.
18    Q. Changing topics here. Not sure if this is an
19 area that you know anything about.
20        Are you familiar with the term, as it's used
21 at Highland, NAV ratio trigger period?
22    A. No.
23    Q. This may go very quick. If I represent to
24 you that it's a term that's used in the -- in the
25 fourth amended limited partnership agreement for

**108**

1 Highland Capital Management, would that refresh your
2 recollection at all?
3    A. No.
4    Q. Fair to say, then, that you have no knowledge
5 as to whether NAV ratio trigger period was ever reached
6 at any time prior to bankruptcy buyouts?
7    A. No, I don't know.
8    Q. Have you ever had any conversations with
9 Nancy Dondero?
10    A. I have not.
11    Q. Never met her?
12    A. No. I may have exchanged an email with her
13 on an invoice, but that's the extent of it. No
14 conversations.
15    Q. In the years leading up to the bankruptcy of
16 Highland Capital, was there any time period where
17 Highland was unable to pay its salaries?
18    A. Salaries?
19    Q. Salaries of its employees?
20    A. No.
21    Q. In the time leading up to the Highland
22 bankruptcy, was there any time period where Highland
23 wasn't able to pay bonuses owed to any of its
24 employees?
25    A. Not that I know of. Not that I can recall.

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176 Part 4 File Page 09904 of 472ge 177 of 200   PageID 24389

28 (Pages 109 to 112)

Kristin Hendrix - October 27, 2021

**109**

1   Q.  Are you aware of any time period leading up
2   to the Highland bankruptcy where Highland was unable to
3   pay its bills?
4       A.  There's times where we would be in a cash
5   flow crunch and we would stretch our AP, but eventually
6   it would get paid.
7       Q.  And I think this is the last topic and we can
8   probably move through this pretty quickly.
9           Are you aware of any loans made by Highland
10  to any of its employees or officers that were forgiven
11  in part or all?
12      A.  Yes.
13      Q.  Which officers or employees are you aware of?
14      A.  I recall there were two employees.  I can't
15  remember one of them, but I believe another, the second
16  one, was Paul Adkins.  Again, I'm just recalling this
17  was years ago.
18      Q.  And these two are the only ones you're aware
19  of?
20      A.  Or I'm sorry, not Paul Adkins, Tim Lawler.
21  It's possible Paul Adkins was the other one, but I
22  can't tell you for sure.
23      Q.  Tim Lawler and some other employee that you
24  can't remember the name of are the only two that you're
25  aware of?

**110**

1       A.  Yes.
2       Q.  This other employee, I know you don't
3   remember the name.  Is there any other description that
4   you can give me, what their position was, how long they
5   worked, or is it just you remember those loans?
6       A.  I just remember we had two employee loans.
7       Q.  Approximately when was this?
8       A.  I couldn't even tell you.  All the years just
9   commingle together.
10      Q.  More than five years ago?
11      A.  Yes.
12      Q.  More than 10 years ago?
13      A.  I couldn't say.
14          MR. AIGEN:  Why don't we take a five-minute
15  break and then I'll either be done or have just a few
16  wrap-up questions.
17          MR. RUKAVINA:  Okay.
18          (Off the record.)
19          FURTHER EXAMINATION
20      Q.  (BY MR. RUKAVINA)  Ms. Hendrix, in May of
21  2019, would you on behalf of Highland alone,
22  unilaterally, have the authority to lend to HCMFA 2.4-
23  and/or $5.0 million?
24      A.  No.
25      Q.  And would you have had any authority on

**111**

1   behalf of HCMFA in May of 2019 to bind HCMFA to such
2   notes?
3       A.  No.
4       Q.  Thank you, ma'am.
5           EXAMINATION
6       Q.  (BY MR. MORRIS)  Ms. Hendrix, can you get out
7   of your pile, Exhibit Number 3.
8           And this is the email from Dave Klos to
9   corporate accounting on May 2nd concerning the
10  $2.4 million that was going to be transferred from
11  HCMLP to HCMFA?
12      A.  Yes.
13      Q.  And how did Mr. Klos characterize that
14  transfer?
15      A.  He called it a new intercompany loan.
16      Q.  What does a new intercompany loan mean to
17  you?
18      A.  That means we are creating a new loan
19  document, sending money out, tracking it as a
20  brand-new, fresh loan.
21      Q.  And he sent this email to an email group
22  called corporateaccounting@hcmlp.com.  Do I have that
23  right?
24      A.  Yes.
25      Q.  Were you included in that email group?

**112**

1       A.  I was.
2       Q.  Can you identify everybody else who you
3   recall being in that email group?
4       A.  Yes.
5       Q.  Who else was in that email group?
6       A.  Dave Klos, Frank Waterhouse, myself, Hayley
7   Eliason, and Blair Roeber.
8       Q.  Okay.  Did Mr. Waterhouse ever tell anybody,
9   to the best of your knowledge, in May 2019 that the
10  transaction should not be booked as a loan?
11      A.  No, not to my knowledge.
12      Q.  You testified earlier that there was, you
13  recall, a similar email the next day with respect to a
14  $5 million transaction.
15          Do you recall that?
16      A.  Yes.
17      Q.  Do you recall if that email also went to
18  corporate accounting?
19      A.  I believe so, yes.
20      Q.  And to the best of your knowledge, would
21  Mr. Waterhouse have been informed on May 3, 2019, that
22  the transaction was being booked by the corporate
23  accounting department as a loan?
24      A.  Yes.
25      Q.  Did Mr. Waterhouse tell you at that time or

Kristin Hendrix - October 27, 2021

---

**113**

1  at any time thereafter that it was a mistake to book it
2  as a loan?
3      A.  No.
4      Q.  Did Mr. Waterhouse tell you at that time or
5  at any time thereafter that he didn't intend to sign
6  the promissory notes?
7      A.  No.
8      MR. RUKAVINA:  Objection.  To the last
9  question, objection to form.
10     Go ahead.
11     Q.  (BY MR. MORRIS)  Okay.  The promissory notes,
12 to be clear, are the two promissory notes that you
13 testified to earlier that have been marked as exhibits
14 in this deposition for $5 million and $2.4 million
15 respectively.
16     With that definition as promissory notes, did
17 Mr. Waterhouse ever tell you at any time that it was a
18 mistake to sign those notes?
19     MR. RUKAVINA:  I'll object to the form.
20     Go ahead.
21     THE WITNESS:  No.
22     Q.  (BY MR. MORRIS)  Did Mr. Waterhouse or
23 anybody -- withdrawn.  I'll go back to the first
24 question.
25     Did Mr. Waterhouse or anybody in the world

---

**114**

1  ever tell you at any time since May of 2019 that it was
2  a mistake to issue the promissory notes as we've
3  defined them?
4      A.  No.
5      Q.  Did Mr. Waterhouse or anybody in the world
6  tell you that Mr. Waterhouse wasn't authorized to affix
7  his signature to those promissory notes?
8      MR. RUKAVINA:  And I'll object.  Assumes
9  facts not in evidence, i.e., the signature.  That's
10 what I've been objecting to.
11     But go ahead and answer.
12     THE WITNESS:  Say it again.
13     Q.  (BY MR. MORRIS)  Did Mr. Waterhouse or
14 anybody in the world tell you at any time that he
15 wasn't authorized to have his signature affixed to the
16 promissory notes?
17     MR. RUKAVINA:  Same objection.
18     THE WITNESS:  No.
19     Q.  (BY MR. MORRIS)  Did you have anything to do
20 with Highland's annual audit?
21     A.  Yes.
22     Q.  What role did you play with respect to
23 Highland's annual audit?
24     A.  I personally was in charge of completely
25 writing the entire audit report for the debtor and for

---

**115**

1  HCMFA.  I oversaw all other aspects of the audit my
2  team carried out.
3      Any requests from the auditors, emails with
4  questions, any issues that arose, all of that went
5  through me.
6      Q.  And did Mr. Waterhouse play a role in
7  relation to the annual audit?
8      A.  Yes.
9      Q.  What is your understanding of
10 Mr. Waterhouse's role?
11     A.  Let's see.  He was in charge of reviewing the
12 financial statements as they were done, so he saw the
13 end product.  He would sign off on the management rep
14 letter.  He signed engagement letters.
15     If there were any big issues, those got --
16 those would be brought to Frank's attention for sure.
17     Q.  Okay.  And are you a CPA?
18     A.  Yes.
19     Q.  And are you familiar with management rep
20 letters?
21     A.  Yes.
22     Q.  What is your understanding of what a
23 management rep letter is?
24     A.  That's basically telling the auditors that
25 everything in the audited report is accurate

---

**116**

1  to the best of their knowledge, they've presented
2  everything that they have fair and accurately, they're
3  not withholding any information.
4      Q.  And do you recall that the -- Highland's 2018
5  audit was completed in early June 2019?
6      A.  Yes.
7      Q.  And did you cause the two promissory notes
8  that we're talking about here to be delivered to
9  PricewaterhouseCoopers in connection with the audit?
10     A.  Yes.
11     Q.  And were those two promissory notes delivered
12 to PricewaterhouseCoopers because they constituted
13 subsequent events?
14     A.  Yes.
15     Q.  Do you recall whether those promissory notes
16 were described in Highland's 2018 audited financial
17 statements?
18     A.  Yes.
19     Q.  And did Mr. Waterhouse or Mr. Dondero ever
20 tell you at any time that there was a mistake in the
21 audited financial statements?
22     A.  No.
23     Q.  Did they ever tell you -- did Mr. Waterhouse
24 or Mr. Dondero or anybody in the world ever tell you at
25 any time that the two notes were mischaracterized in

---

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 05/09/24    Page 179 of 200    PageID 24391
Appendix Part 4 Page 3924 of 472

30 (Pages 117 to 120)

Kristin Hendrix - October 27, 2021

---

**117**

1  the 2018 audited financial statements of Highland
2  Capital?
3      A.  No.
4      Q.  Do you know whether HCMFA also had its annual
5  financial statements audited by PricewaterhouseCoopers?
6      A.  Yes.
7      Q.  Did you play any role in connection with that
8  audit?
9      A.  Yes.
10     Q.  What role did you play in connection with
11  HCMFA's audit of the 2018 financial statements?
12     A.  Same exact role as with the debtors --
13     Q.  And --
14     A.  -- writing the audit report, overseeing all
15  other audit functions.
16     Q.  And did you and your group cause HCMFA to
17  deliver to PricewaterhouseCoopers the two promissory
18  notes that we've been discussing from May 2019?
19     A.  Yes.
20     Q.  Did Mr. Waterhouse or Mr. Dondero or anybody
21  in the world ever tell you that it was a mistake to
22  deliver those promissory notes to PwC in connection
23  with HCMFA's 2018 audit?
24     A.  No.
25     Q.  Were those notes delivered -- withdrawn.

---

**118**

1          Were those notes delivered to
2  PricewaterhouseCoopers because they constituted
3  subsequent events in connection with the 2018 audit?
4      A.  Yes.
5      Q.  Do you recall whether PricewaterhouseCoopers
6  included as a liability on HCMFA's balance sheet the
7  obligations reflected in the two promissory notes at
8  issue?
9          MR. RUKAVINA:  Objection.  Best evidence.
10         Answer.
11         THE WITNESS:  On the 2018 financials?
12     Q.  (BY MR. MORRIS)  Correct.
13     A.  Those would not have been included as
14  liabilities in the 2018 financials.
15     Q.  Do you know if HCMFA completed their audit
16  for 2019?
17     A.  No.
18     Q.  Okay.  Did the notes appear in HCMFA's 2018
19  audited financials under the subsequent events section?
20     A.  Yes.
21         MR. RUKAVINA:  Objection.  Best evidence.
22         Go ahead.
23     Q.  (BY MR. MORRIS)  Did Mr. Dondero or -- did
24  Mr. Waterhouse or Mr. Dondero or anybody in the world
25  ever tell you that it was a mistake to include

---

**119**

1  reference to these notes in HCMFA's 2018 audited
2  financial statements?
3          MR. RUKAVINA:  Same objection.
4          THE WITNESS:  No.
5      Q.  (BY MR. MORRIS)  Okay.  Do you recall, did
6  anybody in the world ever tell you that the
7  transactions described in Exhibit 3 and the other
8  document that you recall should never have been booked
9  as a loan?
10     A.  No.
11     Q.  Did anybody in the world tell you that you
12  made a mistake when you created those promissory notes?
13     A.  No.
14     Q.  Can you pull out what was marked as
15  Exhibit 16.
16         Do you understand that the Advisors provide
17  services to certain retail funds?
18     A.  Yes.
19     Q.  And do you recall that the services are
20  subject to an agreement that's subject to annual
21  review?
22     A.  Yes.
23     Q.  So looking at Exhibit 16, did you understand
24  that the retail board had asked Highland to disclose --
25  I'll just read it from the document on page 2,

---

**120**

1  Bates number ending 881.
2          There's an email from Ms. Thedford that says,
3  quote, are there any material amounts -- withdrawn.
4          Are there any material outstanding amounts
5  currently payable or due in the future, open paren,
6  e.g., notes, close paren, to HCMLP by HCMFA or NexPoint
7  Advisors or any other affiliate that provides services
8  to the funds?
9          Do you see that?
10     A.  Yes.
11     Q.  And were you generally aware that that was
12  part of the annual renewal process?
13     A.  Yes.
14     Q.  And you made some comments earlier about
15  Ms. Thedford's response on the first page.
16         Do you recall that?
17     A.  Yes.
18     Q.  And you actually were able to correct certain
19  mistakes that you perceived in her response.
20         Do I have that right?
21     A.  Correct.
22     Q.  Do you know -- do you see where it says,
23  HCMFA due to HCMLP as of June 30, 2020, let's just call
24  it $12.3 million.
25         Do you see that?

