Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 1-20    Filed 11/02/24    Page 1 of 200    PageID 24613
Appendix Part 6 Page 106 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 86 of
324

## 45    Dividends, Distributions and Reserves

45.1    Subject to the Statute, these Articles, and the special rights attaching to Participating Shares of any Class and/or Series, the Directors may, in their absolute discretion, declare dividends and distributions on Participating Shares of any Class and/or Series in issue and authorise payment of the dividends or distributions out of the relevant Separate Account in respect of such Participating Shares.  No dividend or distribution shall be paid except out of the realised or unrealised profits of the Company, or out of the share premium account attributable to Participating Shares of the Class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by the Statute.

45.2    Except as otherwise provided by the rights attached to Participating Shares, or as otherwise determined by the Directors, all dividends and distributions in respect of Participating Shares of a particular Class and/or Series shall be declared and paid according to the Net Asset Value of the Participating Shares of the Class and/or Series that a Member holds. If any Participating Share is issued on terms providing that it shall rank for dividend or distribution as from a particular date, that Participating Share shall rank for dividend or distribution accordingly.

45.3    The Directors may deduct and withhold from any dividend or distribution otherwise payable to any Member all sums of money (if any) then payable by it to the Company on account of calls or otherwise or any monies which the Company is obliged by law to pay to any taxing or other authority.

45.4    Under no circumstances may the assets (or the income derived from such assets) attributed to a Separate Account in respect of any Class and/or Series be used to pay a dividend in respect of a Separate Account that is attributed to any other Class and/or Series.

45.5    The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures or securities of any other company or in any one or more of such ways and, where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

45.6    Any dividend, distribution, interest or other monies payable in cash in respect of Participating Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct.  Every such cheque or warrant shall (unless the Directors in their sole discretion otherwise determine) be made payable to the order of the person to whom it is sent.  Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the Participating Share held by them as joint holders.

45.7    Any dividend or distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date of declaration of such dividend or distribution may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the dividend or distribution shall remain as a debt due to the Member.  Any dividend or distribution which remains

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

26

**Appx. 03378**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Filed Part 6/21/22 of 867Page 2 of 200    PageID 24614
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 87 of
324

unclaimed after a period of six years from the date of declaration of such dividend or distribution shall be forfeited and shall revert to the Company.

45.8    No dividend or distribution shall bear interest against the Company.

**46    Capitalisation**

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members of any Class and/or Series in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued Participating Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid.  In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Participating Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned).  The Directors may authorise any person to enter into an agreement with the Company, on behalf of all of the Members interested, providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

**47    Books of Account**

47.1    The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company.  Such books of account must be retained for a minimum period of five years from the date on which they are prepared.  Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

47.2    The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute, or authorised by the Directors or by the Company in general meeting.

47.3    The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

**48    Audit**

48.1    The Directors may appoint an Auditor of the Company who shall hold office on such terms as the Directors determine.

48.2    Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 1-20 Filed 02/24/20    Page 3 of 200    PageID 24615
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 88 of
324

the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

48.3    Any Auditors of the Company shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

## 49    Notices

49.1    Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to the Member or to the address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member).  Any notice, if posted from one country to another, is to be sent airmail.

49.2    Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier.  Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in the Cayman Islands) following the day on which the notice was posted.  Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted.  Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

49.3    A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

49.4    Notice of every general meeting shall be given in the manner authorised by these Articles to every person shown as holding Shares carrying an entitlement to receive such notice in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of such person being a legal personal representative or a trustee in bankruptcy of a Member where the Member but for such Member's death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.



Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03380**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16 Filed 01/02/24 87age 4 of 200    PageID 24616
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 89 of
324

**50      Winding Up**

50.1    If the Company shall be wound up the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as such liquidator thinks fit.   The liquidator shall in relation to the assets available for distribution among the Members make in the books of the Company such transfers thereof to and from Separate Accounts as may be necessary in order that the effective burden of such creditors' claims may be shared among the holders of Participating Shares of different Classes and/or Series in such proportions as the liquidator in such liquidator's absolute discretion may think equitable.

50.2    Subject to the special rights attaching to Participating Shares of any Class or Series, the balance shall then be applied in the following priority:

(a)      first, to the holders of Management Shares, an amount equal to the par value of such Management Shares; and

(b)      second, the balance shall be paid to the holders of Participating Shares in proportion to the Net Asset Value of Participating Shares held, subject to a deduction from those Participating Shares in respect of which there are monies due, of all monies due to the Company for unpaid calls, or otherwise.

50.3    If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution or resolutions passed by the holders of Participating Shares (whether as a whole or at separate Class meetings), divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of property of different kinds, and may for such purposes set such value as the liquidator deems fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members.  The liquidator may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares or other property in respect of which there is a liability.

**51      Indemnity and Insurance**

51.1    Every Director and officer of the Company (which for the avoidance of doubt, shall not include any Auditor), together with every former Director and former officer of the Company (each an "**Indemnified Person**") shall be indemnified out of the assets of the Company against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud or wilful default.  No Indemnified Person shall be liable to the Company for any loss or damage incurred by the Company as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud or wilful default of such Indemnified Person.  No person shall be found to have committed actual fraud or wilful default under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

51.2    The Company shall advance to each Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defence of any action, suit, proceeding or

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2 Filed 01/24/24 Page 5 of 200    PageID 24617
Appendix Part 6 Page 02442 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 90 of
324

investigation involving such Indemnified Person for which indemnity will or could be sought.  In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to the Company if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article.  If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Company (without interest) by the Indemnified Person.

51.3    The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

51.4    Pursuant to the foregoing provisions, the Company may enter into a service or other agreement with any Director (or any entity providing one or more persons to the Company to act as Directors) upon such terms and conditions (including as to indemnification and exculpation) as the Directors shall, in their absolute discretion, determine.  Any such indemnification and exculpation provisions may be specified to a standard equal to or more favourable (but not less favourable) to the Company than any standard specified in these Articles.

## 52    Disclosure

If required to do so under the laws of any jurisdiction to which the Company, the Investment Manager, the Administrator or any other service provider is subject, or in compliance with the rules of any stock exchange upon which the Company's Shares are listed, or to ensure the compliance by any person with any anti-money laundering law in any relevant jurisdiction, any Director, Officer, the Investment Manager, the Administrator or Auditor of the Company shall be entitled to release or disclose any information in its possession regarding the affairs of the Company or a Member including, without limitation, any information contained in the Register of Members or subscription documentation of the Company relating to any Member.

## 53    Financial Year

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

## 54    Transfer by way of Continuation

The Company shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

## 55    Mergers and Consolidations

The Company shall, with the approval of a Special Resolution, have the power to merge or consolidate with one or more constituent companies (as defined in the Statute), upon such terms as the Directors may determine.



Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-20    Filed 01/09/24    Page 6 of 200    PageID 24618
Appendix Part 6 Page 252 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 91 of
324

# HIGHLAND DYNAMIC INCOME MASTER FUND, L.P.

*A Cayman Islands Exempted Limited Partnership*

**Second Amended and Restated Exempted Limited Partnership Agreement**

**April 1, 2018**

Appx. 03383

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 216 Filed 02/22/22   Page 7 of 200   PageID 24619
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 92 of
324

## NOTICE

NEITHER HIGHLAND DYNAMIC INCOME MASTER FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES.  THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND DYNAMIC INCOME MASTER FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT.

Appx. 03384

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-20 Filed 01/27/22    Page 8 of 200    PageID 24620
Appendix Part 6 Page 127 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 93 of
324

## Table of Contents

*Page*

Article I DEFINITIONS ...........................................................................................................1

Article II ORGANIZATION ...................................................................................................8
    2.1    Continuation of Limited Partnership .............................................................8
    2.2    Name of Partnership .......................................................................................9
    2.3    Registered Office ...........................................................................................9
    2.4    Term of Partnership........................................................................................9
    2.5    Object and Powers of Partnership ................................................................10
    2.6    Liability of Partners .....................................................................................10
    2.7    Actions by Partnership .................................................................................10
    2.8    Reliance by Third Parties .............................................................................10
    2.9    Filings ...........................................................................................................11
    2.10   Series of Interests ........................................................................................11

Article III CAPITAL .............................................................................................................11
    3.1    Contributions to Capital ..............................................................................11
    3.2    Rights of Partners in Capital ........................................................................12
    3.3    Capital Accounts ..........................................................................................12
    3.4    Allocation of Net Profit and Net Loss .........................................................13
    3.5    Allocation of Management Fees, Withholding Taxes and Certain Other
           Expenditures ................................................................................................13
    3.6    Reserves; Adjustments for Certain Future Events .......................................15
    3.7    Performance Allocation ................................................................................15
    3.8    Limited Participation Investments ...............................................................16
    3.9    Allocation to Avoid Capital Account Deficits .............................................16
    3.10   Allocations for Income Tax Purposes ..........................................................16
    3.11   Curative Allocations ....................................................................................19
    3.12   Individual Partners' Tax Treatment .............................................................20
    3.13   Distributions.................................................................................................20
    3.14   Other Matters ...............................................................................................20

Article IV MANAGEMENT ..................................................................................................20
    4.1    Duties and Powers of the General Partner ...................................................20
    4.2    Expenses ......................................................................................................22
    4.3    Rights of Limited Partners ...........................................................................25
    4.4    Other Activities of Partners..........................................................................25
    4.5    Duty of Care; Indemnification .....................................................................26
    4.6    Advisory Committee ....................................................................................28
    4.7    Pricing Committee .......................................................................................29

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ........................................30
    5.1    Admission of Partners ..................................................................................30
    5.2    Transfer and Withdrawal of the General Partner .........................................30
    5.3    Transfer and Withdrawal of Interests of Limited Partners...........................30

Article VI LIQUIDATION AND TERMINATION .................................................................31

Appx. 03385

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-20    Filed 01/09/24    Page 9 of 200    PageID 24621
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 94 of
324

| 6.1 | Termination of Partnership | 31 |
| 6.2 | Liquidation of Assets | 32 |
| Article VII | ACCOUNTING AND VALUATION; BOOKS AND RECORDS | 33 |
| 7.1 | Accounting and Reports | 33 |
| 7.2 | Certain Tax Matters | 34 |
| 7.3 | AEOI | 35 |
| 7.4 | Valuation of Partnership Assets and Interests | 37 |
| 7.5 | Determinations by the General Partner | 37 |
| 7.6 | Books and Records | 37 |
| Article VIII | GENERAL PROVISIONS | 38 |
| 8.1 | Amendment of Partnership Agreement | 38 |
| 8.2 | Special Power-of-Attorney | 38 |
| 8.3 | Notices | 40 |
| 8.4 | Agreement Binding Upon Successors and Assigns; Delegation | 40 |
| 8.5 | Governing Law | 40 |
| 8.6 | Interpretation of Partnership Accounting Systems and Terminology | 41 |
| 8.7 | Miscellaneous | 41 |

Appx. 03386

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 02/24 of 86ge 10 of 200    PageID 24622
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 95 of
324

THIS SECOND AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT of Highland Dynamic Income Master Fund, L.P. is made on April 1, 2018 by and among Highland Dynamic Income Fund GP, LLC, as General Partner, those Persons who are listed on Exhibit A as Limited Partners and any other Persons who are admitted, from time to time, as Limited Partners of the Partnership, in accordance with this Agreement.  This Agreement amends and restates in its entirety the Amended and Restated Exempted Limited Partnership Agreement of the Partnership dated March 28, 2013 (the "*Prior Agreement*").

---

## Article I  DEFINITIONS

---

For purposes of this Agreement:

"*Act*" means the Exempted Limited Partnership Law, 2014 of the Cayman Islands, as amended, supplemented or replaced from time to time.

"*Administrator*" means such Person as the General Partner may designate from time to time, in its sole discretion, to serve as administrator to the Partnership.

"*Advisory Committee*" has the meaning set forth in Section 4.6.

"*AEOI*" means:

    (i)        Sections 1471 through 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

    (ii)       the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters – the Common Reporting Standard and any associated guidance;

    (iii)     any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation, regulations, guidance or standards described in sub-paragraphs (a) and (b); and

    (iv)     any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"*Affiliate*" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person. For these purposes, "control" means the

1

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-21   Filed 03/04/24   Page 11 of 200   PageID 24623
Appendix Part 6 Page 03024 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 96 of
324

possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" means this Second Amended and Restated Exempted Limited Partnership Agreement, as amended from time to time.

"*Automatic Dissolution Date*" has the meaning set forth in Section 6.1(a)(ii).

"*BBA*" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"*BBA Effective Period*" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in the BBA.

"*Business Day*" means any day or days on which banks are open for business in the city of New York, NY and the Cayman Islands and/or such other place or places as the General Partner may determine.

"*Calculation Period*" means, with respect to each Capital Account of a Limited Partner, the period commencing as of the date of the establishment of the Capital Account (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Account, and ending as of the close of business on the first to occur of the following:

(a)     the last day of a calendar year;

(b)     the withdrawal of all or a portion of the Interest attributable to such Capital Account (but only with respect to such withdrawn amount);

(c)     the permitted transfer of all or any portion of such Capital Account; or

(d)     the final distribution with respect to such Capital Account to such Limited Partner following the dissolution of the Partnership.

"*Capital Account*" has the meaning set forth in Section 3.3(a).

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"*Commencement Date*" means the first date on or as of which a Limited Partner makes a capital contribution to the Partnership.

"*Designated Individual*" has the meaning set forth in Section 7.2(a).

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-2tr Filel6-2xh Pag03/2f 867age 12 of 200    PageID 24624
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 97 of
324

"*Domestic Fund*" means Highland Dynamic Income Fund, L.P., a Delaware limited partnership.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"*ERISA Partner*" means a Limited Partner which is (a) an employee benefit plan subject to the fiduciary provisions of ERISA, (b) a "plan" subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the entity, or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA or any regulation promulgated thereunder.

"*Feeder Fund Investor*" means an investor in one of the Feeder Funds.

"*Feeder Funds*" means the Domestic Fund and the Offshore Fund.

"*Fiscal Period*" means each period that starts at the opening of business on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day immediately following the last day of the preceding Fiscal Period, and that ends at the close of business on the earliest of the following dates:

(a)    the last day of a calendar month;

(b)    any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)    the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)    any other date which the General Partner selects.

"*Fiscal Year*" means the period commencing on the Commencement Date and ending on December 31 of the year of commencement, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect another fiscal year, *provided* that any such other fiscal year shall be permissible for U.S. federal income tax purposes.  In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "*Fiscal Year*" means the portion of the calendar year ending on the date on which the Partnership is terminated.

"*GAAP*" means generally accepted accounting principles in the United States.

"*General Partner*" means Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands, any successor thereto,

Appx. 03389

Case 21-03003-sgj Doc 135-6 Filed 12/18/21 Entered 12/18/21 01:38:22 Desc
Case 3:21-cv-00881-X Document 26-1 Filed 03/24/22 Page 13 of 200 PageID 24625
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20 Entered 02/24/20 17:25:25 Page 98 of
324

and any Persons hereafter admitted as additional general partners, in its capacity as general partner of the Partnership.

"*Gross Negligence*" means "gross negligence" as such term is defined and interpreted in accordance with the laws of the State of Delaware.

"*Indemnified Person*" means each of the General Partner, the Investment Manager, any member, shareholder, partner, manager, director, officer, employee or agent of, or any person who controls, the General Partner, each of the respective affiliates of the foregoing, members of the Advisory Committee or the Pricing Committee, their respective affiliates, or any of the legal representatives of any of the foregoing.

"*Index Return Amount*" means the amount that would have been credited or debited to such Capital Account for the Calculation Period if the rate of return had been equal to the return of the S&P/LSTA Leveraged Loan Total Return Index for such Calculation Period.

"*Interest*" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"*Investment Management Agreement*" means the Investment Management Agreement by and among the Investment Manager, the General Partner, the Feeder Funds and the Partnership.

"*Investment Manager*" means Highland Capital Management, L.P., a Delaware limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"*Investments*" means investments in securities or other financial or intangible investment instruments, contracts or products made by the Partnership, as more fully described in the Feeder Funds' offering memoranda (as may be amended, updated or supplemented from time to time).

"*Limited Participation Investment*" means an Investment which, as determined by the General Partner, is suitable for some but not all of the Capital Accounts, or of which certain Capital Accounts should receive a reduced participation, for legal, tax, regulatory or other *bona fide* reasons.

"*Limited Participation Sub-Accounts*" means memorandum accounts to be maintained in the accounting records of the Partnership on a Capital Account-by-Capital Account basis with respect to each particular Limited Participation Investment to reflect the entitlement of each Capital Account (other than a Capital Account that does not have any credit balance at the time of the establishment of the Limited Participation Sub-Account that is unrelated to a pre-existing Limited Participation Sub-Account) to allocations and distributions attributable to Partnership transactions involving such Limited Participation Investments.

"*Limited Partner*" means each of the Persons set forth on Exhibit A and any Person who has become a Limited Partner pursuant to the terms of this Agreement, in each case in such

Appx. 03390

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Filed 03/24 of 88 Page 14 of 200    PageID 24626
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 99 of
324

Person's capacity as a limited partner of the Partnership.   The General Partner may subdivide the Interests into separate series and establish new series pursuant to Section 2.10; *provided, that*, except as expressly set forth in this Agreement, for all purposes of the Act, the Limited Partners constitute a single class or group of limited partners.

"*Liquidator*" has the meaning set forth in Section 6.1(b).

"*Management Fee*" means an amount calculated at an annual rate of (i) 0.75% of each Capital Account of a Limited Partner.  The Management Fee is calculated and payable quarterly in advance as further described in Section 3.5(a).

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

"*Negative Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the effective date of withdrawal, but such Partner shall cease to be a Negative Basis Partner at such time as it shall have received allocations pursuant to Section 3.10(d) equal to such Partner's Negative Basis as of the effective date of withdrawal and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Net Assets*" means the total value, as determined by the General Partner or its delegate(s) in accordance with Section 7.3, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6).  Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal Period but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period and after giving effect to Management Fee charges and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

(a)     any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(b)     withholding or other taxes (including any amounts under any BBA provision), expenses of processing withdrawals and other items payable, any increases or decreases in any reserves or other amounts recorded pursuant to Section 3.6 and any increases or decreases in the value of any Limited Participation Investments during the Fiscal Period ending as of the date on which such determination is

Appx. 03391

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Appendix Part 6 Filed 03/24/ of 867age 15 of 200    PageID 24627
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 100 of
324

made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"*Net Loss*" means any amount by which the Net Assets as of the first day of a Fiscal Period exceed the Net Assets as of the last day of the same Fiscal Period.

"*Net Profit*" means any amount by which the Net Assets as of the last day of a Fiscal Period exceed the Net Assets as of the first day of the same Fiscal Period.

"*New Limited Partner*" has the meaning assigned to such term in Section 8.2(a)(vi).

"*Offshore Fund*" means Highland Dynamic Income Fund, Ltd., a Cayman Islands exempted company.

"*Other Account*" means any assets or investment of the General Partner, or any assets managed by the General Partner or any Affiliate of the General Partner for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "Partners" means the General Partner and all of the Limited Partners.

"*Partnership*" means the exempted limited partnership formed upon the filing of a statement under Section 9 of the Act with the Registrar on February 26, 2013, pursuant to the Prior Agreement and registered with the name "Highland Dynamic Income Master Fund, L.P."

"*Partnership Minimum Gain*" has the meaning set forth in Regulations Section 1.704-2(b)(2) and (d).

"*Partnership Percentage*" means a percentage established for each Capital Account on the Partnership's books as of the first day of each Fiscal Period. The Partnership Percentage of a Capital Account for a Fiscal Period shall be determined by dividing the amount of such Capital Account as of the beginning of the Fiscal Period (after crediting all capital contributions to such Capital Account which are effective as of such date, net of all deductions, including Management Fees) by the sum of all Capital Accounts as of the beginning of the Fiscal Period (after crediting all capital contributions to the Partnership which are effective as of such date, net of all deductions, including Management Fees). The sum of the Partnership Percentages of all Capital Accounts for each Fiscal Period shall equal 100%.

Appx. 03392

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-1 Part 6 Filed 03/25/24    Appendix Part 6 Page 16 of 200    PageID 24628
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 101 of
324

"***Performance Allocation***" means, with respect to each Capital Account of a Limited Partner, 10% of the amount, determined as of the close of each Calculation Period with respect to such Capital Account, by which the Performance Change amount (positive and negative) for such Calculation Period exceeds the Index Return Amount (positive and negative) for such Capital Account for such Calculation Period.

"***Performance Change***" means, with respect to each Capital Account of a Limited Partner for each Calculation Period, the difference between:

(a)     the sum of (a) the balance of such Capital Account as of the close of the Calculation Period (after giving effect to all allocations to be made to such Capital Account as of such date other than any Performance Allocation to be debited against such Capital Account), plus (b) any debits to such Capital Account during the Calculation Period to reflect any actual or deemed distributions or withdrawals with respect to such Capital Account, plus (c) any debits to such Capital Account during the Calculation Period to reflect any items allocable to such Capital Account pursuant to Section 3.5(b) or 3.5(c) hereof; and

(b) the sum of (a) the balance of such Capital Account as of the commencement of the Calculation Period, plus (b) any credits to such Capital Account during the Calculation Period to reflect any contributions by such Limited Partner to the Capital Account.

"***Person***" means any individual, partnership, corporation, limited liability company, trust, or other entity.

"***Plan Assets***" means assets of the Partnership that are considered to be assets of an ERISA Partner, as determined pursuant to Section 3(42) of ERISA.

"***Positive Basis***" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death).

"***Positive Basis Partner***" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the effective date of withdrawal, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.10(c) equal to such Partner's Positive Basis as of the effective date of withdrawal and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"***Pricing Committee***" has the meaning set forth in Section 4.7.

"***Prior Agreement***" has the meaning set forth in the recitals hereto.

"***Registrar***" means the Registrar of Exempted Limited Partnerships of the Cayman Islands.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-1    Filed 03/16/24    Page 17 of 200    PageID 24629
Appendix Part 6 Page 102 of 887
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 102 of
324

"*Regulations*" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"*Regulatory Allocations*" has the meaning set forth in Section 3.11.

"*Section 9 Statement*" has the meaning set forth in Section 2.1(a).

"*Section 10 Statement*" has the meaning set forth in Section 2.1(b).

"*Tax Matters Partner*" has the meaning set forth in Section 7.2(a).

"*Termination Date*" has the meaning assigned to such term in Section 6.1(a).

"*Transfer*" means any sale, exchange, transfer, assignment or other disposition by a Partner of its Interest to another party, whether voluntary or involuntary, including a transfer by operation of law, but not including a pledge of or a granting of another form of security interest in any such Interest.

---

## Article II  ORGANIZATION

---

**2.1    Continuation of Limited Partnership**

(a)    The General Partner and Offshore Fund established the Partnership upon filing a statement under section 9 of the Act (the "*Section 9 Statement*") with the Registrar on February 26, 2013, pursuant to the Prior Agreement, which Prior Agreement has governed the operation of the Partnership since that date.  The General Partner hereby admits the Limited Partners who are a party to this Agreement (provided that the Initial Limited Partner (as defined in the Prior Agreement) is not hereby admitted but shall continue as a Limited Partner) and the General Partner and the Limited Partners hereby amend and restate the Prior Agreement in its entirety on the terms of this Agreement.

(b)    If requested by the General Partner, the Limited Partners will promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filings, recordings, publishings and other acts as may be appropriate to comply with all requirements for (i) the formation and operation of an exempted limited partnership under the laws of the Cayman Islands, (ii) if the General Partner deems it advisable, the operation of the Partnership as an exempted limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (iii) all other filings required by the Act to be made by the Partnership.    The General Partner shall cause any required amendment to the Section 9 Statement, which shall be effected by way of the execution by the General Partner of a statement under Section 10 of the Act (the "*Section 10 Statement*") with such statement to be filed promptly following the

Appx. 03394

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Page 18 of 200    PageID 24630
Appendix Part 6    Filed 09/03/24    Page 18 of 887
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 103 of
324

event requiring such amendment.    All Section 10 Statements or any such amendments may be signed by the General Partner (as required by the Act), and may be signed either personally or by an attorney-in-fact or agent of the General Partner.

(c)    The Partnership received an undertaking from the Governor-in-Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Partnership or to any Partner in respect of the operations or assets of the Partnership or the Interest of a Partner.    The parties hereto acknowledge that they intend that the Partnership be taxed in the United States as a partnership and not as an association taxable as a corporation for U.S. federal income tax purposes. No election may be made to treat the Partnership as other than a partnership for U.S. federal income tax purposes.

**2.2    Name of Partnership**

(a)    The name of the Partnership shall be Highland Dynamic Income Master Fund, L.P. or such other name as the General Partner may hereafter adopt upon (i) causing a statement pursuant to Section 10 of the Act to be filed with the Registrar and (ii) giving notice thereof to the Limited Partners.

(b)    The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's winding up or at such time as there ceases to be a General Partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3    Registered Office**

(a)    The registered office address of the Partnership in the Cayman Islands is at c/o Maples Corporate Services Limited, P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

(b)    The General Partner may at any time change the location of the Partnership's registered office or registered agent in its sole discretion, provided that the registered office of the Partnership shall be in the Cayman Islands.

**2.4    Term of Partnership**

The term of the Partnership commenced on the date of formation and continues until wound up and dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1).

9

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-1 Filed 03/22/24    Page 19 of 200    PageID 24631
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 104 of
324

**2.5    Object and Powers of Partnership**

(a)    The object and business of the Partnership is to (1) purchase, sell (including short sales), invest and trade in Investments (2) engage in financial transactions, including borrowing, financing, pledging, hedging and other derivative transactions relating thereto for the benefit of the Partnership, (3) engage in any lawful act or activity for which exempted limited partnerships may be formed under the Act and (4) engage in any and all activities necessary or incidental to the foregoing; provided that the Partnership shall not undertake business with the public in the Cayman Islands other than so far as is necessary for the carrying on of the business of the Partnership exterior to the Cayman Islands.

(b)    The Partnership possesses and the General Partner on behalf of the Partnership may exercise all such powers and privileges as the General Partner considers necessary, convenient or incidental to the conduct, promotion or attainment of the objects of the Partnership.

**2.6    Liability of Partners**

(a)    The liability of the Limited Partners is limited to their obligations under this Agreement and the Act.  The General Partner is liable for all of the debts and obligations of the Partnership to the extent that the Partnership has insufficient assets.  The General Partner shall not be personally liable for the withdrawal, payment or distribution of all or any part of any Interest, it being expressly agreed that any such withdrawal, payment or distribution to be made pursuant to this Agreement shall be made solely from the assets of the Partnership (which shall not include the General Partner's capital contributions) and on the terms and subject to the conditions contained in this Agreement.

(b)    In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any personal liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act or other applicable law.

**2.7    Actions by Partnership**

The General Partner on behalf of the Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out the objects of the Partnership as set forth in Section 2.5 above.  Notwithstanding the foregoing, the Partnership shall not issue any securities other than Interests in the Partnership.

**2.8    Reliance by Third Parties**

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 01/14/24    Page 20 of 200    PageID 24632
Appendix Part 6    Page 132 of 887
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 105 of
324

**2.9**   **Filings**

(a)   The General Partner shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Partnership as an exempted limited partnership under the Act and other laws of the Cayman Islands, including the filing of a notice pursuant to Section 10 of the Act with the Registrar signed by the General Partner upon the occurrence of certain amendments to the Section 9 Statement of the Partnership, and any other states or jurisdictions in which the Partnership engages in business.

(b)   Following the winding up of the Partnership and to effect the dissolution of the same, the General Partner or any duly appointed liquidator shall promptly (i) comply with the applicable provisions of Section 15 of the Act, (ii) execute and cause to be filed a notice of dissolution in accordance with Section 15(3) of the Act and (iii) file any certificates of cancellation in accordance with the laws of any states or jurisdictions in which the Partnership has filed certificates.

**2.10**   **Series of Interests**

The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different classes or series of Interests in the Partnership with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such class or series; *provided* that such class or series would not reasonably be expected to have a material adverse effect on the existing Limited Partners.

––––––––––

**Article III  CAPITAL**

––––––––––

**3.1**   **Contributions to Capital**

(a)   Each Partner is permitted to make contributions to the capital of the Partnership at such times and in such amounts as the General Partner, in its sole discretion, may determine.   The Limited Partners are not required to make any additional contributions to the Partnership, subject to the provisions of Section 3.5(b) and any contrary provision of the Act.

(b)   Each Person admitted as a General Partner agrees to make and maintain a capital contribution as a General Partner of at least U.S.$1.00.  Except as provided above or in the Act, the General Partner is not required or obligated to make any additional contributions to the capital of the Partnership.  The General Partner or an Affiliate shall have the right at any time to make additional capital contributions as a Limited Partner or General Partner.

**Appx. 03397**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2 Part 6 Page 09/02 of 86ge 21 of 200    PageID 24633
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 106 of
324

**3.2    Rights of Partners in Capital**

(a)    No Partner shall be entitled to interest on its capital contributions to the Partnership.

(b)    No Partner shall have the right to the return of any capital contribution to the Partnership except, subject to the Act, (i) upon withdrawal by such Partner of all or part of its Interest pursuant to Section 5.3 or (ii) upon the winding up and dissolution of the Partnership pursuant to Section 6.1. The entitlement to any such return shall be limited to the value of the Capital Account of the Partner. The General Partner shall not be liable for the return of any amounts.

**3.3    Capital Accounts**

(a)    The Partnership maintains a separate capital account (each a "***Capital Account***") on the books and records of the Partnership for each Partner. The General Partner may, in its discretion, maintain separate memorandum sub-accounts related to a Capital Account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting or to otherwise give effect to the provisions of this Agreement, and, if so determined by the General Partner, with each memorandum sub-account being maintained as if it were the Capital Account of a separate Partner for all purposes of this Agreement unless the context requires otherwise. References herein to a "Capital Account" shall be deemed to refer to such a capital memorandum sub-account where the context admits. Each Capital Account must reflect the aggregate sum of the balances of memorandum sub-accounts in such Partner's Capital Account. Without limiting the foregoing:

(i)    with respect to the Domestic Fund, the Partnership maintains a separate memorandum sub-account with respect to the Domestic Fund's Capital Account with respect to the capital account (and applicable memorandum sub-account) of each partner of such Domestic Fund;

(ii)    in the case of the Offshore Fund, the Partnership maintains a separate memorandum sub-account with respect to each class and series of shares of the Offshore Fund attributable to a shareholder; and

(iii)    Any separate memorandum sub-accounts established for a Limited Partner's Capital Account may be consolidated at the beginning of each Calculation Period, as determined by the General Partner.

(b)    Each Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to the Partnership.

Appx. 03398

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-1    Filed 04/12/24    Page 22 of 200    PageID 24634
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 107 of
324

(c)     Each Capital Account shall be increased by the amount of any cash and the net value of any property constituting additional contributions to such Capital Account permitted pursuant to Section 3.1.

(d)     Each Capital Account shall be reduced by the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.3 or 6.2.

(e)     The Capital Account of the General Partner will be increased by the amount of the Performance Allocation allocated to such Capital Account and the investment gains thereon pursuant to Section 3.7(a).

(f)     Each Capital Account, including any related Limited Participation Sub-Accounts, shall be adjusted to reflect allocations and other changes in the value of such Capital Account in the manner specified in the remaining provisions of this Article III.

**3.4     Allocation of Net Profit and Net Loss**

(a)     Subject to the remaining provisions of this Article III, as of the last day of each Fiscal Period, any Net Profit or Net Loss for such Fiscal Period shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages for such Fiscal Period.

(b)     Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses for a Fiscal Period that are not allocable to specific Investments of the Partnership, including short term interest income, and audit, administration and legal expenses, shall be credited to or debited against the Capital Accounts of the Partners *pro rata* in accordance with their Partnership Percentages for such Fiscal Period.

(c)     Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses that relate to a Limited Participation Investment shall be allocated exclusively to those Capital Accounts that the General Partner determines are eligible to participate in such Limited Participation Investment on a *pro rata* basis based on their relative participation in such Limited Participation Investment.

**3.5     Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures**

(a)     As of the first Business Day of each calendar quarter, and in the case of any Limited Partner who makes a capital contribution as of any other date, as of the date of such capital contribution, the Management Fee applicable to each Capital Account for such calendar quarter will be debited against the relevant Capital Account.  Capital contributions accepted after the commencement of the calendar quarter shall be subject to a prorated Management Fee reflecting the time remaining during such calendar quarter.  The General Partner may waive or

13

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Appendix Part 6 Filed 09/24 of 887age 23 of 200    PageID 24635
Case 3:21-cv-00881-X    Document 176-21    Page 24 of 86
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 108 of
324

decrease the Management Fee with respect to any Limited Partner and any Capital Account. The General Partner may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the Limited Partners.

(b)     Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or AEOI withholding), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required. If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement. Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Fiscal Period during which the Partnership so withholds, pays or incurs such obligation. If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership within 10 business days after notification and demand by the General Partner in the amount of such excess. The General Partner is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax. Each Limited Partner agrees to repay to the Partnership and the General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)     Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be charged only to the relevant Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments. Such charges shall be debited from the relevant Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-1    Filed 09/24/2  Page 24 of 200    PageID 24636
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 109 of
324

3.6     **Reserves; Adjustments for Certain Future Events**

(a)     The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets including Limited Participation Investments and proportionately against the Capital Accounts for contingent liabilities or probable losses, such reserves to be in the amounts which the General Partner deems necessary or appropriate. The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate. The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be charged or credited, as the General Partner deems appropriate, to the Capital Accounts of those parties that were Partners at the time when such reserve was created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties that were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established by the General Partner.

(b)     If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately charged or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period.

3.7     **Performance Allocation**

(a)     The Performance Allocation will be debited against each Capital Account of each Limited Partner as of the last day of each Calculation Period with respect to such Capital Account, and the amount so debited will simultaneously be credited to the Capital Account of the General Partner pursuant to Section 3.3(e).

(b)     The General Partner may waive or decrease the Performance Allocation with respect to any Limited Partner and any Capital Account.

(c)     Net Profit for each year shall be allocated to the Capital Account of the General Partner from the Capital Accounts of the Limited Partners pro rata in accordance with their share of Net Profits for such Calculation Period determined prior to the application of this Section 3.7 in an amount equal to the Performance Allocation for such Calculation Period. If the Performance Allocation for the Calculation Period is greater than the aggregate net profits realized by the Partnership allocable to the Capital Accounts bearing the Performance Allocation for such Calculation Period, the Capital Account of the General Partner will be allocated, in addition to the Net Profits, additional items of gross income realized by the Partnership allocable to the Capital Accounts bearing the Performance Allocation during such year sufficient to credit the Capital Account of the General Partner with the full Performance Allocation. If such special allocations of items of gross income cannot be made in an amount equal to such shortfall, the excess amounts shall be treated as a guaranteed payment for services pursuant to Section 707(c) of

15

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16-1  Appendix Part 6  Filed 09/22/  Page 25 of 200   PageID 24637
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 110 of
324

the Code.  Appropriate adjustments will be made to the Capital Accounts bearing the Performance Allocation to reflect allocations of gross income described in the preceding sentence.  The parties agree that, to the extent permitted by applicable law, for all federal income tax purposes, the Performance Allocation shall be treated as an allocation of profits of the partnership for purposes of Section 704(b) of the Code and the Regulations promulgated thereunder.

**3.8    Limited Participation Investments**

Whenever the Partnership makes a Limited Participation Investment, a Limited Participation Sub-Account shall be established for each Capital Account participating in such Limited Participation Investment to reflect such Capital Account's *pro rata* share of the Partnership's portion of all allocations and distributions attributable to transactions involving such Limited Participation Investment (and any related follow-on Investments, unless the General Partner determines to treat such follow-on Investment as a new Limited Participation Investment).  Thereafter, the Partnership's portion of all credits and debits relating to such Limited Participation Investment (including those specifically referred to herein) shall be allocated among the Limited Participation Sub-Accounts for such Limited Participation Investment on a *pro rata* basis in accordance with each Capital Account's interest in such Limited Participation Investment.  Expenses that relate to a Limited Participation Investment shall be allocated exclusively among the Limited Participation Sub-Accounts for such Limited Participation Investment on a *pro rata* basis in accordance with each Capital Account's interest in such Limited Participation Investment.

**3.9    Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner.  Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.9 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.9 not previously recovered.

**3.10    Allocations for Income Tax Purposes**

Notwithstanding anything to the contrary in this Agreement:

(a)    <u>Income Tax Allocations</u>.  Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year will be allocated among the Partners (and among such Partner's Capital Accounts) in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Accounts, whether in such Fiscal Year or in prior Fiscal Years.  To this end, the Partnership will establish and maintain records which shall show the extent to which the Capital Accounts of each Partner will, as of the last day of each Fiscal Year, comprise amounts that

16

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/24 of 86age 26 of 200    PageID 24638
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 111 of
324

have not been reflected in the taxable income of such Partner.  To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts.  Non-U.S. tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations.    All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b)    Basis Adjustments.  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations; *provided* that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)    Positive Basis Allocations.  If the Partnership realizes gains or items of gross income (including short term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.3, the General Partner may elect: (i) to allocate such gains or items of gross income among such Positive Basis Partners, pro rata in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Positive Basis Partner

17

Case 21-03003-sgj Doc 135-6 Filed 12/18/21 Entered 12/18/21 01:38:22 Desc
Case 3:21-cv-00881-X Document 16-2 Filed 09/24 Page 27 of 200 PageID 24639
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20 Entered 02/24/20 17:25:25 Page 112 of
324

an amount of such gains or items of gross income equal to the amount, if any, by which its Positive Basis as of the effective date of withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence. For the avoidance of doubt, the General Partner may also, in its sole discretion, to apply the Positive Basis definitions and the provisions of this Section 3.10(c) to a withdrawal from a Capital Account.

(d)    <u>Negative Basis Allocations</u>. If the Partnership realizes net losses or items of gross loss or deduction (including short term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.3, the General Partner may elect: (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, pro rata in proportion to the respective Negative Basis of each such Negative Basis Partners, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its Negative Basis as of the effective date of withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence. For the avoidance of doubt, the General Partner may also, in its sole discretion, to apply the Negative Basis definitions and the provisions of this Section 3.10(d) to a withdrawal from a Capital Account.

(e)    <u>Qualified Income Offset</u>. In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; provided that an allocation pursuant to this Section 3.10(e) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.10(e) were not in this Agreement. This Section 3.10(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and shall be interpreted consistently therewith.

Appx. 03404

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-1 Filed 09/24/21 Page 28 of 200    PageID 24640
Appendix Part 6    Page 114 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 113 of
324

(f)     <u>Minimum Gain Chargeback</u>.   Notwithstanding any other provision of this Section 3.10, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, the Partners will be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of any such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Sections 1.704-2(f) and (g). This Section 3.10(f) is intended to comply with the minimum gain chargeback requirement in such sections of the Regulations and must be interpreted consistently therewith.

(g)     <u>Gross Income Allocation</u>.   In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 3.10(g) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.10(e) and this Section 3.10(g) were not in this Agreement.

(h)     <u>Section 704(b) Compliance</u>.   The allocations provided in this Section 3.10 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

**3.11    Curative Allocations**

The allocations set forth in Sections 3.10(b), (e), (f) and (g) (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations.   It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.11.   Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-1    Filed 04/24/24    Page 29 of 200    PageID 24641
Appendix Part 6 Page 94 of 887
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 114 of
324

**3.12    Individual Partners' Tax Treatment**

Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

**3.13    Distributions**

(a)    The amount and timing of any distributions from the Partnership shall be determined by the General Partner. Distributions will generally be made in proportion to the Capital Account balances of the Partners at the beginning of the Fiscal Period when made; *provided* that distributions related to Limited Participation Investments will be made based on the proportionate interests of the Capital Accounts participating in such Limited Participation Investments. Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner on any account of its Interest if such distribution would violate the Act or other applicable law.

**3.14    Other Matters**

(a)    The General Partner does not have any personal liability for the repayment of any capital contribution of any Partner.

(b)    Subject only to the relevant provisions of the Act, the Limited Partners are not personally liable for the debts, liabilities, contracts or other obligations of the Partnership except to the extent of their respective capital contributions; provided, however, that the foregoing is not to be construed as relieving any Partner of any obligations arising under Section 3.1 of this Agreement.

(c)    The Limited Partners shall not participate in the conduct of the Partnership's business nor shall they transact business for the Partnership, nor shall they have the power to sign for or bind the Partnership, said powers being vested exclusively in the General Partner.

---

### Article IV  MANAGEMENT

---

**4.1    Duties and Powers of the General Partner**

(a)    Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for (i) all investment and investment management decisions to be undertaken on behalf of the Partnership and (ii) managing and administering

Appx. 03406

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 1-7   Filed 04/22/21   Page 30 of 200    PageID 24642
Appendix Part 6 Page 142 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 115 of
324

the affairs of the Partnership, and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership.

(b)    The General Partner shall have the right, without the notification to or consent of any Limited Partner or other Person, to make adjustments to the structure of the Partnership in order to address applicable structural, ownership, legal, or regulatory issues, or to improve overall tax efficiency; *provided* that no such adjustment would cause any material adverse consequences to the Limited Partners.

(c)    Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner shall have full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1, including, without in any manner limiting the generality of the foregoing, (i) contracts, agreements, undertakings and transactions with any Partner or with any other Person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (ii) agreements with each Limited Partner in connection with its purchase of an Interest, (iii) any agreements to induce any Person to purchase an Interest, and (iv) the Investment Management Agreement delegating to the Investment Manager certain of the powers and authority vested by this Agreement in the General Partner as the General Partner and the Investment Manager may agree from time to time, each without any further act, approval or vote of any Person.

(d)    The General Partner may terminate or replace the Investment Manager in accordance with the terms of the Investment Management Agreement. The General Partner may delegate to any other Person any power and authority vested in the General Partner pursuant to this Agreement that is not otherwise delegated to the Investment Manager.

(e)    Every power vested in the General Partner pursuant to this Agreement shall be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein. No provision of this Agreement shall be construed to require the General Partner to violate the Act or any other law, regulation or rule of any self-regulatory organization.

(f)    Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own

Appx. 03407

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-7    Filed 05/24/23    Page 31 of 200    PageID 24643
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 116 of
324

interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Limited Partners, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards. Unless otherwise expressly stated, for purposes of this Section 4.1(f), the General Partner shall be deemed to be permitted or required to make all decisions hereunder in its sole discretion.

(g)    The General Partner must cause the Partnership to conduct its dealings with third parties in its own name.

(h)    The General Partner must, throughout the term of the Partnership as set out in Section 2.4, take all actions that may be necessary or appropriate for the continuation of the Partnership's valid existence as an exempted limited partnership under the laws of the Cayman Islands.

## 4.2    Expenses

(a)    Subject to Section 4.2(f), each of the General Partner and the Investment Manager pays all of its own operating and overhead costs without reimbursement by the Partnership (except liability insurance and items described in Section 4.2(b)(iv)). The Partnership will not have its own separate employees or officers, and it will not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead expenses of the General Partner or the Investment Manager.

(b)    The Partnership, and not the General Partner or the Investment Manager, will pay, or reimburse the General Partner and the Investment Manager for, all other costs, fees and expenses arising in connection with the Partnership's operations. Such expenses payable by the Partnership include the following:

(i)    all investment-related expenses (including those related to identifying and evaluating contemplated investments, whether or not such contemplated investments are actually made), including, but not limited to, brokerage commissions and other transaction costs, expenses related to short sales, clearing and settlement charges, expenses related to proxies, underwriting and private placements, custodial fees, transfer agent fees, bank service fees, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, consulting and any other professional fees or compensation (including investment banking expenses) relating to particular investments or contemplated investments, appraisal fees and expenses, investment-related travel and lodging expenses and research-related expenses (including, without limitation, news and quotation equipment and services), fees to third-party providers of risk-monitoring services, investment and trading-related computer hardware and software,

Appx. 03408

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-1    Filed 05/24/ 887age 32 of 200    PageID 24644
Appendix Part 6 Page 152 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 117 of
324

including, without limitation, trade order management software (i.e., software used to route trade orders);

(ii)      accounting (including accounting software), audit and tax preparation expenses;

(iii)     costs and expenses associated with reporting and providing information to existing and prospective investors;

(iv)     any legal fees and costs (including indemnification expenses, regulatory costs and settlement costs) arising in connection with any litigation or regulatory investigation instituted against the Partnership, the General Partner, the Investment Manager or any of their respective affiliates in their capacity as such, subject to Section 4.5;

(v)      except as otherwise provided in Section 3.5, any taxes imposed or assessed upon, or payable by, the Partnership (including interest and penalties);

(vi)     costs of any meeting of the Partners (or of obtaining the consent of the Partners in lieu of meeting);

(vii)    expenses related to the Advisory Committee and the Pricing Committee;

(viii)   premiums for directors' and officers' liability insurance (if any) and any other insurance benefiting the Partnership;

(ix)     Management Fees;

(x)      administrative expenses (including, without limitation, the fees and expenses of the Administrator in relation to its services provided pursuant to the administration agreement);

(xi)     fees relating to valuing the Partnership's assets;

(xii)    expenses related to the maintenance of the Partnership's registered office;

(xiii)   corporate licensing expenses;

(xiv)   extraordinary expenses; and

(xv)    any costs or expenses of winding up and liquidating the Partnership.

(c)      Expenses generally will be borne *pro rata* by the Partners in accordance with the balances of their respective Capital Accounts; *provided* that expenses may be specially allocated among the Capital Accounts as follows:

(i)      with respect to expenses related to Investments (other than Limited Participation Investments), *pro rata* in accordance with the balances of

Appx. 03409

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 76-11 Filed 05/24/88ge 33 of 200   PageID 24645
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 118 of
324

their respective Capital Accounts exclusive of the value of any Limited Participation Sub-Account; and

(ii)      as provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6, 3.8 and 5.3.

(d)      Each of the General Partner and the Investment Manager, as appropriate, shall be entitled to reimbursement from the Partnership for any of the expenses paid by it on behalf of the Partnership pursuant to Section 4.2(b); *provided* that the General Partner may absorb any or all of such expenses incurred on behalf of the Partnership. The Investment Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Partnership, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and the Partnership shall not have any liability therefor; *provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Partnership hereunder, and the Partnership shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(e)      If the General Partner or the Investment Manager, as appropriate, shall incur any of the expenses referred to in Section 4.2(b) for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, will allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)      Each of the General Partner and the Investment Manager is entitled to use "soft dollars" generated by the Partnership to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the General Partner or the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended, or is otherwise reasonably related to the investment decision-making process, or to cover certain Partnership expenses described in Section 4.2(b). Use of "soft dollars" by the General Partner or the Investment Manager as described herein shall not constitute a breach by the either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part 6 Page 153 of 867 Page 34 of 200    PageID 24646
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 119 of
324

**4.3    Rights of Limited Partners**

The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.  Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

**4.4    Other Activities of Partners**

(a)    The General Partner shall not be required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine in good faith to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)    Each Partner agrees that any other Partner, and any partner, director, officer, shareholder, member, Affiliate or employee of any other Partner, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Partnership.  Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Partners or their respective partners, directors, officers, shareholders, members, Affiliates or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners and their respective partners, directors, officers, shareholders, members, Affiliates and employees are hereby authorized to engage in activities contemplated by this Section 4.4(b) with, or to purchase, sell or otherwise deal or invest in Investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Partnership, without the consent or approval of the Partnership or any other Partner.  The Partners expressly agree that no other Partner shall have any rights in or to such other activities, or any profits derived therefrom.

(c)    The General Partner and its Affiliates shall allocate investment opportunities to the Partnership and any Other Account fairly and equitably over time.  Notwithstanding the foregoing, the General Partner is under no obligation to accord exclusivity or priority to the Partnership in the event of limited investment opportunities.  This means that such opportunities will be allocated among those

25

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-1 Filed 05/24/of 803ge 35 of 200    PageID 24647
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 120 of
324

accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed Investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific Investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed Investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed Investment; and (vi) the need to re-size risk in the account's portfolio. The General Partner has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the General Partner may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d) The principals of the General Partner, as well as the employees and officers thereof and of organizations affiliated with the General Partner, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Partnership (such prohibition does not extend to the purchase or sale of Interests) unless appropriate approval of the Advisory Committee is obtained and such purchase or sale is in compliance with the applicable provisions of the Advisers Act or such purchase or sale is otherwise in compliance with the applicable provisions of the Advisers Act.

(e) Each Partner hereto hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.4.

(f) The General Partner and its Affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Partnership or that are targeted primarily to investors for which the Partnership is not designed to be a suitable investment vehicle. The General Partner and its Affiliates also reserve the right to establish and provide management or advisory services pursuant to separate Other Accounts for significant investors, whether or not such accounts have the same investment program as the Partnership.

## 4.5    Duty of Care; Indemnification

(a) None of the Indemnified Persons will be liable to the Partnership or any Limited Partner or any other person for mistakes of judgment or for action or inaction that did not constitute Gross Negligence, willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Partnership, provided that such broker or agent

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16 Part 6 Filed 09/24/21   Page 36 of 200   PageID 24648
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 121 of
324

was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above. No Indemnified Person shall be liable to the Partnership or any Limited Partner or any other person for any amount in excess of the amount of Management Fees received by the Investment Manager, to the extent permitted under applicable law. In addition, in no event shall any Indemnified Person be liable for any special, indirect, exemplary, consequential or punitive losses or damages. An Indemnified Person may consult with counsel and accountants in respect of the Partnership's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above. The foregoing provisions, however, shall not be construed so as to provide for the exculpation of an Indemnified Person of any liability (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the abovementioned provisions to the fullest extent permitted by law.

(b)     The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all loss, cost or expense suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability, damage loss, cost or expense resulted from a mistake of judgment on the part of an Indemnified Person or from action or inaction that did not constitute Gross Negligence, willful misconduct or bad faith, or from the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Person, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above. The Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct. In the event that such an advance is made by the Partnership, the Indemnified Person will agree to reimburse the Partnership to the extent that it is finally determined that it was not entitled to indemnification in respect thereof.

(c)     Notwithstanding any of the foregoing, the provisions of this Section 4.5 do not provide for the indemnification of any Indemnified Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Appx. 03413

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Filed 05/24/23 Page 37 of 200    PageID 24649
Appendix Part 6    Page 156 of 367
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 122 of
324

(d)     Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Person, the Partnership (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent Gross Negligence, bad faith or willful misconduct of any Indemnified Person.

(e)     The above-mentioned Indemnified Persons are also indemnified by each Limited Partner for any amounts of tax withheld or required to be withheld with respect to that Limited Partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the Limited Partner's Capital Account is insufficient to fully compensate the General Partner or the Investment Manager for such costs.

(f)     The General Partner may make, execute, record and file on its own behalf and on behalf of the Partnership all instruments and other documents (including one or more deed polls in favor of categories of Indemnified Persons and/or one or more separate indemnification agreements between the Partnership and individual Indemnified Persons) that the General Partner deems necessary or appropriate in order to extend the benefit of the provisions of Sections 4.5(a) and 4.5(b) to the Indemnified Persons; provided, that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in Sections 4.5(a) and 4.5(b) except as otherwise may be required by applicable law.

**4.6     Advisory Committee**

(a)     The General Partner and/or the Investment Manager may appoint a committee (the "*Advisory Committee*") composed of one or more individuals selected by the General Partner and/or the Investment Manager from time to time, none of whom is affiliated with the General Partner or the Investment Manager.

(b)     The General Partner and/or the Investment Manager may in its/their discretion seek the approval of the Advisory Committee or establish any other reasonable mechanism in connection with (i) approvals that are or would be required under the Investment Advisers Act of 1940, as amended (including Section 206(3)), or (ii) any other matter deemed appropriate by the General Partner and/or the Investment Manager.  Each Limited Partner agrees that, except as otherwise specifically provided herein and to the extent permitted by applicable law, the approval of a majority of the members of the Advisory Committee at such time is binding upon the Partnership and each Partner with respect to any approval sought under this Section 4.6(b).

(c)     Subject to the foregoing, any recommendations of or actions taken by the Advisory Committee are advisory only and the General Partner and the Investment Manager are not required or otherwise bound to act in accordance with any such recommendations or actions.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1   Filed 05/24/2 Page 38 of 200   PageID 24650
Appendix Part 6 Page 157 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 123 of
324

(d)     As determined by the General Partner and/or the Investment Manager, meetings of the Advisory Committee may be held in person or by telephone. Approval of the Advisory Committee is deemed to have been given if given by a majority of those members present at a meeting or by a majority of all members of the Advisory Committee if given pursuant to a written consent without a meeting.

(e)     The Partnership agrees to reimburse members of the Advisory Committee for their reasonable out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**4.7     Pricing Committee**

(a)     The General Partner and/or the Investment Manager shall appoint a committee (a "*Pricing Committee*") whose quorum consists of at least a majority of the following individuals:  the Chief Financial Officer of the Investment Manager, the Chief Compliance Officer of the Investment Manager and one or more traders of the Investment Manager.  The Pricing Committee meets on at least a monthly basis to review, confirm and agree on all pricing information established by the Investment Manager in respect of the Partnership's assets that are fair valued. The final pricing or valuation of such Partnership assets shall require the approval of a majority in number of the members of the Pricing Committee constituting a quorum as of a relevant valuation date. In lieu of meeting, the Pricing Committee may take action by written consent signed by a majority of the committee members.  The Pricing Committee may, at the Partnership's expense, engage third-party experts and consultants to provide services in connection with any determination to be made by the Pricing Committee.  The General Partner and/or the Investment Manager may replace members of the Pricing Committee or change the composition of the Pricing Committee, in their sole discretion.

(b)     In connection with the valuation of Partnership assets, the General Partner shall:

(i)     with respect to the Partnership's assets that are tracked by third party pricing services to which the Investment Manager's data administrator currently subscribes, use reasonable efforts to cause the Administrator (if any) to obtain independent pricing on at least a monthly basis from such data administrator;

(ii)     with respect to the Partnership's assets that are not tracked by third party pricing services, but for which the Investment Manager obtains pricing information from third party brokerage firms, require that the Investment Manager provide copies of such brokerage pricing to the Administrator on at least a monthly basis; and

(iii)     with respect to the Partnership's assets that are neither tracked by a third party pricing service nor for which the Investment Manager obtains pricing information from third party brokerage firms, require the Investment Manager to calculate pricing in its reasonable discretion and

Appx. 03415

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 05/24/23   Page 39 of 200   PageID 24651
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 124 of
324

will provide all such pricing information directly to the Administrator on at least a monthly basis.

---

## Article V  ADMISSIONS, TRANSFERS AND WITHDRAWALS

---

**5.1     Admission of Partners**

The General Partner may, without the consent of any existing Partners, admit any Person who agrees to be bound by all of the terms of this Agreement as a General Partner or a Limited Partner upon the execution by or on behalf of it and the acceptance by the General Partner of a deed of adherence to this Agreement in form satisfactory to the General Partner.  The amount of any initial capital contribution to be made by such additional Partner is determined by the General Partner (in its sole discretion).  Effective upon such admission, the Partnership Percentage of each existing Partner is adjusted pro rata to reflect the Partnership Percentage of the additional Partner, and the Partnership's records are revised to reflect such adjusted Partnership Percentages, as well as the name, initial capital contribution and Partnership Percentage of such additional Partner.  No Limited Partner may Transfer all or any portion of its Interest without the prior written consent of the General Partner.

**5.2     Transfer and Withdrawal of the General Partner**

Without the consent of a majority in number of the Limited Partners, the General Partner shall not have the right to assign or otherwise transfer its Interest as the general partner of the Partnership, and the General Partner shall not have the right to withdraw from the Partnership without the consent of the Limited Partners.  In the event of an assignment or transfer of all of its Interest as a general partner of the Partnership in accordance with this clause, the new general partner will immediately notify the Registrar in the Cayman Islands in accordance with Section 10 of the Act and the outgoing General Partner will take such actions as may be necessary to novate and assign all contracts signed on behalf of the Partnership to the new general partner whereupon the new general partner will be substituted as general partner of the Partnership in place of the outgoing General Partner and immediately thereafter the outgoing General Partner will cease to be the general partner of the Partnership.

**5.3     Transfer and Withdrawal of Interests of Limited Partners**

(a)     The General Partner shall have the right, in its sole discretion, to (i) prohibit Transfers of Limited Partner Interests, (ii) compel withdrawals of Limited Partner Interests and (iii) take such other actions as the General Partner deems necessary to ensure that the assets of the Partnership do not constitute Plan Assets for purposes of ERISA.

(b)     Subject to obtaining the General Partner's consent, each of the Limited Partners may voluntarily withdraw all or part of its Interest at such times and in such amounts as such Limited Partner may determine.

30

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 7-21 Appendix Part 6 Filed 05/24/87 Page 40 of 200    PageID 24652
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 125 of
324

(c)     The General Partner may postpone or suspend (a) the calculation of the net asset value of the Partnership (and the applicable valuation date); (b) the issuance of Interests, (c) the withdrawal by Limited Partners (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any stock exchange or over-the-counter market on which the Partnership's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of investments by the Partnership, or the determination of the value of the assets of the Partnership, would not be reasonably practicable or would be seriously prejudicial to the non-redeeming partners; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Partnership's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Partnership cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange; or (v) automatically upon termination of the Partnership as described in Section 6.1.

----

## Article VI  LIQUIDATION AND TERMINATION

----

**6.1    Termination of Partnership**

(a)     The Partnership shall be wound up and dissolved upon the first to occur of the following dates (each, a "***Termination Date***") and Sections 36(1)(b), 36(9) and 36(12) of the Act shall not apply to the Partnership:

   (i)     any date on which the General Partner shall elect in writing to terminate the Partnership;

   (ii)     if the General Partner is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice by the General Partner (or its legal representative) on all the Limited Partners informing the Limited Partners of:

      (1)     the commencement of liquidation or bankruptcy proceedings in relation to the General Partner; or

      (2)     the withdrawal, removal or making of a winding up or dissolution order in relation to the General Partner;

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1   Filed 06/04/24   Page 41 of 200   PageID 24653
Appendix Part 6 Page 126 of 887
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 126 of
324

*provided that*, if a majority in number of the Limited Partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Partnership shall be resumed and continued.  If a new general partner is not elected by the Automatic Dissolution Date, the Partnership shall be wound up and dissolved in accordance with terms of this Agreement and the Act.

(b)   Upon such Termination Date, the Partnership shall be wound up in accordance with the Act by the General Partner or if the General Partner is unable to perform this function, a liquidator elected by a Majority of the Limited Partners (a "***Liquidator***"), which shall take all steps necessary or appropriate to wind up the affairs of the Partnership as promptly as practicable thereafter.  Neither the admission of Partners nor the withdrawal, bankruptcy, death, legal incapacity or disability of a Limited Partner shall terminate the Partnership.

(c)   The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.  Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.  Accordingly, to the fullest extent permitted by law, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein, and no Limited Partner may present a winding up petition against the Partnership without the prior written consent of the General Partner.

## 6.2   Liquidation of Assets

(a)   Upon the Termination Date of the Partnership, the General Partner or Liquidator (as applicable) shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible.  Net Profit and Net Loss and any balances in Limited Participation Sub-Accounts during the Fiscal Periods, which includes the period of liquidation, shall be allocated pursuant to Article III.  The proceeds from liquidation shall be divided in the following manner, subject to the Act:

(i)   the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)   such debts as are owing to the Partners as Partners are next paid; and

(iii)   the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the

Appx. 03418

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Filed 01/24/24    Page 42 of 200    PageID 24654
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 127 of
324

Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)     Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or Liquidator may distribute ratably in-kind rather than in cash, upon dissolution, any assets of the Partnership; *provided*, *however*, that if any in-kind distribution is to be made, (i) the assets distributed in-kind shall be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in-kind shall be included in the Net Profit, Net Loss or Limited Participation Sub-Accounts for the Fiscal Period ending on the date of such distribution.

(c)     The General Partner shall, pursuant to Section 36(2) of the Act, file a notice of dissolution with the Registrar upon completion of the winding up of the Partnership.

---

### Article VII  ACCOUNTING AND VALUATION; BOOKS AND RECORDS

---

**7.1     Accounting and Reports**

(a)     The Partnership may adopt for tax accounting purposes any accounting method which the General Partner shall decide is in the best interests of the Partnership and which is permissible for U.S. federal income tax purposes.

(b)     As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of each such period to be made by a firm of independent accountants selected by the General Partner.  As soon as is practicable thereafter the General Partner shall furnish to each Limited Partner a copy of the set of financial statements prepared in accordance with GAAP (subject to this Agreement), with such adjustments thereto as the General Partner determines appropriate, including the report of such independent accountants. The General Partner may elect not to reserve certain amounts that may be required by GAAP and not to provide certain portfolio disclosure required by GAAP to investors and may capitalize and amortize certain of its organizational expenses in deviation from GAAP.  Such deviations from GAAP may result in a qualified opinion rendered on the financial statements of the Partnership.

(c)     As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each Limited Partner properly to report for U.S. federal, state, local or other income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 05/24/2 Page 43 of 200    PageID 24655
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 128 of
324

credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

**7.2    Certain Tax Matters**

(a)    By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "***Tax Matters Partner***"), or, in each case, under any similar state or local law and, if the "partnership representative" is an entity, the General Partner shall have the exclusive authority to appoint and designate the individual through whom such partnership representative will act for all purposes under subchapter C of chapter 63 of the Code and, if applicable, any similar state or local law (the "***Designated Individual***"). All references to the Tax Matters Partner herein shall include the Designated Individual, unless the context requires otherwise.  The Tax Matters Partner shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner.  The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period.  The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b)    The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

(c)    Each Limited Partner further agrees that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d)    The General Partner may in its sole discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws.

(e)    To the fullest extent permitted by law, each Limited Partner agrees to (i) provide such cooperation and assistance, including executing and filing forms or other

34

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 08/13/24    Page 44 of 200    PageID 24656
Appendix Part 6 Page 163 of 887
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 129 of
324

statements and providing information about the Limited Partner, as is reasonably requested by the Tax Matters Partner, to enable the Partnership to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Partner was admitted to the Partnership, (ii) amend the Limited Partner's tax returns and pay any resulting taxes, interest and penalties in connection with the Partnership's electing under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from the Partnership's electing under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Partnership, the Tax Matters Partner and any other individual designated to interact with tax authorities on behalf of the Partnership from and against any liability with respect to the Limited Partner's share of any tax deficiency (including any interest and penalties associated therewith) paid or payable by the Partnership that is (a) allocable to such Limited Partner (as reasonably determined by the General Partner in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Partner was a Partner in the Partnership or (b) attributable (as reasonably determined by the General Partner) to the failure of such Limited Partner to cooperate with or provide any such forms, statements, or other information as requested by the Tax Matters Partner pursuant to clause (i) above.

(f)    The obligations and covenants of the Limited Partners set forth in Sections 3.5, 7.2 and 7.3 hereof shall apply jointly and severally to each Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and shall survive such Limited Partner's ceasing to be a Partner in the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

**7.3    AEOI**

Each Partner acknowledges and agrees that:

(a)    the Partnership is required to comply with the provisions of AEOI;

(b)    it will provide, in a timely manner, such information regarding the Partner and its beneficial owners and such forms or documentation as may be requested from time to time by the Partnership (whether by its General Partner or other agents such as the Investment Manager or the Administrator) to enable the Partnership to comply with the requirements and obligations imposed on it pursuant to AEOI, specifically, but not limited to, forms and documentation which the Partnership may require to determine whether or not the Partner's relevant investment is a "Reportable Account" (under any AEOI regime) and to comply with the relevant due diligence procedures in making such determination;

(c)    any such forms or documentation requested by the Partnership or its agents pursuant to paragraph (b), or any financial or account information with respect to

35

**Appx. 03421**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Appendix Part 6    Filed 01/14/22    Page 45 of 200    Page 45 of 200    PageID 24657
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 130 of
324

the Partner's investment in the Partnership, may be disclosed to the Cayman
Islands Tax Information Authority (or any other Cayman Islands governmental
body which collects information in accordance with AEOI) and to any
withholding agent where the provision of that information is required by such
agent to avoid the application of any withholding tax on any payments to the
Partnership;

(d)    it waives, and/or shall cooperate with the Partnership to obtain a waiver of, the
provisions of any law which:

(i)    prohibit the disclosure by the Partnership, or by any of its agents, of the
information or documentation requested from the Partner pursuant to
paragraph (b);

(ii)    prohibit the reporting of financial or account information by the
Partnership or its agents required pursuant to AEOI; or

(iii)    otherwise prevent compliance by the Partnership with its obligations under
AEOI;

(e)    if it provides information and documentation that is in anyway misleading, or it
fails to provide the Partnership or its agents with the requested information and
documentation necessary in either case to satisfy the Partnership's obligations
under AEOI, the General Partner reserves the right (whether or not such action or
inaction leads to compliance failures by the Partnership, or a risk of the
Partnership or its investors being subject to withholding tax or other costs, debts,
expenses, obligations or liabilities (whether external, or internal, to the
Partnership) (together, "*costs*") under AEOI), in its sole discretion, to take any
action and/or pursue all remedies at its disposal including, without limitation:

(i)    to establish separate sub-accounts within a Partner's Capital Account for
the purpose of calculating AEOI related costs; and/or

(ii)    to allocate any or all AEOI costs among Capital Accounts on a basis
determined solely by the General Partner; and/or

(iii)    to compulsory withdraw such Partner from the Partnership; and/or

(iv)    to hold back or deduct from any withdrawal proceeds or from any other
payments or distributions due to such Partner any costs caused (directly or
indirectly) by the Partner's action or inaction;

(f)    it shall have no claim against the Partnership, the General Partner or any of its or
their agents, for any form of damages or liability as a result of actions taken or
remedies pursued by or on behalf of the Partnership in order to comply with
AEOI; and

(g)    it hereby indemnifies the Partnership, the General Partner and each of their
respective principals, members, partners, managers, officers, directors,

36

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 05/24 of 887age 46 of 200    PageID 24658
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 131 of
324

stockholders, employees and agents and holds them harmless from and against any AEOI related liability, action, proceeding, claim, demand, costs, damages, expenses (including legal expenses) penalties or taxes whatsoever which such parties may incur as a result of any action or inaction (directly or indirectly) of such Partner (or any related person) described in the preceding paragraphs. This indemnification shall survive the disposition of such Partner's Interest in the Partnership.

**7.4    Valuation of Partnership Assets and Interests**

(a)    The Partnership's assets are valued as of the close of each Fiscal Period and on any other date selected by the General Partner in its sole discretion in accordance with its valuation policies and procedures.

(b)    The value of the assets of the Partnership and the net worth of the Partnership as a whole determined pursuant to this Section 7.3 are conclusive and binding on all of the Partners and all parties claiming through or under them.

**7.5    Determinations by the General Partner**

(a)    All matters concerning the determination and allocation among the Partners and their respective Capital Accounts of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)    The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner and their respective Capital Accounts, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners and their respective Capital Accounts in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or sub-account as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

**7.6    Books and Records**

The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 1-1    Filed 06/05/21    Page 47 of 200    PageID 24659
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 132 of
324

Partnership.  Subject to the documentation requirements of the Act, such books and records of the Partnership must be kept at the Partnership's office or at the office of an agent.

-----------

### Article VIII  GENERAL PROVISIONS

-----------

**8.1**    **Amendment of Partnership Agreement**

(a)    Except as required by law, this Agreement may be amended, in whole or in part, by an instrument in writing signed by each of the Limited Partners and the General Partners.

(b)    The General Partner may amend this Agreement without the consent of the Limited Partners in order:

(i)    to make consequential amendments following any amendment made pursuant to this Section 8.1;

(ii)    to clarify any manifest or clerical inaccuracy, ambiguity or reconcile any inconsistency in this Agreement;

(iii)    to add to the representations, duties or obligations of the General Partner or waive any right or power of the General Partner for the benefit of the Limited Partners;

(iv)    so as to qualify or maintain the qualification of the Partnership as a limited partnership in any jurisdiction;

(v)    to change the name of the Partnership;

(vi)    to admit any new Limited Partners or to carry out the Transfer of any Interests;

(vii)    to make any other amendment whatsoever to this Agreement which the General Partner deems advisable, provided that it does not adversely affect any rights of the Limited Partners; or

(viii)    to create separate classes or sub-classes or series or sub-series of Partnership Interests.

**8.2**    **Special Power-of-Attorney**

(a)    Each Limited Partner hereby appoints the General Partner for the time being, with power of substitution, as his lawful attorney in his name to execute, acknowledge, swear to (and deliver as may be appropriate) on his behalf and file and record in

Appx. 03424

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-1 Filed 06/24/8 Page 48 of 200    PageID 24660
Appendix Part 6 Page 187 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 133 of
324

the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law):

(i)     any amendments to this Agreement made in accordance with the terms hereof;

(ii)    any instruments or documents which the General Partner determines in its sole discretion are required to admit any new Limited Partners or to carry out the Transfer of any Interests;

(iii)   declarations of limited partnership in various jurisdictions and amendments thereto;

(iv)    all deeds, agreements and other documents which the General Partner deems appropriate to conduct and carry on the business of the Partnership, including without limitation to qualify or continue the Partnership as an exempted limited partnership in the Cayman Islands and as required in the jurisdictions in which the Partnership may conduct business, or which may be required to be filed by the Partnership or the Partners under the laws of any jurisdiction or under any amendments or successor statute to the Act, to reflect the dissolution or termination of the Partnership or the Partnership being governed by any amendments or successor statutes to the Act or to reorganize or refile the Partnership in a different jurisdiction, provided that such reorganization or refiling does not result in a material change in the rights of the Partners;

(v)     to file, prosecute, defend, settle or compromise litigation, claims or arbitration on behalf of the Partnership;

(vi)    one or more subscription agreements (or other agreements or documents) on behalf of such Limited Partner between the Partnership, the General Partner and any Person (a "*New Limited Partner*") being admitted by the General Partner to the Partnership as a limited partner thereof (or such other parties as may be appropriate) in such form and on such terms and conditions as the General Partner considers in its absolute discretion necessary or appropriate, including reference to this Agreement and its novation and agreeing and covenanting with such New Limited Partner on behalf of such Limited Partner that the Limited Partner will from the effective date of such subscription agreement or agreements comply with and observe the terms of this Agreement.

(b)     The above power of attorney shall be irrevocable and deemed to be given to secure a proprietary interest of the donee of the power or performance of an obligation owed to the donee and shall survive and shall not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any Limited Partner.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 06/08/24    Page 49 of 200    PageID 24661
Appendix Part 6    Page 168 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 134 of
324

(c)     Each Limited Partner shall, at the request of the General Partner, execute additional powers of attorney on a document separate from this Agreement. In the event of any conflict between this Agreement and any instruments executed, delivered, or filed by the General Partner (and any successor thereto) pursuant to this power of attorney, this Agreement shall prevail.

(d)     The General Partner may exercise this power of attorney by listing all of the Partners executing any agreement, certificate, instrument, or document with the single signature of the General Partner as attorney-in-fact for all Partners.

(e)     Each Limited Partner hereby appoints the General Partner by any one or more of its directors or officers in office from time to time, acting singly, to be the Limited Partner's agent and attorney-in-fact.

**8.3     Notices**

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile or telecopier facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses or facsimile numbers as may be designated by any party hereto by notice addressed to (i) the General Partner, in the case of notice given by any Limited Partner, and (ii) each of the Limited Partners, in the case of notice given by the General Partner. Notices shall be deemed to have been given (A) when delivered by hand, transmitted by facsimile or transmitted electronically or (B) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.    Sections 8 and 19 of the Electronic Transactions Law (2003 Revision) of the Cayman Islands shall not apply to this Agreement.

**8.4     Agreement Binding Upon Successors and Assigns; Delegation**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Section 4.1(d) and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections shall be void.

**8.5     Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the Cayman Islands, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in Dallas, Texas. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the register of limited partnership interests maintained by the General Partner in accordance with the Act.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Filed 01/09/24    Page 50 of 200    PageID 24662
Appendix Part 6 Page 1692 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 135 of
324

**8.6    Interpretation of Partnership Accounting Systems and Terminology**

In the event that the Partnership employs an accounting system which is different from the accounting system of the General Partner or whose terminology does not conform precisely to the terminology in this Agreement, the General Partner shall have the authority to interpret such accounting system and/or terminology in a manner which it, in its sole discretion, determines to be consistent with the objectives of this Agreement.

**8.7    Miscellaneous**

(a)    The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.  Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)    This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

*[Signature Page Follows]*

Appx. 03427

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part 6 Filed 07/02/4 887ge 51 of 200    PageID 24663

Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 136 of
324

The parties hereto have executed and unconditionally delivered this Agreement as a deed on the day and year first above written.

**General Partner:**

**Highland Dynamic Income Fund GP, LLC**

By:   Highland Capital Management, L.P., its sole member
     By:   Strand Advisors, Inc., its general partner

     By: _____
     Name: Trey Parker
     Title:  Assistant Secretary

Witness:

By: _____
Name:     HELEN KIM
Title:     PARALEGAL

**Limited Partners:**

**Highland Dynamic Income Fund, L.P.**

By:   Highland Dynamic Income Fund GP, LLC, its general partner
     By:   Highland Capital Management, L.P., its sole member
          By:   Strand Advisors, Inc., its general partner

     By: _____
     Name: Trey Parker
     Title:   Assistant Secretary

Witness:

By: _____
Name:     HELEN KIM
Title:     PARALEGAL

*Signature Page to Second Amended and Restated Exempted Limited Partnership Agreement of Highland Dynamic Income Master Fund, L.P.*

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-21    Filed 09/12/24    Page 52 of 200    PageID 24664
Appendix Part 6 Page 137 of 887

Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 137 of
324

**Highland Dynamic Income Fund, Ltd.**

By: _____

Name: Trey Parker

Title:   Director

Witness:

By: _____

Name:   HELEN KIM

Title:    PARALEGAL

*Signature Page to Second Amended and Restated Exempted Limited Partnership Agreement of Highland Dynamic Income Master Fund, L.P.*

Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 138 of
324

**<u>EXHIBIT A</u>**

<u>General Partner</u>:
Highland Dynamic Income Fund GP, LLC

<u>Limited Partners</u>:
Highland Dynamic Income Fund, L.P.
Highland Dynamic Income Fund, Ltd.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part of Page 973 of 867age 54 of 200    PageID 24666
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 139 of
324

**INVESTMENT MANAGEMENT AGREEMENT**

**by and among**

**HIGHLAND LOAN FUND, LTD.**

**HIGHLAND CAPITAL LOAN FUND, L.P.**

**HIGHLAND LOAN MASTER FUND, L.P.**

**HIGHLAND CAPITAL LOAN GP, LLC**

**and**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**March 28, 2013**

203404989 v4

**Appx. 03431**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1 Filed 07/14/4 of 863age 55 of 200   PageID 24667
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 140 of
324

**INVESTMENT MANAGEMENT AGREEMENT** ("*Agreement*"), dated effective as of March 28, 2013, by and among:

HIGHLAND LOAN FUND, LTD., an exempted company incorporated in the Cayman Islands with limited liability (the "*Offshore Fund*");

HIGHLAND CAPITAL LOAN FUND, L.P., a Delaware limited partnership (the "*Domestic Fund*");

HIGHLAND LOAN MASTER FUND, L.P., a Cayman Islands exempted limited partnership (the "*Master Fund*" and, together with the Domestic Fund and the Offshore Fund, the "*Clients*");

HIGHLAND CAPITAL LOAN GP, LLC, a Delaware limited liability company as the general partner of each of the Domestic Fund and the Master Fund (the "*General Partner*"); and

HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership (the "*Investment Manager*").

**Preliminary Statements**

A.    The Domestic Fund and the Offshore Fund each invest all of their investable assets in the Master Fund.  The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund or the Domestic Fund and will serve merely as a steward thereof and the investment activities of the Investment Manager will be conducted at the Master Fund level as the Investment Manager to the Master Fund.

B.    The Clients desire to retain the Investment Manager to provide certain discretionary advisory services relating to the assets and liabilities of the Master Fund, and the Investment Manager desires to accept such appointment, all subject to the terms and conditions hereinafter set forth.

In consideration of the mutual covenants herein contained, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**Agreement**

For good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Appointment**.

The Clients hereby appoint the Investment Manager as investment manager with respect to the assets and liabilities of the Master Fund, and to provide certain custodial services in respect of the Domestic Fund and the Offshore Fund, and the Investment Manager hereby accepts such appointment and agrees to perform its obligations in accordance with the terms hereof and of the Amended and Restated Exempted Limited Partnership Agreement of the Master Fund, as amended from time to time (the "*Master Fund*

1

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-1   Filed 05/24/22   Page 56 of 200   PageID 24668
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 141 of
324

*Partnership Agreement*") and the investment objectives, policies, guidelines and restrictions that from time to time are set forth in the confidential private placement memorandum of the Domestic Fund, as supplemented or superseded from time to time (the "***PPM***"), the confidential private offering memorandum of the Offshore Fund, as supplemented or superseded from time to time (the "***POM***"), the Memorandum and Articles of Association of the Offshore Fund (the "***Articles***") and the Limited Partnership Agreement of the Domestic Fund, as amended from time to time (the "***Domestic Fund Partnership Agreement***" and, together with the Master Fund Partnership Agreement, the "***Partnership Agreements***" and, the Partnership Agreements collectively with the PPM, the POM and the Articles, the "***Governing Documents***").  Any capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Governing Documents.

2.    **Authority and Duties of the Investment Manager**.

(a)    All of the assets of the Domestic Fund and the Offshore Fund shall be invested in the Master Fund.  The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund or the Domestic Fund and will serve merely as a steward thereof and the investment activities of the Investment Manager will be conducted at the Master Fund level as the Investment Manager to the Master Fund.

(b)    Subject to 2(a), the Investment Manager shall serve as the investment manager to the Master Fund and shall in that capacity have full discretion and authority, without obtaining the prior approval of any officer or other agent of the Master Fund: (i) to effect any and all transactions in securities, currencies and other financial instruments (and options and other contracts thereon), and everything connected therewith in the broadest sense; (ii) to determine all matters relating to the manner, method and timing of portfolio transactions and to engage consultants and analysts in connection therewith; (iii) to select brokers, dealers, banks and other intermediaries by or through whom such transactions will be executed or carried out; (iv) to make short sales; (v) to purchase or write options (including uncovered options); (vi) to direct the administrator of the Master Fund, banks, brokers or other custodians to effect deliveries of funds or assets, but only in the course of effecting portfolio transactions for the account of the Master Fund; (vii) to exercise all voting and other powers and privileges attributable to any securities or other property held for the Master Fund's account hereunder; (viii)  to authorize remuneration for the Directors of the Offshore Fund other than Directors of the Offshore Fund who are principals or employees of the Investment Manager; and (ix) to make and execute all such documents and to take all such other actions as the Investment Manager considers necessary or appropriate to carry out its investment management duties hereunder.

(c)    In furtherance of the foregoing, the Clients hereby designate and appoint the Investment Manager as its agent and attorney-in-fact, with full power and authority and without the need for further approval of the Clients (except as may be required by law) to complete and execute all such documents and to take any and all actions that the Investment Manager, in its discretion, shall deem advisable to carry out the foregoing with respect to the assets of the Clients; provided,

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Filed 03/24/24 age 57 of 200    PageID 24669
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 142 of
324

however, that the Investment Manager is not intended to have actual or constructive custody of any securities or other assets of the Clients. In connection with any of the foregoing, the Investment Manager is further authorized to transfer or tender for cash or exchange such securities. In all such purchases, sales or trades the Clients authorize the Investment Manager to act for the Clients, and at their risk, and in their name and on their behalf, in the same manner and with the same force and effect as the Clients might or could do with respect to such purchases, sales or trades without prior consultation with the Clients. The Clients also appoint the Investment Manager as their agent and attorney-in-fact to vote, and to execute proxies, waivers, consents and other instruments with respect to, the securities and other assets of the Clients.

(d)    In connection with the execution of transactions on behalf of the Master Fund, the Master Fund hereby acknowledges and agrees that in the course of selecting brokers, dealers, banks and financial intermediaries to effect transactions for the Master Fund's account, the Investment Manager may agree to such commissions, fees and other charges on behalf of the Master Fund's account as it shall deem reasonable in the circumstances, taking into consideration all such factors as the Investment Manager deems relevant, including the following: price quotes; the size of the transaction; the nature of the market for the financial instrument; the timing of the transaction; difficulty of execution; the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade; the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets; the broker-dealer's skill in positioning the financial instruments involved; the broker-dealer's promptness of execution; the broker-dealer's financial stability, reputation for diligence, fairness and integrity; quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates; confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; the broker-dealer's willingness to correct errors; the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction; and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread. It is understood that the costs of such services will not necessarily represent the lowest costs available and that the Investment Manager is under no obligation to combine or arrange orders so as to obtain reduced charges.

(e)    At the request of a Client, in any wind down of such Client, the Investment Manager will manage the realization of the Client's assets and the distribution thereof to investors.

(f)    The General Partner, on behalf of the Domestic Fund and the Master Fund, agrees that the Investment Manager shall be entitled to all of the benefits of the Partnership Agreements applicable to it as a delegate of the General Partner, including, without limitation, the right to reimbursement of expenses provided under the Partnership Agreements and the right to indemnification provided under

Appx. 03434

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 1 Part 6 Filed 07/24 of 887age 58 of 200    PageID 24670
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 143 of 324

the Partnership Agreements, and such sections are hereby incorporated by reference as if set forth in full herein; provided, however, this proviso shall not operate to provide duplicative amounts to any reimbursement or payment received pursuant to Sections 4 and 8 of this Agreement.

3.    **Management Fees.**

Pursuant to this Agreement, the Investment Manager is entitled to be paid management fees by the Master Fund, which shall be calculated with the methodology set out in the Master Fund Partnership Agreement.

4.    **Expenses.**

(a)    The Clients will pay, or will reimburse the Investment Manager, for all costs and expenses arising in connection with their administration and operations, including without limitation, the following expenses:

(i)    all investment-related expenses (including those related to identifying and evaluating contemplated investments, whether or not such contemplated investments are actually made), including, but not limited to, brokerage commissions and other transaction costs, expenses related to short sales, clearing and settlement charges, expenses related to proxies, underwriting and private placements, custodial fees, transfer agent fees, bank service fees, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, consulting and any other professional fees or compensation (including investment banking expenses) relating to particular investments or contemplated investments, appraisal fees and expenses, investment-related travel and lodging expenses and research-related expenses (including, without limitation, news and quotation equipment and services), fees to third-party providers of risk-monitoring services, and investment and trading-related computer hardware and software, including, without limitation, trade order management software (i.e., software used to route trade orders);

(ii)    accounting (including accounting software), audit and tax preparation expenses;

(iii)    costs and expenses associated with reporting and providing information to existing and prospective investors;

(iv)    any legal fees and costs (including indemnification expenses, regulatory costs and settlement costs) arising in connection with any litigation or regulatory investigation instituted against any of the Clients, the General Partner, the Investment Manager or any of their respective affiliates in their capacity as such, subject to the indemnification provisions of the Partnership Agreements and Section 8 below;

(v)    any taxes imposed upon the Clients;

Appx. 03435

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Appendix Part 6 Filed 05/24/1 of 867age 59 of 200    PageID 24671
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 144 of
324

(vi)     costs of any meeting of investors (or of obtaining the consent of investors in lieu of meeting);

(vii)    expenses related to the Advisory Committee and the Pricing Committee;

(viii)   premiums for directors' and officers' liability insurance (if any) and any other insurance benefiting the Clients;

(ix)     administrative expenses (including, without limitation, the fees and expenses of any administration in relation to its services provided pursuant to an administration agreement);

(x)      fees relating to valuing the Clients' assets;

(xi)     expenses related to the maintenance of the Clients' registered offices;

(xii)    corporate licensing expenses;

(xiii)   extraordinary expenses; and

(xiv)    any costs or expenses of winding up and liquidating any of the Clients.

(b)    The Investment Manager will pay all of its own operating and overhead costs (except liability insurance and items described in Section 4(a)(iv) above) without reimbursement by the Clients, and any expenses arising in connection with the Investment Manager's services to the Clients, other than those specified in this Agreement to be the obligation of the Clients and the fees payable to the Investment Manager, shall be the responsibility of the Investment Manager.

(c)    The Investment Manager shall be entitled to reimbursement from the Clients for any of the expenses mentioned in Section 4(a) above paid by it on behalf of the Clients; provided that, the Investment Manager in its sole discretion may absorb any or all of such expenses incurred on behalf of the Clients. The Investment Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and the Clients shall not have any liability therefor; *provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Clients hereunder, and the Clients shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(d)    If the Investment Manager shall incur any of the expenses mentioned in Section 4(a) above for the account of the Clients and any Other Accounts (as defined in Section 5(c) hereof), the Investment Manager will allocate such expense among the Clients and each such Other Account in proportion to the size of the

5

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 05/24/24    Page 60 of 200    PageID 24672
Appendix Part 6 Page 59 of 87
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 145 of
324

investment made by each in the activity or entity to which the expense relates, or in such other manner as the Investment Manager in its sole discretion considers fair and reasonable.

(a)     The Investment Manager is entitled to use "soft dollars" generated by the Master Fund to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended, or is otherwise reasonably related to the investment decision-making process, or to cover certain Client expenses described in Section 4(a).  Use of "soft dollars" by the Investment Manager as described herein shall not constitute a breach by the Investment Manager of any fiduciary or other duty which the Investment Manager may be deemed to owe to the Clients.

5.     **Other Activities and Investments.**

(a)     The Investment Manager shall not be required to devote any specific amount of its time to the affairs of the Clients, but shall devote such of its time to the business and affairs of the Clients as it shall determine in good faith to be necessary to conduct the affairs of the Clients for the benefit of the Clients.

(b)     Each of the Clients agree that the Investment Manager, and any partner, director, officer, shareholder, member, affiliate or employee of the Investment Manager, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Clients.  Without in any way limiting the foregoing, each Clients hereby acknowledge that (i) none of the Investment Manager or its partners, directors, officers, shareholders, members, affiliates or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 5 to the Clients, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Investment Manager and its partners, directors, officers, shareholders, members, affiliates and employees are hereby authorized to engage in activities contemplated by this Section 5 with, or to purchase, sell or otherwise deal or invest in investments issued by, companies in which the Investment Manager might from time to time invest or be able to invest or otherwise have any interest on behalf of the Clients, without the consent or approval of the Clients.

(c)     The Investment Manager shall act allocate investment opportunities to the Master Fund and any Other Account fairly and equitably over time.  "***Other Account***" means any assets or investment of the Investment Manager, or any assets managed by the Investment Manager or any affiliate of the Investment Manager

Appx. 03437

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 1-6   Filed 04/09/24   Page 61 of 200   PageID 24673
Appendix Part 6 Page 180 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 146 of
324

for the account of any person or entity (including investment vehicles) other than the Clients, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Clients. The Investment Manager is under no obligation to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (vi) the need to re-size risk in the account's portfolio. The Investment Manager has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d)     The principals of the Investment Manager, as well as the employees and officers thereof and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Clients (such prohibition does not extend to the purchase or sale of limited partner interests or shares, as applicable, in any of the Clients) unless appropriate approval of the Advisory Committee is obtained and such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended (the "*Advisers Act*") or such purchase or sale is otherwise in compliance with the applicable provisions of the Advisers Act.

(e)     Each Client hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Clients which is or may be inconsistent with this Section 5.

(f)     The Investment Manager and its affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Clients or that are targeted primarily to investors for which the Clients are not designed to be suitable investment vehicles. The Investment Manager and its affiliates also reserve the right to establish and provide management or advisory services pursuant to separate Other Accounts for significant investors, whether or not such accounts have the same investment program as the Clients.

7

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16-12 Part 6 Page 62 of 200   PageID 24674
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 147 of
324

6.      **Custody.**

The assets of the Clients shall be held in the custody of one or more qualified custodians (or other independent institutions performing the functions of custodian, with respect to the assets which are held by such institutions) selected by the Investment Manager.

7.      **Scope of Liability.**

None of the Investment Manager, nor any member, shareholder, partner, manager, director, officer, employee or agent of, or any person who controls, the Investment Manager, each of the respective affiliates of the foregoing, or any of the legal representatives of any of the foregoing (collectively, the "***Indemnified Persons***") will be liable to the Clients or any other person for mistakes of judgment or for action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Clients, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above.  No Indemnified Person shall be liable to the Clients or any other person for any amount in excess of the amount of Management Fees received by the Investment Manager, to the extent permitted under applicable law.  In addition, in no event shall any Indemnified Person be liable for any special, indirect, exemplary, consequential or punitive losses or damages.  An Indemnified Person may consult with counsel and accountants in respect of the Clients' affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.  The foregoing provisions, however, shall not be construed so as to provide for the exculpation of an Indemnified Person of any liability (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the abovementioned provisions to the fullest extent permitted by law.

8.      **Indemnification.**

(a)      The Clients shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all loss, cost or expense suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability, damage, loss, cost or expense resulted from a mistake of judgment on the part of an Indemnified Person or from action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or from the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Person, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above.  Each of the Clients shall, in the sole discretion of the General Partner or the Directors, as applicable, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection

8

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16-2 Filed 01/24/21 Appendix Part 6 Page 63 of 200   PageID 24675
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 148 of
324

with the defense of any action, suit or proceeding which arises out of such conduct.  In the event that such an advance is made by the Client(s), the Indemnified Person will agree to reimburse the Client(s) to the extent that it is finally determined that it was not entitled to indemnification in respect thereof.

(b)     Notwithstanding any of the foregoing, the provisions of this Section 8 do not provide for the indemnification of any Indemnified Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(c)     Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Person, the Clients (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence, bad faith or willful misconduct of any Indemnified Person.

(d)     To the extent that the indemnity under this Section 8 inures for the benefit of the Investment Manager or of any Indemnified Person (whether existing or in the future) and for the benefit of any successor of the Investment Manager or any Indemnified Person, the General Partner, on behalf of the Master Fund, declares that it holds the benefit of that promise on trust for that person.

9.     **Committees.**

(a)     The Investment Manager may appoint a committee (the "***Advisory Committee***") consisting of one or more individuals selected by the Investment Manager, none of whom is affiliated with the Investment Manager (except as an investor in one of the Clients or an affiliate of the Clients).  If established, the Advisory Committee will have the authority, at the request of the Investment Manager, to consult with the Investment Manager on any matters that may involve a conflict of interest between the Investment Manager (and its affiliates) on the one hand and the Clients on the other.  The Advisory Committee may also grant approvals required under the Advisers Act or related to any other matter deemed appropriate by the Investment Manager.  Any such approval given by the Advisory Committee is binding on the Clients.  The Clients will have the authority to agree to reasonably compensate members of the Advisory Committee for their services and to agree to reimburse them for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.  In the event an Advisory Committee is not appointed, the Investment Manager may obtain the approval of an unaffiliated third party, as is determined advisable by the Investment Manager, and any such approval by such third party shall, to the extent permitted under applicable law, serve as the approval of the Advisory Committee and shall be binding on the Clients.

(b)     The Investment Manager may appoint a committee (the "***Pricing Committee***") whose quorum consists of at least a majority of the following individuals:  the

Appx. 03440

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1 Filed 09/24/24   Page 64 of 200   PageID 24676
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 149 of 324

Chief Financial Officer of the Investment Manager, the Chief Compliance Officer of the Investment Manager and one or more traders of the Investment Manager. The Pricing Committee will meet on at least a monthly basis to review, confirm and agree on all pricing information established by the Investment Manager in respect of the Master Fund's assets that are fair valued or which the Investment Manager believes should require review.  The final pricing or valuation of such Master Fund assets will require the approval of a majority in number of the members of the Pricing Committee constituting a quorum.  In lieu of meeting, the Pricing Committee may take action by written consent signed by a majority of the committee members.  The Pricing Committee may, at the Master Fund's expense, engage third-party experts and consultants to provide services in connection with any determination to be made by the Pricing Committee.  The Investment Manager may replace members of the Pricing Committee or change the composition of the Pricing Committee, in its sole discretion.

10.   **Independent Contractor.**

For all purposes of this Agreement, the Investment Manager shall be an independent contractor and not an employee or dependent agent of the Clients, nor shall anything herein be construed as making the Clients a partner or co-venturer with the Investment Manager or any of its affiliates or Other Accounts.  Except as provided in this Agreement, the Investment Manager shall have no authority to bind, obligate or represent the Clients.

11.   **Acknowledgement.**

The Clients certify and acknowledge to the Investment Manager that the Clients:

(i)   have fully disclosed to potential investors the fee provisions and other arrangements relating to the Clients' accounts with the Investment Manager and are satisfied that the potential investors have received sufficient information from the Investment Manager to enable them to evaluate the terms of this Agreement; and

(ii)   fully understand the method of compensation provided herein and its associated risks, and that such risks have been disclosed to potential investors.

12.   **Entire Agreement.**

This instrument, together with the Governing Documents, contains the entire agreement between the parties hereto relating to the subject matter hereof.  No provision of this Agreement may be amended without the written consent of the Investment Manager and the Clients.

**Appx. 03441**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16 Part 6 Page 065 of 867 Page 65 of 200    PageID 24677
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 150 of
324

13.    **Amendment; Modification; Waiver.**

Except as otherwise expressly provided herein, this Agreement shall not be amended, nor shall any provision of this Agreement be considered modified or waived, unless evidenced by a writing signed by all parties hereto.

14.    **Binding Effect; Assignment.**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors.  The rights and obligations hereunder shall not, except as otherwise expressly provided herein, be assignable, transferable or delegable by the Investment Manager without the written consent of the Clients, and any attempted assignment, transfer or delegation thereof without such consent shall be void.  The rights and obligations hereunder shall not, except as otherwise expressly provided herein, be assignable, transferable or delegable by the Clients without the written consent of the Investment Manager, and any attempted assignment, transfer or delegation thereof without such consent shall be void.  The Investment Manager agrees to notify the Clients in writing within thirty (30) days after any change in control of the Investment Manager.

15.    **Termination.**

This Agreement shall become effective on the date hereof and shall continue in effect until the earlier of the dissolution (or in the case of the Offshore Fund, the liquidation) of the Clients, or the termination by any of the Investment Manager, the Offshore Fund or the General Partner on behalf of the Domestic Fund or the Master Fund upon at least seventy-five (75) days' prior written notice.

16.    **Governing Law.**

This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Delaware which are applicable to contracts made and entirely to be performed therein, without regard to the place of performance hereunder.

[Signature Page Follows]

11

**Appx. 03442**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 10/25/24   Page 66 of 200   PageID 24678
Appendix Part 6 Page 152 of 367

Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 151 of
324

The parties have executed this Agreement to be effective as of the day and year first above written.

**HIGHLAND CAPITAL LOAN FUND, L.P.**
By:   Highland Loan GP, LLC, its general partner
By:   Highland Capital Management, L.P., its sole member
By:   Strand Advisors, Inc., its general partner

By:   _____
Name:   James D. Dondero
Title:   President

**HIGHLAND LOAN FUND, LTD.**

By:   _____
Name:  Trey Parker
Title:   Director

**HIGHLAND LOAN MASTER FUND, L.P.**
By:   Highland Loan GP, LLC, its general partner
By:   Highland Capital Management, L.P., its sole member
By:   Strand Advisors, Inc., its general partner

By:   _____
Name:   James D. Dondero
Title:   President

**HIGHLAND CAPITAL LOAN GP, LLC**
By:   Highland Capital Management, L.P., its sole member
By:   Strand Advisors, Inc., its general partner

By:   _____
Name:   James D. Dondero
Title:   President

*Signature Page to Investment Management Agreement*

**Appx. 03443**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Appendix Part 6   Filed 01/06/24   Page 67 of 200   PageID 24679

Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 152 of
324

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     Strand Advisors, Inc., its general partner

By:     _____
        Name:     James D. Dondero
        Title:    President

*Signature Page to Investment Management Agreement*

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 71-1    Filed 09/24/... Page 68 of 200    PageID 24680
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 153 of
324

Memorandum Number _____

# Confidential Private Offering Memorandum

*Shares*

*of*

# Highland Dynamic Income Fund, Ltd.

*Investment Manager*

## Highland Capital Management, L.P.

## April 2018

4255; 7296'x55

Appx. 03445

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 26-1 6 Filed 09/08/24   Page 69 of 200   PageID 24681
Appendix Part 6 Page 0324 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 154 of 324

## TABLE OF CONTENTS

Rci g

P QVKE G(IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)kk

F KT GEVQT[ (IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)kk

GZ GEWVKXG'UWO O CT[ (IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)B

RP XGUVO GP V'RTQI TCO (IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)4

O CP CI GO GP V (IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)9

UWO O CT[ 'QH'VGTO U(IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)B4

UJ CTGU'QH'VJ G'HWP F (IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)4;

VJ G'O C UVGT "HWP F (IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)55

TKUM'HCEVQTU'CP F '"RQVGP VKCN'EQP HNKEVU'QH'KP VGTGUV(IIIIIIIIIIIIIIIIIIIIIIII)59

DTQMGTCI G'CP F '"EWUVQF [ (IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)92

VCZ'EQP UKF GTCVKQP U(IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII)95

GT KUC'CP F QVJ GT "TGI WNCVQT[ 'EQP UKF GTCVKQP U(IIIIIIIIIIIIIIIIIIIIIIIIIIIII)0 5

k

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-1 Filed 01/09/24   Page 70 of 200   PageID 24682
Appendix Part 6 Page 152 of 367
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 155 of
324

**NOTICE**

This Confidential Private Offering Memorandum (this "***Memorandum***") is being furnished on a confidential basis solely to selected qualified investors for the purpose of enabling the recipient to evaluate an investment in Highland Dynamic Income Fund, Ltd. (the "***Fund***"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of the board of directors of the Fund. Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other matters relevant to the suitability of an investment in the Fund for such investor.

In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The participating non-voting shares of the Fund (the "***Shares***") have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

Neither this Memorandum nor the Shares described herein have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities. This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Shares in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized.

The Shares have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any of the states of the United States, and the Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended. Direct or indirect acquisition or ownership of Shares by "***United States Persons***" (as defined in Annex A) without compliance with applicable U.S. securities laws or in contravention of the relevant provisions of the constituent documents of the Fund is prohibited. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Shares, and there is no obligation on the part of any person to register the Shares under the Securities Act or any state securities laws.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "***CFTC***"), Highland Capital Management, L.P., the investment manager to the Fund (the "***Investment Manager***"), is not registered with the CFTC as a commodity pool operator ("***CPO***") and therefore,

ii

**Appx. 03447**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part 6 Filed 09/04 of 884ge 71 of 200    PageID 24683
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 156 of
324

unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors. The Investment Manager qualifies for an exemption from registration as a commodity trading advisor pursuant to CFTC Rule 4.14(a)(8).

In each European Economic Area member state (each a "**Relevant Member State**") that has implemented Directive 2011/61/EU of the European Parliament and the Council of the European Union on Alternative Investment Fund Managers and applicable implementing legislation, including Commission Delegated Regulation (EU) No 231/2013 (the "**AIFMD**"), the Fund may only be offered to investors in accordance with local measures implementing AIFMD. Investors, together with any relevant person making or assisting in the decision to invest in the Fund, who are situated, domiciled or who have a registered office, in a Relevant Member State where the Fund is not being offered pursuant to private placement rules implementing AIFMD may invest, or effect an investment in the Fund, but only in circumstances where they do so at their own initiative. The Memorandum may only be issued to "Professional Clients" within the meaning of Directive 200439/EC on Markets in Financial Instruments. At the date hereof, the Investment Manager has not registered and does not intend to register the Fund for marketing in any Relevant Member State. It may register the Fund in Relevant Member States in the future.

NO OFFER OR INVITATION TO SUBSCRIBE FOR SHARES MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS.

Highland Dynamic Income Master Fund, L.P. (the "**Master Fund**") is not hereby offering any securities and accordingly this Memorandum is not to be regarded as having been authorised or issued by the Master Fund. The Master Fund does not have an offering document or equivalent document.

Any information forwarded to the Fund by any potential shareholder will be treated on a confidential basis except that such information may be passed on to a relevant third party by the Fund where so required by law or regulation and each shareholder, upon subscribing for Shares, shall be deemed to have consented to such release of such confidential information pursuant to the terms of the Confidential Information Disclosure Law, 2016 of the Cayman Islands (as amended).

An investment in the Fund involves significant risk. Potential investors should pay particular attention to the information in "*Risk Factors and Potential Conflicts of Interest*." Investment in the Fund is suitable only for sophisticated investors and requires the financial ability and willingness to accept the high risks inherent in an investment in the Fund. An investment in the Fund does not constitute a complete investment program. No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Shares are offered subject to the right of the Fund to reject any subscription in whole or in part.

This Memorandum does not purport to be, and should not be construed as, a complete description of the Fund's Memorandum of Association and Articles of Association, as may be

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Filed 09/24/21 Page 72 of 200    PageID 24684
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 157 of
324

amended from time to time (together, the "*Articles of Association*") or the exempted limited partnership agreement, as may be amended from time to time (the "*Master Fund Partnership Agreement*"), of the Master Fund. Each prospective investor in the Fund is encouraged to review the Articles of Association and the Master Fund Partnership Agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Articles of Association or the Master Fund Partnership Agreement, the terms of the Articles of Association or the Master Fund Partnership Agreement (as applicable) shall control. A copy of the Master Fund Partnership Agreement is available upon request from the Investment Manager.

The Fund and the Master Fund are regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands (the "*Mutual Funds Law*"). The Cayman Islands Monetary Authority (the "*Authority*") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Fund or the Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the directors of the Fund or the Master Fund, as applicable, and may result in the Authority applying to the court to have the Fund or the Master Fund wound up.

Neither the Fund nor the Master Fund are, however, subject to supervision in respect of their investment activities or the constitution of the Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund and the Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of the directors of the Fund or the Master Fund, to appoint a person to advise the Fund or the Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund or the Master Fund, as the case may be. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund or the Master Fund since the date hereof. An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those described in "*Risk Factors and Potential Conflicts of Interest*," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21  Filed 01/09/24  Page 73 of 200    PageID 24685
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 158 of
324

All references herein to "$" refer to U.S. dollars.  All references to day, month, quarter and year are to calendar day, calendar month, calendar quarter and calendar year, unless otherwise specified or the context so requires.  Except as the context otherwise requires, references to the term "Fund" in this Memorandum shall be deemed to include the Master Fund.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 09/14/23    Page 74 of 200    PageID 24686
Appendix Part 6 Page 193 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 159 of
324

# DIRECTORY

| | |
|---|---|
| **Registered Office** | Highland Dynamic Income Fund, Ltd.<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104<br>Cayman Islands |
| **Investment Manager** | Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Administrator** | SEI Alternative Investment Fund Services<br>One Freedom Valley Drive<br>Oaks, PA 19456 |
| **Directors** | Mark Okada<br>Trey Parker |
| **Auditors** | PricewaterhouseCoopers LLP<br>Strathvale House<br>90 North Church Street<br>PO Box 258<br>Grand Cayman KY1-1104<br>Cayman Islands |
| **Custodian** | US Bank, N.A.<br>190 South LaSalle, 10th Floor<br>Chicago, Illinois 60603 |
| **Legal Counsel** | *In the United States:*<br>Akin Gump Strauss Hauer & Feld LLP<br>1700 Pacific Avenue<br>Suite 4100<br>Dallas, TX 75201<br><br>*In the Cayman Islands:*<br>Maples and Calder<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104<br>Cayman Islands |

**Appx. 03451**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16-1 Appendix Part 6 Filed 09/14/21   Page 75 of 200   PageID 24687
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 160 of 324

## EXECUTIVE SUMMARY

Highland Dynamic Income Fund, Ltd., a Cayman Islands exempted company with limited liability (the "***Fund***"), seeks to generate returns that exceed the S&P/LSTA Leveraged Loan Total Return Index[1] by investing all of its investable assets in Highland Dynamic Income Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which provides exposure to the broader bank loan market.

Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company (the "***Master Fund GP***"), acts as general partner of the Master Fund and is registered as a foreign company in the Cayman Islands.   Highland Capital Management, L.P., a Delaware limited partnership (the "***Investment Manager***" and, together with its affiliates, shareholders, directors, members, partners, officers and employees, the "***Advisory Parties***"), serves as investment manager to the Fund and the Master Fund and manages the Master Fund's investment program.  Each of the Master Fund GP and the Investment Manager are ultimately controlled by James D. Dondero (the "***Principal***").

In order to facilitate investments by U.S. investors, the Investment Manager has sponsored the formation of Highland Dynamic Income Fund, L.P., a Delaware limited partnership of which the Master Fund GP also serves as the general partner  (the "***Domestic Fund***" and, together with the Fund, the "***Feeder Funds***").  The Feeder Funds place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund.   References in this Memorandum to the Fund shall include the Master Fund, unless otherwise specified or the context so requires.

The Fund is seeking subscriptions for participating non-voting shares of the Fund (the "***Shares***") from eligible investors.  The minimum initial investment is $1,000,000, although the Fund may accept investments in a lesser amount, subject to an absolute minimum of $100,000, or such other sum as may be required from time to time by applicable law.  The Fund generally accepts subscriptions on the first business day of each month.

For its services to the Master Fund, the Investment Manager is generally entitled to a management fee (the "***Management Fee***"), which is calculated and paid quarterly in advance at the Master Fund level, and the Master Fund GP is entitled to an annual performance-based allocation, at the Master Fund level, essentially to the extent that the return of a Share (positive or negative) outperforms the hypothetical return of the capital account based on the S&P/LSTA Leveraged Loan Total Return Index for such year.  Please see "*Summary of Terms – Management Fee*" and "*Summary of Terms – Performance Allocation*."

A shareholder is generally permitted to redeem all or a portion of its Shares on 45 days' prior written notice on the last business day of each quarter.  Redemptions may be subject to reserves for contingencies, hold-back pending audit, gating and suspension restrictions as discussed further in this Memorandum.

The Fund may agree with certain shareholders to a variation of the terms set forth in this Memorandum or establish additional series of Shares that have terms that differ from those described herein, including, without limitation, different management fees and redemption rights.

---

[1] The S&P/LSTA Leveraged Loan Total Return Index (the "***Index***") is used only for purposes of calculating performance fees.  The Fund will not directly invest in the Index nor seek to replicate the Index, and there might or might not be a close correlation between the performance of the Fund and that of the Index.  The Index does not reflect the investment strategy of the Fund.

1

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-1    Filed 09/12/24    Page 76 of 200    PageID 24688
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 161 of 324

# INVESTMENT PROGRAM

## Investment Objective

The Fund's investment objective is to seek high current income and capital appreciation by maximizing risk-adjusted returns as measured against the S&P/LSTA Leveraged Loan Total Return Index.[2]

## Investment Strategy

The Master Fund's net assets will be invested and traded primarily in senior secured floating rate bank loans ("*Bank Loans*"), high yield debt securities and structured credit products denominated in U.S. dollars.  The Master Fund's investments will be subject to the following restrictions:

(a)    a minimum of 50% (measured at the time of settlement) of the Master Fund's gross assets will be invested in loans, and no more than 5% (measured at the time of settlement) of the Master Fund's gross assets will be invested in a single loan instrument;

(b)    no more than 50% (measured at the time of settlement) of the Master Fund's gross assets will be invested in collateralized loan obligations ("*CLO*" or "*CLO Securities*") and structured credit products, and no more than 5% (measured at the time of settlement) of the Master Fund's gross assets will be invested in a single CLO issuer;

(c)    no more than 10% (measured at the time of settlement) of the Master Fund's gross assets will be invested in high yield bonds;

(d)    no more than 10% (measured at the time of settlement) of the Master Fund's gross assets will be invested in equity securities, which equity securities are primarily issued in connection with a reorganization or restructuring of a borrower or debt positions of the Master Fund that convert into equity securities ("*Re-Org Equities*");

(e)    the top 3 industries in which the Master Fund holds positions will comprise no more than 50% (measured at the time of settlement) of the Master Fund's gross assets, and no more than 20% (measured at the time of settlement) of the Master Fund's gross assets will be invested in a single industry; and

(f)    the minimum weighted average rating of the Master Fund's entire portfolio will be B+, the minimum weighted average rating of the Master Fund's holdings that are loans will be B, and the minimum weighted average rating of the Master Fund's holdings that are CLOs will be BB (in each case, measured at the time of settlement).

*Bank Loans*

Bank Loans represent amounts borrowed by corporate entities from banks and other lenders.  In many cases, they are issued in connection with recapitalizations, acquisitions, leveraged buyouts and refinancings.  Most, if not all, of the Bank Loans in which the Master Fund invests will have a below

---

[2] The S&P/LSTA Leveraged Loan Total Return Index (the "*Index*") is used only for purposes of calculating performance fees.  The Fund will not directly invest in the Index nor seek to replicate the Index, and there might or might not be a close correlation between the performance of the Fund and that of the Index.  The Index does not reflect the investment strategy of the Fund.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-1    Filed 09/24/23    Page 77 of 200    PageID 24689
Appendix Part 6  Page 196 of 887
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 162 of
324

investment-grade credit rating or will not be rated by a major credit rating agency. The Bank Loans in which the Master Fund invests are often referred to as "leveraged loans" because the borrowing companies have significantly more debt than equity.

Bank Loans have the highest seniority within a borrower's capital structure. Therefore, in the event of a bankruptcy, holders of Bank Loans are typically paid (to the extent assets are available) before certain other creditors, such as bond and equity holders. Bank Loan maturities typically range from 5 to 8 years, although loan prepayments and refinancings generally result in effective average lives of approximately 3 years depending on market conditions.

Bank Loans generally pay interest at rates that are determined periodically by reference to a base lending rate plus a premium. These rates often are re-determined daily, monthly, quarterly or semi-annually. As a result, the Investment Manager believes the Master Fund should experience less sensitivity to changes in market interest rates and lower volatility than if the Master Fund invested exclusively in fixed rate obligations.

The Bank Loan market has grown significantly in recent years, as investors have been drawn into the market by the advantageous characteristics of Bank Loans, which include floating interest rates, senior secured status, lower volatility, growing liquidity, greater control over an issuer in times of stress, and lower correlation with other asset classes.

*Collateralized Loan Obligations*

An investment in CLO tranches represents varying levels of exposure primarily to credit performance of the underlying assets (i.e., bank loans, which comprise the primary asset class of the Master Fund's portfolio) and is characterized by a combination of expected significant current cash flow as well as the opportunity for positive returns through long-term gains on the underlying portfolios. Investments in CLO Securities often have a relatively short expected duration (usually less than 10 years), as a typical CLO distributes excess cash flows quarterly or semi-annually concurrent with the payment of interest on its liabilities subject to compliance with overall collateral quality tests and other performance criteria.

*High Yield Bonds*

The price and yield of lower-quality (high yield, high-risk) bonds, commonly referred to as "junk bonds," can be expected to fluctuate more than the price and yield of higher-quality bonds. Because these bonds are rated below BBB or are in default, they are regarded as predominantly speculative with respect to the issuer's continuing ability to meet principal and interest payments. Successful investment in lower-medium- and low-quality bonds involves greater investment risk and is highly dependent on the Advisory Parties' credit analysis. A real or perceived economic downturn could cause a decline in high yield bond prices by lessening the ability of issuers to make principal and interest payments. These bonds can be more difficult to sell and value accurately than high-quality bonds. Because objective pricing data may be less available, judgment may play a greater role in the valuation process. In addition, the entire high yield bond market can experience sudden and sharp price swings due to a variety of factors, including changes in economic forecasts, stock market activity, large or sustained sales by major investors, a high-profile default, or just a change in the market's psychology. This type of volatility is usually associated more with stocks than bonds, but junk bond investors should be prepared for it.

*Reorganization Equities*

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6    Page 197 of 867 Appendix Part 6 Page 78 of 200    PageID 24690
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 163 of
324

Re-Org Equity refers to equity securities that are issued in connection with a reorganization or restructuring of a borrower, including both registered and non-registered securities under Section 12 of the Securities Exchange Act of 1934 and therefore are not traded on an exchange or inter-dealer quotation system, and debt positions of the Master Fund that convert into equity securities. The Master Fund may receive Re-Org Equities as a loan marker participant and/or trade such securities on a stand-alone basis.

*Cash Positions and Money Market Instruments*

From time to time, subject to the investment limitations set forth above, the Investment Manager may maintain cash positions and invest some of the Master Fund's assets in short-term U.S. Government obligations, certificates of deposit, commercial paper and other money market instruments. A greater percentage of Master Fund assets may be invested in such obligations if the Investment Manager believes that a defensive position is appropriate because of expected economic or business conditions or the outlook for security prices. From time to time, in the sole discretion of the Investment Manager, cash balances in the Master Fund's brokerage account may be placed in a money-market fund or other cash equivalents.

*Derivative Transactions*

The Master Fund may enter into derivative transactions, including options, futures, credit default swaps and other derivatives transactions to hedge the market risk or express market views of its portfolio.

*Foreign Investments*

Although the Investment Manager intends to focus primarily on the U.S. marketplace, it may invest in dollar-denominated securities of foreign issuers or loans of foreign borrowers. Investing in foreign securities and loans of foreign borrowers involve special risks that can increase the potential for losses. These include exposure to potentially adverse local, political, and economic developments such as war, political instability, hyperinflation, currency devaluations, and overdependence on particular industries; government interference in markets such as nationalization and exchange controls, expropriation of assets, or imposition of punitive taxes; potentially lower liquidity and higher volatility; possible problems arising from accounting, disclosure, settlement, and regulatory practices and legal rights that differ from U.S. standards; and the chance that fluctuations in foreign exchange rates will decrease the investment's value (favorable changes can increase its value). In addition, information with respect to foreign borrowers may differ from that available for U.S. borrowers because foreign companies are not generally subject to accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to U.S. borrowers. These risks are heightened for investments in emerging markets.

**Risk Management and Hedging Activity**

*Risk Management*

Risk management is integrated into all levels of the investment process, from due diligence to portfolio construction and management to ongoing monitoring. The process addresses factors including credit risk, liquidity risk and volatility risk. The Investment Manager conducts extensive position and portfolio monitoring activities on a daily basis. Portfolio risk is reviewed using internally generated daily, weekly and monthly reports which measure transaction compliance including metrics

Appx. 03455

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 6-1 Filed 09/19/24   Page 79 of 200   PageID 24691
Appendix Part 6 Page 192 of 863
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25    Page 164 of
324

such as portfolio concentrations or required test scores, as well as compliance with evolving internal positioning targets.  Individual position risk is monitored in a number of ways, including the extensive proprietary intranet system (Highland Online Management Engine or "**HOME**"), which pulls together data from our various data providers (Wall Street Office, LPC, Moody's, S&P, MarkIt, S&P LCD, CSFB Index) to provide a comprehensive portfolio/risk management system.  The system allows the Investment Manager to monitor metrics at any level of aggregation (instrument, issuer, portfolio, fund and across the platform).  Additionally, the system is designed to be scalable with flexibility to enable future data inputs and reporting requirements.

For both CLOs and for the underlying loans, the HOME intranet system allows the Investment Manager to monitor portfolios on a real-time, ongoing basis by receiving alerts showing positions with the largest daily/weekly/monthly mark change, as well as alerts on downgrades/upgrades and when the Investment Manager has changed the opinion on a broadly syndicated loan.  The Investment Manager monitors existing positions by receiving monthly Trustee Reports and other data feeds to track the ongoing metrics of each particular investment, looking for trends and comparing current deal statistics to original expectations when the investment was made.

Certain of the Investment Manager's employees meet every morning to discuss current events in the market and meet weekly and monthly to take detailed looks at current economic data and leading indicators such as jobless claims and consumer expectations, consumer confidence, employment, industrial production and manufacturing, inflation, business conditions/confidence, construction/housing and commodity prices.  The Investment Manager also determines risk-on/risk-off parameters, which allow it to adjust holdings and exposures accordingly.

*Hedging Activity*

The Investment Manager may, from time to time, employ its differentiated and sophisticated quasi-systematic hedging programs for the Master Fund.  Such hedging programs may be customized for the Master Fund and may employ derivatives to partially or fully hedge the following risks:

- Tail Risk – The risk that the Master Fund's portfolio value declines by 2 standard deviations or more over a 1-month period.

- Systematic Risk – Undiversifiable risk of the Master Fund's portfolio.

- Catalyst/Event Risk – The risk that a catalyst or an event results in losses to the Master Fund's portfolio.

- Currency Risk – The downside sensitivity of the Master Fund's portfolio value to changes in exchange rates.

- Interest Rate Risk – The downside sensitivity of the Master Fund's portfolio value to changes in interest rates.

- Credit Risk – The downside sensitivity of the Master Fund's portfolio value.

The Investment Manager may employ derivative instruments to structure a "net" buyer of protection profile for the Master Fund.  The Investment Manager classifies the risks arising from the use of derivatives into the following categories:

Appx. 03456

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 76-1 Filed 09/02/21   Page 80 of 200   PageID 24692
Appendix Part 6 Page 192 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 165 of
324

- Delta – The change in value of the derivative instrument due to a unit change in the underlying security.

- Gamma – The change in the delta due to a unit change in the underlying security.

- Vega – The change in value of the derivative instrument due to a unit change in volatility.

- Theta – The change in value of the derivative instrument due to the passage of time.

- Rates DV01 – The change in value of the derivative instrument due to a 1 basis point increase in interest rates.

- Credit DV01 – The change in value of the derivative instrument due to a 1 basis point increase in credit spreads.

The Investment Manager may monitor these risks associated with the use of derivative instruments on a real-time basis.  In addition, the Investment Manager may perform scenario analyses on such derivative instruments to assess the payouts for market fluctuations up and down.  The Investment Manager also may monitor such scenarios on a real-time basis.

Although the Investment Manager expects to maintain a diversified portfolio of investments, it does not intend to limit itself to any one particular investment theme or asset class.

*The investment objectives and methods summarized above represent the Investment Manager's current intentions.  The foregoing discussion includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.  There can be no assurance that the Fund's investment strategy will achieve profitable results.*

**Appx. 03457**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Filed 09/09/24    Page 81 of 200    PageID 24693
Appendix Part 6 Page 200 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 166 of
324

# MANAGEMENT

## The Master Fund GP and the Investment Manager

Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company (the "*Master Fund GP*"), acts as the general partner of the Master Fund and is registered as a foreign company in the Cayman Islands.

Highland Capital Management, L.P., a Delaware partnership (the "*Investment Manager*"), serves as the investment manager of the Fund and the Master Fund and has responsibility for the Master Fund's investment program.

Each of the Master Fund GP and the Investment Manager are ultimately controlled by James D. Dondero (the "*Principal*").

## The Investment Management Agreement

The Investment Manager was appointed as the investment manager to the Fund, the Domestic Fund and the Master Fund pursuant to an investment management agreement (the "*Investment Management Agreement*"). Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Master Fund in pursuit of the investment objective and strategy described in this Memorandum. **For its services, the Investment Manager is entitled to the management fee as well as reimbursement for any Fund or Master Fund expenses incurred by the Investment Manager.**

**The Investment Management Agreement provides that, in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith, each of the Investment Manager, its members, shareholders, partners, managers, directors, officers, employees or agents, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and any of the legal representatives of any of the foregoing, will be indemnified by the Fund, the Domestic Fund and/or the Master Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.**

## Key Investment Personnel

The key investment professionals of the Investment Manager who will be responsible for the Master Fund's investments are described below.

## Mark Okada, CFA, *Co-Founder*, *Chief Investment Officer*

Mark Okada is Co-founder and Chief Investment Officer of Highland Capital Management, L.P., a Dallas-based alternative investment firm with approximately $15 billion in assets under management. In his role, Mr. Okada oversees Highland's broad investment activities for both the institutional and retail investment platforms, which include hedge funds, separate accounts, special situation private equity, collateralized loan obligations (CLOs), mutual funds, and ETFs. He also remains portfolio manager of the Highland Floating Rate Opportunities Fund. With more than 30 years of experience in credit markets, Mr. Okada is widely regarded as an industry innovator in alternative credit investing; he is responsible for structuring one of the industry's first non-bank CLOs and is a

Appx. 03458

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-21 - File 12/19/21 - Page 82 of 200   PageID 24694
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 167 of
324

pioneer in the development of the bank loan market. Mr. Okada is on the board of directors at NexBank Capital, Inc., a Dallas-based financial services company. He received a B.A. in both economics and psychology, cum laude, from the University of California, Los Angeles and has earned the right to use the Chartered Financial Analyst (CFA) designation. Mr. Okada is a regular guest on Bloomberg Television and CNBC, and is frequently quoted in the financial and business press. He is also devoted to a number of philanthropic and civic causes with a particular focus on education, faith-based service, and Japanese-American relations. He is chairman of the board of directors of Education Is Freedom, a Dallas-based nonprofit that provides college preparatory services for underserved students. Mr. Okada is also chairman of the board for Common Grace Ministries, Inc. and is a board member of the Japanese Evangelical Missionary Society. Additionally, he serves on the executive board of Dedman College Humanities and Sciences at Southern Methodist University and is a council leader at the U.S.-Japan Council.

**Trey Parker,** *Co-Chief Investment Officer, Partner, Portfolio Manager*

Trey Parker is a Partner and Co-Chief Investment Officer at Highland Capital Management, L.P. Prior to his current role, Mr. Parker was responsible for managing the Credit Team/Platform; he also worked as a Managing Director covering a number of the industrial verticals, as well as parts of tech, media and telecom; he started his tenure at Highland as a Senior Portfolio Analyst on the Distressed & Special Situations investment team. Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing. Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries. Prior to joining Hunt in 2004, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal. While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions. Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley. Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute. Mr. Parker serves on the Board of Directors of Euramax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

**Jon Poglitsch, CFA,** *Managing Director, Head of Credit Research*

Jon Poglitsch is a Managing Director and Head of Credit Research at Highland Capital Management, L.P. His previous roles at Highland include Managing Director, Senior Portfolio Analyst and Director on both the Institutional and Retail research teams. Prior to joining Highland in September 2007, Mr. Poglitsch was a consultant for Muse Stancil and Co., where he provided mergers & acquisition, valuation, and strategic advisory services to a variety of clients in the energy sector, including integrated oil, pipeline, power, and renewable fuel companies. Prior to Muse, Mr. Poglitsch was a senior financial analyst for American Airlines. He received an MBA with a concentration in Finance from the University of Texas at Austin and a BS in Chemical Engineering from the University of Oklahoma. Mr. Poglitsch is a holder of the right to use the Chartered Financial Analyst designation.

**Neil Desai,** *Managing Director*

Mr. Desai is a Managing Director and Portfolio Manager at Highland Capital Management, L.P. He is responsible for CLO trading, portfolio management, and risk management of over $1bn in CLO securities across the firm's hedge funds, mutual funds and separate accounts. Prior to joining

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 7-21   Filed 09/02/22   Page 83 of 200   PageID 24695
Appendix Part 6 Page 202 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 168 of 324

Highland in 2015, Mr. Desai was a Director in Pfizer Inc.'s Treasury organization where he built and ran Pfizer's structured products business. Prior to Pfizer, Mr. Desai spent several years structuring and trading various structured products at Credit Suisse, Barclays Capital, and its spin-off hedge fund, C12 capital. Mr. Desai received both a Bachelor's and Master's degree in Computer Science & Electrical Engineering from MIT.

**Other Key Investment Manager Personnel**

**James Dondero, CFA, CMA,** *President, Co-Founder*

James Dondero is Co-founder and President of Highland Capital Management, L.P. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Under Mr. Dondero's leadership, Highland has been a pioneer in both developing the collateralized loan obligation (CLO) market and advancing credit-oriented solutions for institutional and retail investors worldwide. Highland's product offerings include institutional separate accounts, CLOs, hedge funds, private equity funds, mutual funds, REITs, and ETFs.

Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NXRT), is Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board.

A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans' affairs, and public policy.

Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program.

Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as a Certified Public Accountant (CPA) and a Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

**Hunter Covitz, CFA,** *Head of Structured Products*

Mr. Covitz is Head of Structured Products and Portfolio Manager at Highland Capital Management, L.P. He is responsible for all CLOs and CLO investments managed by Highland. Mr. Covitz serves on Highland's investment committee and leads the structured products investment team. Since joining Highland in 2003, Mr. Covitz has been instrumental in the structuring, warehousing, ramping, and ongoing portfolio management of over 30 Highland-originated CLOs. Prior to joining Highland, Mr. Covitz served as a tax consultant at Deloitte & Touche and KBA Group LLP, where he focused on high-net worth individuals and middle-market companies. He received both his MS and BBA in Accounting from the University of Oklahoma, where he played baseball. Mr. Covitz is a licensed Certified Public Accountant.

Appx. 03460

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-21   Filed 02/02/24   Page 84 of 200   PageID 24696
Appendix Part 6 Page 203 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 169 of
324

**Advisory Committee**

The Master Fund GP and/or the Investment Manager may appoint a committee (the "*Advisory Committee*") consisting of one or more individuals selected by the Master Fund GP and/or the Investment Manager, none of whom is affiliated with the Master Fund GP or the Investment Manager (except as an investor in the Fund or an affiliate of the Fund). If established, the Advisory Committee will have the authority, at the request of the Master Fund GP and/or Investment Manager, to consult with the Master Fund GP and/or Investment Manager on any matters that may involve a conflict of interest between the Investment Manager (and its affiliates) on the one hand and the shareholders and the Fund on the other. The Advisory Committee may also grant approvals required under the Advisers Act or related to any other matter deemed appropriate by the Investment Manager. Any such approval given by a majority of the members of the Advisory Committee is binding on the Fund and the shareholders. Meetings of the Advisory Committee may be held in person or by telephone. The Fund will have the authority to agree to reasonably compensate members of the Advisory Committee for their services and to agree to reimburse them for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**Pricing Committee**

The Master Fund GP and/or the Investment Manager may appoint a committee (the "*Pricing Committee*") consisting of the following individuals: the Chief Financial Officer of the Investment Manager, the Chief Compliance Officer of the Investment Manager and one or more traders of the Investment Manager. The Pricing Committee will meet on at least a monthly basis to review, confirm and agree on all pricing information established by the Investment Manager in respect of the Master Fund's assets that are fair valued. The final pricing or valuation of such assets will require the approval of a majority in number of the members of the Pricing Committee constituting a quorum. In lieu of meeting, the Pricing Committee may take action by written consent signed by a majority of the committee members. The Pricing Committee may, at the Master Fund's expense, engage third-party experts and consultants to provide services in connection with any determination to be made by the Pricing Committee. The Master Fund GP and/or the Investment Manager may replace members of the Pricing Committee or change the composition of the Pricing Committee in its sole discretion.

**Board of Directors**

The Fund's board of directors (the "*Board of Directors*") currently consists of two directors (each, a "*Director*" and, collectively, the "*Directors*"). The current members of the Board of Directors are Mark Okada and Trey Parker. The biographies of Mark Okada and Trey Parker are set forth above.

**The Administrator and Administration Agreement**

The Master Fund has entered into an Administration Agreement (the "*Administration Agreement*"), with SEI Global Services, Inc. (the "*Administrator*") pursuant to which the Administrator performs certain administrative and accounting services for the Fund and the Master Fund, subject to the oversight and control of the Investment Manager. SEI Investments Global (Cayman), Limited ("*SEI Cayman*"), an affiliate of the Administrator, will also be a party to the Administration Agreement in a limited capacity pursuant to which SEI Cayman provides certain investor servicing and transfer agency services (including anti-money laundering services) directly to the Fund.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-1    Filed 02/24/20    Page 85 of 200    PageID 24697
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 170 of
324

Pursuant to the Administration Agreement, the Administrator is responsible, under the overall supervision of the Investment Manager, for certain matters pertaining to the day-to-day administration of the Fund including, but not limited to: (a) maintaining books and records related to Fund and Master Fund cash and position reconciliations, and portfolio transactions; (b) preparation of financial statements and other reports for the Fund and the Master Fund; (c) calculating the net asset value of the Master Fund (in accordance with the Investment Manager's valuation policies and procedures); (d) preparing certain reports to investors; (e) calculating fees payable or allocable to the Investment Manager (as applicable); (f) reviewing Subscription Documents and withdrawal requests and performing various other transfer agency and investor services; and (g) performing certain other administrative and clerical services in connection with the administration of the Fund and the Master Fund pursuant to the terms of the Administration Agreement.  For purposes of determining net asset value, the Administrator will follow the valuation policies and procedures adopted by the Master Fund and the Investment Manager.

The fees payable to the Administrator will be based on the schedule of fees charged by the Administrator and as detailed in the Administration Agreement.  The Master Fund may elect to terminate the Administration Agreement (in accordance with the terms thereof) and enter into a new agreement with a new administrator on behalf of the Master Fund and the Fund, in its discretion and on such terms as it deems advisable, without prior notice to, or approval of, investors.

The Administration Agreement provides that the Administrator may delegate some or all of its administrative functions on behalf of the Fund to one or more third parties, and also provides for certain limitations of the Administrator's liability and indemnification of the Administrator by the Fund.

The Administrator does not have a direct contractual relationship with the investors.  The Administrator, however, has entered into a contractual relationship with the Fund in relation to the performance of the services described herein.  The Fund will enforce its contractual rights with respect to the Administrator as necessary to protect the interests of the Fund (and, therefore, the interest of investors).

The Administrator in no way acts or will act as guarantor or offeror of interests in the Fund or any underlying investment, nor will it be responsible for the actions of the Fund's sales agents, its brokers, its custodians, any other brokers or the Investment Manager.  The Administrator will not be responsible for any trading decisions of the Investment Manager or the Master Fund.  The Administrator will not be responsible in any way for the Master Fund's selection or ongoing monitoring of its brokers, custodians or other counterparties.  The decision to select any counterparties on behalf of the Master Fund will be made solely by the Investment Manager.

THE ADMINISTRATOR WILL NOT PROVIDE ANY INVESTMENT ADVISORY OR INVESTMENT MANAGEMENT SERVICES TO THE FUND AND, THEREFORE, WILL NOT BE IN ANY WAY RESPONSIBLE FOR THE FUND'S PERFORMANCE.  THE ADMINISTRATOR WILL NOT BE RESPONSIBLE FOR MONITORING ANY INVESTMENT RESTRICTIONS OR COMPLIANCE WITH ANY INVESTMENT RESTRICTIONS APPLICABLE TO THE FUND AND THEREFORE WILL NOT BE LIABLE FOR ANY BREACH THEREOF.

Appx. 03462

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1 Filed 02/05/24   Page 86 of 200   PageID 24698
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 171 of
324

# SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms governing an investment in the Fund, and is subject, and qualified in its entirety by reference, to the Fund's Articles of Association, the Master Fund Partnership Agreement and the Fund's subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Articles of Association, the Master Fund Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

**The Fund**

Highland Dynamic Income Fund, Ltd. (formerly known as Highland Capital Loan Fund, Ltd.) an exempted company incorporated in the Cayman Islands with limited liability (the "***Fund***"), primarily seeks to maximize risk adjusted absolute returns, and secondarily seeks to preserve capital by investing all of its investable assets in Highland Dynamic Income Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which provides exposure to the broader bank loan market.

**Master Fund GP**

Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company (the "***Master Fund GP***"), acts as the general partner of the Master Fund and is registered as a foreign company in the Cayman Islands. James D. Dondero (the "***Principal***") ultimately controls the Master Fund GP.

**Investment Manager**

Highland Capital Management, L.P., a Delaware limited partnership controlled by the Principal (the "***Investment Manager***"), serves as investment manager to the Fund and the Master Fund and has responsibility for the Master Fund's investments.

**Directors**

The Fund's board of directors (the "***Board of Directors***") currently consists of two directors (each, a "***Director***" and, collectively, the "***Directors***"). The current members of the Board of Directors are Mark Okada and Trey Parker. The Directors are responsible for the overall management and control of the Fund in accordance with its Articles of Association; however, the Directors have delegated the day-to-day operation of the Fund to service providers, including the Investment Manager and the Administrator. References herein to the "Board of Directors" shall mean the Board of Directors acting in consultation with the Investment Manager.

**Master-Feeder Structure**

In order to facilitate investments by U.S. investors, the Master Fund GP has sponsored the formation of Highland Dynamic Income Fund, L.P., a Delaware limited partnership (the "***Domestic Fund***" and, together with the Fund, the "***Feeder Funds***"). The Feeder Funds place all of their investible assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund. Accordingly, references herein to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Fund. The Feeder

Appx. 03463

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 1-6 Part 6 Filed 2002 of 88ge 87 of 200    PageID 24699
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 172 of
324

Funds share all items of profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund. Except as the context otherwise requires, the term "Fund" also includes the Master Fund.

The Investment Manager or an affiliate may also sponsor one or more additional investment funds or accounts.

**Eligible Investors**

Participating non-voting shares of the Fund (the "***Shares***") may be purchased only by eligible investors. Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The Board of Directors reserves the right to reject any investor for any reason or for no reason in its sole discretion.

No Shares may be offered to the public in the Cayman Islands. Shares may be purchased only by eligible investors who are sophisticated individual or institutional investors. Each subscriber for Shares must certify that the beneficial owner of such Shares will not be a United States Person (as defined in Appendix A); provided, however, that subscriptions for Shares may also be accepted from certain qualified U.S. tax-exempt organizations.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Series of Shares**

The Fund may create and offer various classes or series of Shares with different terms and conditions than those described in this Memorandum, including, without limitation, fees, performance allocations and redemption rights. New classes or series of Shares may be established by the Board of Directors without notice to or approval of the shareholders.

**Share Sub-Series**

Shares are offered in a separate series to each shareholder on each subscription date (each, a "***Sub-Series***") at $1,000 per Share. The Fund issues Shares as a separate Sub-Series for the purposes, among others, of accounting for any profits and losses attributable to each individual shareholder to reflect different returns achieved as a result of subscriptions received from shareholders at different times in order to calculate the Performance Allocation (as defined below) at the Master Fund level. Each separate Sub-Series of Shares will be identified and referable to each shareholder.

13

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-1 Filed 02/04/24   Page 88 of 200   PageID 24700
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 173 of
324

| | |
|---|---|
| **Subscriptions** | Subscriptions for Shares may be accepted as of the first Business Day of each month and/or such other days as the Board of Directors may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date.  The initial minimum investment is $1,000,000, although the Fund may accept investments in a lesser amount, subject to an absolute minimum of $100,000 or such other amount as may, from time to time, be prescribed by the Mutual Funds Law or other applicable law. |
| | "***Business Day***" is defined as any day on which commercial banks are open in New York City and the Cayman Islands, or such other day as the Board of Directors may determine from time to time. |
| | All subscriptions for Shares will be subject to applicable anti-money laundering regulations.  As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Board of Directors or its delegate may require verification of identity from all prospective investors.    Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity. |
| | Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant subscription date. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date. |
| **Placement Agents** | There will be no sales charge payable by or to the Fund in connection with the offering of Shares.  However, the Investment Manager may enter into arrangements with placement agents (which may include its affiliates) to solicit investors in the Fund, and such arrangements, may provide for the compensation of such placements agents for their services at the Investment Manager's expense. |
| | Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation.  Investors should consider these potential conflicts of interest in making their investment decisions. |
| | Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Shares. |
| **Affiliated Investors** | The Investment Manager, the Master Fund GP and their respective affiliates, principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes ("***Affiliated Investors***") may not be subject to restrictions on redemptions or be |

14

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-1    Filed 09/29/23    Page 89 of 200    PageID 24701
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 174 of
324

assessed the Management Fee or the Performance Allocation (each as defined below) that are applicable to other investors in the Fund, but do share *pro rata* in all other applicable expenses of the Fund.

**Borrowing and Leverage**

The Master Fund may buy securities or commodities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities or commodities in order to employ leverage when the Master Fund GP deems such action appropriate.

**Management Fee**

For its services to the Master Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***") calculated and payable quarterly in advance at an annual rate of 2.75% of the net asset value of each Sub-Series Account (as defined below). The Management Fee is paid at the Master Fund level. The Management Fee will be prorated for any period that is less than a full quarter.

The Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any shareholder, including, without limitation, Affiliated Investors.

The Fund and/or the Investment Manager may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the shareholders. The Investment Manager may also assign all or any portion of fees payable to the Investment Manager to any affiliate thereof in its sole discretion.

**Performance Allocation**

Pursuant to the Master Fund Partnership Agreement, generally, as of the close of each year and subject to the limitations described below, a performance-based allocation (the "***Performance Allocation***") is debited against the Sub-Series Account relating to each Sub-Series of Shares attributable to a shareholder and simultaneously credited to the Master Fund capital account of the Master Fund GP. The Performance Allocation is calculated and allocated at the Master Fund level, but is equal to 10% of the amount by which the Performance Change Amount (positive and negative) for such fiscal year exceeds the Index Return Amount (positive and negative) for such fiscal year.

A Sub-Series Account's "***Performance Change Amount***" for any fiscal year equals such Sub-Series Account's pro rata allocation of net profit or net loss, plus or minus the Sub-Series Account's share items that are allocated on a Sub-Series Account-by- Sub-Series Account basis, such as the Management Fee. Net profit and net loss includes unrealized appreciation or depreciation of the Master Fund's assets and accrued applicable expenses of the Fund and the Master Fund for the applicable fiscal year.

The "***Index Return Amount***" is the amount that would have been credited or debited to such Sub-Series Account for the fiscal year if the rate of return had been equal to the return of the S&P/LSTA Leveraged Loan

Appx. 03466

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part 6 Page 90 of 200    PageID 24702
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 175 of 324

Total Return Index for such fiscal year.[3]

The Performance Allocation is generally allocable to the Master Fund GP at the end of each fiscal year.  The Performance Allocation is also calculated and charged with respect to any Sub-Series Account with respect to Shares redeemed as of any time other than the close of a fiscal year on the basis of the Performance Change Amount with respect to such Shares through the Redemption Date (as defined below).  In the case of a partial redemption, the Performance Allocation is calculated and charged only with respect to the portion of the Sub-Series Account related to such Shares being redeemed.

The Performance Allocation with respect to any shareholder may be fully or partially waived or rebated by the Master Fund GP in its sole discretion.

The Performance Allocation is calculated and allocated at the Master Fund level through the use of separate memorandum sub-accounts with respect to the Fund's capital account in the Master Fund that correspond to each Sub-Series of Shares attributable to a shareholder (each a "*Sub-Series Account*").  No separate Performance Allocation will be charged at the Fund level.

**Other Fees and Expenses**
The Fund bears the expenses of the organization of the Fund and the offering of Shares (including legal and accounting fees, printing costs, travel, "blue sky" filing fees and expenses and out-of-pocket expenses).  In general, the Fund's financial statements will be prepared in accordance with accounting principles generally accepted in the United States ("*GAAP*").  However, the Fund intends to amortize its organizational expenses over a period of 60 months from the date the Fund commenced operations because it believes such treatment is more equitable than expensing the entire amount of the organizational expenses in the Fund's first year of operation, as is required by GAAP.  The Fund may, however, limit the amount of start-up and organizational expenses that the Fund amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund bears its own operating, administrative and other expenses, as well as a *pro rata* portion of the Master Fund's expenses, including, but not limited to, investment-related expenses (including those related to identifying and evaluating contemplated investments, whether or not such contemplated investments are actually made), brokerage commissions and other transaction costs, expenses related to short sales, clearing and settlement charges, expenses related to proxies, underwriting and private placements, custodial fees, transfer agent fees, bank service fees, any

---

[3] The S&P/LSTA Leveraged Loan Total Return Index is used only for purposes of establishing the Index Return Amount. The Partnership will not directly invest in the Index nor seek to replicate the Index, and there might or might not be a close correlation between the performance of the Fund and that of the Index.  The Index does not reflect the investment strategy of the Fund.

16

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 09/02/4 of 867age 91 of 200    PageID 24703
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 176 of
324

governmental, regulatory, licensing, filing or registration fees incurred in
compliance with the rules of any self-regulatory organization or any
federal, state or local laws, consulting and any other professional fees or
compensation (including investment banking expenses) relating to
particular investments or contemplated investments, appraisal fees and
expenses, investment-related travel and lodging expenses and research-
related expenses (including, without limitation, news and quotation
equipment and services), fees to third-party providers of risk-monitoring
services, investment and trading-related computer hardware and software,
including, without limitation, trade order management software (*i.e.*,
software used to route trade orders), accounting (including accounting
software), audit and tax preparation expenses, organizational expenses,
expenses relating to the offer and sale of Shares and interests of the
Master Fund (including the legal and other expenses associated with
preparing and updating offering materials), costs and expenses associated
with reporting and providing information to existing and prospective
investors, any legal fees and costs (including indemnification expenses,
regulatory costs and settlement costs) arising in connection with any
litigation or regulatory investigation instituted against the Fund, the
Master Fund, the Master Fund GP, the Investment Manager or any of
their respective affiliates in their capacity as such unless a final
determination was made by a court of competent jurisdiction that any of
the foregoing indemnified parties was grossly negligent or acted in bad
faith, except as otherwise provided in the Articles of Association and/or
the Master Fund Partnership Agreement, any withholding, transfer or
other taxes imposed or assessed upon, or payable by, the Fund (including
any interest and penalties), costs of any meeting of the shareholders (or in
obtaining the consent of shareholders in lieu of meeting), expenses related
to the Advisory Committee and the Pricing Committee, premiums for
directors' and officers' liability insurance (if any) and any other insurance
benefiting the Fund, the Management Fee, administrative expenses
(including, without limitation, the fees and expenses of the Administrator
in relation to its services provided pursuant to the Administration
Agreement), fees relating to valuing the Fund's assets, expenses related to
the maintenance of the Fund's registered office, corporate licensing
expenses, and extraordinary expenses.

The Investment Manager may retain, in connection with its
responsibilities under the Investment Management Agreement, the
services of others to assist in the investment advice to be given to the
Master Fund, including, but not limited to, any affiliate of the Investment
Manager, but payment for any such services will be assumed by the
Investment Manager. However, the Investment Manager, in its sole
discretion, may retain the services of independent third party
professionals, including, without limitation, attorneys, accountants and
consultants, to advise and assist it in connection with the performance of
its activities on behalf of the Master Fund, and the Master Fund will bear
full responsibility therefor and the expense of any fees and disbursements
arising therefrom.

17

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-12    Filed 09/14/24    Page 92 of 200    PageID 24704
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 177 of 324

The Fund and the Master Fund do not have their own separate employees or office, and neither the Fund nor the Master Fund reimburse the Master Fund GP or the Investment Manager for salaries, office rent and other general overhead costs of the Master Fund GP or the Investment Manager. A portion of the commissions generated on the Master Fund's brokerage transactions may generate soft dollar credits that the Investment Manager is authorized to use to pay for research and other research-related services and products used by the Investment Manager. It is the current policy of the Investment Manager to limit such use of soft dollars to fall within the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended, or to be otherwise reasonably related to the investment decision-making process or for Master Fund expenses. See "*Brokerage and Custody*."

**Certain Fees**

The Investment Manager, including, without limitation, the employees of the Investment Manager, may serve on the board of directors or committees thereof and/or provide financial advisory, consulting and/or as officers or otherwise provide management services, in each case for a fee to portfolio companies in which the Master Fund may have an interest. Such services are provided only after approval by the board of directors of such portfolio companies (or after approval of a court of appropriate jurisdiction with respect to bankruptcy proceedings or other appropriate approval) and based on "arm's length" negotiations of terms and conditions. Any fees earned pursuant to any such agreements for services will be retained by the Investment Manager.

**Distributions**

Subject to the quarterly redemption privilege described below, all earnings of the Fund are ordinarily retained for investment. Shareholders should not expect the Fund to make any distributions.

**Redemptions Generally**

Subject to certain redemption restrictions described below, a shareholder is generally permitted to redeem all or a portion of its Shares as of the last Business Day of each quarter (and/or such other days as the Board of Directors may determine in its sole discretion) (each, a "***Redemption Date***"). Written notice of any redemption request must be received in writing by the Administrator at least 45 days prior to the requested Redemption Date. The Board of Directors may waive such notice requirements, or permit redemptions under such other circumstances as it, in its sole discretion, deems appropriate.

**Settlement of Redemption Proceeds**

A redemption request is normally settled in cash or, subject to the sole discretion of the Board of Directors, wholly or partially with securities or other assets of the Fund (received from the Master Fund), whether or not readily marketable, generally within 30 days after the Redemption Date; provided that the Board of Directors may delay such payment if such delay is reasonably necessary to prevent such redemption from having a material adverse impact on the Fund.

In the event that distributions during a fiscal year to a redeeming

18

Case 21-03003-sgj Doc 135-6 Filed 12/18/21 Entered 12/18/21 01:38:22 Desc
Case 3:21-cv-00881-X Document 16-1 Filed 02/24 of 86 Page 93 of 200 PageID 24705
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20 Entered 02/24/20 17:25:25 Page 178 of 324

shareholder would exceed 90% of the value of such shareholder's Shares as of the beginning of such fiscal year, excess requested amounts will be held back and distributed (without interest thereon) within 30 days following completion of the audit of the Fund's financial statements for the year.

Notwithstanding anything to the contrary herein, the Board of Directors may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the Board of Directors and whether or not incurred directly or indirectly), which could reduce the amount of a distribution upon a shareholder's redemption of Shares. The Board of Directors may withhold for the benefit of the Fund from any distribution to a redeeming shareholder an amount representing the actual or estimated costs incurred by the Fund with respect to such redemption.

|                         |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                              |
|-------------------------|----|
| **Redemption Gate**     | If, for any Redemption Date, (i) shareholders submit redemption notices that, when combined, are in excess of 25% of the Fund's net asset value, or (ii) redemption requests are received by the Master Fund from any or all feeder vehicles in the Master Fund in excess of 25% of the Master Fund's net asset value, then the Board of Directors may determine, in its sole discretion, to reduce all such requests proportionately (based on the net asset value of each shareholder's Shares) so that the aggregate amount of such redemptions does not exceed 25% of the Fund's net asset value or such greater amount if the Board of Directors so determines (such restriction is referred to herein as the "***Redemption Gate***"). If redemptions are subject to the Redemption Gate, redemption requests are carried over to the next Redemption Date (and, if not fully satisfied as of that date because of the Redemption Gate, then as of the next, and, if necessary, successive Redemption Dates), except to the extent shareholders rescind their redemption request(s). |
|                         | Any remaining amount of a redemption request that is not satisfied due to the Redemption Gate (i) remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee, if any, until such amount is finally and fully redeemed, (ii) is considered requested as of the next Redemption Date without further action by the redeeming shareholder, (iii) is not entitled to priority over redemption requests on any subsequent Redemption Date, and (iv) remains subject to further application of the Redemption Gate on subsequent Redemption Dates. |
| **Redemption Conditions** | The Fund or the Administrator may refuse to accept a redemption request if it is not accompanied by such additional information as the Fund or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where redemption proceeds are requested to be |

19

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 21-1 Filed 03/24/23 Page 94 of 200    PageID 24706
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 179 of
324

remitted to an account which is not in the name of the investor, the Fund and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the redemption proceeds will be paid.  The redemption proceeds will not be paid to a third-party account if the investor and/or owner of the account fails to provide such information.

Redemption payments will be made by wire transfer only to a bank account in the name of the shareholder located at a recognized financial institution which is regulated by a recognized regulatory authority and carries on business in a country recognized in Schedule 3 of the Money Laundering Regulations (2017 Revision) of the Cayman Islands (the "*Money Laundering Regulations*").

**Compulsory Redemptions**

The Board of Directors reserves the right, in its sole discretion, to compel the redemption of a shareholder's Shares at any time and for any reason on not less than five days' prior written notice (or immediately if the Directors, in their sole discretion, determine that such shareholder's continued investment in the Fund may cause the Fund or the Investment Manager to violate any applicable law).  Settlements are made in the same manner as voluntary redemptions, but without application of the Redemption Gate.

**Suspension of Redemptions and Redemption Payments**

The Board of Directors may postpone or suspend (a) the calculation of the net asset value of the Shares (and the applicable valuation date); (b) the issuance of Shares, (c) the redemption by shareholders of Shares (and the applicable Redemption Date); and/or (d) the payment of redemption proceeds (even if the calculation dates and Redemptions Dates are not postponed) (each, a "*Suspension*") if it determines that such a Suspension is warranted by extraordinary circumstances, including: (i) during any period when any stock exchange or over-the-counter market on which the Master Fund's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the Board of Directors, disposal of investments by the Fund, or the determination of the value of the assets of the Fund, would not be reasonably practicable or would be seriously prejudicial to the non-redeeming shareholders; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Fund's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Fund cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Board of Directors, be effected at normal rates of exchange; (v) automatically upon liquidation of the Fund; or (vi) automatically upon any suspension of redemptions by the Master Fund

**Appx. 03471**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-21    Page 95 of 200    PageID 24707    Appendix Part 6 Filed 09/24 of 367
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 180 of
324

for similar reasons as described in "*The Master Fund*," below.

The Fund will promptly notify each shareholder who has submitted a redemption request and to whom payment in full of the amount being redeemed has not yet been remitted of any Suspension of redemptions or Suspension of the payment of redemption proceeds.  Any remaining amount of a redemption request that is not satisfied due to such a Suspension remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee until such amount is finally and fully redeemed.  Such shareholders will not be given any priority with respect to the redemption of Shares after the cause for such Suspension or limitation ceases to exist.  The Board of Directors may in their sole discretion, however, permit such shareholders to withdraw their redemption requests to the extent that the relevant Redemption Date has not yet passed.  For the avoidance of doubt, where a suspension of the payment of redemption proceeds is declared between the relevant Redemption Date and the remittance of such payment proceeds, affected shareholders shall not have any right to withdraw their redemption requests.  Upon the reasonable determination by the Board of Directors that conditions leading to Suspension no longer apply, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, redemption rights shall be promptly reinstated, and any pending redemption requests which were not withdrawn (or new, timely redemption requests) will be effected as of the first Redemption Date following the removal of the Suspension, subject to the foregoing restrictions on redemptions.

The Directors have the power, in the circumstances described above, to effect a Suspension.  It is anticipated that any Suspension would ordinarily be temporary.  However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the Directors, in consultation with the Investment Manager, consider it appropriate to keep the Suspension in place indefinitely.  In certain circumstances, even where a Suspension has not been declared, the Directors may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued.  During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the Directors that the Fund be managed with the objective of returning the Fund's assets to shareholders in an orderly manner (an "***Orderly Realization***").   The Directors may, in such circumstances, resolve to effect an Orderly Realization should they determine that doing so is in the best interests of the Fund's stakeholders.  Such Orderly Realization shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the shareholders.  The

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-21   Filed 09/25/24   Page 96 of 200   PageID 24708
Appendix Part 6 Page 295 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 181 of
324

Directors shall promptly communicate to shareholders any resolution to proceed with an Orderly Realization of the Fund. During an Orderly Realization, the Investment Manager may, in consultation with the Directors, take such steps as are considered appropriate in the best interests of the Fund's stakeholders to effect the Orderly Realization. The Directors, in consultation with the Investment Manager shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "**Realization Period**"). Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under the Companies Law (2016 Revision) of the Cayman Islands (the "**Companies Law**") or any other applicable bankruptcy or insolvency regime. The Directors, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. The Management Fee shall be payable during an Orderly Realization on the same basis as described herein.

**Transfers**

Shares are not transferable except with the prior written consent of the Board of Directors, which consent may be withheld in its sole discretion. The Board of Directors will require any transferee or assignee of any shareholder to execute the Subscription Documents.

**Duty of Care; Indemnification**

Pursuant to the Master Fund Partnership Agreement and the Investment Management Agreement, the Master Fund GP, the Investment Manager, each member, shareholder, partner, manager, director, officer, employee and agent of, and any person who controls, the Master Fund GP or the Investment Manager, each of the respective affiliates of the foregoing, members of the Advisory Committee and Pricing Committee, their respective affiliates, and any of the legal representatives of any of the foregoing (each such person, an "**Indemnified Party**") shall not be liable to the Master Fund, Fund or the shareholders for any loss or damage arising by reason of being or having been the Master Fund GP or the Investment Manager or from any acts or omissions in the performance of its services as the Master Fund GP or the Investment Manager in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith, or as otherwise required by law. No Indemnified Party shall be liable to the Master Fund, the Fund, any shareholder or any other person for any amount in excess of the amount of the Management Fee received by the Investment Manager, to the extent permitted under applicable law. In addition, in no event shall any Indemnified Party be liable for any special, indirect, exemplary, consequential or punitive losses or damages.

The Master Fund Partnership Agreement and Investment Management Agreement contain provisions for the indemnification of the Indemnified Parties by the Master Fund and the Fund (but not by the shareholders

22

Appx. 03473

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1 Filed 02/24/21   Page 97 of 200   PageID 24709
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 182 of
324

individually) against any liabilities arising by reason of being or having been the Master Fund GP or the Investment Manager or in connection with the Master Fund Partnership Agreement, the Investment Management Agreement, or the Master Fund or the Fund's business or affairs to the fullest extent permitted by law.  The Investment Manager is not personally liable to any shareholder for the repayment of any redemption proceeds or for contributions by such shareholder to the capital of the Fund or by reason of any change in the U.S. federal or state income tax laws applicable to the Fund or its investors.

Every Director and officer of the Fund, together with every former Director and former officer of the Fund, shall be indemnified out of the assets of the Fund against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud or willful default.  No Director or officer of the Fund shall be liable to the Fund for any loss or damage incurred by the Fund as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud or willful default of such Indemnified Party.  No person shall be found to have committed actual fraud or willful default under the Articles of Association unless or until a court of competent jurisdiction shall have made a finding to that effect.

**Non-Exclusivity; Allocation of Opportunities**

The partners, officers, managers, members, employees and affiliates of the Master Fund GP and the Investment Manager are not precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund.   See "*Risk Factors and Potential Conflicts of Interest – Allocation of Trading Opportunities*" below.

**Affiliated Service Providers**

NexBank, SSB ("*NexBank SSB*") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund and other vehicles in which the Fund may invest) or third parties engaged in transactions involving the Investment Manager.  NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest).  Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB.  Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment

23

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-1 Part 6 Page 29 of 867 Page 98 of 200    PageID 24710
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 183 of
324

Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc., NexBank Capital Advisors and Governance Re, Ltd. may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest.  See "*Risk Factors and Potential Conflicts of Interest*" below.

**Valuations**

In general, the Fund's financial statements will be prepared in accordance with GAAP.  The Board of Directors has delegated the valuation of the Fund's assets, based on the Master Fund's assets, to the Investment Manager who values the Fund's assets as of the close of each fiscal period in accordance with its valuation policies and procedures.

**Reserves**

Appropriate reserves may be accrued and charged against net assets and proportionately against the Shares of the shareholders for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the Board of Directors in its sole discretion deems necessary or appropriate.  At the sole discretion of the Board of Directors, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Shares of those investors who are shareholders at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were shareholders at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the Board of Directors determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were shareholders during any such prior period.

**Fiscal Year**

The Fund has a fiscal year ending on December 31 of each year.

**Reports to Shareholders**

Shareholders will receive unaudited monthly statements of the estimated net asset value of the Fund, monthly performance and portfolio reports, and an annual financial report of the Fund audited by the Fund's independent auditors.  The Fund may elect not to reserve certain amounts that may be required by GAAP and not to provide certain portfolio disclosure required by GAAP to investors and may capitalize and amortize certain of its organizational expenses in deviation from GAAP.  Such deviations from GAAP may result in a qualified opinion rendered on the financial statements of the Fund.  In addition, the Fund may provide certain information to certain shareholders, but not to all shareholders.

**Tax Status**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

Appx. 03475

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-1   Filed 09/24/21   Page 99 of 200   PageID 24711
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 184 of
324

The Fund has applied for and can expect to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

The Investment Manager believes that the Fund will be treated as a non-U.S. corporation for U.S. federal income tax purposes.  The Fund generally does not expect to be subject to U.S. federal income tax on its capital gains from securities trading.   Dividends (including certain dividend equivalent amounts) and certain interest received by the Fund may be subject to withholding at the source.  See "*Tax Considerations.*"

**ERISA**

The Investment Manager intends to limit investment in the Master Fund by "benefit plan investors" so that the assets of the Master Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*").  It is anticipated that the assets of the Fund may constitute "plan assets" for purposes of ERISA. See "*ERISA and Other Regulatory Considerations*."

**Variation of Terms**

The Fund may enter into agreements with certain shareholders pursuant to which such shareholders will invest in the Fund on different terms, and in some cases, more favorable terms (including with respect to information and reporting, the Management Fee, the Performance Allocation and redemption rights), than those described herein, without the consent of, or notice to, the other shareholders.

The Articles of Association provide that, subject to the Companies Law of the Cayman Islands and the other provisions of the Articles of Association, all or any of the series rights or other terms of offer whether set out in the Memorandum, the Subscription Documents or otherwise (including any representations, warranties or other disclosure relating to the offer or holding of Shares) (collectively referred to as "*Share Rights*") for the time being applicable to any class or series of Shares in issue (unless otherwise provided by the terms of issue of those Shares) may (whether or not the Fund is being wound up) be varied without the consent of the holders of the issued Shares of that class or series where such variation is considered by the Directors, not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation shall be made only with the prior consent in writing of the

25

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 02/09/24 Page 100 of 200   PageID 24712
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 185 of
324

holders of not less than two-thirds by net asset value of such Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Shares.  For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of such Shares.  At any class meeting, the voting rights attributable to each Share shall be calculated by reference to the net asset value per Share and not on the basis of one Share, one vote.  Each subscriber for Shares will be required to agree that the terms of offer set out in the applicable Subscription Documents and the rights attaching to the Shares can be varied in accordance with the provisions of the Articles of Association.

**Dissolution Right**

Shareholders that are not affiliates or employees of the Investment Manager ("***Nonaffiliated Shareholders***") may cause the dissolution of the Fund upon the affirmative vote of shareholders holding Shares representing more than 50% of the net asset value of all Shares attributable to Non-Affiliated Shareholders at a special meeting of shareholders duly called by the Board of Directors pursuant to a notice circulated by the Board of Directors at the written request of shareholders holding Shares representing 20% or more of the net asset value of all Shares attributable to Non-Affiliated Shareholders.  In the event of a dissolution of the Fund effected pursuant to the Articles, the Master Fund will make an in-kind distribution to the Fund (to the extent such in-kind distribution is reasonably practicable) and the Fund will distribute its assets to the shareholders in kind (to the extent such in-kind distribution is reasonably practicable).

A petition to submit to shareholders a proposal to dissolve the Fund (any such petition, a "***Dissolution Petition***") may be submitted to the Board of Directors by any Nonaffiliated Shareholders holding Shares representing 2% or more of the net asset value of all Shares attributable to Non-Affiliated Shareholders.  The Board of Directors shall have the power and duty to determine whether a Dissolution Petition was properly made in accordance with the Articles.  If a Dissolution Petition was not properly made in accordance with the Articles, the Board of Directors shall so notify the requesting Nonaffiliated Shareholder(s) in writing of any procedural or eligibility deficiencies and such Dissolution Petition shall be disregarded.  If the Dissolution Petition is properly made in accordance with the Articles, the Board of Directors shall within 30 days after receipt of the Dissolution Petition mail the Dissolution Petition to all Nonaffiliated Shareholder(s) together with written instructions specifying that a special meeting of shareholders will be called to dissolve the Fund if the Dissolution Petition is signed by Nonaffiliated Shareholders holding Shares representing 20% or more of the net asset value of all Shares attributable to Non-Affiliated Shareholders and returned to the Fund within 60 days after the date of such mailing.  To be properly made, a Dissolution Petition must be received in writing by the Board of Directors at the principal place of business of the Fund, request that the Board of

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1 Part 6   Filed 02/04/24   Page 101 of 200   PageID 24713
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 186 of
324

Directors mail the Dissolution Petition to all Nonaffiliated Shareholders and set forth as to the Nonaffiliated Shareholder(s) making the Dissolution Petition: (i) each such Nonaffiliated Shareholder's name and address, as they appear on the Fund's books, (ii) the net asset value of each such Nonaffiliated Shareholder's Shares as of the most recent month-end (which in the aggregate must represent at least 2% of the net asset value of all Shares attributable to Non-Affiliated Shareholders), and (iii) a representation that at least one shareholder from the group of shareholders that will sign the Dissolution Petition (or a qualified representative of at least one such shareholder) intends to appear in person at the special meeting of shareholders to determine whether to dissolve the Fund.

The Dissolution Petition may not set forth any proposal regarding the Fund other than the dissolution of the Fund.  The Dissolution Petition shall be improper if it contains any false or misleading statements.  The Board of Directors may, in its sole and absolute discretion, deem a Dissolution Petition improper if another proposal to dissolve the Fund was previously submitted by one or more of the same shareholders (or an affiliate or immediate family member thereof) during the preceding two years.

Upon receipt of the Dissolution Petition, signed by Nonaffiliated Shareholders holding Shares representing 20% or more of the net asset value of all Shares attributable to Non-Affiliated Shareholders and returned to the Fund within 60 days after the date on which the Dissolution Petition was mailed, the Board of Directors shall, by written notice to each shareholder of record within 15 days after such receipt, call such a special meeting of shareholders to vote (in person or by proxy) on the dissolution of the Fund.  Such meeting shall be held at least 30 but not more than 60 days after the mailing of such notice, and such notice shall specify the date, a reasonable place (which shall include, for avoidance of doubt, the principal place of business of the Fund or the Board of Directors), and time for such meeting, as well as its purpose, and include a form of proxy.

Except as otherwise required by the Articles of Association, neither the Fund nor the Board of Directors shall have any obligation to forward any communication received by a shareholder to any other shareholder or to call a meeting of shareholders.  Nothing herein shall in any way limit or restrict the ability of the Fund or the Board of Directors to solicit votes or consents in opposition of any Dissolution Petition.  If no shareholder from the group of shareholders that signed the Dissolution Petition (or any qualified representative of at least one such shareholder) appears in person at the special meeting of shareholders, then no vote on the dissolution of the Fund will be taken at such meeting.  In order to be considered a qualified representative of the shareholder, a person must be authorized by a written instrument executed by such shareholder or an electronic transmission delivered by such shareholder to act for such shareholder as proxy at the meeting of shareholders and such person must

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-2 Part 6 Filed 02/14/24    Page 102 of 200    PageID 24714
Appendix Part 6 Page 274 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 187 of
324

produce such written instrument or electronic transmission, or a reliable reproduction of the written instrument or electronic transmission, at the meeting of shareholders.  By submitting a Dissolution Petition to the Board of Directors, the Nonaffiliated Shareholder(s) shall be deemed to consent to the Board of Director's mailing of the Dissolution Petition to all Nonaffiliated Shareholders for all purposes, including without limitation for purposes of Regulation S-P under section 504 of the Gramm-Leach-Bliley Act, as amended, and other applicable privacy laws.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Page 2224 of 867ge 103 of 200    PageID 24715
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 188 of
324

## SHARES OF THE FUND

**The Fund's Share Capital**

The Fund has an authorized share capital of U.S.$50,000 divided into 100 management shares ("***Management Shares***") of a nominal par value of U.S.$1.00 each and 4,990,000 participating non-voting shares (the "***Shares***") of a nominal par value of U.S.$0.01. The Directors may by resolution divide the Shares into separate series (each, a "***Series***") which may be subject to different rights, restrictions, preferences, privileges and payment obligations as between the different Series and further into separate Sub-Series within such Series. The different Series and Sub-Series thereof shall be established and designated, and the variations in the relative rights and preferences as between the different Series and Sub-Series thereof shall be fixed and determined by the Board of Directors. Sub-Series of Shares of each Series are issued for the purposes, among others, of accounting for any profits and losses attributable to each individual shareholder to reflect different returns achieved as a result of subscriptions received at different times.

Each separate Sub-Series of Shares is identified by the investor to whom it was issued and its date of issue. Shares are issued to shareholders in Sub-Series at $1,000 per Share. Immediately following the close of any fiscal year, each such Sub-Series of Shares may be redeemed and the proceeds applied to the subscription for an earlier Sub-Series of Shares of such Series.

The Shares are being offered pursuant to this Memorandum. The Shares generally will be entitled to all rights and privileges of Share ownership (including the right to receive dividends when declared and distributions of assets, net of all final fees and expenses, upon winding up) other than voting rights, except under limited circumstances.

The Management Shares will carry all the voting rights but will have no right to participate in the assets of the Fund (other than to a return of the par value on a winding up). The Management Shares will be held by the Investment Manager or an affiliate, and will be voted in accordance with the instructions of the Investment Manager.

The holders of Shares will only be entitled to vote at class meetings of shareholders to the extent that the matter considered thereat would materially adversely vary or abrogate the existing class rights attaching to the Shares. The holders of Shares have no other voting rights.

The Articles of Association provide that, subject to the Companies Law and the other provisions of the Articles of Association, all or any of the class and/or Series rights or other terms of offer, whether set out in this Memorandum, the Subscription Documents or otherwise (including any representations, warranties or other disclosures relating to the offer or holding of Shares) (collectively referred to as "***Share Rights***"), for the time being applicable to any class or Series of Shares in issue (unless otherwise provided by the terms of issue of those Shares) may (whether or not the Fund is being wound up) be varied without the consent of the holders of the issued Shares of that class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation shall be made only with the prior consent in writing of the holders of not less than two-thirds by net asset value of such Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation might not have a material adverse effect, to obtain consent from the holders of such Shares. At any class meeting, the voting rights attributable to each

29

**Appx. 03480**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 02/23/24   Page 104 of 200   PageID 24716
Appendix Part 6 Page 023 of 366
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 189 of
324

Share shall be calculated by reference to the net asset value per Share and not on the basis of one Share, one vote.  Each subscriber for Shares will be required to agree that the terms of offer set out in the Subscription Documents and the rights attaching to the Shares can be varied in accordance with the provisions of the Articles of Association.  The Articles of Association provide that, in relation to any class or Series consent required pursuant to the "Variation of Share Rights" Article, the Directors in their discretion may invoke the following procedure (the "*Negative Consent Procedure*").  The Directors shall provide written notice in respect of the proposed variation (the "*Proposal*") to the members of the affected class or Series and shall specify a deadline (the "*Redemption Request Date*"), which shall be no earlier than 30 days after the date of giving such notice, by which date such members may submit a written request for redemption of some or all of their Shares of the affected class and/or Series on the Redemption Date (the "*Specified Redemption Date*") specified by the Directors in such notice.  The terms of the Proposal shall be such that its specified effective date (the "*Effective Date*") shall not be on or prior to the Specified Redemption Date.  Such notice shall further provide that the holders of any Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "*Affected Shares*") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "*Negative Consent Shares*").  In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under the "*Variation of Share Rights*" Article with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favor of the Proposal on the Effective Date.

The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares, be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them, the redemption or purchase of any Shares or by the passing of any Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to the Shares or any modification of the fees payable to any service provider to the Fund.

In general, each Share will participate in the Fund's profits and losses attributable to the relevant class in the same manner.  Each of the Shares will participate ratably with all other outstanding Shares in the Fund's assets and earnings and will have the redemption rights discussed above.

The Directors may impose such restrictions as they think necessary for the purpose of ensuring that no Shares in the Fund are held by (i) any person in breach of the laws or requirements of any country or governmental authority or (ii) any person or persons in circumstances which, in the opinion of the Directors, might result in the Fund incurring any liability of taxation or suffering any other pecuniary disadvantage which the Fund might not otherwise have incurred or suffered.  A person who becomes aware that he or she is holding or owning Shares in breach of any restriction mentioned in the Articles of Association shall promptly either deliver to the Fund a written request for redemption of his or her Shares or transfer the same to a person who would not thereby be a non-qualified person.

**Management Shares**

The Fund will have a single class of Management Shares that is not entitled to participate in the Fund's assets, earnings and distributions, other than with respect to a return of their par value on a winding up of the Fund.  The Management Shares are issued at par value at U.S.\$1.00 per share.

Appx. 03481

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 6 Filed 02/24/24    Page 105 of 200    PageID 24717
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 190 of
324

General meetings of the holders of Management Shares may be held to vote on various matters including to elect the Directors and to attend to such other business as may properly be placed before the meeting.  At any such general meeting, the favorable vote of a majority of the Management Shares present is sufficient for the approval of any action, unless such action is a matter requiring a special resolution, in which case two-thirds of the Management Shares shall be required, in each case as further detailed in the Articles of Association.

### Registration of Management Shares and Shares and Share Certificates

Management Shares and Shares of the Fund are issued only in registered form; the Fund will not issue bearer shares.  A current register of the names and addresses of the Fund's shareholders and their shareholdings is maintained at the office of the Administrator.  Management Shares and Shares are registered only in book entry form.  No share certificates have been or will be issued.

### Other Rights and Liabilities

Under the terms of the Articles of Association, the liability of the shareholders of the Fund is limited, and shareholders will not be liable for any debt, obligation or default of the Fund in excess of the amounts unpaid on their Shares.

The Fund and the Investment Manager may agree with certain investors to a fee structure, redemption rights or other terms that differ from the fee structure, redemption rights and other terms that are set forth in this Memorandum.  Such different rights may, subject to applicable law, be effected by issuance of a separate Series of Shares or any other permissible means.  Such rights may not be offered to all investors.

### Calculation of Fund Net Asset Value

The Directors have delegated to the Administrator the calculation of the net asset value of the Fund and the net asset value per Share of each Series and, if applicable, Sub-Series, subject to the overall supervision and direction of the Directors.  Net asset valuations of the Fund and each Sub-Series of each Series of Shares will be calculated as of the close of business on the last day of each month, or such other days as may from time to time be determined by the Fund (each, a "*Valuation Date*") in accordance with United States generally accepted accounting principles.  To the extent feasible, liabilities are accrued as of each Valuation Date.

The Fund's assets are valued based on the Master Fund's assets.  The net asset value of the Fund is determined by taking the amount of all cash and credit balances plus the market value of all commodities and other assets comprising the Fund's assets (including any interest and dividends receivable but excluding any subscription amounts committed to the Fund from time to time to the extent such amounts are not held by or on behalf of the Fund), as valued by the Investment Manager and the Administrator, minus all debit balances and other liabilities and obligations of the Fund (including any liability for the payment of the Management Fee and Performance Allocation hereunder).  Net asset value in respect of any Series or Sub-Series of participating Share is calculated by dividing the value of the account relating to that Series or Sub-Series of participating Share by the number of participating Shares of that Series or Sub-Series in issue.  For the sole purpose of determining the number of participating Shares of a Series or Sub-Series in issue, participating Shares of that Series or Sub-Series which are to be redeemed on the relevant Valuation Date shall be deemed to be in issue until and including the close of business on the applicable Valuation Date.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 5 Filed 02/05/24    Page 106 of 200    PageID 24718
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 191 of 324

Based on the Master Fund's assets, assets of the Fund will be valued by both the Investment Manager, who will provide such valuations to the Administrator, and independently by the Administrator.  The Administrator will then calculate and disseminate the net asset value of the Fund and each Sub-Series of each Series of Shares.

Appx. 03483

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 01/09/24 Page 107 of 200   PageID 24719
Appendix 1 Part 6 Page 264 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 192 of
324

## THE MASTER FUND

### The Master Fund's Limited Partner Interests

The Master Fund's partnership interests are currently held exclusively by the Fund and the Domestic Fund as limited partners, as well as the Master Fund GP, as the general partner of the Master Fund pursuant to the Master Fund Partnership Agreement.  The Master Fund GP is registered as a foreign company in the Cayman Islands pursuant to Part IX of the Companies Law (2016 Revision) of the Cayman Islands (the "*Companies Law*").

### The Master Fund Partnership Agreement

The Master Fund is constituted as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 (the "*Exempted Limited Partnership Law*").  A Cayman Islands exempted limited partnership is constituted by the signing of the relevant partnership agreement and its registration with the Registrar of Exempted Limited Partnerships in the Cayman Islands.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners.  Under the Exempted Limited Partnership Law, any property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the partnership in accordance with the terms of the partnership agreement.  Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership.  Registration under the Exempted Limited Partnership Law entails that the partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Exempted Limited Partnership Law (subject to compliance therewith).

*Liability of Partners and Indemnification of the Master Partnership GP and Others*.  The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the partnership has insufficient assets.  As a general matter, a limited partner of a Cayman Islands partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

(i)     as expressed in the partnership agreement,

(ii)    if such limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, then that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited partnership incurred during the period that he so participates in the conduct of the business as though he were, for such period, a general partner, provided always that he shall be rendered liable pursuant to the foregoing provision only to a person who transacts business with the exempted limited partnership during such period with actual knowledge of such participation and who then reasonably believed such limited partner to be a general partner, or

(iii)   if such limited partner is obligated pursuant to Section 34(1) of the Exempted Limited Partnership Law to return a distribution made to it (with interest at a rate of 10% per

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2   Part 6   Filed 02/24/22   Page 108 of 200   PageID 24720
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 193 of
324

annum, unless otherwise specified in the Master Fund Partnership Agreement) when the exempted limited partnership is insolvent or within six months prior to such insolvency.

The Master Fund Partnership Agreement provides that none of the Indemnified Parties will be liable to the Master Fund or any limited partner of the Master Fund (including the Feeder Funds) or any other person for mistakes of judgment or for action or inaction that did not constitute gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Master Fund, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with the standard of care set forth above.  An Indemnified Party may consult with counsel and accountants in respect of the Master Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.  The foregoing provisions, however, shall not be construed so as to provide for the exculpation of an Indemnified Party of any liability (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the abovementioned provisions to the fullest extent permitted by law.  The Master Fund Partnership Agreement also limits the liability of any Indemnified Party to the amount of the Management Fee received, to the extent permitted under applicable law.  In addition, in no event shall any Indemnified Party be liable for any special, indirect, exemplary, consequential or punitive losses or damages.

The Master Fund Partnership Agreement provides that the Master Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Party from and against any and all loss, cost or expense suffered or sustained by an Indemnified Party by reason of the fact that it, he or she is or was an Indemnified Party, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability, damage loss, cost or expense resulted from a mistake of judgment on the part of an Indemnified Party or from action or inaction that did not constitute gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith, or from the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Party, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with the standard of care set forth above.  The Master Fund Partnership Agreement also provides that the Master Fund will, in the sole discretion of the Master Fund GP, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct.  In the event that such an advance is made by the Master Fund, the Indemnified Party will agree to reimburse the Master Fund to the extent that it is finally determined that it was not entitled to indemnification in respect thereof.

Notwithstanding any of the foregoing, the provisions of the Master Fund Partnership Agreement do not provide for the indemnification of any Indemnified Party for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Appx. 03485

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Page 110 of 234 PageID 24721
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 194 of 324

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Party, the Master Fund (and not the applicable Indemnified Party) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith. Given the volume of transactions executed on behalf of the Master Fund, trading errors (and similar errors) will occur and the Master Fund will be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Indemnified Party.

The Indemnified Parties will also be indemnified by each limited partner of the Master Fund for any amounts of tax withheld or required to be withheld with respect to that limited partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the limited partner's capital account is insufficient to fully compensate the Master Fund GP ad the Investment Manager for such costs.

*Contributions and Withdrawals by the Fund*. Limited partners of the Master Fund may make contributions at such times and in such amounts as the Master Fund GP determines. As a limited partner of the Master Fund, the Fund may, subject to the consent of the Master Fund GP, voluntarily request a withdrawal of all or part of its capital in the Master Fund at such times and in such amounts as it may determine. The Master Fund GP may postpone or suspend (a) the calculation of the net asset value of the Master Fund (and the applicable valuation date); (b) the issuance of limited partner interests, (c) the withdrawal by limited partners (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any stock exchange or over-the-counter market on which the Master Fund's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the Master Fund GP, disposal of investments by the Master Fund, or the determination of the value of the assets of the Master Fund, would not be reasonably practicable or would be seriously prejudicial to the non-withdrawing partners; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Master Fund's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Master Fund cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Master Fund GP, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Master Fund.

*Amendment of the Master Fund Partnership Agreement*. The Master Fund Partnership Agreement may be amended by the Master Fund GP without the consent of the limited partners in any manner that does not materially adversely affect any limited partner.

*Dissolution of the Master Fund*. The Master Fund shall be wound up and dissolved upon the first to occur of any of the following liquidating events, and Sections 36(1)(b), 36(9) and 36(12) of the Exempted Limited Partnership Law shall not apply to the Master Fund:

(i)     the written election of the Master Fund GP to dissolve the Master Fund; or

(ii)    if the Master Fund GP is the sole or last remaining general partner, the date (the "*Automatic Dissolution Date*") falling 90 days after the date of the service of a notice

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Page 222 of 866 Page 110 of 200    PageID 24722
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 195 of
324

by the Master Fund GP (or its legal representative) on all the limited partners informing the limited partners of:

(1)    the commencement of liquidation or bankruptcy proceedings in relation to the Master Fund GP; or

(2)    the withdrawal, removal or making of a winding up or dissolution order in relation to the Master Fund GP;

*provided that*, if a majority in number of the limited partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Master Fund shall be resumed and continued.  If a new general partner is not elected by the Automatic Dissolution Date, the Master Fund shall be wound up and dissolved in accordance with terms of the Master Fund Partnership Agreement and the Exempted Limited Partnership Law.

*Power of Attorney*.  Each limited partner of the Master Fund shall make, constitute and appoint the Master Fund GP its true and lawful attorney to make, sign, execute, certify, acknowledge, file and record any instrument deemed necessary or appropriate by the Master Fund GP to carry out fully the provisions of the Master Fund Partnership Agreement, including the admission of any new partners of the Master Fund and any amendments to the Master Fund Partnership Agreement.  Each limited partner of the Master Fund shall authorize the Master Fund GP to take any further action that the Master Fund GP considers necessary or advisable in connection with the foregoing.  Such power of attorney granted is intended to secure an interest in property and, in addition, the obligation of each relevant limited partner of the Master Fund under the Master Fund Partnership Agreement shall be irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of the Master Fund.

**Valuation of Assets**

The Master Fund GP (meaning for the purposes of the valuation of assets described herein, the Master Fund GP itself, the Investment Manager or the Administrator under the ultimate supervision of the Master Fund GP) will generally compute the value of the securities and other assets of the Master Fund as of the close of business on the last day of each fiscal period and on any other date selected by the Master Fund GP in its sole discretion.  In addition, the Master Fund GP must compute the value of the securities that are being distributed in-kind as of their date of distribution in accordance with the Master Fund Partnership Agreement.  In determining the value of the assets of the Master Fund, no value is placed on the goodwill or name of the Master Fund, or the office records, files, statistical data or any similar intangible assets of the Master Fund not normally reflected in the Master Fund's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

A copy of the Master Fund's valuation policy is available upon request from the Master Fund GP.

The value of each security and other asset of the Master Fund and the net worth of the Master Fund as a whole determined pursuant Master Fund Partnership Agreement are conclusive and binding on all of the partners of the Master Fund and all persons claiming through or under them.

Appx. 03487

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Filed 01/03/24    Page 111 of 200    PageID 24723
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 196 of
324

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves substantial risks, including, but not limited to, those summarized below. The Fund is not suitable for all investors and is intended for sophisticated investors who can accept the risks associated with their investments. Prospective investors should carefully consider the risk factors described in this section, among others, in determining whether an investment in the Fund is suitable for them. There can be no assurance that the Fund's program will be successful or that investments purchased by the Fund will increase in value. An investor must be prepared to bear capital losses that might result from an investment in the Fund, including a complete loss of the investor's invested capital. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

*For purposes of this section, references to the "Fund" should be understood to mean each of the Fund and the Master Fund, as applicable, and each of the risk factors set forth herein, while not exhaustive, shall apply equally to each of the Fund and the Master Fund, as applicable.*

**General Risks**

*Limited Operating History.* The Fund, the Master Fund and the Master Fund GP have limited operating histories upon which investors can evaluate the anticipated performance of the Fund. The Investment Manager has been in operation since 1993. However, the past performance of the Investment Manager and its officers and personnel is not an indication of future success of the Fund.

*Risks Associated With Investments in Securities.* Any investment in securities carries market risks. An investment in the Fund is highly speculative and involves a high degree of risk due to the nature of the Fund's investments and the strategies to be employed. An investment in the Fund should not in itself be considered a balanced investment program, but rather is intended to provide diversification in a more complete investment portfolio.

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Master Fund, there is always some, and occasionally a significant, degree of market risk.

*Limited Liquidity; Additional Information.* An investment in the Fund provides limited liquidity since the Shares are not freely transferable and may only be redeemed at such times as set forth in this Memorandum. The Board of Directors may suspend redemptions, in whole or in part, when, in the sole discretion of the Board of Directors, such a suspension is warranted by extraordinary circumstances. The Board of Directors may also delay the payment of redemption proceeds as more fully described elsewhere in this Memorandum. Investments that remain in the Fund are subject to all risks related to an investment in the Fund as described in this Memorandum.

Also, certain shareholders (including, without limitation, the Affiliated Investors), may invest on terms that provide access to information that is not generally available to other shareholders of the Fund and, as a result, may be able to act on such additional information (e.g., redeem their Shares) that other shareholders do not receive. An investment in the Fund is suitable only for sophisticated investors who have no need for current liquidity.

**Appx. 03488**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-4 Part 6 Filed 02/04/24 of 866 ge 112 of 200   PageID 24724
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 197 of
324

*Effect of Substantial Redemptions*.  Several factors make substantial redemptions (and possibly substantial withdrawals from the Domestic Fund) a risk factor for shareholders.  The Master Fund will pursue a variety of investment strategies that will take time to develop and implement.  The Master Fund may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a period of time.  Substantial redemptions (and possibly substantial withdrawals from the Domestic Fund) could be triggered by a number of events, including, for example, unsatisfactory performance or a significant change in personnel or management of the Investment Manager, investor reaction to redemptions or withdrawals from other investment funds sponsored by the Investment Manager, legal or regulatory issues that investors perceive to have a bearing on the Fund or the Investment Manager, or other factors.  Actions taken to meet substantial redemption requests from the Fund (as well as similar actions taken simultaneously in other investment funds sponsored by the Investment Manager) could result in prices of financial instruments held by the Master Fund decreasing and in Master Fund expenses increasing (e.g., transaction costs and the costs of terminating agreements).  The overall value of the Master Fund also may decrease because the liquidation value of certain assets may be materially less than their mark-to-market value.  The Master Fund may be forced to sell its more liquid positions while maintaining a relatively concentrated portfolio of illiquid assets.  Substantial redemptions could also significantly restrict the Master Fund's ability to obtain financing or derivatives counterparties needed for its investment and trading strategies, which would have a further material adverse effect on the Master Fund's performance.

Substantial redemptions from the Fund within a short period of time could require the Master Fund to liquidate securities positions more rapidly than would otherwise be desirable, possibly reducing the value of the Fund's assets and/or disrupting the Investment Manager's investment strategy.  Reduction in the size of the Fund could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Master Fund's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

*Master-Feeder Structure*.  The Fund will invest all of its investable assets in the Master Fund.  The "master-feeder" fund structure presents certain risks to the shareholders.  Smaller feeder funds may be materially affected by the actions of larger feeder funds.

While the Investment Manager, as investment manager of the Master Fund, generally will not consider tax issues applicable to any particular investors, it generally will take into account the tax positions of the Fund and the Domestic Fund that invest in the Master Fund.  However, the use of a "master-feeder" structure may create a conflict of interest in that different tax considerations for the Fund and the Domestic Fund may cause or result in the Master Fund structuring or disposing of an investment in a manner or at a time that is more advantageous (or disadvantageous) for tax purposes to one Feeder Fund or its investors.

*Management Fee and Performance Allocations.*  As described above, the Master Fund Partnership Agreement provides for the payment of the Management Fee to the Investment Manager and the Performance Allocation to the Master Fund GP.  The Performance Allocation may create an incentive for the Investment Manager, an affiliate of the Master Fund GP, to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Side Letters*.  The Fund may from time to time enter into letter agreements or other similar agreements (collectively, "**Side Letters**") with one or more shareholders which provide such shareholder(s) with additional and/or different rights (including, without limitation, with respect to access to information, the Management Fee, the Performance Allocation, minimum investment

Appx. 03489

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 08/06/24    Page 113 of 200    PageID 24725
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 198 of
324

amounts, voting rights and liquidity terms) than such shareholder(s) have pursuant to this Memorandum. As a result of such Side Letters, certain shareholders may receive additional benefits (including, but not limited to, reduced fee obligations, the ability to redeem Shares on shorter notice and/or expanded informational rights) which other shareholders will not receive. For example, a Side Letter may permit a shareholder to redeem its Shares on less notice and/or at different times than other shareholders. As a result, should the Fund experience a decline in performance over a period of time, a shareholder who is party to a Side Letter that permits less notice and/or different redemption times may be able to redeem its Shares prior to other shareholders. In general, the Fund and/or the Investment Manager will not be required to notify any or all of the other shareholders of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund and/or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other shareholders. The Fund and/or the Investment Manager may cause the Fund to enter into such Side Letters with any party as the Fund and/or the Investment Manager may determine in its sole discretion at any time. The other shareholders will have no recourse against the Fund and/or the Investment Manager in the event certain shareholders receive additional and/or different rights and/or terms as a result of such Side Letters. A shareholder will be required to enter into such undertakings with respect to maintaining the confidentiality of any such additional information as the Fund and/or the Investment Manager may in their sole discretion determine.

*Net Asset Value Considerations*. The net asset value of the Fund is expected to fluctuate over time with the performance of the Master Fund's investments. A shareholder may not fully recover its investment when it chooses to redeem its Shares from the Fund or upon a compulsory redemption if the net asset value of the shareholder's Shares at the time of such redemption is less than the share price of such Shares or if there remain any unamortized costs and expenses of establishing the Fund.

*No Participation by Investors*. All decisions with respect to the management of the day-to-day affairs of the Fund are made exclusively by the Board of Directors and the Investment Manager. Shareholders have no right or power to take part in the management of the Fund. The Investment Manager makes all of the trading and investment decisions of the Fund. In the event of the withdrawal of the Investment Manager, generally the Fund will be liquidated.

*Investment Strategies*. The Investment Manager will seek to engage in the investment activities that have been discussed in "*Investment Program*" herein. There can be no assurance that the Investment Manager will be successful in applying any such strategy and that losses will be avoided.

*Competition*. The markets in which the Master Fund invests are competitive and some of the opportunities that the Investment Manager may explore may be pursued by better known investors or investment funds. There can be no assurance that the Investment Manager will be able to identify or successfully pursue such opportunities in this environment. The Investment Manager competes with many firms that may have greater financial resources, more extensive development, better marketing and service capabilities, more favorable financing arrangements, larger research staffs and more securities traders than are available to the Investment Manager.

*In-Kind Distributions*. A redeeming shareholder may, in the discretion of the Fund and/or Investment Manager, receive securities owned by the Fund in lieu of, or in combination with, cash. The value of securities distributed may increase or decrease before the securities can be sold, and the shareholder will incur transaction costs in connection with the sale of such securities. Additionally, securities distributed with respect to a redemption by a shareholder may not be readily marketable. The risk of loss and delay in liquidating these securities will be borne by the shareholder, with the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Filed 02/03/24    Page 114 of 200    PageID 24726
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 199 of
324

result that such shareholder may receive less cash than it would have received on the date of redemption.

*No Current Income*.  Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current income.

*Terrorist Action*.  There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in the global market.  Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced.  The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

*Unforeseen Events*.  The Master Fund may be adversely affected by unforeseen events involving such matters as changes in interest rates or the credit status of an issuer, forced redemptions of securities or acquisition proposals, break-up of planned mergers, unexpected changes in relative value or changes in tax treatment.

*Cybersecurity*.  Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Master Fund and/or the Fund may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Master Fund's and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors.  Such interruptions could harm the Investment Manager's, the Master Fund's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance. The foregoing risks and consequences are also extant at any issuer in which the Master Fund invests and could manifest as adverse performance of such investment.

*Accounting Rules*.  The Fund's and the Master Fund's assets and liabilities are valued in accordance with the Articles of Association or the Master Fund Partnership Agreement (collectively, the "***Operating Agreements***"), as applicable.  However, for purposes of preparing the Fund's and the Master Fund's annual audited financial statements, which are prepared in accordance with U.S. generally accepted accounting principles ("***GAAP***"), certain of the Fund's and the Master Fund's assets and liabilities may be valued in a manner that, while consistent with GAAP, is different from the manner in which such assets are valued pursuant to the Operating Agreements.

Accordingly, to the extent that GAAP would require any of the Fund's assets or liabilities to be valued in a manner that differs from the valuation procedures set forth in the Operating Agreements, such assets or liabilities will be valued in accordance with GAAP, solely for purposes of preparing the Fund's GAAP-compliant annual audited financial statements, and in accordance with the Operating Agreements (without regard to any GAAP requirements relating to the determination of fair value), for all other purposes.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2   Filed 02/01/24    Page 115 of 200    PageID 24727
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 200 of
324

Generally, GAAP and other related accounting rules applicable to investment funds and various assets they invest in are evolving. Such changes may adversely affect the Fund and the Master Fund. For example, the evolution of rules governing the determination of the fair market value of assets to the extent such rules become more stringent would tend to increase the cost and/or reduce the availability of third-party determinations of fair market value. This may in turn increase the costs associated with selling assets or affect their liquidity due to an inability to obtain a third-party determination of fair market value.

*Valuations.* From time to time, certain situations affecting the valuation of the Master Fund's investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Master Fund) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed. The Fund is not required to make retroactive adjustments to prior subscription or redemption transactions or the Management Fee or Performance Allocations based on subsequent valuation data.

*Trade Errors.* The Investment Manager, on behalf of the Fund, may from time to time make trade errors. Trade errors are not errors in judgment, strategy, market analysis, economic outlook or the like, but rather errors in implementing specific trades which the Investment Manager has determined (rightly or wrongly) to make. Examples of trade errors would be: buying 10,000 shares of an issue, rather than the 1,000 that was intended or taking a short, rather than the intended long, position in a particular issue. Trade errors can result from clerical mistakes, miscommunications between the Investment Manager's personnel and other reasons. Importantly, however, trade errors are not the function of poor strategies, valuation models, economic expectations, undue speculation, unauthorized trades or the like, but rather of the physical implementation of specific trades on which the Investment Manager had decided. The Investment Manager will determine whether to have the costs arising from trade errors borne by the Fund or the Investment Manager by applying the pertinent standard of liability for the Investment Manager in its management of the Fund's capital — i.e., the same standard of liability which would apply to any other action or omission by the Investment Manager in the course of such management. The Investment Manager will, accordingly, be obligated to reimburse the Fund for any trade error resulting from the Investment Manager's willful misconduct, bad faith or gross negligence (as interpreted in accordance with the laws of the State of Delaware), and not otherwise. The Investment Manager will itself determine in good faith whether or not a given trade error is required to be reimbursed under the general liability and exculpation standards applicable to the Fund. The Investment Manager has a conflict of interest in determining whether a trade error should be for the account of the Fund or the Investment Manager and will attempt to resolve such conflict by an objective determination of the status of such trade error under the applicable liability standard. Trade error costs can be significant — including market losses resulting from the position incorrectly acquired as well as the additional brokerage costs of closing out or reversing the error. The opportunity cost (lost profits) of not having made the trade intended to be made is not considered a trade error cost. Any gains recognized on trade errors will be for the benefit of the Fund; none will be retained by the Investment Manager.

**Investment Strategy and Investment Risks**

<u>Risks Associated with Investing in CLOs</u>

*Dependence Upon Other Unrelated Managers*. The success of a collateralized loan obligation ("**CLO**" or "**CLO Securities**") may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-4 Part 6 FiledP0a2/g0e4/2523 of 360e 116 of 200    PageID 24728
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 201 of
324

Master Fund as an investor in such CLO. Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Master Fund's investments in such CLOs will depend on the performance of unrelated managers.

*Investments in CLOs Managed by the Investment Manager or its Affiliates*. The Master Fund may invest a significant portion of its capital in structured investments, including CLO tranches originated and managed by third parties and CLO tranches managed by the Investment Manager or its affiliates (the "***Affiliated CLOs***"); provided, however, that the Master Fund will only invest in Affiliated CLOs in secondary transactions, and not primary issuance. The Investment Manager or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Affiliated CLOs. The Investment Manager will have conflicting division of loyalties and responsibilities regarding the Master Fund and an Affiliated CLO, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Master Fund would not be subordinated to those of an Affiliated CLO or to other interests of the Investment Manager.

*Multiple Levels of Fees*. The Master Fund and the CLOs (including Affiliated CLOs) are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a CLO may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees). Additionally, the Investment Manager may receive fees from certain CLOs in connection with its role as "backup manager" for the CLOs.

*Limited Diversification*. CLOs may invest in concentrated portfolios of assets. The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs to a greater degree of risk with respect to economic downturns relating to such industry. The Master Fund may have a concentrated exposure to a particular type of CLO.

*Risks of Investment Focus*. The Master Fund's portfolio will primarily consist of CLO Securities. CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks.

The value of the CLO Securities that the Master Fund may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("***CLO Collateral***"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof. If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation ("***CLO Debt***"). The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 02/26/24   Page 117 of 200   PageID 24729
Appendix Part 6   Page 264 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 202 of 324

agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution.

CLO Collateral may consist of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality). Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower ratings of below investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest. Such investments may be speculative.

*Interest Rate Mismatch.* CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate. As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate (*"Fixed Rate Assets"*), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets (*"Floating Rate Assets"*). In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO Securities. In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

*Defaulted Assets Underlying CLO Securities.* If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset. In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset. The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon. Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO Security. Therefore, if any CLO Security has defaulted assets which correspond to the exposure of the Master Fund's interest in the CLO Security, the Fund may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities as a result of the current liquidity crisis. Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security. These additional risks may affect the returns on the investments in the Master Fund's portfolio.

*Subordination of CLO Debt and CLO Equity.* The Master Fund's portfolio may consist of CLO Equity and subordinate CLO Debt. Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches. CLO Equity generally is fully subordinated to any related CLO Debt.

43

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 02/02/24 of 866 Page 118 of 200   PageID 24730
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 203 of
324

Thus, some of the investments of the Master Fund in a CLO may rank behind other creditors of the CLO and an investment by the Master Fund in the equity tranche of a CLO may rank behind all creditors of the CLO.  To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches.  In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO.  Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt and/or the holders of the related CLO Equity, as applicable.  Investments of the Master Fund may be the first to absorb any losses by the CLO on its underlying portfolio.  This may result in losses on the invested proceeds of the Master Fund and could result in the complete loss of invested proceeds.

*Mandatory Redemption of CLO Senior Tranches and CLO Debt.*  Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt will be used to redeem the related CLO senior tranches.  This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt, which could adversely impact the returns to the holders of such CLO Debt.

*Optional Redemption of CLO Senior Tranches and CLO Debt.*  An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO Securities, including the Master Fund).  As a result of any such rapid liquidation of a CLO, a holder of the related CLO Securities (including the Master Fund) could lose all or a substantial portion of its investment in such CLO Securities.

*Insolvency Risks.*  Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "***Insolvent Company***").  The information in this paragraph and the following paragraph is applicable with respect to U.S. issuers of CLO Collateral.  Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral.  If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness.  The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured.  There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 02/08/24   Page 119 of 200   PageID 24731
Appendix Part 6   Page 02684 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 204 of
324

that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Master Fund) or from subsequent transferees of such payments (such as the Limited Partners). However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets. Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable. Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States Federal and state laws. Insofar as the Master Fund's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

*"Widening" Risk*. For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Master Fund invests may decline substantially. In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale. It may not be possible to predict, or to hedge against, such "spread widening" risk.

*There Is Limited Disclosure About the CLO Securities and the Underlying CLO Collateral in this Memorandum*. The Investment Manager will not be required to provide the investors in the Fund with financial or other information (which may include material non-public information) it receives related to the CLO Securities. The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Master Fund to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor. In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or terms of, or the identity of any obligor on, any CLO Securities.

*Impact of the Volcker Rule on the Liquidity of the Notes*. Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions. The Volcker Rule also provides for certain supervised nonbank

45

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Filed 01/03/24    Page 120 of 200    PageID 24732
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 205 of
324

financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions. The conformance period for the Volcker Rule ended July 21, 2017 for CLOs. Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities. This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Master Fund's ability to liquidate these positions on a timely basis.

<u>Investment Strategy and Investment Risks</u>

*General Economic and Market Conditions*. The success of the Master Fund's activities will be affected by general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation of the Master Fund's investments), trade barriers, currency exchange controls, and national and international political circumstances (including wars, terrorist acts or security operations). These factors may affect the level and volatility of securities prices and the liquidity of the Master Fund's investments. Volatility or illiquidity could impair the Master Fund's profitability or result in losses. The Master Fund may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets; the larger the positions, the greater the potential for loss.

Unpredictable or unstable market conditions may result in reduced opportunities to find suitable investments to deploy capital or make it more difficult to exit and realize value (or avoid significant losses) from the Master Fund's existing investments. This sort of instability occurred in late 2008 and continued into 2009 when markets experienced significant losses arising largely because global credit spreads widened materially, equity index levels declined, and many funds liquidated assets. It is important to understand that the Master Fund can incur material losses even if it reacts quickly to difficult market conditions and there can be no assurance that the Master Fund will not suffer material adverse effects from broad and rapid changes in market conditions.

*Foreign Currencies and Investments*. Investing in foreign issuers involves certain considerations comprising of both risks and opportunities not typically associated with investing in United States issuers. These considerations include changes in exchange control regulations, political and social instability, expropriation, imposition of withholding and other foreign taxes, less liquid markets and less available information than is generally the case in the United States, higher transaction costs, less government supervision of exchanges, brokers and issuers, different legal systems with less developed bankruptcy laws, difficulty in enforcing contractual obligations, lack of uniform accounting and auditing standards and greater price volatility.

Although the Master Fund intends that most of its investments will be U.S. dollar denominated, Master Fund investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies. Among the factors that may affect currency values are trade balances, the level of interest rates, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments. The Investment Manager intends, but is under no obligation, to employ hedging techniques to reduce these risks, but there can be no assurance that such strategies will be effective.

*Diversification*. Since the Master Fund's portfolio will not necessarily be widely diversified, the investment portfolio of the Master Fund may be subject to more rapid changes in value than would

Appx. 03497

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/04/24 of 867 Page 121 of 200    PageID 24733
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 206 of
324

be the case if the Master Fund were required to maintain a wide diversification among companies, securities and types of securities.

*Volatility Risk*.  The Master Fund's investment program may involve the purchase and sale of relatively volatile instruments.  Fluctuations or prolonged changes in the volatility of such instruments, therefore, can adversely affect the value of investments held by the Master Fund.  In addition, many non-U.S. financial markets are not as developed or as efficient as those in the U.S., and as a result, price volatility may be higher for the Master Fund's investments.

*Illiquid Securities*.  From time to time, the Master Fund may invest in financial instruments that are not publicly traded.  The Master Fund may also invest in securities and other financial instruments that trade regularly but may be only thinly traded, either periodically or on an on-going basis.  The Master Fund may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a specified period of time.  Accordingly, the Master Fund may be forced to sell its more liquid positions at a disadvantageous time, resulting in a greater percentage of the portfolio consisting of illiquid securities.  In addition, the market prices, if any, for such financial instruments tend to be volatile, and the Master Fund may not be able to sell them when it desires to do so or to realize what it perceives to be their fair value in the event of a sale.  The sale of illiquid securities also often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets.  Furthermore, there may be limited information available about the assets of such issuers of the financial instruments which may make valuation of such financial instruments difficult or uncertain.  It also should be noted that, even those markets which the Investment Manager expects to be liquid can experience periods, possibly extended periods, of illiquidity.

*Market Liquidity*.  The Master Fund may be adversely affected by a decrease in market liquidity for the instruments in which it invests, which may impair the Master Fund's ability to adjust its positions.  The size of the Master Fund's positions may magnify the effect of a decrease in market liquidity for such instruments.  Changes in overall market leverage, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Master Fund's portfolio.

*Reinvestment Risk*.  The Master Fund reinvests the cash flows received from a security.  The additional income from such reinvestment, sometimes called interest-on-interest, is reliant on the prevailing interest rate levels at the time of reinvestment.  There is a risk that the interest rate at which interim cash flows can be reinvested will fall.  Reinvestment risk is greater for longer holding periods and for securities with large, early cash flows such as high-coupon bonds.  Reinvestment risk also applies generally to the reinvestment of the proceeds the Master Fund receives upon the maturity or sale of a portfolio security.

*Leverage*.  The Master Fund may seek to maximize its investment position by purchasing securities on margin or by arranging with banks, brokers and others to borrow money against a pledge of securities or commodities.  As a result, the possibilities of profit and loss will be increased.  Borrowing money to purchase securities will provide the Master Fund with advantages of leverage, but exposes it to capital risk, interest rate risk and higher current expenses.  Any gain in the value of securities purchased with borrowed money or income earned from these securities that exceeds interest paid on the amount borrowed would cause the Master Fund's net profit to increase faster than would otherwise be the case.  Conversely, any decline in the value of the securities purchased would cause the Master Fund's net loss to increase faster than would otherwise be the case.  In addition to purchasing securities on margin, the Master Fund will engage in short selling of securities.  A short sale will result

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 5 Filed 02/11/24    Page 122 of 200    PageID 24734
Appendix Part 5    Page 204 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 207 of
324

in a gain if the price of the securities sold declines sufficiently between the time of the short sale and the time at which securities are purchased to replace those borrowed. A short sale will result in a loss if the price of the securities sold short increases or does not decline sufficiently to cover transaction costs. Any gain would be decreased and any loss would be increased by the amount of any premium or interest which the Master Fund may be required to pay with respect to the borrowed securities.

*Inflation Risk*. Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if the Master Fund purchases a five (5) year bond in which it can realize a coupon rate of five percent (5%), but the rate of inflation is six percent (6%), then the purchasing power of the cash flow has declined. For all but adjustable securities or floating rate securities, the Master Fund is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate securities have a lower level of inflation risk.

*Over-the-Counter-Trading*. Financial instruments that may be purchased or sold by the Master Fund may include instruments not traded on an exchange. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Master Fund can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions. To the extent that the Master Fund engages in these transactions, the Master Fund must rely on the creditworthiness of its counterparty.

*Position Limits*. "Position limits" imposed by various regulators or regulations may also limit the Master Fund's ability to effect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Master Fund does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated. If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Master Fund, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Master Fund might have to forgo or modify certain of its contemplated trades.

Dodd-Frank significantly expanded the scope of the CFTC's authority and obligation to require reporting of, and adopt limits on, the size of positions that market participants may own or control in commodity futures and futures options contracts and swaps. Dodd-Frank also narrowed existing exemptions from such position limits for a broad range of risk management transactions.

In accordance with the requirements of Dodd-Frank, the CFTC has proposed speculative position limits on listed futures and options on physical commodities and economically equivalent over-the-counter derivatives; position limits applicable to swaps that are economically equivalent to United States listed futures and futures options contracts, including contracts on non-physical commodities, such as rates, currencies, equities and credit default swaps; and aggregate position limits for a broad range of derivatives contracts based on the same underlying commodity, including swaps and futures and futures options contracts. While certain persons, contracts or transactions or classes

48

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 6    File 02/24/24    Page 123 of 200    PageID 24735
Appendix Part 6    Page 242 of 363
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 208 of
324

thereof are exempt from the speculative position limit requirements, such position aggregation requirements may further restrict the swap positions that the Master Fund may enter into or require additional filings, policies and monitoring.

The full impact of these recent changes to aggregation and whether the proposed changes to position limits themselves will take effect are not known at this time. Individually and collectively, if these changes take effect, they could increase the costs to the Master Fund of maintaining positions in commodity futures and futures option contracts and swaps, reduce the level of exposure the Master Fund is able to obtain (whether for risk management or investment purposes) through commodity futures and futures option contracts and swaps. These changes could also impair liquidity in certain swaps and adversely affect the quality of execution pricing obtained by the Master Fund, all of which could adversely impact the Master Fund's investment returns.

*Prime Brokers*. The Master Fund will rank as an unsecured creditor to each of its prime brokers in relation to assets that each such prime broker borrows, lends or otherwise uses and, in the event of the insolvency of a prime broker, the Master Fund might not be able to recover equivalent assets in full. In addition, if applicable law permits, cash that a prime broker holds or receives on the Master Fund's behalf may not be treated by the prime broker as client money, may not be segregated from the prime broker's own cash and may be used by the prime broker in the course of its investment business. In such event, the Master Fund will rank as one of the prime broker's general creditors.

*Counterparty Risk*. Some of the markets in which the Master Fund may effect transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange-based" markets. This exposes the Master Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Master Fund to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Master Fund has concentrated its transactions with a single or small group of counterparties. The Master Fund is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty. Moreover, the Master Fund's internal credit function, which evaluates the creditworthiness of its counterparties, may prove insufficient. The lack of a complete and "foolproof" evaluation of the financial capabilities of the Master Fund's counterparties and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Master Fund.

*Undervalued Securities*. The Master Fund may invest in undervalued securities. The identification of investment opportunities in misvalued securities is a difficult task, and there can be no assurance that such opportunities will be successfully recognized. While purchases of undervalued securities offer opportunities for above-average capital appreciation, these investments involve a high degree of financial risk and can result in substantial losses. Returns generated from the investments of the Master Fund may not adequately compensate for the business and financial risks assumed.

The Master Fund may make certain speculative investments in securities which the Investment Manager believes to be misvalued; however, there can be no assurance that the securities purchased and sold will in fact be misvalued. In addition, the Master Fund may be required to maintain positions in such securities for a substantial period of time before realizing their anticipated value. During this period, a portion of the capital of the Master Fund may be committed to the securities, thus possibly preventing the Master Fund from investing in other opportunities.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 02/24/21   Page 124 of 200   PageID 24736
Appendix Part 6 Page 124 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 209 of
324

*Small and Medium Capitalization Companies*.   While the Investment Manager believes securities in companies with small and medium capitalizations often provide significant potential for appreciation, the securities of certain companies, particularly smaller-capitalization companies, involve higher risks in some respects than do investments in securities of larger companies.   For example, prices of small-capitalization and even medium-capitalization securities are often more volatile than prices of large-capitalization securities and the risk of bankruptcy or insolvency of many smaller companies (with the attendant losses to investors) is higher than for larger, "blue-chip" companies.   In addition, due to thin trading in the securities of some small-capitalization companies, an investment in those companies may be illiquid.

*Senior Loans Risk*.   Senior loans are usually rated below investment grade or may also be unrated.   As a result, the risks associated with senior loans are similar to the risks of below investment grade fixed income instruments, although senior loans are senior and secured in contrast to other below investment grade fixed income instruments, which are often subordinated or unsecured.   Investment in senior loans rated below investment grade is considered speculative because of the credit risk of their issuers.   Such companies are more likely than investment grade issuers to default on their payments of interest and principal owed to the Master Fund, and such defaults could have a materially adverse effect on the Master Fund's performance.   An economic downturn would generally lead to a higher non-payment rate, and a senior loan may lose significant market value before a default occurs.   Moreover, any specific collateral used to secure a senior loan may decline in value or become illiquid, which would adversely affect the senior loan's value.   Senior loans are subject to a number of risks described elsewhere in this Memorandum, including liquidity risk and the risk of investing in below investment grade fixed income instruments.

There may be less readily available and reliable information about most senior loans than is the case for many other types of securities, including securities issued in transactions registered under the Securities Act of 1933, as amended, or registered under the Exchange Act of 1934, as amended.   As a result, the Investment Manager will rely primarily on its own evaluation of a borrower's credit quality rather than on any available independent sources. Therefore, the Master Fund will be particularly dependent on the analytical abilities of the Investment Manager.

In general, the secondary trading market for senior loans is not well developed.   No active trading market may exist for certain senior loans, which may make it difficult to value them. Illiquidity and adverse market conditions may mean that the Master Fund may not be able to sell senior loans quickly or at a fair price.   To the extent that a secondary market does exist for certain senior loans the market for them may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods.

*Variable Interest Rate Risk*.   Because senior loans with floating or variable rates reset their interest rates periodically, changes in prevailing interest rates can be expected to cause some fluctuations in the value of the Master Fund's investments.   Similarly, a sudden and significant increase in market interest rates may cause a decline in the value of the Master Fund's investments.   In addition, senior loans or similar securities may allow the borrower or issuer to opt between LIBOR-based interest rates and interest rates based on bank prime rates, which may have an impact on value of the Master Fund's investments.

*Bank Loans*.   The Master Fund's investment program will include investments in significant amounts of Bank Loans and participations.   These obligations are subject to unique risks, including: (i) the possible invalidation of an investment transaction as a fraudulent conveyance under relevant creditors' rights laws; (ii) so-called lender-liability claims by the issuer of the obligations; (iii)

Appx. 03501

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1   Filed 02/14/24   Page 125 of 200   PageID 24737
Appendix Part 6 Page 202 of 860
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 210 of
324

environmental liabilities that may arise with respect to collateral securing the obligations; and (iv) limitations on the ability of the Master Fund to directly enforce its rights with respect to participations. In analyzing each Bank Loan or participation, the Investment Manager compares the relative significance of the risks against the expected benefits of the investment.  Successful claims by third parties arising from these and other risks will be borne by the Master Fund.

*DIP Loans*.  From time to time, the Master Fund may invest in loans to companies that have filed for protection under Chapter 11 of the U.S. Bankruptcy Code, as amended.  DIP loans are typically asset-based, revolving working-capital facilities put into place at the outset of a Chapter 11 bankruptcy to provide both immediate cash as well as ongoing working capital during the reorganization process.  Such loans are risky and present significant exposure for default risk to the Master Fund.

*Adjustments to Terms of Fund Investments*.  The terms and conditions of loan agreements and related assignments may be amended, modified or waived only by the agreement of the lenders. Generally, any such agreement must include a majority or a super majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders. Consequently, the terms and conditions of the payment obligation arising from loan agreements could be modified, amended or waived in a manner contrary to the preferences of the Master Fund if a sufficient number of the other lenders concurred with such modification, amendment or waiver.  There can be no assurance that any obligations arising from a loan agreement will maintain the terms and conditions to which the Master Fund originally agreed.

The exercise of remedies may also be subject to the vote of a specified percentage of the lenders thereunder.  The Investment Manager will have the authority to cause the Master Fund to consent to certain amendments, waivers or modifications to the Master Fund's investments requested by obligors or the lead agents for loan syndication agreements.  The Investment Manager may, in accordance with its investment management standards, cause the Master Fund to extend or defer the maturity, adjust the outstanding balance of any investment, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder. The Investment Manager will make such determinations in accordance with its investment management standards.  Any amendment, waiver or modification of the terms of an investment could adversely impact the Master Fund's investment returns.

*Prepayments*.  Certain of the Master Fund's investments may be prepaid more quickly than expected.  Prepayment rates are influenced by changes in interest rates and a variety of economic, geographic and other factors beyond the Master Fund's control and consequently cannot be predicted with certainty.  Early prepayments give rise to increased re-investment risk, as the Master Fund might realize excess cash earlier than it expected.  If the Master Fund is unable to reinvest the principle portion of a prepayment in a new investment with an expected rate of return at least equal to that of the investment repaid, this may reduce the Master Fund's net investment income and, consequently, could have an adverse impact on the Fund's ability to make distributions.

*Investments in Loans Secured by Real Estate*.  While direct real estate investment is not intended to be the focus of the Master Fund, it is possible that, from time to time, the Master Fund may, as a result of default, foreclosure or otherwise, hold real estate assets.  Special risks associated with such investments include changes in the general economic climate or local conditions (such as an oversupply of space or a reduction in demand for space), competition based on rental rates,

51

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/04/24 of 866 Page 126 of 200    PageID 24738
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 211 of
324

attractiveness and location of the properties, changes in the financial condition of tenants, and changes in operating costs. Real estate values are also affected by such factors as government regulations (including those governing usage, improvements, zoning and taxes), interest rate levels, the availability of financing and potential liability under changing environmental and other laws. Of particular concern may be those mortgaged properties which are, or have been, the site of manufacturing, industrial or disposal activity. Such environmental risks may give rise to a diminution in the value of property (including real property securing any portfolio investment) or liability for cleanup costs or other remedial actions, which liability could exceed the value of such property or the principal balance of the related portfolio investment. In certain circumstances, a lender may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

*Limitations on the Enforcement of Creditor's Rights.* The Master Fund's investments may or may not be secured by mortgages, charges, pledges, liens or other security interests. Depending on the jurisdiction in which such security interests are created, enforcement of such security interests may be a complicated and difficult process. Any attempt by the Fund to enforce its rights against the obligor or to realize value from any security interests in connection with a credit investment will be subject to numerous risks, delays and uncertainties, including those related to the validity or enforceability of the Fund's claims, the maintenance of the anticipated priority and perfection of any security interests, the effect of any bankruptcy or insolvency laws, disputes among different classes of creditors, the possibility of counterclaims or defenses, practical difficulties and costs in litigating and enforcing claims in foreign jurisdictions, unfriendly venues for litigation and many others. All of these risks are magnified by the political and legal environment in many emerging markets. As a result, there can be no assurance that the Fund will be able to enforce its legal rights to the extent expected.

*Environmental Hazards.* Under environmental laws enacted by the United States and the various states, owners of property may be liable for the cleanup and removal of hazardous substances even where the owner was not responsible for placing the hazardous substances on the property or where the property was contaminated prior to the time the owner took title. The kinds of hazardous substances for which liability may be incurred include, among other things, chemicals and other materials commonly used by small businesses and manufacturing operations. The costs of removal and clean-up of hazardous substances and wastes can be extremely expensive and, in some cases, can exceed the value of a property. If any property acquired by the Master Fund through foreclosure or otherwise subsequently were found to have an environmental problem, such acquiring entity could incur substantial costs and suffer a complete loss of its investment in such property as well as of other assets. Similarly, real estate is subject to loss due to so-called "special hazards" (e.g., floods, earthquakes and hurricanes). It may be impractical or impossible to fully insure against such events and, should such an event occur, the Master Fund could incur substantial costs and suffer a loss of its investment in such property.

*Fraud.* Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Master Fund to perfect or effectuate a lien on the collateral securing the loan. The Master Fund will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Master Fund may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 02/24/... Page 127 of 200   PageID 24739
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 212 of
324

*Debt Securities*. The Master Fund intends to invest in bonds or other fixed income securities, including, without limitation, commercial paper and "higher yielding" (and, therefore, higher risk) debt securities.  It is likely that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities.  In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

*Investing in High Yield Securities*.  The Master Fund intends to invest in high-yield securities. Such securities are generally not exchange traded and, as a result, these instruments trade in the over-the-counter marketplace, which is less transparent than the exchange-traded marketplace.  In addition, the Master Fund will invest in bonds of issuers that do not have publicly traded equity securities, making it more difficult to hedge the risks associated with such investments.  High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments.  The market values of certain of these lower-rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities.  Companies that issue such securities are often highly leveraged and may not have available to them more traditional methods of financing.  It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities.  In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

*Timing Risk*.  Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date.  The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate.  There are three disadvantages to the call provision.  First, the cash flow pattern of a callable bond is not known with certainty.  Second, because the issuer will call the bonds when interest rates have dropped, the Master Fund is exposed to reinvestment rate risk, i.e., the Master Fund will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

*Maturity Risk*.  In certain situations, the Master Fund may purchase a bond of a given maturity as an alternative to another bond of a different maturity.  Ordinarily, under these circumstances, the Master Fund will make an adjustment to account for the differential interest rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move.  To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk.  Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

*Revolving Credit Facilities*.  From time to time the Master Fund may incur contingent liabilities in connection with an investment.  For example, the Master Fund may purchase from a lender a revolving credit facility that has not yet been fully drawn.  If the borrower subsequently draws down on the facility, the Master Fund would be obligated to fund the amounts due.

*Investments in Stressed Debt*.  The Master Fund is authorized to invest in securities and other obligations of stressed issuers.  Stressed issuers are issuers that are not yet deemed distressed or

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 6    Filed 02/24/20    Page 128 of 200    PageID 24740
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 213 of
324

bankrupt and whose debt securities are trading at a discount to par, but not yet at distressed levels. An example would be an issuer that is in technical default of its credit agreement, or undergoing strategic or operational changes, which results in market pricing uncertainty.

*Investments in Distressed Securities*. The Master Fund may invest in securities and obligations of issuers in weak financial condition, experiencing poor operating results, having substantial capital needs or negative net worth, facing special competitive or product obsolescence problems, including companies involved in bankruptcy or other reorganization and liquidation proceedings. These securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns. Among the risks inherent in investments in troubled entities is the fact that it frequently may be difficult to obtain information as to the true condition of such issuers. Such investments may also be adversely affected by laws relating to, among other things, fraudulent transfers and other voidable transfers or payments, lender liability and the bankruptcy court's power to disallow, reduce, subordinate or disenfranchise particular claims. Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry or specific developments within such companies. In addition, there is no minimum credit standard that is a prerequisite to the Master Fund's investment in any instrument, and a significant portion of the obligations and securities in which the Master Fund invests may be less than investment grade. The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial difficulties is unusually high. There is no assurance that the Investment Manager will correctly evaluate the value of the assets collateralizing the Master Fund's loans or the prospects for a successful reorganization or similar action. In any reorganization or liquidation proceeding relating to a company in which the Master Fund invests, the Master Fund may lose its entire investment, may be required to accept cash or securities with a value less than the Master Fund's original investment and/or may be required to accept payment over an extended period of time. Under such circumstances, the returns generated from the Master Fund's investments may not compensate the investors adequately for the risks assumed.

In liquidation (both in and out of bankruptcy) and other forms of corporate reorganization, there exists the risk that the reorganization either will be unsuccessful (due to, for example, failure to obtain requisite approvals), will be delayed (for example, until various liabilities, actual or contingent, have been satisfied) or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Master Fund of the security in respect to which such distribution was made.

*Troubled Origination*. The investments chosen by the Investment Manager may have been originated by financial institutions or other entities that are, or may in the future be, insolvent, in serious financial difficulty, or no longer in existence. As a result, the standards by which such investments were originated, the recourse to the selling institution, or the standards by which such investments are being serviced or operated may be adversely affected.

*Issuer Default Risk; Negative Loan Performance*. There are varying sources of statistical default and recovery rate data for commercial loans and numerous methods for measuring default and recovery rates. The levels of defaults and delinquencies with respect to loans have been increasing, and slowing economic activity continues to contribute to a decline in overall credit quality. The historical performance of the loan market is not necessarily indicative of its future performance, and there is no way to determine whether such trends in the credit markets will improve or worsen in the future.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 6 Page 224 of 862ge 129 of 200    PageID 24741
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 214 of 324

A substantial portion of the Master Fund's income is expected to be derived, directly or indirectly, from repayments of principal and interest received in respect of debt securities. A wide range of factors may adversely affect an obligor's ability to make repayments, including: adverse changes in the financial condition of such obligor or the industries or regions in which it operates; the obligor's exposure to counterparty risk; systemic risk in the financial system and settlement; changes in law or taxation; changes in governmental regulations or other policies; natural disasters; terrorism; social unrest, civil disturbances; or general economic conditions. Default rates tend to accelerate during economic downturns. A continuing decreased ability of borrowers to obtain refinancing may result in a further economic decline that could delay an economic recovery and cause a further deterioration in loan performance generally.

To the extent the Master Fund invests in debt securities secured by collateral, there can be no assurance that the liquidation of any collateral securing any of the Master Fund's investments would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that the collateral could be readily liquidated. In the event of bankruptcy or insolvency of a borrower, the Master Fund could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing such investment. The collateral securing an investment may lose all or substantially all of its value in the event of the bankruptcy or insolvency of a borrower.

Any defaults will have a negative impact on the value of the Master Fund's investments and may reduce the return that such Master Fund receives from its investments in certain circumstances. While some amount of defaults is expected to occur in the Master Fund's portfolio, in the event that the Master Fund elects to apply leverage to an investment, defaults in or declines in the value of the portfolio investments in excess of these expected amounts may result in breaches of covenants under applicable financing arrangements, triggering credit enhancement requirements or accelerated repayment provisions and, if not cured within the relevant grace periods, permitting the finance provider to enforce its security over all the assets of the Master Fund.

In the case of debt ranking equally with the loans or debt securities in which the Master Fund invests, the Master Fund would have to share on an equal basis any distributions with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the relevant company's debt securities. Each jurisdiction in which the Master Fund invests has its own insolvency laws. As a result, investments in similarly situated companies in different jurisdictions may confer different rights in the event of insolvency.

*Post-Reorganization Securities*. The Master Fund will hold debt and equity of companies as a result of the recapitalization or restructuring of debt obligations. Investments in the debt or equity of companies involved in reorganization proceedings typically entail a number of risks that do not normally apply to investments in financially sound companies. For example, if the Investment Manager's evaluation of the anticipated outcome of a reorganization or the timing of such outcome should prove incorrect, the Master Fund could experience losses. Moreover, post-reorganization securities can be subject to heavy selling or downward pricing pressure after the completion of a bankruptcy reorganization or restructuring. A wide variety of considerations make any evaluation of the outcome of an investment in such a company uncertain. Such considerations include, for example, the possibility of litigation between the participants in a reorganization or liquidation proceeding or a requirement to obtain mandatory or discretionary consents from various governmental authorities or others. The uncertainties inherent in evaluating such investments may be increased by legal and practical considerations which limit the access of the Investment Manager to reliable and timely information concerning material developments affecting a company, or which cause lengthy delays in the completion of a reorganization or liquidation proceeding. Competition from other investors may

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6   Filed 02/04/24   Page 130 of 200   PageID 24742
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 215 of
324

also render it difficult or impossible for the Master Fund to achieve intended results or promptly effect transactions.

*Insolvency and Enforceability of Security*.  The Master Fund's investments may be secured by mortgages, charges, pledges, liens or other security interests.  Depending on the jurisdiction in which such security interests are created, enforcement of such security interests may be a complicated and difficult process.  For example, enforcement of security interests in certain jurisdictions may require a court order and a sale of the secured property through public bidding or auction.  In addition, some jurisdictions grant courts the power to declare security interest arrangements to be void if they deem the security interest to be excessive.

*Risks Associated with Bankruptcy Cases*.  Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors.  While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Master Fund.  Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated.  The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court.  This process can involve substantial legal, professional and administrative costs to the company and the Master Fund; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately.  In some cases, the company may not be able to reorganize and may be required to liquidate assets.  Although the Master Fund intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value.  Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Master Fund's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class.  In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor.  In those cases where the Master Fund, by virtue of such action, is found to exercise "domination and control" of a debtor, the Master Fund may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Master Fund.

The Master Fund may invest in companies based outside the United States.  Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the

**Appx. 03507**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 6 Page 250 of 867 Page 131 of 200    PageID 24743
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 216 of
324

classification, seniority and treatment of claims. In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The Investment Manager, on behalf of the Master Fund, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation of the Master Fund's position as a creditor or equity holder. A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents. If the Investment Manager concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Master Fund, it will resign from that committee or group, and the Master Fund may not realize the benefits, if any, of participation on the committee or group. In addition, and also as discussed above, if the Master Fund is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Master Fund may purchase creditor claims subsequent to the commencement of a bankruptcy case. Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

*Equitable Subordination*. Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "equitable subordination"). The Master Fund does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Master Fund may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

*Liability Following the Disposal of Investments*. While the Master Fund may hold certain of its investments to maturity, the Master Fund may dispose of investments in some circumstances prior to termination and, in connection therewith, may be required to pay damages to the extent that any representations or warranties given in connection with such investments turn out to be inaccurate. The Master Fund may become involved in disputes or litigation concerning such representations and warranties and may be required to make payments to third parties as a result of such disputes or litigation. In the event the Master Fund does not have cash available to conduct such litigation or make such payments, it may be forced to sell investments to obtain funds. Such sales may be effected on unsatisfactory terms.

*Potential Involvement in Litigation*. In the event that the Master Fund holds investments in distressed investments, there is a possibility that the Investment Manager may participate in restructuring activities, it is possible that the Master Fund may become involved in litigation respecting creditor issues and similar issues among classes of claimants. Litigation entails expense and the possibility of counterclaims against the Master Fund including the Master Fund GP and the Investment Manager and ultimately judgments may be rendered against the Master Fund for which the Master Fund does not carry insurance.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6   Page 2514 of 867   Page 132 of 200   PageID 24744
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 217 of
324

*Directorships on Boards of Portfolio Companies*.  The Principal and other members and employees of the Investment Manager or its designees may serve as directors of companies the securities of which are purchased or sold on behalf of the Master Fund and may be compensated for such service.  In the event that material non-public information obtained with respect to such companies becomes subject to trading restrictions pursuant to the internal trading policies of such companies or as a result of applicable law or regulations, the Master Fund may be prohibited for a period of time from purchasing or selling the securities of such companies, which prohibition may have an adverse effect on the Master Fund.

*Material, Nonpublic Information*.  From time to time, certain personnel of the Investment Manager may come into possession of material, nonpublic information (including in connection with other investments or proposed investments not intended to benefit the Master Fund) that would limit the Investment Manager's ability to buy and sell investments.  The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to take certain actions because of such information.  The Master Fund may experience losses if it is unable to sell an investment that it holds because certain personnel of the Investment Manager have obtained material, nonpublic information about such investment.

*Investments in Structured Products*:  The Master Fund may invest in securities backed by, or representing interests in, certain underlying instruments ("**Structured Products**").  The cash flow on the underlying instruments may be apportioned among the Structured Products to create securities with different investment characteristics such as varying maturities, payment priorities and interest rate provisions, and the extent of the payments made with respect to the Structured Products is dependent on the extent of the cash flow on the underlying instruments.  The Master Fund may invest in Structured Products that represent derived investment positions based on relationships among different markets or asset classes.

The performance of a Structured Product will be affected by a variety of factors, including its priority in the capital structure of the issuer, the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans or other assets that are being securitized, remoteness of those assets from the originator or transferor, the adequacy of and ability to realize upon any related collateral and the capability of the servicer of the securitized assets.

*Investments in Collateralized Loan Obligations*.  The Master Fund may look to invest in CLOs diversified across maturities, underlying assets, tranches (debt, mezzanine and equity) and managers.  In addition to implementing its investment process and utilizing proprietary analytical tools to evaluate and select investments for the Master Fund, the Investment Manager uses its market knowledge and industry position to add value by addressing what it believes are material inefficiencies of the existing CLO execution process.  For example, within the primary new issuance market the Investment Manager will look to invest in CLOs where it can leverage its expertise and market relationships to achieve the timing, structural and financial terms especially advantageous to the Investment Manager's investments.  In addition, the Investment Manager will look to assess value dislocations of CLO and other structured investments within the secondary market, as the Investment Manager believes structured products markets have inherent inefficiencies which often cause significant differentials between intrinsic value and market value.  Such inefficiencies are typically driven by factors such as (i) little secondary market liquidity, (ii) complex valuation requirements for both underlying collateral as well as derivative instruments, and (iii) explosive growth of the market.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 5    Page 525 of 867    Page 133 of 200    PageID 24745
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 218 of
324

*Short-Swing Liability and Other Limitations*.  From time to time, the Master Fund, acting alone or as part of a group, may acquire beneficial ownership of more than 10% of a certain class of securities of a public company, or may place a director on the board of directors of such a company. As a result, under Section 16 of the Securities Exchange Act of 1934, as amended, the Master Fund may be subject to certain additional reporting requirements and may be required to disgorge certain short-swing profits arising from purchases and sales of such securities.  In addition, in such circumstances the Master Fund will be prohibited from entering into a short position in such issuer's securities, and therefore limited in its ability to hedge such investments.

*Fixed Interest Rate Risk*.  The value of the fixed rate securities in which the Master Fund may invest generally will have an inverse relationship with interest rates.  Accordingly, if interest rates rise the value of such securities may decline.  In addition, to the extent that the receivables or loans underlying specific securities are prepayable without penalty or premium, the value of such securities may be negatively affected by increasing prepayments, which generally occur when interest rates decline.

*Other Instruments*.  The Master Fund may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Master Fund and legally permissible.  Special risks may apply to instruments that are invested in by the Master Fund in the future that cannot be determined at this time or until such instruments are developed or invested in by the Master Fund.

*Long-Biased Investment Program.*  The Master Fund expects that its strategy will have a long bias.  Therefore, any decline in the overall market may result in a decline in the value of the Master Fund's assets.

**Certain Regulatory Risks**

*Regulatory Risks of Commingled Loan Funds*.  Legal, tax and regulatory changes could occur that may adversely affect the Fund.  The regulatory environment for commingled loan funds is evolving and changes in the regulation of such funds may adversely affect the value of investments held by the Master Fund.  In addition, the securities markets are subject to comprehensive statutes, regulations and margin requirements.  The United States Securities and Exchange Commission, other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies.  The effect of any future regulatory change on the Fund could be substantial and adverse.

The Fund and/or the Investment Manager also may be subject to regulation in jurisdictions in which the Fund and the Investment Manager engage in business.  Investors should understand that the Fund's business is dynamic and is expected to change over time.  Therefore, the Fund may be subject to new or additional regulatory constraints in the future.  This Memorandum cannot address or anticipate every possible current or future regulation that may affect the Investment Manager, the Fund or their businesses.  Such regulations may have a significant impact on shareholders or the operations of the Fund, including, without limitation, restricting the types of investments the Fund may make, preventing the Fund from exercising its voting rights with regard to certain financial instruments, requiring the Fund to disclose the identity of its investors or otherwise.  The Investment Manager may, in its sole discretion, cause the Fund to be subject to such regulations if it believes that an investment or business activity is in the Fund's interest, even if such regulations may have a detrimental effect on

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-4    Filed 02/25/24 of 861ge 134 of 200    PageID 24746
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 219 of
324

one or more shareholders.  Prospective investors are encouraged to consult their own advisors regarding an investment in the Fund.

*Absence of Regulatory Oversight*.  While the Fund may be considered similar to an investment company, it is not required and does not intend to register as such under the U.S. Investment Company Act of 1940, as amended (the "**Company Act**"), and, accordingly, the provisions of the Company Act (which may provide certain regulatory safeguards to investors) are not applicable to investors in the Fund.  The Fund will not maintain custody of its securities or place its securities in the custody of a bank or a member of a national securities exchange in the manner required of registered investment companies under rules promulgated by the SEC.  A registered investment company which places its securities in the custody of a member of a national securities exchange is required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company, and which contains other provisions complying with SEC regulations.  The Fund generally will maintain such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies.  Under the provisions of the Securities Investor Protection Act of 1970, as amended, the bankruptcy of any such brokerage firm might have a greater adverse effect on the Fund than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

*Forward-Looking Statements*.  Certain statements contained in this Memorandum, including without limitation, statements containing the words "believes," "anticipates," "intends," "expects," and words of similar import constitute "forward-looking statements."  Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the Fund to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  Certain of these factors are discussed in more detail elsewhere in this Memorandum, including without limitation under "*Summary of Terms*," "*Certain Risk Factors*," and "*Investment Program*."  Given these uncertainties, prospective investors are cautioned not to place undue reliance on such forward-looking statements.  The Investment Manager and the Fund disclaim any obligation to update any such factors or to announce the result of any revisions to any of the forward-looking statements contained herein to reflect future events or developments.

*Impact of U.S. Presidential Election.*  On January 20, 2017, Donald Trump became President of the United States of America.  President Trump and other members of the Republican Party have proposed to reverse some of the recent regulation of the financial industry and to change tax policy.  If some of these proposals were enacted, banks could dramatically increase their lending practices and accept additional types of collateral, borrowers could reduce their demand for debt financing, certain investment advisers could de-register with SEC and portfolio companies that are net importers or hold significant assets outside of the United States could be subject to increased tax liability.  The effect of any such regulatory or tax changes on the Master Fund and the markets in which it trades and invests is uncertain.

*Evolving Regulatory Risks of Private Investment Funds.*  The regulatory environment for private investment funds is evolving, and changes in the regulation of private investment funds and their advisers may adversely affect the value of investments held by the Master Fund.

Dodd-Frank, which was enacted in July 2010, regulates markets, market participants and financial instruments that were historically unregulated and has substantially altered the regulation of many other markets, market participants and financial instruments.  Certain provisions of Dodd-Frank

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2art 6iledle02/54/of 86ge 135 of 200    PageID 24747
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 220 of
324

subject registered investment advisers to requirements to keep records and to report information to the SEC, which could in turn be supplied to the Board of Governors of the Federal Reserve, a new Financial Services Oversight Council or other U.S. governmental agencies or Congress. Under Dodd-Frank, the information includes, among other things, the amount of assets under management, use of leverage (including off-balance sheet leverage), counterparty credit risk exposures, trading and investment positions, and trading practices. All such records are subject to examination by the SEC at any time. It is anticipated that there may be significant changes to the financial regulatory environment as a result of the outcome of the recent U.S. elections. There is currently pending legislation in U.S. Congress which if enacted would result in the repeal of portions of Dodd-Frank which in turn would have a significant impact on the regulatory environment for private investment funds. In addition, the impact of the legislation on current and future rulemaking by various regulators under Dodd-Frank is difficult to predict. It is possible that rules that have been proposed by various regulators, which had been anticipated to take effect previously, may no longer be implemented in their proposed form or at all. Further, there may also be substantial changes in the enforcement and interpretation of existing statutes and rules by governmental regulatory authorities or self-regulatory organizations that supervise the financial markets. The effect of future regulatory change on the Fund and the Master Fund and their operations is uncertain. Prospective investors should seek, and must rely on, the advice of their own advisers with respect to the possible impact on its investment of any future proposed legislation or administrative or judicial action.

*Enhanced Regulation of Swaps*. The recently enacted Wall Street Transparency and Accountability Act of 2010 (the "***WSTAA***") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "***DCO***") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer" and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts. Due to the new requirements imposed by the WSTAA, the Master Fund may experience increased transaction costs to pay for the clearing, execution and segregation obligations. In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Master Fund's ability to engage in leverage and limit the Master Fund's return. The application of position limits to swap contracts may also limit the Master Fund's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Master Fund's ability to take advantage of current market trends or conditions. Any tightening in the market for swaps may significantly impact the Master Fund and its returns. In addition, if the Master Fund were deemed to be a swap dealer or a major swap participant under WSTAA, the Master Fund may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Master Fund's legal obligations and its returns.

*Contagion Risk Factor*. The Fund has the power to issue Shares in classes or series. The Articles provide for the manner in which the liabilities are to be attributed across the various classes or series (liabilities are to be attributed to the specific class or series in respect of which the liability was incurred). However, the Fund is a single legal entity and there is no limited recourse protection for any class or series. Accordingly, all of the assets of the Fund will be available to meet all of its liabilities regardless of the class or series to which such assets or liabilities are attributable. In practice, cross-class or cross-series liability is only expected to arise where liabilities referable to one class or series are in excess of the assets referable to such class or series and it is unable to meet all liabilities attributed to it. In such a case, the assets of the Fund attributable to other classes or series may be

Appx. 03512

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1 Part 6 Filed 02/25/24   Page 136 of 200   PageID 24748
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 221 of
324

applied to cover such liability excess and the value of the contributing classes or series will be reduced as a result.

*Handling of mail*. Mail addressed to the Fund and/or the Master Fund and received at its registered office will be forwarded unopened to the forwarding address supplied by the Investment Manager to be dealt with. None of the Fund and/or the Master Fund, its directors, officers, advisors or service providers (including the organization which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the forwarding address. In particular the Directors will only receive, open or deal directly with mail which is addressed to them personally (as opposed to mail which is addressed just to the Fund and/or the Master Fund).

*Subscription Monies*. Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant subscription date. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in the Fund are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA and Other Regulatory Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares and to consult their own independent tax advisors.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the U.S. Internal Revenue Service (the "*Service*") or other applicable taxing authority, or significantly modified by new legislation, changes in a taxing authority's positions, or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the U.S. federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the Fund or the Investment Manager with respect to the U.S. federal income tax consequences relating to an investment in the Fund. The Master Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts or other applicable taxing authority. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Master Fund and consequently, the Fund.

*Tax Audit*. An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund, which examination could affect the after-tax returns of a shareholder's investment in the Fund. If such audit adjustments result in an increase in the Fund's U.S. federal income tax liability for any year, the Fund may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund.

Appx. 03513

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-2   Filed 02/25/24   Page 137 of 200   PageID 24749
Appendix Part 6 Page 2564 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 222 of
324

*Tax Considerations Taken into Account*.  The Investment Manager may take tax considerations into account in determining when the Master Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax-Exempt Entities*.  Certain prospective investors that are tax-exempt for U.S. income tax purposes may be subject to U.S. federal and state laws, rules and regulations that regulate their participation in the Fund, or their engaging directly or indirectly through an investment in the Fund, in certain investment strategies that the Master Fund may utilize from time-to-time (e.g., short-sales of securities and the use of leverage, the purchase and sale of options and limited diversification).  While the Fund believes its investment program is generally appropriate for U.S. tax-exempt investors for which an investment in the Fund would otherwise be suitable, each type of tax-exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund. Investments in the Fund by entities subject to ERISA, and other tax-exempt entities, require special consideration.  Trustees or administrators of such entities are urged to review carefully the matters discussed in this Memorandum.

*Non-U.S. Taxation*.  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Master Fund, political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.  The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Shareholder Level Taxation*.  Tax consequences to each shareholder will depend on tax laws in that shareholder's jurisdiction.  Shareholders should consult their professional advisors as to the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

*Tax Changes*.  Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund.  Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund.  Certain provisions of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*"), may be further amended or interpreted in a manner adverse to the Fund or the Master Fund, in which event any benefits derived from an investment in the Fund may be adversely affected.  In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government.  The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain.  The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or its shareholders.  Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

*Recently Enacted Tax Reform Legislation*.  Recently enacted H.R. 1 (Pub. L. No. 115-97) makes significant changes to the rules potentially applicable to the Fund and/or its investors. Certain of these new rules are complex and, pending guidance that may be forthcoming, the impact on the Fund and its investors may be unclear. Prospective investors should consult their own tax advisers regarding potential changes in any tax laws, potentially with retroactive effect.

63

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1 Part 6 Page 25 of 367 Page 138 of 200   PageID 24750
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 223 of
324

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund. Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund. In addition, as the investment program of the Fund develops and changes over time, an investment in the Fund may be subject to additional and different risk factors. No assurance can be made that profits will be achieved or that substantial losses will not be incurred.*

*In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.*

**Potential Conflicts of Interest**

Given the nature and size of Highland Capital Management, L.P.'s ("**Highland Capital**") operations, various potential conflicts of interest arise in connection with its advisory services and the advisory services provided by its affiliates. Information about Highland Capital and its potential conflicts of interest is provided in Highland Capital's Form ADV Part 2 Brochure that can be found by going to https://adviserinfo.sec.gov/IAPD/Default.aspx, searching by firm name and selecting the Part 2 Brochure to be viewed. The Fund is subject to these conflicts of interest, as well as the other items discussed below.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "**Highland Group**") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. The Investment Manager is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Master Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "**CDOs**") and other vehicles managed by members of the Highland Group ("**Highland Accounts**") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund and the Master Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Master Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and the Master Fund and the Master Fund's portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Master Fund and, therefore, may compete with the Master Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Master Fund; and (viii) the Investment Manager will devote to the Master

Appx. 03515

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/25/24 Page 139 of 200    PageID 24751
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 224 of
324

Fund and the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Master Fund's and the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Manager will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the Investment Advisers Act of 1940, as amended. The Investment Manager will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy, a copy of which will be provided upon request. However, there is no assurance that such investment opportunities will be allocated to the Master Fund fairly or equitably in the short-term or over time and there can be no assurance that the Master Fund will be able to participate in all investment opportunities that are suitable for it

The Investment Manager may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Investment Manager, the Master Fund and other accounts managed by the Investment Manager are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Cross Transactions and Principal Transactions*

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Master Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Master Fund any time that the Investment Manager believes such transaction

Appx. 03516

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/25/24 Page 140 of 200    PageID 24752
Appendix Part 6 Page 225 of 866
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 225 of
324

to be fair to the Master Fund and such other client.  By subscribing for an Interest, a Limited Partner is deemed to have consented to such client cross-transactions between the Master Fund and another client of the Investment Manager or one of its affiliates.

The Investment Manager may direct the Master Fund to acquire or dispose of securities in cross trades between the Master Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements.  In addition, the Master Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Master Fund may enhance the profitability of the Investment Manager's own investments in such companies.  Moreover, the Master Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Master Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or such affiliates.  In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Master Fund and for the other party to the transaction, to the extent permitted under applicable law.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of Interests in the Fund), unless appropriate approval of the Advisory Committee is obtained and such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

*Conflicts Relating to Equity and Debt Ownership by the Master Fund and Affiliates*

In certain circumstances, the Master Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure.  If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Master Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Master Fund and such other accounts may have competing claims for the remaining assets of such issuers.  Under these circumstances it may not be feasible for the Investment Manager to reconcile the conflicting interests in the Master Fund and such other accounts in a way that protects the Master Fund's interests.  Additionally, the Investment Manager or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Manager in that such votes or actions may favor the interests of one account over another account.  Furthermore, the Investment Manager's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Affiliated Entity Services*

Affiliated entities of the Investment Manager may provide services with respect to the Investment Manager, the Master Fund or the Fund.  NexBank, SSB ("*NexBank SSB*") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Part 6    Filed 02/6/24    Page 141 of 200    PageID 24753
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 226 of
324

Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund, the Master Fund and other vehicles in which the Fund (through the Master Fund) may invest) or third parties engaged in transactions involving the Investment Manager.  NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest).  Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB.  Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc., NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest.  Highland Latin America Consulting, Ltd., an affiliate of the Investment Manager, has been engaged to provide certain administrative and consulting services to the Investment Manager, as more fully described below in "*Management –Services Agreement*."

## Management Fee

A portion of any Management Fee may be paid to broker-dealers, placement agents or independent third parties, other than the Investment Manager, for services provided in connection with the solicitation of subscriptions from investors.  Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation.  Investors should consider these potential conflicts of interest in making their investment decisions.  Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

## Diverse Membership

The Limited Partners are expected to include entities, persons, or entities organized in various jurisdictions and subject to different tax and regulatory regimes.  Such diverse investors may thus have conflicting investment, tax and other interests, relating to, among other things, the nature of investments made by the Master Fund, the structuring or the acquisition of investments and the timing of disposition of investments.  As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager including as to the nature and structure of investments that may be more beneficial for one type of Limited Partner than for another type of Limited Partner, including Limited Partners affiliated with the Investment Manager.  The results of the Fund's activities may affect individual Limited Partners differently, depending upon their individual financial and tax situations because, for instance, of the timing of an event of realization of gain or loss and its characterization as long-term or short-term gain or loss.  In addition, the Master Fund may make investments that may have a negative impact on related investments made by the Limited Partners in separate transactions.  In selecting, structuring and managing investments appropriate for the Master Fund, the Investment Manager will consider the investment and tax objectives of the Master Fund and the Feeder Funds as a whole, not the investment, tax, or other objectives of any Limited Partner individually.  However, there can be no assurance that a result will not be more advantageous to some Limited Partners than to others or to the Investment Manager and/or its affiliates than to a particular Limited Partner.

Appx. 03518

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176 Part 6    Page 142 of 200    PageID 24754
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 227 of
324

*Soft Dollars*

The Investment Manager's authority to use "soft dollar" credits generated by the Master Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Manager or the Master Fund GP may give the Investment Manager an incentive to select brokers or dealers for Master Fund transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Manager rather than giving exclusive consideration to the interests in the Master Fund. See "*Brokerage and Custody*."

*No Separate Counsel*

Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") serves as counsel to the Fund, the Master Fund, the Investment Manager, the Master Fund GP and certain of their Affiliates (the "**Clients**") in connection with the formation of the Fund and certain other Clients, the offering of Shares as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any shareholders nor does it purport to represent their interests. No independent counsel has been retained to represent the shareholders. In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the Master Fund GP and certain of the Fund's other service providers (including, without limitation, the Principal's biographical data, summaries of market conditions, the planned investment strategy of the Master Fund and the performance of the Master Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund, the Master Fund and the Master Fund GP. In connection with the offering of shares and/or interests and subsequent advice to the Fund, the Master Fund and the Master Fund GP, Maples and Calder will not be representing shareholders and/or limited partners. No independent legal counsel has been retained to represent the shareholders and/or limited partners. Maples and Calder's representation of the Master Fund GP is limited to specific matters as to which it has been consulted by the Master Fund GP. There may exist other matters that could have a bearing on the Master Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the Master Fund GP and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Master Fund GP, there are times when the interests of the shareholders/limited partners may differ from those of the Fund, Master Fund and/or the Master Fund GP. Maples and Calder does not represent the shareholders and/or limited partners' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Master Fund GP and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund, Master Fund and/or the Master Fund GP.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Part 6 Filed 02/24 Page 143 of 200    PageID 24755
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 228 of
324

*Non-Public Information*

From time to time, the Investment Manager may come into possession of non-public information concerning specific companies although internal structures are in place to prevent the receipt of such information.  Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies.  The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*The foregoing list of risk factors and potential conflicts of interest do not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.*

Appx. 03520

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 01/09/24    Page 144 of 200    PageID 24756
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 229 of
324

## BROKERAGE AND CUSTODY

**Brokerage Arrangements**

The Investment Manager will be responsible for the placement of the portfolio transactions of the Master Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion. The Investment Manager is not required to weigh any of these factors equally.

Substantially all of the Master Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held with brokers or custodians selected by the Investment Manager. Instruments not constituting marketable securities generally are recorded through book entry by the borrower or by an agent for the borrower or the creditors. Documentary evidence of the acquisition, ownership and disposition of these assets typically will be held by the Investment Manager.

Brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

Accordingly, if the Investment Manager concludes that the commissions charged by a broker or the spreads applied by a dealer are reasonable in relation to the quality of services rendered by such broker or dealer (including, without limitation, the value of the brokerage and research products or services provided by such broker or dealer), the Master Fund may pay commissions to, or be subject to spreads applied by, such broker-dealer in an amount greater than the amount another broker-dealer might charge or apply.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund, the Master Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-

Appx. 03521

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-21    Filed 02/04/24    Page 145 of 200    PageID 24757
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 230 of
324

dealers in the Fund or other entities managed by the Investment Manager. However, the Investment Manager does not believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Master Fund.

Research-related goods and services provided by brokers and dealers through which portfolio transactions for the Master Fund are executed, settled and cleared may include research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities, certain research services, and other goods and services providing lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities on behalf of the Master Fund and related accounts (collectively, "*soft dollar items*").

Soft dollar items may be provided directly by brokers and dealers, by third parties at the direction of brokers and dealers or purchased on behalf of the Master Fund with credits or rebates provided by brokers and dealers. Soft dollar items may arise from over-the-counter principal transactions, as well as exchange traded agency transactions. Brokers and dealers sometimes suggest a level of business they would like to receive in return for the various services they provide. Actual business received by any broker or dealer may be less than the suggested allocations, but can (and often does) exceed the suggestions, because total transaction volume is allocated on the basis of all the considerations described above. A broker or dealer will not be excluded from executing transactions for the Master Fund because it has not been identified as providing soft dollar items.

The use of commissions or "soft dollars" if any, generated by the Master Fund through agency and certain riskless principal transactions to pay for research and research-related products or services, if any, will fall within the safe harbor created by Section 28(e) of the Securities Exchange Act of 1934, as amended. Under Section 28(e), research products or services obtained with soft dollars generated by the Master Fund may be used by the Investment Manager to service accounts other than the Master Fund. Soft dollars generated in respect of futures, currency and derivatives transactions and principal transactions (that are not riskless principal transactions) do not generally fall within the safe harbor created by Section 28(e) and will be utilized only with respect to research-related products and services for the benefit of the account generating such soft dollars.

Research and brokerage products and services may be used by the Investment Manager in servicing some or all of the Investment Manager's clients. In addition, some research and brokerage may not be used by the Investment Manager in servicing the clients whose commission dollars provided for the research or brokerage. Clients may not, in any particular instance, be the direct or indirect beneficiaries of the research or brokerage provided. Certain clients, who are the beneficiaries of research or brokerage, may have an investment style which results in the generation of a small amount of brokerage commissions due to a lack of active trading for their accounts. As a result, clients who generate sizeable commissions subsidize research or brokerage provided to clients whose accounts generate minimal brokerage commissions since the commission dollars generated by transactions for such clients are not sufficient to pay for research or brokerage that may be received by such clients from other brokers.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients. The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from

Appx. 03522

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/05/24   Page 146 of 200   PageID 24758
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 231 of
324

brokers will be supplemental to the Investment Manager's own research efforts.  While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products.  As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate.  In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes.  In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes.  The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Master Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources.  The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients, including the Master Fund.

**Custody**

U.S. Bank has been retained to perform certain custodial services for the Fund and the Master Fund (in such capacity, the "***Custodian***").  In its capacity as Custodian, it will receive customary fees that will be paid out of the assets of the Fund.  The Custodian will also be reimbursed for all reasonable out-of-pocket expenses.

The Custodian does not have a direct contractual relationship with the investors. The Custodian has, however, entered into a contractual relationship with the Fund in relation to the performance of the services described herein.  The Fund will enforce its contractual rights with respect to the Custodian as necessary to protect the interests of the Fund (and, therefore, the interest of investors).

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Filed 02/05/24    Page 147 of 200    PageID 24759
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 232 of
324

# TAX CONSIDERATIONS

**General**

The following is a general discussion of certain of the anticipated U.S. federal and Cayman Islands income tax considerations applicable to the Fund's activities and those relevant to "Non-U.S. Shareholders" (as defined below) and "Tax-Exempt U.S. Shareholders" (as defined below) arising from the purchase, ownership and disposition of Shares. The discussion that follows is based on the provisions of the Code and the U.S. Treasury regulations promulgated thereunder (the "***Treasury Regulations***") as in effect on the date hereof and on existing judicial and administrative interpretations thereof. These authorities are subject to change and to differing interpretations, which could apply retroactively.

This discussion does not address all tax consequences that may be applicable to a beneficial owner of Shares, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Shares as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Shares as capital assets within the meaning of Code Section 1221.

If a partnership holds Shares of the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the Fund. Prospective investors who are partners of a partnership should consult their own tax advisors.

In addition, this summary does not address U.S. federal alternative minimum or estate and gift tax consequences or consequences under the tax laws of any non-U.S. jurisdiction. The Fund has not sought any ruling from the Service with respect to the statements made and the conclusions reached in this summary, and cannot assure any investor that the Service will agree with such statements and conclusions. As with any investment, potential investors should consult their own tax advisors in determining the U.S. federal, state, local, non-U.S. and any other tax consequences to them of the purchase, ownership and disposition of Shares.

In view of the number of different jurisdictions where local laws may apply to shareholders, the discussion below does not address the local tax consequences to prospective investors of the purchase, ownership and disposition of Shares. Prospective investors are urged to consult their own tax advisors in determining the possible tax, exchange control or other consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries or in which they conduct business.

This summary assumes that only persons that are *not* "United States persons" as defined in Code Section 7701(a)(30) (such investors, "***Non-U.S. Shareholders***") and organizations that are exempt from U.S. federal income tax under the Code (such investors, "***Tax-Exempt U.S. Shareholders***") will invest in the Fund. Therefore, this summary does not address the U.S. tax consequences to U.S. taxable investors. The Fund is expected to constitute a "passive foreign investment company" (a "***PFIC***") for U.S. federal income tax purposes. Potential U.S. investors should be aware that the Fund does not intend to provide information to any U.S. person for purposes of such person qualifying to make an election to treat the Fund as a "qualified electing fund" (a

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 02/26/24    Page 148 of 200    PageID 24760
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 233 of
324

"***QEF***") for U.S. federal income tax purposes under Code Section 1295.  Accordingly, potential U.S. investors are urged to consult their tax advisors in this regard.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN ORDER TO UNDERSTAND FULLY THE U.S. FEDERAL, STATE AND LOCAL AND ANY NON-U.S. TAX CONSEQUENCES OF AN INVESTMENT IN ITS PARTICULAR SITUATION, INCLUDING CONSEQUENCES TO THEM UNDER THE LAWS OF THE JURISDICTIONS OF WHICH THEY ARE OR WERE CITIZENS, RESIDENTS OR DOMICILIARIES, OR IN WHICH THEY CONDUCT BUSINESS.

**Material U.S. Federal Income Taxation Matters**

<u>Classification and Taxation of the Fund and the Master Fund</u>

For U.S. federal income tax purposes, the Fund is expected to be treated as a corporation and the Master Fund is expected to be treated as a partnership.  The Fund and the Master Fund will make any necessary entity classification elections for U.S. tax purposes.

The following discussion assumes that the Master Fund will be treated as a partnership for U.S. federal income tax purposes.  Unless otherwise indicated, references in the following discussion to the tax consequences of Fund investments, activities, income, gain and loss include the indirect investments, activities, income, gain and loss attributable to the Fund as a result of being a limited partner of the Master Fund.

Under Code Section 864, a safe harbor (the "***Safe Harbor***") applies to a non-U.S. corporation (other than a dealer in securities or commodities) that engages in trading securities (including contracts or options to buy or sell securities) and commodities (including derivatives) for its own account within the United States, pursuant to which such a non-U.S. corporation will not be deemed to be engaged in a U.S. trade or business by reason of such trading activities.  If certain of the activities of the Fund were determined not to be of the type described in the Safe Harbor, the activities of the Fund could constitute a U.S. trade or business, in which case the Fund would be subject to U.S. income and branch profits tax on the income and gain treated as connected with those activities.  Although there is a risk that certain of the Fund's investments could fall outside of the Safe Harbor and constitute a trade or business (e.g., a lending business), the Fund intends to take the position that it is not engaged in trade or business.

The Fund also may be deemed to be engaged in a U.S. trade or business by attribution from a pass-through entity in which it owns an interest and which is so engaged.  In this circumstance, the Fund's share of any income and gain that is effectively connected with such U.S. trade or business will be subject to regular U.S. federal income taxation (currently imposed at a maximum rate of 21%) on a net basis and an additional 30% U.S. branch profits tax on certain of its after-tax earnings and profits that are not reinvested in a U.S. business, and the Fund will be required to file U.S. federal (and potentially, state and local) income tax returns in connection with such trade or business.  Such a pass-through entity would also be required (and would be legally liable) to withhold and pay over to the Service on behalf of the Fund an amount equal to 21% of the Fund's share of such entity's effectively connected income.  Any amount so withheld would be creditable against the Fund's ultimate U.S. federal income tax liability, and the Fund would be entitled to a refund to the extent that the amount withheld exceeded the Fund's U.S. federal income tax liability for the taxable year.  Further, if the Fund holds certain property (or is deemed to hold certain property as the result of its investments), such property could be treated as U.S. real property interests.  Upon the disposition of any such U.S.

74

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-1 Part 5    Filed 02/24/20    Page 149 of 200    PageID 24761
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 234 of
324

real property interest, the Fund would be subject to tax on any gain recognized as though such gain were effectively connected with a U.S. trade or business of the Fund. Gains from the disposition by the Fund of securities that are not (and are not deemed to be) effectively connected with a U.S. trade or business of the Fund would generally be free from U.S. federal income and withholding tax. The Fund may, however, also be subject to U.S. federal income tax on any gain realized, or deemed realized, upon a sale or exchange of an interest in a partnership directly or indirectly held which is engaged in a U.S. trade or business (including, without limitation, certain gains realized upon a redemption of interests from the Master Fund). In such case, U.S. withholding tax may be incurred (or required to be deducted by the Master Fund, as applicable) equal to 10% of the amount realized. Any amounts so withheld would generally be creditable (subject to certain limitations) against the Fund's ultimate U.S. federal income tax liability, and the Fund would be entitled to a refund to the extent that the amount withheld exceeded the Fund's U.S. federal income tax liability for the taxable year. In addition, it is possible the Fund could be subject to taxation on a net basis by state and local jurisdictions within the United States. Any such taxation could materially adversely affect the Fund's investment returns.

In general, under Section 881 of the Code, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business, generally payable through withholding under Section 1442 of the Code. Income subject to such a flat tax rate is of a fixed or determinable annual or periodical nature, including dividends (including "dividend equivalent" income under Section 871(m) of the Code) and certain interest income. There is presently no tax treaty between the United States and the Cayman Islands.

Certain types of income are specifically exempted from the 30% tax and thus withholding is not required on payments of such income to a non-U.S. corporation. The 30% tax does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a non-U.S. corporation on its deposits with U.S. banks. The 30% tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which has been issued after July 18, 1984 that is paid to persons with limited ownership in the obligor and with respect to which the person who would otherwise be required to deduct and withhold the 30% tax receives the required statement that the beneficial owner of the obligation is not a U.S. person within the meaning of the Code. Also exempt from the 30% tax is income from original issue discount obligations which are payable no more than 183 days from the date of issue. Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto).

As indicated above, certain investments by the Fund could result in the Fund being deemed to be engaged in a U.S. trade or business, including, without limitation, direct investments by the Fund in U.S. real estate or real estate acquired in foreclosures on mortgages held by the Fund. The Fund may conduct such activities through U.S. corporate entities, in order for the Fund to avoid filing a U.S. income tax return and directly paying tax on such investments. Each such investment may be made in a separate U.S. corporation directly owned by the Fund (a "*U.S. Subsidiary*"). Each U.S. Subsidiary will be subject to U.S. income tax on its net taxable income at regular U.S. federal corporate income tax rates. Dividend distributions from the U.S. Subsidiary to the Fund will be subject to a 30% U.S. withholding tax. However, cash distributions by the U.S. Subsidiary upon its complete liquidation will generally not be subject to taxation or to U.S. withholding tax.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2 Part 6 Filed 02/05/24    Page 150 of 200    PageID 24762
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 235 of
324

<u>Taxation of Non-U.S. Shareholders</u>

For U.S. federal income tax purposes, a Non-U.S. Shareholder will not be subject to U.S. federal income taxation on amounts paid by the Fund in respect of Shares or gains recognized on the sale, exchange or redemption of Shares, provided that such income and gains are not considered to be effectively connected with the conduct of a trade or business by the shareholder in the United States. In limited circumstances, an individual Non-U.S. Shareholder who is present in the United States for 183 days or more during a taxable year may be subject to U.S. income tax at a flat rate of 30% on gains realized on a disposition of Shares in such year.  Individual shareholders who at the time of their death are not citizens, former citizens or residents of the United States should not be subject, by reason of the ownership of Shares, to any U.S. federal gift or estate taxes.

Special rules may apply in the case of non-U.S. persons that (i) conduct a trade or business in the United States or that have an office or fixed place of business in the United States, (ii) have a tax home in the United States, (iii) are former citizens or long-term residents of the United States or (iv) are controlled foreign corporations, PFICs, foreign insurance companies ("**CFCs**") that hold Shares in connection with their U.S. business or corporations which accumulate earnings to avoid U.S. federal income tax.  Such persons are urged to consult their U.S. tax advisors before investing in the Fund.

In the case of Shares held in the United States by a custodian or nominee for a non-U.S. person, U.S. "backup" withholding taxes may apply to distributions in respect of Shares held by such shareholder unless such shareholder properly certifies as to its non-U.S. status or otherwise establishes an exemption from "backup" withholding.  Backup withholding is not an additional tax.  Rather, the U.S. federal income tax liability of non-U.S. persons subject to backup withholding will be reduced by the amount of tax withheld.  If backup withholding results in an overpayment of U.S. federal income taxes, a refund may be obtained, provided the required documents are timely filed with the Service.

<u>Taxation of Tax-Exempt U.S. Shareholders</u>

Tax-Exempt U.S. Shareholders are subject to U.S. tax on their "unrelated business taxable income" ("**UBTI**") as defined in Section 512 of the Code.  UBTI is generally the excess of gross income from any unrelated trade or business conducted by a tax-exempt entity over the deductions attributable to such trade or business, with certain modifications.  These modifications provide that UBTI generally does not include interest, dividends or gains from the sale of securities not held as either inventory or primarily for sale to customers in the ordinary course of business, except to the extent that any such item of income is deemed to constitute "unrelated debt financed income" within the meaning of Section 514 of the Code and the Treasury Regulations, and certain other requirements are met.  The ability to offset deductions or losses realized in respect of one "unrelated trade or business" against income or gains from other "unrelated trades or businesses" is subject to certain limitations.  Income that a U.S. tax-exempt entity derives from an investment in Shares generally should not give rise to UBTI, except to the extent that such entity's acquisition of Shares is debt financed.

The Fund will constitute a PFIC for U.S. federal income tax purposes. Under the Treasury Regulations, a tax-exempt entity is generally not considered to be a shareholder in a PFIC.  Therefore, the tax-exempt entity would generally not be subject to the PFIC tax rules, except to the extent that a "dividend" paid by such PFIC would be taxable under subchapter F of the Code.  Hence, a tax-exempt entity would be subject to tax under the PFIC regime in respect of an excess distribution from, or any gain realized on the sale of, the shares of a PFIC in only limited circumstances. Additionally, the

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1 Part 6 Filed 02/14/24   Page 151 of 200   PageID 24763
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 236 of
324

Treasury Regulations provide that a tax-exempt entity that is not taxable under the PFIC rules may not make a QEF election under Section 1295 of the Code and the Fund will not provide any QEF information to investors.

The Fund may be classified as a CFC for U.S. federal income tax purposes if U.S. persons who own (actually or constructively) 10% or more of either voting interest or the value of the Fund hold 50% or more of the vote or value of the Fund, as determined under the Code. However, a Tax-Exempt U.S. Shareholder's share of the Fund's "subpart F income" generally would not be treated as UBTI (provided that such investor has not debt-financed its investment in the Fund) except in the case of certain insurance- and reinsurance-related income. In addition, if the Fund is classified as a CFC, U.S. tax-exempt investors may be subject to special information reporting requirements. Prospective investors are urged to consult their own tax advisors as to the U.S. federal income tax consequences in this regard, including with respect to certain other types of income, and with respect to complex attribution rules that may apply.

Moreover, different rules may apply to certain types of tax-exempt entities, such as charitable remainder trusts. Accordingly, potential tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of an investment in the Fund.

**Prospective Tax-Exempt U.S. Shareholders are urged to consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of Shares.**

Information Reporting Requirements

A U.S. person (including in certain circumstances a Tax-Exempt U.S. Shareholder) that transfers property (including cash) to the Fund in exchange for Shares will be required to file a Form 926 or a similar form with the Service. In the event a U.S. shareholder fails to file any required form, such shareholder could be subject to a penalty of up to 10% of the value of the property transferred, subject to a $100,000 limit so long as the failure was not due to intentional disregard.

Under the Treasury Regulations, any U.S. person, within the meaning of the Code, owning 10% or more (taking certain attribution rules into account) of either the total combined voting power or total value of all classes of the shares of a non-U.S. corporation, or whose ownership interest changes by a statutorily specified amount, may be required to file an information return with the Service containing certain disclosures concerning the filing shareholder, other U.S. shareholders and the corporation. The determination of whether a U.S. person is a 10% U.S. shareholder for purposes of this filing requirement may be made by reference to such shareholder's percentage ownership of Shares within each class rather than that of all Shares of the Fund. The Fund has not committed to provide all of the information about the Fund or its shareholders necessary to complete such an information return. Prospective investors should consult their tax advisors about such information return filing requirements.

Certain U.S. persons are required to file Financial Crimes Enforcement Network ("*FinCEN*") Form 114 with the Service with respect to financial interests in foreign financial accounts held by such U.S. persons during the previous year if the aggregate value of such accounts exceeds $10,000 at any time during the year. Significant penalties may apply in respect of the failure to file FinCEN Form 114 in respect of foreign financial accounts. Thus, potential Tax-Exempt U.S. Shareholders should consult their tax advisors as to whether to file FinCEN Form 114 in respect of ownership of Shares.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-1   Filed 02/27/24   Page 152 of 200   PageID 24764
Appendix Part 6 Page 277 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 237 of
324

<u>Investor Tax Filings and Record Retention</u>

The United States Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, these Treasury Regulations require investors in specified transactions (including certain shareholders in non-U.S. corporations and partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be imposed (in addition to penalties that generally may be applicable as a result of a failure to comply with applicable Treasury Regulations) for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope and it is conceivable that the Master Fund may enter into transactions that will subject the Fund and certain investors in the Fund to the special tax filing and record retention rules. The Fund and the Investment Manager intend to use reasonable efforts to obtain and provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Master Fund.

<u>Reporting Under FATCA</u>

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an agreement with the Service, and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities that do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance to implement FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "***Cayman-U.S. IGA***") and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014, and guidance notes thereunder, each as updated from time to time.

Both the Fund and the Master Fund are likely to be considered FFIs. In order to avoid incurring U.S. withholding under FATCA, the Master Fund and the Fund each are generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder. The Fund and the Master Fund each have registered with the Service and expect that they will be required to identify and report on certain direct and indirect U.S. owners in order to comply with the Cayman-U.S. IGA. Therefore, the Fund and the Master Fund generally do not expect to become subject to U.S. withholding under FATCA. An investor may be required to provide to the Fund information which identifies its direct and indirect ownership. Any such information provided to the Fund may ultimately be shared with the Cayman Islands Tax Information Authority ("***TIA***") and transmitted to the Service and, potentially, certain other authorities and withholding agents, as applicable.

Appx. 03529

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 02/24/20    Page 153 of 200    PageID 24765
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 238 of
324

## CAYMAN ISLANDS LEGAL, REGULATORY AND TAX MATTERS

It is the responsibility of all persons interested in purchasing Shares to inform themselves as to any tax consequences from their investing in the Fund and the Fund's operations or management, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of Shares.  Investors should therefore seek their own separate tax advice in relation to their holding of Shares and accordingly none of the Fund, the Investment Manager or the Administrator accepts any responsibility for the taxation consequences of any investment in the Fund by an investor.

**Taxation of the Fund**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the shareholders.  The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

**Taxation of the Master Fund**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Master Fund or the limited partners of the Master Fund (the "***Master Fund Limited Partners***"). Interest, dividends and gains payable to the Master Fund and all distributions by the Master Fund to Master Fund Limited Partners will be received free of any Cayman Islands income or withholding taxes.  The Master Fund has registered as an exempted limited partnership under Cayman Islands law and the Master Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Master Fund or to any partner thereof in respect of the operations or assets of the Master Fund or the interest of a partner therein; and may further provide that any such taxes or any tax in the nature of estate duty or inheritance tax shall not be payable in respect of the obligations of the Master Fund or the interests of the partners therein.  The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Master Fund.

**Cayman Islands – Automatic Exchange of Financial Account Information**

The Cayman Islands has signed two inter-governmental agreements to improve international tax compliance and the exchange of information - one with the United States, the Cayman-U.S. IGA, and one with the United Kingdom (the "***Cayman-U.K. IGA***").  The Cayman Islands has also signed, along with over 80 other countries, a multilateral competent authority agreement to implement the

**Appx. 03530**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/734 of 86ge 154 of 200    PageID 24766
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 239 of
324

OECD Standard for Automatic Exchange of Financial Account Information – Common Reporting Standard (the "**CRS**" and together with the Cayman-U.S. IGA and the Cayman-U.K. IGA, "**AEOI**").

Cayman Islands regulations were issued on 4 July 2014 to give effect to the Cayman-U.S. IGA and the Cayman-U.K. IGA, and on 16 October 2015 to give effect to the CRS (collectively, the "**AEOI Regulations**"). Pursuant to the AEOI Regulations, the TIA has published guidance notes on the application of the Cayman-U.S. IGA and Cayman-U.K. IGAs and the CRS. It is anticipated that the Cayman-U.K. IGA related regulations and relevant provisions of the guidance notes will be phased out and replaced with CRS.

All Cayman Islands "Financial Institutions" will be required to comply with the registration, due diligence and reporting requirements of the AEOI Regulations, except to the extent that they can rely on an exemption that allows them to become a "Non-Reporting Financial Institution" (as defined in the relevant AEOI Regulations) with respect to one or more of the AEOI regimes. The Fund does not propose to rely on any reporting exemption and therefore intends to comply with the requirements of the AEOI Regulations.

The AEOI Regulations require the Fund to, amongst other things (i) register with the Service to obtain a Global Intermediary Identification Number (in the context of the Cayman-U.S. IGA only), (ii) register with the TIA, and thereby notify the TIA of its status as a "Reporting Financial Institution"; (iii) conduct due diligence on its accounts to identify whether any such accounts are considered "Reportable Accounts", and (iv) report information on such Reportable Accounts to the TIA. The TIA will transmit the information reported to it to the overseas fiscal authority relevant to a reportable account (i.e. the Service in the case of a US Reportable Account, HMRC in the case of a UK Reportable Account, etc.) annually on an automatic basis.

By investing (or continuing to invest) in the Fund (and indirectly investing in the Master Fund), investors will be deemed to have acknowledged, and to have given their consent to, the following:

(i)    the Fund (or its agent) may be required to disclose to the TIA and withholding agents certain information (which could otherwise be deemed to be confidential) in relation to the investor or its direct or indirect owners, including the investor's name, address, date of birth, tax identification number (if any), social security or national insurance number (if any) and certain additional information or documentation relating to the investor's investment or identity, and the investor may be required to provide any such information or documentation;

(ii)    the TIA may be required to automatically exchange information with, among other authorities, the Service, and to provide additional information to such authorities, and the Master Fund or the Fund (or its agent) may be required to disclose certain information (including information that could otherwise be deemed to be confidential) when registering with such authorities and in response to a request by any such authority for further information;

(iii)    in the event an investor's failure to comply with any AEOI related reporting requirements gives rise to any withholding tax or other liabilities the Fund reserves the right to ensure that any such withholding tax and or any related cost, interest, penalties and other losses or liabilities suffered by the Fund, the Master Fund, the Master Fund GP, the Administrator or any other investor, or any agent, delegate, employee, director,

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Part 6    File Page 240 of 867    Page 155 of 200    PageID 24767
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 240 of
324

officer or affiliate of any of the foregoing persons, arising from such investor's failure to provide information to the Fund, is economically borne by such investor;

(iv)    in the event an investor does not provide the information and/or documentation necessary for the Fund's (or the Master Fund's) satisfaction of its AEOI related reporting requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund (or the Master Fund) or its investors being subject to U.S. withholding under FATCA or other liabilities under AEOI generally, the Fund reserves the right to take any action and/or pursue all remedies at its disposal to mitigate the consequences of the investor's failure to comply with the requirements described above, including compulsory redemption or withdrawal of the investor concerned; and

(v)    no investor affected by any such action or remedy shall have any claim against the Fund, the Master Fund, the Master Fund GP, the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with AEOI.

Shareholders should consult their tax advisors as to the filing and information requirements that may be imposed on them in respect of their ownership of Shares of the Fund.

**The European Union Savings Directive**

On November 10, 2015, the European Council repealed the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "*EUSD*") with effect from January 1, 2016 (January 1, 2017 in the case of Austria) in order to avoid overlap with the requirements of the CRS and other tax information reporting regimes. It is anticipated that the Cayman Islands, together with those other jurisdictions which have adopted EUSD-equivalent legislation, will also give consideration in due course to the repeal of their EUSD-equivalent legislation in the light of the introduction of the CRS regime.

**Future Changes in Applicable Law**

The foregoing description of U.S. and Cayman Islands income tax consequences of an investment in, and the operations of, the Fund are based on laws and Treasury Regulations that are subject to change through legislative, judicial or administrative action.  There can be no assurance that the U.S. or Cayman Islands tax laws will not be changed adversely with respect to the Fund and its shareholders, or that the Fund's income tax status will not be successfully challenged by such authorities.  In addition, future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively.

**Other Taxation**

A portion of the Master Fund's investments may be made in non-U.S. jurisdictions.  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation and imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund and political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/02/24   Page 156 of 200    PageID 24768
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 241 of
324

domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund and the Master Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund or the Master Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on shareholders will vary with the particular circumstances of each shareholder and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

It is the responsibility of all persons interested in purchasing Shares to inform themselves as to any tax consequences from their investing in the Fund and the Fund's operations or management, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of Shares. Accordingly, each prospective investor should therefore consult their own advisors regarding tax treatment by the jurisdiction applicable to them in relation to their holding of Shares. Shareholders should rely only upon advice received from their own tax advisors based upon their own individual circumstances and the laws applicable to them. In no event will the Fund, the Master Fund, the Master Fund GPs, the Investment Manager, the Principal, the Directors or their principals, affiliates, counsel or other professional advisers be liable to any shareholder for any tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the shareholders, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each shareholder, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Shares. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

Appx. 03533

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-21   Filed 02/28/24   Page 157 of 200   PageID 24769
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 242 of
324

## ERISA AND OTHER REGULATORY CONSIDERATIONS

**ERISA Considerations**

**General**

Fiduciaries and other persons who are proposing to invest in Shares on behalf of retirement plans, IRAs and other employee benefit plans ("*Plans*") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), or the Internal Revenue Code of 1986, as amended (the "*Code*"), must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of shareholders to redeem all or any part of their Shares or to transfer their Shares and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

**Plan Asset Regulations and Benefit Plan Investors**

The United States Department of Labor ("*DOL*") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("*Plan Assets*"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "*significant participation test*"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "Benefit Plan Investors" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (i.e., plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (e.g., IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "*Plan Asset Entity*").

In order to prevent the assets of the Master Fund from being considered Plan Assets under ERISA, it is the intention of the Master Fund to monitor the investments in the Master Fund and prohibit the acquisition, withdrawal or transfer of any limited partner interests of the Master Fund by any investor, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of limited partner interests of each class of the Master Fund owned by Benefit Plan Investors would be less than 25% of the aggregate value of that class of limited partner interests (determined, as described above, by excluding certain limited partner interests held by the Master Fund GP, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of limited partner interests of the Master Fund by Benefit Plan Investors to less than 25%, the Fund may require the compulsory redemption of Shares. Each shareholder that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and

Appx. 03534

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-1 Part 6 Filed 02/27/24 Page 158 of 200    PageID 24770
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 243 of
324

warrant as of the date it acquires Shares the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "**Maximum Percentage**") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Master Fund.  Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Shares, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Fund of that occurrence and shall, if and as directed by the Fund, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Shares held in its general account or Plan Asset Entity.

It is anticipated that investment in the Fund by benefit plan investors may be "significant" for purposes of the regulations.  In such event, the underlying assets of the Fund would be deemed to constitute "plan assets" for purposes of ERISA.  As a general rule, if the assets of the Fund were regarded as "plan assets" of a benefit plan investor, the Investment Manager would be deemed a fiduciary with respect to each Plan investing in the Fund.  However, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund.  Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any benefit plan investor.  Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, the fiduciary of each such benefit plan investor has retained the fiduciary authority and responsibility with respect to the investor's initial and continuing investment in the Fund as though the benefit plan investor is investing directly in the Master Fund.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

In addition, each Plan proposing to invest in the Fund will be required to represent that, in connection with its decision to invest in the Fund, it is and will remain represented by a party independent of the Master Fund GP, the Investment Manager and each of their affiliates and employees and such party (A) is described in 29 CFR §2510.3-21(c)(1)(i); (B) is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies; (C) acknowledges that it has been informed that none of the Master Fund GP, the Investment Manager or any of their affiliates or employees is undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the Plan's investment in the Fund; and (D) is acting as a fiduciary under ERISA with respect to the Plan's investment in the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 02/24 of 86ge 159 of 200   PageID 24771
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 244 of
324

Fund and is responsible for exercising independent judgment in evaluating such investment. If a Plan cannot make the representations set forth in the preceding sentence, it must contact the Investment Manager and its subscription will not be accepted unless specifically agreed to by the Investment Manager.

**Ineligible Purchasers**

Limited partner interests may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

*Other Regulatory Matters*

Securities Act of 1933

Shares will not be registered under the U.S. Securities Act of 1933, as amended, any state "blue sky" laws or the securities laws of any other jurisdiction. Shares may be offered privately (i) outside the United States of America, its territories or possessions or areas subject to its jurisdiction (the "*United States*"), or to or for the benefit of an investor that is not a United States Person, only in accordance with relevant laws of the jurisdiction where the offer is made or (ii) within the United States or to a United States Person only in a transaction that does not require the registration of the Shares or the Fund under applicable U.S. federal or state securities laws.

Investment Company Act of 1940

The Fund is exempt from the provisions of the U.S. Investment Company Act of 1940, as amended, pursuant to the exemption contained in Section 3(c)(7) thereunder.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Filed 02/04/24   Page 160 of 200   PageID 24772
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 245 of
324

Investment Adviser Registration

The Investment Manager is registered as an investment adviser with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended.

Commodity Exchange Act

Neither the Master Fund GP nor the Investment Manager is required to register as a commodity pool operator ("*CPO*") or commodity trading advisor under the U.S. Commodity Exchange Act and each has filed a notice of claim effectuating exemption. As such, the Master Fund GP and the Investment Manager will operate the Fund and the Master Fund pursuant to such exemption. Unlike a registered CPO, the Master Fund GP and the Investment Manager are not required to deliver a disclosure document and a certified annual report to participants in the Fund. Among other things, the exemption requires the Master Fund GP and the Investment Manager to file a claim of exemption with the National Futures Association. The Investment Manager qualifies for an exemption from registration with the CFTC as a commodity trading adviser pursuant to CFTC Rule 4.14(a)(8).

Cayman Islands Mutual Fund Law

The Fund and the Master Fund are regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands ("*Mutual Funds Law*"). The Cayman Islands Monetary Authority (the "*Authority*") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Fund or the Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the directors of the Fund or the Master Fund, as applicable, and may result in the Authority applying to the court to have the Fund or the Master Fund wound up.

Neither the Fund nor the Master Fund are, however, subject to supervision in respect of their investment activities or the constitution of the Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund and the Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of the directors of the Fund or the Master Fund, to appoint a person to advise the Fund or the Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund or the Master Fund, as the case may be. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1   Page 284 of 867   Page 161 of 200   PageID 24773
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 246 of
324

Anti-Money Laundering Regulations

**Cayman Islands**

In order to comply with legislation or regulations aimed at the prevention of money laundering the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity and source of funds.  Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures (including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a shareholder (i.e. a subscriber or a transferee) and the identity of their beneficial owners/controllers (where applicable).  Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required at subscription where an exemption applies under the Anti-Money Laundering Regulations, 2017 of the Cayman Islands, as amended and revised from time to time or any other applicable law. However, detailed verification information may be required prior to the payment of any proceeds from or any transfer of an interest in Shares. Depending on the circumstances of each application, a detailed verification of identity might not be required where:

(a)     the subscriber makes the payment for their investment from an account held in the subscriber's name at a recognized financial institution and redemptions/dividends are repaid directly to the subscriber; or

(b)     the subscriber is regulated by a recognized regulatory authority or listed on a recognized stock exchange (or is a subsidiary of either) and is based or incorporated in, or formed under the law of, a recognized jurisdiction; or

(c)     the application is made through an intermediary which is regulated by a recognized regulatory authority and is based in or incorporated in, or formed under the law of a recognized jurisdiction and an assurance is provided in relation to the procedures undertaken on the underlying investors.

For the purposes of these exceptions, recognition of a financial institution, regulatory authority, stock exchange or jurisdiction will be determined in accordance with the Money Laundering Regulations by reference to those jurisdictions recognized by the Cayman Islands Monetary Authority as having equivalent anti-money laundering regulations to the Cayman Islands.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a shareholder if the Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

**Appx. 03538**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2 Part 6    Filed 02/03/24    Page 162 of 200    PageID 24774
Appendix Part 6 Page 2614 of 8667
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 247 of
324

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law, 2016 Revision of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the Financial Reporting Authority, pursuant to the Terrorism Law (2015 Revision) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property. Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

As a regulated mutual fund in the Cayman Islands, the Master Fund is also subject to the same legislation and regulations aimed at the prevention of money laundering that are applicable to the Fund. The Master Fund will discharge its obligations by implementing procedures substantially similar to the Fund.

**Requests for Information**

The Fund and the Master Fund, or any of its or their directors or agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognized overseas regulatory authority, under the Monetary Authority Law (2016 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2017 Revision) or Reporting of Savings Income information (European Union) Law (2014 Revision) and associated regulations, agreements, arrangements and memoranda of understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, the Master Fund and any of its or their directors or agents, may be prohibited from disclosing that the request has been made.

**United States**

All subscriptions for Shares will be subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Fund or its delegate may require verification of identity from all prospective investors. Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The Fund reserves the right to request such information as is necessary to verify the identity of a prospective investor. The Fund also reserves the right to request such identification evidence in respect of a transferee of Shares. In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Shares) any funds received will be returned without interest to the account from which the monies were originally debited.

Appx. 03539

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Part 6    Page 024 of 863    Page 163 of 200    PageID 24775
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 248 of
324

The Fund also reserves the right to refuse to make any redemption payment or distribution to a shareholder, if the Fund suspects or is advised that the payment of any redemption or distribution moneys to such shareholder might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

**Beneficial Ownership Regime**

The Fund is regulated as a mutual fund under the Mutual Funds Law and, accordingly, does not fall within the scope of the primary obligations under Part XVIIA of the Companies Law (the "*Beneficial Ownership Regime*").  The Fund is therefore not required to maintain a beneficial ownership register.  The Fund may, however, be required from time to time to provide, on request, certain particulars to other Cayman Islands entities which are within the scope of the Beneficial Ownership Regime and which are therefore required to maintain beneficial ownership registers under the Beneficial Ownership Regime.  It is anticipated that such particulars will generally be limited to the identity and certain related particulars of (i) any person holding (or controlling through a joint arrangement) a majority of the voting rights in respect of the Fund; (ii) any person who is a member of the Fund and who has the right to appoint and remove a majority of the board of directors of the Fund; and (iii) any person who has the right to exercise, or actually exercises, dominant direct influence or control over the Fund.

**Legal Implications of Investment in the Fund**

The Fund is incorporated under the laws of the Cayman Islands and has its registered office in the Cayman Islands.  In summary, the main Cayman Islands legal implications of investing in the Fund are as follows:

(a) by submitting the Subscription Documents to the Administrator, the prospective investor makes an offer to subscribe for the Shares which, once accepted by the Fund, has the effect of a binding contract. The terms of such contract are governed by the Subscription Documents (read together with the Memorandum);

(b) upon the issue of the Shares, such prospective investor becomes a shareholder of the Fund, and the Articles of Association of the Fund take effect as a contract between the shareholders and the Fund by operation of law;

(c) the Articles of Association may only be amended by way of a special resolution in accordance with the Cayman Islands Companies Law (as amended);

(d) subject to any separate contractual arrangements agreed to by a shareholder with the Fund and the indemnity provisions of the Subscription Documents, a shareholder's liability to the Fund will generally be limited to the amount, if any, unpaid on the Shares held by such shareholder;

(e) the Articles of Association are governed by, and construed in accordance with, the laws of the Cayman Islands. The Subscription Documents are expressed to be governed by, and construed in accordance with, the laws of the Cayman Islands;

(f) the rights and restrictions that apply to a shareholder's Shares may be modified and/or additional terms agreed by way of side letters (subject to such terms being consistent with the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-1 Part 6 Page 02634 of 867   Page 164 of 200   PageID 24776
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 249 of
324

Articles of Association). As a matter of Cayman Islands law, side letters may not contravene the terms of the Articles of Association or Cayman Islands law generally; and

(g) although there is no statutory enforcement in the Cayman Islands of judgments obtained in a foreign jurisdiction (other than judgments rendered by an Australian superior court which may be enforced under the Cayman Islands Foreign Judgments Reciprocal Enforcement Law (1996 Revision)), a judgment obtained in such jurisdiction will be recognized and enforced in the courts of the Cayman Islands at common law, without any re-examination of the merits of the underlying dispute, by an action commenced on the foreign judgment debt in the Grand Court of the Cayman Islands, provided such judgment satisfies certain criteria.

Appx. 03541

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1  Part 6  Filed 02/04/24  Page 165 of 200  PageID 24777
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 250 of
324

## Appendix A

**Definition of "United States Person"**

For purposes of the applicable prohibitions against ownership and transfer of Shares of the Fund, the term "***United States Person***" and "***U.S. Person***" means:

(1)    a resident or citizen of the United States;

(2)    a partnership or corporation organized under the laws of the United States;

(3)    any entity not organized under the laws of the United States:

    (a)    that has its principal office or place of business in the United States; or

    (b)    (i)    in which citizens or residents of or entities organized under the laws of or existing in the United States directly or indirectly hold in the aggregate 50% or more of the beneficial interests; and

        (ii)    that will own directly or indirectly, either alone or together with affiliated persons, an aggregate of more than 9.9% of the Fund's outstanding Shares; or

    (c)    (i)    that is organized principally for passive investment (such as an investment company, a commodity pool or other similar vehicle); and

        (ii)    (A)    in which the amount of units of participation held by United States Persons (other than "qualified eligible participants" as defined in Rule 4.7(a)(2) under the United States Commodity Exchange Act) represents in the aggregate 10% or more of the beneficial interest in the entity;

        (B)    that was formed for the purpose of facilitating investment by United States Persons in the Fund, or in any other commodity pool with respect to which the operator is exempt from certain requirements of Part 4 of the regulations promulgated by the United States Commodity Futures Trading Commission by virtue of its participants being non-United States Persons; or

        (C)    that was formed by United States Persons principally for the purpose of investing in securities not registered under the United States Securities Act of 1933, as amended, unless it is formed and owned by "accredited investors" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) who are not natural persons, estates or trusts;

(4)    an estate or trust:

    (a)    of which an executor, administrator or trustee is a United States Person, unless:

        (i)    an executor, administrator or trustee who is not a United States Person has sole or shared investment discretion with respect to the assets of the estate or trust; and

        (ii)    (A)    in the case of an estate, it is governed by non-U.S. law; or

1

**Appx. 03542**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2    Part 6    Page 252 of 867    Page 166 of 200    PageID 24778
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 251 of
324

        (B)      in the case of a trust, no beneficiary (and no settlor if the trust is revocable) is a United States Person; or

    (b)     the income of which is subject to United States income tax regardless of source;

(5)    any agency or branch of a foreign entity located in the United States;

(6)    any non-discretionary account or similar account (other than an estate or trust) held for the benefit or account of one or more United States Persons; and

(7)    any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States, unless it is held by a dealer or other professional fiduciary exclusively for the benefit or account of one or more non-United States Persons.

For purposes of the foregoing, the term "***United States***" or "***U.S.***" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia. Persons requiring details regarding other terms used in the foregoing definition (such as "qualified eligible participant" and "accredited investor") should contact the Fund or the Administrator.

Appx. 03543

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 01/28/24   Page 167 of 200   PageID 24779
Appendix Part 6 Page 2864 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 252 of
324

Memorandum Number _____

# Confidential Private Placement Memorandum

*Series A Interests*
*Series B Interests*
*Series C Interests*
*in*

# Highland Argentina Regional Opportunity Fund, L.P.

*General Partner*

## Highland Argentina Regional Opportunity Fund GP, LLC

*Investment Manager*

## Highland Capital Management Latin America, L.P.

## March 2019

208786464 v12

**Appx. 03544**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/00/24 of 86age 168 of 200    PageID 24780
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 253 of
324

# <u>TABLE OF CONTENTS</u>

Page

NOTICE.................................................................................................................................... ii

DIRECTORY ........................................................................................................................... v

EXECUTIVE SUMMARY ..................................................................................................... 1

INVESTMENT PROGRAM .................................................................................................... 3

MANAGEMENT AND ADMINISTRATION ........................................................................ 6

SUMMARY OF TERMS ......................................................................................................... 10

THE MASTER FUND .............................................................................................................. 25

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST ..................................... 29

BROKERAGE AND CUSTODY ............................................................................................. 47

TAX CONSIDERATIONS ....................................................................................................... 50

ERISA AND OTHER REGULATORY CONSIDERATIONS ................................................. 63

**Appx. 03545**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 02/04/24    Page 169 of 200    PageID 24781
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 254 of
324

## NOTICE

This Confidential Private Placement Memorandum (this "***Memorandum***") is being furnished on a confidential basis solely to selected qualified investors considering the purchase of limited partner interests (the "***Interests***") in Highland Argentina Regional Opportunity Fund, L.P. (the "***Fund***"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Highland Argentina Regional Opportunity Fund GP, LLC (the "***General Partner***"). Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other matters relevant to the suitability of an investment in the Fund for such investor.

In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Interests have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any of the states of the United States. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws.

The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "***Investment Company Act***"), since Interests will only be sold to persons who are "qualified purchasers," as defined in the Investment Company Act.

Each subscriber for an Interest will be required to certify that it is an "accredited investor" as defined in Regulation D under the Securities Act and a "qualified purchaser," as defined in the Investment Company Act.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "***CFTC***"), Highland Capital Management Latin America, L.P., the investment manager to the Fund (the "***Investment Manager***"), is not registered with the CFTC as a commodity pool operator ("***CPO***") and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the

Appx. 03546

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-2 Part 6 Page 02834 of 866 Page 170 of 200    PageID 24782
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 255 of
324

aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors. The Investment Manager qualifies for an exemption from registration as a commodity trading advisor pursuant to CFTC Rule 4.14(a)(8).

Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a substantial degree of risk. See "*Risk Factors and Potential Conflicts of Interest*." No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom. The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund, as amended (the "***Partnership Agreement***"). Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner.

The Interests are offered subject to the right of the General Partner to reject any subscription in whole or in part.

This Memorandum is intended solely for the use of the person to whom it has been delivered by the General Partner or its authorized representative for the purpose of evaluating a possible investment by the recipient in the Interests described herein, and is not to be reproduced or distributed to any other persons (other than professional advisors of the prospective investor receiving this Memorandum from the General Partner or its authorized representative).

This Memorandum does not purport to be, and should not be construed as, a complete description of the Partnership Agreement or the investment management agreement by and among the Investment Manager, the General Partner, the Master Fund, the Offshore Fund (each as defined below) and the Fund (the "***Investment Management Agreement***"). Each prospective investor in the Fund is encouraged to review the Partnership Agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Partnership Agreement, the terms of the Partnership Agreement shall control.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund or Highland Argentina Regional

iii

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-21 Part 6 Page 229 of 367 age 171 of 200    PageID 24783
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 256 of
324

Opportunity Master Fund, L.P. (the "**Master Fund**") since the date hereof.  An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those described in "*Risk Factors and Potential Conflicts of Interest*," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

All references herein to "$" refer to U.S. dollars.  Except as the context otherwise requires, references to the term "Fund" in this Memorandum shall be deemed to include the Master Fund.

**Appx. 03548**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 78-21 Part 6 Page 22914 of 867 age 172 of 200    PageID 24784
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 257 of
324

## DIRECTORY

| | |
|---|---|
| **General Partner** | Highland Argentina Regional Opportunity Fund GP, LLC<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Investment Manager** | Highland Capital Management Latin America, L.P.<br>c/o Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Administrator** | MUFG Fund Services (Cayman) Limited<br>2nd Floor, Strathvale House<br>90 North Church Street<br>P.O. Box 609<br>Grand Cayman  KY1-1107<br>Cayman Islands |
| **Auditor** | PricewaterhouseCoopers LLP<br>5th Floor Strathvale House<br>P.O. Box 258<br>Grand Cayman  KY1-1104<br>Cayman Islands |
| **Prime Brokers** | Société Générale<br>440 S. LaSalle St., Suite 2400<br>Chicago, IL 60605<br><br>BNP Paribas Prime Brokerage, Inc.<br>787 Seventh Avenue<br>The Equitable Tower<br>New York, NY 10019 |
| **Legal Counsel** | *In the United States:*<br>Akin Gump Strauss Hauer & Feld LLP<br>1700 Pacific Avenue<br>Suite 4100<br>Dallas, TX 75201 |

Appx. 03549

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1    Filed 01/09/24    Page 173 of 200    PageID 24785
Appendix Part 6    Page 229 of 367
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 258 of
324

## EXECUTIVE SUMMARY

Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership (the "*Fund*"), seeks to maximize the total return of its assets through capital appreciation by investing all of its investable assets in Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "*Master Fund*"), which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina.

Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "*General Partner*"), acts as general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands.  Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership (the "*Investment Manager*" and, together with its affiliates, shareholders, directors, members, partners, officers and employees, the "*Advisory Parties*"), serves as investment manager to the Fund, the Offshore Fund (as defined below) and the Master Fund and manages the Master Fund's investment program.  Each of the General Partner and the Investment Manager is ultimately controlled by James D. Dondero (the "*Principal*").

In order to facilitate investments by non-U.S. and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently assumed the management of an existing investment fund, Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company (the "*Offshore Fund*" and, together with the Fund, the "*Feeder Funds*").  The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund.  References in this Memorandum to the Fund shall include the Master Fund, unless otherwise specified or the context so requires.

The Fund (but not the Master Fund) is seeking subscriptions from investors who qualify as both "accredited investors" and "qualified purchasers" (each as defined in the Fund's subscription materials).  The minimum initial investment is $500,000, and thereafter, the minimum subsequent investment is $500,000, although, in each case, the Fund may accept investments in a lesser amount, but no less than $100,000 with respect to Series B Interests.  The Fund generally accepts subscriptions on the first day of each calendar month.  A subscriber admitted to the Fund as a limited partner (each, a "*Limited Partner*") will receive, in exchange for its initial capital contribution and any subsequent capital contribution, a limited partner interest representing a proportionate share of the net assets of the Fund at that time.

The Fund intends to issue multiple series of limited partner interests ("*Interests*") over time.  Not all series of Interests will be available for subscription at the same time and the terms among the series of Interests will vary.  The Fund is currently offering Series A Interests, Series B Interests and Series C Interests pursuant to this Memorandum.

For its services to the Master Fund, the Investment Manager is generally entitled to a management fee (the "*Management Fee*"), which is calculated monthly and paid quarterly in arrears at the Master Fund level.  The Management Fee is calculated at an annual rate of (i) 1.75% of each Limited Partner's capital account that is attributable to a Series A Interest, (ii) 1.25% of each Limited Partner's capital account that is attributable to a Series B Interest, and (iii) 1.00% of each Limited Partner's capital account that is attributable to a Series C Interest.

Appx. 03550

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Page 292 of 867   Page 174 of 200   PageID 24786
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 259 of
324

In addition, the Investment Manager, in its capacity as the special limited partner of the Master Fund (the "***Special Limited Partner***"), is entitled to a quarterly performance-based profits allocation (the "***Performance Allocation***") at the end of each fiscal quarter.  The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to (i) 20.0% of the amount by which the net asset value of each Series A Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series A Interest, if any, (ii) 17.5% of the amount by which the net asset value of each Series B Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series B Interest, if any, and (iii) 15.0% of the amount by which the net asset value of each Series C Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series C Interest, if any.

Subject to a one-year "soft lock-up" with an early withdrawal reduction attributable to Series B Interests only and a two-year "soft lock-up" with an early withdrawal reduction attributable to Series C Interests only, a Limited Partner is generally permitted to withdraw all or a portion of its Interest on 30 calendar days' prior written notice on the last business day of each calendar month.  Withdrawals may be subject to reserves for contingencies and suspension restrictions as discussed further in this Memorandum.

The Fund may agree with certain Limited Partners to a variation of the terms set forth in this Memorandum or establish additional series of Interests that have terms that differ from those described herein, including, without limitation, different management fees, performance allocations and withdrawal rights.

Appx. 03551

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 6 Filed 02/04/24    Page 175 of 200    PageID 24787
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 260 of
324

# INVESTMENT PROGRAM

## INVESTMENT OBJECTIVE

The investment objective of the Fund is to maximize the total return of its assets through capital appreciation by investing all of its investable assets in the Master Fund, which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina, and that the Investment Manager believes would provide profitable investment opportunities for the Master Fund.  The Master Fund will invest in a single portfolio of assets and does not currently intend to have a separate portfolio of assets for each of its series, each of which will correspond to a series of limited partner interests in the Fund.

## INVESTMENT STRATEGY

The Master Fund is a multi-strategy investment fund and there is no limit on the investment strategies that may be utilized.  The Investment Manager believes that focusing on a multi-strategy approach will enable the Master Fund to enhance results by compounding returns generated by each strategy and at the same time have the needed flexibility to adjust to potentially changing regulations and market conditions.

The Investment Manager will be focused on identifying assets that are mispriced against similar assets and/or against the Investment Manager's expectations for assets' fair values and market movements, special situations, such as mergers, financial restructurings, hostile takeovers, or leveraged buy-outs.  There is no set allocation among these and any other strategies that the Investment Manager may use.

The Master Fund may hold long and short positions in a wide range of liquid or illiquid fixed income securities including, but not limited to, sovereign and private debt, distressed debt, secured and unsecured debt, structured debt, loans, asset-backed securities and collateralized debt obligations.  Furthermore, the Master Fund may invest, both long and short, in a wide range of liquid or illiquid equity-related instruments including, but not limited to, equities, convertible bonds, options, equity-linked notes, preferred shares and warrants, whether or not listed or traded on one or more exchanges.

The Master Fund may hold any of these positions indirectly by entering into swaps, options, futures, forward contracts or similar derivative transactions.

The Master Fund may hold both U.S. dollar and non-U.S. dollar denominated securities.

The Master Fund may leverage its investment portfolio by up to 100% of the Master Fund's net asset value (calculated at the time of investment) by borrowing for investment purposes and by using leverage techniques and products.  It is anticipated that by doing so the performance of the Master Fund will be enhanced.  While the use of the leverage may improve the return on invested capital, leverage may also significantly increase the impact of adverse movement in the value of the Master Fund.

The Master Fund may also utilize hedging strategies in order to maximize returns and reduce the risk to principal or the volatility associated with its holdings.  As part of these hedging strategies, the Master Fund may hedge any of its investments with long or short positions in any financial instrument, which the Investment Manager deems appropriate.  The Master Fund may utilize U.S. and European securities for hedging purposes.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 02/05/24    Page 176 of 200    PageID 24788
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 261 of
324

The Master Fund may invest through one or more subsidiaries established in an appropriate jurisdiction in order to take advantage of applicable tax treaties or increase the tax efficiency of the Master Fund's investments, or in such other circumstances as the General Partner, in its capacity as the general partner of the Master Fund, following consultation with the Investment Manager, deem appropriate, including compliance with local investment laws.

The Master Fund may maintain assets in cash or cash equivalent instruments, money market funds, repurchase agreements, or other cash management vehicles pending investment, for defensive purposes, to fund withdrawals requested by the limited partners of the Master Fund or otherwise at the discretion of the Investment Manager.  The Master Fund may hold with no limitation U.S. and European AAA fixed income securities for defensive purposes.

**INVESTMENT RESTRICTIONS**

In deploying the investment strategy, the Master Fund will observe the following investment restrictions.  The Master Fund will not at the time of investment:

1. Invest more than 50 percent of its gross assets in its net holdings of equities;

2. Borrow more than 100 percent of its net assets;

3. Invest more than 20 percent of its gross assets in a single equity position;

4. Invest more than 20 percent of its gross assets in a single corporate issuer position;

5. Invest more than 30 percent of its gross assets in a single GDP-linked warrant position; and

6. Invest more than 30 percent of its gross assets in a single sovereign issuer security position; and

7.  Invest more than 30 percent of its gross assets in a single provincial issuer.

If a percentage limitation on investment or use of assets set forth above is adhered to at the time a transaction is effected, later changes in percentage resulting from changing values will not be considered a violation.

In the event that the Investment Manager discovers that a violation of any of the Master Fund's investment limitations has occurred (the date of such discovery being the "***Discovery Date***"), the Investment Manager shall inform the limited partners of the Master Fund, including the Fund, who shall: (i) notify each of their limited partners or shareholders, as applicable, in writing within 30 business days after the Discovery Date of the nature of the violation, the steps taken, or to be taken, to remedy the violation and the reason the violation occurred and (ii) use reasonable commercial efforts to cause the Investment Manager to remedy such violation within 90 business days after the Discovery Date (the "***Remedy Date***").  If such violation has not been remedied on or before the Remedy Date, the limited partners of the Master Fund, including the Fund, shall: (i) notify each of their limited partners or shareholders, as applicable, in writing, 30 business days after the Remedy Date, of the steps taken to remedy the violation and the reason that the violation has not been remedied by the Remedy Date (the "***Remedy Notice***") and (ii) use reasonable commercial efforts to cause the Master Fund's portfolio to be examined by an independent auditor other than PricewaterhouseCoopers LLP and shall request that such independent auditor issue a report to the investors in each of the Master Fund's limited partners as to its

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 02/05/24    Page 177 of 200    PageID 24789
Appendix Part 6 Page 296 of 367
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 262 of
324

concurrence or disagreement with the statements in the Remedy Notice.  The Investment Manager shall pay for the costs of such audit and the costs of the Remedy Notice if the violation that was the subject of the Remedy Notice occurred as a result of the Investment Manager's willful misfeasance, bad faith or gross negligence.  In addition, the failure to remedy the violation in a timely manner may give rise to special withdrawal rights.  See "*Summary of Terms – Withdrawals; Lock-Ups*."

**DISTRIBUTION POLICY**

The Fund's objective is to maximize capital appreciation and accordingly it is not envisaged that any income or gains derived from the investments made by the Master Fund will be distributed by way of dividend.  This does not preclude the General Partner from declaring a dividend at any time in the future if it considers it appropriate to do so.  To the extent that a dividend may be declared, it will be paid in compliance with any applicable laws.

*The investment objectives and strategies summarized herein represent the Investment Manager's current intentions.  Depending on conditions and trends in the securities markets and the economy in general, the Investment Manager may pursue any strategies, employ any investment techniques or purchase any type of security that it considers appropriate, whether or not described in this section, subject to any applicable law or regulation.  The discussion herein includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.  There can be no assurance that the investment strategy of the Master Fund will achieve the intended investment objective.  The Master Fund's investment program is speculative and involves a high degree of risk, including, without limitation, the risk of loss of the entire amount invested.*

**Appx. 03554**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 02/02/24   Page 178 of 200   PageID 24790
Appendix Part 6   Page 2974 of 3662
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 263 of
324

## MANAGEMENT AND ADMINISTRATION

**The General Partner and the Investment Manager**

Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "**General Partner**"), acts as the general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands.

Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership (the "**Investment Manager**"), serves as the investment manager of the Fund, the Offshore Fund and the Master Fund and has responsibility for the Master Fund's investment program.

Each of the General Partner and the Investment Manager is ultimately controlled by James D. Dondero (the "**Principal**").

**The Investment Management Agreement**

The Investment Manager was appointed as the investment manager to the Fund, the Offshore Fund and the Master Fund pursuant to an investment management agreement (the "**Investment Management Agreement**"). Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Master Fund in pursuit of the investment objective and strategy described in this Memorandum. For its services, the Investment Manager is entitled to the Management Fee, as well as reimbursement for any Feeder Fund or Master Fund expenses incurred by the Investment Manager.

The Investment Management Agreement provides that, in the absence of gross negligence, willful misconduct or fraud, each of the Investment Manager, its members, shareholders, partners, managers, directors, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and each of their respective executors, heirs, assigns, successors and other legal representatives, will be indemnified by the Fund, the Offshore Fund and/or the Master Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.

**Services Agreement**

The Investment Manager engaged Highland Latin America Consulting, Ltd., a Cayman Islands exempted company and a wholly-owned subsidiary of the Investment Manager ("**Highland Latin America**"), pursuant to a services agreement (the "**Services Agreement**") to provide certain administrative and consulting services to the Investment Manager related to its management of the Fund, the Offshore Fund and the Master Fund, including back- and middle-office services; credit analysis; investment vehicle management; valuation; execution and documentation; marketing; reporting; administrative services; and other ancillary services.

The Services Agreement provides that in the absence of bad faith, gross negligence, fraud or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), the Investment Manager will, to the extent permitted by law, indemnify and hold harmless Highland Latin America, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities incurred by such person in performing their duties under the Services Agreement. The

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 6 Filed 09/24/Page 179 of 200    PageID 24791
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 264 of
324

Fund will not be liable for any consulting services provided by Highland Latin America or any consultants or service providers that Highland Latin America engages, and the Fund will not bear any costs or expenses related to the services provided by Highland Latin America.

**Investment Personnel**

The key investment professionals of the Investment Manager and Highland Latin America who will be responsible for the Master Fund's investments are described below:

*James Dondero, CFA, CMA, President, Co-Founder*. Mr. Dondero is Co-Founder and President of Highland Capital Management, L.P. and a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager.  Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing.  Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NYRT), Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc.  He also serves on the Southern Methodist University Cox School of Business Executive Board.  A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy.  Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993.  Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express.  Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program.  Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance.  He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

*Gustavo Prilick*.  Mr. Prilick is a Managing Partner at Highland Capital Brasil and a registered asset manager in Brazil, and is a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. He has extensively worked in several of Highland Capital Brasil's portfolio companies in the US mainly as CEO. Prior to his involvement with Highland Capital Brasil, he was a Partner at South America Fund, a private equity firm, mainly focused on providing financial services to export companies in Argentina and Uruguay. Prior to South America Fund, he was the Chief Operating Officer of Millicom International Cellular for 7 years, serving Latin America, Asia, Africa and ten operations in Russia. Prior to Millicom, he served as the Director of International Business for Oracle Corporation where he was responsible for the establishment of most of Oracle's International Subsidiaries on several continents, including the Brazilian operation. Later he became President of Oracle South America with oversight of several countries in South America. He also served as CEO of Nacion Factoring, a subsidiary of Banco Nacion in Argentina building its operations to reach one of the leading positions in the country. Mr. Prilick received an MBA from the Stanford University Graduate School of Business and a degree in Electrical Engineering from Universidad de Buenos Aires. He has also held teaching positions as a visiting professor in several leading Business Schools in Argentina.

Highland Latin America will enter into relationships and agreements with Argentine relevant parties and/or individuals to obtain supporting services for the management of the Fund, the Offshore Fund and the Master Fund, and will enter into consulting agreements with Andrés Pitchón, Julieta Prieto and Javier Casabal pursuant to which these consultants will provide investment and related services to the Feeder Funds and the Master Fund.  Mr. Pitchón will provide portfolio management services to the Master Fund under the overall supervision of the Investment Manager.

Appx. 03556

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-1 Part 6 Filed 02/09/24   Page 180 of 200   PageID 24792
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 265 of
324

*Andrés Pitchón*. Mr. Pitchón, through a consulting arrangement with Highland Latin America Consulting, Ltd., provides portfolio management services to the Master Fund. Mr. Pitchón began his career in 1993 as Head of Equity Research for Argentina for MBA-Salomon Brothers and later he also became responsible for Fixed income. As Head of the Research Department, his work was recognized by international publications such as Institutional Investor, Latin Finance, The Reuters Survey and The Greenwich Survey. Since 1997 and 1999, he has managed the Offshore Fund's equity and fixed income mutual funds. Since 2003, Mr. Pitchón had been Senior Portfolio Manager of the Offshore Fund's hedge funds. Mr. Pitchón received a BA degree in IT, focused on Business Administration from the University of Belgrano (1989), together with an academic merit medal for highest GPA in the School of Technology. Mr. Pitchón also received a Master's degree in Business Administration from Anderson Graduate School of Business at UCLA in 1992.

## The Administrator

The Master Fund has entered into an Administration Agreement (the "*Administration Agreement*") with MUFG Fund Services (Cayman) Limited (the "*Administrator*") pursuant to which the Administrator performs certain administrative and accounting services for the Feeder Funds and the Master Fund, subject to the oversight and control of the General Partner, in its capacity as the general partner of the Master Fund.

Pursuant to the Administration Agreement, the Administrator is responsible, under the overall supervision of the General Partner, in its capacity as the general partner of the Master Fund, for certain matters pertaining to the administration for the Fund, including: (i) maintaining the accounts of the Fund and the Master Fund, (ii) calculating the Master Fund's net asset value, (iii) maintaining the principal corporate records of the Fund and the Master Fund, (iv) communicating with Limited Partners, (v) accepting the subscriptions of new Limited Partners, (vi) effecting withdrawals of Interests, (vii) maintaining the register of sub-fund investments, (viii) executing sub-fund subscriptions and withdrawals as instructed by the Fund, and (ix) ensuring compliance with applicable law and regulation (including anti-money laundering regulations). For its services, the Administrator receives a fee from the Master Fund.

The Administration Agreement may be terminated by the Administrator or the Master Fund upon ninety (90) days' written notice or, under certain circumstances, shorter notice. In such event, the Master Fund may enter into a new agreement with a new administrator on behalf of the Master Fund and the Feeder Funds, in its discretion and on such terms as it deems advisable, without prior notice to, or approval of, investors.

Under the Administration Agreement, the Master Fund agrees to indemnify and hold harmless the Administrator and its affiliated persons and delegates, as well as their respective officers, directors, employees and agents for, and to defend and hold each such person harmless from, any and all taxes, claims, demands, actions, suits, judgments, liabilities, losses, damages, costs, charges, counsel fees (on a solicitor and his own client basis), fines, assessments, amounts paid in settlement and expenses imposed on, incurred by, or asserted against the person which may arise out of or in connection with the Administration Agreement. The Administrator or any other indemnified person will not be indemnified for their own gross negligence, wilful default or fraud.

The Administrator is not responsible for valuing the Master Fund's investments, monitoring any investment restrictions of the Master Fund, determining compliance by the Master Fund with its investment restrictions, the Master Fund's trading activities, the management or performance of the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-21    Filed 03/04/24    Page 181 of 200    PageID 24793
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 266 of
324

Master Fund or the accuracy or adequacy of this Memorandum.  In addition, the Administrator does not assume any liability to any person or entity, including Limited Partners, except as specifically provided in the Administration Agreement.  The Administrator may delegate certain services and share information concerning the Fund and its Limited Partners with its various non-United States affiliates subject to applicable confidentiality provisions.

   **The Administrator has no responsibility with respect to trading activities, the Investment Manager, the management or performance of the Master Fund, or the accuracy or adequacy of this Memorandum**.

9

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Part 6 Filed 03/04/24    Page 182 of 200    PageID 24794
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 267 of 324

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms governing an investment in the Fund, and is subject, and qualified in its entirety by reference, to the Partnership Agreement, the exempted limited partnership agreement of the Master Fund, as amended (the "**Master Fund Partnership Agreement**"), and the Fund's subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Partnership Agreement, the Master Fund Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership (the "***Fund***"), primarily seeks to maximize the total return of its assets through capital appreciation by investing all of its investable assets in Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina. |
| **General Partner** | Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), acts as the general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands. James D. Dondero (the "***Principal***") ultimately controls the General Partner. |
| **Investment Manager** | Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership controlled by the Principal (the "***Investment Manager***"), serves as investment manager to the Feeder Funds (as defined below) and the Master Fund and has responsibility for the Master Fund's investments. |
| **Master-Feeder Structure** | In order to facilitate investments by non-U.S. and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently assumed the management of an existing investment fund, Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***" and, together with the Fund, the "***Feeder Funds***"). The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund. Accordingly, references herein to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Fund. The Feeder Funds share all items of profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund. Except as the context otherwise requires, the term "Fund" also includes the Master Fund. |

Appx. 03559

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 03/04/24 of 86 Page 183 of 200    PageID 24795
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 268 of
324

The Investment Manager or an affiliate may also sponsor one or more additional investment funds or accounts.

|  |  |
|---|---|
| **Eligible Investors** | Limited partner interests ("***Interests***") may be purchased only by investors who qualify as both "accredited investors" and "qualified purchasers," each as defined in the Fund's Subscription Documents. Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The General Partner reserves the right to reject any investor for any reason or for no reason in its sole discretion. |

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Series of Interests**
The Fund intends to issue multiple series of Interests over time. Not all series of Interests will be available for subscription at the same time and the terms among the series of Interests will vary. Each series will have separate rights and preferences, including, without limitation, with respect to fees and withdrawal rights. The Fund is currently offering Series A Interests, Series B Interests and Series C Interests (each, a "***Series***").

New series of Interests may be established by the General Partner without notice to or approval of the Limited Partners (defined below). References herein to "Interests" or "Limited Partners" shall include all Series and Limited Partners unless otherwise specified or context so requires.

**Subscriptions**
Subscriptions for Interests may be accepted as of the first day of each calendar month and/or such other days as the General Partner may determine in its discretion from time to time, generally subject to the receipt of cleared funds no later than the Business Day immediately preceding the acceptance date. The initial minimum investment is $500,000, and thereafter, a Limited Partner may make additional investments, with the consent of the General Partner, in increments of not less than $500,000; provided that, in each case, the Fund may accept investments in a lesser amount, but no less than $100,000 with respect to Series B Interests.

"***Business Day***" is defined as any day on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for

11

Appx. 03560

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-2 Part 6 Filed 03/03/24 of 867ge 184 of 200   PageID 24796
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 269 of
324

business or such other days as the General Partner may determine generally, or in any particular case.

A subscriber admitted to the Fund (a "*Limited Partner*") receives, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in this Memorandum and the Subscription Documents.

**Placement Agents**    There will be no sales charge payable by or to the Fund in connection with the offering of Interests.  However, the General Partner and/or the Investment Manager may enter into arrangements with placement agents (which may include its affiliates) to solicit investors in the Fund, and such arrangements may provide for the compensation of such placements agents for their services at the General Partner's and/or the Investment Manager's expense or such placement agents may be paid a portion of the Management Fee.  For the avoidance of doubt, the Fund will not bear any placement agent fees.

Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation.  Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

**Capital Accounts**    The Fund will maintain a book capital account (a "*Capital Account*"), which may be divided into capital sub-accounts, for the General Partner and each Limited Partner (each, a "*Partner*" and together, the "*Partners*") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss, with each sub-account being maintained as if it were the Capital Account of a separate Partner in order to calculate the Series B Early Withdrawal Reduction and Series C Early Withdrawal Reduction (each as defined below), as applicable, and the Performance Allocation (as defined below) for each capital contribution.  The initial balance of each Partner's Capital Account will be equal to the amount of cash or net value of any property contributed to the Fund by such Partner.

If a Partner invests in more than one Series, the Fund will maintain a separate Capital Account on behalf of such Partner with respect to each such Series and each Capital Account will be treated as if it were the

12

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Page 003244 of 867ge 185 of 200    PageID 24797
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 270 of
324

Capital Account of a separate Partner for purposes of determining the Management Fee (as defined below) and Performance Allocation applicable to each Capital Account.

The Master Fund will issue to the Fund a limited partner interest in the Master Fund and will maintain capital accounts and sub-accounts that correspond to Limited Partners' Capital Accounts in the Fund.

**Affiliated Investors**

The Investment Manager, the General Partner and their respective affiliates, principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes ("***Affiliated Investors***") may not be subject to restrictions on withdrawals or be assessed the Management Fee or the Performance Allocation that are applicable to other investors in the Fund, but do share *pro rata* in all other applicable expenses of the Fund; provided that, the Special Limited Partner may, unless prohibited by law, make withdrawals of all or any part of its Performance Allocation and gains thereon from its capital account in the Master Fund as of any Withdrawal Date (as defined below).

**Borrowing and Leverage**

The Master Fund may buy securities or commodities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities or commodities in order to employ leverage when the Investment Manager deems such action appropriate. The Master Fund may not borrow more than 100% of its net assets as described in "*Investment Program – Investment Restrictions*" above.

**Management Fee**

For its services to the Master Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***") calculated monthly and payable quarterly in arrears at an annual rate of (i) 1.75% of each Limited Partner's Capital Account balance that is attributable to a Series A Interest, (ii) 1.25% of each Limited Partner's Capital Account balance that is attributable to a Series B Interest, and (iii) 1.00% of each Limited Partner's Capital Account balance that is attributable to a Series C Interest. The Management Fee is paid at the Master Fund level. The Management Fee will be prorated for any period that is less than a full calendar quarter.

The General Partner or the Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any Limited Partner, including, without limitation, Affiliated Investors. To effect such reduction, waiver or difference in calculation, the Fund may issue a separate series of Interests.

The General Partner may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the Limited Partners. The Investment Manager may also assign all or any portion of fees payable to the Investment Manager,

13

**Appx. 03562**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-21 Part 6  Filed 01/09/24  Page 186 of 200    PageID 24798
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 271 of
324

including the Management Fee and the Performance Allocation, to any affiliate thereof or any third party in its sole discretion.

**Performance Allocation**

Pursuant to the Master Fund Partnership Agreement, generally, as of the close of each fiscal quarter and subject to the limitations described below, a performance-based profits allocation (the "***Performance Allocation***") is debited against the Master Fund capital sub-account relating to each Series attributable to a Limited Partner and simultaneously credited to the Master Fund capital account of the Special Limited Partner. The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to (i) 20.0% of the Net Capital Appreciation (as defined below) of each Series A Interest for such fiscal quarter, (ii) 17.5% of the Net Capital Appreciation of each Series B Interest for such fiscal quarter, and (iii) 15.0% of the Net Capital Appreciation of each Series C Interest for such fiscal quarter.

The "***Net Capital Appreciation***" applicable to an Interest shall mean the amount by which the net asset value of such Interest on the last day of the fiscal quarter (or on the Withdrawal Date, if applicable) exceeds the higher of the following amounts: (i) the highest net asset value of such Interest as of the commencement of any fiscal quarter and (ii) the issue price of such Interest. All such calculations include realized and unrealized gains and losses and are made before deduction of the Performance Allocation, but after deduction of the accrued applicable expenses of the Fund and the Master Fund for the applicable period, and in each case adjusted for any subscriptions and withdrawals made during the quarter.

The Performance Allocation is calculated and allocated at the Master Fund level through the use of separate memorandum sub-accounts with respect to the Fund's capital account in the Master Fund that correspond to each Series attributable to a Limited Partner. No separate Performance Allocation will be charged at the Fund level.

The Performance Allocation generally will be allocable to the Special Limited Partner after the end of each fiscal quarter and as of any Withdrawal Date occurring prior to the end of any fiscal quarter. The Performance Allocation payable with respect to any Interests withdrawn prior to the end of a fiscal quarter will be determined solely by reference to such withdrawn Interests and will be allocable to the Special Limited Partner on the Withdrawal Date. The Performance Allocation with respect to any Limited Partner may be fully or partially waived or rebated by the General Partner in its sole discretion.

**Other Fees and Expenses**

The Fund bears all of its own initial organizational expenses and its *pro rata* share of the initial organizational expenses of the Master Fund. In general, the Fund's financial statements will be prepared in accordance with generally accepted accounting principles in the United States ("***GAAP***"). However, the General Partner intends to amortize the Fund's

14

**Appx. 03563**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 01/09/24   Page 187 of 200   PageID 24799
Appendix Part 6 Page 3064 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 272 of
324

organizational expenses over a period of 60 calendar months from the date the Fund commenced operations because it believes such treatment is more equitable than expensing the entire amount of the organizational expenses in the Fund's first year of operation, as is required by GAAP. The General Partner may, however, limit the amount of start-up and organizational expenses that the Fund amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund pays all costs, fees and expenses arising in connection with the Fund's operations. The Fund also bears its *pro rata* share of the cost of the Master Fund's operations and investments as provided in the Master Fund Partnership Agreement. Expenses payable by the Fund in connection with the Master Fund's investment program, include, but are not limited to, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence, willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring investments. Expenses payable by the Fund in connection with its operations include, but are not limited to, fees and expenses of advisers and consultants; the Management Fee; fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers; indemnification expenses and the cost of insurance against potential indemnification liabilities; interest and other borrowing expenses; legal, administrative, accounting, tax, audit and insurance expenses; expenses of preparing and distributing reports, financial statements and notices to Limited Partners; litigation or other extraordinary expenses; any withholding, transfer or other taxes payable by the Fund (including any interest and penalties), and the cost of periodically updating this Memorandum and the Partnership Agreement.

The Investment Manager may retain, in connection with its responsibilities under the Investment Management Agreement, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager. Payment for any such services will be assumed by the Investment Manager. However, the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Master Fund, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund will bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

The Fund and the Master Fund do not have their own separate employees or office, and neither the Fund nor the Master Fund will reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 03/04/24 Page 188 of 200   PageID 24800
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 273 of
324

Manager. A portion of the commissions generated on the Master Fund's brokerage transactions may generate soft dollar credits that the Investment Manager is authorized to use to pay for research and other research-related services and products used by the Investment Manager. It is the current policy of the Investment Manager to limit such use of soft dollars to fall within the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended, or to be otherwise reasonably related to the investment decision-making process or for Master Fund expenses. See "*Brokerage and Custody*."

If the General Partner or the Investment Manager, as appropriate, incurs any expenses for both the Master Fund and one or more Other Accounts (as defined herein), the General Partner or the Investment Manager, as appropriate, will allocate such expenses among the Master Fund and each such Other Account in proportion to the size of the investment made by each in the activity or entity to which the expenses relate, or in such other manner as the General Partner considers fair and reasonable.

**Allocation of Net Profit and Loss**

Net profit or net loss of the Fund is allocated among the Capital Accounts of the Partners as of the close of each calendar month, at any other time when the Fund receives an additional capital contribution or effects a withdrawal or distribution, or at such other times as the General Partner may determine (each, a "***Fiscal Period***").

The net profit or net loss of the Fund for any calendar month or other valuation period will reflect, with respect to all positions:

(a)   the dividends and interest accrued during the period;

(b)   the net realized gains or losses from the sale or other disposition of investments during the period allocated by the Fund;

(c)   the net change in the unrealized appreciation or depreciation of investments during the period held at the close of the period (*i.e.*, the difference between the fair market value of each investment at the end of the period compared with either the fair market value at the commencement of the period or, in the case of any investment made after the commencement of the period, the cost); and

(d)   the expenses of the Fund incurred or accrued during the period (other than the Management Fee and any other items that are charged on a Partner-by-Partner basis).

As of the close of each Fiscal Period, the net profit or net loss (subject to any applicable Performance Allocation paid at the Master Fund level) will be allocated *pro rata* among the Capital Accounts of the Partners in proportion to their percentage interests in the Fund as of the commencement of the period. Each Partner's percentage interest in the Fund as of the commencement of any period is based on the value of the

16

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6    Filed 03/04/... Page 189 of 200    PageID 24801
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 274 of
324

|                       | Partner's Capital Account at such time in relation to the sum of the Capital Accounts of all of the Partners at such time. |
|-----------------------|---|

Partner's Capital Account at such time in relation to the sum of the Capital Accounts of all of the Partners at such time.

The Management Fee will be calculated separately with respect to each Limited Partner and will be debited from the capital sub-account at the Master Fund level corresponding to each Limited Partner's Capital Account.

**Distributions**

Subject to the monthly withdrawal privilege described below, all earnings of the Fund are ordinarily retained for investment. Limited Partners should not expect the Fund to make any dividend distributions.

**Withdrawals; Lock-Up**

Subject to certain withdrawal restrictions described below, a Limited Partner is generally permitted to withdraw all or a portion of its Capital Account as of the last Business Day of each calendar month (and/or such other Business Days as the General Partner may determine in its sole discretion) (each, a "***Withdrawal Date***"); provided that, any partial withdrawals may only be made in minimum amounts of $100,000. Notwithstanding the foregoing, any Limited Partner that withdraws all or a portion of its Capital Account with respect to a Series B Interest prior to the one-year anniversary of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of up to 3.0% of the net asset value of the portion of the Series B Interest being withdrawn, as determined at the close of business of such Withdrawal Date (such fee, the "***Series B Early Withdrawal Reduction***"). In addition, any Limited Partner that withdraws all or a portion of its Capital Account with respect to a Series C Interest prior to the:

(i)     one-year anniversary of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of 5.0% of the net asset value of the portion of the Series C Interest being withdrawn, as determined at the close of business of such Withdrawal Date, and

(ii)     two-year anniversary, but on or after the one-year anniversary, of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of 3.0% of the net asset value of the portion of the Series C Interest being withdrawn, as determined at the close of business of such Withdrawal Date (such fees with respect to Series C Interests, the "***Series C Early Withdrawal Reduction***" and together with the Series B Early Withdrawal Reduction, the "***Early Withdrawal Reduction***").

The Early Withdrawal Reduction is retained by the Fund (and generally invested in the Master Fund) and deducted from the withdrawal proceeds of the withdrawing Limited Partner. The Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal (defined below).

17

**Appx. 03566**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6   Filed 03/04/24   Page 190 of 200   PageID 24802
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 275 of
324

Written notice of any withdrawal request must be received in writing by the Administrator at least 30 calendar days prior to the requested Withdrawal Date.  The General Partner may waive such notice requirements, or permit withdrawals under such other circumstances, if, in its sole discretion, it determines that, under the circumstances, to waive such requirement will not have an adverse effect on the Master Fund's portfolio.

If the Master Fund violates the investment restrictions and fails to remedy the violation on or before the Remedy Date (as described in "*Investment Program – Investment Restrictions*"), any Limited Partner may withdraw all or part of its Capital Account on the next Withdrawal Date and will not be subject to the Early Withdrawal Reduction; provided that, such Limited Partner has requested such withdrawal in writing within 30 Business Days after the Remedy Date.

**Settlement of Withdrawal Proceeds**

A withdrawal request is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Fund (received from the Master Fund), whether or not readily marketable, generally within 10 Business Days after the Withdrawal Date; provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund.  In the event that the General Partner satisfies a withdrawal request with assets in kind, such securities may be transferred to a liquidating account and sold by the Fund for the benefit of the withdrawing Limited Partner, in which case, payment of the withdrawal proceeds attributable to such investments will be delayed until such investments are sold.  The amount payable in respect of such investments will depend on the performance of such investments through to the date on which they are sold.  The cost of operating the liquidating account and selling the investment(s) will be deducted from the proceeds of sale paid to the withdrawing Limited Partner.

Notwithstanding anything to the contrary herein, the General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the General Partner and whether or not incurred directly or indirectly), which could reduce the amount of a distribution upon a Limited Partner's withdrawal.  The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal, as well as any Early Withdrawal Reduction described above.

Appx. 03567

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 09/14/ Page 191 of 200    PageID 24803
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 276 of 324

| | |
|---|---|
| **Withdrawal Conditions** | The General Partner or the Administrator may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner or the Administrator may reasonably require.  This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes.  In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the Limited Partner, the General Partner and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the Limited Partner and the owner of the account to which the withdrawal proceeds will be paid.  The withdrawal proceeds will not be paid to a third-party account if the Limited Partner and/or owner of the account fails to provide such information. |
| **Compulsory Withdrawals** | The General Partner reserves the right, in its sole discretion, to compel the withdrawal of a Limited Partner's Interest at any time and for any reason on not less than seven days' prior written notice (or immediately if the General Partner, in its sole discretion, determines that such Limited Partner's continued investment in the Fund may cause the Fund, the Master Fund, the General Partner or the Investment Manager to violate any applicable law) (a "***Compulsory Withdrawal***").  The General Partner will compel the withdrawal of a Limited Partner's Interest in its entirety if a Limited Partner requests a withdrawal that would cause its total investment with respect to a particular Series to fall below a minimum of $100,000 (a "***Minimum Required Withdrawal***").   In either case, settlements are made in the same manner as voluntary withdrawals, except that the Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal, but will apply to any Minimum Required Withdrawal. |
| **Suspension of Withdrawals and Withdrawal Payments** | The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Interests (and the applicable valuation date); (b) the issuance of Interests, (c) the withdrawal by Limited Partners of Interests (and the applicable Withdrawal Date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and Withdrawals Dates are not postponed) (each, a "***Suspension***") during any period which: (i) any stock exchange on which a substantial part of investments owned by the Fund (through the Master Fund) are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Fund (through the Master Fund) would not be reasonably practicable and might seriously prejudice the Limited Partners, or (B) it is not reasonably practicable for the Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the |

19

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1 Part 6 Filed 03/14/... Page 192 of 200    PageID 24804
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 277 of
324

investments of the Fund (through the Master Fund); (v) in the sole discretion of the General Partner, it is necessary to preserve the Fund's assets; or (vi) automatically upon any suspension of withdrawals by the Master Fund for similar reasons as described in "*The Master Fund*," below.

The Administrator will promptly notify each Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any Suspension of withdrawals or Suspension of the payment of withdrawal proceeds. Any remaining amount of a withdrawal request that is not satisfied due to such a Suspension remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners will not be given any priority with respect to the withdrawal of Interests after the cause for such Suspension or limitation ceases to exist. The General Partner may in its sole discretion, however, permit such Limited Partners to withdraw their withdrawal requests to the extent that the relevant Withdrawal Date has not yet passed. For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant Withdrawal Date and the remittance of such payment proceeds, affected Limited Partners shall not have any right to withdraw their withdrawal requests. Upon the reasonable determination by the General Partner that conditions leading to a Suspension no longer apply, the Administrator will notify the Limited Partners of the end of the Suspension. At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first Withdrawal Date following the removal of the Suspension, subject to the foregoing restrictions on withdrawals.

**Transfers**

Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in its sole discretion. The General Partner will require any transferee or assignee of any Limited Partner to execute the Subscription Documents.

**Duty of Care; Indemnification**

Pursuant to the Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement, the General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the General Partner or the Investment Manager, each of the respective affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives (each such person, an "*Indemnified Party*") shall not be liable to the Master Fund, the Fund and the Limited Partners for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence, willful misconduct or fraud, or as otherwise required by

20

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 03/24/24    Page 193 of 200    PageID 24805
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 278 of
324

law.   In no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement contain provisions for the indemnification of the Indemnified Parties by the Master Fund and the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been an Indemnified Party or in connection with the Partnership Agreement, the Master Fund Partnership Agreement, the Investment Management Agreement, or the Master Fund's or the Fund's business or affairs to the fullest extent permitted by law in the absence of gross negligence, willful misconduct or fraud.  The General Partner is not personally liable to any Limited Partner for the repayment of any withdrawal proceeds or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the U.S. federal or state income tax laws applicable to the Fund or its investors.

**Non-Exclusivity; Allocation of Opportunities**

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund.

The Master Fund Partnership Agreement requires the General Partner, and the Investment Manager as delegatee of the General Partner, to act in a manner that it considers fair and equitable over time in allocating investment opportunities to the Master Fund.  Although the General Partner and the Investment Manager consider certain factors set forth in the Investment Manager's policies to determine how to allocate trades, the Investment Manager's policies and the Master Fund Partnership Agreement do not otherwise impose any specific obligations or requirements concerning the allocation of time, effort or investment opportunities to the Master Fund or any restrictions on the nature or timing of investments for the account of the Master Fund and for the General Partner's or the Investment Manager's own accounts or for other accounts that the General Partner, the Investment Manager or their affiliates may manage (each, an "***Other Account***").  The General Partner and the Investment Manager are not obligated to devote any specific amount of time to the affairs of the Master Fund and are not required to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities arising from the application of speculative position limits or other factors.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of interests in the

21

**Appx. 03570**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-4 Part 6 Filed 09/13/24 of 866ge 194 of 200    PageID 24806
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 279 of
324

Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate. The Investment Manager has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more accounts on other than a *pari passu* basis. See "*Risk Factors and Potential Conflicts of Interest*" below.

**Affiliated Service Providers**

NexBank, SSB ("*NexBank SSB*") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund and other vehicles in which the Fund, through the Master Fund, may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc.,NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America, an affiliate of the Investment Manager, has been engaged to provide certain administrative and consulting services to the Investment Manager. See "*Risk Factors and Potential Conflicts of Interest*" below.

22

**Appx. 03571**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-21 Part 6 Filed 03/14/24   Page 195 of 200   PageID 24807
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 280 of 324

| | |
|---|---|
| **Valuations** | In general, the Fund's financial statements will be prepared in accordance with GAAP. The General Partner has delegated the valuation of the Fund's assets, based on the Master Fund's assets, to the Administrator who values the Fund's assets as of the close of each Fiscal Period in accordance with the Investment Manager's valuation policies and procedures. |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its sole discretion deems necessary or appropriate. At the sole discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Limited Partners at the time when such reserve is created, increased or decreased, as the case may be, or alternatively may be charged or credited to those investors who were Limited Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Limited Partners during any such prior period(s). |
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Limited Partners** | The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) such tax information as is necessary for each Partner to complete U.S. federal and state income tax or information returns, along with any other tax information required by law. Within 120 days of the end of each year (or as soon as practicable thereafter), the Fund distributes to each Partner audited financial statements of the Fund, including a statement of profit or loss for such fiscal year and an unaudited status of each such Partner's holdings in the Fund at such time. Partners will also receive, upon request to the Administrator, copies of semi-annual financial statements of the Fund. |
| **Tax Status** | The General Partner believes that the Fund should be treated as a partnership for U.S. federal income tax purposes and should not itself be subject to U.S. federal income taxation. Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions. Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period |

Appx. 03572

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Part 6 Page 0.154 of 86 Page 196 of 200    PageID 24808
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 281 of
324

|  | may differ from its financial or economic results. The deductibility of a Limited Partner's share of any Fund losses or deductions may be limited. See "*Tax Considerations*." |
|---|---|
| **ERISA** | The Investment Manager intends to limit investment in the Master Fund by "benefit plan investors" so that the assets of the Master Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"). It is anticipated that the assets of the Fund may constitute "plan assets" for purposes of ERISA. See "*ERISA and Other Regulatory Considerations*." |
| **Amendment of the Limited Partnership Agreement** | The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent. However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; or (c) reduce any Limited Partner's right to share in net profits or assets of the Fund, in each case, without the consent of each Limited Partner adversely affected thereby. The above consent may be obtained by negative consent. |
|  | Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund (without being subject to the Early Withdrawal Reduction) as of a date that is not less than 30 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment. |
| **Variation of Terms** | The General Partner or the Investment Manager, in its sole discretion, may enter into a side letter or similar agreement to or with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of, the Partnership Agreement or of any Subscription Documents (including those relating to access to information, the Management Fee, the Performance Allocation, minimum investment amount, voting rights and withdrawal rights) with respect to such Limited Partner(s). |

24

**Appx. 03573**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-1  FiledPart 6  File Page 01624 of 86Page 197 of 200   PageID 24809
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20      Entered 02/24/20 17:25:25    Page 282 of
324

# THE MASTER FUND

**The Master Fund's Partnership Interests**

The Master Fund's partnership interests are currently held exclusively by the Fund and the Offshore Fund as limited partners, the Investment Manager as the special limited partner of the Master Fund, and the General Partner as the general partner of the Master Fund, pursuant to the Master Fund Partnership Agreement. The General Partner is registered as a foreign company in the Cayman Islands pursuant to Part IX of the Companies Law (2016 Revision).

**The Master Fund Partnership Agreement**

The Master Fund is constituted as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 (the "***Exempted Limited Partnership Law***"). A Cayman Islands exempted limited partnership is constituted by the signing of the relevant partnership agreement and its registration with the Registrar of Exempted Limited Partnerships in the Cayman Islands.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners. Under the Exempted Limited Partnership Law, any property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the partnership in accordance with the terms of the partnership agreement. Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership. Registration under the Exempted Limited Partnership Law entails that the partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Exempted Limited Partnership Law (subject to compliance therewith).

*Liability of Partners and Indemnification of the General Partner and Others*. The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the partnership has insufficient assets. As a general matter, a limited partner of a Cayman Islands partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

(i)     as expressed in the partnership agreement,

(ii)    if such limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, then that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited partnership incurred during the period that he so participates in the conduct of the business as though he were, for such period, a general partner, provided always that he shall be rendered liable pursuant to the foregoing provision only to a person who transacts business with the exempted limited partnership during such period with actual knowledge of such participation and who then reasonably believed such limited partner to be a general partner, or

(iii)   if such limited partner is obligated pursuant to Section 34(1) of the Exempted Limited Partnership Law to return a distribution made to it (with interest at a rate of 10% per annum, unless otherwise specified in the Master Fund Partnership Agreement) when the exempted limited partnership is insolvent or within six months prior to such insolvency.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 FilePageld 907/24 of 86ge 198 of 200    PageID 24810
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 283 of
324

The Master Fund Partnership Agreement provides that none of the Indemnified Parties will be liable to the Master Fund or any limited partner of the Master Fund (including the Feeder Funds) for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud, or as otherwise required by law.  An Indemnified Party may consult with counsel and accountants in respect of the Master Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.  In addition, in no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Master Fund Partnership Agreement provides that the Master Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Party from and against any and all liabilities suffered or sustained by an Indemnified Party by reason of the fact that it, he or she is or was an Indemnified Party or in connection with the Master Fund Partnership Agreement or the Master Fund's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of such Indemnified Party.  The Master Fund Partnership Agreement also provides that the Master Fund will, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct, subject to receiving a written undertaking from the Indemnified Party to repay such amounts if and to the extent that it is finally determined that the Indemnified Party was not entitled to indemnification in respect thereof.

Notwithstanding any of the foregoing, the provisions of the Master Fund Partnership Agreement do not provide for the exculpation or indemnification of any Indemnified Party for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Party, the Master Fund (and not the applicable Indemnified Party) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud.  Given the volume of transactions executed on behalf of the Master Fund, trading errors (and similar errors) will occur and the Master Fund will be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Indemnified Party.

The Indemnified Parties will also be indemnified by each limited partner of the Master Fund for any amounts of tax withheld or required to be withheld with respect to that limited partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the limited partner's capital account is insufficient to fully compensate the General Partner and the Investment Manager for such costs.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Part 6 Page 199 of 200    PageID 24811
Appendix Part 6 Page 199 of 200    PageID 24811
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 284 of
324

*Contributions and Withdrawals by the Fund*.  Limited partners of the Master Fund may make contributions at such times and in such amounts as the General Partner determines.  As a limited partner of the Master Fund, the Fund may, subject to the consent of the General Partner, voluntarily request a withdrawal of all or part of its capital in the Master Fund at such times and in such amounts as it may determine.  The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Master Fund (and the applicable valuation date); (b) the issuance of limited partner interests in the Master Fund; (c) the withdrawal by limited partners of their interests (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) during any period which: (i) any stock exchange on which a substantial part of investments owned by the Master Fund are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Master Fund would not be reasonably practicable and might seriously prejudice the limited partners of the Master Fund, or (B) it is not reasonably practicable for the Master Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Master Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Master Fund; or (v) in the sole discretion of the General Partner, it is necessary to preserve the Master Fund's assets.

*Amendment of the Master Fund Partnership Agreement*.  The Master Fund Partnership Agreement may be amended by an instrument in writing signed by each of the limited partners of the Master Fund and the General Partner; provided that, the General Partner may amend the Master Fund Partnership Agreement without the consent of the limited partners so long as the amendment does not adversely affect any rights of the limited partners.

*Dissolution of the Master Fund*.  The Master Fund shall be wound up and dissolved upon the first to occur of any of the following liquidating events, and Sections 36(1)(b), 36(9) and 36(12) of the Exempted Limited Partnership Law shall not apply to the Master Fund:

(i)      the written election of the General Partner to terminate the Master Fund; or

(ii)     if the General Partner is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice by the General Partner (or its legal representative) on all the limited partners informing the limited partners of:

(1)      the commencement of liquidation or bankruptcy proceedings in relation to the General Partner; or

(2)      the withdrawal, removal or making of a winding up or dissolution order in relation to the General Partner;

*provided that*, if a majority in number of the limited partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Master Fund shall be resumed and continued.  If a new general partner is not elected by the Automatic Dissolution Date, the Master Fund shall be wound up and dissolved in accordance with terms of the Master Fund Partnership Agreement and the Exempted Limited Partnership Law.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Page 93124 of 867e 200 of 200    PageID 24812
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 285 of
324

*Power of Attorney*.  Each limited partner of the Master Fund shall make, constitute and appoint the General Partner (and each of its successors and permitted assigns) for the time being, with full power of substitution, as its true and lawful agent and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to (and deliver as may be appropriate) on its behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law), including the admission of any new partners of the Master Fund and any amendments to the Master Fund Partnership Agreement. Each limited partner of the Master Fund shall authorize the General Partner to take any further action that the General Partner considers necessary or advisable in connection with the foregoing.  Such power of attorney granted is intended to secure a proprietary interest of the General Partner and the performance by each limited partner of the Master Fund of its obligations under the Master Fund Partnership Agreement and shall be irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of the Master Fund.

**Valuation of Assets**

The General Partner has delegated the valuation of the Master Fund's assets to the Administrator, which will generally compute the value of the securities and other assets of the Master Fund as of the close of business on the last day of each fiscal period and on any other date selected by the General Partner in its sole discretion.  In addition, the Administrator must compute the value of the securities that are being distributed in-kind as of their date of distribution in accordance with the Master Fund Partnership Agreement.  In determining the value of the assets of the Master Fund, no value is placed on the goodwill or name of the Master Fund, or the office records, files, statistical data or any similar intangible assets of the Master Fund not normally reflected in the Master Fund's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

A copy of the Investment Manager's valuation policy is available upon request from the General Partner.

The value of each security and other asset of the Master Fund and the net worth of the Master Fund as a whole determined pursuant Master Fund Partnership Agreement are conclusive and binding on all of the partners of the Master Fund and all persons claiming through or under them.

**Appx. 03577**