Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 1-26    Filed 03/20/24    Page 1 of 200    PageID 24813
Appendix Page 6 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 286 of
324

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves substantial risks, including, but not limited to, those summarized below. The Fund is not suitable for all investors and is intended for sophisticated investors who can accept the risks associated with their investments. Prospective investors should carefully consider the risk factors described in this section, among others, in determining whether an investment in the Fund is suitable for them. There can be no assurance that the Master Fund's program will be successful or that investments purchased by the Master Fund will increase in value. An investor must be prepared to bear capital losses that might result from an investment in the Fund, including a complete loss of the investor's invested capital. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

*For purposes of this section, references to the "Fund" should be understood to mean each of the Fund and the Master Fund, as applicable, and each of the risk factors set forth herein, while not exhaustive, shall apply equally to each of the Fund and the Master Fund, as applicable.*

**General Risks**

*Lack of Operating History.* The Fund, the Master Fund and the General Partner do not have operating histories upon which investors can evaluate the anticipated performance of the Fund. Although the principals of the Investment Manager have extensive prior experience in Latin America, past performance of the Investment Manager should not be construed as an indication of the future results of an investment in the Fund. The Master Fund's investment program should be evaluated on the basis that there can be no assurance that the Investment Manager's assessment of the short-term or long-term prospects of its investment strategy will prove accurate, or that the Master Fund will achieve its investment objectives.

*Risks Associated With Investments in Securities.* Any investment in securities carries market risks. An investment in the Fund is highly speculative and involves a high degree of risk due to the nature of the Master Fund's investments and the strategies to be employed. An investment in the Fund should not in itself be considered a balanced investment program, but rather is intended to provide diversification in a more complete investment portfolio.

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Master Fund, there is always some, and occasionally a significant, degree of market risk.

*Limited Liquidity; Additional Information.* An investment in the Fund provides limited liquidity since the Interests are not freely transferable and may only be withdrawn at such times as set forth in this Memorandum. The General Partner may suspend withdrawals, in whole or in part, when such a suspension is warranted by extraordinary circumstances described in "*Summary of Terms – Suspension of Withdrawals and Withdrawal Payments*" above. The General Partner may also delay the payment of withdrawal proceeds as more fully described elsewhere in this Memorandum. Investments that remain in the Fund are subject to all risks related to an investment in the Fund as described in this Memorandum.

Also, certain Limited Partners (including, without limitation, the Affiliated Investors), may invest on terms that provide access to information that is not generally available to other Limited Partners and,

Appx. 03578

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-6 Filed 08/12/24    Page 2 of 200    PageID 24814
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 287 of
324

as a result, may be able to act on such additional information (e.g., withdraw their Interests) that other Limited Partners do not receive. An investment in the Fund is suitable only for sophisticated investors who have no need for current liquidity.

*Effect of Substantial Withdrawals*. Substantial withdrawals from the Fund could require the Master Fund to liquidate its positions more rapidly than otherwise desired in order to raise the cash necessary to fund the withdrawals at the Fund level. Illiquidity in certain securities could make it difficult for the Master Fund to liquidate positions on favorable terms, which could result in losses or a decrease in the net asset value of the Master Fund, and thus, the Fund. The Master Fund is permitted to borrow cash necessary to make payments in connection with withdrawals from the Fund when the Investment Manager determines that it would not be advisable to liquidate portfolio assets for that purpose. The Master Fund is also authorized to pledge portfolio assets as collateral security for the repayment of such loans. In these circumstances, the continuing Limited Partners will bear the risk of any subsequent decline in the value of the Fund's assets.

*Effect of Withdrawal by Limited Partner on its Investment*. Where a withdrawal request is accepted, an Interest will be treated as having been withdrawn effective as of the relevant Withdrawal Date, irrespective of whether or not such withdrawing Limited Partner has been removed from the Fund's books and records or the withdrawal proceeds have been determined or remitted. Accordingly, on and from the relevant Withdrawal Date, Limited Partners in their capacity as such will not be entitled to or be capable of exercising any rights arising under the Partnership Agreement or Subscription Documents with respect to the Interest being withdrawn, save the right to receive the withdrawal proceeds. Such withdrawing Limited Partners will be creditors of the Fund with respect to the withdrawal proceeds. In an insolvent liquidation, withdrawing Limited Partners will rank behind ordinary creditors but ahead of existing Limited Partners.

*Master-Feeder Structure*. The Fund will invest all of its investable assets in the Master Fund. The "master-feeder" fund structure presents certain risks to the Limited Partners. Smaller feeder funds may be materially affected by the actions of larger feeder funds.

While the Investment Manager, as investment manager of the Master Fund, generally will not consider tax issues applicable to any particular investors, it generally will take into account the tax positions of the Fund and the Offshore Fund that invest in the Master Fund. However, the use of a "master-feeder" structure may create a conflict of interest in that different tax considerations for the Fund and the Offshore Fund may cause or result in the Master Fund structuring or disposing of an investment in a manner or at a time that is more advantageous (or disadvantageous) for tax purposes to one Feeder Fund or its investors.

*Management Fee and Performance Allocations*. As described above, the Master Fund Partnership Agreement provides for the payment of the Management Fee to the Investment Manager and the Performance Allocation to the Investment Manager, in its capacity as the Special Limited Partner. The Performance Allocation may create an incentive for the Investment Manager, as the Special Limited Partner, to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Side Letters*. The Investment Manager or the Fund may from time to time enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more Limited Partners which provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, the Management Fee, the Performance Allocation,

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 1-26   Filed 03/22/22   Page 3 of 200   PageID 24815
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 288 of
324

minimum investment amounts, voting rights and withdrawal rights) than such Limited Partner(s) have pursuant to this Memorandum. As a result of such Side Letters, certain Limited Partners may receive additional benefits (including, but not limited to, reduced fee obligations, the ability to withdraw Interests on shorter notice and/or expanded informational rights) which other Limited Partners will not receive. For example, a Side Letter may permit a Limited Partner to withdraw its Interest on less notice and/or at different times than other Limited Partners. As a result, should the Fund experience a decline in performance over a period of time, a Limited Partner who is party to a Side Letter that permits less notice and/or different withdrawal times may be able to withdraw its Interest prior to other Limited Partners. In general, the Fund and/or the Investment Manager will not be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund and/or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners. The Fund and/or the Investment Manager may cause the Fund to enter into such Side Letters with any party as the Fund and/or the Investment Manager may determine in its sole discretion at any time. The other Limited Partners will have no recourse against the Fund and/or the Investment Manager in the event certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters. A Limited Partner will be required to enter into such undertakings with respect to maintaining the confidentiality of any such additional information as the Fund and/or the Investment Manager may in their sole discretion determine.

*Valuation Considerations*. Valuation of the Master Fund's securities and other investments may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the net asset value of the Master Fund and the Fund could be adversely affected. Independent pricing information may not at times be available or otherwise utilized regarding certain of the Master Fund's securities and other investments. Valuation determinations will be made in good faith in accordance with the policies of the Investment Manager in effect from time to time, a copy of which will be made available upon request.

The Master Fund may have some of its assets in investments, which by their very nature may be extremely difficult to accurately value. To the extent that the value assigned by the Administrator to any such investment differs from the actual value, the net asset value of the Master Fund and the Fund may be understated or overstated, as the case may be. In light of the foregoing, there is a risk that a Limited Partner that withdraws all or part of its Interests while the Master Fund holds such investments will be paid an amount less than it would otherwise be paid if the actual value of such investments is higher than the value designated by the Administrator. Similarly, there is a risk that such Limited Partner might, in effect, be overpaid if the actual value of such investments is lower than the value designated by the Administrator. In addition, there is risk that an investment in the Fund by a new Limited Partner (or an additional investment by an existing Limited Partner) could dilute the value of such investments for the other Limited Partners if the designated value of such investments is higher than the value designated by the Administrator. Further, there is risk that a new Limited Partner (or an existing Limited Partner that makes an additional investment) could pay more than it might otherwise if the actual value of such investments is lower than the value designated by the Administrator. The Administrator does not intend to adjust the net asset value of the Master Fund and the Fund retroactively.

None of the Fund, the Master Fund, the General Partner, the Investment Manager or the Administrator shall have any liability in the event that any price or valuation, used in good faith in connection with the above procedures, proves to be an incorrect or an inaccurate estimate or determination of the price or value of any part of the property of the Master Fund, subject to the standard of care set forth in "*Summary of Terms – Duty of Care; Indemnification*" above.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 28-6 Filed 03/22/22    Page 4 of 200    PageID 24816
Appendix Page 362 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 289 of
324

*No Participation by Investors*.  All decisions with respect to the management of the day-to-day affairs of the Fund are made exclusively by the General Partner and the Investment Manager.  Limited Partners have no right or power to take part in the management of the Fund.  The Investment Manager makes all of the trading and investment decisions of the Master Fund.  In the event of the withdrawal of the Investment Manager, generally the Fund will be liquidated.

*Investment Strategies*.  The Investment Manager will seek to engage in the investment activities that have been discussed in "*Investment Program*" herein.  There can be no assurance that the Investment Manager will be successful in applying any such strategy and that losses will be avoided.

*Competition*.  The markets in which the Master Fund invests are competitive and some of the opportunities that the Investment Manager may explore may be pursued by better known investors or investment funds.  There can be no assurance that the Investment Manager will be able to identify or successfully pursue such opportunities in this environment.  The Investment Manager competes with many firms that may have greater financial resources, more extensive development, better marketing and service capabilities, more favorable financing arrangements, larger research staffs and more securities traders than are available to the Investment Manager.

*In-Kind Distributions*.  A withdrawing Limited Partner may, in the discretion of the General Partner and/or Investment Manager, receive securities owned by the Fund (through the Master Fund) in lieu of, or in combination with, cash.  The value of securities distributed may increase or decrease before the securities can be sold (either by the Limited Partner or by the Fund if the General Partner establishes a liquidating account on behalf of the Limited Partner to sell such assets), and the Limited Partner will incur transaction costs in connection with the sale of such securities.  Additionally, securities distributed with respect to a withdrawal by a Limited Partner may not be readily marketable.  The risk of loss and delay in liquidating these securities will be borne by the Limited Partner, with the result that such Limited Partner may receive less cash than it would have received on the date of withdrawal.

*No Current Income*.  Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current income.  Moreover, an investor is required to report and pay taxes on his allocable share of income from the Fund, even though no cash is distributed by the Fund.

*Cybersecurity*.  Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes.  Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Master Fund and/or the Fund may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Master Fund's and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors.  Such interruptions could harm the Investment Manager's, the Master Fund's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.  The foregoing risks and consequences are also extant at any issuer in which the Master Fund invests and could manifest as adverse performance of such investment.

Appx. 03581

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 166-6 Filed 01/09/24 Page 5 of 200   PageID 24817
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 290 of
324

**Investment Strategy and Investment Risks**

*Changes in Strategy.*  The Investment Manager has the power to expand, revise or alter its trading strategies on behalf of the Master Fund without prior approval by, or notice to, the Fund or the Limited Partners.  Any such change could result in exposure of the Fund's assets (through the Master Fund) to additional risks, which may be substantial.  The Investment Manager may also invest in additional instruments than those specifically identified in the "*Investment Program*" section.

*Latin America Investments*. The Master Fund invests in securities of companies based in Latin America or issued by Latin American governments, or in the securities of companies which are not incorporated in Latin America, but which derive some of their revenues from business activities conducted in Latin America.  Such investment involves certain considerations not usually associated with investing in securities of developed countries or of companies located in developed countries, including political and economic consideration, such as greater risks of expatriation, nationalization and general, political, and economic instability, the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and substantially greater price volatility, fluctuations in the rate of exchange between currencies, and costs associated with currency conversions, certain government policies that may restrict the Master Fund's investment opportunities and problems that may arise in connection with the clearance and settlements of trades.  In addition, accounting and financial reporting standards that prevail in such countries are not equivalent to standards in more developed countries, consequently, less information is available to investors in companies located in more developed countries.  There is also less regulation, generally, of the securities markets in Latin American countries than there is in more developed countries.

*Risks Related to Investing in Argentina*.  Argentina has experienced high interest rates, economic volatility, inflation, currency devaluations and high unemployment rates. The economy is heavily dependent on exports and commodities.  Argentina's default on its debt in 2001, and its past nationalization of private pensions and national oil company YPF, continues to impact the confidence of investors in Argentina, which might adversely impact returns in the Master Fund, and thus, the Fund.

*Argentina's Economy*.  Argentina's economy could grow at a lower rate than in past years, or could contract.  Factors that could negatively affect Argentina's rate of economic growth, its public finances and Argentina's ability to service its debt include: the competitiveness of Argentine exports, which are influenced by the peso's value relative to the value of the currencies of Argentina's trading partners and trade competitors; the level of inflation in Argentina; international commodities prices, foreign currency exchange rates and the levels of consumer consumption and foreign and domestic investment; negative economic developments in Argentina's major trading partners, or "contagion" effects more generally; and Argentina's ability to meet its energy requirements.

*Uncertainty of Economic Reforms*. A runoff election on November 22, 2015 resulted in Mr. Mauricio Macri being elected President of Argentina. The Macri administration assumed office on December 10, 2015. Since assuming office on December 10, 2015, the Macri administration has announced several significant economic and policy reforms, including methodological reforms with respect to the calculation of certain macroeconomic statistics, the loosening of foreign exchange controls, reduction of tariffs, other easing of international trade restrictions, infrastructure reforms and reopened negotiation with holders of debt in default since 2001. The impact that these measures and any future measures taken by the new administration will have on the Argentine economy as a whole and the financial sector in particular cannot be predicted. The Investment Manager believes that the effect of the planned liberalization of the economy and renewed access to capital markets will be positive for the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 175-6    Filed 01/25/24    Page 6 of 200    PageID 24818
Appendix Part 6    Page 6 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 291 of
324

Master Fund's intended investments by stimulating economic activity, but it is not possible to predict such effect with certainty and such liberalization could also be disruptive to the economy and fail to benefit or harm companies in Argentina. The Investment Manager cannot predict how the Macri administration will address certain other political and economic issues that were central during the 2015 presidential election campaign, such as the financing of public expenditures, public service subsidies and tax reforms, the resolution of holdout debt or the impact that any measures related to these issues that are implemented by the Macri administration will have on the Argentine economy as a whole.

*Currency Controls.* In the past, Argentina imposed exchange controls and transfer restrictions substantially limiting the ability of companies to retain foreign currency or make payments abroad. Although the Macri government lifted exchange controls and liberalized capital controls, there can be no assurances regarding future modifications to exchange and capital controls. Exchange and capital controls could adversely affect the financial condition or results of operations of issuers in whose securities the Master Fund intends to invest, as well as their ability to meet foreign currency obligations and to execute financing plans.

*Challenges to Argentina's Debt Payments.* Argentina's payments in connection with a debt offering may be attached, enjoined or otherwise challenged. In recent years, hold-out creditors have used litigation against sovereign debtors, most prominently Peru and Nicaragua, to attach or interrupt payments made by these sovereign debtors to, among others, bondholders who have agreed to a debt restructuring and accepted new securities in an exchange offer. Argentina has been subjected to suits to collect on amounts due on defaulted bonds, including actions in the United States, the United Kingdom, Italy and Germany. Some of these actions have resulted in judgments against Argentina. There can be no assurance that a creditor will not be able to interfere, through an attachment of assets, injunction, temporary restraining order or otherwise, with payments made in connection with a debt offering.

*Pro Rata Payment Litigation.* Argentina's defaults with respect to the payment of its foreign debt could prevent the government and the private sector from accessing the international capital markets, which could adversely affect the financial condition of sovereign and corporate issuers in which the Master Fund invests. In September 2014, the Argentine Congress passed a law to restructure foreign-law bonds held by exchange bondholders to allow the payment in Argentina and to appoint a new paying agent. On September 29, 2014, the U.S. District Court for the Southern District of New York held Argentina in contempt of court as a result of this law. The U.S. District Court authorized limited exceptions to the injunction allowing certain custodians of Argentine law-governed bonds to process payments in August 2014, September 2014 and December 2014.

On May 11, 2015, the plaintiffs that obtained pari passu injunctions asked the U.S. district court to amend their complaints to include claims alleging that Argentina's issuance and servicing of its 2024 dollar-denominated bonds, and its external indebtedness in general, would violate the pari passu clause. On June 5, 2015, the Second Circuit granted partial summary judgment to a group of 526 "me-too" plaintiffs in 36 separate lawsuits, finding that, consistent with the previous ruling of such court, Argentina violated a pari passu clause in bonds issued to the "me-too" bondholders. The decision obligates Argentina to pay the plaintiffs $5.4 billion before it can make payments on restructured debt.

In 2016, the Argentine government working under a court appointed mediator, entered into settlement agreements with a large portion of hold-out debt holders contingent on Argentina repealing laws that prevented the country from complying with rulings by U.S. courts. In this context Judge Thomas Griesa ruled he would lift the injunctions preventing Argentina from serving post-2005 exchange debt if these laws are repealed. Argentina's lower chamber approved the repeal of these laws

34

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 03/26/24    Page 7 of 200    PageID 24819
Appendix Part 6    Page 326 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 292 of
324

and Argentina's senate voted to approve the same in March 2016. In April 2016, the Second Circuit Court of Appeals in the United States upheld Judge Griesa's ruling, finding that he did not abuse his discretion in lifting the pari passu injunctions.

The repercussions of restructuring Argentina's bond debts are ongoing. The 2016 U.S. court rulings only settled claims of certain bondholders. Argentina reached a $475 million settlement with other bondholders in November 2016. Financial indices have only just started moving Argentina back to "emerging market" status, where it had been before 2009.

Argentina's default with respect to the payment of its foreign debt, its delay in completing the debt restructuring process with creditors that did not participate in the related exchange offers, the complaints filed against Argentina discussed above, the U.S. Supreme Court's decision not to hear Argentina's appeal, the declaration of contempt, and the long-term difficulty of reestablishing itself in the global marketplace could prevent Argentina's government from obtaining international private financing or receiving direct foreign investment, as well as private sector companies in Argentina from accessing the international capital markets. Without access to international private financing, Argentina may not be able to finance its obligations, and financing from multilateral financial institutions may be limited or not available. Without access to direct foreign investment, the government may not have sufficient financial resources to foster economic growth and the performance of the Master Fund's investments in Argentina could be materially and adversely affected.

*Derivative Instruments.* The Investment Manager may use various derivative instruments, including futures, options, forward contracts, swaps and other derivatives which may be volatile and speculative. Certain positions may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses. Use of derivative instruments presents various risks, including the following:

- *Tracking* – When used for hedging purposes, an imperfect or variable degree of correlation between price movements of the derivative instrument and the underlying investment sought to be hedged may prevent the Investment Manager from achieving the intended hedging effect or expose the portfolio to the risk of loss.

- *Liquidity* – Derivative instruments, especially when traded in large amounts, may not be liquid in all circumstances, so that in volatile markets the Investment Manager may not be able to close out a position without incurring a loss. In addition, daily limits on price fluctuations and speculative positions limits on exchanges on which the Investment Manager may conduct its transactions in certain derivative instruments may prevent prompt liquidation of positions, subjecting the portfolio to the potential of greater losses.

- *Leverage* – Trading in derivative instruments can result in large amounts of leverage. Thus, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Master Fund and could cause the Master Fund's net asset value to be subject to wider fluctuations than would be the case if the Investment Manager did not use the leverage feature in derivative instruments.

- *Over-the-Counter-Trading* – Derivative instruments that may be purchased or sold for the portfolio may include instruments not traded on an exchange. Over-the-counter options, unlike exchanged-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller. The risk of non-performance by the obligor on such an instrument may be

35

**Appx. 03584**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 16-6   Filed 08/27/24   Page 8 of 200   PageID 24820
Appendix Part 6 Page 327 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 293 of
324

greater and the ease with which the Investment Manager can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

*Short Sales.* Short sales by the Master Fund that are not made "against the box" create opportunities to increase the Master Fund's return but, at the same time, involve special risk considerations and may be considered a speculative technique. Since the Master Fund, in effect, profits from a decline in the price of the securities sold short without the need to invest the full purchase price of the securities on the date of the short sale, the value of the Master Fund will tend to increase more when the securities it has sold short decrease in value, and to decrease more when the securities it has sold short increase in value, than otherwise would be the case if it had not engaged in such short sales. Short sales theoretically involve unlimited loss potential, as the market price of securities sold short may increase continuously, although the Master Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions the Master Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales may be used with the intent of hedging against the risk of declines in the market value of the Master Fund's long portfolio, but there can be no assurance that such hedging operations will be successful.

*Risks of Execution of Investment Strategies.* The Master Fund will invest in a number of securities and obligations that entail substantial inherent risks. Although the Master Fund will attempt to manage those risks through careful research, ongoing monitoring of investments and appropriate hedging techniques, there can be no assurance that the securities and other instruments purchased by the Master Fund will in fact increase in value or that the Master Fund will not incur significant losses.

*Market Risks and Liquidity.* The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Master Fund will be able to predict accurately these price movements. Although the Master Fund may attempt to mitigate market risk through the use of long and short positions or other methods, there is always some, and occasionally a significant, degree of market risk.

Furthermore, the Master Fund may be adversely affected by a decrease in market liquidity for the instruments in which they invest, which may impair the Master Fund's ability to adjust their position. The size of the Master Fund's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in overall market leverage, deleveraging as a consequence of a decision by a broker to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Master Fund's portfolio. Some of the underlying investments of the Master Fund may not be actively traded and there may be uncertainties involved in the valuation of such investments. Potential investors should be warned that under such circumstances, the net asset value of the Master Fund may be adversely affected.

*Hedging.* Although the Master Fund will attempt to hedge its exposure to specific arbitrage positions, it will not always be possible fully to hedge risk from such positions or any other position. In

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 6-20 Filed 06/13/22   Page 9 of 200   PageID 24821
Appendix Page 8282 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 294 of
324

addition, the Master Fund may take positions based on the expected future direction of the markets without fully hedging the market risks.

*Currency Risks*.  A portion of the Master Fund's assets may be invested in securities denominated in various currencies and in other financial instruments, the price of which is determined with reference to such currencies.  The account of the Master Fund will, however, be valued in U.S. Dollars.  To the extent unhedged, the value of the net assets of the Master Fund will fluctuate with U.S. Dollars exchange rates as well as with price changes of their investments in the various local markets and currencies.  Forward currency contracts and options may be utilized by the Master Fund to hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

*Counterparty and Settlement Risk*.  Due to the nature of some of the investments which the Master Fund may make, the Master Fund may rely on the ability of the counterparty to a transaction to perform its obligations.  In the event that any such party fails to complete its obligations for any reason, the Master Fund may suffer losses.  The Master Fund will therefore be exposed to a credit risk on the counterparties with which it trades.  The Master Fund will also bear the risk of settlement default by clearing houses and exchanges.  Any default by a counterparty or on settlement could have a material adverse effect on the Master Fund.

*Borrowing*.  The Master Fund is permitted to finance its operations with secured and unsecured borrowing up to 100% of its net assets, to the extent allowable under applicable credit regulations.  Like other forms of leverage, the use of borrowing can enhance the risk of capital loss in the event of adverse changes in the level of market prices of the assets being financed with the borrowings.

*Concentration of Investments*.  Although the Investment Manager will follow a general policy of seeking to spread the Master Fund's capital among a number of investments, the Investment Manager may depart from such policy from time to time and may hold a few, relatively large securities positions in relation to the Master Fund's capital.  The result of such concentration of investments is that a loss in any such position could materially reduce the Master Fund's capital.

*Difficult Market for Investment Opportunities*.  The activity of identifying, completing and realizing on attractive investments involves a high degree of uncertainty.  There can be no assurance that the Master Fund will be able to locate and complete investments which satisfy the Master Fund's rate of return objective or realize upon their values or that the Master Fund will be able to invest fully its subscribed capital in a manner consistent with its investment strategy.

**Certain Regulatory Risks**

*Absence of Regulatory Oversight*.  While the Fund may be considered similar to an investment company, it is not required and does not intend to register as such under the Investment Company Act of 1940, as amended (the "***Investment Company Act***"), and, accordingly, the provisions of the Investment Company Act (which may provide certain regulatory safeguards to investors) are not applicable to investors in the Fund.  Neither the Fund nor the Master Fund will maintain custody of its securities or place its securities in the custody of a bank or a member of a national securities exchange in the manner required of registered investment companies under rules promulgated by the Securities and Exchange Commission (the "***SEC***").  A registered investment company which places its securities in the custody of a member of a national securities exchange is required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment

Appx. 03586

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 03/24/22    Page 10 of 200    PageID 24822
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 295 of
324

company, and which contains other provisions complying with SEC regulations. The Master Fund generally will maintain such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies. Under the provisions of the Securities Investor Protection Act of 1970, as amended, the bankruptcy of any such brokerage firm might have a greater adverse effect on the Master Fund and the Fund than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

*Forward-Looking Statements*. Certain statements contained in this Memorandum, including without limitation, statements containing the words "believes," "anticipates," "intends," "expects," and words of similar import constitute "forward-looking statements." Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the Fund to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. Certain of these factors are discussed in more detail elsewhere in this Memorandum, including without limitation under "*Summary of Terms*," "*Certain Risk Factors*," and "*Investment Program*." Given these uncertainties, prospective investors are cautioned not to place undue reliance on such forward-looking statements. The Investment Manager and the Fund disclaim any obligation to update any such factors or to announce the result of any revisions to any of the forward-looking statements contained herein to reflect future events or developments.

*Impact of U.S. Presidential Election*. On January 20, 2017, Donald Trump became President of the United States of America. President Trump and other members of the Republican Party have proposed to reverse some of the recent regulation of the financial industry and to change tax policy. If some of these proposals were enacted, banks could dramatically increase their lending practices and accept additional types of collateral, borrowers could reduce their demand for debt financing, certain investment advisers could de-register with SEC and portfolio companies that are net importers or hold significant assets outside of the United States could be subject to increased tax liability. The effect of any such regulatory or tax changes on the Master Fund and the markets in which it trades and invests is uncertain.

*Evolving Regulatory Risks of Private Investment Funds*. The regulatory environment for private investment funds is evolving, and changes in the regulation of private investment funds and their advisers may adversely affect the value of investments held by the Master Fund.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**"), which was enacted in July 2010, regulates markets, market participants and financial instruments that were historically unregulated and has substantially altered the regulation of many other markets, market participants and financial instruments. Certain provisions of Dodd-Frank subject registered investment advisers to requirements to keep records and to report information to the SEC, which could in turn be supplied to the Board of Governors of the Federal Reserve, a new Financial Services Oversight Council or other U.S. governmental agencies or Congress. Under Dodd-Frank, the information includes, among other things, the amount of assets under management, use of leverage (including off-balance sheet leverage), counterparty credit risk exposures, trading and investment positions, and trading practices. All such records are subject to examination by the SEC at any time. It is anticipated that there may be significant changes to the financial regulatory environment as a result of the outcome of the recent U.S. elections. There is currently pending legislation in U.S. Congress which if enacted would result in the repeal of portions of Dodd-Frank which in turn would have a significant impact on the regulatory environment for private investment funds. In addition, the impact of the legislation on current and future rulemaking by various regulators under Dodd-Frank is difficult to predict. It is possible that rules that

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Appendix Part 6    Filed 03/04/22    Page 11 of 200    PageID 24823
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 296 of 324

have been proposed by various regulators, which had been anticipated to take effect previously, may no longer be implemented in their proposed form or at all.  Further, there may also be substantial changes in the enforcement and interpretation of existing statutes and rules by governmental regulatory authorities or self-regulatory organizations that supervise the financial markets.  The effect of future regulatory change on the Fund and the Master Fund and their operations is uncertain. Prospective investors should seek, and must rely on, the advice of their own advisers with respect to the possible impact on its investment of any future proposed legislation or administrative or judicial action.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment*.  The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain.  Statutory provisions and administrative regulations have been interpreted inconsistently by the courts.  Additionally, some statutory provisions remain to be interpreted by administrative regulations.  Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund.  Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.  Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA and Other Regulatory Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests and to consult their own independent tax advisors.

*Risk of Adverse Determination*.  There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the U.S. Internal Revenue Service (the "***Service***") or other applicable taxing authority, or significantly modified by new legislation, changes in the Service's positions or court decisions.  The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum.  No representation or warranty of any kind is made by the General Partner with respect to the tax consequences relating to an investment in the Fund.  The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts.  Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit*.  An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund.  If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment.  The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund.  The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Entity-Level Audits*.  Pursuant to the Bipartisan Budget Act of 2015, for taxable years beginning after December 31, 2017, the Service generally will be permitted to determine adjustments to items of income, gain, deduction, loss or credit of the Fund, and assess and collect taxes attributable thereto (including any applicable penalties and interest), at the Fund level.  If this new regime applies to the Fund (which depends, among other things, on whether the Fund has more than 100 partners or has any partner that is itself classified as a partnership for U.S. federal income tax purposes), then any person

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 03/27/24   Page 12 of 200   PageID 24824
Appendix Part 6   Page 332 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 297 of
324

who is a partner of the Fund in the relevant year of the adjustment may indirectly bear the economic burden of any such taxes assessed or collected (initially determined at the highest rate of tax applicable to an individual or corporation in effect for the reviewed year), regardless of whether such person was a Limited Partner during any reviewed year.  It is expected that guidance will be issued that permits the Fund to reduce the underpayment of taxes owed by the Fund, including to the extent that the Fund demonstrates such taxes are allocable to a Limited Partner that would not owe any tax by reason of its status as a "tax-exempt entity" or the character of income is subject to a lower rate of tax.  The Fund may under certain circumstances have the ability to avoid such entity-level tax assessment or collection by electing to issue a statement to each partner of any reviewed year with its share of such adjustment, resulting in such partner being required to take into account any such adjustment for the taxable year which includes the date such statement was furnished.  In such case, the partners of the reviewed year would also incur a two-percentage point increase on the interest rate that would otherwise have been imposed on any underpayment of taxes.  There can be no assurances, however, that the Fund will avoid, or be able to avoid, any entity-level determination, assessment or collection.  Limited Partners should note that there is substantial uncertainty regarding the implementation of these rules and the impact on any current or future allocations made or cash available for distributions or withdrawals by the Fund. The Fund may also be exposed to the risk that these rules apply to any lower-tier entity in which the Fund directly or indirectly invests and that is treated as a partnership for U.S. federal income tax purposes.  If this new legislation applies to the Fund, the Fund will designate a tax representative, which is expected to be the General Partner, the Investment Manager, or an affiliate thereof, who shall have the sole authority to act on behalf of the Fund with respect to dealings with the Service under these new procedures.  Prospective Limited Partners should consult their own tax advisors regarding this new legislation.

*Tax Considerations Taken into Account*.  The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Foreign Taxation*.  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, and imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.  The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Tax Liabilities Without Distributions*.  If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its allocable share of the Fund's profits, whether or not such profits have been distributed.  Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities.  In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund.  Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter.  In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter.  Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 03/24/23    Page 13 of 200    PageID 24825
Appendix Part 6    Page 332 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 298 of
324

*Delayed Schedules K-1*.  The Fund will provide Schedules K-1 as soon as practicable after receipt of all of the necessary information.  However, the Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year.  The General Partner will endeavor to provide Limited Partners with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but final Schedules K-1 may not be available until completion of the Fund's annual audit.  Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income*.  The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("***UBTI***") under Sections 512 and 514 of the U.S. Internal Revenue Code of 1986, as amended (the "***Code***").  Thus, an investment in the Fund may be less desirable for certain tax-exempt investors.  For example, the Fund may incur leverage giving rise to UBTI or may participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes.  Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI.  Because of the General Partner's objective of maximizing the pre-tax returns of all the Limited Partners, the General Partner may be required to make certain decisions to maximize pre-tax returns that result in tax-exempt investors recognizing more UBTI than might otherwise be the case.  In some cases, the General Partner may forgo actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes*.  Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund.  Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund.  Certain provisions of the Code may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected.  In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government.  The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain.  The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners.  Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund.  In addition, as the investment program of the Fund develops and changes over time, an investment in the Fund may be subject to additional and different risk factors.  No assurance can be made that profits will be achieved or that substantial losses will not be incurred.*

*In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.*

**Potential Conflicts of Interest**

Given the nature and size of Highland Capital Management, L.P.'s ("***Highland Capital***") operations, various potential conflicts of interest arise in connection with its advisory services and the

Appx. 03590

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-21    Filed 03/24/22    Page 14 of 200    PageID 24826
Appendix Part 6    Page 333 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 299 of
324

advisory services provided by its affiliates. Information about Highland Capital and its potential conflicts of interest is provided in Highland Capital's Form ADV Part 2 Brochure that can be found by going to https://adviserinfo.sec.gov/IAPD/Default.aspx, searching by firm name and selecting the Part 2 Brochure to be viewed. The Fund is subject to these conflicts of interest, as well as the other items discussed below.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "***Highland Group***") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. The Investment Manager is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Master Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "***CDOs***") and other vehicles managed by members of the Highland Group ("***Highland Accounts***") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund and the Master Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Master Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and the Master Fund and the Master Fund's portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Master Fund and, therefore, may compete with the Master Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Master Fund; and (viii) the Investment Manager will devote to the Master Fund and the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Master Fund's and the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 03/24/ of 83    Page 15 of 200    PageID 24827
Appendix Part 6 Page 334 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 300 of
324

account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Manager will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the Investment Advisers Act of 1940, as amended. The Investment Manager will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy, a copy of which will be provided upon request. However, there is no assurance that such investment opportunities will be allocated to the Master Fund fairly or equitably in the short-term or over time and there can be no assurance that the Master Fund will be able to participate in all investment opportunities that are suitable for it

The Investment Manager may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Investment Manager, the Master Fund and other accounts managed by the Investment Manager are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Cross Transactions and Principal Transactions*

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Master Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Master Fund any time that the Investment Manager believes such transaction to be fair to the Master Fund and such other client. By subscribing for an Interest, a Limited Partner is deemed to have consented to such client cross-transactions between the Master Fund and another client of the Investment Manager or one of its affiliates.

The Investment Manager may direct the Master Fund to acquire or dispose of securities in cross trades between the Master Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Master Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Master Fund may enhance the profitability of the Investment Manager's own investments in such companies. Moreover, the Master Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Master Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or

43

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-5 Part 6 Page 335 of 867 Page 16 of 200    PageID 24828
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 301 of
324

such affiliates. In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Master Fund and for the other party to the transaction, to the extent permitted under applicable law.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of interests in the Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

*Conflicts Relating to Equity and Debt Ownership by the Master Fund and Affiliates*

In certain circumstances, the Master Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Master Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Master Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Manager to reconcile the conflicting interests in the Master Fund and such other accounts in a way that protects the Master Fund's interests. Additionally, the Investment Manager or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Manager in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Manager's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Affiliated Entity Services*

Affiliated entities of the Investment Manager may provide services with respect to the Investment Manager, the Master Fund or the Fund. NexBank, SSB ("***NexBank SSB***") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund, the Master Fund and other vehicles in which the Fund (through the Master Fund) may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc., NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America Consulting, Ltd., an affiliate of the Investment Manager, has been engaged to provide certain

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part 6 Page 336 of 867 Page 17 of 200    PageID 24829
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 302 of
324

administrative and consulting services to the Investment Manager, as more fully described below in "*Management –Services Agreement*."

*Management Fee*

A portion of any Management Fee may be paid to broker-dealers, placement agents or independent third parties, other than the Investment Manager, for services provided in connection with the solicitation of subscriptions from investors. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions. Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

*Diverse Membership*

The Limited Partners are expected to include entities, persons, or entities organized in various jurisdictions and subject to different tax and regulatory regimes. Such diverse investors may thus have conflicting investment, tax and other interests, relating to, among other things, the nature of investments made by the Master Fund, the structuring or the acquisition of investments and the timing of disposition of investments. As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager including as to the nature and structure of investments that may be more beneficial for one type of Limited Partner than for another type of Limited Partner, including Limited Partners affiliated with the Investment Manager. The results of the Fund's activities may affect individual Limited Partners differently, depending upon their individual financial and tax situations because, for instance, of the timing of an event of realization of gain or loss and its characterization as long-term or short-term gain or loss. In addition, the Master Fund may make investments that may have a negative impact on related investments made by the Limited Partners in separate transactions. In selecting, structuring and managing investments appropriate for the Master Fund, the Investment Manager will consider the investment and tax objectives of the Master Fund and the Feeder Funds as a whole, not the investment, tax, or other objectives of any Limited Partner individually. However, there can be no assurance that a result will not be more advantageous to some Limited Partners than to others or to the Investment Manager and/or its affiliates than to a particular Limited Partner.

*Soft Dollars*

The Investment Manager's authority to use "soft dollar" credits generated by the Master Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Manager or the General Partner may give the Investment Manager an incentive to select brokers or dealers for Master Fund transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Manager rather than giving exclusive consideration to the interests in the Master Fund. See "*Brokerage and Custody*."

*No Separate Counsel*

Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") serves as counsel to the Fund, the Master Fund, the Investment Manager, the General Partner and certain of their Affiliates (the "***Clients***") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Page 6-4 of 867    Page 18 of 200    PageID 24830
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 303 of
324

law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests. No independent counsel has been retained to represent the Limited Partners. In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the Principal's biographical data, summaries of market conditions, the planned investment strategy of the Master Fund and the performance of the Master Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Offshore Fund, the Master Fund and the General Partner. In connection with the offering of interests and subsequent advice to the Offshore Fund, the Master Fund and the General Partner, Maples and Calder will not be representing shareholders and/or limited partners. No independent legal counsel has been retained to represent the shareholders and/or limited partners. Maples and Calder's representation of the General Partner is limited to specific matters as to which it has been consulted by the General Partner. There may exist other matters that could have a bearing on the Master Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the General Partner and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the General Partner, there are times when the interests of the shareholders/limited partners may differ from those of the Offshore Fund, Master Fund and/or the General Partner. Maples and Calder does not represent the shareholders and/or limited partners' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the General Partner and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Offshore Fund, Master Fund and/or the General Partner.

