PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Adv. Proc. No. 21-03003-sgj |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § | Case No. 3:21-cv-01010-E |
| Defendants. | § § § | |

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| | § |
| Plaintiff, | § Adv. Proc. No. 21-3004 |
| | § |
| vs. | § |
| | § |
| | § Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § |
| | § |
| | § |
| Defendant. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| | § |
| Plaintiff, | § Adv. Proc. No. 21-3005 |
| | § |
| vs. | § |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § Case No. 3:21-cv-00880-C |
| | § |
| | § |
| | § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| | § |
| Plaintiff, | § Adv. Proc. No. 21-3006 |
| | § |
| vs. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § Case No. 3:21-cv-01378-N |
| | § |
| | § |
| | § |
| Defendants. | § |

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§
§                  Adv. Proc. No. 21-3007
§
§
§                  Case No. 3:21-cv-01379-X

                              Plaintiff,

vs.

HCRE PARTNERS, LLC (n/k/a NexPoint
Real Estate Partners, LLC), JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

§
§
§
§
§
§
§
§

                              Defendants.

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 2

       A.     BACKGROUND ......................................................................... 2

              1.     The Bankruptcy Case ..................................................... 2

              2.     Procedural History ......................................................... 3

                     i.      Commencement of the Adversary Proceedings ........................... 3

                     ii.     Defendants' Motions to Withdraw the Reference ......................... 4

                     iii.    The Adversary Proceedings are Consolidated for Pretrial Purposes ................................................................. 4

                     iv.     Plaintiff Files the Amended Complaints ...................................... 5

       B.     HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT ....................................... 5

              1.     The Demand Notes ......................................................... 5

                     i.      James Dondero ................................................................. 6

                     ii.     HCMFA ........................................................................... 6

                     iii.    HCMS ............................................................................. 6

                     iv.     HCRE .............................................................................. 7

              2.     The Term Notes .............................................................. 9

       C.     THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING ........................ 12

              1.     Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet ..................................... 13

              2.     In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes ............. 17

              3.     Without Exception, the Notes were Disclosed in Highland's Books and Records Carried as Assets without Discount ........................... 19

              4.     Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections ........................................................ 21

       D.     THE OBLIGORS' AFFIRMATIVE DEFENSES ............................... 23

i

|  | 1. | The Alleged Agreement Defense | 23 |
|  |  | i. | The Allegations Materially Changed Over Time | 24 |
|  |  | ii. | The Final Version of the "Alleged Agreement" Defense | 26 |
|  |  | iii. | No Reasonable Trier of Fact Can Find that the Alleged Agreement Existed | 26 |
|  | 2. | HCMFA's "Mutual Mistake" Defense | 32 |
|  | 3. | Waiver and Estoppel [NexPoint, HCMS, HCRE] | 37 |
|  | 4. | Other Defenses | 38 |

III. ARGUMENT ... 38

A. Legal Standard ... 38

    1. Summary Judgment Standard ... 38

    2. Summary Judgment Standard for Promissory Notes ... 40

B. Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes ... 40

C. Defendants Fail to Rebut Highland's Prima Facie Case ... 43

    1. No Reasonable Jury Could Find that the "Alleged Agreement" Exists ... 43

    2. No Reasonable Jury Could Find the HCMFA Note Was a "Mistake" ... 46

    3. No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence ... 48

    4. No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note ... 49

CONCLUSION ... 49

EXHIBIT A - Parties, Witnesses, and Definitions

DOCS_NY:44673.9 36027/003

## TABLE OF AUTHORITIES

**CASES**

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*,
   MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021)................................. 46, 48

*Alton v. Texas A&M University*,
   168 F.3d 196 (5th Cir. 1999) ......................................................................... 39, 40

*Armstrong v. City of Dallas*,
   997 F.2d 62 (5th Cir.1993) ................................................................................. 40

*Crisalli v. ARX Holding Corp.*,
   177 F. App'x 417 (5th Cir. 2006)........................................................................ 46

*FDIC v. Cardinal Oil Well Servicing Co.*,
   837 F.2d 1369 (5th Cir.1988) ............................................................................. 40

*Hall v. Branch Banking*,
   No. H-13-328, 2014 WL 12539728 (S.D.Tex. Apr. 30, 2014)................................. 39

*Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*,
   CIV.A. 06-1959, 2007 WL 2752692 (S.D. Tex. Sept. 20, 2007)............................ 47

*In re Heritage Org., L.L.C.*,
   354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006)............................................. 45, 46

*In re Magna Cum Latte, Inc.*,
   07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007) ................. 39, 40, 44

*Latimer v. Smithkline & French Laboratories*,
   919 F.2d 301 (5th Cir.1990) ............................................................................. 39

*Looney v. Irvine Sensors Corp.*,
   CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ................ 40, 43, 46, 48

*Melanson v. Navistar, Inc.*,
   3:13-CV-2018-D, 2014 WL 4375715 (N.D. Tex. Sept. 4, 2014)............................ 45

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
   40 F.3d 698 (5th Cir. 1994) ............................................................................. 39

*Resolution Tr. Corp. v. Starkey*,
   41 F.3d 1018 (5th Cir. 1995) ........................................................................ 40, 43

*Scott v. Wollney*,
   No. 3:20-CV-2825-M-BH, 2021 WL 4202169 (N.D. Tex Aug. 28, 2021)............................ 45

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) ........................................................................... 39

*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) ........................................................................... 38

iii

*Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*,
   No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27, 2007) ..................................... 46, 47, 48

**RULES**

FED. R. CIV. P. 56(c) ................................................................................................................. 36

DOCS_NY:44673.9 36027/003

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S AMENDED MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the above-captioned adversary proceedings ("Highland" or "Plaintiff"), hereby files this amended memorandum of law in support of its *Motion for Partial Summary Judgment* (the "Motion") on its First and Second Causes of Action.[1]  In support of its Motion, Highland states as follows:

## I.   PRELIMINARY STATEMENT[2]

1.     In accordance with its Plan and the clear and unambiguous terms of the Notes, Plaintiff seeks to collect on over $50 million of promissory notes issued by Mr. Dondero and certain entities controlled by him.  The Notes were tendered in exchange for hard dollars at a time when Mr. Dondero controlled both the borrower and the lender.  Now, Mr. Dondero refuses to make good on his promises to repay the money he borrowed.

2.     Plaintiff makes out its prima facie case for summary judgment for Defendants' breach of the Notes.  The uncontroverted documentary evidence shows that the Notes are (i) valid, (ii) executed by Defendants and in favor of Highland, and (iii) there is a balance due and owing under the Notes.  Defendants fail to rebut Plaintiff's prima facie case because Defendants fail to create a genuine issue of material fact regarding their breach.   There is a complete absence of evidence to support each of Defendants' affirmative defenses.

3.     Nevertheless, Defendants are certain to contest every single fact and erect countless strawmen regardless of the record in support of their own fabricated stories.  But in the end, there will be no evidence to corroborate the Defendants' contentions other than their own

---

[1] Concurrently herewith, Highland is filing the *Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (the "Appendix"). Citations to the Appendix are notated as follows: Ex. #, Appx. #

[2] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below.

1

self-serving, conclusory, and unsubstantiated assertions.  There will be no documents or written communications that credibly support Defendants' story.  By contrast, Plaintiffs claims are both simple and buttressed by a mountain of undisputed evidence including contemporaneous written communications, audited financial statements, statements to third parties, books and records, and the plain words of the Defendants and their officers.

4.      Plaintiff does not have to prove its case beyond a reasonable doubt or by clear and convincing evidence nor does Plaintiff have the burden of proving that *no* facts are in dispute.  Instead, Plaintiff need only show that there is no "genuine" dispute of material fact.

5.      Viewed fairly, Plaintiff's evidence is so overwhelming, and Defendants' stories are so weak, that the Court must grant the Motion.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   BACKGROUND[3]

#### 1.   The Bankruptcy Case

6.      On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7.      On December 4, 2019, the Delaware Court entered an order transferring venue of Highland's bankruptcy case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") [Bankr. Docket No. 186].[4]

---

[3] Attached hereto as **Exhibit A** is a list of *Parties, Witnesses, and Definitions*.

[4] "Bankr. Docket No. __" refers to the docket maintained by the Bankruptcy Court in case no. 19-34054.

DOCS_NY:44673.9 36027/003

8.      On January 22, 2021, Highland filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (the "Plan").

9.      On February 22, 2021, the Bankruptcy Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order") which confirmed Highland's Plan.[5]

10.     On August 11, 2021, the Plan became Effective (as defined in the Plan), and Highland became the Reorganized Debtor (as defined in the Plan).  *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 2700].

### 2.  Procedural History

#### i.  Commencement of the Adversary Proceedings

11.     On January 22, 2021, Plaintiff commenced the Adversary Proceedings by filing a *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Original Complaints") against each of the Defendants.[6]

12.     In its Original Complaints, Plaintiff asserted claims against each Defendant for (i) breach of contract for the Defendant's breach of its respective obligations under the Notes and (ii) turnover by each Defendant for all accrued and unpaid principal and interest due under the

---

[5] The confirmed Plan included certain amendments filed on February 1, 2021.  *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Bankr. Docket No. 1875].

[6] *See* Adv. Pro. No. 21-03003 (the "Dondero Action"), Docket No. 1 (the "Dondero Original Complaint"); Adv. Proc. No. 21-03004 (the "HCFMA Action"), Docket No. 1 (the "HCMFA Original Complaint"); Adv. Pro. No. 21-03005 (the "NexPoint Action"), Docket No. 1 (the "NexPoint Original Complaint"); Adv. Proc. No. 21-03006 (the "HCMS Action"), Docket No. 1 (the "HCMS Original Complaint"); and Adv. Pro. No. 21-03007 (the "HCRE Action"), Docket No. 1 (the "HCRE Original Complaint").  The forgoing are collectively referred to as the "Original Complaints."

Notes until the date of payment, plus Plaintiff's cost of collection and reasonable attorney's fees (as expressly provided for under each of the Notes).

ii.    **Defendants' Motions to Withdraw the Reference**

13.    Between April and June 2021, the Obligors each filed a similar motion to withdraw the reference (the "Motions to Withdraw") in which the Obligors sought to withdraw the Adversary Proceedings from the Bankruptcy Court to the District Court.

14.    In July 2021, the Bankruptcy Court issued Reports and Recommendations (the "R&Rs") to the District Court recommending that the Motions to Withdraw be granted, but that the Bankruptcy Court retain the cases for all pre-trial matters, including the consideration (but not determination) of any dispositive motions.

15.    The applicable District Court subsequently adopted the Bankruptcy Court's R&Rs in the NexPoint, HCMS, HCRE, and HCMFA Actions, but the decision on the R&R in the Dondero Action remains pending.

iii.    **The Adversary Proceedings are Consolidated for Pretrial Purposes**

16.    The Parties subsequently agreed to, among other things, consolidate discovery for all purposes and coordinate the timing of the service of pleadings (i.e., Plaintiff's amended complaints adding the New Claims against the Duty Defendants and the Defendants' responses thereto).  That agreement was memorialized in a *Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* dated August 17, 2021, approved by the Bankruptcy Court on September 6, 2021, and entered in each respective Adversary Proceeding (collectively, the "Discovery Stipulations").

17.    In furtherance of the intent reflected in the Discovery Stipulations, and consistent with the related Orders granting Plaintiff's unopposed motions for leave to amend its pleadings, Plaintiff was "deemed to have served the Amended Complaint on the [applicable]

[D]efendant on July 13, 2021," even though the Amended Complaints were not actually filed on the dockets until August 27, 2021.

### iv.   Plaintiff Files the Amended Complaints

18.   On August 27, 2021, Highland filed its Amended Complaints against Mr. Dondero (Ex. 32, Appx. 658-728), NexPoint (Ex. 2, Appx. 22-95), HCMS (Ex. 3, Appx. 96-179), and HCRE (Ex. 4, Appx. 180-263).[7]  In the Amended Complaints, Highland added the new claims against new defendants.  Specifically, Plaintiff (a) added as defendants (i) Ms. Dondero; (ii) Dugaboy; and (iii) Mr. Dondero, in his capacity as an "aider and abetter" to Dugaboy (collectively, the "Duty Defendants") and (b) asserted claims against the Duty Defendants for (i) declaratory relief; (ii) breach of fiduciary duty; and (iii) aiding and abetting a breach of fiduciary duty, arising from the Duty Defendants' unlawful entry into the Alleged Agreements.[8]

### B.   HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT

19.   The Obligors are the makers under a series of promissory notes tendered to Highland in exchange for contemporaneous loans and other consideration.  These Notes were executed between 2013 and 2019 and are described below.

#### 1.   The Demand Notes

20.   As the documentary evidence specifically identified below establishes, Mr. Dondero, HCMFA, HCMS, and HCRE each executed certain demand notes, as makers, in favor of Highland (collectively, the "Demand Notes") in exchange for contemporaneous loans as follows:

---

[7] All of the amendments related to the belated assertion of the Alleged Agreement defense.  Plaintiff did not amend its complaint against HCMFA because that entity did not assert the Alleged Agreement defense.

[8] Plaintiff also added claims for actual fraudulent transfer against Mr. Dondero, NexPoint, HCRE, and HCMS because their respective Notes were purportedly all subject to the Alleged Agreement.

5

i.    **James Dondero**

- a Demand Note in the original principal amount of $3,825,000, executed on February 2, 2018, in favor of Highland (the "First Dondero Note"); (Klos Dec.[9] ¶ 18 at Ex. D); Ex. 125 at 9, Appx. 2357; Ex. 188, Appx. 3001-3002; Ex. 189, Appx. 3003-3004; Ex. 74, Appx. 1338-1340; Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Ex. 32 ¶ 20, Appx. 664; Ex. 31 ¶ 20, Appx. 647)

- a Demand Note in the original principal amount of $2,500,000, executed on August 1, 2018, favor of Highland (the "Second Dondero Note"); (Klos Dec. ¶ 19 at Ex. E); Ex. 126 at 2, Appx. 2366; Ex. 190, Appx. 3005-3006; Ex. 76, Appx. 1354-1356; Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Ex. 32 ¶ 21, Appx. 664; Ex. 31 ¶ 21, Appx. 647); and

- a Demand Note in the original principal amount of $2,500,000, executed on August 13, 2018, in favor of Highland (the "Third Dondero Note," collectively with the First Dondero Note and the Second Dondero Note, the "Dondero Notes") (Klos Dec. ¶ 20 at Ex. F); Ex. 126 at 2, Appx. 2366; Ex. 77, Appx. 1357-1359; Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Ex. 32 ¶ 22, Appx. 664; Ex. 31 ¶ 22, Appx. 647).

ii.    **HCMFA**

- a Demand Note in the original principal amount of $2,400,000, executed on May 2, 2019, in favor of Highland (the "First HCMFA Note") (Klos Dec. ¶ 21 at Ex. G); Ex. 147 at 7, Appx. 2526; Ex. 54, Appx. 870-873; Ex. 55, Appx. 874-875; Ex. 1 (Exhibit 1) Appx. 9-11; Ex. 53, Appx. 866-869); and

- a Demand Note in the original principal amount of $5,000,000, executed on May 3, 2019, in favor of Highland (the "Second HCMFA Note," together with the First HCMFA Note, the "HCMFA Notes") (Klos Dec. ¶ 22 at Ex. H); Ex. 147 at 7, Appx. 2526; Ex. 56, Appx. 876-877; Ex. 1 (Exhibit 2), Appx. 12-15; Ex. 57, Appx. 878-880).

iii.    **HCMS**

- a Demand Note in the original principal amount of $150,000, executed on March 28, 2018, in favor of Highland (the "First HCMS Demand Note") (Klos Dec. ¶ 23 at Ex. I); Ex. 143, Appx. 2487-2490; Ex. 3 (Exhibit 1), Appx. 117-119;

---

[9] Refers to the *Declaration of David Klos in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, being filed concurrently herewith.

- a Demand Note in the original principal amount of $200,000, executed on June 25, 2018, in favor of Highland (the "Second HCMS Demand Note") (Klos Dec. ¶ 24 at Ex. J); Ex. 144, Appx. 2491-2494; Ex. 3 (Exhibit 2), Appx. 120-122);

- a Demand Note in the original principal amount of $400,000, executed on May 29, 2019, in favor of Highland (the "Third HCMS Demand Note") (Klos Dec. ¶ 25 at Ex. K); Ex. 145 at 11, Appx. 2506; Ex. 3 (Exhibit 3), Appx. 123-125); and

- a Demand Note in the original principal amount of $150,000, executed on June 26, 2019, in favor of Highland (the "Fourth HCMS Demand Note," collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and the Third HCMS Demand Note, the "HCMS Demand Notes") (Klos Dec. ¶ 26 at Ex. L); Ex. 146 at 7, Appx. 2516; Ex. 3 (Exhibit 4), Appx. 126-128).

### iv.   **HCRE**

- a Demand Note in the original principal amount of $100,000, executed on November 27, 2013, in favor of Highland (the "First HCRE Demand Note") (Klos Dec. ¶ 27 at Ex. M); Ex. 148, Appx. 2533-2536; Ex. 4 (Exhibit 1), Appx. 201-203);

- a Demand Note in the original principal amount of $2,500,000, executed on October 12, 2017, in favor of Highland (the "Second HCRE Demand Note") (Klos Dec. ¶ 28 at Ex. N); Ex. 154 at 7, Appx. 2575; Ex. 4 (Exhibit 2), Appx. 204-206);

- a Demand Note in the original principal amount of $750,000, executed on October 15, 2018, in favor of Highland (the "Third HCRE Demand Note") (Klos Dec. ¶ 29 at Ex. O); (Ex. 155 at 5, Appx. 2585; Ex. 4 (Exhibit 3), Appx. 207-209); and

- a Demand Note in the original principal amount of $900,000, executed on September 25, 2019, in favor of Highland (the "Fourth HCRE Demand Note," collectively with the First HCRE Demand Note, the Second HCRE Demand Note, and the Third HCRE Demand Note, the "HCRE Demand Notes") (Klos Dec. ¶ 30 at Ex. P); Ex. 156 at 6, Appx. 2596; Ex. 4 (Exhibit 4), Appx. 210-212).

21.    Except for the date, the amount, the maker, and the interest rate, each of the Demand Notes is identical and includes the following provisions, among others:

2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be ***due and payable on demand of the Payee***.

5.    <u>Acceleration Upon Default</u>.  ***Failure to pay this Note or any installment hereunder as it becomes due shall***, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.***  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.    <u>Waiver</u>.  Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection***, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Ex. 74, Appx. 1338-1340; Ex. 76, Appx. 1354-1356; Ex. 77, Appx. 1357-1359; Ex. 1 (Exhibits 1-2), Appx. 9-15; Ex. 3 (Exhibits 1-4), Appx. 117-128; and Ex. 4 (Exhibits 1-4), Appx. 201-212 (emphases added).

22.    On December 3, 2020, Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020.  The Demand Letters also included a demand for all costs of collection, including attorneys' fees, as provided in the Notes.  Ex. 79, Appx. 1370-1373; Ex. 1 (Exhibit 3), Appx. 16-19; Ex. 3 (Exhibit 5), Appx. 129-132; and Ex. 4 (Exhibit 5), Appx. 213-216 (collectively, the "<u>Demand Letters</u>").

23.     Neither Mr. Dondero, nor HCMFA, nor HCMS, nor HCRE made any payments to Highland on account of Notes or otherwise responded to the Demand Letters prior to the commencement of the Adversary Proceedings.

24.     Consequently, Mr. Dondero, HCMFA, HCMS, and HCRE breached Section 2 of each Demand Note, and each such Obligor is in default.

25.     As of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

26.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Demand Notes was $7,874,436.09. (Klos Dec. ¶ 40).

27.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. (Klos Dec. ¶ 45).

28.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. (Klos Dec. ¶ 50).

### 2.     **The Term Notes**

29.     As the documentary evidence specifically identified below establishes, on May 31, 2017, Mr. Dondero executed a 30-year term note on behalf of NexPoint (the "NexPoint Term Note"), HCMS (the "HCMS Term Note"), and HCRE (the "HCRE Term Note"),

respectively, each as a maker, in favor of Highland (collectively, the "Term Notes"). (Klos Dec. ¶¶ 27-29).

30.    Each of the Term Notes "rolled up" the respective maker's obligations under certain then-outstanding demand notes that were identified as the "Prior Notes" in each Term Note.[10]

31.    The following Term Notes are at issue:

- a Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "NexPoint Term Note") (Klos Dec. ¶ 31 at Ex. A); Ex. 2 (Exhibit 1), Appx. 41-44; Ex. 2 ¶ 21, Appx. 28; Ex. 15 ¶ 21, Appx. 428);

- a Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes") (Klos Dec. ¶ 32 at Ex. R); Ex. 3 (Exhibit 6), Appx. 133-136); and

- a Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes") (Klos Dec. ¶ 33 at Ex. S); Ex. 4 (Exhibit 6), Appx. 217-220).

32.    According to Mr. Waterhouse, Highland loaned money to NexPoint, HCMS, and HCRE to enable those entities to make investments. Ex. 105 at 126:21-129:3, Appx. 2081.[11]

---

[10] Proof of the loans underlying the Prior Notes (as defined in each Term Note) can be found at Exs. 127-141, Appx. 2368-2481 (HCMS); Exs. 149-153, Appx. 2537-2567 (HCRE); Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 Prior Note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (*see* Ex. 161))).

[11] Highland sought to inquire as to the use of the loan proceeds by NexPoint, HCMS, and HCRE (Exs. 47-49, Appx. 842-859 (Rule 30(b)(6) Topic 3(e))), but (a) those Obligors objected on relevance grounds (Ex. 191, Appx. 3007-3012; Ex. 98 at 348:18-20, Appx. 1758), and (b) Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds.  Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

33.     Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Note), each of the Term Notes is identical and includes the following provisions, among others:

> 2.1     Annual Payment Dates.   During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full.   ***Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

> 4.     Acceleration Upon Default.   *Failure to pay this Note or any installment hereunder as it becomes due shall*, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof***.   No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

> 5.     Waiver.   Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

> 6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection,*** all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

34.     NexPoint, HCMS, and HCRE each failed to make the Annual Installment payment due on December 31, 2020.

35.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and (b) December 17, 2021, the unpaid

DOCS_NY:44673.9 36027/003

principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[12] (Klos Dec. ¶ 51).

36.    As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.[13] (Klos Dec. ¶ 52).

37.    As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[14] (Klos Dec. ¶ 53).

## C.    THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING

38.    As described in more detail below, the existence, validity, and enforceability of the Notes is corroborated by the following undisputed facts:

- Plaintiff's audited financial statements (prepared based on management representation letters signed by Mr. Dondero and Mr. Waterhouse) showed that each of the Notes (including the HCMFA Notes) (a) was carried as an asset on Plaintiff's balance sheet, (b) had a value equal to the unpaid principal and interest then due, and (c) was disclosed without reference to the Alleged Agreement, HCMFA's Mistake Defense, or any other defense;

- HCMFA and NexPoint jointly reported to the Retail Board in October 2020 that they were obligated to pay Highland the amounts due under the HCMFA Notes and the NexPoint Notes, respectively, each without any setoff or reservation;

---

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[13] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[14] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

- Without exception, Plaintiff's contemporaneous books and records recorded the Notes (including the HCMFA Notes) as debts due and owing by each of the Obligors to Plaintiff;

- Without exception, throughout Plaintiff's bankruptcy (including during the period from the Petition Date through January 9, 2020, when Mr. Dondero solely controlled Plaintiff), Plaintiff's bankruptcy filings (most of which were prepared or signed by Mr. Waterhouse) reported the Notes (including the HCMFA Notes) as being assets of the Debtor's estate, each without any setoff or reservation;

- The Notes (including the HCMFA Notes) were identified as substantial assets and sources of recovery under Plaintiff's proposed Plan, yet none of the Obligors informed the Court, Plaintiff, or any creditors of any of their purported defenses even though (a) each of them filed a Plan Objection, and (b) the Adversary Proceedings had already been commenced when the confirmation hearing on the Plaintiff's Plan was conducted.

1. **Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet**

39.     The undisputed evidence cited below establishes, among other things, that (a) all of the Notes executed through early May 2019 were provided to PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[15] and (c) neither Highland nor Mr. Dondero disclosed the Alleged Agreement, HCMFA's Mistake Defense, or any other defense to PwC despite having an affirmative obligation to do so under generally accepted accounting principals ("GAAP").

---

[15] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Ex. 34 at 39, Appx. 782.  Because the HCMFA Notes were executed after the end of the fiscal year, they were **not** included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its *own* 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its *own* balance sheet.  Ex. 45 at 17; Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

40.     PwC's audit process was extensive and took months to complete.  Ex. 94 at 9:24-12:14, Appx. 1554-1555.

41.     As part of the process, Highland was responsible for drafting the financial statements and accompanying notes and "management" provided the information that PwC needed to conduct its audits.  *Id*. at 14:8-15:14, Appx. 1556; *see also id*. at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse, and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized.  Ex. 105 at 87:25-89:10, Appx. 2071.

42.     Before signing off on its audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558.  *See also* Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness.").

43.     For at least the fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed.  Ex. 33, Appx. 729-740, Ex. 86, Appx. 1420-1431, Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

44.     On June 3, 2019, in connection with PwC's audit of Highland's financial statements for the period ending December 31, 2018, Mr. Dondero and Mr. Waterhouse made the following representations to PwC:

14

- The Affiliated Party Notes represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019 (Ex. 33 ¶11, Appx. 732; Ex. 94 at 24:6-25:5, Appx. 1558);[16]

- If there were any errors in Highland's financial statements, they were not "material" (Ex. 33 ¶32, Appx. 735; Ex. 94 at 25:6-26:13, Appx. 1558-1559);

- There were no "material" transactions or agreements that were not recorded in the financial statements (Ex. 33 ¶34, Appx. 735; Ex. 94 at 26:14-27:11, Appx. 1559);

- All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements (Ex. 33 ¶35(d), Appx. 735; Ex. 94 at 27:12-28:11, Appx. 1559);

- All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed (Ex. 33 ¶36, Appx. 736; Ex. 94 at 28:12-29:5, Appx. 1559); and

- All subsequent events were disclosed (Ex. 33 (signature page), Appx. 738; Ex. 94 at 29:6-30:2, Appx. 1559-1560).

45.     Under GAAP, Highland was required to disclose to PwC (a) all "material" related party transactions and (b) any circumstances that would call into question the collectability of any of the Notes.  Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570.[17]

46.     Neither Mr. Dondero nor Highland ever disclosed to PwC (a) the existence or terms of the Alleged Agreement; (b) the existence of any oral or written amendment to any of the Affiliate Notes listed in PwC's 2018 work papers; or (c) that any of the Notes might be

---

[16] "Affiliated Party Notes" is the term used by PwC to refer to notes tendered to Highland by officers, employees, or affiliates of Highland.  *See generally* Ex. 33, Appx. 729-740; Ex. 94, Appx. 1551-1585.

[17] For purposes of the 2017 audit, the "materiality" threshold was $2 million.  Ex. 86 at 1, Appx. 1421.  For purposes of the 2018 audit, the "materiality" threshold was $1.7 million or more.  Ex. 33 at 1, Appx. 730; Ex. 94 at 22:11-23:3, Appx. 1558.  *See also* Ex. 105 at 91:14-93:6, Appx. 2072.

DOCS_NY:44673.9 36027/003

forgiven.  Ex. 24 (Responses to RFAs 1-2), Appx. 521; Ex. 94 at 67:16-70:19, Appx. 1569-1570,

71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Ex. 105 at 102:2-5, Appx. 2075.

47.    If PwC had learned before June 3, 2019, that any of the Notes (a) might not

be collectible, or (b) might be forgiven, or (c) was amended, or (d) would be extinguished based

on the fulfillment of certain conditions subsequent, it would have required that fact to be disclosed.

Ex. 94 at 74:19-76:12, Appx. 1571.

48.    For purposes of PwC's audit, "affiliate notes" were considered receivables

of Highland and were carried as assets on Highland's balance sheet under "Notes and other

amounts due from affiliates."  Ex. 34 at 2, Appx. 745; Ex. 72 at 2, Appx. 1291; Ex. 94 at 23:10-

22, Appx. 1558, 31:11-33:20, Appx. 1560; Ex. 105 at 106:20-109:12, Appx. 2076.

49.    For the 2017 fiscal year, Highland valued "Notes and other amounts due

from affiliates" in the aggregate amount of approximately $163.4 million, which then constituted

more than 10% of Highland's total assets; for the 2018 fiscal year, Highland valued "Notes and

other amounts due from affiliates" in the aggregate amount of approximately $173.4 million,

which then constituted more than 15% of Highland's total assets.  Ex. 72 at 2, Appx. 1291; Ex. 34

at 2, Appx. 745; Ex. 94 at 33:21-34:2, Appx. 1560-1561, 51:2-16, Appx. 1565.

50.    The notes to the financial statements described the "Affiliate Notes" that

were carried on Highland's balance sheet; management calculated the amounts due and owing to

Highland from each Affiliate.  Ex. 72 at 30-31; Ex. 34 at 28-29; Ex. 94 at 34:17-36:25; 51:17-

53:12, Appx. 1565; Ex. 105 at 110:22-112:21, Appx. 2077.

51.    The "fair value" of the Affiliate Notes was "equal to the principal and

interest due under the notes."  Ex. 72 at 30-31, Appx. 1319-1320; Ex. 34 at 28-29, Appx. 771-772;

Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565.

52.      At the time PwC completed its 2017 and 2018 audits, PwC had no reason to discount the value of any of the Affiliate Notes.  Ex. 94 at 39:17-21, Appx. 1562; 54:2-8, Appx. 1566.

53.      Moreover, as reflected in PwC's work papers, and based on the information provided by Highland and PwC's own independent analysis, PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Ex. 92, Appx. 1514-1530; Ex. 93, Appx. 1531-1550; Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

54.      Note 15 to Highland's 2018 audited financial statements disclosed as a "subsequent event" (*i.e.*, an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit) the following:

> Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million.  The notes accrue interest at a rate of 2.39%.

Ex. 34 at 39, Appx. 782.  *See also* Ex. 94 at 54:9-55:7, Appx. 1566.

55.      There will be no evidence that HCMFA issued any notes to Highland in 2019 other than the HCMFA Notes.

## 2.      In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes

56.      The Advisors have contracts to manage certain funds (the "Fund Agreements").  The Fund Agreements are among the most important contracts the Advisors have; HCMFA's Rule 30(b)(6) witness acknowledged that its contracts with the Funds are largely the reason for HCMFA's existence.  Ex. 192 at 66:3-67:6, Appx. 3031.

17

57.     The Funds are purportedly managed by a board (the "Retail Board").  In the fall of each year, the Retail Board must determine whether to renew the Fund Agreements with the Advisors, a process referred to as a "15(c) Review."  As part of the 15(c) Review process, the Retail Board requests information from the Advisors.  Ex. 99 at 129:17-130:3, Appx. 1844-1845, Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092.

58.     Mr. Waterhouse, the Advisors' Treasurer, and Mr. Norris, HCMFA's Executive Vice President, participated in the annual 15(c) Review process with the Retail Board. Ex. 192 at 67:7-68:19, Appx. 3031; Ex. 105 at 168:13-169:8, Appx. 2091.

59.     In October 2020, as part of its 15(c) Review, the Retail Board asked the Advisors to provide certain information including the following:

> Are there any outstanding amounts currently payable or due in the future (e.g., notes) to HCMLP by HCMFA or NexPoint Advisors or any other affiliate that provides services to the Funds?

Ex. 36 at 3, Appx. 793.

60.     Ms. Thedford, the Secretary of the Advisors and an employee of Highland, followed up on this particular question, and Mr. Waterhouse directed her to "the balance sheet that was provided to the [Retail Board] as part of the" 15(c) Review.  *Id.* at 2, Appx. 792.

61.     As directed by Mr. Waterhouse, Ms. Thedford (a) obtained the relevant information from the Advisors' June 30, 2020 financial statements and (b) drafted a response that she shared with, among others, Mr. Waterhouse, Mr. Norris (the Advisors' Executive Vice President), and Mr. Post (the Advisors' Chief Compliance Officer).  Ex. 35, Appx. 788-789; Ex. 37, Appx. 795-796.

62.     Based on HCMFA's June 30, 2020 financial statements, Ms. Thedford sent her draft response to Mr. Waterhouse, Mr. Norris, Mr. Post, and others and reported that "$12,286,000 remains outstanding to HCMLP from HCMFA."  Ex. 36 at 1, Appx. 791.

18

63.     This amount necessarily included the amounts due under the HCMFA Notes because, as HCMFA has admitted, HCMFA carried the HCMFA Notes as liabilities on its balance sheet and the balance sheet was Ms. Thedford's source of information.  Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029; Ex. 194 at 117:16-122:15, Appx. 3156-3157; Ex. 195 at 120:23-122:13, Appx. 3211-3212.

64.     On October 23, 2020, the Advisors provided their final, formal responses to the questions posed by the Retail Board.  As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, the Advisors reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA.  The Note between HCMLP and NexPoint comes due on December 31, 2047.  The earliest the Note between HCMLP and HCMFA could come due is in May 2021.  All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter.  The Advisor notes that both entities have the full faith and support of James Dondero.

Ex. 59 at 2, Appx. 885.

65.     Based on the foregoing, there is no dispute that the Advisors -- with the full knowledge of each of their officers and based on HCMFA's own balance sheet -- informed the Retail Board in October 2020 of their unmitigated obligations under the NexPoint Note the HCMFA Notes.

### 3.     Without Exception, the Notes were Disclosed in Highland's Books and Records and Were Consistently Carried as Assets without Discount

66.     In addition to its audited financial statements, and without exception, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the Notes as valid debts due and owing by each of the Obligors to Plaintiff.

67.     For example, in the Debtor's February 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the transfer to Mr. Dondero on February 2, 2018 was contemporaneously identified as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801.  *See also* Ex. 78 at 2, Appx. 1362 (in the Debtor's August 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan.").

68.     After the Petition Date, but while Mr. Dondero was still in control of Highland, the Debtor filed its *Schedules of Assets and Liabilities* [Bankr. Docket No. 247] (the "Debtor's Schedules").  The Debtor's Schedules included the Notes among the Debtor's assets. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

69.     In every one of the Debtor's *Monthly Operating Reports* (the "MORs") filed with the Court (while Mr. Dondero was in control of Highland and after), the Debtor included as assets of the estate amounts "Due from affiliates" that included the Notes.  *See, e.g.,* Ex. 41, Appx. 816-825; Ex. 42, Appx. 826-835; Ex. 88, Appx. 1475-1486; Ex. 89, Appx. 1487-1496.[18]

70.     Highland's "back-up" to the amounts "Due from affiliates" set forth in the MORs identified the Obligors under the Notes and included all unpaid principal and accrued

---

[18] *See also* Bankr. Docket No. 405 (October 2019); Bankr. Docket No. 289 (November 2019); Bankr. Docket No. 418 (December 2019); Bankr. Docket No. 497 (January 2020); Bankr. Docket No. 558 (February 2020); Bankr. Docket No. 634 (March 2020); Bankr. Docket No. 686 (April 2020); Bankr. Docket No. 800 (May 2020), as amended in Bankr. Docket No. 905; Bankr. Docket No. 913 (June 2020); Bankr. Docket No. 1014 (July 2020); Bankr. Docket No. 1115 (August 2020); Bankr. Docket No. 1329 (September 2020); Bankr. Docket No. 1493 (October 2020); Bankr. Docket No. 1710 (November 2020); Bankr. Docket No. 1949 (December 2020); and Bankr. Docket No. 2030 (January 2021).

