PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § | _____ |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**COMPLAINT FOR (I) BREACH OF CONTRACT
AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant, Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## PRELIMINARY STATEMENT

1.      The Debtor brings this action against HCMFA as a result of HCMFA's defaults under two promissory notes executed by HCMFA in favor of the Debtor in the aggregate original principal amount of $7,400,000 and payable upon the Debtor's demand.  Despite due demand, HCMFA has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      Through this Complaint, the Debtor seeks (a) damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Notes), and (b) turnover by HCMFA to the Debtor of the foregoing amounts.

## JURISDICTION AND VENUE

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

2

4.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.       This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.       Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.       The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.       Upon information and belief, HCMFA is a limited partnership with offices located in Dallas, Texas and is organized under the laws of the state of Delaware.

## CASE BACKGROUND

9.       On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.      On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

### A.      The HCMFA Notes

13.     HCMFA is the maker under a series of promissory notes in favor of the Debtor.

14.     Specifically, on May 2, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note").  A true and correct copy of HCMFA's First Note is attached hereto as **Exhibit 1**.

15.     On May 3, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "Notes").  A true and correct copy of HCMFA's Second Note is attached hereto as **Exhibit 2**.

16.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

17.     Section 4 of each Note provides:

> **Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

18.     Section 6 of each Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

## B.     HCMFA's Default under Each Note

19.     By letter dated December 3, 2020, the Debtor made demand on HCMFA for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 3**.  The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

20.     Despite the Debtor's demand, HCMFA did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020 or at any time thereafter.

21.     As of December 11, 2020, there was an outstanding principal amount of $2,457,517.15 on HCMFA's First Note and accrued but unpaid interest in the amount of $35,884.46, resulting in a total outstanding amount as of that date of $2,493,401.61.

22.     As of December 11, 2020, there was an outstanding principal balance of $5,119,827.40 on HCMFA's Second Note and accrued but unpaid interest in the amount of $74,424.05, resulting in a total outstanding amount as of that date of $5,194,251.45.

23.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $7,687,653.07

24.     Pursuant to Section 4 of each Note, each Note is in default and is currently due and payable.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

25.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

26.     Each Note is a binding and enforceable contract.

27.     HCMFA breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

28.     Pursuant to each Note, the Debtor is entitled to damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

29.     As a direct and proximate cause of HCMFA's breach of each Note, the Debtor has suffered damages in the total amount of at least $7,687,653.07 as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

31.     HCMFA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs

and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

32.     Each Note is property of the Debtor's estate, and the amounts due under each Note are matured and payable upon demand.

33.     HCMFA has not paid the amounts due under each Note to the Debtor.

34.     The Debtor has made demand for the turnover of the amounts due under each Note.

35.     As of the date of filing of this Complaint, HCMFA has not turned over to the Debtor all or any of the amounts due under each of the Notes.

36.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

WHEREFORE, the Debtor prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by HCMFA to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)    Such other and further relief as this Court deems just and proper.

Dated:  January 22, 2021.                    **PACHULSKI STANG ZIEHL & JONES LLP**

                                             Jeffrey N. Pomerantz (CA Bar No.143717)
                                             Ira D. Kharasch (CA Bar No. 109084)
                                             John A. Morris (NY Bar No. 2405397)
                                             Gregory V. Demo (NY Bar No. 5371992)
                                             Hayley R. Winograd (NY Bar No. 5612569)
                                             10100 Santa Monica Blvd., 13th Floor
                                             Los Angeles, CA 90067
                                             Telephone: (310) 277-6910
                                             Facsimile: (310) 201-0760
                                             E-mail:    jpomerantz@pszjlaw.com
                                                        ikharasch@pszjlaw.com
                                                        jmorris@pszjlaw.com
                                                        gdemo@pszjlaw.com
                                                        hwinograd@pszjlaw.com

                                             -and-

                                             **HAYWARD PLLC**

                                             */s/ Zachery Z. Annable*
                                             Melissa S. Hayward
                                             Texas Bar No. 24044908
                                             MHayward@HaywardFirm.com
                                             Zachery Z. Annable
                                             Texas Bar No. 24053075
                                             ZAnnable@HaywardFirm.com
                                             10501 N. Central Expy, Ste. 106
                                             Dallas, Texas 75231
                                             Tel: (972) 755-7100
                                             Fax: (972) 755-7110

                                             *Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

EXHIBIT 1

# PROMISSORY NOTE

$2,400,000.00                                                                                    May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "***Note***").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

# EXHIBIT 2

**EXHIBIT 2**

# PROMISSORY NOTE

$5,000,000.00                                                                                            May 3, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

# EXHIBIT 3

**EXHIBIT 3**

# HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

      Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019.  Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021.  Payee reserves all rights with respect to such amounts.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:  Highland Capital Management, LP
Account #:        5500014686

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>Highland Capital Management Fund Advisors, L.P. |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward LLP<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, Texas 75201  Tel.: (214) 855-7500 |
|---|---|

| PARTY (Check One Box Only)<br>☑ Debtor            ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor         ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor            ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor         ☑ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1:  Breach of contract; Count 2:  Turnover pursuant to 11 U.S.C. 542

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☑ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $7,687,653.07 plus interest, fees, and expenses |
| Other Relief Sought | |

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>January 22, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund Advisors, L.P.*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for Highland Capital Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § § | |
| | § | |
| Defendant. | § | |

### <u>DEFENDANT'S ORIGINAL ANSWER</u>

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "<u>Defendant</u>"), the

defendant in the above-styled and numbered adversary proceeding (the "<u>Adversary Proceeding</u>")

filed by Highland Capital Management, L.P. (the "<u>Plaintiff</u>"), and files this its *Defendant's*

*Original Answer* (the "<u>Answer</u>"), responding to the *Complaint for (I) Breach of Contract and (II)*

*Turnover of Property of the Debtor's Estate* (the "<u>Complaint</u>").  Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

<u>**PRELIMINARY STATEMENT**</u>

1.    The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.    Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

<u>**JURISDICTION AND VENUE**</u>

3.    The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.    The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.    The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.    The Defendant admits ¶ 6 of the Complaint.

**THE PARTIES**

7.      The Defendant admits ¶ 7 of the Complaint.

8.      The Defendant admits ¶ 8 of the Complaint.

**CASE BACKGROUND**

9.      The Defendant admits ¶ 9 of the Complaint.

10.     The Defendant admits ¶ 10 of the Complaint.

11.     The Defendant admits ¶ 11 of the Complaint.

12.     The Defendant admits ¶ 12 of the Complaint.

**STATEMENT OF FACTS**

A.      **The HCMFA Notes**

13.     The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.     The Defendant admits ¶ 14 of the Complaint.

15.     The Defendant admits ¶ 15 of the Complaint.

16.     The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.     The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.     The Defendant admits ¶ 18 of the Complaint.

B.      **HCMFA's Default under Each Note**

19.     The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.     To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.     The Defendant denies ¶ 24 of the Complaint.

**FIRST CLAIM FOR RELIEF**
**(For Breach of Contract)**

25.     Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.     Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 26 of the Complaint and therefore denies the same.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 27 of the Complaint and therefore denies the same.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

to form a belief about the truth of the allegations in ¶ 28 of the Complaint and therefore denies the same.

29.    The Defendant denies ¶ 29 of the Complaint.

### SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.    Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response. All prior denials are incorporated herein by reference.

31.    Paragraph 31 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 31 of the Complaint and therefore denies the same.

32.    Paragraph 32 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 32 of the Complaint and therefore denies the same.

33.    The Defendant denies ¶ 33 of the Complaint.

34.    Paragraph 34 of the Complaint states a legal conclusion that does not require a response. The Defendant admits that the Plaintiff transmitted the Demand Letter. To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.    The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.    Paragraph 36 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

to form a belief about the truth of the allegations in ¶ 36 of the Complaint and therefore denies the same.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## JURY DEMAND

38.     The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

39.     The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
_____
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas  75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com
    jvasek@munsch.com

**K&L GATES LLP**

    Artoush Varshosaz (TX Bar No. 24066234)
    1717 Main Street, Suite 2800
    Dallas, TX 75201
    Tel: (214) 939-5659
    artoush.varshosaz@klgates.com

    A. Lee Hogewood, III (*pro hac vice*)
    4350 Lassiter at North Hills Ave., Suite 300
    Raleigh, NC 27609
    Tel: (919) 743-7306
    Lee.hogewood@klgates.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

<u>**CERTIFICATE OF SERVICE**</u>

    The undersigned hereby certifies that, on the 1st day of March, 2021, a true and correct copy of this document was electronically served by the Court's ECF system on parties entitled to notice thereof, including counsel for the Plaintiff.

    /s/ Davor Rukavina
    _____
        Davor Rukavina, Esq.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 19-34054-sgj-11**<br>Chapter 11 |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P., | Dallas, Texas<br>Tuesday, May 25, 2021<br>1:30 p.m. Docket |
| Debtor. | |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P., | **Adversary Proceeding 21-3003-sgj** |
| Plaintiff, | JAMES DONDERO'S MOTION TO<br>STAY PENDING THE MOTION TO<br>WITHDRAW THE REFERENCE OF<br>PLAINTIFF'S COMPLAINT [22] |
| v. | |
| JAMES DONDERO, | STATUS CONFERENCE RE: MOTION<br>FOR WITHDRAWAL OF REFERENCE |
| Defendant. | [21] |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P., | **Adversary Proceeding 21-3004-sgj** |
| Plaintiff, | STATUS CONFERENCE RE:<br>MOTION TO WITHDRAW THE<br>REFERENCE |
| v. | |
| HIGHLAND CAPITAL MANAGEMENT<br>FUND ADVISORS, L.P., | |
| Defendant. | |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P. | **Adversary Proceeding 21-3005-sgj** |
| Plaintiff, | STATUS CONFERENCE RE:<br>MOTION TO WITHDRAW THE<br>REFERENCE |
| v. | |
| NEXPOINT ADVISORS, L.P., | |
| Defendant. | |

```
                    TRANSCRIPT OF PROCEEDINGS
1
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.
2
    WEBEX APPEARANCES:
3

4   For the Debtor/Plaintiff:   Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
5                               10100 Santa Monica Blvd.,
                                  13th Floor
6                               Los Angeles, CA  90067-4003
                                (310) 277-6910
7
    For the Debtor/Plaintiff:   John A. Morris
8                               Gregory V. Demo
                                PACHULSKI STANG ZIEHL & JONES, LLP
9                               780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
10                              (212) 561-7700

11  For James Dondero,          Deborah Rose Deitsch-Perez
    Defendant:                  STINSON LEONARD STREET
12                              3102 Oak Lawn Avenue, Suite 777
                                Dallas, TX  75219
13                              (214) 560-2201

14  For Highland Capital        Davor Rukavina
    Management Fund             MUNSCH, HARDT, KOPF & HARR
15  Advisors, LP, and           500 N. Akard Street, Suite 3800
    NexPoint Advisors, LP,      Dallas, TX  75201-6659
16  Defendants:                 (214) 855-7587

17  Recorded by:                Michael F. Edmond, Sr.
                                UNITED STATES BANKRUPTCY COURT
18                              1100 Commerce Street, 12th Floor
                                Dallas, TX  75242
19                              (214) 753-2062

20  Transcribed by:             Kathy Rehling
                                311 Paradise Cove
21                              Shady Shores, TX  76208
                                (972) 786-3063
22

23

24
            Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
```

3

1          DALLAS, TEXAS - MAY 25, 2021 - 1:33 P.M.

2          THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, The Honorable Stacey Jernigan presiding.

5          THE COURT:  Good afternoon.  Please be seated.  All

6    right.  We have settings in some Highland adversary

7    proceedings.  These are motions to withdraw the reference in

8    three different adversary proceedings.  So I will start with

9    Highland versus Dondero, Adversary 21-3003.  Who do we have

10   appearing for Movant, Mr. Dondero?

11         MS. DEITSCH-PEREZ:  Deborah Deitsch-Perez.  Good

12   morning.  Or afternoon, Your Honor.

13         THE COURT:  Good afternoon.  All right.  For the

14   Debtor, who do we have appearing?

15         MR. POMERANTZ:  Good morning, Your Honor.  Good

16   afternoon, Your Honor.  Jeff Pomerantz and Greg Demo;

17   Pachulski Stang Ziehl & Jones.  Also on the line is John

18   Morris.  Greg Demo will be handling the argument today.

19         THE COURT:  All right.  Thank you.  I'll go ahead and

20   get appearances in the other two adversaries.  The next one is

21   Highland versus Highland Capital Management Fund Advisers,

22   L.P., Adversary 21-3004.  Who do we have appearing for the

23   Movant on this one?

24         MR. RUKAVINA:  Your Honor, good afternoon.  Davor

25   Rukavina for the Movant and Defendant.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 25    Filed 09/236    Page 31 of 159    PageID 27588

4

1          THE COURT:  All right.  Thank you.  So, same team

2    appearing for the Debtor on this one, I presume?

3          MR. DEMO:  Yes, Your Honor.

4          MR. POMERANTZ:  Yes, Your Honor.  I forgot to mention

5    Jim Seery, the Debtor's CEO and a member of the Independent

6    Board, is also present today as well.

7          THE COURT:  All right.  Thank you.  And last but not

8    least, we have the adversary Highland Capital versus NexPoint

9    Advisors, L.P., Adversary 21-3005.  Who do we have appearing

10   for the Movant, NexPoint?

11         MR. RUKAVINA:  Davor Rukavina again, Your Honor.

12   Good afternoon.

13         THE COURT:  Okay.  Good afternoon.  And then we have

14   the same team, I presume, for the Debtor for this one as well,

15   Mr. Pomerantz, correct?

16         MR. POMERANTZ:  That is correct, Your Honor.

17         THE COURT:  All right.  So, let's be sure the record

18   is crystal clear here.  These are status conferences with

19   regard to the three motions to withdraw the reference.  As we

20   all know, under Local Bankruptcy Rule 5011, the Bankruptcy

21   Court is required to hold a status conference, hear the

22   parties' arguments, and then make a report and recommendation

23   to the District Court to actually rule on the motions to

24   withdraw the reference.

25      We do have a motion for stay pending a decision on the

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 25    Filed 09/30/21    Page 32 of 159    PageID 27589

5

1   motion to withdraw the reference by Mr. Dondero, so the

2   Bankruptcy Court actually decides that motion.

3        All right.  So, as far as sequence on these, I don't know

4   if you all have talked and reached any agreements.  It

5   occurred to me there were two different reasonable ways to do

6   this.  We could have, for all three of the adversaries, each

7   of the Movants make their arguments -- in other words, Ms.

8   Deitsch-Perez and then Mr. Rukavina -- and then have the

9   Debtor collectively respond, and then rebuttal at the end, or

10  we could take this where we do Dondero first, argument, you

11  know.

12           MR. RUKAVINA:  Your Honor, Ms. Deitsch-Perez and I

13  had conferred and we had suggested that I begin, since I have

14  a couple arguments that are duplicative of hers, and then I

15  can finish my point, and then I know that her adversary has

16  other issues, and she can follow up with what I have said on

17  those other issues, if that's agreeable to the Court.

18           THE COURT:  Okay.  So, joint Movant presentation on

19  all three of these, but you go first and then Ms. Perez, and

20  then Mr. Demo would collectively respond to all three

21  arguments, and then back to you all for rebuttal?  Any

22  disagreement with that from the Debtor side?  Do you want to

23  argue for anything different?

24           MR. DEMO:  No, Your Honor.  That's fine with the

25  Debtor.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 25-1    Filed 09/06/22    Page 33 of 159    PageID 27590
Document    Page 6 of 236

6

1            THE COURT:  Okay.  Makes sense to me.  All right.

2     Well, with that, Mr. Rukavina, you may proceed.

3            MR. RUKAVINA:  Thank you, Your Honor.  And I will be

4     discrete and I will be brief, because I think that the issues

5     are discrete and brief and not evidentiary.  And I think we'll

6     talk about evidence and documents some time later.  We can

7     talk about that when the Debtor's turn comes.

8         To me, there's very few facts that are relevant, and those

9     facts appear on the face of the record, nor are they disputed.

10        My two clients have disallowed proofs of claim.  So they

11    did file proofs of claim.  Those claims were disallowed by

12    final order months ago.  So my clients are not prepetition

13    creditors of the Debtor.  Nor under any theory would these two

14    adversary proceedings involve anything having to do with my

15    clients' former claims.

16        I say that, of course, because we know *Stern v. Marshall*

17    and we know that whether there's a counterclaim or a claim, it

18    changes the jurisdictional analysis.  Here, the Advisors have

19    no claims.

20        These two adversaries are very, very simple.  The Debtor

21    has sued my clients on prepetition promissory notes.  So the

22    Court's decision or report and recommendation today comes down

23    to, I think, three very targeted issues:  Is a suit on a

24    promissory note, the prepetition promissory note, a core

25    claim?  One.  Two, do my clients have jury rights?  And then,

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 26-25 Filed 09/07/23 Document   Page 34 of 159   PageID 27591   Page 34 of 159

7

1    three, what about the Debtor's 542 action?

2        So, my two adversary proceedings are virtually identical.

3    The Debtor sues my clients for a breach of contract in not

4    paying these promissory notes, and the Debtor seeks a 542(b)

5    turnover.

6        In its responsive briefing, the Debtor has not contested

7    that the cause of action itself, the breach of contract, is

8    non-core, nor has the Debtor contested that I have jury

9    rights.

10       The Debtor's sole real argument, other than a bunch of mud

11   being thrown on the wall which I think has no relevance at all

12   today, not to the Court's jurisdiction, the Debtor's sole real

13   argument is that the 542(b) claim, which clearly is a core

14   claim, that the fact that they have sued for that claim

15   somehow now makes this whole adversary proceeding a core

16   claim, one in which I take it that jury rights aren't even

17   involved.  So we'll talk about that a little bit.  But those

18   are the three issues that I think that the Court needs to

19   focus on for the HCMFA and the NexPoint adversaries.

20       Obviously, a breach of contract claim, a suit on a

21   promissory note, that exists outside of bankruptcy.  That is

22   not a right or a cause of action created by a bankruptcy.

23   Clearly, that's a non-core matter.  That's the same as

24   *Marathon v. Northern Pipeline*, where it was a suit on a

25   prepetition contract.  And we have given Your Honor plenty of

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 25-1   Filed 09/09/21   Page 35 of 159   PageID 27592

8

1    case law, and I don't think it can really be disputed that,

2    all other things being equal, the Debtor's lawsuit for breach

3    of contract on a prepetition contract is a non-core claim.

4    That means that the reference -- whether the reference should

5    be withdrawn or not is an issue of permissive reference

6    withdrawal, because even though it's non-core, of course, the

7    Court can make a report and recommendation and there's a trial

8    de novo before the District Court.  But we begin with that

9    it's a non-core claim.

10       We add to this mix the *Stern v. Marshall*, which couldn't

11   be clearer in that, when all that a debtor is doing is trying

12   to augment its estate by prepetition causes of action, the

13   Court doesn't have constitutionally core jurisdiction.

14       So, now we look at the jury right.  There's no question

15   that there's a Seventh Amendment jury right when you're being

16   sued for breach of contract.  That's as *Bankruptcy 101*, as

17   *Common Law 101*, as it gets.  And my clients are being sued for

18   breach of contract.  We have asserted our jury right.  Again,

19   because the prepetition proofs of claims have been adjudicated

20   and are in no way, shape, or form linked with these two

21   promissory notes, it's impossible to argue that we have

22   somehow waived our jury rights.  And the Debtor has not made

23   that argument, to its credit.

24       So, because the Fifth Circuit holds that when it comes to

25   jury rights reference withdrawal is mandatory, we believe that

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document Documeent Filed 09/0936    Page 36 of 159    PageID 27593

9

1  the Court must withdraw or that the District Court must

2  withdraw their reference of these two adversary proceedings,

3  the only question then being at what point in time should the

4  District Court do that.  And we can talk a little bit about

5  that.

6      If Your Honor needs to understand the basis of my clients'

7  prepetition proofs of claim, I can certainly go through those

8  in detail.  Suffice it to say that those claims led with --

9  have to do with overpayments and not getting benefits of the

10 bargain for the transiti... I'm sorry, for the prepetition

11 shared services agreements.  So even if there was some

12 relation between the disallowed claims and the Debtor's claims

13 in that situation, there is no core nucleus of operative

14 facts.  Again, these are standalone promissory notes that have

15 nothing to do in the world with those disallowed claims under

16 the shared services agreements, nor have we asserted any

17 affirmative defense or setoff based on those disallowed

18 claims.  So, again, all you're dealing with are prepetition

19 promissory note claims against someone who is not a

20 prepetition creditor of this estate.

21     Now we go to the 542(b) issue.

22          THE COURT:  Can I --

23          MR. RUKAVINA:  Your Honor, we believe --

24          THE COURT:  Can I interrupt with a question?  And

25 this wasn't really argued in any of the pleadings, and yet

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 76-15   Filed 11/09/21   Page 37 of 159   PageID 27594

10

1    it's sticking in my brain as an issue, maybe.  This is a

2    NexPoint issue only.  Okay?  The NexPoint note, unlike the

3    other notes in these three adversaries, is not a demand note.

4    It, as you know, had the annual payments, and the whole

5    complaint of the Debtor is centered around NexPoint missed its

6    December 31, 2020 payment.  That was a default.  The Debtor

7    was entitled to accelerate and declare the whole amount due.

8    So here's where I'm going.  In this adversary, the NexPoint

9    adversary, there's an affirmative defense argued by NexPoint

10   that basically:  Debtor, you made us default because you,

11   under the shared services agreement, were doing accounting

12   work for us, and I'm paraphrasing, but that's the argument,

13   that you were negligent in performing your duties under the

14   shared services agreement and made us default.

15        So here's my question.  As I understand it, NexPoint has

16   an administrative expense that it has asserted in this case

17   that we've kicked the can down the road and I can't remember

18   now when we're going to have the trial on that.  My question

19   is, even though NexPoint's proofs of claim have now been

20   disallowed, what if your defense in this case is inextricably

21   intertwined with your administrative expense claim?  I mean,

22   (a) is that the case, and (b) does that all of a sudden

23   convert the breach of contract to a core matter?

