Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 76-37   Filed 01/09/24   Page 1 of 200   PageID 27917

Page 146

                      WATERHOUSE - 10-19-21

 1    notes?

 2         A.    I didn't ask -- I don't specifically

 3    ask people to draft notes really.  I mean,

 4    again, you know, the legal group at Highland is

 5    responsible and has always been responsible for

 6    drafting promissory notes.

 7         Q.    So based on your -- based on the

 8    practice, you believe that somebody from the

 9    Highland's legal department would have drafted

10    these notes.  Do I have that right?

11              MS. DEITSCH-PEREZ:  Object to the

12         form.  John, I also asked you for the Word

13         versions of these notes so we could look at

14         the properties, and you have not provided

15         them.  Are you intending to?

16              MR. MORRIS:  No.

17         Q.    Can you answer my question, sir?

18         A.    Again, I --

19              MS. DANDENEAU:  Do you want him to

20         repeat it?

21         A.    Yeah, why don't you repeat it?

22         Q.    Sure.  Mr. Waterhouse, based on the

23    practice that you have described in your

24    understanding, do you believe that these notes

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 176-87   Page 202 of 452 Page 2 of 200   PageID 27918

Page 147

```
 1                    WATERHOUSE - 10-19-21

 2     would have been drafted by somebody in the

 3     legal department?

 4                    MS. DEITSCH-PEREZ:  Object to the

 5            form.

 6            A.    Yes.

 7            Q.    Okay.  And do you know who would

 8     have instructed -- do you have any knowledge as

 9     to who would have instructed the legal

10     department to draft these notes?

11                    MS. DEITSCH-PEREZ:  Object to the

12            form.

13            A.    It was whoever was working -- I

14     mean, it was likely someone on the team.  I

15     mean, I don't remember exactly on every note or

16     every document, but, again, a lot of these

17     things of this nature -- they're operational in

18     nature -- were handled by the team.

19                    The team knows to -- I mean, we

20     don't draft documents.  We're not lawyers.

21     We're not attorneys.  It is not what I do or

22     accountants do.

23                    So they are always instructed to go

24     and -- and go to the legal team to get

25     documents like this drafted.  Also, when you go
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/23   Page 3 of 200   PageID 27919

Page 148

 1                    WATERHOUSE - 10-19-21

 2   to the legal team, the -- you know, we always

 3   loop in compliance.  And compliance -- when you

 4   go to the legal team, compliance is part of

 5   legal team.  They're made aware of -- of -- of

 6   these types of transactions.

 7        Q.    And do you believe that you had

 8   the -- withdrawn.

 9              Did you ever tell Mr. Dondero --

10   (inaudible) -- did you see those?

11        A.    Sorry.

12              MS. DEITSCH-PEREZ:  I did not hear

13        the end of that question.

14        Q.    Did you ever tell Mr. Dondero that

15   you signed these two notes?

16        A.    I don't recall ever -- no, I don't

17   recall having a conversation with him.

18        Q.    Did you ever discuss these two notes

19   with him at any time?

20        A.    The conversation, I recall, was what

21   I described earlier.  And that is the only time

22   I recall ever discussing this.

23        Q.    Okay.  But the corporate accounting

24   group had a copy of this -- of these two notes.

25   And pursuant to the audit process, the

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 176-87   Page 204 of 452Page 4 of 200   PageID 27920

Page 149

```
 1                    WATERHOUSE - 10-19-21

 2    corporate accounting group gave the two notes

 3    to PricewaterhouseCoopers in connection with

 4    the audit; correct?

 5                 MS. DANDENEAU:  Objection to form.

 6         A.    Yes.  I mean, that is -- yeah, I

 7    mean, they -- unless the legal team can also

 8    retain copies of items like this.  I mean, I

 9    don't know everything that they would retain as

10    well.

11                 The legal team would also, if they

12    had documents as part of audits, turn that over

13    to the auditors as well.  So it could have been

14    the corporate accounting team.  It could be

15    someone on the legal team.

16         Q.    All right.  So you didn't -- you

17    didn't draft this note; right?

18         A.    I -- I -- I did not.

19         Q.    But somebody at Highland did; is

20    that fair?

21                 MS. DEITSCH-PEREZ:  Object to the

22         form.

23         A.    I don't know.  I mean, we can go to

24    the legal team.  I don't -- I'm not sitting

25    behind someone in legal.  Maybe they went to
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 176-87   Page 205 of 452   Page 5 of 200   PageID 27921

Page 150

1                    WATERHOUSE - 10-19-21

2    outside counsel.  I have no idea.

3        Q.    Did you have any reason to believe

4    you weren't authorized to sign this note,

5    either of these two notes?

6        A.    I think I have already answered that

7    question.

8        Q.    Okay.  You didn't give these notes

9    to PricewaterhouseCoopers; correct?

10              MS. DANDENEAU:  Objection to form.

11       A.    I don't recall giving these to

12    PricewaterhouseCoopers.

13       Q.    And in the practice that you have

14    described, somebody in the corporate accounting

15    group would have given these two notes to

16    PricewaterhouseCoopers; correct?

17              MS. DANDENEAU:  Objection to form.

18       A.    I think I've answered that.  I said

19    either the corporate accounting team or maybe

20    the legal team.

21              MR. MORRIS:  Okay.  Why don't we

22         take our lunch break here.

23              VIDEOGRAPHER:  We're going off the

24         record at 1:04 p.m.

25         (Recess taken 1:04 p.m. to 1:49 p.m.)

1              WATERHOUSE - 10-19-21

2              VIDEOGRAPHER:  We are back on the

3         record at 1:49 p.m.

4         Q.    Mr. Waterhouse, did you speak with

5    anybody during the break about the substance of

6    this deposition?

7         A.    I spoke to -- to Deb and Michelle.

8         Q.    About the substance of the

9    deposition?

10        A.    Yes.

11        Q.    Can you tell me what you talked

12   about?

13             MS. DANDENEAU:  No.  We object on

14        the basis of privilege.

15        Q.    Okay.  You are going to follow your

16   counsel's objection here?

17        A.    Yes.

18        Q.    Okay.

19             MR. MORRIS:  Can we put up on the

20        screen Exhibit 35.

21             (Exhibit 35 marked.)

22        Q.    Are you able to see that document,

23   sir?

24        A.    Yes.

25        Q.    Have you ever seen an incumbency

1                    WATERHOUSE - 10-19-21

2    certificate before?

3          A.    I have.

4          Q.    Do you have a general understanding

5    of what an incumbency certificate is?

6          A.    I have a general understanding.

7          Q.    What is your general understanding?

8          A.    You know, those -- my general

9    understanding is that the incumbency

10   certificate basically lists folks that can --

11   are like authorized signers.

12         Q.    Okay.  And do you see that this is

13   an incumbency certificate for Highland Capital

14   Management Fund Advisors, L.P.?

15         A.    Yes.

16         Q.    Okay.  And if we could scroll down

17   just a little bit, do you see that it's dated

18   effective as of April 11th, 2019?

19         A.    Yes, I see that.

20         Q.    Okay.  And is that your signature in

21   the middle of the signature block?

22         A.    Yes, it is.

23         Q.    And by signing it, did you accept

24   appointment as the treasurer of HCMFA effective

25   as of April 11th, 2019?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 176-87   Filed 01/09/24   Page 8 of 200   PageID 27924

Page 153

1                    WATERHOUSE - 10-19-21

2        A.     Again, I'm not the legal -- I don't

3    know if this makes me the treasurer or the

4    appointment.  I don't know -- I don't know

5    that, so I don't -- I don't know if that

6    document -- again, I think -- again, I'm not

7    the legal expert.  I think isn't there --

8    aren't there other legal documents that detail

9    who the officers are that could be incorporated

10   or things like that?  Again, I don't want to

11   play armchair attorney here.

12       Q.     I'm not asking you for a legal

13   conclusion.  I'm asking you for your knowledge

14   and understanding.  When you signed this

15   document, did you understand that you were

16   accepting an appointment as the treasurer of

17   HCMFA?

18                 MS. DANDENEAU:  Objection to form.

19                 MS. DEITSCH-PEREZ:  Objection, form.

20       A.     Again, I don't think this -- that

21   wasn't my understanding.  I don't think this

22   makes -- this document makes me the treasurer.

23       Q.     What do you think this document --

24   why did you sign this document?

25                 MS. DEITSCH-PEREZ:  Objection to

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 76-87    Page 209 of 452    Page 9 of 200    PageID 27925

Page 154

```
 1                    WATERHOUSE - 10-19-21

 2         form.

 3               MR. MORRIS:  You're objecting to the

 4         form of the question when I asked him why

 5         did you sign the document?  What is the

 6         basis for the objection?

 7               MS. DEITSCH-PEREZ:  Because, John, I

 8         think that it does call for a legal

 9         conclusion other than -- with him saying

10         because somebody told me to sign this

11         document.  But if you want to go there,

12         that is fine.

13               MR. MORRIS:  Okay.

14               MS. DANDENEAU:  I don't think --

15         he's already said he's not a lawyer.

16               MR. MORRIS:  I'll allow the witness

17         to answer this question.

18         Q.    Why did you sign this document, sir?

19         A.    I mean, our -- our legal group would

20    bring by these incumbency certificates from

21    time to time.  I have no idea why they're being

22    updated, and I was asked to sign.

23         Q.    Did you ask anybody, what is this

24    document?

25         A.    No.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/10/22   Page 10 of 200   PageID 27926

Page 155

1                    WATERHOUSE - 10-19-21

2         Q.    Did anybody tell you why they needed

3    you to sign the document?

4         A.    Not that I can recall.

5         Q.    You testified earlier that you

6    understood that you served as the acting

7    treasurer for HCMFA; correct?

8         A.    Yes.

9         Q.    How did you become the acting

10   treasurer of HCMFA?

11              MS. DANDENEAU:  Objection to form.

12        A.    I don't -- I don't know the legal --

13   I don't know the legal mechanic of how I became

14   the acting treasurer.

15        Q.    I'm not asking for the legal

16   mechanic.  I'm asking you as the person who

17   is --

18              MS. DANDENEAU:  John, you said --

19              MR. MORRIS:  Stop.

20              MS. DANDENEAU:  -- how did you

21        become the treasurer.  That is --

22              MR. MORRIS:  Please stop.

23              MS. DANDENEAU:  That is a legal

24        question.

25              MR. MORRIS:  I am not asking any

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 177    Filed 02/09/22    Page 11 of 200    PageID 27927

Page 156

1                        WATERHOUSE - 10-19-21

2              legal questions, to be clear.  I'm asking

3              for this witness' understanding as to how

4              he became the acting treasurer of HCMFA.

5              If he doesn't know, he can say he doesn't

6              know, but this legal stuff is nonsense, and

7              I really object to it.

8        Q.    Sir, I'm asking you a very simple

9    question.

10                    MS. DANDENEAU:  Argumentative.

11       Q.    You testified -- you testified that

12   you became the acting treasurer of HCM --

13   HCMFA; correct?

14       A.    Yes.

15       Q.    How did that happen?

16                    MS. DANDENEAU:  Again, object to

17             form.

18                    MR. MORRIS:  I can't wait to do this

19             in a courtroom.  Good God.

20       Q.    Go ahead, sir.

21       A.    I don't know the exact process of

22   how that happened.

23       Q.    Do you have any idea whether signing

24   this document was part of the process?

25                    MR. MORRIS:  You know what --

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/09/22   Page 12 of 200   PageID 27928

Page 157

```
1              WATERHOUSE - 10-19-21

2         MS. DANDENEAU:  Objection.

3         MR. MORRIS:  -- withdrawn.  You guys

4    want to do this, I can't wait.  I can't

5    wait.  This is the craziest stuff ever.

6         MS. DANDENEAU:  John, he said he's

7    not a lawyer, and you are asking him for a

8    legal conclusion, and he says he doesn't

9    know, and you persist.

10        MR. MORRIS:  Okay.

11        MS. DANDENEAU:  So you can ask these

12   questions --

13        MR. MORRIS:  Did anyone -- please

14   stop talking.

15        MS. DANDENEAU:  -- at another

16   point -- no, no, no, I'm entitled to talk,

17   too; right?  If you're going to make these

18   accusations as if we're trying to stonewall

19   you, this is not the witness to ask that

20   question.

21        MR. MORRIS:  I can't -- I can't

22   wait -- I can't wait to do this in a

23   courtroom.  I will just leave it at that.

24        MS. DANDENEAU:  That's right, I'm

25   sure you can't.
```

Page 158

1                    WATERHOUSE - 10-19-21

2         Q.    Did anyone ever tell you, sir, that

3    even though you were the acting treasurer of

4    HCMFA, that you were not authorized to sign the

5    two promissory notes that we looked at before

6    lunch?

7         A.    I'm not sure I understand the

8    question.  I wasn't -- I mean, I'm -- I'm the

9    current acting treasurer.

10        Q.    Did anybody ever tell you at any

11   time that even though you were the acting

12   treasurer of HCMFA, that you were not

13   authorized to sign the two promissory notes

14   that we looked at before lunch?

15             MS. DANDENEAU:  Objection to form.

16        A.    Not that I recall.

17        Q.    Did anybody ever tell you at any

18   time that you were not authorized to sign the

19   two promissory notes that we looked at before

20   lunch?

21        A.    Not that I recall.

22        Q.    Did anybody ever tell you at any

23   time that you should not have signed the two

24   promissory notes that we looked at before

25   lunch?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/24   Page 14 of 200   PageID 27930

Page 159

```
 1                  WATERHOUSE - 10-19-21

 2          A.    Not that I recall.

 3          Q.    Did you ever tell anybody at any

 4   time that you weren't authorized to sign the

 5   two promissory notes that we looked at before

 6   lunch?

 7          A.    Not that I recall.

 8          Q.    Did you ever tell anybody at any

 9   time that you made a mistake when you signed

10   the two promissory notes that we looked at

11   before lunch?

12          A.    Not that I recall.

13          Q.    As you sit here right now, do you

14   have any reason to believe that you were not

15   authorized to sign the two documents that we

16   looked at before lunch?

17                MS. DANDENEAU:  Objection to form.

18          A.    If -- if this is the -- the valid

19   incumbency certificate, I mean, this does --

20   this does detail who the signers are.

21          Q.    Okay.  And looking at that document,

22   does that give you comfort that you were

23   authorized to sign the two promissory notes

24   that we looked at before lunch?

25                MS. DEITSCH-PEREZ:  Object to the
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/05/24   Page 15 of 200   PageID 27931

Page 160

```
 1                     WATERHOUSE - 10-19-21

 2          form.

 3                  MS. DANDENEAU:  Objection, form.

 4          A.    Yes.

 5          Q.    As of October 20th -- withdrawn.

 6                  I'm trying to take your mind back to

 7     a year ago, October 2020.  Do you recall at

 8     that time that the boards of the retail funds

 9     were making inquiries about obligations that

10     were owed by the advisors to Highland in

11     connection with their 15(c) review?

12                  MS. DANDENEAU:  Objection to form.

13          A.    I don't -- I don't recall.

14          Q.    As of October 2020, you had no

15     reason to believe you weren't authorized to

16     sign the two promissory notes that we just

17     looked at; correct?

18                  MS. DANDENEAU:  Objection, form.

19                  MS. DEITSCH-PEREZ:  Objection to

20          form.

21          A.    I didn't think about it in October

22     of 2020, but I mean --

23          Q.    Did you have any reason to believe

24     at that time that you weren't authorized to

25     sign the two notes that we just looked at?
```

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 177    Filed 02/09/452    Page 16 of 200    PageID 27932

Page 161

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Not that I'm aware, no.

 3        Q.    Did you have any reason to believe a

 4  year ago that you made a mistake when you

 5  signed those two notes?

 6        A.    Not that I'm aware.

 7        Q.    A year ago you believed that HCMFA

 8  owed Highland the unpaid principal amounts that

 9  were due under those two notes; correct?

10        A.    They're -- they're promissory notes

11  that were -- as you presented, that were --

12  that were executed.  Whether they're valid or

13  if there's other reasons, I didn't -- I don't

14  know.

15        Q.    I'm not asking you whether they're

16  valid or not.  I'm asking you for your state of

17  mind.  A year ago you believed that HCMFA

18  was -- was obligated to pay the unpaid

19  principal amount under the two notes that you

20  signed; correct?

21        A.    Yeah, I'm -- I'm -- yes.

22        Q.    Thank you.  Are you aware -- you're

23  aware that -- that in 2017, NexPoint issued a

24  note in favor of Highland in the approximate

25  amount of $30 million; correct?
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/24   Page 17 of 200   PageID 27933

Page 162

1                    WATERHOUSE - 10-19-21

2          A.    I'm -- I'm -- I'm generally aware.

3          Q.    Okay.  And are you generally aware

4    that from time to time, after the note was

5    issued by NexPoint, that moneys were applied to

6    principal and interest that were due under the

7    NexPoint note?

8          A.    Yes, I'm generally aware.

9          Q.    Okay.  And did anybody ever tell you

10   that the payments that were made against the

11   NexPoint notes were made by mistake?

12         A.    Yes.

13         Q.    And is it the one payment that we

14   talked about earlier today?

15         A.    We talked about a lot of things

16   today.  What payment are we talking about?

17         Q.    Okay.  Who told you that any payment

18   made against the NexPoint note was made by

19   mistake?

20         A.    D.C. Sauter.

21         Q.    When did Mr. Sauter tell you that?

22         A.    I don't -- I don't remember

23   specifically.

24         Q.    Do you remember what payments --

25         A.    Sometime -- sometime this year.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/22   Page 18 of 200   PageID 27934

Page 163

                         WATERHOUSE - 10-19-21

1

2       Q.      Sometime in 2021?

3       A.      Yes.

4       Q.      Do you remember what payment he was

5    referring to?

6       A.      It was the -- the payment made in

7    January of 2021 or -- yeah, January of -- of

8    this -- January of 2021.

9       Q.      Okay.  So did anybody ever tell you

10   at any time that any payment that was made

11   against principal --

12      A.      And -- and -- and -- hold on, and it

13   may have been other -- again, it may have been

14   that payment or -- or there may have been what

15   he was explaining, a misapplication of prior

16   payments as well.

17      Q.      Can you -- can you give me any

18   specificity -- withdrawn.

19              Withdrawn.  Can you tell me

20   everything that Mr. Sauter told you about --

21   about errors in relation to payments made

22   against principal and interest due under the

23   NexPoint note?

24              MS. DANDENEAU:  Can I just --

25              MR. RUKAVINA:  Hold on.  Hold on.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/22   Page 19 of 200   PageID 27935

Page 164

```
 1                    WATERHOUSE - 10-19-21

 2          I'm going to object here, and I'm going to

 3          instruct the witness not to answer

 4          depending on the discussion that you had --

 5          Mr. Waterhouse, I'm the lawyer for

 6          NexPoint, and as everyone here knows, D.C.

 7          Sauter is in-house counsel.

 8                 So if you and Mr. Sauter were having

 9          a factual discussion and him preparing his

10          affidavit, et cetera, then go ahead and

11          answer that.  But if you were having a

12          discussion as to our legal strategy in this

13          lawsuit, or anything having to do with

14          that, then do not answer that.

15                 And if you need to talk to either

16          your counsel or me about that, then we need

17          to have that discussion now.

18          A.    Okay.  Yeah, I don't -- I don't

19   really know how to make that distinction, so

20   maybe I need to talk to counsel before I

21   answer, or if I can answer.

22          Q.    Let me just ask you this question:

23   Did -- did you have any conversation with

24   Mr. Sauter about any payment of principal and

25   interest prior to the time that you left
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/20/24   Page 20 of 200   PageID 27936

Page 165

```
 1                    WATERHOUSE - 10-19-21

 2    Highland's employment, or did it happen after

 3    you left Highland's employment?

 4         A.    I don't -- I don't recall if -- I

 5    don't recall.  I mean, it was sometime in 2021.

 6    I don't remember if it was before or after I

 7    was let go from Highland.

 8         Q.    Okay.  So -- so nobody told you

 9    prior to 2021 that any error or mistake was

10    made in the application of payments against

11    principal and interest due on the NexPoint

12    note.  Do I have that right?

13         A.    Yeah, I don't -- I don't recall this

14    being in 2020.

15         Q.    Okay.  And it didn't happen in 2019;

16    correct?

17         A.    I don't recall that happened.

18         Q.    And it didn't happen in 2018;

19    correct?

20         A.    I don't -- I don't recall that

21    happening.

22         Q.    And it didn't happen in 2017;

23    correct?

24         A.    I don't recall.

25         Q.    But -- but you believe the
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/22   Page 21 of 200   PageID 27937

Page 166

```
 1                    WATERHOUSE - 10-19-21

 2     conversation took place in 2021.  You just

 3     don't remember if it was before or after you

 4     left Highland's employment.  Do I have that

 5     right?

 6          A.    It was sometime this year.  I

 7     don't -- I don't remember.

 8          Q.    Okay.  Did you report this

 9     conversation to Mr. Seery at any point?

10          A.    I don't believe so.

11          Q.    Did you report this conversation to

12     anybody at DSI at any time?

13          A.    I don't recall.

14          Q.    Do you have -- you don't have a

15     recollection of ever doing that; correct?

16          A.    Yeah, that's right.  I don't recall

17     doing that.

18          Q.    Do you recall telling anybody at

19     Pachulski Stang about the conversation you

20     recall with Mr. Sauter?

21          A.    No, I don't -- I don't recall.

22          Q.    Did you tell any of the independent

23     board members about your conversation with

24     Mr. Sauter?

25          A.    I don't recall.
```

1                      WATERHOUSE - 10-19-21

2          Q.    Did you tell any of the employees at

3    Highland before you left Highland's employment

4    about this call that you had with Mr. Sauter?

5                MS. DANDENEAU:  Objection to form.

6          A.    No, I don't -- no, I don't recall.

7          Q.    NexPoint -- to the best of your

8    knowledge, did NexPoint ever file a proof of

9    claim against Highland to try to recover moneys

10   that were mistakenly paid against the principal

11   and interest due under the note?

12         A.    Okay.  Hold on.  You are saying did

13   NexPoint Advisors file a proof of claim to

14   Highland for errors related to payments under

15   the NexPoint note to Highland?

16         Q.    Correct.

17         A.    I'm -- I'm -- I'm not -- I'm not

18   aware.

19         Q.    Are you aware --

20         A.    I'm not the legal person here, I

21   don't know.

22         Q.    I'm just asking for your knowledge,

23   sir.

24         A.    Yeah, I don't know.  I'm not aware.

25         Q.    Are you aware of any claim of any

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/452   Page 23 of 200   PageID 27939

Page 168

1                    WATERHOUSE - 10-19-21

2      kind that NexPoint has ever made to try to

3      recover the amounts that it contends were -- or

4      that Mr. Sauter contend were mistakenly applied

5      against principal and interest due under the

6      NexPoint note?

7           A.    I'm not aware.

8                 MS. DANDENEAU:  Objection to form.

9           Q.    Okay.  The advisors' agreements with

10     the retail funds are subject to annual renewal;

11     correct?

12          A.    Yes.

13          Q.    And do you participate in the

14     renewal process each year?

15          A.    Yes.

16          Q.    What role do you play in the renewal

17     process?

18          A.    I'm -- I'm asked by the retail board

19     to walk-through the advisors financials.

20          Q.    And do you do that in the context of

21     a board meeting?

22          A.    Yes, it is -- yes, it is typically

23     done in a board meeting.

24          Q.    And do you recall the time --

25     does -- does the renewal process happen around

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/29/22   Page 24 of 200   PageID 27940

Page 169

                        WATERHOUSE - 10-19-21

1

2    the same time each year?

3         A.    Yes, it is -- it is around the same

4    time every year.

5         Q.    And what -- what time period of the

6    year does the renewal process occur?

7         A.    Approximately the September

8    timeframe.

9         Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12        A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16        Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18        A.    Yes.  Yes.

19        Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22        A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 02/25/04452    Page 25 of 200    PageID 27941

Page 170

1                    WATERHOUSE - 10-19-21

2          Q.    No, I apologize.

3                Do you have an understanding of

4    what -- of what 15(c) refers to in the context

5    of the annual renewal process?

6          A.    Yes, generally.

7          Q.    All right.  What is your general

8    understanding of the term "15(c)" in the

9    context of the annual renewal process?

10         A.    I -- I think 15(c) is the section

11   that -- that -- you know, that -- that the

12   board has to evaluate every year, the retail

13   board.  They have to, you know, go through,

14   evaluate, and go through that approval process

15   on a yearly basis.

