Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 01/09/24   Page 1 of 261   PageID 28317
Appendix Page 2 Page 1449 of 379

149

Kristin Hendrix - October 27, 2021

prepayments
81:25
presence 25:4
present 9:4,6,12
24:5 45:24
90:15 97:3
presented 116:1
presenting 46:14
97:18
preserve 78:8
pretty 14:11
109:8
previous 100:9
previously 17:24
48:25 131:9
Pricewaterhou...
116:9,12 117:5
117:17 118:2,5
130:20
principal 30:12
78:14,17 79:5
79:11,23 80:10
89:23 121:14
122:10 124:5
124:19 125:3
125:18 130:14
print 56:1
printed 42:8,12
42:24 47:18
55:18,22 56:7
57:4,21,22,24
57:25 58:11,14
58:21,22
printing 55:23,25
printouts 42:21
prior 9:25 10:4
19:17 28:11
35:24 40:25
55:2 65:23
71:25 86:9 96:6
105:3 108:6
124:24 127:19
128:12 133:12
privileged 9:8
95:24

privy 64:9,11
69:19
probably 9:15
17:2 49:14 50:6
58:22 61:9
63:15 99:15
109:8 126:13
proceed 61:20,25
proceeding 46:20
proceedings 95:1
95:3,12
process 31:7
32:16 45:11,12
120:12
produce 78:9
produced 1:18
17:24 33:15
34:1 59:4 67:10
76:20 82:14,19
125:6
product 115:13
production 10:1
33:15
profitability
26:25
program 47:25
programs 47:16
projections 17:18
promised 39:2
promissory 3:10
3:12,17,19,21
3:23 4:12,14
5:3 14:9 15:18
16:10,16,20
17:1,3,6,22
18:13 19:17
27:3 28:13,21
30:11,19 31:1,8
32:21 33:2
35:18 38:11
42:7 43:11,12
45:1,9 47:6
52:10,24 53:1,8
53:25 54:5,12
54:23 55:11

68:5 71:13,19
72:11,12,16
76:13 77:7,10
80:9 81:8 113:6
113:11,12,16
114:2,7,16
116:7,11,15
117:17,22
118:7 119:12
122:11 124:6
prompt 128:14
prompted 83:22
prospect 53:20
provide 7:12
9:19 15:21
30:11 42:21
59:17 63:3 64:5
64:16 119:16
121:25
provided 17:24
33:5,9,10 61:14
70:12 89:17
121:11 122:5
129:11 135:15
provides 120:7
providing 15:10
54:8 65:5
public 16:19
pull 119:14
pulled 49:3
purpose 86:12
125:22
purposes 39:5
98:1 126:23
purview 89:6
put 23:20 84:25
PwC 97:21 98:1
117:22

———————
Q
———————
qualification
16:20
question 7:1
14:10,22 15:25
16:23 18:15

19:12 20:19,24
22:9,22 24:9,16
28:4 29:5,16
34:7 35:11
36:14,23 37:1
38:8 39:18 41:2
41:14 45:4,5
46:5 47:21
48:23 49:11,21
50:5 51:15,21
52:2,4 53:10
54:18 55:6,15
55:20 56:5
58:17 65:17
66:10 69:9
70:16 73:21
74:6 75:8 77:23
80:4,17 82:2
84:14 86:9,19
86:20 87:8,19
88:16 89:3,16
95:10 96:10,19
100:9 102:3
103:14 105:20
106:19 113:9
113:24 124:17
127:8 128:5
questions 6:21,24
7:6 8:8 61:21
95:2 110:16
115:4 133:24
quick 52:5 95:4
107:23
quickly 6:16
109:8
quite 36:21 41:20
104:24
quote 120:3

———————
R
———————
R-o-e-b-e-r 32:10
raise 131:1
raised 95:12
range 89:10
rate 19:7 43:16

49:2 80:12
ratio 107:21
108:5
re-up 86:16
reached 108:5
read 7:9 8:9
32:18 82:21
86:17 119:25
reading 81:9
ready 94:16
real 11:14
really 35:13
67:21
reason 6:23
22:23,25 52:11
52:13 56:1,6,7
72:7 77:3 82:5
82:8 101:13
129:13,16
131:1
recall 7:19 10:8
21:6 34:15,20
36:16 37:2
44:11 46:10
50:14,20 51:17
51:23 52:4
55:25 56:7
59:22,25 60:2,3
60:8,10 63:11
64:1 65:3 66:7
67:3 68:22,25
69:22 72:3 73:1
74:11 83:22
84:4,23,25
86:12 88:17
91:25 92:3 93:5
93:7 102:21
104:21 105:15
107:6 108:25
109:14 112:3
112:13,15,17
116:4,15 118:5
119:5,8,19
120:16 123:4
123:15 127:5

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 178-2   Filed 01/09/24    Page 2 of 261    PageID 28318
Appendix Page 2 Filed 01/09/24 Page 2 of 379

150

Kristin Hendrix - October 27, 2021

129:25 130:17
131:5 133:10
**recalling** 109:16
**Receivable** 4:19
**receivables**
130:25 131:22
**received** 63:13
64:21 71:5
129:2
**receiving** 32:4
124:23
**recipient** 60:25
**recognize** 44:12
**recollection** 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
**reconciling** 13:20
**record** 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
**recorded** 73:11
81:24
**recording** 73:18
**records** 10:6,6
59:18 62:7 64:5
73:12
**reduced** 135:10
**refer** 99:25
**reference** 71:13
119:1 121:2,6,9
**referenced** 34:5
84:6
**referencing**
33:25 121:10
**referred** 96:2

**referring** 66:25
100:2,5
**reflected** 118:7
123:12
**reflecting** 43:15
**refresh** 9:17 42:1
42:20 69:18
108:1
**regarding** 86:1
90:17 107:12
**regardless** 99:16
**regularly** 23:24
**reinforces** 41:8
**reissue** 21:14
**related** 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
**relates** 32:21
64:17
**relation** 115:7
**relieve** 93:10,11
**rely** 42:8
**remember** 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
**remotely** 6:8
**renewal** 120:12
**reorganized** 25:7
25:15 26:17,24
27:2
**rep** 115:13,19,23

**repaid** 23:10
**repay** 69:6
**repeat** 14:10
22:10 28:15
44:22 66:10
**rephrase** 6:25
**report** 12:25 25:9
25:12 114:25
115:25 117:14
123:6
**reported** 1:23
13:6 36:22
**reporter** 135:1,3
135:15
**reporters** 27:13
**reporting** 12:22
12:23 13:22
**reports** 127:3
**repository** 54:22
55:9
**represent** 27:10
46:25 57:3 83:1
94:24 107:23
**represented** 2:4
2:11,18 93:5
**representing**
42:23
**request** 4:9 60:5
84:22
**requested** 63:3
63:21 64:5,17
84:2 135:13,14
**requesting** 63:25
**requests** 10:1
69:14 115:3
**required** 7:6 21:4
**respect** 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
**respectfully** 39:5
**respecting** 45:22

**respectively**
113:15
**respond** 122:23
**responded** 65:1
**response** 60:13
120:15,19
122:16,25
**responsibilities**
97:12 103:6,10
**responsibility**
69:7 102:23
105:2
**responsible** 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
**responsive** 10:6
**rest** 44:23
**restrictive** 47:17
**restroom** 52:6
93:16
**restructured**
19:21
**retail** 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
**reveal** 50:11
**review** 8:4 50:11
54:11 119:21
125:10,17
135:13
**reviewed** 9:15,19
**reviewing** 32:24
115:11
**revised** 17:6
**right** 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
**Roeber** 32:9
112:7
**role** 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
**roles** 73:6
**roll-up** 72:22
131:9
**rolled** 79:23
131:13
**Romey** 61:15,18
61:25 62:3
**room** 75:15
**roughly** 39:3
**routine** 20:4,21
20:25
**routinely** 21:1
**row** 131:3
**RPR** 1:23
**rude** 25:3
**Rukavina** 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 174-21    Filed 01/05/24    Appendix Page 2 Filed 11/30/21    Page 3 of 261    PageID 28319
Page 3 of 379

151

Kristin Hendrix - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 31:12,20 34:10 | 125:6 126:12 | 86:23 87:1,5 | services 15:11,22 | 96:10 112:13 |
| 35:16 36:18 | saying 37:19 | 89:8,11 105:9 | 70:13,13 86:16 | single 104:2,3 |
| 38:10 39:22 | 41:15 49:23 | 115:11 120:9 | 119:17,19 | sitting 30:25 |
| 41:4,17 42:19 | 53:4 73:8 76:14 | 120:22,25 | 120:7 | 33:24 42:1 |
| 43:6 44:4,7 | 93:19 99:5 | 121:4 126:4 | set 26:10,11,14 | 50:15 53:23 |
| 45:5 46:8 47:22 | 101:9 | seeing 31:4 50:14 | 35:15 53:21 | 54:4 55:24 82:4 |
| 49:6,17,25 | says 32:1,6 34:10 | 57:14 65:23 | shape 37:10 | 85:16 91:21 |
| 50:10 51:6,17 | 44:10,13,18 | 90:12 | shared 54:9,16 | 105:16 106:23 |
| 51:24 52:5,8 | 57:8,22,25 | seek 46:20 | 55:14 70:13 | situation 34:9 |
| 53:4,15 55:9,23 | 60:23 63:2 64:4 | seeking 24:3 | 77:16 86:16 | slightly 96:10 |
| 56:9,19 57:2,20 | 78:25 86:23 | seen 33:14 65:22 | shareholders | SMU 10:23 |
| 58:19 59:11 | 87:10 89:9 | 69:13 72:15 | 39:2 | so-called 15:22 |
| 62:19,23 65:20 | 120:2,22 | 76:21 88:7 | sheet 118:6 | somebody 35:19 |
| 69:13 70:19 | scan 55:13 | 122:25 | 121:11 | 37:8 53:12,12 |
| 72:15 73:24 | schedule 76:24 | Seery 4:8 5:1 8:8 | sheets 63:8,22 | 53:19 55:21 |
| 74:8 75:9,13 | 77:5,6,21 80:20 | 25:12,20 29:24 | short 74:22 75:17 | 129:3 |
| 76:19 78:1,7,11 | 82:7 85:3,13,17 | 59:13 60:18,22 | 75:23 93:15 | soon 32:17 |
| 79:8,10,14 80:8 | 131:20 | 61:12 62:4,6,9 | shorthand 1:24 | sophisticated |
| 80:19 82:4,21 | scheduled 16:4,7 | 63:1,2 64:4 | 135:2,7,25 | 14:12 |
| 82:25 83:8,13 | schedules 77:9 | 65:9 67:3,14,17 | shortly 11:11,12 | sorry 11:12 14:24 |
| 83:15 85:24 | 85:12 | 67:25 68:13,22 | show 82:10 | 19:15 47:8 52:4 |
| 86:2 87:9 88:6 | schooling 10:20 | 69:14 88:11,23 | showing 92:15 | 57:21 66:2 |
| 88:20 89:5,19 | Scott 4:3 18:9 | 96:25 125:25 | 131:21 | 82:23 92:12 |
| 90:3 93:23 94:5 | 60:4,12,15 | 126:13 | sick 82:17 | 97:3 103:9,23 |
| 94:14,19 | 61:10,13 62:1 | Seery's 8:10,20 | sign 52:20,20 | 109:20 |
| 110:17,20 | Scott's 60:13 | send 29:14 32:13 | 53:7,20,22 54:3 | sort 25:21 43:23 |
| 113:8,19 114:8 | scratch 17:3 | 34:24 37:7 | 104:25 105:1 | 96:11 97:24 |
| 114:17 118:9 | search 10:5 | 53:21 59:7 | 113:5,18 | sought 88:24 |
| 118:21 119:3 | second 7:15 44:5 | 60:11 62:2 | 115:13 | sound 58:15 |
| 121:17 122:12 | 62:18 78:23 | 63:17 83:22 | signatory 52:14 | sounds 98:3 |
| 125:7 128:2 | 80:22 99:24 | sending 13:19 | signature 46:15 | speak 36:2 |
| 130:13 133:25 | 109:15 | 36:3 54:12 | 47:1,6,11,18 | speaking 13:17 |
| 134:2 | Secondly 87:16 | 60:17 61:2 | 49:8,14,15 | 43:11 44:1 |
| | section 80:9 86:1 | 111:19 | 114:7,9,15 | speakings 95:21 |
| _____ | 118:19 | senior 12:8,11,11 | signed 47:9 52:10 | specific 7:19 |
| **S** | see 6:8 8:5,12,14 | 12:12,17 | 52:11,25 55:4,8 | 21:18 29:7 |
| S-e-e-r-y 8:8 | 23:3 31:5,20 | sense 44:12 58:1 | 115:14 131:6 | 34:21 36:4,17 |
| Sadly 94:9 | 32:25 35:7 | sent 28:22 29:11 | 132:5,9 | 37:1,14 38:2 |
| salaries 108:17 | 54:11 57:9,21 | 37:17 42:9 83:2 | signer 53:13 | 43:10 46:11,22 |
| 108:18,19 | 59:7,15,20 60:6 | 83:17 92:16,22 | significant 20:20 | 47:25 48:11,13 |
| salary 25:15 | 60:20 61:23 | 106:20 107:3 | 51:19,22 | 54:14 71:8 |
| sale 68:4,8 | 63:5,9 64:2,7 | 111:21 123:19 | signing 52:16,24 | 88:17 90:19 |
| save 55:13 72:19 | 78:24 79:14 | 126:11,13 | 53:25 | 100:11 101:22 |
| saved 56:11 | 80:15,18,24 | separate 18:5 | similar 32:25 | 103:11,18 |
| saw 41:8 86:6 | 81:3 84:11 85:6 | served 10:1 | 34:9 38:25 | 105:21 106:24 |
| 115:12 123:19 | | | | |

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 178-2 Filed 01/09/24    Appendix Page 4 of 261    PageID 28320
Page 4 of 375    Page 1522 of 379

152

Kristin Hendrix - October 27, 2021

127:6
**specifically** 21:6
  21:10 23:11
  29:9 34:15 37:8
  49:12 50:12,16
  50:19 51:2 52:3
  52:19 54:1,7
  55:8 64:25 65:3
  65:4,8 68:25
  69:22 77:14
  84:19,21 93:5
  98:16 103:2,7
  125:13,18
**specifics** 22:4
**speculating** 58:9
**speculation**
  106:4
**sphere** 69:6
**spit** 48:1
**spoken** 35:23
  61:13
**spreadsheet** 78:9
**spreadsheets**
  31:6 77:12
**staff** 48:2
**stake** 27:7
**stamp** 47:19
  82:18
**standard** 46:16
  50:7 53:6,11,15
  53:16 55:3
**standing** 67:2
**STANG** 2:10
**start** 54:19 59:11
  95:10 100:11
**started** 11:13,17
  20:11 100:10
**starting** 10:19
  11:9
**starts** 59:12
**state** 1:23 6:5
  10:25 67:25
  68:14 76:22
  78:16 136:1
**stated** 48:25

135:9
**statement** 99:3
**statements** 4:5
  13:20 63:7,8,21
  63:22 97:16,17
  115:12 116:17
  116:21 117:1,5
  117:11 119:2
  122:4 133:18
  133:22
**STATES** 1:1
**status** 66:20
**stay** 26:4
**steps** 92:13
**STINSON** 2:17
**stop** 34:24
**stopped** 23:22
**stored** 56:2
**straightforward**
  26:14
**Strasburger**
  44:13,16
**Street** 1:25 2:4
**stretch** 109:5
**strike** 7:24 8:4
  15:8 38:16
  52:22 53:5
  68:12 87:9
  90:11
**string** 122:19
**stuff** 49:15
**stupid** 86:9
**subject** 16:5
  119:20,20
  132:19
**subparts** 86:20
**Subscribed** 134:7
**subsequent** 14:7
  59:25 61:12
  64:10 95:13
  96:22 105:12
  116:13 118:3
  118:19
**subsequently**
  32:11

**sued** 28:21
**suggest** 124:14
**suing** 28:5
**Suite** 2:4,17
  136:2
**summarize** 72:19
**summary** 7:12
  8:14
**summer** 123:16
  124:18
**supervision**
  135:11
**supplementally**
  9:19
**supposed** 98:20
**sure** 6:12,15
  10:21 11:4,11
  12:20 13:20
  14:11 18:22
  19:23 22:11
  26:7 28:16 31:2
  33:10,21,22
  37:5 42:3,22
  43:20 52:25
  58:18 60:16
  62:1,19 63:17
  65:4 66:11
  75:21 76:11,11
  84:15 99:3
  100:7 101:1
  107:18 109:22
  115:16 125:24
  126:23 130:23
  130:24
**Surgent** 29:24
**surprise** 76:1,3
**surprised** 94:11
**surprises** 40:8
  76:2
**suspect** 23:15
**switch** 58:24
**sworn** 1:19 6:2
  135:4
**synopsis** 7:12
  8:14

**system** 56:12
  77:16 84:20

———————
**T**

**T-h-e-d-f-o-r-d's**
  86:22
**take** 25:14 30:8
  38:11 45:5 52:5
  52:20 72:15
  75:17 76:15
  82:12 87:10
  89:13 92:13
  104:1 110:14
**taken** 1:20 16:15
  17:6 45:8 135:7
**talk** 7:21,24 8:1
  8:17,20,23,25
  28:10 34:21
  44:9 66:11,15
  78:1
**talked** 9:12 97:4
  99:8
**talking** 8:19,22
  29:1 64:11
  101:2 116:8
  121:15,23
  125:13
**taxes** 14:9
**team** 13:19 17:25
  18:21 26:4 31:6
  39:15 49:15,18
  50:24 51:7
  64:16 97:16
  102:4 104:11
  106:15 115:2
**telephone** 23:17
  74:11 75:23,25
**tell** 34:13,16,24
  44:2 53:1 54:1
  54:2 55:7 60:14
  63:24 71:23
  74:19,23 79:22
  79:24 84:3
  91:11,15,18
  93:24 99:2

100:12 106:14
  107:1 109:22
  110:8 112:8,25
  113:4,17 114:1
  114:6,14
  116:20,23,24
  117:21 118:25
  119:6,11 122:4
  122:8 123:2,8
  123:11 130:22
  131:24 132:4,8
  132:11,14,18
  132:23 133:2
  135:4
**telling** 35:25
  37:11 53:24
  100:13,21
  105:22 115:24
**template** 18:20
  18:24 43:14,18
  45:8 46:17 58:4
  58:6,12
**templates** 43:12
  50:9
**term** 17:2 66:9
  66:16 67:8,13
  73:10 76:24
  77:10 98:17,25
  100:4 107:20
  107:24 125:19
  126:2 127:12
  127:16,24
  128:8,21 130:7
  131:5,8,14
**terminology**
  27:14
**TerreStar** 38:22
**test** 20:9
**testified** 6:2 45:7
  72:18 112:12
  113:13 127:22
  129:22
**testify** 83:10,12
**testifying** 6:16
**testimony** 19:8

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 29-2 Filed 01/05/22   Page 5 of 261   PageID 28321
Appendix Page 2 Filed 11/30/21   Page 5 of 373

153

Kristin Hendrix - October 27, 2021

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

**treasury** 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,14
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

_____
**U**
**Uh-huh** 27:16
33:12 47:3

**umbrella** 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 183-2 Filed 01/09/24    Page 6 of 261    PageID 28322
Appendix Page 2    Page 1054 of 379

154

Kristin Hendrix - October 27, 2021

**use** 21:17 45:12 47:19 48:12 49:18 59:1 79:1 100:4
**usually** 24:5

**V**

**Vaguely** 63:12
**valid** 131:25
**valuation** 39:15
**various** 14:15 15:11 59:13
**verbatim** 27:14 78:25 85:20 86:22
**verification** 50:3
**version** 30:13 42:7
**versions** 30:24
**video** 8:5,12 59:6 62:16 85:24
**videoconference** 1:19 2:19
**view** 41:9
**volume** 94:19
**vs** 1:8

**W**

**wait** 44:23
**walk** 10:18 11:8
**walking** 54:7
**want** 28:10 47:15 58:25 86:18 95:8 100:7
**wanted** 52:19 54:2,9 60:12,14 82:17 84:7 102:11 105:9
**wanting** 65:10
**wasn't** 108:23 114:6,15 127:7 129:14
**Waterhouse** 4:21 7:10,21 13:7,8 23:13,22,23

24:6 29:23 34:19 35:24 36:2 37:3,5,9 38:5 47:24 49:7 50:12,16 52:10 52:23 53:24 54:5,13 60:11 62:10 63:1,18 64:3 67:3 71:5 72:1 73:8 74:13 75:20 83:19 84:1 90:4,7,16 91:10,22 93:9 99:5,18 102:16 103:8,12,19 106:14 112:6,8 112:21,25 113:4,17,22,25 114:5,6,13 115:6 116:19 116:23 117:20 118:24 122:3,7 122:22 124:8 124:10,13,16 124:24 125:25 126:6,24 127:3 127:9,19 128:9 128:14,18,19 129:23 130:4 130:11
**Waterhouse's** 8:1,6 47:1,6 48:11 75:25 115:10
**way** 11:18 12:23 14:8 21:15 35:13,15 37:8 37:10,16 56:12 58:20 60:19 76:1 81:12 83:3 92:25 93:10 101:21 122:5 135:19
**ways** 6:7 54:19
**we'll** 9:10 15:9

17:5 44:8,23 66:11,15 75:17 82:18 94:3
**we're** 6:7 27:22 28:16 29:1 30:6 35:19 50:22 58:9,24 59:2,3 76:11,11 85:20 93:22 100:7 104:3 116:8 125:13
**we've** 9:11 28:8 50:7 56:21,22 69:16 88:9 114:2 117:18 121:23
**website** 49:3
**week** 8:2,10 9:2 9:22,25 10:5 13:22 28:9,17 29:18 60:22 61:6 67:6 86:1 95:19
**weekly** 66:21,25 67:2
**welcome** 59:1 86:17
**went** 9:15 10:22 10:23 24:19,22 49:23 112:17 115:4
**weren't** 19:25 28:23 40:7,9 64:12 96:7 98:21,24 99:20 100:24 101:13 105:22 106:3 131:1
**wire** 34:25 106:15 107:3
**withdrawn** 113:23 117:25 120:3 124:9,21 126:6,7 127:7,9 129:15 132:12

133:9
**withholding** 116:3
**within-entitled** 135:6
**witness** 1:19 16:1 16:24 18:16 19:13 20:25 22:10,23 24:10 24:17 30:3 31:11 34:8 35:12 36:15 38:9 39:19 41:3 41:15 46:6 48:24 49:12,22 50:6 51:5,16,22 52:3 53:11 55:7 55:21 56:6 57:18 58:18 69:10 70:17 73:22 74:7 75:12 77:24 80:5,18 82:3 83:10,12 88:17 89:4,17 94:14 96:20 102:4 103:15 105:21 106:7,20 113:21 114:12 114:18 118:11 119:4 121:18 122:14 135:3 135:10
**word** 42:6,6 43:7 43:8 45:11 47:2 77:13
**words** 21:5 23:20 68:14
**work** 11:8 52:4 98:2 126:22
**worked** 11:16,18 36:6 61:19 110:5
**works** 35:1
**world** 113:25

114:5,14 116:24 117:21 118:24 119:6 119:11 122:3,8 124:17
**wouldn't** 36:22 37:6 53:22
**wrap-up** 110:16
**write** 60:4
**writes** 60:18,22 61:13,20
**writing** 37:10 41:14 64:3 114:25 117:14
**written** 80:7 82:19 91:25 99:7 104:12,15
**wrong** 57:5 87:13 99:7
**wrongly** 123:12
**www.dickman...** 136:4

**X**

**Y**

**yeah** 7:2 14:13 21:10 34:9 44:23 51:9 80:18 93:17
**year** 12:2 20:10 26:14 78:1,5 81:6 104:5 127:15 128:21 128:25 129:7 129:14 130:8 131:21
**years** 11:15,18 12:9 18:20 21:9 22:25 23:9 36:7 37:18 40:25 51:7 52:4 104:21,22 108:15 109:17 110:8,10,12

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 29-2 Filed 01/05/22    Page 7 of 261    PageID 28323

155

Kristin Hendrix - October 27, 2021

131:3 133:5,12
**Yep** 76:9 123:17
**yesterday** 9:2
86:7,9
**York** 2:11

**Z**

**zeros** 87:15
**ZIEHL** 2:10
**Zoom** 6:8,10

**0**

**05.02.2019** 4:1
**05.03.2019** 3:25

**1**

**1** 3:10 30:14,15
30:18 33:1 71:4
71:25 72:4
74:10 80:9
93:21 129:24
135:22
**1-31-23** 136:4
**1.3** 81:1,2
**1.4** 90:23 91:3,23
**1:19** 1:22 134:4
**10** 4:3 9:23,25
10:5 28:17 59:4
59:9 110:12
**10,530,000** 87:20
**10.5** 85:6,9
124:11
**10:11** 1:22
**10017-2024** 2:11
**101** 136:2
**11** 4:7 62:14,21
62:23
**11:27** 57:22
**110** 3:5
**111** 3:6
**12** 4:11 5:5 65:13
65:18,21 90:5,7
90:17
**12,286** 87:10,10
**12,286,000** 87:6
87:16,20,24

**12.3** 120:24
121:13 123:5,9
**12/30/29** 78:25
**13** 4:14 72:11,13
72:16
**13-week** 67:5
125:7,10,14,23
126:16,19
**14** 4:17 22:25
23:9 36:7 40:25
76:10,17,19
82:6 85:17
90:22 91:4 93:8
**14-year** 38:3
**15** 4:19 36:7 83:1
83:4,15,17 84:8
84:14,18,19
85:7 87:21
89:21,22
123:16,22
124:5 133:5
**15(c)** 4:22 86:1
121:11
**16** 4:21 85:21,22
85:25 86:3
119:15,23
**17** 5:1 11:15 52:4
88:2,4,7
**18** 5:5 89:25 90:1
90:3
**19** 59:12
**1982** 10:17

**2**

**2** 3:12,12,14,19
3:23 4:3 30:19
30:20,21 31:16
32:21 34:14
37:11 41:11,18
44:19 56:22
57:22 58:11
60:25 61:6,12
79:8 119:25
**2.1** 81:1

**2.4** 30:20 32:13
32:21 33:19
37:12 38:22
39:7 42:16 43:3
58:5,11 111:10
113:14
**2.4-** 110:22
**2.4M** 3:12,19,23
**2000** 86:22
**2001** 127:23
**2004** 10:21 11:12
**2005** 11:11 20:16
21:2,9,19
**2009** 10:23
**2014** 133:12
**2015** 10:24
**2017** 12:15 19:23
73:2 74:7 131:6
131:12
**2018** 116:4,16
117:1,11,23
118:3,11,14,18
119:1 128:25
**2019** 3:14 12:10
12:17,19,25
13:8,14 17:9,12
17:20 18:2,8,10
18:10 19:15
20:2,2 21:2,9
21:19 23:16,16
24:12,14 30:20
31:17 34:14
37:11 38:17,21
39:6,14 40:3,5
41:11,18 44:25
45:14 46:9,12
46:19 47:12,24
48:21 49:6,19
50:2 53:5,6
54:21 55:3,10
56:9,20 57:22
74:7 78:5 80:23
81:6,18 110:21
111:1 112:9,21
114:1 116:5

117:18 118:16
129:8
**2020** 4:4,11,22
12:7 14:2,5
15:6,10,21 16:3
24:22 59:12
62:6,10 65:14
66:3,7,18,19
67:13,17,20
68:1,8,14,21
70:23 71:4 74:8
75:19 76:4 78:2
79:10 83:18
86:25 87:6
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:20 103:21
105:4,18
120:23 122:17
122:19 124:18
125:14,20
126:9 127:6
128:20 129:14
129:17
**2021** 1:15,21 4:8
5:2,6 24:24
26:4 28:20
29:11 62:25
64:15 71:25
73:3 88:2 90:5
90:17 94:10
106:10,25
128:2,8,15
134:9 135:22
**21-03004-sgj** 1:8
**214** 136:3
**23** 85:1 87:3
**23,846,000** 84:9
**24,471,000** 89:9
**25** 61:6
**26** 10:17
**27** 1:15,21
**28** 125:20

**29** 83:18 84:1
**2nd** 58:5 111:9

**3**

**3** 3:10,14,17,21
4:11 31:15,18
34:4,11 35:21
36:20 37:11,19
38:12 41:11,18
44:18 56:20
65:14 66:3
111:7 112:21
119:7
**30** 3:10,12 71:4
72:4 74:10
86:25 87:6
93:21 120:23
129:24
**30-year** 19:22
**30,746,812.33**
4:14
**30.7** 66:9,13
**30.7M** 4:17
**31** 3:14 4:15
67:16 70:22
79:10 88:12
98:21,25
100:25 101:11
101:19 102:8
102:19 103:20
105:3,18 131:6
**3102** 2:17
**312** 136:1
**34th** 2:11
**3800** 2:4
**38th** 1:25

**4**

**4** 3:17 42:15,17
42:19 43:6,18
43:18 44:21,24
45:22,25 46:3
46:19 48:11,19
50:13,17 51:2
52:8 55:17,24

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 29-2 Filed 05/62 of 379    Page 8 of 261    PageID 28324

156

Kristin Hendrix - October 27, 2021

57:16
**42** 3:17,19
**4228** 136:2
**43** 3:21,23
**445-9548** 136:3

_____

**5**

**5** 3:19 30:12 33:1
 33:20,25 34:5
 35:3 36:25
 37:12 38:25
 39:3,8 42:15,16
 42:17,20 43:2,6
 43:18,19 44:21
 44:24 45:22,25
 46:3,19 48:11
 48:19 50:13,18
 51:2 52:9 55:17
 55:24 57:16
 58:13,13 94:9
 112:14 113:14
**5-** 33:19
**5.0** 110:23
**5/31/2020** 79:5
**500** 1:24 2:3
**530,000** 78:25
**56** 3:25 4:1
**575-** 79:23
**575,000** 79:12
**575,550** 79:6
**59** 4:3
**5M** 3:10,17,21

_____

**6**

**6** 3:3,21 4:8,22
 43:2,4,21 44:9
 44:18 62:25
 64:15 80:12
 86:22
**6/30** 86:23 121:3
 121:6,11,25
 122:8
**62** 4:7
**65** 4:11
**683** 87:3

_____

**7**

**7** 3:23 5:2 43:2,4
 44:9,19 88:2,21
**7.4** 38:18 39:11
 39:23 40:15,21
 122:10 123:12
**72** 4:14
**75201** 2:4
**75206** 136:2
**75219** 2:18
**76** 4:17
**777** 2:17
**780** 2:10

_____

**8**

**8** 3:25 56:19,24
 56:25 58:10
 89:9
**800** 136:3
**83** 4:19
**85** 4:21
**855-5100** 136:3
**88** 5:1
**881** 120:1

_____

**9**

**9** 4:1 56:21,24,25
 58:10
**90** 5:5
**94** 3:4
**99** 49:14

# PROMISSORY NOTE

$5,000,000.00                                                                    May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1. <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2. <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4. <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

HCMFA APP 0607

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 402    Filed 05/25/22    Page 11 of 261    PageID 28327
Appendix Page 4550 of 3788    Page 11 of 261    Page 2 of 28

**PROMISSORY NOTE**

$2,400,000.00                                                        May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

HCMFA APP 0609



CONFIDENTIAL

HCMFA...

D-HCMFA030908

# PROMISSORY NOTE

$5,000,000.00                                                                May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      <u>Interest Rate</u>.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      <u>Payment of Principal and Interest</u>.   The accrued interest and principal of this Note shall be due and payable on demand.

3.      <u>Prepayment Allowed; Renegotiation Discretionary</u>.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      <u>Acceleration Upon Default</u>.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      <u>Waiver</u>.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      <u>Attorneys' Fees</u>.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

HCMFA APP 0612

**PROMISSORY NOTE**

$2,400,000.00                                                                                                         May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, LP. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL
MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the
principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars
($2,400,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums
hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address
as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.    The unpaid principal balance of this Note from time to time
outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%)
in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the
Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on
the anniversary of the date of this Note.    Interest shall be calculated at a daily rate equal to
1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual
number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>.    The accrued interest and principal of this Note
shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.    Maker may prepay in whole
or in part the unpaid principal or accrued interest of this Note.    Any payments on this Note shall
be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.    Failure to pay this Note or any installment hereunder
as it becomes due shall, at the election of the holder hereof, without notice, demand,
presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind
which are hereby waived, mature the principal of this Note and all interest then accrued, if any,
and the same shall at once become due and payable and subject to those remedies of the holder
hereof.    No failure or delay on the part of Payee in exercising any right, power or privilege
hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.    Maker hereby waives grace, demand, presentment for payment, notice of
nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and
all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.    If this Note is not paid at maturity (whether by acceleration or
otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a
bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other
amounts owing hereunder, all actual expenses of collection, all court costs and reasonable
attorneys' fees and expenses incurred by the holder hereof.



7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

MAKER:

_____

FRANK WATERHOUSE

2

HCMFA APP 0614

RELATED DOCUMENTS

No family members
Not part of a conversation
Similar (56)

METADATA

Doc ID          90599
Pages           2
Custodian       Hcmf
Bates No.       -
Revealed
Unrevealed
Tags            20211025 Client Files
Filenames       HCMF loan 05.03.2019.doc
Author          JFORSHEE
Company         Strasburger
Title           PROMISSORY NOTE
Created         5/3/2019 2:03 PM CDT
Modified        5/3/2019 2:03 PM CDT
Accessed        5/3/2019 2:03 PM CDT
Printed         5/2/2019 11:27 AM CDT
Path            /HCMF loan 05.03.2019.doc

**PROMISSORY NOTE**

$5,000,000.00                                             May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P ("*Payee*"), in legal and lawful tender of the United States of America, the **principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00)**, together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify in writing from time **to time**.

1.   Interest Rate.   The unpaid principal balance of this Note **from time to time** outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) **in effect on the date** hereof for loans of such maturity as determined by Section 1274(d) of the **Internal Revenue** Code, per annum from the date hereof until maturity, compounded annually on **the anniversary** of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.   Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand.

3.   Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.   Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind



HCMFA APP 0615

RELATED DOCUMENTS:
No family members
Not part of a conversation
Similar (56)

METADATA:
Doc ID          90594
Pages:          2
Custodian       Hcmf
Bates No.       
Revealed        
Unrevealed      
Tags            2021025 Client Files
Filenames       HCMF loan 05.02.2019.doc
Author          JFONSHEE
Company         Strasburger
Title           PROMISSORY NOTE
Created         5/2/2019 11:26 AM CDT
Modified        5/2/2019 11:31 AM CDT
Accessed        5/2/2019 11:31 AM CDT
Printed         5/2/2019 11:27 AM CDT
Path            /HCMF loan 05.02.2019.doc

PROMISSORY NOTE

$2,400,000.00                                                May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand.

3.      Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind

EXHIBIT
Bates: 1427
Hendrix
HCMFA APP 0616

# Info

## HCMF loan 05.03.2019

N: » NexPoint » Adversaries » 21-03004 HCMFA

 **Convert File Formats**
These buttons allow you to change the current file formats to a new or older format.

**Convert**

 **ndOffice Echo Backup**
You can explore the backup folder with unsaved documents

**Open Backup Folder**

 **Protect Document**
Control what types of changes people can make to this document.

**Protect Document ▾**

**Inspect Document**
Before publishing this file, be aware that it contains:
- Document properties, e-mail collaboration information, author's name and related dates
- Footers
- Content that cannot be checked for accessibility issues because of the current file type

**Check for Issues ▾**

**Manage Document**
Check in, check out, and recover unsaved changes.
There are no unsaved changes.

**Manage Document ▾**

| Properties ▾ | |
|---|---|
| Size | 61.5KB |
| Pages | 2 |
| Words | 618 |
| Total Editing Time | 0 Minutes |
| Title | PROMISSORY NOTE |
| Tags | Add a tag |
| Comments | Add comments |
| Template | Normal.dotm |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | Strasburger |

**Related Dates**

| | |
|---|---|
| Last Modified | 5/3/2019 2:03 PM |
| Created | 5/3/2019 2:03 PM |
| Last Printed | 5/2/2019 11:27 AM |

**Related People**

| | |
|---|---|
| Manager | Specify the manager |
| Author | JFORSHEE |
| | Add an author |
| Last Modified By | Kristin Hendrix |

**Related Documents**

Open File Location

**Show Fewer Properties**

 EXHIBIT
HCMFA APP 0617
Hendrix

# Info

## HCMF loan 05.02.2019

N: » NexPoint » Adversaries » 21-03004 HCMFA

### Convert File Formats

These buttons allow you to change the current file formats to a new or older format.



Convert

### ndOffice Echo Backup

You can explore the backup folder with unsaved documents



Open Backup
Folder

### Protect Document

Control what types of changes people can make to this document.



Protect
Document ▾

### Inspect Document

Before publishing this file, be aware that it contains:

- Document properties, e-mail collaboration information, author's name and related dates
- Footers
- Content that cannot be checked for accessibility issues because of the current file type



Check for
Issues ▾

### Manage Document

Check in, check out, and recover unsaved changes.

☐ There are no unsaved changes.



Manage
Document ▾



| Properties ▾ | |
|---|---|
| Size | 61.5KB |
| Pages | 2 |
| Words | 621 |
| Total Editing Time | 5 Minutes |
| Title | PROMISSORY NOTE |
| Tags | Add a tag |
| Comments | Add comments |
| Template | Normal.dotm |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | Strasburger |

### Related Dates

| | |
|---|---|
| Last Modified | 5/2/2019 11:31 AM |
| Created | 5/2/2019 11:26 AM |
| Last Printed | 5/2/2019 11:27 AM |

### Related People

| | |
|---|---|
| Manager | Specify the manager |
| Author | JFORSHEE |
| | Add an author |
| Last Modified By | Kristin Hendrix |

### Related Documents

📄 Open File Location
Show Fewer Properties

Dobbs' EXHIBIT
10/25    9
HCMFA APP 0618
Hendrix

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Subject:** Re: HCM - HCMFA Financial Statements
**Date:** Wed, 2 Dec 2020 17:51:57 -0600
**Importance:** Normal

---

Yes please do.

Sent from my iPhone

On Dec 2, 2020, at 4:30 PM, Kristin Hendrix wrote:

Scott, can you confirm this is okay to proceed with providing?

Begin forwarded message:

**From:** James Seery
**Date:** December 2, 2020 at 4:27:43 PM CST
**To:** Kristin Hendrix
**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington , Greg Demo , Thomas Surgent
**Subject: Re: HCM - HCMFA Financial Statements**

All:

Scott and I have spoken and agree that the information should be provided to James immediately.

Kristen, please proceed with James. If anyone has any questions or issues, please call me.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

**From:** Jim Seery
**Date:** Wednesday, December 2, 2020 at 11:50 AM
**To:** Kristin Hendrix



10/27
EXHIBIT
10
Hendrix

HCMFA APP 0813
ACL-072954

**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington ,
Greg Demo
**Subject:** Re: HCM - HCMFA Financial Statements

This is an explicit direction from me as CEO of HCMLP to provide the requested information regarding
HCFMA to James Romey.

If anyone has issued contrary direction at any time, that direction is superseded and void.

Please provide the information now.

Scott, please call me.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery
**Date:** Wednesday, November 25, 2020 at 1:48 PM
**To:** Kristin Hendrix
**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington
**Subject:** Re: HCM - HCMFA Financial Statements

Can I get this ASAP.

HCFMA is way overdue.

Thank.

Sent from my iPhone

On Nov 25, 2020, at 10:56 AM, Kristin Hendrix wrote:

Hi Jack,

Scott Ellington is going to follow up with the board on this request.

Thanks,

Kristin

---

**From:** Jack Donohue
**Sent:** Thursday, November 19, 2020 11:38 AM
**To:** Kristin Hendrix
**Cc:** Jim Seery ; Bradley Sharp ; Fred Caruso ; James Romey
**Subject:** HCM - HCMFA Financial Statements

Kristin,

Jim Seery has asked me to review the financial records of HCMFA due to the funds owed the Debtor.
Can you please send me the balance sheet, P&L and cash flow for 2019 and through 2020?

Thanks,

Jack

_____

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

**http://DSIconsulting.com/**

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the
employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination,
distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify
the sender and delete this e-mail message from your computer.

_____

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is
for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude
any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

_____

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and
any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any
attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** 'James Seery' <jpseeryjr@gmail.com>, Frank Waterhouse
<FWaterhouse@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** RE: HCM - Information Request
**Date:** Wed, 6 Jan 2021 22:38:31 +0000
**Inline-Images:** image001.jpg

---

Confirmed.

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

---

**From:** James Seery [mailto:jpseeryjr@gmail.com]
**Sent:** Wednesday, January 06, 2021 5:37 PM
**To:** Frank Waterhouse
**Cc:** John A. Morris; Thomas Surgent
**Subject:** Re: HCM - Information Request

Adding Thomas

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery
**Date:** Wednesday, January 6, 2021 at 5:35 PM
**To:** Frank Waterhouse
**Cc:** John Morris
**Subject:** Re: HCM - Information Request

Frank:

I am the CEO of HCMLP and your direct supervisor. I have full authority over the Debtor's assets and
operations. Indeed my appointment and authority has been court ordered by a court with full jurisdiction



over the Debtor and its assets.

I am entitled to all information on the HCMLP owned and maintained financial and information systems from wherever it came as well as any other information in the possession of the Debtor. To the extent that the Debtor has information pursuant to a shared service agreement, any other agreement, or any other part of its business (pre or post-petition), I am entitled to it, and you are required as CFO to provide to me or deliver it as I request.

For this one time, I am providing you the courtesy of a detailed response. I will even ask counsel to confirm my authority to give this direction. No third party consents are required by you or the Debtor.

I trust this letter allays your concerns.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Frank Waterhouse
**Date:** Wednesday, January 6, 2021 at 5:22 PM
**To:** Jim Seery
**Subject:** RE: HCM - Information Request

Jim-

I wanted to follow up on our conversation in which you requested that I provide you with certain financial information relating to the entities below. In the first instance, I don't have access to any information relating to Dugaboy. As you know, I have access to this information because, other than Dugaboy, the Debtor continues to provide shared services. I expressed reservation about whether, pursuant to the Shared Services Agreement and my confidentiality obligations, I was permitted to provide the CEO of the Debtor with this financial information, as only a few of the shared services employees are permitted access to the financial information of the former affiliates of the Debtor. You responded by saying that I would be terminated today if I didn't comply.

I'm not a lawyer, and I want to do the right thing in terms of my obligations to these third parties, which is why I asked you if I was permitted to provide the information under a court order or something.

In thinking about it and your statement that I would be terminated, if Debtor's counsel gives me authority to provide this information and approves that it is legal without me obtaining consent of the Trustees or the appropriate representatives of the non-trusts, then I will provide the access.

I will be available to discuss at 4:30 as per your request.

Thanks

Frank

---

**From:** James Seery
**Sent:** Wednesday, January 6, 2021 3:31 PM

**To:** Frank Waterhouse
**Subject:** FW: HCM - Information Request

Frank.

As discussed, after consulting with your personal counsel, please speak to me at 4:30pm Dallas time. I will send you and outlook.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery <jpseeryjr@gmail.com>
**Date:** Wednesday, January 6, 2021 at 3:55 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>, Jack Donohue <JDonohue@DSIConsulting.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>, Bradley Sharp <bsharp@DSIConsulting.com>, Fred Caruso <fcaruso@DSIConsulting.com>, James Romey <jromey@DSIConsulting.com>, "Patrick J. O'Malley" <POMalley@DSIConsulting.com>, Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: HCM - Information Request

My direction.

These are HCMLP business records. Please provided them as requested by Jack ASAP.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Date:** Wednesday, January 6, 2021 at 3:48 PM
**To:** Jack Donohue <JDonohue@DSIConsulting.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Bradley Sharp <bsharp@DSIConsulting.com>, Fred Caruso <fcaruso@DSIConsulting.com>, James Romey <jromey@DSIConsulting.com>, "Patrick J. O'Malley" <POMalley@DSIConsulting.com>
**Subject:** RE: HCM - Information Request

Jack-

I'm assuming you've received approval from these entities to release this information? Please send the approval over to us so we can review. If you haven't done so already, let us know and we will do our best to find out who exactly is representing these entities and can coordinate from there.

Thanks

HCMFA APP 0624
ACL-073048

Frank

---

**From:** Jack Donohue <JDonohue@DSIConsulting.com>
**Sent:** Wednesday, January 6, 2021 2:18 PM
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos
<DKlos@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; Bradley Sharp
<bsharp@DSIConsulting.com>; Fred Caruso <fcaruso@DSIConsulting.com>; James Romey
<jromey@DSIConsulting.com>; Patrick J. O'Malley <POMalley@DSIConsulting.com>
**Subject:** HCM - Information Request

Kristin,

At the direction of Jim Seery, please provide DSI with the requested information for each entity below
immediately.

Entity:

• Hunter Mountain Investment Trust

• NexPoint Advisors, LP

• Dugaboy Investment Trust

• Highland Capital Mgmt Services, Inc.

• NexPoint Real Estate Partners (f/k/a HCRE Partners, LLC)

• Highland Capital Mgmt Fund Advisors, LP

• NexPoint Real Estate Partners (f/k/a HCRE Partners, LLC)

• Highland Capital Mgmt Services, Inc.

Information:

• 2015 – 2020 bank statements (monthly)

• 2015 – 2020 detailed income statements (monthly or broken out by month)

• 2015 – 2020 detailed balance sheets (monthly or broken out by month)

• 2015 – 2020 cash flows (monthly or broken out by month)

Let know if DSI can assist in gathering the data faster.

Thanks,

Jack

---

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

http://DSIconsulting.com/

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 75-1 Page 2 Filed 07/24 Page 30 of 261    PageID 28346
Case 21-03004-sgj Doc 1-3 Filed 01/22/21    Entered 01/22/21 17:54:38    Page 2 of 4

## HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Frank Waterhouse, CFO

   Re: Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019. Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021. Payee reserves all rights with respect to such amounts.



HCMFA APP 0627

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 201-2 Filed 05/92 of 379age 31 of 261    PageID 28347
Case 21-03004-sgj Doc 1-3 Filed 01/22/21    Entered 01/22/21 17:54:38    Page 3 of 4

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:      Fred Caruso
         James Romey
         Jeffrey Pomerantz
         Ira Kharasch
         Gregory Demo
         DC Sauter

HCMFA APP 0628

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 201 2-File Page 03024 of 379ge 32 of 261    PageID 28348
Case 21-03004-sgj Doc 1-3 Filed 01/22/21    Entered 01/22/21 17:54:38    Page 4 of 4

## Appendix A

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

HCMFA APP 0629

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document Appendix Part 2 Filed 01/12/24   Page 33 of 261   PageID 28349
Case 21-03005-sgj Doc 1-1 Filed 01/22/21   Entered 01/22/21 17:59:27   Page 2 of 4

# PROMISSORY NOTE

**$30,746,812.33**                                                       **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their
entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint
Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the
"**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid
interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the
order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of
the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED
FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS
($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are
payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as
Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time
outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof
until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of
this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the
rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be
payable annually.

     2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be
payable as follows:

     2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the
outstanding principal amount of the Note (and all unpaid accrued interest through the date of
each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until
the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December
of each calendar year during the term of this Note, commencing on the first such date to occur
after the date of execution of this Note.

     2.2    <u>Final Payment Date</u>.   The final payment in the aggregate amount of the
then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall
become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole
or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall
be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder
as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment,
notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are
hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same



Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 170-2 Filed 03/22/24   Page 34 of 261   PageID 28350
Appendix Part 2 Page 33 of 379
Case 21-03005-sgj Doc 1-1 Filed 01/22/21   Entered 01/22/21 17:59:27   Page 3 of 4

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    Prior Notes.   The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

HCMFA APP 0631

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 2 Page 08/31 of 378ge 35 of 261    PageID 28351
Case 21-03005-sgj Doc 1-1 Filed 01/22/21    Entered 01/22/21 17:59:27    Page 4 of 4

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|-----------|---------------------|---------------|-------------------------------------------------------|
| 8/21/14   | $4,000,000          | 6.00%         | $4,616,739.73                                         |
| 10/1/14   | $6,000,000          | 6.00%         | $6,959,671.23                                         |
| 11/14/14  | $2,500,000          | 6.00%         | $2,881,780.82                                         |
| 1/29/15   | $3,100,000          | 6.00%         | $3,534,679.45                                         |
| 7/22/15   | $12,075,000         | 6.00%         | $12,753,941.10                                        |
|           | $27,675,000         |               | $30,746,812.33                                        |

3

HCMFA APP 0632

EXHIBIT

14

HCMFA APP 0633

Hendrix

CONFIDENTIAL

D-NNI-029141

REDACTED

D-NNI -029142

CONFIDENTIAL

HCMFA APP 0634

redacted

CONFIDENTIAL

HCMFA APP 0635

D-NNI-029143

D-NNI -029144

redacted

HCMFA APP 0636

CONFIDENTIAL

redacted

D-NNI_028145

CONFIDENTIAL

D-NNI -029146

redacted

CONFIDENTIAL

HCMFA APP 0638

Case 3:21-cv-00881-X    Document 207-1    Filed 09/09/24    Page 42 of 261    PageID 28358

redacted

D-NNI -029147

CONFIDENTIAL

HCMFA APP 0639

redacted

CONFIDENTIAL

D-NNI -029148

HCMFA APP 0640

D-NNI -029149

redacted

CONFIDENTIAL

D-NNL-029150

redacted

CONFIDENTIAL

redacted

CONFIDENTIAL

HCMFA APP 0643

**HCMLP Notes Receivable**
**As of 7/31/2020**

| | | |
|---|---:|---|
| NexPoint Advisors | $    23,846,944 | 30 yr Amort (issued 2017) |
| Dugaboy | 17,788,532 | 30 yr Amort (issued 2017) |
| Highland Capital Management Services | 6,677,529 | 30 yr Amort (issued 2017) |
| HCRE | 5,938,670 | 30 yr Amort (issued 2017) |
| Trussway | 1,004,993 | Due upon maturity - 11/1/2021 |
| SSP Holdings, LLC | 2,037,898 | Due upon maturity - 11/22/2022 |
| Siepe | 2,334,606 | Equity conversion option |
| Highland Capital Management Fund Advisors | 10,530,971 | Demand |
| James Dondero | 8,911,977 | Demand |
| Multi-Strategy Credit Fund | 1,269,000 | Demand |
| HCRE | 4,859,929 | Demand |
| Highland Select Equity Fund | 3,000,000 | Demand |
| Highland Capital Management Korea | 3,760,000 | Due upon maturity - 4/21/2037 |
| Highland Capital Management Services | 934,331 | Demand |
| **Total Notes Receivable** | $    92,895,380 | |

Demand                                    29,506,208



redacted

redacted

CONFIDENTIAL

HCMFA APP 0646
D-HCMFA290881



CONFIDENTIAL

HCMFA APP 0647
D-HCMFA290882

********************************************************************************************

redacted

4

CONFIDENTIAL

HCMFA APP 0648
D-HCMFA290883

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 201-2 Filed 01/22/24    Page 52 of 261    PageID 28368
Appendix Part 2 Page 200 of 379
Case 21-03005-sgj Doc 1-2 Filed 01/22/21    Entered 01/22/21 17:59:27    Page 2 of 4

## HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

      Re: Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year. Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately</u>.** Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41916.2 36027/002



EXHIBIT
17
CMEA APP 0049
Hendrix

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 16-2 Filed 01/22/21   Page 53 of 261   PageID 28369
Case 21-03005-sgj Doc 1-2 Filed 01/22/21   Entered 01/22/21 17:59:27   Page 3 of 4

cc:   Fred Caruso
      James Romey
      Jeffrey Pomerantz
      Ira Kharasch
      Gregory Demo
      DC Sauter

HCMFA APP 0650

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 28-1   Filed 02/02/24   Page 54 of 261   PageID 28370
Case 21-03005-sgj Doc 1-2 Filed 01/22/21   Entered 01/22/21 17:59:27   Page 4 of 4

## Appendix A

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

HCMFA APP 0651

redacted

CONFIDENTIAL

HCMFA APP 0652   D-NNL-007578

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 29 filed 2 filed 02/04/24   Page 56 of 261   PageID 28372
Appendix Part 2 filed 02/04/24   Page 56 of 261   PageID 28372

CONFIDENTIAL

David Klos - October 27, 2021

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
 2             FOR THE NORTHERN DISTRICT OF TEXAS
 3                      DALLAS DIVISION
 4                         --o0o--
 5
 6   HIGHLAND CAPITAL MANAGEMENT,      )
     L.P.,                            )
 7                                    )
                  Plaintiff,          )
 8                                    )
              vs.                     ) No. 21-03004-sgj
 9                                    )
     HIGHLAND CAPITAL MANAGEMENT FUND )
10   ADVISORS, L.P.,                  )
                                      )
11                Defendants.         )
12   _____
13                    DEPOSITION OF
14                     DAVID KLOS
15                   October 27, 2021
16   _____
17
18          DEPOSITION OF DAVID KLOS, produced as a
19   witness, duly sworn by me via videoconference at the
20   instance of the DEFENDANTS, was taken in the
21   above-styled and numbered cause on October 27, 2021,
22   from 2:30 P.M. to 5:14 P.M., before BRANDON D. COMBS,
23   CSR, RPR, in and for the State of Texas, reported by
24   computerized machine shorthand, at 500 North Akard
25   Street, 38th Floor, Dallas, Texas.
```

David Klos - October 27, 2021

```
1                           APPEARANCES

2

3               MUNSCH, HARDT, KOPF & HARR, PC, 500 North

4   Akard Street, Suite 3800, Dallas, TX 75201, represented

5   by DAVOR RUKAVINA, Attorney at Law, appeared via

6   videoconference as counsel on behalf of the Defendants.

7               Email: drukavina@munsch.com

8

9

10              PACHULSKI, STANG, ZIEHL & JONES, 780 Third

11  Avenue, 34th Floor, New York, NY 10017-2024, represented

12  by JOHN A. MORRIS, Attorney at Law, appeared via

13  videoconference as counsel on behalf of the Plaintiff.

14              Email: jmorris@pszjlaw.com

15

16

17              STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,

18  Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney

19  at Law, appeared via videoconference as counsel on

20  behalf of the Defendants Jim Dondero, HCMS and HCRE

21  Partners.

22              Email: michael.aigen@stinson.com

23

24

25
```

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 176-21    Filed 06/20/24    Page 59 of 261    PageID 28375
Appendix Part 2    Page 2074 of 3788

3

David Klos - October 27, 2021

1                              INDEX

2                                                    PAGE

3    Examination by MR. RUKAVINA                         4

4    Examination by MR. AIGEN                           95

5    Examination by MR. MORRIS                         109

6    Further Examination by MR. RUKAVINA               127

7

8

9

10           (No exhibits marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-9 Filed 06/01/24   Page 60 of 261   PageID 28376
Appendix Part 2 Page 2024 of 3798

4

David Klos - October 27, 2021

```
 1                      DAVID KLOS,
 2    having been first duly sworn, testified as follows:
 3                      EXAMINATION
 4        Q.   (BY MR. RUKAVINA)  Sir, state your name for
 5   the record, please.
 6        A.   David Klos.
 7        Q.   K-l-o-s?
 8        A.   K-l-o-s.
 9        Q.   What's your date of birth?
10        A.   May 6, 1982.
11        Q.   And where do you live?
12        A.   I live in Dallas.
13        Q.   What's your educational background?
14        A.   Undergraduate and graduate degrees.  I went
15   to undergrad at Boston College, graduate school at SMU,
16   with a degree in, Master's of Science in accounting and
17   MBA from SMU.
18        Q.   Do you hold any professional licenses?
19        A.   CPA in the state of Texas and, I don't know
20   if it's technically a license, but Series 27 from
21   FINRA.
22        Q.   And when did you get your CPA license?
23        A.   I don't recall specifically, but it would
24   have been probably in the '08, '09 time frame.
25        Q.   Is it current?
```

David Klos - October 27, 2021

1      A.    As far as I know.

2      Q.    Have you ever been disciplined or threatened

3  with disciplinary proceedings?

4      A.    No.

5      Q.    And your relevant work experience, please,

6  starting with college and afterwards?

7      A.    Sure.  Out of grad school I started working

8  at Deloitte in Boston.  I worked at Deloitte for

9  approximately three and a half years, between the

10 Boston office and the Dallas office.

11         And then I began working at Highland Capital

12 Management in March of 2009 and I've been at Highland

13 since then.

14     Q.    And when you joined Highland in March of

15 2009, what was your title or your role at that time?

16     A.    My title, if I remember correctly, was

17 valuation senior analyst.  I'm not certain if that was

18 exactly it, but it was something along those lines.

19     Q.    Was it in the valuation group?

20     A.    Yes.

21     Q.    And then give me your -- today you're the CFO

22 of Highland; correct?

23     A.    Correct.

24     Q.    So give me the progression from valuation

25 analyst to CFO with, to the best of your recollection,

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 176 Page 1 Filed 09/04 of 379 ge 62 of 261    PageID 28378

6

David Klos - October 27, 2021

1  the approximate year that you were promoted, et cetera?

2      A.    Sure.   I was in the valuation role from

3  basically March of 2009 to end of 2009.

4          I was then brought over to what we call the

5  corporate accounting team, so doing the accounting for

6  Highland Capital Management, LP and of the other

7  advisor-type entities, where I was primarily focused on

8  budgeting and forecasting, credit facility compliance.

9          That took from roughly 2010 until I think

10  middle of 2011, at which point I was moved over to the

11  fund accounting group, so doing hedge fund accounting,

12  which was a short role, really, for probably three or

13  four months.

14          At which point I was brought back to the

15  corporate team and also put in charge of the valuation

16  group.   I held that role in some way, shape, or form

17  more or less continuously for the next several years,

18  although certainly my role evolved and changed.

19          But in terms of the groups that I had

20  oversight over, those were the groups.   Like I said, my

21  role definitely evolved over time from 2011.

22      Q.    So by 2017 what was your title?

23      A.    So, yeah, by that time, I was, I believe,

24  controller.   I might have still been assistant

25  controller.

David Klos - October 27, 2021

1            There were a few title changes in between
2    there.  I think at one point I was manager, at one
3    point I was senior manager, at one point I was
4    assistant controller and at one point I was controller.
5            I can't remember the exact times of all of
6    those break points.
7        Q.   Let me pause you.  When you were assistant
8    controller, who was the controller?
9        A.   There was quite a bit of time where I was
10   assistant controller and we didn't have a controller.
11   I couldn't tell you the exact time frame, but there was
12   definitely an extended time frame.
13           And then in April of 2020, our existing chief
14   accounting officer left and I assumed his
15   responsibilities at that time.
16       Q.   Let me pause you.  That's a new term for me.
17   Chief accounting officer?
18       A.   Uh-huh.
19       Q.   Who was that person?
20       A.   The person that left?
21       Q.   The person that was the chief accounting
22   officer until April 2020.
23       A.   Cliff Stoops.
24       Q.   And do you have any idea or knowledge whether
25   at Highland that was like an officer-level position?

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-2   Filed 09/24   Page 64 of 261   PageID 28380
Appendix Part 2 Page 09/24 of 379

8

David Klos - October 27, 2021

1      A.   It was not.  It was more of a term of art, I
2   would describe it.  So it -- so, yeah --
3      Q.   To the best of your recollection, when did
4   you become the controller at Highland Capital
5   Management, LP?
6      A.   I couldn't pin down a specific date.  Like I
7   said, the responsibilities were very similar.  I would
8   guess the change from assistant controller to
9   controller was probably in the, most likely in the '16,
10  '17, maybe '18 time frame.
11     Q.   Can we agree that as of May 1, 2019, you were
12  the controller at Highland?
13     A.   Yes.
14     Q.   So let's focus on that time frame, May 2019,
15  and you're the controller.  Who do you report to at
16  Highland?
17     A.   Frank Waterhouse.
18     Q.   The CFO?
19     A.   Correct.
20     Q.   No one in between you and him?
21     A.   Correct.
22     Q.   So what -- explain to me the role between the
23  chief accounting officer and the chief financial
24  officer in that time frame, '19, '20?
25          MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1   question.

2          THE WITNESS:  Very little.  Like I said,

3   chief accounting officer was more of a term of art.

4   What that role actually had oversight of was our retail

5   fund accounting, institutional fund accounting,

6   operations, so loan settlement and treasury.

7          And probably another department or two that

8   I'm forgetting, but it did not have any oversight over

9   the corporate accounting group.

10      Q.   (BY MR. RUKAVINA)  And in May of 2019, as the

11  controller, what were -- what was your role or what

12  were your duties?

13      A.   In May of 2019 I was at that point still

14  overseeing the valuation group.  I was overseeing the

15  corporate accounting group, which my primary direct

16  report there was Kristin Hendrix, who really was the

17  day-to-day person.  But I certainly oversaw her.

18      Q.   By that you mean the person that answers to

19  you?

20      A.   Correct.  Sorry.  If I flipped that, I

21  apologize.  So I was overseeing that group, which had,

22  you know, fairly broad responsibilities.

23          In terms of, you know, accounting for the

24  Advisor, doing forecasts when they were called for,

25  performing the audit every year, managing cash,

David Klos - October 27, 2021

1  processing payroll, things of that nature.

2         And then at that time I was also put in

3  charge of one of the public REITs that was launching at

4  the time under the NexPoint flag.  And getting that

5  team started.

6     Q.   Did you mention that in May of 2019 you were

7  still involved with the valuation group?

8     A.   I did.

9     Q.   Did you have a title at the valuation group?

10    A.   Nothing distinct from my overall controller

11 title.  These titles were often, like I said, terms of

12 art, whether it was controller or chief accounting

13 officer.

14    Q.   What did the valuation group at Highland do?

15    A.   Well, valuation group was really a liaison

16 with both third-party pricing providers, pricing

17 services, brokers on the street, front office, members

18 at Highland.

19         To, you know, to work on valuing the

20 securities held across the platform, both for Highland

21 HCMLP managed funds as well as affiliated managed

22 funds.

23    Q.   So who did -- did you report to anyone at the

24 valuation group?  In other words, did it have its own

25 separate hierarchy kind of?

David Klos - October 27, 2021

1    A.    Frank Waterhouse.

2    Q.    And were --

3    A.    I should clarify too, that the valuation team

4 isn't ultimately responsible for the valuations

5 themselves, but they do act in this liaison role.

6    Q.    Perhaps that's my confusion.  Is there a

7 separate group that handles just valuation?

8    A.    No.

9    Q.    Is there an outside consultancy that handled

10 that in May of 2019?

11    A.    I don't know if I would call it consultancy,

12 but there was a third-party valuation service provider

13 that would do certain of the, call it illiquid, harder

14 to value securities.

15    Q.    So would you say that you were pretty busy in

16 April, May 2019?

17          MR. MORRIS:  Objection to the form of the

18 question.

19          THE WITNESS:  I've been busy throughout my

20 career.

21    Q.    (BY MR. RUKAVINA)  In April, May, June 2019,

22 how many hours a month do you estimate you worked for

23 Highland?

24          MR. MORRIS:  Objection to the form of the

25 question.

David Klos - October 27, 2021

1          THE WITNESS:  I don't remember.  A
2   significant number.
3          Q.   (BY MR. RUKAVINA)  Certainly full-time?
4          A.   Absolutely.
5          Q.   Would you say that you were working more than
6   200 hours a month in that time frame for Highland?
7          A.   I don't know how many hours.  I should
8   clarify, we're using Highland very liberally.  When I
9   say Highland, supporting the entire apparatus,
10  platform.  Significant number of hours at that time,
11  and before and after.
12         Q.   And let's explore that a little bit.  You
13  mentioned one of the funds for NexPoint.  I'd like to
14  talk about NexPoint Advisors, LP, just NexPoint
15  Advisors, LP.
16         Did you ever have an official role or title
17  with NexPoint Advisors, LP?
18         A.   Not that I can remember.
19         Q.   Do you know if you were ever the controller
20  for that entity?
21         A.   I'm not certain.  I'm not certain.
22         Q.   But I take it that pursuant to the shared
23  services agreement you, as an employee of Highland,
24  were providing services on behalf of NexPoint?
25         MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

```
 1   question.
 2            THE WITNESS:  I provided many of the same
 3   services for NexPoint Advisors that I provided for
 4   Highland, similar types of services.
 5        Q.   (BY MR. RUKAVINA)  And briefly about Highland
 6   Capital Management Fund Advisors, LP, HCMFA, did you
 7   ever have like an official title or role with that
 8   entity, to your knowledge?
 9        A.   Again, not that I can remember.
10        Q.   Not to your knowledge, the controller ever of
11   that entity?
12        A.   I'm not certain whether I was or not.
13        Q.   But you provided services to that entity as
14   part of your role at Highland pursuant to shared
15   services?
16        A.   Similar to NexPoint as I described.
17        Q.   When you were controller of Highland, was
18   that an officer-level position at Highland?
19        A.   No.
20        Q.   When did you become the chief financial
21   officer of Highland?
22        A.   Chief financial officer?
23        Q.   Uh-huh.
24        A.   2021, March.
25        Q.   After Mr. Waterhouse was gone?
```

David Klos - October 27, 2021

```
 1        A.    Yes.
 2        Q.    And I'm going to ask you a little bit about
 3   your compensation today at Highland.
 4              You don't have to give me specific numbers
 5   unless I ask you, please, but I take it you have a base
 6   compensation?
 7        A.    Yes, I have a base.
 8        Q.    Do you have any bonus structure compensation?
 9        A.    Yes, I have a bonus.
10        Q.    And what is that bonus number or whether it's
11   paid out based upon or contingent upon?
12              MR. MORRIS:  Objection to the form of the
13   question.
14              THE WITNESS:  As I understand, it's based on
15   my offer letter.
16        Q.    (BY MR. RUKAVINA)  On your what?
17        A.    My letter for extending an offer.
18        Q.    Tell me, what is your -- without having to
19   use express numbers, what is your bonus compensation?
20   When is it paid, et cetera?
21        A.    Yeah, so it's not too dissimilar from the
22   prior Highland plan that has semiannual installments
23   payable.  And then there's a, kind of an end of plan
24   bonus when -- I don't remember the specifics on exactly
25   what triggers that, but it's back-ended in the plan.
```

David Klos - October 27, 2021

1      Q.   Do you have an expectation as to when the
2  winding down and monetization of Highland and its
3  assets will be complete?
4      A.   That's very hard to speculate, especially
5  given the amount of litigation that's going on because
6  I don't know when that's going to play out and that's a
7  material asset.
8      Q.   Have you discussed with Mr. Seery how long
9  that might be?
10     A.   Not that I can specifically remember.
11     Q.   Do you believe it will be at least probably
12  two years, from today?
13     A.   I don't know.
14     Q.   This bonus compensation, does it or any
15  amount of it depend on how well Highland or the
16  claimant trust, how well they do vis-a-vis collecting
17  money from creditors?
18     A.   Not that I can think of.  I'd have to
19  probably go back and look and understand the back-end
20  piece to say definitively.
21     Q.   And back-end piece, does that mean whenever
22  the winding down is completed?
23     A.   Yeah, like I said, I'm not exactly -- I'm not
24  completely facile with the exact timing, if it's
25  completed 100 percent or 80 percent, what kind of

David Klos - October 27, 2021

1  qualitative considerations go into that.  But

2  substantially completed.

3       Q.   Sitting here today, do you think or believe

4  that any portion of your compensation over the next

5  however long it takes to wind down Highland depends on

6  how much Highland recovers from the litigation

7  regarding promissory notes?

8       A.   I really take exception to that question

9  because the insinuation is that it's going to somehow

10 change my answers here, and it's absolutely not.

11          How litigation, it may or may not affect my

12 ultimate compensation, but that's not going to affect

13 one iota of the answers I give you today or at any

14 time, whether I'm on or off the record.

15      Q.   Fair enough.  So you're going to testify

16 today truthfully regardless of your compensation.  I

17 got you; right?  Correct?

18      A.   I didn't follow what you just asked me.

19      Q.   You're going to testify today truthfully

20 regardless of how these events may or may not affect

21 your compensation; right?

22      A.   It's such a loaded question I can't even

23 begin to answer that.

24      Q.   So sitting here today -- I want to ask you

25 the same question I did before, and your answer to me

1  was that you took exception to the insinuation.  Now

2  I'd like you to answer my question.

3          Which is, sitting here today, do you believe

4  that any part of your compensation in the future,

5  however long it takes to wind down Highland, is going

6  to depend on how well Highland does in these

7  litigations concerning the notes?

8      A.   I believe my ultimate compensation will

9  depend on how long this process takes, which I don't

10  know, and ultimate recoveries to trust beneficiaries

11  under the plan.

12          And so I do expect that it will vary, but I

13  would reiterate my earlier comment.

14      Q.   So sitting here today, you understand that if

15  the trust beneficiaries recover more, then you might be

16  compensated more?

17      A.   That's possible.

18      Q.   Well, sir, I'm not trying to be a smart ass,

19  but --

20          MR. MORRIS:  Actually, you're coming awfully

21  close, just to be clear, so be careful, because I'm

22  offended as well.  But continue.

23          MR. RUKAVINA:  I'm entitled to ask the man

24  about his compensation.

25          MR. MORRIS:  Right.  And your clients have

David Klos - October 27, 2021

1    $75 million, hard dollars at stake in this litigation,
2    so we should never believe anything that he says?  Is
3    that where we are now?
4         Q.   (BY MR. RUKAVINA)  Sir, again, what is your
5    bonus compensation as it relates to how well the
6    claimant trust does?  Do you remember or not?
7         A.   I don't know that that's even something that
8    I could know at this point.
9         Q.   In preparing for this deposition, I take it
10   you spoke to legal counsel, and I'm not entitled to
11   know that and I'm not asking that.
12              But did you talk to anyone else?
13        A.   I've spoken in general terms to Mr. Seery.
14        Q.   Okay.  Anyone else?
15        A.   I've spoken, again in general terms, to
16   Kristin Hendrix.
17        Q.   Anyone else?
18        A.   Not that I can think of.
19        Q.   Now, I understand you spoke to Ms. Hendrix
20   when legal counsel was present; right?
21        A.   Yes.
22        Q.   So let's exclude that conversation.
23              Did you have any conversations with
24   Ms. Hendrix regarding this deposition or this
25   litigation at which counsel was not present?

David Klos - October 27, 2021

1    A.   Not in any substance.

2    Q.   And when do you recall you might have had

3  those discussions with her?

4    A.   I'm not even sure.

5    Q.   Would it have been recently or like 9,

6  10 months ago?

7    A.   No, it would have been recently.

8    Q.   And with Mr. Seery, when did you have a

9  general conversation with Mr. Seery?

10    A.   I've had, you know, one or more general

11  conversations with Mr. Seery.  It's my understanding

12  that he was the 30(b)(6) witness, and he had questions

13  in preparation for his role in that.

14    Q.   So that would have been before last Thursday

15  that you talked to him?  I'll represent to you that

16  that's when his deposition was.

17    A.   Yeah, if I'm accepting that representation,

18  yes, prior to.

19    Q.   Other than that conversation with respect to

20  him preparing for the 30(b)(6), did you have a

21  discussion with him about this litigation as it might

22  relate to your deposition?

23    A.   I don't believe so in terms of relating to

24  this deposition.  We've talked at length about the

25  notes more generally.

David Klos - October 27, 2021

1       Q.    And we'll go through that I'm sure.

2             So other than the conversations with

3  Ms. Hendrix and Mr. Seery and, of course, with counsel

4  that I'm not entitled to know about, did you discuss

5  this deposition or what you might be asked today with

6  anyone else?

7       A.    No.

8       Q.    Okay.  Did you read all or any portions of

9  the deposition of Frank Waterhouse?

10      A.    Certainly didn't read all of it.  I have a

11  general understanding of the topics that were -- that's

12  a bad way to frame it.

13            I have a general understanding of a few

14  points that were covered in his deposition.

15      Q.    Were you provided -- were you provided the

16  exact pages of any of his deposition?

17            MR. MORRIS:  Objection.  Direct him not to

18  answer.

19            MR. RUKAVINA:  You're going to direct him not

20  to answer whether he read --

21            MR. MORRIS:  If you're asking him whether I

22  directed him to particular --

23            MR. RUKAVINA:  I didn't ask that.

24            MR. MORRIS:  Rephrase your question.

25      Q.    (BY MR. RUKAVINA)  Did you read any pages

David Klos - October 27, 2021

```
1   from Mr. Waterhouse's deposition?
2           MR. MORRIS:  Objection.  Asked and answered.
3           You can answer again.
4           THE WITNESS:  I don't recall -- I don't
5   recall reading it.
6       Q.   (BY MR. RUKAVINA)  So were you provided a
7   summary of his deposition?
8       A.   I have had discussions with Mr. Morris in
9   preparation for this deposition.
10      Q.   That's fine.  And we can stop there.
11           Did you read or -- did you read the whole or
12  any portion of Mr. Seery's deposition?
13      A.   No, I don't believe I -- no, I don't believe
14  so.
15      Q.   Is it the same answer, that whatever you
16  discussed would have been through counsel?
17      A.   Yes.
18      Q.   Did you see any of the videotape of either
19  Mr. Waterhouse's or Mr. Seery's deposition?
20      A.   No.
21      Q.   So let's talk about the NexPoint
22  $30.7 million note.
23           You're familiar with that note; right?
24           MR. MORRIS:  Objection to the form of the
25  question.
```

David Klos - October 27, 2021

1              THE WITNESS:  Before I answer that, I'd like
2    to see the note.
3         Q.   (BY MR. RUKAVINA)  It's in here.  I'm looking
4    for the exhibit number.  It's in here somewhere.
5         A.   Yes, I'm familiar with this note.
6         Q.   Are you familiar with anything having to do
7    with the negotiation or execution of this note?
8              MR. MORRIS:  Objection to the form of the
9    question.
10             THE WITNESS:  Can you repeat.
11        Q.   (BY MR. RUKAVINA)  Yes.  Let me rephrase it.
12             Did you have anything to do, back on or about
13   May 31, 2017, with the negotiation or execution of this
14   promissory note?
15             MR. MORRIS:  Objection to the form of the
16   question.
17             THE WITNESS:  Nothing with respect to the
18   negotiation --
19        Q.   (BY MR. RUKAVINA)  I'm sorry.
20        A.   In terms of the execution, I believe I
21   coordinated with internal counsel, who drafted the
22   note, and I can't remember -- I can't recall one way or
23   the other if I assisted in actually physically
24   receiving signatures.  I just don't remember.
25        Q.   Do you remember who that internal counsel

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 1-6 Appendix Part 2 Filed 03/22/24    Page 79 of 261    PageID 28395

23

David Klos - October 27, 2021

```
 1   was?
 2        A.    Yeah, it was Lauren Thedford, who is Highland
 3   in-house counsel.
 4        Q.    She's a lawyer?
 5        A.    Yes.
 6        Q.    Do you recall from that -- strike that.
 7              Did you know on or about May 31, 2017 what
 8   the purpose or reason behind Exhibit 13, this
 9   promissory note, was?
10              MR. MORRIS:   Objection to the form of the
11   question.
12              THE WITNESS:   The purpose was to take
13   existing notes, which I believe were exclusively demand
14   notes, I'm not a hundred percent certain on that, and
15   roll them into a single note that would have a 30-year
16   amortization period.
17        Q.    (BY MR. RUKAVINA)   Do you know why that was
18   done?
19        A.    I believe it was done probably for a number
20   of reasons, one of which was to ensure some level of
21   cash flow back to Highland, when I say Highland,
22   Highland Capital Management, LP, on an annual basis.
23        Q.    Was that a concern at Highland Capital
24   Management, that it wasn't getting any level of cash
25   flow back?
```

David Klos - October 27, 2021

1      A.   It wasn't a concern of mine.  I don't know if
2  it was a concern of others.
3      Q.   Do you recall whether any auditor ever raised
4  that concern?
5      A.   The auditors did raise that in conjunction
6  with the audit that was concluding around this time.
7  So yes, they did raise it, you know, probably in the
8  May of 2017 time frame.
9      Q.   Do you know who decided that it would be a
10 30-year term note?  By that I mean 30 years.
11     A.   Jim Dondero.
12     Q.   Do you know if he decided that in connection
13 with discussions with anybody or, to your knowledge, he
14 just decided?
15     A.   As far as I know he just decided it.  I
16 believe there was a draft at one point that was for
17 20 years, and he wanted to do 30.
18     Q.   So this note is executed in May 31, 2017.
19 Did you have any further role prior to, let's say,
20 December 1, 2020 with respect to anything to do with
21 this promissory note?
22     A.   Sorry, tell me the date again.
23     Q.   From execution of the note until December 1,
24 2020?
25     A.   And the question was?

David Klos - October 27, 2021

1    Q.   Did you have any role in that time frame with
2  respect to this promissory note on behalf of Highland?
3         MR. MORRIS:   Objection to the form of the
4  question.
5         THE WITNESS:   I don't know how to answer
6  that, it's such an open-ended question.  I just don't
7  know how to respond to that.
8    Q.   (BY MR. RUKAVINA)   If payments were made on
9  this note, would you have any duty to record or credit
10  those payments?
11         MR. MORRIS:   Objection to the form of the
12  question.
13         THE WITNESS:   I wouldn't have personally in
14  my role, but my team would have been involved in the
15  recording of those.
16    Q.   (BY MR. RUKAVINA)   And when payments were due
17  on this note, did you personally have any role with
18  respect to doing anything to facilitate those payments?
19    A.   When payments were due did I have anything --
20  yes.
21    Q.   What was your role?
22    A.   So my role, as part of the corporate team,
23  part of our role is managing cash at the various
24  entities.  So I was involved in weekly cash meetings,
25  where things like upcoming, whether it's an obligation

David Klos - October 27, 2021

1   or a receipt, would be put on people's radars.

2          And we would, in connection with the 30-year

3   notes such as this one from NexPoint, we would either

4   confer with Jim or -- certainly Jim.  Also likely his

5   accountant.

6          In terms of teeing them up to make sure that

7   they were prepared from a cash flow statement to make

8   the payment.

9      Q.   What do you mean by his accountant?

10     A.   Melissa Schroth.

11     Q.   What do you mean by his?  That's a new name

12  to me.  Who is Melissa Schroth?

13     A.   I find it hard to believe that she's a new

14  name to you.  But I think her title was executive

15  accountant, and she was the keeper of Jim's -- many of

16  Jim's trusts and personal entities.

17     Q.   Was she a Highland employee?

18     A.   She was.  And when I say Highland, I should

19  be clear, Highland Capital Management, LP.

20     Q.   So when you say Jim's accountant, she was

21  still a debtor employee, just that she handled

22  primarily Jim's personal matters?

23     A.   She was still a Highland Capital Management,

24  LP employee but she did Jim's personal matters.

25     Q.   Did you have any role at either Highland

David Klos - October 27, 2021

```
1   Capital Management or NexPoint Advisors as to a
2   decision as to whether any prepayments on this note
3   would ever be made?
4          MR. MORRIS:  Objection to the form of the
5   question.
6          THE WITNESS:  Can you repeat.
7      Q.   (BY MR. RUKAVINA)  Let's start from scratch.
8          Do you have any memory of any payments being
9   made on this note, Exhibit 13, prior to their scheduled
10  dates of payment?
11     A.   There were payments on -- and to be clear,
12  we're talking about the original 30.7- NexPoint
13  promissory note?  There were payments that I recall
14  happening throughout 2019 on this note.
15     Q.   And we can look at Exhibit 14.
16          MR. MORRIS:  What number?
17          MR. RUKAVINA:  14, 1-4.
18     Q.   (BY MR. RUKAVINA)  And those are only
19  numbered because Ms. Hendrix, they were used for her
20  deposition.
21     A.   Sure.  Just trying to keep these in order, I
22  apologize.  Got it.
23     Q.   Do you recognize Exhibit 14?
24     A.   Generally.  I can't say that I can verify
25  that this is completely accurate.  But it looks
```

David Klos - October 27, 2021

1   familiar to a loan amortization schedule.

2        Q.   Would it have been maintained by Highland?

3        A.   Yes.

4        Q.   And I'll tell you that no one has yet to

5   authenticate this with a hundred percent precision, so

6   I'm not asking you to ratify these numbers, but let's

7   assume that they are what they are.

8             This does purport to show on the second page

9   a number of transfers in 2019, which goes along with

10  your recent answer.

11            Do you see those, sir?

12       A.   I do.

13       Q.   In particular, 750,000, then 1.3 million,

14  300,000, 2.1 million, 630,000, 1.3 million.

15            You see all those, sir?

16       A.   Yes, I see every one.

17       Q.   Do you have any memory, without going into

18  those transfers of those dates to the dollar, do you

19  have any memory that those transfers were made?

20       A.   Yes.  Again, not a specific recollection of

21  where I was at the time, but yes, I know that these

22  transfers were made.

23       Q.   Do you know why they were made in those

24  amounts and on those dates?

25       A.   No, not without speculating.

David Klos - October 27, 2021

1     Q.   What would be your speculation if you were to
2  speculate?
3     A.   My speculation would be that it would be for
4  liquidity needs at HCMLP, Highland Capital Management,
5  LP, needing liquidity to operate.  Again, that's
6  speculation.  I don't know for a fact that that's true,
7  but that's what I would assume.
8     Q.   Who would have made those decisions in 2019
9  to transfer those funds?
10          MR. MORRIS:  Objection to the form of the
11  question.
12          THE WITNESS:  Yeah, it would have been either
13  Frank or Jim.  I can't say with certainty, but one of
14  the two.  When I say Jim, I should be clear,
15  Mr. Dondero.
16     Q.   (BY MR. RUKAVINA)  Between January and
17  July 2019, do you have any recollection that there was
18  any particular liquidity issue or need at Highland
19  Capital Management?
20     A.   Yeah, Highland was dealing with liquidity
21  problems throughout 2019.  Maybe not every single day
22  of the year, but we were continuously needing to bridge
23  liquidity.
24     Q.   And you joined Highland in 2009.  From that
25  point in time, 2009, through 2019, was there any

David Klos - October 27, 2021

```
 1   practice at the enterprise of those businesses to
 2   transfer funds between each other on a basis of when
 3   one needed it and one had it?
 4        A.   Yes, that was a fairly, generally speaking,
 5   that was a fairly common practice, of using different
 6   entities within the overall structure to bridge
 7   liquidity.
 8        Q.   Would that have been Mr. Dondero who, in the
 9   final analysis, would have made those decisions?
10        A.   Maybe not a hundred percent, but I'd say
11   the -- if not a hundred percent, certainly most.
12        Q.   And who else might have participated,
13   Mr. Waterhouse?
14        A.   Potentially Mr. Waterhouse.  And the reason I
15   hedge on that a little bit is I don't think Frank would
16   have made any of these decisions on his own either.
17   But I may have heard them from Frank via Jim.
18        Q.   So in those same years, were you ever asked
19   by Mr. Dondero or Mr. Waterhouse as to whether funds
20   should be transferred from one entity to another for
21   liquidity purposes?
22        A.   Can you ask that again, please.
23        Q.   Yes.  Trying to understand, were you part of
24   those discussions as to whether these transfers should
25   be made, or did you just learn that a decision to make
```

David Klos - October 27, 2021

1  them had been made and you executed them?

2      A.    Both, depending on the circumstances.

3      Q.    So sometimes you would be brought into a

4  discussion?

5      A.    Yes.

6      Q.    And can you think of any particular example?

7      A.    Of when I was brought into the discussion of

8  whether to transfer?  I can't think of an individual

9  example but we met quite regularly with Jim on cash.

10          So to the extent that either he needed cash

11  on one of his entities, he might let us know that.  Or

12  to the extent that Highland needed cash, we might let

13  him know that and ask for basically his assistance in

14  helping us to meet our own cash needs.

15      Q.    And did he usually find a way to facilitate

16  the cash need either at one of his entities or at

17  Highland?

18      A.    I suppose until October 16 of 2019.

19      Q.    Yes.  Prior to bankruptcy, do you recall any

20  instance where one entity wasn't able to transfer funds

21  to another for liquidity purposes?

22      A.    I can't think of a specific situation.  But

23  I'm sure there were situations where -- you know, cash

24  was always something that was being juggled, so I don't

25  know that necessarily liquidity could be met the same

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176 Page 2   Filed 03/24 Page 88 of 261   PageID 28404
Appendix Part 2   Page 2364 of 379
32

David Klos - October 27, 2021

1  day.

2         But eventually we were able to manage through

3  those situations, you know, oftentimes through some of

4  these loans.

5      Q.    In instances that you may remember when

6  Highland Capital Management needed liquidity, do you

7  know how Mr. Dondero decided from which other entity to

8  transfer the cash?

9      A.    I can't step into his brain and think about

10 his decision-making process, but if I was going to

11 oversimplify it I would speculate that it would be

12 based on who has cash in that moment.

13     Q.    Would he ask you or someone on your team who

14 had cash?

15     A.    At times, depending on which entity we're

16 talking about.  Because my team certainly didn't have

17 responsibility for every single entity in the

18 enterprise, but we did have responsibility for some.

19     Q.    And if your team -- so -- strike that.

20        So over the general -- talking about

21 generally now, over those 10 years when there were

22 these intercompany transfers for liquidity purposes,

23 how were they booked by the debtor, by Highland Capital

24 Management?

25        MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

```
 1   question.
 2           THE WITNESS:  Help me on the direction.  So
 3   this is money that Highland is receiving or money that
 4   Highland is sending?
 5       Q.   (BY MR. RUKAVINA)  Sending out.
 6       A.   Sending out.  So this is -- in the scenario
 7   that you're describing, this money that Highland is
 8   sending out to meet some other corporate obligor's
 9   liquidity needs?
10       Q.   Yes, sir.
11       A.   So those would be booked as a loan.  I
12   would -- I need to hedge a little bit because I'm not
13   a hundred percent certain, but I would say if not
14   exclusively via loans close to exclusively.
15       Q.   And would they -- strike that.
16           Would they usually be papered up with a
17   promissory note?
18       A.   Yes.
19       Q.   Now, why was that the general course during
20   10 years?  Was there a policy and procedure in place,
21   or would Dondero say book it as a loan, or was that
22   just the right thing to do from an accounting
23   perspective?
24           MR. MORRIS:  Objection to the form of the
25   question.
```

David Klos - October 27, 2021

```
 1            THE WITNESS:  At the end of the day it's at
 2   the direction of Jim Dondero, so I can't tell you
 3   exactly why he wanted it to be done that way.  But that
 4   was certainly the practice of how it was done in those
 5   situations.
 6       Q.   (BY MR. RUKAVINA)  To your knowledge, did Jim
 7   Dondero ever tell you or anyone else that when Highland
 8   is transferring funds to one of his affiliated entities
 9   that it should always be booked as a loan?
10       A.   So remembering 10 years' worth of
11   conversations, I can't remember a specific instance
12   where he would have said, always book every single
13   transaction I direct you to do as a loan.  However,
14   that was the practice.
15       Q.   Different question.
16            Do you remember that in each instance, and
17   again, that might be unfair over 10 years, but do you
18   remember in each instance when Mr. Dondero said
19   transfer money from Highland to this other entity for
20   liquidity needs that he said book it as a loan?
21            MR. MORRIS:  Objection to the form of the
22   question.
23            THE WITNESS:  I can't recall with any
24   specificity what he may or may not have specifically
25   said so long ago.
```

David Klos - October 27, 2021

1      Q.    (BY MR. RUKAVINA)   To your knowledge, was
2  there any written policy or procedure in place at
3  Highland Capital Management with respect to how
4  transfers from Highland to an affiliated entity should
5  be booked or treated?
6      A.    No written policy or procedure that I'm aware
7  of.
8      Q.    Is it fair to say that by May 2019, the
9  corporate accounting group had handled so many of these
10 transfers that it believed that if Highland was
11 transferring funds to another affiliated entity, it's
12 probably a loan?
13          MR. MORRIS:   Objection to the form of the
14 question.
15          THE WITNESS:   Yeah, I don't know that I can
16 answer that in terms of the corporate accounting team.
17 That just feels way too broad.
18          It was certainly the practice that when
19 somebody needed liquidity and it was appropriate from an
20 accounting perspective, that's how it would be booked.
21          And there was no reason to doubt that that was
22 the appropriate way to do it, particularly with
23 direction from either Frank or Jim.
24      Q.    (BY MR. RUKAVINA)   Is it your testimony that
25 in each instance that happened, that either Frank or

David Klos - October 27, 2021

1  Jim said, this is a loan, the "this" being the transfer
2  from Highland to an affiliated entity for liquidity
3  purposes?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  I can't recall with that level
7  of specificity if those words came out of Jim's mouth.
8  But with 0 percent doubt in my mind, every single one
9  of those loans was done with the authority of Jim or
10 Frank, or both.
11     Q.   (BY MR. RUKAVINA)  So going back to this
12 Exhibit 14, now I'm going to ask you about these
13 payments coming in.
14          Assuming that these payments were actually
15 made in 2019 --
16          And I think, John, you sent me this morning,
17 or maybe last night, some bank statements?
18          MR. MORRIS:  I actually sent all of the
19 backup for all payments made, I think, under the notes
20 at issue a week or two ago.
21     Q.   (BY MR. RUKAVINA)  How would -- so assuming
22 that these payments in 2019 that NexPoint made didn't
23 technically have to be made at that point in time, how
24 would Highland have booked these payments?
25     A.   So I can't tell the column headers, so you'll

1  have to excuse me if I flip them.

2       Q.   They'll be on the first page.  Rip the page

3  off if you need to.

4       A.   First one is interest, second one is

5  principal.  On the far right is the actual amount of

6  the payment.  So, for example, March 29, 750,000.

7            And the -- the column that has the negative

8  411,000 is the application of interest and the 338- is

9  the application of principal.

10      Q.   So again, if Highland -- strike that.

11           If NexPoint made a payment that was not

12  technically due at that point in time, it would be

13  recorded as payments on principal and interest?

14      A.   It would be recorded as it's reflected in the

15  schedule.  So there's an application of interest and an

16  application of principal.

17      Q.   So based on your understanding and

18  experience, if that payment wasn't due at that time,

19  would it have been a prepayment by NexPoint?

20           MR. MORRIS:  Objection to the form of the

21  question.

22           THE WITNESS:  Yeah, I'm not sure that it's a

23  prepayment or not.  It's certainly a payment.  It's

24  certainly voluntary.  It's not spelled out under the

25  schedule.  I don't know that it's a per se, capital P,

David Klos - October 27, 2021

```
 1   prepayment.  I'm just not certain.
 2        Q.   (BY MR. RUKAVINA)  Well, maybe without
 3   respect to these specific transfers.
 4             Generally, generally, if one of the Dondero
 5   affiliates made a payment that wasn't scheduled, how
 6   would the debtor have accounted for that payment?
 7        A.   It would have recorded the payment as a
 8   reduction to either or both outstanding accrued
 9   interest or principal.
10        Q.   You wouldn't call those prepayments?
11        A.   I don't know the definition of prepayment.
12   It's a payment.  It's off schedule, but I don't know
13   whether it's a per se prepayment.
14        Q.   Would that be something in your experience
15   that we would look at the promissory note to maybe
16   determine?
17             MR. MORRIS:  Objection to the form of the
18   question.
19             THE WITNESS:  I don't know.
20        Q.   (BY MR. RUKAVINA)  Well, remember, I'm asking
21   you the same question just in different ways.
22             Who decides at the debtor, or how does the
23   debtor decide, if an unscheduled payment is made, how
24   to apply it?
25             MR. MORRIS:  Objection to the form of the
```

David Klos - October 27, 2021

1   question.

2         Q.   (BY MR. RUKAVINA)   And his objection is

3   valid.   And just to give you a little bit of a fine

4   point, does someone look at the promissory note to

5   decide that?   Or is there some other rule or procedure

6   that someone looks at?

7              MR. MORRIS:   Objection to the form of the

8   question.

9              THE WITNESS:   So the person -- I don't know

10  that I can specifically name a person because the role

11  probably changed over time.

12             But either our corporate accountant, or the

13  corporate accountant's boss, which was Kristin Hendrix

14  for years, would have been responsible for recording and

15  tracking those payments.

16             So some combination of the corporate

17  accountant and Kristin would have applied those

18  payments, and that rolls up through my and Frank's

19  review ultimately.

20        Q.   (BY MR. RUKAVINA)   So if I can round off this

21  discussion, I think you told me a few minutes ago that

22  in each instance that Highland was transferring money

23  out to an affiliate.

24             Whether or not you remember Dondero or

25  Waterhouse saying it's a loan, it would have been a

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-2 Filed 02/24/24   Page 96 of 261   PageID 28412
Appendix Part 2 Page 224 of 378
40

David Klos - October 27, 2021

```
 1  loan because that's how it always was and it was always
 2  authorized.  Generally correct?
 3          MR. MORRIS:  Objection to the form of the
 4  question.
 5          THE WITNESS:  There were a few "always" and
 6  "generallys" in there.  And like I said, when it came
 7  to liquidity needs, my recollection is that these would
 8  be handled via loans.
 9      Q.   (BY MR. RUKAVINA)  And in reverse, if a
10  Dondero entity made a payment prior to a scheduled
11  payment on a note, generally there would be credit
12  against principal and/or interest provided on that
13  note?
14          MR. MORRIS:  Objection to the form of the
15  question.
16          THE WITNESS:  Generally speaking, yes, if the
17  payment was for payment on the note.
18      Q.   (BY MR. RUKAVINA)  Well, that goes back to my
19  question.
20          Do you know how these payments on Exhibit 14
21  in 2019 were determined to be payments on these notes,
22  as opposed to a transfer from NexPoint to Highland for
23  some other reason?
24      A.   What other reason would it be, if I can be so
25  bold.
```

David Klos - October 27, 2021

1     Q.    Can you think of any other reason in 2019?
2     A.     Well, Highland had -- Highland had shared
3  services and intercompany agreements with NexPoint, at
4  this time.
5          But these were not payments that could
6  possibly be confused with those payments.  These are
7  off cycle, they're larger amounts, and there's nothing
8  that they could be other than payments against the
9  loan.
10    Q.   So I asked you before, and I think you said
11 that you were speculating with respect to these
12 payments, that Highland needed money at that time.
13         Do you recall in 2019 any discussions with
14 anyone, Dondero or Waterhouse, to the effect that
15 NexPoint has excess cash so maybe NexPoint should
16 transfer some money to Highland?
17         MR. MORRIS:  Objection.  Asked and answered.
18         THE WITNESS:  Do I still answer?
19    Q.   (BY MR. RUKAVINA)  Yes.
20         MR. MORRIS:  Yes.
21         THE WITNESS:  And sorry, I got lost there.
22    Q.   (BY MR. RUKAVINA)  Yes.  So my predicate was
23 you testified before that you were assuming that these
24 payments were because of a cash need at Highland;
25 right?

David Klos - October 27, 2021

1       A.    Correct.

2       Q.    So with that predicate my question is, do you

3   recall discussing with Dondero or Waterhouse or with

4   anyone as to why NexPoint would be transferring money

5   to Highland at that time?

6       A.    Yes, I would have had conversations with

7   Mr. Dondero or Mr. Waterhouse.

8       Q.    And do you remember specifically in 2019 why

9   these transfers were made from NexPoint as opposed to

10  some other Dondero entity?

11      A.    Not with specificity, but certainly NexPoint

12  was generating cash at that time, and had the ability

13  to assist with Highland's liquidity.

14      Q.    So sitting here today, you've told me

15  generally and logically that you have no specific

16  memory why between January 2019 and August 2019, any of

17  these payments on Exhibit 14 were made by NexPoint?

18      A.    I have no specific memory, but I would say

19  with certainty that most or all of this was driven by

20  Highland HCMLP liquidity needs.

21      Q.    And most or all of this would have been

22  Highland in the first instance going to NexPoint and

23  saying, hey, can you send us some cash?

24          MR. MORRIS:   Objection to the form of the

25  question.

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-21 Filed 09/24/24 Page 99 of 261   PageID 28415
Appendix Part 2 Page 29 of 378

43

David Klos - October 27, 2021

1           THE WITNESS:  Yeah, the premise of that,

2    given that Mr. Dondero is in control of both sides,

3    it's a faulty premise.

4           Q.   (BY MR. RUKAVINA)  But you told me not that

5    long ago that in these weekly cash meetings that it

6    would be your team at Highland who would go to

7    Mr. Dondero and say Highland has a liquidity issue.

8           So wouldn't that liquidity issue have

9    originated with the Highland team?

10          A.   Mr. Dondero is the president of Highland.

11   He's the president of NexPoint.  We're employees of

12   Highland.  We're also shared services providers for

13   NexPoint.

14          The waters are very muddy in terms of who is

15   wearing what hat in that conversation.

16          Q.   But Mr. Dondero doesn't know that Highland

17   has a liquidity issue unless someone from the corporate

18   accounting group tells him, does he?

19          MR. MORRIS:  Objection to the form of the

20   question.  I hope that's not the case.

21          THE WITNESS:  He has the ability to know what

22   our cash position is at any given time, at that time.

23          Q.   (BY MR. RUKAVINA)  So why would you have

24   these weekly cash meetings with Mr. Waterhouse and

25   sometimes Mr. Dondero?

David Klos - October 27, 2021

1      A.   So these were cash forecasts, looking at
2  outlook.  I can tell you almost without exception,
3  maybe -- with maybe without exception, be speculating,
4  but those forecasts would be showing negative numbers
5  at Highland, virtually nonstop.
6           And so it was important, my opinion, but it
7  was probably important to Frank to make sure that he
8  was getting in front of Jim to make sure that those
9  needs were being addressed timely.
10     Q.   So I've asked that question.  I want to ask
11  you a different question.
12           For any of these payments between
13  January 2019 and August 2019 reflected on Exhibit 14,
14  do you have any personal knowledge as to whether they
15  were intended to be prepayments or not?
16           MR. MORRIS:  Objection to the form of the
17  question.
18           THE WITNESS:  I don't know whether they were
19  intended to be prepayments at that time.
20     Q.   (BY MR. RUKAVINA)  Sitting here today, seeing
21  this document as a CPA and as a sophisticated person,
22  do you read this Exhibit 14 to indicate that those
23  payments were booked as prepayments?
24           MR. MORRIS:  Objection to the form of the
25  question.

David Klos - October 27, 2021

1           THE WITNESS:  Again, the term "prepayments"
2    is the one I'm struggling with.  I can ascertain that
3    there are payments and they're off schedule.  But I
4    don't know that I can ascertain that they're
5    prepayments.
6        Q.   (BY MR. RUKAVINA)  Well, if a borrower makes
7    a payment that's ahead of schedule, how would that
8    generally be accounted for?
9           MR. MORRIS:  Objection to the form of the
10   question.
11          THE WITNESS:  It would be accounted for as a
12   reduction of principal or interest or some combination
13   of the two.
14       Q.   (BY MR. RUKAVINA)  Which would relieve the
15   borrower of having to make that at some point in the
16   future; right?
17          MR. MORRIS:  Objection to the form of the
18   question.
19          THE WITNESS:  No.  The borrower still owes
20   the money.  This is showing 23-point -- pick a date.
21   May 31, 23.034-.  That there's significant obligations
22   that are still outstanding.
23       Q.   (BY MR. RUKAVINA)  So on June 4, 2019 -- I'm
24   sorry, on June 19, 2019, the borrower made a
25   $2.1 million payment.  That's what this shows; correct?

David Klos - October 27, 2021

1    A.    I see that.

2    Q.    You're not saying that the borrower would

3  ever have to make that same $2.1 million payment again,

4  are you?

5    A.    No.  What I'm saying is, based on that 2.1-

6  payment -- and this is reading this cold.

7         But based on that 2.1- payment, 66,000 was

8  applied to interest, which left zero accrued interest

9  outstanding.  2.03- applied to principal, which left

10  24.7- and change still outstanding.

11    Q.    Well, I'm going to ask you about the

12  promissory note then, Exhibit 13, in particular

13  Section 3, where it says prepayment allowed.

14         And the first sentence says, may or -- pardon

15  me, maker may prepay in whole or in part the unpaid

16  principal or accrued interest of this note.

17         Do you see that, sir?

18    A.    Yes, I see that.

19    Q.    In your experience, can someone prepay

20  accrued interest?

21         MR. MORRIS:  Objection to the form of the

22  question.

23         THE WITNESS:  The document reads, maker may

24  prepay in whole or in part the unpaid principal or

25  accrued interest of this note.  So I read that to say

David Klos - October 27, 2021

1  that the maker may pay outstanding accrued interest, or
2  unpaid principal.
3       Q.   (BY MR. RUKAVINA)  But my question is, as I
4  understand accrued interest, it means interest that has
5  already occurred or accrued as of the date, like
6  today's date; right?
7       A.   Uh-huh.
8            MR. MORRIS:  Objection to the form of the
9  question.
10      Q.   (BY MR. RUKAVINA)  Do you agree with that?
11           Do you agree with that?  Accrued interest
12  means interest that has already come due, that has
13  actually happened because interest happens over time.
14      A.   Accrued interest --
15           MR. MORRIS:  Objection to the form of the
16  question.
17      Q.   (BY MR. RUKAVINA)  Why don't you start.  Why
18  don't you define for me accrued interest.
19      A.   Sure.  Accrued interest would be outstanding
20  and unpaid interest that -- sorry, it's hard to define
21  it without using the term.  But it's interest that's
22  accumulated in respect of a principal amount through a
23  given date.
24      Q.   So how do you prepay accrued interest?
25      A.   How do you prepay accrued interest.  Again,

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176 Part 2 Filed 02/24 of 372 Page 104 of 261   PageID 28420

48

David Klos - October 27, 2021

1  that's a little bit of a mental jumble.

2       Q.   Exactly.

3       A.   Well, what I'm...

4       Q.   To me one pays accrued interest.  But this

5  note says you can prepay accrued interest.  So I'm just

6  seeing whether you as a CPA, CFO and controller for

7  years agrees that one can prepay accrued interest?

8            MR. MORRIS:  Objection to the form of the

9  question.

10           THE WITNESS:  Frankly, I don't know if it's

11 possible.  That's not how I'm seeing it applied here,

12 based on the quick review of Exhibit 14.

13      Q.   (BY MR. RUKAVINA)  Well, the next sentence

14 says, any payments on this note shall be applied first

15 to unpaid accrued interest hereon, and then to unpaid

16 principal hereof.

17           Do you see that, sir?

18      A.   I see that.

19      Q.   Do you have any understanding based either on

20 your personal knowledge or in your expertise as a CPA

21 and a CFO as to what that sentence means?

22           MR. MORRIS:  Objection to the form of the

23 question.

24           THE WITNESS:  The way that I would read that

25 would be that for a payment, for example, pick a date,

David Klos - October 27, 2021

1   Exhibit 14 again, the $2.1 million payment on or about

2   June 19.  I see that a payment was made.

3           And it was -- it appears that there was

4   accrued and unpaid interest at that time of 66,000.  And

5   so the first 66,000 was applied to outstanding accrued

6   interest, to bring the balance to zero.

7           And the difference between that 66,000 and the

8   2.1 million was applied to principal.

9       Q.   (BY MR. RUKAVINA)  Do you believe, whether

10  from personal knowledge from this note, Exhibit 13, or

11  your experience at Highland or as a CPA, that one can

12  say that interest, accrued interest will be due on a

13  future date, it will accrue by that date, but I'm going

14  to pay it earlier as of that date?

15          MR. MORRIS:  Objection to the form of the

16  question.

17          THE WITNESS:  If I can rephrase back to you

18  just so I make sure I'm understanding the question.

19  You're saying could someone say, I would like to prepay

20  interest into the future.  It hasn't accrued yet, but

21  it will be accrued by end of year.

22          And I would like to be prepaid effectively

23  with respect to that interest, and then have the

24  remainder used to pay down principal.

25          The question is, can someone do that?

David Klos - October 27, 2021

1        Q.    (BY MR. RUKAVINA)  Yes.

2              MR. MORRIS:  I object to the question.

3              THE WITNESS:  I suppose it's possible, but

4   that certainly wasn't the practice if that makes sense.

5        Q.    (BY MR. RUKAVINA)  That does make sense.  I'm

6   still struggling, and again, I'm not trying to be a

7   smart aleck.  I'm still struggling with the first

8   sentence of paragraph 3, that maker may prepay accrued

9   interest.

10             And it sounds like to me like you don't

11  necessarily have a definitive answer as to what that

12  might have meant either.

13             MR. MORRIS:  Objection to the form of the

14  question.

15             THE WITNESS:  I think the document speaks for

16  itself in that sentence.

17       Q.    (BY MR. RUKAVINA)  But have you seen

18  something like this, to your recollection, in other

19  Highland promissory notes?

20       A.    Something like what?

21       Q.    Prepaying accrued interest.

22       A.    Yes, I have seen that.

23       Q.    What's your memory?  Where have you seen

24  that?

25       A.    I can't remember a specific note, but I

David Klos - October 27, 2021

1  believe that has been done in a specific circumstance.

2       Q.   So at least at Highland, you would believe

3  that that phrase, prepaying accrued interest, had some

4  established meaning at Highland?

5            MR. MORRIS:  Objection to the form of the

6  question.

7            THE WITNESS:  No, I don't agree with that.

8       Q.   (BY MR. RUKAVINA)  Okay.  You understand, of

9  course, that it's Highland's position that with respect

10 to this note, a payment was due on December 31 of 2020

11 that wasn't made; correct?

12      A.   Yes, it's my understanding -- if I can state

13 it back just so I make sure I'm getting it correctly.

14 It's my understanding that there was a payment due on

15 December 31, 2020, that wasn't made timely, yes.

16      Q.   Okay.  Do you know why that payment wasn't

17 made timely?

18      A.   By recollection, because Mr. Dondero had

19 directed people not to process payments from Highland

20 affiliates to Highland.

21      Q.   When did you learn of that?

22      A.   Early December 2020.

23      Q.   How did you learn of that?

24      A.   I don't specifically remember the

25 conversation, but I know I had conversations with both

David Klos - October 27, 2021

 1   Kristin and Frank.  I can't remember if those were
 2   individual or collective, but we understood that to be
 3   the marching orders.
 4        Q.    Did you hear Mr. Dondero say anything like
 5   that?
 6        A.    I did not.
 7        Q.    Did Mr. Waterhouse tell you that Mr. Dondero
 8   said something like that to him?
 9        A.    Yes.
10        Q.    Okay.  Separately, do you remember whether
11   Ms. Hendrix told you that Mr. Waterhouse told her that,
12   or would it have been kind of at the same meeting?
13        A.    I don't remember specifically.  It would have
14   been all around the same time.
15        Q.    And to the best of your recollection, what
16   words -- strike that.
17             To the best of your recollection, did
18   Mr. Waterhouse include a reference to promissory notes
19   and the Advisors when he said that Dondero told him not
20   to make payments?
21             MR. MORRIS:  Objection to the form of the
22   question.
23             THE WITNESS:  I don't remember the specific
24   words that Mr. Waterhouse used.  My clear impression
25   was that it was a very global instruction.

David Klos - October 27, 2021

1              And I should clarify also that, you know, at
2       this time, I think as we covered in my background.
3              At this point I had assumed the chief
4       accounting officer role, so I wasn't necessarily in
5       the -- in as much of the chain of command as I had been
6       previously to taking that role, where that sort of thing
7       might have come from Frank, to me, to Kristin.
8              By this time, Frank and Kristin were
9       communicating and I was sometimes in the loop, sometimes
10      not.
11          Q.   (BY MR. RUKAVINA)  Did Mr. Waterhouse tell
12      you why Dondero had told him that?
13          A.   I don't remember with any specificity.
14      However, my perception at the time was that at this
15      time the relationship between Mr. Dondero and Mr. Seery
16      was hopelessly broken, and that this was Jim Dondero,
17      you know, gearing up for a fight in the future.
18          Q.   Prior to December of 2020, had you prepared a
19      report showing potential overpayments that NexPoint and
20      HCMFA had made on account of shared services and
21      payroll reimbursement?
22              MR. MORRIS:  Objection to the form of the
23      question.
24              You can answer.
25              THE WITNESS:  I know the analysis that you're

David Klos - October 27, 2021

1   talking about.  I would not characterize it the way
2   that you characterized it.
3        Q.   (BY MR. RUKAVINA)  And we'll talk about this
4   more in November, so I really don't want to go into any
5   detail, unless you feel the need to.
6             But, so you did not prepare that analysis?
7             MR. MORRIS:  Objection to the form of the
8   question.
9             THE WITNESS:  I prepared an analysis that
10  differed from how you described it.
11       Q.   (BY MR. RUKAVINA)  How would you describe it,
12  in a nutshell?
13       A.   I would describe it as I was asked to refresh
14  a spreadsheet using certain assumptions, based on the
15  direction of Frank Waterhouse, and I updated and I sent
16  him an email.
17       Q.   Do you have any understanding that that
18  analysis was then shared with Mr. Dondero by
19  Mr. Waterhouse?
20       A.   I know that now.  I didn't know that at the
21  time.
22       Q.   Do you have any understanding -- strike that.
23            Did you have any understanding that as of
24  early December 2020 the reason why Mr. Dondero said
25  what he said to Mr. Waterhouse was because that

David Klos - October 27, 2021

1   analysis, right or wrong, suggested that the Advisors
2   had made large overpayments?
3           MR. MORRIS:  Objection to the form of the
4   question.
5           THE WITNESS:  No, that's incorrect.
6       Q.  (BY MR. RUKAVINA)  Why is that incorrect?
7       A.  Because by recollection, to the best of my
8   recollection, that analysis didn't occur until after
9   Dondero had told Frank no more payments.
10      Q.  Is that the only reason why you might suspect
11  that what I just said was incorrect?
12          MR. MORRIS:  Objection to the form of the
13  question.
14          THE WITNESS:  Yeah, I don't know how to
15  answer that.
16      Q.  (BY MR. RUKAVINA)  I'm going back, when I
17  asked you, did Waterhouse tell you why Dondero gave the
18  direction, you said no.
19          MR. MORRIS:  Objection to the form of the
20  question.
21          THE WITNESS:  Sorry, I'm not sure.  If I
22  could have the question asked again, I'd be happy to
23  answer.
24      Q.  (BY MR. RUKAVINA)  I'll ask it again.
25          Mr. Waterhouse tells you that Mr. Dondero

David Klos - October 27, 2021

1   basically said no more payments; right?

2        A.    Yes.

3        Q.    And, but he did not tell you why Mr. Dondero

4   said that?

5        A.    Not that I can recall.

6        Q.    So he might have?

7        A.    He might have.  I don't specifically

8   remember.

9        Q.    Do you recall asking him or anyone else why

10  Dondero would have said that?

11            MR. MORRIS:  Objection.  Asked and answered.

12            THE WITNESS:  I don't recall specifically

13  asking.

14       Q.    (BY MR. RUKAVINA)  Do you recall telling

15  Mr. Seery that Dondero said anything like that?

16       A.    At what point in time?

17       Q.    Prior to December 31, 2020.

18       A.    No, I did not.  I did not say that to

19  Mr. Seery.

20       Q.    In your mind was there any present

21  understanding or concern that NexPoint therefore

22  wouldn't make a scheduled December 31, 2020, payment?

23       A.    Was there any concern that they wouldn't?

24       Q.    Yeah.

25       A.    I would never use the word "concern."  At

David Klos - October 27, 2021

1   that point I wasn't even on the team anymore, so I hate

2   to say it's other people's problem, but I had my hands

3   full with plenty of other things.  It wasn't something

4   I was thinking about.

5       Q.   Do you remember here today that prior to

6   December 31, 2020, you believed that NexPoint would not

7   make the scheduled payment?

8           MR. MORRIS:  Objection to the form of the

9   question.

10          THE WITNESS:  I had no idea whether NexPoint

11  was going to make the payment.

12      Q.   (BY MR. RUKAVINA)  Were you asked prior to

13  December 31, 2020 by Mr. Seery or anyone else as to

14  whether NexPoint was going to make that payment?

15      A.   Was I asked by Mr. Seery?  Not that I can

16  remember.

17      Q.   Prior to December 31, 2020, do you recall any

18  discussion with Mr. Seery about the NexPoint note?

19          MR. MORRIS:  I'm sorry, can I have the

20  question again.

21      Q.   (BY MR. RUKAVINA)  Prior to December 31,

22  2020, do you recall any discussion that you had with

23  Mr. Seery about this NexPoint note?

24      A.   Not that I can remember.  If there was, it

25  would have been in a cash meeting, but I don't remember

David Klos - October 27, 2021

1  at all.
2      Q.   So it might have been some detail as part of
3  a larger discussion, but you don't remember any
4  specific discussion just around this note?
5      A.   No.
6      Q.   When did you learn or how did you learn that
7  the December 31 payment had not been made?
8      A.   I'm not sure, but certainly after
9  December 31.
10     Q.   Do you recall if it was before or after
11 January 7?
12     A.   I think it was after.
13     Q.   The default letter from Highland is in here,
14 if you need to see it.  I'm just telling you it's the
15 January 7.
16          Do you recall having any role with respect to
17 drafting the default letter that went out to NexPoint
18 after the failed payment?
19     A.   No, none that I can remember.
20     Q.   How do you recall learning that the note had
21 been called by Highland?
22     A.   I honestly don't remember.  I think after the
23 fact.  I couldn't tell you how far after the fact.
24     Q.   Are you aware that on or about July -- I'm
25 sorry, January 14, 2021 NexPoint made a $1.4 million

David Klos - October 27, 2021

```
1   and change payment?
2          A.    Yeah, I'm aware that that payment happened.
3          Q.    When did you become aware of that payment?
4          A.    I think after it happened.
5          Q.    Can you tell us, was it days, weeks, months
6   later?
7          A.    It was that day.  And if I can expand, I
8   recall getting an email, seeing a large inflow to
9   Highland, to MLP because I was on an email distribution
10  list that had those payments.
11              And I think I emailed or called Kristin and
12  asked her, is this the NexPoint note, because it was a
13  large amount of money.  And she said yes.
14         Q.    Did she tell you anything more about that
15  payment, when it had been made, why, who authorized it?
16         A.    I had that information of when it had been
17  sent.  I had a wire confirm.
18         Q.    Only important thing to you is where did that
19  money come from?
20         A.    It wasn't important to me.  It was more
21  curiosity.
22         Q.    Did you have any discussions with anyone on
23  or about that time, January 14, 2021, as to why
24  NexPoint made that payment?
25         A.    Not that I can remember.
```

David Klos - October 27, 2021

1    Q.   Did you have any discussion with anybody on

2 or about that time, January 14, 2021, as to how HCMLP

3 should account for that payment?

4    A.   No.

5    Q.   Did you have any discussion with Mr. Seery at

6 all about whether that payment should or shouldn't

7 reinstate the note?

8    A.   No discussion that I can remember.

9    Q.   Is it fair to say that any of those

10 considerations would have been at that point in time

11 above your paygrade?

12        MR. MORRIS:  Objection to the form of the

13 question.

14        THE WITNESS:  Yeah, paygrade, I don't know

15 how to respond to that.  Like I said before, I wasn't

16 on the team at that point.  I wouldn't have been

17 involved in that determination regardless of my

18 compensation.

19    Q.   (BY MR. RUKAVINA)  So you know and you

20 remember that in early December 2020 Frank Waterhouse

21 told you that Dondero had directed no more payments by

22 the Advisors.  And you know that a payment was made on

23 January 14.

24        And that's pretty much the extent of your

25 knowledge about the missed December 31 payment?

David Klos - October 27, 2021

```
 1            MR. MORRIS:  Objection to the form of the
 2    question.
 3            THE WITNESS:  Yeah, it's a very broad
 4    question.  In general terms, yes.
 5       Q.   (BY MR. RUKAVINA)  Well, I'm not asking what
 6    you learned since then.
 7            I'm asking that as of, let's say, January 15,
 8    2021 that would have been the extent of what you would
 9    have known?
10       A.   Correct.  And if I can just restate and make
11    sure I understand what I'm saying.
12            It would have been my understanding that we
13    had had an instruction -- when I say "we," Kristin and
14    Frank and by default the whole corporate team -- not to
15    make payments from these affiliated entities.
16            To my knowledge, none of those payments had
17    occurred since that point.  And then on or about
18    January 14, such a payment was made and I found out
19    about that by seeing a wire confirm.
20       Q.   Well, you mentioned a couple times that you,
21    in December 2020, you weren't part of that group
22    anymore.  So do you have any understanding as to why
23    Mr. Waterhouse would have told you in particular, you
24    being Mr. Klos, about that instruction from Dondero?
25       A.    Sure.  I still was participating in cash
```

David Klos - October 27, 2021

1  meetings, even if it was almost in a nominal role,
2  because of some of my history that I had.  So I was
3  still participating in those meetings.
4            I've worked closely with Kristin for a long
5  time, so I may have caught up with her informally.  But
6  as far as day-to-day duties, I wasn't part of that team
7  anymore.
8        Q.   And is it your, did I understand you
9  correctly, is it your testimony that Mr. Waterhouse
10  informed the whole accounting group there, the
11  corporate accounting group, of Mr. Dondero's
12  instruction?
13        A.   I don't know specifically who he told, if he
14  told every single member of the team, but he certainly
15  told Kristin and Kristin was the head of the team.
16        Q.   And you don't recall anyone, after you heard
17  about that instruction, raising any concern to the
18  effect that NexPoint is going to default and be in
19  trouble if that payment isn't made?
20        A.   I don't remember any discussion to that
21  effect.
22        Q.   Do you remember anyone suggesting that they
23  ought to try to dissuade Mr. Dondero from that
24  direction?
25        A.   Not that I can remember.

David Klos - October 27, 2021

```
 1        Q.   Do you remember any discussion at that
 2   approximate point in time for your cash meetings or
 3   anything else as to whether NexPoint had made any
 4   prepayments on the promissory note?
 5             MR. MORRIS:  Objection to the form of the
 6   question.
 7             THE WITNESS:  Yeah, it's very hard to -- by
 8   the way, I've said yeah a few times.  I want to make
 9   clear that that's just --
10        Q.   (BY MR. RUKAVINA)  That's not a yes?
11        A.   I apologize for that.
12        Q.   Understood.  Yeah means, it's not a yes.
13             MR. MORRIS:  It's a pause; it's an um.
14        Q.   (BY MR. RUKAVINA)  Germans call it flavoring
15   particle.
16        A.   Sorry, I got lost there.  If you can ask
17   again.
18        Q.   Yeah.  Do you recall in November or
19   December 2020 in your weekly meetings or anything else,
20   any discussion whatsoever concerning whether NexPoint
21   had made any prepayments on its note?
22        A.   No discussions of whether or not there had
23   been a prepayment that I can remember, no.
24        Q.   To the best of your knowledge sitting here
25   today -- strike that.
```

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-3   Page 120 of 261   PageID 28436
Appendix Part 2   Filed 02/26/24   Page 120 of 261

64

David Klos - October 27, 2021

1          For my next question, again we're assuming

2   that Exhibit 14 is what it appears to be.

3          A.   Sure, sure.

4          Q.   So with that qualification, to the best of

5   your knowledge, other than what's on Exhibit 14, can

6   you think of any other record or source or document

7   that would address whether any unscheduled payments by

8   NexPoint would or wouldn't be prepayments on the note?

9          MR. MORRIS:   Objection to the form of the

10  question.

11          THE WITNESS:   Again, with the struggle of the

12  prepayment, this is the document that I would expect to

13  explain how the payment was applied.

14          Q.   (BY MR. RUKAVINA)   But you yourself did not

15  play any role in deciding how the payment would be

16  applied?

17          A.   I'd hesitate to say no role, because the team

18  ultimately rolls up to me.

19          Q.   You personally?

20          A.   Me personally, I wouldn't have prepared these

21  schedules.

22          Q.   Or decided, you personally, as Mr. Klos, how

23  any unscheduled payments should be accounted for by

24  Highland?

25          A.   Correct, not without some -- some

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 176 Part 2 Filed 02/04/24    Page 121 of 261    PageID 28437

Appendix Page 02634 of 3792

65

David Klos - October 27, 2021

1   authoritative direction on how they should be applied.

2        Q.    And that authoritative direction would have

3   come from Mr. Waterhouse or Mr. Dondero?

4        A.    That's what I would expect.

5        Q.    Could it have come from anyone else that you

6   can think of here today?

7        A.    Not that I can think of.

8        Q.    Now we're going to switch gears and I think

9   we're going to stop discussing the NexPoint note, and

10  we're going to focus on the HCMFA two promissory notes.

11       A.    Sure.

12       Q.    So we're going to go back in time to

13  May 2019; okay?

14       A.    Sure.

15       Q.    And is it fair to say by -- that by May 2019

16  there were at least dozens if not hundreds of instances

17  of intercompany loans in the years leading up there

18  from Highland to one of the other entities?

19            MR. MORRIS:   Objection to the form of the

20  question.

21            THE WITNESS:   From Highland to one of the

22  other entities.   Can you help with other entities.

23       Q.    (BY MR. RUKAVINA)   Advisors, the trusts, any

24  of the Dondero entities?

25            MR. MORRIS:   Objection to the form of the

David Klos - October 27, 2021

```
 1   question.
 2           THE WITNESS:  Yes, there would have been many
 3   loans over the years.
 4       Q.   (BY MR. RUKAVINA)  And do I understand that
 5   most, if not all, of those loans should have been
 6   papered up with a written promissory note?
 7           MR. MORRIS:  Objection to the form of the
 8   question.
 9           THE WITNESS:  Should have been.  To the
10   extent that they were for a promissory note, then yes.
11       Q.   (BY MR. RUKAVINA)  So in the May 2019 time
12   frame, was there a regular pattern or course or
13   procedure in place as to how a promissory note would be
14   physically prepared and presented for approval?
15           MR. MORRIS:  Objection to the form of the
16   question.
17           THE WITNESS:  Yeah, when you say a process,
18   can you please clarify that for me.
19       Q.   (BY MR. RUKAVINA)  Sure.  Let's look at these
20   two promissory notes and maybe that will help frame the
21   question.  And I apologize for not having them right
22   here.
23       A.   It might be --
24           MR. MORRIS:  1 and 2.
25           MR. RUKAVINA:  Yes.
```

David Klos - October 27, 2021

1      Q.   (BY MR. RUKAVINA)  Are you familiar with
2   Exhibits 1 and 2, sir?
3      A.   Yes, I am.
4      Q.   Do you remember them from back -- strike
5   that.
6           Did you have any role, to your knowledge,
7   with the preparation of Exhibits 1 and/or 2?
8      A.   With the preparation of the documents?
9      Q.   Yeah.
10     A.   No.
11     Q.   But you did have some role with these
12  promissory notes?
13     A.   Yes.
14     Q.   And I'm trying to find that email as well.
15  There's an email here from you.  I'll have it in a
16  moment.  That will help frame the question.
17          MR. MORRIS:  Exhibit 3.
18     Q.   (BY MR. RUKAVINA)  Do you recall that email,
19  sir?
20     A.   Not specifically, but it's right in front of
21  me.  I'm certain that I wrote this email.
22     Q.   You have no reason to deny or reject its
23  authenticity?
24     A.   I have no reason to reject it or question it.
25     Q.   Just give me a second.  I don't understand

David Klos - October 27, 2021

```
 1   what's going on with my exhibits.  I just don't
 2   understand this.
 3              (Off the record.)
 4       Q.   (BY MR. RUKAVINA)  You have Exhibit 3 in
 5   front of you?
 6       A.   I do.
 7       Q.   And it says, please send 2.4 million from
 8   HCMLP to HCMFA.  This is a new interco.
 9              Meaning intercompany; right?
10       A.   Correct.
11       Q.   This is a new intercompany loan.
12              Who told you that this was an intercompany
13   loan?
14       A.   Either Frank or Jim.  I would suspect Frank.
15       Q.   Do you have any present memory of him telling
16   you that with respect to this particular loan?
17       A.   I don't have a specific recollection, but
18   with a hundred percent certainty he or Jim would have
19   directed that.
20       Q.   Would they have directed the payment, or
21   would they have directed that it be papered as a loan,
22   or both?
23       A.   Both.
24       Q.   So in each instance -- well, let's take a
25   step back.
```

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-31 Part 2 Filed 01/09/24   Page 125 of 261   PageID 28441
Appendix 18 Part 2 Page 2734 of 3788

69

David Klos - October 27, 2021

1           So certainly either Jim or Frank directed you
2    to transfer the $2.4 million; correct?
3        A.   Either Jim or Frank would have directed, yes.
4    There's 0 percent chance I would have sent this email
5    if I didn't feel a hundred percent confident that this
6    was authorized in the way that I described in the
7    email.
8        Q.   But can you also say with certainty that
9    either Dondero or Waterhouse also told you that this
10   transfer is an intercompany loan?
11       A.   With a hundred percent certainty, yes.   I
12   can't say that necessarily with respect to Dondero,
13   because I don't remember if I would have talked to him
14   specifically about it.   But, yes, this would have been
15   clear that it's a loan.
16       Q.   You say clear.   Did someone tell you that
17   it's a loan, or are you just, because of the prior
18   10 years of course and conduct, logically deciding that
19   it has to be a loan?
20           MR. MORRIS:   Objection to the form of the
21   question.
22           THE WITNESS:   So this is -- this is not just
23   a situation of past practice.   I would have known with
24   certainty that this was a loan and that's what was
25   authorized.

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176 Part 2   Filed 02/14/24   Page 126 of 261   PageID 28442
Appendix Part 2 Page 274 of 772   Page 126 of 261   PageID 28442
70

David Klos - October 27, 2021

1      Q.   (BY MR. RUKAVINA)   How would you have known
2   with certainty that it was a loan?
3      A.   I'll say in part because of past practice,
4   but also because of the nature of what the money was
5   going to be used for, and the background behind it.
6      Q.   So you knew that nature and that background?
7      A.   The nature and background of the 2.4 million,
8   yes.
9      Q.   So you've told me that in part -- I asked you
10  how did you know it was a loan.  You said in part past
11  practices, in part you knew the nature.  Anything else?
12     A.   I'm certain that given that I wrote this
13  email, which Frank is on, that I would have had a
14  conversation with Frank about what this was.
15     Q.   Was Jim Dondero in the corporate accounting
16  email?
17     A.   No, he wasn't.
18     Q.   So what is your understanding as to what this
19  $2.4 million was for?
20     A.   This related to -- well, to separate the
21  transaction, the 2.4- itself relates to a promissory
22  note.  That's what was executed.
23          HCMFA's use of the 2.4 million was to
24  reimburse a fund that it managed called Highland Global
25  Allocation Fund for a NAV error that had occurred

David Klos - October 27, 2021

1   within that fund.

2        Q.    Who made that NAV error?

3             MR. MORRIS:  Objection to the form of the

4   question.

5             THE WITNESS:  Yeah, it's hard to answer that.

6   So the Highland Capital Management Fund Advisors is the

7   advisor to the fund, so they're the responsible party

8   for making the fund whole in the instances of NAV

9   errors.

10        Q.   (BY MR. RUKAVINA)  And did HCMFA contract out

11   with Highland for valuation services?

12             MR. MORRIS:  Objection to the form of the

13   question.

14             THE WITNESS:  I don't specifically remember

15   if they contracted for valuation services, but if you

16   tell me that they did, I'll take that at face value.

17   So yes, HCMFA utilized HCMLP for valuation services.

18        Q.   (BY MR. RUKAVINA)  Do you have any memory of

19   what human being or beings made that NAV error?

20             MR. MORRIS:  Objection to the form of the

21   question.

22             THE WITNESS:  It's -- in respect to people,

23   not particularly.  In respect to parties, Houlihan

24   Lokey was the service provider that performed the

25   valuation that resulted in the NAV error.

David Klos - October 27, 2021

1          And as I described before, the valuation
2     function was housed at HCMLP by HCMLP employees
3     supporting that through, among other people, front
4     office, compliance, other parts of the organization as
5     well.
6          Q.   (BY MR. RUKAVINA)  So it was your
7     understanding that Highland was loaning $2.4 million to
8     HCMFA for HCMFA to compensate that fund?
9          A.   Yes.
10         Q.   Did you have any understanding that Highland
11    might have been, instead of loaning that money,
12    actually paying that money to HCMFA to compensate HCMFA
13    for Highland's valuation error?
14         A.   First, not Highland's valuation error.  But
15    second, no, there's no way that that would have been
16    what that payment was for.
17         Q.   Why can you say that there's no way that that
18    would have been what that payment was for?
19         A.   First, this wasn't the first NAV error that
20    ever occurred.  There had been other NAV errors.  There
21    were other NAV errors with respect to this valuation
22    that pertain to NexPoint Advisors.
23          There was no reimbursement from HCMLP to
24    NexPoint or HCMFA, regardless of any individual being
25    identified as the person.  That had just never occurred

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-3 Part 2 Filed 02/27/24   Page 129 of 261   PageID 28445
Appendix Part 2 Page 774 of 779

73

David Klos - October 27, 2021

1   to my knowledge.

2            Second, the amount was to meet the liquidity

3   need of HCMFA.  It wasn't to -- it wasn't to

4   dollar-for-dollar make up for the NAV error.  It was

5   that's how much money HCMFA needed.

6            Third, it was definitely Dondero's practice

7   and preference to have expenses at HCMFA for tax

8   purposes.  So if this was compensation, he would

9   ultimately not really be benefiting from the deduction

10  so.

11           That would have been a strong preference of

12  his against having it be compensation.

13           So it would have been excruciatingly clear

14  that this was a loan for liquidity for HCMFA to make

15  the fund whole, just like it had in the past NAV

16  errors.

17      Q.   How did you know that HCMFA needed

18  $2.4 million for liquidity?

19      A.   At that point I was still part of the

20  corporate team, so I had a good sense of how much cash

21  HCMFA would have had at any given moment.  And at that

22  given moment it would not have had -- I'd be shocked if

23  it had even 2.4-.

24           Probably would have had probably between

25  a million and 2 million if I had to speculate.

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176 Part 2   Filed 02/27/24   Page 130 of 261   PageID 28446
Appendix Part 2 Page 2784 of 372

74

David Klos - October 27, 2021

1        Q.    Okay.  So you've given the reasons why this
2    was clearly a loan.
3            But you never heard Mr. Dondero say that this
4    was a loan, did you?
5        A.    I don't remember.  It's possible I did, but I
6    don't specifically remember.
7        Q.    Okay.  What about the $5 million loan on the
8    day after?  What was that $5 million for?
9        A.    That was similar but different.  So again,
10   HCMFA needed liquidity.  This time this was for --
11   related to that same fund.
12           So Highland Global Allocation Fund had
13   converted from an open-end fund, mutual fund, to a
14   closed-end mutual fund.
15           And pursuant to that conversion there was a,
16   I believe it was called a consent fee, for any
17   investors of that fund who consented to the conversion,
18   that they would receive a 3 percent fee payable by the
19   investment advisor.
20           And so at this time the bill came due on that
21   because the conversion had been completed, and the
22   accounting for how much that 3 percent was going to be
23   was complete.
24           HCMFA sure as hell didn't have 5 million
25   bucks.  Excuse my language.  Highland needed to pay

David Klos - October 27, 2021

| | |
|---|---|
| 1 | HCMFA for the liquidity.  HCMFA made the payment to the |
| 2 | fund.  It wasn't dollar for dollar.  I think it was |
| 3 | like 5,019,000, or some such number. |
| 4 | But 5 million was the number that would allow |
| 5 | it to make that payment effectively to the investors of |
| 6 | Global Allocation Fund. |
| 7 | Q.   Do you have any understanding as to why |
| 8 | Highland, as opposed to some other entity, was |
| 9 | transferring $7.4 million? |
| 10 | A.   Highland as opposed to some other entity? |
| 11 | Q.   Uh-huh. |
| 12 | A.   Because Highland had the money. |
| 13 | Q.   But I think we've established earlier that in |
| 14 | the first seven months of 2019, Highland was having |
| 15 | constant liquidity issues? |
| 16 | A.   It was. |
| 17 | Q.   And that's part of the reason that NexPoint |
| 18 | was making unscheduled payments on its note; right? |
| 19 | A.   That's part of the reason NexPoint was making |
| 20 | unscheduled payments on its note, yes. |
| 21 | Q.   So your recollection is that HCMFA needed |
| 22 | $2.4 million for liquidity purposes and about |
| 23 | $5 million for the consent fee.  And Highland |
| 24 | transferred those funds because Highland had the funds? |
| 25 | A.   Yes.  And I should clarify that Highland only |

David Klos - October 27, 2021

1  had the funds because Mr. Dondero repaid personal notes
2  to HCMLP on the same days.
3          So he paid 2.4 million on May 2, which
4  Highland turned around and reloaned.  And he paid 4.4-
5  on May 3, and Highland sent out 5-, so there's a
6  $600,000 difference.  And my recollection, he paid the
7  other 600,000 via note repayment within a few days.
8      Q.   So this would have been part of some broader
9  transaction in Mr. Dondero's mind?
10     A.   I would not characterize it that way.
11     Q.   You established that HCMFA needed money.  You
12  established that Highland temporarily had money because
13  Dondero provided it with money.
14         But you still don't know, sir, as a fact as
15  to whether that transfer was a loan or some other
16  payment from HCMFA -- I'm sorry from HCM, from debtor
17  to HCMFA?
18         MR. MORRIS:  Objection to the form of the
19  question.  Asked and answered a million times.  It's in
20  the documents you're showing him.
21         THE WITNESS:  It was a loan.
22         MR. MORRIS:  Come on, Davor.  With all due
23  respect, it's in the document.  It's on the document.
24     Q.   (BY MR. RUKAVINA)  I'm being courteous and
25  respectful to you and I'd ask the same in return; okay?

David Klos - October 27, 2021

1      A.   Absolutely.  I apologize if I haven't been.
2      Q.   Mr. Dondero, would you agree, was the only
3  person that had the authority at the debtor to
4  authorize a transfer of 2.4- and then $5 million?
5      A.   At the debtor?
6           MR. MORRIS:  Objection to the form of the
7  question.
8      Q.   (BY MR. RUKAVINA)  Yes, at the debtor.
9      A.   No.
10     Q.   Who else could have transferred 2.4 million
11  or $5 million?
12     A.   Those are two different questions.  But if
13  you're asking who had the authority, certainly Frank
14  did as well.
15     Q.   So Frank had the authority.  Perhaps my
16  question was inartful.
17          Do you believe that Mr. Waterhouse would have
18  decided to transfer $2.4 million or $5 million without
19  Mr. Dondero's approval?
20          MR. MORRIS:  Objection to the form of the
21  question.
22          THE WITNESS:  Generally speaking, no, but I
23  don't know exactly what the form of the approval.  But
24  he certainly wouldn't have done that on his own without
25  discussing with Dondero.

David Klos - October 27, 2021

1      Q.    (BY MR. RUKAVINA)  Do you believe that
2   Mr. Waterhouse had the ability on behalf of the debtor
3   to loan $5 million without Mr. Dondero's approval?
4           MR. MORRIS:  Objection to the form of the
5   question.
6           THE WITNESS:  I think he had the technical
7   authority to.  However, I don't believe in practice
8   that he ever would.
9      Q.    (BY MR. RUKAVINA)  Same question, $2.4
10  million?
11     A.    Same answer.
12     Q.    We've established that you never really had a
13  direct employment or types of a role for NexPoint --
14  I'm sorry, for HCMFA; right?
15     A.    Again --
16     Q.    To the best of your recollection?
17     A.    Best of my recollection I can't remember how
18  the titles transferred over or whatever, but I don't
19  believe I did.
20     Q.    Do you know whether Mr. Waterhouse in 2019
21  had the authority, without Mr. Dondero's approval, to
22  borrow $7.4 million on behalf of HCMFA?
23          MR. MORRIS:  Objection to the form of the
24  question.
25          THE WITNESS:  He had the authority to enter

David Klos - October 27, 2021

1   into the note on behalf of HCMFA, yes.

2        Q.   (BY MR. RUKAVINA)  Was that something that he

3   would have done without Mr. Dondero's approval to your

4   understanding and practice at that time?

5             MR. MORRIS:  Objection to the form of the

6   question.

7             THE WITNESS:  Same answer that I gave before

8   with respect to Highland.

9        Q.   (BY MR. RUKAVINA)  So here's where I'm going

10  with all this.

11            Mr. Dondero's position, and tomorrow his

12  testimony will be, that he caused the $7.4 million to

13  be transferred not as a loan to HCMFA, but to

14  compensate HCMFA for various things including that NAV

15  error.

16            Other than perhaps you think he's lying,

17  would you have any knowledge, hearsay, document,

18  anything, to contradict Mr. Dondero's position?

19            MR. MORRIS:  Objection to the form of the

20  question.

21            THE WITNESS:  Yes.  I would point to the fact

22  that as it pertains to the $5 million note, if we're

23  separating issues, there's no other possibility of what

24  that money could be other than either a loan or equity.

25            It's not compensation.  Highland is under --

David Klos - October 27, 2021

1    HCMLP has absolutely zero obligation in respect to that
2    consent fee.  So when Highland sends $5 million to HCMFA
3    there's nothing else that it can be.  That's Point 1.
4           Point 2, we're right in the middle of an audit
5    at this point.  Jim signs rep letters at this point.
6    He's being provided balance sheets throughout 2019 that
7    indicate the loans that Highland has on its books.
8           Balance sheets are being prepared in respect
9    of annual approvals for 15(c) for retail funds in the
10   fall.  Schedules are being created for bankruptcy after
11   we file in October.
12          Nobody says this is a mistake.  Frank is on
13   all of these emails.  Frank never questions it.
14          There's absolutely no evidence from that point
15   in time to whenever this defense got raised that would
16   indicate that anybody said that these weren't exactly
17   what they say they are.
18   Q.   (BY MR. RUKAVINA)  Are you aware that in
19   February or March 2019 some $5.2 million was paid from
20   insurance that HCMFA had to the fund for the NAV error?
21   A.   The amount sounds unfamiliar, but I'm aware
22   that insurance proceeds were paid from HCMFA to the
23   fund.
24   Q.   And do you think that it's impossible for a
25   sane, rational person to conclude that HCMFA had a

David Klos - October 27, 2021

```
1   claim against the debtor related to that NAV error?
2            MR. MORRIS:  Objection to the form of the
3   question.
4            THE WITNESS:  If it did, I don't know how
5   that's not insurance fraud for basically double
6   collecting insurance proceeds and then collecting it
7   again.
8       Q.   (BY MR. RUKAVINA)  So you believe, sir, that
9   if insurance pays a claim you have no more right to go
10  against a person who caused the fault?
11           MR. MORRIS:  Objection to the form of the
12  question.
13           THE WITNESS:  We can speak specifically here.
14  This is about a NAV error that an insurance company
15  reimbursed HCMFA for, which it then turned around and
16  paid for the fund.
17           So if it went to collect that same, let's use
18  round numbers, $5 million from Highland that it's
19  already collected from insurance, that sounds
20  inappropriate to me.
21      Q.   (BY MR. RUKAVINA)  Okay.  But you don't know
22  whether that's allowed in Texas law or not, do you?
23           MR. MORRIS:  Objection to the form of the
24  question.
25           THE WITNESS:  No, I don't know whether it's
```

David Klos - October 27, 2021

1   allowed under Texas law.

2        Q.   (BY MR. RUKAVINA)  So you don't know that if

3   you're hit by someone on the street and your medical

4   insurance pays your bills, you don't know that he still

5   has to pay you for the same bills?

6             MR. MORRIS:  Objection to the form of the

7   question.  I hope I don't miss my plane.

8        Q.   (BY MR. RUKAVINA)  You don't know that under

9   Texas law if someone hits you with their car and causes

10  you medical bills and your medical insurance pays those

11  bills, that you can still sue them for the same

12  damages?

13            MR. MORRIS:  Objection to the form of the

14  question.

15            THE WITNESS:  I'm not familiar at any level

16  of specificity with Texas law.

17       Q.   (BY MR. RUKAVINA)  Again, it just sounds

18  wrong to you that you could go after someone after

19  insurance pays, but you don't know legally one way or

20  the other?

21       A.   Correct.  I'm not a lawyer or expert in Texas

22  law.  It feels wrong, yes.

23       Q.   Okay.  Going back to this email of yours,

24  Exhibit 3, do you recall whether there was a similar

25  email with respect to the $5 million note?

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176 Part 2 Filed 02/04/24   Page 139 of 261   PageID 28455

83

David Klos - October 27, 2021

1      A.    Yes, I am.  I believe Kristin sent that one.

2      Q.    Kristin sent that one?

3      A.    I believe so.

4      Q.    To whom?

5      A.    Likely the same distribution group, but

6  that's speculation.

7      Q.    Did you see such an email in the last week or

8  two?

9      A.    I'm not certain, but probably.  I have seen

10 email communication on or around May 3, but I don't

11 know specifically who all was on the email.  I'm going

12 off what I would expect to see.

13          MR. MORRIS:  If you're really interested,

14 it's right here.  It was produced to you with

15 Bates 3763.  And if you'd like to question the witness.

16          MR. RUKAVINA:  When was it produced?

17          MR. MORRIS:  I can't tell you.  It's part of

18 the same package.

19      Q.    (BY MR. RUKAVINA)  So going back to this

20 Exhibit 3, sir, why did you ask Kristin, can you or

21 Hayley please prep a note for execution?  Why them?

22          Remember, I was asking about what the course

23 or procedure was at that point in time.

24      A.    Yeah, so nomenclature, procedure, process.

25          I would say the informal process for these

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176 Part 2 File Page 28456 of 372 ge 140 of 261   PageID 28456

84

David Klos - October 27, 2021

1   types of loans, they were frequent in nature, would be

2   for someone on the corporate accounting team to prepare

3   a note and have it executed.

4        Q.   Okay.  That was the standard course back

5   then?

6        A.   Again, I don't know what standard course

7   means.  That was fairly typical.

8        Q.   Why would you not have asked someone in the

9   Highland legal department to prepare a note?

10       A.   Because this was a legally reviewed document

11  as far as the form of the agreement.  It's a one-page,

12  two-paragraph form that had been used for a long time.

13            So the only thing that would change with

14  respect to these notes would be the date, the amount,

15  likely the rate.  I can't think of anything else

16  offhand that would have changed from note to note.

17       Q.   After you asked Ms. Hendrix to prepare this

18  note, did you have any further role with respect to the

19  papering, preparation, or execution of that note?

20       A.   Not that I can remember.

21       Q.   Would you have had any role in having either

22  or both of the notes actually signed electronically or

23  by ink by Mr. Waterhouse?

24       A.   Likely not, no.

25       Q.   Do you know who decided to have

David Klos - October 27, 2021

1   Mr. Waterhouse as opposed to Mr. Dondero sign these two

2   promissory notes?

3        A.    I don't.

4        Q.    On the $5 million note, do you remember if

5   you had any role with respect to its physical papering

6   or execution?

7        A.    Not that I recall.

8        Q.    To the best of your memory, your role would

9   have been done by instructing your team, hey, here is

10  these new loans, go paper it up; is that accurate?

11       A.    On the upfront side.  I suppose my role would

12  have also included on the back end making sure that the

13  actual payment had occurred.  But that would have been

14  doing that realtime, seeing the funds went out, and

15  that, most importantly, that the consent fee had been

16  paid from HCMFA to the transfer agent.

17       Q.    How did you or anyone on your team know -- so

18  obviously, you know it's a $2.4 million loan because

19  that's what Waterhouse or Dondero told you; right?

20            How did you know it was a $2.4 million loan?

21            MR. MORRIS:  Objection.  Asked and answered.

22            THE WITNESS:  I knew that the NAV error was

23  2 million, I think it was 398,000, somewhere in that

24  ballpark.  And that 2.4- had been authorized for that

25  purpose.

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-3 Part 2 File Page 2904 of 372 ge 142 of 261   PageID 28458

86

David Klos - October 27, 2021

1      Q.   (BY MR. RUKAVINA)  Do you know who decided
2   what the interest rate in this note would be, or that
3   it would be a demand note as opposed to a term note?
4      A.   I don't specifically know who made that
5   decision.  However, the common practice for fund
6   advisors was to put -- was for the rate to equal the, I
7   forget if it was the short-term or long-term AFR.
8           And for the note to be demand, that was just
9   the standard -- that was the standard.
10      Q.   And I think I asked this, but just if I
11   didn't.
12           For either or both of these two notes, the
13   2.4- and $5 million note, did you have any role with
14   respect to Mr. Waterhouse signing them?
15      A.   No, not that I can remember.  I don't think I
16   did.
17      Q.   And you don't remember doing anything to get
18   his signatures?
19      A.   Not that I recall.
20      Q.   Nor would that have been something that you
21   would expect that you would have a role with?
22      A.   Certainly not in this instance.  Maybe to the
23   extent that nobody else was around and it was time
24   sensitive, but that wouldn't have been the case with
25   these, I don't believe.

David Klos - October 27, 2021

1    Q.   Did you have any understanding in early May

2    of 2019 as to whether HCMFA was solvent or insolvent?

3           MR. MORRIS:   Objection to the form of the

4    question.

5           THE WITNESS:   Whether HCMFA was solvent or

6    insolvent?  I'm not a solvency expert, so I don't know

7    that I could even attempt to answer that.

8    Q.   (BY MR. RUKAVINA)  Did you have an

9    understanding as far as HCMFA goes on May 2, 2019, that

10   its liabilities exceeded its assets?

11   A.   I don't remember specifically where it stood

12   on assets versus liabilities.

13   Q.   Do you have any memory that by May 2, 2019,

14   the debtor had taken a couple prior demand notes from

15   HCMFA and made them not collectible prior to May 31,

16   2021?

17   A.   I know what you're referring to.  I wouldn't

18   characterize it that way.

19   Q.   How would you characterize it?

20   A.   I recall that there was a financial support

21   acknowledgment, I think it was the name of the

22   acknowledgment.

23          That described -- I can't remember if it

24   described those two notes specifically or just referred

25   to them, that there would not be collection sought on

David Klos - October 27, 2021

1    those until May 31 of 2021.

2         Q.    Do you remember why that document was done?

3         A.    My recollection, and it could have been done

4    for other reasons, but my recollection of it was that

5    it was primarily audit-driven.

6              For the auditors to be comfortable that these

7    notes weren't going to be just called and FA not have

8    the ability to pay them right away.

9         Q.    Because it's true in April or May of 2019

10   HCMFA didn't have the ability to pay those notes;

11   correct?

12        A.    It didn't have enough cash to pay those.

13        Q.    And I think you mentioned before that in

14   May 2019 the auditors at the Highland level were

15   talking about rolling up prior demand notes into term

16   notes so the debtor would at least get some regular

17   cash flow; correct?

18             MR. MORRIS:  Objection to the form of the

19   question.

20             THE WITNESS:  No.

21        Q.    (BY MR. RUKAVINA)  So you recall that -- I'm

22   sorry, that was 2017.  I was wrong; right?

23        A.    Correct.

24        Q.    So I guess here is my question, and I'm

25   struggling to understand this.

David Klos - October 27, 2021

```
 1              So why would Highland be loaning an
 2    additional $7.4 million in early May of 2019 to HCMFA
 3    when HCMFA already was then unable to repay its debts
 4    to Highland?
 5              MR. MORRIS:  Objection to the form of the
 6    question.
 7              THE WITNESS:  Yeah, I kind of reject the
 8    premise of the question, and these are all controlled
 9    by Jim.  And it's completely within his power at any
10    point in time to make any payment on any of the loans,
11    depending on where priorities sit.
12              So the idea that HCMFA -- that Highland would
13    be doing a credit analysis on HCMFA, determining that it
14    was unable to make that payment and, therefore, this is
15    a bad note, is a completely foreign, preposterous
16    concept at that time.
17         Q.   (BY MR. RUKAVINA)  And in May of 2019 isn't
18    it also, sir, the case that Mr. Dondero could have,
19    right or wrong, agree or disagree, said, that 7.4- is
20    going to compensate HCMFA for the NAV error as opposed
21    to being a loan?
22         A.   No.
23         Q.   That's not possible?
24         A.   No.
25         Q.   And why is that not possible?
```

David Klos - October 27, 2021

1      A.   As we discussed, the 5-, there's absolutely

2   no construct where that can be compensation for an NAV

3   error.  It's not a NAV error.  It's a consent fee.

4   Highland has absolutely no responsibility for that.

5           Highland also has no responsibility for the

6   2.4-, but if you want to assume that it did, that's

7   completely not the practice.  It was Jim's preference

8   to do these via loans, and that's how it was booked.

9      Q.   You're saying on the one hand Mr. Dondero can

10  absolutely control that one entity make a loan to

11  another, irrespective of credit worthiness, but he

12  can't decide that a transfer is compensation as opposed

13  to a loan?

14          MR. MORRIS:  Objection to the form of the

15  question.  Argumentative.

16          THE WITNESS:  If he wants to call

17  $7.4 million compensation to himself or to HCMFA, I

18  just don't know how he does that.  This is me being an

19  accountant.  I don't know how that's possible.

20          If he wants to pay himself a $7.4 million

21  bonus from HCMFA, fine, he has the power to do that.  If

22  he wants Highland to inject 7.4 million of equity into

23  HCMFA, he has the power to do that.

24          But sending the 7.4 million and calling it

25  something else, I don't know how he could do that.

David Klos - October 27, 2021

1     Q.   (BY MR. RUKAVINA)  So it had to have been a
2   loan; correct?
3          MR. MORRIS:  Objection to the form of the
4   question.
5          THE WITNESS:  In these instances I know it to
6   have been a loan.
7     Q.   (BY MR. RUKAVINA)  Because of what
8   Mr. Waterhouse told you?
9          MR. MORRIS:  Objection to the form of the
10  question.  Asked and answered.
11         THE WITNESS:  Yeah, it was my understanding
12  that these were loans.
13    Q.   (BY MR. RUKAVINA)  You know these 7.4- to be
14  loans even though you never heard Mr. Dondero say that
15  to you?
16    A.   Yes, although to be fair, I don't know
17  whether I ever heard Mr. Dondero.  It's possible he did
18  say it.
19         MR. MORRIS:  Objection.  Withdrawn.
20    Q.   (BY MR. RUKAVINA)  You have no memory that on
21  or before May 4, 2019 you heard Mr. Dondero say that
22  the $2.4 million transfer and/or the $5 million
23  transfer to HCMFA were loans?
24    A.   I have no specific recollection, but such a
25  conversation is just off the reservation impossible.

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 176 Part 2 Filed 09/01/24 Page 148 of 261    PageID 28464

92

David Klos - October 27, 2021

1   That there's no way -- there's no way -- there's no way
2   that it would have been described that way and there's
3   a hundred percent that it's loan.
4       Q.   Do you have any memory discussing prior --
5            MR. MORRIS:   Objection.   Asked and answered.
6   He's answered this a thousand times.
7       Q.   (BY MR. RUKAVINA)   Do you have any memory on
8   or before May 2, 2019 discussing the $2.4 million
9   transfer with Mr. Dondero at all?
10      A.   I do recall, I don't remember the time, but I
11  do remember discussing the NAV error in general terms
12  and the potential magnitude of that.   I don't remember
13  specifically when that occurred.
14      Q.   At least in your discussion with Mr. Dondero,
15  the $2.4 million loan or note was somehow linked to the
16  NAV error?
17      A.   Linked to the NAV error is strong.   It
18  related to the NAV error from the standpoint that
19  that's what Highland was loaning HCMFA the money for,
20  because HCMFA couldn't otherwise make the payment
21  itself.
22      Q.   You just said Highland was loaning the money
23  for.   Are you remembering now Mr. Dondero saying that
24  or are you just extrapolating?
25      A.   No, I'm explaining rationally what the

David Klos - October 27, 2021

1  situation was.

2      Q.   Do you remember on or before May 3, 2019

3  discussing the $5 million transfer with Mr. Dondero?

4      A.   Again, in general terms.  I couldn't tell you

5  a time period, but this was something that, between

6  Frank and I, we had put on Jim's radar that this would

7  be a cash need in the future.  I couldn't specify

8  specifically when that happened.

9      Q.   Okay.  You have no present memory of

10 discussing that issue with Mr. Dondero on or before

11 May 3, 2019?  It must have happened but you have no

12 memory?

13          MR. MORRIS:  Objection to the form of the

14 question.

15          THE WITNESS:  We discussed that there would

16 be a consent fee payable from HCMFA.  We would have

17 discussed -- and again, I don't remember where I was,

18 what day it was, the specifics around the conversation.

19          But I know that we had conversations

20 pertaining to cash, because this was a large need for --

21 cash need for HCMFA to satisfy this, and this was an

22 important payment.

23          And neither HCMFA nor Highland had the

24 wherewithal to make that payment.  The only way that

25 those could make the payment was by Jim Dondero repaying

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-38   Filed 02/28/24   Page 150 of 261   PageID 28466
Appendix Part 2 Page 2934 of 372

94

David Klos - October 27, 2021

```
 1   loans that he owed to HCMLP.  So we absolutely discussed
 2   that with Jim Dondero.
 3        Q.   (BY MR. RUKAVINA)  And with respect to
 4   everything that we just talked about and your
 5   recollection, you still don't remember Mr. Dondero
 6   saying to you or Mr. Waterhouse one way or the other
 7   that one or both of these transfers were loans?
 8            MR. MORRIS:  Objection to the form of the
 9   question.  Asked and answered.
10            THE WITNESS:  Yeah, again --
11        Q.   (BY MR. RUKAVINA)  Just yes or no.  This is a
12   yes-or-no question.
13            MR. MORRIS:  Let him answer the question.
14            MR. RUKAVINA:  If he'll answer the question
15   I'll stop asking him --
16            MR. MORRIS:  He's allowed --
17        Q.   (BY MR. RUKAVINA)  The answer [verbatim] is,
18   do you remember --
19        A.   I don't remember Jim's exact words two and a
20   half years ago in respect to authorizing these
21   payments.  So to answer your question, no, I don't
22   specifically remember him saying these are loans.
23            But every other fact around this tells me
24   that we did have that conversation and that was the
25   conclusion and that was the direction.
```

David Klos - October 27, 2021

1    Q.   So it's possible that Mr. Dondero told no one
2  that these were loans but because y'all have been doing
3  it this way for 10 years, that everyone, all of you
4  CPAs, understood that it had to be a loan?
5         MR. MORRIS:  Objection to the form of the
6  question.
7    Q.   (BY MR. RUKAVINA)  My question is, is that
8  possible?
9    A.   I really don't think it's possible.  I
10  suppose people say anything is possible.  Again, two
11  and a half years ago, I'm certain that that was the
12  intent at the time and I'm sure it was communicated as
13  such.  I just don't have a specific recollection.
14         MR. RUKAVINA:  Thank you.
15         I'll pass the witness.
16         MR. MORRIS:  Michael, do you have any
17  questions?
18         MR. AIGEN:  I do.  I assume you want me to
19  start now to do my best to be done at 5:00?
20         MR. MORRIS:  Yes, please.
21                    EXAMINATION
22    Q.   (BY MR. AIGEN)  Good afternoon, Mr. Klos.  My
23  name is Michael Aigen with the Stinson law firm.  I
24  represent Mr. Dondero, HCMS, and HCRE.
25         How are you today?

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 176 Part 2 Filed 03/04/24    Page 152 of 261    PageID 28468
Appendix Part 2 Page 3004 of 372

96

David Klos - October 27, 2021

1      A.    I'm very good, thank you.

2      Q.    First topic I wanted to ask you about is the

3   defense raised by some of the defendants related to an

4   oral agreement and condition subsequent.

5           So my question for you generally is, are you

6   aware that some of the defendants in these proceedings

7   have raised a defense that there was a subsequent oral

8   agreement allowing notes to be potentially forgiven if

9   certain events occur?

10     A.    Yeah, I'm generally aware of the defenses

11  sitting here today.

12     Q.    And how are you generally aware of this

13  defense?

14     A.    I don't know with specificity.  Potentially

15  through just document flow on the bankruptcy side,

16  potentially with conversations internally or with

17  counsel.  But I generally understand them to have been

18  raised, the defenses that is.

19     Q.    And I don't want to get into conversations

20  with counsel.  I'm not allowed to do that.

21          Let me ask you, have you had any

22  conversations with anyone other than counsel about this

23  subsequent oral agreement defense?

24     A.    I have had general conversations with

25  Mr. Seery about it.  And other than that, nothing

David Klos - October 27, 2021

 1  substantive.

 2      Q.   And what did you discuss about this with

 3  Mr. Seery?

 4      A.   I've discussed with him, I hate to phrase it

 5  this way, the ridiculousness of the defense.  Under

 6  oath.  I've discussed my general understanding of what

 7  is being asserted as a defense.

 8           Which is that there was some sort of an oral

 9  agreement between Jim and his sister at some point in

10  the past pertaining to forgiveness of certain

11  promissory notes that was conditional upon Highland

12  monetizing any of three PE assets for any amount above

13  cost.

14      Q.   And is it fair to say that prior to these

15  lawsuits being brought, you weren't aware of any oral

16  agreements related to the promissory notes related to

17  potential forgiveness?

18      A.   That's correct.  Not that I can remember, and

19  I think I would remember.

20      Q.   And other than your conversations with

21  Mr. Seery and counsel, you haven't had any

22  conversations with anyone else about these alleged oral

23  agreements; is that fair to say?

24      A.   I'm not sure I understand the question.

25      Q.   You told me you may have had questions with

David Klos - October 27, 2021

1   counsel about these oral agreements defense, and you

2   told me about conversations with Mr. Seery, so I'm

3   trying to close that topic.

4          Was there anyone else you had any

5   conversations with about this alleged oral agreement?

6      A.   Like I said before, nothing of substance.

7   I've probably mentioned it in passing to other

8   employees, this is what I understand is being asserted

9   in this, but nothing of substance.

10     Q.   Do you have any personal knowledge as to

11  whether Mr. Dondero or Ms. Dondero entered into any

12  type of oral agreement prior to the bankruptcy?

13     A.   No, not other than what's been pled, or

14  whatever the terminology is.

15     Q.   I want to talk a little bit about, you

16  touched on earlier, you gave some testimony about how

17  in -- there were certain term loans that had payments

18  due in December or on or about December 31, 2020.

19         Do you remember talking about that?

20     A.   Yeah, generally.

21     Q.   And I don't know if you're specifically

22  referring to these loans, but is it also your

23  understanding that HCMS and HCRE also had payments that

24  were due on December 31, 2020?

25     A.   Yes.

David Klos - October 27, 2021

1     Q.   Is it fair to say that if those payments were
2  to be made, it would have been Ms. Hendrix that would
3  have gone and effectuated those payments?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  Can you remind me the entities
7  again.
8     Q.   (BY MR. AIGEN)  Sorry.  HCMS and HCRE
9  Partners.
10    A.   HCMS, yes.  HCRE, I'm not sure, maybe.
11    Q.   Why might it have been different?
12    A.   I just don't recall who had the, you know,
13 kind of bank access to effectuate that payment.  I
14 think Kristin did but I'm not certain.
15    Q.   It wouldn't have been you; is that fair to
16 say?
17    A.   Correct.  It would not have been me.
18    Q.   And if Ms. Hendrix testified that the
19 instruction she received in December 2020 about not
20 making payments related only to the Advisors and not to
21 HMS or HCRE, would you have any reason to disagree with
22 her?
23         MR. MORRIS:  Objection to the form of the
24 question.
25         THE WITNESS:  Yeah, I was struggling with

David Klos - October 27, 2021

```
1    that question.  There was a lot to it.  If you don't
2    mind.
3        Q.  (BY MR. AIGEN)  Okay.  I'll repeat it.  Maybe
4    that will help.
5            MR. MORRIS:  Why don't you ask him about his
6    knowledge, instead of Kristin's.  You had her as a
7    witness.
8            I'll continue to object.  I don't know why
9    you're asking him about her knowledge.
10           MR. AIGEN:  Do you want to keep coaching him?
11           MR. MORRIS:  No, I'm trying to coach you.
12           MR. AIGEN:  Oh, thanks.  That's good.
13   Appreciate if you stop coaching your witness.
14       Q.  (BY MR. AIGEN)  If Ms. Hendrix testified that
15   the instructions she received in December 2020
16   regarding not making any more payments related only to
17   the Advisors and not to HMS or HCRE, would you have any
18   reason to disagree with her?
19           MR. MORRIS:  Objection to the form of the
20   question.
21           THE WITNESS:  I have no reason to question
22   Kristin's testimony.  I'm sure she gave truthful
23   testimony.
24       Q.  (BY MR. AIGEN)  Are you aware or not of
25   whether Ms. Hendrix was told by Mr. Waterhouse not to
```

David Klos - October 27, 2021

1   make payments from certain entities in December of

2   2020?

3           MR. MORRIS:  Objection to the form of the

4   question.

5           THE WITNESS:  Yeah, I'm aware, and I think I

6   spoke to that earlier of the instruction that had come

7   down from Dondero through Frank to Kristin, and I was

8   certainly aware of it.

9           And I'm -- and I think I spoke to the fact

10  that, you know, certainly hearing it from a person who,

11  as I said before, wasn't really on the team at that

12  point, it was certainly my understanding that that was a

13  global instruction at the time.

14      Q.   (BY MR. AIGEN)  And I want to get into what

15  was actually said and what you remember, so let me ask

16  you this.

17          This instruction that came down started from

18  Jim and went to Frank.  Is that your understanding?

19      A.   That's my understanding.

20      Q.   You weren't there during that discussion I

21  assume; is that correct?

22      A.   Correct, I was not.

23      Q.   And then Frank gave an instruction to

24  Kristin; is that your recollection?

25          MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1    question.
2           THE WITNESS:  Yeah, it's my understanding
3    that Frank informed Kristin of that instruction.
4        Q.   (BY MR. AIGEN)  Were you there when Frank
5    provided this instruction to Kristin?
6        A.   I don't believe I was.
7        Q.   Then can I ask, how did you become aware that
8    Frank had given this instruction to Kristin?
9        A.   Through subsequent conversations with Frank
10   and Kristin.  As I said before, I don't recall if it
11   was the three of us or me and Frank or me and Kristin.
12   But subsequent conversations.
13       Q.   Are we talking about conversations back in
14   2020 or after the bankruptcy?
15          MR. MORRIS:  Objection to the form of the
16   question.
17          THE WITNESS:  During 2020, December of 2020.
18       Q.   (BY MR. AIGEN)  Sitting here today, can you
19   say with a hundred percent certainty that the
20   instruction related to all of the entities as opposed
21   to just Advisors?
22       A.   So as you pointed out, I was not party to the
23   direction, so I have no way of knowing with any sort of
24   specificity what the direction actually was.  I just
25   know how it was conveyed to me and how I understood it.

David Klos - October 27, 2021

1      Q.   When you say it was conveyed to you, are you
2  talking about subsequent discussions that you had with
3  Ms. Hendrix and Mr. Waterhouse after they talked to
4  each other?
5      A.   Yes.
6      Q.   Sitting here today, can you tell me for sure
7  that one of them told you that this instruction related
8  to all of the entities, as opposed to just the
9  Advisors?
10     A.   No, I can't say that with certainty, but I
11  think that that was the case.  But, again, I can't say
12  with certainty.
13     Q.   Would you defer to Mr. Waterhouse and
14  Ms. Hendrix over what the specific instructions were?
15          MR. MORRIS:  Objection to the form of the
16  question.
17          THE WITNESS:  Like I said, I wasn't part of
18  the conversation, so I would defer to people who
19  received the directions more directly.
20     Q.   (BY MR. AIGEN)  And you're not aware of
21  anything in writing or anything that reflects these
22  instructions on whether to pay or not to pay certain
23  payments in December of 2020?
24     A.   No, I'm not aware of anything in writing.
25     Q.   And let's change topics for a second here.

David Klos - October 27, 2021

1          I want to throw out a term.  Are you familiar
2    with the term "NAV ratio trigger period" as it was used
3    in --
4          A.   In a very, very general sense, yes.
5          Q.   And in a general sense what does that term
6    mean to you?
7          A.   It's a term I recognize from the limited
8    partnership agreement of HCMLP.  It's a defined term in
9    that agreement.
10         Q.   To your knowledge, was the NAV ratio trigger
11   period ever reached or triggered prior to the Highland
12   bankruptcy?
13         A.   I don't know the definition, so I don't know
14   based on the definition whether it had or hadn't.
15         Q.   Sitting here today, though, it's not your
16   belief, based on your experience, that it was
17   triggered; is that fair to say?
18         MR. MORRIS:  Objection to the form of the
19   question.
20         THE WITNESS:  I don't know the consequence of
21   being in a trigger period, I guess is what -- how I'm
22   trying to answer your question.
23         Q.   (BY MR. AIGEN)  Have you ever had any
24   conversations with Nancy Dondero?
25         A.   Yes.

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176 Part 2 Filed 03/04/2 Page 161 of 261   PageID 28477
Appendix 3087 Filed 03/04 of 379

105

David Klos - October 27, 2021

1      Q.   Generally, how many and what was the
2  reasoning?
3      A.   Probably less than five.  I think maybe only
4  one or two that I can really remember.
5      Q.   At a high level what were those conversations
6  about?
7      A.   From my recollection of my conversations with
8  her, they pertained to the DRIP, which is a dividend
9  reinvestment program that I helped.
10      Q.   And approximately when were these
11  conversations?
12      A.   I don't know.  Sometime between 2017 and
13  probably 2019.  I couldn't tell you with any
14  specificity.  These were very informal.
15      Q.   Fair to say that you've never had any
16  conversations with Nancy Dondero about any of the loans
17  at issue in this case?
18      A.   No, no, no, I've never had a conversation
19  with her like that.
20      Q.   And fair to say that you've never had any
21  conversations with Nancy Dondero about compensation for
22  Jim or any other officers at Highland?
23      A.   Correct.
24           MR. AIGEN:  Why don't we go off the record
25  for two minutes.  I think I'm either done or about

David Klos - October 27, 2021

1   done.

2          (Off the record.)

3      Q.   (BY MR. AIGEN)  You understand you're still

4   under oath?

5      A.   Yes.

6      Q.   Are you aware of any loans that Highland has

7   made to any employees or officers that were forgiven in

8   all or in part?

9      A.   Yes.

10     Q.   Can you tell me who?

11     A.   I don't know that this will be a complete

12  list, but there were a few employees in the kind of

13  late aughts, maybe 2010, 2011 frame.

14     Q.   Do you know the names?

15     A.   One was Jack Yang.  Another, I'm not sure if

16  it was forgiven or not, that's why I'm hesitating, but

17  it was Tim Lawler.  I think his was forgiven in part or

18  in full, but I'm not a hundred percent certain.

19     Q.   And any other individuals that received loans

20  that were forgiven in part that you're aware of?

21     A.   Not that I recall, but there could be others.

22  Some of this is very, very old.

23     Q.   Changing topics here a little bit, I'm going

24  to combine two entities to try to speed this up.  If

25  you need to separate, that's fine.

David Klos - October 27, 2021

1          Can you just generally explain to me what
2  services Highland Capital Management provided for
3  HCMS and HCRE?
4      A.    For HCMS -- I do need to separate these a
5  little bit.  For HCMS, really full-service accounting,
6  tax, treasury, cash payments.  I said tax.  Valuation.
7  Nothing personnel-wise because they didn't have any
8  employees.
9          That's all I can think of right off the top
10  of my head, but I could be missing some.
11      Q.    And what about HCRE?  How is that different?
12      A.    Similar, except different types of assets.
13  So more real estate, so less heavy.
14          Maybe not necessarily differences in terms of
15  the types of services, but services would have, I'd
16  say, more cash activity, more variety of investments,
17  which triggers different types of activities going on
18  at those entities.
19          But similar in terms of tax operations,
20  making payments.  HCRE didn't have employees, so no
21  payroll.  So these would be the broad areas that I
22  would think about.
23      Q.    And you mentioned making payments.  Would one
24  of those services that Highland provided for these two
25  entities include making loan payments on the term loans

David Klos - October 27, 2021

1   like the term loans at issue in these proceedings?

2             MR. MORRIS:  Objection to the form of the

3   question.

4             THE WITNESS:  I think I mentioned before, I

5   couldn't remember whether or not Kristin was authorized

6   to make payments with respect to HCRE.  I think she

7   probably was, but I don't know that with certainty.

8             But, you know, for services, certainly Kristin

9   and her team would be responsible for making those

10  payments, subject to the proper authorization.

11       Q.   (BY MR. AIGEN)  And I'm sorry if I asked this

12  before.  If it wasn't Kristin for HCRE, do you have an

13  idea who it would have been?

14       A.   If not Kristin, it would have been Melissa

15  Schroth.

16       Q.   And how were those responsibilities split up?

17  What entities was Melissa Schroth responsible for?

18       A.   Generally speaking, Melissa was more

19  responsible for entities that were really, like -- I'm

20  going to use this in the most general sense, like Jim

21  entities, Jim's trusts, Jim personally.

22             And for HCRE it was kind of in the middle.

23  When it started out it kind of was more Jim world and

24  then over time it got more complex.

25             And as entities got more complex over time

David Klos - October 27, 2021

1    they tend to get transitioned from Melissa to corporate

2    accounting.  And when they got really complex over to

3    another group of fund accountants.

4            So this is one that was, at its beginning,

5    Melissa was the, called primary accountant.  And at

6    some point in time that transitioned to the corporate

7    accounting team.  I can't remember when the cash

8    process kind of cut over.

9        Q.   Is there a list somewhere saying Melissa is

10   responsible for these, Kristin for the others, or is it

11   just more of a pattern or matter of practice?

12       A.   More of a matter of practice.  If you're

13   responsible for an entity, you're responsible.  If

14   you're not, then you're not.

15           MR. AIGEN:  That's all the questions I have.

16   Thank you for your time.

17           THE WITNESS:  Thank you.

18                   EXAMINATION

19       Q.   (BY MR. MORRIS)  Just a few, Mr. Klos.  Let's

20   pick up where Mr. Aigen left off.

21           To the best of your knowledge, did HCMS have

22   a shared services agreement with Highland?

23       A.   No, it didn't that I'm aware of.

24       Q.   But you described certain services that HCMLP

25   provided to HCMS; is that right?

David Klos - October 27, 2021

1      A.    Yes.

2      Q.    Do you know whether HCMFA ever compensated --

3  do you know whether HCMS ever compensated HCMLP for any

4  of those services that HCMLP provided?

5      A.    No, it didn't.

6      Q.    You mentioned HCRE.  To the best of your

7  knowledge, did HCRE have a shared services agreement

8  with Highland Capital Management, LP?

9      A.    No, it didn't.

10      Q.    Did HCRE provide the services that --

11  withdrawn.

12          Did HCMLP provide the services to HCRE that

13  you just described?

14      A.    Yes.

15      Q.    Did HCRE ever compensate HCMLP for any of the

16  services that HCMLP provided?

17      A.    No.

18      Q.    Okay.  Mr. Rukavina asked you some questions

19  about payments that were made on the NexPoint loan in

20  the first half of 2019.

21          Do you remember that?

22      A.    Yes, generally.

23      Q.    Okay.  Notwithstanding those payments, did

24  your group continue to carry on its books and records

25  NexPoint's obligation to make the installment payment

David Klos - October 27, 2021

1  that was due at the end of the year?

2       A.   Yes, we continued to track it through our

3  interest schedules and through cash.

4       Q.   So in the debtor's books and records is there

5  any evidence that the payments that were made in early

6  2019 were intended to relieve NexPoint's obligation to

7  make the installment payment due at the end of the

8  year?

9            MR. RUKAVINA:  Objection.  Best evidence.

10           THE WITNESS:  No, I don't believe so.

11      Q.   (BY MR. MORRIS)  Did you have a conversation

12  with anybody at any time in the year 2019 about whether

13  the payments made earlier in the year on behalf of

14  NexPoint would eliminate or suspend its obligation --

15  withdrawn.

16           Did you have any conversation with anybody --

17  I think I screwed up the dates.  Going to have to start

18  over.

19           Let me ask better questions.

20           You looked with Mr. Rukavina at certain

21  payments that were made in early 2019 with respect to

22  the NexPoint note.

23           Do I have that right?

24      A.   Yes.

25      Q.   Notwithstanding those payments, did NexPoint

David Klos - October 27, 2021

1  make the installment payment that was due at the end of

2  2019?

3          MR. RUKAVINA:  Objection.  Calls for a legal

4  conclusion.

5          THE WITNESS:  It did make the payment that

6  was due at the end of 2019.

7      Q.   (BY MR. MORRIS)  And the payment that it made

8  at the end of 2019, was that the annual installment

9  payment that was called for in the note itself?

10         MR. RUKAVINA:  Objection.  Legal conclusion.

11         THE WITNESS:  Yes, it was a payment pursuant

12  to the note.

13     Q.   (BY MR. MORRIS)  Did anybody ever tell you at

14  any time prior to the commencement of this lawsuit that

15  any prior payment by or on behalf of NexPoint relieved

16  it of any obligation to pay the installment payment due

17  at the end of 2020?

18     A.   No.

19     Q.   And did in fact -- is it your understanding

20  that Mr. Dondero specifically authorized Highland to

21  effectuate a payment on NexPoint's behalf in mid

22  January 2021?

23     A.   I don't have specific knowledge, but I know

24  that to have occurred.

25     Q.   Okay.  Did anybody ever tell you in 2021 --

David Klos - October 27, 2021

1  withdrawn.

2          Did anybody tell you in December 2020 or

3  December -- or January 2021 that NexPoint didn't have

4  to make the installment payment at year end 2020

5  because of some prior prepayment?

6      A.   No.

7      Q.   Can you think of any reason -- withdrawn.

8          Did you ever hear Mr. Dondero -- withdrawn.

9          Did you ever see anything in writing where

10 NexPoint ever contended, prior to February 1, 2021,

11 that it had no obligation to make the payment due at

12 the end of 2020 because of some prepayment issue?

13     A.   No, not that I remember.

14     Q.   Can you think of any reason why Mr. Dondero

15 would have authorized a payment by NexPoint to HCMLP on

16 account of the note in January of 2021 if he actually

17 believed at that time that no obligation was due

18 because of a prior prepayment?

19          MR. RUKAVINA:  Objection.  Speculation, lacks

20 foundation.

21          THE WITNESS:  No.

22     Q.   (BY MR. MORRIS)  Does it make any sense to

23 you as an accountant that you would pay a seven-figure

24 sum of money that you didn't think was due and owing?

25     A.   No, that does not make sense to me.

David Klos - October 27, 2021

1     Q.    Can you get Exhibit 13, please.

2     A.    Got it.

3     Q.    You were asked some questions about

4  paragraph 3.

5           Do you see that?

6     A.    Yes.

7     Q.    Does paragraph 3 mention annual installment

8  payments at all?

9     A.    No, I'm not seeing it.

10    Q.    Does paragraph 3 state in any way that a

11 prepayment as described in that paragraph would relieve

12 the maker of the obligation to make annual installment

13 payments?

14    A.    No.

15    Q.    Can you turn to the next page and look at

16 paragraph 5.

17          Are you familiar with that paragraph at all?

18    A.    No.  I mean, I've seen it before, but this

19 is, as I said before, this is a provision that probably

20 would have been in most, if not all, of these types of

21 notes.

22    Q.    Can you get Exhibit 3, please.  This is your

23 email dated May 2, 2019.

24          Do I have that right?

25    A.    Yes.

David Klos - October 27, 2021

1     Q.   And you sent it to the corporate accounting
2   email group; is that right?
3     A.   I did.
4     Q.   And to the best of your recollection, was
5   Mr. Waterhouse included in that email group?
6     A.   Yes, absolutely.
7     Q.   And did you instruct the corporate accounting
8   team to transfer $2.4 million from HCMLP to HCMFA on
9   May 2, 2019?
10     A.   Yes, specifically Blair, but yes, for the
11   team as well.
12     Q.   The whole team was aware of this?
13     A.   The whole team is on the email, and I'm
14   sending to Blair, who is the AP person, to please set
15   up the payment.
16     Q.   Is it fair to say that you're being
17   completely transparent here by including the entire
18   corporate accounting group on this email?
19     A.   Yes.
20     Q.   And did you tell the entire corporate
21   accounting group that this transaction would be a,
22   quote, new interco loan?
23     A.   Yes, that's what the email says.
24     Q.   Do you have any reason to believe that
25   Mr. Waterhouse didn't get this?

David Klos - October 27, 2021

```
1        A.    No, he got this.
2        Q.    And did Mr. Waterhouse tell you at any time
3   in the history of the world that this $2.4 million
4   should not have been booked as a loan?
5        A.    No.
6        Q.    Did Mr. Dondero tell you at any moment in the
7   history of the world that this transaction should not
8   have been booked as a loan?
9        A.    No.
10       Q.    You mentioned that there was an audit that
11  followed shortly thereafter?
12       A.    Yes.
13       Q.    Are you familiar with the debtor's audited
14  financial statements for the period ending 2018?
15       A.    Yes, generally.  Not total recall, but yes.
16       Q.    Are you aware that this loan was included as
17  a subsequent event in the debtor's audited financial
18  statements?
19       A.    Yes.
20             MR. RUKAVINA:  Objection.  Best evidence.
21       Q.    (BY MR. MORRIS)  Did Mr. Dondero or
22  Mr. Waterhouse or anybody ever tell you that the debtor
23  should not have included this $2.4 million loan in its
24  audited financial statements?
25             MR. RUKAVINA:  Objection.  Best evidence.
```

```
 1              THE WITNESS:  No.
 2       Q.   (BY MR. MORRIS)  Okay.  And the next day
 3   there was another loan; right?
 4       A.   Yes.
 5       Q.   I'm going to show you here a document that's
 6   been produced.
 7              MR. RUKAVINA:  Would you email it to me and I
 8   can print it out for the court reporter.
 9              MR. MORRIS:  You want to come over here and
10   look --
11              MR. RUKAVINA:  I know it.  I'm just thinking
12   that we can append it to the record right now.
13              MR. MORRIS:  It's eight pages, so it's part
14   of a whole production.
15              MR. RUKAVINA:  But it's just one email?
16              MR. MORRIS:  Just one email that I'm talking
17   about.  So we're looking at Bates stamp D-CNL003763.
18              And I'll email it to you when we're done here.
19   And you're welcome to come over here if you'd like to
20   see it.
21       Q.   (BY MR. MORRIS)  Mr. Klos, can you take a
22   look at the email that I have on my screen.
23       A.   Yes.
24       Q.   And do you see that it's an email from
25   Kristin Hendrix to the corporate accounting group on
```

David Klos - October 27, 2021

1   Friday, May 3?

2        A.    Yes.

3        Q.    And were you also included in the corporate

4   accounting email string?

5        A.    Yes.

6        Q.    Can you read the email out loud, please.

7        A.    It says, Blair, please set up a wire from

8   HCMLP to HCMFA for 5 million as a new loan,

9   parentheses, 4.4 million should be coming in from Jim

10  soon.  Hayley, please add this to your loan tracker.  I

11  will paper the loan.

12       Q.    So based on that email, did you understand on

13  May 3 that HCMLP was going to loan $5 million to HCMFA?

14       A.    Yes, HCMFA.

15       Q.    And did you understand that Kristin

16  specifically told the corporate accounting group that

17  she would take responsibility for papering the loan?

18       A.    Yes, that's what she says.

19       Q.    Do you recall whether Mr. Waterhouse ever

20  objected to any aspect of Kristin's email?

21       A.    He didn't.

22       Q.    Do you recall in the history of the world

23  whether Mr. Waterhouse ever told you that this

24  $5 million transaction should not have been booked as a

25  loan?

David Klos - October 27, 2021

1          A.    No.

2          Q.    Did anybody in the history of the world ever

3   raise a question to you as to whether or not Kristin

4   was authorized to paper the loan, as she describes it

5   in this particular email?

6          A.    No.

7          Q.    Do you know if this $5 million loan was also

8   included in the debtor's audited financial statements?

9               MR. RUKAVINA:  Objection.  Best evidence.

10              THE WITNESS:  Yes.  Again, subsequent event.

11         Q.    (BY MR. MORRIS)  Okay.  And did anybody in

12  the history of the world ever tell you that Highland

13  should not have included as a subsequent event in its

14  2018 audited financial statement this $5 million loan?

15         A.    No.

16              MR. RUKAVINA:  Objection.  Best evidence.

17              THE WITNESS:  No.

18         Q.    (BY MR. MORRIS)  Do you know if HCMFA had its

19  financial statements audited?

20         A.    It did.

21         Q.    And are you generally familiar with those

22  financial statements?

23         A.    Yes.

24         Q.    Are you aware that these two loans totaling

25  $7.4 million were included in HCMFA's audited financial

David Klos - October 27, 2021

1    statements as a subsequent event for the period ended
2    December 31, 2018?
3         A.   Yes.
4              MR. RUKAVINA:  Objection.  Best evidence.
5         Q.   (BY MR. MORRIS)  Did anybody in the history
6    of the world ever tell you that HCMFA should not have
7    included as a subsequent event the borrowing of the
8    money reflected in these loans?
9              MR. RUKAVINA:  Objection.  Best evidence.
10             THE WITNESS:  No, no one said that.
11        Q.   (BY MR. MORRIS)  Do you know if HCMFA
12   included these loans as a liability on its balance
13   sheet?
14        A.   It did.
15             MR. RUKAVINA:  Objection.  Move to strike.
16   Best evidence.
17        Q.   (BY MR. MORRIS)  Did anyone in the history of
18   the world ever tell you that HCMFA should not have
19   included these loans as a liability on its balance
20   sheet?
21             MR. RUKAVINA:  Objection.  Best evidence.
22             THE WITNESS:  No.
23        Q.   (BY MR. MORRIS)  Okay.  Do you recall that in
24   October of 2020 HCMFA and NexPoint made a report to the
25   retail board?

David Klos - October 27, 2021

```
 1        A.    Yes.
 2        Q.    And are you aware that that's part of the
 3   annual review process?
 4        A.    Yes, it's the 15(c) process.
 5        Q.    By the way, as we're talking about these
 6   issues, did Mr. Waterhouse have -- was he an officer of
 7   HCMFA in 2019 and 2020?
 8        A.    Yes.
 9        Q.    And what's your understanding as to the
10   office he held?
11        A.    Treasurer, I believe.
12        Q.    And do you know if Mr. Dondero held an
13   officer position with respect to each of the Advisors?
14        A.    He did.
15        Q.    What position did he hold?
16        A.    I don't recall with certainty, but I believe
17   president.
18        Q.    As officers of those two entities, do you
19   have any knowledge as to whether they participated in
20   the communications with the retail board in the fall of
21   2020?
22        A.    I believe Jim and Frank both did.
23        Q.    And do you know whether the retail board
24   asked the Advisors for a report on all obligations due
25   and owing to HCMLP and affiliates?
```

David Klos - October 27, 2021

1      A.    They asked for financials, I believe as of
2  6/30 as part of that process.
3      Q.    And are you aware as to whether or not the
4  financials that were provided to the retail board
5  included, among other things, the $7.4 million in notes
6  that were -- that we're talking about here?
7      A.    Yes, those financials would have included
8  those amounts as liabilities to HCMLP.
9      Q.    Did Mr. Dondero or Mr. Waterhouse ever tell
10 you or anybody to your knowledge that the Advisors
11 should not have told the retail boards that they were
12 obligated to pay under those two notes?
13     A.    No.
14     Q.    Let's talk about loan forgiveness for a
15 moment.
16           How long have you been with the company?
17     A.    March of 2009.
18     Q.    At any time since you've been employed by
19 Highland, has Highland ever forgiven a promissory note
20 that it held where the maker was a corporate affiliate?
21     A.    Not that I can recall.
22     Q.    Have you ever heard prior -- has anybody ever
23 told you that before you joined the company, Highland
24 had ever forgiven in whole or in part any note that it
25 held where the maker was a corporate affiliate?

David Klos - October 27, 2021

1        A.    Not that I'm aware of.

2        Q.    You referred to a couple of loans that were

3   given to individuals earlier.

4              Do you remember that?

5        A.    Yes.

6        Q.    What's the biggest loan that you can recall

7   Highland ever forgiving?

8        A.    The largest one that I can remember was

9   a half-million dollars, 500,000.

10       Q.    So you have no knowledge of any loan ever

11  being forgiven where the principal amount forgiven

12  exceeded $500,000; is that right?

13       A.    Not that I'm aware of.

14       Q.    And when is the last loan that Highland

15  forgave in whole or in part to one of its officers or

16  employees that you can recall?

17       A.    I don't know a specific year, but it would

18  have been in the 2010, 2011 time frame.  Maybe 2012,

19  but I suspect '10 or '11.

20       Q.    So is it fair to say to the best of your

21  recollection and knowledge that Highland did not

22  forgive a single loan made to an officer or employee

23  for at least seven years prior to the petition date?

24       A.    There's none that I can think of.

25       Q.    Let's just turn our attention to

David Klos - October 27, 2021

1    December 2020.

2              Do you recall that you testified at length

3    about your understanding of the conversations with

4    Mr. Waterhouse and Ms. Hendrix?

5              Do you remember that?

6        A.    Yes.

7        Q.    Okay.  Are you aware of any instruction ever

8    made by Mr. Dondero or Mr. Waterhouse in November or

9    December 2020 in order to make the payments that were

10   due under the three term notes -- withdrawn.

11             There were three term notes that were due --

12   withdrawn.

13             There are three term notes at issue in this

14   case.  Do you understand that?

15       A.    Yeah, that's my understanding.

16       Q.    And one of them was issued by NexBank; is

17   that right?

18       A.    NexPoint Advisors.

19       Q.    Thank you for the clarification.

20             One was by HCRE?

21       A.    Correct.

22       Q.    And one was from HCMS; do I have that right?

23       A.    Yes.

24       Q.    And all three of those notes were executed as

25   of May 31, 2017; right?

David Klos - October 27, 2021

```
 1        A.   Yeah, that was the effective date on all
 2   three.
 3        Q.   And they all rolled up previously outstanding
 4   notes that were due and payable to Highland.
 5             Do I have that right?
 6        A.   Correct.  To the best of my recollection.
 7        Q.   So we'll refer to those notes as the term
 8   notes.  Is that okay?
 9        A.   Sure.
10        Q.   Do you have any knowledge that Mr. Dondero or
11   Mr. Waterhouse ever instructed HCMLP to make the
12   installment payments that were due at the end of 2020
13   with respect to any of those term notes?
14        A.   No, I don't believe they provided that
15   instruction to make those payments.
16             MR. RUKAVINA:  Objection.  Move to strike.
17   Lacks foundation.
18             MR. MORRIS:  I'm asking him if he ever heard.
19             MR. RUKAVINA:  But he answered a different
20   question.  He answered a different question.
21        Q.   (BY MR. MORRIS)  Did you ever see anything in
22   writing where either Mr. Dondero or Mr. Waterhouse
23   directed HCMLP to make the annual installment payments
24   that were due at the end of 2020 with respect to any of
25   the term notes?
```

David Klos - October 27, 2021

1        A.    No.

2        Q.    Okay.  But to the best of your recollection,

3  in the 13-week forecast, those forecasts included the

4  installment payments that were due at the end of the

5  year; is that right?

6        A.    They did.

7        Q.    Did anybody ever tell you prior to

8  February 1, 2021, that your group had made a mistake by

9  not making the payment -- any of the payments that were

10 due under the term notes at the end of 2020?

11       A.    Not that I'm aware of.

12       Q.    Did anybody tell you prior to February 1,

13 2021, that the makers of the term notes expected

14 Highland to effectuate the payments that were due at

15 the end of the year without approval by Mr. Waterhouse

16 or Mr. Dondero?

17       A.    No.

18       Q.    Have you seen any protest in writing prior to

19 the commencement of the litigation by any of the makers

20 of the notes about a failure on the part of HCMLP to

21 perform its duties and make that payment at the end of

22 the year?

23       A.    No.

24             MR. MORRIS:  I have no further questions.

25             MR. RUKAVINA:  I have five minutes.

David Klos - October 27, 2021

1                        FURTHER EXAMINATION
2          Q.    (BY MR. RUKAVINA)   Go to Exhibit 16, please,
3    1-6.
4          A.    Sure.
5          Q.    Sir, this is an email string regarding that
6    Rule 15(c) that you were talking about.  I'm just going
7    to ask you about the top email, but you're welcome to
8    read the whole.
9          A.    Uh-huh.
10         Q.    You're copied on Mr. Waterhouse's email there
11   October 6, 2020; right?
12         A.    Yes, I'm on the email.
13         Q.    And Mr. Waterhouse writes, the HCMFA note is
14   a demand note.  You would have read that; right?
15         A.    Yes.
16         Q.    Did you ever correct Mr. Waterhouse when he
17   says the HCMFA note, as opposed to notes?
18         A.    No, that's not something I would have
19   corrected from Frank.
20         Q.    Do you recall right now that you might have,
21   when you read this, realized that he made a mistake?
22         A.    It would have been such a de minimus,
23   inconsequential mistake that I don't know that I would
24   have addressed it.
25         Q.    What about two sentences over, there was an

David Klos - October 27, 2021

1   agreement between HCMLP and HCMFA the earliest they
2   could demand is May 2021.
3           Did you ever write to him and say that too
4   was a mistake?
5       A.   I didn't write to him.
6       Q.   Did you realize back then when you read it
7   that he had made a mistake?
8       A.   I'm not certain.
9       Q.   Did you -- and I'm not suggesting that you
10  should have.  You're a busy man.  But did you attach
11  any significance outside of the ordinary to this email
12  exchange?
13          MR. MORRIS:  Objection to the form of the
14  question.
15          THE WITNESS:  I struggle with how to answer
16  that.  I saw that this note was in response to retail
17  15(c) follow-up on the Advisors.
18          At this point my role was different, where I
19  was dealing with really the retail funds primarily.  So
20  the fact that I'm even on this email is somewhat
21  incidental.
22      Q.   (BY MR. RUKAVINA)  But surely on October 6,
23  2020 you knew that there were four HCMFA demand notes,
24  didn't you?
25      A.   I'm sure I would have had access to that

David Klos - October 27, 2021

1  information.  I'm not sure that I was keeping track of
2  how many were outstanding at any given point in time.
3      Q.   And surely on October 6, 2020 you knew that
4  only two of them couldn't be demanded by May of 2021,
5  didn't you?
6      A.   Again, I don't know that I was even really
7  thinking about these notes at that time.
8      Q.   Even though you were preparing weekly cash
9  forecasts for Mr. Seery?
10     A.   I wasn't preparing a weekly cash forecast for
11  Mr. Seery.
12     Q.   Going to Exhibit 13, please.  Mr. Morris
13  asked you a couple questions about this.
14     A.   I'm sorry, 13?
15     Q.   Yes, sir.  And again, that paragraph 3 that
16  talks about prepayment.
17          Can you find anything in here, sir, that says
18  that a prepayment does not relieve the maker of any
19  regularly scheduled payment?
20     A.   Sorry, that's a lot to comprehend.  If you
21  could ask again.
22     Q.   Is there any provision that you can see here
23  that's to the effect that a prepayment will not relieve
24  the maker of any regularly scheduled payment?
25     A.   I don't see that specific provision.  I just

David Klos - October 27, 2021

1   read it for what is on the page.

2        Q.   Isn't it, sir, in your experience the case

3   that a promissory note, if it intended not to relieve

4   the borrower of regularly scheduled payments would say

5   that a prepayment does not relieve the borrower of

6   regularly scheduled payments?

7             MR. MORRIS:  Objection to the form of the

8   question.

9             THE WITNESS:  That's a legal question.  I

10  can't -- I don't know the answer.

11       Q.   (BY MR. RUKAVINA)  Do you remember seeing

12  promissory notes that say something like that?

13       A.   Not that I can recall.

14       Q.   You'd be surprised if that's what promissory

15  notes say?

16            MR. MORRIS:  Objection to the form of the

17  question.

18            THE WITNESS:  I don't know.

19       Q.   (BY MR. RUKAVINA)  And Mr. Morris asked you

20  about this.  I'm trying to burn through this so the man

21  can make his plane.

22            Section 2.1 talks about 30 equal annual

23  payments, annual installments.

24            You see that?

25       A.   Yes, I see that.

David Klos - October 27, 2021

1      Q.   And Mr. Morris asked you whether you see
2  anything in here that says that a prepayment relieves
3  an annual installment.

4          Do you remember that question?
5          MR. MORRIS:  Objection.  That's not what I
6  asked.

7          THE WITNESS:  I don't remember that question.
8      Q.   (BY MR. RUKAVINA)  Reading Section 2.1 and 3
9  together, what would a prepayment apply to other than
10 an annual installment?  Do you have a view on that?
11         MR. MORRIS:  Objection to the form of the
12 question.
13         THE WITNESS:  Again, I struggle with
14 prepayment.  But as I read Section 3, it would be
15 applied first to unpaid accrued interest and then to
16 unpaid principal.
17     Q.   (BY MR. RUKAVINA)  Have you ever in your
18 personal life prepaid a promissory note before -- have
19 you ever in your personal life prepaid a promissory
20 note prior to its maturity?
21         MR. MORRIS:  Objection to the form of the
22 question.
23         THE WITNESS:  I don't know.
24     Q.   (BY MR. RUKAVINA)  Sitting here today, with
25 your CPA, your MBA and you're a CFO of a large entity,

David Klos - October 27, 2021

1   you don't understand what a prepayment means?

2           MR. MORRIS:  Objection.  Argumentative.

3           I direct you not to answer.

4           You're going to have ask a different question.

5   That's an argumentative question and it's insulting.

6           MR. RUKAVINA:  What's the privilege on which

7   you're directing him not to answer?

8           MR. MORRIS:  I just said it's argumentative.

9           MR. RUKAVINA:  I'm trying to let you get to

10  your flight.

11          MR. MORRIS:  Ask a proper question.  Don't

12  make this about me.

13      Q.   (BY MR. RUKAVINA)  You were going to answer

14  my question, sir?

15          MR. MORRIS:  No, I'm directing him not to

16  answer.

17          MR. RUKAVINA:  Then we'll end this deposition

18  with a motion to compel.

19          MR. MORRIS:  Okay.  You do that.

20          MR. RUKAVINA:  I'm making a motion to compel.

21  We'll call the judge as soon as we land in New York

22  tomorrow.

23          MR. MORRIS:  You have to read the whole

24  question.  You can ask the question without the

25  verbiage; right?

David Klos - October 27, 2021

```
 1              MR. RUKAVINA:  And I asked you on the basis
 2    of what privilege are you instructing your --
 3              MR. MORRIS:  Argumentative.
 4              MR. RUKAVINA:  That's not a privilege.
 5              MR. MORRIS:  Sir, you can rephrase your
 6    question and end this right now by not being insulting
 7    to my client.
 8         Q.   (BY MR. RUKAVINA)  I was not trying to be
 9    insulting, sir.
10              I'm asking you again, you do not, sitting
11    here today, have an understanding of what the word
12    "prepayment" for a promissory note means?
13              MR. MORRIS:  Objection to the form of the
14    question.
15              You can answer that one.
16              THE WITNESS:  In the context that you're
17    asking the question --
18         Q.   (BY MR. RUKAVINA)  No, I'm not asking any
19    context.  Sitting here today, do you have an
20    understanding of what the word "prepayment" means when
21    it comes to a borrower/lender relationship?
22              MR. MORRIS:  Objection to the form of the
23    question.
24              THE WITNESS:  Yes, I have a general
25    understanding.
```

David Klos - October 27, 2021

```
 1        Q.   (BY MR. RUKAVINA)  What is your
 2   understanding?
 3        A.   That -- you can look at the note.
 4        Q.   I'm not asking about the note.  We got to go
 5   step by step.
 6             What is your general understanding as to what
 7   a prepayment means?
 8             MR. MORRIS:  Objection to the form of the
 9   question.
10             THE WITNESS:  It depends on the context and
11   it's going to depend on what the note says about
12   prepayments.  So I have a hard time answering that
13   question.
14        Q.   (BY MR. RUKAVINA)  So you would agree with me
15   that you have to look at the note before you can answer
16   that question?
17             MR. MORRIS:  Objection to the form of the
18   question.
19             THE WITNESS:  I would want to look at the
20   note before I answer the question, because prepayment
21   is a term that can be used as a defined term or in a
22   casual sense, and those two can sometimes get confused
23   and misconstrued.
24        Q.   (BY MR. RUKAVINA)  Would you agree with me
25   that in any and all circumstances a prepayment is a
```

David Klos - October 27, 2021

```
1   payment made prior to the time that it's due?
2              MR. MORRIS:  Objection to the form of the
3   question.
4              THE WITNESS:  Yes, in the most general sense
5   a prepayment, the prefix "pre" indicates that it's
6   before some other event.  So from that standpoint,
7   prepayment means it was to some extent paid early.
8              MR. RUKAVINA:  Thank you.
9              Pass the witness.
10             MR. MORRIS:  No further questions.
11             Michael?
12             MR. AIGEN:  No questions.
13             THE REPORTER:  Mr. Morris, do you want a copy
14   of the transcript?
15             MR. MORRIS:  I sure do.
16             THE REPORTER:  Mr. Aigen, do you want a copy
17   of the transcript?
18             MR. AIGEN:  Yes, we would also like a copy.
19             MR. MORRIS:  Yeah, and I'd like that rush.
20             (Whereupon, the deposition adjourned at
21             5:14 P.M.)
22                          --oOo--
23             I declare under penalty of perjury that the
24   foregoing is true and correct.  Subscribed at
25   _____, Texas, this _____ day   of
```

David Klos - October 27, 2021

1    _____, 2021.

2

3

4    _____

5    DAVID KLOS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X   Document 178-3   Filed 09/14/... Page 193 of 261    PageID 28509

137

## CERTIFICATE OF REPORTER

1

2          I, BRANDON D. COMBS, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7          That said deposition was taken in shorthand by

8    me, a disinterested person, at the time and place

9    therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12         That before completion of the deposition,

13   review of the transcript was not requested.  If

14   requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17         I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22         DATED: November 1, 2021

23

24   _____

25   Brandon Combs, Certified Shorthand
     Reporter No. 10927 in and for the

HCMFA APP 0790

David Klos - October 27, 2021

1                         State of Texas

                         Dickman Davenport, Inc. Cert 312

2                         4228 North Central Expressway

                         Suite 101, Dallas, TX 75206

3                         (214) 855-5100    (800) 445-9548

                         Email: info@dickmandavenport.com

4                         www.dickmandavenport.com

                         My commission expires 1-31-23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David Klos - October 27, 2021

---

**A**

ability 42:12
43:21 78:2 88:8
88:10
able 31:20 32:2
above-styled
1:21
absolutely 12:4
16:10 77:1 80:1
80:14 90:1,4,10
94:1 115:6
accepting 19:17
access 99:13
128:25
account 53:20
60:3 113:16
accountant 26:5
26:9,15,20
39:12,17 90:19
109:5 113:23
accountant's
39:13
accountants
109:3
accounted 38:6
45:8,11 64:23
accounting 4:16
6:5,5,11,11
7:14,17,21 8:23
9:3,5,5,9,15,23
10:12 33:22
35:9,16,20
43:18 53:4
62:10,11 70:15
74:22 84:2
107:5 109:2,7
115:1,7,18,21
117:25 118:4
118:16
accrue 49:13
accrued 38:8
46:8,16,20,25
47:1,4,5,11,14
47:18,19,24,25
48:4,5,7,15

49:4,5,12,20,21
50:8,21 51:3
131:15
accumulated
47:22
accurate 27:25
85:10
acknowledgment
87:21,22
act 11:5
activities 107:17
activity 107:16
actual 37:5 85:13
add 118:10
additional 89:2
address 64:7
addressed 44:9
127:24
adjourned
135:20
advisor 9:24 71:7
74:19
advisor-type 6:7
advisors 1:10
12:14,15,17
13:3,6 27:1
52:19 55:1
60:22 65:23
71:6 72:22 86:6
99:20 100:17
102:21 103:9
121:13,24
122:10 124:18
128:17
affect 16:11,12
16:20
affiliate 39:23
122:20,25
affiliated 10:21
34:8 35:4,11
36:2 61:15
affiliates 38:5
51:20 121:25
AFR 86:7
afternoon 95:22

agent 85:16
ago 19:6 34:25
36:20 39:21
43:5 94:20
95:11
agree 8:11 47:10
47:11 51:7 77:2
89:19 134:14
134:24
agreement 12:23
84:11 96:4,8,23
97:9 98:5,12
104:8,9 109:22
110:7 128:1
agreements 41:3
97:16,23 98:1
agrees 48:7
ahead 45:7
Aigen 2:18 3:4
95:18,22,23
99:8 100:3,10
100:12,14,24
101:14 102:4
102:18 103:20
104:23 105:24
106:3 108:11
109:15,20
135:12,16,18
Akard 1:24 2:4
aleck 50:7
alleged 97:22
98:5
Allocation 70:25
74:12 75:6
allow 75:4
allowed 46:13
81:22 82:1
94:16 96:20
137:15
allowing 96:8
amortization
23:16 28:1
amount 15:5,15
37:5 47:22
59:13 73:2

80:21 84:14
97:12 123:11
amounts 28:24
41:7 122:8
analysis 30:9
53:25 54:6,9,18
55:1,8 89:13
analyst 5:17,25
and/or 40:12
67:7 91:22
annual 23:22
80:9 112:8
114:7,12 121:3
125:23 130:22
130:23 131:3
131:10
answer 16:23,25
17:2 20:18,20
21:3,15 22:1
25:5 28:10
35:16 41:18
50:11 53:24
55:15,23 71:5
78:11 79:7 87:7
94:13,14,17,21
104:22 128:15
130:10 132:3,7
132:13,16
133:15 134:15
134:20
answered 21:2
41:17 56:11
76:19 85:21
91:10 92:5,6
94:9 125:19,20
answering
134:12
answers 9:18
16:10,13
anybody 24:13
60:1 80:16
111:12,16
112:13,25
113:2 116:22
119:2,11 120:5

122:10,22
126:7,12
anymore 57:1
61:22 62:7
AP 115:14
apologize 9:21
27:22 63:11
66:21 77:1
apparatus 12:9
APPEARANC...
2:1
appeared 2:5,12
2:19
appears 49:3
64:2
append 117:12
appended 137:16
application 37:8
37:9,15,16
applied 39:17
46:8,9 48:11,14
49:5,8 64:13,16
65:1 131:15
apply 38:24
131:9
Appreciate
100:13
appropriate
35:19,22
approval 66:14
77:19,23 78:3
78:21 79:3
126:15
approvals 80:9
approximate 6:1
63:2
approximately
5:9 105:10
April 7:13,22
11:16,21 88:9
areas 107:21
argumentative
90:15 132:2,5,8
133:3
art 8:1 9:3 10:12

---

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X   Document 176-31 Part 2 Filed 03/42 Page 196 of 261   PageID 28512
Appendix Part 21 Page 03424 of 3788

**140**

**David Klos - October 27, 2021**

ascertain 45:2,4
asked 16:18 20:5
  21:2 30:18
  41:10,17 44:10
  54:13 55:17,22
  56:11 57:12,15
  59:12 70:9
  76:19 84:8,17
  85:21 86:10
  91:10 92:5 94:9
  108:11 110:18
  114:3 121:24
  122:1 129:13
  130:19 131:1,6
  133:1
asking 18:11
  20:21 28:6
  38:20 56:9,13
  61:5,7 77:13
  83:22 94:15
  100:9 125:18
  133:10,17,18
  134:4
aspect 118:20
ass 17:18
asserted 97:7
  98:8
asset 15:7
assets 15:3 87:10
  87:12 97:12
  107:12
assist 42:13
assistance 31:13
assistant 6:24 7:4
  7:7,10 8:8
assisted 22:23
assume 28:7 29:7
  90:6 95:18
  101:21
assumed 7:14
  53:3
assuming 36:14
  36:21 41:23
  64:1
assumptions

54:14
attach 128:10
attempt 87:7
attention 123:25
attorney 2:5,12
  2:18 137:18
audit 9:25 24:6
  80:4 116:10
audit-driven
  88:5
audited 116:13
  116:17,24
  119:8,14,19,25
auditor 24:3
auditors 24:5
  88:6,14
aughts 106:13
August 42:16
  44:13
authenticate 28:5
authenticity
  67:23
authoritative
  65:1,2
authority 36:9
  77:3,13,15 78:7
  78:21,25
authorization
  108:10
authorize 77:4
authorized 40:2
  59:15 69:6,25
  85:24 108:5
  112:20 113:15
  119:4
authorizing
  94:20
Avenue 2:11,17
aware 35:6 58:24
  59:2,3 80:18,21
  96:6,10,12
  97:15 100:24
  101:5,8 102:7
  103:20,24
  106:6,20

109:23 115:12
116:16 119:24
121:2 122:3
123:1,13 124:7
126:11
awfully 17:20

———————
**B**
back 6:14 15:19
  22:12 23:21,25
  36:11 40:18
  49:17 51:13
  55:16 65:12
  67:4 68:25
  82:23 83:19
  84:4 85:12
  102:13 128:6
back-end 15:19
  15:21
back-ended
  14:25
background 4:13
  53:2 70:5,6,7
backup 36:19
bad 20:12 89:15
balance 49:6
  80:6,8 120:12
  120:19
ballpark 85:24
bank 36:17 99:13
bankruptcy 1:1
  31:19 80:10
  96:15 98:12
  102:14 104:12
base 14:5,7
based 14:11,14
  32:12 37:17
  46:5,7 48:12,19
  54:14 104:14
  104:16 118:12
basically 6:3
  31:13 56:1 81:5
basis 23:22 30:2
  133:1
Bates 83:15

117:17
began 5:11
beginning 109:4
behalf 2:6,13,20
  12:24 25:2 78:2
  78:22 79:1
  111:13 112:15
  112:21
beings 71:19
belief 104:16
believe 6:23
  15:11 16:3 17:3
  17:8 18:2 19:23
  21:13,13 22:20
  23:13,19 24:16
  26:13 49:9 51:1
  51:2 74:16
  77:17 78:1,7,19
  81:8 83:1,3
  86:25 102:6
  111:10 115:24
  121:11,16,22
  122:1 125:14
believed 35:10
  57:6 113:17
beneficiaries
  17:10,15
benefiting 73:9
best 5:25 8:3
  52:15,17 55:7
  63:24 64:4
  78:16,17 85:8
  95:19 109:21
  110:6 111:9
  115:4 116:20
  116:25 119:9
  119:16 120:4,9
  120:16,21
  123:20 125:6
  126:2
better 111:19
biggest 123:6
bill 74:20
bills 82:4,5,10,11
birth 4:9

bit 7:9 12:12 14:2
  30:15 33:12
  39:3 48:1 98:15
  106:23 107:5
Blair 115:10,14
  118:7
board 120:25
  121:20,23
  122:4
boards 122:11
bold 40:25
bonus 14:8,9,10
  14:19,24 15:14
  18:5 90:21
book 33:21 34:12
  34:20
booked 32:23
  33:11 34:9 35:5
  35:20 36:24
  44:23 90:8
  116:4,8 118:24
books 80:7
  110:24 111:4
borrow 78:22
borrower 45:6,15
  45:19,24 46:2
  130:4,5
borrower/lender
  133:21
borrowing 120:7
boss 39:13
Boston 4:15 5:8
  5:10
brain 32:9
Brandon 1:22
  137:2,25
break 7:6
bridge 29:22
  30:6
briefly 13:5
bring 49:6
broad 9:22 35:17
  61:3 107:21
broader 76:8
broken 53:16

David Klos - October 27, 2021

brokers 10:17
brought 6:4,14
  31:3,7 97:15
bucks 74:25
budgeting 6:8
burn 130:20
businesses 30:1
busy 11:15,19
  128:10

C
call 6:4 11:11,13
  38:10 63:14
  90:16 132:21
called 9:24 58:21
  59:11 70:24
  74:16 88:7
  109:5 112:9
calling 90:24
Calls 112:3
capital 1:6,9 5:11
  6:6 8:4 13:6
  23:22,23 26:19
  26:23 27:1 29:4
  29:19 32:6,23
  35:3 37:25 71:6
  107:2 110:8
car 82:9
career 11:20
careful 17:21
carry 110:24
case 43:20 86:24
  89:18 103:11
  105:17 124:14
  130:2
cash 9:25 23:21
  23:24 25:23,24
  26:7 31:9,10,12
  31:14,16,23
  32:8,12,14
  41:15,24 42:12
  42:23 43:5,22
  43:24 44:1
  57:25 61:25
  63:2 73:20

88:12,17 93:7
93:20,21 107:6
107:16 109:7
111:3 129:8,10
casual 134:22
caught 62:5
cause 1:21 137:6
  137:20
caused 79:12
  81:10
causes 82:9
Central 138:2
Cert 138:1
certain 5:17
  11:13 12:21,21
  13:12 23:14
  33:13 38:1
  54:14 67:21
  70:12 83:9
  95:11 96:9
  97:10 98:17
  99:14 101:1
  103:22 106:18
  109:24 111:20
  128:8
certainly 6:18
  9:17 12:3 20:10
  26:4 30:11
  32:16 34:4
  35:18 37:23,24
  42:11 50:4 58:8
  62:14 69:1
  77:13,24 86:22
  101:8,10,12
  108:8
certainty 29:13
  42:19 68:18
  69:8,11,24 70:2
  102:19 103:10
  103:12 108:7
  121:16
CERTIFICATE
  137:1
Certified 137:2
  137:25

certify 137:3,17
cetera 6:1 14:20
CFO 5:21,25
  8:18 48:6,21
  131:25
chain 53:5
chance 69:4
change 8:8 16:10
  46:10 59:1
  84:13 103:25
changed 6:18
  39:11 84:16
changes 7:1
  137:14
Changing 106:23
characterize 54:1
  76:10 87:18,19
characterized
  54:2
charge 6:15 10:3
chief 7:13,17,21
  8:23,23 9:3
  10:12 13:20,22
  53:3
circumstance
  51:1
circumstances
  31:2 134:25
claim 81:1,9
claimant 15:16
  18:6
clarification
  124:19
clarify 11:3 12:8
  53:1 66:18
  75:25
clear 17:21 26:19
  27:11 29:14
  52:24 63:9
  69:15,16 73:13
clearly 74:2
client 133:7
clients 17:25
Cliff 7:23
close 17:21 33:14

98:3
closed-end 74:14
closely 62:4
coach 100:11
coaching 100:10
  100:13
cold 46:6
collect 81:17
collected 81:19
collectible 87:15
collecting 15:16
  81:6,6
collection 87:25
collective 52:2
college 4:15 5:6
column 36:25
  37:7
combination
  39:16 45:12
combine 106:24
Combs 1:22
  137:2,25
come 47:12 53:7
  59:19 65:3,5
  76:22 101:6
  117:9,19
comes 133:21
comfortable 88:6
coming 17:20
  36:13 118:9
command 53:5
commencement
  112:14 126:19
comment 17:13
commission
  138:4
common 30:5
  86:5
communicated
  95:12
communicating
  53:9
communication
  83:10
communications

121:20
company 81:14
  122:16,23
compel 132:18,20
compensate 72:8
  72:12 79:14
  89:20 110:15
compensated
  17:16 110:2,3
compensation
  14:3,6,8,19
  15:14 16:4,12
  16:16,21 17:4,8
  17:24 18:5
  60:18 73:8,12
  79:25 90:2,12
  90:17 105:21
complete 15:3
  74:23 106:11
completed 15:22
  15:25 16:2
  74:21
completely 15:24
  27:25 89:9,15
  90:7 115:17
completion
  137:12
complex 108:24
  108:25 109:2
compliance 6:8
  72:4
comprehend
  129:20
computer 137:11
computerized
  1:24
concept 89:16
concern 23:23
  24:1,2,4 56:21
  56:23,25 62:17
concerning 17:7
  63:20
conclude 80:25
concluding 24:6
conclusion 94:25

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 176 Part 2    Page 198 of 261    PageID 28514

142

David Klos - October 27, 2021

112:4,10
condition 96:4
conditional 97:11
conduct 69:18
confer 26:4
confident 69:5
confirm 59:17
  61:19
confused 41:6
  134:22
confusion 11:6
conjunction 24:5
connection 24:12
  26:2
consent 74:16
  75:23 80:2
  85:15 90:3
  93:16
consented 74:17
consequence
  104:20
considerations
  16:1 60:10
constant 75:15
construct 90:2
consultancy 11:9
  11:11
contended
  113:10
context 133:16
  133:19 134:10
contingent 14:11
continue 17:22
  100:8 110:24
continued 111:2
continuously
  6:17 29:22
contract 71:10
contracted 71:15
contradict 79:18
control 43:2
  90:10
controlled 89:8
controller 6:24
  6:25 7:4,4,8,8

7:10,10 8:4,8,9
8:12,15 9:11
10:10,12 12:19
13:10,17 48:6
conversation
  18:22 19:9,19
  43:15 51:25
  70:14 91:25
  93:18 94:24
  103:18 105:18
  111:11,16
conversations
  18:23 19:11
  20:2 34:11 42:6
  51:25 93:19
  96:16,19,22,24
  97:20,22 98:2,5
  102:9,12,13
  104:24 105:5,7
  105:11,16,21
  124:3
conversion 74:15
  74:17,21
converted 74:13
conveyed 102:25
  103:1
coordinated
  22:21
copied 127:10
copy 135:13,16
  135:18
corporate 6:5,15
  9:9,15 25:22
  33:8 35:9,16
  39:12,13,16
  43:17 61:14
  62:11 70:15
  73:20 84:2
  109:1,6 115:1,7
  115:18,20
  117:25 118:3
  118:16 122:20
  122:25
correct 5:22,23
  8:19,21 9:20

16:17 40:2 42:1
45:25 51:11
61:10 64:25
68:10 69:2
82:21 88:11,17
88:23 91:2
97:18 99:17
101:21,22
105:23 124:21
125:6 127:16
135:24
corrected 127:19
correctly 5:16
  51:13 62:9
cost 97:13
counsel 2:6,13,19
  18:10,20,25
  20:3 21:16
  22:21,25 23:3
  96:17,20,22
  97:21 98:1
  137:17
couple 61:20
  87:14 123:2
  129:13
course 20:3 33:19
  51:9 66:12
  69:18 83:22
  84:4,6
court 1:1 117:8
courteous 76:24
covered 20:14
  53:2
CPA 4:19,22
  44:21 48:6,20
  49:11 131:25
CPAs 95:4
created 80:10
credit 6:8 25:9
  40:11 89:13
  90:11
creditors 15:17
CSR 1:23
curiosity 59:21
current 4:25

cut 109:8
cycle 41:7

_____

D

D 1:22 137:2
D-CNL003763
  117:17
Dallas 1:3,25 2:4
  2:18 4:12 5:10
  138:2
damages 82:12
date 4:9 8:6
  24:22 45:20
  47:5,6,23 48:25
  49:13,13,14
  84:14 123:23
  125:1
dated 114:23
  137:22
dates 27:10 28:18
  28:24 111:17
Davenport 138:1
David 1:14,18
  4:1,6 136:5
Davor 2:5 76:22
day 29:21 32:1
  34:1 59:7 74:8
  93:18 117:2
  135:25
day-to-day 9:17
  62:6
days 59:5 76:2,7
de 127:22
dealing 29:20
  128:19
debtor 26:21
  32:23 38:6,22
  38:23 76:16
  77:3,5,8 78:2
  81:1 87:14
  88:16 116:22
debtor's 111:4
  116:13,17
  119:8
debts 89:3

December 24:20
  24:23 51:10,15
  51:22 53:18
  54:24 56:17,22
  57:6,13,17,21
  58:7,9 60:20,25
  61:21 63:19
  98:18,18,24
  99:19 100:15
  101:1 102:17
  103:23 113:2,3
  120:2 124:1,9
decide 38:23 39:5
  90:12
decided 24:9,12
  24:14,15 32:7
  64:22 77:18
  84:25 86:1
decides 38:22
deciding 64:15
  69:18
decision 27:2
  30:25 86:5
decision-making
  32:10
decisions 29:8
  30:9,16
declare 135:23
deduction 73:9
default 58:13,17
  61:14 62:18
defendants 1:11
  1:20 2:6,20
  96:3,6
defense 80:15
  96:3,7,13,23
  97:5,7 98:1
defenses 96:10
  96:18
defer 103:13,18
define 47:18,20
defined 104:8
  134:21
definitely 6:21
  7:12 73:6

David Klos - October 27, 2021

definition 38:11
104:13,14
definitive 50:11
definitively 15:20
degree 4:16
degrees 4:14
Deloitte 5:8,8
demand 23:13
86:3,8 87:14
88:15 127:14
128:2,23
demanded 129:4
deny 67:22
department 9:7
84:9
depend 15:15
17:6,9 134:11
depending 31:2
32:15 89:11
depends 16:5
134:10
deponent 137:14
deposition 1:13
1:18 18:9,24
19:16,22,24
20:5,9,14,16
21:1,7,9,12,19
27:20 132:17
135:20 137:4,7
137:12,19
describe 8:2
54:11,13
described 13:16
54:10 69:6 72:1
87:23,24 92:2
109:24 110:13
114:11
describes 119:4
describing 33:7
detail 54:5 58:2
determination
60:17
determine 38:16
determined
40:21

determining
89:13
Dickman 138:1
differed 54:10
difference 49:7
76:6
differences
107:14
different 30:5
34:15 38:21
44:11 74:9
77:12 99:11
107:11,12,17
125:19,20
128:18 132:4
direct 9:15 20:17
20:19 34:13
78:13 132:3
directed 20:22
51:19 60:21
68:19,20,21
69:1,3 125:23
directing 132:7
132:15
direction 33:2
34:2 35:23
54:15 55:18
62:24 65:1,2
94:25 102:23
102:24 137:11
directions 103:19
directly 103:19
disagree 89:19
99:21 100:18
disciplinary 5:3
disciplined 5:2
discuss 20:4 97:2
discussed 15:8
21:16 90:1
93:15,17 94:1
97:4,6
discussing 42:3
65:9 77:25 92:4
92:8,11 93:3,10
discussion 19:21

31:4,7 39:21
57:18,22 58:3,4
60:1,5,8 62:20
63:1,20 92:14
101:20
discussions 19:3
21:8 24:13
30:24 41:13
59:22 63:22
103:2
disinterested
137:8
dissimilar 14:21
dissuade 62:23
distinct 10:10
distribution 59:9
83:5
DISTRICT 1:2
dividend 105:8
DIVISION 1:3
document 44:21
46:23 50:15
64:6,12 76:23
76:23 79:17
84:10 88:2
96:15 117:5
documents 67:8
76:20
doing 6:5,11 9:24
25:18 85:14
86:17 89:13
95:2
dollar 28:18 75:2
75:2
dollar-for-dollar
73:4
dollars 18:1
123:9
Dondero 2:20
24:11 29:15
30:8,19 32:7
33:21 34:2,7,18
38:4 39:24
40:10 41:14
42:3,7,10 43:2

43:7,10,16,25
51:18 52:4,7,19
53:12,15,16
54:18,24 55:9
55:17,25 56:3
56:10,15 60:21
61:24 62:23
65:3,24 69:9,12
70:15 74:3 76:1
76:13 77:2,25
85:1,19 89:18
90:9 91:14,17
91:21 92:9,14
92:23 93:3,10
93:25 94:2,5
95:1,24 98:11
98:11 101:7
104:24 105:16
105:21 112:20
113:8,14 116:6
116:21 121:12
122:9 124:8
125:10,22
126:16
Dondero's 62:11
73:6 76:9 77:19
78:3,21 79:3,11
79:18
double 81:5
doubt 35:21 36:8
dozens 65:16
draft 24:16
drafted 22:21
drafting 58:17
DRIP 105:8
driven 42:19
drukavina@m...
2:7
due 25:16,19
37:12,18 47:12
49:12 51:10,14
74:20 76:22
98:18,24 111:1
111:7 112:1,6
112:16 113:11

113:17,24
121:24 124:10
124:11 125:4
125:12,24
126:4,10,14
135:1
duly 1:19 4:2
137:4
duties 9:12 62:6
126:21
duty 25:9

E
earlier 17:13
49:14 75:13
98:16 101:6
111:13 123:3
earliest 128:1
early 51:22 54:24
60:20 87:1 89:2
111:5,21 135:7
educational 4:13
effect 41:14
62:18,21
129:23
effective 125:1
effectively 49:22
75:5
effectuate 99:13
112:21 126:14
effectuated 99:3
eight 117:13
either 21:18 26:3
26:25 29:12
30:16 31:10,16
35:23,25 38:8
39:12 48:19
50:12 68:14
69:1,3,9 79:24
84:21 86:12
105:25 125:22
137:18
electronically
84:22
eliminate 111:14

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| **email** 2:7,14,22 54:16 59:8,9 67:14,15,18,21 69:4,7 70:13,16 82:23,25 83:7 83:10,11 114:23 115:2,5 115:13,18,23 117:7,15,16,18 117:22,24 118:4,6,12,20 119:5 127:5,7 127:10,12 128:11,20 138:3 | **entitled** 17:23 18:10 20:4 **entity** 12:20 13:8 13:11,13 30:20 31:20 32:7,15 32:17 34:19 35:4,11 36:2 40:10 42:10 75:8,10 90:10 109:13 131:25 **equal** 86:6 130:22 **equity** 79:24 90:22 **error** 70:25 71:2 | **exactly** 5:18 14:24 15:23 34:3 48:2 77:23 80:16 **Examination** 3:3 3:4,5,6 4:3 95:21 109:18 127:1 **example** 31:6,9 37:6 48:25 **exceeded** 87:10 123:12 **exception** 16:8 17:1 44:2,3 **excess** 41:15 | **expect** 17:12 64:12 65:4 83:12 86:21 **expectation** 15:1 **expected** 126:13 **expenses** 73:7 **experience** 5:5 37:18 38:14 46:19 49:11 104:16 130:2 **expert** 82:21 87:6 **expertise** 48:20 **expires** 138:4 **explain** 8:22 64:13 107:1 | 91:16 97:14,23 99:1,15 104:17 105:15,20 115:16 123:20 **fairly** 9:22 30:4,5 84:7 **fall** 80:10 121:20 **familiar** 21:23 22:5,6 28:1 67:1 82:15 104:1 114:17 116:13 119:21 <mark>**far** 5:1</mark> 24:15 |
| **emailed** 59:11 **emails** 80:13 **employed** 122:18 **employee** 12:23 26:17,21,24 123:22 **employees** 43:11 72:2 98:8 106:7 106:12 107:8 107:20 123:16 **employment** 78:13 **ended** 120:1 **ensure** 23:20 **enter** 78:25 **entered** 98:11 **enterprise** 30:1 32:18 **entire** 12:9 115:17,20 **entities** 6:7 25:24 26:16 30:6 31:11,16 34:8 61:15 65:18,22 65:22,24 99:6 101:1 102:20 103:8 106:24 107:18,25 108:17,19,21 108:25 121:18 | 71:19,25 72:13 72:14,19 73:4 79:15 80:20 81:1,14 85:22 89:20 90:3,3 92:11,16,17,18 **errors** 71:9 72:20 72:21 73:16 **especially** 15:4 **established** 51:4 75:13 76:11,12 78:12 **estate** 107:13 **estimate** 11:22 **et** 6:1 14:20 **event** 116:17 119:10,13 120:1,7 135:6 137:19 **events** 16:20 96:9 **eventually** 32:2 **evidence** 80:14 111:5,9 116:20 116:25 119:9 119:16 120:4,9 120:16,21 **evolved** 6:18,21 **exact** 7:5,11 15:24 20:16 94:19 | **exchange** 128:12 **exclude** 18:22 **exclusively** 23:13 33:14,14 **excruciatingly** 73:13 **excuse** 37:1 74:25 **executed** 24:18 31:1 70:22 84:3 124:24 **execution** 22:7,13 22:20 24:23 83:21 84:19 85:6 **executive** 26:14 **exhibit** 22:4 23:8 27:9,15,23 36:12 40:20 42:17 44:13,22 46:12 48:12 49:1,10 64:2,5 67:17 68:4 82:24 83:20 114:1,22 127:2 129:12 **exhibits** 3:10 67:2,7 68:1 **existing** 7:13 23:13 **expand** 59:7 | **explaining** 92:25 **explore** 12:12 **express** 14:19 **Expressway** 138:2 **extended** 7:12 **extending** 14:17 **extent** 31:10,12 60:24 61:8 66:10 86:23 135:7 **extrapolating** 92:24 _____ **F** **FA** 88:7 **face** 71:16 **facile** 15:24 **facilitate** 25:18 31:15 **facility** 6:8 **fact** 29:6 58:23 58:23 76:14 79:21 94:23 101:9 112:19 128:20 **failed** 58:18 **failure** 126:20 **fair** 16:15 35:8 60:9 65:15 | 37:5 58:23 62:6 84:11 87:9 **fault** 81:10 **faulty** 43:3 **February** 80:19 113:10 126:8 126:12 **fee** 74:16,18 75:23 80:2 85:15 90:3 93:16 **feel** 54:5 69:5 **feels** 35:17 82:22 **fight** 53:17 **file** 80:11 **final** 30:9 **financial** 8:23 13:20,22 87:20 116:14,17,24 119:8,14,19,22 119:25 **financials** 122:1 122:4,7 **find** 26:13 31:15 67:14 129:17 **fine** 21:10 39:3 90:21 106:25 **FINRA** 4:21 **firm** 95:23 **first** 4:2 37:2,4 42:22 46:14 48:14 49:5 50:7 |

David Klos - October 27, 2021

72:14,19,19
75:14 96:2
110:20 131:15
**five** 105:3 126:25
**flag** 10:4
**flavoring** 63:14
**flight** 132:10
**flip** 37:1
**flipped** 9:20
**Floor** 1:25 2:11
**flow** 23:21,25
26:7 88:17
96:15
**focus** 8:14 65:10
**focused** 6:7
**follow** 16:18
**follow-up** 128:17
**followed** 116:11
**follows** 4:2
**forecast** 126:3
129:1
**forecasting** 6:8
**forecasts** 9:24
44:1,4 126:3
129:9
**foregoing** 135:24
137:4
**foreign** 89:15
**forgave** 123:15
**forget** 86:7
**forgetting** 9:8
**forgive** 123:22
**forgiven** 96:8
106:7,16,17,20
122:19,24
123:11,11
**forgiveness** 97:10
97:17 122:14
**forgiving** 123:7
**form** 6:16 8:25
11:17,24 12:25
14:12 21:24
22:8,15 23:10
25:3,11 27:4
29:10 32:25

33:24 34:21
35:13 36:4
37:20 38:17,25
39:7 40:3,14
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22
49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 57:8
60:12 61:1 63:5
64:9 65:19,25
66:7,15 69:20
71:3,12,20
76:18 77:6,20
77:23 78:4,23
79:5,19 81:2,11
81:23 82:6,13
84:11,12 87:3
88:18 89:5
90:14 91:3,9
93:13 94:8 95:5
99:4,23 100:19
101:3,25
102:15 103:15
104:18 108:2
128:13 130:7
130:16 131:11
131:21 133:13
133:22 134:8
134:17 135:2
**found** 61:18
**foundation**
113:20 125:17
**four** 6:13 128:23
**frame** 4:24 7:11
7:12 8:10,14,24
12:6 20:12 24:8
25:1 66:12,20
67:16 106:13
123:18
**Frank** 8:17 11:1
20:9 29:13

30:15,17 35:23
35:25 36:10
44:7 52:1 53:7
53:8 54:15 55:9
60:20 61:14
68:14,14 69:1,3
70:13,14 77:13
77:15 80:12,13
93:6 101:7,18
101:23 102:3,4
102:8,9,11
121:22 127:19
**Frank's** 39:18
**Frankly** 48:10
**fraud** 81:5
**frequent** 84:1
**Friday** 118:1
**front** 10:17 44:8
67:20 68:5 72:3
**full** 57:3 106:18
**full-service** 107:5
**full-time** 12:3
**function** 72:2
**fund** 1:9 6:11,11
9:5,5 13:6
70:24,25 71:1,6
71:7,8 72:8
73:15 74:11,12
74:13,13,14,17
75:2,6 80:20,23
81:16 86:5
109:3
**funds** 10:21,22
12:13 29:9 30:2
30:19 31:20
34:8 35:11
75:24,24 76:1
80:9 85:14
128:19
**further** 3:6 24:19
84:18 126:24
127:1 135:10
137:17
**future** 17:4 45:16
49:13,20 53:17

93:7
_____
**G**
**gearing** 53:17
**gears** 65:8
**general** 18:13,15
19:9,10 20:11
20:13 32:20
33:19 61:4
92:11 93:4
96:24 97:6
104:4,5 108:20
133:24 134:6
135:4
**generally** 19:25
27:24 30:4
32:21 38:4,4
40:2,11,16
42:15 45:8
77:22 96:5,10
96:12,17 98:20
105:1 107:1
108:18 110:22
116:15 119:21
**generallys** 40:6
**generating** 42:12
**Germans** 63:14
**getting** 10:4
23:24 44:8
51:13 59:8
**give** 5:21,24 14:4
16:13 39:3
67:25
**given** 15:5 43:2
43:22 47:23
70:12 73:21,22
74:1 102:8
123:3 129:2
**global** 52:25
70:24 74:12
75:6 101:13
**go** 15:19 16:1
20:1 43:6 54:4
65:12 81:9
82:18 85:10

105:24 127:2
134:4
**goes** 28:9 40:18
87:9
**going** 14:2 15:5,6
16:9,12,15,19
17:5 20:19
28:17 32:10
36:11,12 42:22
46:11 49:13
55:16 57:11,14
62:18 65:8,9,10
65:12 68:1 70:5
74:22 79:9
82:23 83:11,19
88:7 89:20
106:23 107:17
108:20 111:17
117:5 118:13
127:6 129:12
132:4,13
134:11
**good** 73:20 95:22
96:1 100:12
**grad** 5:7
**graduate** 4:14,15
**group** 5:19 6:11
6:16 9:9,14,15
9:21 10:7,9,14
10:15,24 11:7
35:9 43:18
61:21 62:10,11
83:5 109:3
110:24 115:2,5
115:18,21
117:25 118:16
126:8
**groups** 6:19,20
**guess** 8:8 88:24
104:21
_____
**H**
**half** 5:9 94:20
95:11 110:20
**half-million**

David Klos - October 27, 2021

123:9
**hand** 90:9
**handled** 11:9
  26:21 35:9 40:8
**handles** 11:7
**hands** 57:2
**happened** 35:25
  47:13 59:2,4
  93:8,11
**happening** 27:14
**happens** 47:13
**happy** 55:22
**hard** 15:4 18:1
  26:13 47:20
  63:7 71:5
  134:12
**harder** 11:13
**HARDT** 2:3
**HARR** 2:3
**hat** 43:15
**hate** 57:1 97:4
**Hayley** 83:21
  118:10
**HCM** 76:16
**HCMFA** 13:6
  53:20 65:10
  68:8 71:10,17
  72:8,8,12,12,24
  73:3,5,7,14,17
  73:21 74:10,24
  75:1,1,21 76:11
  76:16,17 78:14
  78:22 79:1,13
  79:14 80:2,20
  80:22,25 81:15
  85:16 87:2,5,9
  87:15 88:10
  89:2,3,12,13,20
  90:17,21,23
  91:23 92:19,20
  93:16,21,23
  110:2 115:8
  118:8,13,14
  119:18 120:6
  120:11,18,24

121:7 127:13
  127:17 128:1
  128:23
**HCMFA's** 70:23
  119:25
**HCMLP** 10:21
  29:4 42:20 60:2
  68:8 71:17 72:2
  72:2,23 76:2
  80:1 94:1 104:8
  109:24 110:3,4
  110:12,15,16
  113:15 115:8
  118:8,13
  121:25 122:8
  125:11,23
  126:20 128:1
**HCMS** 2:20
  95:24 98:23
  99:8,10 107:3,4
  107:5 109:21
  109:25 110:3
  124:22
**HCRE** 2:20
  95:24 98:23
  99:8,10,21
  100:17 107:3
  107:11,20
  108:6,12,22
  110:6,7,10,12
  110:15 124:20
**he'll** 94:14
**head** 62:15
  107:10
**headers** 36:25
**hear** 52:4 113:8
**heard** 30:17
  62:16 74:3
  91:14,17,21
  122:22 125:18
**hearing** 101:10
**hearsay** 79:17
**heavy** 107:13
**hedge** 6:11 30:15
  33:12

**held** 6:16 10:20
  121:10,12
  122:20,25
**hell** 74:24
**help** 33:2 65:22
  66:20 67:16
  100:4
**helped** 105:9
**helping** 31:14
**Hendrix** 9:16
  18:16,19,24
  20:3 27:19
  39:13 52:11
  84:17 99:2,18
  100:14,25
  103:3,14
  117:25 124:4
**hereof** 48:16
**hereon** 48:15
**hereto** 137:16
**hesitate** 64:17
**hesitating** 106:16
**hey** 42:23 85:9
**hierarchy** 10:25
**high** 105:5
**Highland** 1:6,9
  5:11,12,14,22
  6:6 7:25 8:4,12
  8:16 10:14,18
  10:20 11:23
  12:6,8,9,23
  13:4,5,14,17,18
  13:21 14:3,22
  15:2,15 16:5,6
  17:5,6 23:2,21
  23:21,22,23
  25:2 26:17,18
  26:19,23,25
  28:2 29:4,18,20
  29:24 31:12,17
  32:6,23 33:3,4
  33:7 34:7,19
  35:3,4,10 36:2
  36:24 37:10
  39:22 40:22

41:2,2,12,16,24
  42:5,20,22 43:6
  43:7,9,10,12,16
  44:5 49:11
  50:19 51:2,4,19
  51:20 58:13,21
  59:9 64:24
  65:18,21 70:24
  71:6,11 72:7,10
  74:12,25 75:8
  75:10,12,14,23
  75:24,25 76:4,5
  76:12 79:8,25
  80:2,7 81:18
  84:9 88:14 89:1
  89:4,12 90:4,5
  90:22 92:19,22
  93:23 97:11
  104:11 105:22
  106:6 107:2,24
  109:22 110:8
  112:20 119:12
  122:19,19,23
  123:7,14,21
  125:4 126:14
**Highland's** 42:13
  51:9 72:13,14
**history** 62:2
  116:3,7 118:22
  119:2,12 120:5
  120:17
**hit** 82:3
**hits** 82:9
**HMS** 99:21
  100:17
**hold** 4:18 121:15
**honestly** 58:22
**hope** 43:20 82:7
**hopelessly** 53:16
**Houlihan** 71:23
**hours** 11:22 12:6
  12:7,10
**housed** 72:2
**human** 71:19
**hundred** 23:14

28:5 30:10,11
  33:13 68:18
  69:5,11 92:3
  102:19 106:18
**hundreds** 65:16

      **I**

**idea** 7:24 57:10
  89:12 108:13
**identified** 72:25
**illiquid** 11:13
**important** 44:6,7
  59:18,20 93:22
**importantly**
  85:15
**impossible** 80:24
  91:25
**impression** 52:24
**in-house** 23:3
**inappropriate**
  81:20
**inartful** 77:16
**incidental** 128:21
**include** 52:18
  107:25
**included** 85:12
  115:5 116:16
  116:23 118:3
  119:8,13,25
  120:7,12,19
  122:5,7 126:3
**including** 79:14
  115:17
**inconsequential**
  127:23
**incorrect** 55:5,6
  55:11
**INDEX** 3:1
**indicate** 44:22
  80:7,16
**indicates** 135:5
**individual** 31:8
  52:2 72:24
**individuals**
  106:19 123:3

**David Klos - October 27, 2021**

inflow 59:8
info@dickman...
138:3
informal 83:25
105:14
informally 62:5
information
59:16 129:1
informed 62:10
102:3
inject 90:22
ink 84:23
insinuation 16:9
17:1
insolvent 87:2,6
installment
110:25 111:7
112:1,8,16
113:4 114:7,12
125:12,23
126:4 131:3,10
installments
14:22 130:23
instance 1:20
31:20 34:11,16
34:18 35:25
39:22 42:22
68:24 86:22
instances 32:5
65:16 71:8 91:5
institutional 9:5
instruct 115:7
instructed
125:11
instructing 85:9
133:2
instruction 52:25
61:13,24 62:12
62:17 99:19
101:6,13,17,23
102:3,5,8,20
103:7 124:7
125:15
instructions
100:15 103:14

103:22
insulting 132:5
133:6,9
insurance 80:20
80:22 81:5,6,9
81:14,19 82:4
82:10,19
intended 44:15
44:19 111:6
130:3
intent 95:12
interco 68:8
115:22
intercompany
32:22 41:3
65:17 68:9,11
68:12 69:10
interest 37:4,8,13
37:15 38:9
40:12 45:12
46:8,8,16,20,25
47:1,4,4,11,12
47:13,14,18,19
47:20,21,24,25
48:4,5,7,15
49:4,6,12,12,20
49:23 50:9,21
51:3 86:2 111:3
131:15
interested 83:13
137:19
internal 22:21,25
internally 96:16
investment 74:19
investments
107:16
investors 74:17
75:5
involved 10:7
25:14,24 60:17
iota 16:13
irrespective
90:11
issue 29:18 36:20
43:7,8,17 93:10

105:17 108:1
113:12 124:13
issued 124:16
issues 75:15
79:23 121:6

——— J ———
Jack 106:15
January 29:16
42:16 44:13
58:11,15,25
59:23 60:2,23
61:7,18 112:22
113:3,16
Jim 2:20 24:11
26:4,4 29:13,14
30:17 31:9 34:2
34:6 35:23 36:1
36:9 44:8 53:16
68:14,18 69:1,3
70:15 80:5 89:9
93:25 94:2 97:9
101:18 105:22
108:20,21,23
118:9 121:22
Jim's 26:15,16,20
26:22,24 36:7
90:7 93:6 94:19
108:21
jmorris@pszjl...
2:14
John 2:12 36:16
joined 5:14 29:24
122:23
JONES 2:10
judge 132:21
juggled 31:24
July 29:17 58:24
jumble 48:1
June 11:21 45:23
45:24 49:2

——— K ———
K-l-o-s 4:7,8
keep 27:21

100:10
keeper 26:15
keeping 129:1
kind 10:25 14:23
15:25 52:12
89:7 99:13
106:12 108:22
108:23 109:8
Klos 1:14,18 4:1
4:6 61:24 62:2
95:22 109:19
117:21 136:5
knew 70:6,11
85:22 128:23
129:3
know 4:19 5:1
9:22,23 10:19
11:11 12:7,19
15:6,13 17:10
18:7,8,11 19:10
20:4 23:7,17
24:1,7,9,12,15
25:5,7 28:21,23
29:6 31:11,13
31:23,25 32:3,7
35:15 37:25
38:11,12,19
39:9 40:20
43:16,21 44:18
45:4 48:10
51:16,25 53:1
53:17,25 54:20
54:20 55:14
60:14,19,22
62:13 70:10
73:17 76:14
77:23 78:20
81:4,21,25 82:2
82:4,8,19 83:11
84:6,25 85:17
85:18,20 86:1,4
87:6,17 90:18
90:19,25 91:5
91:13,16 93:19
96:14 98:21

99:12 100:8
101:10 102:25
104:13,13,20
105:12 106:11
106:14 108:7,8
110:2,3 112:23
117:11 119:7
119:18 120:11
121:12,23
123:17 127:23
129:6 130:10
130:18 131:23
knowing 102:23
knowledge 7:24
13:8,10 24:13
34:6 35:1 44:14
48:20 49:10
60:25 61:16
63:24 64:5 67:6
73:1 79:17
98:10 100:6,9
104:10 109:21
110:7 112:23
121:19 122:10
123:10,21
125:10
known 61:9
69:23 70:1
KOPF 2:3
Kristin 9:16
18:16 39:13,17
52:1 53:7,8
59:11 61:13
62:4,15,15 83:1
83:2,20 99:14
101:7,24 102:3
102:5,8,10,11
108:5,8,12,14
109:10 117:25
118:15 119:3
Kristin's 100:6
100:22 118:20

——— L ———
L.P 1:6,10

David Klos - October 27, 2021

lacks 113:19
    125:17
land 132:21
language 74:25
large 55:2 59:8
    59:13 93:20
    131:25
larger 41:7 58:3
largest 123:8
late 106:13
launching 10:3
Lauren 23:2
law 2:5,12,19
    81:22 82:1,9,16
    82:22 95:23
Lawler 106:17
Lawn 2:17
lawsuit 112:14
lawsuits 97:15
lawyer 23:4
    82:21
leading 65:17
learn 30:25 51:21
    51:23 58:6,6
learned 61:6
learning 58:20
left 7:14,20 46:8
    46:9 109:20
legal 18:10,20
    84:9 112:3,10
    130:9
legally 82:19
    84:10
length 19:24
    124:2
let's 8:14 12:12
    18:22 21:21
    24:19 27:7 28:6
    61:7 66:19
    68:24 81:17
    103:25 109:19
    122:14 123:25
letter 14:15,17
    58:13,17
letters 80:5

level 23:20,24
    36:6 82:15
    88:14 105:5
liabilities 87:10
    87:12 122:8
liability 120:12
    120:19
liaison 10:15
    11:5
liberally 12:8
license 4:20,22
licenses 4:18
life 131:18,19
limited 104:7
lines 5:18
linked 92:15,17
liquidity 29:4,5
    29:18,20,23
    30:7,21 31:21
    31:25 32:6,22
    33:9 34:20
    35:19 36:2 40:7
    42:13,20 43:7,8
    43:17 73:2,14
    73:18 74:10
    75:1,15,22
list 59:10 106:12
    109:9
litigation 15:5
    16:6,11 18:1,25
    19:21 126:19
litigations 17:7
little 9:2 12:12
    14:2 30:15
    33:12 39:3 48:1
    98:15 106:23
    107:5
live 4:11,12
LLP 2:17
loaded 16:22
loan 9:6 28:1
    33:11,21 34:9
    34:13,20 35:12
    36:1 39:25 40:1
    41:9 68:11,13

68:16,21 69:10
    69:15,17,19,24
    70:2,10 73:14
    74:2,4,7 76:15
    76:21 78:3
    79:13,24 85:18
    85:20 89:21
    90:10,13 91:2,6
    92:3,15 95:4
    107:25 110:19
    115:22 116:4,8
    116:16,23
    117:3 118:8,10
    118:11,13,17
    118:25 119:4,7
    119:14 122:14
    123:6,10,14,22
loaning 72:7,11
    89:1 92:19,22
loans 32:4 33:14
    36:9 40:8 65:17
    66:3,5 80:7
    84:1 85:10
    89:10 90:8
    91:12,14,23
    94:1,7,22 95:2
    98:17,22
    105:16 106:6
    106:19 107:25
    108:1 119:24
    120:8,12,19
    123:2
logically 42:15
    69:18
Lokey 71:24
long 15:8 16:5
    17:5,9 34:25
    43:5 62:4 84:12
    122:16
long-term 86:7
look 15:19 27:15
    38:15 39:4
    66:19 114:15
    117:10,22
    134:3,15,19

looked 111:20
looking 22:3 44:1
    117:17
looks 27:25 39:6
loop 53:9
lost 41:21 63:16
lot 100:1 129:20
loud 118:6
LP 6:6 8:5 12:14
    12:15,17 13:6
    23:22 26:19,24
    29:5 110:8
lying 79:16

_____

M

machine 1:24
magnitude 92:12
maintained 28:2
maker 46:15,23
    47:1 50:8
    114:12 122:20
    122:25 129:18
    129:24
makers 126:13
    126:19
making 71:8
    75:18,19 85:12
    99:20 100:16
    107:20,23,25
    108:9 126:9
    132:20
man 17:23
    128:10 130:20
manage 32:2
managed 10:21
    10:21 70:24
Management 1:6
    1:9 5:12 6:6 8:5
    13:6 23:22,24
    26:19,23 27:1
    29:4,19 32:6,24
    35:3 71:6 107:2
    110:8
manager 7:2,3
managing 9:25

25:23
March 5:12,14
    6:3 13:24 37:6
    80:19 122:17
marching 52:3
marked 3:10
Master's 4:16
material 15:7
matter 109:11,12
matters 26:22,24
maturity 131:20
MBA 4:17
    131:25
mean 9:18 15:21
    24:10 26:9,11
    104:6 114:18
meaning 51:4
    68:9
means 47:4,12
    48:21 63:12
    84:7 132:1
    133:12,20
    134:7 135:7
meant 50:12
medical 82:3,10
    82:10
meet 31:14 33:8
    73:2
meeting 52:12
    57:25
meetings 25:24
    43:5,24 62:1,3
    63:2,19
Melissa 26:10,12
    108:14,17,18
    109:1,5,9
member 62:14
members 10:17
memory 27:8
    28:17,19 42:16
    42:18 50:23
    68:15 71:18
    85:8 87:13
    91:20 92:4,7
    93:9,12

David Klos - October 27, 2021

mental 48:1
mention 10:6
  114:7
mentioned 12:13
  61:20 88:13
  98:7 107:23
  108:4 110:6
  116:10
met 31:9,25
Michael 2:18
  95:16,23
  135:11
michael.aigen...
  2:22
mid 112:21
middle 6:10 80:4
  108:22
million 18:1
  21:22 28:13,14
  28:14 45:25
  46:3 49:1,8
  58:25 68:7 69:2
  70:7,19,23 72:7
  73:18,25,25
  74:7,8,24 75:4
  75:9,22,23 76:3
  76:19 77:4,10
  77:11,18,18
  78:3,10,22
  79:12,22 80:2
  80:19 81:18
  82:25 85:4,18
  85:20,23 86:13
  89:2 90:17,20
  90:22,24 91:22
  91:22 92:8,15
  93:3 115:8
  116:3,23 118:8
  118:9,13,24
  119:7,14,25
  122:5
mind 36:8 56:20
  76:9 100:2
mine 24:1
minimus 127:22

minutes 39:21
  105:25 126:25
misconstrued
  134:23
missed 60:25
missing 107:10
mistake 80:12
  126:8 127:21
  127:23 128:4,7
MLP 59:9
moment 32:12
  67:16 73:21,22
  116:6 122:15
monetization
  15:2
monetizing 97:12
money 15:17
  33:3,3,7 34:19
  39:22 41:12,16
  42:4 45:20
  59:13,19 70:4
  72:11,12 73:5
  75:12 76:11,12
  76:13 79:24
  92:19,22
  113:24 120:8
month 11:22 12:6
months 6:13 19:6
  59:5 75:14
morning 36:16
Morris 2:12 3:5
  8:25 11:17,24
  12:25 14:12
  17:20,25 20:17
  20:21,24 21:2,8
  21:24 22:8,15
  23:10 25:3,11
  27:4,16 29:10
  32:25 33:24
  34:21 35:13
  36:4,18 37:20
  38:17,25 39:7
  40:3,14 41:17
  41:20 42:24
  43:19 44:16,24

45:9,17 46:21
  47:8,15 48:8,22
  49:15 50:2,13
  51:5 52:21
  53:22 54:7 55:3
  55:12,19 56:11
  57:8,19 60:12
  61:1 63:5,13
  64:9 65:19,25
  66:7,15,24
  67:17 69:20
  71:3,12,20
  76:18,22 77:6
  77:20 78:4,23
  79:5,19 81:2,11
  81:23 82:6,13
  83:13,17 85:21
  87:3 88:18 89:5
  90:14 91:3,9,19
  92:5 93:13 94:8
  94:13,16 95:5
  95:16,20 99:4
  99:23 100:5,11
  100:19 101:3
  101:25 102:15
  103:15 104:18
  108:2 109:19
  111:11 112:7
  112:13 113:22
  116:21 117:2,9
  117:13,16,21
  119:11,18
  120:5,11,17,23
  125:18,21
  126:24 128:13
  129:12 130:7
  130:16,19
  131:1,5,11,21
  132:2,8,11,15
  132:19,23
  133:3,5,13,22
  134:8,17 135:2
  135:10,13,15
  135:19
motion 132:18,20

mouth 36:7
Move 120:15
  125:16
moved 6:10
muddy 43:14
MUNSCH 2:3
mutual 74:13,14

—————— N ——————
name 4:4 26:11
  26:14 39:10
  87:21 95:23
names 106:14
Nancy 104:24
  105:16,21
nature 10:1 70:4
  70:6,7,11 84:1
NAV 70:25 71:2
  71:8,19,25
  72:19,20,21
  73:4,15 79:14
  80:20 81:1,14
  85:22 89:20
  90:2,3 92:11,16
  92:17,18 104:2
  104:10
necessarily 31:25
  50:11 53:4
  69:12 107:14
need 29:18 31:16
  33:12 37:3
  41:24 54:5
  58:14 73:3 93:7
  93:20,21
  106:25 107:4
needed 30:3
  31:10,12 32:6
  35:19 41:12
  73:5,17 74:10
  74:25 75:21
  76:11
needing 29:5,22
needs 29:4 31:14
  33:9 34:20 40:7
  42:20 44:9

negative 37:7
  44:4
negotiation 22:7
  22:13,18
neither 93:23
never 18:2 56:25
  72:25 74:3
  78:12 80:13
  91:14 105:15
  105:18,20
new 2:11 7:16
  26:11,13 68:8
  68:11 85:10
  115:22 118:8
  132:21
NexBank 124:16
NexPoint 10:4
  12:13,14,14,17
  12:24 13:3,16
  21:21 26:3 27:1
  27:12 36:22
  37:11,19 40:22
  41:3,15,15 42:4
  42:9,11,17,22
  43:11,13 53:19
  56:21 57:6,10
  57:14,18,23
  58:17,25 59:12
  59:24 62:18
  63:3,20 64:8
  65:9 72:22,24
  75:17,19 78:13
  110:19 111:14
  111:22,25
  112:15 113:3
  113:10,15
  120:24 124:18
NexPoint's
  110:25 111:6
  112:21
night 36:17
nomenclature
  83:24
nominal 62:1
nonstop 44:5

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| **North** 1:24 2:3 138:2<br>**NORTHERN** 1:2<br>**note** 21:22,23<br>22:2,5,7,14,22<br>23:9,15 24:10<br>24:18,21,23<br>25:2,9,17 27:2<br>27:9,13,14<br>33:17 38:15<br>39:4 40:11,13<br>40:17 46:12,16<br>46:25 48:5,14<br>49:10 50:25<br>51:10 57:18,23<br>58:4,20 59:12<br>60:7 63:4,21<br>64:8 65:9 66:6<br>66:10,13 70:22<br>75:18,20 76:7<br>79:1,22 82:25<br>83:21 84:3,9,16<br>84:16,18,19<br>85:4 86:2,3,3,8<br>86:13 89:15<br>92:15 111:22<br>112:9,12<br>113:16 122:19<br>122:24 127:13<br>127:14,17<br>128:16 130:3<br>131:18,20<br>133:12 134:3,4<br>134:11,15,20<br>**notes** 16:7 17:7<br>19:25 23:13,14<br>26:3 36:19<br>40:21 50:19<br>52:18 65:10<br>66:20 67:12<br>76:1 84:14,22<br>85:2 86:12<br>87:14,24 88:7<br>88:10,15,16<br>96:8 97:11,16 | 114:21 122:5<br>122:12 124:10<br>124:11,13,24<br>125:4,7,8,13,25<br>126:10,13,20<br>127:17 128:23<br>129:7 130:12<br>130:15<br>**Notwithstanding**<br>110:23 111:25<br>**November** 54:4<br>63:18 124:8<br>137:22<br>**number** 12:2,10<br>14:10 22:4<br>23:19 27:16<br>28:9 75:3,4<br>**numbered** 1:21<br>27:19<br>**numbers** 14:4,19<br>28:6 44:4 81:18<br>**nutshell** 54:12<br>**NY** 2:11<br><br>**O**<br><br>**o0o--** 1:4<br>**Oak** 2:17<br>**oath** 97:6 106:4<br>**object** 50:2 100:8<br>**objected** 118:20<br>**objection** 8:25<br>11:17,24 12:25<br>14:12 20:17<br>21:2,24 22:8,15<br>23:10 25:3,11<br>27:4 29:10<br>32:25 33:24<br>34:21 35:13<br>36:4 37:20<br>38:17,25 39:2,7<br>40:3,14 41:17<br>42:24 43:19<br>44:16,24 45:9<br>45:17 46:21<br>47:8,15 48:8,22 | 49:15 50:13<br>51:5 52:21<br>53:22 54:7 55:3<br>55:12,19 56:11<br>57:8 60:12 61:1<br>63:5 64:9 65:19<br>65:25 66:7,15<br>69:20 71:3,12<br>71:20 76:18<br>77:6,20 78:4,23<br>79:5,19 81:2,11<br>81:23 82:6,13<br>85:21 87:3<br>88:18 89:5<br>90:14 91:3,9,19<br>92:5 93:13 94:8<br>95:5 99:4,23<br>100:19 101:3<br>101:25 102:15<br>103:15 104:18<br>108:2 111:9<br>112:3,10<br>113:19 116:20<br>116:25 119:9<br>119:16 120:4,9<br>120:15,21<br>125:16 128:13<br>130:7,16 131:5<br>131:11,21<br>132:2 133:13<br>133:22 134:8<br>134:17 135:2<br>**obligated** 122:12<br>**obligation** 25:25<br>80:1 110:25<br>111:6,14<br>112:16 113:11<br>113:17 114:12<br>**obligations** 45:21<br>121:24<br>**obligor's** 33:8<br>**obviously** 85:18<br>**occur** 55:8 96:9<br>**occurred** 47:5<br>61:17 70:25 | 72:20,25 85:13<br>92:13 112:24<br>**October** 1:15,21<br>31:18 80:11<br>120:24 127:11<br>128:22 129:3<br>**offended** 17:22<br>**offer** 14:15,17<br>**offhand** 84:16<br>**office** 5:10,10<br>10:17 72:4<br>121:10<br>**officer** 7:14,17,22<br>8:23,24 9:3<br>10:13 13:21,22<br>53:4 121:6,13<br>123:22<br>**officer-level** 7:25<br>13:18<br>**officers** 105:22<br>106:7 121:18<br>123:15<br>**official** 12:16<br>13:7<br>**oftentimes** 32:3<br>**Oh** 100:12<br>**okay** 18:14 20:8<br>51:8,16 52:10<br>65:13 74:1,7<br>76:25 81:21<br>82:23 84:4 93:9<br>100:3 110:18<br>110:23 112:25<br>117:2 119:11<br>120:23 124:7<br>125:8 126:2<br>132:19<br>**old** 106:22<br>**one-page** 84:11<br>**oOo--** 135:22<br>**open-end** 74:13<br>**open-ended** 25:6<br>**operate** 29:5<br>**operations** 9:6<br>107:19 | **opinion** 44:6<br>**opposed** 40:22<br>42:9 75:8,10<br>85:1 86:3 89:20<br>90:12 102:20<br>103:8 127:17<br>**oral** 96:4,7,23<br>97:8,15,22 98:1<br>98:5,12<br>**order** 27:21<br>124:9<br>**orders** 52:3<br>**ordinary** 128:11<br>**organization**<br>72:4<br>**original** 27:12<br>**originated** 43:9<br>**ought** 62:23<br>**outlook** 44:2<br>**outside** 11:9<br>128:11<br>**outstanding** 38:8<br>45:22 46:9,10<br>47:1,19 49:5<br>125:3 129:2<br>**overall** 10:10<br>30:6<br>**overpayments**<br>53:19 55:2<br>**oversaw** 9:17<br>**overseeing** 9:14<br>9:14,21<br>**oversight** 6:20<br>9:4,8<br>**oversimplify**<br>32:11<br>**owed** 94:1<br>**owes** 45:19<br>**owing** 113:24<br>121:25<br><br>**P**<br><br>**P** 37:25<br>**P.M** 1:22,22<br>135:21 |

David Klos - October 27, 2021

PACHULSKI
2:10
package 83:18
page 3:2 28:8
37:2,2 114:15
130:1
pages 20:16,25
117:13
paid 14:11,20
76:3,4,6 80:19
80:22 81:16
85:16 135:7
paper 85:10
118:11 119:4
papered 33:16
66:6 68:21
papering 84:19
85:5 118:17
paragraph 50:8
114:4,7,10,11
114:16,17
129:15
pardon 46:14
parentheses
118:9
part 13:14 17:4
25:22,23 30:23
46:15,24 58:2
61:21 62:6 70:3
70:9,10,11
73:19 75:17,19
76:8 83:17
103:17 106:8
106:17,20
117:13 121:2
122:2,24
123:15 126:20
participated
30:12 121:19
participating
61:25 62:3
particle 63:15
particular 20:22
28:13 29:18
31:6 46:12

61:23 68:16
119:5
particularly
35:22 71:23
parties 71:23
137:18,21
Partners 2:21
99:9
partnership
104:8
parts 72:4
party 71:7
102:22
pass 95:15 135:9
passing 98:7
pattern 66:12
109:11
pause 7:7,16
63:13
pay 47:1 49:14
49:24 74:25
82:5 88:8,10,12
90:20 103:22
103:22 112:16
113:23 122:12
payable 14:23
74:18 93:16
125:4
paygrade 60:11
60:14
paying 72:12
payment 26:8
27:10 37:6,11
37:18,23 38:5,6
38:7,12,23
40:10,11,17,17
45:7,25 46:3,6
46:7 48:25 49:1
49:2 51:10,14
51:16 56:22
57:7,11,14 58:7
58:18 59:1,2,3
59:15,24 60:3,6
60:22,25 61:18
62:19 64:13,15

68:20 72:16,18
75:1,5 76:16
85:13 89:10,14
92:20 93:22,24
93:25 99:13
110:25 111:7
112:1,5,7,9,11
112:15,16,21
113:4,11,15
115:15 126:9
126:21 129:19
129:24 135:1
payments 25:8
25:10,16,18,19
27:8,11,13
36:13,14,19,22
36:24 37:13
39:15,18 40:20
40:21 41:5,6,8
41:12,24 42:17
44:12,23 45:3
48:14 51:19
52:20 55:9 56:1
59:10 60:21
61:15,16 64:7
64:23 75:18,20
94:21 98:17,23
99:1,3,20
100:16 101:1
103:23 107:6
107:20,23,25
108:6,10
110:19,23
111:5,13,21,25
114:8,13 124:9
125:12,15,23
126:4,9,14
130:4,6,23
payroll 10:1
53:21 107:21
pays 48:4 81:9
82:4,10,19
PC 2:3
PE 97:12
penalty 135:23

people 51:19
71:22 72:3
95:10 103:18
people's 26:1
57:2
percent 15:25,25
23:14 28:5
30:10,11 33:13
36:8 68:18 69:4
69:5,11 74:18
74:22 92:3
102:19 106:18
perception 53:14
perform 126:21
performed 71:24
performing 9:25
period 23:16
93:5 104:2,11
104:21 116:14
120:1 137:15
perjury 135:23
person 7:19,20
7:21 9:17,18
39:9,10 44:21
72:25 77:3
80:25 81:10
101:10 115:14
137:8
personal 26:16
26:22,24 44:14
48:20 49:10
76:1 98:10
131:18,19
personally 25:13
25:17 64:19,20
64:22 108:21
personnel-wise
107:7
perspective
33:23 35:20
pertain 72:22
pertained 105:8
pertaining 93:20
97:10
pertains 79:22

petition 123:23
phrase 51:3 97:4
physical 85:5
physically 22:23
66:14
pick 45:20 48:25
109:20
piece 15:20,21
pin 8:6
place 33:20 35:2
66:13 137:8
Plaintiff 1:7 2:13
plan 14:22,23,25
17:11
plane 82:7
130:21
platform 10:20
12:10
play 15:6 64:15
please 4:5 5:5
14:5 30:22
66:18 68:7
83:21 95:20
114:1,22
115:14 118:6,7
118:10 127:2
129:12
pled 98:13
plenty 57:3
point 6:10,14 7:2
7:3,3,4 9:13
18:8 24:16
29:25 36:23
37:12 39:4
45:15 53:3
56:16 57:1
60:10,16 61:17
63:2 73:19
79:21 80:3,4,5
80:5,14 83:23
89:10 97:9
101:12 109:6
128:18 129:2
pointed 102:22
points 7:6 20:14

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 178-31 Filed 01/09/24   Page 208 of 261   PageID 28524
Appendix Part 21 Page 2564 of 372

152

David Klos - October 27, 2021

policy 33:20 35:2
  35:6
portion 16:4
  21:12
portions 20:8
position 7:25
  13:18 43:22
  51:9 79:11,18
  121:13,15
possibility 79:23
possible 17:17
  48:11 50:3 74:5
  89:23,25 90:19
  91:17 95:1,8,9
  95:10
possibly 41:6
potential 53:19
  92:12 97:17
potentially 30:14
  96:8,14,16
power 89:9 90:21
  90:23
practice 30:1,5
  34:4,14 35:18
  50:4 69:23 70:3
  73:6 78:7 79:4
  86:5 90:7
  109:11,12
practices 70:11
pre 135:5
precision 28:5
predicate 41:22
  42:2
preference 73:7
  73:11 90:7
prefix 135:5
premise 43:1,3
  89:8
prep 83:21
prepaid 49:22
  131:18,19
preparation
  19:13 21:9 67:7
  67:8 84:19
prepare 54:6

84:2,9,17
prepared 26:7
  53:18 54:9
  64:20 66:14
  80:8
preparing 18:9
  19:20 129:8,10
prepay 46:15,19
  46:24 47:24,25
  48:5,7 49:19
  50:8
prepaying 50:21
  51:3
prepayment
  37:19,23 38:1
  38:11,13 46:13
  63:23 64:12
  113:5,12,18
  114:11 129:16
  129:18,23
  130:5 131:2,9
  131:14 132:1
  133:12,20
  134:7,20,25
  135:5,7
prepayments
  27:2 38:10
  44:15,19,23
  45:1,5 63:4,21
  64:8 134:12
preposterous
  89:15
present 18:20,25
  56:20 68:15
  93:9
presented 66:14
president 43:10
  43:11 121:17
pretty 11:15
  60:24
previously 53:6
  125:3
pricing 10:16,16
primarily 6:7
  26:22 88:5

128:19
primary 9:15
  109:5
principal 37:5,9
  37:13,16 38:9
  40:12 45:12
  46:9,16,24 47:2
  47:22 48:16
  49:8,24 123:11
  131:16
print 117:8
prior 14:22 19:18
  24:19 27:9
  31:19 40:10
  53:18 56:17
  57:5,12,17,21
  69:17 87:14,15
  88:15 92:4
  97:14 98:12
  104:11 112:14
  112:15 113:5
  113:10,18
  122:22 123:23
  126:7,12,18
  131:20 135:1
priorities 89:11
privilege 132:6
  133:2,4
probably 4:24
  6:12 8:9 9:7
  15:11,19 23:19
  24:7 35:12
  39:11 44:7
  73:24,24 83:9
  98:7 105:3,13
  108:7 114:19
problem 57:2
problems 29:21
procedure 33:20
  35:2,6 39:5
  66:13 83:23,24
proceedings 5:3
  96:6 108:1
proceeds 80:22
  81:6

process 17:9
  32:10 51:19
  66:17 83:24,25
  109:8 121:3,4
  122:2
processing 10:1
produced 1:18
  83:14,16 117:6
production
  117:14
professional 4:18
program 105:9
progression 5:24
promissory 16:7
  22:14 23:9
  24:21 25:2
  27:13 33:17
  38:15 39:4
  46:12 50:19
  52:18 63:4
  65:10 66:6,10
  66:13,20 67:12
  70:21 85:2
  97:11,16
  122:19 130:3
  130:12,14
  131:18,19
  133:12
promoted 6:1
proper 108:10
  132:11
protest 126:18
provide 110:10
  110:12
provided 13:2,3
  13:13 20:15,15
  21:6 40:12
  76:13 80:6
  102:5 107:2,24
  109:25 110:4
  110:16 122:4
  125:14 137:15
provider 11:12
  71:24
providers 10:16

43:12
providing 12:24
provision 114:19
  129:22,25
public 10:3
purport 28:8
purpose 23:8,12
  85:25
purposes 30:21
  31:21 32:22
  36:3 73:8 75:22
pursuant 12:22
  13:14 74:15
  112:11
put 6:15 10:2
  26:1 86:6 93:6

                Q
qualification
  64:4
qualitative 16:1
question 9:1
  11:18,25 13:1
  14:13 16:8,22
  16:25 17:2
  20:24 21:25
  22:9,16 23:11
  24:25 25:4,6,12
  27:5 29:11 33:1
  33:25 34:15,22
  35:14 36:5
  37:21 38:18,21
  39:1,8 40:4,15
  40:19 42:2,25
  43:20 44:10,11
  44:17,25 45:10
  45:18 46:22
  47:3,9,16 48:9
  48:23 49:16,18
  49:25 50:2,14
  51:6 52:22
  53:23 54:8 55:4
  55:13,20,22
  57:9,20 60:13
  61:2,4 63:6

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-28 Part 2 FilePage 08/574 of 752ge 209 of 261   PageID 28525

153

David Klos - October 27, 2021

64:1,10 65:20
66:1,8,16,21
67:16,24 69:21
71:4,13,21
76:19 77:7,16
77:21 78:5,9,24
79:6,20 81:3,12
81:24 82:7,14
83:15 87:4
88:19,24 89:6,8
90:15 91:4,10
93:14 94:9,12
94:13,14,21
95:6,7 96:5
97:24 99:5,24
100:1,20,21
101:4 102:1,16
103:16 104:19
104:22 108:3
119:3 125:20
125:20 128:14
130:8,9,17
131:4,7,12,22
132:4,5,11,14
132:24,24
133:6,14,17,23
134:9,13,16,18
134:20 135:3
**questions** 19:12
77:12 80:13
95:17 97:25
109:15 110:18
111:19 114:3
126:24 129:13
135:10,12
**quick** 48:12
**quite** 7:9 31:9
**quote** 115:22

**R**
**radar** 93:6
**radars** 26:1
**raise** 24:5,7
119:3
**raised** 24:3 80:15

96:3,7,18
**raising** 62:17
**rate** 84:15 86:2,6
**ratify** 28:6
**ratio** 104:2,10
**rational** 80:25
**rationally** 92:25
**reached** 104:11
**read** 20:8,10,20
20:25 21:11,11
44:22 46:25
48:24 118:6
127:8,14,21
128:6 130:1
131:14 132:23
**reading** 21:5
46:6 131:8
**reads** 46:23
**real** 107:13
**realize** 128:6
**realized** 127:21
**really** 6:12 9:16
10:15 16:8 54:4
73:9 78:12
83:13 95:9
101:11 105:4
107:5 108:19
109:2 128:19
129:6
**realtime** 85:14
**reason** 23:8
30:14 35:21
40:23,24 41:1
54:24 55:10
67:22,24 75:17
75:19 99:21
100:18,21
113:7,14
115:24
**reasoning** 105:2
**reasons** 23:20
74:1 88:4
**recall** 4:23 19:2
21:4,5 22:22
23:6 24:3 27:13

31:19 34:23
36:6 41:13 42:3
56:5,9,12,14
57:17,22 58:10
58:16,20 59:8
62:16 63:18
67:18 82:24
85:7 86:19
87:20 88:21
92:10 99:12
102:10 106:21
116:15 118:19
118:22 120:23
121:16 122:21
123:6,16 124:2
127:20 130:13
**receipt** 26:1
**receive** 74:18
**received** 99:19
100:15 103:19
106:19
**receiving** 22:24
33:3
**recognize** 27:23
104:7
**recollection** 5:25
8:3 28:20 29:17
40:7 50:18
51:18 52:15,17
55:7,8 68:17
75:21 76:6
78:16,17 88:3,4
91:24 94:5
95:13 101:24
105:7 115:4
123:21 125:6
126:2
**record** 4:5 16:14
25:9 64:6 68:3
105:24 106:2
117:12
**recorded** 37:13
37:14 38:7
**recording** 25:15
39:14

**records** 110:24
111:4
**recover** 17:15
**recoveries** 17:10
**recovers** 16:6
**reduced** 137:10
**reduction** 38:8
45:12
**refer** 125:7
**reference** 52:18
**referred** 87:24
123:2
**referring** 87:17
98:22
**reflected** 37:14
44:13 120:8
**reflects** 103:21
**refresh** 54:13
**regarding** 16:7
18:24 100:16
127:5
**regardless** 16:16
16:20 60:17
72:24
**regular** 66:12
88:16
**regularly** 31:9
129:19,24
130:4,6
**reimburse** 70:24
**reimbursed**
81:15
**reimbursement**
53:21 72:23
**reinstate** 60:7
**reinvestment**
105:9
**reiterate** 17:13
**REITs** 10:3
**reject** 67:22,24
89:7
**relate** 19:22
**related** 70:20
74:11 81:1
92:18 96:3

97:16,16 99:20
100:16 102:20
103:7 137:20
**relates** 18:5
70:21
**relating** 19:23
**relationship**
53:15 133:21
**relevant** 5:5
**relieve** 45:14
111:6 114:11
129:18,23
130:3,5
**relieved** 112:15
**relieves** 131:2
**reloaned** 76:4
**remainder** 49:24
**remember** 5:16
7:5 12:1,18
13:9 14:24
15:10 18:6
22:22,24,25
32:5 34:11,16
34:18 38:20
39:24 42:8
50:25 51:24
52:1,10,13,23
53:13 56:8 57:5
57:16,24,25
58:3,19,22
59:25 60:8,20
62:20,22,25
63:1,23 67:4
69:13 71:14
74:5,6 78:17
83:22 84:20
85:4 86:15,17
87:11,23 88:2
92:10,11,12
93:2,17 94:5,18
94:19,22 97:18
97:19 98:19
101:15 105:4
108:5 109:7
110:21 113:13

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 123:4,8 124:5 130:11 131:4,7 | 121:13 125:13 125:24 | 123:12 124:17 124:22,25 | 49:9 50:1,5,17 51:8 53:11 54:3 | 49:19 61:11 90:9 92:23 94:6 |
| **remembering** 34:10 92:23 | **respectful** 76:25 | 125:5 126:5 127:11,14,20 | 54:11 55:6,16 55:24 56:14 | 94:22 109:9 **says** 18:2 46:13 |
| **remind** 99:6 | **respond** 25:7 60:15 | 132:25 133:6 | 57:12,21 60:19 | 46:14 48:5,14 |
| **rep** 80:5 | **response** 128:16 | **Rip** 37:2 | 61:5 63:10,14 | 68:7 80:12 |
| **repaid** 76:1 | **responsibilities** | **role** 5:15 6:2,12 | 64:14 65:23 | 115:23 118:7 |
| **repay** 89:3 | 7:15 8:7 9:22 | 6:16,18,21 8:22 | 66:4,11,19,25 | 118:18 127:17 |
| **repaying** 93:25 | 108:16 | 9:4,11 11:5 | 67:1,18 68:4 | 129:17 131:2 |
| **repayment** 76:7 | **responsibility** | 12:16 13:7,14 | 70:1 71:10,18 | 134:11 |
| **repeat** 22:10 27:6 100:3 | 32:17,18 90:4,5 118:17 | 19:13 24:19 25:1,14,17,21 | 72:6 76:24 77:8 78:1,9 79:2,9 | **scenario** 33:6 **schedule** 28:1 |
| **rephrase** 20:24 22:11 49:17 | **responsible** 11:4 39:14 71:7 | 25:22,23 26:25 39:10 53:4,6 | 80:18 81:8,21 82:2,8,17 83:16 | 37:15,25 38:12 45:3,7 |
| 133:5 | 108:9,17,19 | 58:16 62:1 | 83:19 86:1 87:8 | **scheduled** 27:9 |
| **report** 8:15 9:16 | 109:10,13,13 | 64:15,17 67:6 | 88:21 89:17 | 38:5 40:10 |
| 10:23 53:19 | **restate** 61:10 | 67:11 78:13 | 91:1,7,13,20 | 56:22 57:7 |
| 120:24 121:24 | **resulted** 71:25 | 84:18,21 85:5,8 | 92:7 94:3,11,14 | 129:19,24 |
| **reported** 1:23 | **retail** 9:4 80:9 | 85:11 86:13,21 | 94:17 95:7,14 | 130:4,6 |
| **reporter** 117:8 | 120:25 121:20 | 128:18 | 110:18 111:9 | **schedules** 64:21 |
| 135:13,16 | 121:23 122:4 | **roll** 23:15 | 111:20 112:3 | 80:10 111:3 |
| 137:1,3,15 | 122:11 128:16 | **rolled** 125:3 | 112:10 113:19 | **school** 4:15 5:7 |
| **represent** 19:15 | 128:19 | **rolling** 88:15 | 116:20,25 | **Schroth** 26:10,12 |
| 95:24 | **return** 76:25 | **rolls** 39:18 64:18 | 117:7,11,15 | 108:15,17 |
| **representation** | **reverse** 40:9 | **roughly** 6:9 | 119:9,16 120:4 | **Science** 4:16 |
| 19:17 | **review** 39:19 | **round** 39:20 | 120:9,15,21 | **scratch** 27:7 |
| **represented** 2:4 | 48:12 121:3 | 81:18 | 125:16,19 | **screen** 117:22 |
| 2:11,18 | 137:13 | **RPR** 1:23 | 126:25 127:2 | **screwed** 111:==17== |
| **requested** 137:13 | **reviewed** 84:10 | **Rukavina** 2:5 3:3 | 128:22 130:11 | ==se 37==:25 38:13 |
| 137:14 | **ridiculousness** | 3:6 4:4 9:10 | 130:19 131:8 | **second** 28:8 37:4 |
| **reservation** | 97:5 | 11:21 12:3 13:5 | 131:17,24 | 67:25 72:15 |
| 91:25 | **right** 16:17,21 | 14:16 17:23 | 132:6,9,13,17 | 73:2 103:25 |
| **respect** 19:19 | 17:25 18:20 | 18:4 20:19,23 | 132:20 133:1,4 | **Section** 46:13 |
| 22:17 24:20 | 21:23 33:22 | 20:25 21:6 22:3 | 133:8,18 134:1 | 130:22 131:8 |
| 25:2,18 35:3 | 37:5 41:25 | 22:11,19 23:17 | 134:14,24 | 131:14 |
| 38:3 41:11 | 45:16 47:6 55:1 | 25:8,16 27:7,17 | 135:8 | **securities** 10:20 |
| 47:22 49:23 | 56:1 66:21 | 27:18 29:16 | **rule** 39:5 127:6 | 11:14 |
| 51:9 58:16 | 67:20 68:9 | 33:5 34:6 35:1 | **rush** 135:19 | **see** 21:18 22:2 |
| 68:16 69:12 | 75:18 78:14 | 35:24 36:11,21 | | 28:11,15,16 |
| 71:22,23 72:21 | 80:4 81:9 83:14 | 38:2,20 39:2,20 | | 46:1,17,18 |
| 76:23 79:8 80:1 | 85:19 88:8,22 | 40:9,18 41:19 | **S** | 48:17,18 49:2 |
| 80:8 82:25 | 89:19 107:9 | 41:22 43:4,23 | **sane** 80:25 | 58:14 83:7,12 |
| 84:14,18 85:5 | 109:25 111:23 | 44:20 45:6,14 | **satisfy** 93:21 | 113:9 114:5 |
| 86:14 94:3,20 | 114:24 115:2 | 45:23 47:3,10 | **saw** 128:16 | 117:20,24 |
| 108:6 111:21 | 117:3,12 | 47:17 48:13 | **saying** 39:25 | 125:21 129:22 |
| | | | 42:23 46:2,5 | |

David Klos - October 27, 2021

129:25 130:24
130:25 131:1
**seeing** 44:20 48:6
48:11 59:8
61:19 85:14
114:9 130:11
**seen** 50:17,22,23
83:9 114:18
126:18
**Seery** 15:8 18:13
19:8,9,11 20:3
53:15 56:15,19
57:13,15,18,23
60:5 96:25 97:3
97:21 98:2
129:9,11
**Seery's** 21:12,19
**semiannual**
14:22
**send** 42:23 68:7
**sending** 33:4,5,6
33:8 90:24
115:14
**sends** 80:2
**senior** 5:17 7:3
**sense** 50:4,5
73:20 104:4,5
108:20 113:22
113:25 134:22
135:4
**sensitive** 86:24
**sent** 36:16,18
54:15 59:17
69:4 76:5 83:1
83:2 115:1
**sentence** 46:14
48:13,21 50:8
50:16
**sentences** 127:25
**separate** 10:25
11:7 70:20
106:25 107:4
**Separately** 52:10
**separating** 79:23
**Series** 4:20

**service** 11:12
71:24
**services** 10:17
12:23,24 13:3,4
13:13,15 41:3
43:12 53:20
71:11,15,17
107:2,15,15,24
108:8 109:22
109:24 110:4,7
110:10,12,16
**set** 115:14 118:7
**settlement** 9:6
**seven** 75:14
123:23
**seven-figure**
113:23
**shape** 6:16
**shared** 12:22
13:14 41:2
43:12 53:20
54:18 109:22
110:7
**sheet** 120:13,20
**sheets** 80:6,8
**shocked** 73:22
**short** 6:12
**short-term** 86:7
**shorthand** 1:24
137:2,7,25
**shortly** 116:11
**show** 28:8 117:5
**showing** 44:4
45:20 53:19
76:20
**shows** 45:25
**side** 85:11 96:15
**sides** 43:2
**sign** 85:1
**signatures** 22:24
86:18
**signed** 84:22
**significance**
128:11
**significant** 12:2

12:10 45:21
**signing** 86:14
**signs** 80:5
**similar** 8:7 13:4
13:16 74:9
82:24 107:12
107:19
**single** 23:15
29:21 32:17
34:12 36:8
62:14 123:22
**sir** 4:4 17:18 18:4
28:11,15 33:10
46:17 48:17
67:2,19 76:14
81:8 83:20
89:18 127:5
129:15,17
130:2 132:14
133:5,9
**sister** 97:9
**sit** 89:11
**sitting** 16:3,24
17:3,14 42:14
44:20 63:24
96:11 102:18
103:6 104:15
131:24 133:10
133:19
**situation** 31:22
69:23 93:1
**situations** 31:23
32:3 34:5
**smart** 17:18 50:7
**SMU** 4:15,17
**solvency** 87:6
**solvent** 87:2,5
**somebody** 35:19
**somewhat** 128:20
**soon** 118:10
132:21
**sophisticated**
44:21
**sorry** 9:20 22:19
24:22 41:21

45:24 47:20
55:21 57:19
58:25 63:16
76:16 78:14
88:22 99:8
108:11 129:14
129:20
**sort** 53:6 97:8
102:23
**sought** 87:25
**sounds** 50:10
80:21 81:19
82:17
**source** 64:6
**speak** 81:13
**speaking** 30:4
40:16 77:22
108:18
**speaks** 50:15
**specific** 8:6 14:4
28:20 31:22
34:11 38:3
42:15,18 50:25
51:1 52:23 58:4
68:17 91:24
95:13 103:14
112:23 123:17
129:25
**specifically** 4:23
15:10 34:24
39:10 42:8
51:24 52:13
56:7,12 62:13
67:20 69:14
71:14 74:6
81:13 83:11
86:4 87:11,24
92:13 93:8
94:22 98:21
112:20 115:10
118:16
**specificity** 34:24
36:7 42:11
53:13 82:16
96:14 102:24

105:14
**specifics** 14:24
93:18
**specify** 93:7
**speculate** 15:4
29:2 32:11
73:25
**speculating**
28:25 41:11
44:3
**speculation** 29:1
29:3,6 83:6
113:19
**speed** 106:24
**spelled** 37:24
**split** 108:16
**spoke** 18:10,19
101:6,9
**spoken** 18:13,15
**spreadsheet**
54:14
**stake** 18:1
**stamp** 117:17
**standard** 84:4,6
86:9,9
**standpoint** 92:18
135:6
**STANG** 2:10
**start** 27:7 47:17
95:19 111:17
**started** 5:7 10:5
101:17 108:23
**starting** 5:6
**state** 1:23 4:4,19
51:12 114:10
138:1
**stated** 137:9
**statement** 26:7
119:14
**statements** 36:17
116:14,18,24
119:8,19,22
120:1
**STATES** 1:1
**step** 32:9 68:25

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 176-3 Part 2 Filed 06/04/24 Page 212 of 261    PageID 28528
Appendix Part 2 Page 3604 of 772

156

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 134:5,5 | summary 21:7 | talked 19:15,24 | tells 43:18 55:25 | 57:3 79:14 |
| **Stinson** 2:17 | **supervision** | 69:13 94:4 | 94:23 | 122:5 |
| 95:23 | 137:11 | 103:3 | **temporarily** | **think** 6:9 7:2 |
| **stood** 87:11 | **support** 87:20 | **talking** 27:12 | 76:12 | 15:18 16:3 |
| **Stoops** 7:23 | **supporting** 12:9 | 32:16,20 54:1 | **tend** 109:1 | 18:18 26:14 |
| **stop** 21:10 65:9 | 72:3 | 88:15 98:19 | **term** 7:16 8:1 9:3 | 30:15 31:6,8,22 |
| 94:15 100:13 | **suppose** 31:18 | 102:13 103:2 | 24:10 45:1 | 32:9 36:16,19 |
| **street** 1:25 2:4 | 50:3 85:11 | 117:16 121:5 | 47:21 86:3 | 39:21 41:1,10 |
| 10:17 82:3 | 95:10 | 122:6 127:6 | 88:15 98:17 | 50:15 53:2 |
| **strike** 23:6 32:19 | **sure** 5:7 6:2 19:4 | **talks** 129:16 | 104:1,2,5,7,8 | 58:12,22 59:4 |
| 33:15 37:10 | 20:1 26:6 27:21 | 130:22 | 107:25 108:1 | 59:11 64:6 65:6 |
| 52:16 54:22 | 31:23 37:22 | **tax** 73:7 107:6,6 | 124:10,11,13 | 65:7,8 75:2,13 |
| 63:25 67:4 | 44:7,8 47:19 | 107:19 | 125:7,13,25 | 78:6 79:16 |
| 120:15 125:16 | 49:18 51:13 | **team** 6:5,15 10:5 | 126:10,13 | 80:24 84:15 |
| **string** 118:4 | 55:21 58:8 | 11:3 25:14,22 | 134:21,21 | 85:23 86:10,15 |
| 127:5 | 61:11,25 64:3,3 | 32:13,16,19 | **terminology** | 87:21 88:13 |
| **strong** 73:11 | 65:11,14 66:19 | 35:16 43:6,9 | 98:14 | 95:9 97:19 |
| 92:17 | 74:24 85:12 | 57:1 60:16 | **terms** 6:19 9:23 | 99:14 101:5,9 |
| **structure** 14:8 | 95:12 97:24 | 61:14 62:6,14 | 10:11 18:13,15 | 103:11 105:3 |
| 30:6 | 99:10 100:22 | 62:15 64:17 | 19:23 22:20 | 105:25 106:17 |
| **struggle** 64:11 | 103:6 106:15 | 73:20 84:2 85:9 | 26:6 35:16 | 107:9,22 108:4 |
| 128:15 131:13 | 125:9 127:4 | 85:17 101:11 | 43:14 61:4 | 108:6 111:17 |
| **struggling** 45:2 | 128:25 129:1 | 108:9 109:7 | 92:11 93:4 | 113:7,14,24 |
| 50:6,7 88:25 | 135:15 | 115:8,11,12,13 | 107:14,19 | 123:24 |
| 99:25 | **surely** 128:22 | **technical** 78:6 | **testified** 4:2 | **thinking** 57:4 |
| **subject** 108:10 | 129:3 | **technically** 4:20 | 41:23 99:18 | 117:11 129:7 |
| **Subscribed** | **surprised** 130:14 | 36:23 37:12 | 100:14 124:2 | **Third** 2:10 73:6 |
| 135:24 | **suspect** 55:10 | **teeing** 26:6 | **testify** 16:15,19 | **third-party** |
| **subsequent** 96:4 | 68:14 123:19 | **tell** 7:11 14:18 | **testimony** 35:24 | 10:16 11:12 |
| 96:7,23 102:9 | **suspend** 111:14 | 24:22 28:4 34:2 | 62:9 79:12 | **thousand** 92:6 |
| 102:12 103:2 | **switch** 65:8 | 34:7 36:25 44:2 | 98:16 100:22 | **threatened** 5:2 |
| 116:17 119:10 | **sworn** 1:19 4:2 | 52:7 53:11 | 100:23 137:9 | **three** 5:9 6:12 |
| 119:13 120:1,7 | 137:4 | 55:17 56:3 | **Texas** 1:2,23,25 | 97:12 102:11 |
| **substance** 19:1 | | 58:23 59:5,14 | 4:19 81:22 82:1 | 124:10,11,13 |
| 98:6,9 | | 69:16 71:16 | 82:9,16,21 | 124:24 125:2 |
| **substantially** | **T** | 83:17 93:4 | 135:25 138:1 | **throw** 104:1 |
| 16:2 | **take** 12:22 14:5 | 103:6 105:13 | **thank** 95:14 96:1 | **Thursday** 19:14 |
| **substantive** 97:1 | 16:8 18:9 23:12 | 106:10 112:13 | 109:16,17 | **Tim** 106:17 |
| **sue** 82:11 | 68:24 71:16 | 112:25 113:2 | 124:19 135:8 | **time** 4:24 5:15 |
| **suggested** 55:1 | 117:21 118:17 | 115:20 116:2,6 | **thanks** 100:12 | 6:21,23 7:9,11 |
| **suggesting** 62:22 | **taken** 1:20 87:14 | 116:22 119:12 | **Thedford** 23:2 | 7:12,15 8:10,14 |
| 128:9 | 137:7 | 120:6,18 122:9 | **thereto** 137:21 | 8:24 10:2,4 |
| **Suite** 2:4,17 | **takes** 16:5 17:5,9 | 126:7,12 137:4 | **thing** 33:22 53:6 | 12:6,10 16:14 |
| 138:2 | **talk** 12:14 18:12 | **telling** 56:14 | 59:18 84:13 | 24:6,8 25:1 |
| **sum** 113:24 | 21:21 54:3 | 58:14 68:15 | **things** 10:1 25:25 | 28:21 29:25 |
| | 98:15 122:14 | | | |

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 36:23 37:12,18 | **told** 39:21 42:14 | **transfers** 28:9,18 | 83:8 85:1 86:12 | 37:17 48:19 |
| 39:11 41:4,12 | 43:4 52:11,11 | 28:19,22 30:24 | 87:24 94:19 | 49:18 51:12,14 |
| 42:5,12 43:22 | 52:19 53:12 | 32:22 35:4,10 | 95:10 105:4,25 | 54:17,22,23 |
| 43:22 44:19 | 55:9 60:21 | 38:3 42:9 94:7 | 106:24 107:24 | 56:21 61:12,22 |
| 47:13 49:4 | 61:23 62:13,14 | **transitioned** | 119:24 121:18 | 70:18 72:7,10 |
| 52:14 53:2,8,14 | 62:15 68:12 | 109:1,6 | 122:12 127:25 | 75:7 79:4 87:1 |
| 53:15 54:21 | 69:9 70:9 85:19 | **transparent** | 129:4 134:22 | 87:9 91:11 97:6 |
| 56:16 59:23 | 91:8 95:1 97:25 | 115:17 | **two-paragraph** | 98:23 101:12 |
| 60:2,10 62:5 | 98:2 100:25 | **Treasurer** | 84:12 | 101:18,19 |
| 63:2 65:12 | 103:7 118:16 | 121:11 | **TX** 2:4,18 138:2 | 102:2 112:19 |
| 66:11 74:10,20 | 118:23 122:11 | **treasury** 9:6 | **type** 98:12 | 121:9 124:3,15 |
| 79:4 80:15 | 122:23 | 107:6 | **types** 13:4 78:13 | 133:11,20,25 |
| 83:23 84:12 | **tomorrow** 79:11 | **treated** 35:5 | 84:1 107:12,15 | 134:2,6 |
| 86:23 89:10,16 | 132:22 | **trigger** 104:2,10 | 107:17 114:20 | **understood** 52:2 |
| 92:10 93:5 | **top** 107:9 127:7 | 104:21 | **typewriting** | 63:12 95:4 |
| 95:12 101:13 | top<mark>ic 96:2</mark> 98:3 | **triggered** 104:11 | 137:10 | 102:25 |
| 108:24,25 | **topics** 20:11 | 104:17 | **typical** 84:7 | **unfair** 34:17 |
| 109:6,16 | 103:25 106:23 | **triggers** 14:25 | | **unfamiliar** 80:21 |
| 111:12 112:14 | **total** 116:15 | 107:17 | _____ | **UNITED** 1:1 |
| 113:17 116:2 | **totaling** 119:24 | **trouble** 62:19 | **U** | **unpaid** 46:15,24 |
| 122:18 123:18 | **touched** 98:16 | **true** 29:6 88:9 | **Uh-huh** 7:18 | 47:2,20 48:15 |
| 129:2,7 134:12 | **track** 111:2 129:1 | 135:24 | 13:23 47:7 | 48:15 49:4 |
| 135:1 137:8 | **tracker** 118:10 | **trust** 15:16 17:10 | 75:11 127:9 | 131:15,16 |
| **timely** 44:9 51:15 | **tracking** 39:15 | 17:15 18:6 | **ultimate** 16:12 | **unscheduled** |
| 51:17 | **transaction** | **trusts** 26:16 | 17:8,10 | 38:23 64:7,23 |
| **times** 7:5 32:15 | 34:13 70:21 | 65:23 108:21 | **ultimately** 11:4 | 75:18,20 |
| 61:20 63:8 | 76:9 115:21 | **truth** 137:5,5,5 | 39:19 64:18 | **upcoming** 25:25 |
| 76:19 92:6 | 116:7 118:24 | **truthful** 100:22 | 73:9 | **updated** 54:15 |
| **timing** 15:24 | **transcript** 135:14 | **truthfully** 16:16 | **um** 63:13 | **upfront** 85:11 |
| **title** 5:15,16 6:22 | 135:17 137:13 | 16:19 | **unable** 89:3,14 | **use** 14:19 56:25 |
| 7:1 10:9,11 | **transfer** 29:9 | **try** 62:23 106:24 | **undergrad** 4:15 | 70:23 81:17 |
| 12:16 13:7 | 30:2 31:8,20 | **trying** 17:18 | **Undergraduate** | 108:20 |
| 26:14 | 32:8 34:19 36:1 | 27:21 30:23 | 4:14 | **usually** 31:15 |
| **titles** 10:11 78:18 | 40:22 41:16 | 50:6 67:14 98:3 | **understand** | 33:16 |
| **today** 5:21 14:3 | 69:2,10 76:15 | 100:11 104:22 | 14:14 15:19 | **utilized** 71:17 |
| 15:12 16:3,13 | 77:4,18 85:16 | 130:20 132:9 | 17:14 18:19 | |
| 16:16,19,24 | 90:12 91:22,23 | 133:8 | 30:23 47:4 51:8 | _____ |
| 17:3,14 20:5 | 92:9 93:3 115:8 | **turn** 114:15 | 61:11 62:8 66:4 | **V** |
| 42:14 44:20 | **transferred** | 123:25 | 67:25 68:2 | **valid** 39:3 |
| 57:5 63:25 65:6 | 30:20 75:24 | **turned** 76:4 | 88:25 96:17 | **valuation** 5:17,19 |
| 95:25 96:11 | 77:10 78:18 | 81:15 | 97:24 98:8 | 5:24 6:2,15 |
| 102:18 103:6 | 79:13 | **two** 9:7 15:12 | 106:3 118:12 | 9:14 10:7,9,14 |
| 104:15 131:24 | **transferring** 34:8 | 29:14 36:20 | 118:15 124:14 | 10:15,24 11:3,7 |
| 133:11,19 | 35:11 39:22 | 45:13 65:10 | 132:1 | 11:12 71:11,15 |
| **today's** 47:6 | 42:4 75:9 | 66:20 77:12 | **understanding** | 71:17,25 72:1 |
| | | | 19:11 20:11,13 | 72:13,14,21 |

Case 21-03004-sgj    Doc 83-1    Filed 11/30/21    Entered 11/30/21 16:45:53    Desc
Case 3:21-cv-00881-X    Document 176 Part 2 Appendix 02624 of 372    Page 214 of 261    PageID 28530

158

David Klos - October 27, 2021

107:6
valuations 11:4
value 11:14
  71:16
valuing 10:19
variety 107:16
various 25:23
  79:14
vary 17:12
verbatim 94:17
verbiage 132:25
verify 27:24
versus 87:12
videoconference
  1:19 2:6,13,19
videotape 21:18
view 131:10
virtually 44:5
vis-a-vis 15:16
voluntary 37:24
vs 1:8

——————
        W
——————
want 16:24 44:10
  54:4 63:8 90:6
  95:18 96:19
  98:15 100:10
  101:14 104:1
  117:9 134:19
  135:13,16
wanted 24:17
  34:3 96:2
wants 90:16,20
  90:22
wasn't 23:24
  24:1 31:20
  37:18 38:5 50:4
  51:11,15,16
  53:4 57:1,3
  59:20 60:15
  62:6 70:17
  72:19 73:3,3
  75:2 101:11
  103:17 108:12
  129:10

Waterhouse 8:17
  11:1 13:25 20:9
  30:13,14,19
  39:25 41:14
  42:3,7 43:24
  52:7,11,18,24
  53:11 54:15,19
  54:25 55:17,25
  60:20 61:23
  62:9 65:3 69:9
  77:17 78:2,20
  84:23 85:1,19
  86:14 91:8 94:6
  100:25 103:3
  103:13 115:5
  115:25 116:2
  116:22 118:19
  118:23 121:6
  122:9 124:4,8
  125:11,22
  126:15 127:13
  127:16
Waterhouse's
  21:1,19 127:10
waters 43:14
way 6:16 20:12
  22:22 31:15
  34:3 35:17,22
  48:24 54:1 63:8
  69:6 72:15,17
  76:10 82:19
  87:18 92:1,1,1
  92:2 93:24 94:6
  95:3 97:5
  102:23 114:10
  121:5 137:19
ways 38:21
we'll 20:1 54:3
  125:7 132:17
  132:21
we're 12:8 27:12
  32:15 43:11,12
  64:1 65:8,9,10
  65:12 79:22
  80:4 117:17,18

121:5 122:6
we've 19:24
  75:13 78:12
wearing 43:15
week 36:20 83:7
weekly 25:24
  43:5,24 63:19
  129:8,10
weeks 59:5
welcome 117:19
  127:7
went 4:14 58:17
  81:17 85:14
  101:18
weren't 61:21
  80:16 88:7
  97:15 101:20
whatsoever
  63:20
wherewithal
  93:24
wind 16:5 17:5
winding 15:2,22
wire 59:17 61:19
  118:7
withdrawn 91:19
  110:11 111:15
  113:1,7,8
  124:10,12
within-entitled
  137:6
witness 1:19 9:2
  11:19 12:1 13:2
  14:14 19:12
  21:4 22:1,10,17
  23:12 25:5,13
  27:6 29:12 33:2
  34:1,23 35:15
  36:6 37:22
  38:19 39:9 40:5
  40:16 41:18,21
  43:1,21 44:18
  45:1,11,19
  46:23 48:10,24
  49:17 50:3,15

51:7 52:23
  53:25 54:9 55:5
  55:14,21 56:12
  57:10 60:14
  61:3 63:7 64:11
  65:21 66:2,9,17
  69:22 71:5,14
  71:22 76:21
  77:22 78:6,25
  79:7,21 81:4,13
  81:25 82:15
  83:15 85:22
  87:5 88:20 89:7
  90:16 91:5,11
  93:15 94:10
  95:15 99:6,25
  100:7,13,21
  101:5 102:2,17
  103:17 104:20
  108:4 109:17
  111:10 112:5
  112:11 113:21
  117:1 119:10
  119:17 120:10
  120:22 128:15
  130:9,18 131:7
  131:13,23
  133:16,24
  134:10,19
  135:4,9 137:3
  137:10
word 56:25
  133:11,20
words 10:24 36:7
  52:16,24 94:19
work 5:5 10:19
worked 5:8 11:22
  62:4
working 5:7,11
  12:5
world 108:23
  116:3,7 118:22
  119:2,12 120:6
  120:18
worth 34:10

worthiness 90:11
wouldn't 25:13
  38:10 43:8
  56:22,23 60:16
  64:8,20 77:24
  86:24 87:17
  99:15
write 128:3,5
writes 127:13
writing 103:21
  103:24 113:9
  125:22 126:18
written 35:2,6
  66:6
wrong 55:1 82:18
  82:22 88:22
  89:19
wrote 67:21
  70:12
www.dickman...
  138:4

——————
        X
——————

——————
        Y
——————
y'all 95:2
Yang 106:15
yeah 6:23 8:2
  14:21 15:23
  19:17 23:2
  29:12,20 35:15
  37:22 43:1
  55:14 56:24
  59:2 60:14 61:3
  63:7,8,12,18
  66:17 67:9 71:5
  83:24 89:7
  91:11 94:10
  96:10 98:20
  99:25 101:5
  102:2 124:15
  125:1 135:19
year 6:1 9:25
  29:22 49:21
  111:1,8,12,13

Case 21-03004-sgj   Doc 83-1   Filed 11/30/21   Entered 11/30/21 16:45:53   Desc
Case 3:21-cv-00881-X   Document 176-28 Filed 01/09/24 Page 215 of 261   PageID 28531
Appendix Part 2 Page 3634 of 372

159

**David Klos - October 27, 2021**

113:4 123:17
126:5,15,22
**years** 5:9 6:17
15:12 24:10,17
30:18 32:21
33:20 34:17
39:14 48:7
65:17 66:3
69:18 94:20
95:3,11 123:23
**years'** 34:10
**yes-or-no** 94:12
**York** 2:11 132:21

**Z**

**zero** 46:8 49:6
80:1
**ZIEHL** 2:10

**0**

**0** 36:8 69:4
**08** 4:24
**09** 4:24

**1**

**1** 8:11 24:20,23
66:24 67:2,7
80:3 113:10
126:8,12
137:22
**1-31-23** 138:4
**1-4** 27:17
**1-6** 127:3
**1.3** 28:13,14
**1.4** 58:25
**10** 19:6 32:21
33:20 34:10,17
69:18 95:3
123:19
**100** 15:25
**10017-2024** 2:11
**101** 138:2
**109** 3:5
**11** 123:19
**127** 3:6
**13** 23:8 27:9

46:12 49:10
114:1 129:12
129:14
**13-week** 126:3
**14** 27:15,17,23
36:12 40:20
42:17 44:13,22
48:12 49:1
58:25 59:23
60:2,23 61:18
64:2,5
**15** 61:7
**15(c)** 80:9 121:4
127:6 128:17
**16** 8:9 31:18
127:2
**17** 8:10
**18** 8:10
**19** 8:24 45:24
49:2
**1982** 4:10

**2**

**2** 66:24 67:2,7
73:25 76:3 80:4
85:23 87:9,13
92:8 114:23
115:9
**2.03-** 46:9
**2.1** 28:14 45:25
46:3 49:1,8
130:22 131:8
**2.1-** 46:5,7
**2.4** 68:7 69:2
70:7,19,23 72:7
73:18 75:22
76:3 77:10,18
78:9 85:18,20
91:22 92:8,15
115:8 116:3,23
**2.4-** 70:21 73:23
77:4 85:24
86:13 90:6
**2:30** 1:22
**20** 8:24 24:17

**200** 12:6
**2009** 5:12,15 6:3
6:3 29:24,25
122:17
**2010** 6:9 106:13
123:18
**2011** 6:10,21
106:13 123:18
**2012** 123:18
**2017** 6:22 22:13
23:7 24:8,18
88:22 105:12
124:25
**2018** 116:14
119:14 120:2
**2019** 8:11,14 9:10
9:13 10:6 11:10
11:16,21 27:14
28:9 29:8,17,21
29:25 31:18
35:8 36:15,22
40:21 41:1,13
42:8,16,16
44:13,13 45:23
45:24 65:13,15
66:11 75:14
78:20 80:6,19
87:2,9,13 88:9
88:14 89:2,17
91:21 92:8 93:2
93:11 105:13
110:20 111:6
111:12,21
112:2,6,8
114:23 115:9
121:7
**2020** 7:13,22
24:20,24 51:10
51:15,22 53:18
54:24 56:17,22
57:6,13,17,22
60:20 61:21
63:19 98:18,24
99:19 100:15
101:2 102:14

102:17,17
103:23 112:17
113:2,4,12
120:24 121:7
121:21 124:1,9
125:12,24
126:10 127:11
128:23 129:3
**2021** 1:15,21
13:24 58:25
59:23 60:2 61:8
87:16 88:1
112:22,25
113:3,10,16
126:8,13 128:2
129:4 136:1
137:22
**21-03004-sgj** 1:8
**214** 138:3
**23-point** 45:20
**23.034-** 45:21
**24.7-** 46:10
**27** 1:15,21 4:20
**29** 37:6

**3**

**3** 46:13 50:8
67:17 68:4
74:18,22 76:5
82:24 83:10,20
93:2,11 114:4,7
114:10,22
118:1,13
129:15 131:8
131:14
**30** 24:10,17
130:22
**30-year** 23:15
24:10 26:2
**30(b)(6)** 19:12,20
**30.7** 21:22
**30.7-** 27:12
**300,000** 28:14
**31** 22:13 23:7
24:18 45:21

51:10,15 56:17
56:22 57:6,13
57:17,21 58:7,9
60:25 87:15
88:1 98:18,24
120:2 124:25
**3102** 2:17
**312** 138:1
**338-** 37:8
**34th** 2:11
**3763** 83:15
**3800** 2:4
**38th** 1:25
**398,000** 85:23

**4**

**4** 3:3 45:23 91:21
**4.4** 118:9
**4.4-** 76:4
**411,000** 37:8
**4228** 138:2
**445-9548** 138:3

**5**

**5** 74:7,8,24 75:4
75:23 77:4,11
77:18 78:3
79:22 80:2
81:18 82:25
85:4 86:13
91:22 93:3
114:16 118:8
118:13,24
119:7,14
**5-** 76:5 90:1
**5,019,000** 75:3
**5.2** 80:19
**5:00** 95:19
**5:14** 1:22 135:21
**500** 1:24 2:3
**500,000** 123:9,12

**6**

**6** 4:10 127:11
128:22 129:3
**6/30** 122:2

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| **600,000** 76:6,7 | | | | |
| **630,000** 28:14 | | | | |
| **66,000** 46:7 49:4 | | | | |
| 49:5,7 | | | | |
| **7** | | | | |
| **7** 58:11,15 | | | | |
| **7.4** 75:9 78:22 | | | | |
| 79:12 89:2 | | | | |
| 90:17,20,22,24 | | | | |
| 119:25 122:5 | | | | |
| **7.4-** 89:19 91:13 | | | | |
| **75** 18:1 | | | | |
| **750,000** 28:13 | | | | |
| 37:6 | | | | |
| **75201** 2:4 | | | | |
| **75206** 138:2 | | | | |
| **75219** 2:18 | | | | |
| **777** 2:17 | | | | |
| **780** 2:10 | | | | |
| **8** | | | | |
| **80** 15:25 | | | | |
| **800** 138:3 | | | | |
| **855-5100** 138:3 | | | | |
| **9** | | | | |
| **9** 19:5 | | | | |
| **95** 3:4 | | | | |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## <u>DECLARATION OF DAVOR RUKAVINA</u>

The undersigned, Davor Rukavina, hereby declares under penalty of perjury pursuant to the laws of the United States of America the following:

1.      My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.

2.      I am an attorney duly licensed to practice law in the State of Texas.  I am lead counsel for Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>"), in the above styled and numbered Adversary Proceeding.

3.      Attached hereto as Exhibit "A" is a true and correct copy of the *Defendant's Second Set of Requests for Production to Plaintiff*, served by HCMFA on May 28, 2021.

---

HCMFA APP 0814

4.    Attached hereto as Exhibit "B" is a true and correct copy of the *Debtor's Responses and Objections to Defendant's Second Set of Requests for Production*, served by Highland Capital Management, L.P. (the "<u>Plaintiff</u>"), on June 28, 2021.

5.    The first time that the Plaintiff produced the promissory notes the subject of this Adversary Proceeding, in their native Word format, was on October 26, 2021.

6.    I caused two of my employees, Julian Vasek and An Nguyen, both associates at Munsch Hardt under my direct supervision, to review the Plaintiff's production in this Adversary Proceeding for any e-mail from Mr. Frank Waterhouse to Ms. Kristin Hendrix authorizing her to affix his electronic signature to the promissory notes the subject of this Adversary Proceeding. After they originally found no such e-mail, I instructed them to search the production again just to be certain.  Again, they reported to me that, after searching again, they found no such e-mail.  I then personally reviewed all e-mails in said production from Mr. Waterhouse to anyone in April and May, 2019, and I found no such e-mail.  Accordingly, I conclude that the Plaintiff's production to HCMFA in this Adversary Proceeding does not contain any e-mail by which Mr. Waterhouse authorized Ms. Hendrix to affix his electronic signature to said notes.

7.    Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 53-449 is a true and correct copy of a deposition of Frank Waterhouse, without exhibits, taken in this Adversary Proceeding on October 19, 2021.

8.    Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 450-653 is a true and correct copy of a deposition of Kristin Hendrix, with exhibits, taken in this Adversary Proceeding on October 27, 2021.

9.    Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 654-813 is a true and correct copy of a deposition of David Klos, taken in this Adversary Proceeding on October 27, 2021.

SUPPLEMENTAL DECLARATION OF DAVOR RUKAVINA—Page 2

10.    I hereby swear under penalty of perjury that the foregoing is true and correct to the

best of my knowledge and ability.

Executed: November 30, 2021.


 /s/ Davor Rukavian
DAVOR RUKAVINA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S SECOND SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF**

**To:    Highland Capital Management, L.P., by and through its counsel of record, John Morris, Esq., Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067**

Pursuant to Federal Rule of Civil Procedure 34, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7034, defendant Highland Capital Management Fund Advisors, L.P. hereby serves upon plaintiff Highland Capital Management, L.P. this its *Second Set of Requests for Production to Plaintiff* (the "Requests").  Responses to the Requests must be served on or before **June 28, 2021**, on the following:

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
3800 Ross Tower
500 N. Akard St.
Dallas, Texas 75201

EXHIBIT "A"

Pursuant to <mark>Federal Rule of Civil Procedure 34(b)(1)(C)</mark>, made applicable to this adversary proceeding by <mark>Federal Rule of Bankruptcy Procedure 7034</mark>, electronically stored information should be produced in native format.

## I.   <u>DEFINITIONS</u>

In responding to these Requests, you are instructed to use the following definitions:

"<u>Communication(s)</u>" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) by any means, including but not limited to any meeting, conversation, discussion, conference, correspondence, message, or other written or oral transmission, exchange, or transfer of information in any form between two or more persons, including in person or by telephone, facsimile, telegraph, telex, electronic mail or other medium.  The term also includes any Document transmitted or exchanged during such transmittal of information.

"<u>Complaint</u>" means the *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate*, filed by the Debtor in this Adversary Proceeding.

"<u>Debtor</u>" means Highland Capital Management, L.P. and includes all agents and representatives thereof.

"<u>Document</u>" means all handwritten, typed, or printed matter of any kind, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise, including, without limitation, agreements, correspondence, forecasts, memoranda, e-mails, notes, jottings, speeches, press releases, diaries, examinations, statistics, letters, telegrams, minutes, time records, payroll records, expense records, contracts, reports, studies, training manuals, canceled checks, statements, receipts, delivery tickets, returns, summaries, work orders, pamphlets, books, prospectuses, statement of operations, inter-office and intra-office communications, internal and external audit reports, internal and external accounting reports, offers, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, printed matter, computer print-outs, teletypes, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing, graphic or aural records of representations of any kind, including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures, and electronic, mechanical or electronic records or representations of any kind, including, without limitation, emails, tapes, cassettes, digital images, digital videos, videotapes, audiotapes, laser disks, disks (including CD-ROM disks), plans or other representations of anything concerning, describing, referring or relating, directly or indirectly, in whole or in part, to the subject matter of the discovery request at issue.

"<u>HCMFA</u>" means Highland Capital Management Fund Advisors, L.P. and includes all agents and representatives thereof.

"NAV Error" means the NAV error in the Highland Global Allocation Fund referred to in that certain April 7, 2019 memo from HCMFA to the Securities and Exchange Commission that was provided to John Morris by Davor Rukavina attached to an email dated May 24, 2021.

"Notes" means those certain alleged promissory notes attached as Exhibits 1 and 2 to the Complaint.

"Related" or "related to" means, without limitation, the following: effect, concern, refer to, reflect, evidence, display, contain, show, prove, encompass, support, demonstrate, involve, and/or include, in any way legally, logically, or factually connected to the matter referred to, or have a tendency to prove or disprove the matter referred to.

## II.    REQUESTS FOR PRODUCTION

**REQUEST NO. 8**

The Debtor's compliance manual.

**RESPONSE:**

**REQUEST NO. 9**

All Microsoft Word copies of the Notes, including metadata.

**RESPONSE:**

**REQUEST NO. 10**

All email communications related to preparation of the Notes.

**RESPONSE:**

**REQUEST NO. 11**

All email communications with external auditors related to the Notes.

**RESPONSE:**

HCMFA APP 0819

**REQUEST NO. 12**

All email communications related to the NAV Error.

**RESPONSE:**

**REQUEST NO. 13**

All email communications related to any insurance claim related to the NAV Error.

**RESPONSE:**

**REQUEST NO. 14**

All email communications related to the payment obligations of HCMFA to Highland Global Allocation Fund for the NAV Error.

**RESPONSE:**

Dated at Dallas, Texas this 28th day of May, 2021.

                        **MUNSCH HARDT KOPF & HARR, P.C.**

                        By: /s/  Davor Rukavina

                           Davor Rukavina, Esq.
                           Texas Bar No. 24030781
                           Julian P. Vasek, Esq.
                           Texas Bar No. 24070790
                           3800 Ross Tower
                           500 N. Akard Street
                           Dallas, Texas  75201-6659
                           Telephone: (214) 855-7500
                           Facsimile: (214) 855-7584
                           Email: drukavina@munsch.com

                        **COUNSEL FOR HIGHLAND CAPITAL
                        MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 28th day of May, 2021, he caused a true and correct copy of this document to be served by e-mail on John Morris, Esq., counsel of record for the Debtor/Plaintiff.

/s/  Davor Rukavina
Davor Rukavina

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


EXHIBIT "B"
HCMFA APP 0822

## DEBTOR'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
## <u>SECOND SET OF REQUESTS FOR PRODUCTION</u>

Highland Capital Management, L.P., ("<u>Plaintiff</u>" or the "<u>Debtor</u>") hereby responds to *Defendant's Second Set of Requests for Production to Plaintiff* (the "<u>Requests</u>")[2] served by Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>" or "<u>Defendant</u>") in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>").  The Debtor's responses and objections to the Requests (the "<u>Responses</u>") are made pursuant to Federal Rules of Civil Procedure ("<u>FRCP</u>") 26, 33, and 34 as made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

## <u>GENERAL OBJECTIONS</u>

Unless otherwise specified, the following general objections and caveats are applicable to each and every Response and are incorporated into each Response as though set forth in full:

1.      The Responses contained herein are based upon information presently known and ascertained by the Debtor.

2.      The Debtor objects to the Requests to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other privilege or immunity.  The inadvertent disclosure or production of any document that is protected from discovery by any privilege or immunity shall not constitute a waiver of any such privilege or immunity.  All references in these objections and responses to the Debtor's agreement to produce documents shall be construed to mean non-privileged documents.

3.      The Debtor objects to the Requests to the extent they request information that is not reasonably or readily available to it, in its possession, custody or control, or is more

---

[2] Capitalized terms not defined herein shall have the meanings set forth in the Requests.

readily available to HCMFA from another source or for which the burden of obtaining such information is not substantially greater for HCMFA than it is for the Debtor.

4.    All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

5.    The Debtor objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

6.    The Debtor's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

7.    These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

HCMFA APP 0824

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 8:**

The Debtor's compliance manual.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

The Debtor objects to Request for Production No. 8 on the grounds that it is vague, overly

broad, not proportional to the needs of the case, and not relevant to the parties' claims or defenses.

*See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 9:**

All Microsoft Word copies of the Notes, including metadata.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

The Debtor objects to Request for Production No. 9 to the extent the term "metadata" is

vague.  Subject to the General Objections and this specific objection, the Debtor will conduct a

reasonable search for, and produce, documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 10:**

All email communications related to preparation of the Notes.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Subject to the General Objections, the Debtor will conduct a reasonable search for, and

produce, documents responsive to Request for Production No. 10, including using search terms

and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 11:**

All email communications with external auditors related to the Notes.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

HCMFA APP 0825

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 11, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 12:**

All email communications related to the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 12, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 13:**

All email communications related to any insurance claim related to the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

The Debtor objects to Request for Production No. 13 on the grounds that it is vague, overly broad, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 13 to the extent they are relevant to the NAV Error and the Notes, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 14:**

All email communications related to the payment obligations of HCMFA to Highland Global Allocation Fund for the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 14, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

Dated:  June 28, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pcszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S SECOND AMENDED ANSWER

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "Defendant"), the

defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding")

filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's Second*

*Amended Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II)*

*Turnover of Property of the Debtor's Estate* (the "Complaint").   Where an allegation in the

Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

---

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.     The Defendant admits ¶ 10 of the Complaint.

11.     The Defendant admits ¶ 11 of the Complaint.

12.     The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

**A.      The HCMFA Notes**

13.     The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.     The Defendant denies ¶ 14 of the Complaint.

15.     The Defendant denies ¶ 15 of the Complaint.

16.     The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.     The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.     The Defendant admits ¶ 18 of the Complaint.

**B.      HCMFA's Default under Each Note**

19.     The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.     To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.     The Defendant denies ¶ 24 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

25.     Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.     Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 26 of the Complaint.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 27 of the Complaint.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 28 of the Complaint.

29.     The Defendant denies ¶ 29 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.     Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 32 of the Complaint.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 36 of the Complaint.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

38.     At all material times to the Complaint, the Defendant, a registered advisor, advised various third-party funds as to their investments.  One such fund was Highland Global Allocation Fund ("HGAF").

39.     At all material times to the Complaint, the Defendant contracted with the Plaintiff whereby the Plaintiff, through its employees, would provide certain services to the Defendant,

including with respect to the Defendant's advice to the third-party funds.  These services so provided included accounting, legal, regulatory, valuation, and compliance services.

40.    In March, 2018, HGAF sold equity interests it held in TerreStar.  As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of HGAF assets. The Defendant was responsible for advising on the NAV.  In turn, pursuant to the Shared Services Agreement in effect at that time between the Plaintiff and the Defendant, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.

41.    The Plaintiff made a mistake in calculating the NAV (the "NAV Error").  The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund.  The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error.  Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

42.    The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019.  In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

43.     At this time, Frank Waterhouse ("Waterhouse") was the Chief Financial Officer to both the Plaintiff and the Defendant.  The two promissory notes the subject of the Complaint (the "Notes") purportedly bear Waterhouse's signature.  But he did not sign the Notes in any representative capacity for the Defendant.  The Defendant did not authorize Waterhouse to sign the Notes or to bind the Defendant in any way to the Notes.

44.     Indeed, Waterhouse testified that he does not specifically recall signing the Notes. Given that Waterhouse's signature on the Notes is identical on both, it appears the Notes were signed electronically, whereas Waterhouse testified the ordinary practice at the time was to use wet-ink signatures.  The metadata associated with the Notes also indicates someone else actually affixed Waterhouse's signature, and there is no evidence such person had authority to do so.

45.     Even if Waterhouse signed the Notes or authorized someone to affix his signature, he made a mistake in preparing and signing the Notes for the Defendant.  Upon information and belief, Waterhouse was not aware that payments from the Plaintiff to the Defendant were to compensate the Defendant for the NAV Error and resulting damages, instead assuming that the Notes were like prior notes between the Plaintiff and the Defendant.  Waterhouse failed to properly inquire into the underlying transaction and, either for unknown accounting or other purposes, Waterhouse prepared and signed the Notes on his own, or caused them to be prepared and signed, without proper knowledge of the underlying facts and without actual authority from either the Plaintiff or the Defendant.

46.     In sum, neither the Plaintiff nor the Defendant intended that any funds paid by the Plaintiff to the Defendant be treated as debt but that they instead be treated as compensation by the Plaintiff to the Defendant for the NAV Error that the Plaintiff caused.  The Notes are an unauthorized mistake and a nullity, and are void for a lack of consideration.

47.     To the extent Waterhouse had apparent authority to bind the Defendant to the Notes, such apparently authority does not apply to the Notes because Waterhouse's lack of actual authority is imputed to the Plaintiff, as Waterhouse was the CFO for the Plaintiff.

48.     Accordingly, the Notes are void or unenforceable for never having been executed, for lack of consideration, for mutual mistake, and/or for the lack of authority from the Defendant to Waterhouse to execute the same for the Defendant.

49.     For the avoidance of doubt, based on the foregoing, the Defendant expressly denies that the Notes were ever signed or executed.

## JURY DEMAND

50.     The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

51.     The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this ___ day of _____, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/
_____
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas  75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com
    jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the ___ day of _____, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the plaintiff.

By: /s/
_____
    Davor Rukavina, Esq.

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## SUPPLEMENTAL DOCUMENTS

COMES NOW Highland Capital Management Fund Advisors, L.P. and files the following

documents in support of its *Defendant's Second Motion for Leave to Amend Answer and Brief in*

*Support Thereof*:

    A.    [Proposed] *Defendant's Second Amended Answer*; and

    B.    Redline of [Proposed] *Defendant's Second Amended Answer*.

---

RESPECTFULLY SUBMITTED this 2nd day of December, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  *Julian P. Vasek*

    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas  75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com
    jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 2nd day of December, 2021, true and correct copies of this document (and attachments) were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the plaintiff.

By: /s/  *Julian P. Vasek*

    Julian P. Vasek, Esq.

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S SECOND AMENDED ANSWER**

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "<u>Defendant</u>"), the defendant in the above-styled and numbered adversary proceeding (the "<u>Adversary Proceeding</u>") filed by Highland Capital Management, L.P. (the "<u>Plaintiff</u>"), and files this its *Defendant's Second Amended Answer* (the "<u>Answer</u>"), responding to the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "<u>Complaint</u>").   Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

8.    The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.    The Defendant admits ¶ 9 of the Complaint.

10.    The Defendant admits ¶ 10 of the Complaint.

11.    The Defendant admits ¶ 11 of the Complaint.

12.    The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

**A.    The HCMFA Notes**

13.    The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.    The Defendant denies ¶ 14 of the Complaint.

15.    The Defendant denies ¶ 15 of the Complaint.

16.    The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.    The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.    The Defendant admits ¶ 18 of the Complaint.

**B.    HCMFA's Default under Each Note**

19.    The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.    To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.     The Defendant denies ¶ 24 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

25.     Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.     Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 26 of the Complaint.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 27 of the Complaint.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 28 of the Complaint.

29.     The Defendant denies ¶ 29 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.     Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 32 of the Complaint.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 36 of the Complaint.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## **AFFIRMATIVE DEFENSES**

38.     At all material times to the Complaint, the Defendant, a registered advisor, advised various third-party funds as to their investments.  One such fund was Highland Global Allocation Fund ("HGAF").

39.     At all material times to the Complaint, the Defendant contracted with the Plaintiff whereby the Plaintiff, through its employees, would provide certain services to the Defendant,

including with respect to the Defendant's advice to the third-party funds. These services so provided included accounting, legal, regulatory, valuation, and compliance services.

40.    In March, 2018, HGAF sold equity interests it held in TerreStar. As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of HGAF assets. The Defendant was responsible for advising on the NAV. In turn, pursuant to the Shared Services Agreement in effect at that time between the Plaintiff and the Defendant, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.

41.    The Plaintiff made a mistake in calculating the NAV (the "NAV Error"). The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund. The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

42.    The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

43.    At this time, Frank Waterhouse ("Waterhouse") was the Chief Financial Officer to both the Plaintiff and the Defendant.  The two promissory notes the subject of the Complaint (the "Notes") purportedly bear Waterhouse's signature.  But he did not sign the Notes in any representative capacity for the Defendant.  The Defendant did not authorize Waterhouse to sign the Notes or to bind the Defendant in any way to the Notes.

44.    Indeed, Waterhouse testified that he does not specifically recall signing the Notes. Given that Waterhouse's signature on the Notes is identical on both, it appears the Notes were signed electronically, whereas Waterhouse testified the ordinary practice at the time was to use wet-ink signatures.  The metadata associated with the Notes also indicates someone else actually affixed Waterhouse's signature, and there is no evidence such person had authority to do so.

45.    Even if Waterhouse signed the Notes or authorized someone to affix his signature, he made a mistake in preparing and signing the Notes for the Defendant.  Upon information and belief, Waterhouse was not aware that payments from the Plaintiff to the Defendant were to compensate the Defendant for the NAV Error and resulting damages, instead assuming that the Notes were like prior notes between the Plaintiff and the Defendant.  Waterhouse failed to properly inquire into the underlying transaction and, either for unknown accounting or other purposes, Waterhouse prepared and signed the Notes on his own, or caused them to be prepared and signed, without proper knowledge of the underlying facts and without actual authority from either the Plaintiff or the Defendant.

46.    In sum, neither the Plaintiff nor the Defendant intended that any funds paid by the Plaintiff to the Defendant be treated as debt but that they instead be treated as compensation by the Plaintiff to the Defendant for the NAV Error that the Plaintiff caused.  The Notes are an unauthorized mistake and a nullity, and are void for a lack of consideration.

47.     To the extent Waterhouse had apparent authority to bind the Defendant to the Notes, such apparently authority does not apply to the Notes because Waterhouse's lack of actual authority is imputed to the Plaintiff, as Waterhouse was the CFO for the Plaintiff.

48.     Accordingly, the Notes are void or unenforceable for never having been executed, for lack of consideration, for mutual mistake, and/or for the lack of authority from the Defendant to Waterhouse to execute the same for the Defendant.

49.     For the avoidance of doubt, based on the foregoing, the Defendant expressly denies that the Notes were ever signed or executed.

## JURY DEMAND

50.     The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

51.     The Defendant does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this ___ day of _____, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ _____
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     Julian P. Vasek, Esq.
     Texas Bar No. 24070790
     500 N. Akard Street, Suite 3800
     Dallas, Texas  75202-2790
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375
     drukavina@munsch.com
     jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P.**

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that, on this the ___ day of _____, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the plaintiff.

By: /s/ _____
     Davor Rukavina, Esq.

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S SECOND AMENDED ANSWER

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "Defendant"), the

defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding")

filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's Second*

*Amended Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II)*

*Turnover of Property of the Debtor's Estate* (the "Complaint").  Where an allegation in the

Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.       The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.       Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.       The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.       The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.       The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.       The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.       The Defendant admits ¶ 7 of the Complaint.

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.      The Defendant admits ¶ 10 of the Complaint.

11.      The Defendant admits ¶ 11 of the Complaint.

12.      The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

**A.      The HCMFA Notes**

13.      The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.      The Defendant denies ¶ 14 of the Complaint.

15.      The Defendant denies ¶ 15 of the Complaint.

16.      The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.      The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.      The Defendant admits ¶ 18 of the Complaint.

**B.      HCMFA's Default under Each Note**

19.      The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.      To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.     The Defendant denies ¶ 24 of the Complaint.

### FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

25.     Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.     Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 26 of the Complaint.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 27 of the Complaint.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 28 of the Complaint.

29.     The Defendant denies ¶ 29 of the Complaint.

### SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.     Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 32 of the Complaint.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 36 of the Complaint.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## **AFFIRMATIVE DEFENSES**

38.     At all material times to the Complaint, the Defendant, a registered advisor, advised various third-party funds as to their investments.  One such fund was Highland Global Allocation Fund ("HGAF").

39.     At all material times to the Complaint, the Defendant contracted with the Plaintiff whereby the Plaintiff, through its employees, would provide certain services to the Defendant,

including with respect to the Defendant's advice to the third-party funds.  These services so provided included accounting, legal, regulatory, valuation, and compliance services.

40.     In March, 2018, HGAF sold equity interests it held in TerreStar.  As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of HGAF assets. The Defendant was responsible for advising on the NAV.  In turn, pursuant to the Shared Services Agreement in effect at that time between the Plaintiff and the Defendant, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.

41.     The ~~Plaintff~~Plaintiff made a mistake in calculating the NAV (the "NAV Error"). The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund.  The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error.  Ultimately, and working with the SEC, the ~~Plantiff~~Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

42.     The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019.  In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

43.    At this time, Frank Waterhouse ("Waterhouse") was the Chief Financial Officer to both the Plaintiff and the Defendant. ~~Waterhouse signed the~~The two promissory notes the subject of the Complaint (the "Notes") purportedly bear Waterhouse's signature. ~~He~~But he did not sign the Notes in any representative capacity for the Defendant.  The Defendant did not authorize Waterhouse to sign the Notes or to bind the Defendant in any way to the ~~Note~~Notes.

44.    Indeed, Waterhouse testified that he does not specifically recall signing the Notes. Given that Waterhouse's signature on the Notes is identical on both, it appears the Notes were signed electronically, whereas Waterhouse testified the ordinary practice at the time was to use wet-ink signatures.  The metadata associated with the Notes also indicates someone else actually affixed Waterhouse's signature, and there is no evidence such person had authority to do so.

45.    ~~44.~~ ~~Even if~~ Waterhouse signed the Notes or authorized someone to affix his signature, he made a mistake in preparing and signing the Notes for the Defendant.  Upon information and belief, Waterhouse was not aware that payments from the Plaintiff to the Defendant were to compensate the Defendant for the NAV Error and resulting damages, instead assuming that the Notes were like prior notes between the Plaintiff and the Defendant. Waterhouse failed to properly inquire into the underlying transaction and, either for unknown accounting or other purposes, Waterhouse prepared and signed the Notes on his own, or caused them to be prepared and signed, without proper knowledge of the underlying facts and without actual authority from either the Plaintiff or the Defendant.

46.    ~~45.~~ In sum, neither the Plaintiff nor the Defendant intended that any funds paid by the Plaintiff to the Defendant be treated as debt but that they instead be treated as compensation by the Plaintiff to the Defendant for the NAV Error that the Plaintiff caused.  The Notes are an unauthorized mistake and a nullity, and are void for a lack of consideration.

47. ~~46.~~ To the extent Waterhouse had apparent authority to bind the Defendant to the Notes, such apparently authority does not apply to the Notes because Waterhouse's lack of actual authority is imputed to the Plaintiff, as Waterhouse was the CFO for the Plaintiff.

48. ~~47.~~ Accordingly, the Notes are void or unenforceable for never having been executed, for lack of consideration, for mutual mistake, and/or for the lack of authority from the Defendant to Waterhouse to execute the same for the Defendant.

49. For the avoidance of doubt, based on the foregoing, the Defendant expressly denies that the Notes were ever signed or executed.

## JURY DEMAND

50. ~~48.~~ The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

51. ~~49.~~ The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this ~~6th~~___ day of ~~July~~_____, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  ~~Davor Rukavina~~

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the ~~6th~~___ day of ~~July~~_____,
2021, true and correct copies of this document were electronically served by the Court's ECF
system on parties entitled to notice thereof, including on counsel for the plaintiff.

By:  /s/  ~~Davor Rukavina~~

Davor Rukavina, Esq.

Document comparison by Workshare 10.0 on Thursday, December 2, 2021
10:48:12 AM

| Input: | |
|---|---|
| Document 1 ID | netdocuments://4846-7642-9033/1 |
| Description | Second Amended Answer of HCMFA |
| Document 2 ID | netdocuments://4846-7642-9033/2 |
| Description | Second Amended Answer of HCMFA |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 29 |
| Deletions | 18 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 47 |