Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03004 |
| v. | § § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § § § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S APPENDIX IN SUPPORT OF
## SECOND MOTION FOR LEAVE TO AMEND ANSWER

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P. ("HCMFA" or the

"Defendant"), the defendant in the above styled and numbered adversary proceeding (the

"Adversary Proceeding") commenced by Highland Capital Management, L.P. (the "Debtor"), and

files this its *Defendant's Appendix In Support of Second Motion for Leave to Amend Answer* (the

"Appendix"), filed in support of the *Defendant's Second Motion for Leave to Amend Answer and Brief In Support Thereof* (the "Motion"), as follows:

| No. | Description | | Range |
|-----|-------------|---|-------|
| 1 | Declaration of Dennis C. Sauter, Jr. | | 1-52 |
| | 1 | Second Amended and Restated Shared Services Agreement | 13-25 |
| | 2 | Amended and Restated Shared Services Agreement | 26-44 |
| | 3 | E-mail Chain | 45-48 |
| | 4 | Order Granting Debtor's Motion for a Preliminary Injunction Against James Dondero | 49-52 |
| 2 | October 19, 2021 Deposition of Frank Waterhouse | | 53-449 |
| 3 | October 27, 2021 Deposition of Kristin Hendrix | | 450-653 |
| 4 | October 27, 2021 Deposition of David Klos | | 654-813 |
| 5 | Declaration of Davor Rukavina | | 814-828 |
| | A | Defendant's Second Set of Requests for Production to Plaintiff | 817-821 |
| | B | Debtor's Responses and Objections to Defendant's Second Set of Requests for Production | 822-828 |

RESPECTFULLY SUBMITTED this 30th day of November, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 30th day of November, 2021, true and correct copies of this document, with the exhibits referenced herein (redacted) were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record, and in unredacted format by e-mail on John Morris, Esq., counsel of record for the Plaintiff.

/s/  Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03005 |
| | § | |
| NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## <u>DECLARATION OF DENNIS C. SAUTER, JR.</u>

I, Dennis C. Sauter, Jr., hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 1

HCMFA APP 0001

## I.   <u>INTRODUCTION</u>

1.      My name is Dennis C. Sauter, Jr.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.  I have personal knowledge of the facts stated in this Declaration, or such facts are known to me from my review of the books and records of Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>") and/or NexPoint Advisors, L.P. ("<u>NexPoint</u>").

2.      I am an attorney licensed to practice law in the State of Texas, and have been such since 2001.  I am in-house counsel for both HCMFA and NexPoint, and have been since at least January 1, 2021, which is why I am aware of both of these adversary proceedings.  I have been responsible for managing outside counsel in both of these adversary proceedings since their filing, and I remain so responsible.

3.      While I provided limited legal services to Highland Capital Management, L.P. (the "<u>Debtor</u>") and its affiliated entities as outside counsel before I became in-house counsel, those services were limited to real estate transactions having nothing to do with the facts discussed in this Declaration.

4.      I am executing this Declaration in Support of the motions of both HCMFA and NexPoint to amend their answers in the above styled and numbered adversary proceedings initiated by the Debtor.

5.      I am aware that both HCMFA and NexPoint previously sought and obtained permission to amend their answers in these adversary proceedings.  Nevertheless, due to very recent events and discovery, HCMFA and NexPoint have determined that it is advisable to again amend their answers to assert certain defenses or affirmative defenses, which should by now have become clear to the Debtor as a result of very recent discovery, in order that justice may be done, that they may assert all available defenses and affirmative defenses, and that the trier of fact in

HCMFA APP 0002

these adversary proceedings will have all relevant claims, defenses, and facts before it. Specifically:

(i)     HCMFA seeks to explicitly assert that Frank Waterhouse ("Waterhouse") did not sign the two promissory notes that the Debtor has sued HCMFA on in adversary proceeding no. 21-03004; and

(ii)    NexPoint seeks to explicitly assert that it had prepaid the promissory note in question in adversary proceeding no. 21-03005 and that, accordingly, the December 31, 2020 payment had been satisfied by prepayment.

## II.    BACKGROUND

6.    HCMFA and NexPoint are registered advisors under the Investment Advisors Act of 1940.  As such, they advise various independent funds which, in turn, are investment vehicles for a large number of investors.

7.    HCMFA and NexPoint have always had very few employees.  During 2019, for example, HCMFA had only 7 to 9 employees.

8.    Instead, most of the services needed by HCMFA to transact its business were provided by the Debtor pursuant to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "HCMFA Agreement"), a true and correct copy of which is attached hereto as Exhibit 1, while most of the services needed by NexPoint to transact its business were provided by the Debtor pursuant to that certain *Amended and Restated Shared Services Agreement* dated January 1, 2018 (the "NexPoint Agreement," with the HCMFA Agreement, the "Shared Services Agreements"), a true and correct copy of which is attached hereto as Exhibit 2.

9.    This was standard business practice for the Debtor and various other affiliated companies, including other advisers, within the Debtor's "complex" of business: the Debtor would

DECLARATION OF DENNIS C. SAUTER, JR.—Page 3

HCMFA APP 0003

employ most of the employees and then share those employees with HCMFA, NexPoint, and other "complex" entities, in exchange for payments by such entities.

10.     Thus, under the Shared Services Agreements, employees of the Debtor (many of whom were highly trained and specialized) provided many key services to HCMFA and NexPoint on an as-needed basis.   These services included legal, accounting, treasury, regulatory, compliance, IT, and tax services, among others.   Additionally, under the Shared Services Agreements, the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored on the Debtor's servers.

11.     On January 22, 2021, the Debtor filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "HCMFA Complaint") against HCMFA, seeking to recover on two alleged promissory notes, each dated May 2, 2019 (the "HCMFA Notes"): (i) a note for $5 million; and (ii) a note for $2.4 million.  HCMFA timely answered.

12.     On January 22, 2021, the Debtor also filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "NexPoint Complaint," with the HCMFA Complaint, the "Complaints") against NexPoint, seeking to recover on an alleged promissory note dated May 31, 2017 in the original principal amount of $30,746,812.33 (the "NexPoint Note," with the HCMFA Notes, the "Notes").  NexPoint timely answered.

13.     At the time that the Debtor filed the Complaints, I promptly undertook an internal review of the background facts concerning the Notes.  I had no knowledge of them, since I had not been employed by HCMFA or NexPoint at the time that they were allegedly executed, and the few direct employees of HCMFA and NexPoint likewise had limited knowledge of the Notes.  I also discussed the Notes with James Dondero, president of HCMFA and NexPoint, and formerly the CEO of the Debtor, and Mr. Dondero recalled only high-level details of the Notes.  My review of

the limited books and records of HCMFA and NexPoint that were not then in the possession of the Debtor did not reveal any background facts regarding the Notes.

14.     Normally, I would have discussed the Notes with employees of the Debtor who also provided services to HCMFA and NexPoint pursuant to the Shared Services Agreements in order to assess what defenses or affirmative defenses to the Complaint existed.  However, in this instance I was precluded from doing so.

15.     First, attached hereto as Exhibit 3 is a true and correct copy of an e-mail exchange between myself and Mr. James Seery dated September 17, 2020.  Mr. Seery was and remains the Chief Executive Officer of the Debtor.  As stated in Exhibit 2, Mr. Seery informed me that Debtor employees had been instructed not to discuss with me anything that is "inimical" to the interests of the Debtor, and that they would be terminated if they did so.  This e-mail communication comports with other communications between myself and Mr. Seery where he cautioned me not to discuss with Debtor employees matters that may be adverse to the Debtor.

16.     Second, by the time of the filing of the Complaints, the Court had entered a preliminary injunction against Mr. Dondero, a true and correct copy of which is attached hereto as Exhibit 4.  That injunction prohibited Mr. Dondero from "directly or indirectly . . . communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided."  As the information concerning the Notes was background information and not related to "services currently provided," I was concerned that, if I discussed the Notes with the Debtor's employees, the Debtor would argue that either Mr. Dondero or I was violating the Court's injunction.

17.     In sum, after the Complaints were filed, the employees of HCMFA or NexPoint knew very little about the Notes, and I was precluded from contacting the people that would have known information about the notes, i.e. the Debtor's employees, to discuss what they may have

known.  I also had very limited access to HCMFA's and NexPoint's books and records, and, even if I had had full access, I would not have known what relevant books and records to search for in the many millions of files without first obtaining a generalized background of the facts regarding the Notes from Debtor employees.

18.    The situation changed by mid-April, 2021.  As of late February, 2021, the Debtor terminated the Shared Services Agreements and terminated most of its former employees.  Many of those employees then formed their own company, Skyview Group, which then contracted with HCMFA and NexPoint to continue providing essentially the same services that they had previously provided under the Shared Services Agreements.  Additionally, the Debtor provided access to HCMFA and NexPoint to many of its books and records (although not all).  Thus, as of March, 2021, I was able to communicate with most former Debtor employees and to access many books and records without fear of violating any court order.

19.    March, 2021, was exceedingly busy, to say the least.  With the termination of the Shared Services Agreements, HCMFA, NexPoint, other entities for which I am in-house counsel, and I were preoccupied with transitioning the services that the Debtor had been providing for more than a decade to a new entity, using new infrastructure, moving into new offices, setting up new networks, etc., all for the primary goal of ensuring a smooth and uninterrupted continuity of business and services provided by HCMFA and NexPoint and others to third parties.

20.    By mid-April, 2021, the situation had calmed down to the point that I was able to discuss the Notes with former employees, most importantly Waterhouse and Will Mabry ("Mabry").  Mabry in particular was able to provide me internal documents and memoranda that I had not previously known about to that helped with the factual background of the Notes.

21.    From these discussions and documents, I was able to better understand the factual background concerning the HCMFA Notes, ultimately concluding at the time that the Notes were

signed by mistake by Waterhouse without authority from HCMFA, had no consideration, and were

never intended to be debt instruments of HCMFA.  I testified as to these matters before based on

my understanding, and HCMFA obtained leave to amend its answer to assert these defenses.

### III.    FACTS PERTINENT TO HCMFA

22.    With respect to the HCMFA Notes, those notes appear to be signed by Waterhouse.

At the time of those alleged Notes, Waterhouse was the Chief Financial Officer of the Debtor.  At

that time, he was also either the Chief Financial Officer, or Treasurer, of HCMFA (either way, an

officer level position at HCMFA).

23.    In the April, 2021 timeframe, when I discussed the HCMFA Notes with

Waterhouse, I asked him whether he had signed those two notes.  At that time, he told me that he

believed that he had, because he had not been electronically signing documents in May, 2019 and

the signatures on the notes looked like they were his.  Although he did not remember many, if any,

of the facts and circumstances concerning the HCMFA Notes, given that he told me that he

believed he signed those notes because the signatures looked like they were his and because he

signed a lot of documents and could not remember each one particularly, I did not have reasonable

grounds to believe that Waterhouse had not in fact signed the HCMFA Notes or authorized his

signature to be affixed to the HCMFA Notes.  And, I was not prepared to assert a defense in which

I did not have a good faith belief.

24.    This changed in late October, 2021.  On October 19, 2021, the Debtor and HCMFA

deposed Waterhouse, including in connection with the HCMFA Notes.  In that deposition, and

among other things, Waterhouse testified that (and I am paraphrasing): (i) he did not remember

signing the HCMFA Notes or giving anyone permission to sign his name to the same; (ii) his

signatures on the HCMFA Notes appeared to be electronic signatures; and (iii) in May, 2019, he

sometimes signed documents electronically, but if he did so, he would have sent an e-mail to Kristen Hendrix ("Hendrix") authorizing and instructing her to sign his name to a document.

25.    Although I understand that HCMFA had requested the originals of the HCMFA Notes previously from the Debtor in discovery, I understand that those native documents were not produced until October 25, 2021.  I understand that, when produced, those originals showed that Waterhouse's signature was indeed an electronic signature on both of the HCMFA Notes and, unlike various electronic signatures that employ some control process or matrix certifying authenticity, here both signatures were merely pictures of his signatures.  Indeed, one can copy and paste that same picture on to any document without any control or approval needed by Waterhouse, as I do below (below is the picture copied from the HCMFA Notes, originally in Word with the signature picture in "picture" format, probably .jpg).



26.    Then, on October 27, 2021, HCMFA deposed Hendrix.  In that deposition, and among other things, Hendrix testified that (and I am paraphrasing): (i) she prepared the HCMFA Notes from a Word document template, by inputting various details into the document and adding Waterhouse's signature picture; (ii) she does not remember Waterhouse authorizing her to affix his signature, although she believes that this was likely the case; (iii) she does not remember printing out the documents and presenting them to Waterhouse for approval or signature; and (iv) she does not remember whether the HCMFA Notes were printed out at all or if they were simply saved in their original electronic format on the Debtor's system.

27.    Importantly, Hendrix remained an employee of the Debtor after the Debtor terminated most employees around February, 2021.  Thus, neither I nor anyone else with HCMFA or NexPoint was able to talk to her directly regarding the Notes, and neither I nor, to my

DECLARATION OF DENNIS C. SAUTER, JR.—Page 8

knowledge, anyone else working with or for HCMFA or NexPoint did so.  In other words, her deposition was the first time that HCMFA and NexPoint learned what she had to say of relevance to the Notes.

28.    Additionally, as noted above, Waterhouse testified that, if he had authorized Hendrix or someone else to electronically sign his name to a document, he would have done so through an e-mail.  I understand from Munsch Hardt that the Debtor has produced no such e-mail in discovery.

29.    Therefore, HCMFA now believes that Waterhouse never in fact signed the HCMFA Notes or authorized Hendrix or anyone else to sign his name to the HCMFA Notes, and HCMFA finds it advisable and appropriate to amend its answer to explicitly assert this defense.

30.    HCMFA did not know, and could not reasonably have known, about this defense until the end of October, 2021, after the Hendrix deposition transcript was prepared.  HCMFA did not delay in any way in seeking to assert this defense.  As noted above, had Waterhouse not told me in April, 2021 that he assumed that he signed the HCMFA Notes because the signatures looked like his, or had he given me any indication that he had not in fact signed the HCMFA Notes, then HCMFA would have asserted this defense sooner.  As is, however, it was not until discovery in late October, 2021 that HCMFA learned that Waterhouse apparently did not sign the HCMFA Notes or authorize his electronic signature, and HCMFA did not delay thereafter in promptly seeking to amend its answer.

31.    HCMFA therefore respectfully requests leave to amend its answer to expressly plead that the HCMFA Notes were never in fact signed.

### IV.    FACTS PERTINENT TO NEXPOINT

32.    The NexPoint note was in the original principal amount of $30,746,812.33.  The note required an annual payment of principal and interest.  By December 31, 2020, the amount due

---

on the NexPoint note was approximately $24,471,804.98.  Thus, even though the NexPoint Note was dated May 31, 2017 and had a thirty (30) year amortization, meaning that there should have been only three (3) annual payments by December 31, 2020 (2017, 2018, and 2019), the amount of the NexPoint Note was significantly lower than it should have been.

33.     This was one of the issues I discussed with Waterhouse in April, 2021 when I was able to finally discuss the Notes with him.  In particular, I asked him why the amount due on the NexPoint Note was significantly less than it appeared that it should have been based on its original principal amount and annual payments.  Waterhouse did not know the answer to that question, but informed me that the payment ledger kept by the Debtor for that note should have the answer.

34.     Like HCMFA, NexPoint deposed Hendrix on October 27, 2021.  During that deposition, it was learned that a document the Debtor produced, bates-labeled D-NNL-029141, was the internal Debtor-maintained payment ledger for the NexPoint Note.  The Debtor had produced this document before, in early June, 2021, but there were two problems: (i) NexPoint did not know that this document was *the* payment ledger for the NexPoint Note; and (ii) NexPoint had no context or ability to know what the entries on the document meant.

35.     Indeed, Mr. James Seery, at his deposition on October 19, 2021, while confirming that the Debtor did maintain a payment ledger for the NexPoint Note and that the Debtor had produced the same, was unable to state whether document D-NNL-029141 was that ledger and, in fact, testified as to his belief that this document "is something else."  If the CEO and CRO of the Debtor was unsure what document D-NNL-029141 was, then NexPoint cannot reasonably be expected to know that that document was the official payment ledger until the October 27, 2019 deposition of Hendrix.  Indeed, it was the Hendrix deposition that confirmed the existence of the prepayment defense because Hendrix testified that (I am paraphrasing): (i) if the Debtor needed

HCMFA APP 0010

cash, then one of its affiliates, such as NexPoint, would transfer the Debtor funds; (ii) this occurred in 2019; and (iii) such transfers would have been recorded by the Debtor as prepayments.

36.    NexPoint believes that that ledger proves that NexPoint had in fact prepaid the December 31, 2020 obligation under the NexPoint Note, such that there was no failure by NexPoint to make that payment and therefore no grounds to accelerate the NexPoint Note. That also explains why the principal amount of the NexPoint Note was significantly less than it would have been without prepayments.

37.    NexPoint did not delay in seeking to expressly assert this prepayment defense. The payment ledger was a document of the Debtor that, prior to discovery, NexPoint did not have access to and, in fact, was prohibited by the Debtor from even trying to access. Once that document was produced by the Debtor in discovery, NexPoint used it at the appropriate depositions which, for scheduling reasons and by the agreement of the parties, did not occur until late October, 2021. As soon as logistically possible thereafter, NexPoint sought to assert this defense. While NexPoint questioned why the amount due on the NexPoint Note was significantly less, and while I personally sought an answer from Waterhouse (who did not know), that does not necessarily mean that the NexPoint Note was prepaid, as it could have been forgiven in part or otherwise treated, and NexPoint did not want to raise a defense without evidence to support the defense which, like I say above, did not come to light until late October, 2021, through discovery.

38.    NexPoint therefore respectfully requests that it be granted leave to amend its answer to assert an additional defense that the December 31, 2020 payment on the NexPoint Note had been prepaid and that there was therefore no default in the failure to make the same, and no right to accelerate the NexPoint Note.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 11

Signed: November 17, 2021

DENNIS C. SAUTER, JR.

HCMFA APP 0012

# SECOND AMENDED AND RESTATED
# SHARED SERVICES AGREEMENT

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "***Agreement***") is entered into to be effective as of 8th day of February, 2013 (the "***Effective Date***") by and among Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("***HCMFA***"), and any affiliate of HCMFA that becomes a party hereto. Each of the signatories hereto is individually a "***Party***" and collectively the "***Parties***".

## RECITALS

A.      During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

## AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

## ARTICLE I
## DEFINITIONS

"***Actual Cost***" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"***Affiliate***" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "***control***" (including, with correlative meanings, the terms "***controlled by***" and "***under common control with***") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocation Percentage***" has the meaning set forth in Section 4.01.

"***Applicable Margin***" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"***Change***" has the meaning set forth in Section 2.02(a).

"***Change Request***" has the meaning set forth in Section 2.02(b).

"***Code***" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

HC                    EXHIBIT 1

"**Effective Date**" has the meaning set forth in the preamble.

"**Governmental Entity**" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**Liabilities**" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"**Loss**" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "**Loss**" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"**New Shared Service**" has the meaning set forth in Section 2.03.

"**Party**" or "**Parties**" has the meaning set forth in the preamble.

"**Person**" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"**Quarterly Report**" has the meaning set forth in Section 5.01.

"**Recipient**" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"**Service Provider**" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"**Service Standards**" has the meaning set forth in Section 6.01.

"**Shared Assets**" shall have the meaning set forth in Section 3.02.

"**Shared Services**" shall have the meaning set forth in Section 2.01.

"**Subsidiary**" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"**Tax**" or "**Taxes**" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"**Term**" has the meaning set forth in Section 7.01.

HCMFA APP 0014

ARTICLE II
SHARED SERVICES

Section 2.01     Services.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "**Shared Services**"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02     Changes to the Shared Services.

(a)     During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "**Change**").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)     The Party requesting a Change will deliver a description of the Change requested (a "**Change Request**") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)     Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03     New Shared Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "**New Shared Service**").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "**Shared Service**" for all purposes of this Agreement.

Section 2.04     Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

ARTICLE III
SHARED ASSETS

Section 3.01    Shared IP Rights.   Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "**Shared IP Rights**") pursuant to third party intellectual property Agreements ("**Third Party IP Agreements**"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    Other Shared Assets.   Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "**Future Shared Assets**" and collectively with the Shared IP Rights, the "**Shared Assets**").

ARTICLE IV
COST ALLOCATION

Section 4.01    Actual Cost Allocation Formula.   The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "**Allocation Percentage**" means:

(a)    To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02    Non-Cash Cost Allocation.   The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    Quarterly Statements.   Within thirty (30) days following the end of each calendar qaurter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

4

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "*Quarterly Report*").

Section 5.02    Settlement Payments.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    Determination and Payment of Cost and Revenue Share.

