Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-42   Page 400 of 2331 Page 1 of 200   PageID 28978

Page 346

```
1                    WATERHOUSE - 10-19-21

2   either way; correct?

3        A.    Yeah, I don't remember.  I don't

4   remember us discussing that.

5        Q.    Now -- and we're almost done, I

6   promise.  I'm just going to -- I don't know how

7   to ask this question, so I'm just going to try

8   to do my best.

9              Prior to the default on December 31,

10  2020, did Mr. Seery ever tell you any words to

11  the effect that you or someone at Highland

12  should ensure that NexPoint doesn't make its

13  payment?

14       A.    No.

15       Q.    Did you have any hint or any belief

16  that anyone at NexPoint -- I'm sorry, strike

17  that.

18             Did you have any reason to believe

19  that anyone with Highland was actively trying

20  to get NexPoint to make that default by not

21  paying on December 31?

22             MR. MORRIS:  Objection to the form

23       of the question.

24       A.    Are you asking, did any Highland

25  employees actively work to make -- to
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-42   Page 402 of 831   Page 2 of 200   PageID 28979

Page 347

```
 1                    WATERHOUSE - 10-19-21

 2   somehow --

 3        Q.    Yes.  Let me take a step back.  Let

 4   me take a step back.

 5             So you are aware now that as a

 6   result of that default, what was still some

 7   25-year note was accelerated and became

 8   immediately due.  You are aware of that now;

 9   right?

10        A.    Yes.

11        Q.    And can you see how someone at

12   Highland might actually have been pleased with

13   that development?

14             MR. MORRIS:  Objection to the form.

15        Q.    Not that they were --- not that they

16   were pleased, but you can see how someone at

17   Highland might have been pleased with that

18   development?

19             MR. MORRIS:  Objection to the form

20        of the question.

21             MS. DANDENEAU:  Object to form.

22        A.    I don't know how they would have

23   reacted to that.

24        Q.    Okay.  But you're not -- you're not

25   aware of any instructions or any actions being
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-42   Filed 04/09/23   Page 3 of 200   PageID 28980

Page 348

1                    WATERHOUSE - 10-19-21

2      given or taken at Highland by Mr. Seery, the

3      independent board, DSI, that -- that would have

4      basically led Highland to ensure that NexPoint

5      would fail to make that payment?

6           A.    I'm not aware.

7           Q.    In other words, there wasn't a trick

8      or a settlement; right?

9                    MS. DEITSCH-PEREZ:  Objection to

10          form.

11                   MS. DANDENEAU:  Object to form.

12                   MR. MORRIS:  Object to form.

13          A.    I'm not aware.

14                   Look, I'm not aware.  I'm not in

15     every conversation.  I mean, and I'm just --

16     again, I'm sitting at home.  It is the end of

17     the year.  Again, I'm not aware.

18          Q.    That is a perfectly legitimate

19     answer.  I don't know why -- why you think

20     otherwise.

21                   Okay.  Just give me one second to

22     compose my thoughts.

23                   MS. DEITSCH-PEREZ:  While you're

24          taking your one second, why don't we take

25          three minutes.  I will be right back.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-42   Page 4 of 231   Page 4 of 200   PageID 28981

Page 349

```
 1                  WATERHOUSE - 10-19-21

 2               VIDEOGRAPHER:  Do we want to go off

 3      the record?

 4               MR. RUKAVINA:  Yes.

 5               VIDEOGRAPHER:  All right.  We're

 6      going off the record at 6:27 p.m.

 7      (Recess taken 6:27 p.m. to 6:30 p.m.)

 8               VIDEOGRAPHER:  We are back on the

 9      record at 6:30 p.m.

10               MR. HORN:  Is Deb back?

11               MS. DANDENEAU:  Are you asking about

12      me?  I'm here.

13               MR. HORN:  Oh, okay.  I don't see

14      you, sorry.

15      Q.   Actually, yeah, Mr. Waterhouse, so

16   when you had --

17               MS. DANDENEAU:  Are you asking about

18      Deb Dandeneau or Deborah?  I mean, there

19      are a lot -- as we talked about, a lot of

20      Debs.  I'm here.

21               MS. DEITSCH-PEREZ:  I'm here.

22               MR. HORN:  Yes, I was asking about

23      DDP.

24               MS. DEITSCH-PEREZ:  Oh, DDP is here.

25               MR. HORN:  Okay.  Here we go.  I'm
```

```
 1                   WATERHOUSE - 10-19-21

 2          going back on mute.

 3                   MS. DANDENEAU:  Get the right

 4          nomenclature.

 5          Q.    Mr. Waterhouse, on January 12th,

 6   2021, when you had those talks with Mr. Dondero

 7   about the $1.4 million payment, did you have a

 8   communication or a conversation with Mr. Seery

 9   about that payment after January 12th, 2021?

10          A.    I don't recall.

11          Q.    Well, in response to Mr. Dondero

12   reaching out to you, do you recall on that day,

13   January 12th, talking to Mr. Seery or anyone at

14   Highland other than the email chain we just saw

15   about Mr. Dondero's call with you?

16          A.    Did I talk to -- I spoke with

17   Kristin -- I don't know if I spoke to her.  I

18   likely spoke to Kristin Hendrix because we had

19   to get the wire on NexPoint's behalf to make

20   the payment to Highland.

21          Q.    So it is true, then, that -- that

22   employees of the debtor did actually cause that

23   payment to be made when it was made after

24   January 12th?

25          A.    Yes, I mean, we -- we -- as I
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X   Document 176-42   Page 406 of 831 Page 6 of 200   PageID 28983

Page 351

```
 1                    WATERHOUSE - 10-19-21

 2      testified earlier, we provided that accounting

 3      finance treasury function as -- under the

 4      shared services agreement.  And so once I

 5      got the -- I talked to Jim, got the approval to

 6      make this payment, we have to then make the

 7      payment, or the team does, and so the payment

 8      was made.

 9           Q.    Okay.  But -- okay.  And -- and

10      sitting here right now, after Jim called you,

11      you don't remember talking to anyone other than

12      the -- the couple of people you mentioned,

13      talking to anyone about something to the effect

14      that, hey, Jim wants to make this payment now?

15                 MR. MORRIS:  Objection to the form

16           of the question.

17           A.    I don't -- I don't recall.

18           Q.    And does that include legal counsel?

19                 Without going into any detail, on

20      January 12th or before that payment was made,

21      did you consult with legal counsel about

22      anything having to do with the $1.4 million

23      payment?

24           A.    I don't recall.

25           Q.    Okay.  Thank you, sir, for your
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-42   Page 407 of 831   Page 7 of 200   PageID 28984

Page 352

```
1                    WATERHOUSE - 10-19-21

2    time.

3              MR. RUKAVINA:  Pass the witness.

4              MR. MORRIS:  I just have a few

5        questions, if I may.

6              MS. DEITSCH-PEREZ:  Don't you go at

7        the end?

8              MR. MORRIS:  Oh, I apologize.  He is

9        your witness.  I'm surprised you want to

10       ask him questions, but go right ahead.

11             MS. DEITSCH-PEREZ:  Just have a

12       couple of things.

13             MR. RUKAVINA:  And I will just

14       object to that, that he's our witness.

15       That's not --

16             MR. MORRIS:  I'm not talking to you.

17       I'm not talking to you.

18             MS. DANDENEAU:  Also, Mr. Morris, it

19       is -- it is --

20             MS. DEITSCH-PEREZ:  He is not my

21       witness.  He's been subpoenaed by you.

22       Okay?

23             That is no offense, Mr. Waterhouse,

24       I'm -- I'm not -- okay.  Anyway.

25                    EXAMINATION
```

Page 353

1          WATERHOUSE - 10-19-21

2    BY MS. DEITSCH-PEREZ:

3         Q.    Good evening.  I'm very sorry to be

4    going last and I know you have had a long and

5    taxing day, so I thank you for indulging me.

6              The kinds of services that you

7    describe that the -- that Highland provided for

8    NexPoint, did Highland also provide similar

9    services to that to HCRE and HCMS?

10        A.    Yes.

11             MR. MORRIS:  Objection to the form

12        of the question.

13        Q.    What kind of services did Highland

14   provide to HCRE and HCMS?

15             MR. MORRIS:  Objection to the form

16        of the question.

17             MS. DEITSCH-PEREZ:  What is your

18        objection, John?

19             MR. MORRIS:  It is vague and

20        ambiguous.  Unlike the advisors and

21        NexPoint, they actually had shared services

22        agreements.

23             MS. DEITSCH-PEREZ:  I got -- I

24        understand your objection.  That is fine.

25        Q.    Let's take them one at a time.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-42   Page 409 of 331 Page 9 of 200   PageID 28986

Page 354

1                    WATERHOUSE - 10-19-21

2                    What kinds of services did Highland

3    provide to HCRE?

4                    MR. MORRIS:  Objection to the form

5        of the question.

6        A.    HCMS, Highland employees provided

7    accounting services, treasury management

8    services, potentially legal services.  I

9    don't -- but I wouldn't have been directly

10   involved in that.  But as far as the teams that

11   I manage, it was accounting, treasury, things

12   of that nature.

13       Q.    Okay.  And that was for HCM, LLP --

14       A.    And -- and, sorry, it would also be

15   any asset valuation if needed as well.

16       Q.    Okay.  We went back and forth on

17   each other and I apologize, so just to clarify.

18                   You were talking about the services

19   that Highland Capital Management provided to

20   HCMS; is that right?

21       A.    HCMS.  So, again, yes.  And

22   accounting, treasury, valuation, and also tax

23   services too.

24       Q.    Okay.

25       A.    Tax services.  Look, I'm expanding

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 172    Filed 04/09/21    Page 10 of 200    PageID 28987

Page 355

 1                    WATERHOUSE - 10-19-21

 2    this, their HR services as well.

 3         Q.    Okay.  And did that include bill

 4    paying?

 5              MR. MORRIS:  Objection to the form

 6         of the question.

 7         Q.    Did the services that HCM provided

 8    to HCMS include bill paying?

 9              MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Yes.

12         Q.    And did the services that HCMLP

13    provided to HCMS include scheduling upcoming

14    bills?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes.

18         Q.    And did HCMLP regularly pay -- cause

19    to be paid the payments on loans HCMS had from

20    HCMLP?

21              MR. MORRIS:  Objection to the form

22         of the question.

23         A.    Yes.

24         Q.    Typically -- if there is a

25    typically, how far in advance of due dates did

1                    WATERHOUSE - 10-19-21

2    HCMLP cause HCMS to pay its bills?

3              MR. MORRIS:  Objection to the form

4         of the question.

5         A.    I mean, it -- it -- it depend -- it

6    depended on the nature of the payment and the

7    vendor, but, you know, if there were -- if

8    there were larger scheduled payments, you know,

9    I would like to give at least 30 days notice.

10             And that is -- that is kind of my

11   rule of thumb so no one is surprised.

12        Q.    Okay.  And was it generally HCMLP's

13   practice to timely pay HCMS' bills?

14             MR. MORRIS:  Objection to the form

15        of the question.

16        A.    It -- it -- it -- that depended on

17   the nature of the payment.

18        Q.    Okay.  And can you explain what you

19   mean by that?

20        A.    Yeah, I mean if -- if it was -- I

21   mean -- if there was some professional fees

22   that weren't -- you know, they were due but

23   they weren't urgent, those fees may not be paid

24   as timely as others that have a due date or --

25   or things like that.

1                       WATERHOUSE - 10-19-21

2          Q.    Okay.  Are loan payments the kinds

3    of thing that HCMLP would pay on time because

4    of potential consequences of not paying on

5    time?

6               MR. MORRIS:  Objection to the form

7          of the question.

8          A.    Yes.  As I testified earlier, we

9    would want to give, you know, notice on -- on

10   -- on larger payments and -- and things of that

11   nature so we didn't miss due dates.

12         Q.    Okay.  And over the course of time,

13   did HCMLP generally pay HCMS' loan payments in

14   a timely fashion?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    I can't remember specifically, but

18   generally, yes.

19         Q.    Okay.  Now, did HCMLP provide

20   similar services to HCRE that you have

21   described it provided to HCMS?

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Yes, but I don't think it -- it

25   provided -- I don't think it provided HR

1              WATERHOUSE - 10-19-21

2    services.

3         Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5         A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9         Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/09/24   Page 14 of 200   PageID 28991

Page 359

1                  WATERHOUSE - 10-19-21

2    loan payment that was due from HCMS to HCMLP in

3    December of 2020?

4              MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I don't believe that payment --

7    payment was made.

8         Q.    Okay.  And when HCMLP caused HCMS in

9    the past to make loan payments, whose money did

10   it use to make those payments?

11             MR. MORRIS:  Objection to the form

12        of the question.

13        A.    It was the -- the money in HCMS's

14   operating account would be made to that --

15   those moneys would be used to make payment to

16   Highland Capital Management.

17        Q.    Okay.  And Highland -- is it correct

18   that Highland Capital Management personnel had

19   the access to HCMS's accounts to be able to

20   cause such payments to be made?

21        A.    Yes, Highland personnel had access

22   to those accounts.

23        Q.    Okay.  And so now for HCRE, whose

24   money was used when HCMLP caused HCRE

25   payments -- loan payments to Highland to be

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 42   Filed 04/09/431   Page 15 of 200   PageID 28992

Page 360

                        WATERHOUSE - 10-19-21

1    made?

2              MR. MORRIS:  Objection to the form

3        of the question.

4    A.    It was -- it was cash in HCRE's bank

5    account that would be used to make payments to

6    Highland Capital Management.

7    Q.    Okay.  And so did Highland Capital

8    Management have access to HCRE's funds in order

9    to be able to make such payments?

10             MR. MORRIS:  Objection to the form

11       of the question.

12   A.    Personnel at Highland Capital

13   Management had access to HCRE's bank account to

14   effectuate the payments.

15   Q.    Okay.  And was the payment due from

16   HCRE to HCMLP due in December of 2020 made?

17   A.    It --

18   Q.    In December of 2020.

19   A.    It was not.

20   Q.    Okay.  And was there money in HCRE's

21   account that would have enabled the payment to

22   be made had HCM personnel attempted to make the

23   payment?

24             MR. MORRIS:  Objection to the form

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 72    Filed 04/06/23    Page 16 of 200    PageID 28993

Page 361

1                     WATERHOUSE - 10-19-21

2          of the question.

3          A.    I -- I don't recall.

4          Q.    Do you have any reason to believe

5     that either HCRE or HCMS simply didn't have the

6     funds on hand to make the December 2020

7     payments?

8          A.    I don't know.

9          Q.    I guess I'm asking, do you have any

10    reason to believe that they didn't have the

11    funds?

12         A.    We managed cash for so many

13    different entities and funds, and I don't

14    recall, you know, where the cash position was

15    for HCRE and HCMS at 12/31/2020.

16         Q.    Okay.

17         A.    I just don't recall, and I don't --

18    and I don't remember what the loan payment

19    obligations were from HCRE to Highland, and

20    from HCMS to Highland.  I don't recall.  I

21    don't recall, I mean...

22         Q.    Let me come at it a different way.

23    Were the -- were the payments that would

24    otherwise have been due in December of 2020

25    made in January of 2021 for HCMS and HCRE?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/09/21   Page 17 of 200   PageID 28994

Page 362

```
 1                    WATERHOUSE - 10-19-21

 2         A.    I believe the HCRE payment was made

 3   in January of 2021.  I don't recall any

 4   payments being made from HCMS to Highland.

 5         Q.    If it -- how is it the HCRE payment

 6   came to be made?  Why did you make it -- why

 7   did HCM make the payment in January of 2021?

 8         A.    Jim -- Jim called me and instructed

 9   me to -- to make the payment on behalf of HCRE,

10   Jim Dondero -- Jim Dondero.

11         Q.    Did he seem upset that -- that the

12   payment had not been made?

13         A.    Yeah.  On the note that was, you

14   know, that was the term note, yes, he -- he was

15   displeased that the -- that the payment had not

16   been made by year-end.

17         Q.    Okay.  And did you make the -- cause

18   the payment to be made as -- as requested?

19         A.    Yes.

20         Q.    And did anyone else from HCM

21   participate with you in causing the payment to

22   be made to -- on the HCRE loan?

23         A.    Yes.  It would have been Kristin

24   Hendrix.  I -- again, I don't -- as I testified

25   earlier, I'm not an officer of HCRE.  I don't
```

```
 1                    WATERHOUSE - 10-19-21

 2    believe I'm an authorized signer.  So I

 3    can't -- other personnel have to make payment

 4    from HCRE to -- to -- to -- to Highland.

 5         Q.    Okay.  And in the conversation

 6    that -- that you had with Mr. Dondero when he

 7    requested the payment to be made, did you say

 8    to him words to the effect, Jim, this loan is

 9    going to stay in default, what are you making

10    the payment for, anything like that?

11         A.    No.

12         Q.    In fact, did you have the impression

13    from him that he thought that the loan would

14    be -- the default would be cured by making the

15    payment?

16              MR. MORRIS:  Objection to the form

17         of the question.

18         A.    Did I get the impression from Jim

19    Dondero that the loan would be cured if the

20    payment from HCRE --

21         Q.    Yeah, if that is what he thought.

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    I didn't get any impression from him

25    on that at the time.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/09/24   Page 19 of 200   PageID 28996

Page 364

WATERHOUSE - 10-19-21

1

2        Q.    Do you know whether there was an

3   HCMS term loan that had a payment due in

4   December of 2020?

5        A.    I don't recall.

6        Q.    Okay.  And so the reason you don't

7   recall whether or not there was a payment in

8   January of 2021 is because you just don't

9   remember whether there was such a loan at all?

10            MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't remember.  There is -- there

13   is so many notes, and I mean, demands, and I

14   don't -- I don't remember.  It's a lot to keep

15   track in your head.

16        Q.    I understand, and -- and I hear your

17   frustration when you have explained that the

18   debtor has your documents and you don't, and so

19   I fully appreciate it, and this is no knock on

20   you.  It's a knock on somebody else on this

21   call.

22            MR. MORRIS:  I move to strike.  That

23        was pretty obnoxious, but go ahead.

24        Q.    Okay.  But so, Mr. Waterhouse, if --

25   if a payment on the HCMS loan was made in

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/20/31   Page 20 of 200   PageID 28997

Page 365

```
 1                    WATERHOUSE - 10-19-21

 2    January of 2021, do you think it was part of

 3    the same conversation where Jim Dondero said,

 4    hey, why didn't that get paid, please make

 5    that -- get that payment done?

 6              MR. MORRIS:  I object to the form of

 7        the question.

 8        A.    Yes.  Likely it would have been -- I

 9    mean, again, I don't recall a payment being

10    made, but, you know, again, I don't remember

11    everything.

12        Q.    Okay.  Did -- at the time you were

13    communicating with Kristin Hendrix about the

14    payment being made, whichever payments were

15    made in January, did she say anything to you

16    about the payments not curing the loan

17    defaults?

18        A.    No.

19        Q.    Okay.  All right.  So I'm going to

20    take you back to very early in the deposition

21    when Mr. Morris was asking you about the --

22    the -- the -- the agreement with respect to

23    the -- the forgiveness element of the loans, so

24    that is just to orient you.

25              Do you remember that there was a
```

1                    WATERHOUSE - 10-19-21

2     time that you and Mr. Dondero were

3     communicating about potential means of

4     resolving the Highland bankruptcy by what was

5     colloquially referred to as a pot plan?

6          A.    Yes.

7          Q.    Okay.  And can you tell me generally

8     when that was?

9          A.    Like mid -- mid 2020, sometime in

10    2020, mid 2020.

11         Q.    Okay.  And did the process of trying

12    to figure out what the numbers should be

13    involve looking at what one should pay for the

14    Highland assets?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes.

18         Q.    Okay.  And did there come a time

19    when you were proposing some potential numbers

20    and Mr. Dondero said something to you like,

21    well, why are you including payment for the

22    related party notes, those, you know, were

23    likely to be forgiven as part of my deferred

24    executive compensation?

25              MR. MORRIS:  Objection to the form

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-12    Filed 04/29/24    Page 22 of 200    PageID 28999

Page 367

```
 1                     WATERHOUSE - 10-19-21

 2       of the question.

 3       A.    Yes, we did have that conversation.

 4       Q.    Okay.  Was that conversation in

 5   connection with trying to figure out the right

 6   numbers for a pot plan?

 7       A.    Yeah.  I mean, it was -- it was -- I

 8   mean, Jim -- Jim would ask for, you know,

 9   most -- most recent asset values, you know, for

10   Highland, and -- and myself and the team

11   provided those to him, so it was in that

12   context.

13       Q.    Okay.  And does that refresh your

14   recollection that these communications were in

15   2020 rather than 2021?

16            MR. MORRIS:  Objection to the form

17       of the question.

18       A.    The -- the -- the executive

19   compensation discussions were definitely in

20   2020.

21       Q.    Okay.  Now, did you ever make

22   proposals that took into account Jim's comment

23   that the notes were likely to end up forgiven

24   as part of his compensation?

25            MR. MORRIS:  Objection to the form
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 72   Filed 04/29/31   Page 23 of 200   PageID 29000

Page 368

```
 1                 WATERHOUSE - 10-19-21

 2         of the question.

 3         A.    Yes, we -- the team and myself put

 4    together, you know, asset summaries of Highland

 5    at various times for all the assets of

 6    Highland, and not including the notes.

 7         Q.    Okay.  And were those presentations

 8    communicated to -- to Mr. Seery?

 9         A.    No.  Well, look, I didn't tell -- I

10    didn't tell Mr. Seery.  I don't know what

11    Mr. Dondero did with the information.

12         Q.    Okay.

13         A.    I did not have conversations with

14    Mr. Seery.

15         Q.    Okay.  Do you know who saw the

16    presentations that you put together that didn't

17    include the value of the related party notes?

18         A.    We're talking presentations -- these

19    are -- these are Excel spreadsheets?

20         Q.    Uh-huh.

21         A.    I don't know who -- these were given

22    to -- to Jim Dondero.  I don't know what was

23    done with them after that.

24         Q.    Okay.  You also mentioned earlier

25    that sometime during your tenure at Highland
```

```
 1                    WATERHOUSE - 10-19-21

 2   you knew of the practice of giving forgivable

 3   loans to executives.

 4             MR. MORRIS:  Objection to the form

 5        of the question.

 6        Q.   Can you -- can you tell me what you

 7   recall about that practice?

 8             MR. MORRIS:  Objection to the form

 9        of the question.

10        A.   Yes, so there were -- there were --

11   during my tenure at Highland, there were loans

12   or -- given to employees that were later

13   forgiven at a future date and time.

14        Q.   Okay.  And when the loans were

15   given, did the notes, to your recollection, say

16   anything about the potential forgiveness term?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.   When you say "did the notes," did

20   the promissory notes detail the forgiveness?

21        Q.   Yes.

22        A.   Not that I recall.

23        Q.   And until such time as whatever was

24   to trigger the forgiveness occurred, were the

25   notes bona fide notes as far as you were
```

1                  WATERHOUSE - 10-19-21

2    concerned?

3               MR. MORRIS:  Objection to the form

4         of the question.

5         A.    Yes, similar to -- yes.

6         Q.    Okay.  You were going to say similar

7    to what?

8         A.    Mr. Morris earlier today showed

9    notes of the financial statements about various

10   affiliate loans.  I -- I -- I do recall these

11   notes because I -- at that time personally

12   worked on the -- the financial statements of

13   Highland.  That was, you know, in my role as a

14   corporate accountant.

15              And there were -- those loans

16   were -- to the partners were detailed in the

17   notes to the financial statements, similar to

18   what we went through earlier today in the prior

19   testimony about what we saw with Highland

20   and -- and -- and the -- and HCMFA.

21        Q.    Is it fair to say that on Highland's

22   balance sheet there were any number of assets

23   that the value of which could be affected by

24   subsequent events?

25              MR. MORRIS:  Objection to the form

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 72   Filed 04/20/23   Page 26 of 200   PageID 29003

Page 371

```
1                    WATERHOUSE - 10-19-21

2         of the question.

3         A.    Yes.  I mean, yes, that -- there

4    are.  And that is -- yes.

5         Q.    Okay.  And is it typical accounting

6    practice that until there is some certainty

7    about those potential future events, that asset

8    value listed on -- on the books doesn't take

9    into account those potential future events?

10                  MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yeah, if those -- yes.  If -- if

13   those future events, you know, at the time of

14   issuance are not known or knowable, like I

15   discussed earlier with, like, market practice,

16   asset dislocation, or, you know, I mean, things

17   like that, you -- I mean, it -- it could affect

18   its fair value --

19        Q.    Okay.

20        A.    -- in the future.

21        Q.    And am I correct you wouldn't feel

22   compelled to footnote in every possible change

23   in -- in an asset when those possibilities are

24   still remote?

25                  MR. MORRIS:  Objection to the form
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 12   Filed 04/27/24   Page 27 of 200   PageID 29004

Page 372

1                     WATERHOUSE - 10-19-21

2          of the question.

3          A.    The accounting standard is you have

4    to estimate to the best -- you know, to -- to

5    the best of your ability, the fair value of an

6    asset as of the balance sheet date under --

7    under GAAP.

8          Q.    Did -- strike that.

9                Okay.  Give me a minute.  I'm

10   close -- I'm close to done.  Let me just go off

11   and look at my notes for a second.  So take two

12   minutes.

13               VIDEOGRAPHER:  We're going off the

14         record at 7:02 p.m.

15         (Recess taken 7:02 p.m. to 7:03 p.m.)

16               VIDEOGRAPHER:  We are back on the

17         record at 7:03 p.m.

18         Q.    Mr. Waterhouse, is it generally your

19   understanding that people you work with now

20   have been asking the debtor for full and

21   unfettered access to their own former files?

22               MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Yes, I am -- I am generally aware.

25         Q.    Okay.  And do you think you could

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 12   Filed 04/28/31   Page 28 of 200   PageID 29005

Page 373

1                    WATERHOUSE - 10-19-21

2    have been better prepared for this deposition

3    if the debtor had complied with those requests?

4              MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I -- I -- I most certainly -- yes.

7    I mean, again, these are multiple years,

8    multiple years ago, lots and lots of

9    transactions.

10             You know, we asked about NAV errors

11   and, you know, things like that and these

12   are -- it would make this process a lot more --

13   a lot easier and if we had -- if we had access

14   to that.

15        Q.    Okay.  And has the debtor -- is the

16   debtor suing you right now?

17        A.    Yes.

18        Q.    And is the debtor trying to renege

19   on deals that it had previously made with you?

20             MR. MORRIS:  Objection to the form

21        of the question.

22        A.    Sorry, I need to -- it is my

23   understanding that the litigation trust is

24   suing me.  And not being a lawyer, I don't

25   know -- is that the debtor?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 12   Filed 04/29/31   Page 29 of 200   PageID 29006

Page 374

```
 1                 WATERHOUSE - 10-19-21

 2                 Is that -- I don't know the

 3     relationship.  So, again, I'm not the lawyers.

 4     I've said many times.  But my understanding is

 5     the litigation trust is suing me.  I could be

 6     wrong there.  I don't know.

 7          Q.   Okay.  I understand.

 8                 Someone with some connection to the

 9     Highland debtor has brought a claim against

10     you; is that fair?

11                 MR. MORRIS:  Objection to the form

12          of the question.

13          A.   Yes.

14          Q.   Okay.  And is there also some motion

15     practice in the bankruptcy where the debtor or

16     someone associated with the debtor is

17     attempting to undo something that was

18     previously resolved with you?

19          A.   Yes.

20          Q.   And so in one action somebody is

21     associated with the debtors trying to --

22     threatening you with trying to take money from

23     you, and then in the other -- and trying to --

24     and in the other they are threatening not to

25     pay you things that had previously been agreed;
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 172    Filed 04/30/24    Page 30 of 200    PageID 29007

Page 375

1                     WATERHOUSE - 10-19-21

2    is that correct?

3              MR. MORRIS:  Objection to the form

4         of the question.

5         A.    I want to be -- yes, I -- there

6    is -- I'm being sued, again, on -- on something

7    that was agreed to with Mr. Seery and myself.

8    I don't -- I don't -- I don't own that claim.

9         Q.    Okay.

10        A.    To be transparent, I don't own that

11   claim.  So it is not my personal property.

12        Q.    Okay.

13        A.    And -- and being the nonlawyer, I

14   don't know how I can get sued for something

15   that I don't owe or, like, I don't own

16   anything.  I'm not the lawyer.  But, I mean, if

17   that is -- if I'm understanding the facts

18   correctly.

19        Q.    Okay.  And the lawsuit that was

20   filed that names you, that was just filed

21   this -- this past week; is that right?

22              MS. DANDENEAU:  Ms. Deitsch-Perez, I

23         do want to interrupt at this point because

24         just as I told Mr. Morris, that this is a

25         deposition about the noticed litigation.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/19/431   Page 31 of 200   PageID 29008

Page 376

```
 1                WATERHOUSE - 10-19-21

 2              I really don't want to go -- go

 3       afield --

 4              MS. DEITSCH-PEREZ:  Yeah.

 5              MS. DANDENEAU:  -- and open up a

 6       whole new line of inquiry about the lawsuit

 7       or the -- the motion and the bankruptcy

 8       court.  We will be here all night.

 9              MS. DEITSCH-PEREZ:  And I

10       understand.

11       Q.    My -- my point is:  Do you feel

12    like -- like there is some effort by these

13    parties related to the debtor to intimidate

14    you -- not that you -- I'm not saying you are

15    or you aren't.

16              But do you feel like there is some

17    effort to intimidate you and maybe an effort to

18    deter you from being as prepared as you might

19    be in this deposition?

20              MR. MORRIS:  Objection to the form

21       of the question.

22       A.    I was -- I was surprised by the

23    lawsuit, by me being named, because, again, I

24    don't own the asset and things like that.

25    Yeah, I just -- I want to move forward with my
```

 1                  WATERHOUSE - 10-19-21

 2    life at Skyview.

