subsequent, the Debtor's prior use of forgivable loans, and Dondero's compensation from the Debtor during his employment.

**Brian Collins, former employee of the Debtor**
Tel: 213-550-4538

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Amy Theriot, former employee of the Debtor**
Tel: 214-893-5352

As a former employee, she may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Mark Okada, former employee of the Debtor**
Tel: 975-989-1000

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Scott Ellington, former employee of the Debtor**
c/o Frances Smith
Ross & Smith PC
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

As a former employee, he may have knowledge regarding the claims, defenses, and factual circumstances at issue in the Debtor's complaint and this adversary proceeding, including, without limitation, the promissory notes, the circumstances surrounding the preparation and/or execution

of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**Frank Waterhouse, former employee of the Debtor**
c/o Frances Smith
Ross & Smith PC
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

As a former employee, he may have knowledge regarding the promissory notes, the circumstances surrounding the execution of the notes and related transfers, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the Debtor's prior use of forgivable loans, compensation of Debtor employees, and Dondero's compensation from the Debtor during his employment.

**John Honis, employee of Rand Advisors**
Tel: 214-335-7969

As an employee of Rand Advisors, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Jack Yang, former employee of the Debtor**
Tel: 646-387-2351

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Paul Adkins, former employee of the Debtor**
Tel: +65 9728 0599

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Pat Daugherty, former employee of the Debtor**
c/o Jason Kathman
Spencer Fane LLP
2200 Ross Avenue, Suite 4800
Dallas, TX 75201

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

Appx. 02986

**Tim Lawler, former employee of the Debtor**
Tel: 847-305-3013

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Appu Mundassery, former employee of the Debtor**

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Mike Hurley, former employee of the Debtor**
Tel: 775-750-8921

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

**Gibran Mahmud, former employee of the Debtor**
Tel: 972-740-0018

As a former employee, he may have knowledge regarding the Debtor's prior use of forgivable loans.

2.      A copy or a description by category and location, of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses.

**ANSWER: Defendant may have documents and communications related to the following matters in his possession, custody, or control that he may use to support his claims or defenses. The inclusion of a general category of documents below does not mean that specific documents necessarily exist or that Defendant has such documents in his possession, custody, or control.**

1.     Documents and communications related to the allegations in the complaint and Dondero's defenses to the allegations in the complaint, including, without limitation, documents related to the terms of the promissory notes, the drafting and execution of the notes, the agreement of the Debtor to not collect on the notes upon fulfillment of conditions subsequent, the purpose and intent of the notes, the Debtor's prior use of forgivable loans, and Dondero's compensation from the Debtor during his employment.

2.     Documents related to Dondero's personal tax returns.

3.     Documents related to tax loan(s) made by the Debtor to Dondero and such tax amounts incurred related to federal partnership tax.

4.     Documents and/or communications related to Dondero's compensation during his employment at Highland.

5.     Any and all pleadings filed in this matter and the main bankruptcy case.

3.     A computation of each category of damages claimed by the disclosing party, who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

**ANSWER:**

Defendant is not seeking actual damages at this time.

4.     For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**ANSWER:**

No such insurance agreements known.

<u>**Reservation of Rights**</u>

Defendant makes these disclosures subject in all respects to his Motion for Withdrawal of the Reference [Adv. Dkt. No. 21] and Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint [Adv. Dkt. No. 22] filed on April 15, 2021. Defendant does not waive, but hereby preserves, his right to a jury trial and all additional rights and relief available as asserted in the motions.

The Defendant's investigation is ongoing, and he reserves the right to further amend, modify and/or supplement these initial disclosures as provided in Federal Rule of Civil Procedure 26(e) if warranted and to the extent additional disclosures are not mooted or made redundant by information made known during the discovery process or in writing. In addition, the Defendant makes these initial disclosures without waiving but expressly preserving: (a) his right to a jury trial; (b) his right to have this proceeding determined by the District Court; (c) his right to object to the entry of any final orders or final judgments by the Bankruptcy Court in this proceeding; (d) the right to object to any discovery requests or to the admissibility of evidence on the grounds of privilege, work product, relevance, materiality, or any other proper ground; and (e) the right to object to the use of any information provided in or derived from these initial disclosures for any purpose in this action.

Dated: April 15, 2021

Respectfully submitted,

*/s/ Bryan C. Assink*
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

ATTORNEYS FOR DEFENDANT JAMES
DONDERO

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on April 15, 2021, a true and correct copy of the foregoing Rule 26 initial disclosure was served via email on counsel for the Plaintiff as listed below.

Jeff Pomerantz
Ira Kharasch
John Morris
Greg Demo
Hayley Winograd
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

*/s/ Bryan C. Assink*
Bryan C. Assink

# EXHIBIT 185

Case 3:21-cv-00881-X   Document 177-10   Filed 01/09/24   Page 8 of 200   PageID 32561
Case 21-03004-sgj Doc 84 Filed 11/30/21   Entered 11/30/21 17:53:40   Page 1 of 7
Docket #0084  Date Filed: 11/30/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § | 21-03004-sgj |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § § | |
| Defendant. | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Cresce

1934054211130000000000013

### PLAINTIFF'S THIRD AMENDED NOTICE OF RULE 30(B)(6) DEPOSITION
### TO HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Highland Capital Management, L.P., the plaintiff in the above-referenced adversary proceeding in the above-captioned chapter 11 case, shall take the deposition of Highland Capital Management Fund Advisors, L.P. ("HCMFA") by the person(s) most qualified to testify on HCMFA's behalf with respect to the topics described in **Exhibit A** attached hereto on **December 1, 2021, commencing at 10:00 a.m. Central Time** or at such other day and time as the Plaintiff may agree in writing.  The deposition will be taken under oath before a notary public or other person authorized by law to administer oaths and will be visually recorded by video or otherwise.

The deposition will be taken remotely via an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition and by use of Interactive Realtime.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated:  November 30, 2021.          **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ John A. Morris*

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:       jpomerantz@pszjlaw.com
               ikharasch@pszjlaw.com
               jmorris@pszjlaw.com
               gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## EXHIBIT A

## DEFINITIONS

1.      "Amended Answer" means *Defendant's Amended Answer* lodged in the above-referenced adversary proceeding at Docket No. 48.

2.      "Bankruptcy Case" refers to the above-referenced bankruptcy case styled as *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11.

3.      "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, text messages, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

4.      "Concerning" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

5.      "Discovery Requests" means (i) the *Debtor's First Requests for Admission Directed to Highland Capital Management Fund Advisors, L.P.*, (ii) the *Debtor's First Request for Production of Documents Directed to Highland Capital Management Fund Advisors, L.P.*, and (iii) the *Debtor's First Interrogatories Directed to Highland Capital Management Fund Advisors, L.P.*

6.      "Document" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made.  This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or

intangible thing or item that contains any information.  Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

7.    "Exhibits" refers to each of the documents identified as Exhibits 28-66 on *Debtor's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 25, 2021* lodged in the above-referenced adversary proceeding at Docket No. 35.

8.    "HGAF" shall have the meaning ascribed to that term in paragraph 38 of the Amended Answer.

9.    "Highland" means Highland Capital Management, L.P.

10.    "Insurance Claim" means any claim that You filed for insurance coverage Concerning the NAV Error.

11.    "Motion to Amend" means *Defendant's Motion for Leave to Amend Answer* lodged in the above-referenced adversary proceeding at Docket No. 32.

12.    "NAV Error" means the error made in calculating the net asset value of the equity interests HGAF held in TerreStar that were sold in March 2018.

13.    "Notes" shall have the meaning ascribed to that term in paragraph 15 of the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* lodged in the above-referenced adversary proceeding at Docket No. 1.

14.    "Original Answer" means *Defendant's Original Answer* lodged in the above-referenced adversary proceeding at Docket No. 6.

15.    "Retail Board" means any board of trustees or directors of any fund to which You provide advisory services.

16.    "Sauter Declaration" means the *Declaration of Dennis C. Sauter, Jr.* lodged in the above-referenced adversary proceeding at Docket No. 32-1.

2

Appx. 02996

17.    "You" or "Your" means Highland Capital Management Fund Advisors, L.P., and anyone authorized to act on its behalf.

**Rule 30(b)6) Topics**

**Topic No. 1:**

Your Original Answer.

**Topic No. 2:**

Your Amended Answer

**Topic No. 3:**

Each Affirmative Defense asserted in Your Amended Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense.  *See* Answer ¶¶ 38-47.

**Topic No. 4:**

The Notes, including but not limited to (a) the negotiation of the Notes, (b) the terms of the Notes, (c) Communications Concerning the Notes, (d) any payments of principal or interest made by You or on Your behalf with respect to the Notes, (e) the use of the proceeds of the Notes, (f) Your communications with Your outside auditors Concerning the Notes and the obligations thereunder, and (g) any agreements Concerning the Notes.

**Topic No. 5:**

The Exhibits.

**Topic No. 6:**

The Motion to Amend.

**Topic No. 7:**

The Sauter Declaration.

**Topic No. 8:**

3

Any Insurance Claim that You filed, including but not limited to: (a) any proceeds You received on account of any Insurance Claim; (b) any deductible paid by You in connection with any Insurance Claim; (c) the date You received any insurance proceeds on account of any Insurance Claim; (d) the use of the proceeds from any Insurance Claim; and (e) any Communications with any insurance carrier that processed any Insurance Claim.

**Topic No. 9**:

Any "consent fee" paid by You in April or May 2019, including the amount, date of payment, and source of funding for any such "consent fee."

**Topic No. 10**:

Your accounting for (a) the $2.4 million transferred from Highland to You on May 2, 2019, and (b) the $5 million transferred from Highland to You on May 3, 2019.

**Topic No. 11**:

Communications in 2020 with any Retail Board concerning any amounts due and owing by You to Highland, including but not limited to the disclosures You made to any Retail Board in October 2020.

**Topic No. 12**:

All Communications that You made in the Bankruptcy Case Concerning the Notes, including in any pleading, court filing, or argument.

**Topic No. 13**:

The identity (including the title or position) of each of Your officer(s), director(s), direct and indirect owner(s), and employee(s) for the period January 1, 2018 through the present.

**Topic No. 14**:

Your responses to the Discovery Requests.

4

# EXHIBIT 186

# INTENTIONALLY

# OMITTED

# EXHIBIT 187

# INTENTIONALLY

# OMITTED

# EXHIBIT 188

Appx. 03001

| | |
|---|---|
| **From:** | David Klos <DKlos@HighlandCapital.com> |
| **Sent:** | Friday, February 02, 2018 2:16 PM |
| **To:** | Corporate Accounting |
| **Cc:** | Melissa Schroth |
| **Subject:** | $3.825mm to Jim |

Blair,
Please set up $3.825mm to go to Jim this afternoon. Frank has approved.

Drew, this is a new loan.


**DAVID KLOS |** CONTROLLER



300 Crescent Court | Suite 700 | Dallas, Texas 75201
C: 214.674.2926 | O: 972.419.4478 | F: 972.628.4147
dklos@highlandcapital.com | www.highlandcapital.com

1

Appx. 03002

# EXHIBIT 189

Appx. 03003

From: wiremail@bbvacompass.com <wiremail@bbvacompass.com>
Sent: Friday, February 2, 2018 1:35 PM
To: Corporate Accounting <CorporateAccounting@hcmlp.com>
Subject: Compass Bank [Texas Bank Outgoing] Message ID:180202133456H400 Advice Code:TxBkOut

Compass Bank Wire Transfer Dept.
701 S 32nd Street
Birmingham, AL  35233

Outgoing Wire - Advice of Debit

Date: 2018-02-02 00:00:00          Wire Create Time 13:34:57

        Account #       :
        Account Name    :  HIGHLAND CAPITAL MANAGEMENT LP
        Amount          :  $3,825,000.00
        GFX Reference      :  180202133456H400
        Receiving Bank  :  311973208
        Recv BK Name       :  NEXBANK SSB

        Originator      :  HIGHLAND CAPITAL MANAGEMENT LP

        Beneficiary     :  James Dondero
        Bene Acct #     :  ███884

        Beneficiary Info (OBI):
        2/2/2018 Loan

        Reference for Beneficiary (RFB):

        FED Reference Number (IMAD):
        20180202F2QCZ60C002532

1

Appx. 03004

# EXHIBIT 190

| | |
|---|---|
| **From:** | Blair Hillis <BHillis@HighlandCapital.com> |
| **Sent:** | Wednesday, August 01, 2018 1:12 PM |
| **To:** | David Klos; Corporate Accounting |
| **Cc:** | Melissa Schroth |
| **Subject:** | RE: $2.5mm loan to Dondero |

Funds have been transferred to Jim's account. Thanks!

Kind Regards,
Blair Roeber

**From:** David Klos
**Sent:** Wednesday, August 1, 2018 10:47 AM
**To:** Corporate Accounting
**Cc:** Melissa Schroth
**Subject:** $2.5mm loan to Dondero

Jim has authorized a $2.5mm loan from HCMLP to Dondero.

Blair, can you please set up this wire today?
Drew, can you please draw up loan docs for execution?

**DAVID KLOS** | CONTROLLER



300 Crescent Court | Suite 700 | Dallas, Texas 75201
C: 214.674.2926 | O: 972.419.4478 | F: 972.628.4147
dklos@highlandcapital.com | www.highlandcapital.com

**Appx. 03006**

**EXHIBIT 191**

Appx. 03007

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Friday, October 15, 2021 1:23 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; 'ddraper@hellerdraper.com' <ddraper@hellerdraper.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Berghman, Thomas (tberghman@munsch.com) <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Douglas Draper <ddraper@hellerdraper.com>; elmsd@gtlaw.com
**Subject:** RE: HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

John:

Defendants have the following objections to your corporate representative topics:

NexPoint, HCMS and HCRE

Topic 1: Your answer.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Subject to these objections, Defendants will provide a witness on this topic.

Topic 2: Each Affirmative Defense asserted in Your Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Subject to these objections, Defendants will provide a witness on this topic.

Topic 3: The Note, including but not limited to (a) the negotiation of the Note, (b) the terms of the Note, (c) Communications Concerning the Note, (d) any payments of principal or interest made by You or on Your behalf with respect to the Note; (e) the use of the proceeds of the Note, (f) Your communications with Your outside auditors Concerning the Note and the obligations thereunder, and (g) all agreements Concerning the Note.

Defendants object to the portion of this topic seeking information related to the use of the proceeds of the Note because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendants will provide a witness on this topic.

Topic 4: Your responses to the Discovery Requests.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Defendants incorporate all objections made in their discovery responses. Subject to these objections, Defendants will provide a witness on this topic.

Dugaboy

Topic 2: Your authority to enter into the Alleged Agreement.

Defendant objects to this topic to the extent that it seeks privileged information and seeks legal conclusions. Subject to these objections, Defendant will provide a witness on this topic.

Topic 3: Ownership, beneficial ownership, and control of The Dugaboy Investment Trust.

Defendant objects to this topic because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant will provide a witness on this topic.

Topics 4-8:  Other agreements other than the agreements at issue in these proceedings.

Defendant object to these topics because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant will provide a witness on these topics.

Topic 9: Your responses to the Discovery Requests.

Defendant objects to this topic because it is vague and not specific enough to allow Defendant to adequately prepare a witness. Defendant incorporates all objections made in its discovery responses.  Subject to these objections, Defendant will provide a witness on this topic.


**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201  \  Bio

**STINSON.COM**

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, October 12, 2021 5:50 PM
**To:** Aigen, Michael P. <michael.aigen@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; 'ddraper@hellerdraper.com' <ddraper@hellerdraper.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Berghman, Thomas (tberghman@munsch.com) <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>
**Subject:** HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

Michael:

HCMLP has the following objections to the attached Rule 30(b)(6) notice:

**HCMLP objects to Topic No. 2**  (a) to the extent it calls for HCMLP to tender a witness to testify with precision to all principal, interest, and fees due under each Note that is the subject of the Complaints, and on the grounds that (b) HCMLP provided calculations of damages in its demand and default letters as well as its Complaints, (c) the categories of damages are all (i) unpaid principal, (ii) accrued but unpaid interest, and (iii) costs of collection, including reasonable attorneys' fees (the "Damages"), (d) based on the Notes and the documents produced proving HCMLP's costs of collection (which will be

supplemented from time to time to account for additional costs), the Defendants are just as easily capable of calculating the Damages at any moment in time as HCMLP, (e) it is unreasonable to expect any witness to specifically recall the precise Damages due under each Note, particularly when such Damages continue to increase every day.

Subject to those objections, HCMLP will tender a witness prepared to testify on Topic No. 2.

**HCMLP objects to Topic No. 4** on the grounds that (a) the phrase "involved in" is vague and ambiguous, and (b) it assumes that any of the Notes were subject to "negotiations."

Subject to those objections, HCMLP will tender a witness prepared to testify as to the identify of individuals it knows were involved in communications related to the execution and/or terms of the notes.

**HCMLP objects to Topic No. 7** on the grounds that (a) it seeks "facts" that are solely within the Defendants' knowledge, and that (b) Defendants' defenses and affirmative defenses have materially changed over time, and are otherwise ambiguous or not specifically set forth in the Answers.

Subject to that objection, HCMLP will tender a witness prepared to testify as to facts that it knows of that relate to or concern the defenses and affirmative defenses specifically proffered by any of the Defendants.

**HCMLP objects to Topics No. 9** on the grounds that (a) there is no time limitation, (b) the existence and terms of all affiliate loans, including all issues concerning forgiveness and forbearance, are set forth in detail in each of HCMLP's audited financial statements for each year from 2008 through 2018 (including the sections concerning "Subsequent Events"), and HCMLP specifically refers Defendants to those audited financial statements, and (c) it is unreasonable to expect any witness to specifically recall the identity of all affiliated borrowers, and the amounts, dates, and terms of all loans made to affiliated borrowers, including whether, when, and to what extent any such affiliated loans were forgiven.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topics No. 10** on the grounds that (a) there is no time limitation, (b) the existence and terms of all affiliate loans, including all issues concerning forgiveness and forbearance, are set forth in detail in each of HCMLP's audited financial statements for each year from 2008 through 2018 (including the sections concerning "Subsequent Events"), and HCMLP specifically refers Defendants to those audited financial statements, and (c) it is unreasonable to expect any witness to specifically recall the identity of all affiliated borrowers, and the amounts, dates, and terms of all loans made to affiliated borrowers, including whether, when, and to what extent any such affiliated loans were forgiven.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topics No. 11** on the grounds that (a) there is no time limitation, (b) documents concerning Mr. Dondero's compensation for the period 2016 through 2020 (the "Compensation Documents") have been or will be produced and HCMLP specifically refers Defendants to the Compensation Documents, and (c) it is unreasonable to expect any witness to specifically recall the specific amounts and components of Mr. Dondero's compensation from 2016 and 2020.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topic No. 12** on the grounds that it is (a) overly broad, unduly burdensome, and not relevant to the claims or defenses in this adversary proceeding, and (b) none of the Defendants who served the attached Rule 30(b)(6) notice is or was a party to a Shared Services Agreement with HCMLP.

Based on the forgoing, HCMLP will not proffer a witness to testify as to Topic No. 12.

Appx. 03010

**HCMLP objects to Topic Nos. 13, 14, 15, 16, and 17** to the extent those topics assume that HCMLP had any contractual or legal duty or obligation to take or refrain from taking the actions described therein.

Subject to those objections, and any additional objections referred to below, HCMLP will tender a witness prepared to testify on Topics 13, 14, 15, 16, and 17.

**HCMLP objects to Topic No. 14** on the ground that the phrase "may have previously had any role" is speculative, vague, and ambiguous.

Subject to that objection, HCMLP will tender a witness prepared to testify as to those referenced employees who actually  processed, made, facilitated or coordinated such payments, if any.

**HCMLP objects to Topic No. 15** on the grounds that the phrase (a) "[a]ny communications or instructions that may have been given" is speculative, vague, and ambiguous, and (b) there is no time limitation.

Subject to those objections, HCMLP will tender a witness prepared to testify as to communications or instructions that were actually given from 2018 to the present, if any.

---

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Thursday, October 07, 2021 2:49 PM
**To:** Rukavina, Davor <drukavina@munsch.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Vasek, Julian <jvasek@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: NexPoint Notice of 30(b)(6) to Debtor

Please see attached notice for the Seery/30B6 deposition.

**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201  \ Bio

**STINSON.COM**
This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information.  If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**From:** Rukavina, Davor <drukavina@munsch.com>
**Sent:** Thursday, October 7, 2021 11:42 AM
**To:** 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Vasek, Julian <jvasek@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R.

**Appx. 03011**

Winograd <hwinograd@pszjlaw.com>
**Subject:** NexPoint Notice of 30(b)(6) to Debtor

**External Email – Use Caution**

Counsel, please see attached notice.

Thank you


**Davor Rukavina, Esq.**

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800 / Dallas, Texas 75201-6659

Direct: +1.214.855.7587 / drukavina@munsch.com / munsch.com


Notice: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

**Appx. 03012**

**EXHIBIT 192**

1      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2                 DALLAS DIVISION

3   In re:                    )Chapter 11
                              )
4   HIGHLAND CAPITAL MANAGEMENT, LP, )
                              )Case No.
5        Debtor.              )19-34054-SGJ-11
    _____)_____
6   HIGHLAND CAPITAL MANAGEMENT, LP, )
                              )
7        Plaintiff,           )
                              )
8   vs.                       )Advisory Proceeding No.
                              )21-03004
9   NEXPOINT ADVISORS, LP; JAMES     )
    DONDERO; NANCY DONDERO; and THE  )
10  DUGABOY INVESTMENT TRUST,        )
                              )
11       Defendants.          )

12       ***********************************

13              REMOTE DEPOSITION OF
                  DUSTIN NORRIS
14               December 1, 2021
         ***********************************

15

16       DUSTIN NORRIS, produced as a witness at the

17  instance of the Highland Capital Management, was

18  duly sworn and deposed in the above-styled and

19  numbered cause on December 1, 2021, from

20  10:01 a.m. CST to 3:25 p.m. CST, stenographically

21  reported, pursuant to the Federal Rules of Civil

22  Procedure and the provisions stated on the record.

23   Job Number:   203362
      Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24            Texas CSR 9306
              California CSR 14407
25            Illinois CSR 084.004659

Page 2

```
 1          A P P E A R A N C E S
 2  (all attendees appearing via remote videoconference)
 3
 4  REPRESENTING HIGHLAND CAPITAL MANAGEMENT, LP:
 5   John Morris, Esq.
     Hayley Winograd, Esq.
 6   PACHULSKI STANG ZIEHL & JONES LLP
     780 Third Avenue
 7   New York City, New York  10017
 8
 9
10  REPRESENTING NEXPOINT ADVISORS, LP:
11   Davor Rukavina, Esq.
     MUNSCH HARDT KOPF & HARR, PC
12   500 North Akard Street
     Dallas, Texas  75201
13
14
15  REPRESENTING JAMES DONDERO, NANCY DONDERO, HCRE,
    and HCMS:
16
     Michael Aigen, Esq.
17   STINSON LLP
     3102 Oak Lawn Avenue
18   Dallas, Texas  75219
19
20
21  ALSO PRESENT:
22   La Asia Canty, Paralegal,
     Pachulski Stang Ziehl & Jones
23
24
25
```

Page 3

```
 1              INDEX
                          PAGE
 2
 3  EXAMINATION BY MR. MORRIS...................... 5
 4
 5
 6              EXHIBITS
 7  NUMBER       DESCRIPTION              PAGE
 8  Exhibit 185  Plaintiff's Third Amended Notice of
 9              Rule 30(b)(6) Deposition to
10              Highland Capital Management Fund
11              Advisors............................ 7
12
13
14          PREVIOUSLY MARKED EXHIBITS
15  NUMBER       DESCRIPTION              PAGE
16  Exhibit 1    Complaint for (I) Breach of
17              Contract and (II) Turnover of
18              Property of the Debtor's Estate...... 38
19  Exhibit 5    Defendant's Original Answer.......... 29
20  Exhibit 13   Defendant's Amended Answer........... 158
21  Exhibit 36   Email Chain; Bates D-HCMFA290880
22              through 290883....................... 87
23
24
25
```

Page 4

```
 1          PREVIOUSLY MARKED EXHIBITS
 2  NUMBER       DESCRIPTION              PAGE
 3  Exhibit 45   Highland Capital Management Fund
 4              Advisors, LP, Consolidated
 5              Financial Statements and
 6              Supplemental Information, 12/31/18;
 7              Bates D-CNL-002273 through 002296..... 46
 8  Exhibit 59   Supplemental 15(c) Info Request;
 9              Bates HCMFAS 000025 through 000031.... 71
10  Exhibit 147  BBVA Compass Bank Statement, Date
11              Ending 5/31/19  (no Bates range)..... 51
12  Exhibit 182  Memo Dated 5/28/19 (no Bates range).. 119
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              PROCEEDINGS
 2          (On the record at 10:01 a.m. CST)
 3          (Witness duly sworn.)
 4              DUSTIN NORRIS,
 5  being first duly sworn, testified as follows:
 6              EXAMINATION
 7  BY MR. MORRIS:
 8      Q    Good morning, Mr. Norris.  As you may
 9  recall, my name is John Morris.  I'm an attorney
10  at Pachulski Stang Ziehl & Jones, and we're
11  counsel to the reorganized debtor known as
12  Highland Capital Management, LP, and we're here
13  for your deposition today.
14          Do you understand that?
15      A    Yes, sir.
16      Q    And do you understand that you're being
17  deposed today in your capacity as what's called a
18  Rule 30(b)(6) witness on behalf of Highland
19  Capital Management Fund Advisors, LP?
20      A    I do.
21      Q    Can we refer to Highland Capital
22  Management Fund Advisors, LP, as "HCMFA"?
23      A    Yes, that works.
24      Q    And can we refer to Highland Capital
25  Management, LP, as either "Highland" or "HCMLP"?
```

Page 6

Dustin Norris

2 A    Yes.
3 Q    Okay.  Are you aware that your answers
4 today will bind HCMFA?
5 A    Generally, yes.
6 Q    Okay.  Have you seen the notice that was
7 served by Highland on HCMFA in connection with
8 this deposition?
9 A    I have.
10 Q    Okay.  I've -- I've examined you before;
11 right?
12 A    Yes.
13 Q    Okay.  So the rules are the exact same,
14 and they are very simple.  If I ask a question, I
15 would ask you to refrain from answering until I've
16 completed my question; is that fair?
17 A    Yes, it is.  Thank you.
18 Q    And if I begin a question or respond
19 before you've completed your answer, will you let
20 me know that?
21 A    Yes.
22 Q    We're going to be putting documents up on
23 the screen from time to time today.  If at any
24 time you believe you need to see other portions of
25 the document in order to give complete and

Page 7

Dustin Norris

2 accurate answers, will you let me know that?
3 A    Yes.
4 Q    If you need a break at any time, will you
5 let me know that as well?
6 A    I will.
7 Q    Okay.
8     MR. MORRIS:  I would ask my
9 colleague, Ms. Canty, to put up on the
10 screen the Rule 30(b)(6) deposition
11 notice.
12     (Norris Exhibit 185 marked.)
13     (Reporter discussion off the record.)
14     MR. MORRIS:  Okay.  Asia, what
15 exhibit number should we put on this
16 document?
17     MS. CANTY:  185.
18     MR. MORRIS:  Okay.  Davor and
19 Michael, this will be Exhibit 185.
20     And if we can scroll down and show
21 it to Mr. Norris.
22 BY MR. MORRIS:
23 Q    Do you see that this is the plaintiff's
24 third amended notice of deposition for today?
25     MR. RUKAVINA:  And just so you

Page 8

Dustin Norris

2 know, John and Dustin, I did not send this
3 to you, Dustin.  All that it does is
4 changes the time of today's deposition.
5 It's identical to the last one that you
6 did get.
7     THE WITNESS:  Okay.  And I have the
8 last one here with me as well.
9 BY MR. MORRIS:
10 Q    Okay.  So there's no -- I'll represent to
11 you that there's no difference between the one
12 that's on the screen and the one you have except
13 that the one on the screen says "Third Amended
14 Notice," and it was scheduled for 9:00 today.
15 It's scheduled for 10:00 today, the -- the time
16 that we're beginning.
17     Do you have any other documents in
18 front of you other than the deposition notice?
19 A    I do.
20 Q    What -- what other documents do you have
21 before you?
22 A    Yeah.  I have the original complaint I
23 believe it's called -- forgive me if I call them
24 the wrong items --
25 Q    Uh-huh.

Page 9

Dustin Norris

2 A    -- but the original complaint from HCMLP.
3 I have the original answer response from HCMFA.  I
4 have the amended response.  I have the declaration
5 from Mr. Sauter.  I have copies of the promissory
6 notes.  I have the shared services agreement.  I
7 have a -- incumbency certificates, which will help
8 me respond to one of your questions in the
9 30(b)(6) notice.  And I have a board to the
10 memo [sic] regarding NAV error, and I have the
11 "Defendant's Second Motion for Leave to Amend
12 Answer and Brief in Support Thereof" that was
13 filed yesterday.
14     So a number of documents that -- and I
15 also have up on my screen your exhibits that I
16 believe we'll be going through in one of the --
17 let me check here -- Topic Number 5.  So I have
18 open, you know, a 650-page document that was filed
19 in Docket 35 on May 24th, I believe, is the
20 correct document.  So those are the materials that
21 I have.
22 Q    Excellent.  I appreciate that.
23     So you've seen -- you've seen at least
24 the plaintiff's second amended notice of
25 Rule 30(b)(6) deposition before today.  Do I have

Page 10

Dustin Norris

1
2  that right?
3  A    That's correct.
4  Q    And you have that with you; right?
5  A    I do.
6  Q    Okay.  Are you prepared to testify on
7  behalf of HCMFA today on -- in connection with
8  each of the topics in the deposition notice?
9  A    Yes, I am.
10  Q    All right.
11     MR. MORRIS:  Let's just, for the
12  record, scroll down to make sure that the
13  topics are the same as the -- the one that
14  Mr. Norris has in front of him.
15  BY MR. MORRIS:
16  Q    Do you see the first five topics on the
17  screen?
18  A    I do.
19  Q    All right.  Can you confirm that they're
20  the same topics that you have in the second
21  amended notice of deposition?
22  A    Yes.  I'm looking now.
23     Yes, they all are the same.
24  Q    Okay.  And if we can continue to scroll
25  down, you see Topics 6, 7, and 8 up on the screen,

Page 11

Dustin Norris

1
2  and 9.  Are they the same as what you have?
3  A    Can you scroll down for 9?
4  Q    Uh-huh.
5  A    They look to be the same, yes.
6  Q    Okay.  And let's just look at the last
7  few.  How about 10 through 14?  Are they the same
8  as the topics that are in your second amended
9  notice?
10  A    They look to be the same, yes.
11  Q    Okay.  And did you do anything to prepare
12  for today's deposition?
13  A    I did.
14  Q    What did you do?
15  A    I reviewed all of the pleadings.  I
16  reviewed all of the -- the documents that were, I
17  believe, responsive to -- to help me to respond to
18  this, look through your exhibits.  I had met with
19  Mr. Rukavina as counsel.  I met and spoke with
20  Mr. Dondero.  I spoke with Jason Post.
21     I spoke with -- I reviewed my
22  documents internally and emails, things that I
23  might have had, confirmed with our IT group that
24  they have provided all documents responsive to
25  your discovery requests.

Page 12

Dustin Norris

1
2     I reviewed the depositions of
3  Mr. Seery, of Frank Waterhouse, Dave Klos, and
4  Kristin Hendrix.  I met in person and by Zoom with
5  Mr. Rukavina over the last few weeks, and -- so
6  that -- that's the general -- you know, there may
7  have been other things, but that's the general
8  overview of the things that I did --
9  Q    I appreciate --
10  A    -- to understand the company's position.
11  Q    I appreciate that.
12     So just focusing in on the people that
13  you spoke with in connection with your
14  preparation, one was Davor; right?
15  A    Correct.
16     And I -- I may have -- I don't know if
17  I said it or not, but DC Sauter as well I also
18  spoke with.
19  Q    Okay.  So the other people are DC Sauter,
20  Jason Post, and Mr. Dondero.  Do I have that
21  right?
22  A    Correct.
23  Q    Did you speak with Frank Waterhouse at
24  all?
25  A    No, I did not.

Page 13

Dustin Norris

1
2  Q    Is there any particular reason you didn't
3  speak with Mr. Waterhouse?
4  A    Yes.
5  Q    And what -- why didn't you speak with
6  Mr. Waterhouse?
7  A    My -- my -- yeah, sorry.
8     My understanding is his counsel did
9  not allow us to speak with him regarding this,
10  because HCMLP had sued him for various things, and
11  so we weren't allowed to talk with him.
12     You'll -- you'll note that DC, earlier
13  on, had spoken to him.  I believe that was back in
14  April, if you look back and I'd refer you to
15  Mr. Sauter's declaration.  In preparation for
16  this, we did not speak with him.  We needed to
17  wait for his deposition based on his attorney's
18  instructions.
19  Q    How many times did you speak with
20  Mr. Dondero about today's deposition?
21  A    Multiple times over the last few weeks.
22  Q    And was Mr. Rukavina present for those
23  discussions?
24  A    He was not.
25  Q    Can you tell me what you discussed with

Page 14

Dustin Norris

2  Mr. Dondero about today's deposition?

3  A    Yeah.  Discussed with him general view of

4  the company from his perspective.  We discussed

5  particularly around – and we'll get into more

6  details on this – but around the purpose and

7  transfer of cash, the seven-and-a-half million

8  dollars.  And I guess there were two transactions.

9        Discussed with him what he remembered

10  in discussions with Frank Waterhouse when he

11  instructed him to transfer the cash, and any

12  recollection he had regarding the notes or the –

13  the – the promissory notes.

14        And so those were the general topics.

15        And we did talk about –

16  Q    Did Mr. –

17  A    Sorry.  Go ahead.

18  Q    Yeah, I don't mean to step on your words.

19  A    No, no.

20        We talked about the NAV error, we

21  talked about responsibility for the NAV error and

22  those aspects as well.

23  Q    Did – did Mr. Dondero tell you when he

24  first learned of the existence of the notes?

25  A    No.

Page 15

Dustin Norris

2  Q    Did you ask him in connection with your

3  preparation for today's deposition?

4  A    What I did ask, I asked him – I said,

5  "Did you tell Frank Waterhouse that there should

6  be – that this should be a loan?"

7        And his response was, "No, that I

8  never told Frank it should be a loan, and Frank

9  never asked if it should be a loan."  And that the

10  intent – and the reason for the transfer was

11  compensation for the NAV error.

12        And so that was – he did not know –

13  and if I – if I remember correctly, looking at

14  his deposition, I believe he did not know about

15  the notes at that time and found out about them

16  much later.

17  Q    I know, and I'm trying to understand from

18  you if you can tell me, as HCMFA's 30(b)(6)

19  representative, whether you can share with me when

20  Mr. Dondero first learned of the existence of the

21  notes.

22  A    It – it would have been – I believe, if

23  my understanding is correct, it would have been

24  after they were demanded.

25  Q    After they were?

Page 16

Dustin Norris

2  A    Demanded.

3  Q    Okay.  How about your conversations with

4  Mr. Post?  Did the subject of when he learned

5  about the existence of the notes come up?

6  A    No.  That was not – a discussion with

7  Jason Post – Post – talking with Jason was more

8  around the NAV error, the events surrounding the

9  NAV error, facts and circumstances around the NAV

10  error.

11  Q    Okay.  And were your discussions with

12  Mr. Sauter limited to the investigation that he

13  undertook earlier this year that's reflected in

14  his declaration?

15  A    I would say it's not limited to that.

16  Q    What other topics did you discuss with

17  Mr. Sauter beyond the investigation that he

18  undertook that's reflected in his declaration?

19        MR. RUKAVINA:  And I would just

20  caution you, Dustin, that to the extent

21  that you and Mr. Sauter discussed factual

22  matters, that's fair game.

23        But as far as if you discussed

24  litigation strategy, that's not fair game.

25  So be careful with your answer, please,

Page 17

Dustin Norris

2  and tell Mr. Morris what you can and can't

3  answer.

4        THE WITNESS:  Yeah.

5        So early on with Mr. Sauter,

6  discussions were around if I had any

7  knowledge of the note, if he had any

8  knowledge of the note, trying to discover

9  what the notes were, what they were

10  related to, and neither of us had

11  knowledge related to notes.

12        And then discussions around more

13  generally – I'm trying to think back.

14  There were many discussions with

15  Mr. Sauter on the topic.

16        General facts and circumstances of

17  what he was learning from his

18  investigation in which – all of which I

19  would refer you to his declaration.

20        And then subsequent, talking with

21  him regarding the – I'm trying to

22  recollect the – the key components.

23        But it was general overview of –

24  of the notes and NAV error and the

25  process.  He wasn't here during much of

Page 18

| | Dustin Norris |
|---|---|
| 1 | that time period or involved, and so we |
| 2 | that time period or involved, and so we |
| 3 | were talking together based on what he was |
| 4 | doing. |
| 5 | BY MR. MORRIS: |
| 6 | Q    Who are you employed by today? |
| 7 | A    NexPoint Advisors. |
| 8 | Q    Do you hold any position or title with |
| 9 | HCMFA? |
| 10 | A    I do. |
| 11 | Q    And what's your position or title with |
| 12 | HCMFA? |
| 13 | A    Executive vice president is my officer |
| 14 | role. |
| 15 | Q    And when did you become an officer of |
| 16 | HCMFA? |
| 17 | A    So I – I was originally secretary – and |
| 18 | I can't remember if I was assistant secretary, but |
| 19 | I've been involved with HCMFA since 2012.  I don't |
| 20 | know if I was added as an assistant secretary at |
| 21 | that time; but for many – for several years, I've |
| 22 | been an officer of HCMFA. |
| 23 | Q    And you were an officer in 2018 and 2019; |
| 24 | is that right? |
| 25 | A    Correct.  I was secretary in 2018, and – |

Page 18 column header: *Dustin Norris*

Page 19

Dustin Norris

1   I'm looking at the incumbency certificates here –
2   and in 2019 in April became executive vice
3   president.  So from January to – January 2018 to
4   April 2019, I was secretary and then became
5   executive vice president.
6   Q    When did you first learn of the existence
7   of the notes?
8   A    So it was after they were demanded, and it
9   was – so I believe the demand came in in early
10  2020 – 2021.  So January-ish 2021.
11  Q    Do you have any role or any title with any
12  of the funds that are managed by either NexPoint
13  or HCMFA?
14  A    I do.
15  Q    Can you describe those roles or titles for
16  me, please?
17  A    Yeah.  I'm – I'm the executive vice
18  president of the funds, and my role more broadly
19  is I am the head of distribution and chief product
20  strategist.  And so in that role, I lead the sales
21  and business development and marketing for the
22  funds, more broadly.
23  Q    And what is your title with NexPoint
24  Advisors, LP?
25

Page 20

Dustin Norris

1   A    I am executive vice president in the
2   officer capacity, and my role is – as an employee
3   is head of distribution and chief product
4   strategist.
5   Q    Okay.  So just to summarize, you're the
6   executive vice president of NexPoint Advisors, LP;
7   correct?
8   A    Correct.
9   Q    And that's an officer position; correct?
10  A    It is.
11  Q    And when did you attain that title?
12  A    Probably – I don't have the incumbency
13  certificates, but it was probably the same time as
14  HCMFA.
15  Q    Is it fair to say that it was sometime
16  before January 1st, 2018?
17  A    No.
18  Q    Can you give me an estimate of when that
19  was?  Feel free –
20  A    Yeah.  The time- – the timeline for HCMFA
21  was April 2019.  I was secretary before that, and
22  I don't recall if NexPoint Advisors changed at the
23  same time.
24  Q    Okay.  Can I refer to HCMFA and NexPoint
25

Page 21

Dustin Norris

1   Advisors, LP, together as "the advisers"?
2   A    That's fine.
3   Q    Okay.  So is it fair to say that you were
4   the executive vice president, which was an officer
5   position, for each of the advisers as of April
6   2019?
7   A    Yes.
8   Q    Okay.  And –
9   A    I believe that's correct.
10  Q    And you also serve as the executive vice
11  president of the funds that each of the advisers
12  manages.  Do I have that right?
13  A    Yes.  Currently.
14  Q    And have you held the –
15  A    Yes, currently.
16  Q    And when did you become the executive vice
17  president of the funds?
18  A    I don't remember the exact date, if that
19  was around the same time, but I was the secretary
20  before that and assistant secretary before that,
21  dating back to 2012.
22  Q    So you've been – is it fair to say that
23  you've been an officer of the funds managed by the
24  advisers since at least 2013?
25

Page 22

Dustin Norris

1
2   A   I believe so.  I'd have to go back and
3   look for sure, but I believe.  There may have been
4   periods of time where I was not, but yes.
5   Q   Okay.  Were any of those periods of time
6   when you were not, at any point since 2018 to the
7   present?
8   A   I don't believe so.
9   Q   Okay.  So to the best of your
10  recollection, you've served as an executive vice
11  president of each of the funds managed by the
12  advisers since at least the beginning of 2018; is
13  that fair?
14  A   No.  That's – that's different than my
15  prior testimony that – I was secretary until
16  April –
17  Q   I apologize.  Let me restate the question.
18      You've been an officer of – of the
19  funds managed by the advisers on a continuous
20  basis since at least the beginning of 2018; fair?
21  A   I believe that's correct, yes.
22  Q   Thank you for the question – for – for
23  the correction.
24      So as I think you pointed out earlier,
25  one of the topics on the 30(b)(6) notice is the

Page 23

Dustin Norris

1
2   identity of officers, directors, and employees of
3   HCMFA?
4   A   Uh-huh.
5   Q   Do you want to take a look at that topic
6   on the document that you have in front of you?
7   A   Yes.
8   Q   Okay.
9   A   That is – which topic?
10  Q   13.
11  A   13, yes.
12  Q   Okay.  So let's focus on 13 for a moment.
13      Can you – can you identify for me
14  HCMFA's officers from January 1st, 2018, to the
15  present –
16  A   Yes.
17  Q   – including names and titles?
18  A   Yes.
19  Q   Okay.
20  A   So from January 1st, 2018 – and I don't
21  have – I – I'm assuming that the dates that I
22  have on the incumbency certificates are complete,
23  but I'm not certain, and – if there was one in
24  between, but I'm assuming this is – that the
25  dates I have changing is – is effective when they

Page 24

Dustin Norris

1
2   changed.
3       But Brad Ross was president of HCMFA
4   from January 1st, 2018, until, I believe,
5   February 2018 – sorry – yeah, until
6   February 2018.
7       In that same time period, Brad Ross,
8   president; Trey Parker, executive vice president;
9   Frank Waterhouse, treasurer; Dustin Norris,
10  secretary.
11      And effective 26th of February –
12  Q   I apologize.  What is Mr. Parker's title?
13  A   Executive vice president.
14  Q   Thank you.
15  A   And beginning February 26th, 2018, Trey
16  Parker, executive vice president; Frank
17  Waterhouse, treasurer; and Dustin Norris,
18  secretary; and no longer president, Brad Ross.
19  There's no president on the lineup.
20      So continuing on, April 11th, 2019,
21  Dustin Norris, executive vice president; Frank
22  Waterhouse, treasurer; Lauren Thedford, secretary.
23  Q   And Trey Parker was no longer an officer
24  as of that time?
25  A   He was no longer an officer.

Page 25

Dustin Norris

1
2   Q   Okay.
3   A   And February 18th, 2021, Dustin Norris,
4   executive vice president; Frank Waterhouse,
5   treasurer; Brian Mitts, assistant treasurer; David
6   Willmore, secretary.  So Lauren Thedford, no
7   longer secretary.
8   Q   And have there been any changes since
9   February 2021?
10  A   Yes.  You have April 8, 2021, Dustin
11  Norris, executive vice president; Frank Waterhouse,
12  treasurer; Will Mabry, assistant treasurer; and
13  Stephanie Vitiello, secretary.
14      Again, I – I don't have – this is
15  based on what was provided to me with effective
16  dates.  I don't know if there was any that were
17  missing, if that's complete, but I – I believe
18  those are accurate.
19  Q   Is it fair to say that you're relying on
20  exclusively on the incumbency certificates to
21  identify the officers of HCMFA since January 1st,
22  2018?
23  A   For this purpose, yes.
24  Q   Do you have any other information that you
25  can share with me regarding the identity of any

Page 26

Dustin Norris

1 officers of HCMFA since January 1st, 2018?
2
3 A    I don't, no.
4 Q    Okay. Can you identify for me HCMFA's
5 direct and indirect owners since January 1st,
6 2018?
7 A    I can, yes. Generally Jim Dondero and
8 Mark Okada are the indirect owners through trusts.
9 They own approximately two-thirds, Jim Dondero, a
10 little less than a third, Mark Okada, with a
11 general partner that is -- that owns 1 percent.
12 Q    And who is the general partner?
13 A    It's a Strand entity that I believe is
14 owned 100 percent by Mr. Dondero.
15 Q    So Mr. Dondero controls the general
16 partner --
17 A    Right.
18 Q    -- of HCMFA?
19 A    Correct, and owns approximately two-thirds
20 of the equity.
21 Q    And is that a controlling interest to the
22 best of your knowledge?
23 A    Yes, I believe so.
24 Q    Okay. Does HCMFA have any directors?
25 A    It does not. It has a sole director

Page 27

Dustin Norris

1 through the general partners. So HCMFA does
2
3 not -- Strand -- whatever the Strand entity does,
4 Jim Dondero is the sole director.
5 Q    Okay. And what about employees? Does
6 HCMFA have any employees?
7 A    It does have some front-office employees,
8 trading professionals.
9 Q    Are there any employees who perform any
10 services other than trading services?
11 A    Trading in front-office investment
12 analysts, portfolio managers, generally that's
13 been the structure with HCMFA, is they held --
14 they had employees that performed front-office
15 functions, and we, as I believe you're aware,
16 outsourced the back-office accounting, compliance,
17 and legal services to Highland Capital Management,
18 LP, during this time period.
19 Q    Let's go to Topic Number 12.
20 A    Okay.
21 Q    And Topic Number 12 asks for a witness who
22 can testify as to all communications that HCMFA
23 "made in the bankruptcy case concerning the notes,
24 including any pleadings, court filing, or
25 argument."

Page 28

Dustin Norris

1 Do you see that?
2
3 A    I do.
4 Q    Are you prepared to answer questions on
5 that topic?
6 A    I am.
7 Q    All right. You're aware that obviously
8 Highland has commenced an adversary proceeding
9 against HCMFA to collect on two promissory notes;
10 right?
11 A    I am, yes, and I believe this right here
12 is the complaint filed January 22nd.
13 Q    Okay. And you're aware that the notes
14 that are the subject of the lawsuit were dated
15 May 2nd and May 3rd, 2019, respectively; right?
16 A    Sorry. Can you repeat that?
17 Q    You're aware that the notes that are the
18 subject of the lawsuit are dated May 2nd and
19 May 3rd, 2019, respectively; correct?
20 A    Yes. The notes that are attached to the
21 complaint, May 2nd and May 3rd.
22 Q    Okay. And can we refer to those two
23 notes -- those two promissory notes for the rest
24 of this deposition collectively as "the notes"?
25 A    Yes.

Page 29

Dustin Norris

1 Q    Okay. And you're aware that after
2
3 Highland commenced this action, HCMFA filed its
4 original answer; correct?
5 A    That's correct.
6 Q    Okay. And Topic Number 1 on your list, in
7 fact, is the answer, correct, the original answer?
8 A    That's correct. It's Topic Number 1.
9 MR. MORRIS:  Okay. Can we put
10 Deposition Exhibit 5 up on the screen?
11 We're going to look at the original
12 answer.
13 (Exhibit 5 tendered.)
14 BY MR. MORRIS:
15 Q    And, again, feel free to let me know if
16 there's any portion of this document that you need
17 to see. But looking at the first page -- and
18 perhaps we can continue to scroll through it -- is
19 this the original answer that was filed on behalf
20 of HCMFA on March 1st, 2021?
21 A    I'll take your representation that it is.
22 It looks to be, yeah.
23 Q    Okay.
24 A    I was not involved in the filing of it,
25 but...

**Appx. 03021**

Page 30

Dustin Norris

1
2  Q    Okay.  Is the copy that you have with you
3  dated March 1st, 2021?
4  A    Yes, it is.
5  Q    And if you can turn to Page 6 of 7, does
6  it appear to be the exact same as what appears on
7  the screen, showing the March 1st, 2021, date?
8  A    It does.
9  Q    And do you refer to the March 1st, 2021,
10  date, as "the answer date"?
11  A    Yes.
12  Q    Okay.  HCMFA did not assert any
13  affirmative defenses in this pleading; correct?
14  A    That's my understanding.
15  Q    Okay.  And HCMFA had full access to you as
16  of March 1st, 2021; correct?
17  A    Yes.
18  Q    And HCMFA had full access to Mr. Dondero
19  as of March 1st, 2021; correct?
20  A    In the term "full access," they could have
21  talked to him, yes.
22  Q    Right.  And there was no restriction from
23  the bankruptcy court or otherwise on HCMFA's
24  ability to communicate with Mr. Dondero that you
25  know of; correct?

Page 31

Dustin Norris

1
2  A    None that I know of.
3  Q    And there was no restriction or limitation
4  on HCMFA's ability to speak with you at or prior
5  to March 1st, 2021; correct?
6  A    That's correct.
7  Q    How about Ms. Thedford?  Are you aware of
8  any restriction or limitation on HCMFA's ability
9  to speak with her prior to March 1st, 2021?
10  A    Yes.
11  Q    Okay.  And what restriction was that?
12  A    Yeah.  So she was part of the Highland
13  legal team.  She was an employee of HCMLP.  And
14  during this time period, we had outsourced our
15  legal and compliance functions to them.  And if --
16  I would refer you to Mr. Sauter's declaration and
17  the attachments and schedules.  There's a very
18  strict direction from Mr. Seery that
19  individuals -- particularly on the legal team --
20  could not work on anything that would be inimical
21  to the debtor.
22  Q    Okay.
23  A    And so Ms. Thedford, on multiple
24  occasions, told us she was unable to work on
25  things, and that began back in fall of 2000- --

Page 32

Dustin Norris

1
2  fall of 2020 -- late summer 2020, actually.  And
3  so she was not accessible for things like this.
4  Q    How about Mr. Post?  Do you know who
5  Mr. Post was employed by in 2018 and 2019?
6  A    2018 and '19, he was employed by Highland
7  Capital Management, LP.
8  Q    Do you know whether, in your conversations
9  with him, does he have any personal knowledge
10  regarding the NAV error?
11  A    Yes.
12  Q    Was he involved in any of the issues
13  surrounding the NAV error?
14  A    He was knowledgeable -- as he was
15  chief -- chief compliance officer of the retail
16  advisers at that time, and interacted with the
17  HCMLP employees and the board regarding the NAV
18  error, he also -- in your schedules, you'll notice
19  in one of the memos, he participated in calls with
20  the SEC, and so he was -- he was involved in the
21  process of the NAV error and understood and worked
22  with the other HCMLP employees, which naturally
23  they would.  We had outsourced valuation services
24  to HCMLP.  We had outsourced legal and compliance
25  to HCMLP, and as such, that was all part of what

Page 33

Dustin Norris

1
2  they were working on.
3  Q    Did -- did -- were there any restrictions
4  or limitations on HCMFA's ability to speak with
5  Mr. Post prior to March 1st, 2021?
6  A    So once -- so Jason -- one important
7  component here is Jason Post did leave the debtor,
8  and working with Mr. Seery, I believe, to then
9  leave and become an employee of NexPoint Advisors,
10  and that was at the request of our retail board,
11  as there were restrictions on Mr. Post at that
12  time.
13  And as chief compliance officer of the
14  funds, the board had become very uncomfortable
15  that they had restrictions on Mr. Post.  And so it
16  was in everybody's interest to allow him to become
17  an employee of NexPoint Advisors, and so that was
18  late 2020, I believe.  I don't know the exact
19  date.  And at that time, there were certain things
20  that Jason was able to then help the adviser with,
21  but there were still restrictions.  And he had
22  limited access to his prior data.  He left the
23  debtor, but he didn't have -- I believe he had
24  restrictions on what he could access in the
25  information.

Page 34

Dustin Norris

1
2  Q    Okay.  But it is fair to say that between
3  January 21st, 2021, the day that the complaint was
4  filed, and March 1st, 2021, the date that HCMFA
5  filed its original answer, HCMFA had complete and
6  unfettered access to you, to Mr. Dondero, and
7  Mr. Post; correct?
8  A    Again, the complete and unfettered access
9  on the Jason Post aspect, they could have talked
10  to him.  I'm not sure if there were any other
11  restrictions related to what he had or information
12  he had or based on his prior role of the debtor,
13  he was restricted on what he could or couldn't
14  talk about, if he had any lease agreement.  I'm
15  not certain on that.  But, yes, we could talk
16  to – or HCMFA could talk to Mr. Post.
17  Q    Okay.  And the topics that you just raised
18  are speculation on your part; correct?
19  A    It is.
20  Q    You're not aware of any restriction of –
21  you don't have any knowledge of any restriction or
22  limitation placed on HCMFA in respect of its
23  ability to communicate with Mr. Post between
24  January 21st, 2021, and March 1st, 2021; correct?
25  A    Based on my personal knowledge, no.  There

Page 35

Dustin Norris

1
2  could have been something, but –
3  Q    Okay.  I'm just asking about your
4  knowledge, not what could have been.
5       All right.  So we're going to use
6  March 1st, 2021, as the answer date.
7       Are you aware of any document that
8  HCMFA filed with the bankruptcy court prior to the
9  answer date that concerns or relates in any way to
10  the notes?
11  A    I'm thinking if I'm aware.
12       Not that I'm aware of.
13  Q    Are you aware – withdrawn.
14       Do you know what a "pleading" is, if I
15  use that phrase?
16  A    I believe so.  These are the answers that
17  we gave.  The first answer, the amended answer,
18  and the second amended answer, that – I believe
19  those are the two pleadings.  Is that correct?
20  Q    You know what?  I think my first question
21  was broad enough, because I just used the word
22  "document," so I'm going to let that sit.
23       Are you aware of any argument that
24  anybody ever made on behalf of HCMFA prior to the
25  answer date that concerned or related to any of

Page 36

Dustin Norris

1
2  the notes?
3  A    And you mean an argument to the Court?
4  Q    Yes.
5  A    Not that I'm aware of.
6  Q    Okay.  Are you aware of any statement of
7  any kind that was made to the bankruptcy court
8  prior to the answer date that concerned or related
9  in any way to the notes?
10  A    Not that I can remember.  But there's
11  obviously been a lot of documents with the Court,
12  but not that I'm aware of.
13  Q    Right.  But you – did you do anything to
14  prepare yourself to answer questions on Topic 12?
15  A    Yes.
16  Q    And do you believe that you're able to
17  competently answer my questions relating to
18  Topic 12 as HCMFA's 30(b)(6) witness?
19  A    I am.  But I guess in this regard you're
20  asking to my knowledge.  And so, I guess, that –
21  are you asking my personal knowledge or as my
22  knowledge as a representative of the company?
23  Q    All right.  I appreciate that.
24       I am only examining you today in your
25  capacity as a 30(b)(6) witness.

Page 37

Dustin Norris

1
2  A    Okay.  That makes sense.  Okay.
3  Q    And so if I use the phrase "you," just as
4  we did in the deposition notice, I'm really
5  referring to HCMFA; is that fair?
6  A    That's fair.
7  Q    Okay.  So let me just ask the questions
8  again with that clarification.
9       Are you aware, in your capacity as the
10  30(b)(6) witness today, of any document that was
11  ever filed on behalf of HCMFA prior to the answer
12  date that concerns or relates to the notes?
13  A    No.
14  Q    Are you aware, in your capacity as the
15  HCMFA 30(b)(6) witness, of any argument that was
16  ever made to the Court prior to the answer date
17  that concerns or relates in any way to the notes?
18  A    No.
19  Q    Are you aware of – again, when I use the
20  phrase "you," I'm referring to HCMFA, just to
21  shorten these questions a little bit.
22       Are you aware of any statement that
23  was ever made on your behalf to the bankruptcy
24  court prior to the answer date that concerns or
25  relates in any way to the notes?

Page 38

Dustin Norris

1
2  A    Not that I recall.
3  Q    Okay. When did HCMFA first learn of the
4  existence of the notes?
5  A    So HCMFA's position is that they learned
6  of them when they were demanded, or after they
7  were demanded. I don't even know that when we
8  received -- or who they were sent to, but it was
9  after they were demanded.
10  Q    Okay. And do you recall when they were
11  demanded?
12  A    I don't have the exact date. If you could
13  remind me or show a document, that might be
14  helpful. I don't know if you have the demand, or
15  if that's one of the documents, but I don't
16  remember the specific date.
17      MR. MORRIS: Can we put Exhibit 1
18  up on the screen?
19      It's actually the complaint -- the
20  original complaint, sir.
21      (Exhibit 1 tendered.)
22  BY MR. MORRIS:
23  Q    If you go to Exhibit 3, do you see there's
24  a demand letter there?
25  A    Yes.

Page 39

Dustin Norris

1
2  Q    And you've seen that before; right?
3  A    I have.
4  Q    Okay. And are you -- do you see that it
5  was sent to Mr. Waterhouse?
6  A    Yes.
7  Q    And Mr. Waterhouse was the treasurer of
8  HCMFA on December 3rd, 2020; correct?
9  A    Correct.
10  Q    Okay. So is it fair to say that HCMFA
11  knew of the existence of the notes on
12  December 3rd, 2020?
13  A    It's safe to say that Frank Waterhouse
14  received this. I'm not sure the date exactly
15  when -- when the company became aware. Frank,
16  yes, is an officer. He's also -- the irony here,
17  he's CFO of the debtor who is demanding this, so
18  he's demanding it from himself. I know it's
19  coming from -- from who is sending it, but at this
20  time, I don't know when Mr. Dondero or other
21  officers became aware of it. Sometime after
22  December 3rd.
23  Q    Okay. Do you know if HCMFA ever responded
24  to this demand letter prior to the time the
25  complaint was filed on January 21st, 2021?

Page 40

Dustin Norris

1
2  A    I don't believe they did.
3  Q    So it's fair to say that nobody on behalf
4  of HCMFA ever told any representative of Highland
5  that it was previously unaware of the existence of
6  the notes?
7  A    Sorry. Can you repeat that one more time?
8  Q    HCMFA never responded to this letter prior
9  to the commencement of the lawsuit; right?
10  A    Not to my knowledge, didn't respond to
11  HCMLP on this.
12  Q    Is there a reason why they didn't reach
13  out to Highland to let Highland know that it
14  disputed the existence of these notes?
15  A    I don't know if there's a reason, but I do
16  know, during this time period, you'll recall,
17  December and January, leading up to the actual
18  demand -- or the initial complaint, there was a
19  lot going on. We were almost in daily depositions
20  and court hearings. There was a hearing
21  injunction handed out against Jim. There was a
22  restraining order. There -- TRO. There were
23  lawsuits against the advisers. And so there was a
24  lot going on, and I think this was put back in the
25  priority line.

Page 41

Dustin Norris

1
2      Again, all of the compliance and legal
3  functions at this time, December 2020, were being
4  outsourced to HCMLP, and we were told they were
5  unable to help with anything that was inimical to
6  the debtor. And so there were no employees of
7  HCMFA that were legal compliance professionals,
8  and so this -- this was -- I guess -- this is my
9  speculation -- was put in the back of the line, or
10  further back from the actual litigation that they
11  were defending or working against the daily
12  depositions and coordinating.
13  Q    Do you have any reason to believe, as you
14  sit here right now, that Mr. Waterhouse did not
15  receive this demand letter on or about
16  December 3rd, 2020?
17  A    I don't know. I don't have any reason to
18  believe that, but I don't know.
19  Q    Okay.
20  A    And I don't recall what he testified to in
21  regard to receiving the demand, but we see here it
22  was sent to him. We can assume it got sent to
23  him.
24  Q    Okay. Let me ask the question again, and
25  I would appreciate you listening carefully to my

Page 42

Dustin Norris

1 question.
2 As HCMFA's 30(b)(6) witness today,
3 does HCMFA contend that this letter was not
4 received by Mr. Waterhouse on or about
5 December 3rd, 2020?
6 MR. RUKAVINA: Well, that's not our
7 contention. We agree that it was received
8 on or about that date.
9 MR. MORRIS: Okay.
10 THE WITNESS: Yeah. That's --
11 yeah.
12 BY MR. MORRIS:
13 Q Okay. HCMFA actually knew about the notes
14 just weeks after they were signed; correct?
15 MR. RUKAVINA: Objection; form.
16 THE WITNESS: So the debtor
17 employees who created the notes knew about
18 them, but it was not knowledge of HCMFA.
19 Those were all Highland Capital
20 Management, LP, employees.
21 BY MR. MORRIS:
22 Q So it's your testimony that HCMFA had no
23 knowledge of the existence of the notes in
24 June 2019; is that correct?

Page 43

Dustin Norris

1 A June 2019.
2 Correct.
3 Q As the executive vice president of HCMFA,
4 have you ever reviewed HCMFA's audited financial
5 statements?
6 A I have not.
7 Q Is there anybody on behalf of HCMFA who is
8 charged with the responsibility of reading HCMFA's
9 audited financial statements?
10 A Yeah. We -- again, the key here is we
11 outsourced finance, accounting, back-office
12 functions. It includes financial statement
13 preparation. The treasurer of HCMFA is an HCMLP
14 employee, Frank Waterhouse, at that time, and at
15 all times that we're talking about. And so with
16 we -- and Frank is a professional, and his team
17 are professionals, right? We outsource to an
18 accounting group to prepare and oversee, work with
19 the auditors in preparation of those financials.
20 And so they were tasked with that. And we relied
21 on them. And there was not a specialist during
22 this time period that did that.
23 Q Does Frank Waterhouse have any
24 responsibility, as the treasurer of HCMFA, to make

Page 44

Dustin Norris

1 sure that HCMFA's audited financial statements are
2 true, accurate, and reliable?
3 A Him and his team, yeah. We actually --
4 that's what we rely on them for.
5 Q And did you rely on him not only in his
6 capacity as an employee of Highland, but in his
7 capacity as the treasurer of HCMFA?
8 A Yeah, he was -- let's take the first --
9 as a -- in his capacity under the shared services
10 agreement, okay, doing accounting, books and
11 records, audited -- audit support, yes, we relied
12 on him in that capacity. And he also, as an HCMLP
13 employee, served as a treasurer of HCMFA. In that
14 role, we would expect him to oversee the
15 financials.
16 MR. MORRIS: Okay. And move to
17 strike.
18 BY MR. MORRIS:
19 Q And I'm going to ask you very
20 specifically: As HCMFA's representative today,
21 did Frank Waterhouse have a duty as the treasurer
22 of HCMFA to make sure that HCMFA's audited
23 financial statements were true and accurate?
24 A That -- very specific from the treasurer

Page 45

Dustin Norris

1 role, I would say the treasurer role was to
2 oversee the financial aspects of the advisers.
3 Q And was one of those aspects HCMFA's
4 audited financial statements?
5 A As -- yeah. And he was -- again, I'll
6 reiterate, he was the CFO of Highland who was
7 tasked with creating the financial statements for
8 the advisers.
9 MR. MORRIS: Okay. I'm again going
10 to move to strike.
11 BY MR. MORRIS:
12 Q I'm not asking about his role as CFO of
13 Highland. I'm limiting it strictly to his role as
14 the treasurer of HCMFA.
15 A And I don't have --
16 Q Did Frank -- let me ask my question.
17 Is any officer of HCMFA responsible
18 for making sure that HCMFA's audited financial
19 statements are true and accurate?
20 A I don't know, but I would assume -- and I
21 don't want to make assumptions here as the
22 representative -- but I would assume that the
23 treasurer would have that role.
24 Q Okay. And what is your assumption based

Appx. 03025

Dustin Norris

1   on?
2   A    Based on the understanding of what a
3   treasurer role would be.  But I – I don't have
4   any – I don't have any knowledge, I'm not
5   representing that we have any roles and
6   responsibilities or defined procedures that the
7   treasurer does this, that, or the other.
8   Q    Okay.  Have you – as you sit here right
9   now, have you ever seen HCMFA's audited financial
10  statements for the period ending December 31st,
11  2018?
12  A    I saw them in the materials that were
13  provided in your schedules, I believe.
14  Q    Okay.  Let's –
15  A    That was the first time.
16  Q    Let's take a quick look at it.
17      MR. MORRIS:  If we could put up on
18  the screen the document that's been marked
19  Exhibit 45.
20      (Exhibit 45 tendered.)
21  BY MR. MORRIS:
22  Q    Okay.  And do you see that this is the
23  first page of HCMFA's audited financial statements
24  for the period ending December 31st, 2018?

Dustin Norris

1   A    I do.
2       MR. MORRIS:  Okay.  And if we could
3   just scroll, I think, to the third page.
4   BY MR. MORRIS:
5   Q    Do you see that it's signed by
6   PricewaterhouseCoopers on June 3rd, 2019?
7   A    I see that the audit opinion is signed by
8   them, yes.
9   Q    Correct.  And – and you're aware that
10  PricewaterhouseCoopers was the outside auditor
11  retained by HCMFA to conduct the audit of HCMFA's
12  financial statements; correct?
13  A    Given that they gave an opinion, yes.
14  Q    Okay.  And you have no reason to believe
15  that the document that's up on the screen is
16  anything other than HCMFA's audited financial
17  statements for the period ending December 31st,
18  2018, do you?
19      And we're happy to – I'm happy to scroll
20  through whatever you need to see.
21  A    Yeah.  And there they're distinguishing –
22  you have an audit opinion and having audited
23  financials, I assume that you have all that is
24  here.  You showed me the first page of the

Dustin Norris

1   financials, which –
2   Q    Yeah.  Yeah.  Let's –
3   A    So I'm assuming that's the –
4   Q    Let's scroll down just a little bit.
5       You can see that the next page is
6   HCMFA's balance sheet.  Do you see that?
7   A    I do.
8   Q    Okay.
9       MR. MORRIS:  Can we go to
10  "Subsequent Events"?  I think it's
11  Page 17.
12  BY MR. MORRIS:
13  Q    Have you seen this page of HCMFA's audited
14  financial statements before?
15  A    Just in preparation for this.
16  Q    Do you understand that in the "Subsequent
17  Events" section, the notes are described in the
18  audited financial statements?
19  A    There is a reference to promissory notes
20  in aggregate of $7.4 million, yes.
21  Q    And those are the two notes that Highland
22  is suing on; correct?
23  A    I would assume that's the case, because
24  the dollar amounts line up.  But I don't have the

Dustin Norris

1   backup, but I would assume that's the case.
2   Q    And not only do the dollar amounts line
3   up, but do you see that the statement in
4   "Subsequent Events" specifically identifies the
5   notes as having been issued in the year 2019?
6   A    Yes.
7   Q    And are you aware of any notes that
8   anybody in the world contends were signed by HCMFA
9   between January 1st, 2019, and June 3rd, 2019,
10  other than the two notes that Highland is suing
11  on?
12  A    No.
13  Q    Okay.  So can you conclude, as HCMFA's
14  30(b)(6) witness, that the notes that are
15  described in the subsequent events are the very
16  notes that are the subject of the pending lawsuit?
17  A    That appears to be the case.
18  Q    Okay.  And so it's also fair to say, then,
19  that HCMFA does not dispute that its own audited
20  financial statements that were the subject of a
21  June 3rd, 2019, opinion by PricewaterhouseCoopers
22  disclosed the existence of the notes at issue;
23  correct?
24  A    No.  We don't dispute that that was

Dustin Norris

1 included in the financial statements. You know,
2 I – I think we're going to get into it in our
3 affirmative defenses, but we dispute that the
4 notes were actually valid notes, and we would say
5 that this was an error. These should not have
6 been included, but were included in good faith by
7 the accounting team who thought that they were
8 valid notes.
9 Q    Okay.
10 A    So –
11            MR. MORRIS: I move to strike
12    everything other than the first portion of
13    your answer that was responsive to my
14    question.
15 BY MR. MORRIS:
16 Q    HCMFA does not dispute that it received
17 $2.4 million from Highland on May 2nd, does it?
18 A    No.
19 Q    HCMFA does not dispute that it received
20 $5 million on May 3rd, 2019, does it?
21 A    No.
22 Q    Let's just confirm that, if we can.
23            MR. MORRIS: Can we put on the
24    screen a document that's been marked as

Dustin Norris

1 Exhibit 147?
2            (Exhibit 147 tendered.)
3 BY MR. MORRIS:
4 Q    Okay. Do you see that this is – or at
5 least this appears to be a bank account statement?
6 A    Yes. BBVA Compass is a bank, so I'll take
7 your representation it's a statement.
8            MR. MORRIS: All right. And if we
9    can just scroll down.
10            All right. Stop right there.
11 BY MR. MORRIS:
12 Q    Do you see that there's a reference on
13 May 2nd to a 2.4-million-dollar transfer?
14 A    I do.
15 Q    Okay. And is that consistent with your
16 testimony just now that on May 2nd, Highland
17 transferred $2.4 million to HCMFA?
18 A    That's correct.
19 Q    And lower on the page, the statement shows
20 a transfer of $5 million on May 3rd; correct?
21 A    Yes.
22 Q    And that's the payment that HCMFA
23 acknowledged – acknowledges receiving from
24 Highland on that day; correct?

Dustin Norris

1 A    Is this HCMFA's bank statement or is this
2 HCMLP's?
3 Q    No. It's HCMLP's.
4 A    Okay. It just says "Highland Capital
5 Management," and I'm assuming it lines up – I'm
6 assuming this is the transfer, but –
7 Q    Okay.
8 A    – I can't confirm an entity. But we're
9 not denying that there was cash received those
10 dates from HCMLP.
11 Q    Okay. And are you aware –
12            MR. MORRIS: We can take this down
13    now.
14 BY MR. MORRIS:
15 Q    Do you recall that Topic Number 10 asks
16 for a witness who can testify about the accounting
17 of these transfers?
18 A    Uh-huh. Yup.
19 Q    Are you prepared to testify on Topic
20 Number 10?
21 A    Yes.
22 Q    Can you tell me how HCMFA accounted for
23 these payments on its books and records?
24 A    I can, yeah.

Dustin Norris

1            So my understanding of the company's
2 position is that – and – and it may be helpful
3 to provide some additional color leading up to the
4 accounting. I don't know if we want to address
5 that later in our affirmative defenses, if you
6 have a preference there.
7 Q    I'd just like you to – maybe it's my
8 question, but I just want you to focus on my
9 question.
10 A    Uh-huh.
11 Q    And that is: First, do you know how HCMFA
12 accounted for these two payments in its books and
13 records?
14 A    Yeah. So the HCMLP employees who were
15 tasked with creating books and records of the
16 adviser, the accounting team recorded, we – we –
17 our position is that is an incorrect recording of
18 a payable to HCMLP. And so there was a payable
19 booked on the balance sheet of HCMFA by the HCMLP
20 accounting team.
21            MR. MORRIS: Okay. I'm going to
22    move to strike.
23 BY MR. MORRIS:
24 Q    I – I'd appreciate not having the

Dustin Norris

1 commentary. Your counsel can ask those questions
2 or if it's responsive to a question. I'm just
3 asking a very simple question.
4 A    Yup.
5 Q    How – how did HCMFA record these payments
6 on its books and records?
7 A    Yeah. My understanding is they recorded a
8 payable to HCMLP, a liability.
9 Q    And do you know when HCMFA first
10 discovered that the payments were booked on its
11 books and records as a liability.
12 A    Our position is that that was revealed
13 through after the – sorry – after the demand.
14 And as we began to get additional information –
15 particularly, and I would refer you to
16 Mr. Sauter's declaration, our amended response,
17 and our second amended response that was filed
18 yesterday regarding each of those time periods.
19 But it was after the demand we found out how it
20 was booked.
21 Q    Okay. So just to simplify this: HCMFA's
22 books and records recorded the transfers on
23 May 2nd and May 3rd as liabilities from HCMFA to
24 Highland; correct?

Dustin Norris

1 A    So my understanding is the audited
2 financials recorded in a subsequent event – you
3 showed me that – they recorded a subsequent
4 event. The balance sheet as of 12/31/2018 wasn't
5 amended because it was a subsequent event. But on
6 their books and records at that time, or
7 subsequent to that, they recorded a liability.
8 Q    And – and do you know if that liability
9 was recorded contemporaneously in May of 2019?
10 A    I don't know.
11 Q    But it's – it's HCMFA's position that,
12 notwithstanding the recording of the liability on
13 it's books and records, that HCMFA didn't learn of
14 that fact until after the demand letter was sent
15 in December of 2020.
16      Do I have that right?
17 A    Correct.
18 Q    Okay. Have there been any changes in
19 HCMFA's books and records since it learned of the
20 promise – of the existence of the promise –
21 withdrawn.
22      Has – has HCMFA changed its books and
23 records after learning that the payments were
24 recorded as liabilities?

Dustin Norris

1 A    I'm not aware of how it's been treated
2 since then.
3 Q    Okay.
4      MR. RUKAVINA: And, John, no
5 urgency, but find some time in the near
6 future for the restroom break. The
7 morning coffee is working its magic.
8      MR. MORRIS: Happy to do it right
9 now, Davor.
10      THE WITNESS: I can use that, too.
11 I'm almost through my water bottle.
12      MR. MORRIS: All right. So, look,
13 it's 12:05. Let's just come back at 12:15
14 or 11:15.
15      THE WITNESS: Thank you.
16      MR. MORRIS: Thanks so much.
17 (Recess from 11:05 a.m. to 11:16 a.m. CST)
18 BY MR. MORRIS:
19 Q    To the best of your knowledge, has HCMFA
20 ever changed its books and records in order to
21 reverse the booking of the payments that were made
22 by Highland in May from liabilities to something
23 else?
24 A    I'm not aware of how the accounting

Dustin Norris

1 entries have been done since then, but – yeah,
2 I'm not aware.
3 Q    Okay. But you'll – you'll agree that the
4 accounting for these two payments was among the
5 30(b)(6) topics, correct, Number 11 – Number 10?
6 A    Yes.
7 Q    And as the 30(b)(6) witness for HCMFA, can
8 you confirm that, to the best of your knowledge,
9 those payments were booked as liabilities and the
10 booking of those payments as – as liabilities has
11 not changed?
12 A    To the best of my knowledge, they were
13 booked as liabilities, and I don't know how they
14 have been treated. There's not been a year-end
15 audit for 2021, and I'm sure the accountants and
16 auditors will determine based on current facts and
17 circumstances how those will be reported.
18 Q    Okay. But as of today, you have no
19 knowledge that the booking of those payments as
20 liabilities has ever been changed; correct?
21 A    Those – there's no financial statements
22 that are prepared, I believe, intra-year, during
23 the year, for audited purposes. And so, you know,
24 that – that would be, I'm sure, determined based

Page 58

Dustin Norris

1    on any audit needs.
2    Q    Does HCMFA maintain an accounts payable
3    ledger?
4    A    I'm sure it does.
5    Q    Did you do anything to try to ascertain
6    whether or not these notes appear as liabilities
7    on the accounts payable ledger?
8    A    As current accounts payable ledger?
9    Q    Yeah.
10   A    No.
11   Q    Did you -- other than the audited
12   financial statements, did you take any steps to
13   ascertain how these payments were recorded in
14   HCMFA's books and records, or is -- or is it only
15   on the audited financial statements?
16   A    So at the time that they were recorded, we
17   know they were recorded as liabilities on the
18   books and records.
19   Q    And when you say that it was recorded as a
20   liability in the books and records, where in the
21   books and records was it recorded as a liability?
22   A    Meaning on the balance sheet?
23   Q    Okay.  So the balance sheet is one place;
24   is that right?
25

Page 59

Dustin Norris

1    A    Yes.  We record liabilities on the balance
2    sheet.
3    Q    Okay.  Did HCMFA complete its audit for
4    2019?
5    A    I don't -- not that I'm aware of.  I don't
6    believe they had an audit for 2019.
7    Q    Okay.  Now, HCMFA contends that the
8    payments were -- should not have been booked as a
9    loan because they were supposed to be compensation
10   for the error that Highland made in connection
11   with the NAV error; correct?
12   A    Correct.
13   Q    Okay.  Did HCMFA ever issue an invoice or
14   a bill of any kind to Highland?
15   A    Not that I'm aware of.
16   Q    Okay.  Is there anything in HCMFA's books
17   and records that reflects its position that the
18   payments should not have been billed as
19   liabilities, but they should have been billed as
20   income?
21   A    As compensation?
22   Q    Yeah.
23   A    Yes.
24           Anything in their records?
25

Page 60

Dustin Norris

1    Q    Yes.
2    A    I -- I would refer you to the testimony of
3    Mr. Dondero and Mr. Waterhouse, who both testified
4    to this; Mr. Dondero that it was compensation, and
5    that Frank testified in his deposition that he
6    don't -- didn't remember Mr. Dondero saying it was
7    a loan, and that Mr. Dondero told him to get the
8    money from Highland.  And so it's -- it's -- that
9    is on the record and in the record.
10          But in HCMFA's other records, we have
11   the president of HCMLP, Jim Dondero, who made that
12   transfer and has said that that is for
13   compensation.
14          So there is -- but there is -- I
15   wouldn't -- I would be surprised to see some kind
16   of a settlement agreement or invoice with -- to
17   affiliates.
18          MR. MORRIS:  Okay.  I move to
19   strike.
20   BY MR. MORRIS:
21   Q    And my answer -- my question is really
22   simple.
23          Is there anything in HCMFA's books and
24   records that reflects its position that these
25

Page 61

Dustin Norris

1    payments were supposed to be made as compensation
2    rather than in the form of loans?
3    A    I -- I would say that the pleadings are a
4    part of our books and records now.  I would say
5    depositions.  And within that, it is well
6    documented.
7    Q    Okay.  Let me ask a different question
8    then.
9           Remember we were using the answer date
10   as being March 1st, 2021.
11   A    Correct.
12   Q    Is there anything in HCMFA's books and
13   records that was created prior to March 1st, 2021,
14   that corroborates HCMFA's position that the
15   payments were intended to be compensation and not
16   in the form of a loan?
17   A    Yeah, and I would, again, refer you to
18   DC's -- what do you call it -- declaration.  That
19   prior to that, we didn't have access to -- to,
20   largely, our books and records as that was
21   outsourced to Highland Capital Management, LP, and
22   their employees, legal, compliance, and
23   accounting.  So our position is we did not have
24   anything at that point related to this agreement.
25

**Appx. 03029**

Dustin Norris

MR. MORRIS: Okay. I move to strike.

BY MR. MORRIS:

Q And listen carefully to my question.

Is HCMFA aware of anything that was created prior to the answer date that corroborates its position today that the payments were intended to be treated as compensation rather than a loan?

A I – I think as far as books and records go, we have NAV error memos, we have communication with the SEC. Right?

There's – there is a lot of information related to the services that were performed under the shared services agreement, were for valuation purposes that Highland had created and was responsible for the valuation process, and that is a host of documents that are in the record, yes.

MR. MORRIS: Okay. I – I move to strike.

BY MR. MORRIS:

Q I'm asking about accounting. Maybe it's my fault. Okay? I'll – I'll take responsibility for this. I'm asking as a matter of accounting.



Dustin Norris

I'm still on 30(b)(6) Topic Number 10.

Is there anything in HCMFA's books and records that was created before the answer date that shows that the payment should have been accounted for as compensation rather than as a loan?

A As far as an accounting record, I wouldn't expect there to be, because the accountant function was outsourced to HCMLP, and – and I would refer you to our latest response and our amended response of – of what was discovered and found throughout the process here.

The accountants recorded a liability and they thought it should be liability. And so, no, there wasn't anything, to my knowledge, prior to that that was in the accounting books and records. And I – you know, I'm not surprised there wasn't, because of the facts that you'll – you'll see in our amended answers.

Q Okay. Do you know whether, if it was intended to be compensation, that HCMFA's income statement should have shown the inflow of the $7.4 million?

A I don't know how it would be reported for



Dustin Norris

accounting purposes. I – I do have an accounting background, but I haven't done accounting in a long time, and I'm not an expert in adviser financial statements. So I would say I don't have – and I guess – I guess that – stepping back and answering on behalf of the company here, I don't have a knowledge of how that would be recorded for income statement purposes.

Q Okay.

A But it would – it would be compensation that would be reported –

Q Okay.

A – somewhere in the financial statements.

Q So it's your testimony today, as HCMFA's 30(b)(6) witness, that HCMFA was unaware that its audited financial statements disclosed these notes until after the lawsuit was commenced.

Do I have that right?

A That's correct.

Q And it's your position today, as HCMFA's 30(b)(6) witness, that HCMFA was unaware that the payments that were made by Highland were booked as liabilities until sometime after the lawsuit was commenced; correct?



Dustin Norris

A Yes, that's correct. The accounting function was outsourced to HCMLP.

Q Okay. And there's – was there anybody – was there any officer of HCMFA who had responsibility for reviewing HCMFA's balance sheet?

A I believe I already answered this earlier.

Q I actually asked the question on the audited financial statements.

A Okay.

Q Now I'm going to ask specifically. Is there anybody who served as an officer of HCMFA who had the responsibility of making sure that HCMFA's balance sheets were true and accurate?

A Yes. So Frank Waterhouse and his team, Frank was the named treasurer of HCMFA, and his role at HCMLP, as a service provider, would have had that responsibility along with his team.

Q Okay. Let's go to the next topic, Topic 11. Do you see Topic 11 refers to "communications in 2020 with any retail board –

A Yes.

Q – concerning the amounts due and owing to Highland"?

Dustin Norris

2  A   Yes, I do.

3  Q   Okay.  HCMFA is a financial advisory firm;

4  correct?

5  A   It is.

6  Q   And it provides advisory services to

7  certain funds; correct?

8  A   It does.

9  Q   And those advisory services are provided

10  pursuant to written agreements; correct?

11  A   They are.

12  Q   And those agreements are subject to annual

13  review; correct?

14  A   They are.

15  Q   And those agreements the principal source

16  of HCMFA's revenue?

17  A   Yes, I believe so.

18  Q   Okay.  It's among the most important

19  contracts HCMFA has; correct?

20  A   Yes.

21  Q   In fact, it's the reason for HCMFA's

22  existence, is that fair, is to serve the funds?

23  A   Largely, yes.

24  Q   And the funds are managed by boards;

25  correct?

Dustin Norris

2  A   Correct.

3  Q   And can we refer to the boards that manage

4  the funds that are served by the advisers as "the

5  retail board"?

6  A   Yes.

7  Q   Okay.  Did you participate -- are you

8  aware that in the fall of 2020 the retail board

9  conducted a review in connection with the

10  determination as to whether or not to renew

11  HCMFA's contracts?

12  A   I am aware, yes.

13  Q   Did you participate in that process?

14  A   I did, in some -- in some parts, yes.

15  Q   What parts did you participate in?

16  A   Yeah, so I attended the board meetings in

17  relation to -- we call this the 15(c) analysis.

18  And so it's Section 15(c) of the 1940 Act requires

19  the board to determine and renew the contracts on

20  an annual basis.  And so they look at a number of

21  factors.  And there's, I believe, certain case law

22  that dictates the things that they should look at:

23  Quality of services, performance, fees.

24          And so my aspect -- the biggest part

25  of my contribution is to talk about the

Dustin Norris

2  performance of the funds, how they performed

3  during the year.  We hire an outside third party

4  to come in and talk about performance and fees.  I

5  help provide insight, talk about -- as I oversee

6  the sales and business development of the firm, I

7  talk about inflows and outflows, which help --

8  helps impact the economies of scale funds.  We

9  have certain funds that are shrinking, some that

10  are growing.  So talking about future, talking

11  about mergers, talking about different aspects of

12  that.

13          And so my -- mine is more of the sales

14  business development function and regarding the

15  services.  One of the things that we do as the

16  adviser is we, again -- they have to determine

17  that the quality of services we're providing are

18  sufficient, and so they have to get comfortable

19  with the various functions.

20  Q   Okay.  Who else on behalf of HCMFA

21  participated in the 15(c) analysis that you've

22  just described?

23  A   Yeah, so as -- again, going back to the

24  shared services agreement, I point you to the

25  services that are provided by HCMLP.  In large

Dustin Norris

2  part, this process is managed and run by the HCMLP

3  employees as part of that shared services.  Legal

4  and compliance help draft the memos.  They are --

5  Q   And I'm going to interrupt you, and I

6  really apologize for doing that.  I'm not asking

7  about HCMLP.

8  A   Yeah.

9  Q   These are -- these are HCMFA's contracts;

10  correct?

11  A   They are.

12  Q   And they're the most important contracts

13  that HCMFA has; correct?

14  A   Correct.

15  Q   Okay.  So who -- which officers of HCMFA

16  are involved in the 15(c) analysis?

17  A   Yeah, one -- going back to -- to clarify

18  on your -- you know, this is the most important

19  thing, you know, that we have, it is, and as such

20  we have -- a lot of those functions, and to talk

21  about HCMFA's role, we have front-office

22  investment professionals who join those meetings

23  to talk about the funds and performance.  The

24  aspects of the adviser that we provide and source

25  is the management of the funds:  The performance,

Page 70

Dustin Norris

1    the investment selection.  And then we bring in
2    HCMLP to provide the various other services.  And
3    so they are a huge part of that.  To say that –
4    yeah, it's not – they are legal, compliance,
5    accounting, finance, back office, settlement.
6    Those are all functions that they're providing.
7  Q    I know – I appreciate that they're
8    functions that they play under the shared services
9    agreement.
10  A    Yup.
11  Q    Let me – let me move on.
12  A    Okay.  Go ahead.
13  Q    In October 2020, HCMFA informed the retail
14   board that HCMFA was obligated to pay Highland the
15   outstanding principal amount due under the notes;
16   correct?
17         MR. RUKAVINA:  Objection; form.
18         THE WITNESS:  Yeah, the
19       obligated – I would – sorry.  Can you
20       ask the question again?
21  BY MR. MORRIS:
22  Q    Sure.
23         In October 2020, HCMFA informed the
24   retail board of the existence of the notes;

Page 71

Dustin Norris

1    correct?
2  A    Not that I'm aware of.  If you have
3    something you could – you know, a document or
4    something that you're thinking of?
5  Q    So you participated in the 15(c) process,
6    and you have no knowledge of HCMFA informing the
7    retail board of the existence of the notes?
8  A    Of these notes?  No.  And I would say that
9    there was a question from the retail board posed
10   to the advisers, which we passed along to HCMLP,
11   which included Lauren Thedford as an HCMLP
12   employee and Frank Waterhouse, is:  Were there any
13   liabilities to – owed to Highland?
14  Q    So let's take a look – I'm sorry.  Go
15   ahead.
16  A    No, go ahead.
17  Q    I was going to say, let's take a look at
18   that.
19         MR. MORRIS:  So if we could put up
20       on the screen Exhibit 59.
21         (Exhibit 59 tendered.)
22  BY MR. MORRIS:
23  Q    Have you seen this document before, sir?
24  A    I have.

Page 72

Dustin Norris

1  Q    And this is the report that the advisers
2    gave to the retail board in October 2020 as part
3    of the 15(c) analysis; correct?
4  A    Yes, working closely with HCMLP in the
5    accounting, compliance, and legal function did
6    draft this.
7  Q    Okay.  And who – who on behalf of the
8    advisers authorized the sending of this memo?
9  A    I don't know that there's a formal
10   authorization.  Lauren Thedford, who was the
11   secretary of the advisers and an HCMLP employee,
12   helped prepare the memo along with the rest of the
13   legal and compliance team.  Thomas Surgent was
14   probably involved.
15         MR. MORRIS:  Okay.  I'm going to
16       move to strike.
17  BY MR. MORRIS:
18  Q    I don't want to know who was probably
19   involved.  I actually asked a very specific
20   question, and if you don't know, please just say
21   you don't know.
22         Who on behalf of the advisers
23   authorized the sending of this memo to the retail
24   board?

Page 73

Dustin Norris

1  A    I don't know.
2  Q    Did anybody on behalf of the advisers ever
3    suggest that this memo was wrong or inaccurate in
4    any way to the best of your knowledge?
5  A    At that time?  Is that what you mean?
6  Q    Yes.
7  A    No, not – not to my knowledge.
8  Q    Okay.  When did you see this memo for the
9    first time?
10  A    I may have been copied on it at the time.
11   I don't remember if I read it, but I did review
12   it – and actually, I didn't review the whole
13   memo.  I reviewed the one email that was related
14   to the note payable in this.  So I don't know that
15   I read the whole memo.
16  Q    So – so –
17         MR. MORRIS:  Can we see how long
18       the memo is?
19  BY MR. MORRIS:
20  Q    So it's two pages, and it's got some
21   charts; is that fair?
22  A    That's fair.
23  Q    And in October 2020, you were the
24   executive vice president of every single entity

Page 74

Dustin Norris

1    that this email is being sent to and from;
2    correct?
3    A    I'm looking at the entities.
4         I'm executive vice president of most
5    of the entities.
6    Q    Okay. You're the executive vice president
7    of each of the entities that are sending this
8    memo; correct?
9    A    No. Not NexPoint Securities.
10   Q    I appreciate that. Thank you for the
11   clarification.
12        Did you review this before it was
13   sent?
14   A    I don't remember.
15   Q    Did you take any steps to make sure that
16   it was accurate?
17   A    Probably not. And that wouldn't have been
18   my function. We had a legal and compliance team
19   that was – through the shared services agreement
20   that prepared memos. This is going to the board.
21   That would have all obviously gone through legal
22   and compliance. It wouldn't have been my
23   function.
24   Q    Did anybody who served as an officer or

Page 75

Dustin Norris

1    employee of HCMFA have any responsibility to make
2    sure that this memo was true and accurate before
3    it was sent to the retail board?
4    A    Lauren Thedford was the secretary of the
5    advisers and the funds, and I believe this has to
6    do with – and depending on the material, I think
7    this has to do with the note, and other things.
8    So the finance team, Frank Waterhouse and his team
9    at HCMLP, would have been supplying those answers.
10   Q    Okay. And why do you keep saying Frank
11   Waterhouse at HCMLP instead of Frank Waterhouse as
12   the treasurer of the entity that's sending this
13   memo?
14   A    Because Frank was the CFO of Highland who
15   was responsible for the accounting, finance,
16   back-office functions of these funds. And the
17   answer – the adviser did not have that
18   information, and intentionally hired HCMLP to
19   provide that function. And so that is how it was
20   viewed. Those were HCMLP employees, and that was
21   under the shared services agreement.
22   Q    Is it your testimony as the HCMFA 30(b)(6)
23   witness that Frank Waterhouse did not have any
24   responsibility in his capacity as the treasurer of

Page 76

Dustin Norris

1    HCMFA to make sure that this report was true and
2    accurate before it was sent to the retail board?
3    A    I don't know of any function or
4    requirement of his role as treasurer of HCMFA that
5    he was responsible for reviewing 15(c) memos prior
6    to going to the board.
7    Q    And other than Lauren Thedford, you can't
8    identify any officer or employee of HCMFA who had
9    any responsibility to make sure that this report
10   was true and accurate before it was sent; is that
11   correct?
12   A    No. And I can't – and I would, again, go
13   back to legal. And this is a memo that is going
14   to the board and would be a legal and compliance
15   function that would have been provided services by
16   HCMLP. And that was always the case. Those
17   employees, for years, have provided the
18   legal/compliance support of memos of the 15(c)
19   process and the support for everything that went
20   into it.
21        MR. MORRIS: Okay. Move to strike.
22   BY MR. MORRIS:
23   Q    Do you know if Jim Dondero reviewed this
24   before it was sent?

Page 77

Dustin Norris

1    A    I don't know for sure, but I highly doubt.
2    He was never, to my knowledge, involved in
3    drafting or reviewing 15(c) memos.
4    Q    Okay. You'll agree that this memo was
5    sent by the advisers in response to the retail
6    board's questions; correct?
7    A    Correct.
8    Q    And you'll agree –
9    A    And actually, let me – let me correct
10   that.
11        It was from the advisers. I believe
12   that HCMLP employees sent it, getting back to –
13   it was sent by – technicality, but I believe
14   Lauren Thedford would have sent this.
15   Q    And why do you say that she sent it in her
16   capacity as an HCMLP employee rather than as the
17   secretary of the entity that's actually the author
18   of the memo?
19   A    Because that was the function that they
20   were providing as part of the shared services
21   agreement. And I – yeah. That was what – she's
22   part of the legal team at HCMLP, and that was the
23   service she was providing. We didn't have a legal
24   and compliance function at HCMFA.

Page 78

Dustin Norris

1
2  Q    Okay.
3       MR. MORRIS:  Can we scroll down to
4  Question 2, please?
5  BY MR. MORRIS:
6  Q    Have you seen Question 2 before?
7  A    Yes.
8  Q    Do you have an understanding of what was
9  being requested by the retail board in Question
10 Number 2?
11 A    Yes.  They are asking for amounts
12 currently payable or due in the future to HCMLP by
13 HCMFA or NexPoint Advisors.
14 Q    And -- and did the advisers report to the
15 retail board in October 2020 that, quote,
16 "$12,286,000 remains outstanding to HCMLP from
17 HCMFA"?
18 A    It says it right there.  That's in the
19 memo.
20 Q    Okay.
21 A    And I would note that came from Frank
22 Waterhouse and his team, that information, the
23 accounting department at HCMLP.
24      MR. MORRIS:  Okay.  I move to
25 strike everything after the portion of

Page 79

Dustin Norris

1
2  your answer that was responsive to my
3  question.
4  BY MR. MORRIS:
5  Q    As HCMFA's 30(b)(6) witness today, have
6  you done anything to determine whether or not the
7  $12.286 million number includes the principal
8  amount of the notes?
9  A    Looking at it, we can't tell.  Because it
10 doesn't line up exactly with those notes.  There
11 were other notes that had been recorded in the
12 books for several years before.  And if you add
13 those two together, it doesn't add up.  So it's
14 not clear.
15 Q    Did you read the testimony of Mr. Klos and
16 Ms. Hendrix?  I think you said you did; right?
17 A    I did.
18 Q    Did you read the portion of their
19 testimony where they said that this number
20 includes the notes as well as certain other
21 amounts that were due and owing to certain
22 Highland affiliates?
23 A    I did -- I didn't read every single line,
24 and there were, between the two of them -- I don't
25 know -- 600 pages.  So if it's in there and you

Page 80

Dustin Norris

1
2  can point to it, then I can take your
3  representation.  But I don't remember that.
4  Q    All right.  So did anybody acting on
5  behalf of HCMFA -- withdrawn.
6       Did any officer of -- or employee of
7  HCMFA do anything to make sure the information in
8  this response was true and accurate before it was
9  sent to the retail board?
10 A    We received it from the individuals
11 responsible.  And there was no -- you know, there
12 was no reason to doubt that it was incorrect.
13 Right?  These were professionals.  We were relying
14 on them.  This is Frank Waterhouse, Dave Klos,
15 Kristen.  We anticipated this would be accurate.
16 Q    Okay.  You anticipated it.  But it's your
17 testimony that no officer or employee of HCMFA did
18 anything independently to make sure that it was
19 accurate; that they completely and 100 percent
20 just deferred and relied on somebody else under a
21 contract?
22 A    Frank Waterhouse was the treasurer.  You
23 said any -- any officer.  He was -- in his role,
24 he provided this information.  And I don't know
25 his extent of how he looked into it, but if you

Page 81

Dustin Norris

1
2  look at the email chain, it didn't look too
3  extensive.  And if you even look at this, he's
4  saying that the earliest the note between HCMLP
5  and HCMFA can come due is May 21st.  He himself
6  seems to be confused here, because as we found out
7  through discovery and in the testimony of what has
8  come out, there was an agreement -- that was a
9  separate agreement.  That wasn't related to the
10 notes at issue in this case.
11      And so I don't know the extent that
12 was gone into this, but it -- it -- there's
13 confusion even in the response.
14      MR. MORRIS:  Okay.  I move to
15 strike.
16 BY MR. MORRIS:
17 Q    Again, I was just asking about the
18 identity of anybody who was charged with the
19 responsibility of making sure that this was true
20 and accurate.
21      Is there any officer or employee of
22 HCMFA who was charged with the responsibility of
23 making sure this response was true and accurate?
24 A    Yeah.  It was sent to -- the request went
25 to Frank Waterhouse because he and his team would

Page 82

Dustin Norris

1
2  have this information.  That's -- that's where we
3  would get this information.
4  Q    Okay.  Thank you.
5       MR. RUKAVINA:  Hey, John, let me
6  just interject for a little.  Let's go off
7  the record for just a minute.
8       (Discussion off the record.)
9  BY MR. MORRIS:
10  Q    Do you know, as HCMFA's 30(b)(6)
11  representative, whether the $12.286 million
12  includes the $7.5 million -- withdrawn.
13       Do you know if the 12. -- withdrawn.
14       As HCMFA's 30(b)(6) witness, do you
15  know whether the $12.286 million referenced in
16  Response Number 2 includes the $7.4 million in
17  principal amount on the notes?
18  A    I don't.
19  Q    Okay.  Did you do anything to try to
20  answer that question before appearing for today's
21  deposition?
22  A    Yeah.  We discussed this with counsel.  We
23  don't have underlying backup.  We couldn't talk to
24  Frank Waterhouse on this in preparation, but the
25  numbers just don't match up to principal amounts

Page 83

Dustin Norris

1
2  and what is owing.  We don't have information on
3  the other notes.  So discussed it with counsel,
4  but I -- we don't have any backup to support or --
5  Q    Did you make -- did you make any attempt
6  to speak with Ms. Thedford?
7  A    No, I didn't.  And she wouldn't have that
8  information.  She's an attorney and was involved
9  in the legal field, and she's no longer employed
10  there or at Skyview.
11       MR. MORRIS:  I move to strike.
12  BY MR. MORRIS:
13  Q    Okay.  And so you don't know what the
14  component parts of this $12.286 million number
15  are; correct?
16  A    I don't.
17  Q    Okay.  Do you see the last sentence of
18  this response that says, quote:  "The adviser
19  notes that both entities have the full faith and
20  support of Jim Dondero," close quote?
21  A    I do.
22  Q    Do you know what that means?
23  A    Other than what Frank Waterhouse
24  testified -- and I, again, refer you to his
25  deposition -- that -- I believe that wording came

Page 84

Dustin Norris

1
2  from him, and he emailed that.  So I would refer
3  you to his testimony.
4  Q    Well, as the 30(b)(6) witness, you were
5  asked to be prepared about communications to the
6  retail board; correct?
7  A    Yes.
8  Q    Okay.  Did you do anything to try to
9  figure out what that sentence meant -- that
10  sentence meant, other than reading Frank
11  Waterhouse's deposition transcript?
12  A    Knowing that it came from Frank, and Frank
13  elaborated, I didn't do any additional research.
14  Q    Did you ask Mr. Dondero if he was aware
15  that that statement was included in the report to
16  the retail board?
17  A    I did not.
18  Q    Do you know why this statement was
19  included in the report to the retail board?
20  A    I could speculate, but I don't know
21  specifically.
22  Q    Do you know if Mr. Dondero authorized the
23  advisers to inform the retail board, in October
24  of 2020, that the advisers had the full faith and
25  support of Mr. Dondero?

Page 85

Dustin Norris

1
2  A    I'm not aware, and if you look at Frank's
3  testimony, I believe he testified that he -- he
4  didn't have that authority either, but I'm not
5  sure.  I would refer you to his -- I don't have
6  any other knowledge.
7  Q    Okay.  So it's HCMFA's position that the
8  statement in the last sentence of Response
9  Number 2 was unauthorized.  Do I have that
10  correctly?
11  A    I don't know that we're taking that
12  position either way.  It wasn't something
13  that -- that we're -- was -- even part of the -- our
14  arguments.
15  Q    I'm not asking if it's part of your
16  arguments.  I'm just asking you, as a factual
17  matter, does HCMFA contend that that sentence was
18  included without authorization?
19  A    I don't have the knowledge of that.
20  That's -- I'm not going to contend that.
21  Q    Okay.
22  A    It may have been.  I don't know.
23  Q    Okay.  So this letter was sent over a year
24  ago.  Do I have that right?
25  A    What's the date on it?

Dustin Norris

1
2     MR. MORRIS:  If we can go back to
3   the top.
4     THE WITNESS:  Yup.
5   BY MR. MORRIS:
6   Q    Okay.  Has – have the advisers ever told
7   the retail board that the response to Question
8   Number 2 was inaccurate in any way?
9   A    Specifically saying, "Hey, let me tell you
10  this memo, Question 2, let me go back, it was
11  inaccurate," no, that was never a specific
12  disclosure of the retail board.
13          However, the retail board is aware of
14  all of the facts and circumstances surrounding the
15  notes, and so they're aware of our position.
16  They're aware of – they've been demanded.
17  There's been a lawsuit involved on both notes.
18          And – and – but, no, this specific
19  Number 2 is incorrect, no.  But they're aware of
20  our position and what we found out since then.
21  Q    Okay.  Earlier in 2020, before this memo
22  was sent to the retail board, HCMFA had provided
23  to the retail board its financial statements for
24  the period ending June 30, 2020; correct?
25  A    I believe that's typical in our August

Dustin Norris

1
2   meeting as part of the 15(c) process, but – I
3   don't know if you have that in hand, but I believe
4   that was supplied.  I'm not certain.  Sometimes it
5   was 12/31 balance sheets, sometimes it was a
6   June 30th balance sheet.
7   Q    Okay.  Can we – are you aware – have you
8   seen an email exchange that preceded the – the
9   finalization of this memo to the retail board?
10  A    I believe it was part of your exhibits.
11  Q    All right.
12        MR. MORRIS:  So let's put that up
13  on the screen, Exhibit 36.
14        (Exhibit 36 tendered.)
15  BY MR. MORRIS:
16  Q    So is this the document that you've seen
17  before?
18  A    Yes.
19  Q    Okay.
20        MR. MORRIS:  And can we start at
21  the bottom of the document?
22  BY MR. MORRIS:
23  Q    Okay.  And do you know who Stacy from
24  Blank Rome is?
25  A    I do.

Dustin Norris

1
2   Q    And who is that?
3   A    She is independent counsel for the retail
4   board, the independent directors.
5   Q    And did she provide to the people on this
6   email string certain questions that the retail
7   board had in connection with its annual 15(c)
8   review?
9   A    Yes.  These were follow-up requests.  So
10  they have a memo that she provides early on with
11  an extensive list of questions, and these were the
12  follow-up questions from the board.
13  Q    Okay.  And so it was sent to you,
14  actually; correct?
15  A    To me and Lauren.
16        MR. MORRIS:  Can we scroll up a
17  little bit, please?  Keep going.
18  BY MR. MORRIS:
19  Q    And then Lauren forwards it to certain
20  people, including you; correct?
21  A    She forwards it to Thomas and copies me.
22  Q    Uh-huh.  And – and she includes the
23  questions that are being asked by the retail
24  board; correct?
25  A    I don't know if – I don't know if that's

Dustin Norris

1
2   all of them.  I don't know if you have the memo.
3   If you represent that is all the questions,
4   then –
5   Q    Yeah.
6   A    – then I'll take that representation,
7   but –
8   Q    And – and Question Number 2 is the same
9   Question Number 2 that we just looked at in the
10  report that was given to the retail board;
11  correct?
12  A    I don't know if it's exact, but – I don't
13  know if you want to pull that up.
14  Q    Don't you have a copy of it with you right
15  there?
16  A    I don't know if I have a copy of that.
17  Oh, I have the exhibits.  What exhibit was that?
18  I have it in PDF.
19  Q    Yeah, that's – that was 59.
20  A    I'm scrolling.  There are 650 pages here.
21        Sorry.  Which exhibit again?
22  Q    You know, let's just move on.
23  A    Is it fair to say that Ms. Thedford
24  forwarded to Mr. Surgent, you, and others,
25  questions that had been presented by Stacy, the

Dustin Norris

1         Dustin Norris
2  retail board's outside counsel?
3  A    Just one correction there.  She forwarded
4  it to Mr. Surgent and copied me.
5  Q    Fair enough.
6  A    I'm not on the "To" line.  That would
7  be –
8        MR. MORRIS:  Let's scroll down,
9  please.  Let's scroll.
10  BY MR. MORRIS:
11  Q    And then – and then she forwards it
12  further to Mr. Waterhouse, Mr. Klos, and
13  Ms. Hendrix.
14        Do you see that?
15  A    I do.
16  Q    And you're still copied on it; correct?
17  A    I am.
18  Q    And do you see that she's asking Frank,
19  Mr. Klos, and Kristin to respond to Question
20  Number 2 that concerns material outstanding
21  amounts currently payable or due in the future to
22  Highland or its affiliates by either of the
23  advisers?
24  A    Yes, it – HCMLP will take that as a typo.
25  But yes.  And that would be standard.  Lauren

Dustin Norris

1         Dustin Norris
2  would go to them as the source for that
3  information.
4  Q    Okay.
5        MR. MORRIS:  And let's scroll up
6  and see the response.
7  BY MR. MORRIS:
8  Q    And do you see Mr. Waterhouse responded
9  with one word:  "Yes"?
10  A    Yes, I see that.
11  Q    And then Ms. Thedford asked if
12  Mr. Waterhouse could provide the amounts.
13        Do you see that?
14  A    I do.
15  Q    And you're still copied on this email
16  chain; correct?
17  A    I am.
18  Q    So –
19  A    Which, again, is not unusual to copy me on
20  some things I wish they wouldn't.  But I was
21  copied on board items fairly regularly.
22        MR. MORRIS:  Okay.  I move to
23  strike.
24  BY MR. MORRIS:
25  Q    I appreciate your wishes, but the question

Dustin Norris

1         Dustin Norris
2  was simply whether or not, you know, you would
3  acknowledge that you were copied on this email.
4  A    Yup, that's my email.
5  Q    Okay.  And let's see what the next
6  response is.
7        And do you see Mr. Waterhouse
8  responds – can you read Mr. Waterhouse's
9  response?
10  A    I can.  He said:  "It's on the balance
11  sheet that was provided the board as part of the
12  15(c) materials."
13  Q    Okay.  So everybody to whom Mr. Waterhouse
14  has sent – withdrawn.
15        So you don't dispute, as HCMFA's
16  30(b)(6) witness, that Mr. Waterhouse informed all
17  of the recipients of his email on Tuesday,
18  October 6th, 2020, at 6:05 p.m. that the answer to
19  the retail board's Question Number 2 could be
20  found in HCMFA's balance sheet; correct?
21  A    Correct.
22  Q    Okay.  Let's go –
23        Actually, can you go back down to the
24  answer – the exact question?
25  Q    Of course.

Dustin Norris

1         Dustin Norris
2        Okay.
3  A    "Are there material outstanding amounts
4  currently payable or due to the future by HCMLP to
5  HCMFA" – yeah – "or any other affiliate?"
6        Okay.
7  Q    Having read that, does that change your
8  answer at all?
9  A    And so – go back to your original
10  question on whether his –
11  Q    Right.  So Mr. –
12        MR. MORRIS:  Can we scroll back up
13  to Mr. Waterhouse's response?
14  BY MR. MORRIS:
15  Q    Thank you for your patience, Mr. Norris.
16  A    Uh-huh.
17  Q    You'll see that Mr. Waterhouse responds at
18  6:05 p.m. on October 6th, and my question is a
19  simple one:  Does HCMFA dispute that in
20  Mr. Waterhouse's email that he is telling the
21  recipients that the answer to the retail board's
22  Question Number 2 can be found in HCMFA's balance
23  sheet?
24  A    I would say the answer – his – his
25  response is the answer to the retail board is not

Page 94

Dustin Norris

1  completely accurate, because there was – there's
2  not enough there to be responsive.  I think what
3  he's saying here is to Lauren, "Hey, it's on the
4  balance sheet.  Can you look at it and figure it
5  out?"
6
7         And I – I think they go back and
8  forth, "Well, can you give us more information?"
9  And so it's – this is not responsive to the
10  question and isn't what was provided to the board,
11  but that's –
12  Q     Well, let – let's see what Ms. Thedford
13  does.  Ms. Thedford's the lawyer; right?
14  A     She is.
15  Q     Yeah.  But she's also the secretary of
16  HCMFA; correct?
17  A     At this time, I believe so, yes.
18  Q     And you wouldn't dispute that she is
19  taking the lead on formulating the advisers'
20  response to the retail board; correct?
21  A     I would not dispute that.
22  Q     Okay.  And do you see that she reports to
23  you and everybody else in her email that she has
24  taken information from the 6/30 financials?
25  A     Yes, I see the below from the 6/30

Page 95

Dustin Norris

1  financials.  And, again, to correct to me, I'm
2  CC'd.  It's a nuance, but she's representing to
3  Frank and Dave and Kristin and a CC to me.
4  Q     Okay.  Does HCMFA acknowledge that the
5  information contained in the October 23rd, 2020,
6  report to the retail board with respect to
7  Question Number 2 was derived from HCMFA's
8  June 30th, 2020, financials?
9  A     Sorry.  One more time?
10  Q     Will you agree, as HCMFA's 30(b)(6)
11  witness, that the information provided to the
12  retail board in October 2020 in response to
13  Question Number 2 was taken directly from HCMFA's
14  financial statements for the period ending
15  June 30th, 2020?
16  A     Yeah.  The unaudited financials, yes.
17  Q     Okay.  And so – so as HCMFA's 30(b)(6)
18  witness, you will agree that the $12,286,000
19  figure that was included in the former response to
20  the retail board was obtained from HCMFA's
21  unaudited financial statements for the period
22  ending June 30th, 2020; correct?
23  A     It appears that way.
24         And I – I think – and, again, we're

Page 96

Dustin Norris

1  looking at a draft answer here.  I don't have the
2  final answer.  But it looks as work product that
3  she's pulling numbers from the unaudited balance
4  sheet and plugging them in here.
5  Q     Okay.  And we can look at the final if you
6  want, but that $12,286,000 number that was due to
7  HCMLP as of June 30th 2020, that's the exact
8  figure that was given to the retail board in the
9  final report; correct?
10  A     "Final report," meaning the final memo –
11  final memos?
12  Q     Yes.
13  A     Yes.  Yes, I believe so.
14  Q     Okay.
15         MR. MORRIS:  Can you scroll back up
16     to the last email?
17  BY MR. MORRIS:
18  Q     So this is Mr. Waterhouse's response to
19  Ms. Thedford.  And, again, Mr. Waterhouse is
20  Highland's CFO and the advisers' treasurer;
21  correct?
22  A     Correct.
23  Q     And at this time, Ms. Thedford is an
24  attorney at Highland, but she also serves as the

Page 97

Dustin Norris

1  secretary for the advisers; correct?
2  A     That's correct.
3  Q     And you are the executive vice president
4  for the advisers; correct?
5  A     As of this date, yes.
6  Q     And you had no position with Highland;
7  correct?
8  A     At this time?
9  Q     Correct.
10  A     No position with Highland, no.
11  Q     Okay.  How about Mr. Post?  Had he
12  transitioned from Highland to the advisers as of
13  October 6th?
14  A     I don't believe so.
15  Q     Okay.  It happened in October, though;
16  right?
17  A     I – I don't know.
18  Q     Okay.
19  A     Late October/November.  It was late in the
20  year.
21  Q     Okay.  And do you know if anybody ever
22  told Mr. Waterhouse in October 2020 that there was
23  any aspect of his email that was incorrect?
24  A     Not at that time, no, that I'm – not that

Appx. 03038

Page 98

```
1           Dustin Norris
2  I'm aware of.
3     Q     Okay.
4     A     And -- and would we have reason to doubt
5  him?  This -- he was the source of the
6  information.
7     Q     Okay.  And do you see that the last
8  sentence of his email actually refers to the last
9  sentence of Response Number 2 that was given to
10  the retail board later in October 2020?
11    A     I do.
12    Q     Did you ever ask Mr. Waterhouse anything
13  about that last sentence?
14    A     I don't believe so.
15    Q     Do you see that he says, quote:  "The
16  response should include, as I covered in the board
17  meeting, that both entities have the full faith
18  and backing from Jim Dondero, and to my knowledge
19  that hasn't changed"?
20          Do you see that?
21    A     I do.
22    Q     Do you know what board meeting he's
23  referring to?
24    A     "The response should include, as I covered
25  in the board meeting, that both entities have a
```

Page 99

```
1           Dustin Norris
2  full faith and backing."
3           So I don't know the exact board
4  meeting.  However, we do have an August board
5  meeting related to 15(c).  There's typically an
6  in-person or telephonic meeting in August, and
7  then there's a September board meeting that is
8  devoted almost exclusively to the 15(c) process.
9           And after that, there is follow-up
10  meetings -- multiple sometimes, particularly in
11  2020 during the bankruptcy proceedings that --
12  where the board was getting comfortable.  So it
13  would have been one of those meetings, but I don't
14  know which one.
15    Q     And -- and did you personally participate
16  in a board meeting where Mr. Waterhouse covered
17  the topic of the advisers having the full faith
18  and backing from Mr. Dondero?
19    A     I -- I probably would have been in most or
20  all of those board meetings, but I don't remember
21  that specifically.
22    Q     Okay.  Do you know -- do you know whether
23  anybody who's copied on this email ever questioned
24  any aspect of the last sentence of
25  Mr. Waterhouse's email at any time prior to the
```

Page 100

```
1           Dustin Norris
2  sending of the final memo on October 23rd?
3     A     Not that I'm aware of.
4     Q     You didn't; isn't that right?
5     A     I don't know that I read it, but I didn't
6  question it.  If I -- I either didn't read it or I
7  didn't question it.
8     Q     Okay.  So you have no recollection of ever
9  asking Mr. Waterhouse what he meant by the last
10  sentence of this email; correct?
11    A     No, I have no recollection.
12    Q     And you have no recollection of any
13  recipient of this email asking Mr. Waterhouse what
14  he meant by that last sentence; correct?
15    A     I don't remember.
16    Q     And you never told Mr. Waterhouse that you
17  had no knowledge of him having covered this issue
18  before the board?
19    A     You're wondering if I ever told him I had
20  no knowledge?
21    Q     Yeah.
22    A     No, I never talked to him about that.
23    Q     And to the best of your knowledge, no
24  recipient of this email ever challenged
25  Mr. Waterhouse's statement in this last sentence;
```

Page 101

```
1           Dustin Norris
2  correct?
3     A     I don't know what the conversations were
4  had between the others, but I have no knowledge of
5  that.
6     Q     Okay.
7     A     And -- and you've got -- sorry.  Go ahead.
8     Q     This email string is -- is an email string
9  devoted for the sole purpose of addressing
10  questions posed by the retail board in connection
11  with the 15(c) review; correct?
12    A     I believe so.
13    Q     Okay.  Have you ever seen HCMFA's
14  unaudited financial statements for June 30th,
15  2020?
16    A     Yes.
17    Q     And do you know if those audited --
18  unaudited financial statements included the
19  amounts due and payable under the notes?
20    A     I -- I think that -- I -- I don't
21  remember, but I think our position is it's
22  unclear, because the amounts don't agree to
23  the -- again, we have prior notes, we have these
24  notes.  The amounts don't line up.
25          So it's -- it's -- the underlying
```

Dustin Norris

1
2 backing is not provided. There's no footnotes.
3 It's just a number that says due to HCMLP.
4   Q   Do you know -- do you know -- do you have
5 any recollection as to the totality of HCMFA's
6 liabilities as of June 30th, 2020?
7   A   Including this note? Or just this note?
8   Q   All -- all liabilities. What's the bottom
9 of the balance sheet?
10   A   I don't know. Do you have it? Do you
11 want to pull it up?
12   Q   I don't.
13   A   Yeah, I don't remember.
14       MR. RUKAVINA: Hey, John, it's
15 approaching 12:15. Just whenever, you
16 know --
17       MR. MORRIS: Yeah. You know what?
18 I was just about to change topics, so this
19 is a good time.
20       MR. RUKAVINA: Okay.
21       MR. MORRIS: Why don't we stop
22 here, and we'll come back at the top of
23 the hour.
24       MR. RUKAVINA: Excellent. Thank
25 you.

Dustin Norris

1
2       (Recess from 12:11 p.m. to 1:06 p.m. CST)
3 BY MR. MORRIS:
4   Q   Mr. Norris, Topic Number 9 relates to
5 consent fees.
6       Do you understand that?
7   A   I do.
8   Q   Do you have an understanding of what a
9 "consent fee" is?
10   A   I do.
11   Q   Did you do anything to prepare for this
12 particular topic?
13   A   I did.
14   Q   What did you do to prepare for this topic?
15   A   I discussed the consent fee with
16 Mr. Dondero, with Mr. Rukavina, and with
17 Mr. Sauter.
18   Q   Okay. Mr. Sauter has no personal
19 knowledge of any consent fee that was paid in the
20 spring of 2019; correct?
21   A   No.
22   Q   Okay. What's your understanding of what a
23 "consent fee" is?
24   A   Generally or the specific consent fee
25 in -- that --

Dustin Norris

1
2   Q   Let's start generally.
3   A   Yeah. So a "consent fee" is a fee paid to
4 a -- paid to someone who's agreeing to amend terms
5 or change the structure of the -- of a document or
6 a loan. In -- in bank loan world, or loan world,
7 if you are going to amend or extend or change the
8 terms, typically there was a consent fee paid to
9 those willing to consent.
10       Those that have voted or consented
11 receive a fee.
12   Q   Okay. And did HCMFA pay any consent fees
13 in or around April or May 2019?
14   A   It began to pay consent fees in May
15 of 2019, I believe.
16   Q   Okay. Are you looking at something as you
17 prepare your answer?
18   A   Yeah. I'm looking at Topic Number 9 that
19 says consent fee in April or May 2019.
20   Q   Okay. Thank you so much.
21       And -- and I think you testified that
22 they began paying consent fees at around that
23 time?
24   A   That's right.
25   Q   What do you mean by that?

Dustin Norris

1
2   A   Yeah. So the consent fee was related to
3 the global allocation fund that converted from an
4 open-end fund to a closed-end fund, and there was
5 a 3 percent fee that would be paid to investors
6 that, one, consented to the conversion from an
7 open-end fund to a closed-end fund, but also held
8 their investment through the conversion.
9       The conversion was finalized in
10 February of 2019, and the consent fee was an
11 operational challenge because you had to determine
12 who the investors were that voted yes and that
13 held on to the conversion.
14       So with that, the -- the amounts that
15 were paid, there was an operational challenge to
16 determine who -- who needed to be paid, and so
17 they were deposited and then paid out over a
18 couple-month period.
19   Q   And who made the decision to pay the
20 consent fee?
21   A   So the consent fee was a collaborative
22 decision of senior management. Jim Dondero and
23 myself were involved in the decision, the
24 discussion to -- and it was a novel idea in terms
25 of converting from an open-end fund to a

Dustin Norris

1
2  closed-end fund, and it was submitted to
3  investors.  It went through SEC review as a proxy
4  statement, and it went out to shareholders who
5  needed to vote for the proposal.
6  Q       And who paid the consent fee?  HCMFA?
7  A       My understanding is HCMFA as the adviser
8  of the global allocation fund paid the consent fee
9  to investors.
10  Q       And whose idea was it to seek consent to
11  change from an open fund to a closed-end fund?
12  A       I – I would say it was collaborative of
13  senior management.  Jim Dondero, myself, legal
14  compliance was involved.  It was, you know, Mark
15  Okada, who was a partner at the time.  There was a
16  lot of discussion involved.
17  Q       And when the decision was made to seek
18  consent to change from an open-end fund to a
19  closed-end fund, did HCMFA understand that there
20  would be costs, fees, and expenses associated with
21  that decision?
22  A       Being cost fees as in the consent fee?
23  Q       Correct.
24  A       Yes.
25  Q       And did it undertake any analysis to

Dustin Norris

1
2  determine what the likely total fee would be?
3  A       Yeah.  I'm sure they did.
4  Q       Do you know what the total fee
5  paid – what the total consent fee paid was?
6  A       I don't have the exact amount, but it was
7  over $5 million.
8  Q       Okay.  And over what period of time were
9  the consent fees paid?
10  A       I know they were paid in May and June, and
11  there may be a portion that were paid thereafter,
12  but at least May and June of 2019.  There were
13  certain broker-dealers that reported later, and
14  when those were reported and verified, they were
15  paid out.  I don't remember the final date of the
16  last distribution.
17  Q       Okay.  And forgive me.  It's not my
18  business.  But were the consent fees paid to the
19  fund's shareholders?
20  A       They were paid to the shareholders.
21  That's correct.
22  Q       Okay.
23  A       That's consented.  The shareholders had to
24  vote, and they had to be a shareholder on
25  conversion date.

Dustin Norris

1
2  Q       Okay.  And the decision to seek and obtain
3  consent, was that a voluntary decision by HCMFA?
4  A       To seek consent to move to a closed-end
5  fund?
6  Q       Yes.  That's not something that any
7  regulator required, was it?
8  A       No.
9  Q       It's not something that any rule or
10  anybody mandated; correct?
11  A       Not that I believe.
12  Q       Okay.  How did HCMFA fund the payment of
13  the total consent fee of over $5 million?
14  A       Yeah, from cash that it had on the balance
15  sheet.
16  Q       And where did it get the cash that was on
17  the balance sheet?
18  A       The cash came from the transaction that we
19  discussed earlier – and you showed me the capital
20  coming in from Highland – which was compensation
21  for the NAV error.
22  Q       So it used the money that it received in
23  the transfers that we talked about to pay the
24  consent fee.  Do I have that right?  Or at least
25  some of it?

Dustin Norris

1
2  A       Yes.
3  Q       And, in fact, it used approximately
4  $5 million of the moneys paid in May 2019 to pay
5  the consent fee of approximately $5 million; is
6  that fair?
7  A       At least $5 million.
8  Q       Okay.  Do you know the exact number?
9  A       Of the consent fee?
10  Q       Withdrawn.
11          Do you have a better or more precise
12  estimate of the total consent fee other than
13  $5 million?
14  A       It was over $5 million.  I don't remember
15  the exact amount, whether it was 5.6 or 5.2 –
16  Q       All right.
17  A       – because it was paid over time.
18  Q       Let's talk about the TerreStar valuation
19  issue for a few minutes, if we can.
20  A       Okay.
21  Q       Just generally, in 2018/2019, HCMFA spent
22  a fair amount of time addressing the consequences
23  of a valuation error concerning TerreStar.  Do I
24  have that right?
25  A       There was a lot in there, but there was,

Page 110

Dustin Norris

1          Dustin Norris
2   during that time, a lot of discussions with
3   TerreStar over the concerns of a valuation error
4   in 2018 and '19.
5   Q      And did it ultimately turn out that there
6   was a valuation error involving TerreStar?
7   A      There was.
8   Q      Okay.  And had HCMFA retained Houlihan
9   Lokey in connection with doing the TerreStar
10  valuation?
11  A      Houlihan Lokey was involved in the
12  valuation, yes.
13  Q      And who retained Houlihan Lokey?
14  A      I don't know.
15  Q      As you sit here right now, you can't tell
16  me who retained Houlihan Lokey?
17  A      I don't know if it was HCMLP or HCMFA
18  or -- I don't know.
19  Q      Okay.  Are you familiar with the firm
20  Houlihan Lokey?
21  A      I am.
22  Q      And do you know what services they
23  provided in connection with the TerreStar
24  valuation?
25  A      I do.

Page 111

Dustin Norris

1          Dustin Norris
2   Q      Can you describe for me the services that
3   were provided by Houlihan Lokey in connection with
4   the TerreStar --
5   A      And I would say I do generally.  I was not
6   involved in the individual details.  That was all
7   the HCMLP employees.
8          So all of the Highland employees that
9   were involved in the shared services agreement,
10  the valuation committee, valuation services were
11  the responsibility of HCMLP.  Key inputs were
12  provided by HCMLP.  Key estimates and
13  interpretations to Houlihan, and they used their
14  models to calculate a valuation that was then
15  approved by the valuation committee at HCMLP.
16         And so that's my general understanding
17  of the valuation process.
18  Q      Do you know how much Houlihan Lokey was
19  paid for its work?
20  A      I don't.
21  Q      Do you know if there's an engagement
22  letter pursuant to which Houlihan Lokey provided
23  these services?
24  A      I'm not aware.
25  Q      Would you dispute that HCMFA is the entity

Page 112

Dustin Norris

1          Dustin Norris
2   that retained Houlihan Lokey?
3   A      I don't know.
4   Q      Would you agree that Houlihan Lokey is
5   fairly described as an independent third-party
6   valuation consultant?
7   A      Yes, generally.
8   Q      Okay.  And do you know when Houlihan Lokey
9   was retained?
10  A      I don't.
11  Q      Houlihan Lokey's retention was approved by
12  the retail board, wasn't it?
13  A      I'm not sure.
14  Q      Have you ever seen any of the work product
15  of Houlihan Lokey in connection with the TerreStar
16  valuation?
17  A      Yeah.  I remember seeing the valuation
18  model.
19  Q      So Houlihan Lokey did prepare the
20  valuation model that is the subject of the
21  TerreStar valuation issue; is that fair?
22  A      Working very closely with the HCMLP
23  employees with the inputs, yes.
24  Q      Did HCMFA rely on the Houlihan Lokey
25  valuation model?

Page 113

Dustin Norris

1          Dustin Norris
2   A      I'm not sure.
3   Q      Does HCMFA contend that Houlihan Lokey
4   made any mistakes in connection with its valuation
5   services?
6   A      I'm not sure.
7   Q      Does HCMFA have a position as to whether
8   or not Houlihan Lokey made any mistakes in any of
9   the services that it performed in connection with
10  the TerreStar valuation?
11  A      I think they don't have details and would
12  retain their rights to understand what their role
13  and -- sorry.  What was the original question?
14  Q      Just whether HCMFA has a position as to
15  whether or not Houlihan Lokey made any mistakes in
16  the work that it did in connection with the
17  TerreStar valuation?
18  A      Yeah.  I think they're retaining their
19  rights to understand that better.
20  Q      Is there any agreement with Houlihan Lokey
21  that would give HCMFA the time to do that?  Is
22  there a tolling agreement or anything like that?
23  A      Not that I'm aware of.
24  Q      Is HCMFA undertaking any analysis to
25  determine whether or not Houlihan Lokey made any

Page 114

Dustin Norris

1  mistakes in connection with the work that it did
2  on the TerreStar valuation?
3
4  A     Sorry.  One more time.
5  Q     Is HCMFA undertaking any analysis or
6  investigation to try to determine whether Houlihan
7  Lokey made any mistakes?
8  A     There are -- I don't know.  I don't know.
9  Q     You have no knowledge, as you sit here
10 today, as to whether HCMFA is undertaking any
11 analysis or investigation to try to determine
12 whether Houlihan Lokey did anything wrong in
13 connection with its valuation services; correct?
14 A     And I wasn't prepared -- I don't think
15 this is one of the topics -- you know, Houlihan
16 Lokey's, you know, involvement, and so I wasn't
17 prepared to answer that one.
18 Q     Okay.  Well, the defense -- HCMFA's
19 defense is that Highland is responsible for the
20 TerreStar valuation issue; correct?
21 A     Yes.
22 Q     And there's no question that Houlihan
23 Lokey provided services in connection with that
24 valuation; correct?
25 A     Correct.

Page 115

Dustin Norris

1
2  Q     But HCMFA has not undertaken any analysis
3  or investigation, to the best of your knowledge,
4  to try to determine if Houlihan Lokey was the
5  responsible party; fair?
6  A     We don't know if there is a contract or
7  not.  At this point, we're talking about the
8  defense of Highland's responsibility.  There's no
9  question they were responsible for the valuations.
10 They were outsource provider of the valuation
11 committee.  Every individual working and
12 coordinating with Houlihan Lokey was an HCMFA
13 employee.  All the data and information that was
14 provided to them came from HCMLP.  There's no
15 question that Highland was responsible for the NAV
16 error.  No one ever questioned that.  That was
17 always known.  It was all the employees that were
18 involved.
19     MR. RUKAVINA:  John, I'll just
20 reiterate that we did not understand your
21 topics to include Houlihan Lokey.  If you
22 need more information about that or if we
23 need to have a supplemental deposition,
24 that's fine.  But this is just not
25 something that we reasonably anticipated

Page 116

Dustin Norris

1  you asking about.
2
3      MR. MORRIS:  I think it's -- I
4  think I have the answer that I need and
5  that the executive vice president and
6  30(b)(6) witness has no knowledge of any
7  investigation or analysis that has been
8  undertaken by HCMFA to try to even
9  determine whether Houlihan Lokey is at
10 fault.
11 BY MR. MORRIS:
12 Q     Do I have that right, Mr. Norris?
13     MR. RUKAVINA:  Well, I will just
14 object that that was not your prior
15 question.
16     MR. MORRIS:  All right.  Well,
17 that's my question now.
18 BY MR. MORRIS:
19 Q     Is that correct, Mr. Norris?
20 A     I know there's been discussion with
21 counsel.
22     MR. RUKAVINA:  Well, I will
23 represent to you that we have looked for a
24 Houlihan Lokey contract and have not been
25 able to find one.  Otherwise, we would

Page 117

Dustin Norris

1  have produced it to you.  So if you have
2  anything like that, we'd love to see it.
3
4  We do not even know whether we had a
5  contract with Houlihan Lokey or not.  So
6  we'll try to find you information, John.
7  We just -- we just don't have it.
8      MR. MORRIS:  We'll get to that in a
9  moment.
10 BY MR. MORRIS:
11 Q     Has HCMFA -- withdrawn.
12     Has HCMFA ever told Houlihan Lokey
13 that it believed it made any mistake or error of
14 any kind in connection with its work on the
15 TerreStar valuation?
16 A     Again, I -- this is not a topic that we
17 reviewed, so I don't know.
18 Q     Okay.  You're not aware of anything today;
19 correct?
20 A     Again, the employees working with Houlihan
21 Lokey were the HCMLP employees.  So I don't know
22 if the debtor employees have that conversation,
23 but --
24     MR. MORRIS:  Yeah, I'm going to
25 move to strike.

Page 118

Dustin Norris

1          Dustin Norris
2   BY MR. MORRIS:
3   Q      And I'm asking about HCMFA.
4          Did -- has HCMFA ever informed
5   Houlihan Lokey that HCMFA believes that Houlihan
6   Lokey made a mistake or error in the work that it
7   did?
8   A      There were ongoing discussions extensively
9   throughout this with Houlihan Lokey and the debtor
10  employees regarding the error and what the causes
11  were.  It was extensive discussions.
12         MR. MORRIS:  Okay.  Move to strike.
13  BY MR. MORRIS:
14  Q      Has HCMFA ever told Houlihan Lokey that
15  HCMFA believes that Houlihan Lokey made a mistake
16  or an error in connection with its valuation
17  services?
18  A      It may have, but I'm not aware.
19  Q      Thank you.
20         Are you familiar with the report that
21  HCMFA prepared and sent to the Global Allocation
22  Fund concerning the TerreStar valuation issues?
23  A      They sent to the fund?
24  Q      Uh-huh.
25  A      What do you mean "they sent to the fund"?

Page 119

Dustin Norris

1          Dustin Norris
2   Q      They sent to the board of the fund?
3   A      Oh, the board of the fund.
4          There were a number of memos and
5   presentations.  If you have one you want to pull
6   up, you can -- we can refer to it.
7   Q      Sure.
8          MR. MORRIS:  Let's put up what
9   we've marked as Exhibit 182.
10         (Exhibit 182 tendered.)
11  BY MR. MORRIS:
12  Q      And while we're doing that, have you ever
13  seen a single document anywhere at any time in
14  which any representative of HCMFA took Highland to
15  task for the work that it did in connection with
16  the TerreStar valuation?
17  A      "Took them to task"?  Define "take them to
18  task."
19  Q      Told them that they were the source and
20  cause of the NAV error.
21  A      The irony of all of the reporting to the
22  board, all of the valuation knowledge was from
23  HCMLP's employees.  We -- we outsourced that to
24  them.  There was -- there was no question that
25  they were at fault, and that's -- every employee

Page 120

Dustin Norris

1          Dustin Norris
2   involved was an HCMLP employee.
3          MR. MORRIS:  I move to strike.
4   BY MR. MORRIS:
5   Q      And I'm going to ask you, sir, to listen
6   carefully to my question.
7          Have you ever seen a document that
8   HCMFA sent to Highland in which HCMFA accused
9   Highland of being the cause of the NAV error?
10  A      I have not.
11  Q      Thank you.
12         Do you see the document that's on the
13  screen?
14  A      I do.
15  Q      Before I get to that, so the NAV error
16  occurred sometime prior to May 2019; correct?
17  A      Beginning -- I don't know the specific
18  dates.  I believe it began in May of 2019 --
19  sorry.  May 2019 --
20  Q      That's when it ended; right?
21  A      What's that?
22  Q      That's when it ended; right?  That's --
23  A      Yeah, it was before May 2019.
24  Q      Okay.  So during the entire time that the
25  TerreStar NAV error was being discussed and

Page 121

Dustin Norris

1          Dustin Norris
2   analyzed and debated and communications with the
3   SEC, during that entire period, Jim Dondero was in
4   control of both HCMFA and Highland; correct?
5   A      Yes, I believe so.
6   Q      Okay.  Can you identify any employee of
7   Highland who was fired as a result of any of the
8   mistakes that were made in connection with the
9   TerreStar valuation?
10  A      No.
11  Q      Can you identify --
12  A      Not that I can remember.
13  Q      Can you identify any steps that
14  Mr. Dondero took against any employee who was
15  allegedly involved in the NAV error?
16  A      That would have been an HCMLP matter.  I
17  don't have any knowledge of HCMLP's hiring or
18  firing practices.
19  Q      So at no time did anybody ever tell
20  you that any disciplinary measures were imposed
21  upon any Highland employee as a result of the NAV
22  error that Highland allegedly caused; correct?
23  A      Any firing practice?  Is that what you
24  said?
25  Q      Disciplinary.  Firing.  Anything.

**Appx. 03044**

Page 122

Dustin Norris

1
2    A       There was a remediation process that had
3    to go into effect, which was improvement of
4    controls, and they maybe even hired additional
5    people.  But it was – and I don't – I'm not
6    aware of any disciplinary, but there could have
7    been.
8    Q       Okay.  But that would just be speculation
9    on your part; correct?
10   A       Yeah.
11   Q       So have you seen the document that's up on
12   the screen?
13   A       I have.
14   Q       Did you read it before it was sent?
15   A       I don't think so.
16   Q       Did anybody – did any officer or employee
17   take responsibility for making sure that –
18   withdrawn.
19           What is this document?
20   A       It is titled "Resolution of the Funds Net
21   Asset Value Error."
22   Q       And was – is it your understanding that
23   the purpose of this document was to enable HCMFA
24   to explain to the Global Allocation Fund how the
25   resolution of the NAV error was being conducted?

Page 123

Dustin Norris

1
2    A       Not to the Global Allocation Fund.  This
3    is a memo to the board.
4    Q       Thank you for the clarification.
5            Subject to that clarification, is my
6    description otherwise correct?
7    A       I believe so.  There had been a number of
8    communications with the board, and this is the
9    resolution of the whole process, or most of the
10   process.
11   Q       This was a pretty big issue for HCMFA,
12   wasn't it?
13   A       There was a lot of people involved.  It
14   was – there was a lot of involvement from –
15   mostly Highland Capital Management, LP, employees,
16   but it was – there was a lot involved.
17   Q       And who – what outside counsel was
18   retained?
19   A       Adviser counsel is counsel – is – I
20   believe it was K&L Gates for HCMFA.
21   Q       And who was Highland's counsel?
22   A       I don't know.
23   Q       Do you know if Highland had counsel?
24   A       I don't know.
25   Q       Do you –

Page 124

Dustin Norris

1
2    A       I know they had counsel they referred to
3    for SEC matters, and I don't know if they utilized
4    them here or not.  They were all Highland
5    employees that worked on this.  So I'm sure you
6    probably have that in your records.
7    Q       Sir, can you identify any outside counsel
8    that was retained by Highland to advise it in
9    connection with the TerreStar valuation issues
10   that were the subject of an SEC investigation?
11   A       I have – I have no knowledge of that.
12   Q       Okay.  Did you see this memo that's up on
13   the screen that's been marked as Exhibit 182 prior
14   to the time that it was sent?
15   A       I don't recall.
16   Q       The NAV error was the subject of an SEC
17   investigation; correct?
18   A       Correct.
19   Q       Do you know if HCMFA ever told the SEC
20   orally, in writing, or otherwise that Highland
21   Capital Management, LP, was the cause of the NAV
22   error?
23   A       Not that I'm aware of, but they were
24   concerned about the ultimate correction of the NAV
25   error.  I don't think they were concerned about

Page 125

Dustin Norris

1
2    the responsible party.
3            But I would say every single person
4    that interacted with the SEC, I believe, were
5    HCMLP employees.  We can see that on the other
6    memo that they have to the SEC following up on a
7    call; all HCMLP employees.  So whether they told
8    them or not, they were all HCMLP employees.
9            MR. MORRIS:  Okay.  Move to strike
10   after the very first portion of the answer
11   that was responsive.
12   BY MR. MORRIS:
13   Q       Did anybody – did any officer or employee
14   of HCMFA ever inform the SEC that Highland Capital
15   Management, LP, was the responsible party for the
16   NAV error?
17   A       Specifically, not that I'm aware of.
18   Q       Okay.  Was any HCMFA officer or employee
19   responsible for making sure that the memorandum up
20   on the screen that's been marked as 182 was true
21   and accurate before it was sent to the board of
22   the Highland Global Allocation Fund?
23   A       I don't know that there is a – there's a
24   specific requirement of an officer to verify the
25   accuracy.

Page 126

Dustin Norris

1
2   Q      Okay. But my question was a little bit
3   broader, and that was whether there was any
4   officer or employee who was given the
5   responsibility of making sure this document was
6   true and accurate before it was sent to the board
7   of the GAF.
8   A      I don't even know who drafted this. It
9   would have come from Highland's compliance legal
10  and accounting team with all the expertise around
11  the NAV error and all of those that were involved.
12  Q      So did you see this document at or around
13  the time it was sent to the GAF board?
14  A      I probably did.
15  Q      Do you recall telling anybody at that time
16  that you believed there were any errors in the
17  document?
18  A      I think, as I testified before, I
19  don't -- I don't remember reading it. But I
20  didn't -- I didn't say there were errors in the
21  document, no.
22  Q      Prior to the answer date of March 1st,
23  2021, did anybody acting on behalf of HCMFA ever
24  tell anybody in the world at any time that there
25  was any error in this memorandum?

Page 127

Dustin Norris

1
2   A      Not that I'm aware of.
3   Q      Did HCMFA send this memorandum --
4   withdrawn.
5          Did HCMFA intend this -- withdrawn.
6          Did HCMFA expect the GAF board to rely
7   on this memorandum?
8   A      I don't know what the intention was.
9   Q      You don't know what HCMFA's intention was
10  in sending this memorandum?
11  A      If it's addressed to the board, it could
12  be to educate. But I'm sure that the board
13  would -- would rely on or expect that that memo
14  would be accurate.
15  Q      Okay. And this is dated after all of the
16  payments have been made that we've been talking
17  about, the May 2nd and the May 3rd payments;
18  correct?
19  A      Correct.
20  Q      Take a look at the second paragraph.
21  A      Yup.
22  Q      Do you see the first sentence refers to
23  two initial determinations that were made by the
24  adviser and Houlihan Lokey?
25  A      Sorry. Which part? Just the first

Page 128

Dustin Norris

1
2   sentence of the second paragraph?
3   Q      Yeah. First of all, do you see that the
4   second paragraph refers to the adviser and
5   Houlihan Lokey?
6   A      It does.
7   Q      And do you see that the reference to
8   Houlihan Lokey includes a reference to Houlihan
9   Lokey having been approved by the board?
10  A      Yes.
11  Q      And do you understand that that means the
12  board of GAF?
13  A      Yes.
14  Q      Does that refresh your recollection that
15  the GAF board approved of the retention of
16  Houlihan Lokey as an independent third-party
17  expert valuation consultant?
18  A      It doesn't refresh my recollection, but it
19  says it there. I don't know that I have a
20  document saying they -- I haven't seen the
21  approval, the agreement.
22  Q      But you don't dispute that this memo was
23  sent to the GAF board on or about May 28th, 2019;
24  correct?
25  A      Correct.

Page 129

Dustin Norris

1
2   Q      Okay. And HCMFA told the GAF board at
3   that time that HCMFA and Houlihan Lokey, quote,
4   "initially determined that the March transactions
5   were non-orderly and should be given zero
6   weighting for purposes of fair value."
7          Is that correct?
8   A      The HCMLFA, as part of the valuation -- or
9   as the outsource valuation provider, were the
10  employees that made that determination. The
11  adviser ultimately has the responsibility, but it
12  was outsourced. And those were HCMLP employees,
13  along with Houlihan Lokey, that determined the
14  March transactions were non-orderly.
15         MR. MORRIS: I'm going to move to
16  strike.
17  BY MR. MORRIS:
18  Q      And I'm going to ask you to listen
19  carefully to my question.
20         I'm asking you what HCMFA told the GAF
21  board. Did HCMFA tell the GAF board on May 28th,
22  2019, that HCMFA and Houlihan Lokey, quote,
23  "initially determined that the March transactions
24  were non-orderly and should be given zero
25  weighting for purposes of determining fair value."

Appx. 03046

Page 130

Dustin Norris

2    Is that correct?
3    A    The -- in the memo, it says that on this
4    date, there were many other conversations probably
5    around this date and on this date discussing the
6    determinations and non-orderly and that it was the
7    HCMLP employees, and the board knew that. They
8    were very aware that it was the -- the valuation
9    control environment of HCMLP that determined these
10   were non-orderly transactions.
11   Q    So this -- so this report is inaccurate,
12   according to you?
13   A    No. There's -- there's just -- your
14   question was did they tell the board. There is a
15   lot that we told the board outside of this memo.
16   This memo does say advised from Houlihan Lokey.
17   The adviser is ultimately responsible. But there
18   was a lot of communication with the board --
19   Q    Okay.
20   A    -- around this, that they knew exactly who
21   was responsible for valuation as the board
22   determining that these were market transactions
23   and orderly or non-orderly.
24   Q    Okay. I want to focus on this memo,
25   because this is the one that I have. And you'll

Page 131

Dustin Norris

2    agree with me that there's no reference to
3    Highland Capital Management, LP, anywhere in this
4    report; correct?
5    A    No, there's not, but the board knew that
6    HCMLP was preparing the valuations.
7        MR. MORRIS:  All right. I move to
8    strike after the word "no."
9    BY MR. MORRIS:
10   Q    And it was the determination concerning
11   whether or not it was orderly or non-orderly, and
12   whether or not to use zero weighting that were the
13   two causes of the NAV error; correct?
14   A    Those were key portions.
15   Q    In the last sentence, in fact, that's the
16   only portions; isn't that fair?
17   A    "Initially determined" -- well, it doesn't
18   say that there's not other factors. They're the
19   only ones mentioned.
20   Q    Let me -- let me -- let me read the last
21   sentence.
22       Quote: "The orderly determination and
23   adoption of the weighted fair value methodology
24   resulted in NAV errors in the fund," and that's
25   what it's defining as the NAV error.

Page 132

Dustin Norris

2        Have I read that correctly?
3    A    You did.
4    Q    And so would you agree with me, as HCMFA's
5    30(b)(6) witness, that on May 28th, 2019, HCMFA
6    told the GAF board that the two causes of the NAV
7    error were the orderly determination and the
8    adoption of the weighted fair value methodology --
9    fair value -- fair valuation methodology?
10   A    Those were -- it doesn't say those are
11   exclusively the only factors, but those are
12   mentioned here.
13   Q    It says those two factors resulted in the
14   NAV error; correct?
15   A    Those -- no, it didn't say "the NAV
16   error." It said "in NAV errors."
17   Q    Which it's defining as the NAV error;
18   correct?
19   A    Defines as "the NAV error."
20   Q    Okay. Does HCMFA contend that there's
21   anything in this paragraph that is inaccurate?
22   A    Again, I -- I don't know that Houlihan
23   Lokey was approved by the board, but I don't know
24   of any other contention.
25   Q    Okay. And you don't -- and HCMFA doesn't

Page 133

Dustin Norris

2    dispute that Houlihan Lokey was approved by the
3    board. You're just telling me that, as you sit
4    here today, that's the one fact that you've not
5    been able to confirm; is that fair?
6    A    As far as I know, yeah.
7    Q    Okay. Let's go on to the next paragraph.
8        MR. MORRIS:  If we could just
9    scroll up a little bit.
10   BY MR. MORRIS:
11   Q    I'm going to try and summarize here, but
12   if you don't think it's a fair summary, of course
13   I would encourage you to let me know.
14       Is it fair to say that, as a general
15   matter, the next paragraph describes a total loss
16   from the NAV error as being approximately
17   $7.5 million?
18   A    Yeah, including processing costs and
19   rebates and offsets, yes.
20   Q    Right. That's what the parenthetical
21   says, a total loss --
22   A    Yup.
23   Q    -- of approximately $7.5 million?
24   A    Correct.
25   Q    And the next paragraph states that that

Dustin Norris

1 loss was funded with two payments. Do I have that
2 correct in the first sentence?
3
4 A    Correct.
5 Q    Okay. Did HCMFA pay approximately
6 $5.186 million on or around February 15, 2019, in
7 connection with the NAV error?
8 A    I believe so.
9        And if we go to the next page, it has
10 dates and payments. I think it's represented
11 there.
12 Q    Okay. Where did HCMFA get the money to
13 make that payment?
14 A    A combination of insurance proceeds and
15 cash that it had. And, again, that's detailed, I
16 believe, on the next page.
17 Q    HCMFA contends that the $7.4 million
18 transferred by Highland to HCMFA was mistakenly
19 recorded as a loan; correct?
20 A    There's – there's two different amounts
21 that we contend were recorded as a note, a
22 combined 7.4 million, yes.
23 Q    Okay. And HCMFA contends that the
24 $7.4 million in payments was not to be a loan, but
25 was supposed to be compensation for Highland's

Dustin Norris

1 negligent valuation services in connection with
2 the NAV error; correct?
3
4 A    Sorry. One more time.
5 Q    HCMFA contends that the $7.4 million in
6 payments was supposed to be compensation resulting
7 from Highland's negligent valuation services;
8 correct?
9 A    Yes, subject to all of our defenses that
10 we've laid out in our pleadings.
11 Q    Okay. When did HCMFA reach the conclusion
12 that Highland was the cause of the NAV error?
13 A    The – there was never – I don't think
14 there was ever a question. It was always known
15 that HCMLP employees were the ones creating the
16 valuation, overseeing the valuation, working with
17 the value – you know, everything that was done
18 was outsourced to HCMLP.
19        And so it was discussed with the
20 board. It was discussed in-depth internally. The
21 employees were all HCMLP employees. So I can't
22 pinpoint a date, but there – it was a known
23 factor that HCMLP was responsible.
24        MR. MORRIS: Okay. I move to
25 strike.

Dustin Norris

1 BY MR. MORRIS:
2
3 Q    The only thing I'm asking you for is a
4 date. And if you don't know, the answer is "I
5 don't know." So let me try one more time.
6        Do you know when HCMFA first
7 determined that Highland was negligent?
8 A    I don't know the first date.
9 Q    Do you know if it was in 2018 or 2019?
10 A    I don't know.
11 Q    Do you know when the NAV error first –
12 was first identified?
13 A    I believe the NAV error was determined in
14 early 2019.
15 Q    Was it before or after – I mean, the –
16 the NAV error must have been identified before
17 February 15, 2019; correct?
18 A    Correct.
19 Q    Okay.
20 A    Well, I should say whether there – I
21 don't know. I don't remember – we'll have to
22 look through the documents – what the actual –
23 oh, you're saying before February 15th. Yes,
24 that's when the paid insurance proceeds came in.
25 So yes.

Dustin Norris

1 Q    No question – no question that HCMFA knew
2 before February 15, 2019, that there was a NAV
3 error; correct?
4 A    Correct.
5 Q    No question that HCMFA knew before
6 February 15, 2019, that the NAV error was caused
7 by Highland; correct?
8 A    Yeah. Like I said, it was always known
9 that these were Highland employees that were
10 outsourced through the valuation, and they were
11 the ones at fault.
12 Q    Okay. Do you know if – if HCMFA ever
13 demanded compensation from Highland for any errors
14 or mistakes it may have made in connection with
15 the TerreStar valuation?
16 A    Yeah. Mr. Dondero told Frank to make the
17 payments to compensate for the NAV error.
18 Q    And did he do that in his capacity as the
19 person in control of HCMFA, or did he do that in
20 his capacity as the person in control of Highland?
21 A    I would imagine it would have been both.
22 Further supported, he transferred money of his
23 own money to HCMLP to then pay HCMFA. And so
24 he – yes, he was on both sides of it, but he had

Page 138

Dustin Norris

1    the authority on both sides to make that decision.

2    Q    Okay.  And so Mr. Dondero reached an

3    agreement with himself pursuant to which HCMFA

4    demanded and Highland agreed to pay the

5    $7.4 million as a consequence of Highland's

6    negligent conduct in the performance of its

7    valuation services.  Do I have that right?

8    A    Sounds like there's a legal determination

9    there that needs to be made.  I –

10   Q    It's a factual one, I promise.

11   A    Entering – whether entering into an

12   agreement or not, I – that seems like a legal

13   determination.  But maybe ask the question again.

14   Q    Did somebody on behalf of Highland agree

15   to pay HCMFA $7.4 million in order to compensate

16   HCMFA for Highland's negligent services in

17   connection with the TerreStar valuation?

18   A    Yes.  Mr. Dondero.

19   Q    Thank you.

20        Is there any document anywhere that

21   you have ever seen that reflects Highland's

22   agreement to pay $7.4 million as compensation to

23   HCMFA?

24   A    I haven't seen a settlement agreement or

Page 139

Dustin Norris

1    an agreement to that effect, no.

2    Q    You haven't seen anything; correct?

3    A    No.

4    Q    Have you looked?

5    A    We have.  I actually wouldn't be

6    surprised – I would be surprised to see one.  And

7    it's – my understanding is – and the company's

8    position is that there doesn't need to be an

9    agreement.  Right?  We –

10   Q    I'm not asking – I'm going to interrupt

11   you again.  I'm not asking you –

12        MR. RUKAVINA:  Well, John –

13        MR. MORRIS:  – anything like that.

14   I need him to answer my questions or we're

15   going to be here all night.

16        MR. RUKAVINA:  John, hold on.

17   BY MR. MORRIS:

18   Q    Have you ever – have you ever seen

19   anything –

20        MR. RUKAVINA:  John, hold on.  Hold

21   on.

22        MR. MORRIS:  No, no.  Davor,

23   please – please –

24        MR. RUKAVINA:  John, it is not our

Page 140

Dustin Norris

1    position – it is not – it is our

2    position that there is no settlement

3    agreement.

4        MR. MORRIS:  Thank you very much.

5    BY MR. MORRIS:

6    Q    Is it your position that there is any

7    document of any kind that reflects Highland's

8    agreement to pay $7.4 million as compensation?

9    A    No.  Subject to our defenses, but there's

10   none.

11   Q    Did Mr. Dondero tell Mr. Waterhouse that

12   the money that he was asking to be transferred

13   from Highland to HCMFA be transferred as

14   compensation for the NAV error?

15   A    Our position is that this was compensation

16   for the NAV error, and that was discussed.

17   Mr. Dondero told Frank.  And I believe Frank even

18   testified to that, and Mr. Dondero testified to

19   that in their depositions.

20   Q    Okay.  Now, you said that the February

21   payment of over $5 million was funded through

22   insurance proceeds and cash.

23        Do I have that right?

24   A    Yes.

Page 141

Dustin Norris

1    Q    And the cash portion was really just the

2    deductible?

3    A    If you want to go to Page 2, we can look

4    at the details.

5    Q    Sure.  Sure.

6    A    I don't have it all by memory.

7    Q    That's fair.

8        MR. MORRIS:  Let's go to the next

9    page.

10   BY MR. MORRIS:

11   Q    Looking at this, do the third and fourth

12   lines refresh your recollection –

13   A    Yes.

14   Q    – that the February payment was funded

15   through insurance proceeds and an insurance

16   deductible paid by the adviser?

17   A    Yes, I believe that's correct.

18   Q    Okay.  And Topic Number 8 on the 30(b)(6)

19   notice relates to the insurance claim; right?

20   A    Uh-huh.

21   Q    Okay.  Did you do anything to familiarize

22   yourself with the insurance claim?

23   A    I did.

24   Q    And what did you do to familiarize

Page 142

Dustin Norris

1           Dustin Norris
2   yourself with the insurance claim?
3   A     I discussed with DC and Davor the
4   company's position on the insurance claim.
5   Q     Okay. I don't want to know what the
6   company's position is. I want to know what the
7   facts are.
8           Did you learn any facts in connection
9   with your diligence and your preparation to answer
10  topic – questions on Topic Number 8?
11  A     Yeah. The HCMFA policy was – was – the
12  HCMFA – HCMFA had an insurance policy with ICI
13  Mutual; and based on the NAV error, the policy
14  was – I don't know what the word is – was used
15  to seek reimbursement for the NAV error.
16  Q     Okay. So –
17          (Reporter discussion off the record.)
18  BY MR. MORRIS:
19  Q     So did HCMFA file a claim for insurance
20  coverage with ICI Mutual in connection with the
21  NAV error?
22  A     The HCMLP employees, I believe, through
23  Frank Waterhouse and his team, did that. They –
24  they managed the insurance as part of the shared
25  services agreement, and they filed with the

Page 143

Dustin Norris

1           Dustin Norris
2   insurance company –
3   Q     And – and the filing –
4   A     – on behalf of HCMFA.
5   Q     And the filing that was made, was that a
6   claim that was made on behalf of HCMFA?
7   A     I believe so, yes.
8   Q     And did HCMFA authorize the filing of that
9   claim?
10  A     Our position is that that – that is a
11  valid claim from HCMFA.
12  Q     All right. Did HCMFA authorize the filing
13  of the insurance claim?
14  A     I – I don't know.
15  Q     Did – has HCMFA ever told anybody at any
16  time that the insurance claim was not authorized
17  by HCMFA?
18  A     No.
19  Q     And HCMFA received almost $5 million on
20  account of the claim; right?
21  A     Correct.
22  Q     And HCMFA wanted to recover on its
23  insurance claim; correct?
24  A     Yes.
25  Q     Did the claim – was the claim made in

Page 144

Dustin Norris

1           Dustin Norris
2   writing?
3   A     I believe so.
4   Q     Have you seen the claim?
5   A     I don't – I don't recall seeing the
6   claim.
7   Q     In connection with the defense of this
8   lawsuit and the preparation, have you made any
9   efforts to identify the actual claim that was
10  filed on behalf of HCMFA?
11          MR. RUKAVINA: Let me interject –
12      let – let me interject. And we can talk
13      about this offline. We searched for that
14      and could not find it. We suspect it
15      might be in HCMLP's legal documents that
16      we don't have access to, but we have and
17      we continue to actively search for the
18      claim itself. We have not been able to
19      find it.
20  BY MR. MORRIS:
21  Q     Does HCMFA use an insurance broker?
22  A     I don't believe so that I. I think it's
23  directly with ICI Mutual. And it – we – there's
24  no broker, but it goes through HCMLP's employees.
25  Frank Waterhouse would have been the one probably

Page 145

Dustin Norris

1           Dustin Norris
2   interacting with ICI Mutual.
3   Q     HCMFA and HCMLP broke up at the end of
4   February; is that fair?
5   A     That's correct.
6   Q     At any time since the end of February, has
7   HCMFA made any effort to obtain any information
8   concerning this insurance claim from ICI Mutual?
9   A     I don't know where we got the source of –
10  of the documents, but there – there was – they
11  were searching for the ICI documents. I don't
12  know if it came from ICI or another source.
13  Q     Anybody –
14  A     I don't –
15  Q     Anybody from HCMFA reach out to ICI Mutual
16  for information relating to this insurance claim
17  at any time?
18  A     I don't – not that I'm aware of.
19  Q     Okay.
20  A     They may have, but I don't know.
21  Q     Do you know when the claim was filed?
22  A     I don't. I – I don't. I – I think it
23  may have been late 2018, but I'm not sure.
24  Q     And at the time HCMFA filed the claim for
25  insurance, it had already formed the opinion that

Dustin Norris

1
2   Highland Capital Management, LP, was the
3   responsible party; correct?
4   A    I believe so, yes.
5   Q    Did HCMFA tell the insurance company that
6   Highland Capital Management was the responsible
7   party?
8   A    I'm not sure. Again, this was Highland
9   employees that filled out the materials and was
10  working with ICI. So I don't know if your
11  employees notified them.
12  Q    So the total estimated loss was
13  approximately $7.5 million; right? That's the top
14  number on the right?
15  A    Yes.
16  Q    Okay. And roughly two-thirds of that was
17  financed through insurance proceeds that were
18  received in February of 2019; correct?
19  A    Correct.
20  Q    And thereafter, it's HCMFA's contention
21  that Highland paid it another $7.4 million for
22  purposes of providing compensation in connection
23  with its negligent work on the -- on the TerreStar
24  valuation error; correct?
25  A    Yes, that's correct. And that lines up,

Dustin Norris

1
2   7.4 million, with the net -- net loss that's shown
3   there, estimated loss.
4   Q    Right. So it's fair to say, then, from --
5   that it's HCMFA's position that it received
6   $7.4 million from Highland as compensation, and
7   approximately $5 million from the insurance
8   carrier as compensation for total receipts of
9   $12.4 million in connection with the NAV star --
10  with the TerreStar valuation error?
11  A    Correct.
12  Q    Okay. Why would H-- why does HCMFA
13  contend that its entitled to $12.4 million from
14  Highland and the insurance company when the total
15  loss was only $7.4 million?
16  A    Yeah, it's -- it's our position that the
17  collateral -- and I'm not an attorney. But
18  understanding our position here, that under Texas
19  law, the collateral source rule would permit you
20  to recover value from the insurance company and to
21  the individual or the -- the company that created
22  the -- or caused you harm.
23  Q    So you're -- would you agree that HCMFA
24  has profited by about $5 million as a result of
25  the NAV error under that theory?

Dustin Norris

1
2   A    I -- I don't know that -- how the theory
3   relates to profits, but we've -- we've paid -- and
4   say, "What's the logic for this?" We paid in
5   insurance premiums for years, significant
6   insurance premiums. And so there's been a loss
7   for years and years for the insurance, and then
8   we're now hitting that insurance to say there's a
9   gain of $5 million, whatever number you threw out.
10  I would disagree with that.
11          But, yes, there was proceeds of
12  12-and-a-half million, but we've been paying in
13  insurance proceeds or premiums for a long time.
14  We're going to continue, and likely, I would
15  imagine, those premiums will go up because of the
16  claim.
17          So I -- I'm, again, not a lawyer. I
18  don't understand all the reasons why it's
19  permitted. But our position is that the
20  collateral source rule under Texas law permits you
21  to receive from the insurance -- your insurance
22  provider and from the party that did you harm.
23  And as you said, here we believe it's negligence.
24  It may be breach of contract, but we believe it's
25  negligence.

Dustin Norris

1
2   Q    Okay. I just want to make this really
3   clean.
4          The estimated net loss from the NAV
5   error is $7.442 million; correct?
6   A    The estimated loss from the NAV error,
7   yes.
8   Q    Okay. And notwithstanding that HCMFA
9   believed that Highland was the responsible party,
10  HCMFA, nevertheless, filed a claim for insurance
11  coverage with ICI Mutual; correct?
12  A    That's correct.
13  Q    And ICI Mutual paid almost $5 million in
14  connection with that claim; correct?
15  A    Correct.
16  Q    And in addition to that almost $5 million,
17  it's HCMFA's position that it received and was
18  entitled to receive an additional $7.4 million
19  from Highland as compensation for its error;
20  correct?
21  A    Correct.
22  Q    So that notwithstanding the fact that the
23  estimated net loss was $7.44 million, HCMFA
24  received and contends that it's entitled to keep
25  $12.4 million; correct?

Page 150

Dustin Norris

2  A    That's correct, subject to our defenses.

3  Q    Okay.  Did – has – has HCMFA ever

4  informed ICI Mutual that it received $7.4 million

5  from Highland on account of the NAV error?

6  A    Not that I'm aware of.

7  Q    Has HCMFA ever told ICI Mutual that

8  Highland was at fault?

9  A    Again, I think I already answered that.  I

10 don't know.  Communication with ICI was done by

11 the HCMLP employees as part of the shared services

12 agreement, and I'm not sure if they communicated

13 that.

14        MR. MORRIS:  Okay.  I move to

15 strike.

16 BY MR. MORRIS:

17 Q    I just – I'm just asking for your

18 knowledge, not speculation.

19        Do you have any knowledge that anyone

20 on behalf of HCMFA ever informed ICI Mutual that

21 Highland was the cause of the NAV error?

22 A    I have no knowledge.

23        MR. MORRIS:  Let's take a short

24 break.  The time now is 3:06 – or 2:06.

25 Let's just come back at 3:20.

Page 151

Dustin Norris

2        (Recess from 2:07 p.m. to 2:21 p.m. CST)

3  BY MR. MORRIS:

4  Q    So we were talking a bit about the

5  insurance payment that was received in February

6  of 2019.  Do you remember that?

7  A    Yes.

8  Q    And there was a claim that was filed on

9  behalf of HCMFA that resulted in that insurance

10 proceed payment; correct?

11 A    Correct.

12 Q    And do you recall if that insurance claim

13 was filed in 2018 or 2019?

14 A    I don't recall, but I believe it was late

15 2018.  But I don't know.

16 Q    Yeah.

17 A    And as we testified, we don't have that

18 claim.  We've searched for it.  It's probably on

19 your server, as I – Frank Waterhouse and his team

20 would have submitted that.

21 Q    Yeah.  But you haven't made any effort to

22 get it from the carrier; right?

23 A    No, not that I know of.

24 Q    Okay.  And would you agree with me that

25 it's probably extremely unlikely that an insurance

Page 152

Dustin Norris

2  carrier would have processed a claim of that

3  magnitude in six weeks?

4  A    I know they expedited it and they

5  specialize in – sorry.  I'll step back.

6        I have no knowledge of how quick

7  carriers make these claims –

8  Q    All right.  Do you know –

9  A    Other than hail on my house – hail damage

10 on my roof, I don't have personal knowledge of

11 insurance claims.

12        MR. MORRIS:  You know, I apologize,

13 but can I ask Ms. Canty to put back up on

14 the screen that last exhibit that we had?

15 I don't have the exhibit number.

16        All right.  And go to the prior

17 page.  And go to the bottom of that page.

18 BY MR. MORRIS:

19 Q    So we've put back up on the screen, I

20 think –

21        MS. CANTY:  182.

22        MR. MORRIS:  182.

23 BY MR. MORRIS:

24 Q    All right.  And do you see in the next to

25 the last paragraph, Mr. Norris, there's a

Page 153

Dustin Norris

2  reference to a period from March 18, 2018, to

3  January 19, 2019?

4  A    Yes.

5  Q    That's what they've defined as the NAV

6  restatement period.  Do you see that?

7  A    Yes, I do.

8  Q    Okay.  Looking at that period, does that

9  refresh your recollection at all as to when in

10 2018 HCMFA first learned about the NAV error?

11 A    No, because that was – that was the

12 period of time when the market – the off-market

13 or on-market transactions happened, March 18th.

14 Q    Okay.

15 A    It was sometime in between that they found

16 out that there was an error.

17 Q    Okay.  And do you know if it was the first

18 half of 2018 or the second half?

19 A    The midyear audits of some of our funds, I

20 believe, is when it first came up.

21 Q    And –

22 A    So 6/30 audits that were due 60 days

23 later.  So second half – I believe second half of

24 2018.

25 Q    So is it fair to say sometime in August or

Page 154

Dustin Norris

1          Dustin Norris
2  September is when HCMFA first learned about it?
3  A     About -- define "it."  Is that the NAV
4  error.
5  Q     I apologize.  Let me ask the question
6  again.
7          Is it fair to say, based on the timing
8  of the audit, 60 days after June 30th would take
9  us to approximately August 31st; right?
10  A     It does.
11  Q     And so is it fair to say, then, that HCMFA
12  first learned about the NAV error sometime in
13  August of 2018 while it was preparing the
14  financials for the period ending June 30th?
15  A     No.  I don't think there was a
16  determination of whether there was a NAV error or
17  not at that point.  I think the reason they have
18  going all the way to January 19 -- 2019 is it
19  wasn't determined -- finalized if there is an
20  error or not.
21          There was a lot of discussion with the
22  SEC and auditors over whether there was or wasn't
23  an error, what the amount was, what the proper
24  valuation should be.  There was consultation with
25  the SEC, and that process lasted, I believe,

Page 155

Dustin Norris

1          Dustin Norris
2  several weeks, if not months.
3          So that is not when they found out
4  about a NAV error, but the questions over
5  valuation, yes.
6  Q     Okay.  So then let me state the question
7  differently then.
8          Is it fair to say that HCMFA first
9  learned in or about August 2018 of the valuation
10  issues?
11  A     The "about" is key here.  I don't know the
12  specific date, but around that time or earlier --
13  Q     Okay.
14  A     -- or later.  On or around that time.
15  Q     And did HCMFA conclude, at the same time
16  it learned of the valuation issues, that HCMFA was
17  the responsible party?  Or was there a gap between
18  learning about the valuation issues and making the
19  determination that Highland was the responsible
20  party?
21  A     Yeah, first you said HCMFA was the
22  responsible party, and then you said Highland.
23  Q     I apologize.  Let me try and restate that.
24          Did HCMFA conclude that Highland was
25  the responsible party at or around the same time

Page 156

Dustin Norris

1          Dustin Norris
2  that it learned of the valuation issues, or was
3  there a period during which it knew about the
4  valuation issues, but not -- had not yet formed
5  the conclusion that Highland was the responsible
6  party?
7  A     From the beginning, everybody knew who the
8  responsible party was for the valuation.  Those
9  reporting the issues, those responding to
10  auditors, those responding to SEC and the board
11  were all HCMLP employees from the beginning.  But
12  I don't have a specific date.
13          Again, as you look here, it doesn't
14  say when the NAV error was determined, but from
15  the beginning, it was the knowledge that HCMLP was
16  responsible for the valuations.
17  Q     Okay.  Do you know when HCMFA first
18  determined that the estimated loss was
19  approximately $7.4 million?
20  A     I don't, no.  I don't have specifics, but
21  it was after there was a determination there was
22  actually a NAV error.  And it may be in some of
23  the documents that you have, I believe it may be
24  in, you know, a memo to the board or the SEC, but
25  I don't know offhand.

Page 157

Dustin Norris

1          Dustin Norris
2  Q     Do you know when there was a determination
3  that there was a NAV error?
4  A     I don't know the specific time, no.
5  Q     Do you know if it was in 2019 or 2018?
6  A     I don't remember.
7  Q     Is it fair to say that it was before
8  May of 2019?
9  A     That there was a determination there was a
10  NAV error?  Yes.
11  Q     And is it fair to say that HCMFA had
12  concluded that the loss of that NAV error was
13  going to be more than a million dollars prior to
14  May 2019?
15  A     More than a million?  Probably -- yes.
16  Q     Okay.  Is there a reason that HCMFA waited
17  until May to have Highland pay it for the
18  compensation?
19  A     I think that the whole process -- as you
20  see, the resolution memo is in May to the board.
21  That was the conclusion of the overall process.
22  So our stance would be that that was when it was
23  the right time and everything was -- the right
24  time to be sent.
25          MR. MORRIS:  Okay.  Can we put up

Page 158

```
1           Dustin Norris
2    on the screen a document that's been
3    marked as, I think, as Exhibit 13?  I
4    don't know if you're able to get that,
5    La Asia.
6        MS. CANTY:  Yup, I got it.
7        MR. MORRIS:  Thank you.
8        (Exhibit 13 tendered.)
9    BY MR. MORRIS:
10   Q    Are you aware, sir, that there came a
11   point in time when HCMFA amended its answer?
12   A    Yes.
13   Q    And I think topic –
14   A    Topic 2 is our amended answer.
15   Q    Okay.  So that's the document that's in
16   front of you?
17   A    Yes.
18   Q    And you've seen that before; correct?
19   A    Yes.
20   Q    Okay.
21       MR. MORRIS:  Can we turn to Page 5
22   of 9, please?
23            And if we can scroll to the bottom.
24   BY MR. MORRIS:
25   Q    These are HCMFA's affirmative defenses; is
```

Page 159

```
1           Dustin Norris
2    that right?
3    A    On the second amended answer, yes.
4    Q    Yes.
5    A    I'm sorry.  The first amended answer, yes.
6    Q    And as of today, is it your understanding
7    that this is HCMFA's operative pleading?
8    A    No.
9    Q    Has it been amended after this time?
10   A    Yeah, we –
11       MR. RUKAVINA:  Well, he doesn't
12   know what "operative pleading" means.
13       THE WITNESS:  Oh.
14       MR. RUKAVINA:  Yes, it is our
15   operative pleading, Dustin.
16       THE WITNESS:  It is our operative
17   pleading then.
18   BY MR. MORRIS:
19   Q    And I didn't mean to trick you.  I
20   apologize.  I just meant to say that this has not
21   been amended as of today; correct?
22   A    We filed a – wait.  Let me see what it's
23   called.
24   Q    You filed a motion for permission to amend
25   it further –
```

Page 160

```
1           Dustin Norris
2    A    Yes.
3    Q    – but that motion hasn't been granted;
4    right?
5    A    To my understanding, no.
6    Q    Okay.  And you understand that your – the
7    answer that's up on the screen can't be amended
8    unless the Court grants the motion; right?
9    A    I – if you tell me that that's the
10   process, I'll take that for what it's worth.  I'm
11   not an attorney.  I don't know the process.
12   Q    Okay.  So let's just look at this
13   document.
14            Is it fair to say that Paragraph 38
15   through 45 deals with –
16   A    I'm going to grab the –
17   Q    Yeah.
18   A    – thing here so I can see it on my desk,
19   too.
20   Q    Sure.
21   A    Okay.
22            38?
23   Q    Right.
24   A    Okay.
25   Q    Now – actually, a little background.
```

Page 161

```
1           Dustin Norris
2            This amended complaint was prepared
3    after DC Sauter conducted an investigation
4    concerning the circumstances surrounding the two
5    notes that Highland was suing on; right?
6    A    Yes.  My understanding is it is after
7    he – so background, when he – we filed our
8    initial response, we didn't have access to the
9    HCMLP employees during that time period.  They
10   were not permitted to talk to us about things like
11   this.  And so he did the best he could to prepare
12   a response.  But once they were mostly all fired
13   by HCMLP and formed their own company called
14   Skyview, he was able to talk to them on
15   particulars.  As you note in his – his statement,
16   he was able to talk to Frank Waterhouse, where he
17   wasn't before, on this topic.
18   Q    Right.  So by the time this document has
19   been prepared, HCMFA had copies of the notes that
20   Highland was suing on for six months; right?
21   Because the lawsuit was commenced in January, and
22   the notes were attached as exhibits to the
23   complaint; right?
24   A    Yes.  This is July 6th this is filed.
25   Q    Right.  Okay.  So this is filed almost six
```

Page 162

Dustin Norris

1

2  months after the complaint is filed; right?

3  A    More like a five-month -- five months and

4  a week, but yeah.

5  Q    All right.  I won't quarrel with you.

6  A    Or five and a half -- five and a half

7  months, yeah.

8  Q    Okay.

9  A    Whether you consider that --

10  Q    Okay.

11  A    -- six full months or not.

12  Q    So --

13  A    We know the dates January 22nd and

14  July 6th.

15  Q    Okay.  So for that entire time period of

16  time, there's no dispute that HCMFA had in its

17  possession copies of the notes that Highland was

18  suing on; correct?

19  A    I'm looking at the original -- you said

20  they were attached, but I --

21  Q    Yeah.

22  A    If you want to show me the original notes

23  on the original filing.

24  Q    Well, I asked you to look at the original

25  complaint.  I think -- was the original complaint

---

Page 163

Dustin Norris

1

2  Topic Number 1?  No.  It's just the answer.

3      In looking at the answer, did you look

4  at the original complaint?

5  A    Yes.

6  Q    Do you recall seeing that the notes were

7  attached to the original complaint?

8  A    I looked at thousands of pages in

9  preparation, so I just -- I could take your word

10  for it if you say it's in there, or if you want to

11  show it to me, we can look at it.

12      MR. RUKAVINA:  They are, Dustin.

13  They are.

14      MR. MORRIS:  Yeah.  I think you'll

15  have to take my word for it.  Thank you,

16  Davor, for confirming my word.

17  BY MR. MORRIS:

18  Q    So let me just try this again to make it

19  clean.

20      Based on my representation, that

21  Mr. Rukavina has agreed with, that the notes that

22  Highland are suing on were attached to its

23  complaint in January, you would agree with me that

24  HCMFA had the notes in its possession from at

25  least the time the complaint was filed until the

---

Page 164

Dustin Norris

1

2  time HCMFA filed this amended answer on July 6th;

3  correct?

4  A    Yes.

5  Q    And this amended answer was filed because

6  HCMFA had a -- had previously made a motion to the

7  Court for leave to amend its answer; correct?

8      MR. RUKAVINA:  That's correct,

9  Dustin.

10      He wouldn't know about that, but

11  that's all correct.

12  BY MR. MORRIS:

13  Q    Okay.  Well, you're familiar with the

14  Sauter declaration; right?

15  A    I am.

16  Q    And the Sauter declaration purports to

17  describe an investigation that Mr. Sauter

18  undertook to determine the circumstances

19  surrounding the notes; is that fair?

20  A    I don't know if I'd characterize it

21  investigation, but he was tasked with -- and I've

22  got it right here.  I would refer you to the

23  agreement on -- or his -- to his declaration on --

24  Q    How would you -- how would you

25  characterize the work that he did?  An

---

Page 165

Dustin Norris

1

2  investigation?  An analysis?  What word do

3  you -- would you use?  Due diligence?  How would

4  you characterize the work that Mr. Sauter did

5  that's set forth in his declaration?

6  A    I -- I'm looking here.  I want to see how

7  he characterizes it.

8      I think he does a very good job of

9  explaining.

10      My investigation would be of the

11  following.  So he calls it an investigation.

12  Q    Okay.  So HCMFA would agree that after

13  Mr. Waterhouse left the employ of Highland, that

14  DC Sauter conducted an investigation into the

15  circumstances surrounding the notes that Highland

16  was suing on; correct?

17  A    Correct.

18  Q    And as part of that investigation, he

19  spoke with Mr. Waterhouse; correct?

20  A    Yes.

21  Q    And as part of that investigation, he

22  spoke with Mr. Dondero; correct?

23  A    I believe so, but let me -- let me confirm

24  in his statement.

25      Because I believe in -- yeah.

Page 166

Dustin Norris

1    Q    Is that correct, that he spoke with
2    Mr. Dondero in connection with his investigation?
3    A    I'm – I'm seeing what he rep'ed to in his
4    statement.
5    Q    And does his statement say that?  I don't
6    have it in front of me.
7    A    I don't know.  That's what I'm looking at.
8    Q    And you don't know, independently of the
9    document, whether Mr. Sauter spoke with
10   Mr. Dondero as part of his investigation?
11   A    I know he did.  I know he talked
12   throughout from when we received the original
13   complaint on.  I just – you're asking about the
14   time frame between filing the original filing.
15   And I think he may have spoken with him before
16   that, too, but I – I just want to take a...
17        So at the time – this is on
18   March 1st, filed the defendant's original answer.
19   At that – at the time the debtor filed a
20   complaint, I promptly undertook an internal review
21   of the background facts concerning the notes.  I
22   had no knowledge of them since I had not been
23   employed by HCMFA.  And a few employees of HCMLP
24   had no knowledge of notes.  I also discussed the

Page 167

Dustin Norris

1    notes of James Dondero, formerly the CEO of the
2    debtor, Mr. Dondero.
3        So this is March 1st when that first
4    filing was made.  So he did speak with Mr. Dondero
5    prior, and then I believe the source of the
6    additional information was being able to speak
7    with Frank Waterhouse and Will Mabry.
8    Q    Okay.  And is it fair to say that the
9    amended complaint is based on Mr. Sauter's
10   investigation?
11   A    Yes, I believe so.
12   Q    Yeah.
13   A    Yes.
14   Q    That's why HCMFA amended its complaint.
15   It's because Mr. Sauter had undertaken this
16   investigation, and he learned what he believed
17   were relevant facts, and those facts are described
18   in his declaration, and they formed the basis of
19   the affirmative defenses that we're looking at now
20   in the amended answer; fair?
21   A    Let me pull up the amended answer just
22   to –
23   Q    It's up on the screen, but if you have a
24   hard copy, that's fine.

Page 168

Dustin Norris

1    A    Yeah.  I have a hard copy here, although I
2    may have mixed my documents.
3        Yeah, it was based on additional facts
4    that weren't available at the time of the original
5    response.
6    Q    Okay.  And is it fair to say that
7    Paragraphs 38 through 45 relate to the affirmative
8    defense that Highland was responsible for the NAV
9    error, and the $7.4 million payment was intended
10   to be compensation for Highland's negligent work?
11   A    Sorry.  Can you ask that one more time?
12   There was a couple parts there.
13   Q    No problem.
14        Is it fair to say that
15   Paragraphs 35 – withdrawn.
16        Is it fair to say that Paragraphs 38
17   to 45 relate to HCMFA's affirmative defense that
18   the $7.4 million that was transferred from
19   Highland to HCMFA in May 2019 was intended to be
20   compensation for Highland's negligent work in
21   connection with the NAV error and not in the form
22   of a loan?
23   A    You said 38 to 42?
24   Q    38 to 45.

Page 169

Dustin Norris

1    A    38 to 45.
2        Yeah, it – the NAV error items are
3    included in there as one of our defenses.
4    Q    Right.
5    A    43 and 44 and 45 discuss additional
6    defenses related to the note and who may or may
7    not have signed the note and who had authority to
8    sign the note.
9    Q    Okay.
10       MR. MORRIS:  Can you – can we turn
11   to Paragraph 42?
12       THE WITNESS:  Yes.
13   BY MR. MORRIS:
14   Q    Do you see the first four – first few
15   words in Paragraph 42 are, quote:  "The defendant
16   accepted responsibility for the NAV error"?
17   A    Yes.
18   Q    Okay.  "Defendant" there refers to
19   Highland Capital Management, LP; correct?
20   A    No.  I believe –
21   Q    Oh, I apologize.  I apologize.
22   A    Thank you.
23   Q    It's HCMFA; right?
24   A    HCMFA.

Appx. 03056

Page 170

Dustin Norris

2  Q    Okay.  And is -- did -- did HCMFA accept

3  responsibility for the NAV error?

4  A    They did.  They -- they are the adviser,

5  and there's already -- in the next sentence, HCMLP

6  then accepted that they had a contract with and

7  accepted responsibility.

8  Q    Okay.  And so when did the plaintiff

9  accept responsibility for having caused the NAV

10  error?

11  A    Again, going back to -- this was always

12  known and communicated that it was HCMLP

13  employees.  It was the valuation services they

14  were performing.  The legal and compliance team

15  was all outsourced in the shared services

16  agreement.

17        And that was -- again, there's not a

18  singular determination; but Jim Dondero, as

19  president, I would say effectuated that with the

20  payment of the NAV -- for the NAV error.

21  Q    So you can't tell me when the plaintiff

22  accepted responsibility for having caused the NAV

23  error; correct?

24  A    Not a specific date.

25  Q    Okay.  And it's HCMFA's position that Jim

Page 171

Dustin Norris

2  Dondero, in his capacity as the president of

3  Highland Capital Management, LP, accepted

4  responsibility on behalf of Highland Capital

5  Management, LP, for having caused the NAV error?

6  A    He, and in addition all of the employees

7  involved.  Right?  The valuation team members,

8  Frank Waterhouse was CFO, Dave Klos overseeing the

9  valuation process, they were all Highland

10  employees, and Jim Dondero as well as president

11  recognized that based on all the communications

12  and conversations they would have had.

13        MR. MORRIS:  Okay.  I'm going to --

14        I'm going to move to strike.

15  BY MR. MORRIS:

16  Q    And I'm going to ask you to listen

17  carefully to my question.

18        Who had the authority to accept, on

19  behalf of plaintiff, the responsibility for having

20  caused the NAV error?

21  A    Ultimately Jim Dondero, as president here,

22  had that authority.

23  Q    Okay.  And then it says, quote:  "The

24  plaintiff ultimately, whether through insurance or

25  its own funds, compensated the defendant."

Page 172

Dustin Norris

2        Do you see that?

3  A    Yes.

4  Q    Is that statement accurate?

5        MR. RUKAVINA:  I'll object to

6        vagueness, given the different points in

7        time.

8  BY MR. MORRIS:

9  Q    Does HCMFA believe that that statement is

10  accurate today?

11  A    We know now.  It's come out in discovery

12  that -- and it was represented that Mr. Dondero

13  transferred money to Highland who transferred it

14  to HCMFA.  And I don't know -- and it says "or,"

15  "or its own funds."  So it's accurate whether

16  through insurance or its own funds.

17        But at the time of this writing, we

18  didn't have all the details and have firmed up

19  those details, and I would refer you to

20  depositions and the pleadings and our additional

21  statement regarding cash and movement.

22  Q    Did Highland file an insurance claim, to

23  the best of your knowledge?

24  A    Not that I know of.

25  Q    Did you ever ask anybody, in preparation

Page 173

Dustin Norris

2  for today's deposition, about that sentence in

3  Paragraph 42 and whether or not Highland had ever

4  filed an insurance claim?

5  A    I didn't ask about that sentence, but we

6  did discuss whether Highland had filed an

7  insurance claim.  And to our knowledge, we don't

8  know that they have.  I'd, again, ask you as their

9  attorney.  That would be a question for you.

10  Q    Well, with all due respect, you have

11  complete and unfettered access to the former

12  president and CFO of Highland; correct?

13  A    I do, but -- I'm sorry.  You said

14  president and CEO?

15  Q    The former president and CFO.

16  A    President and -- I don't have unfettered

17  access to the former CFO.

18        MR. RUKAVINA:  I'll -- I'll object

19        to that.  We have been prohibited by

20        Waterhouse's attorney from discussing the

21        matter with him.

22  BY MR. MORRIS:

23  Q    You're -- you're not allowed -- did -- did

24  you -- did HCMFA ask Mr. Waterhouse at any time

25  whether Highland had filed an insurance claim?

Page 174

Dustin Norris

1
2    A    Not -- not that I know of.  However, we've
3    been not permitted to talk to him related to this,
4    based on his attorney.  So --
5    Q    Well, when did --
6    A    We never really discussed -- go ahead.
7    Q    I'm sorry.
8    A    Go ahead.  You were --
9    Q    I was just going to ask:  When did that
10   prohibition go into effect?
11        MR. RUKAVINA:  John, the witness
12   wouldn't know that.  It's about three
13   months ago that the lady from Baker
14   McKenzie, Deb -- I don't know her last
15   name -- got angry at me because I tried to
16   talk to Frank and she said, "Absolutely
17   not.  You're forbidden, and you're
18   violating your ethical rules if you do."
19        MR. MORRIS:  So sometime in
20   September?
21        MR. RUKAVINA:  I would say August
22   or September.
23        MR. MORRIS:  Okay.
24   BY MR. MORRIS:
25   Q    But sometime -- but you had -- HCMFA had

Page 175

Dustin Norris

1
2    complete, unfettered access to Mr. Waterhouse from
3    the time he left Highland in early March 2021
4    until at least the end of July 2021; right?
5    A    Yeah.  And I would add a point to
6    Mr. Sauter's declaration and our pleadings and the
7    depositions for the various details of what we've
8    discovered since.  However, the unfettered access
9    was also inhibited -- or or Mr. Sauter
10   represented this.  There was a lot going on in
11   March, April, May of 2021.
12   Q    Yeah.
13   A    And we were trying to lift out an entire
14   business and keep everything afloat, and -- as
15   you're very aware.  And so there was a lot going
16   on.
17   Q    Right.  Right.
18        Do you see -- can we go to
19   Paragraph 43, please?
20   A    Yes.
21        MR. MORRIS:  If we could just
22   scroll down to Paragraph 43, please.
23   Thank you.
24   BY MR. MORRIS:
25   Q    Now, again, this amended complaint is

Page 176

Dustin Norris

1
2    filed is July 2006; correct?
3    A    July 6th, not July 2006.
4    Q    I apologize.  Let me ask the question
5    again.
6        This amended answer was filed on
7    July 6th, 2021; correct?
8    A    Correct.
9    Q    And it was filed after Mr. Sauter
10   conducted his investigation to determine the
11   circumstances surrounding the note; correct?
12   A    Uh-huh, correct.
13   Q    And it was filed after HCMFA had had
14   its possession since January copies of the notes
15   that Highland was suing on; correct?
16   A    Correct.
17   Q    And it was filed at a time before any
18   limitation or prohibition was placed on HCMFA's
19   ability to communicate with Mr. Waterhouse since
20   the time he had left Highland; correct?
21   A    Sorry.  You want to repeat the first part
22   of that?
23   Q    Sure.
24        It was filed at a time after
25   Mr. Waterhouse left the employ of Highland but

Page 177

Dustin Norris

1
2    before there was any limitation or restriction
3    imposed on HCMFA's ability to communicate with
4    Mr. Waterhouse?
5    A    Yes.  Once he left in March of 2021 is
6    when that happened.  And, again, in March, we
7    were, on both sides, the creation of Skyview, as
8    well as our employees, trying as -- doing
9    everything we could do to transition the
10   businesses and services.  And so that was an
11   important time.
12        MR. MORRIS:  Okay.  Move to strike.
13   BY MR. MORRIS:
14   Q    I just want to confirm that HCMFA had
15   unfettered access to Mr. Waterhouse between the
16   time he left Highland and the time this amended
17   answer was filed in July.
18   A    We had access to him to ask him what we
19   needed.  Unfettered in the sense of, "Hey, we can
20   access you whenever we need," no, because there
21   was a lot involved in launching and -- launching
22   of Skyview and creating all the services needed
23   for our funds since we -- HCMLP is sharing
24   services provided --
25   Q    Does Mr. Sauter have a role with HCMFA?

Page 178

Dustin Norris

2  A   I don't believe so.

3  Q    Do you know who authorized him to conduct

4  this investigation?

5  A    Yeah.  It would have been management,

6  Mr. Dondero, and probably our outside counsel.  At

7  the time, we had been utilizing Highland's

8  services as legal services, all the way up until

9  the end of February.

10       There were legal and compliance

11  services that were part of the shared services

12  agreement.  There was an entire legal team, entire

13  team of litigators who were unable to work on

14  this.

15       Mr. Sauter was a real estate attorney

16  for us, and he picked up the slack and was

17  assigned by Mr. Dondero to help in these causes

18  working with outside counsel, because HCMLP was

19  not providing or no longer able to provide those

20  legal services based on their -- their view, even

21  though they were contracted to do those.

22  Q    That contract ended at the end of

23  February; isn't that right?

24  A    That's correct.

25  Q    And with the exception of a couple of

Page 179

Dustin Norris

2  people, Highland's legal team migrated to Skyview

3  in early 2021; is that fair?

4  A    Yes.

5  Q    Okay.  And among the people who migrated

6  were Stephanie Vitiello; correct?

7  A    Yes.

8  Q    And Isaac Leventon; correct?

9  A    Correct.

10  Q    And he's the chief litigation guy at

11  Highland prior to the bankruptcy; right?

12  A    I -- I don't know if that was Isaac or if

13  it was Scott Ellington.  I don't know.

14  Q    And Scott -- Scott Ellington also

15  migrated; right?

16  A    Correct.

17  Q    So you had access to those folks for the

18  first six months of 2021; right?

19  A    No.  I would -- our position is that those

20  individuals were unable to work on -- even though

21  they had left, they were unable to work on

22  something of this nature.

23       I -- I believe there was also a

24  preliminary injunction still in place where Jim or

25  his employees could not talk to Scott or Isaac.  I

Page 180

Dustin Norris

2  don't remember all the specific details, but the

3  legal team at Highland -- or at Skyview was not

4  working on this.

5  Q    Okay.

6  A    It was probably professional -- I don't

7  know the standards, but they were unable to work

8  on -- on this.

9  Q    All right.  But you would agree that at

10  the time HCMFA asked the court for permission to

11  amend its answer, it did so based on Mr. Sauter's

12  investigation; correct?

13  A    Yes, and I would caveat that subject to

14  our -- our pleadings.

15  Q    Right.  And I think I moved to strike your

16  earlier answer, so let me try and ask the question

17  again.

18       Did Mr. Dondero authorize Mr. Sauter

19  to conduct the investigation?

20  A    I don't have specific knowledge of that.

21  Q    All right.  I think you used the phrase

22  "management."  Did management authorize Mr. Sauter

23  to conduct this investigation on behalf of HCMFA?

24  A    I don't know specifically who -- who would

25  have asked him to do the -- Jim and -- Jim Dondero

Page 181

Dustin Norris

2  asked him to help with the -- the legal items, and

3  stepped in and help in the absence of HCMLP's

4  help.

5  Q    Okay.  And based on that investigation

6  looking at Paragraph 43, HCMFA took the position,

7  quote:  "Waterhouse signed the two promissory

8  notes the subject of the complaint," close quote;

9  correct?

10  A    That's right.  It's our position that

11  at -- and I'd refer you to our amended pleading

12  with additional information, but it's -- it's our

13  position that Mr. Waterhouse saw the notes, was

14  confronted, discussed with DC and said, "Look,

15  that's my signature.  I signed them."

16  Q    Okay.  So that's -- and it was on the

17  basis of Mr. Waterhouse's conversation with

18  Mr. Sauter that HCMFA wrote that sentence; is that

19  fair?

20  A    I believe so.  And I would refer you to

21  Mr. Sauter's declaration as well, which goes into

22  details on that.

23  Q    And Mr. Sauter specifically said that

24  Mr. Waterhouse signed the notes; correct?

25  A    We can look at Mr. Sauter's declaration.

Page 182

Dustin Norris

1 I – I believe he said he was – Mr. Waterhouse
2 told him he signed, but –
3
4 Q    Right. And, in fact, HCMFA's position
5 throughout this entire case was that
6 Mr. Waterhouse signed the notes, but he did so by
7 mistake and without authority; correct?
8 A    That's right. And if you look at the
9 depositions, he testified of that, that he didn't
10 remember signing them, and he didn't have a
11 recollection, and Mr. Dondero never told him to
12 sign it, and he never asked him whether – or
13 he – Mr. Dondero told him never – told him
14 shouldn't be – didn't – Mr. Dondero didn't tell
15 him it was a note, and he never asked if it should
16 be a note.
17        With this – this amended pleading,
18 the thought was he mistakenly thought it was a
19 note, because that was the practice for other
20 notes or other – other transfers of this
21 nature – not of this nature, but other transfers
22 between companies, and so he had papered it up as
23 a note.
24        But if you look at the depositions,
25 you'll see that additional details came out that

Page 183

Dustin Norris

1 he told his controller, Mr. Klos, to transfer the
2 funds, and Mr. Klos then turned around and asked
3 Kristin to paper it up as a note, and to transfer
4 the cash. And Ms. Hendrix – Kristin Hendrix then
5 added Mr. Waterhouse's JPEG signature to the Word
6 document, which then was filed away.
7        So we – we, through the process of
8 depositions and discovery, were able to find more
9 information that Frank Waterhouse did not
10 remember. He didn't remember signing but said his
11 signature is on there, so he must have signed it.
12
13        MR. MORRIS:  All right. I move to
14     strike. My question is really, really
15     simple.
16 BY MR. MORRIS:
17 Q    Up until the time that you filed the
18 motion last night, HCMFA's publicly stated
19 position has always been that Frank Waterhouse
20 signed the notes, and that he did so by mistake
21 and without authority; correct?
22 A    Correct. It says it here:
23 "Mr. Waterhouse made a mistake in preparing and
24 signing the notes for the defendant."
25 Q    Okay. Good enough.

Page 184

Dustin Norris

1
2 A    And then it says: "Upon information" –
3 Q    That's –
4 A    – "and belief, Waterhouse was not aware
5 that the payment from the plaintiff to defendant
6 were to compensate the defendant for the NAV
7 error."
8 Q    I'm sorry. Where are you reading from?
9 Oh, that's 44?
10 A    That's in number 44.
11 Q    Okay.
12 A    Yeah. "Waterhouse made a mistake in
13 preparing and signing the notes for the
14 defendant."
15 Q    Right. Okay.
16 A    But, again, I'll refer you to the
17 depositions and the evidence –
18        MR. MORRIS:  Move to strike. It's
19     not responsive to my question.
20 BY MR. MORRIS:
21 Q    Do you see in Paragraph 47 there's a
22 reference to "lack of consideration"?
23 A    Yes.
24 Q    Okay. What does that mean?
25 A    My understanding is that there was no

Page 185

Dustin Norris

1
2 consideration. We – there were notes, but there
3 was no payment for those notes. The payment was
4 for compensation related to the NAV error, so
5 there was no payment – or no compensation for
6 notes that had been drafted.
7 Q    Okay. And the next defense there in
8 Paragraph 47 is "mutual mistake."
9        Do you see that?
10 A    Correct.
11 Q    Do you have any facts that support that,
12 that the mistake was mutual?
13 A    Yeah. I – I would look to the
14 depositions. And if you go to the testimony of
15 Frank and Jim Dondero and David Klos and Kristin,
16 it was a clear path and a clear record of mutual
17 mistake.
18        Jim told Frank to transfer the money
19 for the NAV error. Frank then goes, tells
20 Mr. Klos, the controller, to go and transfer the
21 money, who tells Kristin to transfer the money –
22 or to make the transfer and to paper it up.
23 Kristin then papers it up, following the process
24 that she's always followed or she said she's
25 followed for many other notes.

Page 186

Dustin Norris

2 She lacked the authority to do so.

3 Mr. Klos lacked the authority. Mr. Waterhouse was

4 never told to make a note, and so the note itself

5 is drafted by an accountant without authority to

6 do so with a maker and a counterparty that is on

7 both sides of this, representing supposedly both

8 sides.

9 And our position is that the maker of

10 this -- even if you look at the document, Frank

11 Waterhouse signs as maker, not as his position.

12 He's signing as the maker.

13 And so there's various aspects of this

14 that had errors on both sides, the -- the position

15 of HCMFA where they thought they had authority and

16 the position of HCMLP.

17 Q   Anything else, sir?

18 A   I -- I would refer you to the -- again,

19 the depositions and our pleadings. But there's --

20 there's a host of support there.

21 Q   Other than the deposition transcripts and

22 the -- and HCMFA's pleadings, are you aware of any

23 document anywhere in the world that corroborates

24 the defense of mutual mistake?

25 A   Other than the documents, the pleadings,

Page 187

Dustin Norris

2 and any schedules and other forms that are filed

3 with the court, there's -- there's plenty there.

4 Q   Okay. What schedules are you referring

5 to?

6 A   I would say all of your supporting

7 schedules, all of your documentation, the notes

8 themselves, the -- the Word documents that we

9 received as well in discovery that have the

10 metadata showing that Kristin Hendrix applied

11 Frank Waterhouse's JPEG signature.

12 Q   Okay.

13 A   All of those items as well as, again,

14 depositions all -- of all those individuals.

15 Q   So -- so I just want to make sure that I

16 have this clear.

17 So you've got the JPEG documents.

18 You've got the deposition transcripts. You know

19 what? Let me restate the question.

20 You've identified the JPEG documents.

21 Other than the JPEG documents, are you aware of

22 any document in the world that was created before

23 the answer date that supports or corroborates the

24 defense of mutual mistake?

25 A   I'm -- again, I -- I'd point to the --

Page 188

Dustin Norris

2 let -- let me take a look here again.

3 Q   What is it you're looking at?

4 A   This is the amended complaint.

5 Q   Okay.

6 A   Which paragraph was that again?

7 Q   It's 47.

8 A   47.

9 Q   Yeah. There's -- it's a -- there's --

10 A   Mutual mistake.

11 Q   -- one of the defenses there. It's up on

12 the screen.

13 A   Yeah.

14 Q   There's "mutual mistake," and I just want

15 you to identify for me every document that HCMFA

16 is aware of that was created before the answer

17 date of March 1st, 2001 [sic], other than the JPEG

18 documents --

19 A   I would -- I would refer you to --

20 Q   -- that support or corroborate -- that

21 support or corroborate the defense of mutual

22 mistake?

23 A   Yeah. And I'd also point you to DC

24 Sauter's declaration.

25 Q   Okay. That wasn't created before the

Page 189

Dustin Norris

2 answer date; correct?

3 A   Well, you're saying -- you -- it was

4 before the answer date.

5 Q   Pardon me?

6 A   The answer date being when we did the

7 amended answer?

8 Q   No. Let me ask the question again.

9 A   Yes, please. Sorry.

10 Q   Can you identify any document in the

11 world, other than the JPEG documents, that support

12 or corroborate the defense of mutual mistake that

13 was created before March 1st, 2021?

14 A   I got you.

15 The JPEG documents is the Word

16 documents with the metadata.

17 Q   Correct.

18 A   There were emails that went between the

19 accounting team on how to paper it up. That is in

20 your -- your documentation as well, and I would

21 say any other document that's in the court

22 filings.

23 Q   Can you identify them? That's kind of --

24 that's not really helpful to me.

25 A   Yeah. I -- there's the -- there's an

Dustin Norris

1       email -- and this was used in depositions.
2       There's an email that went -- was David Klos
3       instructing the group -- or instructing Kristin to
4       send the cash and to record a note.
5   Q       And you believe that -- and it's HCMFA's
6       contention that that document supports their
7       position of mutual mistake.  Do I have that right?
8   A       Again, I'm not an attorney, so tying the
9       definition as little M, little M, I'm going to
10      have to say I don't know.
11  Q       Okay.  Other than the emails, the two
12      emails that you referenced and the JPEG documents,
13      can you identify any other document created before
14      May 1st -- March 1st, 2021, that supports or
15      corroborates the defense of mutual mistake?
16  A       There may be a document.  I -- I don't
17      know.
18  Q       Okay.
19  A       And, again, as you've seen, there's a lot
20      of stuff that's come out in discovery, and it's
21      important that testimony of -- of those witnesses
22      is taken into account.
23          MR. MORRIS:  Okay.  Move to strike
24      the last portion of that answer.

Dustin Norris

1           Let's take a short break.  I may be
2       done.  It's 4:09.  Can we just come back
3       in six minutes?
4           THE WITNESS:  Yes.  Thank you.
5           MR. RUKAVINA:  Sure.
6           MR. MORRIS:  Thank you.
7       (Recess from 3:09 p.m. to 3:19 p.m. CST)
8   BY MR. MORRIS:
9   Q       Just a couple more questions, Mr. Norris.
10          If you can take a look again at
11      Paragraph 47 of the amended answer.
12  A       Yes.
13  Q       Do you see there's also a reference to,
14      quote, "the lack of authority from the defendant
15      to Waterhouse," close quote?
16  A       Yes.
17  Q       HCMFA does not dispute that Mr. Waterhouse
18      was an officer of HCMFA in May of 2019, does it?
19  A       No, we don't dispute that.
20  Q       And HCMFA doesn't dispute that
21      Mr. Waterhouse, in fact, served as the treasurer
22      of HCMFA in May 2019; correct?
23  A       We don't, no.
24  Q       Okay.  Is the sole basis for the assertion

Dustin Norris

1       that Mr. Waterhouse lacked authority was that
2       Mr. Dondero did not specifically approve it?
3   A       By nature, just the size of this note and
4       the nature of it would have required Mr. Dondero's
5       authority.  And both Mr. Waterhouse and
6       Mr. Dondero testified to that in their deposition.
7       So I'd refer you to that.  They both testified he
8       did not have the authority.
9           MR. MORRIS:  I'm not sure that he
10      did, so I'm going to move to strike.  The
11      testimony will be what the testimony will
12      be, not your characterization of it.
13  BY MR. MORRIS:
14  Q       But what about the size of the notes
15      causes HCMFA to contend that Mr. Waterhouse didn't
16      have authority?
17  A       A seven and a half million dollar note is
18      large enough to rise that Jim Dondero would have,
19      in any instance, authorized or needed to authorize
20      this, and he did not.
21  Q       And is that because a $7.4 million note is
22      a substantial obligation for HCMFA?
23  A       You know, substantial -- define
24      "substantial."  It's sizeable.  Right?  It's seven

Dustin Norris

1       and a half million dollars.  Overall from the
2       operating business, it was meaningful.  But seven
3       and a half million dollars in any entity would
4       have required Jim Dondero's approval.
5   Q       And so can you explain to me why, if it
6       would have required his approval, nobody at HCMFA
7       noticed that it was carried on HCMFA's books and
8       records as a liability since May of 2019?
9   A       Yeah.  I think it's a simple mistake.
10      There were other notes of a similar nature in
11      size.  And as Mr. Dondero testified, he wasn't
12      reviewing these regularly, the balance sheet.
13      Frank Waterhouse was.  The accounting team was.
14      And so the HCMFA side, there was other notes of
15      similar size and nature.  It didn't occur to them
16      that there was new notes.  The accounting team, as
17      we've -- which is our position, created the notes,
18      added the signature of Mr. Waterhouse, and then
19      they continued to record those as liabilities on
20      the balance sheet.  And --
21  Q       Is --
22  A       -- that was -- you had -- and, again, I'd
23      refer you to our pleadings and our amended
24      pleadings and the recent pleading yesterday that

Page 194

Dustin Norris

1 we discovered in the discovery process. But
2 Kristin Hendrix and Dave Klos and Frank Waterhouse
3 made it very clear what the process -- and I would
4 say why -- in answer to your question, it was
5 probably a little sloppy. It may have cut
6 corners. They should have received Mr. Dondero's
7 authorization, and they didn't. And so
8 that's -- that's our position.
9 Q    Does --
10 A    And I would say these are all
11 professionals. These are good people. I don't
12 think they were dishonest. I think they made a
13 mistake. Professionals make mistakes, but this
14 was a costly mistake.
15 Q    Did -- does -- does HCMFA contest that
16 Frank Waterhouse knew, on May 2nd and May 3rd,
17 2019, that the corporate accounting group was
18 going to paper these transactions as loans?
19 A    Again, I would refer you to the actual
20 depositions and pleadings -- and our pleadings.
21 But our position is -- sorry. One more time, do
22 you want to ask the question?
23 Q    Yeah. I think you need to -- I want to
24 try to finish up, and I really appreciate your

Page 195

Dustin Norris

1 patience.
2     MR. RUKAVINA: And I'll just say,
3 John, that was a bit of a confusing
4 question.
5     MR. MORRIS: Okay. And that's
6 fair. Let me try again.
7 BY MR. MORRIS:
8 Q    Does HCMFA contest that Frank Waterhouse
9 knew, on May 2nd and May 3rd, 2019, that the
10 corporate accounting group was going to paper the
11 transfers from Highland as loans?
12 A    Did we contest that he knew that?
13 Q    Correct.
14 A    I think his testimony speaks -- I'll refer
15 you to his testimony. I think he testified that
16 he didn't know, right? He didn't know that
17 they -- yes, he was copied on an email, but he
18 didn't have any recollection that they were
19 papered up as a loan.
20 Q    Okay. And on the basis of that testimony,
21 does HCMFA now contend that Mr. Waterhouse didn't
22 know, in May of 2019, that these transfers were
23 papered as loans?
24 A    I would say that's part of it. I would,

Page 196

Dustin Norris

1 again, refer you to all the pleadings, our
2 pleadings and depositions that -- of these
3 individuals. There's -- there's a lot of support
4 there.
5 Q    Right.
6     Have you seen the emails from May 2nd
7 and May 3rd?
8 A    I can't remember if they were included in
9 your exhibits, but I know they were discussed in
10 detail in the depositions from Dave Klos and
11 Kristin and Frank.
12 Q    Right. Okay.
13     MR. MORRIS: I have no further
14 questions. This is not particularly
15 helpful. Thanks.
16     MR. RUKAVINA: Okay. I'll reserve
17 questions. Thank you.
18     MR. MORRIS: Okay. Thanks a lot.
19     MR. RUKAVINA: Thank you.
20     (Off the record at 3:25 p.m. CST)
21
22
23
24
25

Page 197

1       IN THE UNITED STATES BANKRUPTCY COURT
2        FOR THE NORTHERN DISTRICT OF TEXAS
            DALLAS DIVISION
3 In re:              )Chapter 11
                      )
4 HIGHLAND CAPITAL MANAGEMENT, LP, )
                      )Case No.
5     Debtor.         )19-34054-SGJ-11
   _____)_____
6 HIGHLAND CAPITAL MANAGEMENT, LP, )
                      )
7     Plaintiff,      )
                      )
8 vs.                 )Advisory Proceeding No.
                      )21-03004
9 NEXPOINT ADVISORS, LP; JAMES    )
   DONDERO; NANCY DONDERO; and THE )
10 DUGABOY INVESTMENT TRUST,       )
                      )
11    Defendants.     )
12
      REPORTER'S CERTIFICATION
13     REMOTE DEPOSITION OF
         DUSTIN NORRIS
14      December 1, 2021
15    I, Rebecca A. Graziano, Certified Shorthand
16 Reporter in and for the State of Texas, hereby
17 certify to the following:
18    That the witness, DUSTIN NORRIS, was duly
19 sworn and that the transcript of the oral
20 deposition is a true record of the testimony given
21 by the witness;
22    I further certify that pursuant to FRCP Rule
23 30(f)(1) that the signature of the deponent:
24    ____ was requested by the deponent or a
25 party before the completion of the deposition and

Page 198

1  returned within 30 days from date of receipt of

2  the transcript.  If returned, the attached Changes

3  and Signature Page contains any changes and the

4  reasons therefor.

5  _____ was not requested by the deponent or a

6  party before the completion of the deposition.

7  I further certify that I am neither attorney

8  nor counsel for, related to, nor employed by any

9  of the parties to the action in which this

10  testimony was taken.

11  Further, I am not a relative or employee of

12  any attorney of record in this cause, nor do I

13  have a financial interest in the action.

14  Subscribed and sworn to on this 1st day of

15  December, 2021.

16

17

18

19

20  _____

Rebecca A. Graziano, CSR, RMR, CRR

21  Texas CSR 9306

Expiration:  07/31/22

22  California CSR 14407

Expiration:  09/30/22

23  Illinois CSR 084.004659

Expiration: 05/31/23

24

25

---

Page 199

1  ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads   Should Read  Reason

6  ___ ___ _____  _____  _____

7  ___ ___ _____  _____  _____

8  ___ ___ _____  _____  _____

9  ___ ___ _____  _____  _____

10  ___ ___ _____  _____  _____

11  ___ ___ _____  _____  _____

12  ___ ___ _____  _____  _____

13  ___ ___ _____  _____  _____

14  ___ ___ _____  _____  _____

15  ___ ___ _____  _____  _____

16  ___ ___ _____  _____  _____

17  ___ ___ _____  _____  _____

18  ___ ___ _____  _____  _____

19  ___ ___ _____  _____  _____

20

21  _____

22  Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

23  THIS ____ DAY OF _____, 2021.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____

Index: $12,286,000..7.4

**$**

**$12,286,000** 78:16 95:19 96:7

**$12.286** 79:7 82:11, 15 83:14

**$12.4** 147:9,13 149:25

**$2.4** 50:18 51:18

**$5** 50:21 51:21 107:7 108:13 109:4,5,7,13, 14 140:22 143:19 147:7,24 148:9 149:13,16

**$5.186** 134:6

**$7.4** 48:21 63:24 82:16 134:17,24 135:5 138:6,16,23 140:9 146:21 147:6, 15 149:18 150:4 156:19 168:10,19 192:22

**$7.44** 149:23

**$7.442** 149:5

**$7.5** 82:12 133:17,23 146:13

**1**

**1** 26:11 29:6,8 38:17, 21 163:2

**10** 11:7 52:16,21 57:6 63:2

**100** 26:14 80:19

**10:00** 8:15

**10:01** 5:2

**11** 57:6 65:21

**11:05** 56:18

**11:15** 56:15

**11:16** 56:18

**11th** 24:20

**12** 27:19,21 36:14,18 82:13

**12-and-a-half** 148:12

**12/31** 87:5

**12/31/2018** 55:5

**12:05** 56:14

**12:11** 103:2

**12:15** 56:14 102:15

**13** 23:10,11,12 158:3, 8

**14** 11:7

**147** 51:2,3

**15** 134:6 136:17 137:3,7

**15(c)** 67:17,18 68:21 69:16 71:6 72:4 76:6, 19 77:4 87:2 88:7 92:12 99:5,8 101:11

**15th** 136:23

**17** 48:12

**18** 153:2

**182** 119:9,10 124:13 125:20 152:21,22

**185** 7:12,17,19

**18th** 25:3 153:13

**19** 32:6 110:4 153:3 154:18

**1940** 67:18

**1:06** 103:2

**1st** 20:17 23:14,20 24:4 25:21 26:2,5 29:20 30:3,7,9,16,19 31:5,9 33:5 34:4,24 35:6 49:10 61:11,14 126:22 166:19 167:4 188:17 189:13 190:15

**2**

**2** 78:4,6,10 82:16 85:9 86:8,10,19 89:8,9 90:20 92:19 93:22 95:8,14 98:9 141:4 158:14

**2.4-million-dollar** 51:14

**2000-** 31:25

**2001** 188:17

**2006** 176:2,3

**2012** 18:19 21:22

**2013** 21:25

**2018** 18:23,25 19:4 20:17 22:6,12,20 23:14,20 24:4,5,6,15 25:22 26:2,6 32:5,6 46:12,25 47:19 110:4 136:9 145:23 151:13, 15 153:2,10,18,24 154:13 155:9 157:5

**2018/2019** 109:21

**2019** 18:23 19:3,5 20:22 21:7 24:20 28:15,19 32:5 42:25 43:2 47:7 49:6,10,22 50:21 55:10 59:5,7 103:20 104:13,15,19 105:10 107:12 109:4 120:16,18,19,23 128:23 129:22 132:5 134:6 136:9,14,17 137:3,7 146:18 151:6,13 153:3 154:18 157:5,8,14 168:20 191:19,23 193:9 194:18 195:10, 23

**2020** 19:11 32:2 33:18 39:8,12 41:3, 16 42:6 55:16 65:22 67:8 70:14,24 72:3 73:24 78:15 84:24 86:21,24 92:18 95:6, 9,13,16,23 96:8 97:23 98:10 99:11 101:15 102:6

**2021** 19:11 25:3,9,10 29:20 30:3,7,9,16,19 31:5,9 33:5 34:3,4,24 35:6 39:25 57:16 61:11,14 126:23 175:3,4,11 176:7 177:5 179:3,18 189:13 190:15

**21st** 34:3,24 39:25

81:5

**22nd** 28:12 162:13

**23rd** 95:6 100:2

**24th** 9:19

**26th** 24:11,15

**28th** 128:23 129:21 132:5

**2:06** 150:24

**2:07** 151:2

**2:21** 151:2

**2nd** 28:15,18,21 50:18 51:14,17 54:24 127:17 194:17 195:10 196:7

**3**

**3** 38:23 105:5

**30** 86:24

**30(b)(6)** 5:18 7:10 9:9,25 15:18 22:25 36:18,25 37:10,15 42:3 49:15 57:6,8 63:2 64:16,22 75:23 79:5 82:10,14 84:4 92:16 95:11,18 116:6 132:5 141:19

**30th** 87:6 95:9,16,23 96:8 101:14 102:6 154:8,14

**31st** 46:11,25 47:18 154:9

**35** 9:19 168:16

**36** 87:13,14

**38** 160:14,22 168:8, 17,24,25 169:2

**3:06** 150:24

**3:09** 191:8

**3:19** 191:8

**3:20** 150:25

**3:25** 196:21

**3rd** 28:15,19,21 39:8, 12,22 41:16 42:6 47:7 49:10,22 50:21

**4**

**42** 168:24 169:12,16 173:3

**43** 169:6 175:19,22 181:6

**44** 169:6 184:9,10

**45** 46:20,21 160:15 168:8,18,25 169:2,6

**47** 184:21 185:8 188:7,8 191:12

**4:09** 191:3

**5**

**5** 9:17 29:10,13 158:21

**5.2** 109:15

**5.6** 109:15

**59** 71:21,22 89:19

**6**

**6** 10:25 30:5

**6/30** 94:24,25 153:22

**60** 153:22 154:8

**600** 79:25

**650** 89:20

**650-page** 9:18

**6:05** 92:18 93:18

**6th** 92:18 93:18 97:14 161:24 162:14 164:2 176:3,7

**7**

**7** 10:25 30:5

**7.4** 134:22 147:2

**8**

**8** 10:25 25:10 141:19
142:10

**9**

**9** 11:2,3 103:4 104:18
158:22

**9:00** 8:14

**A**

**a.m.** 5:2 56:18

**ability** 30:24 31:4,8
33:4 34:23 176:19
177:3

**absence** 181:3

**Absolutely** 174:16

**accept** 170:2,9
171:18

**accepted** 169:17
170:6,7,22 171:3

**access** 30:15,18,20
33:22,24 34:6,8
61:20 144:16 161:8
173:11,17 175:2,8
177:15,18,20 179:17

**accessible** 32:3

**account** 51:6 143:20
150:5 190:23

**accountant** 63:9
186:5

**accountants** 57:16
63:14

**accounted** 52:23
53:13 63:6

**accounting** 27:16
43:12,19 44:11 50:8
52:17 53:5,17,21
56:25 57:5 61:24
62:23,25 63:8,17
64:2,3 65:2 70:6 72:6
75:16 78:23 126:10
189:19 193:14,17
194:18 195:11

**accounts** 58:3,8,9

**accuracy** 125:25

**accurate** 7:2 25:18
44:3,24 45:20 65:15
74:17 75:3 76:3,11
80:8,15,19 81:20,23
94:2 125:21 126:6
127:14 172:4,10,15

**accused** 120:8

**acknowledge** 92:3
95:5

**acknowledged**
51:24

**acknowledges**
51:24

**Act** 67:18

**acting** 80:4 126:23

**action** 29:3

**actively** 144:17

**actual** 40:17 41:10
136:22 144:9 194:20

**add** 79:12,13 175:5

**added** 18:20 183:6
193:19

**addition** 149:16
171:6

**additional** 53:4
54:15 84:13 122:4
149:18 167:7 168:4
169:6 172:20 181:12
182:25

**address** 53:5

**addressed** 127:11

**addressing** 101:9
109:22

**adoption** 131:23
132:8

**adversary** 28:8

**advise** 124:8

**advised** 130:16

**adviser** 33:20 53:17
64:4 68:16 69:24
75:18 83:18 106:7
123:19 127:24 128:4

**advisers** 21:2,6,12,
25 22:12,19 32:16
40:23 45:3,9 67:4
71:11 72:2,9,12,23
73:3 75:6 77:6,12
78:14 84:23,24 86:6
90:23 97:2,5,13
99:17

**advisers'** 94:19
96:21

**Advisors** 5:19,22
18:7 19:25 20:7,23
21:2 33:9,17 78:13

**advisory** 66:3,6,9

**affiliate** 93:5

**affiliates** 60:18 79:22
90:22

**affirmative** 30:13
50:4 53:6 158:25
167:20 168:8,18

**afloat** 175:14

**aggregate** 48:21

**agree** 42:8 57:4 77:5,
9 95:11,19 101:22
112:4 131:2 132:4
138:15 147:23
151:24 163:23
165:12 180:9

**agreed** 138:5 163:21

**agreeing** 104:4

**agreement** 9:6 34:14
44:11 60:17 61:25
62:15 68:24 70:10
74:20 75:22 77:22
81:8,9 111:9 113:20,
22 128:21 138:4,13,
23,25 139:2,10
140:4,9 142:25
150:12 164:23
170:16 178:12

**agreements** 66:10,
12,15

**ahead** 14:17 70:13
71:16,17 101:7
174:6,8

**allegedly** 121:15,22

**allocation** 105:3
106:8 118:21 122:24
123:2 125:22

**allowed** 13:11
173:23

**amend** 9:11 104:4,7
159:24 164:7 180:11

**amended** 7:24 8:13
9:4,24 10:21 11:8
35:17,18 54:17,18
55:6 63:12,20
158:11,14 159:3,5,9,
21 160:7 161:2
164:2,5 167:10,15,
21,22 175:25 176:6
177:16 181:11
182:17 188:4 189:7
191:12 193:24

**amount** 70:16 79:8
82:17 107:6 109:15,
22 154:23

**amounts** 48:25 49:3
65:24 78:11 79:21
82:25 90:21 91:12
93:3 101:19,22,24
105:14 134:20

**analysis** 67:17 68:21
69:16 72:4 106:25
113:24 114:5,11
115:2 116:7 165:2

**analysts** 27:12

**analyzed** 121:2

**angry** 174:15

**annual** 66:12 67:20
88:7

**answering** 6:15 64:7

**answers** 6:3 7:2
35:16 63:20 75:10

**anticipated** 80:15,16
115:25

**apologize** 22:17
24:12 69:6 152:12
154:5 155:23 159:20
169:22 176:4

**appearing** 82:20

**appears** 30:6 49:18

**applied** 187:10

**approaching** 102:15

**approval** 128:21
193:5,7

**approve** 192:3

**approved** 111:15
112:11 128:9,15
132:23 133:2

**approximately** 26:9,
19 109:3,5 133:16,23
134:5 146:13 147:7
154:9 156:19

**April** 13:14 19:3,5
20:22 21:6 22:16
24:20 25:10 104:13,
19 175:11

**argument** 27:25
35:23 36:3 37:15

**arguments** 85:14,16

**ascertain** 58:6,14

**Asia** 7:14 158:5

**asks** 27:21 52:16

**aspect** 34:9 67:24
97:24 99:24

**aspects** 14:22 45:3,4
68:11 69:24 186:13

**assert** 30:12

**assertion** 191:25

**Asset** 122:21

**assigned** 178:17

**assistant** 18:18,20
21:21 25:5,12

**assume** 41:22 45:21,
23 47:24 48:24 49:2

**assuming** 23:21,24
48:4 52:6,7

**assumption** 45:25

**assumptions** 45:22

**attached** 28:20
161:22 162:20 163:7,
22

**accounts** 58:3,8,9

**51:6** 95:24

**attachments** 31:17

**attain** 20:12

**attempt** 83:5

**attended** 67:16

**attorney** 5:9 83:8
96:25 147:17 160:11
173:9,20 174:4
178:15 190:9

**attorney's** 13:17

**audit** 44:12 47:8,12,
23 57:16 58:2 59:4,7
154:8

**audited** 43:5,10 44:2,
12,23 45:5,19 46:10,
24 47:17,23 48:14,19
49:20 55:2 57:24
58:12,16 64:17 65:10
101:17

**auditor** 47:11

**auditors** 43:20 57:17
154:22 156:10

**audits** 153:19,22

**August** 86:25 99:4,6
153:25 154:9,13
155:9 174:21

**author** 77:18

**authority** 85:4 138:2
169:8 171:18,22
182:7 183:21 186:2,
3,5,15 191:15 192:2,
6,9,17

**authorization** 72:11
85:18 194:8

**authorize** 143:8,12
180:18,22 192:20

**authorized** 72:9,24
84:22 143:16 178:3
192:20

**aware** 6:3 27:15
28:7,13,17 29:2 31:7
34:20 35:7,11,12,13,
23 36:5,6,12 37:9,14,
19,22 39:15,21 47:10
49:8 52:12 56:2,25
57:3 59:6,16 62:6
67:8,12 71:3 84:14
85:2 86:13,15,16,19

87:7 98:2 100:3
111:24 113:23
117:18 118:18 122:6
124:23 125:17 127:2
130:8 145:18 150:6
158:10 175:15 184:4
186:22 187:21
188:16

---

**B**

**back** 13:13,14 17:13
21:22 22:2 31:25
40:24 41:9,10 56:14
64:7 68:23 69:17
70:6 76:14 77:13
86:2,10 92:23 93:9,
12 94:7 96:16 102:22
150:25 152:5,13,19
170:11 191:3

**back-office** 27:16
43:12 75:17

**background** 64:3
160:25 161:7 166:22

**backing** 98:18 99:2,
18 102:2

**backup** 49:2 82:23
83:4

**Baker** 174:13

**balance** 48:7 53:20
55:5 58:23,24 59:2
65:6,15 87:5,6 92:10,
20 93:22 94:5 96:4
102:9 108:14,17
193:13,21

**bank** 51:6,7 52:2
104:6

**bankruptcy** 27:23
30:23 35:8 36:7
37:23 99:11 179:11

**based** 13:17 18:3
25:15 34:12,25 45:25
46:3 57:17,25 142:13
154:7 163:20 167:10
168:4 171:11 174:4
178:20 180:11 181:5

**basis** 22:20 67:20
167:19 181:17
191:25 195:21

**BBVA** 51:7

**began** 31:25 54:15
104:14,22 120:18

**begin** 6:18

**beginning** 8:16
22:12,20 24:15
120:17 156:7,11,15

**behalf** 5:18 10:7
29:19 35:24 37:11,23
40:3 43:8 64:7 68:20
72:8,23 73:3 80:5
126:23 138:15 143:4,
6 144:10 150:20
151:9 171:4,19
180:23

**belief** 184:4

**believed** 117:13
126:16 149:9 167:17

**believes** 118:5,15

**big** 123:11

**biggest** 67:24

**bill** 59:15

**billed** 59:19,20

**bind** 6:4

**bit** 37:21 48:5 88:17
126:2 133:9 151:4
195:4

**Blank** 87:24

**board** 9:9 32:17
33:10,14 65:22 67:5,
8,16,19 70:15,25
71:8,10 72:3,25
74:21 75:4 76:3,7,15
78:9,15 80:9 84:6,16,
19,23 86:7,12,13,22,
23 87:9 88:4,7,12,24
89:10 91:21 92:11
93:25 94:10,20 95:7,
13,21 96:9 98:10,16,
22,25 99:3,4,7,12,16,
20 100:18 101:10
112:12 119:2,3,22
123:3,8 125:21
126:6,13 127:6,11,12
128:9,12,15,23
129:2,21 130:7,14,
15,18,21 131:5
132:6,23 133:3

135:20 156:10,24
157:20

**board's** 77:7 90:2
92:19 93:21

**boards** 66:24 67:3

**booked** 53:20 54:11,
21 57:10,14 59:9
64:23

**booking** 56:22
57:11,20

**books** 44:11 52:24
53:13,16 54:7,12,23
55:7,14,20,23 56:21
58:15,19,21,22 59:17
60:24 61:5,13,21
62:10 63:3,17 79:12
193:8

**bottle** 56:12

**bottom** 87:21 102:8
152:17 158:23

**Brad** 24:3,7,18

**breach** 148:24

**break** 7:4 56:7
150:24 191:2

**Brian** 25:5

**bring** 70:2

**broad** 35:21

**broader** 126:3

**broadly** 19:19,23

**broke** 145:3

**broker** 144:21,24

**broker-dealers**
107:13

**business** 19:22
68:6,14 107:18
175:14 193:3

**businesses** 177:10

---

**C**

**calculate** 111:14

**call** 8:23 61:19 67:17
125:7

**called** 5:17 8:23
159:23 161:13

**calls** 32:19 165:11

**Canty** 7:9,17 152:13,
21 158:6

**capacity** 5:17 20:3
36:25 37:9,14 44:7,8,
10,13 75:25 77:17
137:19,21 171:2

**capital** 5:12,19,21,24
27:17 32:7 42:20
52:5 61:22 108:19
123:15 124:21
125:14 131:3 146:2,6
169:20 171:3,4

**careful** 16:25

**carefully** 41:25 62:5
120:6 129:19 171:17

**carried** 193:8

**carrier** 147:8 151:22
152:2

**carriers** 152:7

**case** 27:23 48:24
49:2,18 67:21 76:17
81:10 182:5

**cash** 14:7,11 52:10
108:14,16,18 134:15
140:23 141:2 172:21
183:5 190:5

**caused** 121:22 137:7
147:22 170:9,22
171:5,20

**caution** 16:20

**caveat** 180:13

**CC'D** 95:3

**CEO** 167:2 173:14

**certificates** 9:7 19:2
20:14 23:22 25:20

**CFO** 39:17 45:7,13
75:15 96:21 171:8
173:12,15,17

**chain** 81:2 91:16

**challenge** 105:11,15

**challenged** 100:24

**change** 93:7 102:18 104:5,7 106:11,18

**changed** 20:23 24:2 55:23 56:21 57:12,21 98:19

**changing** 23:25

**characterization** 192:13

**characterize** 164:20,25 165:4

**characterizes** 165:7

**charged** 43:9 81:18, 22

**charts** 73:22

**check** 9:17

**chief** 19:20 20:4 32:15 33:13 179:10

**circumstances** 16:9 17:16 57:18 86:14 161:4 164:18 165:15 176:11

**claim** 141:20,23 142:2,4,19 143:6,9, 11,13,16,20,23,25 144:4,6,9,18 145:8, 16,21,24 148:16 149:10,14 151:8,12, 18 152:2 172:22 173:4,7,25

**claims** 152:7,11

**clarification** 37:8 74:12 123:4,5

**clarify** 69:17

**clean** 149:3 163:19

**clear** 79:14 185:16 187:16 194:4

**close** 83:20 181:8 191:16

**closed-end** 105:4,7 106:2,11,19 108:4

**closely** 72:5 112:22

**coffee** 56:8

**collaborative** 105:21 106:12

**collateral** 147:17,19 148:20

**colleague** 7:9

**collect** 28:9

**collectively** 28:24

**color** 53:4

**combination** 134:14

**combined** 134:22

**comfortable** 68:18 99:12

**commenced** 28:8 29:3 64:18,25 161:21

**commencement** 40:9

**commentary** 54:2

**committee** 111:10, 15 115:11

**communicate** 30:24 34:23 176:19 177:3

**communicated** 150:12 170:12

**communication** 62:11 130:18 150:10

**communications** 27:22 65:22 84:5 121:2 123:8 171:11

**companies** 182:22

**company** 14:4 36:22 39:15 64:7 143:2 146:5 147:14,20,21 161:13

**company's** 12:10 53:2 139:8 142:4,6

**Compass** 51:7

**compensate** 137:18 138:16 184:6

**compensated** 171:25

**compensation** 15:11 59:10,22 60:5, 14 61:2,16 62:9 63:6, 22 64:11 108:20 134:25 135:6 137:14 138:23 140:9,15,16

146:22 147:6,8 149:19 157:18 168:11,21 185:4,5

**competently** 36:17

**complaint** 8:22 9:2 28:12,21 34:3 38:19, 20 39:25 40:18 161:2,23 162:2,25 163:4,7,23,25 166:14,21 167:10,15 175:25 181:8 188:4

**complete** 6:25 23:22 25:17 34:5,8 59:4 173:11 175:2

**completed** 6:16,19

**completely** 80:19 94:2

**compliance** 27:16 31:15 32:15,24 33:13 41:2,7 61:23 69:4 70:5 72:6,14 74:19, 23 76:15 77:25 106:14 126:9 170:14 178:10

**component** 33:7 83:14

**components** 17:22

**concerned** 35:25 36:8 124:24,25

**concerns** 35:9 37:12,17,24 90:20 110:3

**conclude** 49:14 155:15,24

**concluded** 157:12

**conclusion** 135:11 156:5 157:21

**conduct** 47:12 138:7 178:3 180:19,23

**conducted** 67:9 122:25 161:3 165:14 176:10

**confirm** 10:19 50:23 52:9 57:9 133:5 165:23 177:14

**confirmed** 11:23

**confirming** 163:16

**confronted** 181:14

**confused** 81:6

**confusing** 195:4

**confusion** 81:13

**connection** 6:7 10:7 12:13 15:2 59:11 67:9 88:7 101:10 110:9,23 111:3 112:15 113:4,9,16 114:2,13,23 117:14 118:16 119:15 121:8 124:9 134:7 135:2 137:15 138:18 142:8, 20 144:7 146:22 147:9 149:14 166:3 168:22

**consent** 103:5,9,15, 19,23,24 104:3,8,9, 12,14,19,22 105:2, 10,20,21 106:6,8,10, 18,22 107:5,9,18 108:3,4,13,24 109:5, 9,12

**consented** 104:10 105:6 107:23

**consequence** 138:6

**consequences** 109:22

**consideration** 184:22 185:2

**consistent** 51:16

**consultant** 112:6 128:17

**consultation** 154:24

**contained** 95:6

**contemporaneously** 55:10

**contend** 42:4 85:17, 20 113:3 132:20 134:21 147:13 192:16 195:22

**contends** 49:9 59:8 134:17,23 135:5 149:24

**contention** 42:8 132:24 146:20 190:7

**contest** 194:16 195:9,13

**continue** 10:24 29:18 144:17 148:14

**continued** 193:20

**continuing** 24:20

**continuous** 22:19

**contract** 80:21 115:6 116:24 117:5 148:24 170:6 178:22

**contracted** 178:21

**contracts** 66:19 67:11,19 69:9,12

**contribution** 67:25

**control** 121:4 130:9 137:20,21

**controller** 183:2 185:20

**controlling** 26:21

**controls** 26:15 122:4

**conversation** 117:22 181:17

**conversations** 16:3 32:8 101:3 130:4 171:12

**conversion** 105:6,8, 9,13 107:25

**converted** 105:3

**converting** 105:25

**coordinating** 41:12 115:12

**copied** 73:11 90:4,16 91:15,21 92:3 99:23 195:18

**copies** 9:5 88:21 161:19 162:17 176:14

**copy** 30:2 89:14,16 91:19 167:25 168:2

**corners** 194:7

**corporate** 194:18 195:11

**correct** 9:20 10:3

12:15,22 15:23 18:25 20:8,9,10 21:10 22:21 26:19 28:19 29:4,5,7,8 30:13,16, 19,25 31:5,6 34:7,18, 24 35:19 39:8,9 42:15,25 43:3 47:10, 13 48:23 49:24 51:19,21,25 54:25 55:18 57:6,21 59:12, 13 61:12 64:20,25 65:2 66:4,7,10,13,19, 25 67:2 69:10,13,14 70:17 71:2 72:4 74:3, 9 76:12 77:7,8,10 83:15 84:6 86:24 88:14,20,24 89:11 90:16 91:16 92:20,21 94:16,20 95:2,23 96:10,22,23 97:2,3,5, 8,10 100:10,14 101:2,11 103:20 106:23 107:21 108:10 114:13,20,24, 25 116:19 117:19 120:16 121:4,22 122:9 123:6 124:17, 18 127:18,19 128:24, 25 129:7 130:2 131:4,13 132:14,18 133:24 134:3,4,19 135:3,8 136:17,18 137:4,5,8 139:3 141:18 143:21,23 145:5 146:3,18,19, 24,25 147:11 149:5, 11,12,14,15,20,21,25 150:2 151:10,11 158:18 159:21 162:18 164:3,7,8,11 165:16,17,19,22 166:2 169:20 170:23 173:12 176:2,7,8,11, 12,15,16,20 178:24 179:6,8,9,16 180:12 181:9,24 182:7 183:21,22 185:10 189:2,17 191:23 195:14

**correction** 22:23 90:3 124:24

**correctly** 15:13 85:10 132:2

**corroborate** 188:20,

21 189:12

**corroborates** 61:15 62:7 186:23 187:23 190:16

**cost** 106:22

**costly** 194:15

**costs** 106:20 133:18

**counsel** 5:11 11:19 13:8 54:2 82:22 83:3 88:3 90:2 116:21 123:17,19,21,23 124:2,7 178:6,18

**counterparty** 186:6

**couple** 168:13 178:25 191:10

**couple-month** 105:18

**court** 27:24 30:23 35:8 36:3,7,11 37:16, 24 40:20 160:8 164:7 180:10 187:3 189:21

**coverage** 142:20 149:11

**covered** 98:16,24 99:16 100:17

**created** 42:18 61:14 62:7,17 63:4 147:21 187:22 188:16,25 189:13 190:14 193:18

**creating** 45:8 53:16 135:15 177:22

**creation** 177:7

**CST** 5:2 56:18 103:2 151:2 191:8 196:21

**current** 57:17 58:9

**cut** 194:6

**D**

**daily** 40:19 41:11

**damage** 152:9

**data** 33:22 115:13

**date** 21:19 30:7,10 33:19 34:4 35:6,9,25

36:8 37:12,16,24 38:12,16 39:14 42:9 61:10 62:7 63:4 85:25 97:6 107:15,25 126:22 130:4,5 135:22 136:4,8 155:12 156:12 170:24 187:23 188:17 189:2,4,6

**dated** 28:14,18 30:3 127:15

**dates** 23:21,25 25:16 52:11 120:18 134:10 162:13

**dating** 21:22

**Dave** 12:3 80:14 95:4 171:8 194:3 196:11

**David** 25:5 185:15 190:3

**Davor** 7:18 12:14 56:10 139:23 142:3 163:16

**day** 34:3 51:25

**days** 153:22 154:8

**DC** 12:17,19 13:12 142:3 161:3 165:14 181:14 188:23

**DC's** 61:19

**deals** 160:15

**Deb** 174:14

**debated** 121:2

**debtor** 5:11 31:21 33:7,23 34:12 39:17 41:6 42:17 117:22 118:9 166:20 167:3

**December** 39:8,12, 22 40:17 41:3,16 42:6 46:11,25 47:18 55:16

**decision** 105:19,22, 23 106:17,21 108:2,3 138:2

**declaration** 9:4 13:15 16:14,18 17:19 31:16 54:17 61:19 164:14,16,23 165:5 167:19 175:6 181:21,

25 188:24

**deductible** 141:3,17

**defendant** 169:16,19 171:25 183:24 184:5, 6,14 191:15

**defendant's** 9:11 166:19

**defending** 41:11

**defense** 114:18,19 115:8 144:7 168:9,18 185:7 186:24 187:24 188:21 189:12 190:16

**defenses** 30:13 50:4 53:6 135:9 140:10 150:2 158:25 167:20 169:4,7 188:11

**deferred** 80:20

**define** 119:17 154:3 192:24

**defined** 46:7 153:5

**Defines** 132:19

**defining** 131:25 132:17

**definition** 190:10

**demand** 19:10 38:14,24 39:24 40:18 41:15,21 54:14,20 55:15

**demanded** 15:24 16:2 19:9 38:6,7,9,11 86:16 137:14 138:5

**demanding** 39:17, 18

**denying** 52:10

**department** 78:23

**depending** 75:7

**deposed** 5:17

**deposited** 105:17

**deposition** 5:13 6:8 7:10,24 8:4,18 9:25 10:8,21 11:12 13:17, 20 14:2 15:3,14 28:24 29:10 37:4 60:6 82:21 83:25

25 188:24

**depositions** 12:2 40:19 41:12 61:6 140:20 172:20 175:7 182:9,24 183:9 184:17 185:14 186:19 187:14 190:2 194:21 196:3,11

**derived** 95:8

**describe** 19:16 111:2 164:17

**describes** 133:15

**description** 123:6

**desk** 160:18

**detail** 196:11

**detailed** 134:15

**details** 14:6 111:6 113:11 141:5 172:18, 19 175:7 180:2 181:22 182:25

**determination** 67:10 129:10 131:10, 22 132:7 138:9,14 154:16 155:19 156:21 157:2,9 170:18

**determinations** 127:23 130:6

**determine** 57:17 67:19 68:16 79:6 105:11,16 107:2 113:25 114:6,11 115:4 116:9 164:18 176:10

**determined** 57:25 129:4,13,23 130:9 131:17 136:7,13 154:19 156:14,18

**determining** 129:25 130:22

**development** 19:22 68:6,14

**devoted** 99:8 101:9

**dictates** 67:22

**difference** 8:11

**differently** 155:7

**diligence** 142:9
165:3

**direct** 26:5

**direction** 31:18

**directly** 95:14 144:23

**director** 26:25 27:4

**directors** 23:2 26:24
88:4

**disagree** 148:10

**disciplinary** 121:20,
25 122:6

**disclosed** 49:23
64:17

**disclosure** 86:12

**discover** 17:8

**discovered** 54:11
63:12 175:8 194:2

**discovery** 11:25
81:7 172:11 183:9
187:9 190:21 194:2

**discuss** 16:16 169:6
173:6

**discussed** 13:25
14:3,4,9 16:21,23
82:22 83:3 103:15
108:19 120:25
135:19,20 140:17
142:3 166:25 174:6
181:14 196:10

**discussing** 130:5
173:20

**discussion** 7:13
16:6 82:8 105:24
106:16 116:20
142:17 154:21

**discussions** 13:23
14:10 16:11 17:6,12,
14 110:2 118:8,11

**dishonest** 194:13

**dispute** 49:20,25
50:4,17,20 92:15
93:19 94:18,21
111:25 128:22 133:2
162:16 191:18,20,21

**disputed** 40:14

**distinguishing**
47:22

**distribution** 19:20
20:4 107:16

**Docket** 9:19

**document** 6:25 7:16
9:18,20 23:6 29:16
35:7,22 37:10 38:13
46:19 47:16 50:25
71:4,24 87:16,21
104:5 119:13 120:7,
12 122:11,19,23
126:5,12,17,21
128:20 138:21 140:8
158:2,15 160:13
161:18 166:10 183:7
186:10,23 187:22
188:15 189:10,21
190:7,14,17

**documentation**
187:7 189:20

**documented** 61:7

**documents** 6:22
8:17,20 9:14 11:16,
22,24 36:11 38:15
62:18 136:22 144:15
145:10,11 156:23
168:3 186:25 187:8,
17,20,21 188:18
189:11,15,16 190:13

**dollar** 48:25 49:3
192:18

**dollars** 14:8 157:13
193:2,4

**Dondero** 11:20
12:20 13:20 14:2,23
15:20 26:7,9,14,15
27:4 30:18,24 34:6
39:20 60:4,5,7,8,12
76:24 83:20 84:14,
22,25 98:18 99:18
103:16 105:22
106:13 121:3,14
137:17 138:3,19
140:12,18,19 165:22
166:3,11 167:2,3,5
170:18 171:2,10,21
172:12 178:6,17
180:18,25 182:11,13,
14 185:15 192:3,7,19

193:12

**Dondero's** 192:5
193:5 194:7

**doubt** 77:2 80:12
98:4

**draft** 69:4 72:7 96:2

**drafted** 126:8 185:6
186:5

**drafting** 77:4

**due** 65:24 70:16
78:12 79:21 81:5
90:21 93:4 96:7
101:19 102:3 153:22
165:3 173:10

**duly** 5:3,5

**Dustin** 5:4 6:1 7:1
8:1,2,3 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1,20 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1,9,17,21
25:1,3,10 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1

136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1,15
160:1 161:1 162:1
163:1,12 164:1,9
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1

**duty** 44:22

---

**E**

**earlier** 13:12 16:13
22:24 65:8 86:21
108:19 155:12
180:16

**earliest** 81:4

**early** 17:5 19:10
88:10 136:14 175:3
179:3

**economies** 68:8

**educate** 127:12

**effect** 122:3 139:2
174:10

**effective** 23:25 24:11
25:15

**effectuated** 170:19

**effort** 145:7 151:21

**efforts** 144:9

**elaborated** 84:13

**Ellington** 179:13,14

**email** 73:14 74:2 81:2
87:8 88:6 91:15 92:3,
4,17 93:20 94:23
96:17 97:24 98:8

99:23,25 100:10,13,
24 101:8 190:2,3
195:18

**emailed** 84:2

**emails** 11:22 189:18
190:12,13 196:7

**employ** 165:13
176:25

**employed** 18:6 32:5,
6 83:9 166:24

**employee** 20:3
31:13 33:9,17 43:15
44:7,14 71:13 72:12
75:2 76:9 77:17 80:6,
17 81:21 115:13
119:25 120:2 121:6,
14,21 122:16 125:13,
18 126:4

**employees** 23:2
27:5,6,7,9,14 32:17,
22 41:6 42:18,21
53:15 61:23 69:3
75:21 76:18 77:13
111:7,8 112:23
115:17 117:20,21,22
118:10 119:23
123:15 124:5 125:5,
7,8 129:10,12 130:7
135:15,21 137:10
142:22 144:24 146:9,
11 150:11 156:11
161:9 166:24 170:13
171:6,10 177:8
179:25

**enable** 122:23

**encourage** 133:13

**end** 145:3,6 175:4
178:9,22

**ended** 120:20,22
178:22

**ending** 46:11,25
47:18 86:24 95:15,23
154:14

**engagement** 111:21

**entering** 138:12

**entire** 120:24 121:3
162:15 175:13
178:12 182:5

**entities** 74:4,6,8 83:19 98:17,25

**entitled** 147:13 149:18,24

**entity** 26:13 27:3 52:9 73:25 75:13 77:18 111:25 193:4

**entries** 57:2

**environment** 130:9

**equity** 26:20

**error** 9:10 14:20,21 15:11 16:8,9,10 17:24 32:10,13,18,21 50:6 59:11,12 62:11 108:21 109:23 110:3,6 115:16 117:13 118:6,10,16 119:20 120:9,15,25 121:15, 22 122:21,25 124:16, 22,25 125:16 126:11, 25 131:13,25 132:7, 14,16,17,19 133:16 134:7 135:3,12 136:11,13,16 137:4, 7,18 140:15,17 142:13,15,21 146:24 147:10,25 149:5,6,19 150:5,21 153:10,16 154:4,12,16,20,23 155:4 156:14,22 157:3,10,12 168:10, 22 169:3,17 170:3, 10,20,23 171:5,20 184:7 185:4,19

**errors** 126:16,20 131:24 132:16 137:14 186:14

**estate** 178:15

**estimate** 20:19 109:12

**estimated** 146:12 147:3 149:4,6,23 156:18

**estimates** 111:12

**ethical** 174:18

**event** 55:3,5,6

**events** 16:8 48:11,18 49:5,16

**everybody's** 33:16

**evidence** 184:17

**exact** 6:13 21:19 30:6 33:18 38:12 89:12 92:24 96:8 99:3 107:6 109:8,15

**EXAMINATION** 5:6

**examined** 6:10

**examining** 36:24

**Excellent** 9:22 102:24

**exception** 178:25

**exchange** 87:8

**exclusively** 25:20 99:8 132:11

**executive** 18:13 19:3,6,18 20:2,7 21:5,11,17 22:10 24:8,13,16,21 25:4, 11 43:4 73:25 74:5,7 97:4 116:5

**exhibit** 7:12,15,19 29:10,13 38:17,21,23 46:20,21 51:2,3 71:21,22 87:13,14 89:17,21 119:9,10 124:13 152:14,15 158:3,8

**exhibits** 9:15 11:18 87:10 89:17 161:22 196:10

**existence** 14:24 15:20 16:5 19:7 38:4 39:11 40:5,14 42:24 49:23 55:21 66:22 70:25 71:8

**expect** 44:15 63:9 127:6,13

**expedited** 152:4

**expenses** 106:20

**expert** 64:4 128:17

**expertise** 126:10

**explain** 122:24 193:6

**explaining** 165:9

**extend** 104:7

**extensive** 81:3 88:11 118:11

**extensively** 118:8

**extent** 16:20 80:25 81:11

**extremely** 151:25

---

**F**

**fact** 29:7 55:15 66:21 109:3 131:15 133:4 149:22 182:4 191:22

**factor** 135:23

**factors** 67:21 131:18 132:11,13

**facts** 16:9 17:16 57:17 63:19 86:14 142:7,8 166:22 167:18 168:4 185:11

**factual** 16:21 85:16 138:11

**fair** 6:16 16:22,24 20:16 21:4,23 22:13, 20 25:19 34:2 37:5,6 39:10 40:3 49:19 66:22 73:22,23 89:23 90:5 109:6,22 112:21 115:5 129:6,25 131:16,23 132:8,9 133:5,12,14 141:8 145:4 147:4 153:25 154:7,11 155:8 157:7,11 160:14 164:19 167:9,21 168:7,15,17 179:3 181:19 195:7

**fairly** 91:21 112:5

**faith** 50:7 83:19 84:24 98:17 99:2,17

**fall** 31:25 32:2 67:8

**familiar** 110:19 118:20 164:13

**familiarize** 141:22, 25

**fault** 62:24 116:10 119:25 137:12 150:8

**February** 24:5,6,11,

15 25:3,9 105:10 134:6 136:17,23 137:3,7 140:21 141:15 145:4,6 146:18 151:5 178:9, 23

**fee** 103:9,15,19,23,24 104:3,8,11,19 105:2, 5,10,20,21 106:6,8, 22 107:2,4,5 108:13, 24 109:5,9,12

**feel** 20:20 29:15

**fees** 67:23 68:4 103:5 104:12,14,22 106:20, 22 107:9,18

**field** 83:9

**figure** 84:9 94:5 95:20 96:9

**file** 142:19 172:22

**filed** 9:13,18 28:12 29:3,19 34:4,5 35:8 37:11 39:25 54:18 142:25 144:10 145:21,24 149:10 151:8,13 159:22,24 161:7,24,25 162:2 163:25 164:2,5 166:19,20 173:4,6,25 176:2,6,9,13,17,24 177:17 183:7,17 187:2

**filing** 27:24 29:24 143:3,5,8,12 162:23 166:15 167:5

**filings** 189:22

**filled** 146:9

**final** 96:3,6,10,11,12 100:2 107:15

**finalization** 87:9

**finalized** 105:9 154:19

**finance** 43:12 70:6 75:9,16

**financed** 146:17

**financial** 43:5,10,13 44:2,24 45:3,5,8,19 46:10,24 47:13,17 48:15,19 49:21 50:2

**financials** 43:20 44:16 47:24 48:2 55:3 94:24 95:2,9,17 154:14

**find** 56:6 116:25 117:6 144:14,19 183:9

**fine** 21:3 115:24 167:25

**finish** 194:25

**fired** 121:7 161:12

**firing** 121:18,23,25

**firm** 66:3 68:6 110:19

**firmed** 172:18

**five-month** 162:3

**focus** 23:12 53:9 130:24

**focusing** 12:12

**folks** 179:17

**follow-up** 88:9,12 99:9

**footnotes** 102:2

**forbidden** 174:17

**forgive** 8:23 107:17

**form** 42:16 61:3,17 70:18 168:22

**formal** 72:10

**formed** 145:25 156:4 161:13 167:19

**forms** 187:2

**formulating** 94:19

**forwarded** 89:24 90:3

**forwards** 88:19,21 90:11

**found** 15:15 54:20 63:13 81:6 86:20 92:20 93:22 153:15 155:3

**fourth** 141:12

**frame** 166:15

**Frank** 12:3,23 14:10
15:5,8 24:9,16,21
25:4,11 39:13,15
43:15,17,24 44:22
45:17 60:6 65:16,17
71:13 75:9,11,12,15,
24 78:21 80:14,22
81:25 82:24 83:23
84:10,12 90:18 95:4
137:17 140:18
142:23 144:25
151:19 161:16 167:8
171:8 174:16 183:10,
19 185:15,18,19
186:10 187:11
193:14 194:3,17
195:9 196:12

**Frank's** 85:2

**free** 20:20 29:15

**front** 8:18 10:14 23:6
158:16 166:7

**front-office** 27:7,11,
14 69:21

**full** 30:15,18,20 83:19
84:24 98:17 99:2,17
162:11

**function** 63:10 65:3
68:14 72:6 74:19,24
75:20 76:4,16 77:20,
25

**functions** 27:15
31:15 41:3 43:13
68:19 69:20 70:7,9
75:17

**fund** 5:19,22 105:3,4,
7,25 106:2,8,11,18,
19 108:5,12 118:22,
23,25 119:2,3 122:24
123:2 125:22 131:24

**fund's** 107:19

**funded** 134:2 140:22
141:15

**funds** 19:13,19,23
21:12,18,24 22:11,19
33:14 66:7,22,24
67:4 68:2,8,9 69:23,
25 75:6,17 122:20

153:19 171:25
172:15,16 177:23
183:3

**future** 56:7 68:10
78:12 90:21 93:4

———

**G**

**GAF** 126:7,13 127:6
128:12,15,23 129:2,
20,21 132:6

**gain** 148:9

**game** 16:22,24

**gap** 155:17

**Gates** 123:20

**gave** 35:17 47:14
72:3

**general** 12:6,7 14:3,
14 17:16,23 26:11,
12,15 27:2 111:16
133:14

**generally** 6:5 17:13
26:7 27:12 103:24
104:2 109:21 111:5
112:7

**give** 6:25 20:19 94:8
113:21

**global** 105:3 106:8
118:21 122:24 123:2
125:22

**good** 5:8 50:7 102:19
165:8 183:25 194:12

**grab** 160:16

**granted** 160:3

**grants** 160:8

**group** 11:23 43:19
190:4 194:18 195:11

**growing** 68:10

**guess** 14:8 36:19,20
41:8 64:6

**guy** 179:10

———

**H**

**H-** 147:12

**hail** 152:9

**half** 153:18,23 162:6
192:18 193:2,4

**hand** 87:3

**handed** 40:21

**happened** 97:16
153:13 177:6

**happy** 47:20 56:9

**hard** 167:25 168:2

**harm** 147:22 148:22

**HCMFA** 5:22 6:4,7
9:3 10:7 18:9,12,16,
19,22 19:14 20:15,
21,25 23:3 24:3
25:21 26:2,18,24
27:2,6,13,22 28:9
29:3,20 30:12,15,18
34:4,5,16,22 35:8,24
37:5,11,15,20 38:3
39:8,10,23 40:4,8
41:7 42:4,14,19,23
43:4,8,14,25 44:8,14,
23 45:15,18 47:12
49:9,20 50:17,20
51:18,23 52:23
53:12,20 54:6,10,24
55:14,23 56:20 57:8
58:3 59:4,8,14 62:6
64:16,22 65:5,13,17
66:3,19 68:20 69:13,
15 70:14,15,24 71:7
75:2,23 76:2,5,9
77:25 78:13,17 80:5,
7,17 81:5,22 85:17
86:22 93:5,19 94:16
95:5 104:12 106:6,7,
19 108:3,12 109:21
110:8,17 111:25
112:24 113:3,7,14,
21,24 114:5,10
115:2,12 116:8
117:11,12 118:3,4,5,
14,15,21 119:14
120:8 121:4 122:23
123:11,20 124:19
125:14,18 126:23
127:3,5,6 129:2,3,20,
21,22 132:5,20,25
134:5,12,17,18,23
135:5,11 136:6
137:2,6,13,20,24
138:4,16,17,24

140:14 142:11,12,19
143:4,6,8,11,12,15,
17,19,22 144:10,21
145:3,7,15,24 146:5
147:12,23 149:8,10,
23 150:3,7,20 151:9
153:10 154:2,11
155:8,15,16,21,24
156:17 157:11,16
158:11 161:19
162:16 163:24 164:2,
6 165:12 166:24
167:15 168:20
169:24,25 170:2
172:9,14 173:24
174:25 176:13
177:14,25 180:10,23
181:6,18 186:15
188:15 191:18,19,21,
23 192:16,23 193:7,
15 194:16 195:9,22

**HCMFA's** 15:18
23:14 26:4 30:23
31:4,8 33:4 36:18
38:5 42:3 43:5,9
44:2,21,23 45:4,19
46:10,24 47:12,17
48:7,14 49:14 52:2
54:22 55:12,20 58:15
59:17 60:11,24
61:13,15 63:3,22
64:15,21 65:6,15
66:16,21 67:11 69:9,
21 79:5 82:10,14
85:7 92:15,20 93:22
95:8,11,14,18,21
101:13 102:5 114:18
127:9 132:4 146:20
147:5 149:17 158:25
159:7 168:18 170:25
176:18 177:3 182:4
183:18 186:22 190:6
193:8

**HCMLP** 5:25 9:2
13:10 31:13 32:17,
22,24,25 40:11 41:4
43:14 44:13 52:11
53:15,19,20 54:9
60:12 63:10 65:3,18
68:25 69:2,7 70:3
71:11,12 72:5,12
75:10,12,19,21 76:17
77:13,17,23 78:12,
16,23 81:4 90:24
93:4 96:8 102:3

110:17 111:7,11,12,
15 112:22 115:14
117:21 120:2 121:16
125:5,7,8 129:8,12
130:7,9 131:6
135:15,18,21,23
137:24 142:22 145:3
150:11 156:11,15
161:9,13 166:24
170:5,12 177:23
178:18 186:16

**HCMLP's** 52:3,4
119:23 121:17
144:15,24 181:3

**head** 19:20 20:4

**hearing** 40:20

**hearings** 40:20

**held** 21:15 27:13
105:7,13

**helped** 72:13

**helpful** 38:14 53:3
189:24 196:16

**helps** 68:8

**Hendrix** 12:4 79:16
90:13 183:5 187:10
194:3

**Hey** 82:5 86:9 94:4
102:14 177:19

**Highland** 5:12,18,21,
24,25 6:7 27:17 28:8
29:3 31:12 32:6 40:4,
13 42:20 44:7 45:7,
14 48:22 49:11 50:18
51:17,25 52:5 54:25
56:23 59:11,15 60:9
61:22 62:16 64:23
65:25 70:15 71:14
75:15 79:22 90:22
96:25 97:7,11,13
108:20 111:8 114:19
115:15 119:14 120:8,
9 121:4,7,21,22
123:15,23 124:4,8,20
125:14,22 131:3
134:18 135:12 136:7
137:8,10,14,21
138:5,15 140:14
146:2,6,8,21 147:6,
14 149:9,19 150:5,8,
21 155:19,22,24

156:5 157:17 161:5, 20 162:17 163:22 165:13,15 168:9,20 169:20 171:3,4,9 172:13,22 173:3,6, 12,25 175:3 176:15, 20,25 177:16 179:11 180:3 195:12

**Highland's** 96:21 115:8 123:21 126:9 134:25 135:7 138:6, 17,22 140:8 168:11, 21 178:7 179:2

**highly** 77:2

**hire** 68:3

**hired** 75:19 122:4

**hiring** 121:17

**hitting** 148:8

**hold** 18:8 139:17,21

**host** 62:18 186:20

**Houlihan** 110:8,11, 13,16,20 111:3,13, 18,22 112:2,4,8,11, 15,19,24 113:3,8,15, 20,25 114:6,12,15,22 115:4,12,21 116:9,24 117:5,12,20 118:5,9, 14,15 127:24 128:5, 8,16 129:3,13,22 130:16 132:22 133:2

**hour** 102:23

**house** 152:9

**huge** 70:4

---

**I**

**ICI** 142:12,20 144:23 145:2,8,11,12,15 146:10 149:11,13 150:4,7,10,20

**idea** 105:24 106:10

**identical** 8:5

**identified** 136:12,16 187:20

**identifies** 49:5

**identify** 23:13 25:21

26:4 76:9 121:6,11, 13 124:7 144:9 188:15 189:10,23 190:14

**identity** 23:2 25:25 81:18

**imagine** 137:22 148:15

**impact** 68:8

**important** 33:6 66:18 69:12,18 177:11 190:22

**imposed** 121:20 177:3

**improvement** 122:3

**in-depth** 135:20

**in-person** 99:6

**inaccurate** 73:4 86:8,11 130:11 132:21

**include** 98:16,24 115:21

**included** 50:2,7 71:12 84:15,19 85:18 95:20 101:18 169:4 196:9

**includes** 43:13 79:7, 20 82:12,16 88:22 128:8

**including** 23:17 27:24 88:20 102:7 133:18

**income** 59:21 63:22 64:9

**incorrect** 53:18 80:12 86:19 97:24

**incumbency** 9:7 19:2 20:13 23:22 25:20

**independent** 88:3,4 112:5 128:16

**independently** 80:18 166:9

**indirect** 26:5,8

**individual** 111:6 115:11 147:21

individuals 31:19 80:10 179:20 187:14 196:4

**inflow** 63:23

**inflows** 68:7

**inform** 84:23 125:14

**information** 25:24 33:25 34:11 54:15 62:14 75:19 78:22 80:7,24 82:2,3 83:2,8 91:3 94:8,24 95:6,12 98:6 115:13,22 117:6 145:7,16 167:7 181:12 183:10 184:2

**informed** 70:14,24 92:16 118:4 150:4,20

**informing** 71:7

**inhibited** 175:9

**inimical** 31:20 41:5

**initial** 40:18 127:23 161:8

**initially** 129:4,23 131:17

**injunction** 40:21 179:24

**inputs** 111:11 112:23

**insight** 68:5

**instance** 192:20

**instructed** 14:11

**instructing** 190:4

**instructions** 13:18

**insurance** 134:14 136:24 140:23 141:16,20,23 142:2, 4,12,19,24 143:2,13, 16,23 144:21 145:8, 16,25 146:5,17 147:7,14,20 148:5,6, 7,8,13,21 149:10 151:5,9,12,25 152:11 171:24 172:16,22 173:4,7,25

**intend** 127:5

**intended** 61:16 62:8 63:22 168:10,20

**intent** 15:10

**intention** 127:8,9

**intentionally** 75:19

**interacted** 32:16 125:4

**interacting** 145:2

**interest** 26:21 33:16

**interject** 82:6 144:11,12

**internal** 166:21

**internally** 11:22 135:20

**interpretations** 111:13

**interrupt** 69:5 139:11

**intra-year** 57:23

**investigation** 16:12, 17 17:18 114:6,11 115:3 116:7 124:10, 17 161:3 164:17,21 165:2,10,11,14,18,21 166:3,11 167:11,17 176:10 178:4 180:12, 19,23 181:5

**investment** 27:11 69:22 70:2 105:8

**investors** 105:5,12 106:3,9

**invoice** 59:14 60:17

**involved** 18:2,19 29:24 32:12,20 69:16 72:15,20 77:3 83:8 86:17 105:23 106:14, 16 110:11 111:6,9 115:18 120:2 121:15 123:13,16 126:11 171:7 177:21

**involvement** 114:16 123:14

**involving** 110:6

**irony** 39:16 119:21

**Isaac** 179:8,12,25

**issue** 49:23 59:14 81:10 100:17 109:19

112:21 114:20 123:11

**issued** 49:6

**issues** 32:12 118:22 124:9 155:10,16,18 156:2,4,9

**items** 8:24 91:21 169:3 181:2 187:13

---

**J**

**James** 167:2

**January** 19:4 20:17 23:14,20 24:4 25:21 26:2,5 28:12 34:3,24 39:25 40:17 49:10 153:3 154:18 161:21 162:13 163:23 176:14

**January-ish** 19:11

**Jason** 11:20 12:20 16:7 33:6,7,20 34:9

**Jim** 26:7,9 27:4 40:21 60:12 76:24 83:20 98:18 105:22 106:13 121:3 170:18,25 171:10,21 179:24 180:25 185:15,18 192:19 193:5

**job** 165:8

**John** 5:9 8:2 56:5 82:5 102:14 115:19 117:6 139:13,17,21, 25 174:11 195:4

**join** 69:22

**Jones** 5:10

**JPEG** 183:6 187:11, 17,20,21 188:17 189:11,15 190:13

**July** 161:24 162:14 164:2 175:4 176:2,3, 7 177:17

**June** 42:25 43:2 47:7 49:10,22 86:24 87:6 95:9,16,23 96:8 101:14 102:6 107:10, 12 154:8,14

---

## K

**K&I** 123:20

**key** 17:22 43:11 111:11,12 131:14 155:11

**kind** 36:7 59:15 60:16 117:14 140:8 189:23

**Klos** 12:3 79:15 80:14 90:12,19 171:8 183:2,3 185:15,20 186:3 190:3 194:3 196:11

**knew** 39:11 42:14,18 130:7,20 131:5 137:2,6 156:3,7 194:17 195:10,13

**Knowing** 84:12

**knowledge** 17:7,8, 11 26:22 32:9 34:21, 25 35:4 36:20,21,22 40:10 42:19,24 46:5 56:20 57:9,13,20 63:16 64:8 71:7 73:5, 8 77:3 85:6,19 98:18 100:17,20,23 101:4 103:19 114:9 115:3 116:6 119:22 121:17 124:11 150:18,19,22 152:6,10 156:15 166:23,25 172:23 173:7 180:20

**knowledgeable** 32:14

**Kristen** 80:15

**Kristin** 12:4 90:19 95:4 183:4,5 185:15, 21,23 187:10 190:4 194:3 196:12

## L

**La** 158:5

**lack** 184:22 191:15

**lacked** 186:2,3 192:2

**lady** 174:13

**laid** 135:10

**large** 68:25 192:19

**largely** 61:21 66:23

**lasted** 154:25

**late** 32:2 33:18 97:20 145:23 151:14

**latest** 63:11

**launching** 177:21

**Lauren** 24:22 25:6 71:12 72:11 75:5 76:8 77:15 88:15,19 90:25 94:4

**law** 67:21 147:19 148:20

**lawsuit** 28:14,18 40:9 49:17 64:18,24 86:17 144:8 161:21

**lawsuits** 40:23

**lawyer** 94:13 148:17

**lead** 19:21 94:19

**leading** 40:17 53:4

**learn** 19:7 38:3 55:14 142:8

**learned** 14:24 15:20 16:4 38:5 55:20 153:10 154:2,12 155:9,16 156:2 167:17

**learning** 17:17 55:24 155:18

**lease** 34:14

**leave** 9:11 33:7,9 164:7

**ledger** 58:4,8,9

**left** 33:22 165:13 175:3 176:20,25 177:5,16 179:21

**legal** 27:17 31:13,15, 19 32:24 41:2,7 61:23 69:3 70:5 72:6, 14 74:19,22 76:14,15 77:23,24 83:9 106:13 126:9 138:9,13 144:15 170:14 178:8, 10,12,20 179:2 180:3 181:2

**legal/compliance** 76:19

**letter** 38:24 39:24 40:8 41:15 42:4 55:15 85:23 111:22

**Leventon** 179:8

**liabilities** 54:24 55:25 56:23 57:10, 11,14,21 58:7,18 59:2,20 64:24 71:14 102:6,8 193:20

**liability** 54:9,12 55:8, 9,13 58:21,22 63:14, 15 193:9

**lift** 175:13

**limitation** 31:3,8 34:22 176:18 177:2

**limitations** 33:4

**limited** 16:12,15 33:22

**limiting** 45:14

**lines** 52:6 141:13 146:25

**lineup** 24:19

**list** 29:6 88:11

**listen** 62:5 120:5 129:18 171:16

**listening** 41:25

**litigation** 16:24 41:10 179:10

**litigators** 178:13

**loan** 15:6,8,9 59:10 60:8 61:17 62:9 63:7 104:6 134:19,24 168:23 195:20

**loans** 61:3 194:19 195:12,24

**logic** 148:4

**Lokey** 110:9,11,13, 16,20 111:3,18,22 112:2,4,8,15,19,24 113:3,8,15,20,25 114:7,12,23 115:4, 12,21 116:9,24 117:5,12,21 118:5,6, 9,14,15 127:24

**128:**5,8,9,16 129:3, 13,22 130:16 132:23 133:2

**Lokey's** 112:11 114:16

**long** 64:4 73:18 148:13

**longer** 24:18,23,25 25:7 83:9 178:19

**looked** 80:25 89:9 116:23 139:5 163:8

**loss** 133:15,21 134:2 146:12 147:2,3,15 148:6 149:4,6,23 156:18 157:12

**lot** 36:11 40:19,24 62:13 69:20 106:16 109:25 110:2 123:13, 14,16 130:15,18 154:21 175:10,15 177:21 190:20 196:4, 19

**love** 117:3

**lower** 51:20

**LP** 5:12,19,22,25 19:25 20:7 21:2 27:18 32:7 42:21 61:22 123:15 124:21 125:15 131:3 146:2 169:20 171:3,5

## M

**Mabry** 25:12 167:8

**made** 27:23 35:24 36:7 37:16,23 56:22 59:11 60:12 61:2 64:23 105:19 106:17 113:4,8,15,25 114:7 117:13 118:6,15 121:8 127:16,23 129:10 137:15 138:10 143:5,6,25 144:8 145:7 151:21 164:6 167:5 183:23 184:12 194:4,13

**magic** 56:8

**magnitude** 152:3

**maintain** 58:3

**make** 10:12 43:25 44:23 45:22 74:16 75:2 76:2,10 80:7,18 83:5 134:13 137:17 138:2 149:2 152:7 163:18 185:22 186:4 187:15 194:14

**maker** 186:6,9,11,12

**makes** 37:2

**making** 45:19 65:14 81:19,23 122:17 125:19 126:5 155:18

**manage** 67:3

**managed** 19:13 21:24 22:11,19 66:24 69:2 142:24

**management** 5:12, 19,22,25 27:17 32:7 42:21 52:6 61:22 69:25 105:22 106:13 123:15 124:21 125:15 131:3 146:2,6 169:20 171:3,5 178:5 180:22

**managers** 27:12

**manages** 21:13

**mandated** 108:10

**March** 29:20 30:3,7, 9,16,19 31:5,9 33:5 34:4,24 35:6 61:11, 14 126:22 129:4,14, 23 153:2,13 166:19 167:4 175:3,11 177:5,6 188:17 189:13 190:15

**Mark** 26:8,10 106:14

**marked** 7:12 46:19 50:25 119:9 124:13 125:20 158:3

**market** 130:22 153:12

**marketing** 19:22

**match** 82:25

**material** 75:7 90:20 93:3

**materials** 9:20 46:13 92:12 146:9

**matter** 62:25 85:17 121:16 133:15 173:21

**matters** 16:22 124:3

**Mckenzie** 174:14

**meaning** 58:23 96:11

**meaningful** 193:3

**means** 83:22 128:11 159:12

**meant** 84:9,10 100:9, 14 159:20

**measures** 121:20

**meeting** 87:2 98:17, 22,25 99:4,5,6,7,16

**meetings** 67:16 69:22 99:10,13,20

**members** 171:7

**memo** 9:10 72:9,13, 24 73:4,9,14,16,19 74:9 75:3,14 76:14 77:5,19 78:19 86:10, 21 87:9 88:10 89:2 96:11 100:2 123:3 124:12 125:6 127:13 128:22 130:3,15,16, 24 156:24 157:20

**memorandum** 125:19 126:25 127:3, 7,10

**memory** 141:7

**memos** 32:19 62:11 69:4 74:21 76:6,19 77:4 96:12 119:4

**mentioned** 131:19 132:12

**mergers** 68:11

**met** 11:18,19 12:4

**metadata** 187:10 189:16

**methodology** 131:23 132:8,9

**Michael** 7:19

**midyear** 153:19

**migrated** 179:2,5,15

**million** 14:7 48:21 50:18,21 51:18,21 63:24 79:7 82:11,12, 15,16 83:14 107:7 108:13 109:4,5,7,13, 14 133:17,23 134:6, 17,22,24 135:5 138:6,16,23 140:9,22 143:19 146:13,21 147:2,6,7,9,13,15,24 148:9,12 149:5,13, 16,18,23,25 150:4 156:19 157:13,15 168:10,19 192:18,22 193:2,4

**mine** 68:13

**minute** 82:7

**minutes** 109:19 191:4

**missing** 25:17

**mistake** 117:13 118:6,15 182:7 183:20,23 184:12 185:8,12,17 186:24 187:24 188:10,14,22 189:12 190:8,16 193:10 194:14,15

**mistakenly** 134:18 182:18

**mistakes** 113:4,8,15 114:2,7 121:8 137:15 194:14

**Mitts** 25:5

**mixed** 168:3

**model** 112:18,20,25

**models** 111:14

**moment** 23:12 117:9

**money** 60:9 108:22 134:12 137:23,24 140:13 172:13 185:18,21

**moneys** 109:4

**months** 155:2 161:20 162:2,3,7,11 174:13 179:18

**morning** 5:8 56:8

**Morris** 5:7,9 7:8,14, 18,22 8:9 10:11,15 17:2 18:5 29:9,14 38:17,22 42:10,13,22 44:17,19 45:10,12 46:18,22 47:3,5 48:10,13 50:12,16,24 51:4,9,12 52:13,15 53:22,24 56:9,13,17, 19 60:19,21 62:2,4, 20,22 70:22 71:20,23 72:16,18 73:18,20 76:22,23 78:3,5,24 79:4 81:14,16 82:9 83:11,12 86:2,5 87:12,15,20,22 88:16,18 90:8,10 91:5,7,22,24 93:12, 14 96:16,18 102:17, 21 103:3 116:3,11, 16,18 117:8,10,24 118:2,12,13 119:8,11 120:3,4 125:9,12 129:15,17 131:7,9 133:8,10 135:24 136:2 139:14,18,23 140:5,6 141:9,11 142:18 144:20 150:14,16,23 151:3 152:12,18,22,23 157:25 158:7,9,21,24 159:18 163:14,17 164:12 169:11,14 171:13,15 172:8 173:22 174:19,23,24 175:21,24 177:12,13 183:13,16 184:18,20 190:24 191:7,9 192:10,14 195:6,8 196:14,19

**motion** 9:11 159:24 160:3,8 164:6 183:18

**move** 44:17 45:11 50:12 53:23 60:19 62:2,20 70:12 72:17 76:22 78:24 81:14 83:11 89:22 91:22 108:4 117:25 118:12 120:3 125:9 129:15 131:7 135:24 150:14 171:14 177:12 183:13 184:18 190:24 192:11

**moved** 180:15

**movement** 172:21

**multiple** 13:21 31:23 99:10

**mutual** 142:13,20 144:23 145:2,8,15 149:11,13 150:4,7,20 185:8,12,16 186:24 187:24 188:10,14,21 189:12 190:8,16

**named** 65:17

**names** 23:17

**naturally** 32:22

**nature** 179:22 182:21 192:4,5 193:11,16

**NAV** 9:10 14:20,21 15:11 16:8,9 17:24 32:10,13,17,21 59:12 62:11 108:21 115:15 119:20 120:9,15,25 121:15,21 122:25 124:16,21,24 125:16 126:11 131:13,24,25 132:6,14,15,16,17,19 133:16 134:7 135:3, 12 136:11,13,16 137:3,7,18 140:15,17 142:13,15,21 147:9, 25 149:4,6 150:5,21 153:5,10 154:3,12,16 155:4 156:14,22 157:3,10,12 168:9,22 169:3,17 170:3,9,20, 22 171:5,20 184:6 185:4,19

**needed** 13:16 105:16 106:5 177:19,22 192:20

**negligence** 148:23, 25

**negligent** 135:2,7 136:7 138:7,17 146:23 168:11,21

**net** 122:20 147:2 149:4,23

**Nexpoint** 18:7 19:13, 24 20:7,23,25 33:9, 17 74:10 78:13

**night** 139:16 183:18

**non-orderly** 129:5, 14,24 130:6,10,23 131:11

**norris** 5:4,8 6:1 7:1, 12,21 8:1 9:1 10:1,14 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,9,17,21 25:1,3,11 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,15 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1,4 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1, 12,19 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1,25 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1

164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1,10 192:1 193:1
194:1 195:1 196:1

**note** 13:12 17:7,8
73:15 75:8 78:21
81:4 102:7 134:21
161:15 169:7,8,9
176:11 182:15,16,19,
23 183:4 186:4 190:5
192:4,18,22

**notes** 9:6 14:12,13,
24 15:15,21 16:5
17:9,11,24 19:8
27:23 28:9,13,17,20,
23,24 35:10 36:2,9
37:12,17,25 38:4
39:11 40:6,14 42:14,
18,24 48:18,20,22
49:6,8,11,15,17,23
50:5,9 58:7 64:17
70:16,25 71:8,9 79:8,
10,11,20 81:10 82:17
83:3,19 86:15,17
101:19,23,24 161:5,
19,22 162:17,22
163:6,21,24 164:19
165:15 166:22,25
167:2 176:14 181:8,
13,24 182:6,20
183:20,24 184:13
185:2,3,6,25 187:7
192:15 193:11,15,17,
18

**notice** 6:6 7:11,24
8:14,18 9:9,24 10:8,
21 11:9 22:25 32:18
37:4 141:20

**noticed** 193:8

**notified** 146:11

**notwithstanding**
55:13 149:8,22

**nuance** 95:3

**number** 7:15 9:14,17
27:19,21 29:6,8

52:16,21 57:6 63:2
67:20 78:10 79:7,19
82:16 83:14 85:9
86:8,19 89:8,9 90:20
92:19 93:22 95:8,14
96:7 98:9 102:3
103:4 104:18 109:8
119:4 123:7 141:19
142:10 146:14 148:9
152:15 163:2 184:10

**numbers** 82:25 96:4

---

## O

**object** 116:14 172:5
173:18

**Objection** 42:16
70:18

**obligated** 70:15,20

**obligation** 192:23

**obtain** 108:2 145:7

**obtained** 95:21

**occasions** 31:24

**occur** 193:16

**occurred** 120:16

**October** 70:14,24
72:3 73:24 78:15
84:23 92:18 93:18
95:6,13 97:14,16,23
98:10 100:2

**October/november**
97:20

**off-market** 153:12

**offhand** 156:25

**office** 70:6

**officer** 18:13,15,22,
23 20:3,10 21:5,24
22:18 24:23,25 32:15
33:13 39:16 45:18
65:5,13 74:25 76:9
80:6,17,23 81:21
122:16 125:13,18,24
126:4 191:19

**officers** 23:2,14
25:21 26:2 39:21
69:15

**offline** 144:13

**offsets** 133:19

**Okada** 26:8,10
106:15

**on-market** 153:13

**ongoing** 118:8

**open** 9:18 106:11

**open-end** 105:4,7,25
106:18

**operating** 193:3

**operational** 105:11,
15

**operative** 159:7,12,
15,16

**opinion** 47:8,14,23
49:22 145:25

**orally** 124:20

**order** 6:25 40:22
56:21 138:16

**orderly** 130:23
131:11,22 132:7

**original** 8:22 9:2,3
29:4,7,11,19 34:5
38:20 93:9 113:13
162:19,22,23,24,25
163:4,7 166:13,15,19
168:5

**originally** 18:17

**outflows** 68:7

**outsource** 43:18
115:10 129:9

**outsourced** 27:16
31:14 32:23,24 41:4
43:12 61:22 63:10
65:3 119:23 129:12
135:18 137:11
170:15

**outstanding** 70:16
78:16 90:20 93:3

**oversee** 43:19 44:15
45:3 68:5

**overseeing** 135:16
171:8

**overview** 12:8 17:23

**owed** 71:14

**owing** 65:24 79:21
83:2

**owned** 26:14

**owners** 26:5,8

**owns** 26:11,19

---

## P

**p.m.** 92:18 93:18
103:2 151:2 191:8
196:21

**Pachulski** 5:10

**pages** 73:21 79:25
89:20 163:8

**paid** 103:19 104:3,4,8
105:5,15,16,17
106:6,8 107:5,9,10,
11,15,18,20 109:4,17
111:19 136:24
141:17 146:21 148:3,
4 149:13

**paper** 183:4 185:22
189:19 194:19
195:11

**papered** 182:22
195:20,24

**papers** 185:23

**paragraph** 127:20
128:2,4 132:21
133:7,15,25 152:25
160:14 169:12,16
173:3 175:19,22
181:6 184:21 185:8
188:6 191:12

**Paragraphs** 168:8,
16,17

**Pardon** 189:5

**parenthetical**
133:20

**Parker** 24:8,16,23

**Parker's** 24:12

**part** 31:12 32:25
34:18 61:5 67:24
69:2,3 70:4 72:3
77:21,23 85:13,15

**owed** 71:14

87:2,10 92:11 122:9
127:25 129:8 142:24
150:11 165:18,21
166:11 176:21
178:11 195:25

**participate** 67:7,13,
15 99:15

**participated** 32:19
68:21 71:6

**particulars** 161:15

**partner** 26:11,12,16
106:15

**partners** 27:2

**parts** 67:14,15 83:14
168:13

**party** 68:3 115:5
125:2,15 146:3,7
148:22 149:9 155:17,
20,22,25 156:6,8

**passed** 71:11

**path** 185:16

**patience** 93:15 195:2

**pay** 70:15 104:12,14
105:19 108:23 109:4
134:5 137:24 138:5,
16,23 140:9 157:17

**payable** 53:19 54:9
58:3,8,9 73:15 78:12
90:21 93:4 101:19

**paying** 104:22
148:12

**payment** 51:23 63:5
108:12 134:13
140:22 141:15 151:5,
10 168:10 170:20
184:5 185:3,5

**payments** 52:24
53:13 54:6,11 55:24
56:22 57:5,10,11,20
58:14 59:9,19 61:2,
16 62:8 64:23
127:16,17 134:2,10,
24 135:6 137:18

**PDF** 89:18

**pending** 49:17

**people** 12:12,19
88:5,20 122:5 123:13

179:2,5 194:12

**percent** 26:11,14
80:19 105:5

**perform** 27:9

**performance** 67:23
68:2,4 69:23,25
138:7

**performed** 27:14
62:15 68:2 113:9

**performing** 170:14

**period** 18:2 24:7
27:18 31:14 40:16
43:23 46:11,25 47:18
86:24 95:15,22
105:18 107:8 121:3
153:2,6,8,12 154:14
156:3 161:9 162:15

**periods** 22:4,5 54:19

**permission** 159:24
180:10

**permit** 147:19

**permits** 148:20

**permitted** 148:19
161:10 174:3

**person** 12:4 125:3
137:20,21

**personal** 32:9 34:25
36:21 103:18 152:10

**personally** 99:15

**perspective** 14:4

**phrase** 35:15 37:3,20
180:21

**picked** 178:16

**pinpoint** 135:22

**place** 58:24 179:24

**plaintiff** 170:8,21
171:19,24 184:5

**plaintiff's** 7:23 9:24

**play** 70:9

**pleading** 30:13
35:14 159:7,12,15,17
181:11 182:17
193:25

**pleadings** 11:15
27:24 35:19 61:4
135:10 172:20 175:6
180:14 186:19,22,25
193:24,25 194:21
196:2,3

**preference** 53:7

**plenty** 187:3

**plugging** 96:5

**point** 22:6 61:25
68:24 80:2 115:7
154:17 158:11 175:5
187:25 188:23

**pointed** 22:24

**points** 172:6

**policy** 142:11,12,13

**portfolio** 27:12

**portion** 29:16 50:13
78:25 79:18 107:11
125:10 141:2 190:25

**portions** 6:24
131:14,16

**posed** 71:10 101:10

**position** 12:10 18:8,
11 20:10 21:6 38:5
53:3,18 54:13 55:12
59:18 60:25 61:15,24
62:8 64:21 85:7,12
86:15,20 97:7,11
101:21 113:7,14
139:9 140:2,3,7,16
142:4,6 143:10
147:5,16,18 148:19
149:17 170:25
179:19 181:6,10,13
182:4 183:19 186:9,
11,14,16 190:8
193:18 194:9,22

**possession** 162:17
163:24 176:14

**Post** 11:20 12:20
16:4,7 32:4,5 33:5,7,
11,15 34:7,9,16,23
97:12

**practice** 121:23
182:19

**practices** 121:18

**preceded** 87:8

**precise** 109:11

**preference** 53:7

**preliminary** 179:24

**premiums** 148:5,6,
13,15

**preparation** 12:14
13:15 15:3 43:14,20
48:16 82:24 142:9
144:8 163:9 172:25

**prepare** 11:11 36:14
43:19 72:13 103:11,
14 104:17 112:19
161:11

**prepared** 10:6 28:4
52:20 57:23 74:21
84:5 114:14,17
118:21 161:2,19

**preparing** 131:6
154:13 183:23
184:13

**present** 13:22 22:7
23:15

**presentations** 119:5

**presented** 89:25

**president** 18:13
19:4,6,19 20:2,7
21:5,12,18 22:11
24:3,8,13,16,18,19,
21 25:4,11 43:4
60:12 73:25 74:5,7
97:4 116:5 170:19
171:2,10,21 173:12,
14,15,16

**pretty** 123:11

**previously** 40:5
164:6

**Pricewaterhouseco
opers** 47:7,11 49:22

**principal** 66:15
70:16 79:7 82:17,25

**prior** 22:15 31:4,9
33:5,22 34:12 35:8,
24 36:8 37:11,16,24
39:24 40:8 61:14,20
62:7 63:16 76:6
99:25 101:23 116:14
120:16 124:13
126:22 152:16

157:13 167:6 179:11

**priority** 40:25

**problem** 168:14

**procedures** 46:7

**proceed** 151:10

**proceeding** 28:8

**proceedings** 5:1
99:11

**proceeds** 134:14
136:24 140:23
141:16 146:17
148:11,13

**process** 17:25 32:21
62:18 63:13 67:13
69:2 71:6 76:20 87:2
99:8 111:17 122:2
123:9,10 154:25
157:19,21 160:10,11
171:9 183:8 185:23
194:2,4

**processed** 152:2

**processing** 133:18

**produced** 117:2

**product** 19:20 20:4
96:3 112:14

**professional** 43:17
180:6

**professionals** 27:8
41:7 43:18 69:22
80:13 194:12,14

**profited** 147:24

**profits** 148:3

**prohibited** 173:19

**prohibition** 174:10
176:18

**promise** 55:21
138:11

**promissory** 9:5
14:13 28:9,23 48:20
181:7

**promptly** 166:21

**proper** 154:23

**proposal** 106:5

**provide** 53:4 68:5
69:24 70:3 75:20
88:5 91:12 178:19

**provided** 11:24
25:15 46:14 66:9
68:25 76:16,18 80:24
86:22 92:11 94:10
95:12 102:2 110:23
111:3,12,22 114:23
115:14 177:24

**provider** 65:18
115:10 129:9 148:22

**providing** 68:17 70:7
77:21,24 146:22
178:19

**proxy** 106:3

**publicly** 183:18

**pull** 89:13 102:11
119:5 167:22

**pulling** 96:4

**purports** 164:16

**purpose** 14:6 25:23
101:9 122:23

**purposes** 57:24
62:16 64:2,9 129:6,
25 146:22

**pursuant** 66:10
111:22 138:4

**put** 7:9,15 29:9 38:17
40:24 41:9 46:18
50:24 71:20 87:12
119:8 152:13,19
157:25

**putting** 6:22

---

**Q**

**quality** 67:23 68:17

**quarrel** 162:5

**question** 6:14,16,18
22:17,22 35:20 41:24
42:2 45:17 50:15
53:9,10 54:3,4 60:22
61:8 62:5 65:9 70:21
71:10 72:21 78:4,6,9
79:3 82:20 86:7,10
89:8,9 90:19 91:25

92:19,24 93:10,18,22
94:10 95:8,14 100:6,
7 113:13 114:22
115:9,15 116:15,17
119:24 120:6 126:2
129:19 130:14
135:14 137:2,6
138:14 154:5 155:6
171:17 173:9 176:4
180:16 183:14
184:19 187:19 189:8
194:5,23 195:5

**questioned** 99:23
115:16

**questions** 9:8 28:4
36:14,17 37:7,21
54:2 77:7 88:6,11,12,
23 89:3,25 101:10
139:15 142:10 155:4
191:10 196:15,18

**quick** 46:17 152:6

**quote** 78:15 83:18,20
98:15 129:3,22
131:22 169:16
171:23 181:7,8
191:15,16

---

**R**

**raised** 34:17

**reach** 40:12 135:11
145:15

**reached** 138:3

**read** 73:12,16 79:15,
18,23 92:8 93:7
100:5,6 122:14
131:20 132:2

**reading** 43:9 84:10
126:19 184:8

**real** 178:15

**reason** 13:2 15:10
40:12,15 41:13,17
47:15 66:21 80:12
98:4 154:17 157:16

**reasons** 148:18

**rebates** 133:19

**recall** 5:9 20:23 38:2,
10 40:16 41:20 52:16

124:15 126:15 144:5
151:12,14 163:6

**receipts** 147:8

**receive** 41:15 104:11
148:21 149:18

**received** 38:8 39:14
42:5,8 50:17,20
52:10 80:10 108:22
143:19 146:18 147:5
149:17,24 150:4
151:5 166:13 187:9
194:7

**receiving** 41:21
51:24

**recent** 193:25

**recess** 56:18 103:2
151:2 191:8

**recipient** 100:13,24

**recipients** 92:17
93:21

**recognized** 171:11

**recollect** 17:22

**recollection** 14:12
22:10 100:8,11,12
102:5 128:14,18
141:13 153:9 182:11
195:19

**record** 5:2 7:13
10:12 54:6 59:2
60:10 62:19 63:8
82:7,8 142:17 185:16
190:5 193:20 196:21

**recorded** 53:17 54:8,
23 55:3,4,8,10,25
58:14,17,18,20,22
63:14 64:9 79:11
134:19,21

**recording** 53:18
55:13

**records** 44:12 52:24
53:14,16 54:7,12,23
55:7,14,20,24 56:21
58:15,19,21,22
59:18,25 60:11,25
61:5,14,21 62:10
63:4,18 124:6 193:9

**recover** 143:22
147:20

**refer** 5:21,24 13:14
17:19 20:25 28:22
30:9 31:16 54:16
60:3 61:18 63:11
67:3 83:24 84:2 85:5
119:6 164:22 172:19
181:11,20 184:16
186:18 188:19 192:8
193:24 194:20
195:15 196:2

**reference** 48:20
51:13 128:7,8 131:2
153:2 184:22 191:14

**referenced** 82:15
190:13

**referred** 124:2

**referring** 37:5,20
98:23 187:4

**refers** 65:21 98:8
127:22 128:4 169:19

**reflected** 16:13,18

**reflects** 59:18 60:25
138:22 140:8

**refrain** 6:15

**refresh** 128:14,18
141:13 153:9

**regard** 36:19 41:21

**regularly** 91:21
193:13

**regulator** 108:7

**reimbursement**
142:15

**reiterate** 45:7 115:20

**relate** 168:8,18

**related** 17:10,11
34:11 35:25 36:8
61:25 62:14 73:14
81:9 99:5 105:2
169:7 174:3 185:4

**relates** 35:9 37:12,
17,25 103:4 141:20
148:3

**relating** 36:17
145:16

**relation** 67:17

**relevant** 167:18

**reliable** 44:3

**relied** 43:21 44:12
80:20

**rely** 44:5,6 112:24
127:6,13

**relying** 25:19 80:13

**remains** 78:16

**remediation** 122:2

**remember** 15:13
18:18 21:19 36:10
38:16 60:7 61:10
73:12 74:15 80:3
99:20 100:15 101:21
102:13 107:15
109:14 112:17
121:12 126:19
136:21 151:6 157:6
180:2 182:10 183:11
196:9

**remembered** 14:9

**remind** 38:13

**renew** 67:10,19

**reorganized** 5:11

**rep'ed** 166:4

**repeat** 28:16 40:7
176:21

**report** 72:2 76:2,10
78:14 84:15,19 89:10
95:7 96:10,11 118:20
130:11 131:4

**reported** 57:18 63:25
64:12 107:13,14

**reporter** 7:13 142:17

**reporting** 119:21
156:9

**reports** 94:22

**represent** 8:10 89:3
116:23

**representation**
29:21 51:8 80:3 89:6
163:20

**representative**
15:19 36:22 40:4
44:21 45:23 82:11

119:14

**represented** 134:10
172:12 175:10

**representing** 46:6
95:3 186:7

**request** 33:10 81:24

**requested** 78:9

**requests** 11:25 88:9

**required** 108:7 192:5
193:5,7

**requirement** 76:5
125:24

**requires** 67:18

**research** 84:13

**reserve** 196:17

**resolution** 122:20,
25 123:9 157:20

**respect** 34:22 95:7
173:10

**respond** 6:18 9:8
11:17 40:10 90:19

**responded** 39:23
40:8 91:8

**responding** 156:9,
10

**responds** 92:8 93:17

**response** 9:3,4 15:7
54:17,18 63:11,12
77:6 80:8 81:13,23
82:16 83:18 85:8
86:7 91:6 92:6,9
93:13,25 94:20
95:13,20 96:19 98:9,
16,24 161:8,12 168:6

**responsibilities**
46:7

**responsibility** 14:21
43:9,25 62:24 65:6,
14,19 75:2,25 76:10
81:19,22 111:11
115:8 122:17 126:5
129:11 169:17 170:3,
7,9,22 171:4,19

**responsible** 45:18
62:17 75:16 76:6
80:11 114:19 115:5,

9,15 125:2,15,19
130:17,21 135:23
146:3,6 149:9
155:17,19,22,25
156:5,8,16 168:9

**responsive** 11:17,24
50:14 54:3 79:2 94:3,
9 125:11 184:19

**rest** 28:23 72:13

**restate** 22:17 155:23
187:19

**restatement** 153:6

**restraining** 40:22

**restricted** 34:13

**restriction** 30:22
31:3,8,11 34:20,21
177:2

**restrictions** 33:3,11,
15,21,24 34:11

**restroom** 56:7

**result** 121:7,21
147:24

**resulted** 131:24
132:13 151:9

**resulting** 135:6

**retail** 32:15 33:10
65:22 67:5,8 70:14,
25 71:8,10 72:3,24
75:4 76:3 77:6 78:9,
15 80:9 84:6,16,19,
23 86:7,12,13,22,23
87:9 88:3,6,23 89:10
90:2 92:19 93:21,25
94:20 95:7,13,21
96:9 98:10 101:10
112:12

**retain** 113:12

**retained** 47:12
110:8,13,16 112:2,9
123:18 124:8

**retaining** 113:18

**retention** 112:11
128:15

**revealed** 54:13

**revenue** 66:16

**reverse** 56:22

**review** 66:13 67:9
73:12,13 74:13 88:8
101:11 106:3 166:21

**reviewed** 11:15,16,
21 12:2 43:5 73:14
76:24 117:17

**reviewing** 65:6 76:6
77:4 193:13

**rights** 113:12,19

**rise** 192:19

**role** 18:14 19:12,19,
21 20:3 34:12 44:15
45:2,13,14,24 46:4
65:18 69:21 76:5
80:23 113:12 177:25

**roles** 19:16 46:6

**Rome** 87:24

**roof** 152:10

**Ross** 24:3,7,18

**roughly** 146:16

**Rukavina** 7:25 11:19
12:5 13:22 16:19
42:7,16 56:5 70:18
82:5 102:14,20,24
103:16 115:19
116:13,22 139:13,17,
21,25 144:11 159:11,
14 163:12,21 164:8
172:5 173:18 174:11,
21 191:6 195:3
196:17,20

**rule** 5:18 7:10 9:25
108:9 147:19 148:20

**rules** 6:13 174:18

**run** 69:2

———

**S**

**safe** 39:13

**sales** 19:21 68:6,13

**Sauter** 9:5 12:17,19
16:12,17,21 17:5,15
103:17,18 161:3
164:14,16,17 165:4,
14 166:10 167:16

175:9 176:9 177:25
178:15 180:18,22
181:18,23

**Sauter's** 13:15 31:16
54:17 167:10 175:6
180:11 181:21,25
188:24

**scale** 68:8

**scheduled** 8:14,15

**schedules** 31:17
32:18 46:14 187:2,4,
7

**Scott** 179:13,14,25

**screen** 6:23 7:10
8:12,13 9:15 10:17,
25 29:10 30:7 38:18
46:19 47:16 50:25
71:21 87:13 120:13
122:12 124:13
125:20 152:14,19
158:2 160:7 167:24
188:12

**scroll** 7:20 10:12,24
11:3 29:18 47:4,20
48:5 51:10 78:3
88:16 90:8,9 91:5
93:12 96:16 133:9
158:23 175:22

**scrolling** 89:20

**search** 144:17

**searched** 144:13
151:18

**searching** 145:11

**SEC** 32:20 62:12
106:3 121:3 124:3,
10,16,19 125:4,6,14
154:22,25 156:10,24

**secretary** 18:17,18,
20,25 19:5 20:22
21:20,21 22:15
24:10,18,22 25:6,7,
13 72:12 75:5 77:18
94:15 97:2

**section** 48:18 67:18

**Securities** 74:10

**seek** 106:10,17
108:2,4 142:15

**Seery** 12:3 31:18
33:8

**selection** 70:2

**send** 8:2 127:3 190:5

**sending** 39:19 72:9,
24 74:8 75:13 100:2
127:10

**senior** 105:22 106:13

**sense** 37:2 177:19

**sentence** 83:17
84:9,10 85:8,17 98:8,
9,13 99:24 100:10,
14,25 127:22 128:2
131:15,21 134:3
170:5 173:2,5 181:18

**separate** 81:9

**September** 99:7
154:2 174:20,22

**serve** 21:11 66:22

**served** 6:7 22:10
44:14 65:13 67:4
74:25 191:22

**server** 151:19

**serves** 96:25

**service** 65:18 77:24

**services** 9:6 27:10,
17 32:23 44:10
62:14,15 66:6,9
67:23 68:15,17,24,25
69:3 70:3,9 74:20
75:22 76:16 77:21
110:22 111:2,9,10,23
113:5,9 114:13,23
118:17 135:2,7
138:8,17 142:25
150:11 170:13,15
177:10,22,24 178:8,
11,20

**set** 165:5

**settlement** 60:17
70:6 138:25 140:3

**seven-and-a-half**
14:7

**share** 15:19 25:25

**shared** 9:6 44:10
62:15 68:24 69:3

70:9 74:20 75:22
77:21 111:9 142:24
150:11 170:15
178:11

**shareholder** 107:24

**shareholders** 106:4
107:19,20,23

**sharing** 177:23

**sheet** 48:7 53:20
55:5 58:23,24 59:3
65:7 87:6 92:11,20
93:23 94:5 96:5
102:9 108:15,17
193:13,21

**sheets** 65:15 87:5

**short** 150:23 191:2

**shorten** 37:21

**show** 7:20 38:13
162:22 163:11

**showed** 47:25 55:4
108:19

**showing** 30:7 187:10

**shown** 63:23 147:2

**shows** 51:20 63:5

**shrinking** 68:9

**sic** 9:10 188:17

**side** 193:15

**sides** 137:25 138:2
177:7 186:7,8,14

**sign** 169:9 182:12

**signature** 181:15
183:6,12 187:11
193:19

**signed** 42:15 47:6,8
49:9 169:8 181:7,15,
24 182:3,6 183:12,20

**significant** 148:5

**signing** 182:10
183:11,24 184:13
186:12

**signs** 186:11

**similar** 193:11,16

**simple** 6:14 54:4

60:23 93:19 183:15
193:10

**simplify** 54:22

**simply** 92:2

**single** 73:25 79:23
119:13 125:3

**singular** 170:18

**sir** 5:15 38:20 71:24
120:5 124:7 158:10
186:17

**sit** 35:22 41:14 46:9
110:15 114:9 133:3

**size** 192:4,15 193:12,
16

**sizeable** 192:25

**Skyview** 83:10
161:14 177:7,22
179:2 180:3

**slack** 178:16

**sloppy** 194:6

**sole** 26:25 27:4 101:9
191:25

**Sounds** 138:9

**source** 66:15 69:24
91:2 98:5 119:19
145:9,12 147:19
148:20 167:6

**speak** 12:23 13:3,5,
9,16,19 31:4,9 33:4
83:6 167:5,7

**speaks** 195:15

**specialist** 43:22

**specialize** 152:5

**specific** 38:16 44:25
72:20 86:11,18
103:24 120:17
125:24 155:12
156:12 157:4 170:24
180:2,20

**specifically** 44:21
49:5 65:12 84:21
86:9 99:21 125:17
180:24 181:23 192:3

**specifics** 156:20

**speculate** 84:20

**speculation** 34:18
41:9 122:8 150:18

**spent** 109:21

**spoke** 11:19,20,21
12:13,18 165:19,22
166:2,10

**spoken** 13:13 166:16

**spring** 103:20

**Stacy** 87:23 89:25

**stance** 157:22

**standard** 90:25

**standards** 180:7

**Stang** 5:10

**star** 147:9

**start** 87:20 104:2

**state** 155:6

**stated** 183:18

**statement** 36:6
37:22 43:13 49:4
51:6,8,20 52:2 63:23
64:9 84:15,18 85:8
100:25 106:4 161:15
165:24 166:5,6
172:4,9,21

**statements** 43:6,10
44:2,24 45:5,8,20
46:11,24 47:13,18
48:15,19 49:21 50:2
57:22 58:13,16 64:5,
14,17 65:10 86:23
95:15,22 101:14,18

**states** 133:25

**step** 14:18 152:5

**Stephanie** 25:13
179:6

**stepped** 181:3

**stepping** 64:6

**steps** 58:13 74:16
121:13

**stop** 51:11 102:21

**Strand** 26:13 27:3

**strategist** 19:21 20:5

**strategy** 16:24

**strict** 31:18

**strictly** 45:14

**strike** 44:18 45:11
50:12 53:23 60:20
62:23 72:17 76:22
78:25 81:15 83:11
91:23 117:25 118:12
120:3 125:9 129:16
131:8 135:25 150:15
171:14 177:12
180:15 183:14
184:18 190:24
192:11

**string** 88:6 101:8

**structure** 27:13
104:5

**stuff** 190:21

**subject** 16:4 28:14,
18 49:17,21 66:12
112:20 123:5 124:10,
16 135:9 140:10
150:2 180:13 181:8

**submitted** 106:2
151:20

**subsequent** 17:20
48:11,17 49:5,16
55:3,4,6,8

**substantial** 192:23,
24,25

**sued** 13:10

**sufficient** 68:18

**suggest** 73:4

**suing** 48:23 49:11
161:5,20 162:18
163:22 165:16
176:15

**summarize** 20:6
133:11

**summary** 133:12

**summer** 32:2

**supplemental**
115:23

**supplied** 87:4

**supplying** 75:10

**support** 9:12 44:12
76:19,20 83:4,20
84:25 185:11 186:20
188:20,21 189:11
196:4

**supported** 137:23

**supporting** 187:6

**supports** 187:23
190:7,15

**supposed** 59:10
61:2 134:25 135:6

**supposedly** 186:7

**Surgent** 72:14 89:24
90:4

**surprised** 60:16
63:18 139:7

**surrounding** 16:8
32:13 86:14 161:4
164:19 165:15
176:11

**suspect** 144:14

**sworn** 5:3,5

**———**

**T**

**taking** 85:11 94:19

**talk** 13:11 14:15
34:14,15,16 67:25
68:4,5,7 69:20,23
82:23 109:18 144:12
161:10,14,16 174:3,
16 179:25

**talked** 14:20,21
30:21 34:9 100:22
108:23 166:12

**talking** 16:7 17:20
18:3 43:16 68:10,11
115:7 127:16 151:4

**task** 119:15,17,18

**tasked** 43:21 45:8
53:16 164:21

**team** 31:13,19 43:17
44:4 50:8 53:17,21
65:16,19 72:14 74:19
75:9 77:23 78:22

**81:25 126:10 142:23
151:19 170:14 171:7
178:12,13 179:2
180:3 189:19 193:14,
17

**technicality** 77:14

**telephonic** 99:6

**telling** 93:20 126:15
133:3

**tells** 185:19,21

**tendered** 29:13
38:21 46:21 51:3
71:22 87:14 119:10
158:8

**term** 30:20

**terms** 104:4,8 105:24

**Terrestar** 109:18,23
110:3,6,9,23 111:4
112:15,21 113:10,17
114:3,20 117:15
118:22 119:16
120:25 121:9 124:9
137:16 138:18
146:23 147:10

**testified** 5:5 41:20
60:4,6 83:24 85:3
104:21 126:18
140:19 151:17 182:9
192:7,8 193:12
195:16

**testify** 10:6 27:22
52:17,20

**testimony** 22:15
42:23 51:17 60:3
64:15 75:23 79:15,19
80:17 81:7 84:3 85:3
185:14 190:22
192:12 195:15,16,21

**Texas** 147:18 148:20

**Thedford** 24:22 25:6
31:7,23 71:12 72:11
75:5 76:8 77:15 83:6
89:23 91:11 94:12
96:20,24

**Thedford's** 94:13

**theory** 147:25 148:2

**Thereof** 9:12

**thing** 69:19 136:3 160:18

**things** 11:22 12:7,8 13:10 31:25 32:3 33:19 67:22 68:15 75:8 91:20 161:10

**thinking** 35:11 71:5

**third-party** 112:5 128:16

**Thomas** 72:14 88:21

**thought** 50:8 63:15 182:18 186:15

**thousands** 163:8

**threw** 148:9

**time** 6:23,24 7:4 8:4, 15 15:15 18:2,21 20:14,24 21:20 22:4, 5 24:7,24 27:18 31:14 32:16 33:12,19 39:20,24 40:7,16 41:3 43:15,23 46:16 54:19 55:7 56:6 58:17 64:4 73:6,10, 11 94:17 95:10 96:24 97:9,25 99:25 102:19 104:23 106:15 107:8 109:17,22 110:2 113:21 114:4 119:13 120:24 121:19 124:14 126:13,15,24 129:3 135:4 136:5 143:16 145:6,17,24 148:13 150:24 153:12 155:12,14,15, 25 157:4,23,24 158:11 159:9 161:9, 18 162:15,16 163:25 164:2 166:15,18,20 168:5,12 172:7,17 173:24 175:3 176:17, 20,24 177:11,16 178:7 180:10 183:17 194:22

**time-** 20:21

**timeline** 20:21

**times** 13:19,21 43:16

**timing** 154:7

**title** 18:8,11 19:12,24 20:12 24:12

**titled** 122:20

**titles** 19:16 23:17

**today** 5:13,17 6:4,23 7:24 8:14,15 9:25 10:7 18:6 36:24 37:10 42:3 44:21 57:19 62:8 64:15,21 79:5 114:10 117:18 133:4 159:6,21 172:10

**today's** 8:4 11:12 13:20 14:2 15:3 82:20 173:2

**told** 15:8 31:24 40:4 41:4 60:8 86:6 97:23 100:16,19 117:12 118:14 119:19 124:19 125:7 129:2, 20 130:15 132:6 137:17 140:18 143:15 150:7 182:3, 11,13 183:2 185:18 186:4

**tolling** 113:22

**top** 86:3 102:22 146:13

**topic** 9:17 17:15 23:5,9 27:19,21 28:5 29:6,8 36:14,18 52:16,20 63:2 65:20, 21 99:17 103:4,12,14 104:18 117:16 141:19 142:10 158:13,14 161:17 163:2

**topics** 10:8,13,16,20, 25 11:8 14:14 16:16 22:25 34:17 57:6 102:18 114:15 115:21

**total** 107:2,4,5 108:13 109:12 133:15,21 146:12 147:8,14

**totality** 102:5

**trading** 27:8,10,11

**transaction** 108:18

**transactions** 14:8 129:4,14,23 130:10,

22 153:13 194:19

**transcript** 84:11

**transcripts** 186:21 187:18

**transfer** 14:7,11 15:10 51:14,21 52:7 60:13 183:2,4 185:18,20,21,22

**transferred** 51:18 134:18 137:23 140:13,14 168:19 172:13

**transfers** 52:18 54:23 108:23 182:20, 21 195:12,23

**transition** 177:9

**transitioned** 97:13

**treasurer** 24:9,17,22 25:5,12 39:7 43:14, 25 44:8,14,22,25 45:2,15,24 46:4,8 65:17 75:13,25 76:5 80:22 96:21 191:22

**treated** 56:2 57:15 62:9

**Trey** 24:8,15,23

**trick** 159:19

**TRO** 40:22

**true** 44:3,24 45:20 65:15 75:3 76:2,11 80:8 81:19,23 125:20 126:6

**trusts** 26:8

**Tuesday** 92:17

**turn** 30:5 110:5 158:21 169:11

**turned** 183:3

**two-thirds** 26:9,19 146:16

**tying** 190:9

**typical** 86:25

**typically** 99:5 104:8

**typo** 90:24

### U

**Uh-huh** 8:25 11:4 23:4 52:19 53:11 88:22 93:16 118:24 141:21 176:12

**ultimate** 124:24

**ultimately** 110:5 129:11 130:17 171:21,24

**unable** 31:24 41:5 178:13 179:20,21 180:7

**unaudited** 95:17,22 96:4 101:14,18

**unauthorized** 85:9

**unaware** 40:5 64:16, 22

**unclear** 101:22

**uncomfortable** 33:14

**underlying** 82:23 101:25

**understand** 5:14,16 12:10 15:17 48:17 103:6 106:19 113:12, 19 115:20 128:11 148:18 160:6

**understanding** 13:8 15:23 30:14 46:3 53:2 54:8 55:2 78:8 103:8,22 106:7 111:16 122:22 139:8 147:18 159:6 160:5 161:6 184:25

**understood** 32:21

**undertake** 106:25

**undertaken** 115:2 116:8 167:16

**undertaking** 113:24 114:5,10

**undertook** 16:13,18 164:18 166:21

**unfettered** 34:6,8 173:11,16 175:2,8 177:15,19

**unusual** 91:19

**urgency** 56:6

**utilized** 124:3

**utilizing** 178:7

### V

**vagueness** 172:6

**valid** 50:5,9 143:11

**valuation** 32:23 62:16,17 109:18,23 110:3,6,10,12,24 111:10,14,15,17 112:6,16,17,20,21,25 113:4,10,17 114:3, 13,20,24 115:10 117:15 118:16,22 119:16,22 121:9 124:9 128:17 129:8,9 130:8,21 132:9 135:2,7,16 137:11,16 138:8,18 146:24 147:10 154:24 155:5, 9,16,18 156:2,4,8 170:13 171:7,9

**valuations** 115:9 131:6 156:16

**verified** 107:14

**verify** 125:24

**vice** 18:13 19:3,6,18 20:2,7 21:5,11,17 22:10 24:8,13,16,21 25:4 43:4 73:25 74:5, 7 97:4 116:5

**view** 14:3 178:20

**viewed** 75:21

**violating** 174:18

**Vitiello** 25:13 179:6

**voluntary** 108:3

**vote** 106:5 107:24

**voted** 104:10 105:12

### W

**wait** 13:17 159:22

**waited** 157:16

**wanted** 143:22

**water** 56:12

**Waterhouse** 12:3,23 13:3,6 14:10 15:5 24:9,17,22 25:4,11 39:5,7,13 41:14 42:5 43:15,24 44:22 60:4 65:16 71:13 75:9,12, 24 78:22 80:14,22 81:25 82:24 83:23 90:12 91:8,12 92:7, 13,16 93:17 96:20 97:23 98:12 99:16 100:9,13,16 140:12 142:23 144:25 151:19 161:16 165:13,19 167:8 171:8 173:24 175:2 176:19,25 177:4,15 181:7,13,24 182:2,6 183:10,19,23 184:4, 12 186:3,11 191:16, 18,22 192:2,6,16 193:14,19 194:3,17 195:9,22

**Waterhouse's** 84:11 92:8 93:13,20 96:19 99:25 100:25 173:20 181:17 183:6 187:11

**week** 162:4

**weeks** 12:5 13:21 42:15 152:3 155:2

**weighted** 131:23 132:8

**weighting** 129:6,25 131:12

**Willmore** 25:6

**wishes** 91:25

**withdrawn** 35:13 55:22 80:5 82:12,13 92:14 109:10 117:11 122:18 127:4,5 168:16

**witnesses** 190:22

**wondering** 100:19

**word** 35:21 91:9 131:8 142:14 163:9, 15,16 165:2 183:6

187:8 189:15

**wording** 83:25

**words** 14:18 169:16

**work** 31:20,24 43:19 96:3 111:19 112:14 113:16 114:2 117:14 118:6 119:15 146:23 164:25 165:4 168:11, 21 178:13 179:20,21 180:7

**worked** 32:21 124:5

**working** 33:2,8 41:11 56:8 72:5 112:22 115:11 117:20 135:16 146:10 178:18 180:4

**works** 5:23

**world** 49:9 104:6 126:24 186:23 187:22 189:11

**worth** 160:10

**writing** 124:20 144:2 172:17

**written** 66:10

**wrong** 8:24 73:4 114:12

**wrote** 181:18

___

**Y**

**year** 16:13 49:6 57:24 68:3 85:23 97:21

**year-end** 57:15

**years** 18:21 76:18 79:12 148:5,7

**yesterday** 9:13 54:19 193:25

**Yup** 52:19 54:5 70:11 86:4 92:4 127:21 133:22 158:6

___

**Z**

**Ziehl** 5:10

**Zoom** 12:4

# EXHIBIT 193

Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                  DALLAS DIVISION

4
   IN RE:                ) Chapter 11
5  HIGHLAND CAPITAL          ) Case No.
   MANAGEMENT, LP,          ) 19-34054-
6          Debtor.    ) sgj11
   -------------------------  )
7  HIGHLAND CAPITAL          )
   MANAGEMENT, LP,          ) Adversary
8                      ) Proceeding
        Plaintiff,    ) No.
9                  ) 21-03004
     vs.            )
10                    )
   HIGHLAND CAPITAL        )
11  MANAGEMENT FUND ADVISORS,   )
   LP,              )
12                  )
        Defendant.      )
13  -------------------------  )

14

15

16

17    REMOTE ZOOM DEPOSITION OF DENNIS C. SAUTER

18         Wednesday, November 17, 2021

19

20

21

22

23  Reported by:

24  Stacey L. Daywalt

25  JOB NO. 202810

Page 2

```
1
2
3                Wednesday, November 17, 2021
4                1:08 p.m.
5
6
7        Remote Zoom Deposition of DENNIS C.
8   SAUTER, held before Stacey L. Daywalt, a Court
9   Reporter and Notary Public of the District of
10  Columbia.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1   A P P E A R A N C E S :
2   (All appearances via remote Zoom)
3
4        PACHULSKI STANG ZIEHL & JONES
5        Attorneys for Plaintiff
6            780 Third Avenue
7            New York, New York 10017
8        BY:   JOHN MORRIS, ESQ.
9
10       MUNSCH HARDT KOPF & HARR
11       Attorneys for Defendant
12           500 North Akard Street
13           Dallas, Texas 75201
14       BY:   DAVOR RUKAVINA, ESQ.
15
16       STINSON LLP
17       Attorneys for James Dondero and Nancy
18   Dondero
19           3102 Oak Lawn Avenue
20           Dallas, Texas 75219
21       BY:   MICHAEL AIGEN, ESQ.
22
23   ALSO PRESENT:
24
25           LA ASIA CANTY
```

Page 4

```
1                D. Sauter
2   DENNIS C. SAUTER,
3        called as a witness, having been
4   duly sworn by a Notary Public, was examined and
5   testified as follows:
6
7   EXAMINATION BY
8   MR. MORRIS:
9        Q.   Can you please state your name for
10  the record.
11       A.   Dennis Sauter.
12       Q.   Good afternoon, Mr. Sauter.  My name
13  is John Morris.  I'm an attorney at Pachulski
14  Stang Ziehl & Jones.  We are counsel to the
15  reorganized Highland Capital Management, LP.
16       Are you aware of that?
17       A.   Yes, sir.
18       Q.   Okay.  And we're here for your
19  deposition today.  Correct?
20       A.   Yes, sir.
21       Q.   And I've examined you previously.
22  Is that right?
23       A.   I don't believe so.
24       Q.   Okay.  Have you ever been deposed
25  before?
```

Page 5

```
1                D. Sauter
2        A.   I don't think so.
3        Q.   Okay.  So very simple ground rules.
4        I'm going to ask you a series of
5   questions, and it's important that you allow me
6   to finish my question before you begin the
7   answer.
8        Is that fair?
9        A.   Yes, sir.
10       Q.   And I will certainly attempt to do
11  the same for you and -- insofar as I will
12  attempt to allow you to finish your answer
13  before I begin my question.
14       But if I fail to do that, will you
15  let me know?
16       A.   I will.
17       Q.   If there's anything that I ask you
18  that you don't understand, will you let me know
19  that?
20       A.   I will.
21       Q.   If you want to take a break at any
22  time, just let me know and I'll try to
23  accommodate you.  I'd only ask that you don't
24  ask for a break while a question is pending.
25       Is that fair?
```

Page 6

D. Sauter

1
2    A.   That's fair.
3    Q.   Okay.  Do you have a license to
4    practice law, sir?
5    A.   I do.
6    Q.   In what states are you admitted to
7    practice?
8    A.   Just Texas.
9    Q.   When did you obtain your license?
10   A.   November of 2001.
11   Q.   And did you graduate from law
12   school?
13   A.   I did.
14   Q.   Where did you graduate from law
15   school?
16   A.   Southern Methodist University.
17   Q.   And can you describe for me your
18   employment history from the time you graduated
19   law school until today.
20   A.   Sure.
21       Out of law school I began at a firm
22   called Winstead Sechrest & Minick.  And I was
23   there just till tax day, so April 15 of 2002,
24   when my group moved to a firm at the time that
25   was called Godwin Gruber.  I was at Godwin

Page 7

D. Sauter

1
2    Gruber until 2006.
3        And I went in-house with a
4    development firm called St. Ives Realty.  I was
5    there until 2009.
6        And in 2009, I went back to work
7    with the group I'd worked with before but now
8    it was called Langley Weinstein.  I was with
9    Langley Weinstein until December 31 of '13.
10       And in 2014, I started at Wick
11   Phillips Gould & Martin, and I was at Wick
12   Phillips until February of 2020 when I began at
13   Nexpoint.
14   Q.   And while you were at Nexpoint -- I
15   mean, withdrawn.
16       While you were at Wick Phillips, did
17   you provide services to Highland or any of its
18   affiliates?
19   A.   I provided services primarily to
20   Nexpoint advisors and its wholly owned
21   subsidiaries.
22       I did have occasion to do a couple
23   of discrete engagements for -- I think they
24   were CLOs but managed by Highland.
25   Q.   Prior to the time that you joined

Page 8

D. Sauter

1
2    Nexpoint, did you have any particular expertise
3    in a specified area of the law?
4    A.   For about the last ten years, real
5    estate.
6        It was, before that, kind of a
7    hybrid of construction related litigation,
8    landlord-tenant disputes, you know,
9    foreclosures.  It was all real estate related
10   litigation and then real estate transactional
11   work.
12   Q.   How did you come to become employed
13   by Nexpoint?
14   A.   I had worked with the folks here at
15   Nexpoint for my entire tenure at Wick Phillips,
16   and they gave me an offer and I accepted.
17   Q.   What offer did they give you?  What
18   position?
19   A.   I was hired to be general counsel of
20   real estate.
21   Q.   Are you still the general counsel of
22   real estate?
23   A.   I'm now the general counsel of
24   Nexpoint.
25   Q.   When did you become the general

Page 9

D. Sauter

1
2    counsel of Nexpoint?
3    A.   I don't recall exactly, but I would
4    say April or May of this year.
5    Q.   All right.  So from approximately
6    February of 2020 until approximately April of
7    2021, you were the general counsel of real
8    estate, and since approximately April of 2021
9    you were -- you have been the general counsel
10   of Nexpoint.
11       Do I have that right?
12   A.   Correct.
13   Q.   Was there a general counsel of
14   Nexpoint during the time you served as general
15   counsel of real estate?
16   A.   There was not.
17       Generally the way things worked is
18   Scott Ellington was general counsel at Highland
19   Capital, and most of the legal department
20   reported to him.  I was the one attorney that
21   was not under him.
22       So no, there was not.
23   Q.   Okay.  To whom do you report today?
24   A.   Matt McGraner.
25   Q.   And what is Mr. McGraner's title?

Page 10

D. Sauter

1
2    A.  I believe it's managing director.
3    Q.  When did you begin reporting to
4  Mr. McGraner?
5    A.  The day I was hired.
6    Q.  What are your duties and
7  responsibilities today as the general counsel
8  of Nexpoint?
9    A.  A lot different than I anticipated
10  when I came on.
11    Q.  Fair.
12    A.  It's a little bit of everything.  I
13  get lots of questions from lots of different
14  people.
15      As you can imagine, there's been
16  quite a shuffle with the Skyview formation,
17  people leaving, people staying, and so, you
18  know, it's been fairly fluid.  So I try to
19  handle whatever somebody brings me.
20    Q.  In your capacity as general counsel,
21  do you have any responsibility for overseeing
22  Nexpoint's litigation matters?
23    A.  I do.
24    Q.  Okay.  And do you have
25  responsibility for overseeing Nexpoint's

Page 11

D. Sauter

1
2  defense of the lawsuit that Highland has
3  commenced against it?
4    MR. RUKAVINA:  Allow me to interject
5  just a little bit here, John.
6      You subpoenaed Mr. Sauter in the
7  HCMFA lawsuit.
8      Why are you asking him all about
9  this Nexpoint?
10    MR. MORRIS:  Just because he told me
11  that's where he works.
12    MR. RUKAVINA:  Yeah, that's fine.
13    I mean, I'm not trying to be rude.
14  Just –
15    MR. MORRIS:  I appreciate that.
16    MR. RUKAVINA:  – if you're –
17    (Simultaneous crosstalk.)
18    MR. MORRIS:  Duly noted.  Thank you,
19  Davor.
20    THE REPORTER:  Please watch the
21  overlap of talking.  Thank you.
22  BY MR. MORRIS:
23    Q.  Mr. Sauter, Mr. Rukavina brings up a
24  good point.
25      Are you also the general counsel of

Page 12

D. Sauter

1
2  Highland Capital Management Fund Advisors, LLP?
3    A.  I'm not.
4    Q.  You are not?
5    A.  I'm not the general counsel of
6  Highland Capital Management Fund Advisors.
7    Q.  Okay.  Can we refer to that entity
8  as HCMFA today?
9    A.  Yes, sir.
10    Q.  Do you have any title or role with
11  HCMFA today?
12    A.  I don't have any official capacity
13  with HCMFA, although I do perform work from
14  time to time for HCMFA.
15    Q.  Okay.  Does HCMFA have a general
16  counsel, to the best of your knowledge?
17    A.  It does not.
18    Q.  Does HCMFA have any officers today,
19  to the best of your knowledge?
20    A.  It does, but I'm not sure I can name
21  them off to you.
22    Q.  Okay.  What services do you provide
23  to HCMFA?
24    A.  Again, like other affiliated
25  entities, when it has legal needs that meet my

Page 13

D. Sauter

1
2  expertise, people bring it to me and I work on
3  it.
4    Q.  And what's an "affiliated entity" in
5  the way that you've used that term?
6    A.  I generally refer to HCMFA, Nexpoint
7  Advisors and the wholly owned subsidiaries of
8  Nexpoint Advisors as the affiliated entities.
9      HCMFA also owns Nexpoint Securities,
10  which is the broker dealer, and so I do work
11  with those folks from time to time as well.
12    Q.  Is there a source of affiliation
13  between Nexpoint and HCMFA?
14    A.  Yes, Mr. Dondero.
15    Q.  And he controls both to the
16  best of your knowledge.  Is that right?
17    A.  I – I guess it depends on how you
18  define "control."
19      But yes, he is a controlling person
20  of Nexpoint Advisors, and yes, for all intents
21  and purposes, he's the controlling person of
22  HCMFA.
23    Q.  Okay.  And can we refer to HCMFA and
24  Nexpoint Advisors, LP together as "the
25  advisors"?

Appx. 03087

Page 14

D. Sauter

1
2    A.   That's fine.
3    Q.   The advisors are each advisory
4  firms.  Is that right?
5    A.   Correct.
6    Q.   And each of them provide advisory
7  services to certain funds.  Is that correct?
8    A.   Correct.
9    Q.   Okay.  Do you hold any titles with
10  any of the funds that are advised by either of
11  the advisors?
12    A.   Yes, I am general counsel for
13  Nexpoint Residential Trust and I'm general
14  counsel of Nexpoint Real Estate Finance.
15    Q.   Any others?
16    A.   No, sir.
17    Q.   Okay.  Do you have –
18    A.   Wait.  Wait.  Let me clarify.
19         I think I am general counsel of
20  Nexpoint Real Estate Advisors, and I may be
21  general counsel of each of them.  I think there
22  are nine in total.
23    Q.   Okay.  And are each of them separate
24  funds?
25    A.   Each of the advisors are – manage a

---

Page 15

D. Sauter

1
2  discrete business line.  They're separate
3  entities, but not necessarily funds.
4    Q.   And are each of them owned
5  indirectly or directly by Nexpoint Advisors,
6  LP?
7    A.   Yes, sir.
8    Q.   Okay.
9         When did you first meet Mr. Dondero?
10    A.   I don't recall.
11         I think I met him once at an event
12  that I was invited to years ago, maybe 2017.
13    Q.   Do you know if he holds a title at
14  HCMFA?
15    A.   I don't believe he does.
16    Q.   How about Nexpoint?  Does he hold a
17  title at Nexpoint?
18    A.   Yes, he's the president.
19    Q.   And even though he doesn't hold a
20  title at HCMFA, it's your understanding that he
21  controls HCMFA.  Is that right?
22    A.   I don't know that I would say that.
23         And again, I would need to look at
24  the organizational documents.
25    Q.   Well, as – withdrawn.

---

Page 16

D. Sauter

1
2         Do you know if Mr. Dondero serves as
3  the portfolio manager for any of the funds to
4  which the advisors provide advisory services?
5    A.   He does.
6         I don't know which ones.
7    Q.   We're going to talk in a little
8  while about a TerreStar NAV issue.
9         MR. MORRIS:  And Stacey, that's all
10  caps N-A-V, and it's T-E-R-R-A-S-T-A-R [sic].
11    Q.   We're going to talk a little bit
12  about a TerreStar NAV issue.
13         Are you generally familiar with
14  that?
15    A.   Generally.
16    Q.   Okay.  And is it your understanding
17  that that NAV issue, that TerreStar NAV issue,
18  related to certain equity positions that were
19  held by certain funds managed by HCMFA?
20    A.   Yes, I think it was – Global
21  Allocation Fund is the one that was
22  particularly the insured.
23    Q.   And can we refer to that as GAF?
24    A.   Yes, sir.
25    Q.   Do you know who the portfolio

---

Page 17

D. Sauter

1
2  manager of GAF was in 2019?
3    A.   I do not.
4    Q.   Do you know if it was Mr. Dondero?
5    A.   I do not.
6    Q.   In the course of your investigation,
7  did you ever ask who the portfolio manager of
8  GAF was?
9    A.   I did not.
10    Q.   Do you know Frank Waterhouse?
11    A.   I do.
12    Q.   When did you first meet
13  Mr. Waterhouse?
14    A.   I think I met him just before I came
15  on.  It would have been maybe December of 2019.
16    Q.   Okay.  Do you know if Mr. Waterhouse
17  holds any titles with either of the advisors?
18    A.   I believe so, but I'm not exactly
19  sure.
20         MR. RUKAVINA:  I'm going to object
21  to vague or form there.
22         What time are you specifying,
23  Mr. Morris?
24         MR. MORRIS:  I appreciate that.  Let
25  me restate the question.

Page 18

D. Sauter

1            D. Sauter
2   BY MR. MORRIS:
3        Q.   Mr. Sauter, do you know if
4   Mr. Waterhouse held any position with either of
5   the advisors at any time in 2019?
6        A.   I believe he did, but I -- I would
7   say it was probably treasurer and CFO, but I'm
8   speculating.
9        Q.   In the course of your investigation,
10  did you try to determine what title
11  Mr. Waterhouse held with HCMFA?
12       A.   I have not.
13       Q.   Have you ever tried to determine
14  what title Mr. Waterhouse held at HCMFA at any
15  time?
16       A.   At one point I knew what it is.  I
17  just can't recall.
18       Q.   Okay.  Does -- do you know if
19  Mr. Waterhouse holds a position with HCMFA
20  today?
21       A.   I believe he does.
22       Q.   Do you have any understanding as to
23  what that position is?
24       A.   Again, I think it's CFO and/or
25  treasurer.  That's consistent, I think.

Page 19

D. Sauter

1            D. Sauter
2        Q.   Do you have any understanding as to
3   when Mr. Waterhouse became the treasurer and/or
4   the CFO of HCMFA?
5        A.   I do not.
6        Q.   Do you know if Mr. Waterhouse holds
7   any positions with any of the funds that are
8   advised by either of the advisors?
9        A.   I believe he -- I'm speculating.  I
10  don't know for certain.
11       Q.   During the course of your -- you
12  conducted an investigation around the TerreStar
13  NAV issue.  Right?
14       A.   Correct.
15       Q.   Okay.  During the course of your
16  investigation, did you ever try to determine
17  whether Mr. Waterhouse served in any capacity
18  with any of the funds that are managed by
19  HCMFA?
20       A.   Whether he -- yes.
21       Q.   And what did you -- what information
22  did you learn in the course of your
23  investigation on that issue?
24       A.   My understanding is that the
25  valuation team was a subset of the group that

Page 20

D. Sauter

1            D. Sauter
2   Mr. Waterhouse ran.
3        Q.   Right.
4             I'm asking you specifically about
5   whether he held positions at any of the funds.
6             Did you understand that when I asked
7   my question?
8        A.   I don't know whether he held any
9   position with the funds.
10       Q.   Okay.  And during your
11  investigation, did you make any effort to try
12  to determine whether he held any positions with
13  GAF?
14             Let's be very specific.
15       A.   I don't recall.
16       Q.   Do you know a gentleman named Will
17  Mabry?
18       A.   I do.
19       Q.   And do you know if Mr. Mabry was
20  ever employed by either of the advisors?
21       A.   I don't know who employed Mr. Mabry.
22       Q.   Do you know if he was ever employed
23  by Highland Capital Management, LP?
24       A.   I would suspect that he was employed
25  by Highland Capital Management, LP.

Page 21

D. Sauter

1            D. Sauter
2        Q.   Okay.  And what's the basis for that
3   speculation?
4        A.   Because he's at Skyview, and I think
5   all of the employees that were at Nexpoint
6   Advisors or HCMFA remained where they were.
7        Q.   Do you know what position he held at
8   Highland in 2019, if any?
9        A.   I don't know.
10       Q.   Do you know anything about
11  Mr. Mabry's skills or expertise, if any?
12       A.   Other than I believe he was the
13  assistant treasurer at GAF and he was on the
14  valuation team as well.
15       Q.   So your understanding is he was the
16  assistant treasurer of the fund that we have
17  defined as GAF.
18             Do I have that right?
19       A.   That's my understanding.
20       Q.   Okay.  And what's the basis for that
21  understanding?
22       A.   That's just what I recall.
23       Q.   Okay.  To the best of your
24  knowledge, does he have an accounting
25  background?

Page 22

D. Sauter

1
2    A.   I don't know.
3    Q.   And is it your understanding that he
4    was part of a valuation team?
5         I think you used that term.
6    A.   Yes, I believe he was.
7    Q.   Okay.  And what's the basis for that
8    understanding on your part?
9    A.   Discussions that I've had with Frank
10   and his knowledge of the TerreStar NAV error.
11   Q.   Did Mr. Mabry tell you that he was
12   part of the valuation team?
13   A.   I don't recall.
14   Q.   Did you ask him?
15   A.   I don't recall.
16   Q.   Do you know if Mr. Mabry played any
17   role in any aspect of the TerreStar
18   investigation that was conducted by the SEC?
19   A.   I don't know.
20   Q.   Did you ask Mr. Mabry if he played
21   any role in connection with the SEC
22   investigation?
23   A.   I did not.
24   Q.   Do you know if Mr. Mabry played any
25   role in formulating HCMFA's response to the

Page 23

D. Sauter

1
2    SEC?
3    A.   I do not.
4    Q.   Did you ask him?
5    A.   I don't recall.
6    Q.   Do you know when he left Highland?
7    A.   I think he was terminated with the
8    other employees.
9    Q.   You submitted a declaration in
10   connection with the adversary proceeding that
11   Highland commenced against the HCMFA.
12        Do I have that right?
13   A.   Yes, sir.
14   Q.   All right.  Let's take a look at
15   that, if we can put that up on the screen.
16        So from time to time, my assistant
17   Ms. Canty is going to put some documents up on
18   the screen, Mr. Sauter.  And it's very
19   important that you understand that I will give
20   you every opportunity that you believe you need
21   in order to read the document.
22        You know, if there's something
23   that I put up there that you want to see more
24   of, just let me know and we'll just scroll
25   around.  Okay?

Page 24

D. Sauter

1
2    A.   Okay.
3        (Exhibit 181, Declaration of Dennis
4    C. Sauter, Jr., previously marked for
5    identification.)
6    Q.   Okay.  Do you see the first page of
7    this document states that it's your
8    declaration?
9    A.   I do.
10   Q.   And if we can go to the signature
11   line, please.
12        And that's your signature there,
13   sir?
14   A.   It is.
15   Q.   And did you sign this on or about
16   May 21st, 2021?
17   A.   Yes, sir.
18   Q.   Do you remember the purpose of this
19   declaration?
20   A.   It was requesting to file an amended
21   answer.
22   Q.   Okay.  Is it fair to say that your
23   declaration sets forth the factual basis for
24   the proposed amendment?
25   A.   Yes.

Page 25

D. Sauter

1
2    Q.   And is it fair to say that your
3    declaration describes the investigation that
4    you did initially after the complaint was filed
5    and then basically a second phase of the
6    investigation after Mr. Waterhouse and
7    Mr. Mabry migrated from Highland?
8    A.   Yes.
9    Q.   Okay.  So the purpose of your
10   investigation was to understand the origin of
11   two promissory notes.  Right?
12   A.   Yes, sir.
13   Q.   Okay.  I just want to go through to
14   the notes to make sure that the record is clear
15   that we're talking about the same thing.
16        There are certain documents that
17   we've used in other depositions so they've been
18   premarked, and I'd ask Ms. Canty to put up the
19   document that's already been marked as
20   Exhibit 54.
21        MS. CANTY:  Okay.  John, do you want
22   to let the court reporter know this current one
23   is 181, premarked 181, this declaration.
24        MR. MORRIS:  Okay.  Fine.
25        (Exhibit 54, E-mail chain with

Page 26

D. Sauter

1
2    attachment dated 5/2/19, D-CNL003777-779,
3    previously marked for identification.)
4        Q.   So if could just scroll down a
5    little bit.
6             Do you see there's -- do you see
7    it's -- there's an e-mail from David Klos dated
8    May 2nd?
9        A.   Yes.
10       Q.   Do you know who Mr. Klos is?
11       A.   I do.
12       Q.   And who do you understand Mr. Klos
13   to be?  What role did he play in May of 2019?
14       A.   I don't know.
15            I know he worked under Frank.
16       Q.   He worked out of -- do you see
17   there's an e-mail to a corporate accounting
18   group?
19       A.   Yes.
20       Q.   Have you ever sent or received an
21   e-mail from a Highland corporate accounting
22   e-mail chain called the corporate accounting
23   group?
24       A.   I've never sent an e-mail from the
25   corporate accounting group.

Page 27

D. Sauter

1        I can't recall receiving one from
2
3    them either.
4        Q.   Do you see that in this e-mail
5    Mr. Klos asks to have $2.4 million transferred
6    from HCMLP to HCMFA?
7        A.   I do.
8        Q.   And do you see that he states:
9    "This is a new interco loan"?
10       A.   I do.
11       Q.   And if we can see the response
12   above, do you see how Ms. -- do you know
13   Kristin Hendrix?
14       A.   I do.
15       Q.   And who is Ms. Hendrix, to the best
16   of your knowledge.
17       A.   I believe she worked under Mr. Klos.
18       Q.   And do you see that she wrote to
19   someone named Blair and attached a copy of a
20   note?
21       A.   Yes.
22       Q.   Okay.
23       A.   That's what it says.
24       Q.   And can we go to the next page,
25   please.

Page 28

D. Sauter

1        And do you see that this is a
2
3    promissory note for $2.4 million dated May 2,
4    2019?
5        A.   I do.
6        Q.   Okay.  And can we go to the
7    signature line.
8             Do you see Mr. Waterhouse's
9    signature?
10            Do you see Mr. Waterhouse's
11   signature, sir?
12       A.   I can't verify whether that's his
13   signature, but I'll take your word for it.
14       Q.   Okay.  Can you go to the top of the
15   note, please.
16            Do you see that the maker is defined
17   to be Highland Capital Management Fund
18   Advisors, LP?
19       A.   I do see that that's what it says on
20   the first page.
21       Q.   Okay.  And this is one of the two
22   notes that was the source of your
23   investigation.  Right?  This was one of the two
24   notes that you were investigating the origins
25   of?

Page 29

D. Sauter

1        A.   Yes.
2
3        Q.   Okay.  Let's look at the next note,
4    please.
5             (Exhibit 57, Promissory Note dated
6    5/3/19, D-CNL003764-65, previously marked for
7    identification.)
8             Do you see this is a note for
9    $5 million and it's dated the next day,
10   May 3rd, 2019?
11       A.   I see that.
12       Q.   Do you see that it's -- it also
13   defines as the maker Highland Capital
14   Management Fund Advisors, LP?
15       A.   That's what it says on the first
16   page, yes.
17       Q.   Okay.  And if we can go to the
18   signature line.
19            Again, does that appear to be
20   Mr. Waterhouse's signature?
21       A.   Again, I can't verify whether that's
22   Mr. Waterhouse's signature or not.
23            But it does say that the maker is
24   Frank Waterhouse, not Highland Capital
25   Management Fund Advisors.

Page 30

D. Sauter

1
2    Q.   I understand.
3         But the definition of "maker" is
4    above.  Correct?
5    A.   I wouldn't – that's not how I would
6    draft a promissory note.
7    Q.   I didn't ask you how you would draft
8    it.
9         I'm just asking you whether, having
10   just looked at the document and as a lawyer
11   admitted to practice in law, would you agree
12   that the term "maker" is a defined term in this
13   document?
14        MR. RUKAVINA:  I'll just object to
15   form here and also that this witness has not
16   been called as an expert, even though he's a
17   lawyer.
18        So I'll just preserve that for the
19   record.
20        MR. MORRIS:  Fair.  That's fine.
21        THE WITNESS:  I would agree that
22   "maker" is defined on the first page, but that
23   would be an improper signature block, if it was
24   intended to be Highland Capital Management Fund
25   Advisors.

Page 31

D. Sauter

1
2    BY MR. MORRIS:
3    Q.   All right.  We're going to refer to
4    these two notes collectively as "the notes."
5         Is that okay?
6    A.   That's fine.
7    Q.   And these are the two notes that you
8    were investigating.  Right?
9    A.   Yes.
10   Q.   And it's your understanding that
11   these are the two notes that Highland Capital
12   Management is suing to collect on.  Right?
13   A.   Yes.
14   Q.   Okay.  According to your
15   declaration, if we can go to Paragraph 13, if
16   we can put that back up on the screen, as part
17   of the initial investigation – withdrawn.
18        I'm going to use the phrase "initial
19   investigation" to mean the investigation that
20   you conducted between the time the complaint
21   was filed and the time that HCMFA filed its
22   original answer on March 1st.
23        Is that okay?
24   A.   Sure.
25   Q.   And during that initial

Page 32

D. Sauter

1
2    investigation, you spoke with Jim Dondero.
3    Correct?
4    A.   I did.
5    Q.   Okay.  And according to
6    Paragraph 13, he couldn't recall the genesis of
7    the notes.  Is that right?
8    A.   That's correct.
9    Q.   Did you show him the notes?
10   A.   I don't recall.
11   Q.   Did you tell him that the notes were
12   dated May 2nd and May 3rd, 2019?
13   A.   I don't recall that either.
14   Q.   Did you do anything to try to
15   refresh his recollection about the timing of
16   the notes?
17   A.   I'm sure I did.
18        But I don't recall that conversation
19   in any detail as I'm sitting here today.
20   Q.   Did you tell him the principal
21   amount of the notes?
22   A.   Yes.
23   Q.   And even though you told him the
24   principal amount of the notes, he still had no
25   recollection as to what they related to.  Is

Page 33

D. Sauter

1
2    that right?
3    A.   He couldn't recall the genesis,
4    correct.
5    Q.   Did he have any recollection at all
6    as to what the notes related to?
7    A.   I don't – I don't believe so,
8    because if he had, then I would have been able
9    to pin it down further.
10   Q.   How many conversations did you have
11   with Mr. Dondero as part of your initial
12   investigation?
13   A.   I don't recall.
14        Two, three.
15   Q.   Was there anybody present other than
16   the two of you?
17   A.   Again, I don't recall.
18   Q.   Do you recall if they took place on
19   the phone or were they in person?
20   A.   It would have been in person.
21   Q.   And why do you say it would have
22   been in person?
23   A.   Well, now that you say that, no, it
24   probably wasn't in person because he would not
25   have been in the office at that time.

Page 34

D. Sauter

1
2     There was obviously a lot of things
3  going on at this point.  Mr. Dondero had been
4  evicted from the building, and so that made --
5  I shouldn't say evicted.  He'd been kicked out
6  by the debtor, and so that made our
7  communications a little more difficult.
8     So I would have spoken with him on
9  the phone because I did not go over to the
10  NexBank office very often.
11     Q.   Paragraph 13 says that you also
12  spoke with "the few employees of HCMFA."
13     Do you see that in the middle of the
14  paragraph?
15     A.   Yes.
16     Q.   Can you identify the other CMFA
17  employees that you spoke with as part of your
18  initial investigation?
19     A.   I would have spoken with Dustin
20  Norris and --
21     Q.   Do you recall speaking -- I
22  apologize for interrupting.
23     Go ahead.
24     A.   And so he wasn't an HCMFA employee,
25  but Jason Post.

Page 35

D. Sauter

1
2     Q.   Do you have a recollection of
3  speaking to Mr. Norris, or are you just
4  surmising that you probably did?
5     A.   I'm surmising that I probably would
6  have.
7     There was a lot, again, that was
8  happening.  I didn't have the historical
9  knowledge of these things, and so I talked with
10  Mr. Post and Mr. Norris daily about everything
11  that was going on just to get some background
12  on all of the moving parts.
13     Q.   Okay.  Do you know if Mr. Norris
14  held any position with HCMFA in 2019?
15     A.   I don't -- I don't know for certain.
16  I believe he did.
17     I can't recall what his position
18  would have been.
19     Q.   Does he have a position with HCMFA
20  today, to the best of your knowledge?
21     A.   I believe he does.
22     Q.   And what do you understand his
23  position to be?
24     A.   I would say vice president.
25     Q.   Do you know when he became vice

Page 36

D. Sauter

1
2  president of HCMFA?
3     A.   I do not.
4     Q.   Do you know if he was vice president
5  of HCMFA in October 2020?
6     A.   I do not.
7     Q.   Do you know if Mr. Norris holds any
8  positions with DAF -- I'm sorry.
9     Do you know if Mr. Norris holds any
10  positions with GAF?
11     A.   I don't know.
12     Q.   How about Mr. Post?  Do you know if
13  Mr. Post held any positions with HCMFA in 2019?
14     A.   I don't.
15     Q.   Do you know if he holds any
16  positions with HCMFA today?
17     A.   He does not.
18     Q.   Is Mr. Post a compliance officer, to
19  the best of your knowledge?
20     A.   He was.
21     He left a week ago to take another
22  job.
23     Q.   So he was -- and who did he -- for
24  whom did he serve as the chief compliance
25  officer until a week ago?

Page 37

D. Sauter

1
2     A.   He was chief compliance officer for
3  Nexpoint Advisors.
4     He may have been the chief
5  compliance officer for HCMFA as well.
6     Q.   Okay.
7     A.   And if I had to guess, he would have
8  had those same positions back in 2019 --
9     Q.   Okay.
10     A.   -- because Thomas Surgent was the
11  chief compliance officer for HCMLP and Jason
12  worked under him.
13     And I think that started sometime in
14  2014, maybe earlier.
15     Q.   And did Mr. Norris and Mr. Post tell
16  you during your initial investigation that they
17  had no knowledge of the notes?
18     A.   Yeah, generally I don't think that
19  they were aware of the notes, or I should say
20  they weren't aware of the genesis of the notes.
21     Q.   Were they aware of the existence of
22  the notes?
23     A.   They were.
24     Q.   Did they tell you when they had
25  learned of the existence of the notes?

Appx. 03093

Page 38

D. Sauter

1
2    A.   I think it's something that I raised
3  to them because I didn't know where the notes
4  had come from.
5    Q.   Right.
6         And they told you that they were
7  aware of the notes but they didn't know the
8  genesis of them?
9    A.   I don't recall whether they were
10  aware of the notes before I asked about them.
11    Q.   Did you ask them if they were aware
12  of the notes prior to the time you showed it to
13  them?
14    A.   I would have asked them what the
15  notes were about.
16    Q.   I don't want to know what you would
17  have done.
18         I know this is hard, Mr. Sauter.
19  I'm really just asking you to search your
20  memory.
21         Do you recall asking them whether
22  they were aware of the existence of the notes
23  prior to your conversation with them?
24    A.   I don't recall if I asked whether
25  they were aware of the existence of the notes

Page 39

D. Sauter

1
2  prior to my conversation with them.
3    Q.   Now, Paragraph 13 says that
4  Mr. Dondero could not recall the genesis of the
5  notes.
6         Do you see that?
7    A.   Yes.
8    Q.   Did Mr. Dondero indicate to you that
9  he was aware of the existence of the notes even
10  though he couldn't recall the genesis of the
11  notes?
12    A.   That's not how I would characterize
13  it, but...
14    Q.   How would you characterize it?
15    A.   He suggested that I talk to
16  Mr. Waterhouse.
17    Q.   Did you ask Mr. Dondero when he
18  first learned of the existence of the notes?
19    A.   No.
20    Q.   Did he say to you anything that
21  caused you to believe that he was unaware of
22  the existence of the notes prior to the
23  commencement of the lawsuit?
24    A.   No.
25         I guess let me clarify.

Page 40

D. Sauter

1
2  He didn't make any comments that
3  made me think one way or the other.
4    Q.   And you didn't ask.
5         Is that fair?
6    A.   Correct, I did not ask.
7    Q.   So you had no information as to
8  whether or not Mr. Dondero actually knew of the
9  existence of the notes prior to the
10  commencement of the lawsuit.
11         Is that fair?
12    A.   Correct.
13    Q.   Okay.  Paragraph 13 also states that
14  you reviewed limited books and records of
15  HCMFA.
16         Do you see that?
17    A.   Yes.
18    Q.   Okay.  What books and records did
19  you review as part of your initial
20  investigation?
21    A.   I don't recall exactly what I looked
22  at or for.
23         I literally had to just go onto the
24  system and try to find anything that related to
25  the notes so I could try to find out what they

Page 41

D. Sauter

1
2  were.
3    Q.   Did you make any effort to try to
4  determine whether HCMFA had accounted for the
5  notes in its books and records?
6    A.   I did not.
7    Q.   Do you know today whether HCMFA ever
8  accounted for the notes in its books and
9  records?
10    A.   I don't know.
11    Q.   Have you ever reviewed HCMFA's
12  balance sheets?
13    A.   I think I have, but I don't -- I
14  can't recall exactly when.
15    Q.   Did you ever make any effort to
16  determine whether HCMFA carried these notes on
17  its balance sheet as liabilities?
18    A.   I did not.
19    Q.   Do you know if HCMFA ever requested
20  an extension of time to respond to the
21  complaint?
22    A.   I don't know, but I would assume so.
23    Q.   Okay.  Do you have any knowledge of
24  HCMFA having done so?
25    A.   No.

Page 42

D. Sauter

1
2     Q.    Okay.  Do you know if -- prior to
3  the time it filed its original answer, whether
4  HCMFA ever asked HCMLP to provide any documents
5  in connection with the adversary proceeding?
6     A.    Say that again.
7     Q.    Sure.
8          So HCMFA filed its answer on
9  March 1st, according to Paragraph 12.
10         Do I have that right?
11    A.    I believe that's right.
12    Q.    Okay.  Do you know if HCMFA ever
13 asked Highland for any documents before it
14 filed its answer?
15    A.    I don't recall.
16    Q.    So at the time HCMFA filed its
17 answer, Mr. Dondero couldn't recall the genesis
18 of the notes.  Correct?
19    A.    That's right.
20    Q.    And neither Mr. Post nor Mr. Norris
21 could recall the genesis of the notes.
22 Correct?
23    A.    Correct.
24    Q.    And HCMFA had limited access to
25 books and records.  Correct?

Page 43

D. Sauter

1
2     A.    Correct.
3     Q.    And HCMFA had no access to the
4  debtor's employees who had provided services to
5  HCMFA under shared services agreements.
6  Correct?
7     A.    I think our view was it was
8  potentially improper to reach out to those
9  employees on a matter that was adverse to
10 HCMLP, and so we refrained from doing so.
11    Q.    Okay.  And so under those
12 circumstances, HCMFA nevertheless filed an
13 answer that asserted no affirmative defenses.
14 Correct?
15    A.    Yes.
16    Q.    But this situation changed in
17 mid-April 2001.  Correct?
18    A.    Yes.
19    Q.    If we can scroll down to
20 Paragraph 19.
21         (Discussion was held off the
22 record.)
23    Q.    So in April 2001, the situation
24 changed because Mr. Waterhouse and other former
25 employees of Highland had migrated over to

Page 44

D. Sauter

1
2  Skyview so that you had access to them.  Is
3  that right?
4     A.    Correct.
5     Q.    And that's when you conducted the
6  second phase of your investigation.  Correct?
7     A.    Yes.
8     Q.    And you'll see at the end of Page 4
9  you reference that the debtor had provided
10 access to HCMFA of much of its books and
11 records.
12         Do I have that right?
13    A.    Yes.
14    Q.    Okay.  And what books and records
15 did Highland provide between March 1st and
16 mid-April when you conducted the second phase
17 of your investigation?
18         Are there any particular books and
19 records that you're referring to in that
20 sentence?
21    A.    I can't recall exactly what it was.
22         There was a process that we were
23 going through that I think -- if you'll recall,
24 that we went back and forth on obtaining access
25 to books and records, submitting written

Page 45

D. Sauter

1
2  requests, and those were either granted or
3  denied.  And so there were a litany of
4  documents that were sent over.
5     Q.    Can you identify any documents that
6  you reviewed as part of either the initial
7  investigation or the follow-up investigation in
8  April 2021?
9     A.    Yes.
10         I would have reviewed documents
11 related to the TerreStar NAV error.
12    Q.    And can you describe what those
13 documents are.
14    A.    Memos.
15    Q.    Okay.  Do you recall how many memos
16 you reviewed that concerned the TerreStar NAV
17 issue?
18    A.    I want to say that there were three,
19 four or five, something along those lines.
20         I think there was a memo that was
21 submitted to the board and then maybe some
22 communications with the SEC.
23    Q.    And is it your testimony that HCMFA
24 did not have those memos until after March 1st,
25 2021?

Page 46

D. Sauter

1    A.   I don't know whether we had access
2    to those memos, but I didn't – I wasn't able
3    to speak to Frank Waterhouse, and so I didn't
4    know to look for them.
5       Q.   And neither Mr. Dondero nor
6    Mr. Norris nor Mr. Post thought to inform you
7    about the NAV star error [sic] because they had
8    no idea what the notes related to.  Correct?
9       A.   That's my recollection.  That's
10   correct.
11      Q.   Okay.  Other than the three to five
12   memos that you've just described, are there any
13   other documents that you recall reviewing as
14   part of your investigation?
15      A.   No.
16      Q.   Do you know to whom the memos that
17   you've just described were addressed?
18         Who were they sent to?
19      A.   I believe there was one that was
20   sent to the board.
21         And then the others, I think, were
22   just either internal communications or
23   communications with the SEC.
24      Q.   Can we scroll down to Paragraph 22,

Page 47

D. Sauter

1    please.
2       Actually, look at Paragraph 21
3    first.
4       According to Paragraph 21, as part
5    of the second phase of your investigation, you
6    spoke with Mr. Waterhouse and Mr. Mabry.
7    Correct?
8       A.   Yes.
9       Q.   Did you speak with anybody else as
10   part of the second phase of your investigation?
11      A.   Yes, I would have spoken with Jason
12   Post and Dustin Norris.
13      Q.   And is it fair to say based on the
14   second phase of your – withdrawn.
15         Is it fair to say that your
16   conclusions that resulted from the second phase
17   of your investigation are set forth in
18   Paragraph 22?
19      A.   (Reviewing document.)
20         I wouldn't say all of my
21   conclusions.  But yes, that's some of them.
22      Q.   Okay.  Is it fair to say that, based
23   on the second phase of your investigation, you
24   concluded, among other things, "that the notes

Page 48

D. Sauter

1    were signed by mistake by Waterhouse without
2    authority from HCMFA"?
3       A.   Yes.
4       Q.   Okay.  Let's talk about your
5    discussions with Mr. Waterhouse as part of your
6    investigation.
7       How many times did you speak with
8    him?
9       A.   Probably three.
10      Q.   And was anybody else present for any
11   of the three conversations?
12      A.   I don't recall.  I don't think so.
13      Q.   Did you take any notes of your
14   conversations with Mr. Waterhouse?
15      A.   I don't recall.
16      Q.   Do you recall whether you sent
17   anybody any e-mails summarizing your
18   conversations with Mr. Waterhouse?
19      A.   I don't recall.
20      Q.   Did the three conversations take
21   place in person, on the phone or some mix
22   thereof?
23      A.   I think it would have been a mix
24   thereof.

Page 49

D. Sauter

1       Q.   Do you recall which of the three
2    conversations was the longest, which was the
3    shortest?
4       I just want to get a sense of how
5    much time you spent with Mr. Waterhouse.
6       A.   I don't, because again, there was
7    lots going on.
8       The first one was in the conference
9    room on the 11th floor at NexBank.  The second
10   one was in his office.  And I think the third
11   was on a phone call.
12      Q.   Did any of them last more than ten
13   minutes?
14      A.   I can't say for certain.
15         I would think so, but...
16      Q.   Okay.  Did you show Mr. Waterhouse
17   either of the notes as part of either of these
18   three interviews?
19      A.   I don't recall if I did.
20         But he knew – he knew the notes.
21      Q.   And what did he say to you that led
22   you to believe that he knew the notes?
23      A.   Because he was aware of the notes.
24         I...

Page 50

D. Sauter

1
2    Q.   Did he tell the circumstances
3    surrounding the execution of the notes?
4    A.   Yes.
5    Q.   What did he tell you?
6    A.   He said those notes were executed in
7    connection with the TerreStar NAV error.
8    Q.   During your discussions with
9    Mr. Waterhouse, did he ever deny signing the
10   notes?
11   A.   No.
12   Q.   He never told you that he was
13   unaware of the existence of the notes, did he?
14   A.   No.
15   Q.   In fact, before signing your
16   declaration, you believed Mr. Waterhouse in
17   fact had signed the notes.  Correct?
18   A.   Yes.
19   Q.   And that's why in Paragraph 22 you
20   specifically wrote that the notes were signed
21   by mistake by Waterhouse.  Right?
22   A.   Yes.
23   Q.   And you understood at the time you
24   signed your declaration that Mr. Waterhouse had
25   signed the notes at a time when he was HCMFA's

Page 51

D. Sauter

1
2    chief financial officer.  Correct?
3    A.   I don't think I said that, but that
4    would have been my assumption.
5    Q.   Okay.  I think if we can – give me
6    just one moment.  I think I...
7         Can we go to Paragraph 29, please.
8         You'll see, according to your
9    declaration, it says:  "Returning to the notes,
10   Waterhouse was the chief financial officer of
11   both the debtor and the HCMFA during the above
12   events and at the time he signed the notes."
13        Have I read that correctly?
14   A.   You did.
15   Q.   Does that refresh your recollection
16   that at the time you signed this declaration
17   you believed that Mr. Waterhouse was HCMFA's
18   CFO at the time he signed the notes?
19   A.   It does.
20   Q.   Okay.  During your investigation did
21   Mr. Waterhouse ever tell you that he signed the
22   notes by mistake?
23   A.   No.
24   Q.   Did you ever ask Mr. Waterhouse
25   during your investigation whether he signed the

Page 52

D. Sauter

1
2    notes by mistake?
3    A.   I guess I'd like to clarify that
4    response, if I may.
5    Q.   Go right ahead.
6    A.   I asked Mr. Waterhouse why he would
7    have signed it – the notes in his personal
8    capacity.
9         And his response was, I don't know,
10   I didn't prepare them.
11        So I don't know if that gives you
12   the answer you're looking for, but there was
13   some confusion about the execution of those
14   notes.
15   Q.   Okay.  Did he say anything else
16   that – on the topic of whether signing the
17   notes was a mistake?
18   A.   No.
19   Q.   Okay.  Your declaration doesn't
20   disclose what you just described for me.
21   Correct?
22   A.   Not in those exact words, no.
23   Q.   Is there anything in your
24   declaration that suggests that Mr. Waterhouse
25   hadn't signed the notes?

Page 53

D. Sauter

1
2    A.   I don't think there's anything else
3    in my declaration from –
4    Q.   Okay.  There's nothing –
5         (Simultaneous crosstalk.)
6    Q.   I apologize.
7    A.   – from May that would suggest that
8    Mr. Waterhouse didn't sign the notes.
9    Q.   There's nothing in here, in your
10   declaration, that states that Mr. Waterhouse
11   admitted that he made a mistake in signing the
12   notes.  Correct?
13   A.   Correct.
14   Q.   There's nothing in your declaration
15   that suggests that Mr. Waterhouse in fact did
16   not sign or did not authorize the signing of
17   his signature to these notes.  Correct?
18   A.   Correct, because he told me he did.
19   Q.   Okay.  And Mr. – he told you that
20   he had signed the notes.  Correct?
21   A.   Yes.
22        He said that he didn't use his
23   electronic signature then, and if his signature
24   was on them, it would have been his.
25   Q.   Okay.  Mr. Waterhouse never filed

Page 54

D. Sauter

1  his own declaration in support of HCMFA's
2  motion for leave to amend their answer.
3  Correct?
4  Correct?
5     A.   Correct.
6     Q.   During your investigation did you
7  ask Mr. Waterhouse if he had authority to sign
8  the notes?
9     A.   Probably not in those exact words.
10    Q.   Okay.  Did you ask him in form or
11 substance whether he was authorized to sign the
12 notes?
13    A.   Yes.
14    Q.   And what did he say?
15    A.   I think he -- well, his response was
16 if he signed them, he was authorized to sign
17 them.
18    Q.   Okay.  And Mr. Waterhouse never told
19 you that he signed the notes without authority.
20 Correct?
21    A.   He told me that -- I asked him if
22 Mr. Dondero had approved the notes.
23         And I don't think he could recall.
24    Q.   Okay.  Did Mr. Waterhouse ever tell
25 you that he signed the notes without authority?

Page 55

D. Sauter

1
2     A.   No.
3     Q.   Okay.  Your declaration certainly
4  doesn't say that Mr. Waterhouse admitted
5  signing the notes without authority.  Correct?
6     A.   Correct.
7     Q.   Mr. Waterhouse never filed a
8  declaration in this case stating that he had
9  filed the notes without authority.  Correct?
10    A.   Correct.
11    Q.   Are you aware that Mr. Waterhouse
12 was deposed in this case?
13    A.   I'm -- yes, I'm aware.
14    Q.   Have you reviewed his deposition
15 transcript?
16    A.   I have not.
17    Q.   Has his testimony been described for
18 you by anybody?
19         MR. RUKAVINA:  And I'll just caution
20 you, Mr. Sauter.  You know, I think that's a
21 yes or no answer, but don't go into the
22 substance of any discussions with me.
23         THE WITNESS:  Yes.  Okay.
24         Yes.
25

Page 56

D. Sauter

1
2  BY MR. MORRIS:
3     Q.   All right.  Are you aware that he
4  testified that nobody has ever told him that he
5  made a mistake in signing the notes?
6         MR. RUKAVINA:  Objection, form.
7         THE WITNESS:  I'm not.
8     Q.   Are you aware of anybody in the
9  world ever telling Mr. Waterhouse that he made
10 a mistake in signing the notes?
11    A.   Yes.
12    Q.   And who told him that?
13    A.   Me.
14    Q.   And when did you tell him that?
15    A.   When we had this discussion.
16    Q.   Okay.  So it's your testimony that
17 you actually told Mr. Waterhouse that he made a
18 mistake in signing the notes.  Right?
19    A.   I asked him who had approved these
20 notes and what was the process.
21         And he said he couldn't give me any
22 process.  He said the money was transferred,
23 and so we signed the notes.
24    Q.   Okay.  But did you tell him that he
25 made a mistake?

Page 57

D. Sauter

1
2     A.   I think I implied it.
3     Q.   Do you have a recollection of
4  actually telling him that he made a mistake?
5     A.   That would be my recollection.
6         Obviously he disagrees with it.
7     Q.   Do you know if any -- and on what
8  basis did you conclude that he made a mistake?
9         Withdrawn.
10        You have no personal knowledge of
11 anything that happened in connection with the
12 TerreStar valuation issue.  Correct?
13    A.   I was not personally involved in the
14 TerreStar valuation issue, correct.
15    Q.   You weren't involved in any of the
16 decisions that were made in connection with the
17 TerreStar valuation.  Correct?
18    A.   Correct.
19    Q.   You weren't made -- you weren't
20 involved and had no responsibility for HCMFA's
21 response to the SEC.  Correct?
22    A.   Correct.
23    Q.   You had no responsibility or
24 involvement in the decision as to how HCMFA was
25 going to fund the losses to the GAF.  Correct?

Page 58

D. Sauter

1          D. Sauter
2   A.   Correct.
3   Q.   You had no responsibility or
4 involvement in how HCMFA reported to GAF.
5 Correct?
6   A.   Correct.
7   Q.   But nevertheless, despite having no
8 personal knowledge of those issues, you told
9 Mr. Waterhouse or implied to Mr. Waterhouse
10 that he made a mistake in executing the notes.
11 Correct?
12   A.   Correct.
13   Q.   What did Mr. Waterhouse say in
14 response?
15   A.   Not much. He just disagreed.
16   Q.   Did he just say, I disagree, and
17 that's it or did he actually -- do you recall
18 anything specific that he said?
19   A.   I think I've already testified he
20 said, we transferred the money, so I executed
21 the notes. HCMFA didn't have the money to pay
22 GAF, and so we transferred it from HCMLP and I
23 executed the notes.
24   Q.   Okay. Your declaration doesn't
25 attribute any specific statements to

Page 59

D. Sauter

1          D. Sauter
2 Mr. Waterhouse, does it?
3   A.   It does not.
4   Q.   In fact, your declaration is just --
5 withdrawn.
6      If we can go to Paragraph 30.
7      Take a look at Paragraph 30. We'll
8 kind of parse it through.
9      The first sentence says: "It
10 appears clear that Mr. Waterhouse made a
11 mistake." Do you see that?
12      Do you see that?
13   A.   Yes.
14   Q.   But again, Mr. Waterhouse never
15 admitted to making a mistake. Correct?
16   A.   Correct.
17   Q.   And this is your -- this is a
18 conclusion that you're reaching in May of 2021,
19 more than two years after the fact. Correct?
20   A.   Based upon my review of the
21 documents and my discussions with Mr. Post and
22 Mr. Norris.
23   Q.   Did you ever have any discussions
24 with Mr. Dondero in May of 2021 as you were
25 preparing this document?

Page 60

D. Sauter

1          D. Sauter
2   A.   Did I have any discussions with him
3 about this?
4   Q.   I apologize. That was a bad
5 question.
6      Did you discuss in May of 2021 the
7 issues concerning the notes with Mr. Dondero,
8 or was that just part of the initial
9 investigation?
10   A.   I don't recall.
11   Q.   And then a couple of lines down, you
12 say -- you wrote: "It appears that
13 Mr. Waterhouse assumed incorrectly that the
14 funds being paid by the debtor were a loan to
15 HCMFA."
16      Do you see that?
17   A.   Yes.
18   Q.   Did you ask Mr. Waterhouse if he
19 actually made the assumption that you're
20 attributing to him?
21   A.   Yes.
22   Q.   And did he ever admit that the
23 assumption was incorrect?
24   A.   He did not admit that the assumption
25 was incorrect.

Page 61

D. Sauter

1          D. Sauter
2   Q.   Okay. Again, that's your own
3 conclusion. Is that fair?
4   A.   That's correct.
5   Q.   And then you continue on and you
6 write: "Third" -- withdrawn.
7      You write: "Third, it therefore
8 appears that Mr. Waterhouse prepared the notes
9 for some internal accounting or other purpose
10 but without there being actual consideration
11 for the notes and without any intention on the
12 part of the debtor and HCMFA that there be
13 notes or that there be a loan transaction."
14      Have I read that correctly?
15   A.   Yes.
16   Q.   So did Mr. Waterhouse tell you that
17 he prepared the notes for some internal
18 accounting or other purpose?
19   A.   Yes.
20   Q.   And did he tell you what the purpose
21 of the notes was?
22   A.   Yes.
23      He said if he transferred money he
24 had to have a note to go with it.
25   Q.   You state in your declaration:

Page 62

D. Sauter

1
2 "There was no" -- withdrawn.
3     You state in your declaration that
4 there was no "intention on the part of the
5 debtor and HCMFA that there be notes or that
6 there be a loan transaction."
7     Do you see that?
8 A.   Yes.
9 Q.   What's the basis for --
10     MR. RUKAVINA:  Object to the form.
11 I apologize.  I apologize, John.
12 I apologize, DC.
13 I'll just object to the form.
14 That's not what this says.
15     Go ahead.
16     MR. MORRIS:  Well, then let me
17 restate it if I read it incorrectly.
18 BY MR. MORRIS:
19 Q.   Mr. Sauter, does the last sentence
20 of your Paragraph 30 state, among other things,
21 that the notes were prepared "without any
22 intention on the part of the debtor and HCMFA
23 that there be notes or that there be a loan
24 transaction"?
25 A.   Yes.

Page 63

D. Sauter

1
2 Q.   What's the basis for your sworn
3 statement concerning the debtor's intentions?
4     MR. RUKAVINA:  Again, I'll object.
5     Just so that we're clear, Mr. Sauter
6 says "it appears that."  He does not say it is
7 a fact.  He says "it appears that."  There is a
8 distinction there.
9     MR. MORRIS:  Okay.  You've got your
10 objection.
11 BY MR. MORRIS:
12 Q.   What's the basis for your statement
13 that it appeared the debtor had no intention
14 that there would be notes or that there would
15 be a loan transaction?
16 A.   If you're talking about a
17 $7.4 million obligation, I would assume that
18 there would be a process internally on who was
19 responsible for the payment of the fees for
20 the -- or the expenses for the NAV error.
21     Based upon my discussions with Frank
22 Waterhouse, there was no process or the legal
23 department was not involved in making a
24 determination as to whether there should be
25 notes.  It was merely a ministerial act that

Page 64

D. Sauter

1
2 accounting performed when they transferred the
3 funds to pay GAF.
4 Q.   Is it your testimony as the general
5 counsel of Nexpoint that the law department or
6 the legal department is involved in every note
7 that's executed by one of the Highland
8 affiliates?
9     MR. RUKAVINA:  Object to the form.
10     THE WITNESS:  I can't answer that.
11 Q.   Okay.  So other than the fact that
12 it didn't go past the legal department, do you
13 have any other basis for your statement that it
14 appears that the debtor had no intention that
15 there would be notes?
16 A.   Yes, there's an internal NAV error
17 correction policy that obligates the
18 responsible party to pay for it.
19     In this case it was HCMLP that made
20 the NAV error.
21 Q.   There's a policy that you're
22 referring to?
23 A.   Yes.
24 Q.   And do you know when that policy was
25 adopted?

Page 65

D. Sauter

1
2 A.   I don't know for certain.
3     But I know there was a policy in
4 place as of 2018.
5 Q.   Okay.  Other than the policy, have
6 you ever seen any memo written -- withdrawn.
7     Have you ever seen any document in
8 the world that states that HCMLP is responsible
9 for the TerreStar NAV error?
10 A.   I would say the memos that
11 acknowledged that there was a mistake.
12 Q.   And is it your recollection that the
13 memos specifically say that HCMLP was
14 responsible for the mistake?
15 A.   No, because the memos were vis-à-vis
16 HCMFA and GAF.
17 Q.   Okay.  So let me ask you the
18 question again.
19     During the course of your two
20 investigations, did you ever see a document
21 that stated that HCMLP was responsible for the
22 TerreStar NAV error?
23 A.   I don't recall.
24 Q.   You don't recall seeing one.  Is
25 that correct?

Page 66

D. Sauter

1   A.   That's correct.
2   Q.   Okay.
3   A.   Can we take a quick break?
4   Q.   Yeah, now would be perfectly fine.
5        Give me just one second before we go
6   off the record.
7        So it's 2:15 local time.  Can we
8   limit it to ten minutes, Mr. Sauter?
9   A.   Yeah, that would be fine.
10  Q.   Okay.  And I would ask that you're
11  still under oath, and I would ask that you not
12  speak with counsel or communicate with anybody
13  about the substance of your deposition.
14       Is that fair?
15       MR. RUKAVINA:  Don't answer that
16  question, Mr. Sauter.
17       The law is what it is, and we're not
18  going to agree to something (audio issue) than
19  the law requires.
20       MR. MORRIS:  Well, then I'm not
21  going to take a break.  How about that?
22       Let's keep going.
23       MR. RUKAVINA:  No, we're taking a
24  break and I'm going to the restroom.

Page 67

D. Sauter

1        MR. MORRIS:  We're not taking a
2   break, bud.  I'm not –
3        (Simultaneous crosstalk.)
4        MR. RUKAVINA:  We'll be back in ten
5   minutes.
6        MR. MORRIS:  Hey, Davor, I'm going
7   to ask your client a question.  Okay?
8        (Simultaneous crosstalk.)
9        MR. RUKAVINA:  – but we're not –
10  I'm sorry.
11       You can ask him afterwards who he's
12  talked to and about what, but you don't get to
13  tell him that he can't talk to anyone.
14       So let's go take a piss break and be
15  back in nine minutes.
16       MR. MORRIS:  Put that on the record.
17       (Recess was taken from 2:17 p.m. to
18  2:28 p.m.)
19  BY MR. MORRIS:
20  Q.   Are you ready to proceed, Mr.
21  Sauter?
22  A.   I am.
23  Q.   During the break did you speak to
24  anybody about the substance of your testimony?

Page 68

D. Sauter

1   A.   I did not.
2   Q.   Okay.  Did you communicate with
3   anybody about the substance of your testimony?
4   A.   I did not.
5   Q.   I want to stick with the focus on
6   the debtor's intent as stated in Paragraph 30.
7        Before you prepared your
8   declaration, did you spend any time reviewing
9   any of the debtor's bankruptcy filings?
10  A.   Yes.
11  Q.   And are you aware that throughout
12  the bankruptcy the debtor disclosed these notes
13  as assets of the estate?
14  A.   Yes.
15  Q.   And what documents did you review
16  that led you to conclude that the debtor was
17  disclosing the notes as assets of the estate?
18  Do you recall?
19  A.   I mean, I would have known it from
20  the schedules.  I would have known it from your
21  complaint.
22  Q.   Okay.  So you reviewed the debtor's
23  schedules of assets and liabilities prior to
24  the time you signed your declaration.  Is that

Page 69

D. Sauter

1   right?
2   A.   Well, I didn't review them in
3   connection with my preparation of the
4   declaration, but yes, I had reviewed them.
5   Q.   And in reviewing them, did you learn
6   that the debtor had in fact carried the notes
7   as assets on its balance sheet or on its
8   schedules of assets and liabilities?
9        MR. RUKAVINA:  I'm going to object
10  to the form.
11       THE WITNESS:  I was aware that the
12  debtor sought to collect on the note from
13  HCMFA, the notes.
14  BY MR. MORRIS:
15  Q.   Are you aware that Mr. Dondero was
16  in control of Highland Capital Management, LP
17  from at least the date of the bankruptcy filing
18  in October 2019 through around January 9th,
19  2020?
20  A.   Yes.
21  Q.   Okay.  Are you aware that, while
22  Mr. Dondero was in control of the debtor during
23  that period, that Highland filed statements of
24  financial affairs and schedules of assets?

Appx. 03101

Page 70

D. Sauter

1
2    A.  Generally, I guess, yes.
3        But I'm not aware of a particular
4    document called statement of financial affairs.
5    Q.  Are you aware that while Mr. Dondero
6    was in control of Highland during the
7    bankruptcy, the debtor filed documents stating
8    that the notes were assets of the estate?
9    A.  I was not.
10   Q.  Okay.  Did you ever, as part of your
11   investigation, try to see how the debtor
12   treated the notes in its court filings?
13   A.  I did not, beyond the filing of the
14   complaint.
15   Q.  So you never had a conversation with
16   anybody -- withdrawn.
17       Did you ever ask Mr. Waterhouse how
18   the debtor treated the notes in its books and
19   records?
20   A.  No.
21   Q.  Did you ever ask Mr. Waterhouse how
22   HCMFA treated the notes in its books and
23   records?
24   A.  No.
25   Q.  Have you been following developments

Page 71

D. Sauter

1
2    in this particular adversary proceeding?
3    A.  Yes.
4    Q.  Are you aware that both HCMFA and
5    Highland disclosed the existence of the notes
6    to their outside auditors within 30 days of
7    their execution?
8        MR. RUKAVINA:  Objection, form.
9        THE WITNESS:  Yes.
10       And it's my understanding that's why
11   the notes were prepared.
12   Q.  And what's that understanding based
13   on?
14       MR. RUKAVINA:  And now, Mr. Sauter,
15   let's be very careful here.
16       Please answer only if it's based on
17   factual information that a nonlawyer told you.
18       THE WITNESS:  Yeah.  I believe
19   Mr. Waterhouse told me that he needed a note to
20   document the transfer of funds.
21   BY MR. MORRIS:
22   Q.  Okay.  But I asked you a different
23   question, and that's simply whether or not
24   you're aware as you sit here today whether
25   HCMFA and Highland disclosed the existence of

Page 72

D. Sauter

1
2    the notes to the outside auditors.
3        MR. RUKAVINA:  I'll object again.
4        THE WITNESS:  Yes, I am aware.
5    Q.  Have you ever seen HCMFA's audited
6    financial statements?
7    A.  I don't recall.
8        I think you asked me that earlier.
9    And I may have seen them, but I don't recall
10   specifically.
11   Q.  Do you recall looking at the audited
12   financial statements as part of your
13   investigation?
14   A.  No.
15   Q.  Let's put up HCMFA's audited
16   financial statements for the period ending
17   December 31st, 2018.  And it's previously been
18   marked as Deposition Exhibit 45.
19       (Exhibit 45, Consolidated Financial
20   Statements and Supplemental Information
21   December 31, 2018, D-CNL002273-296, previously
22   marked for identification.)
23   Q.  Do you see the first page there?
24       This is the HCMFA consolidated
25   financial statements for the period ending

Page 73

D. Sauter

1
2    December 31st, 2018.
3        Do you see that?
4    A.  I do.
5    Q.  And I think you said you may have
6    seen it before.
7        Did I get that wrong?
8    A.  I said I may have.
9        In looking at this, I don't think
10   I've ever seen this document.
11   Q.  Okay.  Can we just go to the third
12   page and see the date.
13       Do you see that this is the report
14   of the independent auditors
15   PricewaterhouseCoopers?
16   A.  Yes.
17   Q.  And you do see it's dated June 3rd,
18   2019?
19   A.  Yes.
20   Q.  And do you understand that this
21   document was prepared by HCMFA's outside
22   auditors prior to Highland's bankruptcy filing?
23   A.  That's what it purports to be.
24   Q.  Okay.  And it also purports to have
25   been prepared prior to the commencement of the

Page 74

D. Sauter

1
2  adversary proceeding as you understand the
3  timing.  Correct?
4      A.  Yep.
5      Q.  Let's go to Page 17, please.
6          Do you see there's a section in the
7  audited financial statements called Subsequent
8  Events?
9      A.  Yep.
10     Q.  Do you have any understanding as to
11 what a Subsequent Events section is in audited
12 financial statements?
13     A.  Yes.
14     Q.  What's your understanding of what
15 that section is supposed to include?
16     A.  It's intended to pick up events that
17 occurred after the date of the financials but
18 prior to the date the financials are
19 executed -- or issued.
20     Q.  And do you see in the second
21 paragraph there's a description of the two
22 notes?
23     A.  Yes.
24     Q.  Okay.  You were not aware that the
25 two notes were included in HCMFA's audited

Page 75

D. Sauter

1
2  financial statements for -- as subsequent
3  events at the time you executed your
4  declaration.  Correct?
5      A.  Correct.
6      Q.  Now that you know that, do you think
7  HCMFA made a mistake in including these notes
8  in the audited financial statements, or does it
9  cause you to reconsider your conclusion that
10 the issuance of the notes was a mistake?
11     MR. RUKAVINA:  I'll object to that
12 question based on form.
13     THE WITNESS:  You're asking me for
14 my legal conclusion?
15     Q.  No, I'm not actually, but it
16 probably wasn't a great question.
17         So your conclusion was that the
18 execution of the notes was a mistake.  Correct?
19     A.  Yes.
20     Q.  But HCMFA is reporting the notes as
21 part of its audited financial statements.
22 Correct?
23     A.  Yes.
24     Q.  And do you understand that these
25 financial statements have been audited by

Page 76

D. Sauter

1
2  independent -- an independent outside firm
3  called PricewaterhouseCoopers?
4      A.  I assume they're audited financials.
5          And yes, what you've shown me, it
6  appears as though they were prepared by
7  PricewaterhouseCoopers.
8      Q.  Okay.  Would you agree with me that
9  it's inconsistent that the notes can't be both
10 a mistake and be reported as valid obligations
11 in the audited financial statements?
12     MR. RUKAVINA:  I'll object.
13         This witness is not an expert.  He
14 has no personal knowledge.  This is well
15 outside the scope of his factual investigation
16 in May of 2021.
17 BY MR. MORRIS:
18     Q.  You can answer, sir.
19     A.  I would agree that the two
20 statements are at odds with one another.
21     Q.  Okay.  So I'm just asking you
22 whether -- now that you know that HCMFA
23 included these in the audited financial
24 statements, does that cause you to question at
25 all your conclusion that the execution of the

Page 77

D. Sauter

1
2  notes was a mistake?
3      MR. RUKAVINA:  I'll again object.
4          This witness is not an expert.  He's
5  not going to be a trial expert.  And a motion
6  to amend has already been agreed upon and ruled
7  upon.
8  BY MR. MORRIS:
9      Q.  You can answer, sir.
10     A.  I would say that the audited
11 financials were prepared by
12 PricewaterhouseCoopers with input from the
13 accounting team.
14         And as I stated previously, I think
15 there was an -- a breakdown in the process that
16 should have occurred, and had others looked at
17 this, they wouldn't have come to the same
18 conclusion.
19     Q.  So do you believe, based on the
20 investigation that you did, that a second
21 mistake occurred not only in signing the notes
22 but including them in the audited financial
23 statements?
24     MR. RUKAVINA:  Again, I'll object.
25         This witness is not an expert.  He

Page 78

D. Sauter

1    has no personal knowledge.
2        THE WITNESS:  Yeah, I can't tell you
3    whether that's a mistake.
4
5        My experience is that generally
6    accounting folks internally said that.
7        So if the accounting folks made a
8    determination that the notes should be included
9    as a subsequent event, then the auditors would
10   include it as a subsequent event.
11   BY MR. MORRIS:
12       Q.   Okay.  Do you know, is there anybody
13   at HCMFA who's responsible for overseeing the
14   preparation of the audited financial
15   statements?
16       A.   I think Mr. Waterhouse.
17       Q.   When did you first learn that the
18   notes had been included in the financial
19   statements?
20       Are you learning that for the first
21   time right now or did you know that before
22   today?
23       A.   I think I heard that a couple weeks
24   ago.
25       MR. RUKAVINA:  Let's be careful here

Page 79

D. Sauter

1    again, Mr. Sauter, to exclude our
2    communications, please.
3        THE WITNESS:  Okay.
4        Q.   Do you know if HCMFA ever reached
5    out to PricewaterhouseCoopers to inform them
6    that their audited financial statements were
7    incorrect?
8        A.   I don't know.
9        Q.   Do you know whether the debtor
10   included reference to the notes in its audited
11   financial statements?
12       A.   I don't.
13       Q.   Let's go back to your declaration,
14   please, Paragraph 28.
15       Okay.  So Paragraph 28 says:  "The
16   debtor accepted responsibility to HCMFA for
17   having caused the NAV error, and the debtor
18   ultimately, whether through insurance or its
19   own funds, compensated HCMFA for the above
20   payments."
21       Have I read that correctly?
22       A.   Correct.
23       Q.   Paragraph 28 doesn't cite any source
24   for that statement.  Right?
25

Page 80

D. Sauter

1        A.   Correct.
2        Q.   Okay.  You don't attribute that
3    statement to any particular person.  Correct?
4        A.   That's correct.
5        Q.   What is the basis for your statement
6    that the debtor accepted responsibility to
7    HCMFA?
8        A.   It would be that the debtor's
9    employees who performed the valuation function
10   acknowledged that they had made a mistake.
11       Q.   And who are those employees?
12       A.   Well, ultimately I don't know
13   exactly who it was that came to that
14   determination, but I think it was Frank
15   Waterhouse and Thomas Surgent.
16       Q.   Did you ever interview Mr. Surgent
17   as part of your investigation?
18       A.   No, I was prohibited from speaking
19   with him.
20       Q.   So you're not aware of
21   Mr. Waterhouse ever saying that the debtor
22   accepted responsibility – withdrawn.
23       You're not aware of Mr. Surgent –
24   withdrawn.
25

Page 81

D. Sauter

1        You have no personal knowledge that
2    Mr. Surgent accepted, on behalf of the debtor,
3    responsibility for the NAV error.  Correct?
4        A.   I have no personal knowledge of
5    that, correct.
6        Q.   Okay.  And did Mr. Waterhouse tell
7    you that the debtor accepted responsibility to
8    HCMFA for having caused the NAV error?
9        A.   I think Mr. Waterhouse said that the
10   HCMLP employees who formed the valuation
11   committee ultimately concluded that they had
12   made a mistake and they needed to accept that.
13       Q.   Okay.  It doesn't say that in your
14   declaration, does it?
15       A.   Doesn't say what?
16       Q.   That Mr. Waterhouse told you that.
17       A.   No.
18       Q.   In fact, is there any particular
19   reason why you didn't share that with the
20   court?
21       A.   No.
22       Q.   Is there anything in writing that
23   you've ever seen which states that the debtor
24   accepts responsibility to HCMFA for having
25

Page 82

D. Sauter

1  
2 caused the NAV error?
3     A.   Other than what I've identified, no.
4     Q.   And what you've identified is that
5 policy.  Is that right?
6     A.   There's a policy and the
7 acknowledgment that the NAV error was made by
8 the HCMLP employees who were on the valuation
9 committee.
10    Q.   Okay.  You're aware that shortly
11 after HCMFA paid the $7.4 million to the fund,
12 HCMFA sent the fund a written report.  Is that
13 right?
14    A.   Yes.
15    Q.   Let's take a look at that, if we can
16 put that on the screen.
17         MS. CANTY:  Sorry, John, you went
18 out for a second.
19         Can you say that again.
20         MR. MORRIS:  Yeah.
21         If you could, I think -- I think I
22 had it listed as Exhibit 37, but it's one of
23 the new ones.  It's the memo, I think, from
24 HCMFA to the funds.
25         MS. CANTY:  Got it.

Page 83

D. Sauter

1  
2         (Exhibit 182, Memo dated 5/28/19,
3 previously marked for identification.)
4 BY MR. MORRIS:
5     Q.   Is this one of the memos that -- and
6 again, Mr. Sauter, if you need to see more of
7 it, just let me know.
8         But is this one of the memos that
9 you saw as part of your investigation?
10    A.   I believe so.
11    Q.   Okay.  And do you understand that
12 this is a memo from HCMFA to the board of the
13 Highland Global Allocation Fund?
14    A.   Yes.
15    Q.   And this is where HCMFA describes
16 for the board the resolution of the NAV error.
17 Correct?
18    A.   Correct.
19    Q.   Okay.  And did you discuss this memo
20 with anybody as part of your investigation?
21    A.   I mean, other than reviewing it, no.
22    Q.   So -- and how did you obtain a copy
23 of it?
24    A.   Mr. Post.
25    Q.   So Mr. Post gave it to you.

Page 84

D. Sauter

1  
2         But you didn't speak with him about
3 it in substance.  Correct?
4     A.   I mean, I spoke to him about the
5 transaction and the mistake.
6         I did the same thing with Dustin
7 Norris.
8     Q.   Okay.  But you didn't speak with
9 anybody about the substance of this memo.
10 Correct?
11    A.   Correct.
12    Q.   Okay.  And -- but you did see this
13 memo before you signed your declaration.
14 Correct?
15    A.   Yes.
16    Q.   Okay.  And do you have an
17 understanding of what this memo is?
18    A.   Yeah.
19         I'd like to take a -- I'd like to
20 see the memo in full.
21    Q.   Sure.  Take your time.
22         So just tell Ms. Canty when you want
23 to see more and then she'll scroll.
24         Okay.  Stop right there.
25    A.   (Reviewing document.)

Page 85

D. Sauter

1  
2     A.   Yes.  Okay.
3     Q.   So then the second page is this NAV
4 error breakdown.
5         Do you see that?
6     A.   Yes.
7     Q.   All right.  We'll come to that, but
8 let's go back to the first page.
9         Have you taken a look at the second
10 paragraph there that begins:  "The advisor and
11 Houlihan Lokey, an independent third party
12 expert valuation consultant approved by the
13 board," have you read that paragraph?
14    A.   Yes.
15    Q.   Okay.  To the best of your
16 knowledge, did HCMFA accurately define "NAV
17 error" for the board in that paragraph?
18         MR. RUKAVINA:  Objection --
19         THE WITNESS:  As far as I know, yes.
20         MR. RUKAVINA:  This witness is not
21 an expert and has no personal knowledge.
22    Q.   Do you have any reason to believe
23 that HCMFA did not accurately describe for the
24 board the definition of "NAV error"?
25    A.   No.

Appx. 03105

Page 86

D. Sauter

1
2  Q. Do you have any reason to believe –
3  take a look at the last sentence.
4     "The orderly determination and
5  adoption of the weighted fair valuation
6  methodology resulted in NAV errors in the
7  fund."
8     Do you see that?
9  A. Yes.
10  Q. And that's what's being defined as
11  the NAV error. Correct?
12  A. Yes.
13  Q. Do you have any reason to believe
14  that that sentence is false or misleading in
15  any way?
16  A. I do not.
17  Q. Nothing you uncovered during your
18  investigation caused you to believe that that
19  sentence was false or misleading in any way.
20  Correct?
21  A. No.
22  Q. Okay. And the advisor was the
23  entity that made the orderly determination.
24  Correct?
25  A. That's what this memo says.

Page 87

D. Sauter

1
2  Q. Okay. Who's Houlihan Lokey? Do you
3  know who Houlihan Lokey is?
4  A. It's a third party valuation firm.
5  Q. Do they have a good reputation?
6  A. Yes.
7  Q. And did they do the valuation of
8  TerreStar?
9  A. That's my understanding.
10  Q. Okay. And were they retained by the
11  advisor or by HCMLP?
12  A. I don't know.
13  Q. Did you ever ask anybody who hired
14  Houlihan Lokey?
15  A. I did not.
16  Q. Do you know whether HCMFA utilizes
17  Houlihan Lokey's valuation services in the
18  ordinary course of its business?
19  A. I don't know.
20     I know that Houlihan Lokey has been
21  utilized by either HCMLP, HCMFA or Nexpoint
22  Advisors in the past.
23  Q. And to the best of your knowledge,
24  has – have those entities continued to use
25  Houlihan Lokey even after May 2019?

Page 88

D. Sauter

1
2  A. I – I don't know.
3  Q. Do you know whether anybody ever
4  suggested that Houlihan Lokey was responsible
5  for the valuation error?
6  A. I don't.
7  Q. Did you ever ask anybody if Houlihan
8  Lokey was responsible for the valuation error?
9  A. No.
10  Q. Do you know if – to the best of
11  your knowledge, this memo was given to the
12  board by HCMFA. Correct?
13  A. Yes.
14  Q. Did – having reviewed the memo, is
15  there anything that you're aware of in this
16  memo where HCMFA tells the board that HCMLP is
17  responsible for the NAV error?
18  A. No.
19     And I don't think that they would.
20  It would be irrelevant.
21     MR. MORRIS: I move to strike the
22  latter portion of the answer.
23  Q. Let's take a look at the bottom
24  paragraph there.
25     Do you see that there's a reference

Page 89

D. Sauter

1
2  to two different payments?
3  A. Yes.
4  Q. A payment of approximately
5  $5.2 million was made on February 15th, 2019,
6  and a second payment of approximately
7  $2.4 million was made on May 2nd.
8     Do I have that right?
9  A. Yes.
10  Q. Do you know what the source of
11  funding was for the first payment?
12  A. I do not.
13  Q. Did you ever ask anybody how
14  HCMFA – withdrawn.
15     Did you ever ask anybody what the
16  source of HCMFA's funding was to make the
17  payment on February 15th, 2019?
18  A. Say that again.
19  Q. Did you ever ask anybody what the
20  source of HCMFA's capital was to make that
21  payment on February 15th?
22  A. I was told that it was a transfer
23  from HCMLP.
24  Q. You were told that the transfer from
25  HCMLP was made in February of 2019?

Page 90

D. Sauter

2 A. Yes.
3 Q. Who told you that?
4 A. Mr. Waterhouse.
5 Q. Okay. Do you know what the source
6 was -- hold on one second.
7     And do you know what the source of
8 the second payment was, that $2.4 million on
9 May 2nd, 2019?
10 A. HCMLP.
11 Q. Now, we saw earlier that one of the
12 notes was for $2.4 million on May 2nd.
13     Do you recall that?
14 A. Yes. Yes.
15 Q. Okay. So is it fair -- did you
16 conclude as part of your investigation that at
17 least the amount and the date of the payment
18 matched the amount and the date of the note?
19 A. I did on the second one, yes.
20 Q. Okay. But the -- neither the amount
21 nor the date of the first payment matched the
22 amount or the date of the second note.
23 Correct?
24 A. That's correct.
25 Q. Let's take a look at the second

Page 91

D. Sauter

2 page.
3     Have you seen this before?
4 A. I have.
5 Q. Did you ever have any discussions
6 with anybody at any time during your
7 investigation about this page?
8 A. I did at some point, and I don't
9 recall exactly when.
10 Q. Okay.
11 A. But probably it may have been after
12 the declaration.
13 Q. Okay. Do you understand that the
14 first -- I think it's a row -- shows that the
15 total estimated net loss resulting from the NAV
16 error was approximately $7.44 million?
17 A. Yes, I see that.
18 Q. Okay. And do you understand that
19 this chart depicts the sources that are going
20 to be called upon to fund the $7.44 million
21 payment from HCMFA to the fund?
22 A. I -- yes, I understand that now.
23 Q. And do you understand that
24 approximately $5 million was going to be funded
25 through insurance proceeds?

Page 92

D. Sauter

2 A. That's what it appears to show.
3 Q. And during your investigation, were
4 you aware that HCMFA had obtained almost
5 $5 million in connection with the NAV error
6 that it was using to fund the payment to GAF?
7 A. I subsequently learned that, yes.
8 Q. And were you aware prior to the time
9 that you signed your declaration -- I apologize
10 if I asked this before -- withdrawn.
11     Were you aware of the almost
12 $5 million in insurance proceeds that was --
13 that were obtained by HCMFA before you signed
14 your declaration?
15 A. I was not.
16 Q. So that's new information for you
17 since the time you signed your declaration?
18 A. Yes.
19 Q. Okay. Were you aware at the time
20 you signed your declaration that HCMFA had paid
21 an insurance deductible of almost $250,000?
22 A. I was not.
23 Q. Is it your understanding that after
24 the sources described in the top portion of
25 this page, that the total amount needed by the

Page 93

D. Sauter

2 advisor to make GAF whole was approximately
3 $2.4 million?
4     That's the 2,398,842 number there.
5 A. I've not done the math.
6 Q. Well, that number there matches the
7 number in the bottom paragraph of the first
8 page, if we can scroll back up.
9 A. Yeah. No, I understand.
10 Q. Okay. So that's the total payment
11 that was made on May 2nd, 2019, according to
12 this memo?
13 A. That's total payment made to GAF.
14     What I'm unclear about is that it's
15 the total amount out of pocket from the
16 advisor, which may be different, but...
17 Q. Do you know what the total out of
18 pocket was from the advisor?
19 A. I don't.
20     (Simultaneous crosstalk.)
21     THE WITNESS: -- what's listed here.
22 Q. And do you understand that a total
23 of $7.44 million was paid by HCMFA to GAF?
24 A. I do.
25 Q. Okay. And do you have any reason to

Appx. 03107

Page 94

D. Sauter

1        believe that the source of the funding is
2  anything other than what's set forth on this
3  page?
4        A.   I don't.
5        Q.   And the $2.4 million, that's the
6  $2.4 million that HCMFA obtained from Highland
7  on May 2nd.  Correct?
8        MR. RUKAVINA:  Objection.
9            The witness is not qualified to
10  answer that.
11        Q.   During the course of your
12  investigation, did you learn that Highland
13  transferred $2.4 million to HCMFA on May 2nd,
14  2019 so that it could pay GAF?
15        A.   That's what I was told.
16        Q.   Okay.  Is it your conclusion that
17  Highland was responsible for the $7.44 million
18  estimated net loss resulting from the NAV
19  error?
20        MR. RUKAVINA:  Objection.
21            This witness is not an expert, and
22  he has no personal knowledge.
23        THE WITNESS:  Yes, I believe that
24  that's accurate.

Page 95

D. Sauter

1  BY MR. MORRIS:
2        Q.   And that's because you believe the
3  notes were executed by mistake.  Correct?
4        A.   I believe that Highland made the NAV
5  error and was responsible for making GAF whole,
6  albeit vis-à-vis HCMFA, its advisor.
7        Q.   Okay.  So because Highland created
8  the NAV error, your understanding based on your
9  discussions with Mr. Post and Mr. Norris is
10  that Highland paid the $7.4 million to HCMFA
11  not as a loan but as compensation for the error
12  that it made.
13            Do I have that right?
14        A.   That would not be based on my
15  discussions with Mr. Post and Mr. Norris.
16            But yes, your conclusion is
17  accurate.
18        Q.   Okay.  And let's be really clear
19  what the conclusion is.
20            It's your conclusion that because
21  Highland was negligent in making the NAV error,
22  that when it paid $7.4 million to HCMFA on
23  May 2nd and May 3rd, 2019, it did so as
24  compensation for its negligent conduct and not

Page 96

D. Sauter

1  as a loan.  Correct?
2        A.   I didn't say negligent, and I don't
3  know that I can make that conclusion.
4            But it should have been indemnity
5  and reimbursement for the error that Highland
6  created.
7        Q.   Okay.  Can you tell me why HCMFA
8  took $5 million from an insurance company at
9  the same time it was being made whole by
10  Highland?
11        MR. RUKAVINA:  I'll instruct you not
12  to answer that.
13            That is attorney client privileged
14  and work product.
15        Q.   Sir, as part of your investigation,
16  did you make any assessment as to why HCMFA
17  accepted $5 million in proceed – in insurance
18  proceeds at the same time it believed that the
19  $7.4 million was being paid by Highland as
20  compensation?
21        MR. RUKAVINA:  Just want to make
22  sure, Mr. Sauter, you understand that counsel
23  is asking about your investigation in May of
24  this year as referenced in your declaration and

Page 97

D. Sauter

1  not the investigation generally.
2        THE WITNESS:  Yes.
3            And as I said, the May declaration,
4  I was unaware of the $5 million in insurance
5  payments.
6  BY MR. MORRIS:
7        Q.   Now that you're aware of it, does it
8  cause you to question your conclusion that the
9  payment made by Highland in May of 2019 was
10  compensation and not a loan?
11        MR. RUKAVINA:  I instruct you not to
12  answer that, Mr. Sauter.
13        MR. MORRIS:  On what basis?  That
14  you don't like the question?
15        MR. RUKAVINA:  No.
16            Let's be professional here, John.  I
17  don't know why you've got to get –
18        (Simultaneous crosstalk.)
19        MR. MORRIS:  I don't understand.
20  It's a –
21        MR. RUKAVINA:  No, you – the way –
22        MR. MORRIS:  It's an investigation.
23  He made a conclusion in the investigation.
24            He's now learned a new fact.  I'm

Appx. 03108

Page 98

D. Sauter

1             D. Sauter
2 allowed to ask him if it changes his
3 conclusion.
4        MR. RUKAVINA:  Let me just explain
5 what I understand, what's going on here.
6        He undertook an evidentiary and
7 factual conclusion, which is fair game for you
8 to ask about.  Pardon me.
9        He's told you that he didn't know
10 about this.  His declaration says -- I'm
11 paraphrasing -- it appears that there was a
12 mistake.
13        He has never claimed to have
14 personal knowledge.  He has never claimed to be
15 an expert.  He is not going to be a trial
16 witness.  He has never testified and is not
17 testifying today that there was a mistake.
18        But most importantly, and why I'm
19 instructing him not to answer, is because the
20 issue of how this payment relates to the
21 insurance payable, which again arose after his
22 declaration is something that he and I have
23 discussed and is my work product.  That is not
24 a part of his factual investigation.
25        So I am instructing him not to

Page 99

D. Sauter

1             D. Sauter
2 answer.  There's no point in you and I arguing
3 about it now.
4        If you feel my objection is
5 inappropriate, then you have your rights
6 intact.
7        MR. MORRIS:  All right.  I'm going
8 to continue to ask questions.
9 BY MR. MORRIS:
10    Q.   Sir, you had this document before
11 you signed your declaration.  Correct?
12    A.   I did.
13    Q.   Okay.  And your conclusion was that
14 because Highland made the NAV mistake, the
15 $7.4 million payment was supposed to be
16 compensation and not in the form of a loan.
17 Correct?
18        MR. RUKAVINA:  Objection, form.
19        THE WITNESS:  Correct.
20    Q.   Okay.  And now the document that you
21 had before you signed your declaration
22 discloses that HCMFA received almost $5 million
23 as part of the insurance proceeds in connection
24 with the NAV error.  Correct?
25    A.   Yes.

Page 100

D. Sauter

1             D. Sauter
2    Q.   Okay.  Does that cause you to change
3 the conclusion that you reached as set forth in
4 your declaration?
5    A.   I don't know enough about the
6 insurance proceeds, the insurance policy and
7 what transpired at the time to make that
8 determination.
9    Q.   Do you know if HCMFA has ever
10 informed the insurance carrier that HCMLP was
11 responsible for the NAV error?
12    A.   I do not.
13    Q.   Did you ever ask anybody?
14    A.   I did not.
15    Q.   As part of your investigation, did
16 you try to determine whether HCMFA ever told
17 the insurance company that HCMLP was
18 responsible for the NAV error?
19    A.   I think I already said I wasn't
20 aware of the insurance proceeds at the time of
21 my declaration.
22    Q.   Has HCMFA returned all or any
23 portion of the insurance proceeds to the
24 carrier?
25    A.   I wouldn't know.

Page 101

D. Sauter

1             D. Sauter
2    Q.   Have you ever asked anybody?
3    A.   No.
4        MR. RUKAVINA:  You've got to wait a
5 second, Mr. Sauter, before answering.
6        Go ahead.
7    Q.   During the course of your
8 investigation, did anybody tell you that on
9 May 3rd, 2019, HCMFA needed another $5 million?
10    A.   Not during the course of my initial
11 investigation.
12    Q.   Are you aware of that today?
13    A.   I am, yes.
14    Q.   Okay.  And do you understand that
15 that $5 million was needed in order for HCMFA
16 to pay what's called a consent fee?
17        MR. RUKAVINA:  I'm going to object.
18        And I'm going to instruct the
19 witness not to answer.
20        Again, this is attorney-client
21 privilege and work product.
22        He learned about all of this well
23 after his investigation and well after his
24 declaration.
25        MR. MORRIS:  These are facts.

Page 102

D. Sauter

1          D. Sauter
2          I don't get it.  These are facts.
3  And I'm not limited to his declaration.  He's
4  here under a subpoena.  I can ask him whatever
5  I want factually.
6          I don't understand, Davor.
7          MR. RUKAVINA:  Well, there's three
8  things.
9          You're generally right, you can ask
10  him whatever you want factually.  I'm not
11  saying that he -- I haven't prevented you from
12  asking factually.  That's issue one.
13          Issue two, he's not a trial witness.
14  His role is limited to the motion to amend,
15  which was granted by consent.
16          And issue three, the question you're
17  asking him right now, if he has any knowledge,
18  he can have only through discussions with me
19  and things he's learned through me in this
20  litigation.  He's told you he did not know
21  about this during his investigation.
22          So I'm going to stick by my
23  instruction not to answer that, Mr. Sauter.
24          MR. MORRIS:  And I'm going to tell
25  you he is a trial witness.  I will certainly be

Page 103

D. Sauter

1  calling him at trial because he conducted an
2  investigation.
3          And I don't think that I need to
4  stop asking questions as of the date of his
5  declaration.  I'm asking purely factual
6  questions.
7          So you know, if you want to continue
8  to direct him not to answer, we'll deal with
9  it, but I'm going to continue to ask him
10  factual questions.
11          MR. RUKAVINA:  To me, this is --
12          (Simultaneous crosstalk.)
13  BY MR. MORRIS:
14    Q.    Mr. Sauter, do you understand that
15  the $5 million was needed by HCMFA on May 3rd,
16  2019 to pay a consent fee?
17          MR. RUKAVINA:  I'm going to instruct
18  you not to answer that, Mr. Sauter.
19    Q.    Are you going to follow your
20  counsel's instructions?
21    A.    I am.
22    Q.    Do you know what a consent fee is,
23  sir?
24    A.    I don't.

Page 104

D. Sauter

1          D. Sauter
2    Q.    Did you ever have -- withdrawn.
3          Did anybody ever tell you that
4  Highland was responsible for any consent fee
5  that HCMFA paid?
6          MR. RUKAVINA:  You're instructed not
7  to answer that to the extent that whoever told
8  you that would be an attorney.
9  BY MR. MORRIS:
10    Q.    Okay.  Did anybody other than an
11  attorney ever tell you that Highland was
12  responsible for any consent fee ever paid by
13  HCMFA?
14    A.    That Highland was responsible for
15  paying a consent fee?
16    Q.    That Highland was responsible for
17  any consent fee that was paid by HCMFA.
18    A.    I don't believe so.
19    Q.    During your discussions as part of
20  your investigation with Mr. Norris and Mr. Post
21  and Mr. Dondero and Mr. Waterhouse, did anybody
22  tell you why Highland paid HCMFA $5 million on
23  May 3rd, 2019?
24    A.    Yes.
25    Q.    And why did -- what did they tell

Page 105

D. Sauter

1          D. Sauter
2  you?
3    A.    It was payment for a consent fee.
4    Q.    All right.  Okay.
5          And who told you that?
6    A.    Mr. Norris.
7    Q.    And did Mr. Norris tell you that
8  Highland had any responsibility for the payment
9  of that consent fee by HCMFA?
10    A.    I don't know that we got into that.
11    Q.    Okay.  Did anybody else tell you
12  that the May 3rd, 2019 $5 million payment was
13  made so that HCMFA could pay the consent fee?
14          MR. RUKAVINA:  Again, I'll instruct
15  you not to answer to the extent you learned
16  anything from an attorney.
17          THE WITNESS:  I don't believe so.
18    Q.    Okay.  Did you speak with
19  Mr. Waterhouse about the $5 million consent fee
20  that Mr. Norris mentioned to you?
21    A.    I have not spoken with
22  Mr. Waterhouse for quite some time about this,
23  since he's represented by counsel.
24    A.    No.
25          But as part of your investigation,

Page 106

D. Sauter

1
2  after you learned from Mr. Norris that the
3  $5 million was paid so that HCMFA could pay the
4  consent fee, did you follow up with
5  Mr. Waterhouse at all?
6      A.   I didn't know about the consent fee
7  at the time of my investigation.
8      Q.   Okay.  When did Mr. Norris tell you
9  about the consent fee?
10     A.   Probably within the last six weeks.
11     Q.   And does learning about the consent
12 fee from Mr. Norris cause you to question your
13 conclusion that the $7.4 million was paid by
14 Highland to HCMFA on account of the mistake
15 that Highland made on the NAV error?
16         MR. RUKAVINA:  I'll again object
17 that this witness is not an expert and he has
18 no personal knowledge.
19     Q.   You can answer, sir.
20     A.   I wasn't aware of the consent fee.
21         I don't know much about the consent
22 fee.  I don't know what it is, who paid it, why
23 they paid it, what the consideration was for
24 it.
25         So I'm not prepared to answer that.

Page 107

D. Sauter

1
2      Q.   Okay.  Let's go back to your
3  declaration, please, Paragraph 31.
4          Is it fair to summarize this
5  paragraph as saying that because HCMFA and the
6  debtor had executed that acknowledgment, that
7  it would have been illogical for Highland to
8  lend HCMFA $7.4 million in May 2021?
9      A.   Yes.
10     Q.   Okay.  And what was the source of
11 your information for Paragraph 31?
12     A.   I'm not sure I follow.
13     Q.   So you've got the acknowledgment
14 that you attached as Exhibit 4.  Correct?
15     A.   Yes.
16     Q.   Did you discuss with anybody during
17 your investigation any of the facts or
18 conclusions that are set forth in Paragraph 31
19 or did you -- or is it based just on your
20 review of Exhibit 4?
21     A.   Based on my review.
22     Q.   Okay.  Are you aware that in
23 May 2019, Mr. Dondero contemporaneously and
24 personally paid Highland exactly $7.4 million
25 that was owed by Mr. Dondero to Highland under

Page 108

D. Sauter

1
2  a promissory note where he was the maker?
3      A.   I was not.
4      Q.   Nobody told you that as part of your
5  investigation, that the way Highland was able
6  to transfer the $7.4 million to HCMFA was to
7  get that money from Mr. Dondero on account of a
8  note that he signed?
9      A.   No one told me that.
10     Q.   You're hearing that for the first
11 time today?
12     A.   I am.
13     Q.   If Mr. Dondero paid down
14 $7.4 million in obligations that he owed to
15 Highland, would it change your view that it was
16 illogical for Highland to loan that money to
17 HCMFA in May of 2019?
18     A.   Again, without seeing the documents
19 and the timing and the details of the
20 transaction, I can't answer that.
21     Q.   Okay.  Now, the advisors have
22 contracts with the funds they advise.  Correct?
23     A.   Advisory agreements, yes.
24     Q.   And those advisory agreements are
25 subject to annual renewal.  Correct?

Page 109

D. Sauter

1
2      A.   Yes.
3      Q.   As Nexpoint's general counsel, did
4  you participate in the annual renewal process
5  in the fall of 2020?
6      A.   I would have participated in the
7  process, but only with respect to NXRT,
8  Nexpoint Residential Trust and Nexpoint Real
9  Estate Finance.
10     Q.   I see.
11     A.   I had some limited involvement in
12 the 15(c) process with respect to Nexpoint's
13 strategic opportunities fund, but very limited.
14     Q.   Do you know who the representative
15 was for HCMFA who was responsible for the 15(c)
16 annual renewal process in the fall of 2020?
17     A.   I don't.
18         I can speculate, and I would assume
19 it's Mr. -- a combination of Mr. Norris and
20 Mr. Sella (phonetic).
21     Q.   And why do you speculate that it's a
22 combination of them?
23     A.   Because they were actively involved
24 in the process just from conversations I had
25 with them.

Page 110

D. Sauter

1
2    Q.   Okay.  Have you ever seen any of the
3  reports that the advisors sent to the retail
4  board in connection with the 15(c) annual
5  review?
6        MR. RUKAVINA:  Now, this one,
7  Mr. Sauter, I am going to instruct you not to
8  answer.
9        MR. MORRIS:  Have you ever seen the
10  document?  That's what, you're going to
11  instruct him not to --
12        MR. RUKAVINA:  Don't answer that.
13  Don't answer that.  That relates to discovery
14  and work product privilege.
15        The document was produced to you.
16  Mr. Sauter helped me find that document.  Other
17  than that, nothing about that document and his
18  knowledge is fair game.
19        MR. MORRIS:  Well, I'm going to ask
20  my questions, and you can keep directing him
21  not to answer.
22  BY MR. MORRIS:
23    Q.   Mr. Sauter, have you ever seen any
24  of the reports that were issued by the advisors
25  to the funds?

Page 111

D. Sauter

1
2    A.   Could you clarify the question.
3    Q.   Sure.
4        Have you ever seen any of the
5  reports that were issued by the advisors to the
6  retail board in the fall of 2020 in connection
7  with the 15(c) review?
8        MR. RUKAVINA:  Mr. Sauter, I'm
9  instructing you not to answer that if your
10  answer involves working with me in this
11  adversary proceeding.
12        If you saw it otherwise as part of
13  business operation, that's fine.
14        THE WITNESS:  In the fall of 2020, I
15  would have had -- I would not have been
16  involved and I would not have seen anything
17  sent to the board.
18  BY MR. MORRIS:
19    Q.   All right.  Well, let's put it up on
20  the screen.  It's, I think, a document that was
21  previously marked as Deposition Exhibit 59.
22        (Exhibit 59, Memo dated 10/23/20,
23  HCMFAS 000025-031, marked for identification.)
24    Q.   Have you ever seen this document
25  before, sir?

Page 112

D. Sauter

1
2    A.   Could you scroll down.
3    Q.   Sure.
4    A.   (Reviewing document.)
5    Q.   We can keep going.
6    A.   All right.
7        What's the date on this?
8    Q.   October 23rd, 2020.
9    A.   I honestly don't think I would have
10  been involved in that or seen that.
11    Q.   Okay.  Did you ever ask anybody as
12  part of your investigation -- withdrawn.
13        Are you aware that the advisors were
14  asked to provide information to the retail
15  board as to the obligations that it owed to
16  Highland and its affiliates in connection with
17  the 15(c) annual review?
18    A.   I was not.
19    Q.   So is it fair to say that you never
20  saw this document as part of your
21  investigation?
22    A.   I don't think so.
23    Q.   Is it fair to say that nobody ever
24  told you about the advisors' responses to the
25  retail board in connection with the 15(c)

Page 113

D. Sauter

1
2  review in October of 2020?
3    A.   I think that's accurate.
4        MR. MORRIS:  We're going to do the
5  30(b)(6) deposition on December 1st?
6        MR. RUKAVINA:  I think I'm waiting
7  for you to confirm.
8        I think that's what --
9        MR. MORRIS:  Let's confirm that
10  right now.
11        I'll send you an e-mail, but I
12  just...
13        MR. RUKAVINA:  Okay.  10 a.m.,
14  Dallas?
15        MR. MORRIS:  Yeah, that sounds fair.
16  BY MR. MORRIS:
17    Q.   All right.  Let's go back to your
18  declaration, please, Paragraph 32.
19        I'm almost done, sir.
20        So you state, among other things,
21  that -- and I'm paraphrasing.  Let me know if
22  I -- if this is fair -- that as a result of
23  your investigation in April of 2019, HCMFA now
24  believes that it has affirmative defenses to
25  the notes that includes the defense of mutual

Page 114

D. Sauter

1   mistake.
2   Do I have that right?
3   A.   Yes.
4   Q.   Okay.  What does "mutual" -- excuse
5   me -- what does "mutual mistake" mean?
6   MR. RUKAVINA:  Are you asking for
7   his legal opinion or how he used it in this
8   declaration?
9   MR. MORRIS:  Only how he used it in
10  the declaration.
11  THE WITNESS:  Well, wouldn't that be
12  a legal conclusion because it's an affirmative
13  defense?
14  BY MR. MORRIS:
15  Q.   Well, I don't know.  It's in your
16  declaration.  I'm just asking you what you
17  meant when you used the phrase -- withdrawn.
18  Let me ask a better question.  Maybe
19  it's my fault.
20  Mr. Sauter, what did you mean when
21  you used the phrase "mutual mistake"?
22  A.   What I meant is that there was no
23  analysis or consideration of what had
24  transpired and who is legally responsible for
25

Page 115

D. Sauter

1   the payments to the fund.
2   A transfer was made.  A note was
3   executed without any analysis.
4   Q.   And do you have anything else to add
5   to that?
6   A.   I don't think so.
7   Q.   Okay.  You also say that the notes
8   are void for lack of consideration.
9   Do I have that right?
10  A.   Yes.
11  Q.   You don't dispute that Highland paid
12  HCMFA $2.4 million on May 2nd, 2019.  Correct?
13  A.   No.
14  Q.   And you don't dispute that Highland
15  paid HCMFA $5 million on May 3rd, 2019.
16  Correct?
17  A.   I mean, I believe that's right.
18  That's what I've been told.
19  So yeah, I don't dispute that.
20  Q.   Your reference to "a lack of
21  consideration" means only that, in your
22  opinion, the money should not have been
23  transferred in the form of a loan.
24  Do I have that right?
25

Page 116

D. Sauter

1   A.   You do.
2   Q.   It does not mean that HCMFA did not
3   receive an amount of money exactly equal to the
4   principal amount of the notes.  Correct?
5   A.   Based upon what I've been told,
6   correct.
7   Q.   Okay.  You also write here that
8   Mr. Waterhouse did not "have proper authority
9   to sign the notes."
10  Do I have that right?
11  A.   Yes.
12  Q.   What does "proper" -- what did you
13  mean by the phrase "proper authority"?
14  A.   I mean going through the process of
15  what I would expect to see in making a loan of
16  $7.4 million.
17  Q.   So that's just your own subjective
18  view.
19  Is that fair?
20  A.   No.
21  I mean, I think there's a legal
22  basis for that, so yeah.
23  Q.   What's your legal basis for that?
24  A.   There is a process to go through in
25

Page 117

D. Sauter

1   papering a transaction like a $7.4 million
2   loan.  And my understanding of the process, as
3   described to me by Frank Waterhouse, was not
4   the proper process.
5   Q.   Is there a policy or a law that
6   requires a particular process to be followed
7   that you're aware of?
8   A.   What I would expect is
9   communications among the various parties that
10  are involved and agreement that this should be
11  a loan rather than just transferring money and
12  sign a note.
13  Q.   You knew when you signed this
14  declaration that Mr. Waterhouse in fact was an
15  officer of HCMFA at the time his signature was
16  put on the notes.  Correct?
17  A.   Yes.
18  Q.   And is it your view that an officer
19  is not authorized to execute notes on behalf of
20  the company for which he or she works for?
21  A.   I think every company has
22  limitations on authority.
23  Q.   And what limits are you aware of on
24  Mr. Waterhouse -- withdrawn.
25

Page 118

D. Sauter

1        D. Sauter
2        What limits are you aware of that
3    existed on Mr. Waterhouse's authority to sign
4    notes on behalf of HCMFA in May of 2019?
5        A.   I don't know what the HCMFA -- what
6    the partnership agreement says, or I should say
7    the general partnership agreement says.
8        But what I would expect is the full
9    participation of legal, accounting and then
10   perhaps Mr. Dondero.
11       Q.   Do you know if Mr. Waterhouse has
12   ever signed any other notes on behalf of HCMFA
13   or any other affiliated entity?
14       A.   I'm sure he has.
15       Q.   Did you do -- as part of your
16   investigation, before reaching your conclusion
17   that Mr. Waterhouse didn't have proper
18   authority, did you try to determine whether in
19   fact he had previously issued notes on behalf
20   of HCMFA or other affiliates?
21       A.   I can't answer your question without
22   knowing the facts surrounding the execution of
23   any particular note.
24       I mean, I think it matters the
25   amount of the note, the term of the note.

Page 119

D. Sauter

1    There's a number of factors that come into it.
2        Q.   But you didn't --
3        A.   So --
4        Q.   But you made no inquiry as to any of
5    those issues.  Correct?
6        A.   I made an inquiry of Mr. Waterhouse
7    as it relates to this transaction.
8        Q.   Okay.  And again, Mr. Waterhouse did
9    not admit that he was not authorized to sign
10   these notes.  Correct?
11       A.   Sorry.  He did not admit that he was
12   not authorized to sign the notes, correct.
13       Q.   Okay.
14       MR. MORRIS:  Let's just take a
15   five-minute break.  I may be done.
16       It's 4:28.  Let's just come back at
17   4:35 so I can take a break.
18       (Recess was taken from 3:29 p.m. to
19   3:37 p.m.)
20       MR. MORRIS:  Mr. Sauter, I greatly
21   appreciate your time and attention today.  I
22   have no further questions.
23       THE WITNESS:  Okay.
24       MR. RUKAVINA:  I'll pass the
25

Page 120

D. Sauter

1    witness, save my questions till trial.  Thank
2    you.
3        MR. MORRIS:  Thank you, sir.  Have a
4    good day.
5        MR. RUKAVINA:  Madam Reporter, just
6    before we're done, just to confirm, the witness
7    does want his 30 days to read and review, so
8    please send the transcript to me with exhibits.
9        THE REPORTER:  And Michael, do you
10   need a copy?
11       MR. AIGEN:  Yeah, we'll order one,
12   just regular time.  Doesn't need to be
13   expedited.
14       (Time Noted:  3:38 p.m.)
15
16
17       _____
18
19           DENNIS C. SAUTER
20
21   Subscribed and sworn to before me
22   this      day of           2021.
23
24   _____
25   Notary Public

Page 121

1    District of Columbia, to wit:
2        I, Stacey L. Daywalt, a Notary
3    Public of the District of Columbia, do hereby
4    certify that the within-named witness remotely
5    appeared before me at the time and place herein
6    set out, and after having been duly sworn by
7    me, according to law, was examined by Counsel.
8        I further certify that the
9    examination was recorded stenographically by me
10   and this transcript is a true record of the
11   proceedings.
12       I further certify that I am not of
13   counsel to any of the parties, nor an employee
14   of counsel, nor related to any of the parties,
15   nor in any way interested in the outcome of
16   this action.
17       As witness my hand and Notarial Seal
18   this 17th day of November, 2021.
19
20
21   _____
22   Stacey L. Daywalt, Notary Public
23   My Commission Expires:  4/14/2026
24
25

Page 122

1  -------------------I N D E X------------------
2
   WITNESS            EXAMINATION BY     PAGE
3
4  DENNIS C. SAUTER   BY MR. MORRIS        4
5
   -------------------EXHIBITS------------------
6
7  PREVIOUSLY MARKED EXHIBITS       PAGE  LINE
8  Exhibit 181
   Declaration of Dennis C. Sauter,
9  Jr.                      24  3
10  Exhibit 54
   E-mail chain with attachment dated
11  5/2/19
   D-CNL003777-779          25  25
12
   Exhibit 57
13  Promissory Note dated 5/3/19
   D-CNL003764-65           29  5
14
   Exhibit 45
15  Consolidated Financial Statements
   and Supplemental Information
16  December 31, 2018
   D-CNL002273-296          72  19
17
   Exhibit 182
18  Memo dated 5/28/19       83  2
19  Exhibit 59
   Memo dated 10/23/20
20  HCMFAS 000025-031        111  22
21
22
23
24
25

Page 123

1  NAME OF CASE:

2  DATE OF DEPOSITION:

3  NAME OF WITNESS:

4  Reason Codes:

5     1. To clarify the record.

6     2. To conform to the facts.

7     3. To correct transcription errors.

8  Page _____ Line _____ Reason _____

9  From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25        _____

**$**

**$2.4**  27:5 28:3 89:7
90:8,12 93:3 94:6,7,
14 115:13

**$250,000**  92:21

**$5**  29:9 91:24 92:5,12
96:9,18 97:5 99:22
101:9,15 103:16
104:22 105:12,19
106:3 115:16

**$5.2**  89:5

**$7.4**  63:17 82:11
95:11,23 96:20 99:15
106:13 107:8,24
108:6,14 116:17
117:2

**$7.44**  91:16,20 93:23
94:18

**0**

**000025-031**  111:23

**1**

**10**  113:13

**10/23/20**  111:22

**11th**  49:10

**12**  42:9

**13**  7:9 31:15 32:6
34:11 39:3 40:13

**15**  6:23

**15(c)**  109:12,15
110:4 111:7 112:17,
25

**15th**  89:5,17,21

**17**  74:5

**181**  24:3 25:23

**182**  83:2

**19**  43:20

**1st**  31:22 42:9 44:15
45:24 113:5

**2**

**2**  28:3

**2,398,842**  93:4

**2001**  6:10 43:17,23

**2002**  6:23

**2006**  7:2

**2009**  7:5,6

**2014**  7:10 37:14

**2017**  15:12

**2018**  65:4 72:17,21
73:2

**2019**  17:2,15 18:5
21:8 26:13 28:4
29:10 32:12 35:14
36:13 37:8 69:19
73:18 87:25 89:5,17,
25 90:9 93:11 94:15
95:24 97:10 101:9
103:17 104:23
105:12 107:23
108:17 113:23
115:13,16 118:4

**2020**  7:12 9:6 36:5
69:20 109:5,16
111:6,14 112:8 113:2

**2021**  9:7,8 24:16
45:8,25 59:18,24
60:6 76:16 107:8
120:22

**21**  47:3,5

**21st**  24:16

**22**  46:25 47:19 50:19

**23rd**  112:8

**28**  79:15,16,24

**29**  51:7

**2:15**  66:8

**2:17**  67:18

**2:28**  67:19

**2nd**  26:8 32:12 89:7
90:9,12 93:11 94:8,
14 95:24 115:13

**3**

**30**  59:6,7 62:20 68:7
71:6 120:8

**30(b)(6)**  113:5

**31**  7:9 72:21 107:3,
11,18

**31st**  72:17 73:2

**32**  113:18

**37**  82:22

**3:29**  119:19

**3:37**  119:20

**3:38**  120:15

**3rd**  29:10 32:12 73:17
95:24 101:9 103:16
104:23 105:12
115:16

**4**

**4**  44:8 107:14,20

**45**  72:18,19

**4:28**  119:17

**4:35**  119:18

**5**

**5/2/19**  26:2

**5/28/19**  83:2

**5/3/19**  29:6

**54**  25:20,25

**57**  29:5

**59**  111:21,22

**9**

**9th**  69:19

**A**

**a.m.**  113:13

**accept**  81:13

**accepted**  8:16 79:17
80:7,23 81:3,8 96:18

**accepts**  81:25

**access**  42:24 43:3
44:2,10,24 46:2

**accommodate**  5:23

**account**  106:14
108:7

**accounted**  41:4,8

**accounting**  21:24
26:17,21,22,25 61:9,
18 64:2 77:13 78:6,7
118:9

**accurate**  94:25
95:18 113:3

**accurately**  85:16,23

**acknowledged**
65:11 80:11

**acknowledgment**
82:7 107:6,13

**act**  63:25

**actively**  109:23

**actual**  61:10

**add**  115:5

**addressed**  46:18

**admit**  60:22,24
119:10,12

**admitted**  6:6 30:11
53:11 55:4 59:15

**adopted**  64:25

**adoption**  86:5

**adversary**  23:10
42:5 71:2 74:2
111:11

**adverse**  43:9

**advise**  108:22

**advised**  14:10 19:8

**advisor**  85:10 86:22
87:11 93:2,16,18
95:7

**advisors**  7:20 12:2,6
13:7,8,20,24,25 14:3,
11,20,25 15:5 16:4

**accepted**

**17:17 18:5 19:8
20:20 21:6 28:18
29:14,25 30:25 37:3
87:22 108:21 110:3,
24 111:5 112:13

**advisors'**  112:24

**advisory**  14:3,6 16:4
108:23,24

**affairs**  69:25 70:4

**affiliated**  12:24 13:4,
8 118:13

**affiliates**  7:18 64:8
112:16 118:20

**affiliation**  13:12

**affirmative**  43:13
113:24 114:13

**afternoon**  4:12

**agree**  30:11,21 66:19
76:8,19

**agreed**  77:6

**agreement**  117:11
118:6,7

**agreements**  43:5
108:23,24

**ahead**  34:23 52:5
62:15 101:6

**AIGEN**  120:12

**albeit**  95:7

**Allocation**  16:21
83:13

**allowed**  98:2

**amend**  54:3 77:6
102:14

**amended**  24:20

**amendment**  24:24

**amount**  32:21,24
90:17,18,20,22 92:25
93:15 116:4,5 118:25

**analysis**  114:24
115:4

**and/or**  18:24 19:3

**annual**  108:25 109:4,
16 110:4 112:17

**answering** 101:5

**anticipated** 10:9

**apologize** 34:22 53:6 60:4 62:11,12 92:9

**appeared** 63:13

**appears** 59:10 60:12 61:8 63:6,7 64:14 76:6 92:2 98:11

**approved** 54:22 56:19 85:12

**approximately** 9:5, 6,8 89:4,6 91:16,24 93:2

**April** 6:23 9:4,6,8 43:23 45:8 113:23

**area** 8:3

**arguing** 99:2

**arose** 98:21

**asks** 27:5

**aspect** 22:17

**asserted** 43:13

**assessment** 96:17

**assets** 68:14,18,24 69:8,9,25 70:8

**assistant** 21:13,16 23:16

**assume** 41:22 63:17 76:4 109:18

**assumed** 60:13

**assumption** 51:4 60:19,23,24

**attached** 27:19 107:14

**attachment** 26:2

**attempt** 5:10,12

**attention** 119:22

**attorney** 4:13 9:20 96:14 104:8,11 105:16

**attorney-client** 101:20

**attribute** 58:25 80:3

**attributing** 60:20

**audio** 66:19

**audited** 72:5,11,15 74:7,11,25 75:8,21, 25 76:4,11,23 77:10, 22 78:14 79:7,11

**auditors** 71:6 72:2 73:14,22 78:9

**authority** 48:3 54:7, 19,25 55:5,9 116:9, 14 117:23 118:3,18

**authorize** 53:16

**authorized** 54:11,16 117:20 119:10,13

**aware** 4:16 37:19,20, 21 38:7,10,11,22,25 39:9 49:24 55:11,13 56:3,8 68:12 69:12, 16,22 70:3,5 71:4,24 72:4 74:24 80:21,24 82:10 88:15 92:4,8, 11,19 97:8 100:20 101:12 106:20 107:22 112:13 117:8, 24 118:2

---

**B**

**back** 7:6 31:16 37:8 44:24 67:5,16 79:14 85:8 93:8 107:2 113:17 119:17

**background** 21:25 35:11

**bad** 60:4

**balance** 41:12,17 69:8

**bankruptcy** 68:10, 13 69:18 70:7 73:22

**based** 47:14,23 59:20 63:21 71:12,16 75:12 77:19 95:9,15 107:19,21 116:6

**basically** 25:5

**basis** 21:2,20 22:7 24:23 57:8 62:9 63:2,

12 64:13 80:6 97:14 116:23,24

**began** 6:21 7:12

**begin** 5:6,13 10:3

**begins** 85:10

**behalf** 81:3 117:20 118:4,12,19

**believed** 50:16 51:17 96:19

**believes** 113:24

**bit** 10:12 11:5 16:11 26:5

**Blair** 27:19

**block** 30:23

**board** 45:21 46:21 83:12,16 85:13,17,24 88:12,16 110:4 111:6,17 112:15,25

**books** 40:14,18 41:5, 8 42:25 44:10,14,18, 25 70:18,22

**bottom** 88:23 93:7

**break** 5:21,24 66:4, 22,25 67:3,15,24 119:16,18

**breakdown** 77:15 85:4

**bring** 13:2

**brings** 10:19 11:23

**broker** 13:10

**bud** 67:3

**building** 34:4

**business** 15:2 87:18 111:13

---

**C**

**call** 49:12

**called** 4:3 6:22,25 7:4,8 26:22 30:16 70:4 74:7 76:3 91:20 101:16

**calling** 103:2

**Canty** 23:17 25:18,21 82:17,25 84:22

**capacity** 10:20 12:12 19:17 52:8

**capital** 4:15 9:19 12:2,6 20:23,25 28:17 29:13,24 30:24 31:11 69:17 89:20

**caps** 16:10

**careful** 71:15 78:25

**carried** 41:16 69:7

**carrier** 100:10,24

**case** 55:8,12 64:19

**caused** 39:21 79:18 81:9 82:2 86:18

**caution** 55:19

**CFO** 18:7,24 19:4 51:18

**chain** 25:25 26:22

**change** 100:2 108:15

**changed** 43:16,24

**characterize** 39:12, 14

**chart** 91:19

**chief** 36:24 37:2,4,11 51:2,10

**circumstances** 43:12 50:2

**cite** 79:24

**claimed** 98:13,14

**clarify** 14:18 39:25 52:3 111:2

**clear** 25:14 59:10 63:5 95:19

**client** 67:8 96:14

**CLOS** 7:24

**CMFA** 34:16

**collect** 31:12 69:13

**collectively** 31:4

**combination** 109:19,22

**commenced** 11:3 23:11

**commencement** 39:23 40:10 73:25

**comments** 40:2

**committee** 81:12 82:9

**communicate** 66:13 68:3

**communications** 34:7 45:22 46:23,24 79:3 117:10

**company** 96:9 100:17 117:21,22

**compensated** 79:20

**compensation** 95:12,25 96:21 97:11 99:16

**complaint** 25:4 31:20 41:21 68:22 70:14

**compliance** 36:18, 24 37:2,5,11

**concerned** 45:16

**conclude** 57:8 68:17 90:16

**concluded** 47:25 81:12

**conclusion** 59:18 61:3 75:9,14,17 76:25 77:18 94:17 95:17,20,21 96:4 97:9,24 98:3,7 99:13 100:3 106:13 114:13 118:16

**conclusions** 47:17, 22 107:18

**conduct** 95:25

**conducted** 19:12 22:18 31:20 44:5,16 103:2

**conference** 49:9

**confirm** 113:7,9 120:7

**confusion** 52:13

**connection** 22:21 23:10 42:5 50:7 57:11,16 69:4 92:5 99:23 110:4 111:6 112:16,25

**consent** 101:16 102:15 103:17,23 104:4,12,15,17 105:3,9,13,19 106:4,6,9,11,20,21

**consideration** 61:10 106:23 114:24 115:9,22

**consistent** 18:25

**consolidated** 72:19,24

**construction** 8:7

**consultant** 85:12

**contemporaneously** 107:23

**continue** 61:5 99:8 103:8,10

**continued** 87:24

**contracts** 108:22

**control** 13:18 69:17,23 70:6

**controlling** 13:19,21

**controls** 13:15 15:21

**conversation** 32:18 38:23 39:2 70:15

**conversations** 33:10 48:12,15,19,21 49:3 109:24

**copy** 27:19 83:22 120:11

**corporate** 26:17,21,22,25

**correct** 4:19 9:12 14:5,7,8 19:14 30:4 32:3,8 33:4 40:6,12 42:18,22,23,25 43:2,6,14,17 44:4,6 46:9,11 47:8 50:17 51:2 52:21 53:12,13,17,18,20 54:4,5,20 55:5,6,9,10 57:12,14,17,

18,21,22,25 58:2,5,6,11,12 59:15,16,19 61:4 65:25 66:2 74:3 75:4,5,18,22 79:23 80:2,4,5 81:4,6 83:17,18 84:3,10,11,14 86:11,20,24 88:12 90:23,24 94:8 95:4 96:2 99:11,17,19,24 107:14 108:22,25 115:13,17 116:5,7 117:17 119:6,11,13

**correction** 64:17

**correctly** 51:13 61:14 79:22

**counsel** 4:14 8:19,21,23 9:2,7,9,13,15,18 10:7,20 11:25 12:5,16 14:12,14,19,21 64:5 66:13 96:23 105:23 109:3

**counsel's** 103:21

**couple** 7:22 60:11 78:23

**court** 25:22 70:12 81:21

**created** 95:8 96:7

**crosstalk** 11:17 53:5 67:4,9 93:20 97:19 103:13

**current** 25:22

---

**D**

**D-CNL002273-296** 72:21

**D-CNL003764-65** 29:6

**D-CNL003777-779** 26:2

**DAF** 36:8

**daily** 35:10

**Dallas** 113:14

**date** 69:18 73:12 74:17,18 90:17,18,21,22 103:5 112:7

**dated** 26:2,7 28:3 29:5,9 32:12 73:17 83:2 111:22

**David** 26:7

**Davor** 11:19 67:7 102:6

**day** 6:23 10:5 29:9 120:5,22

**days** 71:6 120:8

**DC** 62:12

**deal** 103:9

**dealer** 13:10

**debtor** 34:6 44:9 51:11 60:14 61:12 62:5,22 63:13 64:14 68:13,17 69:7,13,23 70:7,11,18 79:10,17,18 80:7,22 81:3,8,24 107:6

**debtor's** 43:4 63:3 68:7,10,23 80:9

**December** 7:9 17:15 72:17,21 73:2 113:5

**decision** 57:24

**decisions** 57:16

**declaration** 23:9 24:3,8,19,23 25:3,23 31:15 50:16,24 51:9,16 52:19,24 53:3,10,14 54:2 55:3,8 58:24 59:4 61:25 62:3 68:9,25 69:5 75:4 79:14 81:15 84:13 91:12 92:9,14,17,20 96:25 97:4 98:10,22 99:11,21 100:4,21 101:24 102:3 103:6 107:3 113:18 114:9,11,17 117:15

**deductible** 92:21

**defense** 11:2 113:25 114:14

**defenses** 43:13 113:24

**define** 13:18 85:16

**defined** 21:17 28:16 30:12,22 86:10

**defines** 29:13

**definition** 30:3 85:24

**denied** 45:3

**Dennis** 4:11 24:3 120:19

**deny** 50:9

**department** 9:19 63:23 64:5,6,12

**depends** 13:17

**depicts** 91:19

**deposed** 4:24 55:12

**deposition** 4:19 55:14 66:14 72:18 111:21 113:5

**depositions** 25:17

**describe** 6:17 45:12 85:23

**describes** 25:3 83:15

**description** 74:21

**detail** 32:19

**details** 108:19

**determination** 63:24 78:8 80:7 86:4,23 100:8

**determine** 18:10,13 19:16 20:12 41:4,16 100:16 118:18

**development** 7:4

**developments** 70:25

**difficult** 34:7

**direct** 103:9

**directing** 110:20

**directly** 15:5

**director** 10:2

**disagree** 58:16

**disagreed** 58:15

**disagrees** 57:6

**disclose** 52:20

**disclosed** 68:13 71:5,25

**discloses** 99:22

**disclosing** 68:18

**discovery** 110:13

**discrete** 7:23 15:2

**discuss** 60:6 83:19 107:16

**discussed** 98:23

**discussion** 43:21 56:15

**discussions** 22:9 48:6 50:8 55:22 59:21,23 60:2 63:21 91:5 95:10,16 102:18 104:19

**dispute** 115:12,15,20

**disputes** 8:8

**distinction** 63:8

**document** 23:21 24:7 25:19 30:10,13 47:20 59:25 65:7,20 70:4 71:20 73:10,21 84:25 99:10,20 110:10,15,16,17 111:20,24 112:4,20

**documents** 15:24 23:17 25:16 42:4,13 45:4,5,10,13 46:14 59:21 68:16 70:7 108:18

**Dondero** 13:14 15:9 16:2 17:4 32:2 33:11 34:3 39:4,8,17 40:8 42:17 46:6 54:22 59:24 60:7 69:16,23 70:5 104:21 107:23,25 108:7,13 118:10

**draft** 30:6,7

**duly** 4:4 11:18

**Dustin** 34:19 47:13 84:6

**duties** 10:6

## E

**e-mail** 25:25 26:7,17, 21,22,24 27:4 113:11

**e-mails** 48:18

**earlier** 37:14 72:8 90:11

**effort** 20:11 41:3,15

**electronic** 53:23

**Ellington** 9:18

**employed** 8:12 20:20,21,22,24

**employee** 34:24

**employees** 21:5 23:8 34:12,17 43:4,9, 25 80:10,12 81:11 82:8

**employment** 6:18

**end** 44:8

**ending** 72:16,25

**engagements** 7:23

**entire** 8:15

**entities** 12:25 13:8 15:3 87:24

**entity** 12:7 13:4 86:23 118:13

**equal** 116:4

**equity** 16:18

**error** 22:10 45:11 46:8 50:7 63:20 64:16,20 65:9,22 79:18 81:4,9 82:2,7 83:16 85:4,17,24 86:11 88:5,8,17 91:16 92:5 94:20 95:6,9,12,22 96:6 99:24 100:11,18 106:15

**errors** 86:6

**estate** 8:5,9,10,20,22 9:8,15 14:14,20 68:14,18 70:8 109:9

**estimated** 91:15 94:19

## F

**event** 15:11 78:9,10

**events** 51:12 74:8, 11,16 75:3

**evicted** 34:4,5

**evidentiary** 98:6

**exact** 52:22 54:9

**EXAMINATION** 4:7

**examined** 4:4,21

**exclude** 79:2

**excuse** 114:5

**execute** 117:20

**executed** 50:6 58:20,23 64:7 74:19 75:3 95:4 107:6 115:4

**executing** 58:10

**execution** 50:3 52:13 71:7 75:18 76:25 118:22

**exhibit** 24:3 25:20,25 29:5 72:18,19 82:22 83:2 107:14,20 111:21,22

**exhibits** 120:9

**existed** 118:3

**existence** 37:21,25 38:22,25 39:9,18,22 40:9 50:13 71:5,25

**expect** 116:16 117:9 118:8

**expedited** 120:14

**expenses** 63:20

**experience** 78:5

**expert** 30:16 76:13 77:4,5,25 85:12,21 94:22 98:15 106:17

**expertise** 8:2 13:2 21:11

**explain** 98:4

**extension** 41:20

**extent** 104:7 105:15

## F

**fact** 50:15,17 53:15 59:4,19 63:7 64:11 69:7 81:19 97:25 117:15 118:19

**factors** 119:2

**facts** 101:25 102:2 107:17 118:22

**factual** 24:23 71:17 76:15 98:7,24 103:6, 11

**factually** 102:5,10,12

**fail** 5:14

**fair** 5:8,25 6:2 10:11 24:22 25:2 30:20 40:5,11 47:14,16,23 61:3 66:15 86:5 90:15 98:7 107:4 110:18 112:19,23 113:15,22 116:20

**fairly** 10:18

**fall** 109:5,16 111:6,14

**false** 86:14,19

**familiar** 16:13

**fault** 114:20

**February** 7:12 9:6 89:5,17,21,25

**fee** 101:16 103:17,23 104:4,12,15,17 105:3,9,13,19 106:4, 6,9,12,20,22

**feel** 99:4

**fees** 63:19

**file** 24:20

**filed** 25:4 31:21 42:3, 8,14,16 43:12 53:25 55:7,9 69:24 70:7

**filing** 69:18 70:13 73:22

**filings** 68:10 70:12

**Finance** 14:14 109:9

**financial** 51:2,10 69:25 70:4 72:6,12,

16,19,25 74:7,12 75:2,8,21,25 76:11, 23 77:22 78:14,18 79:7,12

**financials** 74:17,18 76:4 77:11

**find** 40:24,25 110:16

**fine** 11:12 14:2 25:24 30:20 31:6 66:5,10 111:13

**finish** 5:6,12

**firm** 6:21,24 7:4 76:2 87:4

**firms** 14:4

**five-minute** 119:16

**floor** 49:10

**fluid** 10:18

**focus** 68:6

**folks** 8:14 13:11 78:6,7

**follow** 103:20 106:4 107:12

**follow-up** 45:7

**foreclosures** 8:9

**form** 17:21 30:15 54:10 56:6 62:10,13 64:9 69:11 71:8 75:12 99:16,18 115:24

**formation** 10:16

**formed** 81:11

**formulating** 22:25

**Frank** 17:10 22:9 26:15 29:24 46:4 63:21 80:15 117:4

**full** 84:20 118:8

**function** 80:10

**fund** 12:2,6 16:21 21:16 28:17 29:14,25 30:24 57:25 82:11,12 83:13 86:7 91:20,21 92:6 109:13 115:2

**funded** 91:24

16,19,25 74:7,12 75:2,8,21,25 76:11, 23 77:22 78:14,18 79:7,12

**funding** 89:11,16 94:2

**funds** 14:7,10,24 15:3 16:3,19 19:7,18 20:5,9 60:14 64:3 71:20 79:20 82:24 108:22 110:25

## G

**GAF** 16:23 17:2,8 20:13 21:13,17 36:10 57:25 58:4,22 64:3 65:16 92:6 93:2,13, 23 94:15 95:6

**game** 98:7 110:18

**gave** 8:16 83:25

**general** 8:19,21,23, 25 9:7,9,13,14,18 10:7,20 11:25 12:5, 15 14:12,13,19,21 64:4 109:3 118:7

**generally** 9:17 13:6 16:13,15 37:18 70:2 78:5 97:2 102:9

**genesis** 32:6 33:3 37:20 38:8 39:4,10 42:17,21

**gentleman** 20:16

**give** 8:17 23:19 51:5 56:21 66:6

**Global** 16:20 83:13

**Godwin** 6:25

**good** 4:12 11:24 87:5 120:5

**Gould** 7:11

**graduate** 6:11,14

**graduated** 6:18

**granted** 45:2 102:15

**great** 75:16

**greatly** 119:21

**ground** 5:3

**group** 6:24 7:7 19:25 26:18,23,25

**Gruber** 6:25 7:2

**guess** 13:17 37:7
39:25 52:3 70:2

**H**

**handle** 10:19

**happened** 57:11

**happening** 35:8

**hard** 38:18

**HCMFA** 11:7 12:8,
11,13,14,15,18,23
13:6,9,13,22,23
15:14,20,21 16:19
18:11,14,19 19:4,19
21:6 23:11 27:6
31:21 34:12,24
35:14,19 36:2,5,13,
16 37:5 40:15 41:4,7,
16,19,24 42:4,8,12,
16,24 43:3,5,12
44:10 45:23 48:3
51:11 57:24 58:4,21
60:15 61:12 62:5,22
65:16 69:14 70:22
71:4,25 72:24 75:7,
20 76:22 78:13 79:5,
17,20 80:8 81:9,25
82:11,12,24 83:12,15
85:16,23 87:16,21
88:12,16 89:14 91:21
92:4,13,20 93:23
94:7,14 95:7,11,23
96:8,17 99:22 100:9,
16,22 101:9,15
103:16 104:5,13,17,
22 105:9,13 106:3,14
107:5,8 108:6,17
109:15 113:23
115:13,16 116:3
117:16 118:4,5,12,20

**HCMFA's** 22:25
41:11 50:25 51:17
54:2 57:20 72:5,15
73:21 74:25 89:16,20

**HCMFAS** 111:23

**HCMLP** 27:6 37:11
42:4 43:10 58:22
64:19 65:8,13,21
81:11 82:8 87:11,21
88:16 89:23,25 90:10

100:10,17

**heard** 78:23

**hearing** 108:10

**held** 16:19 18:4,11,14
20:5,8,12 21:7 35:14
36:13 43:21

**helped** 110:16

**Hendrix** 27:13,15

**Hey** 67:7

**Highland** 4:15 7:17,
24 9:18 11:2 12:2,6
20:23,25 21:8 23:6,
11 25:7 26:21 28:17
29:13,24 30:24 31:11
42:13 43:25 44:15
64:7 69:17,24 70:6
71:5,25 83:13 94:7,
13,18 95:5,8,11,22
96:6,11,20 97:10
99:14 104:4,11,14,
16,22 105:8 106:14,
15 107:7,24,25
108:5,15,16 112:16
115:12,15

**Highland's** 73:22

**hired** 8:19 10:5 87:13

**historical** 35:8

**history** 6:18

**hold** 14:9 15:16,19
90:6

**holds** 15:13 17:17
18:19 19:6 36:7,9,15

**honestly** 112:9

**Houlihan** 85:11 87:2,
3,14,17,20,25 88:4,7

**hybrid** 8:7

**I**

**idea** 46:9

**identification** 24:5
26:3 29:7 72:22 83:3
111:23

**identified** 82:3,4

**identify** 34:16 45:5

**illogical** 107:7
108:16

**imagine** 10:15

**implied** 57:2 58:9

**important** 5:5 23:19

**importantly** 98:18

**improper** 30:23 43:8

**in-house** 7:3

**inappropriate** 99:5

**include** 74:15 78:10

**included** 74:25
76:23 78:8,18 79:11

**includes** 113:25

**including** 75:7 77:22

**inconsistent** 76:9

**incorrect** 60:23,25
79:8

**incorrectly** 60:13
62:17

**indemnity** 96:5

**independent** 73:14
76:2 85:11

**indirectly** 15:5

**inform** 46:7 79:6

**information** 19:21
40:7 71:17 72:20
92:16 107:11 112:14

**informed** 100:10

**initial** 31:17,18,25
33:11 34:18 37:16
40:19 45:6 60:8
101:10

**initially** 25:4

**input** 77:12

**inquiry** 119:5,7

**instruct** 96:12 97:12
101:18 103:18
105:14 110:7,11

**instructed** 104:6

**instructing** 98:19,25
111:9

**instruction** 102:23

**instructions** 103:21

**insurance** 79:19
91:25 92:12,21 96:9,
18 97:5 98:21 99:23
100:6,10,17,20,23

**insured** 16:22

**intact** 99:6

**intended** 30:24
74:16

**intent** 68:7

**intention** 61:11 62:4,
22 63:13 64:14

**intentions** 63:3

**intents** 13:20

**interco** 27:9

**interject** 11:4

**internal** 46:23 61:9,
17 64:16

**internally** 63:18 78:6

**interrupting** 34:22

**interview** 80:17

**interviews** 49:19

**investigating** 28:24
31:8

**investigation** 17:6
18:9 19:12,16,23
20:11 22:18,22 25:3,
6,10 28:23 31:17,19
32:2 33:12 34:18
37:16 40:20 44:6,17
45:7 46:15 47:6,11,
18,24 48:7 51:20,25
54:6 60:9 70:11
72:13 76:15 77:20
80:18 83:9,20 86:18
90:16 91:7 92:3
94:13 96:16,24 97:2,
23,24 98:24 100:15
101:8,11,23 102:21
103:3 104:20 105:25
106:7 107:17 108:5
112:12,21 113:23
118:16

**investigations**
65:20

**invited** 15:12

**involved** 57:13,15,20
63:23 64:6 109:23
111:16 112:10
117:11

**involvement** 57:24
58:4 109:11

**involves** 111:10

**irrelevant** 88:20

**issuance** 75:10

**issue** 16:8,12,17
19:13,23 45:17
57:12,14 66:19 98:20
102:12,13,16

**issued** 74:19 110:24
111:5 118:19

**issues** 58:8 60:7
119:6

**Ives** 7:4

**J**

**January** 69:19

**Jason** 34:25 37:11
47:12

**Jim** 32:2

**job** 36:22

**John** 4:13 11:5 25:21
62:11 82:17 97:17

**joined** 7:25

**Jones** 4:14

**Jr** 24:4

**June** 73:17

**K**

**kicked** 34:5

**kind** 8:6 59:8

**Klos** 26:7,10,12 27:5,
17

**knew** 18:16 40:8
49:21,23 117:14

**knowing** 118:22

**knowledge** 12:16,19 13:16 21:24 22:10 27:16 35:9,20 36:19 37:17 41:23 57:10 58:8 76:14 78:2 81:2, 5 85:16,21 87:23 88:11 94:23 98:14 102:17 106:18 110:18

**Kristin** 27:13

**L**

**lack** 115:9,21

**landlord-tenant** 8:8

**Langley** 7:8,9

**law** 6:4,11,14,19,21 8:3 30:11 64:5 66:18, 20 117:6

**lawsuit** 11:2,7 39:23 40:10

**lawyer** 30:10,17

**learn** 19:22 69:6 78:17 94:13

**learned** 37:25 39:18 92:7 97:25 101:22 102:19 105:15 106:2

**learning** 78:20 106:11

**leave** 54:3

**leaving** 10:17

**led** 49:22 68:17

**left** 23:6 36:21

**legal** 9:19 12:25 63:22 64:6,12 75:14 114:8,13 116:22,24 118:9

**legally** 114:25

**lend** 107:8

**liabilities** 41:17 68:24 69:9

**license** 6:3,9

**limit** 66:9

**limitations** 117:23

**limited** 40:14 42:24 102:3,14 109:11,13

**limits** 117:24 118:2

**lines** 45:19 60:11

**listed** 82:22 93:21

**litany** 45:3

**literally** 40:23

**litigation** 8:7,10 10:22 102:20

**LLP** 12:2

**loan** 27:9 60:14 61:13 62:6,23 63:15 95:12 96:2 97:11 99:16 108:16 115:24 116:16 117:3,12

**local** 66:8

**Lokey** 85:11 87:2,3, 14,20,25 88:4,8

**Lokey's** 87:17

**longest** 49:3

**looked** 30:10 40:21 77:16

**loss** 91:15 94:19

**losses** 57:25

**lot** 10:9 34:2 35:7

**lots** 10:13 49:8

**LP** 4:15 13:24 15:6 20:23,25 28:18 29:14 69:17

**M**

**Mabry** 20:17,19,21 22:11,16,20,24 25:7 47:7

**Mabry's** 21:11

**Madam** 120:6

**made** 34:4,6 40:3 53:11 56:5,9,17,25 57:4,8,16,19 58:10 59:10 60:19 64:19 75:7 78:7 80:11 81:13 82:7 86:23 89:5,7,25 93:11,13

**95:5,13 96:10 97:10, 24 99:14 105:13 106:15 115:3 119:5,7

**make** 20:11 25:14 40:2 41:3,15 89:16, 20 93:2 96:4,17,22 100:7

**maker** 28:16 29:13, 23 30:3,12,22 108:2

**making** 59:15 63:23 95:6,22 116:16

**manage** 14:25

**managed** 7:24 16:19 19:18

**Management** 4:15 12:2,6 20:23,25 28:17 29:14,25 30:24 31:12 69:17

**manager** 16:3 17:2,7

**managing** 10:2

**March** 31:22 42:9 44:15 45:24

**marked** 24:4 25:19 26:3 29:6 72:18,22 83:3 111:21,23

**Martin** 7:11

**matched** 90:18,21

**matches** 93:6

**math** 93:5

**Matt** 9:24

**matter** 43:9

**matters** 10:22 118:24

**Mcgraner** 9:24 10:4

**Mcgraner's** 9:25

**means** 115:22

**meant** 114:18,23

**meet** 12:25 15:9 17:12

**memo** 45:20 65:6 82:23 83:2,12,19 84:9,13,17,20 86:25 88:11,14,16 93:12 111:22

**memory** 38:20

**memos** 45:14,15,24 46:3,13,17 65:10,13, 15 83:5,8

**mentioned** 105:20

**met** 15:11 17:14

**Methodist** 6:16

**methodology** 86:6

**Michael** 120:10

**mid-april** 43:17 44:16

**middle** 34:13

**migrated** 25:7 43:25

**million** 27:5 28:3 29:9 63:17 82:11 89:5,7 90:8,12 91:16, 20,24 92:5,12 93:3, 23 94:6,7,14,18 95:11,23 96:9,18,20 97:5 99:15,22 101:9, 15 103:16 104:22 105:12,19 106:3,13 107:8,24 108:6,14 115:13,16 116:17 117:2

**Minick** 6:22

**ministerial** 63:25

**minutes** 49:14 66:9 67:6,16

**misleading** 86:14,19

**mistake** 48:2 50:21 51:22 52:2,17 53:11 56:5,10,18,25 57:4,8 58:10 59:11,15 65:11,14 75:7,10,18 76:10 77:2,21 78:4 80:11 81:13 84:5 95:4 98:12,17 99:14 106:14 114:2,6,22

**mix** 48:22,24

**moment** 51:6

**money** 56:22 58:20, 21 61:23 108:7,16 115:23 116:4 117:12

**Morris** 4:8,13 11:10, 15,18,22 16:9 17:23,

24 18:2 25:24 30:20 31:2 56:2 62:16,18 63:9,11 66:21 67:2,7, 17,20 69:15 71:21 76:17 77:8 78:11 82:20 83:4 88:21 95:2 97:7,14,20,23 99:7,9 101:25 102:24 103:14 104:9 110:9, 19,22 111:18 113:4, 9,15,16 114:10,15 119:15,21 120:4

**motion** 54:3 77:5 102:14

**move** 88:21

**moved** 6:24

**moving** 35:12

**mutual** 113:25 114:5, 6,22

**N**

**N-A-V** 16:10

**named** 20:16 27:19

**NAV** 16:8,12,17 19:13 22:10 45:11,16 46:8 50:7 63:20 64:16,20 65:9,22 79:18 81:4,9 82:2,7 83:16 85:3,16,24 86:6,11 88:17 91:15 92:5 94:19 95:5,9,22 99:14,24 100:11,18 106:15

**necessarily** 15:3

**needed** 71:19 81:13 92:25 101:9,15 103:16

**negligent** 95:22,25 96:3

**net** 91:15 94:19

**Nexbank** 34:10 49:10

**Nexpoint** 7:13,14,20 8:2,13,15,24 9:2,10, 14 10:8 11:9 13:6,8, 9,13,20,24 14:13,14, 20 15:5,16,17 21:5

37:3 64:5 87:21
109:8

**Nexpoint's** 10:22,25
109:3,12

**nonlawyer** 71:17

**Norris** 34:20 35:3,10,
13 36:7,9 37:15
42:20 46:7 47:13
59:22 84:7 95:10,16
104:20 105:6,7,20
106:2,8,12 109:19

**Notary** 4:4 120:25

**note** 27:20 28:3,15
29:3,5,8 30:6 61:24
64:6 69:13 71:19
90:18,19,22 108:2,8
115:3 117:13 118:23,
25

**noted** 11:18 120:15

**notes** 25:11,14
28:22,24 31:4,7,11
32:7,9,11,16,21,24
33:6 37:17,19,20,22,
25 38:3,7,10,12,15,
22,25 39:5,9,11,18,
22 40:9,25 41:5,8,16
42:18,21 46:9 47:25
48:14 49:18,21,23,24
50:3,6,10,13,17,20,
25 51:9,12,18,22
52:2,7,14,17,25 53:8,
12,17,20 54:8,12,19,
22,25 55:5,9 56:5,10,
18,20,23 58:10,21,23
60:7 61:8,11,13,17,
21 62:5,21,23 63:14,
25 64:15 68:13,18
69:7,14 70:8,12,18,
22 71:5,11 72:2
74:22,25 75:7,10,18,
20 76:9 77:2,21 78:8,
18 79:11 90:12 95:4
113:25 115:8 116:5,
10 117:17,20 118:4,
12,19 119:11,13

**November** 6:10

**number** 93:4,6,7
119:2

**NXRT** 109:7

**O**

**oath** 66:12

**object** 17:20 30:14
62:10,13 63:4 64:9
69:10 72:3 75:11
76:12 77:3,24 101:17
106:16

**objection** 56:6 63:10
71:8 85:18 94:9,21
99:4,18

**obligates** 64:17

**obligation** 63:17

**obligations** 76:10
108:14 112:15

**obtain** 6:9 83:22

**obtained** 92:4,13
94:7

**obtaining** 44:24

**occasion** 7:22

**occurred** 74:17
77:16,21

**October** 36:5 69:19
112:8 113:2

**odds** 76:20

**offer** 8:16,17

**office** 33:25 34:10
49:11

**officer** 36:18,25 37:2,
5,11 51:2,10 117:16,
19

**officers** 12:18

**official** 12:12

**operation** 111:13

**opinion** 114:8
115:23

**opportunities**
109:13

**opportunity** 23:20

**order** 23:21 101:15
120:12

**orderly** 86:4,23

**ordinary** 87:18

**organizational**
15:24

**origin** 25:10

**original** 31:22 42:3

**origins** 28:24

**overlap** 11:21

**overseeing** 10:21,25
78:13

**owed** 107:25 108:14
112:15

**owned** 7:20 13:7
15:4

**owns** 13:9

**P**

**p.m.** 67:18,19 119:19,
20 120:15

**Pachulski** 4:13

**paid** 60:14 82:11
92:20 93:23 95:11,23
96:20 104:5,12,17,22
106:3,13,22,23
107:24 108:13
115:12,16

**papering** 117:2

**paragraph** 31:15
32:6 34:11,14 39:3
40:13 42:9 43:20
46:25 47:3,5,19
50:19 51:7 59:6,7
62:20 68:7 74:21
79:15,16,24 85:10,
13,17 88:24 93:7
107:3,5,11,18 113:18

**paraphrasing** 98:11
113:21

**Pardon** 98:8

**parse** 59:8

**part** 22:4,8,12 31:16
33:11 34:17 40:19
45:6 46:15 47:5,11
48:6 49:18 60:8
61:12 62:4,22 70:10
72:12 75:21 80:18

83:9,20 90:16 96:16
98:24 99:23 100:15
104:19 105:25 108:4
111:12 112:12,20
118:15

**participate** 109:4

**participated** 109:6

**participation** 118:9

**parties** 117:10

**partnership** 118:6,7

**parts** 35:12

**party** 64:18 85:11
87:4

**pass** 119:25

**past** 64:12 87:22

**pay** 58:21 64:3,18
94:15 101:16 103:17
105:13 106:3

**payable** 98:21

**paying** 104:15

**payment** 63:19 89:4,
6,11,17,21 90:8,17,
21 91:21 92:6 93:10,
13 97:10 98:20 99:15
105:3,8,12

**payments** 79:21
89:2 97:6 115:2

**pending** 5:24

**people** 10:14,17 13:2

**perfectly** 66:5

**perform** 12:13

**performed** 64:2
80:10

**period** 69:24 72:16,
25

**person** 13:19,21
33:19,20,22,24 48:22
80:4

**personal** 52:7 57:10
58:8 76:14 78:2 81:2,
5 85:21 94:23 98:14
106:18

**personally** 57:13
107:24

**phase** 25:5 44:6,16
47:6,11,15,17,24

**Phillips** 7:11,12,16
8:15

**phone** 33:19 34:9
48:22 49:12

**phonetic** <mark>109:20</mark>

**phrase** 31:18 114:18,
22 116:14

**pick** 74:16

**pin** 33:9

**piss** 67:15

**place** 33:18 48:22
65:4

**play** 26:13

**played** 22:16,20,24

**pocket** 93:15,18

**point** 11:24 18:16
34:3 91:8 99:2

**policy** 64:17,21,24
65:3,5 82:5,6 100:6
117:6

**portfolio** 16:3,25
17:7

**portion** 88:22 92:24
100:23

**position** 8:18 18:4,
19,23 20:9 21:7
35:14,17,19,23

**positions** 16:18 19:7
20:5,12 36:8,10,13,
16 37:8

**Post** 34:25 35:10
36:12,13,18 37:15
42:20 46:7 47:13
59:21 83:24,25
95:10,16 104:20

**potentially** 43:8

**practice** 6:4,7 30:11

**premarked** 25:18,23

**preparation** 69:4
78:14

**prepare** 52:10

**prepared** 61:8,17 62:21 68:8 71:11 73:21,25 76:6 77:11 106:25

**preparing** 59:25

**present** 33:15 48:11

**preserve** 30:18

**president** 15:18 35:24 36:2,4

**prevented** 102:11

**previously** 4:21 24:4 26:3 29:6 72:17,21 77:14 83:3 111:21 118:19

**Pricewaterhouseco opers** 73:15 76:3,7 77:12 79:6

**primarily** 7:19

**principal** 32:20,24 116:5

**prior** 7:25 38:12,23 39:2,22 40:9 42:2 68:24 73:22,25 74:18 92:8

**privilege** 101:21 110:14

**privileged** 96:14

**proceed** 67:21 96:18

**proceeding** 23:10 42:5 71:2 74:2 111:11

**proceeds** 91:25 92:12 96:19 99:23 100:6,20,23

**process** 44:22 56:20,22 63:18,22 77:15 109:4,7,12,16, 24 116:15,25 117:3, 5,7

**produced** 110:15

**product** 96:15 98:23 101:21 110:14

**professional** 97:17

**prohibited** 80:19

**promissory** 25:11 28:3 29:5 30:6 108:2

**proper** 116:9,13,14 117:5 118:17

**proposed** 24:24

**provide** 7:17 12:22 14:6 16:4 42:4 44:15 112:14

**provided** 7:19 43:4 44:9

**Public** 4:4 120:25

**purely** 103:6

**purports** 73:23,24

**purpose** 24:18 25:9 61:9,18,20

**purposes** 13:21

**put** 23:15,17,23 25:18 31:16 67:17 72:15 82:16 111:19 117:17

---

**Q**

**qualified** 94:10

**question** 5:6,13,24 17:25 20:7 60:5 65:18 66:17 67:8 71:23 75:12,16 76:24 97:9,15 102:16 106:12 111:2 114:19 118:21

**questions** 5:5 10:13 99:8 103:5,7,11 110:20 119:23 120:2

**quick** 66:4

---

**R**

**raised** 38:2

**ran** 20:2

**reach** 43:8

**reached** 79:5 100:3

**reaching** 59:18 118:16

**read** 23:21 51:13 61:14 62:17 79:22

85:13 120:8

**ready** 67:21

**real** 8:4,9,10,20,22 9:7,15 14:14,20 109:8

**Realty** 7:4

**reason** 81:20 85:22 86:2,13 93:25

**recall** 9:3 15:10 18:17 20:15 21:22 22:13,15 23:5 27:2 32:6,10,13,18 33:3, 13,17,18 34:21 35:17 38:9,21,24 39:4,10 40:21 41:14 42:15, 17,21 44:21,23 45:15 46:14 48:13,16,17,20 49:2,20 54:23 58:17 60:10 65:23,24 68:19 72:7,9,11 90:13 91:9

**receive** 116:4

**received** 26:20 99:22

**receiving** 27:2

**recess** 67:18 119:19

**recollection** 32:15, 25 33:5 35:2 46:10 51:15 57:3,5 65:12

**reconsider** 75:9

**record** 4:10 25:14 30:19 43:22 66:7 67:17

**records** 40:14,18 41:5,9 42:25 44:11, 14,19,25 70:19,23

**refer** 12:7 13:6,23 16:23 31:3

**reference** 44:9 79:11 88:25 115:21

**referenced** 96:25

**referring** 44:19 64:22

**refrained** 43:10

**refresh** 32:15 51:15

**regular** 120:13

**reimbursement**

96:6

**related** 8:7,9 16:18 32:25 33:6 40:24 45:11 46:9

**relates** 98:20 110:13 119:8

**remained** 21:6

**remember** 24:18

**renewal** 108:25 109:4,16

**reorganized** 4:15

**report** 9:23 73:13 82:12

**reported** 9:20 58:4 76:10

**reporter** 11:20 25:22 120:6,10

**reporting** 10:3 75:20

**reports** 110:3,24 111:5

**representative** 109:14

**represented** 105:23

**reputation** 87:5

**requested** 41:19

**requesting** 24:20

**requests** 45:2

**requires** 66:20 117:7

**Residential** 14:13 109:8

**resolution** 83:16

**respect** 109:7,12

**respond** 41:20

**response** 22:25 27:11 52:4,9 54:15 57:21 58:14

**responses** 112:24

**responsibilities** 10:7

**responsibility** 10:21,25 57:20,23 58:3 79:17 80:7,23

81:4,8,25 105:8

**responsible** 63:19 64:18 65:8,14,21 78:13 88:4,8,17 94:18 95:6 100:11,18 104:4,12,14,16 109:15 114:25

**restate** 17:25 62:17

**restroom** 66:25

**result** 113:22

**resulted** 47:17 86:6

**resulting** 91:15 94:19

**retail** 110:3 111:6 112:14,25

**retained** 87:10

**returned** 100:22

**Returning** 51:9

**review** 40:19 59:20 68:16 69:3 107:20,21 110:5 111:7 112:17 113:2 120:8

**reviewed** 40:14 41:11 45:6,10,16 55:14 68:23 69:5 88:14

**reviewing** 46:14 47:20 68:9 69:6 84:23 84:25 112:4

**rights** 99:5

**role** 12:10 22:17,21, 25 26:13 102:14

**room** 49:10

**row** 91:14

**rude** 11:13

**Rukavina** 11:4,12, 16,23 17:20 30:14 55:19 56:6 62:10 63:4 64:9 66:16,24 67:5,10 69:10 71:8, 14 72:3 75:11 76:12 77:3,24 78:25 85:18, 20 94:9,21 96:12,22 97:12,16,22 98:4 99:18 101:4,17 102:7 103:12,18 104:6

105:14 106:16 110:6,
12 111:8 113:6,13
114:7 119:25 120:6

**ruled** 77:6

**rules** 5:3

———————

**S**

**Sauter** 4:1,11,12 5:1
6:1 7:1 8:1 9:1 10:1
11:1,6,23 12:1 13:1
14:1 15:1 16:1 17:1
18:1,3 19:1 20:1 21:1
22:1 23:1,18 24:1,4
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1,18 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1,
20 56:1 57:1 58:1
59:1 60:1 61:1 62:1,
19 63:1,5 64:1 65:1
66:1,9,17 67:1,22
68:1 69:1 70:1 71:1,
14 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1,2 80:1 81:1 82:1
83:1,6 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1,23 97:1,13
98:1 99:1 100:1
101:1,5 102:1,23
103:1,15,19 104:1
105:1 106:1 107:1
108:1 109:1 110:1,7,
16,23 111:1,8 112:1
113:1 114:1,21 115:1
116:1 117:1 118:1
119:1,21 120:1,19

**save** 120:2

**schedules** 68:21,24
69:9,25

**school** 6:12,15,19,21

**scope** 76:15

**Scott** 9:18

**screen** 23:15,18
31:16 82:16 111:20

**scroll** 23:24 26:4
43:19 46:25 84:23
93:8 112:2

**search** 38:19

**SEC** 22:18,21 23:2
45:22 46:24 57:21

**Sechrest** 6:22

**section** 74:6,11,15

**Securities** 13:9

**Sella** 109:20

**send** 113:11 120:9

**sense** 49:5

**sentence** 44:20 59:9
62:19 86:3,14,19

**separate** 14:23 15:2

**series** 5:4

**serve** 36:24

**served** 9:14 19:17

**serves** 16:2

**services** 7:17,19
12:22 14:7 16:4 43:4,
5 87:17

**set** 47:18 94:3 100:3
107:18

**sets** 24:23

**share** 81:20

**shared** 43:5

**she'll** 84:23

**sheet** 41:17 69:8

**sheets** 41:12

**shortest** 49:4

**shortly** 82:10

**show** 32:9 49:17 92:2

**showed** 38:12

**shown** 76:5

**shows** 91:14

**shuffle** 10:16

**sic** 16:10 46:8

**sign** 24:15 53:8,16
54:7,11,16 116:10

117:13 118:3 119:10,
13

**signature** 24:10,12
28:7,9,11,13 29:18,
20,22 30:23 53:17,23
117:16

**signed** 48:2 50:17,
20,24,25 51:12,16,
18,21,25 52:7,25
53:20 54:16,19,25
56:23 68:25 84:13
92:9,13,17,20 99:11,
21 108:8 117:14
118:12

**signing** 50:9,15
52:16 53:11,16 55:5
56:5,10,18 77:21

**simple** 5:3

**simply** 71:23

**simultaneous** 11:17
53:5 67:4,9 93:20
97:19 103:13

**sir** 4:17,20 5:9 6:4
12:9 14:16 15:7
16:24 23:13 24:13,17
25:12 28:11 76:18
77:9 96:16 99:10
103:24 106:19
111:25 113:19 120:4

**sit** 71:24

**sitting** 32:19

**situation** 43:16,23

**skills** 21:11

**Skyview** 10:16 21:4
44:2

**sought** 69:13

**sounds** 113:15

**source** 13:12 28:22
79:24 89:10,16,20
90:5,7 94:2 107:10

**sources** 91:19 92:24

**Southern** 6:16

**speak** 46:4 47:10
48:8 66:13 67:24
84:2,8 105:18

**speaking** 34:21 35:3

80:19

**specific** 20:14 58:18,
25

**specifically** 20:4
50:20 65:13 72:10

**speculate** 109:18,21

**speculating** 18:8
19:9

**speculation** 21:3

**spend** 68:9

**spent** 49:6

**spoke** 32:2 34:12,17
47:7 84:4

**spoken** 34:8,19
47:12 105:21

**St** 7:4

**Stacey** 16:9

**Stang** 4:14

**star** 46:8

**started** 7:10 37:13

**state** 4:9 61:25 62:3,
20 113:20

**stated** 65:21 68:7
77:14

**statement** 63:3,12
64:13 70:4 79:25
80:4,6

**statements** 58:25
69:24 72:6,12,16,20,
25 74:7,12 75:2,8,21,
25 76:11,20,24 77:23
78:15,19 79:7,12

**states** 6:6 24:7 27:8
40:13 53:10 65:8
81:24

**stating** 55:8 70:7

**staying** 10:17

**stick** 68:6 102:22

**stop** 84:24 103:5

**strategic** 109:13

**strike** 88:21

**subject** 108:25

**subjective** 116:18

**submitted** 23:9
45:21

**submitting** 44:25

**subpoena** 102:4

**subpoenaed** 11:6

**Subscribed** 120:21

**subsequent** 74:7,11
75:2 78:9,10

**subsequently** 92:7

**subset** 19:25

**subsidiaries** 7:21
13:7

**substance** 54:11
55:22 66:14 67:25
68:4 84:3,9

**suggest** 53:7

**suggested** 39:15
88:4

**suggests** 52:24
53:15

**suing** 31:12

**summarize** 107:4

**summarizing** 48:18

**Supplemental** 72:20

**support** 54:2

**supposed** 74:15
99:15

**Surgent** 37:10 80:16,
17,24 81:3

**surmising** 35:4,5

**surrounding** 50:3
118:22

**suspect** 20:24

**sworn** 4:4 63:2
120:21

**system** 40:24

———————

**T**

**T-E-R-R-A-S-T-A-R**
16:10

**taking** 66:24 67:2

**talk** 16:7,11 39:15 48:5 67:14

**talked** 35:9 67:13

**talking** 11:21 25:15 63:16

**tax** 6:23

**team** 19:25 21:14 22:4,12 77:13

**telling** 56:9 57:4

**tells** 88:16

**ten** 8:4 49:13 66:9 67:5

**tenure** 8:15

**term** 13:5 22:5 30:12 118:25

**terminated** 23:7

**Terrestar** 16:8,12,17 19:12 22:10,17 45:11,16 50:7 57:12, 14,17 65:9,22 87:8

**testified** 4:5 56:4 58:19 98:16

**testifying** 98:17

**testimony** 45:23 55:17 56:16 64:4 67:25 68:4

**Texas** 6:8

**thereof** 48:23,25

**thing** 25:15 84:6

**things** 9:17 34:2 35:9 47:25 62:20 102:8,19 113:20

**Thomas** 37:10 80:16

**thought** 46:7

**till** 6:23 120:2

**time** 5:22 6:18,24 7:25 9:14 12:14 13:11 17:22 18:5,15 23:16 31:20,21 33:25 38:12 41:20 42:3,16 49:6 50:23,25 51:12, 16,18 66:8 68:9,25 75:3 78:21 84:21

**91**:6 92:8,17,19 96:10,19 100:7,20 105:22 106:7 108:11 117:16 119:22 120:13,15

**times** 48:8

**timing** 32:15 74:3 108:19

**title** 9:25 12:10 15:13, 17,20 18:10,14

**titles** 14:9 17:17

**today** 4:19 6:19 9:23 10:7 12:8,11,18 18:20 32:19 35:20 36:16 41:7 71:24 78:22 98:17 101:12 108:11 119:22

**told** 11:10 32:23 38:6 50:12 53:18,19 54:18,21 56:4,12,17 58:8 71:17,19 81:17 89:22,24 90:3 94:16 98:9 100:16 102:20 104:7 105:5 108:4,9 112:24 115:19 116:6

**top** 28:14 92:24

**topic** 52:16

**total** 14:22 91:15 92:25 93:10,13,15, 17,22

**transaction** 61:13 62:6,24 63:15 84:5 108:20 117:2 119:8

**transactional** 8:10

**transcript** 55:15 120:9

**transfer** 71:20 89:22, 24 108:6 115:3

**transferred** 27:5 56:22 58:20,22 61:23 64:2 94:14 115:24

**transferring** 117:12

**transpired** 100:7 114:25

**treasurer** 18:7,25 19:3 21:13,16

**treated** 70:12,18,22

**trial** 77:5 98:15 102:13,25 103:2 120:2

**Trust** 14:13 109:8

**U**

**ultimately** 79:19 80:13 81:12

**unaware** 39:21 50:13 97:5

**unclear** 93:14

**uncovered** 86:17

**understand** 5:18 20:6 23:19 25:10 26:12 30:2 35:22 73:20 74:2 75:24 83:11 91:13,18,22,23 93:9,22 96:23 97:20 98:5 101:14 102:6 103:15

**understanding** 15:20 16:16 18:22 19:2,24 21:15,19,21 22:3,8 31:10 71:10, 12 74:10,14 84:17 87:9 92:23 95:9 117:3

**understood** 50:23

**undertook** 98:6

**University** 6:16

**utilized** 87:21

**utilizes** 87:16

**V**

**vague** 17:21

**valid** 76:10

**valuation** 19:25 21:14 22:4,12 57:12, 14,17 80:10 81:11 82:8 85:12 86:5 87:4, 7,17 88:5,8

**verify** 28:12 29:21

**vice** 35:24,25 36:4

**view** 43:7 108:15 116:19 117:19

**vis-à-vis** 65:15 95:7

**void** 115:9

**W**

**wait** 14:18 101:4

**waiting** 113:6

**watch** 11:20

**Waterhouse** 17:10, 13,16 18:4,11,14,19 19:3,6,17 20:2 25:6 29:24 39:16 43:24 46:4 47:7 48:2,6,15, 19 49:6,17 50:9,16, 21,24 51:10,17,21,24 52:6,24 53:8,10,15, 25 54:7,18,24 55:4,7, 11 56:9,17 58:9,13 59:2,10,14 60:13,18 61:8,16 63:22 70:17, 21 71:19 78:16 80:16,22 81:7,10,17 90:4 104:21 105:19, 22 106:5 116:9 117:4,15,25 118:11, 17 119:7,9

**Waterhouse's** 28:8, 10 29:20,22 118:3

**week** 36:21,25

**weeks** 78:23 106:10

**weighted** 86:5

**Weinstein** 7:8,9

**wholly** 7:20 13:7

**Wick** 7:10,11,16 8:15

**Winstead** 6:22

**withdrawn** 7:15 15:25 31:17 47:15 57:9 59:5 61:6 62:2 65:6 70:16 80:23,25 89:14 92:10 104:2 112:12 114:18 117:25

**word** 28:13

**words** 52:22 54:9

**work** 7:6 8:11 12:13 13:2,10 96:15 98:23 101:21 110:14

**worked** 7:7 8:14 9:17 26:15,16 27:17 37:12

**working** 111:10

**works** 11:11 117:21

**world** 56:9 65:8

**write** 61:6,7 116:8

**writing** 81:23

**written** 44:25 65:6 82:12

**wrong** 73:7

**wrote** 27:18 50:20 60:12

**Y**

**year** 9:4 96:25

**years** 8:4 15:12 59:19

**Z**

**Ziehl** 4:14

# EXHIBIT 194

Kristin Hendrix - October 27, 2021

**1**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

--oOo--

HIGHLAND CAPITAL MANAGEMENT, )
L.P.,                         )
                              )
            Plaintiff,        )
                              )
       vs.                    ) No. 21-03004-sgj
                              )
HIGHLAND CAPITAL MANAGEMENT FUND )
ADVISORS, L.P.,               )
                              )
            Defendants.       )
_____

DEPOSITION OF

KRISTIN HENDRIX

October 27, 2021
_____

DEPOSITION OF KRISTIN HENDRIX, produced as a witness, duly sworn by me via videoconference at the instance of the DEFENDANTS, was taken in the above-styled and numbered cause on October 27, 2021, from 10:11 A.M. to 1:19 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand, at 500 North Akard Street, 38th Floor, Dallas, Texas.

**2**

APPEARANCES

MUNSCH, HARDT, KOPF & HARR, PC, 500 North Akard Street, Suite 3800, Dallas, TX 75201, represented by DAVOR RUKAVINA, Attorney at Law, appeared as counsel on behalf of the Defendants.

Email: drukavina@munsch.com

PACHULSKI, STANG, ZIEHL & JONES, 780 Third Avenue, 34th Floor, New York, NY 10017-2024, represented by JOHN A. MORRIS, Attorney at Law, appeared as counsel on behalf of the Plaintiff.

Email: jmorris@pszjlaw.com

STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777, Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney at Law, appeared via videoconference as counsel on behalf of the Defendants Jim Dondero, HCMS and HCRE Partners.

Email: michael.aigen@stinson.com

**3**

INDEX

                                          PAGE

Examination by MR. RUKAVINA               6

Examination by MR. AIGEN                  94

Further Examination by MR. RUKAVINA       110

Examination by MR. MORRIS                 111

EXHIBITS                                  PAGE

Exhibit 1   Promissory Note, 5M, May 3     30

Exhibit 2   Promissory Note, 2.4M, May 2   30

Exhibit 3   Email from David Klos, May 2, 2019,   31
            HCMLP to HCMFA loan

Exhibit 4   Promissory Note, 5M, May 3     42

Exhibit 5   Promissory Note, 2.4M, May 2   42

Exhibit 6   Promissory Note, 5M, May 3     43

Exhibit 7   Promissory Note, 2.4M, May 2   43

Exhibit 8   Info, HCMF loan 05.03.2019     56

**4**

Exhibit 9   Info, HCMF loan 05.02.2019     56

Exhibit 10  Email from Scott Ellington, Dec 2,   59
            2020, HCM - HCMFA financial
            statements

Exhibit 11  Email from John Morris to       62
            James Seery, Jan 6, 2021,
            HCM information request

Exhibit 12  Letter, Dec 3, 2020, Demand on   65
            Promissory Notes

Exhibit 13  Promissory Note, $30,746,812.33,   72
            May 31

Exhibit 14  NPA $30.7M                      76

Exhibit 15  HCMLP Notes Receivable         83

Exhibit 16  Email from Frank Waterhouse to   85
            Lauren Thedford, Oct 6, 2020, 15(c)
            follow-up

Kristin Hendrix - October 27, 2021

---

**5**

1  Exhibit 17  Email from James Seery to          88
2          James Dondero, Jan 7, 2021, demand
3          on promissory note
4
5  Exhibit 18  Email from Kristin Hendrix, Jan 12,     90
6          2021, NexPoint Note to HCMLP
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**6**

1              KRISTIN HENDRIX,
2    having been first duly sworn, testified as follows:
3              EXAMINATION
4      Q.  (BY MR. RUKAVINA)  Good morning.  If you'll
5  state your name.
6      A.  Kristin Hendrix.
7      Q.  We're doing this both ways.  You're on the
8  Zoom remotely and they can see you, but I would ask
9  that you and I maintain eye contact.  Of course, if
10  someone is asking you on the Zoom, then maintain
11  contact with them, if that's okay with you.
12      A.  Sure.
13      Q.  Have you been deposed before?
14      A.  No.
15      Q.  So I'm sure your counsel explained to you,
16  but very quickly, you understand that you're testifying
17  under oath and penalty of perjury as though you were in
18  a court of law?
19      A.  Yes.
20      Q.  And you understand my job is to ask clear
21  questions that you understand?
22      A.  Yes.
23      Q.  And if for whatever reason you don't
24  understand my questions, please let me know or ask me
25  to rephrase; otherwise, I'm going to assume that you

---

**7**

1  understood my question; okay?
2      A.  Yeah.
3          MR. MORRIS:  Objection.
4      Q.  (BY MR. RUKAVINA)  Sometimes Counsel will
5  make objections.  Unless he instructs you not to
6  answer, you're still required to answer my questions.
7      A.  Okay.
8      Q.  Now, in preparation for this deposition, did
9  you read the deposition transcript or any part of it of
10  Frank Waterhouse?
11      A.  I did not.
12      Q.  Did anyone provide you a synopsis or summary
13  of it?
14      A.  Maybe a few bits and pieces, but...
15          MR. RUKAVINA:  Off the record for a second.
16          (Off the record.)
17      Q.  (BY MR. RUKAVINA)  What do you mean bits and
18  pieces?
19      A.  I don't recall anything specific that was
20  said, other than it was very long.
21      Q.  Did you talk to Frank Waterhouse about it?
22      A.  Did not.
23      Q.  Other than Highland's legal counsel, did you
24  talk to anyone else about -- or -- strike that.
25          Other than Highland's legal counsel, did you

---

**8**

1  talk to anyone about Frank Waterhouse's deposition from
2  last week?
3      A.  I did not.
4      Q.  Did you review -- strike that.
5          Did you see any of the video of
6  Mr. Waterhouse's deposition?
7      A.  Nope.
8      Q.  Same questions now for Mr. Seery, S-e-e-r-y.
9          Did you read any portion or the whole of
10  Mr. Seery's deposition from last week?
11      A.  I did not.
12      Q.  See any of the video?
13      A.  No.
14      Q.  Did you see any synopsis or summary of his
15  deposition?
16      A.  No.
17      Q.  Did you talk to him about his deposition?
18      A.  I did not.
19      Q.  Other than talking to Highland's counsel, did
20  you talk to anyone about Mr. Seery's deposition?
21      A.  No.
22      Q.  Other than talking to Highland's counsel, did
23  you talk to anyone about your deposition today?
24      A.  Just John Morris and Dave Klos.
25      Q.  When did you talk to Mr. Klos, K-l-o-s?

---

Kristin Hendrix - October 27, 2021

**9**

1      A.  First time about this was last Friday.  And
2  then again Monday this week.  And yesterday.  And this
3  morning.
4      Q.  Friday was there any lawyer present during
5  your discussion with Mr. Klos?
6      A.  Yes, every time Mr. Morris was present.
7      MR. RUKAVINA:  Is it your position that those
8  four discussions would be privileged, Counsel?
9      MR. MORRIS:  Yes.
10      MR. RUKAVINA:  Then we'll move on.
11      Q.  (BY MR. RUKAVINA)  So we've established the
12  four times you talked to Mr. Klos with counsel present.
13  Did you do anything else related to or in preparation
14  for today's deposition?
15      A.  Yes, probably went through and reviewed some
16  emails, documentation that I may have had that I need
17  to refresh memory on.
18      Q.  These documents and emails that you might
19  have reviewed, did you supplementally provide them to
20  counsel or anyone else?
21      A.  Yes.
22      Q.  This would have been in the last week or
23  10 days?
24      A.  Yes.
25      Q.  Prior to the last week or 10 days, are you

**10**

1  aware that my office served requests for production on
2  Highland?
3      A.  Yes.
4      Q.  And did you do anything prior to the last
5  week or 10 days to try to search both your personal
6  records and corporate records for any responsive
7  documents?
8      A.  Not that I recall.
9      Q.  Is that something that you understand legal
10  counsel was charged with?
11      A.  Yes.
12      Q.  Let's go briefly now about your background,
13  please.
14      Where do you live?
15      A.  I live in Denton, Texas.
16      Q.  And what is your date of birth, please?
17      A.  January 26, 1982.
18      Q.  And walk me through your educational
19  background, starting with any postsecondary, if any,
20  schooling or college or anything like that.
21      A.  Sure.  Graduated in 2004 from the University
22  of North Texas with a degree in finance.  Went on to
23  get my MBA from SMU in 2009.  And then went further and
24  got my CPA license I believe in 2015.
25      Q.  In the state of Texas?

**11**

1      A.  Yes.
2      Q.  And has your CPA license been current since
3  then?
4      A.  Sure has.
5      Q.  Have you faced any kind of disciplinary
6  action as a CPA?
7      A.  I have not.
8      Q.  Now, please walk me through your work
9  history.  Let's say starting with after you graduated
10  college.
11      A.  Sure.  December of 2005, which was shortly --
12  sorry, 2004, shortly after I graduated from
13  North Texas, I started at Highland.  It was my first
14  real job out of college.  I have been there ever since,
15  almost 17 years now.
16      Have worked in the corporate accounting
17  department the entire time.  Started off as the AP
18  associate, and worked my way up over the years and
19  currently am the controller.
20      Q.  So even when you were getting your MBA and
21  CPA you were employed by Highland?
22      A.  Yes.
23      Q.  Impressive.  You're the controller today you
24  mentioned?
25      A.  Yes.

**12**

1      Q.  That's -- when did you become the controller,
2  sometime February or March of this year?
3      A.  Yes.
4      Q.  Before you became the controller, what was
5  your role at Highland?
6      A.  Right before that I was assistant controller.
7  That was I believe April of 2020.  Before that, the
8  senior accounting manager, and I held that position for
9  years.
10      Q.  So in May of 2019 would you have been the
11  senior -- you said senior account?
12      A.  Senior accounting manager I believe was my
13  title.
14      Q.  And would that have been your title in May of
15  2017?
16      A.  Yes, I believe so.
17      Q.  And let's focus now on May 2019 as the senior
18  accounting manager.  How would you describe your role
19  at Highland in May of 2019?  What were your duties?
20      A.  Sure.  I helped with treasury management
21  function, cash forecasts and things like that.  And
22  oversaw the financial reporting from the last batch of
23  AP all the way to financials and reporting on
24  audits.
25      Q.  Who did you report to in May of 2019?

Kristin Hendrix - October 27, 2021

---

**13**

1    A.   David Klos.
2    Q.   What was Mr. Klos' title to your
3  understanding back then?
4    A.   I believe he was the controller.
5    Q.   And do you have an understanding as to who
6  Mr. Klos reported to back then?
7    A.   Yes, Frank Waterhouse.
8    Q.   Frank Waterhouse.  Who was he in May of 2019?
9    A.   The CFO.
10    Q.   Is Mr. Klos still with Highland today?
11    A.   He is.
12    Q.   What is his role now?
13    A.   He's now CFO.
14    Q.   You mentioned treasury management as of 2019,
15  May.  What do you mean by treasury management?  What is
16  that?
17    A.   Generally speaking, we -- it's not just me as
18  one person.  We have checks and balances.
19       My team would be in charge of sending out
20  payments, reconciling bank statements, making sure
21  money is in the right accounts, creating cash forecasts
22  and reporting on those every week with the CFO and
23  oftentimes the CEO.
24       Generally that's everything that fell under
25  the umbrella.

---

**14**

1    Q.   And would your description of treasury
2  management be the same for the December 2020 period?
3    A.   Yes.
4    Q.   Who at Highland or which group at Highland in
5  December of 2020 would have been responsible for noting
6  that there are certain bills that need to be paid in
7  the near or subsequent future.
8       By way of, let's say, accounts payable or
9  promissory notes or taxes or anything like that?
10    A.   Can you repeat your question.
11    Q.   Sure.  So obviously, Highland was a pretty
12  sophisticated business; correct?
13    A.   Yeah.
14       MR. MORRIS:  Objection to the form.
15    Q.   (BY MR. RUKAVINA)  And had various accounts
16  payable; right?
17    A.   Yes.
18    Q.   And it had maybe, let's just say, certain
19  note obligations that it had to pay from time to time;
20  correct?
21       MR. MORRIS:  Objection to the form of the
22  question.  Do you mean Highland Capital?
23       MR. RUKAVINA:  I mean Highland Capital
24  Management; correct, I'm sorry.  The debtor.
25    Q.   (BY MR. RUKAVINA)  Can we say the debtor?

---

**15**

1    A.   Yes, you can say the debtor.
2    Q.   So when I say the debtor and you say the
3  debtor we understand each other to mean Highland
4  Capital Management, comma, LP; correct?
5    A.   Correct.
6    Q.   I apologize.  In the December 2020 period, I
7  would imagine that the debtor had its own -- that
8  was -- strike that.
9       We'll cut to the chase.
10       In December of 2020, the debtor was providing
11  services to various other entities affiliated with
12  Mr. Dondero; correct?
13    A.   Correct.
14    Q.   That would have included NexPoint Advisors,
15  LP?
16    A.   Correct.
17    Q.   And you're aware that NexPoint Advisors was
18  the obligor on at least one promissory note to the
19  debtor; correct?
20    A.   Correct.
21    Q.   And did the debtor in December 2020 provide
22  so-called treasury management services to NexPoint
23  Advisors?
24       MR. MORRIS:  Objection to the form of the
25  question.

---

**16**

1       THE WITNESS:  Yes.
2    Q.   (BY MR. RUKAVINA)  As part of that, in
3  December 2020, would it have been employees of the
4  debtor that would have scheduled for potential payment,
5  subject to approval by NexPoint, NexPoint's future
6  obligations as they were coming due?
7    A.   Yes, we would have scheduled, only with
8  approval.
9    Q.   And would that have included NexPoint's
10  obligations on the promissory note to Highland?
11    A.   Yes.
12    Q.   Back to your background briefly.
13       Do you have any legal training at all?
14    A.   I do not.
15    Q.   Do you have any courses, have you taken any
16  courses in drafting promissory notes?
17    A.   No.
18    Q.   Do you believe that your expertise as a
19  certified public accountant gives you any greater
20  qualification than anyone else to prepare a promissory
21  note?
22       MR. MORRIS:  Objection to the form of the
23  question.
24       THE WITNESS:  No.
25    Q.   (BY MR. RUKAVINA)  Have you ever prepared or

---

Kristin Hendrix - October 27, 2021

---

**17**

1 drafted a promissory note?

2    A.  That term is probably used loosely.  I have

3 not completely drafted a promissory note from scratch,

4 no.

5    Q.  And we'll go into the details.  Fair to say

6 that you have taken a form promissory note and revised

7 it?

8    A.  Absolutely.

9    Q.  Was this part of your job in May of 2019 at

10 Highland?

11    A.  Yes.

12    Q.  Going back to the May 2019 time frame, were

13 you part of a particular group at Highland, like

14 accounting or legal or compliance?

15    A.  Yes, corporate accounting.

16    Q.  Corporate accounting.  That's what you

17 described before about treasury management and

18 projections and forecasts?

19    A.  Yes.

20    Q.  In May of 2019, was it the practice at

21 Highland that corporate accounting would be responsible

22 for drafting intercompany promissory notes?

23    A.  Not necessarily drafting, but updating a

24 draft that had been previously produced and provided by

25 our legal team, yes.

---

**18**

1    Q.  And Highland in May -- the debtor in May of

2 2019 did have a legal department?

3    A.  Yes.

4    Q.  Kind of like the corporate accounting, there

5 was a separate legal department; correct?

6    A.  Correct.

7    Q.  And who would have been in charge of that

8 department in May of 2019?

9    A.  Scott Ellington, E-l-l-i-n-g-t-o-n.

10    Q.  In May of 2019 or by May of 2019 was there

11 any practice at Highland as to whether its legal

12 department would be involved with the drafting or

13 execution of any intercompany promissory notes?

14    MR. MORRIS:  Objection to the form of the

15 question.

16    THE WITNESS:  It depends on the note.

17    Q.  (BY MR. RUKAVINA)  What did it depend on?

18    A.  Our typical practice is if we have a loan

19 with certain affiliates that it's a demand note.  We

20 have a template that we have used for years that was

21 created by either our internal legal team or an outside

22 law firm, I'm not sure which.

23    The typical practice is always updating a few

24 things on that template, getting it executed, and

25 filing it in our audit folders.

---

**19**

1    Q.  By updating, what do you mean?

2    A.  There's a few things that would need

3 updating, the date.

4    Q.  Maker?

5    A.  Maker.

6    Q.  Amount?

7    A.  The dollar amount, the interest rate.

8    Q.  And is it your testimony that the corporate

9 accounting group would do these things on its own

10 without necessarily the involvement of the legal group?

11    MR. MORRIS:  Objection to the form of the

12 question.

13    THE WITNESS:  Generally, yes.

14    Q.  (BY MR. RUKAVINA)  Do you have any memory in

15 or before May of 2019 if the corporate -- I'm sorry, if

16 the legal group became involved in drafting or

17 executing any prior intercompany promissory notes?

18    A.  Yes.

19    Q.  Explain to me what you remember about that.

20    A.  I do know that they were involved with

21 drafting restructured notes.  So taking demand notes

22 and turning them into a 30-year amort note.

23    That was in 2017.  I know for sure that they

24 were involved in that because it was something

25 different.  We weren't just updating a demand note.

---

**20**

1    Q.  Is it your testimony that to the best of your

2 recollection by May of 2019 and in May of 2019 it would

3 have been the corporate accounting group that would

4 have handled routine intercompany demand notes?

5    A.  Yes.

6    Q.  And you can think of more than one instance

7 on which that happened?

8    A.  Yes.

9    Q.  And this is not a memory test, but going back

10 in time can you try to give an estimate of what year

11 that first started happening, that the corporate

12 accounting would handle the drafting or execution of

13 intercompany demand notes?

14    A.  As far as I can remember.

15    Q.  Is it your testimony that as -- maybe even

16 going back as far as 2005 there were intercompany

17 demand notes?

18    A.  Yes.

19    Q.  I don't know how to ask this question, but

20 was this a significant thing in corporate accounting or

21 just another routine deal when you handled demand

22 notes?

23    MR. MORRIS:  Objection to the form of the

24 question.

25    THE WITNESS:  This is a routine job duty that

---

Kristin Hendrix - October 27, 2021

---

**21**

1  we routinely did.
2      Q.  (BY MR. RUKAVINA)  Between 2005 and 2019, do
3  you remember any maker on these intercompany demand
4  notes actually being required to pay a demand note, in
5  other words, Highland making demand?
6      A.  Not that I can specifically recall.
7      Q.  Do you have any recollection as to what
8  happened to these intercompany demand notes over the
9  years between 2005 and 2019?
10     A.  Yeah.  Typically anytime specifically Jim
11 Dondero would need to move money between related
12 parties, he would pay down -- when I say him, he would
13 have us in corporate accounting move money around, pay
14 off notes, reissue new notes somewhere else.
15         So a way to move money around between his
16 entities.
17     Q.  So let's use just hypotheticals here so that
18 I'm not trying to pin you down to any specific fact.
19         But between 2005 and 2019, is it fair to say
20 that if some Dondero entity that's not the debtor
21 needed money and the debtor had money, then Dondero
22 would have the debtor lend money to that entity on a
23 demand note basis?
24     A.  So long as they have the cash available to do
25 so.

---

**22**

1      Q.  "They" being the debtor?
2      A.  Debtor, yes.
3      Q.  And is it fair to say, then, again
4  hypothetically without any specifics, that if the
5  debtor maybe from time to time needed money and one of
6  these other entities had cash, then Dondero would cause
7  that other entity to pay down the demand note?
8      MR. MORRIS:  Objection to the form of the
9  question.
10     THE WITNESS:  Can you repeat that.
11     Q.  (BY MR. RUKAVINA)  Sure.  So I think you
12 mentioned that from time to time these entities would
13 pay down these demand notes?
14     A.  To the debtor?
15     Q.  To the debtor.
16     A.  Yes.
17     Q.  And is that, hypothetically again, is that
18 because on occasion the debtor might have needed cash
19 and these entities had the cash, so Dondero would have
20 them pay back the note?
21     MR. MORRIS:  Objection to the form of the
22 question.
23     THE WITNESS:  Yes, that could be a reason.
24     Q.  (BY MR. RUKAVINA)  Can you think of any other
25 reason in those 14 years?

---

**23**

1      A.  If the debtor needed cash to lend to another
2  entity.
3      Q.  I see.  So again, it's all one big happy
4  family, and whoever needed cash, the cash moved around;
5  correct?
6      A.  Correct.
7      Q.  Was it Mr. Dondero that basically was the
8  only deciding person in each instance that you're aware
9  of in those 14 years as to when a note would be made or
10 repaid?
11     A.  I can't answer specifically to that.  Most of
12 my direction came from our CFO at the time,
13 Frank Waterhouse.  So what conversations he would have
14 with Jim Dondero, I can't answer to that.  But I would
15 suspect so, yes.
16     Q.  And in May of 2019 or by May of 2019, did you
17 communicate personally, by email or telephone, in
18 person, periodically with Jim Dondero?
19     A.  I can't say periodically, no.
20     Q.  Well, I'm not trying to put words in your
21 mouth.  Is it fair to say that you kind of -- your
22 communications stopped with Mr. Waterhouse and
23 Waterhouse communicated with Dondero, as opposed to you
24 regularly communicating with Dondero?
25     A.  That's typical, yes.

---

**24**

1      Q.  Can you think of any instances in which
2  Mr. Dondero gave you any instructions or you came to
3  him seeking any instructions, without some intermediary
4  between the two of you?
5      A.  No, usually Frank was present.
6      Q.  Would you categorize Mr. Waterhouse as kind
7  of guarding with jealousy his access to Mr. Dondero?
8      MR. MORRIS:  Objection to the form of the
9  question.
10     THE WITNESS:  No.
11     Q.  (BY MR. RUKAVINA)  What kind of boss was he
12 in May of 2019?  Was he laid back, or was he a jerk?
13 Was he demanding?  How would you characterize him in
14 May of 2019?
15     MR. MORRIS:  Objection to the form of the
16 question.
17     THE WITNESS:  I would say he was a good boss.
18     Q.  (BY MR. RUKAVINA)  You think he was competent
19 as far as his job went?
20     A.  Yes, very competent.
21     Q.  Do you think he was competent as far as his
22 job went in December of 2020?
23     A.  Yes.
24     Q.  January 2021?
25     A.  Yes.

---

Kristin Hendrix - October 27, 2021

25

1    Q.  Was he patient and understanding as a boss?
2    A.  Yes.
3    Q.  Okay.  Was he ever condescending or rude to
4  anyone in your presence?
5    A.  No.
6    Q.  So you're the controller today at Highland,
7  the debtor, the reorganized debtor; right?
8    A.  Yes.
9    Q.  And who do you report to?  You mentioned
10  Mr. Klos is the CFO?
11    A.  Yes.
12    Q.  And do you also report to Mr. Seery?
13    A.  Yes, I think everybody does.
14    Q.  And I don't need to know details, but I take
15  it you're on a salary from reorganized Highland?
16    A.  Yes.
17    Q.  Is any part of your compensation merit or
18  bonus based?
19    A.  It could potentially be.
20    Q.  Have you had any discussions with Mr. Seery
21  or Mr. Klos about some sort of bonus compensation?
22    A.  Yes.
23    Q.  Has anything been agreed to?
24    A.  Yes.
25    Q.  And again, I don't need to know the exact

26

1  numbers.  What would your bonus compensation consist
2  of?  How would it be decided?
3    A.  It's actually -- was decided when I agreed to
4  stay on the Highland team back in February 2021, so
5  it's in my employment agreement.
6    Q.  So what's your bonus compensation?
7    A.  I'm not sure I understand what you're asking.
8    Q.  So is the bonus discretionary on the part of
9  Highland?
10    A.  No, it's a set amount.
11    Q.  And what triggers it or governs the set
12  amount?
13    A.  Just it gets paid out on a certain date of
14  the year.  It's very straightforward, set out in my
15  employment agreement.
16    Q.  Is it irrespective of the performance of the
17  reorganized debtor?
18    A.  Yes.
19    Q.  So why do you call it a bonus instead of base
20  compensation?
21    A.  That's what it's called in my agreement.
22    Q.  So your base compensation and your bonus,
23  it's your testimony, you're going to earn it
24  irrespective of whether reorganized Highland does good
25  or bad with respect to its profitability?

27

1    A.  Correct.
2    Q.  And how Highland, reorganized Highland
3  collects these promissory notes is going to play no
4  part in your base and bonus compensation to your
5  understanding; is that correct?
6    A.  To my knowledge, yes.
7    Q.  So you have no direct or indirect stake in
8  the outcome of these litigations?
9    A.  No.
10    Q.  And you understand that I represent HCMFA and
11  NexPoint?
12    A.  Yes.
13    Q.  And these court reporters are not familiar
14  with some of our terminology.  NAP [verbatim], if we
15  say that, that means NexPoint; right?
16    A.  Uh-huh.
17    Q.  You have to say yes or no.
18    A.  Yes, NPA, NexPoint.
19    Q.  NPA.  And when we say NexPoint, you and I are
20  meaning NexPoint Advisors, LP; right?
21    A.  Yes.
22    Q.  And when we say HCMFA, we're meaning Highland
23  Capital Management Fund Advisors, LP, yes?
24    A.  Yes.
25    Q.  What is your understanding of the two

28

1  lawsuits, the one against HCMFA and the one against
2  NexPoint, that you're being deposed on today?
3    MR. MORRIS:  Objection to the form of the
4  question.
5    Q.  (BY MR. RUKAVINA)  Who is suing who and for
6  what?
7    A.  I don't know all the details.
8    Q.  So we've established that you've discussed
9  these lawsuits in the last week or a little bit more
10  with legal counsel.  I don't want to talk about that.
11    Prior to these recent discussions, did you
12  have any discussions with anyone at Highland about its
13  lawsuits against HCMFA and NexPoint on promissory
14  notes?
15    A.  Repeat that again.
16    Q.  Sure.  So remember we're excluding the recent
17  discussions in the last week or 10 days with counsel;
18  right?
19    A.  Okay.
20    Q.  Are you aware that in January of 2021 the
21  debtor sued NexPoint to collect on a promissory note?
22    A.  I'm aware that demand notices were sent.
23    Q.  So until recently you weren't aware that a
24  lawsuit had been filed?
25    A.  There's a lot of lawsuits filed.  I can't

Kristin Hendrix - October 27, 2021

29

1 keep track of what is what or what we're talking about
2 at certain times.
3      Q.  But you have no distinct memory of that?
4      A.  Correct.
5      Q.  And same question for the lawsuit that the
6 debtor filed against HCMFA in January.
7           Do you have any specific memory of that
8 lawsuit having been filed?
9      A.  Not specifically.
10      Q.  You mentioned that you're aware that on or
11 before January 2021, demand letters had been sent?
12      A.  Yes.
13      Q.  Did you play any role in either drafting
14 those demand letters or the decision to send them?
15      A.  No.
16      Q.  So going back to my question about these
17 lawsuits, do you have any memory of anyone asking
18 you -- again, excluding the last week or two.
19           Do you have any memory of anyone asking you
20 to do anything with respect to either or both of these
21 lawsuits?
22      A.  No.
23      Q.  You have no memory of Mr. Waterhouse,
24 Mr. Klos, Mr. Surgent, or Mr. Seery asking for any
25 background information or your input at all on these

30

1 two lawsuits?
2           MR. MORRIS:  Better not have been --
3           THE WITNESS:  No.
4      Q.  (BY MR. RUKAVINA)  Who did I say?  Did I
5 misspeak?  Okay.
6           Now we're going to have some exhibits here.
7           And do you have the labels?
8           Let's take a minute break off the record.
9           (Off the record.)
10      Q.  (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
11 provide to you a promissory note in the original
12 principal amount of $5 million from HCMFA.  This is the
13 PDF version of this as filed with the Court for
14 collection.  It's going to be Exhibit 1.
15           (Whereupon, Exhibit 1 was marked for
16           identification.)
17      Q.  (BY MR. RUKAVINA)  Before you look at
18 Exhibit 1, I'm going to do the same thing for
19 Exhibit 2, which is a promissory note from HCMFA for
20 $2.4 million, dated May 2, 2019.
21           (Whereupon, Exhibit 2 was marked for
22           identification.)
23      Q.  (BY MR. RUKAVINA)  Again, Ms. Hendrix, these
24 are the PDF versions of these notes as filed with the
25 Court.  Sitting here today, do you remember anything

31

1 about either or both of these two promissory notes?
2      A.  Sure, yes.
3      Q.  What do you remember?
4      A.  I remember seeing them because I've recently
5 looked at them.  I see them all the time in our loan
6 tracking spreadsheets.  My team would have been
7 responsible for the whole process that I explained
8 before when it comes to a promissory note.
9      Q.  And --
10           MR. MORRIS:  Are you finished?
11           THE WITNESS:  Yes.
12      Q.  (BY MR. RUKAVINA)  And we have an email here
13 that might give some more context to that if I can find
14 it here.
15           This will be Exhibit 3.  This is an email
16 from David Klos to corporate accounting dated May 2,
17 2019.
18           (Whereupon, Exhibit 3 was marked for
19           identification.)
20      Q.  (BY MR. RUKAVINA)  Do you see this email,
21 ma'am?
22      A.  Yes.
23      Q.  Okay.  Corporate accounting, would that email
24 group have included you?
25      A.  Yes.

32

1      Q.  And this email says, Kristin, can you or
2 Hayley.  Do you think that Kristin was you?
3      A.  I do.
4      Q.  Do you remember receiving this email?
5      A.  Not explicitly.
6      Q.  So it says Blair.  Who would Blair be?
7      A.  Blair was our AP associate.
8      Q.  What is her last name?
9      A.  At this time it would have been Roeber,
10 R-o-e-b-e-r.
11      Q.  Okay.  And did it subsequently change?
12      A.  Yes, it's now Hillis, H-i-l-l-i-s.
13      Q.  Please send $2.4 million from HCMLP to HCMFA.
14 This is a new interco loan.  Kristin, can you or Hayley
15 please prep a note for execution.  I'll have further
16 instructions later today, but please process this
17 payment as soon as possible.
18           Did I read that correctly?
19      A.  Yes.
20      Q.  Do you have any memory of whether this email
21 relates to Exhibit 2, the $2.4 million promissory note?
22      A.  It seems like it does, same date, same
23 amount.
24      Q.  Do you have any memory, or in reviewing your
25 files did you see any similar email or document that

Kristin Hendrix - October 27, 2021

---

**33**

1 would have related to Exhibit 1, the $5 million
2 promissory note?
3    A.  Yes.  I believe there's another email for
4 that one.
5    Q.  And do you believe that you provided that to
6 counsel?
7    A.  Yes.
8    Q.  Recently or some time ago?
9    A.  Well, I don't think I provided it, so I'm not
10 sure when they got it.  I know it has been provided.
11    Q.  You know that it has?
12    A.  Uh-huh.
13    Q.  How do you know?
14    A.  Because I've seen it.
15    Q.  In the production that was produced to me?
16    A.  Yes.
17    Q.  And also from a David Klos?
18    A.  This one, or on the -- when I say this one,
19 on the $2.4 million or the 5-?
20    Q.  On the $5 million note.
21    A.  I'm not sure.
22    Q.  Okay.  Let me make sure I understand you
23 correctly.
24        Sitting here today you believe that there is
25 another email referencing the $5 million loan that has

---

**34**

1 been produced to my office?
2    A.  Yes.  I believe so.
3    Q.  Okay.  And going off memory, did it kind of
4 say the same thing as this Exhibit 3 except that it
5 referenced $5 million?
6        MR. MORRIS:  Objection to the form of the
7 question.
8        THE WITNESS:  Generally, should have said the
9 similar situation, yeah.
10    Q.  (BY MR. RUKAVINA)  So Mr. Klos says, this is
11 a new interco loan, for Exhibit 3.  Other than what he
12 told you, that this is an intercompany loan, did anyone
13 else tell you or did you have any other information on
14 May 2, 2019 that this was a loan?
15    A.  I don't specifically recall these
16 conversations, but I can tell you our normal practice
17 would be we would either likely be in a cash meeting --
18 and I say "we."  Would have been myself, Dave Klos,
19 Frank Waterhouse, potentially even Jim Dondero.
20        But I don't recall conversations on this
21 specific date.  But general practice is we would talk
22 about it.
23        Oftentimes, Frank would either call Dave or I
24 or stop by and tell us that, we need to send money to
25 an affiliate, paper up a new loan, let's get a wire out

---

**35**

1 the door, is typically how this works.
2    Q.  Is the answer generally the same for the
3 $5 million note?
4    A.  Yes.
5    Q.  So is it fair to say that typically,
6 obviously not every time, but typically your corporate
7 accounting group when it would see intercompany
8 transfers in large amounts would believe that they were
9 loans?
10        MR. MORRIS:  Objection to the form of the
11 question.
12        THE WITNESS:  Typically they were loans.
13 There's not really another way to get money from one
14 entity to another.  And if they were papered as a loan,
15 that means we were told to set it up that way.
16    Q.  (BY MR. RUKAVINA)  What do you mean papered
17 as a loan?  Aren't you papering it as a loan when
18 someone makes the promissory note?
19    A.  Yes, because we're told by somebody to do
20 that.
21    Q.  And in this instance, Mr. Klos on Exhibit 3
22 told the group that this was a loan; right?
23    A.  Correct.  But he would have spoken with
24 Frank Waterhouse or Jim Dondero prior to that, before
25 telling anybody to do that.

---

**36**

1    Q.  Okay.  And do you have any knowledge that he
2 did speak to Mr. Waterhouse or Mr. Dondero before
3 sending this email?
4    A.  Again, I don't have specific knowledge on the
5 exact conversations, but that's always how it has
6 worked.
7    Q.  That's how it was for 14 or 15 years;
8 correct?
9    A.  Yes.
10    Q.  But you're logically assuming that it
11 happened here.  You don't know that it happened here;
12 correct?
13        MR. MORRIS:  Objection to the form of the
14 question.
15        THE WITNESS:  I would have to be fairly
16 certain that it did, even though I can't recall
17 specific conversations.
18    Q.  (BY MR. RUKAVINA)  Did you ask Mr. Klos about
19 who told him that this is a new intercompany loan on
20 Exhibit 3?
21    A.  No.  It's quite possible I was involved in
22 the conversation.  I reported to him.  I wouldn't
23 question his authority.
24    Q.  Did you ask Mr. Klos who told him that the
25 $5 million deal was also an intercompany loan?

---

Kristin Hendrix - October 27, 2021

---

37

1    A.  I did not ask that specific question that I
2 can recall.
3    Q.  Did you ask Mr. Waterhouse whether either of
4 these transactions were loans?
5    A.  I'm sure Mr. Waterhouse is the one that told
6 us they were loans.  We wouldn't just paper up a loan,
7 send money out and call it a loan and account for it
8 that way, unless somebody specifically told us.
9    Q.  Do you have any memory of Mr. Waterhouse
10 orally or in writing or email or in any way, shape, or
11 form on or about May 2 or 3, 2019 telling you that the
12 2.4 million or $5 million transfers were intercompany
13 loans?
14    A.  No specific knowledge of exact conversations,
15 but I'm certain that those conversations were had
16 because that's the only way that we would have papered
17 up a loan, sent money out as a loan, had them on our
18 financials for two years.
19    Q.  So you're saying that this email, Exhibit 3,
20 from Mr. Klos was not enough, that there would have
21 been other things that happened to make you and other
22 people in your group confident that these were loans?
23    A.  Yes.
24    Q.  And these other things would have been in
25 person or by email?

---

38

1    A.  Most likely in person via phone call.
2    Q.  Okay.  So again, you have no specific memory
3 of it, but based on the 14-year pattern and conduct you
4 believe that you would have discussed these two
5 transfers with Mr. Waterhouse and he would have told
6 you these are loans?
7    MR. MORRIS:  Objection to the form of the
8 question.
9    THE WITNESS:  Correct.
10    Q.  (BY MR. RUKAVINA)  And then would he have
11 told you to take care of the promissory notes, or was
12 that Mr. Klos here in Exhibit 3?
13    A.  It could have been both.  It's clearly Dave
14 in this email, but Frank could have also said that to
15 me.
16    Q.  Now, do you -- strike that.
17    In May of 2019, did you know or were you told
18 why these $7.4 million were being transferred from the
19 debtor to HCMFA?
20    A.  Yes.  I do have recollection that -- I do
21 know that there were two big events in May 2019.
22 2.4 million was related to a TerreStar NAV error, with
23 one of the funds advised by HCMFA.  That's Global
24 Allocation Fund.
25    Similar with the $5 million loan.  There was

---

39

1 a consent fee that the advisor of the Global Allocation
2 Fund had promised to pay to shareholders of that fund,
3 and it was in the amount of $5 million roughly.
4    So both of these loans were for those
5 purposes respectfully.
6    Q.  And were you in May of 2019 also aware that
7 in addition to the $2.4 million, there was another more
8 than $5 million paid to that fund by HCMFA's insurer as
9 compensation for the NAV error?
10    A.  By the insurance company, yes.
11    Q.  So the $7.4 million, you understood then was
12 a loan as opposed to compensation to HCMFA?
13    A.  Yes.
14    Q.  Okay.  Did you understand in May of 2019 that
15 it had been the debtor and its valuation team that
16 caused that NAV error?
17    MR. MORRIS:  Objection to the form of the
18 question.
19    THE WITNESS:  I can't answer that.  I was not
20 involved with the activities leading up to the NAV
21 error.
22    Q.  (BY MR. RUKAVINA)  How do you know that the
23 $7.4 million were being transferred for the NAV error
24 and consent fee?
25    A.  Because I do know about both of those

---

40

1 instances and I do know that HCMFA needed to pay these
2 dollar amounts for both of those.
3    Q.  And you knew that in May of 2019?
4    A.  Yes.
5    Q.  How did you know that in May of 2019?
6    A.  It was lots of discussions had been going on
7 around both of these issues for months.  These weren't
8 surprises to anybody.
9    Q.  So although you weren't involved directly
10 with the NAV error issues, it was more or less common
11 knowledge in your accounting group?
12    A.  Correct.
13    Q.  Do you have any knowledge at all as to
14 whether Mr. Dondero decided to transfer these
15 $7.4 million not as a loan, but to compensate HCMFA for
16 the debtor's alleged liability?
17    A.  Have not heard of that.
18    Q.  Ever?
19    A.  Never.
20    Q.  But you also never heard Mr. Dondero say that
21 these $7.4 million were a loan; correct?
22    A.  That was not told to me directly.
23    Q.  Again, you're logically assuming that based
24 on many instances of intercompany transfers in the
25 14 years prior to that?

---

**41**

1      MR. MORRIS:  Objection to the form of the
2  question.  Mischaracterizes the testimony.
3      THE WITNESS:  Correct.
4      Q.  (BY MR. RUKAVINA)  I think you answered
5  correct?
6      A.  Correct.
7      Q.  And you mentioned that after these notes, you
8  saw them on internal financials and that reinforces
9  your view that these were loans?
10     A.  Correct.
11     Q.  But as of May 2 and 3, 2019, no one had told
12  you directly that these are loans?
13     MR. MORRIS:  Objection to the form of the
14  question.  It's in writing.
15     THE WITNESS:  That's not what I'm saying at
16  all.
17     Q.  (BY MR. RUKAVINA)  Other than Mr. Klos' email
18  or emails, no one told you on May 2 or May 3, 2019 that
19  you remember today that these were loans?
20     A.  It quite possibly could have been told to me
21  in addition to this email.
22     Q.  I understand.  You just have no memory of
23  that today; correct?
24     A.  Correct.
25     Q.  Is there anything that you can think of

**42**

1  sitting here today to refresh your memory on that
2  point?
3      A.  I do not think so.  I'm sure there was
4  conversation that unfortunately would not be in an
5  email.
6      Q.  Now, we have the Word documents, the Word
7  version of these two promissory notes, and you're going
8  to have rely on me that I printed these out as
9  Mr. Morris sent to me.  If I'm misleading you on that,
10  then I'm in trouble and your answers don't count.
11     So please assume that I didn't doctor these
12  and that I printed them out as they were prepared to
13  me; okay?
14     A.  Yes.
15     Q.  So Exhibit 4 will be the $5 million note and
16  Exhibit 5 will be the 2.4 million.
17     (Whereupon, Exhibits 4 & 5 were marked for
18      identification.)
19     Q.  (BY MR. RUKAVINA)  Before I ask about 4 and
20  5, to be fair to you and refresh your memory, I'm going
21  to provide you printouts of the metadata, metadata --
22  I'm not sure how to better say that -- for both notes.
23     And again I'm representing to you that I
24  printed out the metadata without doctoring it, so
25  please assume that's true, and if it's not, your

**43**

1  answers don't count and I'm in trouble.
2      6 will be the $5 million note, and 7 will be
3  the $2.4 million note.
4      (Whereupon, Exhibits 6 & 7 were marked for
5      identification.)
6      Q.  (BY MR. RUKAVINA)  Okay.  So Exhibit 4 and 5
7  are the Word documents.  Do you have any memory of you
8  doing anything with respect to these two Word
9  documents?
10     A.  I don't have specific memory, but generally
11  speaking, it was my job to update promissory note
12  templates and create promissory notes.
13     Q.  So do you believe that -- we discussed
14  earlier that your group would have used a template and
15  that it would have made changes reflecting the maker,
16  amount, date, interest rate.
17     Do you believe you were the one with respect
18  to 4 and 5 that updated that template to create 4
19  and 5?
20     A.  I'm sure that I was, yes.
21     Q.  Well, Exhibit 6 -- do you know what metadata
22  is?
23     A.  Sort of.
24     Q.  What's your understanding of what metadata
25  is?

**44**

1      A.  Just in context from speaking on it recently,
2  it's going to tell you who made changes to the
3  documents, is what I would assume.
4      MR. RUKAVINA:  Go off the record for one
5  second.
6      (Off the record.)
7      Q.  (BY MR. RUKAVINA)  So a little bit of error
8  on my part.  We'll have some more metadata, but we can
9  still talk about 6 and 7.
10     It says the author JFORSHEE, J-F-O-R-S-H-E-E.
11  Do you recall or do you know who that person was?
12     A.  I recognize the name, and it makes sense.
13  This says Strasburger is the company.  I think he was
14  one of the lawyers that we had used at some point in
15  time.
16     Q.  Strasburger is a law firm?
17     A.  Yes.
18     Q.  And then it says, so Exhibit 6 created May 3,
19  Exhibit 7 created May 2, modified, accessed.  Does that
20  to the best of your understanding comport with when
21  Exhibits 4 and 5 were actually created?
22     A.  Can you repeat that.
23     Q.  Yeah.  We'll wait for the rest of the
24  metadata.  But let's go back to 4 and 5.
25     In and by May 2019 I think you mentioned that

Kristin Hendrix - October 27, 2021

---

**45**

1  it was your job to, I think you said update promissory
2  notes?
3          MR. MORRIS:  Objection to the form of the
4  question.
5      Q.  (BY MR. RUKAVINA)  Let me take that question
6  back.
7          You testified earlier that your group would
8  have taken a template and used it to create or prepare
9  a new promissory note; right?
10     A.  Right.
11     Q.  How would you call that process?  What word
12  would you use for that process?
13     A.  Let's call it papering the loan.
14     Q.  In May of 2019, was it your job to paper the
15  loan?
16     A.  Yes.
17     Q.  Would anyone else at the corporate accounting
18  group have been responsible to paper a loan?
19     A.  At that time, I don't think so.  I think I
20  was the one doing it.
21     Q.  I think you mentioned that you think you
22  papered the loan, respecting Exhibits 4 and 5; correct?
23     A.  Correct.
24     Q.  You have no distinct present memory of
25  papering 4 and 5; correct?

---

**46**

1      A.  Correct.
2      Q.  Can you think of anyone else at the corporate
3  accounting group that would have papered 4 and 5?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  The only other person that
7  could have worked either Dave Klos or Hayley Eliason.
8      Q.  (BY MR. RUKAVINA)  What was Hayley's role in
9  May of 2019?
10     A.  She was the accountant.  I can't recall her
11  specific title.
12     Q.  Now, in May of 2019 when you papered a loan,
13  would you have consulted with either internal or
14  external legal before finishing that loan or presenting
15  it for signature or anything else?
16     A.  Not if it was just our standard demand note
17  that we already had a template on.
18     Q.  So would it have been your general course in
19  May of 2019, if you prepared Exhibits 4 and 5, not to
20  seek advice from internal or legal before proceeding
21  with these notes?
22     A.  With these two specific notes?
23     Q.  Yes.
24     A.  Yes.
25     Q.  If we flip the page, I'll represent to you

---

**47**

1  that Mr. Waterhouse's signature there appears on the
2  Word document as an image.
3      A.  Uh-huh.
4      Q.  Do you have any memory of whether there was
5  an image that someone would have affixed of
6  Mr. Waterhouse's signature to promissory notes?
7      A.  Yes.  We typically always -- he was
8  completely fine with having documentations -- sorry,
9  having documents signed or executed with his
10  e-signature.
11     Q.  Would these pictures of his signature have
12  been his e-signature in May of 2019?
13     A.  Yes.
14     Q.  So let's just clarify that because I don't
15  want there to be any confusion.
16         I know there's some computer programs out
17  there that are restrictive and have passwords before
18  any signature is printed.  And then there's some people
19  that use a stamp or an image; right?
20         MR. MORRIS:  Objection to the form of the
21  question.
22     Q.  (BY MR. RUKAVINA)  Are you following me?
23     A.  I follow you.
24     Q.  In May of 2019, did Mr. Waterhouse have any
25  specific program that would have to -- you would have

---

**48**

1  to go through before it would spit out his e-signature,
2  or was he fine with you and his staff using an image
3  like this?
4      A.  He was fine with using his e-signature, and
5  what is on these documents was that exact e-signature.
6  So I don't know if he had -- I don't know how it was
7  created originally.
8      Q.  The e-signature?
9      A.  E-signature.
10     Q.  Do you have any memory with respect to
11  Exhibits 4 and 5 of getting Mr. Waterhouse's specific
12  approval to use his e-signature?
13     A.  I don't have exact specific memory, same as
14  conversations on these loans.  But he would have had to
15  approve this loan in the dollar amount, the day.
16         He would have been the one directing us to
17  create these loans.  In past practice he has always
18  approved using his e-signature to execute documents.
19     Q.  How would he have approved Exhibits 4 and 5?
20  By that, I mean by email or memorandum?  How would he
21  have approved it in May of 2019?
22         MR. MORRIS:  Objection to the form of the
23  question.
24         THE WITNESS:  I would assume that, as I've
25  stated previously, these directions were coming

---

Kristin Hendrix - October 27, 2021

**49**

1 directly from him to paper a loan. These changes that
2 are made are only to the dollar amount. Interest rate
3 is pulled right off the IRS website.
4        That is his approval to paper a loan and in
5 fact execute or approve the loan.
6        Q.   (BY MR. RUKAVINA)  In May of 2019, would
7 Mr. Waterhouse -- what was his practice as far as using
8 an ink signature on documents as opposed to an
9 e-signature?  Did he have a practice?
10        MR. MORRIS:  Objection to the form of the
11 question.
12        THE WITNESS:  He has never specifically said,
13 on certain documents I would like to ink it with my
14 signature.  Probably at this time, 99 percent of the
15 stuff my team got his signature on was his e-signature.
16 I think it just depended on the group and what it was.
17        Q.   (BY MR. RUKAVINA)  So how would he authorize
18 you or your team to use his e-signature for any given
19 document in May of 2019?
20        MR. MORRIS:  Objection to the form of the
21 question.
22        THE WITNESS:  Through the conversations that
23 would have been had before these emails went out saying
24 paper loan.
25        Q.   (BY MR. RUKAVINA)  And -- okay.  So, and

**50**

1 after his e-signature was used either on these notes or
2 other documents in May of 2019, would you have brought
3 the documents back to him for any kind of verification?
4        MR. MORRIS:  Objection to the form of the
5 question.
6        THE WITNESS:  Probably not.  These are all
7 very standard.  We've papered hundreds of loans.  So I
8 think he trusted that we can handle updating a date and
9 a dollar amount on these loan templates.
10        Q.   (BY MR. RUKAVINA)  Do you know or believe, or
11 your recent review of documents, did it reveal an email
12 from Mr. Waterhouse to you specifically authorizing his
13 e-signature on Exhibits 4 and/or 5?
14        A.   Not that I recall seeing, no.
15        Q.   Sitting here today, do you have any memory of
16 Mr. Waterhouse orally or otherwise specifically
17 authorizing you to affix his e-signature to Exhibits 4
18 and/or 5?
19        A.   Specifically on these loans, no, I don't
20 recall those conversations.  But, again, our practice
21 has always been we have this discussion, he's under the
22 understanding that we're going to paper the loans, he's
23 always comfortable with using his e-signature.
24        This is not something me or my team would
25 have done without that authority and approval from him.

**51**

1        Q.   But you have no memory of that authority or
2 approval, specifically for 4 and 5?
3        MR. MORRIS:  Objection.  Asked and answered
4 about five times.
5        THE WITNESS:  Same as my answer I just gave.
6        Q.   (BY MR. RUKAVINA)  And I think you mentioned
7 that in your years at Highland your team papered
8 hundreds of loans?
9        A.   Yeah.
10        Q.   In your time at Highland, is it your
11 testimony that the accounting -- corporate accounting
12 department never made a mistake with respect to
13 anything that it did?
14        MR. MORRIS:  Objection to the form of the
15 question.
16        THE WITNESS:  No, I did not say that.
17        Q.   (BY MR. RUKAVINA)  Do you recall any mistakes
18 in your time at the corporate accounting group at
19 Highland that had been made, any significant mistakes?
20        MR. MORRIS:  Objection to the form of the
21 question.
22        THE WITNESS:  Significant mistakes, not that
23 I can recall.
24        Q.   (BY MR. RUKAVINA)  No accounts payable
25 mistakenly paid?

**52**

1        MR. MORRIS:  Objection to the form of the
2 question.
3        THE WITNESS:  I cannot specifically answer
4 that question with 17 years of work to recall, sorry.
5        MR. RUKAVINA:  Just take a quick break.  If
6 you need a restroom -- off the record.
7        (Off the record.)
8        Q.   (BY MR. RUKAVINA)  Going back to Exhibits 4
9 and 5.
10        Mr. Waterhouse signed these promissory notes.
11 Is there any particular reason why he signed them as
12 opposed to Dondero or someone else?
13        A.   No particular reason.  He's an officer for
14 both companies.  He's a signatory.
15        Q.   Who decided, if anyone, to your knowledge,
16 that he would be the one signing the notes, these two
17 notes?
18        A.   I don't know who would have decided that, but
19 typically if Frank specifically wanted Jim Dondero to
20 sign it, he would say, take it to Jim to sign.
21        Q.   Do you have a recollection of
22 Mr. Dondero -- strike that.
23        Do you have a recollection of Mr. Waterhouse
24 signing other promissory notes?
25        A.   Yes.  I know for sure he has signed other

Kristin Hendrix - October 27, 2021

---

53

1 promissory notes. I can't tell you explicitly which
2 ones.
3      (Off the record.)
4      Q.  (BY MR. RUKAVINA)  Are you saying that in May
5 of 2019 -- strike that.
6      By May of 2019, was it not the standard
7 practice at the debtor that Mr. Dondero would sign
8 intercompany promissory notes?
9      MR. MORRIS:  Objection to the form of the
10 question.
11     THE WITNESS:  No, that's not standard
12 practice.  Just needed to be somebody -- somebody who
13 is a signer for the entity on the incumbency
14 certificate.
15     Q.  (BY MR. RUKAVINA)  Was there a standard
16 practice, or did you just describe the standard
17 practice that it was someone on the incumbency
18 certificate?
19     A.  That's correct, somebody on the incumbency
20 certificate.  Frank is a great prospect to sign, with
21 giving direction to set loans up, send money out.  Why
22 wouldn't he sign it.
23     Q.  Do you have any memory sitting here today of
24 Mr. Waterhouse telling you or agreeing that he would be
25 signing these two promissory notes for HCMFA?

---

54

1      A.  Not specifically, but he didn't need to tell
2 me.  He typically would tell me if he wanted Jim to
3 sign them.
4      Q.  Sitting here today, do you have any memory of
5 giving Mr. Waterhouse these two promissory notes after
6 they were prepared?
7      A.  I specifically don't remember walking into
8 his office and providing it to him, but he could have
9 found it on our shared drive if he wanted to.
10     Q.  Do you have any memory or in your recent
11 review of documents did you see any email to the effect
12 of you sending either or both of these promissory notes
13 to Mr. Waterhouse after they were papered up?
14     A.  I don't have any specific recollection,
15 again, but he had access to look at them.
16     Q.  On the shared drive?
17     A.  Yes.
18     Q.  In May -- I'm going to ask this question
19 multiple different ways, so let's start with kind of
20 the general.
21     In May or by May of 2019, was there a
22 repository, electronic or paper, where the debtor kept
23 original promissory notes that were owed -- where money
24 was owed to it?
25     A.  Original meaning paper?

---

55

1      Q.  Well, let's go back a little bit in time.
2      Would you agree that at some point prior to
3 2019 the standard course was that paper notes were ink
4 signed?
5      MR. MORRIS:  Objection to the form of the
6 question.
7      THE WITNESS:  I could not tell you
8 specifically when notes were or were not ink signed.
9      Q.  (BY MR. RUKAVINA)  Was there any repository,
10 to the best of your recollection, as of May 2019 where
11 any ink-signed original promissory notes were kept by
12 the debtor?
13     A.  No.  We always would scan them, save them
14 on our shared drive.  Never had paper copies.
15     Q.  So that's -- fixing to ask that question
16 next.
17     So Exhibits 4 and 5, would they even have
18 been printed after they were papered up?
19     MR. MORRIS:  Objection to the form of the
20 question.
21     THE WITNESS:  Possibly.  Somebody could have
22 printed them.
23     Q.  (BY MR. RUKAVINA)  Do you remember printing
24 Exhibits 4 or 5 sitting here today?
25     A.  I don't recall printing them myself, no.

---

56

1      Q.  Would there have been a reason to print them
2 out if, as you said, the notes were stored
3 electronically?
4      MR. MORRIS:  Objection to the form of the
5 question.
6      THE WITNESS:  There could be a reason.  I
7 don't recall that I for any reason printed these
8 particular notes.
9      Q.  (BY MR. RUKAVINA)  So as of May 2019, is it
10 your testimony that notes that were papered up by the
11 corporate accounting group would have been saved
12 electronically on the system and not kept by way of
13 paper copies in some file?
14     A.  Correct.  That's right.
15     Q.  This is additional metadata.  And you
16 understand I have a bit of an accent.
17     What are we on?
18     (Off the record.)
19     Q.  (BY MR. RUKAVINA)  Ms. Hendrix, Exhibit 8 is
20 going to be additional metadata for the May 3, 2019,
21 note that we've been looking at, and Exhibit 9 will be
22 the same thing for the May 2 note that we've been
23 looking at.
24     That's 8.  That's 9.
25     (Whereupon, Exhibits 8 & 9 were marked for

---

Kristin Hendrix - October 27, 2021

---

57

1     identification.)
2     Q.  (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
3  represent to you again that my office has faithfully
4  printed this metadata out without doctoring or changing
5  anything, and I ask you to assume that.  If I'm wrong
6  on that, then your answers don't count.
7         Ma'am, as I look at these two documents, it
8  says last modified by Kristin Hendrix.
9         Do you see that?
10    A.  Yes.
11    Q.  And that would have -- that could have only
12  been you; correct, in that department?
13    A.  I hope so, yes.
14    Q.  Seeing these two documents, can you agree
15  with me now that it was in fact you that papered up
16  Exhibits 4 and 5?
17        MR. MORRIS:  Objection.  Asked and answered.
18        THE WITNESS:  I would assume so since my name
19  is on it, yes.
20    Q.  (BY MR. RUKAVINA)  Both of these documents
21  say last printed -- I'm sorry.  If you see related
22  dates, it says last printed May 2, 2019, 11:27 A.M.  Do
23  you have any memory or any understanding as to why that
24  date would be there or what last printed might mean?
25    A.  I don't know why it says last printed the day

---

58

1  before it was created.  That doesn't make any sense.  I
2  have no idea.
3         Unless, the only thing I could think of is if
4  we changed this template.  When I say "this," I'm going
5  the $2.4 million loan, which was papered on the 2nd, and
6  then used it for the next day for the template to
7  update the date, possibly.  I have no idea.
8     Q.  Well, it may be -- and I understand that you
9  don't have any memory; we're speculating a little bit.
10        It may be, looking at Exhibits 8 and 9, that
11  the $2.4 million note was printed on May 2, and then
12  after having been used as the template for the
13  $5 million note, the $5 million note would not have
14  been printed.
15    Q.  Does that sound possible?
16        MR. MORRIS:  Objection to the form of the
17  question.
18        THE WITNESS:  Sure, it could be possible.
19    Q.  (BY MR. RUKAVINA)  But you don't have any
20  memory either way?
21    A.  No.  And when these were printed they're
22  printed to PDF, I believe, is probably what that means.
23    Q.  Okay.
24        We're going to switch gears a little bit now,
25  if you want to make a pile of those exhibits.

---

59

1  Obviously, you're welcome to use them anytime you need
2  to, but I think we're done with those notes.
3         Going to hand you what we're going to mark as
4  Exhibit 10, which is an email chain produced by the
5  debtor.
6         And I don't know how anyone on the video will
7  see it.  I apologize.  I'll have to send it to you
8  later.
9         (Whereupon, Exhibit 10 was marked for
10        identification.)
11    Q.  (BY MR. RUKAVINA)  Now, if you start with
12  this email chain, it starts on November 19, 2020 from
13  Jack Donohue to you, copying Mr. Seery and various
14  others.
15        Do you see that?
16    A.  Yes.
17    Q.  And Mr. Donohue is asking you to provide him
18  the financial records of HCMFA due to the funds owed
19  the debtor.
20        Do you see that?
21    A.  Yes.
22    Q.  Do you recall that email from Mr. Donohue to
23  you?
24    A.  Yes.
25    Q.  Do you recall any context or subsequent

---

60

1  discussions or how that email came to be, or do you
2  just recall getting that email?
3     A.  I just recall getting the email.
4     Q.  You write back, hi Jack, Scott Ellington is
5  going to follow up with the board on this request.
6         Do you see that?
7     A.  Yes.
8     Q.  Do you recall why you told Jack that
9  Mr. Ellington was going to follow up?
10    A.  From what I recall, I had asked Frank
11  Waterhouse if it was okay to send these financials
12  over, and he wanted me to check with Scott Ellington
13  and that was Scott's response.
14    Q.  And did he tell you why he wanted you to
15  check with Scott Ellington?
16    A.  Just to make sure that there were no issues
17  with sending them over.
18    Q.  Mr. Seery writes back, can I get this ASAP.
19  HCMFA is way overdue.
20        Do you see that?
21    A.  Yes.
22    Q.  And Mr. Seery writes again, it's about a week
23  later, and he says, this is an explicit direction from
24  me as CEO of HCMLP.  But it looks like you are the
25  recipient of that December 2 email; correct?

---

Kristin Hendrix - October 27, 2021

**61**

1    A. Yes.
2    Q. Do you remember him sending you that email
3  and copying those people?
4    A. Yes.
5    Q. Do you remember anything happening in that
6  week between his November 25 and December 2 email along
7  the same discussion lines?
8    A. I don't remember anything. I think I was
9  probably left out of any discussions, and if there were
10  any, it was with Scott Ellington and whomever he had
11  discussions with.
12    Q. Then subsequent, on December 2, Mr. Seery
13  writes, all, Scott and I have spoken and agree that the
14  information should be provided to James immediately.
15      Would that have been James Romey, do you
16  think?
17    A. Yes.
18    Q. And who was James Romey?
19    A. He also worked for DSI.
20    Q. And then he writes, Kristin, please proceed
21  with James. If anyone has any questions or issues,
22  please call me.
23      Do you see that?
24    A. Yes.
25    Q. Did you proceed with James Romey?

**62**

1    A. I further made sure that Scott was okay, to
2  confirm. He said yes, please do, and I did send them
3  to James Romey.
4    Q. So Mr. Seery has some of it in this email
5  chain, but do you have any understanding as to why
6  either DSI or Mr. Seery in November of 2020 was asking
7  for the financial records of HCMFA?
8    A. I do not, other than what's in this email.
9    Q. Did you discuss with either DSI or Mr. Seery
10  or Mr. Waterhouse in November or December 2020 whether
11  the demand notes from HCMFA should be demanded, should
12  be called?
13    A. I did not have discussions.
14    Q. Next exhibit is Exhibit 11. This is another
15  email chain.
16      And I apologize to the folks on the video.
17  I'll have to get it to you during some break.
18    MR. MORRIS: Hold on one second.
19    MR. RUKAVINA: Sure. Off the record.
20    (Off the record.)
21    (Whereupon, Exhibit 11 was marked for
22    identification.)
23    Q. (BY MR. RUKAVINA) Exhibit 11, Ms. Hendrix,
24  if you'll go to the beginning of this email chain, is
25  an email on January 6, 2021, again from Mr. Donohue to

**63**

1  you, copying Waterhouse, Seery, a bunch of others.
2      Where he says, at the direction of Jim Seery,
3  please provide DSI with the requested information for
4  each entity below.
5      And you'll see the entity includes both of my
6  clients, NexPoint Advisors and HCMFA. And the
7  information includes bank statements, income
8  statements, balance sheets, cash flows.
9      Do you see that?
10    A. Yes.
11    Q. Do you recall this email?
12    A. Vaguely, yes.
13    Q. Did you have any concerns when you received
14  this email?
15    A. Concerns about the email, no. I probably
16  checked with -- I would have checked with Frank to make
17  sure it was okay to send this first.
18    Q. Frank Waterhouse?
19    A. Yes.
20    Q. Do you have any understanding as to why
21  Mr. Donohue requested bank statements, income
22  statements, balance sheets for NexPoint and/or HCMFA?
23    A. I do not.
24    Q. Did he or anyone at DSI tell you why they
25  were requesting that?

**64**

1    A. Not that I can recall.
2    Q. If we go forward in time, you'll see that
3  Mr. Waterhouse is writing back to Mr. Donohue. And
4  then Mr. Seery interjects and says, these are HCMLP
5  business records. Please provide them as requested by
6  Jack ASAP.
7      Do you see that?
8    A. Yes.
9    Q. And it looks like you were not privy to
10  subsequent communications where Frank and Jim were
11  talking back and forth about this. You were not privy
12  to those, like you weren't blind copied or anything to
13  your recollection?
14    A. No.
15    Q. Did you in fact on or after January 6, 2021,
16  provide Mr. Donohue or anyone on his team the
17  information that he had requested as it relates to
18  NexPoint and/or HCMFA?
19    A. Without going back to check, I couldn't
20  answer yes or no for certain.
21    Q. So I think you mentioned when you received
22  the email from Mr. Donohue you would have checked with
23  Frank. And what do you remember asking Frank or
24  checking with him about?
25    A. I don't remember asking him specifically. In

Kristin Hendrix - October 27, 2021

---

65

1  fact, it's possible that Frank just responded on his
2  own here to Jack. Again, would have been a
3  conversation that I can't specifically recall.
4      Q. Sure. And you don't specifically remember
5  today providing Mr. Donohue any of that information;
6  right?
7      A. Right.
8      Q. You don't specifically remember today having
9  a discussion with Mr. Donohue or Seery or anyone else
10 at or about that time as to why they were wanting this
11 information?
12     A. Correct.
13     Q. Exhibit 12, Ms. Hendrix, is going to be the
14 December 3, 2020, letter by which Highland called the
15 notes.
16     MR. MORRIS: Objection to the form of the
17 question if there was one.
18     (Whereupon, Exhibit 12 was marked for
19     identification.)
20     Q. (BY MR. RUKAVINA) Are you familiar with
21 Exhibit 12, Ms. Hendrix?
22     A. No, I haven't seen this.
23     Q. Prior to today, you don't remember seeing
24 this?
25     A. No.

---

66

1      Q. I think you're answering no?
2      A. No, sorry, no.
3      Q. On or before December 3, 2020, did anyone
4  discuss with you whether Highland should call the
5  demand notes that were outstanding by HCMFA?
6      A. No.
7      Q. Do you recall in December 2020 any discussion
8  with anyone at the debtor about the NexPoint
9  $30.7 million term note?
10     A. Repeat your question again, please.
11     Q. Sure. So you're familiar, and we'll talk
12 about it in some detail, with the NexPoint
13 $30.7 million note?
14     A. Yes.
15     Q. And again, we'll talk about it, but at that
16 point in time that was a term note; correct?
17     A. Correct.
18     Q. Do you remember in the December 2020 or
19 November 2020 time frame discussing with anyone at the
20 debtor the status of that NexPoint note?
21     A. Yes, we would have discussed this on a weekly
22 basis in our cash meetings that we would have had, as
23 identifying that there are payments due on these loans
24 in December.
25     Q. What weekly cash meetings are you referring

---

67

1  to?
2      A. We had a standing weekly cash meeting with
3  Frank Waterhouse, myself, Jim Seery. I can't recall
4  everyone on it. Some of the DSI folks. We go through
5  cash forecasts. It's a 13-week cash forecast. We go
6  through it every week.
7      It's going to lay out incoming and outgoing
8  payments that are forecasted, of which these term loans
9  were in those forecasts, so they were discussed.
10     Q. And Mr. Morris produced some of those to me
11 this morning. I haven't had time to go through them.
12     But it is your recollection in November and
13 December of 2020 the fact of the NexPoint term note
14 being out there was known to Mr. Seery?
15     A. Yes.
16     Q. And the fact of an upcoming December 31,
17 2020, payment was known to Mr. Seery?
18     A. Yes.
19     Q. So with that background, in November and
20 December of 2020, do you remember discussing with
21 anyone anything to the effect of, oh, it really would
22 be better if NexPoint defaulted on that note so we
23 could call it?
24     A. No.
25     Q. Did Mr. Seery ever state to you anything in

---

68

1  November or December of 2020 about how the debtor might
2  monetize that NexPoint note?
3      A. No.
4      Q. Did he discuss with you any potential sale of
5  that promissory note?
6      A. No.
7      Q. Did DSI ever discuss with you in November or
8  December 2020 any potential sale of that note?
9      A. No.
10     Q. Or how to monetize that note?
11     A. No.
12     Q. So -- well, strike that.
13     Did Mr. Seery or anyone at DSI, or anyone at
14 all, in November or December of 2020 state any words to
15 you to the effect that they were hoping that NexPoint
16 would default on that note?
17     A. Never.
18     Q. Or that it would be in the debtor's interest
19 for NexPoint to default on that note?
20     A. No.
21     Q. In November or December of 2020, do you
22 recall having any discussions with Mr. Seery or anyone
23 at DSI as to the collectibility of that note? And by
24 that I mean whether NexPoint can pay the note?
25     A. I don't specifically recall. It most likely

---

Kristin Hendrix - October 27, 2021

69

1  came up in cash conversations.
2      Q.  I think you were assistant controller back
3  then?
4      A.  Yes.
5      Q.  Would a discussion of a borrower's ability to
6  repay have been something within your general sphere of
7  responsibility in that time frame?
8          MR. MORRIS:  Objection to the form of the
9  question.
10         THE WITNESS:  It depends on who the borrower
11  is, and at that time we did -- we had knowledge over
12  that information, so yes.
13     Q.  (BY MR. RUKAVINA)  Well, you've seen some
14  instructions or requests from Mr. Seery to you and DSI
15  to you for financial information of NexPoint and HCMFA.
16  We've gone through those documents; right?
17     A.  Yes.
18     Q.  Does that refresh your memory that there was
19  any internal discussion that you were privy to about
20  the ability of HCMFA and/or NexPoint to pay these
21  notes?
22     A.  I don't recall that specifically being asked.
23  It could have.
24     Q.  Did you ever at any point in time have any
25  employment or officer or any title or role with

70

1  NexPoint Advisors, LP?
2      A.  No.
3      Q.  Were you ever the controller or assistant
4  controller for NexPoint Advisors LP?
5      A.  No.
6      Q.  Did you ever at any point in time have any
7  employment, officer or any title or role at HCMFA?
8      A.  No.
9      Q.  Were you ever the controller or assistant
10  controller of HCMFA?
11     A.  No.
12     Q.  So you might have indirectly provided
13  services to those two as part of shared services, but
14  never directly; is that fair?
15         MR. MORRIS:  Objection to the form of the
16  question.
17         THE WITNESS:  When you say never directly,
18  meaning I was not employed by those entities?
19     Q.  (BY MR. RUKAVINA)  Correct.
20     A.  That's correct.
21     Q.  Do you have any understanding -- first of
22  all, NexPoint did not make a payment on December 31,
23  2020; correct?
24     A.  Correct.
25     Q.  Okay.  Do you have any understanding of why

71

1  not?
2      A.  Yes.
3      Q.  What's your understanding?
4      A.  Either November 30 or December 1, 2020, I
5  received a phone call from Frank Waterhouse that said,
6  no payments are going from any of the Advisors to
7  Highland.
8      Q.  Can you be more specific with what he said?
9      A.  That's what he said.
10     Q.  So he said no payments from the Advisors to
11  Highland?
12     A.  Yes.
13     Q.  Did he reference the promissory note
14  expressly?
15     A.  No.
16     Q.  But no payments means?
17     A.  Nothing.
18     Q.  That would logically in your mind include the
19  promissory note?
20     A.  Yes.
21     Q.  Did you ask him why?
22     A.  No.
23     Q.  Did he tell you why?
24     A.  No.
25     Q.  Did you, prior to January 1, 2021, did you

72

1  hear from anyone as to why Mr. Waterhouse gave that
2  instruction?
3      A.  Not that I recall.
4      Q.  Did you, after that November 30 or December 1
5  phone call, did you follow up with him or anyone else
6  about the upcoming note payment?
7      A.  I didn't have any reason to.
8      Q.  I'm going to -- let me find you a document
9  for a moment.
10         Just so the record is complete, let's include
11  this promissory note.  It's going to be Exhibit 13.
12  This is the NexPoint promissory note.
13         (Whereupon, Exhibit 13 was marked for
14         identification.)
15     Q.  (BY MR. RUKAVINA)  I take it you've seen this
16  promissory note, Exhibit 13?
17     A.  Yes.
18     Q.  And I think you testified about this before,
19  but just to summarize to save time.
20         This would have been a note that you would
21  not have papered but would have gone through legal
22  because it was a roll-up.  Is that generally accurate?
23     A.  Yes.
24     Q.  And do you have any memory at all of having
25  anything to do with papering up this loan?

Kristin Hendrix - October 27, 2021

**73**

1    A.  Not that I recall.
2    Q.  Would you have had, after 2017 and before
3  2021, any role with respect to any payments or upcoming
4  payments on this note, any role at all?
5    A.  Yes.
6    Q.  What would have been your role or roles?
7    A.  That would have been taking direction from
8  Frank Waterhouse or possibly Jim Dondero saying, go
9  ahead and make these payments that are due on these
10  term notes.
11    Q.  Would you have recorded on any books or
12  records payments that actually were made?
13    A.  Not me personally.
14    Q.  Who would have?
15    A.  Our accountant, which could have been one of
16  two different people, depending on the time frame.
17    Q.  Would you have had any role with respect to
18  recording those payments or is that just something that
19  your group would have done?
20    MR. MORRIS:  Objection to the form of the
21  question.
22    THE WITNESS:  I would not have had a role.
23  My group would have.
24    Q.  (BY MR. RUKAVINA)  What about calculating
25  amortization and/or interest payments that are due or

**74**

1  upcoming?  Who would have done that, you or someone
2  else?
3    A.  Our accountant.
4    Q.  Do you have any memory of doing that?
5    MR. MORRIS:  Objection to the form of the
6  question.
7    THE WITNESS:  Not during 2017 through 2019.
8    Q.  (BY MR. RUKAVINA)  What about 2020?
9    A.  No.
10    Q.  Going back to that November 30 or December 1
11  telephone call, do you recall who initiated the call?
12    A.  To me?
13    Q.  The one between you and Mr. Waterhouse.
14    A.  Frank called me.
15    Q.  Frank called you.
16    And was it just to discuss -- or just to give
17  you that instruction, no payments from the Advisors, or
18  was there other things discussed?
19    A.  I could not tell you if something else was
20  discussed on that phone call.
21    Q.  Do you remember if it was a long phone call
22  or short?
23    A.  Couldn't tell you.
24    Q.  Do you remember where you were when he called
25  you?

**75**

1    A.  At my house.
2    Q.  Did you answer on a cell phone or landline?
3    A.  My cell phone.
4    Q.  Is there any chance in hell that your cell
5  phone would still have a record of that phone call,
6  like what time it was and how long it lasted?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    Q.  (BY MR. RUKAVINA)  I apologize for using
10  hell.
11    MR. MORRIS:  And to foundation.
12    THE WITNESS:  I have no idea.
13    Q.  (BY MR. RUKAVINA)  Do you have your cell
14  phone with you right now?
15    A.  In the other room.
16    Q.  I might ask you during the break to just --
17  we'll take a short break before I'm done, and I'll ask
18  you if you've had a chance to look for November and
19  December 2020 phone logs between you and
20  Mr. Waterhouse.  I would ask you to do that, please.
21    A.  Sure.
22    Q.  And I apologize, I think you said you thought
23  it was a short telephone call?
24    A.  I have no idea.
25    Q.  Did the telephone call or Mr. Waterhouse's

**76**

1  instructions surprise you in any way?
2    A.  Nothing surprises me anymore, so no.
3    Q.  Did it surprise you back in November or
4  December of 2020?
5    A.  No.
6    Q.  Did it pique your curiosity?
7    A.  Nope.
8    Q.  Just another instruction from your boss?
9    A.  Yep.
10    Q.  Exhibit 14 is going to be a document that
11  we're not sure what it is and we're not sure who
12  prepared it.  It appears to be a ledger of charges
13  against and payments on this promissory note.
14    I'm just saying that so the people on the
15  phone know what it is, but you don't have to take what
16  I said as correct.
17    (Whereupon, Exhibit 14 was marked for
18    identification.)
19    Q.  (BY MR. RUKAVINA)  So Ms. Hendrix, Exhibit 14
20  was produced by the debtor.  And I'm going to ask you,
21  do you know what this is or have you seen it before?
22  Can you help us state what it is?
23    A.  This looks like it is an amortization
24  schedule of the NexPoint Advisors term loan.
25    Q.  Would this have been something that it

Kristin Hendrix - October 27, 2021

77

1  appears to you would have been maintained internally by
2  the debtor, or does it look like it might have been
3  prepared by DSI or someone else for some other reason?
4      A.  It looks like the debtor's amortization
5  schedule that they kept.
6      Q.  Did the debtor keep an amortization schedule
7  for the NexPoint promissory note, to your knowledge?
8      A.  Yes.
9      Q.  Did the debtor keep amortization schedules
10  for other term promissory notes?
11      A.  Yes.
12      Q.  In what format, like Excel spreadsheets or
13  Word documents?  What is your recollection for NexPoint
14  specifically?
15      A.  Excel.
16      Q.  Would that have been on the shared system or
17  something?
18      A.  Yes.
19      Q.  And who would have been responsible on an
20  ongoing basis to update the NexPoint amortization
21  schedule?
22      MR. MORRIS:  Objection to the form of the
23  question.
24      THE WITNESS:  Depends on what time you're
25  asking.

78

1      Q.  (BY MR. RUKAVINA)  Let's talk about the year
2  of 2020.
3      A.  That would have been Hayley Eliason, our
4  accountant at that time.
5      Q.  What about the year 2019?
6      A.  Still Hayley.
7      MR. RUKAVINA:  I'm going to just ask, to
8  preserve the record, Mr. Morris, if he hasn't already,
9  to produce any such Excel spreadsheet in the native
10  form.
11      Q.  (BY MR. RUKAVINA)  If we look at this,
12  Ms. Hendrix -- and I'm a little confused as to what
13  these entries mean.  Maybe you could help me.  But
14  columns that say interest paid, principal paid, total
15  paid, do you know what those columns mean?
16      A.  Exactly as they state.  These are interest
17  and principal payments made on the date that's listed,
18  and then you've got a total.
19      Q.  And then they're in brackets because they're
20  negative numbers?
21      A.  Correct.
22      Q.  So here's what I'm not understanding.  Go to
23  the second page.
24      You see there's an entry under interest paid
25  12/30/29 [verbatim] that says negative 530,000 and

79

1  change but it doesn't use brackets?
2      A.  It's a negative number.  It's just a
3  formatting issue.
4      Q.  What about also on that same page in the
5  other column, principal paid, 5/31/2020, it's a
6  positive number, 575,550.
7      MR. MORRIS:  Where are you?
8      MR. RUKAVINA:  On page 2 of this exhibit.
9      MR. MORRIS:  What date?
10      MR. RUKAVINA:  May 31, 2020.  And it's the
11  column over, principal paid.  It's a positive number,
12  575,000 and change.
13      MR. MORRIS:  Got it, thank you.
14      Q.  (BY MR. RUKAVINA)  Do you see that,
15  Ms. Hendrix?
16      A.  Yes.
17      Q.  Do you have an understanding of why that
18  number would be positive?
19      A.  Actually, I think this looks like an entry to
20  me where the interest is what we call picking.  So on
21  the anniversary date of this loan, which is May, from
22  what I can tell, the accrued interest total, which is
23  that 575-, is being rolled into principal.
24      That's what I can tell from looking at it.
25      Q.  Okay.  Do you have any understanding as to

80

1  why that would have been done or why that would have
2  been done on that day?
3      MR. MORRIS:  Objection to the form of the
4  question.
5      THE WITNESS:  Because that's the anniversary
6  date of the loan.  I would assume that that's how the
7  loan is written.
8      Q.  (BY MR. RUKAVINA)  And I think that that
9  Section 1 of the promissory note does say, the unpaid
10  principal balance of this note from time to time
11  outstanding shall bear interest.
12      At the rate of 6 percent per annum from the
13  date hereof until maturity date, compounded annually on
14  the anniversary of the date of this note.
15      Do you see that?
16      MR. MORRIS:  Objection to the form of the
17  question.
18      THE WITNESS:  Yeah, I see that.
19      Q.  (BY MR. RUKAVINA)  Assuming that this is the
20  correct amortization schedule for the NexPoint note,
21  and that the numbers in here are correct, if you look
22  at the second page under the column total paid there
23  are a number of entries for 2019.
24      Do you see that, the far right column?
25      A.  At the top, yes.

Kristin Hendrix - October 27, 2021

81

1      Q.  For example, 1.3 million, 2.1 million,
2   1.3 million.
3          Do you see that?
4      A.  Yes.
5      Q.  Assuming that that's correct, do you have any
6   memory or understanding whether in the year 2019, or
7   why NexPoint was making these payments on this
8   promissory note?
9      A.  Without going back and reading through emails
10  I can only assume that, from looking at this, Highland,
11  the debtor, would have needed cash, and so this is one
12  way of getting cash to the debtor.
13     Q.  This is kind of like what we discussed in the
14  beginning, that Mr. Dondero on a cash needed basis
15  would just transfer money between entities?
16     A.  Yes.
17     Q.  Do you have any memory in the first half of
18  2019 whether Highland, the debtor, had any particular
19  need for cash money at that time?
20     A.  We generally always had a need for cash, so
21  yes.
22     Q.  And so if NexPoint was transferring money
23  back to Highland on this note because Highland needed
24  the money, would those have been recorded as
25  prepayments by the debtor?

82

1      MR. MORRIS:  Objection to the form of the
2   question.
3      THE WITNESS:  Yes.
4      Q.  (BY MR. RUKAVINA)  Sitting here today, do you
5   have any reason to believe based on the formatting or
6   anything on Exhibit 14 that it's not the amortization
7   schedule as it was maintained by the debtor?
8      A.  I don't have any reason to not believe that
9   it was.
10     Q.  Going to show you a few documents that I'm
11  hopefully going to burn through, but you're certainly
12  entitled to take all the time that you need.
13         So first is going to be a document that
14  Mr. Morris produced this morning.  It's not Bates
15  labeled.  I don't know why.
16     MR. MORRIS:  As I said in my email, my
17  paralegal is sick and so I wanted you to have the
18  documents.  We'll Bates stamp them later, but we have a
19  written record from my email of what we produced to
20  you.
21     MR. RUKAVINA:  You're assuming that I read my
22  emails.
23     MR. MORRIS:  Sorry about that.  I confess,
24  sometimes I don't as well.
25     Q.  (BY MR. RUKAVINA)  So I'm going to hand you

83

1   Exhibit 15 and I'm going to represent to you that it's
2   the email that Mr. Morris sent to me today and I've not
3   doctored it in any way.
4          (Whereupon, Exhibit 15 was marked for
5          identification.)
6      MR. MORRIS:  Do you have the email that it
7   was attached to?
8      MR. RUKAVINA:  Somewhere.  I can find it at a
9   break.
10     MR. MORRIS:  I'll let the witness testify.
11  This was attached to an email.  Not my email, but
12  another email.  But I'll let the witness testify.
13     MR. RUKAVINA:  Off the record.
14         (Off the record.)
15     Q.  (BY MR. RUKAVINA)  So you have Exhibit 15.
16         And during the break we established, I don't
17  have a copy of it right now, but you sent Exhibit 15 on
18  August 29, 2020, by email, copying
19  Mr. Waterhouse, as well as a couple of other
20  attachments; is that correct?
21     A.  Correct.
22     Q.  Do you recall what prompted you to send that
23  email and this attachment?
24     A.  Yes.
25     Q.  What?

84

1      A.  Frank Waterhouse called me on August 29, and
2   requested that I do so.
3      Q.  Did he tell you why?
4      A.  From what I recall, this was a time when Jim
5   was trying to come up with his bargain or pop land,
6   whatever he referenced it as.  This was all information
7   that Frank said he wanted.
8      Q.  Okay.  So going back to Exhibit 15, what I'm
9   interested in is NexPoint Advisors, the 23,846,000 and
10  change number.
11         Do you see that?
12     A.  Yes.
13     Q.  Where did that number -- or where did this
14  Exhibit 15 come from, if you understand my question?
15     A.  Sure.  These numbers should all be balances
16  off of the corresponding notes that each entity owed to
17  the debtor.
18     Q.  Did you or someone prepare Exhibit 15
19  specifically for that email?  Or was Exhibit 15 already
20  existing somewhere on the system?
21     A.  I believe that we prepared it specifically
22  for this request.
23     Q.  Do you recall who?
24     A.  It was either myself or our accountant.  I
25  don't recall who put it together.

Kristin Hendrix - October 27, 2021

---

85

1    Q.  Okay.  And where would that 23 million and
2  change number for NexPoint have come from, an
3  amortization schedule?
4    A.  Yes.
5    Q.  And what about Highland Capital Management
6  Fund Advisors?  You see $10.5 million and change demand
7  on Exhibit 15?
8    A.  Yes.
9    Q.  Where would that $10.5 million number have
10  come from, do you remember?
11    A.  The same.  It would have come off of the
12  amortization schedules for all of their notes.
13    Q.  How was there an amortization schedule for a
14  demand note?
15    A.  Because it's accruing interest.
16    Q.  So sitting here today, you expect there would
17  be some amortization schedule like Exhibit 14 but for
18  HCMFA?
19    A.  Yes.
20    Q.  Now we're going to have an exhibit [verbatim]
21  chain that's going to be marked as Exhibit 16.
22    (Whereupon, Exhibit 16 was marked for
23    identification.)
24    MR. RUKAVINA:  For the folks on the video,
25  Exhibit 16 is the email chain that Mr. Morris used last

---

86

1  week regarding the Section 15(c) document.
2    Q.  (BY MR. RUKAVINA)  Are you familiar with this
3  Exhibit 16 email chain, Ms. Hendrix?
4    A.  Yes.
5    Q.  Why are you familiar with it?
6    A.  Well, I'm copied on it, and I saw it
7  yesterday.
8    Q.  Do you have any memory -- well, that's a
9  stupid question.  But prior to yesterday, did you have
10  any memory of this?
11    A.  Yes.
12    Q.  And do you recall the context or the purpose
13  of this exhibit, or this email chain?
14    A.  From what I remember this is the time where
15  information was being prepared for the retail board to
16  re-up the debtor's shared services.
17    Q.  So, here -- you're certainly welcome to read
18  it in its entirety and if you feel like you want to or
19  need to, that's fine.  But I only have one question.
20  Well, one question with two subparts.
21    I'm looking at Ms. Lauren Thedford's,
22  T-h-e-d-f-o-r-d's, email October 6, 2000 [verbatim]
23  where she says, I see the below from the 6/30
24  financials.  NPA, due to HCMLP and affiliates as of
25  June 30, 2020.

---

87

1    Do you see that, ma'am?
2    A.  Yes.
3    Q.  23 million 683?
4    A.  Yes.
5    Q.  And you see, HCMFA due to HCMLP as of
6  June 30, 2020, 12,286,000?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    Q.  (BY MR. RUKAVINA)  Strike that.
10    It says 12,286.  What do you take that 12,286
11  to mean?
12    A.  I think that's a typo and it should have
13  said -- well, there's several things wrong with this,
14  from looking at it.
15    She left off three zeros on the end of it.
16  Should have said 12,286,000.  Secondly, that amount is
17  our due to affiliates on HCMFA's books, not just due to
18  HCMLP.
19    Q.  That was going to be my question, why that
20  12,286,000 number didn't jive with the 10,530,000
21  number on Exhibit 15?
22    A.  Yes, there's another loan due to a different
23  affiliate.
24    Q.  So that $12,286,000 amount doesn't mean that
25  it's all due to Highland; is that correct?

---

88

1    A.  Correct.
2    Q.  Exhibit 17 is going to be the January 7, 2021
3  notice from the debtor to NexPoint about the default.
4    (Whereupon, Exhibit 17 was marked for
5    identification.)
6    Q.  (BY MR. RUKAVINA)  You've been handed
7  Exhibit 17.  Have you seen this document before?
8    A.  Not that I believe.
9    Q.  And I think we've asked this before, but just
10  to clarify.
11    Did anyone at the debtor, including Mr. Seery
12  or DSI, discuss with you after December 31, 2020 that
13  the payment had not been made and what, if anything,
14  the debtor should do about that?
15    MR. MORRIS:  Objection to the form of the
16  question.
17    THE WITNESS:  I can't recall specific
18  conversations that may or may not have been had around
19  that topic.
20    Q.  (BY MR. RUKAVINA)  Would -- so back then you
21  were the assistant controller, on January 7; right?
22    A.  Yes.
23    Q.  Do you think that back then Mr. Seery or DSI
24  would have sought your advice or input as to what they
25  should do about the missed payment?

---

Kristin Hendrix - October 27, 2021

89

```
1        A.  No.
2        MR. MORRIS:  Objection to the form of the
3   question.
4        THE WITNESS:  No.
5        Q.  (BY MR. RUKAVINA)  That would have been
6   outside of your purview?
7        A.  Yes.
8        Q.  And you see in this notice in the middle, it
9   says an amount due as of January 8 in the $24,471,000
10  range.
11       Do you see that?
12       A.  Yes.
13       Q.  Do you have any idea, I take it you don't,
14  where that number came from?
15       MR. MORRIS:  Objection to the form of the
16  question.
17       THE WITNESS:  I don't know who provided that
18  number or where it came from.
19       Q.  (BY MR. RUKAVINA)  Do you have any
20  understanding as to why that number is higher than the
21  number on Exhibit 15?
22       A.  My guess would be that Exhibit 15 is just
23  principal balances.
24       Q.  Okay.
25       Exhibit 18, please.
```

90

```
1        (Whereupon, Exhibit 18 was marked for
2        identification.)
3        Q.  (BY MR. RUKAVINA)  Exhibit 18, Ms. Hendrix,
4   is an email chain between you and Mr. Waterhouse on
5   January 12, 2021.  Do you remember this email chain?
6        A.  No.
7        Q.  Do you remember on January 12 Mr. Waterhouse
8   emailing you, asking when the last amort payment due
9   and what the amount was for NexPoint?
10       A.  No.
11       Q.  When was the last time -- well, strike that.
12       Do you remember ever seeing this email
13  between then and today?
14       A.  No.
15       Q.  Do you have any present memory of any
16  communications with Mr. Waterhouse on or about
17  January 12, 2021 regarding the NexPoint default or
18  note?
19       A.  Not specific, no.
20       Q.  Any general memory?
21       A.  Not that I can pinpoint, no.
22       Q.  Were you aware that on or about January 14
23  NexPoint transferred about $1.4 million and change to
24  the debtor?
25       A.  Yes.
```

91

```
1        Q.  Were you aware of it then?
2        A.  Was I aware of what?
3        Q.  That transfer of $1.4 million and change.
4        A.  On January 14?
5        Q.  Yes.
6        A.  Yes.
7        Q.  Did you facilitate that transfer?
8        A.  Yes.
9        Q.  Who told you to make that transfer?
10       A.  Frank Waterhouse.
11       Q.  Did he tell you why?
12       A.  Nope.
13       Q.  He just said make the transfer?
14       A.  Yes.
15       Q.  Did he tell you that it was on account of the
16  NexPoint note?
17       A.  Yes.
18       Q.  Did he tell you how to, if at all, to credit
19  that note for that amount?
20       A.  No.
21       Q.  Sitting here today, you have no memory other
22  than that Frank Waterhouse told you to transfer some
23  $1.4 million on the NexPoint note?
24       A.  Right.
25       Q.  And do you recall, was that oral or written
```

92

```
1   or how would that have been?
2        A.  That was a phone call.
3        Q.  Do you recall who initiated the phone call?
4        A.  Frank called me.
5        Q.  Was that the only topic discussed in that
6   phone call to your memory?
7        A.  Yes.
8        Q.  Did you ask him why the payment or
9   anything -- did you ask him anything at all?
10       A.  No.
11       Q.  And after you made the payment -- or I'm
12  sorry, after you caused the payment to be made, did you
13  take any further steps with respect to the NexPoint
14  note?
15       A.  I forwarded the payment confirmation, showing
16  that the money was sent from NexPoint Advisors to
17  Highland, forwarded that payment confirmation from the
18  bank to Jack Donohue at DSI, letting him know.
19       Q.  Did you let Mr. Donohue or anyone at DSI know
20  about the transfer before the transfer was made?
21       A.  No.
22       Q.  And you sent that by email to Mr. Donohue?
23       A.  Yes.
24       Q.  Did Mr. Donohue thereafter have any
25  discussion with you about that in any way?
```

Kristin Hendrix - October 27, 2021

93

1    A.  I have no idea.
2    Q.  He didn't ask what this was for or anything
3  like that?
4    A.  He may have asked what the amount
5  represented.  I can't specifically recall.  But it's
6  possible.
7    Q.  Okay.  Do you recall any discussion about
8  that time, January 14, with Mr. Donohue or
9  Mr. Waterhouse or anyone as to whether that payment
10  would in any way relieve NexPoint of the default or
11  would not relieve NexPoint of the default?
12    A.  No.
13    Q.  Ms. Hendrix, I believe that I am done.  I
14  would like you, however, because it's important, to
15  check your phone.  Would you like a short, five-minute
16  restroom break and just check --
17    A.  Yeah, and I might need help figuring out how
18  to do that.
19    Q.  I'm not saying that it's possible, but I'm
20  going to ask you on the record to look for that
21  November 30 or December 1, 2020 phone call.
22      MR. MORRIS:  We're happy to do that.
23    Q.  (BY MR. RUKAVINA)  But what I would like if
24  you find it, I would like you to tell me the time, the
25  date and the length of that call.

94

1    A.  Okay.
2    Q.  Thank you.
3      We'll be back in five minutes.
4      (Off the record.)
5    Q.  (BY MR. RUKAVINA)  Ms. Hendrix, during the
6  break did you look at your phone?
7    A.  I did.
8    Q.  Did you find anything?
9    A.  Sadly, it only goes back to October 5 of
10  2021.
11    Q.  Not surprised.  Thank you.
12      Have I been courteous to you today?
13    A.  Yes.
14      MR. RUKAVINA:  I pass the witness.
15      MR. MORRIS:  Thank you.
16      MR. AIGEN:  Are we ready to move forward?
17      MR. MORRIS:  Yes.  You're a little dark
18  there.
19      MR. RUKAVINA:  Can we increase the volume on
20  that thing?
21      (Off the record.)
22          EXAMINATION
23    Q.  (BY MR. AIGEN)  Good afternoon, Ms. Hendrix.
24  My name is Michael Aigen.  I represent Mr. Dondero,
25  HCMS and HCRE Partners in several of the adversary

95

1  proceedings today.
2      I'm going to try to ask you some questions
3  about these adversary proceedings.  I'll try to make it
4  as quick as possible so we don't keep you here.
5      You understand that you're still under oath;
6  is that correct?
7    A.  Correct.
8    Q.  First topic I want to ask you about is one of
9  the defenses in this case related to an oral agreement.
10  Let me start off with this question.
11      Are you aware that some of the defendants in
12  these adversary proceedings have raised a defense that
13  there was a subsequent oral agreement allowing the
14  notes at issue to be potentially forgiven if certain
15  events occurred?
16    A.  I've recently been made aware that this came
17  up, yes.
18    Q.  When you say recently, approximately when?
19    A.  Within the last week.
20    Q.  And where did you learn that from?
21    A.  In my speakings with John Morris just
22  preparing for today.
23      MR. AIGEN:  And John, I'm going to assume
24  that those conversations are privileged?
25      MR. MORRIS:  That's a very fair assumption.

96

1    Q.  (BY MR. AIGEN)  Other than the conversation
2  you just referred to with Mr. Morris, have you ever had
3  any other conversations with anyone about this alleged
4  oral agreement that Defendants are contending occurred?
5    A.  No.
6    Q.  So prior to that conversation with Mr. Morris
7  you weren't even aware of this alleged defense related
8  to an oral agreement.  Is that fair to say?
9    A.  That's right.
10    Q.  This is a similar question but slightly
11  different, just to sort of finish this topic.  I'm not
12  asking about this oral agreement as a defense, I'm just
13  asking more generally.
14      Other than this conversation, were you aware
15  generally of any conversations that anyone had where
16  the notes at issue might be forgiven if certain events
17  occurred?
18      MR. MORRIS:  Objection to the form of the
19  question.
20      THE WITNESS:  No.
21    Q.  (BY MR. AIGEN)  Is it fair to say that you
22  haven't had any conversations about this subsequent
23  oral agreement with anyone other than Mr. Morris?
24    A.  That's fair.
25    Q.  You never discussed it with Mr. Seery?

Dickman Davenport, Inc
214.855.5100      www.dickmandavenport.com      800.445.9548

Kristin Hendrix - October 27, 2021

---

97

1    A.  No.
2    Q.  Never discussed it with Mr. Klos?
3    A.  No.  Well, sorry, Mr. Klos was present when
4  John and I talked about it.  But that's it.
5    Q.  Have you ever made any investigation or
6  effort in order to determine if this oral agreement
7  actually occurred?
8    A.  No.
9    Q.  If there was such an oral agreement to
10  potentially forgive the notes, do you believe that you
11  would have known about such an oral agreement as part
12  of your duties and responsibilities?
13    A.  Yes, I would hope so.
14    Q.  Why do you say that?
15    A.  That's something that should be disclosed in
16  audited financial statements, and me and my team are
17  responsible for preparing those financial statements
18  and presenting them to the auditors as fair and
19  accurate.
20    Q.  And is it fair to say that this oral
21  agreement should have been disclosed to PwC if it was
22  determined that it was material?
23    A.  Yes.
24    Q.  And have you done any sort of analysis to
25  determine whether the oral agreement at issue here

---

98

1  would have been material for purposes of a PwC audit?
2    A.  I've not done any work, just finding out
3  about it, but from what it sounds like, it would be
4  material.
5    Q.  That's your opinion, that it would have been
6  material; is that fair to say?
7    A.  Fair.
8    Q.  Have you had any discussions with anyone else
9  about whether the oral agreement would have been
10  material?
11    A.  No.
12    Q.  Changing topics a little bit here, are you
13  aware --
14      (Off the record.)
15    Q.  (BY MR. AIGEN)  Are you aware that a few of
16  the loans at issue here, specifically related to HCMS
17  and HCRE, were term loans as opposed to demand loans?
18    A.  Yes.
19    Q.  And are you aware that for those particular
20  loans, there were payments that were supposed to be
21  made but weren't on December 31, 2020?
22    A.  Yes.
23    Q.  Do you have any understanding as to why those
24  payments weren't made with respect to the HCMS and HCRE
25  term loans on December 31, 2020?

---

99

1    A.  Yes.
2    Q.  Can you tell me why?
3    A.  Sure.  It goes along with the same statement
4  as HCMFA and NPA and the phone call that I got from
5  Frank Waterhouse saying there's no payments coming from
6  any of the affiliates to the debtor.
7    Q.  I may have written that down wrong when you
8  talked about that before, but I believe your earlier
9  testimony when you described that conversation was that
10  there was no more payments coming from the Advisors,
11  not affiliates.
12      Let me ask you then, what was the
13  conversation?  Was it no more payments from affiliates
14  or Advisors?
15    A.  It could have been either.  I probably did
16  say Advisors.  But regardless, those payments would
17  have been directed to me to be made, either by Frank
18  Waterhouse or Jim Dondero.
19      And I would assume that nobody directed me to
20  make those payments because we weren't making any
21  payments from Jim's related parties.  I don't know for
22  a fact, but that's what I would assume.  Those were all
23  under the same umbrella.
24    Q.  And again, let's back up a second.
25      When you refer to Advisors, fair to say that

---

100

1  that does not include HCMS and HCRE; is that correct?
2    A.  When I say Advisors, I am referring to HCMFA
3  and NPA.
4    Q.  And when you use the term "affiliates,"
5  you're referring to all four; is that correct?
6    A.  Correct.
7    Q.  Just want to make sure we're on the same
8  page.
9      When you answered the previous question you
10  started to get into assumptions and things like that.
11  Let me start off with what your specific recollection
12  of that phone call was.  Tell me as best as you can
13  what you remember Frank telling you?
14    A.  I remember it as being no payments from the
15  Advisors to the debtor.
16    Q.  So you don't remember the instruction being,
17  don't make payments from the affiliates.  It was, don't
18  make payments from the Advisors; is that correct?
19    A.  Correct.
20    Q.  So is it fair to say that you don't remember
21  any instructions telling you not to make any payments
22  from HCMS or HCRE?
23    A.  That's fair.
24    Q.  So if that is the case, why weren't payments
25  made from HCMS or HCRE for December 31, 2020, payment?

---

Kristin Hendrix - October 27, 2021

101

1    A.  Sure.  Typically what would have happened is
2  Frank would be talking to Jim Dondero about making
3  these payments and getting his approval to do so,
4  because Jim Dondero is, you know, directing payments
5  out of these entities.
6        I have never -- had never been given the
7  direction to effectuate those payments by anybody.
8    Q.  Is it fair to say, then, that you're not
9  aware of any instructions from anyone saying that the
10 HCMS and HCRE payments should not be made on
11 December 31, 2020?
12   A.  That's fair.
13   Q.  So the reason the payments weren't made is
14 because you never got an affirmative instruction to
15 actually make that payment; is that correct?
16   A.  Correct.
17   Q.  And you're not aware of Mr. Dondero
18 instructing anyone that HCMS and HCRE should not have
19 made the December 31, 2020, payments; is that correct?
20   A.  I'm not aware personally, no.  Correct.
21   Q.  You say personally.  In any way are you aware
22 of such a specific instruction?
23   A.  No.
24   Q.  If that payment was to be made, who at the
25 debtor would have been responsible for making those

102

1  payments on behalf of HCMS and HCRE?
2        MR. MORRIS:  Objection to the form of the
3  question.
4        THE WITNESS:  The corporate accounting team.
5    Q.  (BY MR. AIGEN)  And that included you?
6    A.  Yes.
7    Q.  And in December of 2020, were you aware that
8  those payments were due on December 31, 2020?
9    A.  Yes.
10   Q.  Did you make any attempts or efforts to
11 determine whether Mr. Dondero wanted those payments to
12 be made?
13   A.  I did not, no.
14   Q.  Why not?
15   A.  That would have been something that Frank
16 Waterhouse would have done directly with Jim Dondero
17 himself.
18   Q.  Did you have any conversations with anyone
19 about whether the December 31 payments for HCMS and
20 HCRE would be made in December of 2020?
21   A.  Not that I can recall.
22   Q.  And you didn't think it was your
23 responsibility to check on those payments and find out
24 if they should have been made?
25   A.  Right, correct.

103

1    Q.  And is that because it's only your job to
2  make payments that you're told to specifically make; is
3  that correct?
4    A.  Yes, in this case, that is correct.
5    Q.  Is it fair to say then that as part of your
6  job responsibilities you've never made a payment to
7  anyone without being specifically told by Mr. Dondero
8  and Mr. Waterhouse?
9    A.  Sorry, say that again.
10   Q.  As part of your job responsibilities, have
11 you ever made a payment to anyone without the specific
12 instruction of Mr. Waterhouse or Mr. Dondero?
13       MR. MORRIS:  Objection to the form of the
14 question.
15       THE WITNESS:  Yes, we make payments all the
16 time.
17   Q.  (BY MR. AIGEN)  So why is this different in
18 that this payment was not made without the specific
19 instructions from Mr. Waterhouse and Mr. Dondero, even
20 though you believed the payment was due on December 31,
21 2020?
22   A.  The difference between making a loan payment
23 and making normal course -- sorry, normal, ordinary
24 course, you know, overhead expense payments is that
25 something like that is not necessarily what we would

104

1  take to Jim Dondero to approve.
2        He doesn't have time to approve every single
3  overhead payment that we're making out of every single
4  entity.  That's what Frank is for.
5        Something that's once a year that's more
6  material in amount, such as a loan payment, that is
7  something that needs to get approved by Jim Dondero.
8    Q.  You say needs to get approved.  What's your
9  basis for that, something in a policy manual, something
10 someone told you?
11   A.  It's a policy that my team followed.  I don't
12 think that it's written in an actual manual anywhere,
13 but anything that's not ordinary course needs to get
14 approved by Jim Dondero.
15   Q.  Is that something that's written in a policy
16 anywhere?
17   A.  Not that I know of.
18   Q.  Were you ever told that payments in the
19 ordinary course can be made without Mr. Dondero's
20 approval but loan payments cannot?
21   A.  Yes, I do recall years ago that Frank and I,
22 possibly Jim, this was years ago, had a conversation
23 that anything ordinary course is up to Frank to
24 approve.  And this is, quite frankly, up to Frank.
25       Whatever he felt Jim needed to sign off on,

Kristin Hendrix - October 27, 2021

---

**105**

1   that's what Jim would sign off on.  This was not my
2   responsibility to make that decision.
3       Q.  And in December -- prior to the December 31,
4   2020, due date you didn't have any conversations with
5   anyone about whether this -- these payments that were
6   due should be made; is that correct?
7       A.  Correct.
8       Q.  And you didn't try to check with anyone to
9   see whether anyone wanted these payments to be made; is
10  that correct?
11      A.  Correct.
12      Q.  Subsequent to the payment being missed, did
13  you ever have any conversations with anyone about why
14  the payment was not made?
15      A.  Not that I recall.
16      Q.  So is it fair to say that sitting here today
17  you have no idea why the payments were not made for
18  HCMS and HCRE on December 31, 2020?
19          MR. MORRIS:  Objection to the form of the
20  question.
21          THE WITNESS:  I don't have any specific
22  evidence telling me why they weren't.  I can make
23  assumptions but that's not going to help.
24      Q.  (BY MR. AIGEN)  Well, did you ever have any
25  conversations with anyone about why those payments were

---

**106**

1   not made?
2       A.  No.
3       Q.  You have no idea why they weren't made other
4   than just speculation; is that fair to say?
5       A.  Correct.
6          MR. MORRIS:  Objection.  Asked and answered.
7          THE WITNESS:  Correct.
8       Q.  (BY MR. AIGEN)  And are you aware that with
9   respect to those two loans, some payments were actually
10  made in the next month, in January of 2021?
11      A.  Yes.
12      Q.  What role, if any, did you have with respect
13  to those payments?
14      A.  Frank Waterhouse would call me and tell me to
15  have my team effectuate a wire.
16      Q.  And you say would call you.  Do you remember
17  this conversation or are you just assuming it occurred?
18          MR. MORRIS:  Objection to the form of the
19  question.
20          THE WITNESS:  If we sent a payment out, Frank
21  would have told me to do it.  I would not have done it
22  on my own.
23      Q.  (BY MR. AIGEN)  Sitting here today, do you
24  have a specific recollection of the conversation where
25  someone told you to make the January 2021 payments?

---

**107**

1       A.  I can't tell you the exact date, but, yes, I
2   do have a recollection of Frank calling or emailing me
3   to have, I believe it was the HCRE wire sent out for
4   their payment.
5       Q.  What about the HCMS payment?
6       A.  I don't recall that one as much.
7       Q.  Other than the payment being made, do you
8   have any recollection of any other conversations about
9   why the payment was being made?
10      A.  No.
11      Q.  Are you aware of any conversations that
12  anyone had regarding whether these payments would
13  deaccelerate loans?
14      A.  No.
15      Q.  Is that something you would normally be part
16  of, conversations like that?
17      A.  No.
18      Q.  Changing topics here.  Not sure if this is an
19  area that you know anything about.
20          Are you familiar with the term, as it's used
21  at Highland, NAV ratio trigger period?
22      A.  No.
23      Q.  This may go very quick.  If I represent to
24  you that it's a term that's used in the -- in the
25  fourth amended limited partnership agreement for

---

**108**

1   Highland Capital Management, would that refresh your
2   recollection at all?
3       A.  No.
4       Q.  Fair to say, then, that you have no knowledge
5   as to whether NAV ratio trigger period was ever reached
6   at any time prior to bankruptcy buyouts?
7       A.  No, I don't know.
8       Q.  Have you ever had any conversations with
9   Nancy Dondero?
10      A.  I have not.
11      Q.  Never met her?
12      A.  No.  I may have exchanged an email with her
13  on an invoice, but that's the extent of it.  No
14  conversations.
15      Q.  In the years leading up to the bankruptcy of
16  Highland Capital, was there any time period where
17  Highland was unable to pay its salaries?
18      A.  Salaries?
19      Q.  Salaries of its employees?
20      A.  No.
21      Q.  In the time leading up to the Highland
22  bankruptcy, was there any time period where Highland
23  wasn't able to pay bonuses owed to any of its
24  employees?
25      A.  Not that I know of.  Not that I can recall.

---

Kristin Hendrix - October 27, 2021

---

**109**

1    Q.  Are you aware of any time period leading up
2  to the Highland bankruptcy where Highland was unable to
3  pay its bills?
4    A.  There's times where we would be in a cash
5  flow crunch and we would stretch our AP, but eventually
6  it would get paid.
7    Q.  And I think this is the last topic and we can
8  probably move through this pretty quickly.
9        Are you aware of any loans made by Highland
10  to any of its employees or officers that were forgiven
11  in part or all?
12    A.  Yes.
13    Q.  Which officers or employees are you aware of?
14    A.  I recall there were two employees.  I can't
15  remember one of them, but I believe another, the second
16  one, was Paul Adkins.  Again, I'm just recalling this
17  was years ago.
18    Q.  And these two are the only ones you're aware
19  of?
20    A.  Or I'm sorry, not Paul Adkins, Tim Lawler.
21  It's possible Paul Adkins was the other one, but I
22  can't tell you for sure.
23    Q.  Tim Lawler and some other employee that you
24  can't remember the name of are the only two that you're
25  aware of?

---

**110**

1    A.  Yes.
2    Q.  This other employee, I know you don't
3  remember the name.  Is there any other description that
4  you can give me, what their position was, how long they
5  worked, or is it just you remember those loans?
6    A.  I just remember we had two employee loans.
7    Q.  Approximately when was this?
8    A.  I couldn't even tell you.  All the years just
9  commingle together.
10    Q.  More than five years ago?
11    A.  Yes.
12    Q.  More than 10 years ago?
13    A.  I couldn't say.
14        MR. AIGEN:  Why don't we take a five-minute
15  break and then I'll either be done or have just a few
16  wrap-up questions.
17        MR. RUKAVINA:  Okay.
18        (Off the record.)
19        FURTHER EXAMINATION
20    Q.  (BY MR. RUKAVINA)  Ms. Hendrix, in May of
21  2019, would you on behalf of Highland alone,
22  unilaterally, have the authority to lend to HCMFA 2.4-
23  and/or $5.0 million?
24    A.  No.
25    Q.  And would you have had any authority on

---

**111**

1  behalf of HCMFA in May of 2019 to bind HCMFA to such
2  notes?
3    A.  No.
4    Q.  Thank you, ma'am.
5        EXAMINATION
6    Q.  (BY MR. MORRIS)  Ms. Hendrix, can you get out
7  of your pile, Exhibit Number 3.
8        And this is the email from Dave Klos to
9  corporate accounting on May 2nd concerning the
10  $2.4 million that was going to be transferred from
11  HCMLP to HCMFA?
12    A.  Yes.
13    Q.  And how did Mr. Klos characterize that
14  transfer?
15    A.  He called it a new intercompany loan.
16    Q.  What does a new intercompany loan mean to
17  you?
18    A.  That means we are creating a new loan
19  document, sending money out, tracking it as a
20  brand-new, fresh loan.
21    Q.  And he sent this email to an email group
22  called corporateaccounting@hcmlp.com.  Do I have that
23  right?
24    A.  Yes.
25    Q.  Were you included in that email group?

---

**112**

1    A.  I was.
2    Q.  Can you identify everybody else who you
3  recall being in that email group?
4    A.  Yes.
5    Q.  Who else was in that email group?
6    A.  Dave Klos, Frank Waterhouse, myself, Hayley
7  Eliason, and Blair Roeber.
8    Q.  Okay.  Did Mr. Waterhouse ever tell anybody,
9  to the best of your knowledge, in May 2019 that the
10  transaction should not be booked as a loan?
11    A.  No, not to my knowledge.
12    Q.  You testified earlier that there was, you
13  recall, a similar email the next day with respect to a
14  $5 million transaction.
15        Do you recall that?
16    A.  Yes.
17    Q.  Do you recall if that email also went to
18  corporate accounting?
19    A.  I believe so, yes.
20    Q.  And to the best of your knowledge, would
21  Mr. Waterhouse have been informed on May 3, 2019, that
22  the transaction was being booked by the corporate
23  accounting department as a loan?
24    A.  Yes.
25    Q.  Did Mr. Waterhouse tell you at that time or

---

Kristin Hendrix - October 27, 2021

---

113

1  at any time thereafter that it was a mistake to book it
2  as a loan?
3      A.  No.
4      Q.  Did Mr. Waterhouse tell you at that time or
5  at any time thereafter that he didn't intend to sign
6  the promissory notes?
7      A.  No.
8      MR. RUKAVINA:  Objection.  To the last
9  question, objection to form.
10     Go ahead.
11     Q.  (BY MR. MORRIS)  Okay.  The promissory notes,
12 to be clear, are the two promissory notes that you
13 testified to earlier that have been marked as exhibits
14 in this deposition for $5 million and $2.4 million
15 respectively.
16         With that definition as promissory notes, did
17 Mr. Waterhouse ever tell you at any time that it was a
18 mistake to sign those notes?
19     MR. RUKAVINA:  I'll object to the form.
20     Go ahead.
21     THE WITNESS:  No.
22     Q.  (BY MR. MORRIS)  Did Mr. Waterhouse or
23 anybody -- withdrawn.  I'll go back to the first
24 question.
25         Did Mr. Waterhouse or anybody in the world

---

114

1  ever tell you at any time since May of 2019 that it was
2  a mistake to issue the promissory notes as we've
3  defined them?
4      A.  No.
5      Q.  Did Mr. Waterhouse or anybody in the world
6  tell you that Mr. Waterhouse wasn't authorized to affix
7  his signature to those promissory notes?
8      MR. RUKAVINA:  And I'll object.  Assumes
9  facts not in evidence, i.e., the signature.  That's
10 what I've been objecting to.
11        But go ahead and answer.
12     THE WITNESS:  Say it again.
13     Q.  (BY MR. MORRIS)  Did Mr. Waterhouse or
14 anybody in the world tell you at any time that he
15 wasn't authorized to have his signature affixed to the
16 promissory notes?
17     MR. RUKAVINA:  Same objection.
18     THE WITNESS:  No.
19     Q.  (BY MR. MORRIS)  Did you have anything to do
20 with Highland's annual audit?
21     A.  Yes.
22     Q.  What role did you play with respect to
23 Highland's annual audit?
24     A.  I personally was in charge of completely
25 writing the entire audit report for the debtor and for

---

115

1  HCMFA.  I oversaw all other aspects of the audit my
2  team carried out.
3         Any requests from the auditors, emails with
4  questions, any issues that arose, all of that went
5  through me.
6      Q.  And did Mr. Waterhouse play a role in
7  relation to the annual audit?
8      A.  Yes.
9      Q.  What is your understanding of
10 Mr. Waterhouse's role?
11     A.  Let's see.  He was in charge of reviewing the
12 financial statements as they were done, so he saw the
13 end product.  He would sign off on the management rep
14 letter.  He signed engagement letters.
15         If there were any big issues, those got --
16 those would be brought to Frank's attention for sure.
17     Q.  Okay.  And are you a CPA?
18     A.  Yes.
19     Q.  And are you familiar with management rep
20 letters?
21     A.  Yes.
22     Q.  What is your understanding of what a
23 management rep letter is?
24     A.  That's basically telling the auditors that
25 everything in the audited report is accurate

---

116

1  to the best of their knowledge, they've presented
2  everything that they have fair and accurately, they're
3  not withholding any information.
4      Q.  And do you recall that the -- Highland's 2018
5  audit was completed in early June 2019?
6      A.  Yes.
7      Q.  And did you cause the two promissory notes
8  that we're talking about here to be delivered to
9  PricewaterhouseCoopers in connection with the audit?
10     A.  Yes.
11     Q.  And were those two promissory notes delivered
12 to PricewaterhouseCoopers because they constituted
13 subsequent events?
14     A.  Yes.
15     Q.  Do you recall whether those promissory notes
16 were described in Highland's 2018 audited financial
17 statements?
18     A.  Yes.
19     Q.  And did Mr. Waterhouse or Mr. Dondero ever
20 tell you at any time that there was a mistake in the
21 audited financial statements?
22     A.  No.
23     Q.  Did they ever tell you -- did Mr. Waterhouse
24 or Mr. Dondero or anybody in the world ever tell you at
25 any time that the two notes were mischaracterized in

---

Kristin Hendrix - October 27, 2021

117

1  the 2018 audited financial statements of Highland
2  Capital?
3      A.  No.
4      Q.  Do you know whether HCMFA also had its annual
5  financial statements audited by PricewaterhouseCoopers?
6      A.  Yes.
7      Q.  Did you play any role in connection with that
8  audit?
9      A.  Yes.
10     Q.  What role did you play in connection with
11 HCMFA's audit of the 2018 financial statements?
12     A.  Same exact role as with the debtors --
13     Q.  And --
14     A.  -- writing the audit report, overseeing all
15 other audit functions.
16     Q.  And did you and your group cause HCMFA to
17 deliver to PricewaterhouseCoopers the two promissory
18 notes that we've been discussing from May 2019?
19     A.  Yes.
20     Q.  Did Mr. Waterhouse or Mr. Dondero or anybody
21 in the world ever tell you that it was a mistake to
22 deliver those promissory notes to PwC in connection
23 with HCMFA's 2018 audit?
24     A.  No.
25     Q.  Were those notes delivered -- withdrawn.

118

1          Were those notes delivered to
2  PricewaterhouseCoopers because they constituted
3  subsequent events in connection with the 2018 audit?
4      A.  Yes.
5      Q.  Do you recall whether PricewaterhouseCoopers
6  included as a liability on HCMFA's balance sheet the
7  obligations reflected in the two promissory notes at
8  issue?
9          MR. RUKAVINA:  Objection.  Best evidence.
10         Answer.
11         THE WITNESS:  On the 2018 financials?
12     Q.  (BY MR. MORRIS)  Correct.
13     A.  Those would not have been included as
14 liabilities in the 2018 financials.
15     Q.  Do you know if HCMFA completed their audit
16 for 2019?
17     A.  No.
18     Q.  Okay.  Did the notes appear in HCMFA's 2018
19 audited financials under the subsequent events section?
20     A.  Yes.
21         MR. RUKAVINA:  Objection.  Best evidence.
22         Go ahead.
23     Q.  (BY MR. MORRIS)  Did Mr. Dondero or -- did
24 Mr. Waterhouse or Mr. Dondero or anybody in the world
25 ever tell you that it was a mistake to include

119

1  reference to these notes in HCMFA's 2018 audited
2  financial statements?
3          MR. RUKAVINA:  Same objection.
4          THE WITNESS:  No.
5      Q.  (BY MR. MORRIS)  Okay.  Do you recall, did
6  anybody in the world ever tell you that the
7  transactions described in Exhibit 3 and the other
8  document that you recall should never have been booked
9  as a loan?
10     A.  No.
11     Q.  Did anybody in the world tell you that you
12 made a mistake when you created those promissory notes?
13     A.  No.
14     Q.  Can you pull out what was marked as
15 Exhibit 16.
16         Do you understand that the Advisors provide
17 services to certain retail funds?
18     A.  Yes.
19     Q.  And do you recall that the services are
20 subject to an agreement that's subject to annual
21 review?
22     A.  Yes.
23     Q.  So looking at Exhibit 16, did you understand
24 that the retail board had asked Highland to disclose --
25 I'll just read it from the document on page 2,

120

1  Bates number ending 881.
2          There's an email from Ms. Thedford that says,
3  quote, are there any material amounts -- withdrawn.
4          Are there any material outstanding amounts
5  currently payable or due in the future, open paren,
6  e.g., notes, close paren, to HCMLP by HCMFA or NexPoint
7  Advisors or any other affiliate that provides services
8  to the funds?
9          Do you see that?
10     A.  Yes.
11     Q.  And were you generally aware that that was
12 part of the annual renewal process?
13     A.  Yes.
14     Q.  And you made some comments earlier about
15 Ms. Thedford's response on the first page.
16         Do you recall that?
17     A.  Yes.
18     Q.  And you actually were able to correct certain
19 mistakes that you perceived in her response.
20         Do I have that right?
21     A.  Correct.
22     Q.  Do you know -- do you see where it says,
23 HCMFA due to HCMLP as of June 30, 2020, let's just call
24 it $12.3 million.
25         Do you see that?

Kristin Hendrix - October 27, 2021

---

121

1    A.  Yes.
2    Q.  And above that there is a reference to the
3  6/30 financials.
4        Do you see that?
5    A.  I do.
6    Q.  Do you know what the reference to the 6/30
7  financials is?
8    A.  Yes.
9    Q.  And what is that reference?
10    A.  That is referencing the amounts on the
11  balance sheet at 6/30 that we provided for the 15(c)
12  materials to the board.
13    Q.  Okay.  And does that $12.3 million include,
14  to the best of your knowledge, the principal amount of
15  the two notes that we were talking about?
16    A.  Yes.
17        MR. RUKAVINA:  Objection.  Best evidence.
18        THE WITNESS:  Yes.
19    Q.  (BY MR. MORRIS)  And how do you know that?
20    A.  Because I kept their financials, I know for a
21  fact that it included all of their outstanding notes
22  and it most certainly included these two notes that
23  we've been talking about today.
24    Q.  And to the best of your recollection did
25  HCMFA provide the 6/30 financials to the retail board?

---

122

1    A.  Yes.
2    Q.  And to the best of your knowledge did
3  Mr. Dondero or Mr. Waterhouse or anybody in the world
4  ever tell you that the financial statements that were
5  provided to the retail board were erroneous in any way?
6    A.  No.
7    Q.  Did Mr. Dondero or Mr. Waterhouse or anybody
8  in the world ever tell you that the 6/30 financials
9  that were given to the retail board should not have
10  included the $7.4 million principal amount on the two
11  promissory notes?
12        MR. RUKAVINA:  Objection.  Best evidence.
13        Answer.
14        THE WITNESS:  No.
15    Q.  (BY MR. MORRIS)  Do you know whether -- are
16  you at all familiar with the Advisors' actual response
17  to the retail board in October 2020?
18    A.  Say that again, please.
19    Q.  So this email string is October 2020; right?
20    A.  Right.
21    Q.  And do you understand that this is kind of a
22  discussion between Mr. Waterhouse and Ms. Thedford as
23  to how to respond?
24    A.  Yes.
25    Q.  Have you ever seen the actual response that

---

123

1  was given to the retail board?
2    A.  I likely did.  I can't tell you for certain
3  that I was on the correspondence.
4    Q.  Do you recall any discussion at any time that
5  the $12.3 million number in Ms. Thedford's email should
6  be changed in the final report to the retail board?
7    A.  I don't believe so.
8    Q.  Did anybody ever tell you at any time that
9  the $12.3 million number was incorrect?
10    A.  No.
11    Q.  Did anybody ever tell you at any time that
12  that number wrongly included the $7.4 million reflected
13  in the two notes?
14    A.  No.
15    Q.  Okay.  Do you recall that earlier that
16  summer -- we looked at Exhibit 15?
17    A.  Yep.
18    Q.  And that was an attachment to an email that
19  you personally sent to Mr. Dondero.  We saw that
20  before?
21    A.  Right.
22    Q.  And this Exhibit 15, which was attached to
23  your email, identifies amounts due and owing from
24  NexPoint Advisors; right?
25    A.  Right.

---

124

1    Q.  And it identifies amounts due and owing for a
2  number of different entities, including HCMFA; right?
3    A.  Correct.
4    Q.  Do you know whether the amount included for
5  HCMFA on Exhibit 15 included the principal amount due
6  on the two promissory notes?
7    A.  It does.
8    Q.  Did Mr. Dondero or Mr. Waterhouse ever ask
9  you why -- withdrawn.
10        Did Mr. Dondero or Mr. Waterhouse ever ask
11  you how the $10.5 million number was calculated?
12    A.  No.
13    Q.  Did Mr. Dondero or Mr. Waterhouse ever
14  suggest to you that the number was incorrect?
15    A.  No.
16    Q.  Did Mr. Dondero or Mr. Waterhouse or anybody
17  in the world ever question the number that you gave to
18  Mr. Dondero in the summer of 2020 concerning the
19  principal amount due by HCMFA to HCMLP?
20    A.  No.
21    Q.  Have you ever made a payment -- withdrawn.
22        Have you ever caused a payment to be made in
23  connection with an intercompany loan without receiving
24  the prior approval from either Frank Waterhouse or
25  Mr. Dondero?

---

Kristin Hendrix - October 27, 2021

---

**125**

1  A.  No.
2  Q.  Has anybody ever said to you that you made a
3  mistake in applying a payment against principal or
4  interest due on an intercompany loan?
5  A.  No.
6  Q.  We saw this morning, and we produced to
7  Mr. Rukavina and he mentioned earlier, 13-week
8  forecasts?  Do you understand that?
9  A.  Yes.
10  Q.  Did you review the 13-week forecasts
11  recently?
12  A.  Yes.
13  Q.  And we're talking specifically about the
14  13-week forecasts for the November/December 2020 time
15  period.  Do you understand that?
16  A.  Yes.
17  Q.  Based on your review of those forecasts, did
18  those forecasts specifically identify the principal and
19  interest that were due on the three term notes as of
20  December 28, 2020?
21  A.  Yes.
22  Q.  And what was the purpose of creating the
23  13-week forecasts?
24  A.  Sure.  That was to keep everybody informed
25  who was on the cash call, Frank Waterhouse, Jim Seery

---

**126**

1  and others, keep everybody informed of upcoming
2  payments that were due on term loans well in advance.
3  Everybody knew about it.  It was out there
4  for everybody to see that was on these cash calls.
5  Q.  Now, is it your understanding that
6  Mr. Waterhouse -- withdrawn.
7  Did you email these forecasts -- withdrawn.
8  Did anybody email these forecasts to the best
9  of your recollection in late 2020?
10  A.  Yes.
11  Q.  And was it sent to the corporate accounting
12  group that we saw earlier?
13  A.  It was probably sent to Frank, Seery, the DSI
14  guys that were involved with the cash call.
15  Q.  Okay.  And so did you participate in the
16  creation of the 13-week forecasts?
17  A.  Yes.
18  Q.  What role did you play in the creation of the
19  13-week forecasts?
20  A.  I was responsible for creating the entire
21  thing.
22  Q.  Okay.  And based on the work that you did,
23  was one of the purposes to make sure that
24  Mr. Waterhouse was aware of all payments that were
25  coming due under the intercompany notes?

---

**127**

1  A.  Yes.
2  Q.  And was that information that was included on
3  the reports to Mr. Waterhouse?
4  A.  Yes.
5  Q.  And do you recall whether there were any
6  specific discussions in November or December of 2020
7  concerning those payments -- withdrawn.  That wasn't a
8  good question.
9  Did Mr. Waterhouse or -- withdrawn.
10  Did anybody on behalf of HCMS or HCRE ever
11  instruct you to make the payments that were due under
12  their term notes?
13  A.  No.
14  Q.  Did anybody on behalf of NexPoint ever
15  instruct you to make a payment that was due at year end
16  with respect to the NexPoint term note?
17  A.  No.
18  Q.  Were you authorized to make those payments
19  without the prior approval of either Mr. Waterhouse or
20  Mr. Dondero?
21  A.  No.
22  Q.  I think you testified that there were certain
23  payments that were made in January 2001 under each of
24  the three term notes.
25  Do I have that right?

---

**128**

1  A.  Correct.
2  MR. RUKAVINA:  2021.
3  MR. MORRIS:  Thank you very much.
4  Q.  (BY MR. MORRIS)  With that amendment, do you
5  understand my question?
6  A.  Yes.
7  Q.  Do you know why the three payments were made
8  in January of 2021 on each of three term notes?
9  A.  Because Frank Waterhouse instructed me to do
10  so.
11  Q.  And he had not instructed you to make those
12  payments prior to that time?
13  A.  Correct.
14  Q.  Did you have to prompt Frank Waterhouse in
15  January of 2021 to make those payments?
16  A.  No.
17  Q.  So based on the 13-week forecast that you
18  prepared and delivered to Mr. Waterhouse, is it your
19  understanding that Mr. Waterhouse knew as early as mid
20  November 2020 that payments would be due under the
21  three term notes at the end of the year?
22  A.  Yes.
23  Q.  And, in fact, did HCMS and HCRE and NexPoint
24  timely make their installment payments that were due at
25  year end 2018?

---

Kristin Hendrix - October 27, 2021

129

1    A.  Yes.
2    Q.  And was that done because HCMLP received the
3  instructions of somebody authorized to give the
4  instruction on behalf of those entities?
5    A.  Yes.
6    Q.  Did HCMS and HCRE and NexPoint timely make
7  the installment payments that were due at year end
8  2019?
9    A.  Yes.
10    Q.  And why did they make those payments?
11    A.  Because we were provided instruction and
12  authorization to do so.
13    Q.  Okay.  And is the only reason that the
14  payment wasn't made at year end 2020 because nobody on
15  behalf of the Advisors -- withdrawn.
16       Is the only reason that no payment was made
17  at the end of 2020 is because no one on behalf of
18  NexPoint, HCRE, or HCMS directed HCMLP to make those
19  payments?
20    A.  Correct.
21    MR. AIGEN:  Objection.  Form.
22    Q.  (BY MR. MORRIS)  And you testified earlier to
23  a call that you had with Mr. Waterhouse.  I think you
24  said it was either November 30 or December 1.
25       Do you recall that?

130

1    A.  Yes.
2    Q.  And did you personally continue to prepare
3  the 13-week forecasts after your conversation with
4  Mr. Waterhouse?
5    A.  Yes.
6    Q.  And did those 13-week forecasts continue to
7  include the payments that were due under the three term
8  notes at the year end?
9    A.  Yes.
10    Q.  And that's information that you gave to
11  Mr. Waterhouse; is that right?
12    A.  Right.
13    Q.  Mr. Rukavina elicited from you the fact that
14  payments of principal hadn't been made on demand notes
15  that were executed in favor of Mr. Dondero's
16  affiliates.
17       Do you recall that?
18    A.  Yes.
19    Q.  Okay.  Was that a topic of conversation with
20  PricewaterhouseCoopers at any time?
21    A.  Yes.
22    Q.  Can you tell me about that conversation?
23    A.  Sure.  As part of our annual audit, the
24  auditors would, you know, make sure that our
25  receivables are collectible.  And if they thought for

131

1  any reason they weren't, then they were going to raise
2  an issue, a going concern issue.
3       That came up several years in a row with
4  HCMFA.
5    Q.  Do you recall that the three term notes at
6  issue here were all signed on May 31, 2017?
7    A.  Yes.
8    Q.  And all of those term notes involved a
9  roll-up of previously issued demand notes; is that
10  right?
11    A.  Correct.
12    Q.  Do you know why in -- at the end of May 2017
13  NexPoint, HCRE, and HCMS rolled up their demand notes
14  into individualized term notes?
15    A.  Yes.
16    Q.  What is your understanding as to why that
17  happened?
18    A.  That would get the auditors a little bit more
19  comfort over our outstanding loans, ensuring that we
20  have an amortization schedule, an underlying contract,
21  showing that payments will be coming in every year on
22  these outstanding receivables.
23    Q.  Okay.  As the person responsible for
24  preparing Highland's audit, did anybody ever tell you
25  at any time that any of the notes were not valid

132

1  obligations of the maker?
2    A.  No.
3    Q.  As the person responsible for Highland's
4  audit, did anybody ever tell you at any time that any
5  of the notes at issue should not have been signed?
6    A.  No.
7    Q.  As the person responsible for Highland's
8  audit, did anybody ever tell you at any time that any
9  of the notes at issue were signed by mistake?
10    A.  No.
11    Q.  Did anybody ever tell you at any time that --
12  withdrawn.
13       As the person responsible for Highland's
14  audit, did anybody ever tell you at any time that
15  Mr. Dondero didn't approve of any of the notes?
16    A.  No.
17    Q.  As the person responsible for Highland's
18  audit, did anybody ever tell you at any time that
19  the -- any of the notes at issue were subject to an
20  oral agreement?
21    A.  No.
22    Q.  As the person responsible for Highland's
23  audit, did anybody ever tell you at any time that any
24  of the notes were amended?
25    A.  No.

Kristin Hendrix - October 27, 2021

---

**133**

1    Q.  As the person responsible for Highland's
2  audit, did anybody ever tell you at any time that any
3  of the notes would be forgiven?
4    A.  No.
5    Q.  During your 15 years at Highland, has an
6  intercompany loan ever been forgiven in whole or in
7  part?
8    A.  No.
9    Q.  During your -- withdrawn.
10      Can you recall any note that Highland ever
11  held as the payee that was forgiven in whole or in part
12  in the five years prior to bankruptcy, go back to 2014?
13    A.  No.
14    Q.  Is it your understanding as the person
15  responsible for Highland's audit that the forgiveness
16  of notes, if they were in a material amount, would have
17  had to have been disclosed in the audited financial
18  statements?
19    A.  Yes.
20    Q.  So is it fair to say that any evidence of the
21  forgiveness of material amounts would have been
22  disclosed in Highland's financial statements?
23    A.  Yes.
24    MR. MORRIS:  I have no further questions.
25    MR. RUKAVINA:  I have none.

---

**134**

1    MR. AIGEN:  None.
2    MR. RUKAVINA:  Okay.  Thank you very much.
3    (Whereupon, the deposition adjourned at
4    1:19 P.M.)
5      --oOo--
6      I declare under penalty of perjury that the
7  foregoing is true and correct.  Subscribed at
8  _____, Texas, this _____ day  of
9  _____, 2021.
10
11
12  _____
13  KRISTIN HENDRIX
14
15
16
17
18
19
20
21
22
23
24
25

---

**135**

1      CERTIFICATE OF REPORTER
2      I, BRANDON D. COMBS, a Certified Shorthand
3  Reporter, hereby certify that the witness in the
4  foregoing deposition was by me duly sworn to tell the
5  truth, the whole truth, and nothing but the truth in the
6  within-entitled cause;
7      That said deposition was taken in shorthand by
8  me, a disinterested person, at the time and place
9  therein stated, and that the testimony of the said
10  witness was thereafter reduced to typewriting, by
11  computer, under my direction and supervision;
12      That before completion of the deposition,
13  review of the transcript was not requested.  If
14  requested, any changes made by the deponent (and
15  provided to the reporter) during the period allowed are
16  appended hereto.
17      I further certify that I am not of counsel or
18  attorney for either or any of the parties to the said
19  deposition, nor in any way interested in the event of
20  this cause, and that I am not related to any of the
21  parties thereto.
22      DATED: November 1, 2021
23
24      _____
25      Brandon Combs, Certified Shorthand

---

**136**

1      State of Texas
       Dickman Davenport, Inc. Cert 312
2      4228 North Central Expressway
       Suite 101, Dallas, TX 75206
3      (214) 855-5100  (800) 445-9548
       Email: info@dickmandavenport.com
4      www.dickmandavenport.com
       My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Kristin Hendrix - October 27, 2021

**A**

A.M 1:22 57:22
ability 69:5,20
able 108:23
 120:18
above-styled
 1:21
Absolutely 17:8
accent 56:16
access 24:7 54:15
accessed 44:19
account 12:11
 37:7 91:15
accountant 16:19
 46:10 73:15
 74:3 78:4 84:24
accounting 11:16
 12:8,12,18
 17:14,15,16,21
 18:4 19:9 20:3
 20:12,20 21:13
 31:16,23 35:7
 40:11 45:17
 46:3 51:11,11
 51:18 56:11
 102:4 111:9
 112:18,23
 126:11
accounts 13:21
 14:8,15 51:24
accrued 79:22
accruing 85:15
accurate 72:22
 97:19 115:25
accurately 116:2
action 11:6
activities 39:20
actual 104:12
 122:16,25
addition 39:7
 41:21
additional 56:15
 56:20
adjourned 134:3
Adkins 109:16

109:20,21
advance 126:2
adversary 94:25
 95:3,12
advice 46:20
 88:24
advised 38:23
advisor 39:1
Advisors 1:10
 15:14,17,23
 27:20,23 63:6
 70:1,4 71:6,10
 74:17 76:24
 84:9 85:6 92:16
 99:10,14,16,25
 100:2,15,18
 119:16 120:7
 123:24 129:15
Advisors' 122:16
affiliate 34:25
 87:23 120:7
affiliated 15:11
affiliates 18:19
 86:24 87:17
 99:6,11,13
 100:4,17
 130:16
affirmative
 101:14
affix 50:17 114:6
affixed 47:5
 114:15
afternoon 94:23
ago 33:8 104:21
 104:22 109:17
 110:10,12
agree 55:2 57:14
 61:13
agreed 25:23
 26:3
agreeing 53:24
agreement 26:5
 26:15,21 95:9
 95:13 96:4,8,12
 96:23 97:6,9,11

97:21,25 98:9
 107:25 119:20
 132:20
ahead 73:9
 113:10,20
 114:11 118:22
Aigen 2:18 3:4
 94:16,23,24
 95:23 96:1,21
 98:15 102:5
 103:17 105:24
 106:8,23
 110:14 129:21
 134:1
Akard 1:24 2:4
alleged 40:16
 96:3,7
Allocation 38:24
 39:1
allowed 135:15
allowing 95:13
amended 107:25
 132:24
amendment
 128:4
amort 19:22 90:8
amortization
 73:25 76:23
 77:4,6,9,20
 80:20 82:6 85:3
 85:12,13,17
 131:20
amount 19:6,7
 26:10,12 30:12
 32:23 39:3
 43:16 48:15
 49:2 50:9 87:16
 87:24 89:9 90:9
 91:19 93:4
 104:6 121:14
 122:10 124:4,5
 124:19 133:16
amounts 35:8
 40:2 120:3,4
 121:10 123:23

124:1 133:21
analysis 97:24
and/or 50:13,18
 63:22 64:18
 69:20 73:25
 110:23
anniversary
 79:21 80:5,14
annual 114:20,23
 115:7 117:4
 119:20 120:12
 130:23
annually 80:13
annum 80:12
answer 7:6,6
 23:11,14 35:2
 39:19 51:5 52:3
 64:20 75:2
 114:11 118:10
 122:13
answered 41:4
 51:3 57:17
 100:9 106:6
answering 66:1
answers 42:10
 43:1 57:6
anybody 35:25
 40:8 101:7
 112:8 113:23
 113:25 114:5
 114:14 116:24
 117:20 118:24
 119:6,11 122:3
 122:7 123:8,11
 124:16 125:2
 126:8 127:10
 127:14 131:24
 132:4,8,11,14
 132:18,23
 133:2
anymore 76:2
anytime 21:10
 59:1
AP 11:17 12:23
 32:7 109:5

apologize 15:6
 59:7 62:16 75:9
 75:22
appear 118:18
APPEARANC...
 2:1
appeared 2:5,12
 2:19
appears 47:1
 76:12 77:1
appended 135:16
applying 125:3
approval 16:5,8
 48:12 49:4
 50:25 51:2
 101:3 104:20
 124:24 127:19
approve 48:15
 49:5 104:1,2,24
 132:15
approved 48:18
 48:19,21 104:7
 104:8,14
approximately
 95:18 110:7
April 12:7
area 107:19
arose 115:4
ASAP 60:18 64:6
asked 51:3 57:17
 60:10 69:22
 88:9 93:4 106:6
 119:24
asking 6:10 26:7
 29:17,19,24
 59:17 62:6
 64:23,25 77:25
 90:8 96:12,13
aspects 115:1
assistant 12:6
 69:2 70:3,9
 88:21
associate 11:18
 32:7
assume 6:25

Kristin Hendrix - October 27, 2021

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

**B**

**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

**C**

**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:21
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:14
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

Kristin Hendrix - October 27, 2021

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
categorize 24:6
cause 1:21 22:6
116:7 117:16
135:6,20
caused 39:16
92:12 124:22
cell 75:2,3,4,13
Central 136:2
CEO 13:23 60:24
Cert 136:1
certain 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
certainly 82:11
86:17 121:22
certificate 53:14
53:18,20 135:1
certified 16:19
135:2,25
certify 135:3,17
CFO 13:9,13,22
23:12 25:10
chain 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
chance 75:4,18
change 32:11
79:1,12 84:10
85:2,6 90:23
91:3
changed 58:4
123:6
changes 43:15

44:2 49:1
135:14
changing 57:4
98:12 107:18
characterize
24:13 111:13
charge 13:19
18:7 114:24
115:11
charged 10:10
charges 76:12
chase 15:9
check 60:12,15
64:19 93:15,16
102:23 105:8
checked 63:16,16
64:22
checking 64:24
checks 13:18
clarify 47:14
88:10
clear 6:20 113:12
clearly 38:13
clients 63:6
close 120:6
collect 28:21
collectibility
68:23
collectible 130:25
collection 30:14
collects 27:3
college 10:20
11:10,14
column 79:5,11
80:22,24
columns 78:14,15
Combs 1:22
135:2,25
come 84:5,14
85:2,10,11
comes 31:8
comfort 131:19
comfortable
50:23
coming 16:6

48:25 99:5,10
126:25 131:21
comma 15:4
comments 120:14
commingle 110:9
commission
136:4
common 40:10
communicate
23:17
communicated
23:23
communicating
23:24
communications
23:22 64:10
90:16
companies 52:14
company 39:10
44:13
compensate
40:15
compensation
25:17,21 26:1,6
26:20,22 27:4
39:9,12
competent 24:18
24:20,21
complete 72:10
completed 116:5
118:15
completely 17:3
47:8 114:24
completion
135:12
compliance
17:14
comport 44:20
compounded
80:13
computer 47:16
135:11
computerized
1:24
concern 131:2

concerning 111:9
124:18 127:7
concerns 63:13
63:15
condescending
25:3
conduct 38:3
confess 82:23
confident 37:22
confirm 62:2
confirmation
92:15,17
confused 78:12
confusion 47:15
connection 116:9
117:7,10,22
118:3 124:23
consent 39:1,24
consist 26:1
constituted
116:12 118:2
consulted 46:13
contact 6:9,11
contending 96:4
context 31:13
44:1 59:25
86:12
continue 130:2,6
contract 131:20
controller 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
conversation
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
conversations
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
copied 64:12
86:6
copies 55:14
56:13
copy 83:17
copying 59:13
61:3 63:1 83:18
corporate 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
102:4 111:9
112:18,22
126:11
corporateacco...
111:22
correct 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

Kristin Hendrix - October 27, 2021

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
**correctly** 32:18
33:23
**correspondence**
123:3
**corresponding**
84:16
**counsel** 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
**count** 42:10 43:1
57:6
**couple** 83:19
**course** 6:9 46:18
55:3 103:23,24
104:13,19,23
**courses** 16:15,16
**court** 1:1 6:18
27:13 30:13,25
**courteous** 94:12
**CPA** 10:24 11:2
11:6,21 115:17
**create** 43:12,18
45:8 48:17
**created** 18:21
44:18,19,21
48:7 58:1
119:12
**creating** 13:21
111:18 125:22
126:20
**creation** 126:16
126:18
**credit** 91:18

**crunch** 109:5
**CSR** 1:23
**curiosity** 76:6
**current** 11:2
**currently** 11:19
120:5
**cut** 15:9

**D**

**D** 1:22 135:2
**Dallas** 1:3,25 2:4
2:18 136:2
**dark** 94:17
**date** 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
**dated** 30:20
31:16 135:22
**dates** 57:22
**Dave** 8:24 34:18
34:23 38:13
46:7 111:8
112:6
**Davenport** 136:1
**David** 3:14 13:1
31:16 33:17
**DAVOR** 2:5
**day** 48:15 57:25
58:6 80:2
112:13 134:8
**days** 9:23,25 10:5
28:17
**deaccelerate**
107:13
**deal** 20:21 36:25
**debtor** 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
**debtor's** 40:16
68:18 77:4
86:16
**debtors** 117:12
**Dec** 4:3,11
**December** 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
**decided** 26:2,3
40:14 52:15,18
**deciding** 23:8
**decision** 29:14
105:2
**declare** 134:6
**default** 68:16,19

88:3 90:17
93:10,11
**defaulted** 67:22
**defendants** 1:11
1:20 2:6,20
95:11 96:4
**defense** 95:12
96:7,12
**defenses** 95:9
**defined** 114:3
**definition** 113:16
**degree** 10:22
**deliver** 117:17,22
**delivered** 116:8
116:11 117:25
118:1 128:18
**demand** 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
**demanded** 62:11
**demanding** 24:13
**Denton** 10:15
**department**
11:17 18:2,5,8
18:12 51:12
57:12 112:23
**depend** 18:17
**depended** 49:16
**depending** 73:16
**depends** 18:16
69:10 77:24
**deponent** 135:14
**deposed** 6:13
28:2
**deposition** 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
**describe** 12:18
53:16
**described** 17:17
99:9 116:16
119:7
**description** 14:1
110:3
**detail** 66:12
**details** 17:5
25:14 28:7
**determine** 97:6
97:25 102:11
**determined**
97:22
**Dickman** 136:1
**difference** 103:22
**different** 19:25
54:19 73:16
87:22 96:11
103:17 124:2
**direct** 27:7
**directed** 99:17,19
129:18
**directing** 48:16
101:4
**direction** 23:12
53:21 60:23
63:2 73:7 101:7
135:11
**directions** 48:25
**directly** 40:9,22
41:12 49:1
70:14,17
102:16
**disciplinary** 11:5
**disclose** 119:24
**disclosed** 97:15
97:21 133:17
133:22
**discretionary**
26:8
**discuss** 62:9 66:4
68:4,7 74:16

88:12
**discussed** 28:8
38:4 43:13
66:21 67:9
74:18,20 81:13
92:5 96:25 97:2
**discussing** 66:19
67:20 117:18
**discussion** 9:5
50:21 61:7 65:9
66:7 69:5,19
92:25 93:7
122:22 123:4
**discussions** 9:8
25:20 28:11,12
28:17 40:6 60:1
61:9,11 62:13
68:22 98:8
127:6
**disinterested**
135:8
**distinct** 29:3
45:24
**DISTRICT** 1:2
**DIVISION** 1:3
**doctor** 42:11
**doctored** 83:3
**doctoring** 42:24
57:4
**document** 32:25
47:2 49:19 72:8
76:10 82:13
86:1 88:7
111:19 119:8
119:25
**documentation**
9:16
**documentations**
47:8
**documents** 9:18
10:7 42:6 43:7
43:9 44:3 47:9
48:5,18 49:8,13
50:2,3,11 54:11
57:7,14,20

69:16 77:13
82:10,18
**doing** 6:7 43:8
45:20 74:4
**dollar** 19:7 40:2
48:15 49:2 50:9
**Dondero** 2:20 5:2
15:12 21:11,20
21:21 22:6,19
23:7,14,18,23
23:24 24:2,7
34:19 35:24
36:2 40:14,20
52:12,19,22
53:7 73:8 81:14
83:18 94:24
99:18 101:2,4
101:17 102:11
102:16 103:7
103:12,19
104:1,7,14
108:9 116:19
116:24 117:20
118:23,24
122:3,7 123:19
124:8,10,13,16
124:18,25
127:20 132:15
**Dondero's**
104:19 130:15
**Donohue** 59:13
59:17,22 62:25
63:21 64:3,16
64:22 65:5,9
92:18,19,22,24
93:8
**door** 35:1
**draft** 17:24
**drafted** 17:1,3
**drafting** 16:16
17:22,23 18:12
19:16,21 20:12
29:13
**drive** 54:9,16
55:14

drukavina@m...
2:7
**DSI** 61:19 62:6,9
63:3,24 67:4
68:7,13,23
69:14 77:3
88:12,23 92:18
92:19 126:13
**due** 16:6 59:18
66:23 73:9,25
86:24 87:5,17
87:17,22,25
89:9 90:8 102:8
103:20 105:4,6
120:5,23
123:23 124:1,5
124:19 125:4
125:19 126:2
126:25 127:11
127:15 128:20
128:24 129:7
130:7
**duly** 1:19 6:2
135:4
**duties** 12:19
97:12
**duty** 20:25

---

**E**

**E-l-l-i-n-g-t-o-n**
18:9
**e-signature** 47:10
47:12 48:1,4,5
48:8,9,12,18
49:9,15,18 50:1
50:13,17,23
**e.g** 120:6
**earlier** 43:14
45:7 99:8
112:12 113:13
120:14 123:15
125:7 126:12
129:22
**early** 116:5
128:19

**earn** 26:23
**educational**
10:18
**effect** 54:11
67:21 68:15
**effectuate** 101:7
106:15
**effort** 97:6
**efforts** 102:10
**either** 18:21
29:13,20 31:1
34:17,23 37:3
46:7,13 50:1
54:12 58:20
62:6,9 71:4
84:24 99:15,17
110:15 124:24
127:19 129:24
135:18
**electronic** <mark>54:22</mark>
**electronically**
56:3,12
**Eliason** 46:7 78:3
112:7
**elicited** 130:13
**Ellington** 4:3
18:9 60:4,9,12
60:15 61:10
**email** 2:7,14,22
3:14 4:3,7,21
5:1,5 23:17
31:12,15,20,23
32:1,4,20,25
33:3,25 36:3
37:10,19,25
38:14 41:17,21
42:5 48:20
50:11 54:11
59:4,12,22 60:1
60:2,3,25 61:2
61:6 62:4,8,15
62:24,25 63:11
63:14,15 64:22
82:16,19 83:2,6
83:11,11,12,18

83:23 84:19
85:25 86:3,13
86:22 90:4,5,12
92:22 108:12
111:8,21,21,25
112:3,5,13,17
120:2 122:19
123:5,18,23
126:7,8 136:3
**emailing** 90:8
107:2
**emails** 9:16,18
41:18 49:23
81:9 82:22
115:3
**employed** 11:21
70:18
**employee** 109:23
110:2,6
**employees** 16:3
108:19,24
109:10,13,14
**employment** 26:5
26:15 69:25
70:7
**engagement**
115:14
**ensuring** 131:19
**entire** 11:17
114:25 126:20
**entirety** 86:18
**entities** 15:11
21:16 22:6,12
22:19 70:18
81:15 101:5
124:2 129:4
**entitled** 82:12
**entity** 21:20,22
22:7 23:2 35:14
53:13 63:4,5
84:16 104:4
**entries** 78:13
80:23
**entry** 78:24 79:19
**erroneous** 122:5

Kristin Hendrix - October 27, 2021

error 38:22 39:9
  39:16,21,23
  40:10 44:7
established 9:11
  28:8 83:16
estimate 20:10
event 135:19
events 38:21
  95:15 96:16
  116:13 118:3
  118:19
eventually 109:5
everybody 25:13
  112:2 125:24
  126:1,3,4
evidence 105:22
  114:9 118:9,21
  121:17 122:12
  133:20
exact 25:25 36:5
  37:14 48:5,13
  107:1 117:12
Exactly 78:16
Examination 3:3
  3:4,5,6 6:3
  94:22 110:19
  111:5
example 81:1
Excel 77:12,15
  78:9
exchanged
  108:12
excluding 28:16
  29:18
execute 48:18
  49:5
executed 18:24
  47:9 130:15
executing 19:17
execution 18:13
  20:12 32:15
exhibit 3:10,12
  3:14,17,19,21
  3:23,25 4:1,3,7
  4:11,14,17,19

4:21 5:1,5
  30:14,15,18,19
  30:21 31:15,18
  32:21 33:1 34:4
  34:11 35:21
  36:20 37:19
  38:12 42:15,16
  43:6,21 44:18
  44:19 56:19,21
  59:4,9 62:14,14
  62:21,23 65:13
  65:18,21 72:11
  72:13,16 76:10
  76:17,19 79:8
  82:6 83:1,4,15
  83:17 84:8,14
  84:18,19 85:7
  85:17,20,21,22
  85:25 86:3,13
  87:21 88:2,4,7
  89:21,22,25
  90:1,3 111:7
  119:7,15,23
  123:16,22
  124:5
exhibits 3:8 30:6
  42:17 43:4
  44:21 45:22
  46:19 48:11,19
  50:13,17 52:8
  55:17,24 56:25
  57:16 58:10,25
  113:13
existing 84:20
expect 85:16
expense 103:24
expertise 16:18
expires 136:4
Explain 19:19
explained 6:15
  31:7
explicit 60:23
explicitly 32:5
  53:1
expressly 71:14

Expressway
  136:2
extent 108:13
external 46:14
eye 6:9

F
faced 11:5
facilitate 91:7
fact 21:18 49:5
  57:15 64:15
  65:1 67:13,16
  99:22 121:21
  128:23 130:13
facts 114:9
fair 17:5 21:19
  22:3 23:21 35:5
  42:20 70:14
  95:25 96:8,21
  96:24 97:18,20
  98:6,7 99:25
  100:20,23
  101:8,12 103:5
  105:16 106:4
  108:4 116:2
  133:20
fairly 36:15
faithfully 57:3
familiar 27:13
  65:20 66:11
  86:2,5 107:20
  115:19 122:16
family 23:4
far 20:14,16
  24:19,21 49:7
  80:24
favor 130:15
February 12:2
  26:4
fee 39:1,24
feel 86:18
fell 13:24
felt 104:25
figuring 93:17
file 56:13

filed 28:24,25
  29:6,8 30:13,24
files 32:25
filing 18:25
final 123:6
finance 10:22
financial 4:4
  12:22 59:18
  62:7 69:15
  97:16,17
  115:12,25
  116:16,21
  117:1,5,11
  119:2 122:4
  133:17,22
financials 12:23
  37:18 41:8
  60:11 86:24
  118:11,14,19
  121:3,7,20,25
  122:8
find 31:13 72:8
  83:8 93:24 94:8
  102:23
finding 98:2
fine 47:8 48:2,4
  86:19
finish 96:11
finished 31:10
finishing 46:14
firm 18:22 44:16
first 6:2 9:1
  11:13 20:11
  63:17 70:21
  81:17 82:13
  95:8 113:23
  120:15
five 51:4 94:3
  110:10 133:12
five-minute
  93:15 110:14
fixing 55:15
flip 46:25
Floor 1:25 2:11
flow 109:5

flows 63:8
focus 12:17
folders 18:25
folks 62:16 67:4
  85:24
follow 47:23 60:5
  60:9 72:5
follow-up 4:23
followed 104:11
following 47:22
follows 6:2
forecast 67:5
  128:17
forecasted 67:8
forecasts 12:21
  13:21 17:18
  67:5,9 125:8,10
  125:14,17,18
  125:23 126:7,8
  126:16,19
  130:3,6
foregoing 134:7
  135:4
forgive 97:10
forgiven 95:14
  96:16 109:10
  133:3,6,11
forgiveness
  133:15,21
form 14:14,21
  15:24 16:22
  17:6 18:14
  19:11 20:23
  22:8,21 24:8,15
  28:3 34:6 35:10
  36:13 37:11
  38:7 39:17 41:1
  41:13 45:3 46:4
  47:20 48:22
  49:10,20 50:4
  51:14,20 52:1
  53:9 55:5,19
  56:4 58:16
  65:16 69:8
  70:15 73:20

Kristin Hendrix - October 27, 2021

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
**format** 77:12
**formatting** 79:3
82:5
**forth** 64:11
**forward** 64:2
94:16
**forwarded** 92:15
92:17
**found** 54:9
**foundation** 75:11
**four** 9:8,12 100:5
**fourth** 107:25
**frame** 17:12
66:19 69:7
73:16
**Frank** 4:21 7:10
7:21 8:1 13:7,8
23:13 24:5
34:19,23 35:24
38:14 52:19
53:20 60:10
63:16,18 64:10
64:23,23 65:1
67:3 71:5 73:8
74:14,15 84:1,7
91:10,22 92:4
99:5,17 100:13
101:2 102:15
104:4,21,23,24
106:14,20
107:2 112:6
124:24 125:25
126:13 128:9
128:14
**Frank's** 115:16
**frankly** 104:24
**fresh** 111:20

**Friday** 9:1,4
**function** 12:21
**functions** 117:15
**fund** 1:9 27:23
38:24 39:2,2,8
85:6
**funds** 38:23
59:18 119:17
120:8
**further** 3:5 10:23
32:15 62:1
92:13 110:19
133:24 135:17
**future** 14:7 16:5
120:5

──────── **G** ────────
**gears** 58:24
**general** 34:21
46:18 54:20
69:6 90:20
**generally** 13:17
13:24 19:13
34:8 35:2 43:10
72:22 81:20
96:13,15
120:11
**getting** 11:20
18:24 48:11
60:2,3 81:12
101:3
**give** 20:10 31:13
74:16 110:4
129:3
**given** 49:18
101:6 122:9
123:1
**gives** 16:19
**giving** 53:21 54:5
**Global** 38:23
39:1
**go** 10:12 17:5
44:4,24 48:1
55:1 62:24 64:2
67:4,5,11 73:8

78:22 107:23
113:10,20,23
114:11 118:22
133:12
**goes** 94:9 99:3
**going** 6:25 17:12
20:9,16 26:23
27:3 29:16 30:6
30:10,14,18
34:3 40:6 42:7
42:20 44:2
50:22 52:8
54:18 56:20
57:2 58:24 59:3
59:3 60:5,9
64:19 65:13
67:7 71:6 72:8
72:11 74:10
76:10,20 78:7
81:9 82:10,11
82:13,25 83:1
84:8 85:20,21
87:19 88:2
93:20 95:2,23
105:23 111:10
131:1,2
**good** 6:4 24:17
26:24 94:23
127:8
**governs** 26:11
**graduated** 10:21
11:9,12
**great** 53:20
**greater** 16:19
**group** 14:4 17:13
19:9,10,16 20:3
31:24 35:7,22
37:22 40:11
43:14 45:7,18
46:3 49:16
51:18 56:11
73:19,23
111:21,25
112:3,5 117:16
126:12

**guarding** 24:7
**guess** 89:22
**guys** 126:14

──────── **H** ────────
**H-i-l-l-i-s** 32:12
**half** 81:17
**hand** 59:3 82:25
**handed** 88:6
**handle** 20:12
50:8
**handled** 20:4,21
**happened** 20:7
21:8 36:11,11
37:21 101:1
131:17
**happening** 20:11
61:5
**happy** 23:3 93:22
**HARDT** 2:3
**HARR** 2:3
**Hayley** 32:2,14
46:7 78:3,6
112:6
**Hayley's** 46:8
**HCM** 4:4,9
**HCMF** 3:25 4:1
**HCMFA** 3:15 4:4
27:10,22 28:1
28:13 29:6
30:12,19 32:13
38:19,23 39:12
40:1,15 53:25
59:18 60:19
62:7,11 63:6,22
64:18 66:5
69:15,20 70:7
70:10 85:18
87:5 99:4 100:2
110:22 111:1,1
111:11 115:1
117:4,16
118:15 120:6
120:23 121:25
124:2,5,19

131:4
**HCMFA's** 39:8
87:17 117:11
117:23 118:6
118:18 119:1
**HCMLP** 3:15
4:19 5:6 32:13
60:24 64:4
86:24 87:5,18
111:11 120:6
120:23 124:19
129:2,18
**HCMS** 2:20
94:25 98:16,24
100:1,22,25
101:10,18
102:1,19
105:18 107:5
127:10 128:23
129:6,18
131:13
**HCRE** 2:20
94:25 98:17,24
100:1,22,25
101:10,18
102:1,20
105:18 107:3
127:10 128:23
129:6,18
131:13
**hear** 72:1
**heard** 40:17,20
**held** 12:8 133:11
**hell** 75:4,10
**help** 76:22 78:13
93:17 105:23
**helped** 12:20
**Hendrix** 1:14,18
5:5 6:1,6 30:10
30:23 56:19
57:2,8 62:23
65:13,21 76:19
78:12 79:15
86:3 90:3 93:13
94:5,23 110:20

111:6 134:13
**hereof** 80:13
**hereto** 135:16
**hi** 60:4
**higher** 89:20
**Highland** 1:6,9
  10:2 11:13,21
  12:5,19 13:10
  14:4,4,11,22,23
  15:3 16:10
  17:10,13,21
  18:1,11 21:5
  25:6,15 26:4,9
  26:24 27:2,2,22
  28:12 51:7,10
  51:19 65:14
  66:4 71:7,11
  81:10,18,23,23
  85:5 87:25
  92:17 107:21
  108:1,16,17,21
  108:22 109:2,2
  109:9 110:21
  117:1 119:24
  133:5,10
**Highland's** 7:23
  7:25 8:19,22
  114:20,23
  116:4,16
  131:24 132:3,7
  132:13,17,22
  133:1,15,22
**Hillis** 32:12
**history** 11:9
**Hold** 62:18
**hope** 57:13 97:13
**hopefully** 82:11
**hoping** 68:15
**house** 75:1
**hundreds** 50:7
  51:8
**hypothetically**
  22:4,17
**hypotheticals**
  21:17

**I**
**i.e** 114:9
**idea** 58:2,7 75:12
  75:24 89:13
  93:1 105:17
  106:3
**identification**
  30:16,22 31:19
  42:18 43:5 57:1
  59:10 62:22
  65:19 72:14
  76:18 83:5
  85:23 88:5 90:2
**identifies** 123:23
  124:1
**identify** 112:2
  125:18
**identifying** 66:23
**image** 47:2,5,19
  48:2
**imagine** 15:7
**immediately**
  61:14
**important** 93:14
**Impressive** 11:23
**include** 71:18
  72:10 100:1
  118:25 121:13
  130:7
**included** 15:14
  16:9 31:24
  102:5 111:25
  118:6,13
  121:21,22
  122:10 123:12
  124:4,5 127:2
**includes** 63:5,7
**including** 88:11
  124:2
**income** 63:7,21
**incoming** 67:7
**incorrect** 123:9
  124:14
**increase** 94:19
**incumbency**

53:13,17,19
**INDEX** 3:1
**indirect** 27:7
**indirectly** 70:12
**individualized**
  131:14
**Info** 3:25 4:1
**info@dickman...**
  136:3
**information** 4:9
  29:25 34:13
  61:14 63:3,7
  64:17 65:5,11
  69:12,15 84:6
  86:15 116:3
  127:2 130:10
**informed** 112:21
  125:24 126:1
**initiated** 74:11
  92:3
**ink** 49:8,13 55:3
  55:8
**ink-signed** 55:11
**input** 29:25
  88:24
**installment**
  128:24 129:7
**instance** 1:20
  20:6 23:8 35:21
**instances** 24:1
  40:1,24
**instruct** 127:11
  127:15
**instructed** 128:9
  128:11
**instructing**
  101:18
**instruction** 72:2
  74:17 76:8
  100:16 101:14
  101:22 103:12
  129:4,11
**instructions** 24:2
  24:3 32:16
  69:14 76:1

100:21 101:9
  103:19 129:3
**instructs** 7:5
**insurance** 39:10
**insurer** 39:8
**intend** 113:5
**interco** 32:14
  34:11
**intercompany**
  17:22 18:13
  19:17 20:4,13
  20:16 21:3,8
  34:12 35:7
  36:19,25 37:12
  40:24 53:8
  111:15,16
  124:23 125:4
  126:25 133:6
**interest** 19:7
  43:16 49:2
  68:18 73:25
  78:14,16,24
  79:20,22 80:11
  85:15 125:4,19
**interested** 84:9
  135:19
**interjects** 64:4
**intermediary**
  24:3
**internal** 18:21
  41:8 46:13,20
  69:19
**internally** 77:1
**investigation**
  97:5
**invoice** 108:13
**involved** 18:12
  19:16,20,24
  36:21 39:20
  40:9 126:14
  131:8
**involvement**
  19:10
**irrespective**
  26:16,24

**IRS** 49:3
**issue** 79:3 95:14
  96:16 97:25
  98:16 114:2
  118:8 131:2,2,6
  132:5,9,19
**issued** 131:9
**issues** 40:7,10
  60:16 61:21
  115:4,15

**J**
**J-F-O-R-S-H-...**
  44:10
**Jack** 59:13 60:4,8
  64:6 65:2 92:18
**James** 4:8 5:1,2
  61:14,15,18,21
  61:25 62:3
**Jan** 4:8 5:2,5
**January** 10:17
  24:24 28:20
  29:6,11 62:25
  64:15 71:25
  88:2,21 89:9
  90:5,7,17,22
  91:4 93:8
  106:10,25
  127:23 128:8
  128:15
**jealousy** 24:7
**jerk** 24:12
**JFORSHEE**
  44:10
**Jim** 2:20 21:10
  23:14,18 34:19
  35:24 52:19,20
  54:2 63:2 64:10
  67:3 73:8 84:4
  99:18 101:2,4
  102:16 104:1,7
  104:14,22,25
  105:1 125:25
**Jim's** 99:21
**jive** 87:20

Kristin Hendrix - October 27, 2021

jmorris@pszjl...
  2:14
job 6:20 11:14
  17:9 20:25
  24:19,22 43:11
  45:1,14 103:1,6
  103:10
John 2:12 4:7
  8:24 95:21,23
  97:4
JONES 2:10
June 86:25 87:6
  116:5 120:23

K

K-l-o-s 8:25
keep 29:1 77:6,9
  95:4 125:24
  126:1
kept 54:22 55:11
  56:12 77:5
  121:20
kind 11:5 18:4
  23:21 24:6,11
  34:3 50:3 54:19
  81:13 122:21
Klos 3:14 8:24,25
  9:5,12 13:1,6
  13:10 25:10,21
  29:24 31:16
  33:17 34:10,18
  35:21 36:18,24
  37:20 38:12
  46:7 97:2,3
  111:8,13 112:6
Klos' 13:2 41:17
knew 40:3 126:3
  128:19
know 6:24 19:20
  19:23 20:19
  25:14,25 28:7
  33:10,11,13
  36:11 38:17,21
  39:22,25 40:1,5
  43:21 44:11

47:16 48:6,6
  50:10 52:18,25
  57:25 59:6
  76:15,21 78:15
  82:15 89:17
  92:18,19 99:21
  101:4 103:24
  104:17 107:19
  108:7,25 110:2
  117:4 118:15
  120:22 121:6
  121:19,20
  122:15 124:4
  128:7 130:24
  131:12
knowledge 27:6
  36:1,4 37:14
  40:11,13 52:15
  69:11 77:7
  108:4 112:9,11
  112:20 116:1
  121:14 122:2
known 67:14,17
  97:11
KOPF 2:3
Kristin 1:14,18
  5:5 6:1,6 32:1,2
  32:14 57:8
  61:20 134:13

L

L.P 1:6,10
labeled 82:15
labels 30:7
laid 24:12
land 84:5
landline 75:2
large 35:8
lasted 75:6
late 126:9
Lauren 4:22
  86:21
law 2:5,12,19
  6:18 18:22
  44:16

Lawler 109:20
  109:23
Lawn 2:17
lawsuit 28:24
  29:5,8
lawsuits 28:1,9
  28:13,25 29:17
  29:21 30:1
lawyer 9:4
lawyers 44:14
lay 67:7
leading 39:20
  108:15,21
  109:1
learn 95:20
ledger 76:12
left 61:9 87:15
legal 7:23,25 10:9
  16:13 17:14,25
  18:2,5,11,21
  19:10,16 28:10
  46:14,20 72:21
lend 21:22 23:1
  110:22
length 93:25
let's 10:12 11:9
  12:17 14:8,18
  21:17 30:8
  34:25 44:24
  45:13 47:14
  54:19 55:1
  72:10 78:1
  99:24 115:11
  120:23
letter 4:11 65:14
  115:14,23
letters 29:11,14
  115:14,20
letting 92:18
liabilities 118:14
liability 40:16
  118:6
license 10:24
  11:2
limited 107:25

lines 61:7
listed 78:17
litigations 27:8
little 28:9 44:7
  55:1 58:9,24
  78:12 94:17
  98:12 131:18
live 10:14,15
LLP 2:17
loan 3:15,25 4:1
  18:18 31:5
  32:14 33:25
  34:11,12,14,25
  35:14,17,17,22
  36:19,25 37:6,7
  37:17,17 38:25
  39:12 40:15,21
  45:13,15,18,22
  46:12,14 48:15
  49:1,4,5,24
  50:9 58:5 72:25
  76:24 79:21
  80:6,7 87:22
  103:22 104:6
  104:20 111:15
  111:16,18,20
  112:10,23
  113:2 119:9
  124:23 125:4
  133:6
loans 35:9,12
  37:4,6,13,22
  38:6 39:4 41:9
  41:12,19 48:14
  48:17 50:7,19
  50:22 51:8
  53:21 66:23
  67:8 98:16,17
  98:17,20,25
  106:9 107:13
  109:9 110:5,6
  126:2 131:19
logically 36:10
  40:23 71:18
logs 75:19

long 7:20 21:24
  74:21 75:6
  110:4
look 30:17 54:15
  57:7 75:18 77:2
  78:11 80:21
  93:20 94:6
looked 31:5
  123:16
looking 56:21,23
  58:10 79:24
  81:10 86:21
  87:14 119:23
looks 60:24 64:9
  76:23 77:4
  79:19
loosely 17:2
lot 28:25
lots 40:6
LP 15:4,15 27:20
  27:23 70:1,4

M

ma'am 31:21
  57:7 87:1 111:4
machine 1:24
maintain 6:9,10
maintained 77:1
  82:7
maker 19:4,5
  21:3 43:15
  132:1
making 13:20
  21:5 81:7 99:20
  101:2,25
  103:22,23
  104:3
management 1:6
  1:9 12:20 13:14
  13:15 14:2,24
  15:4,22 17:17
  27:23 85:5
  108:1 115:13
  115:19,23
manager 12:8,12

Kristin Hendrix - October 27, 2021

12:18
**manual** 104:9,12
**March** 12:2
**mark** 59:3
**marked** 30:15,21
  31:18 42:17
  43:4 56:25 59:9
  62:21 65:18
  72:13 76:17
  83:4 85:21,22
  88:4 90:1
  113:13 119:14
**material** 97:22
  98:1,4,6,10
  104:6 120:3,4
  133:16,21
**materials** 121:12
**maturity** 80:13
**MBA** 10:23
  11:20
**mean** 7:17 13:15
  14:22,23 15:3
  19:1 35:16
  48:20 57:24
  68:24 78:13,15
  87:11,24
  111:16
**meaning** 27:20
  27:22 54:25
  70:18
**means** 27:15
  35:15 58:22
  71:16 111:18
**meeting** 34:17
  67:2
**meetings** 66:22
  66:25
**memorandum**
  48:20
**memory** 9:17
  19:14 20:9 29:3
  29:7,17,19,23
  32:20,24 34:3
  37:9 38:2 41:22
  42:1,20 43:7,10

45:24 47:4
  48:10,13 50:15
  51:1 53:23 54:4
  54:10 57:23
  58:9,20 69:18
  72:24 74:4 81:6
  81:17 86:8,10
  90:15,20 91:21
  92:6
**mentioned** 11:24
  13:14 22:12
  25:9 29:10 41:7
  44:25 45:21
  51:6 64:21
  125:7
**merit** 25:17
**met** 108:11
**metadata** 42:21
  42:21,24 43:21
  43:24 44:8,24
  56:15,20 57:4
**Michael** 2:18
  94:24
**michael.aigen...**
  2:22
**mid** 128:19
**middle** 89:8
**million** 30:12,20
  32:13,21 33:1
  33:19,20,25
  34:5 35:3 36:25
  37:12,12 38:18
  38:22,25 39:3,7
  39:8,11,23
  40:15,21 42:15
  42:16 43:2,3
  58:5,11,13,13
  66:9,13 81:1,1
  81:2 85:1,6,9
  87:3 90:23 91:3
  91:23 110:23
  111:10 112:14
  113:14,14
  120:24 121:13
  122:10 123:5,9

123:12 124:11
**mind** 71:18
**minute** 30:8
**minutes** 94:3
**mischaracteriz...**
  116:25
**Mischaracterizes**
  41:2
**misleading** 42:9
**missed** 88:25
  105:12
**misspeak** 30:5
**mistake** 51:12
  113:1,18 114:2
  116:20 117:21
  118:25 119:12
  125:3 132:9
**mistakenly** 51:25
**mistakes** 51:17
  51:19,22
  120:19
**modified** 44:19
  57:8
**moment** 72:9
**Monday** 9:2
**monetize** 68:2,10
**money** 13:21
  21:11,13,15,21
  21:21,22 22:5
  34:24 35:13
  37:7,17 53:21
  54:23 81:15,19
  81:22,24 92:16
  111:19
**month** 106:10
**months** 40:7
**morning** 6:4 9:3
  67:11 82:14
  125:6
**Morris** 2:12 3:6
  4:7 7:3 8:24 9:6
  9:9 14:14,21
  15:24 16:22
  18:14 19:11
  20:23 22:8,21

24:8,15 28:3
  30:2 31:10 34:6
  35:10 36:13
  38:7 39:17 41:1
  41:13 42:9 45:3
  46:4 47:20
  48:22 49:10,20
  50:4 51:3,14,20
  52:1 53:9 55:5
  55:19 56:4
  57:17 58:7
  62:18 65:16
  67:10 69:8
  70:15 73:20
  74:5 75:7,11
  77:22 78:8 79:7
  79:9,13 80:3,16
  82:1,14,16,23
  83:2,6,10 85:25
  87:7 88:15 89:2
  89:15 93:22
  94:15,17 95:21
  95:25 96:2,6,18
  96:23 102:2
  103:13 105:19
  106:6,18 111:6
  113:11,22
  114:13,19
  118:12,23
  119:5 121:19
  122:15 128:3,4
  129:22 133:24
**mouth** 23:21
**move** 9:10 21:11
  21:13,15 94:16
  109:8
**moved** 23:4
**multiple** 54:19
**MUNSCH** 2:3

  ─────────────

      **N**

**name** 6:5 32:8
  44:12 57:18
  94:24 109:24
  110:3

**Nancy** 108:9
**NAP** 27:14
**native** 78:9
**NAV** 38:22 39:9
  39:16,20,23
  40:10 107:21
  108:5
**near** 14:7
**necessarily** 17:23
  19:10 103:25
**need** 9:16 14:6
  19:2 21:11
  25:14,25 34:24
  52:6 54:1 59:1
  81:19,20 82:12
  86:19 93:17
**needed** 21:21
  22:5,18 23:1,4
  40:1 53:12
  81:11,14,23
  104:25
**needs** 104:7,8,13
**negative** 78:20,25
  79:2
**never** 40:19,20
  49:12 51:12
  55:14 68:17
  70:14,17 96:25
  97:2 101:6,6,14
  103:6 108:11
  119:8
**new** 2:11 21:14
  32:14 34:11,25
  36:19 45:9
  111:15,16,18
**NexPoint** 5:6
  15:14,17,22
  16:5 27:11,15
  27:18,19,20
  28:2,13,21 63:6
  63:22 64:18
  66:8,12,20
  67:13,22 68:2
  68:15,19,24
  69:15,20 70:1,4

Kristin Hendrix - October 27, 2021

70:22 72:12
76:24 77:7,13
77:20 80:20
81:7,22 84:9
85:2 88:3 90:9
90:17,23 91:16
91:23 92:13,16
93:10,11 120:6
123:24 127:14
127:16 128:23
129:6,18
131:13
**NexPoint's** 16:5
16:9
**Nope** 8:7 76:7
91:12
**normal** 34:16
103:23,23
**normally** 107:15
**North** 1:24 2:3
10:22 11:13
136:2
**NORTHERN** 1:2
**note** 3:10,12,17
3:19,21,23 4:14
5:3,6 14:19
15:18 16:10,21
17:1,3,6 18:16
18:19 19:22,25
21:4,23 22:7,20
23:9 28:21
30:11,19 31:8
32:15,21 33:2
33:20 35:3,18
42:15 43:2,3,11
45:9 46:16
56:21,22 58:11
58:13,13 66:9
66:13,16,20
67:13,22 68:2,5
68:8,10,16,19
68:23,24 71:13
71:19 72:6,11
72:12,16,20
73:4 76:13 77:7

80:9,10,14,20
81:8,23 85:14
90:18 91:16,19
91:23 92:14
127:16 133:10
**notes** 4:12,19
14:9 16:16
17:22 18:13
19:17,21,21
20:4,13,17,22
21:4,8,14,14
22:13 27:3
28:14 30:24
31:1 38:11 41:7
42:7,22 43:12
45:2 46:21,22
47:6 50:1 52:10
52:16,17,24
53:1,8,25 54:5
54:12,23 55:3,8
55:11 56:2,8,10
59:2 62:11
65:15 66:5
69:21 73:10
77:10 84:16
85:12 95:14
96:16 97:10
111:2 113:6,11
113:12,16,18
114:2,7,16
116:7,11,15,25
117:18,22,25
118:1,7,18
119:1,12 120:6
121:15,21,22
122:11 123:13
124:6 125:19
126:25 127:12
127:24 128:8
128:21 130:8
130:14 131:5,8
131:9,13,14,25
132:5,9,15,19
132:24 133:3
133:16

**notice** 88:3 89:8
**notices** 28:22
**noting** 14:5
**November** 59:12
61:6 62:6,10
66:19 67:12,19
68:1,7,14,21
71:4 72:4 74:10
75:18 76:3
93:21 127:6
128:20 129:24
135:22
**November/Dec...**
125:14
**NPA** 4:17 27:18
27:19 86:24
99:4 100:3
**number** 79:2,6
79:11,18 80:23
84:10,13 85:2,9
87:20,21 89:14
89:18,20,21
111:7 120:1
123:5,9,12
124:2,11,14,17
**numbered** 1:21
**numbers** 26:1
78:20 80:21
84:15
**NY** 2:11

_____

**O**
**o0o--** 1:4
**Oak** 2:17
**oath** 6:17 95:5
**object** 113:19
114:8
**objecting** 114:10
**objection** 7:3
14:14,21 15:24
16:22 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 38:7

39:17 41:1,13
45:3 46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
65:16 69:8
70:15 73:20
74:5 75:7 77:22
80:3,16 82:1
87:7 88:15 89:2
89:15 96:18
102:2 103:13
105:19 106:6
106:18 113:8,9
114:17 118:9
118:21 119:3
121:17 122:12
129:21
**objections** 7:5
**obligations** 14:19
16:6,10 118:7
132:1
**obligor** 15:18
**obviously** 14:11
35:6 59:1
**occasion** 22:18
**occurred** 95:15
96:4,17 97:7
106:17
**Oct** 4:22
**October** 1:15,21
86:22 94:9
122:17,19
**office** 10:1 34:1
54:8 57:3
**officer** 52:13
69:25 70:7
**officers** 109:10
109:13
**oftentimes** 13:23
34:23
**oh** 67:21
**okay** 6:11 7:1,7

25:3 28:19 30:5
31:23 32:11
33:22 34:3 36:1
38:2 39:14
42:13 43:6
49:25 58:23
60:11 62:1
63:17 70:25
79:25 84:8 85:1
89:24 93:7 94:1
110:17 112:8
113:11 115:17
118:18 119:5
121:13 123:15
126:15,22
129:13 130:19
131:23 134:2
**once** 104:5
**ones** 53:2 109:18
**ongoing** 77:20
**oOo--** 134:5
**open** 120:5
**opinion** 98:5
**opposed** 23:23
39:12 49:8
52:12 98:17
**oral** 91:25 95:9
95:13 96:4,8,12
96:23 97:6,9,11
97:20,25 98:9
132:20
**orally** 37:10
50:16
**order** 97:6
**ordinary** 103:23
104:13,19,23
**original** 30:11
54:23,25 55:11
**originally** 48:7
**outcome** 27:8
**outgoing** 67:7
**outside** 18:21
89:6
**outstanding** 66:5
80:11 120:4

Kristin Hendrix - October 27, 2021

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

**P**

**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
73:9,12,18,25
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24

Kristin Hendrix - October 27, 2021

prepayments
  81:25
presence 25:4
present 9:4,6,12
  24:5 45:24
  90:15 97:3
presented 116:1
presenting 46:14
  97:18
preserve 78:8
pretty 14:11
  109:8
previous 100:9
previously 17:24
  48:25 131:9
Pricewaterhou...
  116:9,12 117:5
  117:17 118:2,5
  130:20
principal 30:12
  78:14,17 79:5
  79:11,23 80:10
  89:23 121:14
  122:10 124:5
  124:19 125:3
  125:18 130:14
print 56:1
printed 42:8,12
  42:24 47:18
  55:18,22 56:7
  57:4,21,22,24
  57:25 58:11,14
  58:21,22
printing 55:23,25
printouts 42:21
prior 9:25 10:4
  19:17 28:11
  35:24 40:25
  55:2 65:23
  71:25 86:9 96:6
  105:3 108:6
  124:24 127:19
  128:12 133:12
privileged 9:8
  95:24

privy 64:9,11
  69:19
probably 9:15
  17:2 49:14 50:6
  58:22 61:9
  63:15 99:15
  109:8 126:13
proceed 61:20,25
proceeding 46:20
proceedings 95:1
  95:3,12
process 31:7
  32:16 45:11,12
  120:12
produce 78:9
produced 1:18
  17:24 33:15
  34:1 59:4 67:10
  76:20 82:14,19
  125:6
product 115:13
production 10:1
  33:15
profitability
  26:25
program 47:25
programs 47:16
projections 17:18
promised 39:2
promissory 3:10
  3:12,17,19,21
  3:23 4:12,14
  5:3 14:9 15:18
  16:10,16,20
  17:1,3,6,22
  18:13 19:17
  27:3 28:13,21
  30:11,19 31:1,8
  32:21 33:2
  35:18 38:11
  42:7 43:11,12
  45:1,9 47:6
  52:10,24 53:1,8
  53:25 54:5,12
  54:23 55:11

68:5 71:13,19
  72:11,12,16
  76:13 77:7,10
  80:9 81:8 113:6
  113:11,12,16
  114:2,7,16
  116:7,11,15
  117:17,22
  118:7 119:12
  122:11 124:6
prompt 128:14
prompted 83:22
prospect 53:20
provide 7:12
  9:19 15:21
  30:11 42:21
  59:17 63:3 64:5
  64:16 119:16
  121:25
provided 17:24
  33:5,9,10 61:14
  70:12 89:17
  121:11 122:5
  129:11 135:15
provides 120:7
providing 15:10
  54:8 65:5
public 16:19
pull 119:14
pulled 49:3
purpose 86:12
  125:22
purposes 39:5
  98:1 126:23
purview 89:6
put 23:20 84:25
PwC 97:21 98:1
  117:22
_____
Q
qualification
  16:20
question 7:1
  14:10,22 15:25
  16:23 18:15

19:12 20:19,24
  22:9,22 24:9,16
  28:4 29:5,16
  34:7 35:11
  36:14,23 37:1
  38:8 39:18 41:2
  41:14 45:4,5
  46:5 47:21
  48:23 49:11,21
  50:5 51:15,21
  52:2,4 53:10
  54:18 55:6,15
  55:20 56:5
  58:17 65:17
  66:10 69:9
  70:16 73:21
  74:6 75:8 77:23
  80:4,17 82:2
  84:14 86:9,19
  86:20 87:8,19
  88:16 89:3,16
  95:10 96:10,19
  100:9 102:3
  103:14 105:20
  106:19 113:9
  113:24 124:17
  127:8 128:5
questions 6:21,24
  7:6 8:8 61:21
  95:2 110:16
  115:4 133:24
quick 52:5 95:4
  107:23
quickly 6:16
  109:8
quite 36:21 41:20
  104:24
quote 120:3
_____
R
R-o-e-b-e-r 32:10
raise 131:1
raised 95:12
range 89:10
rate 19:7 43:16

49:2 80:12
ratio 107:21
  108:5
re-up 86:16
reached 108:5
read 7:9 8:9
  32:18 82:21
  86:17 119:25
reading 81:9
ready 94:16
real 11:14
really 35:13
  67:21
reason 6:23
  22:23,25 52:11
  52:13 56:1,6,7
  72:7 77:3 82:5
  82:8 101:13
  129:13,16
  131:1
recall 7:19 10:8
  21:6 34:15,20
  36:16 37:2
  44:11 46:10
  50:14,20 51:17
  51:23 52:4
  55:25 56:7
  59:22,25 60:2,3
  60:8,10 63:11
  64:1 65:3 66:7
  67:3 68:22,25
  69:22 72:3 73:1
  74:11 83:22
  84:4,23,25
  86:12 88:17
  91:25 92:3 93:5
  93:7 102:21
  104:21 105:15
  107:6 108:25
  109:14 112:3
  112:13,15,17
  116:4,15 118:5
  119:5,8,19
  120:16 123:4
  123:15 127:5

Kristin Hendrix - October 27, 2021

129:25 130:17
131:5 133:10
**recalling** 109:16
**Receivable** 4:19
**receivables**
130:25 131:22
**received** 63:13
64:21 71:5
129:2
**receiving** 32:4
124:23
**recipient** 60:25
**recognize** 44:12
**recollection** 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
**reconciling** 13:20
**record** 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
**recorded** 73:11
81:24
**recording** 73:18
**records** 10:6,6
59:18 62:7 64:5
73:12
**reduced** 135:10
**refer** 99:25
**reference** 71:13
119:1 121:2,6,9
**referenced** 34:5
84:6
**referencing**
33:25 121:10
**referred** 96:2

**referring** 66:25
100:2,5
**reflected** 118:7
123:12
**reflecting** 43:15
**refresh** 9:17 42:1
42:20 69:18
108:1
**regarding** 86:1
90:17 107:12
**regardless** 99:16
**regularly** 23:24
**reinforces** 41:8
**reissue** 21:14
**related** 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
**relates** 32:21
64:17
**relation** 115:7
**relieve** 93:10,11
**rely** 42:8
**remember** 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
**remotely** 6:8
**renewal** 120:12
**reorganized** 25:7
25:15 26:17,24
27:2
**rep** 115:13,19,23

**repaid** 23:10
**repay** 69:6
**repeat** 14:10
22:10 28:15
44:22 66:10
**rephrase** 6:25
**report** 12:25 25:9
25:12 114:25
115:25 117:14
123:6
**reported** 1:23
13:6 36:22
**reporter** 135:1,3
135:15
**reporters** 27:13
**reporting** 12:22
12:23 13:22
**reports** 127:3
**repository** 54:22
55:9
**represent** 27:10
46:25 57:3 83:1
94:24 107:23
**represented** 2:4
2:11,18 93:5
**representing**
42:23
**request** 4:9 60:5
84:22
**requested** 63:3
63:21 64:5,17
84:2 135:13,14
**requesting** 63:25
**requests** 10:1
69:14 115:3
**required** 7:6 21:4
**respect** 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
**respectfully** 39:5
**respecting** 45:22

**respectively**
113:15
**respond** 122:23
**responded** 65:1
**response** 60:13
120:15,19
122:16,25
**responsibilities**
97:12 103:6,10
**responsibility**
69:7 102:23
105:2
**responsible** 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
**responsive** 10:6
**rest** 44:23
**restrictive** 47:17
**restroom** 52:6
93:16
**restructured**
19:21
**retail** 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
**reveal** 50:11
**review** 8:4 50:11
54:11 119:21
125:10,17
135:13
**reviewed** 9:15,19
**reviewing** 32:24
115:11
**revised** 17:6
**right** 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
**Roeber** 32:9
112:7
**role** 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
**roles** 73:6
**roll-up** 72:22
131:9
**rolled** 79:23
131:13
**Romey** 61:15,18
61:25 62:3
**room** 75:15
**roughly** 39:3
**routine** 20:4,21
20:25
**routinely** 21:1
**row** 131:3
**RPR** 1:23
**rude** 25:3
**Rukavina** 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

Kristin Hendrix - October 27, 2021

31:12,20 34:10
35:16 36:18
38:10 39:22
41:4,17 42:19
43:6 44:4,7
45:5 46:8 47:22
49:6,17,25
50:10 51:6,17
51:24 52:5,8
53:4,15 55:9,23
56:9,19 57:2,20
58:19 59:11
62:19,23 65:20
69:13 70:19
72:15 73:24
74:8 75:9,13
76:19 78:1,7,11
79:8,10,14 80:8
80:19 82:4,21
82:25 83:8,13
83:15 85:24
86:2 87:9 88:6
88:20 89:5,19
90:3 93:23 94:5
94:14,19
110:17,20
113:8,19 114:8
114:17 118:9
118:21 119:3
121:17 122:12
125:7 128:2
130:13 133:25
134:2

**S**

**S-e-e-r-y** 8:8
**Sadly** 94:9
**salaries** 108:17
108:18,19
**salary** 25:15
**sale** 68:4,8
**save** 55:13 72:19
**saved** 56:11
**saw** 41:8 86:6
115:12 123:19

125:6 126:12
**saying** 37:19
41:15 49:23
53:4 73:8 76:14
93:19 99:5
101:9
**says** 32:1,6 34:10
44:10,13,18
57:8,22,25
60:23 63:2 64:4
78:25 86:23
87:10 89:9
120:2,22
**scan** 55:13
**schedule** 76:24
77:5,6,21 80:20
82:7 85:3,13,17
131:20
**scheduled** 16:4,7
**schedules** 77:9
85:12
**schooling** 10:20
**Scott** 4:3 18:9
60:4,12,15
61:10,13 62:1
**Scott's** 60:13
**scratch** 17:3
**search** 10:5
**second** 7:15 44:5
62:18 78:23
80:22 99:24
109:15
**Secondly** 87:16
**section** 80:9 86:1
118:19
**see** 6:8 8:5,12,14
23:3 31:5,20
32:25 35:7
54:11 57:9,21
59:7,15,20 60:6
60:20 61:23
63:5,9 64:2,7
78:24 79:14
80:15,18,24
81:3 84:11 85:6

86:23 87:1,5
89:8,11 105:9
115:11 120:9
120:22,25
121:4 126:4
**seeing** 31:4 50:14
57:14 65:23
90:12
**seek** 46:20
**seeking** 24:3
**seen** 33:14 65:22
69:13 72:15
76:21 88:7
122:25
**Seery** 4:8 5:1 8:8
25:12,20 29:24
59:13 60:18,22
61:12 62:4,6,9
63:1,2 64:4
65:9 67:3,14,17
67:25 68:13,22
69:14 88:11,23
96:25 125:25
126:13
**Seery's** 8:10,20
**send** 29:14 32:13
34:24 37:7
53:21 59:7
60:11 62:2
63:17 83:22
**sending** 13:19
36:3 54:12
60:17 61:2
111:19
**senior** 12:8,11,11
12:12,17
**sense** 44:12 58:1
**sent** 28:22 29:11
37:17 42:9 83:2
83:17 92:16,22
106:20 107:3
111:21 123:19
126:11,13
**separate** 18:5
**served** 10:1

**services** 15:11,22
70:13,13 86:16
119:17,19
120:7
**set** 26:10,11,14
35:15 53:21
**shape** 37:10
**shared** 54:9,16
55:14 70:13
77:16 86:16
**shareholders**
39:2
**sheet** 118:6
121:11
**sheets** 63:8,22
**short** 74:22 75:17
75:23 93:15
**shorthand** 1:24
135:2,7,25
**shortly** 11:11,12
**show** 82:10
**showing** 92:15
131:21
**sick** 82:17
**sign** 52:20,20
53:7,20,22 54:3
104:25 105:1
113:5,18
115:13
**signatory** 52:14
**signature** 46:15
47:1,6,11,18
49:8,14,15
114:7,9,15
**signed** 47:9 52:10
52:11,25 55:4,8
115:14 131:6
132:5,9
**signer** 53:13
**significant** 20:20
51:19,22
**signing** 52:16,24
53:25
**similar** 32:25
34:9 38:25

96:10 112:13
**single** 104:2,3
**sitting** 30:25
33:24 42:1
50:15 53:23
54:4 55:24 82:4
85:16 91:21
105:16 106:23
**situation** 34:9
**slightly** 96:10
**SMU** 10:23
**so-called** 15:22
**somebody** 35:19
37:8 53:12,12
53:19 55:21
129:3
**soon** 32:17
**sophisticated**
14:12
**sorry** 11:12 14:24
19:15 47:8 52:4
57:21 66:2
82:23 92:12
97:3 103:9,23
109:20
**sort** 25:21 43:23
96:11 97:24
**sought** 88:24
**sound** 58:15
**sounds** 98:3
**speak** 36:2
**speaking** 13:17
43:11 44:1
**speakings** 95:21
**specific** 7:19
21:18 29:7
34:21 36:4,17
37:1,14 38:2
43:10 46:11,22
47:25 48:11,13
54:14 71:8
88:17 90:19
100:11 101:22
103:11,18
105:21 106:24

Kristin Hendrix - October 27, 2021

127:6
**specifically** 21:6
21:10 23:11
29:9 34:15 37:8
49:12 50:12,16
50:19 51:2 52:3
52:19 54:1,7
55:8 64:25 65:3
65:4,8 68:25
69:22 77:14
84:19,21 93:5
98:16 103:2,7
125:13,18
**specifics** 22:4
**speculating** 58:9
**speculation**
106:4
**sphere** 69:6
**spit** 48:1
**spoken** 35:23
61:13
**spreadsheet** 78:9
**spreadsheets**
31:6 77:12
**staff** 48:2
**stake** 27:7
**stamp** 47:19
82:18
**standard** 46:16
50:7 53:6,11,15
53:16 55:3
**standing** 67:2
**STANG** 2:10
**start** 54:19 59:11
95:10 100:11
**started** 11:13,17
20:11 100:10
**starting** 10:19
11:9
**starts** 59:12
**state** 1:23 6:5
10:25 67:25
68:14 76:22
78:16 136:1
**stated** 48:25

135:9
**statement** 99:3
**statements** 4:5
13:20 63:7,8,21
63:22 97:16,17
115:12 116:17
116:21 117:1,5
117:11 119:2
122:4 133:18
133:22
**STATES** 1:1
**status** 66:20
**stay** 26:4
**steps** 92:13
**STINSON** 2:17
**stop** 34:24
**stopped** 23:22
**stored** 56:2
**straightforward**
26:14
**Strasburger**
44:13,16
**Street** 1:25 2:4
**stretch** 109:5
**strike** 7:24 8:4
15:8 38:16
52:22 53:5
68:12 87:9
90:11
**string** 122:19
**stuff** 49:15
**stupid** 86:9
**subject** 16:5
119:20,20
132:19
**subparts** 86:20
**Subscribed** 134:7
**subsequent** 14:7
59:25 61:12
64:10 95:13
96:22 105:12
116:13 118:3
118:19
**subsequently**
32:11

sued 28:21
**suggest** 124:14
**suing** 28:5
**Suite** 2:4,17
136:2
**summarize** 72:19
**summary** 7:12
8:14
**summer** 123:16
124:18
**supervision**
135:11
**supplementally**
9:19
**supposed** 98:20
**sure** 6:12,15
10:21 11:4,11
12:20 13:20
14:11 18:22
19:23 22:11
26:7 28:16 31:2
33:10,21,22
37:5 42:3,22
43:20 52:25
58:18 60:16
62:1,19 63:17
65:4 66:11
75:21 76:11,11
84:15 99:3
100:7 101:1
107:18 109:22
115:16 125:24
126:23 130:23
130:24
**Surgent** 29:24
**surprise** 76:1,3
**surprised** 94:11
**surprises** 40:8
76:2
**suspect** 23:15
**switch** 58:24
**sworn** 1:19 6:2
135:4
**synopsis** 7:12
8:14

system 56:12
77:16 84:20

―――――――

**T**

**T-h-e-d-f-o-r-d's**
86:22
**take** 25:14 30:8
38:11 45:5 52:5
52:20 72:15
75:17 76:15
82:12 87:10
89:13 92:13
104:1 110:14
**taken** 1:20 16:15
17:6 45:8 135:7
**talk** 7:21,24 8:1
8:17,20,23,25
28:10 34:21
44:9 66:11,15
78:1
**talked** 9:12 97:4
99:8
**talking** 8:19,22
29:1 64:11
101:2 116:8
121:15,23
125:13
**taxes** 14:9
**team** 13:19 17:25
18:21 26:4 31:6
39:15 49:15,18
50:24 51:7
64:16 97:16
102:4 104:11
106:15 115:2
**telephone** 23:17
74:11 75:23,25
**tell** 34:13,16,24
44:2 53:1 54:1
54:2 55:7 60:14
63:24 71:23
74:19,23 79:22
79:24 84:3
91:11,15,18
93:24 99:2

100:12 106:14
107:1 109:22
110:8 112:8,25
113:4,17 114:1
114:6,14
116:20,23,24
117:21 118:25
119:6,11 122:4
122:8 123:2,8
123:11 130:22
131:24 132:4,8
132:11,14,18
132:23 133:2
135:4
**telling** 35:25
37:11 53:24
100:13,21
105:22 115:24
**template** 18:20
18:24 43:14,18
45:8 46:17 58:4
58:6,12
**templates** 43:12
50:9
**term** 17:2 66:9
66:16 67:8,13
73:10 76:24
77:10 98:17,25
100:4 107:20
107:24 125:19
126:2 127:12
127:16,24
128:8,21 130:7
131:5,8,14
**terminology**
27:14
**TerreStar** 38:22
**test** 20:9
**testified** 6:2 45:7
72:18 112:12
113:13 127:22
129:22
**testify** 83:10,12
**testifying** 6:16
**testimony** 19:8

Kristin Hendrix - October 27, 2021

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

**treasury** 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,14
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

_____
**U**
**Uh-huh** 27:16
33:12 47:3

**umbrella** 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8

Kristin Hendrix - October 27, 2021

**use** 21:17 45:12
  47:19 48:12
  49:18 59:1 79:1
  100:4
**usually** 24:5

**V**

**Vaguely** 63:12
**valid** 131:25
**valuation** 39:15
**various** 14:15
  15:11 59:13
**verbatim** 27:14
  78:25 85:20
  86:22
**verification** 50:3
**version** 30:13
  42:7
**versions** 30:24
**video** 8:5,12 59:6
  62:16 85:24
**videoconference**
  1:19 2:19
**view** 41:9
**volume** 94:19
**vs** 1:8

**W**

**wait** 44:23
**walk** 10:18 11:8
**walking** 54:7
**want** 28:10 47:15
  58:25 86:18
  95:8 100:7
**wanted** 52:19
  54:2,9 60:12,14
  82:17 84:7
  102:11 105:9
**wanting** 65:10
**wasn't** 108:23
  114:6,15 127:7
  129:14
**Waterhouse** 4:21
  7:10,21 13:7,8
  23:13,22,23

24:6 29:23
34:19 35:24
36:2 37:3,5,9
38:5 47:24 49:7
50:12,16 52:10
52:23 53:24
54:5,13 60:11
62:10 63:1,18
64:3 67:3 71:5
72:1 73:8 74:13
75:20 83:19
84:1 90:4,7,16
91:10,22 93:9
99:5,18 102:16
103:8,12,19
106:14 112:6,8
112:21,25
113:4,17,22,25
114:5,6,13
115:6 116:19
116:23 117:20
118:24 122:3,7
122:22 124:8
124:10,13,16
124:24 125:25
126:6,24 127:3
127:9,19 128:9
128:14,18,19
129:23 130:4
130:11
**Waterhouse's**
  8:1,6 47:1,6
  48:11 75:25
  115:10
**way** 11:18 12:23
  14:8 21:15
  35:13,15 37:8
  37:10,16 56:12
  58:20 60:19
  76:1 81:12 83:3
  92:25 93:10
  101:21 122:5
  135:19
**ways** 6:7 54:19
**we'll** 9:10 15:9

17:5 44:8,23
66:11,15 75:17
82:18 94:3
**we're** 6:7 27:22
  28:16 29:1 30:6
  35:19 50:22
  58:9,24 59:2,3
  76:11,11 85:20
  93:22 100:7
  104:3 116:8
  125:13
**we've** 9:11 28:8
  50:7 56:21,22
  69:16 88:9
  114:2 117:18
  121:23
**website** 49:3
**week** 8:2,10 9:2
  9:22,25 10:5
  13:22 28:9,17
  29:18 60:22
  61:6 67:6 86:1
  95:19
**weekly** 66:21,25
  67:2
**welcome** 59:1
  86:17
**went** 9:15 10:22
  10:23 24:19,22
  49:23 112:17
  115:4
**weren't** 19:25
  28:23 40:7,9
  64:12 96:7
  98:21,24 99:20
  100:24 101:13
  105:22 106:3
  131:1
**wire** 34:25
  106:15 107:3
**withdrawn**
  113:23 117:25
  120:3 124:9,21
  126:6,7 127:7,9
  129:15 132:12

133:9
**withholding**
  116:3
**within-entitled**
  135:6
**witness** 1:19 16:1
  16:24 18:16
  19:13 20:25
  22:10,23 24:10
  24:17 30:3
  31:11 34:8
  35:12 36:15
  38:9 39:19 41:3
  41:15 46:6
  48:24 49:12,22
  50:6 51:5,16,22
  52:3 53:11 55:7
  55:21 56:6
  57:18 58:18
  69:10 70:17
  73:22 74:7
  75:12 77:24
  80:5,18 82:3
  83:10,12 88:17
  89:4,17 94:14
  96:20 102:4
  103:15 105:21
  106:7,20
  113:21 114:12
  114:18 118:11
  119:4 121:18
  122:14 135:3
  135:10
**word** 42:6,6 43:7
  43:8 45:11 47:2
  77:13
**words** 21:5 23:20
  68:14
**work** 11:8 52:4
  98:2 126:22
**worked** 11:16,18
  36:6 61:19
  110:5
**works** 35:1
**world** 113:25

114:5,14
116:24 117:21
118:24 119:6
119:11 122:3,8
124:17
**wouldn't** 36:22
  37:6 53:22
**wrap-up** 110:16
**write** 60:4
**writes** 60:18,22
  61:13,20
**writing** 37:10
  41:14 64:3
  114:25 117:14
**written** 80:7
  82:19 91:25
  99:7 104:12,15
**wrong** 57:5 87:13
  99:7
**wrongly** 123:12
**www.dickman...**
  136:4

**X**

**Y**

**yeah** 7:2 14:13
  21:10 34:9
  44:23 51:9
  80:18 93:17
**year** 12:2 20:10
  26:14 78:1,5
  81:6 104:5
  127:15 128:21
  128:25 129:7
  129:14 130:8
  131:21
**years** 11:15,18
  12:9 18:20 21:9
  22:25 23:9 36:7
  37:18 40:25
  51:7 52:4
  104:21,22
  108:15 109:17
  110:8,10,12

Kristin Hendrix - October 27, 2021

131:3 133:5,12
**Yep** 76:9 123:17
**yesterday** 9:2
  86:7,9
**York** 2:11

___

**Z**

**zeros** 87:15
**ZIEHL** 2:10
**Zoom** 6:8,10

___

**0**

**05.02.2019** 4:1
**05.03.2019** 3:25

___

**1**

**1** 3:10 30:14,15
  30:18 33:1 71:4
  71:25 72:4
  74:10 80:9
  93:21 129:24
  135:22
**1-31-23** 136:4
**1.3** 81:1,2
**1.4** 90:23 91:3,23
**1:19** 1:22 134:4
**10** 4:3 9:23,25
  10:5 28:17 59:4
  59:9 110:12
**10,530,000** 87:20
**10.5** 85:6,9
  124:11
**10:11** 1:22
**10017-2024** 2:11
**101** 136:2
**11** 4:7 62:14,21
  62:23
**11:27** 57:22
**110** 3:5
**111** 3:6
**12** 4:11 5:5 65:13
  65:18,21 90:5,7
  90:17
**12,286** 87:10,10
**12,286,000** 87:6
  87:16,20,24

**12.3** 120:24
  121:13 123:5,9
**12/30/29** 78:25
**13** 4:14 72:11,13
  72:16
**13-week** 67:5
  125:7,10,14,23
  126:16,19
  128:17 130:3,6
**14** 4:17 22:25
  23:9 36:7 40:25
  76:10,17,19
  82:6 85:17
  90:22 91:4 93:8
**14-year** 38:3
**15** 4:19 36:7 83:1
  83:4,15,17 84:8
  84:14,18,19
  85:7 87:21
  89:21,22
  123:16,22
  124:5 133:5
**15(c)** 4:22 86:1
  121:11
**16** 4:21 85:21,22
  85:25 86:3
  119:15,23
**17** 5:1 11:15 52:4
  88:2,4,7
**18** 5:5 89:25 90:1
  90:3
**19** 59:12
**1982** 10:17

___

**2**

**2** 3:12,12,14,19
  3:23 4:3 30:19
  30:20,21 31:16
  32:21 34:14
  37:11 41:11,18
  44:19 56:22
  57:22 58:11
  60:25 61:6,12
  79:8 119:25
**2.1** 81:1

**2.4** 30:20 32:13
  32:21 33:19
  37:12 38:22
  39:7 42:16 43:3
  58:5,11 111:10
  113:14
**2.4-** 110:22
**2.4M** 3:12,19,23
**2000** 86:22
**2001** 127:23
**2004** 10:21 11:12
**2005** 11:11 20:16
  21:2,9,19
**2009** 10:23
**2014** 133:12
**2015** 10:24
**2017** 12:15 19:23
  73:2 74:7 131:6
  131:12
**2018** 116:4,16
  117:1,11,23
  118:3,11,14,18
  119:1 128:25
**2019** 3:14 12:10
  12:17,19,25
  13:8,14 17:9,12
  17:20 18:2,8,10
  18:10 19:15
  20:2,2 21:2,9
  21:19 23:16,16
  24:12,14 30:20
  31:17 34:14
  37:11 38:17,21
  39:6,14 40:3,5
  41:11,18 44:25
  45:14 46:9,12
  46:19 47:12,24
  48:21 49:6,19
  50:2 53:5,6
  54:21 55:3,10
  56:9,20 57:22
  74:7 78:5 80:23
  81:6,18 110:21
  111:1 112:9,21
  114:1 116:5

117:18 118:16
  129:8
**2020** 4:4,11,22
  12:7 14:2,5
  15:6,10,21 16:3
  24:22 59:12
  62:6,10 65:14
  66:3,7,18,19
  67:13,17,20
  68:1,8,14,21
  70:23 71:4 74:8
  75:19 76:4 78:2
  79:10 83:18
  86:25 87:6
  88:12 93:21
  98:21,25
  100:25 101:11
  101:19 102:7,8
  102:20 103:21
  105:4,18
  120:23 122:17
  122:19 124:18
  125:14,20
  126:9 127:6
  128:20 129:14
  129:17
**2021** 1:15,21 4:8
  5:2,6 24:24
  26:4 28:20
  29:11 62:25
  64:15 71:25
  73:3 88:2 90:5
  90:17 94:10
  106:10,25
  128:2,8,15
  134:9 135:22
**21-03004-sgj** 1:8
**214** 136:3
**23** 85:1 87:3
**23,846,000** 84:9
**24,471,000** 89:9
**25** 61:6
**26** 10:17
**27** 1:15,21
**28** 125:20

**29** 83:18 84:1
**2nd** 58:5 111:9

___

**3**

**3** 3:10,14,17,21
  4:11 31:15,18
  34:4,11 35:21
  36:20 37:11,19
  38:12 41:11,18
  44:18 56:20
  65:14 66:3
  111:7 112:21
  119:7
**30** 3:10,12 71:4
  72:4 74:10
  86:25 87:6
  93:21 120:23
  129:24
**30-year** 19:22
**30,746,812.33**
  4:14
**30.7** 66:9,13
**30.7M** 4:17
**31** 3:14 4:15
  67:16 70:22
  79:10 88:12
  98:21,25
  100:25 101:11
  101:19 102:8
  102:19 103:20
  105:3,18 131:6
**3102** 2:17
**312** 136:1
**34th** 2:11
**3800** 2:4
**38th** 1:25

___

**4**

**4** 3:17 42:15,17
  42:19 43:6,18
  43:18 44:21,24
  45:22,25 46:3
  46:19 48:11,19
  50:13,17 51:2
  52:8 55:17,24

___

Kristin Hendrix - October 27, 2021

57:16
**42** 3:17,19
**4228** 136:2
**43** 3:21,23
**445-9548** 136:3

**5**
**5** 3:19 30:12 33:1
33:20,25 34:5
35:3 36:25
37:12 38:25
39:3,8 42:15,16
42:17,20 43:2,6
43:18,19 44:21
44:24 45:22,25
46:3,19 48:11
48:19 50:13,18
51:2 52:9 55:17
55:24 57:16
58:13,13 94:9
112:14 113:14
**5-** 33:19
**5.0** 110:23
**5/31/2020** 79:5
**500** 1:24 2:3
**530,000** 78:25
**56** 3:25 4:1
**575-** 79:23
**575,000** 79:12
**575,550** 79:6
**59** 4:3
**5M** 3:10,17,21

**6**
**6** 3:3,21 4:8,22
43:2,4,21 44:9
44:18 62:25
64:15 80:12
86:22
**6/30** 86:23 121:3
121:6,11,25
122:8
**62** 4:7
**65** 4:11
**683** 87:3

**7**
**7** 3:23 5:2 43:2,4
44:9,19 88:2,21
**7.4** 38:18 39:11
39:23 40:15,21
122:10 123:12
**72** 4:14
**75201** 2:4
**75206** 136:2
**75219** 2:18
**76** 4:17
**777** 2:17
**780** 2:10

**8**
**8** 3:25 56:19,24
56:25 58:10
89:9
**800** 136:3
**83** 4:19
**85** 4:21
**855-5100** 136:3
**88** 5:1
**881** 120:1

**9**
**9** 4:1 56:21,24,25
58:10
**90** 5:5
**94** 3:4
**99** 49:14

# EXHIBIT 195

David Klos - October 27, 2021

**1**

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2            FOR THE NORTHERN DISTRICT OF TEXAS
 3                      DALLAS DIVISION
 4                        --o0o--
 5
 6  HIGHLAND CAPITAL MANAGEMENT,    )
    L.P.,                          )
 7                                 )
                 Plaintiff,        )
 8                                 )
             vs.                   )  No. 21-03004-sgj
 9                                 )
    HIGHLAND CAPITAL MANAGEMENT FUND )
10  ADVISORS, L.P.,                )
                                   )
11               Defendants.       )
12  _____
13                  DEPOSITION OF
14                   DAVID KLOS
15                 October 27, 2021
16  _____
17
18         DEPOSITION OF DAVID KLOS, produced as a
19  witness, duly sworn by me via videoconference at the
20  instance of the DEFENDANTS, was taken in the
21  above-styled and numbered cause on October 27, 2021,
22  from 2:30 P.M. to 5:14 P.M., before BRANDON D. COMBS,
23  CSR, RPR, in and for the State of Texas, reported by
24  computerized machine shorthand, at 500 North Akard
25  Street, 38th Floor, Dallas, Texas.
```

**2**

```
 1                    APPEARANCES
 2
 3          MUNSCH, HARDT, KOPF & HARR, PC, 500 North
 4  Akard Street, Suite 3800, Dallas, TX 75201, represented
 5  by DAVOR RUKAVINA, Attorney at Law, appeared via
 6  videoconference as counsel on behalf of the Defendants.
 7          Email: drukavina@munsch.com
 8
 9
10          PACHULSKI, STANG, ZIEHL & JONES, 780 Third
11  Avenue, 34th Floor, New York, NY 10017-2024, represented
12  by JOHN A. MORRIS, Attorney at Law, appeared via
13  videoconference as counsel on behalf of the Plaintiff.
14          Email: jmorris@pszjlaw.com
15
16
17          STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,
18  Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney
19  at Law, appeared via videoconference as counsel on
20  behalf of the Defendants Jim Dondero, HCMS and HCRE
21  Partners.
22          Email: michael.aigen@stinson.com
23
24
25
```

**3**

```
 1                      INDEX
 2                                              PAGE
 3  Examination by MR. RUKAVINA                    4
 4  Examination by MR. AIGEN                      95
 5  Examination by MR. MORRIS                    109
 6  Further Examination by MR. RUKAVINA          127
 7
 8
 9
10        (No exhibits marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1          DAVID KLOS,
 2  having been first duly sworn, testified as follows:
 3          EXAMINATION
 4      Q.  (BY MR. RUKAVINA)  Sir, state your name for
 5  the record, please.
 6      A.  David Klos.
 7      Q.  K-l-o-s?
 8      A.  K-l-o-s.
 9      Q.  What's your date of birth?
10      A.  May 6, 1982.
11      Q.  And where do you live?
12      A.  I live in Dallas.
13      Q.  What's your educational background?
14      A.  Undergraduate and graduate degrees.  I went
15  to undergrad at Boston College, graduate school at SMU,
16  with a degree in, Master's of Science in accounting and
17  MBA from SMU.
18      Q.  Do you hold any professional licenses?
19      A.  CPA in the state of Texas and, I don't know
20  if it's technically a license, but Series 27 from
21  FINRA.
22      Q.  And when did you get your CPA license?
23      A.  I don't recall specifically, but it would
24  have been probably in the '08, '09 time frame.
25      Q.  Is it current?
```

David Klos - October 27, 2021

---

**5**

1    A.  As far as I know.
2    Q.  Have you ever been disciplined or threatened
3  with disciplinary proceedings?
4    A.  No.
5    Q.  And your relevant work experience, please,
6  starting with college and afterwards?
7    A.  Sure.  Out of grad school I started working
8  at Deloitte in Boston.  I worked at Deloitte for
9  approximately three and a half years, between the
10  Boston office and the Dallas office.
11     And then I began working at Highland Capital
12  Management in March of 2009 and I've been at Highland
13  since then.
14    Q.  And when you joined Highland in March of
15  2009, what was your title or your role at that time?
16    A.  My title, if I remember correctly, was
17  valuation senior analyst.  I'm not certain if that was
18  exactly it, but it was something along those lines.
19    Q.  Was it in the valuation group?
20    A.  Yes.
21    Q.  And then give me your -- today you're the CFO
22  of Highland; correct?
23    A.  Correct.
24    Q.  So give me the progression from valuation
25  analyst to CFO with, to the best of your recollection,

---

**6**

1  the approximate year that you were promoted, et cetera?
2    A.  Sure.  I was in the valuation role from
3  basically March of 2009 to end of 2009.
4     I was then brought over to what we call the
5  corporate accounting team, so doing the accounting for
6  Highland Capital Management, LP and of the other
7  advisor-type entities, where I was primarily focused on
8  budgeting and forecasting, credit facility compliance.
9     That took from roughly 2010 until I think
10  middle of 2011, at which point I was moved over to the
11  fund accounting group, so doing hedge fund accounting,
12  which was a short role, really, for probably three or
13  four months.
14     At which point I was brought back to the
15  corporate team and also put in charge of the valuation
16  group.  I held that role in some way, shape, or form
17  more or less continuously for the next several years,
18  although certainly my role evolved and changed.
19     But in terms of the groups that I had
20  oversight over, those were the groups.  Like I said, my
21  role definitely evolved over time from 2011.
22    Q.  So by 2017 what was your title?
23    A.  So, yeah, by that time, I was, I believe,
24  controller.  I might have still been assistant
25  controller.

---

**7**

1     There were a few title changes in between
2  there.  I think at one point I was manager, at one
3  point I was senior manager, at one point I was
4  assistant controller and at one point I was controller.
5     I can't remember the exact times of all of
6  those break points.
7    Q.  Let me pause you.  When you were assistant
8  controller, who was the controller?
9    A.  There was quite a bit of time where I was
10  assistant controller and we didn't have a controller.
11  I couldn't tell you the exact time frame, but there was
12  definitely an extended time frame.
13     And then in April of 2020, our existing chief
14  accounting officer left and I assumed his
15  responsibilities at that time.
16    Q.  Let me pause you.  That's a new term for me.
17  Chief accounting officer?
18    A.  Uh-huh.
19    Q.  Who was that person?
20    A.  The person that left?
21    Q.  The person that was the chief accounting
22  officer until April 2020.
23    A.  Cliff Stoops.
24    Q.  And do you have any idea or knowledge whether
25  at Highland that was like an officer-level position?

---

**8**

1    A.  It was not.  It was more of a term of art, I
2  would describe it.  So it -- so, yeah --
3    Q.  To the best of your recollection, when did
4  you become the controller at Highland Capital
5  Management, LP?
6    A.  I couldn't pin down a specific date.  Like I
7  said, the responsibilities were very similar.  I would
8  guess the change from assistant controller to
9  controller was probably in the, most likely in the '16,
10  '17, maybe '18 time frame.
11    Q.  Can we agree that as of May 1, 2019, you were
12  the controller at Highland?
13    A.  Yes.
14    Q.  So let's focus on that time frame, May 2019,
15  and you're the controller.  Who do you report to at
16  Highland?
17    A.  Frank Waterhouse.
18    Q.  The CFO?
19    A.  Correct.
20    Q.  No one in between you and him?
21    A.  Correct.
22    Q.  So what -- explain to me the role between the
23  chief accounting officer and the chief financial
24  officer in that time frame, '19, '20?
25     MR. MORRIS:  Objection to the form of the

---

David Klos - October 27, 2021

9

1  question.
2       THE WITNESS:  Very little.  Like I said,
3  chief accounting officer was more of a term of art.
4  What that role actually had oversight of was our retail
5  fund accounting, institutional fund accounting,
6  operations, so loan settlement and treasury.
7       And probably another department or two that
8  I'm forgetting, but it did not have any oversight over
9  the corporate accounting group.
10      Q.  (BY MR. RUKAVINA)  And in May of 2019, as the
11  controller, what were -- what was your role or what
12  were your duties?
13      A.  In May of 2019 I was at that point still
14  overseeing the valuation group.  I was overseeing the
15  corporate accounting group, which my primary direct
16  report there was Kristin Hendrix, who really was the
17  day-to-day person.  But I certainly oversaw her.
18      Q.  By that you mean the person that answers to
19  you?
20      A.  Correct.  Sorry.  If I flipped that, I
21  apologize.  So I was overseeing that group, which had,
22  you know, fairly broad responsibilities.
23      In terms of, you know, accounting for the
24  Advisor, doing forecasts when they were called for,
25  performing the audit every year, managing cash,

10

1  processing payroll, things of that nature.
2       And then at that time I was also put in
3  charge of one of the public REITs that was launching at
4  the time under the NexPoint flag.  And getting that
5  team started.
6       Q.  Did you mention that in May of 2019 you were
7  still involved with the valuation group?
8       A.  I did.
9       Q.  Did you have a title at the valuation group?
10      A.  Nothing distinct from my overall controller
11  title.  These titles were often, like I said, terms of
12  art, whether it was controller or chief accounting
13  officer.
14      Q.  What did the valuation group at Highland do?
15      A.  Well, valuation group was really a liaison
16  with both third-party pricing providers, pricing
17  services, brokers on the street, front office, members
18  at Highland.
19      To, you know, to work on valuing the
20  securities held across the platform, both for Highland
21  HCMLP managed funds as well as affiliated managed
22  funds.
23      Q.  So who did -- did you report to anyone at the
24  valuation group?  In other words, did it have its own
25  separate hierarchy kind of?

11

1       A.  Frank Waterhouse.
2       Q.  And were --
3       A.  I should clarify too, that the valuation team
4  isn't ultimately responsible for the valuations
5  themselves, but they do act in this liaison role.
6       Q.  Perhaps that's my confusion.  Is there a
7  separate group that handles just valuation?
8       A.  No.
9       Q.  Is there an outside consultancy that handled
10  that in May of 2019?
11      A.  I don't know if I would call it consultancy,
12  but there was a third-party valuation service provider
13  that would do certain of the, call it illiquid, harder
14  to value securities.
15      Q.  So would you say that you were pretty busy in
16  April, May 2019?
17      MR. MORRIS:  Objection to the form of the
18  question.
19      THE WITNESS:  I've been busy throughout my
20  career.
21      Q.  (BY MR. RUKAVINA)  In April, May, June 2019,
22  how many hours a month do you estimate you worked for
23  Highland?
24      MR. MORRIS:  Objection to the form of the
25  question.

12

1       THE WITNESS:  I don't remember.  A
2  significant number.
3       Q.  (BY MR. RUKAVINA)  Certainly full-time?
4       A.  Absolutely.
5       Q.  Would you say that you were working more than
6  200 hours a month in that time frame for Highland?
7       A.  I don't know how many hours.  I should
8  clarify, we're using Highland very liberally.  When I
9  say Highland, supporting the entire apparatus,
10  platform.  Significant number of hours at that time,
11  and before and after.
12      Q.  And let's explore that a little bit.  You
13  mentioned one of the funds for NexPoint.  I'd like to
14  talk about NexPoint Advisors, LP, just NexPoint
15  Advisors, LP.
16      Did you ever have an official role or title
17  with NexPoint Advisors, LP?
18      A.  Not that I can remember.
19      Q.  Do you know if you were ever the controller
20  for that entity?
21      A.  I'm not certain.  I'm not certain.
22      Q.  But I take it that pursuant to the shared
23  services agreement you, as an employee of Highland,
24  were providing services on behalf of NexPoint?
25      MR. MORRIS:  Objection to the form of the