Kristin Hendrix - October 27, 2021

**129**

1    A. Yes.
2    Q. And was that done because HCMLP received the
3  instructions of somebody authorized to give the
4  instruction on behalf of those entities?
5    A. Yes.
6    Q. Did HCMS and HCRE and NexPoint timely make
7  the installment payments that were due at year end
8  2019?
9    A. Yes.
10   Q. And why did they make those payments?
11   A. Because we were provided instruction and
12  authorization to do so.
13   Q. Okay. And is the only reason that the
14  payment wasn't made at year end 2020 because nobody on
15  behalf of the Advisors -- withdrawn.
16   Is the only reason that no payment was made
17  at the end of 2020 is because no one on behalf of
18  NexPoint, HCRE, or HCMS directed HCMLP to make those
19  payments?
20   A. Correct.
21   MR. AIGEN: Objection. Form.
22   Q. (BY MR. MORRIS) And you testified earlier to
23  a call that you had with Mr. Waterhouse. I think you
24  said it was either November 30 or December 1.
25   Do you recall that?

**130**

1    A. Yes.
2    Q. And did you personally continue to prepare
3  the 13-week forecasts after your conversation with
4  Mr. Waterhouse?
5    A. Yes.
6    Q. And did those 13-week forecasts continue to
7  include the payments that were due under the three term
8  notes at the year end?
9    A. Yes.
10   Q. And that's information that you gave to
11  Mr. Waterhouse; is that right?
12   A. Right.
13   Q. Mr. Rukavina elicited from you the fact that
14  payments of principal hadn't been made on demand notes
15  that were executed in favor of Mr. Dondero's
16  affiliates.
17   Do you recall that?
18   A. Yes.
19   Q. Okay. Was that a topic of conversation with
20  PricewaterhouseCoopers at any time?
21   A. Yes.
22   Q. Can you tell me about that conversation?
23   A. Sure. As part of our annual audit, the
24  auditors would, you know, make sure that our
25  receivables are collectible. And if they thought for

**131**

1  any reason they weren't, then they were going to raise
2  an issue, a going concern issue.
3    That came up several years in a row with
4  HCMFA.
5    Q. Do you recall that the three term notes at
6  issue here were all signed on May 31, 2017?
7    A. Yes.
8    Q. And all of those term notes involved a
9  roll-up of previously issued demand notes; is that
10  right?
11   A. Correct.
12   Q. Do you know why in -- at the end of May 2017
13  NexPoint, HCRE, and HCMS rolled up their demand notes
14  into individualized term notes?
15   A. Yes.
16   Q. What is your understanding as to why that
17  happened?
18   A. That would get the auditors a little bit more
19  comfort over our outstanding loans, ensuring that we
20  have an amortization schedule, an underlying contract,
21  showing that payments will be coming in every year on
22  these outstanding receivables.
23   Q. Okay. As the person responsible for
24  preparing Highland's audit, did anybody ever tell you
25  at any time that any of the notes were not valid

**132**

1  obligations of the maker?
2    A. No.
3    Q. As the person responsible for Highland's
4  audit, did anybody ever tell you at any time that any
5  of the notes at issue should not have been signed?
6    A. No.
7    Q. As the person responsible for Highland's
8  audit, did anybody ever tell you at any time that any
9  of the notes at issue were signed by mistake?
10   A. No.
11   Q. Did anybody ever tell you at any time that --
12  withdrawn.
13   As the person responsible for Highland's
14  audit, did anybody ever tell you at any time that
15  Mr. Dondero didn't approve of any of the notes?
16   A. No.
17   Q. As the person responsible for Highland's
18  audit, did anybody ever tell you at any time that
19  the -- any of the notes at issue were subject to an
20  oral agreement?
21   A. No.
22   Q. As the person responsible for Highland's
23  audit, did anybody ever tell you at any time that any
24  of the notes were amended?
25   A. No.

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 173-23    Filed 02/02/24    Page 2 of 188    PageID 35075

34 (Pages 133 to 136)

Kristin Hendrix - October 27, 2021

**133**

1    Q.  As the person responsible for Highland's
2  audit, did anybody ever tell you at any time that any
3  of the notes would be forgiven?
4    A.  No.
5    Q.  During your 15 years at Highland, has an
6  intercompany loan ever been forgiven in whole or in
7  part?
8    A.  No.
9    Q.  During your -- withdrawn.
10    Can you recall any note that Highland ever
11  held as the payee that was forgiven in whole or in part
12  in the five years prior to bankruptcy, go back to 2014?
13    A.  No.
14    Q.  Is it your understanding as the person
15  responsible for Highland's audit that the forgiveness
16  of notes, if they were in a material amount, would have
17  had to have been disclosed in the audited financial
18  statements?
19    A.  Yes.
20    Q.  So is it fair to say that any evidence of the
21  forgiveness of material amounts would have been
22  disclosed in Highland's financial statements?
23    A.  Yes.
24    MR. MORRIS:  I have no further questions.
25    MR. RUKAVINA:  I have none.

**134**

1    MR. AIGEN:  None.
2    MR. RUKAVINA:  Okay.  Thank you very much.
3  (Whereupon, the deposition adjourned at
4  1:19 P.M.)
5    --oOo--
6    I declare under penalty of perjury that the
7  foregoing is true and correct.  Subscribed at
8  _____, Texas, this _____ day  of
9  _____, 2021.
10
11
12  _____
13  KRISTIN HENDRIX
14
15
16
17
18
19
20
21
22
23
24
25

**135**

1          CERTIFICATE OF REPORTER
2    I, BRANDON D. COMBS, a Certified Shorthand
3  Reporter, hereby certify that the witness in the
4  foregoing deposition was by me duly sworn to tell the
5  truth, the whole truth, and nothing but the truth in the
6  within-entitled cause;
7    That said deposition was taken in shorthand by
8  me, a disinterested person, at the time and place
9  therein stated, and that the testimony of the said
10  witness was thereafter reduced to typewriting, by
11  computer, under my direction and supervision;
12    That before completion of the deposition,
13  review of the transcript was not requested.  If
14  requested, any changes made by the deponent (and
15  provided to the reporter) during the period allowed are
16  appended hereto.
17    I further certify that I am not of counsel or
18  attorney for either or any of the parties to the said
19  deposition, nor in any way interested in the event of
20  this cause, and that I am not related to any of the
21  parties thereto.
22    DATED: November 1, 2021
23
24  _____
25    Brandon Combs, Certified Shorthand

**136**

1  State of Texas
    Dickman Davenport, Inc. Cert 312
2  4228 North Central Expressway
    Suite 101, Dallas, TX 75206
3  (214) 855-5100  (800) 445-9548
    Email: info@dickmandavenport.com
4  www.dickmandavenport.com
    My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 17-23    Page 609 of 2488    Page 3 of 188    PageID 35076

137

Kristin Hendrix - October 27, 2021

**A**

**A.M** 1:22 57:22
**ability** 69:5,20
**able** 108:23
    120:18
**above-styled**
    1:21
**Absolutely** 17:8
**accent** 56:16
**access** 24:7 54:15
**accessed** 44:19
**account** 12:11
    37:7 91:15
**accountant** 16:19
    46:10 73:15
    74:3 78:4 84:24
**accounting** 11:16
    12:8,12,18
    17:14,15,16,21
    18:4 19:9 20:3
    20:12,20 21:13
    31:16,23 35:7
    40:11 45:17
    46:3 51:11,11
    51:18 56:11
    102:4 111:9
    112:18,23
    126:11
**accounts** 13:21
    14:8,15 51:24
**accrued** 79:22
**accruing** 85:15
**accurate** 72:22
    97:19 115:25
**accurately** 116:2
**action** 11:6
**activities** 39:20
**actual** 104:12
    122:16,25
**addition** 39:7
    41:21
**additional** 56:15
    56:20
**adjourned** 134:3
**Adkins** 109:16

109:20,21
**advance** 126:2
**adversary** 94:25
    95:3,12
**advice** 46:20
    88:24
**advised** 38:23
**advisor** 39:1
**Advisors** 1:10
    15:14,17,23
    27:20,23 63:6
    70:1,4 71:6,10
    74:17 76:24
    84:9 85:6 92:16
    99:10,14,16,25
    100:2,15,18
    119:16 120:7
    123:24 129:15
**Advisors'** 122:16
**affiliate** 34:25
    87:23 120:7
**affiliated** 15:11
**affiliates** 18:19
    86:24 87:17
    99:6,11,13
    100:4,17
    130:16
**affirmative**
    101:14
**affix** 50:17 114:6
**affixed** 47:5
    114:15
**afternoon** 94:23
**ago** 33:8 104:21
    104:22 109:17
    110:10,12
**agree** 55:2 57:14
    61:13
**agreed** 25:23
    26:3
**agreeing** 53:24
**agreement** 26:5
    26:15,21 95:9
    95:13 96:4,8,12
    96:23 97:6,9,11

97:21,25 98:9
    107:25 119:20
    132:20
**ahead** 73:9
    113:10,20
    114:11 118:22
**Aigen** 2:18 3:4
    94:16,23,24
    95:23 96:1,21
    98:15 102:5
    103:17 105:24
    106:8,23
    110:14 129:21
    134:1
**Akard** 1:24 2:4
**alleged** 40:16
    96:3,7
**Allocation** 38:24
    39:1
**allowed** 135:15
**allowing** 95:13
**amended** 107:25
    132:24
**amendment**
    128:4
**amort** 19:22 90:8
**amortization**
    73:25 76:23
    77:4,6,9,20
    80:20 82:6 85:3
    85:12,13,17
    131:20
**amount** 19:6,7
    26:10,12 30:12
    32:23 39:3
    43:16 48:15
    49:2 50:9 87:16
    87:24 89:9 90:9
    91:19 93:4
    104:6 121:14
    122:10 124:4,5
    124:19 133:16
**amounts** 35:8
    40:2 120:3,4
    121:10 123:23

124:1 133:21
**analysis** 97:24
**and/or** 50:13,18
    63:22 64:18
    69:20 73:25
    110:23
**anniversary**
    79:21 80:5,14
**annual** 114:20,23
    115:7 117:4
    119:20 120:12
    130:23
**annually** 80:13
**annum** 80:12
**answer** 7:6,6
    23:11,14 35:2
    39:19 51:5 52:3
    64:20 75:2
    114:11 118:10
    122:13
**answered** 41:4
    51:3 57:17
    100:9 106:6
**answering** 66:1
**answers** 42:10
    43:1 57:6
**anybody** 35:25
    40:8 101:7
    112:8 113:23
    113:25 114:5
    114:14 116:24
    117:20 118:24
    119:6,11 122:3
    122:7 123:8,11
    124:16 125:2
    126:8 127:10
    127:14 131:24
    132:4,8,11,14
    132:18,23
    133:2
**anymore** 76:2
**anytime** 21:10
    59:1
**AP** 11:17 12:23
    32:7 109:5

**apologize** 15:6
    59:7 62:16 75:9
    75:22
**appear** 118:18
**APPEARANC...**
    2:1
**appeared** 2:5,12
    2:19
**appears** 47:1
    76:12 77:1
**appended** 135:16
**applying** 125:3
**approval** 16:5,8
    48:12 49:4
    50:25 51:2
    101:3 104:20
    124:24 127:19
**approve** 48:15
    49:5 104:1,2,24
    132:15
**approved** 48:18
    48:19,21 104:7
    104:8,14
**approximately**
    95:18 110:7
**April** 12:7
**area** 107:19
**arose** 115:4
**ASAP** 60:18 64:6
**asked** 51:3 57:17
    60:10 69:22
    88:9 93:4 106:6
    119:24
**asking** 6:10 26:7
    29:17,19,24
    59:17 62:6
    64:23,25 77:25
    90:8 96:12,13
**aspects** 115:1
**assistant** 12:6
    69:2 70:3,9
    88:21
**associate** 11:18
    32:7
**assume** 6:25

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 173    Page 604 of 2488  Page 4 of 188    PageID 35077

138

Kristin Hendrix - October 27, 2021

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

_____ B _____
**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

_____ C _____
**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:21
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:13
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 173    Page 605 of 2488    Page 5 of 188    PageID 35078

139

Kristin Hendrix - October 27, 2021

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
**categorize** 24:6
**cause** 1:21 22:6
116:7 117:16
135:6,20
**caused** 39:16
92:12 124:22
**cell** 75:2,3,4,13
**Central** 136:2
**CEO** 13:23 60:24
**Cert** 136:1
**certain** 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
**certainly** 82:11
86:17 121:22
**certificate** 53:14
53:18,20 135:1
**certified** 16:19
135:2,25
**certify** 135:3,17
**CFO** 13:9,13,22
23:12 25:10
**chain** 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
**chance** 75:4,18
**change** 32:11
79:1,12 84:10
85:2,6 90:23
91:3
**changed** 58:4
123:6
**changes** 43:15

44:2 49:1
135:14
**changing** 57:4
98:12 107:18
**characterize**
24:13 111:13
**charge** 13:19
18:7 114:24
115:11
**charged** 10:10
**charges** 76:12
**chase** 15:9
**check** 60:12,15
64:19 93:15,16
102:23 105:8
**checked** 63:16,16
64:22
**checking** 64:24
**checks** 13:18
**clarify** 47:14
88:10
**clear** 6:20 113:12
**clearly** 38:13
**clients** 63:6
**close** 120:6
**collect** 28:21
**collectibility**
68:23
**collectible** 130:25
**collection** 30:14
**collects** 27:3
**college** 10:20
11:10,14
**column** 79:5,11
80:22,24
**columns** 78:14,15
**Combs** 1:22
135:2,25
**come** 84:5,14
85:2,10,11
**comes** 31:8
**comfort** 131:19
**comfortable**
50:23
**coming** 16:6

48:25 99:5,10
126:25 131:21
**comma** 15:4
**comments** 120:14
**commingle** 110:9
**commission**
136:4
**common** 40:10
**communicate**
23:17
**communicated**
23:23
**communicating**
23:24
**communications**
23:22 64:10
90:16
**companies** 52:14
**company** 39:10
44:13
**compensate**
40:15
**compensation**
25:17,21 26:1,6
26:20,22 27:4
39:9,12
**competent** 24:18
24:20,21
**complete** 72:10
**completed** 116:5
118:15
**completely** 17:3
47:8 114:24
**completion**
135:12
**compliance**
17:14
**comport** 44:20
**compounded**
80:13
**computer** 47:16
135:11
**computerized**
1:24
**concern** 131:2

concerning 111:9
124:18 127:7
**concerns** 63:13
63:15
**condescending**
25:3
**conduct** 38:3
**confess** 82:23
**confident** 37:22
**confirm** 62:2
**confirmation**
92:15,17
**confused** 78:12
**confusion** 47:15
**connection** 116:9
117:7,10,22
118:3 124:23
**consent** 39:1,24
**consist** 26:1
**constituted**
116:12 118:2
**consulted** 46:13
**contact** 6:9,11
**contending** 96:4
**context** 31:13
44:1 59:25
86:12
**continue** 130:2,6
**contract** 131:20
**controller** 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
**conversation**
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
**conversations**
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
**copied** 64:12
86:6
**copies** 55:14
56:13
**copy** 83:17
**copying** 59:13
61:3 63:1 83:18
**corporate** 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
102:4 111:9
112:18,22
126:11
**corporateacco...**
111:22
**correct** 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

Kristin Hendrix - October 27, 2021

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
**correctly** 32:18
33:23
**correspondence**
123:3
**corresponding**
84:16
**counsel** 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
**count** 42:10 43:1
57:6
**couple** 83:19
**course** 6:9 46:18
55:3 103:23,24
104:13,19,23
**courses** 16:15,16
**court** 1:1 6:18
27:13 30:13,25
**courteous** 94:12
**CPA** 10:24 11:2
11:6,21 115:17
**create** 43:12,18
45:8 48:17
**created** 18:21
44:18,19,21
48:7 58:1
119:12
**creating** 13:21
111:18 125:22
126:20
**creation** 126:16
126:18
**credit** 91:18

**crunch** 109:5
**CSR** 1:23
**curiosity** 76:6
**current** 11:2
**currently** 11:19
120:5
**cut** 15:9

_____
**D**
**D** 1:22 135:2
**Dallas** 1:3,25 2:4
2:18 136:2
**dark** 94:17
**date** 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
**dated** 30:20
31:16 135:22
**dates** 57:22
**Dave** 8:24 34:18
34:23 38:13
46:7 111:8
112:6
**Davenport** 136:1
**David** 3:14 13:1
31:16 33:17
**DAVOR** 2:5
**day** 48:15 57:25
58:6 80:2
112:13 134:8
**days** 9:23,25 10:5
28:17
**deaccelerate**
107:13
**deal** 20:21 36:25
**debtor** 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
**debtor's** 40:16
68:18 77:4
86:16
**debtors** 117:12
**Dec** 4:3,11
**December** 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
**decided** 26:2,3
40:14 52:15,18
**deciding** 23:8
**decision** 29:14
105:2
**declare** 134:6
**default** 68:16,19

88:3 90:17
93:10,11
**defaulted** 67:22
**defendants** 1:11
1:20 2:6,20
95:11 96:4
**defense** 95:12
96:7,12
**defenses** 95:9
**defined** 114:3
**definition** 113:16
**degree** 10:22
**deliver** 117:17,22
**delivered** 116:8
116:11 117:25
118:1 128:18
**demand** 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
**demanded** 62:11
**demanding** 24:13
**Denton** 10:15
**department**
11:17 18:2,5,8
18:12 51:12
57:12 112:23
**depend** 18:17
**depended** 49:16
**depending** 73:16
**depends** 18:16
69:10 77:24
**deponent** 135:14
**deposed** 6:13
28:2
**deposition** 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
**describe** 12:18
53:16
**described** 17:17
99:9 116:16
119:7
**description** 14:1
110:3
**detail** 66:12
**details** 17:5
25:14 28:7
**determine** 97:6
97:25 102:11
**determined**
97:22
**Dickman** 136:1
**difference** 103:22
**different** 19:25
54:19 73:16
87:22 96:11
103:17 124:2
**direct** 27:7
**directed** 99:17,19
129:18
**directing** 48:16
101:4
**direction** 23:12
53:21 60:23
63:2 73:7 101:7
135:11
**directions** 48:25
**directly** 40:9,22
41:12 49:1
70:14,17
102:16
**disciplinary** 11:5
**disclose** 119:24
**disclosed** 97:15
97:21 133:17
133:22
**discretionary**
26:8
**discuss** 62:9 66:4
68:4,7 74:16

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 173    Page 607 of 2488  Page 7 of 188    PageID 35080

141

Kristin Hendrix - October 27, 2021

88:12
**discussed** 28:8
  38:4 43:13
  66:21 67:9
  74:18,20 81:13
  92:5 96:25 97:2
**discussing** 66:19
  67:20 117:18
**discussion** 9:5
  50:21 61:7 65:9
  66:7 69:5,19
  92:25 93:7
  122:22 123:4
**discussions** 9:8
  25:20 28:11,12
  28:17 40:6 60:1
  61:9,11 62:13
  68:22 98:8
  127:6
**disinterested**
  135:8
**distinct** 29:3
  45:24
**DISTRICT** 1:2
**DIVISION** 1:3
**doctor** 42:11
**doctored** 83:3
**doctoring** 42:24
  57:4
**document** 32:25
  47:2 49:19 72:8
  76:10 82:13
  86:1 88:7
  111:19 119:8
  119:25
**documentation**
  9:16
**documentations**
  47:8
**documents** 9:18
  10:7 42:6 43:7
  43:9 44:3 47:9
  48:5,18 49:8,13
  50:2,3,11 54:11
  57:7,14,20

69:16 77:13
  82:10,18
**doing** 6:7 43:8
  45:20 74:4
**dollar** 19:7 40:2
  48:15 49:2 50:9
**Dondero** 2:20 5:2
  15:12 21:11,20
  21:21 22:6,19
  23:7,14,18,23
  23:24 24:2,7
  34:19 35:24
  36:2 40:14,20
  52:12,19,22
  53:7 73:8 81:14
  83:18 94:24
  99:18 101:2,4
  101:17 102:11
  102:16 103:7
  103:12,19
  104:1,7,14
  108:9 116:19
  116:24 117:20
  118:23,24
  122:3,7 123:19
  124:8,10,13,16
  124:18,25
  127:20 132:15
**Dondero's**
  104:19 130:15
**Donohue** 59:13
  59:17,22 62:25
  63:21 64:3,16
  64:22 65:5,9
  92:18,19,22,24
  93:8
**door** 35:1
**draft** 17:24
**drafted** 17:1,3
**drafting** 16:16
  17:22,23 18:12
  19:16,21 20:12
  29:13
**drive** 54:9,16
  55:14

drukavina@m...
  2:7
**DSI** 61:19 62:6,9
  63:3,24 67:4
  68:7,13,23
  69:14 77:3
  88:12,23 92:18
  92:19 126:13
**due** 16:6 59:18
  66:23 73:9,25
  86:24 87:5,17
  87:17,22,25
  89:9 90:8 102:8
  103:20 105:4,6
  120:5,23
  123:23 124:1,5
  124:19 125:4
  125:19 126:2
  126:25 127:11
  127:15 128:20
  128:24 129:7
  130:7
**duly** 1:19 6:2
  135:4
**duties** 12:19
  97:12
**duty** 20:25

—————————
       **E**
—————————
**E-l-l-i-n-g-t-o-n**
  18:9
**e-signature** 47:10
  47:12 48:1,4,5
  48:8,9,12,18
  49:9,15,18 50:1
  50:13,17,23
**e.g** 120:6
**earlier** 43:14
  45:7 99:8
  112:12 113:13
  120:14 123:15
  125:7 126:12
  129:22
**early** 116:5
  128:19

**earn** 26:23
**educational**
  10:18
**effect** 54:11
  67:21 68:15
**effectuate** 101:7
  106:15
**effort** 97:6
**efforts** 102:10
**either** 18:21
  29:13,20 31:1
  34:17,23 37:3
  46:7,13 50:1
  54:12 58:20
  62:6,9 71:4
  84:24 99:15,17
  110:15 124:24
  127:19 129:24
  135:18
**electronic** 54:22
**electronically**
  56:3,12
**Eliason** 46:7 78:3
  112:7
**elicited** 130:13
**Ellington** 4:3
  18:9 60:4,9,12
  60:15 61:10
**email** 2:7,14,22
  3:14 4:3,7,21
  5:1,5 23:17
  31:12,15,20,23
  32:1,4,20,25
  33:3,25 36:3
  37:10,19,25
  38:14 41:17,21
  42:5 48:20
  50:11 54:11
  59:4,12,22 60:1
  60:2,3,25 61:2
  61:6 62:4,8,15
  62:24,25 63:11
  63:14,15 64:22
  82:16,19 83:2,6
  83:11,11,12,18

83:23 84:19
  85:25 86:3,13
  86:22 90:4,5,12
  92:22 108:12
  111:8,21,21,25
  112:3,5,13,17
  120:2 122:19
  123:5,18,23
  126:7,8 136:3
**emailing** 90:8
  107:2
**emails** 9:16,18
  41:18 49:23
  81:9 82:22
  115:3
**employed** 11:21
  70:18
**employee** 109:23
  110:2,6
**employees** 16:3
  108:19,24
  109:10,13,14
**employment** 26:5
  26:15 69:25
  70:7
**engagement**
  115:14
**ensuring** 131:19
**entire** 11:17
  114:25 126:20
**entirety** 86:18
**entities** 15:11
  21:16 22:6,12
  22:19 70:18
  81:15 101:5
  124:2 129:4
**entitled** 82:12
**entity** 21:20,22
  22:7 23:2 35:14
  53:13 63:4,5
  84:16 104:4
**entries** 78:13
  80:23
**entry** 78:24 79:19
**erroneous** 122:5

Case 21-03004-sgj Doc 109 Filed 12/30/21 Entered 12/30/21 18:34:00 Desc Main
Case 3:21-cv-00881-X Document 17-23 Page 008 of 488 Page 8 of 188 PageID 35081

142

Kristin Hendrix - October 27, 2021

error 38:22 39:9
39:16,21,23
40:10 44:7
established 9:11
28:8 83:16
estimate 20:10
event 135:19
events 38:21
95:15 96:16
116:13 118:3
118:19
eventually 109:5
everybody 25:13
112:2 125:24
126:1,3,4
evidence 105:22
114:9 118:9,21
121:17 122:12
133:20
exact 25:25 36:5
37:14 48:5,13
107:1 117:12
Exactly 78:16
Examination 3:3
3:4,5,6 6:3
94:22 110:19
111:5
example 81:1
Excel 77:12,15
78:9
exchanged
108:12
excluding 28:16
29:18
execute 48:18
49:5
executed 18:24
47:9 130:15
executing 19:17
execution 18:13
20:12 32:15
exhibit 3:10,12
3:14,17,19,21
3:23,25 4:1,3,7
4:11,14,17,19

4:21 5:1,5
30:14,15,18,19
30:21 31:15,18
32:21 33:1 34:4
34:11 35:21
36:20 37:19
38:12 42:15,16
43:6,21 44:18
44:19 56:19,21
59:4,9 62:14,14
62:21,23 65:13
65:18,21 72:11
72:13,16 76:10
76:17,19 79:8
82:6 83:1,4,15
83:17 84:8,14
84:18,19 85:7
85:17,20,21,22
85:25 86:3,13
87:21 88:2,4,7
89:21,22,25
90:1,3 111:7
119:7,15,23
123:16,22
124:5
exhibits 3:8 30:6
42:17 43:4
44:21 45:22
46:19 48:11,19
50:13,17 52:8
55:17,24 56:25
57:16 58:10,25
113:13
existing 84:20
expect 85:16
expense 103:24
expertise 16:18
expires 136:4
Explain 19:19
explained 6:15
31:7
explicit 60:23
explicitly 32:5
53:1
expressly 71:14

Expressway
136:2
extent 108:13
external 46:14
eye 6:9

F
faced 11:5
facilitate 91:7
fact 21:18 49:5
57:15 64:15
65:1 67:13,16
99:22 121:21
128:23 130:13
facts 114:9
fair 17:5 21:19
22:3 23:21 35:5
42:20 70:14
95:25 96:8,21
96:24 97:18,20
98:6,7 99:25
100:20,23
101:8,12 103:5
105:16 106:4
108:4 116:2
133:20
fairly 36:15
faithfully 57:3
familiar 27:13
65:20 66:11
86:2,5 107:20
115:19 122:16
family 23:4
far 20:14,16
24:19,21 49:7
80:24
favor 130:15
February 12:2
26:4
fee 39:1,24
feel 86:18
fell 13:24
felt 104:25
figuring 93:17
file 56:13

filed 28:24,25
29:6,8 30:13,24
files 32:25
filing 18:25
final 123:6
finance 10:22
financial 4:4
12:22 59:18
62:7 69:15
97:16,17
115:12,25
116:16,21
117:1,5,11
119:2 122:4
133:17,22
financials 12:23
37:18 41:8
60:11 86:24
118:11,14,19
121:3,7,20,25
122:8
find 31:13 72:8
83:8 93:24 94:8
102:23
finding 98:2
fine 47:8 48:2,4
86:19
finish 96:11
finished 31:10
finishing 46:14
firm 18:22 44:16
first 6:2 9:1
11:13 20:11
63:17 70:21
81:17 82:13
95:8 113:23
120:15
five 51:4 94:3
110:10 133:12
five-minute
93:15 110:14
fixing 55:15
flip 46:25
Floor 1:25 2:11
flow 109:5

flows 63:8
focus 12:17
folders 18:25
folks 62:16 67:4
85:24
follow 47:23 60:5
60:9 72:5
follow-up 4:23
followed 104:11
following 47:22
follows 6:2
forecast 67:5
128:17
forecasted 67:8
forecasts 12:21
13:21 17:18
67:5,9 125:8,10
125:14,17,18
125:23 126:7,8
126:16,19
130:3,6
foregoing 134:7
135:4
forgive 97:10
forgiven 95:14
96:16 109:10
133:3,6,11
forgiveness
133:15,21
form 14:14,21
15:24 16:22
17:6 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 37:11
38:7 39:17 41:1
41:13 45:3 46:4
47:20 48:22
49:10,20 50:4
51:14,20 52:1
53:9 55:5,19
56:4 58:16
65:16 69:8
70:15 73:20

Kristin Hendrix - October 27, 2021

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
**format** 77:12
**formatting** 79:3
  82:5
**forth** 64:11
**forward** 64:2
  94:16
**forwarded** 92:15
  92:17
**found** 54:9
**foundation** 75:11
**four** 9:8,12 100:5
**fourth** 107:25
**frame** 17:12
  66:19 69:7
  73:16
**Frank** 4:21 7:10
  7:21 8:1 13:7,8
  23:13 24:5
  34:19,23 35:24
  38:14 52:19
  53:20 60:10
  63:16,18 64:10
  64:23,23 65:1
  67:3 71:5 73:8
  74:14,15 84:1,7
  91:10,22 92:4
  99:5,17 100:13
  101:2 102:15
  104:4,21,23,24
  106:14,20
  107:2 112:6
  124:24 125:25
  126:13 128:9
  128:14
**Frank's** 115:16
**frankly** 104:24
**fresh** 111:20

**Friday** 9:1,4
**function** 12:21
**functions** 117:15
**fund** 1:9 27:23
  38:24 39:2,2,8
  85:6
**funds** 38:23
  59:18 119:17
  120:8
**further** 3:5 10:23
  32:15 62:1
  92:13 110:19
  133:24 135:17
**future** 14:7 16:5
  120:5

───────
**G**
**gears** 58:24
**general** 34:21
  46:18 54:20
  69:6 90:20
**generally** 13:17
  13:24 19:13
  34:8 35:2 43:10
  72:22 81:20
  96:13,15
  120:11
**getting** 11:20
  18:24 48:11
  60:2,3 81:12
  101:3
**give** 20:10 31:13
  74:16 110:4
  129:3
**given** 49:18
  101:6 122:9
  123:1
**gives** 16:19
**giving** 53:21 54:5
**Global** 38:23
  39:1
**go** 10:12 17:5
  44:4,24 48:1
  55:1 62:24 64:2
  67:4,5,11 73:8

78:22 107:23
  113:10,20,23
  114:11 118:22
  133:12
**goes** 94:9 99:3
**going** 6:25 17:12
  20:9,16 26:23
  27:3 29:16 30:6
  30:10,14,18
  34:3 40:6 42:7
  42:20 44:2
  50:22 52:8
  54:18 56:20
  57:2 58:24 59:3
  59:3 60:5,9
  64:19 65:13
  67:7 71:6 72:8
  72:11 74:10
  76:10,20 78:7
  81:9 82:10,11
  82:13,25 83:1
  84:8 85:20,21
  87:19 88:2
  93:20 95:2,23
  105:23 111:10
  131:1,2
**good** 6:4 24:17
  26:24 94:23
  127:8
**governs** 26:11
**graduated** 10:21
  11:9,12
**great** 53:20
**greater** 16:19
**group** 14:4 17:13
  19:9,10,16 20:3
  31:24 35:7,22
  37:22 40:11
  43:14 45:7,18
  46:3 49:16
  51:18 56:11
  73:19,23
  111:21,25
  112:3,5 117:16
  126:12

**guarding** 24:7
**guess** 89:22
**guys** 126:14

───────
**H**
**H-i-l-l-i-s** 32:12
**half** 81:17
**hand** 59:3 82:25
**handed** 88:6
**handle** 20:12
  50:8
**handled** 20:4,21
**happened** 20:7
  21:8 36:11,11
  37:21 101:1
  131:17
**happening** 20:11
  61:5
**happy** 23:3 93:22
**HARDT** 2:3
**HARR** 2:3
**Hayley** 32:2,14
  46:7 78:3,6
  112:6
**Hayley's** 46:8
**HCM** 4:4,9
**HCMF** 3:25 4:1
**HCMFA** 3:15 4:4
  27:10,22 28:1
  28:13 29:6
  30:12,19 32:13
  38:19,23 39:12
  40:1,15 53:25
  59:18 60:19
  62:7,11 63:6,22
  64:18 66:5
  69:15,20 70:7
  70:10 85:18
  87:5 99:4 100:2
  110:22 111:1,1
  111:11 115:1
  117:4,16
  118:15 120:6
  120:23 121:25
  124:2,5,19

131:4
**HCMFA's** 39:8
  87:17 117:11
  117:23 118:6
  118:18 119:1
**HCMLP** 3:15
  4:19 5:6 32:13
  60:24 64:4
  86:24 87:5,18
  111:11 120:6
  120:23 124:6
  129:2,18
**HCMS** 2:20
  94:25 98:16,24
  100:1,22,25
  101:10,18
  102:1,19
  105:18 107:5
  127:10 128:23
  129:6,18
  131:13
**HCRE** 2:20
  94:25 98:17,24
  100:1,22,25
  101:10,18
  102:1,20
  105:18 107:3
  127:10 128:23
  129:6,18
  131:13
**hear** 72:1
**heard** 40:17,20
**held** 12:8 133:11
**hell** 75:4,10
**help** 76:22 78:13
  93:17 105:23
**helped** 12:20
**Hendrix** 1:14,18
  5:5 6:1,6 30:10
  30:23 56:19
  57:2,8 62:23
  65:13,21 76:19
  78:12 79:15
  86:3 90:3 93:13
  94:5,23 110:20

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/09/22    Page 10 of 188    PageID 35083

144

Kristin Hendrix - October 27, 2021

111:6 134:13
**hereof** 80:13
**hereto** 135:16
**hi** 60:4
**higher** 89:20
**Highland** 1:6,9
  10:2 11:13,21
  12:5,19 13:10
  14:4,4,11,22,23
  15:3 16:10
  17:10,13,21
  18:1,11 21:5
  25:6,15 26:4,9
  26:24 27:2,2,22
  28:12 51:7,10
  51:19 65:14
  66:4 71:7,11
  81:10,18,23,23
  85:5 87:25
  92:17 107:21
  108:1,16,17,21
  108:22 109:2,2
  109:9 110:21
  117:1 119:24
  133:5,10
**Highland's** 7:23
  7:25 8:19,22
  114:20,23
  116:4,16
  131:24 132:3,7
  132:13,17,22
  133:1,15,22
**Hillis** 32:12
**history** 11:9
**Hold** 62:18
**hope** 57:13 97:13
**hopefully** 82:11
**hoping** 68:15
**house** 75:1
**hundreds** 50:7
  51:8
**hypothetically**
  22:4,17
**hypotheticals**
  21:17

**I**
**i.e** 114:9
**idea** 58:2,7 75:12
  75:24 89:13
  93:1 105:17
  106:3
**identification**
  30:16,22 31:19
  42:18 43:5 57:1
  59:10 62:22
  65:19 72:14
  76:18 83:5
  85:23 88:5 90:2
**identifies** 123:23
  124:1
**identify** 112:2
  125:18
**identifying** 66:23
**image** 47:2,5,19
  48:2
**imagine** 15:7
**immediately**
  61:14
**important** 93:14
**Impressive** 11:23
**include** 71:18
  72:10 100:1
  118:25 121:13
  130:7
**included** 15:14
  16:9 31:24
  102:5 111:25
  118:6,13
  121:21,22
  122:10 123:12
  124:4,5 127:2
**includes** 63:5,7
**including** 88:11
  124:2
**income** 63:7,21
**incoming** 67:7
**incorrect** 123:9
  124:14
**increase** 94:19
**incumbency**

53:13,17,19
**INDEX** 3:1
**indirect** 27:7
**indirectly** 70:12
**individualized**
  131:14
**Info** 3:25 4:1
**info@dickman...**
  136:3
**information** 4:9
  29:25 34:13
  61:14 63:3,7
  64:17 65:5,11
  69:12,15 84:6
  86:15 116:3
  127:2 130:10
**informed** 112:21
  125:24 126:1
**initiated** 74:11
  92:3
**ink** 49:8,13 55:3
  55:8
**ink-signed** 55:11
**input** 29:25
  88:24
**installment**
  128:24 129:7
**instance** 1:20
  20:6 23:8 35:21
**instances** 24:1
  40:1,24
**instruct** 127:11
  127:15
**instructed** 128:9
  128:11
**instructing**
  101:18
**instruction** 72:2
  74:17 76:8
  100:16 101:14
  101:22 103:12
  129:4,11
**instructions** 24:2
  24:3 32:16
  69:14 76:1

100:21 101:9
  103:19 129:3
**instructs** 7:5
**insurance** 39:10
**insurer** 39:8
**intend** 113:5
**interco** 32:14
  34:11
**intercompany**
  17:22 18:13
  19:17 20:4,13
  20:16 21:3,8
  34:12 35:7
  36:19,25 37:12
  40:24 53:8
  111:15,16
  124:23 125:4
  126:25 133:6
**interest** 19:7
  43:16 49:2
  68:18 73:25
  78:14,16,24
  79:20,22 80:11
  85:15 125:4,19
**interested** 84:9
  135:19
**interjects** 64:4
**intermediary**
  24:3
**internal** 18:21
  41:8 46:13,20
  69:19
**internally** 77:1
**investigation**
  97:5
**invoice** 108:13
**involved** 18:12
  19:16,20,24
  36:21 39:20
  40:9 126:14
  131:8
**involvement**
  19:10
**irrespective**
  26:16,24

**IRS** 49:3
**issue** 79:3 95:14
  96:16 97:25
  98:16 114:2
  118:8 131:2,2,6
  132:5,9,19
**issued** 131:9
**issues** 40:7,10
  60:16 61:21
  115:4,15

**J**
**J-F-O-R-S-H-...**
  44:10
**Jack** 59:13 60:4,8
  64:6 65:2 92:18
**James** 4:5 5:1,2
  61:14,15,18,21
  61:25 62:3
**Jan** 4:8 5:2,5
**January** 10:17
  24:24 28:20
  29:6,11 62:25
  64:15 71:25
  88:2,21 89:9
  90:5,7,17,22
  91:4 93:8
  106:10,25
  127:23 128:8
  128:15
**jealousy** 24:7
**jerk** 24:12
**JFORSHEE**
  44:10
**Jim** 2:20 21:10
  23:14,18 34:19
  35:24 52:19,20
  54:2 63:2 64:10
  67:3 73:8 84:4
  99:18 101:2,4
  102:16 104:1,7
  104:14,22,25
  105:1 125:25
**Jim's** 99:21
**jive** 87:20

Kristin Hendrix - October 27, 2021

jmorris@pszjl...
2:14
job 6:20 11:14
17:9 20:25
24:19,22 43:11
45:1,14 103:1,6
103:10
John 2:12 4:7
8:24 95:21,23
97:4
JONES 2:10
June 86:25 87:6
116:5 120:23

**K**

K-l-o-s 8:25
keep 29:1 77:6,9
95:4 125:24
126:1
kept 54:22 55:11
56:12 77:5
121:20
kind 11:5 18:4
23:21 24:6,11
34:3 50:3 54:19
81:13 122:21
Klos 3:14 8:24,25
9:5,12 13:1,6
13:10 25:10,21
29:24 31:16
33:17 34:10,18
35:21 36:18,24
37:20 38:12
46:7 97:2,3
111:8,13 112:6
Klos' 13:2 41:17
knew 40:3 126:3
128:19
know 6:24 19:20
19:23 20:19
25:14,25 28:7
33:10,11,13
36:11 38:17,21
39:22,25 40:1,5
43:21 44:11

47:16 48:6,6
50:10 52:18,25
57:25 59:6
76:15,21 78:15
82:15 89:17
92:18,19 99:21
101:4 103:24
104:17 107:19
108:7,25 110:2
117:4 118:15
120:22 121:6
121:19,20
122:15 124:4
128:7 130:24
131:12
knowledge 27:6
36:1,4 37:14
40:11,13 52:15
69:11 77:7
108:4 112:9,11
112:20 116:1
121:14 122:2
known 67:14,17
97:11
KOPF 2:3
Kristin 1:14,18
5:5 6:1,6 32:1,2
32:14 57:8
61:20 134:13

**L**

L.P 1:6,10
labeled 82:15
labels 30:7
laid 24:12
land 84:5
landline 75:2
large 35:8
lasted 75:6
late 126:9
Lauren 4:22
86:21
law 2:5,12,19
6:18 18:22
44:16

Lawler 109:20
109:23
Lawn 2:17
lawsuit 28:24
29:5,8
lawsuits 28:1,9
28:13,25 29:17
29:21 30:1
lawyer 9:4
lawyers 44:14
lay 67:7
leading 39:20
108:15,21
109:1
learn 95:20
ledger 76:12
left 61:9 87:15
legal 7:23,25 10:9
16:13 17:14,25
18:2,5,11,21
19:10,16 28:10
46:14,20 72:21
lend 21:22 23:1
110:22
length 93:25
let's 10:12 11:9
12:17 14:8,18
21:17 30:8
34:25 44:24
45:13 47:14
54:19 55:1
72:10 78:1
99:24 115:11
120:23
letter 4:11 65:14
115:14,23
letters 29:11,14
115:14,20
letting 92:18
liabilities 118:14
liability 40:16
118:6
license 10:24
11:2
limited 107:25

lines 61:7
listed 78:17
litigations 27:8
little 28:9 44:7
55:1 58:9,24
78:12 94:17
98:12 131:18
live 10:14,15
LLP 2:17
loan 3:15,25 4:1
18:18 31:5
32:14 33:25
34:11,12,14,25
35:14,17,17,22
36:19,25 37:6,7
37:17,17 38:25
39:12 40:15,21
45:13,15,18,22
46:12,14 48:15
49:1,4,5,24
50:9 58:5 72:25
76:24 79:21
80:6,7 87:22
103:22 104:6
104:20 111:15
111:16,18,20
112:10,23
113:2 119:9
124:23 125:4
133:6
loans 35:9,12
37:4,6,13,22
38:6 39:4 41:9
41:12,19 48:14
48:17 50:7,19
50:22 51:8
53:21 66:23
67:8 98:16,17
98:17,20,25
106:9 107:13
109:9 110:5,6
126:2 131:19
logically 36:10
40:23 71:18
logs 75:19

long 7:20 21:24
74:21 75:6
110:4
look 30:17 54:15
57:7 75:18 77:2
78:11 80:21
93:20 94:6
looked 31:5
123:16
looking 56:21,23
58:10 79:24
81:10 86:21
87:14 119:23
looks 60:24 64:9
76:23 77:4
79:19
loosely 17:2
lot 28:25
lots 40:6
LP 15:4,15 27:20
27:23 70:1,4

**M**

ma'am 31:21
57:7 87:1 111:4
machine 1:24
maintain 6:9,10
maintained 77:1
82:7
maker 19:4,5
21:3 43:15
132:1
making 13:20
21:5 81:7 99:20
101:2,25
103:22,23
104:3
management 1:6
1:9 12:20 13:14
13:15 14:2,24
15:4,22 17:17
27:23 85:5
108:1 115:13
115:19,23
manager 12:8,12

Kristin Hendrix - October 27, 2021

12:18
manual 104:9,12
March 12:2
mark 59:3
marked 30:15,21
  31:18 42:17
  43:4 56:25 59:9
  62:21 65:18
  72:13 76:17
  83:4 85:21,22
  88:4 90:1
  113:13 119:14
material 97:22
  98:1,4,6,10
  104:6 120:3,4
  133:16,21
materials 121:12
maturity 80:13
MBA 10:23
  11:20
mean 7:17 13:15
  14:22,23 15:3
  19:1 35:16
  48:20 57:24
  68:24 78:13,15
  87:11,24
  111:16
meaning 27:20
  27:22 54:25
  70:18
means 27:15
  35:15 58:22
  71:16 111:18
meeting 34:17
  67:2
meetings 66:22
  66:25
memorandum
  48:20
memory 9:17
  19:14 20:9 29:3
  29:7,17,19,23
  32:20,24 34:3
  37:9 38:2 41:22
  42:1,20 43:7,10

45:24 47:4
48:10,13 50:15
51:1 53:23 54:4
54:10 57:23
58:9,20 69:18
72:24 74:4 81:6
81:17 86:8,10
90:15,20 91:21
92:6
mentioned 11:24
  13:14 22:12
  25:9 29:10 41:7
  44:25 45:21
  51:6 64:21
  125:7
merit 25:17
met 108:11
metadata 42:21
  42:21,24 43:21
  43:24 44:8,24
  56:15,20 57:4
Michael 2:18
  94:24
michael.aigen...
  2:22
mid 128:19
middle 89:8
million 30:12,20
  32:13,21 33:1
  33:19,20,25
  34:5 35:3 36:25
  37:12,12 38:18
  38:22,25 39:3,7
  39:8,11,23
  40:15,21 42:15
  42:16 43:2,3
  58:5,11,13,13
  66:9,13 81:1,1
  81:2 85:1,6,9
  87:3 90:23 91:3
  91:23 110:23
  111:10 112:14
  113:14,14
  120:24 121:13
  122:10 123:5,9

123:12 124:11
mind 71:18
minute 30:8
minutes 94:3
mischaracteriz...
  116:25
Mischaracterizes
  41:2
misleading 42:9
missed 88:25
  105:12
misspeak 30:5
mistake 51:12
  113:1,18 114:2
  116:20 117:21
  118:25 119:12
  125:3 132:9
mistakenly 51:25
mistakes 51:17
  51:19,22
  120:19
modified 44:19
  57:8
moment 72:9
Monday 9:2
monetize 68:2,10
money 13:21
  21:11,13,15,21
  21:21,22 22:5
  34:24 35:13
  37:7,17 53:21
  54:23 81:15,19
  81:22,24 92:16
  111:19
month 106:10
months 40:7
morning 6:4 9:3
  67:11 82:14
  125:6
Morris 2:12 3:6
  4:7 7:3 8:24 9:6
  9:9 14:14,21
  15:24 16:22
  18:14 19:11
  20:23 22:8,21

24:8,15 28:3
30:2 31:10 34:6
35:10 36:13
38:7 39:17 41:1
41:13 42:9 45:3
46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
62:18 65:16
67:10 69:8
70:15 73:20
74:5 75:7,11
77:22 78:8 79:7
79:9,13 80:3,16
82:1,14,16,23
83:2,6,10 85:25
87:7 88:15 89:2
89:15 93:22
94:15,17 95:21
95:25 96:2,6,18
96:23 102:2
103:13 105:19
106:6,18 111:6
113:11,22
114:13,19
118:12,23
119:5 121:19
122:15 128:3,4
129:22 133:24
mouth 23:21
move 9:10 21:11
  21:13,15 94:16
  109:8
moved 23:4
multiple 54:19
MUNSCH 2:3

─────────
       N
─────────
name 6:5 32:8
  44:12 57:18
  94:24 109:24
  110:3

Nancy 108:9
NAP 27:14
native 78:9
NAV 38:22 39:9
  39:16,20,23
  40:10 107:21
  108:5
near 14:7
necessarily 17:23
  19:10 103:25
need 9:16 14:6
  19:2 21:11
  25:14,25 34:24
  52:6 54:1 59:1
  81:19,20 82:12
  86:19 93:17
needed 21:21
  22:5,18 23:1,4
  40:1 53:12
  81:11,14,23
  104:25
needs 104:7,8,13
negative 78:20,25
  79:2
never 40:19,20
  49:12 51:12
  55:14 68:17
  70:14,17 96:25
  97:2 101:6,6,14
  103:6 108:11
  119:8
new 2:11 21:14
  32:14 34:11,25
  36:19 45:9
  111:15,16,18
NexPoint 5:6
  15:14,17,22
  16:5 27:11,15
  27:18,19,20
  28:2,13,21 63:6
  63:22 64:18
  66:8,12,20
  67:13,22 68:2
  68:15,19,24
  69:15,20 70:1,4

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 123    Filed 06/09/4788    Page 13 of 188    PageID 35086

147

Kristin Hendrix - October 27, 2021

70:22 72:12
76:24 77:7,13
77:20 80:20
81:7,22 84:9
85:2 88:3 90:9
90:17,23 91:16
91:23 92:13,16
93:10,11 120:6
123:24 127:14
127:16 128:23
129:6,18
131:13
**NexPoint's** 16:5
16:9
**Nope** 8:7 76:7
91:12
**normal** 34:16
103:23,23
**normally** 107:15
**North** 1:24 2:3
10:22 11:13
136:2
**NORTHERN** 1:2
**note** 3:10,12,17
3:19,21,23 4:14
5:3,6 14:19
15:18 16:10,21
17:1,3,6 18:16
18:19 19:22,25
21:4,23 22:7,20
23:9 28:21
30:11,19 31:8
32:15,21 33:2
33:20 35:3,18
42:15 43:2,3,11
45:9 46:16
56:21,22 58:11
58:13,13 66:9
66:13,16,20
67:13,22 68:2,5
68:8,10,16,19
68:23,24 71:13
71:19 72:6,11
72:12,16,20
73:4 76:13 77:7

80:9,10,14,20
81:8,23 85:14
90:18 91:16,19
91:23 92:14
127:16 133:10
**notes** 4:12,19
14:9 16:16
17:22 18:13
19:17,21,21
20:4,13,17,22
21:4,8,14,14
22:13 27:3
28:14 30:24
31:1 38:11 41:7
42:7,22 43:12
45:2 46:21,22
47:6 50:1 52:10
52:16,17,24
53:1,8,25 54:5
54:12,23 55:3,8
55:11 56:2,8,10
59:2 62:11
65:15 66:5
69:21 73:10
77:10 84:16
85:12 95:14
96:16 97:10
111:2 113:6,11
113:12,16,18
114:2,7,16
116:7,11,15,25
117:18,22,25
118:1,7,18
119:1,12 120:6
121:15,21,22
122:11 123:13
124:6 125:19
126:25 127:12
127:24 128:8
128:21 130:8
130:14 131:5,8
131:9,13,14,25
132:5,9,15,19
132:24 133:3
133:16

**notice** 88:3 89:8
**notices** 28:22
**noting** 14:5
**November** 59:12
61:6 62:6,10
66:19 67:12,19
68:1,7,14,21
71:4 72:4 74:10
75:18 76:3
93:21 127:6
128:20 129:24
135:22
**November/Dec...**
125:14
**NPA** 4:17 27:18
27:19 86:24
99:4 100:3
**number** 79:2,6
79:11,18 80:23
84:10,13 85:2,9
87:20,21 89:14
89:18,20,21
111:7 120:1
123:5,9,12
124:2,11,14,17
**numbered** 1:21
**numbers** 26:1
78:20 80:21
84:15
**NY** 2:11

_____

**O**
o0o-- 1:4
**Oak** 2:17
**oath** 6:17 95:5
**object** 113:19
114:8
**objecting** 114:10
**objection** 7:3
14:14,21 15:24
16:22 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 38:7

39:17 41:1,13
45:3 46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
65:16 69:8
70:15 73:20
74:5 75:7 77:22
80:3,16 82:1
87:7 88:15 89:2
89:15 96:18
102:2 103:13
105:19 106:6
106:18 113:8,9
114:17 118:9
118:21 119:3
121:17 122:12
129:21
**objections** 7:5
**obligations** 14:19
16:6,10 118:7
132:1
**obligor** 15:18
**obviously** 14:11
35:6 59:1
**occasion** 22:18
**occurred** 95:15
96:4,17 97:7
106:17
**Oct** 4:22
**October** 1:15,21
86:22 94:9
122:17,19
**office** 10:1 34:1
54:8 57:3
**officer** 52:13
69:25 70:7
**officers** 109:10
109:13
**oftentimes** 13:23
34:23
**oh** 67:21
**okay** 6:11 7:1,7

25:3 28:19 30:5
31:23 32:11
33:22 34:3 36:1
38:2 39:14
42:13 43:6
49:25 58:23
60:11 62:1
63:17 70:25
79:25 84:8 85:1
89:24 93:7 94:1
110:17 112:8
113:11 115:17
118:18 119:5
121:13 123:15
126:15,22
129:13 130:19
131:23 134:2
**once** 104:5
**ones** 53:2 109:18
**ongoing** 77:20
**oOo--** 134:5
**open** 120:5
**opinion** 98:5
**opposed** 23:23
39:12 49:8
52:12 98:17
**oral** 91:25 95:9
95:13 96:4,8,12
96:23 97:6,9,11
97:20,25 98:9
132:20
**orally** 37:10
50:16
**order** 97:6
**ordinary** 103:23
104:13,19,23
**original** 30:11
54:23,25 55:11
**originally** 48:7
**outcome** 27:8
**outgoing** 67:7
**outside** 18:21
89:6
**outstanding** 66:5
80:11 120:4

Kristin Hendrix - October 27, 2021

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

**P**

**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
73:9,12,18,25
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24

Kristin Hendrix - October 27, 2021

**prepayments**
81:25
**presence** 25:4
**present** 9:4,6,12
24:5 45:24
90:15 97:3
**presented** 116:1
**presenting** 46:14
97:18
**preserve** 78:8
**pretty** 14:11
109:8
**previous** 100:9
**previously** 17:24
48:25 131:9
**Pricewaterhou...**
116:9,12 117:5
117:17 118:2,5
130:20
**principal** 30:12
78:14,17 79:5
79:11,23 80:10
89:23 121:14
122:10 124:5
124:19 125:3
125:18 130:14
**print** 56:1
**printed** 42:8,12
42:24 47:18
55:18,22 56:7
57:4,21,22,24
57:25 58:11,14
58:21,22
**printing** 55:23,25
**printouts** 42:21
**prior** 9:25 10:4
19:17 28:11
35:24 40:25
55:2 65:23
71:25 86:9 96:6
105:3 108:6
124:24 127:19
128:12 133:12
**privileged** 9:8
95:24

**privy** 64:9,11
69:19
**probably** 9:15
17:2 49:14 50:6
58:22 61:9
63:15 99:15
109:8 126:13
**proceed** 61:20,25
**proceeding** 46:20
**proceedings** 95:1
95:3,12
**process** 31:7
32:16 45:11,12
120:12
**produce** 78:9
**produced** 1:18
17:24 33:15
34:1 59:4 67:10
76:20 82:14,19
125:6
**product** 115:13
**production** 10:1
33:15
**profitability**
26:25
**program** 47:25
**programs** 47:16
**projections** 17:18
**promised** 39:2
**promissory** 3:10
3:12,17,19,21
3:23 4:12,14
5:3 14:9 15:18
16:10,16,20
17:1,3,6,22
18:13 19:17
27:3 28:13,21
30:11,19 31:1,8
32:21 33:2
35:18 38:11
42:7 43:11,12
45:1,9 47:6
52:10,24 53:1,8
53:25 54:5,12
54:23 55:11

68:5 71:13,19
72:11,12,16
76:13 77:7,10
80:9 81:8 113:6
113:11,12,16
114:2,7,16
116:7,11,15
117:17,22
118:7 119:12
122:11 124:6
**prompt** 128:14
**prompted** 83:22
**prospect** 53:20
**provide** 7:12
9:19 15:21
30:11 42:21
59:17 63:3 64:5
64:16 119:16
121:25
**provided** 17:24
33:5,9,10 61:14
70:12 89:17
121:11 122:5
129:11 135:15
**provides** 120:7
**providing** 15:10
54:8 65:5
**public** 16:19
**pull** 119:14
**pulled** 49:3
**purpose** 86:12
125:22
**purposes** 39:5
98:1 126:23
**purview** 89:6
**put** 23:20 84:25
**PwC** 97:21 98:1
117:22

―――――――――
**Q**
―――――――――
**qualification**
16:20
**question** 7:1
14:10,22 15:25
16:23 18:15

19:12 20:19,24
22:9,22 24:9,16
28:4 29:5,16
34:7 35:11
36:14,23 37:1
38:8 39:18 41:2
41:14 45:4,5
46:5 47:21
48:23 49:11,21
50:5 51:15,21
52:2,4 53:10
54:18 55:6,15
55:20 56:5
58:17 65:17
66:10 69:9
70:16 73:21
74:6 75:8 77:23
80:4,17 82:2
84:14 86:9,19
86:20 87:8,19
88:16 89:3,16
95:10 96:10,19
100:9 102:3
103:14 105:20
106:19 113:9
113:24 124:17
127:8 128:5
**questions** 6:21,24
7:6 8:8 61:21
95:2 110:16
115:4 133:24
**quick** 52:5 95:4
107:23
**quickly** 6:16
109:8
**quite** 36:21 41:20
104:24
**quote** 120:3

―――――――――
**R**
―――――――――
**R-o-e-b-e-r** 32:10
**raise** 131:1
**raised** 95:12
**range** 89:10
**rate** 19:7 43:16

49:2 80:12
**ratio** 107:21
108:5
**re-up** 86:16
**reached** 108:5
**read** 7:9 8:9
32:18 82:21
86:17 119:25
**reading** 81:9
**ready** 94:16
**real** 11:14
**really** 35:13
67:21
**reason** 6:23
22:23,25 52:11
52:13 56:1,6,7
72:7 77:3 82:5
82:8 101:13
129:13,16
131:1
**recall** 7:19 10:8
21:6 34:15,20
36:16 37:2
44:11 46:10
50:14,20 51:17
51:23 52:4
55:25 56:7
59:22,25 60:2,3
60:8,10 63:11
64:1 65:3 66:7
67:3 68:22,25
69:22 72:3 73:1
74:11 83:22
84:4,23,25
86:12 88:17
91:25 92:3 93:5
93:7 102:21
104:21 105:15
107:6 108:25
109:14 112:3
112:13,15,17
116:4,15 118:5
119:5,8,19
120:16 123:4
123:15 127:5

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 123    Filed 06/09/22    Page 16 of 188    PageID 35089

150

Kristin Hendrix - October 27, 2021

129:25 130:17
131:5 133:10
**recalling** 109:16
**Receivable** 4:19
**receivables**
130:25 131:22
**received** 63:13
64:21 71:5
129:2
**receiving** 32:4
124:23
**recipient** 60:25
**recognize** 44:12
**recollection** 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
**reconciling** 13:20
**record** 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
**recorded** 73:11
81:24
**recording** 73:18
**records** 10:6,6
59:18 62:7 64:5
73:12
**reduced** 135:10
**refer** 99:25
**reference** 71:13
119:1 121:2,6,9
**referenced** 34:5
84:6
**referencing**
33:25 121:10
**referred** 96:2

**referring** 66:25
100:2,5
**reflected** 118:7
123:12
**reflecting** 43:15
**refresh** 9:17 42:1
42:20 69:18
108:1
**regarding** 86:1
90:17 107:12
**regardless** 99:16
**regularly** 23:24
**reinforces** 41:8
**reissue** 21:14
**related** 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
**relates** 32:21
64:17
**relation** 115:7
**relieve** 93:10,11
**rely** 42:8
**remember** 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
**remotely** 6:8
**renewal** 120:12
**reorganized** 25:7
25:15 26:17,24
27:2
**rep** 115:13,19,23

**repaid** 23:10
**repay** 69:6
**repeat** 14:10
22:10 28:15
44:22 66:10
**rephrase** 6:25
**report** 12:25 25:9
25:12 114:25
115:25 117:14
123:6
**reported** 1:23
13:6 36:22
**reporter** 135:1,3
135:15
**reporters** 27:13
**reporting** 12:22
12:23 13:22
**reports** 127:3
**repository** 54:22
55:9
**represent** 27:10
46:25 57:3 83:1
94:24 107:23
**represented** 2:4
2:11,18 93:5
**representing**
42:23
**request** 4:9 60:5
84:22
**requested** 63:3
63:21 64:5,17
84:2 135:13,14
**requesting** 63:25
**requests** 10:1
69:14 115:3
**required** 7:6 21:4
**respect** 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
**respectfully** 39:5
**respecting** 45:22

**respectively**
113:15
**respond** 122:23
**responded** 65:1
**response** 60:13
120:15,19
122:16,25
**responsibilities**
97:12 103:6,10
**responsibility**
69:7 102:23
105:2
**responsible** 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
**responsive** 10:6
**rest** 44:23
**restrictive** 47:17
**restroom** 52:6
93:16
**restructured**
19:21
**retail** 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
**reveal** 50:11
**review** 8:4 50:11
54:11 119:21
125:10,17
135:13
**reviewed** 9:15,19
**reviewing** 32:24
115:11
**revised** 17:6
**right** 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
**Roeber** 32:9
112:7
**role** 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
**roles** 73:6
**roll-up** 72:22
131:9
**rolled** 79:23
131:13
**Romey** 61:15,18
61:25 62:3
**room** 75:15
**roughly** 39:3
**routine** 20:4,21
20:25
**routinely** 21:1
**row** 131:3
**RPR** 1:23
**rude** 25:3
**Rukavina** 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/09/14788    Page 17 of 188    PageID 35090

151

Kristin Hendrix - October 27, 2021

31:12,20 34:10
35:16 36:18
38:10 39:22
41:4,17 42:19
43:6 44:4,7
45:5 46:8 47:22
49:6,17,25
50:10 51:6,17
51:24 52:5,8
53:4,15 55:9,23
56:9,19 57:2,20
58:19 59:11
62:19,23 65:20
69:13 70:19
72:15 73:24
74:8 75:9,13
76:19 78:1,7,11
79:8,10,14 80:8
80:19 82:4,21
82:25 83:8,13
83:15 85:24
86:2 87:9 88:6
88:20 89:5,19
90:3 93:23 94:5
94:14,19
110:17,20
113:8,19 114:8
114:17 118:9
118:21 119:3
121:17 122:12
125:7 128:2
130:13 133:25
134:2

**S**

**S-e-e-r-y** 8:8
**Sadly** 94:9
**salaries** 108:17
108:18,19
**salary** 25:15
**sale** 68:4,8
**save** 55:13 72:19
**saved** 56:11
**saw** 41:8 86:6
115:12 123:19

125:6 126:12
**saying** 37:19
41:15 49:23
53:4 73:8 76:14
93:19 99:5
101:9
**says** 32:1,6 34:10
44:10,13,18
57:8,22,25
60:23 63:2 64:4
78:25 86:23
87:10 89:9
120:2,22
**scan** 55:13
**schedule** 76:24
77:5,6,21 80:20
82:7 85:3,13,17
131:20
**scheduled** 16:4,7
**schedules** 77:9
85:12
**schooling** 10:20
**Scott** 4:3 18:9
60:4,12,15
61:10,13 62:1
**Scott's** 60:13
**scratch** 17:3
**search** 10:5
**second** 7:15 44:5
62:18 78:23
80:22 99:24
109:15
**Secondly** 87:16
**section** 80:9 86:1
118:19
**see** 6:8 8:5,12,14
23:3 31:5,20
32:25 35:7
54:11 57:9,21
59:7,15,20 60:6
60:20 61:23
63:5,9 64:2,7
78:24 79:14
80:15,18,24
81:3 84:11 85:6

86:23 87:1,5
89:8,11 105:9
115:11 120:9
120:22,25
121:4 126:4
**seeing** 31:4 50:14
57:14 65:23
90:12
**seek** 46:20
**seeking** 24:3
**seen** 33:14 65:22
69:13 72:15
76:21 88:7
122:25
**Seery** 4:8 5:1 8:8
25:12,20 29:24
59:13 60:18,22
61:12 62:4,6,9
63:1,2 64:4
65:9 67:3,14,17
67:25 68:13,22
69:14 88:11,23
96:25 125:25
126:13
**Seery's** 8:10,20
**send** 29:14 32:13
34:24 37:7
53:21 59:7
60:11 62:2
63:17 83:22
**sending** 13:19
36:3 54:12
60:17 61:2
111:19
**senior** 12:8,11,11
12:12,17
**sense** 44:12 58:1
**sent** 28:22 29:11
37:17 42:9 83:2
83:17 92:16,22
106:20 107:3
111:21 123:19
126:11,13
**separate** 18:5
**served** 10:1

**services** 15:11,22
70:13,13 86:16
119:17,19
120:7
**set** 26:10,11,14
35:15 53:21
**shape** 37:10
**shared** 54:9,16
55:14 70:13
77:16 86:16
**shareholders**
39:2
**sheet** 118:6
121:11
**sheets** 63:8,22
**short** 74:22 75:17
75:23 93:15
**shorthand** 1:24
135:2,7,25
**shortly** 11:11,12
**show** 82:10
**showing** 92:15
131:21
**sick** 82:17
**sign** 52:20,20
53:7,20,22 54:3
104:25 105:1
113:5,18
115:13
**signatory** 52:14
**signature** 46:15
47:1,6,11,18
49:8,14,15
114:7,9,15
**signed** 47:9 52:10
52:11,25 55:4,8
115:14 131:6
132:5,9
**signer** 53:13
**significant** 20:20
51:19,22
**signing** 52:16,24
53:25
**similar** 32:25
34:9 38:25

96:10 112:13
**single** 104:2,3
**sitting** 30:25
33:24 42:1
50:15 53:23
54:4 55:24 82:4
85:16 91:21
105:16 106:23
**situation** 34:9
**slightly** 96:10
**SMU** 10:23
**so-called** 15:22
**somebody** 35:19
37:8 53:12,12
53:19 55:21
129:3
**soon** 32:17
**sophisticated**
14:12
**sorry** 11:12 14:24
19:15 47:8 52:4
57:21 66:2
82:23 92:12
97:3 103:9,23
109:20
**sort** 25:21 43:23
96:11 97:24
**sought** 88:24
**sound** 58:15
**sounds** 98:3
**speak** 36:2
**speaking** 13:17
43:11 44:1
**speakings** 95:21
**specific** 7:19
21:18 29:7
34:21 36:4,17
37:1,14 38:2
43:10 46:11,22
47:25 48:11,13
54:14 71:8
88:17 90:19
100:11 101:22
103:11,18
105:21 106:24

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/08/22    Page 18 of 188    PageID 35091

152

Kristin Hendrix - October 27, 2021

127:6
**specifically** 21:6
21:10 23:11
29:9 34:15 37:8
49:12 50:12,16
50:19 51:2 52:3
52:19 54:1,7
55:8 64:25 65:3
65:4,8 68:25
69:22 77:14
84:19,21 93:5
98:16 103:2,7
125:13,18
**specifics** 22:4
**speculating** 58:9
**speculation**
106:4
**sphere** 69:6
**spit** 48:1
**spoken** 35:23
61:13
**spreadsheet** 78:9
**spreadsheets**
31:6 77:12
**staff** 48:2
**stake** 27:7
**stamp** 47:19
82:18
**standard** 46:16
50:7 53:6,11,15
53:16 55:3
**standing** 67:2
**STANG** 2:10
**start** 54:19 59:11
95:10 100:11
**started** 11:13,17
20:11 100:10
**starting** 10:19
11:9
**starts** 59:12
**state** 1:23 6:5
10:25 67:25
68:14 76:22
78:16 136:1
**stated** 48:25

135:9
**statement** 99:3
**statements** 4:5
13:20 63:7,8,21
63:22 97:16,17
115:12 116:17
116:21 117:1,5
117:11 119:2
122:4 133:18
133:22
**STATES** 1:1
**status** 66:20
**stay** 26:4
**steps** 92:13
**STINSON** 2:17
**stop** 34:24
**stopped** 23:22
**stored** 56:2
**straightforward**
26:14
**Strasburger**
44:13,16
**Street** 1:25 2:4
**stretch** 109:5
**strike** 7:24 8:4
15:8 38:16
52:22 53:5
68:12 87:9
90:11
**string** 122:19
**stuff** 49:15
**stupid** 86:9
**subject** 16:5
119:20,20
132:19
**subparts** 86:20
**Subscribed** 134:7
**subsequent** 14:7
59:25 61:12
64:10 95:13
96:22 105:12
116:13 118:3
118:19
**subsequently**
32:11

sued 28:21
**suggest** 124:14
**suing** 28:5
**Suite** 2:4,17
136:2
**summarize** 72:19
**summary** 7:12
8:14
**summer** 123:16
124:18
**supervision**
135:11
**supplementally**
9:19
**supposed** 98:20
**sure** 6:12,15
10:21 11:4,11
12:20 13:20
14:11 18:22
19:23 22:11
26:7 28:16 31:2
33:10,21,22
37:5 42:3,22
43:20 52:25
58:18 60:16
62:1,19 63:17
65:4 66:11
75:21 76:11,11
84:15 99:3
100:7 101:1
107:18 109:22
115:16 125:24
126:23 130:23
130:24
**Surgent** 29:24
**surprise** 76:1,3
**surprised** 94:11
**surprises** 40:8
76:2
**suspect** 23:15
**switch** 58:24
**sworn** 1:19 6:2
135:4
**synopsis** 7:12
8:14

**system** 56:12
77:16 84:20

————————
**T**
**T-h-e-d-f-o-r-d's**
86:22
**take** 25:14 30:8
38:11 45:5 52:5
52:20 72:15
75:17 76:15
82:12 87:10
89:13 92:13
104:1 110:14
**taken** 1:20 16:15
17:6 45:8 135:7
**talk** 7:21,24 8:1
8:17,20,23,25
28:10 34:21
44:9 66:11,15
78:1
**talked** 9:12 97:4
99:8
**talking** 8:19,22
29:1 64:11
101:2 116:8
121:15,23
125:13
**taxes** 14:9
**team** 13:19 17:25
18:21 26:4 31:6
39:15 49:15,18
50:24 51:7
64:16 97:16
102:4 104:11
106:15 115:2
**telephone** 23:17
74:11 75:23,25
**tell** 34:13,16,24
44:2 53:1 54:1
54:2 55:7 60:14
63:24 71:23
74:19,23 79:22
79:24 84:3
91:11,15,18
93:24 99:2

100:12 106:14
107:1 109:22
110:8 112:8,25
113:4,17 114:1
114:6,14
116:20,23,24
117:21 118:25
119:6,11 122:4
122:8 123:2,8
123:11 130:22
131:24 132:4,8
132:11,14,18
132:23 133:2
135:4
**telling** 35:25
37:11 53:24
100:13,21
105:22 115:24
**template** 18:20
18:24 43:14,18
45:8 46:17 58:4
58:6,12
**templates** 43:12
50:9
**term** 17:2 66:9
66:16 67:8,13
73:10 76:24
77:10 98:17,25
100:4 107:20
107:24 125:19
126:2 127:12
127:16,24
128:8,21 130:7
131:5,8,14
**terminology**
27:14
**TerreStar** 38:22
**test** 20:9
**testified** 6:2 45:7
72:18 112:12
113:13 127:22
129:22
**testify** 83:10,12
**testifying** 6:16
**testimony** 19:8

Kristin Hendrix - October 27, 2021

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

treasury 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,14
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

**U**

**Uh-huh** 27:16
33:12 47:3

**umbrella** 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/29/22    Page 20 of 188    PageID 35093

154

Kristin Hendrix - October 27, 2021

**use** 21:17 45:12
  47:19 48:12
  49:18 59:1 79:1
  100:4
**usually** 24:5

---

**V**

**Vaguely** 63:12
**valid** 131:25
**valuation** 39:15
**various** 14:15
  15:11 59:13
**verbatim** 27:14
  78:25 85:20
  86:22
**verification** 50:3
**version** 30:13
  42:7
**versions** 30:24
**video** 8:5,12 59:6
  62:16 85:24
**videoconference**
  1:19 2:19
**view** 41:9
**volume** 94:19
**vs** 1:8

---

**W**

**wait** 44:23
**walk** 10:18 11:8
**walking** 54:7
**want** 28:10 47:15
  58:25 86:18
  95:8 100:7
**wanted** 52:19
  54:2,9 60:12,14
  82:17 84:7
  102:11 105:9
**wanting** 65:10
**wasn't** 108:23
  114:6,15 127:7
  129:14
**Waterhouse** 4:21
  7:10,21 13:7,8
  23:13,22,23

24:6 29:23
34:19 35:24
36:2 37:3,5,9
38:5 47:24 49:7
50:12,16 52:10
52:23 53:24
54:5,13 60:11
62:10 63:1,18
64:3 67:3 71:5
72:1 73:8 74:13
75:20 83:19
84:1 90:4,7,16
91:10,22 93:9
99:5,18 102:16
103:8,12,19
106:14 112:6,8
112:21,25
113:4,17,22,25
114:5,6,13
115:6 116:19
116:23 117:20
118:24 122:3,7
122:22 124:8
124:10,13,16
124:24 125:25
126:6,24 127:3
127:9,19 128:9
128:14,18,19
129:23 130:4
130:11
**Waterhouse's**
  8:1,6 47:1,6
  48:11 75:25
  115:10
**way** 11:18 12:23
  14:8 21:15
  35:13,15 37:8
  37:10,16 56:12
  58:20 60:19
  76:1 81:12 83:3
  92:25 93:10
  101:21 122:5
  135:19
**ways** 6:7 54:19
**we'll** 9:10 15:9

17:5 44:8,23
66:11,15 75:17
82:18 94:3
**we're** 6:7 27:22
28:16 29:1 30:6
35:19 50:22
58:9,24 59:2,3
76:11,11 85:20
93:22 100:7
104:3 116:8
125:13
**we've** 9:11 28:8
50:7 56:21,22
69:16 88:9
114:2 117:18
121:23
**website** 49:3
**week** 8:2,10 9:2
9:22,25 10:5
13:22 28:9,17
29:18 60:22
61:6 67:6 86:1
95:19
**weekly** 66:21,25
67:2
**welcome** 59:1
86:17
**went** 9:15 10:22
10:23 24:19,22
49:23 112:17
115:4
**weren't** 19:25
28:23 40:7,9
64:12 96:7
98:21,24 99:20
100:24 101:13
105:22 106:3
131:1
**wire** 34:25
106:15 107:3
**withdrawn**
113:23 117:25
120:3 124:9,21
126:6,7 127:7,9
129:15 132:12

133:9
**withholding**
116:3
**within-entitled**
135:6
**witness** 1:19 16:1
16:24 18:16
19:13 20:25
22:10,23 24:10
24:17 30:3
31:11 34:8
35:12 36:15
38:9 39:19 41:3
41:15 46:6
48:24 49:12,22
50:6 51:5,16,22
52:3 53:11 55:7
55:21 56:6
57:18 58:18
69:10 70:17
73:22 74:7
75:12 77:24
80:5,18 82:3
83:10,12 88:17
89:4,17 94:14
96:20 102:4
103:15 105:21
106:7,20
113:21 114:12
114:18 118:11
119:4 121:18
122:14 135:3
135:10
**word** 42:6,6 43:7
43:8 45:11 47:2
77:13
**words** 21:5 23:20
68:14
**work** 11:8 52:4
98:2 126:22
**worked** 11:16,18
36:6 61:19
110:5
**works** 35:1
**world** 113:25

114:5,14
116:24 117:21
118:24 119:6
119:11 122:3,8
124:17
**wouldn't** 36:22
37:6 53:22
**wrap-up** 110:16
**write** 60:4
**writes** 60:18,22
61:13,20
**writing** 37:10
41:14 64:3
114:25 117:14
**written** 80:7
82:19 91:25
99:7 104:12,15
**wrong** 57:5 87:13
99:7
**wrongly** 123:12
**www.dickman...**
136:4

---

**X**

---

**Y**

**yeah** 7:2 14:13
21:10 34:9
44:23 51:9
80:18 93:17
**year** 12:2 20:10
26:14 78:1,5
81:6 104:5
127:15 128:21
128:25 129:7
129:14 130:8
131:21
**years** 11:15,18
12:9 18:20 21:9
22:25 23:9 36:7
37:18 40:25
51:7 52:4
104:21,22
108:15 109:17
110:8,10,12

Kristin Hendrix - October 27, 2021

131:3 133:5,12
**Yep** 76:9 123:17
**yesterday** 9:2
  86:7,9
**York** 2:11

**Z**

**zeros** 87:15
**ZIEHL** 2:10
**Zoom** 6:8,10

**0**

**05.02.2019** 4:1
**05.03.2019** 3:25

**1**

**1** 3:10 30:14,15
  30:18 33:1 71:4
  71:25 72:4
  74:10 80:9
  93:21 129:24
  135:22
**1-31-23** 136:4
**1.3** 81:1,2
**1.4** 90:23 91:3,23
**1:19** 1:22 134:4
**10** 4:3 9:23,25
  10:5 28:17 59:4
  59:9 110:12
**10,530,000** 87:20
**10.5** 85:6,9
  124:11
**10:11** 1:22
**10017-2024** 2:11
**101** 136:2
**11** 4:7 62:14,21
  62:23
**11:27** 57:22
**110** 3:5
**111** 3:6
**12** 4:11 5:5 65:13
  65:18,21 90:5,7
  90:17
**12,286** 87:10,10
**12,286,000** 87:6
  87:16,20,24

**12.3** 120:24
  121:13 123:5,9
**12/30/29** 78:25
**13** 4:14 72:11,13
  72:16
**13-week** 67:5
  125:7,10,14,23
  126:16,19
  128:17 130:3,6
**14** 4:17 22:25
  23:9 36:7 40:25
  76:10,17,19
  82:6 85:17
  90:22 91:4 93:8
**14-year** 38:3
**15** 4:19 36:7 83:1
  83:4,15,17 84:8
  84:14,18,19
  85:7 87:21
  89:21,22
  123:16,22
  124:5 133:5
**15(c)** 4:22 86:1
  121:11
**16** 4:21 85:21,22
  85:25 86:3
  119:15,23
**17** 5:1 11:15 52:4
  88:2,4,7
**18** 5:5 89:25 90:1
  90:3
**19** 59:12
**1982** 10:17

**2**

**2** 3:12,12,14,19
  3:23 4:3 30:19
  30:20,21 31:16
  32:21 34:14
  37:11 41:11,18
  44:19 56:22
  57:22 58:11
  60:25 61:6,12
  79:8 119:25
**2.1** 81:1

**2.4** 30:20 32:13
  32:21 33:19
  37:12 38:22
  39:7 42:16 43:3
  58:5,11 111:10
  113:14
**2.4-** 110:22
**2.4M** 3:12,19,23
**2000** 86:22
**2001** 127:23
**2004** 10:21 11:12
**2005** 11:11 20:16
  21:2,9,19
**2009** 10:23
**2014** 133:12
**2015** 10:24
**2017** 12:15 19:23
  73:2 74:7 131:6
  131:12
**2018** 116:4,16
  117:1,11,23
  118:3,11,14,18
  119:1 128:25
**2019** 3:14 12:10
  12:17,19,25
  13:8,14 17:9,12
  17:20 18:2,8,10
  18:10 19:15
  20:2,2 21:2,9
  21:19 23:16,16
  24:12,14 30:20
  31:17 34:14
  37:11 38:17,21
  39:6,14 40:3,5
  41:11,18 44:25
  45:14 46:9,12
  46:19 47:12,24
  48:21 49:6,19
  50:2 53:5,6
  54:21 55:3,10
  56:9,20 57:22
  74:7 78:5 80:23
  81:6,18 110:21
  111:1 112:9,21
  114:1 116:5

117:18 118:16
  129:8
**2020** 4:4,11,22
  12:7 14:2,5
  15:6,10,21 16:3
  24:22 59:12
  62:6,10 65:14
  66:3,7,18,19
  67:13,17,20
  68:1,8,14,21
  70:23 71:4 74:8
  75:19 76:4 78:2
  79:10 83:18
  86:25 87:6
  88:12 93:21
  98:21,25
  100:25 101:11
  101:19 102:7,8
  102:20 103:21
  105:4,18
  120:23 122:17
  122:19 124:18
  125:14,20
  126:9 127:6
  128:20 129:14
  129:17
**2021** 1:15,21 4:8
  5:2,6 24:24
  26:4 28:20
  29:11 62:25
  64:15 71:25
  73:3 88:2 90:5
  90:17 94:10
  106:10,25
  128:2,8,15
  134:9 135:22
**21-03004-sgj** 1:8
**214** 136:3
**23** 85:1 87:3
**23,846,000** 84:9
**24,471,000** 89:9
**25** 61:6
**26** 10:17
**27** 1:15,21
**28** 125:20

**29** 83:18 84:1
**2nd** 58:5 111:9

**3**

**3** 3:10,14,17,21
  4:11 31:15,18
  34:4,11 35:21
  36:20 37:11,19
  38:12 41:11,18
  44:18 56:20
  65:14 66:3
  111:7 112:21
  119:7
**30** 3:10,12 71:4
  72:4 74:10
  86:25 87:6
  93:21 120:23
  129:24
**30-year** 19:22
**30,746,812.33**
  4:14
**30.7** 66:9,13
**30.7M** 4:17
**31** 3:14 4:15
  67:16 70:22
  79:10 88:12
  98:21,25
  100:25 101:11
  101:19 102:8
  102:19 103:21
  105:3,18 131:6
**3102** 2:17
**312** 136:1
**34th** 2:11
**3800** 2:4
**38th** 1:25

**4**

**4** 3:17 42:15,17
  42:19 43:6,18
  43:18 44:21,24
  45:22,25 46:3
  46:19 48:11,19
  50:13,17 51:2
  52:8 55:17,24

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 02/09/22    Page 22 of 188    PageID 35095

156

Kristin Hendrix - October 27, 2021

57:16
**42** 3:17,19
**4228** 136:2
**43** 3:21,23
**445-9548** 136:3

---
**5**
---
**5** 3:19 30:12 33:1
33:20,25 34:5
35:3 36:25
37:12 38:25
39:3,8 42:15,16
42:17,20 43:2,6
43:18,19 44:21
44:24 45:22,25
46:3,19 48:11
48:19 50:13,18
51:2 52:9 55:17
55:24 57:16
58:13,13 94:9
112:14 113:14
**5-** 33:19
**5.0** 110:23
**5/31/2020** 79:5
**500** 1:24 2:3
**530,000** 78:25
**56** 3:25 4:1
**575-** 79:23
**575,000** 79:12
**575,550** 79:6
**59** 4:3
**5M** 3:10,17,21

---
**6**
---
**6** 3:3,21 4:8,22
43:2,4,21 44:9
44:18 62:25
64:15 80:12
86:22
**6/30** 86:23 121:3
121:6,11,25
122:8
**62** 4:7
**65** 4:11
**683** 87:3

---
**7**
---
**7** 3:23 5:2 43:2,4
44:9,19 88:2,21
**7.4** 38:18 39:11
39:23 40:15,21
122:10 123:12
**72** 4:14
**75201** 2:4
**75206** 136:2
**75219** 2:18
**76** 4:17
**777** 2:17
**780** 2:10

---
**8**
---
**8** 3:25 56:19,24
56:25 58:10
89:9
**800** 136:3
**83** 4:19
**85** 4:21
**855-5100** 136:3
**88** 5:1
**881** 120:1

---
**9**
---
**9** 4:1 56:21,24,25
58:10
**90** 5:5
**94** 3:4
**99** 49:14

# EXHIBIT 195

Appx. 00618

David Klos - October 27, 2021

**1**

1    IN THE UNITED STATES BANKRUPTCY COURT
2    FOR THE NORTHERN DISTRICT OF TEXAS
3           DALLAS DIVISION
4              --oOo--
5
6  HIGHLAND CAPITAL MANAGEMENT,    )
   L.P.,                          )
7                                 )
              Plaintiff,          )
8                                 )
        vs.                       )  No. 21-03004-sgj
9                                 )
   HIGHLAND CAPITAL MANAGEMENT FUND )
10 ADVISORS, L.P.,                )
                                  )
11            Defendants.         )
12 _____
13            DEPOSITION OF
14             DAVID KLOS
15          October 27, 2021
16 _____
17
18       DEPOSITION OF DAVID KLOS, produced as a
19 witness, duly sworn by me via videoconference at the
20 instance of the DEFENDANTS, was taken in the
21 above-styled and numbered cause on October 27, 2021,
22 from 2:30 P.M. to 5:14 P.M., before BRANDON D. COMBS,
23 CSR, RPR, in and for the State of Texas, reported by
24 computerized machine shorthand, at 500 North Akard
25 Street, 38th Floor, Dallas, Texas.

**2**

1              APPEARANCES
2
3        MUNSCH, HARDT, KOPF & HARR, PC, 500 North
4  Akard Street, Suite 3800, Dallas, TX 75201, represented
5  by DAVOR RUKAVINA, Attorney at Law, appeared via
6  videoconference as counsel on behalf of the Defendants.
7        Email: drukavina@munsch.com
8
9
10       PACHULSKI, STANG, ZIEHL & JONES, 780 Third
11 Avenue, 34th Floor, New York, NY 10017-2024, represented
12 by JOHN A. MORRIS, Attorney at Law, appeared via
13 videoconference as counsel on behalf of the Plaintiff.
14       Email: jmorris@pszjlaw.com
15
16
17       STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,
18 Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney
19 at Law, appeared via videoconference as counsel on
20 behalf of the Defendants Jim Dondero, HCMS and HCRE
21 Partners.
22       Email: michael.aigen@stinson.com
23
24
25

**3**

1                 INDEX
2                                    PAGE
3  Examination by MR. RUKAVINA           4
4  Examination by MR. AIGEN             95
5  Examination by MR. MORRIS           109
6  Further Examination by MR. RUKAVINA 127
7
8
9
10       (No exhibits marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1              DAVID KLOS,
2  having been first duly sworn, testified as follows:
3              EXAMINATION
4        Q.  (BY MR. RUKAVINA)  Sir, state your name for
5  the record, please.
6        A.  David Klos.
7        Q.  K-l-o-s?
8        A.  K-l-o-s.
9        Q.  What's your date of birth?
10       A.  May 6, 1982.
11       Q.  And where do you live?
12       A.  I live in Dallas.
13       Q.  What's your educational background?
14       A.  Undergraduate and graduate degrees.  I went
15 to undergrad at Boston College, graduate school at SMU,
16 with a degree in, Master's of Science in accounting and
17 MBA from SMU.
18       Q.  Do you hold any professional licenses?
19       A.  CPA in the state of Texas and, I don't know
20 if it's technically a license, but Series 27 from
21 FINRA.
22       Q.  And when did you get your CPA license?
23       A.  I don't recall specifically, but it would
24 have been probably in the '08, '09 time frame.
25       Q.  Is it current?

David Klos - October 27, 2021

**5**

1     A.  As far as I know.
2     Q.  Have you ever been disciplined or threatened
3  with disciplinary proceedings?
4     A.  No.
5     Q.  And your relevant work experience, please,
6  starting with college and afterwards?
7     A.  Sure.  Out of grad school I started working
8  at Deloitte in Boston.  I worked at Deloitte for
9  approximately three and a half years, between the
10  Boston office and the Dallas office.
11        And then I began working at Highland Capital
12  Management in March of 2009 and I've been at Highland
13  since then.
14     Q.  And when you joined Highland in March of
15  2009, what was your title or your role at that time?
16     A.  My title, if I remember correctly, was
17  valuation senior analyst.  I'm not certain if that was
18  exactly it, but it was something along those lines.
19     Q.  Was it in the valuation group?
20     A.  Yes.
21     Q.  And then give me your -- today you're the CFO
22  of Highland; correct?
23     A.  Correct.
24     Q.  So give me the progression from valuation
25  analyst to CFO with, to the best of your recollection,

**6**

1  the approximate year that you were promoted, et cetera?
2     A.  Sure.  I was in the valuation role from
3  basically March of 2009 to end of 2009.
4        I was then brought over to what we call the
5  corporate accounting team, so doing the accounting for
6  Highland Capital Management, LP and of the other
7  advisor-type entities, where I was primarily focused on
8  budgeting and forecasting, credit facility compliance.
9        That took from roughly 2010 until I think
10  middle of 2011, at which point I was moved over to the
11  fund accounting group, so doing hedge fund accounting,
12  which was a short role, really, for probably three or
13  four months.
14        At which point I was brought back to the
15  corporate team and also put in charge of the valuation
16  group.  I held that role in some way, shape, or form
17  more or less continuously for the next several years,
18  although certainly my role evolved and changed.
19        But in terms of the groups that I had
20  oversight over, those were the groups.  Like I said, my
21  role definitely evolved over time from 2011.
22     Q.  So by 2017 what was your title?
23     A.  So, yeah, by that time, I was, I believe,
24  controller.  I might have still been assistant
25  controller.

**7**

1        There were a few title changes in between
2  there.  I think at one point I was manager, at one
3  point I was senior manager, at one point I was
4  assistant controller and at one point I was controller.
5        I can't remember the exact times of all of
6  those break points.
7     Q.  Let me pause you.  When you were assistant
8  controller, who was the controller?
9     A.  There was quite a bit of time where I was
10  assistant controller and we didn't have a controller.
11  I couldn't tell you the exact time frame, but there was
12  definitely an extended time frame.
13        And then in April of 2020, our existing chief
14  accounting officer left and I assumed his
15  responsibilities at that time.
16     Q.  Let me pause you.  That's a new term for me.
17  Chief accounting officer?
18     A.  Uh-huh.
19     Q.  Who was that person?
20     A.  The person that left?
21     Q.  The person that was the chief accounting
22  officer until April 2020.
23     A.  Cliff Stoops.
24     Q.  And do you have any idea or knowledge whether
25  at Highland that was like an officer-level position?

**8**

1     A.  It was not.  It was more of a term of art, I
2  would describe it.  So it -- so, yeah --
3     Q.  To the best of your recollection, when did
4  you become the controller at Highland Capital
5  Management, LP?
6     A.  I couldn't pin down a specific date.  Like I
7  said, the responsibilities were very similar.  I would
8  guess the change from assistant controller to
9  controller was probably in the, most likely in the '16,
10  '17, maybe '18 time frame.
11     Q.  Can we agree that as of May 1, 2019, you were
12  the controller at Highland?
13     A.  Yes.
14     Q.  So let's focus on that time frame, May 2019,
15  and you're the controller.  Who do you report to at
16  Highland?
17     A.  Frank Waterhouse.
18     Q.  The CFO?
19     A.  Correct.
20     Q.  No one in between you and him?
21     A.  Correct.
22     Q.  So what -- explain to me the role between the
23  chief accounting officer and the chief financial
24  officer in that time frame, '19, '20?
25        MR. MORRIS:  Objection to the form of the

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 123    Filed 06/26/24    Page 26 of 188    PageID 35099
Document 23    Page 26 of 188

3 (Pages 9 to 12)

David Klos - October 27, 2021

---

**9**

1  question.
2       THE WITNESS:  Very little.  Like I said,
3  chief accounting officer was more of a term of art.
4  What that role actually had oversight of was our retail
5  fund accounting, institutional fund accounting,
6  operations, so loan settlement and treasury.
7       And probably another department or two that
8  I'm forgetting, but it did not have any oversight over
9  the corporate accounting group.
10      Q.  (BY MR. RUKAVINA)  And in May of 2019, as the
11  controller, what were -- what was your role or what
12  were your duties?
13      A.  In May of 2019 I was at that point still
14  overseeing the valuation group.  I was overseeing the
15  corporate accounting group, which my primary direct
16  report there was Kristin Hendrix, who really was the
17  day-to-day person.  But I certainly oversaw her.
18      Q.  By that you mean the person that answers to
19  you?
20      A.  Correct.  Sorry.  If I flipped that, I
21  apologize.  So I was overseeing that group, which had,
22  you know, fairly broad responsibilities.
23      In terms of, you know, accounting for the
24  Advisor, doing forecasts when they were called for,
25  performing the audit every year, managing cash,

---

**10**

1  processing payroll, things of that nature.
2       And then at that time I was also put in
3  charge of one of the public REITs that was launching at
4  the time under the NexPoint flag.  And getting that
5  team started.
6       Q.  Did you mention that in May of 2019 you were
7  still involved with the valuation group?
8       A.  I did.
9       Q.  Did you have a title at the valuation group?
10      A.  Nothing distinct from my overall controller
11  title.  These titles were often, like I said, terms of
12  art, whether it was controller or chief accounting
13  officer.
14      Q.  What did the valuation group at Highland do?
15      A.  Well, valuation group was really a liaison
16  with both third-party pricing providers, pricing
17  services, brokers on the street, front office, members
18  at Highland.
19      To, you know, to work on valuing the
20  securities held across the platform, both for Highland
21  HCMLP managed funds as well as affiliated managed
22  funds.
23      Q.  So who did -- did you report to anyone at the
24  valuation group?  In other words, did it have its own
25  separate hierarchy kind of?

---

**11**

1       A.  Frank Waterhouse.
2       Q.  And were --
3       A.  I should clarify too, that the valuation team
4  isn't ultimately responsible for the valuations
5  themselves, but they do act in this liaison role.
6       Q.  Perhaps that's my confusion.  Is there a
7  separate group that handles just valuation?
8       A.  No.
9       Q.  Is there an outside consultancy that handled
10  that in May of 2019?
11      A.  I don't know if I would call it consultancy,
12  but there was a third-party valuation service provider
13  that would do certain of the, call it illiquid, harder
14  to value securities.
15      Q.  So would you say that you were pretty busy in
16  April, May 2019?
17      MR. MORRIS:  Objection to the form of the
18  question.
19      THE WITNESS:  I've been busy throughout my
20  career.
21      Q.  (BY MR. RUKAVINA)  In April, May, June 2019,
22  how many hours a month do you estimate you worked for
23  Highland?
24      MR. MORRIS:  Objection to the form of the
25  question.

---

**12**

1       THE WITNESS:  I don't remember.  A
2  significant number.
3       Q.  (BY MR. RUKAVINA)  Certainly full-time?
4       A.  Absolutely.
5       Q.  Would you say that you were working more than
6  200 hours a month in that time frame for Highland?
7       A.  I don't know how many hours.  I should
8  clarify, we're using Highland very liberally.  When I
9  say Highland, supporting the entire apparatus,
10  platform.  Significant number of hours at that time,
11  and before and after.
12      Q.  And let's explore that a little bit.  You
13  mentioned one of the funds for NexPoint.  I'd like to
14  talk about NexPoint Advisors, LP, just NexPoint
15  Advisors, LP.
16      Did you ever have an official role or title
17  with NexPoint Advisors, LP?
18      A.  Not that I can remember.
19      Q.  Do you know if you were ever the controller
20  for that entity?
21      A.  I'm not certain.  I'm not certain.
22      Q.  But I take it that pursuant to the shared
23  services agreement you, as an employee of Highland,
24  were providing services on behalf of NexPoint?
25      MR. MORRIS:  Objection to the form of the

---

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 06/20/24    Page 27 of 188    PageID 35100

4 (Pages 13 to 16)

David Klos - October 27, 2021

**13**

1  question.
2          THE WITNESS:  I provided many of the same
3  services for NexPoint Advisors that I provided for
4  Highland, similar types of services.
5      Q.  (BY MR. RUKAVINA)  And briefly about Highland
6  Capital Management Fund Advisors, LP, HCMFA, did you
7  ever have like an official title or role with that
8  entity, to your knowledge?
9      A.  Again, not that I can remember.
10     Q.  Not to your knowledge, the controller ever of
11  that entity?
12     A.  I'm not certain whether I was or not.
13     Q.  But you provided services to that entity as
14  part of your role at Highland pursuant to shared
15  services?
16     A.  Similar to NexPoint as I described.
17     Q.  When you were controller of Highland, was
18  that an officer-level position at Highland?
19     A.  No.
20     Q.  When did you become the chief financial
21  officer of Highland?
22     A.  Chief financial officer?
23     Q.  Uh-huh.
24     A.  2021, March.
25     Q.  After Mr. Waterhouse was gone?

**14**

1      A.  Yes.
2      Q.  And I'm going to ask you a little bit about
3  your compensation today at Highland.
4          You don't have to give me specific numbers
5  unless I ask you, please, but I take it you have a base
6  compensation?
7      A.  Yes, I have a base.
8      Q.  Do you have any bonus structure compensation?
9      A.  Yes, I have a bonus.
10     Q.  And what is that bonus number or whether it's
11  paid out based upon or contingent upon?
12         MR. MORRIS:  Objection to the form of the
13  question.
14         THE WITNESS:  As I understand, it's based on
15  my offer letter.
16     Q.  (BY MR. RUKAVINA)  On your what?
17     A.  My letter for extending an offer.
18     Q.  Tell me, what is your -- without having to
19  use express numbers, what is your bonus compensation?
20  When is it paid, et cetera?
21     A.  Yeah, so it's not too dissimilar from the
22  prior Highland plan that has semiannual installments
23  payable.  And then there's a, kind of an end of plan
24  bonus when -- I don't remember the specifics on exactly
25  what triggers that, but it's back-ended in the plan.

**15**

1      Q.  Do you have an expectation as to when the
2  winding down and monetization of Highland and its
3  assets will be complete?
4      A.  That's very hard to speculate, especially
5  given the amount of litigation that's going on because
6  I don't know when that's going to play out and that's a
7  material asset.
8      Q.  Have you discussed with Mr. Seery how long
9  that might be?
10     A.  Not that I can specifically remember.
11     Q.  Do you believe it will be at least probably
12  two years, from today?
13     A.  I don't know.
14     Q.  This bonus compensation, does it or any
15  amount of it depend on how well Highland or the
16  claimant trust, how well they do vis-a-vis collecting
17  money from creditors?
18     A.  Not that I can think of.  I'd have to
19  probably go back and look and understand the back-end
20  piece to say definitively.
21     Q.  And back-end piece, does that mean whenever
22  the winding down is completed?
23     A.  Yeah, like I said, I'm not exactly -- I'm not
24  completely facile with the exact timing, if it's
25  completed 100 percent or 80 percent, what kind of

**16**

1  qualitative considerations go into that.  But
2  substantially completed.
3      Q.  Sitting here today, do you think or believe
4  that any portion of your compensation over the next
5  however long it takes to wind down Highland depends on
6  how much Highland recovers from the litigation
7  regarding promissory notes?
8      A.  I really take exception to that question
9  because the insinuation is that it's going to somehow
10  change my answers here, and it's absolutely not.
11         How litigation, it may or may not affect my
12  ultimate compensation, but that's not going to affect
13  one iota of the answers I give you today or at any
14  time, whether I'm on or off the record.
15     Q.  Fair enough.  So you're going to testify
16  today truthfully regardless of your compensation.  I
17  got you; right?  Correct?
18     A.  I didn't follow what you just asked me.
19     Q.  You're going to testify today truthfully
20  regardless of how these events may or may not affect
21  your compensation; right?
22     A.  It's such a loaded question I can't even
23  begin to answer that.
24     Q.  So sitting here today -- I want to ask you
25  the same question I did before, and your answer to me

**David Klos - October 27, 2021**

---

**17**

1  was that you took exception to the insinuation.  Now
2  I'd like you to answer my question.
3       Which is, sitting here today, do you believe
4  that any part of your compensation in the future,
5  however long it takes to wind down Highland, is going
6  to depend on how well Highland does in these
7  litigations concerning the notes?
8       A.  I believe my ultimate compensation will
9  depend on how long this process takes, which I don't
10  know, and ultimate recoveries to trust beneficiaries
11  under the plan.
12       And so I do expect that it will vary, but I
13  would reiterate my earlier comment.
14       Q.  So sitting here today, you understand that if
15  the trust beneficiaries recover more, then you might be
16  compensated more?
17       A.  That's possible.
18       Q.  Well, sir, I'm not trying to be a smart ass,
19  but --
20       MR. MORRIS:  Actually, you're coming awfully
21  close, just to be clear, so be careful, because I'm
22  offended as well.  But continue.
23       MR. RUKAVINA:  I'm entitled to ask the man
24  about his compensation.
25       MR. MORRIS:  Right.  And your clients have

---

**18**

1  $75 million, hard dollars at stake in this litigation,
2  so we should never believe anything that he says?  Is
3  that where we are now?
4       Q.  (BY MR. RUKAVINA)  Sir, again, what is your
5  bonus compensation as it relates to how well the
6  claimant trust does?  Do you remember or not?
7       A.  I don't know that that's even something that
8  I could know at this point.
9       Q.  In preparing for this deposition, I take it
10  you spoke to legal counsel, and I'm not entitled to
11  know that and I'm not asking that.
12       But did you talk to anyone else?
13       A.  I've spoken in general terms to Mr. Seery.
14       Q.  Okay.  Anyone else?
15       A.  I've spoken, again in general terms, to
16  Kristin Hendrix.
17       Q.  Anyone else?
18       A.  Not that I can think of.
19       Q.  Now, I understand you spoke to Ms. Hendrix
20  when legal counsel was present; right?
21       A.  Yes.
22       Q.  So let's exclude that conversation.
23       Did you have any conversations with
24  Ms. Hendrix regarding this deposition or this
25  litigation at which counsel was not present?

---

**19**

1       A.  Not in any substance.
2       Q.  And when do you recall you might have had
3  those discussions with her?
4       A.  I'm not even sure.
5       Q.  Would it have been recently or like 9,
6  10 months ago?
7       A.  No, it would have been recently.
8       Q.  And with Mr. Seery, when did you have a
9  general conversation with Mr. Seery?
10       A.  I've had, you know, one or more general
11  conversations with Mr. Seery.  It's my understanding
12  that he was the 30(b)(6) witness, and he had questions
13  in preparation for his role in that.
14       Q.  So that would have been before last Thursday
15  that you talked to him?  I'll represent to you that
16  that's when his deposition was.
17       A.  Yeah, if I'm accepting that representation,
18  yes, prior to.
19       Q.  Other than that conversation with respect to
20  him preparing for the 30(b)(6), did you have a
21  discussion with him about this litigation as it might
22  relate to your deposition?
23       A.  I don't believe so in terms of relating to
24  this deposition.  We've talked at length about the
25  notes more generally.

---

**20**

1       Q.  And we'll go through that I'm sure.
2       So other than the conversations with
3  Ms. Hendrix and Mr. Seery and, of course, with counsel
4  that I'm not entitled to know about, did you discuss
5  this deposition or what you might be asked today with
6  anyone else?
7       A.  No.
8       Q.  Okay.  Did you read all or any portions of
9  the deposition of Frank Waterhouse?
10       A.  Certainly didn't read all of it.  I have a
11  general understanding of the topics that were -- that's
12  a bad way to frame it.
13       I have a general understanding of a few
14  points that were covered in his deposition.
15       Q.  Were you provided -- were you provided the
16  exact pages of any of his deposition?
17       MR. MORRIS:  Objection.  Direct him not to
18  answer.
19       MR. RUKAVINA:  You're going to direct him not
20  to answer whether he read --
21       MR. MORRIS:  If you're asking him whether I
22  directed him to particular --
23       MR. RUKAVINA:  I didn't ask that.
24       MR. MORRIS:  Rephrase your question.
25       Q.  (BY MR. RUKAVINA)  Did you read any pages

---

David Klos - October 27, 2021

**21**

1  from Mr. Waterhouse's deposition?
2     MR. MORRIS: Objection. Asked and answered.
3     You can answer again.
4     THE WITNESS: I don't recall -- I don't
5  recall reading it.
6     Q. (BY MR. RUKAVINA) So were you provided a
7  summary of his deposition?
8     A. I have had discussions with Mr. Morris in
9  preparation for this deposition.
10    Q. That's fine. And we can stop there.
11       Did you read or -- did you read the whole or
12 any portion of Mr. Seery's deposition?
13    A. No, I don't believe I -- no, I don't believe
14 so.
15    Q. Is it the same answer, that whatever you
16 discussed would have been through counsel?
17    A. Yes.
18    Q. Did you see any of the videotape of either
19 Mr. Waterhouse's or Mr. Seery's deposition?
20    A. No.
21    Q. So let's talk about the NexPoint
22 $30.7 million note.
23       You're familiar with that note; right?
24       MR. MORRIS: Objection to the form of the
25 question.

**22**

1     THE WITNESS: Before I answer that, I'd like
2  to see the note.
3     Q. (BY MR. RUKAVINA) It's in here. I'm looking
4  for the exhibit number. It's in here somewhere.
5     A. Yes, I'm familiar with this note.
6     Q. Are you familiar with anything having to do
7  with the negotiation or execution of this note?
8     MR. MORRIS: Objection to the form of the
9  question.
10    THE WITNESS: Can you repeat.
11    Q. (BY MR. RUKAVINA) Yes. Let me rephrase it.
12       Did you have anything to do, back on or about
13 May 31, 2017, with the negotiation or execution of this
14 promissory note?
15    MR. MORRIS: Objection to the form of the
16 question.
17    THE WITNESS: Nothing with respect to the
18 negotiation --
19    Q. (BY MR. RUKAVINA) I'm sorry.
20    A. In terms of the execution, I believe I
21 coordinated with internal counsel, who drafted the
22 note, and I can't remember -- I can't recall one way or
23 the other if I assisted in actually physically
24 receiving signatures. I just don't remember.
25    Q. Do you remember who that internal counsel

**23**

1  was?
2     A. Yeah, it was Lauren Thedford, who is Highland
3  in-house counsel.
4     Q. She's a lawyer?
5     A. Yes.
6     Q. Do you recall from that -- strike that.
7        Did you know on or about May 31, 2017 what
8  the purpose or reason behind Exhibit 13, this
9  promissory note, was?
10       MR. MORRIS: Objection to the form of the
11 question.
12       THE WITNESS: The purpose was to take
13 existing notes, which I believe were exclusively demand
14 notes, I'm not a hundred percent certain on that, and
15 roll them into a single note that would have a 30-year
16 amortization period.
17    Q. (BY MR. RUKAVINA) Do you know why that was
18 done?
19    A. I believe it was done probably for a number
20 of reasons, one of which was to ensure some level of
21 cash flow back to Highland, when I say Highland,
22 Highland Capital Management, LP, on an annual basis.
23    Q. Was that a concern at Highland Capital
24 Management, that it wasn't getting any level of cash
25 flow back?

**24**

1     A. It wasn't a concern of mine. I don't know if
2  it was a concern of others.
3     Q. Do you recall whether any auditor ever raised
4  that concern?
5     A. The auditors did raise that in conjunction
6  with the audit that was concluding around this time.
7  So yes, they did raise it, you know, probably in the
8  May of 2017 time frame.
9     Q. Do you know who decided that it would be a
10 30-year term note? By that I mean 30 years.
11    A. Jim Dondero.
12    Q. Do you know if he decided that in connection
13 with discussions with anybody or, to your knowledge, he
14 just decided?
15    A. As far as I know he just decided it. I
16 believe there was a draft at one point that was for
17 20 years, and he wanted to do 30.
18    Q. So this note is executed in May 31, 2017.
19 Did you have any further role prior to, let's say,
20 December 1, 2020 with respect to anything to do with
21 this promissory note?
22    A. Sorry, tell me the date again.
23    Q. From execution of the note until December 1,
24 2020?
25    A. And the question was?

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 123    Filed 06/30/22    Page 30 of 188    PageID 35103

7 (Pages 25 to 28)

David Klos - October 27, 2021

**25**

1    Q.  Did you have any role in that time frame with
2  respect to this promissory note on behalf of Highland?
3          MR. MORRIS:  Objection to the form of the
4  question.
5          THE WITNESS:  I don't know how to answer
6  that, it's such an open-ended question.  I just don't
7  know how to respond to that.
8    Q.  (BY MR. RUKAVINA)  If payments were made on
9  this note, would you have any duty to record or credit
10  those payments?
11          MR. MORRIS:  Objection to the form of the
12  question.
13          THE WITNESS:  I wouldn't have personally in
14  my role, but my team would have been involved in the
15  recording of those.
16    Q.  (BY MR. RUKAVINA)  And when payments were due
17  on this note, did you personally have any role with
18  respect to doing anything to facilitate those payments?
19    A.  When payments were due did I have anything --
20  yes.
21    Q.  What was your role?
22    A.  So my role, as part of the corporate team,
23  part of our role is managing cash at the various
24  entities.  So I was involved in weekly cash meetings,
25  where things like upcoming, whether it's an obligation

**26**

1  or a receipt, would be put on people's radars.
2          And we would, in connection with the 30-year
3  notes such as this one from NexPoint, we would either
4  confer with Jim or -- certainly Jim.  Also likely his
5  accountant.
6          In terms of teeing them up to make sure that
7  they were prepared from a cash flow statement to make
8  the payment.
9    Q.  What do you mean by his accountant?
10    A.  Melissa Schroth.
11    Q.  What do you mean by his?  That's a new name
12  to me.  Who is Melissa Schroth?
13    A.  I find it hard to believe that she's a new
14  name to you.  But I think her title was executive
15  accountant, and she was the keeper of Jim's -- many of
16  Jim's trusts and personal entities.
17    Q.  Was she a Highland employee?
18    A.  She was.  And when I say Highland, I should
19  be clear, Highland Capital Management, LP.
20    Q.  So when you say Jim's accountant, she was
21  still a debtor employee, just that she handled
22  primarily Jim's personal matters?
23    A.  She was still a Highland Capital Management,
24  LP employee but she did Jim's personal matters.
25    Q.  Did you have any role at either Highland

**27**

1  Capital Management or NexPoint Advisors as to a
2  decision as to whether any prepayments on this note
3  would ever be made?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  Can you repeat.
7    Q.  (BY MR. RUKAVINA)  Let's start from scratch.
8          Do you have any memory of any payments being
9  made on this note, Exhibit 13, prior to their scheduled
10  dates of payment?
11    A.  There were payments on -- and to be clear,
12  we're talking about the original 30.7- NexPoint
13  promissory note?  There were payments that I recall
14  happening throughout 2019 on this note.
15    Q.  And we can look at Exhibit 14.
16          MR. MORRIS:  What number?
17          MR. RUKAVINA:  14, 1-4.
18    Q.  (BY MR. RUKAVINA)  And those are only
19  numbered because Ms. Hendrix, they were used for her
20  deposition.
21    A.  Sure.  Just trying to keep these in order, I
22  apologize.  Got it.
23    Q.  Do you recognize Exhibit 14?
24    A.  Generally.  I can't say that I can verify
25  that this is completely accurate.  But it looks

**28**

1  familiar to a loan amortization schedule.
2    Q.  Would it have been maintained by Highland?
3    A.  Yes.
4    Q.  And I'll tell you that no one has yet to
5  authenticate this with a hundred percent precision, so
6  I'm not asking you to ratify these numbers, but let's
7  assume that they are what they are.
8          This does purport to show on the second page
9  a number of transfers in 2019, which goes along with
10  your recent answer.
11          Do you see those, sir?
12    A.  I do.
13    Q.  In particular, 750,000, then 1.3 million,
14  300,000, 2.1 million, 630,000, 1.3 million.
15          You see all those, sir?
16    A.  Yes, I see every one.
17    Q.  Do you have any memory, without going into
18  those transfers of those dates to the dollar, do you
19  have any memory that those transfers were made?
20    A.  Yes.  Again, not a specific recollection of
21  where I was at the time, but yes, I know that these
22  transfers were made.
23    Q.  Do you know why they were made in those
24  amounts and on those dates?
25    A.  No, not without speculating.

David Klos - October 27, 2021

**29**

1    Q.  What would be your speculation if you were to
2    speculate?
3        A.  My speculation would be that it would be for
4    liquidity needs at HCMLP, Highland Capital Management,
5    LP, needing liquidity to operate.  Again, that's
6    speculation.  I don't know for a fact that that's true,
7    but that's what I would assume.
8        Q.  Who would have made those decisions in 2019
9    to transfer those funds?
10       MR. MORRIS:  Objection to the form of the
11   question.
12       THE WITNESS:  Yeah, it would have been either
13   Frank or Jim.  I can't say with certainty, but one of
14   the two.  When I say Jim, I should be clear,
15   Mr. Dondero.
16       Q.  (BY MR. RUKAVINA)  Between January and
17   July 2019, do you have any recollection that there was
18   any particular liquidity issue or need at Highland
19   Capital Management?
20       A.  Yeah, Highland was dealing with liquidity
21   problems throughout 2019.  Maybe not every single day
22   of the year, but we were continuously needing to bridge
23   liquidity.
24       Q.  And you joined Highland in 2009.  From that
25   point in time, 2009, through 2019, was there any

**30**

1    practice at the enterprise of those businesses to
2    transfer funds between each other on a basis of when
3    one needed it and one had it?
4        A.  Yes, that was a fairly, generally speaking,
5    that was a fairly common practice, of using different
6    entities within the overall structure to bridge
7    liquidity.
8        Q.  Would that have been Mr. Dondero who, in the
9    final analysis, would have made those decisions?
10       A.  Maybe not a hundred percent, but I'd say
11   the -- if not a hundred percent, certainly most.
12       Q.  And who else might have participated,
13   Mr. Waterhouse?
14       A.  Potentially Mr. Waterhouse.  And the reason I
15   hedge on that a little bit is I don't think Frank would
16   have made any of these decisions on his own either.
17   But I may have heard them from Frank via Jim.
18       Q.  So in those same years, were you ever asked
19   by Mr. Dondero or Mr. Waterhouse as to whether funds
20   should be transferred from one entity to another for
21   liquidity purposes?
22       A.  Can you ask that again, please.
23       Q.  Yes.  Trying to understand, were you part of
24   those discussions as to whether these transfers should
25   be made, or did you just learn that a decision to make

**31**

1    them had been made and you executed them?
2        A.  Both, depending on the circumstances.
3        Q.  So sometimes you would be brought into a
4    discussion?
5        A.  Yes.
6        Q.  And can you think of any particular example?
7        A.  Of when I was brought into the discussion of
8    whether to transfer?  I can't think of an individual
9    example but we met quite regularly with Jim on cash.
10       So to the extent that either he needed cash
11   on one of his entities, he might let us know that.  Or
12   to the extent that Highland needed cash, we might let
13   him know that and ask for basically his assistance in
14   helping us to meet our own cash needs.
15       Q.  And did he usually find a way to facilitate
16   the cash need either at one of his entities or at
17   Highland?
18       A.  I suppose until October 16 of 2019.
19       Q.  Yes.  Prior to bankruptcy, do you recall any
20   instance where one entity wasn't able to transfer funds
21   to another for liquidity purposes?
22       A.  I can't think of a specific situation.  But
23   I'm sure there were situations where -- you know, cash
24   was always something that was being juggled, so I don't
25   know that necessarily liquidity could be met the same

**32**

1    day.
2        But eventually we were able to manage through
3    those situations, you know, oftentimes through some of
4    these loans.
5        Q.  In instances that you may remember when
6    Highland Capital Management needed liquidity, do you
7    know how Mr. Dondero decided from which other entity to
8    transfer the cash?
9        A.  I can't step into his brain and think about
10   his decision-making process, but if I was going to
11   oversimplify it I would speculate that it would be
12   based on who has cash in that moment.
13       Q.  Would he ask you or someone on your team who
14   had cash?
15       A.  At times, depending on which entity we're
16   talking about.  Because my team certainly didn't have
17   responsibility for every single entity in the
18   enterprise, but we did have responsibility for some.
19       Q.  And if your team -- so -- strike that.
20       So over the general -- talking about
21   generally now, over those 10 years when there were
22   these intercompany transfers for liquidity purposes,
23   how were they booked by the debtor, by Highland Capital
24   Management?
25       MR. MORRIS:  Objection to the form of the

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 06/02/22    Page 32 of 188    PageID 35105

9 (Pages 33 to 36)

David Klos - October 27, 2021

**33**

1  question.
2      THE WITNESS:  Help me on the direction.  So
3  this is money that Highland is receiving or money that
4  Highland is sending?
5      Q.  (BY MR. RUKAVINA)  Sending out.
6      A.  Sending out.  So this is -- in the scenario
7  that you're describing, this money that Highland is
8  sending out to meet some other corporate obligor's
9  liquidity needs?
10     Q.  Yes, sir.
11     A.  So those would be booked as a loan.  I
12  would -- I need to hedge a little bit because I'm not
13  a hundred percent certain, but I would say if not
14  exclusively via loans close to exclusively.
15     Q.  And would they -- strike that.
16         Would they usually be papered up with a
17  promissory note?
18     A.  Yes.
19     Q.  Now, why was that the general course during
20  10 years?  Was there a policy and procedure in place,
21  or would Dondero say book it as a loan, or was that
22  just the right thing to do from an accounting
23  perspective?
24     MR. MORRIS:  Objection to the form of the
25  question.

**34**

1      THE WITNESS:  At the end of the day it's at
2  the direction of Jim Dondero, so I can't tell you
3  exactly why he wanted it to be done that way.  But that
4  was certainly the practice of how it was done in those
5  situations.
6      Q.  (BY MR. RUKAVINA)  To your knowledge, did Jim
7  Dondero ever tell you or anyone else that when Highland
8  is transferring funds to one of his affiliated entities
9  that it should always be booked as a loan?
10     A.  So remembering 10 years' worth of
11  conversations, I can't remember a specific instance
12  where he would have said, always book every single
13  transaction I direct you to do as a loan.  However,
14  that was the practice.
15     Q.  Different question.
16         Do you remember that in each instance, and
17  again, that might be unfair over 10 years, but do you
18  remember in each instance when Mr. Dondero said
19  transfer money from Highland to this other entity for
20  liquidity needs that he said book it as a loan?
21     MR. MORRIS:  Objection to the form of the
22  question.
23     THE WITNESS:  I can't recall with any
24  specificity what he may or may not have specifically
25  said so long ago.

**35**

1      Q.  (BY MR. RUKAVINA)  To your knowledge, was
2  there any written policy or procedure in place at
3  Highland Capital Management with respect to how
4  transfers from Highland to an affiliated entity should
5  be booked or treated?
6      A.  No written policy or procedure that I'm aware
7  of.
8      Q.  Is it fair to say that by May 2019, the
9  corporate accounting group had handled so many of these
10  transfers that it believed that if Highland was
11  transferring funds to another affiliated entity, it's
12  probably a loan?
13     MR. MORRIS:  Objection to the form of the
14  question.
15     THE WITNESS:  Yeah, I don't know that I can
16  answer that in terms of the corporate accounting team.
17  That just feels way too broad.
18         It was certainly the practice that when
19  somebody needed liquidity and it was appropriate from an
20  accounting perspective, that's how it would be booked.
21         And there was no reason to doubt that that was
22  the appropriate way to do it, particularly with
23  direction from either Frank or Jim.
24     Q.  (BY MR. RUKAVINA)  Is it your testimony that
25  in each instance that happened, that either Frank or

**36**

1  Jim said, this is a loan, the "this" being the transfer
2  from Highland to an affiliated entity for liquidity
3  purposes?
4      MR. MORRIS:  Objection to the form of the
5  question.
6      THE WITNESS:  I can't recall with that level
7  of specificity if those words came out of Jim's mouth.
8  But with 0 percent doubt in my mind, every single one
9  of those loans was done with the authority of Jim or
10  Frank, or both.
11     Q.  (BY MR. RUKAVINA)  So going back to this
12  Exhibit 14, now I'm going to ask you about these
13  payments coming in.
14         Assuming that these payments were actually
15  made in 2019 --
16         And I think, John, you sent me this morning,
17  or maybe last night, some bank statements?
18     MR. MORRIS:  I actually sent all of the
19  backup for all payments made, I think, under the notes
20  at issue a week or two ago.
21     Q.  (BY MR. RUKAVINA)  How would -- so assuming
22  that these payments in 2019 that NexPoint made didn't
23  technically have to be made at that point in time, how
24  would Highland have booked these payments?
25     A.  So I can't tell the column headers, so you'll

**10 (Pages 37 to 40)**

David Klos - October 27, 2021

### 37

1  have to excuse me if I flip them.
2      Q.  They'll be on the first page.  Rip the page
3  off if you need to.
4      A.  First one is interest, second one is
5  principal.  On the far right is the actual amount of
6  the payment.  So, for example, March 29, 750,000.
7      And the -- the column that has the negative
8  411,000 is the application of interest and the 338- is
9  the application of principal.
10     Q.  So again, if Highland -- strike that.
11     If NexPoint made a payment that was not
12  technically due at that point in time, it would be
13  recorded as payments on principal and interest?
14     A.  It would be recorded as it's reflected in the
15  schedule.  So there's an application of interest and an
16  application of principal.
17     Q.  So based on your understanding and
18  experience, if that payment wasn't due at that time,
19  would it have been a prepayment by NexPoint?
20     MR. MORRIS:  Objection to the form of the
21  question.
22     THE WITNESS:  Yeah, I'm not sure that it's a
23  prepayment or not.  It's certainly a payment.  It's
24  certainly voluntary.  It's not spelled out under the
25  schedule.  I don't know that it's a per se, capital P,

### 38

1  prepayment.  I'm just not certain.
2      Q.  (BY MR. RUKAVINA)  Well, maybe without
3  respect to these specific transfers.
4      Generally, generally, if one of the Dondero
5  affiliates made a payment that wasn't scheduled, how
6  would the debtor have accounted for that payment?
7      A.  It would have recorded the payment as a
8  reduction to either or both outstanding accrued
9  interest or principal.
10     Q.  You wouldn't call those prepayments?
11     A.  I don't know the definition of prepayment.
12  It's a payment.  It's off schedule, but I don't know
13  whether it's a per se prepayment.
14     Q.  Would that be something in your experience
15  that we would look at the promissory note to maybe
16  determine?
17     MR. MORRIS:  Objection to the form of the
18  question.
19     THE WITNESS:  I don't know.
20     Q.  (BY MR. RUKAVINA)  Well, remember, I'm asking
21  you the same question just in different ways.
22     Who decides at the debtor, or how does the
23  debtor decide, if an unscheduled payment is made, how
24  to apply it?
25     MR. MORRIS:  Objection to the form of the

### 39

1  question.
2      Q.  (BY MR. RUKAVINA)  And his objection is
3  valid.  And just to give you a little bit of a fine
4  point, does someone look at the promissory note to
5  decide that?  Or is there some other rule or procedure
6  that someone looks at?
7      MR. MORRIS:  Objection to the form of the
8  question.
9      THE WITNESS:  So the person -- I don't know
10  that I can specifically name a person because the role
11  probably changed over time.
12     But either our corporate accountant, or the
13  corporate accountant's boss, which was Kristin Hendrix
14  for years, would have been responsible for recording and
15  tracking those payments.
16     So some combination of the corporate
17  accountant and Kristin would have applied those
18  payments, and that rolls up through my and Frank's
19  review ultimately.
20     Q.  (BY MR. RUKAVINA)  So if I can round off this
21  discussion, I think you told me a few minutes ago that
22  in each instance that Highland was transferring money
23  out to an affiliate.
24     Whether or not you remember Dondero or
25  Waterhouse saying it's a loan, it would have been a

### 40

1  loan because that's how it always was and it was always
2  authorized.  Generally correct?
3      MR. MORRIS:  Objection to the form of the
4  question.
5      THE WITNESS:  There were a few "always" and
6  "generallys" in there.  And like I said, when it came
7  to liquidity needs, my recollection is that these would
8  be handled via loans.
9      Q.  (BY MR. RUKAVINA)  And in reverse, if a
10  Dondero entity made a payment prior to a scheduled
11  payment on a note, generally there would be credit
12  against principal and/or interest provided on that
13  note?
14     MR. MORRIS:  Objection to the form of the
15  question.
16     THE WITNESS:  Generally speaking, yes, if the
17  payment was for payment on the note.
18     Q.  (BY MR. RUKAVINA)  Well, that goes back to my
19  question.
20     Do you know how these payments on Exhibit 14
21  in 2019 were determined to be payments on these notes,
22  as opposed to a transfer from NexPoint to Highland for
23  some other reason?
24     A.  What other reason would it be, if I can be so
25  bold.

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 173    Filed 06/29/21    Page 34 of 188    PageID 35107

**11 (Pages 41 to 44)**

David Klos - October 27, 2021

**41**

1    Q.   Can you think of any other reason in 2019?
2    A.   Well, Highland had -- Highland had shared
3 services and intercompany agreements with NexPoint, at
4 this time.
5      But these were not payments that could
6 possibly be confused with those payments. These are
7 off cycle, they're larger amounts, and there's nothing
8 that they could be other than payments against the
9 loan.
10    Q.   So I asked you before, and I think you said
11 that you were speculating with respect to these
12 payments, that Highland needed money at that time.
13      Do you recall in 2019 any discussions with
14 anyone, Dondero or Waterhouse, to the effect that
15 NexPoint has excess cash so maybe NexPoint should
16 transfer some money to Highland?
17    MR. MORRIS: Objection. Asked and answered.
18    THE WITNESS: Do I still answer?
19    Q.   (BY MR. RUKAVINA) Yes.
20    MR. MORRIS: Yes.
21    THE WITNESS: And sorry, I got lost there.
22    Q.   (BY MR. RUKAVINA) Yes. So my predicate was
23 you testified before that you were assuming that these
24 payments were because of a cash need at Highland;
25 right?

**42**

1    A.   Correct.
2    Q.   So with that predicate my question is, do you
3 recall discussing with Dondero or Waterhouse or with
4 anyone as to why NexPoint would be transferring money
5 to Highland at that time?
6    A.   Yes, I would have had conversations with
7 Mr. Dondero or Mr. Waterhouse.
8    Q.   And do you remember specifically in 2019 why
9 these transfers were made from NexPoint as opposed to
10 some other Dondero entity?
11    A.   Not with specificity, but certainly NexPoint
12 was generating cash at that time, and had the ability
13 to assist with Highland's liquidity.
14    Q.   So sitting here today, you've told me
15 generally and logically that you have no specific
16 memory why between January 2019 and August 2019, any of
17 these payments on Exhibit 14 were made by NexPoint?
18    A.   I have no specific memory, but I would say
19 with certainty that most or all of this was driven by
20 Highland HCMLP liquidity needs.
21    Q.   And most or all of this would have been
22 Highland in the first instance going to NexPoint and
23 saying, hey, can you send us some cash?
24    MR. MORRIS: Objection to the form of the
25 question.

**43**

1    THE WITNESS: Yeah, the premise of that,
2 given that Mr. Dondero is in control of both sides,
3 it's a faulty premise.
4    Q.   (BY MR. RUKAVINA) But you told me not that
5 long ago that in these weekly cash meetings that it
6 would be your team at Highland who would go to
7 Mr. Dondero and say Highland has a liquidity issue.
8      So wouldn't that liquidity issue have
9 originated with the Highland team?
10    A.   Mr. Dondero is the president of Highland.
11 He's the president of NexPoint. We're employees of
12 Highland. We're also shared services providers for
13 NexPoint.
14      The waters are very muddy in terms of who is
15 wearing what hat in that conversation.
16    Q.   But Mr. Dondero doesn't know that Highland
17 has a liquidity issue unless someone from the corporate
18 accounting group tells him, does he?
19    MR. MORRIS: Objection to the form of the
20 question. I hope that's not the case.
21    THE WITNESS: He has the ability to know what
22 our cash position is at any given time, at that time.
23    Q.   (BY MR. RUKAVINA) So why would you have
24 these weekly cash meetings with Mr. Waterhouse and
25 sometimes Mr. Dondero?

**44**

1    A.   So these were cash forecasts, looking at
2 outlook. I can tell you almost without exception,
3 maybe -- with maybe without exception, be speculating,
4 but those forecasts were showing negative numbers
5 at Highland, virtually nonstop.
6      And so it was important, my opinion, but it
7 was probably important to Frank to make sure that he
8 was getting in front of Jim to make sure that those
9 needs were being addressed timely.
10    Q.   So I've asked that question. I want to ask
11 you a different question.
12      For any of these payments between
13 January 2019 and August 2019 reflected on Exhibit 14,
14 do you have any personal knowledge as to whether they
15 were intended to be prepayments or not?
16    MR. MORRIS: Objection to the form of the
17 question.
18    THE WITNESS: I don't know whether they were
19 intended to be prepayments at that time.
20    Q.   (BY MR. RUKAVINA) Sitting here today, seeing
21 this document as a CPA and as a sophisticated person,
22 do you read this Exhibit 14 to indicate that those
23 payments were booked as prepayments?
24    MR. MORRIS: Objection to the form of the
25 question.

David Klos - October 27, 2021

---

**45**

1    THE WITNESS: Again, the term "prepayments"
2  is the one I'm struggling with. I can ascertain that
3  there are payments and they're off schedule. But I
4  don't know that I can ascertain that they're
5  prepayments.
6    Q. (BY MR. RUKAVINA) Well, if a borrower makes
7  a payment that's ahead of schedule, how would that
8  generally be accounted for?
9    MR. MORRIS: Objection to the form of the
10  question.
11    THE WITNESS: It would be accounted for as a
12  reduction of principal or interest or some combination
13  of the two.
14    Q. (BY MR. RUKAVINA) Which would relieve the
15  borrower of having to make that at some point in the
16  future; right?
17    MR. MORRIS: Objection to the form of the
18  question.
19    THE WITNESS: No. The borrower still owes
20  the money. This is showing 23-point -- pick a date.
21  May 31, 23.034-. That there's significant obligations
22  that are still outstanding.
23    Q. (BY MR. RUKAVINA) So on June 4, 2019 -- I'm
24  sorry, on June 19, 2019, the borrower made a
25  $2.1 million payment. That's what this shows; correct?

---

**46**

1    A. I see that.
2    Q. You're not saying that the borrower would
3  ever have to make that same $2.1 million payment again,
4  are you?
5    A. No. What I'm saying is, based on that 2.1-
6  payment -- and this is reading this cold.
7    But based on that 2.1- payment, 66,000 was
8  applied to interest, which left zero accrued interest
9  outstanding. 2.03- applied to principal, which left
10  24.7- and change still outstanding.
11    Q. Well, I'm going to ask you about the
12  promissory note then, Exhibit 13, in particular
13  Section 3, where it says prepayment allowed.
14    And the first sentence says, may or -- pardon
15  me, maker may prepay in whole or in part the unpaid
16  principal or accrued interest of this note.
17    Do you see that, sir?
18    A. Yes, I see that.
19    Q. In your experience, can someone prepay
20  accrued interest?
21    MR. MORRIS: Objection to the form of the
22  question.
23    THE WITNESS: The document reads, maker may
24  prepay in whole or in part the unpaid principal or
25  accrued interest of this note. So I read that to say

---

**47**

1  that the maker may pay outstanding accrued interest, or
2  unpaid principal.
3    Q. (BY MR. RUKAVINA) But my question is, as I
4  understand accrued interest, it means interest that has
5  already occurred or accrued as of the date, like
6  today's date; right?
7    A. Uh-huh.
8    MR. MORRIS: Objection to the form of the
9  question.
10    Q. (BY MR. RUKAVINA) Do you agree with that?
11    Do you agree with that? Accrued interest
12  means interest that has already come due, that has
13  actually happened because interest happens over time.
14    A. Accrued interest --
15    MR. MORRIS: Objection to the form of the
16  question.
17    Q. (BY MR. RUKAVINA) Why don't you start. Why
18  don't you define for me accrued interest.
19    A. Sure. Accrued interest would be outstanding
20  and unpaid interest that -- sorry, it's hard to define
21  it without using the term. But it's interest that's
22  accumulated in respect of a principal amount through a
23  given date.
24    Q. So how do you prepay accrued interest?
25    A. How do you prepay accrued interest. Again,

---

**48**

1  that's a little bit of a mental jumble.
2    Q. Exactly.
3    A. Well, what I'm...
4    Q. To me one pays accrued interest. But this
5  note says you can prepay accrued interest. So I'm just
6  seeing whether you as a CPA, CFO and controller for
7  years agrees that one can prepay accrued interest?
8    MR. MORRIS: Objection to the form of the
9  question.
10    THE WITNESS: Frankly, I don't know if it's
11  possible. That's not how I'm seeing it applied here,
12  based on the quick review of Exhibit 14.
13    Q. (BY MR. RUKAVINA) Well, the next sentence
14  says, any payments on this note shall be applied first
15  to unpaid accrued interest hereon, and then to unpaid
16  principal hereof.
17    Do you see that, sir?
18    A. I see that.
19    Q. Do you have any understanding based either on
20  your personal knowledge or in your expertise as a CPA
21  and a CFO as to what that sentence means?
22    MR. MORRIS: Objection to the form of the
23  question.
24    THE WITNESS: The way that I would read that
25  would be that for a payment, for example, pick a date,

---

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/30/22    Page 36 of 188    PageID 35109

**13 (Pages 49 to 52)**

**David Klos - October 27, 2021**

**49**

1 Exhibit 14 again, the $2.1 million payment on or about
2 June 19. I see that a payment was made.
3        And it was -- it appears that there was
4 accrued and unpaid interest at that time of 66,000. And
5 so the first 66,000 was applied to outstanding accrued
6 interest, to bring the balance to zero.
7        And the difference between that 66,000 and the
8 2.1 million was applied to principal.
9    **Q.  (BY MR. RUKAVINA)  Do you believe, whether**
10 **from personal knowledge from this note, Exhibit 13, or**
11 **your experience at Highland or as a CPA, that one can**
12 **say that interest, accrued interest will be due on a**
13 **future date, a future date, but I'm going**
14 **to pay it earlier as of that date?**
15        **MR. MORRIS:** Objection to the form of the
16 question.
17        THE WITNESS:  If I can rephrase back to you
18 just so I make sure I'm understanding the question.
19 You're saying could someone say, I would like to prepay
20 interest into the future.  It hasn't accrued yet, but
21 it will be accrued by end of year.
22        And I would like to be prepaid effectively
23 with respect to that interest, and then have the
24 remainder used to pay down principal.
25        The question is, can someone do that?

**50**

1    **Q.  (BY MR. RUKAVINA)  Yes.**
2        **MR. MORRIS:** I object to the question.
3        THE WITNESS:  I suppose it's possible, but
4 that certainly wasn't the practice if that makes sense.
5    **Q.  (BY MR. RUKAVINA)  That does make sense.  I'm**
6 **still struggling, and again, I'm not trying to be a**
7 **smart aleck.  I'm still struggling with the first**
8 **sentence of paragraph 3, that maker may prepay accrued**
9 **interest.**
10        **And it sounds like to me like you don't**
11 **necessarily have a definitive answer as to what that**
12 **might have meant either.**
13        **MR. MORRIS:** Objection to the form of the
14 question.
15        THE WITNESS:  I think the document speaks for
16 itself in that sentence.
17    **Q.  (BY MR. RUKAVINA)  But have you seen**
18 **something like this, to your recollection, in other**
19 **Highland promissory notes?**
20    **A.  Something like what?**
21    **Q.  Prepaying accrued interest.**
22    **A.  Yes, I have seen that.**
23    **Q.  What's your memory?  Where have you seen**
24 **that?**
25    **A.  I can't remember a specific note, but I**

**51**

1 believe that has been done in a specific circumstance.
2    **Q.  So at least at Highland, you would believe**
3 **that that phrase, prepaying accrued interest, had some**
4 **established meaning at Highland?**
5        **MR. MORRIS:** Objection to the form of the
6 question.
7        THE WITNESS:  No, I don't agree with that.
8    **Q.  (BY MR. RUKAVINA)  Okay.  You understand, of**
9 **course, that it's Highland's position that with respect**
10 **to this note, a payment was due on December 31 of 2020**
11 **that wasn't made; correct?**
12    **A.  Yes, it's my understanding -- if I can state**
13 **it back just so I make sure I'm getting it correctly.**
14 **It's my understanding that there was a payment due on**
15 **December 31, 2020, that wasn't made timely, yes.**
16    **Q.  Okay.  Do you know why that payment wasn't**
17 **made timely?**
18    **A.  By recollection, because Mr. Dondero had**
19 **directed people not to process payments from Highland**
20 **affiliates to Highland.**
21    **Q.  When did you learn of that?**
22    **A.  Early December 2020.**
23    **Q.  How did you learn of that?**
24    **A.  I don't specifically remember the**
25 **conversation, but I know I had conversations with both**

**52**

1 **Kristin and Frank.  I can't remember if those were**
2 **individual or collective, but we understood that to be**
3 **the marching orders.**
4    **Q.  Did you hear Mr. Dondero say anything like**
5 **that?**
6    **A.  I did not.**
7    **Q.  Did Mr. Waterhouse tell you that Mr. Dondero**
8 **said something like that to him?**
9    **A.  Yes.**
10    **Q.  Okay.  Separately, do you remember whether**
11 **Ms. Hendrix told you that Mr. Waterhouse told her that,**
12 **or would it have been kind of at the same meeting?**
13    **A.  I don't remember specifically.  It would have**
14 **been all around the same time.**
15    **Q.  And to the best of your recollection, what**
16 **words -- strike that.**
17        **To the best of your recollection, did**
18 **Mr. Waterhouse include a reference to promissory notes**
19 **and the Advisors when he said that Dondero told him not**
20 **to make payments?**
21        **MR. MORRIS:** Objection to the form of the
22 question.
23        THE WITNESS:  I don't remember the specific
24 words that Mr. Waterhouse used.  My clear impression
25 was that it was a very global instruction.

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 123    Filed 06/30/22    Page 37 of 188    PageID 35110

**14 (Pages 53 to 56)**

**David Klos - October 27, 2021**

---

**53**

1    And I should clarify also that, you know, at
2  this time, I think as we covered in my background.
3    At this point I had assumed the chief
4  accounting officer role, so I wasn't necessarily in
5  the -- in as much of the chain of command as I had been
6  previously to taking that role, where that sort of thing
7  might have come from Frank, to me, to Kristin.
8    By this time, Frank and Kristin were
9  communicating and I was sometimes in the loop, sometimes
10  not.
11    Q.  (BY MR. RUKAVINA)  Did Mr. Waterhouse tell
12  you why Dondero had told him that?
13    A.  I don't remember with any specificity.
14  However, my perception at the time was that at this
15  time the relationship between Mr. Dondero and Mr. Seery
16  was hopelessly broken, and that this was Jim Dondero,
17  you know, gearing up for a fight in the future.
18    Q.  Prior to December of 2020, had you prepared a
19  report showing potential overpayments that NexPoint and
20  HCMFA had made on account of shared services and
21  payroll reimbursement?
22    MR. MORRIS:  Objection to the form of the
23  question.
24    You can answer.
25    THE WITNESS:  I know the analysis that you're

---

**54**

1  talking about.  I would not characterize it the way
2  that you characterized it.
3    Q.  (BY MR. RUKAVINA)  And we'll talk about this
4  more in November, so I really don't want to go into any
5  detail, unless you feel the need to.
6    But, so you did not prepare that analysis?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    THE WITNESS:  I prepared an analysis that
10  differed from how you described it.
11    Q.  (BY MR. RUKAVINA)  How would you describe it,
12  in a nutshell?
13    A.  I would describe it as I was asked to refresh
14  a spreadsheet using certain assumptions, based on the
15  direction of Frank Waterhouse, and I updated and I sent
16  him an email.
17    Q.  Do you have any understanding that that
18  analysis was then shared with Mr. Dondero by
19  Mr. Waterhouse?
20    A.  I know that now.  I didn't know that at the
21  time.
22    Q.  Do you have any understanding -- strike that.
23    Did you have any understanding that as of
24  early December 2020 the reason why Mr. Dondero said
25  what he said to Mr. Waterhouse was because that

---

**55**

1  analysis, right or wrong, suggested that the Advisors
2  had made large overpayments?
3    MR. MORRIS:  Objection to the form of the
4  question.
5    THE WITNESS:  No, that's incorrect.
6    Q.  (BY MR. RUKAVINA)  Why is that incorrect?
7    A.  Because by recollection, to the best of my
8  recollection, that analysis didn't occur until after
9  Dondero had told Frank no more payments.
10    Q.  Is that the only reason why you might suspect
11  that what I just said was incorrect?
12    MR. MORRIS:  Objection to the form of the
13  question.
14    THE WITNESS:  Yeah, I don't know how to
15  answer that.
16    Q.  (BY MR. RUKAVINA)  I'm going back, when I
17  asked you, did Waterhouse tell you why Dondero gave the
18  direction, you said no.
19    MR. MORRIS:  Objection to the form of the
20  question.
21    THE WITNESS:  Sorry, I'm not sure.  If I
22  could have the question asked again, I'd be happy to
23  answer.
24    Q.  (BY MR. RUKAVINA)  I'll ask it again.
25    Mr. Waterhouse tells you that Mr. Dondero

---

**56**

1  basically said no more payments; right?
2    A.  Yes.
3    Q.  And, but he did not tell you why Mr. Dondero
4  said that?
5    A.  Not that I can recall.
6    Q.  So he might have?
7    A.  He might have.  I don't specifically
8  remember.
9    Q.  Do you recall asking him or anyone else why
10  Dondero would have said that?
11    MR. MORRIS:  Objection.  Asked and answered.
12    THE WITNESS:  I don't recall specifically
13  asking.
14    Q.  (BY MR. RUKAVINA)  Do you recall telling
15  Mr. Seery that Dondero said anything like that?
16    A.  At what point in time?
17    Q.  Prior to December 31, 2020.
18    A.  No, I did not.  I did not say that to
19  Mr. Seery.
20    Q.  In your mind was there any present
21  understanding or concern that NexPoint therefore
22  wouldn't make a scheduled December 31, 2020, payment?
23    A.  Was there any concern that they wouldn't?
24    Q.  Yeah.
25    A.  I would never use the word "concern."  At

---

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/38/478    Page 38 of 188    PageID 35111

15 (Pages 57 to 60)

David Klos - October 27, 2021

**57**

1  that point I wasn't even on the team anymore, so I hate
2  to say it's other people's problem, but I had my hands
3  full with plenty of other things. It wasn't something
4  I was thinking about.
5      Q. Do you remember here today that prior to
6  December 31, 2020, you believed that NexPoint would not
7  make the scheduled payment?
8          MR. MORRIS: Objection to the form of the
9  question.
10         THE WITNESS: I had no idea whether NexPoint
11  was going to make the payment.
12     Q. (BY MR. RUKAVINA) Were you asked prior to
13  December 31, 2020 by Mr. Seery or anyone else as to
14  whether NexPoint was going to make that payment?
15     A. Was I asked by Mr. Seery? Not that I can
16  remember.
17     Q. Prior to December 31, 2020, do you recall any
18  discussion with Mr. Seery about the NexPoint note?
19         MR. MORRIS: I'm sorry, can I have the
20  question again.
21     Q. (BY MR. RUKAVINA) Prior to December 31,
22  2020, do you recall any discussion that you had with
23  Mr. Seery about this NexPoint note?
24     A. Not that I can remember. If there was, it
25  would have been in a cash meeting, but I don't remember

**58**

1  at all.
2      Q. So it might have been some detail as part of
3  a larger discussion, but you don't remember any
4  specific discussion just around this note?
5      A. No.
6      Q. When did you learn or how did you learn that
7  the December 31 payment had not been made?
8      A. I'm not sure, but certainly after
9  December 31.
10     Q. Do you recall if it was before or after
11  January 7?
12     A. I think it was after.
13     Q. The default letter from Highland is in here,
14  if you need to see it. I'm just telling you it's the
15  January 7.
16         Do you recall having any role with respect to
17  drafting the default letter that went out to NexPoint
18  after the failed payment?
19     A. No, none that I can remember.
20     Q. How do you recall learning that the note had
21  been called by Highland?
22     A. I honestly don't remember. I think after the
23  fact. I couldn't tell you how far after the fact.
24     Q. Are you aware that on or about July -- I'm
25  sorry, January 14, 2021 NexPoint made a $1.4 million

**59**

1  and change payment?
2      A. Yeah, I'm aware that that payment happened.
3      Q. When did you become aware of that payment?
4      A. I think after it happened.
5      Q. Can you tell us, was it days, weeks, months
6  later?
7      A. It was that day. And if I can expand, I
8  recall getting an email, seeing a large inflow to
9  Highland, to MLP because I was on an email distribution
10  list that had those payments.
11         And I think I emailed or called Kristin and
12  asked her, is this the NexPoint note, because it was a
13  large amount of money. And she said yes.
14     Q. Did she tell you anything more about that
15  payment, when it had been made, why, who authorized it?
16     A. I had that information of when it had been
17  sent. I had a wire confirm.
18     Q. Only important thing to you is where did that
19  money come from?
20     A. It wasn't important to me. It was more
21  curiosity.
22     Q. Did you have any discussions with anyone on
23  or about that time, January 14, 2021, as to why
24  NexPoint made that payment?
25     A. Not that I can remember.

**60**

1      Q. Did you have any discussion with anybody on
2  or about that time, January 14, 2021, as to how HCMLP
3  should account for that payment?
4      A. No.
5      Q. Did you have any discussion with Mr. Seery at
6  all about whether that payment should or shouldn't
7  reinstate the note?
8      A. No discussion that I can remember.
9      Q. Is it fair to say that any of those
10  considerations would have been at that point in time
11  above your paygrade?
12         MR. MORRIS: Objection to the form of the
13  question.
14         THE WITNESS: Yeah, paygrade, I don't know
15  how to respond to that. Like I said before, I wasn't
16  on the team at that point. I wouldn't have been
17  involved in that determination regardless of my
18  compensation.
19     Q. (BY MR. RUKAVINA) So you know and you
20  remember that in early December 2020 Frank Waterhouse
21  told you that Dondero had directed no more payments by
22  the Advisors. And you know that a payment was made on
23  January 14.
24         And that's pretty much the extent of your
25  knowledge about the missed December 31 payment?

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 06/29/22    Page 39 of 188    PageID 35112

**16 (Pages 61 to 64)**

David Klos - October 27, 2021

---

**61**

1      MR. MORRIS:  Objection to the form of the
2  question.
3      THE WITNESS:  Yeah, it's a very broad
4  question.  In general terms, yes.
5      Q.  (BY MR. RUKAVINA)  Well, I'm not asking what
6  you learned since then.
7      I'm asking that as of, let's say, January 15,
8  2021 that would have been the extent of what you would
9  have known?
10     A.  Correct.  And if I can just restate and make
11  sure I understand what I'm saying.
12     It would have been my understanding that we
13  had had an instruction -- when I say "we," Kristin and
14  Frank and by default the whole corporate team -- not to
15  make payments from these affiliated entities.
16     To my knowledge, none of those payments had
17  occurred since that point.  And then on or about
18  January 14, such a payment was made and I found out
19  about that by seeing a wire confirm.
20     Q.  Well, you mentioned a couple times that you,
21  in December 2020, you weren't part of that group
22  anymore.  So do you have any understanding as to why
23  Mr. Waterhouse would have told you in particular, you
24  being Mr. Klos, about that instruction from Dondero?
25     A.  Sure.  I still was participating in cash

---

**62**

1  meetings, even if it was almost in a nominal role,
2  because of some of my history that I had.  So I was
3  still participating in those meetings.
4      I've worked closely with Kristin for a long
5  time, so I may have caught up with her informally.  But
6  as far as day-to-day duties, I wasn't part of that team
7  anymore.
8      Q.  And is it your, did I understand you
9  correctly, is it your testimony that Mr. Waterhouse
10  informed the whole accounting group there, the
11  corporate accounting group, of Mr. Dondero's
12  instruction?
13     A.  I don't know specifically who he told, if he
14  told every single member of the team, but he certainly
15  told Kristin and Kristin was the head of the team.
16     Q.  And you don't recall anyone, after you heard
17  about that instruction, raising any concern to the
18  effect that NexPoint is going to default and be in
19  trouble if that payment isn't made?
20     A.  I don't remember any discussion to that
21  effect.
22     Q.  Do you remember anyone suggesting that they
23  ought to try to dissuade Mr. Dondero from that
24  direction?
25     A.  Not that I can remember.

---

**63**

1      Q.  Do you remember any discussion at that
2  approximate point in time for your cash meetings or
3  anything else as to whether NexPoint had made any
4  prepayments on the promissory note?
5      MR. MORRIS:  Objection to the form of the
6  question.
7      THE WITNESS:  Yeah, it's very hard to -- by
8  the way, I've said yeah a few times.  I want to make
9  clear that that's just --
10     Q.  (BY MR. RUKAVINA)  That's not a yes?
11     A.  I apologize for that.
12     Q.  Understood.  Yeah means, it's not a yes.
13     MR. MORRIS:  It's a pause; it's an um.
14     Q.  (BY MR. RUKAVINA)  Germans call it flavoring
15  particle.
16     A.  Sorry, I got lost there.  If you can ask
17  again.
18     Q.  Yeah.  Do you recall in November or
19  December 2020 in your weekly meetings or anything else,
20  any discussion whatsoever concerning whether NexPoint
21  had made any prepayments on its note?
22     A.  No discussions of whether or not there had
23  been a prepayment that I can remember, no.
24     Q.  To the best of your knowledge sitting here
25  today -- strike that.

---

**64**

1      For my next question, again we're assuming
2  that Exhibit 14 is what it appears to be.
3      A.  Sure, sure.
4      Q.  So with that qualification, to the best of
5  your knowledge, other than what's on Exhibit 14, can
6  you think of any other record or source or document
7  that would address whether any unscheduled payments by
8  NexPoint would or wouldn't be prepayments on the note?
9      MR. MORRIS:  Objection to the form of the
10  question.
11     THE WITNESS:  Again, with the struggle of the
12  prepayment, this is the document that I would expect to
13  explain how the payment was applied.
14     Q.  (BY MR. RUKAVINA)  But you yourself did not
15  play any role in deciding how the payment would be
16  applied?
17     A.  I'd hesitate to say no role, because the team
18  ultimately rolls up to me.
19     Q.  You personally?
20     A.  Me personally, I wouldn't have prepared these
21  schedules.
22     Q.  Or decided, you personally, as Mr. Klos, how
23  any unscheduled payments should be accounted for by
24  Highland?
25     A.  Correct, not without some -- some

---

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 123    Filed 06/09/24    Page 40 of 188    PageID 35113

**17 (Pages 65 to 68)**

David Klos - October 27, 2021

**65**

1 authoritative direction on how they should be applied.
2    Q.  And that authoritative direction should have
3 come from Mr. Waterhouse or Mr. Dondero?
4    A.  That's what I would expect.
5    Q.  Could it have come from anyone else that you
6 can think of here today?
7    A.  Not that I can think of.
8    Q.  Now we're going to switch gears and I think
9 we're going to stop discussing the NexPoint note, and
10 we're going to focus on the HCMFA two promissory notes.
11    A.  Sure.
12    Q.  So we're going to go back in time to
13 May 2019; okay?
14    A.  Sure.
15    Q.  And is it fair to say by -- that by May 2019
16 there were at least dozens if not hundreds of instances
17 of intercompany loans in the years leading up there
18 from Highland to one of the other entities?
19    MR. MORRIS:  Objection to the form of the
20 question.
21    THE WITNESS:  From Highland to one of the
22 other entities.  Can you help with other entities.
23    Q.  (BY MR. RUKAVINA)  Advisors, the trusts, any
24 of the Dondero entities?
25    MR. MORRIS:  Objection to the form of the

**66**

1 question.
2    THE WITNESS:  Yes, there would have been many
3 loans over the years.
4    Q.  (BY MR. RUKAVINA)  And do I understand that
5 most, if not all, of those loans should have been
6 papered up with a written promissory note?
7    MR. MORRIS:  Objection to the form of the
8 question.
9    THE WITNESS:  Should have been.  To the
10 extent that they were for a promissory note, then yes.
11    Q.  (BY MR. RUKAVINA)  So in the May 2019 time
12 frame, was there a regular pattern or course or
13 procedure in place as to how a promissory note would be
14 physically prepared and presented for approval?
15    MR. MORRIS:  Objection to the form of the
16 question.
17    THE WITNESS:  Yeah, when you say a process,
18 can you please clarify that for me.
19    Q.  (BY MR. RUKAVINA)  Sure.  Let's look at these
20 two promissory notes and maybe that will help frame the
21 question.  And I apologize for not having them right
22 here.
23    A.  It might be --
24    MR. MORRIS:  1 and 2.
25    MR. RUKAVINA:  Yes.

**67**

1    Q.  (BY MR. RUKAVINA)  Are you familiar with
2 Exhibits 1 and 2, sir?
3    A.  Yes, I am.
4    Q.  Do you remember them from back -- strike
5 that.
6    Did you have any role, to your knowledge,
7 with the preparation of Exhibits 1 and/or 2?
8    A.  With the preparation of the documents?
9    Q.  Yeah.
10    A.  No.
11    Q.  But you did have some role with these
12 promissory notes?
13    A.  Yes.
14    Q.  And I'm trying to find that email as well.
15 There's an email here from you.  I'll have it in a
16 moment.  That will help frame the question.
17    MR. MORRIS:  Exhibit 3.
18    Q.  (BY MR. RUKAVINA)  Do you recall that email,
19 sir?
20    A.  Not specifically, but it's right in front of
21 me.  I'm certain that I wrote this email.
22    Q.  You have no reason to deny or reject its
23 authenticity?
24    A.  I have no reason to reject it or question it.
25    Q.  Just give me a second.  I don't understand

**68**

1 what's going on with my exhibits.  I just don't
2 understand this.
3    (Off the record.)
4    Q.  (BY MR. RUKAVINA)  You have Exhibit 3 in
5 front of you?
6    A.  I do.
7    Q.  And it says, please send 2.4 million from
8 HCMLP to HCMFA.  This is a new interco.
9    Meaning intercompany; right?
10    A.  Correct.
11    Q.  This is a new intercompany loan.
12    Who told you that this was an intercompany
13 loan?
14    A.  Either Frank or Jim.  I would suspect Frank.
15    Q.  Do you have any present memory of him telling
16 you that with respect to this particular loan?
17    A.  I don't have a specific recollection, but
18 with a hundred percent certainty he or Jim would have
19 directed that.
20    Q.  Would they have directed the payment, or
21 would they have directed that it be papered as a loan,
22 or both?
23    A.  Both.
24    Q.  So in each instance -- well, let's take a
25 step back.

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 04/06/22    Page 41 of 188    PageID 35114

**18 (Pages 69 to 72)**

David Klos - October 27, 2021

**69**

1      So certainly either Jim or Frank directed you
2  to transfer the $2.4 million; correct?
3      A.  Either Jim or Frank would have directed, yes.
4  There's 0 percent chance I would have sent this email
5  if I didn't feel a hundred percent confident that this
6  was authorized in the way that I described in the
7  email.
8      Q.  But can you also say with certainty that
9  either Dondero or Waterhouse also told you that this
10  transfer is an intercompany loan?
11      A.  With a hundred percent certainty, yes.  I
12  can't say that necessarily with respect to Dondero,
13  because I don't remember if I would have talked to him
14  specifically about it.  But, yes, this would have been
15  clear that it's a loan.
16      Q.  You say clear.  Did someone tell you that
17  it's a loan, or are you just, because of the prior
18  10 years of course and conduct, logically deciding that
19  it has to be a loan?
20      MR. MORRIS:  Objection to the form of the
21  question.
22      THE WITNESS:  So this is -- this is not just
23  a situation of past practice.  I would have known with
24  certainty that this was a loan and that's what was
25  authorized.

**70**

1      Q.  (BY MR. RUKAVINA)  How would you have known
2  with certainty that it was a loan?
3      A.  I'll say in part because of past practice,
4  but also because of the nature of what the money was
5  going to be used for, and the background behind it.
6      Q.  So you knew that nature and that background?
7      A.  The nature and background of the 2.4 million,
8  yes.
9      Q.  So you've told me that in part -- I asked you
10  how did you know it was a loan.  You said in part past
11  practices, in part you knew the nature.  Anything else?
12      A.  I'm certain that given that I wrote this
13  email, which Frank is on, that I would have had a
14  conversation with Frank about what this was.
15      Q.  Was Jim Dondero in the corporate accounting
16  email?
17      A.  No, he wasn't.
18      Q.  So what is your understanding as to what this
19  $2.4 million was for?
20      A.  This related to -- well, to separate the
21  transaction, the 2.4- itself relates to a promissory
22  note.  That's what was executed.
23      HCMFA's use of the 2.4 million was to
24  reimburse a fund that it managed called Highland Global
25  Allocation Fund for a NAV error that had occurred

**71**

1  within that fund.
2      Q.  Who made that NAV error?
3      MR. MORRIS:  Objection to the form of the
4  question.
5      THE WITNESS:  Yeah, it's hard to answer that.
6  So the Highland Capital Management Fund Advisors is the
7  advisor to the fund, so they're the responsible party
8  for making the fund whole in the instances of NAV
9  errors.
10      Q.  (BY MR. RUKAVINA)  And did HCMFA contract out
11  with Highland for valuation services?
12      MR. MORRIS:  Objection to the form of the
13  question.
14      THE WITNESS:  I don't specifically remember
15  if they contracted for valuation services, but if you
16  tell me that they did, I'll take that at face value.
17  So yes, HCMFA utilized HCMLP for valuation services.
18      Q.  (BY MR. RUKAVINA)  Do you have any memory of
19  what human being or beings made that NAV error?
20      MR. MORRIS:  Objection to the form of the
21  question.
22      THE WITNESS:  It's -- in respect to people,
23  not particularly.  In respect to parties, Houlihan
24  Lokey was the service provider that performed the
25  valuation that resulted in the NAV error.

**72**

1      And as I described before, the valuation
2  function was housed at HCMLP by HCMLP employees
3  supporting that through, among other people, front
4  office, compliance, other parts of the organization as
5  well.
6      Q.  (BY MR. RUKAVINA)  So it was your
7  understanding that Highland was loaning $2.4 million to
8  HCMFA for HCMFA to compensate that fund?
9      A.  Yes.
10      Q.  Did you have any understanding that Highland
11  might have been, instead of loaning that money,
12  actually paying that money to HCMFA to compensate HCMFA
13  for Highland's valuation error?
14      A.  First, not Highland's valuation error.  But
15  second, no, there's no way that that would have been
16  what that payment was for.
17      Q.  Why can you say that there's no way that that
18  would have been what that payment was for?
19      A.  First, this wasn't the first NAV error that
20  ever occurred.  There had been other NAV errors.  There
21  were other NAV errors with respect to this valuation
22  that pertain to NexPoint Advisors.
23      There was no reimbursement from HCMLP to
24  NexPoint or HCMFA, regardless of any individual being
25  identified as the person.  That had just never occurred

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 123    Filed 06/29/21    Page 42 of 188    PageID 35115

**19 (Pages 73 to 76)**

### David Klos - October 27, 2021

**73**

1 to my knowledge.
2        Second, the amount was to meet the liquidity
3 need of HCMFA. It wasn't to -- it wasn't to
4 dollar-for-dollar make up for the NAV error. It was
5 that's how much money HCMFA needed.
6        Third, it was definitely Dondero's practice
7 and preference to have expenses at HCMFA for tax
8 purposes. So if this was compensation, he would
9 ultimately not really be benefiting from the deduction
10 so.
11        That would have been a strong preference of
12 his against having it be compensation.
13        So it would have been excruciatingly clear
14 that this was a loan for liquidity for HCMFA to make
15 the fund whole, just like it had in the past NAV
16 errors.
17    Q. How did you know that HCMFA needed
18 $2.4 million for liquidity?
19    A. At that point I was still part of the
20 corporate team, so I had a good sense of how much cash
21 HCMFA would have had at any given moment. And at that
22 given moment it would not have had -- I'd be shocked if
23 it had even 2.4-.
24        Probably would have had probably between
25 a million and 2 million if I had to speculate.

**74**

1    Q. Okay. So you've given the reasons why this
2 was clearly a loan.
3        But you never heard Mr. Dondero say that this
4 was a loan, did you?
5    A. I don't remember. It's possible I did, but I
6 don't specifically remember.
7    Q. Okay. What about the $5 million loan on the
8 day after? What was that $5 million for?
9    A. That was similar but different. So again,
10 HCMFA needed liquidity. This time this was for --
11 related to that same fund.
12        So Highland Global Allocation Fund had
13 converted from an open-end fund, mutual fund, to a
14 closed-end mutual fund.
15        And pursuant to that conversion there was a,
16 I believe it was called a consent fee, for any
17 investors of that fund who consented to the conversion,
18 that they would receive a 3 percent fee payable by the
19 investment advisor.
20        And so at this time the bill came due on that
21 because the conversion had been completed, and the
22 accounting for how much that 3 percent was going to be
23 was complete.
24        HCMFA sure as hell didn't have 5 million
25 bucks. Excuse my language. Highland needed to pay

**75**

1 HCMFA for the liquidity. HCMFA made the payment to the
2 fund. It wasn't dollar for dollar. I think it was
3 like 5,019,000, or some such number.
4        But 5 million was the number that would allow
5 it to make that payment effectively to the investors of
6 Global Allocation Fund.
7    Q. Do you have any understanding as to why
8 Highland, as opposed to some other entity, was
9 transferring $7.4 million?
10    A. Highland as opposed to some other entity?
11    Q. Uh-huh.
12    A. Because Highland had the money.
13    Q. But I think we've established earlier that in
14 the first seven months of 2019, Highland was having
15 constant liquidity issues?
16    A. It was.
17    Q. And that's part of the reason that NexPoint
18 was making unscheduled payments on its note; right?
19    A. That's part of the reason NexPoint was making
20 unscheduled payments on its note, yes.
21    Q. So your recollection is that HCMFA needed
22 $2.4 million for liquidity purposes and about
23 $5 million for the consent fee. And Highland
24 transferred those funds because Highland had the funds?
25    A. Yes. And I should clarify that Highland only

**76**

1 had the funds because Mr. Dondero repaid personal notes
2 to HCMLP on the same days.
3        So he paid 2.4 million on May 2, which
4 Highland turned around and reloaned. And he paid 4.4-
5 on May 3, and Highland sent out 5-, so there's a
6 $600,000 difference. And my recollection, he paid the
7 other 600,000 via note repayment within a few days.
8    Q. So this would have been part of some broader
9 transaction in Mr. Dondero's mind?
10    A. I would not characterize it that way.
11    Q. You established that HCMFA needed money. You
12 established that Highland temporarily had money because
13 Dondero provided it with money.
14        But you still don't know, sir, as a fact as
15 to whether that transfer was a loan or some other
16 payment from HCMFA -- I'm sorry from HCM, from debtor
17 to HCMFA?
18        MR. MORRIS: Objection to the form of the
19 question. Asked and answered a million times. It's in
20 the documents you're showing him.
21        THE WITNESS: It was a loan.
22        MR. MORRIS: Come on, Davor. With all due
23 respect, it's in the document. It's on the document.
24    Q. (BY MR. RUKAVINA) I'm being courteous and
25 respectful to you and I'd ask the same in return; okay?

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 06/09/22    Page 43 of 188    PageID 35116

20 (Pages 77 to 80)

David Klos - October 27, 2021

**77**

1      A. Absolutely. I apologize if I haven't been.
2      Q. Mr. Dondero, would you agree, was the only
3  person that had the authority at the debtor to
4  authorize a transfer of 2.4- and then $5 million?
5      A. At the debtor?
6      MR. MORRIS: Objection to the form of the
7  question.
8      Q. (BY MR. RUKAVINA) Yes, at the debtor.
9      A. No.
10     Q. Who else could have transferred 2.4 million
11  or $5 million?
12     A. Those are two different questions. But if
13  you're asking who had the authority, certainly Frank
14  did as well.
15     Q. So Frank had the authority. Perhaps my
16  question was inartful.
17     Do you believe that Mr. Waterhouse would have
18  decided to transfer $2.4 million or $5 million without
19  Mr. Dondero's approval?
20     MR. MORRIS: Objection to the form of the
21  question.
22     THE WITNESS: Generally speaking, no, but I
23  don't know exactly what the form of the approval. But
24  he certainly wouldn't have done that on his own without
25  discussing with Dondero.

**78**

1      Q. (BY MR. RUKAVINA) Do you believe that
2  Mr. Waterhouse had the ability on behalf of the debtor
3  to loan $5 million without Mr. Dondero's approval?
4      MR. MORRIS: Objection to the form of the
5  question.
6      THE WITNESS: I think he had the technical
7  authority to. However, I don't believe in practice
8  that he ever would.
9      Q. (BY MR. RUKAVINA) Same question, $2.4
10  million?
11     A. Same answer.
12     Q. We've established that you never really had a
13  direct employment or types of a role for NexPoint --
14  I'm sorry, for HCMFA; right?
15     A. Again --
16     Q. To the best of your recollection?
17     A. Best of my recollection I can't remember how
18  the titles transferred over or whatever, but I don't
19  believe I did.
20     Q. Do you know whether Mr. Waterhouse in 2019
21  had the authority, without Mr. Dondero's approval, to
22  borrow $7.4 million on behalf of HCMFA?
23     MR. MORRIS: Objection to the form of the
24  question.
25     THE WITNESS: He had the authority to enter

**79**

1  into the note on behalf of HCMFA, yes.
2      Q. (BY MR. RUKAVINA) Was that something that he
3  would have done without Mr. Dondero's approval to your
4  understanding and practice at that time?
5      MR. MORRIS: Objection to the form of the
6  question.
7      THE WITNESS: Same answer that I gave before
8  with respect to Highland.
9      Q. (BY MR. RUKAVINA) So here's where I'm going
10  with all this.
11     Mr. Dondero's position, and tomorrow his
12  testimony will be, that he caused the $7.4 million to
13  be transferred not as a loan to HCMFA, but to
14  compensate HCMFA for various things including that NAV
15  error.
16     Other than perhaps you think he's lying,
17  would you have any knowledge, hearsay, document,
18  anything, to contradict Mr. Dondero's position?
19     MR. MORRIS: Objection to the form of the
20  question.
21     THE WITNESS: Yes. I would point to the fact
22  that as it pertains to the $5 million note, if we're
23  separating issues, there's no other possibility of what
24  that money could be other than either a loan or equity.
25     It's not compensation. Highland is under --

**80**

1  HCMLP has absolutely zero obligation in respect to that
2  consent fee. So when Highland sends $5 million to HCMFA
3  there's nothing else that it can be. That's Point 1.
4      Point 2, we're right in the middle of an audit
5  at this point. Jim signs rep letters at this point.
6  He's being provided balance sheets throughout 2019 that
7  indicate the loans that Highland has on its books.
8      Balance sheets are being prepared in respect
9  of annual approvals for 15(c) for retail funds in the
10  fall. Schedules are being created for bankruptcy after
11  we file in October.
12     Nobody says this is a mistake. Frank is on
13  all of these emails. Frank never questions it.
14     There's absolutely no evidence from that point
15  in time to whenever this defense got raised that would
16  indicate that anybody said that these weren't exactly
17  what they say they are.
18     Q. (BY MR. RUKAVINA) Are you aware that in
19  February or March 2019 some $5.2 million was paid from
20  insurance that HCMFA had to the fund for the NAV error?
21     A. The amount sounds unfamiliar, but I'm aware
22  that insurance proceeds were paid from HCMFA to the
23  fund.
24     Q. And do you think that it's impossible for a
25  sane, rational person to conclude that HCMFA had a

David Klos - October 27, 2021

**81**

1 claim against the debtor related to that NAV error?
2     MR. MORRIS: Objection to the form of the
3 question.
4     THE WITNESS: If it did, I don't know how
5 that's not insurance fraud for basically double
6 collecting insurance proceeds and then collecting it
7 again.
8     Q. (BY MR. RUKAVINA) So you believe, sir, that
9 if insurance pays a claim you have no more right to go
10 against a person who caused the fault?
11     MR. MORRIS: Objection to the form of the
12 question.
13     THE WITNESS: We can speak specifically here.
14 This is about a NAV error that an insurance company
15 reimbursed HCMFA for, which it then turned around and
16 paid for the fund.
17     So if it went to collect that same, let's use
18 round numbers, $5 million from Highland that it's
19 already collected from insurance, that sounds
20 inappropriate to me.
21     Q. (BY MR. RUKAVINA) Okay. But you don't know
22 whether that's allowed in Texas law or not, do you?
23     MR. MORRIS: Objection to the form of the
24 question.
25     THE WITNESS: No, I don't know whether it's

**82**

1 allowed under Texas law.
2     Q. (BY MR. RUKAVINA) So you don't know that if
3 you're hit by someone on the street and your medical
4 insurance pays your bills, you don't know that he still
5 has to pay you for the same bills?
6     MR. MORRIS: Objection to the form of the
7 question. I hope I don't miss my plane.
8     Q. (BY MR. RUKAVINA) You don't know that under
9 Texas law if someone hits you with their car and causes
10 you medical bills and your medical insurance pays those
11 bills, that you can still sue them for the same
12 damages?
13     MR. MORRIS: Objection to the form of the
14 question.
15     THE WITNESS: I'm not familiar at any level
16 of specificity with Texas law.
17     Q. (BY MR. RUKAVINA) Again, it just sounds
18 wrong to you that you could go after someone after
19 insurance pays, but you don't know legally one way or
20 the other?
21     A. Correct. I'm not a lawyer or expert in Texas
22 law. It feels wrong, yes.
23     Q. Okay. Going back to this email of yours,
24 Exhibit 3, do you recall whether there was a similar
25 email with respect to the $5 million note?

**83**

1     A. Yes, I am. I believe Kristin sent that one.
2     Q. Kristin sent that one?
3     A. I believe so.
4     Q. To whom?
5     A. Likely the same distribution group, but
6 that's speculation.
7     Q. Did you see such an email in the last week or
8 two?
9     A. I'm not certain, but probably. I have seen
10 email communication on or around May 3, but I don't
11 know specifically who all was on the email. I'm going
12 off what I would expect to see.
13     MR. MORRIS: If you're really interested,
14 it's right here. It was produced to you with
15 Bates 3763. And if you'd like to question the witness.
16     MR. RUKAVINA: When was it produced?
17     MR. MORRIS: I can't tell you. It's part of
18 the same package.
19     Q. (BY MR. RUKAVINA) So going back to this
20 Exhibit 3, sir, why did you ask Kristin, can you or
21 Hayley please prep a note for execution? Why then?
22     Remember, I was asking about what the course
23 or procedure was at that point in time.
24     A. Yeah, so nomenclature, procedure, process.
25     I would say the informal process for these

**84**

1 types of loans, they were frequent in nature, would be
2 for someone on the corporate accounting team to prepare
3 a note and have it executed.
4     Q. Okay. That was the standard course back
5 then?
6     A. Again, I don't know what standard course
7 means. That was fairly typical.
8     Q. Why would you not have asked someone in the
9 Highland legal department to prepare a note?
10     A. Because this was a legally reviewed document
11 as far as the form of the agreement. It's a one-page,
12 two-paragraph form that had been used for a long time.
13     So the only thing that would change with
14 respect to these notes would be the date, the amount,
15 likely the rate. I can't think of anything else
16 offhand that would have changed from note to note.
17     Q. After you asked Ms. Hendrix to prepare this
18 note, did you have any further role with respect to the
19 papering, preparation, or execution of that note?
20     A. Not that I can remember.
21     Q. Would you have had any role in having either
22 or both of the notes actually signed electronically or
23 by ink by Mr. Waterhouse?
24     A. Likely not, no.
25     Q. Do you know who decided to have

David Klos - October 27, 2021

**85**

1  Mr. Waterhouse as opposed to Mr. Dondero sign these two
2  promissory notes?
3      A. I don't.
4      Q. On the $5 million note, do you remember if
5  you had any role with respect to its physical papering
6  or execution?
7      A. Not that I recall.
8      Q. To the best of your memory, your role would
9  have been done by instructing your team, hey, here is
10 these new loans, go paper it up; is that accurate?
11     A. On the upfront side. I suppose my role would
12 have also included on the back end making sure that the
13 actual payment had occurred. But that would have been
14 doing that realtime, seeing the funds went out, and
15 that, most importantly, that the consent fee had been
16 paid from HCMFA to the transfer agent.
17     Q. How did you or anyone on your team know -- so
18 obviously, you know it's a $2.4 million loan because
19 that's what Waterhouse or Dondero told you; right?
20         How did you know it was a $2.4 million loan?
21     MR. MORRIS: Objection. Asked and answered.
22     THE WITNESS: I knew that the NAV error was
23 2 million, I think it was 398,000, somewhere in that
24 ballpark. And that 2.4- had been authorized for that
25 purpose.

**86**

1      Q. (BY MR. RUKAVINA) Do you know who decided
2  what the interest rate in this note would be, or that
3  it would be a demand note as opposed to a term note?
4      A. I don't specifically know who made that
5  decision. However, the common practice for fund
6  advisors was to put -- was for the rate to equal the, I
7  forget if it was the short-term or long-term AFR.
8         And for the note to be demand, that was just
9  the standard -- that was the standard.
10     Q. And I think I asked this, but just if I
11 didn't.
12         For either or both of these two notes, the
13 2.4- and $5 million note, did you have any role with
14 respect to Mr. Waterhouse signing them?
15     A. No, not that I can remember. I don't think I
16 did.
17     Q. And you don't remember doing anything to get
18 his signatures?
19     A. Not that I recall.
20     Q. Nor would that have been something that you
21 would expect that you would have a role with?
22     A. Certainly not in this instance. Maybe to the
23 extent that nobody else was around and it was time
24 sensitive, but that wouldn't have been the case with
25 these, I don't believe.

**87**

1      Q. Did you have any understanding in early May
2  of 2019 as to whether HCMFA was solvent or insolvent?
3      MR. MORRIS: Objection to the form of the
4  question.
5      THE WITNESS: Whether HCMFA was solvent or
6  insolvent? I'm not a solvency expert, so I don't know
7  that I could even attempt to answer that.
8      Q. (BY MR. RUKAVINA) Did you have an
9  understanding as far as HCMFA goes on May 2, 2019, that
10 its liabilities exceeded its assets?
11     A. I don't remember specifically where it stood
12 on assets versus liabilities.
13     Q. Do you have any memory that by May 2, 2019,
14 the debtor had taken a couple prior demand notes from
15 HCMFA and made them not collectible prior to May 31,
16 2021?
17     A. I know what you're referring to. I wouldn't
18 characterize it that way.
19     Q. How would you characterize it?
20     A. I recall that there was a financial support
21 acknowledgment, I think it was the name of the
22 acknowledgment.
23         That described -- I can't remember if it
24 described those two notes specifically or just referred
25 to them, that there would not be collection sought on

**88**

1  those until May 31 of 2021.
2      Q. Do you remember why that document was done?
3      A. My recollection, and it could have been done
4  for other reasons, but my recollection of it was that
5  it was primarily audit-driven.
6         For the auditors to be comfortable that these
7  notes weren't going to be just called and FA not have
8  the ability to pay them right away.
9      Q. Because it's true in April or May of 2019
10 HCMFA didn't have the ability to pay those notes;
11 correct?
12     A. It didn't have enough cash to pay those.
13     Q. And I think you mentioned before that in
14 May 2019 the auditors at the Highland level were
15 talking about rolling up prior demand notes into term
16 notes so the debtor would at least get some regular
17 cash flow; correct?
18     MR. MORRIS: Objection to the form of the
19 question.
20     THE WITNESS: No.
21     Q. (BY MR. RUKAVINA) So you recall that -- I'm
22 sorry, that was 2017. I was wrong; right?
23     A. Correct.
24     Q. So I guess here is my question, and I'm
25 struggling to understand this.

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 2-13    Filed 06/30/21    Page 46 of 188    PageID 35119

23 (Pages 89 to 92)

David Klos - October 27, 2021

**89**

1      So why would Highland be loaning an
2   additional $7.4 million in early May of 2019 to HCMFA
3   when HCMFA already was then unable to repay its debts
4   to Highland?
5      MR. MORRIS:  Objection to the form of the
6   question.
7      THE WITNESS:  Yeah, I kind of reject the
8   premise of the question, and these are all controlled
9   by Jim.  And it's completely within his power at any
10  point in time to make any payment on any of the loans,
11  depending on where priorities sit.
12     So the idea that HCMFA -- that Highland would
13  be doing a credit analysis on HCMFA, determining that it
14  was unable to make that payment and, therefore, this is
15  a bad note, is a completely foreign, preposterous
16  concept at that time.
17     Q.  (BY MR. RUKAVINA)  And in May of 2019 isn't
18  it also, sir, the case that Mr. Dondero could have,
19  right or wrong, agree or disagree, said, that 7.4- is
20  going to compensate HCMFA for the NAV error as opposed
21  to being a loan?
22     A.  No.
23     Q.  That's not possible?
24     A.  No.
25     Q.  And why is that not possible?

**90**

1      A.  As we discussed, the 5-, there's absolutely
2   no construct where that can be compensation for an NAV
3   error.  It's not a NAV error.  It's a consent fee.
4   Highland has absolutely no responsibility for that.
5      Highland also has no responsibility for the
6   2.4-, but if you want to assume that it did, that's
7   completely not the practice.  It was Jim's preference
8   to do these via loans, and that's how it was booked.
9      Q.  You're saying on the one hand Mr. Dondero can
10  absolutely control that one entity make a loan to
11  another, irrespective of credit worthiness, but he
12  can't decide that a transfer is compensation as opposed
13  to a loan?
14     MR. MORRIS:  Objection to the form of the
15  question.  Argumentative.
16     THE WITNESS:  If he wants to call
17  $7.4 million compensation to himself or to HCMFA, I
18  just don't know how he does that.  This is me being an
19  accountant.  I don't know how that's possible.
20     If he wants to pay himself a $7.4 million
21  bonus from HCMFA, fine, he has the power to do that.  If
22  he wants Highland to inject 7.4 million of equity into
23  HCMFA, he has the power to do that.
24     But sending the 7.4 million and calling it
25  something else, I don't know how he could do that.

**91**

1      Q.  (BY MR. RUKAVINA)  So it had to have been a
2   loan; correct?
3      MR. MORRIS:  Objection to the form of the
4   question.
5      THE WITNESS:  In these instances I know it to
6   have been a loan.
7      Q.  (BY MR. RUKAVINA)  Because of what
8   Mr. Waterhouse told you?
9      MR. MORRIS:  Objection to the form of the
10  question.  Asked and answered.
11     THE WITNESS:  Yeah, it was my understanding
12  that these were loans.
13     Q.  (BY MR. RUKAVINA)  You know these 7.4- to be
14  loans even though you never heard Mr. Dondero say that
15  to you?
16     A.  Yes, although to be fair, I don't know
17  whether I ever heard Mr. Dondero.  It's possible he did
18  say it.
19     MR. MORRIS:  Objection.  Withdrawn.
20     Q.  (BY MR. RUKAVINA)  You have no memory that on
21  or before May 4, 2019 you heard Mr. Dondero say that
22  the $2.4 million transfer and/or the $5 million
23  transfer to HCMFA were loans?
24     A.  I have no specific recollection, but such a
25  conversation is just off the reservation impossible.

**92**

1   That there's no way -- there's no way -- there's no way
2   that it would have been described that way and there's
3   a hundred percent that it's loan.
4      Q.  Do you have any memory discussing prior --
5      MR. MORRIS:  Objection.  Asked and answered.
6   He's answered this a thousand times.
7      Q.  (BY MR. RUKAVINA)  Do you have any memory on
8   or before May 2, 2019 discussing the $2.4 million
9   transfer with Mr. Dondero at all?
10     A.  I do recall, I don't remember the time, but I
11  do remember discussing the NAV error in general terms
12  and the potential magnitude of that.  I don't remember
13  specifically when that occurred.
14     Q.  At least in your discussion with Mr. Dondero,
15  the $2.4 million loan or note was somehow linked to the
16  NAV error?
17     A.  Linked to the NAV error is strong.  It
18  related to the NAV error from the standpoint that
19  that's what Highland was loaning HCMFA the money for,
20  because HCMFA couldn't otherwise make the payment
21  itself.
22     Q.  You just said Highland was loaning the money
23  for.  Are you remembering now Mr. Dondero saying that
24  or are you just extrapolating?
25     A.  No, I'm explaining rationally what the

David Klos - October 27, 2021

**93**

1  situation was.
2      Q.  Do you remember on or before May 3, 2019
3  discussing the $5 million transfer with Mr. Dondero?
4      A.  Again, in general terms.  I couldn't tell you
5  a time period, but this was something that, between
6  Frank and I, we had put on Jim's radar that this would
7  be a cash need in the future.  I couldn't specify
8  specifically when that happened.
9      Q.  Okay.  You have no present memory of
10  discussing that issue with Mr. Dondero on or before
11  May 3, 2019?  It must have happened but you have no
12  memory?
13      MR. MORRIS:  Objection to the form of the
14  question.
15      THE WITNESS:  We discussed that there would
16  be a consent fee payable from HCMFA.  We would have
17  discussed -- and again, I don't remember where I was,
18  what day it was, the specifics around the conversation.
19      But I know that we had conversations
20  pertaining to cash, because this was a large need for --
21  cash need for HCMFA to satisfy this, and this was an
22  important payment.
23      And neither HCMFA nor Highland had the
24  wherewithal to make that payment.  The only way that
25  those could make the payment was by Jim Dondero repaying

**94**

1  loans that he owed to HCMLP.  So we absolutely discussed
2  that with Jim Dondero.
3      Q.  (BY MR. RUKAVINA)  And with respect to
4  everything that we just talked about and your
5  recollection, you still don't remember Mr. Dondero
6  saying to you or Mr. Waterhouse one way or the other
7  that one or both of these transfers were loans?
8      MR. MORRIS:  Objection to the form of the
9  question.  Asked and answered.
10      THE WITNESS:  Yeah, again --
11      Q.  (BY MR. RUKAVINA)  Just yes or no.  This is a
12  yes-or-no question.
13      MR. MORRIS:  Let him answer the question.
14      MR. RUKAVINA:  If he'll answer the question
15  I'll stop asking him --
16      MR. MORRIS:  He's allowed --
17      Q.  (BY MR. RUKAVINA)  The answer [verbatim] is,
18  do you remember --
19      A.  I don't remember Jim's exact words two and a
20  half years ago in respect to authorizing these
21  payments.  So to answer your question, no, I don't
22  specifically remember him saying these are loans.
23      But every other fact around this tells me
24  that we did have that conversation and that was the
25  conclusion and that was the direction.

**95**

1      Q.  So it's possible that Mr. Dondero told no one
2  that these were loans but because y'all have been doing
3  it this way for 10 years, that everyone, all of you
4  CPAs, understood that it had to be a loan?
5      MR. MORRIS:  Objection to the form of the
6  question.
7      Q.  (BY MR. RUKAVINA)  My question is, is that
8  possible?
9      A.  I really don't think it's possible.  I
10  suppose people say anything is possible.  Again, two
11  and a half years ago, I'm certain that that was the
12  intent at the time and I'm sure it was communicated as
13  such.  I just don't have a specific recollection.
14      MR. RUKAVINA:  Thank you.
15      I'll pass the witness.
16      MR. MORRIS:  Michael, do you have any
17  questions?
18      MR. AIGEN:  I do.  I assume you want me to
19  start now to do my best to be done at 5:00?
20      MR. MORRIS:  Yes, please.
21      EXAMINATION
22      Q.  (BY MR. AIGEN)  Good afternoon, Mr. Klos.  My
23  name is Michael Aigen with the Stinson law firm.  I
24  represent Mr. Dondero, HCMS, and HCRE.
25      How are you today?

**96**

1      A.  I'm very good, thank you.
2      Q.  First topic I wanted to ask you about is the
3  defense raised by some of the defendants related to an
4  oral agreement and condition subsequent.
5      So my question for you generally is, are you
6  aware that some of the defendants in these proceedings
7  have raised a defense that there was a subsequent oral
8  agreement allowing notes to be potentially forgiven if
9  certain events occur?
10      A.  Yeah, I'm generally aware of the defenses
11  sitting here today.
12      Q.  And how are you generally aware of this
13  defense?
14      A.  I don't know with specificity.  Potentially
15  through just document flow on the bankruptcy side,
16  potentially with conversations internally or with
17  counsel.  But I generally understand them to have been
18  raised, the defenses that is.
19      Q.  And I don't want to get into conversations
20  with counsel.  I'm not allowed to do that.
21      Let me ask you, have you had any
22  conversations with anyone other than counsel about this
23  subsequent oral agreement defense?
24      A.  I have had general conversations with
25  Mr. Seery about it.  And other than that, nothing

David Klos - October 27, 2021

**97**

1 substantive.
2    Q. And what did you discuss about this with
3 Mr. Seery?
4    A. I've discussed with him, I hate to phrase it
5 this way, the ridiculousness of the defense. Under
6 oath. I've discussed my general understanding of what
7 is being asserted as a defense.
8       Which is that there was some sort of an oral
9 agreement between Jim and his sister at some point in
10 the past pertaining to forgiveness of certain
11 promissory notes that was conditional upon Highland
12 monetizing any of three PE assets for any amount above
13 cost.
14    Q. And is it fair to say that prior to these
15 lawsuits being brought, you weren't aware of any oral
16 agreements related to the promissory notes related to
17 potential forgiveness?
18    A. That's correct. Not that I can remember, and
19 I think I would remember.
20    Q. And other than your conversations with
21 Mr. Seery and counsel, you haven't had any
22 conversations with anyone else about these alleged oral
23 agreements; is that fair to say?
24    A. I'm not sure I understand the question.
25    Q. You told me you may have had questions with

**98**

1 counsel about these oral agreements defense, and you
2 told me about conversations with Mr. Seery, so I'm
3 trying to close that topic.
4       Was there anyone else you had any
5 conversations with about this alleged oral agreement?
6    A. Like I said before, nothing of substance.
7 I've probably mentioned it in passing to other
8 employees, this is what I understand is being asserted
9 in this, but nothing of substance.
10    Q. Do you have any personal knowledge as to
11 whether Mr. Dondero or Ms. Dondero entered into any
12 type of oral agreement prior to the bankruptcy?
13    A. No, not other than what's been pled, or
14 whatever the terminology is.
15    Q. I want to talk a little bit about, you
16 touched on earlier, you gave some testimony about how
17 in -- there were certain term loans that had payments
18 due in December on or about December 31, 2020.
19       Do you remember talking about that?
20    A. Yeah, generally.
21    Q. And I don't know if you're specifically
22 referring to these loans, but is it also your
23 understanding that HCMS and HCRE also had payments that
24 were due on December 31, 2020?
25    A. Yes.

**99**

1    Q. Is it fair to say that if those payments were
2 to be made, it would have been Ms. Hendrix that would
3 have gone and effectuated those payments?
4       MR. MORRIS: Objection to the form of the
5 question.
6       THE WITNESS: Can you remind me the entities
7 again.
8    Q. (BY MR. AIGEN) Sorry. HCMS and HCRE
9 Partners.
10    A. HCMS, yes. HCRE, I'm not sure, maybe.
11    Q. Why might it have been different?
12    A. I just don't recall who had the, you know,
13 kind of bank access to effectuate that payment. I
14 think Kristin did but I'm not certain.
15    Q. It wouldn't have been you; is that fair to
16 say?
17    A. Correct. It would not have been me.
18    Q. And if Ms. Hendrix testified that the
19 instruction she received in December 2020 about not
20 making payments related only to the Advisors and not to
21 HMS or HCRE, would you have any reason to disagree with
22 her?
23       MR. MORRIS: Objection to the form of the
24 question.
25       THE WITNESS: Yeah, I was struggling with

**100**

1 that question. There was a lot to it. If you don't
2 mind.
3    Q. (BY MR. AIGEN) Okay. I'll repeat it. Maybe
4 that will help.
5       MR. MORRIS: Why don't you ask him about his
6 knowledge, instead of Kristin's. You had her as a
7 witness.
8       I'll continue to object. I don't know why
9 you're asking him about her knowledge.
10       MR. AIGEN: Do you want to keep coaching him?
11       MR. MORRIS: No, I'm trying to coach you.
12       MR. AIGEN: Oh, thanks. That's good.
13 Appreciate if you stop coaching your witness.
14    Q. (BY MR. AIGEN) If Ms. Hendrix testified that
15 the instructions she received in December 2020
16 regarding not making any more payments related only to
17 the Advisors and not to HMS or HCRE, would you have any
18 reason to disagree with her?
19       MR. MORRIS: Objection to the form of the
20 question.
21       THE WITNESS: I have no reason to question
22 Kristin's testimony. I'm sure she gave truthful
23 testimony.
24    Q. (BY MR. AIGEN) Are you aware of not or not
25 of whether Ms. Hendrix was told by Mr. Waterhouse not to

David Klos - October 27, 2021

**101**

1  make payments from certain entities in December of
2  2020?
3        MR. MORRIS: Objection to the form of the
4  question.
5        THE WITNESS: Yeah, I'm aware, and I think I
6  spoke to that earlier of the instruction that had come
7  down from Dondero through Frank to Kristin, and I was
8  certainly aware of it.
9        And I'm -- and I think I spoke to the fact
10 that, you know, certainly hearing it from a person who,
11 as I said before, wasn't really on the team at that
12 point, it was certainly my understanding that that was a
13 global instruction at the time.
14     Q. (BY MR. AIGEN) And I want to get into what
15 was actually said and what you remember, so let me ask
16 you this.
17        This instruction that came down started from
18 Jim and went to Frank. Is that your understanding?
19     A. That's my understanding.
20     Q. You weren't there during that discussion I
21 assume; is that correct?
22     A. Correct, I was not.
23     Q. And then Frank gave an instruction to
24 Kristin; is that your recollection?
25        MR. MORRIS: Objection to the form of the

**102**

1  question.
2        THE WITNESS: Yeah, it's my understanding
3  that Frank informed Kristin of that instruction.
4     Q. (BY MR. AIGEN) Were you there when Frank
5  provided this instruction to Kristin?
6     A. I don't believe I was.
7     Q. Then can I ask, how did you become aware that
8  Frank had given this instruction to Kristin?
9     A. Through subsequent conversations with Frank
10 and Kristin. As I said before, I don't recall if it
11 was the three of us or me and Frank or me and Kristin.
12 But subsequent conversations.
13     Q. Are we talking about conversations back in
14 2020 or after the bankruptcy?
15        MR. MORRIS: Objection to the form of the
16 question.
17        THE WITNESS: During 2020, December of 2020.
18     Q. (BY MR. AIGEN) Sitting here today, can you
19 say with a hundred percent certainty that the
20 instruction related to all of the entities as opposed
21 to just Advisors?
22     A. So as you pointed out, I was not party to the
23 direction, so I have no way of knowing with any sort of
24 specificity what the direction actually was. I just
25 know how it was conveyed to me and how I understood it.

**103**

1     Q. When you say it was conveyed to you, are you
2  talking about subsequent discussions that you had with
3  Ms. Hendrix and Mr. Waterhouse after they talked to
4  each other?
5     A. Yes.
6     Q. Sitting here today, can you tell me for sure
7  that one of them told you that this instruction related
8  to all of the entities, as opposed to just the
9  Advisors?
10    A. No, I can't say that with certainty, but I
11 think that that was the case. But, again, I can't say
12 with certainty.
13    Q. Would you defer to Mr. Waterhouse and
14 Ms. Hendrix over what the specific instructions were?
15        MR. MORRIS: Objection to the form of the
16 question.
17        THE WITNESS: Like I said, I wasn't part of
18 the conversation, so I would defer to people who
19 received the directions more directly.
20    Q. (BY MR. AIGEN) And you're not aware of
21 anything in writing or anything that reflects these
22 instructions on whether to pay or not to pay certain
23 payments in December of 2020?
24    A. No, I'm not aware of anything in writing.
25    Q. And let's change topics for a second here.

**104**

1        I want to throw out a term. Are you familiar
2  with the term "NAV ratio trigger period" as it was used
3  in --
4     A. In a very, very general sense, yes.
5     Q. And in a general sense what does that term
6  mean to you?
7     A. It's a term I recognize from the limited
8  partnership agreement of HCMLP. It's a defined term in
9  that agreement.
10    Q. To your knowledge, was the NAV ratio trigger
11 period ever reached or triggered prior to the Highland
12 bankruptcy?
13    A. I don't know the definition, so I don't know
14 based on the definition whether it had or hadn't.
15    Q. Sitting here today, though, it's not your
16 belief, based on your experience, that it was
17 triggered; is that fair to say?
18        MR. MORRIS: Objection to the form of the
19 question.
20        THE WITNESS: I don't know the consequence of
21 being in a trigger period, I guess is what -- how I'm
22 trying to answer your question.
23    Q. (BY MR. AIGEN) Have you ever had any
24 conversations with Nancy Dondero?
25    A. Yes.

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 05/09/22    Page 50 of 188    PageID 35123

27 (Pages 105 to 108)

David Klos - October 27, 2021

---

**105**

1    Q.  Generally, how many and what was the
2  reasoning?
3    A.  Probably less than five.  I think maybe only
4  one or two that I can really remember.
5    Q.  At a high level what were those conversations
6  about?
7    A.  From my recollection of my conversations with
8  her, they pertained to the DRIP, which is a dividend
9  reinvestment program that I helped.
10    Q.  And approximately when were these
11  conversations?
12    A.  I don't know.  Sometime between 2017 and
13  probably 2019.  I couldn't tell you with any
14  specificity.  These were very informal.
15    Q.  Fair to say that you've never had any
16  conversations with Nancy Dondero about any of the loans
17  at issue in this case?
18    A.  No, no, no, I've never had a conversation
19  with her like that.
20    Q.  And fair to say that you've never had any
21  conversations with Nancy Dondero about compensation for
22  Jim or any other officers at Highland?
23    A.  Correct.
24    MR. AIGEN:  Why don't we go off the record
25  for two minutes.  I think I'm either done or about

---

**106**

1  done.
2    (Off the record.)
3    Q.  (BY MR. AIGEN)  You understand you're still
4  under oath?
5    A.  Yes.
6    Q.  Are you aware of any loans that Highland has
7  made to any employees or officers that were forgiven in
8  all or in part?
9    A.  Yes.
10    Q.  Can you tell me who?
11    A.  I don't know that this will be a complete
12  list, but there were a few employees in the kind of
13  late aughts, maybe 2010, 2011 frame.
14    Q.  Do you know the names?
15    A.  One was Jack Yang.  Another, I'm not sure if
16  it was forgiven or not, that's why I'm hesitating, but
17  it was Tim Lawler.  I think his was forgiven in part or
18  in full, but I'm not a hundred percent certain.
19    Q.  And any other individuals that received loans
20  that were forgiven in part that you're aware of?
21    A.  Not that I recall, but there could be others.
22  Some of this is very, very old.
23    Q.  Changing topics here a little bit, I'm going
24  to combine two entities to try to speed this up.  If
25  you need to separate, that's fine.

---

**107**

1    Can you just generally explain to me what
2  services Highland Capital Management provided for
3  HCMS and HCRE?
4    A.  For HCMS -- I do need to separate these a
5  little bit.  For HCMS, really full-service accounting,
6  tax, treasury, cash payments.  I said tax.  Valuation.
7  Nothing personnel-wise because they didn't have any
8  employees.
9    That's all I can think of right off the top
10  of my head, but I could be missing some.
11    Q.  And what about HCRE?  How is that different?
12    A.  Similar, except different types of assets.
13  So more real estate, so less heavy.
14    Maybe not necessarily differences in terms of
15  the types of services, but services would have, I'd
16  say, more cash activity, more variety of investments,
17  which triggers different types of activities going on
18  at those entities.
19    But similar in terms of tax operations,
20  making payments.  HCRE didn't have employees, so no
21  payroll.  So these would be the broad areas that I
22  would think about.
23    Q.  And you mentioned making payments.  Would one
24  of those services that Highland provided for these two
25  entities include making loan payments on the term loans

---

**108**

1  like the term loans at issue in these proceedings?
2    MR. MORRIS:  Objection to the form of the
3  question.
4    THE WITNESS:  I think I mentioned before, I
5  couldn't remember whether or not Kristin was authorized
6  to make payments with respect to HCRE.  I think she
7  probably was, but I don't know that with certainty.
8    But, you know, for services, certainly Kristin
9  and her team would be responsible for making those
10  payments, subject to the proper authorization.
11    Q.  (BY MR. AIGEN)  And I'm sorry if I asked this
12  before.  If it wasn't Kristin for HCRE, do you have an
13  idea who it would have been?
14    A.  If not Kristin, it would have been Melissa
15  Schroth.
16    Q.  And how were those responsibilities split up?
17  What entities was Melissa Schroth responsible for?
18    A.  Generally speaking, Melissa was more
19  responsible for entities that were really, like -- I'm
20  going to use this in the most general sense, like Jim
21  entities, Jim's trusts, Jim personally.
22    And for HCRE it was kind of in the middle.
23  When it started out it kind of was more Jim world and
24  then over time it got more complex.
25    And as entities got more complex over time

---

David Klos - October 27, 2021

**109**

1  they tend to get transitioned from Melissa to corporate
2  accounting. And when they got really complex over to
3  another group of fund accountants.
4      So this is one that was, at its beginning,
5  Melissa was the, called primary accountant. And at
6  some point in time that transitioned to the corporate
7  accounting team. I can't remember when the cash
8  process kind of cut over.
9      Q. Is there a list somewhere saying Melissa is
10  responsible for these, Kristin for the others, or is it
11  just more of a pattern or matter of practice?
12      A. More of a matter of practice. If you're
13  responsible for an entity, you're responsible. If
14  you're not, then you're not.
15      MR. AIGEN: That's all the questions I have.
16  Thank you for your time.
17      THE WITNESS: Thank you.
18      EXAMINATION
19      Q. (BY MR. MORRIS) Just a few, Mr. Klos. Let's
20  pick up where Mr. Aigen left off.
21      To the best of your knowledge, did HCMS have
22  a shared services agreement with Highland?
23      A. No, it didn't that I'm aware of.
24      Q. But you described certain services that HCMLP
25  provided to HCMS; is that right?

**110**

1      A. Yes.
2      Q. Do you know whether HCMFA ever compensated --
3  do you know whether HCMS ever compensated HCMLP for any
4  of those services that HCMLP provided?
5      A. No, it didn't.
6      Q. You mentioned HCRE. To the best of your
7  knowledge, did HCRE have a shared services agreement
8  with Highland Capital Management, LP?
9      A. No, it didn't.
10      Q. Did HCRE provide the services that --
11  withdrawn.
12      Did HCMLP provide the services to HCRE that
13  you just described?
14      A. Yes.
15      Q. Did HCRE ever compensate HCMLP for any of the
16  services that HCMLP provided?
17      A. No.
18      Q. Okay. Mr. Rukavina asked you some questions
19  about payments that were made on the NexPoint loan in
20  the first half of 2019.
21      Do you remember that?
22      A. Yes, generally.
23      Q. Okay. Notwithstanding those payments, did
24  your group continue to carry on its books and records
25  NexPoint's obligation to make the installment payment

**111**

1  that was due at the end of the year?
2      A. Yes, we continued to track it through our
3  interest schedules and through cash.
4      Q. So in the debtor's books and records is there
5  any evidence that the payments that were made in early
6  2019 were intended to relieve NexPoint's obligation to
7  make the installment payment due at the end of the
8  year?
9      MR. RUKAVINA: Objection. Best evidence.
10      THE WITNESS: No, I don't believe so.
11      Q. (BY MR. MORRIS) Did you have a conversation
12  with anybody at any time in the year 2019 about whether
13  the payments made earlier in the year on behalf of
14  NexPoint would eliminate or suspend its obligation --
15  withdrawn.
16      Did you have any conversation with anybody --
17  I think I screwed up the dates. Going to have to start
18  over.
19      Let me ask better questions.
20      You looked with Mr. Rukavina at certain
21  payments that were made in early 2019 with respect to
22  the NexPoint note.
23      Do I have that right?
24      A. Yes.
25      Q. Notwithstanding those payments, did NexPoint

**112**

1  make the installment payment that was due at the end of
2  2019?
3      MR. RUKAVINA: Objection. Calls for a legal
4  conclusion.
5      THE WITNESS: It did make the payment that
6  was due at the end of 2019.
7      Q. (BY MR. MORRIS) And the payment that it made
8  at the end of 2019, was that the annual installment
9  payment that was called for in the note itself?
10      MR. RUKAVINA: Objection. Legal conclusion.
11      THE WITNESS: Yes, it was a payment pursuant
12  to the note.
13      Q. (BY MR. MORRIS) Did anybody ever tell you at
14  any time prior to the commencement of this lawsuit that
15  any prior payment by or on behalf of NexPoint relieved
16  it of any obligation to pay the installment payment due
17  at the end of 2020?
18      A. No.
19      Q. And did in fact -- is it your understanding
20  that Mr. Dondero specifically authorized Highland to
21  effectuate a payment on NexPoint's behalf in mid
22  January 2021?
23      A. I don't have specific knowledge, but I know
24  that to have occurred.
25      Q. Okay. Did anybody ever tell you in 2021 --

David Klos - October 27, 2021

113

1  withdrawn.
2      Did anybody tell you in December 2020 or
3  December -- or January 2021 that NexPoint didn't have
4  to make the installment payment at year end 2020
5  because of some prior prepayment?
6      A. No.
7      Q. Can you think of any reason -- withdrawn.
8      Did you ever hear Mr. Dondero -- withdrawn.
9      Did you ever see anything in writing where
10 NexPoint ever contended, prior to February 1, 2021,
11 that it had no obligation to make the payment due at
12 the end of 2020 because of some prepayment issue?
13     A. No, not that I remember.
14     Q. Can you think of any reason why Mr. Dondero
15 would have authorized a payment by NexPoint to HCMLP on
16 account of the note in January of 2021 if he actually
17 believed at that time that no obligation was due
18 because of a prior prepayment?
19     MR. RUKAVINA: Objection. Speculation, lacks
20 foundation.
21     THE WITNESS: No.
22     Q. (BY MR. MORRIS) Does it make any sense to
23 you as an accountant that you would pay a seven-figure
24 sum of money that you didn't think was due and owing?
25     A. No, that does not make sense to me.

114

1      Q. Can you get Exhibit 13, please.
2      A. Got it.
3      Q. You were asked some questions about
4  paragraph 3.
5      Do you see that?
6      A. Yes.
7      Q. Does paragraph 3 mention annual installment
8  payments at all?
9      A. No, I'm not seeing it.
10     Q. Does paragraph 3 state in any way that a
11 prepayment as described in that paragraph would relieve
12 the maker of the obligation to make annual installment
13 payments?
14     A. No.
15     Q. Can you turn to the next page and look at
16 paragraph 5.
17     Are you familiar with that paragraph at all?
18     A. No. I mean, I've seen it before, but this
19 is, as I said before, this is a provision that probably
20 would have been in most, if not all, of these types of
21 notes.
22     Q. Can you get Exhibit 3, please. This is your
23 email dated May 2, 2019.
24     Do I have that right?
25     A. Yes.

115

1      Q. And you sent it to the corporate accounting
2  email group; is that right?
3      A. I did.
4      Q. And to the best of your recollection, was
5  Mr. Waterhouse included in that email group?
6      A. Yes, absolutely.
7      Q. And did you instruct the corporate accounting
8  team to transfer $2.4 million from HCMLP to HCMFA on
9  May 2, 2019?
10     A. Yes, specifically Blair, but yes, for the
11 team as well.
12     Q. The whole team was aware of this?
13     A. The whole team is on the email, and I'm
14 sending to Blair, who is the AP person, to please set
15 up the payment.
16     Q. Is it fair to say that you're being
17 completely transparent here by including the entire
18 corporate accounting group on this email?
19     A. Yes.
20     Q. And did you tell the entire corporate
21 accounting group that this transaction would be a,
22 quote, new interco loan?
23     A. Yes, that's what the email says.
24     Q. Do you have any reason to believe that
25 Mr. Waterhouse didn't get this?

116

1      A. No, he got this.
2      Q. And did Mr. Waterhouse tell you at any time
3  in the history of the world that this $2.4 million
4  should not have been booked as a loan?
5      A. No.
6      Q. Did Mr. Dondero tell you at any moment in the
7  history of the world that this transaction should not
8  have been booked as a loan?
9      A. No.
10     Q. You mentioned that there was an audit that
11 followed shortly thereafter?
12     A. Yes.
13     Q. Are you familiar with the debtor's audited
14 financial statements for the period ending 2018?
15     A. Yes, generally. Not total recall, but yes.
16     Q. Are you aware that this loan was included as
17 a subsequent event in the debtor's audited financial
18 statements?
19     A. Yes.
20     MR. RUKAVINA: Objection. Best evidence.
21     Q. (BY MR. MORRIS) Did Mr. Dondero or
22 Mr. Waterhouse or anybody ever tell you that the debtor
23 should not have included this $2.4 million loan in its
24 audited financial statements?
25     MR. RUKAVINA: Objection. Best evidence.

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 123    Filed 06/30/48    Page 53 of 188    PageID 35126

30 (Pages 117 to 120)

David Klos - October 27, 2021

---

**117**

1    THE WITNESS:  No.
2    Q.  (BY MR. MORRIS)  Okay.  And the next day
3  there was another loan; right?
4    A.  Yes.
5    Q.  I'm going to show you here a document that's
6  been produced.
7    MR. RUKAVINA:  Would you email it to me and I
8  can print it out for the court reporter.
9    MR. MORRIS:  You want to come over here and
10  look --
11    MR. RUKAVINA:  I know it.  I'm just thinking
12  that we can append it to the record right now.
13    MR. MORRIS:  It's eight pages, so it's part
14  of a whole production.
15    MR. RUKAVINA:  But it's just one email?
16    MR. MORRIS:  Just one email that I'm talking
17  about.  So we're looking at Bates stamp D-CNL003763.
18    And I'll email it to you when we're done here.
19  And you're welcome to come over here if you'd like to
20  see it.
21    Q.  (BY MR. MORRIS)  Mr. Klos, can you take a
22  look at the email that I have on my screen.
23    A.  Yes.
24    Q.  And do you see that it's an email from
25  Kristin Hendrix to the corporate accounting group on

---

**118**

1  Friday, May 3?
2    A.  Yes.
3    Q.  And were you also included in the corporate
4  accounting email string?
5    A.  Yes.
6    Q.  Can you read the email out loud, please.
7    A.  It says, Blair, please set up a wire from
8  HCMLP to HCMFA for 5 million as a new loan,
9  parentheses, 4.4 million should be coming in from Jim
10  soon.  Hayley, please add this to your loan tracker.  I
11  will paper the loan.
12    Q.  So based on that email, did you understand on
13  May 3 that HCMLP was going to loan $5 million to HCMFA?
14    A.  Yes, HCMFA.
15    Q.  And did you understand that Kristin
16  specifically told the corporate accounting group that
17  she would take responsibility for papering the loan?
18    A.  Yes, that's what she says.
19    Q.  Do you recall whether Mr. Waterhouse ever
20  objected to any aspect of Kristin's email?
21    A.  He didn't.
22    Q.  Do you recall in the history of the world
23  whether Mr. Waterhouse ever told you that this
24  $5 million transaction should not have been booked as a
25  loan?

---

**119**

1    A.  No.
2    Q.  Did anybody in the history of the world ever
3  raise a question to you as to whether or not Kristin
4  was authorized to paper the loan, as she describes it
5  in this particular email?
6    A.  No.
7    Q.  Do you know if this $5 million loan was also
8  included in the debtor's audited financial statements?
9    MR. RUKAVINA:  Objection.  Best evidence.
10    THE WITNESS:  Yes.  Again, subsequent event.
11    Q.  (BY MR. MORRIS)  Okay.  And did anybody in
12  the history of the world ever tell you that Highland
13  should not have included as a subsequent event in its
14  2018 audited financial statement this $5 million loan?
15    A.  No.
16    MR. RUKAVINA:  Objection.  Best evidence.
17    THE WITNESS:  No.
18    Q.  (BY MR. MORRIS)  Do you know if HCMFA had its
19  financial statements audited?
20    A.  It did.
21    Q.  And are you generally familiar with those
22  financial statements?
23    A.  Yes.
24    Q.  Are you aware that these two loans totaling
25  $7.4 million were included in HCMFA's audited financial

---

**120**

1  statements as a subsequent event for the period ended
2  December 31, 2018?
3    A.  Yes.
4    MR. RUKAVINA:  Objection.  Best evidence.
5    Q.  (BY MR. MORRIS)  Did anybody in the history
6  of the world ever tell you that HCMFA should not have
7  included as a subsequent event the borrowing of the
8  money reflected in these loans?
9    MR. RUKAVINA:  Objection.  Best evidence.
10    THE WITNESS:  No, no one said that.
11    Q.  (BY MR. MORRIS)  Do you know if HCMFA
12  included these loans as a liability on its balance
13  sheet?
14    A.  It did.
15    MR. RUKAVINA:  Objection.  Move to strike.
16  Best evidence.
17    Q.  (BY MR. MORRIS)  Did anyone in the history of
18  the world ever tell you that HCMFA should not have
19  included these loans as a liability on its balance
20  sheet?
21    MR. RUKAVINA:  Objection.  Best evidence.
22    THE WITNESS:  No.
23    Q.  (BY MR. MORRIS)  Okay.  Do you recall that in
24  October of 2020 HCMFA and NexPoint made a report to the
25  retail board?

---

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/29/24    Page 54 of 188    PageID 35127

31 (Pages 121 to 124)

David Klos - October 27, 2021

121

1    A.  Yes.
2    Q.  And are you aware that that's part of the
3 annual review process?
4    A.  Yes, it's the 15(c) process.
5    Q.  By the way, as we're talking about these
6 issues, did Mr. Waterhouse have -- was he an officer of
7 HCMFA in 2019 and 2020?
8    A.  Yes.
9    Q.  And what's your understanding as to the
10 office he held?
11    A.  Treasurer, I believe.
12    Q.  And do you know if Mr. Dondero held an
13 officer position with respect to each of the Advisors?
14    A.  He did.
15    Q.  What position did he hold?
16    A.  I don't recall with certainty, but I believe
17 president.
18    Q.  As officers of those two entities, do you
19 have any knowledge as to whether they participated in
20 the communications with the retail board in the fall of
21 2020?
22    A.  I believe Jim and Frank both did.
23    Q.  And do you know whether the retail board
24 asked the Advisors for a report on all obligations due
25 and owing to HCMLP and affiliates?

122

1    A.  They asked for financials, I believe as of
2 6/30 as part of that process.
3    Q.  And are you aware as to whether or not the
4 financials that were provided to the retail board
5 included, among other things, the $7.4 million in notes
6 that were -- that we're talking about here?
7    A.  Yes, those financials would have included
8 those amounts as liabilities to HCMLP.
9    Q.  Did Mr. Dondero or Mr. Waterhouse ever tell
10 you or anybody to your knowledge that the Advisors
11 should not have told the retail boards that they were
12 obligated to pay under those two notes?
13    A.  No.
14    Q.  Let's talk about loan forgiveness for a
15 moment.
16        How long have you been with the company?
17    A.  March of 2009.
18    Q.  At any time since you've been employed by
19 Highland, has Highland ever forgiven a promissory note
20 that it held where the maker was a corporate affiliate?
21    A.  Not that I can recall.
22    Q.  Have you ever heard prior -- has anybody ever
23 told you that before you joined the company, Highland
24 had ever forgiven in whole or in part any note that it
25 held where the maker was a corporate affiliate?

123

1    A.  Not that I'm aware of.
2    Q.  You referred to a couple of loans that were
3 given to individuals earlier.
4        Do you remember that?
5    A.  Yes.
6    Q.  What's the biggest loan that you can recall
7 Highland ever forgiving?
8    A.  The largest one that I can remember was
9 a half-million dollars, 500,000.
10    Q.  So you have no knowledge of any loan ever
11 being forgiven where the principal amount forgiven
12 exceeded $500,000; is that right?
13    A.  Not that I'm aware of.
14    Q.  And when is the last loan that Highland
15 forgave in whole or in part to one of its officers or
16 employees that you can recall?
17    A.  I don't know a specific year, but it would
18 have been in the 2010, 2011 time frame.  Maybe 2012,
19 but I suspect '10 or '11.
20    Q.  So is it fair to say to the best of your
21 recollection and knowledge that Highland did not
22 forgive a single loan made to an officer or employee
23 for at least seven years prior to the petition date?
24    A.  There's none that I can think of.
25    Q.  Let's just turn our attention to

124

1 December 2020.
2        Do you recall that you testified at length
3 about your understanding of the conversations with
4 Mr. Waterhouse and Ms. Hendrix?
5        Do you remember that?
6    A.  Yes.
7    Q.  Okay.  Are you aware of any instruction ever
8 made by Mr. Dondero or Mr. Waterhouse in November or
9 December 2020 in order to make the payments that were
10 due under the three term notes -- withdrawn.
11        There were three term notes that were due --
12 withdrawn.
13        There are three term notes at issue in this
14 case.  Do you understand that?
15    A.  Yeah, that's my understanding.
16    Q.  And one of them was issued by NexBank; is
17 that right?
18    A.  NexPoint Advisors.
19    Q.  Thank you for the clarification.
20        One was by HCRE?
21    A.  Correct.
22    Q.  And one was from HCMS; do I have that right?
23    A.  Yes.
24    Q.  And all three of those notes were executed as
25 of May 31, 2017; right?

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 06/15/22    Page 55 of 188    PageID 35128

32 (Pages 125 to 128)

David Klos - October 27, 2021

**125**

1    A. Yeah, that was the effective date on all
2  three.
3    Q. And they all rolled up previously outstanding
4  notes that were due and payable to Highland.
5       Do I have that right?
6    A. Correct. To the best of my recollection.
7    Q. So we'll refer to those notes as the term
8  notes. Is that okay?
9    A. Sure.
10    Q. Do you have any knowledge that Mr. Dondero or
11  Mr. Waterhouse ever instructed HCMLP to make the
12  installment payments that were due at the end of 2020
13  with respect to any of those term notes?
14    A. No, I don't believe they provided that
15  instruction to make those payments.
16       MR. RUKAVINA: Objection. Move to strike.
17  Lacks foundation.
18       MR. MORRIS: I'm asking him if he ever heard.
19       MR. RUKAVINA: But he answered a different
20  question. He answered a different question.
21    Q. (BY MR. MORRIS) Did you ever see anything in
22  writing where either Mr. Dondero or Mr. Waterhouse
23  directed HCMLP to make the annual installment payments
24  that were due at the end of 2020 with respect to any of
25  the term notes?

**126**

1    A. No.
2    Q. Okay. But to the best of your recollection,
3  in the 13-week forecast, those forecasts included the
4  installment payments that were due at the end of the
5  year; is that right?
6    A. They did.
7    Q. Did anybody ever tell you prior to
8  February 1, 2021, that your group had made a mistake by
9  not making the payment -- any of the payments that were
10  due under the term notes at the end of 2020?
11    A. Not that I'm aware of.
12    Q. Did anybody tell you prior to February 1,
13  2021, that the makers of the term notes expected
14  Highland to effectuate the payments that were due at
15  the end of the year without approval by Mr. Waterhouse
16  or Mr. Dondero?
17    A. No.
18    Q. Have you seen any protest in writing prior to
19  the commencement of the litigation by any of the makers
20  of the notes about a failure on the part of HCMLP to
21  perform its duties and make that payment at the end of
22  the year?
23    A. No.
24       MR. MORRIS: I have no further questions.
25       MR. RUKAVINA: I have five minutes.

**127**

1       FURTHER EXAMINATION
2    Q. (BY MR. RUKAVINA) Go to Exhibit 16, please,
3  1-6.
4    A. Sure.
5    Q. Sir, this is an email string regarding that
6  Rule 15(c) that you were talking about. I'm just going
7  to ask you about the top email, but you're welcome to
8  read the whole.
9    A. Uh-huh.
10    Q. You're copied on Mr. Waterhouse's email there
11  October 6, 2020; right?
12    A. Yes, I'm on the email.
13    Q. And Mr. Waterhouse writes, the HCMFA note is
14  a demand note. You would have read that; right?
15    A. Yes.
16    Q. Did you ever correct Mr. Waterhouse when he
17  says the HCMFA note, as opposed to notes?
18    A. No, that's not something I would have
19  corrected from Frank.
20    Q. Do you recall right now that you might have,
21  when you read this, realized that he made a mistake?
22    A. It would have been such a de minimus,
23  inconsequential mistake that I don't know that I would
24  have addressed it.
25    Q. What about two sentences over, there was an

**128**

1  agreement between HCMLP and HCMFA the earliest they
2  could demand is May 2021.
3       Did you ever write to him and say that too
4  was a mistake?
5    A. I didn't write to him.
6    Q. Did you realize back then when you read it
7  that he had made a mistake?
8    A. I'm not certain.
9    Q. Did you -- and I'm not suggesting that you
10  should have. You're a busy man. But did you attach
11  any significance outside of the ordinary to this email
12  exchange?
13       MR. MORRIS: Objection to the form of the
14  question.
15       THE WITNESS: I struggle with how to answer
16  that. I saw that this note was in response to retail
17  15(c) follow-up on the Advisors.
18       At this point my role was different, where I
19  was dealing with really the retail funds primarily. So
20  the fact that I'm even on this email is somewhat
21  incidental.
22    Q. (BY MR. RUKAVINA) But surely on October 6,
23  2020 you knew that there were four HCMFA demand notes,
24  didn't you?
25    A. I'm sure I would have had access to that

David Klos - October 27, 2021

**129**

1 information. I'm not sure that I was keeping track of
2 how many were outstanding at any given point in time.
3      Q. And surely on October 6, 2020 you knew that
4 only two of them couldn't be demanded by May of 2021,
5 didn't you?
6      A. Again, I don't know that I was even really
7 thinking about these notes at that time.
8      Q. Even though you were preparing weekly cash
9 forecasts for Mr. Seery?
10     A. I wasn't preparing a weekly cash forecast for
11 Mr. Seery.
12     Q. Going to Exhibit 13, please. Mr. Morris
13 asked you a couple questions about this.
14     A. I'm sorry, 13?
15     Q. Yes, sir. And again, that paragraph 3 that
16 talks about prepayment.
17         Can you find anything in here, sir, that says
18 that a prepayment does not relieve the maker of any
19 regularly scheduled payment?
20     A. Sorry, that's a lot to comprehend. If you
21 could ask again.
22     Q. Is there any provision that you can see here
23 that's to the effect that a prepayment will not relieve
24 the maker of any regularly scheduled payment?
25     A. I don't see that specific provision. I just

**130**

1 read it for what is on the page.
2      Q. Isn't it, sir, in your experience the case
3 that a promissory note, if it intended not to relieve
4 the borrower of regularly scheduled payments would say
5 that a prepayment does not relieve the borrower of
6 regularly scheduled payments?
7      MR. MORRIS: Objection to the form of the
8 question.
9      THE WITNESS: That's a legal question. I
10 can't -- I don't know the answer.
11     Q. (BY MR. RUKAVINA) Do you remember seeing
12 promissory notes that say something like that?
13     A. Not that I can recall.
14     Q. You'd be surprised if that's what promissory
15 notes say?
16     MR. MORRIS: Objection to the form of the
17 question.
18     THE WITNESS: I don't know.
19     Q. (BY MR. RUKAVINA) And Mr. Morris asked you
20 about this. I'm trying to burn through this so the man
21 can make his plane.
22         Section 2.1 talks about 30 equal annual
23 payments, annual installments.
24         You see that?
25     A. Yes, I see that.

**131**

1      Q. And Mr. Morris asked you whether you see
2 anything in here that says that a prepayment relieves
3 an annual installment.
4          Do you remember that question?
5      MR. MORRIS: Objection. That's not what I
6 asked.
7      THE WITNESS: I don't remember that question.
8      Q. (BY MR. RUKAVINA) Reading Section 2.1 and 3
9 together, what would a prepayment apply to other than
10 an annual installment? Do you have a view on that?
11     MR. MORRIS: Objection to the form of the
12 question.
13     THE WITNESS: Again, I struggle with
14 prepayment. But as I read Section 3, it would be
15 applied first to unpaid accrued interest and then to
16 unpaid principal.
17     Q. (BY MR. RUKAVINA) Have you ever in your
18 personal life prepaid a promissory note before -- have
19 you ever in your personal life prepaid a promissory
20 note prior to its maturity?
21     MR. MORRIS: Objection to the form of the
22 question.
23     THE WITNESS: I don't know.
24     Q. (BY MR. RUKAVINA) Sitting here today, with
25 your CPA, your MBA and you're a CFO of a large entity,

**132**

1 you don't understand what a prepayment means?
2      MR. MORRIS: Objection. Argumentative.
3      I direct you not to answer.
4          You're going to have ask a different question.
5 That's an argumentative question and it's insulting.
6      MR. RUKAVINA: What's the privilege on which
7 you're directing him not to answer?
8      MR. MORRIS: I just said it's argumentative.
9      MR. RUKAVINA: I'm trying to let you get to
10 your flight.
11     MR. MORRIS: Ask a proper question. Don't
12 make this about me.
13     Q. (BY MR. RUKAVINA) You were going to answer
14 my question, sir?
15     MR. MORRIS: No, I'm directing him not to
16 answer.
17     MR. RUKAVINA: Then we'll end this deposition
18 with a motion to compel.
19     MR. MORRIS: Okay. You do that.
20     MR. RUKAVINA: I'm making a motion to compel.
21 We'll call the judge as soon as we land in New York
22 tomorrow.
23     MR. MORRIS: You have to read the whole
24 question. You can ask the question without the
25 verbiage; right?

David Klos - October 27, 2021

**133**

1    MR. RUKAVINA: And I asked you on the basis
2 of what privilege are you instructing your --
3    MR. MORRIS: Argumentative.
4    MR. RUKAVINA: That's not a privilege.
5    MR. MORRIS: Sir, you can rephrase your
6 question and end this right now by not being insulting
7 to my client.
8    Q. (BY MR. RUKAVINA) I was not trying to be
9 insulting, sir.
10    I'm asking you again, you do not, sitting
11 here today, have an understanding of what the word
12 "prepayment" for a promissory note means?
13    MR. MORRIS: Objection to the form of the
14 question.
15    You can answer that one.
16    THE WITNESS: In the context that you're
17 asking the question --
18    Q. (BY MR. RUKAVINA) No, I'm not asking any
19 context. Sitting here today, do you have an
20 understanding of what the word "prepayment" means when
21 it comes to a borrower/lender relationship?
22    MR. MORRIS: Objection to the form of the
23 question.
24    THE WITNESS: Yes, I have a general
25 understanding.

**134**

1    Q. (BY MR. RUKAVINA) What is your
2 understanding?
3    A. That -- you can look at the note.
4    Q. I'm not asking about the note. We got to go
5 step by step.
6    What is your general understanding as to what
7 a prepayment means?
8    MR. MORRIS: Objection to the form of the
9 question.
10    THE WITNESS: It depends on the context and
11 it's going to depend on what the note says about
12 prepayments. So I have a hard time answering that
13 question.
14    Q. (BY MR. RUKAVINA) So you would agree with me
15 that you have to look at the note before you can answer
16 that question?
17    MR. MORRIS: Objection to the form of the
18 question.
19    THE WITNESS: I would want to look at the
20 note before I answer the question, because prepayment
21 is a term that can be used as a defined term or in a
22 casual sense, and those two can sometimes get confused
23 and misconstrued.
24    Q. (BY MR. RUKAVINA) Would you agree with me
25 that in any and all circumstances a prepayment is a

**135**

1 payment made prior to the time that it's due?
2    MR. MORRIS: Objection to the form of the
3 question.
4    THE WITNESS: Yes, in the most general sense
5 a prepayment, the prefix "pre" indicates that it's
6 before some other event. So from that standpoint,
7 prepayment means it was to some extent paid early.
8    MR. RUKAVINA: Thank you.
9    Pass the witness.
10    MR. MORRIS: No further questions.
11    Michael?
12    MR. AIGEN: No questions.
13    THE REPORTER: Mr. Morris, do you want a copy
14 of the transcript?
15    MR. MORRIS: I sure do.
16    THE REPORTER: Mr. Aigen, do you want a copy
17 of the transcript?
18    MR. AIGEN: Yes, we would also like a copy.
19    MR. MORRIS: Yeah, and I'd like that rush.
20    (Whereupon, the deposition adjourned at
21    5:14 P.M.)
22    --oOo--
23    I declare under penalty of perjury that the
24 foregoing is true and correct. Subscribed at
25 _____, Texas, this ____ day of

**136**

1 _____, 2021.
2
3
4 _____
5 DAVID KLOS
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 06/08/22    Page 58 of 188    PageID 35131

35 (Pages 137 to 138)

David Klos - October 27, 2021

**137**

1           CERTIFICATE OF REPORTER
2           I, BRANDON D. COMBS, a Certified Shorthand
3    Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell the
5    truth, the whole truth, and nothing but the truth in the
6    within-entitled cause;
7           That said deposition was taken in shorthand by
8    me, a disinterested person, at the time and place
9    therein stated, and that the testimony of the said
10   witness was thereafter reduced to typewriting, by
11   computer, under my direction and supervision;
12          That before completion of the deposition,
13   review of the transcript was not requested.  If
14   requested, any changes made by the deponent (and
15   provided to the reporter) during the period allowed are
16   appended hereto.
17          I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22          **DATED:** November 1, 2021
23
24          _____
25          Brandon Combs, Certified Shorthand

**138**

1    State of Texas
     Dickman Davenport, Inc. Cert 312
2    4228 North Central Expressway
     Suite 101, Dallas, TX 75206
3    (214) 855-5100   (800) 445-9548
     Email: info@dickmandavenport.com
4    www.dickmandavenport.com
     My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

David Klos - October 27, 2021

**A**

**ability** 42:12
43:21 78:2 88:8
88:10
**able** 31:20 32:2
**above-styled**
1:21
**absolutely** 12:4
16:10 77:1 80:1
80:14 90:1,4,10
94:1 115:6
**accepting** 19:17
**access** 99:13
128:25
**account** 53:20
60:3 113:16
**accountant** 26:5
26:9,15,20
39:12,17 90:19
109:5 113:23
**accountant's**
39:13
**accountants**
109:3
**accounted** 38:6
45:8,11 64:23
**accounting** 4:16
6:5,5,11,11
7:14,17,21 8:23
9:3,5,5,9,15,23
10:12 33:22
35:9,16,20
43:18 53:4
62:10,11 70:15
74:22 84:2
107:5 109:2,7
115:1,7,18,21
117:25 118:4
118:16
**accrue** 49:13
**accrued** 38:8
46:8,16,20,25
47:1,4,5,11,14
47:18,19,24,25
48:4,5,7,15

49:4,5,12,20,21
50:8,21 51:3
131:15
**accumulated**
47:22
**accurate** 27:25
85:10
**acknowledgment**
87:21,22
**act** 11:5
**activities** 107:17
**activity** 107:16
**actual** 37:5 85:13
**add** 118:10
**additional** 89:2
**address** 64:7
**addressed** 44:9
127:24
**adjourned**
135:20
**advisor** 9:24 71:7
74:19
**advisor-type** 6:7
**advisors** 1:10
12:14,15,17
13:3,6 27:1
52:19 55:1
60:22 65:23
71:6 72:22 86:6
99:20 100:17
102:21 103:9
121:13,24
122:10 124:18
128:17
**affect** 16:11,12
16:20
**affiliate** 39:23
122:20,25
**affiliated** 10:21
34:8 35:4,11
36:2 61:15
**affiliates** 38:5
51:20 121:25
**AFR** 86:7
**afternoon** 95:22

**agent** 85:16
**ago** 19:6 34:25
36:20 39:21
43:5 94:20
95:11
**agree** 8:11 47:10
47:11 51:7 77:2
89:19 134:14
134:24
**agreement** 12:23
84:11 96:4,8,23
97:9 98:5,12
104:8,9 109:22
110:7 128:1
**agreements** 41:3
97:16,23 98:1
**agrees** 48:7
**ahead** 45:7
**Aigen** 2:18 3:4
95:18,22,23
99:8 100:3,10
100:12,14,24
101:14 102:4
102:18 103:20
104:23 105:24
106:3 108:11
109:15,20
135:12,16,18
**Akard** 1:24 2:4
**aleck** 50:7
**alleged** 97:22
98:5
**Allocation** 70:25
74:12 75:6
**allow** 75:4
**allowed** 46:13
81:22 82:1
94:16 96:20
137:15
**allowing** 96:8
**amortization**
23:16 28:1
**amount** 15:5,15
37:5 47:22
59:13 73:2

80:21 84:14
97:12 123:11
**amounts** 28:24
41:7 122:8
**analysis** 30:9
53:25 54:6,9,18
55:1,8 89:13
**analyst** 5:17,25
**and/or** 40:12
67:7 91:22
**annual** 23:22
80:9 112:8
114:7,12 121:3
125:23 130:22
130:23 131:3
131:10
**answer** 16:23,25
17:2 20:18,20
21:3,15 22:1
25:5 28:10
35:16 41:18
50:11 53:24
55:15,23 71:5
78:11 79:7 87:7
94:13,14,17,21
104:22 128:15
130:10 132:3,7
132:13,16
133:15 134:15
134:20
**answered** 21:2
41:17 56:11
76:19 85:21
91:10 92:5,6
94:9 125:19,20
**answering**
134:12
**answers** 9:18
16:10,13
**anybody** 24:13
60:1 80:16
111:12,16
112:13,25
113:2 116:22
119:2,11 120:5

122:10,22
126:7,12
**anymore** 57:1
61:22 62:7
**AP** 115:14
**apologize** 9:21
27:22 63:11
66:21 77:1
**apparatus** 12:9
**APPEARANC...**
2:1
**appeared** 2:5,12
2:19
**appears** 49:3
64:2
**append** 117:12
**appended** 137:16
**application** 37:8
37:9,15,16
**applied** 39:17
46:8,9 48:11,14
49:5,8 64:13,16
65:1 131:15
**apply** 38:24
131:9
**Appreciate**
100:13
**appropriate**
35:19,22
**approval** 66:14
77:19,23 78:3
78:21 79:3
126:15
**approvals** 80:9
**approximate** 6:1
63:2
**approximately**
5:9 105:10
**April** 7:13,22
11:16,21 88:9
**areas** 107:21
**argumentative**
90:15 132:2,5,8
133:3
**art** 8:1 9:3 10:12

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/09/22    Page 60 of 188    PageID 35133

140

David Klos - October 27, 2021

ascertain 45:2,4
asked 16:18 20:5
  21:2 30:18
  41:10,17 44:10
  54:13 55:17,22
  56:11 57:12,15
  59:12 70:9
  76:19 84:8,17
  85:21 86:10
  91:10 92:5 94:9
  108:11 110:18
  114:3 121:24
  122:1 129:13
  130:19 131:1,6
  133:1
asking 18:11
  20:21 28:6
  38:20 56:9,13
  61:5,7 77:13
  83:22 94:15
  100:9 125:18
  133:10,17,18
  134:4
aspect 118:20
ass 17:18
asserted 97:7
  98:8
asset 15:7
assets 15:3 87:10
  87:12 97:12
  107:12
assist 42:13
assistance 31:13
assistant 6:24 7:4
  7:7,10 8:8
assisted 22:23
assume 28:7 29:7
  90:6 95:18
  101:21
assumed 7:14
  53:3
assuming 36:14
  36:21 41:23
  64:1
assumptions

54:14
attach 128:10
attempt 87:7
attention 123:25
attorney 2:5,12
  2:18 137:18
audit 9:25 24:6
  80:4 116:10
audit-driven
  88:5
audited 116:13
  116:17,24
  119:8,14,19,25
auditor 24:3
auditors 24:5
  88:6,14
aughts 106:13
August 42:16
  44:13
authenticate 28:5
authenticity
  67:23
authoritative
  65:1,2
authority 36:9
  77:3,13,15 78:7
  78:21,25
authorization
  108:10
authorize 77:4
authorized 40:2
  59:15 69:6,25
  85:24 108:5
  112:20 113:15
  119:4
authorizing
  94:20
Avenue 2:11,17
aware 35:6 58:24
  59:2,3 80:18,21
  96:6,10,12
  97:15 100:24
  101:5,8 102:7
  103:20,24
  106:6,20

109:23 115:12
116:16 119:24
121:2 122:3
123:1,13 124:7
126:11
awfully 17:20

_____

          B
back 6:14 15:19
  22:12 23:21,25
  36:11 40:18
  49:17 51:13
  55:16 65:12
  67:4 68:25
  82:23 83:19
  84:4 85:12
  102:13 128:6
back-end 15:19
  15:21
back-ended
  14:25
background 4:13
  53:2 70:5,6,7
backup 36:19
bad 20:12 89:15
balance 49:6
  80:6,8 120:12
  120:19
ballpark 85:24
bank 36:17 99:13
bankruptcy 1:1
  31:19 80:10
  96:15 98:12
  102:14 104:12
base 14:5,7
based 14:11,14
  32:12 37:17
  46:5,7 48:12,19
  54:14 104:14
  104:16 118:12
basically 6:3
  31:13 56:1 81:5
basis 23:22 30:2
  133:1
Bates 83:15

117:17
began 5:11
beginning 109:4
behalf 2:6,13,20
  12:24 25:2 78:2
  78:22 79:1
  111:13 112:15
  112:21
beings 71:19
belief 104:16
believe 6:23
  15:11 16:3 17:3
  17:8 18:2 19:23
  21:13,13 22:20
  23:13,19 24:16
  26:13 49:9 51:1
  51:2 74:16
  77:17 78:1,7,19
  81:8 83:1,3
  86:25 102:6
  111:10 115:24
  121:11,16,22
  122:1 125:14
believed 35:10
  57:6 113:17
beneficiaries
  17:10,15
benefiting 73:9
best 5:25 8:3
  52:15,17 55:7
  63:24 64:4
  78:16,17 85:8
  95:19 109:21
  110:6 111:9
  115:4 116:20
  116:25 119:9
  119:16 120:4,9
  120:16,21
  123:20 125:6
  126:2
better 111:19
biggest 123:6
bill 74:20
bills 82:4,5,10,11
birth 4:9

bit 7:9 12:12 14:2
  30:15 33:12
  39:3 48:1 98:15
  106:23 107:5
Blair 115:10,14
  118:7
board 120:25
  121:20,23
  122:4
boards 122:11
bold 40:25
bonus 14:8,9,10
  14:19,24 15:14
  18:5 90:21
book 33:21 34:12
  34:20
booked 32:23
  33:11 34:9 35:5
  35:20 36:24
  44:23 90:8
  116:4,8 118:24
books 80:7
  110:24 111:4
borrow 78:22
borrower 45:6,15
  45:19,24 46:2
  130:4,5
borrower/lender
  133:21
borrowing 120:7
boss 39:13
Boston 4:15 5:8
  5:10
brain 32:9
Brandon 1:22
  137:2,25
break 7:6
bridge 29:22
  30:6
briefly 13:5
bring 49:6
broad 9:22 35:17
  61:3 107:21
broader 76:8
broken 53:16

David Klos - October 27, 2021

brokers 10:17
brought 6:4,14
  31:3,7 97:15
bucks 74:25
budgeting 6:8
burn 130:20
businesses 30:1
busy 11:15,19
  128:10

**C**
call 6:4 11:11,13
  38:10 63:14
  90:16 132:21
called 9:24 58:21
  59:11 70:24
  74:16 88:7
  109:5 112:9
calling 90:24
Calls 112:3
capital 1:6,9 5:11
  6:6 8:4 13:6
  23:22,23 26:19
  26:23 27:1 29:4
  29:19 32:6,23
  35:3 37:25 71:6
  107:2 110:8
car 82:9
career 11:20
careful 17:21
carry 110:24
case 43:20 86:24
  89:18 103:11
  105:17 124:14
  130:2
cash 9:25 23:21
  23:24 25:23,24
  26:7 31:9,10,12
  31:14,16,23
  32:8,12,14
  41:15,24 42:12
  42:23 43:5,22
  43:24 44:1
  57:25 61:25
  63:2 73:20

88:12,17 93:7
93:20,21 107:6
107:16 109:7
111:3 129:8,10
casual 134:22
caught 62:5
cause 1:21 137:6
  137:20
caused 79:12
  81:10
causes 82:9
Central 138:2
Cert 138:1
certain 5:17
  11:13 12:21,21
  13:12 23:14
  33:13 38:1
  54:14 67:21
  70:12 83:9
  95:11 96:9
  97:10 98:17
  99:14 101:1
  103:22 106:18
  109:24 111:20
  128:8
certainly 6:18
  9:17 12:3 20:10
  26:4 30:11
  32:16 34:4
  35:18 37:23,24
  42:11 50:4 58:8
  62:14 69:1
  77:13,24 86:22
  101:8,10,12
  108:8
certainty 29:13
  42:19 68:18
  69:8,11,24 70:2
  102:19 103:10
  103:12 108:7
  121:16
CERTIFICATE
  137:1
Certified 137:2
  137:25

certify 137:3,17
cetera 6:1 14:20
CFO 5:21,25
  8:18 48:6,21
  131:25
chain 53:5
chance 69:4
change 8:8 16:10
  46:10 59:1
  84:13 103:25
changed 6:18
  39:11 84:16
changes 7:1
  137:14
Changing 106:23
characterize 54:1
  76:10 87:18,19
characterized
  54:2
charge 6:15 10:3
chief 7:13,17,21
  8:23,23 9:3
  10:12 13:20,22
  53:3
circumstance
  51:1
circumstances
  31:2 134:25
claim 81:1,9
claimant 15:16
  18:6
clarification
  124:19
clarify 11:3 12:8
  53:1 66:18
  75:25
clear 17:21 26:19
  27:11 29:14
  52:24 63:9
  69:15,16 73:13
clearly 74:2
client 133:7
clients 17:25
Cliff 7:23
close 17:21 33:14

98:3
closed-end 74:14
closely 62:4
coach 100:11
coaching 100:10
  100:13
cold 46:6
collect 81:17
collected 81:19
collectible 87:15
collecting 15:16
  81:6,6
collection 87:25
collective 52:2
college 4:15 5:6
column 36:25
  37:7
combination
  39:16 45:12
combine 106:24
Combs 1:22
  137:2,25
come 47:12 53:7
  59:19 65:3,5
  76:22 101:6
  117:9,19
comes 133:21
comfortable 88:6
coming 17:20
  36:13 118:9
command 53:5
commencement
  112:14 126:19
comment 17:13
commission
  138:4
common 30:5
  86:5
communicated
  95:12
communicating
  53:9
communication
  83:10
communications

121:20
company 81:14
  122:16,23
compel 132:18,20
compensate 72:8
  72:12 79:14
  89:20 110:15
compensated
  17:16 110:2,3
compensation
  14:3,6,8,19
  15:14 16:4,12
  16:16,21 17:4,8
  17:24 18:5
  60:18 73:8,12
  79:25 90:2,12
  90:17 105:21
complete 15:3
  74:23 106:11
completed 15:22
  15:25 16:2
  74:21
completely 15:24
  27:25 89:9,15
  90:7 115:17
completion
  137:12
complex 108:24
  108:25 109:2
compliance 6:8
  72:4
comprehend
  129:20
computer 137:11
computerized
  1:24
concept 89:16
concern 23:23
  24:1,2,4 56:21
  56:23,25 62:17
concerning 17:7
  63:20
conclude 80:25
concluding 24:6
conclusion 94:25

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 23   Filed 06/29/22   Page 62 of 188   PageID 35135

142

David Klos - October 27, 2021

112:4,10
condition 96:4
conditional 97:11
conduct 69:18
confer 26:4
confident 69:5
confirm 59:17
  61:19
confused 41:6
  134:22
confusion 11:6
conjunction 24:5
connection 24:12
  26:2
consent 74:16
  75:23 80:2
  85:15 90:3
  93:16
consented 74:17
consequence
  104:20
considerations
  16:1 60:10
constant 75:15
construct 90:2
consultancy 11:9
  11:11
contended
  113:10
context 133:16
  133:19 134:10
contingent 14:11
continue 17:22
  100:8 110:24
continued 111:2
continuously
  6:17 29:22
contract 71:10
contracted 71:15
contradict 79:18
control 43:2
  90:10
controlled 89:8
controller 6:24
  6:25 7:4,4,8,8

7:10,10 8:4,8,9
  8:12,15 9:11
  10:10,12 12:19
  13:10,17 48:6
conversation
  18:22 19:9,19
  43:15 51:25
  70:14 91:25
  93:18 94:24
  103:18 105:18
  111:11,16
conversations
  18:23 19:11
  20:2 34:11 42:6
  51:25 93:19
  96:16,19,22,24
  97:20,22 98:2,5
  102:9,12,13
  104:24 105:5,7
  105:11,16,21
  124:3
conversion 74:15
  74:17,21
converted 74:13
conveyed 102:25
  103:1
coordinated
  22:21
copied 127:10
copy 135:13,16
  135:18
corporate 6:5,15
  9:9,15 25:22
  33:8 35:9,16
  39:12,13,16
  43:17 61:14
  62:11 70:15
  73:20 84:2
  109:1,6 115:1,7
  115:18,20
  117:25 118:3
  118:16 122:20
  122:25
correct 5:22,23
  8:19,21 9:20

16:17 40:2 42:1
  45:25 51:11
  61:10 64:25
  68:10 69:2
  82:21 88:11,17
  88:23 91:2
  97:18 99:17
  101:21,22
  105:23 124:21
  125:6 127:16
  135:24
corrected 127:19
correctly 5:16
  51:13 62:9
cost 97:13
counsel 2:6,13,19
  18:10,20,25
  20:3 21:16
  22:21,25 23:3
  96:17,20,22
  97:21 98:1
  137:17
couple 61:20
  87:14 123:2
  129:13
course 20:3 33:19
  51:9 66:12
  69:18 83:22
  84:4,6
court 1:1 117:8
courteous 76:24
covered 20:14
  53:2
CPA 4:19,22
  44:21 48:6,20
  49:11 131:25
CPAs 95:4
created 80:10
credit 6:8 25:9
  40:11 89:13
  90:11
creditors 15:17
CSR 1:23
curiosity 59:21
current 4:25

cut 109:8
cycle 41:7

_____

D

D 1:22 137:2
D-CNL003763
  117:17
Dallas 1:3,25 2:4
  2:18 4:12 5:10
  138:2
damages 82:12
date 4:9 8:6
  24:22 45:20
  47:5,6,23 48:25
  49:13,13,14
  84:14 123:23
  125:1
dated 114:23
  137:22
dates 27:10 28:18
  28:24 111:17
Davenport 138:1
David 1:14,18
  4:1,6 136:5
Davor 2:5 76:22
day 29:21 32:1
  34:1 59:7 74:8
  93:18 117:2
  135:25
day-to-day 9:17
  62:6
days 59:5 76:2,7
de 127:22
dealing 29:20
  128:19
debtor 26:21
  32:23 38:6,22
  38:23 76:16
  77:3,5,8 78:2
  81:1 87:14
  88:16 116:22
debtor's 111:4
  116:13,17
  119:8
debts 89:3

December 24:20
  24:23 51:10,15
  51:22 53:18
  54:24 56:17,22
  57:6,13,17,21
  58:7,9 60:20,25
  61:21 63:19
  98:18,18,24
  99:19 100:15
  101:1 102:17
  103:23 113:2,3
  120:2 124:1,9
decide 38:23 39:5
  90:12
decided 24:9,12
  24:14,15 32:7
  64:22 77:18
  84:25 86:1
decides 38:22
deciding 64:15
  69:18
decision 27:2
  30:25 86:5
decision-making
  32:10
decisions 29:8
  30:9,16
declare 135:23
deduction 73:9
default 58:13,17
  61:14 62:18
defendants 1:11
  1:20 2:6,20
  96:3,6
defense 80:15
  96:3,7,13,23
  97:5,7 98:1
defenses 96:10
  96:18
defer 103:13,18
define 47:18,20
defined 104:8
  134:21
definitely 6:21
  7:12 73:6

David Klos - October 27, 2021

**definition** 38:11
104:13,14
**definitive** 50:11
**definitively** 15:20
**degree** 4:16
**degrees** 4:14
**Deloitte** 5:8,8
**demand** 23:13
86:3,8 87:14
88:15 127:14
128:2,23
**demanded** 129:4
**deny** 67:22
**department** 9:7
84:9
**depend** 15:15
17:6,9 134:11
**depending** 31:2
32:15 89:11
**depends** 16:5
134:10
**deponent** 137:14
**deposition** 1:13
1:18 18:9,24
19:16,22,24
20:5,9,14,16
21:1,7,9,12,19
27:20 132:17
135:20 137:4,7
137:12,19
**describe** 8:2
54:11,13
**described** 13:16
54:10 69:6 72:1
87:23,24 92:2
109:24 110:13
114:11
**describes** 119:4
**describing** 33:7
**detail** 54:5 58:2
**determination**
60:17
**determine** 38:16
**determined**
40:21

**determining**
89:13
**Dickman** 138:1
**differed** 54:10
**difference** 49:7
76:6
**differences**
107:14
**different** 30:5
34:15 38:21
44:11 74:9
77:12 99:11
107:11,12,17
125:19,20
128:18 132:4
**direct** 9:15 20:17
20:19 34:13
78:13 132:3
**directed** 20:22
51:19 60:21
68:19,20,21
69:1,3 125:23
**directing** 132:7
132:15
**direction** 33:2
34:2 35:23
54:15 55:18
62:24 65:1,2
94:25 102:23
102:24 137:11
**directions** 103:19
**directly** 103:19
**disagree** 89:19
99:21 100:18
**disciplinary** 5:3
**disciplined** 5:2
**discuss** 20:4 97:2
**discussed** 15:8
21:16 90:1
93:15,17 94:1
97:4,6
**discussing** 42:3
65:9 77:25 92:4
92:8,11 93:3,10
**discussion** 19:21

31:4,7 39:21
57:18,22 58:3,4
60:1,5,8 62:20
63:1,20 92:14
101:20
**discussions** 19:3
21:8 24:13
30:24 41:13
59:22 63:22
103:2
**disinterested**
137:8
**dissimilar** 14:21
**dissuade** 62:23
**distinct** 10:10
**distribution** 59:9
83:5
**DISTRICT** 1:2
**dividend** 105:8
**DIVISION** 1:3
**document** 44:21
46:23 50:15
64:6,12 76:23
76:23 79:17
84:10 88:2
96:15 117:5
**documents** 67:8
76:20
**doing** 6:5,11 9:24
25:18 85:14
86:17 89:13
95:2
**dollar** 28:18 75:2
75:2
**dollar-for-dollar**
73:4
**dollars** 18:1
123:9
**Dondero** 2:20
24:11 29:15
30:8,19 32:7
33:21 34:2,7,18
38:4 39:24
40:10 41:14
42:3,7,10 43:2

43:7,10,16,25
51:18 52:4,7,19
53:12,15,16
54:18,24 55:9
55:17,25 56:3
56:10,15 60:21
61:24 62:23
65:3,24 69:9,12
70:15 74:3 76:1
76:13 77:2,25
85:1,19 89:18
90:9 91:14,17
91:21 92:9,14
92:23 93:3,10
93:25 94:2,5
95:1,24 98:11
98:11 101:7
104:24 105:16
105:21 112:20
113:8,14 116:6
116:21 121:12
122:9 124:8
125:10,22
126:16
**Dondero's** 62:11
73:6 76:9 77:19
78:3,21 79:3,11
79:18
**double** 81:5
**doubt** 35:21 36:8
**dozens** 65:16
**draft** 24:16
**drafted** 22:21
**drafting** 58:17
**DRIP** 105:8
**driven** 42:19
**drukavina@m...**
2:7
**due** 25:16,19
37:12,18 47:12
49:12 51:10,14
74:20 76:22
98:18,24 111:1
111:7 112:1,6
112:16 113:11

113:17,24
121:24 124:10
124:11 125:4
125:12,24
126:4,10,14
135:1
**duly** 1:19 4:2
137:4
**duties** 9:12 62:6
126:21
**duty** 25:9

---

**E**
**earlier** 17:13
49:14 75:13
98:16 101:6
111:13 123:3
**earliest** 128:1
**early** 51:22 54:24
60:20 87:1 89:2
111:5,21 135:7
**educational** 4:13
**effect** 41:14
62:18,21
129:23
**effective** 125:1
**effectively** 49:22
75:5
**effectuate** 99:13
112:21 126:14
**effectuated** 99:3
**eight** 117:13
**either** 21:18 26:3
26:25 29:12
30:16 31:10,16
35:23,25 38:8
39:12 48:19
50:12 68:14
69:1,3,9 79:24
84:21 86:12
105:25 125:22
137:18
**electronically**
84:22
**eliminate** 111:14

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 06/09/22    Page 64 of 188    PageID 35137

144

David Klos - October 27, 2021

email 2:7,14,22
  54:16 59:8,9
  67:14,15,18,21
  69:4,7 70:13,16
  82:23,25 83:7
  83:10,11
  114:23 115:2,5
  115:13,18,23
  117:7,15,16,18
  117:22,24
  118:4,6,12,20
  119:5 127:5,7
  127:10,12
  128:11,20
  138:3
emailed 59:11
emails 80:13
employed 122:18
employee 12:23
  26:17,21,24
  123:22
employees 43:11
  72:2 98:8 106:7
  106:12 107:8
  107:20 123:16
employment
  78:13
ended 120:1
ensure 23:20
enter 78:25
entered 98:11
enterprise 30:1
  32:18
entire 12:9
  115:17,20
entities 6:7 25:24
  26:16 30:6
  31:11,16 34:8
  61:15 65:18,22
  65:22,24 99:6
  101:1 102:20
  103:8 106:24
  107:18,25
  108:17,19,21
  108:25 121:18

entitled 17:23
  18:10 20:4
entity 12:20 13:8
  13:11,13 30:20
  31:20 32:7,15
  32:17 34:19
  35:4,11 36:2
  40:10 42:10
  75:8,10 90:10
  109:13 131:25
equal 86:6
  130:22
equity 79:24
  90:22
error 70:25 71:2
  71:19,25 72:13
  72:14,19 73:4
  79:15 80:20
  81:1,14 85:22
  89:20 90:3,3
  92:11,16,18,19
errors 71:9 72:20
  72:21 73:16
especially 15:4
established 51:4
  75:13 76:11,12
  78:12
estate 107:13
estimate 11:22
et 6:1 14:20
event 116:17
  119:10,13
  120:1,7 135:6
  137:19
events 16:20 96:9
eventually 32:2
evidence 80:14
  111:5,9 116:20
  116:25 119:9
  119:16 120:4,9
  120:16,21
evolved 6:18,21
exact 7:5,11
  15:24 20:16
  94:19

exactly 5:18
  14:24 15:23
  34:3 48:2 77:23
  80:16
Examination 3:3
  3:4,5,6 4:3
  95:21 109:18
  127:1
example 31:6,9
  37:6 48:25
exceeded 87:10
  123:12
exception 16:8
  17:1 44:2,3
excess 41:15
exchange 128:12
exclude 18:22
exclusively 23:13
  33:14,14
excruciatingly
  73:13
excuse 37:1 74:25
executed 24:18
  31:1 70:22 84:3
  124:24
execution 22:7,13
  22:20 24:23
  83:21 84:19
  85:6
executive 26:14
exhibit 22:4 23:8
  27:9,15,23
  36:12 40:20
  42:17 44:13,22
  46:12 48:12
  49:1,10 64:2,5
  67:17 68:4
  82:24 83:20
  114:1,22 127:2
  129:12
exhibits 3:10
  67:2,7 68:1
existing 7:13
  23:13
expand 59:7

expect 17:12
  64:12 65:4
  83:12 86:21
expectation 15:1
expected 126:13
expenses 73:7
experience 5:5
  37:18 38:14
  46:19 49:11
  104:16 130:2
expert 82:21 87:6
expertise 48:20
expires 138:4
explain 8:22
  64:13 107:1
explaining 92:25
explore 12:12
express 14:19
Expressway
  138:2
extended 7:12
extending 14:17
extent 31:10,12
  60:24 61:8
  66:10 86:23
  135:7
extrapolating
  92:24
_____
          F
FA 88:7
face 71:16
facile 15:24
facilitate 25:18
  31:15
facility 6:8
fact 29:6 58:23
  58:23 76:14
  79:21 94:23
  101:9 112:19
  128:20
failed 58:18
failure 126:20
fair 16:15 35:8
  60:9 65:15

91:16 97:14,23
  99:1,15 104:17
  105:15,20
  115:16 123:20
fairly 9:22 30:4,5
  84:7
fall 80:10 121:20
familiar 21:23
  22:5,6 28:1
  67:1 82:15
  104:1 114:17
  116:13 119:21
far 5:1 24:15
  37:5 58:23 62:6
  84:11 87:9
fault 81:10
faulty 43:3
February 80:19
  113:10 126:8
  126:12
fee 74:16,18
  75:23 80:2
  85:15 90:3
  93:16
feel 54:5 69:5
feels 35:17 82:22
fight 53:17
file 80:11
final 30:9
financial 8:23
  13:20,22 87:20
  116:14,17,24
  119:8,14,19,22
  119:25
financials 122:1
  122:4,7
find 26:13 31:15
  67:14 129:17
fine 21:10 39:3
  90:21 106:25
FINRA 4:21
firm 95:23
first 4:2 37:2,4
  42:22 46:14
  48:14 49:5 50:7

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/09/2488    Page 65 of 188    PageID 35138

145

David Klos - October 27, 2021

72:14,19,19
75:14 96:2
110:20 131:15
**five** 105:3 126:25
**flag** 10:4
**flavoring** 63:14
**flight** 132:10
**flip** 37:1
**flipped** 9:20
**Floor** 1:25 2:11
**flow** 23:21,25
26:7 88:17
96:15
**focus** 8:14 65:10
**focused** 6:7
**follow** 16:18
**follow-up** 128:17
**followed** 116:11
**follows** 4:2
**forecast** 126:3
129:10
**forecasting** 6:8
**forecasts** 9:24
44:1,4 126:3
129:9
**foregoing** 135:24
137:4
**foreign** 89:15
**forgave** 123:15
**forget** 86:7
**forgetting** 9:8
**forgive** 123:22
**forgiven** 96:8
106:7,16,17,20
122:19,24
123:11,11
**forgiveness** 97:10
97:17 122:14
**forgiving** 123:7
**form** 6:16 8:25
11:17,24 12:25
14:12 21:24
22:8,15 23:10
25:3,11 27:4
29:10 32:25

33:24 34:21
35:13 36:4
37:20 38:17,25
39:7 40:3,14
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22
49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 57:8
60:12 61:1 63:5
64:9 65:19,25
66:7,15 69:20
71:3,12,20
76:18 77:6,20
77:23 78:4,23
79:5,19 81:2,11
81:23 82:6,13
84:11,12 87:3
88:18 89:5
90:14 91:3,9
93:13 94:8 95:5
99:4,23 100:19
101:3,25
102:15 103:15
104:18 108:2
128:13 130:7
130:16 131:11
131:21 133:13
133:22 134:8
134:17 135:2
**found** 61:18
**foundation**
113:20 125:17
**four** 6:13 128:23
**frame** 4:24 7:11
7:12 8:10,14,24
12:6 20:12 24:8
25:1 66:12,20
67:16 106:13
123:18
**Frank** 8:17 11:1
20:9 29:13

30:15,17 35:23
35:25 36:10
44:7 52:1 53:7
53:8 54:15 55:9
60:20 61:14
68:14,14 69:1,3
70:13,14 77:13
77:15 80:12,13
93:6 101:7,18
101:23 102:3,4
102:8,9,11
121:22 127:19
**Frank's** 39:18
**Frankly** 48:10
**fraud** 81:5
**frequent** 84:1
**Friday** 118:1
**front** 10:17 44:8
67:20 68:5 72:3
**full** 57:3 106:18
**full-service** 107:5
**full-time** 12:3
**function** 72:2
**fund** 1:9 6:11,11
9:5,5 13:6
70:24,25 71:1,6
71:7,8 72:8
73:15 74:11,12
74:13,13,14,17
75:2,6 80:20,23
81:16 86:5
109:3
**funds** 10:21,22
12:13 29:9 30:2
30:19 31:20
34:8 35:11
75:24,24 76:1
80:9 85:14
128:19
**further** 3:6 24:19
84:18 126:24
127:1 135:10
137:17
**future** 17:4 45:16
49:13,20 53:17

93:7

___
**G**
___
**gearing** 53:17
**gears** 65:8
**general** 18:13,15
19:9,10 20:11
20:13 32:20
33:19 61:4
92:11 93:4
96:24 97:6
104:4,5 108:20
133:24 134:6
135:4
**generally** 19:25
27:24 30:4
32:21 38:4,4
40:2,11,16
42:15 45:8
77:22 96:5,10
96:12,17 98:20
105:1 107:1
108:18 110:22
116:15 119:21
**generallys** 40:6
**generating** 42:12
**Germans** 63:14
**getting** 10:4
23:24 44:8
51:13 59:8
**give** 5:21,24 14:4
16:13 39:3
67:25
**given** 15:5 43:2
43:22 47:23
70:12 73:21,22
74:1 102:8
123:3 129:2
**global** 52:25
70:24 74:12
75:6 101:13
**go** 15:19 16:1
20:1 43:6 54:4
65:12 81:9
82:18 85:10

105:24 127:2
134:4
**goes** 28:9 40:18
87:9
**going** 14:2 15:5,6
16:9,12,15,19
17:5 20:19
28:17 32:10
36:11,12 42:22
46:11 49:13
55:16 57:11,14
62:18 65:8,9,10
65:12 68:1 70:5
74:22 79:9
82:23 83:11,19
88:7 89:20
106:23 107:17
108:20 111:17
117:5 118:13
127:6 129:12
132:4,13
134:11
**good** 73:20 95:22
96:1 100:12
**grad** 5:7
**graduate** 4:14,15
**group** 5:19 6:11
6:16 9:9,14,15
9:21 10:7,9,14
10:15,24 11:7
35:9 43:18
61:21 62:10,11
83:5 109:3
110:24 115:2,5
115:18,21
117:25 118:16
126:8
**groups** 6:19,20
**guess** 8:8 88:24
104:21

___
**H**
___
**half** 5:9 94:20
95:11 110:20
**half-million**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 123   Filed 06/09/22   Page 66 of 188   PageID 35139

146

David Klos - October 27, 2021

123:9
**hand** 90:9
**handled** 11:9
   26:21 35:9 40:8
**handles** 11:7
**hands** 57:2
**happened** 35:25
   47:13 59:2,4
   93:8,11
**happening** 27:14
**happens** 47:13
**happy** 55:22
**hard** 15:4 18:1
   26:13 47:20
   63:7 71:5
   134:12
**harder** 11:13
**HARDT** 2:3
**HARR** 2:3
**hat** 43:15
**hate** 57:1 97:4
**Hayley** 83:21
   118:10
**HCM** 76:16
**HCMFA** 13:6
   53:20 65:10
   68:8 71:10,17
   72:8,8,12,12,24
   73:3,5,7,14,17
   73:21 74:10,24
   75:1,1,21 76:11
   76:16,17 78:14
   78:22 79:1,13
   79:14 80:2,20
   80:22,25 81:15
   85:16 87:2,5,9
   87:15 88:10
   89:2,3,12,13,20
   90:17,21,23
   91:23 92:19,20
   93:16,21,23
   110:2 115:8
   118:8,13,14
   119:18 120:6
   120:11,18,24

121:7 127:13
   127:17 128:1
   128:23
**HCMFA's** 70:23
   119:25
**HCMLP** 10:21
   29:4 42:20 60:2
   68:8 71:17 72:2
   72:2,23 76:2
   80:1 94:1 104:8
   109:24 110:3,4
   110:12,15,16
   113:15 115:8
   118:8,13
   121:25 122:8
   125:11,23
   126:20 128:1
**HCMS** 2:20
   95:24 98:23
   99:8,10 107:3,4
   107:5 109:21
   109:25 110:3
   124:22
**HCRE** 2:20
   95:24 98:23
   99:8,10,21
   100:17 107:3
   107:11,20
   108:6,12,22
   110:6,7,10,12
   110:15 124:20
**he'll** 94:14
**head** 62:15
   107:10
**headers** 36:25
**hear** 52:4 113:8
**heard** 30:17
   62:16 74:3
   91:14,17,21
   122:22 125:18
**hearing** 101:10
**hearsay** 79:17
**heavy** 107:13
**hedge** 6:11 30:15
   33:12

**held** 6:16 10:20
   121:10,12
   122:20,25
**hell** 74:24
**help** 33:2 65:22
   66:20 67:16
   100:4
**helped** 105:9
**helping** 31:14
**Hendrix** 9:16
   18:16,19,24
   20:3 27:19
   39:13 52:11
   84:17 99:2,18
   100:14,25
   103:3,14
   117:25 124:4
**hereof** 48:16
**hereon** 48:15
**hereto** 137:16
**hesitate** 64:17
**hesitating** 106:16
**hey** 42:23 85:9
**hierarchy** 10:25
**high** 105:5
**Highland** 1:6,9
   5:11,12,14,22
   6:6 7:25 8:4,12
   8:16 10:14,18
   10:20 11:23
   12:6,8,9,23
   13:4,5,14,17,18
   13:21 14:3,22
   15:2,15 16:5,6
   17:5,6 23:2,21
   23:21,22,23
   25:2 26:17,18
   26:19,23,25
   28:2 29:4,18,20
   29:24 31:12,17
   32:6,23 33:3,4
   33:7 34:7,19
   35:3,4,10 36:2
   36:24 37:10
   39:22 40:22

41:2,2,12,16,24
   42:5,20,22 43:6
   43:7,9,10,12,16
   44:5 49:11
   50:19 51:2,4,19
   51:20 58:13,21
   59:9 64:24
   65:18,21 70:24
   71:6,11 72:7,10
   74:12,25 75:8
   75:10,12,14,23
   75:24,25 76:4,5
   76:12 79:8,25
   80:2,7 81:18
   84:9 88:14 89:1
   89:4,12 90:4,5
   90:22 92:19,22
   93:23 97:11
   104:11 105:22
   106:6 107:2,24
   109:22 110:8
   112:20 119:12
   122:19,19,23
   123:7,14,21
   125:4 126:14
**Highland's** 42:13
   51:9 72:13,14
**history** 62:2
   116:3,7 118:22
   119:2,12 120:5
   120:17
**hit** 82:3
**hits** 82:9
**HMS** 99:21
   100:17
**hold** 4:18 121:15
**honestly** 58:22
**hope** 43:20 82:7
**hopelessly** 53:16
**Houlihan** 71:23
**hours** 11:22 12:6
   12:7,10
**housed** 72:2
**human** 71:19
**hundred** 23:14

28:5 30:10,11
   33:13 68:18
   69:5,11 92:3
   102:19 106:18
**hundreds** 65:16

_____

**I**

**idea** 7:24 57:10
   89:12 108:13
**identified** 72:25
**illiquid** 11:13
**important** 44:6,7
   59:18,20 93:22
**importantly**
   85:15
**impossible** 80:24
   91:25
**impression** 52:24
**in-house** 23:3
**inappropriate**
   81:20
**inartful** 77:16
**incidental** 128:21
**include** 52:18
   107:25
**included** 85:12
   115:5 116:16
   116:23 118:3
   119:8,13,25
   120:7,12,19
   122:5,7 126:3
**including** 79:14
   115:17
**inconsequential**
   127:23
**incorrect** 55:5,6
   55:11
**INDEX** 3:1
**indicate** 44:22
   80:7,16
**indicates** 135:5
**individual** 31:8
   52:2 72:24
**individuals**
   106:19 123:3

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 23   Filed 06/09/1788   Page 67 of 188   PageID 35140

147

David Klos - October 27, 2021

**inflow** 59:8
**info@dickman...**
138:3
**informal** 83:25
105:14
**informally** 62:5
**information**
59:16 129:1
**informed** 62:10
102:3
**inject** 90:22
**ink** 84:23
**insinuation** 16:9
17:1
**insolvent** 87:2,6
**installment**
110:25 111:7
112:1,8,16
113:4 114:7,12
125:12,23
126:4 131:3,10
**installments**
14:22 130:23
**instance** 1:20
31:20 34:11,16
34:18 35:25
39:22 42:22
68:24 86:22
**instances** 32:5
65:16 71:8 91:5
**institutional** 9:5
**instruct** 115:7
**instructed**
125:11
**instructing** 85:9
133:2
**instruction** 52:25
61:13,24 62:12
62:17 99:19
101:6,13,17,23
102:3,5,8,20
103:7 124:7
125:15
**instructions**
100:15 103:14

103:22
**insulting** 132:5
133:6,9
**insurance** 80:20
80:22 81:5,6,9
81:14,19 82:4
82:10,19
**intended** 44:15
44:19 111:6
130:3
**intent** 95:12
**interco** 68:8
115:22
**intercompany**
32:22 41:3
65:17 68:9,11
68:12 69:10
**interest** 37:4,8,13
37:15 38:9
40:12 45:12
46:8,8,16,20,25
47:1,4,4,11,12
47:13,14,18,19
47:20,21,24,25
48:4,5,7,15
49:4,6,12,12,20
49:23 50:9,21
51:3 86:2 111:3
131:15
**interested** 83:13
137:19
**internal** 22:21,25
**internally** 96:16
**investment** 74:19
**investments**
107:16
**investors** 74:17
75:5
**involved** 10:7
25:14,24 60:17
**iota** 16:13
**irrespective**
90:11
**issue** 29:18 36:20
43:7,8,17 93:10

105:17 108:1
113:12 124:13
**issued** 124:16
**issues** 75:15
79:23 121:6

_____ **J** _____
**Jack** 106:15
**January** 29:16
42:16 44:13
58:11,15,25
59:23 60:2,23
61:7,18 112:22
113:3,16
**Jim** 2:20 24:11
26:4,4 29:13,14
30:17 31:9 34:2
34:6 35:23 36:1
36:9 44:8 53:16
68:14,18 69:1,3
70:15 80:5 89:9
93:25 94:2 97:9
101:18 105:22
108:20,21,23
118:9 121:22
**Jim's** 26:15,16,20
26:22,24 36:7
90:7 93:6 94:19
108:21
**jmorris@pszjl...**
2:14
**John** 2:12 36:16
**joined** 5:14 29:24
122:23
**JONES** 2:10
**judge** 132:21
**juggled** 31:24
**July** 29:17 58:24
**jumble** 48:1
**June** 11:21 45:23
45:24 49:2

_____ **K** _____
**K-l-o-s** 4:7,8
**keep** 27:21

100:10
**keeper** 26:15
**keeping** 129:1
**kind** 10:25 14:23
15:25 52:12
89:7 99:13
106:12 108:22
108:23 109:8
**Klos** 1:14,18 4:1
4:6 61:24 64:22
95:22 109:19
117:21 136:5
**knew** 70:6,11
85:22 128:23
129:3
**know** 4:19 5:1
9:22,23 10:19
11:11 12:7,19
15:6,13 17:10
18:7,8,11 19:10
20:4 23:7,17
24:1,7,9,12,15
25:5,7 28:21,23
29:6 31:11,13
31:23,25 32:3,7
35:15 37:25
38:11,12,19
39:9 40:20
43:16,21 44:18
45:4 48:10
51:16,25 53:1
53:17,25 54:20
54:20 55:14
60:14,19,22
62:13 70:10
73:17 76:14
77:23 78:20
81:4,21,25 82:2
82:4,8,19 83:11
84:6,25 85:17
85:18,20 86:1,4
87:6,17 90:18
90:19,25 91:5
91:13,16 93:19
96:14 98:21

99:12 100:8
101:10 102:25
104:13,15,20
105:12 106:11
106:14 108:7,8
110:2,3 112:23
117:11 119:7
119:18 120:11
121:12,23
123:17 127:23
129:6 130:10
130:18 131:23
**knowing** 102:23
**knowledge** 7:24
13:8,10 24:13
34:6 35:1 44:14
48:20 49:10
60:25 61:16
63:24 64:5 67:6
73:1 79:17
98:10 100:6,9
104:10 109:21
110:7 112:23
121:19 122:10
123:10,21
125:10
**known** 61:9
69:23 70:1
**KOPF** 2:3
**Kristin** 9:16
18:16 39:13,17
52:1 53:7,8
59:11 61:13
62:4,15,15 83:1
83:2,20 99:14
101:7,24 102:3
102:5,8,10,11
108:5,8,12,14
109:10 117:25
118:15 119:3
**Kristin's** 100:6
100:22 118:20

_____ **L** _____
**L.P** 1:6,10

David Klos - October 27, 2021

**lacks** 113:19
  125:17
**land** 132:21
**language** 74:25
**large** 55:2 59:8
  59:13 93:20
  131:25
**larger** 41:7 58:3
**largest** 123:8
**late** 106:13
**launching** 10:3
**Lauren** 23:2
**law** 2:5,12,19
  81:22 82:1,9,16
  82:22 95:23
**Lawler** 106:17
**Lawn** 2:17
**lawsuit** 112:14
**lawsuits** 97:15
**lawyer** 23:4
  82:21
**leading** 65:17
**learn** 30:25 51:21
  51:23 58:6,6
**learned** 61:6
**learning** 58:20
**left** 7:14,20 46:8
  46:9 109:20
**legal** 18:10,20
  84:9 112:3,10
  130:9
**legally** 82:19
  84:10
**length** 19:24
  124:2
**let's** 8:14 12:12
  18:22 21:21
  24:19 27:7 28:6
  61:7 66:19
  68:24 81:17
  103:25 109:19
  122:14 123:25
**letter** 14:15,17
  58:13,17
**letters** 80:5

**level** 23:20,24
  36:6 82:15
  88:14 105:5
**liabilities** 87:10
  87:12 122:8
**liability** 120:12
  120:19
**liaison** 10:15
  11:5
**liberally** 12:8
**license** 4:20,22
**licenses** 4:18
**life** 131:18,19
**limited** 104:7
**lines** 5:18
**linked** 92:15,17
**liquidity** 29:4,5
  29:18,20,23
  30:7,21 31:21
  31:25 32:6,22
  33:9 34:20
  35:19 36:2 40:7
  42:13,20 43:7,8
  43:17 73:2,14
  73:18 74:10
  75:1,15,22
**list** 59:10 106:12
  109:9
**litigation** 15:5
  16:6,11 18:1,25
  19:21 126:19
**litigations** 17:7
**little** 9:2 12:12
  14:2 30:15
  33:12 39:3 48:1
  98:15 106:23
  107:5
**live** 4:11,12
**LLP** 2:17
**loaded** 16:22
**loan** 9:6 28:1
  33:11,21 34:9
  34:13,20 35:12
  36:1 39:25 40:1
  41:9 68:11,13

68:16,21 69:10
  69:15,17,19,24
  70:2,10 73:14
  74:2,4,7 76:15
  76:21 78:3
  79:13,24 85:18
  85:20 89:21
  90:10,13 91:2,6
  92:3,15 95:4
  107:25 110:19
  115:22 116:4,8
  116:16,23
  117:3 118:8,10
  118:11,13,17
  118:25 119:4,7
  119:14 122:14
  123:6,10,14,22
**loaning** 72:7,11
  89:1 92:19,22
**loans** 32:4 33:14
  36:9 40:8 65:17
  66:3,5 80:7
  84:1 85:10
  89:10 90:8
  91:12,14,23
  94:1,7,22 95:2
  98:17,22
  105:16 106:6
  106:19 107:25
  108:1 119:24
  120:8,12,19
  123:2
**logically** 42:15
  69:18
**Lokey** 71:24
**long** 15:8 16:5
  17:5,9 34:25
  43:5 62:4 84:12
  122:16
**long-term** 86:7
**look** 15:19 27:15
  38:15 39:4
  66:19 114:15
  117:10,22
  134:3,15,19

**looked** 111:20
**looking** 22:3 44:1
  117:17
**looks** 27:25 39:6
**loop** 53:9
**lost** 41:21 63:16
**lot** 100:1 129:20
**loud** 118:6
**LP** 6:6 8:5 12:14
  12:15,17 13:6
  23:22 26:19,24
  29:5 110:8
**lying** 79:16

―――――――――

**M**

**machine** 1:24
**magnitude** 92:12
**maintained** 28:2
**maker** 46:15,23
  47:1 50:8
  114:12 122:20
  122:25 129:18
  129:24
**makers** 126:13
  126:19
**making** 71:8
  75:18,19 85:12
  99:20 100:16
  107:20,23,25
  108:9 126:9
  132:20
**man** 17:23
  128:10 130:20
**manage** 32:2
**managed** 10:21
  10:21 70:24
**Management** 1:6
  1:9 5:12 6:6 8:5
  13:6 23:22,24
  26:19,23 27:1
  29:4,19 32:6,24
  35:3 71:6 107:2
  110:8
**manager** 7:2,3
**managing** 9:25

25:23
**March** 5:12,14
  6:3 13:24 37:6
  80:19 122:17
**marching** 52:3
**marked** 3:10
**Master's** 4:16
**material** 15:7
**matter** 109:11,12
**matters** 26:22,24
**maturity** 131:20
**MBA** 4:17
  131:25
**mean** 9:18 15:21
  24:10 26:9,11
  104:6 114:18
**meaning** 51:4
  68:9
**means** 47:4,12
  48:21 63:12
  84:7 132:1
  133:12,20
  134:7 135:7
**meant** 50:12
**medical** 82:3,10
  82:10
**meet** 31:14 33:8
  73:2
**meeting** 52:12
  57:25
**meetings** 25:24
  43:5,24 62:1,3
  63:2,19
**Melissa** 26:10,12
  108:14,17,18
  109:1,5,9
**member** 62:14
**members** 10:17
**memory** 27:8
  28:17,19 42:16
  42:18 50:23
  68:15 71:18
  85:8 87:13
  91:20 92:4,7
  93:9,12

David Klos - October 27, 2021

mental 48:1
mention 10:6
  114:7
mentioned 12:13
  61:20 88:13
  98:7 107:23
  108:4 110:6
  116:10
met 31:9,25
Michael 2:18
  95:16,23
  135:11
michael.aigen...
  2:22
mid 112:21
middle 6:10 80:4
  108:22
million 18:1
  21:22 28:13,14
  28:14 45:25
  46:3 49:1,8
  58:25 68:7 69:2
  70:7,19,23 72:7
  73:18,25,25
  74:7,8,24 75:4
  75:9,22,23 76:3
  76:19 77:4,10
  77:11,18,18
  78:3,10,22
  79:12,22 80:2
  80:19 81:18
  82:25 85:4,18
  85:20,23 86:13
  89:2 90:17,20
  90:22,24 91:22
  91:22 92:8,15
  93:3 115:8
  116:3,23 118:8
  118:9,13,24
  119:7,14,25
  122:5
mind 36:8 56:20
  76:9 100:2
mine 24:1
minimus 127:22

minutes 39:21
  105:25 126:25
misconstrued
  134:23
missed 60:25
missing 107:10
mistake 80:12
  126:8 127:21
  127:23 128:4,7
MLP 59:9
moment 32:12
  67:16 73:21,22
  116:6 122:15
monetization
  15:2
monetizing 97:12
money 15:17
  33:3,3,7 34:19
  39:22 41:12,16
  42:4 45:20
  59:13,19 70:4
  72:11,12 73:5
  75:12 76:11,12
  76:13 79:24
  92:19,22
  113:24 120:8
month 11:22 12:6
months 6:13 19:6
  59:5 75:14
morning 36:16
Morris 2:12 3:5
  8:25 11:17,24
  12:25 14:12
  17:20,25 20:17
  20:21,24 21:2,8
  21:24 22:8,15
  23:10 25:3,11
  27:4,16 29:10
  32:25 33:24
  34:21 35:13
  36:4,18 37:20
  38:17,25 39:7
  40:3,14 41:17
  41:20 42:24
  43:19 44:16,24

45:9,17 46:21
  47:8,15 48:8,22
  49:15 50:2,13
  51:5 52:21
  53:22 54:7 55:3
  55:12,19 56:11
  57:8,19 60:12
  61:1 63:5,13
  64:9 65:19,25
  66:7,15,24
  67:17 69:20
  71:3,12,20
  76:18,22 77:6
  77:20 78:4,23
  79:5,19 81:2,11
  81:23 82:6,13
  83:13,17 85:21
  87:3 88:18 89:5
  90:14 91:3,9,19
  92:5 93:13 94:8
  94:13,16 95:5
  95:16,20 99:4
  99:23 100:5,11
  100:19 101:3
  101:25 102:15
  103:15 104:18
  108:2 109:19
  111:11 112:7
  112:13 113:22
  116:21 117:2,9
  117:13,16,21
  119:11,18
  120:5,11,17,23
  125:18,21
  126:24 128:13
  129:12 130:7
  130:16,19
  131:1,5,11,21
  132:2,8,11,15
  132:19,23
  133:3,5,13,22
  134:8,17 135:2
  135:10,13,15
  135:19
motion 132:18,20

mouth 36:7
Move 120:15
  125:16
moved 6:10
muddy 43:14
MUNSCH 2:3
mutual 74:13,14

────────────
          N
────────────
name 4:4 26:11
  26:14 39:10
  87:21 95:23
names 106:14
Nancy 104:24
  105:16,21
nature 10:1 70:4
  70:6,7,11 84:1
NAV 70:25 71:2
  71:8,19,25
  72:19,20,21
  73:4,15 79:14
  80:20 81:1,14
  85:22 89:20
  90:2,3 92:11,16
  92:17,18 104:2
  104:10
necessarily 31:25
  50:11 53:4
  69:12 107:14
need 29:18 31:16
  33:12 37:3
  41:24 54:5
  58:14 73:3 93:7
  93:20,21
  106:25 107:4
needed 30:3
  31:10,12 32:6
  35:19 41:12
  73:5,17 74:10
  74:25 75:21
  76:11
needing 29:5,22
needs 29:4 31:14
  33:9 34:20 40:7
  42:20 44:9

negative 37:7
  44:4
negotiation 22:7
  22:13,18
neither 93:23
never 18:2 56:25
  72:25 74:3
  78:12 80:13
  91:14 105:15
  105:18,20
new 2:11 7:16
  26:11,13 68:8
  68:11 85:10
  115:22 118:8
  132:21
NexBank 124:16
NexPoint 10:4
  12:13,14,14,17
  12:24 13:3,16
  21:21 26:3 27:1
  27:12 36:22
  37:11,19 40:22
  41:3,15,15 42:4
  42:9,11,17,22
  43:11,13 53:19
  56:21 57:6,10
  57:14,18,23
  58:17,25 59:12
  59:24 62:18
  63:3,20 64:8
  65:9 72:22,24
  75:17,19 78:13
  110:19 111:14
  111:22,25
  112:15 113:3
  113:10,15
  120:24 124:18
NexPoint's
  110:25 111:6
  112:21
night 36:17
nomenclature
  83:24
nominal 62:1
nonstop 44:5

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/09/22    Page 70 of 188    PageID 35143

150

David Klos - October 27, 2021

| | | | |
|---|---|---|---|
| **North** 1:24 2:3 138:2 | 114:21 122:5 122:12 124:10 | 49:15 50:13 51:5 52:21 | 72:20,25 85:13 92:13 112:24 | opinion 44:6 opposed 40:22 |

North 1:24 2:3
138:2
NORTHERN 1:2
note 21:22,23
22:2,5,7,14,22
23:9,15 24:10
24:18,21,23
25:2,9,17 27:2
27:9,13,14
33:17 38:15
39:4 40:11,13
40:17 46:12,16
46:25 48:5,14
49:10 50:25
51:10 57:18,23
58:4,20 59:12
60:7 63:4,21
64:8 65:9 66:6
66:10,13 70:22
75:18,20 76:7
79:1,22 82:25
83:21 84:3,9,16
84:16,18,19
85:4 86:2,3,3,8
86:13 89:15
92:15 111:22
112:9,12
113:16 122:19
122:24 127:13
127:14,17
128:16 130:3
131:18,20
133:12 134:3,4
134:11,15,20
notes 16:7 17:7
19:25 23:13,14
26:3 36:19
40:21 50:19
52:18 65:10
66:20 67:12
76:1 84:14,22
85:2 86:12
87:14,24 88:7
88:10,15,16
96:8 97:11,16

114:21 122:5
122:12 124:10
124:11,13,24
125:4,7,8,13,25
126:10,13,20
127:17 128:23
129:7 130:12
130:15
Notwithstanding
110:23 111:25
November 54:4
63:18 124:8
137:22
number 12:2,10
14:10 22:4
23:19 27:16
28:9 75:3,4
numbered 1:21
27:19
numbers 14:4,19
28:6 44:4 81:18
nutshell 54:12
NY 2:11

——————
**O**
——————

o0o-- 1:4
Oak 2:17
oath 97:6 106:4
object 50:2 100:8
objected 118:20
objection 8:25
11:17,24 12:25
14:12 20:17
21:2,24 22:8,15
23:10 25:3,11
27:4 29:10
32:25 33:24
34:21 35:13
36:4 37:20
38:17,25 39:2,7
40:3,14 41:17
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22

49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 56:11
57:8 60:12 61:1
63:5 64:9 65:19
65:25 66:7,15
69:20 71:3,12
71:20 76:18
77:6,20 78:4,23
79:5,19 81:2,11
81:23 82:6,13
85:21 87:3
88:18 89:5
90:14 91:3,9,19
92:5 93:13 94:8
95:5 99:4,23
100:19 101:3
101:25 102:15
103:15 104:18
108:2 111:9
112:3,10
113:19 116:20
116:25 119:9
119:16 120:4,9
120:15,21
125:16 128:13
130:7,16 131:5
131:11,21
132:2 133:13
133:22 134:8
134:17 135:2
obligated 122:12
obligation 25:25
80:1 110:25
111:6,14
112:16 113:11
113:17 114:12
obligations 45:21
121:24
obligor's 33:8
obviously 85:18
occur 55:8 96:9
occurred 47:5
61:17 70:25

72:20,25 85:13
92:13 112:24
October 1:15,21
31:18 80:11
120:24 127:11
128:22 129:3
offended 17:22
offer 14:15,17
offhand 84:16
office 5:10,10
10:17 72:4
121:10
officer 7:14,17,22
8:23,24 9:3
10:13 13:21,22
53:4 121:6,13
123:22
officer-level 7:25
13:18
officers 105:22
106:7 121:18
123:15
official 12:16
13:7
oftentimes 32:3
Oh 100:12
okay 18:14 20:8
51:8,16 52:10
65:13 74:1,7
76:25 81:21
82:23 84:4 93:9
100:3 110:18
110:23 112:25
117:2 119:11
120:23 124:7
125:8 126:2
132:19
old 106:22
one-page 84:11
oOo-- 135:22
open-end 74:13
open-ended 25:6
operate 29:5
operations 9:6
107:19

opinion 44:6
opposed 40:22
42:9 75:8,10
85:1 86:3 89:20
90:12 102:20
103:8 127:17
oral 96:4,7,23
97:8,15,22 98:1
98:5,12
order 27:21
124:9
orders 52:3
ordinary 128:11
organization
72:4
original 27:12
originated 43:9
ought 62:23
outlook 44:2
outside 11:9
128:11
outstanding 38:8
45:22 46:9,10
47:1,19 49:5
125:3 129:2
overall 10:10
30:6
overpayments
53:19 55:2
oversaw 9:17
overseeing 9:14
9:14,21
oversight 6:20
9:4,8
oversimplify
32:11
owed 94:1
owes 45:19
owing 113:24
121:25

——————
**P**
——————

P 37:25
P.M 1:22,22
135:21

David Klos - October 27, 2021

**PACHULSKI**
2:10
**package** 83:18
**page** 3:2 28:8
37:2,2 114:15
130:1
**pages** 20:16,25
117:13
**paid** 14:11,20
76:3,4,6 80:19
80:22 81:16
85:16 135:7
**paper** 85:10
118:11 119:4
**papered** 33:16
66:6 68:21
**papering** 84:19
85:5 118:17
**paragraph** 50:8
114:4,7,10,11
114:16,17
129:15
**pardon** 46:14
**parentheses**
118:9
**part** 13:14 17:4
25:22,23 30:23
46:15,24 58:2
61:21 62:6 70:3
70:9,10,11
73:19 75:17,19
76:8 83:17
103:17 106:8
106:17,20
117:13 121:2
122:2,24
123:15 126:20
**participated**
30:12 121:19
**participating**
61:25 62:3
**particle** 63:15
**particular** 20:22
28:13 29:18
31:6 46:12

61:23 68:16
119:5
**particularly**
35:22 71:23
**parties** 71:23
137:18,21
**Partners** 2:21
99:9
**partnership**
104:8
**parts** 72:4
**party** 71:7
102:22
**pass** 95:15 135:9
**passing** 98:7
**pattern** 66:12
109:11
**pause** 7:7,16
63:13
**pay** 47:1 49:14
49:24 74:25
82:5 88:8,10,12
90:20 103:22
103:22 112:16
113:23 122:12
**payable** 14:23
74:18 93:16
125:4
**paygrade** 60:11
60:14
**paying** 72:12
**payment** 26:8
27:10 37:6,11
37:18,23 38:5,6
38:7,12,23
40:10,11,17,17
45:7,25 46:3,6
46:7 48:25 49:1
49:2 51:10,14
51:16 56:22
57:7,11,14 58:7
58:18 59:1,2,3
59:15,24 60:3,6
60:22,25 61:18
62:19 64:13,15

68:20 72:16,18
75:1,5 76:16
85:13 89:10,14
92:20 93:22,24
93:25 99:13
110:25 111:7
112:1,5,7,9,11
112:15,16,21
113:4,11,15
115:15 126:9
126:21 129:19
129:24 135:1
**payments** 25:8
25:10,16,18,19
27:8,11,13
36:13,14,19,22
36:24 37:13
39:15,18 40:20
40:21 41:5,6,8
41:12,24 42:17
44:12,23 45:3
48:14 51:19
52:20 55:9 56:1
59:10 60:21
61:15,16 64:7
64:23 75:18,20
94:21 98:17,23
99:1,3,20
100:16 101:1
103:23 107:6
107:20,23,25
108:6,10
110:19,23
111:5,13,21,25
114:8,13 124:9
125:12,15,23
126:4,9,14
130:4,6,23
**payroll** 10:1
53:21 107:21
**pays** 48:4 81:9
82:4,10,19
**PC** 2:3
**PE** 97:12
**penalty** 135:23

**people** 51:19
71:22 72:3
95:10 103:18
**people's** 26:1
57:2
**percent** 15:25,25
23:14 28:5
30:10,11 33:13
36:8 68:18 69:4
69:5,11 74:18
74:22 92:3
102:19 106:18
**perception** 53:14
**perform** 126:21
**performed** 71:24
**performing** 9:25
**period** 23:16
93:5 104:2,11
104:21 116:14
120:1 137:15
**perjury** 135:23
**person** 7:19,20
7:21 9:17,18
39:9,10 44:21
72:25 77:3
80:25 81:10
101:10 115:14
137:8
**personal** 26:16
26:22,24 44:14
48:20 49:10
76:1 98:10
131:18,19
**personally** 25:13
25:17 64:19,20
64:22 108:21
**personnel-wise**
107:7
**perspective**
33:23 35:20
**pertain** 72:22
**pertained** 105:8
**pertaining** 93:20
97:10
**pertains** 79:22

**petition** 123:23
**phrase** 51:3 97:4
**physical** 85:5
**physically** 22:23
66:14
**pick** 45:20 48:25
109:20
**piece** 15:20,21
**pin** 8:6
**place** 33:20 35:2
66:13 137:8
**Plaintiff** 1:7 2:13
**plan** 14:22,23,25
17:11
**plane** 82:7
130:21
**platform** 10:20
12:10
**play** 15:6 64:15
**please** 4:5 5:5
14:5 30:22
66:18 68:7
83:21 95:20
114:1,22
115:14 118:6,7
118:10 127:2
129:12
**pled** 98:13
**plenty** 57:3
**point** 6:10,14 7:2
7:3,3,4 9:13
18:8 24:16
29:25 36:23
37:12 39:4
45:15 53:3
56:16 57:1
60:10,16 61:17
63:2 73:19
79:21 80:3,4,5
80:5,14 83:23
89:10 97:9
101:12 109:6
128:18 129:2
**pointed** 102:22
**points** 7:6 20:14

David Klos - October 27, 2021

**policy** 33:20 35:2
  35:6
**portion** 16:4
  21:12
**portions** 20:8
**position** 7:25
  13:18 43:22
  51:9 79:11,18
  121:13,15
**possibility** 79:23
**possible** 17:17
  48:11 50:3 74:5
  89:23,25 90:19
  91:17 95:1,8,9
  95:10
**possibly** 41:6
**potential** 53:19
  92:12 97:17
**potentially** 30:14
  96:8,14,16
**power** 89:9 90:21
  90:23
**practice** 30:1,5
  34:4,14 35:18
  50:4 69:23 70:3
  73:6 78:7 79:4
  86:5 90:7
  109:11,12
**practices** 70:11
**pre** 135:5
**precision** 28:5
**predicate** 41:22
  42:2
**preference** 73:7
  73:11 90:7
**prefix** 135:5
**premise** 43:1,3
  89:8
**prep** 83:21
**prepaid** 49:22
  131:18,19
**preparation**
  19:13 21:9 67:7
  67:8 84:19
**prepare** 54:6

84:2,9,17
**prepared** 26:7
  53:18 54:9
  64:20 66:14
  80:8
**preparing** 18:9
  19:20 129:8,10
**prepay** 46:15,19
  46:24 47:24,25
  48:5,7 49:19
  50:8
**prepaying** 50:21
  51:3
**prepayment**
  37:19,23 38:1
  38:11,13 46:13
  63:23 64:12
  113:5,12,18
  114:11 129:16
  129:18,23
  130:5 131:2,9
  131:14 132:1
  133:12,20
  134:7,20,25
  135:5,7
**prepayments**
  27:2 38:10
  44:15,19,23
  45:1,5 63:4,21
  64:8 134:12
**preposterous**
  89:15
**present** 18:20,25
  56:20 68:15
  93:9
**presented** 66:14
**president** 43:10
  43:11 121:17
**pretty** 11:15
  60:24
**previously** 53:6
  125:3
**pricing** 10:16,16
**primarily** 6:7
  26:22 88:5

128:19
**primary** 9:15
  109:5
**principal** 37:5,9
  37:13,16 38:9
  40:12 45:12
  46:9,16,24 47:2
  47:22 48:16
  49:8,24 123:11
  131:16
**print** 117:8
**prior** 14:22 19:18
  24:19 27:9
  31:19 40:10
  53:18 56:17
  57:5,12,17,21
  69:17 87:14,15
  88:15 92:4
  97:14 98:12
  104:11 112:14
  112:15 113:5
  113:10,18
  122:22 123:23
  126:7,12,18
  131:20 135:1
**priorities** 89:11
**privilege** 132:6
  133:2,4
**probably** 4:24
  6:12 8:9 9:7
  15:11,19 23:19
  24:7 35:12
  39:11 44:7
  73:24,24 83:9
  98:7 105:3,13
  108:7 114:19
**problem** 57:2
**problems** 29:21
**procedure** 33:20
  35:2,6 39:5
  66:13 83:23,24
**proceedings** 5:3
  96:6 108:1
**proceeds** 80:22
  81:6

**process** 17:9
  32:10 51:19
  66:17 83:24,25
  109:8 121:3,4
  122:2
**processing** 10:1
**produced** 1:18
  83:14,16 117:6
**production**
  117:14
**professional** 4:18
**program** 105:9
**progression** 5:24
**promissory** 16:7
  22:14 23:9
  24:21 25:2
  27:13 33:17
  38:15 39:4
  46:12 50:19
  52:18 63:4
  65:10 66:6,10
  66:13,20 67:12
  70:21 85:2
  97:11,16
  122:19 130:3
  130:12,14
  131:18,19
  133:12
**promoted** 6:1
**proper** 108:10
  132:11
**protest** 126:18
**provide** 110:10
  110:12
**provided** 13:2,3
  13:13 20:15,15
  21:6 40:12
  76:13 80:6
  102:5 107:2,24
  109:25 110:4
  110:16 122:4
  125:14 137:15
**provider** 11:12
  71:24
**providers** 10:16

43:12
**providing** 12:24
**provision** 114:19
  129:22,25
**public** 10:3
**purport** 28:8
**purpose** 23:8,12
  85:25
**purposes** 30:21
  31:21 32:22
  36:3 73:8 75:22
**pursuant** 12:22
  13:14 74:15
  112:11
**put** 6:15 10:2
  26:1 86:6 93:6

_____

**Q**

**qualification**
  64:4
**qualitative** 16:1
**question** 9:1
  11:18,25 13:1
  14:13 16:8,22
  16:25 17:2
  20:24 21:25
  22:9,16 23:11
  24:25 25:4,6,12
  27:5 29:11 33:1
  33:25 34:15,22
  35:14 36:5
  37:21 38:18,21
  39:1,8 40:4,15
  40:19 42:2,25
  43:20 44:10,11
  44:17,25 45:10
  45:18 46:22
  47:3,9,16 48:9
  48:23 49:16,18
  49:25 50:2,14
  51:6 52:22
  53:23 54:8 55:4
  55:13,20,22
  57:9,20 60:13
  61:2,4 63:6

David Klos - October 27, 2021

64:1,10 65:20
66:1,8,16,21
67:16,24 69:21
71:4,13,21
76:19 77:7,16
77:21 78:5,9,24
79:6,20 81:3,12
81:24 82:7,14
83:15 87:4
88:19,24 89:6,8
90:15 91:4,10
93:14 94:9,12
94:13,14,21
95:6,7 96:5
97:24 99:5,24
100:1,20,21
101:4 102:1,16
103:16 104:19
104:22 108:3
119:3 125:20
125:20 128:14
130:8,9,17
131:4,7,12,22
132:4,5,11,14
132:24,24
133:6,14,17,23
134:9,13,16,18
134:20 135:3
questions 19:12
77:12 80:13
95:17 97:25
109:15 110:18
111:19 114:3
126:24 129:13
135:10,12
quick 48:12
quite 7:9 31:9
quote 115:22

_____R_____
radar 93:6
radars 26:1
raise 24:5,7
119:3
raised 24:3 80:15

96:3,7,18
raising 62:17
rate 84:15 86:2,6
ratify 28:6
ratio 104:2,10
rational 80:25
rationally 92:25
reached 104:11
read 20:8,10,20
20:25 21:11,11
44:22 46:25
48:24 118:6
127:8,14,21
128:6 130:1
131:14 132:23
reading 21:5
46:6 131:8
reads 46:23
real 107:13
realize 128:6
realized 127:21
really 6:12 9:16
10:15 16:8 54:4
73:9 78:12
83:13 95:9
101:11 105:4
107:5 108:19
109:2 128:19
129:6
realtime 85:14
reason 23:8
30:14 35:21
40:23,24 41:1
54:24 55:10
67:22,24 75:17
75:19 99:21
100:18,21
113:7,14
115:24
reasoning 105:2
reasons 23:20
74:1 88:4
recall 4:23 19:2
21:4,5 22:22
23:6 24:3 27:13

31:19 34:23
36:6 41:13 42:3
56:5,9,12,14
57:17,22 58:10
58:16,20 59:8
62:16 63:18
67:18 82:24
85:7 86:19
87:20 88:21
92:10 99:12
102:10 106:21
116:15 118:19
118:22 120:23
121:16 122:21
123:6,16 124:2
127:20 130:13
receipt 26:1
receive 74:18
received 99:19
100:15 103:19
106:19
receiving 22:24
33:3
recognize 27:23
104:7
recollection 5:25
8:3 28:20 29:17
40:7 50:18
51:18 52:15,17
55:7,8 68:17
75:21 76:6
78:16,17 88:3,4
91:24 94:5
95:13 101:24
105:7 115:4
123:21 125:6
126:2
record 4:5 16:14
25:9 64:6 68:3
105:24 106:2
117:12
recorded 37:13
37:14 38:7
recording 25:15
39:14

records 110:24
111:4
recover 17:15
recoveries 17:10
recovers 16:6
reduced 137:10
reduction 38:8
45:12
refer 125:7
reference 52:18
referred 87:24
123:2
referring 87:17
98:22
reflected 37:14
44:13 120:8
reflects 103:21
refresh 54:13
regarding 16:7
18:24 100:16
127:5
regardless 16:16
16:20 60:17
72:24
regular 66:12
88:16
regularly 31:9
129:19,24
130:4,6
reimburse 70:24
reimbursed
81:15
reimbursement
53:21 72:23
reinstate 60:7
reinvestment
105:9
reiterate 17:13
REITs 10:3
reject 67:22,24
89:7
relate 19:22
related 70:20
74:11 81:1
92:18 96:3

97:16,16 99:20
100:16 102:20
103:7 137:20
relates 18:5
70:21
relating 19:23
relationship
53:15 133:21
relevant 5:5
relieve 45:14
111:6 114:11
129:18,23
130:3,5
relieved 112:15
relieves 131:2
reloaned 76:4
remainder 49:24
remember 5:16
7:5 12:1,18
13:9 14:24
15:10 18:6
22:22,24,25
32:5 34:11,16
34:18 38:20
39:24 42:8
50:25 51:24
52:1,10,13,23
53:13 56:8 57:5
57:16,24,25
58:3,19,22
59:25 60:8,20
62:20,22,25
63:1,23 67:4
69:13 71:14
74:5,6 78:17
83:22 84:20
85:4 86:15,17
87:11,23 88:2
92:10,11,12
93:2,17 94:5,18
94:19,22 97:18
97:19 98:19
101:15 105:4
108:5 109:7
110:21 113:13

David Klos - October 27, 2021

123:4,8 124:5
130:11 131:4,7
**remembering**
34:10 92:23
**remind** 99:6
**rep** 80:5
**repaid** 76:1
**repay** 89:3
**repaying** 93:25
**repayment** 76:7
**repeat** 22:10 27:6
100:3
**rephrase** 20:24
22:11 49:17
133:5
**report** 8:15 9:16
10:23 53:19
120:24 121:24
**reported** 1:23
**reporter** 117:8
135:13,16
137:1,3,15
**represent** 19:15
95:24
**representation**
19:17
**represented** 2:4
2:11,18
**requested** 137:13
137:14
**reservation**
91:25
**respect** 19:19
22:17 24:20
25:2,18 35:3
38:3 41:11
47:22 49:23
51:9 58:16
68:16 69:12
71:22,23 72:21
76:23 79:8 80:1
80:8 82:25
84:14,18 85:5
86:14 94:3,20
108:6 111:21

121:13 125:13
125:24
**respectful** 76:25
**respond** 25:7
60:15
**response** 128:16
**responsibilities**
7:15 8:7 9:22
108:16
**responsibility**
32:17,18 90:4,5
118:17
**responsible** 11:4
39:14 71:7
108:9,17,19
109:10,13,13
**restate** 61:10
**resulted** 71:25
**retail** 9:4 80:9
120:25 121:20
121:23 122:4
122:11 128:16
128:19
**return** 76:25
**reverse** 40:9
**review** 39:19
48:12 121:3
137:13
**reviewed** 84:10
**ridiculousness**
97:5
**right** 16:17,21
17:25 18:20
21:23 33:22
37:5 41:25
45:16 47:6 55:1
56:1 66:21
67:20 68:9
75:18 78:14
80:4 81:9 83:14
85:19 88:8,22
89:19 107:9
109:25 111:23
114:24 115:2
117:3,12

123:12 124:17
124:22,25
125:5 126:5
127:11,14,20
132:25 133:6
**Rip** 37:2
**role** 5:15 6:2,12
6:16,18,21 8:22
9:4,11 11:5
12:16 13:7,14
19:13 24:19
25:1,14,17,21
25:22,23 26:25
39:10 53:4,6
58:16 62:1
64:15,17 67:6
67:11 78:13
84:18,21 85:5,8
85:11 86:13,21
128:18
**roll** 23:15
**rolled** 125:3
**rolling** 88:15
**rolls** 39:18 64:18
**roughly** 6:9
**round** 39:20
81:18
**RPR** 1:23
**Rukavina** 2:5 3:3
3:6 4:4 9:10
11:21 12:3 13:5
14:16 17:23
18:4 20:19,23
20:25 21:6 22:3
22:11,19 23:17
25:8,16 27:7,17
27:18 29:16
33:5 34:6 35:1
35:24 36:11,21
38:2,20 39:2,20
40:9,18 41:19
41:22 43:4,23
44:20 45:6,14
45:23 47:3,10
47:17 48:13

49:2 50:1,5,17
51:8 53:11 54:3
54:11 55:6,16
55:24 56:14
57:12,21 60:19
61:5 63:10,14
64:14 65:23
66:4,11,19,25
67:1,18 68:4
70:1 71:10,18
72:6 76:24 77:8
78:1,9 79:2,9
80:18 81:8,21
82:2,8,17 83:16
83:19 86:1 87:8
88:21 89:17
91:1,7,13,20
92:7 94:3,11,14
94:17 95:7,14
110:18 111:9
111:20 112:3
112:10 113:19
116:20,25
117:7,11,15
119:9,16 120:4
120:9,15,21
125:16,19
126:25 127:2
128:22 130:11
130:19 131:8
131:17,24
132:6,9,13,17
132:20 133:1,4
133:8,18 134:1
134:14,24
135:8
**rule** 39:5 127:6
**rush** 135:19

49:19 61:11
90:9 92:23 94:6
94:22 109:9
**says** 18:2 46:13
46:14 48:5,14
68:7 80:12
115:23 118:7
118:18 127:17
129:17 131:2
134:11
**scenario** 33:6
**schedule** 28:1
37:15,25 38:12
45:3,7
**scheduled** 27:9
38:5 40:10
56:22 57:7
129:19,24
130:4,6
**schedules** 64:21
80:10 111:3
**school** 4:15 5:7
**Schroth** 26:10,12
108:15,17
**Science** 4:16
**scratch** 27:7
**screen** 117:22
**screwed** 111:==17==
**se 37**:25 38:13
**second** 28:8 37:4
67:25 72:15
73:2 103:25
**Section** 46:13
130:22 131:8
131:14
**securities** 10:20
11:14
**see** 21:18 22:2
28:11,15,16
46:1,17,18
48:17,18 49:2
58:14 83:7,12
113:9 114:5
117:20,24
125:21 129:22

_____
**S**
**sane** 80:25
**satisfy** 93:21
**saw** 128:16
**saying** 39:25
42:23 46:2,5

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 213    Filed 06/09/22    Page 75 of 188    PageID 35148

155

David Klos - October 27, 2021

129:25 130:24
130:25 131:1
**seeing** 44:20 48:6
48:11 59:8
61:19 85:14
114:9 130:11
**seen** 50:17,22,23
83:9 114:18
126:18
**Seery** 15:8 18:13
19:8,9,11 20:3
53:15 56:15,19
57:13,15,18,23
60:5 96:25 97:3
97:21 98:2
129:9,11
**Seery's** 21:12,19
**semiannual**
14:22
**send** 42:23 68:7
**sending** 33:4,5,6
33:8 90:24
115:14
**sends** 80:2
**senior** 5:17 7:3
**sense** 50:4,5
73:20 104:4,5
108:20 113:22
113:25 134:22
135:4
**sensitive** 86:24
**sent** 36:16,18
54:15 59:17
69:4 76:5 83:1
83:2 115:1
**sentence** 46:14
48:13,21 50:8
50:16
**sentences** 127:25
**separate** 10:25
11:7 70:20
106:25 107:4
**Separately** 52:10
**separating** 79:23
**Series** 4:20

**service** 11:12
71:24
**services** 10:17
12:23,24 13:3,4
13:13,15 41:3
43:12 53:20
71:11,15,17
107:2,15,15,24
108:8 109:22
109:24 110:4,7
110:10,12,16
**set** 115:14 118:7
**settlement** 9:6
**seven** 75:14
123:23
**seven-figure**
113:23
**shape** 6:16
**shared** 12:22
13:14 41:2
43:12 53:20
54:18 109:22
110:7
**sheet** 120:13,20
**sheets** 80:6,8
**shocked** 73:22
**short** 6:12
**short-term** 86:7
**shorthand** 1:24
137:2,7,25
**shortly** 116:11
**show** 28:8 117:5
**showing** 44:4
45:20 53:19
76:20
**shows** 45:25
**side** 85:11 96:15
**sides** 43:2
**sign** 85:1
**signatures** 22:24
86:18
**signed** 84:22
**significance**
128:11
**significant** 12:2

12:10 45:21
**signing** 86:14
**signs** 80:5
**similar** 8:7 13:4
13:16 74:9
82:24 107:12
107:19
**single** 23:15
29:21 32:17
34:12 36:8
62:14 123:22
**sir** 4:4 17:18 18:4
28:11,15 33:10
46:17 48:17
67:2,19 76:14
81:8 83:20
89:18 127:5
129:15,17
130:2 132:14
133:5,9
**sister** 97:9
**sit** 89:11
**sitting** 16:3,24
17:3,14 42:14
44:20 63:24
96:11 102:18
103:6 104:15
131:24 133:10
133:19
**situation** 31:22
69:23 93:1
**situations** 31:23
32:3 34:5
**smart** 17:18 50:7
**SMU** 4:15,17
**solvency** 87:6
**solvent** 87:2,5
**somebody** 35:19
**somewhat** 128:20
**soon** 118:10
132:21
**sophisticated**
44:21
**sorry** 9:20 22:19
24:22 41:21

45:24 47:20
55:21 57:19
58:25 63:16
76:16 78:14
88:22 99:8
108:11 129:14
129:20
**sort** 53:6 97:8
102:23
**sought** 87:25
**sounds** 50:10
80:21 81:19
82:17
**source** 64:6
**speak** 81:13
**speaking** 30:4
40:16 77:22
108:18
**speaks** 50:15
**specific** 8:6 14:4
28:20 31:22
34:11 38:3
42:15,18 50:25
51:1 52:23 58:4
68:17 91:24
95:13 103:14
112:23 123:17
129:25
**specifically** 4:23
15:10 34:24
39:10 42:8
51:24 52:13
56:7,12 62:13
67:20 69:14
71:14 74:6
81:13 83:11
86:4 87:11,24
92:13 93:8
94:22 98:21
112:20 115:10
118:16
**specificity** 34:24
36:7 42:11
53:13 82:16
96:14 102:24

105:14
**specifics** 14:24
93:18
**specify** 93:7
**speculate** 15:4
29:2 32:11
73:25
**speculating**
28:25 41:11
44:3
**speculation** 29:1
29:3,6 83:6
113:19
**speed** 106:24
**spelled** 37:24
**split** 108:16
**spoke** 18:10,19
101:6,9
**spoken** 18:13,15
**spreadsheet**
54:14
**stake** 18:1
**stamp** 117:17
**standard** 84:4,6
86:9,9
**standpoint** 92:18
135:6
**STANG** 2:10
**start** 27:7 47:17
95:19 111:17
**started** 5:7 10:5
101:17 108:23
**starting** 5:6
**state** 1:23 4:4,19
51:12 114:10
138:1
**stated** 137:9
**statement** 26:7
119:14
**statements** 36:17
116:14,18,24
119:8,19,22
120:1
**STATES** 1:1
**step** 32:9 68:25

David Klos - October 27, 2021

134:5,5
**Stinson** 2:17
  95:23
**stood** 87:11
**Stoops** 7:23
**stop** 21:10 65:9
  94:15 100:13
**street** 1:25 2:4
  10:17 82:3
**strike** 23:6 32:19
  33:15 37:10
  52:16 54:22
  63:25 67:4
  120:15 125:16
**string** 118:4
  127:5
**strong** 73:11
  92:17
**structure** 14:8
  30:6
**struggle** 64:11
  128:15 131:13
**struggling** 45:2
  50:6,7 88:25
  99:25
**subject** 108:10
**Subscribed**
  135:24
**subsequent** 96:4
  96:7,23 102:9
  102:12 103:2
  116:17 119:10
  119:13 120:1,7
**substance** 19:1
  98:6,9
**substantially**
  16:2
**substantive** 97:1
**sue** 82:11
**suggested** 55:1
**suggesting** 62:22
  128:9
**Suite** 2:4,17
  138:2
**sum** 113:24

**summary** 21:7
**supervision**
  137:11
**support** 87:20
**supporting** 12:9
  72:3
**suppose** 31:18
  50:3 85:11
  95:10
**sure** 5:7 6:2 19:4
  20:1 26:6 27:21
  31:23 37:22
  44:7,8 47:19
  49:18 51:13
  55:21 58:8
  61:11,25 64:3,3
  65:11,14 66:19
  74:24 85:12
  95:12 97:24
  99:10 100:22
  103:6 106:15
  125:9 127:4
  128:25 129:1
  135:15
**surely** 128:22
  129:3
**surprised** 130:14
**suspect** 55:10
  68:14 123:19
**suspend** 111:14
**switch** 65:8
**sworn** 1:19 4:2
  137:4

———————
**T**
**take** 12:22 14:5
  16:8 18:9 23:12
  68:24 71:16
  117:21 118:17
**taken** 1:20 87:14
  137:7
**takes** 16:5 17:5,9
**talk** 12:14 18:12
  21:21 54:3
  98:15 122:14

**talked** 19:15,24
  69:13 94:4
  103:3
**talking** 27:12
  32:16,20 54:1
  88:15 98:19
  102:13 103:2
  117:16 121:5
  122:6 127:6
**talks** 129:16
  130:22
**tax** 73:7 107:6,6
  107:19
**team** 6:5,15 10:5
  11:3 25:14,22
  32:13,16,19
  35:16 43:6,9
  57:1 60:16
  61:14 62:6,14
  62:15 64:17
  73:20 84:2 85:9
  85:17 101:11
  108:9 109:7
  115:8,11,12,13
**technical** 78:6
**technically** 4:20
  36:23 37:12
**teeing** 26:6
**tell** 7:11 14:18
  24:22 28:4 34:2
  34:7 36:25 44:2
  52:7 53:11
  55:17 56:3
  58:23 59:5,14
  69:16 71:16
  83:17 93:4
  103:6 105:13
  106:10 112:13
  112:25 113:2
  115:20 116:2,6
  116:22 119:12
  120:6,18 122:9
  126:7,12 137:4
**telling** 56:14
  58:14 68:15

**tells** 43:18 55:25
  94:23
**temporarily**
  76:12
**tend** 109:1
**term** 7:16 8:1 9:3
  24:10 45:1
  47:21 86:3
  88:15 98:17
  104:1,2,5,7,8
  107:25 108:1
  124:10,11,13
  125:7,13,25
  126:10,13
  134:21,21
**terminology**
  98:14
**terms** 6:19 9:23
  10:11 18:13,15
  19:23 22:20
  26:6 35:16
  43:14 61:4
  92:11 93:4
  107:14,19
**testified** 4:2
  41:23 99:18
  100:14 124:2
**testify** 16:15,19
**testimony** 35:24
  62:9 79:12
  98:16 100:22
  100:23 137:9
**Texas** 1:2,23,25
  4:19 81:22 82:1
  82:9,16,21
  135:25 138:1
**thank** 95:14 96:1
  109:16,17
  124:19 135:8
**thanks** 100:12
**Thedford** 23:2
**thereto** 137:21
**thing** 33:22 53:6
  59:18 84:13
**things** 10:1 25:25

57:3 79:14
  122:5
**think** 6:9 7:2
  15:18 16:3
  18:18 26:14
  30:15 31:6,8,22
  32:9 36:16,19
  39:21 41:1,10
  50:15 53:2
  58:12,22 59:4
  59:11 64:6 65:6
  65:7,8 75:2,13
  78:6 79:16
  80:24 84:15
  85:23 86:10,15
  87:21 88:13
  95:9 97:19
  99:14 101:5,9
  103:11 105:3
  105:25 106:17
  107:9,22 108:4
  108:6 111:17
  113:7,14,24
  123:24
**thinking** 57:4
  117:11 129:7
**Third** 2:10 73:6
**third-party**
  10:16 11:12
**thousand** 92:6
**threatened** 5:2
**three** 5:9 6:12
  97:12 102:11
  124:10,11,13
  124:24 125:2
**throw** 104:1
**Thursday** 19:14
**Tim** 106:17
**time** 4:24 5:15
  6:21,23 7:9,11
  7:12,15 8:10,14
  8:24 10:2,4
  12:6,10 16:14
  24:6,8 25:1
  28:21 29:25

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/09/24    Page 77 of 188    PageID 35150

157

David Klos - October 27, 2021

36:23 37:12,18
39:11 41:4,12
42:5,12 43:22
43:22 44:19
47:13 49:4
52:14 53:2,8,14
53:15 54:21
56:16 59:23
60:2,10 62:5
63:2 65:12
66:11 74:10,20
79:4 80:15
83:23 84:12
86:23 89:10,16
92:10 93:5
95:12 101:13
108:24,25
109:6,16
111:12 112:14
113:17 116:2
122:18 123:18
129:2,7 134:12
135:1 137:8
**timely** 44:9 51:15
51:17
**times** 7:5 32:15
61:20 63:8
76:19 92:6
**timing** 15:24
**title** 5:15,16 6:22
7:1 10:9,11
12:16 13:7
26:14
**titles** 10:11 78:18
**today** 5:21 14:3
15:12 16:3,13
16:16,19,24
17:3,14 20:5
42:14 44:20
57:5 63:25 65:6
95:25 96:11
102:18 103:6
104:15 131:24
133:11,19
**today's** 47:6

**told** 39:21 42:14
43:4 52:11,11
52:19 53:12
55:9 60:21
61:23 62:13,14
62:15 68:12
69:9 70:9 85:19
91:8 95:1 97:25
98:2 100:25
103:7 118:16
118:23 122:11
122:23
**tomorrow** 79:11
132:22
**top** 107:9 127:7
**topic** 96:2 98:3
**topics** 20:11
103:25 106:23
**total** 116:15
**totaling** 119:24
**touched** 98:16
**track** 111:2 129:1
**tracker** 118:10
**tracking** 39:15
**transaction**
34:13 70:21
76:9 115:21
116:7 118:24
**transcript** 115:14
135:17 137:13
**transfer** 29:9
30:2 31:8,20
32:8 34:19 36:1
40:22 41:16
69:2,10 76:15
77:4,18 85:16
90:12 91:22,23
92:9 93:3 115:8
**transferred**
30:20 75:24
77:10 78:18
79:13
**transferring** 34:8
35:11 39:22
42:4 75:9

**transfers** 28:9,18
28:19,22 30:24
32:22 35:4,10
38:3 42:9 94:7
**transitioned**
109:1,6
**transparent**
115:17
**Treasurer**
121:11
**treasury** 9:6
107:6
**treated** 35:5
**trigger** 104:2,10
104:21
**triggered** 104:11
104:17
**triggers** 14:25
107:17
**trouble** 62:19
**true** 29:6 88:9
135:24
**trust** 15:16 17:10
17:15 18:6
**trusts** 26:16
65:23 108:21
**truth** 137:5,5,5
**truthful** 100:22
**truthfully** 16:16
16:19
**try** 62:23 106:24
**trying** 17:18
27:21 30:23
50:6 67:14 98:3
100:11 104:22
130:20 132:9
133:8
**turn** 114:15
123:25
**turned** 76:4
81:15
**two** 9:7 15:12
29:14 36:20
45:13 65:10
66:20 77:12

83:8 85:1 86:12
87:24 94:19
95:10 105:4,25
106:24 107:24
119:24 121:18
122:12 127:25
129:4 134:22
**two-paragraph**
84:12
**TX** 2:4,18 138:2
**type** 98:12
**types** 13:4 78:13
84:1 107:12,15
107:17 114:20
**typewriting**
137:10
**typical** 84:7

_____
**U**
**Uh-huh** 7:18
13:23 47:7
75:11 127:9
**ultimate** 16:12
17:8,10
**ultimately** 11:4
39:19 64:18
73:9
**um** 63:13
**unable** 89:3,14
**undergrad** 4:15
**Undergraduate**
4:14
**understand**
14:14 15:19
17:14 18:19
30:23 47:4 51:8
61:11 62:8 66:4
67:25 68:2
88:25 96:17
97:24 98:8
106:3 118:12
118:15 124:14
132:1
**understanding**
19:11 20:11,13

37:17 48:19
49:18 51:12,14
54:17,22,23
56:21 61:12,22
70:18 72:7,10
75:7 79:4 87:1
87:9 91:11 97:6
98:23 101:12
101:18,19
102:2 112:19
121:9 124:3,15
133:11,20,25
134:2,6
**understood** 52:2
63:12 95:4
102:25
**unfair** 34:17
**unfamiliar** 80:21
**UNITED** 1:1
**unpaid** 46:15,24
47:2,20 48:15
48:15 49:4
131:15,16
**unscheduled**
38:23 64:7,23
75:18,20
**upcoming** 25:25
**updated** 54:15
**upfront** 85:11
**use** 14:19 56:25
70:23 81:17
108:20
**usually** 31:15
33:16
**utilized** 71:17

_____
**V**
**valid** 39:3
**valuation** 5:17,19
5:24 6:2,15
9:14 10:7,9,14
10:15,24 11:3,7
11:12 71:11,15
71:17,25 72:1
72:13,14,21

David Klos - October 27, 2021

107:6
valuations 11:4
value 11:14
  71:16
valuing 10:19
variety 107:16
various 25:23
  79:14
vary 17:12
verbatim 94:17
verbiage 132:25
verify 27:24
versus 87:12
videoconference
  1:19 2:6,13,19
videotape 21:18
view 131:10
virtually 44:5
vis-a-vis 15:16
voluntary 37:24
vs 1:8

**W**
want 16:24 44:10
  54:4 63:8 90:6
  95:18 96:19
  98:15 100:10
  101:14 104:1
  117:9 134:19
  135:13,16
wanted 24:17
  34:3 96:2
wants 90:16,20
  90:22
wasn't 23:24
  24:1 31:20
  37:18 38:5 50:4
  51:11,15,16
  53:4 57:1,3
  59:20 60:15
  62:6 70:17
  72:19 73:3,3
  75:2 101:11
  103:17 108:12
  129:10

Waterhouse 8:17
  11:1 13:25 20:9
  30:13,14,19
  39:25 41:14
  42:3,7 43:24
  52:7,11,18,24
  53:11 54:15,19
  54:25 55:17,25
  60:20 61:23
  62:9 65:3 69:9
  77:17 78:2,20
  84:23 85:1,19
  86:14 91:8 94:6
  100:25 103:3
  103:13 115:5
  115:25 116:2
  116:22 118:19
  118:23 121:6
  122:9 124:4,8
  125:11,22
  126:15 127:13
  127:16
Waterhouse's
  21:1,19 127:10
waters 43:14
way 6:16 20:12
  22:22 31:15
  34:3 35:17,22
  48:24 54:1 63:8
  69:6 72:15,17
  76:10 82:19
  87:18 92:1,1,1
  92:2 93:24 94:6
  95:3 97:5
  102:23 114:10
  121:5 137:19
ways 38:21
we'll 20:1 54:3
  125:7 132:17
  132:21
we're 12:8 27:12
  32:15 43:11,12
  64:1 65:8,9,10
  65:12 79:22
  80:4 117:17,18

121:5 122:6
we've 19:24
  75:13 78:12
wearing 43:15
week 36:20 83:7
weekly 25:24
  43:5,24 63:19
  129:8,10
weeks 59:5
welcome 117:19
  127:7
went 4:14 58:17
  81:17 85:14
  101:18
weren't 61:21
  80:16 88:7
  97:15 101:20
whatsoever
  63:20
wherewithal
  93:24
wind 16:5 17:5
winding 15:2,22
wire 59:17 61:19
  118:7
withdrawn 91:19
  110:11 111:15
  113:1,7,8
  124:10,12
within-entitled
  137:6
witness 1:19 9:2
  11:19 12:1 13:2
  14:14 19:12
  21:4 22:1,10,17
  23:12 25:5,13
  27:6 29:12 33:2
  34:1,23 35:15
  36:6 37:22
  38:19 39:9 40:5
  40:16 41:18,21
  43:1,21 44:18
  45:1,11,19
  46:23 48:10,24
  49:17 50:3,15

51:7 52:23
53:25 54:9 55:5
55:14,21 56:12
57:10 60:14
61:3 63:7 64:11
65:21 66:2,9,17
69:22 71:5,14
71:22 76:21
77:22 78:6,25
79:7,21 81:4,13
81:25 82:15
83:15 85:22
87:5 88:20 89:7
90:16 91:5,11
93:15 94:10
95:15 99:6,25
100:7,13,21
101:5 102:2,17
103:17 104:20
108:4 109:17
111:10 112:5
112:11 113:21
117:1 119:10
119:17 120:10
120:22 128:15
130:9,18 131:7
131:13,23
133:16,24
134:10,19
135:4,9 137:3
137:10
word 56:25
  133:11,20
words 10:24 36:7
  52:16,24 94:19
work 5:5 10:19
worked 5:8 11:22
  62:4
working 5:7,11
  12:5
world 108:23
  116:3,7 118:22
  119:2,12 120:6
  120:18
worth 34:10

worthiness 90:11
wouldn't 25:13
  38:10 43:8
  56:22,23 60:16
  64:8,20 77:24
  86:24 87:17
  99:15
write 128:3,5
writes 127:13
writing 103:21
  103:24 113:9
  125:22 126:18
written 35:2,6
  66:6
wrong 55:1 82:18
  82:22 88:22
  89:19
wrote 67:21
  70:12
www.dickman...
  138:4

**X**

**Y**
y'all 95:2
Yang 106:15
yeah 6:23 8:2
  14:21 15:23
  19:17 23:2
  29:12,20 35:15
  37:22 43:1
  55:14 56:24
  59:2 60:14 61:3
  63:7,8,12,18
  66:17 67:9 71:5
  83:24 89:7
  91:11 94:10
  96:10 98:20
  99:25 101:5
  102:2 124:15
  125:1 135:19
year 6:1 9:25
  29:22 49:21
  111:1,8,12,13

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 23   Filed 06/09/21   Page 79 of 188   PageID 35152

159

David Klos - October 27, 2021

113:4 123:17
126:5,15,22
**years** 5:9 6:17
    15:12 24:10,17
    30:18 32:21
    33:20 34:17
    39:14 48:7
    65:17 66:3
    69:18 94:20
    95:3,11 123:23
**years'** 34:10
**yes-or-no** 94:12
**York** 2:11 132:21

**Z**
**zero** 46:8 49:6
    80:1
**ZIEHL** 2:10

**0**
**0** 36:8 69:4
**08** 4:24
**09** 4:24

**1**
**1** 8:11 24:20,23
    66:24 67:2,7
    80:3 113:10
    126:8,12
    137:22
**1-31-23** 138:4
**1-4** 27:17
**1-6** 127:3
**1.3** 28:13,14
**1.4** 58:25
**10** 19:6 32:21
    33:20 34:10,17
    69:18 95:3
    123:19
**100** 15:25
**10017-2024** 2:11
**101** 138:2
**109** 3:5
**11** 123:19
**127** 3:6
**13** 23:8 27:9

46:12 49:10
114:1 129:12
129:14
**13-week** 126:3
**14** 27:15,17,23
    36:12 40:20
    42:17 44:13,22
    48:12 49:1
    58:25 59:23
    60:2,23 61:18
    64:2,5
**15** 61:7
**15(c)** 80:9 121:4
    127:6 128:17
**16** 8:9 31:18
    127:2
**17** 8:10
**18** 8:10
**19** 8:24 45:24
    49:2
**1982** 4:10

**2**
**2** 66:24 67:2,7
    73:25 76:3 80:4
    85:23 87:9,13
    92:8 114:23
    115:9
**2.03-** 46:9
**2.1** 28:14 45:25
    46:3 49:1,8
    130:22 131:8
**2.1-** 46:5,7
**2.4** 68:7 69:2
    70:7,19,23 72:7
    73:18 75:22
    76:3 77:10,18
    78:9 85:18,20
    91:22 92:8,15
    115:8 116:3,23
**2.4-** 70:21 73:23
    77:4 85:24
    86:13 90:6
**2:30** 1:22
**20** 8:24 24:17

**200** 12:6
**2009** 5:12,15 6:3
    6:3 29:24,25
    122:17
**2010** 6:9 106:13
    123:18
**2011** 6:10,21
    106:13 123:18
**2012** 123:18
**2017** 6:22 22:13
    23:7 24:8,18
    88:22 105:12
    124:25
**2018** 116:14
    119:14 120:2
**2019** 8:11,14 9:10
    9:13 10:6 11:10
    11:16,21 27:14
    28:9 29:8,17,21
    29:25 31:18
    35:8 36:15,22
    40:21 41:1,13
    42:8,16,16
    44:13,13 45:23
    45:24 65:13,15
    66:11 75:14
    78:20 80:6,19
    87:2,9,13 88:9
    88:14 89:2,17
    91:21 92:8 93:2
    93:11 105:13
    110:20 111:6
    111:12,21
    112:2,6,8
    114:23 115:9
    121:7
**2020** 7:13,22
    24:20,24 51:10
    51:15,22 53:18
    54:24 56:17,22
    57:6,13,17,22
    60:20 61:21
    63:19 98:18,24
    99:19 100:15
    101:2 102:14

102:17,17
103:23 112:17
113:2,4,12
120:24 121:7
121:21 124:1,9
125:12,24
126:10 127:11
128:23 129:3
**2021** 1:15,21
    13:24 58:25
    59:23 60:2 61:8
    87:16 88:1
    112:22,25
    113:3,10,16
    126:8,13 128:2
    129:4 136:1
    137:22
**21-03004-sgj** 1:8
**214** 138:3
**23-point** 45:20
**23.034-** 45:21
**24.7-** 46:10
**27** 1:15,21 4:20
**29** 37:6

**3**
**3** 46:13 50:8
    67:17 68:4
    74:18,22 76:5
    82:24 83:10,20
    93:2,11 114:4,7
    114:10,22
    118:1,13
    129:15 131:8
    131:14
**30** 24:10,17
    130:22
**30-year** 23:15
    24:10 26:2
**30(b)(6)** 19:12,20
**30.7** 21:22
**30.7-** 27:12
**300,000** 28:14
**31** 22:13 23:7
    24:18 45:21

51:10,15 56:17
56:22 57:6,13
57:17,21 58:7,9
60:25 87:15
88:1 98:18,24
120:2 124:25
**3102** 2:17
**312** 138:1
**338-** 37:8
**34th** 2:11
**3763** 83:15
**3800** 2:4
**38th** 1:25
**398,000** 85:23

**4**
**4** 3:3 45:23 91:21
**4.4** 118:9
**4.4-** 76:4
**411,000** 37:8
**4228** 138:2
**445-9548** 138:3

**5**
**5** 74:7,8,24 75:4
    75:23 77:4,11
    77:18 78:3
    79:22 80:2
    81:18 82:25
    85:4 86:13
    91:22 93:3
    114:16 118:8
    118:13,24
    119:7,14
**5-** 76:5 90:1
**5,019,000** 75:3
**5.2** 80:19
**5:00** 95:19
**5:14** 1:22 135:21
**500** 1:24 2:3
**500,000** 123:9,12

**6**
**6** 4:10 127:11
    128:22 129:3
**6/30** 122:2

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 172-3   Filed 06/09/14   Page 80 of 188   PageID 35153

160

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| **600,000** 76:6,7<br>**630,000** 28:14<br>**66,000** 46:7 49:4<br> 49:5,7 | | | | |
| **7** | | | | |
| **7** 58:11,15<br>**7.4** 75:9 78:22<br> 79:12 89:2<br> 90:17,20,22,24<br> 119:25 122:5<br>**7.4-** 89:19 91:13<br>**75** 18:1<br>**750,000** 28:13<br> 37:6<br>**75201** 2:4<br>**75206** 138:2<br>**75219** 2:18<br>**777** 2:17<br>**780** 2:10 | | | | |
| **8** | | | | |
| **80** 15:25<br>**800** 138:3<br>**855-5100** 138:3 | | | | |
| **9** | | | | |
| **9** 19:5<br>**95** 3:4 | | | | |

# EXHIBIT 196

**December 2019 Due From Affiliates**

| | | |
|---|---|---:|
| 14585 DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | $ | 57,963,118 |
| 14532 DUE FROM NEXPOINT ADVISORS | | 23,034,644 |
| 14750 LONG TERM NOTES RECEIVABLE | | 18,286,268 |
| 14531 DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | | 10,413,540 |
| 14533 DUE FROM HCRE PARTNERS | | 10,192,686 |
| 14565 DUE FROM OTHER - TAX LOANS | | 9,946,805 |
| 14530 DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | | 7,543,781 |
| 14590 DUE FROM OTHER AFFILIATE | | 5,088,256 |
| 14595 DUE FROM HIGHLAND CAPITAL KOREA | | 3,132,278 |
| 14140 SHARED SVCS FEE RECVBL - PYXIS | | 298,283 |
| 14010 CASH INTEREST RECEIVABLE | | 285,626 |
| 14580 DUE FROM NEXBANK | | 60,000 |
| **Total Due From Affiliates** | $ | **146,245,285** |

# EXHIBIT 197

Appx. 00678

**September 2020 Due From Affiliates**

| | | |
|---|---|---:|
| 14585 | DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | $ 57,963,118 |
| 14532 | DUE FROM NEXPOINT ADVISORS | 23,610,195 |
| 14750 | LONG TERM NOTES RECEIVABLE | 18,286,268 |
| 14531 | DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | 10,635,564 |
| 14533 | DUE FROM HCRE PARTNERS | 10,436,597 |
| 14565 | DUE FROM OTHER - TAX LOANS | 8,929,625 |
| 14530 | DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | 7,518,692 |
| 14590 | DUE FROM OTHER AFFILIATE | 5,088,256 |
| 14595 | DUE FROM HIGHLAND CAPITAL KOREA | 3,832,358 |
| 14536 | DUE FROM SELECT | 3,000,000 |
| 14010 | CASH INTEREST RECEIVABLE | 2,718,375 |
| 14140 | SHARED SVCS FEE RECVBL - PYXIS | 308,093 |
| 14137 | SHARED SVCS FEE RECVBL - OSLI | 122,000 |
| 14580 | DUE FROM NEXBANK | 60,000 |
| 14148 | SHARED SVCS FEE RECVBL - RAND ADVISORS | 40,182 |
| 14142 | SHARED SVCS FEE RECVBL - HCLOH | 24,592 |
| 14535 | DUE FROM HERA | 10,676 |
| | **Total Due From Affiliates** | **$ 152,584,592** |

# EXHIBIT 198

Appx. 00680

Case 21-03003-sgj Doc 11-21 Filed 03/30/21    Entered 03/30/21 11:24:52    Page 2 of 2

**January 2021 Due From Affiliates**

| | | |
|---|---:|---:|
| 14585-DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | $ | 59,480,100 |
| 14532-DUE FROM NEXPOINT ADVISORS | | 23,034,644 |
| 14750-LONG TERM NOTES RECEIVABLE | | 18,286,268 |
| 14531-DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | | 10,635,564 |
| 14533-DUE FROM HCRE PARTNERS | | 10,604,952 |
| 14565-DUE FROM OTHER - TAX LOANS | | 8,929,625 |
| 14530-DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | | 7,518,692 |
| 14536-DUE FROM SELECT | | 4,818,153 |
| 14595-DUE FROM HIGHLAND CAPITAL KOREA | | 3,832,358 |
| 14590-DUE FROM OTHER AFFILIATE | | 2,651,256 |
| 14010-CASH INTEREST RECEIVABLE | | 1,111,875 |
| 14140-SHARED SVCS FEE RECVBL - PYXIS | | 894,280 |
| 14146-SHARED SVCS FEE RECVBL - NEXPOINT | | 336,000 |
| 14149-SHARED SVCS FEE RECVBL - NREA | | 160,000 |
| 14137-SHARED SVCS FEE RECVBL - OSLI | | 122,000 |
| 14580-DUE FROM NEXBANK | | 80,000 |
| 14142-SHARED SVCS FEE RECVBL - HCLOH | | 31,179 |
| 14535-DUE FROM HERA | | 10,676 |
| **Total Due From Affiliates** | $ | 152,537,622 |

# EXHIBIT 199

Appx. 00682

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 23    Filed 06/18/21    Page 88 of 188    PageID 35161
Case 21-03003-sgj Doc 11-22 Filed 03/30/21    Entered 03/30/21 11:24:52    Page 2 of 2

**Loan Summary**

| HCMLP to HCMSI (GL 14530) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCMSI Restructure | 5/31/2017 | 6,572,061 |
| HCMSI #46 | 3/26/2018 | 158,777 |
| HCMSI #47 | 6/25/2018 | 212,403 |
| HCMSI #48 | 5/29/2019 | 409,586 |
| HCMSI #49 | 6/26/2019 | 153,565 |
| BW Salary Recievable | 12/31/2019 | 12,301 |
| | Sub-total | 7,518,692 |
| | | |
| **Total HCMSI Debt to HCM Outstanding** | | **7,518,692** |
| **Total HCMSI Debt per GL** | | 7,518,692 |
| | | |
| | Reconciled Total | 7,518,692 |
| | Unreconciled Difference | - |

| HCMLP to HCMFA (GL 14531) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCMFA #2 | 2/26/2014 | 2,092,825 |
| HCMFA #5 | 2/26/2016 | 965,395 |
| HCMFA #6 | 5/2/2019 | 2,457,517 |
| HCMFA #7 | 5/3/2019 | 5,119,827 |
| | Sub-total | 10,635,564 |
| | | |
| **Total HCMFA Debt to HCM Outstanding** | | **10,635,564** |
| Total HCMFA Debt per GL | | 10,635,564 |
| | | |
| | Reconciled Total | 10,635,564.44 |
| | Unreconciled Difference | - |

| HCMLP to NexPoint Advisors (GL 14532) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| NexPoint Restructure | 5/31/2017 | 23,034,644 |
| | Sub-total | 23,034,644 |
| | | |
| **Total NexPoint Debt to HCM Outstanding** | | **23,034,644** |
| Total NexPoint Debt per GL | | 23,034,644 |
| | | |
| | Reconciled Total | 23,034,644 |
| | Unreconciled Difference | 0.00 |

| HCMLP to HCRE (GL 14533) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCRE #9 | 11/27/2013 | - |
| HCRE Restructure | 5/31/2017 | 5,829,776 |
| HCRE #10 | 10/12/2017 | 3,149,919 |
| HCRE #11 | 10/15/2018 | 874,978 |
| HCRE #12 | 9/25/2019 | 750,279 |
| | Sub-total | 10,604,952 |
| | | |
| **Total HCRE Debt to HCM Outstanding** | | **10,604,952** |
| Total HCRE Debt per GL | | 10,604,952 |
| | | |
| | Reconciling Items Compound Interest | - |
| | | |
| | Reconciled Total | 10,604,951.61 |
| | Unreconciled Difference | 0.01 |

| HCMLP Partner Tax Loans (GL 14565) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| Dondero #4 | 2/2/2018 | 3,687,270 |
| Dondero #5 | 8/1/2018 | 2,619,929 |
| Dondero #6 | 8/13/2018 | 2,622,426 |
| | Sub-total | 8,929,625 |
| | | |
| **Total Partner Debt to HCM Outstanding** | | **8,929,625** |
| Total Partner Debt per GL | | 8,929,625 |
| Reconciling Items | | |
| | Reconciled Total | 8,929,624.74 |
| | Unreconciled Difference | - |

| Get Good Loan (GL 14750) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| Dugaboy Restructure | 5/31/2017 | 18,286,268 |
| | Sub-total | 18,286,268 |
| | | |
| **Total Partner Debt to HCM Outstanding** | | **18,286,268** |
| Total Partner Debt per GL | | 18,286,268 |
| Reconciling Items | | |
| | Reconciled Total | 18,286,268.16 |
| | Unreconciled Difference | - |

**Appx. 00683**

# EXHIBIT 208

Appx. 00684

**From:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Subject:** 7/31/2020 HCMLP Requests
**Date:** Sat, 29 Aug 2020 14:47:29 -0500
**Importance:** Normal
**Attachments:** HCMLP_07_31_2020_SOI.pdf; HCMLP_Notes_Receivable_07_31_2020.pdf; HCMLP_Equity.pdf
**Inline-Images:** image001.jpg

---

Hi Jim,

Please see attached data you had requested for HCMLP.

- 7/31/2020 SOI
- 7/31/2020 affiliate notes
- Oct 2019 – July 2020 equity balances

Please let us know if you have any questions or need anything else.


Thanks,

Kristin

**Kristin Hendrix, CPA |** Assistant Controller



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com

**Highland Capital Management, LP**
**Schedule of Investments, net**



CONFIDENTIAL

**HCMLP Equity**
**10/31/19 - 7/31/20**
**(all values in millions)**



D-HCMFA030557

**Appx. 00687**

**HCMLP Notes Receivable**
**As of 7/31/2020**

| | | |
|---|---|---|
| NexPoint Advisors | $ 23,846,944 | 30 yr Amort (issued 2017) |
| Dugaboy | 17,788,532 | 30 yr Amort (issued 2017) |
| Highland Capital Management Services | 6,677,529 | 30 yr Amort (issued 2017) |
| HCRE | 5,938,670 | 30 yr Amort (issued 2017) |
| Trussway | 1,004,993 | Due upon maturity -  11/1/2021 |
| SSP Holdings, LLC | 2,037,898 | Due upon maturity -  11/22/2022 |
| Siepe | 2,334,606 | Equity conversion option |
| Highland Capital Management Fund Advisors | 10,530,971 | Demand |
| James Dondero | 8,911,977 | Demand |
| Multi-Strategy Credit Fund | 1,269,000 | Demand |
| HCRE | 4,859,929 | Demand |
| Highland Select Equity Fund | 3,000,000 | Demand |
| Highland Capital Management Korea | 3,760,000 | Due upon maturity -  4/21/2037 |
| Highland Capital Management Services | 934,331 | Demand |
| **Total Notes Receivable** | **$ 92,895,380** | |

**Demand**                                29,506,208

# EXHIBIT 209

**From:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>, David Klos <DKlos@HighlandCapital.com>
**Subject:** RE: HCMLP Schedule of Investments
**Date:** Mon, 27 Apr 2020 18:21:21 -0500
**Importance:** Normal
**Attachments:** HCMLP_03_31_2020_SOI.pdf; Look_through_of_HF_interests_3.31.20.pdf; HCMLP_Notes_Receivable_&_Other_Net_Working_Capital_Listing_03_31_2020.pdf; HCMLP_Internal_Jefferies_4.24.20.pdf
**Inline-Images:** image001.jpg; image002.jpg

---

Jim,

Revised schedules are attached with the latest updates.


Thanks,


Kristin

---

**From:** Kristin Hendrix
**Sent:** Monday, April 27, 2020 5:25 PM
**To:** Jim Dondero
**Cc:** Frank Waterhouse ; David Klos
**Subject:** RE: HCMLP Schedule of Investments

Jim,

Attached are updated files, per your earlier conversation with Dave and Frank. Let us know how else we can help.


Thanks,

Kristin

---

**From:** Kristin Hendrix
**Sent:** Monday, April 27, 2020 3:20 PM
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>
**Subject:** HCMLP Schedule of Investments

Hi Jim,

I hope you are doing well!

CONFIDENTIAL

We are sending over a HCMLP SOI, as of 3/31, along with a look through detail to the hedge fund ownership. Please note that the HCMLP investments held at Jefferies are shown gross of their borrow. I have noted those on the schedule. Let us know if you have any questions.

Thanks,


Kristin

**Kristin Hendrix, CPA |** Senior Manager, Corporate Accounting



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com







**HCMLP Jefferies Margin Summary**



CONFIDENTIAL

D-UDFS-001705

**Appx. 00693**

**HCMLP Notes Receivable - Principal**
**As of 3/31/2020**

| | | |
|---|---|---:|
| NexPoint Advisors | $ | 23,034,644 |
| Dugaboy | | 18,286,268 |
| Highland Capital Management Fund Advisors | | 10,458,220 |
| HCRE | | 10,192,686 |
| James Dondero | | 8,834,770 |
| Highland Capital Management Services | | 7,499,238 |
| Multi-Strategy Credit Fund | | 5,019,000 |
| Highland Select Equity Fund | | 3,000,000 |
| SSP Holdings, LLC | | 2,000,000 |
| Siepe | | 1,672,321 |
| Trussway | | 1,000,000 |
| **Total Notes Receivable** | **$** | **90,997,147** |



CONFIDENTIAL

**Lookthrough of Fund Assets**
As Of 03/31/2020



CONFIDENTIAL

D-UDFS-001707

**Appx. 00695**

# EXHIBIT 210

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 102 of 188    PageID 35175
Case 21-03004-sgj  Doc 92  Filed 12/17/21    Entered 12/17/21 23:27:25    Page 1 of 79

Docket #0092  Date Filed: 12/17/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. Proc. No. 21-03003-sgj |
| vs. | § | |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | Case No. 3:21-cv-01010-E |
| | § | |
| Defendants. | § | |
| | § | |

1934054211217000000000052

**Appx. 00696**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 7-28   Filed 09/04/88   Page 103 of 188   PageID 35176
Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 2 of 79

HIGHLAND CAPITAL MANAGEMENT, L.P., §
§
§
Plaintiff,                          §          Adv. Proc. No. 21-3004
§
§
vs.                                 §
§          Case No. 3:21-cv-00881-X
HIGHLAND CAPITAL MANAGEMENT FUND    §
ADVISORS, L.P.,                     §
§
§
Defendant.            §
§
─────────────────────────────────────── §

HIGHLAND CAPITAL MANAGEMENT, L.P., §
§
§
Plaintiff,                          §          Adv. Proc. No. 21-3005
§
§
vs.                                 §
§          Case No. 3:21-cv-00880-C
NEXPOINT ADVISORS, L.P., JAMES      §
DONDERO, NANCY DONDERO, AND         §
THE DUGABOY INVESTMENT TRUST,       §
§
§
Defendants.           §
─────────────────────────────────────── §
HIGHLAND CAPITAL MANAGEMENT, L.P., §
§
§
Plaintiff,                          §          Adv. Proc. No. 21-3006
§
§
vs.                                 §
§          Case No. 3:21-cv-01378-N
HIGHLAND CAPITAL MANAGEMENT         §
SERVICES, INC., JAMES DONDERO,      §
NANCY DONDERO, AND THE DUGABOY      §
INVESTMENT TRUST,                   §
§
§
Defendants.           §
─────────────────────────────────────── §

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 104 of 188    PageID 35177
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 3 of 79

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., <br><br> Plaintiff, <br><br> vs. <br><br> HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, <br><br> Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> §     Adv. Proc. No. 21-3007 <br><br> Case No. 3:21-cv-01379-X |

### DECLARATION OF DAVID KLOS IN SUPPORT OF
### HIGHLAND CAPITAL MANAGEMENT L.P.'S
### <u>MOTION FOR PARTIAL SUMMARY JUDGMENT IN NOTES ACTIONS</u>

     I, David Klos, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

     1.     I am the Chief Financial Officer ("CFO") of the reorganized Highland Capital Management, L.P. ("Highland"), and I submit this Declaration in support of *Highland Capital Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions* (the "Motion"). This Declaration is based on my personal knowledge. I could and would testify to the facts and statements set forth herein if asked or required to do so.

     2.     I joined Highland in 2009 and served as Controller from 2017 to 2020 and Chief Accounting Officer from 2020 to February 2021. At all relevant times, I reported to Frank Waterhouse until he left the company in February 2021. I was appointed CFO in March 2021 following confirmation of Highland's Plan.[1]

---

[1] Capitalized terms not defined herein shall have the meanings ascribed in the Motion.

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 105 of 188    PageID 35178
Case 21-03004-sgj    Doc 92    Filed 12/17/21    Entered 12/17/21 23:27:25    Page 4 of 79

A.    **NexPoint Advisors, LP's ("NexPoint") Prepayment Defense**

3.    I understand that NexPoint contends that it had no obligation to make the Annual Installment payment due on December 31, 2020 under the NexPoint Note because it "pre-paid." Two documents show that NexPoint is mistaken.

4.    The first document is the NexPoint Note, a true and correct copy of which is attached hereto as **Exhibit A**.[2]  Under the NexPoint Note, NexPoint was required to make "Annual Installment" payments on December 31 of each year equal to (i) all unpaid accrued interest, *plus* (ii) 1/30[th] of the outstanding principal amount of the NexPoint Note.  **Exhibit A** ¶2.1.

5.    NexPoint was permitted to make "prepayments" under the NexPoint Note.  Section 3 of the NexPoint Note sets forth NexPoint's agreement concerning the treatment of "prepayments" and provides:

> 3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  **Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.**

**Exhibit A** ¶ 3 (emphasis added).

6.    The second relevant document is an amortization schedule (the "<u>Amortization Schedule</u>") that was prepared and maintained in the ordinary course of Highland's business, a true and correct copy of which is attached hereto as **Exhibit B**.[3]  I understand that the Amortization Schedule is the only document that NexPoint relies upon to support its "prepayment defense."

7.    The Amortization Schedule shows, among other things, the following:

---

[2] The NexPoint Note is also included as Highland's Ex. 2 (Exhibit 1),

[3] The Amortization Schedule is also included as Highland's Ex. 200.

**Appx. 00699**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 106 of 188   PageID 35179
Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 5 of 79

- The "Interest Accrual" column shows the periodic interest that accrued under the NexPoint Note between the dates described in the "Date" column;

- The "Total Paid" column shows the amount NexPoint paid against the NexPoint Note[4]; and

- The "Interest Paid" and "Principal Paid" columns show how each payment was applied.

8.      As the Amortization Schedule shows, (a) between October 20, 2017 and August 13, 2019, NexPoint made twelve (12) payments that could broadly be characterized as unscheduled "prepayments" of principal and/or interest (the "Prepayments")[5], and (b) with one exception, each of the Prepayments was applied first to reduce or eliminate all accrued and outstanding interest and then to unpaid principal, as required by Section 3 of the NexPoint Note.[6]

9.      As can also be seen on the Amortization Schedule, ***notwithstanding the Prepayments***, NexPoint was still required to make additional payments against the NexPoint Note in December of 2017, 2018, and 2019, in order to reduce "Accrued Interest" to $0 as of December 31 in each year[7] as required by Section 2.1 of the NexPoint Note, which it did in each instance.

10.     Indeed, even though NexPoint made six (6) Prepayments totaling $6.38 million between March 29 and August 13, 2019, NexPoint was still required to pay $530,112.36 to fully

---

[4] Note that for the interest payment made December 30, 2019, interest of $530,112.36 was paid in cash and is reflected on the "Interest Paid" column. The amount is omitted from the "Total Paid" column but has no bearing on the actual calculations contained in the Amortization Schedule. For avoidance of doubt, $530,112.36 of interest was paid to Highland from NexPoint on December 30, 2019.

[5] For the avoidance of doubt, NexPoint made the Prepayments on October 20, 2017, April 10, 2018, May 1, 2018, May 9, 2018, September 5, 2019, September 21, 2019, March 29, 2019, April 16, 2019, June 4, 2019, June 19, 2019, July 9, 2019, and August 13, 2019. *See generally* Ex. B.

[6] The exception is the Prepayment made on May 9, 2018, which prepaid approximately six (6) months of future interest.

[7] NexPoint made payments against the NexPoint Note on December 5, 2017, December 18, 2018, and December 30, 2019, respectively, which reduced "Accrued Interest" to $0 as of December 31 in each of those years in order to comply with Section 2.1 of the NexPoint Note.

**Appx. 00700**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 107 of 188   PageID 35180
Case 21-03004-sgj   Doc 92   Filed 12/17/21   Entered 12/17/21 23:27:25   Page 6 of 79

satisfy its obligation to make the unpaid interest portion of the Annual Installment payment due as of December 31, 2019, which it did.

11.      As the Amortization Schedule shows, NexPoint did not make any Prepayments on account of the NexPoint Note in 2020.  Thus, as of December 31, 2020, NexPoint was required to make an Annual Installment payment on December 31 equal to  (i) all unpaid accrued interest, *plus* (ii) 1/30[th] of the outstanding principal amount of the NexPoint Note (the "2020 Annual Installment").  Exhibit A ¶2.1.

12.      NexPoint knew the 2020 Annual Installment was due on December 31, 2020 because it was included in a 13-week forecast that Highland's Corporate Accounting Group updated on a weekly basis and that was provided to (among others) Frank Waterhouse, NexPoint's Treasurer and then Highland's CFO.  *See*, *e.g.*, **Exhibit C** (a true and correct copy of a 13-week forecast prepared for the 13-week period commencing December 14, 2020) Exhibit C shows that Operating Receipts of $2.051 million was due on December 28, 2020 in connection with "Interest Receipts on notes receivable," an amount that included the Required Payment).[8]

13.      NexPoint failed to make the 2020 Annual Installment due on December 31, 2020 as required under Section 2.1 of the NexPoint Note.

14.      On January 14, 2021, after Highland sent notice of default, NexPoint paid Highland $1,406,111.92.  **Exhibit B** (entry dated 1/14/21).

**B.      Highland's Loan Summaries**

15.      Highland's accounting group has a regular practice of creating and maintaining "loan summaries" in the ordinary course of business (the "Loan Summaries").   The Loan

---

[8] This 13-week forecast is also included as Highland's Ex. 58 and is just an example.  For years, the accounting group prepared a 13-week forecast that was updated weekly so that everyone knew what payments and receipts were anticipated.

Appx. 00701

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 108 of 188   PageID 35181
Case 21-03004-sgj   Doc 92   Filed 12/17/21   Entered 12/17/21 23:27:25   Page 7 of 79

Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Ex. 199 is an example of a Loan Summary.  The Loan Summaries identify each Obligor by reference to the "GL" number used in the general ledger.  *See* Ex. 199 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

16.     The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business.  For example, Ex. 199 ties exactly into Ex. 198, the "back up" to the "Due from affiliates" entry in the January 2021 MOR.  Docket No. 2020.[9]

## C.     The Notes

17.     In the ordinary course of business, Highland had (and continues to have) a regular practice of maintaining electronic copies of all promissory notes issued by any officer, employee, or corporate affiliate.

18.     Attached as **Exhibit D** is a true and correct copy of a promissory note dated February 2, 2018, executed by James Dondero, as the maker, in the original principal amount of $3,825,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "First Dondero Note").

---

[9] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates."  Docket No. 2030 (balance sheet).  Ex. 198 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand).  Ex. 199, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger.  As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note.  Interest on these notes is accrued in a single account (general ledger account 14010).

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 09/04/788    Page 109 of 188    PageID 35182
Case 21-03004-sgj    Doc 92    Filed 12/17/21    Entered 12/17/21 23:27:25    Page 8 of 79

19.      Attached as **Exhibit E** is a true and correct copy of a promissory note dated August

1, 2018, executed by James Dondero, as the maker, in the original principal amount of $2,500,000

in favor of Highland that was and is maintained in Highland's books and records in the ordinary

course of business and that was provided to PwC in connection with its annual audits (the "Second

Dondero Note").

20.      Attached as **Exhibit F** is a true and correct copy of a promissory note dated August

13, 2018, executed by James Dondero, as the maker, in the original principal amount of $2,500,000

in favor of Highland that was and is maintained in Highland's books and records in the ordinary

course of business and that was provided to PwC in connection with its annual audits (the "Third

Dondero Note," and together with the First Dondero Note and Second Dondero Note, the

"Dondero Notes").

21.      Attached as **Exhibit G** is a true and correct copy of a promissory note dated May

2, 2019, executed by HCMFA, as the maker, in the original principal amount of $2,400,000 in

favor of Highland that was and is maintained in Highland's books and records in the ordinary

course of business and that was provided to PwC in connection with its annual audits (the "First

HCMFA Demand Note").

22.      Attached as **Exhibit H** is a true and correct copy of a promissory note dated May

3, 2019, executed by HCMFA, as the maker, in the original principal amount of $5,000,000 in

favor of Highland that was and is maintained in Highland's books and records in the ordinary

course of business and that was provided to PwC in connection with its annual audits (the "Second

HCMFA Demand Note," and together with the First HCMFA Note, the "HCMFA Demand

Notes").

**Appx. 00703**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 01/09/24    Page 110 of 188    PageID 35183
Case 21-03004-sgj    Doc 92    Filed 12/17/21    Entered 12/17/21 23:27:25    Page 9 of 79

23.     Attached as **Exhibit I** is a true and correct copy of a promissory note dated March 28, 2018, executed by HCMS, as the maker, in the original principal amount of $150,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "First HCMS Demand Note").

24.     Attached as **Exhibit J** is a true and correct copy of a promissory note dated June 25, 2018, executed by HCMS, as the maker, in the original principal amount of $200,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second HCMS Demand Note").

25.     Attached as **Exhibit K** is a true and correct copy of a promissory note dated May 29, 2019, executed by HCMS, as the maker, in the original principal amount of $400,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Third HCMS Demand Note").

26.     Attached as **Exhibit L** is a true and correct copy of a promissory note dated June 26, 2019, executed by HCMS, as the maker, in the original principal amount of $150,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Fourth HCMS Demand Note," and collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and Third HCMS Demand Notes, the "HCMS Demand Notes").

27.     Attached as **Exhibit M** is a true and correct copy of a promissory note dated November 27, 2013, executed by HCRE, as the maker, in the original principal amount of $100,000 in favor of Highland that was and is maintained in Highland's books and records in the

Appx. 00704

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 111 of 188    PageID 35184
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 10 of 79

ordinary course of business and that was provided to PwC in connection with its annual audits (the "First HCRE Demand Note").

28.    Attached as **Exhibit N** is a true and correct copy of a promissory note dated October 12, 2017, executed by HCRE, as the maker, in the original principal amount of $2,500,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second HCRE Demand Note").

29.    Attached as **Exhibit O** is a true and correct copy of a promissory note dated October 15, 2018, executed by HCRE, as the maker, in the original principal amount of $750,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Third HCRE Demand Note").

30.    Attached as **Exhibit P** is a true and correct copy of a promissory note dated September 25, 2019, executed by HCRE, as the maker, in the original principal amount of $900,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Fourth HCRE Demand Note," and collectively with the First HCRE Demand Note, the Second HCRE Demand Note, and Third HCRE Demand Notes, the "HCRE Demand Notes," and together with the Dondero Demand Notes and the HCMS Demand Notes, the "Demand Notes").

31.    Attached as **Exhibit A** is a true and correct copy of a promissory note dated May 31, 2017, executed by NexPoint, as the maker, in the original principal amount of $30,746,812.23 in favor of Highland that was and is maintained in Highland's books and records in the ordinary

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 10/04/23   Page 112 of 188   PageID 35185
Case 21-03004-sgj   Doc 92   Filed 12/17/21   Entered 12/17/21 23:27:25   Page 11 of 79

course of business and that was provided to PwC in connection with its annual audits (the "NexPoint Note").

32.     Attached as **Exhibit Q** is a true and correct copy of a promissory note dated May 31, 2017, executed by HCMS, as the maker, in the original principal amount of $20,247,628.02 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "HCMS Term Note").

33.     Attached as **Exhibit R** is a true and correct copy of a promissory note dated May 31, 2017, executed by HCRE, as the maker, in the original principal amount of $6,059,831.51 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "HCRE Term Note," and together with the NexPoint Term Note and the HCMS Term Note, the "Term Notes").

34.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First Dondero Note was $3,708,273.71, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the First Dondero Note was $3,808,783.89.

35.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second Dondero Note was $2,647,880.12, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Second Dondero Note was $2,727,300.55.

36.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third Dondero Note was $2,647,859.55, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third Dondero Note was $2,727,280.61.

Appx. 00706

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-23   Filed 01/09/24788   Page 113 of 188   PageID 35186
Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 12 of 79

37.     Thus, (a) as of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05.

38.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCMFA Note was $2,493,401.61, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the First Dondero Note was $2,553,982.49.

39.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCMFA Note was $5,194,251.45, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Second HCMFA Note was $5,320,453.60.

40.     Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,874,436.09.

41.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCMS Demand Note was $162,033.91, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the First HCMS Demand Note was $166,777.82.

42.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCMS Demand Note was $215,402.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Second HCMS Demand Note was $222,082.34.

43.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third HCMS Demand Note was $414,842.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third HCMS Demand Note was $424,922.32.

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 17-28   Filed 10/04/21   Page 114 of 188   PageID 35187
Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 13 of 79

44.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Fourth HCMS Demand Note was $155,239.90, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Fourth HCMS Demand Note was $158,980.33.

45.     Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81.

46.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCRE Demand Note was $171,978.10, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the First HCRE Demand Note was $185,979.85.

47.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCRE Demand Note was $3,191,342.72, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Second HCRE Demand Note was $3,380,385.47.

48.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third HCRE Demand Note was $885,908.76, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third HCRE Demand Note was $938,970.62.

49.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Fourth HCRE Demand Note was $762,941.38, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Fourth HCRE Demand Note was $825,042.29.

50.     Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23.

Appx. 00708

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 115 of 188   PageID 35188
Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 14 of 79

51.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[10]

52.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31[11].

53.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[12]

I declare under penalty of perjury that the forgoing is true and correct.

Dated: December 17, 2021                          _____/s/ David Klos_____
                                                  David Klos

---

[10] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[11] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Appx. 00709

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 116 of 188    PageID 35189
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 15 of 79

# EXHIBIT A

Case 21-03004-sgj  Doc 109  Filed 12/30/21  Entered 12/30/21 18:34:00  Desc Main
Case 3:21-cv-00881-X  Document 177-28  Filed 01/09/24  Page 117 of 188  PageID 35190
Case 21-03005-sgj Doc 53-1 Filed 08/27/21 Entered 08/27/21 23:17:25 Page 62 of 79

# PROMISSORY NOTE

**$30,746,812.33**                                                        **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

     2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

     2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

     2.2    <u>Final Payment Date</u>.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 118 of 188   PageID 35191
Case 21-03005-sgj Doc 53-1 Filed 12/27/21 Entered 12/27/21 23:17:13 Page 73 of 79

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.   Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.   Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.   Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.   Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.   Prior Notes.   The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

D-CNL002955
**Appx. 00712**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 119 of 188   PageID 35192
Case 21-03005-sgj Doc 52-1 Filed 07/27/21 Entered 07/27/21 23:17:25 Page 84 of 94

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

D-CNL002956

Appx. 00713

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 77-28    Filed 01/09/24    Page 120 of 188    PageID 35193
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 19 of 79

# EXHIBIT B

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 121 of 188   PageID 35194
Document   Page 20 of 79

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 20 of 79

**NPA $30.7M**

| | | |
|---|---|---|
| **Closing Date** | | 5/31/2017 |
| **Total Commitment** | $ | 30,746,812 |
| **Rate** | | 6.000% |
| **Maturity:** | | 12/31/2047 |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal | Total Paid |
|---|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | $ 30,746,812 | |
| 6/30/2017 | 151,628.12 | | 151,628.12 | 30,746,812.33 | | 30,746,812.33 | |
| 7/31/2017 | 156,682.39 | | 308,310.50 | 30,746,812.33 | | 30,746,812.33 | |
| 8/31/2017 | 156,682.39 | | 464,992.89 | 30,746,812.33 | | 30,746,812.33 | |
| 9/30/2017 | 151,628.12 | | 616,621.00 | 30,746,812.33 | | 30,746,812.33 | |
| 10/20/2017 | 101,085.41 | (717,706.41) | - | 30,746,812.33 | (82,293.59) | 30,664,518.74 | (800,000.00) |
| 10/31/2017 | 55,448.17 | | 55,448.17 | 30,664,518.74 | | 30,664,518.74 | |
| 11/30/2017 | 151,222.28 | | 206,670.46 | 30,664,518.74 | | 30,664,518.74 | |
| 12/5/2017 | 25,203.71 | (358,904.83) | (127,030.67) | 30,664,518.74 | (942,600.16) | 29,721,918.58 | (1,301,504.99) |
| 12/31/2017 | 127,030.67 | | (0.00) | 29,721,918.58 | | 29,721,918.58 | |
| 1/31/2018 | 151,459.64 | | 151,459.64 | 29,721,918.58 | | 29,721,918.58 | |
| 2/28/2018 | 136,802.26 | | 288,261.90 | 29,721,918.58 | | 29,721,918.58 | |
| 3/31/2018 | 151,459.64 | | 439,721.54 | 29,721,918.58 | | 29,721,918.58 | |
| 4/10/2018 | 48,857.95 | (439,721.54) | 48,857.95 | 29,721,918.58 | | 29,721,918.58 | (439,721.54) |
| 4/30/2018 | 97,715.90 | | 146,573.85 | 29,721,918.58 | | 29,721,918.58 | |
| 5/1/2018 | 4,885.79 | (146,573.85) | 4,885.79 | 29,721,918.58 | | 29,721,918.58 | (146,573.85) |
| 5/9/2018 | 39,086.36 | (879,927.65) | (835,955.50) | 29,721,918.58 | | 29,721,918.58 | (879,927.65) |
| 5/31/2018 | 107,487.49 | | (728,468.01) | 29,721,918.58 | | 29,721,918.58 | |
| 6/30/2018 | 146,573.85 | | (581,894.17) | 29,721,918.58 | | 29,721,918.58 | |
| 7/31/2018 | 151,459.64 | | (430,434.53) | 29,721,918.58 | | 29,721,918.58 | |
| 8/31/2018 | 151,459.64 | | (278,974.89) | 29,721,918.58 | | 29,721,918.58 | |
| 9/5/2018 | 24,428.97 | | (254,545.91) | 29,721,918.58 | (280,765.40) | 29,441,153.18 | (280,765.40) |
| 9/21/2018 | 77,434.27 | | (177,111.65) | 29,441,153.18 | (1,023,750.00) | 28,417,403.18 | (1,023,750.00) |
| 9/30/2018 | 42,042.19 | | (135,069.46) | 28,417,403.18 | | 28,417,403.18 | |
| 10/31/2018 | 144,811.97 | | 9,742.51 | 28,417,403.18 | | 28,417,403.18 | |
| 11/30/2018 | 140,140.62 | | 149,883.13 | 28,417,403.18 | | 28,417,403.18 | |
| 12/18/2018 | 84,084.37 | (294,695.10) | (60,727.60) | 28,417,403.18 | | 28,417,403.18 | (294,695.10) |
| 12/31/2018 | 60,727.60 | | (0.00) | 28,417,403.18 | | 28,417,403.18 | |

D-NNL-029141

**Appx. 00715**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 77-28   Filed 07/09/24   Page 122 of 188   PageID 35195

Case 21-03004-sgj   Doc 92   Filed 12/17/21   Entered 12/17/21 23:27:25   Page 21 of 79

| Date | Amount | Adj 1 | Col 3 | Balance | Adj 2 | Balance 2 | Adj 3 |
|---|---|---|---|---|---|---|---|
| 1/31/2019 | 144,811.97 | | 144,811.97 | 28,417,403.18 | | 28,417,403.18 | |
| 2/28/2019 | 130,797.91 | | 275,609.88 | 28,417,403.18 | | 28,417,403.18 | |
| 3/29/2019 | 135,469.26 | (411,079.15) | (0.00) | 28,417,403.18 | (338,920.85) | 28,078,482.33 | (750,000.00) |
| 3/31/2019 | 9,231.28 | | 9,231.28 | 28,078,482.33 | | 28,078,482.33 | |
| 4/16/2019 | 73,850.25 | (83,081.53) | 0.00 | 28,078,482.33 | (1,216,918.47) | 26,861,563.86 | (1,300,000.00) |
| 4/30/2019 | 61,818.39 | | 61,818.40 | 26,861,563.86 | | 26,861,563.86 | |
| 5/31/2019 | 136,883.59 | (198,701.98) | 0.00 | 26,861,563.86 | 198,701.98 | 27,060,265.84 | - |
| 6/4/2019 | 17,793.05 | (17,793.05) | 0.00 | 27,060,265.84 | (282,206.95) | 26,778,058.89 | (300,000.00) |
| 6/19/2019 | 66,028.09 | (66,028.10) | (0.00) | 26,778,058.89 | (2,033,971.90) | 24,744,086.99 | (2,100,000.00) |
| 6/30/2019 | 44,742.73 | | 44,742.73 | 24,744,086.99 | | 24,744,086.99 | |
| 7/9/2019 | 36,607.69 | (81,350.42) | (0.00) | 24,744,086.99 | (548,649.58) | 24,195,437.41 | (630,000.00) |
| 7/31/2019 | 87,501.31 | | 87,501.31 | 24,195,437.41 | | 24,195,437.41 | |
| 8/13/2019 | 51,705.32 | (139,206.62) | 0.00 | 24,195,437.41 | (1,160,793.38) | 23,034,644.03 | (1,300,000.00) |
| 8/31/2019 | 68,157.30 | | 68,157.31 | 23,034,644.03 | | 23,034,644.03 | |
| 9/30/2019 | 113,595.50 | | 181,752.81 | 23,034,644.03 | | 23,034,644.03 | |
| 10/15/2019 | 56,797.75 | | 238,550.56 | 23,034,644.03 | | 23,034,644.03 | |
| 10/31/2019 | 60,584.27 | | 299,134.83 | 23,034,644.03 | | 23,034,644.03 | |
| 11/30/2019 | 113,595.50 | | 412,730.34 | 23,034,644.03 | | 23,034,644.03 | |
| 12/30/2019 | 113,595.50 | -530,112.36 | (3,786.52) | 23,034,644.03 | | 23,034,644.03 | (530,112.36) |
| 12/31/2019 | 3,786.52 | | 0.00 | 23,034,644.03 | | 23,034,644.03 | |
| 1/31/2020 | 117,382.02 | | 117,382.02 | 23,034,644.03 | | 23,034,644.03 | |
| 2/29/2020 | 109,808.99 | | 227,191.01 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2020 | 117,382.02 | | 344,573.03 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2020 | 113,595.50 | | 458,168.54 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2020 | 117,382.02 | (575,550.56) | (0.00) | 23,034,644.03 | 575,550.56 | 23,610,194.59 | |
| 6/30/2020 | 116,433.84 | | 116,433.83 | 23,610,194.59 | | 23,610,194.59 | |
| 7/31/2020 | 120,314.96 | | 236,748.80 | 23,610,194.59 | | 23,610,194.59 | |
| 8/31/2020 | 120,314.96 | | 357,063.76 | 23,610,194.59 | | 23,610,194.59 | |
| 9/30/2020 | 116,433.84 | | 473,497.60 | 23,610,194.59 | | 23,610,194.59 | |
| 10/31/2020 | 120,314.96 | | 593,812.56 | 23,610,194.59 | | 23,610,194.59 | |
| 11/30/2020 | 116,433.84 | | 710,246.40 | 23,610,194.59 | | 23,610,194.59 | |
| 12/31/2020 | 120,314.96 | | 830,561.36 | 23,610,194.59 | | 23,610,194.59 | |
| 1/14/2021 | 54,335.79 | (830,561.36) | 54,335.79 | 23,610,194.59 | (575,550.56) | 23,034,644.03 | (1,406,111.92) |
| 1/31/2021 | 64,370.79 | | 118,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 2/28/2021 | 106,022.47 | | 224,729.05 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2021 | 117,382.02 | | 342,111.07 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2021 | 113,595.50 | | 455,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2021 | 117,382.02 | | 573,088.60 | 23,034,644.03 | | 23,034,644.03 | |

CONFIDENTIAL

Case 21-03004-sgj  Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 17-28   Filed 01/09/24   Page 123 of 188   PageID 35196

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 22 of 79

| 6/30/2021 | 113,595.50 | 686,684.10 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2021 | 117,382.02 | 804,066.13 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2021 | 117,382.02 | 921,448.15 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2021 | 113,595.50 | 1,035,043.65 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2021 | 117,382.02 | 1,152,425.67 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2021 | 113,595.50 | 1,266,021.18 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2021 | 117,382.02 | 1,383,403.20 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2022 | 117,382.02 | 1,500,785.22 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2022 | 106,022.47 | 1,606,807.69 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2022 | 117,382.02 | 1,724,189.72 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2022 | 113,595.50 | 1,837,785.22 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2022 | 117,382.02 | 1,955,167.24 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2022 | 113,595.50 | 2,068,762.75 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2022 | 117,382.02 | 2,186,144.77 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2022 | 117,382.02 | 2,303,526.79 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2022 | 113,595.50 | 2,417,122.29 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2022 | 117,382.02 | 2,534,504.32 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2022 | 113,595.50 | 2,648,099.82 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2022 | 117,382.02 | 2,765,481.84 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2023 | 117,382.02 | 2,882,863.86 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2023 | 106,022.47 | 2,988,886.34 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2023 | 117,382.02 | 3,106,268.36 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2023 | 113,595.50 | 3,219,863.86 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2023 | 117,382.02 | 3,337,245.88 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2023 | 113,595.50 | 3,450,841.39 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2023 | 117,382.02 | 3,568,223.41 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2023 | 117,382.02 | 3,685,605.43 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2023 | 113,595.50 | 3,799,200.94 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2023 | 117,382.02 | 3,916,582.96 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2023 | 113,595.50 | 4,030,178.46 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2023 | 117,382.02 | 4,147,560.48 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2024 | 117,382.02 | 4,264,942.51 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2024 | 109,808.99 | 4,374,751.49 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2024 | 117,382.02 | 4,492,133.52 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2024 | 113,595.50 | 4,605,729.02 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2024 | 117,382.02 | 4,723,111.04 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2024 | 113,595.50 | 4,836,706.55 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2024 | 117,382.02 | 4,954,088.57 | 23,034,644.03 | 23,034,644.03 |

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 77-28   Filed 01/09/24   Page 124 of 188   PageID 35197

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 23 of 79

| | | | | |
|---|---|---|---|---|
| 8/31/2024 | 117,382.02 | 5,071,470.59 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2024 | 113,595.50 | 5,185,066.10 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2024 | 117,382.02 | 5,302,448.12 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2024 | 113,595.50 | 5,416,043.62 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2024 | 117,382.02 | 5,533,425.64 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2025 | 117,382.02 | 5,650,807.67 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2025 | 106,022.47 | 5,756,830.14 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2025 | 117,382.02 | 5,874,212.16 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2025 | 113,595.50 | 5,987,807.66 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2025 | 117,382.02 | 6,105,189.68 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2025 | 113,595.50 | 6,218,785.19 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2025 | 117,382.02 | 6,336,167.21 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2025 | 117,382.02 | 6,453,549.23 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2025 | 113,595.50 | 6,567,144.74 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2025 | 117,382.02 | 6,684,526.76 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2025 | 113,595.50 | 6,798,122.26 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2025 | 117,382.02 | 6,915,504.29 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2026 | 117,382.02 | 7,032,886.31 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2026 | 106,022.47 | 7,138,908.78 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2026 | 117,382.02 | 7,256,290.80 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2026 | 113,595.50 | 7,369,886.31 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2026 | 117,382.02 | 7,487,268.33 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2026 | 113,595.50 | 7,600,863.83 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2026 | 117,382.02 | 7,718,245.85 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2026 | 117,382.02 | 7,835,627.87 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2026 | 113,595.50 | 7,949,223.38 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2026 | 117,382.02 | 8,066,605.40 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2026 | 113,595.50 | 8,180,200.91 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2026 | 117,382.02 | 8,297,582.93 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2027 | 117,382.02 | 8,414,964.95 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2027 | 106,022.47 | 8,520,987.42 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2027 | 117,382.02 | 8,638,369.44 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2027 | 113,595.50 | 8,751,964.95 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2027 | 117,382.02 | 8,869,346.97 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2027 | 113,595.50 | 8,982,942.47 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2027 | 117,382.02 | 9,100,324.50 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2027 | 117,382.02 | 9,217,706.52 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2027 | 113,595.50 | 9,331,302.02 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 77-28   Filed 01/09/04788   Page 125 of 188   PageID 35198

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 24 of 79

| 10/31/2027 | 117,382.02 | 9,448,684.04 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2027 | 113,595.50 | 9,562,279.55 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2027 | 117,382.02 | 9,679,661.57 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2028 | 117,382.02 | 9,797,043.59 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2028 | 109,808.99 | 9,906,852.58 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2028 | 117,382.02 | 10,024,234.60 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2028 | 113,595.50 | 10,137,830.11 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2028 | 117,382.02 | 10,255,212.13 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2028 | 113,595.50 | 10,368,807.63 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2028 | 117,382.02 | 10,486,189.65 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2028 | 117,382.02 | 10,603,571.68 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2028 | 113,595.50 | 10,717,167.18 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2028 | 117,382.02 | 10,834,549.20 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2028 | 113,595.50 | 10,948,144.71 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2028 | 117,382.02 | 11,065,526.73 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2029 | 117,382.02 | 11,182,908.75 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2029 | 106,022.47 | 11,288,931.22 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2029 | 117,382.02 | 11,406,313.24 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2029 | 113,595.50 | 11,519,908.75 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2029 | 117,382.02 | 11,637,290.77 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2029 | 113,595.50 | 11,750,886.27 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2029 | 117,382.02 | 11,868,268.30 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2029 | 117,382.02 | 11,985,650.32 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2029 | 113,595.50 | 12,099,245.82 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2029 | 117,382.02 | 12,216,627.84 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2029 | 113,595.50 | 12,330,223.35 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2029 | 117,382.02 | 12,447,605.37 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2030 | 117,382.02 | 12,564,987.39 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2030 | 106,022.47 | 12,671,009.86 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2030 | 117,382.02 | 12,788,391.89 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2030 | 113,595.50 | 12,901,987.39 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2030 | 117,382.02 | 13,019,369.41 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2030 | 113,595.50 | 13,132,964.92 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2030 | 117,382.02 | 13,250,346.94 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2030 | 117,382.02 | 13,367,728.96 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2030 | 113,595.50 | 13,481,324.46 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2030 | 117,382.02 | 13,598,706.49 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2030 | 113,595.50 | 13,712,301.99 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-18   Filed 01/20/04788   Page 126 of 188   PageID 35199

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 25 of 79

| 12/31/2030 | 117,382.02 | 13,829,684.01 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2031 | 117,382.02 | 13,947,066.03 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2031 | 106,022.47 | 14,053,088.51 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2031 | 117,382.02 | 14,170,470.53 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2031 | 113,595.50 | 14,284,066.03 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2031 | 117,382.02 | 14,401,448.05 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2031 | 113,595.50 | 14,515,043.56 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2031 | 117,382.02 | 14,632,425.58 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2031 | 117,382.02 | 14,749,807.60 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2031 | 113,595.50 | 14,863,403.11 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2031 | 117,382.02 | 14,980,785.13 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2031 | 113,595.50 | 15,094,380.63 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2031 | 117,382.02 | 15,211,762.65 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2032 | 117,382.02 | 15,329,144.68 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2032 | 109,808.99 | 15,438,953.66 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2032 | 117,382.02 | 15,556,335.69 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2032 | 113,595.50 | 15,669,931.19 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2032 | 117,382.02 | 15,787,313.21 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2032 | 113,595.50 | 15,900,908.72 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2032 | 117,382.02 | 16,018,290.74 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2032 | 117,382.02 | 16,135,672.76 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2032 | 113,595.50 | 16,249,268.27 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2032 | 117,382.02 | 16,366,650.29 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2032 | 113,595.50 | 16,480,245.79 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2032 | 117,382.02 | 16,597,627.81 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2033 | 117,382.02 | 16,715,009.84 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2033 | 106,022.47 | 16,821,032.31 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2033 | 117,382.02 | 16,938,414.33 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2033 | 113,595.50 | 17,052,009.83 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2033 | 117,382.02 | 17,169,391.85 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2033 | 113,595.50 | 17,282,987.36 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2033 | 117,382.02 | 17,400,369.38 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2033 | 117,382.02 | 17,517,751.40 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2033 | 113,595.50 | 17,631,346.91 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2033 | 117,382.02 | 17,748,728.93 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2033 | 113,595.50 | 17,862,324.43 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2033 | 117,382.02 | 17,979,706.46 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2034 | 117,382.02 | 18,097,088.48 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 77-18   Filed 07/29/04788age 127 of 188   PageID 35200

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 26 of 79

| | | | | |
|---|---|---|---|---|
| 2/28/2034 | 106,022.47 | 18,203,110.95 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2034 | 117,382.02 | 18,320,492.97 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2034 | 113,595.50 | 18,434,088.47 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2034 | 117,382.02 | 18,551,470.50 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2034 | 113,595.50 | 18,665,066.00 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2034 | 117,382.02 | 18,782,448.02 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2034 | 117,382.02 | 18,899,830.04 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2034 | 113,595.50 | 19,013,425.55 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2034 | 117,382.02 | 19,130,807.57 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2034 | 113,595.50 | 19,244,403.08 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2034 | 117,382.02 | 19,361,785.10 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2035 | 117,382.02 | 19,479,167.12 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2035 | 106,022.47 | 19,585,189.59 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2035 | 117,382.02 | 19,702,571.61 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2035 | 113,595.50 | 19,816,167.12 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2035 | 117,382.02 | 19,933,549.14 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2035 | 113,595.50 | 20,047,144.64 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2035 | 117,382.02 | 20,164,526.67 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2035 | 117,382.02 | 20,281,908.69 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2035 | 113,595.50 | 20,395,504.19 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2035 | 117,382.02 | 20,512,886.21 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2035 | 113,595.50 | 20,626,481.72 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2035 | 117,382.02 | 20,743,863.74 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2036 | 117,382.02 | 20,861,245.76 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2036 | 109,808.99 | 20,971,054.75 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2036 | 117,382.02 | 21,088,436.77 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2036 | 113,595.50 | 21,202,032.28 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2036 | 117,382.02 | 21,319,414.30 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2036 | 113,595.50 | 21,433,009.80 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2036 | 117,382.02 | 21,550,391.82 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2036 | 117,382.02 | 21,667,773.85 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2036 | 113,595.50 | 21,781,369.35 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2036 | 117,382.02 | 21,898,751.37 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2036 | 113,595.50 | 22,012,346.88 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2036 | 117,382.02 | 22,129,728.90 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2037 | 117,382.02 | 22,247,110.92 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2037 | 106,022.47 | 22,353,133.39 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2037 | 117,382.02 | 22,470,515.41 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 128 of 188   PageID 35201

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 27 of 79

| | | | | |
|---|---|---|---|---|
| 4/30/2037 | 113,595.50 | 22,584,110.92 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2037 | 117,382.02 | 22,701,492.94 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2037 | 113,595.50 | 22,815,088.44 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2037 | 117,382.02 | 22,932,470.47 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2037 | 117,382.02 | 23,049,852.49 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2037 | 113,595.50 | 23,163,447.99 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2037 | 117,382.02 | 23,280,830.01 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2037 | 113,595.50 | 23,394,425.52 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2037 | 117,382.02 | 23,511,807.54 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2038 | 117,382.02 | 23,629,189.56 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2038 | 106,022.47 | 23,735,212.03 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2038 | 117,382.02 | 23,852,594.06 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2038 | 113,595.50 | 23,966,189.56 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2038 | 117,382.02 | 24,083,571.58 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2038 | 113,595.50 | 24,197,167.09 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2038 | 117,382.02 | 24,314,549.11 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2038 | 117,382.02 | 24,431,931.13 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2038 | 113,595.50 | 24,545,526.63 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2038 | 117,382.02 | 24,662,908.66 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2038 | 113,595.50 | 24,776,504.16 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2038 | 117,382.02 | 24,893,886.18 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2039 | 117,382.02 | 25,011,268.20 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2039 | 106,022.47 | 25,117,290.68 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2039 | 117,382.02 | 25,234,672.70 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2039 | 113,595.50 | 25,348,268.20 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2039 | 117,382.02 | 25,465,650.22 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2039 | 113,595.50 | 25,579,245.73 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2039 | 117,382.02 | 25,696,627.75 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2039 | 117,382.02 | 25,814,009.77 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2039 | 113,595.50 | 25,927,605.28 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2039 | 117,382.02 | 26,044,987.30 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2039 | 113,595.50 | 26,158,582.80 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2039 | 117,382.02 | 26,275,964.82 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2040 | 117,382.02 | 26,393,346.85 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2040 | 109,808.99 | 26,503,155.83 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2040 | 117,382.02 | 26,620,537.86 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2040 | 113,595.50 | 26,734,133.36 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2040 | 117,382.02 | 26,851,515.38 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 77-28   Filed 01/29/24   Page 129 of 188   PageID 35202

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 28 of 79

| | | | |
|---|---|---|---|
| 6/30/2040 | 113,595.50 | 26,965,110.89 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2040 | 117,382.02 | 27,082,492.91 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2040 | 117,382.02 | 27,199,874.93 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2040 | 113,595.50 | 27,313,470.44 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2040 | 117,382.02 | 27,430,852.46 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2040 | 113,595.50 | 27,544,447.96 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2040 | 117,382.02 | 27,661,829.98 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2041 | 117,382.02 | 27,779,212.01 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2041 | 106,022.47 | 27,885,234.48 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2041 | 117,382.02 | 28,002,616.50 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2041 | 113,595.50 | 28,116,212.00 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2041 | 117,382.02 | 28,233,594.02 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2041 | 113,595.50 | 28,347,189.53 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2041 | 117,382.02 | 28,464,571.55 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2041 | 117,382.02 | 28,581,953.57 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2041 | 113,595.50 | 28,695,549.08 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2041 | 117,382.02 | 28,812,931.10 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2041 | 113,595.50 | 28,926,526.60 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2041 | 117,382.02 | 29,043,908.63 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2042 | 117,382.02 | 29,161,290.65 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2042 | 106,022.47 | 29,267,313.12 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2042 | 117,382.02 | 29,384,695.14 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2042 | 113,595.50 | 29,498,290.64 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2042 | 117,382.02 | 29,615,672.67 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2042 | 113,595.50 | 29,729,268.17 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2042 | 117,382.02 | 29,846,650.19 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2042 | 117,382.02 | 29,964,032.21 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2042 | 113,595.50 | 30,077,627.72 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2042 | 117,382.02 | 30,195,009.74 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2042 | 113,595.50 | 30,308,605.25 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2042 | 117,382.02 | 30,425,987.27 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2043 | 117,382.02 | 30,543,369.29 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2043 | 106,022.47 | 30,649,391.76 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2043 | 117,382.02 | 30,766,773.78 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2043 | 113,595.50 | 30,880,369.29 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2043 | 117,382.02 | 30,997,751.31 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2043 | 113,595.50 | 31,111,346.81 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2043 | 117,382.02 | 31,228,728.84 | 23,034,644.03 | 23,034,644.03 |

Case 21-03004-sgj  Doc 109  Filed 12/30/21  Entered 12/30/21 18:34:00  Desc Main
Case 3:21-cv-00881-X  Document 77-18  Filed 01/09/24  Page 130 of 188  PageID 35203

Case 21-03004-sgj Doc 92 Filed 12/17/21  Entered 12/17/21 23:27:25  Page 29 of 79

| | | | | |
|---|---|---|---|---|
| 8/31/2043 | 117,382.02 | 31,346,110.86 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2043 | 113,595.50 | 31,459,706.36 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2043 | 117,382.02 | 31,577,088.38 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2043 | 113,595.50 | 31,690,683.89 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2043 | 117,382.02 | 31,808,065.91 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2044 | 117,382.02 | 31,925,447.93 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2044 | 109,808.99 | 32,035,256.92 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2044 | 117,382.02 | 32,152,638.94 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2044 | 113,595.50 | 32,266,234.45 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2044 | 117,382.02 | 32,383,616.47 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2044 | 113,595.50 | 32,497,211.97 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2044 | 117,382.02 | 32,614,593.99 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2044 | 117,382.02 | 32,731,976.02 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2044 | 113,595.50 | 32,845,571.52 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2044 | 117,382.02 | 32,962,953.54 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2044 | 113,595.50 | 33,076,549.05 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2044 | 117,382.02 | 33,193,931.07 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2045 | 117,382.02 | 33,311,313.09 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2045 | 106,022.47 | 33,417,335.56 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2045 | 117,382.02 | 33,534,717.58 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2045 | 113,595.50 | 33,648,313.09 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2045 | 117,382.02 | 33,765,695.11 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2045 | 113,595.50 | 33,879,290.61 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2045 | 117,382.02 | 33,996,672.64 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2045 | 117,382.02 | 34,114,054.66 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2045 | 113,595.50 | 34,227,650.16 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2045 | 117,382.02 | 34,345,032.18 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2045 | 113,595.50 | 34,458,627.69 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2045 | 117,382.02 | 34,576,009.71 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2046 | 117,382.02 | 34,693,391.73 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2046 | 106,022.47 | 34,799,414.20 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2046 | 117,382.02 | 34,916,796.23 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2046 | 113,595.50 | 35,030,391.73 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2046 | 117,382.02 | 35,147,773.75 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2046 | 113,595.50 | 35,261,369.26 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2046 | 117,382.02 | 35,378,751.28 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2046 | 117,382.02 | 35,496,133.30 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2046 | 113,595.50 | 35,609,728.80 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 17-28   Filed 07/09/24   Page 131 of 188   PageID 35204

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 30 of 79

| 10/31/2046 | 117,382.02 | 35,727,110.83 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2046 | 113,595.50 | 35,840,706.33 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2046 | 117,382.02 | 35,958,088.35 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2047 | 117,382.02 | 36,075,470.37 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2047 | 106,022.47 | 36,181,492.85 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2047 | 117,382.02 | 36,298,874.87 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2047 | 113,595.50 | 36,412,470.37 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2047 | 117,382.02 | 36,529,852.39 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2047 | 113,595.50 | 36,643,447.90 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2047 | 117,382.02 | 36,760,829.92 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2047 | 117,382.02 | 36,878,211.94 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2047 | 113,595.50 | 36,991,807.45 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2047 | 117,382.02 | 37,109,189.47 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 132 of 188   PageID 35205
Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 31 of 79

# EXHIBIT C

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 172-23    Filed 09/04/788    Page 133 of 188    PageID 35206
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 32 of 79

**Highland Capital Management, L.P. - Cash**
Next 13 Weeks Commencing December 14, 2020
*(in thousands)*
*CONFIDENTIAL DRAFT FOR ILLUSTRATIVE PURPOSES ONLY - NOT FINAL OR APPROVED FOR FURTHER DISTRIBUTION*

| | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week beginning | 12/7 | 12/14 | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 2/1 | 2/8 | 2/15 | 2/22 | 3/1 | 3/8 |
| **Beginning unrestricted operating cash** | $ 12,537 | $ 11,948 | $ 10,684 | $ 11,051 | $ 11,771 | $ 11,048 | $ 11,188 | $ 11,353 | $ 10,486 | $ 11,445 | $ 10,860 | $ 10,279 | $ 8,145 | $ 8,381 |
| **Operating Receipts** | | | | | | | | | | | | | | |
| Management fees | | | | | | | | | | | | | | |
| CLOs | - | - | - | - | - | - | - | 676 | - | - | - | - | - | - |
| Hedge funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Private Equity, PetroCap, Port Co's | - | - | - | - | 63 | - | - | - | - | - | 270 | - | - | - |
| Separate accounts | - | - | 776 | - | - | - | - | 750 | 165 | - | 579 | - | - | - |
| Management fees - managed funds | $ - | $ - | $ 776 | $ - | $ 63 | $ - | $ - | $ 750 | $ 841 | $ - | $ 849 | $ - | $ - | $ - |
| HCMFA / NPA investment support | - | - | 668 | - | - | 668 | - | - | 668 | - | - | - | 668 | - |
| Shared services receipts | 39 | - | 168 | 385 | - | 168 | 290 | 135 | - | 290 | 60 | 15 | - | - |
| Intercompany and shared services revenue | 39 | $ - | $ 836 | $ 385 | $ - | $ 836 | $ 290 | $ 135 | $ 668 | $ 290 | $ 60 | $ 15 | $ 668 | $ - |
| Fund reimbursements | - | - | 60 | - | - | - | 100 | - | - | - | 100 | - | - | - |
| Interest receipts on notes receivable | - | - | - | 2,051 | - | - | - | - | - | - | - | - | - | - |
| Dividend receipts (unencumbered) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other miscellaneous receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total other receipts | $ - | $ - | $ 60 | $ 2,051 | $ - | $ - | $ 100 | $ - | $ - | $ - | $ 100 | $ - | $ - | $ - |
| **Total operating receipts** | $ 39 | $ - | $ 1,672 | $ 2,436 | $ 63 | $ 836 | $ 390 | $ 885 | $ 1,509 | $ 290 | $ 1,009 | $ 15 | $ 668 | $ - |
| **Compensation and benefits** | | | | | | | | | | | | | | |
| Payroll, benefits, and taxes + exp reimb | (408) | (31) | - | (556) | - | (471) | - | (561) | - | (535) | - | (625) | - | (460) |
| Cash bonuses | - | - | - | - | - | - | - | - | - | - | - | (3,394) | - | - |
| **Total compensation and benefits** | $ (408) | $ (31) | $ - | $ (556) | $ - | $ (471) | $ - | $ (561) | $ - | $ (535) | $ - | $ (4,019) | $ - | $ (460) |
| **General overhead** | | | | | | | | | | | | | | |
| Outside legal (ordinary course) | (621) | - | (499) | - | (560) | - | - | (560) | - | - | (560) | - | - | - |
| Independent director fees | - | - | (210) | - | - | - | - | - | (210) | - | - | - | (210) | - |
| General overhead - critical vendors (pre-petition) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General overhead - post-petition vendors | (158) | (1,233) | (275) | (275) | (225) | (225) | (225) | (225) | (340) | (340) | (340) | (340) | (222) | (222) |
| **Total general overhead** | $ (220) | $ (1,233) | $ (774) | $ (485) | $ (785) | $ (225) | $ (225) | $ (785) | $ (550) | $ (340) | $ (900) | $ (340) | $ (432) | $ (222) |
| **Net change in cash due to operating activity** | **(589)** | **(1,264)** | **898** | **1,395** | **(723)** | **140** | **165** | **(461)** | **959** | **(585)** | **669** | **(4,904)** | **236** | **(682)** |
| **Re-org related - payments direct to professionals** | | | | | | | | | | | | | | |
| Debtor bankruptcy counsel | - | - | (300) | - | - | - | (720) | - | - | (720) | - | - | - | - |
| Debtor FA/CRO | - | - | - | - | - | - | (300) | - | - | (300) | - | - | - | - |
| Compensation consultant | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee counsel | - | (359) | (339) | - | - | - | (600) | - | - | (600) | - | - | - | - |
| Committee FA | - | (172) | (138) | - | - | - | (480) | - | - | (480) | - | - | - | - |
| Claims / noticing agent | - | - | - | - | - | - | (30) | - | - | (30) | - | - | - | - |
| Regulatory & compliance counsel | - | (100) | - | - | - | - | (100) | - | - | (100) | - | - | - | - |
| Mediation | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee | - | - | - | - | - | - | (175) | - | - | - | - | - | - | - |
| **Total re-org related** | $ - | $ - | $ (531) | $ (877) | $ - | $ - | $ - | $ (2,405) | $ - | $ - | $ (2,230) | $ - | $ - | $ - |
| **Net change in cash from ops + reorg costs** | **(589)** | **(1,264)** | **367** | **518** | **(723)** | **140** | **165** | **(2,866)** | **959** | **(585)** | **669** | **(7,134)** | **236** | **(682)** |
| **Investing cash flows (principal only on notes)** | | | | | | | | | | | | | | |
| Jefferies prime brokerage, net or Select Equity Fund funding | - | - | - | - | - | - | 2,000 | - | - | 5,000 | - | - | - | |
| Third party fund capital call obligations | - | - | - | - | - | - | - | - | - | (1,650) | - | - | - | |
| Third party fund expected distributions | - | - | - | - | - | - | 400 | - | - | - | - | - | - | |
| Highland Capital Management Korea (capital call funding) | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Multi Strategy Credit Fund | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Highland Capital Management Latin America | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Proceeds from outstanding notes | - | - | 202 | - | - | - | - | - | - | - | - | - | - | |
| Divs, paydowns, misc from non-PB assets | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Purchases of other investments (non-PB) | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Proceeds from other investments (non-PB) | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Net change in cash due to investing activities** | **-** | **-** | **-** | **202** | **-** | **-** | **-** | **2,000** | **-** | **-** | **(1,250)** | **5,000** | **-** | **-** |
| **Financing cash flows** | | | | | | | | | | | | | | |
| Required equity distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Equity contributions | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Existing debt paydowns | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Net change in cash due to financing activities** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Ending unrestricted operating cash** | $ 11,948 | $ 10,684 | $ 11,051 | $ 11,771 | $ 11,048 | $ 11,188 | $ 11,353 | $ 10,486 | $ 11,445 | $ 10,860 | $ 10,279 | $ 8,145 | $ 8,381 | $ 7,699 |

D-CNL003810
Appx. 00727

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 28    Filed 1/04/24    Page 134 of 188    PageID 35207
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 33 of 79

# EXHIBIT D

# PROMISSORY NOTE

$3,825,000                                                           February 2, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Tax Loan.  This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

5.     Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

**Exhibit 1**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/06/22   Page 136 of 188   PageID 35209
Case 21-03004-sgj   Doc 92-1   Filed 12/17/21   Entered 12/17/21 23:27:05   Page 85 of 89

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.   <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.   <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

Appx. 00730

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X   Document 177-28    Filed 07/09/24   Page 137 of 188   PageID 35210
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 36 of 79

# EXHIBIT E

**PROMISSORY NOTE**

$2,500,000                                                                August 1, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("**_Maker_**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("**_Payee_**"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "**_Note_**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "**_applicable federal rate_**" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**Exhibit 3**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 17-28   Filed 01/09/24   Page 139 of 188   PageID 35212
Case 21-03004-sgj   Doc 92-2   Filed 12/22/21   Entered 12/22/21 23:25:01   Page 83 of 79

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**


JAMES DONDERO

2

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 140 of 188    PageID 35213
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 39 of 79

# EXHIBIT F

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 141 of 188    PageID 35214
Case 21-03004-sgj    Doc 92-3    Filed 12/12/21    Entered 12/12/21 23:27:01    Page 42 of 79

# PROMISSORY NOTE

$2,500,000                                                            August 13, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.   <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.   <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.   <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**Exhibit 4**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 142 of 188   PageID 35215
Case 21-03004-sgj   Doc 92-3   Filed 12/17/21   Entered 12/17/21 23:27:50   Page 43 of 79

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
JAMES DONDERO

2

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 178-8    Filed 01/09/24    Page 143 of 188    PageID 35216
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 42 of 79

# EXHIBIT G

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 144 of 188   PageID 35217
Case 21-03004-sgj   Doc 92-1   Filed 12/17/21   Entered 12/17/21 23:25:38   Page 42 of 79

**PROMISSORY NOTE**

$2,400,000.00                                                                                   May 2, 2019

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.   Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.   Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand.

     3.   Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.   Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.   Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.   Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 145 of 188   PageID 35218
Case 21-03004-sgj   Doc 92-1   Filed 12/17/21   Entered 12/17/21 23:27:58   Page 44 of 79

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

D-CNL002805

**Appx. 00739**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 17-28    Filed 01/09/24    Page 146 of 188    PageID 35219
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 45 of 79

# EXHIBIT H

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-23   Filed 07/09/24   Page 147 of 188   PageID 35220
Case 21-03004-sgj   Doc 92-2   Filed 12/12/21   Entered 12/12/21 23:25:38   Page 42 of 79

**PROMISSORY NOTE**

$5,000,000.00                                                                    May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-23   Filed 01/09/24   Page 148 of 188   PageID 35221
Case 21-03004-sgj   Doc 92-1   Filed 12/12/21   Entered 12/12/21 23:25:38   Page 3 of 9

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL002808
**Appx. 00742**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 149 of 188    PageID 35222
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 48 of 79

# EXHIBIT I

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 772-8    Filed 07/00/47788age 150 of 188    PageID 35223
Case 21-03004-sgj    Doc 92    Filed 12/17/21    Entered 12/17/21 23:27:25    Page 49 of 79
Case 21-03006-sgj    Doc 68-1    Filed 08/27/21    Entered 08/27/21 17:34:12    Page 2 of 3

# PROMISSORY NOTE

$150,000.00                                                          March 28, 2018

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. (*"Maker"*) promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. (*"Payee"*), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED and FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the *"Note"*). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.   <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term *"applicable federal rate"* (2.88 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.   <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.   <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.   <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.   <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.

D-CNL003105

**Appx. 00745**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-23    Filed 01/09/24    Page 152 of 188    PageID 35225
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 51 of 79

# EXHIBIT J

# PROMISSORY NOTE

$200,000.00                                                                                      June 25, 2018

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO HUNDRED THOUSAND and 00/100 Dollars ($200,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (3.05 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL003107

**Appx. 00747**

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.

2

D-CNL003108

**Appx. 00748**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 155 of 188    PageID 35228
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 54 of 79

# EXHIBIT K

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 156 of 188   PageID 35229
Case 21-03004-sgj Doc 62-3 Filed 10/27/21 Entered 10/27/21 23:17:45 Page 52 of 79

**PROMISSORY NOTE**

$400,000                                                                                         May 29, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of FOUR HUNDRED THOUSAND and 00/100 Dollars ($400,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand.

3.      Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 07/09/24   Page 157 of 188   PageID 35230
Case 21-03004-sgj Doc 63 Filed 08/27/21 Entered 08/27/21 23:17:12 Page 63 of 79

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

D-CNL003111
**Appx. 00751**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 158 of 188    PageID 35231
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 57 of 79

# EXHIBIT L

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 159 of 188   PageID 35232
Case 21-03004-sgj   Doc 92-4   Filed 12/27/21   Entered 12/27/21 23:27:45   Page 68 of 79

**PROMISSORY NOTE**

$150,000                                                                                                                          June 26, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.  <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.37%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.  <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 07/09/24   Page 160 of 188   PageID 35233
Case 21-03004-sgj Doc 53-4 Filed 08/27/21 Entered 08/27/21 23:17:45 Page 93 of 79

7.  <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

D-CNL003114

**Appx. 00754**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 161 of 188    PageID 35234
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 60 of 79

# EXHIBIT M

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 162 of 188   PageID 35235
Case 21-03004-sgj   Doc 52   Filed 08/27/21   Entered 08/27/21 23:17:52   Page 12 of 79

# PROMISSORY NOTE

$100,000                                                    November 27, 2013

     FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED THOUSAND and 00/100 Dollars ($100,000.00), together with interest, on the terms set forth below (the "***Note***").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

     7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003262

Appx. 00756

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 163 of 188   PageID 35236
Case 21-03004-sgj   Doc 92-1   Filed 12/27/21   Entered 12/27/21 21:37:25   Page 2 of 9

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

       8.    <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003263

**Appx. 00757**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 164 of 188    PageID 35237
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 63 of 79

# EXHIBIT N

Case 21-03004-sgj Doc 109 Filed 12/30/21 Entered 12/30/21 18:34:00 Desc Main
Case 3:21-cv-00881-X Document 178 Filed 09/04/78 Page 165 of 188 PageID 35238
Case 21-03004-sgj Doc 92 Filed 12/17/21 Entered 12/17/21 23:27:25 Page 64 of 79
Case 21-03007-sgj Doc 63-2 Filed 08/27/21 Entered 08/27/21 17:39:21 Page 2 of 3

# PROMISSORY NOTE

$2,500,000                                                    October 12, 2017

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.  <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.  <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.  <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003265

**Appx. 00759**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 17-28   Filed 07/06/04788   Page 166 of 188   PageID 35239
Case 21-03004-sgj   Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 65 of 79
Case 21-03007-sgj Doc 63-2 Filed 08/27/21   Entered 08/27/21 17:39:21   Page 3 of 3

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

HCRE PARTNERS, LLC

2

D-CNL003266

**Appx. 00760**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 167 of 188    PageID 35240
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 66 of 79

# EXHIBIT O

# PROMISSORY NOTE

$750,000                                                                October 15, 2018

     FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of SEVEN HUNDRED FIFTY THOUSAND and 00/100 Dollars ($750,000.00), together with interest, on the terms set forth below (the "*Note*").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.   <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.   <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.   <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.   <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.   <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

     7.   <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003268

**Appx. 00762**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 169 of 188   PageID 35242
Case 21-03004-sgj   Doc 63-3   Filed 10/27/21   Entered 10/27/21 23:17:25   Page 63 of 79

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003269

**Appx. 00763**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 170 of 188    PageID 35243
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 69 of 79

# EXHIBIT P

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-23   Filed 01/09/24   Page 171 of 188   PageID 35244
Case 21-03004-sgj Doc 63-4 Filed 08/27/21 Entered 08/27/21 23:17:32 Page 20 of 79

**PROMISSORY NOTE**

$900,000                                                         September 25, 2019

      FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of NINE HUNDRED THOUSAND and 00/100 Dollars ($900,000.00), together with interest, on the terms set forth below (the "***Note***").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

      7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003271

**Appx. 00765**

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 172 of 188   PageID 35245
Case 21-03004-sgj Doc 63-4 Filed 12/27/21 Entered 12/27/21 23:17:35 Page 13 of 79

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003272

**Appx. 00766**

Case 21-03004-sgj    Doc 109    Filed 12/30/21    Entered 12/30/21 18:34:00    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 173 of 188    PageID 35246
Case 21-03004-sgj Doc 92 Filed 12/17/21    Entered 12/17/21 23:27:25    Page 72 of 79

# EXHIBIT Q

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 174 of 188   PageID 35247
Case 21-03006-sgj   Doc 53   Filed 12/27/21   Entered 12/27/21 23:17:35   Page 32 of 79

**PROMISSORY NOTE**

**$20,247,628.02**                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from Highland Capital Management Services, Inc., as Maker and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY MILLION, TWO HUNDRED FORTY SEVEN THOUSAND, SIX HUNDRED TWENTY EIGHT AND 02/100 DOLLARS ($20,247,628.02), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of two and seventy-five hundredths percent (2.75%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1      <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2      <u>Final Payment Date</u>.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.      <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No

D-CNL003120
**Appx. 00768**

failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    <u>Prior Notes</u>.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.

By:_____
Name:
Title:

2

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 176 of 188   PageID 35249
Case 21-03004-sgj   Doc 58   Filed 08/27/21   Entered 08/27/21 23:17:25   Page 54 of 79

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 5/29/15 | $500,000 | 2.30% | $523,095 |
| 10/1/15 | $350,000 | 2.58% | $315,500 |
| 10/2/15 | $310,000 | 2.58% | $323,301 |
| 10/27/15 | $200,000 | 2.58% | $208,228 |
| 10/28/15 | $200,000 | 2.58% | $208,214 |
| 10/30/15 | $100,000 | 2.58% | $104,093 |
| 11/23/15 | $100,000 | 2.57% | $103,908 |
| 11/24/15 | $250,000 | 2.57% | $259,752 |
| 2/10/16 | $2,000,000 | 2.62% | $ 83,390 |
| 2/11/16 | $250,000 | 2.62% | $258,524 |
| 4/5/16 | $6,000,000 | 2.25% | $6,155,712 |
| 5/4/16 | $2,700,000 | 2.24% | $2,764,954 |
| 7/1/16 | $30,000 | 2.18% | $30,598 |
| 8/5/16 | $525,000 | 2.18% | $534,375 |
| 8/22/16 | $250,000 | 2.18% | $254,465 |
| 9/22/16 | $185,000 | 2.18% | $187,773 |
| 12/12/16 | $7,700,000 | 2.26% | $7,781,050 |
| 3/31/17 | $150,000 | 2.78% | $150,697 |
| | **$21,800,000** | | **$20,247,628.02** |

3

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 177 of 188   PageID 35250
Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 76 of 79

# EXHIBIT R

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-23   Filed 01/09/24   Page 178 of 188   PageID 35251
Case 21-03004-sgj   Doc 92-4   Filed 12/27/21   Entered 12/27/21 23:27:32   Page 72 of 79

## PROMISSORY NOTE

**$6,059,831.51**                                        **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from HCRE Partners, LLC, as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HCREA PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of SIX MILLION, FIFTY NINE THOUSAND, EIGHT HUNDRED THIRTY ONE AND 51/100 DOLLARS ($6,059,831.51), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of eight percent (8.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

   2.1      Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

   2.2      Final Payment Date.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

Case 21-03004-sgj   Doc 109   Filed 12/30/21   Entered 12/30/21 18:34:00   Desc Main
Case 3:21-cv-00881-X   Document 177-23   Filed 01/09/24   Page 179 of 188   PageID 35252
Case 21-03004-sgj   Doc 92   Filed 12/27/21   Entered 12/27/21 23:17:35   Page 33 of 74

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9. <u>Prior Notes</u>. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HCRE PARTNERS, LLC

By: _____

Name: James Dondero

Title:

D-CNL003279

**Appx. 00773**

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 1/9/14 | $100,000.00 | 8.00% | $108,000.00 |
| 1/29/14 | $600,000.00 | 8.00% | $648,000.00 |
| 3/10/14 | $2,000,000.00 | 8.00% | $2,009,643.84 |
| 3/28/14 | $50,000.00 | 8.00% | $54,000.00 |
| 1/26/15 | $1,500,000.00 | 8.00% | $1,545,356.16 |
| 4/2/15 | $1,500,000.00 | 8.00% | $1,545,356 |
| | $5,750,000.00 | | $6,059,831.51 |

3

D-CNL003280

Appx. 00774

# EXHIBIT 211

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-3004-sgj |
| | § |
| HIGHLAND CAPITAL MANAGEMENT FUND | § |
| ADVISORS, L.P., | § |
| | § |
| Defendant. | § |
| | § |
| | § |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**DECLARATION OF HAYLEY R. WINOGRAD IN SUPPORT OF HIGHLAND
CAPITAL MANAGEMENT, L.P.'S OPPOSITION TO DEFENDANT'S SECOND
MOTION FOR LEAVE TO AMEND ANSWER**

I, Hayley R. Winograd, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, declare as follows:

1.    I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to the above-referenced Reorganized Debtor, and I submit this Declaration in support of *Highland Capital Management, L.P.'s Opposition to Defendant's Second Motion for Leave to Amend Answer* (the "Opposition") being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.    Attached as **Exhibit A** is a true and correct copy of communications from Highland's counsel to HCMFA's counsel on June 25, 2021, producing the May 2, 2019 e-mail.

3.    Attached as **Exhibit B** is a true and correct copy of communications from Highland's counsel to HCMFA's counsel on July 2, 2021, producing Word versions of the HCMFA Notes.


Dated: December 30, 2021.                  */s/ Hayley R. Winograd*
                                            Hayley R. Winograd

1

**From:** Hayley R. Winograd
**Sent:** Friday, June 25, 2021 8:15 PM
**To:** 'Rukavina, Davor' <drukavina@munsch.com>; Vasek, Julian <jvasek@munsch.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>
**Subject:** Debtor's Production to 1st Set of Discovery - Adv. Proc. 21-3004

Counsel,

Below please find the link and password to the production of documents responsive to HCMFA's First Set of Discovery to Plaintiff, at bates numbers: D-HCMFA000001 - D-HCMFA095954.

https://app.everlaw.com/14261/dl/uHZHMlY9wvBBGN7oRKLl42lJv5aGxY0p8OIpH03HhbUS
Password: s4qCG3ppz2DX


Thanks,
Hayley


**Hayley R. Winograd**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7700 | Fax: 212.561.7777
hwinograd@pszjlaw.com



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**Appx. 00778**

**Attachments:**                    HCMFA 7_2_21 Production (2).zip


**From:** Hayley R. Winograd
**Sent:** Friday, July 2, 2021 12:56 PM
**To:** 'Rukavina, Davor' <drukavina@munsch.com>; 'Vasek, Julian' <jvasek@munsch.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>
**Subject:** RE: Debtor's Supplemental Production to 2nd Set of Discovery - Adv. Proc. 21-3004

Counsel,

Please find in the attached link the Debtor's supplemental production responsive to HCMFA's Second Set of Requests for Production, at bates numbers: D-HCMFA290880 - D-HCMFA290883.

Thanks,
Hayley


**Hayley R. Winograd**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7700 | Fax: 212.561.7777
hwinograd@pszjlaw.com



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**Appx. 00779**

# EXHIBIT 212

| **From:** | John A. Morris |
|---|---|
| **Sent:** | Monday, October 25, 2021 5:39 PM |
| **To:** | Deborah R. Deitsch-Perez (deborah.deitschperez@stinson.com); Aigen, Michael P. (michael.aigen@stinson.com); Rukavina, Davor (drukavina@munsch.com); Berghman, Thomas (tberghman@munsch.com); Vasek, Julian (jvasek@munsch.com); Clay Taylor (clay.taylor@bondsellis.com); Bryan Assink (bryan.assink@bondsellis.com); 'ddraper@hellerdraper.com' |
| **Cc:** | Jeff Pomerantz; Gregory V. Demo; Hayley R. Winograd; La Asia S. Canty |
| **Subject:** | Highland:  Word Versions of the Notes |
| **Attachments:** | Notes.zip; RE: Form of Loan Consolidation Agreement.msg |

Counsel:

As requested, attached are two zip files containing the Word versions of the Notes.

Because they are Word versions, they have not been bates stamped. Therefore, this e-mail will serve as the "proof" of the form, format, timing, and content of the production.

As I mentioned, Highland has retained an expert who has performed his analysis of the Metadata but has not prepared a report. Insofar as Mr. Dondero and his related entities will be liable for Highland's fees and expenses in the event Highland prevails in this matter, please let me know if the Defendants intend to dispute the authenticity of the Notes or otherwise challenge any aspect of their creation as soon as possible so we don't unnecessarily incur an expense.

If we don't hear from you by the close of business on Wednesday on this matter, we will direct the expert to turn his findings into a report for delivery on Friday, make him available for a deposition, and include those expenses in a future supplemental production.

Also, Davor, please produce the Advisors' 15c report (including responses to questions 1 and 2) from 2020 by the close of business tomorrow (Tuesday) or Highland will move to compel production.

Please let me know if you have any questions.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

1

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

2