Page 34

```
1              BURGER
2      A.  That's correct.
3      Q.  Okay.  If we could just scroll down
4  to the bottom of the page.  Little further,
5  yeah, right there.
6          Do you see there is a reference that
7  says, quote, the accompanying notes are an
8  integral part of these consolidated financial
9  statements, closed quote?
10     A.  I do.
11     Q.  What does that mean?
12     A.  That is to draw the attention for
13 the reader of not reading this page in a
14 stand-alone basis, because there are further
15 explanations required to the amounts in the
16 footnotes.
17     Q.  Okay.  Let's go to page 28 of the
18 document.  Okay.  Do you see that there is a
19 Section 9 entitled related party transactions?
20     A.  I do.
21     Q.  And can you describe for me your
22 understanding of why there is a note dedicated
23 to related party transactions?
24     A.  It is a GAAP requirement for
25 financial statements to disclose material
```

Page 35

```
1              BURGER
2  related-party relationships and transactions.
3      Q.  If we can go to page 30, please, and
4  just scroll straight down so Mr. Burger can see
5  what he's got front of him, if we can go to
6  page 30.
7          Page 30 has a subheading to note 9
8  called notes and other amounts due from
9  affiliates.  Do you see that?
10     A.  Correct.
11     Q.  Okay.  And do I have it --
12 withdrawn.
13         Highland prepared all of the
14 information that is set forth in this section
15 of note 9; is that correct?
16     MR. AIGEN:  Objection, form.
17     A.  I did.
18     Q.  Is it fair to say that this portion
19 of note 9 is intended to describe obligations
20 due to the debtor by affiliates?
21     MR. AIGEN:  Objection, form.
22     A.  That's correct.
23     Q.  Let me ask a different question to
24 deal with Michael's objection.
25         Can you tell me, Mr. Burger, what
```

Page 36

```
1              BURGER
2  information is conveyed in the section called
3  notes and other amounts due from affiliates?
4      MR. AIGEN:  Objection, form.
5      MR. WANDER:  You can answer.
6      A.  I can answer, sorry.
7          The purpose of this footnote is to
8  strike out out -- because if you look at the
9  balance sheet you just see notes and you have
10 no idea who that is from, which amounts and
11 what the basic terms are.
12     Q.  Is it your understanding that this
13 section of note 9 sets forth the amounts due
14 and owing by each affiliate as of December
15 31st, 2017?
16     A.  That's correct.
17     Q.  And are the amounts included -- are
18 those amounts included in the line item that we
19 just looked at in the balance sheet called
20 notes and other amounts due from affiliates?
21     A.  Correct.
22     Q.  Do you know who calculated the
23 amounts due and owing by each affiliate as of
24 December 31st, 2017?
25     A.  It was management.
```

Page 37

```
1              BURGER
2      Q.  Okay.  Did management ever tell PwC
3  at any time prior to June -- withdrawn.
4          Did management ever tell PwC at any
5  time prior to PwC's signing off on the audited
6  financial statements for 2017 that there was
7  anything inaccurate about this section of the
8  notes?
9      MR. AIGEN:  Objection, form.
10     A.  They did not.
11     Q.  Each of the paragraph ends with a
12 sentence that may differ only in as to whether
13 it is singular or plural, but it says quote,
14 the fair value of the partnership's outstanding
15 notes receivable approximates the carrying
16 value of the notes receivable.  Do you see
17 that?
18     A.  Correct.
19     Q.  And we can scroll down a little bit
20 just so you can -- you have got the document in
21 front of you.  I would just ask you to confirm
22 that each paragraph ends with the same sentence
23 except for the last paragraph.  And does it,
24 sir?
25     A.  Yes, it is on each paragraph for
```

Page 38

BURGER

2  that section of the notes except the paragraph
3  starting on December 21st, 2015.
4      Q.   Do you have an understanding of what
5  that sentence means?
6      A.   That sentence means that these notes
7  are per GAAP, the notes are supposed to be
8  recorded at fair value and the assertion is
9  that the carrying value is considered a
10  reasonable proxy for fair value.
11      Q.   I'm sorry, what is fair value in
12  this context?
13      A.   Fair value of all assets would be
14  what you consider to be the reasonable value
15  for exchange of the asset.
16      Q.   And then what is the carrying value?
17  How does that differ from the carrying value?
18      A.   Carrying value is the -- is a
19  contractual, is the term of the contractual
20  amount.  In other words, whatever their loan
21  plus accrued interest minus payments.  And fair
22  value is -- is basically the concept of this
23  sentence is stating that the fair value of the
24  approximate or reasonable proxy for carrying
25  value in its (inaudible).

Page 39

BURGER

2      Q.   So is it fair to say that based on
3  this portion of note 9, the debtors' financial
4  statements -- withdrawn.
5          Is it fair to say that based on this
6  portion of note 9, Highland is saying that the
7  fair value of the promissory notes from the
8  affiliates was approximately equal to the
9  principal and interest then due under the
10  notes?
11          MR. AIGEN:  Objection, form.
12      A.   That's correct.
13      Q.   Is it fair to say that when the
14  audit -- withdrawn.
15          Is it fair to say that -- no,
16  withdrawn.
17          At the time the audit was completed
18  for 2017, did PwC have any reason to discount
19  the value of any of the notes described on page
20  30 or 31?
21      A.   We did not.
22      Q.   Okay.  Can we go to page 41, please.
23  If you scroll down a little bit you will see
24  there is a section entitled subsequent events
25  which is note 16.  Do you see that?

Page 40

BURGER

2      A.   Correct.
3      Q.   Okay.  What is this section intended
4  to capture?
5      A.   This is supposed to capture any
6  significant material events that occurred after
7  the balance sheet that requires disclosure.
8      Q.   And is the information described
9  here information that was provided by Highland
10  Capital?
11      A.   Yeah, correct, by management.
12      Q.   This section notes that Mr. Dondero
13  issued promissory notes to the partnership in
14  the amount of $11.7 million in 2018.  Do you
15  see that?
16      A.   I do.
17      Q.   Those obligations are not included
18  in the balance sheet that we looked at earlier
19  for the period ending December 31st, 2017;
20  correct?
21      A.   That's correct.
22      Q.   The notes issued by Mr. Dondero are
23  the only material subsequent event that PwC was
24  informed about; is that correct?
25      A.   Correct.

Page 41

BURGER

2      Q.   Let's go to the 2017 workpapers, if
3  we can call it the next exhibit, please.
4          (Exhibit 3 marked.)
5      Q.   All right.  I've put up on the
6  screen what I believe are PwC's workpapers in
7  connection with the 2017 audit as it pertains
8  to notes and other amounts due from affiliates.
9  Is that an accurate way to describe this
10  particular document?
11      A.   Yes, it would be a workpaper that we
12  retain in our file.
13      Q.   Was it prepared in connection with
14  the 2017 audit?
15      A.   Yes, this one was.
16      Q.   And when I use the phrase "2017
17  audit," I'm specifically talking about the
18  audit that was prepared for the financial
19  statements for the fiscal year ending December
20  31st, 2017.  Do you understand that?
21      A.   Correct.
22      Q.   Okay.  Who prepared this particular
23  document?
24      A.   Who prepared it?
25      Q.   I apologize, who prepared it?

Page 42

```
                    BURGER
 1
 2      A.   Sorry, Hilda Garcia.
 3      Q.   Hilda Garcia, is she employed by
 4  PwC?
 5      A.   She is.
 6      Q.   And what is her title?
 7      A.   She is a senior associate now.  She
 8  would have been a senior associate back then as
 9  well.
10      Q.   Does she report to you or to
11  somebody else?
12      A.   She reports to me.
13      Q.   And are you responsible for
14  overseeing Ms. Garcia's work?
15      A.   I am.
16      Q.   And what is the purpose of this
17  document?
18      A.   The purpose of this document is to
19  layout what are the amounts that makes up the
20  line item that is on the balance sheet of
21  HCMLP.  And then the audit procedure is
22  performed to gain comfort over those -- the
23  existence of those amounts based on
24  materiality.
25      Q.   And did PwC prepare workpapers of
```

Page 43

```
                    BURGER
 1
 2  this type in the ordinary course of its
 3  business?
 4      A.   We do.
 5      Q.   And did PwC prepare this particular
 6  workpaper in the ordinary course of its
 7  preparation of Highland's 2017 audit?
 8      A.   We did.
 9      Q.   Okay.  Can we go to the tab that is
10  marked as detailed, if you look at the bottom?
11  Do you have that, sir?
12      A.   Yes, I have.
13      Q.   Is that tab intended to list all of
14  the -- of the notes and other amounts due from
15  affiliates that were outstanding at the end of
16  the fiscal year?
17      A.   Correct.
18      Q.   And is this information -- where did
19  PwC get the information that is set forth on
20  the detail tab?
21      A.   It is from management from the trial
22  balance.
23      Q.   For the record, can you just tell me
24  what a trial balance is?
25      A.   So that is a summary document
```

Page 44

```
                    BURGER
 1
 2  listing out the balances of all accounts from
 3  the general ledger that is used to produce the
 4  set of financial statements.
 5      Q.   And was the trial balance made
 6  available to PwC by Highland in connection with
 7  its audit work?
 8      A.   It was.
 9      Q.   The next tab is marked credit risk
10  analysis.  Do you see that?
11      A.   Yes.
12      Q.   What is the purpose of the credit
13  risk analysis?
14      A.   The purpose of this is that if you
15  think about a receivable or any amount due it
16  is about intent and ability.  And this is where
17  we deal with ability to ask ourself the
18  question is the counterparty reasonably able to
19  repay the amounts.
20      Q.   And did PwC conclude in 2000 -- in
21  connection with the 2017 audit that the makers
22  of the notes set forth on this particular slide
23  had the ability to pay?
24      A.   In our opinion, yes.
25      Q.   Okay.  And did PwC base that opinion
```

Page 45

```
                    BURGER
 1
 2  on the information that was provided by
 3  management?
 4          MR. AIGEN:  Objection, form.
 5      A.   Partly management and partly our own
 6  due diligence.
 7      Q.   Okay.  The next tab is results
 8  template.  Do you see that?
 9      A.   Yes.
10      Q.   Can you just explain to me what that
11  page is, if we could scroll to the top, please?
12      A.   This -- there are a number of notes
13  that are being dealt with.  This -- so if you
14  go back to the detail tab, those are the
15  individual notes that makes up the amount that
16  ties to the back of the financial statement.
17  And there are relevant tabs here that deal with
18  a number of these loans.  In preparation for
19  this, we focused on due from HCMSI as that is
20  under question.
21      Q.   Why is due from HCMSI under
22  question?
23      A.   That is my understanding of what the
24  deposition relates to.
25          MR. WANDER:  When he says in
```

Page 46

BURGER

1
2  preparation for this, he means in
3  preparation for the deposition he reviewed
4  this piece of it, the HCMSI.  Not the rest
5  of the notes, just HCMSI.
6      Q.   Okay.  So, so but with respect to
7  this particular page, is there an analysis that
8  PwC is undertaking?  Does this reflect an –
9  withdrawn.
10      Does this page reflect an analysis
11  that PwC did?
12      MR. AIGEN:  Objection, form.
13      A.   If you add the other relevant tabs
14  to it, yes.  So in other words, some of them
15  link to other tabs.  Some of them have
16  individual documentation as referenced in the
17  marked legends.
18      Q.   And then there are tabs for the
19  individual maker of each set of notes.  Do I
20  have that right?
21      A.   Correct.
22      Q.   All right.  Let's go to the 2018
23  financial statements, please.  Are you familiar
24  with Highland's audited financial statements
25  for the period ending December 31st, 2018?

Page 47

BURGER

1
2      A.   I am.
3      MR. AIGEN:  Sorry to interrupt.  Are
4  you marking this?  I'm trying to keep
5  track, is this –
6      MR. MORRIS:  Yes, I apologize, this
7  will be Exhibit 4.
8      (Exhibit 4 marked.)
9      MR. AIGEN:  4, okay.
10      Q.   And did you oversee the preparation
11  of the audited financial statements on behalf
12  of PwC for the period ending December 31st,
13  2018?
14      A.   Correction, not preparation, we
15  don't prepare any of these documents.
16      Q.   Let – I apologize, let me restate
17  the question.
18      Did you oversee PwC's audit of
19  Highland's financial statements for the period
20  ending December 31st, 2018?
21      A.   Yeah, I did.
22      Q.   Okay.  Do you recall any deviations
23  from the process you described earlier in
24  connection with the preparation of the 2018
25  audited financials?

Page 48

BURGER

1
2      A.   No, I do not.
3      Q.   Can we go to the third page of the
4  document right there.  This document is dated,
5  if you look at the bottom, June 3rd, 2019.  Do
6  you see that?
7      A.   I do.
8      Q.   And that was the same date as the
9  management representation letter that we looked
10  at earlier, do you recall that?  We can pull it
11  up.
12      A.   No, I do.
13      Q.   Is it a coincidence that they both
14  have the same date?
15      A.   No, it is not.  We require that to
16  be the same.
17      Q.   And why do you require that the
18  management representation letter and the report
19  of independent auditors be issued on the same
20  day?
21      A.   This is – this is the date that we
22  effectively consider these financials available
23  to be issued.  And under standards, we are
24  required to consider all subsequent events and
25  representations up to this date.  So therefore,

Page 49

BURGER

1
2  we cannot accept a date of, let's call it June
3  2nd or 1st or earlier from management's
4  representation.
5      Q.   Is – is the report that is set out
6  here required by either GAAS or GAAP?
7      A.   This is – GAAS requires the audit
8  opinion to be – to be the document whereby we
9  report to the general partner on our – on our
10  audit.
11      Q.   And does PwC have an internal
12  process by which it determines whether or not
13  to sign-off on – on any particular client's
14  audit?
15      A.   We do.
16      Q.   Can you describe that process for me
17  generally?
18      A.   From an acceptance phase of the
19  client or do you mean the content of their
20  opinion?
21      Q.   The content of the opinion, thank
22  you.
23      A.   Yes.  So there is a framework that
24  we follow on going back to whether there –
25  whether we consider two things.  Whether there

Page 50

BURGER

1
2 are material uncorrected misstatements to the
3 financials or material deviations from required
4 disclosures. So in other words, are the
5 financials reasonable and accurate in terms of
6 GAAP, and were we able to perform all the
7 procedures. So in other words there weren't
8 any undue scope limitations which -- which got
9 us to a point we weren't able to perform the
10 audit and fulfill our professional duty.
11 If the answer to those are that we
12 fulfill both then we would give what we call an
13 unqualified or a clean opinion.
14 Q. And is there an opinion committee
15 that is -- that is dedicated to this process?
16 A. No, it is -- if it is a clean
17 opinion then it is the partner and if
18 applicable the second partner on the engagement
19 is called. If there is anything which goes
20 away from an unqualified opinion, in any
21 deviation, then there is a whole consultation
22 process with our national office.
23 Q. And did you personally approve this
24 opinion letter?
25 A. I did, that is my signature.

Page 51

BURGER

1
2 Q. Okay. Let's go to page 2, please,
3 consolidated balance sheet.
4 Do you see, again, there is the
5 notes and other amounts due from affiliates?
6 A. I do.
7 Q. And does this just carry over from
8 the prior years subject to any payments or
9 additional notes subject to any changes since
10 the end of the prior fiscal year?
11 A. It does.
12 Q. As of the end of 2018, is it fair to
13 say that the notes and other amounts due from
14 affiliates now exceeded more than 15 percent of
15 Highland's assets?
16 A. That is correct.
17 Q. Now, let's go to page 26, please.
18 And you will see number -- note number 8
19 relates to related-party transactions. Do you
20 see that?
21 A. I do.
22 Q. So again, do I have this right that
23 this section of the notes is intended to
24 provide the detail about transactions between
25 Highland and related parties?

Page 52

BURGER

1
2 A. It is.
3 Q. And that is required by GAAP, do I
4 have that right?
5 A. You have got it correct.
6 Q. Okay. Let's go to page 28, please.
7 Do you see on page 28 and continuing
8 on page 29 there is again a section of note 9
9 entitled notes and other amounts due from
10 affiliates?
11 A. I do.
12 Q. And this information was provided by
13 management; correct?
14 A. Correct.
15 Q. And this portion of note 8 is
16 intended to describe the obligations that were
17 owed to the debtor by affiliates; correct?
18 A. Correct.
19 Q. Does this section of note 8 set
20 forth the amounts that were due and owing by
21 each affiliate as of the end of fiscal year
22 2018?
23 A. It does.
24 Q. And are those amounts included in
25 the line item that we just looked at on the

Page 53

BURGER

1
2 balance sheet called notes and other amounts
3 due from affiliates?
4 A. It is.
5 Q. And can you confirm for me that
6 management is the one who decided -- withdrawn.
7 Can you confirm for me that
8 management is the one who calculated the
9 amounts due and owing by each affiliate as of
10 December 31st, 2018?
11 MR. AIGEN: Objection, form.
12 A. That is correct.
13 Q. To the best of your knowledge, did
14 anybody from Highland ever tell anybody from
15 PwC that any of the amounts due and owing as
16 set forth in the notes and other amounts due
17 from affiliates was wrong or incorrect?
18 A. Not to my knowledge.
19 Q. And can you confirm for me that in
20 connection with the 2018 financial statements
21 Highland again stated in general that the fair
22 value of the notes and other amounts due from
23 affiliates approximates the carrying value of
24 the notes receivable?
25 A. That's correct.

Page 54

```
1              BURGER
2     Q.   Is it fair to say that when PwC
3  issued its audit opinion on June 3rd, 2019 that
4  they had no reason to discount the fair value
5  of any of the notes described in this portion
6  of note 8?
7         MR. AIGEN:  Objection, form.
8     A.   Yeah, that is correct.
9     Q.   Let's go to page 38, please, note
10  15.  Do you see note 15 beginning on page 38?
11     A.   I do.
12     Q.   And is this the section of the notes
13  that are intended to describe material
14  subsequent events that would require
15  disclosure?
16     A.   It is.
17     Q.   And is the information set forth in
18  section 15 or note 15 information that was
19  provided by Highland?
20     A.   Correct.
21     Q.   To the best of PwC's knowledge, as
22  of June 3rd, 2019, did note 15 in fact include
23  a description of all material subsequent events
24  that required disclosure?
25     A.   That's correct.
```

Page 55

```
1              BURGER
2     Q.   Did anyone -- withdrawn.
3         Do you know whether anyone from
4  Highland ever informed anyone at PwC that there
5  were material subsequent events that were
6  omitted from note 15?
7     A.   I'm not.
8     Q.   Let's go to the 2018 workpapers.
9         (Exhibit 5 marked.)
10     Q.   We will mark this as Exhibit 5.
11         MR. MORRIS:  I am trying to go as
12  quickly as I can, Michael, to leave you a
13  little time.
14         MR. AIGEN:  Thanks.
15     Q.   Do you have that, Mr. Burger?
16     A.   Yeah, I do.
17         MR. AIGEN:  This is Exhibit 5, John?
18         MR. MORRIS:  Yes.
19     Q.   Is there anything that you need to
20  look at, Mr. Burger, to confirm that these are
21  PwC's workpapers for the 2018 audit as it
22  relates to notes and other amounts due from
23  affiliates?
24     A.   I can confirm.
25     Q.   Okay.  And was this also prepared in
```

Page 56

```
1              BURGER
2  the first instance by Ms. Garcia?
3     A.   No, this was prepared by Madeline
4  Pacocha.
5     Q.   How do you spell her last name?
6     A.   P-a-c-o-c-h-a.
7     Q.   And did she report directly to you?
8     A.   She did.  She was part of the team.
9     Q.   Okay.  And do you know whether the
10  same process that was followed in 2018 was
11  followed in 2000 -- withdrawn.
12         Did PwC follow the same process in
13  creating this document that it did when it
14  created the workpapers in 2017?
15     A.   We did.
16     Q.   Can you confirm that this document
17  was prepared in the ordinary course of PwC's
18  business?
19     A.   It was.
20     Q.   Can you confirm that this document
21  was prepared in the ordinary course of PwC's
22  audit of Highland's 2018 financial statements?
23     A.   That's correct.
24     Q.   Okay.  I'm going to ask a few more
25  detailed questions than we did last time.  Can
```

Page 57

```
1              BURGER
2  we go to the section called credit risk
3  analysis, the tab.
4         I think earlier you testified that
5  there was kind of two aspects that PwC looked
6  at when analyzing the notes and they were the
7  intent and the ability to pay.  Do I have that
8  right?
9         MR. AIGEN:  Objection, form.
10     A.   That's correct.
11     Q.   Okay.  And this particular tab,
12  credit risk analysis, related to the ability to
13  pay part of that analysis; correct?
14     A.   That's correct.
15     Q.   Do you see there is a column called
16  recoverability?
17     A.   I do.
18     Q.   What is that?
19     A.   That is a qualitative assessment to
20  give us reasonable assurance that these notes
21  are, A, not in default or -- and B, that the --
22  at least materially the maker has enough assets
23  that we are aware of to -- to be able to repay.
24     Q.   And did Highland provide the data
25  and information related to each maker's ability
```

Page 58

```
1            BURGER
2  to pay?
3      A.   This is a combination but most of
4  this is our own due diligence.
5      Q.   And -- and can you describe for me
6  what steps in the due diligence process PwC
7  undertook to ascertain whether the makers have
8  the ability to pay?
9      A.   Mostly -- mostly relates to evidence
10 that there are payments on notes and that none
11 of the notes are contractually in default.  And
12 then also very much specifically to
13 Mr. Dondero's ability from known assets that
14 can be found on public filings.
15     Q.   And did PwC analyze public filings
16 and conclude that Mr. Dondero had the ability
17 to repay the notes that had -- that he had
18 issued to the debtor?
19     A.   Through public filings which we
20 could obtain, we could at least assess that
21 there are assets in those, sort of let's call
22 it public filings that would be adequate to
23 repay the amounts.
24     Q.   Is it fair to say that this section
25 of the workpapers is an assessment of each
```

Page 59

```
1            BURGER
2  affiliate's creditworthiness?
3      A.   Not each individual, but on a more
4  look-through basis to specifically Mr. Dondero.
5  The purpose of this is not to sign-off on an
6  absolute creditworthiness of each party, but to
7  provide enough evidence to give us reasonable
8  assurance that these notes are recoverable.
9      Q.   And based on the due diligence that
10 PwC did and the information provided by
11 Highland, did PwC conclude that the makers of
12 the notes had the ability to repay the
13 obligations set forth therein?
14     A.   We did.
15     Q.   Did PwC rely on the analysis set
16 forth on this document in deciding to issue the
17 opinion in connection -- the clean opinion in
18 connection with the 2018 audit?
19     A.   Yeah, this is part of our workpapers
20 which forms the collective base of our opinion,
21 yes.
22     Q.   If PwC had any concerns that any
23 maker was unable to repay the obligations under
24 any of the notes made to Highland, is there a
25 process or what would happen under that
```

Page 60

```
1            BURGER
2  circumstance?
3          MR. AIGEN:  Objection, form.
4      A.   Do I answer that?
5          MR. WANDER:  Yes.
6      A.   If we become aware of any data or
7  anything which shows us that a counterparty
8  cannot repay the note, the question stems to
9  management as to why they consider the note
10 fully recoverable.  Because the fact that there
11 is a note with a legal agreement to it doesn't
12 mean -- there may be adverse data that show
13 that the counterparty is not able to pay and
14 that then results in additional work to assess
15 whether that loan can be recorded at its full
16 value.
17     Q.   But in connection with the 2018
18 audit, management represented that each of the
19 notes was fully recoverable.  Do I have that
20 right?
21         MR. AIGEN:  Objection, form.
22     A.   They did.
23     Q.   Let's go to the results template,
24 please.
25         Now, do you see that there is
```

Page 61

```
1            BURGER
2  approximately 116 or 117 -- withdrawn.
3          Do you see that there is
4  approximately $116 difference between the
5  amount per client and the balance per testing?
6      A.   Yes, I do.
7      Q.   Okay.  What -- what does --
8  withdrawn.
9          Is the amount per client the total
10 principal and interest due as of the balance
11 sheet date for each of the makers listed under
12 the account description column?
13     A.   That is the amount that is obtained
14 from the trial balance that is used for the
15 financial statements --
16     Q.   Okay.
17     A.   -- in Column D.
18     Q.   And did PwC then test those amounts
19 for accuracy or reasonableness?
20     A.   For reasonableness we went back if
21 material to the appropriate legal agreements.
22         MR. AIGEN:  I didn't want to
23 interrupt, but I was objecting to form with
24 that one.
25     Q.   And based on the testing that PwC
```

Page 62

```
1              BURGER
2    did, did it reach any conclusions as to the
3    reliability of the debtors' of Highland's
4    assessment as to the amount owed by each
5    client?
6        A.   Do you mind repeating that question?
7        Q.   Yeah, that wasn't very good.
8              What is the purpose of the testing
9    that -- that was undertaken that is reflected
10   on this page?
11       A.   So the purpose is, again, the 173 is
12   the amount that goes to the line item in
13   question that we are or that part feeds into
14   another tab called detail, which goes back into
15   the detail.
16             So from there if we have a balance
17   as recorded in the financial statements we need
18   to obtain the detail behind that, what makes up
19   those amounts.  And for each one individually
20   or collective material, we need to test the, A,
21   the existence of the amount and, B, the
22   evaluation of the amount.
23       Q.   Let's go to the next tab, due from
24   HCMSI.  Do you see that?
25       A.   I do.
```

Page 63

```
1              BURGER
2        Q.   So does this show that an entity
3    known as HCMSI had principal and interest due
4    on one or more promissory notes totaling
5    approximately 13 and a half million dollars?
6        A.   It is three promissory notes, which
7    adds up to approximately 13.9 million dollars.
8        Q.   Okay.  So promissory note one is on
9    the left where it says closing date May 31,
10   2017.  Do I have that right?
11       A.   Correct.
12       Q.   And if we scroll down promissory --
13   where is the second promissory note?
14       A.   Just go over to column R and then
15   AB, I can read.
16       Q.   Okay.  So then -- so that is the
17   second promissory note is the one that was
18   issued on June 25th, 2018 in the amount of
19   $200,000, and then the third one is issued on
20   March 26th, 2018 in the amount of $150,000.  Do
21   I have that right?
22       A.   That's correct.
23       Q.   And this shows that under the first
24   note, if we could go to the left a bit, that
25   HCMSI paid Highland exactly $1 million on
```

Page 64

```
1              BURGER
2    October 8th, 2018 that was allocated -- a
3    portion of which was allocated to principal and
4    a portion of which was allocated to interest?
5        A.   That's correct.
6        Q.   Okay.  Let's go to the next tab,
7    Dondero tax loans.  Do you know why the loans
8    to Mr. Dondero are described as tax loans?
9        A.   It is -- it is described as tax loan
10   to facilitate tax payments based on earnings is
11   my understanding.
12       Q.   Did PwC ever make any inquiry as to
13   whether the amounts loaned to Mr. Dondero
14   approximated the amount of tax liability that
15   he faced?
16             MR. AIGEN:  Objection, form.
17       A.   We did not.
18       Q.   Does PwC have any information as to
19   whether or not the loans made to Mr. Dondero
20   were related in any way to his actual tax
21   obligations?
22             MR. AIGEN:  Objection, form.
23       A.   We did not.  We didn't consider it
24   necessary.
25       Q.   Did PwC make any inquiry as to the
```

Page 65

```
1              BURGER
2    purpose of the loans to Mr. Dondero?
3             MR. AIGEN:  Objection, form.
4        A.   In general.
5        Q.   In general you made an inquiry?
6        A.   Yeah, as to the -- the -- as to
7    whether these loans are considered reasonable
8    and arm's length.
9        Q.   What information do you recall that
10   you have whether the loans were reasonable and
11   arm's length?
12       A.   Related to the notes being at an
13   interest rate which is considered a reasonable
14   interest rate considering all the parties
15   involved.  And then more on, you know, again,
16   the testing that were done and the existence of
17   the notes.
18       Q.   Did PwC make any inquiry as to the
19   purpose of any of the loans to any of the
20   affiliates including Mr. Dondero?
21       A.   We did.
22       Q.   Okay.  With respect to Mr. Dondero,
23   do you have any information that you haven't
24   already provided as to PwC's understanding of
25   the purpose of the loans?
```

Page 66

BURGER

2    MR. AIGEN: Objection.
3    A.   No.
4    Q.   No.  And who -- who told PwC, if you
5    know, that the loans were being made to
6    Mr. Dondero to pay tax payments based on
7    earnings?
8    A.   Management.  I cannot recall a
9    specific name.
10    Q.   Okay.  But it is your understanding
11    that the loans were made to Mr. Dondero in
12    order to enable him to pay the taxes due on his
13    earnings.  Do I have that right?
14    A.   That's correct.
15    Q.   And who decided the amount of the
16    loans, to the best of your knowledge?
17    MR. AIGEN: Objection, form.
18    A.   It is an agreement between
19    management and Mr. -- management.
20    Q.   Do you have anybody -- do you have
21    any knowledge as to who on behalf of Highland
22    made the agreement with Mr. Dondero about the
23    amount of the loans?
24    A.   I cannot recall the specific name.
25    Q.   If you look at loan number 1 there,

Page 67

BURGER

2    the $14 million loan that was first made in
3    December 2017, do I have this right that
4    Mr. Dondero made a payment of over $750,000
5    that was applied to principal and interest on
6    December 19th, 2018?
7    A.   That's correct.
8    Q.   Okay.  And if we scroll down a
9    little bit more, keep going, note number 4.
10    Did Mr. Dondero make a $2 million payment to
11    Highland on December 18th, 2018, a portion
12    of which was used to pay principal and a portion
13    of which was used to pay interest on note
14    number 4?
15    A.   That's correct.
16    Q.   Did anybody ever tell you that in
17    January or February 2019 that Mr. Dondero had
18    entered into an oral agreement with his sister
19    acting on behalf of Highland whereby
20    Mr. Dondero and certain of his affiliates would
21    be relieved of the obligation to pay amounts
22    due under the promissory notes if certain
23    conditions subsequent were met?
24    MR. AIGEN: Objection, form.
25    A.   No, they did not.

Page 68

BURGER

2    Q.   Do you know whether anybody at PwC
3    was ever informed by Mr. Dondero -- withdrawn.
4    Do you know if anybody at PwC was
5    ever informed by anybody at Highland that in
6    January or February 2019 Mr. Dondero entered
7    into an oral agreement with his sister acting
8    on behalf of Highland whereby Mr. Dondero and
9    certain of his affiliates would be relieved of
10    all obligations to pay all amounts otherwise
11    due and owing under the promissory notes if
12    certain conditions subsequent were met?
13    MR. AIGEN: Objection, form.
14    A.   I do not.
15    Q.   Okay.  Can we go -- I apologize, but
16    can we go back to tab number -- the detail tab
17    in the -- in the workpapers?
18    MR. WANDER: In Exhibit 5 or Exhibit
19    3?
20    Q.   Exhibit 5, thank you for the
21    clarification.  Okay, so the detail tab and the
22    workpapers for 2018 lists all of the notes
23    receivable that were made by affiliates of
24    Highland; correct?
25    A.   Correct.

Page 69

BURGER

2    Q.   Are you aware of any oral or written
3    amendment to any of the promissory notes that
4    are described on the detail page of Exhibit 5?
5    MR. AIGEN: Objection, form.
6    MR. MORRIS: What -- what is the
7    objection?  Hold on before you answer, what
8    is the objection?
9    MR. AIGEN: I think it is vague.  I
10    don't know which stuff you are talking
11    about here.  Are you asking for a legal
12    conclusion, and there is no foundation.
13    Q.   Yeah, okay.  Certainly not asking
14    for a legal conclusion and I will -- let me ask
15    the question again, sir.
16    This page lists the amounts that
17    each of the affiliates owes to Highland under
18    various promissory notes; correct?
19    A.   Correct.
20    Q.   Are you aware of any oral or written
21    amendment to any of those promissory notes?
22    A.   No, up to June 3rd, 2019.
23    Q.   And do you know whether anyone at
24    PwC was aware of any oral or written amendment
25    to any of the promissory notes as of June 3rd,

Page 70

BURGER

1  2019?
2  MR. AIGEN:  Objection, form.
3  A.  No, I'm not.
4  Q.  Were you ever informed of any
5  amendment, written or oral, to any promissory
6  note at any time?
7  A.  I was not.
8  Q.  Did anyone ever tell you that any of
9  the notes in -- referred to in the detail tab
10  of Exhibit 5 might be forgiven under certain
11  circumstances?
12  A.  No.
13  Q.  Do you know whether anybody at PwC
14  was ever informed by anybody at Highland that
15  any of the notes in the detail tab in Exhibit 5
16  might be forgiven?
17  MR. AIGEN:  Objection, form.
18  A.  I do not.
19  Q.  Under your understanding of the GAAP
20  rules, did Mr. Dondero and Mr. Waterhouse have
21  a continuing obligation to inform PwC of any
22  circumstances that would call into question the
23  collectability of any of the notes due from
24  affiliates?

Page 71

BURGER

1  MR. AIGEN:  Objection, form.
2  A.  Yes, they had the responsibility.
3  Q.  To the best of your knowledge, did
4  Mr. Dondero ever inform anybody at PwC prior to
5  June 3rd, 2019 that any of the notes might not
6  be collectable?
7  MR. AIGEN:  Objection, form.
8  A.  He did not.
9  Q.  To the best of your knowledge, did
10  Mr. Dondero ever inform anybody at PwC prior to
11  June 3rd, 2019 that any of the notes might be
12  forgiven under certain circumstances?
13  MR. AIGEN:  Objection, form.
14  A.  He did not.
15  Q.  To the best of your knowledge, did
16  Mr. Dondero ever inform anyone at PwC prior to
17  June 3rd, 2019 that any of the notes were
18  amended?
19  MR. AIGEN:  Objection, form.
20  A.  He did not.
21  Q.  To the best of your knowledge, did
22  Mr. Dondero ever inform anyone at PwC prior to
23  June 3rd, 2019 that the obligations under any
24  of the notes would be extinguished based on the

Page 72

BURGER

1  fulfillment of certain conditions subsequent?
2  MR. AIGEN:  Objection, form.
3  A.  Again, he did not.
4  Q.  I'm going to ask the same questions
5  now with respect to Mr. Waterhouse.
6  To the best of your knowledge, did
7  Mr. Waterhouse ever inform anyone at PwC prior
8  to June 3rd, 2019 that any of the notes might
9  not be collectable?
10  MR. AIGEN:  Objection, form.
11  A.  He did not.
12  Q.  To the best of your knowledge, did
13  Mr. Waterhouse ever inform anyone at PwC prior
14  to June 3rd, 2019 that any of the notes might
15  be forgiven under certain circumstances?
16  A.  No, he did not.
17  Q.  To the best of your knowledge, did
18  Mr. Waterhouse ever inform anyone at PwC prior
19  to June 3rd, 2019 that any of the notes were
20  amended?
21  A.  He did not.
22  Q.  To the best of your knowledge, did
23  Mr. Waterhouse ever inform anybody at PwC prior
24  to June 3rd, 2019 that the obligations under

Page 73

BURGER

1  any of the notes would be extinguished upon the
2  fulfillment of certain conditions subsequent?
3  MR. AIGEN:  Objection, form.
4  A.  He did not.
5  Q.  Now, just going to finish up the
6  last set of questions to make it broader for
7  anybody at Highland.
8  To the best of your knowledge, did
9  anyone from Highland ever inform anyone at PwC
10  prior to June 3rd, 2019 that any of the notes
11  might not be collectable?
12  MR. AIGEN:  Objection, form.
13  A.  Not to my knowledge.
14  Q.  To the best of your knowledge, did
15  anyone from Highland ever inform anyone at PwC
16  prior to June 3rd, 2019 that any of the notes
17  might be forgiven under certain circumstances?
18  A.  Not to my knowledge.
19  Q.  To the best of your knowledge, did
20  anyone from Highland ever inform anyone at PwC
21  prior to June 3rd, 2019 that any of the notes
22  were amended?
23  MR. AIGEN:  Objection, form.
24  A.  Not to my knowledge.

Page 74

```
 1              BURGER
 2     Q.   To the best of your knowledge, did
 3  anyone from Highland ever inform anyone at PwC
 4  prior to June 3rd, 2019 that the obligations
 5  under any of the notes would be extinguished
 6  upon the fulfillment of certain conditions
 7  subsequent?
 8     A.   Not to my knowledge.
 9     Q.   If PwC had learned before June 3rd,
10  2019 that any of the notes might not be
11  collectable, would PwC have required that
12  information to be disclosed?
13         MR. AIGEN:  Objection, form.
14     A.   Disclosed or potentially based on
15  materiality financials adjusted.
16     Q.   I'm going to ask that question
17  again.
18     A.   Okay.
19     Q.   If PwC had learned before June 3rd,
20  2019 that any of the notes that had an
21  outstanding principal amount of at least $1.7
22  million might not be collectable, would PwC
23  have required that to be disclosed?
24     A.   Correct.
25         MR. AIGEN:  Objection, form.
```

Page 75

```
 1              BURGER
 2     Q.   And why is that?
 3     A.   If you have a material -- if you
 4  have material adverse effects of the balance
 5  sheet which gives a material adjustment to the
 6  financial statements, depending on the type of
 7  event you require either disclosure or actual
 8  adjustment to the balance sheet.
 9     Q.   If PwC had learned before June 3rd,
10  2019 that any of the notes that had a
11  outstanding principal amount due of at least
12  $1.7 million might be forgiven, would PwC have
13  required that to be disclosed?
14     A.   Yes.
15         MR. AIGEN:  Objection, form.
16     Q.   Is that for the same reasons that
17  you just articulated with respect to the lack
18  of collectability?
19     A.   Correct.
20     Q.   Just two more questions.  If PwC
21  learned before June 3rd, 2019 that any of the
22  notes that had an outstanding principal amount
23  of $1.7 million or more, if those notes had
24  been amended, would PwC have required that to
25  be disclosed?
```

Page 76

```
 1              BURGER
 2         MR. AIGEN:  Objection, form.
 3     A.   We would have.
 4     Q.   And finally, if PwC learned before
 5  June 3rd, 2019 that any of the notes that had a
 6  then outstanding principal amount due of at
 7  least $1.7 million would be extinguished based
 8  on the fulfillment of certain conditions
 9  subsequent, would PwC have required that to be
10  disclosed?
11         MR. AIGEN:  Objection, form.
12     A.   We would have.
13     Q.   Okay.
14         MR. MORRIS:  I have no further
15  questions.  Thank you very much, sir.
16         EXAMINATION
17  BY MR. AIGEN:
18     Q.   All right.  I guess my first
19  question is, how much of a hard stop time is
20  11:45?  I don't mean that for you that can be
21  for counsel.
22     A.   I can go to noon.
23     Q.   I will try -- I do not think I'm
24  going to be able to be done by then.  I guess
25  at that point we can stop and it is possible
```

Page 77

```
 1              BURGER
 2  John and I can work out stuff on the side.  But
 3  just for the record, I understand this isn't
 4  your problem I just want to note that we were
 5  never told there would be this sort of time
 6  limit today.  Again, not your problem and I
 7  just want to reserve all rights if we can't
 8  finish today we may have to come back another
 9  time.  Hopefully not, I will do my best to ask
10  questions.
11         Let's start with some of the
12  questions you were asked at the end about --
13  Mr. Morris asked you if you had learned certain
14  things.  And he asked you several questions
15  about it, that PwC would have required that
16  information to be disclosed.  Do you remember
17  that?
18     A.   Okay.
19     Q.   Yes, you remember that?
20     A.   Yes, I do.
21     Q.   When you say or he said required to
22  be disclosed, what are you talking about,
23  disclosed where and to whom?
24     A.   Typically that would be disclosed in
25  your subsequent events footnotes, but you can
```

Page 78

```
                    BURGER
1
2    also disclose it in note 9 or 8 in this
3    instance, the relevant note.
4        Q.    And those questions were, for
5    instance, one of the questions were do you
6    remember being asked if PwC had learned that
7    the notes might be forgiven PwC would have
8    required that to have been disclosed.  Do you
9    remember answering that question?
10       A.    Yeah, I do.
11       Q.    And I want to focus on this.  I know
12   these are Mr. Morris' questions, so it may not
13   have been your language, but you were asked if
14   it might be forgiven.
15            What does that mean to you?  Are we
16   talking about is there a difference for you if
17   there was a 1 percent chance that something
18   would be forgiven or a 90 percent change of it
19   being forgiven?
20       A.    If we learned about something, let's
21   say, we learned might be forgiven, that would
22   have resulted in additional audit work.  The
23   question I understood to be and the answer I
24   gave was if something happened where there was
25   an event that actually occurred before or on
```

Page 79

```
                    BURGER
1
2    June 3rd, we would have required disclosure.
3        Q.    Got it.  So is it fair to say that
4    in response to all of Mr. Morris' questions
5    about what would have been required to be
6    disclosed, in your mind he was referring to
7    those events or items having actually occurred
8    and the notes being actually forgiven at that
9    point in time; is that correct?
10            MR. MORRIS:  Objection to the form
11   of the question.
12       Q.    I didn't hear your answer.
13       A.    Correct.
14       Q.    So you haven't provided any
15   testimony today about what PwC might have
16   required to be disclosed or disclosed if
17   certain events took place in the future; is
18   that fair to say?
19            MR. MORRIS:  Objection to the form
20   of the question.
21       A.    That is fair to say, but any events
22   that we learn of may have -- will be assessed
23   for what the impact on the valuation of the
24   loan is.
25       Q.    And is it fair to say, then, that
```

Page 80

```
                    BURGER
1
2    PwC would have to analyze and assess a
3    condition to determine whether it is something
4    this needs to be disclosed?
5        A.    Yeah, we will have to analyze it.
6        Q.    And how would PwC go about analyzing
7    a potential event that might forgive or
8    discharge the notes?
9        A.    It depends on what the event is.  It
10   comes down to a function of materiality and
11   probability and understanding the potential
12   event through discussions with management.
13   Again, it depends on the event.
14       Q.    Okay.  And without knowing the
15   specific event, would you agree that you can't
16   testify today on whether that would need to be
17   disclosed in the financials?
18            MR. MORRIS:  Objection to the form
19   of the question.
20       A.    Again, the purpose of subsequent
21   event disclosure is to disclose to the reader
22   of the financial statements any events that
23   actually occurred.  And if we are aware of
24   something that -- that did not occur but that
25   may have a material adverse effect on the
```

Page 81

```
                    BURGER
1
2    financial statements, that is something that we
3    would consider for disclosure.
4        Q.    And when you say you'd consider it,
5    is it fair that you would analyze the
6    probability that the event would occur?
7            MR. MORRIS:  Objection to the form
8    of the question.
9        A.    Correct.
10       Q.    And would you also --
11       A.    Correct.
12       Q.    Would you also look at the potential
13   materiality of that event?
14       A.    Yes.
15       Q.    And with respect to the promissory
16   notes at issue in this litigation, is it fair
17   to say that no one at PwC made any sort of
18   analysis about whether those notes would be
19   potentially discharged due to events that might
20   occur in the future?
21            MR. MORRIS:  Objection to the form
22   of the question.
23       A.    That is not part of our professional
24   work responsibility to consider potential
25   events that might occur.
```

Page 82

```
                BURGER
1
2     Q.   And the audits that we were talking
3   about were in 2017 and 2018; is that correct?
4     A.   Yeah, conducted in '18 for '17 and
5   conducted in '19 for '18.
6     Q.   Okay.  And I just want to ask some
7   general questions about the audits that were
8   done.  And to speed things up, I'm going to ask
9   you the questions combining those two years.
10  If you need to break it down per year we can do
11  that, too, but these are pretty general
12  questions.
13        Can you tell me approximately how
14  many people worked on the audits of Highland at
15  PwC in 2017 and 2018?
16    A.   Again, earlier I said six or seven.
17    Q.   And out of those six or seven, how
18  many people had communications with anyone at
19  Highland?
20    A.   I would argue all of them, all of
21  us.
22    Q.   Okay.  And who at Highland did these
23  six or seven people have communications with
24  with respect to the work on the audits?
25    A.   It depends.  It depends on the
```

Page 83

```
                BURGER
1
2   nature of the question.  So again, Kristin
3   Hendrix, and actually earlier there is another
4   name Drew Wilson and actually have been a person that
5   we dealt with on a day-to-day basis.  Above
6   them would be Dave Klos and above them would be
7   Frank Waterhouse, the CFO.
8        So again, if it is a routine matter,
9   our more junior people probably dealt with
10  Kristin and Drew.  And if it is not a routine
11  matter and on periodic status meetings, my
12  communication would have probably been more
13  with Dave Klos and my managers.
14    Q.   I apologize.  Other than those four,
15  Ms. Hendrix, Mr. Wilson, Mr. Klos and
16  Mr. Waterhouse, is there anyone else at
17  Highland that PwC communicated with as part of
18  the audit that you are aware of?
19    A.   Not that I'm aware of.  I mean,
20  there is a chance that they might have had
21  somebody else involved, but not that I can
22  recall.
23    Q.   Have you ever had any conversations
24  with Mr. Dondero?
25    A.   Not specifically relating to any --
```

Page 84

```
                BURGER
1
2   related to the audit directly.
3     Q.   Do you know whether any of the other
4   people at PwC that worked on the audit had any
5   conversations with Mr. Dondero?
6     A.   Not that I'm aware of.
7     Q.   At the end of Mr. Morris' questions
8   if you remember you were asked several
9   questions about whether you or anyone at PwC
10  had different conversations with anyone at
11  Highland about the notes and them being
12  potentially forgivable or discharged or
13  amended.  Do you remember testifying to that?
14    A.   Yeah, I do.
15    Q.   You were asked about conversations
16  you had and you said you had no such
17  conversations; is that correct?
18    A.   Correct.
19    Q.   You also testified that you are not
20  aware of any conversations of anyone else that
21  PwC had with anyone at Highland about this
22  subject; is that correct?
23    A.   That's correct.
24    Q.   Did you -- I know you said you're
25  not aware and I guess my question is how do you
```

Page 85

```
                BURGER
1
2   know that?  Did you have any conversations with
3   anyone else at PwC about whether they had any
4   such conversations with anyone at Highland
5   about potential dischargeability of the notes?
6     A.   I would have had discussions with my
7   manager directly through a review of the
8   engagement as we go through all of this.  And
9   in this instance depending on the person
10  involved whether it was Hilda or Madeline, we
11  analyze, review as we try to get towards
12  sign-off.
13        And on this line item, we would have
14  gone through the work done on this note, you
15  know, and the discussion of whether there is
16  any adverse event that anybody is aware of.
17    Q.   These are all the conversations you
18  are aware of during the audit not in the last
19  couple of years; is that correct?
20    A.   Yeah, during the audit.
21        MR. MORRIS:  Objection to the form
22  of the question.
23    Q.   Are you aware of any specific
24  discussions that you had with anyone else at
25  PwC about whether they had any communications
```

Page 86

BURGER

1        BURGER
2   with anyone at Highland about whether the notes
3   were potentially dischargeable or amended?
4        MR. MORRIS:  Objection.
5        A.   No, I'm not aware.
6        Q.   As part of the audit process, is one
7   of the things that PwC looks at who would be
8   reviewing or relying on the financial
9   statements that you are auditing?
10       A.   Yes, we consider that.
11       Q.   And why is that considered?
12       A.   It is important -- well, A, the --
13  the format of our report and obviously just
14  governed by who relies on it.  So in other
15  words, if you have a public client with the
16  PCAOB standards where everybody in the public
17  relied on there are additional procedures and
18  additional scope than we have to perform.  In a
19  certain sense you can deal with two sets of
20  rules.  And the other part of that is
21  considered in who we address our opinion to.
22       Q.   And in the case of the Highland
23  audits, did PwC make an effort to determine who
24  would be reviewing and relying on the audits,
25  audited financial statements?

Page 87

BURGER

1        BURGER
2        A.   Yes.  As this is a partnership, it
3   is generally available to the general partner
4   and the partners.  And there wasn't any
5   specific need that we were aware of with
6   third-party lenders or banks or anything that
7   we are relying on financials.
8        Q.   Is who is going to end up reviewing
9   and relying on a financial statement relevant
10  to what PwC considers to be material and thus
11  need to be disclosed?
12       MR. MORRIS:  Objection to the form
13       of the question, asked and answered.
14       A.   No, sorry.
15       Q.   Then what is the relevance -- sorry.
16       If it is -- if who is going to
17  review a financial statement is not relevant to
18  what is going to be disclosed, why is it
19  relevant to the work that PwC is doing?
20       A.   We perform audits either in terms of
21  GAAS as promulgated by AICPA or PCAOB, and
22  there are differences in those standards.
23       And a correction to your previous
24  question, on materiality the basis for forming
25  a point of view on what is material is not

Page 88

BURGER

1        BURGER
2   different, but there are certain nuances in our
3   obligation of neutrality as to whether I'm in a
4   PCAOB engagement or a AICPA engagement.
5        Q.   What do you mean by that?
6        A.   So when we decide -- you get to an
7   overall materiality.  So if you for example,
8   are in a fund engagement you can use different
9   metrics as to whether you are in, let's say, a
10  hedge fund or a mutual fund, which is driven by
11  the users of the financials.
12       MR. WANDER:  It is a difference
13       between public and private, Michael.
14       Q.   And this would be a private
15  transaction we're calling it; is that correct?
16       A.   Yes, governed -- sorry, not
17  governed, performed.  Performed under the
18  standards of the AICPA and not the PCAOB.
19       Q.   And would those standards make a
20  difference on what is considered material as
21  part of PwC's work?
22       A.   Depending on the industry, it may.
23       Q.   And would those differences
24  potentially make a difference on what needed to
25  be disclosed in the financial statements?

Page 89

BURGER

1        BURGER
2        A.   Yeah.  The standards from a PCAOB
3   the asset and disclosure requirements under the
4   PCAOB rules, which would not be there under
5   AICPA.
6        Q.   Changing topics a little bit here.
7   We talked about related-party transactions a
8   little earlier.  Do you remember?
9        A.   Sure, I do.
10       Q.   Not we, you and Mr. Morris.  Can you
11  just generally at a high level explain what a
12  related-party transaction is?
13       A.   So related-party I cannot -- I
14  cannot quote the verbatim GAAP or GAAS
15  definition right now, but in effect the
16  related-party is any party that up or down the
17  stream can have material influence or control
18  of the entity.  So it would be key management,
19  anybody in an ownership structure upstream
20  which has significant interest or control as
21  well as even -- it can be in certain
22  circumstances, certain service providers.
23       Q.   Let's concentrate on notes for a
24  second.  There can be --
25       A.   Okay.

Page 90

BURGER

1
2    Q.    – related-party notes and then what
3    would you call them non-related-party notes if
4    they're not related-party notes?  Is there a
5    term for that?
6         MR. MORRIS:  Objection to form of
7    the question.
8    A.    Third party, unaffiliated.
9    Q.    When analyzing the collectability of
10   notes, is there any differences in what PwC was
11   doing looking at affiliated – non-affiliated
12   transaction notes versus related-party notes?
13        MR. MORRIS:  Objection to the form
14   of the question.
15   A.    Not really.
16   Q.    You say "not really," that can –
17   A.    Yeah, not – no, there isn't,
18   because at the end of the day whether a note is
19   collectable or not is something that you have
20   to get evidence of, and the existence of the
21   note is something you have to get evidence of.
22   Q.    I think I can finish up with a
23   couple more questions here.  I just want to
24   sort of go back to what we talked about in the
25   beginning.  PwC did not do any sort of analysis

Page 91

BURGER

1
2    as to whether the notes in question would be
3    potentially forgiven or discharged; is that
4    correct?
5         MR. MORRIS:  Objection to the form
6    of the question.
7         MR. AIGEN:  What is your basis for
8    the objection?
9         MR. MORRIS:  It is not their
10   responsibility to do that.  There is no
11   foundation.
12   Q.    That is fine, you can answer the
13   question.
14   A.    No, we did not as we did not have
15   to.
16   Q.    If PwC had learned that there was
17   some condition down the road that could
18   potentially discharge or forgive the notes,
19   would PwC have had to do some sort of analysis
20   to determine if that condition would need to be
21   disclosed?
22   A.    Yes, if you become aware of any
23   adverse event which may impact the valuation of
24   any asset you have to consider that.
25   Q.    And in order to consider that, you

Page 92

BURGER

1
2    would look at the probability that that event
3    would occur; is that correct?
4    A.    Correct, probability and potential
5    impact.
6    Q.    And materiality?
7    A.    Materiality.
8    Q.    And that is nothing that you or
9    anyone at PwC did with respect to any potential
10   conditions that might forgive these notes; is
11   that correct?
12   A.    Yeah, we did not.  Yeah, we did not.
13        MR. AIGEN:  That is all the
14   questions I have.
15        FURTHER EXAMINATION.
16   BY MR. MORRIS:
17   Q.    I just have a few more, sir, few
18   follow-ups.
19        PwC made no assessment as to whether
20   or not any of the notes might be forgiven
21   because they were never given any information
22   that indicated that that was even possible;
23   correct?
24        MR. AIGEN:  Objection, form.
25   A.    That's correct.

Page 93

BURGER

1
2    Q.    PwC was never given any information
3    about the possibility that any of the
4    affiliated promissory notes might be forgiven;
5    correct?
6    A.    Correct.
7    Q.    PwC was never informed that
8    Mr. Dondero had entered into an agreement that
9    could impact the collectability of any of the
10   promissory notes; correct?
11        MR. AIGEN:  Objection, form.
12   A.    Correct.
13        MR. MORRIS:  I have no further
14   questions.
15        MR. AIGEN:  I don't have anything.
16        MR. MORRIS:  Mr. Burger, I greatly
17   appreciate your time and your patience.
18        Thank you very much, John, same to
19   you.  Thank you for the accommodations and
20   I hope –
21        MR. WANDER:  Certainly, thank you.
22        (Deposition adjourned at 11:41 a.m.)
23
24
25

Page 94

1      BURGER

2      _____

3        PEET BURGER

4

5    Subscribed and sworn to before me

6    this      day of          2021.

7

8    ---------------------------------

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1          BURGER

2        C E R T I F I C A T E

3

4        I, SUSAN S. KLINGER, a certified

5    shorthand reporter within and for the State

6    of Texas, do hereby certify:

7        That PEET BURGER, the witness whose

8    deposition is hereinbefore set forth, was

9    duly sworn by me and that such deposition

10   is a true record of the testimony given by

11   such witness.

12       I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage; and that I am

15   in no way interested in the outcome of this

16   matter.

17       IN WITNESS WHEREOF, I have hereunto

18   set my hand this 30th of July, 2021.

19

20       _____

21       Susan S. Klinger, RMR-CRR, CSR

22       Texas CSR# 6531

23

24

25

Page 96

1        ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg. No. Now Reads    Should Read  Reason

6   ____  ___  _____   _____   _____

7   ____  ___  _____   _____   _____

8   ____  ___  _____   _____   _____

9   ____  ___  _____   _____   _____

10  ____  ___  _____   _____   _____

11  ____  ___  _____   _____   _____

12  ____  ___  _____   _____   _____

13  ____  ___  _____   _____   _____

14  ____  ___  _____   _____   _____

15  ____  ___  _____   _____   _____

16  ____  ___  _____   _____   _____

17  ____  ___  _____   _____   _____

18  ____  ___  _____   _____   _____

19  ____  ___  _____   _____   _____

20

21        _____

21           Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS ____ DAY OF _____, 2021.

24  _____

25  (Notary Public)   MY COMMISSION EXPIRES:_____

Case 21-03004-sgj    Doc 111-12    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-12    Filed 07/09/21    Page 17 of 200    PageID 35478
Exhibit 12    Page 179 of 735

Index: $1..amount

**$**

**$1** 63:25

**$1.7** 74:21 75:12,23 76:7

**$11.7** 40:14

**$116** 61:4

**$14** 67:2

**$150,000** 63:20

**$2** 67:10

**$200,000** 63:19

**$750,000** 67:4

**1**

**1** 17:22,25 66:25 78:17

**10** 33:24

**11** 24:4,6,23

**116** 61:2

**117** 61:2

**11:41** 93:22

**11:45** 76:20

**13** 63:5

**13.9** 63:7

**15** 51:14 54:10,18,22 55:6

**16** 39:25

**17** 82:4

**173** 62:11

**18** 20:25 82:4,5

**18th** 67:11

**19** 82:5

**1997** 6:14,17

**19th** 67:6

**1st** 5:21,24 49:3

**2**

**2** 30:6 31:11 51:2

**20** 6:20

**2000** 44:20 56:11

**2013** 7:2,3,5

**2014** 5:21,24 6:9

**2015** 38:3

**2017** 30:3,18,23 31:3, 9 33:22 36:15,24 37:6 39:18 40:19 41:2,7,14,16,20 43:7 44:21 56:14 63:10 67:3 82:3,15

**2018** 7:6 20:15 21:9 40:14 46:22,25 47:13,20,24 51:12 52:22 53:10,20 55:8, 21 56:10,22 59:18 60:17 63:18,20 64:2 67:6,11 68:22 82:3, 15

**2019** 17:23 19:15 21:14 24:18,24 25:4 48:5 54:3,22 67:17 68:6 69:22 70:2 71:6, 12,18,24 72:9,15,20, 25 73:11,17,22 74:4, 10,20 75:10,21 76:5

**21st** 38:3

**25th** 63:18

**26** 51:17

**26th** 63:20

**28** 34:17 52:6,7

**29** 52:8

**2nd** 49:3

**3**

**3** 41:4 68:19

**30** 35:3,6,7 39:20

**30th** 24:18 25:4

**31** 39:20 63:9

**31st** 20:15 21:9 36:15,24 40:19 41:20 46:25 47:12,20 53:10

**32** 25:9,10,21 26:10

**34** 26:15 27:10

**35D** 27:13,19

**36** 28:14,18,22

**38** 54:9,10

**3rd** 17:23 19:15 21:14 24:20,24 48:5 54:3, 22 69:22,25 71:6,12, 18,24 72:9,15,20,25 73:11,17,22 74:4,9, 19 75:9,21 76:5 79:2

**4**

**4** 47:7,8,9 67:9,14

**41** 39:22

**413** 23:24

**416** 25:7

**417** 28:13

**419** 19:3 29:6

**5**

**5** 55:9,10,17 68:18,20 69:4 70:11,16

**50** 21:2,13 24:16

**8**

**8** 51:18 52:15,19 54:6 78:2

**8th** 64:2

**9**

**9** 34:19 35:7,15,19 36:13 39:3,6 52:8 78:2

**90** 78:18

**A**

**a.m.** 93:22

**AB** 63:15

**ability** 44:16,17,23 57:7,12,25 58:8,13,

16 59:12

**absolute** 59:6

**absolutely** 10:16

**accept** 49:2

**acceptance** 49:18

**Accepted** 8:22,24 9:11,16,18 15:23 16:5 22:2

**accommodations** 93:19

**accompanying** 15:6,17 34:7

**accordance** 15:23 16:8,9

**account** 61:12

**accountant** 13:7,8

**accounting** 8:19 9:19 16:5,6

**accounts** 44:2

**accrued** 38:21

**accuracy** 21:18 61:19

**accurate** 41:9 50:5

**acting** 67:19 68:7

**actual** 64:20 75:7

**add** 46:13

**additional** 51:9 60:14 78:22 86:17,18

**address** 86:21

**adds** 63:7

**adequate** 58:22

**adjourned** 93:22

**adjusted** 74:15

**adjustment** 75:5,8

**adjustments** 25:18

**adverse** 60:12 75:4 80:25 85:16 91:23

**affiliate** 24:11 36:14, 23 52:21 53:9

**affiliate's** 59:2

**affiliated** 23:12,16, 19 24:7,23 25:3 90:11 93:4

**affiliates** 31:17,23,24 32:2,10,20 33:12,18, 23 35:9,20 36:3,20 39:8 41:8 43:15 51:5, 14 52:10,17 53:3,17, 23 55:23 65:20 67:20 68:9,23 69:17 70:25

**African** 6:15

**agree** 80:15

**agreement** 60:11 66:18,22 67:18 68:7 93:8

**agreements** 26:21 61:21

**AICPA** 9:3 87:21 88:4,18 89:5

**AIGEN** 14:19 15:25 16:16 18:3,8 23:8 25:24 26:12 32:22 33:14 35:16,21 36:4 37:9 39:11 45:4 46:12 47:3,9 53:11 54:7 55:14,17 57:9 60:3,21 61:22 64:16, 22 65:3 66:2,17 67:24 68:13 69:5,9 70:3,18 71:2,8,14,20 72:3,11 73:4,13,24 74:13,25 75:15 76:2, 11,17 91:7 92:13,24 93:11,15

**alleged** 28:6

**allocated** 64:2,3,4

**ambiguous** 8:13

**amended** 71:19 72:21 73:23 75:24 84:13 86:3

**amendment** 69:3, 21,24 70:6

**amount** 31:21 38:20 40:14 44:15 45:15 61:5,9,13 62:4,12,21, 22 63:18,20 64:14 66:15,23 74:21 75:11,22 76:6

Case 21-03004-sgj    Doc 111-12    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-12    Filed 12/89/23    Page 18 of 200    PageID 35479
Exhibit 12    Page 289 of 335

Index: amounts..combination

**amounts** 31:16,23
32:2,9,12,19 33:11,
18,23 34:15 35:8
36:3,10,13,17,18,20,
23 41:8 42:19,23
43:14 44:19 51:5,13
52:9,20,24 53:2,9,15,
16,22 55:22 58:23
61:18 62:19 64:13
67:21 68:10 69:16

**analysis** 44:10,13
46:7,10 57:3,12,13
59:15 81:18 90:25
91:19

**analyze** 58:15 80:2,5
81:5 85:11

**analyzing** 57:6 80:6
90:9

**answering** 78:9

**answers** 7:22

**apologize** 7:18 15:3
41:25 47:6,16 68:15
83:14

**applicable** 50:18

**applied** 67:5

**apply** 24:6

**approach** 10:8

**approve** 50:23

**approximate** 38:24

**approximated** 64:14

**approximately** 39:8
61:2,4 63:5,7 82:13

**approximates** 37:15
53:23

**April** 7:3 11:2,3,17

**argue** 82:20

**arising** 24:13

**arm's** 65:8,11

**articulated** 75:17

**ascertain** 58:7

**Asia** 21:6

**aspects** 57:5

**assert** 26:7 28:20

**asserting** 26:18

**assertion** 38:8

**assess** 58:20 60:14
80:2

**assessed** 79:22

**assessment** 26:17
57:19 58:25 62:4
92:19

**asset** 32:5,7,8,10,14,
15,16,17 38:15 89:3
91:24

**assets** 31:13,16
32:3,21 33:12,18,25
38:13 51:15 57:22
58:13,21

**associate** 42:7,8

**assurance** 8:18 9:9,
12,14,15 15:22 16:14
22:20 32:16 57:20
59:8

**attention** 34:12

**audit** 5:18,19,22 6:8,
16,19 7:4 8:17 9:6,8
10:8,24 12:16,18
13:14 14:22,24 16:9,
20 17:12,15,19 21:8,
21,25 22:19 26:11
27:10 29:4 30:22
39:14,17 41:7,14,17,
18 42:21 43:7 44:7,
21 47:18 49:7,10,14
50:10 54:3 55:21
56:22 59:18 60:18
78:22 83:18 84:2,4
85:18,20 86:6

**audited** 13:19 14:10
16:7 30:18 37:5
46:24 47:11,25 86:25

**auditing** 8:19,23,24
9:11,17 10:2 15:23
16:4 22:3 31:3 86:9

**auditors** 48:19

**audits** 6:3,25 13:12
14:14 20:6 23:18
29:25 82:2,7,14,24
86:23,24 87:20

**aware** 23:10 26:20
28:25 57:23 60:6

**asserting** 26:18

**assertion** 38:8

69:2,20,24 80:23
83:18,19 84:6,20,25
85:16,18,23 86:5
87:5 91:22

**awkward** 18:10

---

**B**

**back** 19:11 21:7 42:8
45:14,16 49:24 61:20
62:14 68:16 77:8
90:24

**background** 18:25

**balance** 20:10,14
24:13 29:16 32:3,11,
21 33:4,12,19,22
36:9,19 40:7,18
42:20 43:22,24 44:5
51:3 53:2 61:5,10,14
62:16 75:4,8

**balances** 44:2

**banks** 87:6

**base** 44:25 59:20

**based** 21:12 39:2,5
42:23 59:9 61:25
64:10 66:6 71:25
74:14 76:7

**basic** 36:11

**basically** 9:2 25:22
38:22

**basis** 5:23 6:20 22:19
34:14 59:4 83:5
87:24 91:7

**Bates** 18:4,8

**Beautiful** 30:14

**begin** 6:23 7:22,24,
25 10:23 11:7,19,23

**beginning** 6:8 54:10
90:25

**begins** 22:9 29:8

**behalf** 47:11 66:21
67:19 68:8

**believed** 16:13

**biggest** 13:14

**bit** 37:19 39:23 63:24

**67**:9 89:6

**bona** 24:11

**bottom** 20:18 34:4
43:10 48:5

**break** 8:7 82:10

**briefly** 6:6

**broader** 73:7

**Burger** 5:1,3,10,12
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1,
2,9 19:1 20:1 21:1
22:1 23:1 24:1,3 25:1
26:1 27:1 28:1 29:1
30:1,7 31:1 32:1 33:1
34:1 35:1,4,25 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1,15,20
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1,16

**business** 43:3 56:18

---

**C**

**calculated** 36:22
53:8

**call** 23:15 25:15 26:5
41:3 49:2 50:12
58:21 70:23 90:3

**called** 13:25 35:8
36:2,19 50:19 53:2
57:2,15 62:14

**calling** 88:15

**capably** 30:10

**capacity** 6:2

**Capital** 6:3,24 7:8,11
23:21 31:22 40:10

**capture** 40:4,5

**carried** 21:24 32:2,
20

**carry** 51:7

**carrying** 21:20 33:17
37:15 38:9,16,17,18,
24 53:23

**case** 8:22 11:21
86:22

**CFO** 13:4 19:22 83:7

**chance** 78:17 83:20

**change** 78:18

**Changing** 89:6

**charge** 7:5

**chief** 13:6

**circumstance** 60:2

**circumstances**
70:12,23 71:13 72:16
73:18 89:22

**claims** 24:12

**clarification** 15:4
16:10 24:21 68:21

**classic** 32:14

**clean** 50:13,16 59:17

**clear** 10:20

**client** 49:19 61:5,9
62:5 86:15

**client's** 49:13

**closed** 34:9

**closing** 63:9

**coincidence** 48:13

**collectability** 70:24
75:18 90:9 93:9

**collectable** 71:7
72:10 73:12 74:11,22
90:19

**collective** 59:20
62:20

**column** 57:15 61:12,
17 63:14

**combination** 58:3

Index: combining..Dondero

**combining** 82:9

**comfort** 42:22

**comment** 15:16

**committee** 50:14

**communicated** 83:17

**communication** 12:23 83:12

**communications** 82:18,23 85:25

**compile** 15:8

**compiled** 15:13

**completed** 7:7 39:17

**completeness** 26:17 27:4

**completing** 30:22

**completion** 10:7,11, 22 21:20,25

**compliance** 9:10

**concentrate** 89:23

**concept** 38:22

**concerns** 22:25 59:22

**conclude** 44:20 58:16 59:11

**conclusion** 69:12,14

**conclusions** 62:2

**condition** 80:3 91:17,20

**conditions** 67:23 68:12 72:2 73:3 74:6 76:8 92:10

**conducted** 82:4,5

**confirm** 21:18 37:21 53:5,7,19 55:20,24 56:16,20

**confirmed** 21:11 24:18

**conformance** 16:15

**conglomerate** 9:4

**Connect** 13:25

**connection** 10:2 14:14 16:19 31:8 41:7,13 44:6,21 47:24 53:20 59:17,18 60:17

**considered** 9:3 22:12,17 23:6,20 38:9 65:7,13 86:11, 21 88:20

**considers** 87:10

**consistent** 5:23 6:20

**consolidated** 27:23 31:21 34:8 51:3

**constituted** 33:24

**consultation** 50:21

**contact** 12:17,21 13:3

**content** 49:19,21

**context** 18:23 38:12

**continuing** 52:7 70:22

**contractual** 38:19

**contractually** 58:11

**control** 89:17,20

**conversations** 83:23 84:5,10,15,17, 20 85:2,4,17

**conveyed** 36:2

**copy** 30:13

**correct** 6:15,22 11:25 12:7,11 15:14 19:6,10 20:12,16,17 21:13 24:15,19,20 25:4,5,25 27:24 29:2, 10 33:4,5,8,9 34:2 35:10,15,22 36:16,21 37:18 39:12 40:2,11, 20,21,24,25 41:21 43:17 46:21 51:16 52:5,13,14,17,18 53:12,25 54:8,20,25 56:23 57:10,13,14 63:11,22 64:5 66:14 67:7,15 68:24,25 69:18,19 74:24 75:19 79:9,13 81:9,11 82:3 84:17,18,22,23 85:19

**88:**15 91:4 92:3,4,11, 23,25 93:5,6,10,12

**correction** 47:14 87:23

**correctly** 9:7

**counsel** 76:21

**counterparty** 44:18 60:7,13

**couple** 85:19 90:23

**court** 8:4

**created** 56:14

**creating** 56:13

**credit** 44:9,12 57:2, 12

**creditworthiness** 59:2,6

**current** 21:12 24:24

**D**

**data** 57:24 60:6,12

**date** 20:10 21:20,24 22:5,6 24:13 29:16, 17 48:8,14,21,25 49:2 61:11 63:9

**dated** 48:4

**dates** 6:11

**Dave** 83:6,13

**David** 12:25

**day** 48:20 90:18

**day-to-day** 83:5

**deal** 35:24 44:17 45:17 86:19

**deals** 22:20,21

**dealt** 12:20 45:13 83:5,9

**debtor** 35:20 52:17 58:18

**debtors** 30:22

**debtors'** 39:3 62:3

**December** 20:15 21:9 36:14,24 38:3

**40:**19 41:19 46:25 47:12,20 53:10 67:3, 6,11

**decide** 88:6

**decided** 17:19 53:6 66:15

**deciding** 59:16

**decision** 33:10

**dedicated** 34:22 50:15

**default** 25:3 57:21 58:11

**defer** 25:17

**defined** 23:6 31:24

**definition** 22:12,16, 20,25 32:4,6,8,15 89:15

**depending** 75:6 85:9 88:22

**depends** 13:13 80:9, 13 82:25

**deposed** 7:14

**deposition** 18:7,10 45:24 46:3 93:22

**derived** 20:7

**describe** 9:24 34:21 35:19 41:9 49:16 52:16 54:13 58:5

**description** 54:23 61:12

**detail** 43:20 45:14 51:24 62:14,15,18 68:16,21 69:4 70:10, 16

**detailed** 43:10 56:25

**determine** 80:3 86:23 91:20

**determines** 49:12

**deviation** 50:21

**deviations** 31:6 47:22 50:3

**differ** 37:12 38:17

**difference** 61:4

**78:**16 88:12,20,24

**differences** 87:22 88:23 90:10

**diligence** 45:6 58:4, 6 59:9

**directly** 56:7 84:2 85:7

**discharge** 80:8 91:18

**dischargeability** 85:5

**dischargeable** 86:3

**discharged** 81:19 84:12 91:3

**disclose** 34:25 78:2 80:21

**disclosed** 27:22 28:9,24 74:12,14,23 75:13,25 76:10 77:16,22,23,24 78:8 79:6,16 80:4,17 87:11,18 88:25 91:21

**disclosure** 29:17 40:7 54:15,24 75:7 79:2 80:21 81:3 89:3

**disclosures** 28:6,7 29:18 50:4

**discount** 39:18 54:4

**discussion** 85:15

**discussions** 80:12 85:6,24

**dispute** 32:19

**document** 15:10 17:22 18:12,13,15,21 19:12 30:9 33:7 34:18 37:20 41:10,23 42:17,18 43:25 48:4 49:8 56:13,16,20 59:16

**documentation** 46:16

**documents** 47:15

**dog** 27:16,19

**dollars** 63:5,7

**Dondero** 19:8,14,18,

Index: Dondero's..GAAS

22 21:3,11 23:4,12 24:10,17 25:21 27:20 28:22 40:12,22 58:16 59:4 64:7,8,13,19 65:2,20,22 66:6,11, 22 67:4,10,17,20 68:3,6,8 70:21 71:5, 11,17,23 83:24 84:5 93:8

**Dondero's** 18:7 58:13

**drafted** 20:2

**drafts** 14:21 15:16

**draw** 34:12

**Drew** 83:4,10

**driven** 88:10

**due** 18:24 31:17,24 32:2,9,19 33:11,18, 23 35:8,20 36:3,13, 20,23 39:9 41:8 43:14 44:15 45:6,19, 21 51:5,13 52:9,20 53:3,9,15,16,22 55:22 58:4,6 59:9 61:10 62:23 63:3 66:12 67:22 68:11 70:24 75:11 76:6 81:19

**duly** 5:4

**duties** 9:22

**duty** 27:3 50:10

E

**earlier** 31:7 40:18 47:23 48:10 49:3 57:4 82:16 83:3 89:8

**earnings** 64:10 66:7, 13

**easier** 30:14

**easy** 18:12

**effect** 80:25 89:15

**effectively** 48:22

**effects** 75:4

**effort** 86:23

**efforts** 30:22 31:3

**employed** 5:11 6:6 42:3

**enable** 14:10 66:12

**encourage** 18:18

**end** 14:2 21:19 33:22 43:15 51:10,12 52:21 77:12 84:7 87:8 90:18

**ending** 19:3 20:15,25 21:9 23:24 28:13 40:19 41:19 46:25 47:12,20

**ends** 37:11,22

**engaged** 11:11

**engagement** 7:5 9:5 10:25 15:20 50:18 85:8 88:4,8

**entered** 67:18 68:6 93:8

**entities** 23:12

**entitled** 32:15 34:19 39:24 52:9

**entity** 19:23 32:13 63:2 89:18

**equal** 39:8

**error** 26:5

**evaluation** 62:22

**event** 40:23 75:7 78:25 80:7,9,12,13, 15,21 81:6,13 85:16 91:23 92:2

**events** 22:4 28:8 29:15 39:24 40:6 48:24 54:14,23 55:5 77:25 79:7,17,21 80:22 81:19,25

**evidence** 58:9 59:7 90:20,21

**EXAMINATION** 5:6 76:16 92:15

**exceeded** 51:14

**exchange** 23:13 38:15

**Excuse** 27:15

**execution** 10:8,11 11:6,14,15 12:18 13:15

**exhibit** 17:22,25 30:5,6 41:3,4 47:7,8 55:9,10,17 68:18,20 69:4 70:11,16

**existence** 42:23 62:21 65:16 90:20

**expect** 19:24 22:21

**expected** 17:11

**explain** 10:20 45:10 89:11

**explanations** 34:15

**express** 22:24

**extinguished** 71:25 73:2 74:5 76:7

F

**faced** 64:15

**facilitate** 64:10

**facilitated** 12:21,22

**fact** 25:17 33:6 54:22 60:10

**fair** 6:21 12:2,3 17:17 27:18 28:21 35:18 37:14 38:8,10,11,13, 21,23 39:2,5,7,13,15 51:12 53:21 54:2,4 58:24 79:3,18,21,25 81:5,16

**fall** 11:24

**familiar** 9:21 16:22 46:23

**February** 67:17 68:6

**feed** 12:9

**feeds** 62:13

**fide** 24:11

**fieldwork** 11:2,5 12:12,13

**file** 41:12

**filings** 58:14,15,19, 22

**final** 10:24

**finalized** 14:23

**finally** 76:4

**financial** 7:6 9:9 10:3 13:19 14:11 15:2,5,6, 12,17,22 16:14 26:6, 22 27:23 30:3,19,23 31:3,9 34:8,25 37:6 39:3 41:18 44:4 45:16 46:23,24 47:11,19 53:20 56:22 61:15 62:17 75:6 80:22 81:2 86:8,25 87:9,17 88:25

**financials** 9:17 16:8 47:25 48:22 50:3,5 74:15 80:17 87:7 88:11

**find** 25:13

**fine** 23:17 91:12

**finish** 7:21,25 73:6 77:8 90:22

**firm** 6:15

**fiscal** 10:23 11:24 20:15 21:9,19 41:19 43:16 51:10 52:21

**focus** 78:11

**focused** 45:19

**follow** 10:4 49:24 56:12

**follow-up** 14:18

**follow-ups** 92:18

**footnote** 36:7

**footnotes** 34:16 77:25

**forgivable** 84:12

**forgive** 80:7 91:18 92:10

**forgiven** 70:11,17 71:13 72:16 73:18 75:12 78:7,14,18,19, 21 79:8 91:3 92:20 93:4

**form** 14:19 15:25 16:16,23 20:4 23:8 24:14 25:24 26:12 32:14,22 33:14 35:16,21 36:4 37:9 39:11 45:4 46:12 53:11 54:7 57:9 60:3, 21 61:23 64:16,22 65:3 66:17 67:24 68:13 69:5 70:3,18 71:2,8,14,20 72:3,11 73:4,13,24 74:13,25 75:15 76:2,11 79:10, 19 80:18 81:7,21 85:21 87:12 90:6,13 91:5 92:24 93:11

**format** 86:13

**forming** 87:24

**forms** 32:12 59:20

**forward** 7:12 21:24

**found** 26:5 58:14

**foundation** 69:12 91:11

**framework** 49:23

**Frank** 13:4 19:8 83:7

**fraud** 27:4

**front** 18:12,15 30:13, 19 35:5 37:21

**fulfill** 50:10,12

**fulfillment** 72:2 73:3 74:6 76:8

**full** 60:15

**fully** 30:10 60:10,19

**function** 80:10

**fund** 88:8,10

**future** 79:17 81:20

G

**GAAP** 16:2,8,15 29:20,22 34:24 38:7 49:6 50:6 52:3 70:20 89:14

**GAAS** 16:3,9 29:21 49:6,7 87:21 89:14

Case 21-03004-sgj    Doc 111-12    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-12    Filed 01/09/23    Page 21 of 200    PageID 35482
Exhibit 12    Page 309 of 235

Index: gain..make

**gain** 42:22

**Garcia** 42:2,3 56:2

**Garcia's** 42:14

**gave** 78:24

**general** 19:23,24 21:10 44:3 49:9 53:21 65:4,5 82:7,11 87:3

**generally** 8:22,24 9:10,16,25 15:23 16:5 22:2 23:10 49:17 87:3 89:11

**give** 6:10 15:21 22:22 50:12 57:20 59:7

**good** 5:8 62:7

**governed** 9:3 86:14 88:16,17

**greatly** 93:16

**ground** 7:19

**group** 6:16

**guess** 20:24 76:18, 24 84:25

**H**

**half** 31:12 63:5

**happen** 59:25

**happened** 78:24

**hard** 30:12 76:19

**HCMLP** 42:21

**HCMSI** 45:19,21 46:4,5 62:24 63:3,25

**hear** 79:12

**hedge** 88:10

**Hendrix** 13:5 83:3,15

**high** 89:11

**Highland** 6:3,24 7:5, 8,10,11 10:2,13 11:8 12:6,9,17 13:12 14:4, 14,22 15:13 16:19,24 22:24 23:11,20,21 31:22 32:18 33:6,10 35:13 39:6 40:9 44:6 51:25 53:14,21 54:19

**Highland's** 30:23 31:3,8 32:3,20 33:4, 19,24 43:7 46:24 47:19 51:15 56:22 62:3

**Hilda** 42:2,3 85:10

**Hold** 69:7

**hope** 93:20

**I**

**idea** 36:10

**identified** 31:16

**impact** 79:23 91:23 92:5 93:9

**important** 7:20 28:5 86:12

**inaccurate** 37:7

**inaudible** 38:25

**include** 54:22

**included** 22:16 36:17,18 40:17 52:24

**including** 13:15 21:3 65:20

**incorrect** 53:17

**independent** 48:19

**individual** 12:19 45:15 46:16,19 59:3

**individually** 62:19

**industry** 88:22

**influence** 89:17

**inform** 70:22 71:5, 11,17,23 72:8,14,19, 24 73:10,16,21 74:3

**information** 10:19 12:5,9 13:18,22 14:3, 6,9,18 23:5 35:14 36:2 40:8,9 43:18,19

**Highland's** ...

**informational** 11:8

**informed** 40:24 55:4 68:3,5 70:5,15 93:7

**inquiry** 64:12,25 65:5,18

**instance** 56:2 78:3,5 85:9

**insurance** 9:13

**integral** 34:8

**intended** 35:19 40:3 43:13 51:23 52:16 54:13

**intent** 44:16 57:7

**interest** 38:21 39:9 61:10 63:3 64:4 65:13,14 67:5,13 89:20

**internal** 49:11

**interrupt** 47:3 61:23

**involved** 65:15 83:21 85:10

**issue** 59:16 81:16

**issued** 40:13,22 48:19,23 54:3 58:18 63:18,19

**item** 36:18 42:20 52:25 62:12 85:13

**items** 22:12,17 23:6 79:7

**J**

**James** 19:8

**January** 5:21,24 6:14,17 67:17 68:6

**John** 30:12,17 55:17 77:2 93:18

**join** 6:16

**joined** 6:13,14

**June** 17:23 19:15

**45**:2 52:12 54:17,18 57:25 59:10 64:18 65:9,23 74:12 77:16 92:21 93:2

**21**:14 24:18,20,24 25:3 37:3 48:5 49:2 54:3,22 63:18 69:22, 25 71:6,12,18,24 72:9,15,20,25 73:11, 17,22 74:4,9,19 75:9, 21 76:5 79:2

**junior** 83:9

**K**

**key** 89:18

**kind** 57:5

**Klos** 12:25 13:2 83:6, 13,15

**knowing** 80:14

**knowledge** 21:12 29:8 53:13,18 54:21 66:16,21 71:4,10,16, 22 72:7,13,18,23 73:9,14,15,19,20,25 74:2,8

**Kristin** 13:5 83:2,10

**L**

**L.P.** 6:4,25 7:9,11 23:22 31:22

**La** 21:6

**label** 18:5,8

**lack** 13:5 75:17

**language** 78:13

**layout** 42:19

**lead** 30:21 31:2

**leads** 10:24

**learn** 79:22

**learned** 74:9,19 75:9, 21 76:4 77:13 78:6, 20,21 91:16

**leave** 55:12

**ledger** 44:3

**left** 63:9,24

**legal** 60:11 61:21 69:11,14

**legends** 46:17

**lenders** 87:6

**length** 65:8,11

**letter** 16:23 17:13,24 19:13,19,25 20:2,14, 21 21:8 22:16 23:7 48:9,18 50:24

**letters** 16:19 17:4,8, 18

**level** 25:14 89:11

**liability** 64:14

**limit** 77:6

**limitations** 50:8

**limited** 19:23

**link** 46:15

**list** 31:13 43:13

**listed** 61:11

**listing** 44:2

**lists** 68:22 69:16

**litigation** 81:16

**loan** 38:20 60:15 64:9 66:25 67:2 79:24

**loaned** 23:11 64:13

**loans** 45:18 64:7,8, 19 65:2,7,10,19,25 66:5,11,16,23

**long** 10:6

**look-through** 59:4

**looked** 36:19 40:18 48:9 52:25 57:5

**M**

**made** 20:21 21:2 29:18 33:10 44:5 59:24 64:19 65:5 66:5,11,22 67:2,4 68:23 81:17 92:19

**Madeline** 56:3 85:10

**make** 10:18 12:5 13:21 14:13 17:10 18:4,24 64:12,25 65:18 67:10 73:7

Index: maker..payments

86:23 88:19,24

**maker** 46:19 57:22
59:23

**maker's** 57:25

**makers** 23:19 24:12
44:21 58:7 59:11
61:11

**makes** 42:19 45:15
62:18

**management** 6:3,24
7:9,11 14:9 16:23
17:3,7,10,18,23
19:13,21 20:4,13
21:17 22:15,22 23:22
25:16,17 26:7,18
27:5 28:10,19,21
31:22 36:25 37:2,4
40:11 43:21 45:3,5
48:9,18 52:13 53:6,8
60:9,18 66:8,19
80:12 89:18

**management's** 49:3

**manager** 85:7

**managers** 83:13

**March** 63:20

**mark** 55:10

**marked** 17:22,25
30:6 41:4 43:10 44:9
46:17 47:8 55:9

**marking** 47:4

**material** 22:3,13,17,
23 23:6 25:23 26:8,
20,24 27:6,21 28:8
34:25 40:6,23 50:2,3
54:13,23 55:5 61:21
62:20 75:3,4,5 80:25
87:10,25 88:20 89:17

**materiality** 22:21
23:2 25:14 42:24
74:15 80:10 81:13
87:24 88:7 92:6,7

**materially** 57:22

**math** 33:21

**matter** 83:8,11

**means** 25:11 26:15
28:18 29:14,15 38:5,
6 46:2

**meet** 25:14

**meetings** 83:11

**meets** 32:4

**met** 67:23 68:12

**metrics** 88:9

**Michael** 55:12 88:13

**Michael's** 35:24

**middle** 22:7

**million** 40:14 63:5,7,
25 67:2,10 74:22
75:12,23 76:7

**mind** 30:24 62:6 79:6

**mindful** 7:20

**minus** 38:21

**misstatements**
25:13,16 50:2

**moment** 27:14

**money** 23:11

**morning** 5:8

**morphed** 13:23

**Morris** 5:7 18:6 21:6
30:17 47:6 55:11,18
69:6 76:14 77:13
79:10,19 80:18 81:7,
21 85:21 86:4 87:12
89:10 90:6,13 91:5,9
92:16 93:13,16

**Morris'** 78:12 79:4
84:7

**move** 30:3

**mutual** 88:10

## N

**national** 50:22

**nature** 83:2

**necessarily** 27:3

**needed** 13:19 88:24

**neutrality** 25:19 88:3

**non-affiliated** 90:11

**non-related-party**
90:3

**noon** 76:22

**note** 34:22 35:7,15,
19 36:13 39:3,6,25
51:18 52:8,15,19
54:6,9,10,18,22 55:6
60:8,9,11 63:8,13,17,
24 67:9,13 70:7 77:4
78:2,3 85:14 90:18,
21

**notes** 15:6,12,17
23:13,15,16,20 24:7,
11,23 25:3 31:16,23,
25 32:9,13,19 33:11,
17,23 34:7 35:8 36:3,
9,20 37:8,15,16 38:2,
6,7 39:7,10,19 40:12,
13,22 41:8 43:14
44:22 45:12,15 46:5,
19 51:5,9,13,23 52:9
53:2,16,22,24 54:5,
12 55:22 57:6,20
58:10,11,17 59:8,12,
24 60:19 63:4,6
65:12,17 67:22
68:11,22 69:3,18,21,
25 70:10,16,24 71:6,
12,18,25 72:9,15,20
73:2,11,17,22 74:5,
10,20 75:10,22,23
76:5 78:7 79:8 80:8
81:16,18 84:11 85:5
86:2 89:23 90:2,3,4,
10,12 91:2,18 92:10,
20 93:4,10

**nuances** 88:2

**number** 24:4,6,22
25:8,10,21 26:10,14
27:10,19 28:14,22
45:12,18 51:18 66:25
67:9,14 68:16

## O

**objecting** 61:23

**objection** 14:19
15:25 16:16 23:8
24:14 25:24 26:12
32:22 33:14 35:16,
21,24 36:4 37:9
39:11 45:4 46:12
53:11 54:7 57:9 60:3,
21 64:16,22 65:3
66:2,17 67:24 68:13

69:5,7,8 70:3,18
71:2,8,14,20 72:3,11
73:4,13,24 74:13,25
75:15 76:2,11 79:10,
19 80:18 81:7,21
85:21 86:4 87:12
90:6,13 91:5,8 92:24
93:11

**obligation** 67:21
70:22 88:3

**obligations** 23:19
35:19 40:17 52:16
59:13,23 64:21 68:10
71:24 72:25 74:4

**obtain** 13:18,22
58:20 62:18

**obtained** 61:13

**occur** 80:24 81:6,20,
25 92:3

**occurred** 29:16 40:6
78:25 79:7 80:23

**occurring** 22:4

**October** 11:22 64:2

**office** 50:22

**omitted** 55:6

**one-** 14:25

**opinion** 9:6 14:25
22:5 29:17 44:24,25
49:8,20,21 50:13,14,
17,20,24 54:3 59:17,
20 86:21

**opportunity** 15:15
17:9

**oral** 67:18 68:7 69:2,
20,24 70:6

**order** 15:21 16:13
17:14 18:21 30:10
66:12 91:25

**ordinary** 20:6 43:2,6
56:17,21

**ourself** 44:17

**outlines** 10:9

**outstanding** 37:14
43:15 74:21 75:11,22
76:6

**oversee** 47:10,18

**overseeing** 42:14

**overseen** 6:2

**owed** 52:17 62:4

**owes** 69:17

**owing** 36:14,23
52:20 53:9,15 68:11

**ownership** 28:10
89:19

## P

**P-A-C-O-C-H-A** 56:6

**Pacocha** 56:4

**pages** 15:11

**paid** 63:25

**paragraph** 20:9 22:8
37:11,22,23,25 38:2

**part** 10:16 13:14 17:2
26:6 34:8 56:8 57:13
59:19 62:13 81:23
83:17 86:6,20 88:21

**parties** 27:21 28:20
51:25 65:14

**partly** 45:5

**partner** 5:18,19,22
6:8 7:4 12:16 19:23,
24 49:9 50:17,18
87:3

**partners** 87:4

**partnership** 40:13
87:2

**partnership's** 37:14

**party** 19:21 23:16,19
24:7,11,23 28:6,7,25
34:19,23 59:6 89:16
90:8

**patience** 93:17

**pay** 44:23 57:7,13
58:2,8 60:13 66:6,12
67:12,13,21 68:10

**payment** 67:4,10

**payments** 38:21
51:8 58:10 64:10

Case 21-03004-sgj   Doc 111-12   Filed 01/06/22   Entered 01/06/22 11:03:25   Desc
Case 3:21-cv-00881-X   Document 175-12   Filed 01/09/23   Page 23 of 200   PageID 35484

Index: PCAOB..referring

66:6

**PCAOB** 86:16 87:21 88:4,18 89:2,4

**Peet** 5:3,10

**people** 13:10,16 19:18 82:14,18,23 83:9 84:4

**percent** 33:24 51:14 78:17,18

**perform** 10:10 11:13 50:6,9 86:18 87:20

**performed** 9:16 42:22 88:17

**period** 11:16 40:19 46:25 47:12,19

**periodic** 83:11

**person** 83:4 85:9

**personal** 17:2

**personally** 6:23 16:22 30:21 31:2 50:23

**perspective** 8:17 17:6 26:16 28:18 29:14

**pertains** 41:7

**phase** 11:6,10,11,14 13:13,15 49:18

**phases** 12:18

**phrase** 11:5 41:16

**piece** 46:4

**place** 79:17

**planning** 10:7,11 11:9,10,12,18,23 12:4,18

**plural** 37:13

**point** 50:9 76:25 79:9 87:25

**points** 13:3

**portion** 30:9 32:10 35:18 39:3,6 52:15 54:5 64:3,4 67:11,12

**portions** 18:20

**possibility** 93:3

**potential** 26:5 80:7, 11 81:12,24 85:5 92:4,9

**potentially** 74:14 81:19 84:12 86:3 88:24 91:3,18

**practice** 9:19 21:17

**practices** 9:21

**preparation** 31:8 43:7 45:18 46:2,3 47:10,14,24

**prepare** 13:19 14:10 42:25 43:5 47:15

**prepared** 33:6 35:13 41:13,18,22,24,25 55:25 56:3,17,21

**prepares** 20:5

**presented** 9:18

**pretty** 10:6 82:11

**previous** 87:23

**Previously** 14:4

**Price** 13:11

**Pricewaterhouse opers** 5:15,17,20,23 6:7 13:18 14:8,17

**Pricewaterhouse opers'** 6:19 8:16

**primary** 12:17,20 13:3

**principal** 39:9 61:10 63:3 64:3 67:5,12 74:21 75:11,22 76:6

**principle** 29:21

**prior** 6:7 14:23 22:4,5 37:3,5 51:8,10 71:5, 11,17,23 72:8,14,19, 24 73:11,17,22 74:4

**private** 88:13,14

**probability** 80:11 81:6 92:2,4

**problem** 77:4,6

**procedure** 42:21

**procedures** 9:15 10:10 11:12 50:7 86:17

**process** 9:25 10:4,6, 14,23 31:7 47:23 49:12,16 50:15,22 56:10,12 58:6 59:25 86:6

**produce** 44:3

**produced** 18:3

**professional** 9:5 50:10 81:23

**promissory** 23:13, 15 39:7 40:13 63:4,6, 8,12,13,17 67:22 68:11 69:3,18,21,25 70:6 81:15 93:4,10

**promulgated** 87:21

**properly** 27:22

**provide** 8:18 9:8 14:9,21 15:9 16:13 23:5 51:24 57:24 59:7

**provided** 16:24 19:14 40:9 45:2 52:12 54:19 59:10 65:24 79:14

**providers** 89:22

**proxy** 38:10,24

**public** 58:14,15,19, 22 86:15,16 88:13

**pull** 48:10

**purpose** 8:17 9:8 17:7 36:7 42:16,18 44:12,14 59:5 62:8, 11 65:2,19,25 80:20

**purposes** 12:17 13:11 23:18

**put** 17:21 18:15,22 25:14 30:4 41:5

**Pwc** 6:13 9:25 10:23 12:5,9 14:10,13,21 15:13,15,19,20 16:12,18,24 17:14,17 19:14 20:5 21:17,23 23:4 25:20 26:2,9,24 27:7,9,25 29:3,23

33:16 37:2,4 39:18 40:23 42:4,25 43:5, 19 44:6,20,25 46:8, 11 47:12 49:11 53:15 54:2 55:4 56:12 57:5 58:6,15 59:10,11,15, 22 61:18,25 64:12, 18,25 65:18 66:4 68:2,4 69:24 70:14, 22 71:5,11,17,23 72:8,14,19,24 73:10, 16,21 74:3,9,11,19, 22 75:9,12,20,24 76:4,9 77:15 78:6,7 79:15 80:2,6 81:17 82:15 83:17 84:4,9, 21 85:3,25 86:7,23 87:10,19 90:10,25 91:16,19 92:9,19 93:2,7

**PWC's** 12:10 17:6 22:25 24:9 26:15 28:17 29:13 30:21 31:2 37:5 41:6 47:18 54:21 55:21 56:17,21 65:24 88:21

**Q**

**qualitative** 57:19

**question** 7:24 8:11 16:11 18:23 30:11,25 33:17 35:23 44:18 45:20,22 47:17 60:8 62:6,13 69:15 70:23 74:16 76:19 78:9,23 79:11,20 80:19 81:8, 22 83:2 84:25 85:22 87:13,24 90:7,14 91:2,6,13

**questions** 7:21 15:20 16:12 18:17 24:2 56:25 72:5 73:7 75:20 76:15 77:10, 12,14 78:4,5,12 79:4 82:7,9,12 84:7,9 90:23 92:14 93:14

**quickly** 55:12

**quote** 34:7,9 37:13 89:14

**R**

**raise** 14:5

**rate** 65:13,14

**reach** 62:2

**read** 27:13 29:11 63:15

**reader** 34:13 80:21

**reading** 34:13

**reason** 33:16 39:18 54:4

**reasonable** 8:18 9:9 15:21 16:14 22:19 32:16 38:10,14,24 50:5 57:20 59:7 65:7, 10,13

**reasonableness** 61:19,20

**reasons** 75:16

**recall** 6:25 12:15,20 23:3 31:6 47:22 48:10 65:9 66:8,24 83:22

**receivable** 37:15,16 44:15 53:24 68:23

**receivables** 23:20, 21 32:13

**receive** 16:18

**recollection** 18:22

**record** 5:9 18:5 33:11 43:23 77:3

**recorded** 26:22 38:8 60:15 62:17

**recoverability** 32:17 57:16

**recoverable** 59:8 60:10,19

**refer** 7:10

**reference** 20:10 34:6

**referenced** 46:16

**referred** 70:10

**referring** 8:21 79:6

Case 21-03004-sgj    Doc 111-12    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-12    Filed 13/49/23    Page 24 of 200    PageID 35485
Exhibit 12    Page 34 of 235

Index: reflect..steps

**reflect** 46:8,10

**reflected** 62:9

**refresh** 18:22

**related** 27:21 28:7,
20,24 34:19,23 51:25
57:12,25 64:20 65:12
84:2

**related-party** 35:2
51:19 89:7,12,13,16
90:2,4,12

**relates** 31:19 45:24
51:19 55:22 58:9

**relating** 83:25

**relationships** 35:2

**relevance** 87:15

**relevant** 10:9 15:21
45:17 46:13 78:3
87:9,17,19

**reliability** 62:3

**relied** 17:18 86:17

**relies** 86:14

**relieved** 67:21 68:9

**rely** 14:9 23:4 26:9
27:5,7,9 28:10 29:3,
23 59:15

**relying** 86:8,24 87:7,
9

**remember** 77:16,19
78:6,9 84:8,13 89:8

**remind** 30:8

**rep** 19:25

**repay** 44:19 57:23
58:17,23 59:12,23
60:8

**repeating** 30:24 62:6

**rephrase** 16:11

**report** 42:10 48:18
49:5,9 56:7 86:13

**reported** 27:22

**reporter** 8:5

**reports** 14:22,24
42:12

**represent** 22:22

**representation**
16:18,23 17:4,7,13,
18,24 19:13 20:5,14
22:16 24:3,6,22 25:8,
10,12,21 26:3,10,14,
25 27:9,12,19 28:2,
14,18,22 29:4,20,24
48:9,18 49:4

**representations**
17:10 20:20 21:2,13,
18,24 22:9 24:2,17
48:25

**represented** 24:10,
11 25:22 27:20 28:23
60:18

**representing** 26:19
27:7

**request** 14:5 18:19
26:2 27:25

**requests** 10:18 11:8
12:5 14:18

**require** 21:17,23
26:7 48:15,17 54:14
75:7

**required** 17:14
29:17,20 34:15 48:24
49:6 50:3 52:3 54:24
74:11,23 75:13,24
76:9 77:15,21 78:8
79:2,5,16

**requirement** 34:24

**requirements** 89:3

**requires** 40:7 49:7

**reserve** 77:7

**respect** 46:6 65:22
72:6 75:17 81:15
82:24 92:9

**response** 12:8 79:4

**responsibilities**
17:3

**responsibility** 15:9
71:3 81:24 91:10

**responsible** 19:21
42:13

**rest** 30:15 46:4

**restate** 47:16

**resulted** 78:22

**results** 45:7 60:14,23

**retain** 41:12

**review** 12:10 14:22
15:16 17:3 18:13,21
85:7,11 87:17

**reviewed** 46:3

**reviewing** 86:8,15
87:8

**rights** 77:7

**risk** 44:9,13 57:2,12

**road** 91:17

**room** 18:11

**routine** 83:8,10

**rules** 7:19 9:2,4
70:21 86:20 89:4

---

**S**

**save** 11:16

**scope** 17:11 50:8
86:18

**screen** 17:21 18:16
30:16 31:13 41:6

**scroll** 20:18,24 34:3
35:4 37:19 39:23
45:11 63:12 67:8

**section** 34:19 35:14
36:2,13 37:7 38:2
39:24 40:3,12 51:23
52:8,19 54:12,18
57:2 58:24

**secure** 13:24 14:5,6

**send** 11:8,9

**senior** 42:7,8

**sense** 10:18 19:22
22:23 86:19

**sentence** 21:10
24:22 29:7,14,24
37:12,22 38:5,6,23

**separate** 21:2

**September** 11:22

**series** 20:20

**service** 89:22

**set** 9:2 35:14 43:19
44:4,22 46:19 49:5
52:19 53:16 54:17
59:13,15 73:7

**sets** 36:13 86:19

**setting** 11:12

**share** 10:12,15

**sheet** 20:10,14 24:13
29:16 32:11,21
33:13,22 36:9,19
40:7,18 42:20 51:3
53:2 61:11 75:5,8

**sheets** 32:3 33:4,19

**show** 60:12 63:2

**shows** 33:22 60:7
63:23

**side** 77:2

**sign** 9:6 19:25

**sign-off** 17:14,19
49:13 59:5 85:12

**signature** 29:7 50:25

**signatures** 19:5,8

**signed** 14:25 19:18
29:4,25

**significant** 40:6
89:20

**signing** 26:10 27:10
37:5

**single** 10:16

**singular** 37:13

**sir** 30:19 37:24 43:11
69:15 76:15 92:17

**sister** 67:18 68:7

**site** 13:24,25 14:5,7,
13

**slide** 44:22

**slightly** 11:20

**sort** 9:4 12:21 13:6
26:4 58:21 77:5
81:17 90:24,25 91:19

**South** 6:15

**specific** 7:8 28:7
66:9,24 80:15 85:23
87:5

**specifically** 28:6
41:17 58:12 59:4
83:25

**speed** 82:8

**spell** 56:5

**spend** 11:16

**stage** 10:11 11:2,18
12:4

**stand-alone** 34:14

**standard** 20:7 21:16

**standards** 8:20,21,
23,25 9:5,11,17,20
10:9 15:24 16:6 22:3
26:7 27:2 48:23
86:16 87:22 88:18,19
89:2

**start** 10:25 77:11

**started** 7:18

**starting** 19:20 38:3

**starts** 10:6

**state** 5:8

**stated** 25:2 53:21

**statement** 45:16
87:9,17

**statements** 7:6 9:10
10:3 13:20 14:11
15:2,5,7,12,17,22
16:15 26:6,23 27:23
30:4,19,23 31:4,9
34:9,25 37:6 39:4
41:19 44:4 46:23,24
47:11,19 53:20 56:22
61:15 62:17 75:6
80:22 81:2 86:9,25
88:25

**stating** 38:23

**status** 83:11

**stems** 60:8

**step** 12:13

**steps** 58:6

Case 21-03004-sgj    Doc 111-12    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 17-12    Filed 03/09/21    Page 25 of 200    PageID 35486

Index: stop..years

| | | | |
|---|---|---|---|
| **stop** 20:19 76:19,25 | **50:5** 87:20 | **typically** 13:10 20:5 77:24 | 36:5 45:25 60:5 68:18 88:12 93:21 |
| **straight** 35:4 | **test** 61:18 62:20 | | **Waterhouse** 13:4,11 19:9,15,17,20 21:3, 11 23:5 24:10,18 25:22 27:20 28:23 70:21 72:6,8,14,19, 24 83:7,16 |
| **stream** 89:17 | **testified** 5:4 57:4 84:19 | **U** | |
| **strike** 36:8 | **testify** 80:16 | **unable** 59:23 | |
| **strongly** 18:18 | **testifying** 84:13 | **unaffiliated** 90:8 | |
| **structure** 89:19 | **testimony** 79:15 | **uncorrected** 25:15 50:2 | |
| **stuff** 69:10 77:2 | **testing** 61:5,25 62:8 65:16 | **understand** 8:4,11, 12 10:13 19:7,12 20:22 25:20 32:24 41:20 77:3 | **Wilson** 83:4,15 |
| **subheading** 35:7 | | | **withdrawn** 27:8 32:7 35:12 37:3 39:4,14, 16 46:9 53:6 55:2 56:11 61:2,8 68:3 |
| **subject** 51:8,9 84:22 | **things** 28:24 49:25 77:14 82:8 86:7 | | |
| **subparts** 21:4 | **third-party** 87:6 | | |
| **subsequent** 39:24 40:23 48:24 54:14,23 55:5 67:23 68:12 72:2 73:3 74:7 76:9 77:25 80:20 | **thought** 15:20 | **understanding** 24:9 25:10 34:22 36:12 38:4 45:23 64:11 65:24 66:10 70:20 80:11 | **word** 8:5 13:6 |
| | **ties** 45:16 | | **words** 26:18 38:20 46:14 50:4,7 86:15 |
| | **time** 6:7 7:6,20 8:7 11:7,17 12:15 13:24 14:23 30:8 37:3,5 39:17 55:13 56:25 70:7 76:19 77:5,9 79:9 93:17 | **understood** 78:23 | **work** 11:15 42:14 44:7 60:14 77:2 78:22 81:24 82:24 85:14 87:19 88:21 |
| | | **undertaken** 62:9 | |
| **summary** 25:15 43:25 | | **undertaking** 46:8 | |
| | | **undertook** 9:25 58:7 | |
| **supposed** 10:10 11:13 38:7 40:5 | **time-to-time** 23:11 | **undue** 50:8 | **worked** 82:14 84:4 |
| | **title** 5:16 32:13 42:6 | **unit** 6:19 11:3 | **working** 6:24 |
| **sworn** 5:4 | **today** 77:6,8 79:15 80:16 | **unqualified** 50:13, 20 | **workpaper** 41:11 43:6 |
| | **told** 66:4 77:5 | **upload** 14:2,6 | **workpapers** 10:15 41:2,6 42:25 55:8,21 56:14 58:25 59:19 68:17,22 |
| **T** | **top** 19:12 21:7 25:9 31:12 45:11 | **upstream** 89:19 | |
| | **topics** 89:6 | **users** 88:11 | |
| **tab** 43:9,13,20 44:9 45:7,14 57:3,11 62:14,23 64:6 68:16, 21 70:10,16 | **total** 61:9 | | **written** 69:2,20,24 70:6 |
| | **totaling** 63:4 | **V** | |
| | **track** 47:5 | | **wrong** 25:23 53:17 |
| **tabs** 45:17 46:13,15, 18 | **transaction** 11:15 88:15 89:12 90:12 | **vague** 69:9 | |
| **taking** 8:5 | **transactions** 24:12 26:20 27:5,6,21 28:8, 25 34:19,23 35:2 51:19,24 89:7 | **valuation** 79:23 91:23 | **Y** |
| **talked** 89:7 90:24 | | **verbatim** 89:14 | **year** 10:23 11:20,24 16:24 20:15 21:9,19 41:19 43:16 51:10 52:21 82:10 |
| **talking** 41:17 69:10 77:22 78:16 82:2 | | **versus** 90:12 | |
| **tax** 64:7,8,9,10,14,20 66:6 | **trial** 43:21,24 44:5 61:14 | **view** 26:8 87:25 | |
| | **two-page** 14:25 | **visits** 14:13,16 | **year-end** 22:4 |
| **taxes** 66:12 | **type** 43:2 75:6 | | **years** 6:20 13:23 51:8 82:9 85:19 |
| **team** 13:11 56:8 | **typical** 14:17 | **W** | |
| **technology** 18:25 | | | |
| **template** 20:8 45:8 60:23 | | **WANDER** 9:12 16:2, 7 24:14 30:12 32:24 | |
| **term** 38:19 90:5 | | | |
| **terms** 8:19 9:16,18 17:11 25:19 36:11 | | | |

# EXHIBIT 13

Page 1

1         IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION

3
    In re:                    :
4                             : Chapter 11
                              : Case No.
5    HIGHLAND CAPITAL MANAGEMENT, : 19-34054-sgj11
    L.P.                      :
6            Debtor.          :
    ----------------------------
7                             :
    HIGHLAND CAPITAL MANAGEMENT, :
8    L.P.                     :
                              :
9            Plaintiff,       :
                              :
10       vs.              : Adversary
                          : Proceeding No.
11   NEXPOINT ADVISORS, L.P.,    : 21-03005-sgj
    JAMES DONDERO, NANCY DONDERO,:
12    AND THE DUGABOY INVESTMENT   :
    TRUST,                    :
13                            :
            Defendants.    :
14   ----------------------------

15

16

17

18      REMOTE VIDEO DEPOSITION OF JAMES DONDERO

19                VOLUME III

20         Thursday, November 4, 2021

21

22

23

24

25   JOB NO. 202288

Page 2

```
 1
 2
 3
 4        November 4, 2021
 5        1:17 p.m. CDT
 6
 7
 8        Remote video deposition of JAMES
 9   DONDERO taken in the above-entitled matter
10   before Suzanne J. Stotz, a Certified Shorthand
11   Reporter, Certified Realtime Reporter,
12   Registered Professional Reporter, and Notary
13   Public of the State of Texas, on Thursday,
14   November 4, 2021, commencing at 1:17 p.m. CDT.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S:
 2
 3   Attorneys for Highland Capital Management L.P.:
 4     (Via videoconference)
       PACHULSKI STANG ZIEHL & JONES
 5       780 Third Avenue
         New York, New York 10017
 6
 7   BY:  JOHN MORRIS, ESQ.
 8        HAYLEY WINOGRAD, ESQ.
 9
10   Attorneys for NexPoint Advisors, L.P.:
11     (Via videoconference)
       MUNSCH HARDT KOPF & HARR
12       500 North Akard Street
         Dallas, Texas 75201
13
14   BY:  THOMAS BERGHMAN, ESQ.
15
16   Attorneys for James Dondero, Nancy Dondero,
       HCRE HCMS:
17
       (Via videoconference)
18     STINSON
         3102 Oak Lawn Avenue
19         Dallas, Texas 75219
20   BY:  DEBORAH DEITSCH-PEREZ, ESQ
21   BY:  MICHAEL AIGEN, ESQ.
22
23
24
25
```

Page 4

```
 1   A P P E A R A N C E S (Continued):
 2
 3   Attorneys for Nancy Dondero:
 4     (Via videoconference)
       GREENBERG TRAURIG
 5       220 Ross Avenue
         Dallas, Texas 75201
 6
 7   BY:  DANIEL ELMS, ESQ.
 8
 9   Attorneys for The Dugaboy Investment Trust:
10     (Via videoconference)
       HELLER, DRAPER, HAYDEN, PATRICK & HORN
11       650 Poydras Street
         New Orleans, Louisiana 70130
12
13
       BY:  DOUGLAS DRAPER, ESQ.
14          MICHAEL LANDIS, ESQ.
15
16   Attorneys for The Litigation Trust:
17     (Via videoconference)
       QUINN EMANUEL URQUHART & SULLIVAN
18       51 Madison Avenue
         New York, New York 10010
19
20
       BY:  ROBERT LOIGMAN, ESQ.
21          DEBORAH NEWMAN, ESQ.
22
23
24
25
```

Page 5

```
 1   A P P E A R A N C E S (Continued):
 2
 3   ALSO PRESENT:
 4     (Via Videoconference)
       JACOB ARVOLD, Videographer
 5
       (Via Videoconference)
 6     LA ASIA CANTY, Legal Assistant
       c/o Pachulski Stang Ziehl & Jones
 7
       (Via Videoconference)
 8     AARON LAWRENCE, Law Clerk
       c/o Quinn Emanuel Urquhart & Sullivan
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

INDEX

EXAMINATION                          Page No.
JAMES DONDERO
  BY MR. MORRIS                            10


EXHIBITS

Exhibit
Name        Description              Page No.

Exhibit     James Dondero Compensation    56
68          and Benefits Statement,
            Bates stamped D-CNL003585

Exhibit     James Dondero Compensation    59
50          and Benefits Statement,
            Bates stamped D-CNL003587

Exhibit     E-mail correspondence, Bates  95
53          stamped D-CNL003768 through
            D-CNL003770

Exhibit     E-mail correspondence, Bates  107
54          stamped D-CNL003777 through
            D-CNL003779

Exhibit     E-mail correspondence, Bates  116
56          stamped D-CNL003763
Exhibit     Promissory Note, Bates        119
57          stamped D-CNL003764 through
            D-CNL003765

Page 7

INDEX (Continued)

EXHIBITS (Continued)

Exhibit
Name        Description              Page No.

Exhibit     Highland Capital Management,  123
34          L.P., Consolidated Financial
            Statements and Supplemental
            Information, dated December
            31, 2018, Bates stamped
            D-CNL000212 through
            D-CNL000257

Exhibit     Memorandum, dated            130
59          October 23, 2020, Bates
            stamped HCMFAS 000025
            through HCMFAS 000031
Exhibit     Defendant James Dondero's    163
24          Objections and Responses to
            Plaintiff's Requests for
            Admission, Interrogatories,
            and Requests for Production
Exhibit     Defendant NexPoint Advisors, 173
27          L.P.'s Objections and
            Responses to Plaintiff's
            Requests for Admission,
            Interrogatories, and
            Requests for Production

(Exhibits attached to transcript.)

Page 8

JAMES DONDERO

1      THE VIDEOGRAPHER:  Good afternoon.
2  My name is Jacob Arvold.  I'm a certified
3  legal videographer in association with
4  TSG Reporting, Inc.
5      Due to the severity of COVID-19 and
6  following the practice of social
7  distancing, I will not be in the same room
8  with the witness; instead, I will record
9  this video deposition remotely.
10      The reporter, Suzanne Stotz, also
11  will not be in the same room and will swear
12  the witness remotely.
13      Do all parties stipulate to the
14  validity of video recording and remote
15  swearing and that it will be admissible in
16  the courtroom as if it had been taken
17  following Rule 30 of the Federal Rules of
18  Civil Procedures and the state's rules
19  where this case is pending?
20      MR. MORRIS:  Yes.
21      If anybody objects to that, please
22  speak up.
23      Nobody has spoken up.  So everybody
24  is deemed to have accepted that.

Page 9

JAMES DONDERO

1      THE VIDEOGRAPHER:  Thank you.
2      This is the start of Media Number 1,
3  Volume II [sic] of the video-recorded
4  deposition of James Dondero in the matter
5  of In Re:  Highland Capital Management,
6  L.P., in the United States Bankruptcy Court
7  for the Northern District of Texas.
8      This deposition is being held
9  remotely on November 4, 2021, at
10  approximately 1:17 p.m.
11      Counsel, please introduce
12  yourselves.
13      MR. MORRIS:  Everybody is -- is on
14  here.  I don't -- we can't take the time to
15  do that.  I'm familiar with everybody on
16  here.  Everybody's appeared in this action
17  before, and I'd like to proceed.
18      THE VIDEOGRAPHER:  All right.  The
19  appearances will be on the stenographic
20  record.
21      Will the court reporter please
22  reswear the witness.
23      THE COURT REPORTER:  Could you raise
24  your hand.

Page 10

```
1            JAMES DONDERO
2       THE WITNESS:  (Complies with
3    request.)
4       J A M E S   D O N D E R O,
5  having first been duly sworn, was examined and
6  testified as follows:
7       MS. DEITSCH-PEREZ:  I only have one
8    questions.  Who's Robert Loigman?
9       MR. LOIGMAN:  I already stated for
10   the record.  I'm with Quinn Emanuel.  I'm
11   Debbie Newman's partner.
12      MS. DEITSCH-PEREZ:  Okay.  Thank
13   you.
14      MR. MORRIS:  Can we please put up on
15   the screen the document that's been marked
16   Exhibit 31.
17      MS. CANTY:  (Complies with request.)
18          EXAMINATION
19  BY MR. MORRIS:
20      Q.   Mr. Dondero, do you understand that
21  this is a continuation of your deposition from
22  Friday?
23      A.   Yes.
24      Q.   Have you spoken with anybody about
25  your testimony since we concluded the
```

Page 11

```
1            JAMES DONDERO
2    deposition on Friday?
3       A.   No.
4       Q.   Nobody in the world?
5       A.   Just my attorney.
6       Q.   And did you speak with your attorney
7    about the substance of the deposition on
8    Friday?  Just --
9       MS. DEITSCH-PEREZ:  I'm going to
10   direct -- I'm going to direct him not to
11   answer.
12  BY MR. MORRIS:
13      Q.   Okay.  I'm just asking you a
14   yes-or-no question.  I'm not asking for the
15   substance of any communications.
16      MS. DEITSCH-PEREZ:  Well, you're --
17   one, I'd have to talk to him to see what he
18   thinks "substance" means.
19      And to the extent that's
20   substantive, you're actually getting at the
21   content potentially of a discussion.  So
22   I'm going to direct him not to answer.
23  BY MR. MORRIS:
24      Q.   Are you going to follow your
25   counsel's advice?
```

Page 12

```
1            JAMES DONDERO
2       A.   Yes.
3       Q.   How much time did you spend speaking
4    with your attorney since the conclusion of the
5    last deposition?
6       A.   30 minutes, 40 minutes.
7       Q.   Are you aware that Alan Johnson
8    testified in this case the other day?
9       A.   I don't know who Alan Johnson is.
10   Uh, no.
11      Q.   Okay.  Is it fair to say that you
12   have no knowledge of Mr. Johnson's testimony?
13      A.   I have no knowledge of Mr. Johnson's
14   testimony.
15      Q.   Are you aware that an expert was
16   examined by me earlier in the week in
17   connection with this case?
18      A.   I'm aware there's an expert.  I'm
19   not -- I'm not aware that you've examined,
20   deposed, or whatever you did with him.
21      Q.   Okay.  When did you speak with your
22   counsel for 30 minutes about -- following last
23   Friday's examination?
24      A.   About 40 minutes ago.
25      Q.   Okay.
```

Page 13

```
1            JAMES DONDERO
2       MR. MORRIS:  Can we go to
3    paragraph 82 of this document --
4       Q.   -- Mr. Dondero, do you see that this
5    is your answer to the Plaintiff's Amended
6    Complaint.
7       A.   Yes.
8       Q.   And we looked at this the other day;
9    do you remember that?
10      A.   Yes.
11      MR. MORRIS:  Can we can go to page--
12   paragraph 82, please.
13      MS. CANTY:  (Complies with request.)
14  BY MR. MORRIS:
15      Q.   And I just want to table set to make
16   sure we're on the same page.
17      Paragraph 82 describes the
18   agreements that you entered into with Dugaboy
19   consuming the forgiveness of certain Promissory
20   Notes subject to conditions subsequent.
21      Is that a fair overarching overview
22   of the nature of the agreements?
23      A.   Yes.
24      Q.   Okay.  And for the rest of the
25   deposition today, when I use the phrase
```

Page 14

JAMES DONDERO

1  "agreements," I'm going to mean the agreements
2  that are referred to in paragraph 82; is that
3  fair?
4      A.   Yes, generally.  If I have any
5  questions, I'll -- I'll ask.
6      Q.   Thank you very much.
7          The agreements covered each of the
8  notes that are the subject of the lawsuits that
9  Highland commenced against you, HCRE Services,
10 and NexPoint; is that right?
11     A.   The -- yes.
12     Q.   What are you looking at?
13     A.   Just this note sheet that covers all
14 the notes.
15     Q.   Oh.
16         MR. MORRIS:  Deborah, I would demand
17 that that sheet be produced immediately.
18         MS. DEITSCH-PEREZ:  Okay.
19         MR. MORRIS:  Okay.  And I would ask
20 him to put it away.
21         MS. DEITSCH-PEREZ:  No.  He's a
22 30(b)(6) witness.  He's entitled to have a
23 list of the notes.  He sure he is.
24         MR. MORRIS:  I'm telling you now --

Page 15

JAMES DONDERO

1      MS. DEITSCH-PEREZ:  I'm sorry to say
2  to you.
3      MR. MORRIS:  I object.  That is -- I
4  have never in my life seen a witness --
5      MS. DEITSCH-PEREZ:  I have had
6  30(b)(6) witnesses with whole notebooks of
7  information.
8      MR. MORRIS:  Okay.  So let's just
9  make sure the record is clear.
10 BY MR. MORRIS:
11     Q.   Please describe for me what's on
12 that page.
13     A.   It's a listing of the Notes payable
14 to Highland, what their original term and
15 amount was, what the term is, and what the loan
16 date was.
17     Q.   Okay.  I'm going to ask the --
18         MS. DEITSCH-PEREZ:  No.  I'm going
19 to take a picture, and I'm going to send it
20 to you, okay?
21         MR. MORRIS:  Okay.  And what we're
22 going to do right now is ask him to put it
23 away, and I'm going to ask him questions
24 solely in his capacity as an individual,

Page 16

JAMES DONDERO

1  okay?
2      Please put it away.
3          THE WITNESS:  Isn't that what this
4  deposition is, right?  This deposition --
5          MS. DEITSCH-PEREZ:  Well, this
6  deposition is both.
7          We're going to take a break for a
8  second.  Let me think about that, but
9  I'll --
10         MR. MORRIS:  I object.  I really
11 object.  I really object.  I'm glad that
12 this is all on the record.  I object.
13         My request is that he put it away
14 and answer questions in his capacity as an
15 individual.
16         I don't know why we need to take a
17 break.
18         MS. DEITSCH-PEREZ:  Well, because
19 I'm going to go take a picture of it and
20 send it to you.
21         MR. MORRIS:  I don't want you to do
22 that, though.
23         MS. DEITSCH-PEREZ:  Why don't you
24 want -- okay.

Page 17

JAMES DONDERO

1          MR. MORRIS:  We can do that -- we
2  can do that when I ask him questions as a
3  30(b)(6) witness.
4          By the way, it's still
5  inappropriate, but --
6          MS. DEITSCH-PEREZ:  No, it's not
7  John.
8          MR. MORRIS:  Okay.
9          MS. DEITSCH-PEREZ:  It's just not.
10 You can say it as much as you want.  It
11 doesn't make it inappropriate.
12         And I am going to -- I want to think
13 for a minute about whether or not your
14 request to have him not have it in front of
15 him in his individual capacity is
16 appropriate.  And I'm not going to make a
17 snap decision.  I'm going to talk to my
18 colleagues, and we'll be back on the record
19 in a couple of minutes.
20         MR. MORRIS:  I object, but I can't
21 stop you.
22         MS. DEITSCH-PEREZ:  Okay.
23         THE VIDEOGRAPHER:  Would you like to
24 go off the video record, Counsel?

Page 18

JAMES DONDERO

1
2    MR. MORRIS:  No, no, not at all.
3    THE VIDEOGRAPHER:  Okay.
4    MR. MORRIS:  And just keep the --
5    keep the record going.
6    THE VIDEOGRAPHER:  Yep, will do.
7    MR. MORRIS:  And we're not off the
8    record?
9    THE VIDEOGRAPHER:  Correct.
10    THE COURT REPORTER:  Correct.
11    MS. DEITSCH-PEREZ:  Okay.  We're
12    back on the record.
13    THE VIDEOGRAPHER:  We remained on
14    the record.
15    MS. DEITSCH-PEREZ:  Okay.  And this
16    part -- this -- at this point Mr. Morris
17    only taking Mr. Dondero's deposition in his
18    personal capacity, not as a 30(b)(6)
19    witness.
20    If you want to resume taking his
21    deposition as a 30(b)(6) witness, let me
22    know; and I will tell him to get his list
23    of notes.
24    MR. MORRIS:  So he doesn't have it
25    in front of him right now?

Page 19

JAMES DONDERO

1
2    THE WITNESS:  Correct.
3    MS. DEITSCH-PEREZ:  Correct, he does
4    not.
5    MR. MORRIS:  Okay.  I'm going to
6    proceed; and I would ask, Deborah, that
7    somebody from your office send that to me
8    as soon as possible.  I'm sure it's on an
9    e-mail somewhere and all they have to do is
10    hit send.
11    BY MR. MORRIS:
12    Q.    Mr. Dondero, let's continue.
13    So you don't have that document in
14    front of you right now?
15    A.    Correct.
16    Q.    Okay.  How many agreements did you
17    enter into with Dugaboy?
18    MS. DEITSCH-PEREZ:  You mean with
19    the Dugaboy trustee?
20    We had an agreement that you were
21    going to refer to these as the agreements
22    with the Dugaboy trustee.  So let's stay
23    consistent.
24    BY MR. MORRIS:
25    Q.    Mr. Dondero, how many agreements did

Page 20

JAMES DONDERO

1
2    you enter into with Dugaboy trustee concerning
3    Promissory Notes?
4    A.    Is your question -- is your
5    questions how many Notes were entered into?
6    Q.    No.  How many separate agreements
7    did you enter into?
8    A.    The 2017, '18, and '19 agreements.
9    Q.    Okay.  I didn't ask you what
10    agreements.  I asked how many agreements you
11    entered into with the Dugaboy trustee.
12    MS. DEITSCH-PEREZ:  Asked and
13    answered.
14    THE WITNESS:  Three major ones.
15    BY MR. MORRIS:
16    Q.    Are there any minor ones?
17    A.    Not that I can recall right now.
18    Q.    Okay.  When did you enter into your
19    first major agreement with the Dugaboy trustee?
20    A.    At the end of '17.
21    Q.    Meaning December 2017 or early 2018?
22    A.    Yes.
23    Q.    What Promissory Notes are the
24    subject of the first major agreement that you
25    entered into with the Dugaboy trust-- with

Page 21

JAMES DONDERO

1
2    the Dugaboy trustee?
3    A.    I don't remember which ones
4    specifically.  I remember the amount was more
5    substantial than subsequent years.
6    Q.    Do you know how many Promissory
7    Notes were the subject of your first major
8    agreement with the Dugaboy trustee?
9    A.    No.
10    Q.    Can you identify the maker of any
11    Note that's subject to the first major
12    agreement with the Dugaboy trustee?
13    A.    Not without my list or details.
14    Q.    Can you identify the principal
15    amount of any Promissory Note that was subject
16    to the first agreement that you entered into
17    with the Dugaboy trustee?
18    A.    I know they were -- I know the gross
19    amount.  I know they were some of the term
20    loans, but I don't know the specifics.
21    Q.    Can you tell me the aggregate
22    amount -- withdrawn.
23    Can you tell me the aggregate
24    principal amount of the Notes that are the
25    subject of your first agreement with the

Page 22

1              JAMES DONDERO
2  Dugaboy trustee?
3       A.   I -- I believe it was 30 -- 30 some
4  odd million, 30 -- I can't remember the
5  principal and interest, but it's only 30 -- 34,
6  35, 36.  It was in that range.
7       Q.   Did your first agreement with the --
8  withdrawn.
9            Can you identify the date of any of
10 the Promissory Notes that are the subject of
11 your first agreement with the Dugaboy trustee?
12      A.   No.
13      Q.   Can you tell me the year that any of
14 the Promissory Notes that are the subject of
15 the -- withdrawn.
16           Can you tell me the year that any of
17 the Promissory Notes were entered into that are
18 the subject of your first agreement with the
19 Dugaboy trustee?
20           MS. DEITSCH-PEREZ:  Asked and
21 answered.
22           THE WITNESS:  No, not off the top of
23 my head.
24 BY MR. MORRIS:
25      Q.   When did you -- did -- when did you

Page 23

1              JAMES DONDERO
2  enter into the second agreement with the
3  Dugaboy trustee?
4            Was that in December of 2018 or
5  early 2019?
6       A.   Yes.
7       Q.   How many Notes are subject to your
8  second agreement with the Dugaboy trustee?
9       A.   Less than the first, but I don't
10 know how many.
11      Q.   You don't know the number of Notes
12 that are the subject of your second agreement
13 with the Dugaboy trustee; is that right?
14      A.   Correct.
15      Q.   Can you identify the maker of any
16 Notes that are the subject of your second
17 agreement with the Dugaboy trustee?
18      A.   No, I -- I -- no, I don't remember.
19      Q.   Okay.  So as you sit here right now,
20 you can't identify the maker of any of the
21 Notes that are the subject of the second
22 agreement with the Dugaboy trustee; is that
23 right?
24      A.   Well, it would be one of the three
25 parties or four parties here, me or NexPoint or

Page 24

1              JAMES DONDERO
2  whatever; but I don't remember --
3       Q.   Okay.
4       A.   -- off the top of my head.
5       Q.   Off the top of your head, can you
6  tell me the original principal amount of any
7  Note that's subject to your second agreement
8  with the Dugaboy trustee?
9       A.   No.  I just -- no.
10      Q.   Can you identify the date on which
11 any of the Promissory Notes were executed that
12 were the subject of your second agreement with
13 the Dugaboy trustee?
14      A.   No.
15      Q.   Can you tell me the aggregate
16 principal amount of the Notes that are the
17 subject of your second agreement with the
18 Dugaboy trustee?
19      A.   Yes.  A fraction of the prior year.
20 Less than ten million.
21      Q.   Can you be anymore precise than
22 that?
23      A.   Approximately ten million, I think.
24 Just under.
25      Q.   Okay.  Did you enter into your third

Page 25

1              JAMES DONDERO
2  agreement with the Dugaboy trustee in December
3  2019 or early 2020?
4       A.   Yes.
5       Q.   That's after the petition date; do I
6  have that right?
7       A.   I -- yes.
8       Q.   Did you do it before or after
9  January 9, 2020?
10      A.   Before, I believe.
11      Q.   So while you were still in control
12 of Highland but after the petition date, you
13 entered into your third agreement with the
14 Dugaboy trustee concerning Promissory Notes.
15           Do I have that right?
16      A.   Yes.
17      Q.   Did you ever inform the bankruptcy
18 court of this agreement?
19      A.   No.
20      Q.   Did you ever inform the independent
21 directors of this agreement that you entered
22 into after the petition date?
23      A.   No.
24      Q.   Can you tell me which notes are the
25 subject of your third agreement with the

Page 26

JAMES DONDERO

2  Dugaboy trustee?

3      A.   No.

4      Q.   Can you identify the maker on any

5  Note that's the subject of your agreement that

6  you entered into after the petition date with

7  the Dugaboy trustee?

8      A.   Not off the top of my head.

9          MS. DEITSCH-PEREZ:  I mean, John, if

10  you would let him look at his list, he

11  could tell you.

12         But if you insist on making this a

13  memory test of 18 or so different things or

14  however many there are, 13, 14, then this

15  is -- it's your deposition.  But if you

16  want more specific details, he could look

17  at the list.

18         MR. MORRIS:  Okay.  That's not even

19  an objection let alone a speaking

20  objection.

21         It is my deposition --

22         MS. DEITSCH-PEREZ:  No.

23         MR. MORRIS:  It is my deposition,

24  and I would appreciate your not making

25  gratuitous comments.

Page 27

JAMES DONDERO

2  BY MR. MORRIS:

3      Q.   Mr. Dondero, can you tell me the

4  aggregate value of the Notes that are the

5  subject of the third agreement that you entered

6  into with the Dugaboy trustee after the

7  petition date?

8      A.   I believe it was about a million

9  bucks.

10      Q.   And who were the makers of the Notes

11  that are the subject of the agreement with the

12  Dugaboy trustee that you entered into after the

13  petition date?

14      A.   I don't know.

15      Q.   Without the sheet that you looked at

16  earlier, you have no ability to tell me which

17  notes were the subject of which agreement that

18  you entered into with the Dugaboy trustee,

19  correct?

20         MS. DEITSCH-PEREZ:  Object to the

21  form.

22         THE WITNESS:  If I'm not certain off

23  the top of my head I can remember

24  accurately, I don't want to speculate.

25

Page 28

JAMES DONDERO

2  BY MR. MORRIS:

3      Q.   All right.  I don't want you to

4  speculate either.  So I'm going to ask you just

5  broad follow-up questions.

6          Can you identify any Promissory Note

7  that is the subject of any specific agreement

8  that you ever entered into with the Dugaboy

9  trustee without looking at the list?

10         MS. DEITSCH-PEREZ:  Object to the

11  form.  He's already done that to some

12  degree.

13         THE WITNESS:  I believe it covered

14  virtually all of them.  So I don't remember

15  which ones specifically in each year.

16         Generally, it was, I believe, the

17  ones incurred in that year; but I don't

18  remember which entities.  But again, the

19  ultimate result being that the term loans,

20  the demand notes, the things incurred, the

21  things outstanding were part of the

22  agreement.

23  BY MR. MORRIS:

24      Q.   Sir, you never wrote down a list of

25  the notes that are the subject of the

Page 29

JAMES DONDERO

2  agreements, correct?

3      A.   Correct.

4      Q.   You never asked anybody to make a

5  list of the notes that were the subject of each

6  of the agreements, correct?

7      A.   Correct.

8      Q.   You're not aware of any document

9  that was created prior to the commencement of

10  these lawsuits that identifies the Notes that

11  are the subject of the agreements, correct?

12      A.   Correct.

13      Q.   Other than the Promissory Notes that

14  are the subject of this lawsuit -- withdrawn.

15         Other than the Promissory Notes that

16  are the subject of these lawsuits, are you

17  aware of any other doc- -- Promissory Notes

18  that are the subject of an agreement with the

19  Dugaboy trustee?

20      A.   I believe there are from time to

21  time, yes.  But I -- I don't know off the top

22  of my head.

23      Q.   Can you identify the maker of any

24  Promissory Note that is the subject of any

25  agreement with the Dugaboy trustee other than

Page 30

JAMES DONDERO

2  the Promissory Notes that are the subject of
3  the pending lawsuits?
4      A.  Not specifically, but I believe
5  there are.
6      Q.  Okay.  Can you identify the
7  principal amount of any Promissory Note that is
8  the subject of an agreement with the Dugaboy
9  trustee that is not part of the pending
10  lawsuits?
11      A.  Not specifically.
12      Q.  Can you tell me the year in which
13  any Promissory Note was ever executed that is
14  the subject of any agreement with the Dugaboy
15  trustee other than the Promissory Notes that
16  are the subject of the pending lawsuits?
17      A.  I believe there were several, and I
18  believe there were numerous ones over the
19  years.
20      Q.  Okay.  And -- and are those
21  Promissory Notes subject to one of the three
22  agreements that we've identified or subject to
23  some other agreement with the Dugaboy trustee?
24      A.  Well, they weren't to these related
25  entities.  I -- I don't know what the

Page 31

JAMES DONDERO

2  agreements were specifically subject to.
3      Q.  Are you the person who entered into
4  the agreement with the Dugaboy trustee
5  concerning the notes that you are describing
6  right now?
7      A.  Yes, I guess.
8      Q.  As the person who entered into the
9  agreement with the Dugaboy trustee concerning
10  Notes that are not the subject of the pending
11  litigation, can you identify anything about
12  those Notes, whether it's the maker, the date,
13  the principal amount, anything at all?
14      A.  Not off the top of my head.
15      Q.  Okay.  What would -- what would you
16  have to look at to know?  The chart or
17  something else?
18      A.  No, not this -- not this chart.
19  This only has to do with what we thought this
20  deposition was going to be about.
21          It would be the financials of
22  Dugaboy; and then from there, the detail
23  regarding any Notes that it has.
24      Q.  Did you enter into an agreement with
25  the Dugaboy trustee to forgive a Promissory

Page 32

JAMES DONDERO

2  Note where Dugaboy is the maker and Highland is
3  the payee?
4      A.  Dugaboy -- can you repeat that
5  question one more time?
6      Q.  Sure.  Did you enter into an
7  agreement with the Dugaboy trustee relating to
8  any Promissory Note where Dugaboy is the maker?
9      A.  No, I don't believe so.
10      Q.  Okay.  So you don't have any
11  recollection of ever entering into an agreement
12  with the Dugaboy trustee concerning the
13  potential forgiveness of any Note that was made
14  by Dugaboy, correct?
15      A.  I -- I do not believe so.
16      Q.  Okay.  And is there a -- is there a
17  document that we could look at that would
18  refresh your recollection?
19      A.  Not beyond the financials of Dugaboy
20  and any relevant Note detail.
21      Q.  And would -- is it -- is it your
22  testimony that an agreement with Dugaboy would
23  be reflected in the Dugaboy financial
24  statements?
25      A.  No, but the Notes would be.

Page 33

JAMES DONDERO

2      Q.  Well, the Dugaboy Notes are
3  reflected in Highland's financial statements.
4          Do you want me to get that?
5      A.  No.  I didn't think that was -- I
6  didn't think that was the question you were
7  asking me.
8      Q.  I apologize.  Maybe it was my fault.
9          What would we have to look at in
10  order to refresh your recollection as to
11  whether or not you entered into an agreement
12  with the Dugaboy trustee concerning the
13  potential forgiveness of any Note made by
14  Dugaboy?
15      A.  Other than the ones we're talking
16  about today, right?
17      Q.  We're not talking about -- there's
18  no Promissory Note where Dugaboy is the maker
19  that is the subject of any of the pending
20  lawsuits, correct?
21      A.  Correct.
22      Q.  So I'm asking you to identify if you
23  can any Promissory Note that is the subject of
24  any agreement you have ever entered into with
25  the Dugaboy trustee that is not the subject of

Page 34

```
 1              JAMES DONDERO
 2   one of the pending lawsuits.
 3        Do you understand that that's what
 4   I'm trying to get at?
 5        MS. DEITSCH-PEREZ:  Asked and
 6      answered.
 7        THE WITNESS:  Yes.
 8   BY MR. MORRIS:
 9    Q.   Okay.  Can you identify any such
10   Promissory Note?
11    A.   No, not specifically as I sit here
12   today.
13    Q.   Okay.  Other than the promissory --
14   withdrawn.
15        Are you familiar with the term
16   "majority interest" as used in the Highland
17   Limited Partnership Agreement?
18    A.   Yes.
19    Q.   Okay.  Other than the Promissory
20   Notes that are the subject of the pending
21   lawsuits, are you aware of any other Promissory
22   Notes that are the subject of any agreement
23   with the majority interest?
24        MS. DEITSCH-PEREZ:  Object to the
25      form.  Asked and answered.
```

Page 35

```
 1              JAMES DONDERO
 2        THE WITNESS:  The majority interest
 3   is controlled by the 75 percent.  It's
 4   controlled by Dugaboy.  But the majority
 5   interest isn't an entity in and of itself,
 6   right?
 7   BY MR. MORRIS:
 8    Q.   Okay.  Has Dugaboy held the majority
 9   interest since the time that Highland was
10   created?
11    A.   No.
12    Q.   Okay.  So -- so then I'm going to
13   ask my question again.
14        Are you aware of any agreement
15   concerning a Promissory Note that is the
16   subject -- withdrawn.
17        Are you aware of any agreement with
18   the majority interest that concerns any
19   Promissory Note where Highland is the payee
20   other than the Notes that are the subject of
21   the pending lawsuit?
22        MS. DEITSCH-PEREZ:  Asked and
23      answered.
24        THE WITNESS:  Not specifically as I
25      sit here today, but I do believe there have
```

Page 36

```
 1              JAMES DONDERO
 2      been numerous notes other than to these
 3      entities today where Dugaboy was the maker
 4      or recipient or whatever.
 5   BY MR. MORRIS:
 6    Q.   So you do believe that Dugaboy was
 7   the maker of a Promissory Note that's subject
 8   to an agreement with the majority interest?
 9        MS. DEITSCH-PEREZ:  Object to the
10      form.
11        THE WITNESS:  What I'm saying is I
12      believe Dugaboy had other -- made other
13      Notes and received other Notes from other
14      entities other than Highland.
15   BY MR. MORRIS:
16    Q.   Does that have anything to do with
17   Highland?
18        Maybe I wasn't clear.  I'm using the
19   phrase "majority interest" as that phrase -- I
20   thought we had -- I thought we had an
21   understanding -- as that phrase is used in the
22   Highland Limited Partnership Agreement, right?
23    A.   I thought it was a definition term
24   in the Highland, L.P.
25    Q.   It is, and I just -- I'd like to
```

Page 37

```
 1              JAMES DONDERO
 2   move on if I can, but I just want some clarity
 3   here.
 4        Is there any agreement between
 5   Dugaboy and the majority interest concerning
 6   any Promissory Note where Dugaboy is the maker?
 7        MS. DEITSCH-PEREZ:  Object to the
 8      form.
 9        THE WITNESS:  I -- I don't know what
10      you're getting at.  I have a tried to
11      answer it the best I can several different
12      ways.
13        But try it one more time, and I'll
14      try and answer it just specifically yes or
15      no.
16   BY MR. MORRIS:
17    Q.   Okay.  Is Dugaboy the maker on any
18   Promissory Note where Highland is the payee?
19    A.   I don't believe so at this point.
20    Q.   Was Dugaboy ever the maker on a Note
21   where Highland was the payee to the best of
22   your knowledge?
23    A.   I don't -- I just don't know what
24   the actual accounting was or could have or
25   should have been.  But if it prepays a Note,
```

Page 38

JAMES DONDERO

1    instead of prepaying a Note, it could have left
2    it in an existing Note outstanding and then
3    issued a separate Note, right, instead of
4    prepaying, right?
5         So I don't know in the – in the pas
6    past or how exactly they handled prepays
7    consistently over time.  But at the moment, I
8    don't believe there's a loan going from Dugaboy
9    to Highland.
10        But I do believe over the years,
11   there were numerous loans from Dugaboy to other
12   entities other than the ones we're talking
13   about today.
14        MS. DEITSCH-PEREZ:  Okay.  John,
15   we've gone way far afield of the topics for
16   this deposition or anything that you ought
17   to be even asking this individual witness
18   about given what these litigations are.
19   Could we move on, please?
20        MR. MORRIS:  No.  Other than –
21        MS. DEITSCH-PEREZ:  You're spending
22   time on things other than the –
23        MR. MORRIS:  Please stop talking.
24        MS. DEITSCH-PEREZ:  -- action.

Page 39

JAMES DONDERO

1         MR. MORRIS:  Please stop talking.
2    BY MR. MORRIS:
3    Q.   Other than the Promissory Notes that
4    are the subject of the lawsuits, are you aware
5    of any other Promissory Notes that are the
6    subject of any agreement that the Dugaboy
7    trustee ever entered into as a representative
8    of the majority of Class A shareholders?
9         MS. DEITSCH-PEREZ:  Asked and
10   answered.  I think we've answered after the
11   sixth time.
12        THE WITNESS:  Not as I sit here
13   today.
14   BY MR. MORRIS:
15   Q.   In paragraph 82 in about the fifth
16   line down, there's a statement that, quote,
17   "Nancy Dondero is representative for a majority
18   of the Class A holders of plaintiff, agree that
19   plaintiff would forgive the Notes."
20        Do you see that?
21   A.   Yes.
22   Q.   The word "plaintiff" as used in your
23   answer refers to Highland Capital Management,
24   L.P., correct?

Page 40

JAMES DONDERO

1    A.   I – no – or wait.  Hold on a
2    second.
3         Yes.  I guess, yes.
4    Q.   Okay.  At the time you entered into
5    the agreements, did you understand that
6    Dugaboy, as a majority – as a representative
7    of a majority of the Class A shareholders of
8    the plaintiff was the entity that entered into
9    the agreement on behalf of Highland?
10   A.   Yes.
11   Q.   And your sister Nancy is the trustee
12   of Dugaboy today, correct?
13   A.   Yes.
14   Q.   And Nancy was the trustee of Dugaboy
15   at the time you entered into each of the
16   agreements, correct?
17   A.   Yes.
18   Q.   And you knew that at the time you
19   entered each of the agreements, correct?
20   A.   Yes.
21   Q.   You knew she was acting on behalf of
22   Dugaboy, correct?
23   A.   Yes.
24   Q.   Your understanding at that time that

Page 41

JAMES DONDERO

1    you entered into each of the agreements with
2    the Dugaboy trustee was that Dugaboy held the
3    majority of Highland's Class A interest,
4    correct?
5    A.   Yes.
6    Q.   And that's exactly why you contacted
7    Nancy to discuss the topics that ultimately led
8    to the agreements, correct?
9    A.   Yes.
10   Q.   You specifically called Nancy
11   because you wanted her to cause Dugaboy to
12   enter into the agreements with you on behalf of
13   Highland, correct?
14   A.   Yes.
15   Q.   And just as you wanted, Nancy, in
16   fact, caused Dugaboy, as a representative of a
17   majority of the Class A shareholders of
18   plaintiff, to enter into each of the
19   agreements, correct?
20   A.   Yes.
21   Q.   Would you agree with me that the
22   Promissory Notes that are the subject of the
23   agreements were the debtor's property?
24   A.   I think I've stated numerous times

Page 42

```
 1          JAMES DONDERO
 2   due to them as that they would ultimately be
 3   compensation; but to be a bona fide Note and to
 4   have bona fide deferral at the time that they
 5   were issued, they were the debtor's property.
 6   And I guess they remained such until satisfied
 7   or until the condition as present -- the
 8   condition subsequent is either triggered or
 9   impossible to be triggered.
10      Q.   Okay.  Is it fair to say that the
11   Promissory Notes that are the subject of the
12   agreements were assets of the debtor at the
13   time you entered into the agreements?
14      A.   Yes.
15      Q.   At the time you entered into the
16   agreements, you understood that Dugaboy was
17   exercising control over the debtor's property,
18   correct?
19          MS. DEITSCH-PEREZ:  Object to the
20      form.
21          MR. MORRIS:  Withdrawn.
22   BY MR. MORRIS:
23      Q.   At the time you entered into the
24   agreements, you understood that the Dugaboy
25   trustee was going to exercise control over the
```

Page 43

```
 1          JAMES DONDERO
 2   debtor's property, correct?
 3          MS. DEITSCH-PEREZ:  Object.  Object
 4      to the form.
 5          THE WITNESS:  Exercise control?  I
 6      understood the trustee had the ability to
 7      grant the, whatever you want to call them,
 8      conditions subsequent.
 9   BY MR. MORRIS:
10      Q.   On that --
11      A.   Yes.
12      Q.   And that was -- by entering into the
13   agreement, would you agree with me, that the
14   Dugaboy trustee exercised control over the
15   Promissory Notes?
16          MS. DEITSCH-PEREZ:  Object to the
17      form.
18          THE WITNESS:  They -- The trustee
19      exercised the rights given to it as a
20      majority of Class A holders.
21   BY MR. MORRIS:
22      Q.   Okay.  And is it your understanding
23   that as part of the right, it altered the
24   characteristics of the Promissory Notes?
25          MS. DEITSCH-PEREZ:  Object to the
```

Page 44

```
 1          JAMES DONDERO
 2      form.
 3          THE WITNESS:  I just want to -- I
 4      believe my testimony, I granted the
 5      conditions subsequent is my interpretation.
 6   BY MR. MORRIS:
 7      Q.   Right.  And so that's fine.  But
 8   that's -- that's the thing that happened, but
 9   I'm just asking you what the impact of that
10   was.
11          When the Dugaboy trustee entered
12   into the agreement, the result was that the
13   terms and conditions of the Promissory Note
14   were altered, correct?
15          MS. DEITSCH-PEREZ:  Object to the
16      form.
17          THE WITNESS:  I don't want to -- I
18      want to say I don't know to that next week.
19   BY MR. MORRIS:
20      Q.   You can't -- okay.  You can't tell
21   me if your agreement with the Dugaboy trustee
22   altered the terms and conditions of the
23   Promissory Notes that were subject to the
24   agreement; you can't tell me that?
25          MS. DEITSCH-PEREZ:  Object to the
```

Page 45

```
 1          JAMES DONDERO
 2      form.
 3          THE WITNESS:  Yeah.  I -- again, it
 4      sounds like you're trying to take me
 5      towards legal terms of changing terms or
 6      modification in a Note or whatever; and
 7      I -- I'm not -- I don't have an opinion or
 8      the expert to comment on that.
 9          I can just say I knew she had the
10      ability to create conditions subsequent.
11   BY MR. MORRIS:
12      Q.   Okay.  So let's take, for example,
13   the Notes that you signed.
14          Those were demand notes, right?
15      A.   Yes.
16      Q.   Okay.  And after you entered into
17   the agreement with the Dugaboy trustee, instead
18   of it being a demand note, it was now a demand
19   note subject to conditions subsequent, correct?
20          MS. DEITSCH-PEREZ:  Object to the
21      form.
22          THE WITNESS:  Yeah, that ultimately
23      they couldn't be demanded until conditions
24      subsequent were met or unable to be met.
25
```

Page 46

1              JAMES DONDERO
2    BY MR. MORRIS:
3         Q.    Okay.  So can you agree with me that
4    that -- that that was a change in the term of
5    the Note?
6              MS. DEITSCH-PEREZ:  Object to the
7         form.
8              THE WITNESS:  Yeah.  See, that's the
9         part I don't want to comment on.  I just
10        want to say I don't know.
11   BY MR. MORRIS:
12        Q.    Okay.  Wasn't that the purpose of
13   entering into the agreements was to change the
14   terms of the each of the Promissory Notes?
15        Wasn't that your intent?
16             MS. DEITSCH-PEREZ:  Object to the
17        form.
18             THE WITNESS:  I'd say the intent was
19        to find and make compensation appropriate
20        for industry standards and Highland in
21        particular.
22   BY MR. MORRIS:
23        Q.    And did you believe that the Notes
24   as originally drafted and signed by you or the
25   representatives of the makers didn't take that

Page 47

1              JAMES DONDERO
2    into account?
3         A.    I went through this already last
4    time, but the Notes were intentionally loose
5    and, I think, anticipated the ability to adjust
6    the subsequent conditions or other things.
7         Q.    Now, you told me that each of the
8    agreements was entered in between December of
9    one year or -- actually, withdrawn.
10        If we look at paragraph 82, it says
11   that each of the agreements was made, quote,
12   "sometime between the December of the year in
13   which each note was made and February of the
14   following year."
15        Do I have that right?
16        A.    Yes.
17        Q.    Can you identify with any greater
18   specificity when you entered into the first
19   agreement with the Dugaboy trustee referenced
20   in paragraph 82?
21        A.    No.
22        Q.    It's sometime within that 90-day
23   period; does that sound right to you?
24        A.    I believe it was closer to the
25   holidays around the turn of the year, but I

Page 48

1              JAMES DONDERO
2    don't have specific recollection.
3         Q.    Is that answer the same for all
4    three agreements or only for the first
5    agreement?
6         A.    That would be the same for all
7    three.
8         Q.    So then why -- why does paragraph 82
9    refer to sometime between December of the year
10   in which each note was made and February of the
11   following year if your best recollection is
12   that it happened around the holidays?
13        A.    I don't know.
14        Q.    All right.  But as you sit here
15   right now, is it your testimony that you
16   believe each of the agreements was signed --
17   was more likely signed in December rather than
18   January or February?
19             MS. DEITSCH-PEREZ:  Object to the
20        form.
21             THE WITNESS:  I think signed is a --
22        I'm not -- I'm not testifying that signed,
23        I guess.
24   BY MR. MORRIS:
25        Q.    I apologize.  Maybe that was my

Page 49

1              JAMES DONDERO
2    mistake.
3         Is it your testimony that each --
4    that you entered each of the agreements with
5    the Dugaboy trustee in December rather than
6    January or February of the years indicated?
7         A.    That's the best of my recollection,
8    but there may have been one year that was
9    towards the wider end of the interval.  I can't
10   remember with more specificity.
11        Q.    Okay.  Do you know of anything that
12   memorialized the date on which you entered into
13   any of the agreements?
14        A.    No, other than -- no, other than --
15   no, other than, you know, other than travel
16   schedule or phone logs or whatever.
17        Q.    All right.  During the discussion
18   that led to the agreements, did you ever
19   provide any information to Nancy or to Dugaboy
20   concerning your compensation?
21        A.    Just -- just verbal.  I mean, she
22   knew it was low, and she knew we had reinvested
23   most everything we made back in the company
24   over the years.  And that was the -- that was,
25   I think, understanding by all involved; and it

Page 50

JAMES DONDERO

1          JAMES DONDERO
2  should be obvious to anybody who's looked at
3  the numbers even in hindsight.
4          MR. MORRIS:  Okay.  I move to
5      strike.
6  BY MR. MORRIS:
7      Q.    And please listen carefully to my
8  question.
9          During the discussions that led to
10  each of the agreements, did you ever provide
11  any information to your sister or Dugaboy
12  concerning your compensation?
13          MS. DEITSCH-PEREZ:  Asked and
14      answered.
15          THE WITNESS:  Not specifically.
16  BY MR. MORRIS:
17      Q.    Did you provide any general
18  information to your sister or to Dugaboy prior
19  to the entry of any of the three agreements
20  that you entered into with the Dugaboy trustee?
21      A.    I would repeat the answer that was
22  struck two questions ago.
23      Q.    That's the information that you gave
24  to her?
25      A.    Yeah.  It was – again, it was

Page 51

JAMES DONDERO

1          JAMES DONDERO
2  verbal, and it was – but an understanding but
3  a clear and obvious understanding.
4      Q.    I want to know exactly what
5  information you gave to your sister and to
6  Dugaboy before entering into any of the three
7  agreements with the Dugaboy trustee?
8      A.    Most of what I had made over the
9  years was rolled back into the business to
10  propel growth and initiatives.  And that my
11  actual compensation was very modest based on
12  industry standards and relevant
13  responsibilities at Highland.
14      Q.    Did you tell her anything else?
15  Withdrawn.
16          Did you tell your – Nancy or
17  Dugaboy anything else beyond what you've now
18  testified to?
19      A.    You know, I think some of what I
20  testified to earlier, that forgiveness of the
21  Notes would be a modest increase in that
22  compensation but still not be in the ZIP code
23  of fair and appropriate compensation and that
24  the value of the Notes in aggregate were de
25  minimus relative to Highland and de minimis

Page 52

JAMES DONDERO

1          JAMES DONDERO
2  relative to Dugaboy.
3      Q.    Did you tell her anything else?
4      A.    Anything else would have fallen into
5  the buckets I just described, but I can't
6  remember specifically as I sit here today.
7      Q.    Did you ever tell your sister or
8  Dugaboy that your salary was less than a
9  million dollars?
10      A.    I –
11          MS. DEITSCH-PEREZ:  I mean, just
12      from Highland?
13          THE WITNESS:  Repeat the question
14      again for me, please.
15  BY MR. MORRIS:
16      Q.    Did you ever tell your sister that
17  your salary was less than a million dollars a
18  year?
19      A.    I know my sister was aware that it
20  was very low, and it kind of decreased over
21  time, and I think it was paid by different
22  entities.
23          Whether it was a million or
24  2 million, I can't remember exactly what I
25  would have told her; but it would have been in

Page 53

JAMES DONDERO

1          JAMES DONDERO
2  that ZIP code to paint the proper picture that
3  the cash compensation for somebody in my role
4  was well below industry standards.
5      Q.    Do you recall anything else that you
6  shared with your sister concerning your
7  compensation that you haven't testified to?
8      A.    Like I said, it would generally fall
9  into those buckets as I sit here today.
10      Q.    Did your sister or Dugaboy ask you
11  any questions about your compensation before
12  entering into the three agreements that you
13  entered into with the Dugaboy trustee?
14      A.    And, again, it would fall into the
15  buckets I just described.
16      Q.    Can you – can you recall any
17  question that your sister or Dugaboy asked of
18  you concerning your compensation before
19  entering into the agreements?
20          MS. DEITSCH-PEREZ:  Asked answered.
21          THE WITNESS:  Again, I – it would
22      fall into the buckets I just described.
23  BY MR. MORRIS:
24      Q.    Did you provide any documents to
25  your sister or to Dugaboy concerning your

Page 54

JAMES DONDERO

1
2  compensation before entering into the
3  agreements?
4      A.  No, not that I can recall.
5      Q.  Did your sister or Dugaboy ask you
6  for any documents before entering into -- into
7  any of the agreements?
8      A.  I do not -- I do not believe so.
9      Q.  Do you recall that in the ordinary
10 course of business, Highland prepared a
11 document called a Compensation and Benefits
12 Statement for each of its employees?
13     A.  Yes.
14     Q.  And was that prepared by the Human
15 Resources Group?
16     A.  Yes.
17     Q.  And was Mark Collins the head of the
18 Human Resources Group?
19     A.  No.
20     Q.  Who was the head of the Human
21 Resources Group?
22     A.  Brian Collins.
23     Q.  I apologize to Mr. Collins.  Thank
24 you for the correction.
25         And Mr. Collins and his team were

Page 55

JAMES DONDERO

1
2  responsible for preparing the annual
3  Compensation and Benefits Statements for
4  Highland's employees, correct?
5      A.  Yes.
6      Q.  And did you instruct them to do
7  that?
8      A.  Not specifically.
9      Q.  Okay.
10     A.  They do it every year.  They do it
11 every year as a matter of course, so I guess no
12 is the answer.
13     Q.  Okay.  So in the ordinary course of
14 business, Mr. Collins and his team would
15 prepare Compensation and Benefits Statements
16 for each of Highland's employees on an annual
17 basis, right?
18     A.  Yes.
19     Q.  Okay.
20         MR. MORRIS:  Can we please put up
21 Exhibit 68.
22         MS. CANTY:  (Complies with request.)
23
24
25

Page 56

JAMES DONDERO

1
2         (Whereupon, Exhibit 68, James
3      Dondero Compensation and Benefits
4      Statement, Bates stamped D-CNL003585,
5      marked for identification, as of this
6      date.)
7  BY MR. MORRIS:
8      Q.  Do you see the document that's been
9  premarked as Exhibit 68 that's up on the
10 screen, sir?
11     A.  Yup.
12     Q.  And does this appear to be the form
13 of annual Compensation and Benefits Statement
14 that Mr. Collins and his team prepared on an
15 annual basis for Highland's employees?
16     A.  This looks like the format, yes.
17     Q.  Okay.  And the Compensation and
18 Benefits Statement was intended to set forth
19 the types and the amounts of compensation each
20 employee received each year, correct?
21     A.  Yes, generally.
22     Q.  Okay.  Did you ever disclose any
23 information on this page to Nancy or to
24 Dugaboy?
25     A.  Honestly, I don't think I've ever

Page 57

JAMES DONDERO

1
2  seen my award letters before.
3      Q.  Okay.  So you never -- so then it's
4  a fair to say you never showed this letter to
5  your sister or Dugaboy, correct?
6      A.  Correct.
7      Q.  Okay.  Did you ever disclose to
8  Nancy or to Dugaboy the salary that's reflected
9  on this document?
10     A.  I can't remember specifically beyond
11 what I've already testified.
12     Q.  Did you ever describe for Nancy or
13 for Dugaboy the 2016 deferred compensation
14 award that's reflected on this document?
15     A.  No.  I -- by the way, I think that's
16 only 20 percent vested a year.  I think that's
17 a gross amount.  But no, I never -- I never
18 discussed that with her.
19     Q.  Okay.  Do you see in the
20 compensation award refers to 50,000 restricted
21 stock units of NXRT relating to your 2016
22 performance?
23     A.  Yes.
24     Q.  What is NXRT?
25     A.  That's the REIT that Highland used

Page 58

JAMES DONDERO

1    to own million shares of that series hold at 20
2    that now trade at 70.
3        Q.    And is NexPoint REIT affiliated with
4    NexPoint Advisors, L.P.?
5        A.    Yes.
6        Q.    And do you have an understanding of
7    the nature of the relationship?
8        A.    Yes.
9        Q.    And what's -- what's your
10   understanding of the nature of the relationship
11   between NexPoint REIT and NexPoint Advisors,
12   L.P.?
13       A.    It's the external manager of the
14   REIT.
15       Q.    Okay.  Did you ever tell Nancy or
16   Dugaboy that you had received these restricted
17   stock units in 2016?
18       A.    No.  But the vested amount
19   would have probably been about $250,000 worth
20   at that moment.
21       Q.    And did it vest over a couple of
22   years?
23       A.    The first couple of years is vested
24   over five years.  I think now it vests over six

Page 59

JAMES DONDERO

1    or seven years.  I don't remember whether the
2    2016 award was five years, six years, or seven
3    years.
4        Q.    Okay.  We talked earlier about an
5    expert that's been retained on your behalf.
6              Do you remember that?
7        A.    Yes.
8        Q.    Do you recall if you or anybody
9    acting on your behalf ever disclosed to that
10   expert the restricted stock units reflected on
11   this document?
12             MS. DEITSCH-PEREZ:  Object to the
13   form.
14             THE WITNESS:  I don't know.
15             MR. MORRIS:  Let's put up
16   Exhibit 50, please.
17             MS. CANTY:  (Complies with request.)
18             (Whereupon, Exhibit 50, James
19             Dondero Compensation and Benefits
20             Statement, Bates stamped D-CNL003587,
21             marked for identification, as of this
22             date.)
23   BY MR. MORRIS:
24       Q.    Do you see this is your benefits

Page 60

JAMES DONDERO

1    statement for 2017?
2        A.    Yes.
3        Q.    Did you ever disclose any of the
4    information on this page to Nancy or to
5    Dugaboy?
6        A.    No.
7        Q.    Did you ever disclose to Nancy or to
8    Dugaboy that your base salary in 2017 was.
9              2,500,024?
10             MS. DEITSCH-PEREZ:  Object to the
11   form.
12             THE WITNESS:  Not specifically, no,
13             other than the buckets we talked about
14             earlier.
15             Like I said earlier, I'm not sure if
16             I have ever seen these before.  But I also
17             -- until it's verified, I don't want to --
18             everybody to assume that the base salary
19             came a hundred percent from Highland or if
20             it was also from some other entity.
21             Because for the purposes of this letter,
22             Brian Collins wouldn't have -- we have
23             numerous or several employees that are dual
24             employees.  And whether their base salary

Page 61

JAMES DONDERO

1    came from one or multiple entities, he
2    wouldn't have differentiated in that line.
3              So I don't know whether that amount,
4    that 2.5 million came from Highland or a
5    combination of Highland/NexPoint or some
6    other entities.  I don't know.
7    BY MR. MORRIS:
8        Q.    And who made the decision as to how
9    to allocate the base salary?
10       A.    I don't know.  I -- I mean, I don't
11   know how it was split.  But my recollection of
12   my Highland base salary is that it was
13   diminishing over time.
14       Q.    And -- and as the president of
15   Highland and as the president of NexPoint, did
16   you have any say as to how your salary was
17   allocated between those two entities?
18       A.    Not that I recall.
19       Q.    Do you have any idea the basis on
20   which your salary was allocated between those
21   two entities?
22       A.    No.
23       Q.    Do you think -- do -- do you have
24   any understanding that it was allocated based

Page 62

JAMES DONDERO

1  on the amount of time you spent working for
2  each of those entities?
3      A.  I have no idea.
4      Q.  If your salary was $500,000 from
5  Highland in 2017 and $2 million to NexPoint,
6  can you -- can you think of any reason why it
7  would be allocated in that way?
8          MS. DEITSCH-PEREZ:  Object to the
9      form.
10         THE WITNESS:  Cash, cash
11     availability.  I -- I don't know.
12 BY MR. MORRIS:
13     Q.  Okay.  Did you devote your full time
14 and attention to Highland Capital Management,
15 L.P.?
16     A.  I spread my time as appropriate
17 across a variety of entities.
18     Q.  Can you identify for me the entities
19 that you spread your time across?
20     A.  Highland, NexPoint, HCMFA, HCRE.
21     Q.  How about Highland Management
22 Services, Inc.?
23     A.  Yes.
24     Q.  Are there any others?

Page 63

JAMES DONDERO

1      A.  Yes.
2      Q.  Can you identify any other companies
3  to which you devoted your time and attention?
4      A.  Not off the top of my head.  I'm
5  willing to be refreshed.  But over the years
6  there's been multiple initiatives at Highland
7  that have come and gone and private equity
8  companies that have come and gone and other
9  initiatives that have come and gone.
10     Q.  Do you see the reference to the
11 65,772 restricted stock units of the NexPoint
12 REIT there on this document?
13     A.  Yes.
14     Q.  And was that, to the best of your
15 recollection, the award that you were granted
16 in connection with your 2017 performance?
17     A.  It would have been for -- it would
18 have been the prior awards at -- it would have
19 been for the prior years' awards at NFLP.  And
20 it would have been -- it would have been the
21 same five- or seven-year vesting schedule.
22         MR. MORRIS:  Now I'm looking at my
23     phone, and I don't see, Deborah, any e-mail
24     from your firm.

Page 64

JAMES DONDERO

1          MS. DEITSCH-PEREZ:  Yeah.  On a
2      break, I'll take a picture of it and send
3      it to you.
4          Do you want a break now?
5          MR. MORRIS:  I really -- I really
6      don't.  And I don't know why I can't get an
7      e-mail copy rather than a photograph.  It's
8      not going to be -- it's not going to be
9      easy to read, and you know that?
10         MS. DEITSCH-PEREZ:  It'll be
11     perfectly fine.  If you can't, let me know;
12     and then I'll take the time to try and find
13     it.  But the fastest way to get it to you
14     is to take a picture of it.
15 BY MR. MORRIS:
16     Q.  Mr. Dondero, did you ever tell Nancy
17 or Dugaboy that you had received the restricted
18 stock units from the NexPoint REIT as reflected
19 on this page?
20     A.  You're -- you're saying the
21 $1.55-million number that was really 200,000
22 vested or 300,000 vested?
23     Q.  No.  I'm not talking about the
24 value.  I'm just talking about the restricted

Page 65

JAMES DONDERO

1  units.
2          Did you ever tell them -- let's keep
3      it -- let's keep it simple, and let's make it
4      really broad.
5          Did you ever tell Nancy or Dugaboy
6      that you received restricted stock units as
7  part of your compensation?
8      A.  I -- I don't remember.
9      Q.  Okay.  Did you ever -- because this
10 will speed it up.
11         Did you ever tell your expert that
12 you received restricted stock units as part of
13 your compensation?
14         MS. DEITSCH-PEREZ:  Object to the
15     form.
16         THE WITNESS:  I don't -- I don't
17     remember.
18 BY MR. MORRIS:
19     Q.  Did you ever direct anyone acting on
20 your behalf to share with your expert that you
21 had received restricted stock units as a form
22 of compensation?
23         MS. DEITSCH-PEREZ:  Object to the
24     form.

Page 66

JAMES DONDERO

1  THE WITNESS:  I not -- I wasn't
2  involved.
3  MR. MORRIS:  All right.  You know,
4  what, Deborah, let's take a break; and why
5  don't you send me that document.
6  It is now 3:28.  Let's come back at
7  3:40 Eastern, and let's please be on time
8  because I'd like to try to finish this
9  today.  Thank you.
10  THE VIDEOGRAPHER:  Off the record at
11  2:28.
12  (Whereupon, a break was taken.)
13  THE VIDEOGRAPHER:  We are back on
14  the record.  The time is 2:43.
15  MR. MORRIS:  I received from counsel
16  a photograph in text message form of the
17  document that Mr. Dondero was referring to
18  at the beginning of the deposition.
19  I'm going to ask for that production
20  -- for the production of that document with
21  a Bates number by the end of the day, and I
22  hope that could be accommodated.
23  MS. DEITSCH-PEREZ:  I'm not sure --
24  John, I'm not sure it will be by the end of
25

Page 67

JAMES DONDERO

1  the day because I don't know when the
2  people who do the Bates stamping leave.
3  But if it's not today, it will be tomorrow.
4  MR. MORRIS:  All right.  It's 2:44
5  in the afternoon your time.  I hope that
6  your firm has the capability of Bates
7  stamping and producing one page before the
8  close of business.
9  MS. DEITSCH-PEREZ:  Okay.  But I'm
10  not going to get -- John, what difference
11  does it make whether it's tonight or
12  tomorrow?
13  MR. MORRIS:  You know what, I really
14  want to use it in the deposition now, but I
15  can't do that because -- because you're not
16  able -- because you -- because apparently,
17  you can't even promise to do it by the end
18  of the day.
19  BY MR. MORRIS:
20  Q.  Mr. Dondero --
21  MS. DEITSCH-PEREZ:  Could you --
22  could you use it --
23  MR. MORRIS:  I'd like to --
24  MS. DEITSCH-PEREZ:  -- if I sent it
25

Page 68

JAMES DONDERO

1  to you by e-mail instead.
2  MR. MORRIS:  I'd like to proceed.
3  You can e-mail it to me.  I mean, I
4  asked you to do that an hour ago.
5  MS. DEITSCH-PEREZ:  Well, the
6  easiest way to do it is to send a picture
7  is to text it; but if you give me a minute,
8  I'll figure out how to send it by e-mail.
9  Give me a second.  Let's see.
10  It just takes a second because it
11  goes into my personal e-mail first if it's
12  from my iPhone.  Okay.
13  MR. MORRIS:  Can we proceed?
14  MS. DEITSCH-PEREZ:  Yeah.  Give me a
15  minute and you'll have it.
16  Okay.  You should have it in your
17  e-mail now, John.
18  MR. MORRIS:  Thank you.  All right.
19  I'll let you know when it arrives.
20  BY MR. MORRIS:
21  Q.  Mr. Dondero, the questions now are
22  going to be both in your individual capacity
23  and in your capacity as the 30(b)(6) witness.
24  Do you understand that?
25

Page 69

JAMES DONDERO

1  A.  Okay.
2  Q.  Okay.
3  A.  It's either -- it's either/or; it's
4  not one?
5  Q.  No.
6  A.  Okay.
7  Q.  You contend that the Notes are
8  subject to the -- withdrawn.
9  You contend that the Notes that are
10  the subject of the agreements would be forgiven
11  upon the fulfillment of certain conditions
12  present, right?
13  A.  Right.
14  MS. DEITSCH-PEREZ:  Object to the
15  form.  He said "subsequent."
16  MR. MORRIS:  I apologize.  Let me
17  restate the question.
18  BY MR. MORRIS:
19  Q.  You contend that the Notes subject
20  to the agreement should be forgiven or would be
21  forgiven upon the fulfillment of certain
22  conditions subsequent, correct?
23  A.  Yes.
24  Q.  And to the best of your knowledge,
25

Page 70

```
1              JAMES DONDERO
2   none of those conditions have occurred as of
3   today, correct?
4       A.   To the best of my knowledge, yes.
5       Q.   Okay.  You're not aware of any facts
6   showing that any of the conditions subsequent
7   have been satisfied, fair?
8       A.   I -- yeah.  I wouldn't know.  You
9   would probably know.  I don't know.
10      Q.   I'm only asking for your knowledge.
11          One of the conditions subsequent was
12  that the Notes would be forgiven if you caused
13  Highland to sell its interest in one of three
14  portfolio companies above cost, right?
15          MS. DEITSCH-PEREZ:  Object to the
16      form.
17          THE WITNESS:  I -- yeah.  I don't
18      know if the noun is me or Highland, but
19      yeah.
20  BY MR. MORRIS:
21      Q.   Okay.  The portfolio companies at
22  issue were MGM, Cornerstone, and Trustway,
23  correct?
24      A.   Yes.
25      Q.   And prior to the petition date, you
```

Page 71

```
1              JAMES DONDERO
2   had the authority to sell any of those
3   portfolio companies at any time without having
4   to obtain approval from anyone, correct?
5           MS. DEITSCH-PEREZ:  Object to the
6       form.
7           THE WITNESS:  Yeah.  No, I can't
8       agree with that statement.
9   BY MR. MORRIS:
10      Q.   Why not?
11          Who's approval did you have to get
12  before you could sell any of those portfolio
13  companies?
14      A.   MGM, I was one board member and I
15  think an aggregate.  When I was running
16  Highland, we spoke for 18 percent of the
17  equity.  So I couldn't force the overall sale
18  of the company unilaterally.
19          There was also a shareholder's
20  agreement in place that restricted myself and
21  Anchorage and a couple of the large holders
22  from selling their shares without a disclosure
23  and approval process.  That is one example.
24          With regard to Trustway, I believe I
25  was largely unfettered.
```

Page 72

```
1              JAMES DONDERO
2           With regard to Cornerstone, a
3   majority of it -- or not a majority, but a
4   significant minority, I think, was owned by
5   both Restoration and the Old Redeemer Fund.
6       Q.   All right.  Well, let me ask you
7   this:  The conditions subsequent that are
8   embedded in the agreements, did that relate to
9   just Highland's interests in the portfolio
10  companies, or did it relate to interests held
11  by anybody else?
12      A.   It referred to a monetization in
13  creating liquidity around Highland's interests
14  that were large and illiquid portions of
15  Highland's balance sheet.
16      Q.   Okay.  So let me ask the question
17  again.
18          Prior to the petition date, did you
19  have the authority to sell Highland's interests
20  in any of the portfolio companies without
21  having to obtain the authority of anybody else?
22          MS. DEITSCH-PEREZ:  Object to the
23      form.  Asked and answered.
24          THE WITNESS:  Sub -- subject to my
25      prior answer, I could speak for Highland
```

Page 73

```
1              JAMES DONDERO
2       prior to the bankruptcy.
3   BY MR. MORRIS:
4       Q.   Okay.  Before entering into the
5   agreements, did you or anybody acting on your
6   behalf analyze the likelihood that any of the
7   conditions subsequent would occur?
8       A.   Likelihood?  Analyze?  My
9   description of them, which was my understanding
10  of them, but my description of the assets to my
11  sister was -- to the trustee of Dugaboy was
12  that we held them for a long time.  We were
13  working towards monetization, but there wasn't
14  anything imminent regarding any of them in 2017
15  or '18.
16      Q.   Well, but the actual sale is just
17  one part of the condition subsequent, correct?
18          The other part is that it's got to
19  be sold above cost; is that correct?
20      A.   That is right.
21      Q.   Okay.  So at the time you entered
22  into each of your -- each of the three
23  agreements, had you done any analysis to
24  determine whether or not any -- whether
25  Highland's interests in any of the portfolio
```

Page 74

JAMES DONDERO

1  companies exceeded its cost?
2  A.   No, but I -- yes.  No, I did not.
3  Q.   Did you have any understanding at
4  all as to how the value of Highland's interests
5  in MGM compared to its costs at the time you
6  entered into each of these three agreements?
7  A.   No.  I mean, my understanding was I
8  knew they were substantially higher, but I
9  didn't know how much higher.
10  Q.   Okay.  So is it fair to say that the
11  time -- at the time you entered into each of
12  these agreements, you knew and understood that
13  the value of Highland's interests in MGM was
14  substantially higher than its costs?
15  A.   For MGM, yes.
16  Q.   Okay.  Did you have an understanding
17  of the relationship between value and costs
18  concerning Cornerstone at the time you entered
19  into these agreements?
20  A.   My understanding it was moderately
21  higher, and as Trustway was between substantially
22  and moderately and higher, I believe.
23  Q.   Okay.  So is it fair to say that at
24  the time you entered into each of these
25

Page 75

JAMES DONDERO

1  agreements, you believed that the value of
2  Highland's interests in each of the portfolio
3  companies exceeded its costs in varying
4  degrees?
5  A.   Varying degrees.  As a matter of
6  fact, I would adjust.  Cornerstone and
7  Trustway, I believe, were moderately higher
8  than their embedded costs or implied costs.
9  That was my understanding.
10  MGM was somewhat substantially.  But
11  all of them with a fair amount of volatility
12  and a fair amount of illiquidity.
13  Q.   Did you ever give your sister or
14  Dugaboy any information concerning how the
15  value of Highland's interests in any of the
16  portfolio companies compared to Highland's
17  costs before entering into the agreements?
18  A.   Not that I recall.
19  Q.   Do you have any reason to believe
20  that your sister or Dugaboy had any
21  understanding as to the likelihood that the
22  conditions subsequent would be satisfied at the
23  time the Dugaboy trustee entered into the three
24  agreements with you?
25

Page 76

JAMES DONDERO

1  MS. DEITSCH-PEREZ:  Object to the
2  form.
3  THE WITNESS:  I -- I remember saying
4  it would take a few years at minimum; but
5  other than expressing time, I don't believe
6  I expressed value versus cost or the
7  questions you were asking me previously.
8  BY MR. MORRIS:
9  Q.   Okay.  You never showed Nancy or
10  Dugaboy any of the Promissory Notes prior to
11  entering into any of the agreements, correct?
12  A.   Not that I recall.
13  Q.   And you never sent copies of the
14  Promissory Notes to Nancy or Dugaboy before
15  entering into any of these agreements, correct?
16  A.   Not that I recall.
17  MS. DEITSCH-PEREZ:  Object to the
18  form.
19  John, you've asked these at the last
20  deposition and actually also at the first
21  day of the deposition.
22  MR. MORRIS:  Thank you.  He's here
23  now in his 30(b)(6) capacity.  So please
24  just stop.
25

Page 77

JAMES DONDERO

1  You can object to the form of the
2  question.  I really don't appreciate it.
3  You should follow the very professional job
4  that your colleague, Michael Aigen, did the
5  other day.
6  BY MR. MORRIS:
7  Q.   Neither Nancy or Dugaboy has ever
8  asked to see copies of any of the Promissory
9  Notes before entering into any of the
10  agreements, correct?
11  MS. DEITSCH-PEREZ:  Object to the
12  form.
13  THE WITNESS:  I don't know.
14  BY MR. MORRIS:
15  Q.   Do you have any reason to believe
16  that Nancy or Dugaboy ever saw a copy of any of
17  the Promissory Notes at issue before entering
18  into the agreements?
19  A.   I don't know.
20  Q.   During your discussions with Nancy
21  and Dugaboy, did you identify the Promissory
22  Notes that were going to be the subject of each
23  agreement?
24  MS. DEITSCH-PEREZ:  Object to the

Page 78

1        JAMES DONDERO
2    form.
3        You know, we made an agreement that
4    you were going to refer to Nancy as the
5    Dugaboy trustee.  Please stick to it.
6    Otherwise, I'm going to have to object each
7    time, and I'd rather not.
8        MR. MORRIS:  I have no problem with
9    your objecting to the form of the question.
10    It's the speaking that I really do object
11    to.  And I don't know why you can't control
12    yourself.
13        MS. DEITSCH-PEREZ:  Because I
14    hope that --
15        MR. MORRIS:  Please stop.  Please
16    stop.
17        MS. DEITSCH-PEREZ:  -- by telling
18    you this, you will listen.
19        MR. MORRIS:  Okay.  Your discussion
20    and your inability to control yourself is
21    going to cause this deposition to go longer
22    than it needs to, okay?
23        MS. DEITSCH-PEREZ:  No.  It's your
24    repeating questions that's going to do
25    that.

Page 79

1        JAMES DONDERO
2        MR. MORRIS:  You let me know when
3    you're done.
4        MS. DEITSCH-PEREZ:  I'm done.
5    BY MR. MORRIS:
6        Q.    Mr. Dondero, during your discussions
7    with the Dugaboy trustee, did you identify the
8    Promissory Notes that were going to be the
9    subject of each agreement?
10        MS. DEITSCH-PEREZ:  Object to the
11    form.
12        THE WITNESS:  No, not that I recall.
13    BY MR. MORRIS:
14        Q.    Do you recall -- during your
15    discussions with the Dugaboy trustee, did you
16    identify the maker of any of the Notes that
17    were the subject of any of the agreements?
18        A.    You mean Highland as the maker; is
19    that what you're saying?
20        Q.    No.  I'm just asking if during your
21    discussions with the Dugaboy trustee, you ever
22    disclosed the name of the maker of any of the
23    Notes that were subject to the agreements?
24        A.    She -- she knew they were Notes due
25    to Highland from various entities.  So I don't

Page 80

1        JAMES DONDERO
2    know what your question is.  Did I identify
3    specifically that they were Notes due to
4    Highland?  I guess the answer to that is yes,
5    but I don't know what you're asking me.
6        Q.    I'm sorry, sir.  I'll take the
7    responsibility for that.
8        I'm asking you if you identified who
9    the maker of the Notes were, not who the payee
10    was.
11        MS. DEITSCH-PEREZ:  You mean the
12    borrowers, John?
13        THE WITNESS:  See, I don't want to
14    get stuck in my underwear on maker/borrower
15    nomenclature.
16        She was aware that they were notes
17    due to Highland from a variety of entities.
18    BY MR. MORRIS:
19        Q.    Okay.  Did you identify any of those
20    entities?
21        A.    I -- yeah.  She knew that some were
22    Dugaboy, some were NexPoint for sure, and some
23    were other entities.
24        Q.    So -- so there were notes where
25    Dugaboy owed the money or was the obligor or

Page 81

1        JAMES DONDERO
2    was the borrower or was the maker that are
3    subject to agreements that you entered into
4    with the Dugaboy trustee?
5        A.    No.  Wait.  The Dugaboy -- the
6    Dugaboy Notes weren't subject to the
7    forgiveness.  It was the other notes that were
8    subject to forgiveness.
9        Q.    So it's really kind of a simple
10    question, and I'm not trying to trick you.
11        If you think back to the
12    conversations that you had with the Dugaboy
13    trustee, did you identify the entity of -- did
14    you identify who the borrowers were under the
15    Notes that were going to be subject to the
16    agreements?
17        A.    She knew they were entities -- she
18    knew there were other related entities.  She
19    knew NexPoint for sure.  She knew Services.
20        I can't sit here as I remember -- as
21    I sit here today and remember whether or not I
22    specifically identified HCRE or not, you know;
23    but she knew they were related entities.
24        Q.    All of the revisions of the
25    agreement are set forth in paragraph 82; is

Page 82

```
                JAMES DONDERO
 1   that right?
 2        We could put it back up on the
 3   screen if you'd like.
 4        MR. MORRIS:  In fact, why don't we
 5   do that.
 6        MS. CANTY:  I'm sorry, John.  51 --
 7   I mean, 50?
 8        MR. MORRIS:  I think it's
 9   Exhibit 31, paragraph 82.
10        MS. CANTY:  Oh, okay, 82.  I've got
11   you.
12        MR. MORRIS:  Thank you.
13   BY MR. MORRIS:
14        Q.   Does -- Mr. Dondero, other than
15   specifying who the portfolio companies were,
16   does paragraph 82 set forth all of the material
17   terms of each of the agreements?
18        A.   I think it sets forth the conditions
19   subsequent.
20        Q.   Is there any aspect of your
21   agreement -- withdrawn.
22        Is there any aspect of your
23   agreements with the Dugaboy trustees that's not
24   described in this paragraph?
25
```

Page 83

```
                JAMES DONDERO
 1        A.   I don't know if it's captured in
 2   there, but there was definitely a conversation,
 3   discussion that if something like MGM was
 4   sold -- Anchorage is the largest holder almost
 5   a majority in and of themselves.  And if it was
 6   bought or taken out at a price that we couldn't
 7   control or couldn't agree with and it was lower
 8   than cost or -- you know, Cornerstone, again,
 9   had multiple funds between our ownership and
10   control that if -- if things were sold
11   beyond -- without my support but sold below
12   cost -- and I'm not sure that's captured in
13   that paragraph, but I think that was part of
14   the understanding, also.
15        Q.   Is there any other part of the
16   understanding that's not set forth in
17   paragraph 82, Mr. Dondero?
18        A.   Not that I can think of at this --
19   let me read it one more time, please.
20        Q.   Take your time.
21        A.   I believe that generally covers it.
22        Q.   Was any provision of the agreements
23   the subject of negotiation?
24        MS. DEITSCH-PEREZ:  Object to the
25
```

Page 84

```
                JAMES DONDERO
 1   form.
 2        THE WITNESS:  I don't believe it was
 3   materially adjusted by any negotiation.  It
 4   was just clarified based on discussion is
 5   how I would describe it.
 6   BY MR. MORRIS:
 7        Q.   Is there any provision in the
 8   agreements that was included at your sis-- at
 9   the Dugaboy trustee's request?
10        A.   Like I said, there was discussion
11   and clarification.  Not specifically that I
12   recall.
13        Q.   Okay.  Did the Dugaboy trustee
14   refuse to include any provision in the
15   agreement that you had proposed?
16        A.   Not that I recall.
17        Q.   Can you identify any provision of
18   the agreements that were the subject of a
19   counterproposal that the Dugaboy trustee made?
20        A.   I remember clarification discussion
21   around, you know, three companies versus two or
22   one.  I remember clarification of monetization
23   being turned to cash versus illiquid.
24        Yeah.  I mean, I remember
25
```

Page 85

```
                JAMES DONDERO
 1   discussion -- I remember clarification
 2   discussions like that, but I don't remember --
 3   it was a long time ago.  I don't remember the
 4   details of anything specific like that.
 5        It wasn't -- it wasn't a
 6   contentious, nor should it have been a
 7   contentious negotiation.
 8        Q.   How long did -- do you recall how
 9   long each of the conversations lasted that led
10   to the entry of each of the three agreements?
11        A.   I remember the first one being
12   longer than the second two, and then I remember
13   it being spread out periods of time.  So I
14   can't -- I can't -- I can't put an exact
15   estimate on it.
16        Q.   Okay.  I'm going to shift gears.
17        MR. MORRIS:  We can take that down
18   now, please.
19        MS. CANTY:  (Complies with request.)
20   BY MR. MORRIS:
21        Q.   Do you know of any written agreement
22   pursuant to which HCRE provided services to
23   Highland at any time?
24        MS. DEITSCH-PEREZ:  Object to the
25
```

Page 86

JAMES DONDERO

1
2   form.  Asked and answered.
3       THE WITNESS:  HCRE provided
4   preferred services to.  Well, the
5   participants there in HCRE are, my –
6   myself and McGraner.  And, you know, we
7   both provided significant other services to
8   Highland.
9   BY MR. MORRIS:
10      Q.   Okay.  Is that in writing?  Is there
11  a written agreement?
12          That was my question.
13          Is there a written agreement
14  pursuant to which HCRE ever provided services
15  to Highland?
16      A.   I don't believe so.
17      Q.   Did HCRE ever provide services to
18  Highland?
19      A.   I would incorporate my last two
20  answers.  Not under a written agreement, but I
21  believe myself and McGraner provided a lot of
22  services.
23      Q.   And what services did you and Mr.
24  McGraner provide to Highland?
25      A.   I'd say anything real estate related

Page 87

JAMES DONDERO

1
2   on the Highland platform McGraner would have
3   input into.
4       And then I think my – my portfolio
5   management, leadership role in Highland over
6   time is well documented.
7       Q.   And how did you know if you were
8   providing services in your capacity as the
9   president of Highland or in your capacity as an
10  officer or owner of the HCRE at the time you
11  provided the services?
12      A.   Never – never really thought about
13  parsing it that way.
14      Q.   I appreciate that.
15          Do you know whether Highland Capital
16  Management Services ever provided services to
17  Highland?
18      A.   Yeah.
19          MS. DEITSCH-PEREZ:  Object to the
20  form.  Asked and answered.
21          THE WITNESS:  Yeah.  I would – not
22  in writing.  I believe the services owners
23  isn't myself and McGraner.  I think it was
24  myself and Okada.
25          And I would say our portfolio and

Page 88

JAMES DONDERO

1
2   leadership contributions to Highland are
3   well documented.
4   BY MR. MORRIS:
5       Q.   And my question didn't have anything
6   to do with any particular person.  It's just
7   simply whether Highland Capital Management
8   Services ever provided any services to Highland
9   Capital Management, L.P.
10          MS. DEITSCH-PEREZ:  Object to the
11  form.
12          THE WITNESS:  The entities that
13  you're describing or you're asking
14  questions about don't have employees'
15  services in HCRE.  They have ownership
16  individuals that I've described.
17          So I've tried the best I can to
18  answer your question and what the ownership
19  may have done for Highland.
20          But since there's no employee base
21  at either of those two companies, those
22  companies could not have directly provided
23  service to Highland other than, the last
24  thing I would bring up is the track-record
25  concept, you know, in terms of the

Page 89

JAMES DONDERO

1
2   performance of whatever assets are in some
3   of those start-up entities ends up being a
4   useful track record that then Highland can
5   market.
6   BY MR. MORRIS:
7       Q.   Okay.  How about NexPoint, did
8   NexPoint ever provide services to Highland
9   Capital Management, L.P.?
10      A.   Yes.  The real estate – yes.  I
11  mean, can I just say yes or –
12      Q.   You could.  That would be really
13  helpful.
14      A.   Okay.  There we go.
15      Q.   Can you describe the circumstances
16  for me?
17          MS. DEITSCH-PEREZ:  Finally, some
18  accord between the witness and the
19  questioner.
20  BY MR. MORRIS:
21      Q.   Can you describe the services for
22  me?
23      A.   NexPoint has a couple of attorneys
24  that are real estate experts.  We have a lot of
25  different attorneys, or we did at Highland.

Page 90

JAMES DONDERO

1
2  But prior to the bankruptcy, none of the
3  Highland attorneys were experienced in real
4  estate.
5        So anything that required
6  transaction help on the Highland platform
7  regarding real estate, the NexPoint real estate
8  attorneys would help with.
9      Q.   Okay.  Anything else?
10     A.   I'm sure there are others.  That's
11  all I can think of off the top of my head.  I
12  just wanted to give you an example.
13     Q.   I appreciate that.
14        You're aware that Highland has sued
15  HCMFA to collect on two notes that were signed
16  by Frank Waterhouse in 2019 in the aggregate
17  amount of $7.4 million; is that right?
18     A.   Yes.
19     Q.   Okay.  And we actually went through
20  this the other day, so I don't want to belabor
21  it if I don't have.
22        But do you recall that we saw the
23  incumbency certificate which identified
24  Mr. Waterhouse as the treasurer of HCMFA as of
25  April 2019?

Page 91

JAMES DONDERO

1
2      A.   Yes.
3      Q.   Okay.  And do you recall that you
4  signed that incumbency certify in your capacity
5  as president of HCMFA?
6        MS. DEITSCH-PEREZ:  Object to the
7  form.
8        THE WITNESS:  Yes.
9  BY MR. MORRIS:
10     Q.   I want to talk about the first of
11  the two Notes, the $2.4 million Note.
12        Do you recall that in early May
13  2019, Highland transferred $2.4 million to
14  HCMFA?
15     A.   I don't remember a lot of specifics,
16  but I know there were two Notes as you're
17  describing.
18     Q.   Okay.  And there was -- and one of
19  them -- did you authorize the $2.4-million
20  payment?
21     A.   Yes.
22     Q.   And why did you authorize Highland
23  to transfer $2.4 million to HCMFA in early May
24  2019?
25     A.   My answer's the same for both --

Page 92

JAMES DONDERO

1
2  both Notes.  Essentially, it's regarding the
3  terrace start issue that we had with the
4  Fort Worth SEC.
5      Q.   Did you give anyone instructions
6  concerning the transfer of the $2.4 million?
7      A.   I instructed them to make the
8  transfer, or I was involved in the -- involved
9  in approving the transfer.
10     Q.   And who did you instruct to make the
11  transfer of $2.4 million?
12     A.   Yeah.  It would have been Frank.
13     Q.   Do you have a recollection of
14  instructing Frank to transfer $2.4 million?
15     A.   Yeah.  Generally, yes.
16     Q.   Do you have a recollection of what
17  instructions you gave him?
18     A.   It was well-known.  It was a very
19  disruptive -- the whole thing was very
20  disruptive at Highland and HCMFA.  Everybody
21  was aware of it.  The settlement, the
22  negotiations around the settlement, the
23  give-and-take, the amounts changed over time.
24        Everybody was aware of it in senior
25  management, including myself.  And putting the

Page 93

JAMES DONDERO

1
2  money into HCMFA to settle it was something I
3  was aware of and authorized and a critical
4  piece of putting that issue to bed.
5      Q.   Okay.  I'm just asking you if you
6  recall what instructions you gave to
7  Mr. Waterhouse concerning the transfer if you
8  recall?
9      A.   No.  I mean, like I said, I
10  authorized the movement of the money.
11     Q.   Okay.  Were you aware at that time
12  that the transfer of the $2.4 million from
13  Highland to HCMFA was booked as a loan on both
14  Highland and HCMFA's books and records?
15     A.   I was not aware at the time.
16     Q.   Okay.
17        MR. MORRIS:  Can we put up
18  Exhibit 53 please.
19        THE VIDEOGRAPHER:  Counsel, I will
20  need a media break in about five minutes.
21        MR. MORRIS:  Thank you very much.
22  Why don't we take that right now before I
23  begin my examination on this document.  How
24  long do you need?
25        THE VIDEOGRAPHER:  It will just be a

Page 94

JAMES DONDERO

1    minute, but this is the end of Media Number
2    1.
3        MR. MORRIS:  Okay.
4        THE VIDEOGRAPHER:  We are off the
5    record at 3:21.
6        MR. MORRIS:  We are off the record,
7    but don't go anywhere.
8        MS. DEITSCH-PEREZ:  What?
9        MR. MORRIS:  We're not taking a
10   break.
11       THE VIDEOGRAPHER:  Yep.  This will
12   just take a minute.  Please stand by.
13       MR. MORRIS:  Thank you.
14       THE VIDEOGRAPHER:  All right.
15   Suzanne, are you good to go?
16       THE COURT REPORTER:  I'm good.
17       THE VIDEOGRAPHER:  This is the
18   beginning of Media Number 2, Volume II
19   [sic] in the deposition of James Dondero.
20       We are back on the record at 3:22.
21       MR. MORRIS:  All right.  Can we
22   please put up Exhibit 53.
23       MS. CANTY:  Yeah.  Just one second.
24   My computer went haywire.  Give me one

Page 95

JAMES DONDERO

1    minute.
2        (Whereupon, Exhibit 53, E-mail
3    correspondence, Bates stamped D-CNL003768
4    through D-CNL003770, marked for
5    identification, as of this date.)
6    BY MR. MORRIS:
7        Q.   Okay.  So Mr. Dondero, do you see
8    what's on the screen here?
9        Mr. Dondero?
10       MR. MORRIS:  Deborah?
11       Apparently Mr. Dondero has left the
12   seat.
13       THE VIDEOGRAPHER:  Would you like to
14   go off record?
15       MR. MORRIS:  No.
16       THE VIDEOGRAPHER:  Okay.  We'll stay
17   on the record.
18       MR. MORRIS:  The video is still
19   rolling, right, sir?
20       THE VIDEOGRAPHER:  Yes, it is.
21       MR. MORRIS:  Thank you.
22       Hi, Michael.  If you're -- if you're
23   able, can you reach out to your partner?
24       MR. AIGEN:  I had texted her.  I

Page 96

JAMES DONDERO

1    will try to call her, too; but I did text
2    her a couple of minutes ago.  I will try to
3    reach out again.  Hold on.
4        MS. DEITSCH-PEREZ:  I'm back.  I'm
5    lucky in that the ladies room is directly
6    across from the conference room.
7        Mr. Dondero's down at the other end
8    of the floor, so he will be back shortly.
9        And I just saw your note, John.  The
10   -- the videographer said he needed a break;
11   and you said, okay, then let's take our
12   break now.  So we took a restroom break.
13       MR. MORRIS:  I think everybody on
14   the phone -- and there's a transcript of it
15   -- knows that I specifically said, how long
16   do you need.  He said one minute, and I
17   said don't go anywhere.
18       This is your time, not mine.
19       MS. DEITSCH-PEREZ:  Prior to that,
20   you said, let's take the break now.
21       MR. MORRIS:  Yeah, to allow him to
22   change the tape.  I'm not going to question
23   anybody on the call, but I'm 100 percent
24   certain that they would all tell you -- and

Page 97

JAMES DONDERO

1    the record will reflect, I specifically
2    said do not leave.
3        MS. DEITSCH-PEREZ:  Okay.
4    Mr. Dondero is back.
5        You have to turn -- turn the video
6    on.
7        THE WITNESS:  I'm back.
8    BY MR. MORRIS:
9        Q.   All right.  Do you see on the screen
10   there's a document that's been marked as
11   Exhibit 53?
12       A.   Yup.
13       Q.   Do you see there's an e-mail string
14   dated May 2, 2019?
15       A.   Yes.
16       Q.   And do you see that Mr. Waterhouse
17   has -- if you look at the second to the top,
18   Mr. Waterhouse's e-mail is forwarding a
19   spreadsheet to David Klos and Kristin Hendrix
20   that he described as, quote, "The support for
21   the payment to GAF by HCMFA?
22       A.   Yes.
23       Q.   What's GAF?
24       A.   That's the fund itself that owned

Page 98

JAMES DONDERO

1
2 the TerreStar investment. The SEC wanted, I
3 believe, some payment to go to them; but they
4 all, meaning the SEC, and the SEC wanted some
5 payment to go to the fund itself for the
6 benefit of the investors.
7      Q.   Okay.
8          MR. MORRIS:  Can we can to the chart
9      that's attached.
10          MS. CANTY:  (Complies with request.)
11 BY MR. MORRIS:
12      Q.   Have you ever seen this chart
13 before, sir?
14      A.   I don't believe so specifically, but
15 I understand what it is.
16      Q.   And is it your understanding, based
17 on this chart, that the loss to the fund was
18 $6,068,851?
19          MS. DEITSCH-PEREZ:  Object to the
20      form.
21          THE WITNESS:  Yes.
22 BY MR. MORRIS:
23      Q.   And there's -- there's a column
24 there that's lost to fund.
25          Do you see that?

Page 99

JAMES DONDERO

1
2      A.   Yes.
3      Q.   And is it -- is it consistent with
4 your recollection that the estimated loss of
5 the fund or to the fund was approximately
6 $6 million?
7      A.   Yes.  There is approximately --
8 there's some other small numbers moving around,
9 but yes.
10      Q.   Okay.  And do you recall that HCMFA
11 informed the SEC that HCMFA would make the fund
12 whole by paying it an amount of money equal to
13 the loss?
14      A.   Yes.
15      Q.   And, in fact, HCMFA paid the fund
16 approximately $6 million in connection with the
17 losses sustained as a result of the NAV error,
18 correct?
19      A.   I don't know details like that.
20      Q.   So you're not -- you're not aware of
21 the fact that HCMFA paid to the fund
22 approximately $6 million in May of 2019?
23      A.   Approximately six or approximately
24 seven.  I -- I don't know.  Whatever the
25 agreement was with the SEC to be paid to them

Page 100

JAMES DONDERO

1
2 or to the fund or whatever, I -- I have all
3 faith and confidence we complied with; but I
4 don't -- I don't know exact numbers.  I'm
5 not aware of the exact numbers.
6      Q.   Do you understand that this analysis
7 shows how HCMFA was going to finance the
8 payment to the fund as a result of the NAV
9 error?
10          MS. DEITSCH-PEREZ:  Object to the
11      form.
12          THE WITNESS:  I'm sorry.  Could you
13      repeat that question again?
14 BY MR. MORRIS:
15      Q.   Sure.  Do you understand that
16 this -- that this chart here sets forth the
17 manner in which HCMFA is going to fund the
18 payment that it was making to GAF on account of
19 the NAV error?
20      A.   I would call it more of a
21 calculation on where the amounts are coming
22 from.  It doesn't appear to me that this is a
23 funding statement.
24      Q.   Okay.  I appreciate that.
25          So -- so your interpretation of this

Page 101

JAMES DONDERO

1
2 is that this shows the sources of money that
3 were going to be used to make the payment; is
4 that fair?
5          MS. DEITSCH-PEREZ:  Objection to the
6      form.
7          THE WITNESS:  Yeah.  I think it's a
8      reconciliation between the insurance, some
9      forgiveness of fees, and then additional
10      monies that are necessary.
11 BY MR. MORRIS:
12      Q.   Okay.  And --
13      A.   Yeah.  Go ahead.
14      Q.   Did HCMFA file an insurance claim in
15 connection with the NAV error?
16      A.   I believe they did get -- I believe
17 they did, and I believe they did get paid some
18 insurance.
19      Q.   And -- and if we look at the totals
20 column in the right, did HCMFA receive, to the
21 best of your recollection, approximately
22 $5 million from insurance?
23      A.   Yes.  I think we should work -- I
24 think we should work from that column --
25      Q.   Okay.  So let's --

Page 102

```
1              JAMES DONDERO
2      A.   -- versus the other column, yeah.
3      Q.   I apologize, Mr. Dondero.
4           So if we look at the last column,
5  the total, does that comport with your
6  recollection that HCMFA paid GAF approximately
7  $7.44 million in May of 2019 on account of the
8  NAV error?
9      A.   I think it's more than that, and I
10 think it's also the 375 below that.
11     Q.   Okay.
12     A.   And then I -- yeah, definitely those
13 two numbers in aggregate.  I don't know if it's
14 any others.
15     Q.   Okay.  And did, to the best of your
16 recollection, HCMFA make an insurance claim on
17 which it received almost $5 million as a source
18 of funding for the payment that was due to GAF?
19     A.   Yes.
20     Q.   Are you familiar with that insurance
21 claim?
22     A.   No.
23     Q.   Do you know if the insurance claim
24 made any mention of Highland?
25     A.   I have no idea.  I have no idea.
```

Page 103

```
1              JAMES DONDERO
2      Q.   Okay.  So as a -- as a matter of
3  rough math, would you agree with me that the
4  insurance procedures funded approximately
5  5 million of the $7.8 million that was the
6  total loss?
7          MS. DEITSCH-PEREZ:  Object to the
8      form.
9          THE WITNESS:  This was the amount
10     due to the investors.  I -- I -- my rough
11     recollection is there was another amount
12     that was due the SEC, but I don't remember
13     specifically.
14 BY MR. MORRIS:
15     Q.   Okay.  And do you see in the middle
16 of the page, there's a total additional payment
17 from advisor of approximately $2.4 million?
18     A.   Yes.
19     Q.   And is it your understanding that
20 that is the amount that HCMFA had to come out
21 of pocket in order to fully fund the GAF
22 payment?
23     A.   Yes, but it's clear to me also that
24 there's a forgiveness of management fees, also.
25     Q.   Okay.  But is two point -- but is
```

Page 104

```
1              JAMES DONDERO
2  $2.4 million the amount of money that HCMFA
3  needed in order to fully fund the payment to
4  GAF?
5      A.   And I don't want to mince small
6  numbers; but to the extent that they gave up
7  their management fees also, like that 1939 or
8  the 39 above that -- and I don't know what that
9  47 is above that -- those are management fees
10 that would have paid salaries and expenses at
11 HCMFA also.
12          So to the extent they gave up those
13 items as part of the settlement, then HCMFA
14 would have needed more money than even the 2.4
15 that came from Highland.
16     Q.   Do you know if HCMFA ever informed
17 the SEC that Highland was responsible for the
18 NAV error?
19     A.   I -- I don't know.  We wouldn't have
20 hidden it if they would have asked.  My
21 experience with the SEC is they identify the
22 advisor; and who the advisor picks for vendors
23 the advisor's responsible for.
24          MR. MORRIS:  I move to strike
25     everything after "I don't know."
```

Page 105

```
1              JAMES DONDERO
2  BY MR. MORRIS:
3      Q.   Did you ever direct anyone to inform
4  the SEC that Highland was responsible for the
5  NAV error?
6      A.   No, not that I recall.
7      Q.   Do you know if anybody acting on
8  behalf of HCMFA ever informed the SEC that
9  Highland was responsible for the NAV error?
10     A.   I don't know.
11     Q.   Do you know if HCMFA ever informed
12 GAF that Highland was responsible for the NAV
13 error?
14     A.   Yes.
15     Q.   And is that reflected in writing
16 anywhere?
17     A.   Yes.  Numerous places.
18     Q.   And what writing would that be
19 reflected in?
20     A.   The board minutes.  There were
21 conversations every board meeting for over a
22 year.  The retail board represents GAF.  They
23 were well aware of the subadvisory agreements,
24 and they were well aware that all the staff
25 regarding valuation were housed at Highland;
```

Page 106

1          JAMES DONDERO
2 all the valuation activities were performed by
3 Highland. And GAF and HCMFA relied on
4 Highland, and it was a material part of board
5 conversations for over a year.
6        MR. MORRIS: Okay. I move to
7   strike.
8 BY MR. MORRIS:
9     Q. I'm asking you just about writings,
10 sir.
11     Can you identify --
12     A. No, no, no. I'm not -- I'm not
13 going to -- I'm not going to allow that strike,
14 or I'm not answering anymore questions.
15     Q. Well, the judge will be the
16 determiner of that. So I'd like you to answer
17 my question.
18     Is there any -- I don't want to know
19 about board meetings.
20     Is there anything in writing that
21 HCMFA provided to GAF that specifically stated
22 that Highland and not HCMFA was responsible for
23 the NAV error?
24       MS. DEITSCH-PEREZ: Asked and
25   answered.

Page 107

1          JAMES DONDERO
2     THE WITNESS: Yes. Numerous board
3   minutes.
4 BY MR. MORRIS:
5     Q. Okay. And have those board minutes
6 been produced in this litigation?
7     A. I don't know.
8     Q. Okay.
9       MR. MORRIS: Let's go to the next
10   exhibit, 54.
11       MS. CANTY: (Complies with request.)
12     (Whereupon, Exhibit 54, E-mail
13   correspondence, Bates stamped D-CNL003777
14   through D-CNL003779, marked for
15   identification, as of this date.)
16 BY MR. MORRIS:
17     Q. Do you see that on the same day, at
18 the bottom, Mr. Klos sent an e-mail to the
19 Corporate Accounting Group?
20     A. Yes.
21     Q. And do you see that he instructed
22 the Corporate Accounting Group to transfer
23 $2.4 million from HCMLT to HCMFA?
24     A. Yes.
25     Q. And do you see that he specifically

Page 108

1          JAMES DONDERO
2 informed the Corporate Accounting Group that
3 this transaction was a, quote, "New inter
4 co-loan?
5     A. Yes.
6     Q. Do you see that he asked
7 Christian -- Kristin or Hayley to prepare a
8 Promissory Note for discussion?
9     A. Yes.
10     Q. Okay. Are you aware in May 2019,
11 Frank Waterhouse was included in the e-mail
12 string identified as Corporate Accounting?
13     A. I do not have that awareness.
14     Q. Okay. Do you see at the top
15 Ms. Hendrix -- Ms. Hendrix's response to
16 Mr. Klos's e-mail and attaches a copy of a
17 Promissory Note?
18     A. Yes.
19     Q. Okay.
20       MR. MORRIS: Can we just go to the
21   attachment, please.
22       MS. CANTY: (Complies with request.)
23 BY MR. MORRIS:
24     Q. Do you see that that is a Promissory
25 Note dated May 2, 2019, in the amount of

Page 109

1          JAMES DONDERO
2 $2.4 million that where the maker is Highland
3 Capital Management Fund Advisors, L.P.?
4     A. Yeah.
5     Q. Have you ever seen this before?
6     A. I think in our last deposition.
7     Q. Okay. Do you recall when you saw it
8 for the first time?
9     A. Our last deposition.
10     Q. Do you recall when you learned about
11 the existence of this document for the first
12 time?
13     A. I believe somehow regarding the
14 litigation.
15     Q. Okay. So you have no knowledge of
16 this Promissory Note until after the litigation
17 was commenced; do I have that right?
18     A. Correct.
19     Q. So you're not aware of Highland
20 having made a demand for payment on this
21 Promissory Note in December of 2020?
22     A. Not that I recall.
23     Q. Okay. Putting aside the question of
24 the Promissory Note, do you recall when you
25 first learned that the $2.4 million that you

Page 110

```
1              JAMES DONDERO
2   instructed to be paid to HCMFA by Highland in
3   May of 2019, do you recall when you first
4   learned that that was booked as a loan?
5      A.   I believe just generally as part of
6   this litigation, not before then.
7      Q.   Are you aware that the Corporate
8   Accounting Group created a daily list of wire
9   transfers that were being made on behalf of
10  Highland and its affiliates?
11     A.   Not -- no, not specifically.
12     Q.   Okay.  So since you did not know
13  that the $2.4 million transfer had been booked
14  as a loan, is it fair to say that you never
15  told anybody prior to the commencement of this
16  litigation that the transaction should not have
17  been booked as a loan?
18     A.   I had no conversations either way
19  prior to this litigation regarding the booking
20  of the 2.4 million.
21     Q.   Did you ever take any steps to try
22  to determine how Highland and HCMFA accounted
23  for the $2.4 million that you instructed to be
24  transferred from Highland to HCMFA in early
25  May 2019?
```

Page 111

```
1              JAMES DONDERO
2      A.   No.
3      Q.   Did you rely on Mr. Waterhouse to
4   oversee that?
5      A.   Yes.
6      Q.   Okay.  And you did so because he
7   held not only the CFO title at Highland, but he
8   also held the treasurer title at HCMFA,
9   correct?
10         MS. DEITSCH-PEREZ:  Object to the
11  form.
12         THE WITNESS:  I relied on him
13  because generally the accounting function
14  across the organization reported up through
15  him.
16  BY MR. MORRIS:
17     Q.   Let's talk about the $5 million
18  Note.
19         Do you recall that in early
20  May 2019, in fact, the next day, May 3rd,
21  Highland transferred $5 million to HCMFA?
22     A.   I -- I don't recall specifically.
23     Q.   Do you recall authorizing the
24  transfer of $5 million from Highland to HCMFA
25  in early May 2019?
```

Page 112

```
1              JAMES DONDERO
2      A.   Yes, generally.
3      Q.   Okay.  Why did you authorize
4   Highland to transfer $5 million to HCMFA in
5   early 2019?
6      A.   It was part of the overall
7   resolution of the TerreStar situation.
8      Q.   Do you recall that HCMFA paid
9   something called a consent fee equal to
10  $5 million in early May 2019?
11     A.   Well, like I said, I don't recall
12  the exact amounts or the exact amounts net of
13  insurance; but my recollection it was to
14  resolve that.
15     Q.   Do you know -- do you know -- did --
16  let's real simple.
17         Did -- did HCMFA pay a consent fee
18  in May of 2019?
19     A.   I -- I don't recall.
20     Q.   Do you know what a consent fee is?
21     A.   Yes.
22     Q.   What's a consent fee?
23     A.   It's a -- a fee to encourage
24  shareholder vote on something or shareholder
25  restitution on something, typically.
```

Page 113

```
1              JAMES DONDERO
2      Q.   And did -- do you recall if HCMFA
3   ever paid a consent fee in the year 2019?
4      A.   I don't recall.
5      Q.   Would Highland be responsible at all
6   if HCMFA paid a consent fee?
7          MS. DEITSCH-PEREZ:  Object to the
8   form.
9          THE WITNESS:  It could be.  I
10  don't -- I don't know or remember the
11  circumstances.
12  BY MR. MORRIS:
13     Q.   Is the payment of a consent fee a
14  voluntary decision by -- by HCMFA?  Is that
15  something that --
16         MS. DEITSCH-PEREZ:  Object to the
17  form.
18         MR. MORRIS:  Is that -- withdrawn.
19  That's fair.
20  BY MR. MORRIS:
21     Q.   Is the payment of a consent fee
22  required, or is that something that one can
23  exercise discretion in whether or not to make?
24         MS. DEITSCH-PEREZ:  Object to the
25  form.
```

Page 114

1        JAMES DONDERO
2        THE WITNESS: My answer would be it
3    depends.
4  BY MR. MORRIS:
5        Q.   Do you recall whether Highland –
6    withdrawn.
7        Do you recall whether HCMFA was
8    required to make -- to make a -- to pay a
9    consent fee at any time in 2019?
10       A.   I don't recall.
11       Q.   Do you recall ever believing that
12   HCMFA paid a consent fee because of something
13   that -- because of a mistake that Highland
14   made?
15       A.   It could be. I don't know.
16       Q.   I'm just asking if you had a
17   recollection?
18       A.   I don't have a recollection.
19       Q.   Okay.
20       MR. MORRIS: To the videographer, I
21   think Mr. Dondero's screen has frozen.
22       MS. DEITSCH-PEREZ: John, your
23   screen is frozen, too.
24       MR. MORRIS: I'm –
25       MS. DEITSCH-PEREZ: I'm also -- hang

Page 115

1        JAMES DONDERO
2    on. I've lost contact. Give me a minute.
3        THE VIDEOGRAPHER: Okay. I'd like
4    us to go off record. Do you agree?
5        MR. MORRIS: Yeah, but please don't
6    leave.
7        MS. DEITSCH-PEREZ: Yes, we agree.
8        THE VIDEOGRAPHER: All right. Off
9    the record at 3:53.
10       (Discussion held off the record.)
11       THE VIDEOGRAPHER: We are back on
12   the record at 3:54.
13  BY MR. MORRIS:
14       Q.   Okay. Can we put up – no. Before
15   we do that, Mr. Dondero, can you hear me?
16       We can't hear you. Are you on mute?
17       Are you on mute? Can you speak?
18       You're yelling at me now. Stop
19   yelling at me.
20       THE VIDEOGRAPHER: I'm seeing is
21   that Mr. Dondero is on mute.
22       (Interruption.)
23       THE VIDEOGRAPHER: We've got – do
24   you want to go off video record?
25       MR. MORRIS: No.

Page 116

1        JAMES DONDERO
2        Can somebody help Mr. Dondero and
3    get his audio feed fixed?
4        Thank you, sir.
5        MS. DEITSCH-PEREZ: Does this make a
6    difference?
7        MR. MORRIS: It sure does.
8        THE WITNESS: Hello, hello.
9        THE WITNESS: Thank you. All right.
10   Let's try and – let's try and finish this
11   up.
12  BY MR. MORRIS:
13       Q.   Are you ready, sir?
14       A.   Yes.
15       Q.   Were you aware in May 2019 that the
16   $5-million transfer from Highland to HCMFA was
17   booked as a loan?
18       A.   No.
19       MR. MORRIS: Can we put up
20   Exhibit 56, please.
21       MS. CANTY: (Complies with request.)
22       (Whereupon, Exhibit 56, E-mail
23   correspondence, Bates stamped D-CNL003763,
24   marked for identification, as of this
25   date.)

Page 117

1        JAMES DONDERO
2  BY MR. MORRIS:
3        Q.   All right. Do you see that this is
4    an e-mail from Ms. Hendrix to the Corporate
5    Accounting Group on May 3, 2019?
6        Do you see that, sir?
7        A.   Yes.
8        Q.   And do you see that Ms. Hendrix told
9    corporate accounting to transfer $5 million as
10   a, quote, "new loan," close quote?
11       A.   Yes.
12       Q.   And did you see that Ms. Hendrix also
13   said that she would, quote, "paper the loan,"
14   close quote?
15       A.   Yes.
16       Q.   Okay. You're aware that from time
17   to time, members of the Corporate Accounting
18   Group used a template for a Promissory Note
19   that had been previously prepared by counsel,
20   correct?
21       MS. DEITSCH-PEREZ: Object to the
22   form.
23       THE WITNESS: I – yeah. I'm aware
24   they have a loan template, yes.
25

Page 118

| | |
|---|---|
| 1 | JAMES DONDERO |
| 2 | BY MR. MORRIS: |
| 3 | Q.   Okay.  Do you see there's a |
| 4 | parenthetical in the first sentence that says, |
| 5 | "(4.4M should be coming in from Jim soon)"? |
| 6 | A.   Yes. |
| 7 | Q.   Do you know what that refers to? |
| 8 | A.   My -- my educated -- boy.  My |
| 9 | educted speculation is that Highland didn't |
| 10 | have enough cash, so I probably put four into |
| 11 | Highland for Highland to send to HCMFA.  That's |
| 12 | my educated guess; but otherwise, I don't know |
| 13 | specifically. |
| 14 | Q.   And do you recall that you had taken |
| 15 | out a loan from Highland earlier in the year, |
| 16 | and this payment was credited against the |
| 17 | principal and interest then due on that Note? |
| 18 | A.   I don't have specific awareness. |
| 19 | That would make sense. |
| 20 | Q.   Okay. |
| 21 | A.   Versus -- versus creating a new loan |
| 22 | or something. |
| 23 | Q.   Okay. |
| 24 | MR. MORRIS:  Let's go to Exhibit 57, |
| 25 | please. |

Page 119

| | |
|---|---|
| 1 | JAMES DONDERO |
| 2 | MS. CANTY:  (Complies with request.) |
| 3 | (Whereupon, Exhibit 57, Promissory |
| 4 | Note, Bates stamped D-CNL003764 through |
| 5 | D-CNL003765, marked for identification, as |
| 6 | of this date.) |
| 7 | BY MR. MORRIS: |
| 8 | Q.   In fact, were you aware, sir, that |
| 9 | in May 2019, you paid Highland exactly |
| 10 | $7.5 million? |
| 11 | A.   Not specifically, but it makes sense |
| 12 | given the context we're discussing. |
| 13 | Q.   Okay.  So the context that we're |
| 14 | discussing was HCMFA needed $7.5 million. |
| 15 | Highland didn't have it.  So that seven -- you |
| 16 | paid $7.5 million to Highland, which was |
| 17 | applied against your outstanding note.  And |
| 18 | then Highland transferred that money to HCMFA. |
| 19 | Does that sound right to you? |
| 20 | A.   Generally, yes. |
| 21 | Q.   Okay.  So now if we look at this |
| 22 | note that's on the screen, do you see this is a |
| 23 | Promissory Note for $5 million dated May 3, |
| 24 | 2019? |
| 25 | A.   Yes. |

Page 120

| | |
|---|---|
| 1 | JAMES DONDERO |
| 2 | Q.   And did you see this for the first |
| 3 | time when I showed it to you late last week? |
| 4 | A.   Yes. |
| 5 | Q.   And did you learn about the loan |
| 6 | from Highland to HCMFA for the first time after |
| 7 | the litigation was commenced? |
| 8 | A.   That's the first time I remember. |
| 9 | Q.   And did you learn that Highland and |
| 10 | HCMFA had booked the $5-million transfer in May |
| 11 | of 2019 as a loan for the first time after the |
| 12 | litigation was commenced? |
| 13 | A.   That is my recollection. |
| 14 | Q.   Okay.  We talked at your first |
| 15 | deposition in May about Highland's audited |
| 16 | financial statements. |
| 17 | I don't know if you have a |
| 18 | recollection of that.  Do you? |
| 19 | A.   Just generally, yes. |
| 20 | Q.   Okay.  I just want to focus on these |
| 21 | two notes. |
| 22 | For this portion of the deposition, |
| 23 | we are questioning you in your individual |
| 24 | capacity, and you're only focused on these two |
| 25 | notes from HCMFA to Highland, okay? |

Page 121

| | |
|---|---|
| 1 | JAMES DONDERO |
| 2 | A.   Okay. |
| 3 | Q.   Okay.  When did you first learn that |
| 4 | these notes were carried as assets on |
| 5 | Highland's balance sheet? |
| 6 | A.   Like I said, I -- my recollection is |
| 7 | that as part of the bankruptcy and part of the |
| 8 | litigation. |
| 9 | Q.   And so did you learn of it as part |
| 10 | of the bankruptcy before the litigation was |
| 11 | commenced, or did you learn that these notes |
| 12 | were carried as assets after -- only after the |
| 13 | litigation was commenced? |
| 14 | A.   I believe only after.  Especially, |
| 15 | the specificity with regard to the notes, only |
| 16 | after the litigation was commenced. |
| 17 | Q.   Okay.  When did you learn for the |
| 18 | first time that these notes were carried as |
| 19 | liabilities on HCMFA's balance sheet? |
| 20 | Withdrawn.  No foundation. |
| 21 | Are you aware that these notes have |
| 22 | been carried as liabilities on HCMFA's balance |
| 23 | sheet? |
| 24 | A.   I wasn't -- I wasn't -- I wasn't |
| 25 | aware prior to the litigation. |

Page 122

1              JAMES DONDERO
2      Q.    Okay.  Did you learn after the
3  litigation that these notes had been carried as
4  liabilities on HCMFA's balance sheets?
5      A.    Yes.
6      Q.    Okay.  Did you ever review
7  Highland's audited financial statements?
8      A.    Not with any specificity.
9      Q.    Are you aware that Highland gave
10  these Promissory Notes to PWC as part of the
11  audit process?
12      A.    I would assume they did, but I don't
13  have specific awareness.
14      Q.    Okay.  And why do you assume that
15  they did?
16      A.    As part of complete financials to
17  the extent that they were made by Kristin or
18  whoever, properly or improperly.  Once they
19  existed, they would have been part of a
20  complete audit.
21      Q.    Are you aware that these two
22  Promissory Notes were disclosed in Highland's
23  audited financial statements for the period
24  ending December 31, 2018, as subsequent events?
25      A.    No.

Page 123

1              JAMES DONDERO
2      Q.    Okay.
3          MR. MORRIS:  Can we put up
4  Exhibit 34, please.
5          MS. CANTY:  (Complies with request.)
6          (Whereupon, Exhibit 34, Highland
7      Capital Management, L.P., Consolidated
8      Financial Statements and Supplemental
9      Information, dated December 31, 2018, Bates
10      stamped D-CNL000212 through D-CNL000257,
11      marked for identification, as of this
12      date.)
13  BY MR. MORRIS:
14      Q.    And turn to -- just if you can see,
15  sir, the first page of this is the December 31,
16  2018, financials.
17          MR. MORRIS:  And if we could go to
18      the second or third page to see
19      PricewaterhouseCoopers' signature.
20          MS. CANTY:  (Complies with request.)
21  BY MR. MORRIS:
22      Q.    And do you see that
23  PricewaterhouseCoopers signed off on the audit
24  on June 3, 2019?
25      A.    Yes.

Page 124

1              JAMES DONDERO
2      Q.    Okay.
3          MR. MORRIS:  Can we go to page 252
4  of the document?  It's got to be -- let's
5  see the Bates.
6          MS. CANTY:  (Complies with request.)
7          MR. MORRIS:  Yeah.  Right there.
8  Okay.  Scroll just to the page before so we
9  can see the heading.
10          MS. CANTY:  (Complies with request.)
11  BY MR. MORRIS:
12      Q.    Okay.  Do you see that this is the
13  section of the audited financials entitled
14  "Subsequent Events"?
15      A.    Yes.
16      Q.    And is it your understanding that
17  the auditors include in subsequent events
18  material transactions THAT occur between the
19  end of the fiscal period in which had audit has
20  been conducted and the date that the auditors
21  sign off?
22      A.    Yes.
23      Q.    Okay.  So if you look at page 39,
24  the next to the last paragraph, do you see, it
25  says, quote, "Over the course of 2019 through

Page 125

1              JAMES DONDERO
2  the report date, HCMFA issued Promissory Notes
3  to the partnership in the aggregate amount of
4  $7.4 million?
5      A.    Yes.
6      Q.    Okay.  And are you surprised to see
7  that in the audit report?
8          MS. DEITSCH-PEREZ:  Object to the
9      form.
10          MR. MORRIS:  Withdrawn.
11  BY MR. MORRIS:
12      Q.    Have you seen -- have you seen this
13  entry in the audit report before this moment?
14      A.    No.
15      Q.    Okay.  Are you aware that Highland
16  employees were responsible for drafting the
17  audit report?
18      A.    Responsible for drafting the audit
19  report?  I don't know if that's a fair
20  statement.
21          I think they provide the detail; but
22  my understanding, the audit report is a work
23  product of the accounting firm.  That's my
24  understanding.
25      Q.    Was there a group within Highland

Page 126

| | |
|---|---|
| 1 | JAMES DONDERO |
| 2 | that was responsible for working with the |
| 3 | auditors in the preparation of the audit |
| 4 | reports? |
| 5 | A.   Yeah, yes. |
| 6 | Q.   Do you know what group that was? |
| 7 | A.   I believe there's a financial |
| 8 | reporting group that reports to Frank that |
| 9 | handles this interaction. |
| 10 | Q.   Are you familiar -- are you aware of |
| 11 | what role Mr. Waterhouse plays, if any, in |
| 12 | connection with Highland's annual audit, at |
| 13 | least during the time that you were serving as |
| 14 | president? |
| 15 | A.   I think he -- he coordinates -- I |
| 16 | think he has to sign off on many aspects of it, |
| 17 | you know, as a C suite executive.  So he's |
| 18 | responsible for, you know, completeness, |
| 19 | integrity, et cetera. |
| 20 | And there's a certain amount of |
| 21 | reliance that PWC puts on it; but my |
| 22 | understanding is audits for the last bunch of |
| 23 | years has been pretty much a hundred percent |
| 24 | sampling and verification. |
| 25 | Q.   High- -- |

Page 127

| | |
|---|---|
| 1 | JAMES DONDERO |
| 2 | A.   -- PWC. |
| 3 | Q.   I apologize, sir. |
| 4 | Highland was the sole source of |
| 5 | information that's contained in its audit |
| 6 | reports, right, to the best of your knowledge? |
| 7 | A.   No.  No.  When I -- the last thing I |
| 8 | said a minute ago about I believe it was a |
| 9 | hundred percent sampling and verification, I |
| 10 | think the audit firm ties back to vendors, |
| 11 | credit agreements, source documents, et cetera. |
| 12 | Highland is not the only source of |
| 13 | this information. |
| 14 | Q.   You were also responsible for the |
| 15 | audit report; is that fair? |
| 16 | A.   Yes. |
| 17 | Q.   And that's because you signed a |
| 18 | management representation letter, correct? |
| 19 | A.   Yes. |
| 20 | Q.   And do you have an understanding of |
| 21 | what management a representation letter is? |
| 22 | MS. DEITSCH-PEREZ:  Object to the |
| 23 | form.  I think you've asked this in each |
| 24 | day of the deposition. |
| 25 | MR. MORRIS:  Okay.  Just trying to |

Page 128

| | |
|---|---|
| 1 | JAMES DONDERO |
| 2 | get some background here. |
| 3 | THE WITNESS:  Yes, I have a general |
| 4 | understanding.  They very from accounting |
| 5 | firm to accounting firm, and they very |
| 6 | depending upon the type of audit.  But I |
| 7 | have a general understanding of them, yes. |
| 8 | BY MR. MORRIS: |
| 9 | Q.   Okay.  And you're -- are you aware |
| 10 | that HCMFA had its financial statements audited |
| 11 | by PWC as well? |
| 12 | A.   Yes. |
| 13 | Q.   Are you aware that HCMFA disclosed |
| 14 | the May 2019 Notes in its own audited financial |
| 15 | statements? |
| 16 | A.   I assume so. |
| 17 | Q.   Have you ever -- |
| 18 | A.   I don't have specific -- I don't |
| 19 | have specific awareness, but it's not reported |
| 20 | here but not on HCMFA; so I assume they are, |
| 21 | yes. |
| 22 | Q.   Okay.  And do you sign Management |
| 23 | Representation Letters for HCMFA's audit as you |
| 24 | do for Highland? |
| 25 | A.   I believe so. |

Page 129

| | |
|---|---|
| 1 | JAMES DONDERO |
| 2 | Q.   Have you ever told anyone that |
| 3 | HCMFA's audited financial statements for the |
| 4 | period ending December 31, 2018, inaccurately |
| 5 | described the $7.4 million transferred from |
| 6 | Highland to HCMFA as loans? |
| 7 | MS. DEITSCH-PEREZ:  Object to the |
| 8 | form. |
| 9 | THE WITNESS:  No, I have not; but I |
| 10 | haven't been involved in any of the audit |
| 11 | functions for quite some time. |
| 12 | I don't think I was involved or |
| 13 | signed Management Representation Letters |
| 14 | for any period covered by this. |
| 15 | BY MR. MORRIS: |
| 16 | Q.   Okay.  Let's switch gears. |
| 17 | The advisors have annual contracts |
| 18 | to manage certain retail funds, correct? |
| 19 | A.   Yes. |
| 20 | Q.   And the retail funds have a board |
| 21 | that decides whether to renew the contracts |
| 22 | with the advisors, correct? |
| 23 | A.   Yes. |
| 24 | Q.   And in connection with the annual |
| 25 | renewal, the advisors provide information to |

Page 130

1          JAMES DONDERO
2 the retail board, correct?
3     A.   Yes.
4     Q.   And you've participated in meetings
5 with the retail board concerning the renewal
6 process, correct?
7     A.   Sometimes.
8     Q.   Okay.  Do you recall that in late
9 2020, the advisors provided a written memo to
10 the retail board in connection with the annual
11 15-C review process?
12    A.   No.
13    Q.   Okay.
14         MR. MORRIS:  Can we put up
15 Exhibit 59, please.
16         MS. CANTY:  (Complies with request.)
17         (Whereupon, Exhibit 59, Memorandum,
18         dated October 23, 2020, Bates stamped
19         HCMFAS 000025 through HCMFAS 000031, marked
20         for identification, as of this date.)
21 BY MR. MORRIS:
22    Q.   Do you see that this is a memo dated
23 October 23, 2020?
24    A.   Yes.
25    Q.   Is it fair to describe this memo as

Page 131

1          JAMES DONDERO
2 a memo from the advisors to the retail boards
3 concerning a supplemental 15-C information
4 request?
5     A.   Yes.
6     Q.   Okay.  As always, Mr. Dondero, you
7 can view any portion of this document.  But if
8 we could just scroll down a little bit, I just
9 want to know --
10         MS. DEITSCH-PEREZ:  Do we have a
11 copy of this document?  Is it in your book?
12         MR. MORRIS:  No.
13         MS. DEITSCH-PEREZ:  Okay.  Well,
14 then he can't actually look at it.  He's
15 looking at what's on the screen.
16         MR. MORRIS:  Please.
17 BY MR. MORRIS:
18    Q.   Mr. Dondero, do you understand what
19 I meant?
20         Will you let me know if there's any
21 portion of the document you want to see?
22    A.   Sure.  Can you -- can you just keep
23 scrolling and let me see the next page?
24    Q.   Thank you, sir.
25         MS. CANTY:  (Complies with request.)

Page 132

1          JAMES DONDERO
2          THE WITNESS:  Just stop there for a
3 second.
4          MS. CANTY:  (Complies with request.)
5          THE WITNESS:  Okay.  Keep going.
6          MS. CANTY:  (Complies with request.)
7 BY MR. MORRIS:
8     Q.   Just -- I'm going to ask you
9 questions about Section 2 just so you know, but
10 you're welcome to view any portion of this
11 document as you believe necessary.
12         MS. CANTY:  I also put it in the
13 chat, John.
14         MR. MORRIS:  Thank you.
15         THE WITNESS:  I see it.
16 BY MR. MORRIS:
17    Q.   Okay.  So --
18    A.   Can you go -- let's keep going.
19 Just I'll quickly read the whole thing.
20    Q.   No problem.
21    A.   That's it.  Okay.  Got it.  All
22 right.
23    Q.   Okay.  So now that you've seen the
24 substance of the memo, do you recall if you saw
25 it before today?

Page 133

1          JAMES DONDERO
2     A.   I've never seen it before today.
3     Q.   Okay.  So do you know who's
4 responsible for preparing a memo of this type
5 on behalf of the advisors?
6     A.   Let's go back to the front and see
7 who it's from.
8     Q.   Sure.
9          MS. CANTY:  (Complies with request.)
10 BY MR. MORRIS:
11    Q.   Is that --
12    A.   Yeah.  Now, I -- given what it is,
13 it's something that, I'm sure, comes out of
14 legal and compliance.
15    Q.   And does -- do the advisors have --
16 withdrawn.
17         Did the advisors have their own
18 legal and compliance officers as of October 23,
19 2020?
20    A.   No.
21    Q.   Did they have any -- did anybody
22 serve as the advisors' general counsel as of
23 October 23, 2020?
24    A.   My belief and recollection is the
25 Shared Services Agreements provided the legal

Page 134

JAMES DONDERO

2  and accounting support for all the funds listed
3  in the "to" section here.
4        As I said earlier, NexPoint has a
5  couple accountants -- I mean -- I'm sorry -- a
6  couple lawyers who do real estate transactions
7  stuff.  Their -- their title -- their title
8  meaning DC's counsel, DC Sauter, who's the most
9  senior attorney there, it might be general
10  counsel; but he only does real estate
11  transactions.
12        The legal dependents of NexPoint and
13  HCMFA was on the Shared Services Agreement and
14  the Highland attorneys that performed those
15  Shared Services Agreements.
16    Q.  Okay.  Did anybody acting on behalf
17  of the advisors review and approve this memo
18  before it was sent to the retail funds?
19    A.  I don't know.
20    Q.  Is it your practice as the president
21  of the advisors to have memos sent to the
22  retail board without anybody reviewing and
23  approving the memos on behalf of the advisors?
24        MS. DEITSCH-PEREZ:  Object to the
25    form.

Page 135

JAMES DONDERO

2        THE WITNESS:  I'm not aware of what
3    standard practice was or wasn't; but again,
4    the infrastructure for something like this
5    would have been only at Highland.
6        HCMFA only had portfolio managers
7    and analysts as employees, and NexPoint
8    pretty much only had portfolio managers and
9    analysts as employees.
10        The staff functions were at
11    Highland, and Highland serviced the funds
12    via a Shared Services Agreement that was
13    still in place as of the date of this memo.
14        MR. MORRIS:  Okay.  Can we go down
15    to Section 2, please.
16        MS. CANTY:  (Complies with request.)
17  BY MR. MORRIS:
18    Q.  Looking at Section 2, do you see
19  that there's a question as to whether there are
20  any material amounts currently payable or due
21  in the future EG notes to --
22    A.  Yes.
23    Q.  -- the Highland by HCMFA or
24  NexPoint?
25    A.  Yes.

Page 136

JAMES DONDERO

2    Q.  Okay.  In the 53 or 54 weeks since
3  this memo as was sent, do you know if it has
4  been amended or modified in any way?
5    A.  I believe there was similar memos
6  like this for this year's annual -- for the
7  2021 renewal, but I do not have -- I've not
8  seen those either; and I don't know how this
9  answer would have changed.
10    Q.  Okay.  But at least as of
11  October 23, 2020, this is the response that the
12  advisors gave to the retail board in response
13  to Question Number 2, right?
14        MS. DEITSCH-PEREZ:  Object to the
15    form.
16        THE WITNESS:  As far -- as far as I
17    know, having seen it here for the first
18    time and not knowing whether this was the
19    final or if there were subsequent letters
20    and not knowing what the 2021 letter looks
21    like, on its surface that appears so; but I
22    have no awareness.
23  BY MR. MORRIS:
24    Q.  Okay.  And just I'll represent to
25  you, Mr. Dondero, that I obtained this letter

Page 137

JAMES DONDERO

2  from counsel to the advisors in response to my
3  specific request for the October 2020, 15-C
4  response.  So that's how -- that's how I got it
5  just so you know.
6    A.  Okay.
7    Q.  So -- so were you aware in October
8  of 2020 that NexPoint informed the retail board
9  that as of June 30, 2020, it owed Highland and
10  its affiliates approximately $23.7 million?
11        MS. DEITSCH-PEREZ:  Object to the
12    form.
13        THE WITNESS:  I was not aware.
14  BY MR. MORRIS:
15    Q.  Does that amount comport with your
16  recollection as to what was outstanding on the
17  May 31, 2017, note that NexPoint gave to
18  Highland?
19    A.  I don't have awareness.
20    Q.  Okay.  Did NexPoint -- do you know
21  if NexPoint ever informed the retail board that
22  any -- any portion of that $23.7 million was
23  subject to any of the agreements that you
24  entered into with the Dugaboy trustee?
25    A.  I -- I don't know.

Page 138

```
1              JAMES DONDERO
2      Q.   Did you ever instruct anybody on
3   behalf of NexPoint to advise the retail board
4   of the existence of the agreements?
5      A.   No, I do not believe so.
6      Q.   Do you know if anybody acting on
7   behalf of NexPoint has ever informed the retail
8   board that NexPoint's outstanding obligation
9   was subject to the agreements that you entered
10  into with the Dugaboy trustee?
11     A.   No.
12     Q.   Did you ever inform the retail
13  boards that any portion of this $23 million was
14  subject to offset?
15     A.   You know what, I -- let me answer
16  that and let me also adjust the last five no
17  answers I just rattled off.
18         I'm thinking in the context of the
19  time period of this letter, which
20  is October of 2020.
21         Again, there would have been similar
22  letters and disclosures like this and
23  additional questions, initial requests for
24  renewal, and then subsequent questions,
25  probably multiple subsequent questions, given
```

Page 139

```
1              JAMES DONDERO
2   everything that's going on with the Highland
3   bankruptcy in 2021.
4         And I'm not aware of what those
5   letters contain.  I haven't seen those letters
6   either, but those letters may include quite a
7   bit of disclosure regarding the questions that
8   you're asking me; but I don't know.  But I
9   didn't specifically instruct anybody to tell
10  the board.  I also didn't instruct anybody
11  specifically to not tell the board.
12         So I don't know what was told to the
13  board for the period after October 2020.
14     Q.   Okay.  I appreciate that, and I can
15  only ask you what you know, right?
16         And so what may or may not be in any
17  other report is kind of irrelevant here because
18  you haven't seen those reports, right?
19     A.   Correct.
20     Q.   Okay.  And so you have no basis of
21  knowing one way or the other whether any report
22  delivered to the retail board after October
23  2020 -- 2020 contains anything about the
24  agreements that you entered into with the
25  Dugaboy trustee, correct?
```

Page 140

```
1              JAMES DONDERO
2      A.   Right.  I just want to be clear that
3   my answer's saying I did not specifically
4   instruct somebody to tell them.  It doesn't
5   mean they don't know or someone else didn't
6   tell them.
7      Q.   Okay.
8      A.   So that's -- that's a clarification
9   I want to make.
10     Q.   Okay.  No problem.
11         And then -- and then do you see that
12  there's a report to the retail board that HCMFA
13  had approximately $12.3 million outstanding to
14  Highland as of June 30, 2020?
15     A.   Yes.
16     Q.   Okay.  So just the same type of
17  questions.
18         Do you have any knowledge as to how
19  that number was calculated?
20     A.   No.
21     Q.   Do you know if it includes the
22  $7.4 million, which is the aggregate principal
23  amount of the two notes that HCMFA issued to
24  Highland in May of 2019?
25     A.   I don't specifically, but given
```

Page 141

```
1              JAMES DONDERO
2   everything we have gone over in the last -- I
3   don't know.  Probably.
4      Q.   Okay.  Do you know whether anybody
5   has informed the retail board on behalf of
6   HCMFA that that $12.3 million was overstated by
7   $7.4 million?
8      A.   I -- I don't know.
9      Q.   Okay.  Do you know whether -- do you
10  know whether anybody acting behalf of HCMFA
11  ever told the retail boards that the
12  $12.3 million was subject to offset of any
13  kind?
14     A.   I don't know, but I can't imagine
15  the October 21 letter didn't address some of
16  those issues because those issues I'm not sure
17  were known at this point in time.
18     Q.   Okay.  If -- and we can look at
19  paragraph 1 if it helps.
20         But my question is whether you're
21  aware of anybody on behalf of HCMFA ever
22  informing the retail board in 2020 that HCMFA
23  had claims against Highland?
24         MS. DEITSCH-PEREZ:  Object to the
25  form.
```

Page 142

```
1              JAMES DONDERO
2         THE WITNESS:  I don't know.
3    BY MR. MORRIS:
4         Q.   Do you know whether anybody acting
5    on behalf of either the advisors informed the
6    retail board at any time in the year 2020 that
7    either advisor had claims against Highland?
8         MS. DEITSCH-PEREZ:  Object to the
9    form.
10         THE WITNESS:  I don't know.
11         MR. MORRIS:  Okay.  We can take that
12    down, please.
13         MS. CANTY:  (Complies with request.)
14    BY MR. MORRIS:
15         Q.   Are you aware that the Court
16    confirmed the Debtor's Fifth Amended Complaint
17    of Reorganization in February of 2021?
18         A.   Generally.
19         Q.   And do you recall that objections to
20    the confirmation of the plan were filed by you
21    and each of the advisors, among others?
22         A.   Yes.
23         Q.   And do you recall that these
24    actions, these lawsuits to collect on the
25    notes, they were commenced before the
```

Page 143

```
1              JAMES DONDERO
2    confirmation hearing, right?
3         A.   I – I don't – I don't know.
4         Q.   All right.  I'll represent to you
5    that the lawsuits were commenced on or about
6    January 22, and the confirmation hearing took
7    place, I think, on February 2 and February 3,
8    2021.
9         Does that refresh your recollection
10    at all that the lawsuits were known to you at
11    the time of confirmation?
12         MS. DEITSCH-PEREZ:  Object to the
13    form.
14         THE WITNESS:  Not specifically.  I
15    mean, given the details you just explained,
16    I guess generally.
17    BY MR. MORRIS:
18         Q.   Okay.  I'd like to refer to you
19    NexPoint and HCMFA and HCRE and Services
20    collectively as the defendants for the next set
21    of questions, okay?
22         A.   Okay.
23         Q.   And these questions are in your
24    capacity as an individual and in your 30(b)(6)
25    capacity, okay?
```

Page 144

```
1              JAMES DONDERO
2         Is that okay, sir?
3         A.   I'll do the best I can.  If I – if
4    I need clarity or caveats, I'll throw them out
5    there.
6         Q.   Okay.  Now, I do understand you're
7    not a 30(b)(6) witness for HCMFA today.  So
8    let's make that clear.
9         MS. DEITSCH-PEREZ:  Thank you.
10    BY MR. MORRIS:
11         Q.   As to HCMFA, you're just here in
12    your individual capacity as the control person,
13    okay?
14         Prior to confirmation, do you know
15    whether anyone acting on behalf of any of the
16    defendants ever disclosed to the bankruptcy
17    court the terms or the existence of your
18    agreement – agreements with the Dugaboy
19    trustee?
20         A.   I guess generally, I've testified to
21    this already.  There were numerous
22    conversations with Seery, and I know Lynn had
23    conversations.
24         Q.   Sir, I apologize, but I'm going to
25    interrupt because I know you're tired; and I
```

Page 145

```
1              JAMES DONDERO
2    want to get this done.  But my question had to
3    do with the disclosure to the bankruptcy court,
4    okay?  Let me just try again.
5         Are you aware, sir, whether any of
6    the defendants disclosed to the bankruptcy
7    court prior to confirmation the existence of
8    the agreements that you entered into with the
9    Dugaboy trustee?
10         MS. DEITSCH-PEREZ:  Object to the
11    form and to interrupting the witness.
12         THE WITNESS:  I'll say yes.
13    BY MR. MORRIS:
14         Q.   Okay.  Did you do that?
15         A.   Yes.
16         Q.   And did you do that as part of your
17    testimony in the hearing, or did you do it
18    through the filing of a pleading?
19         MS. DEITSCH-PEREZ:  Object to the
20    form.
21         THE WITNESS:  I don't – I don't
22    know about pleadings or filings.  I – I
23    don't know.
24    BY MR. MORRIS:
25         Q.   Do you recall what you told the
```

Page 146

JAMES DONDERO

2  bankruptcy court about the agreements that you
3  entered into with the Dugaboy trustee?
4      A.   No.  I'm not -- yes.  No.  I'm
5  not -- no, I don't.  I don't want to -- I don't
6  want to start talking and have you strike it or
7  object.  So I'll just answer specifically until
8  you get to the question.
9      Q.   Yeah.  So -- so again, I'm not
10  trying to trick you.
11          Can you recall when you told the
12  bankruptcy court that you had entered into will
13  the agreements with the Dugaboy trustee?
14      A.   No.
15      Q.   Can you remember the subject matter
16  of any hearing at which you informed the
17  bankruptcy court about the existence of the
18  agreements that you entered into with the
19  Dugaboy trustee?
20      A.   I don't know where or how this works
21  legally.  But every written proposal we put
22  forward as a solution and as a plot plan,
23  always had a zero on all the affiliated notes
24  as being a zero in something that was
25  ultimately likely to be compensation.

Page 147

JAMES DONDERO

2          All of those settlement proposals,
3  some were done formally through Seery; some
4  were done indirectly; some of it were -- some
5  of them were done to the independent board;
6  some of them were done directly to Clemente.
7  But all of those documented the expectation
8  that the notes were compensation.
9      Q.   Do you believe that any of the
10  documents that you just described were ever
11  presented to the bankruptcy court?
12      A.   Yes.
13      Q.   Okay.  When and in what context were
14  those documents delivered to the bankruptcy
15  court?
16      A.   I believed that the independent
17  board and Seery were representatives of the
18  bankruptcy court in that regard.
19          So I think within a month, two
20  months of the filing, there were proposals made
21  to creditors directly and the independent
22  board; and then subsequently, once Seery became
23  president, to him.
24          And then when Seery proved
25  ineffective regarding settlements, there were

Page 148

JAMES DONDERO

2  reach outs -- reaches out to creditors directly
3  again and -- to Clemente and the committee; but
4  I think the committee already sold all their
5  stuff by that point.
6          I mean, I -- listen, I -- but I
7  consider those reach-outs and characterizations
8  of the notes as not part of settlement under
9  the estate and that is likely to be
10  compensation notifying the Court generally.
11      Q.   Okay.  Are you aware of any notice
12  that was ever given to Judge Jernigan about the
13  existence of any of the agreements that you
14  entered into with the Dugaboy trustee?
15      A.   I -- I don't know.
16      Q.   Okay.  You're not aware of any as
17  you sit here right now; is that fair?
18      A.   Yes.  I'm not aware if any of my
19  reach-outs to the people that I described ever
20  made it to Jernigan.  I don't know.
21      Q.   Okay.
22      A.   I know she asked for updates on the
23  plot plan.  I know she asked for whatever, but
24  I don't know what specificity any of the people
25  I described presented them to her.  So I don't

Page 149

JAMES DONDERO

2  know.
3      Q.   And I appreciate what you've said
4  about the proposals that you've made.  But my
5  next question's very specific.
6          Prior to the commencement of
7  litigation, did you or anybody acting on your
8  behalf ever tell Jim Seery or Matt Clemente of
9  your agreements with the Dugaboy trustee?
10      A.   I -- I don't know specifically.
11      Q.   Thank you very much.
12          THE COURT REPORTER:  I'm sorry.
13  When you get to a good point, could we just
14  take a quick break?
15          MR. MORRIS:  Yeah.  Why don't we do
16  that, and I hope to try to wrap up.  So
17  it's 5:37.  I mean, I'm going to need
18  probably, you know, another half hour or an
19  hour; but I want to try to finish.  It's
20  5:38.
21          I'm fine with if we just come back
22  at 4:45 Central Time, seven minutes.
23          THE VIDEOGRAPHER:  All right.  We're
24  off record at 4:38.
25          (Whereupon, a break was taken.)

Page 150

1          JAMES DONDERO
2          THE VIDEOGRAPHER:  This is the
3   beginning of Media Number 3 in the
4   deposition of James Dondero.  We are back
5   on the record.  The time is 4:45.
6   BY MR. MORRIS:
7          Q.   Just to finish up on the topic we
8   were on when we took the break, Mr. Dondero.
9          Prior to confirmation, do you know
10  which of the defendants ever informed the
11  bankruptcy court that any of the Promissory
12  Notes that are the subject of the lawsuits were
13  unenforceable for any reason?
14          And when I use the phrase
15  "bankruptcy court" here -- you know what, let
16  me ask a different question.
17          Prior to confirmation, do you know
18  if anybody acting on behalf of the defendants
19  ever disclosed to Judge Jernigan that any of
20  the Promissory Notes subject to the lawsuits
21  were unenforceable for any reason?
22          MS. DEITSCH-PEREZ:  Object to the
23  form.
24          THE WITNESS:  I don't know.
25

Page 151

1          JAMES DONDERO
2   BY MR. MORRIS:
3          Q.   Prior to confirmation, did you
4   direct anybody to inform Judge Jernigan that
5   any of the Promissory Notes were unenforceable
6   for any reason?
7          A.   I don't know.
8          Q.   Okay.  I want to direct your
9   attention to December 2020.
10          Do you recall if you had a
11  conversation with Frank Waterhouse concerning
12  payments that were due to Highland by any of
13  the companies that you directly or indirectly
14  own or control?
15          A.   I'm trying to think.  Generally, we
16  overpaid on shared services, so -- by a
17  significant amount, I believe 14, 15 million
18  bucks.  And then there was a supposed to be an
19  overall transition settlement true-up regarding
20  the employees, the office space, you know,
21  whatever.
22          So the -- yeah, that's -- that's the
23  -- that's my general recollection.
24          Q.   But did you give Mr. Waterhouse any
25  instructions as to whether to pay or not pay

Page 152

1          JAMES DONDERO
2   any amounts that were due and owing to Highland
3   under any agreement between Highland and any
4   affiliate?
5          MS. DEITSCH-PEREZ:  Object to the
6   form.
7          Are you asking about the Notes or
8   the Shared Services Agreements?
9          MR. MORRIS:  I'm asking about -- I'm
10  asking very broadly any payments.
11          THE WITNESS:  I do remember having
12  conversations not to pay any more shared
13  services.
14          And I hope there weren't anymore
15  payments on shared services.  There --
16  There was never a specific to not pay the
17  notes.
18  BY MR. MORRIS:
19          Q.   So your recollection is that you
20  instructed Mr. Waterhouse not to make any
21  further payments under the shared services, and
22  that's the instruction you gave?
23          A.   Yes.
24          Q.   Did you ever tell anybody in
25  December of 2020 about your conversation with

Page 153

1          JAMES DONDERO
2   Mr. Waterhouse?
3          A.   Not that I recall.
4          Q.   Do you recall telling anybody other
5   than Mr. Waterhouse in December 2020 that no
6   payment should be made to Highland under the
7   Shared Services Agreement?
8          A.   I do believe there was a team -- I
9   can't remember -- I know Dustin Norris is on
10  that team.  He was aware.  He was aware.  And
11  as a matter of fact, I think -- yeah.  He -- I
12  know he was aware for sure.
13          Q.   Anybody else?
14          A.   There were other people on that
15  team, but I can't remember who was on that team
16  or who was in the room at any time.
17          Q.   Is there anything in writing that
18  you recall that reflects the instruction that
19  you gave to Mr. Waterhouse in December 2020
20  that we're talking about?
21          A.   I believe the back-and-forth and the
22  true-up with Seery on the multiple of things
23  that I was just discussing, you know, right to
24  transition of people, it included no more
25  shared services being paid and a credit for

Page 154

1        JAMES DONDERO
2  overpayment on shared services. And those --
3  those spreadsheets went back and forth, and
4  Seery has copies of them also.
5        Q.  Are you aware of any payments being
6  made by the advisors to Highland after
7  November 30, 2020?
8        A.  Hopefully not on shared services. I
9  believe there were payments on principal and
10 interest on notes.
11       Q.  Were any of those payments that you
12 have in mind made before the end of calendar
13 year 2020 -- withdrawn.
14           Were any of those payments that you
15 have in mind made in December 2020?
16       A.  I don't know. I don't know which
17 ones were paid and kept current. I don't know
18 which ones were cured. I don't -- I don't
19 remember which ones were cured.
20       Q.  Are you aware of any note that was
21 tendered by one of Highland's affiliates on
22 which payment was made in December 2020?
23       A.  I don't know. I don't know when --
24 I don't know which ones were kept current. I
25 don't know which ones were cured in December.

Page 155

1        JAMES DONDERO
2  I don't know which ones were cured in January
3  or February. I don't know.
4        Q.  Is it your testimony that you
5  believe that one or more of Highland affiliates
6  made a payment in December 2020 to cure -- as a
7  cure payment?
8        MS. DEITSCH-PEREZ:  Object to the
9  form.
10 BY MR. MORRIS:
11       Q.  I just -- I'm sorry. I --
12       A.  I -- I -- okay.
13       Q.  Yeah. I just want to try to get
14 this as cleanly as I can. Did you --
15       A.  I believe --
16       Q.  Go ahead, sir.
17       A.  No. I'll let you go. It's better
18 if you ask me.
19       Q.  Okay. Did you direct anybody to
20 make any payment in December 2020 to Highland
21 on behalf of any affiliate that you owned or
22 controlled?
23       A.  I believe all notes are outstanding
24 and current and in good standing. I don't know
25 when they were cured.

Page 156

1        JAMES DONDERO
2        Q.  Are you just talking about the term
3  notes here or the demand notes as well?
4        A.  All of the above. All of the notes
5  as far as I know.
6        Q.  Are you aware that in December 2020,
7  Highland made a demand for payment under all of
8  the demand notes?
9        A.  And I believe they're all current as
10 far as interest and principal amortization. I
11 believe they've all been cured.
12       Q.  Okay. Can you identify any payment
13 that was made in December 2020 to Highland on
14 behalf of yourself or any entity that you
15 directly or indirectly own or control?
16       A.  I wouldn't have been involved in --
17 I wouldn't have been involved in normal course
18 payments. I know there were -- I know for sure
19 there were cure payments in January. I don't
20 know if there were in December.
21       Q.  Okay. And that's -- we'll get to
22 January. I'm just trying to finish up
23 December.
24           Are you aware of any payments made
25 in December 2020 --

Page 157

1        JAMES DONDERO
2        MS. DEITSCH-PEREZ:  Object to the
3  form.
4  BY MR. MORRIS:
5        Q.  -- by you -- by you or any entity
6  directly or indirectly owned or control by you
7  to Highland?
8        A.  I don't have awareness.
9        Q.  Do you recall that early in 2021,
10 Highland gave notice of default on the three
11 term notes?
12       A.  I'm aware in -- that January -- yes,
13 I guess I am aware that Highland declared them
14 in default in January, yes.
15       Q.  And you're aware that in addition to
16 declaring them in default, they gave notice of
17 acceleration?
18       A.  I'm not aware of acceleration. I'm
19 aware of, I guess, default I had heard.
20       Q.  Did you ever see the
21 notice-of-default letters that Highland sent to
22 NexPoint HCRE and services?
23       A.  I don't believe I've seen all of
24 them. I think I've seen one on demand notes.
25 I don't think I've -- I don't remember seeing

Page 158

JAMES DONDERO

1  any on term loans.
2      Q.   All right.  So as you sit here right
3  now, you don't have a recollection of having
4  seen the default notices that were sent by
5  Highland in January 2021 with respect to the
6  term notes, right?
7          MS. DEITSCH-PEREZ:  Why don't you
8  show him one.
9          THE WITNESS:  I don't recall.  Yeah.
10  I mean, I don't – I don't recall seeing
11  any of them.
12  BY MR. MORRIS:
13      Q.   Okay.  How did you learn that
14  Highland had sent the default notices?
15      A.   I believe it was at a hearing I
16  attended in person from which I called Frank,
17  and I was surprised and annoyed that the
18  relative de minimis amounts hadn't been paid;
19  and I asked him what does it take to cure them
20  or make them current.
21          And then he told me the numbers, and
22  they were small and de minimis; and I told him
23  make sure they get paid and make sure the notes
24  are cured.

Page 159

JAMES DONDERO

1      Q.   Did you do anything or say anything
2  else with respect to your – your learning
3  about the declaration of default?
4      A.   No.  It – no.  I don't remember
5  anything else.
6      Q.   Did you ask your – do you know
7  whether anyone acting on behalf of ever reached
8  out to Highland with respect to the payments
9  that were made in January of 2021 as cure
10  payments as you described them?
11      A.   Frank was Highland.
12      Q.   I'm asking –
13      A.   Frank – Frank – Frank was the
14  person I reached out to at Highland.  Who else
15  would I reach out to at Highland?
16      Q.   Did you – did you reach out to
17  anybody else?
18      A.   No.  Just Frank.
19      Q.   Okay.  Did anybody acting on your
20  behalf reach out to anybody else?
21      A.   Not that I know of or not that I
22  thought was necessary.
23      Q.   In January of 2021, did it occur to
24  you to either communicate with or through your

Page 160

JAMES DONDERO

1  lawyer, with Mr. Seery, about this?
2          MS. DEITSCH-PEREZ:  Object to the
3          form.
4          THE WITNESS:  No.  I thought Frank
5          was fully empowered.
6  BY MR. MORRIS:
7      Q.   Okay.  Did you ever confirm your
8  understanding about the cure with
9  Mr. Waterhouse in writing?
10      A.   In writing?  No.  I believe it was
11  all in that phone conversation from the Court.
12  I don't – I don't recall anything in writing,
13  but I'll check.
14      Q.   Do you recall sending him an e-mail
15  in which you confirmed with Mr. Waterhouse your
16  understanding that the debtor had agreed that
17  the payments that were being paid would
18  constitute a cure?
19      A.   No, I didn't – no.  At the time I
20  didn't think it was necessary.  It was – the
21  cure amount was calculated by Frank.  It was
22  paid immediately.  It was accepted.  I never –
23  I never thought to memorialize it beyond that.
24      Q.   Okay.  Did you – did you ever ask

Page 161

JAMES DONDERO

1  your attorneys to confirm with Pachulski Stang
2  Ziehl & Jones or anybody acting on behalf of
3  the debtor that the payments that were made
4  would be deemed to be cure payments?
5          MS. DEITSCH-PEREZ:  I'm going to not
6          to disclose communications with counsel.
7  BY MR. MORRIS:
8      Q.   Okay.  Do you know whether your
9  lawyers or anybody acting on your behalf ever
10  sought to confirm your understanding that the
11  payments would be deemed to have cured the
12  default under the three term notes?
13      A.   Not that I'm aware of.
14      Q.   Okay.  Is there any written record
15  of your call with Mr. Waterhouse?
16      A.   If it was from my cell phone, I'm
17  sure there's a written record taking place of
18  the call taking place.
19      Q.   Right.  But did you take any notes,
20  or is there anything in writing that
21  memorialized or reflected your conversation
22  with Mr. Waterhouse in January of 2021 about
23  the cure?
24      A.   Not that I'm aware of and not that I

Page 162

```
1           JAMES DONDERO
2  thought was necessary.
3      Q.   Okay.  Did -- did you ever tell
4  Judge Jernigan that you had made cure payments?
5      A.   I didn't know I'm allowed to have
6  ex parte conversations with her, but there's a
7  lot of things I'd like to tell her about this
8  case; but no I did not.
9      Q.   All right.  I'm not talking about
10 ex parte conversations, sir.  Let's take
11 confirmation, for example.
12         Did you or anybody acting on any of
13 the defendants' behalf ever inform
14 Judge Jernigan that Frank Waterhouse had told
15 you that the payments in January 2021 would be
16 deemed to be cure payments?
17     A.   Not that I'm aware of.
18     Q.   Thank you.
19         MR. MORRIS:  Give me one more
20 moment.  In fact, I'm going to ask for just
21 three minutes.  I'm going to check and see
22 how much more I have here.  It won't be
23 long if I have anything.  So let's go off
24 the record.
25         THE VIDEOGRAPHER:  Would you like to
```

Page 163

```
1           JAMES DONDERO
2  go off the record?
3         All right.  We're off record at
4  5:03.
5         (Whereupon, a break was taken.)
6         THE VIDEOGRAPHER:  We are back on
7  the record.  The time is 5:06.
8         MR. MORRIS:  Okay.  Asia, can you
9  please put on the screen Exhibit 24, which
10 are Mr. Dondero's written responses to
11 discovery?
12         MS. CANTY:  (Complies with request.)
13         (Whereupon, Exhibit 24, Defendant
14 James Dondero's Objections and Responses to
15 Plaintiff's Requests for Admission,
16 Interrogatories, and Requests for
17 Production, marked for identification, as
18 of this date.)
19 BY MR. MORRIS:
20     Q.   And Mr. Dondero, I don't know if you
21 have that binder in front of you, but this is
22 one of the documents that will be in there,
23 Number 24.
24     A.   Number 24?
25     Q.   Yes, sir.
```

Page 164

```
1           JAMES DONDERO
2         MS. DEITSCH-PEREZ:  Do you got it?
3         THE WITNESS:  Yes.
4  BY MR. MORRIS:
5      Q.   Have you seen this document before,
6  sir?
7      A.   No.
8      Q.   Let's go to page 15 and see if that
9  refreshes your recollection.
10         Is that your signature?
11     A.   Yes.
12         MS. DEITSCH-PEREZ:  Yeah.  It's late
13 in the day, John.
14         THE WITNESS:  Yes.
15         MR. MORRIS:  That's why I showed him
16 the signature.
17 BY MR. MORRIS:
18     Q.   Does that refresh your recollection
19 that you've seen this before?
20     A.   No.  It refreshes my recollection
21 that I signed it.
22     Q.   Okay.  And --
23     A.   Not that I recall -- not that I
24 looked at it in detail in any way.
25     Q.   Okay.  Did you review it before you
```

Page 165

```
1           JAMES DONDERO
2  signed it?
3      A.   I -- as I sit here today, I don't
4  remember.  So let's go through whatever
5  questions you have.
6      Q.   Okay.
7         MR. MORRIS:  Go to page 8, please.
8         MS. CANTY:  (Complies with request.)
9  BY MR. MORRIS:
10     Q.   You will see that Interrogatories 3
11 and 4 ask in substance for you to admit that
12 you never disclosed the terms or existence of
13 the agreement to Frank Waterhouse prior to the
14 commencement of the adversary proceeding.
15         Do you see that?
16         MS. DEITSCH-PEREZ:  Wait.  Object to
17 the form.  Those are two different
18 requests.
19         MR. MORRIS:  Okay.  Okay.  I was
20 trying to do this quickly.  We'll do it --
21 we'll do it -- we'll do it your way?
22         MS. DEITSCH-PEREZ:  No.  I think you
23 -- okay.
24 BY MR. MORRIS:
25     Q.   So let's look at Request for
```

Page 166

JAMES DONDERO

1
2  Admission Number 3.
3          Do you see that Highland asked you
4  to admit, quote, "that prior to the
5  commencement of the adversary proceeding, you
6  never disclosed the terms of the agreement to
7  Frank Waterhouse," close quote?
8      A.  That's on page 8, Number 3, right?
9      Q.  Correct.  And you denied that,
10 correct?
11     A.  Yes.
12     Q.  Okay.  Did you disclose the terms of
13 the agreement as we've defined that term to
14 Frank Waterhouse prior to the commencement of
15 the adversary proceeding?
16     A.  You know, what I've answered was a
17 long answer earlier that the notes were
18 compensation.  The notes were to be -- would be
19 forgiven as part of compensation, shouldn't be
20 included in any settlement.
21         Frank and his group were deeply
22 involved in all the plot plan and settlement,
23 things that went back and forth.  He knew.
24         Now, whether he knew the specifics
25 of the agreement in terms of, whether I ever

Page 167

JAMES DONDERO

1
2  discussed the MGM Cornerstone, Trustway, and
3  the specifics of the agreement with him before,
4  I don't -- I don't know.  So...
5      Q.  Do you --
6      A.  I think denying is appropriate, but
7  I'm at not saying Frank knew the specifics of
8  the agreement prior to the commencement of
9  litigation.
10     Q.  Did you tell him that you had an
11 agreement with the Dugaboy trustee?
12     A.  I told him there were mechanisms for
13 forgiving the -- or there were -- there were
14 mechanisms for the notes being compensation and
15 not being part of any kind of cement or asset
16 to the estate.
17     Q.  Okay.  Do you recall telling him
18 anything else during these conversations?
19     A.  No, I didn't -- no.  I didn't feel
20 it necessary to talk to him about the
21 specifics.
22     Q.  Okay.  And do you recall having this
23 discussion in any context other than in
24 connection with the preparation of a settlement
25 proposal?

Page 168

JAMES DONDERO

1
2      A.  There wasn't another reason -- there
3      -- no, I don't remember any other context.
4      Q.  Okay.
5      A.  But the settlements were regular and
6  ongoing --
7      Q.  Okay.
8      A.      -- in our mind, not in the
9  Stonehill's mind.
10     Q.  Okay.  Can you go -- can we go to
11 page 9, Request for Admission Number 8?
12     A.  Yes.
13     Q.  Number 8 we asked you to "admit that
14 no document was created prior to the
15 commencement of the adversary proceeding
16 concerning the existence of the agreement."
17         Have I read that right --
18     A.  I'm just reading what's on page 9,
19 admit that prior to the agreement he never
20 disclosed any other creditor.
21     Q.  No, no, no.  I'm sorry.  We're on
22 Number 8.
23         Can you read Number 8 out loud?
24     A.  Number 8, I'm sorry.  Admit that no
25 document was created prior to the commencement

Page 169

JAMES DONDERO

1
2  of the adversary proceeding concerning the
3  existence of the agreement.
4      Q.  All right.  So you've read that.
5  And so my question to you is:  Did you deny
6  that because there are settlement proposals
7  that you created that show zero value for the
8  Promissory Notes at issue?
9      A.  Yes, partly.
10     Q.  Okay.  What other documents were
11 created prior to the commencement of the
12 adversary proceeding that you contend concerned
13 the existence of the agreement?
14     A.  I'm trying to think if the LPA does.
15     Q.  Okay.  Anything else?
16     A.  No.  That would be -- that would be
17 it.
18     Q.  Okay.  Request for Admission
19 Number 9, can you identify the creditor that
20 caused you to deny the Request for Admission
21 Number 9?
22     A.  I believe all the creditors via the
23 settlement agreements; but, you know,
24 specifically Clubock, you know, and to the
25 extent Frank is a creditor, Frank.

Page 170

```
1          JAMES DONDERO
2     Q.   But you just testified a few minutes
3  ago, I thought, that you didn't specifically
4  tell Mr. Waterhouse the terms of the
5  agreements to him, right?  Did I miss --
6     A.   That's right.  I mean, not the
7  specific terms, correct.
8     Q.   Okay.  So is there any creditor to
9  whom you -- is there any creditor of Highland's
10 to whom you disclosed the existence of the
11 agreements that you entered into with the
12 Dugaboy trustee prior to the commencement of
13 the adversary proceeding?
14      MS. DEITSCH-PEREZ:  Asked and
15 answered.
16      THE WITNESS:  Yeah.  I mean,
17 generally, all the creditors via the
18 settlement.  And then we have lots of
19 one-off conversations with Clubock
20 representing UBS where the notes were
21 described as going to be forgiven
22 compensation, never part of the estate.
23 BY MR. MORRIS:
24   Q.   All right.  I don't -- I don't want
25 to wrestle with you.
```

Page 171

```
1          JAMES DONDERO
2     A.   Sure.
3     Q.   I'm going to remind you that when I
4  use the word "agreements," I'm referring
5  specifically to the agreements that were set
6  forth in paragraph 82 of your answer.
7         Do you understand that?
8     A.   Yes.  And so I guess my answer is
9  generally but not specifically.
10    Q.   Okay.  And when you say "generally,"
11 you don't mean that you disclosed the existence
12 or terms of the agreement to any creditor.
13 What you mean is that you told all of the
14 creditors that you believed that the notes
15 should be forgiven as part of compensation.
16        Do I have that right?
17    A.   Well, that they would be forgiven as
18 part of compensation.
19    Q.   Okay.  Subject to that correction,
20 are we on the same page now?
21    A.   Yes.
22    Q.   Okay.  Can we go to page 12,
23 Interrogatory Number 2?
24    A.   This is still in Section 24?
25    Q.   Yes, sir.
```

Page 172

```
1          JAMES DONDERO
2      MS. DEITSCH-PEREZ:  Object to the
3  form.
4      THE WITNESS:  24, I'm sorry.
5  Page 2?
6  BY MR. MORRIS:
7     Q.   Page 12.
8     A.   Page 12.  Yes.  Which one?
9     Q.   Number 2.
10    A.   All right.
11    Q.   You didn't identify any email
12 correspondence in response to Interrogatory
13 Number 2; is that correct?
14    A.   I don't have my e-mails.  So we have
15 painfully little from the Highland estate.
16    Q.   Okay.
17    A.   I think at the time we responded, we
18 thought we might get access to things; but we
19 haven't been able to come up with anything.  We
20 have -- we have no access to anything.
21    Q.   Okay.  So as you sit here today, you
22 cannot identify any e-mail correspondence that
23 discusses the existence of the agreement,
24 correct?
25    A.   Not yet, no.
```

Page 173

```
1          JAMES DONDERO
2      (Whereupon, Exhibit 27, Defendant
3  NexPoint Advisors, L.P.'s Objections and
4  Responses to Plaintiff's Requests for
5  Admission, Interrogatories, and Requests
6  for Production, marked for identification,
7  as of this date.)
8  BY MR. MORRIS:
9     Q.   Let's go to Exhibit Number 27.
10    A.   Yes.
11    Q.   And if we can go to page 7.
12      MR. MORRIS:  I think -- I don't know
13 who's shuffling paper.
14 BY MR. MORRIS:
15    Q.   But if we're at page 7, we're
16 looking at Interrogatory Number 3.
17      Is the reason for the denial -- and
18 I apologize.  I may be going too quickly
19 because I know we're all anxious to finish, but
20 I do want to represent to you that we're
21 looking at the discovery responses of NexPoint
22 Advisors.
23    A.   Right.
24    Q.   And if we went to page 12, we'd find
25 your signature on that one, okay?  So looking
```

Page 174

1          JAMES DONDERO
2    at –
3        A.   Yes.
4        Q.   – Request for Admission Number 3,
5    is your answer the same on behalf of NexPoint
6    Advisors as it was for yourself as to why you
7    denied Request for Admission Number 3?
8        A.   Yes.
9        Q.   Okay.  If we can go to Request for
10   Admission Number 6, that is the same Request
11   for Admission that we talked about with respect
12   to yourself in your individual capacity a
13   moment ago.
14         Is your reason for denying Request
15   for Admission Number 6 the same reason that you
16   gave for yourself?
17       A.   Yes.
18       Q.   And looking at Request for
19   Admissions Number 7 and 8, is the reason that
20   you denied those Requests for Admissions
21   because you told Seery and the committee and
22   Clubock that you wouldn't pay anything for the
23   notes because they were supposed to be forgiven
24   as part of your compensation?
25       A.   And the independent board, yes.

Page 175

1          JAMES DONDERO
2        Q.   Okay.  Is there any other reason
3    that you denied Request for Admissions Number 7
4    and 8?
5        A.   Not that I can think of at this
6    point in time.
7         I don't think the LPA applies much
8    here, but I may be –
9         MR. MORRIS:  All right.  I have no
10   further questions.
11        THE WITNESS:  Wonderful.  Thank you.
12   Have a good evening.
13        MR. MORRIS:  Thank you.  Take care.
14        MS. DEITSCH-PEREZ:  Thank you.
15        MR. MORRIS:  Bye now.
16        THE VIDEOGRAPHER:  All right.  If
17   there are no further questions, this
18   concludes today's deposition.  Volume II
19   [sic] consists of three media.  We are off
20   the record at 5:21 p.m.
21        THE COURT REPORTER:  Everybody is
22   leaving, and I wanted to get everybody's
23   order on the record.
24        MS. DEITSCH-PEREZ:  I'd like the
25   rough.  And then the regular can be

Page 176

1          JAMES DONDERO
2    whenever you get the regular done.  No
3    special rush.
4        THE COURT REPORTER:  Okay.  Thank
5    you.
6        MS. DEITSCH-PEREZ:  You're welcome.
7        THE COURT REPORTER:  Ms. Canty, I
8    think there's a standing order for a daily
9    delivery -- or an immediate delivery for
10   your firm?
11        MS. CANTY:  Yes.
12        THE COURT REPORTER:  Okay.  I just
13   wanted to confirm that.  I'll get that out
14   tonight, then.
15        MS. CANTY:  Okay, thank you.
16        (The witness is excused.)
17        (Deposition of James Dondero
18   concluded at 5:21 p.m. CDT.)
19
20
21
22
23
24
25

Page 177

1         C E R T I F I C A T E
2
3
4         I, SUZANNE J. STOTZ, a Certified
5    Shorthand Reporter, Registered Professional
6    Reporter, Certified Realtime Reporter, and
7    Notary Public in and for the State of Texas, do
8    hereby certify that the foregoing is a true and
9    accurate transcript of the stenographic
10   above-captioned matter.
11
12
13         _____
14         SUZANNE J. STOTZ, CSR, RPR, CRR
15         Texas Certification No. 11942
16
17
18   DATED:  November 4, 2021
19
20
21   NOTE:  THE CERTIFICATE APPENDED TO THIS
22   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23   OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24   DIRECT CONTROL AND/OR DIRECTION OF THE
25   CERTIFYING COURT REPORTER.

Page 178

```
 1        E R R A T A   S H E E T

 2      I have read my testimony in the foregoing

 3    transcript and believe it to be true and

 4    correct to the best of my knowledge and belief

 5    with the following changes:

 6    PAGE    LINE      CHANGE

 7    _____ _____ _____

 8    _____ _____ _____

 9    _____ _____ _____

10    _____ _____ _____

11    _____ _____ _____

12    _____ _____ _____

13    _____ _____ _____

14    _____ _____ _____

15    _____ _____ _____

16    _____ _____ _____

17

18    _____ _____

19    WITNESS SIGNATURE            DATE

20

21    Sworn and subscribed to before me this

22    _____ day of _____, 2021.

23

24    Notary Public of the

25    State of _____.
```

Case 21-03004-sgj    Doc 111-13    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-13    Filed 11/89/23    Page 73 of 200    PageID 35534

Exhibit 23    Page 489 of 200

Index: $1.55-million..acting

**$**

**$1.55-million** 64:22

**$12.3** 140:13 141:6, 12

**$2** 62:6

**$2.4** 91:11,13,23 92:6,11,14 93:12 103:17 104:2 107:23 109:2,25 110:13,23

**$2.4-million** 91:19

**$23** 138:13

**$23.7** 137:10,22

**$250,000** 58:20

**$5** 101:22 102:17 111:17,21,24 112:4, 10 117:9 119:23

**$5-million** 116:16 120:10

**$500,000** 62:5

**$6** 99:6,16,22

**$6,068,851** 98:18

**$7.4** 90:17 125:4 129:5 140:22 141:7

**$7.44** 102:7

**$7.5** 119:10,14,16

**$7.8** 103:5

**0**

**000025** 130:19

**000031** 130:19

**1**

**1** 9:3 94:3 141:19

**100** 96:24

**12** 171:22 172:7,8 173:24

**13** 26:14

**14** 26:14 151:17

**15** 151:17 164:8

**15-C** 130:11 131:3 137:3

**17** 20:20

**18** 20:8 26:13 71:16 73:15

**19** 20:8

**1939** 104:7

**1:17** 9:11

**2**

**2** 52:24 94:19 97:15 108:25 132:9 135:15, 18 136:13 143:7 171:23 172:5,9,13

**2,500,024** 60:10

**2.4** 104:14 110:20

**2.5** 61:5

**20** 57:16 58:2

**200,000** 64:22

**2016** 57:13,21 58:18 59:3

**2017** 20:8,21 60:2,9 62:6 63:17 73:14 137:17

**2018** 20:21 23:4 122:24 123:9,16 129:4

**2019** 23:5 25:3 90:16, 25 91:13,24 97:15 99:22 102:7 108:10, 25 110:3,25 111:20, 25 112:5,10,18 113:3 114:9 116:15 117:5 119:9,24 120:11 123:24 124:25 128:14 140:24

**2020** 25:3,9 109:21 130:9,18,23 133:19, 23 136:11 137:3,8,9 138:20 139:13,23 140:14 141:22 142:6 151:9 152:25 153:5, 19 154:7,13,15,22 155:6,20 156:6,13,25

**2021** 9:10 136:7,20 139:3 142:17 143:8 157:9 158:6 159:10, 24 161:23 162:15

**21** 141:15

**22** 143:6

**23** 130:18,23 133:18, 23 136:11

**24** 163:9,13,23,24 171:24 172:4

**252** 124:3

**27** 173:2,9

**2:28** 66:12

**2:43** 66:15

**2:44** 67:5

**3**

**3** 117:5 119:23 123:24 143:7 150:3 165:10 166:2,8 173:16 174:4,7

**30** 8:18 12:6,22 22:3, 4,5 137:9 140:14 154:7

**30(b)(6)** 14:23 15:7 17:4 18:18,21 68:24 76:24 143:24 144:7

**300,000** 64:23

**31** 10:16 82:10 122:24 123:9,15 129:4 137:17

**34** 22:5 123:4,6

**35** 22:6

**36** 22:6

**375** 102:10

**39** 104:8 124:23

**3:21** 94:6

**3:22** 94:21

**3:28** 66:7

**3:40** 66:8

**3:53** 115:9

**3:54** 115:12

**3rd** 111:20

**4**

**4** 9:10 165:11

**4.4M** 118:5

**40** 12:6,24

**47** 104:9

**4:38** 149:24

**4:45** 149:22 150:5

**5**

**5** 103:5

**50** 59:17,19 82:8

**50,000** 57:20

**51** 82:7

**53** 93:18 94:23 95:3 97:12 136:2

**54** 107:10,12 136:2

**56** 116:20,22

**57** 118:24 119:3

**59** 130:15,17

**5:03** 163:4

**5:06** 163:7

**5:21** 175:20 176:18

**5:37** 149:17

**5:38** 149:20

**6**

**6** 174:10,15

**65,772** 63:12

**68** 55:21 56:2,9

**7**

**7** 173:11,15 174:19 175:3

**70** 58:3

**75** 35:3

**8**

**8** 165:7 166:8 168:11, 13,22,23,24 174:19 175:4

**82** 13:3,12,17 14:3 39:16 47:10,20 48:8 81:25 82:10,11,17 83:18 171:6

**9**

**9** 25:9 168:11,18 169:19,21

**90-day** 47:22

**A**

**ability** 27:16 43:6 45:10 47:5

**acceleration** 157:17,18

**accepted** 8:25 160:23

**access** 172:18,20

**accommodated** 66:23

**accord** 89:18

**account** 47:2 100:18 102:7

**accountants** 134:5

**accounted** 110:22

**accounting** 37:24 107:19,22 108:2,12 110:8 111:13 117:5, 9,17 125:23 128:4,5 134:2

**accurately** 27:24

**acting** 40:22 59:10 65:20 73:5 105:7 134:16 138:6 141:10 142:4 144:15 149:7 150:18 159:8,20 161:3,10 162:12

Index: action..back

**action** 9:17 38:25

**actions** 142:24

**activities** 106:2

**actual** 37:24 51:11 73:16

**addition** 157:15

**additional** 101:9 103:16 138:23

**address** 141:15

**adjust** 47:5 75:7 138:16

**adjusted** 84:4

**admissible** 8:16

**Admission** 163:15 166:2 168:11 169:18, 20 173:5 174:4,7,10, 11,15

**Admissions** 174:19, 20 175:3

**admit** 165:11 166:4 168:13,19,24

**adversary** 165:14 166:5,15 168:15 169:2,12 170:13

**advice** 11:25

**advise** 138:3

**advisor** 103:17 104:22 142:7

**advisor's** 104:23

**advisors** 58:5,12 109:3 129:17,22,25 130:9 131:2 133:5, 15,17 134:17,21,23 136:12 137:2 142:5, 21 154:6 173:3,22 174:6

**advisors'** 133:22

**affiliate** 152:4 155:21

**affiliated** 58:4 146:23

**affiliates** 110:10 137:10 154:21 155:5

**afield** 38:16

**afternoon** 8:2 67:6

**aggregate** 21:21,23 24:15 27:4 51:24 71:15 90:16 102:13 125:3 140:22

**agree** 39:19 41:22 43:13 46:3 71:8 83:8 103:3 115:4,7

**agreed** 160:17

**agreement** 19:20 20:19,24 21:8,12,16, 25 22:7,11,18 23:2,8, 12,17,22 24:7,12,17 25:2,13,18,21,25 26:5 27:5,11,17 28:7, 22 29:18,25 30:8,14, 23 31:4,9,24 32:7,11, 22 33:11,24 34:17,22 35:14,17 36:8,22 37:4 39:7 40:10 43:13 44:12,21,24 45:17 47:19 48:5 69:21 71:20 77:24 78:3 79:9 81:25 82:22 84:16 85:22 86:11,13,20 99:25 134:13 135:12 144:18 152:3 153:7 165:13 166:6,13,25 167:3,8,11 168:16,19 169:3,13 171:12 172:23

**agreements** 13:18, 22 14:2,8 19:16,21, 25 20:6,8,10 29:2,6, 11 30:22 31:2 40:6, 17,20 41:2,9,13,20, 24 42:12,13,16,24 46:13 47:8,11 48:4, 16 49:4,13,18 50:10, 19 51:7 53:12,19 54:3,7 69:11 72:8 73:5,23 74:7,13,20 75:2,18,25 76:12,16 77:11,19 79:17,23 81:3,16 82:18,24 83:23 84:9,19 85:11 105:23 127:11 133:25 134:15 137:23 138:4,9 139:24 144:18 145:8 146:2,13,18 148:13 149:9 152:8 169:23

**afternoon** ... 

**170:5,11 171:4,5**

**ahead** 101:13 155:16

**Aigen** 77:5 95:25

**Alan** 12:7,9

**allocate** 61:10

**allocated** 61:18,21, 25 62:8

**allowed** 162:5

**altered** 43:23 44:14, 22

**amended** 13:5 136:4 142:16

**amortization** 156:10

**amount** 15:16 21:4, 15,19,22,24 26:4,16 30:7 31:13 57:17 58:19 61:4 62:2 75:12,13 90:17 99:12 103:9,11,20 104:2 108:25 125:3 126:20 137:15 140:23 151:17 160:22

**amounts** 56:19 92:23 100:21 112:12 135:20 152:2 158:19

**analysis** 73:23 100:6

**analysts** 135:7,9

**analyze** 73:6,8

**Anchorage** 71:21 83:5

**annoyed** 158:18

**annual** 55:2,16 56:13,15 126:12 129:17,24 130:10 136:6

**answer's** 91:25 140:3

**answering** 106:14

**answers** 86:20 138:17

**anticipated** 47:5

**anxious** 173:19

**anymore** 24:21 106:14 152:14

**apologize** 33:8 48:25 54:23 69:17 102:3 127:3 144:24 173:18

**apparently** 67:17 95:12

**appearances** 9:20

**appeared** 9:17

**appears** 136:21

**applied** 119:17

**applies** 175:7

**approval** 71:4,11,23

**approve** 134:17

**approving** 92:9 134:23

**approximately** 9:11 24:23 99:5,7,16,22, 23 101:21 102:6 103:4,17 137:10 140:13

**April** 90:25

**arrives** 68:20

**Arvold** 8:3

**Asia** 163:8

**aspect** 82:21,23

**aspects** 126:16

**asset** 167:15

**assets** 42:12 73:10 89:2 121:4,12

**association** 8:4

**assume** 60:19 122:12,14 128:16,20

**attached** 98:9

**attaches** 108:16

**attachment** 108:21

**attended** 158:17

**attention** 62:15 63:4 151:9

**attorney** 11:5,6 12:4 134:9

**attorneys** 89:23,25 90:3,8 134:14 161:2

**audio** 116:3

**audit** 122:11,20 123:23 124:19 125:7, 13,17,18,22 126:3,12 127:5,10,15 128:6,23 129:10

**audited** 120:15 122:7,23 124:13 128:10,14 129:3

**auditors** 124:17,20 126:3

**audits** 126:22

**authority** 71:2 72:19, 21

**authorize** 91:19,22 112:3

**authorized** 93:3,10

**authorizing** 111:23

**availability** 62:12

**award** 57:2,14,20 59:3 63:16

**awards** 63:19,20

**aware** 12:7,15,18,19 29:8,17 34:21 35:14, 17 39:5 52:19 70:5 80:16 90:14 92:21,24 93:3,11,15 99:20 100:5 105:23,24 108:10 109:19 110:7 116:15 117:16,23 119:8 121:21,25 122:9,21 125:15 126:10 128:9,13 135:2 137:7,13 139:4 141:21 142:15 145:5 148:11,16,18 153:10, 12 154:5,20 156:6,24 157:12,13,15,18,19 161:14,25 162:17

**awareness** 108:13 118:18 122:13 128:19 136:22 137:19 157:8

**B**

**back** 17:19 18:12 49:23 51:9 66:7,14

Case 21-03004-sgj    Doc 111-13    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-23    Filed 05/09/22    Page 75 of 200    PageID 35536
Exhibit 23    Page 509 of 262

Index: back-and-forth..compensation

81:11 82:3 94:21
96:5,9 97:5,8 115:11
127:10 133:6 149:21
150:4 154:3 163:6
166:23

**back-and-forth**
153:21

**background** 128:2

**balance** 72:15 121:5,
19,22 122:4

**bankruptcy** 9:7
25:17 73:2 90:2
121:7,10 139:3
144:16 145:3,6
146:2,12,17 147:11,
14,18 150:11,15

**base** 60:9,19,25
61:10,13 88:20

**based** 51:11 61:25
84:5 98:16

**basis** 55:17 56:15
61:20 139:20

**Bates** 56:4 59:21
66:22 67:3,7 95:4
107:13 116:23 119:4
123:9 124:5 130:18

**bed** 93:4

**begin** 93:23

**beginning** 66:19
94:19 150:3

**behalf** 40:10,22
41:13 59:6,10 65:21
73:6 105:8 110:9
133:5 134:16,23
138:3,7 141:5,10,21
142:5 144:15 149:8
150:18 155:21
156:14 159:8,21
161:3,10 162:13
174:5

**belabor** 90:20

**belief** 133:24

**believed** 75:2 147:16
171:14

**believing** 114:11

**benefit** 98:6

**benefits** 54:11 55:3,
15 56:3,13,18 59:20,
25

**binder** 163:21

**bit** 131:8 139:7

**board** 71:14 105:20,
21,22 106:4,19
107:2,5 129:20
130:2,5,10 134:22
136:12 137:8,21
138:3,8 139:10,11,
13,22 140:12 141:5,
22 142:6 147:5,17,22
174:25

**boards** 131:2 138:13
141:11

**bona** 42:3,4

**book** 131:11

**booked** 93:13 110:4,
13,17 116:17 120:10

**booking** 110:19

**books** 93:14

**borrower** 81:2

**borrowers** 80:12
81:14

**bottom** 107:18

**bought** 83:7

**boy** 118:8

**break** 16:8,18 64:3,5
66:5,13 93:20 94:11
96:11,13,21 149:14,
25 150:8 163:5

**Brian** 54:22 60:23

**bring** 88:24

**broad** 28:5 65:5

**broadly** 152:10

**buckets** 52:5 53:9,
15,22 60:14

**bucks** 27:9 151:18

**bunch** 126:22

**business** 51:9 54:10
55:14 67:9

**Bye** 175:15

**C**

**calculated** 140:19
160:22

**calculation** 100:21

**calendar** 154:12

**call** 43:7 96:2,24
100:20 161:16,19

**called** 41:11 54:11
112:9 158:17

**Canty** 10:17 13:13
55:22 59:18 82:7,11
85:20 94:24 98:10
107:11 108:22
116:21 119:2 123:5,
20 124:6,10 130:16
131:25 132:4,6,12
133:9 135:16 142:13
163:12 165:8 176:7,
11,15

**capability** 67:7

**capacity** 15:25 16:15
17:16 18:18 68:23,24
76:24 87:8,9 91:4
120:24 143:24,25
144:12 174:12

**Capital** 9:6 39:24
62:15 87:15 88:7,9
89:9 109:3 123:7

**captured** 83:2,13

**care** 175:13

**carefully** 50:7

**carried** 121:4,12,18,
22 122:3

**case** 8:20 12:8,17
162:8

**cash** 53:3 62:11
84:24 118:10

**caused** 41:17 70:12
169:20

**caveats** 144:4

**CDT** 176:18

**cell** 161:17

**cement** 167:15

**Central** 149:22

**certificate** 90:23

**certified** 8:3

**certify** 91:4

**cetera** 126:19 127:11

**CFO** 111:7

**change** 46:4,13
96:23

**changed** 92:23
136:9

**changing** 45:5

**characteristics**
43:24

**characterizations**
148:7

**chart** 31:16,18 98:8,
12,17 100:16

**chat** 132:13

**check** 160:14 162:21

**Christian** 108:7

**circumstances**
89:15 113:11

**Civil** 8:19

**claim** 101:14 102:16,
21,23

**claims** 141:23 142:7

**clarification** 84:12,
21,23 85:2 140:8

**clarified** 84:5

**clarity** 37:2 144:4

**Class** 39:9,19 40:8
41:4,18 43:20

**cleanly** 155:14

**clear** 15:10 36:18
51:3 103:23 140:2
144:8

**Clemente** 147:6
148:3 149:8

**close** 67:9 117:10,14
166:7

**closer** 47:24

**Clubock** 169:24
170:19 174:22

**co-loan** 108:4

**code** 51:22 53:2

**colleague** 77:5

**colleagues** 17:19

**collect** 90:15 142:24

**collectively** 143:20

**Collins** 54:17,22,23,
25 55:14 56:14 60:23

**column** 98:23
101:20,24 102:2,4

**combination** 61:6

**commenced** 14:10
109:17 120:7,12
121:11,13,16 142:25
143:5

**commencement**
29:9 110:15 149:6
165:14 166:5,14
167:8 168:15,25
169:11 170:12

**comment** 45:8 46:9

**comments** 26:25

**committee** 148:3,4
174:21

**communicate**
159:25

**communications**
11:15 161:7

**companies** 63:3,9
70:14,21 71:3,13
72:10,20 74:2 75:4,
17 82:16 84:22
88:21,22 151:13

**company** 49:23
71:18

**compared** 74:6
75:17

**compensation** 42:3
46:19 49:20 50:12
51:11,22,23 53:3,7,
11,18 54:2,11 55:3,
15 56:3,13,17,19
57:13,20 59:20 65:8,
14,23 146:25 147:8

Case 21-03004-sgj   Doc 111-13   Filed 01/06/22   Entered 01/06/22 11:03:25   Desc
Case 3:21-cv-00881-X   Document 175-13   Filed 05/09/22   Page 76 of 200   PageID 35537
Exhibit 13   Page 509 of 682

Index: Complaint..December

148:10 166:18,19
167:14 170:22
171:15,18 174:24

**Complaint** 13:6
142:16

**complete** 122:16,20

**completeness**
126:18

**compliance** 133:14,
18

**complied** 100:3

**complies** 10:2,17
13:13 55:22 59:18
85:20 98:10 107:11
108:22 116:21 119:2
123:5,20 124:6,10
130:16 131:25 132:4,
6 133:9 135:16
142:13 163:12 165:8

**comport** 102:5
137:15

**computer** 94:25

**concept** 88:25

**concerned** 169:12

**concerns** 35:18

**concluded** 10:25
176:18

**concludes** 175:18

**conclusion** 12:4

**condition** 42:7,8
73:17

**conditions** 13:20
43:8 44:5,13,22
45:10,19,23 47:6
69:12,23 70:2,6,11
72:7 73:7 75:23
82:19

**conducted** 124:20

**conference** 96:7

**confidence** 100:3

**confirm** 160:8 161:2,
11 176:13

**confirmation** 142:20
143:2,6,11 144:14
145:7 150:9,17 151:3

162:11

**confirmed** 142:16
160:16

**connection** 12:17
63:17 99:16 101:15
126:12 129:24
130:10 167:24

**consent** 112:9,17,
20,22 113:3,6,13,21
114:9,12

**consistent** 19:23
99:3

**consistently** 38:8

**consists** 175:19

**Consolidated** 123:7

**constitute** 160:19

**consuming** 13:19

**contact** 115:2

**contacted** 41:7

**contained** 127:5

**contend** 69:8,10,20
169:12

**content** 11:21

**contentious** 85:7,8

**context** 119:12,13
138:18 147:13
167:23 168:3

**continuation** 10:21

**continue** 19:12

**contracts** 129:17,21

**contributions** 88:2

**control** 25:11 42:17,
25 43:5,14 78:11,20
83:8,11 144:12
151:14 156:15 157:6

**controlled** 35:3,4
155:22

**conversation** 83:3
151:11 152:25
160:12 161:22

**conversations**
81:12 85:10 105:21
106:5 110:18 144:22,

23 152:12 162:6,10
167:18 170:19

**coordinates** 126:15

**copies** 76:14 77:9
154:4

**copy** 64:8 77:17
108:16 131:11

**Cornerstone** 70:22
72:2 74:19 75:7 83:9
167:2

**corporate** 107:19,22
108:2,12 110:7
117:4,9,17

**correct** 18:9,10 19:2,
3,15 23:14 27:19
29:2,3,6,7,11,12
32:14 33:20,21 39:25
40:13,17,20,23 41:5,
9,14,20 42:18 43:2
44:14 45:19 55:4
56:20 57:5,6 69:23
70:3,23 71:4 73:17,
19 76:12,16 77:11
99:18 109:18 111:9
117:20 127:18
129:18,22 130:2,6
139:19,25 166:9,10
170:7 172:13,24

**correction** 54:24
171:19

**correspondence**
95:4 107:11 116:23
172:12,22

**cost** 70:14 73:19 74:2
76:7 83:9,13

**costs** 74:6,15,18
75:4,9,18

**counsel** 9:12 12:22
17:25 66:16 93:19
117:19 133:22 134:8,
10 137:2 161:7

**counsel's** 11:25

**counterproposal**
84:20

**couple** 17:20 58:22,
24 71:21 89:23 96:3
134:5,6

**court** 9:7,22,24 18:10

25:18 94:17 142:15
144:17 145:3,7
146:2,12,17 147:11,
15,18 148:10 149:12
150:11,15 160:12
175:21 176:4,7,12

**courtroom** 8:17

**covered** 14:8 28:13
129:14

**covers** 14:14 83:22

**COVID-19** 8:6

**create** 45:10

**created** 29:9 35:10
110:8 168:14,25
169:7,11

**creating** 72:13
118:21

**credit** 127:11 153:25

**credited** 118:16

**creditor** 168:20
169:19,25 170:8,9
171:12

**creditors** 147:21
148:2 169:22 170:17
171:14

**critical** 93:3

**cure** 155:6,7 156:19
158:20 159:10 160:9,
19,22 161:5,24
162:4,16

**cured** 154:18,25
155:2,25 156:11
158:25 161:12

**current** 154:17,24
155:24 156:9 158:21

**D**

**D-CNL000212**
123:10

**D-CNL000257**
123:10

**D-CNL003585** 56:4

**D-CNL003587** 59:21

**D-CNL003763**

116:23

**D-CNL003764** 119:4

**D-CNL003765** 119:5

**D-CNL003768** 95:4

**D-CNL003770** 95:5

**D-CNL003777**
107:13

**D-CNL003779**
107:14

**daily** 110:8 176:8

**date** 15:17 22:9 24:10
25:5,12,22 26:6 27:7,
13 31:12 49:12 56:6
59:23 70:25 72:18
95:6 107:15 116:25
119:6 123:12 124:20
125:2 130:20 135:13
138:19 163:18 173:7

**dated** 97:15 108:25
119:23 123:9 130:18,
22

**David** 97:20

**day** 12:8 13:8 66:22
67:2,19 76:22 77:6
90:20 107:17 111:20
127:24 164:13

**DC** 134:8

**DC's** 134:8

**de** 51:24,25 158:19,
23

**Debbie** 10:11

**Deborah** 14:17 19:6
63:24 66:5 95:11

**debtor** 42:12 160:17
161:4

**debtor's** 41:24 42:5,
17 43:2 142:16

**December** 20:21
23:4 25:2 47:8,12
48:9,17 49:5 109:21
122:24 123:9,15
129:4 151:9 152:25
153:5,19 154:15,22,
25 155:6,20 156:6,
13,20,23,25

**decides** 129:21

**decision** 17:18 61:9
113:14

**declaration** 159:4

**declared** 157:13

**declaring** 157:16

**decreased** 52:20

**deemed** 8:25 161:5,
12 162:16

**deeply** 166:21

**default** 157:10,14,16,
19 158:5,15 159:4
161:13

**Defendant** 163:13
173:2

**defendants** 143:20
144:16 145:6 150:10,
18

**defendants'** 162:13

**deferral** 42:4

**deferred** 57:13

**defined** 166:13

**definition** 36:23

**degree** 28:12

**degrees** 75:5,6

**DEITSCH-PEREZ**
10:7,12 11:9,16
14:19,22 15:2,6,19
16:6,19,24 17:7,10,
23 18:11,15 19:3,18
20:12 22:20 26:9,22
27:20 28:10 34:5,24
35:22 36:9 37:7
38:15,22,25 39:10
42:19 43:3,16,25
44:15,25 45:20 46:6,
16 48:19 50:13 52:11
53:20 59:13 60:11
62:9 64:2,11 65:15,
24 66:24 67:10,22,25
68:6,15 69:15 70:15
71:5 72:22 76:2,18
77:12,25 78:13,17,23
79:4,10 80:11 83:25
85:25 87:19 88:10
89:17 91:6 94:9 96:5,
20 97:4 98:19 100:10

101:5 103:7 106:24
111:10 113:7,16,24
114:22,25 115:7
116:5 117:21 125:8
127:22 129:7 131:10,
13 134:24 136:14
137:11 141:24 142:8
143:12 144:9 145:10,
19 150:22 152:5
155:8 157:2 158:8
160:3 161:6 164:2,12
165:16,22 170:14
172:2 175:14,24
176:6

**delivered** 139:22
147:14

**delivery** 176:9

**demand** 14:17 28:20
45:14,18 109:20
156:3,7,8 157:24

**demanded** 45:23

**denial** 173:17

**denied** 166:9 174:7,
20 175:3

**deny** 169:5,20

**denying** 167:6
174:14

**dependents** 134:12

**depending** 128:6

**depends** 114:3

**deposed** 12:20

**deposition** 8:10 9:5,
9 10:21 11:2,7 12:5
13:25 16:5,7 18:17,
21 26:15,21,23 31:20
38:17 66:19 67:15
76:21,22 78:21 94:20
109:6,9 120:15,22
127:24 150:4 175:18
176:17

**describe** 15:12
57:12 84:6 89:15,21
130:25

**describes** 13:17

**describing** 31:5
88:13 91:17

**description** 73:9,10

**detail** 31:22 32:20
125:21 164:24

**details** 21:13 26:16
85:5 99:19 143:15

**determine** 73:24
110:22

**determiner** 106:16

**devote** 62:14

**devoted** 63:4

**difference** 67:11
116:6

**differentiated** 61:3

**diminishing** 61:14

**direct** 11:10,22 65:20
105:3 151:4,8 155:19

**directly** 88:22 96:6
147:6,21 148:2
151:13 156:15 157:6

**directors** 25:21

**disclose** 56:22 57:7
60:4,8 161:7 166:12

**disclosed** 59:10
79:22 122:22 128:13
144:16 145:6 150:19
165:12 166:6 168:20
170:10 171:11

**disclosure** 71:22
139:7 145:3

**disclosures** 138:22

**discovery** 163:11
173:21

**discretion** 113:23

**discuss** 41:8

**discussed** 57:18
167:2

**discusses** 172:23

**discussing** 119:12,
14 153:23

**discussion** 11:21
49:17 78:19 83:4
84:5,11,21 85:2
108:8 115:10 167:23

**discussions** 50:9
77:21 79:6,15,21

85:3

**disruptive** 92:19,20

**distancing** 8:8

**District** 9:8

**doc-** 29:17

**document** 10:15
13:3 19:13 29:8
32:17 54:11 56:8
57:9,14 59:12 63:13
66:6,18,21 93:23
97:11 109:11 124:4
131:7,11,21 132:11
164:5 168:14,25

**documented** 87:6
88:3 147:7

**documents** 53:24
54:6 127:11 147:10,
14 163:22 169:10

**dollars** 52:9,17

**Dondero** 8:1 9:1,5
10:1,20 11:1 12:1
13:1,4 14:1 15:1 16:1
17:1 18:1 19:1,12,25
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1,3
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1,
18 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1,3 57:1 58:1
59:1,20 60:1 61:1
62:1 63:1 64:1,17
65:1 66:1,18 67:1,21
68:1,22 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1,6 80:1 81:1
82:1,15 83:1,18 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1,20 95:1,8,
10,12 96:1 97:1,5
98:1 99:1 100:1
101:1 102:1,3 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1,

15,21 116:1,2 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1,6,18
132:1 133:1 134:1
135:1 136:1,25 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1,4,8 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1,20
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1,17

**Dondero's** 18:17
96:8 114:21 163:10,
14

**drafted** 46:24

**drafting** 125:16,18

**dual** 60:24

**due** 8:6 42:2 79:24
80:3,17 102:18
103:10,12 118:17
135:20 151:12 152:2

**Dugaboy** 13:18
19:17,19,22 20:2,11,
19,25 21:2,8,12,17
22:2,11,19 23:3,8,13,
17,22 24:8,13,18
25:2,14 26:2,7 27:6,
12,18 28:8 29:19,25
30:8,14,23 31:4,9,22,
25 32:2,4,7,8,12,14,
19,22,23 33:2,12,14,
18,25 35:4,8 36:3,6,
12 37:5,6,17,20 38:9,
12 39:7 40:7,13,15,
23 41:3,12,17 42:16,
24 43:14 44:11,21
45:17 47:19 49:5,19
50:11,18,20 51:6,7,
17 52:2,8 53:10,13,
17,25 54:5 56:24
57:5,8,13 58:17 60:6,
9 64:18 65:6 73:11

Case 21-03004-sgj   Doc 111-13   Filed 01/06/22   Entered 01/06/22 11:03:25   Desc
Case 3:21-cv-00881-X   Document 175-13   Filed 05/13/22   Page 78 of 200   PageID 35539

Index: duly..form

75:15,21,24 76:11,15
77:8,17,22 78:5 79:7,
15,21 80:22,25 81:4,
5,6,12 82:24 84:10,
14,20 137:24 138:10
139:25 144:18 145:9
146:3,13,19 148:14
149:9 167:11 170:12

**duly** 10:5

**Dustin** 153:9

―――――――――

**E**

**e-mail** 19:9 63:24
64:8 68:2,4,9,12,18
95:3 97:14,19
107:12,18 108:11,16
116:22 117:4 160:15
172:22

**e-mails** 172:14

**earlier** 12:16 27:16
51:20 59:5 60:15,16
118:15 134:4 166:17

**early** 20:21 23:5 25:3
91:12,23 110:24
111:19,25 112:5,10
157:9

**easiest** 68:7

**Eastern** 66:8

**easy** 64:10

**educated** 118:8,12

**educted** 118:9

**either/or** 69:4

**email** 172:11

**Emanuel** 10:10

**embedded** 72:8 75:9

**employee** 56:20
88:20

**employees** 54:12
55:4,16 56:15 60:24,
25 125:16 135:7,9
151:20

**employees'** 88:14

**empowered** 160:6

**encourage** 112:23

**end** 20:20 49:9 66:22,
25 67:18 94:2 96:8
124:19 154:12

**ending** 122:24 129:4

**ends** 89:3

**enter** 19:17 20:2,7,18
23:2 24:25 31:24
32:6 41:13,19

**entered** 13:18 20:5,
11,25 21:16 22:17
25:13,21 26:6 27:5,
12,18 28:8 31:3,8
33:11,24 39:8 40:5,9,
16,20 41:2 42:13,15,
23 44:11 45:16 47:8,
18 49:4,12 50:20
53:13 73:21 74:7,12,
19,25 75:24 81:3
137:24 138:9 139:24
145:8 146:3,12,18
148:14 170:11

**entering** 32:11 43:12
46:13 51:6 53:12,19
54:2,6 73:4 75:18
76:12,16 77:10,18

**entities** 28:18 30:25
36:3,14 38:13 52:22
61:2,7,18,22 62:3,18,
19 79:25 80:17,20,23
81:17,18,23 88:12
89:3

**entitled** 14:23 124:13

**entity** 35:5 40:9
60:21 81:13 156:14
157:5

**entry** 50:19 85:11
125:13

**equal** 99:12 112:9

**equity** 63:8 71:17

**error** 99:17 100:9,19
101:15 102:8 104:18
105:5,9,13 106:23

**Essentially** 92:2

**estate** 86:25 89:10,
24 90:4,7 134:6,10
148:9 167:16 170:22
172:15

**estimate** 85:16

**estimated** 99:4

**evening** 175:12

**events** 122:24
124:14,17

**everybody's** 9:17
175:22

**exact** 85:15 100:4,5
112:12

**examination** 10:18
12:23 93:23

**examined** 10:5
12:16,19

**exceeded** 74:2 75:4

**excused** 176:16

**executed** 24:11
30:13

**executive** 126:17

**exercise** 42:25 43:5
113:23

**exercised** 43:14,19

**exercising** 42:17

**exhibit** 10:16 55:21
56:2,9 59:17,19
82:10 93:18 94:23
95:3 97:12 107:10,12
116:20,22 118:24
119:3 123:4,6
130:15,17 163:9,13
173:2,9

**existed** 122:19

**existence** 109:11
138:4 144:17 145:7
146:17 148:13
165:12 168:16 169:3,
13 170:10 171:11
172:23

**existing** 38:3

**expectation** 147:7

**expenses** 104:10

**experience** 104:21

**experienced** 90:3

**expert** 12:15,18 45:8
59:6,11 65:12,21

**experts** 89:24

**explained** 143:15

**expressed** 76:7

**expressing** 76:6

**extent** 11:19 104:6,
12 122:17 169:25

**external** 58:14

―――――――――

**F**

**fact** 41:17 75:7 82:5
99:15,21 111:20
119:8 153:11 162:20

**facts** 70:5

**fair** 12:11 13:21 14:4
42:10 51:23 57:4
70:7 74:11,24 75:12,
13 101:4 110:14
113:19 125:19
127:15 130:25
148:17

**faith** 100:3

**fall** 53:8,14,22

**fallen** 52:4

**familiar** 9:16 34:15
102:20 126:10

**fastest** 64:14

**fault** 33:8

**February** 47:13
48:10,18 49:6 142:17
143:7 155:3

**Federal** 8:18

**fee** 112:9,17,20,22,23
113:3,6,13,21 114:9,
12

**feed** 116:3

**feel** 167:19

**fees** 101:9 103:24
104:7,9

**fide** 42:3,4

**figure** 68:9

**file** 101:14

**filed** 142:20

**filing** 145:18 147:20

**filings** 145:22

**final** 136:19

**Finally** 89:17

**finance** 100:7

**financial** 32:23 33:3
120:16 122:7,23
123:8 126:7 128:10,
14 129:3

**financials** 31:21
32:19 122:16 123:16
124:13

**find** 46:19 64:13
173:24

**fine** 44:7 64:12
149:21

**finish** 66:9 116:10
149:19 150:7 156:22
173:19

**firm** 63:25 67:7
125:23 127:10 128:5
176:10

**fiscal** 124:19

**five-** 63:22

**fixed** 116:3

**floor** 96:9

**focus** 120:20

**focused** 120:24

**follow** 11:24 77:4

**follow-up** 28:5

**force** 71:17

**forgive** 31:25 39:20

**forgiven** 69:11,21,22
70:12 166:19 170:21
171:15,17 174:23

**forgiveness** 13:19
32:13 33:13 51:20
81:7,8 101:9 103:24

**forgiving** 167:13

**form** 27:21 28:11
34:25 36:10 37:8
42:20 43:4,17 44:2,
16 45:2,21 46:7,17

Case 21-03004-sgj    Doc 111-13    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-23    Filed 05/09/22    Page 79 of 200    PageID 35540

Index: formally..identify

48:20 56:12 59:14
60:12 62:10 65:16,
22,25 66:17 69:16
70:16 71:6 72:23
76:3,19 77:2,13 78:2,
9 79:11 84:2 86:2
87:20 88:11 91:7
98:20 100:11 101:6
103:8 111:11 113:8,
17,25 117:22 125:9
127:23 129:8 134:25
136:15 137:12
141:25 142:9 143:13
145:11,20 150:23
152:6 155:9 157:3
160:4 165:17 172:3

**formally** 147:3

**format** 56:16

**Fort** 92:4

**forward** 146:22

**forwarding** 97:19

**foundation** 121:20

**fraction** 24:19

**Frank** 90:16 92:12,14
108:11 126:8 151:11
158:17 159:12,14,19
160:5,22 162:14
165:13 166:7,14,21
167:7 169:25

**Friday** 10:22 11:2,8

**Friday's** 12:23

**front** 17:15 18:25
19:14 133:6 163:21

**frozen** 114:21,23

**fulfillment** 69:12,22

**full** 62:14

**fully** 103:21 104:3
160:6

**function** 111:13

**functions** 129:11
135:10

**fund** 72:5 97:25 98:5,
17,24 99:5,11,15,21
100:2,8,17 103:21
104:3 109:3

**funded** 103:4

**funding** 100:23
102:18

**funds** 83:10 129:18,
20 134:2,18 135:11

**future** 135:21

---

**G**

**GAF** 97:22,24 100:18
102:6,18 103:21
104:4 105:12,22
106:3,21

**gave** 50:23 51:5
92:17 93:6 104:6,12
122:9 136:12 137:17
152:22 153:19
157:10,16 174:16

**gears** 85:17 129:16

**general** 50:17 128:3,
7 133:22 134:9
151:23

**generally** 14:5 28:16
53:8 56:21 83:22
92:15 110:5 111:13
112:2 119:20 120:19
142:18 143:16
144:20 148:10
151:15 170:17 171:9,
10

**give** 68:8,10,15 75:14
90:12 92:5 94:25
115:2 151:24 162:19

**give-and-take** 92:23

**glad** 16:12

**good** 8:2 94:16,17
149:13 155:24
175:12

**grant** 43:7

**granted** 44:4 63:16

**gratuitous** 26:25

**greater** 47:17

**gross** 21:18 57:17

**group** 54:15,18,21
107:19,22 108:2
110:8 117:5,18
125:25 126:6,8
166:21

**growth** 51:10

**guess** 31:7 40:4 42:6
48:23 55:11 80:4
118:12 143:16
144:20 157:13,19
171:8

---

**H**

**half** 149:18

**hand** 9:25

**handled** 38:7

**handles** 126:9

**hang** 114:25

**happened** 44:8
48:12

**Hayley** 108:7

**haywire** 94:25

**HCMFA** 62:21 90:15,
24 91:5,14,23 92:20
93:2,13 97:22 99:10,
11,15,21 100:7,17
101:14,20 102:6,16
103:20 104:2,11,13,
16 105:8,11 106:3,
21,22 107:23 110:2,
22,24 111:8,21,24
112:4,8,17 113:2,6,
14 114:7,12 116:16
118:11 119:14,18
120:6,10,25 125:2
128:10,13,20 129:6
134:13 135:6,23
140:12,23 141:6,10,
21,22 143:19 144:7,
11

**HCMFA's** 93:14
121:19,22 122:4
128:23 129:3

**HCMFAS** 130:19

**HCMLT** 107:23

**HCRE** 14:10 62:21
81:22 85:23 86:3,5,
14,17 87:10 88:15
143:19 157:22

**head** 22:23 24:4,5
26:8 27:23 29:22
31:14 54:17,20 63:5

90:11

**heading** 124:9

**hear** 115:15,16

**heard** 157:19

**hearing** 143:2,6
145:17 146:16
158:16

**held** 9:9 35:8 41:3
72:10 73:12 111:7,8
115:10

**helpful** 89:13

**helps** 141:19

**Hendrix** 97:20
108:15 117:4,8,12

**Hendrix's** 108:15

**hidden** 104:20

**High-** 126:25

**higher** 74:9,10,15,22,
23 75:8

**Highland** 9:6 14:10
15:15 25:12 32:2
34:16 35:9,19 36:14,
17,22,24 37:18,21
38:10 39:24 40:10
41:14 46:20 51:13,25
52:12 54:10 57:25
60:20 61:5,13,16
62:6,15,21,22 63:7
70:13,18 71:10 72:25
79:18,25 80:4,17
85:24 86:8,15,18,24
87:2,5,9,15,17 88:2,
7,8,19,23 89:4,8,25
90:3,6,14 91:13,22
92:20 93:13,14
102:24 104:15,17
105:4,9,12,25 106:3,
4,22 109:2,19 110:2,
10,22,24 111:7,21,24
112:4 113:5 114:5,13
116:16 118:9,11,15
119:9,15,16,18
120:6,9,25 122:9
123:6 125:15,25
127:4,12 128:24
129:6 134:14 135:5,
11,23 137:9,18 139:2
140:14,24 141:23
142:7 151:12 152:2,3

153:6 154:6 155:5,20
156:7,13 157:7,10,
13,21 158:6,15
159:9,12,15,16 166:3
172:15

**Highland's** 33:3
41:4 55:4,16 56:15
72:9,13,15,19 73:25
74:5,14 75:3,16,17
120:15 121:5 122:7,
22 126:12 154:21
170:9

**Highland/nexpoint**
61:6

**hindsight** 50:3

**hit** 19:10

**hold** 40:2 58:2 96:4

**holder** 83:5

**holders** 39:19 43:20
71:21

**holidays** 47:25 48:12

**Honestly** 56:25

**hope** 66:23 67:6
78:14 149:16 152:14

**hour** 68:5 149:18,19

**housed** 105:25

**Human** 54:14,18,20

**hundred** 60:20
126:23 127:9

---

**I**

**idea** 61:20 62:4
102:25

**identification** 56:5
59:22 95:6 107:15
116:24 119:5 123:11
130:20 163:17 173:6

**identified** 30:22 80:8
81:22 90:23 108:12

**identifies** 29:10

**identify** 21:10,14
22:9 23:15,20 24:10
26:4 28:6 29:23 30:6
31:11 33:22 34:9
47:17 62:19 63:3

77:22 79:7,16 80:2,
19 81:13,14 84:18
104:21 106:11
156:12 169:19
172:11,22

**II** 9:4 94:19 175:18

**illiquid** 72:14 84:24

**illiquidity** 75:13

**imagine** 141:14

**immediately** 14:18
160:23

**imminent** 73:14

**impact** 44:9

**implied** 75:9

**impossible** 42:9

**improperly** 122:18

**inability** 78:20

**inaccurately** 129:4

**inappropriate** 17:6,
12

**include** 84:15 124:17
139:6

**included** 84:9
108:11 153:24
166:20

**includes** 140:21

**including** 92:25

**incorporate** 86:19

**increase** 51:21

**incumbency** 90:23
91:4

**incurred** 28:17,20

**independent** 25:20
147:5,16,21 174:25

**indirectly** 147:4
151:13 156:15 157:6

**individual** 15:25
16:16 17:16 38:18
68:23 120:23 143:24
144:12 174:12

**individuals** 88:16

**industry** 46:20 51:12

53:4

**ineffective** 147:25

**inform** 25:17,20
105:3 138:12 151:4
162:13

**information** 15:8
49:19 50:11,18,23
51:5 56:23 60:5
75:15 123:9 127:5,13
129:25 131:3

**informed** 99:11
104:16 105:8,11
108:2 137:8,21 138:7
141:5 142:5 146:16
150:10

**informing** 141:22

**infrastructure** 135:4

**initial** 138:23

**initiatives** 51:10
63:7,10

**input** 87:3

**insist** 26:12

**instruct** 55:6 92:10
138:2 139:9,10 140:4

**instructed** 92:7
107:21 110:2,23
152:20

**instructing** 92:14

**instruction** 152:22
153:18

**instructions** 92:5,17
93:6 151:25

**insurance** 101:8,14,
18,22 102:16,20,23
103:4 112:13

**integrity** 126:19

**intended** 56:18

**intent** 46:15,18

**intentionally** 47:4

**inter** 108:3

**interaction** 126:9

**interest** 22:5 34:16,
23 35:2,5,9,18 36:8,
19 37:5 41:4 70:13

118:17 154:10
156:10

**interests** 72:9,10,13,
19 73:25 74:5,14
75:3,16

**interpretation** 44:5
100:25

**Interrogatories**
163:16 165:10 173:5

**Interrogatory**
171:23 172:12
173:16

**interrupt** 144:25

**interrupting** 145:11

**Interruption** 115:22

**interval** 49:9

**introduce** 9:12

**investment** 98:2

**investors** 98:6
103:10

**involved** 49:25 66:3
92:8 129:10,12
156:16,17 166:22

**iphone** 68:13

**irrelevant** 139:17

**issue** 70:22 77:18
92:3 93:4 169:8

**issued** 38:4 42:5
125:2 140:23

**issues** 141:16

**items** 104:13

---

**J**

**Jacob** 8:3

**James** 8:1 9:1,5 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1

47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1,2 57:1 58:1
59:1,19 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1,20 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1,4 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1,14
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1,17

**January** 25:9 48:18
49:6 143:6 155:2
156:19,22 157:12,14
158:6 159:10,24
161:23 162:15

**Jernigan** 148:12,20
150:19 151:4 162:4,
14

**Jim** 118:5 149:8

**job** 77:4

**John** 17:8 26:9 38:15
66:25 67:11 68:18
76:20 80:12 82:7

96:10 114:22 132:13
164:13

**Johnson** 12:7,9

**Johnson's** 12:12,13

**Jones** 161:3

**judge** 106:15 148:12
150:19 151:4 162:4,
14

**June** 123:24 137:9
140:14

---

**K**

**kind** 52:20 81:9
139:17 141:13
167:15

**Klos** 97:20 107:18

**Klos's** 108:16

**knew** 40:19,22 45:9
49:22 74:9,13 79:24
80:21 81:17,18,19,23
166:23,24 167:7

**knowing** 136:18,20
139:21

**knowledge** 12:12,13
37:22 69:25 70:4,10
109:15 127:6 140:18

**Kristin** 97:20 108:7
122:17

---

**L**

**L.P.** 9:7 36:24 39:25
58:5,13 62:16 88:9
89:9 109:3 123:7

**L.p.'s** 173:3

**ladies** 96:6

**large** 71:21 72:14

**largely** 71:25

**largest** 83:5

**lasted** 85:10

**late** 120:3 130:8
164:12

**lawsuit** 29:14 35:21

Case 21-03004-sgj    Doc 111-13    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-13    Filed 05/09/22    Page 81 of 200    PageID 35542
Exhibit 13    Page 569 of 282

Index: lawsuits..months

**lawsuits** 14:9 29:10, 16 30:3,10,16 33:20 34:2,21 39:5 142:24 143:5,10 150:12,20

**lawyer** 160:2

**lawyers** 134:6 161:10

**leadership** 87:5 88:2

**learn** 120:5,9 121:3, 9,11,17 122:2 158:14

**learned** 109:10,25 110:4

**learning** 159:3

**leave** 67:3 97:3 115:6

**leaving** 175:22

**led** 41:8 49:18 50:9 85:10

**left** 38:2 95:12

**legal** 8:4 45:5 133:14, 18,25 134:12

**legally** 146:21

**let alone** 26:19

**letter** 57:4 60:22 127:18,21 136:20,25 138:19 141:15

**letters** 57:2 128:23 129:13 136:19 138:22 139:5,6 157:21

**liabilities** 121:19,22 122:4

**life** 15:5

**likelihood** 73:6,8 75:22

**Limited** 34:17 36:22

**liquidity** 72:13

**list** 14:24 18:22 21:13 26:10,17 28:9,24 29:5 110:8

**listed** 134:2

**listen** 50:7 78:18 148:6

**listing** 15:14

**litigation** 31:11 107:6 109:14,16 110:6,16,19 120:7,12 121:8,10,13,16,25 122:3 149:7 167:9

**litigations** 38:19

**loan** 15:16 38:9 93:13 110:4,14,17 116:17 117:10,13,24 118:15, 21 120:5,11

**loans** 21:20 28:19 38:12 129:6 158:2

**logs** 49:16

**Loigman** 10:8,9

**long** 73:12 85:4,9,10 93:24 96:16 162:23 166:17

**longer** 78:21 85:13

**looked** 13:8 27:15 50:2 164:24

**loose** 47:4

**loss** 98:17 99:4,13 103:6

**losses** 99:17

**lost** 98:24 115:2

**lot** 86:21 89:24 91:15 162:7

**lots** 170:18

**loud** 168:23

**low** 49:22 52:20

**lower** 83:8

**LPA** 169:14 175:7

**lucky** 96:6

**Lynn** 144:22

**M**

**made** 32:13 33:13 36:12 47:11,13 48:10 49:23 51:8 61:9 78:3 84:20 102:24 109:20 110:9 114:14 122:17 147:20 148:20 149:4 153:6 154:6,12,15,22 155:6 156:7,13,24

159:10 161:4 162:4

**major** 20:14,19,24 21:7,11

**majority** 34:16,23 35:2,4,8,18 36:8,19 37:5 39:9,18 40:7,8 41:4,18 43:20 72:3 83:6

**make** 13:15 15:10 17:12,17 29:4 46:19 65:4 67:12 92:7,10 99:11 101:3 102:16 113:23 114:8 116:5 118:19 140:9 144:8 152:20 155:20 158:21,24

**maker** 21:10 23:15, 20 26:4 29:23 31:12 32:2,8 33:18 36:3,7 37:6,17,20 79:16,18, 22 80:9 81:2 109:2

**maker/borrower** 80:14

**makers** 27:10 46:25

**makes** 119:11

**making** 26:12,24 100:18

**manage** 129:18

**management** 9:6 39:24 62:15,22 87:5, 16 88:7,9 89:9 92:25 103:24 104:7,9 109:3 123:7 127:18,21 128:22 129:13

**manager** 58:14

**managers** 135:6,8

**manner** 100:17

**Mark** 54:17

**marked** 10:15 56:5 59:22 95:5 97:11 107:14 116:24 119:5 123:11 130:19 163:17 173:6

**market** 89:5

**material** 82:17 106:4 124:18 135:20

**materially** 84:4

**math** 103:3

**Matt** 149:8

**matter** 9:5 55:11 75:6 103:2 146:15 153:11

**Mcgraner** 86:6,21,24 87:2,23

**meaning** 20:21 98:4 134:8

**means** 11:18

**meant** 131:19

**mechanisms** 167:12,14

**media** 9:3 93:20 94:2,19 150:3 175:19

**meeting** 105:21

**meetings** 106:19 130:4

**member** 71:14

**members** 117:17

**memo** 130:9,22,25 131:2 132:24 133:4 134:17 135:13 136:3

**Memorandum** 130:17

**memorialize** 160:24

**memorialized** 49:12 161:22

**memory** 26:13

**memos** 134:21,23 136:5

**mention** 102:24

**message** 66:17

**met** 45:24

**MGM** 70:22 71:14 74:6,14,16 75:11 83:4 167:2

**Michael** 77:5 95:23

**middle** 103:15

**million** 22:4 24:20,23 27:8 52:9,17,23,24 58:2 61:5 62:6 90:17

**mince** 104:5

**mind** 154:12,15 168:8,9

**mine** 96:19

**minimis** 51:25 158:19,23

**minimum** 76:5

**minimus** 51:25

**minor** 20:16

**minority** 72:4

**minute** 17:14 68:8,16 94:2,13 95:2 96:17 115:2 127:8

**minutes** 12:6,22,24 17:20 93:20 96:3 105:20 107:3,5 149:22 162:21 170:2

**mistake** 49:2 114:13

**moderately** 74:21, 23 75:8

**modest** 51:11,21

**modification** 45:6

**modified** 136:4

**moment** 38:8 58:21 125:13 162:20 174:13

**monetization** 72:12 73:13 84:23

**money** 80:25 93:2,10 99:12 101:2 104:2,14 119:18

**monies** 101:10

**month** 147:19

**months** 147:20

Case 21-03004-sgj   Doc 111-13   Filed 01/06/22   Entered 01/06/22 11:03:25   Desc
Case 3:21-cv-00881-X   Document 175-23   Filed 07/09/22   Page 82 of 200   PageID 35543

Index: Morris..owners

**Morris** 8:21 9:14
10:14,19 11:12,23
13:2,11,14 14:17,20,
25 15:4,9,11,22
16:11,22 17:2,9,21
18:2,4,7,16,24 19:5,
11,24 20:15 22:24
26:18,23 27:2 28:2,
23 34:8 35:7 36:5,15
37:16 38:21,24 39:2,
3,15 42:21,22 43:9,
21 44:6,19 45:11
46:2,11,22 48:24
50:4,6,16 52:15
53:23 55:20 56:7
59:16,24 61:8 62:13
63:23 64:6,16 65:19
66:4,16 67:5,14,20,
24 68:3,14,19,21
69:17,19 70:20 71:9
73:3 76:9,23 77:7,15
78:8,15,19 79:2,5,13
80:18 82:5,9,13,14
84:7 85:18,21 86:9
88:4 89:6,20 91:9
93:17,21 94:4,7,10,
14,22 95:7,11,16,19,
22 96:14,22 97:9
98:8,11,22 100:14
101:11 103:14
104:24 105:2 106:6,8
107:4,9,16 108:20,23
111:16 113:12,18,20
114:4,20,24 115:5,
13,25 116:7,9,12,19
117:2 118:2,24 119:7
123:3,13,17,21
124:3,7,11 125:10,11
127:25 128:8 129:15
130:14,21 131:12,16,
17 132:7,14,16
133:10 135:14,17
136:23 137:14 142:3,
11,14 143:17 144:10
145:13,24 149:15
150:6 151:2 152:9,18
155:10 157:4 158:13
160:7 161:8 162:19
163:8,19 164:4,15,17
165:7,9,19,24 170:23
172:6 173:8,12,14
175:9,13,15

**move** 37:2 38:20
50:4 104:24 106:6

**movement** 93:10

**moving** 99:8

**multiple** 61:2 63:7
83:10 138:25 153:22

**mute** 115:16,17,21

**N**

**Nancy** 39:18 40:12,
15 41:8,11,16 49:19
51:16 56:23 57:8,12
58:16 60:5,8 64:17
65:6 76:10,15 77:8,
17,21 78:4

**nature** 13:22 58:8,11

**NAV** 99:17 100:8,19
101:15 102:8 104:18
105:5,9,12 106:23

**needed** 96:11 104:3,
14 119:14

**negotiation** 83:24
84:4 85:8

**negotiations** 92:22

**net** 112:12

**Newman's** 10:11

**Nexpoint** 14:11
23:25 58:4,5,12
61:16 62:6,21 63:12
64:19 80:22 81:19
89:7,8,23 90:7 134:4,
12 135:7,24 137:8,
17,20,21 138:3,7
143:19 157:22 173:3,
21 174:5

**Nexpoint's** 138:8

**NFLP** 63:20

**nomenclature** 80:15

**normal** 156:17

**Norris** 153:9

**Northern** 9:8

**note** 14:14 21:11,15
24:7 26:5 28:6 29:24
30:7,13 32:2,8,13,20
33:13,18,23 34:10
35:15,19 36:7 37:6,
18,20,25 38:2,3,4

42:3 44:13 45:6,18,
19 46:5 47:13 48:10
91:11 96:10 108:8,
17,25 109:16,21,24
111:18 117:18
118:17 119:4,17,22,
23 137:17 154:20

**notebooks** 15:7

**notes** 13:20 14:9,15,
24 15:14 18:23 20:3,
5,23 21:7,24 22:10,
14,17 23:7,11,16,21
24:11,16 25:14,24
27:4,10,17 28:20,25
29:5,10,13,15,17
30:2,15,21 31:5,10,
12,23 32:25 33:2
34:20,22 35:20 36:2,
13 39:4,6,20 41:23
42:11 43:15,24 44:23
45:13,14 46:14,23
47:4 51:21,24 69:8,
10,20 70:12 76:11,15
77:10,18,23 79:8,16,
23,24 80:3,9,16,24
81:6,7,15 90:15
91:11,16 92:2
120:21,25 121:4,11,
15,18,21 122:3,10,22
125:2 128:14 135:21
140:23 142:25
146:23 147:8 148:8
150:12,20 151:5
152:7,17 154:10
155:23 156:3,4,8
157:11,24 158:7,24
161:13,20 166:17,18
167:14 169:8 170:20
171:14 174:23

**notice** 148:11
157:10,16

**notice-of-default**
157:21

**notices** 158:5,15

**notifying** 148:10

**noun** 70:18

**November** 9:10
154:7

**number** 9:3 23:11
64:22 66:22 94:2,19
136:13 140:19 150:3

163:23,24 166:2,8
168:11,13,22,23,24
169:19,21 171:23
172:9,13 173:9,16
174:4,7,10,15,19
175:3

**numbers** 50:3 99:8
100:4,5 102:13 104:6
158:22

**numerous** 30:18
36:2 38:12 41:25
60:24 105:17 107:2
144:21

**NXRT** 57:21,24

**O**

**object** 15:4 16:11,12,
13 17:21 27:20 28:10
34:24 36:9 37:7
42:19 43:3,16,25
44:15,25 45:20 46:6,
16 48:19 59:13 60:11
62:9 65:15,24 69:15
70:15 71:5 72:22
76:2,18 77:2,12,25
78:6,10 79:10 83:25
85:25 87:19 88:10
91:6 98:19 100:10
103:7 111:10 113:7,
16,24 117:21 125:8
127:22 129:7 134:24
136:14 137:11
141:24 142:8 143:12
145:10,19 146:7
150:22 152:5 155:8
157:2 160:3 165:16
172:2

**objecting** 78:9

**objection** 26:19,20
101:5

**objections** 142:19
163:14 173:3

**objects** 8:22

**obligation** 138:8

**obligor** 80:25

**obtain** 71:4 72:21

**obtained** 136:25

**obvious** 50:2 51:3

**occur** 73:7 124:18
159:24

**occurred** 70:2

**October** 130:18,23
133:18,23 136:11
137:3,7 138:20
139:13,22 141:15

**odd** 22:4

**office** 19:7 151:20

**officer** 87:10

**officers** 133:18

**offset** 138:14 141:12

**Okada** 87:24

**one-off** 170:19

**ongoing** 168:6

**opinion** 45:7

**order** 33:10 103:21
104:3 175:23 176:8

**ordinary** 54:9 55:13

**organization** 111:14

**original** 15:15 24:6

**originally** 46:24

**outs** 148:2

**outstanding** 28:21
38:3 119:17 137:16
138:8 140:13 155:23

**overarching** 13:21

**overpaid** 151:16

**overpayment** 154:2

**oversee** 111:4

**overstated** 141:6

**overview** 13:21

**owed** 80:25 137:9

**owing** 152:2

**owned** 72:4 97:25
155:21 157:6

**owner** 87:10

**owners** 87:22

Case 21-03004-sgj    Doc 111-13    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-13    Filed 05/19/22    Page 83 of 200    PageID 35544

Index: ownership..provided

**ownership** 83:10 88:15,18

---

**P**

**p.m.** 9:11 175:20 176:18

**Pachulski** 161:2

**page--** 13:11

**paid** 52:21 99:15,21, 25 101:17 102:6 104:10 110:2 112:8 113:3,6 114:12 119:9,16 153:25 154:17 158:19,24 160:18,23

**painfully** 172:15

**paint** 53:2

**paper** 117:13 173:13

**paragraph** 13:3,12, 17 14:3 39:16 47:10, 20 48:8 81:25 82:10, 17,25 83:14,18 124:24 141:19 171:6

**parenthetical** 118:4

**parsing** 87:13

**part** 18:16 28:21 30:9 43:23 46:9 65:8,13 73:17,18 83:14,16 104:13 106:4 110:5 112:6 121:7,9 122:10,16,19 145:16 148:8 166:19 167:15 170:22 171:15,18 174:24

**parte** 162:6,10

**participants** 86:5

**participated** 130:4

**parties** 8:14 23:25

**partly** 169:9

**partner** 10:11 95:24

**partnership** 34:17 36:22 125:3

**pas** 38:6

**past** 38:7

**pay** 112:17 114:8 151:25 152:12,16 174:22

**payable** 15:14 135:20

**payee** 32:3 35:19 37:18,21 80:9

**paying** 99:12

**payment** 91:20 97:22 98:3,5 100:8, 18 101:3 102:18 103:16,22 104:3 109:20 113:13,21 118:16 153:6 154:22 155:6,7,20 156:7,12

**payments** 151:12 152:10,15,21 154:5, 9,11,14 156:18,19,24 159:9,11 160:18 161:4,5,12 162:4,15, 16

**pending** 8:20 30:3,9, 16 31:10 33:19 34:2, 20 35:21

**people** 67:3 148:19, 24 153:14,24

**percent** 35:3 57:16 60:20 71:16 96:24 126:23 127:9

**perfectly** 64:12

**performance** 57:22 63:17 89:2

**performed** 106:2 134:14

**period** 47:23 122:23 124:19 129:4,14 138:19 139:13

**periods** 85:14

**person** 31:3,8 88:6 144:12 158:17 159:15

**personal** 18:18 68:12

**petition** 25:5,12,22 26:6 27:7,13 70:25 72:18

**phone** 49:16 63:24

96:15 160:12 161:17

**photograph** 64:8 66:17

**phrase** 13:25 36:19, 21 150:14

**picks** 104:22

**picture** 15:20 16:20 53:2 64:3,15 68:7

**piece** 93:4

**place** 71:20 135:13 143:7 161:18,19

**places** 105:17

**plaintiff** 39:19,20,23 40:9 41:19

**Plaintiff's** 13:5 163:15 173:4

**plan** 142:20 146:22 148:23 166:22

**platform** 87:2 90:6

**plays** 126:11

**pleading** 145:18

**pleadings** 145:22

**plot** 146:22 148:23 166:22

**pocket** 103:21

**point** 18:16 37:19 103:25 141:17 148:5 149:13 175:6

**portfolio** 70:14,21 71:3,12 72:9,20 73:25 75:3,17 82:16 87:4,25 135:6,8

**portion** 120:22 131:7,21 132:10 137:22 138:13

**portions** 72:14

**potential** 32:13 33:13

**potentially** 11:21

**practice** 8:7 134:20 135:3

**precise** 24:21

**preferred** 86:4

**premarked** 56:9

**preparation** 126:3 167:24

**prepare** 55:15 108:7

**prepared** 54:10,14 56:14 117:19

**preparing** 55:2 133:4

**prepaying** 38:2,5

**prepays** 37:25 38:7

**present** 42:7 69:13

**presented** 147:11 148:25

**president** 61:15,16 87:9 91:5 126:14 134:20 147:23

**pretty** 126:23 135:8

**previously** 76:8 117:19

**price** 83:7

**Pricewaterhousecoopers** 123:23

**Pricewaterhousecoopers'** 123:19

**principal** 21:14,24 22:5 24:6,16 30:7 31:13 118:17 140:22 154:9 156:10

**prior** 24:19 29:9 50:18 63:19,20 70:25 72:18,25 73:2 76:11 90:2 96:20 110:15,19 121:25 144:14 145:7 149:6 150:9,17 151:3 165:13 166:4,14 167:8 168:14,19,25 169:11 170:12

**private** 63:8

**problem** 78:8 132:20 140:10

**procedures** 8:19 103:4

**proceed** 9:18 19:6 68:3,14

**proceeding** 165:14 166:5,15 168:15 169:2,12 170:13

**process** 71:23 122:11 130:6,11

**produced** 14:18 107:6

**producing** 67:8

**product** 125:23

**production** 66:20,21 163:17 173:6

**professional** 77:4

**promise** 67:18

**promissory** 13:19 20:3,23 21:6,15 22:10,14,17 24:11 25:14 28:6 29:13,15, 17,24 30:2,7,13,15, 21 31:25 32:8 33:18, 23 34:10,13,19,21 35:15,19 36:7 37:6, 18 39:4,6 41:23 42:11 43:15,24 44:13,23 46:14 76:11,15 77:9,18,22 79:8 108:8,17,24 109:16,21,24 117:18 119:3,23 122:10,22 125:2 150:11,20 151:5 169:8

**propel** 51:10

**proper** 53:2

**properly** 122:18

**property** 41:24 42:5, 17 43:2

**proposal** 146:21 167:25

**proposals** 147:2,20 149:4 169:6

**proposed** 84:16

**proved** 147:24

**provide** 49:19 50:10, 17 53:24 86:17,24 89:8 125:21 129:25

**provided** 85:23 86:3, 7,14,21 87:11,16 88:8,22 106:21 130:9

Case 21-03004-sgj    Doc 111-13    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 175-13    Filed 05/09/22    Page 84 of 200    PageID 35545

Index: providing..responses

133:25

**providing** 87:8

**provision** 83:23
84:8,15,18

**purpose** 46:12

**purposes** 60:22

**pursuant** 85:23
86:14

**put** 10:14 14:21 15:23
16:3,14 55:20 59:16
82:3 85:15 93:17
94:23 115:14 116:19
118:10 123:3 130:14
132:12 146:21 163:9

**puts** 126:21

**putting** 92:25 93:4
109:23

**PWC** 122:10 126:21
127:2 128:11

**Q**

**question** 11:14 20:4
32:5 33:6 35:13 50:8
52:13 53:17 69:18
72:16 77:3 78:9 80:2
81:10 86:12 88:5,18
96:23 100:13 106:17
109:23 135:19
136:13 141:20 145:2
146:8 150:16 169:5

**question's** 149:5

**questioner** 89:19

**questioning** 120:23

**questions** 10:8 14:6
15:24 16:15 17:3
20:5 28:5 50:22
53:11 68:22 76:8
78:24 88:14 106:14
132:9 138:23,24,25
139:7 140:17 143:21,
23 165:5 175:10,17

**quick** 149:14

**quickly** 132:19
165:20 173:18

**Quinn** 10:10

**quote** 39:17 47:11
97:21 108:3 117:10,
13,14 124:25 166:4,7

**R**

**raise** 9:24

**range** 22:6

**rattled** 138:17

**reach** 95:24 96:4
148:12 159:16,17,21

**reach-outs** 148:7,19

**reached** 159:8,15

**reaches** 148:2

**read** 64:10 83:20
132:19 168:17,23
169:4

**reading** 168:18

**ready** 116:13

**real** 86:25 89:10,24
90:3,7 112:16 134:6,
10

**reason** 62:7 75:20
77:16 150:13,21
151:6 168:2 173:17
174:14,15,19 175:2

**recall** 20:17 53:5,16
54:4,9 59:9 61:19
75:19 76:13,17
79:12,14 84:13,17
85:9 90:22 91:3,12
93:6,8 99:10 105:6
109:7,10,22,24 110:3
111:19,22,23 112:8,
11,19 113:2,4 114:5,
7,10,11 118:14 130:8
132:24 142:19,23
145:25 146:11
151:10 153:3,4,18
157:9 158:10,11
160:13,15 164:23
167:17,22

**receive** 101:20

**received** 36:13 56:20
58:17 64:18 65:7,13,
22 66:16 102:17

**recipient** 36:4

**recollection** 32:11,
18 33:10 48:2,11
49:7 61:12 63:16
92:13,16 99:4 101:21
102:6,16 103:11
112:13 114:17,18
120:13,18 121:6
133:24 137:16 143:9
151:23 152:19 158:4
164:9,18,20

**reconciliation** 101:8

**record** 8:9 9:21
10:10 15:10 16:13
17:19,25 18:5,8,12,
14 66:11,15 89:4
94:6,7,21 95:15,18
97:2 115:4,9,10,12,
24 149:24 150:5
161:15,18 162:24
163:2,3,7 175:20,23

**recording** 8:15

**records** 93:14

**Redeemer** 72:5

**refer** 19:21 48:9 78:4
143:18

**reference** 63:11

**referenced** 47:19

**referred** 14:3 72:12

**referring** 66:18
171:4

**refers** 39:24 57:20
118:7

**reflect** 97:2

**reflected** 32:23 33:3
57:8,14 59:11 64:19
105:15,19 161:22

**reflects** 153:18

**refresh** 32:18 33:10
143:9 164:18

**refreshed** 63:6

**refreshes** 164:9,20

**refuse** 84:15

**regard** 71:24 72:2
121:15 147:18

**regular** 168:5 175:25
176:2

**reinvested** 49:22

**REIT** 57:25 58:4,12,
15 63:13 64:19

**relate** 72:8,10

**related** 30:24 81:18,
23 86:25

**relating** 32:7 57:21

**relationship** 58:8,11
74:18

**relative** 51:25 52:2
158:19

**relevant** 32:20 51:12

**reliance** 126:21

**relied** 106:3 111:12

**rely** 111:3

**remained** 18:13 42:6

**remember** 13:9
21:3,4 22:4 23:18
24:2 27:23 28:14,18
49:10 52:6,24 57:10
59:2,7 65:9,18 76:4
81:20,21 84:21,23,25
85:2,3,4,12,13 91:15
103:12 113:10 120:8
146:15 152:11 153:9,
15 154:19 157:25
159:5 165:4 168:3

**remind** 171:3

**remote** 8:15

**remotely** 8:10,13
9:10

**renew** 129:21

**renewal** 129:25
130:5 136:7 138:24

**Reorganization**
142:17

**repeat** 32:4 50:21
52:13 100:13

**repeating** 78:24

**report** 125:2,7,13,17,
19,22 127:15 139:17,
21 140:12

**reported** 111:14
128:19

**reporter** 8:11 9:22,
24 18:10 94:17
149:12 175:21 176:4,
7,12

**reporting** 8:5 126:8

**reports** 126:4,8
127:6 139:18

**represent** 136:24
143:4 173:20

**representation**
127:18,21 128:23
129:13

**representative**
39:8,18 40:7 41:17

**representatives**
46:25 147:17

**representing** 170:20

**represents** 105:22

**request** 10:3,17
13:13 16:14 17:15
55:22 59:18 84:10
85:20 98:10 107:11
108:22 116:21 119:2
123:5,20 124:6,10
130:16 131:4,25
132:4,6 133:9 135:16
137:3 142:13 163:12
165:8,25 168:11
169:18,20 174:4,7,9,
10,14,18 175:3

**requests** 138:23
163:15,16 165:18
173:4,5 174:20

**required** 90:5 113:22
114:8

**resolution** 112:7

**resolve** 112:14

**Resources** 54:15,
18,21

**respect** 158:6 159:3,
9 174:11

**responded** 172:17

**response** 108:15
136:11,12 137:2,4
172:12

**responses** 163:10,
14 173:4,21

Index: responsibilities..speculation

**responsibilities**
51:13

**responsibility** 80:7

**responsible** 55:2
104:17,23 105:4,9,12
106:22 113:5 125:16,
18 126:2,18 127:14
133:4

**rest** 13:24

**restate** 69:18

**restitution** 112:25

**Restoration** 72:5

**restricted** 57:20
58:17 59:11 63:12
64:18,25 65:7,13,22
71:20

**restroom** 96:13

**result** 28:19 44:12
99:17 100:8

**resume** 18:20

**reswear** 9:23

**retail** 105:22 129:18,
20 130:2,5,10 131:2
134:18,22 136:12
137:8,21 138:3,7,12
139:22 140:12 141:5,
11,22 142:6

**retained** 59:6

**review** 122:6 130:11
134:17 164:25

**reviewing** 134:22

**revisions** 81:24

**rights** 43:19

**Robert** 10:8

**role** 53:3 87:5 126:11

**rolled** 51:9

**rolling** 95:20

**room** 8:8,12 96:6,7
153:16

**rough** 103:3,10
175:25

**Rule** 8:18

**rules** 8:18,19

**running** 71:15

**rush** 176:3

──────────

**S**

**salaries** 104:10

**salary** 52:8,17 57:8
60:9,19,25 61:10,13,
17,21 62:5

**sale** 71:17 73:16

**sampling** 126:24
127:9

**satisfied** 42:6 70:7
75:23

**Sauter** 134:8

**schedule** 49:16
63:22

**screen** 10:15 56:10
82:4 95:9 97:10
114:21,23 119:22
131:15 163:9

**scroll** 124:8 131:8

**scrolling** 131:23

**seat** 95:13

**SEC** 92:4 98:2,4
99:11,25 103:12
104:17,21 105:4,8

**section** 124:13 132:9
134:3 135:15,18
171:24

**Seery** 144:22 147:3,
17,22,24 149:8
153:22 154:4 160:2
174:21

**sell** 70:13 71:2,12
72:19

**selling** 71:22

**send** 15:20 16:21
19:7,10 64:3 66:6
68:7,9 118:11

**sending** 160:15

**senior** 92:24 134:9

**sense** 118:19 119:11

**sentence** 118:4

**separate** 20:6 38:4

**series** 58:2

**serve** 133:22

**service** 88:23

**serviced** 135:11

**services** 14:10 62:23
81:19 85:23 86:4,7,
14,17,22,23 87:8,11,
16,22 88:8,15 89:8,
21 133:25 134:13,15
135:12 143:19
151:16 152:8,13,15,
21 153:7,25 154:2,8
157:22

**serving** 126:13

**set** 13:15 56:18 81:25
82:17 83:17 143:20
171:5

**sets** 82:19 100:16

**settle** 93:2

**settlement** 92:21,22
104:13 147:2 148:8
151:19 166:20,22
167:24 169:6,23
170:18

**settlements** 147:25
168:5

**seven-year** 63:22

**severity** 8:6

**share** 65:21

**shared** 53:6 133:25
134:13,15 135:12
151:16 152:8,12,15,
21 153:7,25 154:2,8

**shareholder** 112:24

**shareholder's** 71:19

**shareholders** 39:9
40:8 41:18

**shares** 58:2 71:22

**sheet** 14:14,18 27:15
72:15 121:5,19,23

**sheets** 122:4

**shift** 85:17

**shortly** 96:9

**show** 158:9 169:7

**showed** 57:4 76:10
120:3 164:15

**showing** 70:6

**shows** 100:7 101:2

**shuffling** 173:13

**sic** 9:4 94:20 175:19

**sign** 124:21 126:16
128:22

**signature** 123:19
164:10,16 173:25

**signed** 45:13 46:24
48:16,17,21,22 90:15
91:4 123:23 127:17
129:13 164:21 165:2

**significant** 72:4 86:7
151:17

**similar** 136:5 138:21

**simple** 65:4 81:9
112:16

**simply** 88:7

**sir** 28:24 56:10 80:6
95:20 98:13 106:10
116:4,13 117:6 119:8
123:15 127:3 131:24
144:2,24 145:5
155:16 162:10
163:25 164:6 171:25

**sis-** 84:9

**sister** 40:12 50:11,18
51:5 52:7,16,19 53:6,
10,17,25 54:5 57:5
73:11 75:14,21

**sit** 23:19 34:11 35:25
39:13 48:14 52:6
53:9 81:20,21 148:17
158:3 165:3 172:21

**situation** 112:7

**sixth** 39:12

**small** 99:8 104:5
158:23

**snap** 17:18

**social** 8:7

**sold** 73:19 83:5,11,12
148:4

**sole** 127:4

**solely** 15:25

**solution** 146:22

**sought** 161:11

**sound** 47:23 119:19

**sounds** 45:4

**source** 102:17 127:4,
11,12

**sources** 101:2

**space** 151:20

**speak** 8:23 11:6
12:21 72:25 115:17

**speaking** 12:3 26:19
78:10

**special** 176:3

**specific** 26:16 28:7
48:2 85:5 118:18
122:13 128:18,19
137:3 149:5 152:16
170:7

**specifically** 21:4
28:15 30:4,11 31:2
34:11 35:24 37:14
41:11 50:15 52:6
55:8 57:10 60:13
80:3 81:22 84:12
96:16 97:2 98:14
103:13 106:21
107:25 110:11
111:22 118:13
119:11 139:9,11
140:3,25 143:14
146:7 149:10 169:24
170:3 171:5,9

**specificity** 47:18
49:10 121:15 122:8
148:24

**specifics** 21:20
91:15 166:24 167:3,
7,21

**speculate** 27:24
28:4

**speculation** 118:9

Index: speed..transcript

speed 65:11

spend 12:3

spending 38:22

spent 62:2

split 61:12

spoke 71:16

spoken 8:24 10:24

spread 62:17,20 85:14

spreadsheet 97:20

spreadsheets 154:3

staff 105:24 135:10

stamped 56:4 59:21 95:4 107:13 116:23 119:4 123:10 130:18

stamping 67:3,8

stand 94:13

standard 135:3

standards 46:20 51:12 53:4

standing 155:24 176:8

Stang 161:2

start 9:3 92:3 146:6

start-up 89:3

state's 8:19

stated 10:9 41:25 106:21

statement 39:17 54:12 56:4,13,18 59:21 60:2 71:8 100:23 125:20

statements 32:24 33:3 55:3,15 120:16 122:7,23 123:8 128:10,15 129:3

States 9:7

stay 19:22 95:17

stenographic 9:20

steps 110:21

stick 78:5

stipulate 8:14

stock 57:21 58:18 59:11 63:12 64:19 65:7,13,22

Stonehill's 168:9

stop 17:22 38:24 39:2 76:25 78:15,16 115:18 132:2

Stotz 8:11

strike 50:5 104:24 106:7,13 146:6

string 97:14 108:12

struck 50:22

stuck 80:14

stuff 134:7 148:5

Sub- 72:24

subadvisory 105:23

subject 13:20 14:9 20:24 21:7,11,15,25 22:10,14,18 23:7,12, 16,21 24:7,12,17 25:25 26:5 27:5,11, 17 28:7,25 29:5,11, 14,16,18,24 30:2,8, 14,16,21,22 31:2,10 33:19,23,25 34:20,22 35:16,20 36:7 39:5,7 41:23 42:11 44:23 45:19 69:9,11,20 72:24 77:23 79:9,17, 23 81:3,6,8,15 83:24 84:19 137:23 138:9, 14 141:12 146:15 150:12,20 171:19

subsequent 13:20 21:5 42:8 43:8 44:5 45:10,19,24 47:6 69:16,23 70:6,11 72:7 73:7,17 75:23 82:20 122:24 124:14, 17 136:19 138:24,25

subsequently 147:22

substance 11:7,15, 18 132:24 165:11

substantial 21:5

substantially 74:9,

15,22 75:11

substantive 11:20

sued 90:14

suite 126:17

supplemental 123:8 131:3

support 83:12 97:21 134:2

supposed 151:18 174:23

surface 136:21

surprised 125:6 158:18

sustained 99:17

Suzanne 8:11 94:16

swear 8:12

swearing 8:16

switch 129:16

sworn 10:5

T

table 13:15

takes 68:11

taking 18:17,20 94:10 161:18,19

talk 11:17 17:18 91:10 111:17 167:20

talked 59:5 60:14 120:14 174:11

talking 33:15,17 38:13,24 39:2 64:24, 25 146:6 153:20 156:2 162:9

tape 96:23

team 54:25 55:14 56:14 153:8,10,15

telling 14:25 78:17 153:4 167:17

template 117:18,24

ten 24:20,23

tendered 154:21

term 15:15,16 21:19 28:19 34:15 36:23 46:4 156:2 157:11 158:2,7 161:13 166:13

terms 44:13,22 45:5 46:14 82:18 88:25 144:17 165:12 166:6, 12,25 170:4,7 171:12

terrace 92:3

Terrestar 98:2 112:7

test 26:13

testified 10:6 12:8 51:18,20 53:7 57:11 144:20 170:2

testifying 48:22

testimony 10:25 12:12,14 32:22 44:4 48:15 49:3 145:17 155:4

Texas 9:8

text 66:17 68:8 96:2

texted 95:25

thing 44:8 88:24 92:19 127:7 132:19

things 26:13 28:20, 21 38:23 47:6 83:11 153:22 162:7 166:23 172:18

thinking 138:18

thinks 11:18

thought 31:19 36:20, 23 87:12 159:23 160:5,24 162:2 170:3 172:18

throw 144:4

ties 127:10

time 9:15 12:3 29:20, 21 32:5 35:9 37:13 38:8,23 39:12 40:5, 16,19,25 42:4,13,15, 23 47:4 52:21 61:14 62:2,14,17,20 63:4 64:13 66:8,15 67:6 71:3 73:12,21 74:6, 12,19,25 75:24 76:6 78:7 83:20,21 85:4,

14,24 87:6,10 92:23 93:11,15 96:19 109:8,12 114:9 117:16,17 120:3,6,8, 11 121:18 126:13 129:11 136:18 138:19 141:17 142:6 143:11 149:22 150:5 153:16 160:20 163:7 172:17 175:6

times 41:25

tired 144:25

title 111:7,8 134:7

today 13:25 33:16 34:12 35:25 36:3 38:14 39:14 40:13 52:6 53:9 66:10 67:4 70:3 81:21 132:25 133:2 144:7 165:3 172:21

today's 175:18

told 47:7 52:25 110:15 117:8 129:2 139:12 141:11 145:25 146:11 158:22,23 162:14 167:12 171:13 174:21

tomorrow 67:4,13

tonight 67:12 176:14

top 22:22 24:4,5 26:8 27:23 29:21 31:14 63:5 90:11 97:18 108:14

topic 150:7

topics 38:16 41:8

total 102:5 103:6,16

totals 101:19

track 89:4

track-record 88:24

trade 58:3

transaction 90:6 108:3 110:16

transactions 124:18 134:6,11

transcript 96:15

**transfer** 91:23 92:6,
8,9,11,14 93:7,12
107:22 110:13
111:24 112:4 116:16
117:9 120:10

**transferred** 91:13
110:24 111:21
119:18 129:5

**transfers** 110:9

**transition** 151:19
153:24

**travel** 49:15

**treasurer** 90:24
111:8

**trick** 81:10 146:10

**triggered** 42:8,9

**true-up** 151:19
153:22

**trust-** 20:25

**trustee** 19:19,22
20:2,11,19 21:2,8,12,
17 22:2,11,19 23:3,8,
13,17,22 24:8,13,18
25:2,14 26:2,7 27:6,
12,18 28:9 29:19,25
30:9,15,23 31:4,9,25
32:7,12 33:12,25
39:8 40:12,15 41:3
42:25 43:6,14,18
44:11,21 45:17 47:19
49:5 50:20 51:7
53:13 73:11 75:24
78:5 79:7,15,21 81:4,
13 84:14,20 137:24
138:10 139:25
144:19 145:9 146:3,
13,19 148:14 149:9
167:11 170:12

**trustee's** 84:10

**trustees** 82:24

**Trustway** 70:22
71:24 74:22 75:8
167:2

**TSG** 8:5

**turn** 47:25 97:6
123:14

**turned** 84:24

**type** 128:6 133:4
140:16

**types** 56:19

**typically** 112:25

---

**U**

**UBS** 170:20

**ultimate** 28:19

**ultimately** 41:8 42:2
45:22 146:25

**unable** 45:24

**understand** 10:20
34:3 40:6 68:25
98:15 100:6,15
131:18 144:6 171:7

**understanding**
36:21 40:25 43:22
49:25 51:2,3 58:7,11
61:25 73:9 74:4,8,17,
21 75:10,22 83:15,17
98:16 103:19 124:16
125:22,24 126:22
127:20 128:4,7
160:9,17 161:11

**understood** 42:16,
24 43:6 74:13

**underwear** 80:14

**unenforceable**
150:13,21 151:5

**unfettered** 71:25

**unilaterally** 71:18

**United** 9:7

**units** 57:21 58:18
59:11 63:12 64:19
65:2,7,13,22

**updates** 148:22

---

**V**

**validity** 8:15

**valuation** 105:25
106:2

**variety** 62:18 80:17

**varying** 75:4,6

**vendors** 104:22
127:10

**verbal** 49:21 51:2

**verification** 126:24
127:9

**verified** 60:18

**versus** 76:7 84:22,24
102:2 118:21

**vest** 58:22

**vested** 57:16 58:19,
24 64:23

**vesting** 63:22

**vests** 58:25

**video** 8:10,15 17:25
95:19 97:6 115:24

**video-recorded** 9:4

**view** 131:7 132:10

**virtually** 28:14

**volatility** 75:12

**Volume** 9:4 94:19
175:18

**voluntary** 113:14

**vote** 112:24

---

**W**

**wait** 40:2 81:5 165:16

**wanted** 41:12,16
90:12 98:2,4 175:22
176:13

**Waterhouse** 90:16,
24 93:7 97:17 108:11
111:3 126:11 151:11,
24 152:20 153:2,5,19
160:10,16 161:16,23
162:14 165:13 166:7,
14 170:4

**Waterhouse's** 97:19

**ways** 37:12

**week** 12:16 44:18
120:3

**weeks** 136:2

**well-known** 92:18

**wider** 49:9

**wire** 110:8

**withdrawn** 21:22
22:8,15 29:14 34:14
35:16 42:21 47:9
51:15 69:9 82:22
113:18 114:6 121:20
125:10 133:16
154:13

**witnesses** 15:7

**Wonderful** 175:11

**word** 39:23 171:4

**work** 101:23,24
125:22

**working** 62:2 73:13
126:2

**works** 146:20

**world** 11:4

**worth** 58:20 92:4

**wrap** 149:16

**wrestle** 170:25

**writing** 86:10 87:22
105:15,18 106:20
153:17 160:10,11,13
161:21

**writings** 106:9

**written** 85:22 86:11,
13,20 130:9 146:21
161:15,18 163:10

**wrote** 28:24

---

**Y**

**year** 22:13,16 24:19
28:15,17 30:12 47:9,
12,14,25 48:9,11
49:8 52:18 55:10,11
56:20 57:16 105:22
106:5 113:3 118:15
142:6 154:13

**year's** 136:6

**years** 21:5 30:19
38:11 49:6,24 51:9
58:23,24,25 59:2,3,4
63:6 76:5 126:23

**years'** 63:20

**yelling** 115:18,19

**yes-or-no** 11:14

**Yup** 56:11 97:13

---

**Z**

**Ziehl** 161:3

**ZIP** 51:22 53:2

# EXHIBIT 14

Page 1

1          WATERHOUSE - 10-19-21

2      IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
3            DALLAS DIVISION
    ------------------------------
4   IN RE:

5                    Chapter 11
    HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,        CASE NO.
                    19-34054-SGI11
7
        Debtor.
8   ------------------------------
    HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
        Plaintiff,
10  vs.                    Adversary
                        Proceeding No.
11  HIGHLAND CAPITAL MANAGEMENT      21-03000-SGI
    FUND ADVISORS, L.P.; NEXPOINT
12  ADVISORS, L.P.; HIGHLAND
    INCOME FUND; NEXPOINT
13  STRATEGIC OPPORTUNITIES FUND;
    NEXPOINT CAPITAL, INC.; and
14  CLO HOLDCO, LTD.,

15          Defendants.
    ------------------------------
16

17       REMOTE VIDEOTAPED DEPOSITION OF

18          FRANK WATERHOUSE

19          October 19, 2021

20

21

22

23

24  Reported by:  Susan S. Klinger, RMR-CRR, CSR

25  Job No: 201195

Page 2

WATERHOUSE - 10-19-21

 

 

    October 19, 2021

    9:30 a.m.

 

 

 

   Remote Deposition of FRANK WATERHOUSE,

held before Susan S. Klinger, a Registered

Merit Reporter and Certified Realtime Reporter

of the State of Texas.

---

Page 3

WATERHOUSE - 10-19-21

A P P E A R A N C E S:

(All appearances via Zoom.)

Attorneys for the Reorganized Highland Capital

Management:

   John Morris, Esq.

   Hayley Winograd, Esq.

   PACHULSKI STANG ZIEHL & JONES

   780 Third Avenue

   New York, New York  10017

Attorneys for the Witness:

   Debra Dandeneau, Esq.

   Michelle Hartmann, Esq.

   BAKER McKENZIE

   1900 North Pearl Street

   Dallas, Texas  75201

Attorneys for NexPoint Advisors, LP and

Highland Capital Management Fund Advisors,

L.P.:

   Davor Rukavina, Esq.

   An Nguyen, Esq.

   MUNSCH HARDT KOPF & HARDD

   500 North Akard Street

   Dallas, Texas  75201-6659

---

Page 4

WATERHOUSE - 10-19-21

Attorneys for Jim Dondero, Nancy Dondero, HCRA,

and HCMS:

   Deborah Deitsch-Perez, Esq.

   Michael Aigen, Esq.

   STINSON

   3102 Oak Lawn Avenue

   Dallas, Texas  75219

Attorneys for Dugaboy Investment Trust:

   Warren Horn, Esq.

   HELLER, DRAPER & HORN

   650 Poydras Street

   New Orleans, Louisiana 70130

Attorneys for Marc Kirschner as the trustee for

the litigation SunTrust:

   Deborah Newman, Esq.

   QUINN EMANUEL URQUHART & SULLIVAN

   51 Madison Avenue

   New York, New York  10010

Also Present:

   Ms. La Asia Canty

---

Page 5

WATERHOUSE - 10-19-21

I N D E X

WITNESS                        PAGE

FRANK WATERHOUSE

EXAMINATION BY MR. MORRIS          10

EXAMINATION BY MR. RUKAVINA        256

EXAMINATION BY MS. DEITSCH-PEREZ   352

EXAMINATION BY MR. MORRIS          377

EXAMINATION BY MR. RUKAVINA        387

EXAMINATION BY MS. DEITSCH-PEREZ   393


    E X H I B I T S

No.                      Page

Exhibit 2  NPA et al Amended Complaint    142

Exhibit 33 6/3/19 Management     91

   Representation

Exhibit 34 HCMLP Consolidated Financial   94

   Statements

Exhibit 35 HCMFA Incumbency Certificate   151

Exhibit 36 Email string re 15(c)      170

Exhibit 39 HCMLP Operating Results 2/18   226

Exhibit 40 Summary of Assets and      236

   Liabilities

Exhibit 41 12/19 Monthly Operating Report  258

Page 6

| 1 | WATERHOUSE - 10-19-21 | |
| 2 | Exhibit 45 HCMFA Consolidated Financial | 135 |
| 3 | Statements | |
| 4 | Exhibit 46 NexPoint 2019 Audited | 218 |
| 5 | Financials | |
| 6 | | |
| 7 | Exhibit A1 Emails 11/25 | 328 |
| 8 | Exhibit A2 Emails 12/31 | 338 |
| 9 | Exhibit A6 Emails 1/12 | 341 |
| 10 | Exhibit A7 Promissory Notes | 297 |
| 11 | Exhibit A9 Email, 8/31 | 307 |
| 12 | Exhibit A10 Acknowledgment from HCMLP | 302 |
| 13 | Exhibit A11 HCMLP Schedule 71A | 309 |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 7

1    WATERHOUSE - 10-19-21
2        P R O C E E D I N G S
3        VIDEOGRAPHER:  Good morning,
4    Counselors.  My name is Scott Hatch.  I'm a
5    certified legal videographer in association
6    with TSG Reporting, Inc.
7        Due to the severity of COVID-19 and
8    following the practice of social
9    distancing, I will not be in the same room
10   with the witness.  Instead, I will record
11   this videotaped deposition remotely.  The
12   reporter, Susan Klinger, also will not be
13   in the same room and will swear the witness
14   remotely.
15       Do all parties stipulate to the
16   validity of this video recording and remote
17   swearing, and that it will be admissible in
18   the courtroom as if it had been taken
19   following Rule 30 of the Federal Rules of
20   Civil Procedures and the state's rules
21   where this case is pending?
22       MR. HORN:  Yes.
23       MS. DANDENEAU:  Yes.
24       MR. MORRIS:  Yes.  John Morris.  I
25   would just try to do a negative notice

Page 8

1        WATERHOUSE - 10-19-21
2    here, as we did yesterday.  If anybody has
3    a problem with what was just stated, can
4    you state your objection now?
5        Okay.  No response, so everybody
6    accepts the stipulation and the instruction
7    that was just given.
8        VIDEOGRAPHER:  Thank you.  This is
9    the start of media labeled Number 1 of the
10   video recorded deposition of Frank
11   Waterhouse In Re: Highland Capital
12   Management, L.P., in the United States
13   Bankruptcy Court for the Northern District
14   of Texas, Dallas Division, Case Number
15   21-03000-SGI.
16       This deposition is being held via
17   video conference with participants
18   appearing remotely due to COVID-19
19   restrictions on Tuesday, October 19th, 2021
20   at approximately 9:32 a.m.  My name is
21   Scott Hatch, legal video specialist with
22   TSG Reporting, Inc. headquartered at 228
23   East 45th Street, New York, New York.  The
24   court reporter is Susan Klinger in
25   association with TSG Reporting.

Page 9

1        WATERHOUSE - 10-19-21
2        Counsel, please introduce
3    yourselves.
4        MR. MORRIS:  John Morris, Pachulski
5    Stang Ziehl & Jones for the reorganized
6    Highland Capital Management, L.P., the
7    plaintiff in these actions.
8        MS. DANDENEAU:  Deborah Dandeneau
9    from Baker McKenzie.  My partner, Michelle
10   Hartmann, is also in the room with me,
11   representing Frank Waterhouse individually.
12       MS. DEITSCH-PEREZ:  Deborah
13   Deitsch-Perez from Stinson, LLP,
14   representing Jim Dondero, Nancy Dondero,
15   HCRA, and HCMS.
16       MR. HORN:  Warren Horn with Heller,
17   Draper & Horn in New Orleans representing
18   Dugaboy Investment Trust.
19       MR. RUKAVINA:  Davor Rukavina with
20   Munsch Hardt Kopf & Harr in Dallas
21   representing NexPoint Advisors, LP and
22   Highland Capital Management Fund Advisors,
23   L.P.
24       MR. AIGEN:  Michael Aigen from
25   Stinson, and I represent the same parties

Page 10

```
1              WATERHOUSE - 10-19-21
2    as Deborah Deitsch-Perez.
3        MS. NEWMAN:  This is Deborah Newman
4    from Quinn Emanuel.  We represent the
5    litigation – Marc Kirschner as the trustee
6    for the litigation SunTrust.
7        MR. MORRIS:  I think that is
8    everybody.
9        VIDEOGRAPHER:  Thank you.  Will the
10   court reporter please swear in the witness.
11             FRANK WATERHOUSE,
12   having been first duly sworn, testified as
13   follows:
14             EXAMINATION
15   BY MR. MORRIS:
16       Q.   Please state your name for the
17   record.
18       A.   My name is Frank Waterhouse.
19       Q.   Good morning, Mr. Waterhouse.  I'm
20   John Morris, as you know, from Pachulski Stang
21   Ziehl & Jones.  You understand that my firm and
22   I represent Highland Capital Management, L.P.;
23   is that right?
24       A.   Yes.
25       Q.   Okay.  And do you understand that
```

Page 11

```
1              WATERHOUSE - 10-19-21
2    we're here today for your deposition in your
3    individual capacity?
4        A.   Yes.
5        Q.   Did you review and – did you
6    receive and review a subpoena that Highland
7    Capital Management, L.P., served upon you?
8        A.   Yes.
9        Q.   You have been deposed before; right?
10       A.   Yes.
11       Q.   How many times have you been
12   deposed?
13       A.   About three or four times.
14       Q.   Okay.  And I defended you in one
15   deposition; isn't that right?
16       A.   That is correct.
17       Q.   So the general ground rules for this
18   deposition are largely the same as the
19   depositions you have given before.  And that is
20   I will ask you a series of questions, and it is
21   important that you allow me to finish my
22   question before you begin your answer; is that
23   fair?
24       A.   Yes.
25       Q.   And it is important that I allow you
```

Page 12

```
1              WATERHOUSE - 10-19-21
2    to finish your answers before I begin a
3    question, but if I fail to do that, will you
4    let me know?
5        A.   I can certainly do that.
6        Q.   Okay.  Do you understand that this
7    deposition is being videotaped?
8        A.   Yes.
9        Q.   You understand that I may seek to
10   use portions of the videotape in a court of
11   law?
12       A.   I did not know that, until you just
13   said that.
14       Q.   Okay.  And you are aware of that now
15   before the deposition begins substantively; is
16   that right?
17       A.   Yes.
18       Q.   So unlike I think the other
19   depositions that you have given, this one is
20   being given remotely.  So that presents some
21   unique challenges, at least as compared to a
22   deposition that is taken in-person.
23            From time to time we're going to put
24   documents up on the screen, Mr. Waterhouse.
25   And it is important that I give you the
```

Page 13

```
1              WATERHOUSE - 10-19-21
2    opportunity to review any portion of the
3    document that you think you need in order to
4    fully and completely answer the question.
5            So I would ask you to let me know if
6    there is a portion of a document that you need
7    to see in order to fully and completely answer
8    the question.  Can you do that for me?
9        A.   Yes.
10           MS. DANDENEAU:  Mr. Morris, I would
11   just note that we do have hard copies of
12   the documents that you sent, so if you can
13   just refer to the exhibit number as
14   reflected in the documents that you sent,
15   Mr. Waterhouse will be able to look at the
16   hard copies of those documents.
17           MR. MORRIS:  I appreciate that,
18   and – and I will encourage him to do so.
19   There will be other documents that we did
20   not send to you that we'll be using today
21   though.
22       Q.   Okay.  With that as background, if
23   there is anything that I ask you, sir, that you
24   don't understand, will you let me know?
25       A.   Yes.
```

Page 14

WATERHOUSE - 10-19-21

1
2  Q.  Okay.  Are you currently employed?
3  A.  Yes.
4  Q.  By whom?
5  A.  The Skyview Group.
6  Q.  When did you become employed by the
7  Skyview Group?
8  A.  I believe March 1st of 2021.
9  Q.  Do you have a title at Skyview?
10  A.  Yes.
11  Q.  What is your title?
12  A.  My title is chief financial officer.
13  Q.  Do you report to anybody in your
14  role as CFO?
15  A.  I don't, no.
16  Q.  No.  Is there a president or a CEO
17  of Skyview?
18  A.  Yes.
19  Q.  Who is that?
20  A.  That is Scott Ellington.
21  Q.  But you don't report to
22  Mr. Ellington; is that right?
23  A.  I don't think so.
24  Q.  Does Skyview Group –
25       MS. DANDENEAU:  Excuse me, we –

Page 15

WATERHOUSE - 10-19-21

1
2  A.  I – I – I might.  I just – I
3  don't recall.
4  Q.  Okay.  Does Skyview Group provide
5  any services to any entity directly or
6  indirectly owned or controlled by Jim Dondero?
7  A.  Yes.
8  Q.  Can you name – is that pursuant to
9  written contracts?
10  A.  Yes.
11  Q.  And do you know how many contracts
12  exist?
13  A.  Approximately six or so.
14  Q.  And is the Skyview Group made up of
15  individuals who were formerly employees of
16  Highland Capital Management, L.P.?
17  A.  No.
18  Q.  Do you know how many – how many –
19  how many employees does Skyview have?
20  A.  Approximately 35.
21  Q.  And can you tell me how many of
22  those 35 are former officers, directors, or
23  employees of Highland Capital Management, L.P.?
24  A.  I don't know the exact number.
25  Q.  Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  Is it more than 30?
4  A.  I don't know.
5  Q.  Can you tell me what portion of
6  Skyview – Skyview's revenue is derived from
7  entities that are directly or indirectly owned
8  or controlled by Jim Dondero?
9       MS. DANDENEAU:  Mr. Morris, I mean,
10       you called Mr. Waterhouse here individually
11       for purposes of his testimony in connection
12       with the noticed litigation.  I have given
13       you some leeway to ask him some background
14       information about Skyview Group, but this
15       is not a substitute for a deposition in
16       connection with any other pending disputes
17       that exist.  And – and we agreed to accept
18       the subpoena on the basis of he – this is
19       testimony that he is giving in connection
20       with the noticed litigation.
21       I really think that you are now
22       going a little bit far afield from the
23       purpose of this deposition.
24       MR. MORRIS:  Okay.  It is – I'm not
25       intending to use these – the answers to

Page 17

WATERHOUSE - 10-19-21

1
2  these questions for any purpose other than
3  this litigation.  I think you understand
4  fully why I'm asking the questions, and I
5  just have a couple more, if you will bear
6  with me.
7       MS. DANDENEAU:  Okay.
8       MS. DEITSCH-PEREZ:  Can we have an
9       agreement that an objection by one is an
10       objection for any other party here?
11       MR. MORRIS:  Sure.  I would – I
12       would encourage that, sure.
13       MS. DEITSCH-PEREZ:  Thank you.
14       MR. MORRIS:  It can't be sustained
15       or overruled more than one time, so...
16  Q.  Mr. Waterhouse, can you answer my
17  question, please.
18       MS. DANDENEAU:  Do you want to
19       repeat it, Mr. Morris, for his benefit?
20       MR. MORRIS:  Sure.
21  Q.  Can you – can you tell me the
22  approximate portion of Skyview's revenue that
23  is derived from entities that are directly or
24  indirectly owned or controlled by Mr. Dondero?
25  A.  I don't know the exact number.

Page 18

WATERHOUSE - 10-19-21

1
2   Q.   Is it more than 75 percent?
3   A.   Yes.
4   Q.   Is it more than 90 percent?
5   A.   I don't know.
6   Q.   Okay.  Can I refer to Highland
7   Capital Management, L.P., as Highland?
8   A.   Yes.
9   Q.   All right.  And you previously
10  served as Highland's CFO; correct?
11  A.   Yes.
12  Q.   When did you join Highland?
13  A.   I don't recall the exact date.
14  Q.   Can you tell me what year?
15  A.   2006.
16  Q.   When did you -- in what year did you
17  become Highland's CFO?
18  A.   I don't recall the exact date.
19  Q.   I'm not asking you for the exact
20  date.  I'm asking you if you recall the year in
21  which you were appointed CFO.
22  A.   I don't recall the exact year.
23  Q.   Can you tell me which years it is
24  possible that you were appointed to CFO of
25  Highland?

Page 19

WATERHOUSE - 10-19-21

1
2   A.   2011 or 2012.
3   Q.   Did you serve as Highland's CFO on a
4   continuous basis from in or around 2011 or 2012
5   until early 2021?
6   A.   Yes.
7   Q.   During that entire time you reported
8   directly to Jim Dondero; correct?
9   A.   I -- I don't know.
10  Q.   Is there anybody else you reported
11  to -- withdrawn.
12       Did you report to Mr. Dondero for
13  some portion of the time that you served as
14  CFO?
15  A.   Yes.
16  Q.   Is there a portion of time that you
17  don't recall who you reported to?
18  A.   Yes.
19  Q.   What portion of time do you have in
20  your mind when you can't recall who you
21  reported to?
22  A.   From the 2011 to -- for
23  approximately a year or two.
24  Q.   Okay.  So is it fair to say that you
25  reported to Mr. Dondero in your capacity as CFO

Page 20

WATERHOUSE - 10-19-21

1
2   from at least 2014 until the time you left
3   Highland?
4       MS. DANDENEAU:  Objection to form.
5   A.   I don't want to speculate the exact
6   or what year that changed or -- so I would like
7   to stick with my testimony.
8   Q.   Can you recall when you began
9   reporting to Mr. Dondero?
10  A.   I don't recall.
11  Q.   Can you -- can you give me an
12  estimate of what year you think you might have
13  began reporting to Mr. Dondero?
14  A.   I will go back to my prior
15  testimony.
16  Q.   Okay.  There is no -- you have no
17  ability to tell me when you began reporting to
18  Mr. Dondero.
19       Do I have that right?
20       MS. DANDENEAU:  Objection to form.
21  A.   I don't recall.
22  Q.   Okay.  Do you recall who you might
23  have reported to before you began reporting to
24  Mr. Dondero?
25  A.   Yes.

Page 21

WATERHOUSE - 10-19-21

1
2   Q.   Who might you have reported to in
3   your capacity as CFO before you started
4   reporting to Mr. Dondero?
5   A.   That would have been Patrick Boyce.
6   Q.   Are you aware that Highland filed
7   for bankruptcy on October 19th, 2019?
8   A.   Yes.
9   Q.   And we refer to that as the petition
10  date?
11  A.   Yes.
12  Q.   Okay.  Do you hold any professional
13  licenses, sir?
14  A.   Yes.
15  Q.   Can you tell me what professional
16  licenses you hold?
17  A.   I'm a certified public accountant.
18  Q.   Okay.  Anything else?
19  A.   No.
20  Q.   Do you have any other professional
21  licenses or certificates?
22  A.   When you say "professional license,"
23  that is not education?
24  Q.   Tell me -- sure.  Anything other
25  than a driver's license.

Page 22

```
1              WATERHOUSE - 10-19-21
2         Do you have any other license or
3   certificate or certification?
4         A.   Are you asking, like, where I went
5   to school and the --
6         Q.   I am not.  I am not.  I didn't say
7   education.  I didn't ask about degrees.
8         Do you know what a license is?
9         A.   Well, yeah, I mean, a license is
10  something you get after you receive a certain
11  level of proficiency.
12        Q.   Do you have any licenses or
13  certifications other than your CPA?
14             MS. DANDENEAU:  Objection, form.
15        I assume you mean professional
16        licenses, Mr. Morris; correct?
17        Q.   Can you answer my question, sir?
18        A.   Mr. Morris, I'm thinking.  I
19  don't -- I don't think I have any others.
20        Q.   Are you familiar with an entity
21  called Highland Capital Management Fund
22  Advisors?
23        A.   Yes.
24        Q.   Were you ever -- can we refer to
25  that entity as HCMFA?
```

Page 23

```
1              WATERHOUSE - 10-19-21
2         A.   Yes.
3         Q.   Were you ever employed by HCMFA?
4         A.   Not that I recall.
5         Q.   Were you ever -- did you ever hold
6   the title of an officer or director of HCMFA?
7         A.   Yes.
8         Q.   What title did you hold?
9         A.   Treasurer.
10        Q.   When did you become the treasurer of
11  HCMFA?
12        A.   I don't recall.
13        Q.   Can you tell me the year?
14        A.   I don't -- I don't know the year.
15        Q.   Can you approximate the year in
16  which you became the treasurer of HCMFA?
17        A.   I don't know.
18        Q.   Can you tell me if it was before or
19  after 2016?
20        A.   I don't recall.
21        Q.   Are you still the -- do you know if
22  you're still the treasurer of HCMFA today?
23        A.   Today, I am the acting treasurer for
24  HCMFA.
25        Q.   Is there a distinction between
```

Page 24

```
1              WATERHOUSE - 10-19-21
2   treasurer and acting treasurer?
3         A.   I said "acting treasurer" as I am an
4   employee of Skyview, as you previously
5   stated -- or asked.
6         Q.   But you are the treasurer of HCMFA
7   today; correct?
8         A.   I am -- I am the acting treasurer
9   for HCMFA.
10        Q.   How did you become the treasurer of
11  HCMFA?
12        A.   Are you asking how I became the
13  treasurer of HCMFA today?
14        Q.   How did you become appointed to
15  serve as the treasurer of HCMFA?
16        A.   Well, in -- in -- in what time
17  capacity?
18        Q.   The first time that you were
19  appointed.
20        A.   First time.  I believe I was asked
21  to serve as treasurer for HCMFA the first time.
22        Q.   By who?  Who asked you to do that?
23        A.   I don't recall.
24        Q.   Is there anything that would refresh
25  your recollection as to who appointed you as
```

Page 25

```
1              WATERHOUSE - 10-19-21
2   the treasurer of CF- -- HCMFA for the first
3   time?
4         A.   I don't -- I mean, there would be
5   some documents, some legal documents.  I don't
6   know where those are.
7         Q.   How many times have you been
8   appointed the treasurer of HCMFA?
9         A.   I don't know.
10        Q.   Was it more than once?
11        A.   I don't know.
12        Q.   Can you tell me any period of time
13  since 2016 that you did not hold the title of
14  treasurer of HCMFA?
15             MS. DANDENEAU:  Objection to form.
16        A.   I don't recall.
17        Q.   What are your duties and
18  responsibilities as the treasurer of HCMFA?
19        A.   My duties are to do the best job
20  that I can as the -- as an accountant and
21  finance guy.
22        Q.   What specific duties and
23  responsibilities do you have as the treasurer
24  of HCMFA?
25        A.   My duties are to do the best job
```

Page 26

WATERHOUSE - 10-19-21

1
2 that I can as the accounting and finance person
3 for HCMFA.
4      Q.   As the accounting and finance person
5 for HCMFA, do you have any particular areas of
6 responsibility?
7      A.   Yeah, it is to manage the accounting
8 and finance function for HCMFA.
9      Q.   Would that include – do you have
10 responsibility for overseeing HCMFA's annual
11 audit?
12     A.   Can I please elaborate on my prior
13 question?
14     Q.   Of course.  You -- you are giving
15 answers.  I'm asking questions.
16     A.   Okay.  Yes, so the – it – like I
17 said, it is to manage the accounting finance
18 aspect, but I am, as we discussed, the
19 treasurer.  That is – being treasurer is what
20 gives me that – that management function.
21     Q.   Does anybody report to you in your
22 capacity as treasurer of HCMFA?
23     A.   I don't believe so.
24     Q.   Does HCMFA have a chief financial
25 officer?

Page 27

WATERHOUSE - 10-19-21

1
2      A.   I don't – I don't know.
3      Q.   You don't know?
4           You're the treasurer of HCMFA but
5 you don't know if HCMFA has a chief financial
6 officer.
7           Do I have that right?
8      A.   That's right.
9      Q.   Okay.  Have you heard of a company
10 called NexPoint Advisors?
11     A.   Yes.
12     Q.   We will refer to that as NexPoint.
13 Okay?
14     A.   Okay.
15     Q.   Were you ever employed by NexPoint?
16     A.   I don't recall.
17     Q.   Did you ever hold any title with
18 respect to the entity known as NexPoint?
19     A.   Yes.
20     Q.   What titles have you held in
21 relation to NexPoint?
22     A.   Treasurer.  I think it was only
23 treasurer.
24     Q.   Can you tell me the approximate year
25 you became the treasurer of NexPoint?

Page 28

WATERHOUSE - 10-19-21

1
2      A.   I don't know.
3      Q.   Are you still the treasurer of
4 NexPoint today?
5      A.   I am the acting treasurer for
6 NexPoint.
7      Q.   When did your title change from
8 treasurer to acting treasurer?
9      A.   I don't know.
10     Q.   Did your duties and responsibilities
11 change at all when your title was changed from
12 treasurer to acting treasurer?
13     A.   I don't – I don't believe so.
14     Q.   Why did –
15     A.   I still manage the finance and
16 accounting function for NexPoint.
17     Q.   Why did your title change from
18 treasurer to acting treasurer?
19     A.   I don't – I'm using the term
20 "acting treasurer" as I'm a Skyview employee.
21 I don't – I don't know – again, I am a – as
22 I am the Skyview employee.
23     Q.   Okay.
24     A.   And we – we provide officer
25 services.

Page 29

WATERHOUSE - 10-19-21

1
2      Q.   And you serve as an officer of
3 HCMFA; correct?
4      A.   I think we went over that with my
5 testimony.  Yes, I'm the acting treasurer for
6 HCMFA.
7      Q.   And you are an officer of NexPoint;
8 correct?
9      A.   I think – I am the acting treasurer
10 for NexPoint Advisors.
11     Q.   And – and who appointed you acting
12 treasurer of NexPoint Advisors?
13     A.   I don't recall specifically.
14     Q.   Do you have any recollection of who
15 might have appointed you the treasurer of
16 NexPoint?
17     A.   I mean, it – it – I don't recall
18 exactly who it was.
19     Q.   Who were the possibilities?
20          MS. DEITSCH-PEREZ:  Object to the
21 form.
22     Q.   You can answer.
23     A.   Someone in the legal group for
24 NexPoint.  The other officers as well.
25     Q.   Have you heard of a company called

Page 30

```
 1           WATERHOUSE - 10-19-21
 2   Highland Capital Management Services, Inc.?
 3      A.   Yes.
 4      Q.   We will refer to that as HCMS.
 5   Okay?
 6      A.   HCMS.  Okay.
 7      Q.   Were you ever employed by HCMS?
 8      A.   No.
 9      Q.   Have you ever held any titles in
10   relation to HCMF -- I apologize -- HCMS?
11      A.   Yes.
12      Q.   What titles have you held in
13   relation to HCMS?
14      A.   Treasurer and acting treasurer.
15      Q.   When did you first become treasurer
16   or acting treasurer of HCMS?
17      A.   I don't recall the exact dates.
18      Q.   Can you recall -- can you
19   approximate the year that you became the
20   treasurer of HCMS?
21      A.   I don't -- I don't know.
22      Q.   Are you still the treasurer of HCMS
23   today?
24      A.   I am the acting treasurer for HCMS.
25      Q.   And are your duties and
```

Page 31

```
 1           WATERHOUSE - 10-19-21
 2   responsibilities as the acting treasurer for
 3   HCMS and the acting treasurer for NexPoint the
 4   same as your duties and responsibilities in
 5   your role as the acting treasurer of HCMFA?
 6      A.   More or less.
 7      Q.   Have you ever heard of a company
 8   called HCRE Partners, LLC?
 9      A.   Yes.
10      Q.   And do you understand that that
11   entity is now known today as NexPoint Real
12   Estate Partners?
13      A.   I did not know that.
14      Q.   All right.  Can we refer to HCRE
15   Partners as HCRE?
16      MS. DANDENEAU:  Objection to form.
17      Did you mean NexPoint Real Estate
18   Partners, Mr. Morris?
19      MR. MORRIS:  No.
20      MS. DANDENEAU:  Oh.
21      MR. MORRIS:  He said he wasn't
22   familiar that it was succeeded by that
23   entity.  So --
24      MS. DANDENEAU:  Okay.
25      MR. MORRIS:  -- let's go with what
```

Page 32

```
 1           WATERHOUSE - 10-19-21
 2   the witness knows.
 3      Q.   You're familiar with an entity
 4   called HCRE Partners, LLC; correct?
 5      A.   Yes.
 6      Q.   Okay.  So that is the entity that we
 7   will refer to as HCRE.  If you're aware of any
 8   successor, that is great.  If not, let's just
 9   define it as such.
10      Have you ever been employed by HCRE
11   or any entity that you know to have succeeded
12   HCRE?
13      A.   No.
14      Q.   Did you ever serve as an officer or
15   director of HCRE or any successor?
16      A.   Not that I recall.
17      Q.   Okay.  Can we refer to NexPoint and
18   HCMFA as the advisors?
19      A.   Yes.
20      Q.   In general, the advisors provided
21   investment advisory services to certain retail
22   funds; correct?
23      A.   Yes.
24      Q.   And we will refer to the retail
25   funds that are served by the advisors
```

Page 33

```
 1           WATERHOUSE - 10-19-21
 2   collectively as the retail funds; is that okay?
 3      A.   Okay.
 4      Q.   Each of the retail funds is governed
 5   by a board; correct?
 6      A.   Yes.
 7      Q.   And do you know the people who serve
 8   on the boards of the retail funds?
 9      MS. DANDENEAU:  Objection to form.
10      A.   I don't know all of them.
11      Q.   Do you know whether the same people
12   serve on the board of each of the retail funds
13   as we've defined that term?
14      A.   Which -- so when you say "retail
15   funds" -- again, I want to be -- what retail
16   funds are you referring to, because there are
17   -- there are several distinctions?
18      What retail funds are you using when
19   you refer to them?
20      Q.   That is why -- that is why I tried
21   to define the terms.  So let me do it again.
22      Retail funds for the purposes of
23   this deposition means any retail fund to which
24   either of the advisors provides advisory
25   services.  Okay?
```

Page 34

```
 1          WATERHOUSE - 10-19-21
 2    A.  Okay.
 3    Q.  Okay.  So do you know whether the
 4  same people serve on the board of each of the
 5  retail funds?
 6    A.  I don't know.
 7    Q.  Were you ever employed by any of the
 8  retail funds?
 9    A.  No.
10    Q.  No?
11    A.  No.
12    Q.  Okay.  Do you have any title with
13  respect to any of the retail funds?
14    A.  Yes.
15    Q.  What titles do you hold --
16  withdrawn.
17        Do you have the same titles with
18  respect to all of the retail funds or do
19  they -- or just something else?
20        MS. DANDENEAU:  Objection to form.
21    Q.  Withdrawn.
22        Do you have the same title with
23  respect to each of the retail funds?
24    A.  No.
25    Q.  Tell me which title you have with
```

Page 35

```
 1          WATERHOUSE - 10-19-21
 2  respect to each retail fund.
 3        Actually, let's do it a different
 4  way.  I withdraw the question.
 5        Can you give me one title you have
 6  in relation to any retail fund?
 7    A.  Yes.
 8    Q.  What title -- what title can you
 9  give me?
10    A.  Principal executive officer.
11    Q.  Do you serve as principal executive
12  officer for each of the retail funds?
13    A.  No.
14    Q.  Can you identify for me the retail
15  funds in which you serve as the principal
16  executive officer?
17    A.  Yes.  Highland Funds 1, Highland
18  Funds 2, Highland Income Fund, Highland Global
19  Allocation Fund.
20    Q.  I'm sorry, you said "Global
21  Allocation Fund"?
22    A.  Yes.
23        VIDEOGRAPHER:  Excuse me,
24  Mr. Morris.  This is the videographer.  I'm
25  concerned about the lighting in the
```

Page 36

```
 1          WATERHOUSE - 10-19-21
 2  witness' camera.
 3        Do you want to go off the record and
 4  make some adjustments?
 5        MR. MORRIS:  Sure, but just for this
 6  purpose.  I don't want to take a break.  We
 7  just started.
 8        MS. DANDENEAU:  Yeah, that is fine.
 9  That is fine.  We're going to put you on
10  mute.
11        MR. MORRIS:  All right.
12        MS. DANDENEAU:  I'm going to try to
13  open up some of the shades.
14        VIDEOGRAPHER:  We're going off the
15  record at 10:08 a.m.
16        (Recess taken 10:08 a.m. to 10:11 a.m.)
17        VIDEOGRAPHER:  We are back on the
18  record at 10:11 a.m.
19    Q.  Mr. Waterhouse, when did you become
20  the principal executive officer of the four
21  retail funds that you just identified?
22    A.  I don't recall.
23    Q.  Do you recall the approximate year
24  that you became the principal executive officer
25  of the four funds?
```

Page 37

```
 1          WATERHOUSE - 10-19-21
 2    A.  2021.
 3    Q.  Did you ever hold any title with
 4  respect to any of the four funds you have just
 5  identified other than principal executive
 6  officer?
 7    A.  I don't recall.
 8    Q.  Is it possible that you held a
 9  position or a title with the four funds you
10  just identified prior to 2021?
11    A.  Yes.
12    Q.  But you don't recall if you did or
13  not; do I have that right?
14    A.  No.  You -- I thought you asked, did
15  I hold other titles.
16    Q.  Did you hold any title at the four
17  retail funds for which you now serve as
18  principal executive officer at any time prior
19  to 2021?
20    A.  Yes.
21    Q.  What titles did you hold?
22    A.  I don't recall all the titles.
23    Q.  Do you recall any of the titles?
24    A.  Yes.
25    Q.  What titles do you recall holding at
```

Page 38

WATERHOUSE - 10-19-21

1  those four retail funds before 2021?
2      A.   Principal executive officer.
3      Q.   Were you the principal executive
4  officer of the four retail funds that you have
5  identified?
6      A.   Sorry, could you repeat the
7  question?
8      Q.   Were you the principal executive
9  officer for each of the four retail funds that
10 you have identified?
11     A.   Yes.
12     Q.   When did you become the principal
13 executive -- withdrawn.
14         Can you give me the approximate year
15 that you became the principal executive officer
16 for each of the four retail funds you've
17 identified?
18     A.   I don't recall.
19     Q.   What are your duties and
20 responsibilities as the principal executive
21 officer of these four retail funds?
22     A.   It is to manage the finance and
23 accounting positions.
24     Q.   So at the same time you serve as

Page 39

WATERHOUSE - 10-19-21

1  treasurer of the advisors, you also serve as
2  the principal executive officer of these four
3  retail funds; correct?
4      A.   Yes.
5      Q.   Did you ever hold any title with
6  respect to any other retail fund?
7      A.   Not that I recall.
8      Q.   During the period that you served as
9  Highland's CFO, from time to time Highland
10 loaned money to certain of its officers and
11 employees; correct?
12     A.   Yes.
13     Q.   During the period that you served as
14 Highland's CFO, from time to time Highland
15 loaned money to certain --
16     A.   Let me -- let me retract that,
17 sorry, that -- you asked during the time I was
18 CFO, Highland loaned moneys to employees.  I
19 don't -- I don't recall that during my tenure
20 of CFO.
21     Q.   You have no recollection during the
22 time that you were the CFO of Highland of
23 Highland ever loaning any money to any officer
24 or director of Highland?

Page 40

WATERHOUSE - 10-19-21

1      A.   I don't recall during my tenure of
2  Highland or my -- as CFO of Highland -- yeah,
3  if there are any loans as CFO of Highland.
4      Q.   I'm just talking about officers and
5  employees right now.  You have no recollection
6  of Highland ever making a loan to any of its
7  officers or employees during the time that you
8  served as CFO.  Do I have that right?
9          MS. DANDENEAU:  Objection to form.
10     A.   So I thought you were saying
11 officers and employees as CFO, right, so there
12 were -- I mean, okay, yes.
13     Q.   I would ask you to listen carefully
14 to my question.  If I -- if I'm not clear, let
15 me know, but I'm really trying to be as clear
16 as I can.
17     A.   I'm listening as carefully as I can,
18 and you are asking very specific questions in a
19 timeline.  And I'm trying to answer your
20 questions as specifically as I can, and I
21 apologize if -- if I'm going back.  I am -- you
22 are asking very specific questions.  Thank you.
23     Q.   During the period that you served as
24 Highland's CFO, from time to time Highland

Page 41

WATERHOUSE - 10-19-21

1  loaned money to certain corporate affiliates;
2  correct?
3          MS. DANDENEAU:  Objection to form.
4      A.   What are corporate affiliates?
5      Q.   How about the ones that are in
6  Highland's audited financial statements under
7  the section entitled Loans to Affiliates.  Why
8  don't we start with those.  Do you have any
9  understanding of what the phrase "affiliates"
10 means?
11         MS. DANDENEAU:  Objection to form.
12     A.   I understand what affiliates are,
13 yet affiliates can have different meanings in
14 different contexts, so...
15     Q.   Why don't you -- why don't you tell
16 me what your understanding of the term
17 "affiliate" is in relation to Highland Capital
18 Management, L.P.
19     A.   Is that a -- it depends on the
20 context.
21     Q.   How about the context of making
22 loans?
23         MS. DANDENEAU:  Objection to form.
24     A.   I didn't make the determination of

Page 42

WATERHOUSE - 10-19-21

1    who an affiliate was or is at the time those –
2    I didn't – that wasn't my job to make a
3    determination of who an affiliate is.
4        Q.    All right.  So as the CFO of
5    Highland, do you have any ability right now to
6    tell me which companies that were directly or
7    indirectly owned and/or controlled by
8    Mr. Dondero in whole or in part received loans
9    from Highland Capital Management, L.P.?
10        MS. DANDENEAU:  Objection to form.
11        MS. DEITSCH-PEREZ:  Objection, form.
12    A.    Yes.
13        Q.    Okay.  Identify every entity that
14    you can think of that was directly or
15    indirectly owned and/or controlled by
16    Mr. Dondero in whole or in part that received a
17    loan from Highland Capital Management, L.P.
18        MR. RUKAVINA:  Objection, legal
19        conclusion.
20    A.    NexPoint Advisors, Highland Capital
21    Management Fund Advisors, HCM Services,
22    Dugaboy.  Sorry, I don't think – Dugaboy
23    doesn't fit that definition.  You said owned
24    and controlled.  I don't think that that

Page 43

WATERHOUSE - 10-19-21

1    definition –
2        Q.    I said owned and/or controlled.
3        A.    I don't – again, I'm not – I'm not
4    the legal expert.  I don't think it controls –
5    he controls Dugaboy, so again, I'm not the
6    legal person.
7        Q.    I'm not asking you for a legal
8    conclusion, sir.  I'm asking you for your
9    knowledge, okay, as the CFO – the former CFO
10    of Highland Capital Management, other than
11    NexPoint, HCMFA, and HCMF – HCMS, can you
12    think of any other entities that were owned
13    and/or controlled directly or indirectly in
14    whole or in part by Jim Dondero who received a
15    loan from Highland Capital Management, L.P.?
16        MS. DANDENEAU:  Objection to form.
17        A.    HCRE.
18        Q.    Any others?
19        A.    That is – that is all I can think
20    of.
21        Q.    And you're aware that from time to
22    time while you were the CFO, Highland loaned
23    money to Jim Dondero; correct?
24        A.    Yes.

Page 44

WATERHOUSE - 10-19-21

1        Q.    Okay.  Can we refer to the four
2    entities that you just named and Mr. Dondero as
3    the affiliates?
4        A.    So that would be Jim Dondero,
5    NexPoint Advisors, Highland Capital Management
6    Fund Advisors, and HCRE.
7        Q.    And HCMS?
8        A.    And HCMS, okay.
9        Q.    And can we refer to the loans that
10    were given to each of those affiliates as the
11    affiliate loans?
12        A.    Yes.
13        Q.    And is it fair to say that each of
14    the affiliates were the borrowers under the
15    affiliate loans as we're defining the term?
16        MR. RUKAVINA:  Objection, legal
17        conclusion.
18        A.    The borrowers are whoever were on
19    the notes.  I don't – I don't know.  I'm not
20    the legal person.
21        Q.    But you –
22        A.    I don't know.
23        Q.    You do know, as Highland's former
24    CFO, that each of the affiliates that you have

Page 45

WATERHOUSE - 10-19-21

1    identified tendered notes to Highland; correct?
2        MR. RUKAVINA:  Hey, John, will you
3        just give me a running objection to legal
4        conclusion to HCM –
5        MR. MORRIS:  No.  No, if you want to
6        object –
7        MR. RUKAVINA:  I will object every
8        time.  Object to legal conclusion.
9        MR. MORRIS:  That is fine.
10        A.    Sorry, can you repeat the question?
11        Q.    Are you aware that each of the –
12    that each of the affiliates, as we have defined
13    the term, gave to Highland a promissory note in
14    exchange for the loans?
15        MR. RUKAVINA:  Objection to the
16        extent that calls for a legal conclusion.
17        A.    I don't.
18        Q.    No, you don't know that?
19        A.    No, they didn't – you said they
20    exchanged a promissory note for a loan.  I
21    don't – I don't understand that question, so I
22    said no.
23        Q.    At the time of the bankruptcy
24    filing, did Highland have in its possession

Page 46

WATERHOUSE - 10-19-21

1    promissory notes that were signed by each of
2    the affiliates?
3        A.    Yes.
4        Q.    To the best of your knowledge,
5    during the time that you served as Highland's
6    CFO, did Highland disclose to its outside
7    auditors all of the loans that were made to
8    affiliates?
9        MR. RUKAVINA:  Objection, that calls
10   for a legal conclusion.
11       MS. DEITSCH-PEREZ:  I also couldn't
12   hear you, John, because there was some
13   garbling on -- on the -- on the call.
14       MR. MORRIS:  Folks, I've got to tell
15   you this is not going well, and I'm
16   reserving my right --
17       MS. DANDENEAU:  John, it was just
18   the end of that question.  It was just the
19   end of that question.  I couldn't hear it
20   either.  Sorry, if you could repeat it,
21   please.
22       MR. MORRIS:  That is less than an
23   hour into this, but folks are trying to run
24   out the clock, and so I'm just going to
25

Page 47

WATERHOUSE - 10-19-21

1    state that now.
2        MS. DANDENEAU:  You know, and,
3    Mr. Morris, I really object to that.  I
4    mean --
5        MR. MORRIS:  Okay.
6        MS. DANDENEAU:  -- Mr. Waterhouse
7    just told you he's trying to listen to your
8    questions and answer them carefully, and
9    you have no basis for saying that.
10       MR. MORRIS:  Okay.
11       MS. DANDENEAU:  This does not --
12   this is not an experienced witness, so he's
13   trying to do the best he can.
14       Q.    Mr. Waterhouse, during the time that
15   you served as Highland's CFO, did Highland
16   disclose to its outside auditors all of the
17   loans that it made to each of the affiliates
18   that you have identified?
19       MR. RUKAVINA:  Objection, legal
20   conclusion.
21       A.    Yes.
22       Q.    To the best of your knowledge, while
23   you were Highland's CFO, were all of the
24   affiliate loans described in Highland's audited
25

Page 48

WATERHOUSE - 10-19-21

1    financial statements?
2        MR. RUKAVINA:  Objection, legal
3    conclusion.
4        A.    When an audit was performed, any
5    loans that were made by Highland to the
6    affiliates were disclosed to auditors.
7        Q.    Are you aware of any loan that was
8    made to any affiliate that was not disclosed to
9    the auditors?
10       A.    I'm not aware.
11       Q.    To the best of your knowledge, did
12   each of the affiliates who were --
13   (inaudible) -- loaned from Highland execute a
14   promissory note in connection with that loan?
15       MR. RUKAVINA:  Objection, legal
16   conclusion.
17       A.    Sorry, you -- halfway through the
18   question it got muffled.
19       Can you repeat that again?
20       Q.    To the best of your knowledge, did
21   every affiliate execute a promissory note in
22   connection with each loan that it obtained from
23   Highland?
24       MR. RUKAVINA:  Objection, legal
25

Page 49

WATERHOUSE - 10-19-21

1    conclusion.
2        A.    Yes.
3        Q.    You are not aware of any loan that
4    any affiliate ever obtained from Highland where
5    the affiliate did not give a promissory note in
6    return; is that fair?
7        A.    Yes, I'm not aware.
8        Q.    And to the best of your knowledge,
9    did Highland loan to each affiliate an amount
10   of money equal to the principal amount of each
11   promissory note?
12       MR. RUKAVINA:  Objection, legal
13   conclusion.
14       A.    Yes.
15       Q.    During the time that you served as
16   CFO, did Highland ever loan money to
17   Mark Okada?
18       A.    I -- I don't recall.
19       Q.    Did you ever see any promissory
20   notes executed by Mark Okada?
21       A.    I don't recall.
22       Q.    Do you know if Highland ever forgave
23   any loan that it ever made to Mr. Okada?
24       A.    I don't recall.
25

Page 50

1    WATERHOUSE - 10-19-21
2    Q.   Do you recall if Mr. Okada paid back
3    all principal and interest due and owing under
4    any loan he obtained from Highland?
5        MS. DEITSCH-PEREZ:  Objection to
6    form.
7        MS. DANDENEAU:  Objection to form.
8    A.   I don't recall.
9    Q.   Do you recall whether -- during your
10   time as CFO, whether Highland ever loaned money
11   to Jim Dondero?
12   A.   Yes.
13   Q.   To the best of your knowledge, did
14   Mr. Dondero sign and deliver to Highland a
15   promissory note in connection with each loan
16   that he obtained from Highland?
17   A.   If you are referring to the
18   promissory notes that, you know, part of
19   Highland's records, yes.
20   Q.   Okay.  You're not aware of any loan
21   that Mr. Dondero took from Highland that wasn't
22   backed up by -- by a promissory note with a
23   face -- with a principal amount equal to the
24   amount of the loan; correct?
25   A.   Am I aware that Jim Dondero took a

Page 51

1    WATERHOUSE - 10-19-21
2    loan?
3    Q.   Without giving a -- let me ask a
4    better question.  I'm sorry, Mr. Waterhouse.
5        Are you aware of any loan that
6    Mr. Dondero obtained from Highland where he
7    didn't give a promissory note in return?
8    A.   I'm not aware.
9    Q.   During the time that you served as
10   Highland's CFO, did Highland ever forgive any
11   loans, in whole or in part, that it made to
12   Mr. Dondero?
13   A.   Not that I'm aware.
14   Q.   At the time that you served as
15   Highland's CFO, did Highland ever forgive any
16   loan, in whole or in part, that it made to any
17   affiliate as we've defined the term today?
18   A.   Not that I'm aware.
19   Q.   During the time that you served as
20   Highland's CFO, did Highland ever forgive, in
21   whole or in part, any loan that it ever made to
22   any officer or employee?
23   A.   Highland forgave loans to officers
24   and employees.  It may not have been at the
25   time when my title was CFO.

Page 52

1    WATERHOUSE - 10-19-21
2    Q.   Okay.  And so I appreciate the
3    distinction.
4        Is it fair to say that, to the best
5    of your knowledge, Highland did not forgive a
6    loan that it made to an officer or employee
7    after 2013?
8        MS. DANDENEAU:  Objection to form.
9    A.   I don't recall.
10   Q.   To the best of your knowledge, did
11   Highland disclose to its auditors every
12   instance where it forgave, in whole or in part,
13   a loan that it had made to one of its officers
14   or employees?
15   A.   No.
16   Q.   Can you think of -- can you -- can
17   you identify any loan to an officer or employee
18   that was forgiven by Highland, in whole or in
19   part, that was not disclosed to Highland's
20   outside auditors?
21   A.   Look, I don't recall all of the
22   loans and the loan forgiveness.  I just know as
23   part of the audit process there is a
24   materiality concept.
25       So if there were loans to employees

Page 53

1    WATERHOUSE - 10-19-21
2    that were of -- you know, that were deemed
3    immaterial, those items may not have been
4    disclosed by the team to the auditors.
5    Q.   I appreciate that.
6        Do you have an understanding as to
7    what the level of materiality was?
8    A.   I don't recall.
9    Q.   As the CFO of Highland, to the best
10   of your knowledge, did Highland disclose to its
11   outside auditors every loan that was forgiven,
12   in whole or in part, that was material as that
13   term was defined by the outside auditors?
14   A.   Yes.
15   Q.   And do you recall where -- do you
16   recall where the definition of materiality can
17   be found for -- for this particular purpose?
18       MS. DANDENEAU:  Objection to form.
19   A.   No.  You -- I don't determine
20   materiality.
21   Q.   Okay.  I'm just asking you if you
22   can help me understand where it is, but I think
23   we will find it in a few minutes.
24       You are aware that Highland has
25   commenced lawsuits against each of the

Page 54

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2   affiliates, as we've defined the term, to
3   collect under certain promissory notes; is that
4   right?
5      A.   Yes.
6      Q.   And are you familiar with the notes
7   that are issue -- at issue in the lawsuits?
8          MS. DANDENEAU:  Objection to form.
9      A.   Generally familiar.
10     Q.   Can we refer to the lawsuits that
11  Highland has commenced against the affiliates
12  collectively as the lawsuits?
13     A.   Yes.  And, again, the affiliates are
14  NexPoint, HCMFA, HCMS, and HCRE.
15     Q.   And Mr. Dondero?
16     A.   Okay.  See, that is a new -- and now
17  Mr. Dondero is included in your affiliate
18  definition.
19     Q.   I just --
20     A.   I thought affiliates -- I thought
21  affiliates were just the four prior entities,
22  so I just want to be clear.
23     Q.   I appreciate that.  So let's --
24  let's keep them separate and let's refer to the
25  four corporate entities as the affiliates, and

Page 55

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2   Mr. Dondero we will call Mr. Dondero.  Okay?
3      A.   Okay.  Thank you.  As you can see,
4   Mr. Morris, there is a lot of entities -- a lot
5   here.  I just want to be clear.
6      Q.   Okay.  Now, the affiliates of
7   Mr. Dondero signed promissory notes that are
8   not subject to the lawsuit.
9          Do you understand that?
10         MS. DANDENEAU:  Objection to form.
11     A.   The affiliates and Mr. Dondero
12  signed --
13     Q.   You know what?  I will skip it.
14  That is okay.  Okay.
15         From time to time while you were
16  Highland's CFO, payments were applied against
17  principal and interests that were due under the
18  notes that were tendered by the affiliates and
19  Mr. Dondero; correct?
20         MR. RUKAVINA:  Objection to the
21     extent that calls for a legal conclusion.
22     A.   Yes.
23     Q.   Did Highland have a process where --
24  whereby payments would be applied against
25  principal and interest against the notes that

Page 56

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2   were given by the affiliates and Mr. Dondero?
3      A.   Yes.
4      Q.   Can you describe the process for me?
5      A.   The process, payment should be
6   applied as laid out in the -- in the promissory
7   note.
8      Q.   From time to time were payments made
9   that were not required under the promissory
10  notes?
11         MS. DANDENEAU:  Objection to form.
12     A.   Yes.
13     Q.   Who was responsible for deciding
14  when and how much the payments would be made
15  with respect to each of the notes that were
16  issued by the affiliates and Mr. Dondero?
17     A.   Who was responsible for deciding how
18  much was paid prior to the due date?
19     Q.   I don't know.
20     A.   I don't know.
21     Q.   Did you approve of each payment that
22  was made against principal and interest on the
23  notes that were given by the affiliates and
24  Mr. Dondero?
25         MS. DANDENEAU:  Objection to form.

Page 57

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2      A.   Did I approve the payments?  I
3   approve -- I approve -- if there was cash -- if
4   there was cash being repaid on a note payment,
5   yes, I approved in the general sense of being
6   made aware of the payment and the amount.
7      Q.   And are you the person who
8   authorized Highland's employees to effectuate
9   those payments?
10     A.   Yes.
11     Q.   When you gave the instruction to
12  effectuate the payment, did you obtain
13  Mr. Dondero's prior approval?
14     A.   I mean, it -- I mean, it -- it
15  depends.
16     Q.   Can you think of any instance where
17  you directed Highland's employees to make a
18  payment of principal or interest against any
19  note that was tendered by an affiliate or
20  Mr. Dondero that Mr. Dondero did not approve of
21  in advance?
22     A.   I can't recall specifically.
23     Q.   Can you identify -- withdrawn.
24         Did Mr. Dondero ever tell you that a
25  payment that was made against principal and

Page 58

WATERHOUSE - 10-19-21

1  interest due under one of the notes that was
2  tendered by an affiliate or himself should not
3  have been made?
4      A.  Yes.
5      Q.  Can you identify the payment for me?
6      A.  It would be for -- for NexPoint
7  Advisors.
8      Q.  Okay.  And when did Mr. Dondero tell
9  you that a payment that you had initiated on
10  behalf of NexPoint should not have been made?
11     A.  I wasn't initiating payment.  It was
12  in the context of the -- I think you used this
13  term, "the advisors," so NexPoint Advisors and
14  Highland Capital Management Fund Advisors had
15  overpaid on certain agreements with Highland
16  Capital Management, L.P.  And as a part of that
17  process, the advisors -- what I was told at the
18  time were in talks and negotiations and
19  discussions with Highland Capital Management,
20  L.P., on offsets in relation to those
21  overpayments.
22     Q.  When did this conversation take
23  place?
24         MS. DANDENEAU:  Objection to form.

Page 59

WATERHOUSE - 10-19-21

1      A.  I don't recall specifically.
2      Q.  Do you recall what year it was?
3      A.  Yes.
4      Q.  What year did the conversation with
5  Mr. Dondero take place that you just described?
6      A.  2020.
7      Q.  Okay.  Do you remember if it was
8  December 2020?
9      A.  It -- it -- I don't -- I don't
10  recall what month specifically, but it would
11  have been November or December.
12     Q.  And we're talking here about a
13  payment of principal and/or interest that was
14  due -- withdrawn.
15         We're talking here about a payment
16  of principal and interest that was applied
17  against NexPoint's note; correct?
18         MS. DANDENEAU:  Objection to form.
19     A.  I don't recall what that payment
20  consisted of.
21     Q.  Is it possible that the payment you
22  have in mind related to the shared services
23  agreement?
24         MS. DANDENEAU:  Objection to form.

Page 60

WATERHOUSE - 10-19-21

1      A.  No.
2      Q.  Are you certain that the payment --
3  that the payment that you have in mind related
4  to the promissory note that NexPoint issued in
5  favor of Highland?
6          MS. DANDENEAU:  Objection to form.
7      A.  Yes.
8      Q.  Okay.  Other than that one payment,
9  can you identify any other instance where
10  Mr. Dondero told you that a payment should not
11  have been applied against principal and
12  interest under any promissory note tendered by
13  any affiliate or Mr. Dondero?
14         MS. DANDENEAU:  Objection to form.
15         MS. DEITSCH-PEREZ:  Objection to
16  form.
17     A.  Not that I recall.
18     Q.  Thank you very much.
19         Do you know if Mr. Dondero approved
20  in advance of each loan made to each affiliate
21  and himself during the time that you were the
22  CFO?
23         MS. DEITSCH-PEREZ:  Object to the
24  form.

Page 61

WATERHOUSE - 10-19-21

1      A.  Yes, generally.
2      Q.  Can you identify any loan that was
3  ever made to an affiliate or to Mr. Dondero
4  that Mr. Dondero did not approve of in advance?
5      A.  Other than the ones that are in
6  dispute, I'm not aware.
7      Q.  Do you believe that Mr. Dondero did
8  not approve of each of the loans that are in
9  dispute in advance of the time that the loan
10  was made?
11         MS. DANDENEAU:  Objection to form.
12     A.  Given what is in the dispute, you
13  know, and -- and -- and the way things might --
14  yeah, I mean...
15     Q.  I am not asking about the dispute,
16  and it was probably my mistake to follow you
17  there.
18         Were you aware of every loan made by
19  Highland to each of its affiliates and
20  Mr. Dondero while you were the CFO at the time
21  each loan was made?
22     A.  Was I aware of every loan, yes.
23     Q.  Okay.  And if you put yourself back
24  in time, do you recall that any of the loans

Page 62

WATERHOUSE - 10-19-21
1
2   that were made to one of the affiliates or
3   Mr. Dondero during the time that you were the
4   CFO was made without Mr. Dondero's prior
5   knowledge and approval?
6      A.   Not that I recall.
7      Q.   Thank you.  In fact, do you -- as
8   the CFO, would you have allowed Highland to
9   loan money to an affiliate or to Mr. Dondero
10  without obtaining Mr. Dondero's prior approval?
11        MS. DANDENEAU:  Objection to form.
12     A.   I can't -- there was so many times
13  over the years, I can't speak for every single
14  one, but generally, yes, I -- I spoke to him.
15     Q.   You -- you never -- you never --
16  withdrawn.  I will just take that.
17        Can you recall any payment that was
18  ever made against principal and interest on a
19  note that was issued in favor of Highland by an
20  affiliate or Mr. Dondero that you personally
21  did not know about in advance?
22     A.   There are so many through the years,
23  I don't -- I don't -- I don't recall every
24  single one.
25     Q.   Okay.  Can you identify any payment

Page 63

WATERHOUSE - 10-19-21
1
2   that was made against principal and interest on
3   any note tendered by any affiliate or
4   Mr. Dondero that you didn't know about in
5   advance?
6      A.   I don't recall.
7      Q.   Other than Mr. Dondero -- withdrawn.
8        Did anybody at Highland have the
9   authority to make a payment against principal
10  and interest due under a loan given to the
11  affiliates and Mr. Dondero without your
12  knowledge and approval?
13        MS. DANDENEAU:  Objection to form.
14     A.   Sorry, there was -- to make a
15  payment on an affiliate loan, what you are
16  saying would it require my knowledge and
17  approval, yes.
18     Q.   Okay.  I appreciate that.  Thank
19  you.
20        Did anybody at Highland have the
21  authority, to the best of your knowledge, to
22  effectuate a loan to an affiliate without
23  Mr. Dondero's prior knowledge and approval?
24        MS. DANDENEAU:  Objection to form.
25     A.   I can't speak for all, but

Page 64

WATERHOUSE - 10-19-21
1
2   generally, yes.
3      Q.   Did you personally communicate with
4   Mr. Dondero to let him know each time a payment
5   of principal or interest was being made against
6   any note that was tendered by an affiliate or
7   Mr. Dondero to Highland?
8      A.   I don't -- are you saying, did I let
9   Mr. Dondero know if a payment was made on any
10  affiliate or loan to Mr. Dondero?  I mean,
11  not -- not every -- no.
12     Q.   Let me ask it this way:  Did you
13  have a practice of informing Mr. Dondero when
14  payments were made against principal and
15  interest on any note that was tendered by an
16  affiliate or Mr. Dondero?
17        MS. DEITSCH-PEREZ:  Objection to
18  form.
19        MS. DANDENEAU:  Objection to form.
20     A.   No, I did not.
21     Q.   Did Mr. Dondero ever tell you that a
22  payment of principal or interest had been made
23  against a note that was tendered by an
24  affiliate or himself that he had been unaware
25  of?

Page 65

WATERHOUSE - 10-19-21
1
2      A.   Not that I recall.
3      Q.   Are you aware that Mr. Dondero and
4   the affiliates -- withdrawn.
5        Are you aware that Mr. Dondero
6   NexPoint, HCRE, and HCMS all contend that they
7   do not have to pay on any of the notes they
8   issued because they are subject to an oral
9   agreement between Mr. Dondero and Nancy
10  Dondero, in her capacity as the trustee of the
11  Dugaboy Investment Trust?
12        MS. DANDENEAU:  Objection to form.
13     A.   I didn't -- I didn't -- I didn't
14  know that it was all notes.
15     Q.   Okay.  Are you -- did you ever learn
16  that there was an oral agreement between Jim
17  Dondero and Nancy Dondero pertaining to any
18  notes issued by any affiliate or Mr. Dondero?
19        MS. DEITSCH-PEREZ:  Object to the
20  form.
21     A.   Yes.
22     Q.   Do you have any understanding as to
23  the terms of that agreement?
24     A.   Yes.
25     Q.   What is your understanding of the

Page 66

WATERHOUSE - 10-19-21

1  terms of the agreement?
2      A.   That there were certain milestones
3  that had to be reached.
4      Q.   Do you have any understanding of the
5  terms of the agreement between Mr. Dondero and
6  Nancy Dondero concerning any of the notes
7  issued by the affiliates or Mr. Dondero other
8  than that there have to be milestones reached?
9          MS. DEITSCH-PEREZ:  Object to the
10  form.
11     A.   There are milestones, I found out
12  yesterday, or there was some --
13         MS. DANDENEAU:  Okay.  I'm just
14  going to object to the extent that you
15  learned anything in conversations with
16  counsel, please don't reveal -- that is
17  privileged, and don't reveal any privileged
18  communications.
19         THE WITNESS:  Okay.
20     A.   So I'm not aware of anything else.
21     Q.   Do you know what the milestones
22  were?
23         MS. DANDENEAU:  Objection to form.
24     A.   I don't.

Page 67

WATERHOUSE - 10-19-21

1      Q.   Do you know anything about -- do you
2  know what promissory notes the agreement
3  covered?
4      A.   I don't.
5      Q.   Do you know if -- if Jim and Nancy
6  Dondero entered into one agreement or more than
7  one agreement?
8          MS. DEITSCH-PEREZ:  Object to the
9  form.
10     A.   I don't know.
11     Q.   Do you know if the agreement is in
12  writing?
13     A.   I don't know.
14     Q.   How did you learn of the existence
15  of the agreement?
16         MS. DANDENEAU:  Objection to form.
17  Again --
18     A.   I don't -- I don't recall who told
19  me.
20     Q.   You have no recollection of who told
21  you about this agreement between Jim and Nancy
22  Dondero?
23         MS. DEITSCH-PEREZ:  Object to the
24  form.

Page 68

WATERHOUSE - 10-19-21

1      A.   I don't recall.
2      Q.   Do you recall how you learned of the
3  agreement?
4          Was it in a meeting?  Was it in a
5  phone call?  Was it in an email?
6      A.   I don't recall.
7      Q.   Do you recall when you learned of
8  the agreement?
9      A.   Not specifically.
10     Q.   Do you recall what year you learned
11  of the agreement?
12     A.   In -- look, I mean, there are so
13  many notes.  I may be getting -- I believe it
14  was 2020.
15     Q.   All right.  I'm not asking about
16  notes, sir.  I'm asking about the agreement
17  that you testified you knew about between Jim
18  and Don- -- Nancy Dondero.  Okay.
19         Do you understand my question now?
20  Should I ask my question again?
21     A.   Yeah, sure.  Go ahead.
22     Q.   I'm going to use the word
23  "agreement" to refer to the agreement that
24  Mr. Dondero and Nancy Dondero entered into

Page 69

WATERHOUSE - 10-19-21

1  where you understood that certain milestones
2  had to be reached.  Okay?
3      A.   Uh-huh.
4          MS. DANDENEAU:  Objection.
5          MS. DEITSCH-PEREZ:  Object to the
6  form.
7          MR. MORRIS:  Just defining a term,
8  what is the objection.
9          MS. DEITSCH-PEREZ:  The objection --
10         MR. MORRIS:  I will move on.  I will
11  move on.
12         MS. DEITSCH-PEREZ:  John --
13     Q.   Sir, are you okay with that
14  definition of agreement?
15     A.   Okay.
16     Q.   Okay.  So you don't recall who --
17  who informed you of the existence of the
18  agreement; is that right?
19     A.   I don't recall.
20     Q.   You don't recall who told you the
21  terms of the agreement.
22         Do I have that right?
23     A.   Correct.
24     Q.   And you don't recall if you learned

Page 70

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    about the agreement in a meeting, through an
3    email, or through a phone call.
4        Do I have that right?
5    A.   I don't recall.
6    Q.   Can you tell me when you learned of
7    the agreement?
8    A.   I don't -- I don't -- I don't
9    remember specifically.
10   Q.   Can you tell me if you learned of
11   the agreement before or after the petition
12   date?
13   A.   It would have been -- it would have
14   been after.
15   Q.   Can you tell me if you learned of
16   the agreement before or after January 9th,
17   2020?
18   A.   It would have been after.
19   Q.   Can you tell me if you learned of
20   the agreement before or after you left Highland
21   Capital Management in February of 2021?
22   A.   I don't -- I don't -- I don't know.
23   Q.   It is possible that you learned of
24   it while you were a Highland employee.
25       Do I have that right?

Page 71

1    WATERHOUSE - 10-19-21
2    A.   I don't remember the -- I mean, it
3    was sometime in 2021. I don't remember when.
4    Q.   All right. So to the best of your
5    recollection, it was in 2021 but you don't
6    recall if it was before or after you ceased to
7    be a Highland employee.
8        Do I have that right?
9    A.   Yeah, I mean, it was -- it was
10   likely after I was -- after I left Highland
11   because, if I put myself back into the last
12   days of -- of 2021, it was -- you know, the
13   communications with Mr. Dondero were -- were --
14   were -- there weren't as many communications
15   because of the circumstances.
16   Q.   And so based on that you believe
17   that it is most likely that you learned of this
18   agreement sometime after you left Highland
19   employment?
20   A.   I wouldn't use the term "most
21   likely." I don't recall specifically. I don't
22   recall.
23   Q.   Do you recall ever telling Jim Seery
24   about this agreement?
25   A.   No, I don't -- I didn't tell

Page 72

1    WATERHOUSE - 10-19-21
2    Jim Seery.
3    Q.   Did you tell anybody at DSI about
4    this agreement?
5    A.   No.
6    Q.   Did you tell any of Highland's
7    independent directors about this agreement?
8    A.   No.
9    Q.   Did you tell anybody at Pachulski
10   Stang Ziehl & Jones about this agreement?
11   A.   No.
12   Q.   Did you tell any employee of
13   Highland about this agreement?
14   A.   No.
15       MS. DANDENEAU: Mr. Morris, it has
16       been an hour and a half. Is this a good
17       time for a break?
18       MR. MORRIS: Sure.
19   Q.   Mr. Waterhouse, I will just remind
20   you that during the break please don't speak
21   with anybody about the deposition, the
22   substance of your testimony or anything else
23   concerning the deposition. Okay?
24   A.   Yes.
25       MR. MORRIS: So it is 11:02. We're

Page 73

1    WATERHOUSE - 10-19-21
2    at 11:02 your time. Let's come back, I
3    guess, at 15 -- at 11:15 your time.
4        VIDEOGRAPHER: We're going off the
5    record at 11:02 a.m.
6    (Recess taken 11:02 a.m. to 11:20 a.m.)
7        VIDEOGRAPHER: We are back on the
8    record at 11:20 a.m.
9    Q.   Mr. Waterhouse, did you speak with
10   anybody during the break about this deposition?
11   A.   No.
12       MS. DANDENEAU: Other than -- other
13       than his counsel.
14   Q.   Did you speak to your counsel about
15   the substance of your deposition today?
16   A.   No, I didn't bring it up.
17   Q.   I didn't ask you if you brought it
18   up. I asked you if you had any conversation
19   with your lawyer about the substance of your
20   deposition.
21       MS. DANDENEAU: Yes, he did.
22   Q.   Can you tell me what the -- you
23   discussed?
24       MS. DANDENEAU: No, I object to
25       that. He's not going to answer. That is a

Page 74

WATERHOUSE - 10-19-21

1      privileged conversation.
2          MR. MORRIS: So I just want to make
3      sure that I understand. During the break
4      you spoke with your client about the
5      substance of this deposition; is that
6      right?
7          MS. DANDENEAU: Yes, John.
8          MR. MORRIS: And you refuse -- you
9      refuse to let your client tell me what was
10     discussed; is that right?
11         MS. DANDENEAU: That's correct.
12         MR. MORRIS: You know, I had given
13     the instruction prior to the break not to
14     speak with counsel. I would have
15     appreciated --
16         MS. DANDENEAU: No, you didn't --
17     actually, that is not true, Mr. Morris.
18     You said not to speak with anyone. We
19     never have interpreted that to mean
20     conversations with counsel. That's never
21     been -- I have never, ever heard that
22     instruction.
23         MR. MORRIS: Okay. We will -- we
24     will -- we will deal with it when and if we

Page 75

WATERHOUSE - 10-19-21

1      have to.
2          Q.   Mr. Waterhouse, after learning about
3      the agreement, did you ask anybody if the
4      agreement was reflected in a writing?
5          MS. DANDENEAU: Objection to form.
6          A.   No.
7          Q.   Did you ask anybody if the terms of
8      the agreement were memorialized anywhere?
9          MS. DANDENEAU: Objection to form.
10         MR. MORRIS: What is the --
11         A.   No.
12         MS. DANDENEAU: Well, because you
13     keep talking about this agreement and I --
14     I -- I think, Mr. Morris, that is really
15     not clear what you mean by "the agreement."
16     And maybe you can just go back and restate
17     what that is.
18         MR. MORRIS: Okay. Your client has
19     agreed with me twice on the definition, but
20     I will try one more time.
21         Q.   Mr. Waterhouse, do you understand
22     that when I use the term "agreement," I'm
23     referring to the agreement between Jim and
24     Nancy Dondero concerning certain promissory

Page 76

WATERHOUSE - 10-19-21

1      notes where you learned that one of the terms
2      of the agreement was milestones reached?
3          A.   Okay.
4          Q.   And did you understand that that was
5      the -- the agreement that we were referring to
6      every time we used the word "agreement" in this
7      deposition?
8          A.   I don't know anything about this
9      agreement. So, look, I do -- it -- I don't
10     know whether --
11         Q.   Let's -- let's try this again.
12         A.   Yeah. Look, I don't know what this
13     agreement relates.
14         MS. DEITSCH-PEREZ: John, John --
15         Q.   Let me try --
16         MS. DEITSCH-PEREZ: John, please let
17     the witness finish.
18         MR. MORRIS: Please stop. Please
19     stop. Please stop talking.
20         MS. DEITSCH-PEREZ: No, you stop.
21     Let the witness --
22         MR. MORRIS: Stop talking.
23         MS. DEITSCH-PEREZ: -- finish -- you
24     interrupted him.

Page 77

WATERHOUSE - 10-19-21

1          MR. MORRIS: You know what, you
2      guys, this is really wrong. It is really,
3      really wrong. Okay?
4          I had the witness agree not once,
5      but twice to the definition of agreement.
6      Okay? I'm going to try and do it a third
7      time.
8          MS. DANDENEAU: No, but, please,
9      John, really --
10         MR. MORRIS: No, please stop
11     talking. Please. It is my deposition.
12     Object to questions.
13         MS. DANDENEAU: No, but also you
14     instructed him that -- that if you were
15     going -- if you were interrupting him, that
16     he should remind you that you're
17     interrupting him and -- and --
18         MR. MORRIS: Let him do that. Let
19     him do that.
20         MS. DANDENEAU: Okay. Well, you --
21         MR. MORRIS: Please stop talking.
22         A.   Okay. I don't know any of the
23     details of these agreements. I don't know
24     anything about them. I heard -- someone -- I

WATERHOUSE - 10-19-21

1    don't know who, I don't know when, as you
2    asked, sometime in '21, someone told me about
3    this -- or I don't honestly know -- I don't
4    even recall exactly how I was made aware of
5    this, but I was. I don't know -- I don't know
6    any of these details, and I'm getting -- again,
7    there is, you know, I -- I -- I had a passing
8    conversation with -- with Jim at some point
9    on -- on some -- on the executive comp, and I'm
10   getting confused of what is what, because
11   again, I don't know any of these details.
12      Q.   Okay. Let me try again,
13   Mr. Waterhouse, and I apologize.
14           Are you aware of any agreement
15   between Jim Dondero and Nancy Dondero
16   concerning any promissory note that was given
17   to Highland by any affiliate or Mr. Dondero?
18           MS. DEITSCH-PEREZ: Object to the
19   form.
20      A.   I've heard of an agreement. That
21   is -- that is -- I mean, if you are using aware
22   as heard, sure.
23      Q.   And you understand that one of the
24   terms of the agreement is that it was based on

WATERHOUSE - 10-19-21

1    milestones that had to be reached; is that
2    right?
3        MS. DANDENEAU: Objection to form.
4      A.   That was one of the words that was
5    used when I heard about it, yes.
6      Q.   And when you heard about this
7    agreement that had a term in it concerning
8    milestones reached, did you ask the person who
9    was telling you about the agreement whether or
10   not it was in writing?
11      A.   I did not.
12      Q.   Did you ask any questions at all?
13         MS. DANDENEAU: Objection to form.
14      A.   Not that I recall.
15      Q.   But do you understand that going
16   forward, we're going to refer to the agreement
17   as the agreement that you just described that
18   you were --
19         MS. DANDENEAU: Object to the form.
20      A.   Yes.
21      Q.   Okay. You don't have any personal
22   knowledge concerning the terms of the
23   agreement; correct?
24         MS. DEITSCH-PEREZ: Object to the

WATERHOUSE - 10-19-21

1    form.
2      Q.   You can answer.
3      A.   I don't -- I heard about the
4    agreement. I don't know anything -- I heard
5    there was an agreement. That is -- again, as I
6    testified before -- I said before, heard about
7    it, don't know the details. I believe it was
8    sometime this year.
9      Q.   Do you have any personal knowledge
10   about the terms of the agreement, sir?
11         MS. DANDENEAU: Objection to form.
12      A.   Other than what I have previously
13   discussed, I don't -- I don't know.
14      Q.   Did -- did Mr. Dondero tell you
15   about the existence of the agreement?
16      A.   I don't recall.
17      Q.   Do you recall the source of your
18   information when you learned about the
19   agreement?
20      A.   No, I don't -- I don't recall. I
21   don't remember. I just -- I heard about it
22   generally. I don't remember -- I don't
23   remember who, how, if, how. I don't remember.
24      Q.   You know, Mr. Waterhouse, I just

WATERHOUSE - 10-19-21

1    want to be clear that I never would have asked
2    you to appear at this deposition if your name
3    hadn't been included in responses to discovery
4    as to somebody with knowledge about the -- who
5    was told about the existence of the agreement.
6            That is what prompted me do this,
7    and I really do feel compelled to tell you that
8    I otherwise would never have called you as a
9    witness. So I regret that you're being put
10   through this today. I had no intention of
11   burdening or taking your time, but that is
12   the reason that we issued the subpoena is
13   because certain of the defendants identified
14   you as somebody --
15         MS. DEITSCH-PEREZ: Mr. Morris, you
16   are here to ask questions, not to have --
17         MR. MORRIS: I feel badly for the
18   guy. I really do.
19         MS. DEITSCH-PEREZ: I'm sure you do.
20         MR. MORRIS: I do. Stop.
21         MS. DEITSCH-PEREZ: You stop.
22         MR. MORRIS: I'm allowed.
23         MS. DEITSCH-PEREZ: No, you're not
24   allowed to have a chat with the witness.

Page 82

WATERHOUSE - 10-19-21

1       Q.   Okay.  Well, I hope that you
2  appreciate what I'm saying here,
3  Mr. Waterhouse.
4       MS. DANDENEAU:  All right.  Let's go
5  ahead and ask questions, and again, you're
6  entitled to probe his -- his knowledge
7  of -- whatever knowledge he has about
8  this -- this agreement and --
9       MR. MORRIS:  That is what I'm doing.
10      MS. DANDENEAU:  -- he will answer
11  the questions to the best that he can.
12      MR. MORRIS:  That is what I'm doing.
13      Q.   Mr. Waterhouse, I take it you do not
14  know which promissory notes issued by which
15  affiliates or Mr. Dondero are the subject of
16  this agreement; do I have that right?
17      A.   Yes, I don't -- I don't know.
18      Q.   Do you know of any way to determine
19  which promissory notes issued by the affiliates
20  and Mr. Dondero are the subject of this
21  agreement other than asking Jim or Nancy
22  Dondero?
23      MS. DANDENEAU:  Objection to form.
24      A.   I don't know.
25

Page 83

WATERHOUSE - 10-19-21

1       Q.   Did you ever make --
2       A.   I don't know anything about these
3  agreements.
4       Q.   Did you ever make any effort to
5  determine which promissory notes are subject to
6  this agreement?
7       A.   No.
8       Q.   Did you ever ask anybody which
9  promissory notes are subject to this agreement?
10      A.   No.
11      Q.   Do you know if there is a list
12  anywhere of the promissory notes that are
13  subject to this agreement?
14      A.   I'm not aware.
15      Q.   Have you ever seen the terms of the
16  agreement written down anywhere?
17      A.   No.
18      Q.   Have you ever asked anybody whether
19  the terms of the agreement were written down
20  anywhere?
21      A.   I have not.
22      Q.   Did learning about the agreement
23  cause you to do anything in response?
24      MS. DANDENEAU:  Objection to form.
25

Page 84

WATERHOUSE - 10-19-21

1       A.   No.
2       Q.   Did anybody ever describe to you the
3  nature of the milestones that you referred to
4  earlier?
5       A.   No, I don't -- I don't have any
6  details of this.
7       Q.   That is fine.
8            PricewaterhouseCoopers served as
9  Highland's outside auditors prior to the
10  petition date; correct?
11      A.   Yes.
12      Q.   You refer to PricewaterhouseCoopers
13  as PwC?
14      A.   Yes.
15      Q.   PricewaterhouseCoopers audited
16  Highland's financial statements on an annual
17  basis; correct?
18      A.   During my -- during my time as -- as
19  CFO, yes, PricewaterhouseCoopers was the
20  auditor.
21      Q.   Do you know why Highland had its
22  annual financial statements audited each year?
23      A.   Generally.
24      Q.   Tell me your general understanding

Page 85

WATERHOUSE - 10-19-21

1  as to the reason why Highland had its annual
2  financial statements audited each year.
3       A.   From -- from time to time, they were
4  used -- or asked for, as part of diligence or
5  transactions or -- or things of that nature.
6       Q.   And were they given to third parties
7  for purposes of diligence or transactions from
8  time to time?
9       A.   As far as I'm aware, yes.
10      Q.   And was it your understanding as the
11  CFO that the third parties who received the
12  financial statements in diligence or
13  transactions was going to rely on those?
14      MS. DANDENEAU:  Objection to form.
15      A.   I don't know -- I don't know gen --
16  I don't know specifically what they were going
17  to rely on.  You know, we would get requests
18  for audited financial statements.  I don't know
19  what they were relying on.
20      Q.   And --
21      A.   You would have to ask them.
22      Q.   Did you personally play a role in
23  PwC's annual audit and the conduct of the
24  audit?
25

Page 86

```
1        WATERHOUSE - 10-19-21
2        MS. DANDENEAU:  Objection to form.
3     A.   During my tenure as CFO, I played a
4   very minimal role.
5     Q.   What was the minimal role that you
6   played?
7     A.   You know, again, it was -- it was to
8   check in with the team, to make sure that, you
9   know, audit -- the deadlines were being hit,
10  information was being presented to the auditors
11  in a -- in a timely fashion, but, you know,
12  other than that, it was a very capable team
13  that are still current employees of Highland
14  and, you know, they -- they conducted 99
15  percent of -- look, I don't want to give
16  percentages.  I mean, this is -- but I -- I --
17  I played a minimal role towards the end.
18          Before during my earlier years as
19  CFO, I did more, and then as time went on, I
20  did less in it.
21     Q.   Okay.  Was there a person at
22  Highland who was responsible for overseeing
23  Highland's participation in PwC's audit during
24  the time that you were the CFO?
25     A.   Yeah.  I mean, there was -- there
```

Page 87

```
1   was a -- there was a point -- it varies.  It
2   varies by year, in function, in time and, you
3   know, depending on the request, but yes, I
4   mean, there is -- there is -- there is
5   generally a point person of communication.
6     Q.   And who was the point person from
7   2016 until the time you left Highland?
8     A.   I don't -- I don't know
9   specifically, but it would have been, you
10  know -- you know, someone on the corporate
11  accounting team.
12     Q.   And was there a head of the
13  corporate accounting team?
14     A.   Yes, so -- yes.
15     Q.   Who was the head of corporate
16  accounting for the five years prior to the time
17  you left Highland?
18     A.   I don't -- if you're asking from
19  2016 on, I don't -- it was Dave Klos, but,
20  again, there was -- there was changes to the
21  team and the reporting structure.  I don't
22  remember exactly when that happened during --
23  you know, over the last -- since 2016.
24     Q.   Did the folks who participated and
```

Page 88

```
1        WATERHOUSE - 10-19-21
2   ran the audit all report to you, directly or
3   indirectly?
4     A.   Yes.
5     Q.   And did you have any responsibility
6   for making sure that the audit report was
7   accurate before it was finalized?
8     A.   Yeah.  I mean, you know, that --
9   that is -- my responsibility to the auditors
10  was -- again, is -- and the CFO is to -- we are
11  providing accurate financial statements; right?
12          And -- and -- and as part of any
13  audit, we disclose all relevant information as
14  part of any audit.
15     Q.   Okay.  And as the CFO, did you take
16  steps to make sure that the audit report was
17  accurate?
18     A.   I mean, I would say in a general
19  sense, yes.  But, again, I mean, I had a
20  very -- I had a very capable and competent
21  team.  I wasn't managing them.
22          You know, part of what I do is I let
23  the team -- I want managers to grow.  I want
24  managers to have rope.  And that is -- you
25  know, I'm not a stand-behind-you type of guy.
```

Page 89

```
1        WATERHOUSE - 10-19-21
2   If you -- if you talk to my team members, I'm
3   not micromanaging people.  I want people to
4   learn and grow in their function so they can go
5   on and do bigger and better things with their
6   careers.
7          And so, yes, generally I was
8   responsible for it, but I wanted the team to
9   learn and grow and be responsible for the bulk
10  of the audit.
11     Q.   Did you personally review each audit
12  report before it was finalized to satisfy
13  yourself that it was accurate?
14     A.   I don't -- I don't recall, you know,
15  for every single -- we're talking 2016, there
16  would have been three years, 2016 to '17, '18.
17  I don't -- we're -- we're going back
18  five-years-plus.  I don't -- you know, I don't
19  recall.
20     Q.   Did you have a practice that you
21  employed to make sure that you were satisfied
22  that Highland's audit reports were true and
23  accurate to the best of your knowledge?
24     A.   I mean, our -- the practice was set
25  up with our -- the -- the practice to put
```

Page 90

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  together accurate audited or accurate financial
3  statements is to your control environment.
4     So, you know, the – so the practice
5  was to maintain a stable control environment
6  which then the output is – is accurate
7  financial statements.
8     So – so, you know, if I was
9  comfortable that the control environment was
10  operating, then, you know, that would dictate
11  how I would – you know, what I might or might
12  not do in a given year.
13    Q.   Okay.  Do you recall ever being
14  uncomfortable with the control environment
15  during the period that you served as CFO?
16    A.   Yeah.  I mean, look, yes, there are
17  times – you know, nothing is perfect.  So
18  there were – there were times when, yes, you
19  know – there are times when I learned I was
20  uncomfortable with the control environment, and
21  that is part of the management of the process
22  and having, you know – and – and working
23  through whatever obstacles present themselves.
24    Q.   Okay.  Were you ever uncomfortable
25  with the control process as it related to

Page 91

WATERHOUSE - 10-19-21

1  reporting and disclosures of loans to
2  affiliates and Mr. Dondero?
3     MS. DANDENAU:  Objection to form.
4    A.   I don't – I don't recall –
5    Q.   So you don't recall –
6    A.   – the –
7     MS. DANDENEAU:  Mr. Morris –
8    A.   I don't recall being uncomfortable.
9  But, again, we're going back several years.  I
10  don't – you know, the practice in an audit is
11  to disclose all information to the auditors.
12  And I don't – I don't recall.
13    Q.   As part of the process of the audit,
14  did you sign what is sometimes referred to as a
15  management representation letter?
16    A.   Yes.
17     MR. MORRIS:  Can we put up on the
18  screen a document that we have premarked as
19  Exhibit 33.
20     (Exhibit 33 marked.)
21     MS. DANDENEAU:  Mr. Morris, that is
22  not in the binder; correct?
23     MR. MORRIS:  Correct.
24    Q.   So you will see, Mr. Waterhouse,

Page 92

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  this is a letter dated June 3rd.  And if we
3  could go to the signature page.
4     And do you see that you and
5  Mr. Dondero signed this document?
6    A.   Yes.
7    Q.   That is your signature; right?
8    A.   Yes.
9     MR. MORRIS:  Okay.  Can you go back
10  to the top.
11     MS. DANDENEAU:  Mr. Morris, can you
12  have somebody post this in the chat so that
13  we have can have a copy of this, please.
14     MR. MORRIS:  Yeah, sure.  Asia, can
15  you do that, please.
16    Q.   Okay.  Do you see at the bottom of
17  the second paragraph there is a reference to
18  materiality?
19    A.   Yes.
20    Q.   Okay.  It says, Materiality used for
21  purposes of these representations is
22  $1.7 million.
23     Do you see that?
24    A.   I do.
25    Q.   And did PwC set that level of

Page 93

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  materiality?
3    A.   Yes.
4    Q.   And for purposes of the audit, did
5  PwC set the level of materiality each year?
6    A.   Yes.
7    Q.   Did that number change over time?
8    A.   I'm not aware of what materiality is
9  every single year, so – but, you know, this
10  number would likely fluctuate.
11    Q.   Okay.  I'm going to go back to a
12  question I asked you earlier today.  And that
13  is in connection – this letter is issued in
14  connection with the audit for the period ending
15  12/31/2018; correct?
16    A.   Yes.
17    Q.   Okay.  And is it fair to say that if
18  any – actually, withdrawn.  I'm going to take
19  it outside of this.
20     If Highland ever forgave the loan to
21  any affiliate or any of its officers or
22  employees, in whole or in part, to the best of
23  your knowledge, would that forgiveness have
24  been disclosed in the audited financial
25  statements if it exceeded the level of

Page 94

WATERHOUSE - 10-19-21

1    materiality that PwC established?
2    MS. DANDENEAU:  Objection to form.
3    A.    So, again, during my tenure as CFO,
4    and -- Highland -- it was -- it is required to
5    disclose any affiliate loans that are in excess
6    of materiality.
7         Now, the forgiveness of those loans
8    may or may not -- I mean, since materiality
9    fluctuates every year, a -- you know, if a loan
10   was forgiven, it may or may not, you know --
11   and, look, I would want to consult the guidance
12   around this.
13        It is not something we do -- you
14   know, it is not -- you know, GAAP can be and
15   disclosures can be very specialized so, again,
16   we want to consult the guidance.  But we would
17   see if and what would need to be disclosed if
18   it were deemed immaterial.
19   Q.    Did you and Mr. Dondero sign
20   management representation letters of this type
21   in each year in which you served as Highland's
22   CFO?
23   A.    I -- I -- I will speak for myself.
24   I signed them.  There may have been others that

Page 95

WATERHOUSE - 10-19-21

1    signed as well.  I don't -- I don't recall.
2    Q.    But to the best of your knowledge,
3    you, personally, signed a management
4    representation letter in connection with
5    Highland's audit each year that you served as
6    the CFO; correct?
7    A.    I would say generally speaking,
8    Mr. Morris.  I don't recall for every single
9    year, you know, generally, but I would want to
10   refer to all the rep letters and see who signed
11   them.
12   Q.    Do you recall Highland having its
13   financial statements audited in any year during
14   the period that you were a CFO where you didn't
15   sign the management representation letter?
16   A.    I don't recall.  But, John, we're
17   going back five, six, seven, eight, nine,
18   decade.  I don't -- I don't remember.
19   Q.    I don't want to go back that many
20   decades, but I'm just asking you if you recall
21   that there was you didn't sign it?
22   A.    I -- I -- I don't, but my memory
23   is -- again, I -- I -- I can't tell you what I
24   did in 2012.  I mean, I think generally, yes,

Page 96

WATERHOUSE - 10-19-21

1    but I don't -- I don't know for sure, and I
2    would want to rely on the document.
3    Q.    Let me ask the question a little bit
4    differently then.
5         Do you have any reason to believe
6    that Highland had its annual financial audit
7    and you did not sign a management
8    representation letter in connection with that
9    audit?
10   MS. DANDENEAU:  Objection to form.
11   A.    I don't believe it would, but,
12   again, I would want to -- I don't recall and I
13   would want to confirm it to -- to make, you
14   know, an affirmative -- to give an affirmative
15   answer.
16   Q.    Do you know whether PwC required
17   management to sign management representation
18   letters?
19   MS. DANDENEAU:  Objection to form.
20   A.    Yes.  I mean, it -- management
21   representation letters are signed by
22   management.
23   Q.    Okay.  And do you know -- do you
24   have any understanding as to why PwC requires

Page 97

WATERHOUSE - 10-19-21

1    management to sign management representation
2    letters?
3    MS. DEITSCH-PEREZ:  Object to the
4    form.
5    A.    I don't know why PwC's -- what PwC's
6    specific practice is.  I know generally what
7    management representation letters are.
8    Q.    Okay.  Do you personally -- I'm not
9    asking about PwC.  I'm asking for you -- I'm
10   asking you, do you have an understanding
11   as to why the auditor asks for management
12   representation letters?
13   A.    Okay.  So you're asking me in my
14   personal capacity, yes, I have a general
15   understanding of why.
16   Q.    Can you give me the general
17   understanding that you have as to why
18   management representation letters are required?
19   A.    They are -- they are required to --
20   they are -- they are one of the items required
21   in an audit to help verify completeness.
22   Q.    Do you have any -- any other
23   understanding as to why management
24   representation letters are required?

Page 98

```
         WATERHOUSE - 10-19-21
1
2      A.   That is -- that is -- other than
3   what I said, it is -- it is -- it is required
4   so -- to ensure that the -- you know, there
5   is -- there is completeness in what is being
6   audited.
7      Q.   Did you -- did you have a practice
8   whereby you and Mr. Dondero conferred about the
9   management representation letters before you
10  signed them?
11     A.   No.
12     Q.   Did you have a practice --
13  withdrawn.
14          Do you see just the next sentence
15  after the materiality, there is a sentence that
16  states:  We confirm, to the best of our
17  knowledge and belief, as of June 3rd, 2019, the
18  date of your report, the following
19  representations made to you during your audit.
20          Do you see that sentence?
21     A.   Yes.
22     Q.   Okay.  Did you understand when you
23  signed this letter that you were confirming the
24  representations that followed?
25     A.   When I signed this management
```

Page 99

```
         WATERHOUSE - 10-19-21
1
2   letter -- representation letter, yes.
3      Q.   Okay.  Did you discuss this letter
4   with Mr. Dondero before you signed it?
5      A.   I don't recall.
6      Q.   Do you recall if Mr. Dondero asked
7   you any questions before he signed the letter?
8      A.   I don't recall.
9      Q.   Do you recall if you asked
10  Mr. Dondero any questions before you signed
11  this letter?
12     A.   I don't recall.
13     Q.   Is it fair to say that Mr. Dondero
14  did not disclose to you the existence of the
15  agreement that we have -- as we've defined that
16  term prior to the time you signed this letter?
17          MS. DANDENEAU:  Objection to form.
18     A.   I don't think I understand the
19  question.  So, again, you are saying, did
20  Mr. Dondero not disclose to me the existence of
21  this letter?
22     Q.   No, I apologize.
23          Did Mr. Dondero disclose to you the
24  existence of the agreement prior to the time
25  you signed this letter on June 3rd, 2019?
```

Page 100

```
         WATERHOUSE - 10-19-21
1
2      A.   The agreement -- the agreement that
3   we talked about earlier?
4      Q.   Correct.
5      A.   Look, as I said earlier, the first
6   time I heard of this agreement was sometime
7   this year.
8      Q.   Okay.  Can we turn -- let's just
9   look at a couple of items on the list.  If we
10  can go to page 33416.  Do you see in Number 35
11  it talks about the proper recording or
12  disclosure in the financial statements of ND
13  relationships and transactions with related
14  parties.
15          Do you see that?
16     A.   I do.
17     Q.   As the CFO, do you have any
18  understanding as to whether Dugaboy is a
19  related party?
20     A.   I don't recall.
21     Q.   Do you know whether any of the
22  affiliates are related parties?
23     A.   If -- if it was NexPoint, HCMFA,
24  HCMS, HCRE, yeah, if -- if that is the
25  affiliate definition, and there.  In ASC 850 --
```

Page 101

```
         WATERHOUSE - 10-19-21
1
2   again, I mean, I haven't looked at ASC 850 in
3   quite some time, but, you know, if -- if there
4   is a control language, you know, ASC 850, would
5   that -- that section in GAAP would -- would
6   pick up and define what are related parties.
7          So, you know, like I said, if -- one
8   of the four entities I just described, if -- if
9   they are in that control definition of ASC 850,
10  they would be picked up in 35D.
11     Q.   Do you -- do you have any reason to
12  believe that they would be picked up in that
13  definition, based on your knowledge and
14  experience?
15     A.   I -- I believe that entities
16  controlled under GAAP are -- are affiliates.
17     Q.   Okay.  Would Mr. Dondero also
18  qualify as a related party for purposes of
19  Section 35D, to the best of your knowledge?
20     A.   Yeah, I don't -- I don't know.  I
21  would think -- I would have to read the code
22  section to see if someone personally -- is it
23  talking about related parties.  So, look, if
24  your own in control, yeah, I mean, I would have
25  to read the section.
```

Page 102

WATERHOUSE - 10-19-21

2　Q.　To the best of your knowledge, was
3　the existence of the agreement ever disclosed
4　to PwC?
5　A.　I'm not -- I'm not aware.
6　Q.　Do you recall if the agreement was
7　ever disclosed in Highland's audited financial
8　statements?
9　A.　I don't -- I don't remember if it
10　was in every Highland's audited financial
11　statements during my tenure.  We would have to
12　read the financial statements to see what was
13　disclosed, but I'm not -- I mean, as I sit here
14　today, I'm not aware.
15　Q.　That is all I'm asking for.
16　A.　I'm not aware.
17　Q.　Can we go to the next page, please,
18　and look at 36.  36 says, we have disclosed to
19　you the identity of the partnership's related
20　party relationships and all the related party
21　relationships and transactions of which we are
22　aware.
23　　Do you see that?
24　A.　Yes.
25　Q.　To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

2　June 3rd, 2019, did Highland disclose to PwC
3　the identity of the partnership's related
4　parties and all the related party relationships
5　and transactions of which it was aware?
6　A.　I mean, I can speak for myself as
7　signer of this representation letter.  I
8　disclosed what -- what, you know, what --
9　what -- what I knew.  Sorry, look, yes, so I --
10　I disclosed what I knew.
11　Q.　Okay.  Can we go to page 419.  Do
12　you see at the end there is a reference to
13　events that occurred since the end of the
14　fiscal year and the date of the letter?
15　A.　Yes.
16　Q.　And were you aware of that -- of
17　that provision of the management representation
18　letter before you signed the document?
19　A.　Yes.
20　Q.　Do you have an understanding as to
21　why PwC asked for that confirmation of that
22　particular part of the management
23　representation letter?
24　A.　It is -- it is -- it is just -- it
25　is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

2　Q.　And do you understand -- do you have
3　an understanding that PwC wanted to know that
4　as of the date of the audit whether any
5　material changes had occurred since the end of
6　the fiscal year, using the definition of
7　materiality that is in this particular
8　management representation letter?
9　A.　It -- it is -- it is -- it is a --
10　it is as described.  It is just a poorly worded
11　question, so it is hard for me to say yes.
12　Q.　If I asked you this, I apologize,
13　but did you ever learn when the agreement was
14　entered into?
15　A.　I don't -- I don't -- like I said
16　before, I don't know or have any details of the
17　agreement.
18　Q.　Okay.  Did you ever ask anybody when
19　the agreement was entered into?
20　A.　I did not.
21　Q.　Let's look at the audited financial
22　statements.  We will put up on the screen a
23　document that has been premarked as Exhibit 34.
24　　(Exhibit 34 marked.)
25　　MS. DANDENEAU:  And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

2　Canty could please put that in the chat
3　room, that would be great.
4　　MR. MORRIS:  I will assure you we
5　will put every document in the chat room.
6　Q.　Now, I'm just going to ask you
7　questions that are related to the provisions of
8　this report that concern the affiliate loans,
9　but again, Mr. Waterhouse, if there is any part
10　of the document that you need to see or that
11　you think you might need to see in order to
12　refresh your recollection to answer any of my
13　questions, will you let me know that?
14　A.　Yes.
15　Q.　Because this is a pretty lengthy
16　document, but do you see that the cover page
17　here is the Highland consolidated financial
18　statements for the period ending December 31st,
19　2018?
20　A.　Yes.
21　Q.　If we can go to -- I think it is the
22　next one, looking for PwC's signature line.
23　　MS. CANTY:  I'm sorry, John, did you
24　say something?
25　　MR. MORRIS:  Yes, can we turn the

Page 106

WATERHOUSE - 10-19-21

1  page. I think it is 215. Yes, stop right
2  there, just above -- I'm sorry, I want to
3  see just the date of the report.
4     Q.  Okay. Do you see at the bottom of
5  that page there, Mr. Waterhouse,
6  PricewaterhouseCoopers has signed this audit
7  report?
8     A.  Yes, I see their signature.
9     Q.  Okay. And it is the dated same day
10  as your management representation letter; is
11  that right?
12     A.  It is -- yes, it is the same day.
13     Q.  Was that the practice to sign the
14  management representation letter on the same
15  day that the audit report was signed?
16     A.  Yes, that is typical in every audit.
17     Q.  Can we just scroll down to the
18  balance sheet on the next page.
19        Do you see that there is a line
20  there that says, Notes and Other Amounts Due
21  from Affiliates?
22     A.  Yes.
23     Q.  Does that line, to the best of your
24  knowledge, include the amounts that were due

Page 107

WATERHOUSE - 10-19-21

1  under the affiliate under the notes signed by
2  the affiliates and Mr. Dondero?
3     MR. RUKAVINA:  Objection to the
4  extent that calls for a legal conclusion.
5     A.  I mean, I would want to see the
6  detail and the build to this $173,398,000, but,
7  yes, I mean, if -- if -- given what we
8  discussed before, you know, it -- it should
9  capture that.
10     Q.  And -- and while you were the CFO of
11  Highland, were all notes held by Highland that
12  were issued by an affiliate or Mr. Dondero
13  carried as assets on Highland's balance sheets?
14     MS. DANDENEAU:  Objection to form.
15     MS. DEITSCH-PEREZ:  Object to form.
16     A.  I don't -- I don't know how else
17  they would be carried.
18     Q.  Okay. Can you think of any -- are
19  you aware of any promissory note issued by an
20  affiliate or Mr. Dondero that was not carried
21  on Highland's audited financial balance sheets?
22     A.  I'm -- I'm -- I'm not aware.
23     Q.  Okay. Are you aware of any category
24  of asset on Highland's balance sheet in which

Page 108

WATERHOUSE - 10-19-21

1  any of the promissory notes issued by an
2  affiliate or Mr. Dondero would have been
3  included?
4     MS. DANDENEAU:  Objection to form.
5     A.  Sorry, am I aware of any asset of an
6  affiliate being included --
7     Q.  That -- let me -- let me try again.
8        Do you see there is a number of
9  different assets that are described on this
10  balance sheet?
11     A.  Yes.
12     Q.  One of the assets that is described
13  is Notes and Other Amounts Due from Affiliates;
14  right?
15     A.  Yes.
16     Q.  And it is reasonable to conclude
17  that the notes from the affiliates and
18  Mr. Dondero are included in that line item;
19  right?
20     A.  Yes, based on this description.
21  Again, I would want to see a build of this to
22  100 percent confirm, but based on the
23  description, the asset description, it is -- it
24  is likely.

Page 109

WATERHOUSE - 10-19-21

1        Now, does that mean absolute? I
2  don't know.
3     Q.  Do you have any reason to believe
4  that the promissory notes would have been
5  carried on the balance sheet in a category
6  other than Notes and Other Amounts Due from
7  Affiliates?
8     A.  If they were deemed -- no. If they
9  were deemed an affiliate, you know, under GAAP,
10  they should be carried in that line.
11  Otherwise, it would go into another line.
12     Q.  Okay. And do you see the total
13  asset base as of December 31st, 2018, was
14  approximately $1.04 billion?
15     A.  Yes.
16     Q.  Is my math correct that the Notes
17  and Other Amounts Due from Affiliates
18  constituted approximately 17 percent of
19  Highland's assets as of the end of 2018?
20     A.  Well, so how are you defining
21  Highland?
22     Q.  Highland Capital Management, L.P.,
23  the entity that this audit is subject to -- or
24  the subject of.

Page 110

1        WATERHOUSE - 10-19-21
2      A.    On a consolidated or unconsolidated
3   basis?
4      Q.    I'm looking at the balance sheet.
5   It is a consolidated balance sheet.  Okay?
6          Does the Notes and Other Amounts Due
7   from Affiliates constitute approximately
8   17 percent of the total assets of Highland
9   Capital Management, L.P., on a consolidated
10  basis?
11       MS. DANDENEAU:  Objection to form.
12     A.    I don't have a calculator in front
13  of me but I will take your math, if you are
14  taking the 173 divided by the billion.
15     Q.    Okay.
16     A.    If that is accurate, yes.  But,
17  again, on a consolidated basis.
18     Q.    And on an unconsolidated basis the
19  percentage would be higher; correct?
20     A.    I – no.  I don't know.
21     Q.    Well, okay.  That is fair.
22       MR. MORRIS:  Can we turn to
23  page 241, please.
24     Q.    Do you see that this is a section of
25  the audit report that is entitled Notes and

Page 111

1        WATERHOUSE - 10-19-21
2   Other Amounts Due from Affiliates?
3      A.    Sorry, I can't see the – the –
4      Q.    It is at the top.
5      A.    Notes and Other Amounts Due from
6   Affiliates, yes, I see that.  I don't – I
7   don't have a page number, but I'm on a page
8   that says at the top:  Notes and Other Amounts
9   Due from Affiliates.
10     Q.    Okay.  And that is the same title of
11  the line item on the balance sheet that we just
12  looked at; right?  Notes and Other Amounts Due
13  from Affiliates?
14     A.    Yes.
15     Q.    And is it your understanding, based
16  on your experience and knowledge as the CFO,
17  that this is the section of the narrative that
18  ties into the line item that we just looked at?
19     A.    Yes.
20     Q.    And is this section of the audit
21  report intended to describe and disclose all of
22  the material facts concerning the Notes and
23  Other Amounts Due from Affiliates?
24       MS. DANDENEAU:  Objection, form.
25     A.    This – these notes – these notes

Page 112

1        WATERHOUSE - 10-19-21
2   of the financial statements are – the purpose
3   is to disclose any material items in relation
4   to that balance sheet line item.
5      Q.    Okay.  And all of the information,
6   to the best of your knowledge, that is set
7   forth in this section of the audit report was
8   provided by Highland; correct?
9      A.    Yes, it would have been provided by
10  the corporate accounting team.
11     Q.    Okay.  And the corporate accounting
12  team, did that team report to you in the
13  organizational structure?
14     A.    Yes.
15     Q.    And did you have any concerns about
16  the controls that were in place to make sure
17  that the information provided with respect to
18  Notes and Other Amounts Due from Affiliates was
19  accurate and complete?
20       MS. DANDENEAU:  Objection to form.
21     A.    Not that I recall.
22     Q.    Okay.  Do you recall ever being
23  concerned that any portion of the Notes and
24  Other Amounts Due from Affiliates in any audit
25  report was inaccurate, incomplete, or not

Page 113

1        WATERHOUSE - 10-19-21
2   reliable?
3      A.    I didn't – I had concerns about,
4   you know, like I talked about before, of there
5   were – there were potentially issues in the
6   control environment.  But as far as it relates
7   to the audited financial statements, any – the
8   team would work with the auditors to disclose
9   all – all notes in Highland's possession.
10         And any – any notes that were
11  deemed material by the auditor, right, these
12  were disclosed in these – in this section, you
13  know, in – in the notes to the consolidated
14  financial statements as you presented.
15     Q.    Do you recall ever having a
16  conversation with anybody at any time
17  concerning the accuracy of the section of audit
18  reports that relates to Notes and Other Amounts
19  Due from Affiliates?
20       MS. DANDENEAU:  Objection to form.
21     A.    You know, as – as – I didn't have
22  direct conversations with
23  PricewaterhouseCoopers as I had, you know –
24  I – I had the team that managed this.
25         Again, I wasn't anywhere chose to

Page 114

WATERHOUSE - 10-19-21

1  being the point person of this audit.  And I
2  can't recall, you know, when -- you know, I
3  don't even know if I was ever the point person
4  during my tenure as CFO.
5       I don't know if PwC had any concerns
6  when they were performing those audit
7  procedures.  They may have and they may have --
8  and it may not have been communicated to me.  I
9  don't know.
10      MR. MORRIS:  All right.  I move to
11  strike.
12      Q.   And I'm going to ask you to listen
13  carefully to my question.
14           Did you -- do you recall ever having
15  a conversation with anybody at any time
16  concerning the accuracy of the reporting
17  provided in the audited financial statement on
18  the topic of Notes and Other Amounts Due?
19      MS. DANDENEAU:  Objection to form.
20      A.   I don't recall for this, but that
21  doesn't mean that it didn't exist.
22      Q.   Okay.  But you have no reason to
23  believe, as you sit here right now, that you
24  ever discussed with anybody concerns over the

Page 115

WATERHOUSE - 10-19-21

1  accuracy of the section of the audit reports
2  called Notes and Other Amounts Due from
3  Affiliates; correct?
4       MS. DANDENEAU:  Object to the form.
5       MS. DEITSCH-PEREZ:  Objection to
6  form.
7       A.   I don't recall having any
8  conversations.  But, again, I mean, this is --
9  this is two years ago.
10      Q.   I'm just asking for your
11  recollection, sir.
12      A.   Yes.
13      Q.   If you don't recall, this will --
14      A.   Yeah.
15      Q.   (Overspeak) -- if you don't
16  recall --
17      A.   Yeah, I don't -- I don't recall.
18      Q.   Do you know who was responsible for
19  drafting the audit report?
20      A.   Are you asking the actual Highland
21  employee responsible?  I mean, it was
22  Highland's responsibility, so, I mean, that
23  is --
24      Q.   Right.

Page 116

WATERHOUSE - 10-19-21

1  A.   -- Highland's responsibility.
2  Highland's responsibility.
3       Q.   Who, at Highland, was responsible
4  for drafting this section of the audit report?
5       A.   I -- I don't know the answer to
6  that.  Again, there was a team who worked on
7  this.  And I don't know, you know, whether it
8  was the staff or the manager.
9            Again, this is where I let the teams
10 manage.  And, you know, there may be a
11 corporate accountant who worked on this.  I
12 just -- you know, I wasn't part of that process
13 to give that person experience.  I don't know.
14      Q.   Do you recall having any
15 communications with anybody at any time
16 concerning this section of the report?
17      A.   Yeah, I don't recall.
18      Q.   Do you recall whether you ever told
19 anybody at any time that any aspect of this
20 section of the report was inaccurate or
21 incomplete?
22      A.   I don't recall.
23      Q.   As you sit here today, do you have
24 any reason to believe that this section of the

Page 117

WATERHOUSE - 10-19-21

1  audit report is incomplete or inaccurate in any
2  way?
3            And I'm happy to give you a moment
4  to -- to look at it, if you would like.
5       MS. DANDENEAU:  Objection to form.
6       MS. DEITSCH-PEREZ:  Same.
7       A.   I mean, I would have to look at -- I
8  would have to look at the bill to the note
9  schedule to make sure I know you presented me
10 with materiality, but again, there might be a
11 note as of 12/31/18 that somehow was -- was
12 under materiality not disclosed.  I don't -- I
13 don't know.  I would need more information.
14      Q.   Okay.  But without more information,
15 you have no reason to believe anything this
16 section is inaccurate; correct?
17      MS. DANDENEAU:  Objection to form.
18      A.   I don't.  I mean, you know, this was
19 part of the audit.
20      Q.   Thank you.  Now, you will see if we
21 could scroll just a little bit more that each
22 of the first five paragraphs concerns
23 specifically the four affiliates that we've
24 been discussing and Mr. Dondero.

Page 118

```
1              WATERHOUSE - 10-19-21
2         MR. MORRIS:  If we could go the
3    other way, La Asia.  We don't need Okada.
4    We're going to have to thread the needle.
5    Okay.  Good, perfect.
6         Q.  Do you see those five paragraphs
7    certain the four affiliates and Mr. Dondero as
8    we've been referring to today?
9         A.  Yes.
10        Q.  Okay.  And do you see at the end of
11   every paragraph it states, quote:  A fair value
12   of a partnership's outstanding notes receivable
13   approximates the carrying value of the notes
14   receivable?
15        A.  Yes, I see that.
16        Q.  Do you have an understanding of what
17   that means?
18        A.  Yes.
19        Q.  What is your understanding of that
20   sentence?
21        A.  It is the – again, the – the fair
22   value, right, which is – which is what the –
23   what Highland could sell that asset for.  This
24   statement is comparing the fair value of the
25   notes to the carrying value, so the carrying
```

Page 119

```
1              WATERHOUSE - 10-19-21
2    value is the line item that you showed me
3    earlier that is in Notes and Other Amounts Due
4    from Affiliates.
5         Q.  Okay.  Is another way to say this is
6    that the fair market value of the notes equals
7    the principal amount and – withdrawn.
8         Is the fair way to interpret this
9    that the fair market value of the notes equals
10   all remaining unpaid principal and interest due
11   under the notes?
12        MS. DANDENEAU:  Object to the form.
13        MS. DEITSCH-PEREZ:  Objection, form.
14        A.  I don't know the answer to that,
15   because I don't recall where – where any –
16   where – in what line item was the interest
17   component reported.
18        Q.  All right.  Well, if we look in this
19   audit report, you will see in the middle of the
20   first paragraph, for example, it states that as
21   of December 31st, 2018, total interest and
22   principal due on outstanding promissory notes
23   was approximately $5.3 million.
24        Do you see that?
25        A.  I do.
```

Page 120

```
1              WATERHOUSE - 10-19-21
2         Q.  Is that the carrying value or the
3    fair value?
4         A.  That would be the carrying value –
5         Q.  And is the last –
6         A.  – in my opinion.
7         Q.  Okay.  And it is in your opinion as
8    the chief financial officer of Highland during
9    the period of time that you described; right?
10   It is an educated opinion?
11        A.  I'm reading this at face value.  I'm
12   taking that as that is carrying value.
13        Q.  Okay.  And does the last sentence
14   say that the carrying value is roughly
15   approximate to the fair market value?
16        MS. DANDENEAU:  Objection to form.
17        MS. DEITSCH-PEREZ:  Objection, form.
18        A.  Again, this note to the financial
19   statement is specific to notes and other
20   amounts due from affiliates.
21        Q.  Correct.
22        A.  If the interest component is
23   reported elsewhere on the balance sheet, you
24   know, it – it – it could be off.  Again, I
25   don't have the detail.  I don't know, but yes,
```

Page 121

```
1              WATERHOUSE - 10-19-21
2    look, I mean, if you – I mean, if you are
3    saying the 5.3 million is in the notes and
4    other amounts due from affiliates, then the
5    last statement is saying the fair value
6    approximates 5.3 million.  That is what that
7    last sentence is saying.
8         Q.  Do you see in the middle of the
9    first paragraph – not in the middle, the next
10   to last sentence there is a statement that the
11   partnership will not demand payment on amounts
12   that exceed HCMFA's excess cash availability
13   prior to May 31st, 2021.
14        Do you see that?
15        A.  I do.
16        Q.  Do you know when Highland agreed not
17   to demand payment as described in that
18   sentence?
19        A.  I don't know specifically.
20        Q.  Do you know why Highland agreed not
21   to demand payment on HCMFA's notes until May
22   2021?
23        A.  Yes.
24        Q.  Why was that decision made?
25        A.  You know, well, it – it – that
```

Page 122

WATERHOUSE - 10-19-21

1    decision was made as to not put HCMFA into a
2    position where it didn't have sufficient assets
3    to pay for the demand note.
4        Q.    And at the time the agreement was
5    entered into, pursuant to which the partnership
6    wouldn't demand payment, did HCMFA have
7    insufficient assets to satisfy the notes if a
8    demand had been made?
9        MS. DANDENEAU:  Objection to form.
10       A.    I don't have HCMFA's financial
11   statements in front of me as of 12/31/18.
12       Q.    Was there a concern that HCMFA would
13   be unable to satisfy its demands under the
14   notes if demand was made?
15       MS. DANDENEAU:  Objection to form.
16       A.    Well, there is – I don't recall –
17   I mean, there is something, right, in place to
18   basically not demand payment until May 31, 2021
19   as detailed here.
20       Q.    And who made the decision to enter
21   into – who made the decision on behalf of
22   Highland not to demand payment until May 31st,
23   2021?
24       A.    I'm trying to remember.  I don't
25

Page 123

WATERHOUSE - 10-19-21

1    remember exactly – I don't remember if it was
2    myself or – or Jim Dondero who – who – there
3    was – there was something signed, from what I
4    recall, that – that – that backed up this
5    line item in the – in the notes I'm – look,
6    I'm, I'm –
7        Q.    We will get to that.
8        A.    You –
9        Q.    I'm just –
10       A.    You have – I mean –
11       Q.    We're going to give that to you.
12   I'm going to give that to you.
13       A.    You – you – you have all the
14   documents.  I don't have the documents, and
15   that is what makes it so hard.  I don't have
16   any documents to prepare for this deposition;
17   right?  You have all – I don't – I don't – I
18   don't remember, but, you know, again, it would
19   probably be myself or Jim.
20       Q.    Do you know if Highland received
21   anything in return for its agreement not to
22   make a demand for two years?
23       A.    I don't – I don't think it referred
24   anything.
25

Page 124

WATERHOUSE - 10-19-21

1        Q.    And did you and Mr. Dondero discuss
2    HCMFA's ability to satisfy the notes if a
3    demand was made at the time this agreement was
4    entered into?
5        MS. DANDENEAU:  Objection to form.
6        A.    I don't – I don't – I don't recall
7    having a specific conversation, if I did, or –
8    or David Klos.
9        Q.    Okay.  I'm just asking if you recall
10   any conversations that you had.
11       A.    I don't recall.
12       Q.    Okay.  Do you know why Highland
13   loaned the money to HCMFA that is the subject
14   of the notes described in this paragraph?
15       A.    I don't remember specifically why
16   5.3 million was loaned.  I mean, I – it would
17   have to be put in the context.
18       Q.    Do you have any recollection at all
19   as to why Highland ever loaned any money to
20   HCMFA?
21       A.    Yes.
22       MS. DANDENEAU:  Objection to form.
23       Q.    What do you remember about that?
24       A.    There was a Highland Global
25

Page 125

WATERHOUSE - 10-19-21

1    Allocation Fund, which was a – a fund managed
2    by Highland Capital Management Fund Advisors.
3    There was a – we – I'm just telling you,
4    there was – there was – there was a – a
5    ultimately a NAV error found in this fund while
6    it was an open-ended fund and, you know, there
7    were amounts owed by the advisor in – in
8    relation to that NAV error.
9            There were also, for the same fund,
10   that same fund was ongoing an
11   open-end-to-close-end conversion, and as part
12   of that proposal, shareholders who voted for
13   the conversion received compensation from the
14   advisor.
15       Q.    All right.  Now, the events that
16   you're describing occurred in the spring of
17   2019; right?
18       A.    These started back – I think, I
19   mean –
20       Q.    I apologize.
21       A.    – that I mean, the answer to
22   that is no.
23       Q.    I apologize, the loans that were
24   made in connection with the events that you're
25

Page 126

WATERHOUSE - 10-19-21

1   describing occurred in May 2019; right?
2
3           MR. RUKAVINA:  Objection to the
4       extent that calls for a legal conclusion.
5       A.   I don't recall specifically what
6   amounts of money were moved when, for what
7   purpose.
8       Q.   Okay.  Fair enough.  Going to the
9   next paragraph, do you recall that NexPoint
10  Advisors had obtained a number of loans from
11  Highland, and they rolled up those loans into
12  one note in approximately 2017?
13      A.   This is for NexPoint Advisors?
14      Q.   Yes.
15      A.   I -- I mean, I don't -- I don't
16  recall the NexPoint Advisors loan being a
17  roll-up loan, but --
18      Q.   Do you know why?
19      A.   But, look, if you have documents
20  that show -- I mean, look, I just don't recall.
21      Q.   Okay.  That is fair.  Do you know
22  why -- do you have any recollection as to why
23  Highland loaned money to NexPoint?
24      A.   Yes.
25      Q.   Why did High -- why do you recall --

Page 127

WATERHOUSE - 10-19-21

1
2   what is the reason you recall Highland lending
3   money to NexPoint?
4       A.   I mean, I was just -- I just -- I
5   just recall.  I mean, I just -- I don't
6   remember why.
7       Q.   I understand.  And I'm asking you if
8   you recall --
9       A.   Oh, why -- I thought you say --
10  NexPoint Advisors was launching a fund which
11  is -- I believe that the legal name is NexPoint
12  Capital, Inc.  And it -- it provided a
13  co-invest into that fund.
14           And, from what I remember, the --
15  the -- that NexPoint borrowed money from
16  Highland at the time to make that co-invest.
17      Q.   So this was an investment that
18  NexPoint was required to make; is that right?
19           MS. DANDENEAU:  Objection to form.
20      A.   I don't know if it was required to
21  make, I don't recall that, or if it just made
22  it.
23      Q.   Okay.  But your recollection is that
24  NexPoint made an investment and they borrowed
25  money from Highland to finance the investment.

Page 128

WATERHOUSE - 10-19-21

1
2           Do I have that right?
3       A.   Yes.
4       Q.   How about HCRE?  Do you know why
5   HCRE borrowed money from Highland?
6       A.   I don't remember specifically.
7       Q.   Do you remember generally?
8       A.   Generally, yeah -- I mean, yes.
9       Q.   Can you tell me your general
10  recollection as to why Highland loaned money to
11  HCRE?
12      A.   For -- for -- for investment
13  purposes.
14      Q.   So HCRE made the investment and it
15  obtained a loan, or loans, from Highland in
16  order to finance that investment or those
17  investments.
18           Do I have that right?
19      A.   I mean, I -- you know, generally.
20      Q.   Okay.  How about Highland Management
21  Services, Inc.?
22           Do you have any recollection as to
23  why HCMS borrowed money from Highland?
24      A.   Generally.
25      Q.   What is your general recollection as

Page 129

WATERHOUSE - 10-19-21

1
2   to why HCMS borrowed money from Highland?
3       A.   For -- for investment purposes.
4       Q.   So it is the same thing, HCMS wanted
5   to make investments and it borrowed money from
6   Highland in order to finance those investments;
7   is that right?
8       A.   I mean, yes, generally.  I mean, I
9   can't -- I don't -- on the services, there --
10  there are several loans in these schedules.
11  You know, I can't remember why every single one
12  of these were made, but I would say, yeah, I
13  mean, generally.
14      Q.   Okay.  I appreciate that.
15           MR. MORRIS:  Let's go to the page
16  with Bates No. 251.  La Asia, are you
17  there?
18           MS. CANTY:  Sorry, John.  It went
19  out for a minute.  Can you say that again.
20  I don't know what is going on.
21           MR. MORRIS:  The page with Bates
22  No. 251, can we go to that.
23           MS. CANTY:  Yes, sorry.
24           MR. MORRIS:  Keep going to the
25  bottom.  Yeah, there you go.

Page 130

WATERHOUSE - 10-19-21

1

2    Q.   Do you see, Mr. Waterhouse, that
3    there is a section there called Subsequent
4    Events?
5    A.   I do.
6    Q.   And does this relate to the last
7    sentence above the signature line on the
8    management representation letter that we talked
9    about earlier where you made the representation
10   that you disclosed subsequent events?
11   A.   I mean, it relates to it, but not in
12   its entirety.
13   Q.   Okay.
14   MR. MORRIS:  If we can scroll up to
15   capture the entirety of this section right
16   here.
17   Q.   And what do you mean by that, sir?
18   MR. MORRIS:  Yeah, right there.
19   Perfect.
20   A.   There are -- there are different
21   subsequent events in -- under GAAP.  So there
22   are -- and -- and -- so what we see in the
23   notes to the financial statements are one type
24   of subevent.
25   Q.   Okay.  And -- and would the type of

Page 131

WATERHOUSE - 10-19-21

1

2    subsequent event relating to affiliate loans be
3    captured in this section if they were -- if
4    they were made after the end of the fiscal year
5    and prior to the issuance of the audit report?
6    A.   Yes, if they were deemed material or
7    disclosable.
8    Q.   Okay.  I appreciate that.
9    Do you see the next to the last
10   entry there?  It says, Over the course of 2019
11   through the report date, HCMFA issued
12   promissory notes to the partnership in the
13   aggregate amount of $7.4 million?
14   A.   Yes.
15   Q.   And does that refresh your
16   recollection that those are the notes that
17   related to the NAV error that you mentioned
18   earlier?
19   A.   I don't -- I don't remember the
20   exact.  Again, there are -- I mentioned two
21   line items; right?
22   Q.   Yes.
23   A.   I mean, it was the GAAP conversion
24   process plus the -- the NAV error.  I don't
25   have the details.  I don't recall specifically

Page 132

WATERHOUSE - 10-19-21

1

2    if -- you know, what -- if that 7.4 million was
3    solely attributable to the NAV error.
4    Q.   Okay.  But there is no question that
5    Highland told PricewaterhouseCoopers that over
6    the course of 2019 HCMFA issued promissory
7    notes to the partnership in the aggregate
8    amount of $7.4 million; correct?
9    A.   In the course of the audit, we would
10   have produced all promissory notes in our
11   possession, including the ones that are
12   detailed here.
13   Q.   Do you recall that you signed the
14   two promissory notes that are referenced in
15   that provision?
16   MS. DANDENEAU:  Objection to form.
17   A.   I didn't recall initially but I've
18   been reminded.
19   Q.   Okay.  And -- and do you recall that
20   those notes are dated May 2nd and May 3rd,
21   2019?
22   A.   Yes.
23   Q.   So that was just a month before the
24   audit was completed; correct?
25   A.   Yes.  I think we had a June 3rd

Page 133

WATERHOUSE - 10-19-21

1

2    date, right, if -- if my memory serves me
3    right.
4    Q.   Yes, I will represent to you that
5    your memory is accurate in that regard.
6    Did anybody ever instruct you as the
7    CFO to correct this statement that we're
8    looking at in subsequent events?
9    A.   So let me understand.  You're saying
10   when I was CFO at Highland Capital did anyone
11   ever ask me to correct the -- over the course
12   of 2019 through the report date HCMFA issued
13   promissory notes, this statement?
14   Q.   Right.
15   A.   Not that I'm aware.
16   Q.   While you were the CFO of Highland,
17   did anybody ever tell you that that sentence
18   was wrong?
19   A.   Not that I'm aware.
20   Q.   Highland -- withdrawn.
21   HCMFA disclosed these notes in its
22   own audited financial statements; right?
23   MR. RUKAVINA:  Objection, form.
24   A.   I assume that these would be
25   material -- if these are material financial

Page 134

WATERHOUSE - 10-19-21

1   statements, yes, they -- they -- they should be
2   and they were likely disclosed.
3       Q.   Now, there is no statement
4   concerning the 2019 notes about the forbearance
5   that we looked at in the affiliated note
6   section of the report; right?
7       MS. DANDENEAU:  Objection to form.
8       Q.   I'll withdraw.  That was bad.
9       Do you recall when we were looking
10  at the paragraph concerning HCMFA earlier it
11  had that disclosure about the agreement whereby
12  Highland wouldn't ask for demand on the -- on
13  the HCMFA notes?
14      A.   Yes.
15      Q.   That forbearance disclosure is not
16  made with respect to the 2019 notes; right?
17      A.   Not -- look, not that I can recall,
18  unless -- unless it was done at a subsequent
19  day.
20      Q.   Right.  And it is not in the
21  subsequent event section that we're looking at
22  right now where the 2019 notes are described;
23  right?
24      A.   Right.  But this is through

Page 135

WATERHOUSE - 10-19-21

1   June 3rd.  It could have been done on June 4th.
2   I don't -- I don't -- I don't recall.
3       Q.   Okay.
4       MR. MORRIS:  Can we put up on the
5   screen the HCMFA audit report.  And while
6   we're --
7       MS. DANDENEAU:  What exhibit is
8   this?
9       MR. MORRIS:  La Asia, what number is
10  that?
11      MS. CANTY:  45.
12      MR. MORRIS:  So this will be marked
13  as Exhibit 45.
14      (Exhibit 45 marked.)
15      MS. CANTY:  Yeah, and I will put it
16  in the chat.
17      MS. DANDENEAU:  Thank you.
18      Q.   Okay.  All right.  Do you see that
19  this is the consolidated financial statements
20  for HCMFA for the period ending 12/31/18?
21      A.   Yes.
22      Q.   As the treasurer of HCMFA at the
23  time, did you have to sign a management
24  representation letter similar to the one that

Page 136

WATERHOUSE - 10-19-21

1   we looked at earlier for Highland?
2       A.   I would imagine I would have been
3   asked to.  I don't recall if I did.
4       Q.   Do you recall ever being asked by an
5   auditor to sign a management representation
6   letter and then not doing it?
7       A.   No.
8       MR. MORRIS:  Can we just scroll down
9   again.  I just want to see the date of the
10  document.
11      A.   I mean, let me -- you know, there
12  are different versions to management
13  representation letters I will qualify.
14      Yes, there are certain -- from time
15  to time auditors can make representations
16  that -- in the rep letter that is being
17  proposed that are inaccurate or out of scope or
18  things like that and they've asked for
19  signature.
20      In that context, yes.  I mean, you
21  know -- I mean, if I have been asked to sign
22  and make those representations and those
23  representations are invalid, yes, I would not,
24  I mean, I -- I wouldn't sign that.

Page 137

WATERHOUSE - 10-19-21

1       Q.   Okay.  PricewaterhouseCoopers served
2   as HCMFA's outside auditors as well; correct?
3       A.   Yes.
4       Q.   Do you see that this audit report is
5   signed on June 3rd, 2019, just like the
6   Highland audit report?
7       A.   That is correct.
8       Q.   And did the process of -- of
9   preparing HCMFA's audit report, was that the
10  same process that Highland followed when it did
11  its audit report at this time?
12      A.   I mean, it is a different entity.
13  There are different assets.  You know, it --
14  it -- it is -- as you saw, Highland's
15  financials are on a consolidated basis.  This
16  is different, so it is under the same control
17  environment and team.
18      Q.   Okay.  I appreciate that.  So the
19  same control environment and team participated
20  in the preparation of the audit for Highland
21  and for HCMFA at around the same time; correct?
22      A.   Yes.
23      MR. MORRIS:  Can we go to page 17 of
24  the report.  I don't have the Bates number.

Page 138

```
1              WATERHOUSE - 10-19-21
2     Q.   Okay.  Do you see that just like
3  Highland's audited financial report, HCMFA's
4  audited financial report also has a section
5  related to subsequent events?
6     A.   Yes.
7     Q.   And am I reading this correctly that
8  just as Highland had done, HCMFA disclosed in
9  its audited financial report a subsequent event
10  that related to the issuance of promissory
11  notes to Highland in the aggregate amount of
12  $7.4 million in 2019?
13     A.   That is what I see in the report.
14     Q.   And you were the treasurer of HCMFA
15  at the time; right?
16     A.   Yes, to the best of my knowledge.
17     Q.   And did anybody ever tell you prior
18  to the time of the issuance of this audit
19  report that that sentence relating to HCMFA's
20  2019 notes was inaccurate or wrong in any way?
21     A.   Not that I recall.
22     Q.   As you sit here right now, has
23  anybody ever told you that that sentence is
24  inaccurate or wrong in any way?
25     A.   Not that I recall.
```

Page 139

```
1              WATERHOUSE - 10-19-21
2     Q.   I apologize if I asked you this
3  already, but has anybody ever told you at any
4  time that you are not authorized to sign the
5  promissory notes that are the subject of the
6  sentence we're looking at?
7     A.   Not that I recall.
8     Q.   Did anybody ever tell you at any
9  time that you had made a mistake when you
10  signed the promissory notes that are the
11  subject of this sentence?
12     A.   Say that again.  Did anyone ever say
13  that I made a mistake?
14     Q.   Let me ask the question again.
15        Did anybody ever tell you at any
16  time that you made a mistake when you signed
17  the two promissory notes in Highland's favor on
18  behalf of HCMFA in 2019?
19     A.   Not that I recall.
20     MR. MORRIS:  Let's just look at the
21  promissory notes quickly.  Can we please
22  put up Document Number 1, and so this is in
23  the pile that y'all have.  We'll just go
24  for a few more minutes and we can take our
25  lunch break.
```

Page 140

```
1              WATERHOUSE - 10-19-21
2     Q.   All right.  So I don't know if you
3  have seen this before, sir.  Do you see that
4  this is a complaint against HCMFA?
5     A.   Yes, I am looking at it on the
6  screen.
7     Q.   Okay.  And have you ever seen this
8  document before?
9     A.   I went through some of these
10  documents with my counsel here yesterday.
11     MR. MORRIS:  All right.  Can we go
12  to Exhibit 1 of this document.
13     Q.   Do you see Exhibit 1 is a
14  $2.4 million promissory note back in 2019?
15     A.   Yeah, I found it in the book.  Yes,
16  I have it here in front of me.
17     Q.   And this is a demand note, right, if
18  you look at Paragraph 2?
19     A.   Yes.
20     Q.   And this is a note where the maker
21  is HCMFA, and Highland is the payee; right?
22     A.   Yes.
23     MR. MORRIS:  And if we can scroll
24  down, can we just see Mr. Waterhouse's
25  signature.
```

Page 141

```
1              WATERHOUSE - 10-19-21
2     Q.   Is that your signature, sir?
3     A.   Yes, it is.
4     Q.   And did you sign this document on or
5  around May 2nd, 2019?
6     A.   I don't recall specifically signing
7  this, but this is my signature.
8     Q.   Okay.  And do you recall that
9  Highland transferred $2.4 million to HCMFA at
10  or around the time you signed this document?
11     A.   I don't recall specifically.  I
12  would want to, as I sit here today, go back and
13  confirm that, but again, presumably that --
14  that -- that did happen.
15     Q.   You wouldn't have signed this
16  document if you didn't believe that HCMFA
17  either received or was going to receive
18  $2.4 million from Highland; is that fair?
19     A.   I mean, it -- if -- if -- if there
20  wasn't a transfer of value, yeah, I mean, you
21  know, I would have no reason to -- to sign a
22  note.
23     Q.   And -- and Highland wouldn't have
24  given this note to PricewaterhouseCoopers if --
25  withdrawn.
```

Page 142

WATERHOUSE - 10-19-21

1              WATERHOUSE - 10-19-21
2        HCMFA wouldn't have given this note
3  to PricewaterhouseCoopers if it hadn't received
4  the principal value of – of the note in the
5  form of a loan; correct?
6        MR. RUKAVINA:  Objection, legal
7     conclusion, speculation and form.
8     A.   Again, we – what we provided to PwC
9  were, as part of the audit, any promissory
10  notes executed and outstanding.  You know, as a
11  part of the audit, they, you know, they – they
12  have copies of all the bank statements,
13  things – things of that sort.
14        MR. MORRIS:  Okay.  Can we go to
15     Exhibit 2.
16        (Exhibit 2 marked.)
17     Q.   Do you see that this is a promissory
18  note dated May 3rd, 2019 in the amount of
19  $5 million?
20     A.   Yes.
21     Q.   Do you believe this is also a demand
22  note if you look at Paragraph 2?
23     A.   Yes.
24     Q.   And do you see that HCMFA is the
25  maker, and Highland is the payee?

Page 143

WATERHOUSE - 10-19-21

1              WATERHOUSE - 10-19-21
2     A.   Yes.
3     Q.   And if we go to the bottom, can we
4  just confirm that that is your signature?
5     A.   Yes.
6     Q.   And together these notes are the
7  notes that are referred to both in Highland and
8  HCMFA's audited financial reports in the
9  subsequent event sections; correct?
10        MS. DANDENEAU:  Objection to form.
11     A.   They – they – they totaled
12  $7.4 million, so presumably, yes.
13     Q.   Okay.  And you were authorized to
14  sign these two notes; correct?
15        MR. RUKAVINA:  Objection, legal
16     conclusion.
17     A.   Yeah.  I mean, I'm – I was the
18  officer of – of HCMFA.  You know, I – I'm not
19  the legal expert on – on what that – what
20  that confers to me or what it doesn't.  I mean,
21  that is my signature on the notes.
22     Q.   And you believed you were authorized
23  to sign the notes; is that fair?
24     A.   I signed a lot of documents in my
25  capacity, just because it is operational in

Page 144

WATERHOUSE - 10-19-21

1              WATERHOUSE - 10-19-21
2  nature.  So, you know, to me this was just
3  another document, to be perfectly honest.
4     Q.   Sir, would you have signed
5  promissory notes with the principal amount of
6  $7.4 million if you didn't believe you were
7  authorized to do so?
8        MS. DANDENEAU:  Objection to form.
9     Q.   Are you frozen?
10     A.   No.  I'm just – you know, it is –
11  you know, again, I typically don't sign
12  promissory notes, and I don't recall why I
13  signed these, but – you know, but I did.
14     Q.   All right.  So listen carefully to
15  my question.  Would you have ever signed
16  promissory notes with a face amount of
17  $7.4 million without believing that you were
18  authorized to do so?
19     A.   No.  I mean, I'm – I'm putting my
20  signature on there, so no.
21     Q.   Okay.  And would you have signed two
22  promissory notes obligating HCMFA to pay
23  Highland $7.4 million without Mr. Dondero's
24  prior knowledge and approval?
25        MS. DEITSCH-PEREZ:  Object to the

Page 145

WATERHOUSE - 10-19-21

1              WATERHOUSE - 10-19-21
2  form.
3     A.   You know, from – from what I recall
4  around these notes, you know, I don't recall
5  specifically Mr. – Mr. Dondero saying to – to
6  make this a loan.
7        So my conversation with Mr. Dondero
8  around the culmination of the NAV error as
9  related to TerreStar which was a – a – I
10  think it was a year and a half process.  I
11  don't know, it was a multi-month process, very
12  laborious, very difficult.
13        When we got to the end, I had a
14  conversation with Mr. Dondero on where to, you
15  know, basically get the funds to reimburse the
16  fund, and I recall him saying, get the money
17  from Highland.
18     Q.   And so he told you to get the money
19  from Highland; is that right?
20     A.   That is what I recall – in my
21  conversation with him, that is – that is what
22  I can recall.
23     Q.   Do you know who drafted these notes?
24     A.   I don't.
25     Q.   Did you ask somebody to draft the

Page 146

WATERHOUSE - 10-19-21

1    notes?
2    A.   I didn't ask -- I don't specifically
3    ask people to draft notes really.  I mean,
4    again, you know, the legal group at Highland is
5    responsible and has always been responsible for
6    drafting promissory notes.
7    Q.   So based on your -- based on the
8    practice, you believe that somebody from the
9    Highland's legal department would have drafted
10   these notes.  Do I have that right?
11       MS. DEITSCH-PEREZ:  Object to the
12       form.  John, I also asked you for the Word
13       versions of these notes so we could look at
14       the properties, and you have not provided
15       them.  Are you intending to?
16       MR. MORRIS:  No.
17   Q.   Can you answer my question, sir?
18   A.   Again, I --
19       MS. DANDENEAU:  Do you want him to
20       repeat it?
21   A.   Yeah, why don't you repeat it?
22   Q.   Sure.  Mr. Waterhouse, based on the
23   practice that you have described in your
24   understanding, do you believe that these notes

Page 147

WATERHOUSE - 10-19-21

1    would have been drafted by somebody in the
2    legal department?
3        MS. DEITSCH-PEREZ:  Object to the
4        form.
5    A.   Yes.
6    Q.   Okay.  And do you know who would
7    have instructed -- do you have any knowledge as
8    to who would have instructed the legal
9    department to draft these notes?
10       MS. DEITSCH-PEREZ:  Object to the
11       form.
12   A.   It was whoever was working -- I
13   mean, it was likely someone on the team.  I
14   mean, I don't remember exactly on every note or
15   every document, but, again, a lot of these
16   things of this nature -- they're operational in
17   nature -- were handled by the team.
18       The team knows to -- I mean, we
19   don't draft documents.  We're not lawyers.
20   We're not attorneys.  It is not what I do or
21   accountants do.
22       So they are always instructed to go
23   and -- and go to the legal team to get
24   documents like this drafted.  Also, when you go

Page 148

WATERHOUSE - 10-19-21

1    to the legal team, the -- you know, we always
2    loop in compliance.  And compliance -- when you
3    go to the legal team, compliance is part of
4    legal team.  They're made aware of -- of -- of
5    these types of transactions.
6    Q.   And do you believe that you had
7    the -- withdrawn.
8        Did you ever tell Mr. Dondero --
9    (inaudible) -- did you see those?
10   A.   Sorry.
11       MS. DEITSCH-PEREZ:  I did not hear
12       the end of that question.
13   Q.   Did you ever tell Mr. Dondero that
14   you signed these two notes?
15   A.   I don't recall ever -- no, I don't
16   recall having a conversation with him.
17   Q.   Did you ever discuss these two notes
18   with him at any time?
19   A.   The conversation, I recall, was what
20   I described earlier.  And that is the only time
21   I recall ever discussing this.
22   Q.   Okay.  But the corporate accounting
23   group had a copy of this -- of these two notes.
24   And pursuant to the audit process, the

Page 149

WATERHOUSE - 10-19-21

1    corporate accounting group gave the two notes
2    to PricewaterhouseCoopers in connection with
3    the audit; correct?
4        MS. DANDENEAU:  Objection to form.
5    A.   Yes.  I mean, that is -- yeah, I
6    mean, they -- unless the legal team can also
7    retain copies of items like this.  I mean, I
8    don't know everything that they would retain as
9    well.
10       The legal team would also, if they
11   had documents as part of audits, turn that over
12   to the auditors as well.  So it could have been
13   the corporate accounting team.  It could be
14   someone on the legal team.
15   Q.   All right.  So you didn't -- you
16   didn't draft this note; right?
17   A.   I -- I -- I did not.
18   Q.   But somebody at Highland did; is
19   that fair?
20       MS. DEITSCH-PEREZ:  Object to the
21       form.
22   A.   I don't know.  I mean, we can go to
23   the legal team.  I don't -- I'm not sitting
24   behind someone in legal.  Maybe they went to

Page 150

WATERHOUSE - 10-19-21

1  outside counsel. I have no idea.
2      Q.  Did you have any reason to believe
3  you weren't authorized to sign this note,
4  either of these two notes?
5      A.  I think I have already answered that
6  question.
7      Q.  Okay. You didn't give these notes
8  to PricewaterhouseCoopers; correct?
9          MS. DANDENEAU: Objection to form.
10     A.  I don't recall giving these to
11  PricewaterhouseCoopers.
12     Q.  And in the practice that you have
13  described, somebody in the corporate accounting
14  group would have given these two notes to
15  PricewaterhouseCoopers; correct?
16         MS. DANDENEAU: Objection to form.
17     A.  I think I've answered that. I said
18  either the corporate accounting team or maybe
19  the legal team.
20         MR. MORRIS: Okay. Why don't we
21  take our lunch break here.
22         VIDEOGRAPHER: We're going off the
23  record at 1:04 p.m.
24         (Recess taken 1:04 p.m. to 1:49 p.m.)
25

Page 151

WATERHOUSE - 10-19-21

1          VIDEOGRAPHER: We are back on the
2  record at 1:49 p.m.
3      Q.  Mr. Waterhouse, did you speak with
4  anybody during the break about the substance of
5  this deposition?
6      A.  I spoke to -- to Deb and Michelle.
7      Q.  About the substance of the
8  deposition?
9      A.  Yes.
10     Q.  Can you tell me what you talked
11  about?
12         MS. DANDENEAU: No. We object on
13  the basis of privilege.
14     Q.  Okay. You are going to follow your
15  counsel's objection here?
16     A.  Yes.
17     Q.  Okay.
18         MR. MORRIS: Can we put up on the
19  screen Exhibit 35.
20         (Exhibit 35 marked.)
21     Q.  Are you able to see that document,
22  sir?
23     A.  Yes.
24     Q.  Have you ever seen an incumbency

Page 152

WATERHOUSE - 10-19-21

1  certificate before?
2      A.  I have.
3      Q.  Do you have a general understanding
4  of what an incumbency certificate is?
5      A.  I have a general understanding.
6      Q.  What is your general understanding?
7      A.  You know, those -- my general
8  understanding is that the incumbency
9  certificate basically lists folks that can --
10  are like authorized signers.
11     Q.  Okay. And do you see that this is
12  an incumbency certificate for Highland Capital
13  Management Fund Advisors, L.P.?
14     A.  Yes.
15     Q.  Okay. And if we could scroll down
16  just a little bit, do you see that it's dated
17  effective as of April 11th, 2019?
18     A.  I see that.
19     Q.  Okay. And is that your signature in
20  the middle of the signature block?
21     A.  Yes, it is.
22     Q.  And by signing it, did you accept
23  appointment as the treasurer of HCMFA effective
24  as of April 11th, 2019?
25

Page 153

WATERHOUSE - 10-19-21

1      A.  Again, I'm not the legal -- I don't
2  know if this makes me the treasurer or the
3  appointment. I don't know -- I don't know
4  that, so I don't -- I don't know if that
5  document -- again, I think -- again, I'm not
6  the legal expert. I think isn't there --
7  aren't there other legal documents that detail
8  who the officers are that could be incorporated
9  or things like that? Again, I don't want to
10  play armchair attorney here.
11     Q.  I'm not asking you for a legal
12  conclusion. I'm asking you for your knowledge
13  and understanding. When you signed this
14  document, did you understand that you were
15  accepting an appointment as the treasurer of
16  HCMFA?
17         MS. DANDENEAU: Objection to form.
18         MS. DEITSCH-PEREZ: Objection, form.
19     A.  Again, I don't think this -- that
20  wasn't my understanding. I don't think this
21  makes -- this document makes me the treasurer.
22     Q.  What do you think this document --
23  why did you sign this document?
24         MS. DEITSCH-PEREZ: Objection to

Page 154

| | |
|---|---|
| | WATERHOUSE - 10-19-21 |

1        WATERHOUSE - 10-19-21
2    form.
3        MR. MORRIS:  You're objecting to the
4    form of the question when I asked him why
5    did you sign the document?  What is the
6    basis for the objection?
7        MS. DEITSCH-PEREZ:  Because, John, I
8    think that it does call for a legal
9    conclusion other than -- with him saying
10   because somebody told me to sign this
11   document.  But if you want to go there,
12   that is fine.
13       MR. MORRIS:  Okay.
14       MS. DANDENEAU:  I don't think --
15   he's already said he's not a lawyer.
16       MR. MORRIS:  I'll allow the witness
17   to answer this question.
18   Q.   Why did you sign this document, sir?
19   A.   I mean, our -- our legal group would
20   bring by these incumbency certificates from
21   time to time.  I have no idea why they're being
22   updated, and I was asked to sign.
23   Q.   Did you ask anybody, what is this
24   document?
25   A.   No.

Page 155

1        WATERHOUSE - 10-19-21
2    Q.   Did anybody tell you why they needed
3    you to sign the document?
4    A.   Not that I can recall.
5    Q.   You testified earlier that you
6    understood that you served as the acting
7    treasurer for HCMFA; correct?
8    A.   Yes.
9    Q.   How did you become the acting
10   treasurer of HCMFA?
11       MS. DANDENEAU:  Objection to form.
12   A.   I don't -- I don't know the legal --
13   I don't know the legal mechanic of how I became
14   the acting treasurer.
15   Q.   I'm not asking for the legal
16   mechanic.  I'm asking you as the person who
17   is --
18       MS. DANDENEAU:  John, you said --
19       MR. MORRIS:  Stop.
20       MS. DANDENEAU:  -- how did you
21   become the treasurer.  That is --
22       MR. MORRIS:  Please stop.
23       MS. DANDENEAU:  That is a legal
24   question.
25       MR. MORRIS:  I am not asking any

Page 156

1        WATERHOUSE - 10-19-21
2    legal questions, to be clear.  I'm asking
3    for this witness' understanding as to how
4    he became the acting treasurer of HCMFA.
5    If he doesn't know, he can say he doesn't
6    know, but this legal stuff is nonsense, and
7    I really object to it.
8    Q.   Sir, I'm asking you a very simple
9    question.
10       MS. DANDENEAU:  Argumentative.
11   Q.   You testified -- you testified that
12   you became the acting treasurer of HCM --
13   HCMFA; correct?
14   A.   Yes.
15   Q.   How did that happen?
16       MS. DANDENEAU:  Again, object to
17   form.
18       MR. MORRIS:  I can't wait to do this
19   in a courtroom.  Good God.
20   Q.   Go ahead, sir.
21   A.   I don't know the exact process of
22   how that happened.
23   Q.   Do you have any idea whether signing
24   this document was part of the process?
25       MR. MORRIS:  You know what --

Page 157

1        WATERHOUSE - 10-19-21
2        MS. DANDENEAU:  Objection.
3        MR. MORRIS:  -- withdrawn.  You guys
4    want to do this, I can't wait.  I can't
5    wait.  This is the craziest stuff ever.
6        MS. DANDENEAU:  John, he said he's
7    not a lawyer, and you are asking him for a
8    legal conclusion, and he says he doesn't
9    know, and you persist.
10       MR. MORRIS:  Okay.
11       MS. DANDENEAU:  So you can ask these
12   questions --
13       MR. MORRIS:  Did anyone -- please
14   stop talking.
15       MS. DANDENEAU:  -- at another
16   point -- no, no, no, I'm entitled to talk,
17   too; right?  If you're going to make these
18   accusations as if we're trying to stonewall
19   you, this is not the witness to ask that
20   question.
21       MR. MORRIS:  I can't -- I can't
22   wait -- I can't wait to do this in a
23   courtroom.  I will just leave it at that.
24       MS. DANDENEAU:  That's right, I'm
25   sure you can't.

Page 158

```
1           WATERHOUSE - 10-19-21
2      Q.   Did anyone ever tell you, sir, that
3   even though you were the acting treasurer of
4   HCMFA, that you were not authorized to sign the
5   two promissory notes that we looked at before
6   lunch?
7      A.   I'm not sure I understand the
8   question.  I wasn't -- I mean, I'm -- I'm the
9   current acting treasurer.
10     Q.   Did anybody ever tell you at any
11  time that even though you were the acting
12  treasurer of HCMFA, that you were not
13  authorized to sign the two promissory notes
14  that we looked at before lunch?
15          MS. DANDENEAU:  Objection to form.
16     A.   Not that I recall.
17     Q.   Did anybody ever tell you at any
18  time that you were not authorized to sign the
19  two promissory notes that we looked at before
20  lunch?
21     A.   Not that I recall.
22     Q.   Did anyone ever tell you at any
23  time that you should not have signed the two
24  promissory notes that we looked at before
25  lunch?
```

Page 159

```
1           WATERHOUSE - 10-19-21
2      A.   Not that I recall.
3      Q.   Did you ever tell anybody at any
4   time that you weren't authorized to sign the
5   two promissory notes that we looked at before
6   lunch?
7      A.   Not that I recall.
8      Q.   Did you ever tell anybody at any
9   time that you made a mistake when you signed
10  the two promissory notes that we looked at
11  before lunch?
12     A.   Not that I recall.
13     Q.   As you sit here right now, do you
14  have any reason to believe that you were not
15  authorized to sign the two documents that we
16  looked at before lunch?
17          MS. DANDENEAU:  Objection to form.
18     A.   If -- if this is the -- the valid
19  incumbency certificate, I mean, this does --
20  this does detail who the signers are.
21     Q.   Okay.  And looking at that document,
22  does that give you comfort that you were
23  authorized to sign the two promissory notes
24  that we looked at before lunch?
25          MS. DEITSCH-PEREZ:  Object to the
```

Page 160

```
1           WATERHOUSE - 10-19-21
2   form.
3          MS. DANDENEAU:  Objection, form.
4      A.   Yes.
5      Q.   As of October 20th -- withdrawn.
6          I'm trying to take your mind back to
7   a year ago, October 2020.  Do you recall at
8   that time that the boards of the retail funds
9   were making inquiries about obligations that
10  were owed by the advisors to Highland in
11  connection with their 15(c) review?
12          MS. DANDENEAU:  Objection to form.
13     A.   I don't -- I don't recall.
14     Q.   As of October 2020, you had no
15  reason to believe you weren't authorized to
16  sign the two promissory notes that we just
17  looked at; correct?
18          MS. DANDENEAU:  Objection, form.
19          MS. DEITSCH-PEREZ:  Objection to
20  form.
21     A.   I didn't think about it in October
22  of 2020, but I mean --
23     Q.   Did you have any reason to believe
24  at that time that you weren't authorized to
25  sign the two notes that we just looked at?
```

Page 161

```
1           WATERHOUSE - 10-19-21
2      A.   Not that I'm aware, no.
3      Q.   Did you have any reason to believe a
4   year ago that you made a mistake when you
5   signed those two notes?
6      A.   Not that I'm aware.
7      Q.   A year ago you believed that HCMFA
8   owed Highland the unpaid principal amounts that
9   were due under those two notes; correct?
10     A.   They're -- they're promissory notes
11  that were -- as you presented, that were --
12  that were executed.  Whether they're valid or
13  if there's other reasons, I didn't -- I don't
14  know.
15     Q.   I'm not asking you whether they're
16  valid or not.  I'm asking you for your state of
17  mind.  A year ago you believed that HCMFA
18  was -- was obligated to pay the unpaid
19  principal amount under the two notes that you
20  signed; correct?
21     A.   Yeah, I'm -- I'm -- yes.
22     Q.   Thank you.  Are you aware -- you're
23  aware that -- that in 2017, NexPoint issued a
24  note in favor of Highland in the approximate
25  amount of $30 million; correct?
```

Page 162

WATERHOUSE - 10-19-21

1    A.   I'm – I'm – I'm generally aware.

2    Q.   Okay.  And are you generally aware

3    that from time to time, after the note was

4    issued by NexPoint, that moneys were applied to

5    principal and interest that were due under the

6    NexPoint note?

7    A.   Yes, I'm generally aware.

8    Q.   Okay.  And did anybody ever tell you

9    that the payments that were made against the

10   NexPoint notes were made by mistake?

11   A.   Yes.

12   Q.   And is it the one payment that we

13   talked about earlier today?

14   A.   We talked about a lot of things

15   today.  What payment are we talking about?

16   Q.   Okay.  Who told you that any payment

17   made against the NexPoint note was made by

18   mistake?

19   A.   D.C. Sauter.

20   Q.   When did Mr. Sauter tell you that?

21   A.   I don't – I don't remember

22   specifically.

23   Q.   Do you remember what payments –

24   A.   Sometime – sometime this year.

25

Page 163

WATERHOUSE - 10-19-21

1    Q.   Sometime in 2021?

2    A.   Yes.

3    Q.   Do you remember what payment he was

4    referring to?

5    A.   It was the – the payment made in

6    January of 2021 or – yeah, January of – of

7    this – January of 2021.

8    Q.   Okay.  So did anybody ever tell you

9    at any time that any payment that was made

10   against principal –

11   A.   And – and – and – hold on, and it

12   may have been other – again, it may have been

13   that payment or – or there may have been what

14   he was explaining, a misapplication of prior

15   payments as well.

16   Q.   Can you – can you give me any

17   specificity – withdrawn.

18        Withdrawn.  Can you tell me

19   everything that Mr. Sauter told you about –

20   about errors in relation to payments made

21   against principal and interest due under the

22   NexPoint note?

23        MS. DANDENEAU:  Can I just –

24        MR. RUKAVINA:  Hold on.  Hold on.

25

Page 164

WATERHOUSE - 10-19-21

1    I'm going to object here, and I'm going to

2    instruct the witness not to answer

3    depending on the discussion that you had –

4    Mr. Waterhouse, I'm the lawyer for

5    NexPoint, and as everyone here knows, D.C.

6    Sauter is in-house counsel.

7        So if you and Mr. Sauter were having

8    a factual discussion and him preparing his

9    affidavit, et cetera, then go ahead and

10   answer that.  But if you were having a

11   discussion as to our legal strategy in this

12   lawsuit, or anything having to do with

13   that, then do not answer that.

14        And if you need to talk to either

15   your counsel or me about that, then we need

16   to have that discussion now.

17   A.   Okay.  Yeah, I don't – I don't

18   really know how to make that distinction, so

19   maybe I need to talk to counsel before I

20   answer, or if I can answer.

21   Q.   Let me just ask you this question:

22   Did – did you have any conversation with

23   Mr. Sauter about any payment of principal and

24   interest prior to the time that you left

25

Page 165

WATERHOUSE - 10-19-21

1    Highland's employment, or did it happen after

2    you left Highland's employment?

3    A.   I don't – I don't recall if – I

4    don't recall.  I mean, it was sometime in 2021.

5    I don't remember if it was before or after I

6    was let go from Highland.

7    Q.   Okay.  So – so nobody told you

8    prior to 2021 that any error or mistake was

9    made in the application of payments against

10   principal and interest due on the NexPoint

11   note.  Do I have that right?

12   A.   Yeah, I don't – I don't recall this

13   being in 2020.

14   Q.   Okay.  And it didn't happen in 2019;

15   correct?

16   A.   I don't recall that happened.

17   Q.   And it didn't happen in 2018;

18   correct?

19   A.   I don't – I don't recall that

20   happening.

21   Q.   And it didn't happen in 2017;

22   correct?

23   A.   I don't recall.

24   Q.   But – but you believe the

25

Page 166

WATERHOUSE - 10-19-21

1  conversation took place in 2021.  You just
2  don't remember if it was before or after you
3  left Highland's employment.  Do I have that
4  right?
5      A.   It was sometime this year.  I
6  don't – I don't remember.
7      Q.   Okay.  Did you report this
8  conversation to Mr. Seery at any point?
9      A.   I don't believe so.
10      Q.   Did you report this conversation to
11  anybody at DSI at any time?
12      A.   I don't recall.
13      Q.   Do you have – you don't have a
14  recollection of ever doing that; correct?
15      A.   Yeah, that's right.  I don't recall
16  doing that.
17      Q.   Do you recall telling anybody at
18  Pachulski Stang about the conversation you
19  recall with Mr. Sauter?
20      A.   No, I don't – I don't recall.
21      Q.   Did you tell any of the independent
22  board members about your conversation with
23  Mr. Sauter?
24      A.   I don't recall.

Page 167

WATERHOUSE - 10-19-21

1      Q.   Did you tell any of the employees at
2  Highland before you left Highland's employment
3  about this call that you had with Mr. Sauter?
4      MS. DANDENEAU:  Objection to form.
5      A.   No, I don't – no, I don't recall.
6      Q.   NexPoint – to the best of your
7  knowledge, did NexPoint ever file a proof of
8  claim against Highland to try to recover moneys
9  that were mistakenly paid against the principal
10  and interest due under the note?
11      A.   Okay.  Hold on.  You are saying did
12  NexPoint Advisors file a proof of claim to
13  Highland for errors related to payments under
14  the NexPoint note to Highland?
15      Q.   Correct.
16      A.   I'm – I'm – I'm not – I'm not
17  aware.
18      Q.   Are you aware –
19      A.   I'm not the legal person here, I
20  don't know.
21      Q.   I'm just asking for your knowledge,
22  sir.
23      A.   Yeah, I don't know.  I'm not aware.
24      Q.   Are you aware of any claim of any

Page 168

WATERHOUSE - 10-19-21

1  kind that NexPoint has ever made to try to
2  recover the amounts that it contends were – or
3  that Mr. Sauter contend were mistakenly applied
4  against principal and interest due under the
5  NexPoint note?
6      A.   I'm not aware.
7      MS. DANDENEAU:  Objection to form.
8      Q.   Okay.  The advisors' agreements with
9  the retail funds are subject to annual renewal;
10  correct?
11      A.   Yes.
12      Q.   And do you participate in the
13  renewal process each year?
14      A.   Yes.
15      Q.   What role do you play in the renewal
16  process?
17      A.   I'm – I'm asked by the retail board
18  to walk-through the advisors financials.
19      Q.   And do you do that in the context of
20  a board meeting?
21      A.   Yes, it is – yes, it is typically
22  done in a board meeting.
23      Q.   And do you recall the time –
24  does – does the renewal process happen around

Page 169

WATERHOUSE - 10-19-21

1  the same time each year?
2      A.   Yes, it is – it is around the same
3  time every year.
4      Q.   And what – what time period of the
5  year does the renewal process occur?
6      A.   Approximately the September
7  timeframe.
8      Q.   During that process, in your
9  experience, does the board typically conduct
10  its own diligence and ask for information?
11      A.   Does the board ask for lots of – I
12  mean, just – I mean, lots of information as a
13  part of that – that – as part of that board
14  meeting and that process.
15      Q.   Okay.  And do you recall that the
16  process in 2020 spilled into October?
17      A.   Yes.  Yes.
18      Q.   Okay.  And as part of the process in
19  2020, the retail board asked – asked what are
20  referred to as 15(c) questions; right?
21      A.   I guess I don't want to be – they
22  asked 15(c) – are you saying they asked 15(c)
23  questions and this is why it went into October
24  or –

Page 170

WATERHOUSE - 10-19-21

1
2    Q.   No, I apologize.
3        Do you have an understanding of
4    what – of what 15(c) refers to in the context
5    of the annual renewal process?
6    A.   Yes, generally.
7    Q.   All right.  What is your general
8    understanding of the term "15(c)" in the
9    context of the annual renewal process?
10   A.   I – I think 15(c) is the section
11   that – that – you know, that – that the
12   board has to evaluate every year, the retail
13   board.  They have to, you know, go through,
14   evaluate, and go through that approval process
15   on a yearly basis.
16   Q.   Okay.
17       MR. MORRIS:  Can we put up on the
18   screen Exhibit 36, please.
19       (Exhibit 36 marked.)
20       MR. MORRIS:  I guess let's just
21   start at the bottom so Mr. Waterhouse can
22   see what is here.
23   Q.   You see this begins with an email
24   from Blank Rome to a number of people.
25       MR. MORRIS:  And if we can scroll

---

Page 171

WATERHOUSE - 10-19-21

1
2    up – keep going just a little bit.
3    Q.   You will see that there is an email
4    from Lauren Thedford to Thomas Surgent and
5    others where she reports that she was attaching
6    and reproducing below additional 15(c)
7    follow-up questions from the board.
8        Do you see that?
9    A.   Yes.
10   Q.   And do you see Question No. 2 asks
11   whether there are any material outstanding
12   amounts currently payable or due in the future
13   (e.g., notes) to HCMLP by HCMFA or NexPoint
14   Advisors or any other affiliate that provides
15   services to the funds?
16       Do you see that?
17   A.   Yes.
18   Q.   And – and did you – do you recall
19   that in in October of 2020 the retail boards
20   were asking for that information?
21   A.   I don't recall it, but there –
22   they're obviously asking in this email.
23   Q.   Okay.
24       MR. MORRIS:  Can we scroll up a
25   little bit, please.

---

Page 172

WATERHOUSE - 10-19-21

1
2    Q.   And then do you see that
3    Ms. Thedford includes you on the email string
4    on Tuesday, October 6th, at 5:52?
5    A.   Yes.
6    Q.   And she asks you and Dave Klos and
7    Kristin Hendrix for advice on that particular
8    Request No. 2 that I have just read; right?
9    A.   Yes.
10   Q.   Okay.  Can you tell me who
11   Ms. Thedford is?
12   A.   She was an attorney that was in the
13   legal group.
14   Q.   At Highland Capital Management,
15   L.P.?
16   A.   I'm – I'm – I'm – I don't
17   remember if she was an employee of Highland or
18   any of the advisors.
19   Q.   Okay.  Do you know if she served as
20   the corporate secretary for both HCMFA and
21   NexPoint?
22   A.   Yes.
23   Q.   And – okay.
24       Do you know whether Ms. Thedford
25   held any positions in relation to the retail

---

Page 173

WATERHOUSE - 10-19-21

1
2    funds as we defined that term?
3    A.   Yes.
4    Q.   What is your understanding of the
5    positions that Ms. Thedford held at the retail
6    funds?
7    A.   I – I recall her being an officer.
8    I don't recall her title.
9    Q.   Okay.  Is still an officer at
10   any of the retail funds today?
11   A.   No.
12   Q.   Do you know when she ceased to be an
13   officer of the retail funds?
14   A.   Approximately.
15   Q.   And when did she approximately cease
16   to be an officer of the retail funds?
17   A.   It was in – it was in early of
18   2021.
19   Q.   Okay.  Do you know when she became
20   an officer of the retail funds?
21   A.   I don't recall.
22   Q.   To the best of your recollection,
23   was she an officer of the retail funds in
24   October of 2020?
25   A.   I believe so.

Page 174

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you know what title she
3    held in her capacity as an officer, if any?
4    A.   I told you I don't remember.
5    Q.   Okay.  So she sends this email to
6    you at 5:52 p.m. on October 6th.
7         And if we can scroll up to the
8    response, you responded a minute later with a
9    one-word answer:  Yes.
10        Do you see that?
11   A.   Yes.
12   Q.   And – and yes is – yes was in
13   response to the retail board's Question No. 2,
14   right, whether there are any material
15   outstanding amounts currently payable or due in
16   the future?
17   A.   Yes.
18        MR. MORRIS:  And can we scroll up to
19   see what happened next.
20   Q.   So Ms. Thedford writes back to you a
21   few minutes later and she asks whether you
22   could provide the amounts.
23        Do you see that?
24   A.   Yes.
25   Q.   And then you respond further and you

Page 175

WATERHOUSE - 10-19-21

1
2    refer her to the balance sheet that was
3    provided to the board as part of the 15(c)
4    materials.
5         Do you see that?
6    A.   Yes.
7    Q.   And – and did the advisors provide
8    to the board certain balance sheets in 2020 in
9    connection with the 15(c) review?
10   A.   Yes, they did.
11   Q.   Okay.  And were the amounts that
12   were outstanding or that were to be due in the
13   future by the advisors to Highland included in
14   the liability section of the balance sheet that
15   was given to the retail board?
16   A.   Yes.  Notes would be reflected as
17   liabilities.
18   Q.   Okay.  And –
19   A.   If I'm understanding your question
20   correctly.
21   Q.   You are.  And – and – and those
22   liabilities you – you were – you believed
23   were responsive to the retail board's question;
24   correct?
25   A.   Yes.

Page 176

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  And then if we can scroll up,
3    you see Ms. Thedford responds to you
4    nine minutes later with a draft response.
5         Do you see that?
6    A.   Yes.
7    Q.   And she says that she is taking from
8    the 6/30 financials certain information about
9    amounts that were due to HCMLP and affiliates
10   as of June 30th, 2020.
11        Do you see that?
12   A.   I do.
13   Q.   Okay.  And did you believe, as the
14   treasurer of NexPoint and HCMFA and as the CFO
15   of Highland, that the information that
16   Ms. Thedford obtained from the 6/30 financials
17   was accurate and responsive in relation to the
18   retail fund board's question?
19   A.   I just want to make sure I
20   understand the question.
21        Are you saying that the financial
22   information provided to the retail board as
23   part of the 15(c) process, which included
24   financial statements as of June 30th of 2021,
25   did I feel like those were responsive to their

Page 177

WATERHOUSE - 10-19-21

1
2    questions?
3    Q.   Yes.
4    A.   Yes.
5    Q.   Thank you.
6         MS. DEITSCH-PEREZ:  John, it is not
7    in the chat yet.  Can you just make sure it
8    gets put in there.
9         MR. MORRIS:  Sure.
10        MS. CANTY:  I put it in there.  I
11   think maybe I just sent it directly, so let
12   me make sure it says to everyone.  But I
13   did put it in there.  I will try again.
14        MR. MORRIS:  Thank you, La Asia.
15        MS. DANDENEAU:  What number is it.
16        MR. MORRIS:  What, the Bates number?
17        MS. DEITSCH-PEREZ:  No, the –
18   this – yeah, 36 is not in the chat.
19        MR. MORRIS:  Okay.  We'll get it.
20        MS. DANDENEAU:  I think that
21   Ms. Canty just sent it to me originally.
22   Sorry.
23        MR. MORRIS:  Okay.  We will get it
24   there.
25        MS. CANTY:  Okay.  It is there now

Page 178

```
1          WATERHOUSE - 10-19-21
2    for everyone.
3          MS. DEITSCH-PEREZ:  Got it.  Thank
4    you.
5    Q.   Do you recall if the proposed
6    response that Ms. Thedford crafted was
7    delivered to the retail board with the -- with
8    the yellow dates having been completed?
9    A.   I don't know.
10         MR. MORRIS:  Davor, I'm going to ask
11         that the advisors and -- the advisors of
12         both HCMFA and NexPoint produce to me any
13         report that was given to the retail board
14         concerning the promissory notes at issue,
15         including the obligations under the notes.
16   Q.   Do you know -- do you know if
17   ultimately NexPoint informed the retail board
18   in response to its question that NexPoint owed
19   Highland approximately 23 or $24 million?
20         MS. DANDENEAU:  Objection to the
21         form.
22   A.   Sorry, are you asking, did NexPoint
23   tell the retail board that it owed Highland?
24   Q.   Let me ask a better question,
25   Mr. Waterhouse.
```

Page 179

```
1          WATERHOUSE - 10-19-21
2          Did -- do you know if anybody ever
3    answered the retail board's question that was
4    Number 2?
5    A.   I don't -- I can't say for sure.
6    Q.   Okay.  Do you recall -- I think you
7    testified earlier that you walked through the
8    advisors' financials with the retail board;
9    correct?
10   A.   Yes.
11   Q.   And as part of that process, did you
12   disclose to the retail board the obligations
13   that NexPoint and HCMFA had to Highland under
14   promissory notes?
15   A.   The retail board, as I stated
16   earlier, receives financial information,
17   balance sheet, income statement information
18   from the advisors.  That information is
19   provided to the retail board in connection with
20   the 15(c) process.
21         So any notes between the advisors
22   and the Highland would be -- anything would be
23   detailed in those financial statements.
24   Q.   Do you recall in 2020 ever speaking
25   with the retail board about the advisors'
```

Page 180

```
1          WATERHOUSE - 10-19-21
2    obligations under the notes to Highland?
3          MS. DANDENEAU:  Objection to form.
4          MS. DEITSCH-PEREZ:  Object to the
5          form.
6    A.   I don't recall specifically.
7    Q.   Do you have any general recollection
8    of discussing with the retail board the
9    advisors' obligations to Highland under the
10   notes that they issued?
11         MS. DANDENEAU:  Object to the form.
12         MS. DEITSCH-PEREZ:  Object to the
13         form.
14   A.   I just recall generally just -- it
15   is just -- I present the financial statements,
16   and if they have questions, I answer their
17   questions and walk them through.
18         I don't recall what they asked.  I
19   don't recall where the discussion went.  I
20   don't recall anything of that nature.
21   Q.   Okay.  Do you know if anybody on
22   behalf of HCMF -- HCMFA have told the retail
23   board that HCMFA had no obligations under the
24   two 2019 notes that you signed?  Withdrawn.
25         Do you know whether anybody on
```

Page 181

```
1          WATERHOUSE - 10-19-21
2    behalf of HCMFA ever told the retail boards
3    that you weren't authorized to sign either of
4    the two 2019 notes?
5          MS. DANDENEAU:  Objection to form.
6    A.   I'm not aware.
7    Q.   Are you aware of anybody on behalf
8    of HCMFA ever telling the retail boards that
9    your execution of the two 2019 notes was a
10   mistake?
11         MS. DANDENEAU:  Objection to form.
12   A.   I'm not aware.
13   Q.   Are you aware of anybody on behalf
14   of HCMFA ever telling the retail boards that
15   HCMFA did not have to pay the amounts reflected
16   in the two notes that you signed in 2019?
17   A.   I'm not aware.
18   Q.   Do you know whether anybody ever
19   told the retail boards -- withdrawn.
20         Do you know whether anybody ever
21   told the retail boards that Highland has
22   commenced a lawsuit to recover on the two notes
23   that you signed in 2019?
24   A.   I'm not aware.
25   Q.   Are you aware of anybody informing
```

Page 182

WATERHOUSE - 10-19-21

2  the retail boards that Highland has sued to
3  recover on the NexPoint note?
4      A.  I'm not aware.
5      Q.  Do you know whether anybody ever
6  told the retail board that Highland had
7  declared a default with respect to the two
8  HCMFA notes that you signed in 2019?
9      A.  I'm not aware.
10     Q.  Are you aware of anybody ever
11  informing the retail boards that Highland had
12  declared a default under the NexPoint note?
13     A.  I'm not aware.
14     Q.  Are you aware of anybody telling the
15  retail board that Highland made a demand for
16  payment under the 2019 notes that you signed on
17  behalf of HCMFA?
18     A.  I'm not aware.
19     Q.  Let's -- let's see if there is a
20  response to Ms. Thedford's email, if we can
21  scroll up.
22         Do you see you responded to
23  Ms. Thedford five minutes after she provided
24  the draft response to you?
25     A.  Yes.

Page 183

WATERHOUSE - 10-19-21

2      Q.  Okay.  And do you see that Dustin
3  Norris is copied on this email?
4      A.  Yes, he is.
5      Q.  Great.  Do you know whether
6  Mr. Norris held any positions at either of the
7  advisors as of October 6, 2020?
8      A.  I will go back to -- I'm not the
9  legal expert of what appoints you or how or
10  why, but you did see Dustin's name on the
11  incumbency certificate that you produced
12  earlier.
13     Q.  Do you know what his title was in
14  October of 2020?
15     MS. DANDENEAU:  Objection to form.
16     A.  I don't -- I don't recall.
17     Q.  Was he -- did he have a title with
18  each of the advisors, to the best of your
19  recollection?
20     A.  I don't recall.
21     Q.  Do you know why he is included on
22  this email string?
23     A.  I didn't add Dustin.  It looks like
24  Lauren did.  I don't know why she added him or
25  not.  You would have to ask her.

Page 184

WATERHOUSE - 10-19-21

2      Q.  Does Mr. Norris play a role in
3  formulating the advisors' responses to the
4  questions asked by the retail board in
5  connection with the 15(c) annual review?
6      MS. DANDENEAU:  Objection to form.
7      A.  He -- Dustin Norris is there in the
8  board meetings.  But -- so he has a role, yes.
9      Q.  Okay.  And does Mr. Norris hold any
10  positions, to the best of your knowledge, in
11  relation to any of the retail funds?
12     A.  I don't -- I don't believe he does.
13     Q.  How about Mr. Post, do you know
14  whether Mr. Post holds any position in either
15  of the advisors?
16     A.  I mean, he -- he -- yes.
17     Q.  What is your understanding of the
18  positions that Mr. Post holds in relation to
19  the advisors?
20     MS. DANDENEAU:  Objection to form.
21     A.  He is an employee of NexPoint
22  Advisors.  He is also the chief compliance
23  officer for -- for NexPoint.
24     Q.  Who is the chief compliance officer
25  for HCMFA, if you know?

Page 185

WATERHOUSE - 10-19-21

2      MS. DANDENEAU:  Objection to form.
3      A.  That would be Jason as well.
4      Q.  Okay.  Now, looking at your
5  response, you noted initially that nothing was
6  owed under shared services.  Do I have that
7  right in substance?
8      A.  Yeah.  I think I'm being responsive
9  to Lauren's question here, whether any of the
10  shared service invoices are outstanding.
11     Q.  Right.
12     A.  Yes.
13     Q.  And that is because -- and that is
14  because the retail the retail board has asked
15  for the disclosure of all material obligations
16  that were owed to HCMLP either then or in the
17  future; isn't that right?
18     MS. DANDENEAU:  Objection to form.
19     Q.  We can go back down and look.
20     A.  Look, I don't know if that's a
21  material item, I mean, again, but sure.
22     Q.  Okay.  But there were no shared
23  services outstanding; correct?
24     MS. DANDENEAU:  Objection to form.
25     A.  That is what this email seems to

Page 186

WATERHOUSE - 10-19-21

1   indicate.

2      Q.   And you wouldn't have written it if

3   you didn't believe it to be true at the time;

4   correct?

5      A.   Correct.

6      Q.   And when you referred to shared

7   services outstanding, what you meant there was

8   that neither NexPoint nor HCMFA owed Highland

9   any money under the shared services agreements

10  that they had with Highland as of October 6th,

11  2020; right?

12     A.   I don't know if it is as of October

13  6, 2020 or if it was from -- like through the

14  financials -- through the date of the

15  financials as of June 30.

16     Q.   Okay.  And then you noted that

17  HCMA -- the HCMFA note is a demand note; right?

18     A.   Yes.

19     Q.   And then you referred Ms. Thedford

20  to Kristin Hendrix for the term of the NexPoint

21  note.  Do I have that right?

22     A.   Yes.

23     Q.   And then you refer to that agreement

24  that is referenced in the 2018 audited

Page 187

WATERHOUSE - 10-19-21

1   financials about Highland's agreement not to

2   make demand upon HCMFA until May 2021; correct?

3      A.   Correct.

4      Q.   And then -- and then the next thing

5   you write is that the attorneys think that BK

6   doesn't change that, but don't know for sure at

7   the end of the day.

8         Do you see that sentence?

9      A.   Yes.

10     Q.   Which attorneys were you referring

11  to?

12     A.   I don't remember.

13     Q.   Did you have a conversation with

14  attorneys concerning whether the bankruptcy

15  would change or alter in any way the agreement

16  not to make a demand under the HCMFA note?

17     A.   Look, yeah, I mean, I don't

18  specifically remember, but generally, I mean,

19  it is in this email.  I don't -- I don't -- I

20  don't -- I don't remember who I talked to or,

21  you know, was it inside counsel, outside

22  counsel, but obviously I talked to somebody.

23     Q.   Do you have any recollection --

24     A.   Well, I don't even know if it's --

Page 188

WATERHOUSE - 10-19-21

1   actually, it may not even have been me.  I say

2   the attorneys in, you know, a lot of -- like I

3   talked about the team.

4         It could have been someone on the

5   team, like, hey, we need to run this down, and

6   maybe they talked to attorneys again and

7   relayed that information to me.

8         So I really don't know if I spoke or

9   someone else did or -- or, I mean, and maybe it

10  wasn't even from corporate accounting.  Maybe

11  it was, you know, other -- I'm kind of

12  summarizing, you know, again, so I don't really

13  know -- I can't really say for sure.  I don't

14  remember how I came about of this knowledge.

15     Q.   I appreciate your efforts,

16  Mr. Waterhouse, but I will just tell you that

17  if I ask a question and you don't know the

18  answer or you don't recall, I'm happy to accept

19  that.  I don't -- I don't want you to

20  speculate, so I want to be clear about that.

21  So I appreciate it.

22         Let me just ask you simply:  Do you

23  know what attorneys -- can you identify any of

24  the attorneys who thought that the bankruptcy

Page 189

WATERHOUSE - 10-19-21

1   process didn't change the agreement?

2      A.   I don't recall.

3      Q.   Okay.  Perfect.

4         And then let's look at the last

5   sentence.  It says, quote:  The response should

6   include, as I covered in the board meeting,

7   that both entities have the full faith and

8   backing from Jim Dondero, and to my knowledge

9   that hasn't changed.

10        Do you see that?

11     A.   Yes.

12     Q.   Okay.  Prior to October 6th, 2020,

13  had you told the retail board that HCMFA and

14  NexPoint have the full faith and backing from

15  Jim Dondero?

16     A.   Yes.

17     Q.   Do you remember in the context in

18  which you told the retail board that?

19     A.   I mean, generally, yes.

20     Q.   Tell me what you recall.

21     A.   So we were walking through the

22  financials from the advisors; right?  So as I

23  described to you, you have got HCMFA and NPA.

24  And these -- the financials, you know, show

WATERHOUSE - 10-19-21

2  they have liabilities on them that exceed
3  assets.
4        So the retail board has asked, okay,
5  you know, how -- you know, if -- if these
6  liabilities come due or they're payable, you
7  know, how does that come about?
8        And, you know, the response is,
9  well, the advisors have the -- full faith
10  and backing from -- from Jim Dondero.
11     Q.   And how did you know that the
12  advisors had the full faith and backing from
13  Jim Dondero?  What was the basis for that
14  statement that you made to the retail board?
15     A.   I talked to Jim about it at some
16  point in the past.
17     Q.   And did you tell Mr. Dondero that
18  you were going to inform the retail board that
19  the advisors had his full faith and backing
20  before you actually told that to the retail
21  board?
22     A.   I don't recall having that
23  conversation.
24     Q.   Do you recall if you ever informed
25  Mr. Dondero that you had disclosed or told the

WATERHOUSE - 10-19-21

2  retail board that the advisors had the full
3  faith and backing of Mr. -- Mr. Dondero?
4        MS. DEITSCH-PEREZ:  Object to the
5  form.
6     A.   I don't recall discussing that with
7  him at the time.
8     Q.   When you told this to the board, was
9  Mr. Dondero participating in the discussion?
10     A.   Not that I recall.
11     Q.   Withdrawn.  Was it not -- withdrawn.
12        Do you recall whether -- when you
13  covered this issue with the board, was that in
14  a -- a Zoom call or a Webex call?  Was it a
15  telephone call?  Was it in-person?  Like where
16  were you physically in relation to the board?
17     A.   I believe I was at home.
18     Q.   Okay.  Can you identify every person
19  that you recall who was present for this
20  disclosure other than -- other than the board
21  members themselves?
22        MS. DEITSCH-PEREZ:  Object to the
23  form.
24     A.   I don't recall everyone on the call.
25     Q.   Can you identify anybody who was on

WATERHOUSE - 10-19-21

2  the call?
3     A.   Other than the board members?
4     Q.   Yes.
5     A.   Lauren Thedford.  I mean, there
6  are -- there are many -- my section is just one
7  of many sections that are just -- you know, as
8  you can appreciate, this is a long board
9  meeting.
10        I can't recall specifically, really
11  even generally, or who was on when this was
12  discussed.  But Lauren was typically on for the
13  entire time.
14     Q.   I apologize if I asked you this, but
15  do either of Mr. Norris or Mr. Post hold any
16  positions relative to the retail funds?
17     A.   I think you asked me this already,
18  John.
19     Q.   Okay.  I just don't recall.  Can you
20  just refresh my recollection if I did, in fact,
21  ask you the question?
22     A.   I don't believe -- if we can go
23  back.  I don't believe Mr. Norris has a title
24  at the retail funds.  Mr. -- and Mr. Post is
25  the CCO of the advisor, the advisors.

WATERHOUSE - 10-19-21

2     Q.   Okay.  Do you know if either of them
3  have a position with the retail board -- with
4  the retail funds?
5     A.   I don't believe Mr. Norris has a
6  position with the retail funds.
7     Q.   All right.  What about Mr. Post?
8     A.   Mr. Post is the CCO of the advisors.
9     Q.   Okay.  Does he hold any position --
10     A.   I don't believe so.
11     Q.   -- with the retail funds?
12     A.   I don't believe so.
13     Q.   Okay.
14     A.   I don't know if being the CCO for
15  the advisor conveys something for the retail
16  funds.  Again, I am not -- that is the legal
17  compliance part of it.  I don't know.
18     Q.   Why did you tell the retail board
19  that the advisors have the full faith and
20  backing from Mr. Dondero?
21        MS. DANDENEAU:  Objection to form.
22     A.   It is -- it is -- it is what has
23  been discussed with them prior.
24     Q.   And were you -- were you trying to
25  give them comfort that even though the

Page 194

WATERHOUSE - 10-19-21

1    liabilities exceeded the assets that the
2    advisors would still be able to meet their
3    obligations as they become due?
4
5        MS. DANDENEAU: Objection to form.
6        MS. DEITSCH-PEREZ: Object form.
7    A.   I – I can't – I don't remember
8    specifically the conversation, but generally --
9    you know, generally, yes. And that is why --
10    but, you know, again, in this email saying, you
11    know, I am sure I qualified it with the retail
12    board, you know, as I said I like – you know,
13    to my knowledge, that hasn't changed. But,
14    again, generally -- generally that is what I
15    remember.
16    Q.   Okay. Do you recall if in the
17    advisors' response to the retail board's
18    question if the response included any statement
19    concerning Mr. Dondero and -- and the full
20    faith and backing that he was giving to the
21    advisors?
22        MS. DEITSCH-PEREZ: Object to the
23        form.
24    A.   I don't – I don't remember
25    specifically what was provided.

Page 195

WATERHOUSE - 10-19-21

1
2    Q.   Okay.
3    A.   And I don't really – I don't really
4    remember generally either.
5    Q.   Okay.
6        MR. MORRIS: So – so, again, I'm
7    just going to ask Mr. Rukavina if your
8    clients can produce as soon as possible the
9    15(c) response, the written response that
10    the advisors made, if any, to the board's
11    Question No. 2.
12        I'm not looking for the whole
13    response, but I certainly want the response
14    to Question No. 2.
15    Q.   Do you have a general understanding
16    as to the amount by which -- withdrawn.
17        Did -- did the assets of –
18    withdrawn.
19        Did the liabilities of HCMFA exceed
20    its assets in 2020?
21        MS. DANDENEAU: Objection to form.
22        MS. DEITSCH-PEREZ: Objection, form.
23    A.   I believe I have already answered
24    that question earlier, I think. I believe I
25    said yes.

Page 196

WATERHOUSE - 10-19-21

1
2    Q.   Okay. And did the liabilities of
3    NexPoint exceed its assets in 2020?
4        MS. DEITSCH-PEREZ: Objection to
5        form.
6    A.   I don't believe so.
7    Q.   Okay. So – so it was only one of
8    the two advisors who had liabilities that
9    exceeded the value of the assets.
10        Do I have that right?
11        MS. DEITSCH-PEREZ: Objection to
12        form.
13        MS. DANDENEAU: Form.
14    A.   Yes.
15    Q.   And do you know, ballpark, the
16    amount by which the value of HCMFA's
17    liabilities exceeded their assets in 2020?
18        MS. DANDENEAU: Objection to form.
19    A.   I don't – I don't recall.
20        MR. MORRIS: I had specifically
21    requested in discovery the audited
22    financial reports for both advisors and
23    NexPoint. I think I may have gotten one
24    for NexPoint but I'm still waiting for the
25    balance. And I'm going to renew my request

Page 197

WATERHOUSE - 10-19-21

1
2    for those documents too.
3    Q.   Let's go to the next exhibit, which
4    is Number 10. So I think it is in your stack,
5    Mr. Waterhouse.
6        MR. MORRIS: And we can take the one
7    down from the screen and put up Number 10
8    for everybody.
9        (Exhibit 10 marked.)
10    Q.   And I don't know if you have ever
11    seen this before, but I'm really putting it up
12    on the screen for purposes of turning to the
13    very last page of the document.
14        So this is a document that we have
15    been -- that we premarked as Exhibit 10. And
16    we're turning to the last page of the document,
17    which is a document that was filed in the
18    adversary proceeding 21-3004. And -- no, I
19    apologize, I think we -- right there. Perfect.
20        And it is page 31 of 31.
21        MR. MORRIS: I think there may have
22    been some something erroneously stapled to
23    the hard copy that I gave you folks, but
24    I'm looking for page 31 of 31 in the
25    document that begins with the first page of

Page 198

WATERHOUSE - 10-19-21

1       Exhibit 10.
2       Q.   Do you have that, Mr. Waterhouse?
3       A.   I don't have it yet.  I'm looking.
4       Q.   All right.  If you look at the top
5    right-hand corner, you will see it says page
6    hopefully something of 31?
7       A.   Yes, I've got it now.
8       Q.   Okay.  You have got 31 of 31.  You
9    can take a moment to read that, if you would
10   like.
11      A.   (Reviewing document.)  Okay.
12      Q.   Have you ever seen this before?
13      A.   I don't know if I have seen this
14   specific document, but, you know, I've --
15   I'm -- I'm aware of it.
16      Q.   And is this the document that you
17   had in mind when you sent that email to
18   Ms. Thedford that we just looked at where you
19   said that Highland had agreed not to make a
20   demand upon HCMFA until May 2021?
21      A.   Honestly, I don't -- it wasn't this
22   document.  I mean, it's something like this,
23   yes.  I mean, yes.
24      Q.   Well --

Page 199

WATERHOUSE - 10-19-21

1       A.   It is something like this, but I
2    don't think it was this specific document.
3       Q.   Well, but this document does say in
4    the last sentence that Highland agreed not to
5    seek -- not to demand payment from HCMFA prior
6    to May 31, 2021; right?
7       A.   Yes.
8       Q.   And are you aware of any other
9    document that was ever created pursuant to
10   which Highland agreed not to demand payment on
11   amounts owed by HCMFA before May 31, 2021?
12      A.   Hold on.  Are you asking, am I aware
13   of a document that by HCMFA that basically says
14   otherwise?
15      Q.   No.  Let me try again.
16           Are you aware of any other document
17   pursuant to which -- pursuant to which Highland
18   agreed not to make a demand on HCMFA until May
19   31st, 2021?
20      A.   I'm -- I think there was something
21   in connection with -- with the -- with the
22   audit that basically says the same thing.
23      Q.   Okay.  And do you think that the
24   audit is referring to this particular document?

Page 200

WATERHOUSE - 10-19-21

1       A.   I don't know.
2       Q.   All right.  This document is dated
3    April 15, 2019.  Do you see that?
4       A.   I do.
5       Q.   And do you remember that the audit
6    was completed on June 3rd, 2019?
7       A.   Yes.
8       Q.   And do you recall that the audited
9    financials -- and I'm happy to pull them up if
10   you would like, but do you recall that the
11   audited financials included a reference to the
12   agreement pursuant to which Highland agreed not
13   to make a demand until May 31st, 2021?
14      A.   Yes, I remember.
15      Q.   And as part of the process, would
16   you have expected the corporate accounting team
17   to have provided a copy of this document to
18   PwC?
19           MS. DANDENEAU:  Objection to form.
20      A.   Yes, I would have expected something
21   like this, or again, you know, some document
22   that basically states -- states the deferral
23   till May 31 of 2020.
24      Q.   Okay.

Page 201

WATERHOUSE - 10-19-21

1       A.   May 31 of 2021, excuse me.
2       Q.   And this document states the
3    deferral that you just described; correct?
4       A.   It does.
5       Q.   And this document states the
6    deferral that was described in the audited
7    financial statements that we looked at before;
8    correct?
9       A.   It does.
10           MR. MORRIS:  Okay.  Can we scroll
11      down just a little bit to see who signed on
12      behalf of the acknowledgment there.
13      Q.   Okay.  So Mr. Dondero signed this
14   document on behalf of both HCMFA and Highland;
15   do you see that?
16      A.   I do.
17      Q.   Okay.  Did you discuss this document
18   or the -- withdrawn.
19           Did you discuss the concept of the
20   deferral with Mr. Dondero in the spring of
21   2019?
22      A.   I think I testified I don't recall.
23      Q.   Okay.  Do you know whose idea it was
24   to issue the acknowledgment in this form?

Page 202

```
 1        WATERHOUSE - 10-19-21
 2    A.   I don't recall.
 3        MR. MORRIS:  Can we scroll back up
 4    to the document, please.
 5    Q.   Do you see in the beginning it says,
 6    reference is made to certain outstanding
 7    amounts loaned from Highland to HCMFA for
 8    funding ongoing operations.
 9        Do you see that?
10    A.   Yes.
11    Q.   And were you aware as the CFO of
12    Highland and as the treasurer of HCMFA that as
13    of April 15, 2019, Highland had made certain
14    loans to HCMFA to fund HCMFA's ongoing
15    operations?
16    A.   Yes.
17    Q.   And were you aware that those loans
18    were payable on demand and remained outstanding
19    as of December 31st, 2018?
20    A.   Yes.
21    Q.   And were you aware that those
22    amounts were payable on demand, and they
23    remained outstanding as of April 15, 2019?
24        MS. DEITSCH-PEREZ:  Object to the
25    form.
```

Page 203

```
 1        WATERHOUSE - 10-19-21
 2    A.   Well, this -- this document dated
 3    April 15, 2019 says they have been deferred to
 4    May 31, 2021.
 5    Q.   Right.  But I'm just sticking to the
 6    first paragraph where they refer to the
 7    outstanding amounts.  And in the end it says
 8    the -- it remained outstanding on December
 9    31st, 2018, and I think you told me that you
10    understood that, and then I'm just trying to
11    capture the last piece of it.
12        Did you understand that there were
13    amounts outstanding from the loan that Highland
14    made to HCMFA to fund ongoing operations as of
15    April 15th, 2019?
16    A.   Yes.
17    Q.   Thank you.  Let's look at the next
18    sentence.  HCMFA expects that it may be unable
19    to repay such amounts should they become due
20    for the period commencing today and continuing
21    through May 31st, 2021.
22        Do you see that?
23        MS. DANDENEAU:  Objection to form.
24    A.   I do.
25    Q.   As the CFO -- withdrawn.
```

Page 204

```
 1        WATERHOUSE - 10-19-21
 2        As the treasurer of HCMFA, did you
 3    believe that -- do you believe that statement
 4    was true and accurate at the time it was
 5    rendered?
 6    A.   I mean, it -- it -- the answer to
 7    that is I really didn't have any -- I didn't
 8    have an opinion really.
 9    Q.   Did you do anything to educate
10    yourself in April of 2019 on the issue of
11    whether HCMFA could repay the amounts that it
12    owed to Highland should they become due?
13    A.   I don't believe so.
14    Q.   Did you at any time form any
15    opinions as to HCMFA's ability to repay all
16    amounts due to Highland should they become due?
17    A.   Not really.  I guess I don't...
18    Q.   Well, you told the retail board that
19    HCMFA's liabilities exceeded their assets in
20    2020; correct?
21    A.   Yes.
22    Q.   Based on the work that you did to
23    prepare for the retail board, did you form any
24    view as to whether HCMFA would be unable to
25    repay the amounts that it owed to Highland
```

Page 205

```
 1        WATERHOUSE - 10-19-21
 2    should they become due?
 3        MS. DANDENEAU:  Objection to form.
 4    A.   I mean, I -- when you look at that,
 5    to answer you, completely, you know, again,
 6    if -- the response I gave the retail board was,
 7    you know, the -- the advice -- HCMFA advisors
 8    have the -- have the full faith and backing of
 9    Jim Dondero.  So I didn't form an opinion of
10    whether the advisor could pay it or not.
11    Q.   Did you form any view as to whether
12    the advisors could repay the amounts that it
13    owed to Highland should they become due without
14    the full faith and backing of Mr. Dondero?
15        MS. DANDENEAU:  Objection to form.
16        MS. DEITSCH-PEREZ:  Form.
17    A.   I mean, if you -- if you -- if you
18    take that last statement out, I mean, it would
19    be difficult for HCMFA to pay back demand notes
20    at that time.
21    Q.   And it was precisely for that reason
22    that you told the retail board that -- that the
23    retail -- that the advisors had the full faith
24    and backing of Mr. Dondero; correct?
25        MS. DANDENEAU:  Objection to form.
```

Page 206

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2        A.   I mean, yes, as the mouthpiece, I
3    was relaying information.
4        Q.   Okay.  And you relayed that
5    information with the knowledge and approval of
6    Mr. Dondero; correct?
7        MS. DEITSCH-PEREZ:  Object to the
8    form.
9        A.   As I stated in the email, I don't
10   believe, and I think I testified I don't
11   believe I had conversations with Mr. Dondero at
12   the time of that board meeting.
13       Q.   Did you tell the retail board that
14   the advisors had the full faith and backing of
15   Mr. Dondero without Mr. Dondero's prior
16   approval?
17       A.   Yeah, I -- I -- yes, I'm -- like I
18   said, I think I testified earlier, I'm sure I
19   qualified it as well.
20       Q.   What do you mean by that?
21       MS. DANDENEAU:  Objection to form.
22       A.   Again -- again, like I said in the
23   email, it has the full faith and backing of Jim
24   Dondero unless that has changed.
25       Q.   Actually that is not what you said,

Page 207

WATERHOUSE - 10-19-21

1    so let's put the email back up.
2        A.   It is -- it is -- it is in the
3    email.
4        Q.   Let's put the email back up.  You
5    didn't say unless it has changed.  You said you
6    believe it hasn't changed; right?
7        A.   Okay.  And to my knowledge that
8    hasn't changed, that is what it says.
9        Q.   That's right.
10       A.   But, again, I mean, that is -- I
11   don't know everything.  And I'm not in every
12   conversation.  I'm not -- to presume that I am,
13   is -- and you have to put myself -- as you
14   started this out, Mr. Morris, I was at home in
15   October of 2020 with COVID -- or, you know,
16   under these COVID times that we described is
17   very difficult.
18       We have all been working at home for
19   really the first time ever, undergoing
20   processes, procedures, control environments
21   that have been untested, and there is poor
22   communication.
23       So I am relaying, as I'm telling you
24   now, what is in the email.  And unless

Page 208

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2    something has changed -- to my knowledge, it
3    hasn't changed, but it could have changed.
4        Q.   When you say that the advisors have
5    the full faith and backing from Mr. Dondero,
6    did you intend to convey that, to the extent
7    the advisors were unable to satisfy their
8    obligations as they become due, Mr. Dondero
9    would do it for them?
10       MS. DANDENEAU:  Object to the form.
11       MS. DEITSCH-PEREZ:  Object to the
12   form.
13       And, John, we have given you a lot
14   of leeway here but this does not seem
15   relevant to this case.  You seem sort of
16   taking a complete sort of diversion into
17   the allegations and the complaint just
18   filed on Friday, and so I would ask you to
19   move on because --
20       MR. MORRIS:  And I will tell you --
21   I will tell you that I have never read that
22   complaint cover-to-cover.  I have nothing
23   to do with the prosecution of those claims.
24   And this issue that we're talking about
25   right now is related solely to the

Page 209

WATERHOUSE - 10-19-21

1    promissory notes that your clients refuse
2    to pay.
3        So I'm going to continue to ask my
4    questions, and I would ask the court
5    reporter to read back my last question.
6        (Record read.)
7        MS. DEITSCH-PEREZ:  And then I
8    believe there were objections to form.
9        Q.   You can answer the question.
10       A.   Yes.
11       Q.   Thank you very much, sir.
12       MR. MORRIS:  Can we go back to the
13   other document, please?
14       Q.   Mr. Waterhouse, do you know if this
15   document was ever shared with the retail board?
16       A.   I don't recall.
17       Q.   Did you ever share it with the
18   retail board?
19       A.   I don't recall.
20       Q.   Did you ever tell the retail board
21   about the substance of this document?
22       A.   I don't recall.
23       Q.   Did you ever tell the retail board
24   that Highland had agreed not to make a demand

Page 210

WATERHOUSE - 10-19-21

1  against HCMFA until May 2021?
2      Q.   Do you know whether anybody on
3      A.   I don't recall.
4      Q.   Do you know whether anybody on
5  behalf of the advisors ever informed the retail
6  board that Highland had agreed on April 15,
7  2019, not to make a demand against HCMFA under
8  the promissory notes?
9      A.   I don't recall.
10      Q.   Did you instruct Ms. Thedford or
11  anybody else responding to the retail board's
12  15(c) inquiry to disclose this document?
13      A.   Did I instruct Ms. Thedford or
14  anyone else to -- to -- to produce this, to
15  disclose this document?  Is that what you -- I
16  just want to make sure.
17      Q.   Uh-huh.
18      A.   Yeah, I don't -- I don't recall.
19      Q.   Did you instruct anybody to inform
20  the retail board, in response to their question
21  as part of the 15(c) process, to -- to tell the
22  retail board about Highland's agreement not to
23  make a demand until 2021?
24      MS. DANDENEAU:  Objection to form.
25      A.   I don't recall.

Page 211

WATERHOUSE - 10-19-21

1      Q.   Did you ever inform PwC that HCMFA's
2  liabilities exceeded its assets?
3      MS. DANDENEAU:  Object to the form.
4      A.   I don't -- I don't think I told
5  them.  I mean, they -- they audited the
6  financial statements.
7      Q.   Did -- do you know if anybody on
8  behalf of Highland ever informed
9  PricewaterhouseCoopers that HCMFA may be unable
10  to repay amounts owing to Highland, should they
11  become due?
12      MS. DANDENEAU:  Objection to form.
13      A.   Yes.  Again, I think I testified
14  earlier that -- that this was communicated to
15  the auditors.
16      Q.   Ideally --
17      A.   I don't know who exactly did that.
18  I don't recall doing it, but, yeah, it was --
19  it was communicated.  And that is why -- I
20  mean, there is a disclosure in the financial
21  statements; right?
22      Q.   There is, and that disclosure
23  relates to the last sentence of this document;
24  correct?
25

Page 212

WATERHOUSE - 10-19-21

1      A.   Yes.
2      Q.   Do you recall looking in the
3  document and seeing anything that was disclosed
4  with respect to the sentence above that?
5      A.   No.
6      Q.   Do you know whether anybody on
7  behalf of Highland ever informed
8  PricewaterhouseCoopers that HCMFA expects that
9  it may be unable to repay amounts due and owing
10  to Highland should they become due?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.  I think that is the third time.
13      A.   I don't recall.  Again, as I said,
14  we -- all of this was given to the auditors.
15      Q.   Do you know if Highland received
16  anything of value in exchange for its agreement
17  not to demand payment on amounts owed by HCMFA
18  prior to May 31st, 2021?
19      MS. DEITSCH-PEREZ:  Object to the
20  form.  That is the second time.
21      MS. DANDENEAU:  Object to the form.
22      A.   I have answered this question.
23      MR. RUKAVINA:  Hold on.  Object to
24  legal conclusion.  Go ahead.
25

Page 213

WATERHOUSE - 10-19-21

1      A.   I have answered this question
2  before.
3      Q.   And the answer was no?
4      A.   I'm not aware.
5      Q.   Now, this acknowledgment can't
6  possibly apply to the two notes that you signed
7  on behalf of HCMFA because those notes were
8  signed on May 2nd and May 3rd, 2019; is that
9  right?
10      MS. DANDENEAU:  Objection to form.
11      A.   Unless there is a drafting error.
12      Q.   Okay.  Are you aware of a drafting
13  error?
14      A.   I'm not aware.  I didn't -- I wasn't
15  part of -- I didn't sign this note or this
16  acknowledgment.  I didn't draft it.
17      Q.   But you do see it is dated April 15,
18  2019; right?
19      A.   Yes.
20      Q.   And this was a document that was
21  actually included by the advisors in a pleading
22  they filed with the Court; right?
23      MR. RUKAVINA:  Well, I don't know
24  that so I object to form.
25

Page 214

WATERHOUSE - 10-19-21

1    Q.   Okay.  Let's go to the first page of
2  the document and just confirm that.
3        MR. AIGEN:  Mr. Morris, I just note
4  that you already said there was some error
5  with the document that is listed as
6  exhibit --
7        MR. MORRIS:  No.  No, no, no.
8        MS. DEITSCH-PEREZ:  Oh, okay.
9        MR. MORRIS:  What I said is that
10  there is a few pages that were mistakenly
11  stapled to the end of the document.
12        MS. DEITSCH-PEREZ:  Okay.
13        MR. MORRIS:  There is no problem
14  with this document.
15        MS. DEITSCH-PEREZ:  And just so
16  we're clear that the document -- the pages
17  that start with defendant's amended answer
18  are not intended to be part of this
19  document?
20        MR. MORRIS:  That's correct.
21        MS. DEITSCH-PEREZ:  And that the --
22  but it is your representation that the rest
23  of the document is -- is -- is correct
24  because we don't -- we don't have any way

Page 215

WATERHOUSE - 10-19-21

1  of verifying that, we're just --
2        MR. MORRIS:  You do, actually.  You
3  could just go to Docket No. 21-3004.
4        MS. DEITSCH-PEREZ:  If you want to
5  stop this deposition so we can go and pull
6  that document up, we're happy to do it.  So
7  I am just asking you for your
8  representation.
9        MR. MORRIS:  Sure.  I gave that.
10        MS. DEITSCH-PEREZ:  Okay.
11    Q.   So do you see that this is a
12  document that was actually filed with the Court
13  by Highland Capital Management Fund Advisors?
14    A.   No.  I get with the first page in
15  the section.  Maybe I'm looking at the wrong
16  thing.  It says, Highland Capital Management.
17    Q.   Don't worry about it.  Don't worry
18  about it.
19    A.   Maybe I went back -- okay.
20        MR. MORRIS:  All right.  Can we put
21  up on the screen Exhibit 2.
22        (Exhibit 2 marked.)
23        MR. MORRIS:  I think it is
24  Exhibit 1.

Page 216

WATERHOUSE - 10-19-21

1        MS. DANDENEAU:  I'm sorry, John, did
2  you say Exhibit 2 or Exhibit 1?
3        MR. MORRIS:  It is Exhibit 2 in the
4  binders so it is premarked Exhibit 2.  And
5  now I'm asking -- right there -- going to
6  Exhibit 1 to the document that was marked
7  as Exhibit 2.
8        MS. DANDENEAU:  Got it.  In the
9  binder there is no --
10        MS. DEITSCH-PEREZ:  There is no
11  Exhibit 1.
12        MR. MORRIS:  All right.  So look at
13  the one on the screen.
14    Q.   Do you see, Mr. Waterhouse, that
15  this is a promissory note dated May 31st, 2017,
16  in the approximate amount of $30.7 million?
17    A.   Yes.
18    Q.   And do you see that the maker of the
19  note is NexPoint?
20    A.   Yes.
21    Q.   And that Highland is the payee; is
22  that right?
23    A.   Yes.
24    Q.   Okay.  And do you see in Paragraph 2

Page 217

WATERHOUSE - 10-19-21

1  this is an annual installment note?
2    A.   Can you scroll down.
3    Q.   Sure.
4        MR. MORRIS:  Can we scroll down --
5  yeah, there you go.
6    A.   Right there, yeah.  Yes.
7        MR. MORRIS:  And can we scroll down
8  to the signature line.
9    Q.   And do you recognize that as
10  Mr. Dondero's signature?
11    A.   Yes.
12    Q.   And is this the promissory note that
13  we talked about earlier where NexPoint had made
14  certain payments in the aggregate amount of
15  about 6 to $7 million against principal and
16  interest?
17    A.   I don't recall discussing the
18  aggregate principal amounts of 6 to $7 million,
19  but -- so I don't -- I don't recall that prior
20  discussion with those amounts.
21    Q.   All right.  Let's take a look.
22  NexPoint always included this promissory note
23  as a liability on its audited financial
24  statements; right?

Page 218

WATERHOUSE - 10-19-21

1
2    A.    Yes.
3    Q.    And NexPoint had its financial
4    statements audited; isn't that correct?
5    A.    Yes.
6    Q.    And was the process of NexPoint's
7    audit similar to the process you described
8    earlier for Highland and HCMFA?
9    A.    Yes, it is similar.
10    Q.    Okay.
11        MR. MORRIS:  Can we put up
12    NexPoint's audited financials and let
13    everybody know what exhibit number it is,
14    La Asia?
15        MS. CANTY:  It is going to be
16    Exhibit 46.
17        (Exhibit 46 marked.)
18    Q.    And do you see, sir, that we've put
19    up NexPoint Advisors' consolidated financial
20    statements and supplemental information for the
21    period ending December 31st, 2019?
22    A.    Yes.
23    Q.    Did you participate in the process
24    whereby these audited financial statements were
25    issued?

Page 219

WATERHOUSE - 10-19-21

1
2    A.    I didn't participate directly, as
3    I've described before, about the -- the team
4    performing the audit.
5    Q.    Do you recall when the audit of
6    NexPoint's financial statements for the period
7    ending December 31st, 2019 was completed?
8    A.    Yes.
9    Q.    And when do you recall it being
10    completed?
11    A.    In January of 2021.
12    Q.    Do you know why the 2019 audit
13    report wasn't completed until January of 2021?
14    A.    Yes.
15    Q.    Why was the NexPoint audit report
16    for the period ending 12/31/19 not completed
17    until January 2021?
18    A.    Because we had to deal with working
19    from home from -- with COVID, and on top of all
20    of our daily responsibilities and job duties
21    at -- at providing -- at Highland providing
22    services to NexPoint, we had to do all of this
23    extra work for a bankruptcy that was filed in
24    October of 2019.
25        MR. MORRIS:  Can we go to the

Page 220

WATERHOUSE - 10-19-21

1
2    balance sheet on page 3?  Okay.  Stop right
3    there.
4    Q.    Do you see under the liabilities
5    section, the last item is note payable to
6    affiliate?
7    A.    Yes.
8    Q.    And is that the note that we just
9    looked at?
10        MS. DANDENEAU:  Objection to form.
11    Q.    Withdrawn.
12        Is that the approximately
13    $30 million note that we just looked at that
14    was dated from 2017?
15        MS. DANDENEAU:  Objection to form.
16    A.    I believe no.
17    Q.    Okay.  You're not aware of any other
18    note that was outstanding from NexPoint to
19    Highland as of the end of the year 2019, other
20    than that one $30 million note; right?
21    A.    I don't recall.
22    Q.    And as of the end of 2019, the
23    principal amount that was due on the note was
24    approximately $23 million; right?
25        MS. DEITSCH-PEREZ:  Object to the

Page 221

WATERHOUSE - 10-19-21

1
2    form.
3    A.    Approximately.
4    Q.    And does that refresh your
5    recollection that between the time the note was
6    executed and the end of 2019, that NexPoint had
7    paid down approximately $7 million?
8    A.    Yes.  If we are just doing the math,
9    yes.
10    Q.    Okay.  Did NexPoint complete its
11    audit from 2020?
12    A.    Sorry, you kind of broke up.  Do
13    NexPoint complete?
14    Q.    The audit of its financial
15    statements for the period ending December 31st,
16    2020?
17    A.    No.
18    Q.    No, it's not complete?
19    A.    No, it is not complete.
20    Q.    Did HCMFA complete its audit for the
21    year ending December 31st, 2020?
22    A.    No.
23        MR. MORRIS:  Can we go to page 15,
24    please, the paragraph at the bottom.
25    Q.    Do you see that NexPoint has

Page 222

WATERHOUSE - 10-19-21

1 included under notes payable to Highland a
2 reference to the amounts that were outstanding
3 as of the year-end 2019 under the note that we
4 looked at just a moment ago?
5    A.   Yes.  Are you talking about the
6 second paragraph?
7    Q.   I'm actually talking about first
8 paragraph.  Do you understand that the first
9 paragraph is a reference to the 2017 note, and
10 the amounts that were -- the principal amount
11 that was outstanding as of the end of 2019?
12    MS. DANDENEAU:  Objection to form.
13 John, do you mean the first paragraph of
14 that page?
15    MR. MORRIS:  No, the first paragraph
16 under notes payable to Highland.
17    A.   Yeah, I see the paragraph, and
18 again, this is what I answered earlier.  I
19 believe so, just because I don't -- again, this
20 is a number in a balance sheet, and without
21 matching it up and seeing the detail with the
22 schedule like I kind of talked about for
23 Highland's financial statements, it is a little
24 bit more difficult to tie everything in

Page 223

WATERHOUSE - 10-19-21

1 perfectly together.
2    Q.   Okay.  But you're not aware of any
3 note that was outstanding at the end of 2019
4 from NexPoint to Highland other than whatever
5 principal was still due and owing under the
6 $30 million note issued in 2017; correct?
7    A.   Well, it -- I don't -- there is
8 reference in the second paragraph.  I don't --
9 I don't -- I don't recall what that is
10 referring to, so I don't -- I don't know.
11    Q.   Well, if you listen carefully to my
12 question, right, I'm asking about notes that
13 were outstanding at the end of 2019, and if we
14 look at the paragraph you just referred to, it
15 says that during the year there were new notes
16 issued totaling $1.5 million, but by the end of
17 the year, no principal or interest was
18 outstanding on the notes.
19    Do you see that?
20    A.   Oh, I do, yes.
21    Q.   So does that refresh your
22 recollection that there were no notes
23 outstanding from NexPoint to Highland other
24 than the principal remaining under the original

Page 224

WATERHOUSE - 10-19-21

1 $30 million 2017 note that we looked at a
2 moment ago?
3    A.   Well, we're at the bottom of the
4 page.  Is there anything on page 16?
5    Q.   That is a fair question, sure.  That
6 is it.
7    A.   Okay.  So it appears that that is
8 the only note that is detailed in the notes in
9 the financial statement.
10    Q.   And you don't have any memory of any
11 other note other than the 2017 note, right,
12 being outstanding as of the end of the year?
13    A.   I deal with thousands of
14 transactions every year.  I don't really have a
15 very specific memory for what exactly was
16 outstanding.
17    MR. MORRIS:  Why don't we take a
18 break now.  We've been going for a little
19 while.  It's 3:26.  Let's come back at
20 3:40.
21    VIDEOGRAPHER:  We're going off the
22 record at 3:26 p.m.
23    (Recess taken 3:26 p.m. to 3:39 p.m.)
24    VIDEOGRAPHER:  We are going back on

Page 225

WATERHOUSE - 10-19-21

1 the record at 3:39 p.m.
2    Q.   All right.  Mr. Waterhouse, we -- I
3 don't think we have a lot more here.
4    To the best of your knowledge and
5 recollection, were all affiliate loans and all
6 loans made to Mr. Dondero recorded on
7 Highland's books and records as assets of
8 Highland?
9    MS. DANDENEAU:  Object to the form,
10 asked and answered.
11    A.   To my knowledge, yes.
12    Q.   Okay.  Can you recall any loan to
13 any affiliate or Mr. Dondero that was not
14 recorded on Highland's books and records as an
15 asset?
16    A.   Like during my time as CFO?  I don't
17 recall.
18    Q.   How about after the time that you
19 were CFO?  Did you recall that there was a loan
20 by Highland to an affiliate or to Mr. Dondero
21 that hadn't been previously recorded on
22 Highland's books as an asset?
23    MS. DANDENEAU:  Objection to form.
24    A.   I guess I don't understand the

Page 226

WATERHOUSE - 10-19-21

1  question. I left Highland as of – I'm not
2  aware of – I left Highland in February –
3  probably the last day of February of 2021.
4      Q.   Okay.
5      A.   I'm not – I'm not aware of any –
6  I'm not aware of anything past that date.
7      Q.   Okay. While you were the CFO at
8  Highland, did Highland prepare in the ordinary
9  course of business a document that reported
10  operating results on a monthly basis?
11      A.   Yes.
12      Q.   And are you generally familiar with
13  the monthly operating reports?
14      A.   Yeah. You are referring to the
15  reports that we filed to the Court every month?
16      Q.   I apologize, I'm not. I'm taking
17  you back to the pre-petition period. There was
18  a report that I have seen that I'm going to
19  show you, but I'm just asking for your
20  knowledge.
21          MR. MORRIS:  Let's put it up on the
22  screen, Exhibit 39.
23          (Exhibit 39 marked.)
24      Q.   Do you see this is a document that

Page 227

WATERHOUSE - 10-19-21

1  is called operating results?
2      A.   Yeah, that's the title of it.
3      Q.   Okay. And was a report of operating
4  results prepared by Highland on a monthly basis
5  during the time that you served as CFO?
6      A.   No.
7      Q.   Are you familiar with a document of
8  this type? And we can certainly look at the
9  next page or two to refresh your recollection.
10      A.   I'm just looking at the title. I
11  don't really – again, as I discussed before, I
12  don't have any records or documents or emails
13  or appointments or anything that I was able to
14  use prior to – prior to this deposition, so
15  I'm doing the best I can.
16      Q.   Okay. You don't need to apologize.
17  I'm just asking you if you are familiar with
18  the document called Operating Results that was
19  prepared on a monthly basis at Highland?
20          MS. DEITSCH-PEREZ:  Object to the
21  form.
22      Q.   If you're not, you're not.
23      A.   I don't believe this was prepared on
24  a monthly basis.

Page 228

WATERHOUSE - 10-19-21

1      Q.   Okay. Do you see that this one
2  is – is dated February 2018?
3      A.   Yes.
4      Q.   Do you have – do you believe –
5  have you ever seen a document that was
6  purporting to report operating results for
7  Highland?
8          MS. DANDENEAU:  Objection to form.
9      A.   Yes.
10      Q.   Okay. And when you say that you
11  don't believe it was produced on a monthly
12  basis, was it produced on any periodic bases to
13  the best of your recollection?
14      A.   I believe it was – it was prepared
15  on an annual basis.
16      Q.   Okay.
17          MR. MORRIS:  Can we look at the next
18  page.
19      Q.   Do you see that there is a statement
20  here called:  Significant items impacting
21  HCMLP's balance sheet?
22          And it is dated February 2018.
23      A.   Yes.
24      Q.   Do you recall that there was a

Page 229

WATERHOUSE - 10-19-21

1  report that Highland prepared that identified
2  significant items impacting the balance sheet?
3      A.   A report that was prepared.
4      Q.   Let me ask a better question:  Did
5  Highland prepare reports to the best of your
6  recollection that identified significant items
7  that impacted its balance sheet?
8      A.   Well, so Highland prepared a – a
9  monthly close package. And maybe I'm
10  getting – and – and maybe change names at one
11  time or maybe I'm just – again, just
12  misremembering – but in that, yes, there is a
13  page that would detail just changes in – you
14  know, just changes month over month on the
15  balance sheet.
16      Q.   Okay. And maybe it is my fault.
17  Maybe I didn't know the proper name for it.
18  But let's use the phrase "monthly close
19  package."
20          Did Highland prepare a monthly close
21  package in the ordinary course of business
22  during the time that you served as CFO?
23          MS. DANDENEAU:  Objection to form.
24      A.   Yes.

Page 230

WATERHOUSE - 10-19-21

1
2    Q.    And did the monthly close package
3    that Highland prepared include information
4    concerning significant items that impacted
5    Highland's balance sheet?
6    A.    Yes, it had a page like that is –
7    that is on the screen that detailed items
8    like – of that nature.
9    Q.    And do you know who – was there
10    anybody at Highland who was responsible for
11    overseeing the preparation of the monthly
12    reporting package?
13    A.    That would have been – again, it
14    varies over time during my tenure as CFO.
15    It – it varied over – over time, but – but
16    typically a – a corporate accounting manager.
17    Q.    And who were the corporate
18    accounting managers during your tenure as CFO?
19    A.    It would have been Dave Klos and
20    Kristin Hendrix.
21    Q.    And did the corporate accounting
22    manager deliver to you drafts of the monthly
23    close package before it was finalized?
24    A.    Sometimes.
25    Q.    Was that the practice even if there

Page 231

WATERHOUSE - 10-19-21

1
2    were exceptions to the practice?
3    A.    The practice meaning that they
4    sometimes lured them to me?
5    Q.    That that was the expectation even
6    if circumstances prevented that from happening
7    from time to time.
8    MS. DEITSCH-PEREZ:  Object to the
9    form.
10    A.    I – I would say it started out that
11    way but over the years it – it was not
12    enforced.
13    Q.    Okay.  So you were – you reviewed
14    and approved monthly – monthly reporting
15    packages for a certain period of time and then
16    over time you stopped doing that.
17    Do I have that right?
18    MS. DANDENEAU:  Objection to form.
19    A.    Yes, I mean, if you're talking about
20    a formal meeting where we sit down and go
21    through and approve it.  I would say that was
22    standard practice a decade – you know, early
23    on.  And as time went on that – that – that
24    practice wasn't followed.
25    Q.    Okay.

Page 232

WATERHOUSE - 10-19-21

1
2    A.    And, quite frankly, I don't even
3    know if these were – these were sent to me
4    even in any capacity.
5    Q.    What was the purpose of preparing
6    the monthly reporting package – withdrawn.
7    What was the purpose of preparing
8    the monthly close package?
9    MS. DEITSCH-PEREZ:  Object to the
10    form.
11    A.    The – the original purpose was so
12    that it would just – it would be a report that
13    was reviewed monthly with senior management.
14    Q.    Who was included in the idea of
15    senior management?
16    A.    You know, I think originally when
17    this was conceived that would have been like
18    Jim Dondero and Mark Okada.
19    Q.    Were monthly reporting – withdrawn.
20    Were monthly close packages prepared
21    to the best of your knowledge until the time
22    you left Highland?
23    A.    To my knowledge – I don't know,
24    actually.  I mean, to my knowledge, I believe
25    it was being – that was still being done.  I

Page 233

WATERHOUSE - 10-19-21

1
2    don't know because, again, I wasn't reviewing
3    them.  I hadn't reviewed a close package for –
4    for a long time.  But I believe the standard
5    practice that was still being carried out.
6    Q.    Did you ever have any discussions
7    with the debtor's independent board concerning
8    any promissory notes that were issued by any of
9    the affiliates or Mr. Dondero?
10    A.    I can't – I can't – I can't recall
11    specifically.
12    Q.    Did you speak with the independent
13    board from time to time?
14    A.    Yes, from – from – from time to
15    time I had discussions with the independent
16    board members, you know, either – either, you
17    know, by themselves or wholly, you know, as –
18    as a – as a combined work.
19    Q.    Okay.  Before we talk about
20    Mr. Seery, do you recall ever having a
21    conversation with Mr. Nelms or Mr. Dubel
22    concerning any promissory note that was
23    rendered by one of the affiliates or
24    Mr. Dondero to Highland?
25    A.    I don't recall any conversations

Page 234

WATERHOUSE - 10-19-21

1 specifically.
2    Q.   Do you know if the topic was ever
3 discussed, even if you don't remember it
4 specifically?
5         MS. DANDENEAU:  Objection to form.
6    A.   It – it – it may have.  I don't
7 know.  I don't recall.
8    Q.   Do you recall ever discussing any
9 promissory note issued by any of the affiliates
10 or Mr. Dondero with James Seery?
11   A.   I don't – I don't recall
12 specifically.
13   Q.   Do you recall generally ever
14 discussing the topic of promissory notes issued
15 by any of the affiliates or Mr. Dondero to
16 Highland with Mr. Seery?
17   A.   Nothing – nothing is really jumping
18 out at me.
19   Q.   Do you recall if you ever told
20 Mr. Seery that any of the affiliates or
21 Mr. Dondero didn't have an obligation to pay
22 all amounts due and owing under their notes?
23   A.   I don't recall having that
24 conversation.

Page 235

WATERHOUSE - 10-19-21

1    Q.   Did you ever tell Mr. Seery that you
2 had any reason to believe that the amounts
3 reflected in the notes issued by the affiliates
4 and Mr. Dondero were invalid for any reason?
5    A.   I don't – I don't recall.
6    Q.   Did you tell Mr. Dondero – did you
7 tell Mr. Seery that you thought the promissory
8 notes issued by the advisors and Mr. Dondero
9 that were outstanding as of the petition date
10 were assets of the estate?
11   A.   I don't recall having a specific
12 conversation about those – you know, those
13 notes outstanding as -- as of the petition date
14 being assets on the estate.  I mean, we put
15 together – you know, they're in the books and
16 records of the financial statements.  I don't
17 recall having a specific conversation.
18   Q.   Did you ever prepare any documents
19 that were delivered to Mr. Seery that concerned
20 the promissory notes issued by any of the
21 affiliates or Mr. Dondero?
22        MS. DANDENEAU:  Objection to form.
23   A.   Did I produce any that concerned –
24 you mean did I just – did I give Mr. Seery

Page 236

WATERHOUSE - 10-19-21

1 anything that -- that said I have concerns over
2 these notes?
3    Q.   No.  Let me try again.  Maybe it was
4 my question.
5         Did you ever give Mr. Seery any
6 information concerning any of the notes that
7 were issued by any of the affiliates or
8 Mr. Dondero?
9         MS. DANDENEAU:  Objection to form.
10   A.   I don't recall if I did or not.  I
11 don't – I don't remember.  I mean, you have my
12 emails.  You may have asked.  Again, I don't –
13 I don't know.
14        MR. MORRIS:  Can we put up the
15 document that has been premarked as Exhibit
16 39?
17        MS. DANDENEAU:  John, that is this
18 document, isn't it?
19        MR. MORRIS:  Oh, yeah, it might be,
20 as a matter of fact.  Let's go to Number
21 40.
22        (Exhibit 40 marked.)
23   Q.   During the bankruptcy,
24 Mr. Waterhouse, did you prepare documents that

Page 237

WATERHOUSE - 10-19-21

1 were filed with the bankruptcy court?
2    A.   I didn't – I didn't prepare them
3 personally.
4    Q.   Did people prepare them under your
5 direction?
6    A.   Yes.  There were members of the team
7 that prepared them, and they worked in – you
8 know, there were members of DSI that were
9 involved in the process as well.
10   Q.   To the best of your knowledge, did
11 DSI rely on the employees of Highland for the
12 information that they used to prepare the
13 bankruptcy filings?
14   A.   Yes.  The books and records were
15 with the Highland personnel.
16   Q.   Okay.  And do you see on the screen
17 here, there is a document that we have marked
18 as Exhibit 40 that is – that is titled Summary
19 of Assets and Liabilities?
20   A.   Uh-huh.
21   Q.   Okay.  And do you recall reviewing
22 any summary of assets and liabilities before it
23 was filed with the bankruptcy court?
24   A.   Yes, I recall reviewing this at a

Page 238

WATERHOUSE - 10-19-21

1  high level.
2  Q.  And did you believe that it was
3  accurate at the time it was filed?
4  A.  I didn't have any other reason to
5  believe otherwise.
6  Q.  Okay.  Do you see that the total
7  value of all properties listed in Part 1 is
8  approximately $410 million?
9  MS. DEITSCH-PEREZ:  Objection to
10  form.
11  A.  Yes, it is in 1c.
12  Q.  Yes.
13  A.  Yes, I see that.
14  Q.  Okay.  If we go to the second page,
15  now I think I may just have excerpts here, just
16  so everybody is clear, but if we scroll down to
17  the second page, you will see that there is
18  a – a little further.  There you go.  You will
19  see there is a reference to Item 71, notes
20  receivable.
21  Do you see that?
22  A.  I do.
23  Q.  And that was a reference to the
24  notes receivable from the affiliates and

Page 239

WATERHOUSE - 10-19-21

1  Mr. Dondero, among others; is that right?
2  A.  Yes.  The affiliate notes and the
3  MS. DANDENEAU:  Objection to form.
4  A.  Yes.  The affiliate notes and the
5  Dondero notes were in this amount, but they
6  weren't – again, like you said, and among
7  others.
8  Q.  Okay.  We will look at the
9  specificity because I'm not playing gaming
10  here, but do you know if the $150 million of
11  notes receivable was included within the
12  $410 million of total value of the debtor's
13  assets?
14  MS. DANDENEAU:  Objection to form.
15  A.  I – I – I believe so.
16  Q.  Right.  And so is it fair to say
17  that as of the date this document was prepared,
18  the notes receivable were more than one-third
19  of the value of the debtor's assets?
20  MS. DEITSCH-PEREZ:  Object to the
21  form.
22  MS. DANDENEAU:  Object to the form.
23  A.  Again, if you are just taking the
24  math, 150 divided by whatever the $400 million
25  number is above, then yes, you get there.

Page 240

WATERHOUSE - 10-19-21

1  Q.  Okay.
2  A.  You know, but as of the time of this
3  filing, that is what was put in this filing,
4  right, but, you know, I mean, numbers --
5  numbers change, facts and circumstances change.
6  Q.  But as the CFO of Highland, the
7  debtor in bankruptcy, did you believe that this
8  number accurately reflected the total amount
9  due under the notes receivable?
10  A.  That is what we had in our books and
11  records.
12  Q.  Okay.  And did you believe as the
13  CFO that the books and records accurately
14  reported the then value of the debtor's assets?
15  MS. DANDENEAU:  Objection to form.
16  A.  We didn't -- as part of this filing,
17  there was no fair value measurement or
18  anything.  These were just accounting entries
19  for the promissory notes.  There is no analysis
20  for impairment or fair market value adjustments
21  or anything of that nature.  This is purely
22  taking numbers and putting them in our form.
23  Q.  Did you do any impairment analysis
24  at any time while you were employed by

Page 241

WATERHOUSE - 10-19-21

1  Highland?
2  A.  Yes, we did do impairment analysis
3  on – on assets.
4  Q.  Okay.  Did you ever do an impairment
5  analysis on any of the promissory notes that
6  were given to Highland by any of the affiliates
7  or Mr. Dondero?
8  A.  Not that I recall.
9  Q.  Under what circumstances do you
10  prepare impairment analyses?
11  A.  As – as – if you're preparing
12  financials in accordance with GAAP, generally
13  accepted accounting principles, if you're
14  preparing full GAAP financials, you should be
15  preparing – you should be undergoing on a
16  periodic basis any fair market value
17  adjustments to assets.
18  As I was instructed at the time of
19  the petition date, we weren't producing GAAP
20  financials.  So this wasn't something I was
21  worried about nor concerned about.
22  Q.  Okay.  Were NexPoint and HCMFA and
23  Highland's audited financial statements
24  prepared in accordance with GAAP?

Page 242

WATERHOUSE - 10-19-21

1     A.   The audited financials -- yes,
2  audited financial statements are prepared in
3  accordance with GAAP.
4     Q.   Do you recall whether any of
5  Highland or HCMFA or NexPoint ever made a fair
6  market value adjustment to any of the notes
7  issued by any of the affiliates or Mr. Dondero
8  to Highland?
9     A.   I do not recall that happening, but
10  it -- it is because under -- under GAAP,
11  the -- the treatment of liabilities is
12  different than assets.
13     Q.   Okay.  So then let's just focus on
14  Highland's audited financial statements.
15          The last audited financial
16  statements were for the period ending December
17  31st, 2018; correct?
18     A.   That is my understanding.
19     Q.   And you had -- you had an obligation
20  to disclose anything to PricewaterhouseCoopers
21  concerning any subsequent events between the
22  end of 2018 and June 3rd, 2019; correct?
23          MS. DANDENEAU:  Objection to form.
24          MS. DEITSCH-PEREZ:  Form.

Page 243

WATERHOUSE - 10-19-21

1     A.   Correct.
2     Q.   Okay.  To the best of your
3  knowledge, as Highland's CFO, did Highland ever
4  make any fair market value adjustments to any
5  of the promissory notes that were carried on
6  its balance sheet and that were issued by any
7  of the affiliates or Mr. Dondero?
8     A.   I think I answered that question
9  earlier.  I don't recall doing that for any of
10  those -- those notes.  So it would have
11  included the audit for the -- for the 2018
12  period.
13     Q.   Okay.
14          MR. MORRIS:  Can we go to the next
15  page.
16     Q.   Do you see this is a note a list of
17  notes receivable?  Do you see that?
18     A.   Yes, I do.
19     Q.   And do you see that this ties into
20  the page that we were just looking?
21     A.   I'm sorry, can we go back to the
22  prior page?  I mean, it was at 150,331,222.  It
23  was on the prior page.  Next page.  Yes, it
24  agrees.

Page 244

WATERHOUSE - 10-19-21

1     Q.   Okay.  So now let's look at that
2  schedule.  So this was the face amount of all
3  of the promissory notes that Highland held at
4  the time this document was filed with the
5  bankruptcy court; right?
6     A.   Yes.
7     Q.   There is a footnote there that says,
8  doubtful or uncollectible accounts are
9  evaluated at year-end.
10          Do you see that?
11     A.   I do.
12     Q.   Okay.  And is it fair to say that as
13  of the year-end 2018, the year before this,
14  that to the extent any of these notes were
15  outstanding at that time, they weren't deemed
16  to be doubtful or uncollectible?
17     A.   Yeah.  For the 2018 audit, there
18  weren't any -- there weren't any adjustments to
19  fair value.
20     Q.   Okay.  And during the bankruptcy, do
21  you recall that Highland subsequently reserved
22  for the Hunter Mountain Investment Trust note?
23     A.   Yes.
24     Q.   Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1  involved in the decision to reserve the Hunter
2  Mountain Investment Trust note?
3     A.   I was not.
4     Q.   Do you know why Highland decided to
5  reserve for the Hunter Mountain Investment
6  Trust note?
7     A.   I don't know yet decision was made.
8  I believe it was made by someone at DSI.
9     Q.   Okay.  I'm just asking if you know
10  why.
11          Did you ever ask anyone why they
12  reserved for that particular note?
13     A.   I don't recall.
14     Q.   Do you know whether the debtor
15  reserved for any other note on this list during
16  the bankruptcy?
17     A.   Again, I don't recall.  I wasn't
18  part of any process of -- again, like any fair
19  value adjustments or anything to that degree.
20  Like I said, a lot of that was done by DSI and
21  it was kind of out of our court.
22     Q.   Okay.  Do you know if any note
23  receivable on this list was ever deemed by the
24  debtor to be doubtful or uncollectible?

Page 246

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2       A.   I don't -- I don't have a
3   recollection of every filing, so I don't know.
4       Q.   Did you ever have a discussion with
5   anybody at any time about whether any of the
6   notes receivable on this list should be deemed
7   to be doubtful or uncollectible?
8       A.   No.  As I previously stated, we were
9   told we didn't have to keep GAAP financials.
10  We weren't having -- you know, there is no
11  underlying audits being performed, so I mean,
12  it wasn't something I worried about.
13          MR. MORRIS:  I move to strike.
14      Q.   Did you ever have a conversation
15  with anybody about any of the notes receivable
16  and whether they should be deemed to be
17  doubtful or uncollectible?  Did you have the
18  conversation, yes or no?
19          MS. DANDENEAU:  Objection to form.
20      A.   I don't recall.
21      Q.   Do you recall ever telling anybody
22  that you believed any of the notes receivable
23  on this list should be doubtful -- should be
24  deemed to be doubtful or uncollectible?
25          MS. DANDENEAU:  Objection to form.

Page 247

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2       A.   I don't recall.  I mean, it may have
3   happened, you know, again, when we initially
4   getting DSI up to speed and going through
5   financials, it may have happened, but I don't
6   recall specifically.
7       Q.   While you were the CFO of Highland
8   during the time that the company was in
9   bankruptcy, did you have any reason to believe
10  that any of the notes receivable on this list
11  other than Hunter Mountain Investment Trust
12  should have been characterized as doubtful or
13  uncollectible?
14          MS. DANDENEAU:  Objection to form.
15          MS. DEITSCH-PEREZ:  Form.
16      A.   I didn't know.  I didn't form an
17  opinion.  Bankruptcy was new to me.  It still
18  is new to me, even after going through this.
19  So I really didn't know what to expect nor
20  really -- you know, I didn't know.
21          MR. MORRIS:  I move to strike.
22      Q.   During the period of Highland's
23  bankruptcy when you were serving as CFO, did
24  you have any reason to believe any of the notes
25  on this list were doubtful or uncollectible?

Page 248

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2          MS. DEITSCH-PEREZ:  This is like the
3   fifth time you've asked it.  Object to the
4   form.
5          MR. MORRIS:  I'm moving to strike,
6   if you haven't noticed, because he's not
7   answering the question.
8          MS. DEITSCH-PEREZ:  He was answering
9   the question, you just didn't like it, like
10  the answer.
11          MR. MORRIS:  Good Lord.
12      Q.   Go ahead, Mr. Waterhouse.
13      A.   Again, I don't -- we brought up a
14  myriad of issues at the start of the bankruptcy
15  case.  I don't recall if this was one of them,
16  but, again, there are a lot of things we
17  couldn't change.  Even, you know, I was told
18  status quo, blah, blah, blah, right, there is a
19  stay, you can't -- you know, I don't recall
20  specifically, but that doesn't mean it didn't
21  happen.
22          MR. MORRIS:  I move to strike.
23      Q.   During the time that Highland was in
24  bankruptcy and you served as CFO, did you have
25  any reason to believe that any of the notes

Page 249

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2   receivable on this list were doubtful or
3   uncollectible?
4          MS. DEITSCH-PEREZ:  Object to the
5   form.
6       A.   Potentially.
7       Q.   Did you ever tell anybody that?
8       A.   As I just stated like five times,
9   yes, we -- at the beginning after filing and we
10  were getting DSI and others up to speed, you
11  know, we had a myriad of discussions of a lot
12  of things and this was likely one of them.  I
13  don't -- but I don't recall specifically we
14  talked --
15      Q.   I don't want to know -- I don't want
16  to know what was --
17          MS. DEITSCH-PEREZ:  Wait, wait.
18  Excuse me.  Mr. Morris, you did not let him
19  finish his answer.
20      A.   I spoke -- we had -- we were
21  bringing Fred Karesa and Brad Sharp (phonetic)
22  up to speed on all of these items, contracts,
23  and investments and going through -- we had
24  hours and hours and hours of discussion.  And
25  then not only do I have to repeat this not

Page 250

WATERHOUSE - 10-19-21

1    once, twice, three, four times with – you
2    know, I mean, we – I don't – I don't remember
3    the sum culmination of all these discussions.
4    They all kind of blend together.
5        MR. MORRIS:  Okay.  I move to strike
6        and I will try one more time.
7        Q.    Did you ever tell anybody at DSI
8    that you believed any of the notes receivable
9    on this list were doubtful or uncollectible?
10        MS. DANDENEAU:  Object to form.
11        A.    Potentially.
12        Q.    Potentially you told them or
13    potentially they were doubtful or
14    uncollectible?
15        A.    Potentially I told them that we
16    needed to look at the value of these – of
17    these assets.
18        Q.    Okay.  Did you – okay.  It is
19    potential that you told them and it is
20    potentially that you didn't; right?
21        MS. DANDENEAU:  Objection to form.
22        A.    I've gone through that.  I don't
23    recall specifically.
24        Q.    So you should just – I don't want

Page 251

WATERHOUSE - 10-19-21

1    to tell what you to do.  Do you have –
2        MS. DANDENEAU:  Good.
3        Q.    Other than – other than telling
4    them that they should look at the values, do
5    you have any recollection whatsoever of ever
6    having told anybody at DSI that any of the
7    notes receivable on this page were doubtful or
8    uncollectible?
9        MS. DEITSCH-PEREZ:  Object to the
10        form.
11        MS. DANDENEAU:  Objection.
12        A.    I recall having general discussions
13    about everything on our balance sheet which
14    would have included these – these notes
15    receivable.
16        Q.    Okay.
17        A.    I don't recall specifically where
18    those discussions delved into.
19        Q.    Do you recall any discussion at all
20    on the topic of whether any of these notes on
21    this list were doubtful or uncollectible?
22        MR. AIGEN:  Mr. Morris, how on earth
23        is that question different from the
24        question that you just asked for the last

Page 252

WATERHOUSE - 10-19-21

1    five times?  I mean, really I thought you
2    were – (overspeak.)
3        MR. MORRIS:  Because he never
4    answered it.
5        MS. DEITSCH-PEREZ:  Are you
6    listening to him?
7        MR. MORRIS:  You know –
8        MS. DEITSCH-PEREZ:  He basically
9    said that he had a conversation with DSI
10    that went over all of this stuff and that
11    conversation could have included the notes
12    but he doesn't recall specifically.
13        What more do you want him – to ask
14    of him?
15        MR. MORRIS:  I want him – I would
16    love him to say – I would like him to
17    testify to the truth, and that is he has no
18    recollection.
19        MS. DEITSCH-PEREZ:  Well, the truth
20    as you would like to see it, but – but he
21    is testifying truthfully.  And I – and, by
22    the way, I move to strike that comment –
23        MR. MORRIS:  Okay.
24        MS. DEITSCH-PEREZ:  – because it

Page 253

WATERHOUSE - 10-19-21

1    suggests that he has not testified
2    truthfully.
3        MR. MORRIS:  I will ask my question
4    again.  And if at any time you want to
5    direct him not to answer, that is your
6    prerogative.
7        Q.    Mr. Waterhouse, do you have any
8    recollection at all of ever telling anybody
9    from DSI that any of these notes were doubtful
10    or uncollectible?
11        MS. DANDENEAU:  Object to form.
12        A.    I don't remember specifically.
13        Q.    Do you remember generally that
14    specific topic?
15        A.    We generally talked about assets,
16    values.  If – we had discussions of that and
17    collectability in nature.  I mean, of Highland,
18    the funds, the CLOs, the entire complex.  We
19    had discussions like that, which is, you know,
20    as you look at a billion dollar consolidated
21    balance sheet.
22        So I generally remember – this is
23    billions of dollars, including these assets –
24    having discussions of this – of this type.

Page 254

|  | WATERHOUSE - 10-19-21 |
|---|---|
| 1 |  |
| 2 | Q.   Do you believe that an affiliate |
| 3 | loan on this list was doubtful or |
| 4 | uncollectible?  Would you have told that to |
| 5 | DSI? |
| 6 |      MS. DANDENEAU:  Objection to form. |
| 7 |      MS. DEITSCH-PEREZ:  Object to form. |
| 8 | A.   If we had, like -- again, if we -- |
| 9 | if -- if we weren't preparing financial |
| 10 | statements in accordance with GAAP, and -- you |
| 11 | know, if DSI at that point -- they were -- |
| 12 | again, I was new to bankruptcy. |
| 13 |      The CRO is -- we are delegating |
| 14 | everything to the CRO.  All the decisionmaking. |
| 15 | Remember -- remember when you and I went into |
| 16 | Delaware Court and we were saying DSI basically |
| 17 | does everything, remember this, Mr. Morris? |
| 18 |      You were my counsel at the time, and |
| 19 | basically we're everything running through DSI. |
| 20 | That was what this was like in the early part. |
| 21 |      Everything was communicated through |
| 22 | DSI. So DSI says this.  DSI says that.  That |
| 23 | is what we're doing, and we're pointing out |
| 24 | things to them. |
| 25 |      Now, they decide what direction this |

Page 255

|  | WATERHOUSE - 10-19-21 |
|---|---|
| 1 | goes. |
| 2 | Q.   Did you point out that any of |
| 3 | these -- |
| 4 | A.   I don't recall specifically. |
| 5 | Q.   Okay.  At any time that you served |
| 6 | as Highland's CFO, did you ever point out to |
| 7 | DSI that any of these loans were doubtful or |
| 8 | uncollectible? |
| 9 |      MS. DEITSCH-PEREZ:  Object to the |
| 10 | form. |
| 11 |      MS. DANDENEAU:  Objection. |
| 12 | A.   If you're asking me if I had a |
| 13 | conversation with DSI, if any of these loans |
| 14 | were doubtful or uncollectible, I don't recall |
| 15 | specifically. |
| 16 | Q.   Do you recall that the debtor filed |
| 17 | on the docket monthly operating reports? |
| 18 | A.   Yes. |
| 19 | Q.   You prepared those personally, |
| 20 | didn't you? |
| 21 |      MS. DEITSCH-PEREZ:  Objection to |
| 22 | form. |
| 23 | A.   I didn't personally prepare them, |
| 24 | the team did with DSI. |
| 25 |  |

Page 256

|  | WATERHOUSE - 10-19-21 |
|---|---|
| 1 |  |
| 2 | Q.   But you signed them; correct? |
| 3 | A.   My signature is on the MORs. |
| 4 | Q.   And you signed them as the preparer |
| 5 | of the document; correct? |
| 6 | A.   Yes, I did this pursuant to DSI's |
| 7 | instructions. |
| 8 | Q.   Okay.  You wouldn't have signed the |
| 9 | document if you didn't believe it to be |
| 10 | accurate; correct? |
| 11 | A.   If I had reason to believe it |
| 12 | wasn't, presumably I wouldn't have signed it. |
| 13 | Q.   Okay.  And do you have any reason to |
| 14 | believe right now that any monthly operating |
| 15 | report that has your signature on it was |
| 16 | inaccurate in any way? |
| 17 |      MS. DEITSCH-PEREZ:  Object to the |
| 18 | form. |
| 19 | A.   My understanding of the monthly |
| 20 | operating reports is we were filing them in |
| 21 | accordance with the standards set by the Court. |
| 22 | It wasn't -- you know, I don't -- you |
| 23 | know, it wasn't GAAP.  It wasn't these other |
| 24 | standards, so I testified I didn't have |
| 25 | experience in this.  The CRO was running the |

Page 257

|  | WATERHOUSE - 10-19-21 |
|---|---|
| 1 |  |
| 2 | show.  I followed their advice. |
| 3 | Q.   But you assured yourself that |
| 4 | everything in the report was accurate before |
| 5 | you signed them; correct? |
| 6 |      MS. DANDENEAU:  Objection to form. |
| 7 | A.   I trusted the guidance from the CRO |
| 8 | and their team and their experience and their |
| 9 | guidance for doing this for many, many, many |
| 10 | years to -- to -- to categorize and put things |
| 11 | in ways on the form. |
| 12 |      You know, my team had -- had not |
| 13 | filled out these forms before and needed all of |
| 14 | this guidance.  I'm not an expert in this.  I |
| 15 | have oversight of it.  I signed the form.  DSI |
| 16 | told me to. |
| 17 | Q.   And you and your team are the source |
| 18 | of the information that DSI used to create the |
| 19 | reports; correct? |
| 20 |      MS. DANDENEAU:  Objection to form. |
| 21 | A.   The books and records reside with |
| 22 | the -- with -- with the corporate accounting |
| 23 | team. |
| 24 | Q.   Okay.  And the corporate accounting |
| 25 | team was the corporate accounting team that was |

Page 258

WATERHOUSE - 10-19-21

1   under your direction; correct?
2
3       A.   Yes.
4       Q.   So -- so your team was responsible
5   for maintaining Highland's books and records;
6   correct?
7       A.   I'm sorry, my team was responsible?
8       Q.   Correct.
9       A.   Yes.  They -- they -- they were
10  the -- the -- the general ledger of Highland,
11  that responsibility was with the corporate
12  accounting team.
13      Q.   The corporate accounting group
14  reported to you; correct?
15      A.   Yes.
16          MR. MORRIS:  Can we put up 41,
17      please.
18          (Exhibit 41 marked.)
19      Q.   All right.  You will see that this
20  is a report that is dated January 31st, 2020,
21  but it is for the month ending December 2019.
22          Do you see that?
23      A.   I do.
24      Q.   And you signed this report in your
25  capacity as the chief financial officer of

Page 259

WATERHOUSE - 10-19-21

1
2   Highland; correct?
3       A.   Yes.
4       Q.   And you're the preparer -- you're
5   identified as the preparer of the report;
6   correct?
7       A.   That is correct.
8       Q.   Do you recall participating in the
9   preparation of monthly operating reports?
10      A.   As I testified earlier, it was put
11  together, you know, with the team.  The team
12  worked with DSI to put these monthly operating
13  reports together.  We had no experience at this
14  time of the monthly operating reports or things
15  of this nature.
16          MR. MORRIS:  Can you turn to the
17      next page, please.
18      Q.   Do you see a line item under assets
19  due from affiliates?
20      A.   Yes, I do.
21      Q.   Okay.  And to the best of your
22  knowledge and understanding, as the person who
23  is identified as the preparer of this report,
24  does that line item include the affiliate loans
25  that we've been talking about?

Page 260

WATERHOUSE - 10-19-21

1
2       A.   Again, I would have to see, just
3   like we did with the financial statements of
4   Highland and NexPoint, I would have to see a
5   detailed build, but, you know, if you look at
6   the other line items, you know, the only other
7   place it could be would be in -- in other
8   assets.
9       Q.   Okay.  And as a matter of
10  arithmetic, is it fair to say that is the value
11  of the assets due from affiliates was more than
12  25 percent of the value of Highland's total
13  assets as of 12/31/2019?
14          MS. DANDENEAU:  Objection to form.
15      A.   I'm really not doing the mental math
16  right now, so I've been going at this depo for
17  hours, so I'm really not -- you know --
18      Q.   All right.  No problem.
19      A.   -- these are millions of dollars.
20      Q.   Let's look at the Footnote 1,
21  please.  Do you see there is a reference to the
22  Hunter Mountain note?
23      A.   Yes, I see that in Footnote 1.
24      Q.   Okay.  And that's the reserve that
25  was taken against that note?

Page 261

WATERHOUSE - 10-19-21

1
2       A.   Yes, that is what this indicates.
3       Q.   Okay.  And were you aware that the
4   reserve was being taken on that it was?
5       A.   I was -- I was aware, yeah, at some
6   point, yes.
7       Q.   Okay.  And are you aware of any
8   reserve being taken with respect to any other
9   note that was issued in favor of Highland?
10      A.   Again, as I testified, we didn't go
11  through an analysis on -- on -- on the other
12  notes.
13      Q.   Can we turn --
14      A.   I believe -- I believe it says that
15  in Footnote 1, fair value has not been
16  determined with respect to any of the notes.
17          So this footnote -- footnotes, look,
18  there has been no determination.
19      Q.   Okay.  The determination was made in
20  the audited financial statements just six
21  months earlier; right?  We saw that earlier?
22      A.   That was as of 12/31/18.  I mean,
23  things -- circumstances -- there's a bank --
24  circumstances change, things change -- things
25  change over time, you know, facts and

Page 262

WATERHOUSE - 10-19-21

1    circumstances change. Again, you have to do an
2    analysis.
3
4        Q.    Okay. And you do recall that in
5    Highland's 2018 financial statement, all of the
6    notes issued by affiliates and Mr. Dondero that
7    were due at year-end had a fair value equal to
8    the carrying value; correct? We looked at
9    that?
10       A.    Yes. That was in the -- in the
11   disclosure for the -- for the affiliate notes,
12   yes.
13       Q.    And -- and you were obligated to
14   share with PwC any subsequent events between
15   the end of 2018 and the date that you signed
16   your management representation letter on June
17   3rd, 2019; correct?
18           MS. DEITSCH-PEREZ: Object to the
19   form.
20       A.    Yes. I -- I -- I signed the
21   management, you know, my signature is in the
22   management representation letter -- I hope I'm
23   answering your question -- that is dated in
24   June with the representations made in that
25   management representation letter.

Page 263

WATERHOUSE - 10-19-21

1
2        Q.    Okay. And there was nothing that
3    caused PricewaterhouseCoopers to include in
4    subsequent events any adjustment to the
5    conclusion that the fair value of the affiliate
6    notes and the notes issued by Mr. Dondero
7    equaled the carrying value; correct?
8           MS. DANDENEAU: Objection to the
9    form.
10       A.    That is correct. That is what was
11   in the -- in the -- in the footnotes.
12       Q.    Okay. So are you aware of anything
13   that occurred between June 3rd, 2019 and
14   December 31st, 2019 that would have caused the
15   fair value of the notes to differ from the
16   carrying value?
17       A.    Yeah. Highland filed for
18   bankruptcy, things changed -- I mean, there was
19   a bankruptcy filed in October of -- of -- of
20   2019, right, the petition date that we've
21   described earlier.
22           I mean, I had a -- I guess looking
23   back naively, I thought we were going to get an
24   audit from PwC for year-ended 2019, and when we
25   had discussions with PwC, they were like, are

Page 264

WATERHOUSE - 10-19-21

1    you crazy, we're not auditing this. Values
2    change, all these things change, bankruptcy
3    changes the entire scenario. I mean -- and
4    they're like, we're not -- we're not touching
5    this.
6           And so, you know, I was like, okay,
7    sorry, I get it, okay, no an audit.
8           I mean, it is -- you know, and --
9    you know, and we weren't preparing GAAP
10   financial statements.
11          Again, I didn't know what we were
12   doing in relation to our financial statements,
13   but these were the discussions I was having at
14   the time. And yeah, I mean, filing bankruptcy
15   from what I got from outside auditors and
16   others involved changed things dramatically.
17       Q.    Okay. Highland wasn't the obligor
18   under any of the notes that we're talking
19   about; correct?
20       A.    No.
21       Q.    So --
22       A.    That's right.
23       Q.    So can you identify any fact that
24   would cause the fair value to deviate from the

Page 265

WATERHOUSE - 10-19-21

1    carrying value during the seven-month period
2    between June 3rd and the end of the year, 2019?
3           MS. DANDENEAU: Objection to form.
4        A.    No. I mean, I'm putting myself back
5    at that time, right. Hindsight is 2020, but we
6    didn't do an analysis, but we would have done a
7    fulsome analysis and looked at all of the facts
8    and circumstances at the time, but asset values
9    change. You know, there could have been a
10   market crash in hindsight in 2020, which --
11   which affected entities' abilities.
12          There could have been all of these
13   things, right, that -- that happen. It is --
14   it is easy to look back in hindsight, but when
15   you are looking at this in -- in realtime, the
16   analysis is different, and again, we didn't do
17   an analysis.
18       Q.    Okay. You didn't do an analysis.
19          Do I have that right?
20       A.    I don't -- I don't recall doing one
21   or maybe -- you know, I don't recall doing one.
22          MR. MORRIS: Okay. I'm going to
23   take a break. I may be done, so the time
24   now is -- is 4:30 your time. Let's just

Page 266

WATERHOUSE - 10-19-21

1    take a short break until 4:40 your time.
2    MS. DANDENEAU:  Okay.
3    VIDEOGRAPHER:  We're going off the
4    record, 4:31 p.m.
5    (Recess taken 4:31 p.m. to 4:43 p.m.)
6    VIDEOGRAPHER:  We are back on the
7    record at 4:43 p.m.
8    MR. MORRIS:  I have no further
9    questions.
10   MR. RUKAVINA:  Okay.
11   Mr. Waterhouse, I will go next.
12              EXAMINATION
13   BY MR. RUKAVINA:
14   Q.  Sir, my name is Davor Rukavina.  I'm
15   the lawyer for --
16   MR. MORRIS:  Hey, Davor, just before
17   you begin, I just want to put on the record
18   Highland's objection to documents that were
19   produced to me 10 minutes before the
20   deposition began.
21   MR. RUKAVINA:  What the basis of
22   your objection?
23   MR. MORRIS:  That they were due
24   quite some time ago, and the fact that you

Page 267

WATERHOUSE - 10-19-21

1    had -- I just think it's appropriate to --
2    to dump documents on somebody 10 minutes
3    before the deposition.  I just think
4    that's --
5    MR. RUKAVINA:  Well, these are
6    documents Highland produced.  I'm not aware
7    of any rule I have to give you advance
8    documents when I know for the record that
9    other than the exhibits that you sent to us
10   last week, most of the exhibits you used
11   today you did not provide to me prior to
12   this deposition.
13   MR. MORRIS:  No, but the documents
14   were produced by me in -- in litigation,
15   right?
16   MR. RUKAVINA:  I'm going to use
17   primarily, John, the documents that you
18   produced to me today, but you may.
19   MR. MORRIS:  Primarily.  I've got --
20   I've got my objection.  You have got your
21   response.  Proceed.
22   Q.  Mr. Waterhouse, again, I represent
23   the advisors, HCMFA and NexPoint Advisors.
24   Do you understand that?

Page 268

WATERHOUSE - 10-19-21

1    A.  Yes.
2    Q.  You and I have never met or talked
3    before today, have we?
4    A.  No, I have -- I have heard your
5    voice on calls before.
6    Q.  Okay.
7    MR. RUKAVINA:  Madam Court Reporter,
8    I will use a few exhibits today.  My
9    associate, Mr. Nguyen, will find some way
10   to get them to you.  I don't know how to do
11   that, but it looks like you guys do.
12   I am going to use numbers as well.
13   But to differentiate them from Mr. Morris
14   we're going to mark mine with the prefix A
15   for advisors.
16   Do you understand?
17   COURT REPORTER:  Yes.
18   MR. RUKAVINA:  Okay.  Perfect.
19   Q.  Okay.  So, Mr. Waterhouse, let's
20   start with those two HCMFA notes that you were
21   asked about, one for 5 million and one for
22   2.4 million.
23   Do you recall those notes?
24   A.  Yes.

Page 269

WATERHOUSE - 10-19-21

1    Q.  Were you ever the CFO of HCMFA?
2    A.  I don't recall.
3    Q.  So to the best of your recollection,
4    you were still an officer of HCMFA in 2019,
5    just that your title was treasurer?
6    MR. MORRIS:  Object to the form of
7    the question.  There is no leading here.
8    He works for your client.
9    MS. DANDENEAU:  That is not -- that
10   is not true.
11   MR. MORRIS:  He's the treasurer --
12   he is the treasurer of your client.  I
13   don't -- I'm going to object every time you
14   try to lead, so...
15   MR. RUKAVINA:  Totally fine to
16   object.
17   MR. MORRIS:  Okay.
18   Q.  Please answer my question,
19   Mr. Waterhouse.
20   A.  I'm sorry, could you repeat?  There
21   was...
22   Q.  Yes.  You were -- you testified
23   earlier that in 2019 you were an officer of
24   HCMFA; correct?

Page 270

WATERHOUSE - 10-19-21

1
2    A.   Yes, I testified that I was the
3    treasurer and I didn't know if that incumbency
4    certificate, you know, was one that appointed
5    me as a treasurer, but yes.
6    Q.   I'm just trying to confirm that
7    sitting here today, to the best of your
8    recollection, at that time you were -- your
9    title was treasurer.  It was not chief
10   financial officer.
11   A.   I don't recall that being my title.
12   Q.   Okay.  And in May of 2019, however,
13   I think you testified you were the chief
14   financial officer of the debtor; correct?
15       MR. MORRIS:  Objection to the form
16   of the question.
17   A.   Yes, I was -- yes.
18   Q.   Okay.  As such, in May of 2019, did
19   you have the authority, to your understanding,
20   to unilaterally loan $5 million or $2.4 million
21   to anyone on behalf of the debtor?
22       MR. MORRIS:  Objection to the form
23   of the question.
24   A.   Sorry, can you repeat that?
25   Q.   Yes.  So in your capacity as the

Page 271

WATERHOUSE - 10-19-21

1
2    chief financial officer of the debtor, Highland
3    Capital Management, L.P., in May of 2019, did
4    you believe that you unilaterally, just Frank
5    Waterhouse, had the authority to loan on behalf
6    of the debtor to anyone $5 million and
7    $2.4 million?
8        MR. MORRIS:  Objection to the form
9    of the question.
10   A.   No.
11   Q.   Is it because loans of that amount
12   would have had to be approved by someone else?
13   A.   Yes.
14   Q.   Who in '20 -- in May of 2019, if
15   Highland wanted to loan 5 million or
16   $2.4 million to someone, what would have been
17   the internal approval procedure?
18       MR. MORRIS:  Objection to the form
19   of the question.
20   A.   If -- if we had loans of that nature
21   that needed to be made due to their size, we
22   would have gotten approval from the -- the
23   president of Highland.
24   Q.   And who was that individual?
25   A.   It was James Dondero.

Page 272

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Now, I'm going to ask you a
3    similar question but for a different entity.
4        In May of 2019, as the treasurer of
5    HCMFA, did you believe that you unilaterally
6    had the ability to cause HCMFA to become the
7    borrower of a $5 million loan and a
8    $2.4 million loan?
9        MR. MORRIS:  Objection to the form
10   of the question.
11   A.   No.
12   Q.   What would -- what would the
13   approval have taken place -- strike that.
14       What would the approval process have
15   been like in May of 2019 at HCMFA for HCMFA to
16   take out a $7.4 million loan?
17       MR. MORRIS:  Objection to the form
18   of the question.
19   A.   The process would have been similar
20   to what we just discussed on -- for Highland to
21   make a loan to others.  So, again, you know,
22   we -- we would have -- either myself or someone
23   on the team would have discussed this with
24   the -- the president and owner of -- of HCMFA.
25   Q.   And who was that individual?

Page 273

WATERHOUSE - 10-19-21

1
2    A.   That was James -- Jim Dondero.
3    Q.   So do I understand that in May of
4    2019, on behalf of both the lender, Highland,
5    and the borrower, HCMFA, Mr. Dondero would have
6    had to approve $7.4 million in loans?
7        MR. MORRIS:  Objection to the form
8    of the question.
9    A.   Yes.
10   Q.   You mentioned when Mr. Morris was
11   asking you the NAV error, N-A-V error, with
12   respect to TerreStar, without writing us a
13   novel, unless you feel like you have to, can
14   you summarize what that NAV error was?  What
15   happened?
16   A.   There was a -- in the Highland
17   Global Allocation Fund, it owned at the time an
18   equity interest in a company called TerreStar.
19   And TerreStar is -- at the time was a private
20   company, and it may still be today.  Again, I'm
21   putting myself back then as a private company.
22       We had -- sorry, I don't mean we --
23   the fund and the advisor Houlihan Lokey
24   to -- to value that investment.  And during
25   that time there was some trades that were

Page 274

WATERHOUSE - 10-19-21

1    executed at market levels that were much lower
2    than the Houlihan Lokey model.
3        And based on information and
4    discussions with the portfolio managers and,
5    you know, principals that were very familiar
6    with TerreStar, it was determined that those
7    trades were non-orderly and they were not
8    considered in the valuation as consulted with
9    Houlihan Lokey and PricewaterhouseCoopers at
10    the time.
11        Subsequent to a -- I can't remember
12    the exact circumstances of why the SEC got
13    involved. I think it was due to this -- this
14    investment became a material position in the
15    fund. It triggered an SEC, kind of, inquiry.
16    And as part of that inquiry, they questioned
17    the valuation methodology. "They" meaning the
18    SEC.
19        And at the culmination of that
20    process -- this is all summarized -- the value
21    that was -- that ultimately had to be used in
22    the fund's NAV was different than -- materially
23    different than what the original valuation at
24    Houlihan Lokey provided.
25

Page 275

WATERHOUSE - 10-19-21

1        And given that there was this fund
2    was, as we discussed -- I don't know if we
3    discussed it, but it was an open-ended fund
4    that was going -- that was converting to a
5    close-end fund.
6        Due to the fact that it was an
7    open-ended fund, you had to recalculate NAV and
8    see what the impact was on people -- on
9    investors coming in and out of the fund and if
10    there is a detrimental impact and to calculate
11    what that -- what that impact was and if there
12    was any amounts owed to the fund pursuant to
13    the error.
14    Q.    Were you personally involved
15    internally at either Highland or HCMFA with
16    these investigations and discussions with the
17    SEC?
18    A.    I was.
19    Q.    Which other key people or senior
20    people at Highland were involved, to your
21    recollection?
22    A.    Myself, Thomas Surgent, David Klos,
23    Lauren Thedford, Jason Post.
24    Q.    Mr. Dondero, was he --
25

Page 276

WATERHOUSE - 10-19-21

1    A.    I believe Cliff Stoops. I'm trying
2    to think. And maybe that is -- that is -- that
3    is -- that is all kind I can recall at the
4    moment.
5    Q.    Do you recall whether it was
6    determined that the fund suffered losses as a
7    result of this error?
8    A.    The -- the fund -- the -- the --
9    because the open-ended nature of the fund,
10    there were losses that were attributable to
11    investors. Meaning they -- they would have
12    redeemed and got a less money or -- or they
13    subscribed in and maybe because they didn't get
14    enough shares and then they later sold and then
15    they were harmed in that fashion.
16        And there is -- there is -- there
17    were very -- there were very detailed
18    calculations and, you know, all these different
19    scenarios that we had to -- I'm sorry, I keep
20    saying "we" -- that the individuals involved
21    had to calculate and quantify.
22    Q.    Well, do you recall whether HCMFA
23    admitted certain fault and liability for this
24    error?
25

Page 277

WATERHOUSE - 10-19-21

1    A.    I don't recall specifically.
2    Q.    Do you recall whether HCMFA caused
3    any funds to be paid to the investors and the
4    fund the subject of the NAV error?
5    A.    Yes.
6    Q.    Do you recall the approximate amount
7    of funds, moneys paid to the investors and the
8    fund?
9    A.    It was -- it was approximately
10    $7 million.
11    Q.    If I was to suggest 7.8 million,
12    would that ring more true or are you sticking
13    with your original answer?
14    A.    It was -- it was approximately 7 --
15    7 to $8 million. Again, I don't remember the
16    exact number, but it was in that ballpark.
17    Q.    So regardless of whether HCMFA
18    accepted fault or liability, it caused some
19    $7 million or more to be paid out to affected
20    investors in the fund?
21        MR. MORRIS: Objection to the form
22    of the question.
23    A.    And I want to make sure I'm
24    understanding your question because there is a
25

Page 278

```
1         WATERHOUSE - 10-19-21
2   lot of different entities that are going on to
3   my head.
4         I think what you are saying is based
5   on this error, shareholders were harmed by this
6   approximately $7.8 million – by approximately
7   $7.8 million.  Is that what you are asking?
8      Q.   Yes, sir.
9      A.   Yes, that was – again, I don't have
10  the exact numbers.  If I take – it was – it
11  was in that ballpark, and there is a detail
12  calculation and write-up that could, that –
13  that exists someplace.
14     Q.   Now, at that time, at the time that
15  the NAV error occurred, was there a contract in
16  place between HCMFA and the debtor pursuant to
17  which the debtor was providing services to
18  HCMFA?
19     MR. MORRIS:  Objection to the form
20  of the question.
21     A.   Yes.
22     Q.   Was that contract generally called a
23  shared services agreement?
24     A.   It was generally called that, but
25  there were – there were – I mean, it – it –
```

Page 279

```
1         WATERHOUSE - 10-19-21
2   it depends on who you talk to, but yes,
3   generally, there were – there are multiple
4   agreements.
5      Q.   Pursuant to one or more of those
6   agreements, was the debtor providing certain
7   services to HCMFA?
8      MR. MORRIS:  Objection to the form
9   of the question.
10     A.   Yes.
11     Q.   And can you at a very high level
12  summarize in 2018 and 2019 what those services
13  were?
14     A.   Yes, there was a – yes.
15     Q.   Okay.  Please – please go – go
16  through a short summary.
17     A.   There was a – a cost reimbursement
18  agreement between Highland Capital Management
19  Fund Advisors and Highland Capital Management,
20  L.P.  That agreement was for what we referred
21  to as front office services, so investment
22  management, things of that nature.
23        There was I think what most people
24  refer to as the shared services agreement that
25  was – that agreement was between Highland
```

Page 280

```
1         WATERHOUSE - 10-19-21
2   Capital Management Fund Advisors and Highland
3   Capital Management for back office services.
4      Q.   And can you summarize what you mean
5   by back office services?
6      A.   Those services were for accounting,
7   finance, tax, valuation, HR, IT, you know,
8   legal compliance, things of – things of those
9   nature – or things of that nature, excuse me.
10     Q.   So in the spring of 2019, do you
11  recall whether HCMFA took the position that it
12  was actually Highland that caused the NAV error
13  to occur pursuant to the valuation services
14  that Highland was providing?
15     MR. MORRIS:  Objection to the form
16  of the question.
17     A.   I do not recall.
18     Q.   Did you ever have any discussions
19  with anyone, Jim Dondero or anyone in the first
20  half of 2019 as to whether Highland, the
21  debtor, that is, had any liability to HCMFA
22  related to the NAV error?
23     MR. MORRIS:  Objection to the form
24  of the question.
25     A.   I do not recall.
```

Page 281

```
1         WATERHOUSE - 10-19-21
2      Q.   And then you mentioned that the fund
3   was being closed and some compensation related
4   to that.  Can you – can you elaborate?  What
5   were you referring to?
6      A.   Right.  So the advisor, pursuant to
7   board approval, put a proposal in front of the
8   shareholders of the Highland Global Allocation
9   Fund to convert it from an open-ended fund to a
10  closed-end fund.
11        So an open-ended fund, when
12  shareholders subscribe to the fund or redeem
13  into the fund, they do it at NAV.
14        When it is – when you have a
15  closed-end fund, closed-end funds are – are
16  publicly-traded, like on the New York Stock
17  Exchange, exchanges like that, and – and
18  shareholders or investors, they're not –
19  they're – they're not subscribing and
20  redeeming with the fund.  They are like shares
21  of Apple.
22        Those shares of the Highland Global
23  Allocation Fund trade on an exchange, and that
24  is how you, you know, that is how you, you know,
25  you become an equity owner in the fund or you
```

Page 282

WATERHOUSE - 10-19-21

1
2  sell your shares and you are no longer an
3  equity owner.
4          As part of that proposal, the
5  advisor told shareholders if you -- if you vote
6  for this proposal to -- to convert it from an
7  open-ended fund to a closed-end fund, we will
8  pay you some amounts of money.  I forgot -- a
9  certain number of points.  I think it was
10  like -- it was like two to three points or
11  something -- something like that.
12      Q.   Okay.  You mentioned when Mr. Morris
13  was asking you, going back to those two
14  promissory notes, you will recall the 5 million
15  and 2.4 million, you mentioned something to the
16  effect that Mr. Dondero told -- told you to pay
17  some moneys out of Highland.  Do you remember
18  that discussion with Mr. Morris?
19      A.   I do.
20      Q.   So, to the best of your
21  recollection, did you have a discussion with
22  Mr. Dondero about making some payments in May
23  of 2019 out of Highland?
24      A.   I recall, as I testified earlier,
25  that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1
2  for -- for these amounts attributable to -- it
3  was either the error -- you know, the error,
4  and in that conversation he said, go get the
5  money from Highland.  I believe that is what I
6  testified earlier, and that -- that is my
7  recollection.
8      Q.   Do you recall if that was an
9  in-person meeting or some other mode for the
10  meeting?
11      A.   I -- I -- I recall that being
12  in-person.
13      Q.   Do you recall if anyone else was
14  present, or was it just you and Mr. Dondero?
15      A.   I recall just he and I.
16      Q.   And the moneys that he told you to
17  find from -- or get from Highland, was that in
18  the amount of $5 million and $2.4 million?
19          MR. MORRIS:  Objection to the form
20  of the question.
21      A.   I believe so, but I would have to go
22  back and look and see when those moneys were
23  actually paid into the -- into the fund and,
24  you know, when those transfers were done.  If
25  they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1
2  yes, I would say it was -- it was all related
3  to that.
4      Q.   Did Mr. Dondero tell you that those
5  funds would be a loan from Highland to HCMFA?
6      A.   I don't recall.
7          MR. MORRIS:  Objection to the form
8  of the question.
9      Q.   Now, and forgive me, I'm probably
10  the only non-American born here, but I speak
11  reasonably well in English.  I don't recall,
12  does that mean you don't remember or does that
13  mean it didn't happen?
14          MR. MORRIS:  Objection to the form
15  of the question.
16      A.   It -- it means I don't -- I don't
17  remember.
18      Q.   Did Mr. Dondero tell you to have
19  those two promissory notes prepared?
20      A.   I don't recall.
21      Q.   When you -- again, when you say, I
22  don't recall today, that means that sitting
23  here today, you just don't remember one way or
24  the other.  Is that accurate?
25      A.   Yes.

Page 285

WATERHOUSE - 10-19-21

1
2      Q.   Is it possible that you, having
3  heard what Mr. Dondero said and seeing funds
4  being transferred, assumed that that would be a
5  loan without him actually telling you that
6  would be a loan?
7          MR. MORRIS:  Objection to the form
8  of the question.
9      A.   Sorry, I want to make sure -- did I
10  ask the amounts that were transferred that I --
11  that I assumed that that was a loan?
12      Q.   Well, let me -- let me take -- let
13  me try again.
14          So you have established already that
15  there were quite a number of promissory notes
16  back and forth -- I'm sorry, quite a number of
17  promissory notes with affiliated companies and
18  individuals owing Highland money; right?
19      A.   Yes.
20      Q.   And you have established that there
21  were many transactions and transfers going back
22  and forth over the years; right?
23          MS. DANDENEAU:  Objection to form.
24      A.   In -- yes, in my capacity as CFO and
25  my employment, yes, that is -- yes.

Page 286

WATERHOUSE - 10-19-21

1
2    Q.   And that's part of the reason why
3    you just can't remember some of the details
4    today because this -- this happened years ago,
5    and there were a number of transactions.  Is
6    that accurate?
7        MS. DANDENEAU:  Objection to the
8      form.
9        MR. MORRIS:  Objection to the form
10      of the question.
11      A.   I mean, I deal with thousands of --
12    of -- of -- of transactions, you know, whether
13    it has -- the processing of transactions, you
14    know, if it has got, you know, more -- more
15    zeros, you know, behind it than others.
16          When you look at thousands of
17    transactions over the years for funds and
18    advisors and -- and, you know, financial
19    statements, I mean, it is -- it is very hard
20    going back in -- in -- in my -- you know,
21    14-ish year career at -- at Highland to
22    remember a lot of those details, especially
23    when I don't have any records or books or
24    anything like that, and -- and going back many
25    years.

Page 287

WATERHOUSE - 10-19-21

1
2    Q.   And that is fine.  That -- that --
3    that is why I asked the question.
4        Is it possible in May of 2019 when
5    Mr. Dondero told you to transfer the funds from
6    Highland, you just assumed on your own that
7    those would be loans without him actually
8    telling you that those would be loans?
9        MR. MORRIS:  Objection to the form
10      of the question.
11      A.   I don't know.
12      Q.   I'm sorry, you --
13      A.   I said I don't know.
14      Q.   Okay.  Well, as the -- as the CFO
15    for Highland, if you saw $7.4 million going
16    out, you would feel some responsibility to
17    account for that, wouldn't you?
18        MR. MORRIS:  Objection to the form
19      of the question.
20      A.   Yes.
21      Q.   Is it fair to say that those would
22    be in the range large enough to rise up to your
23    level?
24        MR. MORRIS:  Objection to the form
25      of the question.

Page 288

WATERHOUSE - 10-19-21

1
2    A.   If -- I don't know if I understand
3    your question.  Those amounts would arise to my
4    level where I would be involved or...
5    Q.   You would want to know what a
6    transfer for that amount, $7.4 million, was all
7    about, as the CFO of Highland, wouldn't you?
8        MR. MORRIS:  Objection to the form
9      of the question.
10      A.   Yes, I make it -- I mean, I -- I
11    review all sorts of payments, I mean, even
12    smaller dollar payments on a periodic basis,
13    you know, to -- to -- to understand and to make
14    sure that we are paying things in a -- you
15    know, in -- in an informed way.  And, you
16    know -- and we're -- and we're paying things
17    pursuant to vendor contracts and things like
18    that.
19      Q.   So as part of that, is it possible
20    that seeing $7.4 million go out you would have
21    promissory notes made in order to keep a paper
22    trail, assuming that those were loans, when
23    perhaps they were never intended to be loans by
24    Mr. Dondero?
25        MR. MORRIS:  Objection to the form

Page 289

WATERHOUSE - 10-19-21

1
2      of the question.
3      A.   I don't know.  As I testified
4    earlier, I had conversations with Mr. Dondero
5    about -- about the -- the -- the moneys that
6    were needed for the NAV error.  And I recall
7    him saying go get it from Highland -- or get it
8    from Highland.
9      Q.   Well, why did you sign those
10    promissory notes and why didn't you have him
11    sign them?
12        MR. MORRIS:  Objection to the form
13      of the question.
14      A.   I don't know.  I don't know.
15      Q.   You mentioned earlier that you
16    typically don't sign promissory notes.  Am I
17    remembering your testimony correctly?
18        I mean, promissory notes on behalf
19    of the entities.  Not yourself, obviously.
20      A.   Yes, that is what I said earlier.
21      Q.   Do you recall any other promissory
22    notes in the million-plus range that you had
23    ever signed before on behalf of any entity?
24      A.   There is -- there has been a lot of
25    transactions over the years.  I don't -- I

Page 290

```
1        WATERHOUSE - 10-19-21
2   don't -- I don't recall generally.  I don't --
3   I don't recall.
4      Q.    So -- but to the best of your
5   recollection, it was on your initiative,
6   following your discussion with Mr. Dondero,
7   that you had someone draft those two promissory
8   notes; is that correct?
9           MR. MORRIS:  Objection to the form
10     of the question.
11     A.    Yes, we would have -- the team, as I
12  stated earlier, we don't draft promissory
13  notes.  "The team" meaning the accounting and
14  finance team.
15          So the team would have worked with
16  the legal group at Highland to draft any notes.
17     Q.    Do you believe or do you have any
18  recollection as to whether you would have done
19  that pursuant to an email or telephone call or
20  in-person meeting?
21          MR. MORRIS:  Objection to the form
22     of the question.
23     A.    Are you asking if I would have -- if
24  those notes would have been drafted pursuant to
25  an email or phone call?
```

Page 291

```
1        WATERHOUSE - 10-19-21
2      Q.    Strike that.
3           Do you recall whether you sent an
4   email to anyone asking them to draft those two
5   promissory notes?
6      A.    I don't recall because, again,
7   once -- I would have instructed -- likely
8   instructed the team to -- to work with the
9   legal group to draft these documents.
10          I -- I -- I -- yeah, I didn't -- I
11  mean, that is more an operational-type
12  procedure.  So, you know, a manager or a
13  controller or working with legal.  You know,
14  they -- they can certainly handle that task to
15  get that -- you know, to request that from
16  legal.
17     Q.    And who on your team do you think
18  you would have asked to do that?
19          MR. MORRIS:  Objection --
20          Who would have been the logical
21  person or people, if you don't remember their
22  name today?
23          MR. MORRIS:  Objection to the form
24     of the question.
25     A.    It -- it -- there is only two
```

Page 292

```
1        WATERHOUSE - 10-19-21
2   managers of the group.  That would have been
3   Dave Klos or Kristin Hendrix.
4           Dave was the -- one of his duties
5   was managing the valuation team, and so he was
6   intimately involved with this process.  So, you
7   know...
8      Q.    Okay.
9      A.    I don't recall specifically but, I
10  mean, my general -- you know, I -- I -- I
11  likely would have talked to Dave first about it
12  versus someone like Kristin who hadn't been
13  intimately involved.
14     Q.    And -- and do you have a view as to
15  whether it is most likely that you would have
16  done that by email or in-person or how would
17  you believe you would have communicated that to
18  Mr. Klos?
19          MR. MORRIS:  Objection to the form
20     of the question.
21     A.    I likely would have done that in
22  person.  Again, if things of this nature
23  that -- again, you have to put ourselves back
24  to, we have been working on this very stressful
25  project for many, many months.  And once the
```

Page 293

```
1        WATERHOUSE - 10-19-21
2   go-ahead was to -- you know, we see the light
3   at the end of the tunnel with wrapping this up
4   and making shareholders whole -- sorry to say
5   "we" -- you know, the -- so the folks that are
6   involved in it.
7           I like to talk to people
8   face-to-face and -- and go to -- and go
9   to their desk, because that shows if I'm going
10  to their desk that -- that is something that I
11  want done, you know.
12     Q.    And do you remember, Mr. Waterhouse,
13  getting those two promissory notes in paper
14  format or by email before they were executed?
15          MR. MORRIS:  Objection to the form
16     of the question.
17     A.    I don't recall.
18     Q.    For whatever was the ordinary course
19  back then in May 2019, would you expect to have
20  received them only on paper or would you have
21  expected to have received them in Word document
22  or PDF document by email?
23          MR. MORRIS:  Objection to the form
24     of the question.
25     A.    I -- I didn't sign -- I signed very
```

Page 294

WATERHOUSE - 10-19-21

1  few documents via email. I can't say that it
2  never happened, but people either stopped by my
3  office and physically walked in documents for
4  signature that we discussed face-to-face.
5        Or documents were -- if -- if --
6  if -- if -- let's say I wasn't there or I
7  wasn't available, documents were dropped off.
8  I had -- I had some in- and outboxes in front
9  of my -- my office there at the Crescent.
10       Documents would be dropped off for
11 signature. There would be a cover sheet that
12 would be -- have been applied to those
13 documents detailing, you know, who dropped it
14 off, the purpose, why, what time.
15       And then, you know, as I stated, I
16 don't draft documents and I always go to the
17 legal group and the compliance group to make
18 sure that they're in the loop. And there is
19 a -- a box or section that says, Has legal
20 reviewed or approved, or something to that
21 nature.
22       Again, I don't -- I don't have
23 access to that cover sheet anymore, but it
24 was -- it was something to that effect.

Page 295

WATERHOUSE - 10-19-21

1        And my assistant, you know, if she
2  was there, she would review that -- you know,
3  whatever was being dropped off. And if that
4  has legal, you know, reviewed or -- reviewed or
5  approved it, if that wasn't -- if that stuff
6  hadn't been done, it was like she would just
7  tell them like, go -- go -- go to the legal
8  group, because --
9     Q.   Let me -- let me pause --
10       MS. DANDENEAU: Let him finish.
11       MR. MORRIS: Thank you. Go ahead.
12    A.   I take -- go to the legal group
13 because that -- that was my -- you know, I
14 didn't -- I didn't review anything that -- that
15 they weren't -- you know, or there wasn't some
16 representation made to me that they had
17 reviewed, approved in some capacity.
18       Again, my -- my -- my goal, as CFO,
19 is to provide transparency and make sure that
20 groups like compliance and other things -- and
21 the other group in legal are -- are in -- you
22 know, their -- they're made aware of
23 transactions of -- you know, that are crossing
24 my desk.

Page 296

WATERHOUSE - 10-19-21

1        Because I'm not in every
2  conversation. They're not in every
3  conversation -- meaning legal compliance -- and
4  I just want to make sure that -- that everyone
5  is in sync to, you know, to -- to the extent
6  possible.
7     Q.   So if we summarize, you don't
8  specifically remember signing these two notes,
9  but most likely it would have been that they
10 would have presented -- been presented to you
11 physically on paper?
12       MR. MORRIS: Objection to the form
13       of the question.
14    A.   They would -- they would have been
15 presented physically on paper most likely or
16 someone would have left it. But, I mean,
17 again, I don't -- I don't recall.
18    Q.   I understand. Understand.
19       When you signed -- when you signed
20 documents, when you personally signed
21 documents, did you typically use a ink pen or
22 did you use a stamp?
23    A.   No, I -- I -- I use a -- an -- an
24 ink pen.

Page 297

WATERHOUSE - 10-19-21

1     Q.   Do you know -- was there a file at
2  Highland kept anywhere with ink-signed
3  originals of a promissory notes in general or
4  these two promissory notes specifically?
5        MR. MORRIS: Objection to the form
6        of the question.
7     A.   Sorry, I just want to make sure I
8  understand your question. Are you saying is
9  there a file somewhere that has ink-signed
10 originals of these two promissory notes?
11    Q.   Yes.
12    A.   I would -- I would assume they're
13 some place. I mean --
14    Q.   Well, was there a -- was there a
15 place where Highland generally kept originals
16 of promissory notes owed to it?
17    A.   I wouldn't -- no.
18       MR. RUKAVINA: Mr. Nguyen, would you
19 please pull up my A7, alpha 7.
20    Q.   These are the two promissory notes,
21 Mr. Waterhouse.
22       (Exhibit A7 marked.)
23    Q.   And please -- Mr. Waterhouse, please
24 command my associate to scroll down as you need

Page 298

WATERHOUSE - 10-19-21

1  to, but I want you to take a very close look at
2  your two signatures here and tell me whether
3  you believe, in fact, that you ink signed them
4  or whether you --
5      MS. DANDENEAU:  Mr. Rukavina,
6  Mr. Waterhouse has the copies.
7      MR. RUKAVINA:  Perfect.  Then you
8  can take this down, Mr. Nguyen.
9      A.  These -- these -- these signatures
10  are identical, now that I stare at them, and I
11  mean, they are so close -- I mean, they're
12  identical that, I mean, even with my chicken
13  scratch signature, I don't know if I can -- you
14  know, I do this 100 times, could I do that
15  as -- as precisely as I see between the two
16  notes.
17      Q.  Well, that is why I ask.
18  Mr. Waterhouse, now that you have examined
19  them, does it seem like it is more likely that
20  you actually electronically signed these?
21      MR. MORRIS:  Objection to the form
22  of the question.
23      A.  Is -- I don't -- I don't recall
24  specifically.  As I said before, my assistant

Page 299

WATERHOUSE - 10-19-21

1  did have a -- an electronic signature, and that
2  was used from time to time.  It wasn't as
3  common practice back in 2019.  It definitely
4  was more common practice when we had to work
5  from home and remotely for COVID because it
6  that made it almost impossible to, right,
7  provide wet signatures since we're all working
8  from home remotely.
9      Q.  Well, going just for these two
10  promissory notes, Mr. Waterhouse, in light of
11  your inability to remember any details, are you
12  sure you actually signed either or both of
13  those notes?
14      MS. DANDENEAU:  Objection to form.
15      A.  I don't recall specifically
16  signing -- actually physically signing these
17  notes.  As I said before, I don't recall doing
18  that.  This -- this looks like my signature,
19  but yet these two signatures are identical.
20      Q.  So you don't recall physically
21  signing them, and I take it you don't recall
22  electronically signing them either?
23      A.  I don't recall.  You know, Highland
24  has all my emails.  If that occurred, you know,

Page 300

WATERHOUSE - 10-19-21

1  you know, I don't have any of these records is
2  what I'm saying.  I don't have any of those
3  records.
4      Q.  That is why I'm asking you these
5  questions in great detail because I don't have
6  those emails.  I'm trying to -- I'm hoping that
7  you will give me some names or some details so
8  I can go look for more emails, but again, you
9  don't remember any -- any individual, other
10  than Mr. Dondero that we've discussed, you
11  don't remember any individual with whom you
12  discussed these promissory notes prior to their
13  execution?
14      MR. MORRIS:  Objection to the form
15  of the question.
16      A.  I don't recall discussing it with
17  anybody else.
18      Q.  Okay.
19      A.  I mean, prior --
20      Q.  I understand.
21      A.  You know, there was no one else --
22  there was no one else in that meeting that I
23  recall with Mr. Dondero.
24      Q.  Now, when you established that by

Page 301

WATERHOUSE - 10-19-21

1  May of 2019 --
2      A.  And -- and from what I recall, and
3  the reason why I was by myself is -- is, you
4  know, I don't -- I don't want to speculate, I'm
5  sorry.
6      Q.  Okay.  We have established that by
7  May of 2019, in your view, the liabilities of
8  HCMFA exceeded its assets; correct?
9      A.  Yeah.  I mean, again, I don't have
10  financial statements in front of me, but I
11  think, if I recall, we'd have to go through the
12  testimony with Mr. Morris, I believe that was
13  the case.
14      Q.  In fact, you will recall that in
15  April of 2019, Mr. Dondero signed a document
16  that extended the demand feature of two prior
17  notes to May 31, 2019.  Do you recall that?
18      MS. DEITSCH-PEREZ:  I think you
19  might -- maybe have the court reporter read
20  that back.  You might have misspoke.
21      (Record read.)
22      MR. RUKAVINA:  And I did misspeak.
23      Q.  I meant to say to May 31, 2021.  Do
24  you recall that, sir?

Page 302

```
              WATERHOUSE - 10-19-21
1
2         MR. MORRIS:  Objection to the form
3    of the question.
4    A.   Yes.
5         MR. RUKAVINA:  And, Mr. Nguyen, just
6    so that the record is clear, will you please
7    pull up my Exhibit Alpha 10, A10.
8         (Exhibit A10 marked.)
9    Q.   You don't have this one in front of
10   you, Mr. Waterhouse?  This is the one that
11   Mr. Morris used earlier.  Do you see that
12   document, sir?
13   A.   Yes, I do.
14   Q.   And this is what you were testifying
15   about before when Mr. Morris was asking you.
16   Do you remember that?
17   A.   Yes.
18   Q.   So here is my question for you,
19   Mr. Waterhouse:  As the chief financial officer
20   of Highland, was it prudent for Highland less
21   than three weeks later to be lending
22   $7.2 million to an insolvent entity that
23   couldn't even then pay its debts back to
24   Highland?
25        MS. DANDENEAU:  Objection to form.
```

Page 303

```
              WATERHOUSE - 10-19-21
1
2         MR. MORRIS:  Objection to the form
3    of the question.
4    A.   Sorry, I just want to make sure --
5    are you asking me, did you say, was it prudent
6    for Highland to loan $7.4 million to HCMFA a
7    few weeks after this document was executed?
8    Q.   Yes, and at a time when HCMFA's
9    liabilities exceeded its assets.
10        MR. MORRIS:  Objection to the form
11   of the question.
12   A.   I don't -- it is odd.  I don't know.
13        MR. RUKAVINA:  You can take this
14   exhibit down, Mr. Nguyen.
15   Q.   Do you recall asking anyone,
16   Mr. Dondero or -- or anyone outside as to
17   whether Highland ought to be lending
18   $7.4 million to HCMF regarding HCMF's
19   creditworthiness?
20        MR. MORRIS:  Objection to the form
21   of the question.
22   A.   I don't recall.
23   Q.   Did you receive personally any of
24   that $7.4 million?
25   A.   No.
```

Page 304

```
              WATERHOUSE - 10-19-21
1
2    Q.   Did you even --
3         MR. MORRIS:  I didn't hear that
4    question, sir.
5         MR. RUKAVINA:  The one that he
6    answered, John, or my new one?
7         MR. MORRIS:  No, no, your question,
8    Davor.
9         MR. RUKAVINA:  I had asked him
10   whether he received any of the
11   $7.4 million.  He said no.
12        MR. MORRIS:  Yeah.  I thought there
13   was a question after that.  Maybe I was
14   mistaken.  I apologize.
15        MR. RUKAVINA:  I had started a new
16   question, so here, let me start the new
17   question again.
18   Q.   Did you personally receive any
19   direct benefit from those two notes for
20   $7.4 million?
21   A.   No.
22   Q.   Did you ever personally consider
23   yourself obligated to repay either or both of
24   those notes?
25   A.   No.
```

Page 305

```
              WATERHOUSE - 10-19-21
1
2         MR. RUKAVINA:  Pull up those notes
3    again, Mr. Nguyen.
4    Q.   You can have them in front of you,
5    Exhibit 7, Mr. Waterhouse, whatever is easier
6    for you.  If you go to your signature page, my
7    question to you is, why did you not include
8    your title as treasurer by your name, Frank
9    Waterhouse?
10        MS. DANDENEAU:  Objection to form.
11   A.   I didn't -- I didn't draft this
12   document.
13   Q.   So you relied on whoever drafted it
14   to draft it correctly?
15   A.   Yes.
16   Q.   Okay.  But back then when you signed
17   this, did it ever cross your mind that you were
18   the maker on these notes?
19   A.   No.
20   Q.   Back then when you signed this
21   document, did it ever cross your mind that you
22   could be a co-obligor on these notes?
23   A.   No.  I didn't receive $7.4 million,
24   I mean...
25   Q.   But can you say that HCMFA received
```

Page 306

WATERHOUSE - 10-19-21

1  $7.4 million?
2      A.   I would have to go back and look and
3  check in, you know, the -- the financial
4  records and the bank statements.
5      MR. RUKAVINA:   You can take this
6  exhibit down, Mr. Nguyen.
7      Q.   Mr. Waterhouse, I'm not trying to be
8  a smart-ass, but if the law says that because
9  of the way that you signed this promissory
10  note, if that is what the law says, that that
11  made you personally -- personally liable, then
12  you would agree with me that that was never
13  your intent?
14      MR. MORRIS:   Objection to the form
15      of the question.
16      A.   That was never -- I wouldn't sign a
17  note and not get consideration in return.
18      Q.   So putting all other issues aside,
19  if the law -- if the law says that you were
20  liable for those notes because of how you
21  signed them, then would you agree with me that
22  these notes are a mistake?
23      MR. MORRIS:   Objection to the form
24      of the question.
25

Page 307

WATERHOUSE - 10-19-21

1      MS. DANDENEAU:   Objection to the
2      form.
3      A.   Yes.
4      Q.   So do you agree with me that it's
5  odd -- I think that is the word you used --
6  that Highland would be loaning $7.4 million a
7  few weeks after that extension to an entity
8  whose liabilities exceeded its assets, and you
9  would agree with me that it was never your
10  intention to be in any way liable for these two
11  promissory notes; correct?
12      MR. MORRIS:   Objection to the form
13      of the question.
14      A.   Sorry, you -- you asked a lot there.
15      MR. RUKAVINA:   I will strike it and
16  I will move on.
17      Let's go to -- pull up Exhibit 9,
18  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
19  9, A9.
20      (Exhibit A9 marked.)
21      Q.   Sir, take a moment to look at this,
22  but this is an email, and you will see attached
23  July 31, 2020 affiliate notes.
24      Do you see that attachment?
25

Page 308

WATERHOUSE - 10-19-21

1      A.   Yes.
2      Q.   Okay.  And do you see an entry for
3  Highland Capital Management Fund Advisors?
4      MR. MORRIS:   I'm sorry, hold on.
5  Where are you looking?
6      MR. RUKAVINA:   Last page, John.
7      MR. MORRIS:   Is it the page on the
8  screen?
9      MR. RUKAVINA:   Oh, I'm sorry.
10  Mr. Nguyen just did it.  Yes, the last page
11  there.
12      MR. MORRIS:   Thank you.
13      Q.   Do you see an entry there for HCMFA?
14      A.   Yes.
15      Q.   About $10.5 million.
16      Do you see that?
17      A.   I do.
18      Q.   And, now, do you have any
19  explanation for why if HCMFA owed $7.4 million,
20  plus the 5.3 million that had been extended,
21  why that amount was only 10.5 million?
22      A.   I don't know.  Okay.
23      MR. RUKAVINA:   Close this one and
24  pull up, Mr. Nguyen, the schedules,
25

Page 309

WATERHOUSE - 10-19-21

1  schedule of assets.  What exhibit is this
2  of ours, Mr. Nguyen?
3      MR. NGUYEN:   This is A11.
4      MR. RUKAVINA:   Oh, this will be A11.
5      (Exhibit A11 marked.)
6      Q.   You don't have this in front of you,
7  Mr. Waterhouse?
8      A.   Okay.
9      Q.   This is what Mr. Morris used
10  earlier.  Do you remember looking at this with
11  Mr. Morris?
12      A.   Yes.
13      MR. RUKAVINA:   You might have to
14  zoom in a little.  Okay.
15      Q.   Now, I see Affiliate Note A, B, and
16  C.
17      Do you have any recollection as to
18  why the names of the affiliates are omitted?
19      A.   I don't.  I testified earlier that,
20  you know, the team worked with DSI in providing
21  these.  I -- I don't -- I don't know.
22      Q.   Can we deduce -- is it logical to
23  deduce that Affiliate Note A would be NexPoint
24  given its size of $24.5 million?
25

Page 310

```
 1           WATERHOUSE - 10-19-21
 2      MR. MORRIS: Objection to the form
 3  of the question.
 4      A.  I mean, it -- it is a -- it is -- it
 5  is approximate.
 6      Q.  Well, can we -- can we deduce -- or,
 7  I'm sorry, strike that.
 8          Can you, sitting here today,
 9  logically conclude that Affiliate Note B or C
10  represents HCMFA?
11      MR. MORRIS: Objection to the form
12  of the question.
13      A.  I don't know.  I don't know.  I
14  can't.
15      Q.  Okay.  As of the petition date, we
16  have established that HCMFA, under promissory
17  notes, owed $7.4 million and $5.3 million to
18  the debtor; correct?
19      MR. MORRIS: Objection to the form
20  of the question.
21      A.  Yes.
22      Q.  Okay.  And by my reckoning, that
23  would be somewhere approaching $13 million.
24      MR. MORRIS: Objection to the form
25  of the question.
```

Page 311

```
 1           WATERHOUSE - 10-19-21
 2      Q.  It would be $12.7 million.  Is that
 3  generally correct?
 4      A.  Sorry, the amounts were 7.4, 5.3.
 5      Q.  Yes.
 6      A.  Okay.  Yeah, that -- that -- I can
 7  do that math, yes.
 8      Q.  Do you have any explanation or any
 9  understanding of why there is no similar entry
10  listed here on the schedule of assets filed
11  with the bankruptcy court?
12      MR. MORRIS: Objection to the form
13  of the question.
14      A.  I don't know.  We have to look at
15  the supporting schedules, like I talked about
16  other -- presumably there is -- there is a
17  build to the schedule that would provide the
18  detail.
19      Q.  Well, that was going to be my next
20  question.  You anticipated it.
21      MR. RUKAVINA:  You can -- you can
22  take this down, Mr. Nguyen.
23      Q.  Do you believe that whenever you and
24  your team provided the underlying data to the
25  financial advisor that the actual names of the
```

Page 312

```
 1           WATERHOUSE - 10-19-21
 2  affiliates for Affiliate Note A, B, and C would
 3  have been listed there?
 4      A.  Are you asking we provided the names
 5  to the financial advisor?  I don't -- I don't
 6  understand who the financial advisor is.
 7      Q.  I'm sorry, DSI.
 8          Let me ask the question this way,
 9  Mr. Waterhouse.
10          Whenever you provided information
11  about the affiliate notes to DSI, do you
12  believe that you would have included the actual
13  names of the affiliates, you or your team, or
14  that you would have done the Affiliate Note A,
15  Note B, Note C?
16      MR. MORRIS: Objection to the form
17  of the question.
18      MS. DANDENEAU:  Objection to the
19  form.
20      A.  We -- like I testified earlier, when
21  we were -- we gave everything to -- to DSI.  We
22  were giving all of our records, all of our
23  files, everything to DSI.  We weren't redacting
24  information or saying, hey, here is a note,
25  here is Affiliate Note A or B.
```

Page 313

```
 1           WATERHOUSE - 10-19-21
 2          I mean, it was -- our job and our
 3  focus -- and I testified in court back in 2019;
 4  right -- was -- was to be transparent and, you
 5  know, get DSI up to speed on -- on the matters
 6  at Highland.  So I can't see us redacting at
 7  that point.
 8      MR. RUKAVINA:  Mr. Nguyen, will you
 9  please pull up Mr. Morris' Exhibit 36.
10  Just the very first page, the very top
11  email.  You might zoom in a little bit.
12      Q.  Now, you recall being asked about
13  this by Mr. Morris?
14      A.  Yes, I do.
15      Q.  And you wrote:  The HCMFA note is a
16  demand note.
17          You wrote that; right?
18      A.  Yes.
19      Q.  And, in fact, weren't there by that
20  point in time several notes?
21      A.  Yes, there were.  Again, I don't --
22  I don't remember everything specifically.  I
23  mean --
24      Q.  I understand.  I understand.
25          So this is an example where -- where
```

Page 314

WATERHOUSE - 10-19-21

1   you might have made a mistake by referring to a
2   singular instead of a plural; right?
3       A.   Yes.
4       Q.   Okay.  And you -- you wrote -- a
5   couple of sentences later, you wrote:  There
6   was an agreement between HCMLP and HCMFA the
7   earliest they could demand is May 2021.
8           You wrote that; right?
9       A.   Yes.
10      Q.   But I think you -- you agreed with
11  Mr. Morris that that can't possibly apply to
12  the May 2019 notes, can it?
13          MR. MORRIS:  Objection to the form
14      of the question.  That is not what he
15      testified to.
16      Q.   Let me ask -- let me ask a different
17  question.
18          Sitting here today -- or if you can
19  answer me from your memory on October 6,
20  2020 -- did the April acknowledgment that
21  extended the maturity date apply to the
22  May 2019 notes also?
23      A.   I don't recall specifically.
24      Q.   Well, you recall that the notes that

Page 315

WATERHOUSE - 10-19-21

1   you signed were demand notes; right?
2       A.   Yes.
3       Q.   Do you find it logical, based on
4   your experience, that had they intended to have
5   a different or a set maturity date, you would
6   have instructed that that set maturity date be
7   included instead of a demand feature?
8           MR. MORRIS:  Objection to the form
9       of the question.
10      A.   Sorry, just want to make sure I
11  understand.  You are saying that -- that the
12  $5 million note, the $2.4 million note, if
13  those were supposed to be a term note, that I
14  would have made sure that those were a term
15  note?
16      Q.   I'm saying -- I'm saying,
17  Mr. Waterhouse, that on May the 2nd and May the
18  3rd, 2019, if you intended that those two
19  promissory notes could not be called until May
20  2021, would you have included such language in
21  those two promissory notes?
22          MR. MORRIS:  Objection to the form
23      of the question.
24      A.   I guess -- I'm sorry, I don't recall

Page 316

WATERHOUSE - 10-19-21

1   putting language in those May notes.  I don't
2   remember what language you are referring to.
3       Q.   Well, let's read this again.
4           There was an agreement between HCMLP
5   and HCMFA the earliest they could demand is May
6   2021.
7           Do you recall that agreement?
8       A.   Yes, that was the agreement we
9   looked at earlier; correct?
10      Q.   Okay.  Yes.
11          Do you -- do you understand now that
12  that agreement that we looked at earlier also
13  applied to the May 2019 notes that you signed?
14      A.   I don't -- I don't know.
15      Q.   But as of October 6, 2020, you're
16  writing that there is one demand note and
17  you're categorizing that demand note as not
18  being demandable on May 2021; correct?
19      A.   Yes.
20      Q.   And you know now that you made at
21  least one mistake in this email; correct?
22          MR. MORRIS:  Objection to the form
23      of the question.
24      A.   Yes.

Page 317

WATERHOUSE - 10-19-21

1           MR. RUKAVINA:  You can pull this
2       down, Mr. Nguyen.
3       Q.   So, Mr. Waterhouse, you don't
4   remember Mr. Dondero telling you to make these
5   loans or not.  HCMLP was loaning $7.4 million
6   to someone that their assets were less than
7   their liabilities.
8           We don't see on the July list of
9   notes, where there is $12.7 million of notes,
10  we don't see that on the bankruptcy schedules,
11  and we have this Exhibit 36 where you are
12  confused.
13          Are you prepared to tell me, sir,
14  today that you might have made a mistake in
15  executing those two promissory notes?
16          MR. MORRIS:  Objection to the form
17      of the question.
18      A.   I -- I don't know.
19      Q.   And if it turns out that you're
20  personally liable for those promissory notes,
21  it would certainly be a mistake, wouldn't it?
22          MS. DANDENEAU:  Objection to the
23      form.
24          MR. MORRIS:  Join.

Page 318

WATERHOUSE - 10-19-21

1
2    A.    Yes.
3    Q.    If Mr. Dondero testifies that he
4    never told you to make these loans, would you
5    disagree with his testimony?
6        MR. MORRIS:  Objection to the form
7    of the question.
8    A.    Like I testified earlier with my
9    conversation with Mr. Dondero, all I recall is
10    he said, get the money from Highland.
11    Q.    And if Mr. Dondero testifies that
12    he, in consultation with other senior personnel
13    at Highland, decided that Highland needed to
14    pay HCMFA $7.4 million as compensation for the
15    NAV error and not a loan, would you have any
16    reason to disagree with Mr. Dondero?
17        MR. MORRIS:  Objection to the form
18    of the question.
19    A.    If that was -- if that was his
20    intent, yes, it would -- I would --
21    Q.    Do you have any reason to disagree
22    with him?
23        MR. MORRIS:  Objection to the form
24    of the question.
25    A.    If that was his intent, I don't

Page 319

WATERHOUSE - 10-19-21

1    know.  I don't know how I disagree with that.
2
3    Q.    And just to confirm, you don't
4    remember ever asking Mr. Dondero whether you
5    should have two promissory notes prepared?
6    A.    No.
7    Q.    And you don't remember discussing
8    with Mr. Dondero what the terms of those two
9    promissory notes should be?
10    A.    I don't recall -- I testified all I
11    recall is he said, get the money from Highland.
12    I don't -- the -- the terms of the note, I
13    don't recall ever having a discussion around
14    the terms of the note, but since I don't draft
15    the notes, that -- there could have been a
16    conversation with other people later.
17    Q.    Do you have any memory of whether
18    after the notes were drafted, but before you
19    signed them, that you communicated with
20    Mr. Dondero in any way to just confirm or -- or
21    get his blessing or ratification to signing
22    those notes?
23        MR. MORRIS:  Objection to the form
24    of the question.
25    A.    I don't recall.

Page 320

WATERHOUSE - 10-19-21

1
2    Q.    Again, the only thing you remember,
3    sitting here today, was Mr. Dondero said, get
4    the money from Highland, and that is it, that
5    is all you remember?
6        MR. MORRIS:  Objection to the form
7    of the question.
8    A.    I testified to that several times.
9    This was over two years ago.  A lot has
10    happened.  That is all I recall.
11    Q.    And help me here.  I'm not very
12    technologically astute.  When you -- and I -- I
13    recognize that you do it rarely, but when you
14    sign a document electronically, do you believe
15    that there is an electronic record of you
16    having authorized or signed a document
17    electronically?
18        MR. MORRIS:  Objection to the form
19    of the question.
20    A.    I -- I don't know the tech answer to
21    that, but, you know, since I don't have -- I
22    don't ever attach my signature block
23    electronically, my assistant would have done
24    that, and if that is done over email like we
25    did several times -- you know, multiple,

Page 321

WATERHOUSE - 10-19-21

1    multiple times over COVID, she would attach my
2    signature block and then email it out to
3    whatever party.
4    Q.    What was your assistant's name in
5    May 2019?
6    A.    It was Naomi Chisum.
7    Q.    Is she the only one?  I'm sorry, was
8    she your only assistant that would have maybe
9    facilitated logistically something like you
10    just described?
11    A.    You know, she was out on maternity
12    leave at some point.  I don't -- I don't recall
13    those dates where she was out for maternity
14    leave.  There was -- there were folks backing
15    her up.  I don't recall specifically who
16    those -- who those, you know, administrative
17    assistants were, and I don't recall
18    specifically if she was out during this time on
19    maternity leave.
20        I do know that that she was out for
21    a period of time, or who knows, or she could
22    have been on vacation that day or, you know, I
23    don't know.
24    Q.    Switching gears now, the two

Page 322

WATERHOUSE - 10-19-21

1    complaints that have been filed that is against
2    HCMFA and NexPoint, did you see any drafts of
3    those complaints before they were filed?
4        MR. MORRIS:  Objection to the form
5        of the question, and to the extent that you
6        had any communications with counsel or you
7        were shown drafts of the complaints by
8        counsel while you were employed by
9        Highland, I direct you not to answer.
10       A.    I -- I reviewed documents yesterday
11   with counsel here.  I believe that is the first
12   time I have ever seen those.
13       Q.    Okay.  Did you ever discuss with
14   Mr. Seery these two lawsuits before or after
15   they were filed?
16       A.    I don't recall.
17       Q.    Were you ever interviewed by legal
18   counsel, to your knowledge, about these
19   promissory notes before the complaints were
20   filed?  Without going into what was said, were
21   you ever interviewed by legal counsel?
22       MR. MORRIS:  Objection to the form
23       of the question.
24       A.    I don't recall.

Page 323

WATERHOUSE - 10-19-21

1        Q.    Obviously with COVID, it changed,
2    but -- but before COVID, did you used to meet
3    with Mr. Seery from time to time in-person?
4        A.    Yeah, I mean, so before COVID -- so
5    we're talking kind of late March, early April,
6    right, there was about -- I don't remember the
7    specific date when the board for Highland was
8    appointed.  I believe it was around February of
9    2020, so maybe there was a month-and-a-half,
10   two-month window where we were meeting
11   in-person or, you know, like we were actually
12   in the office, excuse me, we were in the
13   office.
14       And, you know, when they were first
15   appointed, the board members and Mr. Seery
16   were -- were definitely down here more
17   in-person.
18       Q.    Did you ever see Mr. Seery taking
19   written notes of -- of his meetings with you or
20   others?
21       A.    I don't recall.
22       Q.    Do you recall on any Zoom or video
23   conference with Mr. Seery, seeing him take
24   notes, written notes?

Page 324

WATERHOUSE - 10-19-21

1        A.    The Zoom calls we had, I don't
2    recall having seen video or, you know, or if it
3    was on Zoom, I just remember it being -- well,
4    no, you know what, there were some -- you know,
5    I take that back.
6        So there were -- there were some
7    times that I did remember seeing Mr. Seery
8    on -- on some of the Zoom calls.
9        Q.    Well, let me --
10       A.    I don't -- sorry, I'm thinking.  I'm
11   thinking -- I'm going back.  I'm trying to
12   process this.
13       Q.    I can make it much quicker,
14   Mr. Waterhouse.  I have heard -- I have heard
15   that Mr. Seery is a copious note taker.
16       Do you have any knowledge about
17   that?
18       A.    No.
19       Q.    Okay.  Switching gears yet again,
20   and this will be last theme.  Do you need a
21   restroom break, or are you good to go for
22   another half an hour?
23       MS. DEITSCH-PEREZ:  I need a
24       restroom break.

Page 325

WATERHOUSE - 10-19-21

1        MR. RUKAVINA:  Can we make it five
2    minutes?
3        THE WITNESS:  Five minutes would be
4    great.
5        VIDEOGRAPHER:  We're going off the
6    record at 5:53 p.m.
7    (Recess taken 5:53 p.m. to 5:59 p.m.)
8        VIDEOGRAPHER:  We are back on the
9    record at 5:59 p.m.
10       Q.    Mr. Waterhouse, I had asked you
11   earlier about contracts between HCMFA and the
12   debtor, and now I'm going to talk about
13   contracts between the debtor and NexPoint
14   Advisors.  Okay?
15       A.    Okay.
16       Q.    Now, were there contracts similar to
17   the ones with HCMFA that NexPoint had in the
18   nature of employee reimbursement and shared
19   services?
20       A.    Yes, they -- NexPoint Advisors and
21   Highland Capital Management Fund Advisors had
22   cost reimbursement and shared services
23   agreements with Highland Capital Management,
24   L.P.

| Page 326 | |
|---|---|

WATERHOUSE - 10-19-21

1
2    Q.    And was that shared services
3    agreement, to the best of your understanding,
4    in place as of December 31, 2020?
5    A.    It was -- it was terminated at some
6    point, and I remember the contracts had
7    different termination dates, but I think the --
8    the date of termination was January 31st of
9    2021, after the termination was put in.
10        So yeah, it would be in place at the
11   end of the year of December -- it would be in
12   place at December 31st, 2020.
13   Q.    And pursuant to that agreement as of
14   December 31st, 2020, was the debtor providing
15   what you would describe as back office services
16   to NexPoint?
17   A.    Yes.
18   Q.    Would those have included accounting
19   services?
20   A.    Yes.
21   Q.    And as part of those accounting
22   services, would the debtor have assisted
23   NexPoint with paying its bills?
24        MR. MORRIS:  Objection to the form
25        of the question.

| Page 327 | |
|---|---|

WATERHOUSE - 10-19-21

1
2    A.    Yes.
3    Q.    So let's break that up.  You were a
4    treasurer of NexPoint as well in December of
5    2020?
6        MR. MORRIS:  Objection to the form
7        of the question.
8    A.    Yes.
9    Q.    Okay.  And in December of 2020, did
10   NexPoint have its own bank accounts?
11   A.    Yes.
12   Q.    And did it use those bank accounts
13   to pay various of its obligations?
14   A.    Yes.
15   Q.    Did employees of the debtor have the
16   ability to cause transfers to be made from
17   those bank accounts on behalf of NexPoint?
18   A.    Yes.
19   Q.    And is that one of services that the
20   debtor provided NexPoint, basically ensuring
21   that accounts payable and other obligations
22   would be paid?
23   A.    Yes.
24        MR. MORRIS:  Objection to the form
25        of the question.

| Page 328 | |
|---|---|

WATERHOUSE - 10-19-21

1
2    Q.    You answered yes?
3    A.    Yes.
4    Q.    And the payments, though, whose
5    funds would they be made from?
6    A.    From the bank account of NexPoint
7    Advisors.  If they were NexPoint advisor
8    obligations, it would be made from NexPoint
9    Advisors' bank account.
10   Q.    So let's pull up Exhibit Alpha 1.
11   You should have that -- it is my Tab 1 or my
12   Exhibit 1.
13        (Exhibit A1 marked.)
14   Q.    So this is a -- this is a series of
15   emails, Mr. Waterhouse.  Let's look at the
16   first page here, November 25, 2020, between
17   Kristin Hendrix and yourself.
18        Do you see that, sir?
19   A.    I do.
20   Q.    And do you see where Ms. Hendrix
21   writes:  NPA.
22        Do you know what NPA stood for?
23   A.    Yes.
24   Q.    And what does it stand for?
25   A.    NexPoint Advisors.

| Page 329 | |
|---|---|

WATERHOUSE - 10-19-21

1
2    Q.    And was that how you-all internally
3    at Highland refer to NexPoint Advisors, L.P.?
4    A.    I mean, yes, amongst other things.
5    Q.    And she writes at the bottom of her
6    email:  Okay to release?
7        Do you see that?
8    A.    Yes, I do.
9    Q.    So what --
10       MR. MORRIS:  Hold on one second.
11       Okay.  Go ahead.
12       MR. RUKAVINA:  Yeah.
13   Q.    So what is -- what is Ms. Hendrix
14   here on November 25 asking of you?
15   A.    She is asking me -- so she -- these
16   are -- these are payments -- typically we would
17   do an accounts payable run every week at the
18   end of every Friday.  But looking at this date,
19   it is Wednesday, November 25th, which means, to
20   me, it is likely Thanksgiving weekend.
21       So this is the day before
22   Thanksgiving, so this is the last kind of --
23   kind of day before the holidays and vacation
24   and things of that nature.  So it is
25   effectively the Friday of that week.

Page 330

```
1        WATERHOUSE - 10-19-21
2         So she is – she is putting in all
3    the payments for the week because we batch
4    payments weekly.  And these are the payments
5    that go out that week, and she is informing me
6    of the payments and – you know, again, at the
7    bottom of the email, she is asking for my okay
8    to – to release these payments in the wire
9    system.
10       Q.   So these would be accounts payable
11   of NexPoint?
12       A.   I mean, it would be accounts payable
13   for all of these entities listed on this email.
14       Q.   And who was Ms. Hendrix employed by
15   in November and December of 2020?
16       A.   Highland Capital Management.
17       Q.   Okay.  So – so part of the services
18   that NexPoint had contracted with was for
19   Highland to ensure that NexPoint timely paid
20   its accounts payable; is that accurate?
21       MR. MORRIS:  Objection to the form
22   of the question.  You have got to be
23   kidding me.
24       Q.   Is that accurate?
25       A.   Yes.
```

Page 331

```
1        WATERHOUSE - 10-19-21
2        Q.   And did NexPoint rely on employees
3    of the debtor to ensure that NexPoint's
4    accounts payable were timely paid?
5        MR. MORRIS:  Objection to the form
6    of the question.
7        A.   Yes.
8        MR. RUKAVINA:  Let's flip to the
9    next page, Mr. Nguyen, if you will please
10   scroll to the next page.
11       Q.   So this is an email similar to the
12   prior one, November 30th.
13        Do you see where it says, NPA HCMFA,
14   USD $325,000 one-day loan?
15        Do you see that, sir?
16       A.   I do.
17       Q.   Do you have any memory of what that
18   was?
19       A.   I don't recall what that – what
20   that payment was for.
21       Q.   Did it sometimes occur that one
22   advisor would, on very short-terms, make loans
23   to another advisor?
24       A.   Yes.  This – this – this occurred
25   from – from – from time to time.  It actually
```

Page 332

```
1        WATERHOUSE - 10-19-21
2    looking at – I'm – I'm looking at the date of
3    this email.  It is November 30th.  It is the
4    last day of the month.
5         HCMFA has obligations it needs to
6    pay to its broker-dealer, which is HCFD.  And
7    it likely was short funds to make those
8    obligations under that – under its agreement,
9    and so it provided a one-day loan because on
10   the next business day on 12/1 – or the next
11   business day in December, it would receive
12   management fees from the underlying funds that
13   it managed and it would be able to pay back
14   that loan to NexPoint Advisors.
15       Q.   So – so here Ms. Hendrix was
16   seeking your approval to transfer $325,000 from
17   NexPoint to HCMFA for a one-day loan; is that
18   correct?
19       A.   That is correct.
20       Q.   Let's flip to the next page, sir.
21       MR. RUKAVINA:  And, Mr. Nguyen, if
22   you will please scroll down.
23       Q.   Now we have an entry for
24   $325,000, 11/30 loan payment.
25        Do you see that, sir?
```

Page 333

```
1        WATERHOUSE - 10-19-21
2        A.   Yes.
3        Q.   And that is probably the loan that
4    was approved on the prior page?
5        A.   Yes, most likely.
6        Q.   So is it also true, sir, that in
7    addition to accounts payable debtor employees
8    would be assisting NexPoint with respect to
9    paying back its debt?
10       MR. MORRIS:  Objection to the form
11   of the question.
12       A.   I mean, yes, for loans of this
13   nature, yes.
14       Q.   Well, what about long term loans?
15   Was it reasonable for NexPoint to expect debtor
16   employees to ensure that NexPoint timely paid
17   its obligations under long-term notes?
18       MR. MORRIS:  Objection to the form
19   of the question.
20       MS. DANDENEAU:  Objection to form.
21       A.   I mean, that is one of the things
22   that the Highland personnel did provide to the
23   advisors.  Yes, we would – we would – over
24   the years, yes, we – we – we – we did do
25   that generally.  Again, I don't remember
```

| Page 334 | Page 335 |
|---|---|
| WATERHOUSE - 10-19-21 | WATERHOUSE - 10-19-21 |
| 1 | 1 |
| 2 specifically but, yes, generally we -- you | 2 the debtor would have played any role in |
| 3 know, we did do that. | 3 NexPoint having made those prior payments? |
| 4    Q.   So do you recall -- and we can pull | 4       MR. MORRIS:  Objection to the form |
| 5 it up, if need be -- that under the NexPoint | 5    of the question. |
| 6 note that Mr. Morris asked you about earlier, | 6    A.   Yes. |
| 7 the one for more than $30 million, that | 7    Q.   And what role in years prior to 2020 |
| 8 NexPoint was obligated to make an annual | 8 would employees of the debtor have had with |
| 9 payment of principal and interest? | 9 respect to NexPoint making that annual payment? |
| 10       MR. MORRIS:  Objection to the form | 10    A.   We -- we -- we would have -- I keep |
| 11    of the question. | 11 saying "we."  The team would have calculated |
| 12    A.   Yes, it was -- yes, it -- it was an | 12 any amounts due under that loan and other |
| 13 amortizing note.  It was -- you know, from what | 13 loans, as -- as standard course. |
| 14 we reviewed earlier, it was payable by | 14       We would -- since we provided |
| 15 December 31st of each year.  So -- but are -- | 15 treasury services to the advisors, we would |
| 16 are you asking me -- | 16 inform the -- the -- the -- we informed |
| 17    Q.   I'm just asking you, sir, if you | 17 Mr. Dondero of any cash obligations that are |
| 18 recall the note. | 18 forthcoming, whether we do cash projections. |
| 19    A.   Yes, the $30 million note, yes, we | 19       If, you know, any of these payments |
| 20 reviewed it earlier, yes. | 20 would have -- or, you know, the sum total of |
| 21    Q.   And do you recall Mr. Morris had you | 21 all of these payments, including any note |
| 22 go through the fact that NexPoint had made | 22 payments, if there were any cash shortfalls, we |
| 23 payments in years prior to 2020 on that note? | 23 would have informed Mr. Dondero of any cash |
| 24    A.   I do. | 24 shortfalls.  We could adequately plan, you |
| 25    Q.   And do you believe that employees of | 25 know, in instances like that. |

| Page 336 | Page 337 |
|---|---|
| WATERHOUSE - 10-19-21 | WATERHOUSE - 10-19-21 |
| 1 | 1 |
| 2       Or, sorry, we -- I say "we" -- I | 2 or accounting would have sent some schedule or |
| 3 keep saying "we" -- I keep wearing my -- again, | 3 a reminder that a payment would be coming due |
| 4 my -- my treasurer hat. | 4 in the future.  Is that generally the practice? |
| 5       But, yes, it is to -- it is to | 5    A.   Yes, we would -- you know, again, I |
| 6 inform Mr. Dondero of the obligations of the | 6 didn't -- I didn't micromanage the teams, but |
| 7 advisors in terms of cash and obligations that | 7 we had a -- a corporate accounting calendar |
| 8 are -- are upcoming and that -- and that are -- | 8 that we use as kind of a tickler file to keep |
| 9 are scheduled to be paid. | 9 track of payments. |
| 10    Q.   And would those obligations that are | 10       I actually, you know, don't know how |
| 11 upcoming and scheduled to be paid prior to 2020 | 11 actively they're using that in -- in prior to |
| 12 have incurred the annual payment on that | 12 2020, but it was actively used at some point. |
| 13 NexPoint $30 million note? | 13       We did look at NexPoint cash |
| 14       MS. DANDENEAU:  Objection to form. | 14 periodically and cash for the other advisors as |
| 15       MS. DEITSCH-PEREZ:  Davor, I think | 15 well and payments.  You know, we -- payments |
| 16    you misspoke.  You might want to just | 16 like this would have appeared in our cash |
| 17    repeat the question. | 17 projections, in the advisor's cash projections. |
| 18    Q.   Okay.  Let me repeat the question, | 18       And, again, as like I said earlier, |
| 19 sir. | 19 they would have appeared there, so there would |
| 20       Prior to 2020, those services that | 20 be time to plan for making any of these |
| 21 you just described, would that -- on behalf of | 21 payments. |
| 22 the debtor, would that have included NexPoint's | 22    Q.   And based on your experience, would |
| 23 payments on the $30 million note? | 23 it have been reasonable for NexPoint to rely on |
| 24    A.   Yes. | 24 the debtors' employees to inform NexPoint of an |
| 25    Q.   So someone at the debtor in treasury | 25 upcoming payment due on the $30 million |

| Page 338 |
| --- |

WATERHOUSE - 10-19-21

1 promissory note?

2       MR. MORRIS: Objection to form of

3 the question.

4       MS. DANDENEAU: Objection to form.

5    A.    Yes. Yes, they did. I mean, but I

6 mean, but I don't think these – these notes

7 were any secret to anybody.

8    Q.    I understand, and I'm not suggesting

9 otherwise.

10       MR. RUKAVINA: Please pull up Alpha

11 2, Mr. Nguyen.

12       (Exhibit A2 marked.)

13    Q.    Now, this document is similar to the

14 ones we've seen before as of December 31, 2020,

15 and I don't see under NTA anything there for

16 paying the promissory note to Highland.

17       Do you see anything like that?

18    A.    I do not.

19       MR. RUKAVINA: You can pull that –

20 that exhibit down, Mr. Nguyen.

21    Q.    You are aware, of course, by now

22 that, in fact, NexPoint failed to make the

23 payment due December 31, 2020, are you not?

24    A.    I am aware, and yes, I do understand

---

| Page 339 |
| --- |

WATERHOUSE - 10-19-21

1 it.

2    Q.    Were you aware that Highland

3 accelerated that $30 million promissory note?

4    A.    I am aware.

5    Q.    Were you aware of that acceleration

6 at the time that it occurred?

7    A.    I don't remember specifically.

8    Q.    Do you recall whether anyone asked

9 you – prior to the acceleration, anyone asked

10 you at Highland, what Highland should do with

11 respect to the missed payment?

12    A.    Did anyone ask me what Highland

13 should do about the missed payment?

14    Q.    Yes, before acceleration.

15       MR. MORRIS: Objection to the form

16 of the question.

17    A.    I mean, what – what I recall is

18 there was the – sorry, are you asking me –

19       MS. DANDENEAU: Why don't you just

20 repeat the question, Mr. Rukavina.

21    Q.    Let me try again, Mr. Waterhouse,

22 let me try again.

23       I am saying you're the CFO of

24 someone, in this case, Highland, and the

---

| Page 340 |
| --- |

WATERHOUSE - 10-19-21

1 borrower failed to make the required payment.

2 Are you with me so far?

3    A.    I am.

4    Q.    Did anyone then ask you, what should

5 we do with respect to our rights against the

6 borrower that missed the payment?

7    A.    Not that I recall.

8    Q.    Did you play a role in the decision

9 to accelerate that $30 million promissory note?

10    A.    I did not.

11    Q.    Do you recall whether Mr. Seery ever

12 asked you before the acceleration as to whether

13 he should accelerate the note?

14    A.    I don't recall.

15    Q.    And you don't recall when you

16 learned of the acceleration itself?

17       MR. MORRIS: Objection to the form

18 of that question.

19    A.    It was – it was sometime in

20 early – early 2021. I don't remember

21 specifically.

22    Q.    But do you recall whether it was

23 after the acceleration had already been

24 transmitted?

---

| Page 341 |
| --- |

WATERHOUSE - 10-19-21

1       MS. DANDENEAU: Objection to the

2 form of the question.

3    A.    I don't recall.

4    Q.    Do you recall in early to mid

5 January of 2021, after the default, discussing

6 the default with Mr. Dondero?

7    A.    I do recall discussing with

8 Mr. Dondero after December 31, 2020?

9    Q.    Yes, the fact of the default.

10    A.    I don't recall.

11       MR. RUKAVINA: Let's pull up my

12 Exhibit 6, Alpha 6.

13       (Exhibit A6 marked.)

14       MR. RUKAVINA: And, Mr. Nguyen, if

15 you will please scroll down.

16    Q.    This email chain begins with you

17 writing to Ms. Hendrix on January the 12th:

18 NexPoint note to HCMLP.

19       Do you see that, sir?

20    A.    I do.

21    Q.    Were you discussing this same

22 $30 million note we're talking about right now

23 with Ms. Hendrix?

24    A.    Yes.

Page 342

WATERHOUSE - 10-19-21

2    Q.   Okay.  Do you recall what prompted
3  you to send that email to her?
4    A.   Yes, I had -- I had a conversation
5  with Jim.
6    Q.   Okay.  And what -- what did you
7  discuss with Jim that led to this email chain?
8    A.   He -- he called me and he said he
9  wanted to make payment on the NexPoint note,
10  and I didn't -- I didn't know the -- the amount
11  offhand, so I reached out to Kristin and got
12  the details and relayed that to him.
13    Q.   And you see you sent that email to
14  her at 11:15 a.m.  Does that help you remember
15  when you had this discussion with Mr. Dondero?
16  In other words, was it that morning or the day
17  before, or can you -- can you --
18    A.   No, it was -- it was that morning.
19    Q.   And do you recall how you had that
20  conversation with him?
21        MR. MORRIS:  Objection to the form
22  of the question.
23    Q.   By telephone, by email, in-person?
24    A.   Yeah, he -- he called me.  I was at
25  home.  We were working from home here in

Page 343

WATERHOUSE - 10-19-21

2  December of 2020.  He called me from home.  He
3  said he was in court.  He wanted to -- he asked
4  about, you know, making payment on the note and
5  the amount, and so I didn't have those numbers
6  in front of me, so I said I would get back to
7  him.  I wanted all the details, so here is
8  this -- so I reached out to Kristin.
9    Q.   And then she gave you that
10  $1,406,000 figure?
11        MR. RUKAVINA:  Mr. Nguyen, if you
12  will scroll up, please.
13    A.   Yes.  Yeah, she -- the $1,406,112.
14    Q.   And do you recall whether you
15  conveyed that amount to Mr. Dondero?
16    A.   Yes.  I -- I called him back and
17  gave him -- gave him this amount.
18    Q.   Are you aware of whether NexPoint,
19  in fact, then made that 1 million 406 and
20  change payment?
21    A.   Yes, they did.
22    Q.   Did you discuss with Mr. Dondero at
23  that time, either the first conference or the
24  second conference that day -- strike that.
25        When you conveyed the number to

Page 344

WATERHOUSE - 10-19-21

2  Mr. Dondero, was -- was it also on January
3  12th?
4    A.   Sorry, when I conveyed the
5  $1.4 million number?
6    Q.   Yes.
7    A.   Yes, yes, it was that -- it was --
8    Q.   So you had --
9    A.   It was that point.
10    Q.   Well, to the best of your
11  recollection, you had a conference with
12  Mr. Dondero by the telephone in the morning,
13  and then another conference with him by
14  telephone after 11:40 a.m. that morning?
15    A.   Yeah, I can't remember -- yeah, it
16  was either that morning or it could have been,
17  you know, early afternoon, but again, I
18  remember calling him back, relaying this
19  information to him, and he said, okay, pay --
20  you know, make -- make this payment.
21    Q.   And during either of those two
22  calls, did you tell Mr. Dondero anything to the
23  effect that making those -- I'm sorry, making
24  that payment would not de-accelerate the
25  promissory note?

Page 345

WATERHOUSE - 10-19-21

2    A.   No.
3    Q.   Did you tell him anything to the
4  effect that making that payment would not cure
5  the default?
6    A.   No.
7    Q.   Did you discuss that in any way with
8  him?
9    A.   No, I did not.
10    Q.   Did he say why he wanted to have
11  that $1.4 million payment made?
12        MR. MORRIS:  Objection to the form
13  of the question.
14    A.   He -- he -- he didn't go into
15  specifics.
16    Q.   Did he say anything to you to the
17  effect that if NexPoint makes that payment,
18  then the note will be de-accelerated?
19        MR. MORRIS:  Objection to the form
20  of the question.
21    A.   I don't recall.
22        MR. RUKAVINA:  You can put this one
23  down, Mr. Nguyen.
24    Q.   And, again, when you say you don't
25  recall, you mean you don't remember right now

Page 346

WATERHOUSE - 10-19-21

1  either way; correct?
2  A.  Yeah, I don't remember.  I don't
3  remember us discussing that.
4  Q.  Now -- and we're almost done, I
5  promise.  I'm just going to -- I don't know how
6  to ask this question, so I'm just going to try
7  to do my best.
8  Prior to the default on December 31,
9  2020, did Mr. Seery ever tell you any words to
10  the effect that you or someone at Highland
11  should ensure that NexPoint doesn't make its
12  payment?
13  A.  No.
14  Q.  Did you have any hint or any belief
15  that anyone at NexPoint -- I'm sorry, strike
16  that.
17  Did you have any reason to believe
18  that anyone with Highland was actively trying
19  to get NexPoint to make that default by not
20  paying on December 31?
21  MR. MORRIS:  Objection to the form
22  of the question.
23  A.  Are you asking, did any Highland
24  employees actively work to make -- to
25

Page 347

WATERHOUSE - 10-19-21

1  somehow --
2  Q.  Yes.  Let me take a step back.  Let
3  me take a step back.
4  So you are aware now that as a
5  result of that default, what was still some
6  25-year note was accelerated and became
7  immediately due.  You are aware of that now;
8  right?
9  A.  Yes.
10  Q.  And can you see how someone at
11  Highland might actually have been pleased with
12  that development?
13  MR. MORRIS:  Objection to the form.
14  Q.  Not that they were -- not that they
15  were pleased, but you can see how someone at
16  Highland might have been pleased with that
17  development?
18  MR. MORRIS:  Objection to the form
19  of the question.
20  MS. DANDENEAU:  Object to form.
21  A.  I don't know how they would have
22  reacted to that.
23  Q.  Okay.  But you're not -- you're not
24  aware of any instructions or any actions being
25

Page 348

WATERHOUSE - 10-19-21

1  given or taken at Highland by Mr. Seery, the
2  independent board, DSI, that -- that would have
3  basically led Highland to ensure that NexPoint
4  would fail to make that payment?
5  A.  I'm not aware.
6  Q.  In other words, there wasn't a trick
7  or a settlement; right?
8  MS. DEITSCH-PEREZ:  Objection to
9  form.
10  MS. DANDENEAU:  Object to form.
11  MR. MORRIS:  Object to form.
12  A.  I'm not aware.
13  Look, I'm not aware.  I'm not in
14  every conversation.  I mean, and I'm just --
15  again, I'm sitting at home.  It is the end of
16  the year.  Again, I'm not aware.
17  Q.  That is a perfectly legitimate
18  answer.  I don't know why -- why you think
19  otherwise.
20  Okay.  Just give me one second to
21  compose my thoughts.
22  MS. DEITSCH-PEREZ:  While you're
23  taking your one second, why don't we take
24  three minutes.  I will be right back.
25

Page 349

WATERHOUSE - 10-19-21

1  VIDEOGRAPHER:  Do we want to go off
2  the record?
3  MR. RUKAVINA:  Yes.
4  VIDEOGRAPHER:  All right.  We're
5  going off the record at 6:27 p.m.
6  (Recess taken 6:27 p.m. to 6:30 p.m.)
7  VIDEOGRAPHER:  We are back on the
8  record at 6:30 p.m.
9  MR. HORN:  Is Deb back?
10  MS. DANDENEAU:  Are you asking about
11  me?  I'm here.
12  MR. HORN:  Oh, okay.  I don't see
13  you, sorry.
14  Q.  Actually, yeah, Mr. Waterhouse, so
15  when you had --
16  MS. DANDENEAU:  Are you asking about
17  Deb Dandeneau or Deborah?  I mean, there
18  are a lot -- as we talked about, a lot of
19  Debs.  I'm here.
20  MS. DEITSCH-PEREZ:  I'm here.
21  MR. HORN:  Yes, I was asking about
22  DDP.
23  MS. DEITSCH-PEREZ:  Oh, DDP is here.
24  MR. HORN:  Okay.  Here we go.  I'm
25

Page 350

WATERHOUSE - 10-19-21

1  going back on mute.
2      MS. DANDENEAU:  Get the right
3  nomenclature.
4      Q.   Mr. Waterhouse, on January 12th,
5  2021, when you had those talks with Mr. Dondero
6  about the $1.4 million payment, did you have a
7  communication or a conversation with Mr. Seery
8  about that payment after January 12th, 2021?
9      A.   I don't recall.
10     Q.   Well, in response to Mr. Dondero
11 reaching out to you, do you recall on that day,
12 January 12th, talking to Mr. Seery or anyone at
13 Highland other than the email chain we just saw
14 about Mr. Dondero's call with you?
15     A.   Did I talk to -- I spoke with
16 Kristin -- I don't know if I spoke to her. I
17 likely spoke to Kristin Hendrix because we had
18 to get the wire on NexPoint's behalf to make
19 the payment to Highland.
20     Q.   So it is true, then, that -- that
21 employees of the debtor did actually cause that
22 payment to be made when it was made after
23 January 12th?
24     A.   Yes, I mean, we -- we -- as I

Page 351

WATERHOUSE - 10-19-21

1  testified earlier, we provided that accounting
2  finance treasury function as -- under the
3  shared services agreement.  And so once I
4  got the -- I talked to Jim, got the approval to
5  make this payment, we have to then make the
6  payment, or the team does, and so the payment
7  was made.
8      Q.   Okay.  But -- okay.  And -- and
9  sitting here right now, after Jim called you,
10 you don't remember talking to anyone other than
11 the -- the couple of people you mentioned,
12 talking to anyone about something to the effect
13 that, hey, Jim wants to make this payment now?
14     MR. MORRIS:  Objection to the form
15 of the question.
16     A.   I don't -- I don't recall.
17     Q.   And does that include legal counsel?
18     Without going into any detail, on
19 January 12th or before that payment was made,
20 did you consult with legal counsel about
21 anything having to do with the $1.4 million
22 payment?
23     A.   I don't recall.
24     Q.   Okay.  Thank you, sir, for your

Page 352

WATERHOUSE - 10-19-21

1  time.
2      MR. RUKAVINA:  Pass the witness.
3      MR. MORRIS:  I just have a few
4  questions, if I may.
5      MS. DEITSCH-PEREZ:  Don't you go at
6  the end?
7      MR. MORRIS:  Oh, I apologize.  He is
8  your witness.  I'm surprised you want to
9  ask him questions, but go right ahead.
10     MS. DEITSCH-PEREZ:  Just have a
11 couple of things.
12     MR. RUKAVINA:  And I will just
13 object to that, that he's our witness.
14 That's not --
15     MR. MORRIS:  I'm not talking to you.
16 I'm not talking to you.
17     MS. DANDENEAU:  Also, Mr. Morris, it
18 is -- it is --
19     MS. DEITSCH-PEREZ:  He is not my
20 witness.  He's been subpoenaed by you.
21 Okay?
22     That is no offense, Mr. Waterhouse,
23 I'm -- I'm not -- okay.  Anyway.
24     EXAMINATION

Page 353

WATERHOUSE - 10-19-21

1  BY MS. DEITSCH-PEREZ:
2      Q.   Good evening.  I'm very sorry to be
3  going last and I know you have had a long and
4  taxing day, so I thank you for indulging me.
5      The kinds of services that you
6  describe that the -- that Highland provided for
7  NexPoint, did Highland also provide similar
8  services to that to HCRE and HCMS?
9      A.   Yes.
10     MR. MORRIS:  Objection to the form
11 of the question.
12     Q.   What kind of services did Highland
13 provide to HCRE and HCMS?
14     MR. MORRIS:  Objection to the form
15 of the question.
16     MS. DEITSCH-PEREZ:  What is your
17 objection, John?
18     MR. MORRIS:  It is vague and
19 ambiguous.  Unlike the advisors and
20 NexPoint, they actually had shared services
21 agreements.
22     MS. DEITSCH-PEREZ:  I got -- I
23 understand your objection.  That is fine.
24     Q.   Let's take them one at a time.

Page 354

WATERHOUSE - 10-19-21

1
2    What kinds of services did Highland
3    provide to HCRE?
4        MR. MORRIS:  Objection to the form
5    of the question.
6    A.   HCMS, Highland employees provided
7    accounting services, treasury management
8    services, potentially legal services.  I
9    don't – but I wouldn't have been directly
10   involved in that.  But as far as the teams that
11   I manage, it was accounting, treasury, things
12   of that nature.
13   Q.   Okay.  And that was for HCM, LLP –
14   A.   And -- and, sorry, it would also be
15   any asset valuation if needed as well.
16   Q.   Okay.  We went back and forth on
17   each other and I apologize, so just to clarify.
18        You were talking about the services
19   that Highland Capital Management provided to
20   HCMS; is that right?
21   A.   HCMS.  So, again, yes.  And
22   accounting, treasury, valuation, and also tax
23   services too.
24   Q.   Okay.
25   A.   Tax services.  Look, I'm expanding

Page 355

WATERHOUSE - 10-19-21

1
2    this, their HR services as well.
3    Q.   Okay.  And did that include bill
4    paying?
5        MR. MORRIS:  Objection to the form
6    of the question.
7    Q.   Did the services that HCM provided
8    to HCMS include bill paying?
9        MR. MORRIS:  Objection to the form
10   of the question.
11   A.   Yes.
12   Q.   And did the services that HCMLP
13   provided to HCMS include scheduling upcoming
14   bills?
15       MR. MORRIS:  Objection to the form
16   of the question.
17   A.   Yes.
18   Q.   And did HCMLP regularly pay -- cause
19   to be paid the payments on loans HCMS had from
20   HCMLP?
21       MR. MORRIS:  Objection to the form
22   of the question.
23   A.   Yes.
24   Q.   Typically -- if there is a
25   typically, how far in advance of due dates did

Page 356

WATERHOUSE - 10-19-21

1
2    HCMLP cause HCMS to pay its bills?
3        MR. MORRIS:  Objection to the form
4    of the question.
5    A.   I mean, it -- it -- it depend -- it
6    depended on the nature of the payment and the
7    vendor, but, you know, if there were -- if
8    there were larger scheduled payments, you know,
9    I would like to give at least 30 days notice.
10        And that is -- that is kind of my
11   rule of thumb so no one is surprised.
12   Q.   Okay.  And was it generally HCMLP's
13   practice to timely pay HCMS' bills?
14       MR. MORRIS:  Objection to the form
15   of the question.
16   A.   It -- it -- it -- that depended on
17   the nature of the payment.
18   Q.   Okay.  And can you explain what you
19   mean by that?
20   A.   Yeah, I mean if -- if it was -- I
21   mean -- if there was some professional fees
22   that weren't -- you know, they were due but
23   they weren't urgent, those fees may not be paid
24   as timely as others that have a due date or --
25   or things like that.

Page 357

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Are loan payments the kinds
3    of thing that HCMLP would pay on time because
4    of potential consequences of not paying on
5    time?
6        MR. MORRIS:  Objection to the form
7    of the question.
8    A.   Yes.  As I testified earlier, we
9    would want to give, you know, notice on -- on
10   -- on larger payments and -- and things of that
11   nature so we didn't miss due dates.
12   Q.   Okay.  And over the course of time,
13   did HCMLP generally pay HCMS' loan payments in
14   a timely fashion?
15       MR. MORRIS:  Objection to the form
16   of the question.
17   A.   I can't remember specifically, but
18   generally, yes.
19   Q.   Okay.  Now, did HCMLP provide
20   similar services to HCRE that you have
21   described it provided to HCMS?
22       MR. MORRIS:  Objection to the form
23   of the question.
24   A.   Yes, but I don't think it -- it
25   provided -- I don't think it provided HR

Page 358

WATERHOUSE - 10-19-21

1    services.
2    Q.    Can you describe the accounting and
3    treasury services that HCMLP provided for HCRE?
4    A.    Yeah, it -- it would provide
5    bookkeeping services on a -- on a periodic
6    basis.  It would make payments, you know, as
7    needed.
8    Q.    Okay.  So did it provide --
9    A.    And -- and I believe it -- it -- it
10    provided tax services as well.
11    Q.    Okay.  And so did it provide the
12    same kind of bill -- did HCMLP provide the same
13    kind of bill-paying services for HCRE that it
14    provided for HCMS and NexPoint?
15    MR. MORRIS:  Objection to the form
16    of the question.
17    A.    Yes.
18    Q.    And over the course of time, did
19    HCMLP generally cause to be made the loan
20    payments that HCRE owed to HCMLP?
21    MR. MORRIS:  Objection to the form
22    of the question.
23    A.    Yes.
24    Q.    Did HCMLP make loan payment -- the

Page 359

WATERHOUSE - 10-19-21

1    loan payment that was due from HCMS to HCMLP in
2    December of 2020?
3    MR. MORRIS:  Objection to the form
4    of the question.
5    A.    I don't believe that payment --
6    payment was made.
7    Q.    Okay.  And when HCMLP caused HCMS in
8    the past to make loan payments, whose money did
9    it use to make those payments?
10    MR. MORRIS:  Objection to the form
11    of the question.
12    A.    It was the -- the money in HCMS's
13    operating account would be made to that --
14    those moneys would be used to make payment to
15    Highland Capital Management.
16    Q.    Okay.  And Highland -- is it correct
17    that Highland Capital Management personnel had
18    the access to HCMS's accounts to be able to
19    cause such payments to be made?
20    A.    Yes, Highland personnel had access
21    to those accounts.
22    Q.    Okay.  And so now for HCRE, whose
23    money was used when HCMLP caused HCRE
24    payments -- loan payments to Highland to be

Page 360

WATERHOUSE - 10-19-21

1    made?
2    MR. MORRIS:  Objection to the form
3    of the question.
4    A.    It was -- it was cash in HCRE's bank
5    account that would be used to make payments to
6    Highland Capital Management.
7    Q.    Okay.  And so did Highland Capital
8    Management have access to HCRE's funds in order
9    to be able to make such payments?
10    MR. MORRIS:  Objection to the form
11    of the question.
12    A.    Personnel at Highland Capital
13    Management had access to HCRE's bank account to
14    effectuate the payments.
15    Q.    Okay.  And was the payment due from
16    HCRE to HCMLP due in December of 2020 made?
17    A.    It --
18    Q.    In December of 2020.
19    A.    It was not.
20    Q.    Okay.  And was there money in HCRE's
21    account that would have enabled the payment to
22    be made had HCM personnel attempted to make the
23    payment?
24    MR. MORRIS:  Objection to the form

Page 361

WATERHOUSE - 10-19-21

1    of the question.
2    A.    I -- I don't recall.
3    Q.    Do you have any reason to believe
4    that either HCRE or HCMS simply didn't have the
5    funds on hand to make the December 2020
6    payments?
7    A.    I don't know.
8    Q.    I guess I'm asking, do you have any
9    reason to believe that they didn't have the
10    funds?
11    A.    We managed cash for so many
12    different entities and funds, and I don't
13    recall, you know, where the cash position was
14    for HCRE and HCMS at 12/31/2020.
15    Q.    Okay.
16    A.    I just don't recall, and I don't --
17    and I don't remember what the loan payment
18    obligations were from HCRE to Highland, and
19    from HCMS to Highland.  I don't recall.  I
20    don't recall, I mean...
21    Q.    Let me come at it a different way.
22    Were the -- were the payments that would
23    otherwise have been due in December of 2020
24    made in January of 2021 for HCMS and HCRE?

Page 362

WATERHOUSE - 10-19-21

1  
2      A.    I believe the HCRE payment was made
3  in January of 2021.  I don't recall any
4  payments being made from HCMS to Highland.
5      Q.    If it -- how is it the HCRE payment
6  came to be made?  Why did you make it -- why
7  did HCM make the payment in January of 2021?
8      A.    Jim -- Jim called me and instructed
9  me to -- to make the payment on behalf of HCRE,
10 Jim Dondero -- Jim Dondero.
11     Q.    Did he seem upset that -- that the
12 payment had not been made?
13     A.    Yeah.  On the note that was, you
14 know, that was the term note, yes, he -- he was
15 displeased that the -- that the payment had not
16 been made by year-end.
17     Q.    Okay.  And did you make the -- cause
18 the payment to be made as -- as requested?
19     A.    Yes.
20     Q.    And did anyone else from HCM
21 participate with you in causing the payment to
22 be made to -- on the HCRE loan?
23     A.    Yes.  It would have been Kristin
24 Hendrix.  I -- again, I don't -- as I testified
25 earlier, I'm not an officer of HCRE.  I don't

Page 363

WATERHOUSE - 10-19-21

1  believe I'm an authorized signer.  So I
2  can't -- other personnel have to make payment
3  from HCRE to -- to -- to Highland.
4
5      Q.    Okay.  And in the conversation
6  that -- that you had with Mr. Dondero when he
7  requested the payment to be made, did you say
8  to him words to the effect, Jim, this loan is
9  going to stay in default, what are you making
10 the payment for, anything like that?
11     A.    No.
12     Q.    In fact, did you have the impression
13 from him that he thought that the loan would
14 be -- the default would be cured by making the
15 payment?
16          MR. MORRIS:  Objection to the form
17     of the question.
18     A.    Did I get the impression from Jim
19 Dondero that the loan would be cured if the
20 payment from HCRE --
21     Q.    Yeah, if that is what he thought.
22          MR. MORRIS:  Objection to the form
23     of the question.
24     A.    I didn't get any impression from him
25 on that at the time.

Page 364

WATERHOUSE - 10-19-21

1  
2      Q.    Do you know whether there was an
3  HCMS term loan that had a payment due in
4  December of 2020?
5      A.    I don't recall.
6      Q.    Okay.  And so the reason you don't
7  recall whether or not there was a payment in
8  January of 2021 is because you just don't
9  remember whether there was such a loan at all?
10          MR. MORRIS:  Objection to the form
11     of the question.
12     A.    I don't remember.  There is -- there
13 is so many notes, and I mean, demands, and I
14 don't -- I don't remember.  It's a lot to keep
15 track in your head.
16     Q.    I understand, and -- and I hear your
17 frustration when you have explained that the
18 debtor has your documents and you don't, and so
19 I fully appreciate it, and this is no knock on
20 you.  It's a knock on somebody else on this
21 call.
22          MR. MORRIS:  I move to strike.  That
23     was pretty obnoxious, but go ahead.
24     Q.    Okay.  But so, Mr. Waterhouse, if --
25 if a payment on the HCMS loan was made in

Page 365

WATERHOUSE - 10-19-21

1  January of 2021, do you think it was part of
2  the same conversation where Jim Dondero said,
3  hey, why didn't that get paid, please make
4  that -- get that payment done?
5          MR. MORRIS:  I object to the form of
6     the question.
7      A.    Yes.  Likely it would have been -- I
8  mean, again, I don't recall a payment being
9  made, but, you know, again, I don't remember
10 everything.
11     Q.    Okay.  Did -- at the time you were
12 communicating with Kristin Hendrix about the
13 payment being made, whichever payments were
14 made in January, did she say anything to you
15 about the payments not curing the loan
16 defaults?
17     A.    No.
18     Q.    Okay.  All right.  So I'm going to
19 take you back to very early in the deposition
20 when Mr. Morris was asking you about the --
21 the -- the -- the agreement with respect to
22 the -- the forgiveness element of the loans, so
23 that is just to orient you.
24          Do you remember that there was a

Page 366

WATERHOUSE - 10-19-21

1    time that you and Mr. Dondero were
2    communicating about potential means of
3    resolving the Highland bankruptcy by what was
4    colloquially referred to as a pot plan?
5        A.    Yes.
6        Q.    Okay.  And can you tell me generally
7    when that was?
8        A.    Like mid – mid 2020, sometime in
9    2020, mid 2020.
10        Q.    Okay.  And did the process of trying
11    to figure out what the numbers should be
12    involve looking at what one should pay for the
13    Highland assets?
14        MR. MORRIS:  Objection to the form
15    of the question.
16        A.    Yes.
17        Q.    Okay.  And did there come a time
18    when you were proposing some potential numbers
19    and Mr. Dondero said something to you like,
20    well, why are you including payment for the
21    related party notes, those, you know, were
22    likely to be forgiven as part of my deferred
23    executive compensation?
24        MR. MORRIS:  Objection to the form

Page 367

WATERHOUSE - 10-19-21

1    of the question.
2        A.    Yes, we did have that conversation.
3        Q.    Okay.  Was that conversation in
4    connection with trying to figure out the right
5    numbers for a pot plan?
6        A.    Yeah.  I mean, it was – it was – I
7    mean, Jim – Jim would ask for, you know,
8    most – most recent asset values, you know, for
9    Highland, and – and myself and the team
10    provided those to him, so it was in that
11    context.
12        Q.    Okay.  And does that refresh your
13    recollection that these communications were in
14    2020 rather than 2021?
15        MR. MORRIS:  Objection to the form
16    of the question.
17        A.    The – the – the executive
18    compensation discussions were definitely in
19    2020.
20        Q.    Okay.  Now, did you ever make
21    proposals that took into account Jim's comment
22    that the notes were likely to end up forgiven
23    as part of his compensation?
24        MR. MORRIS:  Objection to the form

Page 368

WATERHOUSE - 10-19-21

1    of the question.
2        A.    Yes, we – the team and myself put
3    together, you know, asset summaries of Highland
4    at various times for all the assets of
5    Highland, and not including the notes.
6        Q.    Okay.  And were those presentations
7    communicated to – to Mr. Seery?
8        A.    No.  Well, look, I didn't tell – I
9    didn't tell Mr. Seery.  I don't know what
10    Mr. Dondero did with the information.
11        Q.    Okay.
12        A.    I did not have conversations with
13    Mr. Seery.
14        Q.    Okay.  Do you know who saw the
15    presentations that you put together that didn't
16    include the value of the related party notes?
17        A.    We're talking presentations – these
18    are – these are Excel spreadsheets?
19        Q.    Uh-huh.
20        A.    I don't know who – these were given
21    to – to Jim Dondero.  I don't know what was
22    done with them after that.
23        Q.    Okay.  You also mentioned earlier
24    that sometime during your tenure at Highland

Page 369

WATERHOUSE - 10-19-21

1    you knew of the practice of giving forgivable
2    loans to executives.
3        MR. MORRIS:  Objection to the form
4    of the question.
5        Q.    Can you – can you tell me what you
6    recall about that practice?
7        MR. MORRIS:  Objection to the form
8    of the question.
9        A.    Yes, so there were – there were –
10    during my tenure at Highland, there were loans
11    or – given to employees that were later
12    forgiven at a future date and time.
13        Q.    Okay.  And when the loans were
14    given, did the notes, to your recollection, say
15    anything about the potential forgiveness term?
16        MR. MORRIS:  Objection to the form
17    of the question.
18        A.    When you say "did the notes," did
19    the promissory notes detail the forgiveness?
20        Q.    Yes.
21        A.    Not that I recall.
22        Q.    And until such time as whatever was
23    to trigger the forgiveness occurred, were the
24    notes bona fide notes as far as you were

Page 370

WATERHOUSE - 10-19-21

1   concerned?
2       MR. MORRIS:  Objection to the form
3   of the question.
4       A.   Yes, similar to – yes.
5       Q.   Okay.  You were going to say similar
6   to what?
7       A.   Mr. Morris earlier today showed
8   notes of the financial statements about various
9   affiliate loans.  I – I – I do recall these
10  notes because I – at that time personally
11  worked on the – the financial statements of
12  Highland.  That was, you know, in my role as a
13  corporate accountant.
14      And there were – those loans
15  were – to the partners were detailed in the
16  notes to the financial statements, similar to
17  what we went through earlier today in the prior
18  testimony about what we saw with Highland
19  and – and – and the – and HCMFA.
20      Q.   Is it fair to say that on Highland's
21  balance sheet there were any number of assets
22  that the value of which could be affected by
23  subsequent events?
24      MR. MORRIS:  Objection to the form

Page 371

WATERHOUSE - 10-19-21

1   of the question.
2       A.   Yes.  I mean, yes, that – there
3   are.  And that is – yes.
4       Q.   Okay.  And is it typical accounting
5   practice that until there is some certainty
6   about those potential future events, that asset
7   value listed on – on the books doesn't take
8   into account those potential future events?
9       MR. MORRIS:  Objection to the form
10  of the question.
11      A.   Yeah, if those – yes.  If – if
12  those future events, you know, at the time of
13  issuance are not known or knowable, like I
14  discussed earlier with, like, market practice,
15  asset dislocation, or, you know, I mean, things
16  like that, you – I mean, it – it could affect
17  its fair value –
18      Q.   Okay.
19      A.   – in the future.
20      Q.   And am I correct you wouldn't feel
21  compelled to footnote in every possible change
22  in – in an asset when those possibilities are
23  still remote?
24      MR. MORRIS:  Objection to the form

Page 372

WATERHOUSE - 10-19-21

1   of the question.
2       A.   The accounting standard is you have
3   to estimate to the best – you know, to – to
4   the best of your ability, the fair value of an
5   asset as of the balance sheet date under –
6   under GAAP.
7       Q.   Did – strike that.
8       Okay.  Give me a minute.  I'm
9   close – I'm close to done.  Let me just go off
10  and look at my notes for a second.  So take two
11  minutes.
12      VIDEOGRAPHER:  We're going off the
13  record at 7:02 p.m.
14      (Recess taken 7:02 p.m. to 7:03 p.m.)
15      VIDEOGRAPHER:  We are back on the
16  record at 7:03 p.m.
17      Q.   Mr. Waterhouse, is it generally your
18  understanding that people you work with now
19  have been asking the debtor for full and
20  unfettered access to their own former files?
21      MR. MORRIS:  Objection to the form
22  of the question.
23      A.   Yes, I am – I am generally aware.
24      Q.   Okay.  And do you think you could

Page 373

WATERHOUSE - 10-19-21

1   have been better prepared for this deposition
2   if the debtor had complied with those requests?
3       MR. MORRIS:  Objection to the form
4   of the question.
5       A.   I – I – I most certainly – yes.
6   I mean, again, these are multiple years,
7   multiple years ago, lots and lots of
8   transactions.
9       You know, we asked about NAV errors
10  and, you know, things like that and these
11  are – it would make this process a lot more –
12  a lot easier and if we had – if we had access
13  to that.
14      Q.   Okay.  And has the debtor – is the
15  debtor suing you right now?
16      A.   Yes.
17      Q.   And is the debtor trying to renege
18  on deals that it had previously made with you?
19      MR. MORRIS:  Objection to the form
20  of the question.
21      A.   Sorry, I need to – it is my
22  understanding that the litigation trust is
23  suing me.  And not being a lawyer, I don't
24  know – is that the debtor?

Page 374

```
1        WATERHOUSE - 10-19-21
2        Is that -- I don't know the
3   relationship.  So, again, I'm not the lawyers.
4   I've said many times.  But my understanding is
5   the litigation trust is suing me.  I could be
6   wrong there.  I don't know.
7        Q.   Okay.  I understand.
8        Someone with some connection to the
9   Highland debtor has brought a claim against
10  you; is that fair?
11       MR. MORRIS:  Objection to the form
12    of the question.
13       A.   Yes.
14       Q.   Okay.  And is there also some motion
15  practice in the bankruptcy where the debtor or
16  someone associated with the debtor is
17  attempting to undo something that was
18  previously resolved with you?
19       A.   Yes.
20       Q.   And so in one action somebody is
21  associated with the debtors trying to --
22  threatening you with trying to take money from
23  you, and then in the other -- and trying to --
24  and in the other they are threatening not to
25  pay you things that had previously been agreed;
```

Page 375

```
1   is that correct?
2        MR. MORRIS:  Objection to the form
3    of the question.
4        A.   I want to be -- yes, I -- there
5   is -- I'm being sued, again, on -- on something
6   that was agreed to with Mr. Seery and myself.
7   I don't -- I don't -- I don't own that claim.
8        Q.   Okay.
9        A.   To be transparent, I don't own that
10  claim.  So it is not my personal property.
11       Q.   Okay.
12       A.   And -- and being the nonlawyer, I
13  don't know how I can get sued for something
14  that I don't owe or, like, I don't own
15  anything.  I'm not the lawyer.  But, I mean, if
16  that is -- if I'm understanding the facts
17  correctly.
18       Q.   Okay.  And the lawsuit that was
19  filed that names you, that was just filed
20  this -- this past week; is that right?
21       MS. DANDENEAU:  Ms. Deitsch-Perez, I
22  do want to interrupt at this point because
23  just as I told Mr. Morris, that this is a
24  deposition about the noticed litigation.
```

Page 376

```
1        WATERHOUSE - 10-19-21
2        I really don't want to go -- go
3   afield --
4        MS. DEITSCH-PEREZ:  Yeah.
5        MS. DANDENEAU:  -- and open up a
6   whole new line of inquiry about the lawsuit
7   or the -- the motion and the bankruptcy
8   court.  We will be here all night.
9        MS. DEITSCH-PEREZ:  And I
10  understand.
11       Q.   My -- my point is:  Do you feel
12  like -- like there is some effort by these
13  parties related to the debtor to intimidate
14  you -- not that you -- I'm not saying you are
15  or you aren't.
16       But do you feel like there is some
17  effort to intimidate you and maybe an effort to
18  deter you from being as prepared as you might
19  be in this deposition?
20       MR. MORRIS:  Objection to the form
21    of the question.
22       A.   I was -- I was surprised by the
23  lawsuit, by me being named, because, again, I
24  don't own the asset and things like that.
25  Yeah, I just -- I want to move forward with my
```

Page 377

```
1        WATERHOUSE - 10-19-21
2   life at Skyview.
3        MS. DEITSCH-PEREZ:  Thank you.
4        THE WITNESS:  Thank you.
5        FURTHER EXAMINATION
6   BY MR. MORRIS:
7        Q.   If I may, I just have a few
8   questions.
9        Mr. Waterhouse, we saw a number of
10  documents that Mr. Rukavina put up on the
11  screen where Ms. Hendrix would send you a
12  schedule of payments that were due on behalf of
13  certain Highland affiliates.
14       Do you remember that?
15       A.   Yes.
16       Q.   And in each instance she asked for
17  your approval to make the payments; is that
18  right?
19       A.   Yes, she did.
20       Q.   And was that the -- was that the
21  practice in the second half of 2020 whereby
22  Ms. Hendrix would prepare a list of payments
23  that were due on behalf of Highland associates
24  and ask for approval?
25       A.   Yes.
```

Page 378

WATERHOUSE - 10-19-21

1
2    Q.    And I think you said that there was
3    a – a –
4        A.    It was – I think I testified to
5    this earlier when we talked about procedures
6    and policy, you know, again, I want to be
7    informed of – of – of – of – of any
8    payments that are going out.  I want to be made
9    aware of these payments, and that was just a
10    general policy, not just for 2020.
11    Q.    Okay.  So it went beyond 2020?
12    A.    Yes.
13    Q.    Is that right?
14    A.    Yes.
15    Q.    Okay.  And the corporate accounting
16    group would prepare a calendar that would set
17    forth all of the payments that were anticipated
18    in the – in the three weeks ahead; is that
19    right?
20    A.    I – like I testified earlier, we
21    had a corporate calendar that was set up, you
22    know, to – to provide reminders or, you know,
23    of anything of any nature, whether it is
24    payments or – or financial statements or, you
25    know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21

1
2    deadlines.
3        I don't know how, as I testified
4    earlier, how much they were using that
5    calendar.
6    Q.    Okay.  But – but you did get notice
7    and a request to approve the payments that were
8    coming due on behalf of Highland's affiliates.
9    Do I have that right?
10    MS. DANDENEAU:  Objection to form.
11    A.    I mean, generally, yes.  I mean, you
12    know, as we saw with these emails, generally, I
13    mean, did that encompass everything, no.
14    Q.    Okay.  Do you know why the
15    payment – do you know why there was no payment
16    made by NexPoint at the end of 2020?
17    A.    Yes.  There was – there was – we
18    talked about these agreements between the
19    advisors and Highland, the shared services and
20    the cost reimbursement agreement.
21        And in late 2020, there were
22    overpayments, large overpayments that had been
23    made over the years on these agreements, and it
24    was my understanding that the advisors were –
25    were talking with – like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21

1
2    to offset any obligations that the advisors
3    owed to Highland as offset to the overpayments
4    on these agreements.
5    Q.    Okay.  Did you participate in any of
6    those conversations?
7    A.    I did not.
8    Q.    Okay.  Do you know – do you recall
9    that the – at the end of November, the debtor
10    did notice to the advisors of their intent to
11    terminate the shared services agreements?
12    A.    Like I testified earlier, there
13    was – the agreements weren't identical, from
14    what I recall, and there is one that had a
15    longer notice period, which I think had a
16    60-day notice period.  I don't recall which one
17    that was, so not all of them were – notice
18    hadn't been given as of November 30th, for all
19    of the agreements.
20    Q.    Upon the receipt of the – the
21    termination notices that you recall, do you
22    know if the advisors decided at that point not
23    to make any further payments of any kind to
24    Highland?
25    MR. RUKAVINA:  Objection, form.

Page 381

WATERHOUSE - 10-19-21

1
2    A.    No.  The advisors – the advisors
3    had stopped making payments prior to that
4    notice.
5    Q.    Okay.  And how do you know that the
6    advisors stopped making – making payments
7    prior to the notice?
8    A.    I had – I had a conversation
9    with – with Jim Dondero.
10    Q.    And did Mr. Dondero tell you that
11    the advisors would no longer make payments to
12    Highland?
13    MS. DEITSCH-PEREZ:  Object to the
14    form.
15    A.    Yes, he – he – again, he said
16    they – they – the advisors have overpaid on
17    these agreements, to not make any future
18    payments, and that there needs to be offsets,
19    and they're working on getting offsets to these
20    overpayment.
21    Q.    Do you know if anybody ever
22    instructed Highland's employees to make the
23    payment that was due by NexPoint at the end of
24    the year?
25    A.    Did anyone instruct Highland's

Page 382

WATERHOUSE - 10-19-21

2  employees to make that payment?

3      Q.   Correct.

4      A.   Anyone – not that I'm aware.

5      Q.   Were any of Highland's employees

6  authorized to make the payments on behalf of

7  its affiliates – withdrawn.

8           Was any of Highland's employees

9  authorized to effectuate the payment on behalf

10  of NexPoint that was due at the end of the year

11  without getting approval from either you or

12  Mr. Dondero?

13      A.   They had the – they had the ability

14  to make the payment, but they didn't – you

15  know, that – that payment needed to be

16  approved.

17      Q.   Okay.  And it needed to be approved

18  by you or Mr. Dondero; is that right?

19      A.   I mean, I'm not going to make the

20  unilateral decision.

21      Q.   Is that a decision that you

22  understood had to be made by Mr. Dondero?

23      A.   Yes.  Sitting back in December of

24  2020, the – that – there was this off –

25  offset negotiation that – that was happening,

Page 383

WATERHOUSE - 10-19-21

2  so I mean, until those negotiations were

3  resolved, you know, there wasn't any

4  payments – there weren't any payments.

5      Q.   And – and there were no payments

6  until the negotiations were resolved because

7  that was the directive that you received from

8  Mr. Dondero; correct?

9      A.   I don't think he said – I mean, I

10  think – yeah, I mean – I'm trying to recall

11  the conversation.  It was – you know, there

12  is – there is these negotiations.  There's –

13  there needs to be these offsets.  They're

14  talking with the debtor.  So, you know, until

15  this is resolved, right, I mean, depending on

16  how, whatever that resolution was, were we to

17  take any action.

18      Q.   Okay.  How about with respect to

19  HCMS, did HCMS have a term payment due at the

20  end of the year?

21      A.   Again, I don't – I don't recall.

22      Q.   Okay.  You discussed briefly two

23  payments that were made in January of 2021, one

24  on behalf of NexPoint, and one on behalf of

25  HCMS.  Do I have that right?

Page 384

WATERHOUSE - 10-19-21

2      A.   No.  The two payments I recall were

3  NexPoint and HCRE.

4      Q.   Okay.  And those two payments –

5  thank you for the correction.  And those two

6  payments were made because Mr. Dondero

7  authorized those payments to be made; correct?

8      A.   Yes.

9      Q.   And they hadn't been made before

10  that because Mr. Dondero had not authorized

11  them to be made?

12           MS. DEITSCH-PEREZ:  Object to the

13  form.

14      A.   Yes, because of these negotiations.

15      Q.   Okay.  Just a couple of more

16  questions.

17           Did anybody, to the best of your

18  knowledge, on behalf of HCMFA, ever tell the

19  SEC that HCMLP was responsible for the mistakes

20  that were made on the TerreStar valuation?

21      A.   Did anyone from Highland on HCMFA's

22  behalf tell the SEC that Highland – that

23  Highland was responsible for there – I just

24  want to make sure –

25      Q.   It was a little bit different, so

Page 385

WATERHOUSE - 10-19-21

2  let me try again.

3      A.   These are very long questions, John.

4  I'm not trying to be –

5      Q.   That is good.  Do you know whether

6  anybody – do you know whether anybody on

7  behalf of HCMS – HCMFA ever told the SEC that

8  Highland was the responsible party for the

9  TerreStar valuation error?

10      A.   Not that I'm aware.

11      Q.   Okay.  Did anybody on behalf of

12  the – on behalf of HCMFA ever tell the retail

13  board that Highland was responsible for the

14  TerreStar valuation error?

15      A.   Not that I'm aware.

16      Q.   Do you know if HCMFA made an

17  insurance claim with respect to the damages

18  that were incurred in relation to the TerreStar

19  valuation error?

20      A.   Yes.

21      Q.   And do you know why they made that

22  insurance claim?

23      A.   Because there was an error.  I

24  mean –

25      Q.   Was the insured's claim made – was

Page 386

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   the insurance claim made under HCMFA's policy?
3       A.  Yes.
4       Q.  Did HCMFA at any time prior to the
5   petition date – withdrawn.
6           You were asked a couple of questions
7   where – where you said that Mr. Dondero told
8   you that he was ascribing zero value to the
9   notes as part of a pot plan because he believed
10  that the notes were part of executive
11  compensation.
12          Do I have that right?
13          MS. DEITSCH-PEREZ:  Object to the
14      form.
15      A.  Yes.
16      Q.  Okay.  Have you ever heard that
17  before the time that Mr. Dondero told you that
18  in the conversation about the pot plan?
19      A.  Had I heard that prior to my
20  conversation with Mr. Dondero?
21      Q.  Yes.
22      A.  No, I had not heard that prior.
23      Q.  Okay.  And that was in the context
24  of his formulation of the settlement proposal;
25  is that right?

Page 387

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2       A.  I mean, generally, yes.  You know,
3   we were asked to provide asset values, right,
4   and he was having settlement discussions.
5   Again, I don't know who those went to
6   ultimately.  I don't recall.
7           MR. MORRIS:  I have no further
8       questions.  Thank you very much for your
9       patience.  I apologize for the late hour.
10          MS. DEITSCH-PEREZ:  John, you stay
11      on about your email when –
12          MR. RUKAVINA:  Hold on, I'm not
13      done.
14          MS. DEITSCH-PEREZ:  Oh, okay.  Davor
15      still has questions.  Sorry.  I was going
16      to say both John and Davor, could you stay
17      on afterwards just to talk about the
18      requests.
19          FURTHER EXAMINATION
20  BY MR. RUKAVINA:
21      Q.  Mr. Waterhouse, you were just now
22  testifying about a discussion you had with
23  Mr. Dondero where he said something like no
24  more payments.
25          Do you remember that testimony?

Page 388

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2       A.  Yes.
3       Q.  Okay.  And was that late November or
4   early December of 2020?
5       A.  It was, I would say, first or second
6   week of November.
7       Q.  Okay.  Do you recall whether –
8   whenever you had that discussion, whether
9   Mr. Dondero had already been fired by the
10  debtor?
11      A.  Yes, I – I believe he was not an
12  employee of the debtor anymore at that time.
13      Q.  And when you were discussing this
14  with Mr. Dondero and he said no more payments,
15  you were discussing the two shared services
16  agreements and employee reimbursement
17  agreements we testified -- you testified about
18  before; is that correct?
19          MR. MORRIS:  Objection to the form
20      of the question.
21      A.  That is correct.
22      Q.  And had your office or you – and we
23  will talk at a future deposition about the
24  administrative claim.
25          But had – by that time that you

Page 389

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   talked to Mr. Dondero, had your office or you
3   done any estimate of what the alleged
4   overpayments were?
5           MR. MORRIS:  Objection to the form
6       of the question.
7       A.  Yes, we had – there was a – there
8   was a detailed analysis that was put together
9   by David Klos at the time.
10      Q.  And do you recall just generally
11  what the total amount for both advisors of the
12  overpayments were?
13      A.  It was in excess of $10 million.
14      Q.  Was it in excess of $14 million?
15          MR. MORRIS:  Objection to the form
16      of the question.
17      A.  I – I remember it was an
18  eight-figure number.  I don't remember
19  specifically.
20      Q.  Okay.  And did you convey that
21  number to Mr. Dondero when you had that
22  conversation?
23      A.  Yes.
24      Q.  What was his reaction?
25      A.  I mean, he wasn't happy.

Page 390

```
 1            WATERHOUSE - 10-19-21
 2    Q.   Is it fair to say he was upset?
 3    A.   Yes.
 4    Q.   Did Mr. Dondero ever expressly tell
 5  you to not have NexPoint make the required
 6  December 31, 2020, payment?
 7    A.   Yes, I recall him saying don't make
 8  the payment because it was being negotiated, as
 9  I discussed with Mr. Morris, this offset
10  concept.  So there were obligations due by the
11  advisors to Highland, they should be offset
12  that – you know, those obligations should be
13  offset by this – by this overpayment.
14    Q.   And when did he tell you that?
15    A.   I would say – I would say around –
16  probably December – December-ish.
17    Q.   Early December, late December?
18    A.   I don't recall with as much
19  specificity as – as – as – as stopping the
20  shared services payments, because we had
21  actually made one shared services payment in
22  November.  So that is why I need to remember
23  that one more clearly.  I don't remember where
24  exactly in December that conversation occurred.
25    Q.   Did Mr. Dondero expressly use the
```

Page 391

```
 1            WATERHOUSE - 10-19-21
 2  word "NexPoint" when he was saying don't make
 3  these payments?
 4        MR. MORRIS:  Objection to the form
 5    of the question, asked and answered.
 6    A.   Yeah, we were – we were discussing
 7  advisor obligations.  So it was – you know, it
 8  was just obligations from the advisors.
 9        And – and he specifically talked
10  about the NexPoint payment as well.
11    Q.   Okay.  And it is your testimony that
12  he expressly told you not to make that NexPoint
13  December 31 payment?
14        MR. MORRIS:  Objection, asked and
15    answered twice.
16    A.   Yes, he – he did, during that
17  conversation.
18    Q.   And did you ever follow up with him
19  after that about whether NexPoint should or
20  shouldn't make that payment?
21    A.   I did not.
22    Q.   Did you ever, on or about
23  December 31, 2020, remind him and say, hey,
24  this payment is due, what shall I – what
25  should I do?
```

Page 392

```
 1            WATERHOUSE - 10-19-21
 2    A.   I did not.
 3    Q.   So sitting here today, you – you
 4  remember distinctly that Dondero in December of
 5  2020 expressly told you not to have NexPoint
 6  make that payment?
 7        MR. MORRIS:  Objection, asked and
 8    answered three times.
 9    A.   Yes.
10    Q.   Can you say categorically it wasn't
11  just some general discussion where he told you
12  not to make payments?
13        MR. MORRIS:  Objection, asked and
14    answer four times.
15        MR. HORN:  Four times now.  Go for
16    five.
17    A.   Yes.
18    Q.   Did you tell Mr. Seery that?
19    A.   I don't believe I did.  I don't
20  recall.
21    Q.   And was this an in-person discussion
22  or telephone or email?  Do you remember?
23    A.   This was a phone – a phone
24  conversation.
25    Q.   Okay.  Would you have a record of –
```

Page 393

```
 1            WATERHOUSE - 10-19-21
 2  on your cell phone of when that conversation
 3  might have taken place?
 4    I'm sorry, strike that.
 5    Was that by cell phone?
 6    A.   I believe – yes, because we – I
 7  was at home.  I mean, I don't have a landline.
 8  All I have is my cell phone.
 9    Q.   Do you know whether your cell phone
10  still has records of conversations from
11  December 2020 on it?
12    A.   My call log doesn't go back that
13  far.
14    Q.   Okay.  Thank you.
15        MR. RUKAVINA:  I will pass the
16    witness.
17        MS. DEITSCH-PEREZ:  Just a couple
18    quick questions.
19            FURTHER EXAMINATION
20  BY MS. DEITSCH-PEREZ:
21    Q.   With respect to HCRE and HCMS, am I
22  correct there was – there was no direction not
23  to pay those loan payments?
24        MR. MORRIS:  Objection to the form
25    of the question.
```

Page 394

WATERHOUSE - 10-19-21

1

2   A.   Yes, I don't recall having

3   conversations about, you know, those -- those

4   entities.

5   Q.   And, in fact, what was the tone that

6   Mr. Dondero had when he talked to you about the

7   fact that HCRE and HCMS payments hadn't been

8   made when he found out that they hadn't been

9   paid?

10           MS. DANDENEAU:  Objection to form.

11           MR. MORRIS:  Objection to form.

12   Q.   What was the tone he took with you?

13   A.   Oh, it was -- it was -- it was -- it

14   was very negative.  I mean, I think he cursed

15   at me and he doesn't usually curse.

16   Q.   Okay.  And in your mind, is that

17   consistent with the fact that he was surprised

18   that those payments hadn't been made?

19           MR. MORRIS:  Objection to the form

20   of the question.

21   A.   Yes.

22   Q.   Okay.  Thank you.

23           MR. MORRIS:  I have nothing further.

24   Thank you so much, Mr. Waterhouse.

25           MR. HORN:  I have no questions.

Page 395

WATERHOUSE - 10-19-21

1

2   Thank you, Mr. Waterhouse.  We appreciate

3   your time.  I am logging off the discussion

4   and I will talk to y'all tomorrow.

5           MR. MORRIS:  Super.

6           VIDEOGRAPHER:  If there are no

7   further questions, this ends the

8   deposition -- excuse me.  This ends the

9   deposition, and we are going off the record

10   at 7:30 p.m.

11   (Deposition concluded at 7:30 p.m.)

12

13   _____

14           FRANK WATERHOUSE

15

16   Subscribed and sworn to before me

17   this      day of         2021.

18

19   _____

20

21

22

23

24

25

Page 396

WATERHOUSE - 10-19-21

1

2   C E R T I F I C A T E

3

4       I, SUSAN S. KLINGER, a certified shorthand

5   reporter within and for the State of Texas, do

6   hereby certify:

7       That FRANK WATERHOUSE, the witness whose

8   deposition is hereinbefore set forth, was duly

9   sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11       I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15       IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18   _____

19           Susan S. Klinger, RMR-CRR, CSR

20           Texas CSR# 6531

21

22

23

24

25

Page 397

WATERHOUSE - 10-19-21

1

2   NAME OF CASE:  In re:  Highland Capital

3   DATE OF DEPOSITION:  October 19, 2021

4   NAME OF WITNESS:  Frank Waterhouse

5   Reason Codes:

6     1.  To clarify the record.

7     2.  To conform to the facts.

8     3.  To correct transcription errors.

9   Page____Line____Reason_____

10  From_____to_____

11  Page____Line____Reason_____

12  From_____to_____

13  Page____Line____Reason_____

14  From_____to_____

15  Page____Line____Reason_____

16  From_____to_____

17  Page____Line____Reason_____

18  From_____to_____

19  Page____Line____Reason_____

20  From_____to_____

21  Page____Line____Reason_____

22  From_____to_____

23  Page____Line____Reason_____

24  From_____to_____

25

Case 21-03004-sgj    Doc 111-14    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 177-25    Filed 01/09/24    Page 189 of 200    PageID 35650
Exhibit 25    Page 102 of 131

Index: $1,406,000..2

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11
350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18
270:20 271:7,16
272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20
223:7 224:2 334:7,19
336:13,23 337:25
339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14
332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20
271:6 272:7 283:18
315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7
277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8
138:12 143:12 144:6,
17,23 272:16 273:6

**$7.8** 278:6,7

**$8** 277:16

---

**1**

**1** 8:9 35:17 139:22
140:12,13 215:25
216:3,7,12 238:8
260:20,23 261:15
328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15
198:2 266:20 267:3
302:7

**10-19-21** 3:1 4:1 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1

287:15 288:6,20
303:6,18,24 304:11,
20 305:23 306:2
307:7 308:20 310:17
317:6 318:14

129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1

297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12
122:12 135:21
261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3
350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13,
23 203:3 210:6
213:18 221:23

**15(c)** 5:21 160:11
169:21,23 170:4,8,10
171:6 175:3,9 176:23
179:20 184:5 195:9
210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19
110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

---

**2**

**2** 5:15 35:18 140:18
142:15,16,22 171:10

Case 21-03004-sgj   Doc 111-14   Filed 01/06/22   Entered 01/06/22 11:03:25   Desc
Case 3:21-cv-00881-X   Document 177-25   Filed 01/30/24   Page 190 of 200   PageID 35651
Exhibit 24   Page 103 of 131

Index: 2.4..780

172:8 174:13 179:4
195:11,14 215:22,23
216:3,4,5,8,25
338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13
87:8,20,24 89:15,16

**2017** 126:12 161:23
165:22 216:16
220:14 222:10 223:7
224:2,12

**2018** 105:19 109:14,
20 119:21 165:18
186:25 202:19 203:9
228:3,23 242:18,23
243:12 244:14,18
262:5,15 279:12

**2019** 6:4 21:7 98:17
99:25 103:2 125:18
126:2 131:10 132:6,
21 133:12 134:5,17,
23 137:6 138:12,20
139:18 140:14 141:5
142:18 152:18,25
165:15 180:24 181:4,
9,16,23 182:8,16
200:4,7 201:22
202:13,23 203:3,15
204:10 210:7 213:9,
19 218:21 219:7,12,
24 220:19,22 221:6
222:4,12 223:4,14
242:23 258:21
262:17 263:13,14,20,
24 265:3 269:5,24
270:12,18 271:3,14
272:4,15 273:4
279:12 280:10,20
282:23 287:4 293:19
299:4 301:2,8,16,18
313:3 314:13,23
315:19 316:14 321:6

**2020** 59:7,9 68:15
70:17 160:7,14,22
165:14 169:17,20
171:19 173:24 175:8
176:10 179:24 183:7,
14 186:12,14 189:13
195:20 196:3,17
200:24 204:20
207:16 221:11,16,21
258:20 265:6,11
307:24 314:21
316:16 323:10 326:4,
12,14 327:5,9 328:16
330:15 334:23 335:7
336:11,20 337:12
338:15,24 341:9
343:2 346:10 359:3
360:17,19 361:6,24
364:4 366:9,10
367:15,20 377:21
378:10,11 379:16,21
382:24 388:4 390:6
391:23 392:5 393:11

**2021** 8:19 14:8 19:5
37:2,10,19 38:2
70:21 71:3,5,12
121:13,22 122:19,24
163:2,7,8 165:5,9
166:2 173:18 176:24
187:3 198:21 199:7,
12,20 200:14 201:2
203:4,21 210:2,23
212:19 219:11,13,17
226:4 301:24 314:8
315:21 316:7,19
326:9 340:21 341:6
350:6,9 361:25
362:3,7 364:8 365:2
367:15 383:23
395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18
215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16
329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5
213:9 315:18

---

**3**

**3** 220:2

**30** 7:19 16:3 186:16
356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24
331:12 332:3 380:18

**31** 122:19 197:20,24
198:7,9 199:7,12
200:24 201:2 203:4
301:18,24 307:24
326:4 338:15,24
341:9 346:9,21 390:6
391:13,23

**3102** 4:7

**31st** 105:18 109:14
119:21 121:13
122:23 199:20
200:14 202:19 203:9,
21 212:19 216:16
218:21 219:7 221:15,
21 242:18 258:20
263:14 326:8,12,14
334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22
100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18
170:18,19 177:18
313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24
236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25
103:2 132:20,25
135:2 137:6 142:18
200:7 213:9 242:23
262:17 263:13 265:3
315:19

---

**4**

**40** 5:23 236:22,23
237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

---

**5**

**5** 268:22 271:15
282:14

**5.3** 121:3,6 124:17
308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

---

**6**

**6** 183:7 186:14
217:16,19 314:20
316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6
186:11 189:13

---

**7**

**7** 277:15,16 297:20
305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

Case 21-03004-sgj    Doc 111-14    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 174-25    Filed 01/09/24    Page 191 of 200    PageID 35652
Exhibit 25    Page 104 of 131

Index: 7:02..agreement

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18 73:5,6,8 342:14 344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6 124:3 204:15 272:6 327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10, 14

**accelerated** 339:4 347:7

**acceleration** 339:6, 10,15 340:13,17,24

**accept** 16:17 152:23 188:19

**accepted** 241:14 277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24 359:19,21 360:9,14 372:21 373:13

**accordance** 241:13, 25 242:4 254:10 256:21

**account** 287:17 328:6,9 359:14 360:6,14,22 367:22 371:9

**accountant** 21:17 25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4, 7,17 28:16 38:24 87:12,14,17 112:10, 11 148:23 149:2,14 150:14,19 188:11 200:17 230:16,18,21 240:19 241:14 257:22,24,25 258:12, 13 280:6 290:13 326:18,21 337:2,7 351:2 354:7,11,22 358:3 371:5 372:3 378:15

**accounts** 244:9 327:10,12,17,21 329:17 330:10,12,20 331:4 333:7 359:19, 22

**accuracy** 113:17 114:17 115:2

**accurate** 88:7,11,17 89:13,23 90:2,6 110:16 112:19 133:5 176:17 204:4 238:4 256:10 257:4 284:24 286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25 213:6,17 314:21

**acting** 23:23 24:2,3,8 28:5,8,12,18,20 29:5, 9,11 30:14,16,24 31:2,3,5 155:6,9,14 156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12 346:19,25

**actual** 115:21 311:25 312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7 263:4

**adjustments** 36:4 240:21 241:18 243:5 244:19 245:20

**administrative** 321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21 61:5,10 62:21 63:5 267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7 257:2

**advisor** 125:8,15 192:25 193:15 205:10 273:23 281:6 282:5 311:25 312:5,6 328:7 331:22,23 391:7

**advisor's** 337:17

**advisors** 3:17,18 9:21,22 22:22 27:10 29:10,12 32:18,20,25 33:24 39:2 42:21,22 44:6,7 58:8,14,15,18

125:3 126:10,13,16 127:10 152:14 160:10 167:13 168:19 171:14 172:18 175:7,13 178:11 179:18,21 183:7,18 184:15,19, 22 189:23 190:9,12, 19 191:2 192:25 193:8,19 194:3,21 195:10 196:8,22 205:7,12,23 206:14 208:4,7 210:5 213:22 215:14 235:9 267:24 268:16 279:19 280:2 286:18 308:4 325:15, 21,22 328:7,25 329:3 332:14 333:23 335:15 336:7 337:14 353:20 379:19,24 380:2,10,22 381:2,6, 11,16 389:11 390:11 391:8

**advisors'** 168:9 179:8,25 180:9 184:3 194:17 218:19 328:9

**advisory** 32:21 33:24

**affect** 371:17

**affected** 265:12 277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4 44:12,16 47:25 48:9, 22 49:5,6,10 51:17 54:17 57:19 58:3 60:14,21 61:4 62:9, 20 63:3,15,22 64:6, 10,16,24 65:18 78:18 93:21 94:6 100:25 105:8 107:2,13,21 108:3,7 109:10 131:2 171:14 220:6 225:6, 14,21 239:4 254:2 259:24 262:11 263:5 307:24 309:16,24 310:9 312:2,11,14,25 370:10

**affiliated** 134:6 285:17

**affiliates** 41:2,5,8,10, 13,14 44:4,11,15,25

45:13 46:3,9 47:18 48:7,13 54:2,11,13, 20,21,25 55:6,11,18 56:2,16,23 61:20 62:2 63:11 65:4 66:8 82:16,20 91:3 100:22 101:16 106:22 107:3 108:14,18 109:8,18 110:7 111:2,6,9,13, 23 112:18,24 113:19 115:4 117:24 118:7 119:4 120:20 121:4 176:9 233:9,23 234:10,16,21 235:4, 22 236:8 238:25 241:7 242:8 243:8 259:19 260:11 262:6 309:19 312:2,13 377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13 132:7 138:11 217:15, 19

**agree** 77:5 306:13,22 307:5,10

**agreed** 16:17 75:20 121:16,20 198:20 199:5,11,19 200:13 209:25 210:6 314:11 374:25 375:7

**agreement** 17:9 59:24 65:9,16,23 66:2,6 67:3,7,8,12, 16,22 68:4,9,12,17, 24 69:15,19,22 70:2, 7,11,16,20 71:18,24 72:4,7,10,13 75:4,5, 9,14,16,23,24 76:3,6, 7,10,14 77:6 78:15, 21,25 79:8,10,17,18, 24 80:5,6,11,16,20 81:6 82:9,17,22 83:7, 10,14,17,20,23 99:15,24 100:2,6 102:3,6 104:13,17,19 122:5 123:22 124:4 134:12 186:24 187:2, 16 189:2 200:13 210:22 212:17 278:23 279:18,20,24,

25 314:7 316:5,8,9,
13 326:3,13 332:8
351:4 365:22 379:20

**agreements** 58:16
77:24 83:4 168:9
186:10 279:4,6
325:24 353:22
379:18,23 380:4,11,
13,19 381:17 388:16,
17

**agrees** 243:25

**ahead** 68:22 82:6
156:20 164:10
212:25 248:12
295:12 329:11
352:10 364:23
378:18

**Aigen** 4:5 9:24 214:4
251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21
125:2 273:17 281:8,
23

**allowed** 62:8 81:23,
25

**alpha** 297:20 302:7
307:19 328:10
338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15
214:18

**amortizing** 334:13

**amount** 49:10,11
50:23,24 57:6 119:7
131:13 132:8 138:11
142:18 144:5,16
161:19,25 195:16
196:16 216:17
217:15 220:23
222:11 239:5 240:9
244:3 271:11 277:7
283:18 288:6 308:22
342:10 343:5,15,17
389:11

**amounts** 106:21,25
108:14 109:7,18
110:6 111:2,5,8,12,
23 112:18,24 113:18
114:19 115:3 119:3
120:20 121:4,11
125:8 126:6 161:8
168:3 171:12 174:15,
22 175:11 176:9
181:15 199:12 202:7,
22 203:7,13,19
204:11,16,25 205:12
211:11 212:10,18
217:19,21 222:3,11
234:23 235:3 275:13
282:8 283:2 285:10
288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24
241:3,6 261:11 262:3
265:7,8,17,18,19
389:8

**and/or** 42:8,16 43:3,
14 59:14

**annual** 26:10 84:17,
23 85:2,24 96:7
168:10 170:5,9 184:5
217:2 228:16 334:8
335:9 336:12

**answering** 248:7,8
262:23

**answers** 12:2 16:25
26:15

**anticipated** 311:20
378:17

**anymore** 294:24
388:12

**apologize** 30:10
40:22 78:14 99:22
104:12 125:21,24
139:2 170:2 192:14
197:19 226:17
227:17 304:14 352:8
354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24
56:6 59:17 60:12
162:5 168:4 294:13
316:14

**apply** 213:7 314:12,
22

**appointed** 18:21,24
24:14,19,25 25:8
29:11,15 270:4
323:9,16

**appointment** 152:24
153:4,16

**appointments**
227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5,
10 63:12,17,23
144:24 170:14 206:5,
16 271:17,22 272:13,
14 281:7 332:16
351:5 377:17,24
382:11

**approve** 56:21 57:2,
3,20 61:5,9 231:21
273:6 379:7

**approved** 57:5 60:20
231:14 271:12
294:21 295:6,18
333:4 382:16,17

**approximate** 17:22
23:15 27:24 30:19
36:23 38:15 120:15
161:24 216:17 277:7
310:5

**approximately** 8:20
15:13,20 19:23
109:15,19 110:7
119:23 126:12 169:7
173:14,15 178:19
220:12,24 221:3,7
238:9 277:10,15
278:6

**approximates**
118:13 121:6

**April** 152:18,25 200:4
202:13,23 203:3,15
204:10 210:6 213:18
301:16 314:21 323:6

**areas** 26:5

**Argumentative**
156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4,
9

**ascribing** 386:8

**Asia** 4:24 92:14
118:3 129:16 135:10
177:14 218:14

**asks** 97:12 171:10
172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6,
24 109:14 118:23
225:16,23 265:9
354:15 367:9 368:4
371:7,16,23 372:6
376:24 387:3

**assets** 5:23 107:14
108:10,13 109:20
110:8 122:3,8 137:14
190:3 194:2 195:17,
20 196:3,9,17 204:19
211:3 225:8 235:11,
15 237:20,23 239:13,
19 240:15 241:4,18
242:13 250:18
253:16,24 259:18
260:8,11,13 301:9
303:9 307:9 309:2
311:10 317:7 366:14
368:5 370:22

**assistant** 295:2
298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10
297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15
133:24 297:13

**assumed** 285:4,11
287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11
172:12

**attorneys** 3:4,11,17
4:2,10,16 147:21
187:6,11,15 188:3,7,
24,25

**attributable** 132:3
276:11 283:2

**audit** 26:11 48:5
52:23 85:24,25 86:9,
23 88:2,6,13,14,16
89:10,11,22 91:11,14
93:4,14 95:6 96:7,10
97:22 98:19 103:25
104:4 106:7,16,17
109:24 110:25
111:20 112:7,24
113:17 114:2,7
115:2,20 116:5
117:2,20 119:19
131:5 132:9,24 135:6
137:5,7,10,12,21
138:18 142:9,11
148:25 149:4 199:23,
25 200:6 218:7
219:4,5,12,15
221:11,14,20 243:12
244:18 263:24 264:8

**audited** 6:4 41:7
47:25 84:16,23 85:3,
19 90:2 93:24 95:14

Index: auditing..briefly

98:6 102:7,10 104:21
107:22 113:7 114:18
133:22 138:3,4,9
143:8 186:25 196:21
200:9,12 201:7 211:6
217:24 218:4,12,24
241:24 242:2,3,15,16
261:20

**auditing** 264:2

**auditor** 84:21 97:12
113:11 136:6

**auditors** 46:8 47:17
48:7,10 52:11,20
53:4,11,13 84:10
86:10 88:9 91:12
113:8 136:16 137:3
149:13 211:16
212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21
270:19 271:5

**authorized** 57:8
139:4 143:13,22
144:7,18 150:4
152:11 158:4,13,18
159:4,15,23 160:15,
24 181:3 320:16
363:2 382:6,9 384:7,
10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6
32:7 43:22 45:12
48:8,11 49:4,8 50:20,
25 51:5,8,13,18
53:24 57:6 61:7,19,
23 65:3,5 66:21 78:5,
15,22 83:15 85:10
93:8 102:5,14,16,22
103:5,16 107:20,23,
24 108:6 133:15,19
148:5 161:2,6,22,23
162:2,3,8 167:18,19,
24,25 168:7 181:6,7,
12,13,17,24,25
182:4,9,10,13,14,18
198:16 199:9,13,17
202:11,17,21 213:5,
13,15 220:17 223:3
226:3,6,7 261:3,5,7
263:12 267:7 295:23

338:22,25 339:3,5,6
343:18 347:5,8,25
348:6,13,14,17
372:24 378:9 382:4
385:10,15

---

**B**

**back** 20:14 36:17
40:22 50:2 61:24
71:11 73:2,7 75:17
89:17 91:10 92:9
93:11 95:18,20
125:19 140:14
141:12 151:2 160:6
174:20 183:8 185:19
192:23 202:3 205:19
207:2,5 209:6,13
215:20 224:20,25
226:18 243:22
263:23 265:5,15
266:7 273:21 280:3,5
282:13 283:22
285:16,21 286:20,24
292:23 293:19 299:4
301:21 302:23
305:16,20 306:3
313:3 324:6,12 325:9
326:15 332:13 333:9
343:6,16 344:18
347:3,4 348:25
349:8,10 350:2
354:16 365:20
372:16 382:23
393:12

**backed** 50:22 123:5

**background** 13:22
16:13

**backing** 189:9,15
190:10,12,19 191:3
193:20 194:20 205:8,
14,24 206:14,23
208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19
107:14,22,25 108:11
109:6 110:4,5 111:11
112:4 120:23 175:2,
8,14 179:17 196:25
220:2 222:21 228:22

229:3,8,16 230:5
243:7 251:14 253:22
370:22 372:6

**ballpark** 196:15
277:17 278:11

**bank** 142:12 261:23
306:5 327:10,12,17
328:6,9 360:5,14

**bankruptcy** 8:13
21:7 45:24 187:15
188:25 219:23
236:24 237:2,14,24
240:8 244:6,21
245:17 247:9,17,23
248:14,24 254:12
263:18,19 264:3,15
311:11 317:11 366:4
374:15 376:7

**base** 109:14

**based** 71:16 78:25
101:13 108:21,23
111:15 146:8,23
204:22 274:4 278:4
315:4 337:22

**bases** 228:13

**basically** 122:19
145:15 152:10
199:14,23 200:23
252:9 254:16,19
327:20 348:4

**basis** 16:18 19:4
47:10 84:18 110:3,
10,17,18 137:16
151:14 154:6 170:15
190:13 226:11 227:5,
20,25 228:13,16
241:17 266:22
288:12 358:7

**batch** 330:3

**Bates** 129:16,21
137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23
266:21

**begin** 11:22 12:2
266:18

**beginning** 202:5
249:9

**begins** 12:15 170:23
197:25 341:17

**behalf** 58:11 122:22
139:18 180:22 181:2,
7,13 182:17 201:13,
15 210:5 211:9 212:8
213:8 270:21 271:5
273:4 289:18,23
327:17 336:21
350:19 362:9 377:12,
23 379:8 382:6,9
383:24 384:18,22
385:7,11,12

**belief** 98:17 346:15

**believed** 143:22
161:7,17 175:22
246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8
358:13

**bill-paying** 358:14

**billion** 109:15 110:14
253:21

**billions** 253:24

**bills** 326:23 355:14
356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22
152:17 171:2,25
201:12 222:25
313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22
321:3

**board** 33:5,12 34:4
166:23 168:18,21,23
169:10,12,14,20
170:12,13 171:7

175:3,8,15 176:22
178:7,13,17,23
179:8,12,15,19,25
180:8,23 182:6,15
184:4,8 185:14
189:7,14,19 190:4,
14,18,21 191:2,8,13,
16,20 192:3,8 193:3,
18 194:12 204:18,23
205:6,22 206:12,13
209:16,19,21,24
210:6,20,22 233:7,
13,16 281:7 323:8,16
348:3 385:13

**board's** 174:13
175:23 176:18 179:3
194:17 195:10
210:11

**boards** 33:8 160:8
171:19 181:2,8,14,
19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23
235:16 237:15
240:11,14 257:21
258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24
128:5,23 129:2,5

**borrower** 272:7
273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5
129:25 143:3 170:21
221:24 224:4 329:5
330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20
73:10 74:4,14 139:25
150:22 151:5 224:19
265:24 266:2 324:22,
25 327:3

**briefly** 383:22

Index: bring..company

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17
248:13 374:9

**build** 107:7 108:22
260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10
229:22 332:10,11

———————

**C**

**calculate** 275:11
276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7
378:16,21 379:5

**call** 46:14 55:2 68:6
70:3 154:8 167:4
191:14,15,24 192:2
290:19,25 350:15
364:21 393:12

**called** 16:10 22:21
27:10 29:25 31:8
32:4 81:9 115:3
130:3 227:2,19
228:21 273:18
278:22,24 315:20
342:8,24 343:2,16
351:10 362:8

**calling** 344:18

**calls** 45:17 46:10
55:21 107:5 126:4
268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23
129:18,23 135:12,16
177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25
21:3 24:17 26:22
65:10 97:15 143:25
174:3 232:4 258:25
270:25 285:24
295:18

**Capital** 3:4,18 8:11
9:6,22 10:22 11:7
15:16,23 18:7 22:21
30:2 41:18 42:10,18,
21 43:11,16 44:6
58:15,17,20 70:21
109:23 110:9 125:3
127:12 133:10
152:13 172:14
215:14,17 271:3
279:18,19 280:2,3
308:4 325:22,24
330:16 354:19
359:16,18 360:7,8,13

**capture** 107:10
130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18
47:9 114:14 144:14
223:12

**carried** 107:14,18,21
109:6,11 233:5 243:6

**carrying** 118:13,25
120:2,4,12,14 262:8
263:7,16 265:2

**case** 7:21 8:14
208:15 248:15
301:14 339:25

**cash** 57:3,4 121:12
335:17,18,22,23
336:7 337:13,14,16,
17 360:5 361:12,14

**categorically**
392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24
109:6

**caused** 263:3,14
277:3,19 280:12
359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3
152:2,5,10,13 159:19
183:11 270:4

**certificates** 21:21
154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17,
21,24 19:3,14,25
21:3 39:10,15,19,21,
23 40:3,4,9,12,25
42:5 43:10,23 44:25
46:7 47:16,24 49:17
50:10 51:10,15,20,25
53:9 55:16 60:23
61:21 62:4,8 84:20
85:12 86:3,19,24
88:10,15 90:15 94:4,
23 95:7,15 100:17
107:11 111:16 114:5
133:7,10,16 176:14
202:11 203:25
225:17,20 226:8
227:6 229:23 230:14,
18 240:7,14 243:4
247:7,23 248:24
255:7 269:2 285:24
287:14 288:7 295:19
339:24

**chain** 341:17 342:7
350:14

**challenges** 12:21

**change** 28:7,11,17
93:7 187:7,16 189:2

229:11 240:6 248:17
261:24,25 262:2
264:3 265:10 343:20
371:22

**changed** 20:6 28:11
189:10 194:13
206:24 207:6,7,9
208:2,3 263:18
264:17 323:2

**characterized**
247:12

**chat** 81:25 92:12
105:2,5 135:17
177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24
27:5 120:8 184:22,24
258:25 270:9,13
271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances**
71:15 231:6 240:6
241:10 261:23,24
262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25
374:9 375:8,11
385:17,22,25 386:2
388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22
55:5 75:16 81:2
156:2 188:21 214:17
238:17 302:6

**client** 74:5,10 75:19
269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21
230:2,23 232:8,20
233:3 298:2,12

308:24 372:10

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10,
15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2
54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22
193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25
54:11 181:22

**commencing**
203:20

**comment** 252:23
367:22

**common** 299:4,5

**communicate** 64:3

**communicated**
114:9 211:15,25
254:21 292:17
319:19 368:8

**communicating**
365:13 366:3

**communication**
87:6 207:23 350:8

**communications**
66:19 71:13,14
116:16 322:7 367:14

**comp** 78:10

**companies** 42:7
285:17

**company** 27:9 29:25
31:7 247:8 273:18,

Case 21-03004-sgj   Doc 111-14   Filed 01/06/22   Entered 01/06/22 11:03:25   Desc
Case 3:21-cv-00881-X   Document 174-25   Filed 01/09/24   Page 195 of 200   PageID 35656
Exhibit 24   Page 108 of 131

Index: compared..COVID

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:17

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

Case 21-03004-sgj    Doc 111-14    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X    Document 174-25    Filed 01/09/24    Page 196 of 200    PageID 35657
Exhibit 24    Page 109 of 131

Index: COVID-19..Deitsch-perez

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness**
303:19

**Crescent** 294:10

**CRO** 254:13,14
256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8
250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14

---

**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8
8:14 9:20

**damages** 385:17

**Dandeneau** 3:12
7:23 9:8 13:10 14:25
16:9 17:7,18 20:4,20
22:14 25:15 31:16,
20,24 33:9 34:20
36:8,12 40:10 41:4,
12,24 42:11 43:17
46:18 47:3,7,12 50:7
52:8 53:18 54:8
55:10 56:11,25 58:25
59:19,25 60:7,15

61:12 62:11 63:13,24
64:19 65:12 66:14,24
67:17 69:5 72:15
73:12,21,24 74:8,12,
17 75:6,10,13 77:9,
14,21 79:4,14,20
80:12 82:5,11,24
83:25 85:15 86:2
91:4,8,22 92:11 94:3
96:11,20 99:17
104:25 107:15 108:5
110:11 111:24
112:20 113:20
114:20 115:5 117:6,
18 119:12 120:16
122:10,16 124:6,23
127:19 132:16 134:8
135:8,18 143:10
144:8 146:20 149:5
150:10,17 151:13
153:18 154:14
155:11,18,20,23
156:10,16 157:2,6,
11,15,24 158:15
159:17 160:3,12,18
163:24 167:5 168:8
177:15,20 178:20
180:3,11 181:5,11
183:15 184:6,20
185:2,18,24 193:21
194:5 195:21 196:13,
18 200:20 203:23
205:3,15,25 206:21
208:10 210:24 211:4,
13 212:22 213:11
216:2,9 220:10,15
222:13 225:10,24
228:9 229:24 231:18
234:6 235:23 236:10,
18 239:3,14,22
240:16 242:24
246:19,25 247:14
250:11,22 251:3,12
253:12 254:6 255:12
257:6,20 260:14
263:8 265:4 266:3
269:10 285:23 286:7
295:11 298:6 299:15
302:25 305:10 307:2
312:18 317:23
333:20 336:14 338:5
339:20 341:2 347:21
348:11 349:11,17,18
350:3 352:18 375:22
376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20
21:10 56:18 70:12
84:11 98:18 103:14
104:4 106:4 131:11
133:2,12 136:10
186:15 226:7 235:10,
14 239:17 241:20
262:15 263:20
310:15 314:22 315:6,
7 323:8 326:8 329:18
332:2 356:24 369:13
372:6 386:5

**dated** 92:2 106:10
132:20 142:18
152:17 200:3 203:2
213:18 216:16
220:14 228:3,23
258:20 262:23

**dates** 30:17 178:8
321:14 326:7 355:25
357:11

**Dave** 87:20 172:6
230:19 292:3,4,11

**David** 124:9 275:23
389:9

**Davor** 3:20 9:19
178:10 266:15,17
304:8 336:15 387:14,
16

**day** 106:10,13,16
134:20 187:8 226:4
321:23 329:21,23
332:4,10,11 342:16
343:24 350:12 353:5
395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate**
344:24

**de-accelerated**
345:18

**deadlines** 86:9
379:2

**deal** 74:25 219:18
224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8,
12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15,
25 255:17 270:14,21
271:2,6 278:16,17
279:6 280:21 310:18
325:13,14 326:14,22
327:15,20 331:3
333:7,15 335:2,8
336:22,25 350:22
364:18 372:20 373:3,
15,16,18,25 374:9,
15,16 376:13 380:9
383:14 388:10,12

**debtor's** 233:7
239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12
105:18 109:14
119:21 202:19 203:8
218:21 219:7 221:15,
21 242:17 258:21
263:14 326:4,11,12,
14 327:4,9 330:15
332:11 334:15
338:15,24 341:9
343:2 346:9,21 359:3
360:17,19 361:6,24
364:4 382:23 388:4
390:6,16,17,24
391:13,23 392:4
393:11

**December-ish**
390:16

**decide** 254:25

**decided** 245:5
318:13 380:22

**deciding** 56:13,17

**decision** 121:24
122:2,21,22 245:2,8
340:9 382:20,21

**decisionmaking**
254:14

**declared** 182:7,12

**deduce** 309:23,24
310:6

**deemed** 53:2 94:19
109:9,10 113:11
131:6 244:16 245:24
246:6,16,24

**default** 182:7,12
341:6,7,10 345:5
346:9,20 347:6
363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23
201:4,7,21

**deferred** 203:3
366:23

**define** 32:9 33:21
101:6

**defined** 33:13 45:13
51:17 53:13 54:2
99:15 173:2

**defining** 44:16 69:8
109:21

**definition** 42:24 43:2
53:16 54:18 69:15
75:20 77:6 100:25
101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4
5:8,11 9:12,13 10:2
17:8,13 29:20 42:12
46:12 50:5 60:16,24
64:17 65:19 66:10
67:9,24 69:6,10,13
76:15,17,21,24 78:19
79:25 81:16,20,22,24
97:4 107:16 115:6
117:7 119:13 120:17
144:25 146:12 147:4,
11 148:12 149:21
153:19,25 154:7

Case 21-03004-sgj   Doc 111-14   Filed 01/06/22   Entered 01/06/22 11:03:25   Desc
Case 3:21-cv-00881-X   Document 175-24   Filed 01/09/24   Page 197 of 200   PageID 35658
Exhibit 24   Page 110 of 131

Index: Delaware..Dondero

159:25 160:19 177:6,
17 178:3 180:4,12
191:4,22 194:6,22
195:22 196:4,11
202:24 205:16 206:7
208:11 209:8 212:12,
20 214:9,13,16,22
215:5,11 216:11
220:25 227:21 231:8
232:9 238:10 239:20
242:25 247:15 248:2,
8 249:4,17 251:10
252:6,9,20,25 254:7
255:10,22 256:17
262:18 301:19
324:24 336:15 348:9,
23 349:21,24 352:6,
11,20 353:2,17,23
375:22 376:4,9 377:3
381:13 384:12
386:13 387:10,14
393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7
235:20

**delved** 251:19

**demand** 121:11,17,
21 122:4,7,9,15,19,
23 123:23 124:4
134:13 140:17
142:21 182:15
186:18 187:3,17
198:21 199:6,11,19
200:14 202:18,22
205:19 209:25 210:7,
23 212:18 301:17
313:16 314:8 315:2,8
316:6,17,18

**demandable** 316:19

**demands** 122:14
364:13

**department** 146:10
147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4
164:4 383:15

**depends** 41:20
57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11
8:10,16 11:2,15,18
12:7,15,22 16:15,23
33:23 72:21,23
73:10,15,20 74:6
76:8 77:12 81:3
123:17 151:6,9 215:6
227:15 266:21 267:4,
13 365:20 373:2
375:25 376:19
388:23 395:8,9,11

**depositions** 11:19
12:19

**derived** 16:6 17:23

**describe** 56:4 84:3
111:21 326:15 353:7
358:3

**describing** 125:17
126:2

**description** 108:21,
24

**desk** 293:9,10 295:25

**detail** 107:7 120:25
153:8 159:20 222:22
229:14 278:11 300:6
311:18 351:19
369:20

**detailed** 122:20
132:12 179:23 224:9
230:7 260:5 276:18
370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12
80:8 84:7 104:16
131:25 286:3,22
299:12 300:8 342:12
343:7

**deter** 376:18

**determination**
41:25 42:4 261:18,19

**determine** 53:19
82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development**
347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12
205:19 207:18
222:25

**diligence** 85:5,8,13
169:11

**direct** 113:22 253:6
304:19 322:10

**directed** 57:17

**direction** 237:6
254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7
17:23 19:8 42:7,15
43:14 88:2 177:11
219:2 354:9

**director** 23:6 32:15
39:25

**directors** 15:22 72:7

**disagree** 318:5,16,
21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17
52:11 53:10 88:13
91:12 94:6 99:14,20,
23 103:2 111:21
112:3 113:8 179:12
210:12,15 242:21

**disclosed** 48:7,9
52:19 53:4 93:24
94:18 102:3,7,13,18
103:8,10 113:12
117:13 130:10
133:21 134:3 138:8
190:25 212:4

**disclosure** 100:12
134:12,16 185:15

191:20 211:21,23
262:11

**disclosures** 91:2
94:16

**discovery** 81:4
196:21

**discuss** 99:3 124:2
148:18 201:18,20
322:14 342:7 343:22
345:7

**discussed** 26:18
73:23 74:11 80:14
107:9 114:25 192:12
193:23 227:12 234:4
272:20,23 275:3,4
294:5 300:11,13
371:15 383:22 390:9

**discussing** 117:25
148:22 180:8 191:6
217:18 234:9,15
300:17 319:7 341:6,
8,22 346:4 388:13,15
391:6

**discussion** 164:4,9,
12,17 180:19 191:9
217:21 246:4 249:24
251:20 282:18,21
290:6 319:13 342:15
387:22 388:8 392:11,
21 395:3

**discussions** 58:20
233:6,15 249:11
250:4 251:13,19
253:17,20,25 263:25
264:14 274:5 275:17
280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13,
16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25
52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14
239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6
91:19 92:5 96:3
103:18 104:23 105:5,
10,16 136:11 139:22
140:8,12 141:4,10,16
144:3 147:16 151:22
153:6,15,22,23,24
154:5,11,18,24 155:3
156:24 159:21
197:13,14,16,17,25
198:12,15,17,23
199:3,4,10,14,17,25
200:3,18,22 201:3,6,
15,18 202:4 203:2
209:14,16,22 210:12,
15 211:24 212:4
213:21 214:3,6,12,
15,17,20,24 215:7,13
216:7 226:10,25
227:8,19 228:6
236:16,19 237:18
239:17 244:5 256:5,9
293:21,22 301:16
302:12 303:7 305:12,
21 320:14,16 338:14

**documents** 12:24
13:12,14,16,19 25:5
123:15,17 126:19
140:10 143:24
147:20,25 149:12
153:8 159:15 197:2
227:13 235:19
236:25 266:19 267:3,
7,9,14,18 291:9
294:2,4,6,8,11,14,17
296:21,22 322:11
364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24
260:19

**Don-** 68:19

**Dondero** 4:2 9:14
15:6 16:8 17:24 19:8,
12,25 20:9,13,18,24
21:4 42:9,17 43:15,
24 44:3,5 50:11,14,

Case 21-03004-sgj    Doc 111-14    Filed 01/06/22    Entered 01/06/22 11:03:25    Desc
Case 3:21-cv-00881-X   Document 24   Filed 01/09/22   Page 198 of 200   PageID 35659
Exhibit 14    Page 1190 of 1431

Index: Dondero's..ensure

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,22 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:23
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 311:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**easier** 305:5 373:13

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 118:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 242:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

348:4

**ensuring** 327:20

**enter** 122:21

**entered** 67:7 68:25
104:14,19 122:6
124:5

**entire** 19:7 192:13
253:19 264:4

**entirety** 130:12,15

**entities** 16:7 17:23
43:13 44:3 54:21,25
55:4 101:8,15 189:8
278:2 289:19 330:13
361:13 394:4

**entities'** 265:12

**entitled** 41:8 82:7
110:25 157:16

**entity** 15:5 22:20,25
27:18 31:11,23 32:3,
6,11 42:14 109:24
137:13 272:3 289:23
302:22 307:8

**entries** 240:19

**entry** 131:10 308:3,
14 311:9 332:23

**environment** 90:3,5,
9,14,20 113:6
137:18,20

**environments**
207:21

**equal** 49:11 50:23
262:7

**equaled** 263:7

**equals** 119:6,9

**equity** 273:18 281:25
282:3

**erroneously** 197:22

**error** 125:6,9 131:17,
24 132:3 145:8 165:9
213:12,14 214:5
273:11,14 275:14
276:8,25 277:5
278:5,15 280:12,22
283:3 289:6 318:15
385:9,14,19,23

**errors** 163:21 167:14
373:10

**Esq** 3:6,7,12,13,20,
21 4:4,5,11,18

**established** 94:2
285:14,20 300:25
301:7 310:16

**estate** 31:12,17
235:11,15

**estimate** 20:12 372:4
389:3

**et al** 5:15

**evaluate** 170:12,14

**evaluated** 244:10

**evening** 353:3

**event** 131:2 134:22
138:9 143:9

**events** 103:13
125:16,25 130:4,10,
21 133:8 138:5
242:22 262:14 263:4
370:24 371:7,9,13

**exact** 15:24 17:25
18:13,18,19,22 20:5
30:17 131:20 156:21
274:13 277:17
278:10

**EXAMINATION** 5:6,
7,8,9,10,11 10:14
266:13 352:25 377:5
387:19 393:19

**examined** 298:19

**exceed** 121:12 190:2
195:19 196:3

**exceeded** 93:25
194:2 196:9,17
204:19 211:3 301:9
303:9 307:9

**Excel** 368:19

**exceptions** 231:2

**excerpts** 238:16

**excess** 94:6 121:12
389:13,14

**exchange** 45:15
212:17 281:17,23

**exchanged** 45:21

**exchanges** 281:17

**excuse** 14:25 35:23
201:2 249:18 280:9
323:13 395:8

**execute** 48:14,22

**executed** 49:21
142:10 161:12 221:6
274:2 293:14 303:7

**executing** 317:16

**execution** 181:9
300:14

**executive** 35:10,11,
16 36:20,24 37:5,18
38:3,4,9,14,16,21
39:3 78:10 366:24
367:18 386:10

**executives** 369:3

**exhibit** 5:15,16,18,
20,21,22,23,25 6:2,4,
7,8,9,10,11,12,13
13:13 91:20,21
104:23,24 135:8,14,
15 140:12,13 142:15,
16 151:20,21 170:18,
19 197:3,9,15 198:2
214:7 215:22,23,25
216:3,4,5,7,8,12
218:13,16,17 226:23,
24 236:16,23 237:19
258:18 297:23 302:7,
8 303:14 305:5 306:7
307:18,21 309:2,6
313:9 317:12 328:10,
12,13 338:13,21
341:13,14

**exhibits** 267:10,11
268:9

**exist** 15:12 16:17
114:22

**existence** 67:15
69:18 80:16 81:6
99:14,20,24 102:3

**exists** 278:13

**expanding** 354:25

**expect** 247:19
293:19 333:15

**expectation** 231:5

**expected** 200:17,21
293:21

**expects** 203:18
212:9

**experience** 101:14
111:16 116:14
169:10 256:25 257:8
259:13 315:5 337:22

**experienced** 47:13

**expert** 43:5 143:19
153:7 183:9 257:14

**explain** 356:18

**explained** 364:17

**explaining** 163:15

**explanation** 308:20
311:8

**expressly** 390:4,25
391:12 392:5

**extended** 301:17
308:21 314:22

**extension** 307:8

**extent** 45:17 55:21
66:15 107:5 126:4
208:6 244:15 296:6
322:6

**extra** 219:23

---

**F**

**face** 50:23 120:11
144:16 244:3

**face-to-face** 293:8
294:5

**facilitated** 321:10

**fact** 62:7 192:20
236:21 264:24
266:25 275:7 298:4
301:15 313:19
334:22 338:23
341:10 343:19
363:12 394:5,7,17

**facts** 111:22 240:6
261:25 265:8 375:17

**factual** 164:9

**fail** 12:3 348:5

**failed** 338:23 340:2

**fair** 11:23 19:24 44:14
49:7 52:4 93:17
99:13 110:21 118:11,
21,24 119:6,8,9
120:3,15 121:5
126:8,21 141:18
143:23 149:20 224:6
239:16 240:18,21
241:17 242:6 243:5
244:13,20 245:19
260:10 261:15 262:7
263:5,15 264:25
287:21 370:21
371:18 372:5 374:10
390:2

**faith** 189:8,15 190:9,
12,19 191:3 193:19
194:20 205:8,14,23
206:14,23 208:5

**familiar** 22:20 31:22
32:3 54:6,9 226:13
227:8,18 274:6

**fashion** 86:11 276:16
357:14

**fault** 229:17 276:24
277:19

**favor** 60:6 62:19
139:17 161:24 261:9

**feature** 301:17 315:8

**February** 70:21
226:3,4 228:3,23
323:9

**Federal** 7:19

**feel** 81:8,18 176:25
273:13 287:16
371:21 376:11,16

**fees** 332:12 356:21,
23

**fide** 369:25

**figure** 343:10 366:12
367:5

**file** 167:8,13 297:2,10
337:8

**filed** 21:6 197:17
208:18 213:23
215:13 219:23

Index: files..funds

226:16 237:2,24
238:4 244:5 255:17
263:17,19 311:10
322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17
246:3 249:9 256:20
264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12
230:23

**finance** 25:21 26:2,4,
8,17 28:15 38:23
127:25 128:16 129:6
280:7 290:14 351:3

**financial** 5:18 6:2
14:12 26:24 27:5
41:7 48:2 84:17,23
85:3,13,19 88:11
90:2,7 93:24 95:14
96:7 100:12 102:7,
10,12 104:21 105:17
107:22 112:2 113:7,
14 114:18 120:8,18
122:11 130:23
133:22,25 135:20
138:3,4,9 143:8
176:21,24 179:16,23
180:15 196:22 201:8
211:7,21 217:24
218:3,19,24 219:6
221:14 222:24
224:10 235:17
241:24 242:3,15,16
254:9 258:25 260:3
261:20 262:5 264:11,
13 270:10,14 271:2
286:18 301:11
302:19 306:4 311:25
312:5,6 370:9,12,17
378:24

**financials** 6:5
137:16 168:19 176:8,
16 179:8 186:15,16
187:2 189:23,25
200:10,12 218:12
241:13,15,21 242:2
246:9 247:5

**find** 53:23 268:10
283:17 315:4

**fine** 36:8,9 45:10 84:8
154:12 269:16 287:2
353:24

**finish** 11:21 12:2
76:18,24 249:19
295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6
131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25
152:10 197:23 293:5
321:15

**follow** 61:17 151:15
391:18

**follow-up** 171:7

**footnote** 244:8
260:20,23 261:15,17
371:22

**footnotes** 261:17
263:11

**forbearance** 134:5,
16

**forgave** 49:23 51:23
52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20
52:5 284:9

**forgiven** 52:18 53:11
94:11 366:23 367:23
369:13

**forgiveness** 52:22
93:23 94:8 365:23
369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14
25:15 29:21 31:16
33:9 34:20 40:10
41:4,12,24 42:11,12

43:17 50:6,7 52:8
53:18 54:8 55:10
56:11,25 58:25
59:19,25 60:7,15,17,
25 61:12 62:11
63:13,24 64:18,19
65:12,20 66:11,24
67:10,17,25 69:7
75:6,10 78:20 79:4,
14,20 80:2,12 82:24
83:25 85:15 86:2
91:4 94:3 96:11,20
97:5 99:17 107:15,16
108:5 110:11 111:24
112:20 113:20
114:20 115:5,7
117:6,18 119:12,13
120:16,17 122:10,16
124:6,23 127:19
132:16 133:23 134:8
142:5,7 143:10 144:8
145:2 146:13 147:5,
12 149:5,22 150:10,
17 153:18,19 154:2,4
155:11 156:17
158:15 159:17 160:2,
3,12,18,20 167:5
168:8 178:21 180:3,
5,11,13 181:5,11
183:15 184:6,20
185:2,18,24 191:5,23
193:21 194:5,6,23
195:21,22 196:5,12,
13,18 200:20 201:25
202:25 203:23
204:14,23 205:3,9,
11,15,16,25 206:8,21
208:10,12 209:9
210:24 211:4,13
212:13,21,22 213:11,
25 220:10,15 221:2
222:13 225:10,24
227:22 228:9 229:24
231:9,18 232:10
234:6 235:23 236:10
238:11 239:3,14,21,
22 240:16,23 242:24,
25 246:19,25 247:14,
15,16 248:4 249:5
250:11,22 251:11
253:12 254:6,7
255:11,23 256:18
257:6,11,15,20
260:14 262:19 263:9
265:4 269:7 270:15,
22 271:8,18 272:9,17

273:7 277:22 278:19
279:8 280:15,23
283:19 284:7,14
285:7,23 286:8,9
287:9,18,24 288:8,25
289:12 290:9,21
291:23 292:19
293:15,23 296:13
297:6 298:22 299:15
300:15 302:2,25
303:2,10,20 305:10
306:15,24 307:3,13
310:2,11,19,24
311:12 312:16,19
314:14 315:9,23
316:23 317:17,24
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:3
342:21 345:12,19
346:22 347:14,19,21
348:10,11,12 351:15
353:11,15 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 365:6
366:15,25 367:16,25
369:4,8,17 370:3,25
371:10,25 372:22
373:4,20 374:11
375:3 376:20 379:10
380:25 381:14
384:13 386:14
388:19 389:5,15
391:4 393:24 394:10,
11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17
376:25

**found** 53:17 66:12
125:6 140:15 394:8

**Frank** 5:5 8:10 9:11
10:11,18 271:4 305:8
395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18
329:18,25

**front** 110:12 122:12
140:16 279:21 281:7
294:9 301:11 302:9
305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9,
12,19 191:2 193:19
194:19 205:8,14,23
206:14,23 208:5
241:15 372:20

**fully** 13:4,7 17:4
364:19

**fulsome** 265:8

**function** 26:8,20
28:16 87:3 89:4
351:3

**fund** 3:18 9:22 22:21
33:23 35:2,6,18,19,
21 39:7 42:22 44:7
58:15 125:2,3,6,7,10,
11 127:10,13 145:16
152:14 176:18
202:14 203:14
215:14 273:17,23
274:16 275:2,4,6,8,
10,13 276:7,9,10
277:5,9,21 279:19
280:2 281:2,9,10,11,
12,13,15,20,23,25
282:7 283:23 308:4
325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2,
4,8,12,15,16,18,22
34:5,8,13,18,23
35:12,15,17,18
36:21,25 37:4,9,17
38:2,5,10,17,22 39:4
145:15 160:8 168:10
171:15 173:2,6,10,