Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S REPLY IN SUPPORT OF ITS
## SECOND MOTION FOR LEAVE TO AMEND ANSWER

TO THE HONORABLE STACEY G. C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P. ("HCMFA"), the defendant in the above styled and numbered Adversary Proceeding, and files this its *Reply* in support of its *Defendant's Second Motion for Leave to Amend Answer and Brief In Support Thereof* (the "Motion"), replying to the objection to the Motion filed by Highland Capital Management, L.P. (the "Debtor"), the plaintiff in this Adversary Proceeding, respectfully stating as follows:

## I.   <u>SUMMARY</u>

1.      It is a fact that Mr. Waterhouse did not sign the Notes.  Whether he authorized Ms. Hendrix to sign them electronically for him is a separate matter.  It is also a fact that this was not learned until October 25, 2021, when the Debtor finally produced the originals of the Notes.  It is also a fact that HCMFA requested the production of those originals in May, 2021 and that, as late as October 19, 2021, the Debtor was refusing to produce the same.  Any delay was caused by the Debtor.  The only issue is whether leave to assert an affirmative defense more expressly—that the Notes were not signed by Mr. Waterhouse—should be granted.  Since Mr. Waterhouse did not sign them, and since the Debtor is responsible for any delay, leave should be freely granted.  The Debtor's arguments in response do not address these discrete issues, but rather seek to try the underlying facts and allegations—something that cannot be done on a Rule 15 motion.  And, the Debtor's arguments of prejudice are without merit: HCMFA informed the Debtor that it would be asserting this defense *before* the Debtor ever indicated any intention to seek summary judgment, and HCMFA filed its Motion weeks before the Debtor actually sought summary judgment.  Likewise, the alleged need to take additional depositions is wrong.  The only two individuals with knowledge of these facts have already been deposed and asked about these precise issues at length.  There is therefore no "substantial reason" to deny the Motion.

## II.   <u>REPLY</u>

### A.   <u>No Undue Delay; Any Delay Was Solely the Debtor's Fault</u>

2.      The Debtor asserts that HCMFA delayed with respect to its affirmative defense that Mr. Waterhouse did not sign the Notes.  It did not.  Any delay is due solely to the Debtor's unexplained and unreasonable refusal to produce the originals of the Notes for almost five (5) months and until *after* the parties deposed Mr. Waterhouse.  As late as October 19, 2021 and while

Mr. Waterhouse was being deposed, the Debtor was refusing—without explanation—to produce the originals of the Notes. *See* Motion at ¶ 4(ii)-(v).[1, 2]

3.      Even so, there was no delay.  As HCMFA has always explained, HCMFA did not know anything about the Notes.  *See* HCMFA App. 4.  When this Adversary Proceeding was filed, HCMFA was prevented from discussing the Notes with its own officer and with Debtor employees who knew some of the relevant background.  *See id*. at 5 (¶¶ 14-21).  Only after the Debtor terminated most of its employees and HCMFA was able to talk to former employees did HCMFA learn that the Notes were executed in error.  *See id*.  HCMFA promptly asked Mr. Waterhouse whether he signed the Notes and, at that time, having signed many, many documents over the

---

[1]      Contemporaneously with the filing of this reply, HCMFA is filing *Defendant's* ==*Supplemental Appendix* in *Support of its Second Motion for Leave to Amend Answer*==, the pagination of which, beginning HCMFA APP 829, is continued from the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* (==Dkt. No. 87==).

[2]      Ms. Winograd states in her declaration that the Debtor produced the originals of the Notes on July 2, 2021. That production scrubbed the Metadata, meaning that it was impossible to know when the Notes were created, who created them, and whether, how, and when they were signed. HCMFA APP 829. Certainly, for example, if Mr. Waterhouse drafted the Notes and affixed his own electronic signature, then there would be no issue (and it is only now known that he did not prepare them or affix his signature, but that Ms. Hendrix instead did so).  Had the Notes been produced in their original format with all Metadata, then HCMFA would not have been asking for them as late as October 19, 2021, and the Debtor would not have been refusing to produce the same. *See* Motion at p. 3, n. 3.

Likewise with respect to Mr. Morris' attempt to e-mail the originals of the Notes on October 25, 2021, the cover e-mail for which is included in Ms. Winograd's declaration.  *See* Debtor APP. 781.  Those Word documents came through with the Metadata scrubbed, probably due to an automatic e-mail filter.  HCMFA APP 829-30, 832.  Mr. Morris resent the same on October 26, 2021, with the Metadata.  HCMFA APP 830. That was the first time that the Debtor produced the originals of the Notes in their native format with Metadata and the first time that it was learned that Ms. Hendrix prepared the Notes and affixed Mr. Waterhouse's electronic signature.

In fact, it was not until October 23, 2021, during negotiations concerning discovery, that the Debtor agreed to produce the originals: "We also expect to produce to you the Word versions of each of the Notes in advance of the depositions . . .  Davor, based on Highland's willingness to produce the Word versions of the Notes, please confirm that HCMFA and NexPoint will produce reasonably in advance of Mr. Dondero's deposition their actual 15c responses to the Retail Board from later 2020."  HCMFA APP 834-35.  Counsel for both the Debtor and HCMFA would not have engaged in these discussions had the Debtor in fact produced the originals of the Notes beforehand.

This agreement and production was the culmination of negotiations concerning the production of the originals.  HCMFA APP 836 (October 15, 2021 e-mail requesting the production of the "word versions of all of the Notes at issue" and Debtor responding that it will "look into it.").

---

years, he informed HCMFA that he must have because the signatures were his. *See id.* at 7 (¶¶ 22-23). HCMFA acted promptly in asking this question—only the facts were not then known. Without having the originals, HCMFA could not inquire further, but it never delayed in inquiring into whether the Notes were signed. Even so, on May 22, 2021, once HCMFA began learning the background, it filed its motion for leave to amend its answer to assert affirmative defenses, in which HCMFA denied having executed the Notes. *See* Docket No. 32 and Docket No. 48 at ¶¶ 13-14. Since May 22, 2021, the Debtor has known that HCMFA was denying that it signed the Notes, even though, at that time, the fact that the Notes were not even actually signed by Mr. Waterhouse was still not known. And then, for five (5) months, the Debtor inexplicably refused to produce the originals of the Notes even though it responded to discovery in late June, 2021 that it would produce them. *See* Motion at ¶ 4 and p. 3, n. 3.

4.     The Debtor does not address the foregoing facts and instead makes the sweeping argument that "HCMFA knew, or should have known, of the facts upon which the Proposed Amendment is based given the litany of events between May 2019 and July 2021 that should have caused HCMFA to inquire." Response Brief at ¶ 66. This argument appears to address HCMFA's underlying defense that the Notes were created in error but it does not address the actual issue before the Court, which is that Mr. Waterhouse did not sign the Notes or authorize their execution using his electronic signature. Nothing between May, 2019 and July, 2021 would lead HCMFA to reasonably suspect this—in fact, HCMFA was not aware of the Notes until shortly before this litigation and, with the originals in the Debtor's possession, *not* HCMFA's possession, HCMFA could not ascertain even the simple fact that the Notes were signed electronically by Ms. Hendrix. The Debtor dos not seriously attempt to demonstrate any actual delay regarding this issue, which is the only relevant one.

5.      A party asserting undue delay to defeat a Rule 15 motion must present evidence of undue delay.  *See, e.g., Onasset Intelligence Inc. v. 7PSolutions, LLC,* 2013 U.S. Dist. LEXIS 195013 at *23 (N.D. Tex. 2013).  The Debtor's sweeping statement that HCMFA should have known that Mr. Waterhouse did not sign the note between 2019 and 2021 is not evidence; it is a conclusory statement.  And, the Debtor offers no evidence to support this conclusion (such as some prior e-mail or statement by Mr. Waterhouse that he did not sign the Notes).  On the contrary, the only evidence is that Mr. Waterhouse himself *assumed* that he signed the Notes until the October depositions when the Debtor finally ended up producing the originals.

**B.      THE PROPOSED AMENDMENT IS NOT FUTILE**

6.      The Debtor argues that the relief requested in the Motion is futile because "there is a complete absence of evidence to support the notion that Mr. Waterhouse did not sign and authorize the HCMFA Notes, and all of the testimonial and documentary evidence goes the other way."  Response Brief at p. 20.  HCMFA does not understand how the Debtor can make this argument.  It is a fact that Mr. Waterhouse did not sign the Notes and that Ms. Hendrix instead affixed his electronic signature.  *See* Motion at ¶¶ 29-37.  Less clear is whether he authorized Ms. Hendrix to do so, on which there is conflicting evidence, but to say that "all . . . of the evidence goes the other way" is demonstrably false.  And, that Mr. Waterhouse may have been copied on e-mails concerning the creation of the Notes does not mean that he signed them or that he authorized his electronic signature.

7.      Regardless, the Debtor's arguments on futility are irrelevant because the Debtor asks the Court to effectively try the underlying facts.  This argument is not appropriate on a Rule 15 motion and the Court should not pass on the credibility or merits of the underlying facts and allegations.  An amendment is futile if the amendment "would fail to state a claim upon which relief could be granted."  *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000).  "[T]o

determine futility, we will apply the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Id.* (internal quotation omitted). "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Id.* The Court must accept the well pled facts as true, and the Court must limit itself to the contents of the pleadings and necessary attachments thereto. *See, e.g., Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

8.      Here, HCMFA has demonstrated that the Uniform Commercial Code provides a defense to a promissory note that is not signed. *See* TEX. BUS. & COMM. CODE ANN. § 3.308(a). HCMFA's proposed amendment alleges that Mr. Waterhouse did not sign the Notes, which is undeniably true, and that he did not authorize Ms. Hendrix to sign them for him electronically. These well pled facts must be accepted as true. As such, the law recognizes a defense to the Notes and the amendment is not futile. On the contrary, the amendment is appropriate to ensure that justice be done.

9.      Notwithstanding this clear conclusion, HCMFA has demonstrated more than ample facts to support its defenses. In this respect, the Court should remember two key facts. First, separate and apart from the Notes at issue, HCMFA previously executed two other *valid* demand notes to the Debtor for very similar amounts, with respect to which the Debtor later extended the date that these other notes could be demanded to May 31, 2021. *See* Adversary Proceeding No. 21-03082 at docket no. 1 (complaint by the Debtor against HCMFA on account of the two prior promissory note and exhibit 3 to same extending date for demand). Second, it is normal that the very people (Debtor employees; not HCMFA employees) who mistakenly created the new Notes would carry the Notes on the books and records as debts of HCMFA. That is the nature of a mistake; that it be compounded in the future. But the continuation of a mistake does not make the mistake any less a mistake.

10.     The Debtor's smoking gun on the futility argument is a written acknowledgment from officers of HCMFA in October 2020 to the board of the retail funds that HCMFA manages to the effect that the Notes are valid and are debt obligations.  That is not correct.  In fact, the Debtor's alleged smoking gun states: "The earliest the Note between HCMLP and HCMFA could come due is in May 2021."  Debtor APP. 172.

11.     The same is true of the internal communications leading up to this document, in which Mr. Waterhouse, who purportedly signed the Notes, writes: "The HCMFA note is a demand note. . .   There was an agreement between HCMLP and HCMFA the earliest they could demand is May 2021."  Debtor APP. 156.

12.     These communications cannot be referring to the Notes at issue, since these statements acknowledge the existence of *one* note that cannot be collected before May, 2021 (recalling that the two promissory notes that are valid were extended through this date).  If anything, these communications demonstrate that HCMFA was not aware of the Notes at issue, especially because there were the communications from Mr. Waterhouse himself; *i.e.* if he did not remember the Notes at issue but instead only remembered the prior notes whose demand dates had been extended, then that is evidence that the present Notes were in fact created by mistake and not, as the Debtor suggests, that HCMFA always knew of the Notes.

13.     Likewise with respect to how the Notes were allegedly recorded and communicated to HCMFA.  As an example, the Debtor includes an e-mail from Ms. Hendrix to Mr. Dondero listing all affiliate notes to the Debtor.  *See* Debtor APP. 685-688.  The entry for HCMFA states: "10,530,971 Demand."  *See id.* at 688.  Recalling that there were the two prior notes totaling $6.3 million, not to mention many other affiliate notes, it is easy to see why Mr. Dondero and others would not have realized the mistake.  The fact of four (4) alleged notes owing by HCMFA is not disclosed, only an aggregate amount owing (and even then an amount that does not total the

principal sums under the four alleged notes).  And, recalling that the two prior notes were extended on April 15, 2019 to May 31, 2021 because HCMFA "expects that it may be unable to repay such amounts should they become due," *see* Adversary Proceeding No. 21-03082 at docket no. 1-3, it defies logic that, two weeks later, the Debtor would loan an additional $7.4 million to HCMFA.

14.     HCMFA conceded that there is evidence that both the Debtor and HCMFA carried the Notes on their books and records as debt obligations of HCMFA.  *See* Motion at ¶ 12.  That is not determinative of the underlying issue of whether the Notes were ever valid, which issue is not even relevant to the Motion.  What is relevant is that Mr. Waterhouse did not sign the Notes, and that there is strong evidence that he did not authorize Mr. Hendrix to sign them for him either.

## C.     THERE IS NO PREJUDICE TO THE DEBTOR

15.     The Debtor argues prejudice in two forms: first, that the Motion seeks leave after the Debtor filed its motion for summary judgment; second, that the Debtor would have to engage in more discovery.  Both arguments are factually incorrect and are not evidenced by the Debtor.

16.     First the Debtor argues that the Motion "comes after [] Highland's Motion for Summary Judgment was filed."  Response Brief at ¶ 77.  This is obviously false.  HCMFA filed its Motion on November 30, 2021.  The Debtor filed its motion for summary judgment on December 17, 2021.  *See* Docket No. 91.  Perhaps what the Debtor is referring to is its announcement to HCMFA that it would be filing a motion for summary judgment, which the Debtor did on November 6, 2021.  HCMFA APP 830, 843.  But HCMFA informed the Debtor that it would be asserting the defense of non-signature on October 28, 2021, well before the Debtor ever raised the prospect of its summary judgment proceedings, at which time the Debtor informed HCMFA that it would oppose a motion to amend.  HCMFA APP 830, 842.  And, the Debtor could have prevented any prejudice by simply agreeing to the proposed amendment.

17.     On the issue of additional discovery, the Debtor argues that it would need to re-depose HCMFA, Mr. Waterhouse, Mr. Dondero, and Mr. Sauter.  This is a nonsensical argument: only Mr. Waterhouse knows whether he signed the Notes and only he and Ms. Hendrix know whether Mr. Waterhouse authorized Ms. Hendrix to sign the Notes using his electronic signature, and both were deposed regarding these precise issues at length.  HCMFA, Mr. Dondero, and Mr. Sauter would have no discoverable information on these issues.  All relevant facts regarding these issues are already known.  Ms. Hendrix continues to be a Debtor employee and the Debtor has free access to her should the Debtor be able to locate any authorization by Mr. Waterhouse to Ms. Hendrix to sign the Notes for him.

### III.  <u>CONCLUSION</u>

18.     Leave to amend HCMFA's answer should be "freely given" unless there is a "substantial reason" to deny such leave.  There is no substantial reason to deny the Motion.  The issue is not the merits of HCMFA's defenses, but simply whether HCMFA should be permitted to more expressly assert that the Notes were not signed.  There has been no undue delay by HCMFA and the only delay was caused by the Debtor in not producing the originals of the Notes for five (5) months after HCMFA requested them.  The amendment is not futile because the law recognizes a defense to a promissory note that is not signed.  And, there is no prejudice to the Debtor, since the Motion was filed prior to the Debtor's summary judgment motion and since no additional discovery is needed.

RESPECTFULLY SUBMITTED this 7th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina
     State Bar No. 24030781
     Julian P. Vasek.
     State Bar No. 24070790
     500 N. Akard Street, Suite 3800
     Dallas, Texas 75202-2790
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375
     Email:  drukavina@munsch.com
     Email: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned hereby certifies that, on January 7, 2022, a true and correct copy of the foregoing document, including any exhibits thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

Davor Rukavina on behalf of Defendant Highland Capital Management Fund Advisors, L.P.
drukavina@munsch.com

Julian Preston Vasek on behalf of Defendant Highland Capital Management Fund Advisors, L.P.
jvasek@munsch.com

                /s/ Davor Rukavina
                Davor Rukavina

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email:  drukavina@munsch.com

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S SUPPLEMENTAL APPENDIX IN SUPPORT OF ITS
SECOND MOTION FOR LEAVE TO AMEND ANSWER**

TO THE HONORABLE STACEY G. C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P., the defendant in the above styled and numbered Adversary Proceeding, and files this its *Supplemental Appendix* in support of its *Defendant's Second Motion for Leave to Amend Answer* and its *Defendant's Reply in Support of Its Second Motion for Leave to Amend Answer*, as follows:

| DESCRIPTION | RANGE |
|---|---|
| Supplemental Declaration of Davor Rukavina | 829-831 |
| A | Email chain dated October 26, 2021 | 832-833 |
| B | Email dated October 23, 2021 | 834-835 |
| C | Email chain dated October 15, 2021 | 836-841 |
| D | D. Rukavina Time Entry October 28, 2021 | 842 |
| E | Email dated November 6, 2021 | 843 |

RESPECTFULLY SUBMITTED this 7th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 7, 2022, a true and correct copy of the foregoing document, including any exhibits thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

Davor Rukavina on behalf of Defendant Highland Capital Management Fund Advisors, L.P.
drukavina@munsch.com

Julian Preston Vasek on behalf of Defendant Highland Capital Management Fund Advisors, L.P.
jvasek@munsch.com

/s/ Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**SUPPLEMENTAL DECLARATION OF DAVOR RUKAVINA**

The undersigned, Davor Rukavina, hereby declares under penalty of perjury pursuant to the laws of the United States of America the following:

1.      My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.

2.      I am an attorney duly licensed to practice law in the State of Texas.  I am lead counsel for Highland Capital Management Fund Advisors, L.P. ("HCMFA"), in the above styled and numbered Adversary Proceeding commenced by Highland Capital Management, L.P. (the "Debtor").

3.      The Debtor's production of documents in July, 2021 did not include Word versions of the promissory notes with metadata, meaning that HCMFA was not able to determine who created the notes, when, and who signed them.  Likewise when counsel for the Debtor attempted

to e-mail the originals of the notes on October 25, 2021, when the metadata was again excluded from the notes, as evidenced by Exhibit "A" attached hereto.

4.      In fact, it was not until October 23, 2021 that the Debtor agreed to produce the originals of the notes, and then only after HCMFA agreed to produce certain other documents that the Debtor had requested, as evidenced by Exhibit "B" attached hereto.

5.      This is further evidenced by an e-mail exchange on October 15, 2021, attached hereto as Exhibit "C," where my co-counsel Deborah Deitsch-Perez requested of the Debtor's counsel that the Debtor produce the originals of all of the notes.

6.      The Debtor produced those versions with all metadata only on October 26, 2021, as I stated in my original declaration.

7.      I first informed the Debtor, through its counsel John A. Morris, Esq., that HCMFA would be seeking to amend its answer to assert that Mr. Waterhouse did not sign the notes at issue, during a telephone conference we had on October 28, 2021 addressing various issues.  Attached hereto as Exhibit "D" is a true and correct copy of my time entry for this matter for that day, which I entered and kept contemporaneously.

8.      During that conference, Mr. Morris informed me that he believed that any such amended answer would be filed in bad faith.  Both HCMFA and myself took this very seriously, and we spent considerable efforts to go over all evidence, document production, deposition transcripts, and the law to assure ourselves that HCFMA would be proceeding in good faith, as it always believed it was.  This was the reason why the filing of the motion to amend was delayed by several weeks.

9.      To the best of my memory, the first time that the Debtor informed me and HCMFA that it would be filing a motion for summary judgment in this Adversary Proceeding was on November 6, 2021, when Mr. Morris sent me (and others) an e-mail to that effect, which is attached

hereto as Exhibit "E."  However, I cannot state for a fact that this is the first time that Mr. Morris

informed me of the Debtor's intention to seek summary judgment, as I have a vague memory that

he may have mentioned this to me before.  In any event, I do not believe that Mr. Morris informed

me of the Debtor's intention to seek summary judgment before I informed him that HCMFA would

seek to amend its answer.

10.    I hereby swear under penalty of perjury that the foregoing is true and correct to the

best of my knowledge and ability.

Executed: January 7, 2022.


 /s/ Davor Rukavina_____
DAVOR RUKAVINA

**Rukavina, Davor**

---

| | |
|---|---|
| **From:** | John A. Morris <jmorris@pszjlaw.com> |
| **Sent:** | Tuesday, October 26, 2021 8:34 AM |
| **To:** | Vasek, Julian; Deborah R. Deitsch-Perez (deborah.deitschperez@stinson.com); Aigen, Michael P. (michael.aigen@stinson.com); Rukavina, Davor; Berghman, Thomas; Clay Taylor (clay.taylor@bondsellis.com); Bryan Assink (bryan.assink@bondsellis.com); 'ddraper@hellerdraper.com' |
| **Cc:** | Jeff Pomerantz; Gregory V. Demo; Hayley R. Winograd; La Asia S. Canty |
| **Subject:** | RE: Highland:  Word Versions of the Notes |

In transit.  Will respond when I land Julian.

Thanks.

---

**From:** Vasek, Julian [mailto:jvasek@munsch.com]
**Sent:** Tuesday, October 26, 2021 9:30 AM
**To:** John A. Morris <jmorris@pszjlaw.com>; Deborah R. Deitsch-Perez (deborah.deitschperez@stinson.com) <deborah.deitschperez@stinson.com>; Aigen, Michael P. (michael.aigen@stinson.com) <michael.aigen@stinson.com>; Rukavina, Davor <drukavina@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; 'ddraper@hellerdraper.com' <ddraper@hellerdraper.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; La Asia S. Canty <lsc@pszjlaw.com>
**Subject:** RE: Highland: Word Versions of the Notes

John:

Does your firm use a metadata scrubber on outgoing emails?  I ask because the metadata on all these files matches the time and date of your email below (see attached).  I also wonder whether the files were scrubbed once before, when Highland sent them to you.  Will you please look into this?  As a workaround, I can send a courier to Highland's office if you will ask them to save the files directly to a flash drive.  Please let me know.

Thanks,
Julian


**Julian P. Vasek**

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800 / Dallas, Texas 75201-6659

Direct: +1.214.855.7528 / jvasek@munsch.com / munsch.com

Notice: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, October 25, 2021 4:39 PM
**To:** Deborah R. Deitsch-Perez (deborah.deitschperez@stinson.com) <deborah.deitschperez@stinson.com>; Aigen,



HCMFA APP 832

Michael P. ([michael.aigen@stinson.com](mailto:michael.aigen@stinson.com)) <[michael.aigen@stinson.com](mailto:michael.aigen@stinson.com)>; Rukavina, Davor <[drukavina@munsch.com](mailto:drukavina@munsch.com)>; Berghman, Thomas <[tberghman@munsch.com](mailto:tberghman@munsch.com)>; Vasek, Julian <[jvasek@munsch.com](mailto:jvasek@munsch.com)>; Clay Taylor ([clay.taylor@bondsellis.com](mailto:clay.taylor@bondsellis.com)) <[clay.taylor@bondsellis.com](mailto:clay.taylor@bondsellis.com)>; Bryan Assink ([bryan.assink@bondsellis.com](mailto:bryan.assink@bondsellis.com)) <[bryan.assink@bondsellis.com](mailto:bryan.assink@bondsellis.com)>; 'ddraper@hellerdraper.com' <[ddraper@hellerdraper.com](mailto:ddraper@hellerdraper.com)>
**Cc:** Jeff Pomerantz <[jpomerantz@pszjlaw.com](mailto:jpomerantz@pszjlaw.com)>; Gregory V. Demo <[GDemo@pszjlaw.com](mailto:GDemo@pszjlaw.com)>; Hayley R. Winograd <[hwinograd@pszjlaw.com](mailto:hwinograd@pszjlaw.com)>; La Asia S. Canty <[lsc@pszjlaw.com](mailto:lsc@pszjlaw.com)>
**Subject:** Highland: Word Versions of the Notes

Counsel:

As requested, attached are two zip files containing the Word versions of the Notes.

Because they are Word versions, they have not been bates stamped.  Therefore, this e-mail will serve as the "proof" of the form, format, timing, and content of the production.

As I mentioned, Highland has retained an expert who has performed his analysis of the Metadata but has not prepared a report.  Insofar as Mr. Dondero and his related entities will be liable for Highland's fees and expenses in the event Highland prevails in this matter, please let me know if the Defendants intend to dispute the authenticity of the Notes or otherwise challenge any aspect of their creation as soon as possible so we don't unnecessarily incur an expense.

If we don't hear from you by the close of business on Wednesday on this matter, we will direct the expert to turn his findings into a report for delivery on Friday, make him available for a deposition, and include those expenses in a future supplemental production.

Also, Davor, please produce the Advisors' 15c report  (including responses to questions 1 and 2) from 2020 by the close of business tomorrow (Tuesday) or Highland will move to compel production.

Please let me know if you have any questions.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
[jmorris@pszjlaw.com](mailto:jmorris@pszjlaw.com)
[vCard](#) | [Bio](#) | [LinkedIn](#)

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

HCMFA APP 833

**Rukavina, Davor**

| | |
|---|---|
| **From:** | John A. Morris <jmorris@pszjlaw.com> |
| **Sent:** | Saturday, October 23, 2021 6:19 AM |
| **To:** | Deborah R. Deitsch-Perez (deborah.deitschperez@stinson.com); Rukavina, Davor |
| **Cc:** | Jeff Pomerantz; Gregory V. Demo; Hayley R. Winograd; Aigen, Michael P. (michael.aigen@stinson.com); Bryan Assink (bryan.assink@bondsellis.com); Clay Taylor (clay.taylor@bondsellis.com); 'ddraper@hellerdraper.com' |
| **Subject:** | Highland:  Outstanding Discovery (TIME SENSITIVE) |

Deborah and Davor:

I am still waiting for responses to the following questions:

1. Will Mr. Dondero make himself available for a full-day deposition on Monday, Thursday or Friday of this upcoming week?  If so, when?
2. Assuming the Defendants still intend to call them, when do you propose to make your expert witnesses available for deposition between November 1 and November 8?
3. Do the defendants intend to call any witnesses that have not been previously noticed so that Highland has an opportunity to depose them?

We need prompt answers to these questions, the latter two of which have been asked multiple times over several weeks.

Separately, while the Defendants never accepted Highland's offers to consider any specific requests Defendants had concerning e-mail searches, be advised that based on the questions at the end of Mr. Seery's deposition, out of an abundance of caution, Highland ran the following e-mail searches yesterday that are intended to cover the period surrounding the dates each note was executed:

1. Custodians (a) Kristin Hendrix, (b) Frank Waterhouse, and (c) "Corporate Accounting" using the search terms (i) "loan" and (ii) "note" for the following dates:

   - May 28, 2017 through June 2, 2017
   - October 14, 2018 through October 16, 2018
   - May 1, 2019 through May 4, 2019
   - May 28, 2019 through May 30, 2019
   - June 24, 2019 through June 26, 2019
   - September 24, 2019 through September 26, 2019

2. Custodians (a) Drew Wilson, (b) Frank Waterhouse, and (c) "Corporate Accounting" using the search terms (i) "loan" and (ii) "note" for the following dates:

   - May 28, 2017 through June 2, 2017
   - October 11, 2017 through October 13, 2017
   - February 1, 2018 through February 3, 2018
   - March 27, 2018 through March 29, 2018
   - June 24, 2018 through June 26, 2018
   - July 31, 2018 through August 2, 2018
   - August 10, 2018 through August 14, 2018

Exhibit B

HCMFA APP 834

We will produce responsive documents (if any, and we're not checking to see if they have already been produced so anything produced may be duplicative) in advance of Wednesday's depositions.

We also expect to produce to you the Word versions of each of the Notes in advance of the depositions.  Please let us know whether Defendants will challenge the authenticity or raise any other issue concerning the creation and editing (if any) of any of the Notes because Highland has engaged an expert who is reviewing the metadata and who will be prepared to offer an expert report next Friday concerning those matters, if needed.

Davor, based on Highland's willingness to produce the Word versions of the Notes, please confirm that HCMFA and NexPoint will produce reasonably in advance of Mr. Dondero's deposition their actual 15c responses to the Retail Board from later 2020 covering both question numbers 1 (shared services) and 2 (debts to HCMLP).

I look forward to your attention and prompt responses.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

HCMFA APP 835

**Rukavina, Davor**

| | |
|---|---|
| **From:** | John A. Morris <jmorris@pszjlaw.com> |
| **Sent:** | Friday, October 15, 2021 1:41 PM |
| **To:** | Deitsch-Perez, Deborah R.; Aigen, Michael P.; Hayley R. Winograd |
| **Cc:** | Jeff Pomerantz; Gregory V. Demo; Hayley R. Winograd; 'zannable@haywardfirm.com'; Rukavina, Davor; 'ddraper@hellerdraper.com'; Vasek, Julian; Berghman, Thomas; Clay Taylor (clay.taylor@bondsellis.com); Bryan Assink (bryan.assink@bondsellis.com); Douglas Draper; elmsd@gtlaw.com |
| **Subject:** | RE: HCMLP's Objections to Defendants' Rule 30(b)(6) Notice |

I'll look into it, Deborah.

When can I expect responses to the questions I asked concerning (a) the witnesses your client intends to call so I can have a chance to depose them, and (b) whether there are any other factual bases for the defenses of "waiver" and "estoppel" other than what Mr. Rukavina identified that you now contend fall within those general defenses?

I need answers to those questions – and they are within your knowledge yet you seem to be neglecting them.

John

---

**From:** Deitsch-Perez, Deborah R. [mailto:deborah.deitschperez@stinson.com]
**Sent:** Friday, October 15, 2021 2:59 PM
**To:** Aigen, Michael P. ; John A. Morris ; Hayley R. Winograd
**Cc:** Jeff Pomerantz ; Gregory V. Demo ; Hayley R. Winograd ; 'zannable@haywardfirm.com' ; Rukavina, Davor (drukavina@munsch.com) ; 'ddraper@hellerdraper.com' ; Vasek, Julian (jvasek@munsch.com) ; Berghman, Thomas (tberghman@munsch.com) ; Clay Taylor (clay.taylor@bondsellis.com) ; Bryan Assink (bryan.assink@bondsellis.com) ; Douglas Draper ; elmsd@gtlaw.com
**Subject:** RE: HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

John, Please have Debtor produce the word versions of all of the Notes at issue. We have searched and it does not appear that they were produced. Can you do that today, thanks.

**Deborah R. Deitsch-Perez**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2218 \ Mobile: 214.232.7582 \ Bio

Assistant: Kinga McCoy \ 214.560.2212 \ kinga.mccoy@stinson.com

**STINSON.COM**

**From:** Aigen, Michael P. <michael.aigen@stinson.com>
**Sent:** Friday, October 15, 2021 12:23 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; Rukavina, Davor



HCMFA APP 836

([drukavina@munsch.com](mailto:drukavina@munsch.com)) <[drukavina@munsch.com](mailto:drukavina@munsch.com)>; Deitsch-Perez, Deborah R.
<[deborah.deitschperez@stinson.com](mailto:deborah.deitschperez@stinson.com)>; 'ddraper@hellerdraper.com' <[ddraper@hellerdraper.com](mailto:ddraper@hellerdraper.com)>; Vasek, Julian
([jvasek@munsch.com](mailto:jvasek@munsch.com)) <[jvasek@munsch.com](mailto:jvasek@munsch.com)>; Berghman, Thomas ([tberghman@munsch.com](mailto:tberghman@munsch.com))
<[tberghman@munsch.com](mailto:tberghman@munsch.com)>; Clay Taylor ([clay.taylor@bondsellis.com](mailto:clay.taylor@bondsellis.com)) <[clay.taylor@bondsellis.com](mailto:clay.taylor@bondsellis.com)>; Bryan Assink
([bryan.assink@bondsellis.com](mailto:bryan.assink@bondsellis.com)) <[bryan.assink@bondsellis.com](mailto:bryan.assink@bondsellis.com)>; Douglas Draper <[ddraper@hellerdraper.com](mailto:ddraper@hellerdraper.com)>;
[elmsd@gtlaw.com](mailto:elmsd@gtlaw.com)
**Subject:** RE: HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

John:

Defendants have the following objections to your corporate representative topics:

NexPoint, HCMS and HCRE

Topic 1: Your answer.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Subject to these objections, Defendants will provide a witness on this topic.

Topic 2: Each Affirmative Defense asserted in Your Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Subject to these objections, Defendants will provide a witness on this topic.

Topic 3: The Note, including but not limited to (a) the negotiation of the Note, (b) the terms of the Note, (c) Communications Concerning the Note, (d) any payments of principal or interest made by You or on Your behalf with respect to the Note; (e) the use of the proceeds of the Note, (f) Your communications with Your outside auditors Concerning the Note and the obligations thereunder, and (g) all agreements Concerning the Note.

Defendants object to the portion of this topic seeking information related to the use of the proceeds of the Note because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendants will provide a witness on this topic.

Topic 4: Your responses to the Discovery Requests.

Defendants object to this topic because it is vague and not specific enough to allow Defendants to adequately prepare a witness. Defendants incorporate all objections made in their discovery responses. Subject to these objections, Defendants will provide a witness on this topic.

Dugaboy

Topic 2: Your authority to enter into the Alleged Agreement.

Defendant objects to this topic to the extent that it seeks privileged information and seeks legal conclusions. Subject to these objections, Defendant will provide a witness on this topic.

Topic 3: Ownership, beneficial ownership, and control of The Dugaboy Investment Trust.

HCMFA APP 837

Defendant objects to this topic because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant will provide a witness on this topic.

Topics 4-8: Other agreements other than the agreements at issue in these proceedings.

Defendant object to these topics because that information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant will provide a witness on these topics.

Topic 9: Your responses to the Discovery Requests.

Defendant objects to this topic because it is vague and not specific enough to allow Defendant to adequately prepare a witness. Defendant incorporates all objections made in its discovery responses. Subject to these objections, Defendant will provide a witness on this topic.

Michael P. Aigen
Partner
Dallas
214.560.2207
x62207

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, October 12, 2021 5:50 PM
**To:** Aigen, Michael P. <michael.aigen@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; 'ddraper@hellerdraper.com' <ddraper@hellerdraper.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Berghman, Thomas (tberghman@munsch.com) <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>
**Subject:** HCMLP's Objections to Defendants' Rule 30(b)(6) Notice

Michael:

HCMLP has the following objections to the attached Rule 30(b)(6) notice:

**HCMLP objects to Topic No. 2** (a) to the extent it calls for HCMLP to tender a witness to testify with precision to all principal, interest, and fees due under each Note that is the subject of the Complaints, and on the grounds that (b) HCMLP provided calculations of damages in its demand and default letters as well as its Complaints, (c) the categories of damages are all (i) unpaid principal, (ii) accrued but unpaid interest, and (iii) costs of collection, including reasonable attorneys' fees (the "Damages"), (d) based on the Notes and the documents produced proving HCMLP's costs of collection (which will be supplemented from time to time to account for additional costs), the Defendants are just as easily capable of calculating the Damages at any moment in time as HCMLP, (e) it is unreasonable to expect any witness to specifically recall the precise Damages due under each Note, particularly when such Damages continue to increase every day.

Subject to those objections, HCMLP will tender a witness prepared to testify on Topic No. 2.

HCMFA APP 838

**HCMLP objects to Topic No. 4** on the grounds that (a) the phrase "involved in" is vague and ambiguous, and (b) it assumes that any of the Notes were subject to "negotiations."

Subject to those objections, HCMLP will tender a witness prepared to testify as to the identify of individuals it knows were involved in communications related to the execution and/or terms of the notes.

**HCMLP objects to Topic No. 7** on the grounds that (a) it seeks "facts" that are solely within the Defendants' knowledge, and that (b) Defendants' defenses and affirmative defenses have materially changed over time, and are otherwise ambiguous or not specifically set forth in the Answers.

Subject to that objection, HCMLP will tender a witness prepared to testify as to facts that it knows of that relate to or concern the defenses and affirmative defenses specifically proffered by any of the Defendants.

**HCMLP objects to Topics No. 9** on the grounds that (a) there is no time limitation, (b) the existence and terms of all affiliate loans, including all issues concerning forgiveness and forbearance, are set forth in detail in each of HCMLP's audited financial statements for each year from 2008 through 2018 (including the sections concerning "Subsequent Events"), and HCMLP specifically refers Defendants to those audited financial statements, and (c) it is unreasonable to expect any witness to specifically recall the identity of all affiliated borrowers, and the amounts, dates, and terms of all loans made to affiliated borrowers, including whether, when, and to what extent any such affiliated loans were forgiven.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topics No. 10** on the grounds that (a) there is no time limitation, (b) the existence and terms of all affiliate loans, including all issues concerning forgiveness and forbearance, are set forth in detail in each of HCMLP's audited financial statements for each year from 2008 through 2018 (including the sections concerning "Subsequent Events"), and HCMLP specifically refers Defendants to those audited financial statements, and (c) it is unreasonable to expect any witness to specifically recall the identity of all affiliated borrowers, and the amounts, dates, and terms of all loans made to affiliated borrowers, including whether, when, and to what extent any such affiliated loans were forgiven.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topics No. 11** on the grounds that (a) there is no time limitation, (b) documents concerning Mr. Dondero's compensation for the period 2016 through 2020 (the "Compensation Documents") have been or will be produced and HCMLP specifically refers Defendants to the Compensation Documents, and (c) it is unreasonable to expect any witness to specifically recall the specific amounts and components of Mr. Dondero's compensation from 2016 and 2020.

Subject to those objections, HCMLP will tender a witness prepared to testify as to loans it made to employees or officers that were forgiven, in whole or in part, during the period 2008 through the Petition Date.

**HCMLP objects to Topic No. 12** on the grounds that it is (a) overly broad, unduly burdensome, and not relevant to the claims or defenses in this adversary proceeding, and (b) none of the Defendants who served the attached Rule 30(b)(6) notice is or was a party to a Shared Services Agreement with HCMLP.

Based on the forgoing, HCMLP will not proffer a witness to testify as to Topic No. 12.

**HCMLP objects to Topic Nos. 13, 14, 15, 16, and 17** to the extent those topics assume that HCMLP had any contractual or legal duty or obligation to take or refrain from taking the actions described therein.

HCMFA APP 839

Subject to those objections, and any additional objections referred to below, HCMLP will tender a witness prepared to testify on Topics 13, 14, 15, 16, and 17.

**HCMLP objects to Topic No. 14** on the ground that the phrase "may have previously had any role" is speculative, vague, and ambiguous.

Subject to that objection, HCMLP will tender a witness prepared to testify as to those referenced employees who actually processed, made, facilitated or coordinated such payments, if any.

**HCMLP objects to Topic No. 15** on the grounds that the phrase (a) "[a]ny communications or instructions that may have been given" is speculative, vague, and ambiguous, and (b) there is no time limitation.

Subject to those objections, HCMLP will tender a witness prepared to testify as to communications or instructions that were actually given from 2018 to the present, if any.

---

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Thursday, October 07, 2021 2:49 PM
**To:** Rukavina, Davor <drukavina@munsch.com>; 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Vasek, Julian <jvasek@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: NexPoint Notice of 30(b)(6) to Debtor

Please see attached notice for the Seery/30B6 deposition.

**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201 \ Bio

**STINSON.COM**
This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**From:** Rukavina, Davor <drukavina@munsch.com>
**Sent:** Thursday, October 7, 2021 11:42 AM
**To:** 'zannable@haywardfirm.com' <zannable@haywardfirm.com>; John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Vasek, Julian <jvasek@munsch.com>; Berghman, Thomas <tberghman@munsch.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>; Bryan Assink (bryan.assink@bondsellis.com) <bryan.assink@bondsellis.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R.

HCMFA APP 840

Winograd <hwinograd@pszjlaw.com>
**Subject:** NexPoint Notice of 30(b)(6) to Debtor

**External Email – Use Caution**

Counsel, please see attached notice.

Thank you

**Davor Rukavina, Esq.**

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800 / Dallas, Texas 75201-6659

Direct: +1.214.855.7587 / drukavina@munsch.com / munsch.com


Notice: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

HCMFA APP 841

File   Edit   View   Reports   Tools   Window   Help

| Status | Transferred | | | OK |
|---|---|---|---|---|
| TimeKeeper: | 0566 | ... | Davor Rukavina | Cancel |
| Date Worked: | 10/28/2021 | 15 | Thursday, October 28, 2021 | ◀◀ ◀ ▶ ▶▶ |
| Client: | 019717 | ... | NexPoint Advisors, LP | More >> |
| Matter: | 00004 | ... | Notes Litigation | |
| Time: | 2.50 | ... | Billable Status: Billable | |
| NO CHARGE: | | ... | | |

Narrative:

Conference with John Morris regarding deposition scheduling and closing discovery; communications with DC Sauter and Dustin Norris regarding same and regarding discovery; multiple communications and conference with Deborah Perez regarding expert retention and expert issues, Dondero deposition preparation, and amending answers; communications with John Morris regarding motions to amend answers; follow-up strategy communications regarding same and coordinate drafting of motions; communications with duties expert and coordinate retention of same

Exhibit D

HCMFA APP 842

**Rukavina, Davor**

| | |
|---|---|
| **From:** | John A. Morris <jmorris@pszjlaw.com> |
| **Sent:** | Saturday, November 6, 2021 1:08 PM |
| **To:** | Deborah R. Deitsch-Perez (deborah.deitschperez@stinson.com); Aigen, Michael P. (michael.aigen@stinson.com); Rukavina, Davor; Berghman, Thomas; Vasek, Julian; Bryan Assink (bryan.assink@bondsellis.com); Clay Taylor (clay.taylor@bondsellis.com); 'ddraper@hellerdraper.com' |
| **Cc:** | Jeff Pomerantz; Gregory V. Demo; Hayley R. Winograd |
| **Subject:** | Highland:  Proposed schedule for summary judgment in the Notes Litigation |

Counsel:

Highland intends to inform the Court at next week's hearing that it will be moving for summary judgment on some or all of the counts asserted in the five pending "notes litigations."  We will share with you the specific counts as soon as practicable after the hearing but the motion will certainly cover at least all counts not subject to the motion to dismiss and all defenses thereto.

In that regard, Highland proposes the following briefing schedule:

| Deadline | Event |
|---|---|
| 12/17/21 | Highland files its opening brief in support of its motion for summary judgment and all documents in support thereof |
| 1/17/22 | Defendants file their opposition to the MTD and all documents in support thereof |
| 1/31/22 | Highland files its reply papers and all documents in support thereof |

Please let us know as soon as possible (and in any event, reasonably in advance of the November 9 hearing) if the defendants have any comments to this proposed schedule.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Exhibit E

HCMFA APP 843

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03004-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## REORGANIZED DEBTOR'S AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO EVIDENTIARY HEARING TO BE HELD ON JANUARY 10, 2022

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Highland Capital Management, L.P. (the "<u>Reorganized Debtor</u>") submits the following amended witness and exhibit list with respect to *Defendant's Second Motion for Leave to Amend Answer and Brief in Support Thereof* [Docket No. 82], which the Court has set for hearing at 9:30 a.m. (Central Time) on January 10, 2022 (the "<u>Hearing</u>") in the above-styled adversary proceeding (the "<u>Adversary Proceeding</u>").

A.    <u>**Witnesses**</u>:

    1.    Dennis C. Sauter;

    2.    Any witness identified by or called by any other party; and

    3.    Any witness necessary for rebuttal.

B.    <u>**Exhibits**</u>:

| Number | Exhibit | Offered | Admitted |
|:---:|---|:---:|:---:|
| 1. | Complaint against HCMFA [Docket No. 109] | | |
| 2. | Amended Complaint against HCMS [Docket No. 109] | | |
| 3. | Highland's Consolidated Financial Statements, dated December 31, 2018 [Docket No. 109] | | |
| 4. | HCMFA's Incumbency Certificate, April 2019 | | |
| 5. | Email string re 15(c) Follow up (10/2/21 – 10/6/21) | | |
| 6. | HCMFA's Consolidated Financial Statements and Supplemental Information (December 31, 2018) [Docket No. 109] | | |
| 7. | 5/2/19 e-mail and attachment (Promissory Note) [Docket No. 109] | | |
| 8. | 5/3/19 e-mail [Docket No. 109] | | |
| 9. | 5/3/19 Promissory Note [Docket No. 109] | | |

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 10. | Supplemental 15(c) Information Request 10.23.20 [Docket No. 109] | | |
| 11. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s Second Set of Interrogatories [Docket No. 109] | | |
| 12. | Peet Burger 7/30/21 Deposition Transcript [Docket No. 109] | | |
| 13. | James Dondero 11/4/21 Deposition Transcript [Docket No. 109] | | |
| 14. | Frank Waterhouse 10/19/21 Deposition Transcript [Docket No. 109] | | |
| 15. | Declaration of Dennis C. Sauter, Jr. [Docket No. 109] | | |
| 16. | Email from David Klos to the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated February 2, 2018 [Docket No. 109] | | |
| 17. | (a) Email from Blair Hillis to David Klos and the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated August 1, 2018 and (b) an email from David Klos to the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated August 1, 2018 [Docket No. 109] | | |
| 18. | Dustin Norris 12/1/21 Deposition Transcript [Docket No. 109] | | |
| 19. | Dennis C. Sauter 11/17/21 Deposition Transcript [Docket No. 109] | | |
| 20. | Kristin Hendrix 10/27/21 Deposition Transcript [Docket No. 109] | | |
| 21. | David Klos 10/27/21 Deposition Transcript [Docket No. 109] | | |
| 22. | Debtor's back-up for the December Monthly Operating Report, titled "December 2019 Due From Affiliates" [Docket No. 109] | | |
| 23. | Debtor's back-up for the September Monthly Operating Report, titled "September 2020 Due From Affiliates" [Docket No. 109] | | |
| 24. | Debtor's back-up for the January 2021 Monthly Operating Report, titled "January 2021 Due From Affiliates" [Docket No. 109] | | |

| Number | Exhibit | Offered | Admitted |
|:------:|---------|:-------:|:--------:|
| 25. | Debtor's January 2021 Affiliates Loan Receivables Summary [Docket No. 109] | | |
| 26. | Email from Kristin Hendrix to Jim Dondero, with a copy to Frank Waterhouse, dated August 29, 2020 regarding 7/31/20 HCMLP Requests **(REDACTED)** [Docket No. 109] | | |
| 27. | Email from Kristin Hendrix to Jim Dondero, with a copy to Frank Waterhouse and David Klos, dated April 27, 2020 regarding HCMLP Schedule of Investments **(REDACTED)** [Docket No. 109] | | |
| 28. | Declaration of David Klos in Support of HCMLP's Motion for Partial Summary Judgment [Docket No. 109] | | |
| 29. | Declaration of Hayley R. Winograd in Support of HCMLP's Opposition to HCMFA's Second Motion to Amend [Docket No. 109] | | |
| 30. | Email to counsel for HCMFA on October 25, 2021 producing word versions of the HCMFA Notes [Docket No. 109] | | |
| 31. | GAF Resolution Memo dated May 28, 2019 | | |
| 32. | Any document entered or filed in the Adversary Proceeding, including any exhibits thereto | | |
| 33. | Any document entered or filed in the Reorganized Debtor's Bankruptcy Case, including any exhibits thereto | | |
| 34. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 35. | All exhibits identified by or offered by any other party at the Hearing | | |

Dated:  January 10, 2022.    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         ikharasch@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com-and-

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 31



**DATE:**    May 28, 2019

**TO:**    The Board of Trustees (the "<u>Board</u>") of Highland Global Allocation Fund (the "<u>Fund</u>")

**FROM:**    Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>" or the "<u>Adviser</u>")

**RE:**    Resolution of the Fund's Net Asset Value ("<u>NAV</u>") Error

This memorandum summarizes the final resolution of the Fund's NAV error related to its TerreStar Corporation ("<u>TerreStar</u>") equity holding. In connection with the Fund's conversion from an open-end fund to a closed-end fund (the "<u>Conversion</u>") on February 13, 2019, the Office of the Chief Accountant ("<u>OCA</u>") of the SEC reviewed the Adviser's fair valuation of TerreStar equity, in particular the application of Financial Accounting Standards Board Accounting Standards Update 2011-4, Topic 820, Fair Value Measurement ("<u>ASC 820</u>") to two transactions in TerreStar equity that occurred in March 2018 (the "<u>March Transactions</u>"). The OCA provided its feedback during an exit call on February 8, 2019 and subsequently confirmed no comments to the Adviser's confirmation of understanding letter on February 14, 2019.

The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value. As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly." The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value. The "orderly" determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "<u>NAV Error</u>").

After incorporation of the updated valuation into the Fund's NAV, the gross NAV Error, excluding interest, the advisory fee rebate, and processing costs, amounted to approximately $6.1 million of loss to the Fund and approximately $1.4 million of losses to Shareholders (a total loss of approximately $7.5 million) over the period between March 18, 2018 and January 19, 2019 (the "<u>NAV Restatement Period</u>").

The Fund was made whole through a $5,186,496 payment on February 15, 2019, and a $2,398,842 payment on May 2, 2019. A detailed breakdown of the NAV Error and the make whole payments is set forth below. Shareholder reprocessing and reimbursement are in progress with the Fund's prior transfer agent, DST Systems, Inc. (as transfer agent to the open-end fund), and given detailed omnibus account information has not yet been obtained the estimated make whole payments are subject to change. A representative of the Adviser will provide the Board with an update on the process during the May 28, 2019 Board meeting.

## NAV Error Breakdown and Make Whole Payments

| | Transaction Date(s) | Loss to Fund | Estimated Loss to Shareholders[3] | Totals |
|---|---|---|---|---|
| Estimated Net Loss | 3/14/18 thru 1/7/19 | (6,068,851) | (1,373,272) | (7,442,123) |
| Processing, Fees, Interest | 3/14/18 thru 1/7/19 | (375,000) | - | (375,000) |
| Insurance Proceeds | 2/15/2019 | 3,566,248 | 1,373,272 | 4,939,520 |
| Insurance deductible paid by Adviser | 2/15/2019 | 246,976 | - | 246,976 |
| Management fee offset | 4/1/2019 | 47,000 | - | 47,000 |
| Additional payment from Adviser | 5/2/2019 | 2,339,627[2] | - | 2,339,627 |
| Reimbursement of Processing costs from Adviser | -[1] | 244,000 | - | 244,000 |
| Total | | - | - | - |

**Supplemental Numerical Update**

| | | |
|---|---|---|
| Additional estimated loss to fund and shareholders | 1/8/19 thru 1/28/19 [5] | (19,789) |
| Additional processing, management fees, and interest | Note 4 | (39,426) |
| Additional payment from Adviser | 5/2/2019 | 59,215 |

| | | |
|---|---|---|
| **Total additional payment from Adviser [6]** | **5/2/2019** | **2,398,842** |

**Notes**

1 - Expected to be incurred thru 12/31/19, and will be reimbursed by Adviser as incurred. To date no invoices have been billed or paid, but upon receipt of a future invoice, the Adviser will promptly pay.

2 - Includes $2,255,628 of previously outstanding balance, and $84,000 of interest calculated through 1/7/19, which was the "as of date" used for the calculations in the OCA submission.

3 - Represents the estimated losses to shareholder subscribing into the fund during the NAV Restatement Period and estimated losses to be determined after reprocessing individual capital activity that was held in Omnibus accounts.

4 - Proposal from service provider was higher than original estimate, and includes interest thru date of final payment made by Adviser.

5 - This includes the calculations subsequent to 1/7/19 (which was the "as of date" used for the calculations in the OCA submission) "through date" 1/28/19, which the final date in which the revised mark was fully reflected in the NAV.

6 - Includes $2,339,627 and $59,215 of Additional payments from Adviser

BTXN 208 (rev. 07/09)

| | | |
|---|---|---|
| IN RE: Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. | Defendant's Motion (Second) To Amend Answer #82 | Case # 21–03004–sgj |
| **DEBTOR** | | |

**TYPE OF HEARING**

| | | |
|---|---|---|
| Highland Capital Management, L.P. | *VS* | Highland Capital Management Fund Advisors, L.P. |
| **PLAINTIFF / MOVANT** | | **DEFENDANT / RESPONDENT** |

| | |
|---|---|
| John A. Morris | Davor Rukavina, Esq. |
| **ATTORNEY** | **ATTORNEY** |

**EXHIBITS**

| SEE EXHIBIT LIST | SEE EXHIBIT LIST |
|---|---|
| Court Admitted Exhibit's #1 through #31 | Court Admitted Exhibit HCMFA's R#1 – Rebuttal |
| | Court Admitted Defendant's Appendix (Declaration of Dennis C. Sauter, Jr.) In Support of Second Motion of #831 pages |
| | NOTE* Paragraph #6 through #10 of the declaration where not admitted as part of this record |

| | | |
|---|---|---|
| Michael Edmond | January 10, 2022 | Stacey G. Jernigan |
| **REPORTED BY** | **HEARING DATE** | **JUDGE PRESIDING** |

BTXN 191 (rev. 11/20)

# AUDIO / TRANSCRIPT ORDER

| 1. ORDER REQUEST: | | 2. DATE OF ORDER: | FOR COURT USE ONLY DUE DATE: |
|---|---|---|---|
| ☐ DUPLICATE OF AUDIO CD Recordings Only | ☒ TRANSCRIPT | January 11, 2022 | |

| 3. NAME: | 4. PHONE NUMBER: | 5. EMAIL ADDRESS: |
|---|---|---|
| Julian Vasek | 214-855-7528 | jvasek@munsch.com |

| 6. MAILING ADDRESS: | 7. CITY: | 8. STATE: | 9. ZIP CODE: |
|---|---|---|---|
| 500 N. Akard St., Ste. 3800 | Dallas | TX | 75201 |

| 10. CASE NUMBER: | 11. CASE NAME: | 12. JUDICIAL OFFICIAL: | 13. DATE OF PROCEEDING: |
|---|---|---|---|
| 21-03004 | Highland Capital Management v. HCMFA | Judge Jernigan | FROM:  01 / 10 / 2022 |

| 14. ORDER FOR: | ☒ APPEAL | ☐ BANKRUPTCY | ☐ OTHER |
|---|---|---|---|

**15. ORDER:**

| | ORDINARY | 7 DAY EXPEDITED | DAILY | HOURLY |
|---|---|---|---|---|
| A. | ☐ | ☐ | ☒ | ☐ |

| | 14 DAY EXPEDITED | 3 DAY EXPEDITED |
|---|---|---|
| | ☐ | ☐ |

**16. AUDIO/TRANSCRIPT REQUESTED**  Specify portion(s) and date(s) of proceeding(s):

| PORTION(S) | | PORTION(S) | |
|---|---|---|---|
| ☒ | ENTIRE HEARING | ☐ | TESTIMONY (SPECIFY WITNESS) |
| ☐ | OPENING STATEMENT (PLAINTIFF) | | |
| ☐ | OPENING STATEMENT (DEFENDANT) | | |
| ☐ | CLOSING ARGUMENT (PLAINTIFF) | ☐ | VOIR DIRE |
| ☐ | CLOSING ARGUMENT (DEFENDANT) | ☐ | OTHER (SPECIFY) |
| ☐ | COURT RULING ONLY | | |

| CERTIFICATION | 17. SIGNATURE: /s/ Julian Vasek |
|---|---|
| By signing 17. & 18, I certify that I will pay all charges (deposit plus additional as specified by the assigned transcriber). | 18. DATE: 1/11/2022 |

**COURT USE ONLY**

| A. PROCESSED BY: | B. TRANSCRIPT TO BE PREPARED BY: |
|---|---|
| PHONE NUMBER: | ADDRESS: |
| EMAIL ADDRESS: | TELEPHONE: EMAIL ADDRESS: |

| C. PARTY RECEIVED AUDIO: | DATE: | BY: | $32 FEE PAID: |
|---|---|---|---|

**DISTRIBUTION:**        COURT COPY        ORDER RECEIPT        ORDER COPY

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S REBUTTAL EXHIBIT LIST

TO THE HONORABLE STACEY G. C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P. ("HCMFA"), the defendant in the above styled and numbered Adversary Proceeding, and files this its *Rebuttal Exhibit List* in support of its *Defendant's Second Motion for Leave to Amend Answer and Brief In Support Thereof* (the "Motion"). Attached hereto is following rebuttal exhibit admitted into evidence at the hearing on the Motion that took place on January 10, 2022:

| Exhibit No. | Description |
|---|---|
| HCMFA-R1 | Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error dated April 7, 2019 |

RESPECTFULLY SUBMITTED this 12th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ *Julian P. Vasek*
     Davor Rukavina
     State Bar No. 24030781
     Julian P. Vasek.
     State Bar No. 24070790
     500 N. Akard Street, Suite 3800
     Dallas, Texas 75202-2790
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375
     Email: drukavina@munsch.com
     Email: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on January 12, 2022, a true and correct copy of the foregoing document, including any exhibits thereto, was served electronically on all parties who receive CM/ECF service.

     /s/ *Julian P. Vasek*
     Julian P. Vasek



**DATE:** April 7, 2019

**TO:** Securities and Exchange Commission (the "SEC")

**FROM:** Highland Capital Management Fund Advisors, L.P. (the "Adviser")

**RE:** Amended Memorandum regarding the Treatment of the TerreStar Corporation ("TerreStar") Equity NAV Error in the Fund

This memorandum is intended to provide supplemental information regarding the NAV Error in the Highland Global Allocation Fund ("GAF" or the "Fund") and reflect the discussions on the March 8, 2019 call. Attendees of the call included:

(i)  SEC Staff: David Bartels, Paul Cellupica, Alison Staloch, Vince DiStefano, Dan Rooney, Christian Sandoe, Kathryn Feld and Linda Hoffman;

(ii)  Adviser Representatives: Thomas Surgent, Frank Waterhouse, Jason Post and Lauren Thedford;

(iii) Independent Trustee Counsel: Stacy Louizos of Drinker Biddle & Reath LLP; and

(iv) Fund and Adviser Counsel: George Zornada and Jon-Luc Dupuy of KL Gates LLP.

In connection with the Fund's conversion from an open-end fund to a closed-end fund (the "Conversion") on February 13, 2019, the Office of the Chief Accountant ("OCA") of the SEC reviewed the Adviser's fair valuation of TerreStar equity, in particular the application of Financial Accounting Standards Board Accounting Standards Update 2011-4, Topic 820, Fair Value Measurement ("ASC 820") to two transactions in TerreStar equity that occurred in March 2018 (the "March Transactions"). The OCA provided its feedback during an exit call on February 8, 2019 and subsequently confirmed no comments to the Adviser's confirmation of understanding letter on February 14, 2019.

The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value. As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly." The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value. The "orderly" determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "NAV Error").

After incorporation of the updated valuation into the Fund's NAV, the gross NAV Error, excluding interest, the advisory fee rebate, and processing costs, amounted to approximately $6.1 million of loss to the Fund and approximately $1.4 million of losses to Shareholders over the period between March 18, 2018 and January 19, 2019 (the "NAV Restatement Period").

**Calculation of the NAV Error**

a.  For each day during the NAV Restatement Period, the Adviser analyzed the impact on the Fund's NAV resulting from the revised mark relative to the original mark for TerreStar Equity. This amount includes:

(i)  "Loss to Fund", which represents the sum of the overpayment of net redemptions (and resulting remaining shareholder dilution) caused by the NAV overstatement for each day in the period where the difference in marks resulted in a NAV error in accordance with the NAV Error

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)



Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

Correction Procedures. This number is an estimate based on net investor activity for all shareholders for each period, as provided to the Adviser by the Fund's transfer agent, DST Asset Manager Solutions, Inc. (the "Transfer Agent").   This amount is an estimate based on all investor activity for each period, as provided by the Transfer Agent.  Final numbers will be determined once an investor-by-investor analysis is performed for the entire NAV restatement period by the Adviser and the Transfer Agent.

(ii) "Loss to Shareholders", which occurred where either (i) the revised mark was higher than the original mark for the period and shareholders who redeemed during the period were underpaid (these shareholders will be made whole as part of the shareholder reprocessing exercise); or (ii) the revised mark was lower than the original mark for the period and shareholders who subscribed or reinvested shares of the Fund overpaid (these shareholders will be made whole as part of the shareholder reprocessing exercise).

(iii) "Estimated Gross Up for Additional Omnibus Accounts", which is intended to estimate the potential impact for the reprocessing of individual capital activity that is currently netted within the Omnibus accounts. The investor level detail within the Omnibus accounts is aggregated into one net investor in the detail available from the Transfer Agent. The current analysis is only looking through to the NFS Omnibus account, but there may be additional omnibus accounts that require this look-through treatment, which will be determined after an analysis of the various omnibus agreements.

(iv) "Processing fees", which refer to the rough amount the Adviser expects to have to pay the Transfer Agent to reprocess shareholder transactions as described above.

(v) "Management fee rebate", which is the excess advisory fee calculated on the higher TerreStar valuation reflected in the NAV.

(vi)  "Interest", which is calculated on the daily cumulative Fund receivable at a rate of Fed Funds + 45 bps using the "Actual/360" methodology.

| Components of NAV Error | |
|---|---|
| Total NAV error | 7,442,124 |
| Interest on NAV error | 84,000 |
| Processing Fees | 244,000[1] |
| Management Fee Rebate | 47,000 |
| **Total due to Fund** | **7,817,124** |

**Treatment of the NAV Error and Resolution of Loss**

The GAF NAV Error represents a unique set of circumstances where, during the NAV Restatement period there are days in which there is (1) an original fair value mark, an (2) Updated Valuation (defined below), and (3) the price at which TerreStar was sold in a negotiated arm's length transaction to an unaffiliated third party.  The latter price is greater than both the original fair value mark and the Updated Valuation, and results in a Gain above

---

[1] Updated April 1, 2019 using the most recent reprocessing fee estimate available from the Transfer Agent's special events team.

Fair Value (defined below) which the Adviser believes should also be considered with respect to any equitable resolution of the error correction. On December 7, 2018, the Fund sold $23 million of TerreStar equity at $350 per share (above its restated December 2018 fair value mark of $274.38, as calculated under the methodology set forth in the consultation, and above the Adviser's original fair value mark of $333.12 prior to the OCA consultation). As addressed below in detail, when applying the fair valuation approach expressed to the SEC Staff during the OCA consult process (the "Updated Valuation") and determining the appropriate resolution under the NAV Error Correction Procedures (as addressed below), the Adviser believes it is equitable and appropriate also to consider a *portion* of the total gain realized on the December 7, 2018 sale in excess of the restated fair value, which total gain was approximately $4,959,992 (the "Gain above Fair Value").

The NAV Error amount of $7.8 million (including interest, rebate of Advisory fees, and processing costs) ignores the actual realized gain represented by the Gain above Fair Value. As a result of the Updated Valuation, the Loss to Fund was caused by "paper" dilution to remaining investors from a lowered NAV per share and real losses resulting from redemptions made at a NAV higher than the Updated Valuation. A significant part of the losses from the redemptions were in a practical sense compensated for by the Gain above Fair Value because the Fund's net assets increased due to the actual cash realized in the December 7, 2018 sale at a price higher than the Updated Value; while not reflected as an offset of the NAV Error in accounting, such sale benefitted remaining investors. The fair value of the remaining TerreStar equity (reflected in the Updated Value), however, was not increased to reflect the full, realized sale price or taken into account when calculating the $7.8 million of loss. Although subject to continuing assessment of valuation inputs, in the absence of negative inputs, applying the valuation methodology set forth in the OCA consult may result in the fair value of remaining TerreStar equity, over time, increasing to a price per share closer or equal to the realized sale price to any extent the weighting of the March Transactions decreases with age. Any such resulting gains would counter the "paper" losses incurred by remaining investors who continue to hold their interest in the Fund.

The NAV Error will be covered by: (i) GAF's pro rata portion of the Adviser's and the Fund's joint insurance policy and $250,000 deductible (paid by the Adviser); (ii) an additional payment and rebate of advisory fees by the Adviser; and (iii) recognizing the effect of the Gain above Fair Value (an approximately $2.3 million portion) in the correction. This later aspect is unique to GAF and arises from a sale of TerreStar equity above fair value after the shareholder approval of the conversion, and results in a write down of the remaining balance of the receivable due to the Fund. A numerical summary is as follows:

| | Loss to Fund | Loss to Shareholders | Totals |
|---|---|---|---|
| Net Loss | (6,068,851) | (1,373,272) | (7,442,124) |
| Processing, Fees, Interest | (375,000)[1] | - | (231,000) |
| Insurance Proceeds | 3,566,248 | 1,373,272 | 4,939,520 |
| Insurance Deductible paid by Adviser | 246,976 | - | 246,976 |
| Additional Payment from Adviser | 375,000[1] | - | 231,000 |
| Gain above Fair Value | 2,255,628 | - | 2,255,628 |
| Total* | - | - | - |

*The Total row should net to zero and serves solely as a check figure.

[1] As noted on page 2, processing costs were updated on April 1, 2019 based on the most recent reprocessing fee estimate available from the Transfer Agent's special events team.

Taking into account all relevant data surrounding the TerreStar investment (including the Gain above Fair Value) when applying the NAV Error Correction Procedures is particularly important in light of (i) the robust

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

disclosure included in the Fund's definitive proxy statement, which made very clear the risks associated with the ongoing valuation of the TerreStar investment; and (ii) shareholder's overwhelming vote in favor of the Conversion (95% of shareholders present at the shareholder meeting voted in favor of the Conversion proposals). This shareholder affirmation suggests that shareholders chose to continue to seek exposure to the TerreStar investment. The Adviser also believes that these shareholders have invested in the Fund (as well as other funds advised by the Adviser) for these unique and opportunistic investment opportunities that provide investors with access to institutional quality strategies in a 1940 Act offering.

The following granular points were considered with respect to the realized Gain above Fair Value in the application of the NAV Error Correction Procedures:

- On December 7, 2018, and prior to incorporation of the Updated Valuation, TerreStar was marked at $333.12 per share.

- When applying the Updated Valuation to GAF over its NAV Restatement Period, TerreStar's fair value marks were restated to $274.38 per share on December 7, 2018 (different values were determined for various other dates throughout the period).

- This restated value was intended to represent fair value more accurately than the previous TerreStar fair value marks, as set forth in the OCA consultation.

- The delta between $333.12 and $274.38 per share initially resulted in a NAV Error; however, *on the same day* GAF also executed a negotiated arm's length sale of 65,591 shares of TerreStar equity at a price of $350 per share for a total of $23 million.

- If the restated fair value price per share of $274.38 is representative of TerreStar's fair value on December 7, 2018, then a determination of the total impact to shareholders within the parameters of the Fund's NAV Error Correction Procedures (as discussed below) should consider <u>cumulatively</u> the delta between (i) the original mark of $333.12 per share and the revised mark of $274.38 share (red in the chart below) (the "<u>Basis of the NAV Error</u>") *and* (ii) the December 7, 2018 sale price of $350 per share and the revised mark of $274.38, or approximately $4.96 million (green in the chart below) (the Gain above Fair Value).

- While the Basis of the NAV Error (as reflected above under "Calculation of NAV Error") represents both a paper (unrealized) loss on the records of the Fund, the redemptions processed at the higher NAV values were actual (realized) losses to the Fund that were paid out in cash to shareholders; moreover the Gain above Fair Value reflects actual (realized) gains related to the same asset (TerreStar equity).

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)



- As addressed below in further detail, consideration in the resolution of the NAV Error of approximately $2.3 million of the Gain above Fair Value against the Basis of the NAV Error represents the equitable application and inclusion of all relevant data of the TerreStar price in the resolution of Loss to Fund from dilution of remaining investors.  As described in above, certain material components of the NAV error were estimated and can be finalized only after an investor-by-investor analysis is performed for the entire NAV restatement period by the Adviser and the Fund's transfer agent.  As such, the $2.3 million of the Gain above Fair Value that is proposed to be considered in the resolution of the loss (the "Remaining Liability") against the Basis of the NAV error could change materially, but would be limited to the total Gain above Fair Value of $4.96 million.

- Note, the benefit derived from the Gain above Fair Value compared to the amount of the total Loss to the Fund not covered by insurance inured to the benefit of all GAF shareholders on December 7, 2018 and not a subset of shareholders.

- Any shareholders subscribing into GAF subsequent to December 7, 2018 did not benefit from the Gain above Fair Value, but the approximate $17,000 of subscription proceeds paid in excess of the restated NAV will be made whole from insurance proceeds and the related deductible.

- As noted below under "Applicable Governance Standards in the Error Correction," the Adviser believes that the Gain above Fair Value should be equitably recognized in fairness under the NAV Error Correction Procedures. The analysis takes into account the "paper" dilution referenced above in resolution of the loss because the Fund's net assets increased due to *actual cash* realized in the December 7, 2018 sale at a price *higher* than the Updated Value. This sale benefitted remaining investors, however the fair value of the remaining TerreStar equity (reflected in the Updated Value) was not increased to reflect the full realized sale price.

- The factual circumstances surrounding the valuation of TerreStar equity, including:

  o The use of Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, to assist in the fair valuation;

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

    o    The initial conclusion that the sales of TerreStar in March 2018 (the "March Transactions") were "non-orderly", and the ultimate conclusion of the Adviser, after conclusion of a formal audit of affiliated funds holding TerreStar, that the March Transactions should be classified as "orderly"; and

    o    The consultation with the OCA.[2]

**Applicable Governance Standards in the Error Correction**

In order to determine the appropriate handling of the NAV Error, the applicable provisions of the Adviser's NAV Error Correction Procedures, in the context of provisions of the Advisory Agreement, must be considered. Based on the facts and circumstances present, the Adviser believes that the Remaining Liability may be discharged notwithstanding that such discharge decreases current NAV, provided that such discharge is considered to be equitable under application of the NAV Error Correction Procedures in light of all of the circumstances.

The Adviser's NAV Error Correction Procedures

The Fund's NAV Error Correction Procedures are internal procedures of general application and are neither disclosed nor provided to shareholders and therefore are not relied on by investors in connection with their investment in the Fund. While these procedures generally contemplate a determination of a "responsible party" for a NAV error, such a determination is with respect to which party will bear the loss rather than a determination of strict liability, and the procedures expressly contemplate that scenarios may arise where the Adviser, subject to approval of the Board of the Fund, may reach a variety of correction determinations.

The Adviser's process in taking into account the Gain above Fair Value when assessing the NAV Error is consistent with the Fund's NAV Error Correction Procedures in that:

To any extent circumstances are not expressly covered in the procedures (as is the case here), Item 9 of Section II, "Correction Procedures," states the following (emphasis added):

"9. The foregoing Procedures are designed for general application. However, *there may be situations where equity would suggest a different result under the circumstances*. Accordingly, the Adviser may, with the approval of the Board, diverge from these Procedures, as they deem appropriate, on a case by case basis.

Further and in support of such considerations here, according to Item 4 of Section I, "Definitions," in relevant part, "Fund Loss" includes a situation where a Fund "has paid excessive redemption proceeds as a result of an overstatement of net asset value." Although the definition of Fund Loss is silent on the unique circumstances present here, Item 2 of Section I provides context for analyzing the total harm in its definition of a NAV error:

"one or more errors in the computation of [NAV] that, *when considered cumulatively*, result in a difference between the originally computed NAV and the corrected NAV of at least $0.01 per share. If there are one or more errors in the computation of NAV that, *when considered cumulatively*,

---

[2] As a policy matter, a determination under these circumstances to ignore the Gain above Fair Value would result in an outcome where the Adviser's sale of an asset at a price above fair value results in an increase in Adviser liability due to the sale price not being fully reflected in the fair value of the asset afterwards (i.e., such an outcome would set precedent in effect for the penalization of the Adviser's sale of an asset at a material gain by actually increasing the Adviser's liability). The Adviser believes that its overarching duty of best execution would unfairly then operate to harm the Adviser and create a new potentially disclosable conflict of interest arising from seeking a higher sale price if it would result in increased Adviser liability.

6

result in a difference between the originally computed NAV and the corrected NAV of less than $0.01 per share, the impact is deemed to be immaterial and no corrective adjustment will be made to the Fund or any shareholder account. This computation is based upon the *actual difference* and is not based upon the rounding of NAV to the nearest cent per share." (emphasis added)

To the extent circumstances are not expressly covered, Item 9 as discussed above should govern.

Although the definition of Fund Loss is not a bright line rule in this circumstance, it follows that these two provisions should be taken together and the Adviser should expand the scope of the NAV Error analysis to include all factors when determining the equitable resolution for all parties. This results in the consideration of the Gain above Fair Value to the NAV Error, as discussed below when taking into account the NAV Error Correction Procedures, the Advisory Agreement as discussed below, and overall recompense of shareholders.

As the NAV Error Correction Procedures are designed for general application, the procedures do not, and were not intended to, contemplate or address every possible circumstance or scenario. Given the unique circumstances that produced the Gain above Fair Value (i.e. a period during which there is (1) an original fair value mark, an (2) Updated Valuation (defined below), and (3) the mark at which TerreStar was sold in a negotiated arm's length transaction to an unaffiliated third party), this particular scenario is not explicitly addressed in the general NAV Error Correction Procedures (set forth in Exhibit 1 of the attached NAV Error Correction Procedures).

The language preceding Item 9 in the NAV Error Correction Procedures is expressly designed to address shareholders of the Fund. Item 9, however, includes language that explicitly allows for a "divergence" from those procedures in, presumably, extraordinary circumstances where it is warranted. The Adviser believes the intent of Item 9 was to provide the flexibility needed to consider the unique circumstances described above where all factors should be considered when assessing the total impact to shareholders and the Fund so that an equitable outcome to *all* parties involved can be achieved. Based on this line of reasoning and because the Gain above Fair Value also occurred during the NAV Restatement Period, the Adviser views the Gain above Fair Value as equitable partial compensation for the Fund's losses resulting from the NAV Error. In addition, as discussed below, the Adviser believes this outcome is consistent not only with the equitable application of the NAV Error Correction Procedures but with the standards governing adviser conduct in the Advisory Agreement and general principles of fairness to investors and the Adviser, as well as the Adviser's fiduciary duty of best execution in seeking to and ultimately selling TerreStar at the highest price possible. This approach has been discussed with the Board (see below).

Applicable Advisory Agreement Provisions

To provide additional context for the Adviser's view on the appropriate treatment of the NAV Error, the Adviser believes that it also is appropriate to examine the relationship between the Fund and Adviser under contractual obligations and representations to investors. The standards of the contractual relationship are disclosed to shareholders in the Fund's offering documents and relied upon by shareholders when investing in the Fund. Under the investment advisory agreement between the Fund and the Adviser (the "Advisory Agreement"), the Adviser does not act as a guarantor against all loss arising from error or mistake, but rather is responsible for error or loss arising only from the Adviser's Disabling Conduct, as defined in the Advisory Agreement.

Section 8 of the Advisory Agreement states that "the Adviser shall not be liable for any error of judgment or mistake of law or any loss suffered by the Fund in connection with matters to which the Agreement relates," provided that nothing in the Agreement shall protect the Adviser against liability to the Fund or shareholders to which the Adviser may be subject by reason of Disabling Conduct. Section 6(a) of the Advisory Agreement defines "Disabling Conduct") as (i) willful misfeasance, (ii) bad faith, (iii) gross negligence or (iv) reckless disregard of the duties involved in the conduct of his position".

7

The Advisory Agreement also comports with Section 17(i) of the Investment Company Act of 1940, as amended (the "1940 Act"), which states that no contract or agreement can protect an investment adviser against any liability to a fund or shareholders "by reason of willful misconduct, bad faith, or gross negligence, in the performance of his duties, or by reason of reckless disregard of his obligations and duties under such contract or agreement." The Advisory Agreement's standards of liability and indemnification provisions also are consistent with common industry practice for adviser indemnity and liability provisions in advisory agreements of registered funds.

The Advisory Agreement is an exhibit to the Fund's registration statement, and the Fund's Statement of Additional information includes a description of the terms of the Advisory Agreement, including in relevant part:

> "The Investment Advisory Agreements provide that in the absence of willful misfeasance, bad faith or gross negligence in the performance (or reckless disregard) of its obligations or duties thereunder on the part of HCMFA, HCMFA shall not be subject to liability to a Fund for any error of judgment or mistake of law or for any loss suffered by the Fund in connection with the matters to which the Investment Advisory Agreement relates."

**Analysis of the Facts**

Under the NAV Error Correction Procedures (Part II, Section 9), the Adviser, with the approval of the Board, may diverge from such general procedures as they deem appropriate where equity would suggest a different result under the circumstances.  As a result of and based on the facts and circumstances present, which have been addressed above, the Adviser believes that the Remaining Liability owed by the Adviser may be discharged notwithstanding that such discharge decreases current NAV. As set forth above, numerous points were considered with respect to the realized Gain above Fair Value, taking into context facts discussed in the OCA consult, the resulting fair valuation and the circumstances of the Adviser's December sale of TerreStar equity.

As noted, the Adviser under the Advisory Agreement does not act as a guarantor against all loss arising from error or mistake, but rather is responsible for error or loss arising only from the Adviser's Disabling Conduct. The Adviser believes that the record supports that it has acted consistently in good faith in the reasonable belief that its actions were in the best interests of the Fund, and have not acted at any point in a manner amounting to Disabling Conduct.[3]  In addition, the Adviser's actions should be viewed within its general fiduciary duty under Section 36(a) of the 1940 Act and Section 206 of the Investment Advisers Act of 1940.  In this regard the Adviser strongly asserts that it did not engage in personal misconduct, was not grossly negligent, acted in good faith and intent at all times, and in fact sought and received a price on the TerreStar equity sale at a price that significantly exceeded the assessed fair value, to the significant benefit of informed investors who chose to stay in the Fund through the conversion. In such context, the Adviser believes that, upon Board agreement, it is proper under the NAV Error Correction Procedures to acknowledge the Gain above Fair Value in the manner described.

---

[3] Although as noted in the OCA consult process, the Adviser identified a material weakness in the control environment related to assessments of non-observable inputs for certain affiliated funds and the Fund, such matter does not result in the Adviser having failed to act in good faith or in accordance with its duties to the Fund. As noted above, the Adviser does not manage the Fund as a strictly liable party, but rather is responsible for error or loss arising only from its Disabling Conduct. The Adviser believes that its conduct throughout has never reflected willful misfeasance, bad faith, gross negligence or a reckless disregard of its duties. Indeed, it has consistently sought to value TerreStar appropriately, and indeed has, in the form of actual sales reflected by the Gain above Fair Value, achieved sales of TerreStar above the original fair value as well as the fair value resulting from the OCA consult.

**Shareholder and Fund Reprocessing**

The NAV Error totals approximately $7.8 million (including interest, rebate of Advisory fees, and processing costs). The NAV Error will be covered by: (i) GAF's pro rata portion of the Adviser's and the Fund's joint insurance policy and $250,000 deductible (paid by the Adviser); (ii) an additional payment and rebate of advisory fees by the Adviser; and (iii) the equitable determinations under the NAV Error Correction Procedures with respect to recognizing the effect of the Gain above Fair Value (an approximately $2.3 million portion) in the correction, which is unique to GAF.

In connection with this analysis, the Adviser has proposed to the Board the following process regarding the GAF NAV Error:

1.  Book a receivable for the NAV Error.

2.  Apply the insurance proceeds pro rata based on losses across the impacted funds.

3.  Adviser to pay the:

    •   Ratable share of insurance deductible across the impacted funds; and

    •   Management fee rebate, interest and processing costs across the impacted funds.

4.  Application of the Gain above Fair Value to the remaining GAF NAV Error as fair and equitable under the NAV Error Correction Procedures, and general principles of equity.

Note: items 1-3 have been completed.

**Accounting Treatment**

The Adviser notes the sale of the TerreStar equity in December 2018 is separate from the revised valuations of the asset that gave rise to the NAV Error and resulting receivable. It is the Adviser's position, however, that the gains from the sale of TerreStar equity simply cannot be ignored in an equitable and comprehensive assessment of total impact to shareholders during a specific accounting period (i.e., the NAV Restatement period).

U.S. generally accepted accounting principles ("GAAP"), however, lacks specific guidance that addresses the proper accounting treatment for striking the daily NAV of a fund where there is (1) an original fair value mark, (2) an Updated Valuation, and (3) a price at which the same asset was sold in a negotiated arm's length transaction to an unaffiliated third party. As such, whatever resolution is ultimately reached regarding the proposal outlined in this memo will dictate the accounting entries to be made in the books and records of the Fund.

If the Remaining Liability is discharged pursuant to Item 9 from Section II of the NAV Correction Procedures, the Adviser notes there is applicable accounting guidance that should be considered. ASC 405-20-40 holds that a liability has been extinguished if "the debtor is legally released from being the primary obligor under the liability, either judicially or by the creditor." In this case, without admission that the Adviser is responsible for the remaining NAV error, the Adviser is the debtor and the Fund is the creditor. The approval of this proposal would remove the liability for payment of this balance. With the extinguishment of the liability, the receivable would no longer be collectible as of the date of the approval.

The following accounting entry would be recorded on the records of the Fund in order to extinguish the remaining Receivable due to the NAV Error:

| | | |
|---|---|---|
| Equity of the Fund | $2,255,628 | |
| Receivable due to Fund | | $2,255,628 |

*To write down the remaining balance of the receivable due to the Fund*

The Adviser views this "write down" as the reduction of a portion of the approximately $5 million of Gain above Fair Value, which has been settled in cash and reflected as an increase in the net assets of the Fund as of the date of the sale. This approach represents an equitable resolution under the NAV Error Correction Procedures and has been discussed with and reviewed by the Fund's counsel, Chief Compliance Officer and Treasurer. Fund counsel believes that the proposed treatment represents an equitable and reasonable resolution under the NAV Error Correction Procedures.

Regarding the appropriate disclosure under GAAP, paragraph 11.67 of the AICPA Guide to the Audit of Investment Companies, "Regulation S-X requires disclosure of more information about transactions with [or related to] affiliates in prospectuses and annual reports to the SEC than is required under GAAP. Various rules of Regulation S-X require the financial statements of an investment company to state separately investments in affiliates, investment income from affiliates, gain or loss on sales of securities of affiliates, and management fees or other service fees payable to controlled entities and other affiliates." Here, the gain on the sale of TerreStar to an unaffiliated third party is a gain on the sale of securities of a portfolio affiliate; as such, the Adviser acknowledges its disclosure obligation in the Fund's 2019 Annual Report.

The proposed treatment of receivable recorded by the Fund would not affect the balances and disclosures in the audited financial statements previously filed for the Fund for the year ended September 30, 2018. If the Remaining Liability is not discharged, a receivable for the same amount will remain on the books and records of the Fund.

**Board Discussions**

The Board agrees in principal with the aforementioned treatment of the NAV error, subject to consultation with and review by the SEC Staff. Although the Adviser has begun shareholder reprocessing with the Fund's transfer agent, the Adviser does not intend to begin issuing payments to shareholders until all SEC Staff comments, if applicable, have been answered.

**Conclusion**

The NAV Error for the Fund totals approximately $7.8 million (including interest, rebate of Advisory fees, and processing costs); the Fund and its shareholders have received $5.2 million and will receive an additional amount of approximately $328,000 from the Adviser (i.e., shareholders who subscribed into the Fund at a price higher than the restated NAV will be made whole). The remaining approximately $2.3 million can appropriately be discharged based on the consideration of all of the circumstances and the equitable authority included in the NAV Error Correction Procedures. This equitable treatment, which includes viewing all data points on an aggregate basis and considering the totality of the circumstances, is permitted under the Fund's NAV Error Correction Procedures and aligns with the Adviser's contractual duties to the Fund.

10

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

**<u>EXHIBIT A</u>**

**NAV Error Correction Procedures**

John A. Morris (*pro hac vice*) (NY Bar No. 266326)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Telecopier: (310) 201-0760
Email:    jmorris@pszjlaw.com

*Attorneys for Debtor Highland Capital Management, LP*

Deborah Deitsch-Perez (TX Bar No. 24036072)
Michael P. Aigen (TX Bar No. 24012196)
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email:    deborah.deitschperez@Ssinson.com
          michael.aigen@stinson.com

*Attorneys for James Dondero, Nancy Dondero,*
*Highland Capital Management Services, Inc.*
*and HCRE Partners, LLC*

Davor Rukavina (TX Bar No. 24030781)
Julian P. Vasek (TX Bar No. 24070790)
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Telecopier: (214) 978-4375
Email:    drukavina@munsch.com

*Attorneys for NexPoint Advisors, L.P. and*
*Highland Capital Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff,<br><br>vs.<br><br>JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adv. Proc. No. 21-03003 |

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 21-03004-sgj |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | |
| Defendant. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 21-03005 |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | |
| Defendants. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 21-03006 |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | |
| Defendants. | |

HIGHLAND CAPITAL MANAGEMENT, L.P.,

     Plaintiff,

vs.

HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate
Partners, LLC), JAMES DONDERO, NANCY
DONDERO, AND THE DUGABOY INVESTMENT
TRUST,

     Defendants.

Adv. Proc. No. 21-03007

## STIPULATION TO EXTEND TIME OF SUMMARY JUDGMENT BRIEFING

This Stipulation is entered into between and among Highland Capital Management, L.P., the plaintiff (the "Plaintiff") in the above-referenced adversary proceedings (the "Adversary Proceedings"), on the one hand, and James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Capital Management Services, Inc. and HCRE Partners, LLC (the "Defendants") (Plaintiff and Defendants together, the "Parties"), the defendants in the Adversary Proceedings, on the other hand.

## RECITALS

WHEREAS, on January 22, 2021, Plaintiff commenced the Adversary Proceedings;

WHEREAS, Plaintiff subsequently amended its pleading to add additional claims and parties (collectively, the "Amended Complaints");

WHEREAS, Plaintiff filed its Motion for Partial Summary Judgment (the "Summary Judgment Motion");

WHEREAS, the deadline for Defendants to file their opposition to the Summary Judgment Motion is January 17, 2022;

3

WHEREAS, the deadline for Plaintiff to file its reply in support of the Summary Judgment Motion is January 31, 2022;

WHEREAS, oral argument on the Summary Judgment Motion has been scheduled for March 8, 2022, at 9:30 a.m. (the "Hearing Date"); and

WHEREAS, the Parties have agreed to enter into this Stipulation to extend the briefing schedule on the Summary Judgment Motion.

## STIPULATION

NOW, THEREFORE, in consideration of the foregoing, the Parties agree and stipulate as follows:

1.      The Parties agree that the deadline for Defendants to file their opposition to the Summary Judgment Motion and all documents in support thereof shall be extended to, and include, **January 20, 2022 at 11:59 p.m.**

2.      The Parties agree that the deadline for Plaintiff to file its reply in support of the Summary Judgment Motion and all documents in support thereof shall be extended to, and include, **February 7, 2022 at 11:59 p.m.**

3.      The Parties agree that Defendants will not file anything in response to the Summary Judgment Motion other than the opposition, evidence, and/or motions to strike and objections and specifically agree that Defendants will not seek to stay or continue any of the deadlines set forth herein or the Hearing Date (absent compelling circumstances) on the Summary Judgment Motion or seek to have it heard by a different court or judge.

Dated: January 12, 2022

CONSENTED AND AGREED TO BY:

/s/ John A. Morris

John A. Morris *(pro hac vice)*
(NY Bar No. 266326)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Telecopier: (310) 201-0760
Email:   jmorris@pszjlaw.com

*Attorneys for Debtor Highland Capital
Management, LP*


/s/ Davor Rukavina

Davor Rukavina (TX Bar No. 24030781)
Julian P. Vasek (TX Bar No. 24070790)
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Telecopier: (214) 978-4375
Email:   drukavina@munsch.com

*Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors,
L.P.*

/s/ Michael P. Aigen

Deborah Deitsch-Perez (TX Bar No. 24036072)
Michael P. Aigen (TX Bar No. 24012196)
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Telecopier: (214) 560-2203
Email:   deborah.deitschperez@stinson.com
               michael.aigen@stinson.com

*Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc.
and HCRE Partners, LLC*

CORE/3522697.0002/172079994

## CERTIFICATE OF SERVICE

I certify that on January 12, 2022, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing system to the parties that are registered or otherwise entitled to receive electronic notices in this adversary proceeding.

*/s/ Michael P. Aigen*
Michael P. Aigen

CORE/3522697.0002/172079994

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| | ) **Case No. 19-34054-sgj-11** |
| In Re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) Monday, January 10, 2022 |
| | ) 9:30 a.m. Docket |
| Debtor. | ) |
| —————————————————— | ) |
| | ) |
| HIGHLAND CAPITAL | ) **Adversary Proceeding 21-3004-sgj** |
| MANAGEMENT, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) DEFENDANT'S SECOND MOTION TO |
| | ) AMEND ANSWER [82] |
| HIGHLAND CAPITAL MANAGEMENT | ) |
| FUND ADVISORS, L.P., | ) |
| | ) |
| Defendant. | ) |
| —————————————————— | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor-Plaintiff:   John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For the Defendant:          Davor Rukavina
                            Julian Preston Vasek
                            MUNSCH HARDT KOPF & HARR, P.C.
                            500 N. Akard Street, Suite 3800
                            Dallas, TX  75201-6659
                            (214) 855-7587

Recorded by:                Michael F. Edmond, Sr.
                            UNITED STATES BANKRUPTCY COURT
                            1100 Commerce Street, 12th Floor
                            Dallas, TX  75242
                            (214) 753-2062

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 12/06/24    Page 59 of 347    PageID 36108

2

1   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
2                                Shady Shores, TX   76208
                                 (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24              Proceedings recorded by electronic sound recording;
                  transcript produced by transcription service.
25

 1                   DALLAS, TEXAS - JANUARY 10, 2022 - 10:19 A.M.

 2              THE COURT:  I will now take appearances in the

 3   Highland Capital Management versus HCMFA adversary.  This is

 4   Adversary 21-3004.  We have Defendant's Second Motion to Amend

 5   Answer.  Who do we have appearing for the Defendant?

 6              MR. RUKAVINA:  Your Honor, good morning.  Davor

 7   Rukavina and Julian Vasek for the Defendant.

 8              THE COURT:  Good morning.  Who do we have appearing

 9   for Highland?

10              MR. MORRIS:  Good morning, Your Honor.  This is John

11   Morris from Pachulski Stang Ziehl & Jones for Highland

12   Capital, for the Reorganized Debtor Highland Capital

13   Management, LP.

14              THE COURT:  All right.  Thank you.  I know we have

15   many observers.  Is there anyone else who wanted to appear?

16        (No response.)

17              THE COURT:  All right.  Well, we had lots of paper

18   filed on this matter.  Mr. Rukavina, how did you want to

19   proceed?

20              MR. RUKAVINA:  Your Honor, I'd like to give an

21   opening.  Well, I'd like to give my argumentation.  There is a

22   disagreement.  I understand Mr. Morris would like to call D.C.

23   Sauter as a witness.  It's my position that that's not

24   possible under the Local Rules.  But perhaps the Court wants

25   to rule on that matter first, because that would then affect

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 27   Filed 04/07/24   Page 61 of 347   PageID 36110

4

1    the manner of presentation.

2           THE COURT:  Okay.  So you say it's not allowed under

3    Local Rules for the Debtor to call a witness?  What Local Rule

4    do you mean?

5           MR. RUKAVINA:   Yes, Your Honor.  I'm referring to

6    the Local Rule 7007(g), which talks about that a party who

7    relies on exhibits, evidence, et cetera, does so through an

8    appendix.  In fact, the Debtor filed its appendix.  I filed my

9    appendix.

10       And I think certainly the Court has discretion, but I

11   think in twenty years of practicing before this Court, unless

12   it's a sanctions issue or unless it's a preliminary injunction

13   issue, it's been my understanding that motions are always

14   adjudicated based on the appendices.

15       And I believe that Your Honor has indicated or even stated

16   that the District Court rules should applies to this

17   proceeding, and the District Court rules, I think, are even

18   clearer, because they provide that there is not even a hearing

19   on the motion.  But, and they again require that any evidence

20   in support or opposition to a motion be by a declaration or by

21   deposition transcripts, again, in an appendix.

22       So I really have nothing more to add than that.  It's just

23   a matter of Local Rules.  Mr. Sauter is available should the

24   Court require him to be cross-examined.  And I'll -- I'll just

25   rely on Rule 7007(g).

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/06/24   Page 62 of 347   PageID 36111

5

```
 1              MR. MORRIS:  If I may, Your Honor?

 2              THE COURT:  Yes.  I'm pulling it up, since I don't

 3    have every Local Rule memorized.  So, appendix requirement.

 4    Isn't this just a rule whenever you have -- do an appendix,

 5    here are the requirements?  I don't know.  What did you --

 6              MR. RUKAVINA:  Well, Your Honor, --

 7              THE COURT:  Go ahead.

 8              MR. RUKAVINA:  It says a party who relies on

 9    documentary or nondocumentary evidence to support or oppose a

10    motion shall include such evidence in an appendix.  I've

11    always taken that to mean that -- we don't have many hearings

12    with live testimony, with cross-examination, on pure motion

13    practice, especially procedural motion practice.

14        But I don't have a case for you.  I don't have, you know,

15    this isn't -- this isn't a U.S. Supreme Court matter.  This is

16    just a matter of local practice.

17              MR. MORRIS:  May I be heard, Your Honor?

18              THE COURT:  Okay.  Mr. Morris, go ahead.

19              MR. MORRIS:  Just briefly.  It's exactly why I raised

20    this issue last week.  I raised it with Mr. Rukavina.  He told

21    me his position.  He's never given me any authority that says

22    I can't do this.

23        We wrote to the Court.  We copied him.  The Court told the

24    parties last Thursday that it's the Court's practice to allow

25    litigants to cross-examine witnesses who put forth
```

1    declarations.  Mr. Sauter has put forth a substantive

2    declaration.  This is not an attorney's declaration that

3    attaches documents.  It's testimony.  And that testimony is

4    going to be put in the record to support a motion, and

5    Highland respectfully requests the opportunity to cross-

6    examine Mr. Sauter on his statements.

7             THE COURT:  Okay.  I remember the question coming to

8    me through the courtroom deputy last week, and so I understand

9    she communicated an answer.  This should be no surprise.  I

10   mean, we generally allow the opportunity for cross-examination

11   wherever there's a declarant submitting evidence.  And, I

12   mean, I see the rule you're talking about, Mr. Rukavina, but I

13   don't think there should have been any doubt because of the

14   communication through my courtroom deputy that I was going to

15   allow cross-examination for any declarant.

16       And, frankly, I mean, this is a pretty important motion.

17   You know, for crying out loud, it was an 800-page-plus

18   appendix, I think, with all the documentation.  I think that

19   was yours, Mr. Rukavina.  So the ruling is we will allow

20   cross-examination of Mr. Sauter.

21       All right.  Mr. Rukavina?

22            MR. RUKAVINA:  Then, Your Honor, then I'll propose --

23   I propose that I just give you my argumentation based on Mr.

24   Sauter's declaration as his direct testimony, and then, of

25   course, Mr. Morris will cross-examine him.  I don't know that

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/06/24   Page 64 of 347   PageID 36113

7

1    we need an opening, evidence, then closing.

2              MR. MORRIS:  I'd like the opportunity to make a brief

3    opening, Your Honor.

4              THE COURT:  Okay.  I'll --

5              MR. MORRIS:  If Mr. Rukavina doesn't want to do that,

6    that's fine.

7              THE COURT:  I'll allow opening statements.  Again, I

8    think this is a pretty big deal.  So I'll allow it if you want

9    to make an opening statement.

10             MR. RUKAVINA:  Okay, Your Honor.  Thank you.

11             OPENING STATEMENT ON BEHALF OF THE DEFENDANT

12             MR. RUKAVINA:  So, as the Court is certainly aware,

13   this is our second motion to amend our answer.  The amended

14   answer would more specifically and expressly deny that Mr.

15   Waterhouse signed the two promissory notes at issue in this

16   lawsuit.

17       I don't think that we've had a contested hearing in this

18   adversary, Your Honor, although it is one of the note cases.

19   So I think it would help the Court just to give you a very

20   quick summary of what the issues in this adversary are.

21       We, the Defendant, deny that they are -- that there are

22   valid promissory notes here.  This isn't an issue where we

23   have the potential forgivable promissory notes.  This isn't an

24   issue where we have other defenses like in the other cases.

25   Here, our defense -- really, our only defense -- goes to the

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 65 of 347   PageID 36114

8

1   core of whether there are enforceable contractual promises

2   here.

3        In May of 2019, it is true that the Debtor transferred

4   $7.4 million to HCMFA.  That is not disputed.  What is

5   disputed is whether that transfer was for compensation to

6   HCMFA or whether it was to be a loan to be repaid.

7        That defense has already been pled.  We're not here today

8   to try that defense.  We're not here to prove that defense.

9   But it is important context because how and why Mr. Waterhouse

10  would have or did sign these promissory notes goes to the core

11  of this mistake.

12       What the evidence is is that Mr. Dondero told Mr.

13  Waterhouse to transfer $7.4 million.  Mr. Dondero, in his

14  mind, was doing that because the Debtor caused a misstate

15  which cost $7.4 million of liability for HCMFA.  Mr. Dondero

16  never told Mr. Waterhouse to paper it up as a loan.  Mr.

17  Waterhouse doesn't remember being told to paper it up as a

18  loan.  Mr. Waterhouse told his team to transfer the funds.

19  That team then implemented its standard operating procedure,

20  which is that when it sees intercompany transfers going back

21  and forth it papers them as loans.

22       Mr. Waterhouse confirmed that only Mr. Dondero would have

23  had authority to create this loan.

24       In any event, Mr. Vasek, if you'll please share the

25  promissory note with the Court, one of them, Your Honor will

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 66 of 347   PageID 36115

9

1   see what these notes look like.  And, again, I'm not here

2   today to try the underlying merits, but it's important to see

3   that everything regarding these notes is a mistake, really.

4       So here's one of these two promissory notes.  And

5   obviously, HCMFA is defined as the maker here, but Mr. Vasek,

6   if you'll scroll to the second page, you'll see, Your Honor,

7   that the note is signed by Frank Waterhouse.  And he's not

8   signing it as a CFO.  He's not signing it as a treasurer.  And

9   I know that Your Honor has extensive experience, both as a

10  judge and in private practice, with promissory notes and

11  corporate obligations.  The UCC is very clear.  When someone

12  signs a note like this, he is signing it in order to be

13  jointly and severally liable with the maker.

14      So immediately here, when this case was filed, we saw

15  something that you don't have in the other cases, you have

16  something that's very strange, you have maker Frank

17  Waterhouse.  Clearly, it was not the intent of the parties

18  that Frank Waterhouse would be personally liable for $7.4

19  million.  But it just shows how the mistakes kept happening.

20      So, Mr. Vasek, if you'll please share with the Court my

21  request for production.

22      Your Honor, what Mr. Vasek is going to show you is my May

23  28, 2021 request for production.  It's my second request for

24  production.

25      And if you'll scroll down, Mr. Vasek, I believe it's

1    Request #2.

2          Okay.  Your Honor -- oh, I'm sorry, it's Request #9.  Your

3    Honor can see I'm requesting all Microsoft Word copies of the

4    notes, including metadata.

5          So, again, the manner in which the note is signed

6    certainly -- certainly raised our eyebrows.  It certainly made

7    us think.  And we did what we are supposed to do.  We

8    requested through discovery the originals and metadata so that

9    we can see what happened.  Because Your Honor will see, and

10   I'm sure Mr. Sauter will testify about it, by this time Mr.

11   Sauter had asked Mr. Waterhouse, what are these notes?  Did

12   you sign these notes?  And Mr. Waterhouse told Mr. Sauter,

13   well, it looks like my signature so I must have signed them.

14   So, so as of this time in May, we still did not have any real

15   reason to say that Mr. Waterhouse didn't sign the notes except

16   we had a reasonable suspicion based on the way that the notes

17   are signed that something happened here.

18         Mr. Vasek, if you'll please share the Debtor's response to

19   the RFP.  And if you'll scroll down to the answer to RFP #9.

20         So, Your Honor, this is in July now.  I'm sorry, this is

21   in June.  And the Debtor makes a limited objection to Request

22   #9.  But the Debtor basically says it'll conduct a reasonable

23   search for and produce documents responsive to this request.

24         You can pull that down.

25         So, so I did not file a motion to compel.  There was no

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 28    Filed 10/21/44    Page 68 of 347    PageID 36117

11

1    need to file a motion to compel.  The Debtor's objection based

2    on metadata was limited.  And I expected that the Debtor would

3    produce the originals of the notes.

4        It didn't.  It didn't.  It did, in late July, produce some

5    Word documents that had all metadata scrubbed.  It was not

6    obvious what those were.  The Debtor is now saying that those

7    were the originals of the notes.  But that was not my

8    understanding.  There were not -- there was no metadata.  And

9    it wasn't the Debtor's understanding.  And I'll show you why

10   the Debtor also believed that it did not produce the originals

11   of the notes.

12       If you'll pull up the October 15th email, Mr. Vasek.

13       So, remember, Judge, we just stopped in late June when the

14   Debtor answers my RFPs.  Here we are now in mid-October.

15   We're about to go into two weeks of depositions.  Your Honor

16   knows who Ms. Deitsch-Perez is.  She's my co-counsel.

17       Scroll down a little bit, Julian, please, to my -- to Ms.

18   Deitsch-Perez's email.  So, stop right there.

19       So, Judge, this is a long email string.  The Court can

20   certainly look over it if it needs to.  The only relevant

21   portions are these top two emails, where Ms. Perez says, John,

22   please have Debtor produce the Word versions of all the notes

23   at issue.  We have searched and it does not appear that they

24   were produced.  Can you do that today?  Thanks.

25       And if you'll scroll up, Mr. Vasek, Mr. Morris writes

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178-28   Filed 11/29/24   Page 69 of 347   PageID 36118

12

1    back, I'll look into it, Deborah.

2         You can -- you can close this document.

3         And, again, this is important because we're about to

4    depose Mr. Waterhouse.  Ms. Perez, Deitsch-Perez and I, we're

5    waiting for the notes.  We're waiting for the metadata.  I'm

6    starting to think, well, they can't find the notes, there are

7    no notes.  But we go forward.

8         And if you'll pull up the next -- the transcript, Mr.

9    Vasek.

10        So now, Your Honor, we are on October the 19th, 2021.  Now

11   we are deposing Mr. Waterhouse.  Mr. Waterhouse, recall, is

12   the person that purportedly signed these notes.  Mr.

13   Waterhouse is the key witness.  Only he and Mr. Dondero know

14   what was said.  And Ms. Deitsch-Perez, you can see here, she

15   asks on the record, John, I also asked you for the Word

16   versions of these notes so we can look at the properties and

17   you have not provided them.  Are you intending to?  Mr. Morris

18   answers, No.

19        So this is October 19th now.  This is during the

20   Waterhouse deposition.

21        You can close this document, Mr. Vasek, and pull up the

22   October 23rd email.

23        Now, after this, after this deposition, Mr. Morris and I

24   talk and we continue to negotiate.  And ultimately Mr. Morris

25   and I reach an agreement.  Mr. Morris wanted certain documents

1   of my clients that I'm sure he'll go through today.  They're

2   what we, I guess, call Rule 15(c).  Not Civil Practice Rules,

3   but SEC Rule 15(c)'s.  And I wanted these notes.  So, so this

4   is an October 23rd email.

5       Scroll down, Mr. Vasek.  Please scroll down some more.

6       And, again, the Court can read all this.  A lot of this

7   deals with ordinary discovery issues.

8       Stop right there.  Scroll down.  You have to scroll up

9   now.  Okay.  Stop right there.

10      Okay.  So this is Mr. Morris writing to me:  We also

11  expect to produce you the Word versions of each of the notes

12  in advance of the depositions.

13      And here, the depositions we're talking about are those of

14  Mr. Klos and Ms. Hendrix.

15      Please let us know whether we'll challenge the

16  authenticity, et cetera.  Highland has a potential expert, if

17  needed, et cetera.  And then you'll see Mr. Morris continues:

18  Davor, based on Highland's willingness to produce the Word

19  versions of the notes, please confirm that HCMFA and NexPoint

20  will produce those -- those 15(c) response.

21      So, again, this -- this is -- this is reflective of our

22  October 23rd agreement to produce these documents to each

23  other, remembering that I requested these notes in May.  And,

24  really, I don't understand why the Debtor would have not

25  produced those right away with all metadata.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 11/09/21   Page 71 of 347   PageID 36120

14

1          And then Mr. Vasek, if you'll please pull up the October

2     26th email.

3          And this, Your Honor -- and Mr. Morris, almost immediately

4     after that, on October the 25th, sends me an email, copying my

5     associate, with -- with the promissory notes.  But Mr. -- I

6     think that Mr. Morris's email system, just like mine, it

7     automatically scrubs metadata from attachments until you --

8     unless you tell it not to.

9          So if you'll scroll up, Mr. Vasek, so this is October the

10    25th.  Mr. Morris sends it.  My associate tells him, We still

11    don't have the metadata.  Please check.

12         Keep scrolling up.

13         And Mr. Morris says, in transit, he will respond.  And he

14    did respond.  He sent, on October the 26th, the promissory

15    notes in Word with all metadata intact.  So Mr. Morris did

16    what he said he would, he got it to us, and we had the

17    originals for the Klos, and far more importantly, the Hendrix

18    deposition.

19         You can close that, Mr. Vasek, please.  And pull up one of

20    the notes.

21         So now Mr. Vasek, Your Honor, is going to pull up for you

22    one of the promissory notes in its original Word.  And you

23    will see hopefully why this is of importance to me.  Only when

24    we got this did we see that these notes are electronically

25    signed.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 11/09/21   Page 72 of 347   PageID 36121

15

1    Go ahead and show Her Honor how -- how you can move it

2    around.

3    You see, Your Honor?  So these are not even electronically

4    signed in the way that there's all these sophisticated systems

5    that have identification and receipts for when you've signed.

6    This is a picture of Mr. Waterhouse's signature that was

7    affixed to this promissory note.

8    More importantly -- if you'll go the metadata, Mr. Vasek

9    -- and I'm sure Your Honor knows what metadata is.  But now,

10   now we see, for the first time, we see that, in fact, this

11   document was created by Strasburger by a lawyer there named

12   Mr. Forsay (phonetic).  I don't know how to pronounce that; I

13   apologize.  But that Ms. Kristin Hendrix actually modified

14   this document and created the document and printed the

15   document on May 3rd and May 2nd, 2019.  In fact, she never

16   printed this document.  She just closed it onto the system,

17   affixing Mr. Waterhouse's picture of his -- of his signature.

18   So this is what spurred the motion.

19   You can close this now, Mr. Vasek.

20   So now we know for a fact, Your Honor, that Mr. Waterhouse

21   didn't sign these notes.  That's a fact.  The only question

22   is, did he authorize Ms. Hendrix to sign the notes for him?

23   And here, the evidence is contradictory.  Mr. Waterhouse --

24   you have it in my brief; I can walk you through the appendix

25   -- Mr. Waterhouse says that in May 2019, May 2019, he very

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 7-28   Filed 10/09/21   Page 73 of 347   PageID 36122

16

1  rarely authorized anyone to sign anything for him

2  electronically and that it would have been his administrative

3  assistant.  He testified that he would not have signed notes

4  like this unless they were approved by the Debtor's legal

5  department with a little piece of paper on the front and a

6  stamp that said, Approved by blah-blah-blah.  And he -- he

7  testified that if he were to authorize someone to sign a

8  document for him electronically, that he would have done so by

9  an email.

10     Ms. Hendrix testified the opposite.  Ms. Hendrix testified

11  that in May 2019 she was or Mr. Waterhouse was signing almost

12  everything electronically.  She testified that these notes

13  would have been created by her or someone in her department,

14  not by the Debtor's legal department.  And she testified that,

15  well, she would not have signed the notes for Mr. Waterhouse

16  if he had not authorized her to.  But neither she nor Mr.

17  Waterhouse could remember any such authorization.  Neither she

18  nor Mr. Waterhouse have any email communication to that

19  effect.  And the Debtor has not produced any emails such as

20  Mr. Waterhouse said would exist had he authorized this

21  electronic signature.

22     So it appears that Ms. Hendrix deduced or concluded that

23  she was authorized to sign Mr. Waterhouse's name because Mr.

24  Waterhouse, as part of many people in the accounting group,

25  was copied on emails by which she created these notes.  In

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 11/09/22   Page 74 of 347   PageID 36123

17

1   other words, she's told, transfer money from the Debtor to

2   HCMFA.  She does that.  Mr. Klos tells her -- Mr. Klos was her

3   boss then -- prepare notes, because that's standard operating

4   procedure.  And then when she prepares the notes, she

5   circulates them and copies Mr. Waterhouse.  And that's it.

6   From that, she believes that she was authorized to sign his

7   name.

8        Those are questions for the jury.  Those are questions for

9   the jury as to whether there is an estoppel issue, whether Ms.

10  Hendrix was right to conclude that she was authorized, whether

11  Mr. Waterhouse, through a course of conduct and pattern, had

12  authorized her.  I will just say that I analogize it in my

13  mind with our Local Rules and our practices and procedures.  I

14  frequently sign proposed orders for other lawyers, as they do

15  for me, with approval, and we are required to keep an email or

16  fax proof of that.

17       So, where this leaves us is that there is no question Mr.

18  Waterhouse didn't sign the notes.  There is a question as to

19  whether he authorized Ms. Hendrix to sign the notes.  That's a

20  question for the jury.  If in fact he did not sign the notes,

21  there is a material defense under the Uniform Commercial Code

22  that strips the notes of their prima facie validity.

23       We have denied in our prior answer that we signed the

24  notes.  That is potentially ambiguous.  We deny that we've

25  signed the notes because Mr. Waterhouse didn't sign them in a

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 128   Filed 08/02/44   Page 75 of 347   PageID 36124

18

1   representative capacity.  We now want to more clearly assert

2   that, in fact, the notes were not signed at all, because

3   that's how we read the UCC requirement here.

4         Your Honor, this is a Rule 15 motion.  This is not a Rule

5   16 motion.  Leave should be freely given unless there's a

6   substantial reason not to.  There has been no undue delay.

7   Your Honor can see very clearly that it was not until late

8   October that the notes were produced with metadata.  It was

9   not until Mr. Waterhouse was deposed on October 19th that he

10  first raised the issue of, well, it looks like that's my

11  electronic signature.  These signatures are too perfect to be

12  made by me.  I think he used the word chicken scratch for his

13  writing.

14        So there is no undue delay.  I requested these very early

15  in this lawsuit.  For whatever reason, they were not produced

16  until late.

17        There is no futility, Your Honor.  The Debtor seeks to try

18  the actual merits of the defense.  As I've briefed, the Fifth

19  Circuit is very clear.  On a Rule 15 motion, you apply a

20  reverse 12(b)(6) analysis.  The Court does not look at the

21  merits.  The only question is, is the person seeking to amend

22  its answer asserting an affirmative defense that has a basis

23  in law?  It's a 12(b)(6) standard, and we have demonstrated

24  both legally that failure to sign a note is a defense and

25  we've demonstrated factually, to the extent that factual

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 10/07/22   Page 76 of 347   PageID 36125

19

1   demonstration is even required, that there is substantial

2   evidence, although it's disputed, admittedly, that the Debtor

3   -- I'm sorry, that HCMFA did not sign these notes nor

4   authorize their signature.  So there is no futility issue,

5   Your Honor.

6       There's no bad faith.  There's no dilatory -- there's no

7   -- nothing like that.  This is not going to delay any trial.

8   If they want more discovery, they can have it.  But Waterhouse

9   and Klos and Hendrix have been deposed about these very, very

10  issues.  And they were deposed at length.  This is -- but

11  ultimately, whenever trial is going to be, whenever the MSJ

12  rulings are going to be, none of this should have to delay any

13  of that, unless the Debtor wants to delay it.

14      And, again, if the Debtor wants more discovery -- it's

15  suggested it wants discovery of D.C. Sauter and James Dondero

16  and others -- it can have it.  But I'm telling you that only

17  Hendrix, who prepared these notes, only Klos, who instructed

18  her to prepare these notes, and only Waterhouse, who allegedly

19  signed them or authorized them to be signed, are relevant, and

20  they have been deposed at length.   And by the way, Your

21  Honor, Klos and Hendrix are still employed by the Debtor.  The

22  Debtor doesn't need to depose them to get whatever additional

23  information it may need.  And Your Honor, so there is no undue

24  prejudice.

25      And Your Honor, finally, there have not been repeated

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 12/09/2144   Page 77 of 347   PageID 36126

20

1   failures to cure prior omissions.  Yes, this is our second

2   motion, that is true, but we did not have any cause or

3   reasonable cause to seek such relief before the end of

4   October.

5        And Your Honor, I think that we are entitled to a little

6   bit of understanding here, that it was not until several

7   months after we were sued that we were even allowed to talk to

8   our CFO about this lawsuit.  Your Honor has in the record

9   communications from Mr. Seery forbidding Mr. Waterhouse or us

10  -- perfectly rationally so; I'm not here to criticize Mr.

11  Seery -- but he forbade Mr. Waterhouse from discussing these

12  matters with us, and it was not until Mr. Waterhouse was

13  terminated, which would have been in March of this year, and

14  it wasn't until sometime later that we were actually able to

15  talk to our CFO and the person who purportedly signed these

16  notes.

17       So the fact that this is our second motion to amend really

18  should not bear any weight to these issues, especially under

19  the facts of this case.

20       Your Honor, that is both my opening, I guess, and my

21  closing.  I have -- I have nothing more except to, I guess,

22  address any issues that Mr. Morris raises.  And I'll rest,

23  really, on our appendices and my argumentation.

24            THE COURT:  Well, I'll ask you this question, since

25  you said that was your opening and closing:  I almost always

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 78   Filed 11/09/21   Page 78 of 347   PageID 36127

21

1    create a timeline in situations like this.  And you said it

2    was several months before your client could talk to Mr.

3    Waterhouse.  And my timeline shows that December 3, 2020,

4    Highland made a demand on these notes.  And then January 22,

5    2021, this adversary was filed to collect on the notes.  And

6    then in February, I don't have the exact date, sometime in

7    February Waterhouse was terminated from the Debtor.  And then

8    he said in his 400-page deposition that I read yesterday

9    afternoon March 1st was when he started with Skyview, which

10   obviously serves in the same role that Highland did as far as

11   shared services for HCMFA.

12        So my point is it wasn't really several months, right?  It

13   was just about a month --

14             MR. RUKAVINA:  Well, I think, Your Honor, --

15             THE COURT:  The original answer was filed on March

16   1st, I guess the same day Mr. Waterhouse started with his

17   employment.  And so it wasn't really months before your client

18   had access to Mr. Waterhouse, correct?

19             MR. RUKAVINA:  I think -- I think Your Honor is

20   correct on a technical reading of that, but Your Honor has to

21   take into context Mr. Sauter's declaration and the facts here

22   that on March 1 all of these employees were being

23   transitioned.  Mr. Waterhouse was the CFO.  He had a thousand

24   and one things going on, as did my clients, the Advisors here.

25   And yes, of course, having a lawsuit for $7.4 million filed

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 02/09/24   Page 79 of 347   PageID 36128

22

1   against you is important, and we took it seriously.  We didn't

2   -- we didn't fail to file an answer.  But it's not like this

3   lawsuit was first and foremost on Mr. Waterhouse's mind.

4       Mr. Sauter took a little bit of time before he got Mr.

5   Waterhouse's attention.  So I would say it was, according to

6   his declaration, would have probably been early April, if

7   memory serves -- I don't have it right in front of me --

8   before he was able to discuss the matters with Mr. Waterhouse,

9   which is why I said it was several months before we were able

10  to really talk to him.

11          THE COURT:  Okay.  Mr. Morris, your opening

12  statement?

13          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

14          MR. MORRIS:  Good morning, Your Honor.  John Morris;

15  Pachulski Stang Ziehl & Jones; for the Reorganized Debtor.

16      Before I get to my prepared remarks, I do want to follow

17  up on the observation you just -- Your Honor just made with

18  respect to timeline.  Mr. Rukavina showed the document request

19  that set forth a demand that the Debtor produce the metadata.

20  And if you look at the last exhibit in the Movant's appendix,

21  you will find Highland's response.  And as he showed you,

22  Highland objected to the phrase metadata as vague.  And that

23  was back in June.

24      No motion to compel, no follow up in the month of July.

25  No motion to compel, no follow up in the month of August.  And

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 12/09/21    Page 80 of 347    PageID 36129

23

1    mind you, this is at a time that Mr. Rukavina has told you

2    that they knew -- they thought that there might be a problem

3    with the notes.

4        So they sit on their hands in July.  They sit on their

5    hands in August.  They sit on their hands in September.  They

6    sit on their hands in the first two weeks of October.  And

7    within ten days of the follow up request, we produced the

8    documents.

9        I think it's very important for the Court to consider the

10   almost hundred-day delay between the time the Defendant was

11   specifically told that the Debtor objected to the production

12   of metadata and the time they followed up.

13       I'd also like to put into context the notes in their

14   entirety.  These notes were created at a time -- and there is

15   no dispute about this -- that Mr. Dondero controlled both the

16   borrower and the lender.  He controlled both Highland as well

17   as the maker of the note.  There is no dispute about that.

18   This is not an arm's-length negotiation.  This is not a deal

19   between two strangers.  These are all people wearing multiple

20   hats, doing multiple things, at the same time, as Mr. Rukavina

21   just said, in the ordinary course of business.

22       And I think it's really important, when Your Honor hears

23   the technicalities that Mr. Rukavina is raising, to put them

24   in the context of who these people are.  Because as we've

25   cited in our brief, Mr. Dondero has signed notes on behalf of

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 12/09/21   Page 81 of 347   PageID 36130

24

 1   Mr. Rukavina's clients in exactly the same way.  So is Mr.

 2   Dondero now personally liable?  It's ridiculous.

 3        There's also evidence in the record, unobjected to, there

 4   are notes in other litigations that have Mr. Waterhouse's

 5   electronic signature.  Silence from that Defendant.  Right?

 6   These are all people who were working together under the same

 7   roof for the same master.  I think the context is very

 8   important.

 9        Let me spend a moment on the elephant that is not in the

10   room.  You do not have any evidence in the form of testimony

11   or a declaration from anybody with personal knowledge.  Where

12   is Mr. Dondero's declaration?  Where is Mr. Waterhouse's

13   declaration?  He is still the treasurer of the Movant.  Where

14   is Dustin Norris?  Dustin Norris is the executive vice

15   president of the Movant.  Instead, we have two lawyers'

16   declarations, two people who have absolutely no personal

17   knowledge of any of the underlying facts.

18        You have a substantive investigation conducted by D.C.

19   Sauter.  Mr. Sauter has no official relationship to the

20   Movant.  He is not the general counsel.  He is not employed by

21   them.  He never has been.  He simply is the general counsel of

22   NexPoint.  And because the Movant is an affiliate of Mr.

23   Dondero's, he was told, do this.  And he's doing it.  And this

24   is what he did.

25        And we're going to spend a lot of time with Mr. Sauter on

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 12/09/2144   Page 82 of 347   PageID 36131

25

 1   what Mr. Waterhouse told him last spring that neither he nor

 2   HCMFA told this Court.  And he missed the opportunity in the

 3   spring and he missed the opportunity again when he submitted a

 4   second declaration.  And what Mr. Waterhouse told Mr. Sauter

 5   that he declined to share with you proves that this is just

 6   nonsense.

 7       There are three issues that we're going to address today,

 8   two specifically with Mr. Sauter:  undue delay and futility.

 9   And the evidence that we have put into the record goes to both

10   issues.  And I'd like to begin just to show you a couple of

11   documents, Your Honor.  And the first one would be Exhibit 7,

12   if we can put that on the screen.  And scroll down, please.

13       This is the genesis, Your Honor.  I think -- wants to

14   know, where did the notes come from?  This is the first note

15   that's created.  It was created on May 2, 2019.  There's no

16   dispute about that.  Nor is there any dispute that Highland

17   transferred to HCMFA $2.4 million on that day.  And this is an

18   email from David Klos to Corporate Accounting.  There will

19   never be a dispute that the corporate accounting group email

20   included Frank Waterhouse.

21       And Mr. Klos's email, look at the subject:  HCMLP to HCMFA

22   Loan.  And he instructs a member of his group to send $2.4

23   million from Highland to HCMFA.  And he says, "This is a new

24   interco loan."  And he asks Ms. Hendrix or another member of

25   the group to prepare a note for execution.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 12/03/21   Page 83 of 347   PageID 36132

26

1      Mr. Water -- there is no dispute again.  These are just

2  undisputed facts, Your Honor.  Mr. Waterhouse is the treasurer

3  of HCMFA at the same time he's the CFO of Highland.  He wears

4  at least those two hats.  Those are the only two hats we have

5  to talk about today.  He's included on this email because he's

6  in the corporate accounting group.  And I agree with Mr.

7  Rukavina:  We don't have to resolve today what the discussion

8  between any of these people were, because we know it is an

9  undisputed fact that Frank Waterhouse and therefore HCMFA was

10  told on May 2, 2019 that this $2.4 million transfer was being

11  treated as a loan and that the accounting group was going to

12  prepare it.

13      Can we go to the next exhibit, please?  Number 8?

14      This is the next day.  This is the $5 million loan.  And

15  here's another email, this one from Ms. Hendrix.  She again

16  sends it to the corporate accounting group.  Again, Mr.

17  Waterhouse and therefore HCMFA are told by Ms. Hendrix that

18  there was going to be a new $5 million loan and that she

19  specifically says, I will paper the loan.  HCMFA knew on May

20  3, 2019 that Kristin Hendrix was going to prepare a promissory

21  note to support the transfer of $5 million from Highland to

22  HCMFA.  There is no dispute about any of these facts.

23      If Mr. Waterhouse had any question as to what she or Mr.

24  Klos were doing at this moment in time, if he believed that he

25  hadn't given the instruction, that was his moment to speak up.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 12/09/21   Page 84 of 347   PageID 36133

27

1  Well, that was his first in dozens and dozens of moments to

2  speak up.  But he didn't.

3      Where is the evidence that Mr. Waterhouse -- because this

4  is all out in the open now.  He's still the treasurer of

5  HCMFA.  Where's the declaration from Mr. Waterhouse saying, I

6  didn't see that email?  It never occurred to me what they were

7  doing.  It'll -- there will never be that evidence, Your

8  Honor.

9      So this is just -- this is the beginning.  And, again,

10  this -- these emails, these two documents alone establish both

11  undue delay, because here you're on notice that those pesky

12  Highland accounting folks are running amok here and doing

13  something they shouldn't be doing.  That's what we're told.

14  They shouldn't have -- this was all a grave mistake.  HCMFA

15  knows it.  And you know what they do in less than 30 days?

16  They report these notes in their audited financial statements.

17  I don't want to go through all of my evidence right now, but

18  this is just such incredible evidence.

19      If we can go to the next document, which is the Highland

20  audited financial statements, Exhibit 3.  And this is dated

21  June 3, 2019.  It is literally one month after the notes are

22  executed.  And if we can just flip to Page 39, please.

23      Page 39, you may have seen this referenced in our papers,

24  Your Honor, is the Subsequent Events section.  I apologize.

25  If we could go just to the top of the section so the Court can

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 12/09/21   Page 85 of 347   PageID 36134

28

 1    see the section of the financial statements.  Yeah.  Thank

 2    you.

 3         So, Section 15 is Subsequent Events.  And continued on to

 4    the next page, it says, "Over the course of 2019 through the

 5    report date, HCMFA issued promissory notes to the partnership

 6    in the aggregate amount of $7.4 million."  And it notes the

 7    interest rate.

 8         So this notion of mutual mistake, it's contradicted by the

 9    plain and unambiguous words of Highland's audited financial

10    statements.  And Mr. Sauter is going to confirm what the Court

11    probably already knows and that Mr. Waterhouse is responsible

12    for the oversight of the completion of the audit.

13         But it wasn't just Highland who disclosed the existence of

14    these notes.  HCMFA did it itself.

15         Can we go to Exhibit 6?

16         Now, Your Honor, Exhibit 6 was filed under seal.  We're

17    only going to put up the one piece of Exhibit 6 that relates

18    to the notes.  So on the screen now is the mirror image of the

19    Subsequent Events section, and this is -- Exhibit 6.  This is

20    HCMFA's notes.  Again, this audited financial statements, both

21    audited financial statements are audited by

22    PricewaterhouseCoopers at a time when Mr. Dondero is in

23    control of both entities, at a time when Mr. Waterhouse is

24    serving as both the chief financial officer of Highland as

25    well as the treasurer of HCMFA, and HCMFA's audited financial

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 10/08/21   Page 86 of 347   PageID 36135

29

1    statements also show the recording of these promissory notes.

2         HCMFA knew that the notes existed, and therefore could

3    have and should have began to investigate if they thought

4    those notes were mistakenly created.  But they did nothing.

5    There will never be any evidence to explain why HCMFA included

6    the notes in their audited financial statements and did

7    nothing.  There will never be an explanation for that.

8         There is so much more, Your Honor, that's set forth in our

9    papers.  I'll just summarize that Mr. Waterhouse, wearing both

10   hats, prepared dozens of monthly operating reports that he

11   filed with this Court in which these notes were included as an

12   asset of Highland's bankruptcy estate, that all creditors

13   relied upon those monthly operating reports.  The evidence is

14   going to be in the record now that Mr. Dondero was told

15   multiple times that HCMFA owed Highland over $10 million.  I

16   don't have to get into the details here, Your Honor, because

17   we know from the audited financial statements that the only

18   other obligations to Highland were the $5 plus million in

19   other notes.  The only way you get over $10 million is with

20   these notes.

21        Mr. Dondero -- there will never be any evidence that Mr.

22   Dondero said, hey, how come there's $10 million of notes

23   there?  I thought there was only five.  There will never be

24   any evidence that any of the officers of HCMFA said, hey, how

25   come we're reporting to the Retail Board that there's almost

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 03/02/44   Page 87 of 347   PageID 36136

30

1   $12 million in obligations to Highland?  I thought there was

2   only $5 million of notes.

3       They actually did that, Your Honor.  The Retail Board is a

4   critical piece of evidence here because, as Mr. Norris has

5   testified, it is the reason for the Advisors' existence.

6   These advisory agreements between the Advisors and the retail

7   funds are the reasons the Advisors exist.  And they're subject

8   to annual review.  And the Retail Board specifically asked the

9   Advisors, how much do you owe on notes?

10      And this has nothing to do with Highland employees at this

11  point.  The only people involved in this are HCMFA officers.

12  It's Lauren Thedford, who's the secretary of HCMFA, and it's

13  Frank Waterhouse, who's the treasurer of HCMFA.  And you've

14  got Mr. Norris who's copied on the email, and he's the

15  executive vice president.  And you've got Justin Post, who is

16  the chief compliance officer.  And they're all working --

17  they're Highland employees, including Klos and Kristin

18  Hendrix, frankly, who are copied on this stuff, but they say

19  nothing.  This is the Advisors' own officers who are relying

20  on HCMFA's own balance sheet to report to the Retail Board, in

21  response to their specific question, that these notes are

22  valid obligations.  And they're going to come to court to you

23  today and say they don't think they were signed properly?

24  Seriously?  It's not right.

25      There is no gotcha moment, Your Honor.  HCMFA has known

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 09/2144 Page 88 of 347   PageID 36137

31

1   for years of the existence of these notes.  Mr. Rukavina may

2   be doing his investigation in October.  I don't know why it

3   wasn't done in May 2019.  I don't know why it wasn't done in

4   June 2019 when the audited financial statements are prepared.

5   I don't know why it's not done in October, November, December

6   of 2019, postpetition, when Mr. Dondero's entities are filing

7   documents with the Bankruptcy Court signed by Mr. Waterhouse

8   that say, these are valid notes.  Why aren't they

9   investigating?  They're not.  They're telling you and all of

10  the interested parties and all of the stakeholders these notes

11  are there.

12      It's not good faith, Your Honor.  It's bad faith.  And

13  what's worse, and we'll get to it in just a moment, is D.C.

14  Sauter.  Mr. Waterhouse told him exactly why the notes were

15  prepared.  He told it to him three different ways.  And he

16  didn't tell the Court that when he filed his first declaration

17  and he didn't tell the Court that when he filed his second

18  declaration.  Instead, what he actually told the Court is that

19  Frank Waterhouse knows little, if -- little, if anything,

20  about these notes.  And that's just not true.

21      So let's call Mr. Sauter, let's put his declaration into

22  evidence, and let's see what he has to say about what Mr.

23  Waterhouse actually told him that he never disclosed to the

24  Court.

25              THE COURT:  All right.  We'll go to the evidence now.

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178-28    Filed 03/09/2144    Page 89 of 347    PageID 36138

Sauter - Cross                          32

1    And as I understand, HCMFA is resting on the declaration for

2    the direct testimony.  So, Mr. Sauter, I need you to turn on

3    your audio and video so I can swear you in and we'll allow

4    cross-examination.  Could you say, "Testing, one, two,"

5    please?

6              MR. SAUTER:  Testing, one, two.

7              THE COURT:  All right.  Are others picking up the

8    video?  I don't see it yet, but my device is slower.

9              MR. RUKAVINA:  Yes, Your Honor.  I see Mr. Sauter.

10             THE COURT:  Okay.  All right.  Could you say

11   "Testing, one, two" one more time, Mr. Sauter?

12             MR. SAUTER:  Testing, one, two.

13             THE COURT:  All right.  Please raise your right hand.

14   Do you solemnly swear or affirm that the declaration as well

15   as the testimony you give today was and will be the truth, the

16   whole truth, and nothing but the truth, so help you God?  If

17   so, say, "I do."

18             THE WITNESS:  I do.

19             THE COURT:  All right.  Thank you.  Mr. Morris, you

20   may proceed.

21                      CROSS-EXAMINATION

22   BY MR. MORRIS:

23   Q    Good morning, Mr. Sauter.  Can you hear me okay?

24   A    Yes, sir.

25   Q    Okay.  You're an attorney admitted to practice law in the

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 09/21/44    Page 90 of 347    PageID 36139

Sauter - Cross                                33

```
 1  State of Texas, correct?

 2  A    Yes, sir.

 3  Q    And you've held your license for about 20 years; is that

 4  right?

 5  A    Yes, sir.

 6  Q    And from 2014 through February 2020, you were affiliated

 7  with the law firm of Wick Phillips, correct?

 8  A    Yes, sir.

 9  Q    And while at Wick Phillips, you provided legal services to

10  NexPoint Advisors and its wholly-owned subsidiaries, correct?

11  A    Yes, sir.

12  Q    And in February 2020, you left Wick Phillips to become

13  NexPoint's general counsel of real estate, correct?

14  A    Not exactly.  I was hired at NexPoint.  I didn't become

15  general counsel until some point in 2021.  I think April,

16  probably.

17  Q    Okay.  I apologize.  But I -- this is difficulty, but I

18  appreciate the clarification, but my question was you became

19  the general counsel of real estate when you first joined

20  NexPoint; is that right?

21  A    That's correct.

22  Q    Okay.  And it wasn't until April or May 2021 that you were

23  promoted to general counsel at NexPoint, correct?

24  A    I was appointed general counsel in April or May, yes.

25  Q    Okay.  And you hold that position today, correct?
```

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178-28   Filed 03/09/22   Page 91 of 347   PageID 36140

Sauter - Cross                            34

1    A    That's correct.

2    Q    And you submitted a declaration in support of Highland

3    Capital Management Fund Advisors' motion for leave to amend

4    their answer in this matter, correct?

5    A    Yes, sir.

6    Q    Okay.

7         MR. MORRIS:  Can we put on the screen Docket #83,

8    which is Exhibit 1, Mr. Sauter's declaration?

9    BY MR. MORRIS:

10   Q    If you'll recall, Mr. Sauter, when we did this in your

11   declaration, if at any time there's anything you need to see

12   in the document, will you let me know that?

13   A    I will.

14   Q    Okay.  And do you understand that this is the declaration

15   that you filed at the end of November in support of HCMFA's

16   motion for leave to amend its answer?

17   A    If that's what you say.  I would need to see the date, but

18   --

19   Q    Okay.

20   A    -- I'll take your --

21   Q    Can you see up top?

22   A    Yes.  Yes, sir.  That looks accurate.

23   Q    Okay.  Who wrote this document?

24        MR. RUKAVINA:  Objection, Your Honor.  It's attorney-

25   client privilege.

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 03/09/22    Page 92 of 347    PageID 36141

Sauter - Cross                                    35

 1              THE COURT:  Attorney-client privilege?

 2   BY MR. MORRIS:

 3   Q    Did you write this document, sir?

 4              THE COURT:  Okay.  You can rephrase the question, Mr.

 5   Morris.

 6   BY MR. MORRIS:

 7   Q    Did you write this document, sir?

 8   A    I worked with my attorneys in drafting the document.

 9   Q    Can you tell me which portions you wrote?

10   A    I can't recall exactly which portions I wrote.

11   Q    Can you recall any aspect of this document that reflects

12   your personal edits?

13   A    I did review and edit the document.  I don't recall

14   exactly which portion.

15   Q    Okay.  Did you receive a draft of the document in the

16   first instance?

17   A    Yes, I believe I did.

18   Q    And how many -- how many drafts of this document were

19   created before you signed your name to it?

20   A    I don't know.

21   Q    Was it more than two?

22   A    I don't recall.  I would think it's probably one.

23   Q    Okay.

24   A    After my review.

25   Q    Okay.  So you got the document, you provided some

Sauter - Cross                                    36

1    comments, and then you have the final version.  Do I have that

2    right?  To the best of your recollection?

3    A    That's my recollection.  Yes, sir.

4    Q    Okay.  Can you identify any issue on which you provided

5    substantive comments to your declaration?

6    A    I don't recall what those substantive comments were at

7    this time.

8    Q    Okay.  In Paragraph 2 --

9          MR. MORRIS:  If we can go down to Paragraph 2.

10   BY MR. MORRIS:

11   Q    Do you see it says, "I am in-house counsel for both HCMFA

12   and NexPoint, and have been since at least January 1, 2001

13   [sic].  Do you see that?

14   A    Yes, sir.

15   Q    Have I read that accurately?

16   A    Yes, sir.

17   Q    That's not really a true statement, is it?

18   A    I -- I wouldn't have said it if I didn't agree with it.

19   Q    You're not the general counsel of HCMFA, are you?

20   A    I am not the general counsel of HCMFA.

21   Q    In fact, you don't have any official role with HCMFA;

22   isn't that correct?

23   A    I do not have any title with HCMFA.

24   Q    You're not an employee of HCMFA, correct?

25   A    That is correct.

1   Q   And you never have been, right?

2   A   That is correct.

3   Q   You're not an officer of HCMFA, correct?

4   A   That is correct.

5   Q   And you never have been; isn't that right?

6   A   That is correct.

7   Q   You're not compensated by HCMFA, correct?

8   A   That is correct.

9   Q   And you never have been; isn't that right?

10  A   Yes, sir.

11  Q   Instead, you just perform work for HCMFA from time to

12  time, as requested.  Isn't that right?

13  A   That is correct.

14  Q   And that's because HCMFA is affiliated with Mr. Dondero,

15  correct?

16  A   I suppose that's part of the reason.

17  Q   Even though you're not employed -- withdrawn.  Even though

18  you're employed by NexPoint, you perform legal services for

19  other entities affiliated with Mr. Dondero whenever called

20  upon, even though you have no formal role.  Correct?

21  A   That's correct.

22  Q   And that's all you're doing here, correct?

23  A   That's correct.

24  Q   And you admit that for all intents and purposes Mr.

25  Dondero is the controlling person at both NexPoint and HCMFA,

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 03/92/144 Page 95 of 347    PageID 36144

Sauter - Cross                                      38

 1  correct?

 2  A    That's correct.

 3  Q    You're aware that about a year ago Highland commenced an

 4  action against HCMFA to recover under two promissory notes

 5  bearing Mr. Waterhouse's signature?

 6  A    That's correct.

 7  Q    Okay.  You have no personal knowledge about the origin of

 8  those promissory notes, correct?

 9  A    I do not.

10  Q    You have no personal -- you had no personal involvement in

11  the TerreStar matters referred to in your declarations,

12  correct?

13  A    I did not.

14  Q    And that's because you were working at Wick Phillips at

15  the time, right?

16  A    That's correct.

17  Q    And even though you had no formal affiliation with HCMFA

18  and no knowledge about any of the facts, you were asked to

19  investigate the origin of the notes that are the subject of

20  the lawsuits, correct?

21  A    That's correct.

22  Q    Who asked you to do that?

23  A    Outside counsel asked me to do an investigation and figure

24  out where the notes came from and what they were for.

25  Q    Is there any particular reason that you know of that

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 09/02/21   Page 96 of 347   PageID 36145

Sauter - Cross                          39

1   outside counsel didn't make those inquiries?

2           MR. RUKAVINA:  Your Honor, I object to the extent

3   that calls for the attorney-client privilege.  I don't know if

4   Mr. Sauter can answer that without invading the privilege.

5           THE COURT:  Mr. Sauter, no communications revealed

6   between you and your lawyer.  If you can answer without doing

7   that.

8           THE WITNESS:  I don't know.

9   BY MR. MORRIS:

10  Q    Okay.  After completing your investigation, you submitted

11  a declaration in support of HCMFA's first motion for leave to

12  amend, correct?

13  A    Yes, sir.

14  Q    Okay.  And your second declaration that you submitted in

15  support of this motion contains a fair portion of what was in

16  the first declaration; do I have that right?

17  A    I believe so.

18  Q    Okay.  Let's look at your first declaration, if we could.

19          MR. MORRIS:  It's -- yeah, there you go.  Exhibit 15.

20  And so if we could scroll down a little bit, perhaps, to the

21  date.

22  BY MR. MORRIS:

23  Q    Oh, actually, you can see at the top.  Do you see it's

24  from May 2021?

25  A    Yes, sir.

Sauter - Cross                              40

1    Q    Okay.  And is that around the time that you signed your
2    declaration?
3    A    I believe so.
4    Q    And your declaration set forth the factual basis for
5    HCMFA's motion for leave to amend its answer, correct?
6    A    Yes, sir.
7    Q    And your declaration describes two phases of your
8    investigation, correct?
9    A    I don't recall.
10   Q    Well, the first phase took place between the time the
11   complaint was filed and March 1, 2021, when HCMFA filed its
12   first original answer, right?
13   A    That's correct.
14   Q    Okay.  And during that first phase, you spoke with Mr.
15   Dondero, correct?
16   A    Yes.
17   Q    And Mr. Dondero told you that he couldn't recall the
18   genesis of the notes, correct?
19   A    That's my recollection.  Yes, sir.
20   Q    But he didn't say anything to you that caused you to
21   believe he was unaware of the notes, right?
22   A    Not that I recall.
23   Q    In fact, when you spoke to him, Mr. Dondero had high-level
24   details concerning the notes.  Isn't that right?
25   A    I mean, I think he generally knew what the notes were

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 78   Filed 11/03/21   Page 98 of 347   PageID 36147

Sauter - Cross                                41

1    about, yes.

2    Q    And so it's not like he -- it's not like he told you he

3    never heard of the notes?  He knew what they were about,

4    right?

5    A    He was aware of the notes.

6    Q    Okay.  And he suggested that you speak with Mr.

7    Waterhouse.  Do I have that correct?

8    A    That's correct.

9    Q    And you did that as part of the second phase of your

10   investigation, correct?

11   A    Yes, sir.

12   Q    We'll get to that shortly.  But your declaration --

13         MR. MORRIS:  If we can go to Paragraph 13, please.

14   Okay.

15   BY MR. MORRIS:

16   Q    The second sentence of Paragraph 13 says, "I had no

17   knowledge of them since I had not been employed by HCMFA, and

18   the few employees of HCMFA had no knowledge of the notes."

19   Have I read that correctly?

20   A    Yes, sir.

21   Q    And the people that you're referring to there specifically

22   are Dustin Norris and Jason Post, right?

23   A    They actually were not employees of HCMFA.  It would have

24   been Joe Sowin.  Joe was not aware of the notes.  And I can't

25   recall whether I spoke with any other HCMFA employees, but I

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 12/16/22    Page 99 of 347    PageID 36148

Sauter - Cross                                        42

 1  did speak with Mr. Norris and Mr. Post about the notes as

 2  well.

 3  Q    Okay.  And when you used the phrase the employees at that

 4  time you were referring to Norris and Post, correct?

 5  A    I'm sorry.  Can you restate that question?

 6  Q    Well, you knew Mr. Norris was a vice president of HCMFA;

 7  isn't that right?

 8  A    I believe he was, yes.

 9  Q    Yeah.  And until he recently left, Mr. Post, to the best

10  of your knowledge, was the chief compliance officer for both

11  NexPoint and HCMFA, correct?

12  A    Yes, sir.

13  Q    Okay.  And those two gentlemen told you at that time

14  during Phase I that they didn't know the origin of the notes,

15  correct?

16  A    That's correct.

17  Q    So, because everybody associated with HCMFA at that time

18  told you you were -- they were unaware of the notes, HCMFA

19  served and filed an answer to the complaint that contained no

20  affirmative defenses; isn't that right?

21  A    I don't recall what the -- the answer said, but if you say

22  there were no affirmative defenses, I'll take your word for

23  it.

24  Q    Okay.  I don't want you to take my word for it.  Let's

25  take your word for it.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 100 of 347   PageID 36149
Document   Page 43 of 144

Sauter - Cross                                    43

1              MR. MORRIS:  Can we go to Paragraph 18, please?

2    BY MR. MORRIS:

3    Q    Do you see you wrote in your declaration, or somebody

4    wrote in your declaration, "That original answer did not

5    contain any affirmative defenses because, as explained above,

6    no one at HCMFA knew any of the facts that might give rise to

7    an affirmative defense."

8         That's what you wrote, right?

9    A    Okay.  Yes, you are correct.  There were no affirmative

10   defenses asserted in our answer.

11   Q    All right.  And all of that changed in mid-April 2001

12   [sic]; isn't that right?

13   A    Yes, sir.

14   Q    And that's because Mr. Waterhouse and other former

15   employees of Highland had migrated over to Skyview so you had

16   access to them, correct?

17   A    That's correct.

18   Q    So Mr. Seery's instructions about not speaking to

19   Highland's employees in ways that were inimical to Highland's

20   interests and the Court's TRO were no longer impediments to

21   your ability to speak with Mr. Waterhouse, correct?

22   A    Yes and no.  But for the most part, I would agree with

23   that.

24   Q    You could ask them anything in the world you wanted at

25   that time.  Is that fair?

1  A   That's not entirely fair.

2  Q   Yeah.  Is there anything about the notes that you thought

3  you couldn't ask them?

4  A   Um, I suppose not.  I guess the better question is whether

5  they would be willing to answer.

6  Q   I -- okay.  Is there any question that Mr. Waterhouse ever

7  refused to answer?

8  A   I think he's referred me to his outside counsel when I've

9  asked him questions from time to time.

10  Q   Okay.  But that never occurred during the period when you

11  were doing your investigation, correct?

12  A   I think there may have been some hesitancy from Mr.

13  Waterhouse early on, and I think once he showed that hesitancy

14  -- I try to be respectful of his concerns.

15          MR. MORRIS:  Your Honor, I apologize for this, but my

16  transcript is in another room.  Can we just -- can you just

17  give me thirty seconds, please?

18          THE COURT:  Certainly.  Do you literally need thirty

19  seconds, or do we need to take a five-minute break?

20          MR. MORRIS:  Hopefully less than thirty.

21     (Pause.)

22          MR. MORRIS:  Okay.  Can you scroll down to Paragraph

23  19, please?  Okay.

24  BY MR. MORRIS:

25  Q   So, the last sentence of Paragraph 19, you wrote, "Thus,

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 102 of 347   PageID 36151
Document   Page 45 of 144

Sauter - Cross                              45

1    as of March 2021, I was able to communicate with most former

2    Debtor employees and to access the books and records of

3    Highland -- of HCMFA without fear of violating any court

4    order."

5        Have I read that correctly?

6    A   Yes, sir.

7    Q   And there's nothing in your declaration -- there's nothing

8    in either declaration that suggests you were impeded in any

9    way in speaking to Mr. Waterhouse during your investigation in

10   the spring.  Correct?

11   A   I would say that I wasn't impeded by the court order.

12   That's correct.  And, yes, I -- I don't recall anything

13   specific in either declaration that mentions any impediment to

14   my discussions with Mr. Waterhouse.

15   Q   There's nothing general in either of your declarations

16   either; isn't that correct?

17   A   Yes, sir.  I don't think there is.

18   Q   Okay.  So you didn't think that it was important to tell

19   the Court that there was anything that you were unable to

20   learn from Mr. Waterhouse, correct?

21   A   That's fair.

22   Q   Okay.  And so, with access to Mr. Waterhouse and the other

23   employees and HCMFA's books and records, you conducted the

24   second phase of your investigation, correct?

25   A   Yes, sir.

1    Q    And during the second phase, you reviewed certain

2    documents relating to the TerreStar NAV error, correct?

3    A    Eventually, yes.

4    Q    And specifically, you reviewed three to five documents

5    that included a memo that was submitted to the board of the

6    retail fund as well as maybe some communications with the SEC,

7    correct?

8    A    Yes, sir.

9    Q    And those are the only documents that you were directed to

10   review, correct?

11   A    That's correct.

12   Q    And none of those documents stated that Highland was

13   responsible for the NAV error, correct?

14   A    That's correct.

15   Q    During the two-phased investigation that you conducted,

16   you never saw a document that stated that Highland Capital

17   Management, LP was responsible for the TerreStar NAV error,

18   correct?

19            MR. RUKAVINA:  Your Honor, I'll object.  This is

20   irrelevant.  The only relevance to this motion today is any

21   alleged delay in us asserting the defense that Mr. Waterhouse

22   did not sign the notes.  Counsel here is trying to try the

23   underlying merits, which we are not here to do today.  It's

24   inappropriate.  And frankly, it's trial by ambush.  The only

25   issue that Mr. Sauter is presenting evidence on today is that

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 104 of 347   PageID 36153
Document   Page 104 of 144

Sauter - Cross                    47

1    in April or May Mr. Waterhouse told him that he signed the

2    notes.  That should be the only topic of legitimate

3    questioning.

4              THE COURT:  I overrule.

5              MR. MORRIS:  If I may, Your Honor?

6              THE COURT:  I overrule.

7              MR. MORRIS:  Oh.  Okay.

8    BY MR. MORRIS:

9    Q    So, my question, Mr. Sauter, is that during your two-

10   phased investigation you never saw any document that stated

11   that HCMLP was responsible for the TerreStar NAV error,

12   correct?

13   A    That's correct.  I never saw a document signed by HCMLP

14   that said, we are responsible.

15   Q    And so, notwithstanding your review of the first

16   declaration, you didn't tell the Court that there were no

17   documents that corroborated your conclusion that the payment

18   was supposed to be made on account of Highland's culpability

19   in connection with the NAV error, correct?

20             MR. RUKAVINA:  Your Honor, objection.  That's --

21   that's argumentative and that's not a fair question.  Why

22   would he tell the Court something like that?  It's an

23   argumentative question, not a question of fact.

24             THE COURT:  Mr. Morris?

25             MR. MORRIS:  Your Honor?

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document Document   Filed 01/13/22   Page 105 of 347   PageID 36154

Sauter - Cross                           48

1        THE COURT:  Go ahead.  Response?

2        MR. MORRIS:  Yeah.  I would say that -- I would say

3   that we have a declaration on the screen, most of which is

4   mimicked in the current declaration on this motion, that

5   discusses in detail his investigation, his review of

6   documents, and his conclusion that the notes were -- were

7   prepared by mistake because the transfer of funds was supposed

8   to be made for the purpose of compensating HCMFA for

9   Highland's error.  This goes to everything from futility to

10  credibility.

11       THE COURT:  Okay.  I overrule the objection.

12  BY MR. MORRIS:

13  Q    You never disclosed to the Court that there were no

14  documents that supported your conclusion that the notes were

15  prepared by mistake because the payments were supposed to be a

16  form of compensation, correct?

17  A    I don't agree with that statement.

18  Q    Can you show me where in your declaration there's a

19  reference to any documents that support your conclusion that

20  the payment was intended to be compensation and not a loan?

21  A    Say that again, please.

22  Q    We can scroll through your declaration -- withdrawn.  Let

23  me start over, Mr. Sauter.  The question is whether you ever

24  told the Court that your investigation didn't uncover any

25  documentary -- any document -- withdrawn.  The question is

Sauter - Cross                    49

1   whether, during -- you ever disclosed to the Court whether

2   there was ever any documentary evidence that corroborated your

3   conclusion that the payment was intended as compensation and

4   not a loan.

5   A   I'm sorry, I'm having trouble because I think you're

6   asking me to affirmatively state a negative.  And if I can

7   expand, I'll tell you why I'm having trouble.  If you don't

8   want me to expand, then I won't.

9   Q   I appreciate that, Mr. Sauter, and I don't want you to

10  expand.  The only question is whether you need to review more

11  of your declaration than is on the screen.  The only question

12  is whether you ever told the Court that there were no

13  documents that corroborated your conclusion.

14  A   You're asking me to tell you whether there's anything in

15  my declaration that says there's no evidence to support my

16  conclusion, and I'm telling you I would not say that.

17  Q   Okay.  And that's not my question, so I'm sure that it's

18  my fault, Mr. Sauter, and I apologize.

19      Are you aware of anything in your declaration that

20  discloses to the Court that there is no document, that you

21  uncovered no document that stated that Highland Capital

22  Management was responsible for the TerreStar NAV error?

23  A   The only way I can answer it is -- is to answer the

24  question you asked me before, which is I am not aware of any

25  document where HCMLP said, I am responsible for the NAV error.

Sauter - Cross                          50

1   Q    Okay.  I appreciate that.  And in fact, that was true

2   during the investigation and it's true today, eight months

3   later, correct?

4   A    Correct.

5   Q    Okay.  During the second phase of your investigation, you

6   spoke with Mr. Waterhouse, right?

7   A    Yes, sir.

8   Q    And you knew that Mr. Waterhouse was the chief financial

9   officer or the treasurer of HCMFA, correct?

10  A    Yes, sir.

11  Q    And you spoke with a gentleman named Will Mabry.  Do I

12  have that right?

13  A    Yes, sir.

14  Q    And you spoke again with Mr. Norris and Mr. Post.

15  Correct?

16  A    Yes, sir.

17  Q    And based on those discussions and your review of the

18  three to five documents, you concluded "The notes were signed

19  by Mr. Waterhouse" -- withdrawn.

20         MR. MORRIS:  Can we go to Paragraph 22?

21  BY MR. MORRIS:

22  Q    You concluded that "The notes were signed by mistake by

23  Waterhouse and without authority from HCMFA."  That was your

24  conclusion based on your investigation, correct?

25  A    That's correct.

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 28    Filed 09/07/44  Page 108 of 347    PageID 36157

Sauter - Cross                                    51

1              MR. MORRIS:  And if we can go to Paragraph 30.

2      BY MR. MORRIS:

3      Q    You also wrote in your declaration, towards the bottom,

4      "It therefore appears that Waterhouse prepared the notes for

5      some internal accounting or other purpose."

6           Did I read that correctly?

7      A    Yes, sir.

8      Q    And that was also part of the conclusions that you reached

9      after conducting this investigation, right?

10     A    Yes, sir.

11     Q    And you interviewed Mr. Waterhouse three times, correct?

12     A    I spoke with him three times, yes.

13     Q    And two of those interviews were face-to-face and one was

14     on the phone, correct?

15     A    Yes, sir.

16     Q    And nobody else participated in those discussions,

17     correct?

18     A    Correct.

19     Q    And you don't recall taking any notes of those interviews,

20     correct?

21     A    I don't.

22     Q    And you don't recall sending any emails summarizing your

23     discussions with Mr. Waterhouse, correct?

24     A    I would not have sent those to Mr. Waterhouse.  I may have

25     sent something to my counsel.

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-21    Filed 12/16/24    Page 109 of 347    PageID 36158

Sauter - Cross                                    52

1   Q    Okay.

2   A    But I don't recall them.

3   Q    You don't recall taking -- you don't recall sending any

4   emails to anybody summarizing your discussions with Mr.

5   Waterhouse, correct?

6   A    I don't.

7   Q    Okay.  You don't recall actually showing the promissory

8   notes to Mr. Waterhouse, do you?

9   A    I don't recall.  You're correct.

10  Q    Okay.  But you had the notes with you at the time, right?

11  A    I don't know if I had the notes with me at the time.  I

12  may have.

13  Q    You certainly had access to them; is that fair?

14  A    That's fair.

15  Q    Nothing prevented you from showing the notes to Mr.

16  Waterhouse, right?

17  A    No, sir.

18  Q    You never asked Mr. Waterhouse to confirm his signature on

19  the notes, right?

20  A    I never presented him with the notes and asked him to

21  confirm that those signatures were his.

22  Q    Okay.  But if you had, he may have told you right then and

23  there that that was his electronic signature, correct?

24         MR. RUKAVINA:  Objection.

25         THE WITNESS:  I actually --

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 107   Filed 12/16/22   Page 110 of 347   PageID 36159

Sauter - Cross                           53

1            MR. RUKAVINA:  Objection, Your Honor.  Speculation.

2            THE COURT:  Overruled.

3            THE WITNESS:  I actually asked him whether he signed

4    them and whether they were electronic signatures, and he

5    indicated that he would not have used an electronic signature

6    at that time, so if they were signed they were his signature.

7    BY MR. MORRIS:

8    Q    But you didn't show him the notes to let him make the

9    determination as to whether or not the signature was his ink

10   signature or whether it was an electronic signature?  He

11   didn't have that opportunity, correct?

12   A    I don't recall doing that.

13   Q    Okay.  And there's no -- but there's no reason you

14   couldn't have done that back in April or May, correct?

15   A    I suppose you're correct, yes.

16   Q    Okay.

17           MR. MORRIS:  Can we flip to the first declaration and

18   go to Paragraph 23?

19   BY MR. MORRIS:

20   Q    Okay.  So, in the middle of this Paragraph 23, it says --

21   it's referring to Mr. Waterhouse.  Do you see that?

22   A    Yes, sir.

23   Q    And you write, "Although he did not remember many, if any,

24   of the facts concerning -- of the facts and circumstances

25   concerning the HCMFA notes," -- do you see that there?

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 27    Filed 159064144    Page 111 of 347    PageID 36160
Document 1 9.00 114

Sauter - Cross                                        54

1  A    Yes, sir.

2  Q    That's not accurate, is it?

3  A    It's -- it's accurate.

4  Q    Mr. Waterhouse remembered a lot about the notes, didn't

5  he?

6  A    I suppose that's your opinion.  He didn't have a good

7  recollection of the notes and seemed to be guessing at what

8  had happened and why they were executed.

9  Q    All right.  Let's spend some time looking at what Mr.

10 Waterhouse told you.  Even though you did not show him the

11 promissory notes that are at issue, Mr. Waterhouse made it

12 perfectly clear to you that he was fully familiar with the

13 notes, correct?

14 A    Actually, in the previous sentence, it says the signatures

15 on the notes looked like they were his, so that would indicate

16 that I did show him copies of the notes and he indicated that

17 those were his signatures.

18 Q    That's what it says in this declaration.  That's not what

19 it said in your first declaration, correct?

20 A    I think --

21          MR. RUKAVINA:  That's argumentative.  That's a false

22 logical argument, and it's argument.  It's not a question.  He

23 can -- he can make these arguments in his closing.  Why would

24 Mr. Sauter in his first declaration go through every single

25 thing that he did or didn't do?

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 05/06/24    Page 112 of 347    PageID 36161

Sauter - Cross                                    55

1          MR. MORRIS:  Your Honor, I'll just ask him --

2          THE COURT:  Response?

3          MR. MORRIS:  I'll just ask him the -- yeah.  I'll

4   just ask him the question again.

5   BY MR. MORRIS:

6   Q    At the time of your deposition, you had no recollection of

7   ever showing the promissory notes to Mr. Waterhouse, correct?

8   A    I -- it's correct that I don't recall whether I showed him

9   the notes.

10  Q    Okay.  That's all I needed.  Who wrote this declaration?

11  Did you write this declaration?

12  A    Isn't -- isn't this the first declaration?

13  Q    No.  This is the second one.  Who wrote the second

14  declaration?

15  A    It would have been the same process.

16  Q    Where it was presented to you in the initial draft?

17  A    Yes, sir.

18  Q    And how many -- how many drafts do you recall this one

19  going through?  One or more than one?

20  A    One, maybe two.  I don't recall exactly.

21  Q    Can you recall any substantive point in your declaration

22  that you provided a comment on?

23  A    I -- I did provide substantive comments.  I don't recall

24  exactly what they were.

25  Q    Can you identify one?

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 05/06/44   Page 113 of 347   PageID 36162

Sauter - Cross                          56

1   A    I really -- I don't recall.

2   Q    Okay.  So even though you did not -- you have no

3   recollection of showing the promissory notes to Mr.

4   Waterhouse, Mr. Waterhouse made it perfectly clear to you that

5   he was fully aware of the notes, correct?

6            MR. RUKAVINA:  Objection, Your Honor.  That assumes

7   facts not in evidence.

8            THE COURT:  Overruled.

9            THE WITNESS:  Would you repeat the question, Mr.

10  Morris?

11  BY MR. MORRIS:

12  Q    Even though you did not show Mr. -- withdrawn.  Even

13  though you have no recollection of showing Mr. Waterhouse the

14  notes, he made it clear to you that he knew exactly what you

15  were talking about when you referred to the notes, correct?

16  A    Yes, sir.

17  Q    The notes were not a surprise to him, right?

18  A    No, sir.

19  Q    Mr. Waterhouse never told you that he was unaware of the

20  existence of the notes, correct?

21  A    No, sir.

22  Q    You knew when you signed both of your declarations that

23  Mr. Waterhouse was HCMFA's CEO and/or treasurer at the time

24  his signature was put on the notes, correct?

25  A    Yes, sir.

Sauter - Cross                                    57

1    Q    Now, notwithstanding your conclusions in your first

2    declaration, Mr. Waterhouse never admitted to signing the

3    notes by mistake, correct?

4    A    Meaning he never said that he signed the notes by mistake?

5    Q    Correct.  He never told you that, right?

6    A    Correct.

7    Q    And that's why there's no reference in either of your

8    declarations to Mr. Waterhouse admitting that he signed the

9    notes by mistake, correct?

10   A    That's right.

11   Q    There's nothing in either of your declarations that

12   suggests Mr. Waterhouse didn't sign or authorize the signing

13   of his signature on the notes, correct?

14   A    I don't think that that's accurate.

15   Q    Mr. Waterhouse did not ever tell you that he's sure he

16   didn't authorize the signing of the notes on his behalf,

17   correct?

18   A    He did not.

19   Q    And the declaration never says that Mr. Waterhouse

20   admitted to having his signature affixed without authority,

21   correct?

22   A    He never said that to me.

23   Q    Now, you specifically asked Mr. Waterhouse, who approved

24   the notes and what was the process?  Correct?

25   A    I did.

1  Q    And this is something that you asked him way back in April

2  or May, right?

3  A    That's correct.

4  Q    And Mr. Waterhouse was very clear to you back in April or

5  May that he couldn't describe the process.  Correct?

6  A    That's correct.  Correct.

7  Q    But he also told you, "The money was transferred, so we

8  signed the notes."  Correct?

9  A    I don't -- I don't know if those were his exact words, but

10 yes, conceptually, that was his statement.

11 Q    And that's how you personally recall his statement,

12 correct?

13 A    Yes.  I personally recall that he said if the money was

14 transferred there had to be a note to document the transfer of

15 funds.

16 Q    You didn't put that in your declaration, correct?

17 A    I -- I don't know that I did, but I don't know that I

18 didn't.  I don't have my declaration committed to memory.

19 Q    I'm sure if it's in there Mr. Rukavina will point it out.

20      So you knew back before HCMFA first sought leave to amend

21 its complaint that Mr. Waterhouse couldn't describe the

22 process by which the notes were created, correct?

23 A    That's correct.

24 Q    And even though you had no personal knowledge of the

25 circumstances surrounding the creation of the notes, you're

1  the only person in the world that you know of that told Mr.

2  Waterhouse he made a mistake in signing the notes.  Correct?

3  A    I'm sorry.  Say that again?

4  Q    Even though you have no personal knowledge of any of the

5  facts or circumstances surrounding the creation of the notes,

6  you told Mr. Waterhouse that he made a mistake when his

7  signature was put on them.  Correct?

8  A    I -- I don't think I ever said to Mr. Waterhouse, you made

9  a mistake.  I certainly asked him that question.

10 Q    Well, you recall during your investigation you told Mr.

11 Waterhouse that he made a mistake, correct?

12 A    I -- I asked him whether he made a mistake and whether it

13 had gone through legal and ethical (garbled) analysis.

14          MR. MORRIS:  Can we call up Mr. Sauter's deposition

15 transcript?  I'm sorry, La Asia, I forget what the deposition

16 -- what the exhibit number is.  And go to Page 57.  I'm sorry.

17 Page 56 at the bottom.

18 BY MR. MORRIS:

19 Q    Mr. Sauter, were you asked these questions and did you

20 give these answers, starting on Page 56, Line 24:

21          "Q    Okay.  But did you tell him that he made a

22          mistake?

23          "A    I think I implied it.

24          "Q    Do you have a recollection of actually telling

25          him that he made a mistake?

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 117 of 347   PageID 36166

Sauter - Cross                                    60

1      "A    That  would  be  my  recollection.    Obviously,  he

2      disagrees with me."

3      Were you asked those questions and did you give those

4  answers in your deposition?

5  A    Yes, sir.

6  Q    Okay.  And you concluded that Mr. Waterhouse made a

7  mistake, even though you have no personal knowledge of

8  anything that happened in connection with the TerreStar

9  valuation issue.  Correct?

10 A    That's correct.

11 Q    And you concluded that Mr. Waterhouse made a mistake, even

12 though you were not involved in any of the decisions that were

13 made in connection with the TerreStar valuation issue,

14 correct?

15 A    I was not involved in the decisions.  That's -- that's

16 correct.

17 Q    And you concluded that Mr. Waterhouse made a mistake even

18 though you weren't involved and had no responsibility for

19 formulating HCMFA's response to the SEC, correct?

20 A    That's correct.

21 Q    And you concluded that Mr. Waterhouse made a mistake even

22 though you had no responsibility or involvement in the

23 decision as to how HCMFA was going to fund the NAV losses,

24 correct?

25 A    That's correct.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 118 of 347   PageID 36167

Sauter - Cross                                    61

1    Q    And you concluded that Mr. Waterhouse made a mistake even

2    though you had no responsibility or involvement in formulating

3    HCMFA's report to GAF, the fund, the Global Allocation Fund.

4    Correct?

5    A    That's correct.

6    Q    And, again, despite not having any of that personal

7    knowledge, you told Mr. Waterhouse or you implied that he made

8    a mistake in executing the notes, correct?

9    A    That's correct.

10   Q    And Mr. Waterhouse obviously disagreed with you.  Correct?

11   A    That's correct.

12   Q    But you didn't inform the Court last spring that you

13   interviewed Mr. Waterhouse, the treasurer of HCMFA, the person

14   whose signature appears on the notes, you didn't tell the

15   Court that Mr. Waterhouse disagreed with your conclusion,

16   correct?

17   A    That was -- that would have been supposition on my part,

18   but no, I did not.

19   Q    What would be supposition?

20   A    Stating that Mr. Waterhouse disagrees with my conclusions.

21   Q    He obviously disagreed with your conclusions, correct?

22   Those are your words, correct?

23   A    I believe he disagreed with my conclusions, yes.

24   Q    But you didn't tell the Court that back in the spring, did

25   you?

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 119 of 347    PageID 36168
Document    Page 119 of 144

                            Sauter - Cross                            62

 1   A    No, sir, I did not.

 2   Q    And Mr. Waterhouse didn't just disagree with you, did he?

 3   A    I'm sorry?

 4   Q    Mr. Waterhouse didn't just disagree with the notion that a

 5   mistake was made, correct?  He actually told you exactly why

 6   the notes were created.  Isn't that right?

 7   A    I -- I don't agree with that.

 8   Q    During these private interviews that you had with Mr.

 9   Waterhouse, Mr. Waterhouse told you exactly why he believed

10   the notes were created, correct?

11   A    He told me why he believed the notes were created, yes.

12   Q    And so he did, in fact, remember the facts and

13   circumstances concerning the notes, correct?

14   A    I would stand by my earlier comment that he told me why he

15   believed the notes were signed.  I don't know that his memory

16   of the events is crystal clear.

17   Q    But it certainly was his belief, right?

18   A    Yes, sir.  I would agree with that.

19   Q    And he's the person whose signature appears on the notes,

20   correct?

21   A    Yes, sir.

22   Q    And he was the treasurer of HCMFA at the time the notes

23   were created, correct?

24   A    He was.

25   Q    Mr. Waterhouse specifically told you, "We transferred the

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 120 of 347   PageID 36169

Sauter - Cross                                    63

1   money so I executed the notes.  HCMFA didn't have the money to

2   pay GAF and so we transferred it from HCMLP and I executed the

3   notes."  That's what he told you, correct?

4   A    Something along those lines, yes.

5   Q    That's exactly what he told you, right?

6   A    I don't know that that's verbatim, but yes, that's my

7   recollection of what he said.

8   Q    And Mr. Waterhouse went even further in describing the

9   facts and circumstances concerning the notes, including an

10   explanation to you of why the notes were prepared.  Correct?

11   A    Could you expand on that?

12   Q    Sure.  Mr. Waterhouse specifically told you that the notes

13   were prepared for accounting purposes, right?

14   A    That was one of the reasons, yes.

15   Q    Uh-huh.  And he told you -- it's your specific

16   understanding that both HCMFA and Highland disclosed the

17   existence of the notes to their respective outside auditors

18   within thirty days of their execution, correct?

19   A    Yes, sir.

20   Q    In fact, it's your understanding that the notes were

21   prepared for the audit, correct?

22   A    I -- no, I don't know for certain that they were prepared

23   for the audit.  But I don't disagree that they were disclosed

24   to the auditors.

25            MR. MORRIS:  Can we go to Page 71, please?

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 121 of 347   PageID 36170

Sauter - Cross                                            64

1    Your Honor, there's an objection that Mr. Rukavina lodged

2    that I would ask the Court to rule on before I examine Mr.

3    Sauter once we put it up on the screen.  So, it's Page 71,

4    Lines 4 through 9.  Yes.

5            THE COURT:  Okay.  Overrule the objection.

6    BY MR. MORRIS:

7    Q   It's your understanding that the notes were prepared for

8    the audit, correct?

9    A   In reading my testimony, yes, I think that's -- that's

10   part of the reason that they were prepared.

11   Q   Okay.  And -- but you never told the Court that, right?

12   You never told the Court of your understanding as to the

13   purpose of the preparation of the notes?

14   A   I don't believe I mentioned the audit in my declaration.

15   No, sir.

16   Q   You didn't mention to the Court in either declaration that

17   it was your understanding that the notes were prepared for the

18   audit, correct?

19   A   I don't think I mentioned the audits in my declarations.

20   That's -- that's correct.

21   Q   Okay.  Now, the preparation of the audit, that is right in

22   Mr. Waterhouse's wheelhouse, correct?

23   A   Yes, sir.

24   Q   You know that Mr. Waterhouse is responsible for overseeing

25   the preparation of HCMFA's audited financial statements,

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 05/06/44   Page 122 of 347   PageID 36171
Document Page 65 of 144

Sauter - Cross                                    65

1    correct?

2    A    Yes, sir.

3    Q    And Mr. Waterhouse, the person responsible for the audit,

4    the person whose name appears on the notes, the person who was

5    the treasurer of HCMFA at the time, he specifically told you,

6    quote, if the money was transferred, he had to have a note to

7    go with it.  Correct?

8    A    Yes.  That's what he told me.

9    Q    And the money was transferred, correct?

10   A    That's my understanding.

11   Q    You don't -- you have no reason to believe -- in fact, Mr.

12   Rukavina, if you heard in his opening, acknowledged that the

13   money was transferred, correct?

14   A    Yeah.  I have no reason to deny that.

15   Q    But you did not inform the Court that the person whose

16   signature appears on the notes explained to you the purpose

17   and origin of them, correct?

18   A    I believe I did have some explanation for the purpose and

19   origin as it was conveyed to me by Mr. Waterhouse.

20   Q    Well, you told the Court in your declaration that's on

21   file right now that Mr. Waterhouse, "did not remember many, if

22   any, of the facts and circumstances concerning the HCMFA

23   notes."  Isn't that right?

24   A    I believe that's -- that's in my declaration.  Yes, sir.

25   Q    Okay.  And you signed that declaration and you filed it

 1  with the Court, even though you knew that the notes were

 2  prepared in connection with the audit, correct?

 3  A    I believe that's one of the reasons the notes were

 4  prepared.  Yes, sir.

 5  Q    There are other statements in your declarations that Mr.

 6  Waterhouse also specifically disagreed with, correct?

 7  A    I don't know that I've ever spoken with Mr. Waterhouse

 8  regarding my declaration.

 9  Q    Okay.

10          MR. MORRIS:  If we can go back to the first

11  declaration, Paragraph 30.

12  BY MR. MORRIS:

13  Q    Okay.  Do you see the third point, towards the end of the

14  paragraph?  It says, "It therefore appears that Waterhouse

15  prepared the notes for some internal accounting or other

16  purpose."  Do you see that?

17  A    Yes, sir.

18  Q    And you raised that issue with Mr. Waterhouse, correct?

19  A    I'm sorry.  We discussed that the notes were prepared

20  because, as I said, the money was transferred and so Mr.

21  Waterhouse was of the opinion, if the money is transferred,

22  there had to be a note.

23  Q    Okay.  And then the second point that you make, --

24          MR. MORRIS:  If we could just go up a little bit.

25  BY MR. MORRIS:

1    Q    It says, "Second, it appears that Mr. Waterhouse assumed

2    incorrectly that the funds being paid by the Debtor were a

3    loan to HCMFA."  Did I read that part correctly?

4    A    You did.

5    Q    And you specifically raised that issue that I just raised

6    with Mr. Waterhouse.  Isn't that right?

7    A    I did.

8    Q    And Mr. Waterhouse would not agree that he made any

9    mistaken assumption, correct?

10   A    That's correct.

11   Q    Mr. Waterhouse refused to admit that he incorrectly

12   assumed that the funds being paid by the Debtor were a loan to

13   HCMFA.  Isn't that right?

14   A    I'm sorry, could you say that one more time?

15   Q    Mr. Waterhouse refused to admit that he made an incorrect

16   assumption concerning the funds being paid by the Debtor to

17   HCMFA.

18   A    Yes, sir.  That's correct.

19   Q    Okay.  And you didn't tell that to the Court in May

20   either, correct?

21   A    I did not.

22   Q    Let's talk about some things that you didn't cover during

23   your investigation that led you to conclude that Mr.

24   Waterhouse signed the notes by mistake and without authority.

25   You never asked Mr. Waterhouse how Highland treated the notes

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document Document 177-28    Filed 01/09/24    Page 169 of 144    Page 125 of 347    PageID 36174

Sauter - Cross                                    68

1    on its books and records, correct?

2    A    That's correct.

3    Q    So when you concluded that the notes were signed based on

4    a mutual mistake, you were unaware that Highland carried the

5    notes at all times as assets on its balance sheet, correct?

6    A    That's correct.

7    Q    You never asked Mr. Waterhouse how HCMFA treated the notes

8    in its books and records, correct?

9    A    That's correct.

10   Q    So when you concluded that the notes were signed based on

11   a mutual mistake, you did not know that HCMFA carried those

12   notes at all times as liabilities on its balance sheet,

13   correct?

14   A    That's correct.

15   Q    We've talked about the audited financial statements, but

16   you never reviewed those as part of your investigation,

17   correct?

18   A    That's correct.

19   Q    So when you concluded that the notes were mistakenly

20   signed, you were unaware that HCMFA had disclosed the

21   existence of the notes in its own audited financial

22   statements, correct?

23   A    That's correct.

24   Q    But you know that now, right?

25   A    I do know that now.

Sauter - Cross                          69

1    Q    And you can't tell me whether HCMFA made yet another

2    mistake by including the notes in its audited financial

3    statements, correct?

4    A    I'm sorry.  You said yet another mistake?

5    Q    Yeah.  You can't tell me that the inclusion of the notes

6    in the audited financial statements was a mistake.  Isn't that

7    right?

8    A    That -- that's correct.  That's not a decision that I

9    make.

10   Q    And you would agree that your assertion that the notion

11   that the notes were signed by mistake is contradicted by

12   HCMFA's own audited financial statements, correct?

13   A    I would agree that -- that the notes are shown on the

14   audited financial statements without any qualification.

15   Q    All right.  Let's talk about some other things that -- now

16   that you did know last spring, in addition to the stuff we

17   talked about.  In your first declaration, --

18              MR. MORRIS:  If we could go to the first declaration,

19   Paragraph 27.

20   BY MR. MORRIS:

21   Q    You told the Court that HCMFA accepted responsibility for

22   the NAV error and paid approximately $5.2 million on February

23   15, 2019.  Correct?

24   A    Yes, sir.

25   Q    But the money used to pay the Global Allocation Fund

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 127 of 347   PageID 36176
Document   Page 70 of 144

                                Sauter - Cross                        70

1    didn't come from Highland, did it?

2    A    I don't know that.

3    Q    Well, the money came from insurance proceeds and HCMFA's

4    funding of their deductible, correct?

5    A    I believe that that's what's indicated in the memo that

6    I've read.

7    Q    And you read that memo before you submitted your first

8    declaration; isn't that right?

9    A    Yes, sir.  I believe so.

10   Q    And that memo -- and we'll look at it in a moment -- that

11   memo specifically discloses HCMFA's receipt of approximately

12   $5 million of insurance proceeds in connection with the NAV

13   error, correct?

14   A    Yes, sir.

15   Q    But you didn't tell the Court that you had a document in

16   your possession that showed that HCMFA received $5 million in

17   connection with the NAV error, did you?

18   A    I did not.

19   Q    Instead, you speculated that Highland may have tapped into

20   its insurance.  Isn't that right?

21   A    Yeah, I -- the fact of the matter is I don't know much

22   about the settlement of the insurance claim.

23   Q    Well, but before signing your declaration, you reviewed a

24   document that specifically described how the NAV losses were

25   being financed by HCMFA; isn't that right?

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 128 of 347    PageID 36177
Document    Page 170 of 144

Sauter - Cross                          71

 1   A    I don't know that I would say financed, but yes, the NAV

 2   losses were being paid by HCMFA to Global Allocation Fund.

 3   Yes, sir.

 4   Q    Okay.

 5          MR. MORRIS:  Can we put up Exhibit 31?

 6   BY MR. MORRIS:

 7   Q    All right.  This is a memo from HCMFA to the board of the

 8   Highland Global Allocation Fund dated May 28, 2019.  Do you

 9   see that?

10   A    Yes, sir.

11   Q    And what's the memo entitled?

12   A    Resolution of the Fund's Net Asset Value Error.

13   Q    Okay.  And this is one of the three to five memos that you

14   reviewed before signing your first declaration, correct?

15   A    Yes, sir.

16   Q    And this memo -- in this memo, HCMFA is describing for the

17   board the resolution of the NAV error, correct?

18   A    Yes, sir.

19   Q    Okay.

20          MR. MORRIS:  Before we get to the insurance issue,

21   can we just scroll down to the second paragraph?  Okay.

22   BY MR. MORRIS:

23   Q    And let me know if I'm reading this correctly.  The second

24   paragraph of the memo that HCMFA sent to the board of the

25   Highland Global Allocation Fund says, "The Advisor and

1    Houlihan Lokey, an independent third-party expert valuation

2    consultant approved by the board, initially determined that

3    the March transactions were non-orderly and should be given

4    zero weighting for purposes of determining fair value.  As

5    reflected in the consultation, the Advisor ultimately

6    determined that both March transactions should be classified

7    as orderly.  The fair valuation methodology adopted, as

8    addressed in the consultation, weights inputs -- weights

9    inputs and does not reflect last sales transaction pricing

10   exclusively in determining fair value.  The orderly

11   determination and adoption of the weighted fair value

12   methodology -- fair value -- fair valuation methodology

13   resulted in NAV errors in the Fund."  And they define that as

14   the NAV error.

15       Have I read that correctly?

16   A   Yes, sir.

17   Q   Okay.  Highland Capital Management, LP is not mentioned in

18   that paragraph, correct?

19   A   No, sir.

20   Q   In fact, there is nothing anywhere in this memo that tells

21   the board that Highland is responsible for the NAV error.

22   Correct?

23   A   That's correct.

24   Q   But Houlihan Lokey is mentioned, correct?

25   A   Yes.  Because Houlihan is -- was retained or authorized to

 1  be retained in connection with valuation services by the

 2  board.

 3  Q    Okay.  They're a third-party valuation firm, right?

 4  A    That's correct.

 5  Q    And they were approved by the board, as you just

 6  mentioned, correct?

 7  A    Yes, sir.

 8  Q    And it's your understanding that Houlihan Lokey did the

 9  valuation of TerreStar, correct?

10  A    I think Houlihan Lokey would have had input on TerreStar

11  valuation, but they would have done so in conjunction with the

12  valuation team at Highland.

13  Q    It's your understanding that Houlihan Lokey did the

14  valuation of TerreStar, correct?

15  A    No, sir.  I think Houlihan Lokey would have worked in

16  conjunction with the valuation team at Highland to prepare the

17  valuation.

18  Q    Okay.

19       MR. MORRIS:  Can we go to Page 87 of Mr. Sauter's

20  transcript, please?

21       THE COURT:  Mr. Morris, after you're through with

22  this subject matter, we're going to have to take a break.  How

23  much more do you have on this particular line of questioning?

24       MR. MORRIS:  I would -- just a moment.  And I don't

25  think I have more than ten minutes after that.  But I'm happy

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 07/09/24   Page 131 of 347   PageID 36180
Document      Page 130 of 144

Sauter - Cross                          74

1   to take a break, Your Honor.

2             THE COURT:  Okay.  Let's take a ten-minute break.

3   And I'll let you all know, I have a 1:30 matter, and it's

4   about ten after 12:00 now.  So we need to be thinking about --

5   when we come back, I need to know about how much more we need

6   collectively, okay?

7             MR. MORRIS:  Yes, Your Honor.

8             THE CLERK:  All rise.

9      (A recess ensued from 12:05 p.m. until 12:15 p.m.)

10            THE CLERK:  All rise.

11            THE COURT:  All right.  Please be seated.  All right.

12  We're back on the record in Highland.  Mr. Morris, you may

13  proceed with your questions of Mr. Sauter.  Mr. Sauter, you're

14  still under oath.

15            MR. MORRIS:  All right.  And in response to your

16  question, Your Honor, I don't think I'll have more than about

17  ten or twelve minutes.  And I don't expect to need more than

18  five or ten minutes in my closing.

19            THE COURT:  Okay.

20  BY MR. MORRIS:

21  Q   Mr. Sauter, if you could take a look, please, at Page 87,

22  Lines 2 through 9.  Were you asked these questions and did you

23  give these answers:

24       "Q   Okay.  Who's Houlihan Lokey?  Do you know who

25       Houlihan Lokey is?

1        "A   It's a third-party valuation firm.

2        "Q   Do they have a good reputation?

3        "A   Yes.

4        "Q   And did they do the valuation of TerreStar?

5        "A   That's my understanding.

6        Did you give those answers to those questions, sir?

7    A   Yes, sir.

8    Q   Okay.  And you don't know if anyone's ever suggested that

9    Houlihan Lokey was responsible for the valuation error,

10   correct?

11   A   I don't know whether anybody ever suggested that or not.

12   Q   And that's because -- and that's because you never asked.

13   Fair?

14   A   I suppose that's fair.

15   Q   Okay.

16           MR. MORRIS:  Now, if we could go back to Exhibit 31,

17   please, that second paragraph.

18   BY MR. MORRIS:

19   Q   You would agree with me that the second paragraph, to the

20   best of your knowledge -- withdrawn.  You would agree with me

21   that in the second paragraph HCMFA accurately defined NAV

22   error for the GAF board, correct?

23   A   Based upon my understanding of the NAV error, yes, I would

24   say that is correct.

25   Q   In fact, at the time of your deposition, you had no reason

1   to believe that HCMFA had inaccurately defined NAV error for

2   the GAF board, correct?

3   A    That's correct.

4   Q    But when you signed your first declaration, you didn't use

5   HCMFA's definition of NAV error, did you?

6   A    I don't recall.  I mean, if you could show me, I think

7   that would help me.

8   Q    Sure.

9        MR. MORRIS:  Can we put back the first declaration

10  and go to Paragraph 25?

11  BY MR. MORRIS:

12  Q    In Paragraph 25, you define NAV error as, "The Debtor made

13  a mistake in calculating the NAV."

14       Have I read that correctly?

15  A    You did.

16  Q    That's pretty different than the way HCMFA described the

17  NAV error in its memo to the GAF board, correct?

18  A    I think we're talking about two different things.  But

19  yes, I would agree that they are different --

20  Q    And you knew --

21  A    -- definitions.

22  Q    And you knew when you signed this declaration that HCMFA

23  had defined NAV error in the manner set forth in its

24  memorandum to the GAF board, correct?

25  A    I suppose so.  But, again, I think we're talking about two

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 17-9    Filed 07/09/14    Page 134 of 347    PageID 36183

Sauter - Cross                                   77

1   different things.

2   Q    Okay.  You didn't use HCMFA's definition of NAV error in

3   your declaration, correct?

4   A    I don't believe I described the nature of the NAV error.

5   No, I did not.

6   Q    And you didn't -- you didn't make the Court aware of

7   HCMFA's definition of NAV error at the time you submitted this

8   declaration, correct?

9   A    I did not.

10  Q    All right.  Let's go back to the insurance issue and the

11  source of funding.  You wrote in Paragraph 27 of your

12  declaration that the first payment was made in February 2019,

13  correct?

14        MR. MORRIS:  We can go back.  Yeah.  Right there at

15  the bottom.

16        THE WITNESS:  Yes.  Based upon the records that were

17  available to me, yes, I think that's accurate.

18  BY MR. MORRIS:

19  Q    And that was -- that was just over $5 million, right?

20  A    Correct.

21  Q    All right.  Now let's go back to the memo to the board

22  that you had in your possession at the time you signed your

23  declaration.  And if we could look at the second page.  This

24  second page is entitled, NAV Error Breakdown and Make Whole

25  Payments.  Do you see that?

1    A    Yes, sir.

2    Q    And you understand that the first row shows that the total

3    estimated net loss resulting from the NAV error was

4    approximately $7.44 million, correct?

5    A    Yes, sir.

6    Q    And you understood that the chart depicts the sources that

7    were going to be called upon to fund the $7.44 million payment

8    from HCMFA to the GAF, correct?

9    A    Yes.  That's what it purports to state.

10   Q    And you understood before you signed your declaration that

11   the GAF board was told in this chart that about $5 million of

12   the total loss was being funded through HCMFA's insurance,

13   correct?

14   A    I don't know whose insurance it was, but yes, it states

15   that there's $4.939 million in insurance proceeds.

16   Q    Did you ask anybody whose insurance proceeds those were?

17   A    I don't recall.

18   Q    But this also says that the deductible was paid by the

19   Advisor, correct?

20   A    That's what it says.  Yes, sir.

21   Q    Okay.  Does that lead you to conclude that it's the

22   Advisor's insurance?  If they were paying the deductible?

23   A    Not necessarily.

24   Q    Okay.  But despite having a document that showed $5

25   million coming from insurance, you didn't ask anybody about

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-30   Filed 07/09/24   Page 136 of 347   PageID 36185
Document   Page 79 of 144

Sauter - Cross                          79

1    whose insurance policy that was being tapped, right?

2    A    At the time, I did not.  No, sir.

3    Q    And you never disclosed to the Court, either last spring

4    or in connection with this motion, that there were insurance

5    proceeds of $5 million that were used to pay about two-thirds

6    of the total net loss for the NAV error, correct?

7    A    No, sir.

8    Q    You have no reason to believe that the source of the

9    funding of the $7.44 million was anything other than what's on

10   this page, correct?

11   A    No, sir, I don't -- I wouldn't know beyond what's on this

12   page.

13   Q    Okay.  And this memo was dated at the end of May 2019; is

14   that right?

15   A    I'll take your word for it, or you can show me, but --

16   Q    Yeah.  No problem, Mr. Sauter.

17           MR. MORRIS:  Let's go back to the top.

18   BY MR. MORRIS:

19   Q    Okay.  Do you see it's May 28, 2019?

20   A    Yes, sir.

21   Q    And that's --

22   A    I agree.  Yes.

23   Q    And that's weeks after Highland's transfer of the $7.4

24   million, correct?

25   A    Yes, sir, I believe so.

Sauter - Cross                          80

1    Q    Okay.  But there's nothing in this report to the board

2    that discloses that Highland made any payment towards the

3    funding of the net losses arising from the NAV error, correct?

4    A    No, nothing in this document indicates that Highland paid

5    for the net losses, the NAV error.

6    Q    And you don't know if HCMFA ever returned the insurance

7    proceeds to the carrier after receiving the $7.4 million from

8    Highland, correct?

9    A    I do not.

10   Q    And that's because you never asked, correct?

11   A    That -- correct.

12   Q    Okay.  Now, after completing your investigation last

13   spring, you learned that on May 3, 2019 HCMFA needed another

14   $5 million for a matter completely unrelated to the NAV error.

15   Correct?

16   A    I'm sorry.  Say that again?

17   Q    After your investigation was completed, you learned that

18   on May 3, 2019 HCMFA needed $5 million for a purpose

19   completely unrelated to the NAV error, correct?

20   A    I can't specify the date, but yes, I did learn that there

21   was a need for additional -- additional funding.

22   Q    And in fact, Mr. Norris told you that Highland transferred

23   $5 million on May 3, 2019 because HCMFA needed that money to

24   pay what is known as a consent fee.  Correct?

25   A    Again, I'm not sure about the exact dates, but yes, that's

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-8   Filed 01/09/24   Page 138 of 347   PageID 36187
Document   Page 81 of 144

Sauter - Cross                              81

1    correct.

2    Q    Your declaration -- neither of your declarations disclose

3    anything about the $5 million consent fee that Mr. Norris told

4    you about, correct?

5    A    No, sir.

6    Q    Neither of your declarations discloses that Mr. Norris

7    specifically told you that the $5 million transferred by

8    Highland on May 3rd was to enable HCMFA to pay a consent fee,

9    correct?

10   A    I don't know that Mr. Norris ever said that to me.

11   Q    Well, -- (pause).

12          MR. MORRIS:  Can we go to Page 104 of Mr. Sauter's

13   transcript, please?

14   BY MR. MORRIS:

15   Q    I'm going to read from Page 104, Line 19, through Page

16   105, Line 6.  Sir, were you asked these questions and did you

17   give these answers:

18       "Q    During   your   discussions   as   part   of   your

19        investigation  with  Mr.  Norris  and  Mr.  Post  and  Mr.

20        Dondero  and  Mr.  Waterhouse,  did  anybody  tell  you  why

21        Highland  paid  HCMFA  $5  million  on  May  3,  2019?

22       "A    Yes.

23       "Q    And why did -- what did they tell you?

24       "A    It was a payment for a consent fee.

25       "Q    All right.  Okay.  Who told you that?

1    "A    Mr. Norris."

2    Did you give those questions -- answers to my questions,

3    sir?

4    A    You read it correctly.

5    Q    Okay.  But you never told the Bankruptcy Court what Mr.

6    Norris told you about the -- about the May 3, 2019 payment,

7    correct?

8    A    No, sir.

9    Q    Before preparing your declaration, you spent time

10   reviewing the Debtor's bankruptcy filings, correct?

11   A    Yes, sir.

12   Q    And it's your understanding that the documents on the

13   docket are publicly available; is that right?

14   A    Yes, sir.

15   Q    And based on the documents on the docket, you were aware

16   that throughout the bankruptcy case the Debtor disclosed the

17   HCMFA promissory notes as assets of the bankruptcy estate,

18   correct?

19   A    Yes, sir.

20   Q    And you'll agree that Highland's view of the notes is

21   reflected in its audited financial statements, its books and

22   records, and its court filings, correct?

23   A    Yes, sir.

24   Q    One other thing you learned during your investigation is

25   that Mr. Waterhouse expressly told you that he did not prepare

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-20   Filed 01/09/24   Page 140 of 347   PageID 36189

Sauter - Cross                                          83

1    the notes, correct?

2    A    That's correct.  He said he would not have prepared the

3    notes.

4    Q    So you didn't need metadata to know that Mr. Waterhouse

5    didn't prepare the notes because you knew that last spring,

6    correct?

7    A    I wouldn't necessarily agree with that statement.

8    Q    Well, the metadata may show you who prepared the notes,

9    but you didn't need the metadata to know that it wasn't Mr.

10   Waterhouse, correct?

11   A    That is correct.

12   Q    And Mr. Waterhouse also specifically told you that no

13   formal process was followed to create the notes, correct?

14   A    That's not accurate.  Or at least not entirely accurate.

15   Q    Mr. Waterhouse told you, in response to your question, he

16   couldn't -- he couldn't describe any process that was filed --

17   followed in creating the notes.  Correct?

18   A    He couldn't recall specifically what happened, but he told

19   me what he thought would have happened --

20   Q    Um, --

21   A    -- in the creation of the notes.

22   Q    During your conversations with Mr. Waterhouse, he also

23   told you that the legal department was not involved, correct?

24   A    That's not accurate.

25   Q    Okay.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 141 of 347   PageID 36190

Sauter - Cross                          84

1          MR. MORRIS:  Can we put up on the screen, please, Mr.

2    Sauter's testimony from Page 63?

3    BY MR. MORRIS:

4    Q    I'm reading from Line 12 through -- let's just go to Line

5    3 at Page 64 for the moment.

6          "Q    What's  the  basis  for  your  statement  that  it

7          appeared the Debtor had no intention that there would

8          be notes or that there would be a loan transaction?

9          "A    If    you're    talking    about    a    $7.4    million

10         obligation, I would assume there would be a process

11         internally on who was responsible for the payment of

12         the  fees  for  the  --  or  the  expenses  for  the  NAV

13         error.     Based    on    my    discussions    with    Frank

14         Waterhouse,    there    was    no    process    or    the    legal

15         department was not involved in making a determination

16         as to whether there should be notes.  It was merely a

17         ministerial  act  that  Accounting  performed  when  they

18         transferred the funds to pay GAF."

19         Have I read that correctly?

20   A    Yes, sir.

21   Q    So you knew, based on your interviews with Mr. Waterhouse

22   last April and May, that Mr. Waterhouse couldn't describe any

23   process for the creation of the notes, correct?

24   A    I think you're asking a separate question.  So I can't say

25   yes or no to that answer without expanding upon it.

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 08/06/44    Page 142 of 347    PageID 36191

Sauter - Cross                                85

1    Q    Okay.  Mr. Waterhouse didn't describe for you any process

2    that was followed for the creation of the notes, correct?

3    A    Again, he couldn't tell me the exact process that

4    occurred, but he told me what he thought would have occurred.

5    Q    Okay.  And during your private conversations with Mr.

6    Waterhouse, he also told you that the legal department was not

7    involved, correct?

8    A    That's not accurate.

9    Q    Did he tell you that the legal department was involved?

10   A    His statement to me was that if the notes were drafted,

11   they would have been drafted by the legal department.

12   Q    So when he told you that, did you ever talk to anybody?

13   Did you talk to Mr. Leventon or Mr. Ellington or any of the

14   other lawyers who had migrated?  Did you follow up with them,

15   --

16   A    Yes, sir.

17   Q    -- ask them -- to ask them what they did?

18   A    Yes, sir.

19   Q    How come you don't mention that anywhere in any of your

20   declarations?

21   A    Because that didn't give me any clarity to what -- what

22   transpired with the notes.

23   Q    It's not -- sir, as you sit here right now, you don't know

24   whether the legal department is involved in all of the notes

25   that are signed by Mr. Dondero and his affiliates; isn't that

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 143 of 347   PageID 36192
                              Document     Page 186 of 144

                              Sauter - Cross                              86

1  right?

2  A    In a note of this size, I would fully expect the legal

3  department to have reviewed and approved a note of -- of this

4  nature.

5  Q    And that's just your opinion; isn't that right?

6  A    Yes.  Based upon having worked at NexPoint for the last

7  three years, yes, sir.

8  Q    Yeah.  It's your testimony -- but you cannot tell me, as

9  the general counsel of NexPoint, that the law department or

10  the legal department is involved in every note that's executed

11  by one of Highland's affiliates, correct?

12  A    I can't say definitively one way or another.  That's

13  correct.

14  Q    Okay.  Thank you very much.

15          MR. MORRIS:  Your Honor, I have no further questions.

16          THE COURT:  All right.  Redirect?

17          MR. RUKAVINA:  Yes.

18      Mr. Vasek, please pull up Mr. Waterhouse's deposition

19  transcript.  Go to Page 145.  Do you want to zoom in a little

20  bit, Julian?  Scroll down to the bottom.  Okay.

21                      REDIRECT EXAMINATION

22  BY MR. RUKAVINA:

23  Q    Now, Mr. Sauter, you are familiar with Mr. Waterhouse's

24  deposition transcript?

25  A    Actually, I've never read it.

Sauter - Redirect                      87

1   Q    Okay.  Well, then this might be interesting to you.  So,

2   at the bottom here on 25, I start asking, "Did you ask someone

3   to draft" --

4              MR. RUKAVINA:  Please scroll down.

5   BY MR. RUKAVINA:

6   Q    -- "draft notes?"  And Mr. Waterhouse answers, "I don't

7   specifically ask people to draft notes, really.  I mean,

8   again, you know, the legal group at Highland is responsible

9   and has always been responsible for drafting promissory

10  notes."

11      So did you -- did you not know that that's how Mr.

12  Waterhouse testified until today?

13             MR. MORRIS:  Objection to the form of the question,

14  Your Honor.  He just said that he hasn't read the transcript.

15             THE COURT:  Sustained.

16             MR. MORRIS:  If Mr. --

17             MR. RUKAVINA:  Okay.

18             MR. MORRIS:  If Mr. --

19  BY MR. RUKAVINA:

20  Q    Well, does what Mr. Waterhouse testified to in this

21  transcript that you haven't read comport almost exactly with

22  what he told you in April or May of that year?

23  A    Yes.  That's exactly what he told me, is he would not have

24  signed a promissory note if it had not been prepared and

25  signed off by Legal.

Sauter - Redirect                                    88

1   Q    Okay.

2              MR. RUKAVINA:   And scroll down a little bit more,

3   Julian, please.

4   BY MR. RUKAVINA:

5   Q    So, so I ask --

6              MR. RUKAVINA:   Sure.  We'll go to 22.  So I'm asked

7   to re-ask the question, Your Honor.  And I ask the question of

8   Mr. Waterhouse:  "Sure, Mr. Waterhouse.  Based on the practice

9   that you have described in your understanding, do you believe

10  that these notes would have been drafted by someone in the

11  legal department?"  And there's an objection from my co-

12  counsel, which I'll withdraw.  And Mr. Waterhouse answers yes.

13  BY MR. RUKAVINA:

14  Q    Does that also, Mr. Sauter, comport with what Mr.

15  Waterhouse told you when you interviewed him in April or May?

16             MR. MORRIS:   Objection to the form of the question,

17  Your Honor.  He hasn't seen the transcript.  Mr. Rukavina is

18  free to make this argument in his closing, but he shouldn't be

19  crossing his own witness with testimony that his witness has

20  never seen.  He's free to make the argument.  I'm not trying

21  to preclude him from making the argument.  But what I don't

22  want is an evidentiary record created by a witness with no

23  knowledge.

24             MR. RUKAVINA:   Your Honor, this transcript is in the

25  record from both of us.  And Mr. Morris was given great leeway

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 146 of 347   PageID 36195
Document   Page 89 of 144

Sauter - Redirect                          89

1   to take this witness through all kinds of questions,

2   insinuating that this witness was wrong or that he was

3   fabricating issues.  And I think it's perfectly legitimate for

4   me to present him with the actual person's testimony and ask

5   whether that testimony comports with what that person told Mr.

6   Waterhouse earlier in the year.

7            THE COURT:  I overrule the objection.

8   BY MR. RUKAVINA:

9   Q   Mr. Sauter, you just saw Mr. Waterhouse's answer.  Does

10  that answer comport with what Mr. Waterhouse told you last

11  spring about these notes?

12  A   Yes, it does.

13  Q   Okay.  So when you talked in your declarations about Mr.

14  Waterhouse's expectation that things would have gone through

15  Legal, that wasn't just supposition or, I'm sorry, speculation

16  on your part, was it?

17  A   No.  That's -- that's what he told me would have happened,

18  although he again indicated that he doesn't have any specific

19  recollection of the drafting of the notes or any emails --

20           MR. MORRIS:  Your Honor, I renew my objection.  Why

21  isn't the witness here?  He is an officer of HCMFA.  Why isn't

22  he here?  I didn't -- I would have had an opportunity now to

23  cross-examine him on these new issues.

24           THE COURT:  Okay.

25           MR. RUKAVINA:  Your Honor, he's not here because --

1              MR. MORRIS:  So I'm objecting based on the best

2     evidence rule.

3              MR. RUKAVINA:  He's not here, Your Honor, because

4     we're not trying the merits of the underlying lawsuit.  We're

5     trying the sole question of why we took ten months to assert

6     this defense.  That's why I objected earlier when Mr. Morris

7     took this witness on a two-hour trip down cross-examination on

8     irrelevant facts.

9              THE COURT:  Okay.

10             MR. RUKAVINA:  And I think he's opened the door --

11             THE COURT:  I overrule the objection.  Continue.

12             MR. RUKAVINA:  Thank you.

13    BY MR. RUKAVINA:

14    Q    Do you recall my question, sir?

15    A    I'm sorry.  Could you repeat it?

16    Q    Actually, I think you were just answering the question

17    when Mr. Morris objected.

18             MR. RUKAVINA:  Mr. Vasek, go to Page -- oh, hold on a

19    sec, Mr. Vasek.

20    BY MR. RUKAVINA:

21    Q    Mr. Sauter, when you spoke to Mr. Waterhouse in April or

22    May, did you ask him whether he signed these notes?

23    A    I did.

24    Q    And what did he say?

25    A    He said, if my signature's on it, I would have signed it,

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 148 of 347    PageID 36197

Sauter - Redirect                                91

1    because at the time I was not using electronic signatures.

2    Q    Okay.  Thank you.

3    A    And he was unequivocal on that.

4    Q    Okay.

5         MR. RUKAVINA:  Go to Page 139, please, Mr. Vasek.

6    BY MR. RUKAVINA:

7    Q    Did you discuss with Mr. Waterhouse whether he would have

8    been -- strike that.  Did you discuss with Mr. Waterhouse who

9    in the organization would have had the authority to bind

10   anyone on notes of this size?

11   A    I did.

12   Q    Okay.  How did he respond?

13   A    He said that he would not have signed any promissory notes

14   unless they'd been signed off by Legal and signed off by Mr.

15   Dondero.

16   Q    Okay.  Now, when Mr. Morris was asking you some questions,

17   he asked you about whether you ever told Mr. Waterhouse that

18   he had made a mistake.  I think the implication was that, who

19   are you after the fact to tell him that he made a mistake?

20   So, so we'll look very quickly here on Page 139.  I'm asking

21   Mr. Waterhouse, I apologize if I asked you this already, but

22   has anyone ever told you at any time that you were not

23   authorized to sign the promissory notes that are the subject

24   of the sentence we're looking at?  And you see his answer is,

25   Not that I recall.

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document Document Filed 109 of 144  Page 149 of 347    PageID 36198

                           Sauter - Redirect                        92

```
1              MR. RUKAVINA:  Yeah.  And scroll down a little bit.
2    And Your Honor can read it for herself, but it goes on:  Let
3    me ask the question again.  Did anybody ever tell you at any
4    time that you made a mistake?
5         Scroll down a little bit.
6         Not that I recall.
7         And I apologize, Your Honor.  That was not me asking those
8    questions.  That was Mr. Morris asking those questions.
9    BY MR. RUKAVINA:
10   Q    So does that refresh your memory, Mr. Sauter, as to
11   whether you actually ever told Mr. Waterhouse that he made a
12   mistake?
13   A    Yeah.  I -- apparently, I never stated to Mr. Waterhouse
14   that -- that he made a mistake in executing the notes.
15   Q    Can you think of any reason why you -- why you would have
16   told him that?
17   A    No.  I -- I wouldn't.
18   Q    Okay.
19             MR. RUKAVINA:  Go to Page 317, please, Julian.
20   Scroll down a little bit.
21        Your Honor, actually, we will pull this down.  I'll argue
22   it at closing.  Go ahead, Mr. Vasek, pull that down, just to
23   hurry this up.  Okay.  Mr. Vasek, please pull up that SEC
24   memorandum.
25   BY MR. RUKAVINA:
```

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 03/30/24   Page 150 of 347   PageID 36199
Document   Page 193 of 144

Sauter - Redirect                              93

```
1    Q   Mr. Sauter, are you familiar with this memorandum to the

2    SEC --

3              THE COURT:  Can you say for the record what we're

4    looking at, what exhibit?

5              MR. RUKAVINA:  Your Honor, yes.  I have not

6    introduced this one into evidence yet, so I want him to

7    authenticate it first.

8              THE COURT:  Okay.

9    BY MR. RUKAVINA:

10   Q   Are you familiar with this document, Mr. Sauter?

11   A   I am.

12   Q   Okay.  Is this a document that you relied on in giving Her

13   Honor your first and your second declarations?

14   A   Yes.  It's one of the documents I reviewed.

15   Q   Okay.

16             MR. RUKAVINA:  Your Honor, I'd move to admit this

17   document.  I have not filed an exhibit list because, again,

18   we're proceeding with appendices, so I don't know how to

19   describe it.  Maybe Rebuttal A.

20             THE COURT:  Is it on the docket attached to your

21   appendix?

22             MR. RUKAVINA:  No, Your Honor.  We'll have to --

23   we'll have to upload it or file it after this hearing.

24             THE COURT:  Well, okay.  I first ask, do we have an

25   objection to this because it wasn't disclosed?
```

1          MR. MORRIS:  I do, for that very reason.  I don't --

2     I don't understand -- I don't -- I don't understand what's

3     happening.  It's his witness.  It's his motion.  He put forth

4     his evidence.  I don't know --

5          MR. RUKAVINA:  Your Honor, all that I can say is

6     that, again, this motion relates to whether Mr. Waterhouse

7     signed these notes.  Mr. Morris took this witness through

8     question upon question about this NAV error.  Mr. Morris did

9     not present -- just as he accuses this witness of not giving

10    the Court all the relevant information -- he has not presented

11    the Court with this relevant information, which is a document

12    where the Debtor's own employees, the Debtor's employees, are

13    saying we are responsible for this NAV error.  So I think that

14    it is a proper rebuttal.  It's -- I know it's weird to offer

15    an exhibit to rebut my own witness, but this is being done in

16    response to what Mr. Morris was asking him about earlier

17    today.

18         THE COURT:  All right.  Well, if it really indicates

19    what you --

20         MR. MORRIS:  Go ahead.

21         THE COURT:  -- say it indicates, then I guess it

22    would be rebuttal evidence.  So, --

23         MR. MORRIS:  Go right ahead, Your Honor.  No -- no

24    objection.

25         THE COURT:  Okay.  It'll be admitted.  And I guess we

Sauter - Redirect                          95

 1   need to call this -- we're going to call it HCMFA's R-1 for

 2   Rebuttal 1.  Okay.  File it on the docket that way.

 3            MR. RUKAVINA:  Thank you, Your Honor.

 4        (HCMFA's Rebuttal Exhibit 1 is received into evidence.)

 5            THE COURT:  Go ahead.

 6            MR. RUKAVINA:  Scroll down a little bit, Julian,

 7   please.  Okay.  Stop there.

 8   BY MR. RUKAVINA:

 9   Q    So you see, Mr. Sauter, where it says the Advisor

10   representatives, Thomas Surgent, Frank Waterhouse, Jason Post,

11   and Lauren Thedford?  Do you see that?

12   A    Yes, sir.

13   Q    Whose employees were those at that time?

14   A    They were all employees of Highland Capital Management,

15   LP.

16   Q    Okay.

17            MR. RUKAVINA:  Scroll down a little bit more, please.

18   Do you see -- stop there.

19   BY MR. RUKAVINA:

20   Q    Do you see where NAV error is defined?

21   A    Yes, sir.

22   Q    Okay.  So obviously it speaks for itself, but define --

23   tell the Judge how you understood NAV error to be defined when

24   you were undertaking your investigation and when you were

25   preparing your declarations.

Sauter - Redirect                          96

1   A    In preparing my declaration, I was simply referring to the

2   mistake that occurred.  The NAV error resulted from some

3   trades that occurred that I would call, you know, outside of

4   the ordinary course of business or -- or not necessarily at

5   arm's length, and so they were determined to be, quote, non-

6   orderly.

7        I think when the SEC became involved, they made a

8   determination that they believed that the excluded trades were

9   orderly and should have been included in the calculation of

10  the NAV, which ultimately resulted in the NAV error.

11  Q    And is it fair to -- or, did the valuation of the

12  underlying fund have -- or its assets have any role in that?

13  A    No.  It would have been Houlihan Lokey and then the

14  valuation committee and I think the individuals listed above

15  and maybe a few others were on the valuation committee, but

16  it's my understanding that all of the employees on the

17  valuation committee were Highland Capital Management

18  employees.

19  Q    Okay.

20           MR. RUKAVINA:  Mr. Vasek, please pull up the shared

21  services agreement.

22       Your Honor, this agreement is in the record as part of Mr.

23  Sauter's declaration.  This is the HCMFA shared services

24  agreement.

25  BY MR. RUKAVINA:

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 154 of 347   PageID 36203

Sauter - Redirect                              97

 1  Q    Are you familiar with this document?

 2  A    Yes, sir.

 3  Q    Okay.  And is this a document that you would have

 4  consulted as well in reaching your conclusion?

 5  A    Yes, sir.

 6  Q    Okay.

 7          MR. RUKAVINA:  And if you'll scroll to the bottom two

 8  pages, Mr. Vasek.

 9      Your Honor, this is Annex A.  This shows the services that

10  the Debtor was to be providing.

11      Zoom in a little bit.

12  BY MR. RUKAVINA:

13  Q    Do you see Compliance, General Compliance?  Do you see

14  that, sir?

15  A    Yes, sir.

16          MR. RUKAVINA:  And scroll down, Mr. Vasek.  The top

17  of the next page.

18  BY MR. RUKAVINA:

19  Q    Do you see Valuation Committee?  Do you see that, Mr.

20  Sauter?

21  A    Yes, sir.  Yes, sir.

22  Q    Were compliance and valuation committee, as part of your

23  understanding and investigation, did those services have

24  anything to do with the NAV error?

25  A     Yes, it does.  The Valuation Committee was primarily

Sauter - Redirect                          98

1   responsible for setting the valuation, with the input of

2   Houlihan Lokey, and that's what ultimately resulted in the NAV

3   error.

4   Q    Did you discuss this NAV error with Mr. Dondero?

5   A    I'm sure I did at some point.

6   Q    Okay.  Well, did you -- did you discuss with Mr. Dondero

7   why he told Mr. Waterhouse to transfer $7.4 million to HCMFA?

8   A    I did, after the fact, after discussing it with Mr.

9   Waterhouse.

10  Q    Okay.  And did -- what did Mr. Dondero tell you?

11  A    I mean, generally speaking, you know, he wouldn't have

12  been involved in the determination of the NAV error.  And, you

13  know, I don't know that he recalled any authorization to

14  execute notes from HCMFA to HCMLP in connection with the --

15  with the NAV error.

16  Q    But did he tell you that this was intended by him to be a

17  loan?

18  A    I don't know that he ever said that.

19  Q    Did he indicate to you any surprise that this was carried

20  as a loan?

21  A    I don't know that he would have indicated any surprise.  I

22  think he relied upon Accounting and Legal to make these

23  determinations and provide input to him.

24  Q    Okay.

25          MR. RUKAVINA:  Mr. Vasek, if you'll pull up, please,

Sauter - Redirect                              99

 1   the Debtor's -- in the Debtor's appendix, it's Exhibit 59.

 2   Zoom in, please.  All right.

 3   BY MR. RUKAVINA:

 4   Q   Are you familiar with this document?

 5   A   Yes, sir.

 6   Q   And what is this document?

 7   A   It's a memo from what I call the Advisors and the broker-

 8   dealer to the retail funds, the boards of the retail funds.

 9           MR. RUKAVINA:  Mr. Vasek, can you go to the second

10   page, Question 2, where it says, Response?  Okay.

11   BY MR. RUKAVINA:

12   Q    So, in the middle there, Mr. Sauter, it says the earliest

13   the note between HCMLP and HCMFA could come due is in May

14   2021.  Did I read that correctly?

15   A   Yes.  Yes, sir.

16           MR. MORRIS:  Objection to the form of the question.

17   Have we established any foundation that Mr. Sauter saw this

18   memo in connection with his review of the -- with -- in

19   connection with his investigation?

20           THE COURT:  I don't think we have.  So, --

21           MR. RUKAVINA:  Well, Your Honor, this exhibit --

22           MR. MORRIS:  So I object, Your Honor.

23           THE COURT:  Sustained.

24           MR. RUKAVINA:  Again, Your Honor, I apologize.  This

25   is an exhibit introduced by the Debtor in its appendix.  Is

1   the Court telling me that every exhibit in the appendix has to

2   be individually offered and admitted as though it was a trial?

3          THE COURT:  Well, I don't know if it was foundation

4   or a personal knowledge objection that was being asserted.

5   Mr. Morris, maybe I was hearing something you weren't saying.

6          MR. MORRIS:  Yeah, no, it -- it was both.  I mean,

7   Mr. Rukavina is right.  We -- we have offered this document

8   into evidence.  But there is no -- there is no personal

9   knowledge.  Let him, if he can, let him testify that he's ever

10  seen this before.

11      You know, these are leading questions.  I haven't been

12  objecting.

13      Again, Mr. Rukavina can make whatever arguments he wants,

14  but I'm very wary about just spoon-feeding them to a witness

15  when there's been absolutely no -- and you'll hear this on my

16  recross, when there's been no foundation established that this

17  witness has any knowledge about this document.

18         THE COURT:  Okay.  Well, I sustained -- Mr. Rukavina,

19  you're going to have to establish some personal knowledge on

20  the part of the witness before you start questioning him about

21  it.

22  BY MR. RUKAVINA:

23  Q   Well, let me ask you this, Mr. Sauter.  Obviously, it's

24  our position today that Mr. Waterhouse didn't sign these

25  notes, correct?

1    A    Yes, sir.

2    Q    Before we filed this motion, had you seen this document?

3    A    I -- I have seen this document.  I can't say for certain

4    when I first saw it.

5    Q    Do you recall whether -- whether this is one of those

6    documents that you would have reviewed in concluding that

7    perhaps Mr. Waterhouse didn't sign the notes?

8    A    I don't recall that.

9    Q    Okay.

10         MR. RUKAVINA:  Well, let's -- let's try a different

11   exhibit here, Julian.  It'll be the Debtor's Exhibit 36.

12   Scroll down a little bit.  Zoom in.

13   BY MR. RUKAVINA:

14   Q    Have you seen this email exchange?  I know you're not on

15   it, but have you seen this email exchange in the course of

16   this litigation?

17   A    I -- I don't recall specifically seeing this, the email

18   communication.  No, I don't.

19   Q    Okay.

20         MR. RUKAVINA:  Very well, then, Your Honor.  I'll

21   move on and I'll just argue these matters at closing.

22         MR. MORRIS:  Just very short recross, Your Honor.

23         THE COURT:  All right.

24         MR. RUKAVINA:  Oh, I'm not -- I'm not done.

25         THE COURT:  Oh, he hasn't passed the witness.

```
 1              MR. MORRIS:  Oh, I apologize.

 2              MR. RUKAVINA:  Just -- just this exhibit, Your Honor.

 3              THE COURT:  Okay.

 4              MR. RUKAVINA:  In light of the Court's --

 5              THE COURT:  Just for my staff and my planning

 6     purposes, how much longer do we think this is going to go?

 7     This was a one-hour time estimate, and we're now three hours

 8     or so into this.  How much longer?  Because I have a 1:30

 9     docket and other things this afternoon, including a conference

10     call at 3:00 and -- et cetera, et cetera.

11              MR. RUKAVINA:  I'm almost done, Your Honor, with this

12     witness.  And as I mentioned, I have no other evidence other

13     than what's in my appendix.

14              THE COURT:  Okay.  I'll take "almost done" to being

15     ten minutes or so.

16              MR. RUKAVINA:  Yeah.  I'll beat that, Your Honor.

17         Mr. Vasek, please pull up the Sauter -- Mr. Sauter's

18     deposition.  Go to Page 63.

19              MR. MORRIS:  Your Honor, I don't understand.  He's

20     going to cross his own witness with his own transcript when

21     he's -- is he impeaching him?

22              MR. RUKAVINA:  No.  No.  You would not let him answer

23     a question, and I want to ask him to answer the question.

24              MR. MORRIS:  Well, why don't you just ask him the

25     question?
```

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 160 of 347   PageID 36209
Document Page 109 of 114

Sauter - Redirect                                103

1          MR. RUKAVINA:  Please pull up Mr. Sauter's deposition

2    to Page 63.

3          THE COURT:  Oh, --

4          MR. MORRIS:  I object.

5          THE COURT:  -- okay.  Well, I object.  I sustained

6    the objection.  You can use, you know, prior inconsistent

7    statements in a depo or, you know, or a depo to refresh, but

8    you've got the live witness here, so what are we doing?

9    BY MR. RUKAVINA:

10   Q    Do you recall, Mr. Sauter, Mr. Morris just a little bit

11   about taking you through your deposition testimony where he

12   was asking you about whether Mr. Waterhouse told you that the

13   note would have to go through Legal or not?

14   A    I do.

15   Q    Okay.  And I believe you testified something like there

16   were two different things that were being discussed there.

17   A    Correct.

18   Q    Okay.  I would like to give it up -- put up the document

19   so you can read it, but we can't do that, so explain why Mr.

20   Morris was wrong in implying that Mr. Waterhouse was telling

21   you about the promissory notes.

22         MR. MORRIS:  Objection to the form of the question.

23         MR. RUKAVINA:  Well, again, Your Honor, I can't -- I

24   can't present -- he was just asked about this testimony, he

25   said I have an explanation but it's not a yes or no answer,

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 161 of 347    PageID 36210
Document    Page 109 of 114

Sauter - Redirect                                    104

1    and I want -- I have the right --

2              THE COURT:  Okay.  Overruled.  He can answer.

3              THE WITNESS:  Thank you, Your Honor.  There were two

4    issues with the notes.  Mr. Waterhouse was adamant that the

5    notes had been prepared by Legal.  I worked with Tim Cournoyer

6    and Lauren Thedford.  They're both good lawyers, and they

7    would not have prepared a note that listed Mr. Waterhouse

8    individually as the maker on the note.  It's an incorrect

9    signature block, and I just didn't believe that they would

10   have done that.

11       But the real issue was whether there was any actual

12   determination of who was responsible for the payment of the

13   NAV error to the GAF, and I asked specifically whether there

14   was a process that involved Mr. Surgent, Mr. Waterhouse, Mr.

15   Dondero, and Mr. Cournoyer in determining who was responsible

16   for that -- that payment.

17       And so those were the two issues.  Mr. Waterhouse was

18   adamant that it had gone through Legal.  So, yes, he did say

19   it had gone through Legal.  But he did not ever say that there

20   was any process in making a determination as to who was

21   responsible for the NAV error vis-à-vis Highland Capital

22   Management and Highland Capital Management Fund Advisors.

23             MR. RUKAVINA:  And Mr. Vasek, will you please pull up

24   Page 162 from the Debtor's appendix?  It's Appendix 162.

25   There it is.  Zoom in a little bit.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 162 of 347   PageID 36211

Sauter - Redirect                                          105

1    BY MR. RUKAVINA:

2    Q   Mr. Sauter, you were asked about this email before, the

3    one from Mr. Klos.  And do you see, sir, where it says:  This

4    is a new interco loan.  Kristin, can you or Hailey please prep

5    a note for execution?

6        Do you see that, sir?

7                MR. MORRIS:  Object --

8                THE WITNESS:  I do.

9                MR. MORRIS:  -- to the form of the question, Your

10   Honor.  I did not examine this witness with this document.  I

11   used it in my opening, but I certainly did not examine this

12   witness with this document.

13               THE COURT:  Wait, wait.  What is the objection?  I do

14   remember this exhibit and him being asked questions.

15               THE WITNESS:  Correct.

16               THE COURT:  What are you saying?

17               MR. MORRIS:  I'm just saying Mr. Rukavina's lead-in,

18   I mean, --

19               MR. RUKAVINA:  I might be wrong.  I might be wrong.

20               MR. MORRIS:  I used -- I used this document in my

21   opening, Your Honor, but this contradicts everything Mr.

22   Sauter has ever said in his life about these matters, and I

23   don't recall ever cross-examining him with this document.

24               THE COURT:  Okay.

25               MR. MORRIS:  If he's ever seen it before, he can --

1   he can testify, but --

2          THE COURT:  Okay.

3          MR. MORRIS:  But I don't think there's any

4   foundation.

5          THE COURT:  I don't remember specifically whether it

6   was your opening or in questioning; I just remember seeing it

7   here on my screen.  So if you could rephrase the question.

8          MR. RUKAVINA:  Sure.  No, my only first -- first,

9   just to set up the question, I just asked the witness whether

10  he just read the same thing that I did.  I can't imagine that

11  being objectionable.

12  BY MR. RUKAVINA:

13  Q   Now, Mr. Sauter, my question is, as a transactional lawyer

14  of over twenty years, what does prepare a note for execution,

15  what does execution mean?

16         MR. MORRIS:  Objection to the form of the question.

17  He's not here as an expert.  He -- there's no foundation that

18  he ever saw this document.  If he had, I think it would be

19  even worse for him --

20         THE COURT:  Okay.  Sustained.

21         MR. MORRIS:  -- than it is right now.

22         THE COURT:  Sustained.

23         MR. RUKAVINA:  Okay.  I'll pass the witness, Your

24  Honor.  Thank you.

25         THE COURT:  Recross?

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178-28    Filed 11/09/04114    Page 164 of 347    PageID 36213

Sauter - Recross                                      107

1            MR. MORRIS:  Just a couple of very brief questions.

2            THE COURT:  Okay.

3                        RECROSS-EXAMINATION

4    BY MR. MORRIS:

5    Q    Mr. Sauter, you made reference to the shared services

6    agreement before, right?

7    A    Yes, sir.

8    Q    You didn't describe that as one of the documents you ever

9    reviewed in your deposition, correct?

10   A    Perhaps I didn't, but I've reviewed it a number of times.

11   Q    And you didn't review it in connection with your

12   investigation, correct?

13   A    I actually reviewed it extensively from January until

14   March with the transition of shared services.

15   Q    There's no argument in your first declaration that relates

16   to the shared services agreement, correct?

17   A    I -- no, I did not mention --

18            MR. RUKAVINA:  Objection, Your Honor.  Let's put up

19   the -- let's put up the document.  I don't remember it being

20   in there.  I don't remember it being attached as an exhibit.

21            MR. MORRIS:  All right.  I stand corrected.

22            THE COURT:  Okay.

23            MR. MORRIS:  I'll move on.  Um, --

24            THE COURT:  Do we want to pull it up, or no?

25            MR. MORRIS:  No, we'll pass.  I'll take Mr.

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178-28    Filed 01/09/24    Page 165 of 347    PageID 36214

Sauter - Recross                                108

 1    Rukavina's word for it.

 2    BY MR. MORRIS:

 3    Q    But when you -- when you testified in your deposition, you

 4    weren't able to recall having ever looked at that, correct?

 5    A    I don't know that I was asked that question.  I'm a

 6    hundred percent certain that I probably reviewed it --

 7    Q    Okay.

 8    A    -- a dozen times --

 9    Q    And --

10    A    -- before that declaration.

11    Q    And I think you testified that you don't recall, you --

12    based on what Mr. Waterhouse said, you now want to retract

13    your testimony that you told Mr. Waterhouse he made a mistake,

14    correct?

15    A    I think my initial statement was it was implied, and I

16    think eventually I said that, yes, I probably said something

17    to him that it was a mistake.

18    Q    Okay.  So Mr. Waterhouse's transcript didn't refresh your

19    recollection at all?  That's what you truly believe, correct?

20    A    Truly believe what, sir?

21    Q    That he made a mistake.  Correct?

22    A    I do.  Yes.

23    Q    And whether implicitly or explicitly, you conveyed that

24    message to Mr. Waterhouse, correct?

25    A    That was my view, yes.

Sauter - Recross                                    109

1   Q    And it's certainly what you said in your declaration

2   multiple times, correct?

3   A    What's that?

4   Q    That he made a mistake.

5   A    Correct.

6   Q    And you said in your declaration multiple times that he

7   signed the notes, correct?

8   A    Correct.

9   Q    Okay.

10          MR. MORRIS:  I have no further questions, Your Honor.

11          THE COURT:  All right.  Thank you, Mr. Sauter.  That

12   concludes your testimony.

13          THE WITNESS:  Thank you, Your Honor.

14       (The witness is excused.)

15          THE COURT:  What evidence do you all want to have in

16   the record here?

17          MR. RUKAVINA:  Well, Your Honor, again, in reliance

18   on the Local Rules, I filed an appendix.  I think Your Honor

19   mentioned it's an extensive appendix.  It has -- I filed a

20   redacted version, but it's not redacted much.  It has the

21   declaration of Mr. Sauter, which has the shared services

22   agreements, an email from Mr. Seery forbidding communications

23   with the Debtor's employees.  It has the depositions of Mr.

24   Waterhouse, Hendrix, and Klos.  And it has my declaration

25   authenticating certain documents.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/09/2114   Page 167 of 347   PageID 36216
Document 17-28   Page 110 of 144

110

1        Then I filed a supplemental declaration on Friday in my

2    reply authenticating certain other documents.

3        I believe that those are part of the record under our

4    Local Rules as being in the appendix, but if they're not then

5    I guess I'll move for their admission.

6            THE COURT:  All right.  Let's talk about where on the

7    docket they appear.

8            MR. RUKAVINA:  Okay.  Mr. Vasek might have to help me

9    here.  The redacted appendix -- you see, I don't have an ECF

10   number on the top for some reason.  Sometimes that happens

11   when I'm downloading documents.  Mr. Vasek, maybe you can

12   quickly tell the Court what docket my appendix is at.

13           THE COURT:  Okay.

14           MR. VASEK:  Sure.  It's 87.

15           THE COURT:  86 or 87.  The unredacted is 87.  Okay.

16   This --

17           MR. VASEK:  87.

18           THE COURT:  Say again?

19           MR. VASEK:  Yes, Your Honor.  87.

20           THE COURT:  Okay.  Mr. Morris?

21           MR. RUKAVINA:  That's right.  I'm remembering now,

22   Your Honor -- yeah.  I'm remembering now, Your Honor, that Mr.

23   Morris and I agreed I could file it publicly in unredacted

24   form, so it's 87.  And then my supplemental declaration is at

25   112/1.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 7-28   Filed 11/09/41147   Page 168 of 347   PageID 36217

111

1          THE COURT:  Okay.  Is there any objection to that

2     being in the record, Mr. Morris?

3          MR. MORRIS:  Yes, Your Honor.  I move to strike from

4     Mr. Sauter's declaration Paragraphs 6 through 10 and 22 to 31

5     as lacking any basis in personal knowledge.  Highland

6     otherwise has no objection to the admission into evidence of

7     the balance of the Movant's exhibits.

8          THE COURT:  Okay.  So --

9          MR. RUKAVINA:  Your Honor, I'll --

10          THE COURT:  -- all those 800-plus pages attached, you

11     have no objection to?

12          MR. MORRIS:  Only -- only if they are described in

13     one of the -- I mean, I can do it that way, Your Honor, if

14     you'll just give me a moment.  But, again, we've got -- we've

15     got a witness here who has no personal knowledge of the shared

16     services agreement he's --

17          MR. RUKAVINA:  John, can you repeat for me the

18     paragraphs that you mentioned you're objecting to?

19          MR. MORRIS:  Yes.  6 through 10 and 22 to 31.

20      (Pause.)

21          MR. RUKAVINA:  Is the Court prepared for my response?

22          THE COURT:  I'm prepared.  I'm looking at it.

23          MR. RUKAVINA:  I don't think that 6 through 10

24     matter.  The rest does matter because it goes exactly to Mr.

25     Sauter's investigation and the reason for why this motion was

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 169 of 347   PageID 36218

112

1   not filed until it was filed.

2       So I think that, again, that these are -- these -- this --

3   he doesn't need -- what are we talking about here?  Are we

4   talking about the underlying facts, that he does not have

5   personal knowledge of?  That's true.  These are not offered

6   for the truth of the underlying facts.  Or are we talking

7   about his investigation and hence the reason why this motion

8   wasn't filed back in April or May?  He does have personal

9   knowledge of that.  He does have personal knowledge of what he

10  relied on.

11           THE COURT:  Okay.  I overrule the objection.  I think

12  this goes to weight, not admissibility.  So, --

13           MR. MORRIS:  All right.  I --

14           THE COURT:  -- everything is admitted.

15           MR. MORRIS:  Just to preserve my record real quick,

16  Your Honor?

17           THE COURT:  Okay.

18           MR. MORRIS:  I'm sorry.  Like, Paragraph 24 is a

19  paraphrase of deposition testimony.  Paragraph 26 is a

20  paraphrasing of deposition testimony.  It has nothing to do

21  with the investigation.  And Highland objects to the inclusion

22  of that stuff in the record.

23           THE COURT:  Okay.  Again, I think this goes to --

24           MR. RUKAVINA:  I don't --

25           THE COURT:  -- weight.

1          MR. RUKAVINA:  I don't see --

2          THE COURT:  I admit it.

3          MR. RUKAVINA:  Okay.

4          THE COURT:  I admit it.  Okay.  What else am I going

5    to put in the record here?

6          MR. MORRIS:  I think -- I think, subject to that

7    objection -- is the Movant withdrawing Paragraphs 6 through

8    10?

9          MR. RUKAVINA:  That's fine.

10          MR. MORRIS:  Okay.

11          THE COURT:  Okay.  Well, --

12          MR. MORRIS:  And my -- my --

13          THE COURT:  -- then that is excluded.

14          MR. MORRIS:  -- other objection will be overruled?

15          THE COURT:  I think the only exhibits referenced were

16    the shared services agreements, right, in that bundle of

17    paragraphs?

18          MR. MORRIS:  Yes.

19          THE COURT:  Okay.

20      (Defendant's exhibits contained in Dockets 87 and 112/1

21    are received into evidence as specified.)

22          THE COURT:  So, --

23          MR. MORRIS:  And then, Your Honor -- I'm sorry.

24          THE COURT:  -- as far as Debtor's exhibits?

25          MR. MORRIS:  They appear on Docket #111 as amended by

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/04/24   Page 171 of 347   PageID 36220

114

1    113.  They were noted on the witness and exhibit list as

2    Exhibits 1 through 31, although they can also be found on the

3    appendixes at Exhibit 109 -- at Docket #109.  And the Debtor

4    would respectfully move into evidence all 31 exhibits

5    appearing on those three docket entries.

6            THE COURT:  Any objection?

7            MR. RUKAVINA:  Your Honor, so long as it's clear that

8    we're not agreeing that these are admissible at trial and that

9    they're limited to this hearing, no objection.

10           THE COURT:  All right.

11           MR. MORRIS:  As long as it goes both ways, I'm good

12   with that, Your Honor.

13           MR. RUKAVINA:  Yeah.  That's fine.

14           THE COURT:  With that proviso, --

15           MR. RUKAVINA:  I understand.

16           THE COURT:  -- they're admitted.

17     (Plaintiff's Exhibits 1 through 31 are received into

18   evidence.)

19           THE COURT:  All right.  Closing arguments?

20            CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

21           MR. RUKAVINA:  I'll be very brief, Your Honor, again.

22   We're here on whether Waterhouse signed the note.  We're not

23   here on whether the underlying NAV error occurred.  We're not

24   here on whether that's what the money was for.  We're here on

25   whether Waterhouse signed the note.  He did not.  He did not

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/09/0114   Page 172 of 347   PageID 36221

115

1   sign the notes and we did not learn that until October the

2   26th of this year.

3       The question of whether the notes were authorized to be

4   signed, guess what, that's all Debtor employees.  They messed

5   it up.  And now the Debtor wants to blame my client because

6   its own employees can't have a clear trail of where a note is

7   authorized to be signed.

8       So what does the Debtor do?  It calls my in-house counsel

9   and spends an hour and a half trying to character-assassinate

10  him, when, again, the only issue is whether Waterhouse signed

11  these notes, which he did not.

12      There was no undue delay.  The defense is valid under the

13  law, so it's not futile.  The Court cannot try the underlying

14  facts.  It's a 12(b)(6) standard.  There is no dilatory or bad

15  faith motive.

16      This is a Rule 15 motion.  Relief should be freely granted

17  unless there is substantial reason not to grant it.  The

18  Debtor has given you no substantial reason to deny this

19  motion.  The only reason the Debtor gives you to deny this

20  motion, Your Honor, is its view that our defense has no merit,

21  that the mistake, the mutual mistake defense has no merit.

22  And that cannot be tried in the context of this motion.

23      The only other thing that I've heard today, Your Honor,

24  that has any weight under Rule 15 is Mr. Morris's statement

25  that, well, I objected to your request for this promissory

1    note.  I objected to it; therefore, you know, you sat -- I

2    think he said exactly that I sat on my hands and did nothing,

3    and I think he took you through June and July and August and

4    September.

5        But look at that objection, Your Honor.  His objection is

6    as follows:  The Debtor objects to the extent the term

7    metadata is vague.  Subject to the general objections and this

8    objection, the Debtor will conduct a reasonable search for and

9    produce documents responsive to this request.

10       The Debtor never says we're not going to produce that.

11   The Debtor never says the term metadata is vague.  The Debtor

12   says that, to the extent it's vague, we object.  That's

13   gamesmanship, Your Honor.  Don't let them get away with such

14   gamesmanship.

15       If I came here with a motion to compel a day after I got

16   served with this, Your Honor would laugh me out of court and

17   Your Honor would sanction me, because Your Honor would say,

18   well, it's just a form objection to the extent something is

19   vague.  And Mr. Morris would come in here and say, oh, whoa,

20   whoa, whoa, whoa, whoa, Davor is completely wrong, of course

21   we're going to -- we're just preserving our rights.  We're

22   going to -- we're going to produce this promissory note.

23       Don't let them get away with that after-the-fact

24   gamesmanship.  That's not a valid objection.  They said they

25   would produce the note with metadata, and they did, in late

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 7-28    Filed 11/09/4144    Page 174 of 347    PageID 36223

117

1    October.  And that's their fault and their fault alone.

2        Your Honor, there is no substantial reason to deny this

3    motion, the one and half hours of cross-examination of my in-

4    house counsel notwithstanding.  We ask that you grant this

5    motion.  Thank you.

6        THE COURT:  All right.  Let me ask you a couple of

7    questions that go to the undue delay factor that courts are

8    supposed to consider in this context.  I'm looking at May 22,

9    2021, when HCMFA filed its first motion for leave to amend

10   answer.  And on May 22nd, Paragraph 1 of that motion states,

11   "Now that the Defendant has access to former employees of the

12   Plaintiff and to various books and records, the Defendant has

13   learned that the notes were unauthorized, represent a mutual

14   mistake, and were never intended as debt, but rather that the

15   Plaintiff was compensating the Defendant for the Plaintiff's

16   own liability to the Defendant for causing a serious valuation

17   error."  And then, "Accordingly, we seek leave to assert this

18   affirmative defense," et cetera, et cetera.

19       Paragraph 14 states, "Waterhouse was not authorized to

20   execute the notes on behalf of the Defendant and he was not

21   authorized to lend funds by the Plaintiff."

22       And then we have Paragraph 22, similar:  It appears that

23   what happened is that Waterhouse, either for some internal

24   accounting purpose or because funds were flowing from the

25   Plaintiff to the Defendant, believed that some document was

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/09/14147   Page 175 of 347   PageID 36224

118

1   necessary or that what was being funded was a loan, so he

2   unilaterally and in mistake prepared and signed the notes.  In

3   short, Waterhouse made a mistake.  There was no loan.  There

4   was no return consideration for the loan.  And the notes, if

5   anything, are mutual mistakes.  Void.

6        Paragraph 29 says, Waterhouse was CFO of both Debtor and

7   HCMFA at the time he signed the notes.

8        Okay.  So the Court grants leave to HCMFA to file the

9   amended answer.  The Court ruled on July 2, 2021.  The amended

10  answer was filed July 6, 2021.  And the amended answer that

11  was filed on July 6, 2021, Paragraph 43:  At this time, Frank

12  Waterhouse was the chief financial officer to both the

13  Plaintiff and the Defendant.  Waterhouse signed the two

14  promissory notes.  He did not sign the notes in any

15  representative capacity for the Defendant.  The Defendant did

16  not authorize Waterhouse to sign the notes or to bind the

17  Defendant in any way to the note.  Waterhouse made a mistake,

18  da, da, da, in signing the notes.

19       I guess what I'm getting at is I'm seeing that, as early

20  as May, this theory of the case, if you will, had evolved, and

21  it seems like a heck of a long time, five months later, to

22  say, oh, everything we said, yeah, except he didn't even sign

23  the notes.  That feels like what we have here.

24            MR. RUKAVINA:  Well, Your Honor, respectfully, I

25  disagree.  I disagree entirely.  Because whether he physically

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 11/09/2114    Page 176 of 347    PageID 36225

119

```
1   signed the note or whether he was authorized to sign the note
2   are two different things.  We've always said he's not
3   authorized to sign the note.  We've always said that.  And
4   that's going to be perhaps a question of fact.  But that's
5   separate from whether he actually signed the note or
6   authorized Ms. Hendrix to sign the note.  That was not learned
7   until late October.  That is a separate defense under the UCC.
8   And, again, that's -- that flows from him telling Mr. Sauter
9   -- basically; I'm paraphrasing -- well, if it's got my
10  signature, I must have signed it.
11      Not until we saw that these were electronically signed and
12  not until we saw that Ms. Hendrix signed them in late October
13  did we realize that not only was there a mistake all around,
14  but the notes weren't even signed, which makes all the more
15  sense because there was a mistake all around.  Even that
16  smoking gun email from Mr. Morris where Mr. Waterhouse is
17  copied that he referenced in his argument, it says, prepare
18  the notes for execution.  Well, they were not -- they were not
19  executed.
20      So, respectfully, Your Honor, it is wrong to suggest that
21  we knew or should have known about this failure-to-sign
22  argument in May.  That's separate from whether he was
23  authorized to sign.
24          THE COURT:  All right.  My last question is this.
25  Well, maybe it's my last question.  I'm troubled we don't have
```

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/09/04144   Page 177 of 347   PageID 36226

120

1    Mr. Waterhouse here today.  As I said in the beginning, this

2    is a very serious motion.  And if it's not obvious, the reason

3    why I say it's a very serious motion is basically what you're

4    telling me is that HCMFA and Mr. Waterhouse and maybe Debtor

5    officers and directors -- I think it all boils down to Mr.

6    Waterhouse, really -- they either lied or made a mistake in

7    about 42 filed documents, including audited financial

8    statements, the 15(c) report, and the monthly operating

9    reports.  I mean, that's about as serious as it gets, right?

10   And Mr. Waterhouse isn't here to say, look, Judge, here's what

11   happened, to the best of my memory.  Here's what happened.

12   Why isn't he here?

13           MR. RUKAVINA:  Your Honor, that's two questions and

14   two answers.  He's not here because, again, I had understood

15   and the practice was always that we don't have live testimony

16   on motions.  If the Court believes that his testimony for

17   whatever reason is necessary, I'll subpoena him.

18           THE COURT:  You don't have a declaration.  You had

19   800 pages worth of testimony --

20           MR. RUKAVINA:  But Your Honor, I had his --

21           THE COURT:  -- and documents.

22           MR. RUKAVINA:  I had his deposition.  I had his eight

23   hours of deposition.  What would be better than his deposition

24   cross-examining under oath in which he -- again, and let's --

25   let me make it clear.  I am not alleging that he or anyone

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/29/04147   Page 178 of 347   PageID 36227

121

1   lied.  I am not alleging that Debtor representatives lied.  I

2   thought I made it very clear in my motion that all of these

3   mistakes are the result of an initial good faith mistake, a

4   good faith assumption.  So, so I think it's very -- and

5   recall, it's in my motion, --

6           THE COURT:  But --

7           MR. RUKAVINA:  -- recall, Your Honor, --

8           THE COURT:  -- the mistake has resulted in dozens of

9   erroneous reports to stakeholders.

10          MR. RUKAVINA:  That may be.  That may be.  You know,

11  but that is -- that is something that the jury will decide

12  whether it's erroneous or not.

13          THE COURT:  Well, it may go beyond a jury trial just

14  in this adversary, right?  It's pretty serious stuff.

15          MR. RUKAVINA:  It -- it is pretty serious stuff, Your

16  Honor.  The fact -- but, again, I think -- I think all of us

17  -- and I'm being -- please understand, I'm being very

18  respectful and humble here.  I think all of us are going far

19  farther than the narrow actual issue before the Court right

20  now, which is whether Frank Waterhouse signed these notes.

21  All of these issues of mistake, all of these other issues, we

22  don't have evidence on today because we're not trying that

23  today.  I'm sure Mr. Waterhouse, Ms. Hendrix, Mr. Klos, they

24  all acted in good faith.  I am sure.  And as Mr. Klos and as

25  Ms. Hendrix confirmed, over the years they would get hundreds

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 11/29/2014   Page 179 of 347   PageID 36228

122

1    of these notes, hundreds of these transfers.  And it was a

2    standard practice to paper them up as a promissory note.  And

3    then of course they'd be carried on books and records as

4    promissory notes.

5        The people that made the initial error, by assumption --

6    not by bad faith; by assumption, or misassumption -- would

7    carry it as an asset on the books and records.  But only Mr.

8    Dondero and perhaps only Mr. Waterhouse know or could have

9    known what the actual purpose of the $7.4 million transfers

10   was.

11       And recall, Your Honor, there were two other promissory

12   notes at about the same time in very similar amounts.  Those

13   promissory notes are valid.  They are valid.  But that, that's

14   why I wanted to walk you through -- it's actually been

15   admitted into evidence now -- Mr. Waterhouse's own emails and

16   Mr. Waterhouse's own Rule 15(c) statement -- it's in my reply

17   brief, Your Honor -- when Mr. Waterhouse refers to these notes

18   as the note and where he says -- Your Honor, it's -- this is

19   his language -- the HCMFA note is a demand note.  There was an

20   agreement between HCMLP and HCMFA the earliest they could

21   demand is May 2021.

22       I say that because again it's clear that everyone was

23   confused about this.  How can the CFO be talking about one

24   note that's not collectable until May 2021, how can he be

25   talking about that unless he truly didn't know about these

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 11/29/24    Page 180 of 347    PageID 36229

123

1    notes and was confused about them?  In good faith?  Because

2    his employees, his -- what's the polite word?  His subservient

3    employees created these notes based on a mistaken assumption

4    and never gave the notes to him to sign.  He never signed

5    them.  And when he or Mr. Dondero would see financials

6    disclosing promissory notes payable by HCML -- HCMFA to HCMLP,

7    they would assume that it's those prior notes that had been

8    extended.

9              THE COURT:  Okay.  Well, --

10             MR. RUKAVINA:  That -- that's -- that's how all this

11   -- Mr. Waterhouse is not lying about not having signed these

12   notes.  Because we have that.  He didn't sign them, the notes.

13   Mr. Waterhouse is not lying, nor is Ms. Hendrix lying, about

14   whether he authorized her to sign these notes for him.  No one

15   is lying to the Court.  The fact is he didn't sign the notes

16   and the fact is the Debtor has no evidence that he authorized

17   --

18             THE COURT:  He didn't -- he didn't ink-sign the

19   notes.  But we have --

20             MR. RUKAVINA:  Right.

21             THE COURT:  -- a dispute, you will acknowledge, about

22   authority.

23             MR. RUKAVINA:  Absolutely.  That is a -- that is a

24   legitimate bona fide dispute, where I understand that there is

25   evidence against me on that.  There's also evidence for me on

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 181 of 347   PageID 36230

124

1   that.

2            THE COURT:  All right.  Mr. Morris, your closing?

3            CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

4            MR. MORRIS:  Your Honor, I think this discussion just

5   highlights the absurdity of all of this.  Mr. Rukavina keeps

6   ignoring the overwhelming evidence here of undue delay,

7   futility, and prejudice.  These notes were described for the

8   treasurer of HCMFA at the moment they were created.  He was

9   told they were being created by the accounting department, he

10  was told that the transactions were being booked as a loan,

11  and he didn't say boo.

12       A month later, they're on HCMFA's audited financial

13  statements.  That is the -- the undue delay clock started on

14  May 2nd and May 3rd, 2019.  How do you have $7.5 million of

15  notes sitting on your balance sheet and nobody asks a

16  question?  Mr. Rukavina says, oh, they thought they were the

17  old notes.  Not possible.  It's an assumption that he's

18  making.  There's no evidence to support it.  And it makes

19  absolutely no sense.

20       How do we know that?  Because those prior notes were $5

21  million.  So how come every single time HCMFA's obligations

22  reported to Highland are more than $10 million?  Where's the

23  evidence to explain that?  They do it to the Retail Board.

24  Mr. Dondero is personally told multiple times during the case,

25  when he's trying -- with his pot plan, it's more than $10

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/29/0114   Page 182 of 347   PageID 36231

125

1   million.  And you're right, Mr. Waterhouse signed monthly

2   operating reports both before and after Mr. Dondero ceded

3   control that had more than $10 million of assets.

4       For them now to try to run away from that, to try to get

5   to a jury to believe it, is a waste of everybody's time and a

6   waste of everybody's money.  They could have conducted this

7   investigation two and half years ago.  They could have

8   conducted this investigation in June of '19.  They could have

9   conducted the investigation when they were preparing their

10  schedules and their monthly operating reports at the

11  commencement of the case.  They could have conducted this

12  investigation in the fall of 2020 when the Retail Board asks

13  the question, tell me all of the notes that you own.  And the

14  officers of HCMFA tell them it's more than $10 million.  How

15  are you confusing the old notes when you're telling your

16  patron that there's $12 million of notes outstanding, and they

17  tell this Bankruptcy Court dozens of times and they tell

18  stakeholders dozens of times?

19      This is not right, Your Honor.  It's both undue delay --

20  every single time they sign another document, every single

21  time they tell their auditors, every single time they put it

22  on their balance sheet, every single time they tell the Retail

23  Board is an opportunity to say, hey, wait a minute, why are

24  these notes there?  And they never do it.

25      It doesn't even start with Mr. Sauter.  All of this

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 11/20/24   Page 183 of 347   PageID 36232

126

1   happens before Mr. Sauter ever has anything to do with this.

2   Where was the leadership?

3       Mr. Rukavina has the audacity to blame the Debtor's

4   employees?  I have news for him.  The Debtor's employees were

5   under the direction and control of Mr. Dondero and Mr.

6   Waterhouse at all times when this happened.  At all times.

7       This is gaslighting, Your Honor.  It is really not right.

8   The prejudice would be overwhelming.  Mr. Rukavina says I have

9   the transcript.  I didn't know what he was doing.  I didn't

10  know he was trying to create some new record of a defense that

11  had never been pleaded.  That transcript, I would -- I would

12  welcome the opportunity, and I'm going to have it, we can

13  revisit these issues in the context of the existing defenses,

14  but they shouldn't be -- how many bites at the apple can they

15  get?  How many times do they get to try to make it right?

16  They're now trying to convince the Court that they should have

17  the opportunity to do exactly the opposite of what Mr. Sauter

18  found.  He wrote in his declaration that he filed under oath

19  with this Court that Mr. Waterhouse signed the notes and that

20  he did so on mistake, and now he wants to say he didn't sign

21  the notes.  He never put it in front of Mr. Waterhouse.

22      And all of this is really just -- it's just irrelevant,

23  because the one -- the most important evidence that the Court

24  should consider today, the most important evidence that the

25  Court should consider is that Mr. Waterhouse told Mr. Sauter

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/29/24   Page 184 of 347   PageID 36233

127

1   multiple times why the notes were created.

2       So we can sit here and talk about metadata if you want,

3   but Mr. Sauter knew, he just didn't tell the Court, he knew in

4   April and May that Mr. Waterhouse told him multiple times that

5   he needed the notes to paper the transfer.  There's no dispute

6   the transfer was made.  He told Mr. Sauter multiple times he

7   needed the notes for the auditors.  There's no dispute about

8   why Mr. Waterhouse -- why he knows the notes were created.

9   It's undisputed.

10      And I just want to finish with this notion that somehow,

11  somehow this is my fault.  It's offensive.  When somebody

12  sends me a document request and I send an objection, you need

13  to follow up.  I'm not -- I don't care what you think.  You

14  wouldn't -- Mr. Rukavina wouldn't have gotten sanctioned if he

15  made a motion, unless he did it without meet-and-conferring.

16  But you know what happened?  When they finally got around to

17  asking for the stuff, not in -- not in May, not in June, not

18  in July, not in August, not in September, but within ten days

19  of his asking I produced them.

20      The one piece of evidence that's missing from this whole

21  frolic and detour is one follow up between May and October:

22  Hey, I haven't gotten the metadata.  Or, hey, you objected,

23  you said the metadata was vague, what do you mean by that?

24  Can we meet and confer?

25      They dropped the ball, Your Honor, and my client shouldn't

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 11/29/24    Page 185 of 347    PageID 36234

128

1    have to pay the price for their negligence.

2          I have nothing further.

3          THE COURT:  I want to ask another question about

4    prejudice.  You know, that's another factor courts are

5    supposed to consider.  I know there's this dispute about

6    motion for summary judgment, was it filed before or after this

7    motion to amend answer?  And I know the obvious answer you're

8    going to tell me is we're ready to go forward on our motion

9    for summary judgment.  If you grant leave to amend, you know,

10   maybe we're going to have to take new discovery, slow down

11   that train.

12         Let me ask you something more -- well, it's nagging at me.

13   I don't know if I want to say it's troubling.  If HCMFA's

14   theory of the case is correct that these notes were not

15   supposed to be created, this was not supposed to be a loan,

16   this was a transfer intended to compensate HCMFA for the

17   losses it incurred that were Highland's fault, blah, blah,

18   blah, okay, this happened in May 2019.  The bankruptcy was

19   October 2019.  To me, that's a -- it's a bombshell morphing of

20   the case, because if that is the reality, then it sets things

21   up for the Plaintiff to argue, well, that was an insider

22   preference, then.  Right?  I don't know.  Am I going down the

23   wrong trail?  It seems like the obvious way this would morph.

24   Except, I guess, the 546 deadline for that ran October 19,

25   2021, which, by the way, is when all of this all kind of came

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 11/09/01147    Page 186 of 347    PageID 36235

129

1    out that we went to.  And then to say he didn't sign it, null

2    and void notes.

3        Anyway, am I going down a crazy trail here?  I guess I'm

4    thinking prejudice to the Debtor.  The Debtor has been

5    deprived of the opportunity to assert a preference -- what

6    would seem like an obvious insider preference cause of action

7    if this theory of the case is true.  Am I all wet on that?

8            MR. RUKAVINA:  Your Honor, I'm not going to say those

9    words.  I'm going to say that Your Honor is wrong because the

10   Debtor knew about this defense since May.

11       Now, the primary defense here is that the payment was

12   compensation.  Whether Waterhouse signed the notes or not

13   doesn't matter to that defense.  That defense has been around

14   since May.  Or if I'm -- if I'm wrong, I apologize.  It's

15   whenever I filed the motion to amend.  We just looked that

16   that motion, and I don't have it in front of me right now.

17           THE COURT:  May 22nd.

18           MR. RUKAVINA:  My memory was -- May 22nd.  Since May

19   22nd, the Debtor has known -- and recall the other cases where

20   other Defendants said, well, the notes were forgivable.  And

21   I'm not involved with that, so my knowledge might be a little

22   bit off.  But as I understand it, the Court said, okay, well,

23   I'm going to grant you leave to state that the notes are

24   forgivable, but I'm going to grant the Plaintiff leave to

25   assert a 548.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/30/14147 Page 187 of 347   PageID 36236

130

1    As soon -- as soon as I filed this motion here, the Debtor

2    knew that, if I'm right, then these notes are illegitimate and

3    the $7.4 million in transfers was compensation to a creditor.

4    The Debtor could have likewise said, Judge, as part of giving

5    Mr. Rukavina leave, give us leave to assert an insider

6    preference, and the Court would have certainly granted it.

7        So, and honestly, the thought had not crossed my mind, I

8    doubt it crossed the Debtor's mind, about the potential 546(e)

9    and the 547(b) issues until the Court mentioned them.

10       So I do think that the Court is -- and I don't know,

11   again, what being all wet means, but I think the Court is

12   being a little bit over-paranoid in thinking that somehow the

13   Defendant here delayed to let limitations run.  That was

14   absolutely not the case.

15           MR. MORRIS:  If I may, Your Honor?

16           THE COURT:  You may.

17           MR. MORRIS:  Just briefly.  This is going to be *part

18   deux*.  Right?  We had litigations for six months, and then we

19   were presented with the condition subsequent defense that all

20   of the obligors instead of HCMFA asserted, and therefore we

21   had to amend our complaint to add new causes of action and we

22   had another three month delay.

23       If they're permitted to do this, we will again have to

24   amend our pleading to assert breach of fiduciary duty causes

25   of action against Mr. Dondero and Mr. Waterhouse, at a

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 11/04/14    Page 188 of 347    PageID 36237

131

1    minimum.  Okay?  This is going to open up yet another can of

2    worms.

3         And there is no basis for it.  I do not understand how

4    HCMFA has the audacity to run away from notes that they

5    carried on their own balance sheet, that they reported to

6    their own auditors, that they told the Retail Board that they

7    owed, that their treasurer signed and certified to this Court

8    that they were valid obligations for the benefit of the

9    Debtor.  I don't understand how they have the audacity to even

10   do this.

11        MR. RUKAVINA:  But Your Honor, Your Honor, what Mr.

12   Morris says again goes to the merits of a defense that's been

13   on file since May.  If the Court grants the current motion,

14   it's not going to slow down summary judgment proceedings.

15   Whether the note was signed or not does not change the

16   question of whether the note is valid or not, of whether there

17   was a mutual mistake or not.

18        So it's not going to slow down the MSJ proceedings.  And,

19   again, the Debtor has had since May to amend its complaint to

20   assert breach of fiduciary duty, to assert insider preference,

21   to assert whatever it wants.  Frankly, the Debtor could have

22   sued Mr. Waterhouse, having signed the note.  It hasn't.

23        Mr. Morris is arguing that this motion is this qualitative

24   difference in this case.  It's not.  The qualitative

25   difference was when we asserted our primary affirmative

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 11/09/24   Page 189 of 347   PageID 36238

132

1   defense in May.  And since then, the Debtor has done nothing.

2          MR. MORRIS:  I have nothing further, Your Honor.

3          THE COURT:  Let me ask you one last question.  I

4   think this really is the last one, Mr. Rukavina.  Whether I

5   allow the amendment or not, even under the existing amended

6   answer, the fact-finder is going to have to get into details

7   about the shared services agreement, correct?

8          MR. RUKAVINA:  I believe so.  Yes, Your Honor.

9          THE COURT:  So here's something else nagging at me.

10  Back when I did the Report and Recommendation to the District

11  Court on the Motion to Withdraw the Reference -- which I

12  notice from the docket they still have not -- the District

13  Court still has not ruled on.  Correct?  Is anyone seeing it?

14  I'm not seeing it.

15         MR. MORRIS:  Your Honor, I think all four -- I think

16  four out of the five have been signed and approved.  I think

17  the only one that has not is the one that was originally in

18  the adversary with Mr. Dondero.

19         THE COURT:  Really?

20         MR. RUKAVINA:  Your Honor, I think Mr. Morse is

21  right.  For some reason, the District Court's orders in some

22  of these adversaries have not been filed on the bankruptcy

23  docket.  I don't understand why, but I've had to go to the

24  District Court docket to see the orders.

25         THE COURT:  Okay.  Well, I'm just getting a little

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 7-28    Filed 11/09/04147 Page 190 of 347    PageID 36239

133

1    bugged that it was represented to me in the motion to withdraw

2    the reference, which I accepted and put in my report, that not

3    only did the note litigation not have anything to do with the

4    proofs of claim or any claims asserted by HCMFA, but "The

5    proofs of claim involve two wholly separate nonintegrated

6    agreements."  That is, the shared service agreement and sub

7    advisory agreement.  Any consideration of the notes is

8    irrelevant to proofs of claim.  They'd already been

9    disallowed.  Here, the Plaintiff's claims arise under a

10   promissory note.  The Defendant's disallowed claims arose

11   under separate contracts having nothing to do with the notes.

12   The two sets of claims share no common set of facts, and

13   resolution of one is not necessary legally, factually, or

14   logically to the resolution of the other.

15        Anyway, what my monologue up here is aiming at:  I made a

16   representation, HCMFA made a representation that the basis for

17   our claims that we filed in the Bankruptcy Court are these

18   shared services agreements, they have nothing to do with

19   notes, they're not inextricably intertwined, which, you know,

20   you have to find that for there to be constitutional authority

21   to adjudicate a matter.

22        This is kind of not the case, right?  As the case has

23   evolved, we actually have -- I mean, I don't know.  I don't

24   know when the administrative expense claim is set for trial,

25   but it kind of feels like we're going to get all wrapped up

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 11/04/24    Page 191 of 347    PageID 36240
Document Page 190 of 344

134

1    into performance and interpretations under those agreements,

2    just like apparently we are now under the new theory of the

3    case.

4        What do you have to say to that?

5        MR. RUKAVINA:  Your Honor, I think, respectfully,

6    Your Honor is wrong.  This is not a new theory of the case.

7    This theory of the case was around since May 22nd.  The Court

8    entered its Report and Recommendation on July the 8th.  The

9    Debtor didn't point out at that time the matter that Your

10   Honor is now thinking should have mattered, and it doesn't

11   matter, because the fact of the shared services agreement is

12   --

13        THE COURT:  Well, I'm just, I'm going to split hairs

14   with you on the dates.  I had the hearing on the motion to

15   withdraw the reference May 25th.  Okay?  So I was looking at

16   the original answer at that point in time.  And then,

17   actually, you had filed the motion to amend the answer three

18   days before that hearing, on May 22nd, but I didn't have a

19   hearing on that until July, and I think it was agreed at that

20   point.

21        So, my point is, at the point in time that I was thinking

22   about this, hearing the lawyers' arguments, and I think I even

23   announced orally my ruling, and then we just papered it up

24   with the Report and Recommendation, the case hadn't really

25   evolved.  And I'm just wondering if that is a problem now.

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 177-28    Filed 01/09/24    Page 192 of 347    PageID 36241

135

1          MR. RUKAVINA:  Your Honor, I don't -- I don't think

2     it's a problem.  If the Debtor wants to try to change those

3     orders, it can.  But let me remind Your Honor that under the

4     -- the claim that my client has under the shared services

5     agreement and the claim that the Debtor has going back, which

6     are set for trial reasonably soon, are purely postpetition

7     matters for postpetition amounts.  Anything that has to do

8     with the shared services agreement as relates to this

9     adversary proceeding would have related to prepetition

10    actions.

11         Nor is my client seeking a claim under the -- a

12    prepetition claim, a general unsecured claim, against the

13    Debtor for having caused the TerreStar NAV error.

14         So I don't agree with Your Honor that the facts here are

15    inextricably intertwined.  There's a promissory note, and the

16    only question is, was the promissory note intended to be a

17    loan or was it intended to be compensation?

18         And yes, the fact-finder will have to understand the

19    existence of the shared services agreement, but the fact-

20    finder will not be asked to construe the shared services

21    agreement.  It won't be asked to quantify any monies under the

22    shared services agreement.  Again, the only question will be

23    what was the intent, a loan or a compensation?

24         That is not a core matter, especially because all this

25    happened prepetition.

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 177-28   Filed 01/09/24   Page 193 of 347   PageID 36242
Document   Page 100 of 114

136

1          MR. MORRIS:  If I may, briefly, Your Honor?

2          THE COURT:  Okay.

3          MR. MORRIS:  The notion that this is not a new theory

4    of the case is mindboggling.  If it weren't, there would be no

5    need for a motion.

6          The issue that was presented and that we were prepared to

7    try is whether or not these were loans or compensation.  Now

8    we're told that somehow the debt -- the -- HCMFA isn't going

9    to be obligated.  Well, let me tell you, if they took our

10   money and Mr. Waterhouse and Mr. Dondero want to take the

11   stand and swear that all of this was a gross mistake and that

12   the two of them, when they were in control, filed dozens of

13   documents with the Court that were wrong, that they should

14   have investigated and they didn't, it will require us to

15   assert new claims for breach of fiduciary duty.

16         I do not know how the person in control of an enterprise

17   and the treasurer and the CFO of a debtor in bankruptcy, I

18   don't know how they can in good faith at this point assert

19   that they -- that the notes are not binding on their company.

20   I just don't know how they can do that.  It is an entirely new

21   theory of the case.  It will require not just discovery but an

22   amendment of our complaint, because we will go after Mr.

23   Waterhouse, we will go after Mr. Dondero with new claims.  And

24   that's part of the prejudice that would result.

25         THE COURT:  All right.  Well, let me say right off

1   the bat that this went a lot longer than any hearing I have

2   ever had on a Rule 15 motion to amend.

3       My law clerk warned me last Thursday, oh, this is a little

4   bit more involved than maybe you were anticipating, which

5   means I ended up spending a great part of my weekend, among

6   other things, looking at the deposition of Frank Waterhouse,

7   which Mr. Sauter had not reviewed.  That alone was 400 pages.

8   That was my Sunday afternoon activity.  So that sounds like

9   whining.  I suppose it is, a little bit.  But my point is this

10  is not your garden-variety motion to amend under Rule 15

11  because never have I had a hearing on such a motion that went

12  on for four hours and that each side submitted 800 pages of

13  evidence.  But such is life in this unique case of Highland, I

14  suppose.

15      As I've said a couple of times today, I do consider this a

16  very serious matter, which I suppose is one reason why I

17  indulged so much evidence and argument.  Because, again, as I

18  interpret the arguments and what's been presented in the

19  record, the proposed second amended answer would essentially

20  mean HCMFA is arguing that Frank Waterhouse and perhaps others

21  within both the Highland and HCMFA organization either lied or

22  made a $7.4 million mistake in dozens of reports to interested

23  stakeholders.

24      Again, we have monthly operating reports, signed at least

25  electronically, purportedly, by Frank Waterhouse.  We have the

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 77-28    Filed 11/09/04144    Page 195 of 347    PageID 36244

138

1    15(c) reports.  We have audited financial statements.  Okay.

2    So that's why I say this is really serious and this was worth

3    indulging a lot of evidence and argument, because, wow, this

4    is really a bombshell.  You're saying all of this information

5    that certain individuals floated out there, allowed to be

6    floated out there, had reason to know was floating out there,

7    was erroneous.

8        Shocking to me, but I heard what I heard.  And what I

9    heard was somewhat surprising.  They didn't have Mr.

10   Waterhouse coming in here saying, as treasurer of HCMFA -- of

11   course, the pleadings at one time said he was CFO -- CFO of

12   Debtor and treasurer of HCMFA, I realize now I, you know, I

13   made a huge mistake.  We didn't have him falling on his sword

14   saying that.  And in fact, in the 400-page deposition that I

15   spent all Sunday afternoon reading, he's -- I would say the

16   closest he comes to being supportive of this theory that HCMFA

17   is now asserting is "I don't recall," "I don't recall," "I

18   think it would have been this way," "I think this," "I think

19   probably that."  But he basically -- again, sophisticated

20   individual, CFO of a billion-dollar company, treasurer of

21   HCMFA, you know, a lot of -- I had a lot of documents that

22   were put in front of me on any daily basis.  I just can't

23   recall.

24       The person, the so-called subordinate who would have been

25   responsible, I think it's agreed, for obtaining Frank

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 11/09/0114    Page 196 of 347    PageID 36245

139

1    Waterhouse's authorization to sign the document, she appears,

2    according to what I saw in the appendix, to be a CPA, who was

3    an accounting major, you know, not a first-year administrative

4    assistant.

5        So these are, again, disturbing things to have presented

6    to me, especially when no documents have been shown to me to

7    support the new theory of the case.  So, well, I guess you can

8    argue about responsive documents, but I certainly don't have

9    anything in the nature of a compromise and settlement

10    agreement, we agree Highland is liable for this and is

11    therefore compensating, reimbursing HCMFA.  We don't have

12    anything of that nature.

13        So, anyway, I think I've made it very clear that I'm very

14    disturbed about the evolving theory of the case.  But the

15    issue before me, of course, is Rule 15.  And what does the

16    case law say about Rule 15?  We all know very well that the

17    Court "should freely give leave when justice so requires."

18    And Rule 15 "evinces a bias in favor of granting leave to

19    amend."

20        The five considerations that the Fifth Circuit has

21    outlined in making this evaluation under Rule 15 is, is there

22    undue delay?  Is there bad faith or dilatory motive?  Is there

23    a repeated failure to cure deficiencies by previous

24    amendments, undue prejudice to the opposing parties, and

25    futility of the amendment?

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 228    Filed 11/09/21    Page 197 of 347    PageID 36246

140

1    I cannot help but conclude there is unreasonable, undue

2    delay when I look at this timeline.  It's a long timeline.

3    But, again, we have a transaction -- transactions, plural --

4    the notes that were or were not authorized to be signed by Mr.

5    Waterhouse.  They were executed May 2nd and May 3rd, or they

6    were purportedly executed May 2nd and May 3rd, 2019.  Not

7    forever ago, about five months before the Highland bankruptcy.

8        We had Highland making demand on the notes December 3,

9    2020, saying, pay up by December 11, 2020.  It didn't happen.

10    January 22, 2021 was when the adversary was filed to collect

11    on the notes.

12        At some point in February, Mr. Waterhouse and numerous

13    other Highland employees ended their employment or were

14    terminated with Highland.  And so, as far as I can tell, even

15    under the terms of prior injunctions of this Court at that

16    point, very shortly after the complaint was filed, HCMFA was

17    free to talk to Mr. Waterhouse as much as they wanted.  But in

18    any event, he testified, Mr. Waterhouse, in his deposition

19    that March 1, 2021 he began working at Skyview with the former

20    Highland employees who now were providing services to HCMFA,

21    and that was the same day as the original answer was filed.

22        And then May 22, 2021, HCMFA files its motion to amend its

23    answer with this evolving theory of the case, that these notes

24    were not supposed to be created, a loan was not intended, and

25    questioning irregularities, I think was the word used, with

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 77-28   Filed 01/09/24   Page 198 of 347   PageID 36247

141

1    regard to Mr. Waterhouse's signature.  And, again, it was not

2    until it looks like October 28th HCMFA told Debtor it will

3    assert a defense of non-signature.  And then November 30,

4    2021, the second motion to amend answer was filed.

5        I'm being clear for the Court of Appeals which is no doubt

6    going to look at this one day.  I've spent hours looking at

7    this.  Okay?  Again, not a garden-variety motion to amend

8    under Rule 15.  I read a 400-page deposition of Frank

9    Waterhouse.  I looked at other items in each 800-page

10   appendix.  And under the totality of what has been submitted

11   here, I find undue delay.  It is an evolving theory of the

12   case, and I'm not a hundred percent clear on why, when these

13   notes, copies of the notes were attached to the original

14   complaint filed on January 22nd.  I mean, the Defendant would

15   have been on notice day one, here are the documents that we're

16   suing under, and yet ten months later they want to argue for

17   the first time he didn't actually sign them.  And, again, I

18   guess they're saying he didn't ink-sign them.  There still

19   would remain a question, which was raised in the previous

20   amended answer, as far as his authority.

21       So undue delay.  I do find prejudice.  We're many, many,

22   many, many, many months down the road in what started over a

23   year ago, making a demand under these notes.  I've got motions

24   for summary judgment teed up.

25       You know, I'm a little bit troubled, as I said, that I did

Case 21-03004-sgj    Doc 121    Filed 01/13/22    Entered 01/13/22 10:17:22    Desc Main
Case 3:21-cv-00881-X    Document 178    Filed 11/09/21    Page 199 of 347    PageID 36248

142

1    a Report and Recommendation to the District Court based on a

2    simpler lawsuit, and maybe even under the first amended answer

3    I should be looking at this a little differently.

4        And again, I'm just, I'm thinking out loud on that.  I

5    have an old opinion that may or may not be relevant, but it

6    was in a case called *Margaux Ventures* and it dealt with the

7    ability to raise a preference defensively if a preference

8    recipient is making a claim against the estate, and even if

9    the bar date, the 546 bar date has passed for affirmatively

10   filing a preference action.  I think that was even an insider

11   preference in *Margaux Ventures*.  The Plaintiff can still argue

12   defensively preference liability.  And what I can't remember

13   for sure is, in *Margaux Ventures*, if it was an administrative

14   expense claim that the preference target was asserting, or was

15   it a prepetition claim.  It might make more sense if it was a

16   prepetition claim.

17       But anyway, all this to say I'm mentioning this because it

18   factors into the undue delay and the prejudice.  I mean, the

19   lawsuit is just going to keep morphing.  I've already heard

20   that it would morph into a breach of fiduciary duty against

21   Mr. Waterhouse and others, but I think it could morph in other

22   ways.  And I've got to go back and look at that *Margaux*

23   *Ventures* case to see if I think this is intertwining -- well,

24   anyway, I don't need to go back and look because I'm denying

25   the motion.  But it's just, it's just way too late to make an

1  argument that should have been apparent many months ago if in

2  fact it's a legitimate argument.

3      And I guess the last thing I want to say is having a

4  witness today that is the general counsel for NexPoint,

5  another entity -- not HCMFA, not the Debtor -- someone who

6  didn't have personal knowledge that was contemporaneous with

7  the actions involved, someone who just after the fact for

8  NexPoint goes back and looks at the evidence, this has been a

9  significant factor here for me today.  The witness just seems

10  like someone who could not make a compelling case regarding

11  the bona fides, shall we say, of the amendment, which in my

12  mind links to the futility of the amendment.

13      All right.  Mr. Morris, please upload an order.  And we

14  are adjourned.  And for the people on WebEx who are here for

15  the 1:30 hearing, we need a short break.  I'll be back in ten

16  minutes.

17          THE CLERK:  All rise.

18          MR. MORRIS:  Thank you very much.

19      (Proceedings concluded at 2:01 p.m.)

20                      --oOo--

21                    CERTIFICATE

22      I certify that the foregoing is a correct transcript from the
   electronic sound recording of the proceedings in the above-entitled matter.

23   /s/ Kathy Rehling                              01/13/2022

24  _____        _____

25  Kathy Rehling, CETD-444                         Date
   Certified Electronic Court Transcriber

Case 21-03004-sgj   Doc 121   Filed 01/13/22   Entered 01/13/22 10:17:22   Desc Main
Case 3:21-cv-00881-X   Document 77-28   Filed 01/09/24   Page 201 of 347   PageID 36250

144

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Rukavina                                             7
- By Mr. Morris                                             22

WITNESSES

Defendant/Movant's Witnesses

Dennis C. "D.C." Sauter, Jr.
- Direct Testimony by Declaration                          32
- Cross-Examination by Mr. Morris                          32
- Redirect Examination by Mr. Rukavina                     86
- Recross-Examination by Mr. Morris                       107

EXHIBITS

HCMFA's Rebuttal Exhibit 1                      Received  94
Defendant's Exhibits (Dockets 87, 112/1)        Received 113
Plaintiff's Exhibits 1 through 31               Received 114
   (Dockets 111, 113)

CLOSING ARGUMENTS

- By Mr. Rukavina                                          114
- By Mr. Morris                                            124

RULINGS                                                    136

END OF PROCEEDINGS                                         143

INDEX                                                      144

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 14, 2022**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-3004-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

## ORDER DENYING
## DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER

This matter having come before the Court on the *Defendant's Second Motion for Leave to Amend Answer and Brief in Support Thereof* [Docket No. 82] (the "Motion") filed by Highland Capital Management Fund Advisors, L.P. ("HCMFA"); and this Court having considered (i) the Motion; (ii) *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* [Docket Nos. 83 and 87] ("Defendant's Appendix")[2]; (iii) *Highland Capital Management, L.P.'s Response in Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 107]; (iv) *Highland Capital Management, L.P.'s Memorandum of Law in Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 108]; (v) the *Appendix in Support of Highland Capital Management, L.P.'s Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 109] ("Highland's Appendix"); (vi) *Defendant's Reply in Support of Its Second Motion for Leave to Amend Answer* [Docket No. 112]; and (vii) the testimonial and documentary evidence admitted at, and the arguments made during, the January 10, 2022 hearing (the "Hearing")[3] on the Motion, including assessing the credibility of Mr. Sauter; and after due deliberation on all of the foregoing, and for the reasons set forth in the record of the Hearing on the Motion, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.    The Motion is **DENIED**.

---

[2] At the January 10, 2022 hearing on the Motion, the Court admitted into evidence HCMFA's rebuttal exhibit identified as exhibit no. HCMFA-R1 ("Exhibit HCMFA-R1"). Exhibit HCMFA-R1 appears at docket no. 118 and is deemed to be included in Defendant's Appendix for purposes of any appeal that may be taken of this Order.

[3] On January 6, 2022, Highland Capital Management, L.P. ("Highland") filed a witness and exhibit list that (a) included as exhibits all documents that were included in Highland's Appendix, and (b) identified Dennis C. Sauter, Jr. ("Mr. Sauter"), as a witness to be examined at the Hearing. [Docket No. 111] (the "W&E List"). On January 10, 2022, Highland amended its witness and exhibit list to include one document (identified as Exhibit 31) not included in Highland's Appendix ("Exhibit 31"). [Docket No. 113]. During the Hearing, the Court admitted Exhibit 31 into evidence without objection, and Exhibit 31 deemed to be included in Highland's Appendix for purposes of any appeal that may be taken of this Order.

2.      This Court retains jurisdiction with respect to all matters arising from or related to

the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT'S RESPONSE IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Davor Rukavina, Esq.
State Bar No. 24030781
Julian P. Vasek, Esq.
State Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard St., Ste. 3800
Dallas, TX 75201
Tel: 214-855-7500
Fax: 214-855-7584

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Highland Capital Management Fund Advisors, L.P. ("HCMFA"),
defendant in the above-captioned adversary proceeding, and files this its response in opposition to
*Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (Dkt. No. 91, the
"Motion"), filed by plaintiff Highland Capital Management, L.P., in support of which HCMFA
would respectfully show the Court as follows:

For the reasons set forth in the *Defendant's Brief in Opposition to Plaintiff's Motion for
Summary Judgment* ("Brief"), which is being filed contemporaneously herewith, and based on the
evidence cited therein, HCMFA opposes all relief requested in the Motion.  Pursuant to Local Rule
7056(d)(2), HCMFA sets forth the legal and factual grounds for its opposition in its Brief.

WHEREFORE, PREMISES CONSIDERED, HCMFA respectfully requests that the
Motion be DENIED and that HCMFA be provided such other and further relief to which it is
entitled.

RESPECTFULLY SUBMITTED this 19th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  Davor Rukavina
     Davor Rukavina, Esq.
     State Bar No. 24030781
     Julian P. Vasek, Esq.
     State Bar No. 24070790
     500 N. Akard St., Ste. 3800
     Dallas, TX 75201
     Tel: 214-855-7500
     Fax: 214-855-7584
     E-mail: drukavina@munsch.com
     E-mail: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND
CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 19, 2022, a true and correct copy of this document, along with all exhibits, if any, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/  Davor Rukavina
Davor Rukavina

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Davor Rukavina, Esq.
State Bar No. 24030781
Julian P. Vasek, Esq.
State Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard St., Ste. 3800
Dallas, TX 75201
Tel: 214-855-7500
Fax: 214-855-7584

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ ii

I.      SUMMARY ................................................................................................. 1

II.     BACKGROUND ........................................................................................... 2

        A.      THE DEBTOR CAUSED HCMFA TO INCUR SUBSTANTIAL LOSSES ........................... 2

        B.      THE PERSON IN CHARGE OF BOTH THE DEBTOR AND HCMFA DIRECTED
                THE DEBTOR TO COMPENSATE HCMFA FOR ITS LOSS, NOT TO MAKE LOANS ...... 4

        C.      THE DEBTOR'S ACCOUNTING STAFF MISTAKENLY BOOKED THE TRANSFERS
                AS LOANS ON BEHALF OF BOTH THE DEBTOR AND HCMFA ................................ 6

        D.      DESPITE THE DEBTOR'S MISTAKE, HCMFA NEVER ACTUALLY SIGNED
                THE NOTES ........................................................................................ 14

III.    SUMMARY JUDGMENT STANDARD ............................................................. 23

IV.     ARGUMENT AND AUTHORITIES ................................................................. 24

        A.      THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
                WHETHER HCMFA SIGNED THE NOTES ................................................... 25

                i.      Waterhouse did not Actually Sign the Notes .............................. 26

                ii.     Even if Waterhouse Signed the Notes, He Did Not Have Authority ........ 27

                iii.    Even if Waterhouse Signed the Notes and had Authority,
                        the Notes are Ambiguous .......................................................... 31

        B.      THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE
                NOTES WERE THE RESULT OF A MUTUAL MISTAKE .................................... 33

        C.      THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE
                DEBTOR GAVE CONSIDERATION IN EXCHANGE FOR THE NOTES ..................... 36

        D.      TURNOVER IS NOT AN APPROPRIATE REMEDY UNDER THESE CIRCUMSTANCES ... 36

V.      CONCLUSION ............................................................................................. 36

CERTIFICATE OF SERVICE ...................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Allen v. Berrey*, 645 S.W.2d 550 (Tex. App.—San Antonio 1982)................................33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................24

*Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*,
    2017 Bankr. LEXIS 3191 (Bankr. N.D. Tex. Sept. 21, 2017)................................23

*Brown v. White's Ferry, Inc.*, 280 F.R.D. 238 (D. Md. 2012)................................10

*Capobianco v. City of N.Y.*, 422 F.3d 47 (2d Cir. 2005)................................10

*Childers v. Pumping Systems, Inc.*, 968 F.2d 565 (5th Cir. 1992)................................31

*Claimant ID 100218776 v. BP Expl. & Prod.*, 712 Fed. Appx. 372 (5th Cir. 2017)................................29

*DeClaire v. G&B McIntosh Family Ltd. P.ship*, 260 S.W.3d 34
    (Tex. App.—Houston [1st] 2008)................................34

*Follenfant v. Rogers*, 359 F.2d 30 (5th Cir. 1966)................................26

*Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007) ................................30

*Garza v. Villarreal*, 345 S.W.3d 473 (Tex. App.—San Antonio 2011) ................................33, 36

*Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010) ................................30

*Gross v. GGNSC Southaven, LLC*, 817 F.3d 169 (5th Cir. 2016) ................................16

*Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011) ................................35

*In re Fang Operators*, 158 B.R. 643 (Bankr. N.D. Tex. 1993) ................................36

*IRA Res., Inc. v. Griego*, 221 S.W. 3d 592 (Tex. 2007) ................................28

*Jones v. Anderson*, 721 Fed. Appx. 333 (5th Cir. 2018)................................25

*Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313 (5th Cir. 2016)................................25

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930 (N.D. Tex. April 13, 2015)............28, 30

*Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170 (4th Cir. 1998)................................10

*Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802
(N.D. Tex. Jan. 10, 2011) ...........................................................................................26

*Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678 (W.D. Tex. Sept. 29, 2011) ...............26

*Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018 (5th Cir. 1995) .......................................24

*Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431 (Colo. App. 1982) .........................31

*Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37 (Tex. App.—Dallas 2003) .......................36

*S. Mansukhlal & Co v. Husein*, 14-04-00018-cv, 2004 Tex. App. LEXIS 8097
(Tex. App.—Houston [14th] Sept. 2, 2004) .............................................................32

*Satelco, Inc. v. North Amer. Publishers, Inc. (In re Satelco, inc.)*, 58 B.R. 781
(Bankr. N.D. Tex. 1986) ..........................................................................................36

*Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005,
Tex. App. LEXIS 6215 (Tex. App.—Fort Worth Aug. 4, 2005) ..............................31

*Silverio v. Silverio*, 625 S.W.3d 680 (Tex. App.—El Paso 2021) .......................25, 27

*Smith-Gilbard v. Perry*, 332 S.W.3d 709 (Tex. App.—Dallas 2011) ...........................33

*Strickland v. Coleman*, 824 S.W.2d 188 (Tex. App.—Houston [1st] 1991) ..............24, 25

*Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607 (Tex. App—Houston [1st] 2004) ................36

## Statutes

TEX. BUS. & COMM. CODE § 1.201 ..........................................................................28

TEX. BUS. & COMM. CODE § 3.305 ..........................................................................24

TEX. BUS. & COMM. CODE § 3.308 .....................................................................25, 27

TEX. BUS. & COMM. CODE § 3.402 .....................................................................27, 31

TEX. BUS. & COMM. CODE § 3.403 ..........................................................................27

## Rules

Fed. R. Civ. P. 8 ..................................................................................................26

Fed. R. Civ. P. 11 ...........................................................................................................26

Tex. R. Civ. P. 92 ..........................................................................................................26

Tex. R. Civ. P. 93 ..........................................................................................................26

TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Highland Capital Management Fund Advisors, L.P. ("HCMFA"), defendant in the above-captioned adversary proceeding (the "Adversary"), and files this its brief in opposition to *Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (Dkt. No. 91, the "Motion"), filed by plaintiff Highland Capital Management, L.P. (the "Debtor"), in support of which HCMFA would respectfully show the Court as follows:

## I.    SUMMARY

1.    The notes represent a mutual mistake: the $7.4 million the Debtor transferred to HCMFA was compensation for damage the Debtor caused to HCMFA by the Debtor's own negligence and fault; it was not as a loan.  Mr. Waterhouse never even signed the Notes or authorized anyone to affix his electronic signature.  Even if he did, HCMFA itself never authorized Mr. Waterhouse to execute the notes, and he did not have apparent authority to bind HCMFA in light of the fact that he was also an officer of the Debtor.

2.    This led to the natural progression of one mistake after another—each by the Debtor's employees.  First, those employees caused the underlying liability to a fund HCMFA manages, pursuant to which HCMFA paid out $7.4 million to third parties.  Second, when Mr. Dondero directed the Debtor to transfer $7.4 million to HCMFA as compensation, the Debtor's employees assumed, without instruction or authority from HCMFA or the Debtor, that the transfers represented intercompany loans.  Third, those employees papered up the transfers as loans, without authority or approval.  Fourth, those employees affixed Mr. Waterhouse's electronic signature to the notes, again without authority or approval.  Fifth, those employees then carried the notes as liabilities on HCMFA's books and records, and as assets on the Debtor's books and records—even then with substantial confusion and ambiguity.  Sixth, because HCMFA executed two prior notes

to the Debtor in similar amounts, someone reviewing either sets of books and records could, and did, easily confuse the unauthorized mistaken notes for the two valid notes.

3.      All of the foregoing presents numerous legal defenses to the Notes under Texas law.  And all of the foregoing has extensive, if not compelling, evidentiary support.  Thus, genuine issues of material fact exist as to whether the notes are even valid and collectible in the first place, and whether they represent a mutual mistake, such that summary judgment is inappropriate and should be denied.  It will be for the jury to decide these questions of fact and the witnesses' credibility.

## II.      BACKGROUND

### A.      THE DEBTOR CAUSED HCMFA TO INCUR SUBSTANTIAL LOSSES

4.      HCMFA is a registered advisor that advises third-party funds as to their investments.  HCMFA Appx 2.[1]  At all relevant times, including from 2018 to present, HCMFA served as advisor to Highland Global Allocation Fund (the "Fund").  HCMFA Appx 2.  At issue are two transactions involving equity interests in TerreStar Corporation ("TerreStar") that took place in March 2018 (the "March Transactions").  HCMFA Appx 2.  In particular, an error occurred concerning the net asset value ("NAV") that was assigned to the TerreStar interests in connection with the March Transactions (the "NAV Error").  HCMFA Appx 2.  The NAV Error is described in more detail in that certain April 7, 2019 *Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error in the Fund* (the "NAV Memo").  HCMFA Appx 2, 7-17.

5.      During this time period, however, HCMFA did not perform its own valuation

---

[1]      "HCMFA Appx." refers to the *Defendant's Appendix in Opposition to Plaintiff's Motion for Summary Judgment*, which is being filed contemporaneously herewith.

services.  HCMFA Appx 3; Debtor Appx. 03042.[2]  Instead, HCMFA outsourced these and many

other services to the Debtor, and the Debtor performed such services on HCMFA's behalf pursuant

to that certain *Second Amended and Restated Shared Services Agreement* (the "SSA").  HCMFA

Appx 3, 18-30; Debtor Appx. 03042.  Indeed, all of the "Adviser Representatives" involved in the

NAV Error—Thomas Surgent, Frank Waterhouse, Jason Post, and Lauren Thedford—were

employees of the Debtor, not HCMFA.  HCMFA Appx 3, 7.  The Fund's board of directors was

well aware of the relationship between the Debtor and HCMFA, was well aware that the Debtor

housed all valuation staff, and was well aware that the Debtor performed all valuation activities.

HCMFA Appx 3; Debtor Appx. 03047.  The Fund and HCMFA relied on the Debtor to perform

these services, and the NAV Error, including the Debtor's involvement and responsibility, were

material aspects of board conversations for over a year.  HCMFA Appx 3.

6.      As described in more detail in the May 28, 2019 *Memo regarding Resolution of the

Fund's Net Asset Value Error*, Debtor Appx. 02978, HCMFA ultimately made the Fund whole

through a $5,186,496 payment from HCMFA on February 15, 2019 and a $2,398,842 payment

from HCMFA on May 2, 2019.

7.      James Dondero, the President of both the Debtor and HCMFA, was fully aware of

these issues at the time.  HCMFA Appx 1, 3.  Mr. Dondero believed and understood that the Debtor

was liable to HCMFA for causing or failing to prevent the NAV Error.  HCMFA Appx 3.

8.      The Debtor tries to deflect responsibility for the NAV Error to Houlihan Lokey.

But during his rule 12(b)(6) deposition, HCMFA's corporate representative explained the Debtor's

responsibility vis-à-vis Houlihan Lokey:

---

[2]      "Debtor Appx." refers to the Debtor's *Appendix in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions* (Dkt. No. 94).

Q.    Okay.    Well, the defense—HCMFA's defense is that Highland is responsible for the TerreStar valuation issue, correct?

A.    Yes.

Q.    And there's no question that Houlihan Lokey provided services in connection with that valuation, correct?

A.    Correct.

Q.    But HCMFA has not undertaken any analysis or investigation, to the best of your knowledge, to try to determine if Houlihan Lokey was the responsible party; fair?

A.    We don't know if there is a contract or not.  At this point, we're talking about the defense of Highland's responsibility.  There's no question they were responsible for the valuations.  They were outsource provider to the valuation committee.  Every individual working and coordinating with Houlihan Lokey was an HCMFA [sic[3]] employee.  All the data and information that was provided to them came from HCMLP.  There's no question that Highland was responsible for the NAV Error.  No one ever questioned that.  That was always known.  It was all the employees that were involved.

Debtor Appx. 03043; Debtor Appx. 03053 (similar testimony).

9.    Regardless of whether Houlihan Lokey or the Debtor was the primary party responsible for the NAV Error and resulting losses, the facts remain that the Debtor caused the losses, HCMFA accepted responsibility to the Fund and paid out compensation, and Mr. Dondero reasonably believed that the Debtor was liable to HCMFA for those losses.  He acted accordingly, and the Debtor has not sued to avoid those actions.

## B.    THE PERSON IN CHARGE OF BOTH THE DEBTOR AND HCMFA DIRECTED THE DEBTOR TO COMPENSATE HCMFA FOR ITS LOSS, NOT TO MAKE LOANS

10.    Accordingly, on May 2, 2019, Mr. Dondero—who, again, was the President of both the Debtor and HCMFA—directed the Debtor to transfer $2.4 million to HCMFA.  On May 3,

---

[3]    This reference to HCMFA instead of HCMLP is plainly a typographical error.  Two pages later, Mr. Norris testified, "Again, all employees working with Houlihan Lokey were the HCMLP employees."  Debtor Appx. 03043.  A few pages later, he testified, "But I would say every single person that interacted with the SEC, I believe, were HCMLP employees."  Debtor Appx. 03045; *see also* Debtor Appx. 03048.

2019, Mr. Dondero directed the Debtor to transfer another $5 million to HCMFA (collectively, the "Transfers"). HCMFA Appx 3. The amounts of these Transfers mirror the amounts HCMFA paid the Fund.

11.     The purpose of the Transfers was for the Debtor to compensate HCMFA for the damages HCMFA paid in connection with the NAV Error. HCMFA Appx 3-4; Debtor Appx. 03048. It was appropriate for the Debtor to compensate HCMFA because the Debtor's employees caused or failed to prevent the NAV Error and because of the Debtor's duties under the SSA. HCMFA Appx 4. As Mr. Dondero testified during his deposition on November 4, 2021, transferring these funds from the Debtor to HCMFA to settle the fallout from the NAV Error was "a critical piece of putting the issue to bed." HCMFA Appx 4; Debtor Appx. 01835.

12.     Specifically, Mr. Dondero instructed Frank Waterhouse, the Debtor's Chief Financial Officer and HCMFA's Treasurer—to make the Transfers. HCMFA Appx 4. He never instructed or suggested to Mr. Waterhouse that the Transfers were loans nor to book them that way. HCMFA Appx 4. Mr. Waterhouse never asked Mr. Dondero whether the Transfers were loans or should be drawn up as such. HCMFA Appx 4; Debtor Appx. 02129 (319:3-6). Indeed, Mr. Dondero never said anything to cause Mr. Waterhouse to reach such an understanding. HCMFA Appx 4. Mr. Waterhouse testified more than once, in fact, that he does not recall Mr. Dondero instructing him to book the Transfers as loans. Debtor Appx. 02085 (145:3), 02120 (284:4-6). Mr. Dondero simply told Mr. Waterhouse to "go get the money from Highland." Debtor Appx. 02120 (283:4-5), 02129 (318:8-10). At the same time, however, Mr. Waterhouse confirmed his understanding from his discussion with Mr. Dondero that the transfers were related to the NAV Error and resulting losses to HCMFA. Debtor Appx. 02085 (145:3-12); 02117-18.

13.     Nor did anyone else at the Debtor or HCMFA follow up with Mr. Dondero to ask whether the transfers were loans, and no one either at HCMFA or the Debtor presented Mr.

Dondero with promissory notes to sign or otherwise presented Mr. Dondero with any document to approve the Notes.  HCMFA Appx 4.  Nor has the Debtor identified any such evidence.  At the amounts of $5 million and $2.4 million, however, internal policies and procedures would have required the Notes to go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA, and ultimately through Mr. Dondero for his approval, neither of which happened.  HCMFA Appx 4.

## C.    THE DEBTOR'S ACCOUNTING STAFF MISTAKENLY BOOKED THE TRANSFERS AS LOANS ON BEHALF OF BOTH THE DEBTOR AND HCMFA

14.    As noted above, the Notes should have gone through the Debtor' legal department for preparation, approval, and execution.  *E.g.*, Debtor Appx. 02122 (291:3-16); 02122-23 (293:18 - 296:7).[4]  In additional to legal, Mr. Waterhouse would have expected Mr. Dondero to approve Notes of this size, as his approval was necessary.  Debtor App. 02117.  Mr. Waterhouse acknowledged he lacked the requisite authority.  *Id.*  But none of that happened.  The Notes did not go through the Debtor's legal department at all; they were prepared and signed by a mid-level Debtor employee in the accounting department, who was not an employee of HCMFA, as detailed below.  Mr. Dondero was unaware of the Notes and never even saw them until just before this litigation commenced.  HCMFA Appx. 5.

15.    Unbeknownst to Mr. Dondero, HCMFA's accounting staff—who were also employees of the Debtor acting under the SSA—erroneously booked the Transfers as loans and erroneously papered promissory notes to reflect their incorrect understanding of the Transfers. HCMFA Appx 5.  Likewise, these same individuals erroneously caused the Debtor and HCMFA

---

[4]    Mr. Morris waived his objection to this question by insisting that the witness complete his answer.  Debtor Appx. 02123 (295:12).  In any event, the question was not objectionable.  To the extent the Debtor asserts a more specific objection, HCMFA reserves the right to respond.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

to reflect these transfers as loans on various financial statements and disclosures.  HCMFA Appx 5.  But Mr. Dondero, the individual ultimately in charge of both entities, was not aware of these errors until this litigation commenced.  HCMFA Appx 5.  Nor could Mr. Waterhouse "recall specifically what amounts of money were moved when, for what purpose."  Debtor Appx. 02081 (126:5-7).

16.    HCMFA's corporate representative likewise testified that HCMFA was unaware of the Notes until the Debtor made its demand because it outsourced finance and corporate accounting functions to the Debtor.  Debtor Appx. 03024 (38:3-9), 03025 (42:23-43:3), 03028 (55:12-18).  At the same time, HCMFA was unaware of the errors on its financial statements, again because it outsourced finance and corporate accounting functions to the Debtor.  Debtor Appx. 03030 (64:15-65:3).

17.    Prior to the Debtor's demand to pay these Notes until shortly before this litigation commenced, no one at the Debtor or HCMFA informed Mr. Dondero of the Notes.  HCMFA Appx 5.  To the extent that he saw any books and records or other financial documents of the Debtor or HCMFA beforehand, he would not have noticed the Notes so as to raise an issue.  HCMFA Appx 5.  Before the Notes in question, HCMFA issued two other promissory notes to the Debtor, in similar amounts, the dates of collection on which were extended through May, 2021.  HCMFA Appx 5, 42, 45.  Thus, if Mr. Dondero saw any such records or documents, he would have naturally assumed that any reference to promissory notes referred to these prior two notes, not the Notes in question.  HCMFA Appx 5.

18.    The Debtor points to documents like the October 23, 2020 *Memo Regarding Supplemental 15(c) Information Request* (the "15(c) Memo") as evidence that HCMFA was aware of the Notes.  Debtor Appx. 00884.  Yet this document, and underlying e-mail communications culminating in the execution of this document, demonstrate the opposite.

19.    The document states that "$12,286,000 remains outstanding to HCMLP from HCMFA. . .  The earliest the Note between HCMLP and HCMFA could come due is in May, 2021."  Debtor Appx. 00885.  Logically, and certainly for purposes of summary judgment, this statement cannot refer to the Notes, as: (i) the Notes are plural, not singular; (ii) they are for materially less than $12 million; and (iii) they are demand notes subject to demand at any time.  Debtor Appx. 00010-15.  In his e-mail leading up to the document, Mr. Waterhouse, who allegedly signed the Notes and who surely would have a memory of the Notes if in fact he signed them, wrote: "The HCMFA note is a demand note. . . There was an agreement between HCMLP and HCMFA the earliest they could demand is May 2021."  Debtor Appx. 00791.  Yet the Notes are not a "note," and there was no collection delay until May, 2021, thus demonstrating that Mr. Waterhouse was not referring to, nor admitting the existence of, the Notes.

20.    As HCMFA's corporate representative explained, "[h]e [Mr. Waterhouse] himself seems to be confused here, because as we found out through discovery and in the testimony of what has come out, there was an agreement—that was a separate agreement.  That wasn't related to the notes at issue in this case."  Debtor Appx. 03034 (81:5-10).[5]  Nor could it have been related.  Mr. Waterhouse used the singular when there are multiple notes at issue.  Additionally, HCMFA's corporate representative explained that the numbers do not add up:

Q.    As HCMFA's 30(b)(6) witness today, have you done anything to determine whether or not the $12.286 million number includes the principal amount of the notes?

A.    Looking at it, we can't tell.  Because it doesn't line up exactly with those notes.  There were other notes that had been recorded in the books for several years before.  And if you add those two together, it doesn't add up.  So it's not clear.

---

[5]    The Court should deny Mr. Morris's motion to strike.  The answer was responsive to the question he asked, even if he did not like the answer.  When asked if Mr. Morris accurately summarized his testimony, the witness was entitled to clarify his testimony.

Debtor Appx. 03034 (79:5-14). Indeed, the Debtor also sued HCMFA to collect on the other two

notes, copies of which are included in HCMFA's appendix. HCMFA Appx. 31-64.

21.    To be clear, Mr. Dondero's intent, both as the person who controlled HCMFA and

the person who controlled the Debtor, was for these Transfers ($5 million and $2.4 million) to

constitute compensation from the Debtor to HCMFA for the NAV Error, not loans. HCMFA Appx

5. But, as Waterhouse informed Mr. Dondero in early May 2019, the Debtor did not have sufficient

funds to make these Transfers. HCMFA Appx 5. Thus, Mr. Dondero personally paid most if not

all of the $7.4 million into the Debtor at or around the same time to enable the Debtor to make the

Transfers to HCMFA, again under the belief and understanding that the Debtor would use these

funds to compensate HCMFA for the NAV Error, not to make a loan. HCMFA Appx 5.

22.    Still, the Debtor's employees, acting for both the Debtor and HCMFA, erroneously

booked the Transfers as loans. But the Debtor's own evidence—specifically, the deposition of

David Klos—demonstrates how this mistake occurred and why it is not surprising. Mr. Klos was

the Debtor's controller, Debtor Appx. 03183 (6:22-25), and he instructed Debtor employee Kristin

Hendrix to prepare the Notes. Debtor Appx. 03198 (68:4-13). Mr. Klos discussed how funds

would be transferred from one affiliated entity to another as needed for liquidity:

> And you joined Highland in 2009. From that point in time, 2009, through 2019,
> was there any practice at the enterprise of those businesses to transfer funds
> between each other on a basis of when one needed it and one had it?
>
> A.    Yes, that was a fairly, generally speaking, that was a fairly common
> practice, of using different entities within the overall structure to bridge liquidity.

Debtor Appx. 03189 (29:24-30:7). Klos also testified as to the standard practice that, where the

Debtor was transferring funds out, the transfer would be booked as a loan:

> So over the general—talking about generally now, over those 10 years when there
> were these intercompany transfers for liquidity purposes, how were they booked by
> the debtor, by Highland Capital Management?

MR. MORRIS: Objection to the form of the question.[6]

THE WITNESS: Help me on the direction. So this is money that Highland is receiving or money that Highland is sending?

Q.       (BY MR. RUKAVINA) Sending out.

A.       Sending out. So this is—in the scenario that you're describing, this money that Highland is sending out to meet some other corporate obligor's liquidity needs?

Q.       Yes, sir.

A.       So those would be booked as a loan. I would—I need to hedge a little bit because I'm not a hundred percent certain, but I would say if not exclusively via loans close to exclusively.

Q.       And would they—strike that.  Would they usually be papered up with a promissory note?

A.       Yes.

Q.       Now, why was that the general course during 10 years? Was there a policy and procedure in place, or would Dondero say book it as a loan, or was that just the right thing to do from an accounting perspective?

MR. MORRIS: Objection to the form of the question.[7]

THE WITNESS: At the end of the day it's at the direction of Jim Dondero, so I can't tell you exactly why he wanted it to be done that way. But that was certainly the practice of how it was done in those situations.

Debtor Appx. 03189-90 (32:20-34:5).

23.       Thus Mr. Klos believed that the underlying transfers were loans, in part because he

believed that Mr. Waterhouse would have told him that (but could not recall for certain), and in

---

[6]       The Debtor has waived Mr. Morris's objections.  "[A] party waives any objection to the admissibility of evidence on summary judgment by offering that evidence in support of its own motion. *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012) (citing *Capobianco v. City of N.Y.*, 422 F.3d 47, 55 (2d Cir. 2005); *Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998)).  In any event, it is unclear what Mr. Morris's objection is, and HCMFA reserves the right to respond if and when the Debtor raises a specific objection.  If the objection is foundation, Mr. Rukavina laid the requisite predicate.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[7]       The Debtor has waived this objection.  *Supra*, note 4.  It is also unclear what the objection is, so HCMFA reserves the right to respond to a specific objection if and when the Debtor makes one.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

part because of past practice. Debtor Appx. 03199 (69:1-70:14). Mr. Klos described the usual

course at the Debtor with respect to papering intercompany loans:

> Q.    (BY MR. RUKAVINA) So going back to this Exhibit 3, sir, why did you
> ask Kristin, can you or Hayley please prep a note for execution? Why them?
> Remember, I was asking about what the course or procedure was at that point in
> time.
>
> A.    Yeah, so nomenclature, procedure, process. I would say the informal
> process for these types of loans, they were frequent in nature, would be for someone
> on the corporate accounting team to prepare a note and have it executed.
>
> Q.    Okay. That was the standard course back then?
>
> A.    Again, I don't know what standard course means. That was fairly typical.
>
> Q.    Why would you not have asked someone in the Highland legal department
> to prepare a note?
>
> A.    Because this was a legally reviewed document as far as the form of the
> agreement. It's a one-page, two-paragraph form that had been used for a long time.
> So the only thing that would change with respect to these notes would be the date,
> the amount, likely the rate. I can't think of anything else offhand that would have
> changed from note to note.
>
> Q.    After you asked Ms. Hendrix to prepare this note, did you have any further
> role with respect to the papering, preparation, or execution of that note?
>
> A.    Not that I can remember.
>
> Q.    Would you have had any role in having either or both of the notes actually
> signed electronically or by ink by Mr. Waterhouse?
>
> A.    Likely not, no.

Debtor Appx. 03202 (83:19-84:24).

24.    Ms. Hendrix, the Debtor's senior accountant and not an employee of HCMFA,

likewise testified to the usual course when intercompany transfers occurred:

> Typically anytime specifically Jim Dondero would need to move money between
> related parties, he would pay down -- when I say him, he would have us in corporate
> accounting move money around, pay off notes, reissue new notes somewhere else.
> So a way to move money around between his entities.

Debtor Appx. 03132 (21:10-16). Stated differently, at that time "it's all one big happy family, and whoever needed cash, the cash moved around." *Id*. 472 (23:3-6).

25.    The point is a simple one: when the Debtor's accountants saw large transfers from the Debtor to an affiliate, in this case HCMFA, they *assumed* the transfers were loans and, pursuant to their historical practice, they papered the transfers up as loans.  But, as non HCMFA employees, they of course had no authority or ability to bind HCMFA on any promissory notes.

26.    Thus began the papering up of the Transfers as loans, based on these assumptions. At the same time, both Mr. Waterhouse and Mr. Dondero confirmed that internal policies and procedures would have required the Debtor's legal department, also providing legal services to HCMFA under the SSA, to review and approve the Notes: "The internal policies and procedures at the Debtor and HCMFA, as well as ordinary practice, required that loans in amounts such as $5 million and $2.4 million would go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA …."  HCMFA Appx. 4.  Mr. Waterhouse likewise testified that "the team [accounting] would have worked with the legal group at Highland to draft any notes."  Debtor Appx. 02122 (290:15-16).[8]  In fact, Mr. Waterhouse would have expected there to be a representation, represented by a box or section on a cover document, that "legal" has reviewed or approved the document before he would sign it.  Debtor Appx. 02123 (294:16-22).[9]

---

[8]    The Debtor has waived Mr. Morris's objection.  *Supra*, note 4.  In any event, the question was not objectionable, and Mr. Waterhouse gave the same answer in response to another question not much later. Debtor App. 02122 (291:3).  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[9]    The Debtor has waived Mr. Morris's objection.  *Supra*, note 4.  In any event, the question was not objectionable, and Mr. Morris waived his objection by insisting that the witness complete his answer. Debtor Appx. 02123 (295:12).  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

27.    This was not done here.  Ms. Hendrix, who prepared and signed the Notes, testified that she did not run the Notes through the legal department.  Debtor Appx. 03138 (46:18-24).  In fact, and contrary to Mr. Waterhouse's testimony, she testified that it was not standard practice for the legal department to prepare and approve intercompany notes, but that this was handled instead by the accounting department using a prior template approved by the legal department.  Debtor Appx. 03131 (18:1-19:13; 20:1-5).[10]

28.    Thus, Mr. Waterhouse instructed Mr. Klos to make the Transfers from the Debtor to HCMFA.  Debtor Appx. 00871; 03134-35 (32:13-33:4).  Mr. Waterhouse never instructed Mr. Klos to paper the Transfers as loans; at least neither one of them remembered or was able to identify any such conversation or instruction.  Debtor Appx. 03199 (69:11-15); *see* Debtor Appx. 02122 (290:4-293:11.  Mr. Klos, understanding that the Transfers were loans—but again, without any authority or instruction to make them loans—then instructed Ms. Hendrix to paper the Transfers as loans.  Debtor Appx. 00871; 03134-35 (32:13-33:4).  It was then Ms. Hendrix who actually prepared the Notes.  Debtor Appx. 03137 (42:15-43:20).

29.    Again, the point is simple: when professional accountants at the Debtor saw funds flowing from the Debtor to an affiliate, such as HCMFA, they *assumed* that the funds were a loan and papered it as such, as this is how it had been done for many years on many occasions.  But that is not how Mr. Dondero, the person in charge of both entities—intended it to be done here, and no one asked him.  HCMFA Appx. 4.  That Mr. Waterhouse, as part of the accounting group, was copied on the e-mails whereby Mr. Klos instructed Ms. Hendrix to paper the Transfers as loans does not change this result.  At most, it is evidence that Mr. Waterhouse also understood the

---

[10]    The Debtor has waived Mr. Morris's objection.  *Supra*, note 4.  In any event, the question was not objectionable, and Ms. Hendrix is competent to testify regarding the ordinary practice at the Debtor given her 17 years of employment.  Debtor Appx. 03129.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Transfers to be loans, but: (i) Mr. Dondero never instructed that they be loans; (ii) Mr. Waterhouse lacked any authority to make them loans; and (iii) at best, he *assumed*, as did the others, that the Transfers were loans.

**D.    DESPITE THE DEBTOR'S MISTAKE, HCMFA NEVER ACTUALLY SIGNED THE NOTES**

30.    Despite the fact that the Notes exist, at least nominally, Mr. Waterhouse does not specifically recall signing the Notes.  Debtor Appx. 02084 (141:4-7).  In fact, Mr. Waterhouse did not typically sign promissory notes.  Debtor Appx. 02085 (144:10-12).  Mr. Waterhouse did not draft the Notes and does not recall asking anyone to draft the Notes.  Debtor Appx. 02085-86 (145:23-146:7).  According to Mr. Waterhouse, "the legal group at Highland is responsible and has always been responsible for drafting promissory notes."  *Id.*  He reiterated, "The team knows to—I mean, we don't draft documents.  We're not lawyers.  We're not attorneys."  It is not what I do or accountants do."  Debtor Appx. 02086 (147:19-22).  But the Debtor has not cited any documents or communications from within the legal department related to the Notes and, as noted above, Ms. Hendrix confirmed that she did not go through the legal department in preparing the Notes.

31.    Upon examining the two notes side by side, Mr. Waterhouse realized that he could not have signed the notes:

> A.    These—these—these signatures are identical, now that I stare at them, and I mean, they are so close—I mean, they're identical that, I mean, even with my chicken scratch signature, I don't know if I can—you know, I do this 100 times, could I do that as—as precisely as I see between the two notes.

> Q.    Well, that is why I ask.  Mr. Waterhouse, now that you have examined them, does it seem like it is more likely that you actually electronically signed these?

> MR. MORRIS: Objection to the form of the question.[11]

---

[11]    The Debtor has waived this objection.  *Supra*, note 4.  Furthermore, it is not clear exactly what the objection is, and HCMFA reserves the right to respond if an when the Debtor asserts one.  If the question is leading, there is no complete prohibition against leading questions, and, in any event, the witness was being cross

A.    Is—I don't—I don't recall specifically.  As I said before, my assistant did have a—an electronic signature, and that was used from time to time.  It wasn't as common practice back in 2019.  It definitely was more common practice when we had to work from home and remotely for COVID because it that made it almost impossible to, right, provide wet signatures since we're all working from home remotely.

Q.    Well, going just for these two promissory notes, Mr. Waterhouse, in light of your inability to remember any details, are you sure you actually signed wither or both of these notes?

MS. DANDENEAU:  Objection to form.

A.    I don't recall specifically signing—actually physically signing these notes.  As I said before, I don't recall doing that.  This—this looks like my signature, but yet these two signatures are identical.

Q.    So you don't recall physically signing them, and I take it you don't recall electronically signing them either?

A.    I don't recall.  You know, Highland has all my emails.  If that occurred, you know, you know, I don't have any of these records is what I'm saying.  I don't have any of those records.

Debtor Appx. 02124 (298:10-300:4).  The Debtor has never produced an email, and HCMFA is

not aware of one, in which Mr. Waterhouse authorized anyone to affix his electronic signature to

the Notes.

32.    Mr. Waterhouse later elaborated on the process he used in the rare circumstance

when he signed documents electronically:

Q.    And help me here.  I'm not very technologically astute.  When you—and I—I recognize that you do it rarely, but when you sign a document electronically, do you believe that there is an electronic record of you having authorized or signed a document electronically?

MR. MORRIS: Objection to the form of the question.[12]

---

examined.  *See* Fed. R. Evid. 611(c).  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[12]    The Debtor waived this objection.  *Supra*, note 4.  Furthermore, it is not clear what the basis of the objection is, and HCMFA reserves the right to respond if and when the Debtor asserts one.  The question is about the witness's belief, which is a legitimate inquiry.  "Form" objections are also invalid under the Federal Rules as

A.      I—I don't know the tech answer to that, but, you know, since I don't have—I don't ever attach my signature block electronically, my assistant would have done that, and if that is done over email like we did several times—you know, multiple, multiple times over COVID, she would attach my signature block and then email it out to whatever party.

Q.      What was your assistant's name in May 2019.

A.      It was Naomi Chisum.

Debtor Appx. 02129 (320:11-321:7).  The Debtor has not included any emails in its appendix with

Ms. Chisum meeting this description.

33.      During his deposition, Mr. Waterhouse also testified that he did not have authority

to borrow at this level as HCMFA's treasurer, nor to lend at this level as the Debtor's CFO:

Q.      Yes.  So in your capacity as the chief financial officer of the debtor, Highland Capital Management, L.P., in May of 2019, did you believe that you unilaterally, just Frank Waterhouse, had the authority to loan on behalf of the debtor to anyone $5 million and $2.4 million?

MR. MORRIS: Objection to the form of the question. [13]

A.      No.

Q.      Is it because loans of that amount would have had to be approved by someone else?

A.      Yes.

Q.      Who in '20—in May of 2019, if Highland wanted to loan 5 million or $2.4 million to someone, what would have been the internal approval procedure?

MR. MORRIS: Objection to the form of the question. [14]

---

they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[13]      The Debtor waived Mr. Morris's objections.  *Supra*, note 4.  In any event, Mr. Waterhouse is competent to testify about his own authority or lack thereof.  *See Gross v. GGNSC Southaven, LLC*, 817 F.3d 169, 179 (5th Cir. 2016) ("holding agent was competent to testify about the scope of his own agency).  Indeed, Mr. Morris opened the door by asking nearly identical questions earlier in the same deposition.  *E.g.* Debtor Appx. 02089.  For purposes of summary judgment however, the Court must accept as true the testimony most favorable to HCMFA.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[14]      *Supra*, note 4.  Furthermore, Mr. Waterhouse, as the Debtor's Chief Financial Officer, it qualified to testify about the Debtor's procedures for extending credit.  "Form" objections are also invalid under the Federal

A.      If—if we had loans of that nature that needed to be made due to their size, we would have gotten approval from the president of Highland.

Q.      And who was that individual?

A.      It was James Dondero.

Q.      Okay.  Now I'm going to ask you a similar question but for a different entity.

In May of 2019, as the treasurer of HCMFA, did you believe that you unilaterally had the ability to cause HCMFA to become the borrower of a $5 million loan and a $2.4 million loan?

MR. MORRIS: Objection to the form of the question.[15]

A.      No.

Q.      What would—what would the approval have taken place—strike that.

What would the approval process been like in May of 2019 at HCMFA for HCMFA to take out a $7.4 million loan?

MR. MORRIS: Objection to the form of the question.[16]

A.      The process would have been similar to what we just discussed in—for Highland to make a loan to others.  So, again, you know, we—we would have—either myself or someone on the team would have discussed this with the—the president and owners of—of HCMFA.

Q.      And who was that individual?

A.      That was James—Jim Dondero.

Q.      So do I understand that in May of 2019, on behalf of both the lender, Highland, and the borrower, HCMFA, Mr. Dondero would have had to approve $7.4 million in loans?

MR. MORRIS: Objection to the form of the question.[17]

---

Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[15]    *Supra*, note 4.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[16]    *Supra*, note 4.  Furthermore, Mr. Waterhouse, as HCMFA's Treasurer, is qualified to testify about HCMFA's procedures for incurring debt.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[17]    *Supra*, note 4.  Furthermore, this question is not objectionable.  It accurately summarizes Mr. Waterhouse's immediately antecedent testimony.  "Form" objections are also invalid under the Federal Rules as they fail

A.      Yes.

Debtor Appx. 02117 (270:25-273:9).   HCMFA's corporate representative confirmed that Mr. Waterhouse alone did not have authority to execute the notes.  Debtor Appx. 03062 (192:4-21).

34.      Another witness's testimony confirms that Mr. Waterhouse never signed the Notes. In May, 2019, Kristin Hendrix was the senior accounting manager at the Debtor.  Debtor Appx. 03129 (12:4-16).   At that time, she reported to David Klos, who reported to Mr. Waterhouse. Debtor Appx. 03129-30 (12:25-13:9).  While Ms. Hendrix never drafted a promissory note from scratch, in May 2019 part of her job was taking a form note and revising it.  Debtor Appx. 03131 (17:5-11).   Contrary to Mr. Waterhouse's testimony, Ms. Hendrix testified that the corporate accounting group at the Debtor, not the legal group, was responsible for updating draft promissory notes so as to create new ones—*i.e.* the Debtor's own witnesses can't get their story straight. Debtor Appx. 03131 (17:20-25).  As Ms. Hendrix testified:

> Our typical practice is if we have a loan with certain affiliates that it's a demand note. We have a template that we have used for years that was created by either our internal legal team or an outside law firm, I'm not sure which.  The typical practice is always updating a few things on that template, getting it executed, and filing it in our audit folders.

Debtor Appx. 03131 (18:18-25).  The corporate accounting group, she claimed, not the legal group, did this "updating."  Debtor Appx. 03131 (19:1-13; 20:1-5).  And Ms. Hendrix confirmed the general purpose of the intercompany notes:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down—when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

Debtor Appx. 03132 (21:10-16).  In other words, at that time "it's all one big happy family, and whoever needed cash, the cash moved around."  Debtor Appx. 03132 (23:3-6).

---

to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

35.     In May 2019, Mr. Klos sent one or two e-mails to Ms. Hendrix—emails on which Mr. Waterhouse but not Mr. Dondero or the legal department were copied—informing her that there were new intercompany loans, asking her to prepare notes for execution. Debtor Appx. 03134-35 (32:13-33:4). In her mind, this instruction comported with the general practice:

> So is it fair to say that typically, obviously not every time, but typically your corporate accounting group when it would see intercompany transfers in large amounts would believe that they were loans?
>
> MR. MORRIS: Objection to the form of the question.[18]
>
> THE WITNESS: Typically they were loans. There's not really another way to get money from one entity to another. And if they were papered as a loan, that means we were told to set it up that way.

Debtor Appx. 03135 (35:5-15). That is "how it was for 14 or 15 years." Debtor Appx. 03135 (36:7-9).

36.     Ms. Hendrix thought that the $2.4 million Note was "related to a TerreStar NAV error" and the $5 million Note was for the "consent fee." Debtor Appx. 03136 (38:17-39:5). It was never "told to [her] directly" that the funds were a loan, but she [subject to objection[19]] "assum[ed] that based on many instances of intercompany transfers in the 14 years prior." Debtor Appx. 03136 (40:20-25).

37.     Ms. Hendrix confirmed that she prepared the Notes from Word documents originally created by outside counsel. Debtor Appx. 03137 (42:15-43:20). However, Ms. Hendrix

---

[18]     The Debtor has waived objections to Ms. Hendrix's testimony by including it in the Debtor's summary judgment evidence. *Supra*, note 4. In any event, it is not clear what the Debtor's objection is, as the question is not objectionable. HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one. If the objection is foundation, Ms. Hendrix has worked in the Debtor's corporate accounting department for 17 years, holds an MBA from SMU, and is a certified public accountant. Debtor Appx. 03129. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[19]     The Debtor has waived its objection. *Supra*, note 4. Furthermore, the question did not mischaracterize Ms. Hendrix's testimony, as she answered unequivocally, "Correct." Debtor Appx. 03137. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

had no memory of papering the Notes.  Debtor Appx. 03138 (45:21-46:1).  It would have been her

practice not to consult the legal group in preparing the Notes.  Debtor Appx. 03138 (46:12-24).

Ms. Hendrix confirmed that, to sign Mr. Waterhouse's name to the Notes, she used an electronic

picture of his signature, which she then affixed to the Word documents, just like this:



Debtor Appx. 03137-38 (43:6-48:18).

   38.   On the question of whether Mr. Waterhouse authorized Ms. Hendrix to affix his

signature to the Notes, Ms. Hendrix testified "I don't have exact specific memory."  Debtor Appx.

03138 (48:10-15).  Again, she appears to have assumed that Mr. Waterhouse must have approved

the Notes and, therefore, approved her using his signature:

> He was fine with using his e-signature, and what is on these documents was that
> exact e-signature.

* * *

> But he would have had to approve this loan in the dollar amount, the day. He would
> have been the one directing us to create these loans.  In past practice he has always
> approved using his e-signature to execute documents.

Debtor Appx. 03138 (48:4-18).  When pressed about *how* Mr. Waterhouse would have authorized

her to use his electronic signature, Ms. Hendrix testified as follows [subject to objection[20]]:

> I would assume that, as I've stated previously, these directions were coming
> directly from him to paper a loan.  These changes that are made are only to the
> dollar amount.  Interest rate is pulled right off the IRS website.  That is his approval
> to paper a loan and in fact execute or approve the loan.

---

[20]   The Debtor has waived this objection.  *Supra*, note 4.  Furthermore, the question is not objectionable.  Ms. Hendrix testified that Mr. Waterhouse "would have had to approve this loan", and the next question was, "How would he have approved Exhibits 4 and 5?  By that, I mean by email or memorandum?  How would he have approved it in May of 2019?"  Debtor Appx. 01318.  HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Debtor Appx. 03138-39 (48:24-49:5).

39.     Then, when asked [subject to objection[21]] "after his e-signature was used either on

these notes or other documents in May of 2019, would you have brought the documents back to

him for any kind of verification," Ms. Hendrix testified:

> Probably not.  These are all very standard.  We've papered hundreds of loans.  So
> I think he trusted that we can handle updating a date and a dollar amount on these
> loan templates.

Debtor Appx. 03139 (50:1-9).

40.     Ms. Hendrix also testified [subject to objection[22]], differently from Mr.

Waterhouse, that "[p]robably at this time, 99 percent of the stuff my team got his signature on was

his e-signature."  Debtor Appx. 03139 (49:12-16).  And, the following exchange is significant:

> Q.     (BY MR. RUKAVINA) Do you know or believe, or your recent review of
> documents, did it reveal an email from Mr. Waterhouse to you specifically
> authorizing his e-signature on Exhibits 4 and/or 5?
>
> A.     Not that I recall seeing, no.
>
> Q.     Sitting here today, do you have any memory of Mr. Waterhouse orally or
> otherwise specifically authorizing you to affix his e-signature to Exhibits 4 and/or
> 5?
>
> A.     Specifically on these loans, no, I don't recall those conversations.  But,
> again, our practice has always been we have this discussion, he's under the
> understanding that we're going to paper the loans, he's always comfortable with
> using his e-signature.  This is not something me or my team would have done
> without that authority and approval from him.

---

[21]   The Debtor has waived this objection.  *Supra*, note 4.  In any event, this question is not objectionable.  Ms. Hendrix's testimony clearly demonstrates that she electronically affixed Mr. Waterhouse's signature to the Notes. Debtor Appx. 03137-38 (43:6-48:18).  HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[22]   The Debtor has waived this objection.  *Supra*, note 4.  Furthermore, the question is not objectionable.  Ms. Hendrix testified that she regularly prepares notes, Debtor Appx. 03131 (20:1-8), and has worked in the Debtor's corporate accounting department for 17 years. Debtor Appx. 03129 (11:14).  She would be familiar with Mr. Waterhouse's practices.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Debtor Appx. 03139 (50:15-25).

41.    But there is no evidence that Ms. Hendrix ever showed the Notes to Waterhouse

after preparing them:

> Q.    Sitting here today, do you have any memory of giving Mr. Waterhouse these
> two promissory notes after they were prepared?
>
> A.    I specifically don't remember walking into his office and providing it to
> him, but he could have found it on our shared drive if he wanted to.
>
> Q.    Do you have any memory or in your recent review of documents did you
> see any email to the effect of you sending either or both of these promissory notes
> to Mr. Waterhouse after they were papered up?
>
> A.    I don't have any specific recollection, again, but he had access to look at
> them.
>
> Q.    On the shared drive?
>
> A.    Yes.

Debtor Appx. 03140 (54:4-17). Scanning in the Notes and then saving them to the system hardly

amounts to showing or giving them to the man who allegedly signed them.

42.    In fact, the Debtor's summary judgment evidence demonstrates that Ms. Hendrix

did not even show the executed Notes to Mr. Waterhouse, much less ask for authority to affix his

electronic signatures to the Notes. While the Debtor points out that Mr. Waterhouse was copied

on Mr. Klos' instruction to Ms. Hendrix to prepare the Notes, when she did prepare them, that

same e-mail chain confirms that she did not copy Mr. Waterhouse—only Hayley Eliason and Blair

Roeber. Debtor Appx. 00871. That same e-mail chain also confirmed that Ms. Hendrix was not

authorized to sign the Notes for Mr. Waterhouse. Mr. Klos' instruction to her was to "prep[are] a

note *for execution*." Debtor Appx. 00871 (emphasis added). Clearly, the execution was to follow,

but that execution did not occur, at least not with authority from Mr. Waterhouse or anyone else.

43.    Ms. Hendrix *assumed* that the transfers were loans and *assumed* that Mr.

Waterhouse authorized her to affix his signature to the Notes because she *assumed* that he

approved of the Notes. But her testimony directly conflicts with his: whereas he testified that he rarely used electronic signatures in May 2019, would have sent an e-mail authorizing the same, and would have expected the legal department to approve a note prior to his signature, she testified that he routinely did this at that time pursuant to some generalized authority and that the accounting department routinely papered notes.

44.    The fact remains that, notwithstanding her subjective assumptions, Ms. Hendrix created erroneous notes (as they appear to make Mr. Waterhouse the "maker" and, as discussed below, make him jointly and severally liable), and she was not authorized—at least there is no evidence that she was authorized—to affix images of Mr. Waterhouse's signature to the Notes. Or, if there was some generalized authority that she believed Mr. Waterhouse gave her, then the condition precedent—that the legal department approve the Notes—was not satisfied. Either way, there is no evidence whatsoever she had authority to affix his signature.

### III.    SUMMARY JUDGMENT STANDARD

45.    Implicitly recognizing there is contradictory evidence, the Debtor hangs its hat on the "reasonable jury" standard. But a reasonable jury can find for a party whenever there is more than a mere scintilla of evidence. *See Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*, 2017 Bankr. LEXIS 3191, *3 (Bankr. N.D. Tex. Sept. 21, 2017) ("To dispute a material fact, a plaintiff must offer more than a mere scintilla of evidence such that a 'reasonable jury could not return a verdict' for the plaintiff."). Here, HCMFA cites the testimony of five individuals in support of its defenses (Mr. Dondero, Mr. Waterhouse, Mr. Klos, Ms. Hendrix, and HCMFA's corporate representative). The Debtor cannot credibly argue that amounts to nothing, particularly in light of this directive from the United States Supreme Court:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.  Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citations omitted).  Based on the voluminous evidence HCMFA cites in this brief, which the Court must accept as true, and with respect to which the Court must draw all reasonable inferences in favor of HCMFA, there are genuine issues of material fact the preclude summary judgment, so the Court should deny the Motion.

## IV.    ARGUMENT AND AUTHORITIES

46.    As a general proposition, HCMFA does not entirely dispute the Debtor's assertion that, "[t]o prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note."  Motion ¶ 132 (citing *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995)).  But there is more to it than that.  A promissory note is a contract, and an action on a promissory note is still "subject to all defenses available in an action on a simple contract."  *Strickland v. Coleman*, 824 S.W.2d 188, 191-92 (Tex. App.—Houston [1st] 1991); TEX. BUS. & COMM. CODE § 3.305(a)(2) ("the right to enforce the obligation of a party to pay an instrument is subject to … a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract").  "Therefore, evidence is admissible that tends to prove a defense to the action on the promissory note, such as want or failure of consideration, non-performance of a condition precedent, non-delivery, delivery for a special purpose, fraud in the

inducement, or other defenses which would be available in an action on a simple contract."

*Strickland v. Coleman*, 824 S.W.2d at 192.

## A. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER HCMFA SIGNED THE NOTES

47.     The Debtor bears the burden to prove HCMFA signed the Notes because "[t]he validity of the signature on the note must be proved by the person claiming validity if validity is denied in the pleadings." *Silverio v. Silverio*, 625 S.W.3d 680, 685 (Tex. App.—El Paso 2021); TEX. BUS. & COMM. CODE § 3.308(a).  HCMFA denied that it signed the Note in the pleadings. The only allegations in the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (Dkt. No. 1, the "Complaint") regarding HCMFA's signature are paragraphs 14 and 15:

> 14. Specifically, on May 2, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note"). A true and correct copy of HCMFA's First Note is attached hereto as Exhibit 1.

> 15. On May 3, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "Notes"). A true and correct copy of HCMFA's Second Note is attached hereto as Exhibit 2.

Complaint ¶¶ 14, 15.  HCMFA expressly denied these allegations in its *Defendant's Amended Answer* (Dkt. No. 48, the "Answer") ("14.  The Defendant denies ¶ 14 of the Complaint.  15.  The Defendant denies ¶ 15 of the Complaint.").[23]

---

[23]     The Bankruptcy Court denied HCMFA's motion to amend its Answer to more affirmatively plead that the Notes were not signed, but HCMFA expressly argued that such amendment was not necessary and that HCMFA's prior Answer sufficiently placed the Debtor on notice under applicable law that HCMFA denied signing the Notes.  Any allegedly contradictory allegations in the Answer notwithstanding, "[r]ule 8 of the Federal Rules of Civil Procedure permits the alternative pleading of inconsistent claims and defenses …." *Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313, 317 (5th Cir. 2016).  And it is axiomatic that unsworn pleadings do not constitute competent summary judgment evidence. *E.g. Jones v. Anderson*, 721 Fed. Appx. 333, 334-35 (5th Cir. 2018).  By denying the only allegation in the Complaint regarding execution, the Answer put the Debtor to its proof on this element of its case.  Out of an abundance of caution, HCMFA is filing an objection with the District Court to the Bankruptcy Court's order, seeking the District Court's review

48.     The Debtor has failed to meet its burden of proof, and there is a genuine issue of material fact as to whether HCMFA signed the Notes, for three independent reasons, any one of which provides grounds to deny the Motion: (i) there is a genuine issue of material fact as to whether Mr. Waterhouse signed the Notes at all; (ii) even if he signed them, there is a genuine issue of material fact as to whether he had the requisite authority; and (iii) even if he had authority, the Notes are ambiguous.  For any one of these reasons, the Court should deny the Motion.

### i.     <u>Waterhouse did not Actually Sign the Notes</u>

49.     The facts set out above demonstrate that Mr. Waterhouse did not actually sign the Notes—of that there can be no legitimate dispute.  In particular, the evidence conclusively demonstrates that Ms. Hendrix electronically affixed an image of Mr. Waterhouse's signature in Microsoft Word.  Debtor Appx. 03137-38 (43:6-48:18).  She herself acknowledged that her actions required Mr. Waterhouse's approval.  *Id.*  But there is no evidence that Mr. Waterhouse gave her his authorization—none whatsoever.  On the contrary, Mr. Waterhouse testified that any such authorization would have been by e-mail to his administrative assistant (Debtor Appx. 02129 (320:11-321:7).  But the Debtor produced no such e-mail and Ms. Hendrix was not Mr. Waterhouse's administrative assistant.  *See id.*  Mr. Waterhouse also testified that he rarely, if at

---

of that order.  To the extent necessary, HCMFA incorporates its motion to amend and its objection to the Bankruptcy Court's denial of that motion in this Brief, and reserves all rights with respect to the same.

For the avoidance of doubt, any confusion over whether HCMFA needed to amend its Answer results from differences between the Texas Rules of Civil Procedure and the Federal Rules of Civil Procedure.  The Texas Rules require specific denials in certain instances because the Texas Rules permit general denials.  Tex. R. Civ. P. 92.  The Federal Rules, on the other hand, require specific denials nearly all the time, including here. Fed. R. Civ. P. 8(b)(1)(B).  To the extent the Debtor attempts to argue the denial needed to be verified under Tex. R. Civ. P. 93 or relies on any other Texas procedural theory, those rules do not apply in federal court. *See Follenfant v. Rogers*, 359 F.2d 30, 31-2 (5th Cir. 1966) (Texas rule 93 "COULD NOT have any effect on the present case, since state rules of practice are not applicable to, or binding on, trials in federal courts. In matters of pleading, federal courts are not governed by the state practice, but by the Federal Rules of Civil Procedure."); *Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678, *16 (W.D. Tex. Sept. 29, 2011); *Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802, *5 n.7 (N.D. Tex. Jan. 10, 2011); *see* Fed. R. Civ. P. 11(a) ("Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit.").

---

all, electronically signed documents in May, 2019.  Debtor Appx. 02124 (298:10-300:14).  But

Mr. Waterhouse did not remember authorizing anyone to use his electronic signature.  *See id.*  Nor

has the Debtor offered any evidence that Mr. Waterhouse ever laid eyes on the Notes electronically

signed by him.  On the contrary, the evidence is that Mr. Hendrix e-mailed the executed Notes to

two other Debtor employees but, for some inexplicable reason, <u>not</u> Mr. Waterhouse.  Debtor Appx.

00871.

50.     The Debtor must prove that HCMFA signed the Notes.  HCMFA denied signing

the Notes in its Answer, so the Debtor bears the burden to prove HCMFA signed them.  *Silverio*,

<mark>625 S.W.3d at 685</mark>; Tex. Bus. & Comm. Code § 3.308(a).  There can be no question that Mr.

Waterhouse did not personally sign the Notes.  The only question is whether he authorized Ms.

Hendrix to sign the Notes electronically for him.  But the Debtor offers no evidence on this critical

fact.  Even if there were some circumstantial evidence from the Debtor on this fact, HCMFA has

demonstrated that there is a genuine issue of disputed fact as to whether Mr. Waterhouse ever

authorized Ms. Hendrix to sign the Notes electronically for him.

**ii.      <u>Even if Waterhouse Signed the Notes, He Did Not Have Authority</u>**

51.     Even if there were not a genuine issue of material fact about whether Mr.

Waterhouse signed the Notes, there is a genuine issue as to whether he had authority to sign them.

General contract law governs whether Mr. Waterhouse's signature binds HCMFA.  *See* Tex. Bus.

& Comm. Code § 3.402(a) ("If a person acting, or purporting to act, as a representative signs an

instrument by signing either the name of the represented person or the name of the signer, the

represented person is bound by the signature to the same extent the represented person would be

bound if the signature were on a simple contract.").  Under the UCC as well, "an unauthorized

signature is ineffective …."  Tex. Bus. & Comm. Code § 3.403.

---

DEFENDANT'S BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                                    Page 27

52.     "'Unauthorized signature' means a signature made without actual, implied, or apparent authority." TEX. BUS. & COMM. CODE § 1.201(b)(41).  But "Texas law does not presume agency, and the party who alleges it has the burden of proving it."  *IRA Res., Inc. v. Griego*, <mark>221 S.W. 3d 592, 597</mark> (Tex. 2007).  The District Court has summarized the concept of actual authority as follows:

> "Actual authority usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *United Residential Props., L.P. v. Theis*, <mark>378 S.W.3d 552, 564</mark> (Tex. App. 2012, no pet.) (citation and internal quotation marks omitted). "'Actual authority is created through written or spoken words or conduct of the principal communicated to the agent.'" *Id.* (quoting *Walker Ins. Servs. v. Bottle Rock Power Corp.*, <mark>108 S.W.3d 538, 549-50</mark> (Tex. App. 2003, no pet.)). The existence of an agency relationship based on actual authority "may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question[, but] cannot be based merely on the words or deeds of the agent." *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, <mark>222 S.W.3d 889, 899</mark> (Tex. App. 2007, pet. denied) (citing *Walker Ins. Servs.*, <mark>108 S.W.3d at 550</mark>).

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930, *26-28 (N.D. Tex. April 13, 2015).

53.     The Debtor has failed to meet its burden to prove Mr. Waterhouse had actual authority to execute the Notes.  Based on the rule that the agent's deeds are insufficient evidence, the fact that Mr. Waterhouse allegedly signed the Notes is irrelevant.  Certainly Mr. Waterhouse does not believe he possessed authority.  He testified that only Mr. Dondero could authorize borrowing at the level in question.  Debtor Appx. 02117 (270:18-273:9).  As for whether HCMFA intentionally conferred authority on Mr. Waterhouse, again his testimony is conclusive—it did not. *Id.*  Likewise, HCMFA's president testified that Mr. Waterhouse did not have authority to sign the Notes and that he was unaware of any corporate documents that would confer such authorization.  HCMFA Appx. 1-2, 4.

54.     The only allegedly contrary evidence the Debtor submits to meet its burden is an Incumbency Certificate that says Mr. Waterhouse is the Treasurer of Strand Advisors XVI, Inc.,

HCMFA's general partner.  Debtor Appx. 00789.[24]  While it says Mr. Waterhouse is authorized
to execute agreements on behalf of the General Partner, it does not unambiguously give him the
same level of authority for the partnership.  Instead, to the extent it confers any rights at all, it
merely authorizes him "to give any party on behalf of the Partnership all notices, orders, directions,
or instructions …."  *Id.*  But this does not unambiguously include executing agreements or
borrowing money on the partnership's behalf.  "The negative implication canon, *expressio unius*,
which dictates that 'specification of the one implies the exclusion of the other,' further buttresses
that conclusion."  *Claimant ID 100218776 v. BP Expl. & Prod.*, 712 Fed. Appx. 372, 376 (5th Cir.
2017) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts
93-100 (2012)).  Perhaps more to the point, the incumbency certificate does not actually confer
any rights, and the Debtor has not offered any documents that do.  Based on the Debtor's own
evidence, there is a genuine issue of material fact as to whether Mr. Waterhouse had actual
authority to sign the Notes.

55.     The District Court also provided a thorough summary of the concept of apparent
authority:

> Apparent authority "is based on the doctrine of estoppel, and one seeking to charge
> the principal through apparent authority of an agent must establish conduct by the
> principal that would lead a reasonably prudent person to believe that the agent has
> the authority that he purports to exercise." *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d
> 624, 629 (Tex. 1981) (citing *Sw. Title Ins. Co. v. Northland Building Corp.*, 552
> S.W.2d 425, 428 (Tex. 1977); *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778-79
> (Tex. 1974); *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422, 427 (Tex.
> 1953)). To determine an agent's apparent authority, the court examines the conduct
> of the principal and the reasonableness of the third party's assumptions regarding
> the agency's authority. *Gaines*, 235 S.W.3d. at 183. "[O]nly the conduct of the
> principal is relevant." *Id.* at 182 (citing *NationsBank, N.A. v. Dilling*, 922 S.W.2d
> 950, 953 (Tex. 1996) (per curiam)); *see also United Residential Props.*, 378
> S.W.3d at 564 ("Apparent authority is based on estoppel, and only the conduct of

---

[24]     To the extent the Debtor attempts to argue Mr. Dondero is not competent to testify regarding Mr.
Waterhouse's authority, then the Debtor must concede that this incumbency certificate is likewise
incompetent for this purpose.  After all, it is simply a signed statement by Mr. Dondero.

the principal in leading a third party to believe that the agent has authority may be considered." (citations and internal quotation marks omitted)). "Declarations of the alleged agent, without more, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183-84 (citing *Sw. Title Ins. Co.*, 552 S.W.2d at 428); *see also Huynh*, 180 S.W.3d at 623 ("Only the conduct of the principal may be considered; representations made by the agent of his authority have no effect.").

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930 at *26-28.

56.     The key to apparent authority is "the reasonableness of the third party's assumptions regarding the agency's authority." First of all, there is no evidence that anyone with control over the Debtor or HCMFA actually believed Mr. Waterhouse had authority. But even if they did, that belief would not have been reasonable. At the time the Debtor demanded payment and filed this lawsuit, Mr. Waterhouse was still the Debtor's CFO. Debtor Appx. 00008 (complaint dated Jan. 22, 2021); 02053 (new employment began March 1, 2021); 02054 (served as Debtor's CFO until early 2021). At all relevant times, he was on both sides of this alleged transaction. And when "there is a dual agent, operating with the consent and knowledge of both principals, the agent's knowledge is imputed to its principals." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924 (Tex. 2010). Yet neither of the principals here consented, as Mr. Waterhouse did not have authority from either the Debtor or HCMFA to execute the Notes and both he and the principals involved knew that. There can be no apparent authority when the other party to the transaction expressly knows that the agent lacks actual authority. *See, e.g., Gaines v. Kelly*, 235 S.W.3d 179, 183-84 (Tex. 2007).

57.     There is therefore a genuine issue of material fact as to whether Waterhouse had authority to sign the Notes, so the Court should deny the Motion.

### iii.    **Even if Waterhouse Signed the Notes and had Authority, the Notes are Ambiguous**

58.    When an "agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury." *Childers v. Pumping Systems, Inc.*, 968 F.2d 565, 569 (5th Cir. 1992); *see Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431, 433 (Colo. App. 1982) ("Because no ambiguity exists concerning the Reichardts' status as makers on this note, the trial court was correct in entering summary judgment in favor of the Bank."). Here, because of the way Mr. Waterhouse allegedly signed the Notes, the identity of the maker is ambiguous.

59.    Under the following statute, Mr. Waterhouse is potentially liable in his individual capacity, even assuming he had authority to act for HCMFA:

> If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:
>
> (1)    If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.
>
> (2)    Subject to Subsection (c), the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity, or (ii) the represented person is not identified in the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.

TEX. BUS. & COMM. CODE § 3.402(b).

60.    In *Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005, Tex. App. LEXIS 6215, *15-16 (Tex. App.—Fort Worth Aug. 4, 2005), the Court evaluated the following signature:

/s/ AAA Auto Glass

/s/ Jackie Holland Secretary & Treasurer

AAA Auto Glass Company

But the Court found the signature ambiguous under § 3.402(b)(1) as to Ms. Holland's individual liability versus the liability of SSH, Inc., whose name was not mentioned.  *Id.* at *16.

61.    Mr. Waterhouse's signature on the Notes presents a similar conundrum:

**MAKER:**



FRANK WATERHOUSE

Debtor Appx. 00011, 00015.  There is no indication from the signature itself that Mr. Waterhouse intended to bind HCMFA instead of himself.

62.    "Comment 2 to [section 3.402] is also instructive; it provides that an agent is not liable under subsection (b)(1) 'if the form of the signature unambiguously shows that it is made on behalf on an identified represented person (for example, 'P, by A, Treasurer').'"  *S. Mansukhlal & Co v. Husein*, 14-04-00018-cv, 2004 Tex. App. LEXIS 8097, *7 (Tex. App.—Houston [14th] Sept. 2, 2004).  The signatures on the Notes do not unambiguously identify HCMFA as the maker, so Mr. Waterhouse is potentially liable in his individual capacity.  He testified, however, that he did not intend to be liable and that signing the Notes in his individual capacity was a mistake.  Debtor Appx. 02126 (306:19-307:4).[25]  This results in an ambiguity as to whether Mr. Waterhouse

---

[25]    The Debtor has waived Mr. Morris's objections.  *Supra*, note 4.  Even if not, the questions are not objectionable.  Mr. Waterhouse is competent to testify regarding his own intent and whether he personally made a mistake, particularly when the issue is his own personal liability.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

intended to sign the Notes at all.    Accordingly, there is a genuine issue of material fact that precludes summary judgment.

**B.    THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE NOTES WERE THE RESULT OF A MUTUAL MISTAKE**

63.    If the Notes were properly executed, then they are a result of a mutual mistake.  As detailed above, Mr. Dondero intended the Transfers to compensate HCMFA for the NAV Error, not to be repaid as loans.  Mr. Dondero, the only person with the authority to characterize the Transfers as loans, never gave that instruction.  Lower level Debtor employees simply assumed the Transfers were loans, and Mr. Waterhouse perhaps shared this assumption, but that does not matter.  Mr. Dondero was the individual who initiated the Transfers; he was the only person with authority to characterize the Transfers as loans for both the Debtor and HCMFA; and he was the very person injecting money into the Debtor to enable the Debtor to make the Transfers in the first place.  At all times, he intended and understood that the Transfers were compensation for damages, not loans.

64.    "A mutual mistake is one common to all parties, wherein each labors under the same misconception respecting a material fact …."  *Garza v. Villarreal*, 345 S.W.3d 473, 483 (Tex. App.—San Antonio 2011) (citing *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App.—San Antonio 1982)).  "In order for the defense of mutual mistake to be sustained, there must be fact issues raised to show that all the parties to a contract were acting under the same understanding of the same material fact."  *Id.*  Put slightly differently, "[a] mutual mistake of fact occurs when the parties to an agreement have a common intention, but the written contract does not reflect the intention of the parties due to a mutual mistake."  *Smith-Gilbert v. Perry*, 332 S.W.3d 709, 713 (Tex. App.—Dallas 2011).  "When a party alleges that, by reason of a mutual mistake, an agreement does not express the real intentions of the parties, extrinsic evidence is admissible to

show the real agreement." *Id.*; *DeClaire v. G&B McIntosh Family Ltd. P.ship*, 260 S.W.3d 34, 47 (Tex. App.—Houston [1st] 2008) ("The parol evidence rule does not bar extrinsic proof of mutual mistake.").

65.     The Debtor's recitation of the law on mutual mistake does not materially differ. But the Debtor's argument misconceives what the Debtor's own evidence actually means under the law.   The common mistake was that the Transfers constituted a loan rather than compensation—if Mr. Waterhouse ever understood the Transfers to be loans and if he executed the Notes then, as an officer of both the Debtor and HCMFA, his mistake would be "mutual" to both of his principals.  The fact that both the Debtor and HCMFA listed the Notes on their financial statements shows that the mistake was mutual.  Debtor Appx. 00782, 00840.  The fact that the same individuals—employees of the Debtor—handled both the Debtor's and HCMFA's accounting shows that the mistake was mutual.  HCMFA Appx. 5; Debtor Appx. 03025 (42:17-21, 43:8-23).   The fact that Debtor employees prepared a memo to HCMFA's board which included the Notes show that the mistake was mutual.  It also explains why no one noticed the mistake sooner.  Mr. Waterhouse even testified that he did not always read audited financials—he relied on his accounting team for that.  Debtor Appx. 02071 (86:3-89:19).  He also testified that he was not always comfortable with the control environment.  Debtor Appx. 02077 (112:22-113:14).

66.     The natural consequence of these facts is that lower-level Debtor employees repeated the mistake in financial documents and disclosures more than once.  The repetition itself does not necessarily indicate the Transfers were loans.  And there is plenty of evidence they were not.  The Debtor initially lacked sufficient funds to make the Transfers.  HCMFA Appx. 3.  Mr. Dondero therefore personally advanced funds to the Debtor.  HCMFA Appx. 3.  As both the Debtor's and HCMFA's President, he intended the Transfers as compensation, not loans.  HCMFA

Appx. 5.  As a matter of fact, the amounts of the two Transfers substantially mirrored the amounts

of the prior two transfers HCMFA made to the Fund on account of the NAV error.  *See* HCMFA

Appx. 3.  Finally, Mr. Waterhouse himself—an officer of both parties—admitted the Note is a

mistake in light of the fact that his signature makes him personally liable, discussed above.  Debtor

Appx. 02126 (306:19-307:4).

67.    The fact that HCMFA received insurance proceeds does not change the analysis.

In Texas, the "collateral source" rule is an exception to the general principle that a plaintiff is

limited to single recovery for a particular injury.  "Long a part of the common law of Texas and

other jurisdictions, the rule precludes any reduction in a tortfeasor's liability because of benefits

received by the plaintiff from someone else — a  collateral source.  Thus, for example, insurance

payments to or for a plaintiff are not credited to damages awarded against the

defendant."  *Haygood v. De Escabedo*, 356 S.W.3d 390, 394–95 (Tex. 2011).  There is a genuine

issue of material fact as to whether the Notes resulted from a mutual mistake, so the Court should

deny the Motion.

68.    The Court need not, and should not, address the issue of whether the Debtor was

liable to HCMFA for the NAV Error.  It doesn't matter.  Both the Debtor and HCMFA, through

their mutual agent and control person, Mr. Dondero, believed this to be the case.  That is all that

matters.  The Debtor did not plead avoidance of that arrangement.  Nor does the potential that

HCMFA carried the Notes on its books and records lead to the conclusion that the Notes are

valid—at best, this is evidence loosely supporting the Debtor's arguments, but then, if anything, it

only demonstrates a genuine issue of disputed, material fact.  The Court need only consider Mr.

Waterhouse's statements, prior to the litigation, that there was one note from HCMFA to the

Debtor, which cannot be collected through May, 2021, to demonstrate confusion on behalf of

HCMFA, at a minimum, or a lack of awareness of the Notes at all.

**C.   THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE DEBTOR GAVE CONSIDERATION IN EXCHANGE FOR THE NOTES**

69.     "'Consideration consists of either a benefit to the promisor or a detriment to the promisee.'"  *Garza v. Villarreal*, 345 S.W.3d at 483 (quoting *Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 41 (Tex. App.—Dallas 2003)).  "A contract lacking in consideration is unenforceable."  *Garza v. Villarreal*, 345 S.W.3d at 483.  "Under common law, as long as something of real and legally cognizable value is given in exchange for a promise to pay under a promissory note, the note is supported by adequate consideration."  *Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 614 (Tex. App—Houston [1st] 2004).  But here, the Debtor did not give *anything* in exchange for the Notes.  The Transfers were compensation for the NAV Error, not loans, and the Debtor has not identified any other consideration.  Accordingly, there is a genuine issue of material fact as to whether the Notes are unenforceable for lack of consideration.

**D.   TURNOVER IS NOT AN APPROPRIATE REMEDY UNDER THESE CIRCUMSTANCES**

70.     The Debtor's cause of action for turnover under section 542 is improper.  This Court has "held that actions to collect prepetition accounts receivable which are based on state law contract principles do not constitute turnover actions under § 157(b)(2)(E) without a final judgment from a court of competent jurisdiction or another binding determination of liability."  *In re Fang Operators*, 158 B.R. 643, 645 (Bankr. N.D. Tex. 1993) (referring to *Satelco, Inc. v. North Amer. Publishers, Inc. (In re Satelco, Inc.)*, 58 B.R. 781 (Bankr. N.D. Tex. 1986)).  The Debtor has asserted a breach of contract claim attempting to collect a disputed debt under state law.  Accordingly, section 542 does not apply.

**V.     CONCLUSION**

71.     The Debtor's conduct caused HCMFA to suffer approximately $7.4 million in damages.  Shortly thereafter, the Debtor paid HCMFA $7.4 million.  But then the Debtor's

employees made a simple mistake.  Based on historical practice, they booked the payments as loans instead of compensation.  One of them even purported to issue promissory notes, which the Debtor now seeks to collect if the face of overwhelmingly contradictory evidence.  The same Debtor employee even affixed a corporate officer's signature without his permission, when he himself admits he lacked authority to incur $7.4 million in debt.  Naturally, she and others then repeated the mistake again and again in financial disclosures.  But it was a mistake nonetheless.  Each of the foregoing is supported by credible and admissible summary judgment evidence.

72.    For these reasons, there are genuine issues of material fact that preclude summary judgment on (a) whether HCMFA signed the notes and whether Mr. Waterhouse was authorized to sign them if he in fact did; (b) whether the notes were the result of a mutual mistake; and (c) whether the notes lacked consideration.  All of these are issues for the jury.  Furthermore, the turnover statute is inapplicable as a matter of law.  The Court should therefore deny the Motion.

RESPECTFULLY SUBMITTED this 19th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  Davor Rukavina
———————————————————
    Davor Rukavina, Esq.
    State Bar No. 24030781
    Julian P. Vasek, Esq.
    State Bar No. 24070790
    500 N. Akard St., Ste. 3800
    Dallas, TX 75201
    Tel: 214-855-7500
    Fax: 214-855-7584
    E-mail: drukavina@munsch.com
    E-mail: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND
CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 19, 2022, a true and correct copy of this document, along with all exhibits, if any, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/  Davor Rukavina
Davor Rukavina

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S APPENDIX IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Davor Rukavina, Esq.
State Bar No. 24030781
Julian P. Vasek, Esq.
State Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard St., Ste. 3800
Dallas, TX 75201
Tel: 214-855-7500
Fax: 214-855-7584

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Highland Capital Management Fund Advisors, L.P. ("HCMFA"), defendant in the above-captioned adversary proceeding, and files this its appendix in opposition to *Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (Dkt. No. 91), filed by plaintiff Highland Capital Management, L.P., in support of which HCMFA would respectfully show the Court as follows:

## CONTENTS

| Description | Pages |
|---|---|
| Declaration of James Dondero | 1 – 6 |
| April 7, 2019 Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error in the Fund | 7 – 17 |
| Second Amended and Restated Shared Services Agreement | 18 – 30 |
| Declaration of Julian Vasek | 31 |
| Complaint for (I) Breach of Contract and (II) Turnover of Property of Highland's Estate (Adv. No. 21-03082-sgj) with Exhibits | 32 – 64 |

RESPECTFULLY SUBMITTED this 19th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  Davor Rukavina
    Davor Rukavina, Esq.
    State Bar No. 24030781
    Julian P. Vasek, Esq.
    State Bar No. 24070790
    500 N. Akard St., Ste. 3800
    Dallas, TX 75201
    Tel: 214-855-7500
    Fax: 214-855-7584
    E-mail: drukavina@munsch.com
    E-mail: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND
CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 19, 2022, a true and correct copy of this document, along with all exhibits, if any, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/  Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF JAMES DONDERO

I, James Dondero, do hereby declare as follows:

1.    My name is James Dondero.  I am over the age of eighteen years and am otherwise competent to make this declaration.  I am making this declaration on behalf of defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") in connection with the motion for summary judgment filed in the above-captioned adversary proceeding (the "Adversary") by plaintiff Highland Capital Management, L.P. (the "Debtor").

2.    In April and May, 2019, I was: (a) the sole director of Strand Advisors XVI, Inc., which is the general partner of HCMFA; and (b) the President of HCMFA.  At that time, Frank Waterhouse ("Waterhouse") was the Treasurer of Strand Advisors XVI, Inc.  As the President of HCMFA and the sole director of its general partner, I am not aware of any corporate governance documents authorizing Waterhouse to incur millions of dollars of debt on behalf of HCMFA.  My

understanding of HCMFA's corporate governance, and certainly the practice at the time, was that I was the sole person who had the authority to authorize HCMFA to incur such obligations.

3.     The Adversary revolves around two promissory notes (the "Notes") allegedly signed by Waterhouse.  At all relevant times, Waterhouse was both the Treasurer of HCMFA's general partner and the Chief Financial Officer of the Debtor.  In both capacities he reported directly to me.  Indeed, all of the individuals whose conduct led to this dispute were employees of the Debtor, not HCMFA.  As pointed out above, I have no reason to believe that Waterhouse or any such other individual had the authority to cause HCMFA to issue or execute the Notes without my approval.  For the reasons set forth herein, the Notes do not constitute legitimate obligations of HCMFA.

4.     HCMFA is a registered advisor that advises third-party funds as to their investments.  At all relevant times, including from 2018 to present, HCMFA served as advisor to Highland Global Allocation Fund (the "Fund").  At issue are two transactions involving equity interests in TerreStar Corporation ("TerreStar") that took place in March 2018 (the "March Transactions").  In particular, an error occurred concerning the net asset value ("NAV") that was assigned to the TerreStar interests in connection with the March Transactions (the "NAV Error").

5.     The NAV Error is described in more detail in that certain April 7, 2019 *Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error in the Fund* (the "NAV Memo"), a true and correct copy of which is attached hereto at HCMFA Appx. 7 – 17. The NAV Memo was made at or near the time by—or from information transmitted by— someone with knowledge; the NAV Memo was kept in the course of HCMFA's regularly conducted business activity; and making the NAV Memo and documents like it was a regular practice of that business activity.

6. During this time period, however, HCMFA did not perform its own valuation services. Instead, the Debtor performed such services on HCMFA's behalf pursuant to that certain *Second Amended and Restated Shared Services Agreement* (the "SSA"), a true and correct copy of which is attached hereto at HCMFA Appx. 18 – 30. Indeed, all of the "Adviser Representatives" listed in the NAV Memo—Thomas Surgent, Frank Waterhouse, Jason Post, and Lauren Thedford—were employees of the Debtor, not HCMFA. As I testified during my deposition on November 4, 2021, the Fund's board of directors was well aware of the relationship between the Debtor and HCMFA, was well aware that all valuation staff were housed at the Debtor, and was well aware that all valuation activities were performed by the Debtor. The Fund and HCMFA relied on the Debtor, and the NAV Error, including the Debtor's involvement and responsibility, was a material part of board conversations for over a year.

7. As described in more detail in the May 28, 2019 *Memo regarding Resolution of the Fund's Net Asset Value Error*, a copy of which is included in the Debtor's summary judgment appendix at pages 02979-02980,[1] the Fund was ultimately made whole through a $5,186,496 payment from HCMFA on February 15, 2019 and a $2,398,842 payment from HCMFA on May 2, 2019. I was fully aware of these issues at the time. I believed and understood that the Debtor was liable to HCMFA for causing or failing to prevent the NAV Error.

8. Accordingly, on May 2, 2019, I directed the Debtor to transfer $2.4 million to HCMFA, and on May 3, 2019, I directed the Debtor to transfer $5 million to HCMFA. Shortly beforehand, I personally transferred funds to the Debtor to enable it to make these payments, as the Debtor lacked sufficient funds to compensate HCMFA. My transfer of funds to the Debtor

---

[1] For the avoidance of doubt, both this memo and the other NAV Memo were prepared by employees of the Debtor acting under the SSA. HCMFA did not have its own legal and compliance officers at the time. HCMFA only employed portfolio managers and analysts as employees. All other staff functions were at the Debtor.

repaid a loan the Debtor had made to me. That repayment provided the Debtor with the liquidity for it to compensate HCMFA for the damages the Debtor caused and HCMFA paid in connection with the NAV Error. I did not intend for the Debtor to use the funds to make a loan to HCMFA. I believed it was appropriate for the Debtor to compensate HCMFA because the Debtor's employees caused or failed to prevent the NAV Error and because of the Debtor's duties under the SSA. As I testified during my deposition on November 4, 2021, transferring these funds from the Debtor to HCMFA to settle the fallout from the NAV Error was "a critical piece of putting the issue to bed."

9.    Thus, I instructed Waterhouse to transfer the foregoing funds from the Debtor to HCMFA. I never instructed or suggested to Waterhouse that these transfers represented loans from the Debtor to HCMFA or that these transfers be drawn up as loans. Waterhouse never asked me whether these transfers were loans or should be drawn up as such. To the extent that Waterhouse understood this to be the case, I never said anything to cause him to reach such an understanding. Nor, after that discussion with Waterhouse where I instructed him to make the transfers, did either he or anyone else at the Debtor or HCMFA follow up with me to ask whether the transfers were a loan or should be papered up as such, and no one either at HCMFA or the Debtor presented me with promissory notes to sign or otherwise presented me with any document for me to approve the Notes. The internal policies and procedures at the Debtor and HCMFA, as well as ordinary practice, required that loans in amounts such as $5 million and $2.4 million would go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA, and ultimately through me for my approval, neither of which happened to my understanding, knowledge, and/or recollection.

10.    Rather, unbeknownst to me at the time and until after litigation over the Notes started, HCMFA's accounting staff—who were also employees of the Debtor acting under the SSA—erroneously booked the $2.4 million and $5 million transfers from the Debtor to HCMFA as loans and erroneously papered promissory notes to reflect their incorrect understanding of the transfers. Likewise, it appears these same individuals erroneously caused the Debtor and HCMFA to reflect these transfers as loans on various financial statements and disclosures. But I was not aware of these errors until this litigation commenced. Prior to the Debtor's demand to pay these Notes until shortly before this litigation commenced, no one at the Debtor or HCMFA informed me of the Notes. To the extent that I saw any books and records or other financial documents of the Debtor or HCMFA prior to that, I would not have noticed the Notes so as to raise an issue. This is because, prior to the Notes in question, HCMFA issued two other promissory notes to the Debtor, in similar amounts, the dates of collection on which were extended through May 2021. Thus, if I saw any such records or documents, I would have naturally assumed that any reference of promissory notes from the Debtor to HCMFA was referring to these prior two notes and not the Notes in question.

11.    To be clear, my intent, both as the person who controlled HCMFA and the person who controlled the Debtor, was for these transfers ($5 million and $2.4 million) to constitute compensation from the Debtor to HCMFA, not loans. Indeed, as Waterhouse informed me in early May 2019, the Debtor did not have the funds to make these transfers. Thus, I personally paid most if not all of the $7.4 million into the Debtor at about that time to enable the Debtor to make the transfers to HCMFA, again under the belief and understanding that the Debtor would use these funds to compensate HCMFA for the NAV Error and not as a loan to HCMFA.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2022.

_____

James Dondero



**DATE:**    April 7, 2019

**TO:**      Securities and Exchange Commission (the "SEC")

**FROM:**    Highland Capital Management Fund Advisors, L.P. (the "Adviser")

**RE:**      Amended Memorandum regarding the Treatment of the TerreStar Corporation ("TerreStar") Equity
             NAV Error in the Fund

This memorandum is intended to provide supplemental information regarding the NAV Error in the Highland Global Allocation Fund ("GAF" or the "Fund") and reflect the discussions on the March 8, 2019 call. Attendees of the call included:

(i) SEC Staff: David Bartels, Paul Cellupica, Alison Staloch, Vince DiStefano, Dan Rooney, Christian Sandoe, Kathryn Feld and Linda Hoffman;

(ii) Adviser Representatives: Thomas Surgent, Frank Waterhouse, Jason Post and Lauren Thedford;

(iii) Independent Trustee Counsel: Stacy Louizos of Drinker Biddle & Reath LLP; and

(iv) Fund and Adviser Counsel: George Zornada and Jon-Luc Dupuy of KL Gates LLP.

In connection with the Fund's conversion from an open-end fund to a closed-end fund (the "Conversion") on February 13, 2019, the Office of the Chief Accountant ("OCA") of the SEC reviewed the Adviser's fair valuation of TerreStar equity, in particular the application of Financial Accounting Standards Board Accounting Standards Update 2011-4, Topic 820, Fair Value Measurement ("ASC 820") to two transactions in TerreStar equity that occurred in March 2018 (the "March Transactions"). The OCA provided its feedback during an exit call on February 8, 2019 and subsequently confirmed no comments to the Adviser's confirmation of understanding letter on February 14, 2019.

The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value. As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly." The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value. The "orderly" determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "NAV Error").

After incorporation of the updated valuation into the Fund's NAV, the gross NAV Error, excluding interest, the advisory fee rebate, and processing costs, amounted to approximately $6.1 million of loss to the Fund and approximately $1.4 million of losses to Shareholders over the period between March 18, 2018 and January 19, 2019 (the "NAV Restatement Period").

**Calculation of the NAV Error**

a. For each day during the NAV Restatement Period, the Adviser analyzed the impact on the Fund's NAV resulting from the revised mark relative to the original mark for TerreStar Equity. This amount includes:

(i) "Loss to Fund", which represents the sum of the overpayment of net redemptions (and resulting remaining shareholder dilution) caused by the NAV overstatement for each day in the period where the difference in marks resulted in a NAV error in accordance with the NAV Error

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

**HCMFA Appx. 7**

DEFENDANTS-0000084

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

Correction Procedures. This number is an estimate based on net investor activity for all shareholders for each period, as provided to the Adviser by the Fund's transfer agent, DST Asset Manager Solutions, Inc. (the "Transfer Agent").  This amount is an estimate based on all investor activity for each period, as provided by the Transfer Agent.  Final numbers will be determined once an investor-by-investor analysis is performed for the entire NAV restatement period by the Adviser and the Transfer Agent.

(ii)  "Loss to Shareholders", which occurred where either (i) the revised mark was higher than the original mark for the period and shareholders who redeemed during the period were underpaid (these shareholders will be made whole as part of the shareholder reprocessing exercise); or (ii) the revised mark was lower than the original mark for the period and shareholders who subscribed or reinvested shares of the Fund overpaid (these shareholders will be made whole as part of the shareholder reprocessing exercise).

(iii) "Estimated Gross Up for Additional Omnibus Accounts", which is intended to estimate the potential impact for the reprocessing of individual capital activity that is currently netted within the Omnibus accounts. The investor level detail within the Omnibus accounts is aggregated into one net investor in the detail available from the Transfer Agent. The current analysis is only looking through to the NFS Omnibus account, but there may be additional omnibus accounts that require this look-through treatment, which will be determined after an analysis of the various omnibus agreements.

(iv) "Processing fees", which refer to the rough amount the Adviser expects to have to pay the Transfer Agent to reprocess shareholder transactions as described above.

(v)  "Management fee rebate", which is the excess advisory fee calculated on the higher TerreStar valuation reflected in the NAV.

(vi)  "Interest", which is calculated on the daily cumulative Fund receivable at a rate of Fed Funds + 45 bps using the "Actual/360" methodology.

| Components of NAV Error | |
|---|---|
| Total NAV error | 7,442,124 |
| Interest on NAV error | 84,000 |
| Processing Fees | 244,000[1] |
| Management Fee Rebate | 47,000 |
| **Total due to Fund** | **7,817,124** |

**Treatment of the NAV Error and Resolution of Loss**

The GAF NAV Error represents a unique set of circumstances where, during the NAV Restatement period there are days in which there is (1) an original fair value mark, an (2) Updated Valuation (defined below), and (3) the price at which TerreStar was sold in a negotiated arm's length transaction to an unaffiliated third party.  The latter price is greater than both the original fair value mark and the Updated Valuation, and results in a Gain above

---

[1] Updated April 1, 2019 using the most recent reprocessing fee estimate available from the Transfer Agent's special events team.

HCMFA Appx. 8

Confidential

DEFENDANTS-0000085

Fair Value (defined below) which the Adviser believes should also be considered with respect to any equitable resolution of the error correction. On December 7, 2018, the Fund sold $23 million of TerreStar equity at $350 per share (above its restated December 2018 fair value mark of $274.38, as calculated under the methodology set forth in the consultation, and above the Adviser's original fair value mark of $333.12 prior to the OCA consultation). As addressed below in detail, when applying the fair valuation approach expressed to the SEC Staff during the OCA consult process (the "Updated Valuation") and determining the appropriate resolution under the NAV Error Correction Procedures (as addressed below), the Adviser believes it is equitable and appropriate also to consider a *portion* of the total gain realized on the December 7, 2018 sale in excess of the restated fair value, which total gain was approximately $4,959,992 (the "Gain above Fair Value").

The NAV Error amount of $7.8 million (including interest, rebate of Advisory fees, and processing costs) ignores the actual realized gain represented by the Gain above Fair Value. As a result of the Updated Valuation, the Loss to Fund was caused by "paper" dilution to remaining investors from a lowered NAV per share and real losses resulting from redemptions made at a NAV higher than the Updated Valuation. A significant part of the losses from the redemptions were in a practical sense compensated for by the Gain above Fair Value because the Fund's net assets increased due to the actual cash realized in the December 7, 2018 sale at a price higher than the Updated Value; while not reflected as an offset of the NAV Error in accounting, such sale benefitted remaining investors. The fair value of the remaining TerreStar equity (reflected in the Updated Value), however, was not increased to reflect the full, realized sale price or taken into account when calculating the $7.8 million of loss. Although subject to continuing assessment of valuation inputs, in the absence of negative inputs, applying the valuation methodology set forth in the OCA consult may result in the fair value of remaining TerreStar equity, over time, increasing to a price per share closer or equal to the realized sale price to any extent the weighting of the March Transactions decreases with age. Any such resulting gains would counter the "paper" losses incurred by remaining investors who continue to hold their interest in the Fund.

The NAV Error will be covered by: (i) GAF's pro rata portion of the Adviser's and the Fund's joint insurance policy and $250,000 deductible (paid by the Adviser); (ii) an additional payment and rebate of advisory fees by the Adviser; and (iii) recognizing the effect of the Gain above Fair Value (an approximately $2.3 million portion) in the correction. This later aspect is unique to GAF and arises from a sale of TerreStar equity above fair value after the shareholder approval of the conversion, and results in a write down of the remaining balance of the receivable due to the Fund. A numerical summary is as follows:

| | Loss to Fund | Loss to Shareholders | Totals |
|---|---|---|---|
| Net Loss | (6,068,851) | (1,373,272) | (7,442,124) |
| Processing, Fees, Interest | (375,000)[1] | - | (231,000) |
| Insurance Proceeds | 3,566,248 | 1,373,272 | 4,939,520 |
| Insurance Deductible paid by Adviser | 246,976 | - | 246,976 |
| Additional Payment from Adviser | 375,000[1] | - | 231,000 |
| Gain above Fair Value | 2,255,628 | - | 2,255,628 |
| Total* | - | - | - |

*The Total row should net to zero and serves solely as a check figure.
[1] As noted on page 2, processing costs were updated on April 1, 2019 based on the most recent reprocessing fee estimate available from the Transfer Agent's special events team.

Taking into account all relevant data surrounding the TerreStar investment (including the Gain above Fair Value) when applying the NAV Error Correction Procedures is particularly important in light of (i) the robust

3

HCMFA Appx. 9

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

disclosure included in the Fund's definitive proxy statement, which made very clear the risks associated with the ongoing valuation of the TerreStar investment; and (ii) shareholder's overwhelming vote in favor of the Conversion (95% of shareholders present at the shareholder meeting voted in favor of the Conversion proposals). This shareholder affirmation suggests that shareholders chose to continue to seek exposure to the TerreStar investment. The Adviser also believes that these shareholders have invested in the Fund (as well as other funds advised by the Adviser) for these unique and opportunistic investment opportunities that provide investors with access to institutional quality strategies in a 1940 Act offering.

The following granular points were considered with respect to the realized Gain above Fair Value in the application of the NAV Error Correction Procedures:

- On December 7, 2018, and prior to incorporation of the Updated Valuation, TerreStar was marked at $333.12 per share.

- When applying the Updated Valuation to GAF over its NAV Restatement Period, TerreStar's fair value marks were restated to $274.38 per share on December 7, 2018 (different values were determined for various other dates throughout the period).

- This restated value was intended to represent fair value more accurately than the previous TerreStar fair value marks, as set forth in the OCA consultation.

- The delta between $333.12 and $274.38 per share initially resulted in a NAV Error; however, *on the same day* GAF also executed a negotiated arm's length sale of 65,591 shares of TerreStar equity at a price of $350 per share for a total of $23 million.

- If the restated fair value price per share of $274.38 is representative of TerreStar's fair value on December 7, 2018, then a determination of the total impact to shareholders within the parameters of the Fund's NAV Error Correction Procedures (as discussed below) should consider cumulatively the delta between (i) the original mark of $333.12 per share and the revised mark of $274.38 share (red in the chart below) (the "Basis of the NAV Error") *and* (ii) the December 7, 2018 sale price of $350 per share and the revised mark of $274.38, or approximately $4.96 million (green in the chart below) (the Gain above Fair Value).

- While the Basis of the NAV Error (as reflected above under "Calculation of NAV Error") represents both a paper (unrealized) loss on the records of the Fund, the redemptions processed at the higher NAV values were actual (realized) losses to the Fund that were paid out in cash to shareholders; moreover the Gain above Fair Value reflects actual (realized) gains related to the same asset (TerreStar equity).

4

HCMFA Appx. 10

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

**December 7, 2018**



- As addressed below in further detail, consideration in the resolution of the NAV Error of approximately $2.3 million of the Gain above Fair Value against the Basis of the NAV Error represents the equitable application and inclusion of all relevant data of the TerreStar price in the resolution of Loss to Fund from dilution of remaining investors. As described in above, certain material components of the NAV error were estimated and can be finalized only after an investor-by-investor analysis is performed for the entire NAV restatement period by the Adviser and the Fund's transfer agent. As such, the $2.3 million of the Gain above Fair Value that is proposed to be considered in the resolution of the loss (the "Remaining Liability") against the Basis of the NAV error could change materially, but would be limited to the total Gain above Fair Value of $4.96 million.

- Note, the benefit derived from the Gain above Fair Value compared to the amount of the total Loss to the Fund not covered by insurance inured to the benefit of all GAF shareholders on December 7, 2018 and not a subset of shareholders.

- Any shareholders subscribing into GAF subsequent to December 7, 2018 did not benefit from the Gain above Fair Value, but the approximate $17,000 of subscription proceeds paid in excess of the restated NAV will be made whole from insurance proceeds and the related deductible.

- As noted below under "Applicable Governance Standards in the Error Correction," the Adviser believes that the Gain above Fair Value should be equitably recognized in fairness under the NAV Error Correction Procedures. The analysis takes into account the "paper" dilution referenced above in resolution of the loss because the Fund's net assets increased due to *actual cash* realized in the December 7, 2018 sale at a price *higher* than the Updated Value. This sale benefitted remaining investors, however the fair value of the remaining TerreStar equity (reflected in the Updated Value) was not increased to reflect the full realized sale price.

- The factual circumstances surrounding the valuation of TerreStar equity, including:

  o The use of Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, to assist in the fair valuation;

5

HCMFA Appx. 11

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

o   The initial conclusion that the sales of TerreStar in March 2018 (the "March Transactions") were "non-orderly", and the ultimate conclusion of the Adviser, after conclusion of a formal audit of affiliated funds holding TerreStar, that the March Transactions should be classified as "orderly"; and

o   The consultation with the OCA.[2]

**Applicable Governance Standards in the Error Correction**

In order to determine the appropriate handling of the NAV Error, the applicable provisions of the Adviser's NAV Error Correction Procedures, in the context of provisions of the Advisory Agreement, must be considered. Based on the facts and circumstances present, the Adviser believes that the Remaining Liability may be discharged notwithstanding that such discharge decreases current NAV, provided that such discharge is considered to be equitable under application of the NAV Error Correction Procedures in light of all of the circumstances.

The Adviser's NAV Error Correction Procedures

The Fund's NAV Error Correction Procedures are internal procedures of general application and are neither disclosed nor provided to shareholders and therefore are not relied on by investors in connection with their investment in the Fund. While these procedures generally contemplate a determination of a "responsible party" for a NAV error, such a determination is with respect to which party will bear the loss rather than a determination of strict liability, and the procedures expressly contemplate that scenarios may arise where the Adviser, subject to approval of the Board of the Fund, may reach a variety of correction determinations.

The Adviser's process in taking into account the Gain above Fair Value when assessing the NAV Error is consistent with the Fund's NAV Error Correction Procedures in that:

To any extent circumstances are not expressly covered in the procedures (as is the case here), Item 9 of Section II, "Correction Procedures," states the following (emphasis added):

"9. The foregoing Procedures are designed for general application. However, *there may be situations where equity would suggest a different result under the circumstances.* Accordingly, the Adviser may, with the approval of the Board, diverge from these Procedures, as they deem appropriate, on a case by case basis.

Further and in support of such considerations here, according to Item 4 of Section I, "Definitions," in relevant part, "Fund Loss" includes a situation where a Fund "has paid excessive redemption proceeds as a result of an overstatement of net asset value." Although the definition of Fund Loss is silent on the unique circumstances present here, Item 2 of Section I provides context for analyzing the total harm in its definition of a NAV error:

"one or more errors in the computation of [NAV] that, *when considered cumulatively*, result in a difference between the originally computed NAV and the corrected NAV of at least $0.01 per share. If there are one or more errors in the computation of NAV that, *when considered cumulatively*,

---

[2] As a policy matter, a determination under these circumstances to ignore the Gain above Fair Value would result in an outcome where the Adviser's sale of an asset at a price above fair value results in an increase in Adviser liability due to the sale price not being fully reflected in the fair value of the asset afterwards (i.e., such an outcome would set precedent in effect for the penalization of the Adviser's sale of an asset at a material gain by actually increasing the Adviser's liability). The Adviser believes that its overarching duty of best execution would unfairly then operate to harm the Adviser and create a new potentially disclosable conflict of interest arising from seeking a higher sale price if it would result in increased Adviser liability.

6

HCMFA Appx. 12

Confidential                                                                      DEFENDANTS-0000089

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

result in a difference between the originally computed NAV and the corrected NAV of less than $0.01 per share, the impact is deemed to be immaterial and no corrective adjustment will be made to the Fund or any shareholder account. This computation is based upon the *actual difference* and is not based upon the rounding of NAV to the nearest cent per share." (emphasis added)

To the extent circumstances are not expressly covered, Item 9 as discussed above should govern.

Although the definition of Fund Loss is not a bright line rule in this circumstance, it follows that these two provisions should be taken together and the Adviser should expand the scope of the NAV Error analysis to include all factors when determining the equitable resolution for all parties. This results in the consideration of the Gain above Fair Value to the NAV Error, as discussed below when taking into account the NAV Error Correction Procedures, the Advisory Agreement as discussed below, and overall recompense of shareholders.

As the NAV Error Correction Procedures are designed for general application, the procedures do not, and were not intended to, contemplate or address every possible circumstance or scenario. Given the unique circumstances that produced the Gain above Fair Value (i.e. a period during which there is (1) an original fair value mark, an (2) Updated Valuation (defined below), and (3) the mark at which TerreStar was sold in a negotiated arm's length transaction to an unaffiliated third party), this particular scenario is not explicitly addressed in the general NAV Error Correction Procedures (set forth in Exhibit 1 of the attached NAV Error Correction Procedures).

The language preceding Item 9 in the NAV Error Correction Procedures is expressly designed to address shareholders of the Fund. Item 9, however, includes language that explicitly allows for a "divergence" from those procedures in, presumably, extraordinary circumstances where it is warranted. The Adviser believes the intent of Item 9 was to provide the flexibility needed to consider the unique circumstances described above where all factors should be considered when assessing the total impact to shareholders and the Fund so that an equitable outcome to *all* parties involved can be achieved. Based on this line of reasoning and because the Gain above Fair Value also occurred during the NAV Restatement Period, the Adviser views the Gain above Fair Value as equitable partial compensation for the Fund's losses resulting from the NAV Error. In addition, as discussed below, the Adviser believes this outcome is consistent not only with the equitable application of the NAV Error Correction Procedures but with the standards governing adviser conduct in the Advisory Agreement and general principles of fairness to investors and the Adviser, as well as the Adviser's fiduciary duty of best execution in seeking to and ultimately selling TerreStar at the highest price possible. This approach has been discussed with the Board (see below).

Applicable Advisory Agreement Provisions

To provide additional context for the Adviser's view on the appropriate treatment of the NAV Error, the Adviser believes that it also is appropriate to examine the relationship between the Fund and Adviser under contractual obligations and representations to investors. The standards of the contractual relationship are disclosed to shareholders in the Fund's offering documents and relied upon by shareholders when investing in the Fund. Under the investment advisory agreement between the Fund and the Adviser (the "Advisory Agreement"), the Adviser does not act as a guarantor against all loss arising from error or mistake, but rather is responsible for error or loss arising only from the Adviser's Disabling Conduct, as defined in the Advisory Agreement.

Section 8 of the Advisory Agreement states that "the Adviser shall not be liable for any error of judgment or mistake of law or any loss suffered by the Fund in connection with matters to which the Agreement relates," provided that nothing in the Agreement shall protect the Adviser against liability to the Fund or shareholders to which the Adviser may be subject by reason of Disabling Conduct. Section 6(a) of the Advisory Agreement defines "Disabling Conduct") as (i) willful misfeasance, (ii) bad faith, (iii) gross negligence or (iv) reckless disregard of the duties involved in the conduct of his position".

7

HCMFA Appx. 13

The Advisory Agreement also comports with Section 17(i) of the Investment Company Act of 1940, as amended (the "1940 Act"), which states that no contract or agreement can protect an investment adviser against any liability to a fund or shareholders "by reason of willful misconduct, bad faith, or gross negligence, in the performance of his duties, or by reason of reckless disregard of his obligations and duties under such contract or agreement." The Advisory Agreement's standards of liability and indemnification provisions also are consistent with common industry practice for adviser indemnity and liability provisions in advisory agreements of registered funds.

The Advisory Agreement is an exhibit to the Fund's registration statement, and the Fund's Statement of Additional information includes a description of the terms of the Advisory Agreement, including in relevant part:

> "The Investment Advisory Agreements provide that in the absence of willful misfeasance, bad faith or gross negligence in the performance (or reckless disregard) of its obligations or duties thereunder on the part of HCMFA, HCMFA shall not be subject to liability to a Fund for any error of judgment or mistake of law or for any loss suffered by the Fund in connection with the matters to which the Investment Advisory Agreement relates."

**Analysis of the Facts**

Under the NAV Error Correction Procedures (Part II, Section 9), the Adviser, with the approval of the Board, may diverge from such general procedures as they deem appropriate where equity would suggest a different result under the circumstances. As a result of and based on the facts and circumstances present, which have been addressed above, the Adviser believes that the Remaining Liability owed by the Adviser may be discharged notwithstanding that such discharge decreases current NAV. As set forth above, numerous points were considered with respect to the realized Gain above Fair Value, taking into context facts discussed in the OCA consult, the resulting fair valuation and the circumstances of the Adviser's December sale of TerreStar equity.

As noted, the Adviser under the Advisory Agreement does not act as a guarantor against all loss arising from error or mistake, but rather is responsible for error or loss arising only from the Adviser's Disabling Conduct. The Adviser believes that the record supports that it has acted consistently in good faith in the reasonable belief that its actions were in the best interests of the Fund, and have not acted at any point in a manner amounting to Disabling Conduct.[3] In addition, the Adviser's actions should be viewed within its general fiduciary duty under Section 36(a) of the 1940 Act and Section 206 of the Investment Advisers Act of 1940. In this regard the Adviser strongly asserts that it did not engage in personal misconduct, was not grossly negligent, acted in good faith and intent at all times, and in fact sought and received a price on the TerreStar equity sale at a price that significantly exceeded the assessed fair value, to the significant benefit of informed investors who chose to stay in the Fund through the conversion. In such context, the Adviser believes that, upon Board agreement, it is proper under the NAV Error Correction Procedures to acknowledge the Gain above Fair Value in the manner described.

---

[3] Although as noted in the OCA consult process, the Adviser identified a material weakness in the control environment related to assessments of non-observable inputs for certain affiliated funds and the Fund, such matter does not result in the Adviser having failed to act in good faith or in accordance with its duties to the Fund. As noted above, the Adviser does not manage the Fund as a strictly liable party, but rather is responsible for error or loss arising only from its Disabling Conduct. The Adviser believes that its conduct throughout has never reflected willful misfeasance, bad faith, gross negligence or a reckless disregard of its duties. Indeed, it has consistently sought to value TerreStar appropriately, and indeed has, in the form of actual sales reflected by the Gain above Fair Value, achieved sales of TerreStar above the original fair value as well as the fair value resulting from the OCA consult.

8

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

**Shareholder and Fund Reprocessing**

The NAV Error totals approximately $7.8 million (including interest, rebate of Advisory fees, and processing costs). The NAV Error will be covered by: (i) GAF's pro rata portion of the Adviser's and the Fund's joint insurance policy and $250,000 deductible (paid by the Adviser); (ii) an additional payment and rebate of advisory fees by the Adviser; and (iii) the equitable determinations under the NAV Error Correction Procedures with respect to recognizing the effect of the Gain above Fair Value (an approximately $2.3 million portion) in the correction, which is unique to GAF.

In connection with this analysis, the Adviser has proposed to the Board the following process regarding the GAF NAV Error:

1.    Book a receivable for the NAV Error.

2.    Apply the insurance proceeds pro rata based on losses across the impacted funds.

3.    Adviser to pay the:

- Ratable share of insurance deductible across the impacted funds; and
- Management fee rebate, interest and processing costs across the impacted funds.

4.    Application of the Gain above Fair Value to the remaining GAF NAV Error as fair and equitable under the NAV Error Correction Procedures, and general principles of equity.

Note: items 1-3 have been completed.

**Accounting Treatment**

The Adviser notes the sale of the TerreStar equity in December 2018 is separate from the revised valuations of the asset that gave rise to the NAV Error and resulting receivable.  It is the Adviser's position, however, that the gains from the sale of TerreStar equity simply cannot be ignored in an equitable and comprehensive assessment of total impact to shareholders during a specific accounting period (i.e., the NAV Restatement period).

U.S. generally accepted accounting principles ("GAAP"), however, lacks specific guidance that addresses the proper accounting treatment for striking the daily NAV of a fund where there is (1) an original fair value mark, (2) an Updated Valuation, and (3) a price at which the same asset was sold in a negotiated arm's length transaction to an unaffiliated third party.  As such, whatever resolution is ultimately reached regarding the proposal outlined in this memo will dictate the accounting entries to be made in the books and records of the Fund.

If the Remaining Liability is discharged pursuant to Item 9 from Section II of the NAV Correction Procedures, the Adviser notes there is applicable accounting guidance that should be considered.  ASC 405-20-40 holds that a liability has been extinguished if "the debtor is legally released from being the primary obligor under the liability, either judicially or by the creditor."  In this case, without admission that the Adviser is responsible for the remaining NAV error, the Adviser is the debtor and the Fund is the creditor.  The approval of this proposal would remove the liability for payment of this balance. With the extinguishment of the liability, the receivable would no longer be collectible as of the date of the approval.

HCMFA Appx. 15

Confidential

DEFENDANTS-0000092

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

The following accounting entry would be recorded on the records of the Fund in order to extinguish the remaining Receivable due to the NAV Error:

| | | |
|---|---|---|
| Equity of the Fund | $2,255,628 | |
| Receivable due to Fund | | $2,255,628 |

*To write down the remaining balance of the receivable due to the Fund*

The Adviser views this "write down" as the reduction of a portion of the approximately $5 million of Gain above Fair Value, which has been settled in cash and reflected as an increase in the net assets of the Fund as of the date of the sale. This approach represents an equitable resolution under the NAV Error Correction Procedures and has been discussed with and reviewed by the Fund's counsel, Chief Compliance Officer and Treasurer. Fund counsel believes that the proposed treatment represents an equitable and reasonable resolution under the NAV Error Correction Procedures.

Regarding the appropriate disclosure under GAAP, paragraph 11.67 of the AICPA Guide to the Audit of Investment Companies, "Regulation S-X requires disclosure of more information about transactions with [or related to] affiliates in prospectuses and annual reports to the SEC than is required under GAAP. Various rules of Regulation S-X require the financial statements of an investment company to state separately investments in affiliates, investment income from affiliates, gain or loss on sales of securities of affiliates, and management fees or other service fees payable to controlled entities and other affiliates." Here, the gain on the sale of TerreStar to an unaffiliated third party is a gain on the sale of securities of a portfolio affiliate; as such, the Adviser acknowledges its disclosure obligation in the Fund's 2019 Annual Report.

The proposed treatment of receivable recorded by the Fund would not affect the balances and disclosures in the audited financial statements previously filed for the Fund for the year ended September 30, 2018. If the Remaining Liability is not discharged, a receivable for the same amount will remain on the books and records of the Fund.

**Board Discussions**

The Board agrees in principal with the aforementioned treatment of the NAV error, subject to consultation with and review by the SEC Staff. Although the Adviser has begun shareholder reprocessing with the Fund's transfer agent, the Adviser does not intend to begin issuing payments to shareholders until all SEC Staff comments, if applicable, have been answered.

**Conclusion**

The NAV Error for the Fund totals approximately $7.8 million (including interest, rebate of Advisory fees, and processing costs); the Fund and its shareholders have received $5.2 million and will receive an additional amount of approximately $328,000 from the Adviser (i.e., shareholders who subscribed into the Fund at a price higher than the restated NAV will be made whole). The remaining approximately $2.3 million can appropriately be discharged based on the consideration of all of the circumstances and the equitable authority included in the NAV Error Correction Procedures. This equitable treatment, which includes viewing all data points on an aggregate basis and considering the totality of the circumstances, is permitted under the Fund's NAV Error Correction Procedures and aligns with the Adviser's contractual duties to the Fund.

10

HCMFA Appx. 16

DEFENDANTS-0000093

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

## EXHIBIT A

**NAV Error Correction Procedures**

HCMFA Appx. 17

Confidential                                                                     DEFENDANTS-0000094

## SECOND AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "*Agreement*") is entered into to be effective as of 8th day of February, 2013 (the "*Effective Date*") by and among Highland Capital Management, L.P., a Delaware limited partnership ("*HCMLP*"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("*HCMFA*"), and any affiliate of HCMFA that becomes a party hereto.  Each of the signatories hereto is individually a "*Party*" and collectively the "*Parties*".

### RECITALS

A.     During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

### AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

### ARTICLE I
### DEFINITIONS

"*Actual Cost*" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"*Affiliate*" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person.  The term "*control*" (including, with correlative meanings, the terms "*controlled by*" and "*under common control with*") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocation Percentage*" has the meaning set forth in Section 4.01.

"*Applicable Margin*" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"*Change*" has the meaning set forth in Section 2.02(a).

"*Change Request*" has the meaning set forth in Section 2.02(b).

"*Code*" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

HCMFA Appx. 18

CONFIDENTIAL

D-HCMFA062396

"*Effective Date*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*New Shared Service*" has the meaning set forth in Section 2.03.

"*Party*" or "*Parties*" has the meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Quarterly Report*" has the meaning set forth in Section 5.01.

"*Recipient*" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"*Service Standards*" has the meaning set forth in Section 6.01.

"*Shared Assets*" shall have the meaning set forth in Section 3.02.

"*Shared Services*" shall have the meaning set forth in Section 2.01.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"*Term*" has the meaning set forth in Section 7.01.

HCMFA Appx. 19

CONFIDENTIAL

D-HCMFA062397

ARTICLE II
SHARED SERVICES

Section 2.01    <u>Services</u>.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "***Shared Services***"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    <u>Changes to the Shared Services</u>.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "***Change***").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "***Change Request***") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    <u>New Shared Services</u>.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "***New Shared Service***").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "***Shared Service***" for all purposes of this Agreement.

Section 2.04    <u>Subcontractors</u>.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

HCMFA Appx. 20

CONFIDENTIAL

D-HCMFA062398

## ARTICLE III
## SHARED ASSETS

Section 3.01    <u>Shared IP Rights</u>.  Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "**Shared IP Rights**") pursuant to third party intellectual property Agreements ("**Third Party IP Agreements**"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    <u>Other Shared Assets</u>.  Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "**Future Shared Assets**" and collectively with the Shared IP Rights, the "**Shared Assets**").

## ARTICLE IV
## COST ALLOCATION

Section 4.01    <u>Actual Cost Allocation Formula</u>.  The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "**Allocation Percentage**" means:

(a)    To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02    <u>Non-Cash Cost Allocation</u>.  The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

## ARTICLE V
## PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    <u>Quarterly Statements</u>.  Within thirty (30) days following the end of each calendar qaurter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

HCMFA Appx. 21

CONFIDENTIAL                                    D-HCMFA062420

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "***Quarterly Report***").

Section 5.02    <u>Settlement Payments</u>.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    <u>Determination and Payment of Cost and Revenue Share</u>.

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04    <u>Taxes</u>.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to

CONFIDENTIAL

HCMFA Appx. 22

D-HCMFA062400

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(c)    The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

ARTICLE VI
SERVICE PROVIDER RESPONSIBILITIES

Section 6.01    Service Provider General Obligations.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "*Service Standards*").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 6.02    Books and Records; Access to Information.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 6.03    Return of Property and Equipment.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

ARTICLE VII
TERM AND TERMINATION

Section 7.01    Term.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "*Term*"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

6

HCMFA Appx. 23

CONFIDENTIAL                                                                                        D-HCMFA062401

Section 7.02    <u>Termination</u>.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

ARTICLE VIII<br>LIMITED WARRANTY

Section 8.01    <u>Limited Warranty</u>.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

ARTICLE IX<br>MISCELLANEOUS

Section 9.01    <u>No Partnership or Joint Venture; Independent Contractor</u>.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    <u>Amendments; Waivers</u>.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    <u>Schedules and Exhibits; Integration</u>.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    <u>Further Assurances</u>.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

7

CONFIDENTIAL

Section 9.05    <u>Governing Law</u>.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    <u>Assignment</u>.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    <u>Headings</u>.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    <u>Counterparts</u>.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10    <u>Notices</u>.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

If to HCMLP, addressed to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

If to HCMFA, addressed to:

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

Section 9.11    <u>Expenses</u>.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

8

HCMFA Appx. 25

CONFIDENTIAL                                                                    D-HCMFA062403

Section 9.12    <u>Waiver</u>.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13    <u>Severability</u>.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14    <u>Arbitration; Jurisdiction</u>.  Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided, however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  The arbitrator(s) shall be duly licensed to practice law in the State of Texas.  The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules.  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15    <u>General Rules of Construction</u>.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

CONFIDENTIAL                                                                                          D-HCMFA062404

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

HCMFA Appx. 27

CONFIDENTIAL

D-HCMFA062405

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     Strand Advisors, Inc., its general partner

By: _____

Name:   James Dondero
Title:   President


**HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

By:     Strand Advisors XVI, Inc., its general partner

By: _____

Name:   Brian Mitts
Title:    Assistant Secretary

11

HCMFA Appx. 28

CONFIDENTIAL                                                                                                    D-HCMFA062406

**<u>Annex A</u>**

**Shared Services**

<u>Compliance</u>

            General compliance

            Compliance systems

<u>Facilities</u>

            Equipment

            General Overhead

            Office Supplies

            Rent & Parking

<u>Finance & Accounting</u>

            Book keeping

            Cash management

            Cash forecasting

            Credit facility reporting

            Financial reporting

            Accounts payable

            Accounts receivable

            Expense reimbursement

            Vendor management

<u>HR</u>

            Drinks/snacks

            Lunches

            Recruiting

<u>IT</u>

            General support & maintenance (OMS, development, support)

            Telecom (cell, phones, broadband)

            WSO

<u>Legal</u>

            Corporate secretarial services

            Document review and preparation

            Litigation support

            Management of outside counsel

<u>Marketing and PR</u>

            Public relations

<u>Tax</u>

            Tax audit support

            Tax planning

            Tax prep and filing

<u>Investments</u>

            Investment research on an ad hoc basis as requested by HCMFA

HCMFA Appx. 29

CONFIDENTIAL

D-HCMFA062407

Valuation Committee

<u>Trading</u>

Trading desk services

<u>Operations</u>

Trade settlement

13

HCMFA Appx. 30

CONFIDENTIAL                                                                          D-HCMFA062408

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF JULIAN VASEK

I, Julian Vasek, do hereby declare as follows:

1.      My name is Julian Vasek, and I have been licensed to practice law in the State of Texas since 2009.  I am over the age of eighteen and am otherwise competent to make this declaration.  I am counsel for defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") in the above-captioned adversary proceeding brought by plaintiff Highland Capital Management, L.P. (the "Debtor").

2.      Attached hereto as HCMFA Appx. 32 - 64 is a true and correct copy of a complaint and the exhibits thereto filed by the Debtor against HCMFA on or about November 9, 2021, thereby initiating Adversary Proceeding No. 21-03082-sgj.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2022.

/s/ *Julian Vasek*
Julian Vasek

HCMFA Appx. 31

Case 21-03082-sgj Doc 12 Filed 11/09/21 Entered 11/09/21 22:27:30 Page 1 of Main
Case 3:21-cv-00881-X Document 177 Filed 09/08/07 Page 285 of 347 PageID 36334
Docket #0001 Date Filed: 11/09/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § _____ |
| | § |
| HIGHLAND CAPITAL MANAGEMENT FUND | § |
| ADVISORS, L.P., | § |
| | § |
| Defendant. | § |

## COMPLAINT FOR (I) BREACH OF CONTRACT AND
## (II) TURNOVER OF PROPERTY OF HIGHLAND'S ESTATE

1934054211109000000000000006

HCMFA Appx. 32

Plaintiff Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, files this complaint (the "Complaint") against defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant") and alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## PRELIMINARY STATEMENT[1]

1.      Highland brings this action against HCMFA as a result of HCMFA's defaults under two promissory notes executed by HCMFA in favor of Highland in the aggregate original principal amount of $6,300,000 and payable upon Highland's demand.  Despite demand having been made, HCMFA has failed to pay amounts due and owing under the Notes and the accrued but unpaid interest thereon.

2.      As remedies, Highland seeks (a) damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Notes) and (b) turnover by HCMFA to Highland of the foregoing amounts.

## JURISDICTION AND VENUE

3.      This Adversary Proceeding arises under and relates to Highland's Bankruptcy Case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

---

[1] Capitalized terms shall take on the meanings ascribed to them below.

5.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Highland consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### THE PARTIES

7.     Highland is a limited liability partnership formed under the laws of Delaware with a business address at 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

8.     Upon information and belief, HCMFA is a limited partnership with offices located in Dallas, Texas, and is organized under the laws of the state of Delaware.

### CASE BACKGROUND

9.     On October 16, 2019, Highland filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

11.     On February 22, 2021, the Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") confirming the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., as Modified* [Docket No. 1808] (the "Plan").

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

12.     The Plan went Effective (as defined in the Plan) on August 11, 2021, and Highland

is the Reorganized Debtor (as defined in the Plan) since the Effective Date. *See Notice of

Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland

Capital Management, L.P.* [Docket No. 2700].

**STATEMENT OF FACTS**

**A.     The HCMFA Notes**

13.     HCMFA is the maker under a series of promissory notes in favor of Highland.

14.     Specifically, on February 26, 2014, HCMFA executed a promissory note in favor

of Highland, as payee, in the original principal amount of $4,000,000 ("HCMFA's First Note").

A true and correct copy of HCMFA's First Note is attached hereto as **Exhibit 1**.

15.     HCMFA's First Note was executed in exchange for a contemporaneous transfer

from Highland to HCMFA in the amount of $4,000,000 (the "First Payment").

16.     On February 26, 2016, HCMFA executed a promissory note in favor of Highland,

as payee, in the original principal amount of $2,300,000 ("HCMFA's Second Note", and together

with HCMFA's First Note, the "Notes").  A true and correct copy of HCMFA's Second Note is

attached hereto as **Exhibit 2.**

17.     HCMFA's Second Note was executed in exchange for a contemporaneous transfer

from Highland to HCMFA in the amount of $2,300,000 (the "Second Payment", and together with

the First Payment, the "Payments").

18.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The

accrued interest and principal of this Note shall be due and payable on demand of the Payee."

19.     Section 4 of each Note provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder
as it becomes due shall, at the election of the holder hereof, without notice, demand,
presentment, notice of intent to accelerate, notice of acceleration, or any other

notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

20.     Section 6 of each Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     Highland Agrees Not to Demand Payment under the Notes Prior to May 31, 2021**

21.     On April 15, 2019, James Dondero signed a letter on behalf of both Highland and HCMFA pursuant to which Highland agreed not to demand payment under the Notes prior to May 31, 2021 (the "Acknowledgement Letter") on the ground that "HCMFA expects that it may be unable to repay such amounts should they become due, for the period commencing today and continuing through May 31, 2021."  A true and correct copy of the Acknowledgement Letter is attached hereto as **Exhibit 3**.[3]

**C.     HCMFA's Default under Each Note**

22.     By letter dated June 2, 2021, Highland made demand on HCMFA for payment under the Notes by June 4, 2021 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 4**.  The Demand Letter provides:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $3,143,181.93, which represents all accrued interest and principal through and including June 4, 2021.

---

[3] On January 22, 2021, Highland commenced a similar adversary proceeding against HCMFA for its default under two other promissory notes. [*See* Adv. Proc. 21-3004, *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*, Docket No. 1] (the "First Complaint").  The Notes that are the subject of this Complaint were not included in the First Complaint because of the Acknowledgement Letter.

Payment is due on June 4, 2021, and failure to make payment in full on such
date will constitute an event of default under the Notes.

23.     Despite Highland's demand, HCMFA did not pay all or any portion of the amounts
demanded by Highland on June 4, 2021, or at any time thereafter.

24.     As of June 4, 2021, there was an outstanding principal amount of $2,134,166.53 on
HCMFA's First Note and accrued but unpaid interest in the amount of $11,288.28, resulting in a
total outstanding amount as of that date of $2,145,454.81.

25.     As of June 4, 2021, there was an outstanding principal balance of $990,757.62 on
HCMFA's Second Note and accrued but unpaid interest in the amount of $6,969.50, resulting in a
total outstanding amount as of that date of $997,727.12.

26.     Thus, as of June 4, 2021, the total outstanding principal and accrued but unpaid
interest due under the Notes was $3,143,181.93

27.     Pursuant to Section 4 of each Note, each Note is in default and is currently due and
payable.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

28.     Highland repeats and re-alleges the allegations in each of the foregoing paragraphs
as though fully set forth herein.

29.     Each Note is a binding and enforceable contract.

30.     HCMFA breached each Note by failing to pay all amounts due to Highland upon
Highland's demand.

31.     Pursuant to each Note, Highland is entitled to damages from HCMFA in an amount
equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and
unpaid interest thereon until the date of payment, plus (iii) an amount equal to Highland's costs of

collection (including all court costs and reasonable attorneys' fees and expenses) for HCMFA's

breach of its obligations under each of the Notes.

32.     As a direct and proximate cause of HCMFA's breach of each Note, Highland has

suffered damages in the total amount of at least $3,143,181.93 as of June 4, 2021, plus an amount

equal to all accrued but unpaid interest from that date, plus Highland's costs of collection.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to <mark>11 U.S.C. § 542(b))</mark>

33.     Highland repeats and re-alleges the allegations in each of the foregoing paragraphs

as though fully set forth herein.

34.     HCMFA owes Highland an amount equal to (i) the aggregate outstanding

principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of

payment, plus (iii) an amount equal to Highland's costs of collection (including all court costs

and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each

of the Notes.

35.     Each Note is property of Highland's estate, and the amounts due under each Note

are matured and payable upon demand.

36.     HCMFA has not paid the amounts due under the Notes to Highland.

37.     Highland has made demand for the turnover of the amounts due under each Note.

38.     As of the date of filing of this Complaint, HCMFA has not turned over to Highland

all or any of the amounts due under the Notes.

39.     Highland is entitled to the turnover of all amounts due under the Notes.

WHEREFORE, Highland prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial but including (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by HCMFA to Highland of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)    Such other and further relief as this Court deems just and proper.

Dated:  November 9, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:        jpomerantz@pszjlaw.com
                   ikharasch@pszjlaw.com
                   jmorris@pszjlaw.com
                   gdemo@pszjlaw.com
                   hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

HCMFA Appx. 41

# PROMISSORY NOTE

$4,000,000.00                                                February 26, 2014

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FOUR MILLION and 00/100 Dollars ($4,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the mid-term "*applicable federal rate*" (1.97%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

# EXHIBIT 2

HCMFA Appx. 44

## PROMISSORY NOTE

$2,300,000.00

February 26, 2016

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, THREE HUNDRED THOUSAND and 00/100 Dollars ($2,300,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the mid-term "*applicable federal rate*" (2.62%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

HCMFA Appx. 46

# EXHIBIT 3

HCMFA Appx. 47

## Acknowledgement from HCMLP

April 15, 2019

Reference is hereby made to certain outstanding amounts loaned from HIGHLAND
CAPITAL MANAGEMENT, L.P. ("HCMLP") to HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. ("HCMF") for funding of HCMF's ongoing operations, which are
payable on demand and remained outstanding on December 31, 2018 and as of the date hereof.

HCMF expects that it may be unable to repay such amounts should they become due, for
the period commencing today and continuing through May 31, 2021.

HCMLP hereby agrees to not demand payment on amounts owed by HCMF prior to May
31, 2021.



Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

By: _____


**Acknowledged By:**

Highland Capital Management Fund Advisors, L.P.
By: Strand XVI, Inc., its general partner

By: _____

# EXHIBIT 4

June 2, 2021

Highland Capital Management Fund Advisors, LP
2515 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Attention: Frank Waterhouse

      Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (6/4/21) | Accrued But Unpaid Interest (6/4/21) | Total Amount Outstanding (6/4/21) |
|---|---|---|---|---|
| 2/26/2014 | $4,000,000 | $2,134,166.53 | $11,288.28 | $2,145,454.81 |
| 2/26/2016 | $2,300,000 | $990,757.62 | $6,969.50 | $997,727.12 |
| **TOTALS** | **$6,300,000** | **$3,124,924.14** | **$18,257.78** | **$3,143,181.93** |

Copies of the notes are attached hereto as **Appendix A**.

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $3,143,181.93, which represents all accrued and unpaid interest and principal through and including June 4, 2021.

**Payment is due on June 4, 2021, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix B**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee on May 2, 2019, and May 3, 2019 (the "May Notes"). Payee sent a demand letter to Maker with respect to the May Notes on December 3, 2020. A copy of such letter is attached hereto as **Appendix C**. Payee reserves all rights with respect the May Notes.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Jeffrey Pomerantz
        John Morris
        Gregory Demo
        DC Sauter
        Davor Rukavina

# Appendix A

# PROMISSORY NOTE

$2,300,000.00

February 26, 2016

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, THREE HUNDRED THOUSAND and 00/100 Dollars ($2,300,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the mid-term "*applicable federal rate*" (2.62%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

HCMFA Appx. 54

# PROMISSORY NOTE

$4,000,000.00                                                     February 26, 2014

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FOUR MILLION and 00/100 Dollars ($4,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.   <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the mid-term "*applicable federal rate*" (1.97%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.   <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

    3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.   <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

HCMFA Appx. 56

# Appendix B

**Appendix B**

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

# Appendix C

HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Frank Waterhouse, CFO

      Re: Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019. Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021. Payee reserves all rights with respect to such amounts.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

HCMFA Appx. 61

**Appendix A**

|  |  |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Highland Capital Management, L.P. | **DEFENDANTS**<br>Highland Capital Management Fund Advisors, L.P. |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | **ATTORNEYS** (If Known)<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, Texas 75201  Tel.: (214) 855-7500 |
|---|---|

| **PARTY** (Check One Box Only)<br>☑ Debtor         ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor         ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☑ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Count 1: Breach of contract; Count 2: Turnover pursuant to 11 U.S.C. 542

---

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $3,143,181.93 plus interest, fees, and expenses |

Other Relief Sought

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>November 9, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

---------------------------------------------------------------------

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3004 |
| | § | |
| vs. | § | |
| | § | |
| | § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

---------------------------------------------------------------------

---------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§

Plaintiff,

§
§

Adv. Proc. No. 21-3005

§

vs.

§
§

NEXPOINT ADVISORS, L.P., JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

§

Case No. 3:21-cv-00880-C

§
§
§
§

Defendants.

§
§

---------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§

Plaintiff,

§
§

Adv. Proc. No. 21-3006

§

vs.

§
§

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC., JAMES DONDERO,
NANCY DONDERO, AND THE DUGABOY
INVESTMENT TRUST,

§

Case No. 3:21-cv-01378-N

§
§
§
§
§

Defendants.

§
§

---------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§

§

Adv. Proc. No. 21-3007

§

Plaintiff,

§
§

vs.

§
§

Case No. 3:21-cv-01379-X

§

HCRE PARTNERS, LLC (n/k/a NexPoint
Real Estate Partners, LLC), JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

§
§
§
§
§

Defendants.

§
§

---------------------------------------------------------------

## PLAINTIFF'S OMNIBUS MOTION
## (A) TO STRIKE CERTAIN DOCUMENTS AND ARGUMENTS FROM THE
## RECORD, (B) FOR SANCTIONS, AND (C) FOR AN ORDER OF CONTEMPT

Highland Capital Management, L.P. ("Highland" or "Plaintiff"), the reorganized debtor in

the above-captioned chapter 11 case (the "Bankruptcy Case") and plaintiff in the above-referenced

2

adversary proceedings (collectively, the "Notes Actions"), hereby files this *Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt* (the "Motion").[1]  In support of the Motion, Plaintiff respectfully represents as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b).

2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.    The predicates for the relief requested in the Motion are section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 12 and 37 of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rules 7012 and 7037 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

4.    Plaintiff requests that this Court enter an order substantially in the form annexed hereto as **Exhibit A** (the "Proposed Order") (a) striking (i) the Pully Report and (ii) all references to, and all arguments derived from, the Pully Report and the Barred Defense, as highlighted on **Morris Exhibits 1 and 2**,[2] respectively; (b) imposing sanctions on the Alleged Violators[3] for

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the *Brief in Support of Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt* (the "Brief") being filed contemporaneously with this Motion.

[2] References to "Morris Exhibit ___" are to the exhibits attached to the *Declaration of John A. Morris in Support of Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt* (the "Morris Declaration") being filed contemporaneously with this Motion.

[3] The "Alleged Violators" include each of the corporate entities that are defendants in the Notes Actions and their counsel.

violating multiple rules; and (c) holding the Alleged Violators in civil contempt for their willful and knowing violation of three court Orders.

5.      In accordance with Rule 7007-1 of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), the evidence and arguments supporting the Motion are set forth in Plaintiff's Brief and the Morris Declaration being filed contemporaneously herewith and are incorporated in this Motion as if set forth fully herein.

6.      Based on the exhibits annexed to the Morris Declaration and the arguments contained in the Brief, Plaintiff is entitled to the relief requested herein as set forth in the Proposed Order.

8.      Notice of this Motion will be provided to all parties in the Notes Actions.  Plaintiff submits that no other or further notice need be provided.

WHEREFORE, Plaintiff respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant Plaintiff such other and further relief as the Court may deem proper.

Dated:  February 7, 2022.                    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

5

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that, between January 22 and January 26, 2022, Plaintiff's counsel corresponded with Defendants' counsel regarding the relief requested in the foregoing Motion.  Based on the email exchange between Plaintiff's counsel and Defendants' counsel, the relief requested in the Motion is **OPPOSED** by Defendants.

  */s/ Zachery Z. Annable*
Zachery Z. Annable

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

---------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

               Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.,

               Defendant.

---------------------------------------------------------------

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-3004

Case No. 3:21-cv-00881-X

---------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,                     §
                                                       §
                          Plaintiff,                   §
                                                       §   Adv. Proc. No. 21-3005
                                                       §
vs.                                                    §
                                                       §
NEXPOINT ADVISORS, L.P., JAMES                         §   Case No. 3:21-cv-00880-C
DONDERO, NANCY DONDERO, AND                            §
THE DUGABOY INVESTMENT TRUST,                          §
                                                       §
                          Defendants.                  §
---------------------------------------------------------------
                                                       §
HIGHLAND CAPITAL MANAGEMENT, L.P.,                     §
                                                       §
                          Plaintiff,                   §
                                                       §   Adv. Proc. No. 21-3006
                                                       §
vs.                                                    §
                                                       §
HIGHLAND CAPITAL MANAGEMENT                            §   Case No. 3:21-cv-01378-N
SERVICES, INC., JAMES DONDERO,                         §
NANCY DONDERO, AND THE DUGABOY                         §
INVESTMENT TRUST,                                      §
                                                       §
                          Defendants.                  §
---------------------------------------------------------------
HIGHLAND CAPITAL MANAGEMENT, L.P.,                     §
                                                       §
                                                       §
                          Plaintiff,                   §   Adv. Proc. No. 21-3007
                                                       §
vs.                                                    §
                                                       §
                                                       §   Case No. 3:21-cv-01379-X
HCRE PARTNERS, LLC (n/k/a NexPoint                     §
Real Estate Partners, LLC), JAMES                      §
DONDERO, NANCY DONDERO, AND                            §
THE DUGABOY INVESTMENT TRUST,                          §
                                                       §
                          Defendants.                  §
---------------------------------------------------------------

**ORDER GRANTING PLAINTIFF'S OMNIBUS MOTION (A) TO STRIKE CERTAIN
DOCUMENTS AND ARGUMENTS FROM THE RECORD, (B) FOR SANCTIONS,
AND (C) FOR AN ORDER OF CONTEMPT**

Having considered (a) the *Omnibus Motion (A) to Strike Certain Documents and
Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt* (the "Motion")
filed by Highland Capital Management, L.P. ("Highland" or "Plaintiff"), the reorganized debtor
in the above-captioned chapter 11 case (the "Bankruptcy Case") and plaintiff in the above-
referenced adversary proceedings (collectively, the "Notes Actions"); (b) the *Brief in Support of
Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B)
for Sanctions, and (C) for an Order of Contempt* (the "Brief");[1] (c) the exhibits annexed to the
*Declaration of John A. Morris in Support of Plaintiff's Omnibus Motion (A) to Strike Certain
Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt*
(the "Morris Declaration"); and (d) all prior proceedings relating to this matter; and this Court
having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having
found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C.
§ 1409; and this Court having found that Plaintiff's notice of the Motion and opportunity for a
hearing on the Motion were appropriate under the circumstances and that no other notice need be
provided; and this Court having determined that the legal and factual bases set forth in the Motion
establish good cause for the relief granted herein; and upon all of the proceedings had before this
Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set
forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

      1.      The Motion is **GRANTED** as set forth herein.

---

[1] Capitalized terms not otherwise defined in this Order have the meanings ascribed to them in the Brief.

2.      The Barred Defense is hereby **STRICKEN**, and HCMFA is directed to refile its

*Brief in Opposition to Plaintiff's Motion for Summary Judgment* [Adv. Proc. No. 21-3004, <mark>Dkt.</mark>

<mark>127</mark>] (the "<u>HCMFA Brief</u>") with all language highlighted in Morris Declaration Exhibit 2 redacted

from the HCMFA Brief.

3.      The Pully Report is hereby **STRICKEN** from the summary judgment record, and

the Term Note Defendants are directed to refile their Appendix without the Pully Report.

4.      HCMFA, the Term Note Defendants, and their counsel shall show cause before this

Court on _____, _____, 2022 at _____ ___.m. **(Central Time)** why an order should

not be granted (i) finding and holding HCMFA, the Term Note Defendants, and their counsel in

civil contempt of the (x) Second Motion for Leave Order, (y) the Scheduling Order, and (z) the

Expert Order; (ii) directing HCMFA, the Term Note Defendants, and their counsel to pay Plaintiff

an amount of money equal to Plaintiff's reasonable and necessary fees and expenses incurred in

bringing this Motion; and (iii) granting Plaintiff such other and further relief as the Court deems

just and proper under the circumstances.

5.      The Court shall retain exclusive jurisdiction with respect to all matters arising from

or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   Mhayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

-------------------------------------------------------------------

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3004 |
| | § | |
| vs. | § | |
| | § | |
| | § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

-------------------------------------------------------------------

--------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                   Plaintiff,

vs.

NEXPOINT ADVISORS, L.P., JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

                   Defendants.

§    Adv. Proc. No. 21-3005
§
§    Case No. 3:21-cv-00880-C

--------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                   Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC., JAMES DONDERO,
NANCY DONDERO, AND THE DUGABOY
INVESTMENT TRUST,

                   Defendants.

§    Adv. Proc. No. 21-3006
§
§    Case No. 3:21-cv-01378-N

--------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                   Plaintiff,

vs.

HCRE PARTNERS, LLC (n/k/a NexPoint
Real Estate Partners, LLC), JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

                   Defendants.

§    Adv. Proc. No. 21-3007
§
§    Case No. 3:21-cv-01379-X

--------------------------------------------------------

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ....................................................................................................... 3

   A.  The Court Denied the Term Note Defendants' Motion to Extend the Expert
       Disclosure and Discovery Deadlines............................................................................ 3

   B.  The Court Denied HCMFA's Second Motion for Leave to Amend Its Answer ............... 5

   C.  The Alleged Violators Ignore the Orders, Include the Pully Report in the Record,
       and Press the Barred Defense ....................................................................................... 7

   D.  Plaintiff Has Been and Will Be Prejudiced by the Wrongful Conduct ............................ 8

ARGUMENT ......................................................................................................................... 10

   A.  HCMFA's Barred Defense Should Be Stricken from the Summary Record
       Pursuant to Rule 12.................................................................................................... 10

   B.  HCMFA Is in Contempt of the Second Motion for Leave Order.................................... 10

   C.  The Term Note Defendants Should Be Sanctioned under Rule 37 .................................. 12

   D.  The Pully Report Should Be Stricken from the Record ................................................. 13

   E.  The Term Note Defendants Are in Contempt of the Expert Order .................................. 13

   F.  The Term Note Defendants Should Reimburse Plaintiff for Reasonable Costs
       Incurred for Their Violation of the Discovery Orders .................................................... 14

CONCLUSION ...................................................................................................................... 14

DOCS_NY:45107.6 36027/003

## TABLE OF AUTHORITIES

**CASES**

*Batson v. Neal Spelce Associates, Inc.,*
  765 F.2d 51 (5th Cir. 1985) ................................................................. 14

*Chilcutt v. United States,*
  4 F.3d 1313 (5th Cir.1993) ................................................................. 14

*F.D.I.C. v. LeGrand,*
  43 F.3d 163 (5th Cir. 1995) ................................................................. 11, 12

*Geiserman v. MacDonald,*
  893 F.2d 787 (5th Cir. 1990) ................................................................. 13, 14

*In re Terrebonne Fuel & Lube, Inc.,*
  108 F.3d 609 (5th Cir. 1997) ................................................................. 12

*Jacobs v. Tapscott,*
  Civ. Act. 304CV1968D, 2004 WL 2921806 (N.D. Tex. Dec. 16, 2004) ................................................................. 10

*Martin v. Trinity Indus., Inc.,*
  959 F.2d 45 (5th Cir.1992) ................................................................. 11

*Matter of Ridgeway,*
  973 F.3d 421, 428 (5th Cir. 2020) ................................................................. 13

*N.L.R.B. v. Trailways, Inc.,*
  729 F.2d 1013 (5th Cir.1984) ................................................................. 11

*Norman Bridge Drug Co. v. Banner,*
  529 F.2d 822 (5th Cir.1976) ................................................................. 12

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.,*
  685 F.3d 486 (5th Cir. 2012) ................................................................. 13, 14

*Travelhost, Inc. v. Blandford,*
  68 F.3d 958 (5th Cir. 1995) ................................................................. 11, 12

*Whitcraft v. Brown,*
  570 F.3d 268 (5th Cir. 2009) ................................................................. 11, 12

**STATUTES**

11 U.S.C. § 105 ................................................................. 10

**RULES**

Fed. R. Civ. P. 12(f) ................................................................. 10

Fed. R. Civ. P. 37(b)(2) ................................................................. 13

Fed. R. Civ. P. 37(b)(2)(A) ................................................................. 13

Fed. R. Civ. P. Rule 37(b)(2)(C) ................................................................. 13

ii

**BRIEF IN SUPPORT OF
PLAINTIFF'S OMNIBUS MOTION (A) TO STRIKE CERTAIN
DOCUMENTS AND ARGUMENTS FROM THE RECORD, (B) FOR
<u>SANCTIONS, AND (C) FOR AN ORDER OF CONTEMPT</u>**

Highland Capital Management, L.P. ("<u>Highland</u>" or "<u>Plaintiff</u>"), the reorganized debtor in

the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>") and plaintiff in the above-referenced

adversary proceedings (collectively, the "<u>Notes Actions</u>"), hereby files this brief in support of its

motion (the "<u>Motion</u>") for the entry of an order substantially in the form annexed as **Exhibit A** to

the Motion (a) striking (i) the Pully Report and (ii) all references to, and all arguments derived

from, the Pully Report and the Barred Defense, as highlighted on **Morris Exhibits 1 and 2,**[1]

respectively, (b) imposing sanctions on the Alleged Violators[2] for violating multiple rules, and

(c) holding the Alleged Violators in civil contempt for their willful and knowing violation of three

court Orders.

The Motion is made pursuant to Rules 12 and 37 of the Federal Rules of Civil Procedure,

Rules 7012 and 7037 of the Federal Rules of Bankruptcy Procedure, and section 105 of the United

States Bankruptcy Code.  In support of the Motion, Plaintiff respectfully represents as follows:

**<u>PRELIMINARY STATEMENT</u>**[3]

1.     Plaintiff brings the Motion due to the Alleged Violators' complete disregard of

multiple court Orders and other straight-forward and applicable rules.

---

[1] References to "<u>Morris Exhibit ___</u>" are to the exhibits attached to the *Declaration of John A. Morris Submitted in Support of Plaintiff's Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt* being filed simultaneously with the Motion.

[2] The "Alleged Violators" include each of the corporate entities that are defendants in the Notes Actions and their counsel.

[3] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

2.      Last fall, (a) the Term Note Defendants asked this Court for permission to extend the expert disclosure and discovery deadlines so that they could offer the expert opinions of Mr. Pully and engage in further expert discovery (*i.e.*, the Expert Motion), and (b) HCMFA asked this Court for permission to amend its Answer to assert the affirmative defense that HCMFA never signed the HCMFA Notes (*i.e.*, the Second Motion for Leave).  Following extended hearings, this Court entered Orders denying both requests.  Nevertheless, the Alleged Violators have proceeded as if the Orders do not exist.

3.      Ignoring basic rules of appellate practice, the Alleged Violators have improperly sought reconsideration of the interlocutory Orders from the District Court.  Not satisfied with the disruption those improper pleadings have caused, the Alleged Violators created further chaos by (a) ignoring the Orders, (b) including the Pully Report in their Appendix, and (c) pressing the Barred Defense, all in opposition to Plaintiff's Summary Judgment Motion (the "<u>Wrongful Conduct</u>").

4.      The Wrongful Conduct violates Rule 12 and Rule 37 and constitutes civil contempt on the ground that the Alleged Violators did ***exactly*** what the Orders prohibited.

5.      Before filing the Motion, Plaintiff gave the Alleged Violators an opportunity to correct their errors and avoid the Motion.  Specifically, Plaintiff demanded in writing that the Alleged Violators withdraw the Pully Report and all references to, and argument based on, the Pully Report and the Barred Defense.  In response, the Alleged Violators doubled down, contending that they could proceed under the guise of "offers of proof" or "proffers."  Nonsense. The Orders and applicable rules govern and, unless overturned by the District Court, prohibited the Alleged Violators from engaging in the Wrongful Conduct.

6.      If the Wrongful Conduct is not remedied and the Alleged Violators are not held accountable, Plaintiff will be severely prejudiced because (a) Plaintiff relied on the Orders and did not seek discovery in connection with the Pully Report or the Barred Defense; (b) consequently, Plaintiff cannot adequately respond to the Pully Report and the Barred Defense; (c) the appellate record will improperly include evidence and arguments concerning an affirmative defense that have already been excluded; and (d) Plaintiff will have effectively expended substantial time, money, and effort opposing the Expert Motion and the Second Motion for Leave for no purpose.

7.      There is no credible justification for any of this Wrongful Conduct.  The appellate rights of the Term Note Defendants and HCMFA were preserved when their Motions were denied – and, in any event, they have (albeit improperly) already sought reconsideration of the Orders from District Court.  Under the circumstances, there is no good faith basis for the Alleged Violators to have engaged in the Wrongful Conduct, and they must be held accountable for the havoc they intentionally created.

8.      For the reasons set forth below, the Motion should be granted in all respects.

## STATEMENT OF FACTS

**A.      The Court Denied the Term Note Defendants' Motion to Extend
the Expert Disclosure and Discovery Deadlines**

9.      In January 2021, Plaintiff commenced five different actions seeking to recover on promissory notes executed by James Dondero and entities he controls.

10.      On September 6, 2021, after a series of maneuvers by the defendants that necessitated the amendment of Plaintiff's original complaints, the Court entered an *Order*

*Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [*see*, *e.g.*, Adv. Pro. No. 21-03005, Docket No. 70][4] (the "Scheduling Order").  **Morris Exhibit 3**.

11.    The Scheduling Order provided that, among other things, "expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021."  *Id*. ¶ 3.

12.    On October 29, 2021, NexPoint Advisors, L.P. ("NexPoint") filed its *Motion to Extend Expert Disclosure and Discovery Deadlines* [Docket No. 86] (the "Expert Motion").[5]  In the Expert Motion, the Term Note Defendants sought this Court's permission to extend the deadlines to designate experts, serve expert reports, and take expert discovery.  Specifically, NexPoint sought permission to commission an expert report by Steven J. Pully (the "Pully Report") concerning the "Debtor's duties [of care] under the Shared Services Agreement" and to otherwise extend the expert discovery deadlines.  Expert Motion ¶¶ 1, 13, 17.

13.    Pursuant to the Court's *Order Approving Amended Stipulation Regarding Briefing and Hearing Schedule* [Docket No. 102], Plaintiff filed its objection to the Expert Motion on December 1, 2021 [Docket No. 104], and NexPoint filed its reply on December 8, 2021 [Docket No. 115].

---

[4] Unless noted otherwise, all docket references are to those maintained in the adversary proceeding captioned *Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. No. 21-03005.

[5] Even though Mr. Pully's opinions concern the interpretation of HCMFA's Shared Services Agreement with Plaintiff, Highland Capital Management Services, Inc. ("HCMS") and HCRE Partners, LLC ("HCRE" and together with NexPoint and HCMS, the "Term Note Defendants") effectively joined the Expert Motion despite the fact that they were never parties to that Agreement and have no written shared services agreement of their own.  *See* Adv. Pro. No. 21-03006 [Docket No. 91] (HCMS's motion to extend expert disclosure and discovery deadlines) and Adv. Pro. No. 21-03007 [Docket No. 86] (HCRE's motion to extend expert disclosure and discovery deadlines).  Notably, NexPoint has been pursuing the issue of Plaintiff's alleged obligations under the Shared Services Agreement since March 1, 2021, but never sought to offer expert discovery concerning Plaintiff's alleged obligations under the Agreement before filing the Expert Motion on October 29, 2021, the last day for the designation of experts under the Scheduling Order. *See Defendant's Original Answer*, Adv. Pro. No. 21-03005, Docket No. 6 ¶ 39 (asserting as an affirmative defense Plaintiff's alleged negligence and breach of its duty of care under the Shared Services Agreement).

14.     On December 13, 2021, at the conclusion of a hearing on the Expert Motion and the presentation of extensive argument, the Court stated that it would deny the Expert Motion. [*See* Docket No. 122].

15.     On December 22, 2021, the Court entered its Order denying the Expert Motion in all respects (the "Expert Order").  [Docket No. 138].  **Morris Ex. 4.**

16.     On January 5, 2022, the Term Note Defendants filed objections in the United States District Court for the Northern District of Texas (the "District Court") seeking "reconsideration" and other forms of review of the Expert Order (the "Expert Reconsideration Motion").[6]

17.     On January 31, 2022, Plaintiff objected to the Term Note Defendants' Expert Reconsideration Motion, arguing that it was both procedurally and substantively improper.  *See* Civ. Act. No. 3:21-cv-00881-X, Docket Nos. 37-39.  **Morris Exhibit 6.**

## B.     The Court Denied HCMFA's Second Motion for Leave to Amend Its Answer

18.     On March 1, 2021, Highland Capital Management Fund Advisors, L.P. ("HCMFA" and together with the Term Note Defendants and their counsel, the "Alleged Violators") filed its *Original Answer* to Plaintiff's Complaint in which it failed to assert any affirmative defenses to Plaintiff's claims for recovery on two promissory notes issued by HCMFA (the "HCMFA Notes"). *See* Adv. Pro. No. 21-03004, Docket No. 6.

19.     On May 22, 2021, HCMFA moved for leave to amend its *Original Answer* to assert as an affirmative defense that Frank Waterhouse, HCMFA's Treasurer and the person whose signature appears on the HCMFA Notes, signed the HCMFA notes by mistake and without

---

[6] *See* Civ. Act. No. 3:21-cv-00880-X, Docket Nos. 21-23 (*Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*) (**Morris Exhibit 5**); Civ. Act. No. 3:21-cv-01378, Docket No. 26 (*Defendants Highland Capital Management Services, Inc. and HCRE Partners, LLC's Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*) (together, the "Expert Reconsideration Motion").

authority.  *See generally Defendants' Motion for Leave to Amend Answer* (the "<u>First Motion for Leave</u>"), Adv. Pro. No. 21-03004, <mark>Docket No. 32</mark>.  HCMFA's First Motion for Leave was based on a purported internal investigation conducted by Dennis C. Sauter, Jr. that included multiple interviews with Mr. Waterhouse.

20.     The Court granted HCMFA's First Motion for Leave and on July 6, 2021, HCMFA filed its *Amended Answer*.  Adv. Pro. No. 21-03004, <mark>Docket No. 48</mark> (the "<u>Amended Answer</u>").  In its *Amended Answer*, HCMFA alleged, among other things, that "Waterhouse **signed** the two promissory notes," and that "Waterhouse made a mistake in preparing and **signing** the Notes for defendant," and that "Waterhouse prepared and **signed** the Notes on his own, without proper knowledge of the underlying facts and without actual authority."  *See* Amended Answer ¶¶ 43-44 (emphases added).

21.     On November 30, 2021, about a month after the close of discovery, HCMFA filed its *Second Motion for Leave to Amend Answer* [Adv. Pro. No. 21-03004, <mark>Docket No. 82</mark>] (the "<u>Second Motion for Leave</u>" and together with the Expert Motion, the "<u>Motions</u>").  In its Second Motion for Leave, HCMFA requested permission "to amend its answer to expressly deny that the notes were signed" by Mr. Waterhouse or HCMFA (the "<u>Barred Defense</u>").  Second Motion for Leave ¶ 1.[7]

---

[7] HCMFA filed its Second Motion for Leave while also contending that it "does not concede that [the relief requested] is required."  Second Motion for Leave ¶ 1.  This contention was (and remains) disingenuous because (i) after conducting an internal investigation that included multiple interviews with the HCMFA officer whose name appears on the HCMFA Notes (*i.e.*, Mr. Waterhouse), HCFMA asserted multiple times in its Amended Answer that ***Mr. Waterhouse signed the Notes***, albeit allegedly by mistake and without authority (Mr. Waterhouse has rejected the claim of mistake and never admitted lack of authority), such that HCMFA's Second Motion for Leave was unquestionably required, but (ii) even if it were not, HCMFA voluntarily filed its Second Motion for Leave and must live with the consequences of its decision.  HCMFA cannot have it both ways: the Court's order denying the Second Motion for Leave was not transformed into an advisory opinion merely because HCMFA did not like the result.

DOCS_NY:45107.6 36027/003

22.      On December 30, 2021, Plaintiff filed its opposition to HCMFA's Second Motion for Leave [Adv. Pro. No. 21-03004, Docket No. 107] and on January 10, 2022, the Court held an evidentiary hearing on HCMFA's Second Motion for Leave during which the Court heard extensive testimony from Mr. Sauter, the person who claims to have conducted HCMFA's internal investigation (including the interviews of Mr. Waterhouse) which formed the foundation for HCMFA's First Motion for Leave.  During cross examination, Mr. Sauter was forced to admit that (a) Mr. Waterhouse specifically told him that the HCFMA Notes were prepared for HCMFA's auditors because the transfer of $7.4 million from Highland to HCMFA in May 2019 had to be documented, and (b) Mr. Sauter failed to disclose Mr. Waterhouse's statements supporting the Notes in Mr. Sauter's Declarations submitted in support of either the First Motion for Leave or the Second Motion for Leave.  **Morris Exhibit 7** at 61:1-62:1; 64:7-20; 67:1-21.

23.      On January 14, 2022, the Court entered an order denying HCMFA's Second Motion for Leave (the "Second Motion for Leave Order" and together with the Scheduling Order and the Expert Order, the "Orders").  Adv. Pro. No. 21-03004, Docket No. 123.  **Morris Exhibit 8**.

24.      On January 27, 2022, HCMFA filed its objection to the *Order Denying Motion to Amend Answer* in the District Court seeking "reconsideration" and other forms of review of the Second Motion for Leave Order.  *See* Civ. Act. No. 3:21-cv-00881-X, Docket Nos. 34-36.[8]

## C.    **The Alleged Violators Ignore the Orders, Include the Pully Report in the Record, and Press the Barred Defense**

25.      In flagrant disregard of the Orders, the Alleged Violators did exactly what the Court told them they could not: they included the Pully Report in the evidentiary record, and fully pressed the Barred Defense, in their opposition to Plaintiff's Summary Judgment Motion.

---

[8] Plaintiff's time for responding to this latest baseless filing has not yet expired.

26.     First, despite the passage of all applicable deadlines in the Scheduling Order and the entry of Expert Order denying the Expert Motion, the Term Note Defendants and their counsel willfully and defiantly (i) included the Pully Report in their appendix (*see, e.g.*, Adv. Pro. No. 21-03005, Docket No. 157 (Def. Ex. 3-F, Def. Appx. 211-235), and (ii) advanced arguments based on the Pully Report in opposition to Plaintiff's Summary Judgment Motion.[9]

27.     Second, despite the entry of the Second Motion for Leave Order denying HCMFA's Second Motion for Leave, HCMFA and its counsel willfully and defiantly made extensive arguments based on the Barred Defense in its opposition to Plaintiff's Summary Judgment Motion. *See* **Morris Exhibit 2** (highlighted portions).

28.     Plaintiff promptly demanded that the Alleged Violators immediately correct their Wrongful Conduct.  They steadfastly refused, claiming that they were merely "preserv[ing] their appellate rights by making a proffer."  **Morris Exhibit 9**.

**D.     Plaintiff Has Been and Will Be Prejudiced by the Wrongful Conduct**

29.     If not rectified, Plaintiff will be severely and irreparably prejudiced by the Alleged Violators' Wrongful Conduct.

30.     Among other things, Plaintiff will be prejudiced because (a) it justifiably relied on the Orders and never sought discovery in connection with the Pully Report or the Barred Defense, (b) consequently, Plaintiff cannot fully respond to the Pully Report or the Barred Defense and the arguments "proffered" in connection therewith, nor should it have been baited into doing so, (c) the appellate record will improperly include evidence (*i.e.*, the Pully Report) and arguments

---

[9] According to the Term Note Defendants, their defense under the Shared Services Agreements (the written agreement between Plaintiff and HCMFA and the allegedly unwritten agreements between Plaintiff and HCMS and HCRE) is "bolstered by the Expert Report of Steven J. Pully . . . which was incorrectly not permitted to be included in the record by the Court.  Defendants submit this proffer to preserve their objection."  *See Defendants' Memorandum of Law in Response to Plaintiff's Motion for Partial Summary Judgment*, Adv. Pro. No. 21-03003 [Docket No. 154] ¶28, n. 76.

concerning an affirmative defense) (*i.e.*, the Barred Defense) that the Court has already excluded, and (d) Plaintiff will have effectively expended substantial time, money, and effort negotiating the Scheduling Order and opposing the Expert Motion and the Second Motion for Leave for no apparent purpose.

31.    All of this (and more) was explained to defense counsel.[10]  Indeed, Plaintiff was willing to address the entire purported premise for the Wrongful Conduct – preserving the record for appeal – stating:

> If your issue is preserving the issue for appeal, I would consider a stipulation – although, given that the evidence and arguments subject to the proffer were already the subject of motions and orders, one of which has already been presented to the District Court for review, I don't understand the concern or the necessity.  Indeed, as you note, "[w]here the "pretrial proffer is adequate and ***evidence is excluded unconditionally by a pretrial order,***" then "the proponent ***has preserved the issue for appeal*** and (other circumstances being unchanged) need not bring the witness to court and proffer the evidence again at trial."  Fusco v. Gen. Motors Corp., 11 F.3d 259, 262–63 (1st Cir. 1993) (emphasis added).

**Morris Exhibit 9**.

32.    *One of the very cases cited by defense counsel gave them all the comfort they needed that their issues were already preserved for appeal*.  Nevertheless, the Alleged Violators

---

[10] Prior to filing the Motion, Plaintiff put the Alleged Violators on notice of the myriad problems caused by their recalcitrant insistence on pursuing the Wrongful Conduct, including raising the following questions:

"1.  Why should any court – whether the bankruptcy court or an appellate court -- consider evidence that has been excluded by court order?

2.  And if you don't intend the Court to consider the evidence and defense, why proffer it?

3.  Why should the record include evidence that has been excluded?  I have never seen that before.  Judge Jernigan has excluded numerous exhibits throughout this bankruptcy and then files a statement showing the evidence that was admitted.  Only admitted evidence is part of the record.

4.  I don't have my own expert to counter yours.  How do I address that?  How can a court consider your expert report when I did not have a chance to obtain my own?

5.  I haven't taken discovery on the Barred Defense.  How do I fairly address the defense?  I just argue in a vaacum [*sic*]?

6.  Am I supposed to address evidence and a defense that have been barred?

7.  You've "incorporated by reference" a 21page [*sic*] brief filed in the District Court (violating the page limits).  Am I supposed to respond to that brief, too?"

Morris Exhibit 9.

contemptuously refused to comply with Plaintiff's demands or the Orders precisely because they wanted the Pully Report and the Barred Defense "in the record as part of an offer of proof." *Id.*

## **ARGUMENT**

**A.    HCMFA's Barred Defense Should Be Stricken from the Summary Record Pursuant to Rule 12**

33.    Rule 12 of the Federal Rules of Civil Procedure provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).  The decision to grant a motion to strike is within the court's discretion. *Jacobs v. Tapscott*, Civ. Act. 304CV1968D, 2004 WL 2921806, at *2 (N.D. Tex. Dec. 16, 2004).

34.    The Barred Defense should be stricken from HCMFA's response to summary judgment under Rule 12(f) because HCMFA failed to plead the Barred Defense in its Amended Answer, and the Court prohibited HCMFA from belatedly asserting such defense in its Second Motion for Leave Order.  As HCMFA and its counsel knew, Plaintiff will be severely prejudiced by the inclusion of the Barred Defense in the summary judgment record because Plaintiff reasonably relied on the entry of the applicable Order and took no discovery related to the Barred Defense.  Consequently, Plaintiff cannot now adequately respond to the Barred Defense.  And, most fundamentally, there is no good faith basis to permit the Alleged Violators to argue an affirmative defense that has been prohibited.

**B.    HCMFA Is in Contempt of the Second Motion for Leave Order**

35.    HCMFA is in civil contempt for violating the Second Motion for Leave Order.

36.    "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995);

10

*Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009) (same).  The party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence: "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."  *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) (same); *Travelhost*, 68 F.3d at 961 (same).  "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Circ. 2000) (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013 1017 (5th Cir.1984)).

37.     Judicial sanctions in civil contempt proceedings may be employed for either or both of two purposes: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines*, 228 F.3d at 586 (internal quotations omitted). "Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of [their] adversary's noncompliance."  *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir.1976); *see also Travelhost*, 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature"); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d 609, 612 (5th Cir. 1997) (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.*, 43 F.3d at 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees).  Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding." *Am. Airlines*, 228 F.3d at 585; *see also F.D.I.C.*, 43 F.3d 168 (reviewing lower court's contempt order for "abuse

of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d at 613 ("The [] court's decision to impose sanctions is discretionary[]").

38.     Plaintiff easily meets the foregoing standards: (a) the Second Motion for Leave Order was entered in response to HCMFA's own motion and was effective when HCMFA defiantly included the Barred Defense in its summary judgment response; (b) the Second Motion for Leave Order expressly prohibited HCMFA from asserting the Barred Defense; and (c) HCMFA failed to comply with the clear requirements of the Second Motion for Leave Order by including the Barred Defense in its summary judgment pleading.  Accordingly, Plaintiff has demonstrated by clear and undisputed evidence that HCMFA is in civil contempt.  *See Whitcraft*, 570 F.3d at 272 (affirming finding of civil contempt where a court order was in effect, party was on notice of such order, and party failed to abide by it).  HCMFA's flouting of the Second Motion for Leave Order cannot be justified or explained away, and there is no basis to oppose this relief requested herein.

**C.     The Term Note Defendants Should Be Sanctioned under Rule 37**

39.     Under Rule 37(b), courts may "strik[e] pleadings in whole or in part" and find a party in "contempt" for violation of a discovery order.  FED. R. CIV. P. 37(b)(2)(A); *see also Matter of Ridgeway*, 973 F.3d 421, 428 (5th Cir. 2020).[11]  "This sort of sanction is justifiable when there is willful misconduct and when lesser sanctions will not achieve the desired deterrent effect." *Id.*; *see also Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012); ("In addition to a broad range of sanctions, including contempt, FED. R. CIV. P. 37(b)(2) authorizes the court to impose a concurrent sanction of reasonable expenses, including attorneys'

---

[11] For the avoidance of doubt, Rule 37 is incorporated into Federal Rule of Bankruptcy Procedure 7037 and applies in adversary proceedings such as these.  FED. R. BANK. P. 7037.

fees, caused by the failure to obey a discovery order"); *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990) (same).  Under Rule 37, a party, their attorney, or both, may be personally liable for reasonable expenses including attorney's fees caused by the failure to comply with a discovery order.  *See* FED. R. CIV. P. 37(b)(2)(C); *Smith*, 685 F.3d at 490; *Batson v. Neal Spelce Assocs., Inc.*, 765 F.2d 511, 516 (5th Cir. 1985).

40.     It is "well within the court's discretion to use sanctions as a tool to deter future abuse of discovery" under Rule 37. *Smith*, 685 F.3d at 490; *see also Chilcutt v. United States*, 4 F.3d 1313, 1323 n. 23 (5th Cir.1993) (stating that district courts "have authority to grant a broad spectrum of sanctions" under Rule 37(b), and "neither this Court nor the Supreme Court has ever determined that the lack of willful, contumacious, or prolonged misconduct prohibits all sanctions").

**D.     The Pully Report Should Be Stricken from the Record**

41.     The Pully Report should be stricken from the Term Note Defendants' Appendix under Rule 37(b)(2)(A)(iii).  By including the Pully Report in the record, the Term Note Defendants violated two discovery orders, the Scheduling Order and the Expert Order.  Moreover, the Term Note Defendants cannot be permitted to create factual issues in the summary judgment record with evidence that is inadmissible at trial.  *See Geiserman*, 893 F.2d at 792 ("We uphold the court's exclusion of the affidavit of the proposed expert witness [in summary judgment pleading], in order to enforce its discovery order and local rule. [Party] cannot attempt to create a fact issue with evidence of facts that cannot be proven at trial").

**E.     The Term Note Defendants Are in Contempt of the Expert Order**

42.     The Term Note Defendants should be held in contempt under Rule 37(b)(2)(A)(vii) for violating the two discovery orders; namely, the Scheduling Order and the Expert Order.

**F.** **The Term Note Defendants Should Reimburse Plaintiff for Reasonable Costs Incurred for Their Violation of the Discovery Orders**

43.      The Term Note Defendants should be held liable to Plaintiff for the reasonable costs and attorney fees and expenses incurred by Plaintiff as a result of Defendants' violation of the discovery orders under Rule 37(b)(2)(C).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order: (i) striking the Barred Defense (and all arguments in support of that defense) from the summary judgment record; (ii) striking the Pully Report from the summary judgment record; (iii) finding HCMFA, the Term Note Defendants, and their counsel in civil contempt of a court order; (iv) finding HCMFA, the Term Note Defendants, and their counsel in contempt of discovery orders and (v) granting Plaintiff such other and further relief that the Court deems just and proper.

Dated:  February 7, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

15