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 1 Filed 09/04/24   Page 180 of 200   PageID 24392

31 (Pages 121 to 124)

Kristin Hendrix - October 27, 2021

---

121

1    A.  Yes.
2    Q.  And above that there is a reference to the
3  6/30 financials.
4       Do you see that?
5    A.  I do.
6    Q.  Do you know what the reference to the 6/30
7  financials is?
8    A.  Yes.
9    Q.  And what is that reference?
10    A.  That is referencing the amounts on the
11  balance sheet at 6/30 that we provided for the 15(c)
12  materials to the board.
13    Q.  Okay.  And does that $12.3 million include,
14  to the best of your knowledge, the principal amount of
15  the two notes that we were talking about?
16    A.  Yes.
17       MR. RUKAVINA:  Objection.  Best evidence.
18       THE WITNESS:  Yes.
19    Q.  (BY MR. MORRIS)  And how do you know that?
20    A.  Because I kept their financials, I know for a
21  fact that it included all of their outstanding notes
22  and it most certainly included these two notes that
23  we've been talking about today.
24    Q.  And to the best of your recollection did
25  HCMFA provide the 6/30 financials to the retail board?

---

122

1    A.  Yes.
2    Q.  And to the best of your knowledge did
3  Mr. Dondero or Mr. Waterhouse or anybody in the world
4  ever tell you that the financial statements that were
5  provided to the retail board were erroneous in any way?
6    A.  No.
7    Q.  Did Mr. Dondero or Mr. Waterhouse or anybody
8  in the world ever tell you that the 6/30 financials
9  that were given to the retail board should not have
10  included the $7.4 million principal amount on the two
11  promissory notes?
12       MR. RUKAVINA:  Objection.  Best evidence.
13       Answer.
14       THE WITNESS:  No.
15    Q.  (BY MR. MORRIS)  Do you know whether -- are
16  you at all familiar with the Advisors' actual response
17  to the retail board in October 2020?
18    A.  Say that again, please.
19    Q.  So this email string is October 2020; right?
20    A.  Right.
21    Q.  And do you understand that this is kind of a
22  discussion between Mr. Waterhouse and Ms. Thedford as
23  to how to respond?
24    A.  Yes.
25    Q.  Have you ever seen the actual response that

---

123

1  was given to the retail board?
2    A.  I likely did.  I can't tell you for certain
3  that I was on the correspondence.
4    Q.  Do you recall any discussion at any time that
5  the $12.3 million number in Ms. Thedford's email should
6  be changed in the final report to the retail board?
7    A.  I don't believe so.
8    Q.  Did anybody ever tell you at any time that
9  the $12.3 million number was incorrect?
10    A.  No.
11    Q.  Did anybody ever tell you at any time that
12  that number wrongly included the $7.4 million reflected
13  in the two notes?
14    A.  No.
15    Q.  Okay.  Do you recall that earlier that
16  summer -- we looked at Exhibit 15?
17    A.  Yep.
18    Q.  And that was an attachment to an email that
19  you personally sent to Mr. Dondero.  We saw that
20  before?
21    A.  Right.
22    Q.  And this Exhibit 15, which was attached to
23  your email, identifies amounts due and owing from
24  NexPoint Advisors; right?
25    A.  Right.

---

124

1    Q.  And it identifies amounts due and owing for a
2  number of different entities, including HCMFA; right?
3    A.  Correct.
4    Q.  Do you know whether the amount included for
5  HCMFA on Exhibit 15 included the principal amount due
6  on the two promissory notes?
7    A.  It does.
8    Q.  Did Mr. Dondero or Mr. Waterhouse ever ask
9  you why -- withdrawn.
10       Did Mr. Dondero or Mr. Waterhouse ever ask
11  you how the $10.5 million number was calculated?
12    A.  No.
13    Q.  Did Mr. Dondero or Mr. Waterhouse ever
14  suggest to you that the number was incorrect?
15    A.  No.
16    Q.  Did Mr. Dondero or Mr. Waterhouse or anybody
17  in the world ever question the number that you gave to
18  Mr. Dondero in the summer of 2020 concerning the
19  principal amount due by HCMFA to HCMLP?
20    A.  No.
21    Q.  Have you ever made a payment -- withdrawn.
22       Have you ever caused a payment to be made in
23  connection with an intercompany loan without receiving
24  the prior approval from either Frank Waterhouse or
25  Mr. Dondero?

---

Kristin Hendrix - October 27, 2021

### 125

1   A.  No.
2   Q.  Has anybody ever said to you that you made a
3   mistake in applying a payment against principal or
4   interest due on an intercompany loan?
5   A.  No.
6   Q.  We saw this morning, and we produced to
7   Mr. Rukavina and he mentioned earlier, 13-week
8   forecasts?  Do you understand that?
9   A.  Yes.
10   Q.  Did you review the 13-week forecasts
11   recently?
12   A.  Yes.
13   Q.  And we're talking specifically about the
14   13-week forecasts for the November/December 2020 time
15   period.  Do you understand that?
16   A.  Yes.
17   Q.  Based on your review of those forecasts, did
18   those forecasts specifically identify the principal and
19   interest that were due on the three term notes as of
20   December 28, 2020?
21   A.  Yes.
22   Q.  And what was the purpose of creating the
23   13-week forecasts?
24   A.  Sure.  That was to keep everybody informed
25   who was on the cash call, Frank Waterhouse, Jim Seery

### 126

1   and others, keep everybody informed of upcoming
2   payments that were due on term loans well in advance.
3         Everybody knew about it.  It was out there
4   for everybody to see that was on these cash calls.
5   Q.  Now, is it your understanding that
6   Mr. Waterhouse -- withdrawn.
7         Did you email these forecasts -- withdrawn.
8         Did anybody email these forecasts to the best
9   of your recollection in late 2020?
10   A.  Yes.
11   Q.  And was it sent to the corporate accounting
12   group that we saw earlier?
13   A.  It was probably sent to Frank, Seery, the DSI
14   guys that were involved with the cash call.
15   Q.  Okay.  And so did you participate in the
16   creation of the 13-week forecasts?
17   A.  Yes.
18   Q.  What role did you play in the creation of the
19   13-week forecasts?
20   A.  I was responsible for creating the entire
21   thing.
22   Q.  Okay.  And based on the work that you did,
23   was one of the purposes to make sure that
24   Mr. Waterhouse was aware of all payments that were
25   coming due under the intercompany notes?

### 127

1   A.  Yes.
2   Q.  And was that information that was included on
3   the reports to Mr. Waterhouse?
4   A.  Yes.
5   Q.  And do you recall whether there were any
6   specific discussions in November or December of 2020
7   concerning those payments -- withdrawn.  That wasn't a
8   good question.
9         Did Mr. Waterhouse or -- withdrawn.
10         Did anybody on behalf of HCMS or HCRE ever
11   instruct you to make the payments that were due under
12   their term notes?
13   A.  No.
14   Q.  Did anybody on behalf of NexPoint ever
15   instruct you to make a payment that was due at year end
16   with respect to the NexPoint term note?
17   A.  No.
18   Q.  Were you authorized to make those payments
19   without the prior approval of either Mr. Waterhouse or
20   Mr. Dondero?
21   A.  No.
22   Q.  I think you testified that there were certain
23   payments that were made in January 2001 under each of
24   the three term notes.
25         Do I have that right?

### 128

1   A.  Correct.
2         MR. RUKAVINA:  2021.
3         MR. MORRIS:  Thank you very much.
4   Q.  (BY MR. MORRIS)  With that amendment, do you
5   understand my question?
6   A.  Yes.
7   Q.  Do you know why the three payments were made
8   in January of 2021 on each of three term notes?
9   A.  Because Frank Waterhouse instructed me to do
10   so.
11   Q.  And he had not instructed you to make those
12   payments prior to that time?
13   A.  Correct.
14   Q.  Did you have to prompt Frank Waterhouse in
15   January of 2021 to make those payments?
16   A.  No.
17   Q.  So based on the 13-week forecast that you
18   prepared and delivered to Mr. Waterhouse, is it your
19   understanding that Mr. Waterhouse knew as early as mid
20   November 2020 that payments would be due under the
21   three term notes at the end of the year?
22   A.  Yes.
23   Q.  And, in fact, did HCMS and HCRE and NexPoint
24   timely make their installment payments that were due at
25   year end 2018?

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 02/09/24    Page 182 of 200    PageID 24394
Appendix Part 4 Page 3954 of 472

33 (Pages 129 to 132)

Kristin Hendrix - October 27, 2021

---

**129**

1    A.  Yes.
2    Q.  And was that done because HCMLP received the
3  instructions of somebody authorized to give the
4  instruction on behalf of those entities?
5    A.  Yes.
6    Q.  Did HCMS and HCRE and NexPoint timely make
7  the installment payments that were due at year end
8  2019?
9    A.  Yes.
10    Q.  And why did they make those payments?
11    A.  Because we were provided instruction and
12  authorization to do so.
13    Q.  Okay.  And is the only reason that the
14  payment wasn't made at year end 2020 because nobody on
15  behalf of the Advisors -- withdrawn.
16      Is the only reason that no payment was made
17  at the end of 2020 is because no one on behalf of
18  NexPoint, HCRE, or HCMS directed HCMLP to make those
19  payments?
20    A.  Correct.
21      MR. AIGEN:  Objection.  Form.
22    Q.  (BY MR. MORRIS)  And you testified earlier to
23  a call that you had with Mr. Waterhouse.  I think you
24  said it was either November 30 or December 1.
25      Do you recall that?