*Non-Public Information*

From time to time, the Investment Manager may come into possession of non-public information concerning specific companies although internal structures are in place to prevent the receipt of such information. Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies. The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*The foregoing list of risk factors and potential conflicts of interest do not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund. Prospective investors should read this entire Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.*

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 03/22/24    Page 19 of 200    PageID 24831
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 304 of
324

# BROKERAGE AND CUSTODY

**Brokerage Arrangements**

The Investment Manager will be responsible for the placement of the portfolio transactions of the Master Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion. The Investment Manager is not required to weigh any of these factors equally.

Substantially all of the Master Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at Société Générale and BNP Paribas Prime Brokerage, Inc. or other prime brokers or custodians selected by the Investment Manager. Instruments not constituting marketable securities generally are recorded through book entry by the borrower or by an agent for the borrower or the creditors. Documentary evidence of the acquisition, ownership and disposition of these assets typically will be held by the Administrator.

Société Générale and BNP Paribas Prime Brokerage, Inc. and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

Accordingly, if the Investment Manager concludes that the commissions charged by a broker or the spreads applied by a dealer are reasonable in relation to the quality of services rendered by such broker or dealer (including, without limitation, the value of the brokerage and research products or services provided by such broker or dealer), the Master Fund may pay commissions to, or be subject to spreads applied by, such broker-dealer in an amount greater than the amount another broker-dealer might charge or apply.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund, the Master Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager. However, the Investment Manager does not

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-21    Filed 03/32/24    Page 20 of 200    PageID 24832
Appendix Part 6 Page 332 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 305 of
324

believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Master Fund.

Research-related goods and services provided by brokers and dealers through which portfolio transactions for the Master Fund are executed, settled and cleared may include research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities, certain research services, and other goods and services providing lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities on behalf of the Master Fund and related accounts (collectively, "*soft dollar items*").

Soft dollar items may be provided directly by brokers and dealers, by third parties at the direction of brokers and dealers or purchased on behalf of the Master Fund with credits or rebates provided by brokers and dealers. Soft dollar items may arise from over-the-counter principal transactions, as well as exchange traded agency transactions. Brokers and dealers sometimes suggest a level of business they would like to receive in return for the various services they provide. Actual business received by any broker or dealer may be less than the suggested allocations, but can (and often does) exceed the suggestions, because total transaction volume is allocated on the basis of all the considerations described above. A broker or dealer will not be excluded from executing transactions for the Master Fund because it has not been identified as providing soft dollar items.

The use of commissions or "soft dollars" if any, generated by the Master Fund through agency and certain riskless principal transactions to pay for research and research-related products or services, if any, will fall within the safe harbor created by Section 28(e) of the Securities Exchange Act of 1934, as amended. Under Section 28(e), research products or services obtained with soft dollars generated by the Master Fund may be used by the Investment Manager to service accounts other than the Master Fund. Soft dollars generated in respect of futures, currency and derivatives transactions and principal transactions (that are not riskless principal transactions) do not generally fall within the safe harbor created by Section 28(e) and will be utilized only with respect to research-related products and services for the benefit of the account generating such soft dollars.

Research and brokerage products and services may be used by the Investment Manager in servicing some or all of the Investment Manager's clients. In addition, some research and brokerage may not be used by the Investment Manager in servicing the clients whose commission dollars provided for the research or brokerage. Clients may not, in any particular instance, be the direct or indirect beneficiaries of the research or brokerage provided. Certain clients, who are the beneficiaries of research or brokerage, may have an investment style which results in the generation of a small amount of brokerage commissions due to a lack of active trading for their accounts. As a result, clients who generate sizeable commissions subsidize research or brokerage provided to clients whose accounts generate minimal brokerage commissions since the commission dollars generated by transactions for such clients are not sufficient to pay for research or brokerage that may be received by such clients from other brokers.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients. The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 03/04/24    Page 21 of 200    PageID 24833
Appendix Part 6    Page 340 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 306 of
324

supplemental to the Investment Manager's own research efforts.  While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products.  As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate.  In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes.  In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes.  The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Master Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources.  The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients, including the Master Fund.

**Custody**

The majority of the Master Fund's securities are held in the custody of its prime brokers.  The Master Fund is eligible for insurance coverage against loss with respect to assets held in the custody of the prime brokers in the event of the bankruptcy or liquidation of either of the prime brokers to the same extent as that broker's other customers.  The Master Fund's and the Fund's cash may be held at banks as well as the prime brokers.  Ownership interests which are not represented by certificates generally will be recorded through book-entry systems maintained by the issuer or its agent, and the underlying documentation relating to the acquisition and disposition of these assets for the account of the Master Fund will be held at the business offices of the Investment Manager.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2   Filed 09/14/23   Page 22 of 200    PageID 24834
Appendix Part 6   Page 294 of 367
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 307 of
324

# TAX CONSIDERATIONS

**Introduction**

The following is a summary of certain aspects of the U.S. federal income taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest that should be considered by a prospective Limited Partner. The Fund has not sought a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting Limited Partners or the Fund, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the U.S. Treasury regulations promulgated under the Code (the "***Treasury Regulations***"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect). Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund. This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code Section 1221.

Further, this summary does not address the tax considerations relevant to an investment in the Fund by a person that is not a "United States person" as defined in Section 7701(a)(30) of the Code because this summary assumes that all such persons will invest in the Offshore Fund.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the Fund. Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or foreign tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors. This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("***AMT***") to the Limited Partners. There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

**THE TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND ARE PARTICULARLY COMPLEX. ACCORDINGLY, PROSPECTIVE INVESTORS SHOULD NOT CONSIDER THIS DISCUSSION AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. PROSPECTIVE INVESTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS, ATTORNEYS OR ACCOUNTANTS ON MATTERS RELATING TO AN INVESTMENT IN THE FUND WITH SPECIAL REFERENCE TO SUCH INVESTOR'S PARTICULAR SITUATION.**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Part 6 Appendix Page 304 of 887Page 23 of 200    PageID 24835
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 308 of
324

**Certain United States Taxation Matters**

<u>U.S. Entity Classification of the Fund</u>

The General Partner believes that, under the provisions of the Code and the Treasury Regulations as currently in effect, each of the Fund and the Master Fund should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). The General Partner believes that the Fund may qualify for an exemption from the publicly traded partnership rules, although there is no assurance that the Fund will so qualify.

The remainder of this discussion assumes that the Fund and the Master Fund will each be treated as a partnership for U.S. federal income tax purposes and not as a publicly-traded partnership treated as an association that is taxable as a corporation. Unless the context requires otherwise, references to the Fund in the following discussion include the Master Fund.

<u>Taxation of the Master Fund</u>

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Master Fund or the limited partners of the Master Fund. Interest, dividends and gains payable to the Master Fund and all distributions by the Master Fund to its limited partners will be received free of any Cayman Islands income or withholding taxes. The Master Fund has registered as an exempted limited partnership under Cayman Islands law and the Master Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Master Fund or to any partner thereof in respect of the operations or assets of the Master Fund or the interest of a partner therein; and may further provide that any such taxes or any tax in the nature of estate duty or inheritance tax shall not be payable in respect of the obligations of the Master Fund or the interests of the partners therein. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Master Fund.

<u>U.S. Federal Income Taxation of the Fund and Partners Generally</u>

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner otherwise subject to tax will be required to report separately on its U.S. federal income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's

Appx. 03600

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 04/24/24    Page 24 of 200    PageID 24836
Appendix Part 6 Page 309 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 309 of
324

taxable income and gain regardless of whether it has received or will receive a distribution from the Fund. Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. Under current law, an audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. For tax years beginning before January 1, 2018 (and absent an election by the Fund to apply the new partnership tax audit rules described in more detail below), the administrative proceeding is managed by the "*Tax Matters Partner*." For tax years beginning on or after January 1, 2018 (or in the case of an election by the Fund to apply the new partnership tax audit rules), the Fund will be required to appoint one person as the "*Partnership Representative*" to act on its behalf in connection with an audit by the Service and related proceedings. Pursuant to the Partnership Agreement, the General Partner or its delegate will be designated as the Tax Matters Partner and/or the Partnership Representative. The Partnership Representative's actions, including the Partnership Representative's agreement to adjustments of the Fund's income in settlement of an audit by the Service of the Fund, will bind all Limited Partners, and opt-out rights available to certain Limited Partners in connection with certain actions of the Tax Matters Partner under the current partnership tax audit rules for tax years beginning before January 1, 2018 will no longer be available.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority. All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs either positively or negatively from its U.S. federal income tax basis in its Interest. There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation. If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The Fund expects to act as a trader or an investor, and not as a dealer, with respect to its securities transactions. Generally, the gains and losses realized by a trader or an investor on the sale of securities are capital gains and losses. Thus, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses. These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction. An investment held for more than one year generally will be eligible for long-term capital gain or loss treatment. The Fund may also realize income from dividends, which will generally be taxed at either ordinary income rates or, if they are eligible for treatment as "qualified dividend income," at applicable long-term capital gains rates.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Filed 03/24/ of 887age 25 of 200    PageID 24837
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 310 of
324

Dividends from Argentine corporations are generally expected to be treated as "qualified dividend income" only to the extent that the stock for which the dividend is paid is readily tradable on an established securities market in the United States. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals with "modified adjusted gross income" that exceeds certain thresholds (e.g., $250,000 for married individuals filing jointly and $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of: (i) their investment income, net of deductions properly allocable to such income, and (ii) the excess of their "modified adjusted gross income" above the applicable threshold. It is expected that most or all of the Fund's income will be treated as investment income for this purpose, and as a result Limited Partners receiving allocations of income from the Fund for these taxable years may be subject to this tax. This tax will be in addition to any U.S. federal income tax imposed on Limited Partners with respect to their allocable share of income of the Fund. Trusts and estates also may be subject to this additional tax. Prospective investors should consult their own tax advisors regarding the application of this Medicare tax to their investment in the Fund.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments. Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund. For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands. Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains. These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year. Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

Special "mark to market" rules apply to the Fund's investment in "Section 1256 Contracts." Section 1256 Contracts include certain regulated futures contracts, certain foreign currency forward contracts and certain options contracts. Capital gains and losses from qualifying Section 1256 Contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof.

The Fund may derive ordinary interest income and dividends on securities, and may be required to recognize income in respect of certain securities prior to receipt of any payment in respect of such securities. For instance, the Fund may hold debt obligations with "original issue discount." In such case, the Fund will be required to include a portion of such discount in its taxable income on a current basis, and allocate such income to the Limited Partners, even though receipt of such amounts by the Fund may occur in a subsequent tax year. The Fund also may acquire debt obligations with "market discount." Upon disposition of such an obligation, which might include the receipt of securities of the issuer in a recapitalization exchange, the Fund generally will be required to treat any gain realized (and required to be recognized) as ordinary interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund. Recapitalization exchanges involving

Appx. 03602

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-2 Page 26 of 200    PageID 24838
Appendix Part 6 Page 315 of 863
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 311 of
324

securities held by the Fund also may result in the recognition of taxable gains prior to the receipt of cash or readily tradable property.

If the Fund is treated as a trader, it may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities as if the securities were sold for fair market value at the close of any taxable year of the Fund. The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market. The election would apply with respect to securities held in connection with the Fund's trade or business as a trader in securities. The election would not apply to any securities with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment. In the event that the Fund makes such an election, the Fund's gains and losses from marking securities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses. The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the securities to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when a security is sold or when an interest payment is made on a security. These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment. Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative. In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments. In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260. The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners. However, there can be no assurance that the Service or a court would agree with the Fund's position. Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (*e.g.*, the "Subpart F" and "passive foreign investment company" provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred, (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain, or (iv) become subject to certain reporting requirements with respect to such investments. There can be no assurance that the General Partner or the Fund will mitigate, or be able to mitigate, the application of these provisions, or provide certain information with respect to such foreign corporations or such filing requirements. Potential investors are advised to consult with their own tax

Appx. 03603

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 21-2    Filed 09/04/24    Page 27 of 200    PageID 24839
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 312 of
324

advisors with respect to the application of these "anti-deferral provisions" in their particular circumstances.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests. Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets. Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

<u>Taxation of Distributions and Withdrawals</u>

Cash nonliquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis in its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Partner's holding

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 03/24/23    Page 28 of 200    PageID 24840
Appendix Part 6 Page 34 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 313 of
324

period (or holding periods) for its Interest. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Partner would recognize ordinary income.

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables). However, a distribution of marketable securities will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c). Although the General Partner cannot provide any assurances of whether the Fund is an "investment partnership" for these purposes, the General Partner anticipates that the Fund should qualify as an "investment partnership." Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Fund consisted of cash, a distribution of marketable securities to such Limited Partner should not require the recognition of gain by such Limited Partner.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing more or less taxable income, which may include short-term gain, in the Partner's last taxable year in the Fund, thereby reducing, or increasing, as applicable, the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal. In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners. Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code Section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

<u>Limitations on Losses, Deductions and Credits</u>

Limited Partners who are individuals or which are certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund. For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund, such as the Management Fee) would be deductible only as itemized deductions, subject to the limitations of Sections 67 and 68 of the Code. In this regard, if all or a portion of the Performance Allocation to the Special Limited Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/24/23    Page 29 of 200    PageID 24841
Appendix Part 6 Page 394 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 314 of
324

such expense could be subject to such limitations. Itemized deductions are non-deductible in computing such Limited Partner's AMT income and AMT liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Section 469 of the Code. Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity losses from other activities are restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

For each taxable year, Section 1277 of the Code limits the deduction of the portion of any interest expense on indebtedness incurred by a taxpayer to purchase or carry a security with market discount which exceeds the amount of interest (including original issue discount) includible in the taxpayer's gross income for such taxable year with respect to such security ("***Net Interest Expense***"). Net Interest Expense in any taxable year is deductible only to the extent it exceeds the amount of market discount which accrued on the security during the taxable year or portion of the taxable year during which the taxpayer held the security. Net Interest Expense that is non-deductible under the rules described above is carried forward and deducted in the year in which the taxpayer disposes of the security. Alternatively, at the taxpayer's election, such Net Interest Expense can be carried forward and deducted in a year prior to the disposition of the security, if any, in which the taxpayer has net interest income from the security.

Section 1277 would apply to a Limited Partner's share of the Fund's Net Interest Expense attributable to a security held by the Fund (through the Master Fund) with market discount. In such case, a Limited Partner would be denied a current deduction for all or part of that portion of its distributive share of the Fund's ordinary losses attributable to such Net Interest Expense and such losses would be carried forward to future years, in each case as described above. Although no guidance has been issued regarding the election to deduct previously disallowed Net Interest Expense prior to the year of disposition of the bond, it appears that the election would be made by the Fund rather than by the Limited Partner. Section 1277 would also apply to the portion of interest paid by a Limited Partner on money borrowed to finance its investment in the Fund to the extent such interest was allocable to securities held by the Fund (through the Master Fund) with market discount.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income", consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it has sufficient investment income from all sources, including the Fund. Any amount not deductible as a result of the applicability of Section 163(d) may be carried forward to future years, subject to certain limitations.

Limited Partners may be entitled to a foreign tax credit with respect to creditable foreign taxes paid on the income and gains of the Fund. There are complex rules contained in the Code that may,

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 03/21/24    Page 30 of 200    PageID 24842
Appendix Part 6 Page 342 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 315 of
324

depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. For example, a Limited Partner's share of gain realized by the Fund will generally be treated as U.S. source income. Consequently, a Limited Partner may not be able to use the foreign tax credit relating to foreign taxes, if any, imposed on such gains unless such credit can be applied against the U.S. tax due on other income derived from foreign sources. Limited Partners should contact their own tax advisors with respect to the availability of any foreign tax credits.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, non-corporate Limited Partners should consult their tax advisors with respect to the application of these limitations.

The Fund may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but generally may, by election of the Fund, be capitalized and amortized for U.S. federal income tax purposes over a period of not less than 180 months. Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

<u>Tax Consequences for Tax-Exempt U.S. Investors</u>

A Limited Partner that is an organization exempt from tax under Code section 501(a) (a "***Tax-Exempt U.S. Investor***") will be subject to tax on its allocable share of the Fund's income that is considered to be "unrelated business taxable income" ("***UBTI***") as defined in Code section 512, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. The Fund may invest in entities that are treated as partnerships or other pass-through entities. UBTI generated by such entities would generally flow up to Tax-Exempt U.S. Investors, causing the realization of UBTI by such investors. A Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph). Prospective Tax-Exempt U.S. Investors should be aware that it is unclear under current law whether income from certain swaps or derivative transactions that the Fund may invest or hold a position in, may be excluded from UBTI.

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("***UDFI***"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time. For these purposes, a Limited Partner is deemed to own a proportionate share of the Fund's debt-financed property and the income attributable thereto, and a short sale of publicly traded stock will not create "acquisition indebtedness" unless the Fund borrows funds to post collateral against such short sale.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-21    Filed 03/24/24    Page 31 of 200    PageID 24843
Appendix Part 6 Page 350 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 316 of
324

The Fund expects to generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors. A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI may be significant (depending upon the degree of leverage utilized by the Fund). In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

***We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.***

Investor Tax Filings and Record Retention.

The U.S. Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, the Treasury Regulations require investors in specified transactions (including certain investors in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be applicable as a result of a failure to comply with these tax filing and record retention rules.

The Treasury Regulations are broad in scope and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain Limited Partners to the special tax filing and record retention rules. Additionally, a Limited Partner's recognition of a loss on its disposition of its Interest in the Fund could in certain circumstances subject such Limited Partner to these rules.

Reporting Under FATCA.

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("*IGA*") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "*FATCA*") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("*FFI*"), unless such FFI enters into an agreement with the Service (an "*FFI Agreement*"), and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities that do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "*Cayman-U.S. IGA*"), which is treated as in effect, and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014 and guidance notes thereunder, each as updated from time to time.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Filed 35/24 of 887age 32 of 200    PageID 24844
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 317 of 324

The Master Fund is likely to be considered an FFI. In order to avoid incurring U.S. withholding under FATCA, the Master Fund is generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder. The Master Fund expects to register with the Service and expects to comply with the Cayman-U.S. IGA and, therefore, generally does not expect to become subject to U.S. withholding under FATCA.

In addition, the Fund may be required to act as a withholding agent under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation to the Fund or its agents showing its exemption from such withholding or compliance with FATCA. The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations made to investors.

The General Partner, the Investment Manager and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned. In this regard, the General Partner, the Investment Manager and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner, the Investment Manager and the Fund in complying with their obligations under FATCA. In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Fund, the Administrator, the Investment Manager, the Master Fund or the General Partner (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

The Cayman Islands has also signed, along with over 80 other countries, a multilateral competent authority agreement to implement the OECD Standard for Automatic Exchange of Financial Account Information – Common Reporting Standard ("*CRS*" and together with the Cayman-U.S. IGA, "*AEOI*").

Cayman Islands regulations have been issued to give effect to the Cayman-U.S. IGA and CRS (collectively, the "*AEOI Regulations*"). Pursuant to the AEOI Regulations, the Cayman Islands Tax Information Authority (the "*TIA*") has published guidance notes on the application of the Cayman-U.S. IGA and CRS.

All Cayman Islands "Financial Institutions" are required to comply with the registration, due diligence and reporting requirements of the AEOI Regulations, unless they are able to rely on an exemption that allows them to become a "Non-Reporting Financial Institution" (as defined in the relevant AEOI Regulations) with respect to one or more of the AEOI regimes, in which case only the registration requirement would apply under CRS. The Master Fund does not propose to rely on any Non-Reporting Financial Institution exemption and therefore intends to comply with all of the requirements of the AEOI Regulations.

The AEOI Regulations require the Master Fund and/or the General Partner (as applicable) to, amongst other things (i) register with the Service to obtain a GIIN (in the context of the U.S. IGA only), (ii) register with the TIA, and thereby notify the TIA of its status as a "Reporting Financial Institution", (iii) adopt and implement written policies and procedures setting out how it will address its obligations under CRS, (iv) conduct due diligence on its accounts to identify whether any such accounts are

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 03/24/24    Page 33 of 200    PageID 24845
Appendix Part 6    Page 352 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 318 of
324

considered "Reportable Accounts", and (v) report information on such Reportable Accounts to the TIA. The TIA will transmit the information reported to it to the overseas fiscal authority relevant to a reportable account (e.g. the Service in the case of a US Reportable Account) annually on an automatic basis.

Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests.

<u>State and Local Taxes</u>

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund.  State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit.  A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income.  Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents.  Each potential investor is urged to consult with its own tax advisor in this regard.

***<u>Each prospective Limited Partner should consult its own tax advisor with respect to its state and local tax consequences and filing obligations as a result of an investment in the Fund.</u>***

<u>Other Taxes</u>

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes.  Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund.  It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction.  However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties.  Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains).  The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits.  Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-22   Filed 01/09/24   Page 34 of 200   PageID 24846
Appendix Part 6 Page 3524 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 319 of
324

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively.  The foregoing analysis is not intended as a substitute for careful tax planning.  The tax matters relating to the Fund are complex and are subject to varying interpretations.  There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions.  Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund.  In no event will the Fund, the General Partner, the Investment Manager, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations.  This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Interests.  Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-22    Filed 05/04/24    Page 35 of 200    PageID 24847
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 320 of
324

## ERISA AND OTHER REGULATORY CONSIDERATIONS

### ERISA Considerations

### General

Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("**Plans**") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or the Code, must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their Interests or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

### Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("**DOL**") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("**Plan Assets**"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "**significant participation test**"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "Benefit Plan Investors" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (i.e., plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (e.g., IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "**Plan Asset Entity**").

In order to prevent the assets of the Master Fund from being considered Plan Assets under ERISA, it is the intention of the Master Fund to monitor the investments in the Master Fund and prohibit the acquisition, withdrawal or transfer of any limited partner interests of the Master Fund by any investor, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of limited partner interests of each class of the Master Fund owned by Benefit Plan Investors would be less than 25% of the aggregate value of that class of limited partner interests (determined, as described above, by excluding certain limited partner interests held by the General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of limited partner interests of the Master Fund by Benefit Plan Investors to less than 25%, the Fund may require the Compulsory Withdrawal of Interests. Each Limited Partner that is an insurance company

63

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6    Filed 09/05/24    Page 36 of 200    PageID 24848
Appendix Part 6 Page 352 of 867
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 321 of
324

acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Interests the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Master Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Interests, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Fund of that occurrence and shall, if and as directed by the Fund, in a manner consistent with the restrictions on transfer set forth herein, withdraw or dispose of some or all of the Interests held in its general account or Plan Asset Entity.

It is anticipated that investment in the Fund by benefit plan investors may be "significant" for purposes of the regulations. In such event, the underlying assets of the Fund would be deemed to constitute "plan assets" for purposes of ERISA. As a general rule, if the assets of the Fund were regarded as "plan assets" of a benefit plan investor, the Investment Manager would be deemed a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any benefit plan investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, the fiduciary of each such benefit plan investor has retained the fiduciary authority and responsibility with respect to the investor's initial and continuing investment in the Fund as though the benefit plan investor is investing directly in the Master Fund.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

**Ineligible Purchasers**

Limited partner interests may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for

Appx. 03613

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 05/06/24    Page 37 of 200    PageID 24849
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 322 of 324

investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

*Other Regulatory Matters*

Securities Act of 1933

Interests are not registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or any other securities law, including state securities or blue sky laws. Interests are offered without registration in reliance upon the exemption contained in Regulation D of the Securities Act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering. Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

Investment Company Act of 1940

The Fund is not registered under the U.S. Investment Company Act of 1940, as amended (the "***Investment Company Act***"), in reliance upon relief from registration afforded to collective investment vehicles whose outstanding securities are not publicly offered and are beneficially owned exclusively by investors that are considered "qualified purchasers" within the meaning of the Investment Company Act. "Qualified purchasers" generally include individuals and certain family-owned companies owning total investments in excess of $5 million and entities owning total investments in excess of $25 million. Each investor will be required to complete the Fund's Subscription Documents to enable the Fund to determine its eligibility.

Investment Adviser Registration

The Investment Manager is registered as relying adviser to Highland Capital Management, L.P., an investment adviser registered with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 171-6    Filed 05/04/23    Page 38 of 200    PageID 24850
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 323 of 324

Commodity Exchange Act

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator ("*CPO*") or commodity trading advisor under the U.S. Commodity Exchange Act and each has filed a notice of claim effectuating exemption. As such, the General Partner and the Investment Manager will operate the Fund and the Master Fund pursuant to such exemption. Unlike a registered CPO, the General Partner and the Investment Manager are not required to deliver a disclosure document and a certified annual report to participants in the Fund. Among other things, the exemption requires the General Partner and the Investment Manager to file a claim of exemption with the National Futures Association. The Investment Manager qualifies for an exemption from registration with the CFTC as a commodity trading adviser pursuant to CFTC Rule 4.14(a)(8).

Cayman Islands Mutual Fund Law

The Offshore Fund and the Master Fund are regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands ("*Mutual Funds Law*"). The Cayman Islands Monetary Authority (the "*Authority*") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Offshore Fund or the Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the directors of the Offshore Fund or the Master Fund, as applicable, and may result in the Authority applying to the court to have the Offshore Fund or the Master Fund wound up.

Neither the Offshore Fund nor the Master Fund is, however, subject to supervision in respect of their investment activities or the constitution of the Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Offshore Fund and the Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of the directors of the Offshore Fund or the Master Fund, to appoint a person to advise the Offshore Fund or the Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Offshore Fund or the Master Fund, as the case may be. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Master Fund and the General Partner or any of its members or agents domiciled in the Cayman Islands may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2016 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2017 Revision) or Reporting of Savings Income Information (European Union) Law (2014 Revision) and associated regulations, agreements, arrangements and memoranda of

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-2 Filed 03/52/24  Page 39 of 200   PageID 24851
Appendix Part 6  Page 355 of 887
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 324 of
324

understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Master Fund, and the General Partner or any of its or their directors or agents, may be prohibited from disclosing that the request has been made.

<u>Anti-Money Laundering Regulations</u>

All subscriptions for Interests will be subject to applicable anti-money laundering regulations.  Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Fund or its delegate may require verification of identity from all prospective investors.  Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The Fund reserves the right to request such information as is necessary to verify the identity of a prospective investor.  The Fund also reserves the right to request such identification evidence in respect of a transferee of Interests.  In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The Fund also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the Fund suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

Appx. 03616

Case 19-34054-sgj11 Doc 474-4 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 1 of 3

# EXHIBIT "D"

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 6 Filed 06/24/22   Page 41 of 200   PageID 24853
Appendix Part 6 Page 360 of 887
Case 19-34054-sgj11 Doc 474-4 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 2 of 3



Highland Capital Management Latin America, L.P.

Case 21-03003-sgj     Doc 135-6     Filed 12/18/21     Entered 12/18/21 01:38:22     Desc
Case 3:21-cv-00881-X     Document 6     Filed 08/24/   Appendix Part 6 Page 36 of 87   Page 42 of 200     PageID 24854
Case 19-34054-sgj11 Doc 474-4 Filed 02/24/20     Entered 02/24/20 17:25:25     Page 3 of 3

## Highland Argentina Regional Opportunity Fund



Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 1 of 324

# EXHIBIT "E"

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-21   Filed 06/05/24   Page 44 of 200   PageID 24856
Appendix Part 6 Page 363 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 2 of 324

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P.**

**A Delaware Limited Partnership**

**Amended and Restated Limited Partnership Agreement**

**November 1, 2017**

208797907 v11

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 03/04/24    Page 45 of 200    PageID 24857
Appendix Part 6 Page 364 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 3 of 324

# NOTICE

NEITHER HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES.  THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT.

**Appx. 03622**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 26 Part of Page 3652 of 807 Page 46 of 200    PageID 24858
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 4 of 324

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS .................................................................................................1

Article II ORGANIZATION.............................................................................................9
    2.1     Continuation of Limited Partnership ..................................................................9
    2.2     Name of Partnership ........................................................................................10
    2.3     Principal Office; Registered Office..................................................................10
    2.4     Term of Partnership .........................................................................................11
    2.5     Object and Powers of Partnership....................................................................11
    2.6     Liability of Partners ........................................................................................12
    2.7     Actions by Partnership.....................................................................................12
    2.8     Reliance by Third Parties.................................................................................12
    2.9     UCC Status of Limited Partner Interests .........................................................12
    2.10    Series of Interests ............................................................................................13

Article III CAPITAL........................................................................................................13
    3.1     Contributions to Capital ..................................................................................13
    3.2     Rights of Partners in Capital ...........................................................................14
    3.3     Capital Accounts..............................................................................................14
    3.4     Allocation of Net Profit and Net Loss .............................................................15
    3.5     Allocation of Management Fees, Withholding Taxes and Certain Other
             Expenditures ....................................................................................................16
    3.6     Reserves; Adjustments for Certain Future Events ...........................................17
    3.7     Performance Allocation ...................................................................................17
    3.8     Allocation to Avoid Capital Account Deficits .................................................18
    3.9     Allocations for U.S. Federal Income Tax Purposes ........................................18
    3.10    Curative Allocations........................................................................................20
    3.11    Tax Matters .....................................................................................................21
    3.12    Distributions....................................................................................................21

Article IV MANAGEMENT.............................................................................................22
    4.1     Duties and Powers of the General Partner .......................................................22
    4.2     Expenses ..........................................................................................................23
    4.3     Rights of Limited Partners ..............................................................................26
    4.4     Other Activities of Partners.............................................................................26
    4.5     Duty of Care; Indemnification ........................................................................28

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ...................................29
    5.1     Admission of Limited Partners ........................................................................29
    5.2     Admission of Additional General Partners.......................................................29
    5.3     Transfer of Interests of Limited Partners .........................................................29
    5.4     Transfer of Interest of the General Partner ......................................................32
    5.5     Withdrawal of Interests of Partners .................................................................32
    5.6     Withdrawal of Original Limited Partner ..........................................................36

Article VI DISSOLUTION AND LIQUIDATION............................................................36
    6.1     Dissolution of Partnership................................................................................36

Appx. 03623

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 6-21   Appendix Part 6   Filed 06/24/21   Page 47 of 200   PageID 24859
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 5 of 324

| | 6.2 | Liquidation of Assets | 37 |

**Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS** ..... 38

| | 7.1 | Accounting and Reports | 38 |
| | 7.2 | Certain Tax Matters | 38 |
| | 7.3 | Valuation of Partnership Assets and Interests | 39 |
| | 7.4 | Determinations by the General Partner | 39 |
| | 7.5 | Books and Records | 40 |
| | 7.6 | Confidentiality | 40 |

**Article VIII GENERAL PROVISIONS** ..... 42

| | 8.1 | Amendment of Partnership Agreement | 42 |
| | 8.2 | Special Power-of-Attorney | 44 |
| | 8.3 | Notices | 45 |
| | 8.4 | Agreement Binding Upon Successors and Assigns; Delegation | 45 |
| | 8.5 | Governing Law | 46 |
| | 8.6 | Not for Benefit of Creditors | 46 |
| | 8.7 | Consents and Voting | 46 |
| | 8.8 | Merger and Consolidation | 46 |
| | 8.9 | Miscellaneous | 47 |
| | 8.10 | BHCA Subject Persons | 47 |
| | 8.11 | RIC Limited Partners | 48 |
| | 8.12 | Bad Actor Limited Partners | 48 |
| | 8.13 | Survival | 49 |
| | 8.14 | Entire Agreement | 49 |

Appx. 03624

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-22    Filed 06/06/24    Page 48 of 200    PageID 24860
Appendix Part 6    Page 367 of 887
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 6 of 324

THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Highland Argentina Regional Opportunity Fund, L.P. is dated effective as of November 1, 2017 by and among Highland Argentina Regional Opportunity Fund GP, LLC, as General Partner, Highland Capital Management Latin America, L.P., as withdrawing Original Limited Partner, and those Persons who are admitted as Limited Partners in accordance with this Agreement. This Agreement amends and restates in its entirety the Limited Partnership Agreement of the Partnership dated September 11, 2017 (the "***Prior Agreement***").

PRELIMINARY STATEMENTS

(A)    The General Partner and the Original Limited Partner formed this limited partnership under the Act by entering into the Prior Agreement and causing the Certificate to be filed with the Secretary of State of the State of Delaware.

(B)    The parties hereto desire to continue the Partnership as a limited partnership under the Act and to make certain modifications to the Prior Agreement, as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the Prior Agreement is amended and restated in its entirety to read as follows:

———————

**Article I
DEFINITIONS**

———————

For purposes of this Agreement:

"***Act***" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as in effect on the date hereof and as amended from time to time, or any successor law.

"***Administrator***" means such Person as the General Partner may designate from time to time, in its sole discretion, to serve as administrator to the Partnership.

"***Advisers Act***" means the U.S. Investment Advisers Act of 1940, as amended, and the rules promulgated thereunder.

"***Affiliate***" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person. For these purposes, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"***Affiliated Investors***" means the Investment Manager, the General Partner and their respective Affiliates, principals, employees, partners, agents, the respective family members of

1

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Page 49 of 200    PageID 24861
Appendix Part 6 Page 362 of 887
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 7 of 324

such personnel and trusts and other entities established primarily for their benefit or for charitable purposes.

"*Agreement*" means this Amended and Restated Limited Partnership Agreement of the Partnership, as amended from time to time.

"*Authorized Representative*" has the meaning set forth in Section 7.6(a).

"*Bad Actor Limited Partner*" means a Limited Partner that (a) would cause the disqualification of the Partnership from using Rule 506 under the Securities Act due to the operation of paragraph (d) thereof (or its successor) if such Limited Partner were to beneficially own 20% or more of the outstanding voting interests of all of the Partners (excluding any other Interests that are Non-Voting Interests) or (b) the General Partner determines is likely to become subject to a conviction, order, judgment or finding that would be likely to cause the disqualification described in clause (a).

"*BBA*" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"*BBA Effective Period*" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in the BBA.

"*BHCA*" means the Bank Holding Company Act of 1956, as amended.

"*BHCA Subject Person*" means any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"*Business Day*" means any day or days on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for business or such other days as the General Partner may determine generally, or in any particular case.

"*Capital Account*" means, with respect to each Partner, the capital account (including any memorandum sub-accounts) established and maintained on behalf of such Partner as described in Section 3.3.

"*Capital Sub-Account*" means, with respect to each Investor, a separate capital sub-account within the Partnership's or the Offshore Fund's (or any Other Feeder Fund's) capital account, as applicable, in the Master Fund that corresponds to such Investor's Capital Account in the Partnership or the series of shares held by such Investor in the Offshore Fund (or capital account or the series of shares in an Other Feeder Fund), as applicable; provided that, the Master Fund will maintain a separate Capital Sub-Account for each Series held by a Partner.

"*Certificate*" means the Certificate of Limited Partnership of the Partnership referred to in Section 2.1(b).

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 08/09/24   Page 50 of 200   PageID 24862
Appendix Part 6   Page 362 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 8 of 324

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"***Commencement Date***" means the first date on or as of which a Limited Partner, other than the Original Limited Partner, makes a capital contribution to the Partnership.

"***Compulsory Withdrawal***" has the meaning set forth in Section 5.5(j).

"***Discovery Date***" means the date on which the Investment Manager discovers that a violation of any of the Master Fund's investment restrictions set forth in the Master Fund Partnership Agreement has occurred.

"***Early Withdrawal Reduction***" means:

(a)     with respect to a Series B Interest, up to 3.0% of the net asset value of the portion of the Series B Interest being withdrawn in any withdrawal occurring prior to the end of the applicable Soft Lock-up Period;

(b)     with respect to a Series C Interest, 5.0% of the net asset value of the portion of the Series C Interest being withdrawn in any withdrawal occurring prior to the end of the applicable Soft Lock-up Period; and

(c)     with respect to a Series C Interest, 3.0% of the net asset value of the portion of the Series C Interest being withdrawn in any withdrawal occurring on or after the Soft Lock-up Period with respect to Series C Interests, but prior to the end of the Second Soft Lock-up Period;

provided that, in each case, such amount is determined at the close of business of the relevant Withdrawal Date, is retained by the Partnership for the benefit of the Partners and is deducted from the withdrawal proceeds of the withdrawing Limited Partner.

"***Election Notice***" has the meaning set forth in Section 8.10(c).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"***ERISA Partner***" means a Limited Partner which is (a) an employee benefit plan subject to the fiduciary provisions of ERISA, (b) a "plan" subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the entity, or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA or any regulation promulgated thereunder.

"***FATCA***" means Sections 1471 through 1474 of the Code, as amended, and any Regulations thereunder or official interpretations or other official guidance thereof, including any successor Regulations or interpretations, and any intergovernmental agreement and any regulations with respect thereto or official interpretations or other official guidance thereof implementing the foregoing.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-2 Filed 09/24/21    Page 51 of 200    PageID 24863
Appendix Part 6 Page 39 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 9 of 324

"*Fiscal Period*" means each period that starts at the opening of business on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day immediately following the last day of the preceding Fiscal Period, and that ends at the close of business on the earliest of the following dates:

(a)      the last day of a calendar month;

(b)      any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)      the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)      any other date which the General Partner selects.