DOCS_NY:44673.9 36027/003

interest. *See, e.g.,* Exs. 196-198, Appx. 3239-3244 (the back-up to the "Due from Affiliates" amounts set forth in the MORs for December, September 2020, and January 2021).

71.     Relatedly, Highland's accounting group has a regular practice of creating, maintaining and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries").  The Loan Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Ex. 199, Appx. 3245-3246 is an example of a Loan Summary.  The Loan Summaries identify each Obligor by reference to the "GL" number used in the general ledger. *See* Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

72.     The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business. For example, Ex. 199, Appx. 3246 ties exactly into Ex. 198, Appx. 3243-3244, the "back up" to the "Due from affiliates" entry in the January 2021 MOR.  Bankr. Docket No. 2020.  Klos Dec. ¶¶15-16.[19]

### 4.     Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections

73.     On November 24, 2020, Highland filed its *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 1473].  Included therein were the Debtor's Liquidation Analysis/Financial Projections (the

---

[19] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates."  Bankr. Docket No. 2030 (balance sheet). Ex. 198, Appx. 3243-3244 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand).  Ex. 199, Appx. 3245-3246, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger.  As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note.  *See* Klos Dec. ¶¶15-16.

"Projections"). Ex. 90, Appx. 1497-1505. Among the assumptions supporting the Projections was that "[a]ll demand notes are collected in the year 2021." *Id.* at 173 of 178, Appx. 1500 (Assumption C).

74.     Thus, even though Highland had not yet called the Demand Notes, the Obligors and all parties in interest were put on notice on November 24, 2020, that the Debtor's Projections assumed all Demand Notes would be collected the following year.

75.     By early February 2021, Highland had already commenced the Adversary Proceedings to collect on all of the Notes.  Consequently, it amended the Projections [Bankr. Docket No. 1875-1] and modified the assumption concerning the Notes to state "[a]ll demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021." Ex. 91 at 2, Appx. 1508 (Assumption C) (the "Assumption").

76.     Thus, as of February 1, 2021, on the eve of confirmation, the Obligors and all parties in interest knew the Debtor's Projections, as amended, assumed that all amounts due under the Notes would be collected as part of the Plan.

77.     At the confirmation hearing, James P. Seery, Jr., Highland's Chief Executive Officer, testified as to (a) why the Debtor believed the Assumption was reasonable, and (b) how the commencement of the Adversary Proceedings impacted the Projections. Mr. Dondero's counsel asked limited questions on cross-examination concerning the Notes. Ex. 206 at 123:23-124:23, Appx. 4305-4306, 128:23-129:21, Appx. 4310-4311, 185:8-15, Appx. 4367.

78.     In his closing argument, Mr. Dondero's counsel discussed the Notes and (a) vaguely suggested that there may be "arguments" against the Debtor's assertion that the Term

Notes are due and payable and (b) observed that the Notes were not discounted for "collectability issues," but made no mention of the Alleged Agreement, HCMFA's Mutual Mistake defense, or any other defense:

> First, there's the notes; and second, there's the assets. The notes are either long-term or demand notes. Those long-term notes, Mr. Seery will tell you some have been validly accelerated and therefore are now due and payable. I think there's arguments to the contrary. But those long-term notes probably have some both time value of money and collection costs. And then, of course, you have to discount them by collectability issues, too.
>
> I don't believe any analysis went into it, or at least the Court was not provided any data or analysis as to what discounts were applied to those notes. And, therefore, I don't think that this Court can make any determination that the best interests of the creditors have been met.

Ex. 207 at 223:22-224:14, Appx. 4701-4702.

## D.    THE OBLIGORS' AFFIRMATIVE DEFENSES

79.    The Obligors have asserted various defenses to Plaintiff's claims concerning Counts One and Two and those are addressed below.

### 1.    The Alleged Agreement Defense

80.    Over the course of several months, Mr. Dondero cobbled together an affirmative defense premised on an alleged oral agreement pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent" or if certain assets were sold by a third party. After Mr. Dondero settled on that defense, all of the Obligors (except HCMFA) amended their pleadings to adopt the same affirmative defense.

23

### i.    The Allegations Materially Changed Over Time

81.    In due course, each of the Defendants filed its respective Original Answer.[20] In his Original Answer, Mr. Dondero asserted as his first affirmative defense that "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes." Ex. 80 ¶40, Appx. 1380 (the "Alleged Agreement"). None of the Corporate Obligors asserted the Alleged Agreement or any similar defense in its respective Original Answer.

82.    In late March, Highland asked Mr. Dondero to admit, among other things, that he did not pay taxes on the amounts loaned to him but that Plaintiff allegedly agreed not to collect. Ex. 81 (Responses to RFAs 4, 8, and 12), Appx. 1387-1388. Having been alerted to a fatal flaw in his defense, Mr. Dondero modified his affirmative defense based on the Alleged Agreement to state that: "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes *upon fulfillment of conditions subsequent*." Ex. 83 ("Amended Answer") ¶40, Appx. 1403.

83.    On April 15, 2021, about ten days after serving his Amended Answer, Mr. Dondero served his *Rule 26 Initial Disclosures*. Ex. 184, Appx. 2982-2990 (the "Rule 26 Disclosures"). In his Rule 26 Disclosures, Mr. Dondero specifically identified fifteen (15) "individuals likely to have discoverable information," but his sister, Ms. Dondero, was not among them. *Id.* at 2-5, Appx. 2984-2987.

84.    On April 26, 2021, Mr. Dondero served his sworn *Objections and Answers to Highland Capital Management L.P.'s First Set of Interrogatories*. Ex. 82, Appx. 1390-1396.

---

[20] Dondero Action, Docket No. 6 (the "Dondero Original Answer"); HCFMA Action, Docket No. 6 (the "HCMFA Original Answer"); NexPoint Action, Docket No. 6 (the "NexPoint Original Answer"); HCMS Action, Docket No. 6 (the "HCMS Original Answer"); and HCRE Action, Docket No. 7 (the "HCRE Original Answer").

85.     In response to an interrogatory that required Mr. Dondero to identify, with respect to each Note, "the person who entered into each [Alleged] Agreement on behalf of the Debtor," Mr. Dondero answered that "[t]he [Alleged] Agreements were entered into on behalf of the Debtor *by James Dondero* subsequent to the time each note was executed." *Id.* at 4, Appx. 1394 (Answer to Interrogatory No. 1) (emphasis added).

86.     In response to an interrogatory that required Mr. Dondero to identify "every person who James Dondero believes has actual knowledge of each [Alleged] Agreement," Mr. Dondero identified five (5) individuals, including himself, but – like the Rule 26 Disclosures – Mr. Dondero's sister was not among them. *Id.*, Appx. 1394 (Answer to Interrogatory No. 2).

87.     It was not until later in discovery that Mr. Dondero identified his sister – someone he failed to include as a person likely to have discoverable information or someone he believed had actual knowledge of each Alleged Agreement – as the person who allegedly bound Plaintiff to the Alleged Agreement, rather than himself.[21]

88.     In the weeks that followed, each of the Obligors (except for HCMFA) sought leave from the Court to amend its respective answer to adopt Mr. Dondero's Alleged Agreement defense, contending that it is not liable under any of the Notes because Plaintiff (bound by Ms. Dondero, acting as the Dugaboy Trustee) previously entered into an oral agreement pursuant to which it promised not to collect on the Notes "upon fulfillment of conditions subsequent as a form of compensation to Mr. Dondero."[22]

---

[21] Ms. Dondero was allegedly acting in her capacity as the Trustee of Dugaboy, a family trust in which Mr. Dondero is the sole beneficiary during his lifetime and that purportedly held a majority of certain of the limited partner interests in Highland. *See* Ex. 31 ¶82, Appx. 655.

[22] *See* Ex. 11, Appx. 384-393 (NexPoint's Motion for Leave to Amend); Ex. 14 (NexPoint's First Amended Answer) ¶42, Appx. 421-422; Ex. 8, Appx. 292-312 (HCMS's Motion for Leave to Amend); Ex. 12 (HCMS's First Amended Answer) ¶56, Appx. 402; Ex. 9 (HCRE's Motion for Leave to Amend), Appx. 313-333; Ex. 17 (HCRE's Amended Answer) ¶99, Appx. 468.

ii.    **The Final Version of the "Alleged Agreement" Defense**

89.    After months of maneuvering, Mr. Dondero, HCMS, HCRE, and NexPoint

finally settled on the following affirmative defense based on the Alleged Agreement:

> Plaintiff's claims are barred … because prior to the demands for
> payment Plaintiff agreed that it would not collect the Notes upon
> fulfillment of conditions subsequent.    Specifically, sometime
> between December of the year in which each note was made and
> February of the following year, [] Nancy Dondero, as representative
> for a majority of the Class A shareholders of Plaintiff agreed that
> Plaintiff would forgive the Notes if certain portfolio companies were
> sold for greater than cost or on a basis outside of James Dondero's
> control.    The purpose of this agreement was to provide
> compensation to Defendant James Dondero, who was otherwise
> underpaid compared to reasonable compensation levels in the
> industry, through the use of forgivable loans, a practice that was
> standard at HCMLP and in the industry.    This agreement setting
> forth the conditions subsequent to demands for payment on the
> Notes was an oral agreement; however, Defendant [ ] believes there
> may be testimony or email correspondence that discusses the
> existence of this agreement that may be uncovered through
> discovery in this Adversary Proceeding.

Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer").[23]

iii.    **No Reasonable Trier of Fact Can Find that the Alleged Agreement
Existed**

90.    For the reasons set forth below, no reasonable trier of fact can find that the

Alleged Agreement ever existed.

91.    Mr. Dondero could not identify a material term of the Alleged Agreements.

Mr. Dondero could not describe a material terms of the Alleged Agreements without relying on a

document prepared by counsel.    Specifically, without a list prepared by counsel, Mr. Dondero

could not identify any of the Notes subject to the Alleged Agreements nor could he recall (i) the

number of Notes subject to each Alleged Agreement, (ii) the maker of each Note subject to each

---

[23] *See also* Ex. 15 ¶83, Appx. 435-436 ("NexPoint's Answer"); Ex. 16 ¶97, Appx. 451-452 ("HCMS's Answer"); and
Ex. 17 ¶99, Appx. 468 ("HCRE's Answer").

Alleged Agreement, (iii) the date of each Note subject to each Alleged Agreement, or (iv) the principal amount of any Note subject to the Alleged Agreements.  Ex. 99 at 13:4-28:22, Appx. 1815-1819.

92.     Mr. Dondero's inability to identify the notes subject to the Alleged Agreement is significant because he and HCMFA had other notes outstanding at the same time. *See, e.g.,* Ex. 43, Appx. 836-838 (January 18, 2018 note executed by Mr. Dondero in the principal amount of $7.9 million); Adv. Pro. 21-03082, Docket No. 1 (Exhibit 1, February 26, 2014 note executed by HCMFA in the principal amount of $4 million) (Exhibit 2, a February 26, 2016 note executed by HCMFA in the principal amount of $2.3 million).

93.     Mr. and Ms. Dondero dispute a key aspect of the Alleged Agreements.  Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements; namely, its scope.  Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement.  Mr. Dondero, on the other hand, disagrees.  *Compare* Ex. 100 at 180:8-183:20, Appx. 1919-1920 *with* Ex. 99 at 79:6-81:23, Appx. 1832.

94.     Mr. Dondero personally caused MGM stock to be sold in November 2019 and failed to declare the Notes forgiven.  According to Mr. and Ms. Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies -- Trussway, Cornerstone, or MGM -- above cost.  *See* Ex. 31 ¶82, Appx. 655.

95.     In November 2019, Mr. Dondero caused the sale of a substantial interest in MGM for $123.25 million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the Alleged Agreement altogether.  *See* Ex. 201 ¶29-30, Appx. 3270-3271; Ex. 202 ¶14, Appx. 4135; Ex. 203 ¶1, Appx. 4143; Ex. 204 at 5 n. 5, Appx. 4156.

96.     <u>Ms. Dondero was not competent to enter into the Alleged Agreements</u>.

Under the circumstances, Ms. Dondero was not competent to enter into the Alleged Agreements, and she made no effort to educate herself before purportedly binding Highland.  Ms. Dondero:

- had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry" (Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928);[24]

- never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date (*Id.* at 61:25-63:13, Appx. 1889-1890);

- did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Ms. Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies (*Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927);

- never saw a promissory note signed by James Dondero, any other officer or employee of Highland, or any "affiliate" of Highland (*Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919);

- learned (falsely, as shown below) from her brother that Highland allegedly had a "common practice" of forgiving loans, but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement (*Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900);

---

[24] The only information Ms. Dondero had concerning Mr. Dondero's compensation from Highland was that he "was not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Ex. 100 at 51:11-22, Appx. 1887.  This information was false.  Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of $4,194,925); and Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

- had no knowledge of NexPoint, HCMS, or HCRE (the Corporate Obligors whose Notes are purportedly subject to the Alleged Agreement), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland, and their use of the proceeds (*Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909).

- had no authority under the HCMLP partnership agreement to negotiate and enter into binding agreements on behalf of HCMLP Ex. 2 (Exhibit4), Appx. 57-93.

97.   Mr. Dondero retained Alan Johnson as an executive compensation expert. Mr. Johnson has experience advising boards, compensation committees, and other parties on issues concerning loan forgiveness transactions.  Based on his expertise, Mr. Johnson would very likely concur that Ms. Dondero was not competent to enter into the Alleged Agreements on behalf of Highland.  Ex. 101 at 12:3-73:17, Appx. 1961-1976.

98.   <u>The Alleged Agreements were kept secret and were never disclosed.</u>  The Alleged Agreements were never disclosed by Mr. Dondero or Ms. Dondero:

- Other than Mr. and Ms. Dondero, no one participated in the discussions that led to each Alleged Agreement. Ex. 100 at 190:16-191:17, Appx. 1922;

- Ms. Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the Alleged Agreements to *anyone*, including PwC, Mr. Waterhouse, or Mr. Okada, and (2) neither ever caused Highland to disclose the existence or terms of the Alleged Agreements to the Bankruptcy Court.  Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 538-542; Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558); and

- Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the Alleged Agreements to PwC, Mr. Okada, or the Bankruptcy Court; and (2) never caused Highland to disclose the existence or terms

of the Alleged Agreement to the Bankruptcy Court.  Ex. 24 (Responses to RFAs 1-2, 5-7, 11-17, Appx. 521-524).[25]

99.    No Document Exists that Reflects the Existence or Terms of the Alleged Agreements.  No document was created prior to the Petition Date that memorializes or reflects the existence or terms of the Alleged Agreement:

- Neither Dugaboy nor Ms. Dondero (a) ever made a list of the promissory notes that are the subject of the Alleged Agreement; or (b) is otherwise aware of anything in writing that identifies the promissory notes that are the subject of each Alleged Agreement.  Ex. 100 at 178:25-180:7, 180:24-181:6, Appx. 1919.

- The terms of the Alleged Agreement were never reduced to writing. Ex. 25 (Responses to RFAs 7-8, Appx. 539, Responses to Interrogatories 3-4, Appx. 542); Ex. 26 (Responses to RFAs 7-8, Appx. 555, Responses to Interrogatories 3-4, Appx. 558); Ex. 100 at 217:2-17, Appx. 1928.

- Mr. Dondero has admitted that (a) he never wrote down a list of the Notes that are subject to the Alleged Agreement; (b) he is unaware of any document that was created prior to the commencement of the Adversary Proceedings that identifies the Notes subject to the Alleged Agreements; and (c) no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Alleged Agreements. Ex. 24, Appx. 522 (Response to RFA 7); Ex. 99 at 28:24-29:12, Appx. 1819.

100.    Even if the Alleged Agreements existed, they are unenforceable for lack of consideration.  Mr. Dondero is the founder of Highland and Highland was the platform he used to support his other businesses, including the Advisors, HCRE, and HCMS.  No reasonable trier of fact could conclude that Highland (a) needed to enter into the Alleged Agreements to retain or motivate Mr. Dondero or (b) that Highland received anything of value in exchange for agreeing to forgive over $50 million in valid promissory notes if either (i) Mr. Dondero sold one of the three

---

[25] Mr. Dondero asserts that he informed Mr. Waterhouse about the Alleged Agreement. Ex. 24, Appx. 521 (Responses to RFAs 3 and 4).  But Mr. Waterhouse testified that he did not learn of the Alleged Agreement until 2021 and even now only knows that it was subject to "milestones" that he cannot identify.  Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

portfolio companies at a dollar above cost or (ii) the portfolio companies were sold by a third party.

Yet, according to Ms. Dondero, "motivating" Mr. Dondero is all Highland received. *See, e.g.,*

Ex. 100 at 221:2-225:7, Appx. 1929-1930.

101.    Indeed, Ms. Dondero admitted that she did not know, and had no reason to

expect, that Highland would benefit from the sale of the portfolio companies by a third party. She

also acknowledged that (a) Highland would not benefit from the Alleged Agreements if a third

party sold the portfolio companies at less than cost and (b) the Notes would all be forgiven even if

a third party sold the portfolio companies at a price "substantially below cost." Ex. 100 at 201:24-

203:11, Appx. 1924-1925; 227:17-229:14, Appx. 1931.

102.    Mr. Dondero fixed the terms of the Alleged Agreements without

negotiation.  No aspect of the Alleged Agreement was the subject of negotiation and Ms. Dondero

made no counterproposal of any kind.  Indeed, the undisputed facts show that Ms. Dondero never

(i) made a counterproposal; (ii) negotiated any aspect of the Alleged Agreements; (iii) asked Mr.

Dondero how he selected the portfolio companies; (iv) inquired as to whether Mr. Dondero already

had a duty to maximize value; (v) rejected any aspect of Mr. Dondero's proposal; or (vi) rejected

or pushed back on Mr. Dondero's proposal that all of the Notes would be forgiven if any of the

portfolio companies were sold by a third party. Ex. 100 at 194:16-19, Appx. 1923, 195:14-199:15,

Appx. 1923-1924.

103.    There is No History of Loans Being Forgiven at Highland.  Mr. Dondero,

NexPoint, HCMS, and HCRE contend that the use of "forgivable loans" was a "practice that was

standard at Highland." *See, e.g.,* Ex. 31 ¶82, Appx. 655.  This is demonstrably false.

104.    Mr. Dondero has admitted that Highland disclosed to its auditors all loans

of a material amount that Highland ever forgave. Ex. 98 at 426:8-427:15, Appx. 1777.  During his

31

deposition, Mr. Johnson, Mr. Dondero's executive compensation expert, reviewed Highland's audited financial statements for each year from 2008 through 2018 (Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland has never forgiven in whole or in part any loan that it extended to any affiliate.  *Id.* at 189:24-192:10, Appx. 2005-2006.  *See also* Ex. 98 at 422:18-428:14, Appx. 1776-1778.

### 2. HCMFA's "Mutual Mistake" Defense

105.    HCMFA's primary affirmative defense is that the HCMFA Notes are "void" or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority from Defendant to Waterhouse to executive the same for Defendant."  Ex. 13 ¶ 47, Appx. 412.

106.    In support of its defense, HCMFA asserts that Mr. Waterhouse signed the HCMFA Notes by mistake and without authority ("HCMFA's Mistake Defense"), and that Highland's transfer of $7.4 million on May 2 and May 3, 2019 should have been treated "as compensation by the Plaintiff to the Defendant." Ex. 13 ¶ 45, Appx. 412.

107.    HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities Highland Global Allocation Fund ("HGAF") held in Terrestar (the "NAV Error").  HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

Ex. 13 ¶¶ 41-42, Appx. 411.

108.    On May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error, HCMFA did not mention Highland but reported:

> The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value.  As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly."  The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value.  The "orderly determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "<u>NAV Error</u>").

Ex. 182, Appx. 2978-2980.

109.    HCMFA will not offer into evidence any document to establish that (a) it ever told Securities and Exchange Commission that Highland, and not HCMFA, was responsible for the NAV Error; (b) it ever told the HGAF Board that anyone other than HCMFA and Houlihan Lokey were responsible for the NAV Error; or that (c) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV error.  *See* Ex. 192 at 140:7-11, Appx. 3049.[26]

---

[26] While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland.  *Id.* Ex. 192 at 138:15-19, Appx. 3049.

DOCS_NY:44673.9 36027/003

110.    <u>HCMFA Recovers Approximately $5 million Through Insurance to
Compensate HGAF for the NAV Error</u>.  HCMFA reported to the HGAF Board that the "Estimated
Net Loss" from the NAV Error was $7,442,123.  Ex. 182 at 2, Appx. 2980.  HCMFA admits that
it received almost $5 million in the form of insurance proceeds to fund the loss and had to pay
approximately $2.4 million out-of-pocket to fully cover the estimated loss.[27]  Despite having
received approximately $5 million in insurance proceeds (representing more than two-third of the
total loss), HCMFA insists that (a) Highland's subsequent payment of $7.4 million was
"compensation" for its negligence and (b) HCMFA was entitled to receive **both** and $5 million in
insurance proceeds $7.4 million in "compensation" from Highland even though the total loss was
only $7.4 million.  HCMFA never told its insurance carrier that Highland was at fault or that
Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered.
Ex. 192 at 133:14-150:22, Appx. 3047-3052.

111.    After HCMFA filed its claim with ICI Mutual, HCMFA received the $7.4
million from Highland in connection with the Notes. Ex. 192 at 146:20-25, Appx. 3051.

112.    Thus, according to HCMFA, "it received $7.4 million from Highland as
compensation, and approximately $5 million from the insurance carrier as compensation for the
total receipts of $12.4 million in connection with the [NAV Error]." Ex. 192 at 147:4-11, Appx.
3051.

113.    HCMFA is not aware of (a) anyone on behalf of HCMFA ever informing
ICI mutual that it received $7.4 million from Highland on account of the NAV Error, Ex. 192 at
150:3-6, Appx. 3052, or (b) anyone on behalf of HCMFA ever informing ICI Mutual that HCMFA

---

[27] Specifically, HCMFA reported that it (a) received $4,939,520 as insurance proceeds, (b) paid a deductible of
$246,976, and (c) after accounting for other sources of capital and expenses, needed an additional payment of
$2,398,842 to fully fund the loss.  Ex. 182 at 2, Appx. 2980.

34

believed Highland was the cause of the NAV Error, Ex. 192 at 150:19-22, Appx. 3052.  In other

words, HCMFA admits that it never told ICI Mutual that Highland made HCMFA "whole" or

otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV

Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

114.   <u>Mr. Waterhouse Knew the HCMFA Notes Were Treated as Intercompany</u>

<u>Loans</u>.  Highland maintained an e-mail group called "Corporate Accounting" that included Mr.

Waterhouse, among others.  *See, e.g.,* Ex. 194 at 111:6-112:7, Appx. 3154.

115.   On May 2, 2019, David Klos, Highland's Controller, sent an e-mail to the

Corporate Accounting group entitled "HCMLP to HCMFA loan" that said:

> Blair, Please send $2,400,000 from HCMLP to HCMFA.  This is a
> new interco loan.  Kristin, can you or Hayley please prep a note for
> execution.  I'll have further instructions later today, but please
> process this payment as soon as possible.

Ex. 54, Appx. 870-873.

116.   Thus, on May 2, 2019, Mr. Waterhouse was informed that (a) HCMLP was

transferring $2.4 million to HCMFA, and (b) Ms. Hendrix and another HCMLP employee were

asked to prepare a promissory note.

117.   The next day, on May 3, 2019, Ms. Hendrix sent an e-mail to the Corporate

Accounting group that said:

> Blair, Please set up a wire from HCMLP to HCMFA for $5M as a
> new loan ($4.4M should be coming in from Jim soon).
>
> Hayley, please add this to your loan tracker.  I will paper the loan.

Ex. 56, Appx. 876-877.

118.   Thus, on May 3, 2019, Mr. Waterhouse was informed that (a) HCMLP was

going to make a "new loan" to HCMFA in the amount of $5 million, and (b) Ms. Hendrix was

going to "paper the loan."  And that's exactly what happened.

119.    <u>HCMFA Represented to Third Parties that the HCMFA Notes Were</u> <u>Liabilities</u>.  As discussed above, HCMFA represented to the Retail Board in October 2020 as part of the 15(c) Review that as of June 30, 2020, the HCMFA Notes were liabilities of HCMFA.  *See* Ex. 59 at 2, Appx. 885.  Before filing its Original Answer, HCMFA never told anyone that was there was an error in the letter to the Retail Board.  Ex. 192 at 125:18-127:2, Appx. 3045-3046.

120.    <u>The HCMFA Notes Are Carried as Liabilities on HCMFA's Balance Sheet</u> <u>and Included in its Audited Financial Statements</u>.  HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its balance sheet.  Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.

121.    <u>Nothing in HCMFA's Books and Records Corroborates HCMFA's Mistake</u> <u>Defense</u>.  There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Ex. 192 at 59:8-63:20, Appx. 3029-3030.

122.    <u>Highland's Bankruptcy Court Filings Contradict HCMFA's Mistake</u> <u>Defense</u>.  As discussed *supra*, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the HCMFA Notes as valid debts due and owing by each of the Obligors to Plaintiff.  Thus, regardless of what HCMFA may think, there is no evidence that any purported mistake is "mutual."  Moreover, if Mr. Waterhouse "made a mistake" in preparing and executing the HCMFA Notes, then he compounded the mistake at least twenty (20) times when he (i) signed off on Highland's and HCMFA's audited financial statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings.

3.      **Waiver and Estoppel [NexPoint, HCMS, HCRE]**

123.    There is no dispute that Highland was never directed or instructed to make the Annual Installment payments due on December 31, 2020. Ex. 98 at 462:16-463:9, Appx. 1786; Ex. 105 at 381:21-382:16, Appx. 2144-2145. Nevertheless, NexPoint, HCMS, and HCRE assert that any default under the Notes was the "result of Plaintiff's own negligence, misconduct, breach of contract" under the Shared Services Agreement. Ex. 15 ¶ 80, Appx. 435; Ex. 12 ¶¶ 54-55, Appx. 402; Ex. 17 ¶¶ 97-98, Appx. 467.

124.    NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "SSA"). Ex. 205, Appx. 4162-4181.

125.    Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services. None of the services authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint. In fact, Article II of the SSA expressly provided that "for the avoidance of doubt   . . . [Highland] shall **not** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ." Ex. 205 at § 2.02, Appx. 4165-4167 (emphasis added).

126.    To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

> Section 2.06 <u>Authority</u>. [Highland's] scope of assistance and advice
> hereunder is ***limited to the services specifically provided for in this
> Agreement. [Highland] shall not assume or be deemed to assume
> any rights or obligations of [NexPoint] under any other document
> or agreement to which NexPoint is a party***. . . . [Highland] shall not

37

> have any duties or obligations to [NexPoint] unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which [NexPoint] is a party.

*Id*. § 2.06, Appx. 4170 (emphasis added).

### 4.    Other Defenses

127.    Mr. Dondero could not identify any facts to support his affirmative defenses of waiver, estoppel, or lack of consideration. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

128.    NexPoint and HCMS assert that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid." Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768. The facts relevant to this defense are described above and in the Klos Declaration. (Klos Dec. ¶¶ 3-14). Further, while NexPoint and HCMS now contend that they "pre-paid," both chose to pay Highland in January 2021 after receiving notice of default (in a transparent but futile attempt to "cure," for which they had no right rather than assert the "prepayment" defense. *See* Ex. 2 (Exhibit 3), Appx. 49-56.

## III.    ARGUMENT

### A.    Legal Standard

#### 1.    Summary Judgment Standard

129.    "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (quoting Fed. R. Civ. P. 56(c)). "A dispute about a material fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999). The moving party meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.*, 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact.").

130.    "If the moving party carries [their] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.3d at 303; *see also Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial."). "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.3d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D.Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted).

131.    Thus, "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming

that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton*, <mark>168 F.3d at 199</mark>; *see also Armstrong v. City of Dallas*, <mark>997 F.2d 62, 66</mark> n 12 (5th Cir.1993) ("We no longer ask whether literally little evidence, *i.e.*, a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

### 2.    Summary Judgment Standard for Promissory Notes

132.    "Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, <mark>41 F.3d 1018, 1023</mark> (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, <mark>837 F.2d 1369, 1371</mark> (5th Cir.1988)); *see also Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, <mark>2010 WL 532431</mark>, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary judgment.").  To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, <mark>41 F.3d at 1023</mark>; *Looney*, <mark>2010 WL 532431</mark>, at *2-3; *Magna Cum Latte*, <mark>2007 WL 3231633</mark>, at *15.

### B.    Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes

133.    Highland has made its *prima facie* case that it is entitled to summary judgment on Defendants' breach of the Notes.

134.    The Dondero Demand Notes are: (i) valid, (ii) signed by Mr. Dondero, and in Highland's favor, (Klos Dec. ¶¶ 18-20, Exs. D, E, F), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was

$9,004,013.07, and as of (b) December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

135.    The HCMFA Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 21-22, Exs. G, H), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09, (Klos Dec. ¶ 40).

136.    The HCMS Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 23-26, Exs. I, J, K, L), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81, (Klos Dec. ¶ 45).

137.    The HCRE Demand Notes are: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶¶ 27-30, Exs. M, N, O, P), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23, (Klos Dec. ¶ 50).

138.    The NexPoint Term Note is: (i) valid, (ii) signed by NexPoint, and in Highland's favor, (Klos Dec. ¶ 31, Ex. A), and (iii) as (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b)

December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27,[28] (Klos Dec. ¶ 51).

139.    The HCMS Term Note is: (i) valid, (ii) signed by HCMS, and in Highland's favor, (Klos Dec. ¶ 32, Ex. R), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31,[29] (Klos Dec. ¶ 52).

140.    The HCRE Term Note is: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶ 33, Ex. S), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[30] (Klos Dec. ¶ 53).

141.    Each of the Obligors under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand.

142.    Each of the Obligors under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[28] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[29] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[30] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

DOCS_NY:44673.9 36027/003

143.    Highland has been damaged by the Obligors' breaches in amounts that are set forth above but which (a) continued to increase daily, and (b) which do not include a calculation of collection costs and attorneys' fees.[31]

144.    Accordingly, Highland has made out its prima facie case for summary judgment that Defendants have breached the Notes. *See Resolution*, ==41 F.3d at 1023== (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney*, ==2010 WL 532431==, at \*2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").[32]

## C.    Defendants Fail to Rebut Highland's Prima Facie Case

145.    Defendants fail cannot rebut Highland's prima facie case for breach of the Notes because there is no substantive or credible evidence to support any of their affirmative defenses and there is substantial evidence to contradict them.

### 1.    No Reasonable Jury Could Find that the "Alleged Agreement" Exists

146.    Mr. Dondero, NexPoint, HCRE, and HCMS fail to show there is any genuine issue of material fact to support their "Alleged Agreement" defense.  There is a complete absence of evidence in support of this defense and there is substantial evidence to contradict them.

---

[31] Plaintiff seeks to add to its damages accrued and unpaid interest, and Plaintiff's costs of collection, including reasonable attorney's fees. Ex. 162-180, Appx. 2637-2945.  Plaintiff respectfully requests an opportunity to conduct a final damage calculation if the Court fully grants the Motion.

[32] In the event the Motion is granted, Highland requests that the Court hold a hearing on damages, as interest under the Notes and attorney's fees continue to accrue.

147.    As discussed above, (i) Mr. Dondero cannot identify materials terms of the
Alleged Agreement, such as (a) which Notes are subject to the Alleged Agreement, (b) the number
of Notes subject to the Alleged Agreement, (c) the maker of each Note subject to the Alleged
Agreement; (d) the date of each Note subject to the Alleged Agreement, or (e) the principal amount
of any Note subject to the Alleged Agreement, (*see supra* ¶¶ 91-92); (ii) Mr. and Ms. Dondero
cannot even agree whether Mr. Dondero identified the Notes subject to each Alleged Agreement,
(*see supra* ¶¶ 93); (iii) Mr. Dondero sold MGM stock in November 2019—an alleged "condition
subsequent" under the Alleged Agreement—but failed to declare the Notes forgiven, and otherwise
remained silent about the Alleged Agreement, (*see supra* ¶¶ 94-95); (iv) Ms. Dondero, the counter-
party to the Alleged Agreement, never saw a Note signed by Mr. Dondero or any affiliate of
Highland and was not competent to enter into the Alleged Agreements (*see supra* ¶¶ 96); (v) the
existence or terms of the Alleged Agreement was never disclosed by Mr. Dondero or Ms. Dondero
to anyone, including PwC, Mr. Waterhouse, Mr. Okada or the Bankruptcy Court, (*see supra* ¶¶
98); (vi) no document exists memorializing or otherwise reflecting the existence of terms of the
Alleged Agreement, (*see supra* ¶ 99); and (vii) there is no history of loans being forgiven at
Highland, (*see supra* ¶¶ 103-104).    Accordingly, there is an absence of evidence showing the
Alleged Agreement exists.  *See Magna*, 2007 WL 3231633, at *16 (granting summary judgment
with respect to breach of promissory note where defendants assert that they are discharged from
debt obligations after terms of lease were altered, finding "[t]here is no evidence that any
agreement was altered. At best, the summary judgment evidence supports a theory that the terms
of the leases were not what the [] Defendants expected them to be.")

148.    The Alleged Agreement would also be unenforceable as a matter of law for
lack of (a) consideration, (b) definiteness, and (c) a meeting of the minds.   In order to be legally

enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (in order to prove existence of a valid and binding subsequent oral agreement binding upon parties, party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014).

149.    Based on the evidence cited above, no reasonable trier of fact could find that there was a meeting of the minds between Ms. Dondero and Mr. Dondero regarding the material terms of the oral Alleged Agreement or that such oral Agreement was exchanged for consideration. *See Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014) (finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x

417, 419 (5th Cir. 2006)) (citation omitted);  *Heritage*, 354 B.R. at 431–32 (finding a "subsequent

oral amendment" defense fails where the summary judgment record does not support the existence

of a subsequent agreement").

150.     Accordingly, there is no genuine issue of material fact regarding the Alleged

Agreement defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's,

NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

## 2.     No Reasonable Jury Could Find the HCMFA Note Was a "Mistake"

151.     HCMFA's Mistake Defense also fails as a matter of law because there is no

evidence to show that HCMFA and Highland were acting under a shared factual mistake when

executing the HCMFA Notes.

152.     "For mutual mistake to nullify a promissory note, the evidence must show

that both parties were acting under the same misunderstanding of the same material fact." *Looney*,

2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law).  "[A] party must show

that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects

the agreed upon exchange. *Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*, No. H-06-

1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27. 2007) (citing Texas law).  In other words,

"[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but

the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.*

(internal quotations omitted).  "In determining the intent of the parties to a written contract, a court

may consider the conduct of the parties and the information available to them at the time of signing

in addition to the written agreement itself." *Id.*  "When mutual mistake is alleged, the party seeking

relief must show what the parties' true agreement was and that the instrument incorrectly reflects

that agreement because of a mutual mistake."  *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co.,*

*Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations

omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*, CIV.A. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7.

153. Here, the HCMFA Notes were apparently hiding in plain sight for almost two years. The undisputed documentary and testimonial evidence overwhelmingly establishes that both HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr. Waterhouse, HCMFA's treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan" (*supra*, ¶¶ 114-118); (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets (*supra* ¶ 120); (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, (see *supra* ¶ 122), and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times, (*supra*, ¶¶ 119).