24        MR. RUKAVINA:  Your Honor, I think those are

25   insightful questions, but I think that it's an easier answer,

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 10-51    Filed 11/09/21    Page 38 of 159    PageID 27595
Document 10-51    Page 109 of 486

11

1   because they are not inter -- I have a hard time pronouncing

2   that.

3           THE COURT:  Me, too.

4           MR. RUKAVINA:  They're not intertwined.

5           THE COURT:  Uh-huh.

6           MR. RUKAVINA:  They're not inseparable.  The base of

7   the administrative claim is that we were billed by the Debtor

8   postpetition for services that the Debtor didn't provide, so

9   we were paying for Debtor employees who weren't there.  In

10  other words, we overpaid.  The Debtor overbilled us to the

11  tune, between both Advisors, to the tune of $14 million for

12  employees that the Debtor had long terminated ago and wasn't

13  providing.

14      The basis, therefore, of the postpetition overpayment has

15  nothing to do in the world with the Debtor's own negligence --

16          THE COURT:  Okay.

17          MR. RUKAVINA:  -- in how it provided services to us

18  regarding this promissory note.

19          THE COURT:  Okay.

20          MR. RUKAVINA:  We have chosen, and I -- we have

21  chosen, and I think it's right, it's our right, we have chosen

22  to assert the Debtor's -- obviously, it's alleged at this time

23  -- we have chosen to assert the Debtor's failure to us as an

24  affirmative defense to this promissory note.  We have not

25  chosen to assert that as an affirmative cause of action

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 10-5    Filed 10/26/21    Page 39 of 159    PageID 27596

12

1    seeking money damages for negligence or something like that.

2    And we have done that intentionally, to be quite blunt, so as

3    to keep it apart from the admin claim.  Because the admin

4    claim clearly is a core matter.  We're not arguing that the

5    reference should be withdrawn.  That's set for trial in late

6    September.  And that body of discovery, really, will be

7    completely separate from this.  We have intentionally kept

8    them separate, and perhaps the Debtor has as well, so as to

9    not cloud the issues.

10        This is a clean promissory note, and do we have an

11   affirmative defense under Texas law because basically the

12   Debtor made us do it?

13        So that's my answer to the Court.  Now, if the Court takes

14   it to the next level and says, well, what you're really

15   saying, Mr. Rukavina, here is that you have an affirmative

16   postpetition cause of action against the Debtor, you're just

17   sprucing it up as an affirmative defense instead of an

18   affirmative cause of action, I would suggest to you that now

19   we're getting too much and too far into the whole *Stern v.*

20   *Marshall* issues.  What we have been sued on is a prepetition

21   promissory note.  That's it.  And we have no prepetition

22   claim.  And I don't think we should be crossing a potential

23   prepetition cause of action against us against a postpetition

24   right that we have against the Debtor.

25             THE COURT:  Okay.

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 10-35   Filed 09/07/86   Page 40 of 159   PageID 27597

13

1           MR. RUKAVINA:  Finally, Your Honor, just briefly on

2     the 542(b) issue, it really is purely an issue of law.  We

3     have cited to you three opinions from this district -- pardon

4     me -- that go back to Judge Abramson.  There's the *Satelco*

5     case, which I think is a very well-known case.  It's been

6     cited to many, many times.  There's also Judge Lynn's opinion

7     in *Mirant*.  And those opinions just basically say, okay,

8     debtor, if you're suing on a prepetition receivable, a

9     prepetition promissory note, you can't use 542(b) to put the

10    cart before the horse.  You've got to prove that your

11    counterparty is liable to you, and then, then, 542(b) is

12    really a remedy, it's a collection remedy, the same as any

13    post-judgment remedy.

14          The Debtor doesn't like these old opinions.  It calls them

15    old; I call them *stare decisis*.  And the Debtor argues, well,

16    you should do what these other bankruptcy courts from across

17    the country have done and you should basically just use 542(b)

18    to try the prepetition receivable.  So, forget about jury

19    rights, forget about core.  542(b), according to the Debtor,

20    is the congressionally-mandated new cause of action that lets

21    the Court actually liquidate a claim even before it collects

22    on that claim.

23          I have pointed out the absurdity with this argument.  The

24    argument is the same as saying, well, Judge, why don't you

25    give me -- you can give me a turnover order, you can give me a

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-65   Filed 10/06/86   Page 41 of 159   PageID 27598

14

1    receiver, so because you can do that, let's now just liquidate

2    an actual cause of action in the context of a turnover.

3    That's not how it works.  You get your judgment, you get your

4    right to a payment, and then you get your remedies.

5        It's not just me saying that, Your Honor.  I have cited

6    the D.C. Circuit, the Eleventh Circuit, the Eighth Circuit,

7    and a host of lower district court opinions from across the

8    country that confirm that, that 542(b) cannot be used to

9    liquidate a disputed claim.

10       I submit, respectfully, that if the Court decides to

11   rewrite *Satelco*, if the Court believes that 542(b) can be used

12   as an actual cause of action, one, I would remind the Court

13   that in a case a few years ago against Michael Craig Kelly,

14   where we had a reference withdrawal, Diane Reed, the Trustee,

15   was also trying to use 542(b).  The Court, in its report and

16   recommendation to the District Court, basically said that no,

17   as I have pointed out, you can't do that.  And I can certainly

18   share with Your Honor that report and recommendation.  I just

19   remembered it this morning, so I did not include it in my

20   briefing.

21       But if the Court decides to revisit the issue, then I

22   would respectfully submit that what we're creating here is

23   exactly a *Northern Pipeline* and a *Stern v. Marshall* issue.  As

24   *Northern Pipeline* made it clear, Congress cannot take a common

25   law cause of action, a cause of action between private

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 10-51   Filed 05/06/24   Page 42 of 159   PageID 27599

15

1    litigants, such as a breach of contract, such as a promissory

2    note, which is the most archetypical breach of contract claim

3    that there is, Congress can't take that, slap a different name

4    on it like turnover, and somehow undo the Constitution.  You

5    can't strip me of my jury rights on that, you can't strip me

6    of my right to an Article III judge, just because you label

7    this a 542(b) turnover.

8         And I respectfully submit, Your Honor, that if that is

9    what this Court recommends, and if that is what the District

10   Court does, then what we are really creating here is another

11   *Stern v. Marshall*.  And as I've been telling everyone that

12   I've known for the last 10 years, that's the last thing that

13   our practice needs.

14        So, Your Honor should recommend the withdrawal of the

15   reference for my clients because I believe that it's clear we

16   have a jury right.  I believe that the reference should be

17   withdrawn immediately.  This Court has more than enough going

18   on in this case.  There is no crossover discovery here.  And

19   if we're going to go to a jury, then it really ought to be the

20   District Court, that's the expert on jury trials, or its

21   magistrate judge, that's the expert on jury trials, deciding

22   pretrial and prejudgment matters, most of which will have to

23   do probably with what the quality of evidence and what

24   evidence there will be that can be even presented to the jury.

25        Your Honor, that's my argumentation, in a nutshell.  I

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-15   Filed 10/06/46   Page 43 of 159   PageID 27600

16

1   really don't have anything to add.  But I'm here to answer any

2   questions, and I will at the appropriate time talk about the

3   Debtor's purported evidence for today.  Thank you.

4           THE COURT:  All right.  Thank you.  No further

5   questions at this time.

6       Ms. Perez?

7           MS. DEITSCH-PEREZ:  Yes.  And could I share my

8   screen?

9           THE COURT:  You may.

10          MS. DEITSCH-PEREZ:  Okay.  Are you able to see the

11  screen?

12          THE COURT:  Yes.

13          MS. DEITSCH-PEREZ:  Okay.  And is the -- the full

14  screen is up there so you can see it?

15          THE COURT:  I can see it.  Uh-huh.

16          MS. DEITSCH-PEREZ:  Thank you.  Okay.  All right.

17  Because I start -- we -- Mr. Rukavina and I started at the

18  same time, there's a little overlap, but where we overlap I

19  will go quickly.

20          THE COURT:  Okay.

21          MS. DEITSCH-PEREZ:  Okay.  So a quick summary.  We

22  have a mandatory withdrawal of the reference argument because

23  of the involvement of federal nonbankruptcy law, and I'll go

24  into more detail on that in a moment.

25      Like Mr. Rukavina's clients, we have a required withdrawal

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-15    Filed 10/06/21    Page 44 of 159    PageID 27601

17

1    because of Mr. Dondero's jury right, which has not been

2    waived.  And I'll address the Debtor's two waiver arguments.

3        And there is permissive withdrawal because the claim is

4    non-core, it is a prepetition state law breach of contract

5    claim, and this Court could only report and recommend, and so

6    the efficiencies favor immediate withdrawal to the District

7    Court.

8        All right.  The Debtor cites a good number of cases, but

9    there is a Northern District of Texas case that looks at when

10    this Court should recommend immediate withdrawal of the

11    reference, and this is it.  And the Debtor says quite a lot

12    about the expertise that this Court has with the matter

13    generally and with Mr. Dondero generally and repeats Mr.

14    Dondero's name, I don't know, a couple dozen times, but that's

15    irrelevant.  Because once it's been determined that the action

16    involves non-Title 11 laws that affect interstate commerce,

17    the withdrawal of the reference is mandatory, regardless of

18    the expertise of either court.

19        And that's why, in *Great Western*, and I think it was Judge

20    Barefoot Sanders, said, if it's not a core proceeding -- and

21    this is not, for all the reasons that Mr. Rukavina noted --

22    the bankruptcy judge's finding would have to be reviewed de

23    novo, and that would result in duplication of effort and a

24    waste of resources, and that's why the most efficient

25    proceeding would be to go directly to the District Court.

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 10-35   Filed 10/07/46   Page 45 of 159   PageID 27602

18

1      And so the question the Debtor raises, well, there's

2   not -- they make light of the tax law that's involved.  So the

3   question is, well, how much nonbankruptcy law does there have

4   to be to implicate mandatory withdrawal of the reference?

5   Well, again, *Great Western* provides the answer.  It has to

6   materially affect the disposition of the case -- doesn't have

7   to be dispositive of the case -- and it has to involve

8   substantial consideration of IRS Code provisions.  What I took

9   out there was ERISA, not because it was something bad for us

10  but because ERISA isn't implicated here.

11      And the Debtor's cases don't really dispute that.  What

12  they all say -- and if you look at them, and we've pointed

13  that out in our reply brief -- the Debtor points to cases

14  where what the court says is this involves a routine tax

15  matter or something that is typically heard by bankruptcy

16  judges.  They make no argument that the issue here, which is

17  what are the tax implications of having a forgivable loan and

18  why does the law on how you create deferred compensation with

19  a loan, how does that relate, that's not something that

20  frequently comes up in a bankruptcy court.  In fact, we were

21  unable to find a single case where a bankruptcy judge dealt

22  with that issue.

23      So the only Northern District case that the Debtor raises

24  is one that's not remotely similar.  It's *Ondova*, where the

25  parties sought to withdraw the reference to an entire

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-51   Filed 10/06/21   Page 46 of 159   PageID 27603

19

1    bankruptcy case.  By contrast is *Great Western*, which says the

2    withdrawal of the reference is mandatory when you have this

3    kind of unusual or atypical tax matter.

4        So, what is the tax issue?  In Mr. Dondero's amended

5    answer and in his discovery responses, he contends that the

6    three notes are subject to a condition subsequent under which

7    they could be forgiven.  This is a form of deferred executive

8    compensation that's governed by rules set out in the federal

9    tax law.  If you do it wrong, it's deemed compensation

10   immediately and you owe taxes right away.  If you do it

11   correctly and the determination of the circumstances under

12   which the loan can be forgiven are not wholly in the debtor --

13   here, I mean debtor as in obligor's control -- then they can

14   be deferred compensation and then taxes are due at the point

15   at which the loan is forgiven, and then there is forgiveness

16   of debt income.

17       So, understanding these rules will inform the fact-finder

18   about the strength and the credibility of Mr. Dondero's

19   defense when he says, this is why I did this, this is what I

20   expected, this is how I anticipated the loans could become my

21   compensation and why.  So these tax considerations are pivotal

22   to the potential deferred compensation being structured in the

23   way that it was.

24       And this information was provided to the Debtor.

25   Interrogatory #1 asked Mr. Dondero to identify the condition

20

1  subsequent referred to in Paragraph 40 of the amended answer.

2  There were not many questions.  This is pretty much it on what

3  the Debtor asked about the defense.  They could have asked

4  more.  They didn't.  I presume they will ask when they depose

5  Mr. Dondero, but they did not yet.  So the absence of a fuller

6  record of what consti... of how the tax law works and why it's

7  important, that's because the Debtor simply didn't ask,

8  because they were content to instead make fun of the defense,

9  which is what they did in their papers.

10        And so the answer in the interrogatories is that the

11  condition subsequent referred to refers to the disposition of

12  the portfolio company interests that were managed or owned,

13  directly or indirectly, by Highland and its affiliates, or

14  managed, the disposition of those on a favorable basis or on a

15  basis wholly outside Dondero's control.  So when those things

16  happened and created a liquidity event, then those loans would

17  be forgiven and at that point Mr. Dondero would have income.

18  But those will all be explored further in discovery and in

19  expert testimony, both -- we anticipate a tax expert and a

20  executive compensation expert.

21        THE COURT:  Question for you.  Is this going to be an

22  issue that applies to all three loans?  Because one --

23        MS. DEITSCH-PEREZ:  Yes, it is.

24        THE COURT:  One of the promissory notes says, this is

25  a tax loan, and the other two do not say that.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 170-51    Filed 01/09/24    Page 48 of 159    PageID 27605

21

1          MS. DEITSCH-PEREZ:  But the records of the company --

2     and this was something that was submitted by the Debtor --

3     show that all three loans were recorded on the books as tax

4     loans.

5          THE COURT:  Okay.

6          MS. DEITSCH-PEREZ:  And so it simply -- and then, in

7     addition to that, all three loans, in -- I think it's either

8     Paragraph 8 or 9 of the note -- refer to other agreements, and

9     that would be somewhat baffling but for the fact that there is

10    in fact an other agreement here that presumably the Debtor

11    will explore when it deposes Mr. Dondero.

12         THE COURT:  Okay.

13         MS. DEITSCH-PEREZ:  So, going on to the turnover

14    claim, and I'm not going to beat what Mr. Rukavina said to

15    death because he said it quite well, but I'm just -- rather

16    than add some cases, I'm going to add *Collier's* to the mix,

17    which is certainly the premier authority.  And Debtor's

18    logical flaw is so well known that it has its own section in

19    *Collier's*, where it berates and bemoans the practice of some

20    district courts to use orders to turn over property of the

21    estate as an end run around *Marathon*.  And it says, in the

22    strongest possible terms -- and there's more cited in our

23    brief -- that an action on a promissory note is not a turnover

24    claim.  That's a breach of contract claim, if it's disputed.

25    And simply name-calling, as the Debtor does -- it says

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 10-11   Page 229 of 86   Page 49 of 159   PageID 27606

22

1    Dondero's claim is spurious and invalid; I think it also says

2    it's a red herring -- the right to a jury trial is not lost

3    because of the strength of the Debtor's disparaging remarks.

4    Instead, the Court should look at *Satelco* because it makes

5    clear that an action to recover a contested debt is not

6    properly the subject of a turnover action.  And in a way, the

7    Debtor tacitly acknowledged that, because it didn't just bring

8    a turnover claim, it brought a breach of contract claim, and

9    that's its principal claim, and that's the correct claim here,

10   and that's one on which Mr. Dondero has a right to a jury

11   trial.

12       So the Debtor then says ah-ha, you filed a proof of claim

13   with respect to the notes, and made a very big deal about it

14   in its response to the motion to withdraw the reference.  It

15   then had to sheepishly withdraw that in a supplement because

16   it recalled that the proof of claim regarding the notes was

17   withdrawn, and we've cited for the Court law that says, once

18   it's withdrawn, it's as if -- it's as if it never existed,

19   especially when, as here, it was withdrawn before the

20   adversary proceeding was filed.  So it preserved an absolute

21   right to a jury trial.

22       And there you can look at the *In re Manchester* case that

23   Judge Houser decided.  And there, even when a proof of claim

24   was withdrawn after the adversary case was filed, Judge Houser

25   determined that there was a genuine desire for a jury trial.

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 170-35   Filed 12/29/21   Page 50 of 159   PageID 27607

23

1   It wasn't fictional.  It wasn't vexatious or designed to

2   harass the debtor.

3        There's no question here that Mr. Dondero does want and

4   would for obvious reasons want a jury trial.  And so certainly

5   the withdrawn proof of claim should not be a barrier.

6        And then unrelated proofs of claim are also not a waiver

7   of the right to a jury trial.  It's only when the adversary

8   and the existing proof of claim are inextricably intertwined

9   -- I got the inextricably in -- that resolution of the -- if

10  resolution of a proof of claim would also resolve the

11  adversary, then there would be a waiver.  But we don't have

12  that here because the remaining proofs of claim are all in the

13  nature of contingent contribution or indemnity claims with

14  respect to things that haven't even happened yet.  And so they

15  in no way relate to this adversary.  They have to do with the

16  2008 taxes and other potential possible future events where

17  something might cause liability for Mr. Dondero as an officer

18  or director, and those have not arisen.

19       Okay.  In addition, the Debtor says that the setoff

20  affirmative defense causes a waiver.  And they only cite cases

21  from outside the jurisdiction.  The only case we found on the

22  issue in this jurisdiction is to the contrary.  That's *In re*

23  *Base Holdings*.  That's this Court's case.  So even a

24  counterclaim, much less a setoff, if it would not be resolved

25  by the adjudication of a party's proof of claim, the

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-51   Filed 12/20/21   Page 51 of 159   PageID 27608

24

1    Bankruptcy Court cannot constitutionally finally resolve the

2    setoff or counterclaim if it is in fact a non-core claim, as

3    here.

4        Here, the issue is even simpler because Mr. Dondero

5    dropped the setoff affirmative defense, as set forth in the

6    Debtor's -- the response to Debtor Interrogatory 3, and that

7    is annexed as Exhibit 4 in Mr. Dondero's appendix to the

8    motion.

9        So if you look at all of the factors -- and the 2020

10   *Curtis* case in the Southern District of Texas has a good

11   summary, and we cite that and you can find that in our

12   pleadings -- you look at whether it's core or non-core matters

13   predominate.  Here, the determination rests on the breach of

14   contract case.  The turnover claim is the remedy.  It's the

15   tail of the dog, not the dog.  You want to have efficiencies?

16   Well, here, because the Bankruptcy Court can only report and

17   recommend, it's more efficient for the District Court to have

18   the proceeding.  There is so much going on in this bankruptcy

19   proceeding that does not have to do with these notes that it

20   would expedite the bankruptcy to take this out.

21       On the issue of forum-shopping, the question is, who's

22   forum-shopping here?  Mr. Dondero has a right to a jury trial,

23   so it is only natural that he would want to be in the District

24   Court because that is the only place he can have a jury trial.

25   It's the Debtor that's forum-shopping because it has expressed

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-1    Filed 12/29/21    Page 52 of 159    PageID 27609

25

1    concern about the possibly more favorable District Court.  So

2    that's where the forum-shopping is, and so that consideration

3    weighs in favor of withdrawal.

4        Obviously, a jury demand has been made, so that is another

5    reason why there should be withdrawal of the reference.

6        So let's look at these factors.  The Debtor says this is a

7    simple note case.  So if in fact it's a simple note case,

8    which is a state court cause of action, there's no particular

9    bankruptcy court expertise needed.  And as we saw, there is

10   some federal law expertise needed on the tax issues.

11       Also, this issue is not intertwined with other matters in

12   the bankruptcy.  It's a core matter.  This Court can only

13   report and recommend.  The District Court has to conduct the

14   jury trial, so it would be most efficient for it to gain

15   familiarity.  As I said, it's the Debtor that's forum-

16   shopping.  If in fact, as the Debtor says, this case is so

17   clear, why is the Debtor afraid that the District Court may be

18   possibly more favorable?

19       And the most analogous case is the *In re Quality Lease*

20   case we cite.  There, the reference was withdrawn.  It was

21   withdrawn immediately.  And the Court indicated it was

22   particularly important for the reference to be withdrawn early

23   because the case was going to be tried to a jury and that

24   would mean there would be motions in limine.  These would --

25   that it would be better for the district court to be familiar

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 10-31    Filed 10/08/21    Page 53 of 159    PageID 27610

26

1  with the case in order to decide evidentiary issues, expert

2  issues, all of the things that are going to come up in this

3  case.

4      Okay.  And *Curtis*, which we cite in the brief, is

5  particularly instructive, and it argues for immediate

6  withdrawal of the reference when a jury trial is requested.

7      Okay.  So I'm briefly going to cover the motion for a

8  stay.  This Court has very recently made clear its view on

9  whether a stay should be granted pending the District Court

10  deciding the motion to withdraw the reference.  And that was

11  last week, when I was unable to be here.  But there, Mr.

12  Phillips was arguing against a stay that was being sought by

13  the Creditors' Committee, and this Court said very clearly

14  it's a hundred percent of the time my practice, and I think

15  the practice of other bankruptcy judges here, and it's out of

16  deference to the District Court, if the District Court ends up

17  withdrawing the reference, they may say I want to withdraw the

18  whole darn thing, we don't want you even doing pretrial

19  matters, we don't want to get ahead of them, and that's why

20  the Court was arguing that Mr. Phillips shouldn't be arguing

21  against the stay that was sought, because since they were

22  seeking to withdraw the reference, nothing should be happening

23  in the case until that was decided.