16         Q.    Okay.

17               MR. MORRIS:  Can we put up on the

18         screen Exhibit 36, please.

19               (Exhibit 36 marked.)

20               MR. MORRIS:  I guess let's just

21         start at the bottom so Mr. Waterhouse can

22         see what is here.

23         Q.    You see this begins with an email

24   from Blank Rome to a number of people.

25               MR. MORRIS:  And if we can scroll

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/20/24   Page 26 of 200   PageID 27942

Page 171

 1                    WATERHOUSE - 10-19-21

 2          up -- keep going just a little bit.

 3          Q.    You will see that there is an email

 4     from Lauren Thedford to Thomas Surgent and

 5     others where she reports that she was attaching

 6     and reproducing below additional 15(c)

 7     follow-up questions from the board.

 8               Do you see that?

 9          A.    Yes.

10          Q.    And do you see Question No. 2 asks

11     whether there are any material outstanding

12     amounts currently payable or due in the future

13     (e.g., notes) to HCMLP by HCMFA or NexPoint

14     Advisors or any other affiliate that provides

15     services to the funds?

16               Do you see that?

17          A.    Yes.

18          Q.    And -- and did you -- do you recall

19     that in -- in October of 2020 the retail boards

20     were asking for that information?

21          A.    I don't recall it, but there --

22     they're obviously asking in this email.

23          Q.    Okay.

24               MR. MORRIS:  Can we scroll up a

25          little bit, please.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/24   Page 27 of 200   PageID 27943

Page 172

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    And then do you see that

 3   Ms. Thedford includes you on the email string

 4   on Tuesday, October 6th, at 5:52?

 5        A.    Yes.

 6        Q.    And she asks you and Dave Klos and

 7   Kristin Hendrix for advice on that particular

 8   Request No. 2 that I have just read; right?

 9        A.    Yes.

10        Q.    Okay.  Can you tell me who

11   Ms. Thedford is?

12        A.    She was an attorney that was in the

13   legal group.

14        Q.    At Highland Capital Management,

15   L.P.?

16        A.    I'm -- I'm -- I'm -- I don't

17   remember if she was an employee of Highland or

18   any of the advisors.

19        Q.    Okay.  Do you know if she served as

20   the corporate secretary for both HCMFA and

21   NexPoint?

22        A.    Yes.

23        Q.    And -- okay.

24              Do you know whether Ms. Thedford

25   held any positions in relation to the retail
```

1                    WATERHOUSE - 10-19-21

2    funds as we defined that term?

3         A.    Yes.

4         Q.    What is your understanding of the

5    positions that Ms. Thedford held at the retail

6    funds?

7         A.    I -- I recall her being an officer.

8    I don't recall her title.

9         Q.    Okay.  Is she still an officer at

10   any of the retail funds today?

11        A.    No.

12        Q.    Do you know when she ceased to be an

13   officer of the retail funds?

14        A.    Approximately.

15        Q.    And when did she approximately cease

16   to be an officer of the retail funds?

17        A.    It was in -- it was in early of

18   2021.

19        Q.    Okay.  Do you know when she became

20   an officer of the retail funds?

21        A.    I don't recall.

22        Q.    To the best of your recollection,

23   was she an officer of the retail funds in

24   October of 2020?

25        A.    I believe so.

 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you know what title she

 3   held in her capacity as an officer, if any?

 4        A.    I told you I don't remember.

 5        Q.    Okay.  So she sends this email to

 6   you at 5:52 p.m. on October 6th.

 7              And if we can scroll up to the

 8   response, you responded a minute later with a

 9   one-word answer:  Yes.

10              Do you see that?

11        A.    Yes.

12        Q.    And -- and yes is -- yes was in

13   response to the retail board's Question No. 2,

14   right, whether there are any material

15   outstanding amounts currently payable or due in

16   the future?

17        A.    Yes.

18              MR. MORRIS:  And can we scroll up to

19        see what happened next.

20        Q.    So Ms. Thedford writes back to you a

21   few minutes later and she asks whether you

22   could provide the amounts.

23              Do you see that?

24        A.    Yes.

25        Q.    And then you respond further and you

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/30/452   Page 30 of 200   PageID 27946

Page 175

1                    WATERHOUSE - 10-19-21

2    refer her to the balance sheet that was

3    provided to the board as part of the 15(c)

4    materials.

5              Do you see that?

6       A.    Yes.

7       Q.    And -- and did the advisors provide

8    to the board certain balance sheets in 2020 in

9    connection with the 15(c) review?

10      A.    Yes, they did.

11      Q.    Okay.  And were the amounts that

12   were outstanding or that were to be due in the

13   future by the advisors to Highland included in

14   the liability section of the balance sheet that

15   was given to the retail board?

16      A.    Yes.  Notes would be reflected as

17   liabilities.

18      Q.    Okay.  And --

19      A.    If I'm understanding your question

20   correctly.

21      Q.    You are.  And -- and -- and those

22   liabilities you -- you were -- you believed

23   were responsive to the retail board's question;

24   correct?

25      A.    Yes.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 02/30/454   Page 31 of 200   PageID 27947

Page 176

```
 1                  WATERHOUSE - 10-19-21

 2      Q.    Okay.  And then if we can scroll up,

 3   you see Ms. Thedford responds to you

 4   nine minutes later with a draft response.

 5            Do you see that?

 6      A.    Yes.

 7      Q.    And she says that she is taking from

 8   the 6/30 financials certain information about

 9   amounts that were due to HCMLP and affiliates

10   as of June 30th, 2020.

11            Do you see that?

12      A.    I do.

13      Q.    Okay.  And did you believe, as the

14   treasurer of NexPoint and HCMFA and as the CFO

15   of Highland, that the information that

16   Ms. Thedford obtained from the 6/30 financials

17   was accurate and responsive in relation to the

18   retail fund board's question?

19      A.    I just want to make sure I

20   understand the question.

21            Are you saying that the financial

22   information provided to the retail board as

23   part of the 15(c) process, which included

24   financial statements as of June 30th of 2021,

25   did I feel like those were responsive to their
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/22/24   Page 32 of 200   PageID 27948

Page 177

1                  WATERHOUSE - 10-19-21

2    questions?

3         Q.    Yes.

4         A.    Yes.

5         Q.    Thank you.

6              MS. DEITSCH-PEREZ:  John, it is not

7         in the chat yet.  Can you just make sure it

8         gets put in there.

9              MR. MORRIS:  Sure.

10             MS. CANTY:  I put it in there.  I

11        think maybe I just sent it directly, so let

12        me make sure it says to everyone.  But I

13        did put it in there.  I will try again.

14             MR. MORRIS:  Thank you, La Asia.

15             MS. DANDENEAU:  What number is it.

16             MR. MORRIS:  What, the Bates number?

17             MS. DEITSCH-PEREZ:  No, the --

18        this -- yeah, 36 is not in the chat.

19             MR. MORRIS:  Okay.  We'll get it.

20             MS. DANDENEAU:  I think that

21        Ms. Canty just sent it to me originally.

22        Sorry.

23             MR. MORRIS:  Okay.  We will get it

24        there.

25             MS. CANTY:  Okay.  It is there now

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 76-17   Filed 02/39/22   Page 33 of 200   PageID 27949

Page 178

1                    WATERHOUSE - 10-19-21

2           for everyone.

3                    MS. DEITSCH-PEREZ:  Got it.  Thank

4           you.

5           Q.    Do you recall if the proposed

6      response that Ms. Thedford crafted was

7      delivered to the retail board with the -- with

8      the yellow dates having been completed?

9           A.    I don't know.

10                   MR. MORRIS:  Davor, I'm going to ask

11          that the advisors and -- the advisors of

12          both HCMFA and NexPoint produce to me any

13          report that was given to the retail board

14          concerning the promissory notes at issue,

15          including the obligations under the notes.

16          Q.    Do you know -- do you know if

17     ultimately NexPoint informed the retail board

18     in response to its question that NexPoint owed

19     Highland approximately 23 or $24 million?

20                   MS. DANDENEAU:  Objection to the

21          form.

22          A.    Sorry, are you asking, did NexPoint

23     tell the retail board that it owed Highland?

24          Q.    Let me ask a better question,

25     Mr. Waterhouse.

 1                    WATERHOUSE - 10-19-21

 2                    Did -- do you know if anybody ever

 3    answered the retail board's question that was

 4    Number 2?

 5         A.    I don't -- I can't say for sure.

 6         Q.    Okay.  Do you recall -- I think you

 7    testified earlier that you walked through the

 8    advisors' financials with the retail board;

 9    correct?

10         A.    Yes.

11         Q.    And as part of that process, did you

12    disclose to the retail board the obligations

13    that NexPoint and HCMFA had to Highland under

14    promissory notes?

15         A.    The retail board, as I stated

16    earlier, receives financial information,

17    balance sheet, income statement information

18    from the advisors.  That information is

19    provided to the retail board in connection with

20    the 15(c) process.

21                    So any notes between the advisors

22    and the Highland would be -- anything would be

23    detailed in those financial statements.

24         Q.    Do you recall in 2020 ever speaking

25    with the retail board about the advisors'

1                    WATERHOUSE - 10-19-21

2    obligations under the notes to Highland?

3                    MS. DANDENEAU:  Objection to form.

4                    MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't recall specifically.

7         Q.    Do you have any general recollection

8    of discussing with the retail board the

9    advisors' obligations to Highland under the

10   notes that they issued?

11                   MS. DANDENEAU:  Object to the form.

12                   MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    I just recall generally just -- it

15   is just -- I present the financial statements,

16   and if they have questions, I answer their

17   questions and walk them through.

18                   I don't recall what they asked.  I

19   don't recall where the discussion went.  I

20   don't recall anything of that nature.

21        Q.    Okay.  Do you know if anybody on

22   behalf of HCMF -- HCMFA ever told the retail

23   board that HCMFA had no obligations under the

24   two 2019 notes that you signed?  Withdrawn.

25                   Do you know whether anybody on

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/30/452   Page 36 of 200   PageID 27952

Page 181

```
 1                   WATERHOUSE - 10-19-21

 2   behalf of HCMFA ever told the retail boards

 3   that you weren't authorized to sign either of

 4   the two 2019 notes?

 5              MS. DANDENEAU:  Objection to form.

 6        A.   I'm not aware.

 7        Q.   Are you aware of anybody on behalf

 8   of HCMFA ever telling the retail boards that

 9   your execution of the two 2019 notes was a

10   mistake?

11              MS. DANDENEAU:  Objection to form.

12        A.   I'm not aware.

13        Q.   Are you aware of anybody on behalf

14   of HCMFA ever telling the retail boards that

15   HCMFA did not have to pay the amounts reflected

16   in the two notes that you signed in 2019?

17        A.   I'm not aware.

18        Q.   Do you know whether anybody ever

19   told the retail boards -- withdrawn.

20              Do you know whether anybody ever

21   told the retail boards that Highland has

22   commenced a lawsuit to recover on the two notes

23   that you signed in 2019?

24        A.   I'm not aware.

25        Q.   Are you aware of anybody informing
```

1                    WATERHOUSE - 10-19-21

2      the retail boards that Highland has sued to

3      recover on the NexPoint note?

4           A.    I'm not aware.

5           Q.    Do you know whether anybody ever

6      told the retail board that Highland had

7      declared a default with respect to the two

8      HCMFA notes that you signed in 2019?

9           A.    I'm not aware.

10          Q.    Are you aware of anybody ever

11     informing the retail boards that Highland had

12     declared a default under the NexPoint note?

13          A.    I'm not aware.

14          Q.    Are you aware of anybody telling the

15     retail board that Highland made a demand for

16     payment under the 2019 notes that you signed on

17     behalf of HCMFA?

18          A.    I'm not aware.

19          Q.    Let's -- let's see if there is a

20     response to Ms. Thedford's email, if we can

21     scroll up.

22                Do you see you responded to

23     Ms. Thedford five minutes after she provided

24     the draft response to you?

25          A.    Yes.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/22   Page 38 of 200   PageID 27954

Page 183

1                    WATERHOUSE - 10-19-21

2       Q.    Okay.  And do you see that Dustin

3    Norris is copied on this email?

4       A.    Yes, he is.

5       Q.    Great.  Do you know whether

6    Mr. Norris held any positions at either of the

7    advisors as of October 6, 2020?

8       A.    I will go back to -- I'm not the

9    legal expert of what appoints you or how or

10   why, but you did see Dustin's name on the

11   incumbency certificate that you produced

12   earlier.

13      Q.    Do you know what his title was in

14   October of 2020?

15            MS. DANDENEAU:  Objection to form.

16      A.    I don't -- I don't recall.

17      Q.    Was he -- did he have a title with

18   each of the advisors, to the best of your

19   recollection?

20      A.    I don't recall.

21      Q.    Do you know why he is included on

22   this email string?

23      A.    I didn't add Dustin.  It looks like

24   Lauren did.  I don't know why she added him or

25   not.  You would have to ask her.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/24   Page 39 of 200   PageID 27955

Page 184

```
 1                    WATERHOUSE - 10-19-21

 2        Q.     Does Mr. Norris play a role in

 3   formulating the advisors' responses to the

 4   questions asked by the retail board in

 5   connection with the 15(c) annual review?

 6              MS. DANDENEAU:  Objection to form.

 7        A.     He -- Dustin Norris is there in the

 8   board meetings.  But -- so he has a role, yes.

 9        Q.     Okay.  And does Mr. Norris hold any

10   positions, to the best of your knowledge, in

11   relation to any of the retail funds?

12        A.     I don't -- I don't believe he does.

13        Q.     How about Mr. Post, do you know

14   whether Mr. Post holds any position in either

15   of the advisors?

16        A.     I mean, he -- he -- yes.

17        Q.     What is your understanding of the

18   positions that Mr. Post holds in relation to

19   the advisors?

20              MS. DANDENEAU:  Objection to form.

21        A.     He is an employee of NexPoint

22   Advisors.  He is also the chief compliance

23   officer for -- for NexPoint.

24        Q.     Who is the chief compliance officer

25   for HCMFA, if you know?
```

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/09/24   Page 40 of 200   PageID 27956

Page 185

1                    WATERHOUSE - 10-19-21

2              MS. DANDENEAU:  Objection to form.

3         A.    That would be Jason as well.

4         Q.    Okay.  Now, looking at your

5    response, you noted initially that nothing was

6    owed under shared services.  Do I have that

7    right in substance?

8         A.    Yeah.  I think I'm being responsive

9    to Lauren's question here, whether any of the

10   shared service invoices are outstanding.

11        Q.    Right.

12        A.    Yes.

13        Q.    And that is because -- and that is

14   because the retail the retail board has asked

15   for the disclosure of all material obligations

16   that were owed to HCMLP either then or in the

17   future; isn't that right?

18             MS. DANDENEAU:  Objection to form.

19        Q.    We can go back down and look.

20        A.    Look, I don't know if that's a

21   material item, I mean, again, but sure.

22        Q.    Okay.  But there were no shared

23   services outstanding; correct?

24             MS. DANDENEAU:  Objection to form.

25        A.    That is what this email seems to

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/10/22   Page 41 of 200   PageID 27957

Page 186

```
 1                 WATERHOUSE - 10-19-21

 2   indicate.

 3        Q.    And you wouldn't have written it if

 4   you didn't believe it to be true at the time;

 5   correct?

 6        A.    Correct.

 7        Q.    And when you referred to shared

 8   services outstanding, what you meant there was

 9   that neither NexPoint nor HCMFA owed Highland

10   any money under the shared services agreements

11   that they had with Highland as of October 6th,

12   2020; right?

13        A.    I don't know if it is as of October

14   6, 2020 or if it was from -- like through the

15   financials -- through the date of the

16   financials as of June 30.

17        Q.    Okay.  And then you noted that

18   HCMA -- the HCMFA note is a demand note; right?

19        A.    Yes.

20        Q.    And then you referred Ms. Thedford

21   to Kristin Hendrix for the term of the NexPoint

22   note.  Do I have that right?

23        A.    Yes.

24        Q.    And then you refer to that agreement

25   that is referenced in the 2018 audited
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/09/22   Page 42 of 200   PageID 27958

Page 187

1                    WATERHOUSE - 10-19-21

2    financials about Highland's agreement not to

3    make demand upon HCMFA until May 2021; correct?

4          A.    Correct.

5          Q.    And then -- and then the next thing

6    you write is that the attorneys think that BK

7    doesn't change that, but don't know for sure at

8    the end of the day.

9                Do you see that sentence?

10         A.    Yes.

11         Q.    Which attorneys were you referring

12   to?

13         A.    I don't remember.

14         Q.    Did you have a conversation with

15   attorneys concerning whether the bankruptcy

16   would change or alter in any way the agreement

17   not to make a demand under the HCMFA note?

18         A.    Look, yeah, I mean, I don't

19   specifically remember, but generally, I mean,

20   it is in this email.  I don't -- I don't -- I

21   don't -- I don't remember who I talked to or,

22   you know, was it inside counsel, outside

23   counsel, but obviously I talked to somebody.

24         Q.    Do you have any recollection --

25         A.    Well, I don't even know if it's --

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/24   Page 43 of 200   PageID 27959

Page 188

```
 1                    WATERHOUSE - 10-19-21

 2      actually, it may not even have been me.  I say

 3      the attorneys in, you know, a lot of -- like I

 4      talked about the team.

 5                It could have been someone on the

 6      team, like, hey, we need to run this down, and

 7      maybe they talked to attorneys again and

 8      relayed that information to me.

 9                So I really don't know if I spoke or

10      someone else did or -- or, I mean, and maybe it

11      wasn't even from corporate accounting.  Maybe

12      it was, you know, other -- I'm kind of

13      summarizing, you know, again, so I don't really

14      know -- I can't really say for sure.  I don't

15      remember how I came about of this knowledge.

16           Q.    I appreciate your efforts,

17      Mr. Waterhouse, but I will just tell you that

18      if I ask a question and you don't know the

19      answer or you don't recall, I'm happy to accept

20      that.  I don't -- I don't want you to

21      speculate, so I want to be clear about that.

22      So I appreciate it.

23                Let me just ask you simply:  Do you

24      know what attorneys -- can you identify any of

25      the attorneys who thought that the bankruptcy
```

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 177    Filed 02/09/24    Page 44 of 200    PageID 27960

Page 189

```
 1                    WATERHOUSE - 10-19-21

 2    process didn't change the agreement?

 3         A.    I don't recall.

 4         Q.    Okay.  Perfect.

 5               And then let's look at the last

 6    sentence.  It says, quote:  The response should

 7    include, as I covered in the board meeting,

 8    that both entities have the full faith and

 9    backing from Jim Dondero, and to my knowledge

10    that hasn't changed.

11               Do you see that?

12         A.    Yes.

13         Q.    Okay.  Prior to October 6th, 2020,

14    had you told the retail board that HCMFA and

15    NexPoint have the full faith and backing from

16    Jim Dondero?

17         A.    Yes.

18         Q.    Do you remember in the context in

19    which you told the retail board that?

20         A.    I mean, generally, yes.

21         Q.    Tell me what you recall.

22         A.    So we were walking through the

23    financials from the advisors; right?  So as I

24    described to you, you have got HCMFA and NPA.

25    And these -- the financials, you know, show
```

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 02/09/22    Page 45 of 200    PageID 27961

Page 190

1                    WATERHOUSE - 10-19-21

2    they have liabilities on them that exceed

3    assets.

4                    So the retail board has asked, okay,

5    you know, how -- you know, if -- if these

6    liabilities come due or they're payable, you

7    know, how does that come about?

8                    And, you know, the response is,

9    well, the advisors have the -- the full faith

10   and backing from -- from Jim Dondero.

11        Q.    And how did you know that the

12   advisors had the full faith and backing from

13   Jim Dondero?  What was the basis for that

14   statement that you made to the retail board?

15        A.    I talked to Jim about it at some

16   point in the past.

17        Q.    And did you tell Mr. Dondero that

18   you were going to inform the retail board that

19   the advisors had his full faith and backing

20   before you actually told that to the retail

21   board?

22        A.    I don't recall having that

23   conversation.

24        Q.    Do you recall if you ever informed

25   Mr. Dondero that you had disclosed or told the

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/09/24   Page 46 of 200   PageID 27962

Page 191

1                    WATERHOUSE - 10-19-21

2    retail board that the advisors had the full

3    faith and backing of Mr. -- Mr. Dondero?

4              MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't recall discussing that with

7    him at the time.

8         Q.    When you told this to the board, was

9    Mr. Dondero participating in the discussion?

10        A.    Not that I recall.

11        Q.    Withdrawn.  Was it not -- withdrawn.

12              Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17        A.    I believe I was at home.

18        Q.    Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22              MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't recall everyone on the call.

25        Q.    Can you identify anybody who was on

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 176-17   Filed 02/09/24   Page 47 of 200   PageID 27963

Page 192

1                    WATERHOUSE - 10-19-21

2    the call?

3         A.    Other than the board members?

4         Q.    Yes.

5         A.    Lauren Thedford.  I mean, there

6    are -- there are many -- my section is just one

7    of many sections that are just -- you know, as

8    you can appreciate, this is a long board

9    meeting.

10              I can't recall specifically, really

11   even generally, or who was on when this was

12   discussed.  But Lauren was typically on for the

13   entire time.

14        Q.    I apologize if I asked you this, but

15   do either of Mr. Norris or Mr. Post hold any

16   positions relative to the retail funds?

17        A.    I think you asked me this already,

18   John.

19        Q.    Okay.  I just don't recall.  Can you

20   just refresh my recollection if I did, in fact,

21   ask you the question?

22        A.    I don't believe -- if we can go

23   back.  I don't believe Mr. Norris has a title

24   at the retail funds.  Mr. -- and Mr. Post is

25   the CCO of the advisor, the advisors.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/18/07452   Page 48 of 200   PageID 27964

Page 193

1                    WATERHOUSE - 10-19-21

2       Q.    Okay.  Do you know if either of them

3   have a position with the retail board -- with

4   the retail funds?

5       A.    I don't believe Mr. Norris has a

6   position with the retail funds.

7       Q.    All right.  What about Mr. Post?

8       A.    Mr. Post is the CCO of the advisors.

9       Q.    Okay.  Does he hold any position --

10      A.    I don't believe so.

11      Q.    -- with the retail funds?

12      A.    I don't believe so.

13      Q.    Okay.

14      A.    I don't know if being the CCO for

15  the advisor conveys something for the retail

16  funds.  Again, I am not -- that is the legal

17  compliance part of it.  I don't know.

18      Q.    Why did you tell the retail board

19  that the advisors have the full faith and

20  backing from Mr. Dondero?

21            MS. DANDENEAU:  Objection to form.

22      A.    It is -- it is -- it is what has

23  been discussed with them prior.

24      Q.    And were you -- were you trying to

25  give them comfort that even though the

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/49/452   Page 49 of 200   PageID 27965

Page 194

```
 1                    WATERHOUSE - 10-19-21

 2    liabilities exceeded the assets that the

 3    advisors would still be able to meet their

 4    obligations as they become due?

 5                MS. DANDENEAU:  Objection to form.

 6                MS. DEITSCH-PEREZ:  Object form.

 7        A.    I -- I can't -- I don't remember

 8    specifically the conversation, but generally --

 9    you know, generally, yes.  And that is why --

10    but, you know, again, in this email saying, you

11    know, I am sure I qualified it with the retail

12    board, you know, as I said I like -- you know,

13    to my knowledge, that hasn't changed.  But,

14    again, generally -- generally that is what I

15    remember.

16        Q.    Okay.  Do you recall if in the

17    advisors' response to the retail board's

18    question if the response included any statement

19    concerning Mr. Dondero and -- and the full

20    faith and backing that he was giving to the

21    advisors?