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient.  Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied.  Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider.  In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name.  Service Provider's authorization will not be unreasonably withheld.  Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings.  However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time.  Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings.  Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14.  Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property.  Recipient agrees to

5

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(c) The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE VI
## SERVICE PROVIDER RESPONSIBILITIES

Section 6.01    Service Provider General Obligations.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "*Service Standards*").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 6.02    Books and Records; Access to Information.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider). Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 6.03    Return of Property and Equipment.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE VII
## TERM AND TERMINATION

Section 7.01    Term.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "*Term*"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

HCMFA APP 0018

Section 7.02    Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

ARTICLE VIII
LIMITED WARRANTY

Section 8.01    Limited Warranty.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

ARTICLE IX
MISCELLANEOUS

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

7

Section 9.05    Governing Law.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    Counterparts.    This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i) immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

> If to HCMLP, addressed to:
>
> Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  General Counsel
> Fax:  (972) 628-4147
>
> If to HCMFA, addressed to:
>
> Highland Capital Management Fund Advisors, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  General Counsel
> Fax:  (972) 628-4147

Section 9.11    Expenses.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

8

HCMFA APP 0020

Section 9.12    <u>Waiver</u>.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13    <u>Severability</u>.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14    <u>Arbitration; Jurisdiction</u>.  Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided, however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  The arbitrator(s) shall be duly licensed to practice law in the State of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules.  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15    <u>General Rules of Construction</u>.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

HCMFA APP 0021

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

10

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    Strand Advisors, Inc., its general partner

By:_____

Name:   James Dondero

Title:    President

**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

By:    Strand Advisors XVI, Inc., its general partner

By:_____

Name:   Brian Mitts

Title:    Assistant Secretary

11

HCMFA APP 0023

**Annex A**

**Shared Services**

Compliance
        General compliance
        Compliance systems

Facilities
        Equipment
        General Overhead
        Office Supplies
        Rent & Parking

Finance & Accounting
        Book keeping
        Cash management
        Cash forecasting
        Credit facility reporting
        Financial reporting
        Accounts payable
        Accounts receivable
        Expense reimbursement
        Vendor management

HR
        Drinks/snacks
        Lunches
        Recruiting

IT
        General support & maintenance (OMS, development, support)
        Telecom (cell, phones, broadband)
        WSO

Legal
        Corporate secretarial services
        Document review and preparation
        Litigation support
        Management of outside counsel

Marketing and PR
        Public relations

Tax
        Tax audit support
        Tax planning
        Tax prep and filing

Investments
        Investment research on an ad hoc basis as requested by HCMFA

|  | Valuation Committee |
| --- | --- |
| <u>Trading</u> | |
|  | Trading desk services |
| <u>Operations</u> | |
|  | Trade settlement |

13

HCMFA APP 0025

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

## ARTICLE I

### DEFINITIONS

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

HC**EXHIBIT 2**

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

HCMFA APP 0027

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

# ARTICLE II

# SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)      *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b) *Legal/Compliance/Risk Analysis.* Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c) *Tax.* Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d) *Management of Clients and Accounts.* Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e) *Valuation.* Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f) *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g) *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h) *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

4

HCMFA APP 0029

(i)  *Administrative Services*.  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

(j)  *Shared Employees*.  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(k)  *Ancillary Services*.  Assistance and advice on all things ancillary or incidental to the foregoing; and

(l)  *Other*.  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03    Shared Employees.

(a)  The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

HCMFA APP 0030

      (b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

      (c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person", or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

      (d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

      (e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

      (f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

      (g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable. To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

      (h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

HCMFA APP 0031

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   Applicable Asset Criteria and Concentrations. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   Compliance with Management Company Policies and Procedures. The Management Company will from time to time provide the Staff and Services Provider and the

HCMFA APP 0032

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06 <u>Authority</u>. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07 <u>Third Parties</u>.

(a) The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b) In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08 <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09 <u>Power of Attorney</u>. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

HCMFA APP 0033

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

HCMFA APP 0034

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

HCMFA APP 0035

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

HCMFA APP 0036

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

HCMFA APP 0037

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

HCMFA APP 0038

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

HCMFA APP 0039

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)     The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)     Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

HCMFA APP 0040

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

HCMFA APP 0041

Section 8.09    Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

HCMFA APP 0042

    (b)      If to the Staff and Services Provider:

            Highland Capital Management, L.P.
            300 Crescent Court
            Suite 700
            Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

HCMFA APP 0043

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

NEXPOINT ADVISORS, L.P.

By:  NexPoint Advisors GP, LLC, its General Partner

By: _____
Name: Frank Waterhouse
Title: Treasurer

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: Frank Waterhouse
Title: Treasurer

**Rukavina, Davor**

| | |
|---|---|
| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Thursday, September 17, 2020 4:17 PM |
| **To:** | DC Sauter |
| **Cc:** | Gregory V. Demo |
| **Subject:** | Re: Acis Settlement |

DC

I believe your concerns regarding the release are misplaced as it does not bind entities that HCMLP does not control.  Greg can walk you through the language, but I do not believe it requires adjustment nor does it create any liability.  To the contrary, it reduces liability.

With regard to the HCMLP employee prohibitions, no employee whether legal or non-legal can work on any matter that is inimical to the interests of HCMLP.  I ,as CEO, and the Independent Board will make the determination as to whether an action violates the prohibition, and a breach of the prohibition will lead to termination for cause.  I believe that most of the employees have been informed of this requirement and are following the directive.

With regard to transactional matters, HCMLP employees will continue to work with you on those issues that do not run afoul of the prohibition above.  If there is a particular matter where you are taking a potentially adversarial action vis a vis HCMLP, please let me know what it is.  We can then consider whether a customized operating protocol for that issue is needed or whether you will simply be on your own.  I will make the determination with the advice of counsel.  We do not believe the Texas rules of professional responsibility apply in this situation.

Please let me know what matter you are considering with respect to the immediately preceding paragraph, and we will consider how to best address your concerns.

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Date:** Thursday, September 17, 2020 at 4:56 PM
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** Greg Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

Jim/Greg, follow up on my email below.  I have a few items that have been placed on my plate, and I really need to understand who I can speak with and the extent to which they are permitted to share information with me.



1

EXHIBIT 3

O: 972.628.4117 | C: 469.877.6440

**From:** DC Sauter
**Sent:** Tuesday, September 15, 2020 8:55 AM
**To:** 'James Seery' <jpseeryjr@gmail.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

My apologies for copying Isaac. I was under the mistaken impression that he would have assisted in the settlement.

In my view, the requested clarification is beneficial to Strand, HCMLP, and the other "HCMLP Entities." The documents purport to release ACIS from claims on behalf of, among others, any entity that is "managed" by HCMLP and "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns" of any "HCMLP Entity." Those "HCMLP Entities" lack the authority to bind a whole host of parties in that laundry list, which could result in claims against HCMLP, Strand, and the other "HCMLP Entities" by both the "ACIS Released Parties," who will claim they didn't receive the benefit of the bargain, and the parties on whose behalf the "HCMLP Parties" purported to release claims who didn't consent to the release.

Additionally, I'd like to visit with you all regarding the board's position that prohibits certain HCMLP personnel from working on certain matters.

First, I am unclear whether the prohibition applies to only HCMLP legal personnel or whether it applies to all HCMLP employees. Please clarify.

Second, as you may know, virtually all of these matters are falling into my lap, and in most cases I lack any knowledge about them. It would help me tremendously if current HCMLP employees, and particularly the legal personnel, could provide me with transactional background to assist in the transition of the matter. While I understand the board's concern with Judge Jernigan's order, I don't believe that the Texas Disciplinary Rules of Professional Conduct mandate or even permit an attorney licensed in the State of Texas to refuse to cooperate with a former client in the transfer of a matter to a new attorney. Rule 1.15(d) states that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned." The comments to that rule provide additional clarity: "In every instance of withdrawal and even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client." T.D.R.P.C. Rule 1.15, comment 9. Proper steps may include providing information to new counsel or even continuing to represent the client for a limited time to meet impending deadlines. *Microsoft Corp. v. Commonwealth Sci. & Indus. Research Org.*, 2007 U.S. Dist. LEXIS 91550 *23-24 fn. 11 (E.D. Tex. Dec. 13, 2007). Even if the board insists that the HCMLP legal personnel cannot continue to represent others in non-HCMLP matters or matters adverse to HCMLP (irrespective of any conflict of interest analysis of whether those attorneys may continue to represent HCMLP in those matters), the ethical rules require that the attorneys provide assistance in transferring those matters to me or others.

Finally, I routinely handle, and am routinely asked to handle, legal matters that relate to real estate for entities owned or controlled by HCMLP (Park West, the Arizona assets, the Maple Ave. property, to name a few). I am not an HCMLP employee, and it's my understanding that NexPoint Advisors, L.P. is not compensated for the time I spend on HCMLP matters. I'm not suggesting that this arrangement should change, but it feels from my perspective that the board's position is only working in one direction. In other words, if I understand the board's position correctly, I can work on both NexPoint and HCMLP matters, but the HCMLP legal employees may only work on HCMLP-related matters. It has also put a significant amount of additional work on my plate. I would like to understand two things. First, what is the scope of my authority in these matters, and what is the proper protocol vis-à-vis you, DSI, and the board? I have tried to take the conservative approach in keeping you all informed and asking for consent or approval where I thoughts it

HCMFA APP 0046

appropriate. I assume this is how you'd like to continue to handle things, but I would like confirmation of that. Second, I have heard that you all were working to transfer a couple of the legal personnel (perhaps Thedford and Post) to HCMFA so they could assist with the work load (particularly in the areas where I don't have a significant amount of experience). I'd like to know where that stands and when relief can be expected.

I'm available most of today and tomorrow to discuss.

**D.C. Sauter**

# NEXPOINT

O: 972.628.4117 | C: 469.877.6440

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Tuesday, September 15, 2020 7:01 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Re: Acis Settlement

DC. We will discuss and revert to you. Neither Isaac nor anyone else at HCMLP is permitted to work on any issues related to the settlement and release other than as directed by me.

Thanks

Sent from my iPad

> On Sep 14, 2020, at 7:08 PM, DC Sauter <DSauter@nexpointadvisors.com> wrote:
>
> Greg,
>
> I've been asked to review the attached release on behalf of HCMFA and the closed-end funds. I'm concerned that the language below creates an ambiguity as to whether the closed-end funds and HCMFA have released claims against the ACIS parties:
>
> 1. The release by Strand, which also serves as the general partner of HCMFA; and
> 2. The release by each "HCMLP Entity" of its "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns."
>
> We would like the final sentence in paragraph 1.a. of the Release to be revised to specifically identify HCMFA and the closed-end funds as parties not covered by the release. Please let me know if you'd like to discuss in more detail.
>
> **D.C. Sauter | General Counsel, Real Estate**
>
> <image001.jpg>
>
> 300 Crescent Court | Suite 700 | Dallas, Texas 75201
> O: 972.628.4117 | C: 469.877.6440 | F: 972.628.4147
> dsauter@nexpointadvisors.com | www.NexPointGroup.com

HCMFA APP 0047

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

<Acis - Release (EXECUTION VERSION).pdf>

HCMFA APP 0048

Case 21-03003-sgj Doc 237 Filed 06/22/21 Entered 06/22/21 17:38:51 Page 36 of 51
Case 3:21-cv-00881-X Document 168-40 Filed 12/16/21 Page 52 of 200 PageID 28029
Docket #0059 Date Filed: 1/12/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 11, 2021**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § No. 20-03190-sgj |
| | § |
| JAMES D. DONDERO, | § |
| | § |
| Defendant. | § |

## ORDER GRANTING DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
## AGAINST JAMES DONDERO

_____

This matter having come before the Court on *Plaintiff Highland Capital Management,*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

193405421011 EXHIBIT 4

*L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction*

*against Mr. James Dondero* [Adv. Pro. Docket No. 2] (the "Motion"), filed by Highland Capital

Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned

chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary

proceeding (the "Adversary Proceeding"); and this Court having considered (a) the Motion, (b)

*Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief*

[Adv. Pro. Docket No. 1] (the "Complaint"), (c) the arguments and law cited in the *Debtor's*

*Amended Memorandum of Law in Support of its Motion for a Temporary Restraining Order and*

*Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 3] (the

"Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"),

(d) *James Dondero's Response in Opposition to Debtor's Motion for a Preliminary Injunction*

[Adv. Pro. Docket No. 52] (the "Opposition") filed by James Dondero, (e) the testimonial and

documentary evidence admitted into evidence during the hearing held on January 8, 2021 (the

"Hearing"), including assessing the credibility of Mr. James Dondero, (f) the arguments made

during the Hearing, and (g) all prior proceedings relating to the Motion, including the December

10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary*

*Injunction against James Dondero* [Adv. Pro. Docket No. 6] (the "TRO Hearing"); and this

Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court

having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court

having found that venue of this proceeding and the Motion in this District is proper pursuant to

28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted

under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the

Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

HCMFA APP 0050

and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted in support thereof, establish good cause for the relief granted herein, and that (1) such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate and reorganization process; (2) the Debtor is likely to succeed on the merits of its underlying claim for injunctive relief; (3) the balance of the equities tip in the Debtor's favor; and (4) such relief serves the public interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      James Dondero is preliminarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the pursuit of the Plan or any

HCMFA APP 0051

alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[2]

3.    James Dondero is further preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

4.    James Dondero is further preliminarily enjoined and restrained from communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

5.    James Dondero is further preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel.  If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

6.    James Dondero is ordered to attend all future hearings in this Bankruptcy Case by Webex (or whatever other video platform is utilized by the Court), unless otherwise ordered by the Court.

7.    This Order shall remain in effect until the date that any plan of reorganization or liquidation resolving the Debtor's case becomes effective, unless otherwise ordered by the Court.

---

[2] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from (1) seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case, or (2) communicating with the committee of unsecured creditors (the "UCC") and its professionals regarding a pot plan.

4

```
 1                   WATERHOUSE - 10-19-21

 2           IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 3                     DALLAS DIVISION
         ------------------------------
 4    IN RE:

 5                              Chapter 11
      HIGHLAND CAPITAL
 6    MANAGEMENT, L.P.,         CASE NO.
                                19-34054-SGI11
 7
              Debtor.
 8    ------------------------------
      HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
              Plaintiff,
10    vs.                         Adversary
                                  Proceeding No.
11    HIGHLAND CAPITAL MANAGEMENT   21-03000-SGI
      FUND ADVISORS, L.P.; NEXPOINT
12    ADVISORS, L.P.; HIGHLAND
      INCOME FUND; NEXPOINT
13    STRATEGIC OPPORTUNITIES FUND;
      NEXPOINT CAPITAL, INC.; and
14    CLO HOLDCO, LTD.,

15            Defendants.
      ------------------------------
16

17         REMOTE VIDEOTAPED DEPOSITION OF

18               FRANK WATERHOUSE

19              October 19, 2021

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No: 201195
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 07/09/23    Page 57 of 200    PageID 28634

Page 2

```
 1                    WATERHOUSE - 10-19-21

 2

 3

 4                         October 19, 2021

 5                         9:30 a.m.

 6

 7

 8

 9         Remote Deposition of FRANK WATERHOUSE,

10    held before Susan S. Klinger, a Registered

11    Merit Reporter and Certified Realtime Reporter

12    of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  WATERHOUSE - 10-19-21

 2    A P P E A R A N C E S:

 3    (All appearances via Zoom.)

 4    Attorneys for the Reorganized Highland Capital

 5    Management:

 6         John Morris, Esq.

 7         Hayley Winograd, Esq.

 8         PACHULSKI STANG ZIEHL & JONES

 9         780 Third Avenue

10         New York, New York  10017

11    Attorneys for the Witness:

12         Debra Dandeneau, Esq.

13         Michelle Hartmann, Esq.

14         BAKER McKENZIE

15         1900 North Pearl Street

16         Dallas, Texas  75201

17    Attorneys for NexPoint Advisors, LP and

18    Highland Capital Management Fund Advisors,

19    L.P.:

20         Davor Rukavina, Esq.

21         An Nguyen, Esq.

22         MUNSCH HARDT KOPF & HARDD

23         500 North Akard Street

24         Dallas, Texas  75201-6659

25
```

 1                    WATERHOUSE - 10-19-21

 2    Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3    and HCMS:

 4          Deborah Deitsch-Perez, Esq.

 5          Michael Aigen, Esq.

 6          STINSON

 7          3102 Oak Lawn Avenue

 8          Dallas, Texas  75219

 9

10    Attorneys for Dugaboy Investment Trust:

11          Warren Horn, Esq.

12          HELLER, DRAPER & HORN

13          650 Poydras Street

14          New Orleans, Louisiana 70130

15

16    Attorneys for Marc Kirschner as the trustee for

17    the litigation SunTrust:

18          Deborah Newman, Esq.

19          QUINN EMANUEL URQUHART & SULLIVAN

20          51 Madison Avenue

21          New York, New York  10010

22

23    Also Present:

24          Ms. La Asia Canty

25

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/23   Page 60 of 200   PageID 28637

Page 5

```
 1              WATERHOUSE - 10-19-21

 2                      I N D E X

 3

 4   WITNESS                              PAGE

 5   FRANK WATERHOUSE

 6   EXAMINATION BY MR. MORRIS               10

 7   EXAMINATION BY MR. RUKAVINA            256

 8   EXAMINATION BY MS. DEITSCH-PEREZ       352

 9   EXAMINATION BY MR. MORRIS             377

10   EXAMINATION BY MR. RUKAVINA            387

11   EXAMINATION BY MS. DEITSCH-PEREZ       393

12

13                  E X H I B I T S

14   No.                                   Page

15   Exhibit 2  NPA et al Amended Complaint   142

16   Exhibit 33 6/3/19 Management             91

17              Representation

18   Exhibit 34 HCMLP Consolidated Financial  94

19              Statements

20   Exhibit 35 HCMFA Incumbency Certificate  151

21   Exhibit 36 Email string re 15(c)         170

22   Exhibit 39 HCMLP Operating Results 2/18  226

23   Exhibit 40 Summary of Assets and         236

24              Liabilities

25   Exhibit 41 12/19 Monthly Operating Report  258
```

```
 1                 WATERHOUSE - 10-19-21

 2    Exhibit 45 HCMFA Consolidated Financial      135

 3               Statements

 4    Exhibit 46 NexPoint 2019 Audited             218

 5               Financials

 6

 7    Exhibit A1 Emails 11/25                       328

 8    Exhibit A2 Emails 12/31                       338

 9    Exhibit A6 Emails 1/12                        341

10    Exhibit A7 Promissory Notes                   297

11    Exhibit A9 Email, 8/31                        307

12    Exhibit A10 Acknowledgment from HCMLP         302

13    Exhibit A11 HCMLP Schedule 71A                309

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          WATERHOUSE - 10-19-21

 2          P R O C E E D I N G S

 3          VIDEOGRAPHER:  Good morning,

 4   Counselors.  My name is Scott Hatch.  I'm a

 5   certified legal videographer in association

 6   with TSG Reporting, Inc.

 7          Due to the severity of COVID-19 and

 8   following the practice of social

 9   distancing, I will not be in the same room

10   with the witness.  Instead, I will record

11   this videotaped deposition remotely.  The

12   reporter, Susan Klinger, also will not be

13   in the same room and will swear the witness

14   remotely.

15          Do all parties stipulate to the

16   validity of this video recording and remote

17   swearing, and that it will be admissible in

18   the courtroom as if it had been taken

19   following Rule 30 of the Federal Rules of

20   Civil Procedures and the state's rules

21   where this case is pending?

22          MR. HORN:  Yes.

23          MS. DANDENEAU:  Yes.

24          MR. MORRIS:  Yes.  John Morris.  I

25   would just try to do a negative notice
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/23   Page 63 of 200   PageID 28640

Page 8

1                WATERHOUSE - 10-19-21

2   here, as we did yesterday.  If anybody has

3   a problem with what was just stated, can

4   you state your objection now?

5        Okay.  No response, so everybody

6   accepts the stipulation and the instruction

7   that was just given.

8        VIDEOGRAPHER:  Thank you.  This is

9   the start of media labeled Number 1 of the

10  video recorded deposition of Frank

11  Waterhouse In Re: Highland Capital

12  Management, L.P., in the United States

13  Bankruptcy Court for the Northern District

14  of Texas, Dallas Division, Case Number

15  21-03000-SGI.

16        This deposition is being held via

17  video conference with participants

18  appearing remotely due to COVID-19

19  restrictions on Tuesday, October 19th, 2021

20  at approximately 9:32 a.m.  My name is

21  Scott Hatch, legal video specialist with

22  TSG Reporting, Inc. headquartered at 228

23  East 45th Street, New York, New York.  The

24  court reporter is Susan Klinger in

25  association with TSG Reporting.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 160   Filed 09/02/31   Page 64 of 200   PageID 28641

Page 9

 1            WATERHOUSE - 10-19-21

 2          Counsel, please introduce

 3    yourselves.

 4          MR. MORRIS:  John Morris, Pachulski

 5    Stang Ziehl & Jones for the reorganized

 6    Highland Capital Management, L.P., the

 7    plaintiff in these actions.

 8          MS. DANDENEAU:  Deborah Dandeneau

 9    from Baker McKenzie.  My partner, Michelle

10    Hartmann, is also in the room with me,

11    representing Frank Waterhouse individually.

12          MS. DEITSCH-PEREZ:  Deborah

13    Deitsch-Perez from Stinson, LLP,

14    representing Jim Dondero, Nancy Dondero,

15    HCRA, and HCMS.

16          MR. HORN:  Warren Horn with Heller,

17    Draper & Horn in New Orleans representing

18    Dugaboy Investment Trust.

19          MR. RUKAVINA:  Davor Rukavina with

20    Munsch Hardt Kopf & Harr in Dallas

21    representing NexPoint Advisors, LP and

22    Highland Capital Management Fund Advisors,

23    L.P.

24          MR. AIGEN:  Michael Aigen from

25    Stinson, and I represent the same parties

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 160   Filed 05/09/23   Page 65 of 200   PageID 28642

Page 10

1                     WATERHOUSE - 10-19-21

2          as Deborah Deitsch-Perez.

3                    MS. NEWMAN:  This is Deborah Newman

4          from Quinn Emanuel.  We represent the

5          litigation -- Marc Kirschner as the trustee

6          for the litigation SunTrust.

7                    MR. MORRIS:  I think that is

8          everybody.

9                    VIDEOGRAPHER:  Thank you.  Will the

10         court reporter please swear in the witness.

11                     FRANK WATERHOUSE,

12    having been first duly sworn, testified as

13    follows:

14                      EXAMINATION

15    BY MR. MORRIS:

16         Q.    Please state your name for the

17    record.

18         A.    My name is Frank Waterhouse.

19         Q.    Good morning, Mr. Waterhouse.  I'm

20    John Morris, as you know, from Pachulski Stang

21    Ziehl & Jones.  You understand that my firm and

22    I represent Highland Capital Management, L.P.;

23    is that right?