 3                  MS. DEITSCH-PEREZ:  Thank you.

 4                  THE WITNESS:  Thank you.

 5                      FURTHER EXAMINATION

 6    BY MR. MORRIS:

 7         Q.     If I may, I just have a few

 8    questions.

 9                  Mr. Waterhouse, we saw a number of

10    documents that Mr. Rukavina put up on the

11    screen where Ms. Hendrix would send you a

12    schedule of payments that were due on behalf of

13    certain Highland affiliates.

14                  Do you remember that?

15         A.     Yes.

16         Q.     And in each instance she asked for

17    your approval to make the payments; is that

18    right?

19         A.     Yes, she did.

20         Q.     And was that the -- was that the

21    practice in the second half of 2020 whereby

22    Ms. Hendrix would prepare a list of payments

23    that were due on behalf of Highland associates

24    and ask for approval?

25         A.     Yes.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 12   Filed 04/39/41   Page 33 of 200   PageID 29010

Page 378

1                    WATERHOUSE - 10-19-21

2        Q.    And I think you said that there was

3    a -- a --

4        A.    It was -- I think I testified to

5    this earlier when we talked about procedures

6    and policy, you know, again, I want to be

7    informed of -- of -- of -- of -- of any

8    payments that are going out.  I want to be made

9    aware of these payments, and that was just a

10   general policy, not just for 2020.

11       Q.    Okay.  So it went beyond 2020?

12       A.    Yes.

13       Q.    Is that right?

14       A.    Yes.

15       Q.    Okay.  And the corporate accounting

16   group would prepare a calendar that would set

17   forth all of the payments that were anticipated

18   in the -- in the three weeks ahead; is that

19   right?

20       A.    I -- like I testified earlier, we

21   had a corporate calendar that was set up, you

22   know, to -- to provide reminders or, you know,

23   of anything of any nature, whether it is

24   payments or -- or financial statements or, you

25   know, whatever it is, you know, to meet

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/29/24   Page 34 of 200   PageID 29011

Page 379

1                  WATERHOUSE - 10-19-21

2    deadlines.

3              I don't know how, as I testified

4    earlier, how much they were using that

5    calendar.

6         Q.    Okay.  But -- but you did get notice

7    and a request to approve the payments that were

8    coming due on behalf of Highland's affiliates.

9    Do I have that right?

10             MS. DANDENEAU:  Objection to form.

11        A.    I mean, generally, yes.  I mean, you

12   know, as we saw with these emails, generally, I

13   mean, did that encompass everything, no.

14        Q.    Okay.  Do you know why the

15   payment -- do you know why there was no payment

16   made by NexPoint at the end of 2020?

17        A.    Yes.  There was -- there was -- we

18   talked about these agreements between the

19   advisors and Highland, the shared services and

20   the cost reimbursement agreement.

21             And in late 2020, there were

22   overpayments, large overpayments that had been

23   made over the years on these agreements, and it

24   was my understanding that the advisors were --

25   were talking with -- like Jim Seery and others

1                    WATERHOUSE - 10-19-21

2   to offset any obligations that the advisors

3   owed to Highland as offset to the overpayments

4   on these agreements.

5        Q.    Okay.  Did you participate in any of

6   those conversations?

7        A.    I did not.

8        Q.    Okay.  Do you know -- do you recall

9   that the -- at the end of November, the debtor

10  did notice to the advisors of their intent to

11  terminate the shared services agreements?

12       A.    Like I testified earlier, there

13  was -- the agreements weren't identical, from

14  what I recall, and there is one that had a

15  longer notice period, which I think had a

16  60-day notice period.  I don't recall which one

17  that was, so not all of them were -- notice

18  hadn't been given as of November 30th, for all

19  of the agreements.

20       Q.    Upon the receipt of the -- the

21  termination notices that you recall, do you

22  know if the advisors decided at that point not

23  to make any further payments of any kind to

24  Highland?

25                MR. RUKAVINA:  Objection, form.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/30/2431   Page 36 of 200   PageID 29013

Page 381

1                     WATERHOUSE - 10-19-21

2          A.    No.  The advisors -- the advisors

3    had stopped making payments prior to that

4    notice.

5          Q.    Okay.  And how do you know that the

6    advisors stopped making -- making payments

7    prior to the notice?

8          A.    I had -- I had a conversation

9    with -- with Jim Dondero.

10         Q.    And did Mr. Dondero tell you that

11   the advisors would no longer make payments to

12   Highland?

13              MS. DEITSCH-PEREZ:  Object to the

14         form.

15         A.    Yes, he -- he -- again, he said

16   they -- they -- the advisors have overpaid on

17   these agreements, to not make any future

18   payments, and that there needs to be offsets,

19   and they're working on getting offsets to these

20   overpayment.

21         Q.    Do you know if anybody ever

22   instructed Highland's employees to make the

23   payment that was due by NexPoint at the end of

24   the year?

25         A.    Did anyone instruct Highland's

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 72    Filed 04/30/31    Page 37 of 200    PageID 29014

Page 382

1                    WATERHOUSE - 10-19-21

2    employees to make that payment?

3         Q.    Correct.

4         A.    Anyone -- not that I'm aware.

5         Q.    Were any of Highland's employees

6    authorized to make the payments on behalf of

7    its affiliates -- withdrawn.

8               Was any of Highland's employees

9    authorized to effectuate the payment on behalf

10   of NexPoint that was due at the end of the year

11   without getting approval from either you or

12   Mr. Dondero?

13        A.    They had the -- they had the ability

14   to make the payment, but they didn't -- you

15   know, that -- that payment needed to be

16   approved.

17        Q.    Okay.  And it needed to be approved

18   by you or Mr. Dondero; is that right?

19        A.    I mean, I'm not going to make the

20   unilateral decision.

21        Q.    Is that a decision that you

22   understood had to be made by Mr. Dondero?

23        A.    Yes.  Sitting back in December of

24   2020, the -- that -- there was this off --

25   offset negotiation that -- that was happening,

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/30/24   Page 38 of 200   PageID 29015

Page 383

```
 1              WATERHOUSE - 10-19-21

 2   so I mean, until those negotiations were

 3   resolved, you know, there wasn't any

 4   payments -- there weren't any payments.

 5        Q.    And -- and there were no payments

 6   until the negotiations were resolved because

 7   that was the directive that you received from

 8   Mr. Dondero; correct?

 9        A.    I don't think he said -- I mean, I

10   think -- yeah, I mean -- I'm trying to recall

11   the conversation.  It was -- you know, there

12   is -- there is these negotiations.  There's --

13   there needs to be these offsets.  They're

14   talking with the debtor.  So, you know, until

15   this is resolved, right, I mean, depending on

16   how, whatever that resolution was, were we to

17   take any action.

18        Q.    Okay.  How about with respect to

19   HCMS, did HCMS have a term payment due at the

20   end of the year?

21        A.    Again, I don't -- I don't recall.

22        Q.    Okay.  You discussed briefly two

23   payments that were made in January of 2021, one

24   on behalf of NexPoint, and one on behalf of

25   HCMS.  Do I have that right?
```

1                    WATERHOUSE - 10-19-21

2        A.     No.   The two payments I recall were

3    NexPoint and HCRE.

4        Q.     Okay.  And those two payments --

5    thank you for the correction.  And those two

6    payments were made because Mr. Dondero

7    authorized those payments to be made; correct?

8        A.     Yes.

9        Q.     And they hadn't been made before

10   that because Mr. Dondero had not authorized

11   them to be made?

12               MS. DEITSCH-PEREZ:  Object to the

13         form.

14       A.     Yes, because of these negotiations.

15       Q.     Okay.  Just a couple of more

16   questions.

17               Did anybody, to the best of your

18   knowledge, on behalf of HCMFA, ever tell the

19   SEC that HCMLP was responsible for the mistakes

20   that were made on the TerreStar valuation?

21       A.     Did anyone from Highland on HCMFA's

22   behalf tell the SEC that Highland -- that

23   Highland was responsible for there -- I just

24   want to make sure --

25       Q.     It was a little bit different, so

                    WATERHOUSE - 10-19-21

1

2   let me try again.

3        A.     These are very long questions, John.

4   I'm not trying to be --

5        Q.     That is good.  Do you know whether

6   anybody -- do you know whether anybody on

7   behalf of HCMS -- HCMFA ever told the SEC that

8   Highland was the responsible party for the

9   TerreStar valuation error?

10       A.     Not that I'm aware.

11       Q.     Okay.  Did anybody on behalf of

12  the -- on behalf of HCMFA ever tell the retail

13  board that Highland was responsible for the

14  TerreStar valuation error?

15       A.     Not that I'm aware.

16       Q.     Do you know if HCMFA made an

17  insurance claim with respect to the damages

18  that were incurred in relation to the TerreStar

19  valuation error?

20       A.     Yes.

21       Q.     And do you know why they made that

22  insurance claim?

23       A.     Because there was an error.  I

24  mean --

25       Q.     Was the insured's claim made -- was

1                    WATERHOUSE - 10-19-21

2     the insurance claim made under HCMFA's policy?

3         A.    Yes.

4         Q.    Did HCMFA at any time prior to the

5     petition date -- withdrawn.

6              You were asked a couple of questions

7     where -- where you said that Mr. Dondero told

8     you that he was ascribing zero value to the

9     notes as part of a pot plan because he believed

10    that the notes were part of executive

11    compensation.

12             Do I have that right?

13             MS. DEITSCH-PEREZ:  Object to the

14        form.

15        A.    Yes.

16        Q.    Okay.  Have you ever heard that

17    before the time that Mr. Dondero told you that

18    in the conversation about the pot plan?

19        A.    Had I heard that prior to my

20    conversation with Mr. Dondero?

21        Q.    Yes.

22        A.    No, I had not heard that prior.

23        Q.    Okay.  And that was in the context

24    of his formulation of the settlement proposal;

25    is that right?

```
 1                   WATERHOUSE - 10-19-21

 2        A.    I mean, generally, yes.  You know,

 3   we were asked to provide asset values, right,

 4   and he was having settlement discussions.

 5   Again, I don't know who those went to

 6   ultimately.  I don't recall.

 7             MR. MORRIS:  I have no further

 8        questions.  Thank you very much for your

 9        patience.  I apologize for the late hour.

10             MS. DEITSCH-PEREZ:  John, you stay

11        on about your email when --

12             MR. RUKAVINA:  Hold on, I'm not

13        done.

14             MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15        still has questions.  Sorry.  I was going

16        to say both John and Davor, could you stay

17        on afterwards just to talk about the

18        requests.

19                   FURTHER EXAMINATION

20   BY MR. RUKAVINA:

21        Q.    Mr. Waterhouse, you were just now

22   testifying about a discussion you had with

23   Mr. Dondero where he said something like no

24   more payments.

25             Do you remember that testimony?
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 72   Filed 04/09/24   Page 43 of 200   PageID 29020

Page 388

 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Okay.  And was that late November or

 4   early December of 2020?

 5        A.    It was, I would say, first or second

 6   week of November.

 7        Q.    Okay.  Do you recall whether --

 8   whenever you had that discussion, whether

 9   Mr. Dondero had already been fired by the

10   debtor?

11        A.    Yes, I -- I believe he was not an

12   employee of the debtor anymore at that time.

13        Q.    And when you were discussing this

14   with Mr. Dondero and he said no more payments,

15   you were discussing the two shared services

16   agreements and employee reimbursement

17   agreements we testified -- you testified about

18   before; is that correct?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    That is correct.

22        Q.    And had your office or you -- and we

23   will talk at a future deposition about the

24   administrative claim.

25             But had -- by that time that you

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 72   Filed 04/09/24   Page 44 of 200   PageID 29021

Page 389

                    WATERHOUSE - 10-19-21

1

2    talked to Mr. Dondero, had your office or you

3    done any estimate of what the alleged

4    overpayments were?

5              MR. MORRIS:  Objection to the form

6         of the question.

7         A.    Yes, we had -- there was a -- there

8    was a detailed analysis that was put together

9    by David Klos at the time.

10        Q.    And do you recall just generally

11   what the total amount for both advisors of the

12   overpayments was?

13        A.    It was in excess of $10 million.

14        Q.    Was it in excess of $14 million?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I -- I remember it was an

18   eight-figure number.  I don't remember

19   specifically.

20        Q.    Okay.  And did you convey that

21   number to Mr. Dondero when you had that

22   conversation?

23        A.    Yes.

24        Q.    What was his reaction?

25        A.    I mean, he wasn't happy.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/09/21   Page 45 of 200   PageID 29022

Page 390

```
1                  WATERHOUSE - 10-19-21

2        Q.    Is it fair to say he was upset?

3        A.    Yes.

4        Q.    Did Mr. Dondero ever expressly tell

5    you to not have NexPoint make the required

6    December 31, 2020, payment?

7        A.    Yes, I recall him saying don't make

8    the payment because it was being negotiated, as

9    I discussed with Mr. Morris, this offset

10   concept.  So there were obligations due by the

11   advisors to Highland, they should be offset

12   that -- you know, those obligations should be

13   offset by this -- by this overpayment.

14       Q.    And when did he tell you that?

15       A.    I would say -- I would say around --

16   probably December -- December-ish.

17       Q.    Early December, late December?

18       A.    I don't recall with as much

19   specificity as -- as -- as -- as stopping the

20   shared services payments, because we had

21   actually made one shared services payment in

22   November.  So that is why I need to remember

23   that one more clearly.  I don't remember where

24   exactly in December that conversation occurred.

25       Q.    Did Mr. Dondero expressly use the
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 172    Filed 04/09/831    Page 46 of 200    PageID 29023

Page 391

```
 1                    WATERHOUSE - 10-19-21

 2     word "NexPoint" when he was saying don't make

 3     these payments?

 4                    MR. MORRIS:  Objection to the form

 5          of the question, asked and answered.

 6          A.     Yeah, we were -- we were discussing

 7     advisor obligations.  So it was -- you know, it

 8     was just obligations from the advisors.

 9                    And -- and he specifically talked

10     about the NexPoint payment as well.

11          Q.     Okay.  And it is your testimony that

12     he expressly told you not to make that NexPoint

13     December 31 payment?

14                    MR. MORRIS:  Objection, asked and

15          answered twice.

16          A.     Yes, he -- he did, during that

17     conversation.

18          Q.     And did you ever follow up with him

19     after that about whether NexPoint should or

20     shouldn't make that payment?

21          A.     I did not.

22          Q.     Did you ever, on or about

23     December 31, 2020, remind him and say, hey,

24     this payment is due, what shall I -- what

25     should I do?
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 72   Filed 04/07/23   Page 47 of 200   PageID 29024

Page 392

```
 1                    WATERHOUSE - 10-19-21

 2      A.    I did not.

 3      Q.    So sitting here today, you -- you

 4   remember distinctly that Dondero in December of

 5   2020 expressly told you not to have NexPoint

 6   make that payment?

 7            MR. MORRIS:  Objection, asked and

 8        answered three times.

 9      A.    Yes.

10      Q.    Can you say categorically it wasn't

11   just some general discussion where he told you

12   not to make payments?

13            MR. MORRIS:  Objection, asked and

14        answer four times.

15            MR. HORN:  Four times now.  Go for

16        five.

17      A.    Yes.

18      Q.    Did you tell Mr. Seery that?

19      A.    I don't believe I did.  I don't

20   recall.

21      Q.    And was this an in-person discussion

22   or telephone or email?  Do you remember?

23      A.    This was a phone -- a phone

24   conversation.

25      Q.    Okay.  Would you have a record of --
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 42   Filed 04/08/24   Page 48 of 200   PageID 29025

Page 393

1                     WATERHOUSE - 10-19-21

2   on your cell phone of when that conversation

3   might have taken place?

4               I'm sorry, strike that.

5               Was that by cell phone?

6       A.   I believe -- yes, because we -- I

7   was at home.  I mean, I don't have a landline.

8   All I have is my cell phone.

9       Q.   Do you know whether your cell phone

10  still has records of conversations from

11  December 2020 on it?

12      A.   My call log doesn't go back that

13  far.

14      Q.   Okay.  Thank you.

15              MR. RUKAVINA:  I will pass the

16  witness.

17              MS. DEITSCH-PEREZ:  Just a couple

18      quick questions.

19                  FURTHER EXAMINATION

20  BY MS. DEITSCH-PEREZ:

21      Q.   With respect to HCRE and HCMS, am I

22  correct there was -- there was no direction not

23  to pay those loan payments?

24              MR. MORRIS:  Objection to the form

25      of the question.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 142   Filed 04/49/04 831   Page 49 of 200   PageID 29026

Page 394

                        WATERHOUSE - 10-19-21

1

2       A.    Yes, I don't recall having

3   conversations about, you know, those -- those

4   entities.

5       Q.    And, in fact, what was the tone that

6   Mr. Dondero had when he talked to you about the

7   fact that HCRE and HCMS payments hadn't been

8   made when he found out that they hadn't been

9   paid?

10              MS. DANDENEAU:  Objection to form.

11              MR. MORRIS:  Objection to form.

12      Q.    What was the tone he took with you?

13      A.    Oh, it was -- it was -- it was -- it

14  was very negative.  I mean, I think he cursed

15  at me and he doesn't usually curse.

16      Q.    Okay.  And in your mind, is that

17  consistent with the fact that he was surprised

18  that those payments hadn't been made?

19              MR. MORRIS:  Objection to the form

20      of the question.

21      A.    Yes.

22      Q.    Okay.  Thank you.

23              MR. MORRIS:  I have nothing further.

24      Thank you so much, Mr. Waterhouse.

25              MR. HORN:  I have no questions.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/09/24   Page 50 of 200   PageID 29027

Page 395

1                    WATERHOUSE - 10-19-21

2          Thank you, Mr. Waterhouse.  We appreciate

3          your time.  I am logging off the discussion

4          and I will talk to y'all tomorrow.

5                    MR. MORRIS:  Super.

6                    VIDEOGRAPHER:  If there are no

7          further questions, this ends the

8          deposition -- excuse me.  This ends the

9          deposition, and we are going off the record

10         at 7:30 p.m.

11         (Deposition concluded at 7:30 p.m.)

12

13                    _____

14                         FRANK WATERHOUSE

15

16    Subscribed and sworn to before me

17    this      day of               2021.

18

19    ---------------------------------

20

21

22

23

24

25

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 42   Filed 04/09/21   Page 51 of 200   PageID 29028

Page 396

1            WATERHOUSE - 10-19-21

2                C E R T I F I C A T E

3

4        I, SUSAN S. KLINGER, a certified shorthand

5    reporter within and for the State of Texas, do

6    hereby certify:

7        That FRANK WATERHOUSE, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11       I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15       IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18   _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25

```
 1                    WATERHOUSE - 10-19-21

 2   NAME OF CASE:  In re:  Highland Capital

 3   DATE OF DEPOSITION:  October 19, 2021

 4   NAME OF WITNESS:  Frank Waterhouse

 5   Reason Codes:

 6          1.  To clarify the record.

 7          2.  To conform to the facts.

 8          3.  To correct transcription errors.

 9   Page____Line_____Reason_____

10   From_____to_____

11   Page____Line_____Reason_____

12   From_____to_____

13   Page____Line_____Reason_____

14   From_____to_____

15   Page____Line_____Reason_____

16   From_____to_____

17   Page____Line_____Reason_____

18   From_____to_____

19   Page____Line_____Reason_____

20   From_____to_____

21   Page____Line_____Reason_____

22   From_____to_____

23   Page____Line_____Reason_____

24   From_____to_____

25
```

Kristin Hendrix - October 27, 2021

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
 2            FOR THE NORTHERN DISTRICT OF TEXAS
 3                     DALLAS DIVISION
 4                        --o0o--
 5
 6   HIGHLAND CAPITAL MANAGEMENT,     )
     L.P.,                            )
 7                                    )
                    Plaintiff,        )
 8                                    )
              vs.                     ) No. 21-03004-sgj
 9                                    )
     HIGHLAND CAPITAL MANAGEMENT FUND )
10   ADVISORS, L.P.,                  )
                                      )
11                  Defendants.       )
12   _____
13                   DEPOSITION OF
14                  KRISTIN HENDRIX
15                 October 27, 2021
16   _____
17
18           DEPOSITION OF KRISTIN HENDRIX, produced as a
19   witness, duly sworn by me via videoconference at the
20   instance of the DEFENDANTS, was taken in the
21   above-styled and numbered cause on October 27, 2021,
22   from 10:11 A.M. to 1:19 P.M., before BRANDON D. COMBS,
23   CSR, RPR, in and for the State of Texas, reported by
24   computerized machine shorthand, at 500 North Akard
25   Street, 38th Floor, Dallas, Texas.
```

Kristin Hendrix - October 27, 2021

```
 1                         APPEARANCES

 2

 3              MUNSCH, HARDT, KOPF & HARR, PC, 500 North

 4  Akard Street, Suite 3800, Dallas, TX 75201, represented

 5  by DAVOR RUKAVINA, Attorney at Law, appeared as counsel

 6  on behalf of the Defendants.

 7              Email: drukavina@munsch.com

 8

 9

10              PACHULSKI, STANG, ZIEHL & JONES, 780 Third

11  Avenue, 34th Floor, New York, NY 10017-2024, represented

12  by JOHN A. MORRIS, Attorney at Law, appeared as counsel

13  on behalf of the Plaintiff.

14              Email: jmorris@pszjlaw.com

15

16

17              STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,

18  Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney

19  at Law, appeared via videoconference as counsel on

20  behalf of the Defendants Jim Dondero, HCMS and HCRE

21  Partners.

22              Email: michael.aigen@stinson.com

23

24

25
```

Kristin Hendrix - October 27, 2021

```
 1                        INDEX
 2                                            PAGE
 3      Examination by MR. RUKAVINA               6
 4      Examination by MR. AIGEN                 94
 5      Further Examination by MR. RUKAVINA     110
 6      Examination by MR. MORRIS               111
 7
 8   EXHIBITS                                   PAGE
 9
10   Exhibit 1    Promissory Note, 5M, May 3      30
11
12   Exhibit 2    Promissory Note, 2.4M, May 2    30
13
14   Exhibit 3    Email from David Klos, May 2, 2019,   31
15                HCMLP to HCMFA loan
16
17   Exhibit 4    Promissory Note, 5M, May 3      42
18
19   Exhibit 5    Promissory Note, 2.4M, May 2    42
20
21   Exhibit 6    Promissory Note, 5M, May 3      43
22
23   Exhibit 7    Promissory Note, 2.4M, May 2    43
24
25   Exhibit 8    Info, HCMF loan 05.03.2019      56
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/06/831   Page 56 of 200   PageID 29033

4

Kristin Hendrix - October 27, 2021

| 1  | Exhibit 9  | Info, HCMF loan 05.02.2019           | 56 |
| 2  |            |                                      |    |
| 3  | Exhibit 10 | Email from Scott Ellington, Dec 2,   | 59 |
| 4  |            | 2020, HCM - HCMFA financial          |    |
| 5  |            | statements                           |    |
| 6  |            |                                      |    |
| 7  | Exhibit 11 | Email from John Morris to            | 62 |
| 8  |            | James Seery, Jan 6, 2021,            |    |
| 9  |            | HCM information request              |    |
| 10 |            |                                      |    |
| 11 | Exhibit 12 | Letter, Dec 3, 2020, Demand on       | 65 |
| 12 |            | Promissory Notes                     |    |
| 13 |            |                                      |    |
| 14 | Exhibit 13 | Promissory Note, $30,746,812.33,     | 72 |
| 15 |            | May 31                               |    |
| 16 |            |                                      |    |
| 17 | Exhibit 14 | NPA $30.7M                            | 76 |
| 18 |            |                                      |    |
| 19 | Exhibit 15 | HCMLP Notes Receivable               | 83 |
| 20 |            |                                      |    |
| 21 | Exhibit 16 | Email from Frank Waterhouse to       | 85 |
| 22 |            | Lauren Thedford, Oct 6, 2020, 15(c)  |    |
| 23 |            | follow-up                            |    |
| 24 |            |                                      |    |
| 25 |            |                                      |    |

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-12   Filed 04/07/23   Page 57 of 200   PageID 29034

5

Kristin Hendrix - October 27, 2021

| 1 | Exhibit 17 | Email from James Seery to | 88 |
| 2 | | James Dondero, Jan 7, 2021, demand | |
| 3 | | on promissory note | |
| 4 | | | |
| 5 | Exhibit 18 | Email from Kristin Hendrix, Jan 12, | 90 |
| 6 | | 2021, NexPoint Note to HCMLP | |

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 72    Filed 04/08/24    Page 58 of 200    PageID 29035
6

Kristin Hendrix - October 27, 2021

1           KRISTIN HENDRIX,

2    having been first duly sworn, testified as follows:

3                    EXAMINATION

4        Q.   (BY MR. RUKAVINA)  Good morning.  If you'll

5    state your name.

6        A.   Kristin Hendrix.

7        Q.   We're doing this both ways.  You're on the

8    Zoom remotely and they can see you, but I would ask

9    that you and I maintain eye contact.  Of course, if

10   someone is asking you on the Zoom, then maintain

11   contact with them, if that's okay with you.

12       A.   Sure.

13       Q.   Have you been deposed before?

14       A.   No.

15       Q.   So I'm sure your counsel explained to you,

16   but very quickly, you understand that you're testifying

17   under oath and penalty of perjury as though you were in

18   a court of law?

19       A.   Yes.

20       Q.   And you understand my job is to ask clear

21   questions that you understand?

22       A.   Yes.

23       Q.   And if for whatever reason you don't

24   understand my questions, please let me know or ask me

25   to rephrase; otherwise, I'm going to assume that you

Kristin Hendrix - October 27, 2021

1  understood my question; okay?

2      A.   Yeah.

3           MR. MORRIS:   Objection.

4      Q.   (BY MR. RUKAVINA)   Sometimes Counsel will

5  make objections.   Unless he instructs you not to

6  answer, you're still required to answer my questions.

7      A.   Okay.

8      Q.   Now, in preparation for this deposition, did

9  you read the deposition transcript or any part of it of

10 Frank Waterhouse?

11     A.   I did not.

12     Q.   Did anyone provide you a synopsis or summary

13 of it?

14     A.   Maybe a few bits and pieces, but...

15          MR. RUKAVINA:   Off the record for a second.

16          (Off the record.)

17     Q.   (BY MR. RUKAVINA)   What do you mean bits and

18 pieces?

19     A.   I don't recall anything specific that was

20 said, other than it was very long.

21     Q.   Did you talk to Frank Waterhouse about it?

22     A.   Did not.

23     Q.   Other than Highland's legal counsel, did you

24 talk to anyone else about -- or -- strike that.

25          Other than Highland's legal counsel, did you

Kristin Hendrix - October 27, 2021

1  talk to anyone about Frank Waterhouse's deposition from
2  last week?
3       A.   I did not.
4       Q.   Did you review -- strike that.
5            Did you see any of the video of
6  Mr. Waterhouse's deposition?
7       A.   Nope.
8       Q.   Same questions now for Mr. Seery, S-e-e-r-y.
9            Did you read any portion or the whole of
10 Mr. Seery's deposition from last week?
11      A.   I did not.
12      Q.   See any of the video?
13      A.   No.
14      Q.   Did you see any synopsis or summary of his
15 deposition?
16      A.   No.
17      Q.   Did you talk to him about his deposition?
18      A.   I did not.
19      Q.   Other than talking to Highland's counsel, did
20 you talk to anyone about Mr. Seery's deposition?
21      A.   No.
22      Q.   Other than talking to Highland's counsel, did
23 you talk to anyone about your deposition today?
24      A.   Just John Morris and Dave Klos.
25      Q.   When did you talk to Mr. Klos, K-l-o-s?

Kristin Hendrix - October 27, 2021

1      A.   First time about this was last Friday.  And

2   then again Monday this week.  And yesterday.  And this

3   morning.

4      Q.   Friday was there any lawyer present during

5   your discussion with Mr. Klos?

6      A.   Yes, every time Mr. Morris was present.

7           MR. RUKAVINA:  Is it your position that those

8   four discussions would be privileged, Counsel?

9           MR. MORRIS:  Yes.

10          MR. RUKAVINA:  Then we'll move on.

11     Q.   (BY MR. RUKAVINA)  So we've established the

12  four times you talked to Mr. Klos with counsel present.

13  Did you do anything else related to or in preparation

14  for today's deposition?

15     A.   Yes, probably went through and reviewed some

16  emails, documentation that I may have had that I need

17  to refresh memory on.

18     Q.   These documents and emails that you might

19  have reviewed, did you supplementally provide them to

20  counsel or anyone else?

21     A.   Yes.

22     Q.   This would have been in the last week or

23  10 days?

24     A.   Yes.

25     Q.   Prior to the last week or 10 days, are you

Kristin Hendrix - October 27, 2021

1   aware that my office served requests for production on
2   Highland?
3        A.   Yes.
4        Q.   And did you do anything prior to the last
5   week or 10 days to try to search both your personal
6   records and corporate records for any responsive
7   documents?
8        A.   Not that I recall.
9        Q.   Is that something that you understand legal
10  counsel was charged with?
11       A.   Yes.
12       Q.   Let's go briefly now about your background,
13  please.
14            Where do you live?
15       A.   I live in Denton, Texas.
16       Q.   And what is your date of birth, please?
17       A.   January 26, 1982.
18       Q.   And walk me through your educational
19  background, starting with any postsecondary, if any,
20  schooling or college or anything like that.
21       A.   Sure.  Graduated in 2004 from the University
22  of North Texas with a degree in finance.  Went on to
23  get my MBA from SMU in 2009.  And then went further and
24  got my CPA license I believe in 2015.
25       Q.   In the state of Texas?