---

**130**

1    A.  Yes.
2    Q.  And did you personally continue to prepare
3  the 13-week forecasts after your conversation with
4  Mr. Waterhouse?
5    A.  Yes.
6    Q.  And did those 13-week forecasts continue to
7  include the payments that were due under the three term
8  notes at the year end?
9    A.  Yes.
10    Q.  And that's information that you gave to
11  Mr. Waterhouse; is that right?
12    A.  Right.
13    Q.  Mr. Rukavina elicited from you the fact that
14  payments of principal hadn't been made on demand notes
15  that were executed in favor of Mr. Dondero's
16  affiliates.
17      Do you recall that?
18    A.  Yes.
19    Q.  Okay.  Was that a topic of conversation with
20  PricewaterhouseCoopers at any time?
21    A.  Yes.
22    Q.  Can you tell me about that conversation?
23    A.  Sure.  As part of our annual audit, the
24  auditors would, you know, make sure that our
25  receivables are collectible.  And if they thought for

---

**131**

1  any reason they weren't, then they were going to raise
2  an issue, a going concern issue.
3      That came up several years in a row with
4  HCMFA.
5    Q.  Do you recall that the three term notes at
6  issue here were all signed on May 31, 2017?
7    A.  Yes.
8    Q.  And all of those term notes involved a
9  roll-up of previously issued demand notes; is that
10  right?
11    A.  Correct.
12    Q.  Do you know why in -- at the end of May 2017
13  NexPoint, HCRE, and HCMS rolled up their demand notes
14  into individualized term notes?
15    A.  Yes.
16    Q.  What is your understanding as to why that
17  happened?
18    A.  That would get the auditors a little bit more
19  comfort over our outstanding loans, ensuring that we
20  have an amortization schedule, an underlying contract,
21  showing that payments will be coming in every year on
22  these outstanding receivables.
23    Q.  Okay.  As the person responsible for
24  preparing Highland's audit, did anybody ever tell you
25  at any time that any of the notes were not valid

---

**132**

1  obligations of the maker?
2    A.  No.
3    Q.  As the person responsible for Highland's
4  audit, did anybody ever tell you at any time that any
5  of the notes at issue should not have been signed?
6    A.  No.
7    Q.  As the person responsible for Highland's
8  audit, did anybody ever tell you at any time that any
9  of the notes at issue were signed by mistake?
10    A.  No.
11    Q.  Did anybody ever tell you at any time that --
12  withdrawn.
13      As the person responsible for Highland's
14  audit, did anybody ever tell you at any time that
15  Mr. Dondero didn't approve of any of the notes?
16    A.  No.
17    Q.  As the person responsible for Highland's
18  audit, did anybody ever tell you at any time that
19  the -- any of the notes at issue were subject to an
20  oral agreement?
21    A.  No.
22    Q.  As the person responsible for Highland's
23  audit, did anybody ever tell you at any time that any
24  of the notes were amended?
25    A.  No.

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4   Filed 03/09/24   Page 183 of 200   PageID 24395
Appendix Part 4 Page 3964 of 472

34 (Pages 133 to 136)

Kristin Hendrix - October 27, 2021

---

**133**

1    Q.  As the person responsible for Highland's
2    audit, did anybody ever tell you at any time that any
3    of the notes would be forgiven?
4    A.  No.
5    Q.  During your 15 years at Highland, has an
6    intercompany loan ever been forgiven in whole or in
7    part?
8    A.  No.
9    Q.  During your -- withdrawn.
10       Can you recall any note that Highland ever
11   held as the payee that was forgiven in whole or in part
12   in the five years prior to bankruptcy, go back to 2014?
13   A.  No.
14   Q.  Is it your understanding as the person
15   responsible for Highland's audit that the forgiveness
16   of notes, if they were in a material amount, would have
17   had to have been disclosed in the audited financial
18   statements?
19   A.  Yes.
20   Q.  So is it fair to say that any evidence of the
21   forgiveness of material amounts would have been
22   disclosed in Highland's financial statements?
23   A.  Yes.
24       MR. MORRIS:  I have no further questions.
25       MR. RUKAVINA:  I have none.

---

**134**

1    MR. AIGEN:  None.
2    MR. RUKAVINA:  Okay.  Thank you very much.
3    (Whereupon, the deposition adjourned at
4    1:19 P.M.)
5    --oOo--
6    I declare under penalty of perjury that the
7    foregoing is true and correct.  Subscribed at
8    _____, Texas, this ____ day  of
9    _____, 2021.
10
11
12   _____
13   KRISTIN HENDRIX
14
15
16
17
18
19
20
21
22
23
24
25

---

**135**

1        CERTIFICATE OF REPORTER
2        I, BRANDON D. COMBS, a Certified Shorthand
3    Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell the
5    truth, the whole truth, and nothing but the truth in the
6    within-entitled cause;
7        That said deposition was taken in shorthand by
8    me, a disinterested person, at the time and place
9    therein stated, and that the testimony of the said
10   witness was thereafter reduced to typewriting, by
11   computer, under my direction and supervision;
12       That before completion of the deposition,
13   review of the transcript was not requested.  If
14   requested, any changes made by the deponent (and
15   provided to the reporter) during the period allowed are
16   appended hereto.
17       I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22       DATED: November 1, 2021
23
24   _____
25       Brandon Combs, Certified Shorthand

---

**136**

1    State of Texas
     Dickman Davenport, Inc. Cert 312
2    4228 North Central Expressway
     Suite 101, Dallas, TX 75206
3    (214) 855-5100  (800) 445-9548
     Email: info@dickmandavenport.com
4    www.dickmandavenport.com
     My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 03/09/24 of 472 Page 184 of 200   PageID 24396

137

Kristin Hendrix - October 27, 2021

**A**

**A.M** 1:22 57:22
**ability** 69:5,20
**able** 108:23
  120:18
**above-styled**
  1:21
**Absolutely** 17:8
**accent** 56:16
**access** 24:7 54:15
**accessed** 44:19
**account** 12:11
  37:7 91:15
**accountant** 16:19
  46:10 73:15
  74:3 78:4 84:24
**accounting** 11:16
  12:8,12,18
  17:14,15,16,21
  18:4 19:9 20:3
  20:12,20 21:13
  31:16,23 35:7
  40:11 45:17
  46:3 51:11,11
  51:18 56:11
  102:4 111:9
  112:18,23
  126:11
**accounts** 13:21
  14:8,15 51:24
**accrued** 79:22
**accruing** 85:15
**accurate** 72:22
  97:19 115:25
**accurately** 116:2
**action** 11:6
**activities** 39:20
**actual** 104:12
  122:16,25
**addition** 39:7
  41:21
**additional** 56:15
  56:20
**adjourned** 134:3
**Adkins** 109:16

109:20,21
**advance** 126:2
**adversary** 94:25
  95:3,12
**advice** 46:20
  88:24
**advised** 38:23
**advisor** 39:1
**Advisors** 1:10
  15:14,17,23
  27:20,23 63:6
  70:1,4 71:6,10
  74:17 76:24
  84:9 85:6 92:16
  99:10,14,16,25
  100:2,15,18
  119:16 120:7
  123:24 129:15
**Advisors'** 122:16
**affiliate** 34:25
  87:23 120:7
**affiliated** 15:11
**affiliates** 18:19
  86:24 87:17
  99:6,11,13
  100:4,17
  130:16
**affirmative**
  101:14
**affix** 50:17 114:6
**affixed** 47:5
  114:15
**afternoon** 94:23
**ago** 33:8 104:21
  104:22 109:17
  110:10,12
**agree** 55:2 57:14
  61:13
**agreed** 25:23
  26:3
**agreeing** 53:24
**agreement** 26:5
  26:15,21 95:9
  95:13 96:4,8,12
  96:23 97:6,9,11

97:21,25 98:9
  107:25 119:20
  132:20
**ahead** 73:9
  113:10,20
  114:11 118:22
**Aigen** 2:18 3:4
  94:16,23,24
  95:23 96:1,21
  98:15 102:5
  103:17 105:24
  106:8,23
  110:14 129:21
  134:1
**Akard** 1:24 2:4
**alleged** 40:16
  96:3,7
**Allocation** 38:24
  39:1
**allowed** 135:15
**allowing** 95:13
**amended** 107:25
  132:24
**amendment**
  128:4
**amort** 19:22 90:8
**amortization**
  73:25 76:23
  77:4,6,9,20
  80:20 82:6 85:3
  85:12,13,17
  131:20
**amount** 19:6,7
  26:10,12 30:12
  32:23 39:3
  43:16 48:15
  49:2 50:9 87:16
  87:24 89:9 90:9
  91:19 93:4
  104:6 121:14
  122:10 124:4,5
  124:19 133:16
**amounts** 35:8
  40:2 120:3,4
  121:10 123:23

124:1 133:21
**analysis** 97:24
**and/or** 50:13,18
  63:22 64:18
  69:20 73:25
  110:23
**anniversary**
  79:21 80:5,14
**annual** 114:20,23
  115:7 117:4
  119:20 120:12
  130:23
**annually** 80:13
**annum** 80:12
**answer** 7:6,6
  23:11,14 35:2
  39:19 51:5 52:3
  64:20 75:2
  114:11 118:10
  122:13
**answered** 41:4
  51:3 57:17
  100:9 106:6
**answering** 66:1
**answers** 42:10
  43:1 57:6
**anybody** 35:25
  40:8 101:7
  112:8 113:23
  113:25 114:5
  114:14 116:24
  117:20 118:24
  119:6,11 122:3
  122:7 123:8,11
  124:16 125:2
  126:8 127:10
  127:14 131:24
  132:4,8,11,14
  132:18,23
  133:2
**anymore** 76:2
**anytime** 21:10
  59:1
**AP** 11:17 12:23
  32:7 109:5

**apologize** 15:6
  59:7 62:16 75:9
  75:22
**appear** 118:18
**APPEARANC...**
  2:1
**appeared** 2:5,12
  2:19
**appears** 47:1
  76:12 77:1
**appended** 135:16
**applying** 125:3
**approval** 16:5,8
  48:12 49:4
  50:25 51:2
  101:3 104:20
  124:24 127:19
**approve** 48:15
  49:5 104:1,2,24
  132:15
**approved** 48:18
  48:19,21 104:7
  104:8,14
**approximately**
  95:18 110:7
**April** 12:7
**area** 107:19
**arose** 115:4
**ASAP** 60:18 64:6
**asked** 51:3 57:17
  60:10 69:22
  88:9 93:4 106:6
  119:24
**asking** 6:10 26:7
  29:17,19,24
  59:17 62:6
  64:23,25 77:25
  90:8 96:12,13
**aspects** 115:1
**assistant** 12:6
  69:2 70:3,9
  88:21
**associate** 11:18
  32:7
**assume** 6:25

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-3 Part Filed 09/30/24 of 472 Page 185 of 200    PageID 24397

138

Kristin Hendrix - October 27, 2021

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

_____

**B**

**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

_____

**C**

**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:21
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:13
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 05/09/24   Page 186 of 200   PageID 24398

139

Kristin Hendrix - October 27, 2021

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
**categorize** 24:6
**cause** 1:21 22:6
116:7 117:16
135:6,20
**caused** 39:16
92:12 124:22
**cell** 75:2,3,4,13
**Central** 136:2
**CEO** 13:23 60:24
**Cert** 136:1
**certain** 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
**certainly** 82:11
86:17 121:22
**certificate** 53:14
53:18,20 135:1
**certified** 16:19
135:2,25
**certify** 135:3,17
**CFO** 13:9,13,22
23:12 25:10
**chain** 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
**chance** 75:4,18
**change** 32:11
79:1,12 84:10
85:2,6 90:23
91:3
**changed** 58:4
123:6
**changes** 43:15

44:2 49:1
135:14
**changing** 57:4
98:12 107:18
**characterize**
24:13 111:13
**charge** 13:19
18:7 114:24
115:11
**charged** 10:10
**charges** 76:12
**chase** 15:9
**check** 60:12,15
64:19 93:15,16
102:23 105:8
**checked** 63:16,16
64:22
**checking** 64:24
**checks** 13:18
**clarify** 47:14
88:10
**clear** 6:20 113:12
**clearly** 38:13
**clients** 63:6
**close** 120:6
**collect** 28:21
**collectibility**
68:23
**collectible** 130:25
**collection** 30:14
**collects** 27:3
**college** 10:20
11:10,14
**column** 79:5,11
80:22,24
**columns** 78:14,15
**Combs** 1:22
135:2,25
**come** 84:5,14
85:2,10,11
**comes** 31:8
**comfort** 131:19
**comfortable**
50:23
**coming** 16:6

48:25 99:5,10
126:25 131:21
**comma** 15:4
**comments** 120:14
**commingle** 110:9
**commission**
136:4
**common** 40:10
**communicate**
23:17
**communicated**
23:23
**communicating**
23:24
**communications**
23:22 64:10
90:16
**companies** 52:14
**company** 39:10
44:13
**compensate**
40:15
**compensation**
25:17,21 26:1,6
26:20,22 27:4
39:9,12
**competent** 24:18
24:20,21
**complete** 72:10
**completed** 116:5
118:15
**completely** 17:3
47:8 114:24
**completion**
135:12
**compliance**
17:14
**comport** 44:20
**compounded**
80:13
**computer** 47:16
135:11
**computerized**
1:24
**concern** 131:2