"*Fiscal Year*" means the period commencing on the Commencement Date and ending on December 31 of the same year, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect another fiscal year; *provided* that any such other fiscal year shall be permissible for U.S. federal income tax purposes.  In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "*Fiscal Year*" means the period commencing on January 1 of that year and ending on the date on which the Partnership is terminated.

"*GAAP*" means generally accepted accounting principles in the United States.

"*General Partner*" means Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"*Indemnified Person*" means each of the General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the General Partner or the Investment Manager, each of the respective affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives.

"*Interest*" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and, for clarity, is cumulative of such Partner's interests in all Series, to the extent such Partner has an interest in more than one Series.

"*Investment Company Act*" means the U.S. Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

4

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Appendix Part 6 Filed 09/12/4 of 86ge 52 of 200    PageID 24864
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 10 of 324

"*Investment Management Agreement*" means the investment management agreement by and among the Investment Manager, the General Partner, the Partnership, the Master Fund and the Offshore Fund, as amended from time to time.

"*Investment Manager*" means Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership.

"*Investments*" means investments in securities or other financial or intangible investment instruments, contracts or products made by the Master Fund, as described in the Partnership's offering memorandum.

"*Investor*" means any Partner, any shareholder of the Offshore Fund or any beneficial owner of any Other Feeder Fund.

"*Limited Partner*" means any Person admitted to the Partnership as a limited partner, until the entire Interest of such Person has been withdrawn pursuant to Section 5.5 or a substitute Limited Partner or Limited Partners are admitted with respect to such Person's entire Interest.  The General Partner may subdivide the Interests into separate Series and establish new Series pursuant to Section 2.10; *provided* that for all purposes of the Act, the Limited Partners constitute a single class or group of limited partners.

"*Majority of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners or the Series of Limited Partners, as applicable.

"*Management Fee*" means the management fee, as defined in the Master Fund Partnership Agreement, payable by the Master Fund to the Investment Manager, any of its Affiliates or any other Person designated by the Investment Manager pursuant to the Investment Management Agreement.

"*Master Fund*" means Highland Argentina Regional Opportunity Master Fund, L.P., a collective investment vehicle formed as an exempted limited partnership under the laws of the Cayman Islands in which the Partnership, the Offshore Fund and any other co-investment vehicle (such as an Other Feeder Fund) invest all of their investible assets and conduct their investment and trading activities.

"*Master Fund Partnership Agreement*" means the amended and restated exempted limited partnership agreement of the Master Fund, as the same may be amended or restated from time to time in accordance with the terms thereof.

"*Minimum Required Withdrawal*" has the meaning set forth in Section 5.5(j)

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 03/24 of 887age 53 of 200   PageID 24865
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 11 of
324

"***Negative Basis Partner***" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the Withdrawal Date, but such Partner shall cease to be a Negative Basis Partner at such time as it shall have received allocations pursuant to Section 3.9(d) equal to such Partner's Negative Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"***Net Assets***" means the total value, as determined by the Administrator in accordance with Section 7.3, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6). Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal Period but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period and after giving effect to Management Fees (borne indirectly at the Master Fund level), and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

(a)   any Performance Allocation (borne indirectly at the Master Fund level) as of the date on which such determination is made;

(b)   any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c)   withholding or other taxes (including any amounts payable under any BBA provision), expenses of processing withdrawals and other items payable, and any increases or decreases in any reserves, holdbacks or other amounts recorded pursuant to Section 3.6 during the Fiscal Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"***Net Loss***" means any amount by which the Net Assets as of the first day of a Fiscal Period exceed the Net Assets as of the last day of the same Fiscal Period.

"***Net Profit***" means any amount by which the Net Assets as of the last day of a Fiscal Period exceed the Net Assets as of the first day of the same Fiscal Period.

"***Non-Voting Interests***" means an Interest, the holder of which is not entitled to vote, consent or withhold consent with respect to any Partnership matter (including, but not limited to, mergers, sales of substantially all assets or consolidations of the Partnership), except as otherwise expressly provided in this Agreement.

"***Offshore Fund***" means Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company.

Appx. 03630

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-21   Filed 09/32/24   Page 54 of 200   PageID 24866
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 12 of
324

"*Original Limited Partner*" means Highland Capital Management Latin America, L.P., in its capacity as the original limited partner.

"*Other Account*" means any assets or investment of the General Partner or the Investment Manager, or any assets managed by the General Partner, the Investment Manager or any of their respective Affiliates for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"*Other Agreement*" has the meaning set forth in Section 8.1.

"*Other Feeder Fund*" means any other investment vehicle sponsored by the Investment Manager or one of its Affiliates that invests in parallel with the Partnership and the Offshore Fund in the Master Fund.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "*Partners*" means the General Partner and all of the Limited Partners.

"*Partnership*" means the limited partnership formed pursuant to this Agreement.

"*Partnership Percentage*" means a percentage established for each Partner on the Partnership's books as of the first day of each Fiscal Period. The Partnership Percentage of a Partner for a Fiscal Period shall be determined by dividing the amount of such Partner's Capital Account as of the beginning of the Fiscal Period (after crediting all capital contributions to such Capital Account which are effective as of such date, net of all deductions, including Management Fees borne at the Master Fund level) by the sum of the Capital Accounts of all of the Partners as of the beginning of the Fiscal Period (after crediting all capital contributions to the Partnership which are effective as of such date, net of all deductions, including Management Fees borne at the Master Fund level). The sum of the Partnership Percentages of all Capital Accounts for each Fiscal Period shall equal 100%.

"*Performance Allocation*" means the performance allocation, as defined in the Master Fund Partnership Agreement, allocated to the Special Limited Partner, any of its Affiliates or any other Person designated by the Special Limited Partner pursuant to the Master Fund Partnership Agreement.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, or other entity.

"*Plan Assets*" means assets of the Partnership that are considered to be assets of an ERISA Partner, pursuant to Section 3(42) of ERISA or otherwise.

"*Positive Basis*" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax

Appx. 03631

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 09/24/24    Page 55 of 200    PageID 24867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 13 of
324

purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death).

"***Positive Basis Partner***" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the Withdrawal Date, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.9(c) equal to such Partner's Positive Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"***Principal***" means James D. Dondero.

"***Prior Agreement***" has the meaning set forth in the preamble hereto.

"***Regulations***" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"***Regulatory Allocations***" has the meaning set forth in Section 3.10.

"***Remedy Date***" means the period commencing on the Discovery Date and ending 90 Business Days thereafter.

"***Revocation Notice***" has the meaning set forth in Section 8.10(c).

"***RIC Limited Partner***" means a Limited Partner that is registered as an investment company under the Investment Company Act.

"***Schedule of Partners***" means a schedule to be maintained by the General Partner containing the following information with respect to each Partner: (a) name; (b) address; (c) date of admission; (d) amount and date of all capital contributions and withdrawals; and (e) the amount and date of any permitted Transfers.

"***Second Soft Lock-up Period***" means, with respect to a Series C Interest, a period commencing on the one-year anniversary of the date that a capital contribution was made to the Capital Account associated with such Series C Interest and ending on the two-year anniversary of the date of such capital contribution.  The General Partner may waive the Second Soft Lock-up Period with respect to any Capital Account.

"***Securities Act***" means the U.S. Securities Act of 1933, as amended from time to time.

"***Series***" means a designated series of Interests established in accordance with this Agreement and having such terms as the General Partner determines.

"***Series A Interests***" means a Series having the rights and obligations applicable to Series A Interests as set forth in this Agreement and which correspond to the "Series A Capital Sub-Accounts" of the Master Fund.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Appendix Part 6 Filed 09/52/24 of 887age 56 of 200    PageID 24868
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 14 of
324

"***Series B Interests***" means a Series having the rights and obligations applicable to Series B Interests as set forth in this Agreement and which correspond to the "Series B Capital Sub-Accounts" of the Master Fund.

"***Series C Interests***" means a Series having the rights and obligations applicable to Series C Interests as set forth in this Agreement and which correspond to the "Series C Capital Sub-Accounts" of the Master Fund.

"***Soft Lock-up Period***" means, with respect to a Series B Interest or a Series C Interest, a period commencing on the date that a capital contribution was made to the Capital Account associated with such Series and ending on the one-year anniversary of the date of such capital contribution.   The General Partner may waive the Soft Lock-up Period with respect to any Capital Account.

"***Special Limited Partner***" means Highland Capital Management Latin America, L.P., in its capacity as a special limited partner of the Master Fund for purposes of the receipt of the Performance Allocation.

"***Transfer***" means any direct or indirect sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

"***Withdrawal Date***" has the meaning set forth in Section 5.5(a).

"***Withdrawal Notice***" has the meaning set forth in Section 5.5(a).

---

### Article II
### ORGANIZATION

---

**2.1**    **Continuation of Limited Partnership**

(a)    The General Partner and the Original Limited Partner hereby agree to continue the Partnership as a limited partnership under and pursuant to the Act and this Agreement.

(b)    The General Partner has executed and filed with the Secretary of State of the State of Delaware a Certificate of Limited Partnership of the Partnership (the "***Certificate***"), and shall execute, acknowledge and file with the Secretary of State of the State of Delaware any further amendments thereto as may be required by the Act, and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in

Appx. 03633

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21  Filed 03/24 of 867 age 57 of 200    PageID 24869
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 15 of
324

which the Partnership determines to do business, or any political subdivision or agency thereof or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership.   The General Partner shall cause any required amendment to the Certificate to be filed promptly following the event requiring such amendment. All amendments may be signed by the General Partner (as required by the Act) and may be signed either personally or by an attorney-in-fact.

(c)    The parties hereto agree to operate the Partnership as a limited partnership pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Limited Partners and the General Partner shall be as provided in the Act for limited partners and the general partner, except as provided herein.

(d)    The General Partner may change the domicile of the Partnership to another state, country or other jurisdiction where advisable due to legal, tax or other considerations; *provided* that no such change of domicile would reasonably be expected to have a material adverse effect on the Limited Partners.

(e)    The parties acknowledge and agree that the Partnership is intended to be taxed in the United States as a partnership and not as an association taxable as a corporation for U.S. federal, state and/or local income tax purposes.   No election may be made to treat the Partnership as other than a partnership for U.S. federal, state and/or local income tax purposes.   Each Partner agrees not to treat, on any income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

**2.2     Name of Partnership**

(a)    The name of the Partnership is Highland Argentina Regional Opportunity Fund, L.P. or such other name as the General Partner may hereafter adopt, subject to causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware in accordance with the Act.   The General Partner will send a notice of any change of name to the Limited Partners. All business of the Partnership will be conducted under such name or under such other name as the General Partner deems appropriate.

(b)    The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's termination or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3     Principal Office; Registered Office**

(a)    The Partnership shall have its principal office at such location as the General Partner shall designate from time to time.

Appx. 03634

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Filed 09/24 of 887age 58 of 200   PageID 24870
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 16 of
324

(b)     The Partnership shall have its registered office at c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, unless a different registered office or agent is designated from time to time by the General Partner.

## 2.4     Term of Partnership

The term of the Partnership commenced on the date on which the Certificate was filed with the office of the Secretary of State of the State of Delaware and will continue until dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1).  The legal existence of the Partnership as a separate legal entity shall continue until the cancellation of the Certificate.

## 2.5     Object and Powers of Partnership

(a)     The Partnership is formed solely for the object and purpose of indirectly investing in Investments by subscribing for and holding a limited partner interest in, and investing all of its investible assets in, the Master Fund.  The Partnership is a directed feeder fund for the Limited Partners with respect to the Master Fund. Notwithstanding any other provision of this Agreement, the Partnership shall perform no other business and shall not make directly any Investments as such Investments will be made by the Master Fund.

(b)     Notwithstanding any other provision of this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may execute, deliver and perform any agreement with any Limited Partner or prospective Limited Partner without any further act, vote or approval of any Partner.  The General Partner is hereby authorized to enter into the agreements described in the preceding sentence on behalf of the Partnership, but such authorization should not be deemed a restriction on the power of the General Partner to enter into other agreements on behalf of the Partnership.   In furtherance of this purpose, the Partnership shall have all powers necessary, suitable or convenient for the accomplishment of the aforesaid purpose, subject to the limitations and restrictions set forth herein alone or with others, as principal or agent.

(c)     Each Limited Partner hereby acknowledges that the Partnership is not expected to qualify as an "operating company" for purposes of ERISA, and the assets of the Partnership may therefore constitute Plan Assets of ERISA Partners; and that the Partnership is therefore intended to be structured as a directed feeder fund through which the Limited Partners may participate in an investment in the Master Fund and with respect to which the General Partner is not, except as expressly provided under the terms of this Agreement, intended to have any discretionary authority or control with respect to the investment of the assets of the Partnership.   Each Limited Partner (i) shall by making a capital contribution to the Partnership with respect to the Partnership's underlying interests in the Master Fund, be deemed to direct the General Partner to invest the amount of such capital contribution in the Master Fund and (ii) acknowledges that during any period when the underlying interests of the Partnership in the Master Fund are deemed to constitute Plan

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 09/24 of 867age 59 of 200    PageID 24871
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 17 of
324

Assets, the General Partner will act as a custodian with respect to the assets of such Limited Partner, but is not intended to be a fiduciary with respect to the assets of such Limited Partner for purposes of ERISA, the Code or any applicable similar law.  No provision of this Agreement shall create any obligation of the General Partner, in its capacity as the general partner of the Master Fund, and the General Partner, in such capacity, will not have any fiduciary obligations to any person, under ERISA or otherwise, pursuant to this Agreement.  Any action or determination of the General Partner, as the general partner of the Master Fund, referenced herein shall only regard such action or determination made by the General Partner solely in its capacity as the general partner thereof.

**2.6    Liability of Partners**

In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any liability for the repayment or discharge of the debts and obligations of the Partnership, except to the extent provided herein or as required by the Act or other applicable law.

**2.7    Actions by Partnership**

The Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects as set forth in Section 2.5 above.

**2.8    Reliance by Third Parties**

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

**2.9    UCC Status of Limited Partner Interests**

(a)    For purposes of the grant, pledge, attachment or perfection of a security interest in an Interest or otherwise, the Interests shall be deemed to be "securities" within the meaning of Section 8-102(a)(15) and as provided by Section 8-103(c) of the Uniform Commercial Code as in effect from time to time in the State of Delaware or analogous provisions in the Uniform Commercial Code in effect in any other jurisdiction.

(b)    Any Interest may be evidenced by a certificate of partnership interest issued by the Partnership in such form as the General Partner may approve. Every certificate representing an Interest shall bear a legend substantially in the following form:

"For the purposes of Section 8-103 of the Uniform Commercial Code of the United States of America in effect in any relevant jurisdiction, the certificates representing an interest in the Limited Partnership shall constitute "securities" within the meaning of Section 8-102 and Section 8-103 of the Uniform Commercial Code."

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 03/24/of 887ge 60 of 200    PageID 24872
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 18 of
324

**2.10    Series of Interests**

The General Partner may, at any time, without notification to or consent of the other Limited Partners, create and offer different Series with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such Series; *provided* that such Series would not reasonably be expected to have a material adverse effect on the existing Limited Partners.    The terms and rights of each such Series may be set forth in the Partnership's offering memorandum, any supplement thereto or a "side letter" or other agreement, which the General Partner may incorporate by reference.    Although the Partnership may offer more than one Series, the Partnership is not a Delaware series limited partnership and the assets and liabilities of the Partnership are not segregated by Series.    As of the effective date of this Agreement, the Partnership has three Series: Series A Interests, Series B Interests and Series C Interests.

———————

**Article III
CAPITAL**

———————

**3.1    Contributions to Capital**

(a)    The minimum required initial capital contribution with respect to each Series is $500,000, or such lesser amount as the General Partner may permit; provided that, the minimum required initial capital contribution with respect to a Series B Interest is no less than $100,000.  Subject to the restriction with respect to any Series B Interest in the immediately preceding sentence, the General Partner may change the required minimum initial capital contribution amount at any time.

(b)    The Partnership may accept additional contributions at such times as the General Partner may permit, but no Limited Partner shall be obligated to make any additional capital contribution to the Partnership, subject to the provisions of Section 3.5 and any contrary provision of the Act.  The minimum required additional capital contribution with respect to each Series is $500,000, or such lesser amount as the General Partner may permit; provided that, the minimum required additional capital contribution with respect to a Series B Interest is no less than $100,000.   Subject to the restriction with respect to any Series B Interest in the immediately preceding sentence, the General Partner may change the required minimum additional capital contribution amount at any time.

(c)    The General Partner or an Affiliate has made a capital contribution to the Partnership as set forth in the Schedule of Partners.  Except as required by the Act, the General Partner (or such Affiliate) shall not be required to make any additional capital contributions to the Partnership.  The General Partner (or such Affiliate) may, however, make capital contributions to the Partnership in such amounts and at

13

**Appx. 03637**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 03/24/24    Page 61 of 200    PageID 24873
Appendix Part 6    Page 380 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 19 of
324

such times as it may determine.  The General Partner or any of its Affiliates shall have the right at any time to make additional capital contributions as a Limited Partner or General Partner.  If an Affiliated Investor makes a capital contribution as a Limited Partner, the General Partner, in its capacity as the general partner of the Master Fund, will have authority to waive or reduce the Management Fee or the Performance Allocation with respect to such Limited Partner.

(d)     The General Partner or the Investment Manager may enter into placement agent agreements with placement agents (which may be Affiliates of the General Partner or the Investment Manager) to assist in obtaining subscriptions for Interests in exchange for compensation; provided that, the Partnership will not bear any such placement agent fees.   Placement agents may be paid a portion of the Management Fee attributable to the investors solicited by such placement agents, thereby reducing the compensation received by the Investment Manager.

(e)     Except as otherwise permitted by the General Partner, (i) initial or additional capital contributions by each Partner shall be payable in cash and/or Investments having an aggregate value as set forth in the Partnership's books and records in one installment, and (ii) initial contributions shall be due no later than the Business Day immediately preceding the date of admission of such Person as a Limited Partner.

**3.2     Rights of Partners in Capital**

(a)     No Partner shall be entitled to interest on its capital contributions to the Partnership.  For the avoidance of doubt, interest income, if any, earned on subscription amounts remitted to the Partnership prior to the date an Interest is issued to a Partner will be payable to the Partnership and not applied toward the purchase of an Interest.

(b)     No Partner shall have the right to the return of any capital contribution to the Partnership, except (i) upon the withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1.  The entitlement to any such return shall be limited to the value of the Capital Account of the Partner.  The General Partner shall not be liable for the return of any such amounts.

**3.3     Capital Accounts**

(a)     The Partnership will maintain a separate Capital Account for each Partner.  In the event a Limited Partner invests in more than one Series, the Partnership will maintain a separate Capital Account with respect to each Series held by such Limited Partner, with each such Capital Account being treated as if it were the Capital Account of a separate Partner for purposes of this Agreement, including for purposes of the Management Fee and the Performance Allocation, each borne indirectly at the Master Fund level.  The General Partner may, in its discretion, maintain separate memorandum sub-accounts with respect to each such Capital Account for purposes of this Agreement, including to reflect additional capital

14

Case 21-03003-sgj Doc 135-6 Filed 12/18/21 Entered 12/18/21 01:38:22 Desc
Case 3:21-cv-00881-X Document 76-2 Filed 08/24/23 Page 62 of 200 PageID 24874
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20 Entered 02/24/20 17:25:25 Page 20 of 324

contributions, withdrawal terms, the Performance Allocation and the application of an Early Withdrawal Reduction. Each Capital Account will reflect the aggregate sum of the balances in all memorandum sub-accounts associated with each such Capital Account.

(b)     Each Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to the Partnership.

(c)     Each Capital Account shall be increased by (i) the amount of any cash and the net value of any property constituting additional contributions to such Capital Account permitted pursuant to Section 3.1 and (ii) such Capital Account's allocable share of the Net Profits allocated by the Partnership to such Capital Account pursuant to Section 3.4.

(d)     Each Capital Account shall be reduced by (i) the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 3.12(a), 5.5 or 6.2, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(c) or 5.5(f), (ii) such Capital Account's allocable share of the Net Losses allocated by the Partnership to such Capital Account pursuant to Section 3.4, (iii) such Capital Account's *pro rata* portion of the expenses allocable (or specially allocable) by the Partnership pursuant to Section 3.5, (iv) such Capital Account's allocable share of the Performance Allocation allocable pursuant to Section 3.7 (borne indirectly at the Master Fund level), and (v) such Capital Account's *pro rata* portion of the expenses payable by the Partnership pursuant to Section 4.2 (b) and (c).

(e)     Each Capital Account (including any corresponding memorandum sub-accounts) shall be adjusted to reflect allocations and other changes in the value of such Capital Account in the manner specified in the remaining provisions of this Article III.

(f)     The Master Fund maintains Capital Sub-Accounts within the Partnership's capital account at the Master Fund level that correspond to the Capital Accounts (and any corresponding memorandum sub-accounts) of the Partners.

**3.4     Allocation of Net Profit and Net Loss**

(a)     Subject to the remaining provisions of this Article III, as of the last day of each Fiscal Period, any Net Profit or Net Loss for such Fiscal Period shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages for such Fiscal Period.

(b)     Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses for a Fiscal Period that are not allocable to specific Investments of the Master Fund, including short term interest income, receipt of any withdrawal charges by the Partnership, and audit, administration and legal expenses, shall be

15

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-1 Page 63 of 200    PageID 24875
Appendix Part 6 Page 332 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 21 of
324

separately allocated among and credited to or debited against the Capital Accounts of the Partners *pro rata* in accordance with their Partnership Percentages for such Fiscal Period.

**3.5    Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures**

(a)    The Partnership shall bear its allocable portion of the Management Fees in accordance with the Master Fund Partnership Agreement.  The Management Fees borne by the Partnership shall be allocated to the Capital Sub-Accounts of the relevant Limited Partners who are subject to the Management Fee based upon the Series they hold, and such Capital Sub-Accounts shall be subject to the corresponding adjustments.  The Management Fee shall be charged at the Master Fund level through the use of Capital Sub-Accounts that correspond to each Capital Account of a Limited Partner.  The Management Fee will be prorated for any period that is less than a full calendar quarter.  The General Partner or the Investment Manager (as the general partner or the investment manager, respectively, of the Master Fund) may reduce, waive or calculate differently the Management Fee with respect to any Capital Sub-Account of a Limited Partner in its discretion.

(b)    Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or FATCA withholding), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required.  If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement.   Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Fiscal Period during which the Partnership so withholds, pays or incurs such obligation.   If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership within 10 Business Days after notification and demand by the General Partner in the amount of such excess.  The General Partner is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax or other tax obligation (including any amount under any BBA provision) on behalf of any Partner that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any withholding tax. Each Limited Partner agrees to repay to the Partnership and the

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 03/24/ Appendix Part 6 Page 64 of 867 Page 64 of 200   PageID 24876
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 22 of
324

General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)     Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership (including any taxes imposed on the Partnership pursuant to Section 6225 of the Code, as amended by the BBA), to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be specially allocated only to the Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments.  Such allocations shall be debited from the relevant Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

**3.6     Reserves; Adjustments for Certain Future Events**

(a)     The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets and proportionately against the Capital Accounts (and the corresponding Capital Sub-Accounts) for contingent liabilities, such reserves to be in the amounts which the General Partner deems necessary or appropriate.  The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate.  The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be charged or credited, as the General Partner deems appropriate, to the Capital Accounts of those parties that are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties that were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established by the General Partner.

(b)     If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately charged or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period(s).

**3.7     Performance Allocation**

The Partnership bears its allocable portion of the Performance Allocation in accordance with the Master Fund Partnership Agreement.  The Performance Allocation borne by the Partnership shall be specially allocated to the Capital Sub-Accounts of the relevant Limited Partners who are subject to the Performance Allocation based upon the Series they hold, and such Capital Sub-Accounts shall be subject to the corresponding adjustments.  The Performance Allocation shall be debited at the Master Fund level through the use of Capital Sub-Accounts that correspond to each Capital Account of a Limited Partner.  The General Partner (as the general

17

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2   Filed 03/24/22   Page 65 of 200   PageID 24877
Appendix Part 6 Page 384 of 887
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 23 of
324

partner of the Master Fund) may waive or reduce the Performance Allocation with respect to any Capital Sub-Account of a Limited Partner.

### 3.8 Allocation to Avoid Capital Account Deficits

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner. Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.8 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.8 not previously recovered.

### 3.9 Allocations for U.S. Federal Income Tax Purposes

Notwithstanding anything to the contrary in this Agreement:

(a) <u>Income Tax Allocations</u>. Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year will be allocated among the Partners in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership will establish and maintain records which shall show the extent to which the Capital Account of each Partner will, as of the last day of each Fiscal Year, comprise amounts that have not been reflected in the taxable income of such Partner. To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts. Foreign tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations. All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b) <u>Basis Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations; *provided* that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to

18

Appx. 03642

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 03/25/21    Page 66 of 200    PageID 24878
Appendix Part 6    Page 24 of 88
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 24 of
324

Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)    Positive Basis Allocations.  If the Partnership realizes gains or items of gross income (including short term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.5, the General Partner may elect:  (i) to allocate such gains or items of gross income among such Positive Basis Partners, *pro rata* in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; *provided*, *however*, that if, following such Fiscal Year, the Partnership realizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Positive Basis Partner an amount of such gains or items of gross income equal to the amount, if any, by which its Positive Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence.

(d)    Negative Basis Allocations.  If the Partnership realizes net losses or items of gross loss or deduction (including short term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.5, the General Partner may elect:  (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Partners, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; *provided*, *however*, that if, following such Fiscal Year, the Partnership realizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its

19

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 03/06/24    Page 67 of 200    PageID 24879
Appendix Part 6 Page 386 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 25 of
324

Interest), there shall may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.9(d).

(e)     Qualified Income Offset.  In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; *provided* that an allocation pursuant to this Section 3.9(e) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.9(e) were not in this Agreement.  This Section 3.9(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and shall be interpreted consistently therewith.

(f)     Gross Income Allocation.  In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 3.9(f) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.9(e) and this Section 3.9(f) were not in this Agreement.

(g)     Section 704(b) Compliance.  The allocations provided in this Section 3.9 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

**3.10    Curative Allocations**

The allocations set forth in Sections 3.9(b), (e) and (f) (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations.  It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.10.  Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17-6    Filed 03/24 of 887age 68 of 200    PageID 24880
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 26 of
324

Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

**3.11    Tax Matters**

    (a)    Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership or which would result in inconsistent treatment, and each Partner further agrees to treat, on any U.S. federal, state, local and/or non-U.S. income tax return in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner consistent with the treatment of such item by the Partnership.

    (b)    To the fullest extent permitted by law, each Limited Partner agrees to (i) provide such cooperation and assistance, including executing and filing forms or other statements and providing information about the Limited Partner, as is reasonably requested by the Tax Matters Partner, to enable the Partnership to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Partner was admitted to the Partnership, (ii) amend the Limited Partner's tax returns and pay any resulting taxes, interest and penalties in connection with an election by the Partnership under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from an election by the Partnership under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Partnership from and against any liability with respect to the Limited Partner's share of any tax deficiency (including any interest and penalties associated therewith) paid or payable by the Partnership that is (A) allocable to such Limited Partner (as reasonably determined by the General Partner in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Partner was a partner in the Partnership or (B) attributable (as reasonably determined by the General Partner) to the failure of such Limited Partner to cooperate with or provide any such forms, statements, or other information as requested by the Tax Matters Partner pursuant to clause (i) above.

**3.12    Distributions**

    (a)    The Partnership will make distributions in respect of withdrawals in accordance with Section 5.5 and liquidation in accordance with Section 6.2.  The amount and timing of any other distributions from the Partnership shall be determined by the General Partner.  Distributions will generally be made in proportion to the respective Partnership Percentages of the Partners for the Fiscal Period when made. Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

Appx. 03645

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 03/24/24    Page 69 of 200    PageID 24881
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 27 of
324

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner from any account in connection with its Interest if such distribution would violate Section 17-607 of the Act or other applicable law.

_____

### Article IV
### MANAGEMENT

_____

**4.1    Duties and Powers of the General Partner**

(a)     Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for managing and administering the affairs of the Partnership (other than any investment or trading activities, which are entered into at the Master Fund level and managed by the Investment Manager), and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership.

(b)     The General Partner shall have the right, without the notification to or consent of any Limited Partner or other Person, to make adjustments to the structure of the Partnership in order to address applicable structural, ownership, legal, or regulatory issues, or to improve overall tax efficiency; *provided* that no such adjustment would cause any material adverse consequences to the Limited Partners.

(c)     Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner shall have full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1, including, without in any manner limiting the generality of the foregoing, (i) contracts, agreements, undertakings and transactions with any Partner or with any other Person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (ii) agreements with each Limited Partner in connection with its purchase of an Interest, including a subscription agreement wherein such Limited Partner agrees to be bound by the terms of this Agreement, (iii) any agreements to induce any Person to purchase an Interest and (iv) the Investment Management Agreement delegating to the Investment Manager certain of the powers and authority vested by this Agreement in the General Partner as the General Partner and the Investment Manager may agree from time to time, each without any further act, approval or vote of any Person.

Appx. 03646

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 08/02/24    Page 70 of 200    PageID 24882
Appendix Part 6 Page 392 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 28 of
324

(d)    The General Partner may terminate or replace the Investment Manager in accordance with the terms of the Investment Management Agreement. The General Partner may delegate to any other Person (including any of its Affiliates) any power and authority vested in the General Partner pursuant to this Agreement that is not otherwise delegated to the Investment Manager.

(e)    Every power vested in the General Partner pursuant to this Agreement shall be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein. No provision of this Agreement shall be construed to require the General Partner to violate the Act, the Advisers Act or any other law, regulation or rule of any self-regulatory organization.

(f)    Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Limited Partners, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards. Unless otherwise expressly stated, for purposes of this Section 4.1(f), the General Partner shall be deemed to be permitted or required to make all decisions hereunder in its sole discretion.

(g)    If requested by the General Partner, each Limited Partner shall deliver to the General Partner: (i) an affidavit in form satisfactory to the General Partner that the applicable Limited Partner (and its partners, shareholders, members, and/or beneficial owners, and/or controlling persons, as the case may be) is not subject to withholding under the provisions of any United States federal, state, local or non-U.S. laws; (ii) any certificate that the General Partner may reasonably request with respect to any such laws; (iii) any other form or instrument reasonably requested by the General Partner relating to such Limited Partner's status under such laws; and/or (iv) any information or documentation prescribed under FATCA or as may be necessary for the Partnership to comply with its obligations, or to avoid withholding, under FATCA or any other automatic exchange of information agreement or arrangement, including, without limitation, the Organisation for Economic Cooperation and Development's Common Reporting Standard. In the event that a Limited Partner fails or is unable to deliver to the General Partner an affidavit described in Section 4.1(g), the General Partner may withhold amounts from such Partner in accordance with Section 3.5(b).

**4.2    Expenses**

(a)    Subject to Section 4.2(f), each of the General Partner and the Investment Manager pays all of its own operating and overhead costs without reimbursement by the Partnership. The Partnership will not have its own separate employees or office,

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 6 Filed 09/04/24   Page 71 of 200   PageID 24883
Appendix Part 6 Page 390 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 29 of
324

and it will not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead expenses of the General Partner or the Investment Manager.

(b) The Partnership, and not the General Partner or the Investment Manager, will pay, or reimburse the General Partner and the Investment Manager for, all costs, fees and expenses arising in connection with the Partnership's operations, as well as its *pro rata* share of the cost of the Master Fund's initial organization, operations and Investment-related expenses. Such expenses payable by the Partnership include the following:

(i) the Partnership's *pro rata* share of the cost of the Master Fund's investment program, including, without limitation, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence, willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring Investments;

(ii) initial organizational expenses of the Partnership; provided that, such organizational costs may be expensed immediately, or in the General Partner's discretion, amortized in whole or in part and capitalized over a period of 60 calendar months from the date the Partnership commences operations, which may result in an exception to GAAP;

(iii) fees and expenses of advisers and consultants;

(iv) Management Fees (charged at the Master Fund level);

(v) fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers;

(vi) indemnification expenses incurred in connection with Section 4.5 and the cost of insurance against potential indemnification liabilities;

(vii) interest and other borrowing expenses;

(viii) legal, administrative, accounting, tax, audit and insurance expenses;

(ix) expenses of preparing and distributing reports, financial statements and notices to Limited Partners;

(x) litigation or other extraordinary expenses;

(xi) any withholding, transfer or other taxes imposed or assessed on, or payable by, the Partnership (including any interest and penalties); and

Appx. 03648

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 09/14/... Page 72 of 200    PageID 24884
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 30 of
324

(xii)   the cost of periodically updating the Partnership's offering memorandum and this Agreement.

(c)   Expenses generally will be borne *pro rata* by the Partners in accordance with their respective Partnership Percentages; *provided* that expenses may be specially allocated among the Partners as follows:

(i)   with respect to expenses related to Investments (other than taxes), *pro rata* in accordance with their respective Partnership Percentages; and

(ii)   as provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6 and 5.5.

(d)   Each of the General Partner and the Investment Manager, as appropriate, shall be entitled to reimbursement from the Partnership for any of the expenses paid by it on behalf of the Partnership pursuant to Section 4.2(b); *provided* that the General Partner or the Investment Manager may absorb any or all of such expenses incurred on behalf of the Partnership. The Investment Manager may retain, in connection with its responsibilities hereunder as a delegatee of the General Partner, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any Affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and neither the Master Fund nor the Partnership shall have any liability therefor; *provided, however,* that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Master Fund, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(e)   If the General Partner or the Investment Manager, as appropriate, shall incur any of the expenses referred to in Section 4.2(b) for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Master Fund and any Other Account, the General Partner or the Investment Manager, as appropriate, will allocate such expense among the Master Fund and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)   Each of the General Partner and the Investment Manager is entitled to use "soft dollars" generated by the Master Fund to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the General Partner or the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended, or is otherwise reasonably related to the investment decision-making process, or to cover certain Master Fund expenses.   Use of "soft dollars" by the General Partner

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 08/09/24    Page 73 of 200    PageID 24885
Appendix Part 6    Page 392 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 31 of 324

or the Investment Manager as described herein shall not constitute a breach by the either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

**4.3    Rights of Limited Partners**

The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law. Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

**4.4    Other Activities of Partners**

(a)    The General Partner shall not be required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine in good faith to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)    Each Partner acknowledges and agrees that any other Partner, its Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustees of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Partnership or the Master Fund. Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Partners, their Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners, their Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees are hereby authorized to engage in activities contemplated by this Section 4.4(b) with, or to purchase, sell or otherwise deal or invest in investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Master Fund, without the consent or approval of the Partnership or any other Partner. The Partners expressly agree that no other Partner shall have any rights in or to such other activities, or any profits derived therefrom.

26

Appx. 03650

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 09/34 of 867 age 74 of 200    PageID 24886
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 32 of
324

(c)    The General Partner and its Affiliates shall allocate investment opportunities to the Master Fund and any Other Account fairly and equitably over time. Notwithstanding the foregoing, the General Partner is under no obligation to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities.  This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.  The General Partner has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable.  Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the General Partner may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d)    The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of Interests), unless such purchase or sale is in compliance with the applicable provisions of the Advisers Act.

(e)    Each Partner hereto hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.4.

(f)    The General Partner and its Affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Partnership or that are targeted primarily to investors for which the Partnership is not designed to be a suitable investment vehicle.  The General Partner and its Affiliates also reserve the right to establish and provide management or advisory services to Other Accounts for significant investors, whether or not such accounts have the same investment program as the Partnership.

27

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-7    Filed 09/09/24    Page 75 of 200    PageID 24887
Appendix Part 6 Page 394 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 33 of
324

(g)     Each Limited Partner acknowledges that the General Partner or the Investment Manager may engage one or more of their respective Affiliates to provide services to the Partnership or the Master Fund for compensation.

## 4.5    Duty of Care; Indemnification

(a)     None of the Indemnified Persons will be liable to the Partnership or any Limited Partner for any loss or damage arising by reason of being or having been an Indemnified Person or from any acts or omissions in the performance of its services as an Indemnified Person in the absence of gross negligence, willful misconduct or fraud, or as otherwise required by law.   In no event shall any Indemnified Person be liable for any consequential damages, special or indirect damages or lost profits. An Indemnified Person may consult with counsel and accountants in respect of the Partnership's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.

(b)     The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all liabilities suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person or in connection with this Agreement or the Partnership's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence, willful misconduct or fraud of such Indemnified Person.   The Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct.   In the event that such an advance is made by the Partnership, the Indemnified Person will agree to reimburse the Partnership to the extent that it is finally determined that the Indemnified Person was not entitled to indemnification in respect thereof.

(c)     Notwithstanding any of the foregoing, the provisions of this Section 4.5 do not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(d)     Pursuant to the indemnification and exculpation provisions above and as set forth in the Master Fund Partnership Agreement, the Master Fund (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, and the Partnership will bear its *pro rata* portion thereof, absent gross negligence, willful misconduct or fraud of any Indemnified Person.