154. There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into this agreement. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) ICI Mutual. (*See supra*, ¶¶ 110-115; 119). The purported "mistake" is also not reflected in HCMFA's books and records or audited financials. (*See supra*, ¶¶ 120).

155. HCMFA's Mistake Defense, therefore, fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where "the fact that

47

[defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.) (emphasis in original); *Whitney*, <mark>2007 WL 3145798</mark>, at *6 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, <mark>2010 WL 532431</mark>, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, <mark>2021 WL 2772808</mark>, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").

156.    Accordingly, there is no genuine issue of material fact regarding HCMFA's Mistake Defense, and Highland is entitled to summary judgment for HCMFA's breach of the HCMFA Demand Notes.

### 3.    No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence

157.    No reasonable jury could find that NexPoint's default under its Note was the result of Highland's negligence under the SSA.[33]  As discussed above, the SSA, by its clear

---

[33] Highland did not enter into shared services agreements with HCRE and HCMS so those Obligors' affirmative defenses fail as a matter of law.

terms, does not impose a duty on Highland to make payments under the Term Notes, on behalf of NexPoint, HCRE, and HCMS, without the express authorization of those entities or an agent of those entities.  *See supra* ¶¶ 120-125.   It is undisputed that Highland was never directed to make the payments under the Term Notes. *See supra* ¶ 123.

158.   Accordingly, there is no genuine issue of material fact regarding NexPoint's, HCRE's, and HCMS's breach under the Term Notes, and Highland is entitled to summary judgment on its claims for breach of the Term Notes.

4.   **No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note**

159.   NexPoint's and HCMS's assertion that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid" is contradicted by undisputed documentary evidence.  (*See* Klos Dec. ¶¶ 3-14).

160.   Accordingly, there can be no genuine dispute of material fact regarding NexPoint's and HCMS's failure to pay amounts due and owing under the NexPoint and HCMS Term Notes.

## CONCLUSION

WHEREFORE, Highland respectfully requests that the Court (i) grant its Motion, (ii) hold Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, including the costs of collection and reasonable attorneys' fees in an amount to be determined and (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated: December 20, 2021      **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

DOCS_NY:44673.9 36027/003

## PARTIES, WITNESSES, AND DEFINITIONS

1.      "Advisors" refers to HCMFA and NexPoint, together.  The Advisors provide investment advisors services to certain retail funds and are effectively owned or controlled by Mr. Dondero.  Ex. 96 at 228:11-19; Ex. 105 at 32:17-23.[34]

2.      "Corporate Obligors" refers to HCMFA, NexPoint, HCMS, and HCRE in their capacities as makers under their respective Notes.

3.      "Dugaboy" refers to The Dugaboy Investment Trust, a trust formed in 2010 to purportedly provide for the living maintenance, education, health, and lifestyle of its beneficiaries. Mr. Dondero is the sole beneficiary of Dugaboy during his lifetime; his children and subsequent generations shall become the beneficiaries following his demise.

4.      "HCMFA" refers to Highland Capital Management Advisors, L.P.  HCMFA is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23. HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:11-15.

5.      "NexPoint" refers to NexPoint Advisors, L.P.  NexPoint is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23.  HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:16-19.

6.      "HCRE" refers to HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), and is an entity that is directly or indirectly owned by Mr. Dondero. Ex. 96 at 228:20-23.

7.      "HCMS" refers to Highland Capital Management Services, Inc., and is an entity that is directly or indirectly owned or controlled by Mr. Dondero. Ex. 96 at 228:24-229:4.

---

[34] All citations herein to "Appx." refer to the *Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*.

1

8.      "Klos Dec." refers to the *Declaration of David Klos In Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, filed simultaneously with the Motion.

9.      "Mr. Dondero" refers to an individual named James Dondero.  Mr. Dondero is the founder and former president and Chief Executive Officer of Highland.  Ex. 96 at 248:3-6.  Mr. Dondero served as Highland's president from 1994 until January 9, 2020. Ex. 98 at 291:6-292:16.  At all relevant times, Mr. Dondero also served as President of HCMFA and directly or indirectly owned or controlled each of the Corporate Obligors.  Ex. 37; Ex. 96 at 228:6-229.

10.      "Ms. Dondero" refers to an individual named Nancy Dondero.  Ms. Dondero is Mr. Dondero's sister.  At Mr. Dondero's request, Ms. Dondero became the sole Trustee of Dugaboy in October 2015 and has served in that capacity since that time.  Ex. 96 at 174:21-25; Ex. 100 at 166:19-169:5.

11.      "Mr. Norris" refers to an individual named Dustin Norris.  Mr. Norris has been an officer of HCMFA since 2012, and currently serves as the Executive Vice President of HCMFA.  Ex. 35; Ex. 192 at 18:11-25.

12.      "Mr. Post" refers to an individual named Jason Post. Mr. Post was employed by Highland in 2018 and 2019, and then became an employee of HCMFA and served as the Chief Compliance Officer for each of the Advisors.  Ex. 105 at 184:13-185:3; Ex. 192 at 32:6-33:25.

13.      "Mr. Sauter" refers to an individual named Dennis C. Sauter.  Mr. Sauter served as Highland's general counsel of real estate from approximately February 2020 until April 2021, and has served as the general counsel of NexPoint from April 2021 to the present. Ex. 193 at: 7:16-9:12.

14.      "Ms. Thedford" refers to an individual named Lauren Thedford.  Ms. Thedford is an attorney who was previously employed by Highland while simultaneously serving as an officer

DOCS_NY:44673.9 36027/003

of HCMFA and NexPoint, holding the title of Secretary.  Ms. Thedford also served as an officer

of the retail funds managed by the Advisors until early 2021.  Ex. 35; Ex. 37; Ex. 105 at 172:10-

173:25.

15.     "Mr. Waterhouse" refers to an individual named Frank Waterhouse.  Mr.

Waterhouse is a Certified Public Accountant who joined Highland Capital Management, L.P. in

2006 and served as Highland's Chief Financial Officer ("CFO") on a continuous basis from

approximately 2011 or 2012 until early 2021.  While serving as Highland's CFO, Mr. Waterhouse

simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of

Treasurer and (2) Principal Executive Officer of certain retail funds managed by the Advisors.  As

Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for

managing the Advisor's accounting and finance functions.  Ex. 35; Ex. 37; Ex. 105 at 18:6-15,

18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-

39:5.

16.     "Notes" refers to the Demand Notes and the Term Notes, as those terms are defined

below.

17.     "Obligors" refers to Mr. Dondero and the Corporate Obligors in their capacities as

makers under the Notes.

18.     "PwC" refers to Pricewaterhouse Coopers, firm that served as Highland's outside

auditors from 2003 through at least June 3, 2019.  Ex. 34; Exs. 63-66; Exs. 69-72; Ex. 87 at 9 (Item

26b.1).

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ------------------------------------------------------------- | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Adv. Proc. No. 21-03003-sgj |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-01010-E |
| JAMES DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| ------------------------------------------------------------- | § | |

1

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03004-sgj |
| | § | |
| vs. | § | |
| | § | |
| | § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03005-sgj |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Case No. 3:21-cv-00880-C |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03006-sgj |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | Case No. 3:21-cv-01378-N |
| SERVICES, INC., JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

```
--------------------------------------------------------
HIGHLAND CAPITAL MANAGEMENT, L.P.,           §
                                             §
                                             §
                  Plaintiff,                 §    Adv. Proc. No. 21-03007-sgj
                                             §
vs.                                          §
                                             §    Case No. 3:21-cv-01379-X
HCRE PARTNERS, LLC (n/k/a NexPoint           §
Real Estate Partners, LLC), JAMES            §
DONDERO, NANCY DONDERO, AND                  §
THE DUGABOY INVESTMENT TRUST,                §
                                             §
                                             §
                  Defendants.                §
--------------------------------------------------------
```

## NOTICE OF FILING OF HIGHLAND CAPITAL MANAGEMENT L.P.'S AMENDED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**PLEASE TAKE NOTICE** that Highland Capital Management, L.P. ("Highland" or "Plaintiff"), the reorganized debtor in the above-captioned chapter 11 case (the "Bankruptcy Case") and plaintiff in the above-referenced adversary proceedings (each, an "Adversary Proceeding" and collectively, the "Adversary Proceedings"), hereby files this *Notice of Filing of Highland Capital Management L.P.'s Amended Memorandum of Law in Support of Motion for Partial Summary Judgment* (the "Notice of Filing").

On December 17, 2021, Highland filed its *Memorandum of Law in Support of Motion for Partial Summary Judgment* [Adv. Proc. Nos. 21-3003, Docket No. 134; 21-3004, Docket No. 93; 21-3005, Docket No. 133; 21-3006, Docket No. 131; 21-3007, Docket No. 126] (the "Brief")

On December 20, 2021, Highland filed its *Amended Memorandum of Law in Support of Motion for Partial Summary Judgment* [Adv. Proc. Nos. 21-3003, Docket No. 137; 21-3004, Docket No. 95; 21-3005, Docket No. 136; 21-3006, Docket No. 133; 21-3007, Docket No. 128] (the "Amended Brief") for the purpose of (a) correcting or completing citations to the record, and (b) adding as an exhibit a list of *Parties, Witnesses, and Definitions* that was inadvertently omitted.

3

Attached hereto as **<u>Exhibit A</u>** is a redline showing the changes made to the Amended

Brief.


Dated:  December 20, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
    jmorris@pszjlaw.com
    gdemo@pszjlaw.com
    hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES ~~DISTRICT~~ BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Adv. Proc. No. 21-03003-sgj |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § | Case No. 3:21-cv-01010-E |
| Defendants. | § § § § | |

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff,<br><br>vs.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>     Defendant. | § <br> § <br> §   Adv. Proc. No. 21-3004 <br> § <br> § <br> § <br> §   Case No. 3:21-cv-00881-X <br> § <br> § <br> § <br> § <br> § <br> § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff,<br><br>vs.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>     Defendants. | § <br> § <br> §   Adv. Proc. No. 21-3005 <br> § <br> § <br> §   Case No. 3:21-cv-00880-C <br> § <br> § <br> § <br> § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff,<br><br>vs.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>     Defendants. | § <br> § <br> §   Adv. Proc. No. 21-3006 <br> § <br> § <br> §   Case No. 3:21-cv-01378-N <br> § <br> § <br> § <br> § <br> § |

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., §<br>§<br>§<br>Plaintiff, §<br>§<br>vs. §<br>§<br>HCRE PARTNERS, LLC (n/k/a NexPoint §<br>Real Estate Partners, LLC), JAMES §<br>DONDERO, NANCY DONDERO, AND §<br>THE DUGABOY INVESTMENT TRUST, §<br>§<br>§<br>Defendants. § | Adv. Proc. No. 21-3007<br><br>Case No. 3:21-cv-01379-X |

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT .......................................................................................1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS .....................................................2

    A.   BACKGROUND .........................................................................................................2

        1.   The Bankruptcy Case ...................................................................................2

        2.   Procedural History .......................................................................................3

            i.   Commencement of the Adversary Proceedings ...............................3

            ii.   Defendants' Motions to Withdraw the Reference ............................4

            iii.   The Adversary Proceedings are Consolidated for Pretrial Purposes
                4

            iv.   Plaintiff Files the Amended Complaints .........................................5

    B.   HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE
        FOR THE NOTES BUT THE OBLIGORS DEFAULT ....................................................5

        1.   The Demand Notes .......................................................................................5

            i.   James Dondero ..................................................................................6

            ii.   HCMFA .............................................................................................6

            iii.   HCMS ...............................................................................................6

            iv.   HCRE ................................................................................................7

        2.   The Term Notes ............................................................................................9

    C.   THE EVIDENCE OF THE EXISTENCE, VALIDITY AND
        ENFORCEABILITY OF THE NOTES IS OVERWHELMING .......................................12

        1.   Highland Disclosed The Notes In its Audited Financial Statements
            and Carried them as Assets on its Balance Sheet .......................................13

        2.   In October 2020, HCMFA and NexPoint Jointly Informed The
            Retail Board of their Obligations under Their Respective Notes ................17

        3.   Without Exception, the Notes were Disclosed in Highland's Books
            and Records and Were Consistently Carried as Assets without
            Discount ......................................................................................................19

        4.   Recovery on the Notes Was A Significant Component of the Plan
            Yet the Obligors Remained Silent On the Point Despite Lodging
            Objections ...................................................................................................21

    D.   THE OBLIGORS' AFFIRMATIVE DEFENSES ...................................................~~22~~23

DOCS_NY:~~44673.8 36027/003~~44673.9 36027/003

| | | | |
|---|---|---|---|
| | 1. | The Alleged Agreement Defense | ~~22~~23 |
| | | i. The Allegations Materially Changed Over Time | ~~23~~24 |
| | | ii. The Final Version of the "Alleged Agreement" Defense | ~~24~~26 |
| | | iii. No Reasonable Trier of Fact Can Find that the Alleged Agreement Existed | ~~25~~26 |
| | 2. | HCMFA's "Mutual Mistake" Defense | ~~30~~32 |
| | 3. | Waiver and Estoppel [NexPoint, HCMS, HCRE] | ~~35~~37 |
| | 4. | Other Defenses | ~~36~~38 |
| III. | ARGUMENT | | ~~37~~38 |
| | A. Legal Standard | | ~~37~~38 |
| | | 1. Summary Judgment Standard | ~~37~~38 |
| | | 2. Summary Judgment Standard for Promissory Notes | ~~38~~40 |
| | B. Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes | | ~~39~~40 |
| | C. Defendants Fail to Rebut Highland's Prima Facie Case | | ~~41~~43 |
| | | 1. No Reasonable Jury Could Find that the "Alleged Agreement" Exists | ~~42~~43 |
| | | 2. No Reasonable Jury Could Find the HCMFA Note Was a "Mistake" | ~~44~~46 |
| | | 3. No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence | ~~47~~48 |
| | | 4. No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note | ~~47~~49 |
| CONCLUSION | | | ~~47~~49 |

EXHIBIT A - Parties, Witnesses, and Definitions

## TABLE OF AUTHORITIES

### CASES

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*,
MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021) ............ 45 46, 47 48

*Alton v. Texas A&M University*,
168 F.3d 196 (5th Cir. 1999) ............................................................ 36 39, 38 40

*Armstrong v. City of Dallas*,
997 F.2d 62 (5th Cir.1993) .................................................................... 38 40

*Crisalli v. ARX Holding Corp.*,
177 F. App'x 417 (5th Cir. 2006) .......................................................... 44 46

*FDIC v. Cardinal Oil Well Servicing Co.*,
837 F.2d 1369 (5th Cir.1988) ................................................................ 38 40

*Hall v. Branch Banking*,
No. H-13-328, 2014 WL 12539728 (S.D.Tex. Apr. 30, 2014) ................. 37 39

*Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*,
CIV.A. 06-1959, 2007 WL 2752692 (S.D. Tex. Sept. 20, 2007) ............. 45, 46 47

*In re Heritage Org., L.L.C.*,
354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) ................................. 43 45, 44 46

*In re Magna Cum Latte, Inc.*,
07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007) ...... 37, 39, 43 40, 44

*Latimer v. Smithkline & French Laboratories*,
919 F.2d 301 (5th Cir.1990) .................................................................. 37 39

*Looney v. Irvine Sensors Corp.*,
CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ........ passim 40, 43, 46, 48

*Melanson v. Navistar, Inc.*,
3:13-CV-2018-D, 2014 WL 4375715 (N.D. Tex. Sept. 4, 2014) ............. 43, 44 45

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
40 F.3d 698 (5th Cir. 1994) .................................................................. 37 39

*Resolution Tr. Corp. v. Starkey*,
41 F.3d 1018 (5th Cir. 1995) .......................................... 38 40, 39, 41 43

*Scott v. Wollney*,
No. 3:20-CV-2825-M-BH, 2021 WL 4202169 (N.D. Tex Aug. 28, 2021) ........ 43 45

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007) ................................................................. 38 39

*Warfield v. Byron*,
436 F.3d 551 (5th Cir. 2006) ................................................................. 36 38

*Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*,
    No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27, 2007) ................................ 45, 46, 47, 48

**RULES**

FED. R. CIV. P. 56(c) ................................ 36

DOCS_NY:44673.8 36027/00344673.9 36027/003

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S AMENDED MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the
above-captioned adversary proceedings ("Highland" or "Plaintiff"), hereby files this amended
memorandum of law in support of its *Motion for Partial Summary Judgment* (the "Motion") on
its First and Second Causes of Action.[1]  In support of its Motion, Highland states as follows:

## I.      PRELIMINARY STATEMENT[2]

1.      In accordance with its Plan and the clear and unambiguous terms of the
Notes, Plaintiff seeks to collect on over $50 million of promissory notes issued by Mr. Dondero
and certain entities controlled by him.  The Notes were tendered in exchange for hard dollars at a
time when Mr. Dondero controlled both the borrower and the lender.  Now, Mr. Dondero refuses
to make good on his promises to repay the money he borrowed.

2.      Plaintiff makes out its prima facie case for summary judgment for
Defendants' breach of the Notes.  The uncontroverted documentary evidence shows that the
Notes are (i) valid, (ii) executed by Defendants and in favor of Highland, and (iii) there is a
balance due and owing under the Notes.  Defendants fail to rebut Plaintiff's prima facie case
because Defendants fail to create a genuine issue of material fact regarding their breach.   There
is a complete absence of evidence to support each of Defendants' affirmative defenses.

3.      Nevertheless, Defendants are certain to contest every single fact and erect
countless strawmen regardless of the record in support of their own fabricated stories.  But in the
end, there will be no evidence to corroborate the Defendants' contentions other than their own

---

[1] Concurrently herewith, Highland is filing the *Appendix of Exhibits in Support of Highland Capital Management,
L.P.'s Motion for Partial Summary Judgment* (the "Appendix"). Citations to the Appendix are notated as follows:
Ex. #, Appx. #

[2] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below.

self-serving, conclusory, and unsubstantiated assertions.  There will be no documents or written

communications that credibly support Defendants' story.  By contrast, Plaintiffs claims are both

simple and buttressed by a mountain of undisputed evidence including contemporaneous written

communications, audited financial statements, statements to third parties, books and records, and

the plain words of the Defendants and their officers.

4.    Plaintiff does not have to prove its case beyond a reasonable doubt or by

clear and convincing evidence nor does Plaintiff have the burden of proving that *no* facts are in

dispute.  Instead, Plaintiff need only show that there is no "genuine" dispute of material fact.

5.    Viewed fairly, Plaintiff's evidence is so overwhelming, and Defendants'

stories are so weak, that the Court must grant the Motion.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    BACKGROUND[3]

#### 1.    The Bankruptcy Case

6.    On October 16, 2019 (the "Petition Date"), Highland filed a voluntary

petition for relief under chapter 11 of the United States Bankruptcy Code in the United States

Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware

Court").

7.    On December 4, 2019, the Delaware Court entered an order transferring

venue of Highland's bankruptcy case to the United States Bankruptcy Court for the Northern

District of Texas, Dallas Division (the "Bankruptcy Court") [Bankr. Docket No. 186].[4]

---

[3] Attached ~~to the Motion~~hereto as **Exhibit ~~B~~A** is *~~Plaintiff's List~~*a list of *Parties, Witnesses, and Definitions.*

[4] "Bankr. Docket No. __" refers to the docket maintained by the Bankruptcy Court in case no. 19-34054.

8.     On January 22, 2021, Highland filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. <mark>Docket No. 1808</mark>] (the "Plan").

9.     On February 22, 2021, the Bankruptcy Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. <mark>Docket No. 1943</mark>] (the "Confirmation Order") which confirmed Highland's Plan.[5]

10.    On August 11, 2021, the Plan became Effective (as defined in the Plan), and Highland became the Reorganized Debtor (as defined in the Plan). *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. <mark>Docket No. 2700</mark>].

**2.    Procedural History**

**i.    Commencement of the Adversary Proceedings**

11.    On January 22, 2021, Plaintiff commenced the Adversary Proceedings by filing a *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Original Complaints") against each of the Defendants.[6]

12.    In its Original Complaints, Plaintiff asserted claims against each Defendant for (i) breach of contract for the Defendant's breach of its respective obligations under

---

[5] The confirmed Plan included certain amendments filed on February 1, 2021. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Bankr. <mark>Docket No. 1875</mark>].

[6] *See* Adv. Pro. No. 21-03003 (the "Dondero Action"), <mark>Docket No. 1</mark> (the "Dondero Original Complaint"); Adv. Pro. No. 21-03004 (the "HCFMA Action"), <mark>Docket No. 1</mark> (the "HCMFA Original Complaint"); Adv. Pro. No. 21-03005 (the "NexPoint Action"), <mark>Docket No. 1</mark> (the "NexPoint Original Complaint"); Adv. Proc. No. 21-03006 (the "HCMS Action"), <mark>Docket No. 1</mark> (the "HCMS Original Complaint"); and Adv. Pro. No. 21-03007 (the "HCRE Action"), <mark>Docket No. 1</mark> (the "HCRE Original Complaint").  The forgoing are collectively referred to as the "Original Complaints."

DOCS_NY:44673.8 36027/003 44673.9 36027/003

the Notes and (ii) turnover by each Defendant for all accrued and unpaid principal and interest due under the Notes until the date of payment, plus Plaintiff's cost of collection and reasonable attorney's fees (as expressly provided for under each of the Notes).

      **ii.**    **Defendants' Motions to Withdraw the Reference**

13.    Between April and June 2021, the Obligors each filed a similar motion to withdraw the reference (the "Motions to Withdraw") in which the Obligors sought to withdraw the Adversary Proceedings from the Bankruptcy Court to the District Court.

14.    In July 2021, the Bankruptcy Court issued Reports and Recommendations (the "R&Rs") to the District Court recommending that the Motions to Withdraw be granted, but that the Bankruptcy Court retain the cases for all pre-trial matters, including the consideration (but not determination) of any dispositive motions.

15.    The applicable District Court subsequently adopted the Bankruptcy Court's R&Rs in the NexPoint, HCMS, HCRE, and HCMFA Actions, but the decision on the R&R in the Dondero Action remains pending.

      **iii.**    **The Adversary Proceedings are Consolidated for Pretrial Purposes**

16.    The Parties subsequently agreed to, among other things, consolidate discovery for all purposes and coordinate the timing of the service of pleadings (i.e., Plaintiff's amended complaints adding the New Claims against the Duty Defendants and the Defendants' responses thereto). That agreement was memorialized in a *Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* dated August 17, 2021, approved by the Bankruptcy Court on September 6, 2021, and entered in each respective Adversary Proceeding (collectively, the "Discovery Stipulations").

17.     In furtherance of the intent reflected in the Discovery Stipulations, and consistent with the related Orders granting Plaintiff's unopposed motions for leave to amend its pleadings, Plaintiff was "deemed to have served the Amended Complaint on the [applicable] [D]efendant on July 13, 2021," even though the Amended Complaints were not actually filed on the dockets until August 27, 2021.

### iv.     Plaintiff Files the Amended Complaints

18.     On August 27, 2021, Highland filed its Amended Complaints against Mr. Dondero (Ex. 32, Appx. 658-728), NexPoint (Ex. 2, Appx. 22-95), HCMS (Ex. 3, Appx. 96-179), and HCRE (Ex. 4, Appx. 180-263).[7]  In the Amended Complaints, Highland added the new claims against new defendants.  Specifically, Plaintiff (a) added as defendants (i) Ms. Dondero; (ii) Dugaboy; and (iii) Mr. Dondero, in his capacity as an "aider and abetter" to Dugaboy (collectively, the "Duty Defendants") and (b) asserted claims against the Duty Defendants for (i) declaratory relief; (ii) breach of fiduciary duty; and (iii) aiding and abetting a breach of fiduciary duty, arising from the Duty Defendants' unlawful entry into the Alleged Agreements.[8]

**B.     HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT**

19.     The Obligors are the makers under a series of promissory notes tendered to Highland in exchange for contemporaneous loans and other consideration.  These Notes were executed between 2013 and 2019 and are described below.

---

[7] All of the amendments related to the belated assertion of the Alleged Agreement defense.  Plaintiff did not amend its complaint against HCMFA because that entity did not assert the Alleged Agreement defense.

[8] Plaintiff also added claims for actual fraudulent transfer against Mr. Dondero, NexPoint, HCRE, and HCMS because their respective Notes were purportedly all subject to the Alleged Agreement.

5

### 3. **The Demand Notes**

20.     As the documentary evidence specifically identified below establishes, Mr. Dondero, HCMFA, HCMS, and HCRE each executed certain demand notes, as makers, in favor of Highland (collectively, the "Demand Notes") in exchange for contemporaneous loans as follows:

#### i. **James Dondero**

- a Demand Note in the original principal amount of $3,825,000, executed on February 2, 2018, in favor of Highland (the "First Dondero Note"); (Klos Dec.[9] ¶ 18 at Ex. D); Ex. 125 at 9, Appx. 2357; Ex. 188, Appx. 3001-3002; Ex. 189, Appx. 3003-3004; Ex. 74, Appx. 1338-1340; Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Ex. 32 ¶ 20, Appx. 664; Ex. 31 ¶ 20, Appx. 647)

- a Demand Note in the original principal amount of $2,500,000, executed on August 1, 2018, favor of Highland (the "Second Dondero Note"); (Klos Dec. ¶ 19 at Ex. E); Ex. 126 at 2, Appx. 2366; Ex. 190, Appx. 3005-3006; Ex. 76, Appx. 1354-1356; Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Ex. 32 ¶ 21, Appx. 664; Ex. 31 ¶ 21, Appx. 647); and

- a Demand Note in the original principal amount of $2,500,000, executed on August 13, 2018, in favor of Highland (the "Third Dondero Note," collectively with the First Dondero Note and the Second Dondero Note, the "Dondero Notes")) (Klos Dec. ¶ 20 at Ex. F); Ex. 126 at 2, Appx. 2366; Ex. 77, Appx. 1357-1359; Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Ex. 32 ¶ 22, Appx. 664; Ex. 31 ¶ 22, Appx. 647).

#### ii. **HCMFA**

- a Demand Note in the original principal amount of $2,400,000, executed on May 2, 2019, in favor of Highland (the "First HCMFA Note") (Klos Dec. ¶ 21 at Ex. G); Ex. 147 at 7, Appx. 2526; Ex. 54, Appx. 870-873; Ex. 55, Appx. 874-875; Ex. 1 (Exhibit 1) Appx. 9-11; Ex. 53, Appx. 866-869); and

---

[9] Refers to the *Declaration of David Klos in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, being filed concurrently herewith.

DOCS_NY:44673.8 36027/003 44673.9 36027/003

- a Demand Note in the original principal amount of $5,000,000, executed on May 3, 2019, in favor of Highland (the "Second HCMFA Note," together with the First HCMFA Note, the "HCMFA Notes") (Klos Dec. ¶ 22 at Ex. H); Ex. 147 at 7, Appx. 2526; Ex. 56, Appx. 876-877; Ex. 1 (Exhibit 2), Appx. 12-15; Ex. 57, Appx. 878-880).

### iii.    HCMS

- a Demand Note in the original principal amount of $150,000, executed on March 28, 2018, in favor of Highland (the "First HCMS Demand Note") (Klos Dec. ¶ 23 at Ex. I); Ex. 143, Appx. 2487-2490; Ex. 3 (Exhibit 1), Appx. 117-119);

- a Demand Note in the original principal amount of $200,000, executed on June 25, 2018, in favor of Highland (the "Second HCMS Demand Note") (Klos Dec. ¶ 24 at Ex. J); Ex. 144, Appx. 2491-2494; Ex. 3 (Exhibit 2), Appx. 120-122);

- a Demand Note in the original principal amount of $400,000, executed on May 29, 2019, in favor of Highland (the "Third HCMS Demand Note") (Klos Dec. ¶ 25 at Ex. K); Ex. 145 at 11, Appx. 2506; Ex. 3 (Exhibit 3), Appx. 123-125); and

- a Demand Note in the original principal amount of $150,000, executed on June 26, 2019, in favor of Highland (the "Fourth HCMS Demand Note," collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and the Third HCMS Demand Note, the "HCMS Demand Notes") (Klos Dec. ¶ 26 at Ex. L); Ex. 146 at 7, Appx. 2516; Ex. 3 (Exhibit 4), Appx. 126-128).

### iv.    HCRE

- a Demand Note in the original principal amount of $100,000, executed on November 27, 2013, in favor of Highland (the "First HCRE Demand Note") (Klos Dec. ¶ 27 at Ex. M); Ex. 148, Appx. 2533-2536; Ex. 4 (Exhibit 1), Appx. 201-203);

- a Demand Note in the original principal amount of $2,500,000, executed on October 12, 2017, in favor of Highland (the "Second HCRE Demand Note") (Klos Dec. ¶ 28 at Ex. N); Ex. 154 at 7, Appx. 2575; Ex. 4 (Exhibit 2), Appx. 204-206);

- a Demand Note in the original principal amount of $750,000, executed on October 15, 2018, in favor of Highland (the "Third HCRE Demand Note") (Klos Dec. ¶ 29 at Ex. O); (Ex. 155 at 5, Appx. 2585; Ex. 4 (Exhibit 3), Appx. 207-209); and

- a Demand Note in the original principal amount of $900,000, executed
  on September 25, 2019, in favor of Highland (the "<u>Fourth HCRE
  Demand Note</u>," collectively with the First HCRE Demand Note, the
  Second HCRE Demand Note, and the Third HCRE Demand Note, the
  "<u>HCRE Demand Notes</u>") (Klos Dec. ¶ 30 at Ex. P); Ex. 156 at 6,
  Appx. 2596; Ex. 4 (Exhibit 4), Appx. 210-212).

21.    Except for the date, the amount, the maker, and the interest rate, each of

the Demand Notes is identical and includes the following provisions, among others:

2.    <u>Payment of Principal and Interest</u>.  The accrued interest and
principal of this Note shall be ***due and payable on demand of the
Payee***.

5.    <u>Acceleration Upon Default</u>.  ***Failure to pay this Note or
any installment hereunder as it becomes due shall***, at the election
of the holder hereof, without notice, demand, presentment, notice
of intent to accelerate notice of acceleration, or any other notice of
any kind which are hereby waived, ***mature the principal of this
Note and all interest then accrued, if any, and the same shall at
once become due and payable and subject to those remedies of
the holder hereof.***  No failure or delay on the part of Payee in
exercising any right, power or privilege hereunder shall operate as
a waiver thereof.

6.    <u>Waiver</u>.  Maker hereby ***waives*** grace, demand, presentment
for payment, notice of nonpayment, protest, notice of protest,
notice of intent to accelerate, notice of acceleration and all other
notices of any kind hereunder.

7.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity
(whether by acceleration or otherwise) and is placed in the hands
of an attorney for collection, or if it is collected through a
bankruptcy court or any other court after maturity, ***the Maker shall
pay, in addition to all other amounts owing hereunder, all actual
expenses of collection***, all court costs and reasonable attorneys'
fees and expenses incurred by the holder hereof.

Ex. 74, Appx. 1338-1340; Ex. 76, Appx. 1354-1356; Ex. 77, Appx. 1357-1359; Ex. 1 (Exhibits
1-2), Appx. 9-15; Ex. 3 (Exhibits 1-4), Appx. 117-128; and Ex. 4 (Exhibits 1-4), Appx. 201-212
(emphases added).

22.    On December 3, 2020, Highland made separate demands on Mr. Dondero,

HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due

under the Demand Notes by December 11, 2020.  The Demand Letters also included a demand for all costs of collection, including attorneys' fees, as provided in the Notes.  Ex. 79, Appx. 1370-1373; Ex. 1 (Exhibit 3), Appx. 16-19; Ex. 3 (Exhibit 5), Appx. 129-132; and Ex. 4 (Exhibit 5), Appx. 213-216 (collectively, the "Demand Letters").

23.     Neither Mr. Dondero, nor HCMFA, nor HCMS, nor HCRE made any payments to Highland on account of Notes or otherwise responded to the Demand Letters prior to the commencement of the Adversary Proceedings.

24.     Consequently, Mr. Dondero, HCMFA, HCMS, and HCRE breached Section 2 of each Demand Note, and each such Obligor is in default.

25.     As of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

26.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Demand Notes was $7,874,436.09. (Klos Dec. ¶ 40).

27.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. (Klos Dec. ¶ 45).

28.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and (b) December 17, 2021, the unpaid

9

principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. (Klos

Dec. ¶ 50).

    **4.**    <u>**The Term Notes**</u>

        29.    As the documentary evidence specifically identified below establishes, on

May 31, 2017, Mr. Dondero executed a 30-year term note on behalf of NexPoint (the "<u>NexPoint</u>

<u>Term Note</u>"), HCMS (the "<u>HCMS Term Note</u>"), and HCRE (the "<u>HCRE Term Note</u>"),

respectively, each as a maker, in favor of Highland (collectively, the "<u>Term Notes</u>"). (Klos Dec.

¶¶ 27-29).

        30.    Each of the Term Notes "rolled up" the respective maker's obligations

under certain then-outstanding demand notes that were identified as the "Prior Notes" in each

Term Note.[10]

        31.    The following Term Notes are at issue:

- a Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "<u>NexPoint Term Note</u>") (Klos Dec. ¶ 31 at Ex. A); Ex. 2 (Exhibit 1), Appx. 41-44; Ex. 2 ¶ 21, Appx. 28; Ex. 15 ¶ 21, Appx. 428);

- a Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "<u>HCMS Term Note</u>" and together with the HCMS Demand Notes, the "<u>HCMS Notes</u>") (Klos Dec. ¶ 32 at Ex. R); Ex. 3 (Exhibit 6), Appx. 133-136); and

- a Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "<u>HCRE Term Note</u>" and together with the HCRE Demand Notes, the "<u>HCRE Notes</u>") (Klos Dec. ¶ 33 at Ex. S); Ex. 4 (Exhibit 6), Appx. 217-220).

---

[10] Proof of the loans underlying the Prior Notes (as defined in each Term Note) can be found at Exs. 127-141, Appx. 2368-2481 (HCMS); Exs. 149-153, Appx. 2537-2567 (HCRE); Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 Prior Note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (*see* Ex. 161))).

DOCS_NY:~~44673.8 36027/003~~44673.9 36027/003

32.     According to Mr. Waterhouse, Highland loaned money to NexPoint, HCMS, and HCRE to enable those entities to make investments.  Ex. 105 at 126:21-129:3, Appx. 2081.[11]

33.     Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Note), each of the Term Notes is identical and includes the following provisions, among others:

> 2.1   <u>Annual Payment Dates</u>.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment"**) until the Note is paid in full.  ***Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

> 4.   <u>Acceleration Upon Default</u>.  *Failure to pay this Note or any installment hereunder as it becomes due shall*, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.***  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

> 5.   <u>Waiver</u>.  Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

> 6.   <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall***

---

[11] Highland sought to inquire as to the use of the loan proceeds by NexPoint, HCMS, and HCRE (Exs. 47-49, Appx. 842-859 (Rule 30(b)(6) Topic 3(e))), but (a) those Obligors objected on relevance grounds (Ex. 191, Appx. 3007-3012; Ex. 98 at 348:18-20, Appx. 1758), and (b) Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds.  Ex. 10598 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

> *pay, in addition to all other amounts owing hereunder, all actual*
> *expenses of collection,* all court costs and reasonable attorneys'
> fees and expenses incurred by the holder hereof.

34.     NexPoint, HCMS, and HCRE each failed to make the Annual Installment payment due on December 31, 2020.

35.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and (b) December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[12] (Klos Dec. ¶ 51).