24      So there's no reason that Mr. Dondero should not be

25  afforded the benefit of that practice that the Court so

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 10-11   Filed 07/06/21   Page 54 of 159   PageID 27611

27

1    strongly asserted last week.  And it would also relive the

2    pressure of the breakneck pace that the Debtor has demanded

3    for this case, and it would allow for consistency between the

4    treatment of the parties in this case and the treatment of the

5    parties in the case involving the Creditors' Committee and the

6    Debtor.

7         Okay.  And just to sum up, we have the mandatory

8    withdrawal issues related to the tax law.  Mr. Dondero has not

9    waived his right to a jury trial, and this Court obviously

10   cannot constitutionally conduct a jury trial breach of

11   contract non-core matter, so this Court couldn't even

12   constitutionally make final findings.  And the summary

13   judgment motion that the Debtor has threatened, clearly, if

14   the Debtor is going to make a summary judgment motion, it

15   would be better for the District Court to have it.  That would

16   most certainly give the District Court the best heads up to be

17   able to conduct the jury trial, because there are factual

18   issues here.  And so this combination of factors and the

19   Debtor's not really even tacit admission -- it's pretty overt

20   -- that it has an advantage in the Bankruptcy Court dictates

21   that the reference should be withdrawn for all purposes

22   immediately.

23        And I thank you, and I'm going to try and see if I could

24   figure out how to turn off the sharing.

25             THE COURT:  Got it.

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 170-35   Filed 12/16/24   Page 55 of 159   PageID 27612

28

1          MS. DEITSCH-PEREZ:  Thank you.

2          THE COURT:  All right.  Thank you.

3      Mr. Demo, I'll hear from you next.  And I counted four of

4  my own cases that collectively Mr. Rukavina and Ms. Deitsch-

5  Perez argued -- well, three published ones, *JRjr33, Ondova,*

6  *Base Holdings*, and then Mr. Rukavina mentioned *Craig Kelly*.

7  So, what are you going to argue?  Are you going to tell me I

8  was wrong in all of those cases, or --

9          MR. DEMO:  I was --

10         THE COURT:  I'm sorry, that's not a fair question,

11  but it's -- it is what it is.  What would you like to say, Mr.

12  Demo?

13         MR. DEMO:  Well, I think first I'd like to start by

14  introducing some very limited exhibits, because -- and

15  normally I wouldn't do this, because I do think that it's

16  generally a legal matter, but Ms. Deitsch-Perez referenced the

17  notes, referenced tax issues that supposedly were in the

18  notes, referenced arguments that or defenses that Mr. Dondero

19  raised in his answer.  And quite honestly, none of that stuff

20  is in those things.  So I would like to put those into

21  evidence so that this Court can review them and we can have

22  them on the record.

23      And if that's all right with Your Honor, I can point you

24  to our witness and exhibit list in this case and have those

25  things admitted.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-15    Filed 12/29/0786    Page 56 of 159    PageID 27613

29

1          MR. RUKAVINA:  Your Honor, does Mr. Demo propose to

2    have those admitted for my two adversaries?

3          MR. DEMO:  No.  I think right now we would plan on

4    doing just a limited admission of Mr. Dondero's notes, Mr.

5    Dondero's first answer, and then his amended answer.  And we

6    are going to talk, you know, about a few other limited things,

7    about how the notes are on the balance sheet.  So I would like

8    to also admit the Debtor's schedules, which were admitted in

9    the motion to compel last Thursday, and then also to admit the

10   MORs, which were also admitted last Thursday as well.

11         MR. RUKAVINA:  Your Honor, I apologize.  Again, are

12   those being offered in my two adversaries or -- again, there's

13   no --

14         MR. DEMO:  I'm sorry, Mr. Rukavina.  The answer is --

15   for the MORs and for the schedules, the answer is no.

16         MR. RUKAVINA:  Okay.  And, of course, there was some

17   sound right when you gave me your answer.  At least, I didn't

18   hear your answer.

19         MR. DEMO:  The MORs and the schedules, we would admit

20   in your case as well.

21         MR. RUKAVINA:  Your Honor, I have no problem with

22   that.

23         THE COURT:  All right.  Well, before I see if Ms.

24   Perez has an objection, let me be a little bit more clear.  I

25   am looking at the witness and exhibit list that you filed at

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 170-31    Filed 01/09/24    Page 57 of 159    PageID 27614

30

1    Docket Entry 46.  Can you just go through that and tell me

2    which ones you're offering?

3              MR. DEMO:  Yes, Your Honor.  So, we filed -- we filed

4    an amended exhibit -- witness and exhibit list at Docket #48.

5    We filed that yesterday.  So that's what I'm looking at.

6              THE COURT:  Okay.  Let me pull that up.  I have the

7    notebook.  So what is the docket again?

8              MR. DEMO:  48, Your Honor.

9              THE COURT:  48.  In the Dondero adversary?

10             MR. DEMO:  Yes, Your Honor.  And we did also file

11   witness and exhibit lists in the NexPoint and HCMFA adversary,

12   but all the numbers are the same in those.

13             THE COURT:  Okay.  Bear with me.  (Pause.)  Okay.  I

14   have it pulled up now.  So which ones are you seeking to

15   offer?

16             MR. DEMO:  4, 5, and 6, which are the three Dondero

17   notes.

18             THE COURT:  4, 5, and 6, the three Dondero notes?

19             MR. DEMO:  We would also offer Mr. Dondero's

20   responses to the interrogatories and requests for admission,

21   which are 16 through 20.

22             THE COURT:  Okay.

23             MR. DEMO:  We would offer 28, 29, --

24             MS. DEITSCH-PEREZ:  Wait, wait, could you stop a

25   minute?  There is -- which interrogatory answers?  Because we

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-35   Filed 01/31/06 86   Page 58 of 159   PageID 27615

31

1   -- they're our Exhibit -- the interrogatory responses are

2   Exhibit 4 in our appendix.  Is this something different that

3   you're offering?

4           MR. DEMO:  I'm looking at my witness and exhibit

5   list, Docket #48.

6           MS. DEITSCH-PEREZ:  Uh-huh.  And what are the --

7           MR. DEMO:  And I'm looking at Entries 16, 17, 18, 19,

8   and 20.

9           MS. DEITSCH-PEREZ:  Yes, that's five things.  What

10  are the five things that you're seeking to admit?

11          MR. DEMO:  Mr. Dondero's objections and responses to

12  Highland's second request for production.

13          MS. DEITSCH-PEREZ:  Uh-huh.

14          MR. DEMO:  Mr. Dondero's objections and responses to

15  the first request for admissions.

16          MS. DEITSCH-PEREZ:  Uh-huh.

17          MR. DEMO:  Mr. Dondero's objections and responses to

18  second request for admissions.

19          MS. DEITSCH-PEREZ:  Uh-huh.

20          MR. DEMO:  Mr. Dondero's objections and responses to

21  Highland's first set of interrogatories.

22          MS. DEITSCH-PEREZ:  Uh-huh.

23          MR. DEMO:  Mr. Dondero's objections and responses to

24  Highland's second set of interrogatories.

25          MS. DEITSCH-PEREZ:  Okay.  Thank you.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-51    Filed 03/20/24    Page 59 of 159    PageID 27616

32

 1              MR. DEMO:  You're welcome.

 2              THE COURT:  All right.

 3              MR. DEMO:  And then next --

 4              THE COURT:  Go ahead.

 5              MR. DEMO:  Sorry, Your Honor.  Is Docket Entries

 6    20 -- I mean, excuse me -- Exhibits 28, 29, and 30, which are

 7    the Debtor's schedules, amended schedules, and Statements of

 8    Financial Affairs.

 9              MR. RUKAVINA:  And those are the only ones for my

10    case, right, Mr. Demo?

11              MR. DEMO:  Through current, yes.  We're going to have

12    MORs which will be in your case as well.

13              MR. RUKAVINA:  Okay.

14              MR. DEMO:  But yes.

15              THE COURT:  Okay.  28, 29, and 30.

16              MR. DEMO:  And then --

17              THE COURT:  Go on.

18              MR. DEMO:  And then 44 through 64, which are the

19    Debtor's MORs and then some limited backup, depending on the

20    --

21              THE COURT:  All right.  So, any objection -- I think

22    we've heard from Mr. Rukavina.  He's fine with those limited

23    items applicable to his adversaries.  Ms. Deitsch-Perez, any

24    objections?

25              MS. DEITSCH-PEREZ:  No.  I mean, I would note that

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-31    Filed 08/30/21    Page 60 of 159    PageID 27617

33

1    the notes are also annexed to the adversary complaint.

2                THE COURT:  Okay.

3                MS. DEITSCH-PEREZ:  So they're part of this record.

4    So, no objection to those.

5                THE COURT:  All right.  So these will be admitted.

6        (Debtor's Exhibits 4 through 6, 16 through 20, 28 through

7    30, and 44 through 64 are received into evidence.)

8                MR. DEMO:  Thank you, Your Honor.  I'd like to start

9    maybe a little bit out of order and start with the motion for

10   a stay pending resolution of this matter.  And I just want to

11   point out, well, first, obviously, that the Debtor is not in

12   favor of a motion for stay pending resolution of this matter,

13   because we've actually done significant amounts of work.  You

14   know, we had Mr. Seery's deposition yesterday.  Mr. Dondero's

15   deposition is scheduled for Friday.  Fact discovery ends on

16   Friday.  Discovery has been ongoing.  We've produced numerous

17   documents.  We've made numerous requests.  And Mr. Dondero has

18   made multiple prior requests to schedule -- to extend this

19   matter.  And the hearings on this matter are set for the next

20   90 to 100 days.

21       There is no basis to stay there, and there is a harm to

22   the estate in staying it, Your Honor.  Specifically, these

23   assets are material assets of the Debtor's estate.  They were

24   built into the plan projections.  And the liquidation and

25   collection on these assets will materially drive creditor

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 6-41    Filed 09/07/21    Page 61 of 159    PageID 27618

34

1  recoveries.

2      To the extent that there's a delay in that, and there

3  already is a delay because of these matters, but to the extent

4  that there's a further delay in that, there is a substantial

5  harm to the Debtor's creditors by that delay.

6          THE COURT:  Did you say discovery cuts off Friday,

7  this Friday?

8          MR. DEMO:  Yes, Your Honor.

9          THE COURT:  Okay.

10         MS. DEITSCH-PEREZ:  And that is over our objection.

11  We had sought a longer schedule, and the Debtor seems to be

12  trying to do an end run around the withdrawal of the reference

13  by pushing the case to conclusion before the District Court

14  can decide.

15         MR. DEMO:  I would object to that characterization,

16  Your Honor.  We're trying to get resolution and we're working

17  quickly towards that, as is generally the matter in

18  bankruptcy.

19         THE COURT:  Okay.  My only question is, is there a

20  scheduling order in place right now and discovery cuts off

21  this Friday under the governing scheduling order?

22         MS. DEITSCH-PEREZ:  That is correct.

23         MR. DEMO:  There is a scheduling order, yes.

24         THE COURT:  Okay.  Is there a motion to amend the

25  scheduling order pending, by any chance?

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 10-35   Filed 08/30/21   Page 62 of 159   PageID 27619

35

1          MR. DEMO:  No, there isn't, Your Honor.

2          THE COURT:  Okay.

3          MS. DEITSCH-PEREZ:  There was -- there was a motion

4    filed, the Debtor opposed it, and the Court granted a much

5    more limited extension than the -- than Mr. Dondero requested.

6          THE COURT:  Okay.

7          MR. DEMO:  Your Honor, I would just ask, you know,

8    I'm arguing.  Ms. Deitsch-Perez had her chance.  So, to the

9    extent that she has anything to add, I mean, I would --

10         THE COURT:  All right.  Well, I asked the question,

11   and I'm fine with both of you weighing in with an answer.

12         All right.  Continue.

13         MR. DEMO:  Yeah.  So, yes, so discovery ended Frida,

14   there is damage to the creditors with a delay, and we would

15   oppose the motion to stay.

16         And that's, you know, quite honestly, Your Honor, all we

17   really have on the motion to stay, because I think it wraps up

18   into the balance of the action, which is a core action which

19   should remain here.  It's a core action that doesn't have a

20   jury right and it's a core action that Your Honor can enter a

21   final order on.

22         And I meant to kind of go through that first, but I do

23   feel like I need to start with the mandatory abstention.

24   Because Ms. Deitsch-Perez has made a lot of references to the

25   Tax Code and a lot of references to tax law and a lot of

1   references to what Your Honor will have to rule on.  But quite

2   honestly, Your Honor, none of that is in the record.  Mr.

3   Dondero filed his first answer.  It didn't mention the Tax

4   Code.  The only affirmative defense was that the note had been

5   forgiven already.  Mr. Dondero filed his amended answer.  It

6   didn't mention the Tax Code.  The only affirmative defense is

7   that there was a condition subsequent that was tied to some

8   sale of assets without any more.  There is no reference to the

9   Tax Code.  There's no reference to specific code provisions

10  throughout these documents.  There's no reference to any code

11  provision in the three notes.

12       Ms. Deitsch-Perez made reference to somehow incorporating

13  other agreements into those notes.  Those notes are each two

14  pages.  None of them have that language.  They're all

15  standalone.

16       The only reference in this case, Your Honor, to taxes is a

17  reference in the first note, which is dated February 2, 2018,

18  saying that the proceeds of the note are used to pay Mr.

19  Dondero's tax liabilities.  That's it.  That is the only

20  actual reference in this case to any type of tax.

21       The fact that Mr. Dondero used the proceeds of the loan to

22  pay taxes really is irrelevant.  I mean, you can use the

23  proceeds of the loan to pay anything.  It doesn't implicate

24  the Tax Code.

25       What Your Honor is going to have to decide here is not tax

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 7-11   Filed 07/07/21   Page 64 of 159   PageID 27621

37

1   law.  What Your Honor is going to have to decide here is do

2   the four corners of these promissory notes beg for extrinsic

3   evidence.  Is the four -- in the four corners of these

4   promissory notes, is there ambiguity?  Did Mr. Dondero agree

5   to repay the Debtor the amounts owed to the Debtor on demand?

6   And all you have to look at for those are the two-page demand

7   notes that are in the evidence right now, Your Honor.

8       No references to the Tax Code.  No need to refer to the

9   Tax Code.  In fact, the only case that's been cited from a tax

10  court is the case, I think it's called *Salloum,* which is cited

11  in Mr. Dondero's responsive papers.  And in that, the Tax Code

12  -- that case says that what you have to do to determine

13  whether or not these notes are forgivable under tax purposes

14  is a fact matter.  It doesn't refer back to the Tax Code.

15      And what that case said and what the cite that Ms.

16  Deitsch-Perez, excuse me, Mr. Dondero's counsel said, put into

17  the document is that the factual things that you look at is

18  was there a written agreement, was there a promissory note,

19  was collateral issued, does the asset show up as an asset on

20  the Debtor's books and records as a loan or as a forgivable

21  loan?  None of those determinations require an analysis under

22  the Tax Code, and there's been no allegations or no statements

23  that it does.

24      Those factors are the same factors that Your Honor would

25  look at for a motion to recharacterize.  It's not a unique

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-25    Filed 08/39/05/36    Page 65 of 159    PageID 27622

38

1    thing.

2        There is no determination of Mr. Dondero's tax liability.

3    There's nothing.  And there's no references to it.  We haven't

4    had a case cite yet or a statutory cite yet for a statute that

5    you're going to have to interpret and analyze.  There is

6    literally nothing, Your Honor.  There are two-page demand

7    notes that make no reference to the Tax Code.  The only thing

8    Your Honor will have to do is determine whether or not they're

9    ambiguous and whether or not Mr. Dondero was given the money

10    and has an obligation under those two-page documents to pay

11    that money back.

12        Moving on from that, Your Honor, because I do think we

13    need to level-set a little bit on the other facts on this

14    case, because there were some things that were said that maybe

15    stretched it a little bit.  You know, specifically, Your

16    Honor, the adversary really does deal with demand notes, two-

17    page demand notes, and then one term note which is also two

18    pages.  Those demand notes and those term notes are

19    indisputably property of the Debtor's estate.  Those demand

20    notes and those term notes at issue here were included on the

21    Debtor's schedules that were filed in December 2019 when Mr.

22    Dondero was in control of the Debtor.  They were filed in

23    December 2019 when Mr. Frank Waterhouse, the Debtor's then-

24    CFO, was firmly in control of the Debtor's financial

25    operations.  They were included on the schedules.  Nobody

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-35   Filed 10/29/24   Page 66 of 159   PageID 27623

39

1  objected.

2       Those notes have been included on the MORs every single

3  month in this case, including the months prior to the

4  appointment of the independent directors.  The notes are

5  included as an asset on the Debtor's books and records.  And

6  as I mentioned earlier, the notes are included on the plan

7  projections that were filed in support of the Debtor's

8  disclosure statement and plan of reorganization.

9       Nobody has challenged these notes.  Nobody has challenged

10 the MORs, the plan projections, which showed these tens of

11 millions of dollars in notes as a material asset of the

12 Debtor's estate.  And that in and of itself is interesting,

13 Your Honor, because everybody in this courtroom objected to

14 the Debtor's disclosure statement and the Debtor's plan,

15 including objections to those plan projections, but they never

16 challenged these notes as an asset of the Debtor's estate.

17      And Ms. Canty, if you're on, can you please put up Exhibit

18 1, please, or Slide 1?

19      As she's doing that, Your Honor, just briefly, Mr. Dondero

20 owes the estate $9 million under three demand notes.  The

21 demand notes were issued in 2018, and as I said, they're each

22 two-page notes.  They were executed by Mr. Dondero, and

23 there's no dispute that Mr. Dondero got the money.  And as you

24 can see, Your Honor, this is the only payment term, the one

25 that's on the screen right now, that says accrued interest and

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-35   Filed 01/09/86   Page 67 of 159   PageID 27624

40

1  principal on this note shall be due and payable on demand of

2  the Payee.

3       On December 3, 2020, demand was made, and Mr. Dondero has

4  refused to pay.  The notes are accelerated.  The notes are not

5  in dispute.  And the amounts due under the notes, Your Honor,

6  are liquidated.  It's principal plus interest plus the costs

7  of collection.

8       If we can turn now to NPA, NexPoint Advisors, which, Ms.

9  Canty, is the next slide.

10      This term note was issued in May 2017.  Pursuant to the

11  term note, NexPoint borrowed $30 million from the Debtor.  The

12  term note was executed by Mr. Dondero in his capacity as the

13  control person for NexPoint.  As you can see very clearly

14  here, the notes were payable in annual installments on

15  December 31st of each calendar year.

16      It is not disputed that on December 31, 2020, a payment

17  was not made.  On January 7th, the Debtor sent a notice to

18  NexPoint Advisors, notifying them that they were in default

19  and that the notes were accelerated.  The notes, which are

20  property of the estate, are due and payable.

21      It's also not disputed that shortly after the Debtor sent

22  that note, NexPoint Advisors tried to make a payment, and that

23  payment was applied to past-due interest and principal, in

24  accordance with the terms of the notes.

25      NexPoint controlled the ability to make payments on these

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-31   Filed 10/06/21   Page 68 of 159   PageID 27625

41

1   notes, and chose not to.  Again, Your Honor, the amounts due

2   under this note are liquidated.  Principal plus interest plus

3   the costs of collection.

4        Finally, Your Honor, -- and Ms. Canty, if you can go to

5   the next slide -- Highland Capital Management Fund Advisors

6   borrowed $7.4 million from the Debtor in May of 2019 under two

7   promissory notes.  And as you can see on the footnote here,

8   Your Honor, these aren't the only debts that are owed by

9   Highland Capital Management Fund Advisors to the Debtor.

10  Highland Capital Management Fund Advisors, we'll just call

11  HCMFA, issued two other demand notes in favor of the Debtor,

12  and those were earlier, and there's a prior agreement that

13  says the Debtor would not demand payment on those notes until

14  May 31st of 2020.  That's the only reason they're not at issue

15  here.  And you'll see in the Debtor's schedules that these

16  notes were included in the aggregate amount owed by Highland

17  Capital Management Fund Advisors.

18       Again, Your Honor, the Debtor sent a demand note on

19  December 3rd.  The notes were not paid.  The notes are

20  accelerated.  The notes are due.  And the damages under the

21  notes are liquidated.  Principal plus interest plus the cost

22  of collections.

23       In each case, Your Honor, and you'll understand that --

24  excuse me, Your Honor.  The underlying agreement in each of

25  these cases is a note instrument.  It's a debt instrument.

1   Has there been a breach?  Yes, absolutely.

2          And Ms. Canty, you could take that down now, if you want.

3          There has been a breach.  The breach is the Debtor's

4   failure to pay.  And there are damages.  The damages are,

5   again, principal, interest, and costs of collection.  And

6   that's all that needs to be determined.  There's no need for

7   Your Honor to create a liability here.  This isn't a contract

8   where Your Honor has to assess whether or not a supplier

9   supplied widgets.  This isn't a contract where Your Honor has

10  to do a factual analysis and determine the damages.  There is

11  a debt here, and it's a liquidated debt that is owed to the

12  estate.

13     That, Your Honor, is how we get to Section 542(b).  In

14  each adversary proceeding, the Debtor has --

15          THE COURT:  Let me stop you there.  I mean, it's not

16  really liquidated, though, right?  You said there is a

17  liquidated debt.  Now, you're saying, oh, it's slam dunk,

18  we'll win on the breach of contract.  That's your idea of

19  this.  So treat it as liquidated.

20          MR. DEMO:  Well, no, I think --

21          THE COURT:  But it's not liquidated.  Your opposing

22  counsel says that's a problem.

23          MR. DEMO:  There's an amount owed under the note.

24  Well, Your Honor, I guess there's a slight distinction.  The

25  notes are disputed.  The obligation to pay the note are

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 10-5   Filed 06/30/22   Page 70 of 159   PageID 27627

43

1   disputed.  The amounts that were lent on the notes are just

2   simply on the face of the notes.

3       And I guess, jumping ahead, Your Honor, the fact -- and

4   you've heard it before, and you, I assume, will hear it again

5   -- the fact that the notes were disputed doesn't take this out

6   of the realm of 542(b).  And Mr. Dondero's counsel cited to

7   *Collier's*, and *Collier's* is clear on this and the case law is

8   clear on this.  The fact that there is a dispute does not mean

9   that 542(b) is not a correct mechanism to collect on a matured

10   note, a note that's payable on demand and a note that's

11   property of the estate.