22                MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't -- I don't remember

25    specifically what was provided.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 77   Filed 02/09/22   Page 50 of 200   PageID 27966

Page 195

```
1                    WATERHOUSE - 10-19-21

2        Q.    Okay.

3        A.    And I don't really -- I don't really

4   remember generally either.

5        Q.    Okay.

6              MR. MORRIS:  So -- so, again, I'm

7        just going to ask Mr. Rukavina if your

8        clients can produce as soon as possible the

9        15(c) response, the written response that

10       the advisors made, if any, to the board's

11       Question No. 2.

12             I'm not looking for the whole

13       response, but I certainly want the response

14       to Question No. 2.

15       Q.    Do you have a general understanding

16  as to the amount by which -- withdrawn.

17             Did -- did the assets of --

18  withdrawn.

19             Did the liabilities of HCMFA exceed

20  its assets in 2020?

21             MS. DANDENEAU:  Objection to form.

22             MS. DEITSCH-PEREZ:  Objection, form.

23       A.    I believe I have already answered

24  that question earlier, I think.  I believe I

25  said yes.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 01/09/24   Page 51 of 200   PageID 27967

Page 196

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  And did the liabilities of

 3   NexPoint exceed its assets in 2020?

 4             MS. DEITSCH-PEREZ:  Objection to

 5        form.

 6        A.    I don't believe so.

 7        Q.    Okay.  So -- so it was only one of

 8   the two advisors who had liabilities that

 9   exceeded the value of the assets.

10             Do I have that right?

11             MS. DEITSCH-PEREZ:  Objection to

12        form.

13             MS. DANDENEAU:  Form.

14        A.    Yes.

15        Q.    And do you know, ballpark, the

16   amount by which the value of HCMFA's

17   liabilities exceeded their assets in 2020?

18             MS. DANDENEAU:  Objection to form.

19        A.    I don't -- I don't recall.

20             MR. MORRIS:  I had specifically

21        requested in discovery the audited

22        financial reports for both advisors and

23        NexPoint.  I think I may have gotten one

24        for NexPoint but I'm still waiting for the

25        balance.  And I'm going to renew my request
```

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 17    Filed 02/02/452    Page 52 of 200    PageID 27968

Page 197

```
 1                     WATERHOUSE - 10-19-21

 2          for those documents too.

 3          Q.    Let's go to the next exhibit, which

 4    is Number 10.  So I think it is in your stack,

 5    Mr. Waterhouse.

 6               MR. MORRIS:  And we can take the one

 7          down from the screen and put up Number 10

 8          for everybody.

 9               (Exhibit 10 marked.)

10          Q.    And I don't know if you have ever

11    seen this before, but I'm really putting it up

12    on the screen for purposes of turning to the

13    very last page of the document.

14               So this is a document that we have

15    been -- that we premarked as Exhibit 10.  And

16    we're turning to the last page of the document,

17    which is a document that was filed in the

18    adversary proceeding 21-3004.  And -- no, I

19    apologize, I think we -- right there.  Perfect.

20               And it is page 31 of 31.

21               MR. MORRIS:  I think there may have

22          been some something erroneously stapled to

23          the hard copy that I gave you folks, but

24          I'm looking for page 31 of 31 in the

25          document that begins with the first page of
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/22   Page 53 of 200   PageID 27969

Page 198

```
 1                  WATERHOUSE - 10-19-21

 2         Exhibit 10.

 3         Q.    Do you have that, Mr. Waterhouse?

 4         A.    I don't have it yet.  I'm looking.

 5         Q.    All right.  If you look at the top

 6    right-hand corner, you will see it says page

 7    hopefully something of 31?

 8         A.    Yes, I've got it now.

 9         Q.    Okay.  You have got 31 of 31.  You

10    can take a moment to read that, if you would

11    like.

12         A.    (Reviewing document.)  Okay.

13         Q.    Have you ever seen this before?

14         A.    I don't know if I have seen this

15    specific document, but, you know, I've --

16    I'm -- I'm aware of it.

17         Q.    And is this the document that you

18    had in mind when you sent that email to

19    Ms. Thedford that we just looked at where you

20    said that Highland had agreed not to make a

21    demand upon HCMFA until May 2021?

22         A.    Honestly, I don't -- it wasn't this

23    document.  I mean, it's something like this,

24    yes.  I mean, yes.

25         Q.    Well --
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 37   Filed 02/09/452   Page 54 of 200   PageID 27970

Page 199

 1                    WATERHOUSE - 10-19-21

 2        A.    It is something like this, but I

 3   don't think it was this specific document.

 4        Q.    Well, but this document does say in

 5   the last sentence that Highland agreed not to

 6   seek -- not to demand payment from HCMFA prior

 7   to May 31, 2021; right?

 8        A.    Yes.

 9        Q.    And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13        A.    Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16        Q.    No.  Let me try again.

17             Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21        A.    I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24        Q.    Okay.  And do you think that the

25   audit is referring to this particular document?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/55/2452   Page 55 of 200   PageID 27971

Page 200

1                    WATERHOUSE - 10-19-21

2         A.    I don't know.

3         Q.    All right.  This document is dated

4    April 15, 2019.  Do you see that?

5         A.    I do.

6         Q.    And do you remember that the audit

7    was completed on June 3rd, 2019?

8         A.    Yes.

9         Q.    And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15        A.    Yes, I remember.

16        Q.    And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20             MS. DANDENEAU:  Objection to form.

21        A.    Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25        Q.    Okay.

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 7    Filed 02/09/24    Page 56 of 200    PageID 27972

Page 201

1                    WATERHOUSE - 10-19-21

2          A.    May 31 of 2021, excuse me.

3          Q.    And this document states the

4    deferral that you just described; correct?

5          A.    It does.

6          Q.    And this document states the

7    deferral that was described in the audited

8    financial statements that we looked at before;

9    correct?

10         A.    It does.

11               MR. MORRIS:  Okay.  Can we scroll

12         down just a little bit to see who signed on

13         behalf of the acknowledgment there.

14         Q.    Okay.  So Mr. Dondero signed this

15   document on behalf of both HCMFA and Highland;

16   do you see that?

17         A.    I do.

18         Q.    Okay.  Did you discuss this document

19   or the -- withdrawn.

20               Did you discuss the concept of the

21   deferral with Mr. Dondero in the spring of

22   2019?

23         A.    I think I testified I don't recall.

24         Q.    Okay.  Do you know whose idea it was

25   to issue the acknowledgment in this form?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 01/09/24   Page 57 of 200   PageID 27973

Page 202

1                    WATERHOUSE - 10-19-21

2        A.    I don't recall.

3              MR. MORRIS:  Can we scroll back up

4        to the document, please.

5        Q.    Do you see in the beginning it says,

6   reference is made to certain outstanding

7   amounts loaned from Highland to HCMFA for

8   funding ongoing operations.

9              Do you see that?

10       A.    Yes.

11       Q.    And were you aware as the CFO of

12   Highland and as the treasurer of HCMFA that as

13   of April 15, 2019, Highland had made certain

14   loans to HCMFA to fund HCMFA's ongoing

15   operations?

16       A.    Yes.

17       Q.    And were you aware that those loans

18   were payable on demand and remained outstanding

19   as of December 31st, 2018?

20       A.    Yes.

21       Q.    And were you aware that those

22   amounts were payable on demand, and they

23   remained outstanding as of April 15, 2019?

24              MS. DEITSCH-PEREZ:  Object to the

25        form.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/22   Page 58 of 200   PageID 27974

Page 203

1                      WATERHOUSE - 10-19-21

2        A.    Well, this -- this document dated

3    April 15, 2019 says they have been deferred to

4    May 31, 2021.

5        Q.    Right.  But I'm just sticking to the

6    first paragraph where they refer to the

7    outstanding amounts.  And in the end it says

8    the -- it remained outstanding on December

9    31st, 2018, and I think you told me that you

10   understood that, and then I'm just trying to

11   capture the last piece of it.

12            Did you understand that there were

13   amounts outstanding from the loan that Highland

14   made to HCMFA to fund ongoing operations as of

15   April 15th, 2019?

16       A.    Yes.

17       Q.    Thank you.  Let's look at the next

18   sentence.  HCMFA expects that it may be unable

19   to repay such amounts should they become due

20   for the period commencing today and continuing

21   through May 31st, 2021.

22            Do you see that?

23            MS. DANDENEAU:  Objection to form.

24       A.    I do.

25       Q.    As the CFO -- withdrawn.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/59/452   Page 59 of 200   PageID 27975

Page 204

```
 1                    WATERHOUSE - 10-19-21

 2                    As the treasurer of HCMFA, did you

 3   believe that -- do you believe that statement

 4   was true and accurate at the time it was

 5   rendered?

 6        A.    I mean, it -- it -- the answer to

 7   that is I really didn't have any -- I didn't

 8   have an opinion really.

 9        Q.    Did you do anything to educate

10   yourself in April of 2019 on the issue of

11   whether HCMFA could repay the amounts that it

12   owed to Highland should they become due?

13        A.    I don't believe so.

14        Q.    Did you at any time form any

15   opinions as to HCMFA's ability to repay all

16   amounts due to Highland should they become due?

17        A.    Not really.  I guess I don't...

18        Q.    Well, you told the retail board that

19   HCMFA's liabilities exceeded their assets in

20   2020; correct?

21        A.    Yes.

22        Q.    Based on the work that you did to

23   prepare for the retail board, did you form any

24   view as to whether HCMFA would be unable to

25   repay the amounts that it owed to Highland
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/24   Page 60 of 200   PageID 27976

Page 205

```
 1                    WATERHOUSE - 10-19-21

 2    should they become due?

 3              MS. DANDENEAU:  Objection to form.

 4        A.    I mean, I -- when you look at that,

 5    to answer you, completely, you know, again,

 6    if -- the response I gave the retail board was,

 7    you know, the -- the advice -- HCMFA advisors

 8    have the -- have the full faith and backing of

 9    Jim Dondero.  So I didn't form an opinion of

10    whether the advisor could pay it or not.

11        Q.    Did you form any view as to whether

12    the advisors could repay the amounts that it

13    owed to Highland should they become due without

14    the full faith and backing of Mr. Dondero?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Form.

17        A.    I mean, if you -- if you -- if you

18    take that last statement out, I mean, it would

19    be difficult for HCMFA to pay back demand notes

20    at that time.

21        Q.    And it was precisely for that reason

22    that you told the retail board that -- that the

23    retail -- that the advisors had the full faith

24    and backing of Mr. Dondero; correct?

25              MS. DANDENEAU:  Objection to form.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/452   Page 61 of 200   PageID 27977

Page 206

```
 1                      WATERHOUSE - 10-19-21

 2           A.    I mean, yes, as the mouthpiece, I

 3    was relaying information.

 4           Q.    Okay.  And you relayed that

 5    information with the knowledge and approval of

 6    Mr. Dondero; correct?

 7                 MS. DEITSCH-PEREZ:  Object to the

 8           form.

 9           A.    As I stated in the email, I don't

10    believe, and I think I testified I don't

11    believe I had conversations with Mr. Dondero at

12    the time of that board meeting.

13           Q.    Did you tell the retail board that

14    the advisors had the full faith and backing of

15    Mr. Dondero without Mr. Dondero's prior

16    approval?

17           A.    Yeah, I -- I -- yes, I'm -- like I

18    said, I think I testified earlier, I'm sure I

19    qualified it as well.

20           Q.    What do you mean by that?

21                 MS. DANDENEAU:  Objection to form.

22           A.    Again -- again, like I said in the

23    email, it has the full faith and backing of Jim

24    Dondero unless that has changed.

25           Q.    Actually that is not what you said,
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 76-37   Filed 02/09/22   Page 62 of 200   PageID 27978

Page 207

1                    WATERHOUSE - 10-19-21

2    so let's put the email back up.

3         A.    It is -- it is -- it is in the

4    email.

5         Q.    Let's put the email back up.  You

6    didn't say unless it has changed.  You said you

7    believe it hasn't changed; right?

8         A.    Okay.  And to my knowledge that

9    hasn't changed, that is what it says.

10        Q.    That's right.

11        A.    But, again, I mean, that is -- I

12   don't know everything.  And I'm not in every

13   conversation.  I'm not -- to presume that I am,

14   is -- and you have to put myself -- as you

15   started this out, Mr. Morris, I was at home in

16   October of 2020 with COVID -- or, you know,

17   under these COVID times that we described is

18   very difficult.

19              We have all been working at home for

20   really the first time ever, undergoing

21   processes, procedures, control environments

22   that have been untested, and there is poor

23   communication.

24              So I am relaying, as I'm telling you

25   now, what is in the email.  And unless

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/03/22   Page 63 of 200   PageID 27979

Page 208

1                    WATERHOUSE - 10-19-21

2   something has changed -- to my knowledge, it

3   hasn't changed, but it could have changed.

4        Q.    When you say that the advisors have

5   the full faith and backing from Mr. Dondero,

6   did you intend to convey that, to the extent

7   the advisors were unable to satisfy their

8   obligations as they become due, Mr. Dondero

9   would do it for them?

10             MS. DANDENEAU:  Object to the form.

11             MS. DEITSCH-PEREZ:  Object to the

12        form.

13             And, John, we have given you a lot

14        of leeway here but this does not seem

15        relevant to this case.  You seem sort of

16        taking a complete sort of diversion into

17        the allegations and the complaint just

18        filed on Friday, and so I would ask you to

19        move on because --

20             MR. MORRIS:  And I will tell you --

21        I will tell you that I have never read that

22        complaint cover-to-cover.  I have nothing

23        to do with the prosecution of those claims.

24        And this issue that we're talking about

25        right now is related solely to the

1                    WATERHOUSE - 10-19-21

2          promissory notes that your clients refuse

3          to pay.

4                    So I'm going to continue to ask my

5          questions, and I would ask the court

6          reporter to read back my last question.

7                              (Record read.)

8                    MS. DEITSCH-PEREZ:  And then I

9          believe there were objections to form.

10         Q.    You can answer the question.

11         A.    Yes.

12         Q.    Thank you very much, sir.

13                   MR. MORRIS:  Can we go back to the

14         other document, please?

15         Q.    Mr. Waterhouse, do you know if this

16    document was ever shared with the retail board?

17         A.    I don't recall.

18         Q.    Did you ever share it with the

19    retail board?

20         A.    I don't recall.

21         Q.    Did you ever tell the retail board

22    about the substance of this document?

23         A.    I don't recall.

24         Q.    Did you ever tell the retail board

25    that Highland had agreed not to make a demand

1                     WATERHOUSE - 10-19-21

2    against HCMFA until May 2021?

3          A.    I don't recall.

4          Q.    Do you know whether anybody on

5    behalf of the advisors ever informed the retail

6    board that Highland had agreed on April 15,

7    2019, not to make a demand against HCMFA under

8    the promissory notes?

9          A.    I don't recall.

10         Q.    Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13         A.    Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document?  Is that what you -- I

16   just want to make sure.

17         Q.    Uh-huh.

18         A.    Yeah, I don't -- I don't recall.

19         Q.    Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24               MS. DANDENEAU:  Objection to form.

25         A.    I don't recall.

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 87    Filed 02/09/22    Page 66 of 200    PageID 27982

Page 211

1                    WATERHOUSE - 10-19-21

2          Q.    Did you ever inform PwC that HCMFA's

3    liabilities exceeded its assets?

4               MS. DANDENEAU:  Object to the form.

5          A.    I don't -- I don't think I told

6    them.  I mean, they -- they audited the

7    financial statements.

8          Q.    Did -- do you know if anybody on

9    behalf of Highland ever informed

10   PricewaterhouseCoopers that HCMFA may be unable

11   to repay amounts owing to Highland, should they

12   become due?

13              MS. DANDENEAU:  Objection to form.

14         A.    Yes.  Again, I think I testified

15   earlier that -- that this was communicated to

16   the auditors.

17         Q.    Ideally --

18         A.    I don't know who exactly did that.

19   I don't recall doing it, but, yeah, it was --

20   it was communicated.  And that is why -- I

21   mean, there is a disclosure in the financial

22   statements; right?

23         Q.    There is, and that disclosure

24   relates to the last sentence of this document;

25   correct?

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 177    Filed 02/09/1452    Page 67 of 200    PageID 27983

Page 212

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Do you recall looking in the

 4   document and seeing anything that was disclosed

 5   with respect to the sentence above that?

 6        A.    No.

 7        Q.    Do you know whether anybody on

 8   behalf of Highland ever informed

 9   PricewaterhouseCoopers that HCMFA expects that

10   it may be unable to repay amounts due and owing

11   to Highland should they become due?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.  I think that is the third time.

14        A.    I don't recall.  Again, as I said,

15   we -- all of this was given to the auditors.

16        Q.    Do you know if Highland received

17   anything of value in exchange for its agreement

18   not to demand payment on amounts owed by HCMFA

19   prior to May 31st, 2021?

20             MS. DEITSCH-PEREZ:  Object to the

21        form.  That is the second time.

22             MS. DANDENEAU:  Object to the form.

23        A.    I have answered this question.

24             MR. RUKAVINA:  Hold on.  Object to

25        legal conclusion.  Go ahead.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/22   Page 68 of 200   PageID 27984

Page 213

1                    WATERHOUSE - 10-19-21

2          A.    I have answered this question

3    before.

4          Q.    And the answer was no?

5          A.    I'm not aware.

6          Q.    Now, this acknowledgment can't

7    possibly apply to the two notes that you signed

8    on behalf of HCMFA because those notes were

9    signed on May 2nd and May 3rd, 2019; is that

10   right?

11              MS. DANDENEAU:  Objection to form.

12         A.    Unless there is a drafting error.

13         Q.    Okay.  Are you aware of a drafting

14   error?

15         A.    I'm not aware.  I didn't -- I wasn't

16   part of -- I didn't sign this note or this

17   acknowledgment.  I didn't draft it.

18         Q.    But you do see it is dated April 15,

19   2019; right?

20         A.    Yes.

21         Q.    And this was a document that was

22   actually included by the advisors in a pleading

23   they filed with the Court; right?

24              MR. RUKAVINA:  Well, I don't know

25         that so I object to form.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/24   Page 69 of 200   PageID 27985

Page 214

```
 1                    WATERHOUSE - 10-19-21

 2         Q.    Okay.  Let's go to the first page of

 3    the document and just confirm that.

 4              MR. AIGEN:  Mr. Morris, I just note

 5         that you already said there was some error

 6         with the document that is listed as

 7         exhibit --

 8              MR. MORRIS:  No.  No, no, no.

 9              MS. DEITSCH-PEREZ:  Oh, okay.

10              MR. MORRIS:  What I said is that

11         there is a few pages that were mistakenly

12         stapled to the end of the document.

13              MS. DEITSCH-PEREZ:  Okay.

14              MR. MORRIS:  There is no problem

15         with this document.

16              MS. DEITSCH-PEREZ:  And just so

17         we're clear that the document -- the pages

18         that start with defendant's amended answer

19         are not intended to be part of this

20         document?

21              MR. MORRIS:  That's correct.

22              MS. DEITSCH-PEREZ:  And that the --

23         but it is your representation that the rest

24         of the document is -- is -- is correct

25         because we don't -- we don't have any way
```

1                  WATERHOUSE - 10-19-21

2          of verifying that, we're just --

3                  MR. MORRIS:  You do, actually.  You

4          could just go to Docket No. 21-3004.

5                  MS. DEITSCH-PEREZ:  If you want to

6          stop this deposition so we can go and pull

7          that document up, we're happy to do it.  So

8          I am just asking you for your

9          representation.

10                 MR. MORRIS:  Sure.  I gave that.

11                 MS. DEITSCH-PEREZ:  Okay.

12         Q.    So do you see that this is a

13   document that was actually filed with the Court

14   by Highland Capital Management Fund Advisors?

15         A.    No.  I get with the first page in

16   the section.  Maybe I'm looking at the wrong

17   thing.  It says, Highland Capital Management.

18         Q.    Don't worry about it.  Don't worry

19   about it.

20         A.    Maybe I went back -- okay.

21                 MR. MORRIS:  All right.  Can we put

22         up on the screen Exhibit 2.

23                 (Exhibit 2 marked.)

24                 MR. MORRIS:  I think it is

25         Exhibit 1.

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 02/09/24    Page 71 of 200    PageID 27987

Page 216

1                    WATERHOUSE - 10-19-21

2               MS. DANDENEAU:  I'm sorry, John, did

3          you say Exhibit 2 or Exhibit 1?

4               MR. MORRIS:  It is Exhibit 2 in the

5          binders so it is premarked Exhibit 2.  And

6          now I'm asking -- right there -- going to

7          Exhibit 1 to the document that was marked

8          as Exhibit 2.

9               MS. DANDENEAU:  Got it.  In the

10         binder there is no --

11              MS. DEITSCH-PEREZ:  There is no

12         Exhibit 1.

13              MR. MORRIS:  All right.  So look at

14         the one on the screen.

15         Q.    Do you see, Mr. Waterhouse, that

16    this is a promissory note dated May 31st, 2017,

17    in the approximate amount of $30.7 million?

18         A.    Yes.

19         Q.    And do you see that the maker of the

20    note is NexPoint?

21         A.    Yes.

22         Q.    And that Highland is the payee; is

23    that right?

24         A.    Yes.

25         Q.    Okay.  And do you see in Paragraph 2

1                  WATERHOUSE - 10-19-21

2   this is an annual installment note?

3        A.    Can you scroll down.

4        Q.    Sure.

5              MR. MORRIS:  Can we scroll down --

6        yeah, there you go.

7        A.    Right there, yeah.  Yes.

8              MR. MORRIS:  And can we scroll down

9        to the signature line.

10       Q.    And do you recognize that as

11  Mr. Dondero's signature?

12       A.    Yes.

13       Q.    And is this the promissory note that

14  we talked about earlier where NexPoint had made

15  certain payments in the aggregate amount of

16  about 6 to $7 million against principal and

17  interest?

18       A.    I don't recall discussing the

19  aggregate principal amounts of 6 to $7 million,

20  but -- so I don't -- I don't recall that prior

21  discussion with those amounts.

22       Q.    All right.  Let's take a look.

23  NexPoint always included this promissory note

24  as a liability on its audited financial

25  statements; right?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 176-17   Filed 02/09/24   Page 73 of 200   PageID 27989

Page 218

                    WATERHOUSE - 10-19-21

1

2       A.    Yes.

3       Q.    And NexPoint had its financial

4  statements audited; isn't that correct?

5       A.    Yes.

6       Q.    And was the process of NexPoint's

7  audit similar to the process you described

8  earlier for Highland and HCMFA?

9       A.    Yes, it is similar.

10       Q.    Okay.

11            MR. MORRIS:  Can we put up

12       NexPoint's audited financials and let

13       everybody know what exhibit number it is,

14       La Asia?

15            MS. CANTY:  It is going to be

16       Exhibit 46.

17            (Exhibit 46 marked.)

18       Q.    And do you see, sir, that we've put

19  up NexPoint Advisors' consolidated financial

20  statements and supplemental information for the

21  period ending December 31st, 2019?

22       A.    Yes.

23       Q.    Did you participate in the process

24  whereby these audited financial statements were

25  issued?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/452   Page 74 of 200   PageID 27990

Page 219

```
 1                   WATERHOUSE - 10-19-21

 2          A.    I didn't participate directly, as

 3    I've described before, about the -- the team

 4    performing the audit.

 5          Q.    Do you recall when the audit of

 6    NexPoint's financial statements for the period

 7    ending December 31st, 2019 was completed?

 8          A.    Yes.

 9          Q.    And when do you recall it being

10    completed?

11          A.    In January of 2021.

12          Q.    Do you know why the 2019 audit

13    report wasn't completed until January of 2021?

14          A.    Yes.

15          Q.    Why was the NexPoint audit report

16    for the period ending 12/31/19 not completed

17    until January 2021?