24         A.    Yes.

25         Q.    Okay.  And do you understand that

1                    WATERHOUSE - 10-19-21

2      we're here today for your deposition in your

3      individual capacity?

4           A.    Yes.

5           Q.    Did you review and -- did you

6      receive and review a subpoena that Highland

7      Capital Management, L.P., served upon you?

8           A.    Yes.

9           Q.    You have been deposed before; right?

10          A.    Yes.

11          Q.    How many times have you been

12     deposed?

13          A.    About three or four times.

14          Q.    Okay.  And I defended you in one

15     deposition; isn't that right?

16          A.    That is correct.

17          Q.    So the general ground rules for this

18     deposition are largely the same as the

19     depositions you have given before.  And that is

20     I will ask you a series of questions, and it is

21     important that you allow me to finish my

22     question before you begin your answer; is that

23     fair?

24          A.    Yes.

25          Q.    And it is important that I allow you

1                       WATERHOUSE - 10-19-21

2     to finish your answers before I begin a

3     question, but if I fail to do that, will you

4     let me know?

5          A.    I can certainly do that.

6          Q.    Okay.  Do you understand that this

7     deposition is being videotaped?

8          A.    Yes.

9          Q.    You understand that I may seek to

10    use portions of the videotape in a court of

11    law?

12         A.    I did not know that, until you just

13    said that.

14         Q.    Okay.  And you are aware of that now

15    before the deposition begins substantively; is

16    that right?

17         A.    Yes.

18         Q.    So unlike I think the other

19    depositions that you have given, this one is

20    being given remotely.  So that presents some

21    unique challenges, at least as compared to a

22    deposition that is taken in-person.

23              From time to time we're going to put

24    documents up on the screen, Mr. Waterhouse.

25    And it is important that I give you the

Page 13

1                      WATERHOUSE - 10-19-21

2    opportunity to review any portion of the

3    document that you think you need in order to

4    fully and completely answer the question.

5              So I would ask you to let me know if

6    there is a portion of a document that you need

7    to see in order to fully and completely answer

8    the question.  Can you do that for me?

9         A.    Yes.

10             MS. DANDENEAU:  Mr. Morris, I would

11        just note that we do have hard copies of

12        the documents that you sent, so if you can

13        just refer to the exhibit number as

14        reflected in the documents that you sent,

15        Mr. Waterhouse will be able to look at the

16        hard copies of those documents.

17             MR. MORRIS:  I appreciate that,

18        and -- and I will encourage him to do so.

19        There will be other documents that we did

20        not send to you that we'll be using today

21        though.

22        Q.    Okay.  With that as background, if

23   there is anything that I ask you, sir, that you

24   don't understand, will you let me know?

25        A.    Yes.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  Are you currently employed?

 3        A.    Yes.

 4        Q.    By whom?

 5        A.    The Skyview Group.

 6        Q.    When did you become employed by the

 7   Skyview Group?

 8        A.    I believe March 1st of 2021.

 9        Q.    Do you have a title at Skyview?

10        A.    Yes.

11        Q.    What is your title?

12        A.    My title is chief financial officer.

13        Q.    Do you report to anybody in your

14   role as CFO?

15        A.    I don't, no.

16        Q.    No.  Is there a president or a CEO

17   of Skyview?

18        A.    Yes.

19        Q.    Who is that?

20        A.    That is Scott Ellington.

21        Q.    But you don't report to

22   Mr. Ellington; is that right?

23        A.    I don't think so.

24        Q.    Does Skyview Group --

25              MS. DANDENEAU:  Excuse me, we --
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X   Document 16-40    Filed 07/09/231   Page 70 of 200    PageID 28647

Page 15

1                  WATERHOUSE - 10-19-21

2          A.    I -- I -- I might.  I just -- I

3   don't recall.

4          Q.    Okay.  Does Skyview Group provide

5   any services to any entity directly or

6   indirectly owned or controlled by Jim Dondero?

7          A.    Yes.

8          Q.    Can you name -- is that pursuant to

9   written contracts?

10         A.    Yes.

11         Q.    And do you know how many contracts

12  exist?

13         A.    Approximately six or so.

14         Q.    And is the Skyview Group made up of

15  individuals who were formerly employees of

16  Highland Capital Management, L.P.?

17         A.    No.

18         Q.    Do you know how many -- how many --

19  how many employees does Skyview have?

20         A.    Approximately 35.

21         Q.    And can you tell me how many of

22  those 35 are former officers, directors, or

23  employees of Highland Capital Management, L.P.?

24         A.    I don't know the exact number.

25         Q.    Is it more than 20?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 07/09/2331 Page 71 of 200   PageID 28648

Page 16

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Is it more than 30?

 4        A.    I don't know.

 5        Q.    Can you tell me what portion of

 6   Skyview -- Skyview's revenue is derived from

 7   entities that are directly or indirectly owned

 8   or controlled by Jim Dondero?

 9               MS. DANDENEAU:  Mr. Morris, I mean,

10          you called Mr. Waterhouse here individually

11          for purposes of his testimony in connection

12          with the noticed litigation.  I have given

13          you some leeway to ask him some background

14          information about Skyview Group, but this

15          is not a substitute for a deposition in

16          connection with any other pending disputes

17          that exist.  And -- and we agreed to accept

18          the subpoena on the basis of he -- this is

19          testimony that he is giving in connection

20          with the noticed litigation.

21               I really think that you are now

22          going a little bit far afield from the

23          purpose of this deposition.

24               MR. MORRIS:  Okay.  It is -- I'm not

25          intending to use these -- the answers to
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 166   Filed 12/02/21   Page 72 of 200   PageID 28649

Page 17

1              WATERHOUSE - 10-19-21

2        these questions for any purpose other than

3        this litigation.  I think you understand

4        fully why I'm asking the questions, and I

5        just have a couple more, if you will bear

6        with me.

7              MS. DANDENEAU:  Okay.

8              MS. DEITSCH-PEREZ:  Can we have an

9        agreement that an objection by one is an

10       objection for any other party here?

11             MR. MORRIS:  Sure.  I would -- I

12       would encourage that, sure.

13             MS. DEITSCH-PEREZ:  Thank you.

14             MR. MORRIS:  It can't be sustained

15       or overruled more than one time, so...

16       Q.    Mr. Waterhouse, can you answer my

17  question, please.

18             MS. DANDENEAU:  Do you want to

19       repeat it, Mr. Morris, for his benefit?

20             MR. MORRIS:  Sure.

21       Q.    Can you -- can you tell me the

22  approximate portion of Skyview's revenue that

23  is derived from entities that are directly or

24  indirectly owned or controlled by Mr. Dondero?

25       A.    I don't know the exact number.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Is it more than 75 percent?

 3        A.    Yes.

 4        Q.    Is it more than 90 percent?

 5        A.    I don't know.

 6        Q.    Okay.  Can I refer to Highland

 7   Capital Management, L.P., as Highland?

 8        A.    Yes.

 9        Q.    All right.  And you previously

10   served as Highland's CFO; correct?

11        A.    Yes.

12        Q.    When did you join Highland?

13        A.    I don't recall the exact date.

14        Q.    Can you tell me what year?

15        A.    2006.

16        Q.    When did you -- in what year did you

17   become Highland's CFO?

18        A.    I don't recall the exact date.

19        Q.    I'm not asking you for the exact

20   date.  I'm asking you if you recall the year in

21   which you were appointed CFO.

22        A.    I don't recall the exact year.

23        Q.    Can you tell me which years it is

24   possible that you were appointed to CFO of

25   Highland?
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 160   Filed 07/09/2331   Page 74 of 200   PageID 28651

Page 19

```
 1                  WATERHOUSE - 10-19-21
 2        A.    2011 or 2012.
 3        Q.    Did you serve as Highland's CFO on a
 4   continuous basis from in or around 2011 or 2012
 5   until early 2021?
 6        A.    Yes.
 7        Q.    During that entire time you reported
 8   directly to Jim Dondero; correct?
 9        A.    I -- I don't know.
10        Q.    Is there anybody else you reported
11   to -- withdrawn.
12              Did you report to Mr. Dondero for
13   some portion of the time that you served as
14   CFO?
15        A.    Yes.
16        Q.    Is there a portion of time that you
17   don't recall who you reported to?
18        A.    Yes.
19        Q.    What portion of time do you have in
20   your mind when you can't recall who you
21   reported to?
22        A.    From the 2011 to -- for
23   approximately a year or two.
24        Q.    Okay.  So is it fair to say that you
25   reported to Mr. Dondero in your capacity as CFO
```

1                        WATERHOUSE - 10-19-21

2    from at least 2014 until the time you left

3    Highland?

4                MS. DANDENEAU:  Objection to form.

5         A.    I don't want to speculate the exact

6    or what year that changed or -- so I would like

7    to stick with my testimony.

8         Q.    Can you recall when you began

9    reporting to Mr. Dondero?

10        A.    I don't recall.

11        Q.    Can you -- can you give me an

12   estimate of what year you think you might have

13   began reporting to Mr. Dondero?

14        A.    I will go back to my prior

15   testimony.

16        Q.    Okay.  There is no -- you have no

17   ability to tell me when you began reporting to

18   Mr. Dondero.

19                Do I have that right?

20                MS. DANDENEAU:  Objection to form.

21        A.    I don't recall.

22        Q.    Okay.  Do you recall who you might

23   have reported to before you began reporting to

24   Mr. Dondero?

25        A.    Yes.

 1                  WATERHOUSE - 10-19-21

 2        Q.    Who might you have reported to in

 3   your capacity as CFO before you started

 4   reporting to Mr. Dondero?

 5        A.    That would have been Patrick Boyce.

 6        Q.    Are you aware that Highland filed

 7   for bankruptcy on October 19th, 2019?

 8        A.    Yes.

 9        Q.    And we refer to that as the petition

10   date?

11        A.    Yes.

12        Q.    Okay.  Do you hold any professional

13   licenses, sir?

14        A.    Yes.

15        Q.    Can you tell me what professional

16   licenses you hold?

17        A.    I'm a certified public accountant.

18        Q.    Okay.  Anything else?

19        A.    No.

20        Q.    Do you have any other professional

21   licenses or certificates?

22        A.    When you say "professional license,"

23   that is not education?

24        Q.    Tell me -- sure.  Anything other

25   than a driver's license.

Page 22

1                    WATERHOUSE - 10-19-21

2                    Do you have any other license or

3    certificate or certification?

4         A.    Are you asking, like, where I went

5    to school and the --

6         Q.    I am not.  I am not.  I didn't say

7    education.  I didn't ask about degrees.

8                    Do you know what a license is?

9         A.    Well, yeah, I mean, a license is

10   something you get after you receive a certain

11   level of proficiency.

12        Q.    Do you have any licenses or

13   certifications other than your CPA?

14                    MS. DANDENEAU:  Objection, form.

15                    I assume you mean professional

16        licenses, Mr. Morris; correct?

17        Q.    Can you answer my question, sir?

18        A.    Mr. Morris, I'm thinking.  I

19   don't -- I don't think I have any others.

20        Q.    Are you familiar with an entity

21   called Highland Capital Management Fund

22   Advisors?

23        A.    Yes.

24        Q.    Were you ever -- can we refer to

25   that entity as HCMFA?

1                    WATERHOUSE - 10-19-21

2         A.    Yes.

3         Q.    Were you ever employed by HCMFA?

4         A.    Not that I recall.

5         Q.    Were you ever -- did you ever hold

6    the title of an officer or director of HCMFA?

7         A.    Yes.

8         Q.    What title did you hold?

9         A.    Treasurer.

10        Q.    When did you become the treasurer of

11   HCMFA?

12        A.    I don't recall.

13        Q.    Can you tell me the year?

14        A.    I don't -- I don't know the year.

15        Q.    Can you approximate the year in

16   which you became the treasurer of HCMFA?

17        A.    I don't know.

18        Q.    Can you tell me if it was before or

19   after 2016?

20        A.    I don't recall.

21        Q.    Are you still the -- do you know if

22   you're still the treasurer of HCMFA today?

23        A.    Today, I am the acting treasurer for

24   HCMFA.

25        Q.    Is there a distinction between

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 16-40   Filed 01/09/23   Page 79 of 200   PageID 28656

Page 24

1                    WATERHOUSE - 10-19-21

2     treasurer and acting treasurer?

3          A.    I said "acting treasurer" as I am an

4     employee of Skyview, as you previously

5     stated -- or asked.

6          Q.    But you are the treasurer of HCMFA

7     today; correct?

8          A.    I am -- I am the acting treasurer

9     for HCMFA.

10         Q.    How did you become the treasurer of

11    HCMFA?

12         A.    Are you asking how I became the

13    treasurer of HCMFA today?

14         Q.    How did you become appointed to

15    serve as the treasurer of HCMFA?

16         A.    Well, in -- in -- in what time

17    capacity?

18         Q.    The first time that you were

19    appointed.

20         A.    First time.  I believe I was asked

21    to serve as treasurer for HCMFA the first time.

22         Q.    By who?  Who asked you to do that?

23         A.    I don't recall.

24         Q.    Is there anything that would refresh

25    your recollection as to who appointed you as

                        WATERHOUSE - 10-19-21

1     the treasurer of CF- -- HCMFA for the first

2     time?

3          A.    I don't -- I mean, there would be

4     some documents, some legal documents.  I don't

5     know where those are.

6          Q.    How many times have you been

7     appointed the treasurer of HCMFA?

8          A.    I don't know.

9          Q.    Was it more than once?

10          A.    I don't know.

11          Q.    Can you tell me any period of time

12     since 2016 that you did not hold the title of

13     treasurer of HCMFA?

14                MS. DANDENEAU:  Objection to form.

15          A.    I don't recall.

16          Q.    What are your duties and

17     responsibilities as the treasurer of HCMFA?

18          A.    My duties are to do the best job

19     that I can as the -- as an accountant and

20     finance guy.

21          Q.    What specific duties and

22     responsibilities do you have as the treasurer

23     of HCMFA?

24          A.    My duties are to do the best job

25          A.    My duties are to do the best job

```
 1                    WATERHOUSE - 10-19-21

 2    that I can as the accounting and finance person

 3    for HCMFA.

 4         Q.    As the accounting and finance person

 5    for HCMFA, do you have any particular areas of

 6    responsibility?

 7         A.    Yeah, it is to manage the accounting

 8    and finance function for HCMFA.

 9         Q.    Would that include -- do you have

10    responsibility for overseeing HCMFA's annual

11    audit?

12         A.    Can I please elaborate on my prior

13    question?

14         Q.    Of course.  You -- you are giving

15    answers.  I'm asking questions.

16         A.    Okay.  Yes, so the -- it -- like I

17    said, it is to manage the accounting finance

18    aspect, but I am, as we discussed, the

19    treasurer.  That is -- being treasurer is what

20    gives me that -- that management function.

21         Q.    Does anybody report to you in your

22    capacity as treasurer of HCMFA?

23         A.    I don't believe so.

24         Q.    Does HCMFA have a chief financial

25    officer?
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 166-40   Filed 02/06/23   Page 82 of 200   PageID 28659

Page 27

```
 1                   WATERHOUSE - 10-19-21

 2        A.     I don't -- I don't know.

 3        Q.     You don't know?

 4               You're the treasurer of HCMFA but

 5   you don't know if HCMFA has a chief financial

 6   officer.

 7               Do I have that right?

 8        A.     That's right.

 9        Q.     Okay.  Have you heard of a company

10   called NexPoint Advisors?

11        A.     Yes.

12        Q.     We will refer to that as NexPoint.

13   Okay?

14        A.     Okay.

15        Q.     Were you ever employed by NexPoint?

16        A.     I don't recall.

17        Q.     Did you ever hold any title with

18   respect to the entity known as NexPoint?

19        A.     Yes.

20        Q.     What titles have you held in

21   relation to NexPoint?

22        A.     Treasurer.  I think it was only

23   treasurer.

24        Q.     Can you tell me the approximate year

25   you became the treasurer of NexPoint?
```

```
 1                    WATERHOUSE - 10-19-21

 2         A.     I don't know.

 3         Q.     Are you still the treasurer of

 4    NexPoint today?

 5         A.     I am the acting treasurer for

 6    NexPoint.

 7         Q.     When did your title change from

 8    treasurer to acting treasurer?

 9         A.     I don't know.

10         Q.     Did your duties and responsibilities

11    change at all when your title was changed from

12    treasurer to acting treasurer?

13         A.     I don't -- I don't believe so.

14         Q.     Why did --

15         A.     I still manage the finance and

16    accounting function for NexPoint.

17         Q.     Why did your title change from

18    treasurer to acting treasurer?

19         A.     I don't -- I'm using the term

20    "acting treasurer" as I'm a Skyview employee.

21    I don't -- I don't know -- again, I am a -- as

22    I am the Skyview employee.

23         Q.     Okay.

24         A.     And we -- we provide officer

25    services.
```

```
 1                    WATERHOUSE - 10-19-21

 2         Q.    And you serve as an officer of

 3    HCMFA; correct?

 4         A.    I think we went over that with my

 5    testimony.  Yes, I'm the acting treasurer for

 6    HCMFA.

 7         Q.    And you are an officer of NexPoint;

 8    correct?

 9         A.    I think -- I am the acting treasurer

10    for NexPoint Advisors.

11         Q.    And -- and who appointed you acting

12    treasurer of NexPoint Advisors?

13         A.    I don't recall specifically.

14         Q.    Do you have any recollection of who

15    might have appointed you the treasurer of

16    NexPoint?

17         A.    I mean, it -- it -- I don't recall

18    exactly who it was.

19         Q.    Who were the possibilities?

20               MS. DEITSCH-PEREZ:  Object to the

21         form.

22         Q.    You can answer.

23         A.    Someone in the legal group for

24    NexPoint.  The other officers as well.

25         Q.    Have you heard of a company called
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 160   Filed 03/09/23   Page 85 of 200   PageID 28662

Page 30

                           WATERHOUSE - 10-19-21

1

2   Highland Capital Management Services, Inc.?

3        A.    Yes.

4        Q.    We will refer to that as HCMS.

5   Okay?

6        A.    HCMS.   Okay.

7        Q.    Were you ever employed by HCMS?

8        A.    No.

9        Q.    Have you ever held any titles in

10  relation to HCMF -- I apologize -- HCMS?

11       A.    Yes.

12       Q.    What titles have you held in

13  relation to HCMS?

14       A.    Treasurer and acting treasurer.

15       Q.    When did you first become treasurer

16  or acting treasurer of HCMS?

17       A.    I don't recall the exact dates.

18       Q.    Can you recall -- can you

19  approximate the year that you became the

20  treasurer of HCMS?

21       A.    I don't -- I don't know.

22       Q.    Are you still the treasurer of HCMS

23  today?

24       A.    I am the acting treasurer for HCMS.

25       Q.    And are your duties and

1                     WATERHOUSE - 10-19-21

2    responsibilities as the acting treasurer for

3    HCMS and the acting treasurer for NexPoint the

4    same as your duties and responsibilities in

5    your role as the acting treasurer of HCMFA?

6         A.    More or less.

7         Q.    Have you ever heard of a company

8    called HCRE Partners, LLC?

9         A.    Yes.

10        Q.    And do you understand that that

11   entity is now known today as NexPoint Real

12   Estate Partners?

13        A.    I did not know that.

14        Q.    All right.  Can we refer to HCRE

15   Partners as HCRE?

16             MS. DANDENEAU:  Objection to form.

17             Did you mean NexPoint Real Estate

18        Partners, Mr. Morris?

19             MR. MORRIS:  No.

20             MS. DANDENEAU:  Oh.

21             MR. MORRIS:  He said he wasn't

22        familiar that it was succeeded by that

23        entity.  So --

24             MS. DANDENEAU:  Okay.

25             MR. MORRIS:  -- let's go with what

1                        WATERHOUSE - 10-19-21

2           the witness knows.

3           Q.    You're familiar with an entity

4     called HCRE Partners, LLC; correct?

5           A.    Yes.

6           Q.    Okay.  So that is the entity that we

7     will refer to as HCRE.  If you're aware of any

8     successor, that is great.  If not, let's just

9     define it as such.

10               Have you ever been employed by HCRE

11    or any entity that you know to have succeeded

12    HCRE?

13          A.    No.

14          Q.    Did you ever serve as an officer or

15    director of HCRE or any successor?

16          A.    Not that I recall.

17          Q.    Okay.  Can we refer to NexPoint and

18    HCMFA as the advisors?

19          A.    Yes.

20          Q.    In general, the advisors provided

21    investment advisory services to certain retail

22    funds; correct?

23          A.    Yes.

24          Q.    And we will refer to the retail

25    funds that are served by the advisors

1              WATERHOUSE - 10-19-21

2    collectively as the retail funds; is that okay?

3         A.    Okay.

4         Q.    Each of the retail funds is governed

5    by a board; correct?

6         A.    Yes.

7         Q.    And do you know the people who serve

8    on the boards of the retail funds?

9              MS. DANDENEAU:  Objection to form.

10        A.    I don't know all of them.

11        Q.    Do you know whether the same people

12   serve on the board of each of the retail funds

13   as we've defined that term?

14        A.    Which -- so when you say "retail

15   funds" -- again, I want to be -- what retail

16   funds are you referring to, because there are

17   -- there are several distinctions?

18             What retail funds are you using when

19   you refer to them?

20        Q.    That is why -- that is why I tried

21   to define the terms.  So let me do it again.

22             Retail funds for the purposes of

23   this deposition means any retail fund to which

24   either of the advisors provides advisory

25   services.  Okay?

Page 34

1                      WATERHOUSE - 10-19-21

2          A.    Okay.

3          Q.    Okay.  So do you know whether the

4    same people serve on the board of each of the

5    retail funds?

6          A.    I don't know.

7          Q.    Were you ever employed by any of the

8    retail funds?

9          A.    No.

10         Q.    No?

11         A.    No.

12         Q.    Okay.  Do you have any title with

13   respect to any of the retail funds?