Kristin Hendrix - October 27, 2021

1       A.    Yes.

2       Q.    And has your CPA license been current since

3   then?

4       A.    Sure has.

5       Q.    Have you faced any kind of disciplinary

6   action as a CPA?

7       A.    I have not.

8       Q.    Now, please walk me through your work

9   history.  Let's say starting with after you graduated

10  college.

11      A.    Sure.  December of 2005, which was shortly --

12  sorry, 2004, shortly after I graduated from

13  North Texas, I started at Highland.  It was my first

14  real job out of college.  I have been there ever since,

15  almost 17 years now.

16            Have worked in the corporate accounting

17  department the entire time.  Started off as the AP

18  associate, and worked my way up over the years and

19  currently am the controller.

20      Q.    So even when you were getting your MBA and

21  CPA you were employed by Highland?

22      A.    Yes.

23      Q.    Impressive.  You're the controller today you

24  mentioned?

25      A.    Yes.

Kristin Hendrix - October 27, 2021

1      Q.    That's -- when did you become the controller,
2  sometime February or March of this year?
3      A.    Yes.
4      Q.    Before you became the controller, what was
5  your role at Highland?
6      A.    Right before that I was assistant controller.
7  That was I believe April of 2020.  Before that, the
8  senior accounting manager, and I held that position for
9  years.
10     Q.    So in May of 2019 would you have been the
11 senior -- you said senior account?
12     A.    Senior accounting manager I believe was my
13 title.
14     Q.    And would that have been your title in May of
15 2017?
16     A.    Yes, I believe so.
17     Q.    And let's focus now on May 2019 as the senior
18 accounting manager.  How would you describe your role
19 at Highland in May of 2019?  What were your duties?
20     A.    Sure.  I helped with treasury management
21 function, cash forecasts and things like that.  And
22 oversaw the financial reporting from the last batch of
23 AP to all the way to financials and reporting on
24 audits.
25     Q.    Who did you report to in May of 2019?

Kristin Hendrix - October 27, 2021

```
 1        A.    David Klos.
 2        Q.    What was Mr. Klos' title to your
 3   understanding back then?
 4        A.    I believe he was the controller.
 5        Q.    And do you have an understanding as to who
 6   Mr. Klos reported to back then?
 7        A.    Yes, Frank Waterhouse.
 8        Q.    Frank Waterhouse.  Who was he in May of 2019?
 9        A.    The CFO.
10        Q.    Is Mr. Klos still with Highland today?
11        A.    He is.
12        Q.    What is his role now?
13        A.    He's now CFO.
14        Q.    You mentioned treasury management as of 2019,
15   May.  What do you mean by treasury management?  What is
16   that?
17        A.    Generally speaking, we -- it's not just me as
18   one person.  We have checks and balances.
19             My team would be in charge of sending out
20   payments, reconciling bank statements, making sure
21   money is in the right accounts, creating cash forecasts
22   and reporting on those every week with the CFO and
23   oftentimes the CEO.
24             Generally that's everything that fell under
25   the umbrella.
```

Kristin Hendrix - October 27, 2021

1    Q.   And would your description of treasury
2  management be the same for the December 2020 period?
3    A.   Yes.
4    Q.   Who at Highland or which group at Highland in
5  December of 2020 would have been responsible for noting
6  that there are certain bills that need to be paid in
7  the near or subsequent future.
8         By way of, let's say, accounts payable or
9  promissory notes or taxes or anything like that?
10   A.   Can you repeat your question.
11   Q.   Sure.  So obviously, Highland was a pretty
12  sophisticated business; correct?
13   A.   Yeah.
14        MR. MORRIS:  Objection to the form.
15   Q.   (BY MR. RUKAVINA)  And had various accounts
16  payable; right?
17   A.   Yes.
18   Q.   And it had maybe, let's just say, certain
19  note obligations that it had to pay from time to time;
20  correct?
21        MR. MORRIS:  Objection to the form of the
22  question.  Do you mean Highland Capital?
23        MR. RUKAVINA:  I mean Highland Capital
24  Management; correct, I'm sorry.  The debtor.
25   Q.   (BY MR. RUKAVINA)  Can we say the debtor?

Kristin Hendrix - October 27, 2021

1      A.    Yes, you can say the debtor.

2      Q.    So when I say the debtor and you say the

3 debtor we understand each other to mean Highland

4 Capital Management, comma, LP; correct?

5      A.    Correct.

6      Q.    I apologize.  In the December 2020 period, I

7 would imagine that the debtor had its own -- that

8 was -- strike that.

9           We'll cut to the chase.

10          In December of 2020, the debtor was providing

11 services to various other entities affiliated with

12 Mr. Dondero; correct?

13     A.    Correct.

14     Q.    That would have included NexPoint Advisors,

15 LP?

16     A.    Correct.

17     Q.    And you're aware that NexPoint Advisors was

18 the obligor on at least one promissory note to the

19 debtor; correct?

20     A.    Correct.

21     Q.    And did the debtor in December 2020 provide

22 so-called treasury management services to NexPoint

23 Advisors?

24          MR. MORRIS:  Objection to the form of the

25 question.

Kristin Hendrix - October 27, 2021

1          THE WITNESS:  Yes.

2      Q.   (BY MR. RUKAVINA)  As part of that, in

3  December 2020, would it have been employees of the

4  debtor that would have scheduled for potential payment,

5  subject to approval by NexPoint, NexPoint's future

6  obligations as they were coming due?

7      A.   Yes, we would have scheduled, only with

8  approval.

9      Q.   And would that have included NexPoint's

10 obligations on the promissory note to Highland?

11     A.   Yes.

12     Q.   Back to your background briefly.

13          Do you have any legal training at all?

14     A.   I do not.

15     Q.   Do you have any courses, have you taken any

16 courses in drafting promissory notes?

17     A.   No.

18     Q.   Do you believe that your expertise as a

19 certified public accountant gives you any greater

20 qualification than anyone else to prepare a promissory

21 note?

22          MR. MORRIS:  Objection to the form of the

23 question.

24          THE WITNESS:  No.

25     Q.   (BY MR. RUKAVINA)  Have you ever prepared or

Kristin Hendrix - October 27, 2021

1  drafted a promissory note?

2      A.   That term is probably used loosely.  I have

3  not completely drafted a promissory note from scratch,

4  no.

5      Q.   And we'll go into the details.  Fair to say

6  that you have taken a form promissory note and revised

7  it?

8      A.   Absolutely.

9      Q.   Was this part of your job in May of 2019 at

10 Highland?

11     A.   Yes.

12     Q.   Going back to the May 2019 time frame, were

13 you part of a particular group at Highland, like

14 accounting or legal or compliance?

15     A.   Yes, corporate accounting.

16     Q.   Corporate accounting.  That's what you

17 described before about treasury management and

18 projections and forecasts?

19     A.   Yes.

20     Q.   In May of 2019, was it the practice at

21 Highland that corporate accounting would be responsible

22 for drafting intercompany promissory notes?

23     A.   Not necessarily drafting, but updating a

24 draft that had been previously produced and provided by

25 our legal team, yes.

Kristin Hendrix - October 27, 2021

1      Q.   And Highland in May -- the debtor in May of
2  2019 did have a legal department?
3      A.   Yes.
4      Q.   Kind of like the corporate accounting, there
5  was a separate legal department; correct?
6      A.   Correct.
7      Q.   And who would have been in charge of that
8  department in May of 2019?
9      A.   Scott Ellington, E-l-l-i-n-g-t-o-n.
10     Q.   In May of 2019 or by May of 2019 was there
11 any practice at Highland as to whether its legal
12 department would be involved with the drafting or
13 execution of any intercompany promissory notes?
14          MR. MORRIS:  Objection to the form of the
15 question.
16          THE WITNESS:  It depends on the note.
17     Q.   (BY MR. RUKAVINA)  What did it depend on?
18     A.   Our typical practice is if we have a loan
19 with certain affiliates that it's a demand note.  We
20 have a template that we have used for years that was
21 created by either our internal legal team or an outside
22 law firm, I'm not sure which.
23          The typical practice is always updating a few
24 things on that template, getting it executed, and
25 filing it in our audit folders.

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 72   Filed 04/09/41   Page 71 of 200   PageID 29048

19
Kristin Hendrix - October 27, 2021

```
1        Q.   By updating, what do you mean?
2        A.   There's a few things that would need
3   updating, the date.
4        Q.   Maker?
5        A.   Maker.
6        Q.   Amount?
7        A.   The dollar amount, the interest rate.
8        Q.   And is it your testimony that the corporate
9   accounting group would do these things on its own
10  without necessarily the involvement of the legal group?
11            MR. MORRIS:  Objection to the form of the
12  question.
13            THE WITNESS:  Generally, yes.
14       Q.   (BY MR. RUKAVINA)  Do you have any memory in
15  or before May of 2019 if the corporate -- I'm sorry, if
16  the legal group became involved in drafting or
17  executing any prior intercompany promissory notes?
18       A.   Yes.
19       Q.   Explain to me what you remember about that.
20       A.   I do know that they were involved with
21  drafting restructured notes.  So taking demand notes
22  and turning them into a 30-year amort note.
23            That was in 2017.  I know for sure that they
24  were involved in that because it was something
25  different.  We weren't just updating a demand note.
```

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 72    Filed 04/09/2431    Page 72 of 200    PageID 29049

20

Kristin Hendrix - October 27, 2021

1      Q.   Is it your testimony that to the best of your

2   recollection by May of 2019 and in May of 2019 it would

3   have been the corporate accounting group that would

4   have handled routine intercompany demand notes?

5      A.   Yes.

6      Q.   And you can think of more than one instance

7   on which that happened?

8      A.   Yes.

9      Q.   And this is not a memory test, but going back

10  in time can you try to give an estimate of what year

11  that first started happening, that the corporate

12  accounting would handle the drafting or execution of

13  intercompany demand notes?

14     A.   As far as I can remember.

15     Q.   Is it your testimony that as -- maybe even

16  going back as far as 2005 there were intercompany

17  demand notes?

18     A.   Yes.

19     Q.   I don't know how to ask this question, but

20  was this a significant thing in corporate accounting or

21  just another routine deal when you handled demand

22  notes?

23          MR. MORRIS:   Objection to the form of the

24  question.

25          THE WITNESS:   This is a routine job duty that

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 12   Filed 04/09/24   Page 73 of 200   PageID 29050

21

Kristin Hendrix - October 27, 2021

1   we routinely did.

2        Q.   (BY MR. RUKAVINA)   Between 2005 and 2019, do

3   you remember any maker on these intercompany demand

4   notes actually being required to pay a demand note, in

5   other words, Highland making demand?

6        A.   Not that I can specifically recall.

7        Q.   Do you have any recollection as to what

8   happened to these intercompany demand notes over the

9   years between 2005 and 2019?

10       A.   Yeah.   Typically anytime specifically Jim

11  Dondero would need to move money between related

12  parties, he would pay down -- when I say him, he would

13  have us in corporate accounting move money around, pay

14  off notes, reissue new notes somewhere else.

15            So a way to move money around between his

16  entities.

17       Q.   So let's use just hypotheticals here so that

18  I'm not trying to pin you down to any specific fact.

19            But between 2005 and 2019, is it fair to say

20  that if some Dondero entity that's not the debtor

21  needed money and the debtor had money, then Dondero

22  would have the debtor lend money to that entity on a

23  demand note basis?

24       A.   So long as they have the cash available to do

25  so.

Kristin Hendrix - October 27, 2021

1       Q.   "They" being the debtor?

2       A.   Debtor, yes.

3       Q.   And is it fair to say, then, again

4   hypothetically without any specifics, that if the

5   debtor maybe from time to time needed money and one of

6   these other entities had cash, then Dondero would cause

7   that other entity to pay down the demand note?

8            MR. MORRIS:  Objection to the form of the

9   question.

10           THE WITNESS:  Can you repeat that.

11      Q.   (BY MR. RUKAVINA)  Sure.  So I think you

12  mentioned that from time to time these entities would

13  pay down these demand notes?

14      A.   To the debtor?

15      Q.   To the debtor.

16      A.   Yes.

17      Q.   And is that, hypothetically again, is that

18  because on occasion the debtor might have needed cash

19  and these entities had the cash, so Dondero would have

20  them pay back the note?

21           MR. MORRIS:  Objection to the form of the

22  question.

23           THE WITNESS:  Yes, that could be a reason.

24      Q.   (BY MR. RUKAVINA)  Can you think of any other

25  reason in those 14 years?

Kristin Hendrix - October 27, 2021

1     A.    If the debtor needed cash to lend to another

2  entity.

3     Q.    I see.  So again, it's all one big happy

4  family, and whoever needed cash, the cash moved around;

5  correct?

6     A.    Correct.

7     Q.    Was it Mr. Dondero that basically was the

8  only deciding person in each instance that you're aware

9  of in those 14 years as to when a note would be made or

10 repaid?

11    A.    I can't answer specifically to that.  Most of

12 my direction came from our CFO at the time,

13 Frank Waterhouse.  So what conversations he would have

14 with Jim Dondero, I can't answer to that.  But I would

15 suspect so, yes.

16    Q.    And in May of 2019 or by May of 2019, did you

17 communicate personally, by email or telephone, in

18 person, periodically with Jim Dondero?

19    A.    I can't say periodically, no.

20    Q.    Well, I'm not trying to put words in your

21 mouth.  Is it fair to say that you kind of -- your

22 communications stopped with Mr. Waterhouse and

23 Waterhouse communicated with Dondero, as opposed to you

24 regularly communicating with Dondero?

25    A.    That's typical, yes.

Kristin Hendrix - October 27, 2021

1    Q.   Can you think of any instances in which
2  Mr. Dondero gave you any instructions or you came to
3  him seeking any instructions, without some intermediary
4  between the two of you?
5    A.   No, usually Frank was present.
6    Q.   Would you categorize Mr. Waterhouse as kind
7  of guarding with jealousy his access to Mr. Dondero?
8         MR. MORRIS:  Objection to the form of the
9  question.
10         THE WITNESS:  No.
11    Q.  (BY MR. RUKAVINA)  What kind of boss was he
12  in May of 2019?  Was he laid back, or was he a jerk?
13  Was he demanding?  How would you characterize him in
14  May of 2019?
15         MR. MORRIS:  Objection to the form of the
16  question.
17         THE WITNESS:  I would say he was a good boss.
18    Q.  (BY MR. RUKAVINA)  You think he was competent
19  as far as his job went?
20    A.   Yes, very competent.
21    Q.   Do you think he was competent as far as his
22  job went in December of 2020?
23    A.   Yes.
24    Q.   January 2021?
25    A.   Yes.

Kristin Hendrix - October 27, 2021

1      Q.    Was he patient and understanding as a boss?

2      A.    Yes.

3      Q.    Okay.  Was he ever condescending or rude to

4   anyone in your presence?

5      A.    No.

6      Q.    So you're the controller today at Highland,

7   the debtor, the reorganized debtor; right?

8      A.    Yes.

9      Q.    And who do you report to?  You mentioned

10   Mr. Klos is the CFO?

11      A.    Yes.

12      Q.    And do you also report to Mr. Seery?

13      A.    Yes, I think everybody does.

14      Q.    And I don't need to know details, but I take

15   it you're on a salary from reorganized Highland?

16      A.    Yes.

17      Q.    Is any part of your compensation merit or

18   bonus based?

19      A.    It could potentially be.

20      Q.    Have you had any discussions with Mr. Seery

21   or Mr. Klos about some sort of bonus compensation?

22      A.    Yes.

23      Q.    Has anything been agreed to?

24      A.    Yes.

25      Q.    And again, I don't need to know the exact

Kristin Hendrix - October 27, 2021

1  numbers.  What would your bonus compensation consist

2  of?  How would it be decided?

3      A.   It's actually -- was decided when I agreed to

4  stay on the Highland team back in February 2021, so

5  it's in my employment agreement.

6      Q.   So what's your bonus compensation?

7      A.   I'm not sure I understand what you're asking.

8      Q.   So is the bonus discretionary on the part of

9  Highland?

10     A.   No, it's a set amount.

11     Q.   And what triggers it or governs the set

12 amount?

13     A.   Just it gets paid out on a certain date of

14 the year.  It's very straightforward, set out in my

15 employment agreement.

16     Q.   Is it irrespective of the performance of the

17 reorganized debtor?

18     A.   Yes.

19     Q.   So why do you call it a bonus instead of base

20 compensation?

21     A.   That's what it's called in my agreement.

22     Q.   So your base compensation and your bonus,

23 it's your testimony, you're going to earn it

24 irrespective of whether reorganized Highland does good

25 or bad with respect to its profitability?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 72   Filed 04/09/24   Page 79 of 200   PageID 29056

27

Kristin Hendrix - October 27, 2021

1        A.    Correct.

2        Q.    And how Highland, reorganized Highland

3   collects these promissory notes is going to play no

4   part in your base and bonus compensation to your

5   understanding; is that correct?

6        A.    To my knowledge, yes.

7        Q.    So you have no direct or indirect stake in

8   the outcome of these litigations?

9        A.    No.

10        Q.    And you understand that I represent HCMFA and

11   NexPoint?

12        A.    Yes.

13        Q.    And these court reporters are not familiar

14   with some of our terminology.  NAP [verbatim], if we

15   say that, that means NexPoint; right?

16        A.    Uh-huh.

17        Q.    You have to say yes or no.

18        A.    Yes, NPA, NexPoint.

19        Q.    NPA.  And when we say NexPoint, you and I are

20   meaning NexPoint Advisors, LP; right?

21        A.    Yes.

22        Q.    And when we say HCMFA, we're meaning Highland

23   Capital Management Fund Advisors, LP, yes?

24        A.    Yes.

25        Q.    What is your understanding of the two

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 172   Filed 04/09/431   Page 80 of 200   PageID 29057

28

Kristin Hendrix - October 27, 2021

1   lawsuits, the one against HCMFA and the one against

2   NexPoint, that you're being deposed on today?

3          MR. MORRIS:  Objection to the form of the

4   question.

5       Q.   (BY MR. RUKAVINA)  Who is suing who and for

6   what?

7       A.   I don't know all the details.

8       Q.   So we've established that you've discussed

9   these lawsuits in the last week or a little bit more

10  with legal counsel.  I don't want to talk about that.

11         Prior to these recent discussions, did you

12  have any discussions with anyone at Highland about its

13  lawsuits against HCMFA and NexPoint on promissory

14  notes?

15      A.   Repeat that again.

16      Q.   Sure.  So remember we're excluding the recent

17  discussions in the last week or 10 days with counsel;

18  right?

19      A.   Okay.

20      Q.   Are you aware that in January of 2021 the

21  debtor sued NexPoint to collect on a promissory note?

22      A.   I'm aware that demand notices were sent.

23      Q.   So until recently you weren't aware that a

24  lawsuit had been filed?

25      A.   There's a lot of lawsuits filed.  I can't

Kristin Hendrix - October 27, 2021

1  keep track of what is what or what we're talking about

2  at certain times.

3      Q.   But you have no distinct memory of that?

4      A.   Correct.

5      Q.   And same question for the lawsuit that the

6  debtor filed against HCMFA in January.

7           Do you have any specific memory of that

8  lawsuit having been filed?

9      A.   Not specifically.

10     Q.   You mentioned that you're aware that on or

11 before January 2021, demand letters had been sent?

12     A.   Yes.

13     Q.   Did you play any role in either drafting

14 those demand letters or the decision to send them?

15     A.   No.

16     Q.   So going back to my question about these

17 lawsuits, do you have any memory of anyone asking

18 you -- again, excluding the last week or two.

19          Do you have any memory of anyone asking you

20 to do anything with respect to either or both of these

21 lawsuits?

22     A.   No.

23     Q.   You have no memory of Mr. Waterhouse,

24 Mr. Klos, Mr. Surgent, or Mr. Seery asking for any

25 background information or your input at all on these

Kristin Hendrix - October 27, 2021

 1   two lawsuits?

 2          MR. MORRIS:  Better not have been --

 3          THE WITNESS:  No.

 4      Q.   (BY MR. RUKAVINA)  Who did I say?  Did I

 5   misspeak?  Okay.

 6          Now we're going to have some exhibits here.

 7          And do you have the labels?

 8          Let's take a minute break off the record.

 9          (Off the record.)

10      Q.   (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to

11   provide to you a promissory note in the original

12   principal amount of $5 million from HCMFA.  This is the

13   PDF version of this as filed with the Court for

14   collection.  It's going to be Exhibit 1.

15          (Whereupon, Exhibit 1 was marked for

16          identification.)

17      Q.   (BY MR. RUKAVINA)  Before you look at

18   Exhibit 1, I'm going to do the same thing for

19   Exhibit 2, which is a promissory note from HCMFA for

20   $2.4 million, dated May 2, 2019.

21          (Whereupon, Exhibit 2 was marked for

22          identification.)

23      Q.   (BY MR. RUKAVINA)  Again, Ms. Hendrix, these

24   are the PDF versions of these notes as filed with the

25   Court.  Sitting here today, do you remember anything

Kristin Hendrix - October 27, 2021

1   about either or both of these two promissory notes?

2        A.    Sure, yes.

3        Q.    What do you remember?

4        A.    I remember seeing them because I've recently

5   looked at them.  I see them all the time in our loan

6   tracking spreadsheets.  My team would have been

7   responsible for the whole process that I explained

8   before when it comes to a promissory note.

9        Q.    And --

10            MR. MORRIS:  Are you finished?

11            THE WITNESS:  Yes.

12       Q.    (BY MR. RUKAVINA)  And we have an email here

13   that might give some more context to that if I can find

14   it here.

15            This will be Exhibit 3.  This is an email

16   from David Klos to corporate accounting dated May 2,

17   2019.

18            (Whereupon, Exhibit 3 was marked for

19            identification.)

20       Q.    (BY MR. RUKAVINA)  Do you see this email,

21   ma'am?

22       A.    Yes.

23       Q.    Okay.  Corporate accounting, would that email

24   group have included you?

25       A.    Yes.

Kristin Hendrix - October 27, 2021

1    Q.   And this email says, Kristin, can you or
2  Hayley.  Do you think that Kristin was you?
3    A.   I do.
4    Q.   Do you remember receiving this email?
5    A.   Not explicitly.
6    Q.   So it says Blair.  Who would Blair be?
7    A.   Blair was our AP associate.
8    Q.   What is her last name?
9    A.   At this time it would have been Roeber,
10 R-o-e-b-e-r.
11   Q.   Okay.  And did it subsequently change?
12   A.   Yes, it's now Hillis, H-i-l-l-i-s.
13   Q.   Please send $2.4 million from HCMLP to HCMFA.
14 This is a new interco loan.  Kristin, can you or Hayley
15 please prep a note for execution.  I'll have further
16 instructions later today, but please process this
17 payment as soon as possible.
18        Did I read that correctly?
19   A.   Yes.
20   Q.   Do you have any memory of whether this email
21 relates to Exhibit 2, the $2.4 million promissory note?
22   A.   It seems like it does, same date, same
23 amount.
24   Q.   Do you have any memory, or in reviewing your
25 files did you see any similar email or document that

Kristin Hendrix - October 27, 2021

1  would have related to Exhibit 1, the $5 million

2  promissory note?

3      A.   Yes.  I believe there's another email for

4  that one.

5      Q.   And do you believe that you provided that to

6  counsel?

7      A.   Yes.

8      Q.   Recently or some time ago?

9      A.   Well, I don't think I provided it, so I'm not

10  sure when they got it.  I know it has been provided.

11      Q.   You know that it has?

12      A.   Uh-huh.

13      Q.   How do you know?

14      A.   Because I've seen it.

15      Q.   In the production that was produced to me?

16      A.   Yes.

17      Q.   And also from a David Klos?

18      A.   This one, or on the -- when I say this one,

19  on the $2.4 million or the 5-?

20      Q.   On the $5 million note.

21      A.   I'm not sure.

22      Q.   Okay.  Let me make sure I understand you

23  correctly.

24          Sitting here today you believe that there is

25  another email referencing the $5 million loan that has

Kristin Hendrix - October 27, 2021

1  been produced to my office?

2      A.   Yes.  I believe so.

3      Q.   Okay.  And going off memory, did it kind of

4  say the same thing as this Exhibit 3 except that it

5  referenced $5 million?

6          MR. MORRIS:  Objection to the form of the

7  question.

8          THE WITNESS:  Generally, should have said the

9  similar situation, yeah.

10     Q.   (BY MR. RUKAVINA)  So Mr. Klos says, this is

11  a new interco loan, for Exhibit 3.  Other than what he

12  told you, that this is an intercompany loan, did anyone

13  else tell you or did you have any other information on

14  May 2, 2019 that this was a loan?

15     A.   I don't specifically recall these

16  conversations, but I can tell you our normal practice

17  would be we would either likely be in a cash meeting --

18  and I say "we."  Would have been myself, Dave Klos,

19  Frank Waterhouse, potentially even Jim Dondero.

20          But I don't recall conversations on this

21  specific date.  But general practice is we would talk

22  about it.

23          Oftentimes, Frank would either call Dave or I

24  or stop by and tell us that, we need to send money to

25  an affiliate, paper up a new loan, let's get a wire out

Kristin Hendrix - October 27, 2021

1  the door, is typically how this works.

2      Q.   Is the answer generally the same for the

3  $5 million note?

4      A.   Yes.

5      Q.   So is it fair to say that typically,

6  obviously not every time, but typically your corporate

7  accounting group when it would see intercompany

8  transfers in large amounts would believe that they were

9  loans?

10         MR. MORRIS:  Objection to the form of the

11  question.

12         THE WITNESS:  Typically they were loans.

13  There's not really another way to get money from one

14  entity to another.  And if they were papered as a loan,

15  that means we were told to set it up that way.

16      Q.   (BY MR. RUKAVINA)  What do you mean papered

17  as a loan?  Aren't you papering it as a loan when

18  someone makes the promissory note?

19      A.   Yes, because we're told by somebody to do

20  that.

21      Q.   And in this instance, Mr. Klos on Exhibit 3

22  told the group that this was a loan; right?

23      A.   Correct.  But he would have spoken with

24  Frank Waterhouse or Jim Dondero prior to that, before

25  telling anybody to do that.

Kristin Hendrix - October 27, 2021

1    Q.   Okay.  And do you have any knowledge that he
2  did speak to Mr. Waterhouse or Mr. Dondero before
3  sending this email?
4    A.   Again, I don't have specific knowledge on the
5  exact conversations, but that's always how it has
6  worked.
7    Q.   That's how it was for 14 or 15 years;
8  correct?
9    A.   Yes.
10   Q.   But you're logically assuming that it
11 happened here.  You don't know that it happened here;
12 correct?
13           MR. MORRIS:  Objection to the form of the
14 question.
15           THE WITNESS:  I would have to be fairly
16 certain that it did, even though I can't recall
17 specific conversations.
18   Q.   (BY MR. RUKAVINA)  Did you ask Mr. Klos about
19 who told him that this is a new intercompany loan on
20 Exhibit 3?
21   A.   No.  It's quite possible I was involved in
22 the conversation.  I reported to him.  I wouldn't
23 question his authority.
24   Q.   Did you ask Mr. Klos who told him that the
25 $5 million deal was also an intercompany loan?

Kristin Hendrix - October 27, 2021

1    A.   I did not ask that specific question that I
2  can recall.

3    Q.   Did you ask Mr. Waterhouse whether either of
4  these transactions were loans?

5    A.   I'm sure Mr. Waterhouse is the one that told
6  us they were loans.  We wouldn't just paper up a loan,
7  send money out and call it a loan and account for it
8  that way, unless somebody specifically told us.

9    Q.   Do you have any memory of Mr. Waterhouse
10 orally or in writing or email or in any way, shape, or
11 form on or about May 2 or 3, 2019 telling you that the
12 2.4 million or $5 million transfers were intercompany
13 loans?

14   A.   No specific knowledge of exact conversations,
15 but I'm certain that those conversations were had
16 because that's the only way that we would have papered
17 up a loan, sent money out as a loan, had them on our
18 financials for two years.

19   Q.   So you're saying that this email, Exhibit 3,
20 from Mr. Klos was not enough, that there would have
21 been other things that happened to make you and other
22 people in your group confident that these were loans?

23   A.   Yes.

24   Q.   And these other things would have been in
25 person or by email?

Kristin Hendrix - October 27, 2021

1        A.    Most likely in person via phone call.

2        Q.    Okay.  So again, you have no specific memory

3   of it, but based on the 14-year pattern and conduct you

4   believe that you would have discussed these two

5   transfers with Mr. Waterhouse and he would have told

6   you these are loans?

7             MR. MORRIS:  Objection to the form of the

8   question.

9             THE WITNESS:  Correct.

10       Q.    (BY MR. RUKAVINA)  And then would he have

11  told you to take care of the promissory notes, or was

12  that Mr. Klos here in Exhibit 3?

13       A.    It could have been both.  It's clearly Dave

14  in this email, but Frank could have also said that to

15  me.

16       Q.    Now, do you -- strike that.

17             In May of 2019, did you know or were you told

18  why these $7.4 million were being transferred from the

19  debtor to HCMFA?