**concerning** 111:9
124:18 127:7
**concerns** 63:13
63:15
**condescending**
25:3
**conduct** 38:3
**confess** 82:23
**confident** 37:22
**confirm** 62:2
**confirmation**
92:15,17
**confused** 78:12
**confusion** 47:15
**connection** 116:9
117:7,10,22
118:3 124:23
**consent** 39:1,24
**consist** 26:1
**constituted**
116:12 118:2
**consulted** 46:13
**contact** 6:9,11
**contending** 96:4
**context** 31:13
44:1 59:25
86:12
**continue** 130:2,6
**contract** 131:20
**controller** 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
**conversation**
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
**conversations**
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
**copied** 64:12
86:6
**copies** 55:14
56:13
**copy** 83:17
**copying** 59:13
61:3 63:1 83:18
**corporate** 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
102:4 111:9
112:18,22
126:11
**corporateacco...**
111:22
**correct** 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176 Part 4 Filed 04/04/24   Page 187 of 200   PageID 24399

140

Kristin Hendrix - October 27, 2021

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
**correctly** 32:18
33:23
**correspondence**
123:3
**corresponding**
84:16
**counsel** 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
**count** 42:10 43:1
57:6
**couple** 83:19
**course** 6:9 46:18
55:3 103:23,24
104:13,19,23
**courses** 16:15,16
**court** 1:1 6:18
27:13 30:13,25
**courteous** 94:12
**CPA** 10:24 11:2
11:6,21 115:17
**create** 43:12,18
45:8 48:17
**created** 18:21
44:18,19,21
48:7 58:1
119:12
**creating** 13:21
111:18 125:22
126:20
**creation** 126:16
126:18
**credit** 91:18

**crunch** 109:5
**CSR** 1:23
**curiosity** 76:6
**current** 11:2
**currently** 11:19
120:5
**cut** 15:9

──────────
**D**
**D** 1:22 135:2
**Dallas** 1:3,25 2:4
2:18 136:2
**dark** 94:17
**date** 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
**dated** 30:20
31:16 135:22
**dates** 57:22
**Dave** 8:24 34:18
34:23 38:13
46:7 111:8
112:6
**Davenport** 136:1
**David** 3:14 13:1
31:16 33:17
**DAVOR** 2:5
**day** 48:15 57:25
58:6 80:2
112:13 134:8
**days** 9:23,25 10:5
28:17
**deaccelerate**
107:13
**deal** 20:21 36:25
**debtor** 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
**debtor's** 40:16
68:18 77:4
86:16
**debtors** 117:12
**Dec** 4:3,11
**December** 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
**decided** 26:2,3
40:14 52:15,18
**deciding** 23:8
**decision** 29:14
105:2
**declare** 134:6
**default** 68:16,19

88:3 90:17
93:10,11
**defaulted** 67:22
**defendants** 1:11
1:20 2:6,20
95:11 96:4
**defense** 95:12
96:7,12
**defenses** 95:9
**defined** 114:3
**definition** 113:16
**degree** 10:22
**deliver** 117:17,22
**delivered** 116:8
116:11 117:25
118:1 128:18
**demand** 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
**demanded** 62:11
**demanding** 24:13
**Denton** 10:15
**department**
11:17 18:2,5,8
18:12 51:12
57:12 112:23
**depend** 18:17
**depended** 49:16
**depending** 73:16
**depends** 18:16
69:10 77:24
**deponent** 135:14
**deposed** 6:13
28:2
**deposition** 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
**describe** 12:18
53:16
**described** 17:17
99:9 116:16
119:7
**description** 14:1
110:3
**detail** 66:12
**details** 17:5
25:14 28:7
**determine** 97:6
97:25 102:11
**determined**
97:22
**Dickman** 136:1
**difference** 103:22
**different** 19:25
54:19 73:16
87:22 96:11
103:17 124:2
**direct** 27:7
**directed** 99:17,19
129:18
**directing** 48:16
101:4
**direction** 23:12
53:21 60:23
63:2 73:7 101:7
135:11
**directions** 48:25
**directly** 40:9,22
41:12 49:1
70:14,17
102:16
**disciplinary** 11:5
**disclose** 119:24
**disclosed** 97:15
97:21 133:17
133:22
**discretionary**
26:8
**discuss** 62:9 66:4
68:4,7 74:16

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 09/04/24   Page 188 of 200   PageID 24400

141

Kristin Hendrix - October 27, 2021

88:12
discussed 28:8
  38:4 43:13
  66:21 67:9
  74:18,20 81:13
  92:5 96:25 97:2
discussing 66:19
  67:20 117:18
discussion 9:5
  50:21 61:7 65:9
  66:7 69:5,19
  92:25 93:7
  122:22 123:4
discussions 9:8
  25:20 28:11,12
  28:17 40:6 60:1
  61:9,11 62:13
  68:22 98:8
  127:6
disinterested
  135:8
distinct 29:3
  45:24
DISTRICT 1:2
DIVISION 1:3
doctor 42:11
doctored 83:3
doctoring 42:24
  57:4
document 32:25
  47:2 49:19 72:8
  76:10 82:13
  86:1 88:7
  111:19 119:8
  119:25
documentation
  9:16
documentations
  47:8
documents 9:18
  10:7 42:6 43:7
  43:9 44:3 47:9
  48:5,18 49:8,13
  50:2,3,11 54:11
  57:7,14,20

69:16 77:13
  82:10,18
doing 6:7 43:8
  45:20 74:4
dollar 19:7 40:2
  48:15 49:2 50:9
Dondero 2:20 5:2
  15:12 21:11,20
  21:21 22:6,19
  23:7,14,18,23
  23:24 24:2,7
  34:19 35:24
  36:2 40:14,20
  52:12,19,22
  53:7 73:8 81:14
  83:18 94:24
  99:18 101:2,4
  101:17 102:11
  102:16 103:7
  103:12,19
  104:1,7,14
  108:9 116:19
  116:24 117:20
  118:23,24
  122:3,7 123:19
  124:8,10,13,16
  124:18,25
  127:20 132:15
Dondero's
  104:19 130:15
Donohue 59:13
  59:17,22 62:25
  63:21 64:3,16
  64:22 65:5,9
  92:18,19,22,24
  93:8
door 35:1
draft 17:24
drafted 17:1,3
drafting 16:16
  17:22,23 18:12
  19:16,21 20:12
  29:13
drive 54:9,16
  55:14

drukavina@m...
  2:7
DSI 61:19 62:6,9
  63:3,24 67:4
  68:7,13,23
  69:14 77:3
  88:12,23 92:18
  92:19 126:13
due 16:6 59:18
  66:23 73:9,25
  86:24 87:5,17
  87:17,22,25
  89:9 90:8 102:8
  103:20 105:4,6
  120:5,23
  123:23 124:1,5
  124:19 125:4
  125:19 126:2
  126:25 127:11
  127:15 128:20
  128:24 129:7
  130:7
duly 1:19 6:2
  135:4
duties 12:19
  97:12
duty 20:25

—— E ——
E-l-l-i-n-g-t-o-n
  18:9
e-signature 47:10
  47:12 48:1,4,5
  48:8,9,12,18
  49:9,15,18 50:1
  50:13,17,23
e.g 120:6
earlier 43:14
  45:7 99:8
  112:12 113:13
  120:14 123:15
  125:7 126:12
  129:22
early 116:5
  128:19

earn 26:23
educational
  10:18
effect 54:11
  67:21 68:15
effectuate 101:7
  106:15
effort 97:6
efforts 102:10
either 18:21
  29:13,20 31:1
  34:17,23 37:3
  46:7,13 50:1
  54:12 58:20
  62:6,9 71:4
  84:24 99:15,17
  110:15 124:24
  127:19 129:24
  135:18
electronic 54:22
electronically
  56:3,12
Eliason 46:7 78:3
  112:7
elicited 130:13
Ellington 4:3
  18:9 60:4,9,12
  60:15 61:10
email 2:7,14,22
  3:14 4:3,7,21
  5:1,5 23:17
  31:12,15,20,23
  32:1,4,20,25
  33:3,25 36:3
  37:10,19,25
  38:14 41:17,21
  42:5 48:20
  50:11 54:11
  59:4,12,22 60:1
  60:2,3,25 61:2
  61:6 62:4,8,15
  62:24,25 63:11
  63:14,15 64:22
  82:16,19 83:2,6
  83:11,11,12,18

83:23 84:19
  85:25 86:3,13
  86:22 90:4,5,12
  92:22 108:12
  111:8,21,21,25
  112:3,5,13,17
  120:2 122:19
  123:5,18,23
  126:7,8 136:3
emailing 90:8
  107:2
emails 9:16,18
  41:18 49:23
  81:9 82:22
  115:3
employed 11:21
  70:18
employee 109:23
  110:2,6
employees 16:3
  108:19,24
  109:10,13,14
employment 26:5
  26:15 69:25
  70:7
engagement
  115:14
ensuring 131:19
entire 11:17
  114:25 126:20
entirety 86:18
entities 15:11
  21:16 22:6,12
  22:19 70:18
  81:15 101:5
  124:2 129:4
entitled 82:12
entity 21:20,22
  22:7 23:2 35:14
  53:13 63:4,5
  84:16 104:4
entries 78:13
  80:23
entry 78:24 79:19
erroneous 122:5

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 04/04/24    Page 189 of 200    PageID 24401
Appendix Part 4 Page 04024 of 472

142

Kristin Hendrix - October 27, 2021

| | | | | |
|---|---|---|---|---|
| **error** 38:22 39:9 39:16,21,23 40:10 44:7 | 4:21 5:1,5 30:14,15,18,19 30:21 31:15,18 | **Expressway** 136:2 | **filed** 28:24,25 29:6,8 30:13,24 | **flows** 63:8 **focus** 12:17 |
| **established** 9:11 28:8 83:16 | 32:21 33:1 34:4 34:11 35:21 | **extent** 108:13 **external** 46:14 | **files** 32:25 **filing** 18:25 | **folders** 18:25 **folks** 62:16 67:4 85:24 |
| **estimate** 20:10 | 36:20 37:19 | **eye** 6:9 | **final** 123:6 | **follow** 47:23 60:5 |
| **event** 135:19 | 38:12 42:15,16 | _____ | **finance** 10:22 | 60:9 72:5 |
| **events** 38:21 | 43:6,21 44:18 | **F** | **financial** 4:4 | **follow-up** 4:23 |
| 95:15 96:16 | 44:19 56:19,21 | **faced** 11:5 | 12:22 59:18 | **followed** 104:11 |
| 116:13 118:3 | 59:4,9 62:14,14 | **facilitate** 91:7 | 62:7 69:15 | **following** 47:22 |
| 118:19 | 62:21,23 65:13 | **fact** 21:18 49:5 | 97:16,17 | **follows** 6:2 |
| **eventually** 109:5 | 65:18,21 72:11 | 57:15 64:15 | 115:12,25 | **forecast** 67:5 |
| **everybody** 25:13 | 72:13,16 76:10 | 65:1 67:13,16 | 116:16,21 | 128:17 |
| 112:2 125:24 | 76:17,19 79:8 | 99:22 121:21 | 117:1,5,11 | **forecasted** 67:8 |
| 126:1,3,4 | 82:6 83:1,4,15 | 128:23 130:13 | 119:2 122:4 | **forecasts** 12:21 |
| **evidence** 105:22 | 83:17 84:8,14 | **facts** 114:9 | 133:17,22 | 13:21 17:18 |
| 114:9 118:9,21 | 84:18,19 85:7 | **fair** 17:5 21:19 | **financials** 12:23 | 67:5,9 125:8,10 |
| 121:17 122:12 | 85:17,20,21,22 | 22:3 23:21 35:5 | 37:18 41:8 | 125:14,17,18 |
| 133:20 | 85:25 86:3,13 | 42:20 70:14 | 60:11 86:24 | 125:23 126:7,8 |
| **exact** 25:25 36:5 | 87:21 88:2,4,7 | 95:25 96:8,21 | 118:11,14,19 | 126:16,19 |
| 37:14 48:5,13 | 89:21,22,25 | 96:24 97:18,20 | 121:3,7,20,25 | 130:3,6 |
| 107:1 117:12 | 90:1,3 111:7 | 98:6,7 99:25 | 122:8 | **foregoing** 134:7 |
| **Exactly** 78:16 | 119:7,15,23 | 100:20,23 | **find** 31:13 72:8 | 135:4 |
| **Examination** 3:3 | 123:16,22 | 101:8,12 103:5 | 83:8 93:24 94:8 | **forgive** 97:10 |
| 3:4,5,6 6:3 | 124:5 | 105:16 106:4 | 102:23 | **forgiven** 95:14 |
| 94:22 110:19 | **exhibits** 3:8 30:6 | 108:4 116:2 | **finding** 98:2 | 96:16 109:10 |
| 111:5 | 42:17 43:4 | 133:20 | **fine** 47:8 48:2,4 | 133:3,6,11 |
| **example** 81:1 | 44:21 45:22 | **fairly** 36:15 | 86:19 | **forgiveness** |
| **Excel** 77:12,15 | 46:19 48:11,19 | **faithfully** 57:3 | **finish** 96:11 | 133:15,21 |
| 78:9 | 50:13,17 52:8 | **familiar** 27:13 | **finished** 31:10 | **form** 14:14,21 |
| **exchanged** | 55:17,24 56:25 | 65:20 66:11 | **finishing** 46:14 | 15:24 16:22 |
| 108:12 | 57:16 58:10,25 | 86:2,5 107:20 | **firm** 18:22 44:16 | 17:6 18:14 |
| **excluding** 28:16 | 113:13 | 115:19 122:16 | **first** 6:2 9:1 | 19:11 20:23 |
| 29:18 | **existing** 84:20 | **family** 23:4 | 11:13 20:11 | 22:8,21 24:8,15 |
| **execute** 48:18 | **expect** 85:16 | <mark>**far** 20:14,16</mark> | 63:17 70:21 | 28:3 34:6 35:10 |
| 49:5 | **expense** 103:24 | 24:19,21 49:7 | 81:17 82:13 | 36:13 37:11 |
| **executed** 18:24 | **expertise** 16:18 | 80:24 | 95:8 113:23 | 38:7 39:17 41:1 |
| 47:9 130:15 | **expires** 136:4 | **favor** 130:15 | 120:15 | 41:13 45:3 46:4 |
| **executing** 19:17 | **Explain** 19:19 | **February** 12:2 | **five** 51:4 94:3 | 47:20 48:22 |
| **execution** 18:13 | **explained** 6:15 | 26:4 | 110:10 133:12 | 49:10,20 50:4 |
| 20:12 32:15 | 31:7 | **fee** 39:1,24 | **five-minute** | 51:14,20 52:1 |
| **exhibit** 3:10,12 | **explicit** 60:23 | **feel** 86:18 | 93:15 110:14 | 53:9 55:5,19 |
| 3:14,17,19,21 | **explicitly** 32:5 | **fell** 13:24 | **fixing** 55:15 | 56:4 58:16 |
| 3:23,25 4:1,3,7 | 53:1 | **felt** 104:25 | **flip** 46:25 | 65:16 69:8 |
| 4:11,14,17,19 | **expressly** 71:14 | **figuring** 93:17 | **Floor** 1:25 2:11 | 70:15 73:20 |
| | | **file** 56:13 | **flow** 109:5 | |