Appx. 03652

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 09/02/22    Page 76 of 200    PageID 24888
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 34 of
324

(e)    The above-mentioned Indemnified Persons are also indemnified by each Limited Partner for any amounts of tax withheld or required to be withheld with respect to that Limited Partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the Limited Partner's Capital Account is insufficient to fully compensate the General Partner or the Investment Manager for such costs.

_____

## Article V
## ADMISSIONS, TRANSFERS AND WITHDRAWALS

_____

### 5.1    Admission of Limited Partners

The General Partner may, on the first day of each calendar month, or at such other times as the General Partner may determine, without advance notice to or consent of the Limited Partners, admit to the Partnership any Person who shall execute this Agreement or any other writing evidencing the intent of such Person to become a Limited Partner.  Such admission shall be effective when the General Partner enters the name of such Person on the Schedule of Partners and does not require the consent or approval of any other Partner.  The General Partner shall have the authority to reject subscriptions for Interests in whole or in part.

### 5.2    Admission of Additional General Partners

(a)    Except as provided in Section 5.2(b), the General Partner may admit one or more Persons as additional general partners to the Partnership.  No additional general partner shall be added unless such additional general partner agrees to be bound by all of the terms of this Agreement and adding such additional general partner would not have any of the effects described in clauses (i) through (iv) of Section 5.3(c) (except as specifically set forth therein).

(b)    Any Person to whom the General Partner has transferred its general partner interest in accordance with Section 5.4 will be admitted to the Partnership as a substitute General Partner without the consent of the Limited Partners unless otherwise provided for in Section 5.4.

### 5.3    Transfer of Interests of Limited Partners

(a)    Each Limited Partner agrees with all other Partners that it shall not make or attempt to make any Transfer of its Interest which will violate this Section 5.3.  In the event of any attempted Transfer of any Limited Partner's Interest in violation of the provisions of this Section 5.3, without limiting any other rights of the Partnership, the General Partner shall have the right to require the withdrawal of such Limited Partner's Interest from the Partnership as provided by Section 5.5(j).

29

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21 Filed 09/04/24   Page 77 of 200    PageID 24889
Appendix Part 6 Page 39 of 88
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 35 of
324

(b)    No Transfer of any Limited Partner's Interest, whether voluntary or involuntary, shall be valid or effective, and no transferee shall become a substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be granted, withheld or conditioned for any reason by the General Partner. In the event of any Transfer, all of the conditions of the remainder of this Section 5.3 must also be satisfied.

(c)    Without limiting the General Partner's discretion pursuant to the preceding paragraph, the General Partner expects to withhold consent to any Transfer of any Limited Partner's Interest, whether voluntary or involuntary, if the General Partner has reason to believe that such Transfer may:

(i)    require registration of any Interest under any securities laws of the United States of America, any state thereof or any other jurisdiction;

(ii)    subject the Partnership or the General Partner to a requirement to register, or to additional disclosure or other requirements, under any securities or commodities laws of the United States of America, any state thereof or any other jurisdiction;

(iii)    result in a termination of the Partnership for U.S. federal income tax purposes under Section 708(b)(1)(B) of the Code, or cause the Partnership to be treated as a "publicly traded partnership" for U.S. federal income tax purposes under Section 7704(b) of the Code or cause the Partnership not to qualify for one of the safe harbors under Section 1.7704 1(e), (f), (g), (h) or (j) of the Regulations;

(iv)    result in the Partnership being considered an investment company within the meaning of the Investment Company Act;

(v)    result in violation of any anti-money laundering rules or regulations applicable to the Partnership, the Investment Manager or the General Partner;

(vi)    violate or be inconsistent with any representation or warranty made by the transferring Limited Partner at the time the Limited Partner subscribed to purchase an Interest; or

(vii)    cause all or any portion of the assets of the Master Fund to constitute Plan Assets of any ERISA Partner for purposes of ERISA or to be subject to the provisions of ERISA to substantially the same extent as if owned directly by an ERISA Partner.

The transferring Limited Partner, or its legal representative, must give the General Partner written notice before making any voluntary Transfer and after any involuntary Transfer and must provide sufficient information to allow legal counsel acting for the Partnership to make the determination that the proposed Transfer would not result in any of the consequences referred to in clauses (i) through (vii)

30

**Appx. 03654**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6 Filed 09/24 of 8 Page 78 of 200    PageID 24890
Appendix Part 6 Filed 09/24 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 36 of
324

above.  If an assignment, Transfer or disposition occurs by reason of the death of a Limited Partner or assignee, the notice may be given by the duly authorized representative of the estate of the Limited Partner or assignee.  The notice must be supported by proof of legal authority and valid assignment acceptable to the General Partner.

(d)    In the event any Transfer permitted by this Section 5.3 shall result in multiple ownership of any Limited Partner's Interest, the General Partner may require one or more trustees or nominees to be designated to represent a portion of or the entire Interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement, and for the purpose of exercising the rights which the transferor as a Limited Partner had pursuant to the provisions of this Agreement.

(e)    Subsequent to receipt of the consent of the General Partner (which consent may be withheld by the General Partner), an authorized transferee shall be entitled to the allocations and distributions attributable to the Interest transferred to such transferee and to transfer such Interest in accordance with the terms of this Agreement; *provided*, *however*, that such transferee shall not be entitled to the other rights of a Limited Partner as a result of such Transfer until it becomes a substituted Limited Partner.  No transferee may become a substituted Limited Partner without the consent of the General Partner (which consent may be withheld for any reason or no reason by the General Partner).  If the General Partner withholds consent to such substitution, a transferee will not have any of the rights of a Limited Partner, except that the transferee will be entitled, unless prohibited by law, to receive that share of capital or profits and to have the right of withdrawal to which its transferor would have been entitled and will be subject to the other terms of this Agreement.  A transferring Limited Partner will remain liable to the Partnership as provided under applicable law and this Agreement regardless of whether its transferee becomes a substituted Limited Partner.  Notwithstanding the above, the Partnership and the General Partner shall incur no liability for allocations and distributions made in good faith to the transferring Limited Partner until a written instrument of transfer has been received by the Partnership and recorded on its books and the effective date of the Transfer has passed.

(f)    Any other provision of this Agreement to the contrary notwithstanding, a transferee shall be bound by the provisions hereof.  Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner may require the transferring Limited Partner to execute and acknowledge an instrument of Transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement.  A transferee shall become a substituted Limited Partner and shall succeed to the portion of the transferor's Capital Account relating to the Interest transferred effective upon the satisfaction of all of the conditions for such Transfer contained in this Section 5.3.

31

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 09/09/24    Page 79 of 200    PageID 24891
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 37 of
324

(g)     In the event of a Transfer or in the event of a distribution of assets of the Partnership to any Partner, the Partnership may, but shall not be required to, file an election under Section 754 of the Code and in accordance with the applicable Regulations, to cause the basis of the Partnership's assets to be adjusted for U.S. federal income tax purposes as provided by Section 734 or 743 of the Code and shall make any mandatory adjustments to the basis of the Partnership's assets as required by Section 734 or 743 of the Code.  If the Partnership does not file an election under Section 754 in connection with a Transfer and if the transferring Limited Partner is a Negative Basis Partner, the General Partner may elect to allocate to the transferring Limited Partner pursuant to Section 3.9(d) net losses or items of loss and deduction realized by the Partnership for the Fiscal Year in which the Transfer occurs as if the transferring Limited Partner were withdrawing from the Partnership pursuant to Section 5.5.

(h)     In the event of a Transfer at any time other than the end of a Fiscal Year, items of income, gain, loss, deduction or credit recognized by the Partnership for U.S. federal income tax purposes will be allocated between the transferring parties, as determined by the General Partner, using any permissible method under Code Section 706(d) and the Regulations thereunder.  The transferring parties agree to reimburse the General Partner and the Partnership for any incidental accounting fees and other expenses incurred by the General Partner and the Partnership in making allocations pursuant to this Section 5.3(h).

**5.4     Transfer of Interest of the General Partner**

The General Partner may not Transfer its Interest as a general partner of the Partnership other than (a) to one or more of its direct or indirect beneficial owners or their Affiliates, or (b) with the approval of a Majority of Limited Partners.  Each Limited Partner shall be deemed to have consented to any such Transfer made in accordance with this Section 5.4.

**5.5     Withdrawal of Interests of Partners**

(a)     Except as provided in this Section 5.5, a Limited Partner may voluntarily withdraw all or part of its Capital Account effective as of the last Business Day of each calendar month and/or such other Business Days as the General Partner may determine in its sole discretion (such date, a "***Withdrawal Date***") upon not less than 30 calendar days' prior written notice ("***Withdrawal Notice***") to the Administrator; provided that, any partial withdrawals may only be made in minimum amounts of $100,000.  Any notice of withdrawal shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner.  The General Partner may waive the notice requirements of this Section 5.5(a), including with respect to the Capital Accounts of the Affiliated Investors.  Notwithstanding anything herein to the contrary, the General Partner may agree with certain Limited Partners to provide for different withdrawal terms and notice periods.

(b)     For the purposes of this Section 5.5 (and as described in Section 3.3(a)), each capital contribution shall be accounted for using a separate memorandum

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 03/09/24    Page 80 of 200    PageID 24892
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 38 of
324

sub-account, and, in the case of a Limited Partner for which more than one memorandum sub-account is maintained, the withdrawals of the balance of any such sub-accounts shall be processed on a "first-in, first-out" basis based upon the date on which each capital contribution was made, unless otherwise agreed between the General Partner and such Limited Partner.  Each memorandum sub-account related to a contribution of capital from a Limited Partner will be treated as if it were the separate Capital Account of a separate Partner for the purposes of applying the withdrawal provisions of this Section 5.5.

(c)     A withdrawal of capital from a Capital Account that occurs during an applicable Soft Lock-up Period or Second Soft Lock-up Period is subject to the applicable Early Withdrawal Reduction.  The General Partner may waive the Soft Lock-up Period or the Second Soft Lock-up Period with respect to any Capital Account of a Limited Partner.

(d)     Any Withdrawal Notice shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner.  For the avoidance of doubt, if a Limited Partner notifies the General Partner of its intent to withdraw and later chooses not to withdraw (with the General Partner's consent), any transaction costs incurred by the Partnership or the General Partner in connection therewith may, in the discretion of the General Partner, be charged to such withdrawing Limited Partner.  The General Partner or the Administrator may refuse to honor any Limited Partner's request for a full or partial withdrawal if such request is not accompanied by such additional information as the General Partner or the Administrator may reasonably require.

(e)     Payment of the estimated amount due with respect to any permitted withdrawal pursuant to this Section 5.5 will generally be made within 10 Business Days of the Withdrawal Date, *provided* that, the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership.  Amounts withdrawn by a Limited Partner will not earn interest for the period from the effective Withdrawal Date through the settlement date.

(f)     The General Partner may deduct from any withdrawal proceeds due to any Limited Partner pursuant to this Section 5.5 an amount representing the Partnership's actual or estimated expenses, as determined by the General Partner in good faith, associated with processing the withdrawal, as well as any Early Withdrawal Reduction.  Any such withdrawal deduction will be retained for the benefit of the Partnership.

(g)     Upon receipt by the Partnership of a Limited Partner's Withdrawal Notice, the General Partner, in its capacity as the general partner of the Master Fund, will have the discretion to manage the Master Fund's assets in a manner that would provide for cash being available to the Partnership to satisfy such Limited Partner's withdrawal request, but the General Partner shall be under no obligation to effect sales of Master Fund assets if the General Partner determines that such transactions

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 17-2 Filed 01/09/24 of 887age 81 of 200    PageID 24893
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 39 of
324

might be detrimental to the interest of the other Investors or that such transactions are not reasonably practicable. The General Partner may effect withdrawal payments (i) in cash, (ii) in kind, by transfer of marketable or non-marketable Investments received from the Master Fund or other assets of the Partnership, the value of which, as determined in accordance with Section 7.3, would satisfy the Limited Partner's request for withdrawal, or (iii) in any combination of the foregoing.   In the event that the General Partner satisfies a withdrawal request with Investments or assets in kind, such securities may be transferred to a liquidating account and sold by the Partnership for the benefit of the withdrawing Limited Partner, in which case, payment of the withdrawal proceeds attributable to such Investments will be delayed until such Investments are sold.   The amount payable in respect of such Investments will depend on the performance of such Investments through to the date on which they are sold.   The cost of operating the liquidating account and selling the Investment(s) will be deducted from the proceeds of sale paid to the withdrawing Limited Partner.

(h)    The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Interests (and the applicable valuation date); (b) the issuance of Interests; (c) the withdrawal by Limited Partners of their Interests (and the applicable Withdrawal Date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and Withdrawal Dates are not postponed), during any period which: (i) any stock exchange on which a substantial part of Investments owned by the Partnership (through the Master Fund) are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the Investments owned by the Partnership (through the Master Fund) would not be reasonably practicable and might seriously prejudice the Limited Partners, or (B) it is not reasonably practicable for the Partnership fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Partnership; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the Investments of the Partnership (through the Master Fund); (v) in the sole discretion of the General Partner, it is necessary to preserve the Partnership's assets; or (vi) automatically upon any suspension of withdrawals by the Master Fund for similar reasons.

(i)    The Administrator will promptly notify each Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any suspension of withdrawals or suspension of the payment of withdrawal proceeds pursuant to Section 5.5(h).   Any remaining amount of a withdrawal request that is not satisfied due to such a suspension remains at risk as per other amounts invested in the Partnership and subject to the applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners will not be given any priority with respect to the withdrawal of Interests after the cause for such suspension or limitation ceases to exist.   The General Partner may in its sole discretion, however, permit such Limited Partners to withdraw their withdrawal requests to the extent that the relevant Withdrawal

Appx. 03658

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2   Filed 04/12/24   Page 82 of 200   PageID 24894
Appendix Part 6   Page 40 of 87
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 40 of
324

Date has not yet passed.  For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant Withdrawal Date and the remittance of such payment proceeds, affected Limited Partners shall not have any right to withdraw their withdrawal requests.  Upon the reasonable determination by the General Partner that conditions leading to a suspension no longer apply, the Administrator will notify the Limited Partners of the end of the suspension.  At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated, and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first Withdrawal Date following the removal of the suspension, subject to the foregoing restrictions on withdrawals.  For the avoidance of doubt, the terms of Section 5.5(h) and this Section 5.5(i) shall not affect the discretion of the General Partner to compel the withdrawal of the Interest of any Limited Partner pursuant to Section 5.5(j).

(j)     The General Partner may, upon not less than seven days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Partnership may cause the Partnership, the Master Fund, the General Partner or the Investment Manager to violate any applicable law), require any Limited Partner's Interest to be withdrawn in part or in its entirety from the Partnership and for the Limited Partner to cease to be a limited partner of the Partnership (in the case of a withdrawal of the Limited Partner's Interest in its entirety) pursuant to this Section 5.5(j) (a "***Compulsory Withdrawal***").  The General Partner will compel the withdrawal of a Limited Partner's Interest in its entirety if a Limited Partner requests a withdrawal that would cause its total investment with respect to a particular Series to fall below a minimum of $100,000 (a "***Minimum Required Withdrawal***").   In either case, the amount due to any such Partner required to withdraw from the Partnership shall be equal to the value of such Partner's Capital Account as of the Withdrawal Date determined by the General Partner, net of any deductions imposed pursuant to Section 5.5(f).  Except as otherwise provided herein, settlements pursuant to this Section 5.5(j) will be made in the same manner as voluntary withdrawals, but the Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal.  However, for purposes of clarity, the Early Withdrawal Reduction will apply to any Minimum Required Withdrawal.

(k)     The right of any Partner to withdraw or receive distributions pursuant to the provisions of this Section 5.5 is subject to all Capital Account allocations and adjustments contemplated by this Agreement and to the provision by the General Partner for all Partnership liabilities and for reserves for contingencies provided in Section 3.6.   Notwithstanding anything to the contrary herein, the General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the General Partner and whether or not incurred directly or

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-21   Filed 09/22/24   Page 83 of 200   PageID 24895
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 41 of
324

indirectly), which could reduce the amount of a distribution upon a Limited Partner's withdrawal.

(l)     With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Partnership or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable Withdrawal Date, except as provided in Section 3.6.  For the avoidance of doubt, none of the Partnership, the General Partner or the Investment Manager will be liable to a Limited Partner for interest on the proceeds of any withdrawal.

(m)    The Interest of a Limited Partner may not be withdrawn from the Partnership prior to its dissolution, except as provided in this Section 5.5.

(n)     Unless prohibited by law, the Special Limited Partner, its Affiliates and any other Person that is entitled to any portion of the Performance Allocation may make withdrawals of all or any portion of the amount of the Performance Allocation from their capital accounts in the Master Fund as of any Withdrawal Date.

(o)     If the Master Fund violates the investment restrictions set forth in the Master Fund Partnership Agreement and fails to remedy the violation on or before the Remedy Date, any Limited Partner may withdraw all or part of its Capital Account (and corresponding Capital Sub-Account) on the next Withdrawal Date and will not be subject to the Early Withdrawal Reduction; provided that, such Limited Partner has requested such withdrawal in writing within 30 Business Days after the Remedy Date.

**5.6    Withdrawal of Original Limited Partner**

The Original Limited Partner (in its capacity as the original limited partner of the Partnership) hereby withdraws from the Partnership and is entitled to the return of any capital contribution, without interest or deduction, upon the Commencement Date.

—————

**Article VI
DISSOLUTION AND LIQUIDATION**

—————

**6.1    Dissolution of Partnership**

(a)     The Partnership shall be dissolved upon the first to occur of the following dates:

(i)      any date on which the General Partner shall elect in writing to dissolve the Partnership; or

**Appx. 03660**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Appendix Part 6    Page 403 of 867    Page 84 of 200    PageID 24896
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 42 of
324

(ii)    the occurrence of any other event causing (A) the General Partner (or a successor to its business) to cease to be the general partner of the Partnership or (B) the dissolution of the Partnership under the Act.

(b)    The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.  Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.  Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

## 6.2    Liquidation of Assets

(a)    Upon dissolution of the Partnership, the General Partner shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority of Limited Partners shall liquidate the business and administrative affairs of the Partnership.  Net Profit and Net Loss during the Fiscal Periods, which includes the period of liquidation, shall be allocated pursuant to Article III.  The proceeds from liquidation shall be divided in the following manner, subject to the Act:

(i)    the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)    such debts as are owing to the Partners as Partners are next paid; and

(iii)    the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)    Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; *provided*, *however*, that if any in kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit or Net Loss for the Fiscal Period ending on the date of such distribution.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/24/4 of 887age 85 of 200    PageID 24897
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 43 of
324

---

### Article VII
### ACCOUNTING AND VALUATION; BOOKS AND RECORDS

---

**7.1    Accounting and Reports**

(a)    The Partnership may adopt for tax accounting purposes any accounting method that the General Partner shall decide is in the best interests of the Partnership and that is permissible for U.S. federal income tax purposes.

(b)    As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of such period to be made by a firm of independent accountants selected by the General Partner.  Within 120 days of the end of each year (or as soon as practicable thereafter), but subject to Section 7.5, the General Partner shall furnish to each Limited Partner a copy of the set of audited financial statements prepared in accordance with GAAP, with such adjustments thereto as the General Partner determines appropriate, including a statement of profit and loss for such Fiscal Year and an unaudited status of each such Partner's holdings in the Partnership at such time.   The General Partner may elect not to reserve certain amounts that may be required by GAAP and not to provide certain portfolio disclosure required by GAAP to investors and may capitalize and amortize certain of its organizational expenses in deviation from GAAP.   Such deviations from GAAP may result in a qualified opinion rendered on the financial statements of the Partnership.

(c)    Upon request to the Administrator, each Partner may receive copies of semi-annual financial statements of the Partnership.

(d)    As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each such Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

**7.2    Certain Tax Matters**

(a)    By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "***Tax Matters Partner***"), or, in each case, under any similar state or local law.   The Tax Matters Partner shall have any powers necessary to perform fully in such

38

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-21   Filed 09/09/24   Page 86 of 200   PageID 24898
Appendix Part 6 Page 405 of 887
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 44 of
324

capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner.  The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period.  The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b)     The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

(c)     Each Limited Partner further agrees that such Limited Partner will not treat any Partnership item inconsistently on such Limited Partner's U.S. federal, state, local and/or non-U.S. tax returns or in any claim for a refund with the treatment of the item on the Partnership's tax returns and that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d)     The General Partner may in its sole discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws.

**7.3     Valuation of Partnership Assets and Interests**

(a)     The Partnership's assets are valued as of the close of each Fiscal Period and on any other date selected by the General Partner in its sole discretion in accordance with the valuation of the Master Fund's assets.  The Partnership shall utilize the Master Fund's valuations for all purposes in connection with the Partnership.

(b)     The value of the assets of the Partnership and the net worth of the Partnership as a whole determined pursuant to this Section 7.3 are conclusive and binding on all of the Partners and all parties claiming through or under them.

**7.4     Determinations by the General Partner**

(a)     All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the

Appx. 03663

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176 Part 6 Page 406 of 887 age 87 of 200    PageID 24899
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 45 of
324

provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)     The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or Capital Sub-Account (or other memorandum sub-account) as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

**7.5     Books and Records**

(a)     The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the Partnership.  The General Partner shall afford to the Partnership's independent auditors reasonable access to such documents during customary business hours and shall permit the Partnership's auditors to make copies thereof or extracts therefrom at the expense of the Partnership.

(b)     The General Partner shall establish such standards as it deems appropriate regarding the access of Limited Partners to the books and records of the Partnership and shall not be obliged to permit access by a Limited Partner to the name or address of any other Limited Partner.

**7.6     Confidentiality**

(a)     Each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns) or disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to any Investment (other than disclosure to such Limited Partner's directors, employees, agents, advisors, or representatives responsible for matters relating to the Partnership or to any other Person approved in writing by the General Partner (each such Person being hereinafter referred to as an "*Authorized Representative*")); *provided* that (i) such Limited Partner and its Authorized Representatives may make such disclosure to the extent that (A) the information to be disclosed is publicly available at the time of proposed disclosure by such Limited Partner or Authorized Representative, (B) the information otherwise is or

40

Appx. 03664

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 02/02/24    Page 88 of 200    PageID 24900
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 46 of
324

becomes legally available to such Limited Partner other than through disclosure by the Partnership or the General Partner, or (C) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; *provided* that such governmental agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) such Limited Partner and its Authorized Representatives may make such disclosure to its beneficial owners to the extent required under the terms of its arrangements with such beneficial owners; and (iii) each Limited Partner will be permitted, after written notice to the General Partner, to correct any false or misleading information which becomes public concerning such Limited Partner's relationship to the Partnership or the General Partner.  Prior to making any disclosure required by law, each Limited Partner shall use its best efforts to notify the General Partner of such disclosure.  Prior to any disclosure to any Authorized Representative or beneficial owner, each Limited Partner shall advise such Authorized Representative or beneficial owner of the obligations set forth in this Section 7.6(a) and each such Authorized Representative or beneficial owner shall agree to be bound by such obligations.

(b)     The General Partner shall have the right to keep confidential from the Limited Partners, for such period of time as the General Partner deems reasonable, any information, including the identity of the Partners or information regarding the Partners or Investments, which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

(c)     Subject to applicable legal, fiscal and regulatory considerations, the General Partner shall use reasonable efforts to keep confidential any information relating to a Limited Partner obtained by the General Partner in connection with or arising out of the Partnership which the Limited Partner requests to be kept confidential.

(d)     Notwithstanding the provisions of this Section 7.6, Partners (and their employees, representatives and other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and its transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to such Person by, or on behalf of the Partnership.  For this purpose, "tax treatment" is the purported or claimed U.S. federal income tax treatment of a transaction and "tax structure" is limited to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction. For this purpose, the names of the Partnership, the Partners, their Affiliates, the names of their partners, members or equity holders and the representatives, agents and tax advisors of any of the foregoing are not items of tax treatment or tax structure.

(e)     The General Partner may disclose to prospective investors such information relating to the Partnership or the Investments as it believes in good faith will benefit

Appx. 03665

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Filed 04/24/21    Page 89 of 200    PageID 24901
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 47 of
324

the Partnership and facilitate investment in the Partnership by such prospective investors.

(f)     The Investment Manager and any other Person acting as a service provider to the Partnership shall have the right to access all information belonging to the Partnership.

_____

**Article VIII**
**GENERAL PROVISIONS**

_____

**8.1     Amendment of Partnership Agreement**

(a)     Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, with the written consent of (i) the General Partner and (ii) the consent of a Majority of Limited Partners (which approval may be obtained by negative consent affording the Limited Partners 30 calendar days to object).

(b)     Any amendment that would:

  (i)     increase the obligation of a Partner to make any contribution to the capital of the Partnership;

  (ii)    reduce the Capital Account of a Partner other than in accordance with Article III;

  (iii)   adversely alter any Partner's rights with respect to the allocation of Net Profit or Net Loss or with respect to distributions and withdrawals; or

  (iv)    change the respective liabilities of the General Partner and the Limited Partners;

may only be made if the prior written consent of each Partner adversely affected thereby is obtained (which consent may be obtained by negative consent affording the Limited Partners 30 calendar days to object).

(c)     Notwithstanding paragraphs (a) and (b) of this Section 8.1, this Agreement may be amended by the General Partner without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Partnership (without being subject to the Early Withdrawal Reduction) as of a date determined by the General Partner that is not less than 30 calendar days after the General Partner has furnished written notice of such amendment to each affected Limited Partner and that is prior to the effective date of the amendment. The admission and withdrawal of Limited

Appx. 03666

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 04/09/24    Page 90 of 200    PageID 24902
Appendix Part 6 Page 402 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 48 of
324

Partners will not require notice or disclosure to, or the approval of, the other Limited Partners.

(d)    The General Partner may at any time without the consent of the other Partners:

(i)    add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

(ii)    cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

(iii)    change the name of the Partnership;

(iv)    make any changes required by a governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners, *provided*, *however*, that no such amendment may be made unless such change (A) is for the benefit of, or not adverse to, the interests of Limited Partners, (B) does not affect the right of the General Partner to manage and control the Partnership's business, (C) does not affect the allocation of profits and losses among the Partners and (D) does not affect the limited liability of the Limited Partners;

(v)    amend this Agreement to reflect a change in the identity of the General Partner which has been made in accordance with this Agreement;

(vi)    amend this Agreement (other than with respect to the matters set forth in Section 8.1(b)) to effect compliance with any applicable laws, regulations or administrative actions, or to reflect any change made in accordance with Section 4.1(b);

(vii)    subject to Section 8.1(b), amend this Agreement to reflect the creation, and terms, of any new Series;

(viii)    effect any other amendment which would not, in the good faith judgment of the General Partner, adversely affect any of the existing Limited Partners;

(ix)    enable the Partnership or the Tax Matters Partner to comply with BBA provisions, or to make any elections or take any other actions available thereunder; and

(x)    restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(e)    The General Partner and the Investment Manager shall have the authority to agree with a Limited Partner to waive, modify or supplement the application of any provision of this Agreement or any subscription agreement with respect to such

43

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2    Filed 04/04 of 88ge 91 of 200    PageID 24903
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 49 of
324

Limited Partner without notifying or obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights as a Limited Partner pursuant to this Agreement would be materially and adversely changed by such waiver or modification). Any such waiver, modification or supplementation may be evidenced by a "side letter" or other agreement, and the form thereof shall not impair its binding effect as if incorporated in this Agreement.

(f)     Notwithstanding anything in this Section 8.1 to the contrary, any amendment to Section 2.5 requires the prior written consent of ERISA Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all ERISA Partners.

**8.2     Special Power-of-Attorney**

(a)     Each Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns), with full power of substitution, as the true and lawful representative and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish:

(i)     an amendment to this Agreement that complies with the provisions of this Agreement (including the provisions of Section 8.1);

(ii)     the Certificate and any amendment thereof required because this Agreement is amended, including an amendment to effectuate any change in the membership of the Partnership or in the capital contributions of the Partners;

(iii)     any financing statement or other filing or document required or permitted to perfect the security interests contemplated by any provision hereof; and

(iv)     all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the State of Delaware, or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership, adjust the structure of the Partnership in accordance with Sections 4.1(b) or 8.8, or to effect the dissolution or termination of the Partnership.

(b)     Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without that Limited Partner's consent. If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner contemplated by this Agreement, each Limited Partner agrees that, notwithstanding

44

**Appx. 03668**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-2  Filed 09/12/4 of 867 Page 92 of 200    PageID 24904
Appendix Part 6  Page 49 of 83
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 50 of
324

any objection which such Limited Partner may assert with respect to such action, the General Partner in its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action to be lawfully taken or omitted. Each Partner is fully aware that each other Partner relies on the effectiveness of this special power-of-attorney with a view to the orderly administration of the affairs of the Partnership. This power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the General Partner and as such:

(i)    is irrevocable and continues in full force and effect notwithstanding the subsequent death or incapacity of any party granting this power-of-attorney, regardless of whether the Partnership or the General Partner has had notice thereof; and

(ii)    survives the delivery of an assignment by a Limited Partner of the whole or any portion of such Limited Partner's Interest, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this power-of-attorney given by the assignor survives the delivery of such agreement for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

**8.3    Notices**

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the Schedule of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner. Notices shall be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.

**8.4    Agreement Binding Upon Successors and Assigns; Delegation**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Sections 4.1(d), 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections shall be null and void *ab initio*.

Appx. 03669

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 76-2    Appendix Part 6 Filed 04/24/ Page 93 of 200    PageID 24905
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 51 of
324

**8.5**      **Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in Dallas, Texas. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the Schedule of Partners maintained by the General Partner.

**8.6**      **Not for Benefit of Creditors**

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership. Except for the rights of the Indemnified Persons hereunder, this Agreement is not intended for the benefit of non-Partner creditors and no rights are granted to non-Partner creditors under this Agreement.

**8.7**      **Consents and Voting**

(a)      Except as provided in Section 5.4, Limited Partners do not have any right to vote for the admission or removal of any General Partner and, except for the right to vote on certain amendments proposed by the General Partner, have no other voting rights. Upon the request of any Limited Partner, including pursuant to Section 8.10 hereof, the General Partner may designate an Interest as a Non-Voting Interest, in which case the Limited Partner shall not have the right to vote on any matter, including amendments.

(b)      Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and a copy thereof shall be filed and kept with the books of the Partnership. (For the avoidance of doubt, an amendment made pursuant to Section 8.1(c) or (d) or pursuant to negative consent under Section 8.1(a) or (b) shall not require any affirmative written response by any Limited Partner who is not electing to withdraw from the Partnership.)

**8.8**      **Merger and Consolidation**

(a)      The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an agreement of merger or consolidation which has been approved in the manner contemplated by Section 17-211(b) of the Act.

(b)      Notwithstanding anything to the contrary contained elsewhere in this Agreement, an agreement of merger or consolidation approved in accordance with Section 17-211(b) of the Act may, to the extent permitted by Section 17-211(g) of the Act, (i) effect any amendment to this Agreement, (ii) effect the adoption of a new limited partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the limited

Appx. 03670

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 09/12/24    Page 94 of 200    PageID 24906
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 52 of
324

partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) shall be the limited partnership agreement of the surviving or resulting limited partnership.

### 8.9    Miscellaneous

(a)    The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.  Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)    This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c)    If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 8.10    BHCA Subject Persons

Notwithstanding any other provision of this Agreement to the contrary:

(a)    Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has an Partnership Percentage in excess of 4.9 percent of the aggregate Partnership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold an Partnership Percentage of only 4.9 percent of the aggregate Partnership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 8.10 on all such Limited Partners), and such Partnership Percentage in excess of said 4.9 percent shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages; *provided* that this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of this Agreement up to the full amount of its Partnership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partner's Interest.  The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; *provided*, *however*, that the foregoing voting restriction shall not continue to apply if the Interest is transferred:

47

**Appx. 03671**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 6-2    Appendix Part 6 Page 94 of 87 Page 95 of 200    PageID 24907
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 53 of
324

(i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no Person acquires more than 2% of the Partnership's outstanding Interests; or (iv) in a single transaction to a third party who acquires at least a majority of the Partnership's outstanding Interests without regard to the Transfer of such Interests.

(b)     Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice, and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law.  Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages.

(c)     A Limited Partner that is a BHCA Subject Person and that elects to be subject to Section 8.10(a) and (b) shall notify the General Partner thereof (an "***Election Notice***") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to Section 8.10(a) and (b) until 30 calendar days after such Limited Partner notifies the General Partner that it elects no longer to be subject to Section 8.10(a) and (b) (a "***Revocation Notice***"), which period may be reduced by the General Partner.

## 8.11    RIC Limited Partners

An Interest of a RIC Limited Partner does not entitle the RIC Limited Partner to vote or consent with respect to any Partnership matter unless the RIC Limited Partner's vote or consent with respect to its Interest would not be considered to be "voting securities" as defined under Section 2(a)(42) of the Investment Company Act.  Except as provided in this Section 8.11, an Interest held by a RIC Limited Partner as a Non-Voting Interest is identical in all regards to all other Interests held by Limited Partners.

## 8.12    Bad Actor Limited Partners

Under Rule 506(d) under the Securities Act, the Partnership may be banned from selling Interests under Rule 506 if a Limited Partner beneficially owning 20% or more of the Partnership's voting securities engages in a "bad act" set forth in Rule 506.  Accordingly, each Limited Partner agrees that the General Partner may deem the portion of any Bad Actor Limited Partner's Interest to be, or convert any Bad Actor Limited Partner's Interest into, a Non-Voting Interest (except for the purposes of voting on any amendment to this Agreement that would materially and adversely change the Bad Actor Limited Partner's rights and preferences as a Limited Partner other than pursuant to an amendment under Section 8.1(c)) to the extent that the General Partner determines that such portion is in excess of 19.99% of the outstanding aggregate voting Interests of all Partners excluding any Interests that are Non-Voting Interests.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 76-2 Filed 09/15/21 Page 96 of 200   PageID 24908
Appendix Part 6 Page 49 of 87
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 54 of
324

**8.13    Survival**

The obligations and covenants of the Limited Partners set forth in Sections 3.5 and 3.12 hereof shall apply jointly and severally to each Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and will survive such Partner's ceasing to be a partner of the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

**8.14    Entire Agreement**

The parties acknowledge and agree that, subject to Section 8.1(f), the General Partner without the approval of any other Partner may enter into a written agreement on behalf of the Partnership with any Limited Partner affecting the terms hereof in order to meet certain requirements of the Limited Partner (each an "***Other Agreement***"), and the terms of such Other Agreement shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement.  This Agreement and each Other Agreement constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements and understandings pertaining thereto.

[Signature Page Follows]

Appx. 03673

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 20-7   Filed 09/09/24   Page 97 of 200   PageID 24909
Appendix Part 6   Page 49 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 55 of
324

The parties hereto have executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

*On behalf of itself and as attorney-in-fact for the
Limited Partners*

**Highland Argentina Regional Opportunity Fund
GP, LLC**

By:    Highland Capital Management Latin
      America, L.P., its sole member
By:    Highland Latin America GP, Ltd., its general
      partner

By: _____
Name: Gustavo Prilick
Title:  Director


**ORIGINAL LIMITED PARTNER:**

**Highland Capital Management Latin America,
L.P.**

By:    Highland Latin America GP, Ltd., its general
      partner

By: _____
Name: Gustavo Prilick
Title:  Director

*Signature Page to the Amended and Restated Limited Partnership Agreement of Highland Argentina Regional
Opportunity Fund, L.P.*

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**


**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**


**OF**


**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION ON 8 NOVEMBER 2017)**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 01/24/24    Page 99 of 200    PageID 24911
Appendix Part 6 Page 49 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 57 of
324

THE COMPANIES LAW (2016 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES


AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.

(AS ADOPTED BY SPECIAL RESOLUTION ON 8 NOVEMBER 2017)


1       The name of the Company is Highland Argentina Regional Opportunity Fund, Ltd..

2       The Registered Office of the Company shall be at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, or at such other place within the Cayman Islands as the Directors may decide.

3       The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the laws of the Cayman Islands.

4       The liability of each Member is limited to the amount unpaid on such Member's Shares.

5       The share capital of the Company is US$50,000 divided into 100 Management Shares of US$1.00 par value each and 999,900 Participating Shares of US$0.01 par value each.

6       The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7       Capitalised terms that are not defined in this Memorandum of Association bear the respective meanings given to them in the Articles of Association of the Company.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Filed 04/04/24    Page 100 of 200    PageID 24912
Appendix Part 6 Page 94 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 58 of
324

THE COMPANIES LAW (2016 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.

(AS ADOPTED BY SPECIAL RESOLUTION ON 8 NOVEMBER 2017)

# 1    Interpretation

1.1    In these Articles, Table A in the First Schedule to the Statute does not apply and unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| **"Administrator"** | means the person, firm or corporation appointed and from time to time acting as administrator of the Company. |
| **"AEOI"** | means: |

(i)    sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii)    the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters – the Common Reporting Standard and any associated guidance;

(iii)    any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation,

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-22   Filed 04/04/24   Page 101 of 200   PageID 24913
Appendix Part 6 Page 9220 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 59 of
324

|  |  |  |
|---|---|---|
|  |  | regulations or guidance described in sub-paragraphs (i) and (ii); and |
|  | (iv) | any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs. |

**"Articles"** means these articles of association of the Company.

**"Auditor"** means the person (if any) for the time being performing the duties of auditor of the Company.

**"Business Day"** means any day normally treated as a business day in such places and/or on such markets as the Directors may from time to time determine.