36.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.[13] (Klos Dec. ¶ 52).

37.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[14] (Klos Dec. ¶ 53).

---

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[13] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[14] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

12

## C.   THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING

38.   As described in more detail below, the existence, validity, and enforceability of the Notes is corroborated by the following undisputed facts:

- Plaintiff's audited financial statements (prepared based on management representation letters signed by Mr. Dondero and Mr. Waterhouse) showed that each of the Notes (including the HCMFA Notes) (a) was carried as an asset on Plaintiff's balance sheet, (b) had a value equal to the unpaid principal and interest then due, and (c) was disclosed without reference to the Alleged Agreement, HCMFA's Mistake Defense, or any other defense;

- HCMFA and NexPoint jointly reported to the Retail Board in October 2020 that they were obligated to pay Highland the amounts due under the HCMFA Notes and the NexPoint Notes, respectively, each without any setoff or reservation;

- Without exception, Plaintiff's contemporaneous books and records recorded the Notes (including the HCMFA Notes) as debts due and owing by each of the Obligors to Plaintiff;

- Without exception, throughout Plaintiff's bankruptcy (including during the period from the Petition Date through January 9, 2020, when Mr. Dondero solely controlled Plaintiff), Plaintiff's bankruptcy filings (most of which were prepared or signed by Mr. Waterhouse) reported the Notes (including the HCMFA Notes) as being assets of the Debtor's estate, each without any setoff or reservation;

- The Notes (including the HCMFA Notes) were identified as substantial assets and sources of recovery under Plaintiff's proposed Plan, yet none of the Obligors informed the Court, Plaintiff, or any creditors of any of their purported defenses even though (a) each of them filed a Plan Objection, and (b) the Adversary Proceedings had already been commenced when the confirmation hearing on the Plaintiff's Plan was conducted.

## 5.   Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet

39.   The undisputed evidence cited below establishes, among other things, that (a) all of the Notes executed through early May 2019 were provided to PwC, Highland's

13

long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[15] and (c) neither Highland nor Mr. Dondero disclosed the Alleged Agreement, HCMFA's Mistake Defense, or any other defense to PwC despite having an affirmative obligation to do so under generally accepted accounting principals ("GAAP").

40.     PwC's audit process was extensive and took months to complete.  Ex. 94 at 9:24-12:14, Appx. 1554-1555.

41.     As part of the process, Highland was responsible for drafting the financial statements and accompanying notes and "management" provided the information that PwC needed to conduct its audits.  *Id*. at 14:8-15:14, Appx. 1556; *see also id*. at 49:11-50:22, Appx. 1564-1565.   All of Highland's employees who worked on the audit reported to Mr. Waterhouse, and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized.  Ex. 105 at 87:25-89:10, Appx. 2071.

42.     Before signing off on its audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon.  Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558.  *See also* Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness.").

---

[15] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Ex. 34 at 39, Appx. 782.  Because the HCMFA Notes were executed after the end of the fiscal year, they were ***not*** included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its *own* 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its *own* balance sheet.  Ex. 45 at 17; Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

43.     For at least the fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed.  Ex. 33, Appx. 729-740, Ex. 86, Appx. 1420-1431, Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

44.     On June 3, 2019, in connection with PwC's audit of Highland's financial statements for the period ending December 31, 2018, Mr. Dondero and Mr. Waterhouse made the following representations to PwC:

- The Affiliated Party Notes represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019 (Ex. 33 ¶11, Appx. 732; Ex. 94 at 24:6-25:5, Appx. 1558);[16]

- If there were any errors in Highland's financial statements, they were not "material" (Ex. 33 ¶32, Appx. 735; Ex. 94 at 25:6-26:13, Appx. 1558-1559);

- There were no "material" transactions or agreements that were not recorded in the financial statements (Ex. 33 ¶34, Appx. 735; Ex. 94 at 26:14-27:11, Appx. 1559);

- All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements (Ex. 33 ¶35(d), Appx. 735; Ex. 94 at 27:12-28:11, Appx. 1559);

- All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed (Ex. 33 ¶36, Appx. 736; Ex. 94 at 28:12-29:5, Appx. 1559); and

- All subsequent events were disclosed (Ex. 33 (signature page), Appx. 738; Ex. 94 at 29:6-30:2, Appx. 1559-1560).

---

[16] "Affiliated Party Notes" is the term used by PwC to refer to notes tendered to Highland by officers, employees, or affiliates of Highland.  *See generally* Ex. 33, Appx. 729-740; Ex. 94, Appx. 1551-1585.

45.    Under GAAP, Highland was required to disclose to PwC (a) all "material" related party transactions and (b) any circumstances that would call into question the collectability of any of the Notes.  Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570.[17]

46.    Neither Mr. Dondero nor Highland ever disclosed to PwC (a) the existence or terms of the Alleged Agreement; (b) the existence of any oral or written amendment to any of the Affiliate Notes listed in PwC's 2018 work papers; or (c) that any of the Notes might be forgiven.  Ex. 24 (Responses to RFAs 1-2), Appx. 521; Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Ex. 105 at 102:2-5, Appx. 2075.

47.    If PwC had learned before June 3, 2019, that any of the Notes (a) might not be collectible, or (b) might be forgiven, or (c) was amended, or (d) would be extinguished based on the fulfillment of certain conditions subsequent, it would have required that fact to be disclosed.  Ex. 94 at 74:19-76:12, Appx. 1571.

48.    For purposes of PwC's audit, "affiliate notes" were considered receivables of Highland and were carried as assets on Highland's balance sheet under "Notes and other amounts due from affiliates."  Ex. 34 at 2, Appx. 745; Ex. 72 at 2, Appx. 1291; Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Ex. 105 at 106:20-109:12, Appx. 2076.

49.    For the 2017 fiscal year, Highland valued "Notes and other amounts due from affiliates" in the aggregate amount of approximately $163.4 million, which then constituted more than 10% of Highland's total assets; for the 2018 fiscal year, Highland valued "Notes and

---

[17] For purposes of the 2017 audit, the "materiality" threshold was $2 million.  Ex. 86 at 1, Appx. 1421.  For purposes of the 2018 audit, the "materiality" threshold was $1.7 million or more.  Ex. 33 at 1, Appx. 730; Ex. 94 at 22:11-23:3, Appx. 1558.  *See also* Ex. 105 at 91:14-93:6, Appx. 2072.

other amounts due from affiliates" in the aggregate amount of approximately $173.4 million, which then constituted more than 15% of Highland's total assets.  Ex. 72 at 2, Appx. 1291; Ex. 34 at 2, Appx. 745; Ex. 94 at 33:21-34:2, Appx. 1560-1561, 51:2-16, Appx. 1565.

50.    The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate.  Ex. 72 at 30-31; Ex. 34 at 28-29; Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Ex. 105: at 110:22-112:21, Appx. 2077.

51.    The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes."  Ex. 72 at 30-31, Appx. 1319-1320; Ex. 34 at 28-29, Appx. 771-772; Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565.

52.    At the time PwC completed its 2017 and 2018 audits, PwC had no reason to discount the value of any of the Affiliate Notes.  Ex. 94 at 39:17-21, Appx. 1562; 54:2-8, Appx. 1566.

53.    Moreover, as reflected in PwC's work papers, and based on the information provided by Highland and PwC's own independent analysis, PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Ex. 92, Appx. 1514-1530; Ex. 93, Appx. 1531-1550; Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

54.    Note 15 to Highland's 2018 audited financial statements disclosed as a "subsequent event" (*i.e.*, an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit) the following:

17

> Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million.  The notes accrue interest at a rate of 2.39%.

Ex. 34 at 39, Appx. 782.  *See also* Ex. 94 at 54:9-55:7), Appx. 1566.

55.     There will be no evidence that HCMFA issued any notes to Highland in 2019 other than the HCMFA Notes.

**6.      In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes**

56.     The Advisors have contracts to manage certain funds (the "Fund Agreements").  The Fund Agreements are among the most important contracts the Advisors have; HCMFA's Rule 30(b)(6) witness acknowledged that its contracts with the Funds are largely the reason for HCMFA's existence.  Ex. 192 at 66:3-67:6, Appx. 3031.

57.     The Funds are purportedly managed by a board (the "Retail Board").  In the fall of each year, the Retail Board must determine whether to renew the Fund Agreements with the Advisors, a process referred to as a "15(c) Review."  As part of the 15(c) Review process, the Retail Board requests information from the Advisors.  Ex. 99 at 129:17-130:3, Appx. 1844-1845, Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092.

58.     Mr. Waterhouse, the Advisors' Treasurer, and Mr. Norris, HCMFA's Executive Vice President, participated in the annual 15(c) Review process with the Retail Board.  Ex. 192 at 67:7-68:19, Appx. 3031; Ex. 105 at 168:13-169:8, Appx. 2091.

59.     In October 2020, as part of its 15(c) Review, the Retail Board asked the Advisors to provide certain information including the following:

18

44673.9 36027/003

> Are there any outstanding amounts currently payable or due in the future (e.g., notes) to HCMLP by HCMFA or NexPoint Advisors or any other affiliate that provides services to the Funds?

Ex. 36 at 3, Appx. 793.

60.    Ms. Thedford, the Secretary of the Advisors and an employee of Highland, followed up on this particular question, and Mr. Waterhouse directed her to "the balance sheet that was provided to the [Retail Board] as part of the" 15(c) Review. *Id.* at 2, Appx. 792.

61.    As directed by Mr. Waterhouse, Ms. Thedford (a) obtained the relevant information from the Advisors' June 30, 2020 financial statements and (b) drafted a response that she shared with, among others, Mr. Waterhouse, Mr. Norris (the Advisors' Executive Vice President), and Mr. Post (the Advisors' Chief Compliance Officer). Ex. 35, Appx. 788-789; Ex. 37, Appx. 795-796.

62.    Based on HCMFA's June 30, 2020 financial statements, Ms. Thedford sent her draft response to Mr. Waterhouse, Mr. Norris, Mr. Post, and others and reported that "$12,286,000 remains outstanding to HCMLP from HCMFA."  Ex. 36 at 1, Appx. 791.

63.    This amount necessarily included the amounts due under the HCMFA Notes because, as HCMFA has admitted, HCMFA carried the HCMFA Notes as liabilities on its balance sheet and the balance sheet was Ms. Thedford's source of information.  Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3,  Appx. 3028, 56:20-59:3, Appx. 3028-3029; Ex. 194 at 117:16-122:15, Appx. 3156-3157; Ex. 195 at 120:23-122:13, Appx. 3211-3212.

64.    On October 23, 2020, the Advisors provided their final, formal responses to the questions posed by the Retail Board.  As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, the Advisors reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA.  The Note between

> HCMLP and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter. The Advisor notes that both entities have the full faith and support of James Dondero.

Ex. 59 at 2, Appx. 885.

65.     Based on the foregoing, there is no dispute that the Advisors -- with the full knowledge of each of their officers and based on HCMFA's own balance sheet -- informed the Retail Board in October 2020 of their unmitigated obligations under the NexPoint Note the HCMFA Notes.

### 7.     Without Exception, the Notes were Disclosed in Highland's Books and Records and Were Consistently Carried as Assets without Discount

66.     In addition to its audited financial statements, and without exception, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the Notes as valid debts due and owing by each of the Obligors to Plaintiff.

67.     For example, in the Debtor's February 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the transfer to Mr. Dondero on February 2, 2018 was contemporaneously identified as "($3.8M) partner loan." Ex. 39 at 21, Appx. 801. *See also* Ex. 78 at 2, Appx. 1362 (in the Debtor's August 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan.").

68.     After the Petition Date, but while Mr. Dondero was still in control of Highland, the Debtor filed its *Schedules of Assets and Liabilities* [Bankr. Docket No. 247] (the "Debtor's Schedules"). The Debtor's Schedules included the Notes among the Debtor's assets.

Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

69.    In every one of the Debtor's *Monthly Operating Reports* (the "MORs") filed with the Court (while Mr. Dondero was in control of Highland and after), the Debtor included as assets of the estate amounts "Due from affiliates" that included the Notes. *See, e.g.,* Ex. 41, Appx. 816-825; Ex. 42, Appx. 826-835; Ex. 88, Appx. 1475-1486; Ex. 89, Appx. 1487-1496.[18]

70.    Highland's "back-up" to the amounts "Due from affiliates" set forth in the MORs identified the Obligors under the Notes and included all unpaid principal and accrued interest. *See, e.g.,* Exs. 196-198, Appx. 3239-3244 (the back-up to the "Due from Affiliates" amounts set forth in the MORs for December, September 2020, and January 2021).

71.    Relatedly, Highland's accounting group has a regular practice of creating, maintaining and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary. The Loan Summaries identify each Obligor by reference to the "GL" number used in

---

[18] *See also* Bankr. Docket No. 405 (October 2019); Bankr. Docket No. 289 (November 2019); Bankr. Docket No. 418 (December 2019); Bankr. Docket No. 497 (January 2020); Bankr. Docket No. 558 (February 2020); Bankr. Docket No. 634 (March 2020); Bankr. Docket No. 686 (April 2020); Bankr. Docket No. 800 (May 2020), as amended in Bankr. Docket No. 905; Bankr. Docket No. 913 (June 2020); Bankr. Docket No. 1014 (July 2020); Bankr. Docket No. 1115 (August 2020); Bankr. Docket No. 1329 (September 2020); Bankr. Docket No. 1493 (October 2020); Bankr. Docket No. 1710 (November 2020); Bankr. Docket No. 1949 (December 2020); and Bankr. Docket No. 2030 (January 2021).

the general ledger.  *See* Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"),

NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

72.    The Loan Summaries were used in connection with the PwC audits and to

support accounting entries and year-end balances in the ordinary course of Highland's business.

For example, Ex. 199, Appx. 3246 ties exactly into Ex. 198, Appx. 3243-3244, the "back up" to

the "Due from affiliates" entry in the January 2021 MOR.  Bankr. Docket No. 2020.  Klos Dec.

¶¶15-16.[19]

8.    **Recovery on the Notes Was A Significant Component of the Plan Yet the
Obligors Remained Silent On the Point Despite Lodging Objections**

73.    On November 24, 2020, Highland filed its *Disclosure Statement for the

Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket

No. 1473].  Included therein were the Debtor's Liquidation Analysis/Financial Projections (the

"Projections").  Ex. 90—, Appx. 1497-1505. Among the assumptions supporting the Projections

was that "[a]ll demand notes are collected in the year 2021."  *Id.* at 173 of 178, Appx. 1500

(Assumption C).

74.    Thus, even though Highland had not yet called the Demand Notes, the

Obligors and all parties in interest were put on notice on November 24, 2020, that the Debtor's

Projections assumed all Demand Notes would be collected the following year.

75.    By early February 2021, Highland had already commenced the Adversary

Proceedings to collect on all of the Notes.  Consequently, it amended the Projections [Bankr.

---

[19] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates."  Bankr. Docket No. 2030 (balance sheet). Ex. 198, Appx. 3243-3244 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand).  Ex. 199, Appx. 3245-3246, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger. As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note.  *See* Klos Dec. ¶¶15-16.

Docket No. 1875-1] and modified the assumption concerning the Notes to state "[a]ll demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021." Ex. 91 at 2, Appx. 1508 (Assumption C) (the "Assumption").

76.     Thus, as of February 1, 2021, on the eve of confirmation, the Obligors and all parties in interest knew the Debtor's Projections, as amended, assumed that all amounts due under the Notes would be collected as part of the Plan.

77.     At the confirmation hearing, James P. Seery, Jr., Highland's Chief Executive Officer, testified as to (a) why the Debtor believed the Assumption was reasonable, and (b) how the commencement of the Adversary Proceedings impacted the Projections.  Mr. Dondero's counsel asked limited questions on cross-examination concerning the Notes.  Ex. 206 at 123:23-124:23, Appx. 4305-4306, 128:23-129:21, Appx. 4310-4311, 185:8-15, Appx. 4367.

78.     In his closing argument, Mr. Dondero's counsel discussed the Notes and (a) vaguely suggested that there may be "arguments" against the Debtor's assertion that the Term Notes are due and payable and (b) observed that the Notes were not discounted for "collectability issues," but made no mention of the Alleged Agreement, HCMFA's Mutual Mistake defense, or any other defense:

> First, there's the notes; and second, there's the assets.  The notes are either long-term or demand notes.  Those long-term notes, Mr. Seery will tell you some have been validly accelerated and therefore are now due and payable.  I think there's arguments to the contrary.  But those long-term notes probably have some both time value of money and collection costs.  And then, of course, you have to discount them by collectability issues, too.
>
> I don't believe any analysis went into it, or at least the Court was not provided any data or analysis as to what discounts were applied to those notes.  And, therefore, I don't think that this Court can

23

make any determination that the best interests of the creditors have been met.

Ex. 207 at 223:22-224:14, Appx. 4701-4702.

**D.       THE OBLIGORS' AFFIRMATIVE DEFENSES**

79.     The Obligors have asserted various defenses to Plaintiff's claims concerning Counts One and Two and those are addressed below.

**9.       The Alleged Agreement Defense**

80.     Over the course of several months, Mr. Dondero cobbled together an affirmative defense premised on an alleged oral agreement pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent" or if certain assets were sold by a third party.  After Mr. Dondero settled on that defense, all of the Obligors (except HCMFA) amended their pleadings to adopt the same affirmative defense.

**i.       The Allegations Materially Changed Over Time**

81.     In due course, each of the Defendants filed its respective Original Answer.[20]  In his Original Answer, Mr. Dondero asserted as his first affirmative defense that "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes."  Ex. 80 ¶40, Appx. 1380 (the "Alleged Agreement").  None of the Corporate Obligors asserted the Alleged Agreement or any similar defense in its respective Original Answer.

82.     In late March, Highland asked Mr. Dondero to admit, among other things, that he did not pay taxes on the amounts loaned to him but that Plaintiff allegedly agreed not to collect.  Ex. 81 (Responses to RFAs 4, 8, and 12), Appx. 1387-1388.  Having been alerted to a

---

[20] Dondero Action, Docket No. 6 (the "Dondero Original Answer"); HCFMA Action, Docket No. 6 (the "HCMFA Original Answer"); NexPoint Action, Docket No. 6 (the "NexPoint Original Answer"); HCMS Action, Docket No. 6 (the "HCMS Original Answer"); and HCRE Action, Docket No. 7 (the "HCRE Original Answer").

fatal flaw in his defense, Mr. Dondero modified his affirmative defense based on the Alleged Agreement to state that: "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes *upon fulfillment of conditions subsequent*." Ex. 83 ("<u>Amended Answer</u>") ¶40, Appx. 1403.

83.    On April 15, 2021, about ten days after serving his Amended Answer, Mr. Dondero served his *Rule 26 Initial Disclosures*. Ex. 184, Appx. 2982-2990 (the "<u>Rule 26 Disclosures</u>"). In his Rule 26 Disclosures, Mr. Dondero specifically identified fifteen (15) "individuals likely to have discoverable information," but his sister, Ms. Dondero, was not among them. *Id.* at 2-5, Appx. 2984-2987.

84.    On April 26, 2021, Mr. Dondero served his sworn *Objections and Answers to Highland Capital Management L.P.'s First Set of Interrogatories*. Ex. 82, Appx. 1390-1396.

85.    In response to an interrogatory that required Mr. Dondero to identify, with respect to each Note, "the person who entered into each [Alleged] Agreement on behalf of the Debtor," Mr. Dondero answered that "[t]he [Alleged] Agreements were entered into on behalf of the Debtor *by James Dondero* subsequent to the time each note was executed." *Id.* at 4, Appx. 1394 (Answer to Interrogatory No. 1) (emphasis added).

86.    In response to an interrogatory that required Mr. Dondero to identify "every person who James Dondero believes has actual knowledge of each [Alleged] Agreement," Mr. Dondero identified five (5) individuals, including himself, but – like the Rule 26 Disclosures – Mr. Dondero's sister was not among them. *Id.*, Appx. 1394 (Answer to Interrogatory No. 2).

DOCS_NY:44673.8 36027/003 44673.9 36027/003

87.    It was not until later in discovery that Mr. Dondero identified his sister –

someone he failed to include as a person likely to have discoverable information or someone he

believed had actual knowledge of each Alleged Agreement – as the person who allegedly bound

Plaintiff to the Alleged Agreement, rather than himself.[21]

88.    In the weeks that followed, each of the Obligors (except for HCMFA)

sought leave from the Court to amend its respective answer to adopt Mr. Dondero's Alleged

Agreement defense, contending that it is not liable under any of the Notes because Plaintiff

(bound by Ms. Dondero, acting as the Dugaboy Trustee) previously entered into an oral

agreement pursuant to which it promised not to collect on the Notes "upon fulfillment of

conditions subsequent as a form of compensation to Mr. Dondero."[22]

**ii.    The Final Version of the "Alleged Agreement" Defense**

89.    After months of maneuvering, Mr. Dondero, HCMS, HCRE, and

NexPoint finally settled on the following affirmative defense based on the Alleged Agreement:

> Plaintiff's claims are barred … because prior to the demands for
> payment Plaintiff agreed that it would not collect the Notes upon
> fulfillment of conditions subsequent.    Specifically, sometime
> between December of the year in which each note was made and
> February of the following year, [] Nancy Dondero, as
> representative for a majority of the Class A shareholders of
> Plaintiff agreed that Plaintiff would forgive the Notes if certain
> portfolio companies were sold for greater than cost or on a basis
> outside of James Dondero's control.    The purpose of this
> agreement was to provide compensation to Defendant James
> Dondero, who was otherwise underpaid compared to reasonable
> compensation levels in the industry, through the use of forgivable

---

[21] Ms. Dondero was allegedly acting in her capacity as the Trustee of Dugaboy, a family trust in which Mr. Dondero
is the sole beneficiary during his lifetime and that purportedly held a majority of certain of the limited partner
interests in Highland.  *See* Ex. 31 ¶82, Appx. 655.

[22] *See* Ex. 11, Appx. 384-393 (NexPoint's Motion for Leave to Amend); Ex. 14 (NexPoint's First Amended
Answer) ¶42, Appx. 421-422; Ex. 8, Appx. 292-312 (HCMS's Motion for Leave to Amend); Ex. 12 (HCMS's First
Amended Answer) ¶56, Appx. 402; Ex. 9 (HCRE's Motion for Leave to Amend), Appx. 313-333; Ex. 17 (HCRE's
Amended Answer) ¶99, Appx. 468.

DOCS_NY:44673.8 36027/00344673.9 36027/003

loans, a practice that was standard at HCMLP and in the industry. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer").[23]

### iii. No Reasonable Trier of Fact Can Find that the Alleged Agreement Existed

90.    For the reasons set forth below, no reasonable trier of fact can find that the Alleged Agreement ever existed.

91.    Mr. Dondero could not identify a material term of the Alleged Agreements.  Mr. Dondero could not describe a material terms of the Alleged Agreements without relying on a document prepared by counsel.  Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the Alleged Agreements nor could he recall (i) the number of Notes subject to each Alleged Agreement, (ii) the maker of each Note subject to each Alleged Agreement, (iii) the date of each Note subject to each Alleged Agreement, or (iv) the principal amount of any Note subject to the Alleged Agreements.  Ex. 99 at 13:4-28:22, Appx. 1815-1819.

92.    Mr. Dondero's inability to identify the notes subject to the Alleged Agreement is significant because he and HCMFA had other notes outstanding at the same time. *See, e.g.,* Ex. 43, Appx. 836-838 (January 18, 2018 note executed by Mr. Dondero in the principal amount of $7.9 million); Adv. Pro. 21-03082, Docket No. 1 (Exhibit 1, February 26,

---

[23] *See also* Ex. 15 ¶83, Appx. 435-436 ("NexPoint's Answer"); Ex. 16 ¶97, Appx. 451-452 ("HCMS's Answer"); and Ex. 17 ¶99, Appx. 468 ("HCRE's Answer").

2014 note executed by HCMFA in the principal amount of $4 million) (Exhibit 2, a February 26,

2016 note executed by HCMFA in the principal amount of $2.3 million).

93.    <u>Mr. and Ms. Dondero dispute a key aspect of the Alleged Agreements</u>.

Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements;

namely, its scope. Ms. Dondero insists that Mr. Dondero identified the notes that are the subject

of each Alleged Agreement. Mr. Dondero, on the other hand, disagrees. *Compare* Ex. 100 at

180:8-183:20, Appx. 1919-1920 *with* Ex. 99 at 79:6-81:23, Appx. 1832.

94.    <u>Mr. Dondero personally caused MGM stock to be sold in November 2019</u>

<u>and failed to declare the Notes forgiven</u>. According to Mr. and Ms. Dondero, all of the Notes

would be forgiven if Mr. Dondero sold one of three portfolio companies -- Trussway,

Cornerstone, or MGM -- above cost. *See* Ex. 31 ¶82, Appx. 655.

95.    In November 2019, Mr. Dondero caused the sale of a substantial interest

in MGM for $123.25 million, a portion of which was for the Debtor's interest in a fund, but

failed to declare all of the Notes forgiven, and remained silent about the Alleged Agreement

altogether. *See* Ex. 201 ¶29-30, Appx. 3270-3271; Ex. 202 ¶14, Appx. 4135; Ex. 203 ¶1, Appx.

4143; Ex. 204 at 5 n. 5, Appx. 4156.

96.    <u>Ms. Dondero was not competent to enter into the Alleged Agreements</u>.

Under the circumstances, Ms. Dondero was not competent to enter into the Alleged Agreements,

and she made no effort to educate herself before purportedly binding Highland. Ms. Dondero:

- had no meaningful knowledge, experience, or understanding of (a)
  Highland or its business, (b) the financial industry, (c) executive
  compensation matters, or (d) Mr. Dondero's compensation or whether
  he was "underpaid compared to reasonable compensation levels in the
  industry" (Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx.
  1886-1889; 211:8-216:21, Appx. 1927-1928);[24]

---

[24] The only information Ms. Dondero had concerning Mr. Dondero's compensation from Highland was that he "was
not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere

DOCS_NY:~~44673.8 36027/003~~44673.9 36027/003

- never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date (*Id.* at 61:25-63:13, Appx. 1889-1890);

- did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Ms. Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies (*Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927);

- never saw a promissory note signed by James Dondero, any other officer or employee of Highland, or any "affiliate" of Highland (*Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919);

- learned (falsely, as shown below) from her brother that Highland allegedly had a "common practice" of forgiving loans, but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement (*Id.* 84:9-92:3-100:11-103:8 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900);

- had no knowledge of NexPoint, HCMS, or HCRE (the Corporate Obligors whose Notes are purportedly subject to the Alleged Agreement), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland, and their use of the proceeds (*Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909).

---

not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Ex. 100 at 51:11-22, Appx. 1887. This information was false. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of $4,194,925); and Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

DOCS_NY:44673.8 36027/003 44673.9 36027/003

- had no authority under the HCMLP partnership agreement to negotiate and enter into binding agreements on behalf of HCMLP Ex. 2 (Exhibit4), Appx. 57-93.

97.    Mr. Dondero retained Alan Johnson as an executive compensation expert. Mr. Johnson has experience advising boards, compensation committees, and other parties on issues concerning loan forgiveness transactions.  Based on his expertise, Mr. Johnson would very likely concur that Ms. Dondero was not competent to enter into the Alleged Agreements on behalf of Highland.  Ex. 101 at 12:3-73:17, Appx. 1961-1976.

98.    The Alleged Agreements were kept secret and were never disclosed.  The Alleged Agreements were never disclosed by Mr. Dondero or Ms. Dondero:

- Other than Mr. and Ms. Dondero, no one participated in the discussions that led to each Alleged Agreement.  Ex. 100 at 190:16-191:17, Appx. 1922;

- Ms. Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the Alleged Agreements to *anyone*, including PwC, Mr. Waterhouse, or Mr. Okada, and (2) neither ever caused Highland to disclose the existence or terms of the Alleged Agreements to the Bankruptcy Court.  ExsEx. 25-2625 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 538-542; Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558); and

- Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the Alleged Agreements to PwC, Mr. Okada, or the Bankruptcy Court; and (2) never caused Highland to disclose the existence or terms of the Alleged Agreement to the Bankruptcy Court.  Ex. 24 (Responses to RFAs 1-2, 5-7, 11-17, Appx. 521-524).[25]

---

[25] Mr. Dondero asserts that he informed Mr. Waterhouse about the Alleged Agreement.  Ex. 24, Appx. 521 (Responses to RFAs 3 and 4).  But Mr. Waterhouse testified that he did not learn of the Alleged Agreement until 2021 and even now only knows that it was subject to "milestones" that he cannot identify.  Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

99.     <u>No Document Exists that Reflects the Existence or Terms of the Alleged</u>

<u>Agreements</u>.  No document was created prior to the Petition Date that memorializes or reflects

the existence or terms of the Alleged Agreement:

- Neither Dugaboy nor Ms. Dondero (a) ever made a list of the promissory notes that are the subject of the Alleged Agreement; or (b) is otherwise aware of anything in writing that identifies the promissory notes that are the subject of each Alleged Agreement.  Ex. 100 at 178:25-180:7, 180:24-181:6, Appx. 1919.

- The terms of the Alleged Agreement were never reduced to writing. ~~Exs~~Ex. ~~25-26~~25 (Responses to RFAs 7-8, Appx. 539, Responses to Interrogatories 3-4, Appx. 542); Ex. 26 (Responses to RFAs 7-8, Appx. 555, Responses to Interrogatories 3-4, Appx. 558); Ex. 100 at 217:2-17, Appx. 1928.

- Mr. Dondero has admitted that (a) he never wrote down a list of the Notes that are subject to the Alleged Agreement; (b) he is unaware of any document that was created prior to the commencement of the Adversary Proceedings that identifies the Notes subject to the Alleged Agreements; and (c) no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Alleged Agreements.  Ex. 24, Appx. 522 (Response to RFA 7); Ex. 99 at 28:24-29:12, Appx. 1819.

100.     <u>Even if the Alleged Agreements existed, they are unenforceable for lack of</u>

<u>consideration</u>.  Mr. Dondero is the founder of Highland and Highland was the platform he used

to support his other businesses, including the Advisors, HCRE, and HCMS.  No reasonable trier

of fact could conclude that Highland (a) needed to enter into the Alleged Agreements to retain or

motivate Mr. Dondero or (b) that Highland received anything of value in exchange for agreeing

to forgive over $50 million in valid promissory notes if either (i) Mr. Dondero sold one of the

three portfolio companies at a dollar above cost or (ii) the portfolio companies were sold by a

third party.  Yet, according to Ms. Dondero, "motivating" Mr. Dondero is all Highland received.

*See, e.g.,* Ex. 100 at 221:2-225:7, Appx. 1929-1930.

101.    Indeed, Ms. Dondero admitted that she did not know, and had no reason to expect, that Highland would benefit from the sale of the portfolio companies by a third party. She also acknowledged that (a) Highland would not benefit from the Alleged Agreements if a third party sold the portfolio companies at less than cost and (b) the Notes would all be forgiven even if a third party sold the portfolio companies at a price "substantially below cost." Ex. 100 at 201:24-203:11, Appx. 1924-1925; 227:17-229:14, Appx. 1931.

102.    <u>Mr. Dondero fixed the terms of the Alleged Agreements without negotiation</u>.    No aspect of the Alleged Agreement was the subject of negotiation and Ms. Dondero made no counterproposal of any kind.  Indeed, the undisputed facts show that Ms. Dondero never (i) made a counterproposal; (ii) negotiated any aspect of the Alleged Agreements; (iii) asked Mr. Dondero how he selected the portfolio companies; (iv) inquired as to whether Mr. Dondero already had a duty to maximize value; (v) rejected any aspect of Mr. Dondero's proposal; or (vi) rejected or pushed back on Mr. Dondero's proposal that all of the Notes would be forgiven if any of the portfolio companies were sold by a third party.  Ex. 100 at 194:16-19, Appx. 1923, 195:14-199:15, Appx. 1923-1924.

103.    <u>There is No History of Loans Being Forgiven at Highland</u>.  Mr. Dondero, NexPoint, HCMS, and HCRE contend that the use of "forgivable loans" was a "practice that was standard at Highland." *See, e.g.,* Ex. 31 ¶82, Appx. 655.  This is demonstrably false.

104.    Mr. Dondero has admitted that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave. Ex. 98 at 426:8-427:15, Appx. 1777.  During his deposition, Mr. Johnson, Mr. Dondero's executive compensation expert, reviewed Highland's audited financial statements for each year from 2008 through 2018 (Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland has not forgiven a loan to

anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland has never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Ex. 98 at 422:18-428:14, Appx. 1776-1778.

### 10.    HCMFA's "Mutual Mistake" Defense

105.    HCMFA's primary affirmative defense is that the HCMFA Notes are "void" or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority from Defendant to Waterhouse to executive the same for Defendant." Ex. 13 ¶ 47, Appx. 412.

106.    In support of its defense, HCMFA asserts that Mr. Waterhouse signed the HCMFA Notes by mistake and without authority ("HCMFA's Mistake Defense"), and that Highland's transfer of $7.4 million on May 2 and May 3, 2019 should have been treated "as compensation by the Plaintiff to the Defendant." Ex. 13 ¶ 45, Appx. 412.

107.    HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities Highland Global Allocation Fund ("HGAF") held in Terrestar (the "NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

33

The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

Ex. 13 ¶¶ 41-42, Appx. 411.

108.    On May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error, HCMFA did not mention Highland but reported:

The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value.  As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly."  The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value.  The "orderly determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "NAV Error").

Ex. 182, Appx. 2978-2980.

109.    HCMFA will not offer into evidence any document to establish that (a) it ever told Securities and Exchange Commission that Highland, and not HCMFA, was responsible for the NAV Error; (b) it ever told the HGAF Board that anyone other than HCMFA and Houlihan Lokey were responsible for the NAV Error; or that (c) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV error.  *See* Ex. 192 at 140:7-11, Appx. 3049.[26]

---

[26] While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland.  *Id.* Ex. 192 at 138 at 15-19138:15-19, Appx. 3049.

110.   <u>HCMFA Recovers Approximately $5 million Through Insurance to Compensate HGAF for the NAV Error</u>.   HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123.  Ex. 182 at 2<u>, Appx. 2980</u>.  HCMFA admits that it received almost $5 million in the form of insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss.[27]  Despite having received approximately $5 million in insurance proceeds (representing more than two-third of the total loss), HCMFA insists that (a) Highland's subsequent payment of $7.4 million was "compensation" for its negligence and (b) HCMFA was entitled to receive **both** and $5 million in insurance proceeds $7.4 million in "compensation" from Highland even though the total loss was only $7.4 million.  HCMFA never told its insurance carrier that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered.  Ex. 192 at 133:14-150:22<u>, Appx. 3047-3052</u>.

111.   After HCMFA filed its claim with ICI Mutual, HCMFA received the $7.4 million from Highland in connection with the Notes. Ex. 192 at 146:20-25<u>, Appx. 3051</u>.

112.   Thus, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for the total receipts of $12.4 million in connection with the [NAV Error]." Ex. 192 at 147:4-11<u>, Appx. 3051</u>.

113.   HCMFA is not aware of (a) anyone on behalf of HCMFA ever informing ICI mutual that it received $7.4 million from Highland on account of the NAV Error, Ex. 192 at 150:3-6, <u>Appx. 3052,</u> or (b) anyone on behalf of HCMFA ever informing ICI Mutual that

---

[27] Specifically, HCMFA reported that it (a) received $4,939,520 as insurance proceeds, (b) paid a deductible of $246,976, and (c) after accounting for other sources of capital and expenses, needed an additional payment of $2,398,842 to fully fund the loss.  Ex. 182 at 2<u>, Appx. 2980</u>.