12       And Your Honor, and I'll get into the case law, and maybe

13   I should just jump into it right now, but that's what, for

14   example, the Southern District of Texas found in 2018 in

15   affirming a bankruptcy court case in *Tow.*  In *Tow*, the facts

16   were that there was an account receivable owed to the Debtor.

17   The Debtor brought an action under 542(b) to recover that

18   account receivable.  The account receivable was challenged.

19   The defendant said he didn't owe the money because there was a

20   settlement agreement in place and he just didn't have to pay.

21   But the Bankruptcy -- I'm sorry, the District Court there,

22   affirming the Bankruptcy Court, said that because the account

23   receivable was property of the estate, that 542(b) was the

24   correct mechanism for the estate to collect on that, despite

25   the fact that there could have been a state law action if the

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X   Document 10-35   Filed 01/09/86   Page 71 of 159   PageID 27628

44

1    Debtor weren't in bankruptcy.

2              THE COURT:  Let me stop you there, --

3              MR. DEMO:  In ruling that way, --

4              THE COURT:  -- because I went back and pulled that

5    case earlier today, --

6              MR. DEMO:  Uh-huh.

7              THE COURT:  -- because, you know, I'm going to get a

8    little bit concerned if the Southern District of Texas goes a

9    different way than the Northern District.  And of course, we

10   don't have a Fifth Circuit opinion on point.  So gee, let's

11   see --

12             MR. DEMO:  Right, Your Honor.

13             THE COURT:  -- different *Tow v. Park Lake* was.  There

14   are a couple of nuances I read that I think maybe matter.  It

15   --

16             MR. DEMO:  Okay.

17             THE COURT:  The Court talks about -- starts out

18   talking about, in the very first sentence, that there had been

19   a settlement agreement between the bankruptcy trustee and Park

20   Lake, and then Park Lake, who owes money under the settlement

21   agreement, later receives proceeds from a utility company,

22   reimbursement of some sort, and then the Trustee asserted a

23   claim for turnover of that reimbursement under 542.  And then,

24   meanwhile, Park Lake files a motion to hold the Trustee in

25   civil contempt for violating the settlement agreement.

1    So, while Judge Rosenthal didn't make a big deal of these

2    facts in distinguishing her opinion from the Northern District

3    *Satelco* case, these do seem like rather important facts to me,

4    that there was a settlement agreement where account debtor

5    Park Lake is saying, okay, I agree, I owe you *x* amount, and

6    then later Park Lake gets some sort of proceeds of a utility

7    reimbursement, and then now all the Trustee is doing is

8    seeking turnover of that reimbursement.  That feels very

9    different than --

10            MR. DEMO:  Well, --

11            THE COURT:  -- a suit on a note, even if --

12            MR. DEMO:  -- it is different.

13            THE COURT:  Even if you think it's slam dunk, no

14    defenses are going to prevail at the end of the day, we do

15    technically have a breach of contract action that you must

16    prevail on first.

17            MR. DEMO:  Well, Your Honor, I mean, yes.  Is *Tow*

18    different on the facts?  Yes.  It's an accountant receivable.

19    It's not a note.

20        The fact that the amount -- the amounts were arguably owed

21    under the settlement agreement, you know, that was disputed.

22    If it hadn't been disputed, the amounts would have just been

23    turned over to the estate.  The fact that there was a fight

24    over it means that there was a fight over it.

25        But Your Honor, I mean, I think possibly the more

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-35   Filed 01/03/24   Page 73 of 159   PageID 27630

46

1   instructive case here is a case called *Faulkner v. Berg*, which

2   is actually out of the Northern District of Texas.  And it's a

3   2006 case from Judge Houser.  In that case, there was, Your

4   Honor, a promissory note at issue.  The Chapter 11 trustee

5   brought an action against a man named Berg because Berg owed

6   the estate money on a promissory note that was issued to Berg

7   in connection with -- I'm sorry, that -- not -- that Berg owed

8   the estate as compensation for certain services that he

9   received.

10       The Chapter 11 trustee brought an action on that

11   promissory note, and the complaint that the Chapter 11 trustee

12   filed included a breach of contract claim and a turnover claim

13   under 542(b).  Mr. Berg brought a number of affirmative

14   defenses, and Judge Houser still held that that was a core

15   proceeding under 542(b).  And it's a 2006 case, a case that

16   was issued after *Satelco*.  And notably, Your Honor, it just

17   honestly doesn't discuss *Satelco*.  It doesn't address it at

18   all.  It just finds that the action on the notes was a core

19   proceeding.

20       And now, Your Honor, the -- Mr. Dondero, in his responsive

21   papers, --

22           THE COURT:  What case was that again?  I just don't

23   remember this case.

24           MR. DEMO:  It was *Faulkner v. Berg*.  And I can get

25   you the case cite, if you'd like.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 10-15    Filed 04/19/21    Page 74 of 159    PageID 27631

47

1          THE COURT:  Okay.  Maybe I do remember it.  I just --

2      (Pause.)

3          MS. DEITSCH-PEREZ:  If I can direct the Court's

4   attention, there's also a subsequent case that I think the

5   Debtor was about to acknowledge.

6          THE COURT:  Okay.  We'll let you have your rebuttal.

7          MR. DEMO:  Yeah.  And I can -- instead of --

8          THE COURT:  Okay.  Go ahead, Mr. Demo.

9          MR. DEMO:  Yeah.  Instead of getting you the case

10  cite, Your Honor, I do think that subsequent case is

11  important, because Mr. Dondero cites it for the fact that the

12  District Court overruled the *Berg* court and found that motion

13  to withdraw the reference in that instance was correct.

14      But what Mr. Dondero neglects to say is that the action to

15  withdraw the reference that was brought to the District Court

16  was actually the second action.  The first motion to withdraw

17  the reference brought to the District Court was denied.  The

18  second motion to withdraw the reference was granted, but based

19  on entirely different facts.  Because Berg also had third-

20  party claims against a nondebtor, a guy named Kornman.  By the

21  time that the case got to the District Court, the debtor's

22  claims on the promissory note against Berg had been resolved.

23  The only parties left in the adversary were Berg and Kornman,

24  non-debtors, and the only actions left in the adversary were

25  non-core actions.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X   Document 70-35   Filed 11/09/23   Page 75 of 159   PageID 27632

48

1    In addition, Your Honor, both Berg and Kornman agreed to

2    withdraw the reference.

3        So I understand why Mr. Dondero cited it, as kind of a bit

4    of a gotcha case, but it doesn't actually stand for the

5    proposition that the Northern District of Texas withdrew the

6    reference when the underlying complaint was a breach of

7    contract and a turnover claim under 542(b) that was brought in

8    an adversary proceeding to collect on a note.

9        And Your Honor, these cases aren't outliers.  There are

10   cases from other districts that stand for the same thing, and

11   they stand for the proposition that the collection of a note

12   is an appropriate remedy under 542(b), despite the fact that

13   there may be affirmative defenses to that note.

14       And the case that I would direct Your Honor to and then

15   pivot from real quick is the Second Circuit Court of Opinions

16   [sic] case in *Willington Convalescent Home*.  That case was

17   cited with approval in *Tow*.

18       But the case that I want to focus on, because I just think

19   there is a great quote from it, is a case out of the Eastern

20   District of Virginia.  It's a 2020 -- 2012 case, excuse me --

21   called *In re Connelly*.  In that case, the debtor sued, seeking

22   turnover on a series of notes, and the defendants filed

23   answers denying the indebtedness and asserting nine

24   affirmative defenses challenging the validity and

25   enforceability of the notes.

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-51   Filed 09/09/21   Page 76 of 159   PageID 27633

49

1    The defendants also argued, as they do here, that a

2    turnover action -- I'm sorry -- that the action couldn't be

3    core because it was disputed.  And I want to read a quote from

4    the *Connelly* court, which says:

5         "While the Defendants assert that they are not

6         indebted to the Trustee, it is simply not relevant that

7         the Defendants dispute liability on the instrument.

8         The presence of a dispute does not preclude a debt from

9         being matured.   It is sufficient if the complaint

10        alleges the existence of matured debt.  For an action

11        to be a turnover proceeding, it is not relevant that

12        the Defendant  disputes the existence of a debt by

13        perhaps denying the complaint's allegations, as long as

14        those allegations state the existence of a mature debt.

15        A cause of action is a turnover proceeding under 542(b)

16        of the Bankruptcy Code where it seeks the collection,

17        rather than creation or liquidation of a matured debt."

18    And *Connelly,* Your Honor, is consistent with *Tow*, and it's

19    consistent with case law from other circuits, and it's also

20    consistent with *Collier's*.  Mr. Dondero's counsel cited to the

21    157(b)(2)(E) section of *Collier's*, but Mr. Dondero's counsel

22    neglected to cite to the actual *Collier's* section on 542(b),

23    which says that 542(b) does not on its face say it does not

24    apply to disputed claims and that 542(b) does apply to

25    disputed claims.  As long as there is a debt which is property

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-31    Filed 09/07/36    Page 77 of 159    PageID 27634

50

1    of the estate which is matured, which is payable on demand,

2    542(b) is the correct mechanism for the estate to collect on

3    that debt.

4         Those are exactly the facts here, Your Honor.  The fact

5    that there is a breach of contract claim right alongside that

6    doesn't change that, because it's black letter jurisdictional

7    bankruptcy law that just because there are state law issues

8    implicated, if an action is core, if it arises under or arises

9    in a bankruptcy statute, the bankruptcy statute governs and

10   creates the bankruptcy court jurisdiction.  State law issues

11   come up in core matters all of the time and it does not make

12   those matters non-core.

13        That's simply the case here, Your Honor.  542(b) is a

14   bankruptcy court provision that provides that a trustee can

15   seek an action to recover on a matured debt.  All of the

16   actions here are matured debts.  Do the people have -- or,

17   excuse me, did the Defendants have defenses?  Yes.  But if you

18   look at our complaints, they were properly pled.  We pled the

19   existence of a debt.  We pled a proper turnover action.

20   They're payable-on-demand notes, and demands have been made.

21   They fit squarely under 542(b).

22        And because they fit squarely under 542(b), they are core,

23   they are equitable, meaning no jury trial right exists, and

24   Your Honor has the authority to issue a final order on these

25   matters.

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-51   Filed 01/09/25   Page 78 of 159   PageID 27635

51

1      And if you look at, you know, turning briefly to the

2   *Satelco* case that Mr. Rukavina cited and the *Satelco* case that

3   Dondero's counsel cited, that is a 1986 case.  It's been cited

4   three times in the Northern District of Texas, and I will

5   concede that it's a Northern District of Texas case.  And I'll

6   also concede, Your Honor, that it stands for the proposition

7   that you need a final judgment in order to use 542(b).  I

8   think that's very narrow.  The majority of cases or courts

9   throughout the United States have found that too narrow, and

10  quite honestly, it just hasn't been followed.  *Satelco* has

11  been cited in 1986 in its own -- I mean, not cited.  *Satelco*

12  was written in 1986.  It was cited in *Fang*, which is a 1993

13  case, and *Fang* really followed the analysis in *Satelco*.  And

14  then it was cited in *Moran* in 2006.  The *Moran* cite was

15  basically just a string cite, Your Honor.  It gave no real

16  analysis.

17      2006, Your Honor, was also the year that Judge Houser

18  entered the *Faulkner v. Berg* decision which we discussed

19  earlier, which did not even address the *Satelco* opinion.

20  Since 2006, I haven't found any instances where it's cited in

21  this district with approval.

22      The only cases in the circuit that I have found are the

23  cases like *Tow*, which address it and distinguish it and say

24  that it's in the minority.

25      Your Honor also heard cases where Mr. Rukavina said, you

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-31    Filed 11/29/23    Page 79 of 159    PageID 27636

52

1    know, you can't use Section 542(b) to collect on a contract

2    claim.  And Your Honor, you know, that's right.  If this were

3    a breach of contract claim in a traditional sense, or an M&A

4    agreement or a supply agreement, where Your Honor would have

5    to determine the responsible party, who actually breached the

6    agreement, where Your Honor would have to do detailed factual

7    analyses of what the damages would be, okay, you know, I can't

8    not say that that would fall out of 542(b), arguably.

9        But again, Your Honor, that's just not the case here.  The

10    case here is squarely under 542(b).  We have two-page notes

11    that are unambiguous.  We have two-page notes where the

12    Defendants have admitted that they got money from the estate,

13    with the promise to pay it back on demand or to pay it back in

14    accordance with its terms.  And yes, they have defenses.  But

15    again, Your Honor, that does not take it out of 542(b).

16        And *Satelco* is -- it's just not current law and it's just

17    not followed in this circuit and it's not followed, quite

18    honestly, throughout the United States.

19            THE COURT:  Okay.  Let me --

20            MR. DEMO:  But even if --

21            THE COURT:  Let me ask you, and maybe I'm

22    interrupting at a time you were about to get into this, but if

23    I accept your argument as correct that, you know, *Satelco* got

24    it wrong and I should follow the courts that have said 542(b)

25    sort of, I don't know, trumps, supersedes, a breach of

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 10-51    Filed 06/09/16    Page 80 of 159    PageID 27637

53

1    contract cause of action on a note, so, following your logic,

2    that would mean this is arising under the Bankruptcy Code,

3    *i.e.*, 542(b) and core matter, we still have the jury trial

4    right problem, correct?

5            MR. DEMO:  No, not correct, Your Honor.

6            THE COURT:  Because even though it's statutory core

7    under your argument, we still look at *Granfinanciera*,

8    *Langenkamp,* and we go back and look at would the court of law

9    versus a court of equity have tried this suit --

10           MR. DEMO:  Yes.

11           THE COURT:  -- and is there legal remedy you're

12   seeking versus an equitable remedy.  And so, you know, even in

13   a preference suit, for example, core, core, core, they're

14   entitled to a jury trial --

15           MR. DEMO:  And --

16           THE COURT:  -- if they didn't file a proof of claim.

17           MR. DEMO:  Understood, Your Honor.  And I just don't

18   think that's the case here.

19       I mean, again, looking back to the *Tow* court, the *Tow*

20   court actually addressed this issue, and the *Tow* court found

21   that 542(b) -- and again, this is consistent with other case

22   law and other courts -- creates an equitable remedy.  It

23   doesn't create a legal remedy.  And because it creates an

24   equitable remedy, the *Tow* court found that the jury trial

25   right did not exist.  And it found that a jury trial right did

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X   Document 70-51    Filed 01/09/24   Page 81 of 159   PageID 27638

54

1    not exist despite the defendant arguing that the action was a

2    suit for money damages.  You know, it wasn't a suit to turn

3    over a car or anything like that; it was actually a suit for

4    money damages.  And the District Court in *Tow* said that the

5    suit for money damages did not mean it wasn't an equitable

6    remedy because it arose under 542(b) and a jury trial right

7    did not exist.

8         So I would, I guess, challenge your premise there a little

9    bit, Your Honor, because I do think that the case law is

10   pretty clear that 542(b) creates an equitable remedy without a

11   jury trial right.

12            THE COURT:  Okay.

13            MR. DEMO:  And with that, Your Honor, I will move on

14   and pivot and say, you know, even if this weren't a core

15   matter and even if a jury trial right existed, that the other

16   *Holland America* factors weigh heavily in favor of Your Honor

17   keeping this case for as long as possible.  And I know that

18   wasn't the most elegant pivot, but, you know, I do -- I am

19   conscious of this Court's time.

20        You know, first, Your Honor, the jury trial right, we

21   didn't press it in our papers.  Did Mr. Dondero file a 553

22   action in his complaint, which arguably creates the claims

23   allowance process, and then recant it?  Yes.  But leaving that

24   aside, looking at forum-shopping, you know, the Defendants

25   argue that we're the ones forum-shopping here.  The Defendants

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 170-51   Filed 01/05/24   Page 82 of 159   PageID 27639

55

1    argue that the Debtors are forum-shopping by having filed

2    these actions in that court.  It's difficult to respond to

3    that, Your Honor, because where else would the Debtor have

4    filed these actions?

5        I can't think of any case I've seen where the debtor is

6    owed money that arose -- that maturity occurred postpetition,

7    and the debtor went out to state court in Texas or state court

8    in Mississippi to collect on those debts.  Those actions are

9    always brought in the Bankruptcy Court.

10       The Bankruptcy Court was created as a court, as a forum,

11   to marshal the assets of the estate, to adjudicate disputes,

12   and then to push those assets out to creditors.  It just

13   doesn't make sense to say that the Debtor is forum-shopping by

14   using the forum created for the Debtor under the Bankruptcy

15   Code.

16       The distinction, Your Honor, and I don't want to belabor

17   this point too much, Mr. Dondero and his affiliate entities

18   have shown that they want nothing more than to not be in this

19   court.  They've filed recusal motions.  They've filed

20   withdrawal of the reference in this case, in these cases.  We

21   anticipate they'll file withdrawals of the reference in the

22   other notes actions.  They filed a withdrawal of the reference

23   in the CLO Holdco-UCC dispute.  Mr. Dondero's controlled

24   entity, the DAF, recently filed an action in the Northern

25   District of Texas seeking to functionally re-litigate the

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 10-35   Filed 06/09/21   Page 83 of 159   PageID 27640

56

 1   HarbourVest settlement and to hold Mr. Seery responsible for

 2   breach of fiduciary duties.

 3        We recently found out that Mr. Dondero's other related

 4   entity, which was a very, very small LP in the Select Fund,

 5   has filed a suit in the Northern District of Texas, seeking to

 6   hold the Debtor liable for mismanaging multi -- or, sorry,

 7   Select Fund with respect to the sale of Trussway and SSP, two

 8   names Your Honor may remember because they came up in December

 9   in the context of the hearing you had on the CLOs seeking to

10   prevent Mr. Seery from exercising his authority under the CLO

11   management agreements.

12        And I do want to be clear, Your Honor, that this new case

13   did not name Mr. Seery as a defendant, but it's still there.

14   This is happening.  Mr. Dondero and his related entities do

15   not want to be here.  They are forum-shopping.

16        And I would push Your Honor to look at the Western

17   District of Texas case *Citibank*, which says that the best way

18   to deal with forum-shopping in a withdrawal case is to wait to

19   withdraw the reference until the absolute last moment, so that

20   no party can be said to be forum-shopping.  No party can be

21   looking at this Court's orders and saying, oh, this is a good

22   one, this is a bad one, let's withdraw the reference.

23        This is the appropriate venue for this, and this is where

24   it should be held and should be adjudicated, up until the last

25   minute.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 170-31    Filed 01/09/24    Page 84 of 159    PageID 27641

57

1          And I should have said this from the beginning, Your

2     Honor, that Your Honor absolutely has jurisdiction.  At a bare

3     minimum, related-to jurisdiction, because these assets are a

4     core asset of the Debtor's estate.  The Debtor is in a

5     monetization plan.  Collecting these assets and distributing

6     these assets out to the creditors is what the Debtor is doing.

7     And so there is, at a minimum, related-to jurisdiction.

8          There are also efficiency concerns that we really need to

9     address here, Your Honor.

10               THE COURT:  You're fading.  Your audio is fading.

11               MR. DEMO:  Oh.  Is this any better?

12               THE COURT:  Yes.  Uh-huh.

13               MR. DEMO:  Okay.  There are also judicial economy

14    issues that favor keeping the case here, Your Honor.  I mean,

15    the case has obviously been pending for 20 months.  That's not

16    new to anybody.  The relationship of all the parties in this

17    case is very important.  The case is complicated.  The parties

18    in this case are complicated.  And understanding those is

19    going to be a key component of actually understanding any

20    action, even a simple two-page note action.

21         This Court -- there are also 19 separate litigations, I

22    believe, currently pending with Mr. Dondero and his entities,

23    and Your Honor has dealt with all of those in an expeditious

24    manner.  When something needs to be heard on an emergency

25    matter, Your Honor has made herself available, and we

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-51   Filed 01/09/24   Page 85 of 159   PageID 27642

58

1    appreciate that.  Your Honor has entered orders in a timely

2    manner, and Your Honor has dealt with the complicated things

3    in this case in a timely manner.  And we would ask Your Honor

4    to keep doing that.

5        Because, in distinction, the District Court has other

6    things to do.  There are criminal cases.  There are other

7    cases.  The District Court is not a court that wants to focus

8    just on this case.  And the District Court's treatment of this

9    case is evident, I think, Your Honor, by the way that they

10   treated the stay motions that were filed.  We still don't have

11   a ruling on them and we never will have a ruling on them

12   because we've passed that by and we're in the Fifth Circuit

13   now.

14       This Court was created to marshal the Debtor's assets and

15   to adjudicate disputes and to allow for the distribution of

16   assets to creditors.  We would ask that Your Honor keep it for

17   that reason, among others.

18       We've also, as we talked about earlier, we are very close

19   to finishing discovery.  We've had multiple depositions.  We

20   will -- or, I'm sorry, not multiple -- we've had Jim Seery's

21   deposition.  We have Mr. Dondero's deposition.  There are

22   document productions that are occurring.  And Your Honor,

23   these cases are scheduled to be heard within the next 90 to

24   100 days.

25       We need a resolution on this matter so that we can make

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 10-35    Filed 05/27/21    Page 86 of 159    PageID 27643

59

1    distributions to creditors.  This Court is the best court to

2    do that.  There is just literally no time to wait for the

3    District Court to get around to hearing -- in the district --

4    I mean, to hearing this matter.

5        And finally, Your Honor, I think, you know, we can draw

6    some inferences here.  We can draw some inferences that, you

7    know, there is some forum-shopping going on.  There is the

8    desire to burn some assets.  That also weighs into the

9    judicial economy, Your Honor, to not allow additional estate

10   assets to be wasted running this Court -- running a very

11   simple proceeding up and down to the District Court.  Your

12   Honor has the authority to enter non-final orders, including

13   orders on partial summary judgment, including orders on

14   evidentiary matters.  Based on those orders, we quite honestly

15   don't think there will ever be a need for a jury trial, and we

16   would ask Your Honor to keep this case for as long as possible

17   in order to enter those orders, in order to provide for an

18   expeditious resolution of this matter.