18          A.    Because we had to deal with working

19    from home from -- with COVID, and on top of all

20    of our daily responsibilities and job duties

21    at -- at providing -- at Highland providing

22    services to NexPoint, we had to do all of this

23    extra work for a bankruptcy that was filed in

24    October of 2019.

25                   MR. MORRIS:  Can we go to the
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 02/09/22   Page 75 of 200   PageID 27991

Page 220

```
 1                    WATERHOUSE - 10-19-21

 2        balance sheet on page 3?  Okay.  Stop right

 3        there.

 4            Q.    Do you see under the liabilities

 5     section, the last item is note payable to

 6     affiliate?

 7            A.    Yes.

 8            Q.    And is that the note that we just

 9     looked at?

10                  MS. DANDENEAU:  Objection to form.

11            Q.    Withdrawn.

12                  Is that the approximately

13     $30 million note that we just looked at that

14     was dated from 2017?

15                  MS. DANDENEAU:  Objection to form.

16            A.    I believe no.

17            Q.    Okay.  You're not aware of any other

18     note that was outstanding from NexPoint to

19     Highland as of the end of the year 2019, other

20     than that one $30 million note; right?

21            A.    I don't recall.

22            Q.    And as of the end of 2019, the

23     principal amount that was due on the note was

24     approximately $23 million; right?

25                  MS. DEITSCH-PEREZ:  Object to the
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 76-37   Filed 02/09/24   Page 76 of 200   PageID 27992

Page 221

1                    WATERHOUSE - 10-19-21

2        form.

3        A.    Approximately.

4        Q.    And does that refresh your

5   recollection that between the time the note was

6   executed and the end of 2019, that NexPoint had

7   paid down approximately $7 million?

8        A.    Yes.  If we are just doing the math,

9   yes.

10       Q.    Okay.  Did NexPoint complete its

11  audit from 2020?

12       A.    Sorry, you kind of broke up.  Do

13  NexPoint complete?

14       Q.    The audit of its financial

15  statements for the period ending December 31st,

16  2020?

17       A.    No.

18       Q.    No, it's not complete?

19       A.    No, it is not complete.

20       Q.    Did HCMFA complete its audit for the

21  year ending December 31st, 2020?

22       A.    No.

23            MR. MORRIS:  Can we go to page 15,

24       please, the paragraph at the bottom.

25       Q.    Do you see that NexPoint has

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/09/22   Page 77 of 200   PageID 27993

Page 222

1              WATERHOUSE - 10-19-21

2    included under notes payable to Highland a

3    reference to the amounts that were outstanding

4    as of the year-end 2019 under the note that we

5    looked at just a moment ago?

6         A.    Yes.  Are you talking about the

7    second paragraph?

8         Q.    I'm actually talking about first

9    paragraph.  Do you understand that the first

10   paragraph is a reference to the 2017 note, and

11   the amounts that were -- the principal amount

12   that was outstanding as of the end of 2019?

13             MS. DANDENEAU:  Objection to form.

14        John, do you mean the first paragraph of

15        that page?

16             MR. MORRIS:  No, the first paragraph

17        under notes payable to Highland.

18        A.    Yeah, I see the paragraph, and

19   again, this is what I answered earlier.  I

20   believe so, just because I don't -- again, this

21   is a number in a balance sheet, and without

22   matching it up and seeing the detail with the

23   schedule like I kind of talked about for

24   Highland's financial statements, it is a little

25   bit more difficult to tie everything in

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 02/09/24    Page 78 of 200    PageID 27994

Page 223

1                     WATERHOUSE - 10-19-21

2   perfectly together.

3        Q.    Okay.  But you're not aware of any

4   note that was outstanding at the end of 2019

5   from NexPoint to Highland other than whatever

6   principal was still due and owing under the

7   $30 million note issued in 2017; correct?

8        A.    Well, it -- I don't -- there is

9   reference in the second paragraph.  I don't --

10  I don't -- I don't recall what that is

11  referring to, so I don't -- I don't know.

12       Q.    Well, if you listen carefully to my

13  question, right, I'm asking about notes that

14  were outstanding at the end of 2019, and if we

15  look at the paragraph you just referred to, it

16  says that during the year there were new notes

17  issued totaling $1.5 million, but by the end of

18  the year, no principal or interest was

19  outstanding on the notes.

20            Do you see that?

21       A.    Oh, I do, yes.

22       Q.    So does that refresh your

23  recollection that there were no notes

24  outstanding from NexPoint to Highland other

25  than the principal remaining under the original

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 02/09/22    Page 79 of 200    PageID 27995

Page 224

1                    WATERHOUSE - 10-19-21

2     $30 million 2017 note that we looked at a

3     moment ago?

4          A.    Well, we're at the bottom of the

5     page.  Is there anything on page 16?

6          Q.    That is a fair question, sure.  That

7     is it.

8          A.    Okay.  So it appears that that is

9     the only note that is detailed in the notes in

10    the financial statement.

11         Q.    And you don't have any memory of any

12    other note other than the 2017 note, right,

13    being outstanding as of the end of the year?

14         A.    I deal with thousands of

15    transactions every year.  I don't really have a

16    very specific memory for what exactly was

17    outstanding.

18              MR. MORRIS:  Why don't we take a

19         break now.  We've been going for a little

20         while.  It's 3:26.  Let's come back at

21         3:40.

22              VIDEOGRAPHER:  We're going off the

23         record at 3:26 p.m.

24         (Recess taken 3:26 p.m. to 3:39 p.m.)

25              VIDEOGRAPHER:  We are going back on

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 03/09/22   Page 80 of 200   PageID 27996

Page 225

1                    WATERHOUSE - 10-19-21

2        the record at 3:39 p.m.

3        Q.    All right.  Mr. Waterhouse, we -- I

4   don't think we have a lot more here.

5             To the best of your knowledge and

6   recollection, were all affiliate loans and all

7   loans made to Mr. Dondero recorded on

8   Highland's books and records as assets of

9   Highland?

10            MS. DANDENEAU:  Object to the form,

11       asked and answered.

12       A.    To my knowledge, yes.

13       Q.    Okay.  Can you recall any loan to

14   any affiliate or Mr. Dondero that was not

15   recorded on Highland's books and records as an

16   asset?

17       A.    Like during my time as CFO?  I don't

18   recall.

19       Q.    How about after the time that you

20   were CFO?  Did you recall that there was a loan

21   by Highland to an affiliate or to Mr. Dondero

22   that hadn't been previously recorded on

23   Highland's books as an asset?

24            MS. DANDENEAU:  Objection to form.

25       A.    I guess I don't understand the

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/01/24   Page 81 of 200   PageID 27997

Page 226

 1                    WATERHOUSE - 10-19-21

 2    question.  I left Highland as of -- I'm not

 3    aware of -- I left Highland in February --

 4    probably the last day of February of 2021.

 5         Q.    Okay.

 6         A.    I'm not -- I'm not aware of any --

 7    I'm not aware of anything past that date.

 8         Q.    Okay.  While you were the CFO at

 9    Highland, did Highland prepare in the ordinary

10    course of business a document that reported

11    operating results on a monthly basis?

12         A.    Yes.

13         Q.    And are you generally familiar with

14    the monthly operating reports?

15         A.    Yeah.  You are referring to the

16    reports that we filed to the Court every month?

17         Q.    I apologize, I'm not.  I'm taking

18    you back to the pre-petition period.  There was

19    a report that I have seen that I'm going to

20    show you, but I'm just asking for your

21    knowledge.

22              MR. MORRIS:  Let's put it up on the

23         screen, Exhibit 39.

24              (Exhibit 39 marked.)

25         Q.    Do you see this is a document that

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 77   Filed 02/29/24   Page 82 of 200   PageID 27998

Page 227

```
 1                     WATERHOUSE - 10-19-21

 2    is called operating results?

 3          A.    Yeah, that's the title of it.

 4          Q.    Okay.  And was a report of operating

 5    results prepared by Highland on a monthly basis

 6    during the time that you served as CFO?

 7          A.    No.

 8          Q.    Are you familiar with a document of

 9    this type?  And we can certainly look at the

10    next page or two to refresh your recollection.

11          A.    I'm just looking at the title.  I

12    don't really -- again, as I discussed before, I

13    don't have any records or documents or emails

14    or appointments or anything that I was able to

15    use prior to -- prior to this deposition, so

16    I'm doing the best I can.

17          Q.    Okay.  You don't need to apologize.

18    I'm just asking you if you are familiar with

19    the document called Operating Results that was

20    prepared on a monthly basis at Highland?

21                MS. DEITSCH-PEREZ:  Object to the

22          form.

23          Q.    If you're not, you're not.

24          A.    I don't believe this was prepared on

25    a monthly basis.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/24   Page 83 of 200   PageID 27999

Page 228

1                     WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you see that this one

3   is -- is dated February 2018?

4        A.    Yes.

5        Q.    Do you have -- do you believe --

6   have you ever seen a document that was

7   purporting to report operating results for

8   Highland?

9             MS. DANDENEAU:  Objection to form.

10       A.    Yes.

11       Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15       A.    I believe it was -- it was prepared

16   on an annual basis.

17       Q.    Okay.

18             MR. MORRIS:  Can we look at the next

19       page.

20       Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23             And it is dated February 2018.

24       A.    Yes.

25       Q.    Do you recall that there was a

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/24   Page 84 of 200   PageID 28000

Page 229

1                    WATERHOUSE - 10-19-21

2    report that Highland prepared that identified

3    significant items impacting the balance sheet?

4         A.    A report that was prepared.

5         Q.    Let me ask a better question:  Did

6    Highland prepare reports to the best of your

7    recollection that identified significant items

8    that impacted its balance sheet?

9         A.    Well, so Highland prepared a -- a

10   monthly close package.  And maybe I'm

11   getting -- and -- and maybe change names at one

12   time or maybe I'm just -- again, just

13   misremembering -- but in that, yes, there is a

14   page that would detail just changes in -- you

15   know, just changes month over month on the

16   balance sheet.

17        Q.    Okay.  And maybe it is my fault.

18   Maybe I didn't know the proper name for it.

19   But let's use the phrase "monthly close

20   package."

21             Did Highland prepare a monthly close

22   package in the ordinary course of business

23   during the time that you served as CFO?

24             MS. DANDENEAU:  Objection to form.

25        A.    Yes.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 77   Filed 02/05/24   Page 85 of 200   PageID 28001

Page 230

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    And did the monthly close package

 3   that Highland prepared include information

 4   concerning significant items that impacted

 5   Highland's balance sheet?

 6        A.    Yes, it had a page like that is --

 7   that is on the screen that detailed items

 8   like -- of that nature.

 9        Q.    And do you know who -- was there

10   anybody at Highland who was responsible for

11   overseeing the preparation of the monthly

12   reporting package?

13        A.    That would have been -- again, it

14   varies over time during my tenure as CFO.

15   It -- it varied over -- over time, but -- but

16   typically a -- a corporate accounting manager.

17        Q.    And who were the corporate

18   accounting managers during your tenure as CFO?

19        A.    It would have been Dave Klos and

20   Kristin Hendrix.

21        Q.    And did the corporate accounting

22   manager deliver to you drafts of the monthly

23   close package before it was finalized?

24        A.    Sometimes.

25        Q.    Was that the practice even if there
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 02/09/24   Page 86 of 200   PageID 28002

Page 231

1                     WATERHOUSE - 10-19-21

2     were exceptions to the practice?

3          A.    The practice meaning that they

4     sometimes lured them to me?

5          Q.    That that was the expectation even

6     if circumstances prevented that from happening

7     from time to time.

8               MS. DEITSCH-PEREZ:  Object to the

9          form.

10         A.    I -- I would say it started out that

11    way but over the years it -- it was not

12    enforced.

13         Q.    Okay.  So you were -- you reviewed

14    and approved monthly -- monthly reporting

15    packages for a certain period of time and then

16    over time you stopped doing that.

17              Do I have that right?

18              MS. DANDENEAU:  Objection to form.

19         A.    Yes, I mean, if you're talking about

20    a formal meeting where we sit down and go

21    through and approve it.  I would say that was

22    standard practice a decade -- you know, early

23    on.  And as time went on that -- that -- that

24    practice wasn't followed.

25         Q.    Okay.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/07/24   Page 87 of 200   PageID 28003

Page 232

1                    WATERHOUSE - 10-19-21

2        A.    And, quite frankly, I don't even

3  know if these were -- these were sent to me

4  even in any capacity.

5        Q.    What was the purpose of preparing

6  the monthly reporting package -- withdrawn.

7              What was the purpose of preparing

8  the monthly close package?

9              MS. DEITSCH-PEREZ:  Object to the

10       form.

11       A.    The -- the original purpose was so

12  that it would just -- it would be a report that

13  was reviewed monthly with senior management.

14       Q.    Who was included in the idea of

15  senior management?

16       A.    You know, I think originally when

17  this was conceived that would have been like

18  Jim Dondero and Mark Okada.

19       Q.    Were monthly reporting -- withdrawn.

20              Were monthly close packages prepared

21  to the best of your knowledge until the time

22  you left Highland?

23       A.    To my knowledge -- I don't know,

24  actually.  I mean, to my knowledge, I believe

25  it was being -- that was still being done.  I

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/89/1452   Page 88 of 200   PageID 28004

Page 233

```
 1                    WATERHOUSE - 10-19-21

 2    don't know because, again, I wasn't reviewing

 3    them.  I hadn't reviewed a close package for --

 4    for a long time.  But I believe the standard

 5    practice that was still being carried out.

 6         Q.    Did you ever have any discussions

 7    with the debtor's independent board concerning

 8    any promissory notes that were issued by any of

 9    the affiliates or Mr. Dondero?

10         A.    I can't -- I can't -- I can't recall

11    specifically.

12         Q.    Did you speak with the independent

13    board from time to time?

14         A.    Yes, from -- from -- from time to

15    time I had discussions with the independent

16    board members, you know, either -- either, you

17    know, by themselves or wholly, you know, as --

18    as a -- as a combined work.

19         Q.    Okay.  Before we talk about

20    Mr. Seery, do you recall ever having a

21    conversation with Mr. Nelms or Mr. Dubel

22    concerning any promissory note that was

23    rendered by one of the affiliates or

24    Mr. Dondero to Highland?

25         A.    I don't recall any conversations
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/24   Page 89 of 200   PageID 28005

Page 234

1                    WATERHOUSE - 10-19-21

2    specifically.

3        Q.    Do you know if the topic was ever

4    discussed, even if you don't remember it

5    specifically?

6              MS. DANDENEAU:  Objection to form.

7        A.    It -- it -- it may have.  I don't

8    know.  I don't recall.

9        Q.    Do you recall ever discussing any

10   promissory note issued by any of the affiliates

11   or Mr. Dondero with James Seery?

12       A.    I don't -- I don't recall

13   specifically.

14       Q.    Do you recall generally ever

15   discussing the topic of promissory notes issued

16   by any of the affiliates or Mr. Dondero to

17   Highland with Mr. Seery?

18       A.    Nothing -- nothing is really jumping

19   out at me.

20       Q.    Do you recall if you ever told

21   Mr. Seery that any of the affiliates or

22   Mr. Dondero didn't have an obligation to pay

23   all amounts due and owing under their notes?

24       A.    I don't recall having that

25   conversation.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/24   Page 90 of 200   PageID 28006

Page 235

1                    WATERHOUSE - 10-19-21

2          Q.     Did you ever tell Mr. Seery that you

3    had any reason to believe that the amounts

4    reflected in the notes issued by the affiliates

5    and Mr. Dondero were invalid for any reason?

6          A.     I don't -- I don't recall.

7          Q.     Did you tell Mr. Dondero -- did you

8    tell Mr. Seery that you thought the promissory

9    notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12         A.     I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19         Q.     Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23              MS. DANDENEAU:  Objection to form.

24         A.     Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 91 of 200   PageID 28007

Page 236

1                WATERHOUSE - 10-19-21

2    anything that -- that said I have concerns over

3    these notes?

4        Q.    No.  Let me try again.  Maybe it was

5    my question.

6            Did you ever give Mr. Seery any

7    information concerning any of the notes that

8    were issued by any of the affiliates or

9    Mr. Dondero?

10            MS. DANDENEAU:  Objection to form.

11       A.    I don't recall if I did or not.  I

12   don't -- I don't remember.  I mean, you have my

13   emails.  You may have asked.  Again, I don't --

14   I don't know.

15            MR. MORRIS:  Can we put up the

16       document that has been premarked as Exhibit

17       39?

18            MS. DANDENEAU:  John, that is this

19       document, isn't it?

20            MR. MORRIS:  Oh, yeah, it might be,

21       as a matter of fact.  Let's go to Number

22       40.

23            (Exhibit 40 marked.)

24       Q.    During the bankruptcy,

25   Mr. Waterhouse, did you prepare documents that

1                    WATERHOUSE - 10-19-21

2     were filed with the bankruptcy court?

3          A.    I didn't -- I didn't prepare them

4     personally.

5          Q.    Did people prepare them under your

6     direction?

7          A.    Yes.  There were members of the team

8     that prepared them, and they worked in -- you

9     know, there were members of DSI that were

10    involved in the process as well.

11         Q.    To the best of your knowledge, did

12    DSI rely on the employees of Highland for the

13    information that they used to prepare the

14    bankruptcy filings?

15         A.    Yes.  The books and records were

16    with the Highland personnel.

17         Q.    Okay.  And do you see on the screen

18    here, there is a document that we have marked

19    as Exhibit 40 that is -- that is titled Summary

20    of Assets and Liabilities?

21         A.    Uh-huh.

22         Q.    Okay.  And do you recall reviewing

23    any summary of assets and liabilities before it

24    was filed with the bankruptcy court?

25         A.    Yes, I recall reviewing this at a

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/22   Page 93 of 200   PageID 28009

Page 238

1                    WATERHOUSE - 10-19-21

2   high level.

3        Q.    And did you believe that it was

4   accurate at the time it was filed?

5        A.    I didn't have any other reason to

6   believe otherwise.

7        Q.    Okay.  Do you see that the total

8   value of all properties listed in Part 1 is

9   approximately $410 million?

10            MS. DEITSCH-PEREZ:  Objection to

11       form.

12       A.    Yes, it is in 1c.

13       Q.    Yes.

14       A.    Yes, I see that.

15       Q.    Okay.  If we go to the second page,

16   now I think I may just have excerpts here, just

17   so everybody is clear, but if we scroll down to

18   the second page, you will see that there is

19   a -- a little further.  There you go.  You will

20   see there is a reference to Item 71, notes

21   receivable.

22            Do you see that?

23       A.    I do.

24       Q.    And that was a reference to the

25   notes receivable from the affiliates and

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/24   Page 94 of 200   PageID 28010

Page 239

1                      WATERHOUSE - 10-19-21

2    Mr. Dondero, among others; is that right?

3                MS. DANDENEAU:  Objection to form.

4         A.    Yes.  The affiliate notes and the

5    Dondero notes were in this amount, but they

6    weren't -- again, like you said, and among

7    others.

8         Q.    Okay.  We will look at the

9    specificity because I'm not playing gaming

10   here, but do you know if the $150 million of

11   notes receivable was included within the

12   $410 million of total value of the debtor's

13   assets?

14                MS. DANDENEAU:  Objection to form.

15        A.    I -- I -- I believe so.

16        Q.    Right.  And so is it fair to say

17   that as of the date this document was prepared,

18   the notes receivable were more than one-third

19   of the value of the debtor's assets?

20                MS. DEITSCH-PEREZ:  Object to the

21        form.

22                MS. DANDENEAU:  Object to the form.

23        A.    Again, if you are just taking the

24   math, 150 divided by whatever the $400 million

25   number is above, then yes, you get there.

1                     WATERHOUSE - 10-19-21

2          Q.     Okay.

3          A.     You know, but as of the time of this

4    filing, that is what was put in this filing,

5    right, but, you know, I mean, numbers --

6    numbers change, facts and circumstances change.

7          Q.     But as the CFO of Highland, the

8    debtor in bankruptcy, did you believe that this

9    number accurately reflected the total amount

10   due under the notes receivable?

11         A.     That is what we had in our books and

12   records.

13         Q.     Okay.  And did you believe as the

14   CFO that the books and records accurately

15   reported the then value of the debtor's assets?

16              MS. DANDENEAU:  Objection to form.

17         A.     We didn't -- as part of this filing,

18   there was no fair value measurement or

19   anything.  These were just accounting entries

20   for the promissory notes.  There is no analysis

21   for impairment or fair market value adjustments

22   or anything of that nature.  This is purely

23   taking numbers and putting them in our form.

24         Q.     Did you do any impairment analysis

25   at any time while you were employed by

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/05/22   Page 96 of 200   PageID 28012

Page 241

1                    WATERHOUSE - 10-19-21

2    Highland?

3         A.    Yes, we did do impairment analysis

4    on -- on assets.

5         Q.    Okay.  Did you ever do an impairment

6    analysis on any of the promissory notes that

7    were given to Highland by any of the affiliates

8    or Mr. Dondero?

9         A.    Not that I recall.

10        Q.    Under what circumstances do you

11   prepare impairment analyses?

12        A.    As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19             As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.    Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/07/24   Page 97 of 200   PageID 28013

Page 242

```
1                    WATERHOUSE - 10-19-21

2          A.     The audited financials -- yes,

3    audited financial statements are prepared in

4    accordance with GAAP.

5          Q.     Do you recall whether any of

6    Highland or HCMFA or NexPoint ever made a fair

7    market value adjustment to any of the notes

8    issued by any of the affiliates or Mr. Dondero

9    to Highland?

10         A.     I do not recall that happening, but

11   the -- it is because under -- under GAAP,

12   the -- the treatment of liabilities is

13   different than assets.

14         Q.     Okay.  So then let's just focus on

15   Highland's audited financial statements.

16                The last audited financial

17   statements were for the period ending December

18   31st, 2018; correct?

19         A.     That is my understanding.

20         Q.     And you had -- you had an obligation

21   to disclose anything to PricewaterhouseCoopers

22   concerning any subsequent events between the

23   end of 2018 and June 3rd, 2019; correct?

24                MS. DANDENEAU:  Objection to form.

25                MS. DEITSCH-PEREZ:  Form.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 02/09/22   Page 98 of 200   PageID 28014

Page 243

```
 1                    WATERHOUSE - 10-19-21

 2         A.    Correct.

 3         Q.    Okay.  To the best of your

 4   knowledge, as Highland's CFO, did Highland ever

 5   make any fair market value adjustments to any

 6   of the promissory notes that were carried on

 7   its balance sheet and that were issued by any

 8   of the affiliates or Mr. Dondero?

 9         A.    I think I answered that question

10   earlier.  I don't recall doing that for any of

11   the -- those -- those notes.  So it would have

12   included the audit for the -- for the 2018

13   period.

14         Q.    Okay.

15               MR. MORRIS:  Can we go to the next

16         page.

17         Q.    Do you see this is a note a list of

18   notes receivable?  Do you see that?

19         A.    Yes, I do.

20         Q.    And do you see that this ties into

21   the page that we were just looking?

22         A.    I'm sorry, can we go back to the

23   prior page?  I mean, it was at 150,331,222.  It

24   was on the prior page.  Next page.  Yes, it

25   agrees.
```

Page 244

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  So now let's look at that

 3   schedule.  So this was the face amount of all

 4   of the promissory notes that Highland held at

 5   the time this document was filed with the

 6   bankruptcy court; right?

 7        A.    Yes.

 8        Q.    There is a footnote there that says,

 9   doubtful or uncollectible accounts are

10   evaluated at year-end.

11              Do you see that?

12        A.    I do.

13        Q.    Okay.  And is it fair to say that as

14   of the year-end 2018, the year before this,

15   that to the extent any of these notes were

16   outstanding at that time, they weren't deemed

17   to be doubtful or uncollectible?

18        A.    Yeah.  For the 2018 audit, there

19   weren't any -- there weren't any adjustments to

20   fair value.

21        Q.    Okay.  And during the bankruptcy, do

22   you recall that Highland subsequently reserved

23   for the Hunter Mountain Investment Trust note?

24        A.    Yes.

25        Q.    Why did Highland -- were you
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 11/30/21   Page 100 of 200   PageID 28016

Page 245

1                    WATERHOUSE - 10-19-21

2    involved in the decision to reserve the Hunter

3    Mountain Investment Trust note?

4         A.    I was not.

5         Q.    Do you know why Highland decided to

6    reserve for the Hunter Mountain Investment

7    Trust note?

8         A.    I don't know yet decision was made.

9    I believe it was made by someone at DSI.

10        Q.    Okay.  I'm just asking if you know

11   why.

12             Did you ever ask anyone why they

13   reserved for that particular note?

14        A.    I don't recall.

15        Q.    Do you know whether the debtor

16   reserved for any other note on this list during

17   the bankruptcy?

18        A.    Again, I don't recall.  I wasn't

19   part of any process of -- again, like any fair

20   value adjustments or anything to that degree.

21   Like I said, a lot of that was done by DSI and

22   it was kind of out of our court.

23        Q.    Okay.  Do you know if any note

24   receivable on this list was ever deemed by the

25   debtor to be doubtful or uncollectible?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/09/24   Page 101 of 200   PageID 28017

Page 246

1                    WATERHOUSE - 10-19-21

2      A.    I don't -- I don't have a

3   recollection of every filing, so I don't know.

4      Q.    Did you ever have a discussion with

5   anybody at any time about whether any of the

6   notes receivable on this list should be deemed

7   to be doubtful or uncollectible?

8      A.    No.  As I previously stated, we were

9   told we didn't have to keep GAAP financials.

10  We weren't having -- you know, there is no

11  underlying audits being performed, so I mean,

12  it wasn't something I worried about.

13          MR. MORRIS:  I move to strike.

14     Q.    Did you ever have a conversation

15  with anybody about any of the notes receivable

16  and whether they should be deemed to be

17  doubtful or uncollectible?  Did you have the

18  conversation, yes or no?

19          MS. DANDENEAU:  Objection to form.

20     A.    I don't recall.

21     Q.    Do you recall ever telling anybody

22  that you believed any of the notes receivable

23  on this list should be doubtful -- should be

24  deemed to be doubtful or uncollectible?