14         A.    Yes.

15         Q.    What titles do you hold --

16   withdrawn.

17               Do you have the same titles with

18   respect to all of the retail funds or do

19   they -- or just something else?

20               MS. DANDENEAU:  Objection to form.

21         Q.    Withdrawn.

22               Do you have the same title with

23   respect to each of the retail funds?

24         A.    No.

25         Q.    Tell me which title you have with

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 16-40   Filed 09/09/22   Page 90 of 200   PageID 28667

Page 35

```
 1                   WATERHOUSE - 10-19-21

 2    respect to each retail fund.

 3                   Actually, let's do it a different

 4    way.  I withdraw the question.

 5                   Can you give me one title you have

 6    in relation to any retail fund?

 7         A.   Yes.

 8         Q.   What title -- what title can you

 9    give me?

10         A.   Principal executive officer.

11         Q.   Do you serve as principal executive

12    officer for each of the retail funds?

13         A.   No.

14         Q.   Can you identify for me the retail

15    funds in which you serve as the principal

16    executive officer?

17         A.   Yes.  Highland Funds 1, Highland

18    Funds 2, Highland Income Fund, Highland Global

19    Allocation Fund.

20         Q.   I'm sorry, you said "Global

21    Allocation Fund"?

22         A.   Yes.

23                   VIDEOGRAPHER:  Excuse me,

24         Mr. Morris.  This is the videographer.  I'm

25         concerned about the lighting in the
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X   Document 176-40    Filed 01/09/23   Page 91 of 200   PageID 28668

Page 36

```
 1                    WATERHOUSE - 10-19-21

 2        witness' camera.

 3               Do you want to go off the record and

 4        make some adjustments?

 5               MR. MORRIS:  Sure, but just for this

 6        purpose.  I don't want to take a break.  We

 7        just started.

 8               MS. DANDENEAU:  Yeah, that is fine.

 9        That is fine.  We're going to put you on

10        mute.

11               MR. MORRIS:  All right.

12               MS. DANDENEAU:  I'm going to try to

13        open up some of the shades.

14               VIDEOGRAPHER:  We're going off the

15        record at 10:08 a.m.

16        (Recess taken 10:08 a.m. to 10:11 a.m.)

17               VIDEOGRAPHER:  We are back on the

18        record at 10:11 a.m.

19        Q.    Mr. Waterhouse, when did you become

20   the principal executive officer of the four

21   retail funds that you just identified?

22        A.    I don't recall.

23        Q.    Do you recall the approximate year

24   that you became the principal executive officer

25   of the four funds?
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 164   Filed 09/09/21   Page 92 of 200   PageID 28669

Page 37

```
 1                WATERHOUSE - 10-19-21

 2        A.    2021.

 3        Q.    Did you ever hold any title with

 4   respect to any of the four funds you have just

 5   identified other than principal executive

 6   officer?

 7        A.    I don't recall.

 8        Q.    Is it possible that you held a

 9   position or a title with the four funds you

10   just identified prior to 2021?

11        A.    Yes.

12        Q.    But you don't recall if you did or

13   not; do I have that right?

14        A.    No.  You -- I thought you asked, did

15   I hold other titles.

16        Q.    Did you hold any title at the four

17   retail funds for which you now serve as

18   principal executive officer at any time prior

19   to 2021?

20        A.    Yes.

21        Q.    What titles did you hold?

22        A.    I don't recall all the titles.

23        Q.    Do you recall any of the titles?

24        A.    Yes.

25        Q.    What titles do you recall holding at
```

                      WATERHOUSE - 10-19-21

1    those four retail funds before 2021?

2        A.    Principal executive officer.

3        Q.    Were you the principal executive

4    officer of the four retail funds that you have

5    identified?

6        A.    Sorry, could you repeat the

7    question?

8        Q.    Were you the principal executive

9    officer for each of the four retail funds that

10   you have identified?

11       A.    Yes.

12       Q.    When did you become the principal

13   executive -- withdrawn.

14             Can you give me the approximate year

15   that you became the principal executive officer

16   for each of the four retail funds you've

17   identified?

18       A.    I don't recall.

19       Q.    What are your duties and

20   responsibilities as the principal executive

21   officer of these four retail funds?

22       A.    It is to manage the finance and

23   accounting positions.

24       Q.    So at the same time you serve as the

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 164   Filed 09/09/21   Page 94 of 200   PageID 28671

Page 39

1                    WATERHOUSE - 10-19-21

2     treasurer of the advisors, you also serve as

3     the principal executive officer of these four

4     retail funds; correct?

5          A.    Yes.

6          Q.    Did you ever hold any title with

7     respect to any other retail fund?

8          A.    Not that I recall.

9          Q.    During the period that you served as

10    Highland's CFO, from time to time Highland

11    loaned money to certain of its officers and

12    employees; correct?

13         A.    Yes.

14         Q.    During the period that you served as

15    Highland's CFO, from time to time Highland

16    loaned money to certain --

17         A.    Let me -- let me retract that,

18    sorry, that -- you asked during the time I was

19    CFO, Highland loaned moneys to employees.  I

20    don't -- I don't recall that during my tenure

21    of CFO.

22         Q.    You have no recollection during the

23    time that you were the CFO of Highland of

24    Highland ever loaning any money to any officer

25    or director of Highland?

Page 40

1                    WATERHOUSE - 10-19-21

2          A.    I don't recall during my tenure of

3    Highland or my -- as CFO of Highland -- yeah,

4    if there are any loans as CFO of Highland.

5          Q.    I'm just talking about officers and

6    employees right now.  You have no recollection

7    of Highland ever making a loan to any of its

8    officers or employees during the time that you

9    served as CFO.  Do I have that right?

10              MS. DANDENEAU:  Objection to form.

11         A.    So I thought you were saying

12   officers and employees as CFO, right, so there

13   were -- I mean, okay, yes.

14         Q.    I would ask you to listen carefully

15   to my question.  If I -- if I'm not clear, let

16   me know, but I'm really trying to be as clear

17   as I can.

18         A.    I'm listening as carefully as I can,

19   and you are asking very specific questions in a

20   timeline.  And I'm trying to answer your

21   questions as specifically as I can, and I

22   apologize if -- if I'm going back.  I am -- you

23   are asking very specific questions.  Thank you.

24         Q.    During the period that you served as

25   Highland's CFO, from time to time Highland

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 160    Filed 09/09/2331    Page 96 of 200    PageID 28673

Page 41

1                   WATERHOUSE - 10-19-21

2    loaned money to certain corporate affiliates;

3    correct?

4                   MS. DANDENEAU:  Objection to form.

5         A.    What are corporate affiliates?

6         Q.    How about the ones that are in

7    Highland's audited financial statements under

8    the section entitled Loans to Affiliates.  Why

9    don't we start with those.  Do you have any

10   understanding of what the phrase "affiliates"

11   means?

12                   MS. DANDENEAU:  Objection to form.

13        A.    I understand what affiliates are,

14   yet affiliates can have different meanings in

15   different contexts, so...

16        Q.    Why don't you -- why don't you tell

17   me what your understanding of the term

18   "affiliate" is in relation to Highland Capital

19   Management, L.P.

20        A.    Is that a -- it depends on the

21   context.

22        Q.    How about the context of making

23   loans?

24                   MS. DANDENEAU:  Objection to form.

25        A.    I didn't make the determination of

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 09/09/2331   Page 97 of 200   PageID 28674

Page 42

1              WATERHOUSE - 10-19-21

2    who an affiliate was or is at the time those --

3    I didn't -- that wasn't my job to make a

4    determination of who an affiliate is.

5        Q.    All right.  So as the CFO of

6    Highland, do you have any ability right now to

7    tell me which companies that were directly or

8    indirectly owned and/or controlled by

9    Mr. Dondero in whole or in part received loans

10   from Highland Capital Management, L.P.?

11              MS. DANDENEAU:  Objection to form.

12              MS. DEITSCH-PEREZ:  Objection, form.

13       A.    Yes.

14       Q.    Okay.  Identify every entity that

15   you can think of that was directly or

16   indirectly owned and/or controlled by

17   Mr. Dondero in whole or in part that received a

18   loan from Highland Capital Management, L.P.

19              MR. RUKAVINA:  Objection, legal

20       conclusion.

21       A.    NexPoint Advisors, Highland Capital

22   Management Fund Advisors, HCM Services,

23   Dugaboy.  Sorry, I don't think -- Dugaboy

24   doesn't fit that definition.  You said owned

25   and controlled.  I don't think that that

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 09/09/23   Page 98 of 200   PageID 28675

Page 43

1                    WATERHOUSE - 10-19-21

2      definition --

3           Q.    I said owned and/or controlled.

4           A.    I don't -- again, I'm not -- I'm not

5      the legal expert.  I don't think it controls --

6      he controls Dugaboy, so again, I'm not the

7      legal person.

8           Q.    I'm not asking you for a legal

9      conclusion, sir.  I'm asking you for your

10     knowledge, okay, as the CFO -- the former CFO

11     of Highland Capital Management, other than

12     NexPoint, HCMFA, and HCMF -- HCMS, can you

13     think of any other entities that were owned

14     and/or controlled directly or indirectly in

15     whole or in part by Jim Dondero who received a

16     loan from Highland Capital Management, L.P.?

17                    MS. DANDENEAU:  Objection to form.

18          A.    HCRE.

19          Q.    Any others?

20          A.    That is -- that is all I can think

21     of.

22          Q.    And you're aware that from time to

23     time while you were the CFO, Highland loaned

24     money to Jim Dondero; correct?

25          A.    Yes.

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 09/09/23    Page 99 of 200    PageID 28676

Page 44

WATERHOUSE - 10-19-21

1

2       Q.     Okay.  Can we refer to the four

3   entities that you just named and Mr. Dondero as

4   the affiliates?

5       A.     So that would be Jim Dondero,

6   NexPoint Advisors, Highland Capital Management

7   Fund Advisors, and HCRE.

8       Q.     And HCMS?

9       A.     And HCMS, okay.

10      Q.     And can we refer to the loans that

11  were given to each of those affiliates as the

12  affiliate loans?

13      A.     Yes.

14      Q.     And is it fair to say that each of

15  the affiliates were the borrowers under the

16  affiliate loans as we're defining the term?

17          MR. RUKAVINA:  Objection, legal

18      conclusion.

19      A.     The borrowers are whoever were on

20  the notes.  I don't -- I don't know.  I'm not

21  the legal person.

22      Q.     But you --

23      A.     I don't know.

24      Q.     You do know, as Highland's former

25  CFO, that each of the affiliates that you have

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 100 of 200   PageID 28677

Page 45

                    WATERHOUSE - 10-19-21

1    identified tendered notes to Highland; correct?

2            MR. RUKAVINA:  Hey, John, will you

3        just give me a running objection to legal

4        conclusion to HCM --

5            MR. MORRIS:  No.  No, if you want to

6        object --

7            MR. RUKAVINA:  I will object every

8        time.  Object to legal conclusion.

9            MR. MORRIS:  That is fine.

10   A.    Sorry, can you repeat the question?

11   Q.    Are you aware that each of the --

12   that each of the affiliates, as we have defined

13   the term, gave to Highland a promissory note in

14   exchange for the loans?

15           MR. RUKAVINA:  Objection to the

16       extent that calls for a legal conclusion.

17   A.    I don't.

18   Q.    No, you don't know that?

19   A.    No, they didn't -- you said they

20   exchanged a promissory note for a loan.  I

21   don't -- I don't understand that question, so I

22   said no.

23   Q.    At the time of the bankruptcy

24   filing, did Highland have in its possession

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 11/09/1483    Page 101 of 200    PageID 28678

Page 46

1                    WATERHOUSE - 10-19-21

2      promissory notes that were signed by each of

3      the affiliates?

4           A.    Yes.

5           Q.    To the best of your knowledge,

6      during the time that you served as Highland's

7      CFO, did Highland disclose to its outside

8      auditors all of the loans that were made to

9      affiliates?

10               MR. RUKAVINA:  Objection, that calls

11          for a legal conclusion.

12               MS. DEITSCH-PEREZ:  I also couldn't

13          hear you, John, because there was some

14          garbling on -- on the -- on the call.

15               MR. MORRIS:  Folks, I've got to tell

16          you this is not going well, and I'm

17          reserving my right --

18               MS. DANDENEAU:  John, it was just

19          the end of that question.  It was just the

20          end of that question.  I couldn't hear it

21          either.  Sorry, if you could repeat it,

22          please.

23               MR. MORRIS:  That is less than an

24          hour into this, but folks are trying to run

25          out the clock, and so I'm just going to

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/2483   Page 102 of 200   PageID 28679

Page 47

1                    WATERHOUSE - 10-19-21

2        state that now.

3               MS. DANDENEAU:  You know, and,

4        Mr. Morris, I really object to that.  I

5        mean --

6               MR. MORRIS:  Okay.

7               MS. DANDENEAU:  -- Mr. Waterhouse

8        just told you he's trying to listen to your

9        questions and answer them carefully, and

10       you have no basis for saying that.

11              MR. MORRIS:  Okay.

12              MS. DANDENEAU:  This does not --

13       this is not an experienced witness, so he's

14       trying to do the best he can.

15       Q.    Mr. Waterhouse, during the time that

16   you served as Highland's CFO, did Highland

17   disclose to its outside auditors all of the

18   loans that it made to each of the affiliates

19   that you have identified?

20              MR. RUKAVINA:  Objection, legal

21       conclusion.

22       A.    Yes.

23       Q.    To the best of your knowledge, while

24   you were Highland's CFO, were all of the

25   affiliate loans described in Highland's audited

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/09/04831   Page 103 of 200   PageID 28680

Page 48

```
 1                    WATERHOUSE - 10-19-21

 2    financial statements?

 3                    MR. RUKAVINA:  Objection, legal

 4         conclusion.

 5         A.    When an audit was performed, any

 6    loans that were made by Highland to the

 7    affiliates were disclosed to auditors.

 8         Q.    Are you aware of any loan that was

 9    made to any affiliate that was not disclosed to

10    the auditors?

11         A.    I'm not aware.

12         Q.    To the best of your knowledge, did

13    each of the affiliates who were --

14    (inaudible) -- loaned from Highland execute a

15    promissory note in connection with that loan?

16                    MR. RUKAVINA:  Objection, legal

17         conclusion.

18         A.    Sorry, you -- halfway through the

19    question it got muffled.

20                    Can you repeat that again?

21         Q.    To the best of your knowledge, did

22    every affiliate execute a promissory note in

23    connection with each loan that it obtained from

24    Highland?

25                    MR. RUKAVINA:  Objection, legal
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 11/04/23    Page 104 of 200    PageID 28681

Page 49

WATERHOUSE - 10-19-21

1

2       conclusion.

3           A.    Yes.

4           Q.    You are not aware of any loan that

5   any affiliate ever obtained from Highland where

6   the affiliate did not give a promissory note in

7   return; is that fair?

8           A.    Yes, I'm not aware.

9           Q.    And to the best of your knowledge,

10  did Highland loan to each affiliate an amount

11  of money equal to the principal amount of each

12  promissory note?

13          MR. RUKAVINA:  Objection, legal

14      conclusion.

15          A.    Yes.

16          Q.    During the time that you served as

17  CFO, did Highland ever loan money to

18  Mark Okada?

19          A.    I -- I don't recall.

20          Q.    Did you ever see any promissory

21  notes executed by Mark Okada?

22          A.    I don't recall.

23          Q.    Do you know if Highland ever forgave

24  any loan that it ever made to Mr. Okada?

25          A.    I don't recall.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 105 of 200   PageID 28682

Page 50

```
 1                    WATERHOUSE - 10-19-21
 2      Q.    Do you recall if Mr. Okada paid back
 3   all principal and interest due and owing under
 4   any loan he obtained from Highland?
 5           MS. DEITSCH-PEREZ:  Objection to
 6      form.
 7           MS. DANDENEAU:  Objection to form.
 8      A.    I don't recall.
 9      Q.    Do you recall whether -- during your
10   time as CFO, whether Highland ever loaned money
11   to Jim Dondero?
12      A.    Yes.
13      Q.    To the best of your knowledge, did
14   Mr. Dondero sign and deliver to Highland a
15   promissory note in connection with each loan
16   that he obtained from Highland?
17      A.    If you are referring to the
18   promissory notes that, you know, part of
19   Highland's records, yes.
20      Q.    Okay.  You're not aware of any loan
21   that Mr. Dondero took from Highland that wasn't
22   backed up by -- by a promissory note with a
23   face -- with a principal amount equal to the
24   amount of the loan; correct?
25      A.    Am I aware that Jim Dondero took a
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 106 of 200   PageID 28683

Page 51

                    WATERHOUSE - 10-19-21

1    loan?

3        Q.    Without giving a -- let me ask a

4    better question.  I'm sorry, Mr. Waterhouse.

5            Are you aware of any loan that

6    Mr. Dondero obtained from Highland where he

7    didn't give a promissory note in return?

8        A.    I'm not aware.

9        Q.    During the time that you served as

10   Highland's CFO, did Highland ever forgive any

11   loans, in whole or in part, that it made to

12   Mr. Dondero?

13       A.    Not that I'm aware.

14       Q.    At the time that you served as

15   Highland's CFO, did Highland ever forgive any

16   loan, in whole or in part, that it made to any

17   affiliate as we've defined the term today?

18       A.    Not that I'm aware.

19       Q.    During the time that you served as

20   Highland's CFO, did Highland ever forgive, in

21   whole or in part, any loan that it ever made to

22   any officer or employee?

23       A.    Highland forgave loans to officers

24   and employees.  It may not have been at the

25   time when my title was CFO.

Page 52

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And so I appreciate the

3   distinction.

4             Is it fair to say that, to the best

5   of your knowledge, Highland did not forgive a

6   loan that it made to an officer or employee

7   after 2013?

8             MS. DANDENEAU:  Objection to form.

9        A.    I don't recall.

10       Q.    To the best of your knowledge, did

11  Highland disclose to its auditors every

12  instance where it forgave, in whole or in part,

13  a loan that it had made to one of its officers

14  or employees?

15       A.    No.

16       Q.    Can you think of -- can you -- can

17  you identify any loan to an officer or employee

18  that was forgiven by Highland, in whole or in

19  part, that was not disclosed to Highland's

20  outside auditors?

21       A.    Look, I don't recall all of the

22  loans and the loan forgiveness.  I just know as

23  part of the audit process there is a

24  materiality concept.

25             So if there were loans to employees

```
 1                    WATERHOUSE - 10-19-21

 2   that were of -- you know, that were deemed

 3   immaterial, those items may not have been

 4   disclosed by the team to the auditors.

 5        Q.    I appreciate that.

 6              Do you have an understanding as to

 7   what the level of materiality was?

 8        A.    I don't recall.

 9        Q.    As the CFO of Highland, to the best

10   of your knowledge, did Highland disclose to its

11   outside auditors every loan that was forgiven,

12   in whole or in part, that was material as that

13   term was defined by the outside auditors?

14        A.    Yes.

15        Q.    And do you recall where -- do you

16   recall where the definition of materiality can

17   be found for -- for this particular purpose?

18              MS. DANDENEAU:  Objection to form.

19        A.    No.  You -- I don't determine

20   materiality.

21        Q.    Okay.  I'm just asking you if you

22   can help me understand where it is, but I think

23   we will find it in a few minutes.

24              You are aware that Highland has

25   commenced lawsuits against each of the
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/09/0483   Page 109 of 200   PageID 28686

Page 54

1              WATERHOUSE - 10-19-21

2    affiliates, as we've defined the term, to

3    collect under certain promissory notes; is that

4    right?

5         A.    Yes.

6         Q.    And are you familiar with the notes

7    that are issue -- at issue in the lawsuits?

8              MS. DANDENEAU:  Objection to form.

9         A.    Generally familiar.

10        Q.    Can we refer to the lawsuits that

11   Highland has commenced against the affiliates

12   collectively as the lawsuits?

13        A.    Yes.  And, again, the affiliates are

14   NexPoint, HCMFA, HCMS, and HCRE.

15        Q.    And Mr. Dondero?

16        A.    Okay.  See, that is a new -- and now

17   Mr. Dondero is included in your affiliate

18   definition.

19        Q.    I just --

20        A.    I thought affiliates -- I thought

21   affiliates were just the four prior entities,

22   so I just want to be clear.

23        Q.    I appreciate that.  So let's --

24   let's keep them separate and let's refer to the

25   four corporate entities as the affiliates, and

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/0483   Page 110 of 200   PageID 28687

Page 55

 1                    WATERHOUSE - 10-19-21

 2    Mr. Dondero we will call Mr. Dondero.  Okay?

 3         A.    Okay.  Thank you.  As you can see,

 4    Mr. Morris, there is a lot of entities -- a lot

 5    here.  I just want to be clear.

 6         Q.    Okay.  Now, the affiliates of

 7    Mr. Dondero signed promissory notes that are

 8    not subject to the lawsuit.

 9              Do you understand that?

10              MS. DANDENEAU:  Objection to form.

11         A.    The affiliates and Mr. Dondero

12    signed --

13         Q.    You know what?  I will skip it.

14    That is okay.  Okay.

15              From time to time while you were

16    Highland's CFO, payments were applied against

17    principal and interests that were due under the

18    notes that were tendered by the affiliates and

19    Mr. Dondero; correct?

20              MR. RUKAVINA:  Objection to the

21         extent that calls for a legal conclusion.

22         A.    Yes.

23         Q.    Did Highland have a process where --

24    whereby payments would be applied against

25    principal and interest against the notes that

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 11/09/4483    Page 111 of 200    PageID 28688

Page 56

```
 1                     WATERHOUSE - 10-19-21

 2   were given by the affiliates and Mr. Dondero?

 3         A.    Yes.

 4         Q.    Can you describe the process for me?

 5         A.    The process, payment should be

 6   applied as laid out in the -- in the promissory

 7   note.

 8         Q.    From time to time were payments made

 9   that were not required under the promissory

10   notes?