20       A.    Yes.  I do have recollection that -- I do

21  know that there were two big events in May 2019.

22  2.4 million was related to a TerreStar NAV error, with

23  one of the funds advised by HCMFA.  That's Global

24  Allocation Fund.

25             Similar with the $5 million loan.  There was

Kristin Hendrix - October 27, 2021

1   a consent fee that the advisor of the Global Allocation

2   Fund had promised to pay to shareholders of that fund,

3   and it was in the amount of $5 million roughly.

4            So both of these loans were for those

5   purposes respectfully.

6        Q.   And were you in May of 2019 also aware that

7   in addition to the $2.4 million, there was another more

8   than $5 million paid to that fund by HCMFA's insurer as

9   compensation for the NAV error?

10       A.   By the insurance company, yes.

11       Q.   So the $7.4 million, you understood then was

12   a loan as opposed to compensation to HCMFA?

13       A.   Yes.

14       Q.   Okay.  Did you understand in May of 2019 that

15   it had been the debtor and its valuation team that

16   caused that NAV error?

17            MR. MORRIS:  Objection to the form of the

18   question.

19            THE WITNESS:  I can't answer that.  I was not

20   involved with the activities leading up to the NAV

21   error.

22       Q.   (BY MR. RUKAVINA)  How do you know that the

23   $7.4 million were being transferred for the NAV error

24   and consent fee?

25       A.   Because I do know about both of those

Kristin Hendrix - October 27, 2021

1   instances and I do know that HCMFA needed to pay these
2   dollar amounts for both of those.
3       Q.    And you knew that in May of 2019?
4       A.    Yes.
5       Q.    How did you know that in May of 2019?
6       A.    It was lots of discussions had been going on
7   around both of these issues for months.  These weren't
8   surprises to anybody.
9       Q.    So although you weren't involved directly
10  with the NAV error issues, it was more or less common
11  knowledge in your accounting group?
12      A.    Correct.
13      Q.    Do you have any knowledge at all as to
14  whether Mr. Dondero decided to transfer these
15  $7.4 million not as a loan, but to compensate HCMFA for
16  the debtor's alleged liability?
17      A.    Have not heard of that.
18      Q.    Ever?
19      A.    Never.
20      Q.    But you also never heard Mr. Dondero say that
21  these $7.4 million were a loan; correct?
22      A.    That was not told to me directly.
23      Q.    Again, you're logically assuming that based
24  on many instances of intercompany transfers in the
25  14 years prior to that?

Kristin Hendrix - October 27, 2021

```
 1              MR. MORRIS:  Objection to the form of the
 2   question.  Mischaracterizes the testimony.
 3              THE WITNESS:  Correct.
 4       Q.   (BY MR. RUKAVINA)  I think you answered
 5   correct?
 6       A.   Correct.
 7       Q.   And you mentioned that after these notes, you
 8   saw them on internal financials and that reinforces
 9   your view that these were loans?
10       A.   Correct.
11       Q.   But as of May 2 and 3, 2019, no one had told
12   you directly that these are loans?
13              MR. MORRIS:  Objection to the form of the
14   question.  It's in writing.
15              THE WITNESS:  That's not what I'm saying at
16   all.
17       Q.   (BY MR. RUKAVINA)  Other than Mr. Klos' email
18   or emails, no one told you on May 2 or May 3, 2019 that
19   you remember today that these were loans?
20       A.   It quite possibly could have been told to me
21   in addition to this email.
22       Q.   I understand.  You just have no memory of
23   that today; correct?
24       A.   Correct.
25       Q.   Is there anything that you can think of
```

Kristin Hendrix - October 27, 2021

1  sitting here today to refresh your memory on that

2  point?

3      A.   I do not think so.  I'm sure there was

4  conversation that unfortunately would not be in an

5  email.

6      Q.   Now, we have the Word documents, the Word

7  version of these two promissory notes, and you're going

8  to have rely on me that I printed these out as

9  Mr. Morris sent to me.  If I'm misleading you on that,

10  then I'm in trouble and your answers don't count.

11          So please assume that I didn't doctor these

12  and that I printed them out as they were prepared to

13  me; okay?

14      A.   Yes.

15      Q.   So Exhibit 4 will be the $5 million note and

16  Exhibit 5 will be the 2.4 million.

17          (Whereupon, Exhibits 4 & 5 were marked for

18          identification.)

19      Q.   (BY MR. RUKAVINA)  Before I ask about 4 and

20  5, to be fair to you and refresh your memory, I'm going

21  to provide you printouts of the metadata, metadata --

22  I'm not sure how to better say that -- for both notes.

23          And again I'm representing to you that I

24  printed out the metadata without doctoring it, so

25  please assume that's true, and if it's not, your

Kristin Hendrix - October 27, 2021

1   answers don't count and I'm in trouble.

2          6 will be the $5 million note, and 7 will be
3   the $2.4 million note.

4          (Whereupon, Exhibits 6 & 7 were marked for
5          identification.)

6      Q.   (BY MR. RUKAVINA)   Okay.   So Exhibit 4 and 5
7   are the Word documents.   Do you have any memory of you
8   doing anything with respect to these two Word
9   documents?

10     A.   I don't have specific memory, but generally
11  speaking, it was my job to update promissory note
12  templates and create promissory notes.

13     Q.   So do you believe that -- we discussed
14  earlier that your group would have used a template and
15  that it would have made changes reflecting the maker,
16  amount, date, interest rate.

17         Do you believe you were the one with respect
18  to 4 and 5 that updated that template to create 4
19  and 5?

20     A.   I'm sure that I was, yes.

21     Q.   Well, Exhibit 6 -- do you know what metadata
22  is?

23     A.   Sort of.

24     Q.   What's your understanding of what metadata
25  is?

Kristin Hendrix - October 27, 2021

1      A.   Just in context from speaking on it recently,
2  it's going to tell you who made changes to the
3  documents, is what I would assume.
4           MR. RUKAVINA:  Go off the record for one
5  second.
6           (Off the record.)
7      Q.   (BY MR. RUKAVINA)  So a little bit of error
8  on my part.  We'll have some more metadata, but we can
9  still talk about 6 and 7.
10          It says the author JFORSHEE, J-F-O-R-S-H-E-E.
11 Do you recall or do you know who that person was?
12     A.   I recognize the name, and it makes sense.
13 This says Strasburger is the company.  I think he was
14 one of the lawyers that we had used at some point in
15 time.
16     Q.   Strasburger is a law firm?
17     A.   Yes.
18     Q.   And then it says, so Exhibit 6 created May 3,
19 Exhibit 7 created May 2, modified, accessed.  Does that
20 to the best of your understanding comport with when
21 Exhibits 4 and 5 were actually created?
22     A.   Can you repeat that.
23     Q.   Yeah.  We'll wait for the rest of the
24 metadata.  But let's go back to 4 and 5.
25          In and by May 2019 I think you mentioned that

Kristin Hendrix - October 27, 2021

1  it was your job to, I think you said update promissory
2  notes?
3          MR. MORRIS:  Objection to the form of the
4  question.
5      Q.  (BY MR. RUKAVINA)  Let me take that question
6  back.
7          You testified earlier that your group would
8  have taken a template and used it to create or prepare
9  a new promissory note; right?
10     A.  Right.
11     Q.  How would you call that process?  What word
12 would you use for that process?
13     A.  Let's call it papering the loan.
14     Q.  In May of 2019, was it your job to paper the
15 loan?
16     A.  Yes.
17     Q.  Would anyone else at the corporate accounting
18 group have been responsible to paper a loan?
19     A.  At that time, I don't think so.  I think I
20 was the one doing it.
21     Q.  I think you mentioned that you think you
22 papered the loan, respecting Exhibits 4 and 5; correct?
23     A.  Correct.
24     Q.  You have no distinct present memory of
25 papering 4 and 5; correct?

Kristin Hendrix - October 27, 2021

1      A.    Correct.

2      Q.    Can you think of anyone else at the corporate

3 accounting group that would have papered 4 and 5?

4            MR. MORRIS:   Objection to the form of the

5 question.

6            THE WITNESS:   The only other person that

7 could have would either be Dave Klos or Hayley Eliason.

8      Q.    (BY MR. RUKAVINA)   What was Hayley's role in

9 May of 2019?

10     A.    She was the accountant.   I can't recall her

11 specific title.

12     Q.    Now, in May of 2019 when you papered a loan,

13 would you have consulted with either internal or

14 external legal before finishing that loan or presenting

15 it for signature or anything else?

16     A.    Not if it was just our standard demand note

17 that we already had a template on.

18     Q.    So would it have been your general course in

19 May of 2019, if you prepared Exhibits 4 and 5, not to

20 seek advice from internal or legal before proceeding

21 with these notes?

22     A.    With these two specific notes?

23     Q.    Yes.

24     A.    Yes.

25     Q.    If we flip the page, I'll represent to you

Kristin Hendrix - October 27, 2021

1   that Mr. Waterhouse's signature there appears on the

2   Word document as an image.

3        A.   Uh-huh.

4        Q.   Do you have any memory of whether there was

5   an image that someone would have affixed of

6   Mr. Waterhouse's signature to promissory notes?

7        A.   Yes.  We typically always -- he was

8   completely fine with having documentations -- sorry,

9   having documents signed or executed with his

10  e-signature.

11       Q.   Would these pictures of his signature have

12  been his e-signature in May of 2019?

13       A.   Yes.

14       Q.   So let's just clarify that because I don't

15  want there to be any confusion.

16            I know there's some computer programs out

17  there that are restrictive and have passwords before

18  any signature is printed.  And then there's some people

19  that use a stamp or an image; right?

20            MR. MORRIS:  Objection to the form of the

21  question.

22       Q.   (BY MR. RUKAVINA)  Are you following me?

23       A.   I follow you.

24       Q.   In May of 2019, did Mr. Waterhouse have any

25  specific program that would have to -- you would have

Kristin Hendrix - October 27, 2021

1   to go through before it would spit out his e-signature,
2   or was he fine with you and his staff using an image
3   like this?
4        A.   He was fine with using his e-signature, and
5   what is on these documents was that exact e-signature.
6   So I don't know if he had -- I don't know how it was
7   created originally.
8        Q.   The e-signature?
9        A.   E-signature.
10        Q.   Do you have any memory with respect to
11   Exhibits 4 and 5 of getting Mr. Waterhouse's specific
12   approval to use his e-signature?
13        A.   I don't have exact specific memory, same as
14   conversations on these loans.  But he would have had to
15   approve this loan in the dollar amount, the day.
16             He would have been the one directing us to
17   create these loans.  In past practice he has always
18   approved using his e-signature to execute documents.
19        Q.   How would he have approved Exhibits 4 and 5?
20   By that, I mean by email or memorandum?  How would he
21   have approved it in May of 2019?
22             MR. MORRIS:  Objection to the form of the
23   question.
24             THE WITNESS:  I would assume that, as I've
25   stated previously, these directions were coming

Kristin Hendrix - October 27, 2021

1   directly from him to paper a loan.  These changes that
2   are made are only to the dollar amount.  Interest rate
3   is pulled right off the IRS website.
4           That is his approval to paper a loan and in
5   fact execute or approve the loan.
6       Q.   (BY MR. RUKAVINA)  In May of 2019, would
7   Mr. Waterhouse -- what was his practice as far as using
8   an ink signature on documents as opposed to an
9   e-signature?  Did he have a practice?
10          MR. MORRIS:  Objection to the form of the
11  question.
12          THE WITNESS:  He has never specifically said,
13  on certain documents I would like to ink it with my
14  signature.  Probably at this time, 99 percent of the
15  stuff my team got his signature on was his e-signature.
16  I think it just depended on the group and what it was.
17      Q.   (BY MR. RUKAVINA)  So how would he authorize
18  you or your team to use his e-signature for any given
19  document in May of 2019?
20          MR. MORRIS:  Objection to the form of the
21  question.
22          THE WITNESS:  Through the conversations that
23  would have been had before these emails went out saying
24  paper loan.
25      Q.   (BY MR. RUKAVINA)  And -- okay.  So, and

Kristin Hendrix - October 27, 2021

```
 1   after his e-signature was used either on these notes or
 2   other documents in May of 2019, would you have brought
 3   the documents back to him for any kind of verification?
 4              MR. MORRIS:  Objection to the form of the
 5   question.
 6              THE WITNESS:  Probably not.  These are all
 7   very standard.  We've papered hundreds of loans.  So I
 8   think he trusted that we can handle updating a date and
 9   a dollar amount on these loan templates.
10         Q.  (BY MR. RUKAVINA)  Do you know or believe, or
11   your recent review of documents, did it reveal an email
12   from Mr. Waterhouse to you specifically authorizing his
13   e-signature on Exhibits 4 and/or 5?
14         A.   Not that I recall seeing, no.
15         Q.   Sitting here today, do you have any memory of
16   Mr. Waterhouse orally or otherwise specifically
17   authorizing you to affix his e-signature to Exhibits 4
18   and/or 5?
19         A.   Specifically on these loans, no, I don't
20   recall those conversations.  But, again, our practice
21   has always been we have this discussion, he's under the
22   understanding that we're going to paper the loans, he's
23   always comfortable with using his e-signature.
24              This is not something me or my team would
25   have done without that authority and approval from him.
```

Kristin Hendrix - October 27, 2021

1      Q.   But you have no memory of that authority or
2   approval, specifically for 4 and 5?
3           MR. MORRIS:  Objection.  Asked and answered
4   about five times.
5           THE WITNESS:  Same as my answer I just gave.
6      Q.   (BY MR. RUKAVINA)  And I think you mentioned
7   that in your years at Highland your team papered
8   hundreds of loans?
9      A.   Yeah.
10     Q.   In your time at Highland, is it your
11  testimony that the accounting -- corporate accounting
12  department never made a mistake with respect to
13  anything that it did?
14          MR. MORRIS:  Objection to the form of the
15  question.
16          THE WITNESS:  No, I did not say that.
17     Q.   (BY MR. RUKAVINA)  Do you recall any mistakes
18  in your time at the corporate accounting group at
19  Highland that had been made, any significant mistakes?
20          MR. MORRIS:  Objection to the form of the
21  question.
22          THE WITNESS:  Significant mistakes, not that
23  I can recall.
24     Q.   (BY MR. RUKAVINA)  No accounts payable
25  mistakenly paid?

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X   Document 162    Filed 10/04/83   Page 104 of 200   PageID 29081

52

Kristin Hendrix - October 27, 2021

```
 1              MR. MORRIS:  Objection to the form of the
 2   question.
 3              THE WITNESS:  I cannot specifically answer
 4   that question with 17 years of work to recall, sorry.
 5              MR. RUKAVINA:  Just take a quick break.  If
 6   you need a restroom -- off the record.
 7              (Off the record.)
 8      Q.   (BY MR. RUKAVINA)  Going back to Exhibits 4
 9   and 5.
10              Mr. Waterhouse signed these promissory notes.
11   Is there any particular reason why he signed them as
12   opposed to Dondero or someone else?
13      A.   No particular reason.  He's an officer for
14   both companies.  He's a signatory.
15      Q.   Who decided, if anyone, to your knowledge,
16   that he would be the one signing the notes, these two
17   notes?
18      A.   I don't know who would have decided that, but
19   typically if Frank specifically wanted Jim Dondero to
20   sign it, he would say, take it to Jim to sign.
21      Q.   Do you have a recollection of
22   Mr. Dondero -- strike that.
23              Do you have a recollection of Mr. Waterhouse
24   signing other promissory notes?
25      A.   Yes.  I know for sure he has signed other
```

Kristin Hendrix - October 27, 2021

 1    promissory notes.  I can't tell you explicitly which

 2    ones.

 3              (Off the record.)

 4        Q.   (BY MR. RUKAVINA)  Are you saying that in May

 5    of 2019 -- strike that.

 6              By May of 2019, was it not the standard

 7    practice at the debtor that Mr. Dondero would sign

 8    intercompany promissory notes?

 9              MR. MORRIS:  Objection to the form of the

10    question.

11              THE WITNESS:  No, that's not standard

12    practice.  Just needed to be somebody -- somebody who

13    is a signer for the entity on the incumbency

14    certificate.

15        Q.   (BY MR. RUKAVINA)  Was there a standard

16    practice, or did you just describe the standard

17    practice that it was someone on the incumbency

18    certificate?

19        A.   That's correct, somebody on the incumbency

20    certificate.  Frank is a great prospect to sign, with

21    giving direction to set loans up, send money out.  Why

22    wouldn't he sign it.

23        Q.   Do you have any memory sitting here today of

24    Mr. Waterhouse telling you or agreeing that he would be

25    signing these two promissory notes for HCMFA?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-12   Filed 01/09/23   Page 106 of 200   PageID 29083

54

Kristin Hendrix - October 27, 2021

1      A.   Not specifically, but he didn't need to tell

2   me.  He typically would tell me if he wanted Jim to

3   sign them.

4      Q.   Sitting here today, do you have any memory of

5   giving Mr. Waterhouse these two promissory notes after

6   they were prepared?

7      A.   I specifically don't remember walking into

8   his office and providing it to him, but he could have

9   found it on our shared drive if he wanted to.

10     Q.   Do you have any memory or in your recent

11  review of documents did you see any email to the effect

12  of you sending either or both of these promissory notes

13  to Mr. Waterhouse after they were papered up?

14     A.   I don't have any specific recollection,

15  again, but he had access to look at them.

16     Q.   On the shared drive?

17     A.   Yes.

18     Q.   In May -- I'm going to ask this question

19  multiple different ways, so let's start with kind of

20  the general.

21          In May or by May of 2019, was there a

22  repository, electronic or paper, where the debtor kept

23  original promissory notes that were owed -- where money

24  was owed to it?

25     A.   Original meaning paper?

Kristin Hendrix - October 27, 2021

1    Q.   Well, let's go back a little bit in time.

2         Would you agree that at some point prior to

3    2019 the standard course was that paper notes were ink

4    signed?

5         MR. MORRIS:  Objection to the form of the

6    question.

7         THE WITNESS:  I could not tell you

8    specifically when notes were or were not ink signed.

9    Q.   (BY MR. RUKAVINA)  Was there any repository,

10   to the best of your recollection, as of May 2019 where

11   any ink-signed original promissory notes were kept by

12   the debtor?

13   A.   No.  We always would scan them in, save them

14   on our shared drive.  Never had paper copies.

15   Q.   So that's -- fixing to ask that question

16   next.

17        So Exhibits 4 and 5, would they even have

18   been printed after they were papered up?

19        MR. MORRIS:  Objection to the form of the

20   question.

21        THE WITNESS:  Possibly.  Somebody could have

22   printed them.

23   Q.   (BY MR. RUKAVINA)  Do you remember printing

24   Exhibits 4 or 5 sitting here today?

25   A.   I don't recall printing them myself, no.

Kristin Hendrix - October 27, 2021

1      Q.    Would there have been a reason to print them
2    out if, as you said, the notes were stored
3    electronically?
4          MR. MORRIS:    Objection to the form of the
5    question.
6          THE WITNESS:    There could be a reason.    I
7    don't recall that I for any reason printed these
8    particular notes.
9      Q.    (BY MR. RUKAVINA)    So as of May 2019, is it
10   your testimony that notes that were papered up by the
11   corporate accounting group would have been saved
12   electronically on the system and not kept by way of
13   paper copies in some file?
14     A.    Correct.    That's right.
15     Q.    This is additional metadata.    And you
16   understand I have a bit of an accent.
17          What are we on?
18          (Off the record.)
19     Q.    (BY MR. RUKAVINA)    Ms. Hendrix, Exhibit 8 is
20   going to be additional metadata for the May 3, 2019,
21   note that we've been looking at, and Exhibit 9 will be
22   the same thing for the May 2 note that we've been
23   looking at.
24          That's 8.    That's 9.
25          (Whereupon, Exhibits 8 & 9 were marked for

Kristin Hendrix - October 27, 2021

1        identification.)
2        Q.   (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
3    represent to you again that my office has faithfully
4    printed this metadata out without doctoring or changing
5    anything, and I ask you to assume that.  If I'm wrong
6    on that, then your answers don't count.
7             Ma'am, as I look at these two documents, it
8    says last modified by Kristin Hendrix.
9             Do you see that?
10       A.   Yes.
11       Q.   And that would have -- that could have only
12   been you; correct, in that department?
13       A.   I hope so, yes.
14       Q.   Seeing these two documents, can you agree
15   with me now that it was in fact you that papered up
16   Exhibits 4 and 5?
17            MR. MORRIS:  Objection.  Asked and answered.
18            THE WITNESS:  I would assume so since my name
19   is on it, yes.
20       Q.   (BY MR. RUKAVINA)  Both of these documents
21   say last printed -- I'm sorry.  If you see related
22   dates, it says last printed May 2, 2019, 11:27 A.M.  Do
23   you have any memory or any understanding as to why that
24   date would be there or what last printed might mean?
25       A.   I don't know why it says last printed the day

Kristin Hendrix - October 27, 2021

1  before it was created.  That doesn't make any sense.  I
2  have no idea.
3          Unless, the only thing I could think of is if
4  we changed this template.  When I say "this," the
5  $2.4 million loan, which was papered on the 2nd, and
6  then used it for the next day for the template to
7  update the date, possibly.  I have no idea.
8      Q.  Well, it may be -- and I understand that you
9  don't have any memory; we're speculating a little bit.
10         It may be, looking at Exhibits 8 and 9, that
11  the $2.4 million note was printed on May 2, and then
12  after having been used as the template for the
13  $5 million note, the $5 million note would not have
14  been printed.
15         Does that sound possible?
16         MR. MORRIS:  Objection to the form of the
17  question.
18         THE WITNESS:  Sure, it could be possible.
19     Q.  (BY MR. RUKAVINA)  But you don't have any
20  memory either way?
21     A.  No.  And when these were printed they're
22  printed to PDF, I believe, is probably what that means.
23     Q.  Okay.
24         We're going to switch gears a little bit now,
25  if you want to make a pile of those exhibits.

Kristin Hendrix - October 27, 2021

1   Obviously, you're welcome to use them anytime you need
2   to, but I think we're done with those notes.
3           Going to hand you what we're going to mark as
4   Exhibit 10, which is an email chain produced by the
5   debtor.
6           And I don't know how anyone on the video will
7   see it.  I apologize.  I'll have to send it to you
8   later.
9           (Whereupon, Exhibit 10 was marked for
10          identification.)
11      Q.   (BY MR. RUKAVINA)  Now, if you start with
12  this email chain, it starts on November 19, 2020 from
13  Jack Donohue to you, copying Mr. Seery and various
14  others.
15          Do you see that?
16      A.   Yes.
17      Q.   And Mr. Donohue is asking you to provide him
18  the financial records of HCMFA due to the funds owed
19  the debtor.
20          Do you see that?
21      A.   Yes.
22      Q.   Do you recall that email from Mr. Donohue to
23  you?
24      A.   Yes.
25      Q.   Do you recall any context or subsequent

Kristin Hendrix - October 27, 2021

1   discussions or how that email came to be, or do you
2   just recall getting that email?
3        A.   I just recall getting the email.
4        Q.   You write back, hi Jack, Scott Ellington is
5   going to follow up with the board on this request.
6             Do you see that?
7        A.   Yes.
8        Q.   Do you recall why you told Jack that
9   Mr. Ellington was going to follow up?
10       A.   From what I recall, I had asked Frank
11  Waterhouse if it was okay to send these financials
12  over, and he wanted me to check with Scott Ellington
13  and that was Scott's response.
14       Q.   And did he tell you why he wanted you to
15  check with Scott Ellington?
16       A.   Just to make sure that there were no issues
17  with sending them over.
18       Q.   Mr. Seery writes back, can I get this ASAP.
19  HCMFA is way overdue.
20            Do you see that?
21       A.   Yes.
22       Q.   And Mr. Seery writes again, it's about a week
23  later, and he says, this is an explicit direction from
24  me as CEO of HCMLP.  But it looks like you are the
25  recipient of that December 2 email; correct?

Kristin Hendrix - October 27, 2021

1       A.   Yes.

2       Q.   Do you remember him sending you that email

3  and copying those people?

4       A.   Yes.

5       Q.   Do you remember anything happening in that

6  week between his November 25 and December 2 email along

7  the same discussion lines?

8       A.   I don't remember anything.  I think I was

9  probably left out of any discussions, and if there were

10 any, it was with Scott Ellington and whomever he had

11 discussions with.

12      Q.   Then subsequent, on December 2, Mr. Seery

13 writes, all, Scott and I have spoken and agree that the

14 information should be provided to James immediately.

15           Would that have been James Romey, do you

16 think?

17      A.   Yes.

18      Q.   And who was James Romey?

19      A.   He also worked for DSI.

20      Q.   And then he writes, Kristin, please proceed

21 with James.  If anyone has any questions or issues,

22 please call me.

23           Do you see that?

24      A.   Yes.

25      Q.   Did you proceed with James Romey?

Kristin Hendrix - October 27, 2021

1    A.   I further made sure that Scott was okay, to

2   confirm.  He said yes, please do, and I did send them

3   to James Romey.

4    Q.   So Mr. Seery has some of it in this email

5   chain, but do you have any understanding as to why

6   either DSI or Mr. Seery in November of 2020 was asking

7   for the financial records of HCMFA?

8    A.   I do not, other than what's in this email.

9    Q.   Did you discuss with either DSI or Mr. Seery

10  or Mr. Waterhouse in November or December 2020 whether

11  the demand notes from HCMFA should be demanded, should

12  be called?

13    A.   I did not have discussions.

14    Q.   Next exhibit is Exhibit 11.  This is another

15  email chain.

16       And I apologize to the folks on the video.

17  I'll have to get it to you during some break.

18       MR. MORRIS:  Hold on one second.

19       MR. RUKAVINA:  Sure.  Off the record.

20       (Off the record.)

21       (Whereupon, Exhibit 11 was marked for

22       identification.)

23    Q.   (BY MR. RUKAVINA)  Exhibit 11, Ms. Hendrix,

24  if you'll go to the beginning of this email chain, is

25  an email on January 6, 2021, again from Mr. Donohue to

Kristin Hendrix - October 27, 2021

1   you, copying Waterhouse, Seery, a bunch of others.

2          Where he says, at the direction of Jim Seery,

3   please provide DSI with the requested information for

4   each entity below.

5          And you'll see the entity includes both of my

6   clients, NexPoint Advisors and HCMFA.  And the

7   information includes bank statements, income

8   statements, balance sheets, cash flows.

9          Do you see that?

10  A.   Yes.

11  Q.   Do you recall this email?

12  A.   Vaguely, yes.

13  Q.   Did you have any concerns when you received

14  this email?

15  A.   Concerns about the email, no.  I probably

16  checked with -- I would have checked with Frank to make

17  sure it was okay to send this first.

18  Q.   Frank Waterhouse?

19  A.   Yes.

20  Q.   Do you have any understanding as to why

21  Mr. Donohue requested bank statements, income

22  statements, balance sheets for NexPoint and/or HCMFA?

23  A.   I do not.

24  Q.   Did he or anyone at DSI tell you why they

25  were requesting that?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-42   Filed 06/04/81   Page 116 of 200   PageID 29093

64
Kristin Hendrix - October 27, 2021

1        A.    Not that I can recall.

2        Q.    If we go forward in time, you'll see that

3   Mr. Waterhouse is writing back to Mr. Donohue.  And

4   then Mr. Seery interjects and says, these are HCMLP

5   business records.  Please provide them as requested by

6   Jack ASAP.

7              Do you see that?

8        A.    Yes.

9        Q.    And it looks like you were not privy to

10  subsequent communications where Frank and Jim were

11  talking back and forth about this.  You were not privy

12  to those, like you weren't blind copied or anything to

13  your recollection?

14       A.    No.

15       Q.    Did you in fact on or after January 6, 2021,

16  provide Mr. Donohue or anyone on his team the

17  information that he had requested as it relates to

18  NexPoint and/or HCMFA?

19       A.    Without going back to check, I couldn't

20  answer yes or no for certain.

21       Q.    So I think you mentioned when you received

22  the email from Mr. Donohue you would have checked with

23  Frank.  And what do you remember asking Frank or

24  checking with him about?

25       A.    I don't remember asking him specifically.  In

Kristin Hendrix - October 27, 2021

1  fact, it's possible that Frank just responded on his
2  own here to Jack.  Again, would have been a
3  conversation that I can't specifically recall.
4       Q.   Sure.  And you don't specifically remember
5  today providing Mr. Donohue any of that information;
6  right?
7       A.   Right.
8       Q.   You don't specifically remember today having
9  a discussion with Mr. Donohue or Seery or anyone else
10  at or about that time as to why they were wanting this
11  information?
12       A.   Correct.
13       Q.   Exhibit 12, Ms. Hendrix, is going to be the
14  December 3, 2020, letter by which Highland called the
15  notes.
16            MR. MORRIS:  Objection to the form of the
17  question if there was one.
18            (Whereupon, Exhibit 12 was marked for
19            identification.)
20       Q.   (BY MR. RUKAVINA)  Are you familiar with
21  Exhibit 12, Ms. Hendrix?
22       A.   No, I haven't seen this.
23       Q.   Prior to today, you don't remember seeing
24  this?
25       A.   No.

Kristin Hendrix - October 27, 2021

1      Q.    I think you're answering no?

2      A.    No, sorry, no.

3      Q.    On or before December 3, 2020, did anyone

4   discuss with you whether Highland should call the

5   demand notes that were outstanding by HCMFA?

6      A.    No.

7      Q.    Do you recall in December 2020 any discussion

8   with anyone at the debtor about the NexPoint

9   $30.7 million term note?