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-2   Filed 04/02/24   Page 190 of 200   PageID 24402
Appendix Part 4 Page 4034 of 4743

143

Kristin Hendrix - October 27, 2021

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
**format** 77:12
**formatting** 79:3
82:5
**forth** 64:11
**forward** 64:2
94:16
**forwarded** 92:15
92:17
**found** 54:9
**foundation** 75:11
**four** 9:8,12 100:5
**fourth** 107:25
**frame** 17:12
66:19 69:7
73:16
**Frank** 4:21 7:10
7:21 8:1 13:7,8
23:13 24:5
34:19,23 35:24
38:14 52:19
53:20 60:10
63:16,18 64:10
64:23,23 65:1
67:3 71:5 73:8
74:14,15 84:1,7
91:10,22 92:4
99:5,17 100:13
101:2 102:15
104:4,21,23,24
106:14,20
107:2 112:6
124:24 125:25
126:13 128:9
128:14
**Frank's** 115:16
**frankly** 104:24
**fresh** 111:20

**Friday** 9:1,4
**function** 12:21
**functions** 117:15
**fund** 1:9 27:23
38:24 39:2,2,8
85:6
**funds** 38:23
59:18 119:17
120:8
**further** 3:5 10:23
32:15 62:1
92:13 110:19
133:24 135:17
**future** 14:7 16:5
120:5

**G**
**gears** 58:24
**general** 34:21
46:18 54:20
69:6 90:20
**generally** 13:17
13:24 19:13
34:8 35:2 43:10
72:22 81:20
96:13,15
120:11
**getting** 11:20
18:24 48:11
60:2,3 81:12
101:3
**give** 20:10 31:13
74:16 110:4
129:3
**given** 49:18
101:6 122:9
123:1
**gives** 16:19
**giving** 53:21 54:5
**Global** 38:23
39:1
**go** 10:12 17:5
44:4,24 48:1
55:1 62:24 64:2
67:4,5,11 73:8

78:22 107:23
113:10,20,23
114:11 118:22
133:12
**goes** 94:9 99:3
**going** 6:25 17:12
20:9,16 26:23
27:3 29:16 30:6
30:10,14,18
34:3 40:6 42:7
42:20 44:2
50:22 52:8
54:18 56:20
57:2 58:24 59:3
59:3 60:5,9
64:19 65:13
67:7 71:6 72:8
72:11 74:10
76:10,20 78:7
81:9 82:10,11
82:13,25 83:1
84:8 85:20,21
87:19 88:2
93:20 95:2,23
105:23 111:10
131:1,2
**good** 6:4 24:17
26:24 94:23
127:8
**governs** 26:11
**graduated** 10:21
11:9,12
**great** 53:20
**greater** 16:19
**group** 14:4 17:13
19:9,10,16 20:3
31:24 35:7,22
37:22 40:11
43:14 45:7,18
46:3 49:16
51:18 56:11
73:19,23
111:21,25
112:3,5 117:16
126:12

**guarding** 24:7
**guess** 89:22
**guys** 126:14

**H**
**H-i-l-l-i-s** 32:12
**half** 81:17
**hand** 59:3 82:25
**handed** 88:6
**handle** 20:12
50:8
**handled** 20:4,21
**happened** 20:7
21:8 36:11,11
37:21 101:1
131:17
**happening** 20:11
61:5
**happy** 23:3 93:22
**HARDT** 2:3
**HARR** 2:3
**Hayley** 32:2,14
46:7 78:3,6
112:6
**Hayley's** 46:8
**HCM** 4:4,9
**HCMF** 3:25 4:1
**HCMFA** 3:15 4:4
27:10,22 28:1
28:13 29:6
30:12,19 32:13
38:19,23 39:12
40:1,15 53:25
59:18 60:19
62:7,11 63:6,22
64:18 66:5
69:15,20 70:7
70:10 85:18
87:5 99:4 100:2
110:22 111:1,1
111:11 115:1
117:4,16
118:15 120:6
120:23 121:25
124:2,5,19

131:4
**HCMFA's** 39:8
87:17 117:11
117:23 118:6
118:18 119:1
**HCMLP** 3:15
4:19 5:6 32:13
60:24 64:4
86:24 87:5,18
111:11 120:6
120:23 124:19
129:2,18
**HCMS** 2:20
94:25 98:16,24
100:1,22,25
101:10,18
102:1,19
105:18 107:5
127:10 128:23
129:6,18
131:13
**HCRE** 2:20
94:25 98:17,24
100:1,22,25
101:10,18
102:1,20
105:18 107:3
127:10 128:23
129:6,18
131:13
**hear** 72:1
**heard** 40:17,20
**held** 12:8 133:11
**hell** 75:4,10
**help** 76:22 78:13
93:17 105:23
**helped** 12:20
**Hendrix** 1:14,18
5:5 6:1,6 30:10
30:23 56:19
57:2,8 62:23
65:13,21 76:19
78:12 79:15
86:3 90:3 93:13
94:5,23 110:20

Kristin Hendrix - October 27, 2021

**I**

111:6 134:13
**hereof** 80:13
**hereto** 135:16
**hi** 60:4
**higher** 89:20
**Highland** 1:6,9
  10:2 11:13,21
  12:5,19 13:10
  14:4,4,11,22,23
  15:3 16:10
  17:10,13,21
  18:1,11 21:5
  25:6,15 26:4,9
  26:24 27:2,2,22
  28:12 51:7,10
  51:19 65:14
  66:4 71:7,11
  81:10,18,23,23
  85:5 87:25
  92:17 107:21
  108:1,16,17,21
  108:22 109:2,2
  109:9 110:21
  117:1 119:24
  133:5,10
**Highland's** 7:23
  7:25 8:19,22
  114:20,23
  116:4,16
  131:24 132:3,7
  132:13,17,22
  133:1,15,22
**Hillis** 32:12
**history** 11:9
**Hold** 62:18
**hope** 57:13 97:13
**hopefully** 82:11
**hoping** 68:15
**house** 75:1
**hundreds** 50:7
  51:8
**hypothetically**
  22:4,17
**hypotheticals**
  21:17

**I**
**i.e** 114:9
**idea** 58:2,7 75:12
  75:24 89:13
  93:1 105:17
  106:3
**identification**
  30:16,22 31:19
  42:18 43:5 57:1
  59:10 62:22
  65:19 72:14
  76:18 83:5
  85:23 88:5 90:2
**identifies** 123:23
  124:1
**identify** 112:2
  125:18
**identifying** 66:23
**image** 47:2,5,19
  48:2
**imagine** 15:7
**immediately**
  61:14
**important** 93:14
**Impressive** 11:23
**include** 71:18
  72:10 100:1
  118:25 121:13
  130:7
**included** 15:14
  16:9 31:24
  102:5 111:25
  118:6,13
  121:21,22
  122:10 123:12
  124:4,5 127:2
**includes** 63:5,7
**including** 88:11
  124:2
**income** 63:7,21
**incoming** 67:7
**incorrect** 123:9
  124:14
**increase** 94:19
**incumbency**

53:13,17,19
**INDEX** 3:1
**indirect** 27:7
**indirectly** 70:12
**individualized**
  131:14
**Info** 3:25 4:1
**info@dickman...**
  136:3
**information** 4:9
  29:25 34:13
  61:14 63:3,7
  64:17 65:5,11
  69:12,15 84:6
  86:15 116:3
  127:2 130:10
**informed** 112:21
  125:24 126:1
**initiated** 74:11
  92:3
**ink** 49:8,13 55:3
  55:8
**ink-signed** 55:11
**input** 29:25
  88:24
**installment**
  128:24 129:7
**instance** 1:20
  20:6 23:8 35:21
**instances** 24:1
  40:1,24
**instruct** 127:11
  127:15
**instructed** 128:9
  128:11
**instructing**
  101:18
**instruction** 72:2
  74:17 76:8
  100:16 101:14
  101:22 103:12
  129:4,11
**instructions** 24:2
  24:3 32:16
  69:14 76:1

100:21 101:9
  103:19 129:3
**instructs** 7:5
**insurance** 39:10
**insurer** 39:8
**intend** 113:5
**interco** 32:14
  34:11
**intercompany**
  17:22 18:13
  19:17 20:4,13
  20:16 21:3,8
  34:12 35:7
  36:19,25 37:12
  40:24 53:8
  111:15,16
  124:23 125:4
  126:25 133:6
**interest** 19:7
  43:16 49:2
  68:18 73:25
  78:14,16,24
  79:20,22 80:11
  85:15 125:4,19
**interested** 84:9
  135:19
**interjects** 64:4
**intermediary**
  24:3
**internal** 18:21
  41:8 46:13,20
  69:19
**internally** 77:1
**investigation**
  97:5
**invoice** 108:13
**involved** 18:12
  19:16,20,24
  36:21 39:20
  40:9 126:14
  131:8
**involvement**
  19:10
**irrespective**
  26:16,24

**IRS** 49:3
**issue** 79:3 95:14
  96:16 97:25
  98:16 114:2
  118:8 131:2,2,6
  132:5,9,19
**issued** 131:9
**issues** 40:7,10
  60:16 61:21
  115:4,15

**J**
**J-F-O-R-S-H-...**
  44:10
**Jack** 59:13 60:4,8
  64:6 65:2 92:18
**James** 4:8 5:1,2
  61:14,15,18,21
  61:25 62:3
**Jan** 4:8 5:2,5
**January** 10:17
  24:24 28:20
  29:6,11 62:25
  64:15 71:25
  88:2,21 89:9
  90:5,7,17,22
  91:4 93:8
  106:10,25
  127:23 128:8
  128:15
**jealousy** 24:7
**jerk** 24:12
**JFORSHEE**
  44:10
**Jim** 2:20 21:10
  23:14,18 34:19
  35:24 52:19,20
  54:2 63:2 64:10
  67:3 73:8 84:4
  99:18 101:2,4
  102:16 104:1,7
  104:14,22,25
  105:1 125:25
**Jim's** 99:21
**jive** 87:20