**"Cayman Islands"** means the British Overseas Territory of the Cayman Islands.

**"Class"** means a separate class of Participating Share.

**"Company"** means the above-named Company.

**"Directors"** means the directors for the time being of the Company.

**"Dollars"** or **"US$"** refers to the currency of the United States.

**"Electronic Record"** has the same meaning as in the Electronic Transactions Law.

**"Electronic    Transactions Law"** means the Electronic Transactions Law (2003 Revision) of the Cayman Islands.

**"Eligible Investor"** means a person eligible to hold Participating Shares, as determined from time to time by the Directors.

**"Gross Negligence"** in relation to a person means a standard of conduct beyond negligence whereby a person acts with reckless disregard for the consequences of his action or inaction.

**"Investment Manager"** means the person, firm or corporation appointed and for the time being acting as the investment manager of the Company.

**"Management Share"** means a voting non participating Share in the capital of the Company of US$0.01 par value designated as a Management Share and having the rights provided for in these Articles.

Appx. 03678

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 23 Part 6 Filed 04/21/of 867ge 102 of 200    PageID 24914

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 60 of
324

| | |
|---|---|
| **"Member"** | means each person whose name is, from time to time and for the time being, entered in the Register of Members as the holder of one or more Shares. |
| **"Memorandum"** | means the memorandum of association of the Company. |
| **"Net Asset Value"** | means the value of the assets less the liabilities of the Company, or of a Separate Account (as the context may require), calculated in accordance with these Articles. |
| **"Net Asset Value per Participating Share"** | means the amount determined in accordance with these Articles as being the Net Asset Value per Participating Share of a particular Class, and/or Series. |
| **"Offering Memorandum"** | means an offering memorandum relating to Participating Shares of any Class, and/or Series as amended or supplemented from time to time subject to and in accordance with these Articles. |
| **"Ordinary Resolution"** | A resolution passed at a quorate meeting of the Fund by a simple majority of the votes cast in its favour by the holders of the Management Shares or a resolution approved in writing by all such holders of Management Shares expressed to be an ordinary resolution. |
| **"Participating Share"** | means a participating redeemable Share in the capital of the Company of US$0.01 par value and having the rights provided for in these Articles. Participating Shares may be divided into Classes in the discretion of the Directors in accordance with the provisions of these Articles and each Class may be further divided into different Series of Participating Shares and the term "Participating Share" shall include all such Classes and/or Series of Participating Share. |
| **"Redemption Date"** | means, in relation to any Class and/or Series of Participating Shares, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time, upon which a Member is entitled to require the redemption of Participating Shares of that Class and/or Series. |
| **"Redemption Fee"** | means such fee (if any) payable by a Member to the Company on a redemption of Participating Shares, as the same may be determined by the Directors and disclosed to the Member at the time of its subscription for such Participating Shares. |

**Appx. 03679**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 23-1   Filed 04/22/24   Page 103 of 200    PageID 24915
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 61 of 324

**"Redemption Notice"** means a notice in a form approved by the Directors by which a holder of Participating Shares is entitled to require the Company to redeem its Participating Shares.

**"Redemption Price"** means the price determined in accordance with these Articles at which redeemable Participating Shares of the relevant Class and/or Series may be redeemed.

**"Register of Members"** means the register of Members, which shall be maintained in accordance with the Statute and includes (except where otherwise stated) any branch or duplicate Register of Members.

**"Registered Office"** means the registered office for the time being of the Company.

**"Sales Charge"** means such sales charge (if any) determined by the Directors as being payable by a subscriber on a subscription for Participating Shares of any Class and/or Series.

**"Seal"** means the common seal of the Company and includes every duplicate seal.

**"Separate Account"** means a separate internal account of the Company which the Directors may establish and cause to be maintained in accordance with these Articles.

**"Series"** means a separate series of Participating Share (and includes any sub-series of any such series).

**"Share"** and **"Shares"** means a share or shares of any class or series in the Company, including a Management Share or a Participating Share, as well as any fraction of a Share.

**"Special Resolution"** has the same meaning as in the Statute, and includes a unanimous written resolution.

**"Statute"** means the Companies Law (2016 Revision) of the Cayman Islands.

**"Subscriber"** means the subscriber to the Memorandum.

**"Subscription Date"** means, in relation to Participating Shares of any Class and/or Series, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time upon which a

**Appx. 03680**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-22   Filed 04/23/24   Page 104 of 200   PageID 24916
Appendix Part 6 Page 9234 of 8667

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 62 of
324

person may subscribe for Participating Shares of that Class and/or Series.

**"Subscription Price"**    means the price determined in accordance with these Articles at which Participating Shares of the relevant Class and/or Series may be subscribed.

**"Suspension"**    means a determination by the Directors to postpone or suspend (i) the calculation of the Net Asset Value of Participating Shares of any one or more Classes and/or Series (and the applicable Valuation Date) (a "**Calculation Suspension**"); (ii) the issue of Participating Shares of any one or more Classes and/or Series (and the applicable Subscription Date) (an "**Issue Suspension**"); (iii) the redemption by Members (in whole or in part) of Participating Shares of any one or more Classes and/or Series (and the applicable Redemption Date) (a "**Redemption Suspension**"); and/or (iv) the payment (in whole or in part) of any redemption proceeds (even if Valuation Dates and Redemption Dates are not postponed) (a "**Payment Suspension**").

**"Transfer"**    means, in respect of any Share, any sale, assignment, exchange, transfer, pledge, encumbrance or other disposition of that Share, and "**Transferred**" shall be construed accordingly.

**"Treasury Share"**    means a Share held in the name of the Company as a treasury share in accordance with the Statute.

**"Valuation Date"**    means, in relation to each Class and/or Series of Participating Shares, the day or days determined from time to time by the Directors to be the day or days on which the Net Asset Value per Participating Share of that Class and/or Series and/or Series is calculated.

**"Valuation Point"**    means, with respect to any Class and/or Series, the time or times on the Valuation Date of such Class and/or Series at which the Directors determine that the Net Asset Value per Participating Share of that Class and/or Series shall be calculated.

1.2    In these Articles:

(a)    the singular number includes the plural number and vice versa;

(b)    the masculine gender includes the feminine gender;

(c)    persons includes corporations;

Appx. 03681

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Filed 04/24/4 of 867age 105 of 200    PageID 24917
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 63 of 324

(d)    "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)    "shall" shall be construed as imperative and "may" shall be construed as permissive;

(f)    references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

(g)    any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(h)    the term "and/or" is used herein to mean both "and" as well as "or."  The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others.  "Or" shall not be interpreted to be exclusive, and "and" shall not be interpreted to require the conjunctive — in each case, unless the context otherwise requires;

(i)    any reference to the powers of the Directors shall include, when the context admits, the service providers or any other person to whom the Directors may delegate their powers;

(j)    any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(k)    any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Law;

(l)    sections 8 and 19(3) of the Electronic Transactions Law shall not apply; and

(m)    headings are inserted for reference only and shall be ignored in construing these Articles.

## 2    Commencement of Business

2.1    The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

2.2    The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and operation of the Company, including the expenses of registration and the initial offering of Participating Shares.

## 3    Service Providers

3.1    The Directors may appoint any person, firm or corporation to act as a service provider to the Company (whether in general or in respect of any Class and/or Series of Shares) and may entrust

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-2 Part 6 Filed 04/25/24    Page 106 of 200    PageID 24918

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 64 of
324

to and confer upon any such service providers any of the functions, duties, powers and discretions exercisable by them as Directors, upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit. Without limiting the generality of the foregoing, such service providers may include managers, investment advisers, administrators, registrars, transfer agents, custodians and prime brokers.

3.2    Without prejudice to the generality of the preceding Article, the Directors may appoint any person, firm or corporation to act as the Investment Manager with respect to the assets of the Company (whether in general or in respect of any Class and/or Series of Shares).  The Directors may entrust to and confer upon the Investment Manager any of the functions, duties, powers and discretions exercisable by them as Directors upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit.

## 4    Rights attaching to Shares

4.1    The Management Shares shall have the following rights:

(a)    as to voting: the holder of a Management Share shall (in respect of such Management Share) have the right to receive notice of, attend at and vote as a Member at any general meeting of the Company; and

(b)    as to capital: a Management Share shall confer upon the holder the right in a winding up to repayment of capital as provided in these Articles but shall confer no other right to participate in the profits or assets of the Company; and

(c)    as to income: no dividends shall be payable on the Management Shares.

4.2    The Participating Shares shall have the following rights:

(a)    as to voting: the holder of a Participating Share shall not (in respect of such Participating Share) have the right to receive notice of, attend at or vote as a Member at any general meeting of the Company, but may vote at a separate Class meeting convened in accordance with these Articles; and

(b)    as to capital: a Participating Share shall confer upon the holder thereof the right in a winding up to participate in the surplus assets of the Company by reference to the Separate Account attributable to the relevant Class or Series of Participating Shares as provided in these Articles; and

(c)    as to income: the Participating Shares shall confer on the holders thereof the right to receive dividends as provided in these Articles.

**Appx. 03683**

Case 21-03003-sgj Doc 135-6 Filed 12/18/21 Entered 12/18/21 01:38:22 Desc
Case 3:21-cv-00881-X Document 178-22 Filed 04/04/24 Page 107 of 200 PageID 24919

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20 Entered 02/24/20 17:25:25 Page 65 of 324

**5        Share Capital**

5.1    Subject to these Articles, the Directors may allot, issue, grant options or warrants over, or otherwise dispose of Shares in separate classes and/or series with different terms, preferences, privileges or special rights including, without limitation, with respect to investment strategy and/or policy, participation in assets, profits and losses of the Company, voting, fees charged (including management, performance and incentive fees), redemption privileges, allocation of costs and expenses (including, without limitation, the costs and expenses incurred in any hedging activities and any profits and losses arising therefrom) as they think proper. Subject to the Statute, these Articles and any applicable subscription agreement, any Share Rights (other than those set out in these Articles or set out in a Special Resolution) may be varied by either the Directors or by Ordinary Resolution.

5.2    On or before the allotment of any Participating Share the Directors shall resolve the Class and/or Series to which such Participating Share shall be classified and may, prior to the issue of any Participating Share, reclassify such Participating Share. Each Class and/or Series shall be specifically identified. Subject to the Statute and these Articles, the Directors may at any time re-name any Participating Share.

5.3    Notwithstanding the currency in which the par value of the Participating Shares is denominated, the Directors may specify any currency as the currency in which the Subscription Price, Redemption Price and Net Asset Value of Participating Shares of a Class and/or Series is calculated.

5.4    The Company shall not issue Shares to bearer.

5.5    Fractional Shares may be issued.

5.6    Unless the Directors determine otherwise, shares shall only be issued as fully paid-up.

5.7    Unless the Directors determine otherwise, no right of pre-emption or first refusal shall attach to any Shares.

**6        Allotment and Issue of Participating Shares**

6.1    The Directors may from time to time allot and issue Participating Shares of any Class and/or Series. The Directors may, in their discretion, refuse to allot and issue any Participating Shares, and shall not issue any Participating Shares to or for the account of an investor who is not an Eligible Investor. If the Directors have declared a Calculation Suspension or Issue Suspension, no Participating Shares of that Class or Series (as appropriate) shall be issued until the relevant Suspension has ended.

6.2    The Directors shall determine the Subscription Price at the time of issue of the first issue of Participating Shares of any Class and/or Series. Thereafter, the Directors may allot and issue

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Filed 04/27/23    Page 108 of 200    PageID 24920

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 66 of
324

Participating Shares of the same Class and/or Series on any Subscription Date provided that such additional Participating Shares are issued at a Subscription Price equal to not less than the Net Asset Value per Participating Share of such Class and/or Series calculated on the relevant Subscription Date (or if the Subscription Date is not also a Valuation Date then on the immediately preceding Valuation Date).

6.3     The Directors may add to the Subscription Price per Participating Share (before making any rounding adjustment) an amount which they consider to be an appropriate allowance to reflect fiscal and purchase charges which would be incurred for the account of the Company in investing an amount equal to the Subscription Price.  The Directors may also add, in their discretion, a Sales Charge and/or an amount equal to any stamp duty and any other governmental taxes or charges payable by the Company with respect to the issue of such Participating Shares.

6.4     An applicant for Participating Shares shall pay for such Participating Shares in such currencies, in such manner, at such time, in such place and to such person acting on behalf of the Company as the Directors may from time to time determine.

6.5     Subject to the terms of any subscription agreement, an application for Participating Shares shall be irrevocable by an applicant for Participating Shares once it has been received by the Company. Participating Shares shall be treated as having been issued with effect from the relevant Subscription Date notwithstanding that the subscriber for those Participating Shares may not be entered in the Register of Members until after the Subscription Date.

6.6     Participating Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case; likewise the Directors may from time to time prescribe an amount as the minimum subscription amount.

6.7     The Directors may resolve to accept non-cash assets in satisfaction (in whole or in part) of the Subscription Price.

6.8     The Directors may require an applicant for Participating Shares to pay to the Company for the benefit of any selling agent such selling commissions or such organisational charges as may have been disclosed to such applicant.  The Directors may differentiate between applicants as to the amount of such selling commissions or such organisational charges.

6.9     The Company may, in so far as the Statute permits, pay a commission to any person in consideration of that person subscribing or agreeing to subscribe whether absolutely or conditionally for any Participating Shares.  Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Participating Shares.  The Company may also on any issue of Participating Shares pay such brokerage as may be lawful.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-22  Part 6  Filed 04/234 of 867ge 109 of 200    PageID 24921

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 67 of
324

**7**    **Separate Accounts**

7.1    The Directors shall have the power to establish and maintain, with respect to Participating Shares of any Class and/or Series, a Separate Account, to record (purely as an internal accounting matter) the allocation, on a differentiated basis, of the assets and liabilities of the Company to the holders of Participating Shares of any such Class and/or a Series in a manner consistent with the methodology set forth in the Offering Memorandum and the rights otherwise attaching to the Participating Shares.

7.2    The proceeds from the issue of Participating Shares of any Class and/or Series shall be applied in the books of the Company to the Separate Account established for Participating Shares of that Class and/or Series.  The assets and liabilities and income and expenditure attributable to that Separate Account shall be applied to such Separate Account and, subject to the provisions of these Articles, to no other Separate Account.  In the event that the assets of a Separate Account referable to any Class and/or Series are exhausted, any and all unsatisfied claims which any Members or former Members referable to that Class and/or Series have against the Company shall be extinguished.  The Members or former Members referable to a Class and/or Series shall have no recourse against the assets of any other Separate Account established by the Company.

7.3    Where any asset is derived from another asset (whether cash or otherwise), such derivative asset shall be applied in the books of the Company to the same Separate Account as the asset from which it was derived, and on each revaluation of an asset the increase or diminution in value shall be applied to the same Separate Account and, subject to the provisions of these Articles, to no other Separate Account.

7.4    In the case of any asset or liability of the Company which the Directors do not consider is attributable to a particular Separate Account, the Directors shall have discretion to determine the basis upon which any such asset or liability shall be allocated between or among Separate Accounts.

7.5    The Directors may, in the books of the Company, allocate assets and liabilities to and from Separate Accounts if, as a result of a creditor proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne if applied under the foregoing Articles.

7.6    The Directors may from time to time transfer, allocate or exchange an asset or liability from one Separate Account to another Separate Account provided that at the time of such transfer, allocation or exchange the Directors form the opinion (in good faith) that the value in money or money's worth of each such asset or liability transferred, allocated or exchanged is not significantly less or more than the value in money or money's worth (referred to in these Articles as "proper value") received by the Separate Account from which such asset or liability is transferred, allocated or exchanged except only as is otherwise provided by these Articles.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-23    Filed 04/04/24    Page 110 of 200    PageID 24922
Appendix Part 6    Page 329 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 68 of 324

**8          Determination of Net Asset Value**

8.1     The Net Asset Value and Net Asset Value per Participating Share of each Class and/or Series shall be determined by or on behalf of the Directors as at the relevant Valuation Point on each relevant Valuation Date.

8.2     In calculating the Net Asset Value and the Net Asset Value per Participating Share, the Directors shall apply such generally accepted accounting principles as they may determine.

8.3     The assets and liabilities of the Company shall be valued in accordance with such policies as the Directors may determine.  Absent bad faith or manifest error, any valuation made pursuant to these Articles shall be binding on all persons.

8.4     Unless otherwise determined by the Directors in any resolution creating a Class and/or Series of Participating Shares or as otherwise disclosed in any Offering Memorandum, the Net Asset Value per Participating Share of each Class (or Series) shall be determined by allocating *pro rata* the Net Asset Value, as at the relevant Valuation Point, of the Company and/or of the relevant Separate Account among each Class and/or Series, adjusting the amount so calculated to reflect any fees, costs, foreign exchange items or other assets or liabilities which are properly attributable to a specific Class and/or Series and then by dividing the resultant amount by the number of Participating Shares of such Class and/or Series then in issue.

8.5     The Directors may determine that the Net Asset Value of any Class and/or Series shall be definitively determined on the basis of estimates and that such determination shall not be modified to reflect final valuations.

8.6     Any expense or liability may be amortised over such period as the Directors may determine.

8.7     The Directors may establish such reserves as they deem reasonably necessary for Company expenses and any other contingent Company assets or liabilities, and may, upon the reversal or release of such reserves, apply any monies resulting therefrom in such manner as they may, in their absolute discretion, determine.

8.8     Net Asset Value per Participating Share shall be rounded to the nearest cent or such other amount as the Directors may determine and the benefit of any such roundings may be retained by the Company.

8.9     The Directors may cause the Company to issue new Participating Shares at par or to compulsorily redeem at par such number of Participating Shares as they consider necessary to address, in such manner as they consider equitable, any prior miscalculation of Net Asset Value or Net Asset Value per Participating Share.  The Company shall not be required to pay to the holder the redemption proceeds of any such compulsorily redeemed Participating Shares, which proceeds shall be retained by the Company.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2  Filed 04/04/22    Page 111 of 200    PageID 24923
Appendix Part 6 Page 4324 of 8667
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 69 of
324

**9      Suspensions**

9.1     The Directors may, from time to time, in the circumstances disclosed in the Offering Memorandum, declare a Suspension with respect to any one or more Classes and/or Series of Participating Shares.

9.2     The Directors shall promptly notify all affected Members of any such Suspension and shall promptly notify such Members upon termination of such Suspension.

**10     Transfer of Shares**

10.1    Subject to Article 5.1, Shares may not be Transferred without the prior written approval of the Directors (which may be withheld for any or no reason) provided that the Directors may waive this requirement to the extent that they deem appropriate in connection with the listing of any Class or Series of Share on a stock exchange.

10.2    The Directors shall not register any Transfer of any Share to any person who is, in the opinion of the Directors, not an Eligible Investor.

10.3    Any proposed transferee shall provide to the Directors such information and documents as the Directors may request, including, without limitation, such documents or information as the Directors deem necessary or desirable:

(a)      to enable the Directors to determine that the proposed transferee is an Eligible Investor; and

(b)      to enable the Company to comply with all applicable laws, including anti-money laundering laws.

10.4    The instrument of Transfer of any Share shall be in writing and shall be executed by or on behalf of the transferor (and, if the Directors so require, signed by or on behalf of the transferee). The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

**11     Transmission of Shares**

11.1    If a Member dies, the survivor or survivors (where the Member was a joint holder) or his or her legal personal representatives (where the Member was a sole holder) shall be the only persons recognised by the Company as having any title to the Member's interest in the Company.  The death of any Member shall not operate to relieve, waive or reduce any liabilities attaching to the Member's Shares at the time of death and such liabilities shall continue to bind any survivor or survivors, or any personal representative, as the case may be.

Appx. 03688

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 22 Part 6   Filed 04/21/22   Page 112 of 200   PageID 24924

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 70 of 324

11.2    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is an Eligible Investor may, upon delivery to the Directors of such evidence as may from time to time be required by them of:

(a)    such person's entitlement to such Shares; and/or

(b)    such person's status as an Eligible Investor,

elect, either to become the holder of such Share or to have such Share Transferred to another Eligible Investor nominated by such person.  If such person elects to become the holder of such Share, such person shall give notice in writing to the Directors to that effect, but the Directors shall, in either case, have the same right to decline registration of such person as a holder of such Share as they would have had in the case of a Transfer of the Share by that Member before his or her death or bankruptcy, or liquidation or dissolution, as the case may be.

11.3    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is not an Eligible Investor shall not be registered as the holder of such Share and shall promptly Transfer such Share to an Eligible Investor in accordance with these Articles.

11.4    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by Transfer), and who is an Eligible Investor, shall be entitled to the same dividends and other advantages to which such person would be entitled if such person were the registered holder of such Share. However, the person shall not, before becoming a Member in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him become the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## 12    Redemption of Shares

12.1    Subject to any provisions relating to a specific Class and/or Series as set out in the Offering Memorandum or these Articles or in any resolution constituting a Class and/or Series or otherwise forming part of the special rights of such Participating Shares, a Member may require the redemption of all or any of such Member's Participating Shares by serving a Redemption Notice on the Company. Unless timely receipt is waived by the Directors in a particular case, a Redemption Notice shall be required to be received on or before a Redemption Date with respect to such Participating Shares (or such number of days prior to such Redemption Date as may be determined

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Part 6 Page 04624 of 866    Page 113 of 200    PageID 24925
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 71 of
324

by the Directors).  Any Member redeeming Participating Shares shall submit to the Directors the share certificate (if any) issued in respect of those Participating Shares.  The Company shall redeem such Participating Shares at the Redemption Price, being an amount equal to the Net Asset Value per Participating Share of the relevant Class and/or Series prevailing on the relevant Redemption Date (or if the Redemption Date is not a Valuation Date then on the immediately preceding Valuation Date) subject to any deductions, holdbacks or adjustments provided for in these Articles and/or the Offering Memorandum.

12.2    The Directors may deduct any Redemption Fee from the Redemption Price.  The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

12.3    A Member may not withdraw a Redemption Notice once submitted to the Company unless (a) the Directors shall have declared a Suspension or (b) the Directors determine (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part).  If a relevant Suspension has been declared by the Directors, the right of a Member to have its Participating Shares redeemed shall be suspended and during the period of Suspension the Member may withdraw its Redemption Notice.  Any withdrawal of the Redemption Notice shall be made in writing and shall only be effective if actually received by the Company before the termination of the period of the Redemption Suspension or Calculation Suspension, as applicable. If the Redemption Notice is not withdrawn, any Participating Shares the redemption of which has been suspended shall be redeemed once the relevant Suspension has ended at the Redemption Price for Participating Shares of the relevant Class and/or Series calculated on the next Redemption Date following the end of the relevant Suspension.

12.4    If one or more redemption requests are received in respect of any one Redemption Day that would, if satisfied, result in the redemptions of an amount equal to more than 15% of the total net asset value of the Company, the Directors may determine in their discretion to reduce the amount of each redemption request pro rata so that redemption requests represent in aggregate an amount equal to no more than 15% of the total net asset value of the Company.  The partial amounts of the redemption requests which remain unsatisfied shall be carried forward to the next Redemption Day and satisfied in priority to any redemption requests received in relation to such subsequent Redemption Day until the prior redemption requests shall have been satisfied in full.

12.5    If the Company is required by the laws of any relevant jurisdiction to make a withholding from any redemption monies payable to the holder of Participating Shares the amount of such withholding shall be deducted from the redemption monies otherwise payable to such person.

12.6    The Directors may deduct any Redemption Fee from the Redemption Price.  The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-2    Part 6 Filed 04/09/24    Page 114 of 200    PageID 24926

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 72 of 324

12.7    No redemption of part of a Member's holding of Participating Shares of any one Class and/or Series may be made if, as a result thereof, such Member would hold fewer Participating Shares of such Class and/or Series than such minimum number or value of Participating Shares of such Class and/or Series as may from time to time be specified (either generally or in any particular case or cases) by the Directors.  If such partial redemption would reduce such Member's holding of Participating Shares to less than such minimum holding, the Directors may, in their discretion, elect to compulsorily redeem all of such Member's Participating Shares.

12.8    The Company may, in the absolute discretion of the Directors, refuse to make a redemption payment to a Member if the Directors suspect or are advised that the payment of any redemption proceeds to such Member may result in a breach or violation of any anti-money laundering law by any person in any relevant jurisdiction, or if such refusal is necessary to ensure the compliance by the Company, its Directors, the Administrator or any other service provider of the Company with any anti-money laundering law in any relevant jurisdiction.

12.9    Any amount payable to a Member for the redemption of Participating Shares shall be paid in such currency or currencies as the Directors may determine.  Subject to any Payment Suspension, the Company shall remit redemption proceeds (net of the costs of remittance) by cheque or wire transfer within such period or periods as the Directors shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period or periods as the Directors shall determine.  In the absence of directions as to payment the Company may remit redemption proceeds by cheque to the address of the Member appearing on the Register of Members or by wire transfer to such account as the Directors deem appropriate in the circumstances.  The Company shall not be liable for any loss resulting from this procedure.

12.10   On any redemption of Participating Shares the Directors shall have the power to satisfy (in whole or in part) the Redemption Price (and any other sums payable on redemption as provided in these Articles) owing on the redemption of such Participating Shares by dividing *in specie* the whole or any part of the assets of the Company (including, without limitation, shares, debentures, or securities of any other company whether or not held by the Company on the Redemption Date in question) and either (i) distributing such assets directly to the redeeming shareholder, and/or (ii) distributing or allocating such assets to a liquidating account or other similar mechanism to be managed and/or liquidated at the discretion of the Directors.

12.11   Participating Shares shall be treated as having been redeemed with effect from the relevant Redemption Date irrespective of whether or not a Member has been removed from the Register of Members or the Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Date, Members in their capacity as such will not be entitled to or be capable of exercising any rights arising under these Articles with respect to Participating Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Company) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Date but not yet paid (in each case with respect to the Participating Shares being redeemed). Such redeemed Members will be creditors of the Company with respect to the

Appx. 03691

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 173-2    Filed 04/04/24    Page 115 of 200    PageID 24927
Appendix Part 5    Page 244 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 73 of 324

Redemption Price. In an insolvent liquidation, redeemed Members will rank behind ordinary creditors but ahead of Members.

12.12   Once a Participating Share is redeemed it shall be available for re issue and, until re issue, shall form part of the authorised and unissued share capital of the Company.

12.13   Upon the written request of a Member or prospective Member in a form acceptable to the Directors, the Company may, in the discretion of the Directors, accept a standing redemption request from such Member or prospective Member pursuant to which the Company shall agree (without assuming any liability for failing to do so) to use its commercially reasonable efforts to redeem such Member's Participating Shares to the extent necessary to ensure that such Member does not own over a specified percentage of the outstanding Participating Shares of the Company or any Class and/or Series thereof; such percentage to be the percentage identified by such Member or prospective Member in such written request as being the percentage which such Member's or prospective Member's ownership cannot exceed without material risk of such Member or prospective Member being in violation of applicable law or regulation.  Any such written request may be revoked by notice in writing to the Company from the affected Member.

12.14   No amendment to these Articles made after a Redemption Date shall affect a Member with respect to Participating Shares of that Member which have been redeemed, or are being treated as redeemed, on or prior to that Redemption Date.

12.15   Unless otherwise provided in the Offering Memorandum, unremitted redemption proceeds shall not bear interest against the Company and redeemed Participating Shares shall not participate in the profits and losses of the Company with effect from the relevant Redemption Date.

**13      Compulsory Redemption**

13.1    The Directors may at any time by notice in writing to any Non-qualified Person compulsorily redeem all or any of the Participating Shares held by such person upon a day which shall be not less than, nor more than, such number of days as the Directors may, in their discretion, from time to time determine, from the date of such notice.  Upon such day, such Participating Shares shall be redeemed in all respects as if the holder thereof had submitted a Redemption Request whether or not the Company shall have received any certificate(s) in respect of such Participating Shares.

13.2    The Directors, in their discretion, with or without cause, may at any time by notice in writing to any Member compulsorily redeem all or any of a Member's Participating Shares on any Redemption Day which shall be not less than such number of days as the Directors may, in their discretion, from time to time determine from the date of the notice.  Upon such day, such Participating Shares shall be redeemed in all respects as if the holder thereof had submitted a Redemption Request whether or not the Company shall have received any certificate(s) in respect of such Participating Shares.

13.3    The Directors may at any time redeem Participating Shares to effect a conversion in the manner described in these Articles, including pursuant to Article 15.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/04/24    Page 116 of 200    PageID 24928
Appendix Part 5 Page 43554 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 74 of
324

13.4    Subject to Article 12.6, any restrictions imposed pursuant to these Articles on redemptions made at the option of the Members shall not apply to any compulsory redemption of Participating Shares by the Company.

13.5    All costs incurred in a compulsory redemption of Participating Shares shall be for the account of the Member thereof and may be deducted from the proceeds of the redemption.

13.6    The procedure for determining which Participating Shares will be compulsorily redeemed in any particular case is subject to change at the discretion of the Directors.  In exercising discretion and in making determinations as to whether to compulsorily redeem Participating Shares, and in determining which Members shall be subject to compulsory redemption, the Directors may act upon the basis of such information as may be known to them, without any obligation to make special enquiries, and may rely upon the advice of counsel.  In no event shall the Company be liable to any Member for any consequence of any determination made by the Directors with respect to such compulsory redemption.

13.7    Without prejudice to the generality of the foregoing, the Company may (without notice) compulsorily redeem the Participating Shares of any Member and, on behalf of such Member, apply the proceeds of redemption in paying for new Participating Shares to give effect to any exchange, conversion or roll up policy disclosed to Members pursuant to which Participating Shares of one Class or Series (the "**Old Shares**") may, at the option of the Company, be exchanged for Participating Shares of another Class or Series (the "**New Shares**") by means of the redemption of the Old Shares and the immediate re-subscription of the redemption proceeds in paying up the New Shares.

## 14    AEOI

14.1    Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member.  Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

14.2    In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

**Appx. 03693**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 173-2    Filed 04/04/24    Page 117 of 200    PageID 24929
Appendix Part 5 Page 3364 of 8617

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 75 of
324

(a)     compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b)     deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

   (i)     comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

   (ii)     allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;

   (iii)     ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

14.3     In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 14.2(a) and 14.2(b), the Directors may undertake any of the following actions:

(a)     create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b)     may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c)     allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors;

(d)     adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-22  Part 6  Filed 04/04/24  of 867 Page 118 of 200    PageID 24930

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 76 of
324

**15      Purchase and Surrender of Shares**

15.1    Subject to the provisions of the Statute and without prejudice to these Articles, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.

15.2    The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

15.3    The Directors may accept the surrender for no consideration of any fully paid Share.

**16      Treasury Shares**

16.1    The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

16.2    The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

**17      Modification of Rights**

17.1    Subject to the following Article, the rights attached to any Series of Participating Shares may be varied or abrogated either whilst the Company is a going concern or during or in contemplation of a winding up, with the consent in writing of two thirds of the issued Shares of that Series or with the sanction of a resolution passed by a two-thirds majority of the holders of the issued Participating Shares of that Series, at a separate meeting of the holders of the Participating Shares of that Series. For such purposes the Directors may, in their discretion, treat all Series of Participating Shares as forming one Series, if they consider that they would all be affected in the same way by the proposals under consideration and that there would be no conflict of interest between them, but in any other case shall treat them as separate Series, as the case may be. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, mutatis mutandis, apply except that the necessary quorum shall be one person holding or representing by proxy at least one-third in nominal amount of the issued Participating Shares of the Series (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those holders who are present shall be a quorum) and that every holder of Participating Shares of the Series shall on a poll have one vote for each Participating Share of the Series held by him.

17.2    The rights conferred upon the holders of the Participating Shares shall be deemed to be varied by the creation or issue of any Participating Shares ranking ahead of the Participating Shares with regard to participation in the profits or assets of the Company. A Series to which different levels of fees are payable to the Manager or different redemption rights apply (including the imposition of, absence of, or different level of, a redemption fee) shall not be deemed to rank in priority to any other Series as regards shareholder rights or participating in the profits or assets of the Company.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2 Part 6 Filed 04/04/24 of 867 Page 119 of 200    PageID 24931
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 77 of
324

17.3    The rights attached to the Participating Shares shall be deemed not to be varied or abrogated by:

    (a)    the creation, allotment or issue of Management Shares;

    (b)    the creation, allotment or issue of Participating Shares of any Series;

    (c)    the redemption or repurchase of any Participating Share;

    (d)    the conversion of Participating Shares of one Series into Participating Shares of another Series at the request of a Member pursuant to Article 13.3;

    (e)    the redesignation of a Series of Participating Share by the Directors pursuant to these Articles;

    (f)    the exercise by the Directors or any liquidator of any of their discretions specified in these Articles; or

    (g)    the Company entering into any written agreement with a prospective member providing for offering terms that vary from those applicable to other Members of the same Series.

## 18    Variation of Terms

The Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a Member to waive or modify the terms applicable to such Member's subscription for Participating Shares (including those relating to management and performance fees and redemption terms) without obtaining the consent of any other Member; provided that such waiver or modification does not amount to a variation of the rights attaching to the Participating Shares of such other Members.

## 19    Certificates for Shares

19.1    A Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates representing Shares, if any, shall be in such form as the Directors may determine. Share certificates shall be signed by one or more Directors or another person authorised by the Directors. The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical process. All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate. All certificates surrendered to the Company for transfer shall be cancelled and, subject to these Articles, no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

19.2    The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 172-2    Filed 04/04/24    Page 120 of 200    PageID 24932
Appendix Part 6 Page 4634 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 78 of
324

19.3    If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) on delivery up of the old certificate.

## 20    Register of Members

20.1    The Company shall maintain or cause to be maintained the Register of Members.

20.2    The Directors may determine that the Company shall maintain one or more branch registers of Members in accordance with the Statute. The Directors may also determine which register of Members shall constitute the principal register and which shall constitute the branch register or registers, and to vary such determination from time to time.

## 21    Closing Register of Members and Fixing Record Date

21.1    For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any dividend, or in order to make a determination of Members for any other proper purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed thirty days.

21.2    In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any dividend or in order to make a determination of Members for any other proper purpose.

21.3    If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such dividend is passed, as the case may be, shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## 22    Non Recognition of Trusts

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the registered holder.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Appendix Part 6 Filed 04/04/24    Page 121 of 200    PageID 24933
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 79 of 324

## 23  Amendments of Memorandum and Articles and Alteration of Capital

23.1  The Company may, by Ordinary Resolution:

(a)  increase its share capital by such sum and with such rights, priorities and privileges annexed thereto, as the resolution shall prescribe;

(b)  consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c)  by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum; and

(d)  cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

23.2  All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of these Articles with reference to liens, Transfer, transmission and otherwise as the Shares in the original share capital.

23.3  Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution the Company may, by Special Resolution:

(a)  change its name;

(b)  alter or add to these Articles;

(c)  alter or add to the Memorandum with respect to any objects, powers or other matters specified therein;

(d)  reduce its share capital or any capital redemption reserve fund; and

(e)  wind up the Company.

## 24  Registered Office

Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.  The Company may, in addition to its Registered Office, maintain such other offices or places of business as the Directors determine.

## 25  General Meetings

25.1  All general meetings other than annual general meetings shall be called extraordinary general meetings.  The Directors may call general meetings.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 04/14/of 862ge 122 of 200    PageID 24934
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 80 of
324

25.2    The Company may but shall not be obliged to hold a general meeting in each year as its annual general meeting, and shall specify the meeting as such in the notice calling it.  Any annual general meeting shall be held at such time and place as the Directors shall determine.

**26      Notice of General Meetings**

26.1    At least seven Business Days' notice shall be given of any general meeting.  Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day on which the meeting is to be held and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a)      in the case of an annual general meeting, by all the Members entitled to attend and vote thereat; and

(b)      in the case of an extraordinary general meeting, by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than ninety per cent. in par value of the Shares giving that right.

26.2    The accidental omission to give notice of a general meeting to, or the non receipt of notice of a meeting by, any person entitled to receive notice thereof shall not invalidate the proceedings of that meeting.

**27      Proceedings at General Meetings**

27.1    No business shall be transacted at any general meeting unless a quorum is present. A quorum shall be one or more Members (present in person, by proxy or authorised corporate representative, as the case may be) entitled to attend and vote and representing not less than one third of the Management Shares present in person or by proxy and carrying the right to vote at the meeting.

27.2    A person may, with the consent of the Directors, participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other.  Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

27.3    A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations or other non-natural persons, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 172-2 Part 6 Filed 04/24/24    Page 123 of 200    PageID 24935

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 81 of 324

27.4 If a quorum is not present within half an hour from the time appointed for the meeting or if during such a meeting a quorum ceases to be present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other day, time or such other place as the Directors may determine, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

27.5 The chairman, if any, of the board of Directors shall preside as chairman at every general meeting of the Company, or if there is no such chairman, or if the chairman shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

27.6 If no Director is willing to act as chairman, or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the Members present shall choose one of their number to be chairman of the meeting.

27.7 The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a general meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Otherwise it shall not be necessary to give any such notice.

27.8 A resolution put to the vote of a meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman or any Member present in person or by proxy (or in the case of a non-natural person, by its duly authorised representative or by proxy) demands a poll.

27.9 Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority, an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

27.10 The demand for a poll may be withdrawn.

27.11 Except on a poll demanded on the election of a chairman or on a question of adjournment, a poll shall be taken as the chairman directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.