HCMFA believed Highland was the cause of the NAV Error, Ex. 192 at 150:19-22, Appx. 3052.

In other words, HCMFA admits that it never told ICI Mutual that Highland made HCMFA

"whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with

the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the

NAV Error.

114. <u>Mr. Waterhouse Knew the HCMFA Notes Were Treated as Intercompany</u>

<u>Loans</u>. Highland maintained an e-mail group called "Corporate Accounting" that included Mr.

Waterhouse, among others. *See, e.g.,* Ex. 194 at 111:6-112:7, Appx. 3154.

115. On May 2, 2019, David Klos, Highland's Controller, sent an e-mail to the

Corporate Accounting group entitled "HCMLP to HCMFA loan" that said:

> Blair, Please send $2,400,000 from HCMLP to HCMFA. This is a
> new interco loan. Kristin, can you or Hayley please prep a note for
> execution. I'll have further instructions later today, but please
> process this payment as soon as possible.

Ex. 54, Appx. 870-873.

116. Thus, on May 2, 2019, Mr. Waterhouse was informed that (a) HCMLP

was transferring $2.4 million to HCMFA, and (b) Ms. Hendrix and another HCMLP employee

were asked to prepare a promissory note.

117. The next day, on May 3, 2019, Ms. Hendrix sent an e-mail to the

Corporate Accounting group that said:

> Blair, Please set up a wire from HCMLP to HCMFA for $5M as a
> new loan ($4.4M should be coming in from Jim soon).
>
> Hayley, please add this to your loan tracker. I will paper the loan.

Ex. 56, Appx. 876-877.

118.    Thus, on May 3, 2019, Mr. Waterhouse was informed that (a) HCMLP was going to make a "new loan" to HCMFA in the amount of $5 million, and (b) Ms. Hendrix was going to "paper the loan." And that's exactly what happened.

119.    HCMFA Represented to Third Parties that the HCMFA Notes Were Liabilities. As discussed above, HCMFA represented to the Retail Board in October 2020 as part of the 15(c) Review that as of June 30, 2020, the HCMFA Notes were liabilities of HCMFA. See Ex. 59 at 2, Appx. 885. Before filing its Original Answer, HCMFA never told anyone that was there was an error in the letter to the Retail Board. Ex. 192 at 125:18-127:2, Appx. 3045-3046.

120.    The HCMFA Notes Are Carried as Liabilities on HCMFA's Balance Sheet and Included in its Audited Financial Statements. HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its balance sheet. Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.

121.    Nothing in HCMFA's Books and Records Corroborates HCMFA's Mistake Defense. There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Ex. 192 at 59:8-63:20, Appx. 3029-3030.

122.    Highland's Bankruptcy Court Filings Contradict HCMFA's Mistake Defense. As discussed supra, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the HCMFA Notes as valid debts due and owing by each of the Obligors to Plaintiff. Thus, regardless of what HCMFA may think, there is no evidence that any purported mistake is "mutual." Moreover, if Mr. Waterhouse "made a mistake" in preparing

37

and executing the HCMFA Notes, then he compounded the mistake at least twenty (20) times when he (i) signed off on Highland's and HCMFA's audited financial statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings.

**11.    Waiver and Estoppel [NexPoint, HCMS, HCRE]**

123.    There is no dispute that Highland was never directed or instructed to make the Annual Installment payments due on December 31, 2020.  Ex. 98 at 462:16-463:9, Appx. 1786; Ex. 105 at 381:21-382:16, Appx. 2144-2145.  Nevertheless, NexPoint, HCMS, and HCRE assert that any default under the Notes was the "result of Plaintiff's own negligence, misconduct, breach of contract" under the Shared Services Agreement. Ex. 15 ¶ 80, Appx. 435; Ex. 12 ¶¶ 54-55, Appx. 402; Ex. 17 ¶¶ 97-98, Appx. 467.

124.    NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "SSA").  Ex. ⸺205, Appx. 4162-4181.

125.    Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services.  None of the services authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint.  In fact, Article II of the SSA expressly provided that "for the avoidance of doubt    . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ."  Ex. ⸺205 at § 2.02, Appx. 4165-4167 (emphasis added).

126.    To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

> Section 2.06 <u>Authority</u>.    [Highland's] scope of assistance and advice hereunder is ***limited to the services specifically provided for in this Agreement.    [Highland] shall not assume or be deemed to assume any rights or obligations of [NexPoint] under any other document or agreement to which NexPoint is a party***. . . . [Highland] shall not have any duties or obligations to [NexPoint] unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which [NexPoint] is a party.

*Id*. § 2.06, Appx. 4170 (emphasis added).

**12.    Other Defenses**

127.    Mr. Dondero could not identify any facts to support his affirmative defenses of waiver, estoppel, or lack of consideration.    Ex. 98 at 357:24-360:14, Appx. 1760-1761.

128.    NexPoint and HCMS assert that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid."    Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.    The facts relevant to this defense are described above and in the Klos Declaration. (Klos Dec. ¶¶ 3-14). Further, while NexPoint and HCMS now contend that they "pre-paid," both chose to pay Highland in January 2021 after receiving notice of default (in a transparent but futile attempt to "cure," for which they had no right rather than assert the "prepayment" defense.    *See* Ex. 2 (Exhibit 3), Appx. 49-56.

### III.   **ARGUMENT**

A.   **Legal Standard**

    **13.**   **Summary Judgment Standard**

      129.   "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (quoting Fed. R. Civ. P. 56(c)).  "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999).  The moving party meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.*, 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact.").

      130.   "If the moving party carries [their] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.3d at 303; *see also Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the

DOCS_NY:44673.8 36027/003 44673.9 36027/003

essential elements of its claim on which it bears the burden of proof at trial."). "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.3d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D.Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted).

131.   Thus, "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton*, 168 F.3d at 199; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n 12 (5th Cir.1993) ("We no longer ask whether literally little evidence, *i.e.,* a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

**14.   Summary Judgment Standard for Promissory Notes**

132.   "Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir.1988)); *see also Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish

(i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

**B.**    **Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes**

133.    Highland has made its *prima facie* case that it is entitled to summary judgment on Defendants' breach of the Notes.

134.    The Dondero Demand Notes are: (i) valid, (ii) signed by Mr. Dondero, and in Highland's favor, (Klos Dec. ¶¶ 18-20, Exs. D, E, F), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,004,013.07, and as of (b) December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

135.    The HCMFA Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 21-22, Exs. G, H), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09, (Klos Dec. ¶ 40).

136.    The HCMS Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 23-26, Exs. I, J, K, L), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81, (Klos Dec. ¶ 45).

137.    The HCRE Demand Notes are: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶¶ 27-30, Exs. M, N, O, P), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23, (Klos Dec. ¶ 50).

138.    The NexPoint Term Note is: (i) valid, (ii) signed by NexPoint, and in Highland's favor, (Klos Dec. ¶ 31, Ex. A), and (iii) as (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27,[28] (Klos Dec. ¶ 51).

139.    The HCMS Term Note is: (i) valid, (ii) signed by HCMS, and in Highland's favor, (Klos Dec. ¶ 32, Ex. R), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31,[29] (Klos Dec. ¶ 52).

140.    The HCRE Term Note is: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶ 33, Ex. S), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December

---

[28] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[29] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

43

17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[30] (Klos Dec. ¶ 53).

141.   Each of the Obligors under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand.

142.   Each of the Obligors under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

143.   Highland has been damaged by the Obligors' breaches in amounts that are set forth above but which (a) continued to increase daily, and (b) which do not include a calculation of collection costs and attorneys' fees.[31]

144.   Accordingly, Highland has made out its prima facie case for summary judgment that Defendants have breached the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney*, 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").[32]

---

[30] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[31] Plaintiff seeks to add to its damages accrued and unpaid interest, and Plaintiff's costs of collection, including reasonable attorney's fees. Ex. 162-180, Appx. 2637-2945.  Plaintiff respectfully requests an opportunity to conduct a final damage calculation if the Court fully grants the Motion.

[32] In the event the Motion is granted, Highland requests that the Court hold a hearing on damages, as interest under the Notes and attorney's fees continue to accrue.

C.     **Defendants Fail to Rebut Highland's Prima Facie Case**

145.     Defendants fail cannot rebut Highland's prima facie case for breach of the Notes because there is no substantive or credible evidence to support any of their affirmative defenses and there is substantial evidence to contradict them.

**15.     No Reasonable Jury Could Find that the "Alleged Agreement" Exists**

146.     Mr. Dondero, NexPoint, HCRE, and HCMS fail to show there is any genuine issue of material fact to support their "Alleged Agreement" defense.    There is a complete absence of evidence in support of this defense and there is substantial evidence to contradict them.

147.     As discussed above, (i) Mr. Dondero cannot identify materials terms of the Alleged Agreement, such as (a) which Notes are subject to the Alleged Agreement, (b) the number of Notes subject to the Alleged Agreement, (c) the maker of each Note subject to the Alleged Agreement; (d) the date of each Note subject to the Alleged Agreement, or (e) the principal amount of any Note subject to the Alleged Agreement, (*see supra* ¶¶ ~~89-90~~91-92); (ii) Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each Alleged Agreement, *(see supra* ¶¶ 93); (iii) Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the Alleged Agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the Alleged Agreement, (*see supra* ¶¶ ~~91-92~~94-95); (iv) Ms. Dondero, the counter-party to the Alleged Agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not competent to enter into the Alleged Agreements (*see supra* ¶¶ ~~93-94~~96); (v) the existence or terms of the Alleged Agreement was never disclosed by Mr. Dondero or Ms. Dondero to anyone, including PwC, Mr. Waterhouse, Mr. Okada or the Bankruptcy Court, (*see supra* ¶¶ ~~95~~98); (vi) no document exists

45

memorializing or otherwise reflecting the existence of terms of the Alleged Agreement, (*see supra* ¶ 9699); and (vii) there is no history of loans being forgiven at Highland, (*see supra* ¶¶ 100-101103-104).  Accordingly, there is an absence of evidence showing the Alleged Agreement exists.  *See Magna*, 2007 WL 3231633, at *16 (granting summary judgment with respect to breach of promissory note where defendants assert that they are discharged from debt obligations after terms of lease were altered, finding "[t]here is no evidence that any agreement was altered.  At best, the summary judgment evidence supports a theory that the terms of the leases were not what the [] Defendants expected them to be.")

148.    The Alleged Agreement would also be unenforceable as a matter of law for lack of (a) consideration, (b) definiteness, and (c) a meeting of the minds.    In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness."  *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (in order to prove existence of a valid and binding subsequent oral agreement binding upon parties, party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.")  "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted).  "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014).

149.    Based on the evidence cited above, no reasonable trier of fact could find that there was a meeting of the minds between Ms. Dondero and Mr. Dondero regarding the

material terms of the oral Alleged Agreement or that such oral Agreement was exchanged for consideration. *See Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014) (finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006)) (citation omitted); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement").

150.    Accordingly, there is no genuine issue of material fact regarding the Alleged Agreement defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### 16.     No Reasonable Jury Could Find the HCMFA Note Was a "Mistake"

151.    HCMFA's Mistake Defense also fails as a matter of law because there is no evidence to show that HCMFA and Highland were acting under a shared factual mistake when executing the HCMFA Notes.

152.    "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law).  "[A] party

must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange. *Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*, No. H-06-1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27. 2007) (citing Texas law). In other words, "[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.* (internal quotations omitted). "In determining the intent of the parties to a written contract, a court may consider the conduct of the parties and the information available to them at the time of signing in addition to the written agreement itself." *Id.* "When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake." *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*, CIV.A. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7.

153.    Here, the HCMFA Notes were apparently hiding in plain sight for almost two years. The undisputed documentary and testimonial evidence overwhelmingly establishes that both HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr. Waterhouse, HCMFA's treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan" (*supra*, ¶¶ 111-115 114-118); (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance

48

sheets (*supra* ¶— 120); (iii) the HCMFA Demand Notes were reflected as assets in Highland's

Bankruptcy filings, (see supra ¶ 119122), and (iv) the HCMFA Demand Notes were represented

as "liabilities" to third parties at all relevant times, (*supra*, ¶¶ 116119).

154.    There is no evidence in support of HCMFA's contention that there existed

a mistake of fact held by both Highland and HCMFA when entering into this agreement.  The

purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail

Board or (ii) ICI Mutual. (*See supra*, ¶¶ 56-60; 116; 107-110110-115; 119).  The purported

"mistake" is also not reflected in HCMFA's books and records or audited financials. (*See supra*,

¶¶ 50-53; 117120).

155.    HCMFA's Mistake Defense, therefore, fails as a matter of law.  *See*

*Hitachi,* 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law

where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where "the

fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed

undermines" the mutual mistake defense.) (emphasis in original); *Whitney*, 2007 WL 3145798, at

*6 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions

were "insufficient to raise a fact issue as to mutual mistake of fact regarding written agreement

where plaintiff "has presented competent evidence" of its own intention regarding the agreement,

"there is no evidence that [plaintiff] had the intent that these defendants assert," "no document

suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL

532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of

law on "mutual mistake" defense where defendant "does not cite any record evidence in support

of its claim that [parties] were operating under a shared mistake when they executed the note.");

*Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to

establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").

156.    Accordingly, there is no genuine issue of material fact regarding HCMFA's Mistake Defense, and Highland is entitled to summary judgment for HCMFA's breach of the HCMFA Demand Notes.

### 17.    No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence

157.    No reasonable jury could find that NexPoint's default under its Note was the result of Highland's negligence under the SSA.[33]  As discussed above, the SSA, by its clear terms, does not impose a duty on Highland to make payments under the Term Notes, on behalf of NexPoint, HCRE, and HCMS, without the express authorization of those entities or an agent of those entities.  *See supra* ¶¶ 120-125.   It is undisputed that Highland was never directed to make the payments under the Term Notes. *See supra* ¶ ~~120~~123.

158.    Accordingly, there is no genuine issue of material fact regarding NexPoint's, HCRE's, and HCMS's breach under the Term Notes, and Highland is entitled to summary judgment on its claims for breach of the Term Notes.

---

[33] Highland did not enter into shared services agreements with HCRE and HCMS so those Obligors' affirmative defenses fail as a matter of law.

**18.**   **No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note**

159.   NexPoint's and HCMS's assertion that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid" is contradicted by undisputed documentary evidence.  (*See* Klos Dec. ¶¶ 3-14).

160.   Accordingly, there can be no genuine dispute of material fact regarding NexPoint's and HCMS's failure to pay amounts due and owing under the NexPoint and HCMS Term Notes.

## CONCLUSION

WHEREFORE, Highland respectfully requests that the Court (i) grant its Motion, (ii) hold Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, including the costs of collection and reasonable attorneys' fees in an amount to be determined and (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated:  December ~~17~~20, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

52

# EXHIBIT A

## PARTIES, WITNESSES, AND DEFINITIONS

1. "Advisors" refers to HCMFA and NexPoint, together. The Advisors provide investment advisors services to certain retail funds and are effectively owned or controlled by Mr. Dondero. Ex. 96 at 228:11-19; Ex. 105 at 32:17-23.[34]

2. "Corporate Obligors" refers to HCMFA, NexPoint, HCMS, and HCRE in their capacities as makers under their respective Notes.

3. "Dugaboy" refers to The Dugaboy Investment Trust, a trust formed in 2010 to purportedly provide for the living maintenance, education, health, and lifestyle of its beneficiaries. Mr. Dondero is the sole beneficiary of Dugaboy during his lifetime; his children and subsequent generations shall become the beneficiaries following his demise.

4. "HCMFA" refers to Highland Capital Management Advisors, L.P. HCMFA is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23. HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:11-15.

5. "NexPoint" refers to NexPoint Advisors, L.P. NexPoint is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23. HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:16-19.

6. "HCRE" refers to HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), and is an entity that is directly or indirectly owned by Mr. Dondero. Ex. 96 at 228:20-23.

7. "HCMS" refers to Highland Capital Management Services, Inc., and is an entity that is directly or indirectly owned or controlled by Mr. Dondero. Ex. 96 at 228:24-229:4.

---

[34] All citations herein to "Appx." refer to the *Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment.*

1

8.    "Klos Dec." refers to the *Declaration of David Klos In Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, filed simultaneously with the Motion.

9.    "Mr. Dondero" refers to an individual named James Dondero.  Mr. Dondero is the founder and former president and Chief Executive Officer of Highland.  Ex. 96 at 248:3-6.  Mr. Dondero served as Highland's president from 1994 until January 9, 2020.  Ex. 98 at 291:6-292:16.  At all relevant times, Mr. Dondero also served as President of HCMFA and directly or indirectly owned or controlled each of the Corporate Obligors.  Ex. 37; Ex. 96 at 228:6-229.

10.    "Ms. Dondero" refers to an individual named Nancy Dondero.  Ms. Dondero is Mr. Dondero's sister.  At Mr. Dondero's request, Ms. Dondero became the sole Trustee of Dugaboy in October 2015 and has served in that capacity since that time.  Ex. 96 at 174:21-25; Ex. 100 at 166:19-169:5.

11.    "Mr. Norris" refers to an individual named Dustin Norris.  Mr. Norris has been an officer of HCMFA since 2012, and currently serves as the Executive Vice President of HCMFA. Ex. 35; Ex. 192 at 18:11-25.

12.    "Mr. Post" refers to an individual named Jason Post. Mr. Post was employed by Highland in 2018 and 2019, and then became an employee of HCMFA and served as the Chief Compliance Officer for each of the Advisors. Ex. 105 at 184:13-185:3; Ex. 192 at 32:6-33:25.

13.    "Mr. Sauter" refers to an individual named Dennis C. Sauter.  Mr. Sauter served as Highland's general counsel of real estate from approximately February 2020 until April 2021, and has served as the general counsel of NexPoint from April 2021 to the present.  Ex. 193 at: 7:16-9:12.

2

DOCS_NY:44673.9 36027/003

14.    "Ms. Thedford" refers to an individual named Lauren Thedford.  Ms. Thedford is an attorney who was previously employed by Highland while simultaneously serving as an officer of HCMFA and NexPoint, holding the title of Secretary.  Ms. Thedford also served as an officer of the retail funds managed by the Advisors until early 2021.  Ex. 35; Ex. 37; Ex. 105 at 172:10-173:25.

15.    "Mr. Waterhouse" refers to an individual named Frank Waterhouse.  Mr. Waterhouse is a Certified Public Accountant who joined Highland Capital Management, L.P. in 2006 and served as Highland's Chief Financial Officer ("CFO") on a continuous basis from approximately 2011 or 2012 until early 2021.  While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer and (2) Principal Executive Officer of certain retail funds managed by the Advisors.  As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing the Advisor's accounting and finance functions.  Ex. 35; Ex. 37; Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

16.    "Notes" refers to the Demand Notes and the Term Notes, as those terms are defined below.

17.    "Obligors" refers to Mr. Dondero and the Corporate Obligors in their capacities as makers under the Notes.

18.    "PwC" refers to Pricewaterhouse Coopers, firm that served as Highland's outside auditors from 2003 through at least June 3, 2019.  Ex. 34; Exs. 63-66; Exs. 69-72; Ex. 87 at 9 (Item 26b.1).

DOCS_NY:44673.9 36027/003

Document comparison by Workshare Compare on Monday, December 20, 2021
1:24:52 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/44673/8 |
| Description | DOCS_NY-#44673-v8-HCMLP_Notes_Actions_-_MOL_ISO_Motion_for_Partial_Summary_Judgment |
| Document 2 ID | PowerDocs://DOCS_NY/44673/9 |
| Description | DOCS_NY-#44673-v9-HCMLP_Notes_Actions_-_MOL_ISO_Motion_for_Partial_Summary_Judgment |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 383 |
| Deletions | 86 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 469 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Adv. Proc. No. 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | Case No. 3:21-cv-00880 |
| Defendants. | § § § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03004-sgj |
| vs. | § § | Case No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § § | |
| Defendant. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03003-sgj |
| vs. | § § | Case No. 3:21-cv-01010 |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| Defendants. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03006-sgj |
| vs. | § § | Case No. 3:21-cv-01378 |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, | § § | |

|  |  |  |
|---|---|---|
| NANCY DONDERO, AND THE<br>DUGABOY INVESTMENT TRUST,<br><br>       Defendants. | §<br>§<br>§<br>§<br>§ |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>       Plaintiff,<br>vs.<br><br>HCRE PARTNERS, LLC (n/k/a NexPoint<br>Real Estate Partners, LLC), JAMES<br>DONDERO, NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>       Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 21-03007-sgj<br><br>Case No. 3:21-cv-01379 |

### ORDER GRANTING
### <u>DEFENDANT'S MOTION TO CONSOLIDATE THE NOTE CASES</u>

Before this Court is Defendant's Motion to Consolidate the Note Cases [Doc. No. 16] (the

"Motion"). Having considered the Motion the Court finds that consolidation of the Note Cases is

warranted under Rule 42(a) of the Federal Rules of Civil Procedure and that the interests of judicial

efficiency are best served by consolidation of the Note Cases under Case No. 3:21-cv-881.

Consolidating the cases under 3:21-cv-881 best services judicial efficiency because (a) Case No.

3:21-cv-881 is the lowest-numbered case in the Dallas Division,[1] and (b) because the undersigned

was originally assigned two of the five Note Cases captioned above (before transfer of the three

others to the undersigned), as well as other cases arising out of the Highland Bankruptcy.[2] The

Court therefore **GRANTS** defendant's motion to consolidate.

---

[1] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here is 3:21-cv-880, previously assigned to Judge Sam Cummings. However, the Court finds that judicial efficiency is best served by consolidating under 3:21-cv-881 because 3:21-cv-880 and 3:21-cv-881 were filed in district court on the same day and several other factors (explained above the line) are served by consolidation under 881 as opposed to 880.

[2] In 3:21-cv-1010, the plaintiffs moved to consolidate under that case. [Doc. No. 10.] That request is denied. Importantly, plaintiffs agree that consolidation of all five note cases is warranted and promotes judicial efficiency.

**IT IS HEREBY ORDERED THAT**:

1.  The Note Cases are consolidated under the lead case, No. 3:21-cv-00881 for all purposes other than that Case No. 3:21-cv-00881-X may be tried separately (or that the determination of whether such case shall be tried separately is deferred until after all summary judgement motions are heard and decided), to be heard by the Honorable Judge Starr.

2.  The cases consolidated under No. 3:21-cv-881 are:

    -   No. 3:21-cv-00880

    -   No. 3:21-cv-01010

    -   No. 3:21-cv-01378

    -   No. 3:21-cv-01379

3.  All future filings related to all five cases shall be filed on the docket for No. 3:21-cv-881.

**IT IS SO ORDERED** this 6th day of January, 2022.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| **vs.** | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **Adv. Proc. No. 21-03005-sgj** |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, AND NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § § | |
| **vs.** | § § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

COMES NOW, Defendants James Dondero, NexPoint Advisors, L.P., Highland Capital Management Services, Inc., and HCRE Partners, LLC, the Defendants in the above-captioned and related adversary proceedings, and hereby submit this *Opposition to Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (the "Opposition"). Defendants fully incorporate by reference their brief in response filed contemporaneously with this Opposition and would show the Court as follows:

1

## <u>RELIEF REQUESTED</u>

1.      By this Opposition, Defendants respectfully request that the Court enter an order denying Plaintiff's Motion for Partial Summary Judgment.

2.      Pursuant to Rule 7056(d) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas and Rule 56.4(b) of the Local Rules of the Northern District of Texas, a separate memorandum of law is being filed contemporaneously with this Opposition that will state why Defendants oppose the Motion for Partial Summary Judgment and is incorporated by reference.

## <u>PRAYER</u>

WHEREFORE, Defendants respectfully request that the Court deny the relief requested in Plaintiff's Motion for Partial Summary Judgment and grant Defendants such further and other relief to which they are entitled.

Dated: January 20, 2022                    Respectfully submitted,

                                           */s/Deborah Deitsch-Perez*
                                           Deborah Deitsch-Perez
                                           State Bar No. 24036072
                                           Michael P. Aigen
                                           State Bar No. 24012196
                                           STINSON LLP
                                           3102 Oak Lawn Avenue, Suite 777
                                           Dallas, Texas 75219
                                           (214) 560-2201 telephone
                                           (214) 560-2203 facsimile
                                           Email: deborah.deitschperez@stinson.com
                                           Email: michael.aigen@stinson.com
                                           **ATTORNEYS FOR JAMES DONDERO, NANCY
                                           DONDERO, HIGHLAND CAPITAL MANAGEMENT
                                           SERVICES, INC. AND NEXPOINT REAL ESTATE
                                           PARTNERS, LLC**

                                           */s/Clay M. Taylor*
                                           Clay M. Taylor
                                           State Bar No. 24033261
                                           Bryan C. Assink
                                           State Bar No. 24089009
                                           BONDS ELLIS EPPICH SCHAFER JONES LLP
                                           420 Throckmorton Street, Suite 1000
                                           Fort Worth, Texas 76102
                                           (817) 405-6900 telephone
                                           (817) 405-6902 facsimile
                                           Email: clay.taylor@bondsellis.com
                                           Email: bryan.assink@bondsellis.com
                                           **ATTORNEYS FOR JAMES DONDERO**

                                           */s/Davor Rukavina*
                                           Davor Rukavina
                                           Julian P. Vasek
                                           MUNSCH HARDT KOPF & HARR, P.C.
                                           500 N. Akard Street, Suite 3800
                                           Dallas, Texas 75202-2790
                                           (214) 855-7500 telephone
                                           (214) 978-4375 facsimile
                                           Email:  drukavina@munsch.com

                                           **ATTORNEYS FOR NEXPOINT ADVISORS, L.P.  AND
                                           HIGHLAND CAPITAL MANAGEMENT FUND
                                           ADVISORS, L.P.**

CORE/3522697.0002/172202497.1

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

4

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, AND NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § § | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § § | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § | **Adv. Proc. No. 21-03007-sgj** |

## <u>DEFENDANTS'[1] MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

---

[1] Defendants Jim Dondero, HCMS, HCRE, and NexPoint, are collectively referred to as the "Defendants" throughout this Memorandum of Law unless otherwise expressly named.

<u>**TABLE OF CONTENTS**</u>

**Page**

I.  Preliminary Statement ................................................................................................ 1

II.  Statement of Facts ................................................................................................... 1

  A.  Procedural Background ......................................................................................... 1

  B.  The Promissory Notes .......................................................................................... 2

  C.  Plaintiff Agreed to Forgive the Notes Upon Fulfilment of Conditions Subsequent ........... 2

    1.  Forgivable Loans as Compensation Are Not Uncommon. ................................. 2

    2.  The Agreements to Forgive the Notes ............................................................ 3

    3.  The Agreements Were Never Kept "Secret" from Anyone ............................. 5

    4.  Jim and Nancy Dondero Do Not Disagree About Whether the Notes Were Specifically Identified. .......................................................................................... 7

    5.  Jim and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements ................................................................................. 9

  D.  Plaintiff was Responsible for Making Term Note Payments under a Shared Services Agreement with NexPoint, HCMS, and HCRE ......................................................... 11

    1.  The NexPoint Shared Services Agreement ..................................................... 11

    2.  The HCMS and HCRE Shared Services Agreements ...................................... 13

  E.  Prepayment on the Term Notes ........................................................................... 15

    1.  NexPoint's Prepayments .............................................................................. 15

    2.  HCMS' Prepayments ................................................................................... 16

III.  Argument and Authorities ..................................................................................... 17

  A.  Legal Standard .................................................................................................. 17

  B.  Plaintiff is Not Entitled to Summary Judgment because Defendants Raise Genuine Issues of Material Fact with their Defenses ................................................................ 18

    1.  The Agreements to Forgive the Notes ........................................................... 18

      a.  The Evidence Shows that the Agreements Exist ......................................... 18

        (i)  The Evidence Shows That Jim Dondero Identifies Material Terms of the Agreements ................................................................................................. 19

        (ii)  The Evidence Shows that Jim and Nancy Dondero Do Not Disagree About Whether Jim Dondero Identified the Notes Subject to the Agreements ................. 20

        (iii) Jim Dondero Not "Declaring the Notes Forgiven" upon the Sale of the MGM Asset Has No Bearing on Whether the Agreements Exist ................................. 20

        (iv) Whether Nancy Dondero Ever Saw a Note is Irrelevant to the Agreements' Existence. ...................................................................................................... 21

(v) Whether the Agreements Were Disclosed is Irrelevant to the Agreements' Existence. ........................................................................................................... 21

(vi) The Lack of Written Documentation of the Oral Agreements is Irrelevant to the Agreements' Existence. ........................................................................... 22

(vii)   Defendant's Summary Judgment Evidence Shows that Plaintiff Does Have a History of Forgiving Loans as Compensation. ..................................... 22

b.   Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence. ................................................................................ 22

c.   The Evidence Shows the Agreements Were Supported by Consideration ................. 25

d.   The Evidence Shows the Agreements Were Definite .................................................. 28

e.   The Evidence Shows the Agreements Were Supported by a Meeting of the Minds ............................................................................................................................ 29

f.   Nancy Dondero Was Competent to Cause Plaintiff to Enter into the Agreements. .................................................................................................................. 31

(i) Nancy Dondero Lacking Certain Information Has No Bearing on her Competency to Enter into the Agreements. ............................................... 32

(ii) Nancy Dondero Had the Information She Needed to Cause Highland Capital to Enter into the Agreements. ............................................................... 32

(iii) Nancy Dondero's Personal Lack of Financial Details Has No Bearing on the Validity or Enforceability of the Agreements. ...................................... 34

(iv) Nancy Dondero Was Personally "Competent" to Cause Plaintiff to Enter into the Agreements. ........................................................................... 35

2.   The Evidence Shows that Debtor was Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes under Shared Services Agreements .......................... 36

a.   The Affirmative Defense .......................................................................................... 36

b.   The Law .................................................................................................................... 36

c.   The NexPoint SSA and the Debtor's Duties Thereunder ......................................... 37

3.   The Debtor Failed to Assist, Advise, or Facilitate Any Payment Obligation ............... 42

4.   Debtor's Negligence and Fault In Creating Alleged Default ........................................ 44

(i)  If Dondero Did Not Issue the Non-Payment Instruction ....................................... 44

(ii) If Dondero Issued the Non-Payment Instruction: Offer of Proof ........................... 45

5.   The HCMS and HCRE SSAs. ....................................................................................... 47

6.   Prepayments by NexPoint and HCMS ......................................................................... 47

a.   NexPoint Prepayments ............................................................................................ 47

b.   HCMS Prepayments ................................................................................................. 52

IV.   Conclusion ......................................................................................................................... 55

CORE/3522697.0002/171927721.9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*,
584 S.W.3d 53 (Tex. App. 2018) ............................................................26

*271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*,
03-07-00498-CV, 2008 WL 2387630 (Tex. App.—Austin
June 11, 2008, no pet.) ............................................................24

*Al-Saud v. Youtoo Media, L.P.*,
3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. Mar. 15, 2017) ...................18, 20

*Alexander v. Good Marble & Tile Co.*,
4 S.W.2d  636 (Tex. Civ. App. 1928) ............................................37, 38

*Anderson Bros. Corp. v. O'Meara*,
306 F.3d 672 (5th Cir. 1962) ............................................................35

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986) ............................................................44

*Armstrong v. Assocs. Int'l Holding Corp.*,
No. 3:05-CV-02006-K, 2006 U.S. Dist. LEXIS 70043
(N.D. Tex. Sept. 20, 2006) ............................................................34

*Bacher v. Maddux*,
550 S.W.2d 405 (Tex. Civ. App. 1977) ............................................48

*Brown v. Jackson*,
40 S.W. 162 (Tex. Civ. App. 1897) ............................................26

*Buxani v. Nussbaum*,
940 S.W.2d 350 (Tex. App.—San Antonio 1997, no writ) ...................23

*In re Capco Energy, Inc.*,
669 F.3d 274 (5th Cir. 2012) ............................................................30

*Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*,
297 S.W.3d 248 (Tex. 2009) ............................................................47

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ............................................................18

*Collier v. Robinson*,
129 S.W. 389, 61 Tex. Civ. App. 164 (Tex. Civ. App. 1910) ...................36

iii

*Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*,
    No. 3:21-CV-01748-N, 2021 LEXIS 247218 (N.D. Tex., Dec. 29, 2021)............................35

*Craig Sessions M.D., P.A. v. TH Healthcare Ltd.*
    412 S.W.3d 738 (Tex. App. – Texarkana 2013)............................38, 48

*Critchfield v. Smith*,
    151 S.W.3d 225 (Tex. App.—Tyler 2004, pet. denied)............................22

*Curry v. O'Daniel*,
    102 S.W.2d 481 (Tex. Civ. App. 1937) ............................48

*Del Bosque v. AT&T Adver., L.P.*,
    441 Fed. Appx. 258 (5th Cir. Sept. 16, 2011)............................36

*DeWitt County Elec. Coop. Inc. v. Parks*,
    1 S.W.3d 96 (Tex. 1999)............................48

*Diamond v. Hodges*,
    58 S.W.2d 187 (Tex. Civ. App. 1933) ............................54

*Dorsett v. Hispanic Hous. & Educ. Corp.*,
    389 S.W.3d 609 (Tex. App.—Houston [14th Dist.] 2012, no pet.)............................18

*Envtl. Conservation Org. v. City of Dallas, Tex.*,
    529 F.3d 519 (5th Cir. 2008) ............................18

*First Com. Bank v. Palmer*,
    226 S.W.3d 396 (Tex. 2007)............................26

*First Nat'l Bank v. Whirlpool Corp.*,
    517 S.W.2d 262 (Tex. 1974)............................51

*Fischer v. CTMI, LLC*,
    479 S.W.3d 231 (Tex. 2016)............................29

*Fisher v. Blue Cross and Blue Shield of Tex., Inc.*,
    3:10-CV-2652-L, 2015 WL 5603711 (N.D. Tex. Sept. 23, 2015) ............................23, 24

*Floyd v. Hefner*,
    556 F. Supp. 2d 617 (S.D. Tex. 2008) ............................45

*Franklin v. Regions Bank*,
    CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021) ............................24

*Garcia v. Lumacorp, Inc.*,
    No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635 (N.D. Tex. July 27, 2004),
    aff'd, 429 F.3d 549 (5th Cir. 2005) ............................28

CORE/3522697.0002/171927721.9

*Getto v. Gray*,
627 S.W.2d 437 (Tex. App. 1981)..........................................................................48

*Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank*,
600 S.W.2d 856 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) .....................34

*Hallmark v. Hand*,
885 S.W.2d 471 (Tex. App.—El Paso 1994, writ denied)........................................30

*Haverda v. Hays County*,
723 F.3d 586 (5th Cir. 2013) ...............................................................................18

*Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*,
480 S.W.2d 607 (Tex. 1972)................................................................................23

*Hoard v. McFarland*,
229 S.W. 687 (Tex. Civ. App. 1921).....................................................................26

*Honore v. Douglas*,
833 F.2d 565 (5th Cir.1987) ................................................................................25

*Ibarra v. Texas Employment Commission*,
823 F.2d 873 (5th Cir. 1987) ...............................................................................34

*Katy Int'l, Inc. v. Jinchun Jiang*,
451 S.W.3d 74 (Tex. App. 2014).........................................................................26

*Katz v. Intel Pharma*,
CV H-18-1347, 2019 WL 13037048 (S.D. Tex. Apr. 19, 2019)..............................29

*Looney v. Irvine Sensors Corp*,
CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) .....................17

*Mack v. John L. Wortham & Son, L.P.*,
541 Fed. Appx. 348 (5th Cir. 2013)......................................................................30

*Mandell & Wright v. Thomas*,
441 S.W.2d 841 (Tex. 1969)................................................................................35

*Martinez v. Pilgrim's Pride Corp.*,
3:16-CV-3043-D, 2017 WL 6372385 (N.D. Tex Dec. 13, 2017).............................30

*Marx v. FDP, LP*,
474 S.W.3d 368 (Tex. App. 2015).......................................................................26

*Nat'l Union Fire Ins. Co. v. CBI Indus.*,
907 S.W.2d 517 (Tex. 1995)...............................................................................48

v

*O'Connor v. United States*,
    479 U.S. 27 (1986)..................................................................................48

*In re Palms at Water's Edge, L.P.*,
    334 B.R. 853 (Bankr. W.D. Tex. 2005).................................................23

*Parrish v. Haynes*,
    62 F.2d 105 (5th Cir. 1932) ....................................................................51

*PGP Gas Products, Inc. v. Reserve Equip., Inc.*,
    667 S.W.2d 604 (Tex. App.—Austin 1984, writ ref'd n.r.e.)................24

*Phillips v. Herdon*,
    78 Tex. 378 (Tex. 1890) ...........................................................................52

*Roark v. Stallworth Oil and Gas, Inc.*,
    813 S.W.2d 492 (Tex. 1991).....................................................................28

*Runnells v. Firestone*,
    746 S.W.2d 845 (Tex. App.—Houston [14th Dist.] 1988, writ denied)...............................23

*Samuel v. Holmes*,
    138 F.3d 173 (5th Cir.1998) .....................................................................18

*In re Schooler*,
    725 F.3d 498 (5th Cir. 2013) ....................................................................45

*Sinclair Oil Corp. v. Heights Energy Corp.*,
    4:05-CV-825-Y, 2007 WL 9718223 (N.D. Tex. Nov. 13, 2007) ............30

*Southern Equip. Sales, Inc. v. Ready Mix Sols., LLC*,
    No. 05-17-01176-CV, 2018 WL 3454801 (Tex. App. July 18, 2018) ...................26

*Szanto v. Pagel*,
    47 S.W.2d 632 (Tex. Civ. App. – Austin 1932) ......................................37

*T.O. Stanley Boot Co., Inc. v. Bank of El Paso*,
    847 S.W.2d 218 (Tex. 1992)......................................................................29

*Texas Co. v. Schram*,
    93 S.W.2d 544 (Tex. Civ. App. – Austin 1936) ......................................52

*Vaughan v. Crown Plumbing & Sewer Serv., Inc.*,
    523 S.W.2d 72 (Tex. Civ. App. 1975)......................................................54

*W.E. Grace Mfg. Co. v. Levin*,
    506 S.W.2d 580 (Tex. 1974)......................................................................51

CORE/3522697.0002/171927721.9

*WCW Int'l, Inc. v. Broussard*,
   No. 14–12–00940–CV, 2014 WL 2700892 (Tex.App.-Houston [14th Dist.]
   Mar. 4, 2014, pet. filed) ........................................................................................26

*Williams v. Cambridge Cos.*,
   615 S.W.2d 172 (Tex. 1981)...................................................................................48

*Yaquinto v. Segerstrom (In re Segerstrom)*,
   247 F.3d 218 (5th Cir.2001) ..................................................................................18

## Other Authorities

Restatement (Second) of Contracts § 12(2) (1981) .................................................36

Restatement (Second) of Contracts § 33 comment A ..............................................29

14 Tex. Jur. 3d Contracts § 157 ...............................................................................26

3 Williston on Contracts § 7:44 (4th ed.).................................................................26

CORE/3522697.0002/171927721.9

Defendants file this Memorandum of Law in Response to Highland Capital Management, L.P.'s ("Highland Capital" or "Plaintiff") *Motion for Partial Summary Judgment* (the "Motion").