19       Unless Your Honor has any questions, I think that's it for

20   me.

21           THE COURT:  All right.  No more questions at this

22   time.  I am going to come back to that Trussway matter before

23   we finish today.  All right.  So, words in rebuttal.

24           MR. RUKAVINA:  Thank you.

25           THE COURT:  Mr. Rukavina?

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-35    Filed 01/09/36    Page 87 of 159    PageID 27644

60

1          MR. RUKAVINA:  Thank you, Your Honor.  Thank you,

2    Your Honor.  I'll be brief.

3        Let me address the case, the *Faulkner v. Berg* case.

4          THE COURT:  Okay.

5          MR. RUKAVINA:  Because I think there's a valuable

6    lesson to learn from this case, Judge.  And here is the whole

7    extent, and I mean literally every molecule, of what Judge

8    Houser wrote:  "The complaint contains a claim for breach of

9    contract and a claim for turnover of property of the estate

10   under 542.  These two are core claims pursuant to 28 U.S.C.

11   157."

12       That's it.  That's all she wrote.  Now, is Judge Houser an

13   inattentive judge?  Is she a stupid judge?  Absolutely not.

14   But she wrote this in 2006, five years before *Stern v.*

15   *Marshall*, Your Honor.

16       Similarly, Judge Felsenthal -- I'm sorry, Judge Abramson

17   wrote the Sel -- the --

18          THE COURT:  *Satelco*.

19          MR. RUKAVINA:  -- the satellite case.

20          MS. DEITSCH-PEREZ:  *Satelco*.

21          MR. RUKAVINA:  Thank you.  Two or three years after

22   *Northern Pipeline*.  And that's my point.  And it seems like

23   trustees and debtors sometimes forget the painful lessons of

24   the Supreme Court's precedent, and then we're all shocked when

25   a case like *Stern v. Marshall* comes down and we're all

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-35    Filed 01/09/86    Page 88 of 159    PageID 27645

61

1   shocked, because we've been led down the road for years and

2   years and years of whittling away here and whittling away

3   there, that at least the U.S. Supreme Court finds these things

4   of paramount importance.  So that's what we're dealing with

5   today.

6       So Mr. Vasek, will you please pull up the HCMFA notes?

7       So, I do not purport, Your Honor, to have a mini-trial

8   today on the merits of anything.  That's not what this is

9   about.  But Mr. Demo brought up a couple notes, so let me --

10  let's go look at the HCMFA notes, Your Honor.

11          MR. DEMO:  Are these -- are these notes going to be

12  put into evidence?

13          MR. RUKAVINA:  These are attached to the complaint,

14  sir.

15          MR. DEMO:  And we don't have an objection.

16          MR. RUKAVINA:  These are attached to your complaint.

17          MR. DEMO:  Oh.

18          MR. RUKAVINA:  Didn't you -- didn't you quote from

19  them earlier?

20      So Mr. Vasek, will you go to the signature page?

21      Your Honor, look at that.  Maker:  Frank Waterhouse.

22  That's what these notes are.  Maker:  Frank Waterhouse.  I

23  would survive summary judgment today if all they did was they

24  told you, look, Judge, give me my $7.54 million.  I'd say,

25  well, who in the world is Frank Waterhouse?  Of course, we all

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 7-35    Filed 06/29/21    Page 89 of 159    PageID 27646

62

1    know who he is.  But look at how he signed that.  Not as a

2    representative capacity.

3        So what Mr. Demo is saying, Judge, forget about what Mr.

4    Rukavina just said.  Forget about these defenses.  Forget

5    about looking at the facts.  Forget about looking at Mr.

6    Waterhouse's actual or apparent authority.  Here's a note.

7    Pay me.  Oh, and if you don't pay me, it's contempt of court.

8    That is what he is trying to get the Court to do, by saying

9    that 542(b) somehow does away with the need to use -- I think

10   Your Honor said it -- to liquidate a claim.  And as soon as we

11   start that process of liquidation, we get into the whole issue

12   of who's going to be our fact-finder.  Is it going to be a

13   jury?  And who's going to be our judge.  Is it going to be an

14   Article III or an Article I judge?

15       I did not create the Article I/Article III distinction.  I

16   would love it if every bankruptcy judge was an Article III

17   judge.  I think having these hearings and so many contentious

18   adversary proceedings is a gross, gross waste of all of our

19   times.  But this is the mechanism that Congress has created.

20   And if we mess with this mechanism, we're just inviting

21   trouble.

22       And, of course, any party that comes before a judge,

23   whether it's a reference withdrawal or whatever, of course

24   there's always underlying strategy.  Of course parties would

25   prefer to be in front of one court or another.  That's not

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 1-35    Filed 06/29/86    Page 90 of 159    PageID 27647

63

1    gamesmanship.  That's not forum-shopping.  The Debtor could

2    have filed a suit and a sworn account in a Dallas court and I

3    bet they would have already had a judgment by now, probably,

4    given how a suit and a sworn account works in Texas.  But they

5    probably didn't talk to their local counsel about Texas

6    procedure.

7        So all of those things wash out.  Every litigant in front

8    of you has an ulterior motive, Your Honor, which is that they

9    want to win.  What matters is the Court's jurisdiction.  What

10   matters is the Seventh Amendment.  What matters is the jury

11   right.  And what matters is 542(b).

12       I think Your Honor has, through her questions, suggested

13   that she doesn't buy the argument that 542(b) can be used to

14   liquidate a disputed claim.  I hope that the Court will

15   reaffirm that.

16       And while I understand that the usual practice is that the

17   bankruptcy judge stays on board for pretrial matters, I

18   understand that there's a lot of wisdom to that practice in

19   other cases, here, I think because this Court has so much

20   going on in this case already, and these note cases really are

21   different, they really don't have a large universe of

22   discovery, they really are divorced from the bankruptcy case,

23   I respectfully submit it's in everyone's interest to have the

24   District Court enter its orders throughout this case and not

25   have to revisit potentially every order that this Court enters

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 7-31    Filed 06/09/21    Page 91 of 159    PageID 27648

64

1    in the interim before we get to trial.

2         Thank you, Your Honor.

3              THE COURT:  All right.  Do you have any comment about

4    the -- I think it was Eastern District of Virginia case that

5    Debtor argued?  Drawing a blank on the name.

6              MR. DEMO:  No, Your Honor.

7              MR. RUKAVINA:  Your Honor, I do not have any discrete

8    comments on it.  I would just point out that you're -- the

9    Court is right.  The Fifth Circuit has not addressed this

10   issue.  But I have briefed, and it's black letter in those

11   cases, the D.C. Court of Appeals, the Eleventh Court of

12   Appeals, and the Eighth Circuit Court of Appeals.  So those

13   are three court of appeals that agree with *Satelco*, and not a

14   single court of appeals holds otherwise.  And as Judge Dodd

15   taught us when --

16             THE COURT:  I take it there's a Second Circuit case

17   that holds otherwise, right?

18             MR. RUKAVINA:  That's what the Debtor has briefed,

19   yes.  I apologize.

20             THE COURT:  Uh-huh.  Uh-huh.

21             MR. RUKAVINA:  That's what the Debtor has briefed.

22   But again, I go back to just thinking about it conceptually.

23   If Congress says, okay, you have a breach of contract case,

24   you have a promissory note case, and Congress says, I want to

25   slap my own label on it and I'm going to assign it to an

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-15    Filed 06/09/86    Page 92 of 159    PageID 27649

65

1   Article I court to enter a final order, and I'm going to strip

2   you of your jury rights because it's equitable, Your Honor,

3   that's -- that's exactly what *Northern Pipeline* was.  That's

4   exactly what *Stern v. Marshall* was.

5       With due respect to the Eastern District, with due respect

6   to the Second Circuit, it's common sense, Your Honor.

7   Congress cannot take something that is a constitutional right,

8   that is a common law right, and just give it a label, and

9   because of its label somehow do away with 250 years of

10  constitutional law.

11          THE COURT:  Thank you.  All right.  Any last words,

12  Ms. Deitsch-Perez?

13          MS. DEITSCH-PEREZ:  Yes.  I think I can answer your

14  question about -- I think you were asking about *Willington*

15  *Convalescent Home*?

16          THE COURT:  Right.

17          MS. DEITSCH-PEREZ:  Which was the case the Debtor

18  referred to.  Well, first of all, it's a 1988 case, so pre-

19  *Stern v. Marshall*.  And I believe the only claims that were

20  brought in there were turnover and preference.  And so it's,

21  in any event, distinguishable from the case here, which is a

22  contested contractual matter.

23      And to that end, while, like Mr. Rukavina, I'm not trying

24  -- I'm not going to try the case here, I do want to point out

25  that there are defenses, there are real defenses.  And so for

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 10-35    Filed 06/09/21    Page 93 of 159    PageID 27650

66

1    that reason I would like to -- let me pull up one of the

2    notes.  So, if I can share my screen.  Okay.  Are you able to

3    see my screen now?

4            THE COURT:  No.

5            MS. DEITSCH-PEREZ:  Okay.  Can you see it now?

6            THE COURT:  Yes.

7            MS. DEITSCH-PEREZ:  Okay.  So this is one of the

8    three notes.  And this is what I referred to earlier and what

9    the Debtor would like to ignore.  The Debtor keeps saying

10   these are two-page notes.  There's nothing to them.  There are

11   no defenses.  But what Mr. Dondero has alleged is that there

12   is a subsequent agreement that put conditions, conditions

13   subsequent that would cause the note to be forgiven.  And they

14   relate to the sale of the portfolio companies.  I don't know

15   if you saw it in the newspaper that MGM may be sold to Amazon

16   for $9 billion.  So you will hear, when you hear Mr. Dondero

17   testify, if you hear it, or the District Court will hear that

18   these notes were to be forgiven under certain circumstances.

19       And so, first of all, the Debtor alluded, without saying

20   so, to the parol evidence rule.  Obviously, a subsequent

21   agreement can be proven up.  The parol evidence rule does not

22   prevent that.  That's a live defense.  And in addition to

23   that, you can certainly have parol evidence if your note is

24   ambiguous.  And while the note does not say anything about the

25   conditions -- and the reason it didn't is rooted in tax law,

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-15    Filed 06/09/86    Page 94 of 159    PageID 27651

67

1    because in order for the note not to be immediately taxable as

2    income to a party, it has to be a valid note at the time and

3    the forgiveness has to be based on events that are not

4    entirely in the borrower's control, and that's -- that's what

5    the fact-finder will hear about.

6        And if you look at each of the notes -- in the first one

7    it's in Paragraph 8; I think in the others it might be in

8    Paragraph 7 or 9 -- the note refers to the existence of other

9    agreements.  And that is consistent with there being a

10   subsequent agreement that the notes would be forgivable under

11   certain circumstances that related to the portfolio companies.

12       So, to be clear, there are issues to be tried here to a

13   fact-finder.  The Debtor admits that the tax determinations

14   are also intertwined with factual determinations.  And that's

15   our point, that you have to know the tax law relating to when

16   a note is a bona fide loan at the start but can be

17   compensation under certain circumstances.  And we will have

18   expert testimony on that.  That is something Mr. Dondero is

19   entitled to try to a jury in the District Court.

20       Thank you very much for your time and attention.

21            THE COURT:  Thank you.  By the way, --

22            MR. DEMO:  Your Honor, with apologies --

23            THE COURT:  -- we both -- well, the Eastern District

24   of Virginia case that I was asking about was *Connelly*.  *Shaia*

25   *v. Taylor (In re Connelly).*  It was a 2012 case.  So that was

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-35   Filed 06/09/21   Page 95 of 159   PageID 27652

68

1  the one I was wondering if either you or Mr. Rukavina could

2  specifically address.

3      (Pause.)

4      MR. DEMO:  And Your Honor, that case -- there are

5  other cases that support that proposition as well.  I don't

6  need to go through them chapter and verse, but they all stand

7  for basically the same proposition.

8      MS. DEITSCH-PEREZ:  I don't have that one

9  particularly in mind, but this -- this falls right in line

10  with what's in *Collier's*, that there are some courts across

11  the country that have mistakenly and incorrectly used the

12  turnover statute to unconstitutionally exercise jurisdiction

13  over what is a non-core matter that should be able to be tried

14  before a jury in the District Court.

15      THE COURT:  All right.  I just wondered if anyone

16  could zero in on the facts of that case, because I --

17      MS. DEITSCH-PEREZ:  No.  But may I -- may I have the

18  opportunity to look at it, and if there is a particular

19  distinction we should bring to your attention in a very brief

20  letter, do it after the hearing?

21      MR. RUKAVINA:  Well, Your Honor, --

22      MR. DEMO:  Your Honor, I think --

23      MR. RUKAVINA:  -- I remember -- I have that case in

24  front of me.

25      THE COURT:  Okay.  Everybody's talking --

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 6-5   Filed 09/09/21   Page 96 of 159   PageID 27653

69

1          MR. RUKAVINA:  I have the case in front of me.

2          THE COURT:  You have the case in front of you?  Is

3    that what you said?

4          MR. RUKAVINA:  Yes, Your Honor.  And I do remember --

5    I do remember reading it, and it does stand for the

6    proposition that Mr. Demo says, --

7          THE COURT:  Okay.

8          MR. RUKAVINA:  -- which is that a disputed debt, a

9    disputed claim, does not remove the claim from the operation

10   of 542(b) and from it being core.  And I think what Ms.

11   Deitsch-Perez started telling you is that it's just wrong.

12   It's just a wrong case.  Because, again, it ignores the -- it

13   looks at is this statutorily core, and it says it's

14   statutorily core, and it doesn't look at the fundamental

15   constitutional issue.

16        But I will quote this case right now, Your Honor, and

17   here's the -- the key of it.  So, again, Mr. Demo is correct

18   that it says that whether the debt is disputed or not doesn't

19   matter.  But here's what he -- the Court says:  "A cause of

20   action is a turnover proceeding under 542(b) of the Bankruptcy

21   Code where it seeks the collection rather than the creation or

22   liquidation of a matured debt."

23        That goes to Your Honor's point.  You have to have the

24   liquidation of a debt.  A promissory note is not a judgment.

25   A promissory note is a means to a judgment.  You have to

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 170-11   Filed 07/09/86   Page 97 of 159   PageID 27654

70

1   liquidate that promissory note.

2         MR. DEMO:  Your Honor, this is Greg Demo.  I'll take

3   issue with that.  That's just impossible, Mr. Rukavina's

4   construction of that case.  You can never have a final

5   judgment on a note if that note is also disputed.  You have to

6   resolve the dispute first.

7       What that case says, and it's also in the *Tow* opinion,

8   it's also in the Second Circuit opinion, it's also in the case

9   out of the Western District of North Carolina, I think, what

10  that court says is that 542(b) can be used to collect on a

11  debt even if that debt is disputed.  If what that means, that

12  you have to have a final judgment on the debt before you can

13  use 542(b), that language means nothing.  Because how can you

14  have a debt that's disputed and also have a debt that has a

15  final judgment on it?  The language says what it says, and it

16  applies here.

17      And Your Honor, I point you to, quickly, the *Tow* case, and

18  I'll read you a quote from the *Tow* case which cites to that

19  Second Circuit case that I referenced.  It says, "*See,*

20  *example, In re Willington Convalescent Home, Inc.*"  And the

21  quote from *Willington* is:  "The mere fact that Connecticut

22  denies that it owes the matured debt relating to the services

23  because of a recoupment right does not take the Trustee's

24  actions outside the scope of Section 542(b)."  That's the

25  quote in *Tow*.  That's the quote in in the Southern District of

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 70-35   Filed 07/09/16   Page 98 of 159   PageID 27655

71

1   Texas.

2        Does it have as much as the case that I cited from

3   Virginia?  No.  But it has the exact same substance, Your

4   Honor.  And what that means is that *Satelco* has to be wrong

5   because you cannot have a dispute on a debt and allow that

6   dispute to be heard under 542(b) if 542(b) requires a final

7   judgment.  It just doesn't make sense.

8        And Your Honor, while I have you, I do want to address the

9   *Stern v. Marshall* issue.  Because this Court is not going to

10  cause friction under *Stern v. Marshall*.  The *Tow* court

11  addressed *Stern v. Marshall* and found that, despite the fact

12  that there were state law issues, again, the action was a

13  542(b) action and had no *Stern* implications.  There are cases

14  from this circuit, there are cases from other circuits, all of

15  which have found that turnover is an appropriate means to

16  collect on a matured note, even with disputes.  If this Court

17  follows that line of cases, this Court is not going to be

18  creating a new *Stern* controversy, because that controversy

19  already exists.  Your Honor is not going to be creating a

20  constitutional mess.

21        THE COURT:  Do all of these cases you say support

22  your position, do they say also no jury trial right?

23        MR. DEMO:  Yes.  They do, Your Honor.

24        THE COURT:  And forget about *Tow*, because *Tow*, I

25  think, is distinguishable.  There was a settlement agreement.

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 70-35    Filed 10/29/24    Page 99 of 159    PageID 27656

72

1    The obligor on the settlement agreement got some sort of

2    recovery.  The trustee was seeking to turn over that recovery.

3    That is very distinguishable in my view.  Okay?  There had

4    already been resolution, liquidation, whatever you want to

5    call it, of the amount due.  It was purely, turn over this

6    recovery you're getting, obligor, under the settlement

7    agreement.  I mean, that's very different.

8        But I feel like, even if 542(b) supersedes the breach of

9    contract nature of your lawsuit, we still have this problem of

10   there's -- you know, a suit on a note was tried in a court of

11   law back in Elizabethan times, okay?  It's a legal remedy

12   you're seeking as well as an equitable remedy, liquidation of

13   the claim as well.

14            MR. DEMO:  It -- it --

15            THE COURT:  I just feel like they're entitled to a

16   jury trial.

17            MR. DEMO:  And Your Honor, I guess what I would say

18   to that is, well, one, even if they are, Your Honor doesn't

19   need to withdraw the reference today and Your Honor should

20   keep this for --

21            THE COURT:  Okay.

22            MR. DEMO:  -- as long as possible.  Make dispositive

23   findings, enter partial summary judgment motions, and all of

24   that.

25       But what I would also say is that the language in 542(b)

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 25   Filed 09/04/86   Page 100 of 159   PageID 27657

73

1    -- and I'm sorry, I'm not facile enough to run through the

2    cases on the fly -- 542(b) is the action that creates the

3    equitable remedy.  It doesn't matter what the underlying

4    dispute is.  If 542(b) applies, 542(b) is itself an equitable

5    remedy.  542(b) is, per se, equitable, per se arises under the

6    Bankruptcy Code, and it's that that vitiates the right to a

7    jury trial.  It doesn't matter what the underlying facts are

8    if 542(b) applies.

9            THE COURT:  Okay.  All right.  Well, I thank you all

10   for your arguments.  We've really gone into great depth here.

11       Here is what we're going to do.  We are going to draft up

12   three reports and recommendation for each of these

13   adversaries, and I am concluding recommending to the district

14   Court that the breach of contract claims here are non-core,

15   and tacking a turnover claim under 542(b) onto them as Count

16   II doesn't change the underlying nature.

17       So there's a split of authority, I understand, but I think

18   certainly under *Stern*, *Marathon*, I think that's the better

19   answer, that we have a non-core claim and a core claim, with

20   the breach of contract being non-core.

21       I also think that there are jury trial rights here on

22   behalf of the Defendants.  Were it not for the fact that they

23   withdrew their proofs of claim -- I mean, at one time, it

24   appears, at least in the case of Mr. Dondero and, well, and in

25   the case of NexPoint and Highland Advisors -- they had proofs

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 28-1   Filed 04/04/86   Page 101 of 159   PageID 27658

74

1    of claim that involved some overlapping issues with these

2    notes.  But they're gone now.  And the fact that they're gone

3    changes everything.  So I do determine and am going to

4    recommend to the District Court that there are jury trial

5    rights here.

6         By the way, I'll address this issue with regard to the tax

7    issues that are being raised by Mr. Dondero.  I don't think

8    there is substantial or material consideration of other non-

9    bankruptcy federal law that would be involved here.  But

10   that's really irrelevant, I suppose, because I'm finding non-

11   core jury trial rights, no consent by the Defendants, and so

12   I'm going to recommend that the reference be withdrawn.  But I

13   am going to do what is the usual protocol and recommend that

14   the reference only be withdrawn at such time as the Bankruptcy

15   Court  notifies the District Court that the matters are trial-

16   ready, and therefore recommend the District Court defer to the

17   bankruptcy judge to handle all pretrial matters.

18        The reality is you're either going to get a magistrate

19   handling pretrial matters or you're going to get a bankruptcy

20   judge.  And I'm going to follow -- I see no reason not to

21   follow the usual protocol in this district, where I recommend

22   the bankruptcy judge preside over pretrial matters.

23        Last, with regard to the motion for stay that's only been

24   filed in the Dondero adversary, I am going to grant a 60-day

25   stay that will start after Friday.  In other words, I'm not

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document Document 28    Filed 09/04/86    Page 102 of 159    PageID 27659

75

1    going to suspend, interrupt discovery that is about to end in

2    three days, okay?  But I guess I'll say, beginning at midnight

3    Friday night, I'll impose a stay, and it'll be a 60-day stay,

4    and subject to further extensions, but I'm assuming that might

5    be the approximate amount of time that it takes the district

6    Court to either adopt or not adopt this Court's report and

7    recommendation.

8        Again, this is -- I was going to say it's consistent with

9    protocol.  We don't always stay adversaries pending a decision

10   on a motion to withdraw the reference, but as a practical

11   matter, there ends up being a stay, because I will not rule on

12   a motion for summary judgment until the District Court rules

13   on a report and recommendation, because, for all I know, the

14   District Court will want to yank the whole thing up.  So

15   that's my ruling.

16           MR. DEMO:  And Your Honor?

17           THE COURT:  Yes.

18           MR. DEMO:  I'm very sorry to interrupt.  Expert

19   discovery, we're supposed to get an expert report from Mr.