25          MS. DANDENEAU:  Objection to form.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/04/22   Page 102 of 200   PageID 28018

Page 247

1                    WATERHOUSE - 10-19-21

2        A.    I don't recall.  I mean, it may have

3   happened, you know, again, when we initially

4   getting DSI up to speed and going through

5   financials, it may have happened, but I don't

6   recall specifically.

7        Q.    While you were the CFO of Highland

8   during the time that the company was in

9   bankruptcy, did you have any reason to believe

10  that any of the notes receivable on this list

11  other than Hunter Mountain Investment Trust

12  should have been characterized as doubtful or

13  uncollectible?

14            MS. DANDENEAU:  Objection to form.

15            MS. DEITSCH-PEREZ:  Form.

16       A.    I didn't know.  I didn't form an

17  opinion.  Bankruptcy was new to me.  It still

18  is new to me, even after going through this.

19  So I really didn't know what to expect nor

20  really -- you know, I didn't know.

21            MR. MORRIS:  I move to strike.

22       Q.    During the period of Highland's

23  bankruptcy when you were serving as CFO, did

24  you have any reason to believe any of the notes

25  on this list were doubtful or uncollectible?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/09/22   Page 103 of 200   PageID 28019

Page 248

1                    WATERHOUSE - 10-19-21

2               MS. DEITSCH-PEREZ:  This is like the

3          fifth time you've asked it.  Object to the

4          form.

5               MR. MORRIS:  I'm moving to strike,

6          if you haven't noticed, because he's not

7          answering the question.

8               MS. DEITSCH-PEREZ:  He was answering

9          the question, you just didn't like it, like

10         the answer.

11              MR. MORRIS:  Good Lord.

12    Q.    Go ahead, Mr. Waterhouse.

13    A.    Again, I don't -- we brought up a

14    myriad of issues at the start of the bankruptcy

15    case.  I don't recall if this was one of them,

16    but, again, there are a lot of things we

17    couldn't change.  Even, you know, I was told

18    status quo, blah, blah, blah, right, there is a

19    stay, you can't -- you know, I don't recall

20    specifically, but that doesn't mean it didn't

21    happen.

22              MR. MORRIS:  I move to strike.

23    Q.    During the time that Highland was in

24    bankruptcy and you served as CFO, did you have

25    any reason to believe that any of the notes

1                      WATERHOUSE - 10-19-21

2     receivable on this list were doubtful or

3     uncollectible?

4                      MS. DEITSCH-PEREZ:  Object to the

5           form.

6           A.    Potentially.

7           Q.    Did you ever tell anybody that?

8           A.    As I just stated like five times,

9     yes, we -- at the beginning after filing and we

10    were getting DSI and others up to speed, you

11    know, we had a myriad of discussions of a lot

12    of things and this was likely one of them.  I

13    don't -- but I don't recall specifically we

14    talked --

15          Q.    I don't want to know -- I don't want

16    to know what was --

17                     MS. DEITSCH-PEREZ:  Wait, wait.

18          Excuse me.  Mr. Morris, you did not let him

19          finish his answer.

20          A.    I spoke -- we had -- we were

21    bringing Fred Karesa and Brad Sharp (phonetic)

22    up to speed on all of these items, contracts,

23    and investments and going through -- we had

24    hours and hours and hours of discussion.  And

25    then not only do I have to repeat this not

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 09/04/45   Page 105 of 200   PageID 28021

Page 250

1              WATERHOUSE - 10-19-21

2    once, twice, three, four times with -- you

3    know, I mean, we -- I don't -- I don't remember

4    the sum culmination of all these discussions.

5    They all kind of blend together.

6              MR. MORRIS:  Okay.  I move to strike

7         and I will try one more time.

8         Q.    Did you ever tell anybody at DSI

9    that you believed any of the notes receivable

10   on this list were doubtful or uncollectible?

11             MS. DANDENEAU:  Object to form.

12        A.    Potentially.

13        Q.    Potentially you told them or

14   potentially they were doubtful or

15   uncollectible?

16        A.    Potentially I told them that we

17   needed to look at the value of these -- of

18   these assets.

19        Q.    Okay.  Did you -- okay.  It is

20   potential that you told them and it is

21   potentially that you didn't; right?

22             MS. DANDENEAU:  Objection to form.

23        A.    I've gone through that.  I don't

24   recall specifically.

25        Q.    So you should just -- I don't want

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/09/22   Page 106 of 200   PageID 28022

Page 251

                         WATERHOUSE - 10-19-21

1    to tell what you to do.  Do you have --

2

3              MS. DANDENEAU:  Good.

4        Q.    Other than -- other than telling

5    them that they should look at the values, do

6    you have any recollection whatsoever of ever

7    having told anybody at DSI that any of the

8    notes receivable on this page were doubtful or

9    uncollectible?

10             MS. DEITSCH-PEREZ:  Object to the

11        form.

12             MS. DANDENEAU:  Objection.

13       A.    I recall having general discussions

14   about everything on our balance sheet which

15   would have included these -- these notes

16   receivable.

17       Q.    Okay.

18       A.    I don't recall specifically where

19   those discussions delved into.

20       Q.    Do you recall any discussion at all

21   on the topic of whether any of these notes on

22   this list were doubtful or uncollectible?

23             MR. AIGEN:  Mr. Morris, how on earth

24        is that question different from the

25        question that you just asked for the last

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 12/07/21    Page 107 of 200    PageID 28023

Page 252

1                WATERHOUSE - 10-19-21

2    five times?  I mean, really I thought you

3    were -- (overspeak.)

4         MR. MORRIS:  Because he never

5    answered it.

6         MS. DEITSCH-PEREZ:  Are you

7    listening to him?

8         MR. MORRIS:  You know --

9         MS. DEITSCH-PEREZ:  He basically

10   said that he had a conversation with DSI

11   that went over all of this stuff and that

12   conversation could have included the notes

13   but he doesn't recall specifically.

14        What more do you want him -- to ask

15   of him?

16        MR. MORRIS:  I want him -- I would

17   love him to say -- I would like him to

18   testify to the truth, and that is he has no

19   recollection.

20        MS. DEITSCH-PEREZ:  Well, the truth

21   as you would like to see it, but -- but he

22   is testifying truthfully.  And I -- and, by

23   the way, I move to strike that comment --

24        MR. MORRIS:  Okay.

25        MS. DEITSCH-PEREZ:  -- because it

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 03/04/452   Page 108 of 200   PageID 28024

Page 253

```
 1                   WATERHOUSE - 10-19-21

 2          suggests that he has not testified

 3          truthfully.

 4               MR. MORRIS:  I will ask my question

 5          again.  And if at any time you want to

 6          direct him not to answer, that is your

 7          prerogative.

 8          Q.    Mr. Waterhouse, do you have any

 9   recollection at all of ever telling anybody

10   from DSI that any of these notes were doubtful

11   or uncollectible?

12               MS. DANDENEAU:  Object to form.

13          A.    I don't remember specifically.

14          Q.    Do you remember generally that

15   specific topic?

16          A.    We generally talked about assets,

17   values.  If -- we had discussions of that and

18   collectability in nature.  I mean, of Highland,

19   the funds, the CLOs, the entire complex.  We

20   had discussions like that, which is, you know,

21   as you look at a billion dollar consolidated

22   balance sheet.

23               So I generally remember -- this is

24   billions of dollars, including these assets --

25   having discussions of this -- of this type.
```

Page 254

1                    WATERHOUSE - 10-19-21

2        Q.    Do you believe that an affiliate

3   loan on this list was doubtful or

4   uncollectible?  Would you have told that to

5   DSI?

6               MS. DANDENEAU:  Objection to form.

7               MS. DEITSCH-PEREZ:  Object to form.

8        A.    If we had, like -- again, if we --

9   if -- if we weren't preparing financial

10  statements in accordance with GAAP, and -- you

11  know, if DSI at that point -- they were --

12  again, I was new to bankruptcy.

13              The CRO is -- we are delegating

14  everything to the CRO.  All the decisionmaking.

15  Remember -- remember when you and I went into

16  Delaware Court and we were saying DSI basically

17  does everything, remember this, Mr. Morris?

18              You were my counsel at the time, and

19  basically we're running everything through DSI.

20  That was what this was like in the early part.

21              Everything was communicated through

22  DSI.  So DSI says this.  DSI says that.  That

23  is what we're doing, and we're pointing out

24  things to them.

25              Now, they decide what direction this

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 03/09/452   Page 110 of 200   PageID 28026

Page 255

1                     WATERHOUSE - 10-19-21

2    goes.

3         Q.    Did you point out that any of

4    these --

5         A.    I don't recall specifically.

6         Q.    Okay.  At any time that you served

7    as Highland's CFO, did you ever point out to

8    DSI that any of these loans were doubtful or

9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13        A.    If you're asking me if I had a

14   conversation with DSI, if any of these loans

15   were doubtful or uncollectible, I don't recall

16   specifically.

17        Q.    Do you recall that the debtor filed

18   on the docket monthly operating reports?

19        A.    Yes.

20        Q.    You prepared those personally,

21   didn't you?

22              MS. DEITSCH-PEREZ:  Objection to

23         form.

24        A.    I didn't personally prepare them,

25   the team did with DSI.

1                      WATERHOUSE - 10-19-21

2        Q.    But you signed them; correct?

3        A.    My signature is on the MORs.

4        Q.    And you signed them as the preparer

5   of the document; correct?

6        A.    Yes, I did this pursuant to DSI's

7   instructions.

8        Q.    Okay.  You wouldn't have signed the

9   document if you didn't believe it to be

10  accurate; correct?

11       A.    If I had reason to believe it

12  wasn't, presumably I wouldn't have signed it.

13       Q.    Okay.  And do you have any reason to

14  believe right now that any monthly operating

15  report that has your signature on it was

16  inaccurate in any way?

17            MS. DEITSCH-PEREZ:  Object to the

18       form.

19       A.    My understanding of the monthly

20  operating reports is we were filing them in

21  accordance with the standards set by the Court.

22  It wasn't -- you know, again, I don't -- you

23  know, it wasn't GAAP.  It wasn't these other

24  standards, so I testified I didn't have

25  experience in this.  The CRO was running the

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 167    Filed 03/02/452    Page 112 of 200    PageID 28028

Page 257

1                    WATERHOUSE - 10-19-21

2      show.   I followed their advice.

3           Q.    But you assured yourself that

4      everything in the report was accurate before

5      you signed them; correct?

6                    MS. DANDENEAU:   Objection to form.

7           A.    I trusted the guidance from the CRO

8      and their team and their experience and their

9      guidance for doing this for many, many, many

10     years to -- to -- to categorize and put things

11     in ways on the form.

12                   You know, my team had -- had not

13     filled out these forms before and needed all of

14     this guidance.   I'm not an expert in this.   I

15     have oversight of it.   I signed the form.   DSI

16     told me to.

17          Q.    And you and your team are the source

18     of the information that DSI used to create the

19     reports; correct?

20                   MS. DANDENEAU:   Objection to form.

21          A.    The books and records reside with

22     the -- with -- with the corporate accounting

23     team.

24          Q.    Okay.   And the corporate accounting

25     team was the corporate accounting team that was

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 03/09/22   Page 113 of 200   PageID 28029

Page 258

1                    WATERHOUSE - 10-19-21

2      under your direction; correct?

3           A.     Yes.

4           Q.     So -- so your team was responsible

5      for maintaining Highland's books and records;

6      correct?

7           A.     I'm sorry, my team was responsible?

8           Q.     Correct.

9           A.     Yes.  They -- they -- they were

10     the -- the -- the general ledger of Highland,

11     that responsibility was with the corporate

12     accounting team.

13          Q.     The corporate accounting group

14     reported to you; correct?

15          A.     Yes.

16                 MR. MORRIS:  Can we put up 41,

17          please.

18                 (Exhibit 41 marked.)

19          Q.     All right.  You will see that this

20     is a report that is dated January 31st, 2020,

21     but it is for the month ending December 2019.

22                 Do you see that?

23          A.     I do.

24          Q.     And you signed this report in your

25     capacity as the chief financial officer of

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 04/14/22   Page 114 of 200   PageID 28030

Page 259

1                    WATERHOUSE - 10-19-21

2    Highland; correct?

3         A.    Yes.

4         Q.    And you're the preparer -- you're

5    identified as the preparer of the report;

6    correct?

7         A.    That is correct.

8         Q.    Do you recall participating in the

9    preparation of monthly operating reports?

10        A.    As I testified earlier, it was put

11   together, you know, with the team.  The team

12   worked with DSI to put these monthly operating

13   reports together.  We had no experience at this

14   time of the monthly operating reports or things

15   of this nature.

16             MR. MORRIS:  Can you turn to the

17        next page, please.

18        Q.    Do you see a line item under assets

19   due from affiliates?

20        A.    Yes, I do.

21        Q.    Okay.  And to the best of your

22   knowledge and understanding, as the person who

23   is identified as the preparer of this report,

24   does that line item include the affiliate loans

25   that we've been talking about?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/04/52   Page 115 of 200   PageID 28031

Page 260

1                     WATERHOUSE - 10-19-21

2          A.     Again, I would have to see, just

3     like we did with the financial statements of

4     Highland and NexPoint, I would have to see a

5     detailed build, but, you know, if you look at

6     the other line items, you know, the only other

7     place it could be would be in -- in other

8     assets.

9          Q.     Okay.  And as a matter of

10    arithmetic, is it fair to say that is the value

11    of the assets due from affiliates was more than

12    25 percent of the value of Highland's total

13    assets as of 12/31/2019?

14               MS. DANDENEAU:  Objection to form.

15         A.     I'm really not doing the mental math

16    right now, so I've been going at this depo for

17    hours, so I'm really not -- you know --

18         Q.     All right.  No problem.

19         A.     -- these are millions of dollars.

20         Q.     Let's look at the Footnote 1,

21    please.  Do you see there is a reference to the

22    Hunter Mountain note?

23         A.     Yes, I see that in Footnote 1.

24         Q.     Okay.  And that's the reserve that

25    was taken against that note?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 09/04/52   Page 116 of 200   PageID 28032
Document 67   Page 116 of 452

Page 261

1                  WATERHOUSE - 10-19-21

2        A.    Yes, that is what this indicates.

3        Q.    Okay.  And were you aware that the

4   reserve was being taken on that it was?

5        A.    I was -- I was aware, yeah, at some

6   point, yes.

7        Q.    Okay.  And are you aware of any

8   reserve being taken with respect to any other

9   note that was issued in favor of Highland?

10       A.    Again, as I testified, we didn't go

11  through an analysis on -- on -- on the other

12  notes.

13       Q.    Can we turn --

14       A.    I believe -- I believe it says that

15  in Footnote 1, fair value has not been

16  determined with respect to any of the notes.

17             So this footnote -- footnotes, look,

18  there has been no determination.

19       Q.    Okay.  The determination was made in

20  the audited financial statements just six

21  months earlier; right?  We saw that earlier?

22       A.    That was as of 12/31/18.  I mean,

23  things -- circumstances -- there's a bank --

24  circumstances change, things change -- things

25  change over time, you know, facts and

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 167    Filed 09/04/52 Page 117 of 200    PageID 28033

Page 262

1          WATERHOUSE - 10-19-21

2   circumstances change.  Again, you have to do an

3   analysis.

4          Q.    Okay.  And you do recall that in

5   Highland's 2018 financial statement, all of the

6   notes issued by affiliates and Mr. Dondero that

7   were due at year-end had a fair value equal to

8   the carrying value; correct?  We looked at

9   that?

10         A.    Yes.  That was in the -- in the

11  disclosure for the -- for the affiliate notes,

12  yes.

13         Q.    And -- and you were obligated to

14  share with PwC any subsequent events between

15  the end of 2018 and the date that you signed

16  your management representation letter on June

17  3rd, 2019; correct?

18              MS. DEITSCH-PEREZ:  Object to the

19         form.

20         A.    Yes.  I -- I -- I signed the

21  management, you know, my signature is in the

22  management representation letter -- I hope I'm

23  answering your question -- that is dated in

24  June with the representations made in that

25  management representation letter.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/09/22   Page 118 of 200   PageID 28034

Page 263

1                   WATERHOUSE - 10-19-21

2        Q.    Okay.  And there was nothing that

3   caused PricewaterhouseCoopers to include in

4   subsequent events any adjustment to the

5   conclusion that the fair value of the affiliate

6   notes and the notes issued by Mr. Dondero

7   equaled the carrying value; correct?

8                   MS. DANDENEAU:  Objection to the

9        form.

10       A.    That is correct.  That is what was

11  in the -- in the -- in the footnotes.

12       Q.    Okay.  So are you aware of anything

13  that occurred between June 3rd, 2019 and

14  December 31st, 2019 that would have caused the

15  fair value of the notes to differ from the

16  carrying value?

17       A.    Yeah.  Highland filed for

18  bankruptcy, things changed -- I mean, there was

19  a bankruptcy filed in October of -- of -- of

20  2019, right, the petition date that we've

21  described earlier.

22             I mean, I had a -- I guess looking

23  back naively, I thought we were going to get an

24  audit from PwC for year-ended 2019, and when we

25  had discussions with PwC, they were like, are

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/09/24   Page 119 of 200   PageID 28035

Page 264

1                      WATERHOUSE - 10-19-21

2      you crazy, we're not auditing this.  Values

3      change, all these things change, bankruptcy

4      changes the entire scenario.  I mean -- and

5      they're like, we're not -- we're not touching

6      this.

7                  And so, you know, I was like, okay,

8      sorry, I get it, okay, no an audit.

9                  I mean, it is -- you know, and --

10     you know, and we weren't preparing GAAP

11     financial statements.

12                 Again, I didn't know what we were

13     doing in relation to our financial statements,

14     but these were the discussions I was having at

15     the time.  And yeah, I mean, filing bankruptcy

16     from what I got from outside auditors and

17     others involved changed things dramatically.

18        Q.    Okay.  Highland wasn't the obligor

19     under any of the notes that we're talking

20     about; correct?

21        A.    No.

22        Q.    So --

23        A.    That's right.

24        Q.    So can you identify any fact that

25     would cause the fair value to deviate from the

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 12/20/21   Page 120 of 200   PageID 28036

Page 265

1                    WATERHOUSE - 10-19-21

2    carrying value during the seven-month period

3    between June 3rd and the end of the year, 2019?

4              MS. DANDENEAU:  Objection to form.

5         A.    No.  I mean, I'm putting myself back

6    at that time, right.  Hindsight is 2020, but we

7    didn't do an analysis, but we would have done a

8    fulsome analysis and looked at all of the facts

9    and circumstances at the time, but asset values

10   change.  You know, there could have been a

11   market crash in hindsight in 2020, which --

12   which affected entities' abilities.

13             There could have been all of these

14   things, right, that -- that happen.  It is --

15   it is easy to look back in hindsight, but when

16   you are looking at this in -- in realtime, the

17   analysis is different, and again, we didn't do

18   an analysis.

19        Q.    Okay.  You didn't do an analysis.

20             Do I have that right?

21        A.    I don't -- I don't recall doing one

22   or maybe -- you know, I don't recall doing one.

23             MR. MORRIS:  Okay.  I'm going to

24        take a break.  I may be done, so the time

25        now is -- is 4:30 your time.  Let's just

 1                    WATERHOUSE - 10-19-21

 2         take a short break until 4:40 your time.

 3               MS. DANDENEAU:  Okay.

 4               VIDEOGRAPHER:  We're going off the

 5         record, 4:31 p.m.

 6         (Recess taken 4:31 p.m. to 4:43 p.m.)

 7               VIDEOGRAPHER:  We are back on the

 8         record at 4:43 p.m.

 9               MR. MORRIS:  I have no further

10         questions.

11               MR. RUKAVINA:  Okay.

12         Mr. Waterhouse, I will go next.

13                     EXAMINATION

14   BY MR. RUKAVINA:

15         Q.    Sir, my name is Davor Rukavina.  I'm

16   the lawyer for --

17               MR. MORRIS:  Hey, Davor, just before

18         you begin, I just want to put on the record

19         Highland's objection to documents that were

20         produced to me 10 minutes before the

21         deposition began.

22               MR. RUKAVINA:  What the basis of

23         your objection?

24               MR. MORRIS:  That they were due

25         quite some time ago, and the fact that you

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/29/4452   Page 122 of 200   PageID 28038

Page 267

```
 1                   WATERHOUSE - 10-19-21

 2         had -- I just think it's appropriate to --

 3         to dump documents on somebody 10 minutes

 4         before the deposition.  I just think

 5         that's --

 6              MR. RUKAVINA:  Well, these are

 7         documents Highland produced.  I'm not aware

 8         of any rule I have to give you advance

 9         documents when I know for the record that

10         other than the exhibits that you sent to us

11         last week, most of the exhibits you used

12         today you did not provide to me prior to

13         this deposition.

14              MR. MORRIS:  No, but the documents

15         were produced by me in -- in litigation,

16         right?

17              MR. RUKAVINA:  I'm going to use

18         primarily, John, the documents that you

19         produced to me today, but you may.

20              MR. MORRIS:  Primarily.  I've got --

21         I've got my objection.  You have got your

22         response.  Proceed.

23         Q.   Mr. Waterhouse, again, I represent

24    the advisors, HCMFA and NexPoint Advisors.

25              Do you understand that?
```

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 87    Filed 01/09/22    Page 123 of 200    PageID 28039

Page 268

1                     WATERHOUSE - 10-19-21

2          A.    Yes.

3          Q.    You and I have never met or talked

4    before today, have we?

5          A.    No, I have -- I have heard your

6    voice on calls before.

7          Q.    Okay.

8                MR. RUKAVINA:  Madam Court Reporter,

9          I will use a few exhibits today.  My

10         associate, Mr. Nguyen, will find some way

11         to get them to you.  I don't know how to do

12         that, but it looks like you guys do.

13               I am going to use numbers as well.

14         But to differentiate them from Mr. Morris

15         we're going to mark mine with the prefix A

16         for advisors.

17               Do you understand?

18               COURT REPORTER:  Yes.

19               MR. RUKAVINA:  Okay.  Perfect.

20         Q.    Okay.  So, Mr. Waterhouse, let's

21    start with those two HCMFA notes that you were

22    asked about, one for 5 million and one for

23    2.4 million.

24               Do you recall those notes?

25         A.    Yes.

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 12/24/21    Page 124 of 200    PageID 28040

Page 269

1                    WATERHOUSE - 10-19-21

2         Q.    Were you ever the CFO of HCMFA?

3         A.    I don't recall.

4         Q.    So to the best of your recollection,

5    you were still an officer of HCMFA in 2019,

6    just that your title was treasurer?

7              MR. MORRIS:  Object to the form of

8         the question.  There is no leading here.

9         He works for your client.

10             MS. DANDENEAU:  That is not -- that

11        is not true.

12             MR. MORRIS:  He's the treasurer --

13        he is the treasurer of your client.  I

14        don't -- I'm going to object every time you

15        try to lead, so...

16             MR. RUKAVINA:  Totally fine to

17        object.

18             MR. MORRIS:  Okay.

19        Q.    Please answer my question,

20   Mr. Waterhouse.

21        A.    I'm sorry, could you repeat?  There

22   was...

23        Q.    Yes.  You were -- you testified

24   earlier that in 2019 you were an officer of

25   HCMFA; correct?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 67   Filed 03/29/04452 Page 125 of 200   PageID 28041

Page 270

1                    WATERHOUSE - 10-19-21

2          A.    Yes, I testified that I was the

3    treasurer and I didn't know if that incumbency

4    certificate, you know, was one that appointed

5    me as a treasurer, but yes.

6          Q.    I'm just trying to confirm that

7    sitting here today, to the best of your

8    recollection, at that time you were -- your

9    title was treasurer.  It was not chief

10   financial officer.

11         A.    I don't recall that being my title.

12         Q.    Okay.  And in May of 2019, however,

13   I think you testified you were the chief

14   financial officer of the debtor; correct?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes, I was -- yes.

18         Q.    Okay.  As such, in May of 2019, did

19   you have the authority, to your understanding,

20   to unilaterally loan $5 million or $2.4 million

21   to anyone on behalf of the debtor?

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Sorry, can you repeat that?

25         Q.    Yes.  So in your capacity as the

1          WATERHOUSE - 10-19-21

2   chief financial officer of the debtor, Highland

3   Capital Management, L.P., in May of 2019, did

4   you believe that you unilaterally, just Frank

5   Waterhouse, had the authority to loan on behalf

6   of the debtor to anyone $5 million and

7   $2.4 million?

8          MR. MORRIS:  Objection to the form

9      of the question.

10   A.   No.

11   Q.   Is it because loans of that amount

12   would have had to be approved by someone else?