11               MS. DANDENEAU:  Objection to form.

12         A.    Yes.

13         Q.    Who was responsible for deciding

14   when and how much the payments would be made

15   with respect to each of the notes that were

16   issued by the affiliates and Mr. Dondero?

17         A.    Who was responsible for deciding how

18   much was paid prior to the due date?

19         Q.    Yes.

20         A.    I don't know.

21         Q.    Did you approve of each payment that

22   was made against principal and interest on the

23   notes that were given by the affiliates and

24   Mr. Dondero?

25               MS. DANDENEAU:  Objection to form.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 112 of 200   PageID 28689

Page 57

1                    WATERHOUSE - 10-19-21

2          A.    Did I approve the payments?  I

3    approve -- I approve -- if there was cash -- if

4    there was cash being repaid on a note payment,

5    yes, I approved in the general sense of being

6    made aware of the payment and the amount.

7          Q.    And are you the person who

8    authorized Highland's employees to effectuate

9    those payments?

10         A.    Yes.

11         Q.    When you gave the instruction to

12   effectuate the payment, did you obtain

13   Mr. Dondero's prior approval?

14         A.    I mean, it -- I mean, it -- it

15   depends.

16         Q.    Can you think of any instance where

17   you directed Highland's employees to make a

18   payment of principal or interest against any

19   note that was tendered by an affiliate or

20   Mr. Dondero that Mr. Dondero did not approve of

21   in advance?

22         A.    I can't recall specifically.

23         Q.    Can you identify -- withdrawn.

24              Did Mr. Dondero ever tell you that a

25   payment that was made against principal and

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 01/09/24    Page 113 of 200    PageID 28690

Page 58

                        WATERHOUSE - 10-19-21

1

2      interest due under one of the notes that was

3      tendered by an affiliate or himself should not

4      have been made?

5           A.    Yes.

6           Q.    Can you identify the payment for me?

7           A.    It would be for -- for NexPoint

8      Advisors.

9           Q.    Okay.  And when did Mr. Dondero tell

10     you that a payment that you had initiated on

11     behalf of NexPoint should not have been made?

12          A.    I wasn't initiating payment.  It was

13     in the context of the -- I think you used this

14     term, "the advisors," so NexPoint Advisors and

15     Highland Capital Management Fund Advisors had

16     overpaid on certain agreements with Highland

17     Capital Management, L.P.  And as a part of that

18     process, the advisors -- what I was told at the

19     time were in talks and negotiations and

20     discussions with Highland Capital Management,

21     L.P., on offsets in relation to those

22     overpayments.

23          Q.    When did this conversation take

24     place?

25               MS. DANDENEAU:  Objection to form.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/04/23   Page 114 of 200   PageID 28691

Page 59

```
 1                     WATERHOUSE - 10-19-21

 2         A.    I don't recall specifically.

 3         Q.    Do you recall what year it was?

 4         A.    Yes.

 5         Q.    What year did the conversation with

 6   Mr. Dondero take place that you just described?

 7         A.    2020.

 8         Q.    Okay.  Do you remember if it was

 9   December 2020?

10         A.    It -- it -- I don't -- I don't

11   recall what month specifically, but it would

12   have been November or December.

13         Q.    And we're talking here about a

14   payment of principal and/or interest that was

15   due -- withdrawn.

16               We're talking here about a payment

17   of principal and interest that was applied

18   against NexPoint's note; correct?

19               MS. DANDENEAU:  Objection to form.

20         A.    I don't recall what that payment

21   consisted of.

22         Q.    Is it possible that the payment you

23   have in mind related to the shared services

24   agreement?

25               MS. DANDENEAU:  Objection to form.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/0483   Page 115 of 200   PageID 28692

Page 60

```
 1                  WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Are you certain that the payment --

 4   that the payment that you have in mind related

 5   to the promissory note that NexPoint issued in

 6   favor of Highland?

 7              MS. DANDENEAU:  Objection to form.

 8        A.    Yes.

 9        Q.    Okay.  Other than that one payment,

10   can you identify any other instance where

11   Mr. Dondero told you that a payment should not

12   have been applied against principal and

13   interest under any promissory note tendered by

14   any affiliate or Mr. Dondero?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Objection to

17        form.

18        A.    Not that I recall.

19        Q.    Thank you very much.

20              Do you know if Mr. Dondero approved

21   in advance of each loan made to each affiliate

22   and himself during the time that you were the

23   CFO?

24              MS. DEITSCH-PEREZ:  Object to the

25        form.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/0483   Page 116 of 200   PageID 28693

Page 61

 1                    WATERHOUSE - 10-19-21

 2        A.    Yes, generally.

 3        Q.    Can you identify any loan that was

 4    ever made to an affiliate or to Mr. Dondero

 5    that Mr. Dondero did not approve of in advance?

 6        A.    Other than the ones that are in

 7    dispute, I'm not aware.

 8        Q.    Do you believe that Mr. Dondero did

 9    not approve of each of the loans that are in

10    dispute in advance of the time that the loan

11    was made?

12              MS. DANDENEAU:  Objection to form.

13        A.    Given what is in the dispute, you

14    know, and -- and -- and the way things might --

15    yeah, I mean...

16        Q.    I am not asking about the dispute,

17    and it was probably my mistake to follow you

18    there.

19              Were you aware of every loan made by

20    Highland to each of its affiliates and

21    Mr. Dondero while you were the CFO at the time

22    each loan was made?

23        A.    Was I aware of every loan, yes.

24        Q.    Okay.  And if you put yourself back

25    in time, do you recall that any of the loans

1                    WATERHOUSE - 10-19-21

2    that were made to one of the affiliates or

3    Mr. Dondero during the time that you were the

4    CFO was made without Mr. Dondero's prior

5    knowledge and approval?

6         A.    Not that I recall.

7         Q.    Thank you.  In fact, do you -- as

8    the CFO, would you have allowed Highland to

9    loan money to an affiliate or to Mr. Dondero

10   without obtaining Mr. Dondero's prior approval?

11              MS. DANDENEAU:  Objection to form.

12        A.    I can't -- there was so many times

13   over the years, I can't speak for every single

14   one, but generally, yes, I -- I spoke to him.

15        Q.    You -- you never -- you never --

16   withdrawn.  I will just take that.

17              Can you recall any payment that was

18   ever made against principal and interest on a

19   note that was issued in favor of Highland by an

20   affiliate or Mr. Dondero that you personally

21   did not know about in advance?

22        A.    There are so many through the years,

23   I don't -- I don't -- I don't recall every

24   single one.

25        Q.    Okay.  Can you identify any payment

```
 1                    WATERHOUSE - 10-19-21
 2   that was made against principal and interest on
 3   any note tendered by any affiliate or
 4   Mr. Dondero that you didn't know about in
 5   advance?
 6        A.    I don't recall.
 7        Q.    Other than Mr. Dondero -- withdrawn.
 8              Did anybody at Highland have the
 9   authority to make a payment against principal
10   and interest due under a loan given to the
11   affiliates and Mr. Dondero without your
12   knowledge and approval?
13              MS. DANDENEAU:  Objection to form.
14        A.    Sorry, there was -- to make a
15   payment on an affiliate loan, what you are
16   saying would it require my knowledge and
17   approval, yes.
18        Q.    Okay.  I appreciate that.  Thank
19   you.
20              Did anybody at Highland have the
21   authority, to the best of your knowledge, to
22   effectuate a loan to an affiliate without
23   Mr. Dondero's prior knowledge and approval?
24              MS. DANDENEAU:  Objection to form.
25        A.    I can't speak for all, but
```

Page 64

1                    WATERHOUSE - 10-19-21

2    generally, yes.

3         Q.    Did you personally communicate with

4    Mr. Dondero to let him know each time a payment

5    of principal or interest was being made against

6    any note that was tendered by an affiliate or

7    Mr. Dondero to Highland?

8         A.    I don't -- are you saying, did I let

9    Mr. Dondero know if a payment was made on any

10   affiliate or loan to Mr. Dondero?  I mean,

11   not -- not every -- no.

12        Q.    Let me ask it this way:  Did you

13   have a practice of informing Mr. Dondero when

14   payments were made against principal and

15   interest on any note that was tendered by an

16   affiliate or Mr. Dondero?

17             MS. DEITSCH-PEREZ:  Objection to

18        form.

19             MS. DANDENEAU:  Objection to form.

20        A.    No, I did not.

21        Q.    Did Mr. Dondero ever tell you that a

22   payment of principal or interest had been made

23   against a note that was tendered by an

24   affiliate or himself that he had been unaware

25   of?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 120 of 200   PageID 28697

Page 65

1                    WATERHOUSE - 10-19-21

2          A.    Not that I recall.

3          Q.    Are you aware that Mr. Dondero and

4    the affiliates -- withdrawn.

5                Are you aware that Mr. Dondero

6    NexPoint, HCRE, and HCMS all contend that they

7    do not have to pay on any of the notes they

8    issued because they are subject to an oral

9    agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12               MS. DANDENEAU:  Objection to form.

13         A.    I didn't -- I didn't -- I didn't

14   know that it was all notes.

15         Q.    Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19               MS. DEITSCH-PEREZ:  Object to the

20         form.

21         A.    Yes.

22         Q.    Do you have any understanding as to

23   the terms of that agreement?

24         A.    Yes.

25         Q.    What is your understanding of the

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/29/43   Page 121 of 200   PageID 28698

Page 66

```
 1                  WATERHOUSE - 10-19-21

 2   terms of the agreement?

 3        A.    That there were certain milestones

 4   that had to be reached.

 5        Q.    Do you have any understanding of the

 6   terms of the agreement between Mr. Dondero and

 7   Nancy Dondero concerning any of the notes

 8   issued by the affiliates or Mr. Dondero other

 9   than that there have to be milestones reached?

10             MS. DEITSCH-PEREZ:  Object to the

11        form.

12        A.    There are milestones, I found out

13   yesterday, or there was some --

14             MS. DANDENEAU:  Okay.  I'm just

15        going to object to the extent that you

16        learned anything in conversations with

17        counsel, please don't reveal -- that is

18        privileged, and don't reveal any privileged

19        communications.

20             THE WITNESS:  Okay.

21        A.    So I'm not aware of anything else.

22        Q.    Do you know what the milestones

23   were?

24             MS. DANDENEAU:  Objection to form.

25        A.    I don't.
```

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Do you know anything about -- do you

 3   know what promissory notes the agreement

 4   covered?

 5        A.    I don't.

 6        Q.    Do you know if -- if Jim and Nancy

 7   Dondero entered into one agreement or more than

 8   one agreement?

 9             MS. DEITSCH-PEREZ:  Object to the

10        form.

11        A.    I don't know.

12        Q.    Do you know if the agreement is in

13   writing?

14        A.    I don't know.

15        Q.    How did you learn of the existence

16   of the agreement?

17             MS. DANDENEAU:  Objection to form.

18        Again --

19        A.    I don't -- I don't recall who told

20   me.

21        Q.    You have no recollection of who told

22   you about this agreement between Jim and Nancy

23   Dondero?

24             MS. DEITSCH-PEREZ:  Object to the

25        form.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/29/04831   Page 123 of 200   PageID 28700

Page 68

1                    WATERHOUSE - 10-19-21

2         A.    I don't recall.

3         Q.    Do you recall how you learned of the

4     agreement?

5              Was it in a meeting?  Was it in a

6     phone call?  Was it in an email?

7         A.    I don't recall.

8         Q.    Do you recall when you learned of

9     the agreement?

10        A.    Not specifically.

11        Q.    Do you recall what year you learned

12    of the agreement?

13        A.    In -- look, I mean, there are so

14    many notes.  I may be getting -- I believe it

15    was 2020.

16        Q.    All right.  I'm not asking about

17    notes, sir.  I'm asking about the agreement

18    that you testified you knew about between Jim

19    and Don- -- Nancy Dondero.  Okay.

20             Do you understand my question now?

21    Should I ask my question again?

22        A.    Yeah, sure.  Go ahead.

23        Q.    I'm going to use the word

24    "agreement" to refer to the agreement that

25    Mr. Dondero and Nancy Dondero entered into

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 124 of 200   PageID 28701

Page 69

WATERHOUSE - 10-19-21

1

2   where you understood that certain milestones

3   had to be reached.  Okay?

4        A.    Uh-huh.

5              MS. DANDENEAU:  Objection.

6              MS. DEITSCH-PEREZ:  Object to the

7        form.

8              MR. MORRIS:  Just defining a term,

9        what is the objection.

10             MS. DEITSCH-PEREZ:  The objection --

11             MR. MORRIS:  I will move on.  I will

12        move on.

13             MS. DEITSCH-PEREZ:  John --

14        Q.    Sir, are you okay with that

15   definition of agreement?

16        A.    Okay.

17        Q.    Okay.  So you don't recall who --

18   who informed you of the existence of the

19   agreement; is that right?

20        A.    I don't recall.

21        Q.    You don't recall who told you the

22   terms of the agreement.

23             Do I have that right?

24        A.    Correct.

25        Q.    And you don't recall if you learned

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 125 of 200   PageID 28702

Page 70

WATERHOUSE - 10-19-21

1

2    about the agreement in a meeting, through an

3    email, or through a phone call.

4            Do I have that right?

5        A.    I don't recall.

6        Q.    Can you tell me when you learned of

7    the agreement?

8        A.    I don't -- I don't -- I don't

9    remember specifically.

10       Q.    Can you tell me if you learned of

11   the agreement before or after the petition

12   date?

13       A.    It would have been -- it would have

14   been after.

15       Q.    Can you tell me if you learned of

16   the agreement before or after January 9th,

17   2020?

18       A.    It would have been after.

19       Q.    Can you tell me if you learned of

20   the agreement before or after you left Highland

21   Capital Management in February of 2021?

22       A.    I don't -- I don't -- I don't know.

23       Q.    It is possible that you learned of

24   it while you were a Highland employee.

25            Do I have that right?

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 12/06/21    Page 126 of 200    PageID 28703

Page 71

 1                  WATERHOUSE - 10-19-21

 2        A.    I don't remember the -- I mean, it

 3   was sometime in 2021.  I don't remember when.

 4        Q.    All right.  So to the best of your

 5   recollection, it was in 2021 but you don't

 6   recall if it was before or after you ceased to

 7   be a Highland employee.

 8              Do I have that right?

 9        A.    Yeah, I mean, it was -- it was

10   likely after I was -- after I left Highland

11   because, if I put myself back into the last

12   days of -- of 2021, it was -- you know, the

13   communications with Mr. Dondero were -- were --

14   were -- there weren't as many communications

15   because of the circumstances.

16        Q.    And so based on that you believe

17   that it is most likely that you learned of this

18   agreement sometime after you left Highland

19   employment?

20        A.    I wouldn't use the term "most

21   likely."  I don't recall specifically.  I don't

22   recall.

23        Q.    Do you recall ever telling Jim Seery

24   about this agreement?

25        A.    No, I don't -- I didn't tell

1                  WATERHOUSE - 10-19-21

2   Jim Seery.

3        Q.    Did you tell anybody at DSI about

4   this agreement?

5        A.    No.

6        Q.    Did you tell any of Highland's

7   independent directors about this agreement?

8        A.    No.

9        Q.    Did you tell anybody at Pachulski

10  Stang Ziehl & Jones about this agreement?

11       A.    No.

12       Q.    Did you tell any employee of

13  Highland about this agreement?

14       A.    No.

15            MS. DANDENEAU:  Mr. Morris, it has

16       been an hour and a half.  Is this a good

17       time for a break?

18            MR. MORRIS:  Sure.

19       Q.    Mr. Waterhouse, I will just remind

20  you that during the break please don't speak

21  with anybody about the deposition, the

22  substance of your testimony or anything else

23  concerning the deposition.  Okay?

24       A.    Yes.

25            MR. MORRIS:  So it is 11:02.  We're

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 128 of 200   PageID 28705

Page 73

```
 1                  WATERHOUSE - 10-19-21

 2      at 11:02 your time.  Let's come back, I

 3      guess, at 15 -- at 11:15 your time.

 4              VIDEOGRAPHER:  We're going off the

 5      record at 11:02 a.m.

 6      (Recess taken 11:02 a.m. to 11:20 a.m.)

 7              VIDEOGRAPHER:  We are back on the

 8      record at 11:20 a.m.

 9      Q.    Mr. Waterhouse, did you speak with

10   anybody during the break about this deposition?

11      A.    No.

12              MS. DANDENEAU:  Other than -- other

13      than his counsel.

14      Q.    Did you speak to your counsel about

15   the substance of your deposition today?

16      A.    No, I didn't bring it up.

17      Q.    I didn't ask you if you brought it

18   up.  I asked you if you had any conversation

19   with your lawyer about the substance of your

20   deposition.

21              MS. DANDENEAU:  Yes, he did.

22      Q.    Can you tell me what the -- you

23   discussed?

24              MS. DANDENEAU:  No, I object to

25      that.  He's not going to answer.  That is a
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/29/24   Page 129 of 200   PageID 28706

Page 74

1           WATERHOUSE - 10-19-21

2   privileged conversation.

3           MR. MORRIS:  So I just want to make

4   sure that I understand.  During the break

5   you spoke with your client about the

6   substance of this deposition; is that

7   right?

8           MS. DANDENEAU:  Yes, John.

9           MR. MORRIS:  And you refuse -- you

10  refuse to let your client tell me what was

11  discussed; is that right?

12          MS. DANDENEAU:  That's correct.

13          MR. MORRIS:  You know, I had given

14  the instruction prior to the break not to

15  speak with counsel.  I would have

16  appreciated --

17          MS. DANDENEAU:  No, you didn't --

18  actually, that is not true, Mr. Morris.

19  You said not to speak with anyone.  We

20  never have interpreted that to mean

21  conversations with counsel.  That's never

22  been -- I have never, ever heard that

23  instruction.

24          MR. MORRIS:  Okay.  We will -- we

25  will -- we will deal with it when and if we

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 01/09/24    Page 130 of 200    PageID 28707

Page 75

1                    WATERHOUSE - 10-19-21

2          have to.

3          Q.    Mr. Waterhouse, after learning about

4    the agreement, did you ask anybody if the

5    agreement was reflected in a writing?

6               MS. DANDENEAU:  Objection to form.

7          A.    No.

8          Q.    Did you ask anybody if the terms of

9    the agreement were memorialized anywhere?

10              MS. DANDENEAU:  Objection to form.

11              MR. MORRIS:  What is the --

12         A.    No.

13              MS. DANDENEAU:  Well, because you

14         keep talking about this agreement and I --

15         I -- I think, Mr. Morris, that is really

16         not clear what you mean by "the agreement."

17         And maybe you can just go back and restate

18         what that is.

19              MR. MORRIS:  Okay.  Your client has

20         agreed with me twice on the definition, but

21         I will try one more time.

22         Q.    Mr. Waterhouse, do you understand

23    that when I use the term "agreement," I'm

24    referring to the agreement between Jim and

25    Nancy Dondero concerning certain promissory

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 01/09/24    Page 131 of 200    PageID 28708

Page 76

```
 1                   WATERHOUSE - 10-19-21

 2    notes where you learned that one of the terms

 3    of the agreement was milestones reached?

 4         A.    Okay.

 5         Q.    And did you understand that that was

 6    the -- the agreement that we were referring to

 7    every time we used the word "agreement" in this

 8    deposition?

 9         A.    I don't know anything about this

10    agreement.  So, look, I do -- it -- I don't

11    know whether --

12         Q.    Let's -- let's try this again.

13         A.    Yeah.  Look, I don't know what this

14    agreement relates.

15              MS. DEITSCH-PEREZ:  John, John --

16         Q.    Let me try --

17              MS. DEITSCH-PEREZ:  John, please let

18         the witness finish.

19              MR. MORRIS:  Please stop.  Please

20         stop.  Please stop talking.