10     A.    Repeat your question again, please.

11     Q.    Sure.  So you're familiar, and we'll talk

12  about it in some detail, with the NexPoint

13  $30.7 million note?

14     A.    Yes.

15     Q.    And again, we'll talk about it, but at that

16  point in time that was a term note; correct?

17     A.    Correct.

18     Q.    Do you remember in the December 2020 or

19  November 2020 time frame discussing with anyone at the

20  debtor the status of that NexPoint note?

21     A.    Yes, we would have discussed this on a weekly

22  basis in our cash meetings that we would have had, as

23  identifying that there are payments due on these loans

24  in December.

25     Q.    What weekly cash meetings are you referring

Kristin Hendrix - October 27, 2021

1   to?

2       A.   We had a standing weekly cash meeting with

3   Frank Waterhouse, myself, Jim Seery.  I can't recall

4   everyone on it.  Some of the DSI folks.  We go through

5   cash forecasts.  It's a 13-week cash forecast.  We go

6   through it every week.

7           It's going to lay out incoming and outgoing

8   payments that are forecasted, of which these term loans

9   were in those forecasts, so they were discussed.

10      Q.   And Mr. Morris produced some of those to me

11  this morning.  I haven't had time to go through them.

12          But it is your recollection in November and

13  December of 2020 the fact of the NexPoint term note

14  being out there was known to Mr. Seery?

15      A.   Yes.

16      Q.   And the fact of an upcoming December 31,

17  2020, payment was known to Mr. Seery?

18      A.   Yes.

19      Q.   So with that background, in November and

20  December of 2020, do you remember discussing with

21  anyone anything to the effect of, oh, it really would

22  be better if NexPoint defaulted on that note so we

23  could call it?

24      A.   No.

25      Q.   Did Mr. Seery ever state to you anything in

Kristin Hendrix - October 27, 2021

1   November or December of 2020 about how the debtor might
2   monetize that NexPoint note?
3        A.    No.
4        Q.    Did he discuss with you any potential sale of
5   that promissory note?
6        A.    No.
7        Q.    Did DSI ever discuss with you in November or
8   December 2020 any potential sale of that note?
9        A.    No.
10       Q.    Or how to monetize that note?
11       A.    No.
12       Q.    So -- well, strike that.
13             Did Mr. Seery or anyone at DSI, or anyone at
14  all, in November or December of 2020 state any words to
15  you to the effect that they were hoping that NexPoint
16  would default on that note?
17       A.    Never.
18       Q.    Or that it would be in the debtor's interest
19  for NexPoint to default on that note?
20       A.    No.
21       Q.    In November or December of 2020, do you
22  recall having any discussions with Mr. Seery or anyone
23  at DSI as to the collectibility of that note?  And by
24  that I mean whether NexPoint can pay the note?
25       A.    I don't specifically recall.  It most likely

Kristin Hendrix - October 27, 2021

1   came up in cash conversations.

2       Q.   I think you were assistant controller back

3   then?

4       A.   Yes.

5       Q.   Would a discussion of a borrower's ability to

6   repay have been something within your general sphere of

7   responsibility in that time frame?

8           MR. MORRIS:  Objection to the form of the

9   question.

10          THE WITNESS:  It depends on who the borrower

11  is, and at that time we did -- we had knowledge over

12  that information, so yes.

13      Q.   (BY MR. RUKAVINA)  Well, you've seen some

14  instructions or requests from Mr. Seery to you and DSI

15  to you for financial information of NexPoint and HCMFA.

16  We've gone through those documents; right?

17      A.   Yes.

18      Q.   Does that refresh your memory that there was

19  any internal discussion that you were privy to about

20  the ability of HCMFA and/or NexPoint to pay these

21  notes?

22      A.   I don't recall that specifically being asked.

23  It could have.

24      Q.   Did you ever at any point in time have any

25  employment or officer or any title or role with

Kristin Hendrix - October 27, 2021

```
 1  NexPoint Advisors, LP?
 2       A.    No.
 3       Q.    Were you ever the controller or assistant
 4  controller for NexPoint Advisors LP?
 5       A.    No.
 6       Q.    Did you ever at any point in time have any
 7  employment, officer or any title or role at HCMFA?
 8       A.    No.
 9       Q.    Were you ever the controller or assistant
10  controller of HCMFA?
11       A.    No.
12       Q.    So you might have indirectly provided
13  services to those two as part of shared services, but
14  never directly; is that fair?
15            MR. MORRIS:  Objection to the form of the
16  question.
17            THE WITNESS:  When you say never directly,
18  meaning I was not employed by those entities?
19       Q.    (BY MR. RUKAVINA)  Correct.
20       A.    That's correct.
21       Q.    Do you have any understanding -- first of
22  all, NexPoint did not make a payment on December 31,
23  2020; correct?
24       A.    Correct.
25       Q.    Okay.  Do you have any understanding of why
```

Kristin Hendrix - October 27, 2021

 1   not?

 2        A.   Yes.

 3        Q.   What's your understanding?

 4        A.   Either November 30 or December 1, 2020, I

 5   received a phone call from Frank Waterhouse that said,

 6   no payments are going from any of the Advisors to

 7   Highland.

 8        Q.   Can you be more specific with what he said?

 9        A.   That's what he said.

10        Q.   So he said no payments from the Advisors to

11   Highland?

12        A.   Yes.

13        Q.   Did he reference the promissory note

14   expressly?

15        A.   No.

16        Q.   But no payments means?

17        A.   Nothing.

18        Q.   That would logically in your mind include the

19   promissory note?

20        A.   Yes.

21        Q.   Did you ask him why?

22        A.   No.

23        Q.   Did he tell you why?

24        A.   No.

25        Q.   Did you, prior to January 1, 2021, did you

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-12   Filed 01/09/23   Page 124 of 200   PageID 29101

72

Kristin Hendrix - October 27, 2021

1   hear from anyone as to why Mr. Waterhouse gave that

2   instruction?

3        A.   Not that I recall.

4        Q.   Did you, after that November 30 or December 1

5   phone call, did you follow up with him or anyone else

6   about the upcoming note payment?

7        A.   I didn't have any reason to.

8        Q.   I'm going to -- let me find you a document

9   for a moment.

10            Just so the record is complete, let's include

11   this promissory note.  It's going to be Exhibit 13.

12   This is the NexPoint promissory note.

13            (Whereupon, Exhibit 13 was marked for

14            identification.)

15       Q.   (BY MR. RUKAVINA)  I take it you've seen this

16   promissory note, Exhibit 13?

17       A.   Yes.

18       Q.   And I think you testified about this before,

19   but just to summarize to save time.

20            This would have been a note that you would

21   not have papered but would have gone through legal

22   because it was a roll-up.  Is that generally accurate?

23       A.   Yes.

24       Q.   And do you have any memory at all of having

25   anything to do with papering up this loan?

Kristin Hendrix - October 27, 2021

 1      A.   Not that I recall.

 2      Q.   Would you have had, after 2017 and before

 3   2021, any role with respect to any payments or upcoming

 4   payments on this note, any role at all?

 5      A.   Yes.

 6      Q.   What would have been your role or roles?

 7      A.   That would have been taking direction from

 8   Frank Waterhouse or possibly Jim Dondero saying, go

 9   ahead and make these payments that are due on these

10   term notes.

11      Q.   Would you have recorded on any books or

12   records payments that actually were made?

13      A.   Not me personally.

14      Q.   Who would have?

15      A.   Our accountant, which could have been one of

16   two different people, depending on the time frame.

17      Q.   Would you have had any role with respect to

18   recording those payments or is that just something that

19   your group would have done?

20           MR. MORRIS:  Objection to the form of the

21   question.

22           THE WITNESS:  I would not have had a role.

23   My group would have.

24      Q.   (BY MR. RUKAVINA)  What about calculating

25   amortization and/or interest payments that are due or

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-42   Filed 05/06/24   Page 126 of 200   PageID 29103

74

Kristin Hendrix - October 27, 2021

1  upcoming?  Who would have done that, you or someone

2  else?

3       A.   Our accountant.

4       Q.   Do you have any memory of doing that?

5            MR. MORRIS:  Objection to the form of the

6  question.

7            THE WITNESS:  Not during 2017 through 2019.

8       Q.   (BY MR. RUKAVINA)  What about 2020?

9       A.   No.

10      Q.   Going back to that November 30 or December 1

11  telephone call, do you recall who initiated the call?

12      A.   To me?

13      Q.   The one between you and Mr. Waterhouse.

14      A.   Frank called me.

15      Q.   Frank called you.

16           And was it just to discuss -- or just to give

17  you that instruction, no payments from the Advisors, or

18  was there other things discussed?

19      A.   I could not tell you if something else was

20  discussed on that phone call.

21      Q.   Do you remember if it was a long phone call

22  or short?

23      A.   Couldn't tell you.

24      Q.   Do you remember where you were when he called

25  you?

Kristin Hendrix - October 27, 2021

```
1        A.    At my house.

2        Q.    Did you answer on a cell phone or landline?

3        A.    My cell phone.

4        Q.    Is there any chance in hell that your cell

5   phone would still have a record of that phone call,

6   like what time it was and how long it lasted?

7              MR. MORRIS:  Objection to the form of the

8   question.

9        Q.    (BY MR. RUKAVINA)  I apologize for using

10  hell.

11             MR. MORRIS:  And to foundation.

12             THE WITNESS:  I have no idea.

13       Q.    (BY MR. RUKAVINA)  Do you have your cell

14  phone with you right now?

15       A.    In the other room.

16       Q.    I might ask you during the break to just --

17  we'll take a short break before I'm done, and I'll ask

18  you if you've had a chance to look for November and

19  December 2020 phone logs between you and

20  Mr. Waterhouse.  I would ask you to do that, please.

21       A.    Sure.

22       Q.    And I apologize, I think you said you thought

23  it was a short telephone call?

24       A.    I have no idea.

25       Q.    Did the telephone call or Mr. Waterhouse's
```

Kristin Hendrix - October 27, 2021

 1  instructions surprise you in any way?
 2      A.   Nothing surprises me anymore, so no.
 3      Q.   Did it surprise you back in November or
 4  December of 2020?
 5      A.   No.
 6      Q.   Did it pique your curiosity?
 7      A.   Nope.
 8      Q.   Just another instruction from your boss?
 9      A.   Yep.
10      Q.   Exhibit 14 is going to be a document that
11  we're not sure what it is and we're not sure who
12  prepared it.  It appears to be a ledger of charges
13  against and payments on this promissory note.
14           I'm just saying that so the people on the
15  phone know what it is, but you don't have to take what
16  I said as correct.
17           (Whereupon, Exhibit 14 was marked for
18           identification.)
19      Q.   (BY MR. RUKAVINA)  So Ms. Hendrix, Exhibit 14
20  was produced by the debtor.  And I'm going to ask you,
21  do you know what this is or have you seen it before?
22  Can you help us state what it is?
23      A.   This looks like it is an amortization
24  schedule of the NexPoint Advisors term loan.
25      Q.   Would this have been something that it

Kristin Hendrix - October 27, 2021

1    appears to you would have been maintained internally by
2    the debtor, or does it look like it might have been
3    prepared by DSI or someone else for some other reason?
4         A.   It looks like the debtor's amortization
5    schedule that they kept.
6         Q.   Did the debtor keep an amortization schedule
7    for the NexPoint promissory note, to your knowledge?
8         A.   Yes.
9         Q.   Did the debtor keep amortization schedules
10   for other term promissory notes?
11        A.   Yes.
12        Q.   In what format, like Excel spreadsheets or
13   Word documents?  What is your recollection for NexPoint
14   specifically?
15        A.   Excel.
16        Q.   Would that have been on the shared system or
17   something?
18        A.   Yes.
19        Q.   And who would have been responsible on an
20   ongoing basis to update the NexPoint amortization
21   schedule?
22             MR. MORRIS:  Objection to the form of the
23   question.
24             THE WITNESS:  Depends on what time you're
25   asking.

Kristin Hendrix - October 27, 2021

1    Q.   (BY MR. RUKAVINA)  Let's talk about the year
2  of 2020.
3    A.   That would have been Hayley Eliason, our
4  accountant at that time.
5    Q.   What about the year 2019?
6    A.   Still Hayley.
7         MR. RUKAVINA:  I'm going to just ask, to
8  preserve the record, Mr. Morris, if he hasn't already,
9  to produce any such Excel spreadsheet in the native
10  form.
11    Q.   (BY MR. RUKAVINA)  If we look at this,
12  Ms. Hendrix -- and I'm a little confused as to what
13  these entries mean.  Maybe you could help me.  But
14  columns that say interest paid, principal paid, total
15  paid, do you know what those columns mean?
16    A.   Exactly as they state.  These are interest
17  and principal payments made on the date that's listed,
18  and then you've got a total.
19    Q.   And then they're in brackets because they're
20  negative numbers?
21    A.   Correct.
22    Q.   So here's what I'm not understanding.  Go to
23  the second page.
24         You see there's an entry under interest paid
25  12/30/29 [verbatim] that says negative 530,000 and

Kristin Hendrix - October 27, 2021

1  change but it doesn't use brackets?

2      A.   It's a negative number.  It's just a

3  formatting issue.

4      Q.   What about also on that same page in the

5  other column, principal paid, 5/31/2020, it's a

6  positive number, 575,550.

7           MR. MORRIS:  Where are you?

8           MR. RUKAVINA:  On page 2 of this exhibit.

9           MR. MORRIS:  What date?

10          MR. RUKAVINA:  May 31, 2020.  And it's the

11  column over, principal paid.  It's a positive number,

12  575,000 and change.

13          MR. MORRIS:  Got it, thank you.

14      Q.   (BY MR. RUKAVINA)  Do you see that,

15  Ms. Hendrix?

16      A.   Yes.

17      Q.   Do you have an understanding of why that

18  number would be positive?

19      A.   Actually, I think this looks like an entry to

20  me where the interest is what we call picking.  So on

21  the anniversary date of this loan, which is May, from

22  what I can tell, the accrued interest total, which is

23  that 575-, is being rolled into principal.

24          That's what I can tell from looking at it.

25      Q.   Okay.  Do you have any understanding as to

Kristin Hendrix - October 27, 2021

```
 1   why that would have been done or why that would have
 2   been done on that day?
 3              MR. MORRIS:  Objection to the form of the
 4   question.
 5              THE WITNESS:  Because that's the anniversary
 6   date of the loan.  I would assume that that's how the
 7   loan is written.
 8        Q.   (BY MR. RUKAVINA)  And I think that that
 9   Section 1 of the promissory note does say, the unpaid
10   principal balance of this note from time to time
11   outstanding shall bear interest.
12              At the rate of 6 percent per annum from the
13   date hereof until maturity date, compounded annually on
14   the anniversary of the date of this note.
15              Do you see that?
16              MR. MORRIS:  Objection to the form of the
17   question.
18              THE WITNESS:  Yeah, I see that.
19        Q.   (BY MR. RUKAVINA)  Assuming that this is the
20   correct amortization schedule for the NexPoint note,
21   and that the numbers in here are correct, if you look
22   at the second page under the column total paid there
23   are a number of entries for 2019.
24              Do you see that, the far right column?
25        A.   At the top, yes.
```

Kristin Hendrix - October 27, 2021

```
 1        Q.   For example, 1.3 million, 2.1 million,
 2   1.3 million.
 3             Do you see that?
 4        A.   Yes.
 5        Q.   Assuming that that's correct, do you have any
 6   memory or understanding whether in the year 2019, or
 7   why NexPoint was making these payments on this
 8   promissory note?
 9        A.   Without going back and reading through emails
10   I can only assume that, from looking at this, Highland,
11   the debtor, would have needed cash, and so this is one
12   way of getting cash to the debtor.
13        Q.   This is kind of like what we discussed in the
14   beginning, that Mr. Dondero on a cash needed basis
15   would just transfer money between entities?
16        A.   Yes.
17        Q.   Do you have any memory in the first half of
18   2019 whether Highland, the debtor, had any particular
19   need for cash money at that time?
20        A.   We generally always had a need for cash, so
21   yes.
22        Q.   And so if NexPoint was transferring money
23   back to Highland on this note because Highland needed
24   the money, would those have been recorded as
25   prepayments by the debtor?
```

Kristin Hendrix - October 27, 2021

1          MR. MORRIS:  Objection to the form of the
2     question.
3          THE WITNESS:  Yes.
4      Q.   (BY MR. RUKAVINA)  Sitting here today, do you
5     have any reason to believe based on the formatting or
6     anything on Exhibit 14 that it's not the amortization
7     schedule as it was maintained by the debtor?
8      A.   I don't have any reason to not believe that
9     it was.
10     Q.   Going to show you a few documents that I'm
11    hopefully going to burn through, but you're certainly
12    entitled to take all the time that you need.
13          So first is going to be a document that
14    Mr. Morris produced this morning.  It's not Bates
15    labeled.  I don't know why.
16          MR. MORRIS:  As I said in my email, my
17    paralegal is sick and so I wanted you to have the
18    documents.  We'll Bates stamp them later, but we have a
19    written record from my email of what we produced to
20    you.
21          MR. RUKAVINA:  You're assuming that I read my
22    emails.
23          MR. MORRIS:  Sorry about that.  I confess,
24    sometimes I don't as well.
25     Q.   (BY MR. RUKAVINA)  So I'm going to hand you

Kristin Hendrix - October 27, 2021

1   Exhibit 15 and I'm going to represent to you that it's
2   the email that Mr. Morris sent to me today and I've not
3   doctored it in any way.
4               (Whereupon, Exhibit 15 was marked for
5               identification.)
6               MR. MORRIS:  Do you have the email that it
7   was attached to?
8               MR. RUKAVINA:  Somewhere.  I can find it at a
9   break.
10              MR. MORRIS:  I'll let the witness testify.
11  This was attached to an email.  Not my email, but
12  another email.  But I'll let the witness testify.
13              MR. RUKAVINA:  Off the record.
14              (Off the record.)
15       Q.   (BY MR. RUKAVINA)  So you have Exhibit 15.
16              And during the break we established, I don't
17  have a copy of it right now, but you sent Exhibit 15 on
18  August 29, 2020, to Mr. Dondero by email, copying
19  Mr. Waterhouse, as well as a couple of other
20  attachments; is that correct?
21       A.   Correct.
22       Q.   Do you recall what prompted you to send that
23  email and this attachment?
24       A.   Yes.
25       Q.   What?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-42   Filed 05/30/0483   Page 136 of 200   PageID 29113
Document Page 500 of 831

84

Kristin Hendrix - October 27, 2021

1      A.   Frank Waterhouse called me on August 29, and
2   requested that I do so.

3      Q.   Did he tell you why?

4      A.   From what I recall, this was a time when Jim
5   was trying to come up with his bargain or pop land,
6   whatever he referenced it as.  This was all information
7   that Frank said he wanted.

8      Q.   Okay.  So going back to Exhibit 15, what I'm
9   interested in is NexPoint Advisors, the 23,846,000 and
10  change number.

11          Do you see that?

12     A.   Yes.

13     Q.   Where did that number -- or where did this
14  Exhibit 15 come from, if you understand my question?

15     A.   Sure.  These numbers should all be balances
16  off of the corresponding notes that each entity owed to
17  the debtor.

18     Q.   Did you or someone prepare Exhibit 15
19  specifically for that email?  Or was Exhibit 15 already
20  existing somewhere on the system?

21     A.   I believe that we prepared it specifically
22  for this request.

23     Q.   Do you recall who?

24     A.   It was either myself or our accountant.  I
25  don't recall who put it together.

Kristin Hendrix - October 27, 2021

1    Q.   Okay.  And where would that 23 million and
2  change number for NexPoint have come from, an
3  amortization schedule?

4    A.   Yes.

5    Q.   And what about Highland Capital Management
6  Fund Advisors?  You see $10.5 million and change demand
7  on Exhibit 15?

8    A.   Yes.

9    Q.   Where would that $10.5 million number have
10 come from, do you remember?

11   A.   The same.  It would have come off of the
12 amortization schedules for all of their notes.

13   Q.   How was there an amortization schedule for a
14 demand note?

15   A.   Because it's accruing interest.

16   Q.   So sitting here today, you expect there would
17 be some amortization schedule like Exhibit 14 but for
18 HCMFA?

19   A.   Yes.

20   Q.   Now we're going to have an exhibit [verbatim]
21 chain that's going to be marked as Exhibit 16.

22        (Whereupon, Exhibit 16 was marked for
23        identification.)

24        MR. RUKAVINA:  For the folks on the video,
25 Exhibit 16 is the email chain that Mr. Morris used last

Kristin Hendrix - October 27, 2021

1  week regarding the Section 15(c) document.

2        Q.   (BY MR. RUKAVINA)  Are you familiar with this

3  Exhibit 16 email chain, Ms. Hendrix?

4        A.   Yes.

5        Q.   Why are you familiar with it?

6        A.   Well, I'm copied on it, and I saw it

7  yesterday.

8        Q.   Do you have any memory -- well, that's a

9  stupid question.  But prior to yesterday, did you have

10  any memory of this?

11        A.   Yes.

12        Q.   And do you recall the context or the purpose

13  of this exhibit, or this email chain?

14        A.   From what I remember this is the time where

15  information was being prepared for the retail board to

16  re-up the debtor's shared services.

17        Q.   So, here -- you're certainly welcome to read

18  it in its entirety and if you feel like you want to or

19  need to, that's fine.  But I only have one question.

20  Well, one question with two subparts.

21             I'm looking at Ms. Lauren Thedford's,

22  T-h-e-d-f-o-r-d's, email October 6, 2000 [verbatim]

23  where she says, I see the below from the 6/30

24  financials.  NPA, due to HCMLP and affiliates as of

25  June 30, 2020.

Kristin Hendrix - October 27, 2021

1           Do you see that, ma'am?

2      A.    Yes.

3      Q.    23 million 683?

4      A.    Yes.

5      Q.    And you see, HCMFA due to HCMLP as of

6   June 30, 2020, 12,286,000?

7           MR. MORRIS:  Objection to the form of the

8   question.

9      Q.    (BY MR. RUKAVINA)  Strike that.

10          It says 12,286.  What do you take that 12,286

11  to mean?

12     A.    I think that's a typo and it should have

13  said -- well, there's several things wrong with this,

14  from looking at it.

15          She left off three zeros on the end of it.

16  Should have said 12,286,000.  Secondly, that amount is

17  our due to affiliates on HCMFA's books, not just due to

18  HCMLP.

19     Q.    That was going to be my question, why that

20  12,286,000 number didn't jive with the 10,530,000

21  number on Exhibit 15?

22     A.    Yes, there's another loan due to a different

23  affiliate.

24     Q.    So that $12,286,000 amount doesn't mean that

25  it's all due to Highland; is that correct?

Kristin Hendrix - October 27, 2021

1      A.    Correct.

2      Q.    Exhibit 17 is going to be the January 7, 2021

3   notice from the debtor to NexPoint about the default.

4           (Whereupon, Exhibit 17 was marked for

5           identification.)

6      Q.   (BY MR. RUKAVINA)  You've been handed

7   Exhibit 17.  Have you seen this document before?

8      A.    Not that I believe.

9      Q.    And I think we've asked this before, but just

10  to clarify.

11          Did anyone at the debtor, including Mr. Seery

12  or DSI, discuss with you after December 31, 2020 that

13  the payment had not been made and what, if anything,

14  the debtor should do about that?

15          MR. MORRIS:  Objection to the form of the

16  question.

17          THE WITNESS:  I can't recall specific

18  conversations that may or may not have been had around

19  that topic.

20     Q.    (BY MR. RUKAVINA)  Would -- so back then you

21  were the assistant controller, on January 7; right?

22     A.    Yes.

23     Q.    Do you think that back then Mr. Seery or DSI

24  would have sought your advice or input as to what they

25  should do about the missed payment?

Kristin Hendrix - October 27, 2021

```
 1        A.   No.
 2             MR. MORRIS:  Objection to the form of the
 3   question.
 4             THE WITNESS:  No.
 5        Q.   (BY MR. RUKAVINA)  That would have been
 6   outside of your purview?
 7        A.   Yes.
 8        Q.   And you see in this notice in the middle, it
 9   says an amount due as of January 8 in the $24,471,000
10   range.
11             Do you see that?
12        A.   Yes.
13        Q.   Do you have any idea, I take it you don't,
14   where that number came from?
15             MR. MORRIS:  Objection to the form of the
16   question.
17             THE WITNESS:  I don't know who provided that
18   number or where it came from.
19        Q.   (BY MR. RUKAVINA)  Do you have any
20   understanding as to why that number is higher than the
21   number on Exhibit 15?
22        A.   My guess would be that Exhibit 15 is just
23   principal balances.
24        Q.   Okay.
25             Exhibit 18, please.
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-42   Filed 09/04/83   Page 142 of 200   PageID 29119

90

Kristin Hendrix - October 27, 2021

1              (Whereupon, Exhibit 18 was marked for

2              identification.)

3        Q.   (BY MR. RUKAVINA)  Exhibit 18, Ms. Hendrix,

4   is an email chain between you and Mr. Waterhouse on

5   January 12, 2021.  Do you remember this email chain?

6        A.   No.

7        Q.   Do you remember on January 12 Mr. Waterhouse

8   emailing you, asking when the last amort payment due

9   and what the amount was for NexPoint?

10       A.   No.

11       Q.   When was the last time -- well, strike that.

12             Do you remember ever seeing this email

13  between then and today?

14       A.   No.

15       Q.   Do you have any present memory of any

16  communications with Mr. Waterhouse on or about

17  January 12, 2021 regarding the NexPoint default or

18  note?

19       A.   Not specific, no.

20       Q.   Any general memory?

21       A.   Not that I can pinpoint, no.

22       Q.   Were you aware that on or about January 14

23  NexPoint transferred about $1.4 million and change to

24  the debtor?

25       A.   Yes.

Kristin Hendrix - October 27, 2021

```
 1        Q.   Were you aware of it then?

 2        A.   Was I aware of what?

 3        Q.   That transfer of $1.4 million and change.

 4        A.   On January 14?

 5        Q.   Yes.

 6        A.   Yes.

 7        Q.   Did you facilitate that transfer?

 8        A.   Yes.

 9        Q.   Who told you to make that transfer?

10        A.   Frank Waterhouse.

11        Q.   Did he tell you why?

12        A.   Nope.

13        Q.   He just said make the transfer?

14        A.   Yes.

15        Q.   Did he tell you that it was on account of the

16   NexPoint note?

17        A.   Yes.

18        Q.   Did he tell you how to, if at all, to credit

19   that note for that amount?

20        A.   No.

21        Q.   Sitting here today, you have no memory other

22   than that Frank Waterhouse told you to transfer some

23   $1.4 million on the NexPoint note?