Kristin Hendrix - October 27, 2021

| | | | |
|---|---|---|---|
| **jmorris@pszjl...** 2:14 | 47:16 48:6,6 50:10 52:18,25 | **Lawler** 109:20 109:23 | **lines** 61:7 **listed** 78:17 | **long** 7:20 21:24 74:21 75:6 |

jmorris@pszjl...
2:14
**job** 6:20 11:14
17:9 20:25
24:19,22 43:11
45:1,14 103:1,6
103:10
**John** 2:12 4:7
8:24 95:21,23
97:4
**JONES** 2:10
**June** 86:25 87:6
116:5 120:23

**K**

**K-l-o-s** 8:25
**keep** 29:1 77:6,9
95:4 125:24
126:1
**kept** 54:22 55:11
56:12 77:5
121:20
**kind** 11:5 18:4
23:21 24:6,11
34:3 50:3 54:19
81:13 122:21
**Klos** 3:14 8:24,25
9:5,12 13:1,6
13:10 25:10,21
29:24 31:16
33:17 34:10,18
35:21 36:18,24
37:20 38:12
46:7 97:2,3
111:8,13 112:6
**Klos'** 13:2 41:17
**knew** 40:3 126:3
128:19
**know** 6:24 19:20
19:23 20:19
25:14,25 28:7
33:10,11,13
36:11 38:17,21
39:22,25 40:1,5
43:21 44:11

47:16 48:6,6
50:10 52:18,25
57:25 59:6
76:15,21 78:15
82:15 89:17
92:18,19 99:21
101:4 103:24
104:17 107:19
108:7,25 110:2
117:4 118:15
120:22 121:6
121:19,20
122:15 124:4
128:7 130:24
131:12
**knowledge** 27:6
36:1,4 37:14
40:11,13 52:15
69:11 77:7
108:4 112:9,11
112:20 116:1
121:14 122:2
**known** 67:14,17
97:11
**KOPF** 2:3
**Kristin** 1:14,18
5:5 6:1,6 32:1,2
32:14 57:8
61:20 134:13

**L**

**L.P** 1:6,10
**labeled** 82:15
**labels** 30:7
**laid** 24:12
**land** 84:5
**landline** 75:2
**large** 35:8
**lasted** 75:6
**late** 126:9
**Lauren** 4:22
86:21
**law** 2:5,12,19
6:18 18:22
44:16

**Lawler** 109:20
109:23
**Lawn** 2:17
**lawsuit** 28:24
29:5,8
**lawsuits** 28:1,9
28:13,25 29:17
29:21 30:1
**lawyer** 9:4
**lawyers** 44:14
**lay** 67:7
**leading** 39:20
108:15,21
109:1
**learn** 95:20
**ledger** 76:12
**left** 61:9 87:15
**legal** 7:23,25 10:9
16:13 17:14,25
18:2,5,11,21
19:10,16 28:10
46:14,20 72:21
**lend** 21:22 23:1
110:22
**length** 93:25
**let's** 10:12 11:9
12:17 14:8,18
21:17 30:8
34:25 44:24
45:13 47:14
54:19 55:1
72:10 78:1
99:24 115:11
120:23
**letter** 4:11 65:14
115:14,23
**letters** 29:11,14
115:14,20
**letting** 92:18
**liabilities** 118:14
**liability** 40:16
118:6
**license** 10:24
11:2
**limited** 107:25

**lines** 61:7
**listed** 78:17
**litigations** 27:8
**little** 28:9 44:7
55:1 58:9,24
78:12 94:17
98:12 131:18
**live** 10:14,15
**LLP** 2:17
**loan** 3:15,25 4:1
18:18 31:5
32:14 33:25
34:11,12,14,25
35:14,17,17,22
36:19,25 37:6,7
37:17,17 38:25
39:12 40:15,21
45:13,15,18,22
46:12,14 48:15
49:1,4,5,24
50:9 58:5 72:25
76:24 79:21
80:6,7 87:22
103:22 104:6
104:20 111:15
111:16,18,20
112:10,23
113:2 119:9
124:23 125:4
133:6
**loans** 35:9,12
37:4,6,13,22
38:6 39:4 41:9
41:12,19 48:14
48:17 50:7,19
50:22 51:8
53:21 66:23
67:8 98:16,17
98:17,20,25
106:9 107:13
109:9 110:5,6
126:2 131:19
**logically** 36:10
40:23 71:18
**logs** 75:19

**long** 7:20 21:24
74:21 75:6
110:4
**look** 30:17 54:15
57:7 75:18 77:2
78:11 80:21
93:20 94:6
**looked** 31:5
123:16
**looking** 56:21,23
58:10 79:24
81:10 86:21
87:14 119:23
**looks** 60:24 64:9
76:23 77:4
79:19
**loosely** 17:2
**lot** 28:25
**lots** 40:6
**LP** 15:4,15 27:20
27:23 70:1,4

**M**

**ma'am** 31:21
57:7 87:1 111:4
**machine** 1:24
**maintain** 6:9,10
**maintained** 77:1
82:7
**maker** 19:4,5
21:3 43:15
132:1
**making** 13:20
21:5 81:7 99:20
101:2,25
103:22,23
104:3
**management** 1:6
1:9 12:20 13:14
13:15 14:2,24
15:4,22 17:17
27:23 85:5
108:1 115:13
115:19,23
**manager** 12:8,12

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 04/04/24   Page 193 of 200   PageID 24405
Appendix Part 4 Page 04064 of 472

146

Kristin Hendrix - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 12:18 | 45:24 47:4 | 123:12 124:11 | 24:8,15 28:3 | **Nancy** 108:9 |
| **manual** 104:9,12 | 48:10,13 50:15 | **mind** 71:18 | 30:2 31:10 34:6 | **NAP** 27:14 |
| **March** 12:2 | 51:1 53:23 54:4 | **minute** 30:8 | 35:10 36:13 | **native** 78:9 |
| **mark** 59:3 | 54:10 57:23 | **minutes** 94:3 | 38:7 39:17 41:1 | **NAV** 38:22 39:9 |
| **marked** 30:15,21 | 58:9,20 69:18 | **mischaracteriz...** | 41:13 42:9 45:3 | 39:16,20,23 |
| 31:18 42:17 | 72:24 74:4 81:6 | 116:25 | 46:4 47:20 | 40:10 107:21 |
| 43:4 56:25 59:9 | 81:17 86:8,10 | **Mischaracterizes** | 48:22 49:10,20 | 108:5 |
| 62:21 65:18 | 90:15,20 91:21 | 41:2 | 50:4 51:3,14,20 | **near** 14:7 |
| 72:13 76:17 | 92:6 | **misleading** 42:9 | 52:1 53:9 55:5 | **necessarily** 17:23 |
| 83:4 85:21,22 | **mentioned** 11:24 | **missed** 88:25 | 55:19 56:4 | 19:10 103:25 |
| 88:4 90:1 | 13:14 22:12 | 105:12 | 57:17 58:16 | **need** 9:16 14:6 |
| 113:13 119:14 | 25:9 29:10 41:7 | **misspeak** 30:5 | 62:18 65:16 | 19:2 21:11 |
| **material** 97:22 | 44:25 45:21 | **mistake** 51:12 | 67:10 69:8 | 25:14,25 34:24 |
| 98:1,4,6,10 | 51:6 64:21 | 113:1,18 114:2 | 70:15 73:20 | 52:6 54:1 59:1 |
| 104:6 120:3,4 | 125:7 | 116:20 117:21 | 74:5 75:7,11 | 81:19,20 82:12 |
| 133:16,21 | **merit** 25:17 | 118:25 119:12 | 77:22 78:8 79:7 | 86:19 93:17 |
| **materials** 121:12 | **met** 108:11 | 125:3 132:9 | 79:9,13 80:3,16 | **needed** 21:21 |
| **maturity** 80:13 | **metadata** 42:21 | **mistakenly** 51:25 | 82:1,14,16,23 | 22:5,18 23:1,4 |
| **MBA** 10:23 | 42:21,24 43:21 | **mistakes** 51:17 | 83:2,6,10 85:25 | 40:1 53:12 |
| 11:20 | 43:24 44:8,24 | 51:19,22 | 87:7 88:15 89:2 | 81:11,14,23 |
| **mean** 7:17 13:15 | 56:15,20 57:4 | 120:19 | 89:15 93:22 | 104:25 |
| 14:22,23 15:3 | **Michael** 2:18 | **modified** 44:19 | 94:15,17 95:21 | **needs** 104:7,8,13 |
| 19:1 35:16 | 94:24 | 57:8 | 95:25 96:2,6,18 | **negative** 78:20,25 |
| 48:20 57:24 | **michael.aigen...** | **moment** 72:9 | 96:23 102:2 | 79:2 |
| 68:24 78:13,15 | 2:22 | **Monday** 9:2 | 103:13 105:19 | **never** 40:19,20 |
| 87:11,24 | **mid** 128:19 | **monetize** 68:2,10 | 106:6,18 111:6 | 49:12 51:12 |
| 111:16 | **middle** 89:8 | **money** 13:21 | 113:11,22 | 55:14 68:17 |
| **meaning** 27:20 | **million** 30:12,20 | 21:11,13,15,21 | 114:13,19 | 70:14,17 96:25 |
| 27:22 54:25 | 32:13,21 33:1 | 21:21,22 22:5 | 118:12,23 | 97:2 101:6,6,14 |
| 70:18 | 33:19,20,25 | 34:24 35:13 | 119:5 121:19 | 103:6 108:11 |
| **means** 27:15 | 34:5 35:3 36:25 | 37:7,17 53:21 | 122:15 128:3,4 | 119:8 |
| 35:15 58:22 | 37:12,12 38:18 | 54:23 81:15,19 | 129:22 133:24 | **new** 2:11 21:14 |
| 71:16 111:18 | 38:22,25 39:3,7 | 81:22,24 92:16 | **mouth** 23:21 | 32:14 34:11,25 |
| **meeting** 34:17 | 39:8,11,23 | 111:19 | **move** 9:10 21:11 | 36:19 45:9 |
| 67:2 | 40:15,21 42:15 | **month** 106:10 | 21:13,15 94:16 | 111:15,16,18 |
| **meetings** 66:22 | 42:16 43:2,3 | **months** 40:7 | 109:8 | **NexPoint** 5:6 |
| 66:25 | 58:5,11,13,13 | **morning** 6:4 9:3 | **moved** 23:4 | 15:14,17,22 |
| **memorandum** | 66:9,13 81:1,1 | 67:11 82:14 | **multiple** 54:19 | 16:5 27:11,15 |
| 48:20 | 81:2 85:1,6,9 | 125:6 | **MUNSCH** 2:3 | 27:18,19,20 |
| **memory** 9:17 | 87:3 90:23 91:3 | **Morris** 2:12 3:6 | | 28:2,13,21 63:6 |
| 19:14 20:9 29:3 | 91:23 110:23 | 4:7 7:3 8:24 9:6 | **N** | 63:22 64:18 |
| 29:7,17,19,23 | 111:10 112:14 | 9:9 14:14,21 | **name** 6:5 32:8 | 66:8,12,20 |
| 32:20,24 34:3 | 113:14,14 | 15:24 16:22 | 44:12 57:18 | 67:13,22 68:2 |
| 37:9 38:2 41:22 | 120:24 121:13 | 18:14 19:11 | 94:24 109:24 | 68:15,19,24 |
| 42:1,20 43:7,10 | 122:10 123:5,9 | 20:23 22:8,21 | 110:3 | 69:15,20 70:1,4 |

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 4 Filed 04/04/22 Page 194 of 200    PageID 24406
Appendix Part 4 Page 0074 of 472