27.12 A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time as the chairman of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22 Part 6 Filed 04/04/24    Page 124 of 200    PageID 24936

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 82 of 324

27.13    In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall not be entitled to a second or casting vote.

## 28    Votes of Members

28.1    Subject to any rights or restrictions attached to any Shares, on a show of hands every Member holding Shares carrying the right to vote on the matter in question who (being an individual) is present in person or by proxy or (if a corporation or other non-natural person) is present by its duly authorised representative or by proxy, shall have one vote and on a poll every such Member shall have one vote for every Share of which he is the holder.

28.2    In the case of joint holders of record, the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders. Seniority among joint holders shall be determined by the order in which the names of the holders stand in the Register of Members.

28.3    A Member of unsound mind, or in respect of whom an order has been made by any court or authority having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by the Member's committee, receiver, curator bonis, or other similar person appointed on such Member's behalf by that court or authority and any such committee, receiver, curator bonis or other similar person may vote by proxy.

28.4    No person shall be entitled to vote at any general meeting unless such person is registered as a Member on the record date for such meeting, nor unless all calls or other monies then payable by such person in respect of such Shares have been paid.

28.5    No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is purported to be given or tendered and every vote not disallowed at the meeting shall be valid.  Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.

28.6    On a poll or on a show of hands votes may be cast either personally or by proxy. A Member may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Member appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands.

28.7    On a poll, a Member holding more than one Share need not cast the votes in respect of its Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain (any such abstentions to count neither for nor against the resolution) from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing it, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which such proxy is appointed either for or against a resolution and/or abstain from voting.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-22    Filed 04/14/24    Page 125 of 200    PageID 24937
Appendix Part 6 Page 9444 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 83 of 324

**29    Proxies**

29.1    The instrument appointing a proxy shall be in writing, be executed under the hand of the appointor or of such appointor's attorney duly authorised in writing or, if the appointor is a corporation or other non-natural person, under the hand of an officer or other person duly authorised for that purpose. A proxy need not be a Member of the Company.

29.2    The Directors may, in the notice convening any meeting or adjourned meeting, or in an instrument of proxy sent out by the Company, specify the place and the time (being not later than the time for holding the meeting or adjourned meeting to which the proxy relates) at which the instrument appointing a proxy shall be deposited.  In the absence of any such direction from the Directors in the notice convening any meeting or adjourned meeting, the instrument appointing a proxy shall be deposited at the Registered Office not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

29.3    The chairman may in any event, at the chairman's discretion, declare that an instrument of proxy shall be deemed to have been duly deposited.  An instrument of proxy that is not deposited in the manner permitted and which has not been declared to have been duly deposited by the chairman, shall be invalid.

29.4    The instrument appointing a proxy may be in any usual or common form and may be incorporated within any subscription agreement or other document signed by or on behalf of the Member.  An instrument appointing a proxy may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked.  An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

29.5    Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the Transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or Transfer was received by the Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

**30    Corporate Members**

Any corporation or other non-natural person which is a Member of the Company may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any Class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as the corporation could exercise if it were an individual Member.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-23    Filed 04/04/24    Page 126 of 200    PageID 24938
Appendix Part 6 Page 0454 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 84 of
324

## 31    Shares Beneficially Owned by the Company

Shares of the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

## 32    Directors

There shall be a board of Directors consisting of not less than one person (exclusive of alternate Directors) provided however that the Company may from time to time by Ordinary Resolution increase or reduce the limits in the number of Directors.  The first Directors of the Company shall be determined in writing by, or appointed by a resolution of, the Subscriber.

## 33    Powers of Directors

33.1    Subject to the provisions of the Statute, the Memorandum and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company.  No alteration of the Memorandum or these Articles and no such direction shall invalidate any prior act of the Directors which would have been valid if that alteration had not been made or that direction had not been given.  A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

33.2    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

33.3    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.  Notwithstanding the foregoing, the Directors shall not exercise the powers specified in this Article in breach of any limits or restrictions specified in the Offering Memorandum.

## 34    Appointment and Removal of Directors

34.1    The Company may, by Ordinary Resolution, appoint any person to be a Director and may, by Ordinary Resolution, remove any Director.

34.2    The Directors may appoint any person to be a Director, either to fill a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with these Articles as the maximum number of Directors.

## 35    Vacation of Office of Director

The office of a Director shall be vacated if:

Appx. 03703

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Filed 04/04/24    Page 127 of 200    PageID 24939

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 85 of
324

(a)    he becomes prohibited by law from being a Director;

(b)    he becomes bankrupt or makes any arrangement or composition with his creditors generally;

(c)    he dies, or is, in the opinion of all his co-Directors, incapable by reason in mental disorder of discharging his duties as a Director;

(d)    he resigns the office of Director by notice to the Company;

(e)    he has for more than six consecutive months been absent without permission of the Directors from meetings of Directors held during that period and his alternate Director (if any) has not during such period attended any such meetings in his stead, and the Directors resolve that his office be vacated; or

(f)    he is removed from the office of Director by notice addressed to him at his last known address and signed by all his co-Directors.

## 36    Proceedings of Directors

36.1    The quorum for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two if there are two or more Directors, and shall be one if there is only one Director.  A person who holds office as an alternate Director shall, if such person's appointor is not present, be counted in the quorum.  A Director who also acts as an alternate Director shall, if such Director's appointor is not present, count twice towards the quorum.

36.2    Subject to the provisions of these Articles, the Directors may regulate their proceedings as they think fit.  Questions arising at any meeting shall be decided by a majority of votes.  In the case of an equality of votes, the chairman shall not have a second or casting vote.  A Director who is also an alternate Director shall be entitled in the absence of such Director's appointor to a separate vote on behalf of such Director's appointor in addition to such Director's own vote.

36.3    A person may participate in a meeting of the Directors or any committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting.  Unless otherwise determined by the Directors, the meeting shall be deemed to be held at the place where the chairman is located at the start of the meeting.

36.4    A resolution in writing (in one or more counterparts) signed by all the Directors or all the members of a committee of Directors (an alternate Director being entitled to sign such a resolution on behalf of such alternate Director's appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held.

Appx. 03704

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 28-2   Filed 04/04/24   Page 128 of 200   PageID 24940
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 86 of 324

36.5    A Director or alternate Director may, or other officer of the Company at the direction of a Director or alternate Director may call a meeting of the Directors by at least two days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held.

36.6    The continuing Directors may act notwithstanding any vacancy in their body, but if so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

36.7    The Directors may elect a chairman of their board and determine the period for which the chairman is to hold office; but if no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

36.8    All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

36.9    A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by such Director.  The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

## 37      Presumption of Assent

A Director who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless the Director's dissent shall be entered in the minutes of the meeting or unless the Director shall file such Director's written dissent from such action with the person acting as the chairman or secretary of the meeting before the close or adjournment thereof or shall forward such dissent by personal delivery, courier or registered post to such person immediately after the close or adjournment of the meeting.  Such right to dissent shall not apply to a Director who voted in favour of such action.

## 38      Directors' Interests

38.1    A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with such Director's office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-23 Part 5 Page 434 of 867    Page 129 of 200    PageID 24941

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 87 of 324

38.2    A Director may act alone or by such Director's firm in a professional capacity for the Company and the Director or such Director's firm shall be entitled to remuneration for professional services as if such Director were not a Director or alternate Director.

38.3    A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by such Director or alternate Director as a director or officer of, or from such Director or alternate Director's interest in, such other company.

38.4    No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relationship thereby established.   A Director (or such Director's alternate Director in such Director's absence) shall be at liberty to vote in respect of any contract or transaction in which such Director is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by such Director at or prior to such Director's consideration and any vote thereon.

38.5    A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which such Director has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## 39    Minutes

The Directors shall cause minutes to be made in books kept for the purpose of recording all appointments of officers made by the Directors, all proceedings at meetings of the Company or the holders of any Class of Shares and of the Directors, and of committees of Directors including the names of the Directors or alternate Directors present at each meeting.

## 40    Delegation of Directors' Powers

40.1    The Directors may delegate any of their powers to any committee consisting of one or more Directors or such other persons as the Directors may designate. They may also delegate to any managing director or any Director holding any other executive office such of their powers as they consider desirable to be exercised by such managing director or any Director provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if such managing director ceases to be a Director.  Any such appointment may be made subject to any conditions the Directors may impose, and either collaterally with or to

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 177-23    Part 6    Filed 04/04/24    Page 130 of 200    PageID 24942

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 88 of 324

the exclusion of their own powers, and may be revoked or altered.  Subject to any such conditions, the proceedings of a committee of Directors shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

40.2    The Directors may establish any committees, local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees or local boards.  Any such appointment may be made either collaterally with or to the exclusion of the Directors' powers, shall be subject to any conditions the Directors may impose, and may be revoked or altered.  Subject to any such conditions, the proceedings of any such committee, local board or agency shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

40.3    The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised person to delegate all or any of the powers, authorities and discretions vested in such attorney or authorised person.

40.4    The Directors may appoint such officers as they consider necessary on such terms, at such remuneration (if any) and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors may think fit.  Unless otherwise specified in the terms of such officer's appointment an officer may be removed by resolution of the Directors or Members.

## 41    Alternate Directors

41.1    Any Director (other than an alternate Director) may by written notice to the Company appoint any other Director, or any other person willing to act, to be an alternate Director and by written notice to the Company may remove from office an alternate Director so appointed by the Director.

41.2    An alternate Director shall be entitled to receive notice of all meetings of Directors and of meetings of committees of Directors of which such alternate Director's appointor is a member, to attend and vote at every such meeting at which the Director appointing such alternate Director is not personally present, and generally to perform all the functions of such alternate Director's appointor as a Director in such Director's absence.

41.3    An alternate Director shall cease to be an alternate Director if such alternate Director's appointor ceases to be a Director.

41.4    Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-22    Filed 04/04/24    Page 131 of 200    PageID 24943
Appendix Part 6 Page 4504 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 89 of
324

41.5    Subject to the provisions of the Articles, an alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for such alternate Director's own acts and defaults and shall not be deemed to be the agent of the Director appointing such alternate Director.

## 42    No Minimum Shareholding for Directors

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director shall not be required to hold Shares.

## 43    Remuneration of Directors

43.1    The remuneration to be paid to the Directors, if any, shall be such remuneration as the Directors shall determine.  The Directors shall also be entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors, or general meetings of the Company, or separate meetings of the holders of any Class of Shares or debentures of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors, or a combination partly of one such method and partly the other.

43.2    The Directors may by resolution approve additional remuneration to any Director for any services other than such Director's ordinary routine work as a Director.  Any fees paid to a Director who is also counsel to the Company, or otherwise serves it in a professional capacity, shall be in addition to such Director's remuneration as a Director.

## 44    Seal

The Company may, if the Directors so determine, have a Seal, which shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors.  Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person authorised by the Directors for the purpose.

## 45    Dividends, Distributions and Reserves

45.1    Subject to the Statute, these Articles, and the special rights attaching to Participating Shares of any Class and/or Series, the Directors may, in their absolute discretion, declare dividends and distributions on Participating Shares of any Class and/or Series in issue and authorise payment of the dividends or distributions out of the relevant Separate Account in respect of such Participating Shares.  No dividend or distribution shall be paid except out of the realised or unrealised profits of the Company, or out of the share premium account attributable to Participating Shares of the Class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by law.

45.2    Except as otherwise provided by the rights attached to Participating Shares, or as otherwise determined by the Directors, all dividends and distributions in respect of Participating Shares of a

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Filed 04/14/14 of 867ge 132 of 200    PageID 24944
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 90 of
324

particular Class and/or Series shall be declared and paid according to the Net Asset Value of the Participating Shares of the Class and/or Series that a Member holds. If any Participating Share is issued on terms providing that it shall rank for dividend or distribution as from a particular date, that Participating Share shall rank for dividend or distribution accordingly.

45.3   The Directors may deduct and withhold from any dividend or distribution otherwise payable to any Member all sums of money (if any) then payable by it to the Company on account of calls or otherwise or any monies which the Company is obliged by law to pay to any taxing or other authority.

45.4   Under no circumstances may the assets (or the income derived from such assets) attributed to a Separate Account in respect of any Class and/or Series be used to pay a dividend in respect of a Separate Account that is attributed to any other Class and/or Series.

45.5   The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures or securities of any other company or in any one or more of such ways and, where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

45.6   Any dividend, distribution, interest or other monies payable in cash in respect of Participating Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct.  Every such cheque or warrant shall (unless the Directors in their sole discretion otherwise determine) be made payable to the order of the person to whom it is sent.  Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the Participating Share held by them as joint holders.

45.7   Any dividend or distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date of declaration of such dividend or distribution may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the dividend or distribution shall remain as a debt due to the Member.  Any dividend or distribution which remains unclaimed after a period of six years from the date of declaration of such dividend or distribution shall be forfeited and shall revert to the Company.

45.8   No dividend or distribution shall bear interest against the Company.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2  Part 6  Filed 04/524 of 86Page 133 of 200    PageID 24945
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 91 of
324

**46      Capitalisation**

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members of any Class and/or Series in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued Participating Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid. In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Participating Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned). The Directors may authorise any person to enter into an agreement with the Company, on behalf of all of the Members interested, providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

**47      Books of Account**

47.1    The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company. Such books of account must be retained for a minimum period of five years from the date on which they are prepared. Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

47.2    The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute, or authorised by the Directors or by the Company in general meeting.

47.3    The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

**48      Audit**

48.1    The Directors shall appoint an Auditor of the Company who shall hold office on such terms as the Directors determine.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Filed 04/24/24    Page 134 of 200    PageID 24946
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 92 of
324

48.2     Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

48.3     Any Auditors of the Company shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

**49**     **Notices**

49.1     Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to the Member or to the address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member).  Any notice, if posted from one country to another, is to be sent airmail.

49.2     Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier.  Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in the Cayman Islands) following the day on which the notice was posted.  Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted.  Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

49.3     A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Filed 04/24 of 867    Page 135 of 200    PageID 24947
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 93 of 324

49.4    Notice of every general meeting shall be given in the manner authorised by these Articles to every person shown as holding Shares carrying an entitlement to receive such notice in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of such person being a legal personal representative or a trustee in bankruptcy of a Member where the Member but for such Member's death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.

## 50    Winding Up

(a)    If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

(b)    The assets available for distribution to the Members shall be distributed in the following manner and priority:

(i)    first, in the payment to the holders of the Participating Shares of each Class of a sum as nearly as possible equal to the nominal amount of the Participating Shares of that Class held by such holders respectively; and

(ii)    second, in the payment to the holders of Management Shares of an amount equal to the nominal amount of such Management Shares; and

(iii)    third, in the payment to the holders of each Class of Participating Shares of any remaining balance then attributable to the relevant Record, such payment being made in proportion to the number of Participating Shares of that Class held (adjusted to give effect to any equalisation arising by reason of the winding up pursuant to any equalisation policy adopted by the Directors pursuant to Article 29).

If the Company is wound up (whether the liquidation is voluntary, or under supervision by the Court) the liquidator may, with the sanction of a Special Resolution and any other sanction required by the Law, divide among the Members in specie the whole or any part of the assets of the Company and whether or not the assets shall consist of property of a single kind, and may for such purposes set such value as he deemed fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members.  The liquidator may, with the like sanction, vest the whole or any part of the assets in trustees upon such trusts for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares in respect of which there is a liability.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22 Part 6 Filed 04/25/24   Page 136 of 200   PageID 24948
Appendix Part 6 Page 45 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 94 of
324

**51      Indemnity and Insurance**

51.1    Every Director (including for the purposes of this Article, any alternate Director appointed pursuant to the provisions of these Articles), managing Director, agent, Secretary, or other officer for the time being and from time to time of the Company and the personal representatives of the same shall be indemnified and secured harmless out of the assets and funds of the Company against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by him otherwise than by reason of his own Gross Negligence or wilful default in or about the conduct of the Company's business or affairs or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by him in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Islands or elsewhere.

51.2    The Administrator, the Manager and any other agent which the Company has appointed shall be entitled to such indemnity from the Company under such terms and subject to such conditions and exceptions and with such entitlement to have recourse to the assets of the Company with a view to meeting and discharging the cost thereof as shall be specified in the relevant contract or instrument appointing such agent.

51.3    No such Director, alternate Director, managing Director, agent, Secretary, or other officer of the Company and the personal representatives of the same shall be liable (i) for the acts, receipts, neglects, defaults or omissions of any other such Director or officer or agent of the Company, (ii) by reason of his having joined in any receipt for money not received by him personally or in any other act to which he was not a direct party for conformity, (iii) for any loss on account of defect of title to any property of the Company, (iv) on account of the insufficiency of any security in or upon which any money of the Company shall be invested, (v) for any loss incurred through any bank, broker or other agent or any other party with whom any of the Company's property may be deposited or (vi) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities or discretions of his office or in relation thereto unless the same shall happen through his own Gross Negligence or wilful default.

51.4    The Directors may exercise all the powers of the Company to purchase and maintain insurance for the benefit of a person who is or was a Director, alternate Director, Secretary or auditor of the Company indemnifying him against any liability which may lawfully be insured against by the Company:

**52      Disclosure**

If required to do so under the laws of any jurisdiction to which the Company, the Investment Manager, the Administrator or any other service provider is subject, or in compliance with the rules of any stock exchange upon which the Company's Shares are listed, or to ensure the compliance by any person with any anti-money laundering law in any relevant jurisdiction, any Director, Officer, the Investment Manager, the Administrator or Auditor of the Company shall be entitled to release or disclose any information in its possession regarding the affairs of the Company or a Member

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 23    Filed 04/04/24    Page 137 of 200    PageID 24949
Appendix Part 6 Page 564 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 95 of 324

including, without limitation, any information contained in the Register of Members or subscription documentation of the Company relating to any Member.

**53      Financial Year**

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

**54      Transfer by way of Continuation**

The Company shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

**55      Mergers and Consolidations**

The Company shall have the power to merge or consolidate with one or more other constituent companies (as defined in the Statute) upon such terms as the Directors may determine and (to the extent required by the Statute) with the approval of a Special Resolution.

Appx. 03714

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-23   Appendix Part 6 Filed 04/04/24   Page 138 of 200   PageID 24950
Page 574 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 96 of
324

**AMENDMENT**
**TO**
**AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT**
**OF**
**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.**

THIS AMENDMENT (this "*Amendment*") to the Amended and Restated Exempted Limited Partnership Agreement (the "*Partnership Agreement*") dated November 1, 2017 (the "*Effective Date*") of Highland Argentina Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "*Partnership*"), is entered into to be effective as of the Effective Date by Highland Argentina Opportunity Fund GP, LLC, as the General Partner, and as the true and lawful agent and attorney-in-fact on behalf of each of the Limited Partners.  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Partnership Agreement.

WHEREAS, due to a scrivener's error, the definition of "*Calculation Period*" under subsection (a) of Article I of the Partnership Agreement incorrectly provided that the Calculation Period with respect to Capital Sub-Account of a Feeder Fund, after the initial Calculation Period, shall commence as of the day following the last day of the preceding Calculation Period and end as of the close of business on the last day of a calendar year;

WHEREAS, at all times the Calculation Period was intended to end as of the close of business on the last day of a fiscal quarter;

WHEREAS, pursuant to the authority granted under Sections 8.1 and 8.2 of the Partnership Agreement, the General Partner, on behalf of itself and on behalf of each of the Limited Partners, now desires to correct the definition of "*Calculation Period*" under subsection (a) of Article I of the Partnership Agreement to provide that the Calculation Period shall end as of the close of business on the last day of a fiscal quarter.

NOW, THEREFORE, in consideration of the premises and the agreements contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the General Partner, on behalf of itself and on behalf of each of the Limited Partners, hereby amends the Partnership Agreement as follows:

1.      The definition of "*Calculation Period*" in the Partnership Agreements is hereby amended and replaced in its entirety to read as follows:

"*Calculation Period*" means, with respect to each Capital Sub-Account of a Feeder Fund, the period commencing as of the date of the establishment of the Capital Sub-Account (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Sub-Account, and ending as of the close of business on the first to occur of the following:

(a)      the last day of a fiscal quarter;

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2 Part 6 Filed 04/534 of 867ge 139 of 200    PageID 24951
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 97 of
324

(b)    the withdrawal of all or a portion of the Capital Sub-Account, including as a result of a distribution (but only with respect to the amount withdrawn in the event of a partial withdrawal);

(c)    the permitted Transfer of all or any portion of the Capital Sub-Account (but only with respect to the amount withdrawn in the event of a partial permitted Transfer); or

(d)    the final distribution with respect to the Capital Sub-Account following the dissolution of the Partnership.

If a Calculation Period ends solely due to a partial withdrawal or a partial Transfer from the Capital Sub-Account, the Calculation Period is deemed to have ended only with respect to that particular Capital Sub-Account and only with respect to the portion of such Capital Sub-Account withdrawn or transferred. Thus, the Performance Allocation for such withdrawn or transferred amount shall be determined by multiplying the Performance Allocation attributable to the entire Capital Sub-Account at such time by a fraction (i) the numerator of which is equal to the amount so withdrawn or transferred from such Capital Sub-Account and (ii) the denominator of which is equal to the balance of such Capital Sub-Account immediately before giving effect to such withdrawal or Transfer."

2.    This Amendment shall be governed by and construed in accordance with the laws of the Cayman Islands, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction.

3.    This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original or faxed signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed agreement. All such fully executed original or faxed counterparts will collectively constitute a single agreement.

4.    Except as modified hereby, the Partnership Agreement shall remain in full force and effect and the Amendment shall be binding upon the parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Amendment and the terms of the Partnership Agreements, the Amendment shall prevail.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 16-2 Part 6 Filed 04/06/24    Page 140 of 200    PageID 24952

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 98 of 324

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed to be effective as of the Effective Date.

**GENERAL PARTNER:**

**Highland Argentina Regional Opportunity Fund GP, LLC**

By:    Highland Capital Management Latin America, L.P., its sole member

By:    Highland Latin America GP, Ltd., its general partner

By: _____

Name:    Gustavo Prilick

Title:    Director

3

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 178-23   Filed 04/04/24   Page 141 of 200   PageID 24953
Appendix Part 6 Page 4604 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 99 of
324

# HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.

*A Cayman Islands Exempted Limited Partnership*

**Amended and Restated Exempted Limited Partnership Agreement**

**November 1, 2017**

Appx. 03718

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-22    Filed 04/04/24    Page 142 of 200    PageID 24954
Appendix Part 6 Page 0461 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 100 of
324

## NOTICE

NEITHER HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED, THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY NON-U.S. JURISDICTION. THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE OR NON-U.S. SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT.

i

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 01/04/24    Page 143 of 200    PageID 24955
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 101 of 324

## Table of Contents

*Page*

Article I DEFINITIONS ..........................................................................................................1

Article II ORGANIZATION.................................................................................................12
    2.1    Continuation of Exempted Limited Partnership ....................................12
    2.2    Name of Partnership ..............................................................................13
    2.3    Registered Office ..................................................................................13
    2.4    Term of Partnership ..............................................................................13
    2.5    Object and Powers of Partnership.........................................................13
    2.6    Liability of Partners ..............................................................................14
    2.7    Actions by Partnership..........................................................................14
    2.8    Reliance by Third Parties .....................................................................14
    2.9    Filings ...................................................................................................14
    2.10    Series of Interests ................................................................................15

Article III CAPITAL............................................................................................................15
    3.1    Contributions to Capital.......................................................................15
    3.2    Rights of Partners in Capital ................................................................15
    3.3    Capital Accounts ..................................................................................16
    3.4    Allocation of Net Profit and Net Loss ..................................................17
    3.5    Allocation of Management Fees, Withholding Taxes and Certain Other
        Expenditures ........................................................................................17
    3.6    Reserves; Adjustments for Certain Future Events ...............................19
    3.7    Performance Allocation ........................................................................19
    3.8    Allocation to Avoid Capital Account Deficits .....................................19
    3.9    Allocations for U.S. Federal Income Tax Purposes .............................20
    3.10    Curative Allocations ...........................................................................23
    3.11    Tax Matters .........................................................................................23
    3.12    Distributions.......................................................................................24
    3.13    Other Matters .....................................................................................24

Article IV MANAGEMENT .................................................................................................24
    4.1    Duties and Powers of the General Partner ...........................................24
    4.2    Expenses ...............................................................................................26
    4.3    Rights of Limited Partners ...................................................................28
    4.4    Other Activities of Partners..................................................................28
    4.5    Duty of Care; Indemnification .............................................................30
    4.6    Investment Restrictions ........................................................................31

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS .................................32
    5.1    Admission of Partners..........................................................................32
    5.2    Transfer and Withdrawal of the General Partner .................................32
    5.3    Transfer and Withdrawal of Interests of Limited Partners...................33

Article VI LIQUIDATION AND TERMINATION ...........................................................34
    6.1    Termination of Partnership ...................................................................34
    6.2    Liquidation of Assets ...........................................................................35

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/04/24    Page 144 of 200    PageID 24956
Appendix Part 6 Page 4634 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 102 of
324

Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS ............................36
    7.1    Accounting and Reports.................................................................36
    7.2    Certain Tax Matters....................................................................36
    7.3    AEOI..........................................................................................37
    7.4    Valuation of Partnership Assets and Interests .............................39
    7.5    Determinations by the General Partner.......................................39
    7.6    Books and Records ......................................................................39
Article VIII GENERAL PROVISIONS..................................................................40
    8.1    Amendment of Partnership Agreement........................................40
    8.2    Special Power-of-Attorney ...........................................................40
    8.3    Notices........................................................................................42
    8.4    Agreement Binding Upon Successors and Assigns; Delegation..........42
    8.5    Governing Law ...........................................................................42
    8.6    Interpretation of Partnership Accounting Systems and Terminology ...................43
    8.7    Miscellaneous ............................................................................43
    8.8    Survival......................................................................................43
    8.9    Entire Agreement .......................................................................43

Appx. 03721

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Page 04624 of 869 Page 145 of 200    PageID 24957
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 103 of
324

THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT of Highland Argentina Regional Opportunity Master Fund, L.P. is made on November 1, 2017 by and among Highland Argentina Regional Opportunity Fund GP, LLC, as General Partner, Gustavo Prilick, as withdrawing Original Limited Partner, those Persons who are listed on Exhibit A as Limited Partners and any other Persons who are admitted, from time to time, as limited partners of the Partnership, in accordance with this Agreement.  This Agreement amends and restates in its entirety the Initial Exempted Limited Partnership Agreement of the Partnership, dated September 21, 2017 (the "***Prior Agreement***").

---

## Article I  DEFINITIONS

---

For purposes of this Agreement:

"***Act***" means the Exempted Limited Partnership Law, 2014 of the Cayman Islands, as amended, supplemented or replaced from time to time.

"***Administrator***" means such Person as the General Partner may designate from time to time, in its sole discretion, to serve as administrator to the Partnership.

"***Advisers Act***" means the U.S. Investment Advisers Act of 1940, as amended, and the rules promulgated thereunder.

"***AEOI***" means:

(i)     Sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii)    the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters – the Common Reporting Standard and any associated guidance;

(iii)   any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation, regulations, guidance or standards described in sub-paragraphs (a) and (b); and

(iv)    any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

1

Case 21-03003-sgj  Doc 135-6  Filed 12/18/21  Entered 12/18/21 01:38:22  Desc
Case 3:21-cv-00881-X  Document 178-2 Part 6 Filed 04/654 of 86age 146 of 200  PageID 24958
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20  Entered 02/24/20 17:25:25  Page 104 of
324

"*Affiliate*" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person. For these purposes, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Affiliated Investor*" means the Investment Manager, the General Partner and their respective Affiliates, principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes.

"*Agreement*" means this Amended and Restated Exempted Limited Partnership Agreement of the Partnership, as amended from time to time.

"*Automatic Dissolution Date*" has the meaning set forth in Section 6.1(a)(ii).

"*BBA*" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"*BBA Effective Period*" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in Bipartisan Budget Act Section 1101(g)(1), as applicable, or in any other BBA guidance.

"*Business Day*" means any day or days on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for business or such other days as the General Partner may determine generally, or in any particular case.

"*Calculation Period*" means, with respect to each Capital Sub-Account of a Feeder Fund, the period commencing as of the date of the establishment of the Capital Sub-Account (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Sub-Account, and ending as of the close of business on the first to occur of the following:

(a)     the last day of a calendar year;

(b)     the withdrawal of all or a portion of the Capital Sub-Account, including as a result of a distribution (but only with respect to the amount withdrawn in the event of a partial withdrawal);

(c)     the permitted Transfer of all or any portion of the Capital Sub-Account (but only with respect to the amount withdrawn in the event of a partial permitted Transfer); or

(d)     the final distribution with respect to the Capital Sub-Account following the dissolution of the Partnership.

Appx. 03723

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 04/04/24   Page 147 of 200   PageID 24959
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 105 of
324

If a Calculation Period ends solely due to a partial withdrawal or a partial Transfer from the Capital Sub-Account, the Calculation Period is deemed to have ended only with respect to that particular Capital Sub-Account and only with respect to the portion of such Capital Sub-Account withdrawn or transferred. Thus, the Performance Allocation for such withdrawn or transferred amount shall be determined by multiplying the Performance Allocation attributable to the entire Capital Sub-Account at such time by a fraction (i) the numerator of which is equal to the amount so withdrawn or transferred from such Capital Sub-Account and (ii) the denominator of which is equal to the balance of such Capital Sub-Account immediately before giving effect to such withdrawal or Transfer.

"*Capital Account*" means, with respect to each Partner, the capital account (including any related Capital Sub-Accounts) established and maintained on behalf of such Partner as described in Section 3.3.

"*Capital Sub-Account*" means, with respect to each Feeder Fund, the separate memorandum account to be recorded in the books and records of the Partnership as a sub-account within such Feeder Fund's Capital Account that corresponds to each series or sub-series of interests held by each Feeder Fund Investor, including Series A Capital Sub-Accounts, Series B Capital Sub-Accounts and Series C Capital Sub-Accounts. Each Capital Sub-Account with respect to the Capital Account of the Domestic Fund shall correspond to the beneficial interest of each partner in the Domestic Fund; and each Capital Sub-Account with respect to the Capital Account of the Offshore Fund shall correspond to each Sub-Series of shares of the Offshore Fund. The Partnership will also maintain Capital Sub-Accounts to reflect varied ownership interests in a Feeder Fund. The aggregate of the balances of all Capital Sub-Accounts with respect to each Feeder Fund shall equal the balance of each such Feeder Fund's Capital Account. Except as the context otherwise requires, the term Capital Account includes any Capital Sub-Account of a Feeder Fund.

"*Carryforward Account*" means a memorandum account to be recorded in the books and records of the Partnership with respect to each Capital Sub-Account of a Feeder Fund. The Carryforward Account with respect to each Capital Sub-Account of any Feeder Fund will have an initial balance of zero and will be adjusted as follows:

(a)     As of the first day after the close of each Calculation Period for such Capital Sub-Account, the balance of the Carryforward Account is (i) increased by the amount, if any, of the Negative Performance Change with respect to such Capital Sub-Account for such Calculation Period and (ii) reduced (but not below zero) by the amount, if any, of the Positive Performance Change with respect to such Capital Sub-Account for such Calculation Period.

(b)     As of the close of the Calculation Period, any positive balance of the Carryforward Account is further adjusted if such Capital Sub-Account has been reduced during such Calculation Period as a result of a distribution or withdrawal, by reducing such positive balance (but not below zero) by an amount determined by multiplying (i) such positive balance by (ii) a fraction, of which (A) the numerator is equal to the amount so distributed

3

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176 Part 6 Filed 04/04/74 of 866ge 148 of 200    PageID 24960
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 106 of
324

or withdrawn, and (B) the denominator is equal to the balance of such Capital Sub-Account immediately before giving effect to such distribution or withdrawal.

"***Carrying Value***" means, with respect to any Investment, except as set forth herein, the asset's adjusted tax basis for United States federal income tax purposes, except that the Carrying Values of all Investments may, in the discretion of the General Partner, be adjusted to equal their respective fair market values (as determined by the General Partner), in accordance with the rules set forth in Regulation Section 1.704-1(b)(2)(iv)(f).  In the case of any Investment that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of depreciation, depletion and amortization calculated for purposes of the definition of Net Profit and Net Loss rather than the amount of depreciation, depletion and amortization determined for United States federal income tax purposes.

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"***Commencement Date***" means the first date on or as of which a Limited Partner, other than the Original Limited Partner, makes a capital contribution to the Partnership.

"***Domestic Fund***" means Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership that invests in the Partnership as a Limited Partner.

"***Domestic Fund LPA***" means the Amended and Restated Limited Partnership Agreement of the Domestic Fund, dated November 1, 2017, as may be amended from time to time.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"***ERISA Partner***" means a Limited Partner which is (a) an employee benefit plan subject to the fiduciary provisions of ERISA, (b) a "plan" subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the entity, or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA or any regulation promulgated thereunder.

"***FATCA***" means legislation known as the U.S. Foreign Account Tax Compliance Act, Sections 1471 through 1474 of the Code and any Regulations thereunder, including any subsequent amendments, and administrative guidance promulgated thereunder (or which may be promulgated in the future), any applicable intergovernmental agreements and related statutes, regulations or rules and other guidance thereunder, any governmental authority pursuant to the foregoing authorities, and any agreement entered into with respect thereto.

"***Feeder Fund Investor***" means an investor in one of the Feeder Funds.

"***Feeder Funds***" means the Domestic Fund, the Offshore Fund and any other investment vehicle(s) sponsored by the Investment Manager or one of its Affiliates that invests in parallel with the Domestic Fund and the Offshore Fund in the Partnership.

4

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/04/24    Page 149 of 200    PageID 24961
Appendix Part 6    Page 34 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 107 of
324

"***Fiscal Period***" means each period that starts at the opening of business on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day immediately following the last day of the preceding Fiscal Period, and that ends at the close of business on the earliest of the following dates:

(a)    the last day of a calendar month;

(b)    any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)    the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)    any other date which the General Partner selects.

"***Fiscal Year***" means the period commencing on the Commencement Date and ending on December 31 of the same year, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect another fiscal year; *provided* that any such other fiscal year shall be permissible for U.S. federal income tax purposes.  In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "***Fiscal Year***" means the period commencing on January 1 of that year and ending on the date on which the Partnership is terminated.

"***GAAP***" means generally accepted accounting principles in the United States.

"***General Partner***" means Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"***Gross Negligence***" means "gross negligence" as such term is defined and interpreted in accordance with the laws of the State of Delaware, United States.

"***IFRS***" means the International Financial Reporting Standards issued by the International Accounting Standards Board.

"***Indemnified Person***" means each of the General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the General Partner or the Investment Manager, each of the respective Affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives.

"***Interest***" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 04/04/24   Page 150 of 200   PageID 24962
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 108 of
324

be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"*Investment Management Agreement*" means the investment management agreement by and among the Investment Manager, the General Partner, the Domestic Fund, the Offshore Fund and the Partnership, as amended from time to time.

"*Investment Manager*" means Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"*Investments*" means investments in securities or other financial or intangible investment instruments, contracts or products made by the Partnership, as more fully described in the Feeder Funds' offering memoranda (as may be amended, updated or supplemented from time to time).

"*Limited Partner*" means each of the Persons set forth on Exhibit A, other than the General Partner, and any Person who hereafter becomes a Limited Partner pursuant to the terms of this Agreement, in each case in such Person's capacity as a limited partner of the Partnership.   The General Partner may subdivide the Interests into separate series and establish new series pursuant to Section 2.10; *provided, that*, except as expressly set forth in this Agreement, for all purposes of the Act, the Limited Partners constitute a single class or group of limited partners.

"*Liquidator*" has the meaning set forth in Section 6.1(b).

"*Majority of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners or the series of Limited Partners, as applicable.

"*Management Fee*" means an amount calculated at an annual rate of (a) 1.75% of each Series A Capital Sub-Account, (b) 1.25% of each Series B Capital Sub-Account, and (c) 1.00% of each Series C Capital Sub-Account.   The Management Fee accrues from the date a Capital Sub-Account is created, is calculated monthly based on the Capital Sub-Account balance on the last day of each calendar month (before giving effect to any withdrawals from such Capital Sub-Account during such calendar month) and is payable quarterly in arrears on the last day of each calendar quarter.   The General Partner or the Investment Manager may reduce, waive or calculate differently the Management Fee with respect to any Limited Partner and any Capital Sub-Account.

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest) over the amount that such Partner is entitled to receive upon withdrawal from or the winding up and subsequent dissolution of the Partnership.