## I.       Preliminary Statement

1.       Plaintiff's central argument is that it does not believe – and therefore, this Court should not believe – Defendants' "story," a set of facts that is supported by sworn declarations and uncontroverted deposition testimony.  Plaintiff's assertion that "there is a complete absence of evidence to support each of Defendants' affirmative defenses" is demonstrably false and misleading.  Indeed, the very fact that Plaintiff's principal argument is that the "Defendants' stories are so weak that the Court must grant [Plaintiff's] Motion" is a concession that the case turns on disputed genuine issues of material fact, regardless of how loudly or snidely Plaintiff avows disbelief. Plaintiff's disdain for Defendants' defenses does not equate to an absence of evidence. Defendants' affirmative defenses are supported by facts and evidence in their Appendix, and the Court – when viewing the evidence in the light most favorable to the Defendants – must deny Plaintiff's Motion.  Plaintiff's Motion is essentially a closing argument at trial – arguing that Plaintiff's version of the facts should be accepted over Defendants' version – rather than a motion for summary judgment, as it is based almost entirely on the credibility of disputed facts and lacks authorities addressing the legal sufficiency of Defendants' evidence.  In this Response, Defendants direct the Court to summary judgment evidence supporting their defenses that create genuine issues of material fact requiring the Court to deny Plaintiff's Motion.

## II.       Statement of Facts

### A.       Procedural Background

2.       Defendants generally agree with Plaintiff's recitation of procedural background recited in ¶¶ 6-18 of its Motion; however, the procedural history and the description of claims on which Plaintiff is not moving are not relevant to this Motion.

CORE/3522697.0002/171927721.9

### B.    The Promissory Notes

3.    Plaintiff issued three demand promissory notes (collectively, the "<u>Dondero Demand Notes</u>") to Jim Dondero in 2018.[2]  Defendant Jim Dondero does not dispute the amounts or the existence of the Dondero Demand Notes as Plaintiff has recited and referenced them.[3]

4.    Plaintiff issued four demand promissory notes to Highland Capital Management Services, Inc. ("<u>HCMS</u>") in 2019 (collectively, the "<u>HCMS Demand Notes</u>").[4]  Defendant HCMS does not dispute the initial amount loaned or the existence of the HCMS Demand Notes.[5]

5.    Plaintiff issued one promissory term note payable on a term schedule with NexPoint Advisors, L.P. ("<u>NexPoint</u>"), on May 31, 2017 (the "<u>NexPoint Term Note</u>").[6]  Defendant NexPoint does not dispute the initial amount loaned or the existence of the NexPoint Term Note.[7]

6.    Plaintiff issued five promissory notes payable on demand and one promissory note payable on a term schedule with HCRE Partners, LLC ("<u>HCRE</u>"),  between November of 2013 and October of 2018 (the "<u>HCRE Demand Notes</u>" and the "<u>HCRE Term Note</u>").[8]  Defendant HCRE does not dispute the initial amounts loaned or the existence of either the HCRE Demand Notes or the HCRE Term Note.[9]

### C.    Plaintiff Agreed to Forgive the Notes Upon Fulfilment of Conditions Subsequent

#### 1.    Forgivable Loans as Compensation Are Not Uncommon.

7.    Contrary to Plaintiff's assertion that "There is No History of Loans Being Forgiven [by Plaintiff]," it was not an uncommon practice for Plaintiff to provide executives with forgivable

---

[2] Def. Ex. 1, Declaration of James Dondero ("J Dondero Dec."), ¶¶ 5-7, Def. Appx. 5.
[3] Motion, ¶ 20(i).
[4] Def. Ex. 1, J Dondero Dec., ¶¶ 14-18, Def. Appx. 9-11.
[5] Motion, ¶ 20(iii).
[6] Def. Ex. 1, J Dondero Dec., ¶ 8, Def. Appx. 6-7.
[7] Motion, ¶ 20(iii).
[8] Def. Ex. 1, J Dondero Dec., ¶¶ 9-13, Def. Appx. 7-9.
[9] Motion, ¶¶ 29-31.

CORE/3522697.0002/171927721.9

loans as compensation.[10]  Along with Jim Dondero, several of Plaintiff's executives received loans that were forgiven, including Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery.[11]  Plaintiff's corporate representative, James Seery, confirmed that several of the above-named individuals received loans that were forgiven in the past.[12]  Further, Plaintiff's own Motion contradicts itself by claiming there is no history of loans being forgiven, but in the very next paragraph concedes that "[Plaintiff] has not forgiven any loan to Mr. Dondero since at least 2008," recognizing that, in fact, Plaintiff has forgiven loans to Jim Dondero in the past.[13]  Using forgivable loans to compensate Jim Dondero made sense for Plaintiff, as Jim Dondero was undercompensated in his position compared to other similarly-situated contemporaries at comparable investment firms.[14]

### 2.    The Agreements to Forgive the Notes

8.    The Highland Capital Limited Partnership Agreement (the "LPA") authorized the Dugaboy Family Trust ("Dugaboy") to approve compensation for the General Partner and Affiliates of the General Partner.  Specifically, the LPA provides, in pertinent part:

>    (a)    <u>Compensation</u>.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements *unless approved by a Majority Interest.*"[15]

The LPA defines the relevant actors in the Compensation provision as follows:

---

[10] Motion, ¶ 103; Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 98, Jim Dondero 10/29/21 Tr.  424:4-8, Pl. Appx. 01777.

[11] Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 24, Jim Dondero's Objections and Responses to Plaintiff's Requests for Admission, Interrogatories, and Requests for Production, Pl. Appx. 00526; Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 109:7-22, Pl. Appx. 03154; Pl. Ex. 195, David Klos 10/27/21 Tr. 106:6-22, Pl. Appx. 03208; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 212:4-25, Pl. Appx. 02011.

[12] Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 94:21-96:22, Pl. Appx. 01982; Def. Ex. 3-A, Deposition of James P. Seery, Jr. (177:19-178:5), Def. Appx. 141-142.

[13] Motion, ¶ 104.

[14] Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 160:10-161:3; 218:12-222:14, Pl. Appx. 02013-02014; Def. Ex. 3-B, Deposition of Bruce McGovern Tr. 24:7-25:4, Def. Appx. 193 (providing expert testimony that the Agreements did not create taxable income for Jim Dondero).

[15] Pl. Ex. 30, 4th LPA, § 3.10(a) (emphasis added), Pl. Appx. 00622.

"'***Majority Interest***' means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[16]

"'***Class A Limited Partners***' means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A."[17]

**Exhibit A** reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.[18]

Nancy Dondero is the Dugaboy Trustee and was therefore the individual entitled to approve compensation under the pertinent LPA provisions above.[19]

9.    In December of 2017 or January of 2018, Nancy Dondero – on behalf of Plaintiff and as representative for a majority of Class A shareholders – entered into an oral agreement with Jim Dondero that Plaintiff would forgive the Notes issued in 2017 upon the fulfilment of certain conditions subsequent.[20]  Specifically, if certain portfolio companies were sold at or above cost – Trussway, Cornerstone, or MGM – the Notes would be forgiven.[21]  Jim and Nancy Dondero entered into identical Agreements subsequent to each Note at issue in this litigation in 2018, 2019, and 2020, respectively (referred to collectively as the "Agreements").[22]  Notably, nowhere in Plaintiff's Motion does it dispute that Jim Dondero and Nancy Dondero had the authority to enter into these Agreements or that the Agreements would be legally binding on Plaintiff.

10.    The Agreements themselves served as an incentive for Jim Dondero to work particularly diligently on the sale of the portfolio companies and to make sure they were

---

[16] *Id.*, § 2.1, Pl. Appx. 00612.

[17] *Id.*, § 2.1, Pl. Appx. 00610.

[18] *Id.*, Exhibit A, line 5, Pl. Appx. 00639.

[19] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 22:13-15, Pl. Appx. 01880; Pl. Ex. 98, James Dondero 10/29/21 Tr. 400:8-19, Pl. Appx. 01771; Def. Ex. 1, J Dondero Dec., ¶ 21, Def. Appx. 13; Def. Ex. 2, N Dondero Dec., ¶ 3, Def. Appx. 80; Def. Ex. 2-A, Nancy Dondero Acceptance of Appointment of [Dugaboy] Family Trustee, Def. Appx. 89.

[20] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 162:22-163:8, Pl. Appx. 01915; Pl. Ex. 96, James Dondero 5/28/21 Tr. 176:20-177:5, Pl. Appx. 01659; Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 6, Def. Appx. 81.

[21] *Id.*

[22] Def. Ex. 1, J Dondero Dec., ¶¶ 25-26, Def. Appx. 14-15; Def. Ex. 2, N Dondero Dec., ¶¶ 7-8, Def. Appx. 81-83

successful.[23]  This incentive benefitted Plaintiff by maintaining its profitability and reputation across the industry for successful performance as a private equity firm.[24]  The Agreements acted to motivate and retain Jim Dondero as Plaintiff's employee.[25]  Further, Jim Dondero forwent opting to increase his own salary with cash compensation in accordance with § 3.10 of the LPA, as he would have been allowed to do.  Instead, Jim Dondero elected to make his potential compensation conditional upon his own successful performance, and Plaintiff benefitted from the Agreements by not paying Jim Dondero higher base compensation, something Jim Dondero thought was "great for the [Plaintiff] at the time," and "reduces other compensation [that he would have otherwise taken].[26]  Therefore, Plaintiff benefited from the Agreements on two fronts: (i) receiving more focused and dedicated work from Jim Dondero in his efforts to make the portfolio companies more profitable, and (ii) not paying Jim Dondero a higher base compensation.

### 3.   The Agreements Were Never Kept "Secret" from Anyone

11.   Plaintiff's assertion that the Agreements were "kept secret" and "never disclosed by Mr. Dondero" is not only irrelevant to the Motion, but also inaccurate.[27]  Jim Dondero indicated to both Frank Waterhouse and Plaintiff's counsel that the Notes were forgivable.  Well before these proceedings, Jim Dondero told Frank Waterhouse, the Debtor's Chief Financial Officer, that there were "mechanisms in place for forgiving the Notes, or for having them considered as compensation and not being an asset to the Debtor's estate."[28]  Further, on February 1, 2021, counsel for Jim Dondero – the late Judge Michael Lynn – informed opposing counsel that "[a]s you are aware, in addition to other defenses, Mr. Dondero views the notes in question as *having*

---

[23] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[24] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[25] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[26] Pl. Ex. 96, James Dondero 5/28/21 Tr. 182:2-18, Pl. Appx. 01660; Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[27] Motion ¶ 98.
[28] Pl. Ex. 99, James Dondero 11/4/21 Tr. 167:10-16, Pl. Appx. 01854; Def. Ex. 1, J Dondero Dec., ¶ 28, Def. Appx. 15.

been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero.”[29]
Although that correspondence did not detail every facet of the Agreements, it alerted Debtor to
Defendants' position that the Notes were potentially forgivable, which Debtor did not question.

12.     Jim Dondero did not disclose the Agreements to the financial auditors at Highland
Capital because such disclosure was unnecessary.[30]  In light of Highland Capital's sizable financial
assets, potential Note forgiveness under the Agreements was *de minimis.*[31]  Thus, such a disclosure
was not considered material, and would have been unwarranted.[32]  And, of course, whether the
Agreements were disclosed to the financial auditors – or anyone else for that matter – has no
bearing on whether the Agreements are legally enforceable.

13.     Plaintiff's claim in ¶ 47 of its Motion that: “[i]f PwC had learned before June 3,
2019, at any of the Notes (a) might not be collectible, or (b) might be forgiven, or (c) was amended,
or (d) would be extinguished based on the fulfillment of certain conditions subsequent, it would
have required that fact to be disclosed,” is demonstrably untrue, as cross-examination testimony
from Peet Burger of PwC – the testimonial basis for Plaintiff's position – concedes.[33]  On cross
examination, Burger confirmed that disclosure of the Agreements would only have been required
when the Notes were *actually forgiven*, not that they *might* be forgivable.[34]  Thus, Peet Burger

---

[29] Def. Ex. 1-D, Letter to Pachulski Stang Ziehl & Jones, LLP, Def. Appx. 74 (emphasis added).
[30] Def. Ex. 1, J Dondero Dec., ¶ 27, Def. Appx. 15.
[31] *Id.*
[32] *Id.*
[33] Motion, ¶ 47, citing the Deposition of Peet Burger (74:19-76:12), Pl. Appx. 1571.
[34] Pl. Ex. 94 Peet Burger 7/30/21 Tr. 78:11-79:13, Pl. Appx. 01572:

Q:    And I want to focus on this. I know these are [Plaintiff's counsel's] questions, so it may not have been your language, but you were asked if it [the loans] might be forgiven. What does that mean to you? Are we talking about is there a difference for you if there was a 1 percent chance that something would be forgiven or a 90 percent chance of it being forgiven?
A:    If we learned about something, let's say, we learned [it] might be forgiven, that would have resulted in additional audit work. *The question I understood to be and the answer I gave was if something happened where there was an event that actually occurred before or on June 3rd, we would have required disclosure.*
Q:    Got it. So is it fair to say that in response to all of [Plaintiff's counsel's] questions about what would have been required to be disclosed, in your mind he was referring those events or items have *actually occurred* and the notes being *actually forgiven* at that point in time; is that correct?

very quickly changed his position and conceded that he misunderstood Plaintiff's counsel's question when he gave the quote that forms the basis of Plaintiff's Motion, ¶ 47. Plaintiff is fully aware of the recantation, making its use of a demonstrably false statement in its Motion a concession of the Motion's lack of merit.

### 4. Jim and Nancy Dondero Do Not Disagree About Whether the Notes Were Specifically Identified.

14.     Plaintiff's assertion that Jim and Nancy Dondero disagree as to whether or not Jim Dondero identified which notes were subject to the Agreements is a mischaracterization of the deposition testimony.[35] Nancy Dondero testified that she understood which Notes were subject to the Agreements:

> "Q:     At the time that you entered into the agreements, did you have any understanding that the agreements would cover all notes executed by your brother, NexPoint, HCRE and HCMS?
>
> A:     Yes."[36]
>
>        . . . .
>
> "Q:     Was it your understanding that when you entered into each of these agreements, that the agreements would cover every promissory note that was executed by your brother, by NexPoint, by HCMS, and by HCRE, irrespective of whether it wound up being part of the lawsuit?
>
> A:     My understanding for the agreement I had with Jim is just for these 13 notes."[37]
>
>        . . . .
>
> "Q:     Why don't you tell me what the conversations were that led to each of the agreements to best that you can recall.
>
> A:     The conversations with my brother that took place towards the end of each of the years that we're discussing, they started as general conversations about business, about work. And Jim would bring up the loans that were done earlier in the year. He had stated in the conversation that he thought he was undercompensated for the work that he does and the time that he

---

Q:     I didn't hear your answer.

A:     Correct.

[35] Motion, ¶ 93 ("Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements; namely, its scope. Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement. Mr. Dondero, on the other hand, disagrees.").

[36] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 186:7-12, Pl. Appx. 01921.

[37] *Id.* at (186:25-187-10), Pl. Appx. 01921.

CORE/3522697.0002/171927721.9

> puts in.  And he wanted those loans to be forgiven if any of the three
> portfolio companies that we talked about monetized at a higher value.
>
> Q:  And you agreed with that?
>
> A:  Well, it was – yes, I did agree with that proposal.  I thought it was a win-
> win for everybody. [38]

Nancy Dondero reaffirms in her declaration: "During our conversations in which we made the

Agreements, I understood which Notes were subject to the Agreements."[39]

15.    Jim Dondero did not "disagree" with Nancy Dondero that he identified the Notes

subject to the Agreements.  Rather, Plaintiff cites a portion of Jim Dondero's deposition in which,

in response to unclear questioning,[40]  Jim Dondero indicated that he communicated to Nancy

Dondero that the Notes were made by different entities:

> "Q:  No.  I'm just asking if during your discussions with the Dugaboy trustee,
> you ever disclosed the name of the maker of any of the Notes that were
> subject to the agreements?
>
> A:  She – she knew they were Notes due to Highland from various entities.
> So I don't know what your question is.  Did I identify specifically that
> they were Notes due to Highland?  I guess the answer to that is yes, *but I
> don't know what you're asking me*."[41]
> . . . .
>
> "A:  She was aware that they were notes due to Highland from a variety of
> entities."[42]

Jim Dondero reiterates in his declaration: "when entering into the Agreements . . . I specifically

remember discussing and identifying the Notes to Nancy Dondero."[43]  Thus, Plaintiff's argument

---

[38] *Id.* at (193:19-194:15), Pl. Appx. 01923.

[39] Def. Ex. 2, N Dondero Dec., ¶ 8, Def. Appx. 81-83.

[40] Motion, ¶ 93, citing Ex. 99 at 79:6-81:23, Appx. 1832.

[41] Pl. Ex. 99, James Dondero 11/4/21 Tr. 79:20-80:5, Pl. Appx. 01832 (emphasis added).

[42] *Id.* at (80:16-17), Pl. Appx. 01832. Moreover, Mr. Dondero's additional testimony is even clearer. Pl. Ex. 99, James Dondero 11/4/21 Tr. 28:6-21, Pl. Appx. 01819; Declaration of Jim Dondero, ¶ 24-26; James Dondero 10/29/21 Tr. 403:10-404:12, Pl. Appx. 01771-01771; Pl. Ex. 96, James Dondero 5/28/21 Tr. 153:5-154:6, 180:5-9, 214:16-24, Pl. Appx. 01653, 01660, 01668.

[43] Def. Ex. 1, J Dondero Dec., ¶¶ 25-26, Def. Appx. 14-15.

CORE/3522697.0002/171927721.9

that there is some discrepancy between Jim Dondero and Nancy Dondero's testimony that supports its summary judgment motion is without foundation.

> ### 5.    Jim and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements

16.    Throughout this litigation, Plaintiff has taken the position that the Agreements are fabricated and lack any evidence of their existence.[44]  However, Jim and Nancy Dondero have consistently testified under oath that the Agreements took place, exist, and are valid.[45]  Further, both Jim and Nancy Dondero have provided this Court with declarations swearing to the Agreements' factual existence:

> 24.  At either the end of 2017 or the beginning of 2018, Dugaboy – through Nancy Dondero – entered into a verbal agreement (the "2017 Agreement") with myself that HCM would not collect on any of the aforementioned Notes issued in 2017 if certain events occurred.  [The Declaration of James Dondero goes on to also describe the Agreements for the Notes issued in years 2018 and 2019].[46]

> 6.  In either December of 2017 or January of 2018, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into the first of a series of verbal agreements with Jim Dondero that provided that the repayment obligation on the notes made in 2017 involved in this litigation would be forgiven if Highland Capital sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control. [The Declaration of Nancy Dondero goes on to also describe the Agreements for the Notes issued in years 2018 and 2019].[47]

17.    Plaintiff also suggests that because Jim Dondero would have preferred to use a list of the Notes to refresh his recollection regarding the Agreements during his deposition, no reasonable trier of fact could find the Agreements existed.[48]  While whether an agreement was

---

[44] Motion, ¶ 90.
[45] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 162:22-163:8, Pl. Appx. 01915; Pl. Ex. 96, James Dondero 5/28/21 Tr. 176:20-177:5, Pl. Appx. 01659; Def. Ex. 1, J Dondero Dec., ¶ 24-26, Def. Appx. 14-15; Def. Ex. 2, N Dondero Dec., ¶¶ 6-8, Def. Appx. 81-83.
[46] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[47] Def. Ex. 2, N Dondero Dec., ¶ 6, Def. Appx. 81.
[48] Motion, ¶ 91.

actually made is potentially a proper issue for summary judgment in a he said she said situation

(which does not exist here), whether or not a witness uses notes to refresh his recollection is not a

basis for granting a summary judgment.  It would be a factor for a fact-finder to take into account

in determining the credibility of a witness.  Here, the fuss Debtor makes about Jim Dondero's list

of the Notes is much ado about nothing, as shown by the following:

> Q:      Thank you very much.  The agreements covered each of the notes that are
> the subject of the lawsuits that Highland commenced against you, HCRE
> Services, and NexPoint, is that right?
>
> A:      The – yes.[49]
> . . . .
>
> Q:      Can you identify any Promissory Note that is the subject of any specific
> agreement that you ever entered into with the Dugaboy trustee without
> looking at the list?
>
> A:       I believe it covered virtually all of them.  So I don't remember [now]
> which ones specifically in each year.  Generally, it was, I believe, the ones
> incurred in that year, but I don't remember which entities.  But again, the
> ultimate result being that the term loans, the demand notes, the things
> incurred, the things outstanding were part of the agreement.[50]

A deposition, much less a 30(b)6(6) deposition, where witnesses frequently bring notebooks full

of data to be able to testify to specific details is not a game of gotcha, entitling one party to force

the other to testify about dozens of details without the aids a business person would typically use

to keep track of such information.

18.      Defendants refer the Court to the declarations and deposition testimony of Jim

Dondero and Nancy Dondero to demonstrate that the Agreements exist, and Plaintiff's assertion

that "no reasonable trier of fact can find that the [] Agreement[] existed" is simply inconsistent

with the summary judgment evidence.

---

[49] Pl. Ex. 99, James Dondero 11/4/21 Tr. 14:7-12, Pl. Appx. 01816.
[50] *Id.* at (28:6-21), Pl. Appx. 01819.

### D.   Plaintiff was Responsible for Making Term Note Payments under a Shared Services Agreement with NexPoint, HCMS, and HCRE

19.    The Shared Services Agreements ("SSAs") between Highland Capital and NexPoint, HCMS, and HCRE provided that Highland Capital would manage "back and middle office" tasks, which included making debt payments for NexPoint, HCMS, and HCRE.[51]  SSAs are common in the private equity industry, and exist to consolidate function and manpower between large and small entities that share overlapping ownership structure.[52]

### 1.   The NexPoint Shared Services Agreement

20.    NexPoint and Plaintiff entered into a written Shared Services Agreement (the "NexPoint SSA") on January 1, 2018, which resulted in Plaintiff providing almost the entire workforce for NexPoint's business.[53]  Specifically, Plaintiff was to provide back- and middle-office, legal compliance, administrative services, management of clients and accounts, and other services to NexPoint.[54]  These services included making debt payments on behalf of NexPoint. The NexPoint SSA outlined these responsibilities in Section 2.02:

> Section 2.02   Provision of Services. . . .[T]he Staff and Services Provider [Plaintiff] hereby agrees, from the date hereof, to provide the following back- and middle-offices services and administrative, infrastructure and other services to the Management Company [NexPoint].
>
> > (a)    *Back- and Middle-Office*:  Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, ***payments***, operations, book keeping, cash management . . . . ***accounts payable*** . . .[55]

Further, the NexPoint SSA provided the standard of care that Plaintiff was required to adhere to when it provided such services for NexPoint:

---

[51] *Id.* at ¶ 36.

[52] *Id.*

[53] Def. Ex. 1, J Dondero Dec., ¶ 32, Def. Appx. 16-17; Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, Pl. Appx. 04162.

[54] *Id.*

[55] *Id.* at 04165-04166 (emphasis added).

> Section 6.01 <u>Standard of Care</u>.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .[56]

Thus, the NexPoint SSA itself clearly provided both the specific services that Plaintiff was to provide NexPoint – namely the back- and middle-office tasks of handling payments and accounts payable – and the standard of care under which Plaintiff was to provide those services.

21.    Further, Kristin Hendrix – who served as Plaintiff's assistant controller in 2020 and is currently employed by Plaintiff – stated that she knew about the upcoming NexPoint Annual Installment in 2020, but received a phone call from Frank Waterhouse instructing her not to make any payments from the Advisors (which includes NexPoint) to Plaintiff.[57]

22.    Therefore, Plaintiff decided on either November 30, 2020 or December 1, 2020 that it was not going to make the annual term payment on the NexPoint Note.  However, Plaintiff never reached out in writing to confirm this with Jim Dondero or anyone else at NexPoint, or to inquire about clarification or whether Frank Waterhouse's instruction was a mistake, given the significant consequences of nonpayment.  Plaintiff's inaction certainly ran afoul of the NexPoint SSA Section 6.01 "Standard of Care" provision.

23.    Plaintiff's characterization of the relationship between Highland and NexPoint under the NexPoint SSA is disputed and inaccurate.[58]  Plaintiff claims that "[n]one of the services [provided for under the NexPoint SSA] authorized Highland to…effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint."[59] However, Highland Capital made payments for NexPoint in December of 2017,

---

[56] *Id.* at 04173.
[57] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 71:3-20, Pl. Appx. 03144.
[58] Motion, ¶ 123-126.
[59] Motion, ¶ 125.

2018, and 2019 ***without any specific authorization, direction, or permission*** from either Jim Dondero or any other NexPoint executive.[60]

24.    This course of conduct would lead any reasonable person to believe that Plaintiff would continue to make the annual payments without explicit direction, ***as they had done for three years prior.***  Defendant believed that Plaintiff would continue to make the NexPoint Term Note payments, and was surprised to learn that Plaintiff decided not to make the December 31, 2020 annual payment.[61]  Whether or not Plaintiff should have continued to make payments on the NexPoint Note is a genuine issue of material fact.  Moreover, Plaintiff failed to bring certain prepayments to NexPoint's attention, resulting in NexPoint believing that payment was due, when it was not, although Plaintiff now claims it was due, even though it failed to make that payment.

### 2.    The HCMS and HCRE Shared Services Agreements

25.    Similar to the NexPoint SSA, Plaintiff had similar SSAs with both HCMS (the "HCMS SSA") and HCRE (the "HCRE SSA"), which were both established by oral agreement and course of conduct.[62]  Plaintiff provided identical services to both HCMS and HCRE as it did to NexPoint, and made sure all their financial obligations were promptly paid on time.[63]  There was a lengthy history of Plaintiff providing such services to HCMS and HCRE.[64]  The need for these SSAs with HCMS and HCRE were predicated on the fact that both entities – like NexPoint – lacked the internal infrastructure to operate entirely independently.[65]  Both HCMS and HCRE heavily relied on Plaintiff to provide these services, as Plaintiff had for years prior.[66]  Plaintiff was

---

[60] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03248-03249; Def. Ex. 1, J Dondero Dec., ¶ 34, Def. Appx. 17.
[61] J Dondero Dec. at ¶ 35, Def. Appx. 17-18.
[62] *Id.* at ¶¶ 36-39, Def. Appx. 18-19.
[63] *Id*.
[64] *Id.* at ¶¶ 36, 38, Def. Appx. 18-19.
[65] Pl. Ex. 98, James Dondero 10/29/21 Tr. 335:14-337:3, Pl. Appx. 01754-01755; Def. Ex. 1, J Dondero Dec., ¶¶ 36, 38, Def. Appx. 18-19.
[66] *Id.*

required to act reasonably in the performance of its obligations to HCMS and HCRE, given the record of past practices and the precedent created by similar work done by Plaintiff for NexPoint.[67]

26.    Frank Waterhouse confirmed in his deposition that Plaintiff provided the same services to HCRE and HCMS as it did to NexPoint, including ". . . accounting services, treasury management services, [and] potentially legal services."[68]  He also specifically confirmed that loan payments were the "kinds of things that [Plaintiff] would pay on time because of potential consequences of not paying on time" for HCMS and HCRE.[69]

27.    Further, Kristin Hendrix testified that it was "fair to say that [she] [did not] remember any instructions telling [her] not to make any payments from HCMS or HCRE,"[70] and that the reason she never made the December 31, 2020 payments on the HCMS or HCRE Term Notes was because she "never got an affirmative instruction to actually make the payment."[71]  However, Hendrix later confirmed that Plaintiff "make[s] payments all the time" without the specific instruction of Frank Waterhouse or Jim Dondero.[72]  Hendrix made no attempts to determine if Jim Dondero wanted the HCMS or HCRE annual installment payments to be made.[73]

28.    Plaintiff ultimately knew about but failed to make the December 31, 2020 payments on both the HCMS Term Note and the HCRE Term Note.[74]  No one at HCMS or HCRE – including Jim Dondero – directed any person to miss or skip the payments on these Notes.[75]  Whether or not Plaintiff should have continued to make payments on the HCMS Term Note and

---

[67] Def. Ex. 3-F, Expert Report of Steven J. Pully ¶ 57, Def. Appx. 231.
[68] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 353:3-354:12, Pl. Appx. 02137-02138.
[69] *Id.* at (357:2-11), Pl. Appx. 02138.
[70] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 100:20-23, Pl. Appx. 03151.
[71] *Id.* at (101:13-16), Pl. Appx. 03152.
[72] *Id.* at (103:10-16), Pl. Appx. 03152.
[73] *Id.* at (102:10-13), Pl. Appx. 03152.
[74] Def. Ex. 1, J Dondero Dec., ¶¶ 37, 39, Def. Appx. 18-19.
[75] *Id.*

14

the HCRE Term Note pursuant to the respective oral SSAs are genuine issues of material fact.[76] Moreover, as discussed in greater detail below, Plaintiff failed to remind HCMS of prepayments that had been made that relieved it of the obligation to make any additional payment in 2020.

### E.     Prepayment on the Term Notes

#### 1.     NexPoint's Prepayments

29.     NexPoint asserts the affirmative defense of prepayment on the NexPoint Note, which relieved NexPoint of any obligation to make any additional payment in 2020.  Thus, the NexPoint Note was not in default when no payment was made on December 31, 2020.  NexPoint demonstrates *infra* that there is evidence supporting this affirmative defense and summary judgment denying this affirmative defense is inappropriate as a matter of law.

30.     There is no dispute of fact that, between March and August of 2019, the following payments were made on the NexPoint Note (collectively, the "NexPoint Prepayments"): (i) $750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June 4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi) $1,300,000.00 on August 13, 2019.[77]  These payments totaled $6,380,000.00 in 2019.[78]  The normal December, 2019 payment of principal and interest on the Note would have been $2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

31.     None of the aforementioned payments were scheduled payments or payments on arrears.[79]  Rather, they were prepayments since the Plaintiff needed money and asked NexPoint to transfer it funds for liquidity purposes, which NexPoint did.[80]  These transfers were intended by

---

[76] Defendants' position is bolstered by the Expert Report of Steven J. Pully, ¶ 59 (Def. Ex. 3-F, Def. Appx. 232), which was incorrectly not permitted to be included in the record by the Court. Defendants submit this proffer to preserve their objection.
[77] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249.
[78] *Id.*
[79] *Id.*
[80] Def. Ex. 1, J Dondero Dec., ¶ 42, Def. Appx. 21.

both NexPoint and Plaintiff to be prepayments on the Note.[81]  This fact is confirmed by testimony

from Plaintiff's personnel and its amortization schedule for the NexPoint Note.[82]  The only dispute

here is how these NexPoint Prepayments should have been applied; more specifically, whether

they should have been applied to the December 31, 2020 scheduled payment, rendering further

payment at that time unnecessary.

### 2.    HCMS' Prepayments

32.    Plaintiff's Motion never directly addresses HCMS's prepayment defense. Rather,

in its 50-page Motion, Plaintiff lists HCMS in several headings, but then never actually makes any

arguments or raises any facts specific to HCMS.  Moreover, not once in paragraphs 3-14 Mr.

Klos's Declaration addressing the NexPoint prepayment defense (or anywhere else), does Klos

mention the HCMS Term Note.[83]  Therefore, it does not appear that Plaintiff actually is moving

for summary judgment on HCMS' prepayment defense.  However, as with NexPoint, any such

motion would have no merit.