20   Dondero's counsel on Friday as well, and we just want to make

21   sure that we have enough time built in to actually do a

22   deposition of his expert and complete that part of the --

23           MS. DEITSCH-PEREZ:  I would --

24           MR. DEMO:  -- discovery process.

25           MS. DEITSCH-PEREZ:  I would suggest that we stay the

1   provision of expert discovery until the District Court rules.

2   The District Court may rule that it's taking everything, as

3   the Court said, in *Great Western*, and so we ought to hold onto

4   that.

5           MR. DEMO:  Your Honor, we have a scheduling order --

6           MR. MORRIS:  Your Honor -- Mr. Demo, let me just

7   speak for a moment.

8       Your Honor, this is John Morris.  I've listened patiently

9   to all of this, and I apologize for interrupting.  But the

10  deadline for serving expert reports was last Friday.  I

11  graciously granted an extension until this Friday for personal

12  reasons that I won't get into, but Mr. Dondero should not use

13  our kindness as -- improperly here.  We granted a one-week

14  extension of time until Friday.  They should produce the

15  report.  They should make their witness available.  And

16  otherwise, Your Honor, if you're going to stay it, you'll stay

17  it, but they should complete what's been started, particularly

18  since the only reason they have the right to serve the report

19  on Friday is because we gave them that extension of time.

20          MS. DEITSCH-PEREZ:  Yes, but --

21          THE COURT:  All right.

22          MS. DEITSCH-PEREZ:  But that is --

23          THE COURT:  Just a moment while I read this.  Okay.

24  I was taking at face value that discovery completely ended

25  this Friday, the 28th, but now I've got the order in front of

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 28-1    Filed 07/09/21    Page 104 of 159    PageID 27661
Document    Page 79 of 486

77

1    me and I see deadline for completion of expert discovery is

2    June 7th, and that was premised on expert disclosures being

3    May 21st, and now you're saying you've pushed that off to May

4    28th.  And I guess, Mr. Morris, you're saying you'd like

5    discovery to proceed on the experts through June 14th.  Is

6    that a recap?

7              MR. MORRIS:  Yes, Your Honor.  And again, the only

8    reason we're even having this conversation is because the

9    Debtor gave an extension of time, and that shouldn't be used

10   against us.  We should complete this discovery right now.

11             THE COURT:  All right.  Now, Ms. Perez, you were

12   saying?

13             MS. DEITSCH-PEREZ:  To be fair, Your Honor, --

14             THE COURT:  Go ahead.

15             MS. DEITSCH-PEREZ:  Yeah.  To be fair, we asked for a

16   stay long before the request for the extension for the expert

17   report, which was for personal reasons.  But we did ask for a

18   stay to start with, and it's not abusing Mr. Morris's courtesy

19   to say we still want that stay.  We would have liked to have

20   had that stay earlier.  The motion for stay did not get -- was

21   not set for hearing until today.  We would have had it

22   earlier.  The Debtor would not consent.  And then the Debtor

23   didn't even respond to our motion for stay.

24       We just think it would make sense to include the expert

25   discovery in the stuff that's held in abeyance that the

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 09/04/86   Page 105 of 159   PageID 27662
Document   Page 79 of 486

78

1    District Court may want to preside over.

2             THE COURT:  Okay.  The motion for stay was filed

3    April 15th, so that was, you know, Lord knows, --

4             MS. DEITSCH-PEREZ:  Long time ago.

5             THE COURT:  -- people seek emergency hearings all the

6    time in this case.  What I had intended before I focused on

7    this expert issue, I intended to let discovery play out,

8    because it seemed to me we were close enough to the end of

9    discovery that we ought not to put the brakes on it.

10        So I am going to let discovery play out as addressed in

11   the current scheduling order.  Okay?  So the expert --

12   discovery on facts cuts off this Friday.  The expert reports

13   will be due this Friday.  And deadline for completion of

14   expert discovery, as I understand it, would be June 14th,

15   pursuant to the one-week extension.  Yes or no?  Or did you

16   all intend June 7th?

17            MR. MORRIS:  I'm happy to work with counsel, Your

18   Honor.  John Morris for the Debtor.  I'm happy to work with

19   counsel to get this done before June 14th.  It's not a

20   problem.

21            THE COURT:  Okay.  So that's the ruling.  I'll let

22   discovery play out as we've just announced.  But other than

23   that, there is a stay, so no motions for --

24            MS. DEITSCH-PEREZ:  Can I ask for a clarification?

25            THE COURT:  -- summary judgment, no trial filings for

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 28-1    Filed 09/04/86    Page 106 of 159    PageID 27663

79

1    60 days after entry of the order.

2        And Mr. Demo, I'm going to ask you to upload a form of

3    order on this stay ruling.  But, obviously, my law clerks and

4    I will do the three reports and recommendation.

5        You had a question?

6            MR. MORRIS:  Your Honor?

7            MS. DEITSCH-PEREZ:  Your Honor, I have a question

8    about it, --

9            THE COURT:  Okay.

10           MS. DEITSCH-PEREZ:  -- if I may.  We have -- we

11   conferred today about some documents that the Debtor did not

12   produce, and because of the results of the conference, we were

13   about to file a motion to compel.  It's very discrete.  It's

14   on the Highland audited financial statements that are

15   literally a push of the button for the Debtor but they don't

16   want to produce them.

17           MR. MORRIS:  I can -- I can respond to that, Your

18   Honor.  We haven't had a chance to respond.  But nevertheless,

19   what I will say is that the Debtor will produce the audited

20   financial statements for the sole purpose of disclosing

21   information related to those notes.  And, to the extent it

22   exists, and I don't know that it does, Mr. Dondero's

23   compensation.

24       We are not giving full audited financial statements.  But

25   to the extent that there's any information concerning the

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 25   Filed 09/04/86   Page 107 of 159   PageID 27664
Document   Page 80 of 186

80

1    notes or Mr. Dondero's compensation, we'll provide that.

2             MS. DEITSCH-PEREZ:  That -- that -- what we also

3    need, because our expert would like to have it, is the

4    information about the assets under management.  So anything

5    that might relate to an executive's compensation.  It's

6    broader than what Mr. Morris is saying.  So, --

7             MR. MORRIS:  Your Honor, the Debtor will not agree to

8    provide information about assets.  It just won't.

9             MS. DEITSCH-PEREZ:  Will it -- this is why we should

10   be conferencing outside.  But we would like the information

11   about assets under management.  It is not something that Mr.

12   Dondero didn't already have a right to.  He had them at the

13   time.

14            THE COURT:  All right.  I don't --

15            MS. DEITSCH-PEREZ:  There's no reason to --

16            THE COURT:  I don't know what you want me to do or

17   say, but I've allowed a lot of discussion, but I don't have a

18   motion to compel in front of me and I don't intend to --

19            MS. DEITSCH-PEREZ:  That was my question, Your Honor.

20   May -- may we make that -- I mean, if Mr. Morris and I cannot

21   reach agreement, we would like to be able to make that motion

22   tomorrow so that it's on file before the close of discovery.

23            MR. MORRIS:  Your Honor, if I may just be heard

24   briefly.  We're now told that this information is required for

25   the expert.  We didn't hear about an expert for the first time

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 25    Filed 09/04/86    Page 108 of 159    PageID 27665

81

1    until last week.  We were told that they needed an extension

2    of time.  It was an understandable reason.  We were happy to

3    give the extension of time.

4        It's now Tuesday.  The report is due in three days.  And I

5    am literally hearing for the first time that this information

6    is required for the experts.  I just don't want this to be

7    used as yet another excuse for delay, because, you know --

8    I'll just leave it at that.

9        And we can talk after this, Counsel.  We can talk after

10   this.  And if you want to make a motion, you can make a

11   motion.  But this should not be used as another basis for

12   delay.  The report was due last week.  We got the request for

13   an extension just a few days before that.  And to hear now

14   that they need this information for the report has me very,

15   very concerned and suspicious.

16            THE COURT:  All right.  Well, --

17            MS. DEITSCH-PEREZ:  And I think Mr. Morris --

18            THE COURT:  -- yes, I'm done hearing about this.

19   There is zero chance I'm granting a hearing on a motion to

20   compel this week.  And again, given that it is related to

21   information supposedly the expert needs and we're already past

22   the deadline for an expert, I mean, I don't know --

23            MS. DEITSCH-PEREZ:  Your Honor, we asked for this

24   many, many, many weeks ago.

25            THE COURT:  Okay.  Well, --

1          MS. DEITSCH-PEREZ:  Okay.

2          THE COURT:  -- maybe a motion to compel should have

3     been filed many, many weeks ago.  But I've let you know where

4     I stand on this.

5          All right.  So I will try to get these reports and

6     recommendations out as quickly as possible.

7          I said I wanted to come back to *Trussway*.  You know, we're

8     not here on anything except these three adversaries today, but

9     could you repeat what you said, Mr. Demo, about a new district

10    court action filed by -- I'm not quite sure who was the

11    plaintiff.

12         MS. DEMO:  It was filed by the Sbaiti firm, which is

13    the same file -- law firm which filed --

14         THE COURT:  It was filed by who?  Your audio is not

15    great today.

16         MR. DEMO:  The --

17         THE COURT:  It was filed by who?

18         MR. DEMO:  Oh.  Sorry.  The Sbaiti firm.  I don't

19    know how to pronounce the name of that firm.  But that's the

20    same firm who filed the DAF action.  And it was filed on

21    behalf of an entity called PCMG, and then there's a bunch of

22    Roman numerals after it.  PCMG had a very, very, very small

23    interest in the Highland Select Fund, which is an entity

24    managed by Highland that's 99.95 percent owned by Highland,

25    and then the balance, I think, is owned by this fund and maybe

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 25    Filed 09/04/86 Page 110 of 159    PageID 27667
Document    Page 89 of 486

83

 1    a little bit by Mr. Okada.  This firm is owned by Mr. Dondero.

 2        They filed an action on the 21st.  We found out about it

 3    by accident yesterday, because we haven't been served yet.  We

 4    haven't fully digested it, but the crux of the matter is that

 5    Mr. Seery breached his obligations under the Investment

 6    Advisers Act when he sold the Trussway asset and the SSP asset

 7    for under value and for not allowing Mr. Dondero to bid on

 8    those assets.

 9        And so we will respond accordingly, Your Honor, and that's

10    -- I really can't get into it because we just got it last

11    night and we're still digesting it.

12            THE COURT:  But the Debtor is the one and only

13    Defendant?

14            MR. DEMO:  I believe that's the case, Your Honor,

15    yes.  So, there -- there were no allegations that they're

16    going to add Mr. Seery like the last one, but yes.

17            MR. SEERY:  I'd be happy to offer some clarity if

18    you'd like, Your Honor.

19            THE COURT:  Yes.  Go ahead, Mr. Seery.

20            MR. SEERY:  We received a copy of this lawsuit

21    through the -- originally through the press and then we hunted

22    it down.  We have not been served.  It's by an entity called

23    PCMG, and I believe it's 17, Roman Numeral XVII.  It is a

24    small entity owned by Mr. Dondero and Mr. Okada.  It owned .2

25    percent of Highland Select Equity Fund.  Highland Select

Case 21-03004-sgj    Doc 39    Filed 05/27/21    Entered 05/27/21 17:44:25    Desc Main
Case 3:21-cv-00881-X    Document 28    Filed 04/04/86    Page 111 of 159    PageID 27668

84

1   Equity Fund owned 89 -- or does own 89.9 percent of Trussway

2   Holdings.  It's this -- PCMG is no longer a partner in

3   Highland Select Equity.

4       Trussway Holdings owned 76.6 percent of SSP Holdings,

5   which was an entity that was sold.  The remaining balance of

6   that, those interests were owned by third parties, including a

7   small business lending group.

8       The complaint was just filed against the Debtor, arguing

9   nonsensically that somehow the Debtor has an obligation to

10  PCMG as an investor in Equity Select.  Anyone who knows

11  anything about the Investment Advisers Act knows that's not

12  the case, that the obligation is to the fund, not to the

13  investors.

14      We'll deal with it, but it's just another of the myriad of

15  examples filed by the Sbaiti firm -- this is their second go

16  -- of just creating costs.  This one is a -- if you go

17  derivatively, it's a .137 percent interest in SSP.

18              THE COURT:  All right.  Well, we --

19              MR. SEERY:  Thank you.

20              THE COURT:  Thank you, Mr. Seery.  We have a hearing

21  on the other lawsuit that includes you as a defendant coming

22  up in June.  I can't remember when in June.

23              MR. DEMO:  It's June 8th, Your Honor.

24              THE COURT:  June 8th.  In person.  So I'm going to

25  stay tuned for what this Sbaiti law firm has to say.

Case 21-03004-sgj   Doc 39   Filed 05/27/21   Entered 05/27/21 17:44:25   Desc Main
Case 3:21-cv-00881-X   Document 25   Filed 09/04/86   Page 112 of 159   PageID 27669

85

1          To say I'm concerned is a big understatement, but we'll

2     hear what the evidence and argument is on June 8th.  I hope

3     the message gets delivered how concerned I am to hear that yet

4     another lawsuit has been filed that appears to be an end run

5     around certain prior orders of the Court.

6          So, all right.  We'll look for the order on the stay.

7               MR. DEMO:  Yes, Your Honor.

8               THE COURT:  And again, we'll try to be as quick as we

9     can on the reports and recommendation.

10         (Proceedings concluded at 3:36 p.m.)

11                         --oOo--

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21         I certify that the foregoing is a correct transcript from
      the electronic sound recording of the proceedings in the
22    above-entitled matter.

23     **/s/ Kathy Rehling**                              **05/27/2021**

24    _____        _____
      Kathy Rehling, CETD-444                         Date
25    Certified Electronic Court Transcriber

86

1

                                    INDEX

2       PROCEEDINGS                                                    3

3       WITNESSES

4       -none-

5       EXHIBITS

6       Debtor's Exhibits 4 through 6, 16 through 20,    Received 33
        28 through 30, and 44 through 64

7

8       RULINGS                                                       73

9       END OF PROCEEDINGS                                            85

10      INDEX                                                         86

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                    )   Case No. 19-34054-sgj-11
In Re:                              )   Chapter 11
                                    )
HIGHLAND CAPITAL                    )   Dallas, Texas
MANAGEMENT, L.P.,                   )   June 24, 2021
                                    )   9:30 a.m. Docket
         Debtor.                    )
_____     )
                                    )
HIGHLAND CAPITAL                    )   Adversary Proceeding 21-3004-sgj
MANAGEMENT, L.P.,                   )
                                    )
         Plaintiff,                 )
                                    )
v.                                  )   DEFENDANT'S MOTION FOR LEAVE
                                    )   TO AMEND ANSWER [32]
HIGHLAND CAPITAL MANAGEMENT )
FUND ADVISORS, L.P.,                )
                                    )
         Defendant.                 )
_____     )


                      TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor/Plaintiff:   Hayley Winograd
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For Highland Capital        Davor Rukavina
Management Fund             MUNSCH, HARDT, KOPF & HARR
Advisors, LP, Defendant:    500 N. Akard Street, Suite 3800
                            Dallas, TX  75201-6659
                            (214) 855-7587