13   A.   Yes.

14   Q.   Who in '20 -- in May of 2019, if

15   Highland wanted to loan 5 million or

16   $2.4 million to someone, what would have been

17   the internal approval procedure?

18          MR. MORRIS:  Objection to the form

19      of the question.

20   A.   If -- if we had loans of that nature

21   that needed to be made due to their size, we

22   would have gotten approval from the -- the

23   president of Highland.

24   Q.   And who that was individual?

25   A.   It was James Dondero.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 02/13/02   Page 127 of 200   PageID 28043

Page 272

 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  Now, I'm going to ask you a

 3    similar question but for a different entity.

 4              In May of 2019, as the treasurer of

 5    HCMFA, did you believe that you unilaterally

 6    had the ability to cause HCMFA to become the

 7    borrower of a $5 million loan and a

 8    $2.4 million loan?

 9              MR. MORRIS:  Objection to the form

10         of the question.

11        A.    No.

12        Q.    What would -- what would the

13    approval have taken place -- strike that.

14              What would the approval process have

15    been like in May of 2019 at HCMFA for HCMFA to

16    take out a $7.4 million loan?

17              MR. MORRIS:  Objection to the form

18         of the question.

19        A.    The process would have been similar

20    to what we just discussed on -- for Highland to

21    make a loan to others.  So, again, you know,

22    we -- we would have -- either myself or someone

23    on the team would have discussed this with

24    the -- the president and owner of -- of HCMFA.

25        Q.    And who was that individual?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/28/452   Page 128 of 200   PageID 28044

Page 273

1           WATERHOUSE - 10-19-21

2       A.     That was James -- Jim Dondero.

3       Q.     So do I understand that in May of

4   2019, on behalf of both the lender, Highland,

5   and the borrower, HCMFA, Mr. Dondero would have

6   had to approve $7.4 million in loans?

7           MR. MORRIS:  Objection to the form

8       of the question.

9       A.     Yes.

10      Q.     You mentioned when Mr. Morris was

11  asking you the NAV error, N-A-V error, with

12  respect to TerreStar, without writing us a

13  novel, unless you feel like you have to, can

14  you summarize what that NAV error was?  What

15  happened?

16      A.     There was a -- in the Highland

17  Global Allocation Fund, it owned at the time an

18  equity interest in a company called TerreStar.

19  And TerreStar is -- at the time was a private

20  company, and it may still be today.  Again, I'm

21  putting myself back then as a private company.

22           We had -- sorry, I don't mean we --

23  the fund and the advisor used Houlihan Lokey

24  to -- to value that investment.  And during

25  that time there was some trades that were

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/04/22   Page 129 of 200   PageID 28045

Page 274

```
1                    WATERHOUSE - 10-19-21

2     executed at market levels that were much lower

3     than the Houlihan Lokey model.

4                    And based on information and

5     discussions with the portfolio managers and,

6     you know, principals that were very familiar

7     with TerreStar, it was determined that those

8     trades were non-orderly and they were not

9     considered in the valuation as consulted with

10    Houlihan Lokey and PricewaterhouseCoopers at

11    the time.

12                   Subsequent to a -- I can't remember

13    the exact circumstances of why the SEC got

14    involved.  I think it was due to this -- this

15    investment became a material position in the

16    fund.  It triggered an SEC, kind of, inquiry.

17    And as part of that inquiry, they questioned

18    the valuation methodology.  "They" meaning the

19    SEC.

20                   And at the culmination of that

21    process -- this is all summarized -- the value

22    that was -- that ultimately had to be used in

23    the fund's NAV was different than -- materially

24    different than what the original valuation at

25    Houlihan Lokey provided.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 67   Filed 09/04/152   Page 130 of 200   PageID 28046

Page 275

 1                    WATERHOUSE - 10-19-21

 2              And given that there was this fund

 3    was, as we discussed -- I don't know if we

 4    discussed it, but it was an open-ended fund

 5    that was going -- that was converting to a

 6    close-end fund.

 7              Due to the fact that it was an

 8    open-ended fund, you had to recalculate NAV and

 9    see what the impact was on people -- on

10    investors coming in and out of the fund and if

11    there is a detrimental impact and to calculate

12    what that -- what that impact was and if there

13    was any amounts owed to the fund pursuant to

14    the error.

15        Q.    Were you personally involved

16    internally at either Highland or HCMFA with

17    these investigations and discussions with the

18    SEC?

19        A.    I was.

20        Q.    Which other key people or senior

21    people at Highland were involved, to your

22    recollection?

23        A.    Myself, Thomas Surgent, David Klos,

24    Lauren Thedford, Jason Post.

25        Q.    Mr. Dondero, was he --

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 09/01/22   Page 131 of 200   PageID 28047

Page 276

1                   WATERHOUSE - 10-19-21

2          A.    I believe Cliff Stoops.  I'm trying

3     to think.  And maybe that is -- that is -- that

4     is -- that is all kind I can recall at the

5     moment.

6          Q.    Do you recall whether it was

7     determined that the fund suffered losses as a

8     result of this error?

9          A.    The -- the fund -- the -- the --

10    because the open-ended nature of the fund,

11    there were losses that were attributable to

12    investors.  Meaning they -- they would have

13    redeemed and got a less money or -- or they

14    subscribed in and maybe because they didn't get

15    enough shares and then they later sold and then

16    they were harmed in that fashion.

17               And there is -- there is -- there

18    were very -- there were very detailed

19    calculations and, you know, all these different

20    scenarios that we had to -- I'm sorry, I keep

21    saying "we" -- that the individuals involved

22    had to calculate and quantify.

23         Q.    Well, do you recall whether HCMFA

24    admitted certain fault and liability for this

25    error?

                         WATERHOUSE - 10-19-21

1

2        A.    I don't recall specifically.

3        Q.    Do you recall whether HCMFA caused

4   any funds to be paid to the investors and the

5   fund the subject of the NAV error?

6        A.    Yes.

7        Q.    Do you recall the approximate amount

8   of funds, moneys paid to the investors and the

9   fund?

10       A.    It was -- it was approximately

11  $7 million.

12       Q.    If I was to suggest 7.8 million,

13  would that ring more true or are you sticking

14  with your original answer?

15       A.    It was -- it was approximately 7 --

16  7 to $8 million.  Again, I don't remember the

17  exact number, but it was in that ballpark.

18       Q.    So regardless of whether HCMFA

19  accepted fault or liability, it caused some

20  $7 million or more to be paid out to affected

21  investors in the fund?

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.    And I want to make sure I'm

25  understanding your question because there is a

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/09/452 Page 133 of 200   PageID 28049

Page 278

1                        WATERHOUSE - 10-19-21

2     lot of different entities that are going on to

3     my head.

4                    I think what you are saying is based

5     on this error, shareholders were harmed by this

6     approximately $7.8 million -- by approximately

7     $7.8 million.  Is that what you are asking?

8          Q.    Yes, sir.

9          A.    Yes, that was -- again, I don't have

10    the exact numbers.  If I take -- it was -- it

11    was in that ballpark, and there is a detail

12    calculation and write-up that could, that --

13    that exists someplace.

14         Q.    Now, at that time, at the time that

15    the NAV error occurred, was there a contract in

16    place between HCMFA and the debtor pursuant to

17    which the debtor was providing services to

18    HCMFA?

19                    MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Was that contract generally called a

23    shared services agreement?

24         A.    It was generally called that, but

25    there were -- there were -- I mean, it -- it --

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 03/04/22   Page 134 of 200   PageID 28050

Page 279

1                    WATERHOUSE - 10-19-21

2    it depends on who you talk to, but yes,

3    generally, there were -- there are multiple

4    agreements.

5         Q.    Pursuant to one or more of those

6    agreements, was the debtor providing certain

7    services to HCMFA?

8              MR. MORRIS:  Objection to the form

9         of the question.

10        A.    Yes.

11        Q.    And can you at a very high level

12   summarize in 2018 and 2019 what those services

13   were?

14        A.    Yes, there was a -- yes.

15        Q.    Okay.  Please -- please go -- go

16   through a short summary.

17        A.    There was a -- a cost reimbursement

18   agreement between Highland Capital Management

19   Fund Advisors and Highland Capital Management,

20   L.P.  That agreement was for what we referred

21   to as front office services, so investment

22   management, things of that nature.

23              There was I think what most people

24   refer to as the shared services agreement that

25   was -- that agreement was between Highland

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 87    Filed 09/04/52    Page 135 of 200    PageID 28051

Page 280

1                    WATERHOUSE - 10-19-21

2      Capital Management Fund Advisors and Highland

3      Capital Management for back office services.

4          Q.    And can you summarize what you mean

5      by back office services?

6          A.    Those services were for accounting,

7      finance, tax, valuation, HR, IT, you know,

8      legal compliance, things of -- things of those

9      nature -- or things of that nature, excuse me.

10         Q.    So in the spring of 2019, do you

11     recall whether HCMFA took the position that it

12     was actually Highland that caused the NAV error

13     to occur pursuant to the valuation services

14     that Highland was providing?

15             MR. MORRIS:  Objection to the form

16         of the question.

17         A.    I do not recall.

18         Q.    Did you ever have any discussions

19     with anyone, Jim Dondero or anyone in the first

20     half of 2019 as to whether Highland, the

21     debtor, that is, had any liability to HCMFA

22     related to the NAV error?

23             MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I do not recall.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 01/14/22   Page 136 of 200   PageID 28052

Page 281

1          WATERHOUSE - 10-19-21

2       Q.    And then you mentioned that the fund

3   was being closed and some compensation related

4   to that.  Can you -- can you elaborate?  What

5   were you referring to?

6       A.    Right.  So the advisor, pursuant to

7   board approval, put a proposal in front of the

8   shareholders of the Highland Global Allocation

9   Fund to convert it from an open-ended fund to a

10  closed-end fund.

11          So an open-ended fund, when

12  shareholders subscribe to the fund or redeem

13  into the fund, they do it at NAV.

14          When it is -- when you have a

15  closed-end fund, closed-end funds are -- are

16  publicly-traded, like on the New York Stock

17  Exchange, exchanges like that, and -- and

18  shareholders or investors, they're not --

19  they're -- they're not subscribing and

20  redeeming with the fund.  They are like shares

21  of Apple.

22          Those shares of the Highland Global

23  Allocation Fund trade on an exchange, and that

24  is how you, you know, that is how, you know,

25  you become an equity owner in the fund or you

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 09/04/52   Page 137 of 200   PageID 28053

Page 282

```
 1                WATERHOUSE - 10-19-21

 2   sell your shares and you are no longer an

 3   equity owner.

 4              As part of that proposal, the

 5   advisor told shareholders if you -- if you vote

 6   for this proposal to -- to convert it from an

 7   open-ended fund to a closed-end fund, we will

 8   pay you some amounts of money.  I forgot -- a

 9   certain number of points.  I think it was

10   like -- it was like two to three points or

11   something -- something like that.

12        Q.    Okay.  You mentioned when Mr. Morris

13   was asking you, going back to those two

14   promissory notes, you will recall the 5 million

15   and 2.4 million, you mentioned something to the

16   effect that Mr. Dondero told -- told you to pay

17   some moneys out of Highland.  Do you remember

18   that discussion with Mr. Morris?

19        A.    I do.

20        Q.    So, to the best of your

21   recollection, did you have a discussion with

22   Mr. Dondero about making some payments in May

23   of 2019 out of Highland?

24        A.    I recall, as I testified earlier,

25   that I had a conversation with Mr. Dondero
```

```
 1                    WATERHOUSE - 10-19-21

 2    for -- for these amounts attributable to -- it

 3    was either the error -- you know, the error,

 4    and in that conversation he said, go get the

 5    money from Highland.  I believe that is what I

 6    testified earlier, and that -- that is my

 7    recollection.

 8          Q.    Do you recall if that was an

 9    in-person meeting or some other mode for the

10    meeting?

11          A.    I -- I -- I recall that being

12    in-person.

13          Q.    Do you recall if anyone else was

14    present, or was it just you and Mr. Dondero?

15          A.    I recall just he and I.

16          Q.    And the moneys that he told you to

17    find from -- or get from Highland, was that in

18    the amount of $5 million and $2.4 million?

19                MR. MORRIS:  Objection to the form

20          of the question.

21          A.    I believe so, but I would have to go

22    back and look and see when those moneys were

23    actually paid into the -- into the fund and,

24    you know, when those transfers were done.  If

25    they were all done around that same time, then
```

```
 1                    WATERHOUSE - 10-19-21

 2    yes, I would say it was -- it was all related

 3    to that.

 4         Q.    Did Mr. Dondero tell you that those

 5    funds would be a loan from Highland to HCMFA?

 6         A.    I don't recall.

 7              MR. MORRIS:  Objection to the form

 8         of the question.

 9         Q.    Now, and forgive me, I'm probably

10    the only non-American born here, but I speak

11    reasonably well in English.  I don't recall,

12    does that mean you don't remember or does that

13    mean it didn't happen?

14              MR. MORRIS:  Objection to the form

15         of the question.

16         A.    It -- it means I don't -- I don't

17    remember.

18         Q.    Did Mr. Dondero tell you to have

19    those two promissory notes prepared?

20         A.    I don't recall.

21         Q.    When you -- again, when you say, I

22    don't recall today, that means that sitting

23    here today, you just don't remember one way or

24    the other.  Is that accurate?

25         A.    Yes.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 01/09/24   Page 140 of 200   PageID 28056

Page 285

```
 1                 WATERHOUSE - 10-19-21

 2      Q.    Is it possible that you, having

 3  heard what Mr. Dondero said and seeing funds

 4  being transferred, assumed that that would be a

 5  loan without him actually telling you that

 6  would be a loan?

 7            MR. MORRIS:  Objection to the form

 8      of the question.

 9      A.    Sorry, I want to make sure -- did I

10  ask the amounts that were transferred that I --

11  that -- that I assumed that that was a loan?

12      Q.    Well, let me -- let me take -- let

13  me try again.

14            So you have established already that

15  there were quite a number of promissory notes

16  back and forth -- I'm sorry, quite a number of

17  promissory notes with affiliated companies and

18  individuals owing Highland money; right?

19      A.    Yes.

20      Q.    And you have established that there

21  were many transactions and transfers going back

22  and forth over the years; right?

23            MS. DANDENEAU:  Objection to form.

24      A.    In -- yes, in my capacity as CFO and

25  my employment, yes, that is -- yes.
```

1                    WATERHOUSE - 10-19-21

2         Q.    And that's part of the reason why

3    you just can't remember some of the details

4    today because this -- this happened years ago,

5    and there were a number of transactions.    Is

6    that accurate?

7              MS. DANDENEAU:    Objection to the

8         form.

9              MR. MORRIS:    Objection to the form

10        of the question.

11        A.    I mean, I deal with thousands of --

12   of -- of -- of transactions, you know, whether

13   it has -- the processing of transactions, you

14   know, if it has got, you know, more -- more

15   zeros, you know, behind it than others.

16              When you look at thousands of

17   transactions over the years for funds and

18   advisors and -- and, you know, financial

19   statements, I mean, it is -- it is very hard

20   going back in -- in -- in my -- you know,

21   14-ish year career at -- at Highland to

22   remember a lot of those details, especially

23   when I don't have any records or books or

24   anything like that, and -- and going back many

25   years.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/09/22   Page 142 of 200   PageID 28058

Page 287

WATERHOUSE - 10-19-21

1

2      Q.    And that is fine.  That -- that --

3   that is why I asked the question.

4            Is it possible in May of 2019 when

5   Mr. Dondero told you to transfer the funds from

6   Highland, you just assumed on your own that

7   those would be loans without him actually

8   telling you that those would be loans?

9            MR. MORRIS:  Objection to the form

10       of the question.

11      A.    I don't know.

12      Q.    I'm sorry, you --

13      A.    I said I don't know.

14      Q.    Okay.  Well, as the -- as the CFO

15   for Highland, if you saw $7.4 million going

16   out, you would feel some responsibility to

17   account for that, wouldn't you?

18            MR. MORRIS:  Objection to the form

19       of the question.

20      A.    Yes.

21      Q.    Is it fair to say that those would

22   be in the range large enough to rise up to your

23   level?

24            MR. MORRIS:  Objection to the form

25       of the question.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 03/09/452   Page 143 of 200   PageID 28059

Page 288

```
 1                  WATERHOUSE - 10-19-21

 2        A.    If -- I don't know if I understand

 3   your question.  Those amounts would arise to my

 4   level where I would be involved or...

 5        Q.    You would want to know what a

 6   transfer for that amount, $7.4 million, was all

 7   about, as the CFO of Highland, wouldn't you?

 8              MR. MORRIS:  Objection to the form

 9        of the question.

10        A.    Yes, I make it -- I mean, I -- I

11   review all sorts of payments, I mean, even

12   smaller dollar payments on a periodic basis,

13   you know, to -- to -- to understand and to make

14   sure that we are paying things in a -- you

15   know, in -- in -- in an informed way.  And, you

16   know -- and we're -- and we're paying things

17   pursuant to vendor contracts and things like

18   that.

19        Q.    So as part of that, is it possible

20   that seeing $7.4 million go out you would have

21   promissory notes made in order to keep a paper

22   trail, assuming that those were loans, when

23   perhaps they were never intended to be loans by

24   Mr. Dondero?

25              MR. MORRIS:  Objection to the form
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/09/22   Page 144 of 200   PageID 28060

Page 289

1                    WATERHOUSE - 10-19-21

2          of the question.

3          A.    I don't know.  As I testified

4     earlier, I had conversations with Mr. Dondero

5     about -- about the -- the -- the moneys that

6     were needed for the NAV error.  And I recall

7     him saying go get it from Highland -- or get it

8     from Highland.

9          Q.    Well, why did you sign those

10    promissory notes and why didn't you have him

11    sign them?

12               MR. MORRIS:  Objection to the form

13         of the question.

14         A.    I don't know.  I don't know.

15         Q.    You mentioned earlier that you

16    typically don't sign promissory notes.  Am I

17    remembering your testimony correctly?

18               I mean, promissory notes on behalf

19    of the entities.  Not yourself, obviously.

20         A.    Yes, that is what I said earlier.

21         Q.    Do you recall any other promissory

22    notes in the million-plus range that you had

23    ever signed before on behalf of any entity?

24         A.    There is -- there has been a lot of

25    transactions over the years.  I don't -- I

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 87    Filed 03/09/452    Page 145 of 200    PageID 28061

Page 290

1                    WATERHOUSE - 10-19-21

2    don't -- I don't recall generally.  I don't --

3    I don't recall.

4         Q.    So -- but to the best of your

5    recollection, it was on your initiative,

6    following your discussion with Mr. Dondero,

7    that you had someone draft those two promissory

8    notes; is that correct?

9              MR. MORRIS:  Objection to the form

10         of the question.

11        A.    Yes, we would have -- the team, as I

12   stated earlier, we don't draft promissory

13   notes.  "The team" meaning the accounting and

14   finance team.

15             So the team would have worked with

16   the legal group at Highland to draft any notes.

17        Q.    Do you believe or do you have any

18   recollection as to whether you would have done

19   that pursuant to an email or telephone call or

20   in-person meeting?

21             MR. MORRIS:  Objection to the form

22         of the question.

23        A.    Are you asking if I would have -- if

24   those notes would have been drafted pursuant to

25   an email or phone call?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 01/09/22   Page 146 of 200   PageID 28062

Page 291

1                    WATERHOUSE - 10-19-21

2        Q.    Strike that.

3              Do you recall whether you sent an

4    email to anyone asking them to draft those two

5    promissory notes?

6        A.    I don't recall because, again,

7    once -- I would have instructed -- likely

8    instructed the team to -- to work with the

9    legal group to draft these documents.

10             I -- I -- I -- yeah, I didn't -- I

11   mean, that is more an operational-type

12   procedure.  So, you know, a manager or a

13   controller or working with legal.  You know,

14   they -- they can certainly handle that task to

15   get that -- you know, to request that from

16   legal.

17       Q.    And who on your team do you think

18   you would have asked to do that?

19             MR. MORRIS:  Objection --

20       Q.    Who would have been the logical

21   person or people, if you don't remember their

22   name today?

23             MR. MORRIS:  Objection to the form

24       of the question.

25       A.    It -- it -- there is only two

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 11/30/21    Page 147 of 200    PageID 28063

Page 292

1                    WATERHOUSE - 10-19-21

2    managers of the group.  That would have been

3    Dave Klos or Kristin Hendrix.

4              Dave was the -- one of his duties

5    was managing the valuation team, and so he was

6    intimately involved with this process.  So, you

7    know...

8         Q.    Okay.

9         A.    I don't recall specifically but, I

10   mean, my general -- you know, I -- I -- I

11   likely would have talked to Dave first about it

12   versus someone like Kristin who hadn't been

13   intimately involved.

14        Q.    And -- and do you have a view as to

15   whether it is most likely that you would have

16   done that by email or in-person or how would

17   you believe you would have communicated that to

18   Mr. Klos?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I likely would have done that in

22   person.  Again, if things of this nature

23   that -- again, you have to put ourselves back

24   to, we have been working on this very stressful

25   project for many, many months.  And once the

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 09/04/452    Page 148 of 200    PageID 28064

Page 293

1                   WATERHOUSE - 10-19-21

2    go-ahead was to -- you know, we see the light

3    at the end of the tunnel with wrapping this up

4    and making shareholders whole -- sorry to say

5    "we" -- you know, the -- so the folks that are

6    involved in it.

7                   I like to talk to people

8    face-to-face and -- and -- and go to -- and go

9    to their desk, because that shows if I'm going

10   to their desk that -- that is something that I

11   want done, you know.

12        Q.    And do you remember, Mr. Waterhouse,

13   getting those two promissory notes in paper

14   format or by email before they were executed?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall.

18        Q.    For whatever was the ordinary course

19   back then in May 2019, would you expect to have

20   received them only on paper or would you have

21   expected to have received them in Word document

22   or PDF document by email?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I -- I didn't sign -- I signed very

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 03/09/22   Page 149 of 200   PageID 28065

Page 294

1                    WATERHOUSE - 10-19-21

2    few documents via email.  I can't say that it

3    never happened, but people either stopped by my

4    office and physically walked in documents for

5    signature that we discussed face-to-face.

6                    Or documents were -- if -- if --

7    if -- if -- let's say I wasn't there or I

8    wasn't available, documents were dropped off.

9    I had -- I had some in- and outboxes in front

10   of my -- my office there at the Crescent.

11                   Documents would be dropped off for

12   signature.  There would be a cover sheet that

13   would be -- have been applied to those

14   documents detailing, you know, who dropped it

15   off, the purpose, why, what time.

16                   And then, you know, as I stated, I

17   don't draft documents and I always go to the

18   legal group and the compliance group to make

19   sure that they're in the loop.  And there is

20   a -- a box or section that says, Has legal

21   reviewed or approved, or something to that

22   nature.

23                   Again, I don't -- I don't have

24   access to that cover sheet anymore, but it

25   was -- it was something to that effect.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 03/30/452   Page 150 of 200   PageID 28066

Page 295

```
 1                      WATERHOUSE - 10-19-21

 2              And my assistant, you know, if she

 3   was there, she would review that -- you know,

 4   whatever was being dropped off.  And if that

 5   has legal, you know, reviewed or -- reviewed or

 6   approved it, if that wasn't -- if that stuff

 7   hadn't been done, it was like she would just

 8   tell them like, go -- go -- go to the legal

 9   group, because --

10       Q.    Let me -- let me pause --

11             MS. DANDENEAU:  Let him finish.

12             MR. MORRIS:  Thank you.  Go ahead.

13       A.    I take -- go to the legal group

14   because that -- that was my -- you know, I

15   didn't -- I didn't review anything that -- that

16   they weren't -- you know, or there wasn't some

17   representation made to me that they had

18   reviewed, approved in some capacity.

19              Again, my -- my -- my goal, as CFO,

20   is to provide transparency and make sure that

21   groups like compliance and other things -- and

22   the other group in legal are -- are in -- you

23   know, their -- they're made aware of

24   transactions of -- you know, that are crossing

25   my desk.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 01/09/24   Page 151 of 200   PageID 28067

Page 296

1                    WATERHOUSE - 10-19-21

2               Because I'm not in every

3    conversation.  They're not in every

4    conversation -- meaning legal compliance -- and

5    I just want to make sure that -- that everyone

6    is in sync to, you know, to -- to the extent

7    possible.

8        Q.    So if we summarize, you don't

9    specifically remember signing these two notes,

10   but most likely it would have been that they

11   would have presented -- been presented to you

12   physically on paper?