21              MS. DEITSCH-PEREZ:  No, you stop.

22         Let the witness --

23              MR. MORRIS:  Stop talking.

24              MS. DEITSCH-PEREZ:  -- finish -- you

25         interrupted him.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 132 of 200   PageID 28709

Page 77

```
 1                   WATERHOUSE - 10-19-21

 2              MR. MORRIS:  You know what, you

 3         guys, this is really wrong.  It is really,

 4         really wrong.  Okay?

 5              I had the witness agree not once,

 6         but twice to the definition of agreement.

 7         Okay?  I'm going to try and do it a third

 8         time.

 9              MS. DANDENEAU:  No, but, please,

10    John, really --

11              MR. MORRIS:  No, please stop

12         talking.  Please.  It is my deposition.

13         Object to questions.

14              MS. DANDENEAU:  No, but also you

15         instructed him that -- that if you were

16         going -- if you were interrupting him, that

17         he should remind you that you're

18         interrupting him and -- and --

19              MR. MORRIS:  Let him do that.  Let

20         him do that.

21              MS. DANDENEAU:  Okay.  Well, you --

22              MR. MORRIS:  Please stop talking.

23    A.    Okay.  I don't know any of the

24    details of these agreements.  I don't know

25    anything about them.  I heard -- someone -- I
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/04/31   Page 133 of 200   PageID 28710

Page 78

```
                         WATERHOUSE - 10-19-21
 1
 2   don't know who, I don't know when, as you

 3   asked, sometime in '21, someone told me about

 4   this -- or I don't honestly know -- I don't

 5   even recall exactly how I was made aware of

 6   this, but I was.  I don't know -- I don't know

 7   any of these details, and I'm getting -- again,

 8   there is, you know, I -- I -- I had a passing

 9   conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.    Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15             Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.    And you understand that one of the

25   terms of the agreement is that it was based on
```

1                    WATERHOUSE - 10-19-21

2    milestones that had to be reached; is that

3    right?

4              MS. DANDENEAU:  Objection to form.

5         A.    That was one of the words that was

6    used when I heard about it, yes.

7         Q.    And when you heard about this

8    agreement that had a term in it concerning

9    milestones reached, did you ask the person who

10   was telling you about the agreement whether or

11   not it was in writing?

12        A.    I did not.

13        Q.    Did you ask any questions at all?

14             MS. DANDENEAU:  Objection to form.

15        A.    Not that I recall.

16        Q.    But do you understand that going

17   forward, we're going to refer to the agreement

18   as the agreement that you just described that

19   you were --

20             MS. DANDENEAU:  Object to the form.

21        A.    Yes.

22        Q.    Okay.  You don't have any personal

23   knowledge concerning the terms of the

24   agreement; correct?

25             MS. DEITSCH-PEREZ:  Object to the

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/05/24   Page 135 of 200   PageID 28712

Page 80

1                    WATERHOUSE - 10-19-21

2          form.

3          Q.    You can answer.

4          A.    I don't -- I heard about the

5    agreement.  I don't know anything -- I heard

6    there was an agreement.  That is -- again, as I

7    testified before -- I said before, heard about

8    it, don't know the details.  I believe it was

9    sometime this year.

10         Q.    Do you have any personal knowledge

11   about the terms of the agreement, sir?

12                MS. DANDENEAU:  Objection to form.

13         A.    Other than what I have previously

14   discussed, I don't -- I don't know.

15         Q.    Did -- did Mr. Dondero tell you

16   about the existence of the agreement?

17         A.    I don't recall.

18         Q.    Do you recall the source of your

19   information when you learned about the

20   agreement?

21         A.    No, I don't -- I don't recall.  I

22   don't remember.  I just -- I heard about it

23   generally.  I don't remember -- I don't

24   remember who, how, if, how.  I don't remember.

25         Q.    You know, Mr. Waterhouse, I just

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 01/09/24    Page 136 of 200    PageID 28713

Page 81

1                    WATERHOUSE - 10-19-21

2     want to be clear that I never would have asked

3     you to appear at this deposition if your name

4     hadn't been included in responses to discovery

5     as to somebody with knowledge about the -- who

6     was told about the existence of the agreement.

7                    That is what prompted me do this,

8     and I really do feel compelled to tell you that

9     I otherwise would never have called you as a

10    witness.  So I regret that you're being put

11    through this today.  I had no intention of

12    burdening you or taking your time, but that is

13    the reason that we issued the subpoena is

14    because certain of the defendants identified

15    you as somebody --

16                    MS. DEITSCH-PEREZ:  Mr. Morris, you

17         are here to ask questions, not to have --

18                    MR. MORRIS:  I feel badly for the

19         guy.  I really do.

20                    MS. DEITSCH-PEREZ:  I'm sure you do.

21                    MR. MORRIS:  I do.  Stop.

22                    MS. DEITSCH-PEREZ:  You stop.

23                    MR. MORRIS:  I'm allowed.

24                    MS. DEITSCH-PEREZ:  No, you're not

25         allowed to have a chat with the witness.

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 01/07/483    Page 137 of 200    PageID 28714

Page 82

WATERHOUSE - 10-19-21

1

2      Q.    Okay.  Well, I hope that you

3   appreciate what I'm saying here,

4   Mr. Waterhouse.

5           MS. DANDENEAU:  All right.  Let's go

6      ahead and ask questions, and again, you're

7      entitled to probe his -- his knowledge

8      of -- whatever knowledge he has about

9      this -- this agreement and --

10          MR. MORRIS:  That is what I'm doing.

11          MS. DANDENEAU:  -- he will answer

12      the questions to the best that he can.

13          MR. MORRIS:  That is what I'm doing.

14     Q.    Mr. Waterhouse, I take it you do not

15   know which promissory notes issued by which

16   affiliates or Mr. Dondero are the subject of

17   this agreement; do I have that right?

18     A.    Yes, I don't -- I don't know.

19     Q.    Do you know of any way to determine

20   which promissory notes issued by the affiliates

21   and Mr. Dondero are the subject of this

22   agreement other than asking Jim or Nancy

23   Dondero?

24          MS. DANDENEAU:  Objection to form.

25     A.    I don't know.

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 11/09/04831    Page 138 of 200    PageID 28715

Page 83

WATERHOUSE - 10-19-21

1
2      Q.    Did you ever make --

3      A.    I don't know anything about these

4   agreements.

5      Q.    Did you ever make any effort to

6   determine which promissory notes are subject to

7   this agreement?

8      A.    No.

9      Q.    Did you ever ask anybody which

10  promissory notes are subject to this agreement?

11     A.    No.

12     Q.    Do you know if there is a list

13  anywhere of the promissory notes that are

14  subject to this agreement?

15     A.    I'm not aware.

16     Q.    Have you ever seen the terms of the

17  agreement written down anywhere?

18     A.    No.

19     Q.    Have you ever asked anybody whether

20  the terms of the agreement were written down

21  anywhere?

22     A.    I have not.

23     Q.    Did learning about the agreement

24  cause you to do anything in response?

25              MS. DANDENEAU:   Objection to form.

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 01/09/24    Page 139 of 200    PageID 28716

Page 84

WATERHOUSE - 10-19-21

1

2      A.    No.

3      Q.    Did anybody ever describe to you the

4  nature of the milestones that you referred to

5  earlier?

6      A.    No, I don't -- I don't have any

7  details of this.

8      Q.    That is fine.

9            PricewaterhouseCoopers served as

10 Highland's outside auditors prior to the

11 petition date; correct?

12     A.    Yes.

13     Q.    You refer to PricewaterhouseCoopers

14 as PwC?

15     A.    Yes.

16     Q.    PricewaterhouseCoopers audited

17 Highland's financial statements on an annual

18 basis; correct?

19     A.    During my -- during my time as -- as

20 CFO, yes, PricewaterhouseCoopers was the

21 auditor.

22     Q.    Do you know why Highland had its

23 annual financial statements audited each year?

24     A.    Generally.

25     Q.    Tell me your general understanding

Page 85

1                     WATERHOUSE - 10-19-21

2    as to the reason why Highland had its annual

3    financial statements audited each year.

4         A.    From -- from time to time, they were

5    used -- or asked for, as part of diligence or

6    transactions or -- or things of that nature.

7         Q.    And were they given to third parties

8    for purposes of diligence or transactions from

9    time to time?

10        A.    As far as I'm aware, yes.

11        Q.    And was it your understanding as the

12   CFO that the third parties who received the

13   financial statements in diligence or

14   transactions was going to rely on those?

15             MS. DANDENEAU:  Objection to form.

16        A.    I don't know -- I don't know gen --

17   I don't know specifically what they were going

18   to rely on.  You know, we would get requests

19   for audited financial statements.  I don't know

20   what they were relying on.

21        Q.    And --

22        A.    You would have to ask them.

23        Q.    Did you personally play a role in

24   PwC's annual audit and the conduct of the

25   audit?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 01/09/24   Page 141 of 200   PageID 28718

Page 86

```
 1                   WATERHOUSE - 10-19-21

 2             MS. DANDENEAU:  Objection to form.

 3        A.    During my tenure as CFO, I played a

 4   very minimal role.

 5        Q.    What was the minimal role that you

 6   played?

 7        A.    You know, again, it was -- it was to

 8   check in with the team, to make sure that, you

 9   know, audit -- the deadlines were being hit,

10   information was being presented to the auditors

11   in a -- in a timely fashion, but, you know,

12   other than that, it was a very capable team

13   that are still current employees of Highland

14   and, you know, they -- they conducted 99

15   percent of -- look, I don't want to give

16   percentages.  I mean, this is -- but I -- I --

17   I played a minimal role towards the end.

18             Before during my earlier years as

19   CFO, I did more, and then as time went on, I

20   did less in it.

21        Q.    Okay.  Was there a person at

22   Highland who was responsible for overseeing

23   Highland's participation in PwC's audit during

24   the time that you were the CFO?

25        A.    Yeah.  I mean, there was -- there
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/0483   Page 142 of 200   PageID 28719

Page 87

1           WATERHOUSE - 10-19-21

2    was a -- there was a point -- it varies.  It

3    varies by year, in function, in time and, you

4    know, depending on the request, but yes, I

5    mean, there is -- there is -- there is

6    generally a point person of communication.

7           Q.    And who was the point person from

8    2016 until the time you left Highland?

9           A.    I don't -- I don't know

10   specifically, but it would have been, you

11   know -- you know, someone on the corporate

12   accounting team.

13          Q.    And was there a head of the

14   corporate accounting team?

15          A.    Yes, so -- yes.

16          Q.    Who was the head of corporate

17   accounting for the five years prior to the time

18   you left Highland?

19          A.    I don't -- if you're asking from

20   2016 on, I don't -- it was Dave Klos, but,

21   again, there was -- there was changes to the

22   team and the reporting structure.  I don't

23   remember exactly when that happened during --

24   you know, over the last -- since 2016.

25          Q.    Did the folks who participated and

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/2481   Page 143 of 200   PageID 28720

Page 88

                        WATERHOUSE - 10-19-21

1    ran the audit all report to you, directly or

2    indirectly?

3    A.    Yes.

4    Q.    And did you have any responsibility

5    for making sure that the audit report was

6    accurate before it was finalized?

7    A.    Yeah.  I mean, you know, that --

8    that is -- my responsibility to the auditors

9    was -- again, is -- and the CFO is to -- we are

10   providing accurate financial statements; right?

11        And -- and -- and as part of any

12   audit, we disclose all relevant information as

13   part of any audit.

14   Q.    Okay.  And as the CFO, did you take

15   steps to make sure that the audit report was

16   accurate?

17   A.    I mean, I would say in a general

18   sense, yes.  But, again, I mean, I had a

19   very -- I had a very capable and competent

20   team.  I wasn't managing them.

21        You know, part of what I do is I let

22   the team -- I want managers to grow.  I want

23   managers to have rope.  And that is -- you

24   know, I'm not a stand-behind-you type of guy.

Page 89

1                    WATERHOUSE - 10-19-21

2    If you -- if you talk to my team members, I'm

3    not micromanaging people.  I want people to

4    learn and grow in their function so they can go

5    on and do bigger and better things with their

6    careers.

7                    And so, yes, generally I was

8    responsible for it, but I wanted the team to

9    learn and grow and be responsible for the bulk

10   of the audit.

11        Q.    Did you personally review each audit

12   report before it was finalized to satisfy

13   yourself that it was accurate?

14        A.    I don't -- I don't recall, you know,

15   for every single -- we're talking 2016, there

16   would have been three years, 2016 to '17, '18.

17   I don't -- we're -- we're going back

18   five years-plus.  I don't -- you know, I don't

19   recall.

20        Q.    Did you have a practice that you

21   employed to make sure that you were satisfied

22   that Highland's audit reports were true and

23   accurate to the best of your knowledge?

24        A.    I mean, our -- the practice was set

25   up with our -- the -- the practice to put

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 145 of 200   PageID 28722

Page 90

WATERHOUSE - 10-19-21

1

2   together accurate audited or accurate financial

3   statements is to your control environment.

4            So, you know, the -- so the practice

5   was to maintain a stable control environment

6   which then the output is -- is accurate

7   financial statements.

8            So -- so, you know, if I was

9   comfortable that the control environment was

10  operating, then, you know, that would dictate

11  how I would -- you know, what I might or might

12  not do in a given year.

13      Q.   Okay.  Do you recall ever being

14  uncomfortable with the control environment

15  during the period that you served as CFO?

16      A.   Yeah.  I mean, look, yes, there are

17  times -- you know, nothing is perfect.  So

18  there were -- there were times when, yes, you

19  know -- there are times I learned I was

20  uncomfortable with the control environment, and

21  that is part of the management of the process

22  and having, you know -- and -- and working

23  through whatever obstacles present themselves.

24      Q.   Okay.  Were you ever uncomfortable

25  with the control process as it related to

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 146 of 200   PageID 28723

Page 91

```
 1                  WATERHOUSE - 10-19-21

 2    reporting and disclosures of loans to

 3    affiliates and Mr. Dondero?

 4              MS. DANDENEAU:  Objection to form.

 5         A.    I don't -- I don't recall --

 6         Q.    So you don't recall --

 7         A.    -- the --

 8              MS. DANDENEAU:  Mr. Morris --

 9         A.    I don't recall being uncomfortable.

10    But, again, we're going back several years.  I

11    don't -- you know, the practice in an audit is

12    to disclose all information to the auditors.

13    And I don't -- I don't recall.

14         Q.    As part of the process of the audit,

15    did you sign what is sometimes referred to as a

16    management representation letter?

17         A.    Yes.

18              MR. MORRIS:  Can we put up on the

19         screen a document that we have premarked as

20         Exhibit 33.

21              (Exhibit 33 marked.)

22              MS. DANDENEAU:  Mr. Morris, that is

23         not in the binder; correct?

24              MR. MORRIS:  Correct.

25         Q.    So you will see, Mr. Waterhouse,
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 01/09/2483    Page 147 of 200    PageID 28724

Page 92

                           WATERHOUSE - 10-19-21

1

2    this is a letter dated June 3rd.  And if we

3    could go to the signature page.

4              And do you see that you and

5    Mr. Dondero signed this document?

6         A.   Yes.

7         Q.   That is your signature; right?

8         A.   Yes.

9              MR. MORRIS:  Okay.  Can you go back

10        to the top.

11             MS. DANDENEAU:  Mr. Morris, can you

12        have somebody post this in the chat so that

13        we have can have a copy of this, please.

14             MR. MORRIS:  Yeah, sure.  Asia, can

15        you do that, please.

16        Q.   Okay.  Do you see at the bottom of

17   the second paragraph there is a reference to

18   materiality?

19        A.   Yes.

20        Q.   Okay.  It says, Materiality used for

21   purposes of these representations is

22   $1.7 million.

23             Do you see that?

24        A.   I do.

25        Q.   And did PwC set that level of

```
 1                 WATERHOUSE - 10-19-21
```

 2   materiality?

 3        A.    Yes.

 4        Q.    And for purposes of the audit, did

 5   PwC set the level of materiality each year?

 6        A.    Yes.

 7        Q.    Did that number change over time?

 8        A.    I'm not aware of what materiality is

 9   every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20              If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 11/09/04831    Page 149 of 200    PageID 28726

Page 94

1                    WATERHOUSE - 10-19-21

2    materiality that PwC established?

3                    MS. DANDENEAU:  Objection to form.

4         A.    So, again, during my tenure as CFO,

5    and -- Highland -- it was -- it is required to

6    disclose any affiliate loans that are in excess

7    of materiality.

8                    Now, the forgiveness of those loans

9    may or may not -- I mean, since materiality

10   fluctuates every year, a -- you know, if a loan

11   was forgiven, it may or may not, you know --

12   and, look, I would want to consult the guidance

13   around this.

14                   It is not something we do -- you

15   know, it is not -- you know, GAAP can be and

16   disclosures can be very specialized so, again,

17   we want to consult the guidance.  But we would

18   see if and what would need to be disclosed if

19   it were deemed immaterial.

20        Q.    Did you and Mr. Dondero sign

21   management representation letters of this type

22   in each year in which you served as Highland's

23   CFO?

24        A.    I -- I -- I will speak for myself.

25   I signed them.  There may have been others that

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 150 of 200   PageID 28727

Page 95

1          WATERHOUSE - 10-19-21

2    signed as well.  I don't -- I don't recall.

3          Q.    But to the best of your knowledge,

4    you, personally, signed a management

5    representation letter in connection with

6    Highland's audit each year that you served as

7    the CFO; correct?

8          A.    I would say generally speaking,

9    Mr. Morris.  I don't recall for every single

10   year, you know, generally, but I would want to

11   refer to all the rep letters and see who signed

12   them.

13         Q.    Do you recall Highland having its

14   financial statements audited in any year during

15   the period that you were a CFO where you didn't

16   sign the management representation letter?

17         A.    I don't recall.  But, John, we're

18   going back five, six, seven, eight, nine,

19   decade.  I don't -- I don't remember.

20         Q.    I don't want to go back that many

21   decades, but I'm just asking you if you recall

22   that there was you didn't sign it?

23         A.    I -- I -- I don't, but my memory

24   is -- again, I -- I -- I can't tell you what I

25   did in 2012.  I mean, I think generally, yes,

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 01/09/24   Page 151 of 200   PageID 28728

Page 96

```
 1                  WATERHOUSE - 10-19-21
 2   but I don't -- I don't know for sure, and I
 3   would want to rely on the document.
 4        Q.    Let me ask the question a little bit
 5   differently then.
 6              Do you have any reason to believe
 7   that Highland had its annual financial audit
 8   and you did not sign a management
 9   representation letter in connection with that
10   audit?
11              MS. DANDENEAU:  Objection to form.
12        A.    I don't believe it would, but,
13   again, I would want to -- I don't recall and I
14   would want to confirm it to -- to make, you
15   know, an affirmative -- to give an affirmative
16   answer.
17        Q.    Do you know whether PwC required
18   management to sign management representation
19   letters?
20              MS. DANDENEAU:  Objection to form.
21        A.    Yes.  I mean, it -- management
22   representation letters are signed by
23   management.
24        Q.    Okay.  And do you know -- do you
25   have any understanding as to why PwC requires
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/02/0483   Page 152 of 200   PageID 28729

Page 97

 1                    WATERHOUSE - 10-19-21

 2     management to sign management representation

 3     letters?

 4                    MS. DEITSCH-PEREZ:  Object to the

 5           form.

 6           A.    I don't know why PwC's -- what PwC's

 7     specific practice is.  I know generally what

 8     management representation letters are.

 9           Q.    Okay.  Do you personally -- I'm not

10     asking about PwC.  I'm asking for you -- I'm

11     asking about you, do you have an understanding

12     as to why the auditor asks for management

13     representation letters?

14           A.    Okay.  So you're asking me in my

15     personal capacity, yes, I have a general

16     understanding of why.

17           Q.    Can you give me the general

18     understanding that you have as to why

19     management representation letters are required?

20           A.    They are -- they are required to --

21     they are -- they are one of the items required

22     in an audit to help verify completeness.

23           Q.    Do you have any -- any other

24     understanding as to why management

25     representation letters are required?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/2483   Page 153 of 200   PageID 28730

Page 98

1                     WATERHOUSE - 10-19-21

2          A.     That is -- that is -- other than

3    what I said, it is -- it is -- it is required

4    so -- to ensure that the -- you know, there

5    is -- there is completeness in what is being

6    audited.

7          Q.     Did you -- did you have a practice

8    whereby you and Mr. Dondero conferred about the

9    management representation letters before you

10   signed them?

11         A.     No.

12         Q.     Did you have a practice --

13   withdrawn.

14               Do you see just the next sentence

15   after the materiality, there is a sentence that

16   states:  We confirm, to the best of our

17   knowledge and belief, as of June 3rd, 2019, the

18   date of your report, the following

19   representations made to you during your audit.

20               Do you see that sentence?

21         A.     Yes.

22         Q.     Okay.  Did you understand when you

23   signed this letter that you were confirming the

24   representations that followed?

25         A.     When I signed this management

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/43   Page 154 of 200   PageID 28731

Page 99

1                    WATERHOUSE - 10-19-21

2    letter -- representation letter, yes.

3        Q.    Okay.  Did you discuss this letter

4    with Mr. Dondero before you signed it?

5        A.    I don't recall.

6        Q.    Do you recall if Mr. Dondero asked

7    you any questions before he signed the letter?

8        A.    I don't recall.

9        Q.    Do you recall if you asked

10   Mr. Dondero any questions before you signed

11   this letter?

12       A.    I don't recall.

13       Q.    Is it fair to say that Mr. Dondero

14   did not disclose to you the existence of the

15   agreement that we have -- as we've defined that

16   term prior to the time you signed this letter?

17            MS. DANDENEAU:  Objection to form.

18       A.    I don't think I understand the

19   question.  So, again, you are saying, did

20   Mr. Dondero not disclose to me the existence of

21   this letter?

22       Q.    No, I apologize.

23            Did Mr. Dondero disclose to you the

24   existence of the agreement prior to the time

25   you signed this letter on June 3rd, 2019?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/0483   Page 155 of 200   PageID 28732

Page 100

1                    WATERHOUSE - 10-19-21

2          A.     The agreement -- the agreement that

3    we talked about earlier?

4          Q.     Correct.

5          A.     Look, as I said earlier, the first

6    time I heard of this agreement was sometime

7    this year.

8          Q.     Okay.  Can we turn -- let's just

9    look at a couple of items on the list.  If we

10   can go to page 33416.  Do you see in Number 35

11   it talks about the proper recording or

12   disclosure in the financial statements of ND

13   relationships and transactions with related

14   parties.

15               Do you see that?

16         A.     I do.

17         Q.     As the CFO, do you have any

18   understanding as to whether Dugaboy is a

19   related party?

20         A.     I don't recall.

21         Q.     Do you know whether any of the

22   affiliates are related parties?

23         A.      If -- if it was NexPoint, HCMFA,

24   HCMS, HCRE, yeah, if -- if that is the

25   affiliate definition, and there.  In ASC 850 --

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 170-40   Filed 01/09/24   Page 156 of 200   PageID 28733

Page 101

                    WATERHOUSE - 10-19-21

 1

 2    again, I mean, I haven't looked at ASC 850 in

 3    quite some time, but, you know, if -- if there

 4    is a control language, you know, ASC 850, would

 5    that -- that section in GAAP would -- would

 6    pick up and define what are related parties.

 7              So, you know, like I said, if -- one

 8    of the four entities I just described, if -- if

 9    they are in that control definition of ASC 850,

10    they would be picked up in 35D.

11        Q.    Do you -- do you have any reason to

12    believe that they would be picked up in that

13    definition, based on your knowledge and

14    experience?

15        A.    I -- I believe that entities

16    controlled under GAAP are -- are affiliates.