24        A.   Right.

25        Q.   And do you recall, was that oral or written
```

Kristin Hendrix - October 27, 2021

1   or how would that have been?

2         A.    That was a phone call.

3         Q.    Do you recall who initiated the phone call?

4         A.    Frank called me.

5         Q.    Was that the only topic discussed in that

6   phone call to your memory?

7         A.    Yes.

8         Q.    Did you ask him why the payment or

9   anything -- did you ask him anything at all?

10        A.    No.

11        Q.    And after you made the payment -- or I'm

12  sorry, after you caused the payment to be made, did you

13  take any further steps with respect to the NexPoint

14  note?

15        A.    I forwarded the payment confirmation, showing

16  that the money was sent from NexPoint Advisors to

17  Highland, forwarded that payment confirmation from the

18  bank to Jack Donohue at DSI, letting him know.

19        Q.    Did you let Mr. Donohue or anyone at DSI know

20  about the transfer before the transfer was made?

21        A.    No.

22        Q.    And you sent that by email to Mr. Donohue?

23        A.    Yes.

24        Q.    Did Mr. Donohue thereafter have any

25  discussion with you about that in any way?

Kristin Hendrix - October 27, 2021

1      A.    I have no idea.

2      Q.    He didn't ask what this was for or anything

3  like that?

4      A.    He may have asked what the amount

5  represented.  I can't specifically recall.  But it's

6  possible.

7      Q.    Okay.  Do you recall any discussion about

8  that time, January 14, with Mr. Donohue or

9  Mr. Waterhouse or anyone as to whether that payment

10  would in any way relieve NexPoint of the default or

11  would not relieve NexPoint of the default?

12      A.    No.

13      Q.    Ms. Hendrix, I believe that I am done.  I

14  would like you, however, because it's important, to

15  check your phone.  Would you like a short, five-minute

16  restroom break and just check --

17      A.    Yeah, and I might need help figuring out how

18  to do that.

19      Q.    I'm not saying that it's possible, but I'm

20  going to ask you on the record to look for that

21  November 30 or December 1, 2020 phone call.

22          MR. MORRIS:  We're happy to do that.

23      Q.    (BY MR. RUKAVINA)  But what I would like if

24  you find it, I would like you to tell me the time, the

25  date and the length of that call.

Kristin Hendrix - October 27, 2021

```
 1        A.    Okay.
 2        Q.    Thank you.
 3              We'll be back in five minutes.
 4              (Off the record.)
 5        Q.    (BY MR. RUKAVINA)  Ms. Hendrix, during the
 6   break did you look at your phone?
 7        A.    I did.
 8        Q.    Did you find anything?
 9        A.    Sadly, it only goes back to October 5 of
10   2021.
11        Q.    Not surprised.  Thank you.
12              Have I been courteous to you today?
13        A.    Yes.
14              MR. RUKAVINA:  I pass the witness.
15              MR. MORRIS:  Thank you.
16              MR. AIGEN:  Are we ready to move forward?
17              MR. MORRIS:  Yes.  You're a little dark
18   there.
19              MR. RUKAVINA:  Can we increase the volume on
20   that thing?
21              (Off the record.)
22                        EXAMINATION
23        Q.    (BY MR. AIGEN)  Good afternoon, Ms. Hendrix.
24   My name is Michael Aigen.  I represent Mr. Dondero,
25   HCMS and HCRE Partners in several of the adversary
```

Kristin Hendrix - October 27, 2021

1   proceedings today.

2            I'm going to try to ask you some questions

3   about these adversary proceedings.  I'll try to make it

4   as quick as possible so we don't keep you here.

5            You understand that you're still under oath;

6   is that correct?

7       A.    Correct.

8       Q.    First topic I want to ask you about is one of

9   the defenses in this case related to an oral agreement.

10  Let me start off with this question.

11           Are you aware that some of the defendants in

12  these adversary proceedings have raised a defense that

13  there was a subsequent oral agreement allowing the

14  notes at issue to be potentially forgiven if certain

15  events occurred?

16      A.    I've recently been made aware that this came

17  up, yes.

18      Q.    When you say recently, approximately when?

19      A.    Within the last week.

20      Q.    And where did you learn that from?

21      A.    In my speakings with John Morris just

22  preparing for today.

23           MR. AIGEN:  And John, I'm going to assume

24  that those conversations are privileged?

25           MR. MORRIS:  That's a very fair assumption.

Kristin Hendrix - October 27, 2021

1      Q.    (BY MR. AIGEN)  Other than the conversation
2  you just referred to with Mr. Morris, have you ever had
3  any other conversations with anyone about this alleged
4  oral agreement that Defendants are contending occurred?
5      A.    No.
6      Q.    So prior to that conversation with Mr. Morris
7  you weren't even aware of this alleged defense related
8  to an oral agreement.  Is that fair to say?
9      A.    That's right.
10     Q.    This is a similar question but slightly
11 different, just to sort of finish this topic.  I'm not
12 asking about this oral agreement as a defense, I'm just
13 asking more generally.
14         Other than this conversation, were you aware
15 generally of any conversations that anyone had where
16 the notes at issue might be forgiven if certain events
17 occurred?
18         MR. MORRIS:  Objection to the form of the
19 question.
20         THE WITNESS:  No.
21     Q.    (BY MR. AIGEN)  Is it fair to say that you
22 haven't had any conversations about this subsequent
23 oral agreement with anyone other than Mr. Morris?
24     A.    That's fair.
25     Q.    You never discussed it with Mr. Seery?

Kristin Hendrix - October 27, 2021

1      A.    No.

2      Q.    Never discussed it with Mr. Klos?

3      A.    No.  Well, sorry, Mr. Klos was present when

4  John and I talked about it.  But that's it.

5      Q.    Have you ever made any investigation or

6  effort in order to determine if this oral agreement

7  actually occurred?

8      A.    No.

9      Q.    If there was such an oral agreement to

10 potentially forgive the notes, do you believe that you

11 would have known about such an oral agreement as part

12 of your duties and responsibilities?

13     A.    Yes, I would hope so.

14     Q.    Why do you say that?

15     A.    That's something that should be disclosed in

16 audited financial statements, and me and my team are

17 responsible for preparing those financial statements

18 and presenting them to the auditors as fair and

19 accurate.

20     Q.    And is it fair to say that this oral

21 agreement should have been disclosed to PwC if it was

22 determined that it was material?

23     A.    Yes.

24     Q.    And have you done any sort of analysis to

25 determine whether the oral agreement at issue here

Kristin Hendrix - October 27, 2021

1   would have been material for purposes of a PwC audit?

2       A.   I've not done any work, just finding out

3   about it, but from what it sounds like, it would be

4   material.

5       Q.   That's your opinion, that it would have been

6   material; is that fair to say?

7       A.   Fair.

8       Q.   Have you had any discussions with anyone else

9   about whether the oral agreement would have been

10  material?

11      A.   No.

12      Q.   Changing topics a little bit here, are you

13  aware --

14          (Off the record.)

15      Q.   (BY MR. AIGEN)  Are you aware that a few of

16  the loans at issue here, specifically related to HCMS

17  and HCRE, were term loans as opposed to demand loans?

18      A.   Yes.

19      Q.   And are you aware that for those particular

20  loans, there were payments that were supposed to be

21  made but weren't on December 31, 2020?

22      A.   Yes.

23      Q.   Do you have any understanding as to why those

24  payments weren't made with respect to the HCMS and HCRE

25  term loans on December 31, 2020?

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 76-42    Filed 05/09/431    Page 151 of 200    PageID 29128

99

Kristin Hendrix - October 27, 2021

1      A.    Yes.

2      Q.    Can you tell me why?

3      A.    Sure.  It goes along with the same statement

4    as HCMFA and NPA and the phone call that I got from

5    Frank Waterhouse saying there's no payments coming from

6    any of the affiliates to the debtor.

7      Q.    I may have written that down wrong when you

8    talked about that before, but I believe your earlier

9    testimony when you described that conversation was that

10   there was no more payments coming from the Advisors,

11   not affiliates.

12          Let me ask you then, what was the

13   conversation?  Was it no more payments from affiliates

14   or Advisors?

15     A.    It could have been either.  I probably did

16   say Advisors.  But regardless, those payments would

17   have been directed to me to be made, either by Frank

18   Waterhouse or Jim Dondero.

19          And I would assume that nobody directed me to

20   make those payments because we weren't making any

21   payments from Jim's related parties.  I don't know for

22   a fact, but that's what I would assume.  Those were all

23   under the same umbrella.

24     Q.    And again, let's back up a second.

25          When you refer to Advisors, fair to say that

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 16-12   Filed 05/02/43   Page 152 of 200   PageID 29129
Document 162   Page 552 of 831

100

Kristin Hendrix - October 27, 2021

1   that does not include HCMS and HCRE; is that correct?

2       A.   When I say Advisors, I am referring to HCMFA
3   and NPA.

4       Q.   And when you use the term "affiliates,"
5   you're referring to all four; is that correct?

6       A.   Correct.

7       Q.   Just want to make sure we're on the same
8   page.

9            When you answered the previous question you
10  started to get into assumptions and things like that.
11  Let me start off with what your specific recollection
12  of that phone call was.  Tell me as best as you can
13  what you remember Frank telling you?

14      A.   I remember it as being no payments from the
15  Advisors to the debtor.

16      Q.   So you don't remember the instruction being,
17  don't make payments from the affiliates.  It was, don't
18  make payments from the Advisors; is that correct?

19      A.   Correct.

20      Q.   So is it fair to say that you don't remember
21  any instructions telling you not to make any payments
22  from HCMS or HCRE?

23      A.   That's fair.

24      Q.   So if that is the case, why weren't payments
25  made from HCMS or HCRE for December 31, 2020, payment?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-12   Filed 05/06/22   Page 153 of 200   PageID 29130

101

Kristin Hendrix - October 27, 2021

1      A.    Sure.   Typically what would have happened is
2  Frank would be talking to Jim Dondero about making
3  these payments and getting his approval to do so,
4  because Jim Dondero is, you know, directing payments
5  out of these entities.
6            I have never -- had never been given the
7  direction to effectuate those payments by anybody.
8      Q.    Is it fair to say, then, that you're not
9  aware of any instructions from anyone saying that the
10 HCMS and HCRE payments should not be made on
11 December 31, 2020?
12     A.    That's fair.
13     Q.    So the reason the payments weren't made is
14 because you never got an affirmative instruction to
15 actually make that payment; is that correct?
16     A.    Correct.
17     Q.    And you're not aware of Mr. Dondero
18 instructing anyone that HCMS and HCRE should not have
19 made the December 31, 2020, payments; is that correct?
20     A.    I'm not aware personally, no.   Correct.
21     Q.    You say personally.   In any way are you aware
22 of such a specific instruction?
23     A.    No.
24     Q.    If that payment was to be made, who at the
25 debtor would have been responsible for making those

Kristin Hendrix - October 27, 2021

1    payments on behalf of HCMS and HCRE?

2            MR. MORRIS:  Objection to the form of the

3    question.

4            THE WITNESS:  The corporate accounting team.

5        Q.   (BY MR. AIGEN)  And that included you?

6        A.   Yes.

7        Q.   And in December of 2020, were you aware that

8    those payments were due on December 31, 2020?

9        A.   Yes.

10       Q.   Did you make any attempts or efforts to

11   determine whether Mr. Dondero wanted those payments to

12   be made?

13       A.   I did not, no.

14       Q.   Why not?

15       A.   That would have been something that Frank

16   Waterhouse would have done directly with Jim Dondero

17   himself.

18       Q.   Did you have any conversations with anyone

19   about whether the December 31 payments for HCMS and

20   HCRE would be made in December of 2020?

21       A.   Not that I can recall.

22       Q.   And you didn't think it was your

23   responsibility to check on those payments and find out

24   if they should have been made?

25       A.   Right, correct.

Kristin Hendrix - October 27, 2021

1      Q.   And is that because it's only your job to
2   make payments that you're told to specifically make; is
3   that correct?
4      A.   Yes, in this case, that is correct.
5      Q.   Is it fair to say then that as part of your
6   job responsibilities you've never made a payment to
7   anyone without being specifically told by Mr. Dondero
8   and Mr. Waterhouse?
9      A.   Sorry, say that again.
10     Q.   As part of your job responsibilities, have
11  you ever made a payment to anyone without the specific
12  instruction of Mr. Waterhouse or Mr. Dondero?
13          MR. MORRIS:   Objection to the form of the
14  question.
15          THE WITNESS:   Yes, we make payments all the
16  time.
17     Q.   (BY MR. AIGEN)   So why is this different in
18  that this payment was not made without the specific
19  instructions from Mr. Waterhouse and Mr. Dondero, even
20  though you believed the payment was due on December 31,
21  2020?
22     A.   The difference between making a loan payment
23  and making normal course -- or sorry, normal, ordinary
24  course, you know, overhead expense payments is that
25  something like that is not necessarily what we would

Kristin Hendrix - October 27, 2021

1  take to Jim Dondero to approve.

2          He doesn't have time to approve every single

3  overhead payment that we're making out of every single

4  entity.  That's what Frank is for.

5          Something that's once a year that's more

6  material in amount, such as a loan payment, that is

7  something that needs to get approved by Jim Dondero.

8      Q.  You say needs to get approved.  What's your

9  basis for that, something in a policy manual, something

10 someone told you?

11     A.  It's a policy that my team followed.  I don't

12 think that it's written in an actual manual anywhere,

13 but anything that's not ordinary course needs to get

14 approved by Jim Dondero.

15     Q.  Is that something that's written in a policy

16 anywhere?

17     A.  Not that I know of.

18     Q.  Were you ever told that payments in the

19 ordinary course can be made without Mr. Dondero's

20 approval but loan payments cannot?

21     A.  Yes, I do recall years ago that Frank and I,

22 possibly Jim, this was years ago, had a conversation

23 that anything ordinary course is up to Frank to

24 approve.  And this is, quite frankly, up to Frank.

25          Whatever he felt Jim needed to sign off on,

Kristin Hendrix - October 27, 2021

1  that's what Jim would sign off on.  This was not my
2  responsibility to make that decision.
3      Q.   And in December -- prior to the December 31,
4  2020, due date you didn't have any conversations with
5  anyone about whether this -- these payments that were
6  due should be made; is that correct?
7      A.   Correct.
8      Q.   And you didn't try to check with anyone to
9  see whether anyone wanted these payments to be made; is
10  that correct?
11      A.   Correct.
12      Q.   Subsequent to the payment being missed, did
13  you ever have any conversations with anyone about why
14  the payment was not made?
15      A.   Not that I recall.
16      Q.   So is it fair to say that sitting here today
17  you have no idea why the payments were not made for
18  HCMS and HCRE on December 31, 2020?
19          MR. MORRIS:  Objection to the form of the
20  question.
21          THE WITNESS:  I don't have any specific
22  evidence telling me why they weren't.  I can make
23  assumptions but that's not going to help.
24      Q.   (BY MR. AIGEN)  Well, did you ever have any
25  conversations with anyone about why those payments were

Kristin Hendrix - October 27, 2021

```
 1  not made?
 2       A.   No.
 3       Q.   You have no idea why they weren't made other
 4  than just speculation; is that fair to say?
 5       A.   Correct.
 6            MR. MORRIS:  Objection.  Asked and answered.
 7            THE WITNESS:  Correct.
 8       Q.   (BY MR. AIGEN)  And are you aware that with
 9  respect to those two loans, some payments were actually
10  made in the next month, in January of 2021?
11       A.   Yes.
12       Q.   What role, if any, did you have with respect
13  to those payments?
14       A.   Frank Waterhouse would call me and tell me to
15  have my team effectuate a wire.
16       Q.   And you say would call you.  Do you remember
17  this conversation or are you just assuming it occurred?
18            MR. MORRIS:  Objection to the form of the
19  question.
20            THE WITNESS:  If we sent a payment out, Frank
21  would have told me to do it.  I would not have done it
22  on my own.
23       Q.   (BY MR. AIGEN)  Sitting here today, do you
24  have a specific recollection of the conversation where
25  someone told you to make the January 2021 payments?
```

Kristin Hendrix - October 27, 2021

1      A.    I can't tell you the exact date, but, yes, I

2  do have a recollection of Frank calling or emailing me

3  to have, I believe it was the HCRE wire sent out for

4  their payment.

5      Q.    What about the HCMS payment?

6      A.    I don't recall that one as much.

7      Q.    Other than the payment being made, do you

8  have any recollection of any other conversations about

9  why the payment was being made?

10     A.    No.

11     Q.    Are you aware of any conversations that

12 anyone had regarding whether these payments would

13 deaccelerate loans?

14     A.    No.

15     Q.    Is that something you would normally be part

16 of, conversations like that?

17     A.    No.

18     Q.    Changing topics here.  Not sure if this is an

19 area that you know anything about.

20         Are you familiar with the term, as it's used

21 at Highland, NAV ratio trigger period?

22     A.    No.

23     Q.    This may go very quick.  If I represent to

24 you that it's a term that's used in the -- in the

25 fourth amended limited partnership agreement for

Kristin Hendrix - October 27, 2021

```
 1    Highland Capital Management, would that refresh your
 2    recollection at all?
 3         A.   No.
 4         Q.   Fair to say, then, that you have no knowledge
 5    as to whether NAV ratio trigger period was ever reached
 6    at any time prior to bankruptcy buyouts?
 7         A.   No, I don't know.
 8         Q.   Have you ever had any conversations with
 9    Nancy Dondero?
10         A.   I have not.
11         Q.   Never met her?
12         A.   No.  I may have exchanged an email with her
13    on an invoice, but that's the extent of it.  No
14    conversations.
15         Q.   In the years leading up to the bankruptcy of
16    Highland Capital, was there any time period where
17    Highland was unable to pay its salaries?
18         A.   Salaries?
19         Q.   Salaries of its employees?
20         A.   No.
21         Q.   In the time leading up to the Highland
22    bankruptcy, was there any time period where Highland
23    wasn't able to pay bonuses owed to any of its
24    employees?
25         A.   Not that I know of.  Not that I can recall.
```

Kristin Hendrix - October 27, 2021

1   Q.   Are you aware of any time period leading up
2  to the Highland bankruptcy where Highland was unable to
3  pay its bills?
4   A.   There's times where we would be in a cash
5  flow crunch and we would stretch our AP, but eventually
6  it would get paid.
7   Q.   And I think this is the last topic and we can
8  probably move through this pretty quickly.
9        Are you aware of any loans made by Highland
10  to any of its employees or officers that were forgiven
11  in part or all?
12   A.   Yes.
13   Q.   Which officers or employees are you aware of?
14   A.   I recall there were two employees.  I can't
15  remember one of them, but I believe another, the second
16  one, was Paul Adkins.  Again, I'm just recalling this
17  was years ago.
18   Q.   And these two are the only ones you're aware
19  of?
20   A.   Or I'm sorry, not Paul Adkins, Tim Lawler.
21  It's possible Paul Adkins was the other one, but I
22  can't tell you for sure.
23   Q.   Tim Lawler and some other employee that you
24  can't remember the name of are the only two that you're
25  aware of?

Kristin Hendrix - October 27, 2021

```
 1        A.    Yes.
 2        Q.    This other employee, I know you don't
 3   remember the name.  Is there any other description that
 4   you can give me, what their position was, how long they
 5   worked, or is it just you remember those loans?
 6        A.    I just remember we had two employee loans.
 7        Q.    Approximately when was this?
 8        A.    I couldn't even tell you.  All the years just
 9   commingle together.
10        Q.    More than five years ago?
11        A.    Yes.
12        Q.    More than 10 years ago?
13        A.    I couldn't say.
14             MR. AIGEN:  Why don't we take a five-minute
15   break and then I'll either be done or have just a few
16   wrap-up questions.
17             MR. RUKAVINA:  Okay.
18             (Off the record.)
19                     FURTHER EXAMINATION
20        Q.    (BY MR. RUKAVINA)  Ms. Hendrix, in May of
21   2019, would you on behalf of Highland alone,
22   unilaterally, have the authority to lend to HCMFA 2.4-
23   and/or $5.0 million?
24        A.    No.
25        Q.    And would you have had any authority on
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-42   Filed 05/09/2483   Page 163 of 200   PageID 29140

111

Kristin Hendrix - October 27, 2021

 1  behalf of HCMFA in May of 2019 to bind HCMFA to such
 2  notes?
 3       A.   No.
 4       Q.   Thank you, ma'am.
 5                       EXAMINATION
 6       Q.   (BY MR. MORRIS)  Ms. Hendrix, can you get out
 7  of your pile, Exhibit Number 3.
 8            And this is the email from Dave Klos to
 9  corporate accounting on May 2nd concerning the
10  $2.4 million that was going to be transferred from
11  HCMLP to HCMFA?
12       A.   Yes.
13       Q.   And how did Mr. Klos characterize that
14  transfer?
15       A.   He called it a new intercompany loan.
16       Q.   What does a new intercompany loan mean to
17  you?
18       A.   That means we are creating a new loan
19  document, sending money out, tracking it as a
20  brand-new, fresh loan.
21       Q.   And he sent this email to an email group
22  called corporateaccounting@hcmlp.com.  Do I have that
23  right?
24       A.   Yes.
25       Q.   Were you included in that email group?

Kristin Hendrix - October 27, 2021

1      A.   I was.

2      Q.   Can you identify everybody else who you

3  recall being in that email group?

4      A.   Yes.

5      Q.   Who else was in that email group?

6      A.   Dave Klos, Frank Waterhouse, myself, Hayley

7  Eliason, and Blair Roeber.

8      Q.   Okay.  Did Mr. Waterhouse ever tell anybody,

9  to the best of your knowledge, in May 2019 that the

10 transaction should not be booked as a loan?

11     A.   No, not to my knowledge.

12     Q.   You testified earlier that there was, you

13 recall, a similar email the next day with respect to a

14 $5 million transaction.

15          Do you recall that?

16     A.   Yes.

17     Q.   Do you recall if that email also went to

18 corporate accounting?

19     A.   I believe so, yes.

20     Q.   And to the best of your knowledge, would

21 Mr. Waterhouse have been informed on May 3, 2019, that

22 the transaction was being booked by the corporate

23 accounting department as a loan?

24     A.   Yes.

25     Q.   Did Mr. Waterhouse tell you at that time or

Kristin Hendrix - October 27, 2021

 1   at any time thereafter that it was a mistake to book it
 2   as a loan?
 3        A.    No.
 4        Q.    Did Mr. Waterhouse tell you at that time or
 5   at any time thereafter that he didn't intend to sign
 6   the promissory notes?
 7        A.    No.
 8             MR. RUKAVINA:  Objection.  To the last
 9   question, objection to form.
10             Go ahead.
11        Q.   (BY MR. MORRIS)  Okay.  The promissory notes,
12   to be clear, are the two promissory notes that you
13   testified to earlier that have been marked as exhibits
14   in this deposition for $5 million and $2.4 million
15   respectively.
16             With that definition as promissory notes, did
17   Mr. Waterhouse ever tell you at any time that it was a
18   mistake to sign those notes?
19             MR. RUKAVINA:  I'll object to the form.
20             Go ahead.
21             THE WITNESS:  No.
22        Q.   (BY MR. MORRIS)  Did Mr. Waterhouse or
23   anybody -- withdrawn.  I'll go back to the first
24   question.
25             Did Mr. Waterhouse or anybody in the world

Kristin Hendrix - October 27, 2021

```
 1   ever tell you at any time since May of 2019 that it was
 2   a mistake to issue the promissory notes as we've
 3   defined them?
 4        A.   No.
 5        Q.   Did Mr. Waterhouse or anybody in the world
 6   tell you that Mr. Waterhouse wasn't authorized to affix
 7   his signature to those promissory notes?
 8             MR. RUKAVINA:  And I'll object.  Assumes
 9   facts not in evidence, i.e., the signature.  That's
10   what I've been objecting to.
11             But go ahead and answer.
12             THE WITNESS:  Say it again.
13        Q.   (BY MR. MORRIS)  Did Mr. Waterhouse or
14   anybody in the world tell you at any time that he
15   wasn't authorized to have his signature affixed to the
16   promissory notes?
17             MR. RUKAVINA:  Same objection.
18             THE WITNESS:  No.
19        Q.   (BY MR. MORRIS)  Did you have anything to do
20   with Highland's annual audit?
21        A.   Yes.
22        Q.   What role did you play with respect to
23   Highland's annual audit?
24        A.   I personally was in charge of completely
25   writing the entire audit report for the debtor and for
```

Kristin Hendrix - October 27, 2021

1   HCMFA.  I oversaw all other aspects of the audit my
2   team carried out.
3           Any requests from the auditors, emails with
4   questions, any issues that arose, all of that went
5   through me.
6       Q.   And did Mr. Waterhouse play a role in
7   relation to the annual audit?
8       A.   Yes.
9       Q.   What is your understanding of
10  Mr. Waterhouse's role?
11      A.   Let's see.  He was in charge of reviewing the
12  financial statements as they were done, so he saw the
13  end product.  He would sign off on the management rep
14  letter.  He signed engagement letters.
15          If there were any big issues, those got --
16  those would be brought to Frank's attention for sure.
17      Q.   Okay.  And are you a CPA?
18      A.   Yes.
19      Q.   And are you familiar with management rep
20  letters?
21      A.   Yes.
22      Q.   What is your understanding of what a
23  management rep letter is?
24      A.   That's basically telling the auditors that
25  everything in the audited financial report is accurate

Kristin Hendrix - October 27, 2021

```
 1   to the best of their knowledge, they've presented
 2   everything that they have fair and accurately, they're
 3   not withholding any information.
 4        Q.   And do you recall that the -- Highland's 2018
 5   audit was completed in early June 2019?
 6        A.   Yes.
 7        Q.   And did you cause the two promissory notes
 8   that we're talking about here to be delivered to
 9   PricewaterhouseCoopers in connection with the audit?
10        A.   Yes.
11        Q.   And were those two promissory notes delivered
12   to PricewaterhouseCoopers because they constituted
13   subsequent events?
14        A.   Yes.
15        Q.   Do you recall whether those promissory notes
16   were described in Highland's 2018 audited financial
17   statements?
18        A.   Yes.
19        Q.   And did Mr. Waterhouse or Mr. Dondero ever
20   tell you at any time that there was a mistake in the
21   audited financial statements?
22        A.   No.
23        Q.   Did they ever tell you -- did Mr. Waterhouse
24   or Mr. Dondero or anybody in the world ever tell you at
25   any time that the two notes were mischaracterized in
```

Kristin Hendrix - October 27, 2021

1  the 2018 audited financial statements of Highland

2  Capital?

3      A.   No.

4      Q.   Do you know whether HCMFA also had its annual

5  financial statements audited by PricewaterhouseCoopers?

6      A.   Yes.

7      Q.   Did you play any role in connection with that

8  audit?

9      A.   Yes.

10     Q.   What role did you play in connection with

11 HCMFA's audit of the 2018 financial statements?

12     A.   Same exact role as with the debtors --

13     Q.   And --

14     A.   -- writing the audit report, overseeing all

15 other audit functions.

16     Q.   And did you and your group cause HCMFA to

17 deliver to PricewaterhouseCoopers the two promissory

18 notes that we've been discussing from May 2019?

19     A.   Yes.

20     Q.   Did Mr. Waterhouse or Mr. Dondero or anybody

21 in the world ever tell you that it was a mistake to

22 deliver those promissory notes to PwC in connection

23 with HCMFA's 2018 audit?

24     A.   No.

25     Q.   Were those notes delivered -- withdrawn.

Kristin Hendrix - October 27, 2021

1          Were those notes delivered to

2    PricewaterhouseCoopers because they constituted

3    subsequent events in connection with the 2018 audit?

4          A.   Yes.

5          Q.   Do you recall whether PricewaterhouseCoopers

6    included as a liability on HCMFA's balance sheet the

7    obligations reflected in the two promissory notes at

8    issue?

9              MR. RUKAVINA:  Objection.  Best evidence.

10             Answer.

11             THE WITNESS:  On the 2018 financials?

12         Q.   (BY MR. MORRIS)  Correct.

13         A.   Those would not have been included as

14   liabilities in the 2018 financials.

15         Q.   Do you know if HCMFA completed their audit

16   for 2019?

17         A.   No.

18         Q.   Okay.  Did the notes appear in HCMFA's 2018

19   audited financials under the subsequent events section?

20         A.   Yes.

21             MR. RUKAVINA:  Objection.  Best evidence.

22             Go ahead.

23         Q.   (BY MR. MORRIS)  Did Mr. Dondero or -- did

24   Mr. Waterhouse or Mr. Dondero or anybody in the world

25   ever tell you that it was a mistake to include

Kristin Hendrix - October 27, 2021

```
 1   reference to these notes in HCMFA's 2018 audited
 2   financial statements?
 3           MR. RUKAVINA:  Same objection.
 4           THE WITNESS:  No.
 5      Q.  (BY MR. MORRIS)  Okay.  Do you recall, did
 6   anybody in the world ever tell you that the
 7   transactions described in Exhibit 3 and the other
 8   document that you recall should never have been booked
 9   as a loan?
10      A.   No.
11      Q.   Did anybody in the world tell you that you
12   made a mistake when you created those promissory notes?
13      A.   No.
14      Q.   Can you pull out what was marked as
15   Exhibit 16.
16           Do you understand that the Advisors provide
17   services to certain retail funds?
18      A.   Yes.
19      Q.   And do you recall that the services are
20   subject to an agreement that's subject to annual
21   review?
22      A.   Yes.
23      Q.   So looking at Exhibit 16, did you understand
24   that the retail board had asked Highland to disclose --
25   I'll just read it from the document on page 2,
```

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-42   Filed 09/04/23   Page 172 of 200   PageID 29149

120

Kristin Hendrix - October 27, 2021

 1   Bates number ending 881.

 2             There's an email from Ms. Thedford that says,

 3   quote, are there any material amounts -- withdrawn.

 4             Are there any material outstanding amounts

 5   currently payable or due in the future, open paren,

 6   e.g., notes, close paren, to HCMLP by HCMFA or NexPoint

 7   Advisors or any other affiliate that provides services

 8   to the funds?

 9             Do you see that?

10        A.   Yes.

11        Q.   And were you generally aware that that was

12   part of the annual renewal process?

13        A.   Yes.

14        Q.   And you made some comments earlier about

15   Ms. Thedford's response on the first page.

16             Do you recall that?

17        A.   Yes.

18        Q.   And you actually were able to correct certain

19   mistakes that you perceived in her response.

20             Do I have that right?

21        A.   Correct.

22        Q.   Do you know -- do you see where it says,

23   HCMFA due to HCMLP as of June 30, 2020, let's just call

24   it $12.3 million.

25             Do you see that?

Kristin Hendrix - October 27, 2021

1      A.   Yes.

2      Q.   And above that there is a reference to the

3  6/30 financials.

4           Do you see that?

5      A.   I do.

6      Q.   Do you know what the reference to the 6/30

7  financials is?

8      A.   Yes.

9      Q.   And what is that reference?

10     A.   That is referencing the amounts on the

11 balance sheet at 6/30 that we provided for the 15(c)

12 materials to the board.

13     Q.   Okay.  And does that $12.3 million include,

14 to the best of your knowledge, the principal amount of

15 the two notes that we were talking about?

16     A.   Yes.

17          MR. RUKAVINA:  Objection.  Best evidence.

18          THE WITNESS:  Yes.

19     Q.   (BY MR. MORRIS)  And how do you know that?

20     A.   Because I kept their financials, I know for a

21 fact that it included all of their outstanding notes

22 and it most certainly included these two notes that

23 we've been talking about today.

24     Q.   And to the best of your recollection did

25 HCMFA provide the 6/30 financials to the retail board?

Kristin Hendrix - October 27, 2021

1      A.    Yes.

2      Q.    And to the best of your knowledge did

3   Mr. Dondero or Mr. Waterhouse or anybody in the world

4   ever tell you that the financial statements that were

5   provided to the retail board were erroneous in any way?

6      A.    No.

7      Q.    Did Mr. Dondero or Mr. Waterhouse or anybody

8   in the world ever tell you that the 6/30 financials

9   that were given to the retail board should not have

10  included the $7.4 million principal amount on the two

11  promissory notes?