147

Kristin Hendrix - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 70:22 72:12 | 80:9,10,14,20 | **notice** 88:3 89:8 | 39:17 41:1,13 | 25:3 28:19 30:5 |
| 76:24 77:7,13 | 81:8,23 85:14 | **notices** 28:22 | 45:3 46:4 47:20 | 31:23 32:11 |
| 77:20 80:20 | 90:18 91:16,19 | **noting** 14:5 | 48:22 49:10,20 | 33:22 34:3 36:1 |
| 81:7,22 84:9 | 91:23 92:14 | **November** 59:12 | 50:4 51:3,14,20 | 38:2 39:14 |
| 85:2 88:3 90:9 | 127:16 133:10 | 61:6 62:6,10 | 52:1 53:9 55:5 | 42:13 43:6 |
| 90:17,23 91:16 | **notes** 4:12,19 | 66:19 67:12,19 | 55:19 56:4 | 49:25 58:23 |
| 91:23 92:13,16 | 14:9 16:16 | 68:1,7,14,21 | 57:17 58:16 | 60:11 62:1 |
| 93:10,11 120:6 | 17:22 18:13 | 71:4 72:4 74:10 | 65:16 69:8 | 63:17 70:25 |
| 123:24 127:14 | 19:17,21,21 | 75:18 76:3 | 70:15 73:20 | 79:25 84:8 85:1 |
| 127:16 128:23 | 20:4,13,17,22 | 93:21 127:6 | 74:5 75:7 77:22 | 89:24 93:7 94:1 |
| 129:6,18 | 21:4,8,14,14 | 128:20 129:24 | 80:3,16 82:1 | 110:17 112:8 |
| 131:13 | 22:13 27:3 | 135:22 | 87:7 88:15 89:2 | 113:11 115:17 |
| **NexPoint's** 16:5 | 28:14 30:24 | **November/Dec...** | 89:15 96:18 | 118:18 119:5 |
| 16:9 | 31:1 38:11 41:7 | 125:14 | 102:2 103:13 | 121:13 123:15 |
| **Nope** 8:7 76:7 | 42:7,22 43:12 | **NPA** 4:17 27:18 | 105:19 106:6 | 126:15,22 |
| 91:12 | 45:2 46:21,22 | 27:19 86:24 | 106:18 113:8,9 | 129:13 130:19 |
| **normal** 34:16 | 47:6 50:1 52:10 | 99:4 100:3 | 114:17 118:9 | 131:23 134:2 |
| 103:23,23 | 52:16,17,24 | **number** 79:2,6 | 118:21 119:3 | **once** 104:5 |
| **normally** 107:15 | 53:1,8,25 54:5 | 79:11,18 80:23 | 121:17 122:12 | **ones** 53:2 109:18 |
| **North** 1:24 2:3 | 54:12,23 55:3,8 | 84:10,13 85:2,9 | 129:21 | **ongoing** 77:20 |
| 10:22 11:13 | 55:11 56:2,8,10 | 87:20,21 89:14 | **objections** 7:5 | **oOo--** 134:5 |
| 136:2 | 59:2 62:11 | 89:18,20,21 | **obligations** 14:19 | **open** 120:5 |
| **NORTHERN** 1:2 | 65:15 66:5 | 111:7 120:1 | 16:6,10 118:7 | **opinion** 98:5 |
| **note** 3:10,12,17 | 69:21 73:10 | 123:5,9,12 | 132:1 | **opposed** 23:23 |
| 3:19,21,23 4:14 | 77:10 84:16 | 124:2,11,14,17 | **obligor** 15:18 | 39:12 49:8 |
| 5:3,6 14:19 | 85:12 95:14 | **numbered** 1:21 | **obviously** 14:11 | 52:12 98:17 |
| 15:18 16:10,21 | 96:16 97:10 | **numbers** 26:1 | 35:6 59:1 | **oral** 91:25 95:9 |
| 17:1,3,6 18:16 | 111:2 113:6,11 | 78:20 80:21 | **occasion** 22:18 | 95:13 96:4,8,12 |
| 18:19 19:22,25 | 113:12,16,18 | 84:15 | **occurred** 95:15 | 96:23 97:6,9,11 |
| 21:4,23 22:7,20 | 114:2,7,16 | **NY** 2:11 | 96:4,17 97:7 | 97:20,25 98:9 |
| 23:9 28:21 | 116:7,11,15,25 | | 106:17 | 132:20 |
| 30:11,19 31:8 | 117:18,22,25 | _____ | **Oct** 4:22 | **orally** 37:10 |
| 32:15,21 33:2 | 118:1,7,18 | **O** | **October** 1:15,21 | 50:16 |
| 33:20 35:3,18 | 119:1,12 120:6 | **oOo--** 1:4 | 86:22 94:9 | **order** 97:6 |
| 42:15 43:2,3,11 | 121:15,21,22 | **Oak** 2:17 | 122:17,19 | **ordinary** 103:23 |
| 45:9 46:16 | 122:11 123:13 | **oath** 6:17 95:5 | **office** 10:1 34:1 | 104:13,19,23 |
| 56:21,22 58:11 | 124:6 125:19 | **object** 113:19 | 54:8 57:3 | **original** 30:11 |
| 58:13,13 66:9 | 126:25 127:12 | 114:8 | **officer** 52:13 | 54:23,25 55:11 |
| 66:13,16,20 | 127:24 128:8 | **objecting** 114:10 | 69:25 70:7 | **originally** 48:7 |
| 67:13,22 68:2,5 | 128:21 130:8 | **objection** 7:3 | **officers** 109:10 | **outcome** 27:8 |
| 68:8,10,16,19 | 130:14 131:5,8 | 14:14,21 15:24 | 109:13 | **outgoing** 67:7 |
| 68:23,24 71:13 | 131:9,13,14,25 | 16:22 18:14 | **oftentimes** 13:23 | **outside** 18:21 |
| 71:19 72:6,11 | 132:5,9,15,19 | 19:11 20:23 | 34:23 | 89:6 |
| 72:12,16,20 | 132:24 133:3 | 22:8,21 24:8,15 | **oh** 67:21 | **outstanding** 66:5 |
| 73:4 76:13 77:7 | 133:16 | 28:3 34:6 35:10 | **okay** 6:11 7:1,7 | 80:11 120:4 |
| | | 36:13 38:7 | | |

Kristin Hendrix - October 27, 2021

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

___

**P**
**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
73:9,12,18,25
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-23 Part 4 Filed 04/09/24 Page 196 of 200    PageID 24408

149

Kristin Hendrix - October 27, 2021

prepayments
  81:25
presence 25:4
present 9:4,6,12
  24:5 45:24
  90:15 97:3
presented 116:1
presenting 46:14
  97:18
preserve 78:8
pretty 14:11
  109:8
previous 100:9
previously 17:24
  48:25 131:9
Pricewaterhou...
  116:9,12 117:5
  117:17 118:2,5
  130:20
principal 30:12
  78:14,17 79:5
  79:11,23 80:10
  89:23 121:14
  122:10 124:5
  124:19 125:3
  125:18 130:14
print 56:1
printed 42:8,12
  42:24 47:18
  55:18,22 56:7
  57:4,21,22,24
  57:25 58:11,14
  58:21,22
printing 55:23,25
printouts 42:21
prior 9:25 10:4
  19:17 28:11
  35:24 40:25
  55:2 65:23
  71:25 86:9 96:6
  105:3 108:6
  124:24 127:19
  128:12 133:12
privileged 9:8
  95:24

privy 64:9,11
  69:19
probably 9:15
  17:2 49:14 50:6
  58:22 61:9
  63:15 99:15
  109:8 126:13
proceed 61:20,25
proceeding 46:20
proceedings 95:1
  95:3,12
process 31:7
  32:16 45:11,12
  120:12
produce 78:9
produced 1:18
  17:24 33:15
  34:1 59:4 67:10
  76:20 82:14,19
  125:6
product 115:13
production 10:1
  33:15
profitability
  26:25
program 47:25
programs 47:16
projections 17:18
promised 39:2
promissory 3:10
  3:12,17,19,21
  3:23 4:12,14
  5:3 14:9 15:18
  16:10,16,20
  17:1,3,6,22
  18:13 19:17
  27:3 28:13,21
  30:11,19 31:1,8
  32:21 33:2
  35:18 38:11
  42:7 43:11,12
  45:1,9 47:6
  52:10,24 53:1,8
  53:25 54:5,12
  54:23 55:11

68:5 71:13,19
  72:11,12,16
  76:13 77:7,10
  80:9 81:8 113:6
  113:11,12,16
  114:2,7,16
  116:7,11,15
  117:17,22
  118:7 119:12
  122:11 124:6
prompt 128:14
prompted 83:22
prospect 53:20
provide 7:12
  9:19 15:21
  30:11 42:21
  59:17 63:3 64:5
  64:16 119:16
  121:25
provided 17:24
  33:5,9,10 61:14
  70:12 89:17
  121:11 122:5
  129:11 135:15
provides 120:7
providing 15:10
  54:8 65:5
public 16:19
pull 119:14
pulled 49:3
purpose 86:12
  125:22
purposes 39:5
  98:1 126:23
purview 89:6
put 23:20 84:25
PwC 97:21 98:1
  117:22

_____
Q
qualification
  16:20
question 7:1
  14:10,22 15:25
  16:23 18:15

19:12 20:19,24
  22:9,22 24:9,16
  28:4 29:5,16
  34:7 35:11
  36:14,23 37:1
  38:8 39:18 41:2
  41:14 45:4,5
  46:5 47:21
  48:23 49:11,21
  50:5 51:15,21
  52:2,4 53:10
  54:18 55:6,15
  55:20 56:5
  58:17 65:17
  66:10 69:9
  70:16 73:21
  74:6 75:8 77:23
  80:4,17 82:2
  84:14 86:9,19
  86:20 87:8,19
  88:16 89:3,16
  95:10 96:10,19
  100:9 102:3
  103:14 105:20
  106:19 113:9
  113:24 124:17
  127:8 128:5
questions 6:21,24
  7:6 8:6 61:21
  95:2 110:16
  115:4 133:24
quick 52:5 95:4
  107:23
quickly 6:16
  109:8
quite 36:21 41:20
  104:24
quote 120:3

_____
R
R-o-e-b-e-r 32:10
raise 131:1
raised 95:12
range 89:10
rate 19:7 43:16

49:2 80:12
ratio 107:21
  108:5
re-up 86:16
reached 108:5
read 7:9 8:9
  32:18 82:21
  86:17 119:25
reading 81:9
ready 94:16
real 11:14
really 35:13
  67:21
reason 6:23
  22:23,25 52:11
  52:13 56:1,6,7
  72:7 77:3 82:5
  82:8 101:13
  129:13,16
  131:1
recall 7:19 10:8
  21:6 34:15,20
  36:16 37:2
  44:11 46:10
  50:14,20 51:17
  51:23 52:4
  55:25 56:7
  59:22,25 60:2,3
  60:8,10 63:11
  64:1 65:3 66:7
  67:3 68:22,25
  69:22 72:3 73:1
  74:11 83:22
  84:4,23,25
  86:12 88:17
  91:25 92:3 93:5
  93:7 102:21
  104:21 105:15
  107:6 108:25
  109:14 112:3
  112:13,15,17
  116:4,15 118:5
  119:5,8,19
  120:16 123:4
  123:15 127:5

Case 21-03003-sgj    Doc 135-4    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Appendix Part 4    Filed 04/04/24    Page 197 of 200    PageID 24409

150

Kristin Hendrix - October 27, 2021

129:25 130:17
131:5 133:10
**recalling** 109:16
**Receivable** 4:19
**receivables**
130:25 131:22
**received** 63:13
64:21 71:5
129:2
**receiving** 32:4
124:23
**recipient** 60:25
**recognize** 44:12
**recollection** 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
**reconciling** 13:20
**record** 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
**recorded** 73:11
81:24
**recording** 73:18
**records** 10:6,6
59:18 62:7 64:5
73:12
**reduced** 135:10
**refer** 99:25
**reference** 71:13
119:1 121:2,6,9
**referenced** 34:5
84:6
**referencing**
33:25 121:10
**referred** 96:2

**referring** 66:25
100:2,5
**reflected** 118:7
123:12
**reflecting** 43:15
**refresh** 9:17 42:1
42:20 69:18
108:1
**regarding** 86:1
90:17 107:12
**regardless** 99:16
**regularly** 23:24
**reinforces** 41:8
**reissue** 21:14
**related** 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
**relates** 32:21
64:17
**relation** 115:7
**relieve** 93:10,11
**rely** 42:8
**remember** 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
**remotely** 6:8
**renewal** 120:12
**reorganized** 25:7
25:15 26:17,24
27:2
**rep** 115:13,19,23