"*Negative Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the effective date of

6

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 04/04/24 of 866  Page 151 of 200   PageID 24963
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 109 of
324

withdrawal, but such Partner will cease to be a Negative Basis Partner at such time as it has received allocations pursuant to Section 3.9(d) equal to such Partner's Negative Basis as of the effective date of withdrawal and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Net Assets*" means the total value, as determined by the Administrator in accordance with Section 7.3, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6). Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal Period but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period and after giving effect to Management Fee charges and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

(a)     any Performance Allocation as of the date on which such determination is made;

(b)     any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c)     withholding or other taxes (including any amounts payable under any BBA provision), expenses of processing withdrawals and other items payable and any increases or decreases in any reserves, holdbacks or other amounts recorded pursuant to Section 3.6 during the Fiscal Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"*Net Profit or Net Loss*" means, for each Fiscal Year or other period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for United States federal income tax purposes with the following adjustments: (a) all items of income, gain, loss or deduction specially allocated pursuant to Section 3.9 shall not be taken into account in computing such Net Profit or Net Loss; (b) any income of the Partnership that is exempt from United States federal income taxation and not otherwise taken into account in computing Net Profit and Net Loss shall be added to such taxable income or loss; (c) if the Carrying Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Carrying Value; (d) if the Carrying Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset shall, for purposes of determining Net Profit and Net Loss, be an amount that bears the same ratio to such Carrying Value as the United States federal income tax depreciation, amortization or other

7

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/14/23    Page 152 of 200    PageID 24964
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 110 of 324

cost recovery deductions bears to such adjusted tax basis (provided, that, if the United States federal income tax depreciation, amortization or other cost recovery deduction is zero (0), the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Net Profit and Net Loss); (e) any expenditures of the Partnership that are described in Section 705(a)(2)(B) of the Code or are treated as described in Section 705(a)(2)(B) of the Code pursuant to Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profit and Net Loss shall be treated as deductible items; (f) any deduction or debit of the Partnership attributable to Management Fees, placement fees or Organizational Expenses, as the case may be, shall not be taken into account in computing such Net Profit or Net Loss; and (g) if the Carrying Value of any Partnership property is adjusted as provided in the definition of Carrying Value, the amount of such adjustment shall be taken into account, as and if appropriate, immediately prior to the event giving rise to such adjustment, as gain or loss from the hypothetical disposition of such property.

"*New Limited Partner*" has the meaning assigned to such term in Section 8.2(a)(vi).

"*Offshore Fund*" means Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company that invests in the Partnership as a Limited Partner.

"*Offshore Fund POM*" means the Offering Memorandum of the Offshore Fund, dated October 2017, as may be modified or supplemented from time to time.

"*Original Limited Partner*" means Gustavo Prilick, in his capacity as the original limited partner of the Partnership.

"*Other Account*" means any assets or investment of the General Partner or the Investment Manager, or any assets managed by the General Partner, the Investment Manager or any of their respective Affiliates for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "Partners" means the General Partner and all of the Limited Partners.

"*Partnership*" means the exempted limited partnership formed upon the filing of a statement under Section 9 of the Act with the Registrar on September 21, 2017, pursuant to the Prior Agreement and registered with the name "Highland Argentina Regional Opportunity Master Fund, L.P."

"*Partnership Percentage*" means a percentage established for each Capital Account on the Partnership's books as of the first day of each Fiscal Period. The Partnership Percentage of a Capital Account for a Fiscal Period shall be determined by dividing the amount of such Capital Account as of the beginning of the Fiscal Period (after crediting all capital contributions to such Capital Account which are effective as of such date, net of all deductions, including Management Fees) by the sum of all Capital Accounts as of the beginning of the Fiscal Period (after crediting

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-22   Filed 04/24 of 86 Page 153 of 200   PageID 24965
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 111 of
324

all capital contributions to the Partnership which are effective as of such date, net of all deductions, including Management Fees).  The sum of the Partnership Percentages of all Capital Accounts for each Fiscal Period shall equal 100%.

"*Performance Allocation*" means:

(a)      with respect to each Series A Capital Sub-Account, 20.0% of the amount, determined as of the close of each Calculation Period with respect to such Capital Sub-Account, by which (i) such Capital Sub-Account's Positive Performance Change for such Calculation Period, if any, exceeds (ii) any positive balance in such Capital Sub-Account's Carryforward Account as of the most recent prior date as of which any adjustment has been made thereto;

(b)      with respect to each Series B Capital-Sub Account, 17.5% of the amount, determined as of the close of each Calculation Period with respect to such Capital Sub-Account, by which (i) such Capital Sub-Account's Positive Performance Change for such Calculation Period, if any, exceeds (ii) any positive balance in such Capital Sub-Account's Carryforward Account as of the most recent prior date as of which any adjustment has been made thereto; and

(c)      with respect to each Series C Capital Sub-Account, 15.0% of the amount, determined as of the close of each Calculation Period with respect to such Capital Sub-Account, by which (i) such Capital Sub-Account's Positive Performance Change for such Calculation Period, if any, exceeds (ii) any positive balance in such Capital Sub-Account's Carryforward Account as of the most recent prior date as of which any adjustment has been made thereto.

The General Partner has the discretion to fully or partially waive or decrease the Performance Allocation with respect to any Capital Sub-Account.  For the avoidance of doubt, if and for so long as Capital Sub-Accounts are maintained for any Limited Partner, the Performance Allocation shall be calculated separately with respect to each such Capital Sub-Account as if such Capital Sub-Account was the sole Capital Account of a Person admitted as a Limited Partner upon establishment of such Capital Sub-Account.  In such event, the Performance Allocation for such Limited Partner shall be the total of the Performance Allocations as calculated with respect to each such Capital Sub-Account.

"*Performance Change*" means, with respect to each Capital Sub-Account for each Calculation Period, the difference between:

(a)      the sum of (i) the balance of such Capital Sub-Account as of the close of the Calculation Period (after giving effect to Management Fees and all allocations to be made to such Capital Sub-Account as of such date other than any Performance Allocation to be debited against such Capital Sub-Account), plus (ii) any debits to such Capital Sub-Account during the Calculation Period to reflect any actual or deemed distributions or withdrawals with respect to such Capital Sub-Account, plus (iii) any debits to such Capital Sub-Account during the Calculation Period to

9

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/24/24    Page 154 of 200    PageID 24966
Appendix Part 5 Page 04734 of 866
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 112 of
324

reflect any items allocable to such Capital Sub-Account pursuant to Section 3.5(b) or (c); and

(b)    the sum of (i) the balance of such Capital Sub-Account as of the commencement of the Calculation Period, plus (ii) any credits to such Capital Sub-Account during the Calculation Period to reflect any contributions by such Limited Partner to the Capital Sub-Account.

If there is any change in the Net Assets associated with such Capital Sub-Account during a relevant Calculation Period that is not reflected in the Carrying Value of the Partnership's Investment, the General Partner shall be permitted, in its sole discretion, to adjust the Performance Change with respect to such Capital Sub-Account as if such change had been (i) reflected in the Carrying Value of the Partnership's Investments in respect of the relevant Calculation Period and (ii) allocated among the Capital Sub-Accounts in the manner prescribed for comparable items by this Agreement.

The calculation of the Performance Change will take into account all expenses of the relevant Feeder Fund incurred with respect to such Capital Sub-Account as of such calculation date.  If the amount specified in clause (a) exceeds the amount specified in clause (b), such difference is a "*Positive Performance Change*," and if the amount specified in clause (b) exceeds the amount specified in clause (a), such difference is a "*Negative Performance Change*."

For the avoidance of doubt, if and for so long as Capital Sub-Accounts are maintained for any Limited Partner, the Performance Change for each Calculation Period shall be computed separately with respect to each such Capital Sub-Account and the resulting "Positive Performance Changes" and "Negative Performance Changes" shall be separately allocated to such Capital Sub-Accounts and shall not be netted against each other.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, or other entity.

"*Plan Assets*" means assets of the Partnership that are considered to be assets of an ERISA Partner, as determined pursuant to Section 3(42) of ERISA.

"*Positive Basis*" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or the winding up and subsequent dissolution of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest).

"*Positive Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the effective date of withdrawal, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.9(c) equal to such Partner's Positive Basis as of the effective date of withdrawal and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

10

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 01/09/24   Page 155 of 200   PageID 24967
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 113 of
324

"***Prior Agreement***" has the meaning set forth in the recitals hereto.

"***Registrar***" means the Registrar of Exempted Limited Partnerships of the Cayman Islands.

"***Regulations***" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"***Regulatory Allocations***" has the meaning set forth in Section 3.10.

"***Section 9 Statement***" has the meaning set forth in Section 2.1(a).

"***Series A Capital Sub-Account***" means a Capital Sub-Account that corresponds to a holder of Series A Interests (as defined in the Domestic Fund LPA) in the Domestic Fund or a holder of a Sub-Series of Series A Shares (as defined in the Offshore Fund POM) in the Offshore Fund, as applicable.

"***Series B Capital Sub-Account***" means a Capital Sub-Account that corresponds to a holder of Series B Interests (as defined in the Domestic Fund LPA) in the Domestic Fund or a holder of a Sub-Series of Series B Shares (as defined in the Offshore Fund POM) in the Offshore Fund, as applicable.

"***Series C Capital Sub-Account***" means a Capital Sub-Account that corresponds to a holder of Series C Interests (as defined in the Domestic Fund LPA) in the Domestic Fund or a holder of a Sub-Series of Series C Shares (as defined in the Offshore Fund POM) in the Offshore Fund, as applicable.

"***Special Limited Partner***" means Highland Capital Management Latin America, L.P., in its capacity as a special limited partner of the Partnership for purposes of the receipt of the Performance Allocation.

"***Sub-Series***" means sub-series of shares of the Offshore Fund, as created from time to time, for purposes of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received from shareholders at different times.

"***Termination Date***" has the meaning assigned to such term in Section 6.1(a).

"***Transfer***" means any direct or indirect sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

Appx. 03732

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/24/24    Page 156 of 200    PageID 24968
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 114 of
324

## Article II  ORGANIZATION

**2.1    Continuation of Exempted Limited Partnership**

(a)    The General Partner and the Original Limited Partner established the Partnership upon filing a statement under Section 9 of the Act (the "*Section 9 Statement*") with the Registrar on September 21, 2017, pursuant to the Prior Agreement, which Prior Agreement has governed the operation of the Partnership since that date.  The Original Limited Partner hereby withdraws as a Limited Partner immediately following the admission of any additional Limited Partner and thereafter shall have no further rights, interest or obligations of any kind whatsoever under or in respect of this Agreement or as the Original Limited Partner.  The General Partner hereby admits the Limited Partners who are a party to this Agreement (excluding the Original Limited Partner) and the General Partner and the Limited Partners hereby amend and restate the Prior Agreement in its entirety on the terms of this Agreement.

(b)    If requested by the General Partner, the Limited Partners will promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filings, recordings, publishings and other acts as may be appropriate to comply with all requirements for (i) the formation and operation of an exempted limited partnership under the laws of the Cayman Islands, (ii) if the General Partner deems it advisable, the operation of the Partnership as an exempted limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (iii) all other filings required by the Act to be made by the Partnership.    The General Partner shall cause any required amendment to the Section 9 Statement or any other amendment requiring filing under the Act to be filed promptly following the event requiring such amendment. All such amendments may be signed by the General Partner (as required by the Act), and may be signed either personally or by an attorney-in-fact or agent of the General Partner.

(c)    The Partnership expects to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Partnership or to any Partner in respect of the operations or assets of the Partnership or the Interest of a Partner.  The parties hereto acknowledge that they intend that the Partnership be taxed in the United States as a partnership and not as an association taxable as a corporation for U.S. federal income tax purposes. No election may be made to treat the Partnership as other than a partnership for U.S. federal income tax purposes.

Appx. 03733

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 04/24/24   Page 157 of 200   PageID 24969
Appendix Part 6 Page 784 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 115 of
324

**2.2     Name of Partnership**

(a)     The name of the Partnership is Highland Argentina Regional Opportunity Master Fund, L.P. or such other name as the General Partner may hereafter adopt upon (i) causing a statement pursuant to Section 10 of the Act to be filed with the Registrar and (ii) giving notice thereof to the Limited Partners.

(b)     The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's winding up or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner or one of its Affiliates without payment by the assignee(s) of any consideration therefor.

**2.3     Registered Office**

(a)     The registered office address of the Partnership in the Cayman Islands is at c/o Maples Corporate Services Limited, P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

(b)     The General Partner may at any time change the location of the Partnership's registered office or registered agent in its sole discretion, provided that the registered office of the Partnership shall be in the Cayman Islands.

**2.4     Term of Partnership**

The term of the Partnership commenced on the date of formation and continues until wound up and dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1).

**2.5     Object and Powers of Partnership**

(a)     The object and business of the Partnership is to (1) purchase, sell (including short sales), invest and trade in the Investments, (2) engage in financial transactions, including borrowing, financing, pledging, hedging and other derivative transactions relating thereto for the benefit of the Partnership, (3) engage in any other lawful act or activity for which exempted limited partnerships may be formed under the Act and (4) engage in any and all activities necessary or incidental to the foregoing; provided that the Partnership shall not undertake business with the public in the Cayman Islands other than so far as is necessary for the carrying on of the business of the Partnership exterior to the Cayman Islands.

(b)     The Partnership possesses and the General Partner on behalf of the Partnership may exercise all such powers and privileges as the General Partner considers necessary, convenient or incidental to the conduct, promotion or attainment of the objects of the Partnership.

Appx. 03734

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 04/04/24    Page 158 of 200    PageID 24970
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 116 of
324

**2.6    Liability of Partners**

(a)    The liability of the Limited Partners is limited to their obligations under this Agreement and the Act.  The General Partner is liable for all of the debts and obligations of the Partnership to the extent that the Partnership has insufficient assets.  The General Partner shall not be personally liable for the withdrawal, payment or distribution of all or any part of any Interest, it being expressly agreed that any such withdrawal, payment or distribution to be made pursuant to this Agreement shall be made solely from the assets of the Partnership (which shall not include the General Partner's capital contributions) and on the terms and subject to the conditions contained in this Agreement.

(b)    In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any personal liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act or other applicable law.

**2.7    Actions by Partnership**

The General Partner on behalf of the Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out the objects of the Partnership as set forth in Section 2.5 above.  Notwithstanding the foregoing, the Partnership shall not issue any securities other than interests in the Partnership.

**2.8    Reliance by Third Parties**

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

**2.9    Filings**

(a)    The General Partner shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Partnership as an exempted limited partnership under the Act and other laws of the Cayman Islands, including the filing of a notice pursuant to Section 10 of the Act with the Registrar signed by the General Partner upon the occurrence of certain amendments to the Section 9 Statement of the Partnership, and any other states or jurisdictions in which the Partnership engages in business.

(b)    Following the winding up of the Partnership in accordance with the terms of this Agreement and to effect the dissolution of the same, the General Partner or any duly appointed liquidator shall promptly (i) comply with the applicable provisions of Section 15 of the Act, (ii) execute and cause to be filed a notice of dissolution in accordance with Section 15(3) of the Act and (iii) file any certificates of

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/24/24    Page 159 of 200    PageID 24971
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 117 of
324

cancellation in accordance with the laws of any states or jurisdictions in which the Partnership has filed certificates.

**2.10    Series of Interests**

The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different series of Interests with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such series of Interests; *provided* that such series of Interests would not reasonably be expected to have a material adverse effect on the existing Feeder Fund Investors. The terms and rights of each such series of Interests may be set forth in the Feeder Funds' offering memoranda, any supplement thereto or a "side letter" or other agreement, which the General Partner may incorporate by reference.

---

## Article III  CAPITAL

---

**3.1    Contributions to Capital**

(a)    Each Partner is permitted to make contributions to the capital of the Partnership at such times and in such amounts as the General Partner, in its sole discretion, may determine.  The Limited Partners are not required to make any additional capital contributions to the Partnership, subject to the provisions of Section 3.5(b) and any contrary provision of the Act.

(b)    Each Person admitted as a general partner of the Partnership agrees to make and maintain a capital contribution as a general partner of at least U.S.$1.00.  Except as provided above or in the Act, the General Partner is not required or obligated to make any additional contributions to the capital of the Partnership.  However, the General Partner or an Affiliate shall have the right at any time to make additional capital contributions as a Limited Partner or General Partner in such amounts as it may determine.  If an Affiliated Investor makes a capital contribution as a Feeder Fund Investor or a Limited Partner, the General Partner has the authority to waive the Management Fee and/or Performance Allocation with respect to such Feeder Fund Investor or Limited Partner, respectively.

**3.2    Rights of Partners in Capital**

(a)    No Partner shall be entitled to interest on its capital contributions to the Partnership.

(b)    No Partner shall have the right to the return of any capital contribution to the Partnership except, subject to the Act, (i) upon withdrawal by such Partner of all or part of its Interest pursuant to Section 5.3 or (ii) upon the winding up and

Appx. 03736

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/24/1 of 360ge 160 of 200    PageID 24972
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 118 of
324

dissolution of the Partnership pursuant to Section 6.1. The entitlement to any such return shall be limited to the value of the Capital Account, including corresponding Capital Sub-Accounts, of the Partner. The General Partner shall not be liable for the return of any such amounts.

**3.3**     **Capital Accounts**

(a)     The Partnership shall maintain a separate Capital Account for each Partner. The General Partner may, in its discretion, maintain separate memorandum sub-accounts with respect to each such Capital Account for purposes of this Agreement. Each Capital Account will reflect the aggregate sum of the balances of all memorandum sub-accounts associated with each such Capital Account. Without limiting the foregoing, the Partnership shall also maintain separate Capital Sub-Accounts within the Capital Account of each Feeder Fund relating to the beneficial interest of each Feeder Fund Investor therein. If a Feeder Fund Investor invests in more than one series of limited partner interests in the Domestic Fund, the Partnership will maintain a separate Capital Sub-Account on behalf of such Feeder Fund Investor with respect to each series. The Partnership will maintain a separate Capital Sub-Account corresponding to each Sub-Series of shares held by a Feeder Fund Investor in the Offshore Fund. Each Capital Sub-Account will be treated as if it were the Capital Account of a separate Partner for purposes of this Agreement, unless otherwise determined by the General Partner, including, without limitation, for purposes of determining the Management Fee and the Performance Allocation applicable to each such Capital Sub-Account. References herein to a "Capital Account" shall be deemed to refer to such a Capital Sub-Account where the context admits.

(b)     Each Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to the Partnership.

(c)     Each Capital Account shall be increased by (i) the amount of any cash and the net value of any property constituting additional contributions to such Capital Account permitted pursuant to Section 3.1 and (ii) such Capital Account's allocable share of the Net Profits allocated by the Partnership to such Capital Account pursuant to Section 3.4.

(d)     Each Capital Account shall be reduced by (i) the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.3 or 6.2, (ii) such Capital Account's allocable share of the Net Losses allocated by the Partnership to such Capital Account pursuant to Section 3.4, (iii) such Capital Account's *pro rata* portion of the expenses allocable (or specially allocable) by the Partnership pursuant to Section 3.5, (iv) such Capital Account's allocable share of the Performance Allocation allocable pursuant to Section 3.7, and (v) such Capital Account's *pro rata* portion of the expenses payable by the Partnership pursuant to Section 4.2(b).

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2  Part 6  File Page 04804 of 867  Page 161 of 200    PageID 24973
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 119 of
324

(e)  The Capital Account of the Special Limited Partner will be increased by the amount of the Performance Allocation allocated to such Capital Account and the investment gains thereon pursuant to Section 3.7(a).

(f)  Each Capital Account shall be adjusted to reflect all other allocations and other changes in the value of such Capital Account not otherwise described in this Section 3.3 in the manner specified in the remaining provisions of this Article III.

## 3.4    Allocation of Net Profit and Net Loss

(a)  Except as otherwise provided in this Agreement, Net Profits, Net Losses and, to the extent necessary, individual items of income, gain, loss, deduction or credit of the Partnership shall be allocated among the Partners in a manner that, after giving effect to the special allocations set forth in Section 3.5, give economic effect to the provisions of this Agreement taking into account such facts and circumstances as the General Partner deems reasonably necessary or appropriate for this purpose.  For the avoidance of doubt and solely for the purposes of applying the preceding sentence, the General Partner shall be permitted, in its sole discretion, to cause the Carrying Value of the Partnership's Investments to be adjusted, as described in the definition of "Carrying Value", on a *mutatis mutandis* basis, at the time at which such allocations are made.

(b)  Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses for a Fiscal Period that are not allocable to specific Investments of the Partnership, including short term interest income, and audit, administration and legal expenses, shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners *pro rata* in accordance with their Partnership Percentages for such Fiscal Period.

## 3.5    Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures

(a)  As of the last day of each calendar quarter, the Management Fee applicable to each Capital Account for such calendar quarter will be debited against the relevant Capital Account.    Capital contributions accepted after the commencement of the calendar quarter shall be subject to a prorated Management Fee reflecting the time remaining during such calendar quarter.  The General Partner or the Investment Manager may reduce, waive or calculate differently the Management Fee with respect to any Limited Partner and any Capital Sub-Account.  For the avoidance of doubt, if and for so long as Capital Sub-Accounts are maintained for any Limited Partner, the Management Fee shall be calculated separately with respect to each such Capital Sub-Account as if such Capital Sub-Account was the sole Capital Account of a Person admitted as a Limited Partner upon establishment of such Capital Sub-Account.  The General Partner may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the Feeder Fund Investors.    The Investment Manager may also assign all or any portion of fees payable to the

17

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 04/24 Page 162 of 200    PageID 24974
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 120 of
324

Investment Manager to any Affiliate thereof or any third party in its sole discretion.

(b)    Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or FATCA withholding), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required.  If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement.  Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Fiscal Period during which the Partnership so withholds, pays or incurs such obligation.  If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership within 10 Business Days after notification and demand by the General Partner in the amount of such excess. The General Partner is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax or other tax obligation (including any amount under any BBA provision) on behalf of any Partner that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any withholding tax. Each Limited Partner agrees to repay to the Partnership and the General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)    Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership (including any taxes imposed on the Partnership pursuant to Section 6225 of the Code, as amended by the BBA), to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be specially allocated only to the Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments.  Such allocations shall be debited from the relevant Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

18

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2 Part 5 Filed 04/24/24    Page 163 of 200    PageID 24975
Appendix Part 5 Page 04824 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 121 of
324

3.6    **Reserves; Adjustments for Certain Future Events**

(a)    The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets and proportionately against the Capital Accounts (and the corresponding Capital Sub-Accounts) for contingent liabilities, such reserves to be in the amounts which the General Partner deems necessary or appropriate.  The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate.  The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be charged or credited, as the General Partner deems appropriate, to the Capital Accounts of those parties that are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties that were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established by the General Partner.

(b)    If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately charged or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period(s).

3.7    **Performance Allocation**

(a)    The Performance Allocation is debited against each applicable Capital Sub-Account as of the last day of each Calculation Period with respect to such Capital Sub-Account, and the amount so debited is simultaneously credited to the Capital Account of the Special Limited Partner pursuant to Section 3.3(e). Notwithstanding anything herein to the contrary, the Special Limited Partner may assign all or any portion of the Performance Allocation to its Affiliates or any other Person.

(b)    The General Partner may fully or partially waive or decrease the Performance Allocation with respect to any Limited Partner and any Capital Sub-Account.

3.8    **Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner.  Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.8 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.8 not previously recovered.

19

**Appx. 03740**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-22 Part 6 File Page 104334 of 866 age 164 of 200    PageID 24976
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 122 of
324

**3.9    Allocations for U.S. Federal Income Tax Purposes**

Notwithstanding anything to the contrary in this Agreement:

(a)    <u>Income Tax Allocations</u>.  Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year will be allocated among the Partners (and among such Partner's Capital Accounts) in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Accounts, whether in such Fiscal Year or in prior Fiscal Years.  To this end, the Partnership will establish and maintain records which shall show the extent to which the Capital Accounts of each Partner will, as of the last day of each Fiscal Year, comprise amounts that have not been reflected in the taxable income of such Partner.  To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts.  Non-U.S. tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations.  All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b)    <u>Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations; *provided* that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)    <u>General Partner Special Allocations</u>.  Notwithstanding anything to the contrary in this Agreement, if the General Partner withdraws (or is otherwise entitled to withdraw) all or a portion of its Capital Account during any Fiscal Year, the General Partner, in its sole discretion, may specially allocate items of income, gain, deduction, loss or credit that are recognized for U.S. federal income tax purposes to itself equal to the amount by which the withdrawn amount exceed its

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Part 6    Filed 04/24/24    Page 165 of 200    PageID 24977
Appendix Part 6 Page 04824 of 8667
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 123 of
324

adjusted tax basis, for U.S. federal income tax purposes, in its Partnership interest (determined prior to any such special allocations).

(d)    <u>Positive Basis Allocations</u>.  If the Partnership realizes gains or items of gross income (including short term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.3, the General Partner may elect: (i) to allocate such gains or items of gross income among such Positive Basis Partners, pro rata in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Positive Basis Partner an amount of such gains or items of gross income equal to the amount, if any, by which its Positive Basis as of the effective date of withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence. For the avoidance of doubt, the General Partner may also, in its sole discretion, to apply the Positive Basis definitions and the provisions of this Section 3.9(c) to a withdrawal from a Capital Sub-Account.

(e)    <u>Negative Basis Allocations</u>.  If the Partnership realizes net losses or items of gross loss or deduction (including short term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.3, the General Partner may elect:  (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, pro rata in proportion to the respective Negative Basis of each such Negative Basis Partners, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such

Appx. 03742

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6   Filed 04/08/24 of 866   Page 166 of 200   PageID 24978
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 124 of
324

withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its Negative Basis as of the effective date of withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence. For the avoidance of doubt, the General Partner may also, in its sole discretion, to apply the Negative Basis definitions and the provisions of this Section 3.9(d) to a withdrawal from a Capital Sub-Account.

(f)    <u>Qualified Income Offset</u>.  In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; provided that an allocation pursuant to this Section 3.9(e) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.9(e) were not in this Agreement.  This Section 3.9(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and shall be interpreted consistently therewith.

(g)    <u>Gross Income Allocation</u>.  In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 3.9(f) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.9(e) and this Section 3.9(f) were not in this Agreement.

(h)    <u>Section 704(b) Compliance</u>.  The allocations provided in this Section 3.9 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.  In the event the General Partner determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are determined (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or any Partners), the General Partner may make such modification, provided that it is not likely to have a material adverse effect on the amounts distributed to any Partner pursuant to Sections 3.12 and 6.2 hereof. The General Partner also shall (i) make any adjustments that are necessary or

Appx. 03743

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-2   Part 6   Filed 04/04/24   Page 167 of 200   PageID 24979
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 125 of
324

appropriate to maintain equality between the Capital Accounts of the Partners and the amount of capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

## 3.10    Curative Allocations

The allocations set forth in Sections 3.9(b), (e) and (f) (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations.  It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.10.  Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

## 3.11    Tax Matters

(a)    Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership or which would result in inconsistent treatment, and each Partner further agrees to treat, on any U.S. federal, state, local and/or non-U.S. income tax return in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner consistent with the treatment of such item by the Partnership.

(b)    To the fullest extent permitted by law, each Limited Partner agrees to (i) provide such cooperation and assistance, including executing and filing forms or other statements and providing information about the Limited Partner, as is reasonably requested by the Tax Matters Partner, to enable the Partnership to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Partner was admitted to the Partnership, (ii) amend the Limited Partner's tax returns and pay any resulting taxes, interest and penalties in connection with an election by the Partnership under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from an election by the Partnership under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Partnership from and against any liability with respect to the Limited Partner's share of any tax deficiency

23

Appx. 03744

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 04/04/24    Page 168 of 200    PageID 24980
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 126 of
324

(including any interest and penalties associated therewith) paid or payable by the Partnership that is (A) allocable to such Limited Partner (as reasonably determined by the General Partner in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Partner was a partner in the Partnership or (B) attributable (as reasonably determined by the General Partner) to the failure of such Limited Partner to cooperate with or provide any such forms, statements, or other information as requested by the Tax Matters Partner pursuant to clause (i) above.

### 3.12    Distributions

(a)    The amount and timing of any distributions from the Partnership shall be determined by the General Partner. Distributions will generally be made in proportion to the respective Partnership Percentages of the Partners for the Fiscal Period when made.  Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner from any account in connection with its Interest if such distribution would violate the Act or other applicable law.

### 3.13    Other Matters

(a)    The General Partner does not have any personal liability for the repayment of any capital contribution of any Partner.

(b)    Subject only to the relevant provisions of the Act, the Limited Partners are not personally liable for the debts, liabilities, contracts or other obligations of the Partnership except to the extent of their respective capital contributions; provided, however, that the foregoing is not to be construed as relieving any Partner of any obligations arising under Section 3.1 of this Agreement.

(c)    The Limited Partners shall not participate in the conduct of the Partnership's business nor shall they transact business for the Partnership, nor shall they have the power to sign for or bind the Partnership, said powers being vested exclusively in the General Partner.

---

### Article IV  MANAGEMENT

---

### 4.1    Duties and Powers of the General Partner

(a)    Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for (i) all investment and investment management decisions

Appx. 03745

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 04/04/24    Page 169 of 200    PageID 24981
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 127 of
324

to be undertaken on behalf of the Partnership and (ii) managing and administering the conduct of the business and the affairs of the Partnership, and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership. Without limiting the generality of the foregoing, the General Partner's powers include the power to borrow, obtain leverage or otherwise incur indebtedness with respect to the Partnership's capital. The General Partner has delegated (and the Investment Manager has agreed to assume) its rights and responsibilities with respect to making Investments and the operation of the Partnership to the Investment Manager.

(b)     The General Partner shall have the right, without the notification to or consent of any Limited Partner or other Person, to make adjustments to the structure of the Partnership in order to address applicable structural, ownership, legal, or regulatory issues, or to improve overall tax efficiency; *provided* that no such adjustment would cause any material adverse consequences to the Feeder Fund Investors.

(c)     Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner shall have full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1, including, without in any manner limiting the generality of the foregoing, (i) contracts, agreements, undertakings and transactions with any Partner or with any other Person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (ii) agreements with each Limited Partner in connection with its purchase of an Interest, (iii) any agreements to induce any Person to purchase an Interest, and (iv) the Investment Management Agreement delegating to the Investment Manager certain of the powers and authority vested by this Agreement in the General Partner as the General Partner and the Investment Manager may agree from time to time, each without any further act, approval or vote of any Person.

(d)     The General Partner may terminate or replace the Investment Manager in accordance with the terms of the Investment Management Agreement. The General Partner may delegate to any other Person (including any of its Affiliates) any power and authority vested in the General Partner pursuant to this Agreement that is not otherwise delegated to the Investment Manager.

(e)     Every power vested in the General Partner pursuant to this Agreement shall be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein. No provision of this Agreement

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 04/04/24   Page 170 of 200   PageID 24982
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 128 of
324

shall be construed to require the General Partner to violate the Act or any other law, regulation or rule of any self-regulatory organization.

(f)   Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Limited Partners, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards. Unless otherwise expressly stated, for purposes of this Section 4.1(f), the General Partner shall be deemed to be permitted or required to make all decisions hereunder in its sole discretion.

(g)   The General Partner must cause the Partnership to conduct its dealings with third parties in its own name.

(h)   The General Partner must, throughout the term of the Partnership as set out in Section 2.4, take all actions that may be necessary or appropriate for the continuation of the Partnership's valid existence as an exempted limited partnership under the laws of the Cayman Islands.

**4.2    Expenses**

(a)   Subject to Section 4.2(f), each of the General Partner and the Investment Manager pays all of its own operating and overhead costs without reimbursement by the Partnership (except liability insurance). The Partnership will not have its own separate employees or office, and it will not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead expenses of the General Partner or the Investment Manager.

(b)   The Partnership, and not the General Partner or the Investment Manager, will pay, or reimburse the General Partner and the Investment Manager for, all costs, fees and expenses arising in connection with the Partnership's operations. Such expenses payable by the Partnership include the following:

(i)   all costs related to the Partnership's investment program, including, without limitation, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's Gross Negligence, willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring Investments;

Appx. 03747

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-22    Filed 04/04/24    Page 171 of 200    PageID 24983
Case 19-34054-sgj11  Doc 474-5  Filed 02/24/20    Entered 02/24/20 17:25:25    Page 129 of
324

(ii)    initial organizational expenses of the Partnership; <u>provided</u> that, such organizational costs may be expensed immediately, or in the General Partner's discretion, amortized in whole or in part and capitalized over a period of 60 calendar months from the date the Partnership commences operations, which may result in an exception to IFRS;

(iii)    fees and expenses of advisers and consultants;

(iv)    Management Fees;

(v)    fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers;

(vi)    indemnification expenses incurred in connection with Section 4.5 and the cost of insurance against potential indemnification liabilities;

(vii)    interest and other borrowing expenses;

(viii)    legal, administrative, accounting, tax, audit and insurance expenses;

(ix)    expenses of preparing and distributing reports, financial statements and notices to Limited Partners;

(x)    litigation or other extraordinary expenses;

(xi)    any withholding, transfer or other taxes imposed or assessed on, or payable by, the Partnership (including any interest and penalties); and

(xii)    the cost of periodically updating this Agreement.

(c)    Expenses generally will be borne *pro rata* by the Partners in accordance with their respective Partnership Percentages; *provided* that expenses may be specially allocated among the Partners as follows:

(i)    with respect to expenses related to Investments (other than taxes), *pro rata* in accordance with their respective Partnership Percentages; and

(ii)    as provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6 and 5.3.

(d)    Each of the General Partner and the Investment Manager, as appropriate, shall be entitled to reimbursement from the Partnership for any of the expenses paid by it on behalf of the Partnership pursuant to Section 4.2(b); *provided* that the General Partner or the Investment Manager may absorb any or all of such expenses incurred on behalf of the Partnership. The Investment Manager may retain, in connection with its responsibilities hereunder as a delegate of the General Partner, the services of others to assist in the investment advice to be given to the Partnership, including, but not limited to, any Affiliate of the Investment

27

**Appx. 03748**

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 04/14/23   Page 172 of 200   PageID 24984
Appendix Page 04921 of 8667
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 130 of
324

Manager, but payment for any such services shall be assumed by the Investment Manager and the Partnership shall not have any liability therefor; *provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Partnership, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Partnership hereunder, and the Partnership shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(e)     If the General Partner or the Investment Manager, as appropriate, shall incur any of the expenses referred to in Section 4.2(b) for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, will allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)     Each of the General Partner and the Investment Manager is entitled to use "soft dollars" generated by the Partnership to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the General Partner or the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended.  Use of "soft dollars" by the General Partner or the Investment Manager as described herein shall not constitute a breach by the either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

## 4.3     Rights of Limited Partners

The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.  Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

## 4.4     Other Activities of Partners

(a)     The General Partner shall not be required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine in good faith to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)     Each Partner acknowledges and agrees that any other Partner, its Affiliates and their respective officers, directors, shareholders, members, partners, personnel and

28

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2   Part 6 Filed 04/27/24   Page 173 of 200   PageID 24985
Appendix Part 6 Page 04924 of 8667
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 131 of
324

employees, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustees of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Partnership. Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Partners, their Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners, their Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees are hereby authorized to engage in activities contemplated by this Section 4.4(b) with, or to purchase, sell or otherwise deal or invest in investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Partnership, without the consent or approval of the Partnership or any other Partner. The Partners expressly agree that no other Partner shall have any rights in or to such other activities, or any profits derived therefrom.

(c)     The General Partner and its Affiliates shall allocate investment opportunities to the Partnership and any Other Account fairly and equitably over time. Notwithstanding the foregoing, the General Partner is under no obligation to accord exclusivity or priority to the Partnership in the event of limited investment opportunities. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio. The General Partner has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 04/04/24    Page 174 of 200    PageID 24986
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 132 of
324

cannot be fully allocated under prevailing market conditions, the General Partner may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d)  The principal of the General Partner, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Partnership (such prohibition does not extend to the purchase or sale of Interests) unless such purchase or sale is in compliance with the applicable provisions of the Advisers Act.

(e)  Each Partner hereto hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.4.

(f)  The General Partner and its Affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Partnership or that are targeted primarily to investors for which the Partnership is not designed to be a suitable investment vehicle. The General Partner and its Affiliates also reserve the right to establish and provide management or advisory services to Other Accounts for significant investors, whether or not such accounts have the same investment program as the Partnership.

(g)  Each Limited Partner acknowledges that the General Partner or the Investment Manager may engage one or more of their respective Affiliates to provide services to the Partnership for compensation.

**4.5    Duty of Care; Indemnification**

(a)  None of the Indemnified Persons will be liable to the Partnership or any Limited Partner (or any Feeder Fund Investors) for any loss or damage arising by reason of being or having been an Indemnified Person or from any acts or omissions in the performance of its services as an Indemnified Person in the absence of Gross Negligence, willful misconduct or fraud, or as otherwise required by law.  In no event shall any Indemnified Person be liable for any consequential damages, special or indirect damages or lost profits.  An Indemnified Person may consult with counsel and accountants in respect of the Partnership's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.

(b)  The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all liabilities suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person or in connection with this Agreement or the

30

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-2 Part 6 Page 175 of 200   PageID 24987
Appendix Filed 04/24   Page 175 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 133 of
324

Partnership's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the Gross Negligence, willful misconduct or fraud of such Indemnified Person. The Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct. In the event that such an advance is made by the Partnership, the Indemnified Person will agree to reimburse the Partnership to the extent that it is finally determined that the Indemnified Person was not entitled to indemnification in respect thereof.

(c)     Notwithstanding any of the foregoing, the provisions of this Section 4.5 do not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(d)     Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Person, the Partnership (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent Gross Negligence, willful misconduct or fraud of any Indemnified Person.

(e)     The above-mentioned Indemnified Persons are also indemnified by each Limited Partner for any amounts of tax withheld or required to be withheld with respect to that Limited Partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the Limited Partner's Capital Account is insufficient to fully compensate the General Partner or the Investment Manager for such costs.

(f)     The General Partner may make, execute, record and file on its own behalf and on behalf of the Partnership all instruments and other documents (including one or more deed polls in favor of categories of Indemnified Persons and/or one or more separate indemnification agreements between the Partnership and individual Indemnified Persons) that the General Partner deems necessary or appropriate in order to extend the benefit of the provisions of Sections 4.5(a) and 4.5(b) to the Indemnified Persons; provided, that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in Sections 4.5(a) and 4.5(b) except as otherwise may be required by applicable law.