33.    There is no factual dispute that between May of 2017 and December of 2020, the

HCMS Term Note's principal amount was paid down by almost $14,000,000.00.[84]   Between May

of 2017 and December of 2020, the following prepayments were made on the HCMS Note

(collectively, the "HCMS Prepayments"): (i) $985,216.44 on June 23, 2017; (ii) $907,296.25 on

July 6, 2017; (iii) $1,031,463.70 on July 18, 2017; (iv) $1,971,260.13 on August 25, 2017; (v)

$1,500,000.00 on December 21, 2017; (vi) $160,665.94 on May 31, 2018; (vii) $1,000,000.00 on

---

[81] *Id.*
[82] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249; Pl. Ex. 194, Kristen Hendrix 10/27/21 Tr. 81:13-82:3, Pl. Appx. 03147 (objections omitted).
[83] Declaration of David Klos in Support of [Plaintiff's] Motion for Partial Summary Judgment in Note Actions, ¶¶ 3-14, Case 21-03003-sgj [Doc. 133].
[84] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.

October 8, 2018; (viii) $1,015,000.00 on May 5, 2019; (ix) $550,000.00 on August 9, 2019; (x) $5,600,000.00 on August 21, 2019; and (xi) $65,360.49 on December 30, 2019.[85]

34.    Again, none of the above payments were scheduled, nor were they ever made on December 31 of any given year.[86] Further, none of these payments were made on arrears.[87] Rather, these prepayments were intended by HCMS to be applied to the scheduled Annual Installment payments, and were obviously accepted as such, since Plaintiff never declared the note to be in default in 2017, 2018, or 2019.[88] Plaintiff presents no legal or factual argument to the contrary, so summary judgment for this defense must be denied.

### III.    Argument and Authorities

#### A.    Legal Standard

35.    Plaintiff suggests that there is a separate or independent summary judgment standard for promissory notes.[89] The fact that the elements of breach of promissory note differ from breach of contract in no way lessens Plaintiff's burden of proving there are no genuine issues of material fact.[90] *Looney v. Irvine Sensors Corp*, CIV.A.309-CV-0840-G, 2010 WL 532431 at 2 (N.D. Tex. Feb. 15, 2010) (noting that, although the elements for breach of a promissory note differs from traditional breach of contract, "[s]ummary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, what that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law").

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[89] Compare, Motion, III. A. 1: "Summary Judgment Standard" with III. A. 2: "Summary Judgment Standard for Promissory Notes."
[90] Motion, ¶ 132 (under the heading: "Summary Judgment Standard for Promissory Notes").

CORE/3522697.0002/171927721.9

36.    Plaintiff's Motion is a "no-evidence" motion, arguing that "[t]here is a complete absence of evidence to support each of Defendants' affirmative defenses." Motion, ¶ 2. Therefore, the Court may only grant Plaintiff's Motion if: ". . . (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact."[91]

37.    When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.[92]  To determine whether a genuine dispute exists such that the case must be submitted to a jury, courts must consider all of the evidence in the light most favorable to the non-moving party, draw all reasonable inferences in favor of the non-moving party, refuse to make credibility determinations or weigh the relative strength of the evidence, and disregard all evidence favorable to the movant that the jury would not be required to believe.[93]

**B.    Plaintiff is Not Entitled to Summary Judgment because Defendants Raise Genuine Issues of Material Fact with their Defenses**

**1.    The Agreements to Forgive the Notes**

**a.    The Evidence Shows that the Agreements Exist**

38.    Plaintiff argues that "[t]here is a complete absence of evidence in support of this defense [the Agreements]," claiming that: (i) Jim Dondero could not "identify material terms" of the Agreements, (ii) "Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each. . .Agreement," (iii) Jim Dondero "failed to declare the Notes forgiven" when

---

[91] *Dorsett v. Hispanic Hous. & Educ. Corp.*, 389 S.W.3d 609, 613 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex. 2005)).
[92] *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008); *Yaquinto v. Segerstrom (In re Segerstrom),* 247 F.3d 218, 223 (5th Cir.2001); *Samuel v. Holmes,* 138 F.3d 173, 176 (5th Cir.1998).
[93] *Al-Saud v. Youtoo Media, L.P.*, 3:15-CV-3074-C, 2017 WL 3841197, at 2 (N.D. Tex. Mar. 15, 2017) (citing *Haverda v. Hays County,* 723 F.3d 586, 591 (5th Cir. 2013)).

MGM stock was sold in November 2019, (iv) "Ms. Dondero. . .never saw a Note signed by Mr. Dondero. . .and was not competent to enter into the [] Agreements," (v) the Agreements were "never disclosed to anyone," (vi) there is no written evidence of the Agreements, (vii) and "there is no history of loans being forgiven [by Plaintiff]."[94]   These are simply closing arguments that address credibility of evidence and are properly made at trial, not at summary judgment.

**(i)     The Evidence Shows That Jim Dondero Identified Material Terms of the Agreements**

39.     Plaintiff argues that Jim Dondero was not able to identify the material terms of the Agreements.[95]   However – as addressed in section C.4, *supra* – Jim Dondero identified that the Notes that were subject to the Agreements and provided general details,[96] but was prevented by the examiner from referencing his list of the Notes to give the specific details of each.[97] Mr. Dondero was noticed for deposition in both his personal and 30(b)(6) capacities and therefore it was appropriate for him to have a list to be able to give precise details for questions that might be asked about the exact amounts, dates and terms of the Notes.   There is no surprise about which loans the Agreements applied to since Jim Dondero has consistently stated that all the loans at issue in this litigation were subject to the Agreements.[98]   Regardless, Jim Dondero provides the Court with a sworn declaration evidencing his knowledge of the details of the Notes.[99]

40.     Plaintiff provides no legal authority supporting its claim that no jury could believe the Agreements exist because Jim Dondero could not reference the specific terms without his

---

[94] Motion, ¶ 147.
[95] *Id.*
[96] Response, ¶ 15.
[97] *Id.*
[98] See note 42 *supra*.
[99] J Dondero Dec., ¶¶ 5-18 (itemizing the Notes subject to the Agreements, including their amounts and dates of each Note).

19

notes.  Plaintiff's argument is simply an attack on Mr. Dondero's credibility, which is improper at the summary judgment stage.  *See, Al-Saud* at 2.

> **(ii)    The Evidence Shows that Jim and Nancy Dondero Do Not Disagree About Whether Jim Dondero Identified the Notes Subject to the Agreements**

41.    As demonstrated in section C.4, *supra*, Jim and Nancy Dondero do not disagree about whether Jim Dondero identified the Notes subject to the Agreements.  Defendants have pointed this court to specific summary judgment evidence that there is no disagreement about which Notes Jim Dondero identified.[100]  Further, Plaintiff has no authority supporting its claim that no reasonable trier of fact could find that the Agreements exist in these circumstances.

> **(iii)    Jim Dondero Not "Declaring the Notes Forgiven" upon the Sale of the MGM Asset Has No Bearing on Whether the Agreements Exist**

42.    Regarding whether Jim Dondero failed to declare the Notes forgiven upon the alleged sale of some unspecified amount of HCM's interest in MGM, Plaintiff provides no legal authority (nor have Defendants located any) addressing the relevance of this point.  Even if all of Plaintiff's interest in MGM had been sold for more than it had cost (in which case Mr. Dondero would have raised the forgiveness of the Notes), there is no legal proposition in Texas requiring a party to a contract to declare that a contractual term has been completed in an effort to prove that contract's existence.  But, in fact, Plaintiff does not assert that HCM's interest in MGM was sufficiently liquidated to trigger forgiveness, and indeed only a tiny amount was sold.[101]

43.    More importantly, Plaintiff is estopped from making this argument because it is contradicted by its sworn interrogatory answers.  When Defendants requested Plaintiff "[i]dentify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies)

---

[100] Response, ¶¶ 14-17.
[101] Def. Ex. 1, J Dondero Dec., ¶ 47, Def. Appx. 22.

owned (wholly or partially) by the [Plaintiff], including, but not limited to, Trussway, MGM and

Cornerstone…," Plaintiff responded that it "ha[d] not sold Trussway, MGM or Cornerstone…."[102]

### (iv)    Whether Nancy Dondero Ever Saw a Note is Irrelevant to the Agreements' Existence.

44.    Whether Nancy Dondero ever saw the Notes is completely irrelevant to whether a

reasonable trier of fact could conclude the Agreements existed.  Again, Plaintiff cites no legal

authority to support its position that this fact has any bearing on the existence of the Agreements.

Similar to the MGM issue above, Plaintiff's point is irrelevant and must be disregarded.

### (v)    Whether the Agreements Were Disclosed is Irrelevant to the Agreements' Existence.

45.    Plaintiff argues – without any supporting legal authority – that since the

Agreements were "never disclosed . . . to anyone," there is no evidence supporting their

existence.[103]  However, Plaintiff overlooks the fact that Jim Dondero alerted Frank Waterhouse

that there were mechanisms in place for forgiving the Notes,[104] and that Jim Dondero's counsel

sent a letter to Plaintiff's counsel indicating that Jim Dondero planned on citing the Agreements

as an affirmative defense.[105]  Moreover, Plaintiff cites no authority for its proposition that a failure

to broadly disclose an agreement has any bearing on whether the agreement does or does not exist.

Plaintiff's lack of authority is especially telling in a case that is not a "he said, she said" debate on

whether an agreement was made: rather both side to the Agreements (Dugaboy for HCM and Jim

Dondero) agree ***that the Agreements were made***. Therefore, again, Plaintiff's argument does not

support its motion for summary judgment.

---

[102] Def. Ex. 3-H, Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, Interrogatory 14, Def. Appx. 299.
[103] Motion, ¶¶ 145-147.
[104] Response, ¶ 11.
[105] *Id.*

21

> ### (vi)    The Lack of Written Documentation of the Oral Agreements is Irrelevant to the Agreements' Existence.

46.    Plaintiff argues that, because there is no written documentation evidencing the oral Agreements, the existence of the oral Agreements cannot be believed.[106]  The fact that the oral Agreements between Jim and Nancy Dondero lack written documentation should not be surprising, as they were reached through verbal communication.  In Texas, oral contracts have the same validity and enforceability as written contracts.  "The elements of written and oral contracts are the same and must be present for a contract to be binding." *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied).  Plaintiff cites no authority to the contrary.

> ### (vii)    Defendant's Summary Judgment Evidence Shows that Plaintiff Does Have a History of Forgiving Loans as Compensation.

47.    Plaintiff's argument that "there is no history of loans being forgiven" by Plaintiff is rebutted by the record.  As demonstrated *supra*, Defendants present evidence that Plaintiff has forgiven loans to several executives in the past.[107]  Further, Plaintiff has forgiven loans to Jim Dondero in the past, a fact conceded in its Motion and confirmed by its own witness.[108]

> ## b.    Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence.

48.    Jim and Nancy Dondero's testimony alone is sufficient under Texas law to show that the Agreements exist.  Plaintiff's lack of legal authority supporting the proposition that when *both sides* to an agreement testify to that same agreement's existence, there is somehow still a material issue of fact regarding that agreement's existence, should not come as a surprise.  Only one side to an oral agreement is required to testify as to its existence to survive a motion for

---

[106] Motion, ¶ 147.
[107] Response, ¶ 7.
[108] *Id.*

summary judgment.  "Where there is no written contract in evidence, and ***one party*** attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact under Texas law."[109]  In other words, Defendants' summary judgment evidence is more than sufficient to provide proof that the Agreements exist and create a genuine issue of material fact, since they present testimony from ***both*** sides to the Agreements while Texas law only requires testimony from ***one***.

49.     Further, "whether the parties had a meeting of the minds or common understanding is better suited for the trier of fact and cannot be determined by the court at this [summary judgment] juncture."[110]  In *Fisher*, the movant argued on summary judgment that no implied contract with the non-movant existed.  However, the court denied summary judgment on the existence of an implied contract where the non-movant produced evidence of a course of conduct that "raised a genuine dispute of material fact as to whether the parties had an implied contract…"[111]

50.     Of course, unlike the case cites above, here, ***both sides*** that made the Agreements attest the Agreements exist.   Jim and Nancy Dondero – the only two individuals who have firsthand knowledge of the Agreements – have testified numerous times that the Agreements occurred and do exist.  Nancy Dondero testified to the Agreements' existence at her deposition:

Q:     Is it your testimony that you, as the trustee of The Dugaboy Investment Trust, entered into oral agreements with your brother between December and the year each note was made and February of the following year,

---

[109] *In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005) (citing *Runnells v. Firestone*, 746 S.W.2d 845, 849 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (emphasis added); *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607, 610 (Tex. 1972); *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no writ)).

[110] *Fisher v. Blue Cross and Blue Shield of Tex., Inc.*, 3:10-CV-2652-L, 2015 WL 5603711 at 10 (N.D. Tex. Sept. 23, 2015) (analogizing the *In re Palms* in a summary judgment context: "[s]imply alleging there was no meeting of the minds is not a legitimate basis for summary judgment because "[w]here there is no written contract in evidence, and ***one party*** attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact.").

[111] *Id.* at 10.

CORE/3522697.0002/171927721.9

pursuant to which plaintiff agreed that plaintiff would forgive the notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control?

A:      That is correct.[112]

Jim Dondero also testified to the Agreements' existence at his deposition:

Q:      Okay.  And in the first sentence to your answer in Interrogatory 1, you wrote, or somebody wrote on your behalf, quote: "The agreements were entered into on behalf of the debtor by James Dondero, subsequent to the time each note was executed."  Is that an accurate statement, or is it an inaccurate statement?"

A:      Again, it was between me and the Class A, the majority of the Class A members.  It was a Class A – the Class A members were representing Highland, never the debtor, because the debtor didn't exist yet.[113]

51.      Plaintiff ignores this testimony in its Motion.  Both Jim and Nancy Dondero also provide this Court with sworn Declarations explicitly asserting that the Agreements exist.  Based on the evidence above, Defendant Jim Dondero provides evidence that the Agreements exist, and creates a genuine issue of material fact.  *See, Fisher* at 10.

52.      Plaintiff seems to suggest that testimony from Jim and Nancy Dondero attesting to the Agreements' existence is insufficient to create an issue of material fact that the Agreements exist.  While this may be the case in one state with markedly different law than other states (*see Franklin v. Regions Bank*, CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021) (statutorily requiring corroborating evidence in addition to testimony from one party to prove an oral contract in excess of $500.00 in Louisiana)), this is not the case in Texas.  In Texas, "[t]he existence of an oral contract may be proved by circumstantial evidence as well as by direct evidence."[114]  The circumstantial evidence supports the existence of the Agreements.  Plaintiff never demanded any

---

[112] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 164:13-23, Pl. Appx. 1915.
[113] Pl. Ex. 96, James Dondero 5/28/21 Tr. 165:8-20, Pl. Appx. 01656.
[114] *271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*, 03-07-00498-CV, 2008 WL 2387630 at 4 (Tex. App.—Austin June 11, 2008, no pet.) (citing *PGP Gas Products, Inc. v. Reserve Equip., Inc.*, 667 S.W.2d 604, 607 (Tex. App.—Austin 1984, writ ref'd n.r.e.)).

CORE/3522697.0002/171927721.9

of demand notes at issue in this case (nor did it declare any Term Notes to be in default) until James Seery assumed control of Plaintiff.  Actually, it was not until Plaintiff was in bankruptcy that Plaintiff decided to conspicuously call all the demand notes for payment.[115]  Prior to the bankruptcy, Plaintiff made no attempt to demand the Notes.  Circumstantially, it appears that Plaintiff was operating from 2017 to 2020 as if the Agreements were valid and in effect.

53.     Plaintiff's argument that the evidence of the Agreements' existence is factually insufficient flies in the face of black letter law that the court cannot "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."[116]  Because Jim and Nancy Dondero have sworn to the existence and validity of the Agreements, Plaintiff's arguments amount to nothing more than factual attacks that impermissibly require this Court to opine on the credibility of Defendants' evidence.  Thus, summary judgement must be denied.

### c.     The Evidence Shows the Agreements Were Supported by Consideration

54.     Plaintiff also argues that the Agreements are unenforceable due to a lack of consideration.[117]   Specifically, Plaintiff simply broadly asserts – without reference to any supporting facts – that ". . . no reasonable trier of fact could find that . . . such oral agreement was exchanged for consideration."[118]  Despite Plaintiff's lack of any relevant supporting facts besides a "laundry list" of grievances against the Donderos that have no applicability to Plaintiff's arguments – discussed in more detail *infra* – the Agreements were supported by adequate consideration independent from any pre-existing consideration supporting the Notes.

---

[115] Motion, ¶ 22 (referencing Plaintiff's demand on the Demand Notes); Pl. Ex. 2, Amended Complaint against NPA et al., ¶ 27, Pl. Appx. 00029; Pl. Ex. 3, Amended Complaint against HCMS, ¶ 43, Pl. Appx. 00189; Pl. Ex. 4, Amended Complaint against HCRE et al., ¶ 43, Pl. Appx. 00189.
[116] *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir.1987).
[117] Motion, ¶ 148.
[118] Motion, ¶ 149.

CORE/3522697.0002/171927721.9

55.     Consideration is a present exchange bargained for in return for a promise that may consist of *some* right, interest, or profit, or benefit that accrues to one party or of *some* forbearance, loss, or responsibility that is undertaken or incurred by the other party.[119]  Consideration consists of *either* a benefit to the promisor *or* a detriment to the promisee and thus, there is valid consideration when "when a party gives up a pre-existing legal right."[120]

56.     Here, Jim Dondero's forbearance from increasing his own compensation—a legal right he possessed prior to entering into the Agreements—as well as his contribution to increasing the value of all of the portfolio companies in efforts to sell the companies above cost, is adequate consideration for the Agreements.  At the time the Agreements were formed, Jim Dondero was authorized as General Partner of the Plaintiff to set his own compensation subject to approval by the Majority Interest.[121] Therefore, Jim Dondero had a legal right to increase his own salary that existed before the Agreement was formed.[122]  Accordingly, his decision to set his compensation conditional upon his own performance instead of exercising his right under the LPA to increase the immediate cash component of his compensation provided adequate consideration in exchange

---

[119] *Katy Int'l, Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 85 (Tex. App. 2014) (emphasis added) (citing *WCW Int'l, Inc. v. Broussard*, No. 14–12–00940–CV, 2014 WL 2700892, at *9 (Tex.App.-Houston [14th Dist.] Mar. 4, 2014, pet. filed) (sub. mem. op.).

[120] *See, e.g., 1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*, 584 S.W.3d 53, 65–66 (Tex. App. 2018); *Marx v. FDP, LP*, 474 S.W.3d 368, 378–79 (Tex. App. 2015) (cleaned up) (relinquishment of disputed claims against each other adequate consideration agreement granting purchaser option to purchase vendors' homestead); *First Com. Bank v. Palmer*, 226 S.W.3d 396, 398–99 (Tex. 2007) (guaranties executed in connection with renewal of promissory note to prevent payee from accelerating debt supported by consideration consisting of the payee's forbearance on prior guaranties and agreement to renew and extend the original debt); *Southern Equip. Sales, Inc. v. Ready Mix Sols., LLC*, No. 05-17-01176-CV, 2018 WL 3454801, at *5 (Tex. App. July 18, 2018) (extending time for payment of note or debt suffices as consideration); *Hoard v. McFarland*, 229 S.W. 687 (Tex. Civ. App. 1921) (cancellation of vendor's lien note before expiration of limitations period was sufficient consideration for reconveyance), writ refused (June 7, 1922); *Brown v. Jackson*, 40 S.W. 162 (Tex. Civ. App. 1897) (agreement by execution debtor with agent of execution creditor not to bid at execution sale was sufficient consideration for agent's promise to allow the debtor to redeem). *See also* 3 Williston on Contracts § 7:44 (4th ed.) ("Just as a promisor may make an agreement for acts or promises to act, so too may it bargain for forbearances or promises to forbear."); 14 Tex. Jur. 3d Contracts § 157 ("Generally, forbearance from exercising a legal right, or the outright surrender of a legal right that one is not bound to surrender, is sufficient consideration for a contract or promise.").

[121] Pl. Ex. 30, 4th LPA, § 3.10(a), Pl. Appx. 00622.

[122] *Id.*

for the Agreements.  Jim Dondero's testimony was clear that the Agreements served to motivate his performance with heightened focus and reduce other compensation Plaintiff would have otherwise had to pay him through an increased salary.[123]

57.     Here, Jim Dondero was incentivized to work particularly hard on the profitability and sale of the three portfolio companies – MGM, Trussway, and Cornerstone – to ensure that Plaintiff maintained its profitability and reputation.[124]   Jim Dondero's increased efforts and workload to maximize these assets was also a right he gave up – and a benefit obtained by Plaintiff – in exchange for the potential for increased deferred compensation.

58.     At the time of the Agreements, Nancy Dondero believed that Jim Dondero was undercompensated for the work that he did for the Debtor and that he was also undercompensated in comparison to other asset managers in similar industry roles.[125]   Therefore, Nancy Dondero understood Jim Dondero's forbearance of pay increase as a fair exchange for the Agreements.

59.     In addition, Nancy Dondero agreed that Jim Dondero's efforts to increase the value of any of the portfolio companies would cause them to be sold for the highest value possible; if she did not believe that to be true, the Agreements would not have been made.[126]  Plaintiff's Motion not only fails to cite to any authority to support failed or inadequate consideration, but also misconstrues Nancy Dondero's testimony. The Motion inaccurately states that Nancy Dondero "admitted that she did not know, and had no reason to expect, that Highland would benefit from the sale of the portfolio companies by a third party."[127]  What she actually stated, however, was

---

[123] Pl. Ex. 96, James Dondero 5/28/21 Tr. 182:2-19, Pl. Appx. 01660.
[124] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[125] Pl. Ex. 100,  Nancy Dondero 10/18/21 Tr. 193:19-25-194:1-19, 206:17-25-207:1-17, 211:12-23, Pl. Appx. 01922-01923, 01926-01927;  Pl. Ex. 99, James Dondero 11/4/21 Tr. 51:8-13, 52:19-25-53:1-4, Pl. Appx. 01825-01826; Pl. Ex. 98, James Dondero 10/29/21 Tr. 421:4-17, Pl. Appx. 01776; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 94:21-96:22, Pl. Appx. 01982.
[126] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 194:20-25-195:1-10, 206:17-25-207:1-17, Pl. Appx. 01926.
[127] Motion, ¶¶ 98, 101.

that she entered into the Agreements and understood that if "any of the portfolio companies monetized higher [] the notes would be forgiven."[128]  Only when Plaintiff's counsel asked if she expected the Plaintiff to benefit if the portfolio companies were "sold on a basis outside of Mr. Dondero's control" did she answer that she did not know what to expect.[129] Nancy Dondero acknowledged that if the portfolio companies were sold for less than their value by a third party, then that would not be in Jim Dondero's control.[130]

60.     Furthermore, "[i]n order for the consideration to be deemed inadequate, it must be *so grossly inadequate as to shock the conscience*, being tantamount to fraud."[131] Even if this Court finds that the exchange was not made for equal value, Jim Dondero's conditional forbearance to increase his own pay and his specific dedication to increase his focus on the profitable sale of the portfolio companies is ***not so inadequate as to shock the conscience***, particularly given that it is common practice in private companies to forgive bona fide debt in order to manage compensation and provide incentives to managers.[132]  Simply because Plaintiff disagrees with Mr. Dondero's assessment does not make the consideration "grossly inadequate;" it is an issue of fact for a jury.[133]

### d.    The Evidence Shows the Agreements Were Definite

61.     Plaintiff argues, with very limited supportive facts and no legal authority, that the Agreements are not enforceable as a matter of law "for lack of. . .(b) definitiveness."[134]  However, Plaintiff never specifically articulates how the Agreements fail for lack of definitiveness.[135]

---

[128] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 205:14-21, Pl. Appx. 01925.

[129] *Id.* at (202:23-25-203:1-11), Pl. Appx. 01925.

[130] *Id.*

[131] *Garcia v. Lumacorp, Inc.*, No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635, at *11 (N.D. Tex. July 27, 2004), aff'd, 429 F.3d 549 (5th Cir. 2005) (emphasis added, citations omitted).

[132] It was common practice in private companies to loan money that is bona fide debt and then forgive it over time to manage compensation and as incentives to managers of private companies. Pl. Ex. 98, James Dondero 10/29/21 Tr. 421:18-25, Pl. Appx. 1776; Alan Johnson Expert Report p. 14-15.

[133] *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (determining that adequacy of consideration is a question of fact for the jury).

[134] Motion, ¶ 148.

[135] *Id.*

62.     In Texas, "[i]n order to be legally binding, a [verbal] contract must be sufficiently definite in its terms so that a court can understand what a promisor understood."[136]  Further, "[t]he material terms of a contract are determined on a case-by-case basis."[137]  "[A] term that 'appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties,'" and "[t]erms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of an agreement to the contrary."[138]

63.     Here, there is certainly enough evidence for the Court to understand what the promisor (Nancy Dondero) understood.  Nancy Dondero understood that Jim Dondero was undercompensated, and that the Agreements created an "everybody wins" situation for both the Plaintiff and Jim Dondero.[139]  Further, Nancy Dondero and Jim Dondero articulated the terms of the Agreements in their depositions: that if any of the three portfolio companies were sold for above cost, the Notes would be forgiven.[140]  The Agreements were simple, and both the promisor and promisee understood their terms.[141]  The only individuals that entered into the Agreements were Nancy and Jim Dondero, and both have provided this Court with sworn declarations providing evidence of the Agreements' definitiveness.

### e.     The Evidence Shows the Agreements Were Supported by a Meeting of the Minds

64.     Plaintiff's argument that the Agreements were not supported by a meeting of the minds fails because the summary judgment evidence shows that Jim Dondero and Nancy Dondero, on behalf of Plaintiff, objectively assented to the terms of the Agreement.[142]  Plaintiff does not

---

[136] *Katz v. Intel Pharma*, CV H-18-1347, 2019 WL 13037048 at 6 (S.D. Tex. Apr. 19, 2019) (quoting *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992)).
[137] *Intel Pharma* at 6 (quoting *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016)).
[138] *CTMI, LLC* at 239-240 (quoting the Restatement (Second) of Contracts § 33 comment A).
[139] Response, ¶ 14.
[140] Response, throughout.
[141] Response, ¶ 16.
[142] Response, ¶ throughout.

CORE/3522697.0002/171927721.9

articulate how the evidence does not support a meeting of the minds.  Nor does Plaintiff articulate

specific facts that show there was no meeting of the minds between Jim Dondero and Nancy

Dondero, other than the "scope" issue, which Defendants have addressed in section C.4, *supra*.

Regardless, the contested issue of whether or not Jim Dondero and Nancy Dondero had a meeting

of the minds is an issue of fact that precludes summary judgment.

65.     In Texas, "[t]he determination of a meeting of the minds, and thus offer and

acceptance, is based on the objective standard of what the parties said and did and not their

subjective state of mind."[143]  "[A] meeting of the minds refers to a mutual understanding and assent

to the agreement regarding the subject matter and the essential terms of the contract."[144]  Further,

". . .the determination of whether the parties reached an agreement – whether there was a meeting

of the minds – is a question of fact, which precludes summary judgment."[145]

66.     Plaintiff does not identify what facts lend themselves to the argument that there was

no meeting of the minds other than its very brief "scope" argument: "Ms. Dondero insists that Mr.

Dondero identified the notes that are the subject of each Alleged Agreement.  Mr. Dondero, on the

other hand disagrees."  Motion, ¶ 93.  Nevertheless, Jim and Nancy Dondero provide evidence that

they objectively understood and agreed to the essential terms and scope of the Agreements.  Nancy

Dondero testified that she understood which Notes were subject to the Agreements, as well as the

Agreements' terms.[146]  These facts are also asserted in Nancy Dondero's declaration.[147]

---

[143] *Martinez v. Pilgrim's Pride Corp.*, 3:16-CV-3043-D, 2017 WL 6372385 at 4 (N.D. Tex Dec. 13, 2017) (quoting *In re Capco Energy, Inc.*, 669 F.3d 274, 280 (5th Cir. 2012)).
[144] *Pilgrim's Pride* at 4 (quoting *Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 362 (5th Cir. 2013)).
[145] *Sinclair Oil Corp. v. Heights Energy Corp.*, 4:05-CV-825-Y, 2007 WL 9718223 at 3 (N.D. Tex. Nov. 13, 2007) (Court agreeing with respondent that meeting of the minds is an issue of fact precluding summary judgment); *See also: Hallmark v. Hand,* 885 S.W.2d 471, 476 (Tex. App.—El Paso 1994, writ denied) ("Where the element pertaining as to whether or not there was a meeting of the minds is contested, determination of the existence of a contract is a question of fact").
[146] Response, ¶ 14, quoting Nancy Dondero's deposition testimony.
[147] Def. Ex. 2, N Dondero Dec., ¶¶ 6-8, Def. Appx. 81.

67.     Plaintiff's assertion that Jim Dondero "disagrees" with Nancy Dondero that he identified the Notes subject to the Agreements misstates Jim Dondero's testimony.  Jim Dondero clarified that Nancy Dondero did know that the Notes were made by different entities.[148] These facts are also set forth in Jim Dondero's Declaration.[149]

68.     Ignoring Plaintiff's attempt to paraphrase Jim Dondero's testimony out of context – and in light of Nancy Dondero's testimony that Jim Dondero did identify the Notes – it is clear that Jim Dondero communicated to Nancy Dondero that the Notes were made on behalf of the various entities on behalf of which they were made, and Nancy Dondero understood this. Therefore, not only is the issue of whether there is a meeting of the minds a fact issue not susceptible of summary judgment, the evidence also shows the Donderos objectively understood the terms of the Agreements.  If anything, the evidence would support summary judgment *that there was a meeting of the minds*.

### f.      Nancy Dondero Was Competent to Cause Plaintiff to Enter into the Agreements.

69.     Plaintiff argues that Nancy Dondero was not "competent" to enter into the Agreements.[150]  The cited evidence has nothing to do with Nancy Dondero's competency to contract (as "competency" is normally understood under Texas law), but instead references various bits of information that Nancy Dondero allegedly lacked when she caused Plaintiff to enter into the Agreements.  Although mislabeled, the Debtor's argument appears to be that the Agreements are unenforceable because they were the product of a unilateral mistake by Nancy Dondero.

70.     This argument fails for several reasons.  First, Texas law provides that Nancy Dondero gets to determine the information she needed to decide whether to cause Plaintiff to enter

---

[148] Response, ¶ 15, quoting Jim Dondero's deposition testimony.
[149] *Id.*
[150] Motion ¶ 96.

into the Agreements, and the evidence confirms that she had what she needed.  Second, Plaintiff

does not argue or submit any evidence suggesting that Plaintiff – the actual party to the Agreements

– lacked any relevant information.  Third, a unilateral mistake can invalidate a contract only when

it goes to a material term, when enforcement of the contract would be unreasonable, and when the

mistake is made despite the exercise of due care.  Plaintiff does not even allege any of these

elements, much less submit any evidence to support them.

> **(i)     Nancy Dondero Lacking Certain Information Has No Bearing on her Competency to Enter into the Agreements.**

71.     The evidence shows that Nancy Dondero had the information she considered

necessary and appropriate to cause Plaintiff to enter into the Agreements, and Texas law requires

nothing more.  Plaintiff's assertion that Nancy Dondero should have had more and different

information before entering into those Agreements has no legal effect on their validity or

enforceability.

> **(ii)    Nancy Dondero Had the Information She Needed to Cause Highland Capital to Enter into the Agreements.**

72.     Plaintiff's allegation that Nancy Dondero was ignorant of the facts and

circumstances giving rise to the Agreements is not accurate.[151]  Specifically, at the time Nancy

Dondero caused Plaintiff to enter into the Agreements, she knew Plaintiff was in the hedge fund

business which included buying and selling portfolio companies, and she knew that it owned an

interest in each of Cornerstone, MGM and Trussway, the portfolio companies involved in the

Agreements.[152]  She knew that Jim Dondero's annual salary had historically been around $500,000

to $700,000 in the years preceding the Agreements, and she understood that Jim Dondero was

---

[151] Motion, ¶ 96; Plaintiff also ignores Nancy Dondero's business experience outlined in Def. Ex. 2, N Dondero Dec., ¶ 2, Def. Appx. 80.
[152] *Id.* at ¶ 9, Def. Appx. 83.

undercompensated as compared to other senior executives in the financial services industry.[153] She also knew that executives in the financial services industry tend to be paid on a bonus or incentive basis.[154] Nancy Dondero knew that potentially increasing Jim Dondero's compensation through contingent loan forgiveness would have less of an impact on Plaintiff's financial condition than requiring it to pay him additional cash in salary or bonus.[155]

73.    Nancy Dondero was aware that Plaintiff owned an interest in Cornerstone, MGM, and Trussway, the portfolio companies that were involved in the Agreements.[156] Nancy Dondero knew that Plaintiff's business included, among other things, buying and selling portfolio companies or interests in them for a profit.[157] Nancy Dondero also knew that Jim Dondero would the person most involved in, and responsible for, Plaintiff's marketing and eventual sale of Cornerstone, MGM, and Trussway.[158] And Nancy Dondero knew and believed that the Agreements would operate to further motivate and incentivize Jim Dondero to maximize Plaintiff's return on its investments in Cornerstone, MGM, and Trussway.[159] That Nancy Dondero may not have known every detail identified by the Plaintiff has no bearing on whether she had sufficient information to cause Plaintiff to enter into valid and binding Agreements.[160]

---

[153] *Id.* at ¶ 4, Def. Appx. 80-81.
[154] *Id.* at ¶ 9, Def. Appx. 83.
[155] *Id.* at ¶ 10, Def. Appx. 83-84.
[156] *Id.* at ¶ 9, Def. Appx. 83.
[157] *Id.*
[158] *Id.*
[159] *Id.* at ¶ 10, Def. Appx. 83-84.
[160] Plaintiff ignores the fact that Plaintiff was the actual party to the Agreements, and, even if Nancy Dondero lacked specific information, Plaintiff cannot credibly claim that it too lacked that information.

CORE/3522697.0002/171927721.9

(iii)     **Nancy Dondero's Personal Lack of Financial Details Has No Bearing on the Validity or Enforceability of the Agreements.**

74.     Under Texas law, the parties to a contract determine what they need to know before entering into the agreement.[161] The summary judgment evidence confirms that Nancy Dondero knew and understood the nature of the Agreements, and had all of the information she believed she needed to cause Plaintiff to enter into them.[162]  Nancy Dondero did not investigate the additional specifics identified by the Plaintiff because she did not believe she needed that information in order to make an informed and reasonable decision regarding the Agreements.[163]

75.     Nevertheless, Plaintiff seems to argue that the Agreements should be invalidated under the doctrine of unilateral mistake, arguing that Nancy Dondero was mistaken about, or unaware of, certain facts. Under Texas law, a unilateral mistake is generally not grounds for voiding a contract, and can do so only when (i) the mistake relates to a material term, (ii) the mistake makes enforcement of the contract unreasonable, and (iii) the mistake is made despite the exercise of due care.[164]  Plaintiff does not allege the existence of any (much less all) of these conditions, or offer any supporting evidence.

76.     Unsurprisingly, Texas law does not permit a party to avoid a contractual obligation when it could have conducted further investigation into the facts and circumstances underlying the contract, but chose not to do so.

---

[161] *Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank*, 600 S.W.2d 856, 861 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) (recognizing that it is presumed that a contracting party has sufficient information to enter into an agreement in Texas).