Recorded by:                Michael F. Edmond, Sr.
                            UNITED STATES BANKRUPTCY COURT
                            1100 Commerce Street, 12th Floor
                            Dallas, TX  75242
                            (214) 753-2062
```

Case 21-03004-sgj   Doc 44   Filed 07/01/21   Entered 07/01/21 16:59:57   Desc Main
Case 3:21-cv-00881-X   Document 36-35 Filed 09/02/46   Page 115 of 159   PageID 27672

2

1   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
2                                Shady Shores, TX  76208
                                 (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25           Proceedings recorded by electronic sound recording;
                 transcript produced by transcription service.

Case 21-03004-sgj    Doc 44    Filed 07/01/21    Entered 07/01/21 16:59:57    Desc Main
Case 3:21-cv-00881-X    Document 36    Filed 09/06/16    Page 116 of 159    PageID 27673
Document Page 109 of 146

3

                    DALLAS, TEXAS - JUNE 24, 2021 - 9:58 A.M.

1

2               THE COURT:  All right.  Matter Number 6 this morning

3   is Highland versus Highland Capital Management Fund Advisors,

4   LP, Adversary 21-3004.  We have Defendant's Motion for Leave

5   to Amend Answer.  So I'll ask first, it looks like we have Mr.

6   Rukavina out there appearing for the Defendant.  Is that

7   correct?

8               MR. RUKAVINA:  Yes, Your Honor.  Good morning.

9               THE COURT:  Good morning.  Do we have the Debtor-

10  Plaintiff appearing this morning?

11              MS. WINOGRAD:  Hi, Your Honor.  This is Hayley

12  Winograd appearing on behalf of the Debtor.  For some reason,

13  the Cisco Webex isn't letting me turn my camera on.  But I'm

14  trying to.  So just bear with me for a minute.

15              THE COURT:  Okay.  All right.  Well, we can at least

16  hear you loud and clear.

17         We probably have interested observers, but I'm guessing no

18  other appearances, since it's just these two parties?

19         (No response.)

20              THE COURT:  All right.  Well, Mr. Rukavina, am I

21  correct that there is no opposition to this motion?

22              MR. RUKAVINA:  Your Honor, there's been no objection

23  filed, even though this motion was filed more than a month

24  ago, and Mr. Morris and I were talking a couple days ago about

25  submitting basically a consent order.  Unfortunately, I got

1    buried with court in front of Judge King yesterday.  So I

2    would ask that the Court summarily grant this motion based on

3    the lack of objection, timely objection, and based on the

4    simple standard under Rule 15.

5         That being said, I am prepared to argue the motion if the

6    Court believes that that's necessary.

7              THE COURT:  Well, --

8              MS. WINOGRAD:  So, Your Honor, --

9              THE COURT:  -- Ms. Winograd?

10             MS. WINOGRAD:  -- this is -- oh, I'm sorry.

11             THE COURT:  Go ahead.

12             MS. WINOGRAD:  This is Hayley Winograd.

13    Unfortunately, I can't get my camera started, so I apologize.

14    But the Debtor is unopposed to Highland Capital Management

15    Fund Advisors' motion to amend their answer.  The parties are

16    working on a global revised scheduling order for all of the

17    notes litigations, in light of amended pleadings on both

18    sides.

19             THE COURT:  All right.  Well, thank you for that

20    report.

21        All right.  In light of there being no objection, and this

22    appearing to have merit under Rule 15(a), I do grant this

23    motion as presented.  And so, Mr. Rukavina, if you'll upload

24    your order.

25        As I recall, this is one of three adversary proceedings

Case 21-03004-sgj   Doc 44   Filed 07/01/21   Entered 07/01/21 16:59:57   Desc Main
Case 3:21-cv-00881-X   Document 36   Filed 09/06   Page 118 of 159   PageID 27675
                                                                    Document   Filed 09/06/46

5

1  where I have a report and recommendation being drafted, not

2  yet finished, with regard to the motion to withdraw the

3  reference.

4      So, again, you can go ahead and upload your order, and

5  then hopefully we're going to have that report and

6  recommendation finalized and in the District Court's hands

7  pretty soon.  All right?  Like you, we've been very snowed

8  under here, and we just --

9          MR. RUKAVINA:  Yeah.

10          THE COURT:  -- have had it in the queue of things to

11  finish off.

12      All right.  Well, thank you.  That concludes this

13  morning's Highland matter.  Okay.

14          MR. RUKAVINA:  Thank you, Your Honor.  May we be

15  excused?

16          THE COURT:  Yes, you may.

17      (Proceedings concluded at 10:01 a.m.)

18                      --oOo--

19

20                  CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **07/01/2021**

24  _____        _____

25  Kathy Rehling, CETD-444                              Date
    Certified Electronic Court Transcriber

6

INDEX

PROCEEDINGS                                                              3

WITNESSES

-none-

EXHIBITS

-none-

RULING                                                                  4

END OF PROCEEDINGS                                                       5

INDEX                                                                   6



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 2, 2021**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## <u>ORDER GRANTING DEFENDANT'S MOTION TO AMEND</u>

CAME ON FOR HEARING on the 24th day of June, 2021, the *Defendant's Motion for Leave to Amend Answer* (the "<u>Motion</u>"), filed by Highland Capital Management Fund Advisors, L.P. (the "<u>Defendant</u>"). Having considered the Motion and, for the reasons stated on the record of said hearing, finding that the Motion should be granted, it is hereby:

ORDER GRANTING DEFENDANT'S MOTION TO AMEND—Page 1

ORDERED that the Motion is GRANTED and that the Defendant shall have ten (10) days from the date of entry of this Order to file its *Defendant's Amended Answer* attached to the Motion as Exhibit "B."

### END OF ORDER ###

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**<u>DEFENDANT'S AMENDED ANSWER</u>**

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "<u>Defendant</u>"), the defendant in the above-styled and numbered adversary proceeding (the "<u>Adversary Proceeding</u>") filed by Highland Capital Management, L.P. (the "<u>Plaintiff</u>"), and files this its *Defendant's Amended Answer* (the "<u>Answer</u>"), responding to the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "<u>Complaint</u>").  Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.      The Defendant admits ¶ 10 of the Complaint.

11.      The Defendant admits ¶ 11 of the Complaint.

12.      The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

**A.      The HCMFA Notes**

13.      The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.      The Defendant denies ¶ 14 of the Complaint.

15.      The Defendant denies ¶ 15 of the Complaint.

16.      The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.      The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.      The Defendant admits ¶ 18 of the Complaint.

**B.      HCMFA's Default under Each Note**

19.      The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.      To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.    The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.    The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.    The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.    The Defendant denies ¶ 24 of the Complaint.

**FIRST CLAIM FOR RELIEF**
**(For Breach of Contract)**

25.    Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.    Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 26 of the Complaint.

27.    Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 27 of the Complaint.

28.    Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 28 of the Complaint.

29.    The Defendant denies ¶ 29 of the Complaint.

**SECOND CLAIM FOR RELIEF**
**(Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))**

30.    Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

---

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 32 of the Complaint.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 36 of the Complaint.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## **AFFIRMATIVE DEFENSES**

38.     At all material times to the Complaint, the Defendant, a registered advisor, advised various third-party funds as to their investments.  One such fund was Highland Global Allocation Fund ("HGAF").

39.     At all material times to the Complaint, the Defendant contracted with the Plaintiff whereby the Plaintiff, through its employees, would provide certain services to the Defendant,

including with respect to the Defendant's advice to the third-party funds.  These services so provided included accounting, legal, regulatory, valuation, and compliance services.

40.    In March, 2018, HGAF sold equity interests it held in TerreStar.  As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of HGAF assets. The Defendant was responsible for advising on the NAV.  In turn, pursuant to the Shared Services Agreement in effect at that time between the Plaintiff and the Defendant, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.

41.    The Plaintff made a mistake in calculating the NAV (the "NAV Error").  The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund.  The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error.  Ultimately, and working with the SEC, the Plantiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

42.    The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019.  In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

43.    At this time, Frank Waterhouse ("Waterhouse") was the Chief Financial Officer to both the Plaintiff and the Defendant.  Waterhouse signed the two promissory notes the subject of the Complaint (the "Notes").  He did not sign the Notes in any representative capacity for the Defendant.  The Defendant did not authorize Waterhouse to sign the Notes or to bind the Defendant in any way to the Note.

44.    Waterhouse made a mistake in preparing and signing the Notes for the Defendant. Upon information and belief, Waterhouse was not aware that payments from the Plaintiff to the Defendant were to compensate the Defendant for the NAV Error and resulting damages, instead assuming that the Notes were like prior notes between the Plaintiff and the Defendant.  Waterhouse failed to properly inquire into the underlying transaction and, either for unknown accounting or other purposes, Waterhouse prepared and signed the Notes on his own, without proper knowledge of the underlying facts and without actual authority from either the Plaintiff or the Defendant.

45.    In sum, neither the Plaintiff nor the Defendant intended that any funds paid by the Plaintiff to the Defendant be treated as debt but that they instead be treated as compensation by the Plaintiff to the Defendant for the NAV Error that the Plaintiff caused.  The Notes are an unauthorized mistake and a nullity, and are void for a lack of consideration.

46.    To the extent Waterhouse had apparent authority to bind the Defendant to the Notes, such apparently authority does not apply to the Notes because Waterhouse's lack of actual authority is imputed to the Plaintiff, as Waterhouse was the CFO for the Plaintiff.

47.    Accordingly, the Notes are void or unenforceable for lack of consideration, for mutual mistake, and for the lack of authority from the Defendant to Waterhouse to execute the same for the Defendant.

## JURY DEMAND

48.    The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

49.    The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 6th day of July, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 6th day of July, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the plaintiff.

By:  /s/  Davor Rukavina
Davor Rukavina, Esq.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Civil Action No. 3:21-CV-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § § | |
| *Defendant.* | § § | |

## <u>ORDER</u>

Before the Court is a report and recommendation from the United States
Bankruptcy Court.  [Doc. No. 2 Exhibit 1].  The Bankruptcy Court recommends that
this Court grant the defendant's motion to withdraw the reference when the
bankruptcy court certifies that this action is ready for trial and defer all pretrial
matters to the Bankruptcy Court.  The defendant filed a limited objection.[1]

This Court holds that the Bankruptcy Court's familiarity with the facts and
the parties make it well-situated to handle pretrial matters in this case.  This Court
further finds that allowing Bankruptcy Court to handle pretrial filings would further
both judicial economy and the important goal of uniformity and efficiency in
bankruptcy administration.

---

[1] Doc. No. 5.

1

Case 3:21-cv-02888-X   Document 84-1   Filed 09/29/22   Page 132 of 159   PageID 127689

Therefore, this Court **ACCEPTS** the recommendation.  This case is hereby **REFERRED** for pretrial management to the United States Bankruptcy Court. When the Bankruptcy Court's concludes this case is ready for trial, that Court should notify this Court, and this Court will then withdraw the reference.

**IT IS SO ORDERED** this 14th day of September, 2021.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER
<u>AND BRIEF IN SUPPORT THEREOF</u>**

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

I.      SUMMARY ....................................................................................................................1

II.     TIMING ..........................................................................................................................2

III.    BACKGROUND ............................................................................................................4

        A.      THE NOTES, THE ADVERSARY PROCEEDING, AND HCMFA'S DEFENSE.................4

        B.      WATERHOUSE'S DEPOSITION AND ADMISSION OF MISTAKE....................................6

        C.      MR. KLOS' DEPOSITION AND CREATION OF THE NOTES .........................................13

        D.      MS. HENDRIX'S DEPOSITION AND LACK OF AUTHORITY TO SIGN THE NOTES........15

IV.     ARGUMENTS AND AUTHORITIES..........................................................................19

V.      PRAYER........................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004)......................................................20, 21

**Statutes and Rules**

TEX. BUS. & COMM. CODE ANN.  3.308(a) .................................................................................1

TEX. BUS. & COMM. CODE ANN. § 3.402(b) ..............................................................................7

FED. R. CIV. P. 15(a)(2).............................................................................................................20

### DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER
### AND BRIEF IN SUPPORT THEREOF

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P. ("HCMFA" or the "Defendant"), the defendant in the above styled and numbered adversary proceeding (the "Adversary Proceeding") commenced by Highland Capital Management, L.P. (the "Debtor"), and files this its *Defendant's Second Motion for Leave to Amend Answer and Brief In Support Thereof* (the "Motion"), respectfully stating as follows:

## I.      SUMMARY[1]

1.      By this Motion, HCMFA requests leave to amend its answer to expressly deny that the Notes were signed.  HCMFA does not concede that this relief is required, as it has already denied that it signed the notes—Mr. Waterhouse purportedly signed them as maker.  However, the Uniform Commercial Code ("U.C.C.") appears to require a more express denial of signature.[2]

2.      This is not an ordinary note case.  The way that the Notes were signed, the fact that they did not go through "legal," the absence of evidence that anyone involved was told that the underlying transfers were loans—accounting personnel *assumed* the transfers to be loans— and the fact that the Debtor was liable to HCMFA for causing a valuation error that led to $7.4 million in liabilities, which was the purpose of the transfers; *i.e.* compensation, all demonstrates that the Notes are a mistake created by Debtor employees in good faith based on their assumptions, and not the facts.  Indeed, it is now apparent that Mr. Waterhouse did not sign the Notes or authorize his electronic signature.

---

[1]      This Motion is supported by the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer*, filed concurrently herewith, and cited to herein as HCMFA APP.

[2]      *See* TEX. BUS. & COMM. CODE ANN.  3.308(a).

3.    This case is an example of how one mistake and assumption snowballs and leads to another, which leads to another, and which leads to yet another, with a plaintiff now seeking to exploit these mistakes—its own mistakes, by the way—rather than looking at the actual facts:

Step 1.    Mr. Dondero went to Mr. Waterhouse and told Mr. Waterhouse to transfer $7.4 million to HCMFA.  Mr. Dondero <u>never</u> told Mr. Waterhouse that this was a loan; just to transfer the funds.  In fact, the transfers were compensation from the Debtor to HCMFA because the Debtor, through its negligence, created a $7.4 million liability of HCMFA to third parties.  Mr. Dondero never told Mr. Waterhouse that the transfers were loans.

Step 2.    Mr. Waterhouse did <u>not</u> have the authority to enter into a loan of this size either for HCMFA or the Debtor.  He simply told his controller to transfer the funds and put the matter out of his head.

Step 3.    That controller, pursuant to a multi-year course of conduct and many other inter-company promissory notes, asked a subordinate to paper the transfers as loans, <u>assuming</u> that they must be loans because intercompany transfers are usually booked as such and the auditors need paper notes.

Step 4.    The subordinate, who is not a lawyer, took a Word document form, years old, and populated it, instead of going through the legal department.  And, instead of asking Mr. Waterhouse to sign the notes, she affixed a .jpg image of his signature to the Notes, <u>without</u> authority from him.

Step 5.    Now that there are notes in the system, and even though none of them know anything about it, accountants and auditors do what they do: they record and report the Notes, thereby breathing life into something that should never have been.

Step 6.    Complicating matters, there were prior promissory notes from HCMFA to the Debtor in the amounts of $6.3 million—similar to $7.4 million—such that persons subsequently reviewing books and records would naturally have assumed that HCMFA's books, which carried the Notes, were referring to these old notes and not something new, such that the mistake was not caught until after this litigation commenced.

## II.    <u>TIMING</u>

4.    NexPoint will first address timing issues, since the Debtor is certain, as it always does, to allege that NexPoint somehow delayed in asserting a right, conveniently ignoring that it had NexPoint's documents, that it had secured an injunction preventing Mr. Dondero from talking

to Debtor employees, and that it had instructed its key employees not to communicate with HCMFA regarding this litigation.  HCMFA APP 3-6.  The following dates are key:

(i)     April, 2021.  Mr. Sauter interviews Mr. Waterhouse, who basically informs him that, as he did not use electronic signatures in May, 2019, if a note has his signature, then he must have signed it.  *Id*. 7 (¶ 23).  HCMFA at that time has no reason to question this.  *See id*.

(ii)    May 28, 2021.  HCMFA serves a request for production on the Debtor, which includes "[a]ll Microsoft Word copies of the Notes, including Metada."  *Id*. 819.

(iii)   The Debtor does not produce the same.  *Id*. 815 (¶ 5).  As late as October 19, 2021, as HCMFA is deposing Mr. Waterhouse—the person who purportedly signed the Notes—the Debtor is still refusing to produce the original Word documents of the Notes.[3]

(iv)    October 19, 2021.  The Debtor and HCMFA depose Mr. Waterhouse, who testifies that he does not remember signing the Notes and, if he authorized someone to affix his electronic signature to the Notes (even though he was not sure this was being done in May, 2019), then there would be an e-mail from him to an administrative assistant so authorizing.  *See* Discussion, *infra*, at pp. 12-16.

(v)     October 25, 2021.  The Debtor finally produces the original of the Notes.  HCMFA APP 815 (¶ 5).  This confirms that the signature of Mr. Waterhouse is not even an electronic signature, but rather a .jpg image of his signature affixed to the Word version (not even the .pdf version) of the Notes.  *See* Discussion, *infra*, at pp. 20-21.

(vi)    October 27, 2021.  HCMFA deposes Mr. Klos and Ms. Hendrix and learns that Ms. Hendrix affixed Mr. Waterhouse's signature to the Notes, apparently assuming that this was authorized, but without actual authority to do so.  No document authorizing Ms. Hendrix to so do has been produced.  *See* Discussion, *infra*, at pp. 19-23.  *See* HCMFA APP 815 (¶ 6).

5.      Through no fault of HCMFA, it was not until the completion of these depositions that HCMFA learned that Mr. Waterhouse did not sign the Notes and that he did not authorize his

---

[3]     "John, I also asked you for the Word versions of these notes so we could look at the properties, and you have not provided them.  Are you intending to?

MR. MORRIS:  No."

HCMFA APP 198 (146:12-17).

electronic signature to the Notes.  In that respect, discovery worked as it should, and HCMFA should now have the ability to amend its Answer accordingly.

### III.  BACKGROUND FACTS

**A.  THE NOTES, THE ADVERSARY PROCEEDING, AND HCMFA'S DEFENSE**

6.     On January 22, 2021, the Plaintiff filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "Complaint"), thereby initiating this Adversary Proceeding.  By the Complaint, the Debtor seeks to recover on two demand promissory notes allegedly issued by HCMFA (the "Notes") and signed by Frank Waterhouse ("Waterhouse"): (i) a note dated May 2, 2019 in the amount of $2.4 million; and (ii) a note dated May 3, 2019 in the amount of $5 million.

7.     Each of the Notes, in its body, defines "maker" as HCMFA.  On the signature pares, however, the Notes say:

**MAKER:**

_____
FRANK WATERHOUSE

8.     Mr. Waterhouse does not sign the Notes in any representative capacity, such as "Treasurer" or "Chief Financial Officer."  (Dkt. No. 1 at exh. 1 & 2).

9.     On May 22, 2021, HCMFA filed its *Defendant's Motion for Leave to Amend Answer* (Dkt. No. 32), and on July 2, 2021, the Court entered its *Order Granting Defendant's Motion to Amend* (Dkt. No. 45).  Accordingly, on July 6, 2021, HCMFA filed its *Defendant's Amended Answer* (Dkt. No. 48), asserting various affirmative defenses, including that Waterhouse did not have authority to execute the Notes on behalf of HCMFA and that, therefore, HCMFA did not sign the Notes.  (Dkt. No. 48 at pp. 5-7).

10.     The purpose of this prior amendment was to assert that the Notes were executed by mistake, which is also relevant to the present Motion.  Pursuant to a Shared Services Agreement, HCMFA contracted with the Debtor, for pay, for the Debtor to provide various valuation services to HCMFA as it advises various funds.  HCMFA APP 13-25.  The Debtor made a mistake relating to a valuation issue for one of those funds, Highland Global Allocation Fund, and specifically the valuation of TerreStar.  *Id*. 325-330 (273:10-278:13).  This mistake led to liability at HCMFA of $7.4 million.  *See id*.  It is HCMFA's position that this was the Debtor's liability under the Shared Services Agreement, as the Debtor breached the standard of care and its duties as specified in the agreement.  *See, e.g., id*. 18 (§ 6.01).  Soon thereafter, as HCMFA needed money (both to pay the remaining portion of that liability and to pay a $5 million consent fee to the investors of a fund), Highland transferred these sums ($7.4 million) to HCMFA.  *Id*. 334-35 (282:24-283:5).  This was done at the direction of Mr. Dondero, who believed that it was proper for Highland to transfer these funds to compensate HCMFA for Highland's valuation error, and not as a loan from the Debtor to HCMFA.[4]  HCMFA APP 334-35 (282:12-283:7).

11.     As detailed below, that is when the errors and assumptions began: The Debtor's (and HCMFA's) Chief Financial Officer, Frank Waterhouse ("Waterhouse"), perhaps assumed that, when Mr. Dondero told him to transfer the funds, it was a loan, even though Mr. Dondero never told him that it was a loan; the Debtor's controller, David Klos ("Klos"), when told to transfer the funds by Mr. Waterhouse, assumed that this was a loan and assumed that promissory notes should be prepared; and Kristin Hendrix ("Hendrix"), Mr. Klos' subordinate, prepared the Notes as instructed by Mr. Klos, and purported to electronically sign Mr. Waterhouse's name to

---

[4]     This is further evidenced because the source of the funds that the Debtor used to pay HCMFA came from funds paid into the Debtor by Mr. Dondero.  Clearly Mr. Dondero knew what was going on, and clearly he intended the subsequent transfer to be compensation.  Otherwise he could have just transferred funds to HCMFA directly.

the Notes.  All of these individuals, in the accounting group and not the legal group, simply assumed that funds flowing from the Debtor to HCMFA must be loans, and therefore that the loans must be "papered up" for accounting and audit purposes, as had been done many, many times in the prior fifteen years.

12.    The Debtor will point out instances where HCMFA carried the Notes as liabilities on its books and records.  There is evidence of that, but there is also evidence otherwise.  That is not conclusive, however, or even necessarily persuasive to the jury—of course the same accounting personnel who *assumed* that the transfers were loans would then carry the resulting (mistaken) Notes on the books and records.

## B.    WATERHOUSE'S DEPOSITION AND ADMISSION OF MISTAKE

13.    As noted, Mr. Waterhouse signed the Notes as "maker."  Certainly, his signature does not indicate any representative capacity such as "treasurer" or as "CFO."  In the body of the Notes, "Maker" is defined as HCMFA.  Thus, there is ambiguity and, more importantly, *prima facie* liability for Mr. Waterhouse.

14.    Here, the Texas U.C.C. contemplates this potential and directly applies, providing as follows:

> (1) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.

> (2) Subject to Subsection (c), the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity, or (ii) the represented person is not identified in the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.

TEX. BUS. & COMM. CODE ANN. § 3.402(b). The comments to the U.C.C. explain with an

analogous situation:

> Case # 3. The name "Richard Roe" is written on the note and immediately below
> that name Doe signs "John Doe" without indicating that Doe signed as agent.
>
> In each case Doe is liable on the instrument to a holder in due course without notice
> that Doe was not intended to be liable. In none of the cases does Doe's signature
> unambiguously show that Doe was signing as agent for an identified principal. A
> holder in due course should be able to resolve any ambiguity against Doe.
>
> But the situation is different if a holder in due course is not involved. In each case
> Roe is liable on the note. Subsection (a). If the original parties to the note did not
> intend that Doe also be liable, imposing liability on Doe is a windfall to the person
> enforcing the note. Under subsection (b)(2) Doe is prima facie liable because his
> signature appears on the note and the form of the signature does not unambiguously
> refute personal liability. But Doe can escape liability by proving that the original
> parties did not intend that he be liable on the note. This is a change from former
> Section 3-403(2)(a).

U.C.C. cmt. 3.

15.     Mr. Waterhouse was asked at length about his potential personal liability on the

Notes:

> Q.   Okay.  But back then when you signed this, did it ever cross your mind that
> you were the maker on these notes?
>
> A.   No.
>
> Q.   Back then when you signed this document, did it ever cross your mind that
> you could be a co-obligor on these notes?
>
> A.   No.  I didn't receive $7.4 million, I mean...
>
> *        *        *
>
> Q.   So putting all other issues aside, if the law -- if the law says that you were
> liable for those notes because of how you signed them, then would you agree with
> me that these notes are a mistake?
>
> MR. MORRIS:  Objection to the form of the question.
>
> MS. DANDENEAU:  Objection to the form.

A.    Yes.

HCMFA APP 357-59 (305:16-307:4).

16.    Given that the law makes Mr. Waterhouse *prima facie* liable for the Notes, even though that was not his intention, the Notes are a mistake and Mr. Waterhouse admitted that they are a mistake.  More to the point however, Mr. Waterhouse testified extensively regarding whether he signed (or did not sign) the Notes.  This is important because, when HCMFA first interviewed Mr. Waterhouse regarding the Notes (once he was no longer prohibited by the Debtor from communicating with HCMFA regarding litigation matters), Mr. Waterhouse stated that, if the Notes bear his signatures, then he must have signed them as he did not use an electronic signature in May, 2019.  HCMFA APP 7 (¶ 23).  In other words, even though HCMFA had reason to believe that the Notes were a mistake, it had no reason at that time to believe that Mr. Waterhouse did not actually sign the Notes.

17.    This changed when HCMFA deposed Mr. Waterhouse on October 19, 2021.  The deposition began with Mr. Waterhouse repeatedly testifying that he did not recall signing the Notes, even though the signatures were his.  "I don't recall specifically signing this, but this is my signature."  HCMFA APP 193 (141:4-7).  In other words, as he had told HCMFA in April, 2021, given that the signature is his, he must have signed the Notes.  As detailed below, however, once Mr. Waterhouse reviewed the Notes and confirmed that they contain his electronic signatures, it became clear that he did not sign the Notes and, equally as importantly, that he did not authorize his electronic signature to the Notes.

18.    First, Mr. Waterhouse confirmed some background facts.  He confirmed that he, as the CFO for the Debtor and an officer of HCMFA, would not have had the authority on his own to cause the Debtor to lend, or HCMFA to borrow, $7.4 million [subject to objection].  Only Mr.

Dondero would have had that authority [subject to objection].  HCMFA APP 322-25 (270:18-273:9).  Mr. Waterhouse admitted that, as a result of the TerreStar valuation error, shareholders in funds advised by HCMFA had damages of between $7 and $8 million.  *Id*. 329-30  (277:7-278:13).  Mr. Waterhouse confirmed that Mr. Dondero told him to transfer funds from the Debtor to HCMFA:

> I testified earlier, that I had a conversation with Mr. Dondero for -- for these amounts attributable to – it was either the error -- you know, the error, and in that conversation he said, go get the money from Highland.

*Id*. 334-35 (282:24-283:5).

19.     Critically, Mr. Waterhouse could not remember if Mr. Dondero told him this was a loan.  *Id*. 336 (284:4-6).  Mr. Waterhouse did not remember if Mr. Dondero told him to have promissory notes prepared.  *Id*. 336 (284:18-20).  Regarding the genesis of the Notes, Mr. Waterhouse testified:

> Q. Okay. And would you have signed two promissory notes obligating HCMFA to pay Highland $7.4 million without Mr. Dondero's prior knowledge and approval?
>
> MS. DEITSCH-PEREZ:  Object to the form.
>
> A. You know, from -- from what I recall around these notes, you know, I don't recall specifically Mr. -- Mr. Dondero saying to – to make this a loan.  So my conversation with Mr. Dondero around the culmination of the NAV error as related to TerreStar which was a -- a – I think it was a year and a half process. I don't know, it was a multi-month process, very laborious, very difficult. When we got to the end, I had a conversation with Mr. Dondero on where to, you know, basically get the funds to reimburse the fund, and I recall him saying, get the money from Highland.
>
> Q. And so he told you to get the money from Highland; is that right?
>
> A. That is what I recall -- in my conversation with him, that is -- that is what I can recall.

HCMFA APP 196-97 (144:14-145:22).  Asked if he would disagree with Mr. Dondero that Mr.

Dondero never told him to make the transfers loans, Mr. Waterhouse testified [subject to

objection]: "all I recall is he said, get the money from Highland."  *Id*. 370 (318:3-10).  Continuing:

> And you don't remember discussing with Mr. Dondero what the terms of those two
> promissory notes should be?
>
> A. I don't recall -- I testified all I recall is he said, get the money from Highland.
> I don't -- the -- the terms of the note, I don't recall ever having a discussion around
> the terms of the note, but since I don't draft the notes, that -- there could have been
> a conversation with other people later.

*Id*. 371 (319:7-16).

20.     When asked whether it was possible that, "when Mr. Dondero told you to transfer

the funds from Highland, you just assumed on your own that those would be loans without him

actually telling you that those would be loans," Mr. Waterhouse testified [subject to objection] that

"I don't know."  HCMFA APP 339 (287:4-13).  Asked again whether, seeing $7.4 million being

transferred out of the Debtor, whether it is possible that he assumed this to be a loan, Mr.

Waterhouse answered [subject to objection]:

> I don't know.  As I testified earlier, I had conversations with Mr. Dondero about -
> - about the -- the -- the moneys that were needed for the NAV error.  And I recall
> him saying go get it from Highland -- or get it from Highland.

*Id*. 340-41 (288:19-289:8).  In fact, Mr. Waterhouse confirmed that it was on his "initiative" to

have the Notes drafted [subject to objection].  *Id*. 342 (290:4-16).  And, Mr. Waterhouse believed

that the legal team would be involved with drafting the notes.  *Id*. 342 (290:15-16).

21.     Mr. Waterhouse did not recall if the Notes were presented to him on paper form to

sign.  *Id*. 344-45 (292:14-293:17).  Mr. Waterhouse testified:

> I signed very few documents via email.  I can't say that it never happened, but
> people either stopped by my office and physically walked in documents for
> signature that we discussed face-to-face.

*Id*. 345-46 (293:25-294:5).  And, before signing documents, Mr. Waterhouse would usually have the legal department or the compliance department sign off on the document.  *Id*. 346-348 (294:16-296:7).  When asked again if he remembered signing the Notes, Mr. Waterhouse testified [subject to objection]:

> They would -- they would have been presented physically on paper most likely or someone would have left it.  But, I mean, again, I don't -- I don't recall."

*Id*. 348 (296:8-18).  And, Mr. Waterhouse confirmed that, back then, he used an "ink pen" to sign documents, as he told HCMFA in April, 2019.  *Id*. 348 (296:19-25).

22.    When presented with the Notes and asked whether he believed that he ink-signed them, Mr. Waterhouse answered:

> These -- these -- these signatures are identical, now that I stare at them, and I mean, they are so close -- I mean, they're identical that, I mean, even with my chicken scratch signature, I don't know if I can -- you know, I do this 100 times, could I do that as -- as precisely as I see between the two notes.

*Id*. 350 (298:2-17).  Pressed further regarding whether he "actually signed either or both notes":

> Is -- I don't -- I don't recall specifically.  As I said before, my assistant did have a -- an electronic signature, and that was used from time to time.  It wasn't as common practice back in 2019.  It definitely was more common practice when we had to work from home and remotely for COVID because it that made it almost impossible to, right, provide wet signatures since we're all working from home remotely.
>
> Q. Well, going just for these two promissory notes, Mr. Waterhouse, in light of your inability to remember any details, are you sure you actually signed either or both of those notes?
>
> MS. DANDENEAU: Objection to form.
>
> A. I don't recall specifically signing -- actually physically signing these notes.  As I said before, I don't recall doing that.  This -- this looks like my signature, but yet these two signatures are identical.
>
> Q. So you don't recall physically signing them, and I take it you don't recall electronically signing them either?

A. I don't recall.  You know, Highland has all my emails.  If that occurred, you
know, you know, I don't have any of these records is what I'm saying.  I don' t
have any of those records.

*Id*. 350-52 (298:300:4).

23.    Regarding the possibility that Mr. Waterhouse electronically signed the Notes, as

rare as that may have been in May, 2019, Mr. Waterhouse testified as follows:

And help me here.  I'm not very technologically astute.  When you -- and I – I
recognize that you do it rarely, but when you sign a document electronically, do
you believe that there is an electronic record of you having authorized or signed a
document electronically?

MR. MORRIS:  Objection to the form of the question.

I -- I don't know the tech answer to that, but, you know, since I don't have – I don't
ever attach my signature block electronically, my assistant would have done that,
and if that is done over email like we did several times -- you know, multiple,
multiple times over COVID, she would attach my signature block and then email it
out to whatever party.

Q.    What was your assistant's name in May 2019?

A.    It was Naomi Chisum.

Q.    Is she the only one?  I'm sorry, was she your only assistant that would have
maybe facilitated logistically something like you just described?

A.    You know, she was out on maternity leave at some point.  I don't -- I don't
recall those dates where she was out for maternity leave.  There was -- there were
folks backing her up.  I don't recall specifically who those -- who those, you know,
administrative assistants were, and I don't recall specifically if she was out during
this time on maternity leave.

*Id*. 372-73 (320:11-321:20).

24.    Aside from providing valuable testimony regarding the genesis of the Notes, for

purposes of the present Motion Mr. Waterhouse testified: (i) that he does not remember signing

the Notes in person or electronically; (ii) he rarely signed documents in May, 2019 electronically;

(iii) he would have expected that documents he signed were approved by the legal department; (iv)

the Notes strongly appear to be signed electronically; and (v) if signed electronically, he would

have sent an e-mail authorizing the same.  Interestingly, he also testified that it would have been

his "assistant" to sign his name electronically; not Ms. Hendrix, a mid-level manager and not an

"administrative" assistant.

25.      No such e-mail authorizing Mr. Waterhouse's electronic signature has been

produced by the Debtor.  HCMFA APP 815 (¶ 6).

**C.      MR. KLOS' DEPOSITION AND CREATION OF THE NOTES**

26.      HCMFA deposed Mr. Klos on October 27, 2021.  In May, 2021, Mr. Klos was the

controller for the Debtor.  HCMFA APP 661 (8:11-13).  It is Mr. Klos who directed Ms. Hendrix

to prepare the Notes.  *Id*. 721 (68:4-13).  Mr. Klos discussed how funds would be transferred from

one affiliated entity to another as needed for liquidity:

> And you joined Highland in 2009. From that point in time, 2009, through 2019,
> was there any practice at the enterprise of those businesses to transfer funds
> between each other on a basis of when one needed it and one had it?
>
> A. Yes, that was a fairly, generally speaking, that was a fairly common practice, of
> using different entities within the overall structure to bridge liquidity.

*Id*. 682-83 (29:24-30:7).  Klos also testified as to the standard practice that, where the Debtor was

transferring funds out, the transfer would be booked as a loan:

> So over the general -- talking about generally now, over those 10 years when there
> were these intercompany transfers for liquidity purposes, how were they booked by
> the debtor, by Highland Capital Management?
>
> MR. MORRIS: Objection to the form of the question.
>
> THE WITNESS: Help me on the direction. So this is money that Highland is
> receiving or money that Highland is sending?
>
> Q. (BY MR. RUKAVINA) Sending out.
>
> A. Sending out. So this is -- in the scenario that you're describing, this money that
> Highland is sending out to meet some other corporate obligor's liquidity needs?
>
> Q. Yes, sir.

A. So those would be booked as a loan. I would -- I need to hedge a little bit because I'm not a hundred percent certain, but I would say if not exclusively via loans close to exclusively.

Q. And would they -- strike that.  Would they usually be papered up with a promissory note?

A. Yes.

Q. Now, why was that the general course during 10 years? Was there a policy and procedure in place, or would Dondero say book it as a loan, or was that just the right thing to do from an accounting perspective?

MR. MORRIS: Objection to the form of the question.

THE WITNESS: At the end of the day it's at the direction of Jim Dondero, so I can't tell you exactly why he wanted it to be done that way. But that was certainly the practice of how it was done in those situations.

*Id.* 685-87 (32:20-34:5).

27.    Thus Mr. Klos believed that the underlying transfers were loans, in part because he

believed that Mr. Waterhouse would have told him that (but could not recall for certain), and in

part because of past practice.  *Id.* 722-23 (69:1-70:14).  Mr. Klos described the usual course at the

Debtor with respect to papering intercompany loans:

Q. (BY MR. RUKAVINA) So going back to this Exhibit 3, sir, why did you ask Kristin, can you or Hayley please prep a note for execution? Why them? Remember, I was asking about what the course or procedure was at that point in time.

A. Yeah, so nomenclature, procedure, process. I would say the informal process for these types of loans, they were frequent in nature, would be for someone on the corporate accounting team to prepare a note and have it executed.

Q. Okay. That was the standard course back then?

A. Again, I don't know what standard course means. That was fairly typical.

Q. Why would you not have asked someone in the Highland legal department to prepare a note?

A. Because this was a legally reviewed document as far as the form of the agreement. It's a one-page, two-paragraph form that had been used for a long time.

So the only thing that would change with respect to these notes would be the date, the amount, likely the rate. I can't think of anything else offhand that would have changed from note to note.

Q. After you asked Ms. Hendrix to prepare this note, did you have any further role with respect to the papering, preparation, or execution of that note?

A. Not that I can remember.

Q. Would you have had any role in having either or both of the notes actually signed electronically or by ink by Mr. Waterhouse?

A. Likely not, no.

*Id*. 736-37 (83:19-84-24).

28.    The point is simple: when professional accountants at the Debtor saw funds flowing from the Debtor to an affiliate, such as HCMFA, they *assumed* that the funds were a loan and papered it as such, as this is how it had been done for many years on many occasions.

D.    **M**S. **H**ENDRIX'S **D**EPOSITION AND **L**ACK OF **A**UTHORITY TO **S**IGN THE **N**OTES

29.    HCMFA deposed Ms. Hendrix on October 27, 2021.  In May, 2019, Ms. Hendrix was the senior accounting manager at the Debtor.  HCMFA APP 461 (12:4-16).  At that time, she reported to Mr. Klos, who reported to Mr. Waterhouse.  *Id*. 461-62 (12:25-13:9).  While Ms. Hendrix never drafted a promissory note from scratch, in May, 2019, part of her job was taking a form note and revising it.  *Id*. 466 (17:5-11).  At that time, it was the corporate accounting group at the Debtor, not the legal group, that was responsible for updating draft promissory notes so as to create new ones.  *Id*. 466 (17:20-25).  As Ms. Hendrix testified:

Our typical practice is if we have a loan with certain affiliates that it's a demand note. We have a template that we have used for years that was created by either our internal legal team or an outside law firm, I'm not sure which. The typical practice is always updating a few things on that template, getting it executed, and filing it in our audit folders.

*Id*. 467 (18:18-25).  The corporate accounting group, not the legal group, did this "updating."  *Id*. 468-69 (19:1-13; 20:1-5).  And Ms. Hendrix confirmed the general purpose of the intercompany notes:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down -- when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

*Id*. 470 (21:10-16).  Stated differently, at that time "it's all one big happy family, and whoever needed cash, the cash moved around."  *Id*. 472 (23:3-6).

30.     In May, 2019, Mr. Klos sent one or two e-mails to Ms. Hendrix—emails on which Mr. Waterhouse but not Mr. Dondero or the legal department were copied—informing her that there were new intercompany loans and asking her to prepare notes for execution.  *Id*. 481-82 (32:13-33:4).  This instruction comported with the general practice:

> So is it fair to say that typically, obviously not every time, but typically your corporate accounting group when it would see intercompany transfers in large amounts would believe that they were loans?

> MR. MORRIS: Objection to the form of the question.

> THE WITNESS: Typically they were loans.  There's not really another way to get money from one entity to another.  And if they were papered as a loan, that means we were told to set it up that way.

*Id*. 484 (35:5-15).  That is "how it was for 14 or 15 years."  *Id*. 485 (36:7-9).

31.     Ms. Hendrix confirmed that the $2.4 million Note was "related to a TerreStar NAV error" and the $5 million Note was for the "consent fee."  *Id*. 487-88 (38:17-39:5).  Ms. Hendrix was never "told to [her] directly" that the funds were a loan, but she [subject to objection] "assum[ed] that based on many instances of intercompany transfers in the 14 years prior."  *Id*. 489 (40:20-25).

32.     Ms. Hendrix confirmed that she prepared the Notes from Word documents originally created by outside counsel.  *Id*. 491 (42:15-43:20).  However, Ms. Hendrix had no memory of papering the Notes.  *Id*. 494 (45:21-46:1).  It would have been her practice to not consult the legal group in preparing the Notes.  *Id*. 495 (46:12-24).  Ms. Hendrix confirmed that, to sign Mr. Waterhouse's name to the Notes, she used an electronic picture of his signature, which she then affixed to the Word documents, the same as the undersigned counsel does below:

33.     On the question of whether Mr. Waterhouse authorized Ms. Hendrix to affix his signature to the Notes, Ms. Hendrix testified "I don't have exact specific memory." *Id*. 497 (48:10-15).  Again, she appears to have assumed that Mr. Waterhouse must have approved the Notes and, therefore, her using his signature:

> He was fine with using his e-signature, and what is on these documents was that exact e-signature.

> *      *      *

> But he would have had to approve this loan in the dollar amount, the day. He would have been the one directing us to create these loans.  In past practice he has always approved using his e-signature to execute documents.

*Id*. 497(48:4-18).  When pressed about *how* Mr. Waterhouse would have authorized his electronic signature to be used, Ms. Hendrix testified as follows [subject to objection]:

> I would assume that, as I've stated previously, these directions were coming directly from him to paper a loan.  These changes that are made are only to the dollar amount.  Interest rate is pulled right off the IRS website.  That is his approval to paper a loan and in fact execute or approve the loan.

*Id*. 497-98 (48:24-49:5).

34.      Then, when asked [subject to objection] "after his e-signature was used either on

these notes or other documents in May of 2019, would you have brought the documents back to

him for any kind of verification," Ms. Hendrix testified:

> Probably not.  These are all very standard.  We've papered hundreds of loans.  So
> I think he trusted that we can handle updating a date and a dollar amount on these
> loan templates.

*Id*. 499 (50:1-9).

35.      Ms. Hendrix also testified [subject to objection], differently from Mr. Waterhouse,

that "[p]robably at this time, 99 percent of the stuff my team got his signature on was his e-

signature." *Id*. 498 (49:12-16).  And, the following exchange is significant:

> Q. (BY MR. RUKAVINA) Do you know or believe, or your recent review of
> documents, did it reveal an email from Mr. Waterhouse to you specifically
> authorizing his e-signature on Exhibits 4 and/or 5?
>
> A. Not that I recall seeing, no.
>
> Q. Sitting here today, do you have any memory of Mr. Waterhouse orally or
> otherwise specifically authorizing you to affix his e-signature to Exhibits 4 and/or
> 5?
>
> A. Specifically on these loans, no, I don't recall those conversations.  But, again,
> our practice has always been we have this discussion, he's under the understanding
> that we're going to paper the loans, he's always comfortable with using his e-
> signature.  This is not something me or my team would have done without that
> authority and approval from him.

*Id*. 499 (50:15-25).

36.      And, there is no evidence that Ms. Hendrix ever showed the Notes to Waterhouse

after preparing them:

> Q. Sitting here today, do you have any memory of giving Mr. Waterhouse these
> two promissory notes after they were prepared?
>
> A. I specifically don't remember walking into his office and providing it to him,
> but he could have found it on our shared drive if he wanted to.

Q. Do you have any memory or in your recent review of documents did you see any email to the effect of you sending either or both of these promissory notes to Mr. Waterhouse after they were papered up?

A. I don't have any specific recollection, again, but he had access to look at them.

Q. On the shared drive?

A. Yes.

*Id.* 503 (54:4-17). Scanning in the Notes and then saving them to the system, is hardly a substitute for showing or giving them to the man who is personally liable on them to the tune of $7.4 million.

37.    Ms. Hendrix *assumed* that the transfers were loans and *assumed* that Mr. Waterhouse authorized her to affix his signature to the Notes because she *assumed* that he approved of the Notes. But her testimony directly conflicts with his: whereas he testified that he rarely used electronic signatures in May, 2019, and would have had to send an e-mail authorizing the same, and would have expected that the legal department would approve a note prior to his signature, she testified that he routinely did this at that time pursuant to some generalized authority and that the accounting department routinely papered notes.

38.    The fact remains that, notwithstanding her good faith, Ms. Hendrix created erroneous notes (as they appear to make Mr. Waterhouse the "maker" and to make him jointly and severally liable), and she was not authorized—at least there is no evidence that she was authorized—to affix images of Mr. Waterhouse's signature to the Notes or, if there was some generalized authority that she believed Mr. Waterhouse gave her, then the condition precedent—that the legal department approve the Notes—was not satisfied.

## IV.    <u>ARGUMENTS AND AUTHORITIES</u>

39.    This Motion is necessarily driven by the facts; hence the lengthy discussion of recent discovery proceedings above. From those facts, the following sequence emerges:

(i)     Mr. Dondero told Mr. Waterhouse to transfer the fuds, and Mr. Waterhouse does not recall Mr. Dondero telling him that this was a loan, perhaps assuming this to be the case.

(ii)    Mr. Waterhouse told Mr. Klos to process the transfers, and perhaps he also told him that the funds are a loan.  Either way, pursuant to standard practice, Mr. Klos believed that the funds were a loan and instructed others to paper up the Notes, without any instruction from Mr. Dondero that the transfers were a loan.

(iii)   Ms. Hendrix then, again pursuant to standard practice, took an old form for a note and populated it with new details and created the Notes.

(iv)    Mr. Waterhouse did not sign the Notes.  Instead, Ms. Hendrix affixed pictures of his signature on the Notes.  She did not then provide the Notes to him.

(v)     There is no evidence that Mr. Waterhouse authorized Ms. Hendrix to do so.  Neither Mr. Waterhouse nor Ms. Hendrix remembers any such express authorization. Moreover, Mr. Waterhouse confirmed that, if he authorized an electronic signature, he would have e-mailed such authority to his administrative assistant.  Ms. Hendrix was not his administrative assistant.  And, Mr. Waterhouse confirmed that he would only sign a note if the legal department approved the note, which did not occur here.

40.     HCMFA therefore submits that Ms. Hendrix, in good faith and acting pursuant to an established course and pattern, was not authorized to affix Mr. Waterhouse's signature to the Notes.  Instead, she *assumed* that, as Mr. Waterhouse had authorized the Notes, she was authorized to sign them for him.  And, despite Mr. Waterhouse's expectations, none of this went through the legal department.  Hence the result, where Mr. Waterhouse signed as "maker" and is *prima facie* jointly liable, something that he confirmed was a mistake.  But it is the same note—if that is a mistake, then so is the whole note.

41.     Importantly, the Scheduling Order does not provide for a deadline to seek leave to amend the operative pleadings.  *See* Docket No. 67.  This means that, unlike the heightened "good cause" standard under Rule 16, the more lenient standard of Rule 15 applies to this Motion.   That rule provides that "[t]he court should freely give [leave] when justice so requires."  FED. R. CIV. P. 15(a)(2).  The Court must "possess a 'substantial reason' to deny a request for leave to amend." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).   The Fifth Circuit has outlined five

"considerations" guiding the Rule 15 inquiry: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Id*.

42.    There has been no undue delay.   As discussed above and evidenced with the Appendix, HCMFA did not know that Mr. Waterhouse did not sign the Notes until his deposition, as he had previously told HCMFA that he assumed he must have signed the Notes since the Notes bear his signature.  It is the Debtor who delayed in producing the original Notes, requested in May, 2021, until late October, 2021, going so far as to even say that it would not produce the originals on October 19, 2021 (a decision which, to its credit, it subsequently reversed).  Had the Debtor produced the originals in May or June, as requested, it would have been obvious that the signatures were electronic signatures, and perhaps HCMFA would have reasonably questioned any authority to sign, but this did not happen due to the Debtor' delay.  And, it was not until HCMFA deposed Mr. Waterhouse, Ms. Hendrix, and Mr. Klos that the facts were learned.  There is nothing that HCMFA could have done to expedite this process.  On the contrary, discovery worked as it should have.

43.    There is no bad faith or dilatory motive.  All of HCMFA's defenses are made in good faith and are supported by the evidence.  That evidence may be subject to dispute and to contradictory evidence, but then that is the point of a trial.  Certainly, there is enough testimony and evidence to support the defense that Mr. Waterhouse did not sign the Notes or authorize their signing.  Nor is HCMFA trying to "weasel" its way out of a debt: the Debtor, through its negligence, caused a $7.4 million liability to HCMFA.  It was just and proper for the Debtor to compensate HCMFA, which it did.  None of this is "invented" after the fact or presented in bad faith.

44.     There are no repeated failures to cure deficiencies.  True, this is the second motion to amend the answer.  But, the first motion was necessitated by the simple fact that HCMFA did not have access to its books and records (then still under the control of the Debtor), and the Debtor had prohibited its employees, including Mr. Waterhouse, from discussing litigation matters with HCMFA.  In many ways, that first motion should not have to count against HCMFA.  Either way, for the same reasons as discussed above with respect to timing, HCMFA did not know and could not have known about this defense until the end of October, 2021, meaning that there was no prior "deficiency" to now cure.

45.     There is no undue prejudice to the Debtor.  Trial is not set.  All of the people with knowledge of the Notes have been deposed, and if the Debtor needs additional discovery, then it can readily take it.  The Debtor certainly believes that it already has strong arguments as to why HCMFA's defenses have no merit, as it will no doubt present in opposition to this Motion.  And, as the Debtor has had possession of the originals of the Notes all of this time, and as Ms. Hendrix and Mr. Klox are still the Debtor's employees, as was Mr. Waterhouse through February, 2021, none of what is stated in this Motion should come as a surprise to the Debtor, as much as the Debtor may disagree with HCMFA's position and arguments.

46.     Finally, the amendment is not futile.  Texas law provides for a recognized defense when a promissory note is not signed.  *See* TEX. BUS. & COMM. CODE ANN. § 3.401(a).

47.      Mr. Waterhouse, Mr. Klos, and Ms. Hendrix have each given testimony that raises serious doubt regarding whether Mr. Waterhouse actually signed the Notes or authorized his electronic signature—something that the Court cannot adjudicate at this stage.  The Debtor will have every opportunity to argue at trial why the defense is wrong, and it will have every opportunity to present its evidence.

48.    Accordingly, as no substantial reason exists to deny the amendment, and the interests of justice support freely granting leave, the Court should grant leave to the Defendant to amend its Answer.

## V.    PRAYER

WHEREFORE, PREMISES CONSIDERED, HCMFA respectfully requests that the Court enter an order: (i) granting this Motion; (ii) granting HCMFA leave to file the Amended Answer attached hereto as Exhibit "A"; and (iii) granting HCMFA such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 30th day of November, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that he discussed the relief requested herein with John Morris, Esq., counsel of record for the Debtor, who informed the undersigned that the Debtor opposes said relief.

/s/ Davor Rukavina
_____
Davor Rukavina

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 30th day of November, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/ Davor Rukavina
_____
Davor Rukavina