13               MR. MORRIS:  Objection to the form

14       of the question.

15       A.    They would -- they would have been

16   presented physically on paper most likely or

17   someone would have left it.  But, I mean,

18   again, I don't -- I don't recall.

19       Q.    I understand.  Understand.

20               When you signed -- when you signed

21   documents, when you personally signed

22   documents, did you typically use a ink pen or

23   did you use a stamp?

24       A.    No, I -- I -- I use a -- an -- an

25   ink pen.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/04/22   Page 152 of 200   PageID 28068

Page 297

1                    WATERHOUSE - 10-19-21

2        Q.    Do you know -- was there a file at

3   Highland kept anywhere with ink-signed

4   originals of a promissory notes in general or

5   these two promissory notes specifically?

6              MR. MORRIS:  Objection to the form

7        of the question.

8        A.    Sorry, I just want to make sure I

9   understand your question.  Are you saying is

10  there a file somewhere that has ink-signed

11  originals of these two promissory notes?

12       Q.    Yes.

13       A.    I would -- I would assume they're

14  some place.  I mean --

15       Q.    Well, was there a -- was there a

16  place where Highland generally kept originals

17  of promissory notes owed to it?

18       A.    I wouldn't -- no.

19             MR. RUKAVINA:  Mr. Nguyen, would you

20  please pull up my A7, alpha 7.

21       Q.    These are the two promissory notes,

22  Mr. Waterhouse.

23             (Exhibit A7 marked.)

24       Q.    And please -- Mr. Waterhouse, please

25  command my associate to scroll down as you need

Page 298

1                    WATERHOUSE - 10-19-21

2     to, but I want you to take a very close look at

3     your two signatures here and tell me whether

4     you believe, in fact, that you ink signed them

5     or whether you --

6                    MS. DANDENEAU:  Mr. Rukavina,

7          Mr. Waterhouse has the copies.

8                    MR. RUKAVINA:  Perfect.  Then you

9          can take this down, Mr. Nguyen.

10         A.    These -- these -- these signatures

11    are identical, now that I stare at them, and I

12    mean, they are so close -- I mean, they're

13    identical that, I mean, even with my chicken

14    scratch signature, I don't know if I can -- you

15    know, I do this 100 times, could I do that

16    as -- as precisely as I see between the two

17    notes.

18         Q.    Well, that is why I ask.

19    Mr. Waterhouse, now that you have examined

20    them, does it seem like it is more likely that

21    you actually electronically signed these?

22                   MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Is -- I don't -- I don't recall

25    specifically.  As I said before, my assistant

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 03/04/22    Page 154 of 200    PageID 28070

Page 299

1                    WATERHOUSE - 10-19-21

2     did have a -- an electronic signature, and that

3     was used from time to time.  It wasn't as

4     common practice back in 2019.  It definitely

5     was more common practice when we had to work

6     from home and remotely for COVID because it

7     that made it almost impossible to, right,

8     provide wet signatures since we're all working

9     from home remotely.

10          Q.    Well, going just for these two

11    promissory notes, Mr. Waterhouse, in light of

12    your inability to remember any details, are you

13    sure you actually signed either or both of

14    those notes?

15                MS. DANDENEAU:  Objection to form.

16          A.    I don't recall specifically

17    signing -- actually physically signing these

18    notes.  As I said before, I don't recall doing

19    that.  This -- this looks like my signature,

20    but yet these two signatures are identical.

21          Q.    So you don't recall physically

22    signing them, and I take it you don't recall

23    electronically signing them either?

24          A.    I don't recall.  You know, Highland

25    has all my emails.  If that occurred, you know,

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 67    Filed 03/09/1452    Page 155 of 200    PageID 28071

Page 300

WATERHOUSE - 10-19-21

1

2  you know, I don't have any of these records is

3  what I'm saying.  I don't have any of those

4  records.

5      Q.    That is why I'm asking you these

6  questions in great detail because I don't have

7  those emails.  I'm trying to -- I'm hoping that

8  you will give me some names or some details so

9  I can go look for more emails, but again, you

10  don't remember any -- any individual, other

11  than Mr. Dondero that we've discussed, you

12  don't remember any individual with whom you

13  discussed these promissory notes prior to their

14  execution?

15          MR. MORRIS:  Objection to the form

16      of the question.

17      A.    I don't recall discussing it with

18  anybody else.

19      Q.    Okay.

20      A.    I mean, prior --

21      Q.    I understand.

22      A.    You know, there was no one else --

23  there was no one else in that meeting that I

24  recall with Mr. Dondero.

25      Q.    Now, when you established that by

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 03/04/22   Page 156 of 200   PageID 28072

Page 301

```
1                     WATERHOUSE - 10-19-21

2    May of 2019 --

3         A.    And -- and from what I recall, and

4    the reason why I was by myself is -- is, you

5    know, I don't -- I don't want to speculate, I'm

6    sorry.

7         Q.    Okay.  We have established that by

8    May of 2019, in your view, the liabilities of

9    HCMFA exceeded its assets; correct?

10        A.    Yeah.  I mean, again, I don't have

11   financial statements in front of me, but I

12   think, if I recall, we'd have to go through the

13   testimony with Mr. Morris, I believe that was

14   the case.

15        Q.    In fact, you will recall that in

16   April of 2019, Mr. Dondero signed a document

17   that extended the demand feature of two prior

18   notes to May 31, 2019.  Do you recall that?

19             MS. DEITSCH-PEREZ:  I think you

20        might -- maybe have the court reporter read

21        that back.  You might have misspoke.

22             (Record read.)

23             MR. RUKAVINA:  And I did misspeak.

24        Q.    I meant to say to May 31, 2021.  Do

25   you recall that, sir?
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/07/24   Page 157 of 200   PageID 28073

Page 302

 1                    WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3       of the question.

 4       A.    Yes.

 5              MR. RUKAVINA:  And, Mr. Nguyen, just

 6    so that the record is clear, will you please

 7    pull up my Exhibit Alpha 10, A10.

 8              (Exhibit A10 marked.)

 9       Q.    You don't have this one in front of

10    you, Mr. Waterhouse?  This is the one that

11    Mr. Morris used earlier.  Do you see that

12    document, sir?

13       A.    Yes, I do.

14       Q.    And this is what you were testifying

15    about before when Mr. Morris was asking you.

16    Do you remember that?

17       A.    Yes.

18       Q.    So here is my question for you,

19    Mr. Waterhouse:  As the chief financial officer

20    of Highland, was it prudent for Highland less

21    than three weeks later to be lending

22    $7.2 million to an insolvent entity that

23    couldn't even then pay its debts back to

24    Highland?

25              MS. DANDENEAU:  Objection to form.

Page 303

1                    WATERHOUSE - 10-19-21

2              MR. MORRIS:  Objection to the form

3       of the question.

4       A.    Sorry, I just want to make sure --

5  are you asking me, did you say, was it prudent

6  for Highland to loan $7.4 million to HCMFA a

7  few weeks after this document was executed?

8       Q.    Yes, and at a time when HCMFA's

9  liabilities exceeded its assets.

10             MR. MORRIS:  Objection to the form

11      of the question.

12      A.    I don't -- it is odd.  I don't know.

13             MR. RUKAVINA:  You can take this

14  exhibit down, Mr. Nguyen.

15      Q.    Do you recall asking anyone,

16  Mr. Dondero or -- or anyone outside as to

17  whether Highland ought to be lending

18  $7.4 million to HCMF regarding HCMF's

19  creditworthiness?

20             MR. MORRIS:  Objection to the form

21      of the question.

22      A.    I don't recall.

23      Q.    Did you receive personally any of

24  that $7.4 million?

25      A.    No.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 03/04/452   Page 159 of 200   PageID 28075

Page 304

1                    WATERHOUSE - 10-19-21

2          Q.    Did you even --

3                 MR. MORRIS:  I didn't hear that

4          question, sir.

5                 MR. RUKAVINA:  The one that he

6          answered, John, or my new one?

7                 MR. MORRIS:  No, no, your question,

8          Davor.

9                 MR. RUKAVINA:  I had asked him

10         whether he received any of the

11         $7.4 million.  He said no.

12                MR. MORRIS:  Yeah.  I thought there

13         was a question after that.  Maybe I was

14         mistaken.  I apologize.

15                MR. RUKAVINA:  I had started a new

16         question, so here, let me start the new

17         question again.

18         Q.    Did you personally receive any

19    direct benefit from those two notes for

20    $7.4 million?

21         A.    No.

22         Q.    Did you ever personally consider

23    yourself obligated to repay either or both of

24    those notes?

25         A.    No.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 03/30/22   Page 160 of 200   PageID 28076

Page 305

 1                     WATERHOUSE - 10-19-21

 2                MR. RUKAVINA:  Pull up those notes

 3   again, Mr. Nguyen.

 4       Q.    You can have them in front of you,

 5   Exhibit 7, Mr. Waterhouse, whatever is easier

 6   for you.  If you go to your signature page, my

 7   question to you is, why did you not include

 8   your title as treasurer by your name, Frank

 9   Waterhouse?

10                MS. DANDENEAU:  Objection to form.

11       A.    I didn't -- I didn't draft this

12   document.

13       Q.    So you relied on whoever drafted it

14   to draft it correctly?

15       A.    Yes.

16       Q.    Okay.  But back then when you signed

17   this, did it ever cross your mind that you were

18   the maker on these notes?

19       A.    No.

20       Q.    Back then when you signed this

21   document, did it ever cross your mind that you

22   could be a co-obligor on these notes?

23       A.    No.  I didn't receive $7.4 million,

24   I mean...

25       Q.    But can you say that HCMFA received

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 03/01/22   Page 161 of 200   PageID 28077

Page 306

                    WATERHOUSE - 10-19-21

1     $7.4 million?

2         A.    I would have to go back and look and

3     check in, you know, the -- the financial

4     records and the bank statements.

5              MR. RUKAVINA:  You can take this

6     exhibit down, Mr. Nguyen.

7         Q.    Mr. Waterhouse, I'm not trying to be

8     a smart-ass, but if the law says that because

9     of the way that you signed this promissory

10    note, if that is what the law says, that that

11    made you personally -- personally liable, then

12    you would agree with me that that was never

13    your intent?

14             MR. MORRIS:  Objection to the form

15        of the question.

16        A.    That was never -- I wouldn't sign a

17    note and not get consideration in return.

18        Q.    So putting all other issues aside,

19    if the law -- if the law says that you were

20    liable for those notes because of how you

21    signed them, then would you agree with me that

22    these notes are a mistake?

23             MR. MORRIS:  Objection to the form

24        of the question.

 1                    WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to the

 3         form.

 4         A.    Yes.

 5         Q.    So do you agree with me that it's

 6    odd -- I think that is the word you used --

 7    that Highland would be loaning $7.4 million a

 8    few weeks after that extension to an entity

 9    whose liabilities exceeded its assets, and you

10    would agree with me that it was never your

11    intention to be in any way liable for these two

12    promissory notes; correct?

13              MR. MORRIS:  Objection to the form

14         of the question.

15         A.    Sorry, you -- you asked a lot there.

16              MR. RUKAVINA:  I will strike it and

17    I will move on.

18              Let's go to -- pull up Exhibit 9,

19    please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20    9, A9.

21              (Exhibit A9 marked.)

22         Q.    Sir, take a moment to look at this,

23    but this is an email, and you will see attached

24    July 31, 2020 affiliate notes.

25              Do you see that attachment?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187-37   Filed 01/09/24   Page 163 of 200   PageID 28079

Page 308

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    Okay.  And do you see an entry for

4   Highland Capital Management Fund Advisors?

5              MR. MORRIS:  I'm sorry, hold on.

6        Where are you looking?

7              MR. RUKAVINA:  Last page, John.

8              MR. MORRIS:  Is it the page on the

9        screen?

10             MR. RUKAVINA:  Oh, I'm sorry.

11       Mr. Nguyen just did it.  Yes, the last page

12       there.

13             MR. MORRIS:  Thank you.

14       Q.    Do you see an entry there for HCMFA?

15       A.    Yes.

16       Q.    About $10.5 million.

17             Do you see that?

18       A.    I do.

19       Q.    And, now, do you have any

20   explanation for why if HCMFA owed $7.4 million,

21   plus the 5.3 million that had been extended,

22   why that amount was only 10.5 million?

23       A.    I don't know.  Okay.

24             MR. RUKAVINA:  Close this one and

25       pull up, Mr. Nguyen, the schedules,

```
 1                    WATERHOUSE - 10-19-21

 2          schedule of assets.  What exhibit is this

 3          of ours, Mr. Nguyen?

 4                    MR. NGUYEN:  This is A11.

 5                    MR. RUKAVINA:  Oh, this will be A11.

 6                    (Exhibit A11 marked.)

 7          Q.    You don't have this in front of you,

 8     Mr. Waterhouse?

 9          A.    Okay.

10          Q.    This is what Mr. Morris used

11     earlier.  Do you remember looking at this with

12     Mr. Morris?

13          A.    Yes.

14                    MR. RUKAVINA:  You might have to

15          zoom in a little.  Okay.

16          Q.    Now, I see Affiliate Note A, B, and

17     C.

18                    Do you have any recollection as to

19     why the names of the affiliates are omitted?

20          A.    I don't.  I testified earlier that,

21     you know, the team worked with DSI in providing

22     these.  I -- I don't -- I don't know.

23          Q.    Can we deduce -- is it logical to

24     deduce that Affiliate Note A would be NexPoint

25     given its size of $24.5 million?
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 67   Filed 01/09/24   Page 165 of 200   PageID 28081

Page 310

 1                    WATERHOUSE - 10-19-21

 2                    MR. MORRIS:  Objection to the form

 3        of the question.

 4        A.    I mean, it -- it is a -- it is -- it

 5   is approximate.

 6        Q.    Well, can we -- can we deduce -- or,

 7   I'm sorry, strike that.

 8               Can you, sitting here today,

 9   logically conclude that Affiliate Note B or C

10   represents HCMFA?

11                    MR. MORRIS:  Objection to the form

12        of the question.

13        A.    I don't know.  I don't know.  I

14   can't.

15        Q.    Okay.  As of the petition date, we

16   have established that HCMFA, under promissory

17   notes, owed $7.4 million and $5.3 million to

18   the debtor; correct?

19                    MR. MORRIS:  Objection to the form

20        of the question.

21        A.    Yes.

22        Q.    Okay.  And by my reckoning, that

23   would be somewhere approaching $13 million.

24                    MR. MORRIS:  Objection to the form

25        of the question.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/09/22   Page 166 of 200   PageID 28082

Page 311

1                    WATERHOUSE - 10-19-21

2          Q.     It would be $12.7 million.  Is that

3    generally correct?

4          A.     Sorry, the amounts were 7.4, 5.3.

5          Q.     Yes.

6          A.     Okay.  Yeah, that -- that -- I can

7    do that math, yes.

8          Q.     Do you have any explanation or any

9    understanding of why there is no similar entry

10   listed here on the schedule of assets filed

11   with the bankruptcy court?

12               MR. MORRIS:  Objection to the form

13        of the question.

14         A.     I don't know.  We have to look at

15   the supporting schedules, like I talked about

16   other -- presumably there is -- there is a

17   build to the schedule that would provide the

18   detail.

19         Q.     Well, that was going to be my next

20   question.  You anticipated it.

21               MR. RUKAVINA:  You can -- you can

22        take this down, Mr. Nguyen.

23         Q.     Do you believe that whenever you and

24   your team provided the underlying data to the

25   financial advisor that the actual names of the

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 167    Filed 07/04/22    Page 167 of 200    PageID 28083

Page 312

1                    WATERHOUSE - 10-19-21

2    affiliates for Affiliate Note A, B, and C would

3    have been listed there?

4         A.    Are you asking we provided the names

5    to the financial advisor?  I don't -- I don't

6    understand who the financial advisor is.

7         Q.    I'm sorry, DSI.

8               Let me ask the question this way,

9    Mr. Waterhouse.

10              Whenever you provided information

11   about the affiliate notes to DSI, do you

12   believe that you would have included the actual

13   names of the affiliates, you or your team, or

14   that you would have done the Affiliate Note A,

15   Note B, Note C?

16              MR. MORRIS:  Objection to the form

17        of the question.

18              MS. DANDENEAU:  Objection to the

19        form.

20        A.    We -- like I testified earlier, when

21   we were -- we gave everything to -- to DSI.  We

22   were giving all of our records, all of our

23   files, everything to DSI.  We weren't redacting

24   information or saying, hey, here is a note,

25   here is Affiliate Note A or B.

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 11/30/21    Page 168 of 200    PageID 28084
Document 17-37    Page 369 of 452

Page 313

1                    WATERHOUSE - 10-19-21

2              I mean, it was -- our job and our

3    focus -- and I testified in court back in 2019;

4    right -- was -- was to be transparent and, you

5    know, get DSI up to speed on -- on the matters

6    at Highland.  So I can't see us redacting at

7    that point.

8              MR. RUKAVINA:  Mr. Nguyen, will you

9         please pull up Mr. Morris' Exhibit 36.

10        Just the very first page, the very top

11        email.  You might zoom in a little bit.

12        Q.    Now, you recall being asked about

13   this by Mr. Morris?

14        A.    Yes, I do.

15        Q.    And you wrote:  The HCMFA note is a

16   demand note.

17              You wrote that; right?

18        A.    Yes.

19        Q.    And, in fact, weren't there by that

20   point in time several notes?

21        A.    Yes, there were.  Again, I don't --

22   I don't remember everything specifically.  I

23   mean --

24        Q.    I understand.  I understand.

25              So this is an example where -- where

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 03/09/2022   Page 169 of 200   PageID 28085

Page 314

1                    WATERHOUSE - 10-19-21

2    you might have made a mistake by referring to a

3    singular instead of a plural; right?

4         A.    Yes.

5         Q.    Okay.  And you -- you wrote -- a

6    couple of sentences later, you wrote:  There

7    was an agreement between HCMLP and HCMFA the

8    earliest they could demand is May 2021.

9              You wrote that; right?

10        A.    Yes.

11        Q.    But I think you -- you agreed with

12   Mr. Morris that that can't possibly apply to

13   the May 2019 notes, can it?

14             MR. MORRIS:  Objection to the form

15        of the question.  That is not what he

16        testified to.

17        Q.    Let me ask -- let me ask a different

18   question.

19             Sitting here today -- or if you can

20   answer me from your memory on October 6,

21   2020 -- did the April acknowledgment that

22   extended the maturity date apply to the

23   May 2019 notes also?

24        A.    I don't recall specifically.

25        Q.    Well, you recall that the notes that

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 09/04/52   Page 170 of 200   PageID 28086

Page 315

```
1                   WATERHOUSE - 10-19-21

2    you signed were demand notes; right?

3         A.    Yes.

4         Q.    Do you find it logical, based on

5    your experience, that had they intended to have

6    a different or a set maturity date, you would

7    have instructed that that set maturity date be

8    included instead of a demand feature?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Sorry, just want to make sure I

12   understand.  You are saying that -- that the

13   $5 million note, the $2.4 million note, if

14   those were supposed to be a term note, that I

15   would have made sure that those were a term

16   note?

17        Q.    I'm saying -- I'm saying,

18   Mr. Waterhouse, that on May the 2nd and May the

19   3rd, 2019, if you intended that those two

20   promissory notes could not be called until May

21   2021, would you have included such language in

22   those two promissory notes?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I guess -- I'm sorry, I don't recall
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/09/452   Page 171 of 200   PageID 28087

Page 316

 1                  WATERHOUSE - 10-19-21

 2    putting language in those May notes.  I don't

 3    remember what language you are referring to.

 4         Q.    Well, let's read this again.

 5               There was an agreement between HCMLP

 6    and HCMFA the earliest they could demand is May

 7    2021.

 8               Do you recall that agreement?

 9         A.    Yes, that was the agreement we

10    looked at earlier; correct?

11         Q.    Okay.  Yes.

12               Do you -- do you understand now that

13    that agreement that we looked at earlier also

14    applied to the May 2019 notes that you signed?

15         A.    I don't -- I don't know.

16         Q.    But as of October 6, 2020, you're

17    writing that there is one demand note and

18    you're categorizing that demand note as not

19    being demandable on May 2021; correct?

20         A.    Yes.

21         Q.    And you know now that you made at

22    least one mistake in this email; correct?

23               MR. MORRIS:  Objection to the form

24         of the question.

25         A.    Yes.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/04/22   Page 172 of 200   PageID 28088

Page 317

  1                    WATERHOUSE - 10-19-21

  2              MR. RUKAVINA:  You can pull this

  3        down, Mr. Nguyen.

  4        Q.    So, Mr. Waterhouse, you don't

  5    remember Mr. Dondero telling you to make these

  6    loans or not.  HCMLP was loaning $7.4 million

  7    to someone that their assets were less than

  8    their liabilities.

  9              We don't see on the July list of

 10    notes, where there is $12.7 million of notes,

 11    we don't see that on the bankruptcy schedules,

 12    and we have this Exhibit 36 where you are

 13    confused.

 14              Are you prepared to tell me, sir,

 15    today that you might have made a mistake in

 16    executing those two promissory notes?

 17              MR. MORRIS:  Objection to the form

 18        of the question.

 19        A.    I -- I don't know.

 20        Q.    And if it turns out that you're

 21    personally liable for those promissory notes,

 22    it would certainly be a mistake, wouldn't it?

 23              MS. DANDENEAU:  Objection to the

 24        form.

 25              MR. MORRIS:  Join.

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 11/30/21    Page 173 of 200    PageID 28089

Page 318

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    If Mr. Dondero testifies that he

 4   never told you to make these loans, would you

 5   disagree with his testimony?

 6              MR. MORRIS:  Objection to the form

 7        of the question.

 8        A.    Like I testified earlier with my

 9   conversation with Mr. Dondero, all I recall is

10   he said, get the money from Highland.

11        Q.    And if Mr. Dondero testifies that

12   he, in consultation with other senior personnel

13   at Highland, decided that Highland needed to

14   pay HCMFA $7.4 million as compensation for the

15   NAV error and not a loan, would you have any

16   reason to disagree with Mr. Dondero?

17              MR. MORRIS:  Objection to the form

18        of the question.

19        A.    If that was -- if that was his

20   intent, yes, it would -- I would --

21        Q.    Do you have any reason to disagree

22   with him?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    If that was his intent, I don't
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/09/24   Page 174 of 200   PageID 28090

Page 319

                        WATERHOUSE - 10-19-21

1

2    know.  I don't know how I disagree with that.

3         Q.    And just to confirm, you don't

4    remember ever asking Mr. Dondero whether you

5    should have two promissory notes prepared?

6         A.    No.

7         Q.    And you don't remember discussing

8    with Mr. Dondero what the terms of those two

9    promissory notes should be?

10        A.    I don't recall -- I testified all I

11   recall is he said, get the money from Highland.

12   I don't -- the -- the terms of the note, I

13   don't recall ever having a discussion around

14   the terms of the note, but since I don't draft

15   the notes, that -- there could have been a

16   conversation with other people later.

17        Q.    Do you have any memory of whether

18   after the notes were drafted, but before you

19   signed them, that you communicated with

20   Mr. Dondero in any way to just confirm or -- or

21   get his blessing or ratification to signing

22   those notes?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I don't recall.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 10/09/24   Page 175 of 200   PageID 28091

Page 320

1                    WATERHOUSE - 10-19-21

2        Q.    Again, the only thing you remember,

3   sitting here today, was Mr. Dondero said, get

4   the money from Highland, and that is it, that

5   is all you remember?

6              MR. MORRIS:  Objection to the form

7        of the question.

8        A.    I testified to that several times.

9   This was over two years ago.  A lot has

10  happened.  That is all I recall.

11       Q.    And help me here.  I'm not very

12  technologically astute.  When you -- and I -- I

13  recognize that you do it rarely, but when you

14  sign a document electronically, do you believe

15  that there is an electronic record of you

16  having authorized or signed a document

17  electronically?

18             MR. MORRIS:  Objection to the form

19       of the question.

20       A.    I -- I don't know the tech answer to

21  that, but, you know, since I don't have -- I

22  don't ever attach my signature block

23  electronically, my assistant would have done

24  that, and if that is done over email like we

25  did several times -- you know, multiple,

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 11/30/21   Page 176 of 200   PageID 28092

Page 321

1                    WATERHOUSE - 10-19-21

2    multiple times over COVID, she would attach my

3    signature block and then email it out to

4    whatever party.

5         Q.    What was your assistant's name in

6    May 2019?

7         A.    It was Naomi Chisum.

8         Q.    Is she the only one?  I'm sorry, was

9    she your only assistant that would have maybe

10   facilitated logistically something like you

11   just described?

12        A.    You know, she was out on maternity

13   leave at some point.  I don't -- I don't recall

14   those dates where she was out for maternity

15   leave.  There was -- there were folks backing

16   her up.  I don't recall specifically who

17   those -- who those, you know, administrative

18   assistants were, and I don't recall

19   specifically if she was out during this time on

20   maternity leave.

21              I do know that that she was out for

22   a period of time, or who knows, or she could

23   have been on vacation that day or, you know, I

24   don't know.

25        Q.    Switching gears now, the two

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 01/09/452   Page 177 of 200   PageID 28093

Page 322

1                   WATERHOUSE - 10-19-21

2    complaints that have been filed that is against

3    HCMFA and NexPoint, did you see any drafts of

4    those complaints before they were filed?

5                   MR. MORRIS:  Objection to the form

6           of the question, and to the extent that you

7           had any communications with counsel or you

8           were shown drafts of the complaints by

9           counsel while you were employed by

10          Highland, I direct you not to answer.

11      A.    I -- I reviewed documents yesterday

12   with counsel here.  I believe that is the first

13   time I have ever seen those.

14      Q.    Okay.  Did you ever discuss with

15   Mr. Seery these two lawsuits before or after

16   they were filed?

17      A.    I don't recall.

18      Q.    Were you ever interviewed by legal

19   counsel, to your knowledge, about these

20   promissory notes before the complaints were

21   filed?  Without going into what was said, were

22   you ever interviewed by legal counsel?

23                  MR. MORRIS:  Objection to the form

24          of the question.

25      A.    I don't recall.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 01/09/24   Page 178 of 200   PageID 28094

Page 323

1                WATERHOUSE - 10-19-21

2        Q.    Obviously with COVID, it changed,

3   but -- but before COVID, did you used to meet

4   with Mr. Seery from time to time in-person?

5        A.    Yeah, I mean, so before COVID -- so

6   we're talking kind of late March, early April,

7   right, there was about -- I don't remember the

8   specific date when the board for Highland was

9   appointed.  I believe it was around February of

10  2020, so maybe there was a month-and-a-half,

11  two-month window where we were meeting

12  in-person or, you know, like we were actually

13  in the office, excuse me, we were in the

14  office.

15            And, you know, when they were first

16  appointed, the board members and Mr. Seery

17  were -- were definitely down here more

18  in-person.

19       Q.    Did you ever see Mr. Seery taking

20  written notes of -- of his meetings with you or

21  others?

22       A.    I don't recall.

23       Q.    Do you recall on any Zoom or video

24  conference with Mr. Seery, seeing him take

25  notes, written notes?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 07/09/24   Page 179 of 200   PageID 28095

Page 324

WATERHOUSE - 10-19-21

1

2        A.    The Zoom calls we had, I don't

3   recall having seen video or, you know, or if it

4   was on Zoom, I just remember it being -- well,

5   no, you know what, there were some -- you know,

6   I take that back.

7              So there were -- there were some

8   times that I did remember seeing Mr. Seery

9   on -- on some of the Zoom calls.

10       Q.    Well, let me --

11       A.    I don't -- sorry, I'm thinking.  I'm

12  thinking -- I'm going back.  I'm trying to

13  process this.

14       Q.    I can make it much quicker,

15  Mr. Waterhouse.  I have heard -- I have heard

16  that Mr. Seery is a copious note taker.

17             Do you have any knowledge about

18  that?

19       A.    No.

20       Q.    Okay.  Switching gears yet again,

21  and this will be last theme.  Do you need a

22  restroom break, or are you good to go for

23  another half an hour?

24             MS. DEITSCH-PEREZ:  I need a

25        restroom break.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 01/30/452   Page 180 of 200   PageID 28096

Page 325

```
 1                    WATERHOUSE - 10-19-21

 2                    MR. RUKAVINA:  Can we make it five

 3          minutes?

 4                    THE WITNESS:  Five minutes would be

 5          great.

 6                    VIDEOGRAPHER:  We're going off the

 7          record at 5:53 p.m.

 8          (Recess taken 5:53 p.m. to 5:59 p.m.)

 9                    VIDEOGRAPHER:  We are back on the

10          record at 5:59 p.m.

11          Q.    Mr. Waterhouse, I had asked you

12    earlier about contracts between HCMFA and the

13    debtor, and now I'm going to talk about

14    contracts between the debtor and NexPoint

15    Advisors.  Okay?

16          A.    Okay.

17          Q.    Now, were there contracts similar to

18    the ones with HCMFA that NexPoint had in the

19    nature of employee reimbursement and shared

20    services?

21          A.    Yes, they -- NexPoint Advisors and

22    Highland Capital Management Fund Advisors had

23    cost reimbursement and shared services

24    agreements with Highland Capital Management,

25    L.P.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 09/04/52   Page 181 of 200   PageID 28097

Page 326

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    And was that shared services

 3   agreement, to the best of your understanding,

 4   in place as of December 31, 2020?

 5        A.    It was -- it was terminated at some

 6   point, and I remember the contracts had

 7   different termination dates, but I think the --

 8   the date of termination was January 31st of

 9   2021, after the termination was put in.

10              So yeah, it would be in place at the

11   end of the year of December -- it would be in

12   place at December 31st, 2020.

13        Q.    And pursuant to that agreement as of

14   December 31st, 2020, was the debtor providing

15   what you would describe as back office services

16   to NexPoint?

17        A.    Yes.

18        Q.    Would those have included accounting

19   services?

20        A.    Yes.

21        Q.    And as part of those accounting

22   services, would the debtor have assisted

23   NexPoint with paying its bills?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 02/09/22   Page 182 of 200   PageID 28098

Page 327

1                    WATERHOUSE - 10-19-21

2          A.    Yes.

3          Q.    So let's break that up.  You were a

4    treasurer of NexPoint as well in December of

5    2020?

6                MR. MORRIS:  Objection to the form

7          of the question.

8          A.    Yes.

9          Q.    Okay.  And in December of 2020, did

10   NexPoint have its own bank accounts?

11         A.    Yes.

12         Q.    And did it use those bank accounts

13   to pay various of its obligations?

14         A.    Yes.

15         Q.    Did employees of the debtor have the

16   ability to cause transfers to be made from

17   those bank accounts on behalf of NexPoint?

18         A.    Yes.

19         Q.    And is that one of services that the

20   debtor provided NexPoint, basically ensuring

21   that accounts payable and other obligations

22   would be paid?

23         A.    Yes.

24                MR. MORRIS:  Objection to the form

25         of the question.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 87   Filed 03/04/22   Page 183 of 200   PageID 28099

Page 328

1                    WATERHOUSE - 10-19-21

2        Q.    You answered yes?

3        A.    Yes.

4        Q.    And the payments, though, whose

5   funds would they be made from?

6        A.    From the bank account of NexPoint

7   Advisors.  If they were NexPoint advisor

8   obligations, it would be made from NexPoint

9   Advisors' bank account.

10       Q.    So let's pull up Exhibit Alpha 1.

11  You should have that -- it is my Tab 1 or my

12  Exhibit 1.

13              (Exhibit A1 marked.)

14       Q.    So this is a -- this is a series of

15  emails, Mr. Waterhouse.  Let's look at the

16  first page here, November 25, 2020, between

17  Kristin Hendrix and yourself.

18              Do you see that, sir?

19       A.    I do.

20       Q.    And do you see where Ms. Hendrix

21  writes:  NPA.

22              Do you know what NPA stood for?

23       A.    Yes.

24       Q.    And what does it stand for?

25       A.    NexPoint Advisors.

1                    WATERHOUSE - 10-19-21

2       Q.    And was that how you-all internally

3    at Highland refer to NexPoint Advisors, L.P.?

4       A.    I mean, yes, amongst other things.

5       Q.    And she writes at the bottom of her

6    email:  Okay to release?

7             Do you see that?

8       A.    Yes, I do.

9       Q.    So what --

10            MR. MORRIS:  Hold on one second.

11            Okay.  Go ahead.

12            MR. RUKAVINA:  Yeah.

13      Q.    So what is -- what is Ms. Hendrix

14   here on November 25 asking of you?

15      A.    She is asking me -- so she -- these

16   are -- these are payments -- typically we would

17   do an accounts payable run every week at the

18   end of every Friday.  But looking at this date,

19   it is Wednesday, November 25th, which means, to

20   me, it is likely Thanksgiving weekend.

21            So this is the day before

22   Thanksgiving, so this is the last kind of --

23   kind of day before the holidays and vacation

24   and things of that nature.  So it is

25   effectively the Friday of that week.

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 09/04/52   Page 185 of 200   PageID 28101

Page 330

1          WATERHOUSE - 10-19-21

2              So she is -- she is putting in all

3    the payments for the week because we batch

4    payments weekly.  And these are the payments

5    that go out that week, and she is informing me

6    of the payments and -- you know, again, at the

7    bottom of the email, she is asking for my okay

8    to -- to release these payments in the wire

9    system.

10         Q.    So these would be accounts payable

11   of NexPoint?

12         A.    I mean, it would be accounts payable

13   for all of these entities listed on this email.

14         Q.    And who was Ms. Hendrix employed by

15   in November and December of 2020?

16         A.    Highland Capital Management.

17         Q.    Okay.  So -- so part of the services

18   that NexPoint had contracted with was for

19   Highland to ensure that NexPoint timely paid

20   its accounts payable; is that accurate?

21             MR. MORRIS:  Objection to the form

22         of the question.  You have got to be

23         kidding me.

24         Q.    Is that accurate?

25         A.    Yes.

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 03/00/452    Page 186 of 200    PageID 28102

Page 331

 1                    WATERHOUSE - 10-19-21

 2        Q.     And did NexPoint rely on employees

 3   of the debtor to ensure that NexPoint's

 4   accounts payable were timely paid?

 5               MR. MORRIS:  Objection to the form

 6         of the question.

 7        A.     Yes.

 8               MR. RUKAVINA:  Let's flip to the

 9         next page, Mr. Nguyen, if you will please

10         scroll to the next page.

11        Q.     So this is an email similar to the

12   prior one, November 30th.

13               Do you see where it says, NPA HCMFA,

14   USD $325,000 one-day loan?

15               Do you see that, sir?

16        A.     I do.

17        Q.     Do you have any memory of what that

18   was?

19        A.     I don't recall what that -- what

20   that payment was for.

21        Q.     Did it sometimes occur that one

22   advisor would, on very short-terms, make loans

23   to another advisor?

24        A.     Yes.  This -- this -- this occurred

25   from -- from -- from time to time.  It actually

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 09/04/25   Page 187 of 200   PageID 28103

Page 332

1                       WATERHOUSE - 10-19-21

2       looking at -- I'm -- I'm looking at the date of

3       this email.  It is November 30th.  It is the

4       last day of the month.

5               HCMFA has obligations it needs to

6       pay to its broker-dealer, which is HCFD.  And

7       it likely was short funds to make those

8       obligations under that -- under its agreement,

9       and so it provided a one-day loan because on

10      the next business day on 12/1 -- or the next

11      business day in December, it would receive

12      management fees from the underlying funds that

13      it managed and it would be able to pay back

14      that loan to NexPoint Advisors.

15          Q.    So -- so here Ms. Hendrix was

16      seeking your approval to transfer $325,000 from

17      NexPoint to HCMFA for a one-day loan; is that

18      correct?

19          A.    That is correct.

20          Q.    Let's flip to the next page, sir.

21              MR. RUKAVINA:  And, Mr. Nguyen, if

22          you will please scroll down.

23          Q.    Now we have as an entry for

24      $325,000, 11/30 loan payment.

25              Do you see that, sir?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 09/04/52   Page 188 of 200   PageID 28104

Page 333

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And that is probably the loan that

 4   was approved on the prior page?

 5        A.    Yes, most likely.

 6        Q.    So is it also true, sir, that in

 7   addition to accounts payable debtor employees

 8   would be assisting NexPoint with respect to

 9   paying back its debt?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I mean, yes, for loans of this

13   nature, yes.

14        Q.    Well, what about long term loans?

15   Was it reasonable for NexPoint to expect debtor

16   employees to ensure that NexPoint timely paid

17   its obligations under long-term notes?

18             MR. MORRIS:  Objection to the form

19        of the question.

20             MS. DANDENEAU:  Objection to form.

21        A.    I mean, that is one of the things

22   that the Highland personnel did provide to the

23   advisors.  Yes, we would -- we would -- over

24   the years, yes, we -- we -- we -- we did do

25   that generally.  Again, I don't remember
```

1                    WATERHOUSE - 10-19-21

2     specifically but, yes, generally we -- you

3     know, we did do that.

4          Q.    So do you recall -- and we can pull

5     it up, if need be -- that under the NexPoint

6     note that Mr. Morris asked you about earlier,

7     the one for more than $30 million, that

8     NexPoint was obligated to make an annual

9     payment of principal and interest?

10              MR. MORRIS:  Objection to the form

11         of the question.

12         A.    Yes, it was -- yes, it -- it was an

13    amortizing note.  It was -- you know, from what

14    we reviewed earlier, it was payable by

15    December 31st of each year.  So -- but are --

16    are you asking me --

17         Q.    I'm just asking you, sir, if you

18    recall the note.

19         A.    Yes, the $30 million note, yes, we

20    reviewed it earlier, yes.

21         Q.    And do you recall Mr. Morris had you

22    go through the fact that NexPoint had made

23    payments in years prior to 2020 on that note?

24         A.    I do.

25         Q.    And do you believe that employees of

1                    WATERHOUSE - 10-19-21

2     the debtor would have played any role in

3     NexPoint having made those prior payments?

4                    MR. MORRIS:  Objection to the form

5          of the question.

6          A.    Yes.

7          Q.    And what role in years prior to 2020

8     would employees of the debtor have had with

9     respect to NexPoint making that annual payment?

10         A.    We -- we -- we would have -- I keep

11    saying "we."  The team would have calculated

12    any amounts due under that loan and other

13    loans, as -- as standard course.

14                    We would -- since we provided

15    treasury services to the advisors, we would

16    inform the -- the -- the -- we informed

17    Mr. Dondero of any cash obligations that are

18    forthcoming, whether we do cash projections.

19                    If, you know, any of these payments

20    would have -- or, you know, the sum total of

21    all of these payments, including any note

22    payments, if there were any cash shortfalls, we

23    would have informed Mr. Dondero of any cash

24    shortfalls.  We could adequately plan, you

25    know, in instances like that.

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 03/01/22    Page 191 of 200    PageID 28107

Page 336

1                      WATERHOUSE - 10-19-21

2                      Or, sorry, we -- I say "we" -- I

3        keep saying "we" -- I keep wearing my -- again,

4        my -- my treasurer hat.

5                      But, yes, it is to -- it is to

6        inform Mr. Dondero of the obligations of the

7        advisors in terms of cash and obligations that

8        are -- are upcoming and that -- and that are --

9        are scheduled to be paid.

10           Q.     And would those obligations that are

11       upcoming and scheduled to be paid prior to 2020

12       have incurred the annual payment on that

13       NexPoint $30 million note?

14                   MS. DANDENEAU:  Objection to form.

15                   MS. DEITSCH-PEREZ:  Davor, I think

16           you misspoke.  You might want to just

17           repeat the question.

18           Q.     Okay.  Let me repeat the question,

19       sir.

20                   Prior to 2020, those services that

21       you just described, would that -- on behalf of

22       the debtor, would that have included NexPoint's

23       payments on the $30 million note?

24           A.     Yes.

25           Q.     So someone at the debtor in treasury

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/30/452   Page 192 of 200   PageID 28108

Page 337

1                    WATERHOUSE - 10-19-21

2    or accounting would have sent some schedule or

3    a reminder that a payment would be coming due

4    in the future.  Is that generally the practice?

5         A.    Yes, we would -- you know, again, I

6    didn't -- I didn't micromanage the teams, but

7    we had a -- a corporate accounting calendar

8    that we use as kind of a tickler file to keep

9    track of payments.

10              I actually, you know, don't know how

11   actively they're using that in -- in prior to

12   2020, but it was actively used at some point.

13              We did look at NexPoint cash

14   periodically and cash for the other advisors as

15   well and payments.  You know, we -- payments

16   like this would have appeared in our cash

17   projections, in the advisor's cash projections.

18              And, again, as like I said earlier,

19   they would have appeared there, so there would

20   be time to plan for making any of these

21   payments.

22         Q.    And based on your experience, would

23   it have been reasonable for NexPoint to rely on

24   the debtors' employees to inform NexPoint of an

25   upcoming payment due on the $30 million

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 187    Filed 05/09/22    Page 193 of 200    PageID 28109

Page 338

1                    WATERHOUSE - 10-19-21

2     promissory note?

3                    MR. MORRIS:  Objection to form of

4          the question.

5                    MS. DANDENEAU:  Objection to form.

6          A.    Yes.  Yes, they did.  I mean, but I

7     mean, but I don't think these -- these notes

8     were any secret to anybody.

9          Q.    I understand, and I'm not suggesting

10    otherwise.

11                   MR. RUKAVINA:  Please pull up Alpha

12    2, Mr. Nguyen.

13                   (Exhibit A2 marked.)

14         Q.    Now, this document is similar to the

15    ones we've seen before as of December 31, 2020,

16    and I don't see under NTA anything there for

17    paying the promissory note to Highland.

18                   Do you see anything like that?

19         A.    I do not.

20                   MR. RUKAVINA:  You can pull that --

21    that exhibit down, Mr. Nguyen.

22         Q.    You are aware, of course, by now

23    that, in fact, NexPoint failed to make the

24    payment due December 31, 2020, are you not?

25         A.    I am aware, and yes, I do understand

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 167   Filed 03/04/22   Page 194 of 200   PageID 28110
Document 77   Page 394 of 452

Page 339

```
 1                WATERHOUSE - 10-19-21

 2   it.

 3        Q.    Were you aware that Highland

 4   accelerated that $30 million promissory note?

 5        A.    I am aware.

 6        Q.    Were you aware of that acceleration

 7   at the time that it occurred?

 8        A.    I don't remember specifically.

 9        Q.    Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13        A.    Did anyone ask me what Highland

14   should do about the missed payment?

15        Q.    Yes, before acceleration.

16              MR. MORRIS:  Objection to the form

17        of the question.

18        A.    I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20              MS. DANDENEAU:  Why don't you just

21        repeat the question, Mr. Rukavina.

22        Q.    Let me try again, Mr. Waterhouse,

23   let me try again.

24              I am saying you're the CFO of

25   someone, in this case, Highland, and the
```

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 167    Filed 03/09/452    Page 195 of 200    PageID 28111

Page 340

1                      WATERHOUSE - 10-19-21

2    borrower failed to make the required payment.

3    Are you with me so far?

4          A.    I am.

5          Q.    Did anyone then ask you, what should

6    we do with respect to our rights against the

7    borrower that missed the payment?

8          A.    Not that I recall.

9          Q.    Did you play a role in the decision

10   to accelerate that $30 million promissory note?

11         A.    I did not.

12         Q.    Do you recall whether Mr. Seery ever

13   asked you before the acceleration as to whether

14   he should accelerate the note?

15         A.    I don't recall.

16         Q.    And you don't recall when you

17   learned of the acceleration itself?

18               MR. MORRIS:  Objection to the form

19         of that question.

20         A.    It was -- it was sometime in

21   early -- in early 2021.  I don't remember

22   specifically.

23         Q.    But do you recall whether it was

24   after the acceleration had already been

25   transmitted?

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 03/04/22   Page 196 of 200   PageID 28112

Page 341

```
 1                    WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to the

 3       form of the question.

 4       A.    I don't recall.

 5       Q.    Do you recall in early to mid

 6   January of 2021, after the default, discussing

 7   the default with Mr. Dondero?

 8       A.    I do recall discussing with

 9   Mr. Dondero after December 31, 2020?

10       Q.    Yes, the fact of the default.

11       A.    I don't recall.

12              MR. RUKAVINA:  Let's pull up my

13   Exhibit 6, Alpha 6.

14              (Exhibit A6 marked.)

15              MR. RUKAVINA:  And, Mr. Nguyen, if

16       you will please scroll down.

17       Q.    This email chain begins with you

18   writing to Ms. Hendrix on January the 12th:

19   NexPoint note to HCMLP.

20              Do you see that, sir?

21       A.    I do.

22       Q.    Were you discussing this same

23   $30 million note we're talking about right now

24   with Ms. Hendrix?

25       A.    Yes.
```

Case 21-03004-sgj   Doc 83   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc Main
Case 3:21-cv-00881-X   Document 187   Filed 03/01/22   Page 197 of 200   PageID 28113

Page 342

WATERHOUSE - 10-19-21

1

2      Q.    Okay.  Do you recall what prompted

3  you to send that email to her?

4      A.    Yes, I had -- I had a conversation

5  with Jim.

6      Q.    Okay.  And what -- what did you

7  discuss with Jim that led to this email chain?

8      A.    He -- he called me and he said he

9  wanted to make payment on the NexPoint note,

10 and I didn't -- I didn't know the -- the amount

11 offhand, so I reached out to Kristin and got

12 the details and relayed that to him.

13     Q.    And you see you sent that email to

14 her at 11:15 a.m.  Does that help you remember

15 when you had this discussion with Mr. Dondero?

16 In other words, was it that morning or the day

17 before, or can you -- can you --

18     A.    No, it was -- it was that morning.

19     Q.    And do you recall how you had that

20 conversation with him?

21           MR. MORRIS:  Objection to the form

22     of the question.

23     Q.    By telephone, by email, in-person?

24     A.    Yeah, he -- he called me.  I was at

25 home.  We were working from home here in

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 167    Filed 09/09/22    Page 198 of 200    PageID 28114

Page 343

1                    WATERHOUSE - 10-19-21

2     December of 2020.  He called me from home.  He

3     said he was in court.  He wanted to -- he asked

4     about, you know, making payment on the note and

5     the amount, and so I didn't have those numbers

6     in front of me, so I said I would get back to

7     him.  I wanted all the details, so here is

8     this -- so I reached out to Kristin.

9          Q.    And then she gave you that

10    $1,406,000 figure?

11              MR. RUKAVINA:  Mr. Nguyen, if you

12    will scroll up, please.

13         A.    Yes.  Yeah, she -- the $1,406,112.

14         Q.    And do you recall whether you

15    conveyed that amount to Mr. Dondero?

16         A.    Yes.  I -- I called him back and

17    gave him -- gave him this amount.

18         Q.    Are you aware of whether NexPoint,

19    in fact, then made that 1 million 406 and

20    change payment?

21         A.    Yes, they did.

22         Q.    Did you discuss with Mr. Dondero at

23    that time, either the first conference or the

24    second conference that day -- strike that.

25              When you conveyed the number to

Page 344

```
 1                  WATERHOUSE - 10-19-21

 2    Mr. Dondero, was -- was it also on January

 3    12th?

 4         A.    Sorry, when I conveyed the

 5    $1.4 million number?

 6         Q.    Yes.

 7         A.    Yes, yes, it was that -- it was --

 8         Q.    So you had --

 9         A.    It was that point.

10         Q.    Well, to the best of your

11    recollection, you had a conference with

12    Mr. Dondero by the telephone in the morning,

13    and then another conference with him by

14    telephone after 11:40 a.m. that morning?

15         A.    Yeah, I can't remember -- yeah, it

16    was either that morning or it could have been,

17    you know, early afternoon, but again, I

18    remember calling him back, relaying this

19    information to him, and he said, okay, pay --

20    you know, make -- make this payment.

21         Q.    And during either of those two

22    calls, did you tell Mr. Dondero anything to the

23    effect that making those -- I'm sorry, making

24    that payment would not de-accelerate the

25    promissory note?
```

Case 21-03004-sgj    Doc 83    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc Main
Case 3:21-cv-00881-X    Document 167    Filed 04/00/451    Page 200 of 200    PageID 28116

Page 345

```
 1                   WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did you tell him anything to the

 4   effect that making that payment would not cure

 5   the default?

 6        A.    No.

 7        Q.    Did you discuss that in any way with

 8   him?

 9        A.    No, I did not.

10        Q.    Did he say why he wanted to have

11   that $1.4 million payment made?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    He -- he -- he didn't go into

15   specifics.

16        Q.    Did he say anything to you to the

17   effect that if NexPoint makes that payment,

18   then the note will be de-accelerated?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I don't recall.

22              MR. RUKAVINA:  You can put this one

23        down, Mr. Nguyen.

24        Q.    And, again, when you say you don't

25   recall, you mean you don't remember right now
```