17        Q.    Okay.  Would Mr. Dondero also

18    qualify as a related party for purposes of

19    Section 35D, to the best of your knowledge?

20        A.    Yeah, I don't -- I don't know.  I

21    would think -- I would have to read the code

22    section to see if someone personally -- is it

23    talking about related parties.  So, look, if

24    your own in control, yeah, I mean, I would have

25    to read the section.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/2431   Page 157 of 200   PageID 28734

Page 102

WATERHOUSE - 10-19-21

1

2      Q.     To the best of your knowledge, was

3   the existence of the agreement ever disclosed

4   to PwC?

5      A.     I'm not -- I'm not aware.

6      Q.     Do you recall if the agreement was

7   ever disclosed in Highland's audited financial

8   statements?

9      A.     I don't -- I don't remember if it

10  was in every Highland's audited financial

11  statements during my tenure.  We would have to

12  read the financial statements to see what was

13  disclosed, but I'm not -- I mean, as I sit here

14  today, I'm not aware.

15     Q.     That is all I'm asking for.

16     A.     I'm not aware.

17     Q.     Can we go to the next page, please,

18  and look at 36.  36 says, we have disclosed to

19  you the identity of the partnership's related

20  party relationships and all the related party

21  relationships and transactions of which we are

22  aware.

23            Do you see that?

24     A.     Yes.

25     Q.     To the best of your knowledge, as of

1                    WATERHOUSE - 10-19-21

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6          A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11         Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15         A.    Yes.

16         Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19         A.    Yes.

20         Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24         A.    It is -- it is -- it is just -- it

25   is a typical audit request.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/03   Page 159 of 200   PageID 28736

Page 104

1              WATERHOUSE - 10-19-21

2        Q.    And do you understand -- do you have

3   an understanding that PwC wanted to know that

4   as of the date of the audit whether any

5   material changes had occurred since the end of

6   the fiscal year, using the definition of

7   materiality that is in this particular

8   management representation letter?

9        A.    It -- it is -- it is -- it is a --

10  it is as described.  It is just a poorly worded

11  question, so it is hard for me to say yes.

12       Q.    If I asked you this, I apologize,

13  but did you ever learn when the agreement was

14  entered into?

15       A.    I don't -- I don't -- like I said

16  before, I don't know or have any details of the

17  agreement.

18       Q.    Okay.  Did you ever ask anybody when

19  the agreement was entered into?

20       A.    I did not.

21       Q.    Let's look at the audited financial

22  statements.  We will put up on the screen a

23  document that has been premarked as Exhibit 34.

24              (Exhibit 34 marked.)

25              MS. DANDENEAU:  And again, if Ms. La

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 160 of 200   PageID 28737

Page 105

1                    WATERHOUSE - 10-19-21

2          Canty could please put that in the chat

3          room, that would be great.

4                    MR. MORRIS:  I will assure you we

5          will put every document in the chat room.

6          Q.    Now, I'm just going to ask you

7    questions that are related to the provisions of

8    this report that concern the affiliate loans,

9    but again, Mr. Waterhouse, if there is any part

10   of the document that you need to see or that

11   you think you might need to see in order to

12   refresh your recollection to answer any of my

13   questions, will you let me know that?

14         A.    Yes.

15         Q.    Because this is a pretty lengthy

16   document, but do you see that the cover page

17   here is the Highland consolidated financial

18   statements for the period ending December 31st,

19   2018?

20         A.    Yes.

21         Q.    If we can go to -- I think it is the

22   next one, looking for PwC's signature line.

23                    MS. CANTY:  I'm sorry, John, did you

24   say something?

25                    MR. MORRIS:  Yes, can we turn the

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 161 of 200   PageID 28738

Page 106

```
 1                   WATERHOUSE - 10-19-21

 2          page.  I think it is 215.  Yes, stop right

 3          there, just above -- I'm sorry, I want to

 4          see just the date of the report.

 5          Q.     Okay.  Do you see at the bottom of

 6     that page there, Mr. Waterhouse,

 7     PricewaterhouseCoopers has signed this audit

 8     report?

 9          A.     Yes, I see their signature.

10          Q.     Okay.  And it is the dated same day

11     as your management representation letter; is

12     that right?

13          A.     It is -- yes, it is the same day.

14          Q.     Was that the practice to sign the

15     management representation letter on the same

16     day that the audit report was signed?

17          A.     Yes, that is typical in every audit.

18          Q.     Can we just scroll down to the

19     balance sheet on the next page.

20                 Do you see that there is a line

21     there that says, Notes and Other Amounts Due

22     from Affiliates?

23          A.     Yes.

24          Q.     Does that line, to the best of your

25     knowledge, include the amounts that were due
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/09/0483   Page 162 of 200   PageID 28739

Page 107

WATERHOUSE - 10-19-21

1

2    under the affiliate under the notes signed by

3    the affiliates and Mr. Dondero?

4              MR. RUKAVINA:  Objection to the

5         extent that calls for a legal conclusion.

6         A.    I mean, I would want to see the

7    detail and the build to this $173,398,000, but,

8    yes, I mean, if -- if -- given what we

9    discussed before, you know, it -- it should

10   capture that.

11        Q.    And -- and while you were the CFO of

12   Highland, were all notes held by Highland that

13   were issued by an affiliate or Mr. Dondero

14   carried as assets on Highland's balance sheets?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Object to form.

17        A.    I don't -- I don't know how else

18   they would be carried.

19        Q.    Okay.  Can you think of any -- are

20   you aware of any promissory note issued by an

21   affiliate or Mr. Dondero that was not carried

22   on Highland's audited financial balance sheets?

23        A.    I'm -- I'm -- I'm not aware.

24        Q.    Okay.  Are you aware of any category

25   of asset on Highland's balance sheet in which

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/09/0483   Page 163 of 200   PageID 28740

Page 108

1          WATERHOUSE - 10-19-21

2    any of the promissory notes issued by an

3    affiliate or Mr. Dondero would have been

4    included?

5              MS. DANDENEAU:  Objection to form.

6        A.    Sorry, am I aware of any asset of an

7    affiliate being included --

8        Q.    That -- let me -- let me try again.

9              Do you see there is a number of

10   different assets that are described on this

11   balance sheet?

12       A.    Yes.

13       Q.    One of the assets that is described

14   is Notes and Other Amounts Due from Affiliates;

15   right?

16       A.    Yes.

17       Q.    And it is reasonable to conclude

18   that the notes from the affiliates and

19   Mr. Dondero are included in that line item;

20   right?

21       A.    Yes, based on this description.

22   Again, I would want to see a build of this to

23   100 percent confirm, but based on the

24   description, the asset description, it is -- it

25   is likely.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 164 of 200   PageID 28741

Page 109

1                    WATERHOUSE - 10-19-21

2              Now, does that mean absolute?  I

3    don't know.

4         Q.    Do you have any reason to believe

5    that the promissory notes would have been

6    carried on the balance sheet in a category

7    other than Notes and Other Amounts Due from

8    Affiliates?

9         A.    If they were deemed -- no.  If they

10   were deemed an affiliate, you know, under GAAP,

11   they should be carried in that line.

12   Otherwise, it would go into another line.

13        Q.    Okay.  And do you see the total

14   asset base as of December 31st, 2018, was

15   approximately $1.04 billion?

16        A.    Yes.

17        Q.    Is my math correct that the Notes

18   and Other Amounts Due from Affiliates

19   constituted approximately 17 percent of

20   Highland's assets as of the end of 2018?

21        A.    Well, so how are you defining

22   Highland?

23        Q.    Highland Capital Management, L.P.,

24   the entity that this audit is subject to -- or

25   the subject of.

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 01/09/24    Page 165 of 200    PageID 28742

Page 110

 1                    WATERHOUSE - 10-19-21

 2        A.    On a consolidated or unconsolidated

 3   basis?

 4        Q.    I'm looking at the balance sheet.

 5   It is a consolidated balance sheet.  Okay?

 6              Does the Notes and Other Amounts Due

 7   from Affiliates constitute approximately

 8   17 percent of the total assets of Highland

 9   Capital Management, L.P., on a consolidated

10   basis?

11              MS. DANDENEAU:  Objection to form.

12        A.    I don't have a calculator in front

13   of me but I will take your math, if you are

14   taking the 173 divided by the billion.

15        Q.    Okay.

16        A.    If that is accurate, yes.  But,

17   again, on a consolidated basis.

18        Q.    And on an unconsolidated basis the

19   percentage would be higher; correct?

20        A.    I -- no.  I don't know.

21        Q.    Well, okay.  That is fair.

22              MR. MORRIS:  Can we turn to

23        page 241, please.

24        Q.    Do you see that this is a section of

25   the audit report that is entitled Notes and

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 01/09/24   Page 166 of 200   PageID 28743

Page 111

 1                    WATERHOUSE - 10-19-21

 2  Other Amounts Due from Affiliates?

 3        A.    Sorry, I can't see the -- the --

 4        Q.    It is at the top.

 5        A.    Notes and Other Amounts Due from

 6  Affiliates, yes, I see that.  I don't -- I

 7  don't have a page number, but I'm on a page

 8  that says at the top:  Notes and Other Amounts

 9  Due from Affiliates.

10        Q.    Okay.  And that is the same title of

11  the line item on the balance sheet that we just

12  looked at; right?  Notes and Other Amounts Due

13  from Affiliates?

14        A.    Yes.

15        Q.    And is it your understanding, based

16  on your experience and knowledge as the CFO,

17  that this is the section of the narrative that

18  ties into the line item that we just looked at?

19        A.    Yes.

20        Q.    And is this section of the audit

21  report intended to describe and disclose all of

22  the material facts concerning the Notes and

23  Other Amounts Due from Affiliates?

24              MS. DANDENEAU:  Objection, form.

25        A.    This -- these notes -- these notes

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 10/07/43   Page 167 of 200   PageID 28744

Page 112

 1                    WATERHOUSE - 10-19-21

 2   of the financial statements are -- the purpose

 3   is to disclose any material items in relation

 4   to that balance sheet line item.

 5        Q.    Okay.  And all of the information,

 6   to the best of your knowledge, that is set

 7   forth in this section of the audit report was

 8   provided by Highland; correct?

 9        A.    Yes, it would have been provided by

10   the corporate accounting team.

11        Q.    Okay.  And the corporate accounting

12   team, did that team report to you in the

13   organizational structure?

14        A.    Yes.

15        Q.    And did you have any concerns about

16   the controls that were in place to make sure

17   that the information provided with respect to

18   Notes and Other Amounts Due from Affiliates was

19   accurate and complete?

20             MS. DANDENEAU:  Objection to form.

21        A.    Not that I recall.

22        Q.    Okay.  Do you recall ever being

23   concerned that any portion of the Notes and

24   Other Amounts Due from Affiliates in any audit

25   report was inaccurate, incomplete, or not

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 168 of 200   PageID 28745

Page 113

1                    WATERHOUSE - 10-19-21

2     reliable?

3          A.    I didn't -- I had concerns about,

4     you know, like I talked about before, of there

5     were -- there were potentially issues in the

6     control environment.  But as far as it relates

7     to the audited financial statements, any -- the

8     team would work with the auditors to disclose

9     all -- all notes in Highland's possession.

10              And any -- any notes that were

11    deemed material by the auditor, right, these

12    were disclosed in these -- in this section, you

13    know, in -- in the notes to the consolidated

14    financial statements as you presented.

15         Q.    Do you recall ever having a

16    conversation with anybody at any time

17    concerning the accuracy of the section of audit

18    reports that relates to Notes and Other Amounts

19    Due from Affiliates?

20              MS. DANDENEAU:  Objection to form.

21         A.    You know, as -- as -- I didn't have

22    direct conversations with

23    PricewaterhouseCoopers as I had, you know --

24    I -- I had the team that managed this.

25              Again, I wasn't anywhere chose to

1      WATERHOUSE - 10-19-21

2    being the point person of this audit.  And I

3    can't recall, you know, when -- you know, I

4    don't even know if I was ever the point person

5    during my tenure as CFO.

6            I don't know if PwC had any concerns

7    when they were performing those audit

8    procedures.  They may have and they may have --

9    and it may not have been communicated to me.  I

10   don't know.

11           MR. MORRIS:  All right.  I move to

12       strike.

13       Q.    And I'm going to ask you to listen

14   carefully to my question.

15           Did you -- do you recall ever having

16   a conversation with anybody at any time

17   concerning the accuracy of the reporting

18   provided in the audited financial statement on

19   the topic of Notes and Other Amounts Due?

20           MS. DANDENEAU:  Objection to form.

21       A.    I don't recall for this, but that

22   doesn't mean that it didn't exist.

23       Q.    Okay.  But you have no reason to

24   believe, as you sit here right now, that you

25   ever discussed with anybody concerns over the

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 11/09/0483    Page 170 of 200    PageID 28747

Page 115

                      WATERHOUSE - 10-19-21

1

2    accuracy of the section of the audit reports

3    called Notes and Other Amounts Due from

4    Affiliates; correct?

5              MS. DANDENEAU:  Object to the form.

6              MS. DEITSCH-PEREZ:  Objection to

7         form.

8         A.    I don't recall having any

9    conversations.  But, again, I mean, this is --

10   this is two years ago.

11        Q.    I'm just asking for your

12   recollection, sir.

13        A.    Yes.

14        Q.    If you don't recall, this will --

15        A.    Yeah.

16        Q.    (Overspeak) -- if you don't

17   recall --

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Do you know who was responsible for

20   drafting the audit report?

21        A.    Are you asking the actual Highland

22   employee responsible?  I mean, it was

23   Highland's responsibility, so, I mean, that

24   is --

25        Q.    Right.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/0483   Page 171 of 200   PageID 28748

Page 116

                    WATERHOUSE - 10-19-21

1

2        A.      -- Highland's responsibility.

3    Highland's responsibility.

4        Q.      Who, at Highland, was responsible

5    for drafting this section of the audit report?

6        A.      I -- I don't know the answer to

7    that.  Again, there was a team who worked on

8    this.  And I don't know, you know, whether it

9    was the staff or the manager.

10              Again, this is where I let the teams

11   manage.  And, you know, there may be a

12   corporate accountant who worked on this.  I

13   just -- you know, I wasn't part of that process

14   to give that person experience.  I don't know.

15       Q.      Do you recall having any

16   communications with anybody at any time

17   concerning this section of the report?

18       A.      Yeah, I don't recall.

19       Q.      Do you recall whether you ever told

20   anybody at any time that any aspect of this

21   section of the report was inaccurate or

22   incomplete?

23       A.      I don't recall.

24       Q.      As you sit here today, do you have

25   any reason to believe that this section of the

```
 1                    WATERHOUSE - 10-19-21
 2    audit report is incomplete or inaccurate in any
 3    way?
 4               And I'm happy to give you a moment
 5    to -- to look at it, if you would like.
 6               MS. DANDENEAU:  Objection to form.
 7               MS. DEITSCH-PEREZ:  Same.
 8        A.    I mean, I would have to look at -- I
 9    would have to look at the bill to the note
10    schedule to make sure I know you presented me
11    with materiality, but again, there might be a
12    note as of 12/31/18 that somehow was -- was
13    under materiality not disclosed.  I don't -- I
14    don't know.  I would need more information.
15        Q.    Okay.  But without more information,
16    you have no reason to believe anything this
17    section is inaccurate; correct?
18               MS. DANDENEAU:  Objection to form.
19        A.    I don't.  I mean, you know, this was
20    part of the audit.
21        Q.    Thank you.  Now, you will see if we
22    could scroll just a little bit more that each
23    of the first five paragraphs concerns
24    specifically the four affiliates that we've
25    been discussing and Mr. Dondero.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 40   Filed 11/09/04831   Page 173 of 200   PageID 28750

Page 118

    1              WATERHOUSE - 10-19-21

    2              MR. MORRIS:  If we could go the

    3         other way, La Asia.  We don't need Okada.

    4         We're going to have to thread the needle.

    5         Okay.  Good, perfect.

    6         Q.    Do you see those five paragraphs

    7    certain the four affiliates and Mr. Dondero as

    8    we've been referring to today?

    9         A.    Yes.

   10         Q.    Okay.  And do you see at the end of

   11    every paragraph it states, quote:  A fair value

   12    of a partnership's outstanding notes receivable

   13    approximates the carrying value of the notes

   14    receivable?

   15         A.    Yes, I see that.

   16         Q.    Do you have an understanding of what

   17    that means?

   18         A.    Yes.

   19         Q.    What is your understanding of that

   20    sentence?

   21         A.    It is the -- again, the -- the fair

   22    value, right, which is -- which is what the --

   23    what Highland could sell that asset for.  This

   24    statement is comparing the fair value of the

   25    notes to the carrying value, so the carrying

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 174 of 200   PageID 28751

Page 119

                    WATERHOUSE - 10-19-21

1

2    value is the line item that you showed me

3    earlier that is in Notes and Other Amounts Due

4    from Affiliates.

5        Q.    Okay.  Is another way to say this is

6    that the fair market value of the notes equals

7    the principal amount and -- withdrawn.

8            Is the fair way to interpret this

9    that the fair market value of the notes equals

10   all remaining unpaid principal and interest due

11   under the notes?

12           MS. DANDENEAU:  Object to the form.

13           MS. DEITSCH-PEREZ:  Objection, form.

14       A.    I don't know the answer to that,

15   because I don't recall where -- where any --

16   where -- in what line item was the interest

17   component reported.

18       Q.    All right.  Well, if we look in this

19   audit report, you will see in the middle of the

20   first paragraph, for example, it states that as

21   of December 31st, 2018, total interest and

22   principal due on outstanding promissory notes

23   was approximately $5.3 million.

24           Do you see that?

25       A.    I do.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/09/0483   Page 175 of 200   PageID 28752

Page 120

1                      WATERHOUSE - 10-19-21

2          Q.     Is that the carrying value or the

3     fair value?

4          A.     That would be the carrying value --

5          Q.     And is the last --

6          A.     -- in my opinion.

7          Q.     Okay.  And it is in your opinion as

8     the chief financial officer of Highland during

9     the period of time that you described; right?

10    It is an educated opinion?

11         A.     I'm reading this at face value.  I'm

12    taking that as that is carrying value.

13         Q.     Okay.  And does the last sentence

14    say that the carrying value is roughly

15    approximate to the fair market value?

16              MS. DANDENEAU:  Objection to form.

17              MS. DEITSCH-PEREZ:  Objection, form.

18         A.     Again, this note to the financial

19    statement is specific to notes and other

20    amounts due from affiliates.

21         Q.     Correct.

22         A.     If the interest component is

23    reported elsewhere on the balance sheet, you

24    know, it -- it -- it could be off.  Again, I

25    don't have the detail.  I don't know, but yes,

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/0483   Page 176 of 200   PageID 28753

Page 121

```
 1                  WATERHOUSE - 10-19-21

 2    look, I mean, if you -- I mean, if you are

 3    saying the 5.3 million is in the notes and

 4    other amounts due from affiliates, then the

 5    last statement is saying the fair value

 6    approximates 5.3 million.  That is what that

 7    last sentence is saying.

 8         Q.    Do you see in the middle of the

 9    first paragraph -- not in the middle, the next

10    to last sentence there is a statement that the

11    partnership will not demand payment on amounts

12    that exceed HCMFA's excess cash availability

13    prior to May 31st, 2021.

14              Do you see that?

15         A.    I do.

16         Q.    Do you know when Highland agreed not

17    to demand payment as described in that

18    sentence?

19         A.    I don't know specifically.

20         Q.    Do you know why Highland agreed not

21    to demand payment on HCMFA's notes until May

22    2021?

23         A.    Yes.

24         Q.    Why was that decision made?

25         A.    You know, well, it -- it -- that
```

```
 1                      WATERHOUSE - 10-19-21

 2    decision was made as to not put HCMFA into a

 3    position where it didn't have sufficient assets

 4    to pay for the demand note.

 5         Q.    And at the time the agreement was

 6    entered into, pursuant to which the partnership

 7    wouldn't demand payment, did HCMFA have

 8    insufficient assets to satisfy the notes if a

 9    demand had been made?

10              MS. DANDENEAU:  Objection to form.

11         A.    I don't have HCMFA's financial

12    statements in front of me as of 12/31/18.

13         Q.    Was there a concern that HCMFA would

14    be unable to satisfy its demands under the

15    notes if demand was made?

16              MS. DANDENEAU:  Objection to form.

17         A.    Well, there is -- I don't recall --

18    I mean, there is something, right, in place to

19    basically not demand payment until May 31, 2021

20    as detailed here.

21         Q.    And who made the decision to enter

22    into -- who made the decision on behalf of

23    Highland not to demand payment until May 31st,

24    2021?

25         A.    I'm trying to remember.  I don't
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/09/2483   Page 178 of 200   PageID 28755

Page 123

```
 1              WATERHOUSE - 10-19-21

 2    remember exactly -- I don't remember if it was

 3    myself or -- or Jim Dondero who -- who -- there

 4    was -- there was something signed, from what I

 5    recall, that -- that -- that backed up this

 6    line item in the -- in the notes I'm -- look,

 7    I'm, I'm --

 8         Q.    We will get to that.

 9         A.    You --

10         Q.    I'm just --

11         A.    You have -- I mean --

12         Q.    We're going to give that to you.

13    I'm going to give that to you.

14         A.    You -- you -- you have all the

15    documents.  I don't have the documents, and

16    that is what makes it so hard.  I don't have

17    any documents to prepare for this deposition;

18    right?  You have all -- I don't -- I don't -- I

19    don't remember, but, you know, again, it would

20    probably be myself or Jim.

21         Q.    Do you know if Highland received

22    anything in return for its agreement not to

23    make a demand for two years?

24         A.    I don't -- I don't think it referred

25    anything.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/04431   Page 179 of 200   PageID 28756

Page 124

```
 1                  WATERHOUSE - 10-19-21

 2       Q.    And did you and Mr. Dondero discuss

 3  HCMFA's ability to satisfy the notes if a

 4  demand was made at the time this agreement was

 5  entered into?

 6             MS. DANDENEAU:  Objection to form.

 7       A.    I don't -- I don't -- I don't recall

 8  having a specific conversation, if I did, or --

 9  or David Klos.

10       Q.    Okay.  I'm just asking if you recall

11  any conversations that you had.

12       A.    I don't recall.

13       Q.    Okay.  Do you know why Highland

14  loaned the money to HCMFA that is the subject

15  of the notes described in this paragraph?

16       A.    I don't remember specifically why

17  5.3 million was loaned.  I mean, I -- it would

18  have to be put in the context.

19       Q.    Do you have any recollection at all

20  as to why Highland ever loaned any money to

21  HCMFA?

22       A.    Yes.

23             MS. DANDENEAU:  Objection to form.

24       Q.    What do you remember about that?

25       A.    There was a Highland Global
```

                        WATERHOUSE - 10-19-21

1   Allocation Fund, which was a -- a fund managed

2   by Highland Capital Management Fund Advisors.

3   There was a -- we -- I'm just telling you,

4   there was -- there was -- there was a -- a

5   ultimately a NAV error found in this fund while

6   it was an open-ended fund and, you know, there

7   were amounts owed by the advisor in -- in

8   relation to that NAV error.

9              There were also, for the same fund,

10  that same fund was ongoing an

11  open-end-to-close-end conversion, and as part

12  of that proposal, shareholders who voted for

13  the conversion received compensation from the

14  advisor.

15       Q.    All right.  Now, the events that

16  you're describing occurred in the spring of

17  2019; right?

18       A.    These started back -- I think, I

19  mean --

20       Q.    I apologize.

21       A.    -- that -- I mean, the answer to

22  that is no.

23       Q.    I apologize, the loans that were

24  made in connection with the events that you're

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 181 of 200   PageID 28758

Page 126

WATERHOUSE - 10-19-21

1    describing occurred in May 2019; right?

2              MR. RUKAVINA:  Objection to the

3         extent that calls for a legal conclusion.

4    A.    I don't recall specifically what

5    amounts of money were moved when, for what

6    purpose.

7    Q.    Okay.  Fair enough.  Going to the

8    next paragraph, do you recall that NexPoint

9    Advisors had obtained a number of loans from

10   Highland, and they rolled up those loans into

11   one note in approximately 2017?

12   A.    This is for NexPoint Advisors?

13   Q.    Yes.

14   A.    I -- I mean, I don't -- I don't

15   recall the NexPoint Advisors loan being a

16   roll-up loan, but --

17   Q.    Do you know why?

18   A.    But, look, if you have documents

19   that show -- I mean, look, I just don't recall.

20   Q.    Okay.  That is fair.  Do you know

21   why -- do you have any recollection as to why

22   Highland loaned money to NexPoint?

23   A.    Yes.

24   Q.    Why did High -- why do you recall --


Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 181 of 200   PageID 28758

Page 126

1                    WATERHOUSE - 10-19-21

2    describing occurred in May 2019; right?

3              MR. RUKAVINA:  Objection to the

4         extent that calls for a legal conclusion.

5    A.    I don't recall specifically what

6    amounts of money were moved when, for what

7    purpose.

8    Q.    Okay.  Fair enough.  Going to the

9    next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13   A.    This is for NexPoint Advisors?

14   Q.    Yes.

15   A.    I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18   Q.    Do you know why?

19   A.    But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21   Q.    Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24   A.    Yes.

25   Q.    Why did High -- why do you recall --

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 182 of 200   PageID 28759

Page 127

```
 1                    WATERHOUSE - 10-19-21
 2    what is the reason you recall Highland lending
 3    money to NexPoint?
 4         A.    I mean, I was just -- I just -- I
 5    just recall.  I mean, I just -- I don't
 6    remember why.
 7         Q.    I understand.  And I'm asking you if
 8    you recall --
 9         A.    Oh, why -- I thought you say --
10    NexPoint Advisors was launching a fund which
11    is -- I believe that the legal name is NexPoint
12    Capital, Inc.  And it -- it provided a
13    co-invest into that fund.
14              And, from what I remember, the --
15    the -- that NexPoint borrowed money from
16    Highland at the time to make that co-invest.
17         Q.    So this was an investment that
18    NexPoint was required to make; is that right?
19              MS. DANDENEAU:  Objection to form.
20         A.    I don't know if it was required to
21    make, I don't recall that, or if it just made
22    it.
23         Q.    Okay.  But your recollection is that
24    NexPoint made an investment and they borrowed
25    money from Highland to finance the investment.
```

1                    WATERHOUSE - 10-19-21

2              Do I have that right?

3         A.    Yes.

4         Q.    How about HCRE?  Do you know why

5    HCRE borrowed money from Highland?

6         A.    I don't remember specifically.

7         Q.    Do you remember generally?

8         A.    Generally, yeah -- I mean, yes.

9         Q.    Can you tell me your general

10   recollection as to why Highland loaned money to

11   HCRE?

12        A.    For -- for -- for investment

13   purposes.

14        Q.    So HCRE made the investment and it

15   obtained a loan, or loans, from Highland in

16   order to finance that investment or those

17   investments.

18              Do I have that right?

19        A.    I mean, I -- you know, generally.

20        Q.    Okay.  How about Highland Management

21   Services, Inc.?

22              Do you have any recollection as to

23   why HCMS borrowed money from Highland?

24        A.    Generally.

25        Q.    What is your general recollection as

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 01/09/24    Page 184 of 200    PageID 28761

Page 129

                        WATERHOUSE - 10-19-21

1

2    to why HCMS borrowed money from Highland?

3         A.    For -- for investment purposes.

4         Q.    So it is the same thing, HCMS wanted

5    to make investments and it borrowed money from

6    Highland in order to finance those investments;

7    is that right?

8         A.    I mean, yes, generally.  I mean, I

9    can't -- I don't -- on the services, there --

10   there are several loans in these schedules.

11   You know, I can't remember why every single one

12   of these were made, but I would say, yeah, I

13   mean, generally.

14        Q.    Okay.  I appreciate that.

15             MR. MORRIS:  Let's go to the page

16        with Bates No. 251.  La Asia, are you

17        there?

18             MS. CANTY:  Sorry, John.  It went

19        out for a minute.  Can you say that again.

20        I don't know what is going on.

21             MR. MORRIS:  The page with Bates

22        No. 251, can we go to that.

23             MS. CANTY:  Yes, sorry.

24             MR. MORRIS:  Keep going to the

25        bottom.  Yeah, there you go.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/483   Page 185 of 200   PageID 28762

Page 130

1                    WATERHOUSE - 10-19-21

2          Q.    Do you see, Mr. Waterhouse, that

3    there is a section there called Subsequent

4    Events?

5          A.    I do.

6          Q.    And does this relate to the last

7    sentence above the signature line on the

8    management representation letter that we talked

9    about earlier where you made the representation

10   that you disclosed subsequent events?

11         A.    I mean, it relates to it, but not in

12   its entirety.

13         Q.    Okay.

14               MR. MORRIS:  If we can scroll up to

15         capture the entirety of this section right

16         here.

17         Q.    And what do you mean by that, sir?

18               MR. MORRIS:  Yeah, right there.

19         Perfect.

20         A.    There are -- there are different

21   subsequent events in -- under GAAP.  So there

22   are -- and -- and -- so what we see in the

23   notes to the financial statements are one type

24   of subevent.

25         Q.    Okay.  And -- and would the type of

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-40    Filed 01/09/24    Page 186 of 200    PageID 28763

Page 131

1                    WATERHOUSE - 10-19-21

2   subsequent event relating to affiliate loans be

3   captured in this section if they were -- if

4   they were made after the end of the fiscal year

5   and prior to the issuance of the audit report?

6        A.    Yes, if they were deemed material or

7   disclosable.

8        Q.    Okay.  I appreciate that.

9              Do you see the next to the last

10  entry there?  It says, Over the course of 2019

11  through the report date, HCMFA issued

12  promissory notes to the partnership in the

13  aggregate amount of $7.4 million?

14       A.    Yes.

15       Q.    And does that refresh your

16  recollection that those are the notes that

17  related to the NAV error that you mentioned

18  earlier?

19       A.    I don't -- I don't remember the

20  exact.  Again, there are -- I mentioned two

21  line items; right?

22       Q.    Yes.

23       A.    I mean, it was the GAAP conversion

24  process plus the -- the NAV error.  I don't

25  have the details.  I don't recall specifically

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 187 of 200   PageID 28764

Page 132

```
 1                    WATERHOUSE - 10-19-21

 2    if -- you know, what -- if that 7.4 million was

 3    solely attributable to the NAV error.

 4         Q.    Okay.  But there is no question that

 5    Highland told PricewaterhouseCoopers that over

 6    the course of 2019 HCMFA issued promissory

 7    notes to the partnership in the aggregate

 8    amount of $7.4 million; correct?

 9         A.    In the course of the audit, we would

10    have produced all promissory notes in our

11    possession, including the ones that are

12    detailed here.

13         Q.    Do you recall that you signed the

14    two promissory notes that are referenced in

15    that provision?

16              MS. DANDENEAU:  Objection to form.

17         A.    I didn't recall initially but I've

18    been reminded.

19         Q.    Okay.  And -- and do you recall that

20    those notes are dated May 2nd and May 3rd,

21    2019?

22         A.    Yes.

23         Q.    So that was just a month before the

24    audit was completed; correct?

25         A.    Yes.  I think we had a June 3rd
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/0483   Page 188 of 200   PageID 28765

Page 133

1                    WATERHOUSE - 10-19-21

2      date, right, if -- if my memory serves me

3      right.

4           Q.    Yes, I will represent to you that

5      your memory is accurate in that regard.

6                 Did anybody ever instruct you as the

7      CFO to correct this statement that we're

8      looking at in subsequent events?

9           A.    So let me understand.  You're saying

10     when I was CFO at Highland Capital did anyone

11     ever ask me to correct the -- over the course

12     of 2019 through the report date HCMFA issued

13     promissory notes, this statement?

14          Q.    Right.

15          A.    Not that I'm aware.

16          Q.    While you were the CFO of Highland,

17     did anybody ever tell you that that sentence

18     was wrong?

19          A.    Not that I'm aware.

20          Q.    Highland -- withdrawn.

21                HCMFA disclosed these notes in its

22     own audited financial statements; right?

23                MR. RUKAVINA:  Objection, form.

24          A.    I assume that these would be

25     material -- if these are material financial

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 11/09/1483    Page 189 of 200    PageID 28766

Page 134

1                    WATERHOUSE - 10-19-21

2    statements, yes, they -- they -- they should be

3    and they were likely disclosed.

4        Q.    Now, there is no statement

5    concerning the 2019 notes about the forbearance

6    that we looked at in the affiliated note

7    section of the report; right?

8              MS. DANDENEAU:   Objection to form.

9        Q.    I'll withdraw.  That was bad.

10             Do you recall when we were looking

11   at the paragraph concerning HCMFA earlier it

12   had that disclosure about the agreement whereby

13   Highland wouldn't ask for demand on the -- on

14   the HCMFA notes?

15       A.    Yes.

16       Q.    That forbearance disclosure is not

17   made with respect to the 2019 notes; right?

18       A.    Not -- look, not that I can recall,

19   unless -- unless it was done at a subsequent

20   day.

21       Q.    Right.  And it is not in the

22   subsequent event section that we're looking at

23   right now where the 2019 notes are described;

24   right?

25       A.    Right.  But this is through

Page 135

```
 1                    WATERHOUSE - 10-19-21

 2    June 3rd.  It could have been done on June 4th.

 3    I don't -- I don't -- I don't recall.

 4         Q.    Okay.

 5              MR. MORRIS:  Can we put up on the

 6         screen the HCMFA audit report.  And while

 7         we're --

 8              MS. DANDENEAU:  What exhibit is

 9         this?

10              MR. MORRIS:  La Asia, what number is

11         that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14         as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17         in the chat.

18              MS. DANDENEAU:  Thank you.

19         Q.    Okay.  All right.  Do you see that

20    this is the consolidated financial statements

21    for HCMFA for the period ending 12/31/18?

22         A.    Yes.

23         Q.    As the treasurer of HCMFA at the

24    time, did you have to sign a management

25    representation letter similar to the one that
```

                        WATERHOUSE - 10-19-21

1      we looked at earlier for Highland?

2          A.    I would imagine I would have been

3      asked to.  I don't recall if I did.

4          Q.    Do you recall ever being asked by an

5      auditor to sign a management representation

6      letter and then not doing it?

7          A.    No.

8               MR. MORRIS:  Can we just scroll down

9          again.  I just want to see the date of the

10         document.

11         A.    I mean, let me -- you know, there

12     are different versions to management

13     representation letters I will qualify.

14              Yes, there are certain -- from time

15     to time auditors can make representations

16     that -- in the rep letter that is being

17     proposed that are inaccurate or out of scope or

18     things like that and they've asked for

19     signature.

20              In that context, yes.  I mean, you

21     know -- I mean, if I have been asked to sign

22     and make those representations and those

23     representations are invalid, yes, I would not,

24     I mean, I -- I wouldn't sign that.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/09/14831 Page 192 of 200   PageID 28769

Page 137

```
 1                 WATERHOUSE - 10-19-21

 2        Q.     Okay.  PricewaterhouseCoopers served

 3   as HCMFA's outside auditors as well; correct?

 4        A.     Yes.

 5        Q.     Do you see that this audit report is

 6   signed on June 3rd, 2019, just like the

 7   Highland audit report?

 8        A.     That is correct.

 9        Q.     And did the process of -- of

10   preparing HCMFA's audit report, was that the

11   same process that Highland followed when it did

12   its audit report at this time?

13        A.     I mean, it is a different entity.

14   There are different assets.  You know, it --

15   it -- it is -- as you saw, Highland's

16   financials are on a consolidated basis.  This

17   is different, so it is under the same control

18   environment and team.

19        Q.     Okay.  I appreciate that.  So the

20   same control environment and team participated

21   in the preparation of the audit for Highland

22   and for HCMFA at around the same time; correct?

23        A.     Yes.

24               MR. MORRIS:  Can we go to page 17 of

25        the report.  I don't have the Bates number.
```

1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  Do you see that just like

3    Highland's audited financial report, HCMFA's

4    audited financial report also has a section

5    related to subsequent events?

6          A.    Yes.

7          Q.    And am I reading this correctly that

8    just as Highland had done, HCMFA disclosed in

9    its audited financial report a subsequent event

10   that related to the issuance of promissory

11   notes to Highland in the aggregate amount of

12   $7.4 million in 2019?

13         A.    That is what I see in the report.

14         Q.    And you were the treasurer of HCMFA

15   at the time; right?

16         A.    Yes, to the best of my knowledge.

17         Q.    And did anybody ever tell you prior

18   to the time of the issuance of this audit

19   report that that sentence relating to HCMFA's

20   2019 notes was inaccurate or wrong in any way?

21         A.    Not that I recall.

22         Q.    As you sit here right now, has

23   anybody ever told you that that sentence is

24   inaccurate or wrong in any way?

25         A.    Not that I recall.

1                    WATERHOUSE - 10-19-21

2        Q.    I apologize if I asked you this

3    already, but has anybody ever told you at any

4    time that you are not authorized to sign the

5    promissory notes that are the subject of the

6    sentence we're looking at?

7        A.    Not that I recall.

8        Q.    Did anybody ever tell you at any

9    time that you had made a mistake when you

10   signed the promissory notes that are the

11   subject of this sentence?

12       A.    Say that again.  Did anyone ever say

13   that I made a mistake?

14       Q.    Let me ask the question again.

15            Did anybody ever tell you at any

16   time that you made a mistake when you signed

17   the two promissory notes in Highland's favor on

18   behalf of HCMFA in 2019?

19       A.    Not that I recall.

20            MR. MORRIS:  Let's just look at the

21            promissory notes quickly.  Can we please

22            put up Document Number 1, and so this is in

23            the pile that y'all have.  We'll just go

24            for a few more minutes and we can take our

25            lunch break.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-40   Filed 11/09/04:83   Page 195 of 200   PageID 28772

Page 140

 1                    WATERHOUSE - 10-19-21

 2        Q.    All right.  So I don't know if you

 3   have seen this before, sir.  Do you see that

 4   this is a complaint against HCMFA?

 5        A.    Yes, I am looking at it on the

 6   screen.

 7        Q.    Okay.  And have you ever seen this

 8   document before?

 9        A.    I went through some of these

10   documents with my counsel here yesterday.

11              MR. MORRIS:  All right.  Can we go

12        to Exhibit 1 of this document.

13        Q.    Do you see Exhibit 1 is a

14   $2.4 million promissory note back in 2019?

15        A.    Yeah, I found it in the book.  Yes,

16   I have it here in front of me.

17        Q.    And this is a demand note, right, if

18   you look at Paragraph 2?

19        A.    Yes.

20        Q.    And this is a note where the maker

21   is HCMFA, and Highland is the payee; right?

22        A.    Yes.

23              MR. MORRIS:  And if we can scroll

24        down, can we just see Mr. Waterhouse's

25        signature.

Page 141

                    WATERHOUSE - 10-19-21

1

2        Q.    Is that your signature, sir?

3        A.    Yes, it is.

4        Q.    And did you sign this document on or

5    around May 2nd, 2019?

6        A.    I don't recall specifically signing

7    this, but this is my signature.

8        Q.    Okay.  And do you recall that

9    Highland transferred $2.4 million to HCMFA at

10   or around the time you signed this document?

11       A.    I don't recall specifically.  I

12   would want to, as I sit here today, go back and

13   confirm that, but again, presumably that --

14   that -- that did happen.

15       Q.    You wouldn't have signed this

16   document if you didn't believe that HCMFA

17   either received or was going to receive

18   $2.4 million from Highland; is that fair?

19       A.    I mean, it -- if -- if -- if there

20   wasn't a transfer of value, yeah, I mean, you

21   know, I would have no reason to -- to sign a

22   note.

23       Q.    And -- and Highland wouldn't have

24   given this note to PricewaterhouseCoopers if --

25   withdrawn.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 01/09/24   Page 197 of 200   PageID 28774

Page 142

1                        WATERHOUSE - 10-19-21

2            HCMFA wouldn't have given this note

3    to PricewaterhouseCoopers if it hadn't received

4    the principal value of -- of the note in the

5    form of a loan; correct?

6            MR. RUKAVINA:  Objection, legal

7        conclusion, speculation and form.

8        A.    Again, we -- what we provided to PwC

9    were, as part of the audit, any promissory

10   notes executed and outstanding.  You know, as a

11   part of the audit, they, you know, they -- they

12   have copies of all the bank statements,

13   things -- things of that sort.

14            MR. MORRIS:  Okay.  Can we go to

15       Exhibit 2.

16            (Exhibit 2 marked.)

17       Q.    Do you see that this is a promissory

18   note dated May 3rd, 2019 in the amount of

19   $5 million?

20       A.    Yes.

21       Q.    Do you believe this is also a demand

22   note if you look at Paragraph 2?

23       A.    Yes.

24       Q.    And do you see that HCMFA is the

25   maker, and Highland is the payee?

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-40    Filed 11/09/23    Page 198 of 200    PageID 28775

Page 143

 1                    WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    And if we go to the bottom, can we

 4  just confirm that that is your signature?

 5       A.    Yes.

 6       Q.    And together these notes are the

 7  notes that are referred to both in Highland and

 8  HCMFA's audited financial reports in the

 9  subsequent event sections; correct?

10            MS. DANDENEAU:  Objection to form.

11       A.    They -- they -- they totaled

12  $7.4 million, so presumably, yes.

13       Q.    Okay.  And you were authorized to

14  sign these two notes; correct?

15            MR. RUKAVINA:  Objection, legal

16       conclusion.

17       A.    Yeah.  I mean, I'm -- I was the

18  officer of -- of HCMFA.  You know, I -- I'm not

19  the legal expert on -- on what that -- what

20  that confers to me or what it doesn't.  I mean,

21  that is my signature on the notes.

22       Q.    And you believed you were authorized

23  to sign the notes; is that fair?

24       A.    I signed a lot of documents in my

25  capacity, just because it is operational in

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-40   Filed 11/09/0483   Page 199 of 200   PageID 28776

Page 144

                    WATERHOUSE - 10-19-21

1

2    nature.  So, you know, to me this was just

3    another document, to be perfectly honest.

4         Q.    Sir, would you have signed

5    promissory notes with the principal amount of

6    $7.4 million if you didn't believe you were

7    authorized to do so?

8              MS. DANDENEAU:  Objection to form.

9         Q.    Are you frozen?

10        A.    No.  I'm just -- you know, it is --

11   you know, again, I typically don't sign

12   promissory notes, and I don't recall why I

13   signed these, but -- you know, but I did.

14        Q.    All right.  So listen carefully to

15   my question.  Would you have ever signed

16   promissory notes with a face amount of

17   $7.4 million without believing that you were

18   authorized to do so?

19        A.    No.  I mean, I'm -- I'm putting my

20   signature on there, so no.

21        Q.    Okay.  And would you have signed two

22   promissory notes obligating HCMFA to pay

23   Highland $7.4 million without Mr. Dondero's

24   prior knowledge and approval?

25             MS. DEITSCH-PEREZ:  Object to the

1              WATERHOUSE - 10-19-21

2         form.

3         A.    You know, from -- from what I recall

4    around these notes, you know, I don't recall

5    specifically Mr. -- Mr. Dondero saying to -- to

6    make this a loan.

7              So my conversation with Mr. Dondero

8    around the culmination of the NAV error as

9    related to TerreStar which was a -- a -- I

10   think it was a year and a half process.  I

11   don't know, it was a multi-month process, very

12   laborious, very difficult.

13             When we got to the end, I had a

14   conversation with Mr. Dondero on where to, you

15   know, basically get the funds to reimburse the

16   fund, and I recall him saying, get the money

17   from Highland.

18        Q.    And so he told you to get the money

19   from Highland; is that right?

20        A.    That is what I recall -- in my

21   conversation with him, that is -- that is what

22   I can recall.

23        Q.    Do you know who drafted these notes?

24        A.    I don't.

25        Q.    Did you ask somebody to draft the