12          MR. RUKAVINA:  Objection.  Best evidence.

13          Answer.

14          THE WITNESS:  No.

15     Q.    (BY MR. MORRIS)  Do you know whether -- are

16  you at all familiar with the Advisors' actual response

17  to the retail board in October 2020?

18     A.    Say that again, please.

19     Q.    So this email string is October 2020; right?

20     A.    Right.

21     Q.    And do you understand that this is kind of a

22  discussion between Mr. Waterhouse and Ms. Thedford as

23  to how to respond?

24     A.    Yes.

25     Q.    Have you ever seen the actual response that

Kristin Hendrix - October 27, 2021

1    was given to the retail board?

2         A.   I likely did.  I can't tell you for certain

3    that I was on the correspondence.

4         Q.   Do you recall any discussion at any time that

5    the $12.3 million number in Ms. Thedford's email should

6    be changed in the final report to the retail board?

7         A.   I don't believe so.

8         Q.   Did anybody ever tell you at any time that

9    the $12.3 million number was incorrect?

10        A.   No.

11        Q.   Did anybody ever tell you at any time that

12   that number wrongly included the $7.4 million reflected

13   in the two notes?

14        A.   No.

15        Q.   Okay.  Do you recall that earlier that

16   summer -- we looked at Exhibit 15?

17        A.   Yep.

18        Q.   And that was an attachment to an email that

19   you personally sent to Mr. Dondero.  We saw that

20   before?

21        A.   Right.

22        Q.   And this Exhibit 15, which was attached to

23   your email, identifies amounts due and owing from

24   NexPoint Advisors; right?

25        A.   Right.

Kristin Hendrix - October 27, 2021

1      Q.   And it identifies amounts due and owing for a
2  number of different entities, including HCMFA; right?
3      A.   Correct.
4      Q.   Do you know whether the amount included for
5  HCMFA on Exhibit 15 included the principal amount due
6  on the two promissory notes?
7      A.   It does.
8      Q.   Did Mr. Dondero or Mr. Waterhouse ever ask
9  you why -- withdrawn.
10         Did Mr. Dondero or Mr. Waterhouse ever ask
11 you how the $10.5 million number was calculated?
12     A.   No.
13     Q.   Did Mr. Dondero or Mr. Waterhouse ever
14 suggest to you that the number was incorrect?
15     A.   No.
16     Q.   Did Mr. Dondero or Mr. Waterhouse or anybody
17 in the world ever question the number that you gave to
18 Mr. Dondero in the summer of 2020 concerning the
19 principal amount due by HCMFA to HCMLP?
20     A.   No.
21     Q.   Have you ever made a payment -- withdrawn.
22         Have you ever caused a payment to be made in
23 connection with an intercompany loan without receiving
24 the prior approval from either Frank Waterhouse or
25 Mr. Dondero?

Kristin Hendrix - October 27, 2021

1        A.    No.

2        Q.    Has anybody ever said to you that you made a

3    mistake in applying a payment against principal or

4    interest due on an intercompany loan?

5        A.    No.

6        Q.    We saw this morning, and we produced to

7    Mr. Rukavina and he mentioned earlier, 13-week

8    forecasts?  Do you understand that?

9        A.    Yes.

10       Q.    Did you review the 13-week forecasts

11   recently?

12       A.    Yes.

13       Q.    And we're talking specifically about the

14   13-week forecasts for the November/December 2020 time

15   period.  Do you understand that?

16       A.    Yes.

17       Q.    Based on your review of those forecasts, did

18   those forecasts specifically identify the principal and

19   interest that were due on the three term notes as of

20   December 28, 2020?

21       A.    Yes.

22       Q.    And what was the purpose of creating the

23   13-week forecasts?

24       A.    Sure.  That was to keep everybody informed

25   who was on the cash call, Frank Waterhouse, Jim Seery

Kristin Hendrix - October 27, 2021

```
 1  and others, keep everybody informed of upcoming
 2  payments that were due on term loans well in advance.
 3           Everybody knew about it.  It was out there
 4  for everybody to see that was on these cash calls.
 5       Q.   Now, is it your understanding that
 6  Mr. Waterhouse -- withdrawn.
 7           Did you email these forecasts -- withdrawn.
 8           Did anybody email these forecasts to the best
 9  of your recollection in late 2020?
10       A.   Yes.
11       Q.   And was it sent to the corporate accounting
12  group that we saw earlier?
13       A.   It was probably sent to Frank, Seery, the DSI
14  guys that were involved with the cash call.
15       Q.   Okay.  And so did you participate in the
16  creation of the 13-week forecasts?
17       A.   Yes.
18       Q.   What role did you play in the creation of the
19  13-week forecasts?
20       A.   I was responsible for creating the entire
21  thing.
22       Q.   Okay.  And based on the work that you did,
23  was one of the purposes to make sure that
24  Mr. Waterhouse was aware of all payments that were
25  coming due under the intercompany notes?
```

Kristin Hendrix - October 27, 2021

1      A.    Yes.

2      Q.    And was that information that was included on

3  the reports to Mr. Waterhouse?

4      A.    Yes.

5      Q.    And do you recall whether there were any

6  specific discussions in November or December of 2020

7  concerning those payments -- withdrawn.  That wasn't a

8  good question.

9            Did Mr. Waterhouse or -- withdrawn.

10           Did anybody on behalf of HCMS or HCRE ever

11 instruct you to make the payments that were due under

12 their term notes?

13     A.    No.

14     Q.    Did anybody on behalf of NexPoint ever

15 instruct you to make a payment that was due at year end

16 with respect to the NexPoint term note?

17     A.    No.

18     Q.    Were you authorized to make those payments

19 without the prior approval of either Mr. Waterhouse or

20 Mr. Dondero?

21     A.    No.

22     Q.    I think you testified that there were certain

23 payments that were made in January 2001 under each of

24 the three term notes.

25           Do I have that right?

Kristin Hendrix - October 27, 2021

1    A.    Correct.

2          MR. RUKAVINA:   2021.

3          MR. MORRIS:   Thank you very much.

4    Q.    (BY MR. MORRIS)   With that amendment, do you

5    understand my question?

6    A.    Yes.

7    Q.    Do you know why the three payments were made

8    in January of 2021 on each of three term notes?

9    A.    Because Frank Waterhouse instructed me to do

10   so.

11   Q.    And he had not instructed you to make those

12   payments prior to that time?

13   A.    Correct.

14   Q.    Did you have to prompt Frank Waterhouse in

15   January of 2021 to make those payments?

16   A.    No.

17   Q.    So based on the 13-week forecast that you

18   prepared and delivered to Mr. Waterhouse, is it your

19   understanding that Mr. Waterhouse knew as early as mid

20   November 2020 that payments would be due under the

21   three term notes at the end of the year?

22   A.    Yes.

23   Q.    And, in fact, did HCMS and HCRE and NexPoint

24   timely make their installment payments that were due at

25   year end 2018?

Kristin Hendrix - October 27, 2021

1       A.    Yes.

2       Q.    And was that done because HCMLP received the

3  instructions of somebody authorized to give the

4  instruction on behalf of those entities?

5       A.    Yes.

6       Q.    Did HCMS and HCRE and NexPoint timely make

7  the installment payments that were due at year end

8  2019?

9       A.    Yes.

10      Q.    And why did they make those payments?

11      A.    Because we were provided instruction and

12  authorization to do so.

13      Q.    Okay.  And is the only reason that the

14  payment wasn't made at year end 2020 because nobody on

15  behalf of the Advisors -- withdrawn.

16           Is the only reason that no payment was made

17  at the end of 2020 is because no one on behalf of

18  NexPoint, HCRE, or HCMS directed HCMLP to make those

19  payments?

20      A.    Correct.

21           MR. AIGEN:  Objection.  Form.

22      Q.    (BY MR. MORRIS)  And you testified earlier to

23  a call that you had with Mr. Waterhouse.  I think you

24  said it was either November 30 or December 1.

25           Do you recall that?

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-12   Filed 05/04/23   Page 182 of 200   PageID 29159

130

Kristin Hendrix - October 27, 2021

1        A.    Yes.
2        Q.    And did you personally continue to prepare
3   the 13-week forecasts after your conversation with
4   Mr. Waterhouse?
5        A.    Yes.
6        Q.    And did those 13-week forecasts continue to
7   include the payments that were due under the three term
8   notes at the year end?
9        A.    Yes.
10       Q.    And that's information that you gave to
11  Mr. Waterhouse; is that right?
12       A.    Right.
13       Q.    Mr. Rukavina elicited from you the fact that
14  payments of principal hadn't been made on demand notes
15  that were executed in favor of Mr. Dondero's
16  affiliates.
17            Do you recall that?
18       A.    Yes.
19       Q.    Okay.  Was that a topic of conversation with
20  PricewaterhouseCoopers at any time?
21       A.    Yes.
22       Q.    Can you tell me about that conversation?
23       A.    Sure.  As part of our annual audit, the
24  auditors would, you know, make sure that our
25  receivables are collectible.  And if they thought for

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 76-12   Filed 09/04/23   Page 183 of 200   PageID 29160

131

Kristin Hendrix - October 27, 2021

1  any reason they weren't, then they were going to raise

2  an issue, a going concern issue.

3          That came up several years in a row with

4  HCMFA.

5      Q.   Do you recall that the three term notes at

6  issue here were all signed on May 31, 2017?

7      A.   Yes.

8      Q.   And all of those term notes involved a

9  roll-up of previously issued demand notes; is that

10 right?

11     A.   Correct.

12     Q.   Do you know why in -- at the end of May 2017

13 NexPoint, HCRE, and HCMS rolled up their demand notes

14 into individualized term notes?

15     A.   Yes.

16     Q.   What is your understanding as to why that

17 happened?

18     A.   That would get the auditors a little bit more

19 comfort over our outstanding loans, ensuring that we

20 have an amortization schedule, an underlying contract,

21 showing that payments will be coming in every year on

22 these outstanding receivables.

23     Q.   Okay.  As the person responsible for

24 preparing Highland's audit, did anybody ever tell you

25 at any time that any of the notes were not valid

Kristin Hendrix - October 27, 2021

1   obligations of the maker?

2        A.   No.

3        Q.   As the person responsible for Highland's

4   audit, did anybody ever tell you at any time that any

5   of the notes at issue should not have been signed?

6        A.   No.

7        Q.   As the person responsible for Highland's

8   audit, did anybody ever tell you at any time that any

9   of the notes at issue were signed by mistake?

10       A.   No.

11       Q.   Did anybody ever tell you at any time that --

12  withdrawn.

13            As the person responsible for Highland's

14  audit, did anybody ever tell you at any time that

15  Mr. Dondero didn't approve of any of the notes?

16       A.   No.

17       Q.   As the person responsible for Highland's

18  audit, did anybody ever tell you at any time that

19  the -- any of the notes at issue were subject to an

20  oral agreement?

21       A.   No.

22       Q.   As the person responsible for Highland's

23  audit, did anybody ever tell you at any time that any

24  of the notes were amended?

25       A.   No.

Kristin Hendrix - October 27, 2021

1    Q.   As the person responsible for Highland's

2    audit, did anybody ever tell you at any time that any

3    of the notes would be forgiven?

4    A.   No.

5    Q.   During your 15 years at Highland, has an

6    intercompany loan ever been forgiven in whole or in

7    part?

8    A.   No.

9    Q.   During your -- withdrawn.

10        Can you recall any note that Highland ever

11   held as the payee that was forgiven in whole or in part

12   in the five years prior to bankruptcy, go back to 2014?

13   A.   No.

14   Q.   Is it your understanding as the person

15   responsible for Highland's audit that the forgiveness

16   of notes, if they were in a material amount, would have

17   had to have been disclosed in the audited financial

18   statements?

19   A.   Yes.

20   Q.   So is it fair to say that any evidence of the

21   forgiveness of material amounts would have been

22   disclosed in Highland's financial statements?

23   A.   Yes.

24        MR. MORRIS:  I have no further questions.

25        MR. RUKAVINA:  I have none.

Kristin Hendrix - October 27, 2021

1          MR. AIGEN:  None.

2          MR. RUKAVINA:  Okay.  Thank you very much.

3          (Whereupon, the deposition adjourned at

4          1:19 P.M.)

5                    --oOo--

6          I declare under penalty of perjury that the

7   foregoing is true and correct.  Subscribed at

8   _____, Texas, this _____ day  of

9   _____, 2021.

10

11

12   _____

13   KRISTIN HENDRIX

14

15

16

17

18

19

20

21

22

23

24

25

Case 21-03004-sgj   Doc 87   Filed 12/02/21   Entered 12/02/21 17:03:51   Desc Main
Case 3:21-cv-00881-X   Document 176-12   Filed 08/09/83   Page 187 of 200   PageID 29164

135

## CERTIFICATE OF REPORTER

1   I, BRANDON D. COMBS, a Certified Shorthand

2   Reporter, hereby certify that the witness in the

3   foregoing deposition was by me duly sworn to tell the

4   truth, the whole truth, and nothing but the truth in the

5   within-entitled cause;

6   That said deposition was taken in shorthand by

7   me, a disinterested person, at the time and place

8   therein stated, and that the testimony of the said

9   witness was thereafter reduced to typewriting, by

10   computer, under my direction and supervision;

11   That before completion of the deposition,

12   review of the transcript was not requested.  If

13   requested, any changes made by the deponent (and

14   provided to the reporter) during the period allowed are

15   appended hereto.

16   I further certify that I am not of counsel or

17   attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties thereto.

21   DATED: November 1, 2021

22

23

24

25   Brandon Combs, Certified Shorthand
     Reporter No. 10927 in and for the

HCMFA APP 0584

Kristin Hendrix - October 27, 2021

1                    State of Texas

                    Dickman Davenport, Inc. Cert 312

2                    4228 North Central Expressway

                    Suite 101, Dallas, TX 75206

3                    (214) 855-5100   (800) 445-9548

                    Email: info@dickmandavenport.com

4                    www.dickmandavenport.com

                    My commission expires 1-31-23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kristin Hendrix - October 27, 2021

**A**

**A.M** 1:22 57:22
**ability** 69:5,20
**able** 108:23
  120:18
**above-styled**
  1:21
**Absolutely** 17:8
**accent** 56:16
**access** 24:7 54:15
**accessed** 44:19
**account** 12:11
  37:7 91:15
**accountant** 16:19
  46:10 73:15
  74:3 78:4 84:24
**accounting** 11:16
  12:8,12,18
  17:14,15,16,21
  18:4 19:9 20:3
  20:12,20 21:13
  31:16,23 35:7
  40:11 45:17
  46:3 51:11,11
  51:18 56:11
  102:4 111:9
  112:18,23
  126:11
**accounts** 13:21
  14:8,15 51:24
**accrued** 79:22
**accruing** 85:15
**accurate** 72:22
  97:19 115:25
**accurately** 116:2
**action** 11:6
**activities** 39:20
**actual** 104:12
  122:16,25
**addition** 39:7
  41:21
**additional** 56:15
  56:20
**adjourned** 134:3
**Adkins** 109:16

109:20,21
**advance** 126:2
**adversary** 94:25
  95:3,12
**advice** 46:20
  88:24
**advised** 38:23
**advisor** 39:1
**Advisors** 11:10
  15:14,17,23
  27:20,23 63:6
  70:1,4 71:6,10
  74:17 76:24
  84:9 85:6 92:16
  99:10,14,16,25
  100:2,15,18
  119:16 120:7
  123:24 129:15
**Advisors'** 122:16
**affiliate** 34:25
  87:23 120:7
**affiliated** 15:11
**affiliates** 18:19
  86:24 87:17
  99:6,11,13
  100:4,17
  130:16
**affirmative**
  101:14
**affix** 50:17 114:6
**affixed** 47:5
  114:15
**afternoon** 94:23
**ago** 33:8 104:21
  104:22 109:17
  110:10,12
**agree** 55:2 57:14
  61:13
**agreed** 25:23
  26:3
**agreeing** 53:24
**agreement** 26:5
  26:15,21 95:9
  95:13 96:4,8,12
  96:23 97:6,9,11

97:21,25 98:9
  107:25 119:20
  132:20
**ahead** 73:9
  113:10,20
  114:11 118:22
**Aigen** 2:18 3:4
  94:16,23,24
  95:23 96:1,21
  98:15 102:5
  103:17 105:24
  106:8,23
  110:14 129:21
  134:1
**Akard** 1:24 2:4
**alleged** 40:16
  96:3,7
**Allocation** 38:24
  39:1
**allowed** 135:15
**allowing** 95:13
**amended** 107:25
  132:24
**amendment**
  128:4
**amort** 19:22 90:8
**amortization**
  73:25 76:23
  77:4,6,9,20
  80:20 82:6 85:3
  85:12,13,17
  131:20
**amount** 19:6,7
  26:10,12 30:12
  32:23 39:3
  43:16 48:15
  49:2 50:9 87:16
  87:24 89:9 90:9
  91:19 93:4
  104:6 121:14
  122:10 124:4,5
  124:19 133:16
**amounts** 35:8
  40:2 120:3,4
  121:10 123:23

124:1 133:21
**analysis** 97:24
**and/or** 50:13,18
  63:22 64:18
  69:20 73:25
  110:23
**anniversary**
  79:21 80:5,14
**annual** 114:20,23
  115:7 117:4
  119:20 120:12
  130:23
**annually** 80:13
**annum** 80:12
**answer** 7:6,6
  23:11,14 35:2
  39:19 51:5 52:3
  64:20 75:2
  114:11 118:10
  122:13
**answered** 41:4
  51:3 57:17
  100:9 106:6
**answering** 66:1
**answers** 42:10
  43:1 57:6
**anybody** 35:25
  40:8 101:7
  112:8 113:23
  113:25 114:5
  114:14 116:24
  117:20 118:24
  119:6,11 122:3
  122:7 123:8,11
  124:16 125:2
  126:8 127:10
  127:14 131:24
  132:4,8,11,14
  132:18,23
  133:2
**anymore** 76:2
**anytime** 21:10
  59:1
**AP** 11:17 12:23
  32:7 109:5

124:1 133:21
**apologize** 15:6
  59:7 62:16 75:9
  75:22
**appear** 118:18
**APPEARANC...**
  2:1
**appeared** 2:5,12
  2:19
**appears** 47:1
  76:12 77:1
**appended** 135:16
**applying** 125:3
**approval** 16:5,8
  48:12 49:4
  50:25 51:2
  101:3 104:20
  124:24 127:19
**approve** 48:15
  49:5 104:1,2,24
  132:15
**approved** 48:18
  48:19,21 104:7
  104:8,14
**approximately**
  95:18 110:7
**April** 12:7
**area** 107:19
**arose** 115:4
**ASAP** 60:18 64:6
**asked** 51:3 57:17
  60:10 69:22
  88:9 93:4 106:6
  119:24
**asking** 6:10 26:7
  29:17,19,24
  59:17 62:6
  64:23,25 77:25
  90:8 96:12,13
**aspects** 115:1
**assistant** 12:6
  69:2 70:3,9
  88:21
**associate** 11:18
  32:7
**assume** 6:25

Kristin Hendrix - October 27, 2021

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

---

**B**

**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

---

**C**

**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:21
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:14
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-42    Filed 01/09/24    Page 191 of 200    PageID 29168

139

Kristin Hendrix - October 27, 2021

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
**categorize** 24:6
**cause** 1:21 22:6
116:7 117:16
135:6,20
**caused** 39:16
92:12 124:22
**cell** 75:2,3,4,13
**Central** 136:2
**CEO** 13:23 60:24
**Cert** 136:1
**certain** 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
**certainly** 82:11
86:17 121:22
**certificate** 53:14
53:18,20 135:1
**certified** 16:19
135:2,25
**certify** 135:3,17
**CFO** 13:9,13,22
23:12 25:10
**chain** 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
**chance** 75:4,18
**change** 32:11
79:1,12 84:10
85:2,6 90:23
91:3
**changed** 58:4
123:6
**changes** 43:15

44:2 49:1
135:14
**changing** 57:4
98:12 107:18
**characterize**
24:13 111:13
**charge** 13:19
18:7 114:24
115:11
**charged** 10:10
**charges** 76:12
**chase** 15:9
**check** 60:12,15
64:19 93:15,16
102:23 105:8
**checked** 63:16,16
64:22
**checking** 64:24
**checks** 13:18
**clarify** 47:14
88:10
**clear** 6:20 113:12
**clearly** 38:13
**clients** 63:6
**close** 120:6
**collect** 28:21
**collectibility**
68:23
**collectible** 130:25
**collection** 30:14
**collects** 27:3
**college** 10:20
11:10,14
**column** 79:5,11
80:22,24
**columns** 78:14,15
**Combs** 1:22
135:2,25
**come** 84:5,14
85:2,10,11
**comes** 31:8
**comfort** 131:19
**comfortable**
50:23
**coming** 16:6

48:25 99:5,10
126:25 131:21
**comma** 15:4
**comments** 120:14
**commingle** 110:9
**commission**
136:4
**common** 40:10
**communicate**
23:17
**communicated**
23:23
**communicating**
23:24
**communications**
23:22 64:10
90:16
**companies** 52:14
**company** 39:10
44:13
**compensate**
40:15
**compensation**
25:17,21 26:1,6
26:20,22 27:4
39:9,12
**competent** 24:18
24:20,21
**complete** 72:10
**completed** 116:5
118:15
**completely** 17:3
47:8 114:24
**completion**
135:12
**compliance**
17:14
**comport** 44:20
**compounded**
80:13
**computer** 47:16
135:11
**computerized**
1:24
**concern** 131:2

**concerning** 111:9
124:18 127:7
**concerns** 63:13
63:15
**condescending**
25:3
**conduct** 38:3
**confess** 82:23
**confident** 37:22
**confirm** 62:2
**confirmation**
92:15,17
**confused** 78:12
**confusion** 47:15
**connection** 116:9
117:7,10,22
118:3 124:23
**consent** 39:1,24
**consist** 26:1
**constituted**
116:12 118:2
**consulted** 46:13
**contact** 6:9,11
**contending** 96:4
**context** 31:13
44:1 59:25
86:12
**continue** 130:2,6
**contract** 131:20
**controller** 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
**conversation**
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
**conversations**
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
**copied** 64:12
86:6
**copies** 55:14
56:13
**copy** 83:17
**copying** 59:13
61:3 63:1 83:18
**corporate** 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
102:4 111:9
112:18,22
126:11
**corporateacco...**
111:22
**correct** 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

Kristin Hendrix - October 27, 2021

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
**correctly** 32:18
33:23
**correspondence**
123:3
**corresponding**
84:16
**counsel** 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
**count** 42:10 43:1
57:6
**couple** 83:19
**course** 6:9 46:18
55:3 103:23,24
104:13,19,23
**courses** 16:15,16
**court** 1:1 6:18
27:13 30:13,25
**courteous** 94:12
**CPA** 10:24 11:2
11:6,21 115:17
**create** 43:12,18
45:8 48:17
**created** 18:21
44:18,19,21
48:7 58:1
119:12
**creating** 13:21
111:18 125:22
126:20
**creation** 126:16
126:18
**credit** 91:18

**crunch** 109:5
**CSR** 1:23
**curiosity** 76:6
**current** 11:2
**currently** 11:19
120:5
**cut** 15:9

─────────
**D**
**D** 1:22 135:2
**Dallas** 1:3,25 2:4
2:18 136:2
**dark** 94:17
**date** 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
**dated** 30:20
31:16 135:22
**dates** 57:22
**Dave** 8:24 34:18
34:23 38:13
46:7 111:8
112:6
**Davenport** 136:1
**David** 3:14 13:1
31:16 33:17
**DAVOR** 2:5
**day** 48:15 57:25
58:6 80:2
112:13 134:8
**days** 9:23,25 10:5
28:17
**deaccelerate**
107:13
**deal** 20:21 36:25
**debtor** 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
**debtor's** 40:16
68:18 77:4
86:16
**debtors** 117:12
**Dec** 4:3,11
**December** 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
**decided** 26:2,3
40:14 52:15,18
**deciding** 23:8
**decision** 29:14
105:2
**declare** 134:6
**default** 68:16,19

88:3 90:17
93:10,11
**defaulted** 67:22
**defendants** 1:11
1:20 2:6,20
95:11 96:4
**defense** 95:12
96:7,12
**defenses** 95:9
**defined** 114:3
**definition** 113:16
**degree** 10:22
**deliver** 117:17,22
**delivered** 116:8
116:11 117:25
118:1 128:18
**demand** 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
**demanded** 62:11
**demanding** 24:13
**Denton** 10:15
**department**
11:17 18:2,5,8
18:12 51:12
57:12 112:23
**depend** 18:17
**depended** 49:16
**depending** 73:16
**depends** 18:16
69:10 77:24
**deponent** 135:14
**deposed** 6:13
28:2
**deposition** 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
**describe** 12:18
53:16
**described** 17:17
99:9 116:16
119:7
**description** 14:1
110:3
**detail** 66:12
**details** 17:5
25:14 28:7
**determine** 97:6
97:25 102:11
**determined**
97:22
**Dickman** 136:1
**difference** 103:22
**different** 19:25
54:19 73:16
87:22 96:11
103:17 124:2
**direct** 27:7
**directed** 99:17,19
129:18
**directing** 48:16
101:4
**direction** 23:12
53:21 60:23
63:2 73:7 101:7
135:11
**directions** 48:25
**directly** 40:9,22
41:12 49:1
70:14,17
102:16
**disciplinary** 11:5
**disclose** 119:24
**disclosed** 97:15
97:21 133:17
133:22
**discretionary**
26:8
**discuss** 62:9 66:4
68:4,7 74:16

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 42    Filed 09/04/21    Page 193 of 200    PageID 29170

141

Kristin Hendrix - October 27, 2021

88:12
discussed 28:8
  38:4 43:13
  66:21 67:9
  74:18,20 81:13
  92:5 96:25 97:2
discussing 66:19
  67:20 117:18
discussion 9:5
  50:21 61:7 65:9
  66:7 69:5,19
  92:25 93:7
  122:22 123:4
discussions 9:8
  25:20 28:11,12
  28:17 40:6 60:1
  61:9,11 62:13
  68:22 98:8
  127:6
disinterested
  135:8
distinct 29:3
  45:24
DISTRICT 1:2
DIVISION 1:3
doctor 42:11
doctored 83:3
doctoring 42:24
  57:4
document 32:25
  47:2 49:19 72:8
  76:10 82:13
  86:1 88:7
  111:19 119:8
  119:25
documentation
  9:16
documentations
  47:8
documents 9:18
  10:7 42:6 43:7
  43:9 44:3 47:9
  48:5,18 49:8,13
  50:2,3,11 54:11
  57:7,14,20

69:16 77:13
  82:10,18
doing 6:7 43:8
  45:20 74:4
dollar 19:7 40:2
  48:15 49:2 50:9
Dondero 2:20 5:2
  15:12 21:11,20
  21:21 22:6,19
  23:7,14,18,23
  23:24 24:2,7
  34:19 35:24
  36:2 40:14,20
  52:12,19,22
  53:7 73:8 81:14
  83:18 94:24
  99:18 101:2,4
  101:17 102:11
  102:16 103:7
  103:12,19
  104:1,7,14
  108:9 116:19
  116:24 117:20
  118:23,24
  122:3,7 123:19
  124:8,10,13,16
  124:18,25
  127:20 132:15
Dondero's
  104:19 130:15
Donohue 59:13
  59:17,22 62:25
  63:21 64:3,16
  64:22 65:5,9
  92:18,19,22,24
  93:8
door 35:1
draft 17:24
drafted 17:1,3
drafting 16:16
  17:22,23 18:12
  19:16,21 20:12
  29:13
drive 54:9,16
  55:14

drukavina@m...
  2:7
DSI 61:19 62:6,9
  63:3,24 67:4
  68:7,13,23
  69:14 77:3
  88:12,23 92:18
  92:19 126:13
due 16:6 59:18
  66:23 73:9,25
  86:24 87:5,17
  87:17,22,25
  89:9 90:8 102:8
  103:20 105:4,6
  120:5,23
  123:23 124:1,5
  124:19 125:4
  125:19 126:2
  126:25 127:11
  127:15 128:20
  128:24 129:7
  130:7
duly 1:19 6:2
  135:4
duties 12:19
  97:12
duty 20:25

_____ E _____

E-l-l-i-n-g-t-o-n
  18:9
e-signature 47:10
  47:12 48:1,4,5
  48:8,9,12,18
  49:9,15,18 50:1
  50:13,17,23
e.g 120:6
earlier 43:14
  45:7 99:8
  112:12 113:13
  120:14 123:15
  125:7 126:12
  129:22
early 116:5
  128:19

earn 26:23
educational
  10:18
effect 54:11
  67:21 68:15
effectuate 101:7
  106:15
effort 97:6
efforts 102:10
either 18:21
  29:13,20 31:1
  34:17,23 37:3
  46:7,13 50:1
  54:12 58:20
  62:6,9 71:4
  84:24 99:15,17
  110:15 124:24
  127:19 129:24
  135:18
electronic 54:22
electronically
  56:3,12
Eliason 46:7 78:3
  112:7
elicited 130:13
Ellington 4:3
  18:9 60:4,9,12
  60:15 61:10
email 2:7,14,22
  3:14 4:3,7,21
  5:1,5 23:17
  31:12,15,20,23
  32:1,4,20,25
  33:3,25 36:3
  37:10,19,25
  38:14 41:17,21
  42:5 48:20
  50:11 54:11
  59:4,12,22 60:1
  60:2,3,25 61:2
  61:6 62:4,8,15
  62:24,25 63:11
  63:14,15 64:22
  82:16,19 83:2,6
  83:11,11,12,18

83:23 84:19
  85:25 86:3,13
  86:22 90:4,5,12
  92:22 108:12
  111:8,21,21,25
  112:3,5,13,17
  120:2 122:19
  123:5,18,23
  126:7,8 136:3
emailing 90:8
  107:2
emails 9:16,18
  41:18 49:23
  81:9 82:22
  115:3
employed 11:21
  70:18
employee 109:23
  110:2,6
employees 16:3
  108:19,24
  109:10,13,14
employment 26:5
  26:15 69:25
  70:7
engagement
  115:14
ensuring 131:19
entire 11:17
  114:25 126:20
entirety 86:18
entities 15:11
  21:16 22:6,12
  22:19 70:18
  81:15 101:5
  124:2 129:4
entitled 82:12
entity 21:20,22
  22:7 23:2 35:14
  53:13 63:4,5
  84:16 104:4
entries 78:13
  80:23
entry 78:24 79:19
erroneous 122:5

Kristin Hendrix - October 27, 2021

error 38:22 39:9
  39:16,21,23
  40:10 44:7
established 9:11
  28:8 83:16
estimate 20:10
event 135:19
events 38:21
  95:15 96:16
  116:13 118:3
  118:19
eventually 109:5
everybody 25:13
  112:2 125:24
  126:1,3,4
evidence 105:22
  114:9 118:9,21
  121:17 122:12
  133:20
exact 25:25 36:5
  37:14 48:5,13
  107:1 117:12
Exactly 78:16
Examination 3:3
  3:4,5,6 6:3
  94:22 110:19
  111:5
example 81:1
Excel 77:12,15
  78:9
exchanged
  108:12
excluding 28:16
  29:18
execute 48:18
  49:5
executed 18:24
  47:9 130:15
executing 19:17
execution 18:13
  20:12 32:15
exhibit 3:10,12
  3:14,17,19,21
  3:23,25 4:1,3,7
  4:11,14,17,19

4:21 5:1,5
  30:14,15,18,19
  30:21 31:15,18
  32:21 33:1 34:4
  34:11 35:21
  36:20 37:19
  38:12 42:15,16
  43:6,21 44:18
  44:19 56:19,21
  59:4,9 62:14,14
  62:21,23 65:13
  65:18,21 72:11
  72:13,16 76:10
  76:17,19 79:8
  82:6 83:1,4,15
  83:17 84:8,14
  84:18,19 85:7
  85:17,20,21,22
  85:25 86:3,13
  87:21 88:2,4,7
  89:21,22,25
  90:1,3 111:7
  119:7,15,23
  123:16,22
  124:5
exhibits 3:8 30:6
  42:17 43:4
  44:21 45:22
  46:19 48:11,19
  50:13,17 52:8
  55:17,24 56:25
  57:16 58:10,25
  113:13
existing 84:20
expect 85:16
expense 103:24
expertise 16:18
expires 136:4
Explain 19:19
explained 6:15
  31:7
explicit 60:23
explicitly 32:5
  53:1
expressly 71:14

Expressway
  136:2
extent 108:13
external 46:14
eye 6:9

—————
F
faced 11:5
facilitate 91:7
fact 21:18 49:5
  57:15 64:15
  65:1 67:13,16
  99:22 121:21
  128:23 130:13
facts 114:9
fair 17:5 21:19
  22:3 23:21 35:5
  42:20 70:14
  95:25 96:8,21
  96:24 97:18,20
  98:6,7 99:25
  100:20,23
  101:8,12 103:5
  105:16 106:4
  108:4 116:2
  133:20
fairly 36:15
faithfully 57:3
familiar 27:13
  65:20 66:11
  86:2,5 107:20
  115:19 122:16
family 23:4
far 20:14,16
  24:19,21 49:7
  80:24
favor 130:15
February 12:2
  26:4
fee 39:1,24
feel 86:18
fell 13:24
felt 104:25
figuring 93:17
file 56:13

filed 28:24,25
  29:6,8 30:13,24
files 32:25
filing 18:25
final 123:6
finance 10:22
financial 4:4
  12:22 59:18
  62:7 69:15
  97:16,17
  115:12,25
  116:16,21
  117:1,5,11
  119:2 122:4
  133:17,22
financials 12:23
  37:18 41:8
  60:11 86:24
  118:11,14,19
  121:3,7,20,25
  122:8
find 31:13 72:8
  83:8 93:24 94:8
  102:23
finding 98:2
fine 47:8 48:2,4
  86:19
finish 96:11
finished 31:10
finishing 46:14
firm 18:22 44:16
first 6:2 9:1
  11:13 20:11
  63:17 70:21
  81:17 82:13
  95:8 113:23
  120:15
five 51:4 94:3
  110:10 133:12
five-minute
  93:15 110:14
fixing 55:15
flip 46:25
Floor 1:25 2:11
flow 109:5

flows 63:8
focus 12:17
folders 18:25
folks 62:16 67:4
  85:24
follow 47:23 60:5
  60:9 72:5
follow-up 4:23
followed 104:11
following 47:22
follows 6:2
forecast 67:5
  128:17
forecasted 67:8
forecasts 12:21
  13:21 17:18
  67:5,9 125:8,10
  125:14,17,18
  125:23 126:7,8
  126:16,19
  130:3,6
foregoing 134:7
  135:4
forgive 97:10
forgiven 95:14
  96:16 109:10
  133:3,6,11
forgiveness
  133:15,21
form 14:14,21
  15:24 16:22
  17:6 18:14
  19:11 20:23
  22:8,21 24:8,15
  28:3 34:6 35:10
  36:13 37:11
  38:7 39:17 41:1
  41:13 45:3 46:4
  47:20 48:22
  49:10,20 50:4
  51:14,20 52:1
  53:9 55:5,19
  56:4 58:16
  65:16 69:8
  70:15 73:20

Kristin Hendrix - October 27, 2021

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
**format** 77:12
**formatting** 79:3
82:5
**forth** 64:11
**forward** 64:2
94:16
**forwarded** 92:15
92:17
**found** 54:9
**foundation** 75:11
**four** 9:8,12 100:5
**fourth** 107:25
**frame** 17:12
66:19 69:7
73:16
**Frank** 4:21 7:10
7:21 8:1 13:7,8
23:13 24:5
34:19,23 35:24
38:14 52:19
53:20 60:10
63:16,18 64:10
64:23,23 65:1
67:3 71:5 73:8
74:14,15 84:1,7
91:10,22 92:4
99:5,17 100:13
101:2 102:15
104:4,21,23,24
106:14,20
107:2 112:6
124:24 125:25
126:13 128:9
128:14
**Frank's** 115:16
**frankly** 104:24
**fresh** 111:20

**Friday** 9:1,4
**function** 12:21
**functions** 117:15
**fund** 1:9 27:23
38:24 39:2,2,8
85:6
**funds** 38:23
59:18 119:17
120:8
**further** 3:5 10:23
32:15 62:1
92:13 110:19
133:24 135:17
**future** 14:7 16:5
120:5

### G
**gears** 58:24
**general** 34:21
46:18 54:20
69:6 90:20
**generally** 13:17
13:24 19:13
34:8 35:2 43:10
72:22 81:20
96:13,15
120:11
**getting** 11:20
18:24 48:11
60:2,3 81:12
101:3
**give** 20:10 31:13
74:16 110:4
129:3
**given** 49:18
101:6 122:9
123:1
**gives** 16:19
**giving** 53:21 54:5
**Global** 38:23
39:1
**go** 10:12 17:5
44:4,24 48:1
55:1 62:24 64:2
67:4,5,11 73:8

78:22 107:23
113:10,20,23
114:11 118:22
133:12
**goes** 94:9 99:3
**going** 6:25 17:12
20:9,16 26:23
27:3 29:16 30:6
30:10,14,18
34:3 40:6 42:7
42:20 44:2
50:22 52:8
54:18 56:20
57:2 58:24 59:3
59:3 60:5,9
64:19 65:13
67:7 71:6 72:8
72:11 74:10
76:10,20 78:7
81:9 82:10,11
82:13,25 83:1
84:8 85:20,21
87:19 88:2
93:20 95:2,23
105:23 111:10
131:1,2
**good** 6:4 24:17
26:24 94:23
127:8
**governs** 26:11
**graduated** 10:21
11:9,12
**great** 53:20
**greater** 16:19
**group** 14:4 17:13
19:9,10,16 20:3
31:24 35:7,22
37:22 40:11
43:14 45:7,18
46:3 49:16
51:18 56:11
73:19,23
111:21,25
112:3,5 117:16
126:12

**guarding** 24:7
**guess** 89:22
**guys** 126:14

### H
**H-i-l-l-i-s** 32:12
**half** 81:17
**hand** 59:3 82:25
**handed** 88:6
**handle** 20:12
50:8
**handled** 20:4,21
**happened** 20:7
21:8 36:11,11
37:21 101:1
131:17
**happening** 20:11
61:5
**happy** 23:3 93:22
**HARDT** 2:3
**HARR** 2:3
**Hayley** 32:2,14
46:7 78:3,6
112:6
**Hayley's** 46:8
**HCM** 4:4,9
**HCMF** 3:25 4:1
**HCMFA** 3:15 4:4
27:10,22 28:1
28:13 29:6
30:12,19 32:13
38:19,23 39:12
40:1,15 53:25
59:18 60:19
62:7,11 63:6,22
64:18 66:5
69:15,20 70:7
70:10 85:18
87:5 99:4 100:2
110:22 111:1,1
111:11 115:1
117:4,16
118:15 120:6
120:23 121:25
124:2,5,19

131:4
**HCMFA's** 39:8
87:17 117:11
117:23 118:6
118:18 119:1
**HCMLP** 3:15
4:19 5:6 32:13
60:24 64:4
86:24 87:5,18
111:11 120:6
120:23 124:19
129:2,18
**HCMS** 2:20
94:25 98:16,24
100:1,22,25
101:10,18
102:1,19
105:18 107:5
127:10 128:23
129:6,18
131:13
**HCRE** 2:20
94:25 98:17,24
100:1,22,25
101:10,18
102:1,20
105:18 107:3
127:10 128:23
129:6,18
131:13
**hear** 72:1
**heard** 40:17,20
**held** 12:8 133:11
**hell** 75:4,10
**help** 76:22 78:13
93:17 105:23
**helped** 12:20
**Hendrix** 1:14,18
5:5 6:1,6 30:10
30:23 56:19
57:2,8 62:23
65:13,21 76:19
78:12 79:15
86:3 90:3 93:13
94:5,23 110:20

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 176-42    Filed 09/04/21    Page 196 of 200    PageID 29173

144

Kristin Hendrix - October 27, 2021

111:6 134:13
**hereof** 80:13
**hereto** 135:16
**hi** 60:4
**higher** 89:20
**Highland** 1:6,9
10:2 11:13,21
12:5,19 13:10
14:4,4,11,22,23
15:3 16:10
17:10,13,21
18:1,11 21:5
25:6,15 26:4,9
26:24 27:2,2,22
28:12 51:7,10
51:19 65:14
66:4 71:7,11
81:10,18,23,23
85:5 87:25
92:17 107:21
108:1,16,17,21
108:22 109:2,2
109:9 110:21
117:1 119:24
133:5,10
**Highland's** 7:23
7:25 8:19,22
114:20,23
116:4,16
131:24 132:3,7
132:13,17,22
133:1,15,22
**Hillis** 32:12
**history** 11:9
**Hold** 62:18
**hope** 57:13 97:13
**hopefully** 82:11
**hoping** 68:15
**house** 75:1
**hundreds** 50:7
51:8
**hypothetically**
22:4,17
**hypotheticals**
21:17

**I**

**i.e** 114:9
**idea** 58:2,7 75:12
75:24 89:13
93:1 105:17
106:3
**identification**
30:16,22 31:19
42:18 43:5 57:1
59:10 62:22
65:19 72:14
76:18 83:5
85:23 88:5 90:2
**identifies** 123:23
124:1
**identify** 112:2
125:18
**identifying** 66:23
**image** 47:2,5,19
48:2
**imagine** 15:7
**immediately**
61:14
**important** 93:14
**Impressive** 11:23
**include** 71:18
72:10 100:1
118:25 121:13
130:7
**included** 15:14
16:9 31:24
102:5 111:25
118:6,13
121:21,22
122:10 123:12
124:4,5 127:2
**includes** 63:5,7
**including** 88:11
124:2
**income** 63:7,21
**incoming** 67:7
**incorrect** 123:9
124:14
**increase** 94:19
**incumbency**

53:13,17,19
**INDEX** 3:1
**indirect** 27:7
**indirectly** 70:12
**individualized**
131:14
**Info** 3:25 4:1
info@dickman...
136:3
**information** 4:9
29:25 34:13
61:14 63:3,7
64:17 65:5,11
69:12,15 84:6
86:15 116:3
127:2 130:10
**informed** 112:21
125:24 126:1
**initiated** 74:11
92:3
**ink** 49:8,13 55:3
55:8
**ink-signed** 55:11
**input** 29:25
88:24
**installment**
128:24 129:7
**instance** 1:20
20:6 23:8 35:21
**instances** 24:1
40:1,24
**instruct** 127:11
127:15
**instructed** 128:9
128:11
**instructing**
101:18
**instruction** 72:2
74:17 76:8
100:16 101:14
101:22 103:12
129:4,11
**instructions** 24:2
24:3 32:16
69:14 76:1

100:21 101:9
103:19 129:3
**instructs** 7:5
**insurance** 39:10
**insurer** 39:8
**intend** 113:5
**interco** 32:14
34:11
**intercompany**
17:22 18:13
19:17 20:4,13
20:16 21:3,8
34:12 35:7
36:19,25 37:12
40:24 53:8
111:15,16
124:23 125:4
126:25 133:6
**interest** 19:7
43:16 49:2
68:18 73:25
78:14,16,24
79:20,22 80:11
85:15 125:4,19
**interested** 84:9
135:19
**interjects** 64:4
**intermediary**
24:3
**internal** 18:21
41:8 46:13,20
69:19
**internally** 77:1
**investigation**
97:5
**invoice** 108:13
**involved** 18:12
19:16,20,24
36:21 39:20
40:9 126:14
131:8
**involvement**
19:10
**irrespective**
26:16,24

100:21 101:9
**IRS** 49:3
**issue** 79:3 95:14
96:16 97:25
98:16 114:2
118:8 131:2,2,6
132:5,9,19
**issued** 131:9
**issues** 40:7,10
60:16 61:21
115:4,15

**J**

**J-F-O-R-S-H-...**
44:10
**Jack** 59:13 60:4,8
64:6 65:2 92:18
**James** 4:8 5:1,2
61:14,15,18,21
61:25 62:3
**Jan** 4:8 5:2,5
**January** 10:17
24:24 28:20
29:6,11 62:25
64:15 71:25
88:2,21 89:9
90:5,7,17,22
91:4 93:8
106:10,25
127:23 128:8
128:15
**jealousy** 24:7
**jerk** 24:12
**JFORSHEE**
44:10
**Jim** 2:20 21:10
23:14,18 34:19
35:24 52:19,20
54:2 63:2 64:10
67:3 73:8 84:4
99:18 101:2,4
102:16 104:1,7
104:14,22,25
105:1 125:25
**Jim's** 99:21
**jive** 87:20

Kristin Hendrix - October 27, 2021

jmorris@pszjl...
2:14
job 6:20 11:14
17:9 20:25
24:19,22 43:11
45:1,14 103:1,6
103:10
John 2:12 4:7
8:24 95:21,23
97:4
JONES 2:10
June 86:25 87:6
116:5 120:23

K

K-l-o-s 8:25
keep 29:1 77:6,9
95:4 125:24
126:1
kept 54:22 55:11
56:12 77:5
121:20
kind 11:5 18:4
23:21 24:6,11
34:3 50:3 54:19
81:13 122:21
Klos 3:14 8:24,25
9:5,12 13:1,6
13:10 25:10,21
29:24 31:16
33:17 34:10,18
35:21 36:18,24
37:20 38:12
46:7 97:2,3
111:8,13 112:6
Klos' 13:2 41:17
knew 40:3 126:3
128:19
know 6:24 19:20
19:23 20:19
25:14,25 28:7
33:10,11,13
36:11 38:17,21
39:22,25 40:1,5
43:21 44:11

47:16 48:6,6
50:10 52:18,25
57:25 59:6
76:15,21 78:15
82:15 89:17
92:18,19 99:21
101:4 103:24
104:17 107:19
108:7,25 110:2
117:4 118:15
120:22 121:6
121:19,20
122:15 124:4
128:7 130:24
131:12
knowledge 27:6
36:1,4 37:14
40:11,13 52:15
69:11 77:7
108:4 112:9,11
112:20 116:1
121:14 122:2
known 67:14,17
97:11
KOPF 2:3
Kristin 1:14,18
5:5 6:1,6 32:1,2
32:14 57:8
61:20 134:13

L

L.P 1:6,10
labeled 82:15
labels 30:7
laid 24:12
land 84:5
landline 75:2
large 35:8
lasted 75:6
late 126:9
Lauren 4:22
86:21
law 2:5,12,19
6:18 18:22
44:16

Lawler 109:20
109:23
Lawn 2:17
lawsuit 28:24
29:5,8
lawsuits 28:1,9
28:13,25 29:17
29:21 30:1
lawyer 9:4
lawyers 44:14
lay 67:7
leading 39:20
108:15,21
109:1
learn 95:20
ledger 76:12
left 61:9 87:15
legal 7:23,25 10:9
16:13 17:14,25
18:2,5,11,21
19:10,16 28:10
46:14,20 72:21
lend 21:22 23:1
110:22
length 93:25
let's 10:12 11:9
12:17 14:8,18
21:17 30:8
34:25 44:24
45:13 47:14
54:19 55:1
72:10 78:1
99:24 115:11
120:23
letter 4:11 65:14
115:14,23
letters 29:11,14
115:14,20
letting 92:18
liabilities 118:14
liability 40:16
118:6
license 10:24
11:2
limited 107:25

lines 61:7
listed 78:17
litigations 27:8
little 28:9 44:7
55:1 58:9,24
78:12 94:17
98:12 131:18
live 10:14,15
LLP 2:17
loan 3:15,25 4:1
18:18 31:5
32:14 33:25
34:11,12,14,25
35:14,17,17,22
36:19,25 37:6,7
37:17,17 38:25
39:12 40:15,21
45:13,15,18,22
46:12,14 48:15
49:1,4,5,24
50:9 58:5 72:25
76:24 79:21
80:6,7 87:22
103:22 104:6
104:20 111:15
111:16,18,20
112:10,23
113:2 119:9
124:23 125:4
133:6
loans 35:9,12
37:4,6,13,22
38:6 39:4 41:9
41:12,19 48:14
48:17 50:7,19
50:22 51:8
53:21 66:23
67:8 98:16,17
98:17,20,25
106:9 107:13
109:9 110:5,6
126:2 131:19
logically 36:10
40:23 71:18
logs 75:19

long 7:20 21:24
74:21 75:6
110:4
look 30:17 54:15
57:7 75:18 77:2
78:11 80:21
93:20 94:6
looked 31:5
123:16
looking 56:21,23
58:10 79:24
81:10 86:21
87:14 119:23
looks 60:24 64:9
76:23 77:4
79:19
loosely 17:2
lot 28:25
lots 40:6
LP 15:4,15 27:20
27:23 70:1,4

M

ma'am 31:21
57:7 87:1 111:4
machine 1:24
maintain 6:9,10
maintained 77:1
82:7
maker 19:4,5
21:3 43:15
132:1
making 13:20
21:5 81:7 99:20
101:2,25
103:22,23
104:3
management 1:6
1:9 12:20 13:14
13:15 14:2,24
15:4,22 17:17
27:23 85:5
108:1 115:13
115:19,23
manager 12:8,12

Kristin Hendrix - October 27, 2021

12:18
manual 104:9,12
March 12:2
mark 59:3
marked 30:15,21
  31:18 42:17
  43:4 56:25 59:9
  62:21 65:18
  72:13 76:17
  83:4 85:21,22
  88:4 90:1
  113:13 119:14
material 97:22
  98:1,4,6,10
  104:6 120:3,4
  133:16,21
materials 121:12
maturity 80:13
MBA 10:23
  11:20
mean 7:17 13:15
  14:22,23 15:3
  19:1 35:16
  48:20 57:24
  68:24 78:13,15
  87:11,24
  111:16
meaning 27:20
  27:22 54:25
  70:18
means 27:15
  35:15 58:22
  71:16 111:18
meeting 34:17
  67:2
meetings 66:22
  66:25
memorandum
  48:20
memory 9:17
  19:14 20:9 29:3
  29:7,17,19,23
  32:20,24 34:3
  37:9 38:2 41:22
  42:1,20 43:7,10

45:24 47:4
48:10,13 50:15
51:1 53:23 54:4
54:10 57:23
58:9,20 69:18
72:24 74:4 81:6
81:17 86:8,10
90:15,20 91:21
92:6
mentioned 11:24
  13:14 22:12
  25:9 29:10 41:7
  44:25 45:21
  51:6 64:21
  125:7
merit 25:17
met 108:11
metadata 42:21
  42:21,24 43:21
  43:24 44:8,24
  56:15,20 57:4
Michael 2:18
  94:24
michael.aigen...
  2:22
mid 128:19
middle 89:8
million 30:12,20
  32:13,21 33:1
  33:19,20,25
  34:5 35:3 36:25
  37:12,12 38:18
  38:22,25 39:3,7
  39:8,11,23
  40:15,21 42:15
  42:16 43:2,3
  58:5,11,13,13
  66:9,13 81:1,1
  81:2 85:1,6,9
  87:3 90:23 91:3
  91:23 110:23
  111:10 112:14
  113:14,14
  120:24 121:13
  122:10 123:5,9

123:12 124:11
mind 71:18
minute 30:8
minutes 94:3
mischaracteriz...
  116:25
Mischaracterizes
  41:2
misleading 42:9
missed 88:25
  105:12
misspeak 30:5
mistake 51:12
  113:1,18 114:2
  116:20 117:21
  118:25 119:12
  125:3 132:9
mistakenly 51:25
mistakes 51:17
  51:19,22
  120:19
modified 44:19
  57:8
moment 72:9
Monday 9:2
monetize 68:2,10
money 13:21
  21:11,13,15,21
  21:21,22 22:5
  34:24 35:13
  37:7,17 53:21
  54:23 81:15,19
  81:22,24 92:16
  111:19
month 106:10
months 40:7
morning 6:4 9:3
  67:11 82:14
  125:6
Morris 2:12 3:6
  4:7 7:3 8:24 9:6
  9:9 14:14,21
  15:24 16:22
  18:14 19:11
  20:23 22:8,21

24:8,15 28:3
30:2 31:10 34:6
35:10 36:13
38:7 39:17 41:1
41:13 42:9 45:3
46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
62:18 65:16
67:10 69:8
70:15 73:20
74:5 75:7,11
77:22 78:8 79:7
79:9,13 80:3,16
82:1,14,16,23
83:2,6,10 85:25
87:7 88:15 89:2
89:15 93:22
94:15,17 95:21
95:25 96:2,6,18
96:23 102:2
103:13 105:19
106:6,18 111:6
113:11,22
114:13,19
118:12,23
119:5 121:19
122:15 128:3,4
129:22 133:24
mouth 23:21
move 9:10 21:11
  21:13,15 94:16
  109:8
moved 23:4
multiple 54:19
MUNSCH 2:3
——————————
          N
name 6:5 32:8
  44:12 57:18
  94:24 109:24
  110:3

Nancy 108:9
NAP 27:14
native 78:9
NAV 38:22 39:9
  39:16,20,23
  40:10 107:21
  108:5
near 14:7
necessarily 17:23
  19:10 103:25
need 9:16 14:6
  19:2 21:11
  25:14,25 34:24
  52:6 54:1 59:1
  81:19,20 82:12
  86:19 93:17
needed 21:21
  22:5,18 23:1,4
  40:1 53:12
  81:11,14,23
  104:25
needs 104:7,8,13
negative 78:20,25
  79:2
never 40:19,20
  49:12 51:12
  55:14 68:17
  70:14,17 96:25
  97:2 101:6,6,14
  103:6 108:11
  119:8
new 2:11 21:14
  32:14 34:11,25
  36:19 45:9
  111:15,16,18
NexPoint 5:6
  15:14,17,22
  16:5 27:11,15
  27:18,19,20
  28:2,13,21 63:6
  63:22 64:18
  66:8,12,20
  67:13,22 68:2
  68:15,19,24
  69:15,20 70:1,4

Kristin Hendrix - October 27, 2021

70:22 72:12
76:24 77:7,13
77:20 80:20
81:7,22 84:9
85:2 88:3 90:9
90:17,23 91:16
91:23 92:13,16
93:10,11 120:6
123:24 127:14
127:16 128:23
129:6,18
131:13
**NexPoint's** 16:5
16:9
**Nope** 8:7 76:7
91:12
**normal** 34:16
103:23,23
**normally** 107:15
**North** 1:24 2:3
10:22 11:13
136:2
**NORTHERN** 1:2
**note** 3:10,12,17
3:19,21,23 4:14
5:3,6 14:19
15:18 16:10,21
17:1,3,6 18:16
18:19 19:22,25
21:4,23 22:7,20
23:9 28:21
30:11,19 31:8
32:15,21 33:2
33:20 35:3,18
42:15 43:2,3,11
45:9 46:16
56:21,22 58:11
58:13,13 66:9
66:13,16,20
67:13,22 68:2,5
68:8,10,16,19
68:23,24 71:13
71:19 72:6,11
72:12,16,20
73:4 76:13 77:7

80:9,10,14,20
81:8,23 85:14
90:18 91:16,19
91:23 92:14
127:16 133:10
**notes** 4:12,19
14:9 16:16
17:22 18:13
19:17,21,21
20:4,13,17,22
21:4,8,14,14
22:13 27:3
28:14 30:24
31:1 38:11 41:7
42:7,22 43:12
45:2 46:21,22
47:6 50:1 52:10
52:16,17,24
53:1,8,25 54:5
54:12,23 55:3,8
55:11 56:2,8,10
59:2 62:11
65:15 66:5
69:21 73:10
77:10 84:16
85:12 95:14
96:16 97:10
111:2 113:6,11
113:12,16,18
114:2,7,16
116:7,11,15,25
117:18,22,25
118:1,7,18
119:1,12 120:6
121:15,21,22
122:11 123:13
124:6 125:19
126:25 127:12
127:24 128:8
128:21 130:8
130:14 131:5,8
131:9,13,14,25
132:5,9,15,19
132:24 133:3
133:16

**notice** 88:3 89:8
**notices** 28:22
**noting** 14:5
**November** 59:12
61:6 62:6,10
66:19 67:12,19
68:1,7,14,21
71:4 72:4 74:10
75:18 76:3
93:21 127:6
128:20 129:24
135:22
**November/Dec...**
125:14
**NPA** 4:17 27:18
27:19 86:24
99:4 100:3
**number** 79:2,6
79:11,18 80:23
84:10,13 85:2,9
87:20,21 89:14
89:18,20,21
111:7 120:1
123:5,9,12
124:2,11,14,17
**numbered** 1:21
**numbers** 26:1
78:20 80:21
84:15
**NY** 2:11

———————————
### O
**oOo--** 1:4
**Oak** 2:17
**oath** 6:17 95:5
**object** 113:19
114:8
**objecting** 114:10
**objection** 7:3
14:14,21 15:24
16:22 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 38:7

39:17 41:1,13
45:3 46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
65:16 69:8
70:15 73:20
74:5 75:7 77:22
80:3,16 82:1
87:7 88:15 89:2
89:15 96:18
102:2 103:13
105:19 106:6
106:18 113:8,9
114:17 118:9
118:21 119:3
121:17 122:12
129:21
**objections** 7:5
**obligations** 14:19
16:6,10 118:7
132:1
**obligor** 15:18
**obviously** 14:11
35:6 59:1
**occasion** 22:18
**occurred** 95:15
96:4,17 97:7
106:17
**Oct** 4:22
**October** 1:15,21
86:22 94:9
122:17,19
**office** 10:1 34:1
54:8 57:3
**officer** 52:13
69:25 70:7
**officers** 109:10
109:13
**oftentimes** 13:23
34:23
**oh** 67:21
**okay** 6:11 7:1,7

25:3 28:19 30:5
31:23 32:11
33:22 34:3 36:1
38:2 39:14
42:13 43:6
49:25 58:23
60:11 62:1
63:17 70:25
79:25 84:8 85:1
89:24 93:7 94:1
110:17 112:8
113:11 115:17
118:18 119:5
121:13 123:15
126:15,22
129:13 130:19
131:23 134:2
**once** 104:5
**ones** 53:2 109:18
**ongoing** 77:20
**oOo--** 134:5
**open** 120:5
**opinion** 98:5
**opposed** 23:23
39:12 49:8
52:12 98:17
**oral** 91:25 95:9
95:13 96:4,8,12
96:23 97:6,9,11
97:20,25 98:9
132:20
**orally** 37:10
50:16
**order** 97:6
**ordinary** 103:23
104:13,19,23
**original** 30:11
54:23,25 55:11
**originally** 48:7
**outcome** 27:8
**outgoing** 67:7
**outside** 18:21
89:6
**outstanding** 66:5
80:11 120:4

Case 21-03004-sgj    Doc 87    Filed 12/02/21    Entered 12/02/21 17:03:51    Desc Main
Case 3:21-cv-00881-X    Document 162    Filed 06/04/21    Page 200 of 200    PageID 29177

148

Kristin Hendrix - October 27, 2021

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

**P**
**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
73:9,12,18,25
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24