**repaid** 23:10
**repay** 69:6
**repeat** 14:10
22:10 28:15
44:22 66:10
**rephrase** 6:25
**report** 12:25 25:9
25:12 114:25
115:25 117:14
123:6
**reported** 1:23
13:6 36:22
**reporter** 135:1,3
135:15
**reporters** 27:13
**reporting** 12:22
12:23 13:22
**reports** 127:3
**repository** 54:22
55:9
**represent** 27:10
46:25 57:3 83:1
94:24 107:23
**represented** 2:4
2:11,18 93:5
**representing**
42:23
**request** 4:9 60:5
84:22
**requested** 63:3
63:21 64:5,17
84:2 135:13,14
**requesting** 63:25
**requests** 10:1
69:14 115:3
**required** 7:6 21:4
**respect** 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
**respectfully** 39:5
**respecting** 45:22

**respectively**
113:15
**respond** 122:23
**responded** 65:1
**response** 60:13
120:15,19
122:16,25
**responsibilities**
97:12 103:6,10
**responsibility**
69:7 102:23
105:2
**responsible** 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
**responsive** 10:6
**rest** 44:23
**restrictive** 47:17
**restroom** 52:6
93:16
**restructured**
19:21
**retail** 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
**reveal** 50:11
**review** 8:4 50:11
54:11 119:21
125:10,17
135:13
**reviewed** 9:15,19
**reviewing** 32:24
115:11
**revised** 17:6
**right** 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
**Roeber** 32:9
112:7
**role** 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
**roles** 73:6
**roll-up** 72:22
131:9
**rolled** 79:23
131:13
**Romey** 61:15,18
61:25 62:3
**room** 75:15
**roughly** 39:3
**routine** 20:4,21
20:25
**routinely** 21:1
**row** 131:3
**RPR** 1:23
**rude** 25:3
**Rukavina** 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Appendix Part 4 Filed 04/14/22   Page 198 of 200   PageID 24410

151

Kristin Hendrix - October 27, 2021

31:12,20 34:10
35:16 36:18
38:10 39:22
41:4,17 42:19
43:6 44:4,7
45:5 46:8 47:22
49:6,17,25
50:10 51:6,17
51:24 52:5,8
53:4,15 55:9,23
56:9,19 57:2,20
58:19 59:11
62:19,23 65:20
69:13 70:19
72:15 73:24
74:8 75:9,13
76:19 78:1,7,11
79:8,10,14 80:8
80:19 82:4,21
82:25 83:8,13
83:15 85:24
86:2 87:9 88:6
88:20 89:5,19
90:3 93:23 94:5
94:14,19
110:17,20
113:8,19 114:8
114:17 118:9
118:21 119:3
121:17 122:12
125:7 128:2
130:13 133:25
134:2

**S**

**S-e-e-r-y** 8:8
**Sadly** 94:9
**salaries** 108:17
108:18,19
**salary** 25:15
**sale** 68:4,8
**save** 55:13 72:19
**saved** 56:11
**saw** 41:8 86:6
115:12 123:19

125:6 126:12
**saying** 37:19
41:15 49:23
53:4 73:8 76:14
93:19 99:5
101:9
**says** 32:1,6 34:10
44:10,13,18
57:8,22,25
60:23 63:2 64:4
78:25 86:23
87:10 89:9
120:2,22
**scan** 55:13
**schedule** 76:24
77:5,6,21 80:20
82:7 85:3,13,17
131:20
**scheduled** 16:4,7
**schedules** 77:9
85:12
**schooling** 10:20
**Scott** 4:3 18:9
60:4,12,15
61:10,13 62:1
**Scott's** 60:13
**scratch** 17:3
**search** 10:5
**second** 7:15 44:5
62:18 78:23
80:22 99:24
109:15
**Secondly** 87:16
**section** 80:9 86:1
118:19
**see** 6:8 8:5,12,14
23:3 31:5,20
32:25 35:7
54:11 57:9,21
59:7,15,20 60:6
60:20 61:23
63:5,9 64:2,7
78:24 79:14
80:15,18,24
81:3 84:11 85:6

86:23 87:1,5
89:8,11 105:9
115:11 120:9
120:22,25
121:4 126:4
**seeing** 31:4 50:14
57:14 65:23
90:12
**seek** 46:20
**seeking** 24:3
**seen** 33:14 65:22
69:13 72:15
76:21 88:7
122:25
**Seery** 4:8 5:1 8:8
25:12,20 29:24
59:13 60:18,22
61:12 62:4,6,9
63:1,2 64:4
65:9 67:3,14,17
67:25 68:13,22
69:14 88:11,23
96:25 125:25
126:13
**Seery's** 8:10,20
**send** 29:14 32:13
34:24 37:7
53:21 59:7
60:11 62:2
63:17 83:22
**sending** 13:19
36:3 54:12
60:17 61:2
111:19
**senior** 12:8,11,11
12:12,17
**sense** 44:12 58:1
**sent** 28:22 29:11
37:17 42:9 83:2
83:17 92:16,22
106:20 107:3
111:21 123:19
126:11,13
**separate** 18:5
**served** 10:1

**services** 15:11,22
70:13,13 86:16
119:17,19
120:7
**set** 26:10,11,14
35:15 53:21
**shape** 37:10
**shared** 54:9,16
55:14 70:13
77:16 86:16
**shareholders**
39:2
**sheet** 118:6
121:11
**sheets** 63:8,22
**short** 74:22 75:17
75:23 93:15
**shorthand** 1:24
135:2,7,25
**shortly** 11:11,12
**show** 82:10
**showing** 92:15
131:21
**sick** 82:17
**sign** 52:20,20
53:7,20,22 54:3
104:25 105:1
113:5,18
115:13
**signatory** 52:14
**signature** 46:15
47:1,6,11,18
49:8,14,15
114:7,9,15
**signed** 47:9 52:10
52:11,25 55:4,8
115:14 131:6
132:5,9
**signer** 53:13
**significant** 20:20
51:19,22
**signing** 52:16,24
53:25
**similar** 32:25
34:9 38:25

96:10 112:13
**single** 104:2,3
**sitting** 30:25
33:24 42:1
50:15 53:23
54:4 55:24 82:4
85:16 91:21
105:16 106:23
**situation** 34:9
**slightly** 96:10
**SMU** 10:23
**so-called** 15:22
**somebody** 35:19
37:8 53:12,12
53:19 55:21
129:3
**soon** 32:17
**sophisticated**
14:12
**sorry** 11:12 14:24
19:15 47:8 52:4
57:21 66:2
82:23 92:12
97:3 103:9,23
109:20
**sort** 25:21 43:23
96:11 97:24
**sought** 88:24
**sound** 58:15
**sounds** 98:3
**speak** 36:2
**speaking** 13:17
43:11 44:1
**speakings** 95:21
**specific** 7:19
21:18 29:7
34:21 36:4,17
37:1,14 38:2
43:10 46:11,22
47:25 48:11,13
54:14 71:8
88:17 90:19
100:11 101:22
103:11,18
105:21 106:24

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-3 Part 4 Filed 01/24/24   Page 199 of 200   PageID 24411

152

Kristin Hendrix - October 27, 2021

127:6
**specifically** 21:6
21:10 23:11
29:9 34:15 37:8
49:12 50:12,16
50:19 51:2 52:3
52:19 54:1,7
55:8 64:25 65:3
65:4,8 68:25
69:22 77:14
84:19,21 93:5
98:16 103:2,7
125:13,18
**specifics** 22:4
**speculating** 58:9
**speculation** 106:4
**sphere** 69:6
**spit** 48:1
**spoken** 35:23
61:13
**spreadsheet** 78:9
**spreadsheets** 31:6 77:12
**staff** 48:2
**stake** 27:7
**stamp** 47:19 82:18
**standard** 46:16
50:7 53:6,11,15
53:16 55:3
**standing** 67:2
**STANG** 2:10
**start** 54:19 59:11
95:10 100:11
**started** 11:13,17
20:11 100:10
**starting** 10:19
11:9
**starts** 59:12
**state** 1:23 6:5
10:25 67:25
68:14 76:22
78:16 136:1
**stated** 48:25

135:9
**statement** 99:3
**statements** 4:5
13:20 63:7,8,21
63:22 97:16,17
115:12 116:17
116:21 117:1,5
117:11 119:2
122:4 133:18
133:22
**STATES** 1:1
**status** 66:20
**stay** 26:4
**steps** 92:13
**STINSON** 2:17
**stop** 34:24
**stopped** 23:22
**stored** 56:2
**straightforward** 26:14
**Strasburger** 44:13,16
**Street** 1:25 2:4
**stretch** 109:5
**strike** 7:24 8:4
15:8 38:16
52:22 53:5
68:12 87:9
90:11
**string** 122:19
**stuff** 49:15
**stupid** 86:9
**subject** 16:5
119:20,20
132:19
**subparts** 86:20
**Subscribed** 134:7
**subsequent** 14:7
59:25 61:12
64:10 95:13
96:22 105:12
116:13 118:3
118:19
**subsequently** 32:11

**sued** 28:21
**suggest** 124:14
**suing** 28:5
**Suite** 2:4,17
136:2
**summarize** 72:19
**summary** 7:12
8:14
**summer** 123:16
124:18
**supervision** 135:11
**supplementally** 9:19
**supposed** 98:20
**sure** 6:12,15
10:21 11:4,11
12:20 13:20
14:11 18:22
19:23 22:11
26:7 28:16 31:2
33:10,21,22
37:5 42:3,22
43:20 52:25
58:18 60:16
62:1,19 63:17
65:4 66:11
75:21 76:11,11
84:15 99:3
100:7 101:1
107:18 109:22
115:16 125:24
126:23 130:23
130:24
**Surgent** 29:24
**surprise** 76:1,3
**surprised** 94:11
**surprises** 40:8
76:2
**suspect** 23:15
**switch** 58:24
**sworn** 1:19 6:2
135:4
**synopsis** 7:12
8:14

**system** 56:12
77:16 84:20

─────────

**T**

**T-h-e-d-f-o-r-d's**
86:22
**take** 25:14 30:8
38:11 45:5 52:5
52:20 72:15
75:17 76:15
82:12 87:10
89:13 92:13
104:1 110:14
**taken** 1:20 16:15
17:6 45:8 135:7
**talk** 7:21,24 8:1
8:17,20,23,25
28:10 34:21
44:9 66:11,15
78:1
**talked** 9:12 97:4
99:8
**talking** 8:19,22
29:1 64:11
101:2 116:8
121:15,23
125:13
**taxes** 14:9
**team** 13:19 17:25
18:21 26:4 31:6
39:15 49:15,18
50:24 51:7
64:16 97:16
102:4 104:11
106:15 115:2
**telephone** 23:17
74:11 75:23,25
**tell** 34:13,16,24
44:2 53:1 54:1
54:2 55:7 60:14
63:24 71:23
74:19,23 79:22
79:24 84:3
91:11,15,18
93:24 99:2

100:12 106:14
107:1 109:22
110:8 112:8,25
113:4,17 114:1
114:6,14
116:20,23,24
117:21 118:25
119:6,11 122:4
122:8 123:2,8
123:11 130:22
131:24 132:4,8
132:11,14,18
132:23 133:2
135:4
**telling** 35:25
37:11 53:24
100:13,21
105:22 115:24
**template** 18:20
18:24 43:14,18
45:8 46:17 58:4
58:6,12
**templates** 43:12
50:9
**term** 17:2 66:9
66:16 67:8,13
73:10 76:24
77:10 98:17,25
100:4 107:20
107:24 125:19
126:2 127:12
127:16,24
128:8,21 130:7
131:5,8,14
**terminology** 27:14
**TerreStar** 38:22
**test** 20:9
**testified** 6:2 45:7
72:18 112:12
113:13 127:22
129:22
**testify** 83:10,12
**testifying** 6:16
**testimony** 19:8

Case 21-03003-sgj   Doc 135-4   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 4 Filed 04/22/24   Page 200 of 200   PageID 24412

153

Kristin Hendrix - October 27, 2021

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

treasury 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,14
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

_____
**U**
_____
**Uh-huh** 27:16
33:12 47:3

**umbrella** 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8