## 4.6     Investment Restrictions

Notwithstanding anything in this Agreement to the contrary, the Partnership may not at the time of investment:

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-2   Filed 04/25/24   Page 176 of 200   PageID 24988
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 134 of
324

(a)      invest more than 50% of its gross assets in its net holdings of equities;

(b)      borrow more than 100% of its Net Assets;

(c)      invest more than 20% of its gross assets in a single equity position;

(d)      invest more than 20% of its gross assets in a single corporate issuer;

(e)      invest more than 30% of its gross assets in GDP-linked warrants; and

(f)      invest more than 30% of its gross assets in a single sovereign or provincial issuer.

---

## Article V  ADMISSIONS, TRANSFERS AND WITHDRAWALS

### 5.1    Admission of Partners

The General Partner may, without the consent of any existing Partners, admit any Person to the Partnership who agrees to adhere to and be bound by all of the terms of this Agreement as a General Partner or a Limited Partner upon the execution by or on behalf of it and the acceptance by the General Partner of a deed of adherence to this Agreement in form satisfactory to the General Partner.  The amount of any initial capital contribution to be made by such additional Partner is determined by the General Partner (in its sole discretion).  Effective upon such admission, the Partnership Percentage of each existing Partner is adjusted pro rata to reflect the Partnership Percentage of the additional Partner, and the Partnership's records are revised to reflect such adjusted Partnership Percentages, as well as the name, initial capital contribution and Partnership Percentage of such additional Partner.

### 5.2    Transfer and Withdrawal of the General Partner

Without the consent of a Majority of the Limited Partners, the General Partner shall not have the right to assign or otherwise transfer its Interest as the general partner of the Partnership, and the General Partner shall not have the right to withdraw from the Partnership without the consent of the Limited Partners; provided in each case that, the Feeder Funds must vote their Interests proportionately based on the votes of their respective Feeder Fund Investors.  In the event of an assignment or Transfer of all of its Interest as a general partner of the Partnership in accordance with this clause, the new general partner will immediately notify the Registrar in the Cayman Islands in accordance with Section 10 of the Act and the outgoing General Partner will take such actions as may be reasonably necessary to novate and assign all contracts signed on behalf of the Partnership to the new general partner whereupon the new general partner will be substituted as general partner of the Partnership in place of the outgoing General Partner and immediately thereafter the outgoing General Partner will cease to be the general partner of the Partnership.

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 178-2   Filed 04/04/24   Page 177 of 200   PageID 24989
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 135 of 324

**5.3**      **Transfer and Withdrawal of Interests of Limited Partners**

(a)      The General Partner shall have the right, in its sole discretion, to (i) prohibit Transfers of Interests by Limited Partners, (ii) compel withdrawals of Interests and (iii) take such other actions as the General Partner deems necessary to ensure that the assets of the Partnership do not constitute Plan Assets for purposes of ERISA.

(b)      Subject to obtaining the General Partner's consent, each Limited Partner may voluntarily withdraw all or part of its Interest at such times and in such amounts as such Limited Partner may determine.

(c)      The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Partnership (and the applicable valuation date); (b) the issuance of Interests; (c) the withdrawal by Limited Partners of their Interests (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed), during any period which: (i) any stock exchange on which a substantial part of Investments owned by the Partnership are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the Investments owned by the Partnership would not be reasonably practicable and might seriously prejudice the Limited Partners, or (B) it is not reasonably practicable for the Partnership fairly to determine the value of its Net Assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Partnership; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the Investments of the Partnership; or (v) in the sole discretion of the General Partner, it is necessary to preserve the Partnership's assets.

(d)      The Administrator will promptly notify each Limited Partner and each Feeder Fund Investor who, directly or indirectly through a Limited Partner, has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any suspension of withdrawals or suspension of the payment of withdrawal proceeds pursuant to Section 5.3(c).  Any remaining amount of a withdrawal request that is not satisfied due to such a suspension remains at risk as per other amounts invested in the Partnership and subject to the applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners and Feeder Fund Investors will not be given any priority with respect to the withdrawal of Interests after the cause for such suspension or limitation ceases to exist.   The General Partner may in its sole discretion, however, permit such Limited Partners or Feeder Fund Investors (through a Limited Partner) to withdraw their withdrawal requests to the extent that the relevant withdrawal date has not yet passed.  For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant withdrawal date and the remittance of such payment proceeds, affected Limited Partners and Feeder Fund Investors shall not have any right to withdraw

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 04/04/24 of 86 Page 178 of 200    PageID 24990
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 136 of 324

their withdrawal requests.  Upon the reasonable determination by the General Partner that conditions leading to a suspension no longer apply, the Administrator will notify the Limited Partners and Feeder Fund Investors of the end of the suspension.  At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated, and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first withdrawal date following the removal of the suspension, subject to the foregoing restrictions on withdrawals.

(e)     Unless prohibited by law, the Special Limited Partner, its Affiliates and any other Person that is entitled to any portion of the Performance Allocation may make withdrawals of all or any portion of the amount of the Performance Allocation from their Capital Accounts as of the last Business Day of any calendar month and/or such other Business Days as the General Partner may determine in its sole discretion.

---

## Article VI  LIQUIDATION AND TERMINATION

---

### 6.1     Termination of Partnership

(a)     The Partnership shall be wound up and dissolved upon the first to occur of any of the following dates (each, a "***Termination Date***") and Sections 36(1)(b), 36(9) and 36(12) of the Act shall not apply to the Partnership:

  (i)     any date on which the General Partner shall elect in writing to terminate the Partnership; and

  (ii)    if the General Partner is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice by the General Partner (or its legal representative) on all the Limited Partners informing the Limited Partners of:

    (1)     the commencement of liquidation or bankruptcy proceedings in relation to the General Partner; or

    (2)     the withdrawal, removal or making of a winding up or dissolution order in relation to the General Partner;

  *provided that*, if a majority in number of the Limited Partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Partnership shall be resumed and continued.  If a new general partner is not elected by the Automatic Dissolution Date, the Partnership shall be wound up and dissolved in accordance with terms of this Agreement and the Act.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 04/28/24    Page 179 of 200    PageID 24991
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 137 of
324

(b)  Upon such Termination Date, the Partnership shall be wound up in accordance with the Act by the General Partner or if the General Partner is unable to perform this function, a liquidator elected by a Majority of the Limited Partners (a "*Liquidator*"), which shall take all steps necessary or appropriate to wind up the affairs of the Partnership as promptly as practicable thereafter.  Neither the admission of Partners nor the withdrawal, bankruptcy, death, legal incapacity or disability of a Limited Partner shall terminate the Partnership.

(c)  The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.  Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.  Accordingly, to the fullest extent permitted by law, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein, and no Limited Partner may present a winding up petition against the Partnership without the prior written consent of the General Partner.

**6.2    Liquidation of Assets**

(a)  Upon the Termination Date of the Partnership, the General Partner or Liquidator (as applicable) shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible.  Net Profit and Net Loss during the Fiscal Periods, which includes the period of liquidation, shall be allocated pursuant to Article III.  The proceeds from liquidation shall be divided in the following manner, subject to the Act:

(i)  the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)  such debts as are owing to the Partners as Partners are next paid; and

(iii)  the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)  Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or Liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; *provided, however*, that if any in

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2 Part 6 Filed 04/04/22 of 86 Page 180 of 200    PageID 24992
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 138 of 324

kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit or Net Loss for the Fiscal Period ending on the date of such distribution.

---

**Article VII  ACCOUNTING AND VALUATION; BOOKS AND RECORDS**

---

**7.1     Accounting and Reports**

(a)     The Partnership may adopt for tax accounting purposes any accounting method which the General Partner shall decide is in the best interests of the Partnership and which is permissible for U.S. federal income tax purposes.

(b)     As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of such period to be made by a firm of independent accountants selected by the General Partner.  As soon as is practicable thereafter, the General Partner shall furnish to each Limited Partner a copy of the set of audited financial statements prepared in accordance with IFRS (subject to this Agreement) with GAAP reconciliation and such adjustments thereto as the General Partner determines appropriate, including a statement of profit and loss for such Fiscal Year and an unaudited status of each such Partner's holdings in the Partnership at such time.

(c)     As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each such Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

**7.2     Certain Tax Matters**

(a)     By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "***Tax Matters Partner***"), or, in each case, under any similar state or local law.  The Tax Matters Partner shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner.  The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an

Appx. 03757

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 05/04/24    Page 181 of 200    PageID 24993
Appendix Part 6    Page 50 of 86
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 139 of
324

Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period. The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b)    The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

(c)    Each Limited Partner further agrees that such Limited Partner will not treat any Partnership item inconsistently on such Limited Partner's U.S. federal, state, local and/or non-U.S. tax returns or in any claim for a refund with the treatment of the item on the Partnership's tax returns and that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d)    The General Partner may in its sole discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws.

## 7.3    AEOI

Each Partner acknowledges and agrees that:

(a)    the Partnership is required to comply with the provisions of AEOI;

(b)    it will provide, in a timely manner, such information regarding the Partner and its beneficial owners and such forms or documentation as may be requested from time to time by the Partnership (whether by its General Partner or other agents such as the Investment Manager or the Administrator) to enable the Partnership to comply with the requirements and obligations imposed on it pursuant to AEOI, specifically, but not limited to, forms and documentation which the Partnership may require to determine whether or not the Partner's relevant investment is a "Reportable Account" (under any AEOI regime) and to comply with the relevant due diligence procedures in making such determination;

(c)    any such forms or documentation requested by the Partnership or its agents pursuant to paragraph (b), or any financial or account information with respect to the Partner's investment in the Partnership, may be disclosed to the Cayman Islands Tax Information Authority (or any other Cayman Islands governmental body which collects information in accordance with AEOI) and to any

37

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 05/04/ Page 182 of 200    PageID 24994
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 140 of
324

withholding agent where the provision of that information is required by such agent to avoid the application of any withholding tax on any payments to the Partnership;

(d)    it waives, and/or shall cooperate with the Partnership to obtain a waiver of, the provisions of any law which:

(i)    prohibit the disclosure by the Partnership, or by any of its agents, of the information or documentation requested from the Partner pursuant to paragraph (b);

(ii)   prohibit the reporting of financial or account information by the Partnership or its agents required pursuant to AEOI; or

(iii)  otherwise prevent compliance by the Partnership with its obligations under AEOI;

(e)    if it provides information and documentation that is in anyway misleading, or it fails to provide the Partnership or its agents with the requested information and documentation necessary in either case to satisfy the Partnership's obligations under AEOI, the General Partner reserves the right (whether or not such action or inaction leads to compliance failures by the Partnership, or a risk of the Partnership or its investors being subject to withholding tax or other costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Partnership) (together, "*costs*") under AEOI), in its sole discretion, to take any action and/or pursue all remedies at its disposal including, without limitation:

(i)    to establish separate sub-accounts within a Partner's Capital Account for the purpose of calculating AEOI related costs; and/or

(ii)   to allocate any or all AEOI costs among Capital Accounts (or Capital Sub-Accounts within a Partner's Capital Account) on a basis determined solely by the General Partner; and/or

(iii)  to compulsory withdraw such Partner from the Partnership; and/or

(iv)   to hold back or deduct from any withdrawal proceeds or from any other payments or distributions due to such Partner any costs caused (directly or indirectly) by the Partner's action or inaction;

(f)    it shall have no claim against the Partnership, the General Partner or any of its or their agents, for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Partnership in order to comply with AEOI; and

(g)    it hereby indemnifies the Partnership, the General Partner and each of their respective principals, members, partners, managers, officers, directors, stockholders, employees and agents and holds them harmless from and against any AEOI related liability, action, proceeding, claim, demand, costs, damages,

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Part 6    Filed 05/02/24    Page 183 of 200    PageID 24995
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 141 of
324

expenses (including legal expenses) penalties or taxes whatsoever which such parties may incur as a result of any action or inaction (directly or indirectly) of such Partner (or any related person) described in the preceding paragraphs. This indemnification shall survive the disposition of such Partner's Interest in the Partnership.

## 7.4    Valuation of Partnership Assets and Interests

(a)    The Partnership's assets are valued as of the close of each Fiscal Period and on any other date selected by the General Partner in its sole discretion in accordance with the Investment Manager's valuation policies and procedures.

(b)    The value of the assets of the Partnership and the net worth of the Partnership as a whole determined pursuant to this Section 7.3 are conclusive and binding on all of the Partners and all parties claiming through or under them.

## 7.5    Determinations by the General Partner

(a)    All matters concerning the determination and allocation among the Partners and their respective Capital Accounts of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)    The General Partner may make such adjustments to the computation of Net Profit or Net Loss, the Performance Change and the Carryforward Account or any other allocations with respect to any Limited Partner and their respective Capital Accounts, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners and their respective Capital Accounts in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or Capital Sub-Account (or other memorandum sub-account) as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

## 7.6    Books and Records

The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and associated Capital Sub-Accounts and all

Appx. 03760

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 05/03/24   Page 184 of 200   PageID 24996
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 142 of
324

transactions entered into by the Partnership.  Subject to the documentation requirements of the Act, such books and records of the Partnership (and/or copies thereof, as appropriate) must be kept at the Partnership's principal office, at the registered office of the Partnership or at the office of an agent of the Partnership.

---

### Article VIII  GENERAL PROVISIONS

---

**8.1    Amendment of Partnership Agreement**

(a)    Except as required by law, this Agreement may be amended, in whole or in part, by an instrument in writing signed by each of the Limited Partners and the General Partner.

(b)    Notwithstanding the foregoing or anything in this Agreement to the contrary, the General Partner may amend this Agreement without the consent of the Limited Partners in order:

(i)    to make consequential amendments following any amendment made pursuant to this Section 8.1;

(ii)    to clarify any manifest or clerical inaccuracy, ambiguity or reconcile any inconsistency in this Agreement;

(iii)    to add to the representations, duties or obligations of the General Partner or waive any right or power of the General Partner under this Agreement for the benefit of the Limited Partners;

(iv)    so as to qualify or maintain the qualification of the Partnership as a limited partnership in any jurisdiction;

(v)    to change the name of the Partnership;

(vi)    to admit any new Limited Partners or to carry out the Transfer of any Interests;

(vii)    to make any other amendment whatsoever to this Agreement which the General Partner deems advisable, provided that it does not adversely affect any rights of the Limited Partners; or

(viii)    to create separate classes or sub-classes or series or sub-series of Interests.

**8.2    Special Power-of-Attorney**

(a)    Each Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns) for the time being, with

Appx. 03761

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 5 Filed 01/09/24   Page 185 of 200   PageID 24997
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 143 of
324

full power of substitution, as the true and lawful agent and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to (and deliver as may be appropriate) on its behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law):

(i)     any amendments to this Agreement made in accordance with the terms hereof;

(ii)    any instruments or documents which the General Partner determines in its sole discretion are required to admit any new Limited Partners or to carry out the Transfer of any Interests;

(iii)   declarations of limited partnership in various jurisdictions and amendments thereto;

(iv)    all deeds, agreements and other documents which the General Partner deems appropriate to conduct and carry on the business of the Partnership, including, without limitation, to qualify or continue the Partnership as an exempted limited partnership in the Cayman Islands and as required in the jurisdictions in which the Partnership may conduct business, or which may be required to be filed by the Partnership or the Partners under the laws of any jurisdiction or under any amendments or successor statute to the law, to reflect the dissolution or termination of the Partnership or the Partnership being governed by any amendments or successor statutes to the law or to reorganize or refile the Partnership in a different jurisdiction, provided that such reorganization or refiling does not result in a material change in the rights of the Partners;

(v)     to file, prosecute, defend, settle or compromise litigation, claims or arbitration on behalf of the Partnership;

(vi)    one or more subscription agreements (or other agreements or documents) on behalf of such Limited Partner between the Partnership, the General Partner and any Person (a "***New Limited Partner***") being admitted by the General Partner to the Partnership as a limited partner thereof (or such other parties as may be appropriate) in such form and on such terms and conditions as the General Partner considers in its absolute discretion necessary or appropriate, including reference to this Agreement and its novation and agreeing and covenanting with such New Limited Partner on behalf of such Limited Partner that the Limited Partner will from the effective date of such subscription agreement or agreements comply with and observe the terms of this Agreement.

(b)     The above power of attorney shall be irrevocable and deemed to be given to secure a proprietary interest of the donee of the power or performance of an obligation owed to the donee and shall survive and shall not be affected by the

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Part 6    Filed 05/05/24    Page 186 of 200    PageID 24998
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 144 of
324

subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any Limited Partner.

(c)  Each Limited Partner shall, at the request of the General Partner, execute additional powers of attorney on a document separate from this Agreement.  In the event of any conflict between this Agreement and any instruments executed, delivered, or filed by the General Partner (and any successor thereto) pursuant to this power of attorney, this Agreement shall prevail.

(d)  The General Partner may exercise this power of attorney by listing all of the Partners executing any agreement, certificate, instrument, or document with the single signature of the General Partner as attorney-in-fact for all Partners.

(e)  Each Limited Partner hereby appoints the General Partner by any one or more of its directors or officers in office from time to time, acting singly, to be the Limited Partner's agent and attorney-in-fact.

**8.3    Notices**

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile or telecopier facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner.  Notices shall be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.    Sections 8 and 19 of the Electronic Transactions Law (2003 Revision) of the Cayman Islands shall not apply to this Agreement.

**8.4    Agreement Binding Upon Successors and Assigns; Delegation**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Section 4.1(d), 5.3 and 5.4 and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections shall be null and void *ab initio*.

**8.5    Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the Cayman Islands, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction.  The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in Dallas, Texas.  Each Partner consents to service of process in

Appx. 03763

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 05/06/24    Page 187 of 200    PageID 24999
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 145 of
324

any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the register of limited partnership interests maintained by the General Partner in accordance with the Act.

**8.6    Interpretation of Partnership Accounting Systems and Terminology**

In the event that the Partnership employs an accounting system which is different from the accounting system of the General Partner or whose terminology does not conform precisely to the terminology in this Agreement, the General Partner shall have the authority to interpret such accounting system and/or terminology in a manner which it, in its sole discretion, determines to be consistent with the objectives of this Agreement.

**8.7    Miscellaneous**

(a)    The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.  Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)    This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c)    If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.    Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**8.8    Survival**

The obligations and covenants of the Limited Partners set forth in Sections 3.5 and 3.11 hereof shall apply jointly and severally to each such Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and will survive such Partner's ceasing to be a partner in the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

**8.9    Entire Agreement**

The parties acknowledge and agree that this Agreement, together with any other agreement with a Limited Partner, constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

*[Signature Page Follows]*

43

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-22   Filed 05/02/24   Page 188 of 200   PageID 25000
Appendix Part 6   Page 50 of 867

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 146 of 324

The parties hereto have executed and unconditionally delivered this Agreement as a deed on the day and year first above written.

**General Partner:**

**Highland Argentina Regional Opportunity Fund GP, LLC**

By:     Highland Capital Management Latin America, L.P., its sole member

By:     Highland Latin America GP, Ltd., its general partner

By: _____

Name:          Gustavo Prilick

Title:          Director

Witness:

By: _____

Name:    Timothy J. Cournoyer

Title:

**Limited Partners:**

**Highland Argentina Regional Opportunity Fund, L.P.**

By:     Highland Argentina Regional Opportunity Fund GP, LLC, its general partner

By:     Highland Capital Management Latin America, L.P., its sole member

By:     Highland Latin America GP, Ltd., its general partner

By: _____

Name:          Gustavo Prilick

Title:          Director

Witness:

By: _____

Name:    Timothy J. Cournoyer

Title:

*Signature Page to Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina Regional Opportunity Master Fund, L.P.*

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 05/08/24 Page 189 of 200    PageID 25001

Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 147 of 324

**Highland Argentina Regional Opportunity Fund, Ltd.**

By:    Highland Capital Management Latin America, L.P.,
       its managing shareholder
By:    Highland Latin America GP, Ltd., its general
       partner

By:    _____
Name:        Gustavo Prilick
Title:       Director

Witness:

By:    _____
Name:        Timothy J. Cournoyer
Title:


**Special Limited Partner:**

**Highland Capital Management Latin America, L.P.**

By:    Highland Latin America GP, Ltd., its general partner

By:    _____
Name:        Gustavo Prilick
Title:       Director

Witness:

By:    _____
Name:        Timothy J. Cournoyer
Title:

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2    Part 6    Filed 01/05/24    Page 190 of 200    PageID 25002
Appendix Part 6    Page 05094 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 148 of
324

## EXHIBIT A

<u>General Partner</u>:
Highland Argentina Regional Opportunity Fund GP, LLC

<u>Limited Partners</u>:
Highland Argentina Regional Opportunity Fund, L.P.
Highland Argentina Regional Opportunity Fund, Ltd.

<u>Special Limited Partner</u>:
Highland Capital Management Latin America, L.P.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X   Document 178-22rt 6ileBx05024 of 867age 191 of 200   PageID 25003
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 149 of
324

# AMENDED AND RESTATED

# INVESTMENT MANAGEMENT AGREEMENT

**by and among**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P.,**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.,**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.,**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND GP, LLC**

**and**

**HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA, L.P.**

**November 1, 2017**

**Appx. 03768**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Filed 05/14/ of 86  Page 192 of 200    PageID 25004
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 150 of
324

This **AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT** (this "***Agreement***"), dated as of November 1, 2017, is by and among:

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P.**, a Delaware limited partnership (the "***Domestic Fund***"), acting through its general partner, Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***");

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.**, a Cayman Islands exempted company (the "***Offshore Fund***" and together with the Domestic Fund, the "***Feeder Funds***");

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.**, a Cayman Islands exempted limited partnership (the "***Master Fund***," and together with the Feeder Funds, the "***Clients***") acting by its general partner, the General Partner;

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND GP, LLC**, a Delaware limited liability company, as the general partner of the Domestic Fund and the Master Fund; and

**HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA, L.P.**, a Cayman Islands exempted limited partnership, as the investment manager of each of the Clients (the "***Investment Manager***");

### Preliminary Statements

A.      The Investment Manager and the Offshore Fund entered into an Investment Management Agreement dated as of June 28, 2017 (the "***Original Agreement***").

B.      The Offshore Fund has re-organized into a master-feeder structure together with the Master Fund and the Domestic Fund. As a result, the Investment Manager and the Offshore Fund desire to amend and restate the Original Agreement in its entirety to give effect to this re-structuring and to admit the Master Fund, the General Partner and the Domestic Fund as parties to this Agreement.

C.      Each of the Feeder Funds is required to invest all of its investable assets in the Master Fund. The Investment Manager exercises no discretion with respect to the investment of the assets of the Feeder Funds and will serve merely as a steward thereof. All investment activities of the Investment Manager are conducted at the Master Fund level in the Investment Manager's role as investment manager to the Master Fund.

D.      The Clients desire to retain the Investment Manager to provide certain discretionary advisory services relating to the assets and liabilities of the Master Fund and certain custodial services in respect of the Feeder Funds, and the Investment Manager desires to accept such appointment, all subject to the terms and conditions hereinafter set forth.

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Part 6    Filed 05/12/24    Page 193 of 200    PageID 25005
Appendix Part 6 Page 124 of 867
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 151 of
324

## Agreement

For good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

**1.    Appointment.**

The Investment Manager will serve as investment manager with respect to the assets and liabilities of the Master Fund, and will provide certain administrative services in respect of the Domestic Fund and the Offshore Fund, and the Investment Manager hereby agrees to perform its obligations in accordance with the terms hereof and of the Amended and Restated Exempted Limited Partnership Agreement of the Master Fund, as amended from time to time (the "***Master Fund Partnership Agreement***"), and the investment objectives, policies, guidelines and restrictions that from time to time are set forth in the Governing Documents of the Clients, as applicable.  "***Governing Documents***" means, with respect to:

(a)    the Domestic Fund: the confidential private placement memorandum of the Domestic Fund, as supplemented or superseded from time to time (the "***PPM***"), and the Amended and Restated Limited Partnership Agreement of the Domestic Fund, as amended from time to time (the "***Domestic Fund Partnership Agreement***" and, together with the Master Fund Partnership Agreement, the "***Partnership Agreements***");

(b)    the Offshore Fund: the offering memorandum of the Offshore Fund, as supplemented or superseded from time to time (the "***POM***"), and the Memorandum and Articles of Association of the Offshore Fund, as amended and restated from time to time (the "***Articles***" and, together with the POM, the "***Offshore Governing Documents***"); and

(c)    the Master Fund: the Master Fund Partnership Agreement.

Any capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Governing Documents, as applicable.

**2.    Authority and Duties of the Investment Manager.**

(a)    All of the investable assets of the Feeder Funds shall be invested in, and the investment program of the Feeder Funds is to be conducted by the Investment Manager through, the Master Fund.  The Investment Manager shall exercise no discretion with respect to the investments or the assets of the Feeder Funds and the investment activities of the Investment Manager shall be conducted at the Master Fund level in the Investment Manager's role as investment manager to the Master Fund.

(b)    The Master Fund's investment program will be conducted by the Investment Manager in accordance with the PPM and the POM.

2

**Appx. 03770**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Appendix Part 6    Filed 05/134 of 867    Page 194 of 200    PageID 25006
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 152 of
324

(c)    The Investment Manager serves as the investment manager to the Master Fund and, in that capacity, has full discretion and authority, without obtaining the prior approval of any officer or other agent of the Master Fund, but subject to the investment restrictions set forth in the Governing Documents:  (i) to effect any and all transactions and investments on behalf of the Master Fund; (ii) to determine all matters relating to the manner, method and timing of transactions and to engage consultants and analysts in connection therewith; (iii) to select brokers, dealers, futures commission merchants, banks and other intermediaries by or through whom such transactions will be executed or carried out; (iv) to trade on margin; (v) to borrow funds from banks, futures commission merchants, brokers and other lenders and pledge the securities or other portfolio assets as collateral therefor, and otherwise to utilize any lines of credit, credit balances or overdraft privileges available to the Master Fund; (vi) to direct banks, brokers or other custodians to effect deliveries of funds or assets, but only in the course of effecting portfolio transactions for the account of the Master Fund; (vii) to exercise all voting and other powers and privileges attributable to any investments held for the Master Fund's account hereunder; (viii)  to authorize remuneration for the directors of the Offshore Fund (the "***Directors***") who are not principals or employees of the Investment Manager; and (ix) to make and execute all such documents and to take all such other actions as the Investment Manager considers necessary or appropriate to carry out its investment management duties hereunder (including, but not limited to, the engagement of third party service providers on behalf of the Clients).

(d)    Subject to the terms and conditions of this Agreement, the authority granted hereby to the Investment Manager shall include, without limitation, the power and authority to:

(i)    with respect to the Offshore Fund and in consultation with the Directors, approve the rescission of a request for voluntary redemption submitted by a shareholder of the Offshore Fund (each, a "***Shareholder***"); waive any applicable requirements and restrictions in relation to the redemption of shares of the Offshore Fund ("***Shares***") by any Shareholder; waive certain eligibility requirements with respect to any new subscription for participating Shares or the transfer of Shares; waive any of the subscription requirements as set out in the POM with respect to any new subscription for Shares; permit a Shareholder to redeem its Shares at any time in the event that continuing to hold the Shares becomes impractical or illegal, upon a Shareholder's death or total disability, or in order for a Shareholder to avoid materially adverse tax or regulatory consequences; make in-kind distributions of Offshore Fund assets; approve the establishment of reserves for contingencies and distribution holdbacks; approve Side Letters (as defined in the POM); accept subscriptions below the minimum subscription amount; accept redemptions of Shares outside the frequency established by the Articles; and cause the Offshore Fund to invest all of its investable assets in the Master Fund;

3

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2 Part 6 Filed 05/14/24    Page 195 of 200    PageID 25007
Appendix Part 6 Filed 05/14/24    Page 195 of 200
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 153 of
324

(ii)    with respect to the Domestic Fund, consent to or advise the Domestic Fund with respect to any actions of the Domestic Fund for which its consent or advice is required, as outlined in the PPM; make and execute all such documents and take all such other actions as the Investment Manager considers necessary or appropriate to carry out its duties hereunder; and cause the Domestic Fund to invest all of its investable assets in the Master Fund, in each case to the extent permitted under the Domestic Fund Partnership Agreement; and

(iii)    deposit and withdraw the funds of each Client in the name of such Client in any bank or trust company and to entrust such bank or trust company with any of the securities, monies, documents and papers belonging to or relating to such Client; or to deposit in and entrust to any brokerage firm that is a member of any U.S. national securities exchange any of said funds, securities, monies, documents and papers belonging to or relating to such Client.

(e)    Each Client hereby designates the Investment Manager as the commodity pool operator (the "**CPO**") for such Client with complete authority and responsibility for compliance with the U.S. Commodity Exchange Act and the regulations promulgated thereunder, including the authority to perform any and all duties required of a CPO (i) that is exempt from registration under the regulations of the U.S. Commodity Futures Trading Commission (the "**CFTC**") and (ii) that is in compliance with CFTC Rule 4.13(a)(3), including the filing of a notice of exemption under Rule 4.13(a)(3) with the CFTC.

(f)    Additionally, each of the Clients hereby designates and appoints the Investment Manager as its agent and attorney-in-fact, with full power and authority and without the need for further approval of the Clients (except as may be required by law), to complete and execute all such documents and to take any and all actions that the Investment Manager, in its discretion, may deem advisable to carry out the foregoing with respect to the assets of the Clients; provided, however, that the Investment Manager is not intended to have actual or constructive custody of any securities or other assets of the Clients. In connection with any of the foregoing, the Investment Manager is further authorized to transfer or tender for cash or exchange such securities or other assets. In all such purchases, sales or trades, the Clients authorize the Investment Manager to act for the Clients, at their risk, in their name and on their behalf, in the same manner and with the same force and effect as the Clients might or could do with respect to such purchases, sales or trades without prior consultation with the Clients. The Clients also appoint the Investment Manager as their agent and attorney-in-fact to vote, and to execute proxies, waivers, consents and other instruments with respect to, the securities and other assets of the Clients.

(g)    At the request of a Client, in any wind down of such Client, the Investment Manager will manage the realization of the Client's assets and the distribution thereof to investors.

4

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 05/14/24   Page 196 of 200   PageID 25008
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 154 of
324

(h)     In connection with the execution of transactions on behalf of the Master Fund, the Master Fund hereby acknowledges and agrees that in the course of selecting brokers, dealers, futures commission merchants, banks and financial intermediaries to effect transactions for the Master Fund's account, the Investment Manager may agree to such commissions, fees and other charges on behalf of the Master Fund's account as it may deem reasonable in the circumstances, taking into consideration all such factors as the Investment Manager deems relevant, including, without limitation, the following: price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager.  It is understood that the Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

3.     **Fees, Expenses and Indemnification.**

(a)     The Investment Manager shall be paid the Management Fee by the Master Fund in accordance with the Master Fund Partnership Agreement.

(b)     The Investment Manager agrees to be bound by all of the terms and provisions of the Partnership Agreements applicable to it, as a delegatee of the General Partner, as though expressly made a party thereto, and shall be governed by the same standard of care applicable to the General Partner in connection therewith.  The General Partner, on behalf of each of the Domestic Fund and the Master Fund, agrees that the Investment Manager shall be entitled to all of the benefits of the Partnership Agreements applicable to it as a delegatee of the General Partner, including, without limitation, the right to reimbursement of expenses provided under Section 4.2 of the Master Fund Partnership Agreement and Section 4.2 of the Domestic Fund Partnership Agreement, and the right to limitation of liability and indemnification provided under Section 4.5 of the Master Fund Partnership Agreement and Section 4.5 of the Domestic Fund Partnership Agreement, and such sections are hereby incorporated by reference as if set forth in full herein.

(c)     With respect to the reimbursement of expenses directly attributable to the Offshore Fund separate and apart from the Master Fund, the Offshore Fund agrees that it will pay the Investment Manager's expenses as follows:

5

Case 21-03003-sgj   Doc 135-6   Filed 12/18/21   Entered 12/18/21 01:38:22   Desc
Case 3:21-cv-00881-X   Document 176-2 Part 6 Filed 05/16/24   Page 197 of 200   PageID 25009
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 155 of
324

(i)      In accordance with and subject to the Offshore Governing Documents, the Offshore Fund will pay, or will reimburse the Investment Manager for, all costs, fees and expenses arising in connection with the Offshore Fund's operations and its *pro rata* share of the cost of the Master Fund's operations and investments.   Expenses payable by the Offshore Fund include the following:

    (A)      the Offshore Fund's *pro rata* share of the cost of the Master Fund's investment program, including, without limitation, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring investments;

    (B)      initial organizational expenses of the Offshore Fund;

    (C)      fees and expenses of advisers and consultants;

    (D)      fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers;

    (E)      indemnification expenses incurred in connection with the Offshore Governing Documents and the cost of insurance against potential indemnification liabilities;

    (F)      interest and other borrowing expenses;

    (G)      legal, administrative, accounting, tax, audit and insurance expenses;

    (H)      expenses of preparing and distributing reports, financial statements and notices to Shareholders;

    (I)      litigation or other extraordinary expenses;

    (J)      any withholding, transfer or other taxes imposed or assessed on, or payable by, the Offshore Fund (including any interest and penalties); and

    (K)      the cost of periodically updating the POM.

(ii)      Except as set forth herein or in the POM, in accordance with and subject to the Offshore Governing Documents, the Investment Manager will pay all of its own operating and overhead costs (including salaries, office rent

**Appx. 03774**

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2    Filed 05/17/24    Page 198 of 200    PageID 25010
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 156 of
324

and other general overhead expenses), without reimbursement by the Offshore Fund.

(iii)    The Investment Manager shall be entitled to reimbursement from the Offshore Fund for any expenses paid by it on behalf of the Offshore Fund; provided that, the Investment Manager in its sole discretion may absorb any or all of such expenses incurred on behalf of the Offshore Fund.  The Investment Manager may retain, in connection with its responsibilities hereunder as a delegatee of the General Partner, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and neither the Master Fund nor the Offshore Fund shall have any liability therefor; provided, however, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Master Fund, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(d)    With respect to the right to indemnification directly attributable to the Offshore Fund separate and apart from the Master Fund:

(i)    The Offshore Fund agrees that the Investment Manager, its members, shareholders, partners, managers, directors, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and each of their respective executors, heirs, assigns, successors and other legal representatives (each an "***Indemnified Person***") shall not be liable to the Offshore Fund or to any of the Shareholders for any loss or damage arising by reason of being or having been an Indemnified Person or from any acts or omissions in the performance of its services as an Indemnified Person in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud, or as otherwise required by law.  In no event shall any Indemnified Person be liable for any consequential damages, special or indirect damages or lost profits.  An Indemnified Person may consult with counsel and accountants in respect of the Offshore Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.

(ii)    The Offshore Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all liabilities suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person or in connection

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 176-2    Part 6    Filed 05/11/23    Page 199 of 200    PageID 25011
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 157 of
324

with this Agreement or the Offshore Fund's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of such Indemnified Person. The Offshore Fund will, in the sole discretion of the Directors, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct. In the event that such an advance is made by the Offshore Fund, the Indemnified Person will agree to reimburse the Offshore Fund to the extent that it is finally determined that the Indemnified Person was not entitled to indemnification in respect thereof.

(iii)    Notwithstanding any of the foregoing, the provisions of this Section 3(d) do not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(iv)    Pursuant to the indemnification and exculpation provisions above and as set forth in the Master Fund Partnership Agreement, the Master Fund (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of any Indemnified Person.

(v)    The above-mentioned Indemnified Persons are also indemnified by each Shareholder for any amounts of tax withheld or required to be withheld with respect to that Shareholder, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith.

(vi)    Each Indemnified Person shall be deemed a third-party beneficiary (to the extent not a direct party hereto) of this Agreement and, in particular, the provisions of this Section 3(d). The Investment Manager may enter into agreements on behalf of the Offshore Fund with an Indemnified Person to provide an indemnity to the same extent provided in this Section 3(d).

Case 21-03003-sgj    Doc 135-6    Filed 12/18/21    Entered 12/18/21 01:38:22    Desc
Case 3:21-cv-00881-X    Document 178-2  Part 6 File 05/04/23 of 86ge 200 of 200    PageID 25012
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 158 of
324

4.      **Termination.**

This Agreement shall become effective on the date hereof and shall continue in effect until the earlier of the dissolution of a Client or termination by either the Investment Manager, the Offshore Fund or the General Partner, on behalf of the Domestic Fund or the Master Fund, upon at least 90 days' prior notice.

5.      **Other Activities and Investments.**

(a)      Each party hereto acknowledges and agrees that the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustees of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties to this Agreement. Without in any way limiting the foregoing, each party hereto hereby acknowledges that (i) none of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 5(a) to any Client or its investors, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees are hereby authorized to engage in activities contemplated by this Section 5(a) with, or to purchase, sell or otherwise deal or invest in investments issued by, companies in which the Master Fund might from time to time invest or be able to invest or otherwise have any interest, without the consent or approval of the Clients or their investors. The parties hereto expressly agree that neither the Clients nor their investors shall have any rights in or to such other activities, or any profits derived therefrom.

(b)      The Investment Manager and its affiliates shall allocate investment opportunities to the Master Fund and any Other Account (as defined below) fairly and equitably over time. Notwithstanding the foregoing, the Investment Manager is under no obligation to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the

**Appx. 03777**