[162] *Id.* at ¶¶ 11, 12, Def. Appx. 84.

[163] *Id.* The Debtor's claim that Alan Johnson, Jim Dondero's executive compensation expert, would deem Nancy Dondero incompetent to enter into the Agreements is absurd. Mr. Johnson never said this or anything like it. Rather, he testified that he had no awareness of the Agreements and had never ever heard Nancy Dondero's name, other than that she was represented by legal counsel.  Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 99:5-100:5, Pl. Appx. 01983.

[164] *Armstrong v. Assocs. Int'l Holding Corp*., No. 3:05-CV-02006-K, 2006 U.S. Dist. LEXIS 70043, **9-10 (N.D. Tex. Sept. 20, 2006) (*citing Ibarra v. Texas Employment Commission*, 823 F.2d 873, 879 (5th Cir. 1987)).

> It has been stated that 'though a court of equity will relieve against mistake, it will not assist a man whose condition is attributable to the want of due diligence which may be fairly expected from a reasonable person.' This is consistent with the general rule of equity that when a person does not avail himself of an opportunity to gain knowledge of the facts, he will not be relieved of the consequences of acting on supposition.

*Anderson Bros. Corp. v. O'Meara*, 306 F.3d 672, 677 (5th Cir. 1962) (internal citation omitted).

77.    Nancy Dondero had all of the information she considered necessary to decide whether to cause Plaintiff to enter into the Agreements.[165]  Plaintiff apparently disagrees, listing numerous details and specifics that it believes she should have investigated further.[166]  But Texas law does not permit a party to avoid a contract by claiming unilateral mistake when that party has conducted the due diligence it considered appropriate and necessary prior to entering into that contract. *Id.* This is exactly what happened here, and these facts cannot support a finding that the Agreements were – as a matter of law – the result of any "mistake" by Nancy Dondero.

### (iv)    Nancy Dondero Was Personally "Competent" to Cause Plaintiff to Enter into the Agreements.

78.    The only other possible construction of Plaintiff's "competency" argument is that Nancy Dondero lacked the personal capacity to cause Plaintiff to contract.  Texas law presumes that every party to a legal contract has sufficient capacity to understand the transaction involved, and the burden of proof to overcome this presumption is on the party challenging it.[167]  "A person has the mental capacity to contract under Texas law 'if she appreciated the effect of what she was doing and understood the nature and consequences of her acts.'"[168]

---

[165] Def. Ex. 2, N Dondero Dec., ¶ 11, Def. Appx. 84.
[166] Motion, ¶ 96.
[167] *Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*, No. 3:21-CV-01748-N, 2021 LEXIS 247218, 9 (N.D. Tex., Dec. 29, 2021).
[168] *Id.* (*quoting Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969)).

79.     A party lacks capacity to contract only when he or she is a minor, under a guardianship, mentally ill, or intoxicated.[169] The summary judgment evidence reflects that at the time she caused Highland Capital to enter into the Agreements, Nancy Dondero appreciated the effect of what she was doing and understood the nature and consequences of those acts.[170] Ms. Dondero was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment at the time she caused Highland Capital to enter into the Agreements.[171]

## 2. The Evidence Shows that Debtor was Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes under Shared Services Agreements

### a. The Affirmative Defense

80.     The Debtor declared a default under the NexPoint Note based on its allegation that NexPoint failed to make the December 2020 annual payment allegedly due under that note. Among other defenses, NexPoint pleads that Plaintiff caused the alleged default through its own negligence and fault.  Specifically, NexPoint had outsourced to Plaintiff the responsibility to ensure that NexPoint timely paid its payables, including under the NexPoint Note.  Plaintiff failed to properly discharge its responsibilities, causing the alleged default.  Accordingly, because Plaintiff caused the alleged default, plaintiff is estopped from seeking to capitalize on it.

### b. The Law

81.     Texas law recognizes that, when the plaintiff, through its negligence, has caused a delay in the defendant's performance of a contractual obligation, that delay is excused.[172]   As stated by one Texas appellate court:

---

[169] *Del Bosque v. AT&T Adver., L.P.*, 441 Fed. Appx. 258, 262 (5th Cir. Sept. 16, 2011) (*citing* Restatement (Second) of the Law of Contracts § 12(2) (1981)).
[170] Def. Ex. 2, N Dondero Dec. at ¶ 12, Def. Appx. 84.
[171] *Id.*
[172] *Collier v. Robinson*, 129 S.W. 389, 61 Tex. Civ. App. 164, 166-67 (Tex. Civ. App. 1910) ("plaintiffs were excused from payment of the purchase price of the property within sixty days from the date of the contract, in the event only of a finding by the jury that they were prevented from so doing by the negligence of the defendants").

It is settled law that one may not take advantage of, nor recover damages for, delays for which he is himself responsible, and that the time for performance is excused and a corresponding extension of time given where the delay is occasioned by the act or default of the party claiming the damages.

*Szanto v. Pagel*, 47 S.W.2d 632, 635 (Tex. Civ. App. – Austin 1932).[173]

### c.    The NexPoint SSA and the Debtor's Duties Thereunder

82.    There is no question of fact that, at all times material to the Debtor's claims of default, NexPoint and the Debtor were parties to the SSA.[174]  Under the SSA, NexPoint outsourced various functions to the Debtor and the Debtor was obligated to provide various services to NexPoint.  The Shared Services Agreement identifies at least three services that the Debtor was required to provide that are directly on point:

> (a) Back- and Middle Office. <u>Assistance and advice</u> with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, <u>payments</u>, operation, book keeping, cash management . . . <u>accounts payable</u> . . .
>
> (k) Ancillary Services. Assistance and advice on all things ancillary or incidental to the foregoing.
>
> (l) Other. Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of [NexPoint] as [NexPoint] and [the Debtor] may from time to time agree.[175]

83.    The SSA itself expressly required the Debtor to provide "assistance" and "advice" with respect to, among other things, "payments" and "account payable," including" all things "ancillary" or "incidental" to the same.

84.    There should be no question of fact that the foregoing included providing NexPoint with assistance and advice in making payments allegedly required under the NexPoint Note.  At a

---

[173] *Accord Alexander v. Good Marble & Tile Co.*, 4 S.W.2d   636, 639 (Tex. Civ. App. 1928), *writ ref'd* ("it is elementary that the owner is not entitled to recover damages brought about by his own wrong, regardless of whether the contract expressly so provided").

[174] Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, Pl. Appx. 04163 ("This Amended and Restated Shared Services Agreement. . .is entered into by and between NexPoint Advisors, L.P. . . .and Highland Capital Management, L.P. . . .").

[175] *Id.* at § 2.02, Pl. Appx. 04165-04166 ("Provision of Services") (emphasis added).

minimum, there is a genuine issue of material fact regarding this question.  In this respect, it is not parole evidence to consider the parties' past performance under a contract to determine their intention with respect to the same, so long as this is not offered to vary the express terms of a contract.[176] Here, the question is whether assistance and advice with respect to "payments" and "accounts payable," and all things "ancillary" or "incidental" to the same, included the Debtor assisting and advising NexPoint with respect to the alleged December 2020 annual payment. These phrases are not expressly defined in the SSA, so it is appropriate to consider the parties' prior course of dealing to understand the meanings of these terms.

85.    In this respect, Waterhouse, the CFO of the Debtor and an officer of NexPoint at the time, confirmed that the Debtor was responsible under the SSA to advise and assist NexPoint with respect to the alleged payment:

> Q.    Well, what about long term loans? Was it reasonable for NexPoint to expect debtor employees to ensure that NexPoint timely paid its obligations under longterm notes?
>
> A.    I mean, that is one of the things that the Highland personnel did provide to the advisors. Yes, we would -- we would – over the years, yes, we -- we -- we – we did do that generally. Again, I don't remember specifically but, yes, generally we – you know, we did do that.
>
>     . . . .
>
> Q.    And do you recall Mr. Morris had you go through the fact that NexPoint had made payments in years prior to 2020 on that note?
>
> A.    I do.
>
>     . . . .
>
> Q.    And what role in years prior to 2020 would employees of the debtor have had with respect to NexPoint making that annual payment?
>
> A.    We -- we -- we would have -- I keep saying "we." The team would have calculated any amounts due under that loan and other loans, as -- as standard course.  We would -- since we provided treasury services to the

---

[176] *See Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. – Texarkana 2013). *Accord O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").

advisors,[177] we would inform the -- the -- the -- we informed Mr. Dondero of any cash obligations that are forthcoming, whether we do cash projections.  If, you know, any of these payments would have -- or, you know, the sum total of all of these payments, including any note payments, if there were any cash shortfalls, we would have informed Mr. Dondero of any cash shortfalls. We could adequately plan, you know, in instances like that.  Or, sorry, we -- I say "we" – I keep saying "we" -- I keep wearing my -- again, my -- my treasurer hat.  But, yes, it is to -- it is to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are -- are upcoming and that -- and that are -- are scheduled to be paid.

. . . .

Q.   Prior to 2020, those services that you just described, would that -- on behalf of the debtor, would that have included NexPoint's payments on the $30 million note?

A.   Yes.

Q.   So someone at the debtor in treasury or accounting would have sent some schedule or a reminder that a payment would be coming due in the future. Is that generally the practice?

A.   Yes, we would -- you know, again, I didn't -- I didn't micromanage the teams, but we had a -- a corporate accounting calendar that we use as kind of a tickler file to keep track of payments.

I actually, you know, don't know how actively they're using that in -- in prior to 2020, but it was actively used at some point.

We did look at NexPoint cash periodically and cash for the other advisors as well and payments.  You know, we – payments like this would have appeared in our cash projections, in the advisor's cash projections.

And, again, as like I said earlier, they would have appeared there, so there would be time to plan for making any of these payments.

Q.   And based on your experience, would it have been reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note?

A.   Yes. Yes, they did. I mean, but I mean, but I don't think these -- these notes were any secret to anybody.[178]

---

[177] The "advisors" include NexPoint.
[178] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 333:14-338:8, Pl. Appx. 02132-02134 (objections omitted) (emphasis added).

86.     Debtor was able to perform these services because it had access to and control over the bank accounts of the corporate Defendants, including NexPoint, HCMS and HCRE.[179]   In addition to the testimony of Waterhouse—who testified about the issues, roles, and duties of the parties under the SSA—Hendrix, a senior accountant for the Debtor at that time and still the Debtor's controller, confirmed the Debtor's "treasury" duties under the SSA to advise NexPoint of the alleged December, 2020 payment:

> Q.     You mentioned treasury management as of 2019, May. What do you mean by treasury management? What is that?
>
> A.     Generally speaking, we – it's not just me as one person. We have checks and balances.
> My team would be in charge of sending out payments, reconciling bank statements, making sure money is in the right accounts, creating cash forecasts and reporting on those every week with the CFO and oftentimes the CEO.
> Generally that's everything that fell under the umbrella.
>
> Q.      And would your description of treasury management be the same for the December 2020 period?
>
> A.     Yes.
>
>  . . . .
>
> Q.     We'll cut to the chase. In December of 2020, the debtor was providing services to various other entities affiliated with Mr. Dondero; correct?
>
> A.     Correct.
>
> Q.     That would have included NexPoint Advisors, LP?
>
> A.     Correct.
>
> Q.      And you're aware that NexPoint Advisors was the obligor on at least one promissory note to the debtor; correct?
>
> A.     Correct.
>
> Q.      And did the debtor in December 2020 provide so-called treasury management services to NexPoint Advisors?
>
> Q.     (BY MR. RUKAVINA) As part of that, in December 2020, would it have been employees of the debtor that would have scheduled for potential payment, subject to approval by NexPoint, NexPoint's future obligations as they were coming due?

---

[179] Frank Waterhouse 10/19/21 Tr. 327:9-328:9, 359:17-22, 360:8-15, Pl. Appx. 02131, 02139.

CORE/3522697.0002/171927721.9

A.      Yes, we would have scheduled, only with approval.

Q.      And would that have included NexPoint's obligations on the promissory note to Highland?

A.      Yes.[180]

87.     Finally, Jim Dondero, in charge of NexPoint in December, 2020, and in charge of the Debtor in 2019 and prior years of the NexPoint Note, both the past practice and his understanding that the Debtor would advise him of any payments due under the NexPoint Note and his reliance on that advice, and that it did not occur in 2020:

Q.      Okay. And I just want to make sure that I have this right. Is it -- is it the corporate obligors' -- those three corporate obligors' contention that one of the reasons they didn't make the payments at the end of the year is that they were relying on Highland to make the payment for them?

A.      Absolutely.

Q.      Okay.

A.      It was due course de minimis, and those entities didn't have a single employee or capable financial person other than the people at Highland that were doing the shared services for them.

Q.      NexPoint didn't have any employees in December 2020. Is that your testimony?

A.      I was thinking about HCRE and Services had zero employees. NexPoint had employees but none that were involved in basic accounting functions.

        . . . .

Q.      I'm just – I'm just asking a pretty simple question, sir. I don't mean to be contentious with you. We have identified one defense that these corporate obligors contends exists; and that is, Highland was supposed to make the payment. Fair?

A.      Yes.

        . . . .

Q.      Okay. And do you know whether anybody acting on behalf of any of the three corporate obligors under the term notes ever took any steps in December 2020 to make sure that Highland would, in fact, make the payments that were due at year-end?

A.      No, there was a reliance on Highland.

---

[180] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 13:14-16:11, Pl. Appx. 03130 (objections omitted) (emphasis added).

Q.    Okay.  Is it your testimony that Highland was authorized to make the payments under the notes at year-end without being directed by a representative of the three corporate obligors?

A.    Yes.  It is my contention that that is how it worked in prior years also.

Q     And so you believe that nobody on behalf of any of the corporate obligors ever authorized or directed Highland to make the payments but that Highland did it without -- without direction?

A.    Yes, typically. And in 2017 or 2018, 2019, for sure.[181]

88.    Accordingly, based on the plain language of the SSA and the above testimony, there is ample evidence—if not overwhelming and conclusive evidence—that the Debtor had duties under the SSA to at least remind NexPoint of any upcoming payment on the NexPoint Note and to advise NexPoint regarding the same, if not outright facilitating and making the payment: certainly to advise NexPoint of the upcoming payment and warn of the consequences of not making the payments.

### 3.    The Debtor Failed to Assist, Advise, or Facilitate Any Payment Obligation

89.    Notwithstanding its duties under the SSA and the parties' prior understanding of, and practice, under the SSA and those duties, the evidence demonstrates that the Debtor did nothing to assist NexPoint with, or advise NexPoint regarding, much less to facilitate, NexPoint's alleged payment in December, 2020 on the NexPoint Note.

90.    First, and despite the testimony of both Waterhouse and Hendrix that the Debtor would have, pursuant to the SSA and prior practice, identified and flagged any upcoming payment obligations on the Note and sought approval from NexPoint to make the same, the evidence is that the Debtor failed to do so.  In the record are several weekly runs of upcoming payment obligations of NexPoint, from late November and December, 2020, which fail to include any payment

---

[181] Pl. Ex. 98, James Dondero 10/29/21 Tr. 458:11-463:25, Pl. Appx. 01785-01786 (objections omitted) (emphasis added).

obligation on the Note, even though various other payment obligations—including upcoming loan payments—are listed and scheduled.[182]  Most relevant is the payment run from December 31, 2020 itself, which fails to list or schedule any payment on the NexPoint Note.[183]

91.     Second, Dondero's testimony confirms that the Debtor failed to advise or assist him and NexPoint with respect to the alleged payment, or to facilitate the same, cause the same to be made, or to seek his approval to make the same.

92.     Third, Waterhouse and his team at the Debtor failed to facilitate or to make the payment, despite Dondero's testimony that he relied on them to do so and that this is how the payments had been handed in 2017, 2019, and 2019.[184]  Here, there is a disagreement between Dondero and Waterhouse on the facts.  Namely, Waterhouse testified that, in late November or early December, 2020, he advised Dondero of the upcoming payment on the NexPoint Note and that Dondero expressly instructed him to not make the payment, as NexPoint had overpaid the Debtor millions of dollars on the SSA.[185]  Dondero testified that he only instructed Waterhouse to forbear from making any additional payments for shared services fees because they had been overpaid.[186]  Obviously, the Court cannot determine whose version of the events is correct and whose testimony the jury believe, but either way, Waterhouse's testimony confirms that the Debtor failed to assist with, advice, or facilitate the alleged payment, albeit due to an alleged instruction from Dondero.  Either way, the Debtor was negligent and at fault for the alleged default, as explained below.

---

[182] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 6:7-8 (referencing Exhibits A1 and A2, which were not included in Plaintiff's Appx), Pl. Appx. 02051; Def. Ex. 3-D, Email from F. Waterhouse to K. Hendrix, dated November 25, 2020, Def. Appx. 204-208; Def. Ex. 3-E, Email from F. Waterhouse to K. Hendrix, dated December 31, 2020, Def. Appx. 210.
[183] *Id.*
[184] Pl. Ex. 98, James Dondero 10/29/21 Tr. 458:11-463:25, Pl. Appx. 01785-01786.
[185] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 390:4-392:17, Pl. Appx. 02147.
[186] Pl. Ex. 99, James Dondero 11/4/21 Tr. 151:8-152:23, Pl. Appx. 01850.

43

### 4. Debtor's Negligence and Fault In Creating an Alleged Default

93.     As demonstrated above, the Debtor failed to advise NexPoint of any upcoming

payment on the NexPoint Note, much less to facilitate the same.  As such, there is ample evidence,

at least to demonstrate a genuine issue of material fact, that it was the Debtor's own negligence

and fault that caused the alleged default—all the more so since, on summary judgment, NexPoint's

evidence is to be believed and reasonable inferences must be drawn in favor of NexPoint.  *See*

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

94.     In this respect, the SSA sets forth the applicable standard of care by which the

Debtor must discharge its duties under the SSA:

> "[T]he care, skill, prudence and diligence under the circumstances then prevailing
> that a prudent person acting in a like capacity and familiar with such matters would
> use in the conduct of an enterprise of a like character and with like aims."[187]

95.     Here, the analysis diverges depending on whether the jury will believe Waterhouse

that he did in fact consult with Dondero regarding whether NexPoint should make the December,

2020 alleged payment and that Dondero instructed him not to make the payment, or whether the

jury will believe Dondero that he gave no such instruction and was instead not consulted about the

payment.  As noted throughout, the Court cannot make this determination on summary judgment.

*See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

### (i)     If Dondero Did Not Issue the Non-Payment Instruction

96.     If a jury found that Dondero did not instruct Waterhouse to not cause the December,

2020 payment to be made, then the Debtor clearly breached the standard of care under the SSA by

doing *nothing* to assist and advise with respect to the payment, and no expert testimony is required

---

[187] Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, § 6.01, Pl. Appx.
04173.

on this issue because a layperson juror can reach this conclusion based on his or her own experience:

> under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken some form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013). *Accord Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008) ("an exception to the general rule is recognized where the [ ] lack of care and skill is so evident that the jury can find negligence as a matter of common knowledge").

97.     Because the jury could well accept Dondero's testimony, and because the SSA sets forth a standard of care that would therefore have been breached by the Debtor by doing nothing to assist or advise NexPoint on the December 2020 payment, which conclusion the jury may reach without resort to expert testimony, and drawing all reasonable inferences in favor of NexPoint, the Court should deny summary judgment based on NexPoint's affirmative defense of the Debtor's own negligence and fault without any need to consider the alternative if the jury were to accept Waterhouse's testimony on Dondero's alleged instruction.

### (ii)    If Dondero Issued the Non-Payment Instruction: Offer of Proof

98.     Conversely, if a jury accepted Waterhouse's testimony that Dondero instructed him to not make the December 2020 alleged payment, expert testimony would be helpful to appreciate the consequences. In such an event, the Debtor would still be at fault and would have committed negligence in failing to take any additional steps after receiving the alleged instruction, including to: (i) double check, at a minimum, that Waterhouse correctly understood Dondero; (ii) advise

CORE/3522697.0002/171927721.9

Dondero of the potential consequences of a missed payment; and (iii) try to dissuade Dondero from his alleged instruction.

99.    In this respect, NexPoint offers the expert opinion of its expert on this issue, Steven J. Pully.[188]  The Bankruptcy Court denied NexPoint's motion for leave to extend the expert witness designation, report, and discovery deadlines, even though NexPoint filed its motion seeking such leave only ten (10) days after Waterhouse's deposition, when NexPoint first learned of Waterhouse's testimony regarding the alleged instruction, which first triggered the potential need for expert testimony regarding whether the Debtor properly discharged its duties under the SSA *if* Dondero gave the alleged instruction.  NexPoint has timely filed a motion with the District Court seeking its review of the Bankruptcy Court's denial of its motion for leave, and hereby incorporates, to the extent necessary, said motion.[189]

100.    Accordingly, under this offer of proof, there is a genuine issue of material fact regarding the Debtor's own negligence and fault in creating the alleged default, even if a jury could accept Waterhouse's testimony regarding Dondero's alleged instruction.

101.    At a minimum, there is admissible evidence to create a genuine issue of material fact that the Debtor was negligent and at fault for creating the alleged default, and the law confirms that, in such an event, timely performance under the NexPoint Note was excused as a result of such negligence and fault: (i) the SSA was in place at the time and, under the SSA, NexPoint outsourced payment, accounts payable, and treasury service functions to the Debtor; (ii) these included assisting and advising NexPoint with regard to payment obligations due under the Note, and to facilitate NexPoint's timey payment of such obligations; (iii) the Debtor utterly failed to

---

[188] Def. Ex. 3-F, Expert Report of Steven J. Pully, Def. Appx. 212-235.
[189] *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines,* Case 21-03005-sgj [Doc. 86]; *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines,* Case 21-03005-sgj [Doc. 138].

take any steps to assist, advise, or facilitate the same or, if Dondero in fact instructed that the payment not be made, the Debtor utterly failed to take any steps thereafter consistent with its duties; and (iv) any resulting default in not making a timely payment under the NexPoint note is excused due to the Debtor's own negligence and fault.

### 5.      The HCMS and HCRE SSAs.

102.    For the reasons discussed in section D.2, *supra,* Plaintiff also owed the same services to HCMS and HCRE as it did NexPoint pursuant to its verbal SSAs with HCMS and HCRE.  Because the HCMS and HCRE SSAs carried with them the same obligations, rights, and duties as the NexPoint SSA, Plaintiff is also responsible for the skipped December 2020 annual payments for the same reasons outlined *supra*.  Therefore, there is sufficient summary judgment evidence creating a genuine issue of material fact that Plaintiff is responsible for these missed payments, and the Court must deny summary judgment.

### 6.      Prepayments by NexPoint and HCMS

#### a.      NexPoint Prepayments

103.    NexPoint presents evidence showing a course of conduct wherein prepayments on the NexPoint Term Note were accepted by the Plaintiff without default in prior years in contradiction to Plaintiff's claim that the term Notes required payment precisely on December 31 of each year.  This Court cannot resolve this issue at the summary judgment stage, as it raises a genuine issue of material fact regarding NexPoint's defense of prepayment.  Since the NexPoint Term Note is a contract, Texas law on contract interpretation and ambiguity must be applied.

104.    In Texas, it is clear that this Court's primary goal when interpreting the NexPoint Note is to "determine the parties' intent as reflected in the [Note's] terms."  *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009).  As further summarized:

CORE/3522697.0002/171927721.9

> When a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law.  A term is not ambiguous because of a simple lack of clarity.  Nor does an ambiguity arise merely because parties to an agreement proffer different interpretations of a term.  An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning.  Further, for an ambiguity to exist, both potential meanings must be reasonable.

*DeWitt County Elec. Coop. Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999).  However, when a contract contains an ambiguity, ". . . the courts [may] consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument."[190] Additionally, "[e]vidence of trade usage and ***course of conduct*** is admissible to explain, supplement, or qualify a term or an agreement, but it may not be used to contradict an express term."[191]  And more importantly, Texas law requires a lender to apply prepayments to upcoming installments absent express, contrary instructions.[192]

105.    Here, the NexPoint Term Note itself is ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal.  Section 2.1 of the Note provides:

> 2.1  <u>Annual Payment Dates</u>.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment"**) until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of

---

[190] *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).
[191] *Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. – Texarkana 2013) (emphasis added); s*ee also O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").
[192] *See Williams v. Cambridge Cos.*, 615 S.W.2d 172, 175 (Tex. 1981) ("Even in the absence of [instructions to apply a prepayment to the next installment], the prepayment was correctly applied to the installment first maturing."); *Getto v. Gray*, 627 S.W.2d 437, 440 (Tex. App. 1981) ("In the absence of an express stipulation to the contrary, prepayments on an indebtedness are to be applied to the installments first maturing."); *Bacher v. Maddux*, 550 S.W.2d 405, 405 (Tex. Civ. App. 1977) ("Where a party prepays note payments, these prepayments are applied to the installments first maturing."); *Curry v. O'Daniel*, 102 S.W.2d 481, 482 (Tex. Civ. App. 1937) ("Under these circumstances, the law will make the application according to the justice and equity of the case and this usually requires that such payment be applied according to priority of time—that is to the installments first maturing . . . .").

this Note, commencing on the first such date to occur after the date of execution of this Note.[193]

Section 3 of the Note further provides:

> 3. <u>Prepayment Allowed; Renegotiation Discretionary.</u> Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.[194]

106.    Clearly, the NexPoint Note does not require the annual payment on December 31 despite any prepayments.  In fact, the NexPoint Note contains **no** provision to the effect that a prepayment will not relieve the maker of any regularly scheduled payment.  James Seery – testifying for the Debtor – confirmed this at his deposition.[195]  Most importantly, NexPoint **never made the full annual payment** on December 31 in 2017, 2018, or 2019.[196]  For example, NexPoint paid $294,695.10 on December 18, 2018.[197]  NexPoint paid $530,112.36 on December 30, 2019.[198]  Yet there were **no defaults** because, as explained below, NexPoint had prepaid the annual payment.  Therefore, it is clear from the language of the Note, the parties' understanding of the NexPoint Note, and the parties' course of conduct that the annual installment payment can be prepaid, and was prepaid in the past.

107.    The ambiguity in the NexPoint Note is fairly straightforward: can NexPoint prepay future interest?  The Note itself says that it can "prepay . . . accrued interest."[199]  Accrued interest is of course interest that has already accrued, but the Note expressly permits NexPoint to prepay this interest, in effect prepaying future interest.  Yet the Note also provides that "payments on this

---

[193] Pl. Ex. 2, Amended Complaint against NPA et al., Exhibit 1, Pl. Appx. 00042.
[194] *Id.*
[195] Def. Ex. 3-A, Deposition of James P. Seery (65:20-66:2), Def. Appx. 113-114 ("It's -- it says on, but typically there's no issue about prepayment and that paragraph 3 says you can prepay").
[196] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[197] *Id.*
[198] *Id.*
[199] Pl. Ex. 2, Amended Complaint against NPA et al., Exhibit 1, Pl. Appx. 00042.

Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof."[200]  This provision forecloses the ability to prepay future interest, since any prepayment can only be applied to accrued interest and then to principal.  This is the ambiguity in the Note itself: on the one hand, the Note permits NexPoint to prepay future interest, while on the other hand, such prepayment is impossible.

108.    There is no question that the parties – well before this litigation – understood that NexPoint was permitted to prepay future interest.  On May 9, 2018, NexPoint paid $879,927.65 on the Note.[201]  The ***entirety*** of this payment was applied as a prepayment towards future interest for the months of May through October, 2018, and ***none*** of it was applied to principal.[202]  Likewise, on December 5, 2017, NexPoint made a payment of which $127,030.67 was applied to future interest on the NexPoint Note, such that no payment was due – and no payment was made – on December 31, 2017.[203]  Similarly, on December 18, 2018, $60,727.60 of NexPoint's payment was applied to future interest.[204]   In addition to the parties' actual practice and conduct, Mr. Seery confirmed at his deposition that future interest can be prepaid under the NexPoint Note: "Interest accrues on this note.  How you prepay it is you send the money before the accrual date."[205]  Thus, NexPoint can prepay and has prepaid future interest under the Note, as evidenced by the parties' actual practice and Mr. Seery's testimony, regardless of Section 3's implication that prepaying future interest is impossible (since that provision provides that any prepayment is first applied to accrued interest and then to principal, leaving no room for any prepayment of future interest).

---

[200] *Id.*
[201] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] Def. Ex. 3-A, Deposition of James P. Seery (67:15-22), Def. Appx. 114.

109.    As noted, NexPoint prepaid the Note by $6,380,000.00 in 2019.  Plaintiff clearly

concluded that the 2019 annual principal payment on the Note had been prepaid because there was

no such payment made on December 31, 2019.[206]  But, the Debtor billed NexPoint for $530,112.36

for accrued interest on December 30, 2019, which NexPoint paid.[207]  This was the Plaintiff's error.

In fact – as consistent with prior payments – the large prepayments in 2019 should have prepaid

*future* annual instalments as there is no provision in the Note that links any prepayment to simply

the annual payment for the year in which the prepayment is made; *i.e.* nothing in the Note prevents

a prepayment of annual instalments due in future years.   In sum, when NexPoint made

$6,380,000.00 in 2019, those payments should have been applied to future annual installments in

accordance with the parties' course of conduct and prior dealings.

110.    Fortunately, Texas law addresses the situation where a debt instrument fails to

specify how a payment should be applied against the underlying obligation.  Generally, the debtor

may direct the application of a payment in the absence of a written agreement providing otherwise.

*See Parrish v. Haynes*, 62 F.2d 105, 107 (5th Cir. 1932).  "When a debtor fails to properly exercise

his power to direct the application of the payment, the creditor ordinarily may apply the payment

to any valid and subsisting claim he has against the debtor."  *W.E. Grace Mfg. Co. v. Levin*, 506

S.W.2d 580, 585 (Tex. 1974).   However, the creditor may "not make an application that is

inequitable and unjust to the debtor."  *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 269

(Tex. 1974) (emphasis added).  This is a "limitation on the general rule that in the absence of

application of payments by the parties themselves the law applies them to the oldest items then

due."  *Id.*

---

[206] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[207] *Id.*

111.    However, if neither the debtor not creditor make a proper application of a payment, then "the law will make the application according to the justice of the case." *Phillips v. Herdon*, 78 Tex. 378, 384 (Tex. 1890). *Accord Texas Co. v. Schram*, 93 S.W.2d 544, 548 (Tex. Civ. App. – Austin 1936) ("the law makes the application which is in accord with the justice and equity of the particular case"). And, importantly:

> that the debtor has the absolute right to make the application if he sees proper to exercise it. If he omits to do so, and it is left to the law to make it for him, it ought, it would seem, to be made in accordance with the presumed intention of the debtor. And we think it must be presumed that the debtor intended to apply it to the debt that would be most beneficial to him.

*Phillips*, 78 Tex. at 385.

112.    The Court cannot resolve these ambiguities and course of conduct issues on summary judgment. NexPoint intended that the payments in 2019 be applied as prepayments on the Note in 2019. Plaintiff agreed and understood this to be the case as well.[208] The only question is what the prepayments should be applied to and, in particular, whether they should have been applied to the 2020 annual installment. NexPoint did not expressly direct such prepayment. And, the Plaintiff did not apply the prepayments to the 2020 annual installment. Although the Plaintiff's application is to be given weight, it should not result in a manner that is "inequitable and unjust" to NexPoint. And, the ultimate application of the payments must be made in equity and under the facts and equities of the case, with the presumption that NexPoint "intended to apply [the prepayments] to the debt that would be most beneficial to [it]." *Phillips*, 78 Tex. At 385.

### b.    HCMS Prepayments

113.    Similarly-situated to NexPoint, HCMS also presents evidence showing a course of conduct wherein Plaintiff consistently accepted prepayments prior to December 31 of a given

---

[208] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 81:13-82:3, Pl. Appx. 03147.

calendar year for the HCMS Term Note, but never considered the Note to be in default when a payment was not made precisely on December 31.[209]  Further, the allocation of HCMS' prepayments on the Note between principal and interest raise the same defensive issue of ambiguity as the NexPoint Note discussed *supra*.

114.    The terms of the HCMS Term Note and the NexPoint Term Note are nearly identical, with both presenting the same ambiguity issues.  Section 2.1 of the HCMS Term Note provides:

> 2.1 <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment")** until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.[210]

Further, Section 3 of the HCMS Term Note provides:

> 3.  Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.[211]

115.    HCMS never made a single payment on December 31 of 2017, 2018, or 2019.[212] And, yet again, Plaintiff never called for payment or declared the HCMS Term Note to be in default in January – or any other month – of 2017, 2018, or 2019.[213]  However – like NexPoint – HCMS made large payments on the Note in 2017, 2018, and 2019 that it believed applied towards future scheduled payments on the HCMS Term Note.[214]  Specifically, HCMS paid $6,395,236.52 on the Note in 2017 ($5,395,319.15 more than the annual installment), $1,160,665.94 on the Note in 2018

[209] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[210] Pl. Ex. 3, Amended Complaint against HCMS, Exhibit 6, Pl. Appx. 00134.
[211] *Id.*
[212] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[213] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25; Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[214] *Id.*

($160,748.57 more than the annual installment), and $7,230,360.49 on the Note in 2019 ($6,230,443.12 more than the annual installment).[215]  Again, none of these payments were made on December 31, and at no time did Plaintiff declare the Note in default.[216]

116.    Applying the same Texas precedent raised *supra*, the Court should look to the pattern of conduct between the parties to the instrument to determine how a contractual ambiguity should be resolved.  Here – similarly to the NexPoint prepayments – the Plaintiff accepted enormous prepayments by HCMS in the past, and never once raised the issue of default when it did not receive the annual installment payment on December 31.[217]  Working off of this pattern of conduct, Plaintiff was not entitled to declare the Note in default. Again, however, the Court cannot resolve these ambiguities and course of conduct issues on summary judgment.

117.    Additionally, even if there were any missed payments, payments were made on the NexPoint, HCRE, and HCMS Term Notes to cure any defaults.  "'An optional acceleration of maturity of a note can be waived by the acts and words of one who holds right of election.'"  *Vaughan v. Crown Plumbing & Sewer Serv., Inc.*, 523 S.W.2d 72, 75 (Tex. Civ. App. 1975) (quoting *Diamond v. Hodges*, 58 S.W.2d 187, 188 (Tex. Civ. App. 1933)).  As Defendants' evidence demonstrates, after learning about the alleged missed payments and talking with Frank Waterhouse, Plaintiff's CFO, Jim Dondero instructed him to make the payments and cure any default, and subsequently caused the payments to be made in January of 2021, payments that would not have been made if Mr. Waterhouse disagreed and told Jim Dondero that the payments would not cure and reinstate the loans.[218]  Therefore, to the extent there was a default, it was cured.

---

[215] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[216] Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[217] *Id.*
[218] *Id.* at ¶ 40, Def. Appx. 19-20.

CORE/3522697.0002/171927721.9

## IV.    Conclusion

118.    WHEREFORE, Defendants respectfully request this Court Deny Plaintiff's Motion for Partial Summary Judgment and grant such other and further relief as the Court deems just and proper.

Dated: January 20, 2022                    Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**ATTORNEYS FOR JAMES DONDERO,
NANCY DONDERO, HIGHLAND CAPITAL
MANAGEMENT SERVICES, INC. AND
NEXPOINT REAL ESTATE PARTNERS, LLC**


*/s/Clay M. Taylor*
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**ATTORNEYS FOR JAMES DONDERO**

CORE/3522697.0002/171927721.9

*/s/Davor Rukavina*
Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email:  drukavina@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.  AND
HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez