PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-------------------------------------------------------------------

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3004 |
| | § | |
| vs. | § | |
| | § | |
| | § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

-------------------------------------------------------------------

-------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,                    §
                                                      §
                         Plaintiff,                   §   Adv. Proc. No. 21-3005
                                                      §
vs.                                                   §
                                                      §
NEXPOINT ADVISORS, L.P., JAMES                        §   Case No. 3:21-cv-00880-C
DONDERO, NANCY DONDERO, AND                           §
THE DUGABOY INVESTMENT TRUST,                         §
                                                      §
                         Defendants.                  §
-------------------------------------------------------§
HIGHLAND CAPITAL MANAGEMENT, L.P.,                    §
                                                      §
                         Plaintiff,                   §   Adv. Proc. No. 21-3006
                                                      §
vs.                                                   §
                                                      §
HIGHLAND CAPITAL MANAGEMENT                           §   Case No. 3:21-cv-01378-N
SERVICES, INC., JAMES DONDERO,                        §
NANCY DONDERO, AND THE DUGABOY                        §
INVESTMENT TRUST,                                     §
                                                      §
                         Defendants.                  §
-------------------------------------------------------§
HIGHLAND CAPITAL MANAGEMENT, L.P.,                    §
                                                      §
                                                      §
                         Plaintiff,                   §   Adv. Proc. No. 21-3007
                                                      §
vs.                                                   §
                                                      §
HCRE PARTNERS, LLC (n/k/a NexPoint                    §   Case No. 3:21-cv-01379-X
Real Estate Partners, LLC), JAMES                     §
DONDERO, NANCY DONDERO, AND                           §
THE DUGABOY INVESTMENT TRUST,                         §
                                                      §
                         Defendants.                  §
-------------------------------------------------------§

**DECLARATION OF JOHN A. MORRIS IN SUPPORT OF PLAINTIFF'S OMNIBUS
MOTION (A) TO STRIKE CERTAIN DOCUMENTS AND ARGUMENTS FROM
THE RECORD, (B) FOR SANCTIONS, AND (C) FOR AN ORDER OF CONTEMPT**

I, John A. Morris, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

1.    I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to Highland Capital Management, L.P., the reorganized debtor in the above-captioned chapter 11 case and plaintiff in the above-referenced adversary proceedings, and I submit this Declaration in support of *Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt* (the "Motion"). I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.    Attached as **Exhibit 1** is a true and correct copy of excerpts of *Defendants' Memorandum of Law in Response to Plaintiff's Motion for Partial Summary Judgment* **(Adv. Pro. No. 21-3003, Docket No. 154)** showing the portions subject to the Motion.

3.    Attached as **Exhibit 2** is a true and correct copy of *Defendants' Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment* **(Adv. Pro. No. 21-3004, Docket No. 127)** showing highlighted portions subject to the Motion.

4.    Attached as **Exhibit 3** is a true and correct copy of the *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* **(Adv. Pro. No. 21-3005, Docket No. 70)**.

5.    Attached as **Exhibit 4** is a true and correct copy of the *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines* **(Adv. Pro. No. 21-3005, Docket No. 138)**.

6.    Attached as **Exhibit 5** is a true and correct copy of the *Brief in Support of Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure*

*and Discovery Deadlines* **(Case No. 3:21-cv-00880-X, <mark>Docket No. 22</mark> (N.D. Tex. Jan. 5, 2022))**.

7.       Attached as <mark>**Exhibit 6**</mark> is a true and correct copy of *Highland Capital Management, L.P.'s Brief in Support of its Objection and Response to Objections to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines* **(Case No. 3:21-cv-00881-X, <mark>Docket No. 38</mark> (N.D. Tex. Jan. 31, 2022))**.

8.       Attached as <mark>**Exhibit 7**</mark> is a true and correct copy of the transcript of the hearing held on January 10, 2022 **(Adv. Pro. No. 21-3004)**.

9.       Attached as <mark>**Exhibit 8**</mark> is a true and correct copy of the *Order Denying Defendant's Second Motion for Leave to Amend Answer* **(Adv. Pro. No. 21-3004, <mark>Docket No. 123</mark>)**.

10.       Attached as <mark>**Exhibit 9**</mark> is a true and correct copy of an e-mail string between myself and various counsel regarding our intent to file a motion for contempt.

Dated: February 7, 2022

*/s/ John A. Morris*
John A. Morris

# EXHIBIT 1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

the HCRE Term Note pursuant to the respective oral SSAs are genuine issues of material fact.[76]
Moreover, as discussed in greater detail below, Plaintiff failed to remind HCMS of prepayments
that had been made that relieved it of the obligation to make any additional payment in 2020.

### E. Prepayment on the Term Notes

#### 1. NexPoint's Prepayments

29.     NexPoint asserts the affirmative defense of prepayment on the NexPoint Note,
which relieved NexPoint of any obligation to make any additional payment in 2020.  Thus, the
NexPoint Note was not in default when no payment was made on December 31, 2020.  NexPoint
demonstrates *infra* that there is evidence supporting this affirmative defense and summary
judgment denying this affirmative defense is inappropriate as a matter of law.

30.     There is no dispute of fact that, between March and August of 2019, the following
payments were made on the NexPoint Note (collectively, the "NexPoint Prepayments"): (i)
$750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June
4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi)
$1,300,000.00 on August 13, 2019.[77]  These payments totaled $6,380,000.00 in 2019.[78]  The
normal December, 2019 payment of principal and interest on the Note would have been
$2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

31.     None of the aforementioned payments were scheduled payments or payments on
arrears.■  Rather, they were prepayments since the Plaintiff needed money and asked NexPoint to
transfer it funds for liquidity purposes, which NexPoint did.[80]  These transfers were intended by

---

[76] Defendants' position is bolstered by the Expert Report of Steven J. Pully, ¶ 59 (Def. Ex. 3-F, Def. Appx. 232),
which was incorrectly not permitted to be included in the record by the Court. Defendants submit this proffer to
preserve their objection.
[77] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249.
[78] *Id.*
■ ■
[80] Def. Ex. 1, J Dondero Dec., ¶ 42, Def. Appx. 21.

# EXHIBIT 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Davor Rukavina, Esq.
State Bar No. 24030781
Julian P. Vasek, Esq.
State Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard St., Ste. 3800
Dallas, TX 75201
Tel: 214-855-7500
Fax: 214-855-7584

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ ii

I. SUMMARY ............................................................................................................1

II. BACKGROUND ....................................................................................................2

    A. THE DEBTOR CAUSED HCMFA TO INCUR SUBSTANTIAL LOSSES ............................2

    B. THE PERSON IN CHARGE OF BOTH THE DEBTOR AND HCMFA DIRECTED
       THE DEBTOR TO COMPENSATE HCMFA FOR ITS LOSS, NOT TO MAKE LOANS ......4

    C. THE DEBTOR'S ACCOUNTING STAFF MISTAKENLY BOOKED THE TRANSFERS
       AS LOANS ON BEHALF OF BOTH THE DEBTOR AND HCMFA ...............................6

    D. DESPITE THE DEBTOR'S MISTAKE, HCMFA NEVER ACTUALLY SIGNED
       THE NOTES ...................................................................................................14

III. SUMMARY JUDGMENT STANDARD ........................................................................23

IV. ARGUMENT AND AUTHORITIES ............................................................................24

    A. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
       WHETHER HCMFA SIGNED THE NOTES ............................................................25

        i. Waterhouse did not Actually Sign the Notes ..............................................26

        ii. Even if Waterhouse Signed the Notes, He Did Not Have Authority .........27

        iii. Even if Waterhouse Signed the Notes and had Authority,
           the Notes are Ambiguous ...........................................................................31

    B. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE
       NOTES WERE THE RESULT OF A MUTUAL MISTAKE..............................................33

    C. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE
       DEBTOR GAVE CONSIDERATION IN EXCHANGE FOR THE NOTES ...........................36

    D. TURNOVER IS NOT AN APPROPRIATE REMEDY UNDER THESE CIRCUMSTANCES ...36

V. CONCLUSION.......................................................................................................36

CERTIFICATE OF SERVICE ..........................................................................................38

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Allen v. Berrey*, 645 S.W.2d 550 (Tex. App.—San Antonio 1982)................................33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................24

*Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*,
   2017 Bankr. LEXIS 3191 (Bankr. N.D. Tex. Sept. 21, 2017)................................23

*Brown v. White's Ferry, Inc.*, 280 F.R.D. 238 (D. Md. 2012)......................................10

*Capobianco v. City of N.Y.*, 422 F.3d 47 (2d Cir. 2005)..............................................10

*Childers v. Pumping Systems, Inc.*, 968 F.2d 565 (5th Cir. 1992)................................31

*Claimant ID 100218776 v. BP Expl. & Prod.*, 712 Fed. Appx. 372 (5th Cir. 2017)....................29

*DeClaire v. G&B McIntosh Family Ltd. P.ship*, 260 S.W.3d 34
   (Tex. App.—Houston [1st] 2008) ......................................................34

*Follenfant v. Rogers*, 359 F.2d 30 (5th Cir. 1966)......................................................26

*Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007) ..........................................................30

*Garza v. Villarreal*, 345 S.W.3d 473 (Tex. App.—San Antonio 2011) ..................33, 36

*Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010) ....................30

*Gross v. GGNSC Southaven, LLC*, 817 F.3d 169 (5th Cir. 2016) ................................16

*Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011) ............................................35

*In re Fang Operators*, 158 B.R. 643 (Bankr. N.D. Tex. 1993) ....................................36

*IRA Res., Inc. v. Griego*, 221 S.W. 3d 592 (Tex. 2007) ............................................28

*Jones v. Anderson*, 721 Fed. Appx. 333 (5th Cir. 2018)..........................................25

*Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313 (5th Cir. 2016)..............................25

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930 (N.D. Tex. April 13, 2015)............28, 30

*Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170 (4th Cir. 1998)............................10

*Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802
    (N.D. Tex. Jan. 10, 2011)........................................................................26

*Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678 (W.D. Tex. Sept. 29, 2011)...............26

*Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018 (5th Cir. 1995)........................................24

*Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431 (Colo. App. 1982) ........................31

*Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37 (Tex. App.—Dallas 2003) ..............................36

*S. Mansukhlal & Co v. Husein*, 14-04-00018-cv, 2004 Tex. App. LEXIS 8097
    (Tex. App.—Houston [14th] Sept. 2, 2004) ............................................32

*Satelco, Inc. v. North Amer. Publishers, Inc. (In re Satelco, inc.)*, 58 B.R. 781
    (Bankr. N.D. Tex. 1986) ..................................................................36

*Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005,
    Tex. App. LEXIS 6215 (Tex. App.—Fort Worth Aug. 4, 2005).............................31

*Silverio v. Silverio*, 625 S.W.3d 680 (Tex. App.—El Paso 2021) ..........................................25, 27

*Smith-Gilbard v. Perry*, 332 S.W.3d 709 (Tex. App.—Dallas 2011)......................................33

*Strickland v. Coleman*, 824 S.W.2d 188 (Tex. App.—Houston [1st] 1991) ..........................24, 25

*Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607 (Tex. App—Houston [1st] 2004) ..................36

## Statutes

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 1.201 ........................................................................28

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 3.305 ........................................................................24

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 3.308 ........................................................................25, 27

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 3.402 ........................................................................27, 31

Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 3.403 ........................................................................27

## Rules

Fed. R. Civ. P. 8 ........................................................................................26

Fed. R. Civ. P. 11 .............................................................................................26

Tex. R. Civ. P. 92 .............................................................................................26

Tex. R. Civ. P. 93 .............................................................................................26

TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Highland Capital Management Fund Advisors, L.P. ("HCMFA"),
defendant in the above-captioned adversary proceeding (the "Adversary"), and files this its brief
in opposition to *Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*
(Dkt. No. 91, the "Motion"), filed by plaintiff Highland Capital Management, L.P. (the "Debtor"),
in support of which HCMFA would respectfully show the Court as follows:

## I.     SUMMARY

1.      The notes represent a mutual mistake: the $7.4 million the Debtor transferred to
HCMFA was compensation for damage the Debtor caused to HCMFA by the Debtor's own
negligence and fault; it was not as a loan. Mr. Waterhouse never even signed the Notes or
authorized anyone to affix his electronic signature. Even if he did, HCMFA itself never authorized
Mr. Waterhouse to execute the notes, and he did not have apparent authority to bind HCMFA in
light of the fact that he was also an officer of the Debtor.

2.      This led to the natural progression of one mistake after another—each by the
Debtor's employees. First, those employees caused the underlying liability to a fund HCMFA
manages, pursuant to which HCMFA paid out $7.4 million to third parties. Second, when Mr.
Dondero directed the Debtor to transfer $7.4 million to HCMFA as compensation, the Debtor's
employees assumed, without instruction or authority from HCMFA or the Debtor, that the transfers
represented intercompany loans. Third, those employees papered up the transfers as loans, without
authority or approval. Fourth, those employees affixed Mr. Waterhouse's electronic signature to
the notes, again without authority or approval. Fifth, those employees then carried the notes as
liabilities on HCMFA's books and records, and as assets on the Debtor's books and records—even
then with substantial confusion and ambiguity. Sixth, because HCMFA executed two prior notes

to the Debtor in similar amounts, someone reviewing either sets of books and records could, and did, easily confuse the unauthorized mistaken notes for the two valid notes.

3.       All of the foregoing presents numerous legal defenses to the Notes under Texas law.  And all of the foregoing has extensive, if not compelling, evidentiary support.  Thus, genuine issues of material fact exist as to whether the notes are even valid and collectible in the first place, and whether they represent a mutual mistake, such that summary judgment is inappropriate and should be denied.  It will be for the jury to decide these questions of fact and the witnesses' credibility.

## II.       BACKGROUND

### A.       THE DEBTOR CAUSED HCMFA TO INCUR SUBSTANTIAL LOSSES

4.       HCMFA is a registered advisor that advises third-party funds as to their investments.  HCMFA Appx 2.[1]  At all relevant times, including from 2018 to present, HCMFA served as advisor to Highland Global Allocation Fund (the "Fund").  HCMFA Appx 2.  At issue are two transactions involving equity interests in TerreStar Corporation ("TerreStar") that took place in March 2018 (the "March Transactions").  HCMFA Appx 2.  In particular, an error occurred concerning the net asset value ("NAV") that was assigned to the TerreStar interests in connection with the March Transactions (the "NAV Error").  HCMFA Appx 2.  The NAV Error is described in more detail in that certain April 7, 2019 *Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error in the Fund* (the "NAV Memo").  HCMFA Appx 2, 7-17.

5.       During this time period, however, HCMFA did not perform its own valuation

---

[1]       "HCMFA Appx." refers to the *Defendant's Appendix in Opposition to Plaintiff's Motion for Summary Judgment*, which is being filed contemporaneously herewith.

services. HCMFA Appx 3; Debtor Appx. 03042.[2] Instead, HCMFA outsourced these and many

other services to the Debtor, and the Debtor performed such services on HCMFA's behalf pursuant

to that certain *Second Amended and Restated Shared Services Agreement* (the "SSA"). HCMFA

Appx 3, 18-30; Debtor Appx. 03042. Indeed, all of the "Adviser Representatives" involved in the

NAV Error—Thomas Surgent, Frank Waterhouse, Jason Post, and Lauren Thedford—were

employees of the Debtor, not HCMFA. HCMFA Appx 3, 7. The Fund's board of directors was

well aware of the relationship between the Debtor and HCMFA, was well aware that the Debtor

housed all valuation staff, and was well aware the Debtor performed all valuation activities.

HCMFA Appx 3; Debtor Appx. 03047. The Fund and HCMFA relied on the Debtor to perform

these services, and the NAV Error, including the Debtor's involvement and responsibility, were

material aspects of board conversations for over a year. HCMFA Appx 3.

6. As described in more detail in the May 28, 2019 *Memo regarding Resolution of the
Fund's Net Asset Value Error*, Debtor Appx. 02978, HCMFA ultimately made the Fund whole
through a $5,186,496 payment from HCMFA on February 15, 2019 and a $2,398,842 payment
from HCMFA on May 2, 2019.

7. James Dondero, the President of both the Debtor and HCMFA, was fully aware of
these issues at the time. HCMFA Appx 1, 3. Mr. Dondero believed and understood that the Debtor
was liable to HCMFA for causing or failing to prevent the NAV Error. HCMFA Appx 3.

8. The Debtor tries to deflect responsibility for the NAV Error to Houlihan Lokey.
But during his rule 12(b)(6) deposition, HCMFA's corporate representative explained the Debtor's
responsibility vis-à-vis Houlihan Lokey:

---

[2]     "Debtor Appx." refers to the Debtor's *Appendix in Support of Highland Capital Management, L.P.'s Motion
for Partial Summary Judgment in Notes Actions* (Dkt. No. 94).

Q.     Okay.   Well, the defense—HCMFA's defense is that Highland is responsible for the TerreStar valuation issue, correct?

A.     Yes.

Q.     And there's no question that Houlihan Lokey provided services in connection with that valuation, correct?

A.     Correct.

Q.     But HCMFA has not undertaken any analysis or investigation, to the best of your knowledge, to try to determine if Houlihan Lokey was the responsible party; fair?

A.     We don't know if there is a contract or not.  At this point, we're talking about the defense of Highland's responsibility.  There's no question they were responsible for the valuations.  They were outsource provider to the valuation committee.  Every individual working and coordinating with Houlihan Lokey was an HCMFA [sic[3]] employee.  All the data and information that was provided to them came from HCMLP.  There's no question that Highland was responsible for the NAV Error.  No one ever questioned that.  That was always known.  It was all the employees that were involved.

Debtor Appx. 03043; Debtor Appx. 03053 (similar testimony).

9.     Regardless of whether Houlihan Lokey or the Debtor was the primary party responsible for the NAV Error and resulting losses, the facts remain that the Debtor caused the losses, HCMFA accepted responsibility to the Fund and paid out compensation, and Mr. Dondero reasonably believed that the Debtor was liable to HCMFA for those losses.  He acted accordingly, and the Debtor has not sued to avoid those actions.

## B.    THE PERSON IN CHARGE OF BOTH THE DEBTOR AND HCMFA DIRECTED THE DEBTOR TO COMPENSATE HCMFA FOR ITS LOSS, NOT TO MAKE LOANS

10.     Accordingly, on May 2, 2019, Mr. Dondero—who, again, was the President of both the Debtor and HCMFA—directed the Debtor to transfer $2.4 million to HCMFA.  On May 3,

---

[3]     This reference to HCMFA instead of HCMLP is plainly a typographical error.  Two pages later, Mr. Norris testified, "Again, all employees working with Houlihan Lokey were the HCMLP employees."  Debtor Appx. 03043.  A few pages later, he testified, "But I would say every single person that interacted with the SEC, I believe, were HCMLP employees."  Debtor Appx. 03045; *see also* Debtor Appx. 03048.

2019, Mr. Dondero directed the Debtor to transfer another $5 million to HCMFA (collectively, the "Transfers"). HCMFA Appx 3. The amounts of these Transfers mirror the amounts HCMFA paid the Fund.

11.     The purpose of the Transfers was for the Debtor to compensate HCMFA for the damages HCMFA paid in connection with the NAV Error. HCMFA Appx 3-4; Debtor Appx. 03048. It was appropriate for the Debtor to compensate HCMFA because the Debtor's employees caused or failed to prevent the NAV Error and because of the Debtor's duties under the SSA. HCMFA Appx 4. As Mr. Dondero testified during his deposition on November 4, 2021, transferring these funds from the Debtor to HCMFA to settle the fallout from the NAV Error was "a critical piece of putting the issue to bed." HCMFA Appx 4; Debtor Appx. 01835.

12.     Specifically, Mr. Dondero instructed Frank Waterhouse, the Debtor's Chief Financial Officer and HCMFA's Treasurer—to make the Transfers. HCMFA Appx 4. He never instructed or suggested to Mr. Waterhouse that the Transfers were loans nor to book them that way. HCMFA Appx 4. Mr. Waterhouse never asked Mr. Dondero whether the Transfers were loans or should be drawn up as such. HCMFA Appx 4; Debtor Appx. 02129 (319:3-6). Indeed, Mr. Dondero never said anything to cause Mr. Waterhouse to reach such an understanding. HCMFA Appx 4. Mr. Waterhouse testified more than once, in fact, that he does not recall Mr. Dondero instructing him to book the Transfers as loans. Debtor Appx. 02085 (145:3), 02120 (284:4-6). Mr. Dondero simply told Mr. Waterhouse to "go get the money from Highland." Debtor Appx. 02120 (283:4-5), 02129 (318:8-10). At the same time, however, Mr. Waterhouse confirmed his understanding from his discussion with Mr. Dondero that the transfers were related to the NAV Error and resulting losses to HCMFA. Debtor Appx. 02085 (145:3-12); 02117-18.

13.     Nor did anyone else at the Debtor or HCMFA follow up with Mr. Dondero to ask whether the transfers were loans, and no one either at HCMFA or the Debtor presented Mr.

Dondero with promissory notes to sign or otherwise presented Mr. Dondero with any document to approve the Notes. HCMFA Appx 4. Nor has the Debtor identified any such evidence. At the amounts of $5 million and $2.4 million, however, internal policies and procedures would have required the Notes to go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA, and ultimately through Mr. Dondero for his approval, neither of which happened. HCMFA Appx 4.

## C. THE DEBTOR'S ACCOUNTING STAFF MISTAKENLY BOOKED THE TRANSFERS AS LOANS ON BEHALF OF BOTH THE DEBTOR AND HCMFA

14. As noted above, the Notes should have gone through the Debtor' legal department for preparation, approval, and execution. *E.g.*, Debtor Appx. 02122 (291:3-16); 02122-23 (293:18 - 296:7).[4] In additional to legal, Mr. Waterhouse would have expected Mr. Dondero to approve Notes of this size, as his approval was necessary. Debtor App. 02117. Mr. Waterhouse acknowledged he lacked the requisite authority. *Id.* But none of that happened. The Notes did not go through the Debtor's legal department at all; they were prepared and signed by a mid-level Debtor employee in the accounting department, who was not an employee of HCMFA, as detailed below. Mr. Dondero was unaware of the Notes and never even saw them until just before this litigation commenced. HCMFA Appx. 5.

15. Unbeknownst to Mr. Dondero, HCMFA's accounting staff—who were also employees of the Debtor acting under the SSA—erroneously booked the Transfers as loans and erroneously papered promissory notes to reflect their incorrect understanding of the Transfers. HCMFA Appx 5. Likewise, these same individuals erroneously caused the Debtor and HCMFA

---

[4] Mr. Morris waived his objection to this question by insisting that the witness complete his answer. Debtor Appx. 02123 (295:12). In any event, the question was not objectionable. To the extent the Debtor asserts a more specific objection, HCMFA reserves the right to respond. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

to reflect these transfers as loans on various financial statements and disclosures. HCMFA Appx 5. But Mr. Dondero, the individual ultimately in charge of both entities, was not aware of these errors until this litigation commenced. HCMFA Appx 5. Nor could Mr. Waterhouse "recall specifically what amounts of money were moved when, for what purpose." Debtor Appx. 02081 (126:5-7).

16. HCMFA's corporate representative likewise testified that HCMFA was unaware of the Notes until the Debtor made its demand because it outsourced finance and corporate accounting functions to the Debtor. Debtor Appx. 03024 (38:3-9), 03025 (42:23-43:3), 03028 (55:12-18). At the same time, HCMFA was unaware of the errors on its financial statements, again because it outsourced finance and corporate accounting functions to the Debtor. Debtor Appx. 03030 (64:15-65:3).

17. Prior to the Debtor's demand to pay these Notes until shortly before this litigation commenced, no one at the Debtor or HCMFA informed Mr. Dondero of the Notes. HCMFA Appx 5. To the extent that he saw any books and records or other financial documents of the Debtor or HCMFA beforehand, he would not have noticed the Notes so as to raise an issue. HCMFA Appx 5. Before the Notes in question, HCMFA issued two other promissory notes to the Debtor, in similar amounts, the dates of collection on which were extended through May, 2021. HCMFA Appx 5, 42, 45. Thus, if Mr. Dondero saw any such records or documents, he would have naturally assumed that any reference to promissory notes referred to these prior two notes, not the Notes in question. HCMFA Appx 5.

18. The Debtor points to documents like the October 23, 2020 *Memo Regarding Supplemental 15(c) Information Request* (the "15(c) Memo") as evidence that HCMFA was aware of the Notes. Debtor Appx. 00884. Yet this document, and underlying e-mail communications culminating in the execution of this document, demonstrate the opposite.

19.     The document states that "$12,286,000 remains outstanding to HCMLP from HCMFA. . .   The earliest the Note between HCMLP and HCMFA could come due is in May, 2021."  Debtor Appx. 00885.  Logically, and certainly for purposes of summary judgment, this statement cannot refer to the Notes, as: (i) the Notes are plural, not singular; (ii) they are for materially less than $12 million; and (iii) they are demand notes subject to demand at any time.  Debtor Appx. 00010-15.  In his e-mail leading up to the document, Mr. Waterhouse, who allegedly signed the Notes and who surely would have a memory of the Notes if in fact he signed them, wrote: "The HCMFA note is a demand note. . . There was an agreement between HCMLP and HCMFA the earliest they could demand is May 2021."  Debtor Appx. 00791.  Yet the Notes are not a "note," and there was no collection delay until May, 2021, thus demonstrating that Mr. Waterhouse was not referring to, nor admitting the existence of, the Notes.

20.     As HCMFA's corporate representative explained, "[h]e [Mr. Waterhouse] himself seems to be confused here, because as we found out through discovery and in the testimony of what has come out, there was an agreement—that was a separate agreement.  That wasn't related to the notes at issue in this case."  Debtor Appx. 03034 (81:5-10).[5]  Nor could it have been related.  Mr. Waterhouse used the singular when there are multiple notes at issue.  Additionally, HCMFA's corporate representative explained that the numbers do not add up:

> Q.     As HCMFA's 30(b)(6) witness today, have you done anything to determine whether or not the $12.286 million number includes the principal amount of the notes?
>
> A.     Looking at it, we can't tell.  Because it doesn't line up exactly with those notes.  There were other notes that had been recorded in the books for several years before.  And if you add those two together, it doesn't add up.  So it's not clear.

---

[5]     The Court should deny Mr. Morris's motion to strike.  The answer was responsive to the question he asked, even if he did not like the answer.  When asked if Mr. Morris accurately summarized his testimony, the witness was entitled to clarify his testimony.

Debtor Appx. 03034 (79:5-14). Indeed, the Debtor also sued HCMFA to collect on the other two

notes, copies of which are included in HCMFA's appendix. HCMFA Appx. 31-64.

21.     To be clear, Mr. Dondero's intent, both as the person who controlled HCMFA and

the person who controlled the Debtor, was for these Transfers ($5 million and $2.4 million) to

constitute compensation from the Debtor to HCMFA for the NAV Error, not loans. HCMFA Appx

5. But, as Waterhouse informed Mr. Dondero in early May 2019, the Debtor did not have sufficient

funds to make these Transfers. HCMFA Appx 5. Thus, Mr. Dondero personally paid most if not

all of the $7.4 million into the Debtor at or around the same time to enable the Debtor to make the

Transfers to HCMFA, again under the belief and understanding that the Debtor would use these

funds to compensate HCMFA for the NAV Error, not to make a loan. HCMFA Appx 5.

22.     Still, the Debtor's employees, acting for both the Debtor and HCMFA, erroneously

booked the Transfers as loans. But the Debtor's own evidence—specifically, the deposition of

David Klos—demonstrates how this mistake occurred and why it is not surprising. Mr. Klos was

the Debtor's controller, Debtor Appx. 03183 (6:22-25), and he instructed Debtor employee Kristin

Hendrix to prepare the Notes. Debtor Appx. 03198 (68:4-13). Mr. Klos discussed how funds

would be transferred from one affiliated entity to another as needed for liquidity:

> And you joined Highland in 2009. From that point in time, 2009, through 2019,
> was there any practice at the enterprise of those businesses to transfer funds
> between each other on a basis of when one needed it and one had it?
>
> A.      Yes, that was a fairly, generally speaking, that was a fairly common
> practice, of using different entities within the overall structure to bridge liquidity.

Debtor Appx. 03189 (29:24-30:7). Klos also testified as to the standard practice that, where the

Debtor was transferring funds out, the transfer would be booked as a loan:

> So over the general—talking about generally now, over those 10 years when there
> were these intercompany transfers for liquidity purposes, how were they booked by
> the debtor, by Highland Capital Management?

MR. MORRIS: Objection to the form of the question.[6]

THE WITNESS: Help me on the direction. So this is money that Highland is receiving or money that Highland is sending?

Q.    (BY MR. RUKAVINA) Sending out.

A.    Sending out. So this is—in the scenario that you're describing, this money that Highland is sending out to meet some other corporate obligor's liquidity needs?

Q.    Yes, sir.

A.    So those would be booked as a loan. I would—I need to hedge a little bit because I'm not a hundred percent certain, but I would say if not exclusively via loans close to exclusively.

Q.    And would they—strike that. Would they usually be papered up with a promissory note?

A.    Yes.

Q.    Now, why was that the general course during 10 years? Was there a policy and procedure in place, or would Dondero say book it as a loan, or was that just the right thing to do from an accounting perspective?

MR. MORRIS: Objection to the form of the question.[7]

THE WITNESS: At the end of the day it's at the direction of Jim Dondero, so I can't tell you exactly why he wanted it to be done that way. But that was certainly the practice of how it was done in those situations.

Debtor Appx. 03189-90 (32:20-34:5).

23.    Thus Mr. Klos believed that the underlying transfers were loans, in part because he

believed that Mr. Waterhouse would have told him that (but could not recall for certain), and in

---

[6]    The Debtor has waived Mr. Morris's objections. "[A] party waives any objection to the admissibility of evidence on summary judgment by offering that evidence in support of its own motion. *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012) (citing *Capobianco v. City of N.Y.*, 422 F.3d 47, 55 (2d Cir. 2005); *Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998)). In any event, it is unclear what Mr. Morris's objection is, and HCMFA reserves the right to respond if and when the Debtor raises a specific objection. If the objection is foundation, Mr. Rukavina laid the requisite predicate. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[7]    The Debtor has waived this objection. *Supra*, note 4. It is also unclear what the objection is, so HCMFA reserves the right to respond to a specific objection if and when the Debtor makes one. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

part because of past practice.  Debtor Appx. 03199 (69:1-70:14).  Mr. Klos described the usual

course at the Debtor with respect to papering intercompany loans:

> Q.      (BY MR. RUKAVINA) So going back to this Exhibit 3, sir, why did you ask Kristin, can you or Hayley please prep a note for execution? Why them? Remember, I was asking about what the course or procedure was at that point in time.
>
> A.      Yeah, so nomenclature, procedure, process. I would say the informal process for these types of loans, they were frequent in nature, would be for someone on the corporate accounting team to prepare a note and have it executed.
>
> Q.      Okay. That was the standard course back then?
>
> A.      Again, I don't know what standard course means. That was fairly typical.
>
> Q.      Why would you not have asked someone in the Highland legal department to prepare a note?
>
> A.      Because this was a legally reviewed document as far as the form of the agreement. It's a one-page, two-paragraph form that had been used for a long time. So the only thing that would change with respect to these notes would be the date, the amount, likely the rate. I can't think of anything else offhand that would have changed from note to note.
>
> Q.      After you asked Ms. Hendrix to prepare this note, did you have any further role with respect to the papering, preparation, or execution of that note?
>
> A.      Not that I can remember.
>
> Q.      Would you have had any role in having either or both of the notes actually signed electronically or by ink by Mr. Waterhouse?
>
> A.      Likely not, no.

Debtor Appx. 03202 (83:19-84:24).

24.     Ms. Hendrix, the Debtor's senior accountant and not an employee of HCMFA,

likewise testified to the usual course when intercompany transfers occurred:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down -- when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

Debtor Appx. 03132 (21:10-16). Stated differently, at that time "it's all one big happy family, and whoever needed cash, the cash moved around." *Id*. 472 (23:3-6).

25.      The point is a simple one: when the Debtor's accountants saw large transfers from the Debtor to an affiliate, in this case HCMFA, they *assumed* the transfers were loans and, pursuant to their historical practice, they papered the transfers up as loans. But, as non HCMFA employees, they of course had no authority or ability to bind HCMFA on any promissory notes.

26.      Thus began the papering up of the Transfers as loans, based on these assumptions. At the same time, both Mr. Waterhouse and Mr. Dondero confirmed that internal policies and procedures would have required the Debtor's legal department, also providing legal services to HCMFA under the SSA, to review and approve the Notes: "The internal policies and procedures at the Debtor and HCMFA, as well as ordinary practice, required that loans in amounts such as $5 million and $2.4 million would go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA …." HCMFA Appx. 4. Mr. Waterhouse likewise testified that "the team [accounting] would have worked with the legal group at Highland to draft any notes." Debtor Appx. 02122 (290:15-16).[8] In fact, Mr. Waterhouse would have expected there to be a representation, represented by a box or section on a cover document, that "legal" has reviewed or approved the document before he would sign it. Debtor Appx. 02123 (294:16-22).[9]

---

[8]     The Debtor has waived Mr. Morris's objection. *Supra*, note 4. In any event, the question was not objectionable, and Mr. Waterhouse gave the same answer in response to another question not much later. Debtor App. 02122 (291:3). "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[9]     The Debtor has waived Mr. Morris's objection. *Supra*, note 4. In any event, the question was not objectionable, and Mr. Morris waived his objection by insisting that the witness complete his answer. Debtor Appx. 02123 (295:12). "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

27.      This was not done here.  Ms. Hendrix, who prepared and signed the Notes, testified

that she did not run the Notes through the legal department.  Debtor Appx. 03138 (46:18-24).  In

fact, and contrary to Mr. Waterhouse's testimony, she testified that it was not standard practice for

the legal department to prepare and approve intercompany notes, but that this was handled instead

by the accounting department using a prior template approved by the legal department.  Debtor

Appx. 03131 (18:1-19:13; 20:1-5).[10]

28.      Thus, Mr. Waterhouse instructed Mr. Klos to make the Transfers from the Debtor

to HCMFA.  Debtor Appx. 00871; 03134-35 (32:13-33:4).  Mr. Waterhouse never instructed Mr.

Klos to paper the Transfers as loans; at least neither one of them remembered or was able to

identify any such conversation or instruction.  Debtor Appx. 03199 (69:11-15); *see* Debtor Appx.

02122 (290:4-293:11.  Mr. Klos, understanding that the Transfers were loans—but again, without

any authority or instruction to make them loans—then instructed Ms. Hendrix to paper the

Transfers as loans.  Debtor Appx. 00871; 03134-35 (32:13-33:4).  It was then Ms. Hendrix who

actually prepared the Notes.  Debtor Appx. 03137 (42:15-43:20).

29.      Again, the point is simple: when professional accountants at the Debtor saw funds

flowing from the Debtor to an affiliate, such as HCMFA, they *assumed* that the funds were a loan

and papered it as such, as this is how it had been done for many years on many occasions.  But

that is not how Mr. Dondero, the person in charge of both entities—intended it to be done here,

and no one asked him.  HCMFA Appx. 4.  That Mr. Waterhouse, as part of the accounting group,

was copied on the e-mails whereby Mr. Klos instructed Ms. Hendrix to paper the Transfers as

loans does not change this result.  At most, it is evidence that Mr. Waterhouse also understood the

---

[10]      The Debtor has waived Mr. Morris's objection.  *Supra*, note 4.  In any event, the question was not
objectionable, and Ms. Hendrix is competent to testify regarding the ordinary practice at the Debtor given
her 17 years of employment.  Debtor Appx. 03129.  "Form" objections are also invalid under the Federal
Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to
correct any perceived objection.

Transfers to be loans, but: (i) Mr. Dondero never instructed that they be loans; (ii) Mr. Waterhouse lacked any authority to make them loans; and (iii) at best, he *assumed*, as did the others, that the Transfers were loans.

**D.    DESPITE THE DEBTOR'S MISTAKE, HCMFA NEVER ACTUALLY SIGNED THE NOTES**

30.    Despite the fact that the Notes exist, at least nominally, Mr. Waterhouse does not specifically recall signing the Notes.  Debtor Appx. 02084 (141:4-7).  In fact, Mr. Waterhouse did not typically sign promissory notes.  Debtor Appx. 02085 (144:10-12).  Mr. Waterhouse did not draft the Notes and does not recall asking anyone to draft the Notes.  Debtor Appx. 02085-86 (145:23-146:7).  According to Mr. Waterhouse, "the legal group at Highland is responsible and has always been responsible for drafting promissory notes."  *Id.*  He reiterated, "The team knows to—I mean, we don't draft documents.  We're not lawyers.  We're not attorneys."  It is not what I do or accountants do."  Debtor Appx. 02086 (147:19-22).  But the Debtor has not cited any documents or communications from within the legal department related to the Notes and, as noted above, Ms. Hendrix confirmed that she did not go through the legal department in preparing the Notes.

31.    Upon examining the two notes side by side, Mr. Waterhouse realized that he could not have signed the notes:

A.    These—these—these signatures are identical, now that I stare at them, and I mean, they are so close—I mean, they're identical that, I mean, even with my chicken scratch signature, I don't know if I can—you know, I do this 100 times, could I do that as—as precisely as I see between the two notes.

Q.    Well, that is why I ask.  Mr. Waterhouse, now that you have examined them, does it seem like it is more likely that you actually electronically signed these?

MR. MORRIS: Objection to the form of the question.[11]

_____

[11]    The Debtor has waived this objection.  *Supra*, note 4.  Furthermore, it is not clear exactly what the objection is, and HCMFA reserves the right to respond if an when the Debtor asserts one.  If the question is leading, there is no complete prohibition against leading questions, and, in any event, the witness was being cross

A.   Is—I don't—I don't recall specifically.  As I said before, my assistant did have a—an electronic signature, and that was used from time to time.  It wasn't as common practice back in 2019.  It definitely was more common practice when we had to work from home and remotely for COVID because it that made it almost impossible to, right, provide wet signatures since we're all working from home remotely.

Q.   Well, going just for these two promissory notes, Mr. Waterhouse, in light of your inability to remember any details, are you sure you actually signed wither or both of these notes?

MS. DANDENEAU:  Objection to form.

A.   I don't recall specifically signing—actually physically signing these notes.  As I said before, I don't recall doing that.  This—this looks like my signature, but yet these two signatures are identical.

Q.   So you don't recall physically signing them, and I take it you don't recall electronically signing them either?

A.   I don't recall.  You know, Highland has all my emails.  If that occurred, you know, you know, I don't have any of these records is what I'm saying.  I don't have any of those records.

Debtor Appx. 02124 (298:10-300:4).  The Debtor has never produced an email, and HCMFA is not aware of one, in which Mr. Waterhouse authorized anyone to affix his electronic signature to the Notes.

32.   Mr. Waterhouse later elaborated on the process he used in the rare circumstance when he signed documents electronically:

Q.   And help me here.  I'm not very technologically astute.  When you—and I—I recognize that you do it rarely, but when you sign a document electronically, do you believe that there is an electronic record of you having authorized or signed a document electronically?

MR. MORRIS: Objection to the form of the question.[12]

---

examined.  *See* Fed. R. Evid. 611(c).  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[12]   The Debtor waived this objection.  *Supra*, note 4.  Furthermore, it is not clear what the basis of the objection is, and HCMFA reserves the right to respond if and when the Debtor asserts one.  The question is about the witness's belief, which is a legitimate inquiry.  "Form" objections are also invalid under the Federal Rules as

A.     I—I don't know the tech answer to that, but, you know, since I don't have—I don't ever attach my signature block electronically, my assistant would have done that, and if that is done over email like we did several times—you know, multiple, multiple times over COVID, she would attach my signature block and then email it out to whatever party.

Q.     What was your assistant's name in May 2019.

A.     It was Naomi Chisum.

Debtor Appx. 02129 (320:11-321:7). The Debtor has not included any emails in its appendix with

Ms. Chisum meeting this description.

33.     During his deposition, Mr. Waterhouse also testified that he did not have authority

to borrow at this level as HCMFA's treasurer, nor to lend at this level as the Debtor's CFO:

Q.     Yes. So in your capacity as the chief financial officer of the debtor, Highland Capital Management, L.P., in May of 2019, did you believe that you unilaterally, just Frank Waterhouse, had the authority to loan on behalf of the debtor to anyone $5 million and $2.4 million?

MR. MORRIS: Objection to the form of the question. [13]

A.     No.

Q.     Is it because loans of that amount would have had to be approved by someone else?

A.     Yes.

Q.     Who in '20—in May of 2019, if Highland wanted to loan 5 million or $2.4 million to someone, what would have been the internal approval procedure?

MR. MORRIS: Objection to the form of the question. [14]

---

they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[13] The Debtor waived Mr. Morris's objections. *Supra*, note 4. In any event, Mr. Waterhouse is competent to testify about his own authority or lack thereof. *See Gross v. GGNSC Southaven, LLC*, 817 F.3d 169, 179 (5th Cir. 2016) ("holding agent was competent to testify about the scope of his own agency). Indeed, Mr. Morris opened the door by asking nearly identical questions earlier in the same deposition. *E.g.* Debtor Appx. 02089. For purposes of summary judgment however, the Court must accept as true the testimony most favorable to HCMFA. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[14] *Supra*, note 4. Furthermore, Mr. Waterhouse, as the Debtor's Chief Financial Officer, it qualified to testify about the Debtor's procedures for extending credit. "Form" objections are also invalid under the Federal

A.      If—if we had loans of that nature that needed to be made due to their size, we would have gotten approval from the president of Highland.

Q.      And who was that individual?

A.      It was James Dondero.

Q.      Okay.  Now I'm going to ask you a similar question but for a different entity.

In May of 2019, as the treasurer of HCMFA, did you believe that you unilaterally had the ability to cause HCMFA to become the borrower of a $5 million loan and a $2.4 million loan?

MR. MORRIS: Objection to the form of the question.[15]

A.      No.

Q.      What would—what would the approval have taken place—strike that.

What would the approval process been like in May of 2019 at HCMFA for HCMFA to take out a $7.4 million loan?

MR. MORRIS: Objection to the form of the question.[16]

A.      The process would have been similar to what we just discussed in—for Highland to make a loan to others.  So, again, you know, we—we would have—either myself or someone on the team would have discussed this with the—the president and owners of—of HCMFA.

Q.      And who was that individual?

A.      That was James—Jim Dondero.

Q.      So do I understand that in May of 2019, on behalf of both the lender, Highland, and the borrower, HCMFA, Mr. Dondero would have had to approve $7.4 million in loans?

MR. MORRIS: Objection to the form of the question.[17]

---

Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[15]     *Supra*, note 4.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[16]     *Supra*, note 4.  Furthermore, Mr. Waterhouse, as HCMFA's Treasurer, is qualified to testify about HCMFA's procedures for incurring debt.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[17]     *Supra*, note 4.  Furthermore, this question is not objectionable.  It accurately summarizes Mr. Waterhouse's immediately antecedent testimony.  "Form" objections are also invalid under the Federal Rules as they fail

**A.** Yes.

Debtor Appx. 02117 (270:25-273:9). HCMFA's corporate representative confirmed that Mr. Waterhouse alone did not have authority to execute the notes. Debtor Appx. 03062 (192:4-21).

34. Another witness's testimony confirms that Mr. Waterhouse never signed the Notes. In May, 2019, Kristin Hendrix was the senior accounting manager at the Debtor. Debtor Appx. 03129 (12:4-16). At that time, she reported to David Klos, who reported to Mr. Waterhouse. Debtor Appx. 03129-30 (12:25-13:9). While Ms. Hendrix never drafted a promissory note from scratch, in May 2019 part of her job was taking a form note and revising it. Debtor Appx. 03131 (17:5-11). Contrary to Mr. Waterhouse's testimony, Ms. Hendrix testified that the corporate accounting group at the Debtor, not the legal group, was responsible for updating draft promissory notes so as to create new ones—*i.e.* the Debtor's own witnesses can't get their story straight. Debtor Appx. 03131 (17:20-25). As Ms. Hendrix testified:

> Our typical practice is if we have a loan with certain affiliates that it's a demand note. We have a template that we have used for years that was created by either our internal legal team or an outside law firm, I'm not sure which. The typical practice is always updating a few things on that template, getting it executed, and filing it in our audit folders.

Debtor Appx. 03131 (18:18-25). The corporate accounting group, she claimed, not the legal group, did this "updating." Debtor Appx. 03131 (19:1-13; 20:1-5). And Ms. Hendrix confirmed the general purpose of the intercompany notes:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down—when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

Debtor Appx. 03132 (21:10-16). In other words, at that time "it's all one big happy family, and whoever needed cash, the cash moved around." Debtor Appx. 03132 (23:3-6).

---

to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

35. In May 2019, Mr. Klos sent one or two e-mails to Ms. Hendrix—emails on which Mr. Waterhouse but not Mr. Dondero or the legal department were copied—informing her that there were new intercompany loans, asking her to prepare notes for execution. Debtor Appx. 03134-35 (32:13-33:4). In her mind, this instruction comported with the general practice:

> So is it fair to say that typically, obviously not every time, but typically your corporate accounting group when it would see intercompany transfers in large amounts would believe that they were loans?

> MR. MORRIS: Objection to the form of the question.[18]

> THE WITNESS: Typically they were loans. There's not really another way to get money from one entity to another. And if they were papered as a loan, that means we were told to set it up that way.

Debtor Appx. 03135 (35:5-15). That is "how it was for 14 or 15 years." Debtor Appx. 03135 (36:7-9).

36. Ms. Hendrix thought that the $2.4 million Note was "related to a TerreStar NAV error" and the $5 million Note was for the "consent fee." Debtor Appx. 03136 (38:17-39:5). It was never "told to [her] directly" that the funds were a loan, but she [subject to objection[19]] "assum[ed] that based on many instances of intercompany transfers in the 14 years prior." Debtor Appx. 03136 (40:20-25).

37. Ms. Hendrix confirmed that she prepared the Notes from Word documents originally created by outside counsel. Debtor Appx. 03137 (42:15-43:20). However, Ms. Hendrix

---

[18] The Debtor has waived objections to Ms. Hendrix's testimony by including it in the Debtor's summary judgment evidence. *Supra*, note 4. In any event, it is not clear what the Debtor's objection is, as the question is not objectionable. HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one. If the objection is foundation, Ms. Hendrix has worked in the Debtor's corporate accounting department for 17 years, holds an MBA from SMU, and is a certified public accountant. Debtor Appx. 03129. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[19] The Debtor has waived its objection. *Supra*, note 4. Furthermore, the question did not mischaracterize Ms. Hendrix's testimony, as she answered unequivocally, "Correct." Debtor Appx. 03137. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

had no memory of papering the Notes. Debtor Appx. 03138 (45:21-46:1). It would have been her

practice not to consult the legal group in preparing the Notes. Debtor Appx. 03138 (46:12-24).

Ms. Hendrix confirmed that, to sign Mr. Waterhouse's name to the Notes, she used an electronic

picture of his signature, which she then affixed to the Word documents, just like this:



Debtor Appx. 03137-38 (43:6-48:18).

38.     On the question of whether Mr. Waterhouse authorized Ms. Hendrix to affix his

signature to the Notes, Ms. Hendrix testified "I don't have exact specific memory." Debtor Appx.

03138 (48:10-15). Again, she appears to have assumed that Mr. Waterhouse must have approved

the Notes and, therefore, approved her using his signature:

> He was fine with using his e-signature, and what is on these documents was that
> exact e-signature.

> * * *

> But he would have had to approve this loan in the dollar amount, the day. He would
> have been the one directing us to create these loans. In past practice he has always
> approved using his e-signature to execute documents.

Debtor Appx. 03138 (48:4-18). When pressed about *how* Mr. Waterhouse would have authorized

her to use his electronic signature, Ms. Hendrix testified as follows [subject to objection[20]]:

> I would assume that, as I've stated previously, these directions were coming
> directly from him to paper a loan. These changes that are made are only to the
> dollar amount. Interest rate is pulled right off the IRS website. That is his approval
> to paper a loan and in fact execute or approve the loan.

---

[20]     The Debtor has waived this objection. *Supra*, note 4. Furthermore, the question is not objectionable. Ms.
Hendrix testified that Mr. Waterhouse "would have had to approve this loan", and the next question was,
"How would he have approved Exhibits 4 and 5? By that, I mean by email or memorandum? How would
he have approved it in May of 2019?" Debtor Appx. 01318. HCMFA reserves the right to respond to any
specific objection if and when the Debtor asserts one. "Form" objections are also invalid under the Federal
Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to
correct any perceived objection.

Debtor Appx. 03138-39 (48:24-49:5).

39.    Then, when asked [subject to objection[21]] "after his e-signature was used either on these notes or other documents in May of 2019, would you have brought the documents back to him for any kind of verification," Ms. Hendrix testified:

> Probably not. These are all very standard. We've papered hundreds of loans. So I think he trusted that we can handle updating a date and a dollar amount on these loan templates.

Debtor Appx. 03139 (50:1-9).

40.    Ms. Hendrix also testified [subject to objection[22]], differently from Mr. Waterhouse, that "[p]robably at this time, 99 percent of the stuff my team got his signature on was his e-signature." Debtor Appx. 03139 (49:12-16). And, the following exchange is significant:

> Q.    (BY MR. RUKAVINA) Do you know or believe, or your recent review of documents, did it reveal an email from Mr. Waterhouse to you specifically authorizing his e-signature on Exhibits 4 and/or 5?
>
> A.    Not that I recall seeing, no.
>
> Q.    Sitting here today, do you have any memory of Mr. Waterhouse orally or otherwise specifically authorizing you to affix his e-signature to Exhibits 4 and/or 5?
>
> A.    Specifically on these loans, no, I don't recall those conversations. But, again, our practice has always been we have this discussion, he's under the understanding that we're going to paper the loans, he's always comfortable with using his e-signature. This is not something me or my team would have done without that authority and approval from him.

---

[21]  The Debtor has waived this objection. *Supra*, note 4. In any event, this question is not objectionable. Ms. Hendrix's testimony clearly demonstrates that she electronically affixed Mr. Waterhouse's signature to the Notes. Debtor Appx. 03137-38 (43:6-48:18). HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[22]  The Debtor has waived this objection. *Supra*, note 4. Furthermore, the question is not objectionable. Ms. Hendrix testified that she regularly prepares notes, Debtor Appx. 03131 (20:1-8), and has worked in the Debtor's corporate accounting department for 17 years. Debtor Appx. 03129 (11:14). She would be familiar with Mr. Waterhouse's practices. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Debtor Appx. 03139 (50:15-25).

41.    But there is no evidence that Ms. Hendrix ever showed the Notes to Waterhouse after preparing them:

> Q.    Sitting here today, do you have any memory of giving Mr. Waterhouse these two promissory notes after they were prepared?
>
> A.    I specifically don't remember walking into his office and providing it to him, but he could have found it on our shared drive if he wanted to.
>
> Q.    Do you have any memory or in your recent review of documents did you see any email to the effect of you sending either or both of these promissory notes to Mr. Waterhouse after they were papered up?
>
> A.    I don't have any specific recollection, again, but he had access to look at them.
>
> Q.    On the shared drive?
>
> A.    Yes.

Debtor Appx. 03140 (54:4-17).  Scanning in the Notes and then saving them to the system hardly amounts to showing or giving them to the man who allegedly signed them.

42.    In fact, the Debtor's summary judgment evidence demonstrates that Ms. Hendrix did not even show the executed Notes to Mr. Waterhouse, much less ask for authority to affix his electronic signatures to the Notes.  While the Debtor points out that Mr. Waterhouse was copied on Mr. Klos' instruction to Ms. Hendrix to prepare the Notes, when she did prepare them, that same e-mail chain confirms that she did not copy Mr. Waterhouse—only Hayley Eliason and Blair Roeber.  Debtor Appx. 00871.  That same e-mail chain also confirmed that Ms. Hendrix was not authorized to sign the Notes for Mr. Waterhouse.  Mr. Klos' instruction to her was to "prep[are] a note *for execution*."  Debtor Appx. 00871 (emphasis added).  Clearly, the execution was to follow, but that execution did not occur, at least not with authority from Mr. Waterhouse or anyone else.

43.    Ms. Hendrix *assumed* that the transfers were loans and *assumed* that Mr. Waterhouse authorized her to affix his signature to the Notes because she *assumed* that he

approved of the Notes. But her testimony directly conflicts with his: whereas he testified that he rarely used electronic signatures in May 2019, would have sent an e-mail authorizing the same, and would have expected the legal department to approve a note prior to his signature, she testified that he routinely did this at that time pursuant to some generalized authority and that the accounting department routinely papered notes.

44. The fact remains that, notwithstanding her subjective assumptions, Ms. Hendrix created erroneous notes (as they appear to make Mr. Waterhouse the "maker" and, as discussed below, make him jointly and severally liable), and she was not authorized—at least there is no evidence that she was authorized—to affix images of Mr. Waterhouse's signature to the Notes. Or, if there was some generalized authority that she believed Mr. Waterhouse gave her, then the condition precedent—that the legal department approve the Notes—was not satisfied. Either way, there is no evidence whatsoever she had authority to affix his signature.

## III.   SUMMARY JUDGMENT STANDARD

45.   Implicitly recognizing there is contradictory evidence, the Debtor hangs its hat on the "reasonable jury" standard. But a reasonable jury can find for a party whenever there is more than a mere scintilla of evidence. *See Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*, 2017 Bankr. LEXIS 3191, *3 (Bankr. N.D. Tex. Sept. 21, 2017) ("To dispute a material fact, a plaintiff must offer more than a mere scintilla of evidence such that a 'reasonable jury could not return a verdict' for the plaintiff."). Here, HCMFA cites the testimony of five individuals in support of its defenses (Mr. Dondero, Mr. Waterhouse, Mr. Klos, Ms. Hendrix, and HCMFA's corporate representative). The Debtor cannot credibly argue that amounts to nothing, particularly in light of this directive from the United States Supreme Court:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citations omitted). Based on the voluminous evidence HCMFA cites in this brief, which the Court must accept as true, and with respect to which the Court must draw all reasonable inferences in favor of HCMFA, there are genuine issues of material fact the preclude summary judgment, so the Court should deny the Motion.

## IV.     ARGUMENT AND AUTHORITIES

46.     As a general proposition, HCMFA does not entirely dispute the Debtor's assertion that, "[t]o prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note." Motion ¶ 132 (citing *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995)). But there is more to it than that. A promissory note is a contract, and an action on a promissory note is still "subject to all defenses available in an action on a simple contract." *Strickland v. Coleman*, 824 S.W.2d 188, 191-92 (Tex. App.—Houston [1st] 1991); TEX. BUS. & COMM. CODE § 3.305(a)(2) ("the right to enforce the obligation of a party to pay an instrument is subject to … a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract"). "Therefore, evidence is admissible that tends to prove a defense to the action on the promissory note, such as want or failure of consideration, non-performance of a condition precedent, non-delivery, delivery for a special purpose, fraud in the

inducement, or other defenses which would be available in an action on a simple contract."

*Strickland v. Coleman*, 824 S.W.2d at 192.

**A.    THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER HCMFA SIGNED THE NOTES**

47.    The Debtor bears the burden to prove HCMFA signed the Notes because "[t]he validity of the signature on the note must be proved by the person claiming validity if validity is denied in the pleadings." *Silverio v. Silverio*, 625 S.W.3d 680, 685 (Tex. App.—El Paso 2021); TEX. BUS. & COMM. CODE § 3.308(a).  HCMFA denied that it signed the Note in the pleadings. The only allegations in the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (Dkt. No. 1, the "Complaint") regarding HCMFA's signature are paragraphs 14 and 15:

> 14. Specifically, on May 2, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note"). A true and correct copy of HCMFA's First Note is attached hereto as Exhibit 1.

> 15. On May 3, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "Notes"). A true and correct copy of HCMFA's Second Note is attached hereto as Exhibit 2.

Complaint ¶¶ 14, 15.  HCMFA expressly denied these allegations in its *Defendant's Amended Answer* (Dkt. No. 48, the "Answer") ("14.  The Defendant denies ¶ 14 of the Complaint.  15.  The Defendant denies ¶ 15 of the Complaint.").[23]

---

[23]    The Bankruptcy Court denied HCMFA's motion to amend its Answer to more affirmatively plead that the Notes were not signed, but HCMFA expressly argued that such amendment was not necessary and that HCMFA's prior Answer sufficiently placed the Debtor on notice under applicable law that HCMFA denied signing the Notes.  Any allegedly contradictory allegations in the Answer notwithstanding, "[r]ule 8 of the Federal Rules of Civil Procedure permits the alternative pleading of inconsistent claims and defenses …." *Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313, 317 (5th Cir. 2016).  And it is axiomatic that unsworn pleadings do not constitute competent summary judgment evidence. *E.g. Jones v. Anderson*, 721 Fed. Appx. 333, 334-35 (5th Cir. 2018).  By denying the only allegation in the Complaint regarding execution, the Answer put the Debtor to its proof on this element of its case.  Out of an abundance of caution, HCMFA is filing an objection with the District Court to the Bankruptcy Court's order, seeking the District Court's review

48.     The Debtor has failed to meet its burden of proof, and there is a genuine issue of material fact as to whether HCMFA signed the Notes, for three independent reasons, any one of which provides grounds to deny the Motion: (i) there is a genuine issue of material fact as to whether Mr. Waterhouse signed the Notes at all; (ii) even if he signed them, there is a genuine issue of material fact as to whether he had the requisite authority; and (iii) even if he had authority, the Notes are ambiguous.  For any one of these reasons, the Court should deny the Motion.

### i.     **Waterhouse did not Actually Sign the Notes**

49.     The facts set out above demonstrate that Mr. Waterhouse did not actually sign the Notes—of that there can be no legitimate dispute.  In particular, the evidence conclusively demonstrates that Ms. Hendrix electronically affixed an image of Mr. Waterhouse's signature in Microsoft Word. Debtor Appx. 03137-38 (43:6-48:18).  She herself acknowledged that her actions required Mr. Waterhouse's approval.  *Id.*  But there is no evidence that Mr. Waterhouse gave her his authorization—none whatsoever.  On the contrary, Mr. Waterhouse testified that any such authorization would have been by e-mail to his administrative assistant (Debtor Appx. 02129 (320:11-321:7).  But the Debtor produced no such e-mail and Ms. Hendrix was not Mr. Waterhouse's administrative assistant.  *See id.*  Mr. Waterhouse also testified that he rarely, if at

---

of that order.  To the extent necessary, HCMFA incorporates its motion to amend and its objection to the Bankruptcy Court's denial of that motion in this Brief, and reserves all rights with respect to the same.

For the avoidance of doubt, any confusion over whether HCMFA needed to amend its Answer results from differences between the Texas Rules of Civil Procedure and the Federal Rules of Civil Procedure.  The Texas Rules require specific denials in certain instances because the Texas Rules permit general denials.  Tex. R. Civ. P. 92.  The Federal Rules, on the other hand, require specific denials nearly all the time, including here. Fed. R. Civ. P. 8(b)(1)(B).  To the extent the Debtor attempts to argue the denial needed to be verified under Tex. R. Civ. P. 93 or relies on any other Texas procedural theory, those rules do not apply in federal court. *See Follenfant v. Rogers*, 359 F.2d 30, 31-2 (5th Cir. 1966) (Texas rule 93 "COULD NOT have any effect on the present case, since state rules of practice are not applicable to, or binding on, trials in federal courts. In matters of pleading, federal courts are not governed by the state practice, but by the Federal Rules of Civil Procedure."); *Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678, *16 (W.D. Tex. Sept. 29, 2011); *Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802, *5 n.7 (N.D. Tex. Jan. 10, 2011); *see* Fed. R. Civ. P. 11(a) ("Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit.").

all, electronically signed documents in May, 2019. Debtor Appx. 02124 (298:10-300:14). But Mr. Waterhouse did not remember authorizing anyone to use his electronic signature. *See id.* Nor has the Debtor offered any evidence that Mr. Waterhouse ever laid eyes on the Notes electronically signed by him. On the contrary, the evidence is that Mr. Hendrix e-mailed the executed Notes to two other Debtor employees but, for some inexplicable reason, <u>not</u> Mr. Waterhouse. Debtor Appx. 00871.

50. The Debtor must prove that HCMFA signed the Notes. HCMFA denied signing the Notes in its Answer, so the Debtor bears the burden to prove HCMFA signed them. *Silverio*, 625 S.W.3d at 685; TEX. BUS. & COMM. CODE § 3.308(a). There can be no question that Mr. Waterhouse did not personally sign the Notes. The only question is whether he authorized Ms. Hendrix to sign the Notes electronically for him. But the Debtor offers no evidence on this critical fact. Even if there were some circumstantial evidence from the Debtor on this fact, HCMFA has demonstrated that there is a genuine issue of disputed fact as to whether Mr. Waterhouse ever authorized Ms. Hendrix to sign the Notes electronically for him.

### ii. <u>Even if Waterhouse Signed the Notes, He Did Not Have Authority</u>

51. Even if there were not a genuine issue of material fact about whether Mr. Waterhouse signed the Notes, there is a genuine issue as to whether he had authority to sign them. General contract law governs whether Mr. Waterhouse's signature binds HCMFA. *See* TEX. BUS. & COMM. CODE § 3.402(a) ("If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract."). Under the UCC as well, "an unauthorized signature is ineffective …." TEX. BUS. & COMM. CODE § 3.403.

52. "'Unauthorized signature' means a signature made without actual, implied, or apparent authority." TEX. BUS. & COMM. CODE § 1.201(b)(41). But "Texas law does not presume agency, and the party who alleges it has the burden of proving it." *IRA Res., Inc. v. Griego*, 221 S.W. 3d 592, 597 (Tex. 2007). The District Court has summarized the concept of actual authority as follows:

> "Actual authority usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *United Residential Props., L.P. v. Theis*, 378 S.W.3d 552, 564 (Tex. App. 2012, no pet.) (citation and internal quotation marks omitted). "'Actual authority is created through written or spoken words or conduct of the principal communicated to the agent.'" *Id.* (quoting *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549-50 (Tex. App. 2003, no pet.)). The existence of an agency relationship based on actual authority "may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question[, but] cannot be based merely on the words or deeds of the agent." *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 899 (Tex. App. 2007, pet. denied) (citing *Walker Ins. Servs.*, 108 S.W.3d at 550).

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930, *26-28 (N.D. Tex. April 13, 2015).

53. The Debtor has failed to meet its burden to prove Mr. Waterhouse had actual authority to execute the Notes. Based on the rule that the agent's deeds are insufficient evidence, the fact that Mr. Waterhouse allegedly signed the Notes is irrelevant. Certainly Mr. Waterhouse does not believe he possessed authority. He testified that only Mr. Dondero could authorize borrowing at the level in question. Debtor Appx. 02117 (270:18-273:9). As for whether HCMFA intentionally conferred authority on Mr. Waterhouse, again his testimony is conclusive—it did not. *Id.* Likewise, HCMFA's president testified that Mr. Waterhouse did not have authority to sign the Notes and that he was unaware of any corporate documents that would confer such authorization. HCMFA Appx. 1-2, 4.

54. The only allegedly contrary evidence the Debtor submits to meet its burden is an Incumbency Certificate that says Mr. Waterhouse is the Treasurer of Strand Advisors XVI, Inc.,

HCMFA's general partner. Debtor Appx. 00789.[24]  While it says Mr. Waterhouse is authorized to execute agreements on behalf of the General Partner, it does not unambiguously give him the same level of authority for the partnership.  Instead, to the extent it confers any rights at all, it merely authorizes him "to give any party on behalf of the Partnership all notices, orders, directions, or instructions …."  *Id.*  But this does not unambiguously include executing agreements or borrowing money on the partnership's behalf.  "The negative implication canon, *expressio unius*, which dictates that 'specification of the one implies the exclusion of the other,' further buttresses that conclusion."  *Claimant ID 100218776 v. BP Expl. & Prod.*, 712 Fed. Appx. 372, 376 (5th Cir. 2017) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93-100 (2012)).  Perhaps more to the point, the incumbency certificate does not actually confer any rights, and the Debtor has not offered any documents that do.  Based on the Debtor's own evidence, there is a genuine issue of material fact as to whether Mr. Waterhouse had actual authority to sign the Notes.

55.    The District Court also provided a thorough summary of the concept of apparent authority:

> Apparent authority "is based on the doctrine of estoppel, and one seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise." *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981) (citing *Sw. Title Ins. Co. v. Northland Building Corp.*, 552 S.W.2d 425, 428 (Tex. 1977); *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778-79 (Tex. 1974); *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422, 427 (Tex. 1953)). To determine an agent's apparent authority, the court examines the conduct of the principal and the reasonableness of the third party's assumptions regarding the agency's authority. *Gaines*, 235 S.W.3d. at 183. "[O]nly the conduct of the principal is relevant." *Id.* at 182 (citing *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) (per curiam)); *see also United Residential Props.*, 378 S.W.3d at 564 ("Apparent authority is based on estoppel, and only the conduct of

---

[24]    To the extent the Debtor attempts to argue Mr. Dondero is not competent to testify regarding Mr. Waterhouse's authority, then the Debtor must concede that this incumbency certificate is likewise incompetent for this purpose.  After all, it is simply a signed statement by Mr. Dondero.

the principal in leading a third party to believe that the agent has authority may be considered." (citations and internal quotation marks omitted)). "Declarations of the alleged agent, without more, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183-84 (citing *Sw. Title Ins. Co.*, 552 S.W.2d at 428); *see also Huynh*, 180 S.W.3d at 623 ("Only the conduct of the principal may be considered; representations made by the agent of his authority have no effect.").

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930 at *26-28.

56.     The key to apparent authority is "the reasonableness of the third party's assumptions regarding the agency's authority." First of all, there is no evidence that anyone with control over the Debtor or HCMFA actually believed Mr. Waterhouse had authority. But even if they did, that belief would not have been reasonable. At the time the Debtor demanded payment and filed this lawsuit, Mr. Waterhouse was still the Debtor's CFO. Debtor Appx. 00008 (complaint dated Jan. 22, 2021); 02053 (new employment began March 1, 2021); 02054 (served as Debtor's CFO until early 2021). At all relevant times, he was on both sides of this alleged transaction. And when "there is a dual agent, operating with the consent and knowledge of both principals, the agent's knowledge is imputed to its principals." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924 (Tex. 2010). Yet neither of the principals here consented, as Mr. Waterhouse did not have authority from either the Debtor or HCMFA to execute the Notes and both he and the principals involved knew that. There can be no apparent authority when the other party to the transaction expressly knows that the agent lacks actual authority. *See, e.g.,* *Gaines v. Kelly*, 235 S.W.3d 179, 183-84 (Tex. 2007).

57.     There is therefore a genuine issue of material fact as to whether Waterhouse had authority to sign the Notes, so the Court should deny the Motion.

### iii. Even if Waterhouse Signed the Notes and had Authority, the Notes are Ambiguous

58.     When an "agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury." *Childers v. Pumping Systems, Inc.*, 968 F.2d 565, 569 (5th Cir. 1992); *see Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431, 433 (Colo. App. 1982) ("Because no ambiguity exists concerning the Reichardts' status as makers on this note, the trial court was correct in entering summary judgment in favor of the Bank."). Here, because of the way Mr. Waterhouse allegedly signed the Notes, the identity of the maker is ambiguous.

59.     Under the following statute, Mr. Waterhouse is potentially liable in his individual capacity, even assuming he had authority to act for HCMFA:

> If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:
>
> (1)     If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.
>
> (2)     Subject to Subsection (c), the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity, or (ii) the represented person is not identified in the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.

TEX. BUS. & COMM. CODE § 3.402(b).

60.     In *Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005, Tex. App. LEXIS 6215, *15-16 (Tex. App.—Fort Worth Aug. 4, 2005), the Court evaluated the following signature:

/s/ AAA Auto Glass

/s/ Jackie Holland Secretary & Treasurer

AAA Auto Glass Company

But the Court found the signature ambiguous under § 3.402(b)(1) as to Ms. Holland's individual liability versus the liability of SSH, Inc., whose name was not mentioned. *Id.* at *16.

61.      Mr. Waterhouse's signature on the Notes presents a similar conundrum:

**MAKER:**

_____

FRANK WATERHOUSE

Debtor Appx. 00011, 00015. There is no indication from the signature itself that Mr. Waterhouse intended to bind HCMFA instead of himself.

62.      "Comment 2 to [section 3.402] is also instructive; it provides that an agent is not liable under subsection (b)(1) 'if the form of the signature unambiguously shows that it is made on behalf on an identified represented person (for example, 'P, by A, Treasurer').'" *S. Mansukhlal & Co v. Husein*, 14-04-00018-cv, 2004 Tex. App. LEXIS 8097, *7 (Tex. App.—Houston [14th] Sept. 2, 2004). The signatures on the Notes do not unambiguously identify HCMFA as the maker, so Mr. Waterhouse is potentially liable in his individual capacity. He testified, however, that he did not intend to be liable and that signing the Notes in his individual capacity was a mistake. Debtor Appx. 02126 (306:19-307:4).[25] This results in an ambiguity as to whether Mr. Waterhouse

---

[25]      The Debtor has waived Mr. Morris's objections. *Supra*, note 4. Even if not, the questions are not objectionable. Mr. Waterhouse is competent to testify regarding his own intent and whether he personally made a mistake, particularly when the issue is his own personal liability. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

intended to sign the Notes at all. Accordingly, there is a genuine issue of material fact that precludes summary judgment.

**B.** **THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE NOTES WERE THE RESULT OF A MUTUAL MISTAKE**

63.     If the Notes were properly executed, then they are a result of a mutual mistake. As detailed above, Mr. Dondero intended the Transfers to compensate HCMFA for the NAV Error, not to be repaid as loans. Mr. Dondero, the only person with the authority to characterize the Transfers as loans, never gave that instruction. Lower level Debtor employees simply assumed the Transfers were loans, and Mr. Waterhouse perhaps shared this assumption, but that does not matter. Mr. Dondero was the individual who initiated the Transfers; he was the only person with authority to characterize the Transfers as loans for both the Debtor and HCMFA; and he was the very person injecting money into the Debtor to enable the Debtor to make the Transfers in the first place. At all times, he intended and understood that the Transfers were compensation for damages, not loans.

64.     "A mutual mistake is one common to all parties, wherein each labors under the same misconception respecting a material fact …." *Garza v. Villarreal*, 345 S.W.3d 473, 483 (Tex. App.—San Antonio 2011) (citing *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App.—San Antonio 1982)). "In order for the defense of mutual mistake to be sustained, there must be fact issues raised to show that all the parties to a contract were acting under the same understanding of the same material fact." *Id.* Put slightly differently, "[a] mutual mistake of fact occurs when the parties to an agreement have a common intention, but the written contract does not reflect the intention of the parties due to a mutual mistake." *Smith-Gilbard v. Perry*, 332 S.W.3d 709, 713 (Tex. App.—Dallas 2011). "When a party alleges that, by reason of a mutual mistake, an agreement does not express the real intentions of the parties, extrinsic evidence is admissible to

show the real agreement." *Id.*; *DeClaire v. G&B McIntosh Family Ltd. P.ship*, 260 S.W.3d 34, 47 (Tex. App.—Houston [1st] 2008) ("The parol evidence rule does not bar extrinsic proof of mutual mistake.").

65.     The Debtor's recitation of the law on mutual mistake does not materially differ. But the Debtor's argument misconceives what the Debtor's own evidence actually means under the law.   The common mistake was that the Transfers constituted a loan rather than compensation—if Mr. Waterhouse ever understood the Transfers to be loans and if he executed the Notes then, as an officer of both the Debtor and HCMFA, his mistake would be "mutual" to both of his principals.  The fact that both the Debtor and HCMFA listed the Notes on their financial statements shows that the mistake was mutual.  Debtor Appx. 00782, 00840.  The fact that the same individuals—employees of the Debtor—handled both the Debtor's and HCMFA's accounting shows that the mistake was mutual.  HCMFA Appx. 5; Debtor Appx. 03025 (42:17-21, 43:8-23).   The fact that Debtor employees prepared a memo to HCMFA's board which included the Notes show that the mistake was mutual.  It also explains why no one noticed the mistake sooner.  Mr. Waterhouse even testified that he did not always read audited financials—he relied on his accounting team for that.  Debtor Appx. 02071 (86:3-89:19).  He also testified that he was not always comfortable with the control environment.  Debtor Appx. 02077 (112:22-113:14).

66.     The natural consequence of these facts is that lower-level Debtor employees repeated the mistake in financial documents and disclosures more than once.  The repetition itself does not necessarily indicate the Transfers were loans.  And there is plenty of evidence they were not.  The Debtor initially lacked sufficient funds to make the Transfers.  HCMFA Appx. 3.  Mr. Dondero therefore personally advanced funds to the Debtor.   HCMFA Appx. 3.  As both the Debtor's and HCMFA's President, he intended the Transfers as compensation, not loans.  HCMFA

Appx. 5. As a matter of fact, the amounts of the two Transfers substantially mirrored the amounts of the prior two transfers HCMFA made to the Fund on account of the NAV error. *See* HCMFA Appx. 3. Finally, Mr. Waterhouse himself—an officer of both parties—admitted the Note is a mistake in light of the fact that his signature makes him personally liable, discussed above. Debtor Appx. 02126 (306:19-307:4).

67. The fact that HCMFA received insurance proceeds does not change the analysis. In Texas, the "collateral source" rule is an exception to the general principle that a plaintiff is limited to single recovery for a particular injury. "Long a part of the common law of Texas and other jurisdictions, the rule precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else — a collateral source. Thus, for example, insurance payments to or for a plaintiff are not credited to damages awarded against the defendant." *Haygood v. De Escabedo*, 356 S.W.3d 390, 394–95 (Tex. 2011). There is a genuine issue of material fact as to whether the Notes resulted from a mutual mistake, so the Court should deny the Motion.

68. The Court need not, and should not, address the issue of whether the Debtor was liable to HCMFA for the NAV Error. It doesn't matter. Both the Debtor and HCMFA, through their mutual agent and control person, Mr. Dondero, believed this to be the case. That is all that matters. The Debtor did not plead avoidance of that arrangement. Nor does the potential that HCMFA carried the Notes on its books and records lead to the conclusion that the Notes are valid—at best, this is evidence loosely supporting the Debtor's arguments, but then, if anything, it only demonstrates a genuine issue of disputed, material fact. The Court need only consider Mr. Waterhouse's statements, prior to the litigation, that there was one note from HCMFA to the Debtor, which cannot be collected through May, 2021, to demonstrate confusion on behalf of HCMFA, at a minimum, or a lack of awareness of the Notes at all.

**C.**    **THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE DEBTOR GAVE CONSIDERATION IN EXCHANGE FOR THE NOTES**

69.    "'Consideration consists of either a benefit to the promisor or a detriment to the promisee.'" *Garza v. Villarreal*, 345 S.W.3d at 483 (quoting *Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 41 (Tex. App.—Dallas 2003)).  "A contract lacking in consideration is unenforceable." *Garza v. Villarreal*, 345 S.W.3d at 483.  "Under common law, as long as something of real and legally cognizable value is given in exchange for a promise to pay under a promissory note, the note is supported by adequate consideration." *Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 614 (Tex. App—Houston [1st] 2004).  But here, the Debtor did not give *anything* in exchange for the Notes.  The Transfers were compensation for the NAV Error, not loans, and the Debtor has not identified any other consideration.  Accordingly, there is a genuine issue of material fact as to whether the Notes are unenforceable for lack of consideration.

**D.**    **TURNOVER IS NOT AN APPROPRIATE REMEDY UNDER THESE CIRCUMSTANCES**

70.    The Debtor's cause of action for turnover under section 542 is improper.  This Court has "held that actions to collect prepetition accounts receivable which are based on state law contract principles do not constitute turnover actions under § 157(b)(2)(E) without a final judgment from a court of competent jurisdiction or another binding determination of liability." *In re Fang Operators*, 158 B.R. 643, 645 (Bankr. N.D. Tex. 1993) (referring to *Satelco, Inc. v. North Amer. Publishers, Inc. (In re Satelco, Inc.)*, 58 B.R. 781 (Bankr. N.D. Tex. 1986)).  The Debtor has asserted a breach of contract claim attempting to collect a disputed debt under state law.  Accordingly, section 542 does not apply.

**V.    CONCLUSION**

71.    The Debtor's conduct caused HCMFA to suffer approximately $7.4 million in damages.  Shortly thereafter, the Debtor paid HCMFA $7.4 million.  But then the Debtor's

employees made a simple mistake. Based on historical practice, they booked the payments as loans instead of compensation. One of them even purported to issue promissory notes, which the Debtor now seeks to collect if the face of overwhelmingly contradictory evidence. The same Debtor employee even affixed a corporate officer's signature without his permission, when he himself admits he lacked authority to incur $7.4 million in debt. Naturally, she and others then repeated the mistake again and again in financial disclosures. But it was a mistake nonetheless. Each of the foregoing is supported by credible and admissible summary judgment evidence.

72.      For these reasons, there are genuine issues of material fact that preclude summary judgment on (a) whether HCMFA signed the notes and whether Mr. Waterhouse was authorized to sign them if he in fact did; (b) whether the notes were the result of a mutual mistake; and (c) whether the notes lacked consideration. All of these are issues for the jury. Furthermore, the turnover statute is inapplicable as a matter of law. The Court should therefore deny the Motion.

RESPECTFULLY SUBMITTED this 19th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
      Davor Rukavina, Esq.
      State Bar No. 24030781
      Julian P. Vasek, Esq.
      State Bar No. 24070790
      500 N. Akard St., Ste. 3800
      Dallas, TX 75201
      Tel: 214-855-7500
      Fax: 214-855-7584
      E-mail: drukavina@munsch.com
      E-mail: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND
CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on January 19, 2022, a true and correct copy of this document, along with all exhibits, if any, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/  Davor Rukavina
Davor Rukavina

# EXHIBIT 3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 6, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03005-sgj** |
| **NEXPOINT ADVISORS, L.P.** | § | |
| | § | |
| Defendant. | § | |

### ORDER APPROVING STIPULATION AND AGREED ORDER GOVERNING
### DISCOVERY AND OTHER PRE-TRIAL ISSUES

Upon consideration of the *Stipulation and Agreed Order Governing Discovery and Other*

*Pre-Trial Issues* [Docket No. 62] (the "Stipulation")[1] entered into between Highland Capital

---

[1] Capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Stipulation.

CORE/3522697.0002/168702727
DOCS_NY:43951.2 36027/002

Management, L.P., the reorganized debtor[2] ("Highland") in the above-captioned chapter 11 case ("Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and NexPoint Advisors, L.P. ("NexPoint", and together with Highland, the "Parties"), it is **HEREBY ORDERED THAT**:

1.       The Stipulation, a copy of which is attached hereto as **Exhibit A**, is **APPROVED**.

2.       The Stipulation supersedes any prior stipulation or scheduling order governing the Adversary Proceeding.

3.       The Parties shall abide by the following pretrial schedule (the "Joint Pretrial Schedule") pursuant to the Stipulation:

- NexPoint will have until August 30, 2021 to answer or otherwise respond to the First Amended Complaint.

- The Parties will serve written discovery demands (limited to new claims and allegations in the First Amended Complaint) by September 3, 2021.

- The Parties will respond to discovery requests by September 27, 2021 and will also be substantially complete with document production by September 27, 2021.

- Fact depositions will take place between October 1 and October 22, 2021.

- Expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021.

4.       The Parties agree that discovery taken in this case will be consolidated with discovery taken in the following adversary proceedings, and all discovery in each of the adversary proceedings will be treated as if it was taken in all of the adversary proceedings listed below so

---

[2] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, as modified (the "Plan"). The Plan went Effective (as defined in the Plan) on August 11, 2021, and Highland is the Reorganized Debtor (as defined in the Plan) since the Effective Date. *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 2700].

- 2 -

that each witness will only need to be deposed once and documents produced in any of the proceedings are usable as if received in every other proceeding:

- *Highland Capital Management, L.P. v. James D. Dondero*, Adv. Pro. No. 21-03003;

- *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Pro. No. 21-03004;

- *Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Pro. No. 21-03006; and

- *Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Pro. No. 21-03007.

5.      The Joint Pretrial Schedule set forth in this Order shall only be modified in writing signed by the Parties or upon entry of an order of the Court entered upon notice to the Parties.

6.      The Court shall retain jurisdiction over all disputes arising out of or otherwise governing the interpretation and enforcement of this Order.

###End of Order###

# EXHIBIT A

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
*Counsel for Defendant NexPoint Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03005-sgj** |
| **NEXPOINT ADVISORS, L.P.** | § | |
| | § | |
| Defendant. | § | |

## STIPULATION AND AGREED ORDER GOVERNING DISCOVERY
## AND OTHER PRE-TRIAL ISSUES

This stipulation and agreed order (the "Stipulation") is entered into between Highland

Capital Management, L.P. (the "Debtor") and NexPoint Advisors, L.P. ("NexPoint"). The Debtor

and NexPoint are collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, on **April 13, 2021**, NexPoint filed a Motion to Withdraw the Reference.

WHEREAS, on **July 8, 2021**, the Bankruptcy Court filed its *Report and*

*Recommendation to District Court Proposing that it (A) Grant Defendant's Motion to Withdraw*

*the Reference at Such Time as Bankruptcy Court Certifies that Action is Trial Ready; and (B)*

*Defer Pretrial Matters to Bankruptcy Court* [**Docket No. 40**] (the "Report").

WHEREAS, the Debtor has indicated that it intends to file a First Amended Complaint,

asserting additional claims against NexPoint, as well as claims against new defendants, Nancy

Dondero and The Dugaboy Investment Trust.

WHEREAS, the Parties intend to complete fact and expert discovery in this adversary

proceeding as governed by this Stipulation.

## STIPULATION

**NOW, THEREFORE, IN CONSIDERATION OF THE FOREGOING, THE
PARTIES HEREBY AGREE AND STIPULATE AS FOLLOWS:**

1.    This Stipulation supersedes any prior stipulation or scheduling order governing

the above-referenced adversary proceeding.

2.    The Parties agree to the following deadlines regarding discovery and other pre-

trial deadlines:

- The Parties agree that the Debtor will file and NexPoint will not oppose a Motion
  for Leave to File First Amended Complaint by August 17, 2021, a copy of which
  has previously been provided by the Debtor to NexPoint.  Counsel for NexPoint
  will accept service of the First Amended Complaint on behalf of NexPoint and the
  additional defendants named in the First Amended Complaint.

- NexPoint will have until August 30, 2021, to answer or otherwise respond to the
  First Amended Complaint.

- The Parties will serve written discovery demands (limited to new claims and
  allegations in the First Amended Complaint) by September 3, 2021.

- The Parties will respond to discovery requests by September 27, 2021 and will
  also be substantially complete with document production by September 27, 2021.

- Fact depositions will take place between October 1 and October 22, 2021.

- Expert designations and disclosures of all opinions and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021.

3.    The Parties agree that discovery taken in this case will be consolidated with discovery taken in the following adversary proceedings and all discovery in each of the adversary proceedings will be treated as if it was taken in all of the adversary proceedings listed below, so that each witness will only need to be deposed once and documents produced in any of the proceedings are usable as if received in every other proceeding:

- *Highland Capital Management, L.P. v. James D. Dondero*, Adv. Pro. No. 21-03003;

- *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Pro. No. 21-03004;

- *Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Pro. No. 21-03006; and

- *Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Pro. No. 21-03007.

IT IS SO STIPULATED.

CORE/3522697.0002/168702727

Dated: August 17, 2021

CONSENTED AND AGREED TO BY:

*/s/ Davor Rukavina*
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
Email: drukavina@munsch.com
Email: jvasek@munsch.com

**ATTORNEYS FOR DEFENDANT
NEXPOINT ADVISORS, L.P.**

*/s/ John A. Morris*
John A. Morris
NY Bar No. 266326
(*pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Email: jmorris@pszjlaw.com

**ATTORNEYS FOR DEBTOR
HIGHLAND CAPITAL MANAGEMENT,
L.P.**

*/s/ Michael P. Aigen*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR NANCY DONDERO**

*/s/ Douglas S. Draper*
Douglas S. Draper
LA Bar No. 5073
(*pro hac vice*)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Email: ddraper@hellerdraper.com

**ATTORNEYS FOR THE DUGABOY
INVESTMENT TRUST**

- 4 -

CORE/3522697.0002/168702727

## CERTIFICATE OF SERVICE

I certify that on August 17, 2021, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing system to the parties that are registered or otherwise entitled to receive electronic notices in this case.

*/s/ Julian P. Vasek*
Julian P. Vasek

- 5 -

# EXHIBIT 4



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 21, 2021**

_____
**United States Bankruptcy Judge**

_____


## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007-sgj |
| | § | |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## ORDER DENYING MOTIONS TO EXTEND EXPERT DISCLOSURE
## AND DISCOVERY DEADLINES

This matter having come before the Court on the (a) *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 86] (the "NexPoint Motion") filed by NexPoint Advisors, L.P. ("NexPoint"); (b) *Defendant Highland Capital Management Services, Inc.'s Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 91] (the "HCMS Motion") filed by Highland Capital Management Services, Inc. ("HCMS"); and (c) *Defendant HCRE Partners, LLC's Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3007, Docket No. 86] (the "HCRE Motion," and collectively with the NexPoint Motion and the HCMS Motion, the "Motions") filed by HCRE Partners, LLC ("HCRE," and collectively with NexPoint and HCMS, "Defendants"); and this Court having considered (i) the Motions; (ii) *Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 104; Adv. Proc. 21-3006, Docket No. 109; Adv. Proc. 21-3007, Docket No. 104] (the "Objection") filed by Highland Capital Management, L.P. ("Highland"); (iii) the (a) *Reply of*

*Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, <mark>Docket No. 115</mark>] (the "<u>NexPoint Reply</u>") filed by NexPoint; and (b) *Highland Capital Management Services, Inc. and HCRE partners, LLC's Reply in Support of Defendants' Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, <mark>Docket No. 120</mark>, and Adv. Proc. 21-3007, <mark>Docket No. 115</mark>] (the "<u>HCRE and HCMS Replies</u>," and together with the NexPoint Reply, the "<u>Replies</u>") filed by HCRE and HCMS; and (iv) the arguments made during the hearing held on December 13, 2021 (the "<u>Hearing</u>"); and this Court having found that Defendants have not established "good cause" under Rule 16(b) of the Federal Rules of Civil Procedure for the relief requested in the Motions; and this Court having jurisdiction over this matter pursuant to <mark>28 U.S.C. §§ 157</mark> and <mark>1334</mark>; and this Court having found that venue of this proceeding and the Motions in this District is proper pursuant to <mark>28 U.S.C. §§ 1408</mark> and <mark>1409</mark>; and upon all of the proceedings had before this Court, and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth during the Hearing on these Motions, **IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motions are **DENIED**.

2.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

DOCS_NY:44447.8 36027/003

# EXHIBIT 5

Davor Rukavina
Julian P. Vasek
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

Attorneys for NexPoint Advisors, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. No. 21-03005-sgj |
| | § | |
| vs. | § | Civ. Act. No. 3:21-cv-00880-C |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**BRIEF IN SUPPORT OF OBJECTION OF NEXPOINT
ADVISORS, L.P. TO ORDER DENYING MOTIONS TO EXTEND
EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

I.      RELIEF REQUESTED ................................................................................................1

II.     BACKGROUND ..........................................................................................................1

        A.      THE ADVERSARY PROCEEDING ...................................................................1

        B.      NEXPOINT'S AFFIRMATIVE DEFENSE ..........................................................2

        C.      THE EXPERT WITNESS DEADLINES ............................................................4

        D.      THE MOTION AND THE ORDER ...................................................................5

        E.      NEXPOINT'S RETENTION OF STEVE PULLY AND HIS EXPERT REPORT .....................5

III.    ARGUMENTS AND AUTHORITIES ........................................................................6

        A.      RECONSIDERATION OF ORDER AS ORDER OF MAGISTRATE JUDGE ..........................6

        B.      STANDARD APPLICABLE TO THE MOTION ...................................................7

                1.      Explanation for Failure to Timely Designate Expert ..................................7

                2.      The Importance of the Expert .................................................................10

                3.      No Potential Prejudice to the Debtor ......................................................12

                4.      Availability of Continuance to Avoid Prejudice ......................................13

        C.      THE BANKRUPTCY COURT CLEARLY ERRED IN ENTERING THE ORDER .................13

IV.     CONCLUSION ..........................................................................................................16

CERTIFICATE OF SERVICE ........................................................................................18

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Adams v. Medtronics Inc.*, 2021 U.S. Dist. LEXIS 47246 (E.D. Tex. 2021) ...............................13

*Baylor Health Care Sys. v. Equitable Plan Servs.*, 955 F. Supp. 2 678 (N.D. Tex. 2013)..............7

*Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir. 1990) .............................................................10

*Guzman v. Hacienda Records & Recording Studio Inc.*, 808 F.3d 1031 (5th Cir. 2015)............ 6-7

*In re Geert Duizenstraal*, 1997 U.S. Dist. LEXIS 16506 (N.D. Tex. 1997) ...................................6

*In re Schooler*, 725 F.3d 498 (5th Cir. 2013)..................................................................................8

*Marathon Fin. Ins. Inc. RRG v. Ford Motor Co.*, 591 F.3d 458 (5th Cir. 2009)...........................7

*Quijano v. United States*, 325 F.3d 564 (5th Cir. 2003) ..........................................................10, 15

*S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533 (5th Cir. 2003) .........................................7

*Streber v. Hunter*, 221 F.3d 701 (5th Cir. 2000)......................................................................10, 15

<u>**Other**</u>

Fed. R. Civ. P. 16 .............................................................................................................................7

Fed. R. Civ. P. 54 ........................................................................................................................6, 13

Fed. R. Civ. P. 72 ....................................................................................................................1, 6, 14

Local Civ. R. 72.1 .............................................................................................................................1

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Brief* (the "Brief") in support of its *Objection to Order*

*Denying Motions to Extend Expert Disclosure and Discovery Deadlines* (the "Objection"),

respectfully stating as follows:

## I.    RELIEF REQUESTED

1.    By the Objection, and pursuant to <mark>Federal Rule of Civil Procedure 72(a)</mark> and Local

Civil Rule 72.1, NexPoint seeks the District Court's review of the Bankruptcy Court's *Order*

*Denying Motions to Extend Expert Disclosure and Discovery Deadlines* (the "Order").  NexPoint

submits that, in denying NexPoint leave to extend the expert disclosure and discovery deadlines,

the Order is clearly erroneous and contrary to law and should, therefore, be reconsidered and

reversed by the District Court.

## II.    BACKGROUND

### A.    THE ADVERSARY PROCEEDING

2.    The Debtor was a debtor and is now a reorganized debtor in a Chapter 11 case

pending before the Bankruptcy Court.

3.    The Debtor initiated this Adversary Proceeding with the filing of its original

complaint against NexPoint on January 22, 2021.

4.    By this Adversary Proceeding, the Debtor seeks to collect on a promissory note

issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of

$30,746,812.33 (the "Note").  APP 008 ¶ 21.[1]  The Note is a 30-year note and provides for an

---

[1]    "APP" refers to the *Appendix in Support of Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, which is being filed contemporaneously herewith.

annual payment of principal and interest.  APP 008 ¶ 22.  After prior payments, the Debtor asserts

that $23,071,195.03 remains due and owing on the Note.  APP 010 ¶ 31.

5.      On July 28, 2021, the District Court entered an order adopting this Court's report

and recommendation and ordering that the reference for this Adversary Proceeding will be

withdrawn once the Bankruptcy Court certifies this Adversary Proceeding as being trial ready.

APP 002.  As part of the same, the District Court necessarily agreed and ordered that NexPoint

has a right to a trial by jury of this Adversary Proceeding.

6.      Although not clear, it appears that the Bankruptcy Court is acting in the capacity of

a magistrate judge, as the Bankruptcy Court itself appears to have concluded, although there is no

order so specifying.  APP 775 n.1; APP 776 n.5  Accordingly, in order not to waive its rights,

NexPoint filed the Objection.

**B.      NEXPOINT'S AFFIRMATIVE DEFENSE**

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal

and interest on December 31, 2020, and that NexPoint failed to make this payment.  APP 009 ¶ 26.

Thus, in January 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor

demanded full and immediate payment.  APP 009 ¶ 27.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that

certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement")

between the Debtor and NexPoint dated January 1, 2018.  APP 086 ¶ 80; APP 105.  The Shared

Services Agreement was in place as of December 31, 2020, although the Debtor terminated it later,

in 2021.  APP 462 at 2–9.  Under the Shared Services Agreement, the Debtor provided various

services to NexPoint, including so-called "back office" services, including treasury, accounting,

and payables services.  APP 462 at 13–APP 464 at 9.  NexPoint has alleged that, pursuant to the

Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  APP 473 at 22–APP 474 at 8.

9.      NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place, unaccelerated.  NexPoint has always asserted this as an affirmative defense.  *See* Defendant's Original Answer, <mark>Docket No. 6</mark>.  NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.  In other words, until NexPoint deposed Mr. Waterhouse, NexPoint believed that the Debtor simply forgot to facilitate the December 31, 2020 payment of the Note as it had done in the past and as NexPoint was relying on the Debtor to do again (using NexPoint's funds of course).

10.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.  APP 155 at 3–6; APP 463 at 3–8; APP 549 ¶ 25.  To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement.  Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint

to pay any more funds to the Debtor, including, expressly on the Note.  APP 526 at 4–APP 528 at 17.

11.     This changed the potential facts as NexPoint understood them from a situation where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment.  Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

## C.    THE EXPERT WITNESS DEADLINES

12.     NexPoint did not know that Waterhouse would provide this testimony.  APP 791 ¶ 12.  NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Shared Services Agreement.  But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.     If Dondero told Waterhouse in early December 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.  After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.     At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement.  This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

15.     On September 6, 2021, the Bankruptcy Court entered a scheduling order that provided for a deadline of October 29, 2021 for the parties to designate experts and provide expert disclosures.

**D.    THE MOTION AND THE ORDER**

16.     On October 29, 2021, NexPoint filed its *Motion to Extend Expert Disclosure and Discovery Deadlines* (the "Motion").  APP 089.  The Debtor objected, APP 534, and NexPoint filed a reply brief.  APP 786.

17.     The Bankruptcy Court held a hearing on the Motion on December 13, 2021.  At the conclusion of the hearing, the Bankruptcy Court orally denied the Motion and stated its reasons for such denial on the record.  APP 889–891.

18.     The Bankruptcy Court entered the Order on December 21, 2021.  APP 894.

**E.    NEXPOINT'S RETENTION OF STEVE PULLY AND HIS EXPERT REPORT**

19.     NexPoint filed its Motion as soon as it could after learning of Waterhouse's testimony, and it filed its Motion before the deadline to designate an expert expired.  However, NexPoint's expert was not able to prepare his report before that deadline expired.  Nevertheless, to demonstrate NexPoint's speed and that there would be no delays to this Adversary Proceeding, NexPoint filed on the docket of this Adversary Proceeding its designation of Steve Pully as its

expert, together with Mr. Pully's completed expert report, on December 10, 2021.  APP 830.  Thus, by the time of the hearing on the Motion, NexPoint's expert had already completed his report.

### III.    ARGUMENTS AND AUTHORITIES

**A.    RECONSIDERATION OF ORDER AS ORDER OF MAGISTRATE JUDGE**

20.     The Bankruptcy Court is not a magistrate judge.  The District Court's order on NexPoint's motion for the withdrawal of the reference provides that the Bankruptcy Court shall consider all pretrial matters, but does not state that the Bankruptcy Court shall do so as a magistrate subject to the rules applicable to magistrate judges.  NexPoint therefore submits that the District Court may reconsider, modify, or reverse the Order and grant the Motion *de novo* as it could do with respect to any of its own pretrial orders under Rule 54(b), and NexPoint hereby seeks such review and reconsideration.

21.     However, because the issue is uncertain, and because the Bankruptcy Court appears to understand that it is acting in the capacity of a magistrate judge, NexPoint also seeks the District Court's review of the Order under Rule 72(a).  In this respect, the Federal Rules of Bankruptcy Procedure do not incorporate Rule 72, even though they incorporate most of the Federal Rules of Civil Procedure into an adversary proceeding such as this one.  If Rule 72(a) applies, then the standard for reconsidering the Order is that the Order is "clearly erroneous or is contrary to law." FED. R. CIV. P. 72(a).

22.     Because the Order is not dispositive, the "clearly erroneous" standard applies.  *See, e.g., In re Geert Duizenstraal*, 1997 U.S. Dist. LEXIS 16506 a *3-*4 (N.D. Tex. 1997).  Under this standard, an order is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Guzman v. Hacienda Records & Recording Studio Inc.*, 808 F.3d 1031,

1036 (5th Cir. 2015). *Accord Baylor Health Care Sys. v. Equitable Plan Servs.*, <mark>955 F. Supp. 2</mark> <mark>678</mark>, <mark>689</mark> (N.D. Tex. 2013).

## B.    STANDARD APPLICABLE TO THE MOTION

23.    Rule 16(b) provides that a deadline in a scheduling order may be modified "for good cause," although there is some uncertainty as to whether this standard applies only after a deadline has passed (which is not the case here). *See* <mark>Fed. R. Civ. P. 16(b)(4)</mark>; *Marathon Fin. Ins. Inc. RRG v. Ford Motor Co.*, <mark>591 F.3d 458, 470</mark> (5th Cir. 2009) ("<mark>Federal Rule of Civil Procedure</mark> <mark>16(b)</mark> governs amendment of pleadings after a scheduling order's deadline to amend has expired").

24.    When the issue concerns an "untimely submission of expert reports," the Fifth Circuit has specified the following four factors as guiding the decision: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, <mark>315 F.3d 533, 536</mark> (5th Cir. 2003). Again, this test applies to a deadline which has already expired. Logically, therefore, a lesser standard should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

### 1.    Explanation for Failure to Timely Designate Expert

25.    The explanation for the requested extension of the expert deadlines was simply that the parties deposed Waterhouse on October 19, 2021, and it was not until that deposition that NexPoint knew or could reasonably have known that Waterhouse would testify that he was affirmatively instructed not to make the December 31, 2020 payment on the Note. APP 092 ¶ 12; APP 791 ¶ 11. This testimony directly contradicted Dondero's recollection that he made no such instruction. Since NexPoint relied on Dondero's recollection and had no reasonable grounds to believe that Waterhouse would testify differently, there was no reason for NexPoint to retain an

expert prior to the October 19, 2021 deposition of Waterhouse.  In this respect, discovery worked

as it should have and NexPoint should not be penalized for the natural evolution of this lawsuit.

26.     Prior to this deposition, NexPoint believed that the Debtor had utterly failed to

discharge its duties under the Shared Services Agreement by not facilitating the payment on the

Note.  This did not call for an expert.  But, once Waterhouse testified that Dondero instructed him

not to make the payment, the issue fundamentally changed.  This important distinction has been

aptly explained by the Fifth Circuit in a case where the issue was whether a trustee breached his

duties:

> Finders of fact are supposed to reach their conclusions on the basis of common
> sense, common understanding and fair beliefs, grounded on evidence consisting of
> direct statements by witnesses or proof of circumstances from which inferences can
> fairly be drawn.  Accordingly, we have explained that, as a general rule, expert
> testimony is not needed in many if not most cases. Moreover, although expert
> testimony may be necessary in a professional negligence case to establish the
> standard of care for the industry, an exception applies in instances of negligence
> that are a matter of common knowledge comprehensible to laymen.
>
> Although Liberty Mutual contends that expert testimony was required in this case,
> Lamesa suggests that inasmuch as the Trustee failed to act in the face of obvious
> danger posed by Mrs. Schooler's ready access to the bankruptcy estate's assets, and
> in the face of repeated warnings and inquiries by a concerned creditor, a layperson
> could discern that the standard of care was not met in this case.
>
> We agree with Lamesa that, under the facts of this case, expert testimony was not
> required to establish that the Trustee breached her duties. While the precise course
> of action the Trustee should have taken may be subject to reasonable debate, it
> requires no technical or expert knowledge to recognize that she affirmatively should
> have undertaken *some* form of action to acquire for the bankruptcy estate the assets
> to which it was entitled. As the bankruptcy court explained, by doing nothing, the
> Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013) (internal citations and quotations omitted)

27.     Thus, it was only after the Waterhouse deposition that NexPoint learned that, if the

jury believes Waterhouse, the issue of the Debtor's standard of care under the Shared Services

Agreement becomes much more complicated, thereby necessitating an expert on that standard of

care.  Nor is the Debtor free of blame with respect to the timing of when NexPoint learned of Waterhouse's testimony.  On May 11, 2021, the Debtor served its amended responses to NexPoint's discovery.  APP 813.  In those, the Debtor answered the following interrogatory:

**INTERROGATORY NO. 2:**

If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 2:**

The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal conclusion or legal analysis. Subject to its objection, the Shared Services Agreement did not provide that the Debtor was responsible for causing payments to be made under the Note. The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf. The Debtor's personnel caused the January Payment to be processed upon instruction from NexPoint.

APP 819.

28.     Even though NexPoint asked the Debtor to explain, factually, why the Debtor was not responsible for causing payments to be made, rather than including in its answer that Dondero gave Waterhouse the alleged instruction, the Debtor merely answered that the contract did not impose this responsibility on the Debtor.  Yet, the Debtor's answer to the following request for production strongly suggests that the Debtor knew of the alleged instruction, which it did not include it in the interrogatory answer:

**REQUEST FOR PRODUCTION NO. 1**:

All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Subject to the General Objections, the Debtor is unaware of any documents
responsive to Request for Production No. 1. <u>Any Communications responsive to
Request for Production No. 1 were verbal</u>.

APP 822 (emphasis added).

29.    The Debtor could and should have stated what these verbal communications were

in May, 2021.  Instead, NexPoint was forced to wait until Waterhouse's deposition to learn of the

alleged verbal communication.  Alternatively, the Debtor too did not know ahead of time how Mr.

Waterhouse would answer, but then it can hardly accuse NexPoint of any delay.

        **2.**      <u>**The Importance of the Expert**</u>

30.    This is a jury trial where the issues concern the Debtor's standard of care under the

Shared Services Agreement.  "Expert testimony is generally <u>required</u> to prove the applicable

standard of care." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (emphasis added);

*Streber v. Hunter*, 221 F.3d 701, 724 (5th Cir. 2000) ("Breach of the standard of care must

generally be proven by expert testimony").   [E]xpert testimony is <u>necessary</u> to establish the

standard of care . . . Similarly, breach of a fiduciary duty or a conflict of interest <u>requires</u> proof of

expert testimony." *Geiserman v. MacDonald*, 893 F.2d 787, 793-94 (5th Cir. 1990) (internal

quotations removed) (emphasis added).

31.    The Shared Services Agreement, in place during November and December, 2020

(when Dondero allegedly gave Waterhouse the instruction), provides as follows:

Section 6.01.  <u>Standard of Care</u>.  Except as otherwise expressly provided herein,
each Covered Person shall discharge its duties under this Agreement with the care,
skill, prudence and diligence under the circumstances then prevailing that a prudent
person acting in a like capacity and familiar with such matters would use in the
conduct of an enterprise of a like character and with like aims.  To the extent not
inconsistent with the foregoing, each Covered Person shall follow its customary
standards, policies, and procedures in performing its duties hereunder.

APP 115.

32.    "Covered Person" includes the "Staff and Services Provider," *i.e.* the Debtor, and

its managers, directors, officers, and shareholders.   APP 106.   There can be no dispute that

section 6.01 applied to the Debtor itself, and to Waterhouse.

33.    The Shared Services Agreement identifies at least three services that the Debtor

was required to provide that are directly on point:

> (a)    *Back- and Middle Office*.  Assistance and advice with respect to back- and
> middle-office functions including, but not limited to . . . finance and accounting,
> underline payments, operation, book keeping, cash management . . . accounts payable . . .

> (k)    *Ancillary Services*.   Assistance and advice on all things ancillary or
> incidental to the foregoing.

> (l)    *Other*.  Assistance and advice relating to such other back- and middle-office
> services in connection with the day-to-day business of [NexPoint] as [NexPoint]
> and [the Debtor] may from time to time agree.

APP 107–109 (emphasis added).

34.    The Shared Services Agreement also sets forth the standard of care that the Debtor

was to provide to NexPoint in discharging the Debtor's duties under the Shared Services

Agreement:

> the care, skill, prudence and diligence under the circumstances then prevailing that
> a prudent person acting in a like capacity and familiar with such matters would use
> in the conduct of an enterprise of a like character and with like aims.

APP 115 § 6.01

35.    Assistance and advice—again, *advice*—with respect to "payments" is expressly

included.  And, should there be any doubt, the Debtor's own Chief Financial Officer at the time

confirmed that it was "reasonable for NexPoint to rely on the debtors' employees to inform

NexPoint of an upcoming payment due on the $30 million promissory note."  APP 473 at 22–

APP 474 at 8.  The question therefore is, assuming that Dondero instructed Waterhouse not to

make the payment on the Note, whether Waterhouse thereafter doing nothing to clarify and ensure that he correctly understood Dondero, or to advise Dondero of the potential consequences of non-payment, or to seek to dissuade Dondero from his instruction, comported with "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

36.     This is appropriate for an expert to review because a lay juror is not likely to resolve these questions from personal experience or common sense.  Thus, extending the expert discovery deadline is important for NexPoint to fully present its defense and for the jury to be able to discharge its duties in resolving the defense.

### 3.     No Potential Prejudice to the Debtor

37.     Granting the Motion would not work any prejudice on the Debtor.  NexPoint filed its expert report on December 10, 2021, and only a short additional time would be needed for the Debtor to depose that expert and potentially retain a rebuttal expert.  Trial of this Adversary Proceeding is not set and, on December 17, 2021, the Debtor filed its motion for summary judgment, the hearing on which will not be until March 8, 2022.  The Bankruptcy Court will then provide a report and recommendation on that motion, subject to *de novo* review by the District Court, which will likely take weeks if not months to resolve.  Thus, granting the Motion would not have delayed the ultimate trial of this Adversary Proceeding at all.

38.     With respect to the Debtor's argument that it will be prejudiced by potentially having to expend funds to retain a rebuttal expert, NexPoint's first response is that, if the Debtor prevails on its claims under the Note, it will seek to recover its fees and costs from NexPoint.  Second, and perhaps more importantly, having to incur costs for an expert in a $24 million lawsuit,

where the Debtor has always known of NexPoint's affirmative defense and very likely knew of

Waterhouse's testimony before (as there were two other employees, David Klos and Kristin

Hendrix, who are still employees of the Debtor, who testified at deposition that Waterhouse told

them of Dondero's alleged instruction at approximately the same time the instruction was allegedly

given), is not legally cognizable prejudice any more than it would be in any case:

> any additional costs incurred from an extension would not be unreasonable. Here,
> Plaintiffs seek an extension so they can offer an expert witness for their products
> liability claims.  Defendants have been aware of these claims since this case's
> inception. Because expert witnesses are crucial for Plaintiffs' prima facie case,
> Defendants have known they would need to prepare rebuttal evidence since this
> case began on October 14, 2019.  These facts do not present an instance in which a
> party adds an additional claim, or introduces an eleventh-hour witness, to foist
> additional litigation costs without warning.

*Adams v. Medtronics Inc.*, 2021 U.S. Dist. LEXIS 47246 at *12 (E.D. Tex. 2021).

### 4.    <u>Availability of Continuance to Avoid Prejudice</u>

39.    As this Adversary Proceeding is not set for trial, as it will not be set for trial until it

is certified as trial ready by the Bankruptcy Court, and as it will not be certified as trial ready until

after the Debtor's motion for summary judgment is adjudicated, there is no need for a continuance

and this factor is not relevant to the ultimate issue.  As discussed above, granting the Motion would

not cause any delay in the ultimate adjudication of this Adversary Proceeding.

### C.    <u>THE BANKRUPTCY COURT CLEARLY ERRED IN ENTERING THE ORDER</u>

40.    As noted, NexPoint submits that the District Court can and should review the

Motion and Order under Rule 54(b) *de novo* by considering the underlying evidence, arguments,

and opposition.  This is especially the case because the District Court will try this Adversary

Proceeding to a jury, and the District Court should control what evidence is presented to the jury.

41.     If, however, the District Court applies Rule 72(a), then NexPoint submits that the

District Court should reconsider the Order and grant the Motion because the Bankruptcy Court's

denial of the Motion was clearly erroneous.

42.     In this respect, the Bankruptcy Court concluded that, because NexPoint had always

asserted its affirmative defense that the Debtor caused the alleged default:

> I do not think the sudden statement of Frank Waterhouse suddenly is a game-
> changer that creates some new need for an expert. So, therefore, looking at the
> factors, I don't think the explanation here to extend the deadlines has merit.

APP 890 at 19–23.

43.     This was clearly erroneous.  The only evidence submitted was that NexPoint did

not learn of Waterhouse's testimony until he was deposed, and that NexPoint did not have a

reasonable ability to learn of that testimony beforehand.  No evidence to the contrary was

presented.  And, the Bankruptcy Court failed to take into account the Debtor's failure to fully

answer NexPoint's interrogatory, which asked for any facts as to why the Debtor did not facilitate

or make the payment on the Note.

44.     The Bankruptcy Court also concluded that there was no importance to the amended

schedule:

> And I do not think an expert can testify about contractual duties and attempt to
> interpret its provisions. That is the job of the Court, and I think it is improper subject
> matter for an expert.
>
> I don't buy into any notion that this is terribly unique territory or exotic. I mean, it
> was a contract. Shared services agreements are not all that unique, shall we say?
> It's not a device that is used solely in the investment advisor fund world.  It's in the
> corporate world generally.  Courts see these in all kinds of cases. So, again, I don't
> think contract interpretation needs an expert here or should have an expert here.
>
> And just because experts are sometimes -- often, I should say -- appropriate in legal
> malpractice or medical malpractice or other kinds of tort cases where duties might
> be needing of elaboration, here, the contract spells out the duties, and I just don't
> think any of those cases argued are applicable.

APP 891 at 3–19.

45.     Here, the Bankruptcy Court not only clearly erred; it erred as a matter of law. NexPoint's expert was not being asked to interpret the contract or tell the jury what the contract says.  Rather, he was only being asked to opine on whether the Debtor's failure comported with the standard of care actually set forth in the contract:

> the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

APP 115 § 6.01.

46.     Opining on whether the Debtor acted with the care, skill, prudence, and diligence under the circumstances as a prudent person in a like situation would have is a question of fact.  It is not a legal interpretation of a contract.  Again, the Fifth Circuit holds that "[e]xpert testimony is generally required to prove the applicable standard of care."  *Quijano*, 325 F.3d at 567) (emphasis added); *Streber*, 221 F.3d at 724 ("Breach of the standard of care must generally be proven by expert testimony").  Clearly, therefore, as expert testimony on this issue is potentially required, it cannot invade the province of the Court to determine what the applicable standard of care is.

47.     The Bankruptcy Court also found prejudice in denying the Motion:

> Prejudice, I do think there is potential prejudice in allowing an extension of this deadline. It will be costly, add a layer of expense and delay to this litigation, when I don't think it would be admissible at trial ultimately.

APP 891 at 20–23.

48.     This finding is likewise clearly erroneous and erroneous as a matter of law.  The Bankruptcy Court based its finding of prejudice on its view that the expert testimony may not be admissible.  As noted above, this is wrong: *Dabuert* issues aside, expert testimony on whether a standard of care has been complied with is absolutely admissible and may be required.  The Bankruptcy Court's overall finding of prejudice cannot be separated from this wrong sub-finding.

And, on the issue of cost, as noted above the Debtor will have a claim for any increased fees and expenses if it prevails at trial and such increased fees and expenses—ordinary incidents of high-stakes litigation—are not by themselves legally cognizable prejudice any more than they are in any case.

## IV.   <u>CONCLUSION</u>

49.     The District Court will conduct the jury trial in this case, and the District Court should control what evidence the jury will weigh. In the end, the trial here will be about the truth, the facts, and the equities. A scheduling order should not be used to prevent that result. Here, the delay is not the fault of NexPoint, since NexPoint did not know what Waterhouse would say until he was deposed. Any delay is the fault of the Debtor in not fully answering NexPoint's discovery. The expert is important because, if the jury believes Waterhouse, then NexPoint should have the ability to demonstrate that the Debtor nevertheless breached its duties to NexPoint in causing the alleged default on the Note; something on which expert testimony is certainly appropriate, if not required. And, there is no real prejudice to the Debtor, certainly not by way of any delay in the ultimate adjudication of this case. In the end, while schedules and scheduling orders are important, they should not be used to prejudice an otherwise viable issue or tactically benefit a litigant. NexPoint therefore prays that the District Court reverse the Order and grant the Motion.

RESPECTFULLY SUBMITTED this the 5th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 5, 2022, a true and correct copy of the foregoing document, including any exhibit(s) thereto, was served on the following recipients via the Court's CM/ECF system:

Case Admin Sup        txnb_appeals@txnb.uscourts.gov

Bryan Christopher Assink        bryan.assink@bondsellis.com

Clay M Taylor        clay.taylor@bondsellis.com

Daniel P Elms        elmsd@gtlaw.com, guerrak@gtlaw.com

Davor Rukavina        drukavina@munsch.com

Deborah Rose Deitsch-Perez        deborah.deitsch-perez@stinson.com, kinga.mccoy@stinson.com, patricia.tomasky@stinson.com

Douglas Draper        ddraper@hellerdraper.com, dhepting@hellerdraper.com, gbrouphy@hellerdraper.com, vgamble@hellerdraper.com

Gregory V Demo        gdemo@pszjlaw.com, hwinograd@pszjlaw.com, jfried@pszjlaw.com, lsc@pszjlaw.com

Jeffrey N Pomerantz        jpomerantz@pszjlaw.com

John A Morris        jmorris@pszjlaw.com, hwinograd@pszjlaw.com, lsc@pszjlaw.com

Julian Preston Vasek        jvasek@munsch.com

Leslie A Collins        lcollins@hellerdraper.com, dhepting@hellerdraper.com

Michael P Aigen        michael.aigen@stinson.com, stephanie.gratt@stinson.com

Stacey G Jernigan        sgj_settings@txnb.uscourts.gov, anna_saucier@txnb.uscourts.gov

Zachery Z. Annable        zannable@haywardfirm.com, zannable@franklinhayward.com

/s/ Davor Rukavina
Davor Rukavina

# EXHIBIT 6

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. Nos. 21-3005; 21-3006; 21-3007 |
| | § | |
| vs. | § | Case No. 3:21-cv-00881 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |
| | § | |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  RELEVANT FACTS ............................................................................ 3

   A.  The Note Action ......................................................................... 3

   B.  NexPoint's Affirmative Defense ................................................. 4

   C.  The Shared Services Agreement ................................................ 5

   D.  The Adversary Proceeding is Referred to the Bankruptcy Court for Pretrial
       Proceedings ................................................................................ 5

   E.  The Court Enters the Scheduling Order ...................................... 6

   F.  Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any
       Payments to Highland ................................................................ 6

   G.  Defendant Files the Motion to Modify the Scheduling Order ........ 6

   H.  The Bankruptcy Court Denies the Motion to Modify .................... 9

       1.  Rule 16(b) ........................................................................... 9

       2.  NexPoint's Explanation for Failing to Previously Identify Expert was
           Inadequate ......................................................................... 10

       3.  The Expert Testimony is Improper and Unwarranted .............. 10

       4.  Highland Would Suffer Prejudice if the Scheduling Order was Modified .............. 11

   I.  Defendant Files the Instant Motion .......................................... 11

III. ARGUMENT .................................................................................. 12

   A.  The Motion is Procedurally Improper ........................................ 12

       1.  The Rule 54 Motion was Improperly Filed in this Court ........... 12

       2.  The Rule 72 Motion is Procedurally Improper Because the Bankruptcy Court
           is not a Magistrate Judge .................................................... 13

   B.  The Motion is Without Merit ..................................................... 15

DOCS_NY:44982.7 36027/003

1.    The Rule 54 Motion is Without Merit ........................................................... 16

2.    The Rule 72 Objection is Without Merit .................................................... 19

CONCLUSION ............................................................................................................ 25

DOCS_NY:44982.7 36027/003

**TABLE OF AUTHORITIES**

**Cases**

*Askanase v. Fatjo*,
    130 F.3d 657 (5th Cir. 1997) ........................................................ 25

*Binh Hoa Le v. Exeter Fin. Corp.*,
    3:15-CV-3839-L, 2019 WL 1436375 (N.D. Tex. Mar. 31, 2019) ................ 10, 22

*Caramba, Inc. v. Nationwide Mutual Fire Ins. Co.*,
    No. H-19-1973, 2021 WL 259388 (S.D.Tex. Jan. 26, 2021) ..................... 12, 17

*Cook v. Flight Services and Systems, Inc.*,
    NO. 16-15759, 2018 WL 6591919 (E.D. La. Dec. 14, 2018) .................... 13, 18

*Cormier v. Turnkey Cleaning Services, L.L.C.*,
    295 F.Supp.3d 717 (E.D. La 2017) .................................................. 19

*DAC Surgical Partners P.A. v. United Healthcare Services, Inc.*,
    4:11-CV-1355, 2017 WL 3484507 (S.D. Tex. Aug. 14, 2017) ................... 17, 19

*Daniels v. Bowles*,
    CIV.A. 3:03-CV-1555-, 2004 WL 1810658 (N.D. Tex. Aug. 9, 2004) ............ 18

*Dell Computer Corporation v. Rodriguez*,
    390 F.3d 377 (5th Cir.2004) ........................................................ 20

*eTool Dev., Inc. v. Nat'l Semiconductor Corp.*,
    881 F. Supp. 2d 745 (E.D. Tex. 2012) .............................................. 16, 17

*Flax v. Quitman County Hosp., LLC*,
    2:09-CV-101-M-D, 2011 WL 3585870 (N.D. Miss. Aug. 16, 2011) .............. 24

*Geiserman v. MacDonald*,
    893 F.2d 787 (5th Cir. 1990) .................................................... passim

*Grand Time Corp. v. Watch Factory, Inc.*,
    3:08-CV-1770-K, 2009 WL 10678210 (N.D. Tex. Nov. 18, 2009) ................. 9, 10

*Guy v. Crown Equip. Corp.*,
    394 F.3d 320 (5th Cir.2004) ......................................................... 17

*Hamilton v. First American Title Ins. Co.*,
    No. 3:07–CV–1442–G, 2010 WL 791421 (N.D.Tex. Mar. 8, 2020) ......... 19, 20, 21, 22

*Hanspard v. Otis Elevator Co.*,
    CIV.A. 05-1292, 2007 WL 839994 (W.D. La. Jan. 12, 2007) ...................... 24

*Hightower v. Group 1 Automotive, Inc.*,
    NO. 15-1284, 2016 WL 3430569 (E.D. La. June 22, 2016) ..................... 16, 17, 19

*Hirsch v. Ushealth Advisors, LLC*,
    4:18-CV-00245-P, 2020 WL 1271374 (N.D. Tex. Mar. 12, 2020) ................ 23, 25

*In re Adelphi Institute, Inc.,*
    112 B.R. 534 (S.D.N.Y. 1990) .................................................................... 15

*In re Kennedy,*
    48 B.R. 621 (Bankr. D. Ariz. 1985) ............................................................ 14

*In re Lion Capital Group,*
    46 B.R. 850 (Bankr. S.D.N.Y. 1985) .......................................................... 14

*In re M & L Business Mach. Co., Inc.,*
    159 B.R. 932 (D. Col. 1993) ................................................................. 14, 15

*In re THB Corp.,*
    94 B.R. 797 (Bankr. D. Mass. 1988) .......................................................... 14

*In re Trinsum Group, Inc.,*
    467 B.R. 734 (Bankr. S.D.N.Y. 2012) ........................................................ 13

*Jenkins v. Robotec, Inc.,*
    No. 1:09cv150HSO-JMR, 2009 WL 5166252 (S.D.Miss. Dec. 29, 2009) .................. 19, 21

*Lexington Insurance Company v. ACE American Insurance Co.,*
    192 F.Supp.3d 712 (S.D.Tex. 2016) ....................................................... 12, 19

*Minnis v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.,*
    CV 13-00005-BAJ-RLB, 2014 WL 12811456 (M.D. La. Aug. 15, 2014) .................... 21, 25

*Namer v. Scottsdale Insurance Company,*
    314 F.R.D. 392 (E.D. La 2016) ............................................... 13, 16, 17, 18

*Neaville v. Wells Fargo Bank, N.A.,*
    3:11-CV-97-P, 2013 WL 12124590 (N.D.Tex. June 4, 2013) ............................ 12, 19

*Nerium SkinCare, Inc. v. Nerium Int'l, LLC,*
    3:16-CV-1217-B, 2017 WL 9934881 (N.D. Tex. Feb. 6, 2017) .......................... 20, 21

*Panhandle Adver., LLC v. United Rentals Realty, LLC,*
    2:19-CV-189-Z-BR, 2021 WL 1112901 (N.D. Tex. Feb. 12, 2021) ........................... 24

*Quijano v. United States,*
    325 F.3d 564 (5th Cir. 2003) ............................................... 8, 11, 24

*Reliance Ins. Co. v. La. Land & Expl. Co.,*
    110 F.3d 253 (5th Cir. 1997) ............................................... 10, 22

*Resolution Tr. Corp. v. Sands,*
    151 F.R.D. 616 (N.D. Tex. 1993) ............................................ 23, 25

*S.N.A. Nut Co.,*
    No. 96 C 181, 1996 WL 411290 (N.D. Ill. July 19, 1996) ..................... 14, 15

*Sanders v. Shell Oil Co.,*
    678 F.2d 614 (5th Cir. 1982) .................................................... 20

*Scott v. Monsanto Co.,*
    868 F.2d 786 (5th Cir. 1989) .................................................... 20

iv

*Seabulk Towing, Inc. v. Oceangrafia S.A. de C.V.*,
    01-3791, 2002 WL 398771 (E.D. La. Mar. 12, 2002) ............................................. 20

*Streber v. Hunter*,
    221 F.3d 701 (5th Cir. 2000) ..................................................................... 7, 11, 24

*Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*,
    438 F. Supp. 2d 696 (E.D. Tex. 2006) ............................................................. 24

*Templet v. Hydro Chem Inc.*,
    367 F.3d 473 (5th Cir. 2004) ......................................................................... 16

*T-M Vacuum Products, Inc. v. TAISC, Inc.*,
    CIV.A. H-07-4108, 2008 WL 2785636 (S.D. Tex. July 16, 2008) ......................... 16

Triton Tech of Tex., LLC v. Nintendo of Am., Inc.,
    No. 2:10–CV–328, 2012 WL 2036411 (E.D.Tex. June 6, 2012) ...................... 16, 17

United States v. Saldivar,
    No. 2:03-CR-182-2, 2014 WL 357313 (S.D. Tex. Jan. 31, 2014)........................... 17

*Waltman v. Int'l Paper Co.*,
    875 F.2d 468 (5th Cir. 1989) ......................................................................... 17

*Winfun v. Daimler Chrysler Corporation*,
    255 Fed. Appx. 772 (5th Cir.2007)................................................................. 20

**Statutes**

28 U.S.C. § 157 ........................................................................................... 1, 13, 14

28 U.S.C. § 158................................................................................................ 1, 13, 14

28 U.S.C. § 636(b)(1)(A) ............................................................................. 2, 13, 19, 20

**Rules**

Fed. R. Civ. P. 16(b)(4)........................................................................................... 9

Fed. R. Civ. P. 54(b) ............................................................................................. 16

Fed. R. Civ. P. 59(e) ............................................................................................. 16

Fed. R. Civ. P. 72(a) ......................................................................................... 13, 19

v

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S BRIEF IN SUPPORT OF ITS
OBJECTION AND RESPONSE TO OBJECTIONS TO ORDER DENYING MOTIONS
TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

Highland Capital Management, L.P., the reorganized debtor ("Highland" or "Plaintiff"),

hereby files this brief in support of its opposition (the "Opposition") to the *Objection of NexPoint*

*Advisors, L.P. to Order Denying Motions to Extend Expert Discovery and Discovery Deadlines*

[Docket No. 27-1][1] (the "Motion"), filed by NexPoint Advisors, L.P. ("NexPoint").[2]

## I.       PRELIMINARY STATEMENT[3]

1.       The Motion should be denied because it is both procedurally improper and without

merit.  The Bankruptcy Court, in a proper exercise of its discretion, denied Defendants' Motion to

Extend on the ground that Defendants failed to show "good cause" for modifying the Scheduling

Order under Rule 16(b).  The Bankruptcy Court's Order denying such relief is subject to appellate

review under 28 U.S.C. § 158.

2.       Nevertheless, Defendants seek this Court's review of the Bankruptcy Court's Order

under (i) Rule 54(b) and, alternatively, (ii) Rule 72(a).  The Motion constitutes a thinly veiled

attempt at forum shopping and an end-run around the appellate process.  Defendants' actions also

constitute a wholesale disregard for the Bankruptcy Court's adjudicative powers over discovery

matters until the reference is withdrawn under 28 U.S.C. § 157. ("Section 157").  Section 157

authorizes bankruptcy courts to rule on interlocutory matters in "noncore" proceedings, and enter

proposed rulings on dispositive motions, until a case is trial-ready.  The statute preserves only

"final" orders for entry by the district court.  This division of powers between bankruptcy courts

---

[1] Refers to the docket numbers maintained in this Court.
[2] *See also Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines,* filed by
Highland Capital Management Services, Inc. ("HCMS") and HCRE Partners, LLC ("HCRE," and collectively with
HCMS and NexPoint, "Defendants") [Docket Nos. 27-4, 27-5].
[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed thereto below.

and district courts promotes the efficient administration of pretrial proceedings.  In attempting to

inject this Court into the discovery process, Defendants seek to, without any authority, turn such

process on its head by undermining its very purpose.  If credited, Defendants' interpretation of the

statute would result in a wholesale deferral of all interlocutory orders to the district court, chaos

that Section 157 was designed to prevent.  Thus, in addition to being procedurally improper,

Defendants' attempted manipulation of the system should be summary rejected by the Court on

public policy grounds.

3.      The Rule 54 Motion is procedurally improper because it should have been filed in

the court which rendered the order subject to reconsideration, *i.e.*, the Bankruptcy Court.  To the

extent Defendants seeks reconsideration of the Order, the Rule 54 Motion was improperly filed in

this Court.  For this reason alone, the Rule 54 Motion should be denied.

4.      The Rule 72 Objection is also procedurally deficient because Rule 72(a) is

inapplicable here.  Rule 72(a) objections apply to non-dispositive motions of magistrate judges,

rendered pursuant to 28 U.S.C. § 636(b)(1)(A).  In issuing the Order, the Bankruptcy Court was

not acting as a magistrate judge.  Pursuant to the Order of Reference, until the Adversary

Proceeding is trial-ready, the Bankruptcy Court oversees all pretrial matters.  The Bankruptcy

Court properly exercises its jurisdiction in rendering interlocutory discovery orders under Section

157.  Such orders are subject to appellate review under Section 158(a).  Defendants' application

of Rule 72(a) on the ground that the Bankruptcy Court is acting as a "magistrate judge" is,

therefore, misplaced.  Accordingly, the Motion should be denied on procedural grounds alone.

5.      In the unlikely event the Court considers the substance of the Motion, it is wholly

without merit.  Defendants fail to demonstrate that the extraordinary remedy of reconsideration of

the Order is warranted under Rule 54(b) because they fail to raise (i) an intervening change in

controlling law; (ii) new evidence not previously available; or (iii) the need to correct a clear or manifest error of law or fact or to prevent manifest injustice. The arguments set forth in the Rule 54 Motion rehash those considered and rejected by the Bankruptcy Court. Defendants' Rule 54 Motion demonstrates, at best, Defendants' disagreement with the Order and attempt to re-argue the same issues. This is insufficient to warrant the rare relief of reconsideration under Rule 54(b).

6.    The Rule 72 Objection is equally meritless. Defendants fail to meet their heavy burden of showing the Bankruptcy Court abused its broad discretion in finding that Defendants failed to show "good cause" for modifying the Scheduling Order under Rule 16(b). The Rule 72 Objection restates the same deficient arguments presented to the Bankruptcy Court in support of the Motion to Extend. Disappointment with the Bankruptcy Court's discretionary findings is insufficient to demonstrate that such findings were "clearly erroneous" or "contrary to law." The Motion should be denied.

## II.    RELEVANT FACTS

### A.    The Note Action

7.    On May 31, 2017, James Dondero signed a 30-year term note on behalf of NexPoint and in favor of Highland (the "Note"). Pursuant to the Note, NexPoint was required to pay Highland in Annual Installments:

> 2.1    Annual Payment Dates. During the term of this Note, [NexPoint] shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each payment) in thirty (30) equal annual payments (the "Annual Installments") until the Note is paid in full. [NexPoint] shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

Ex. 1 § 2.1 (Appx. 2).[4]

---

[4] "Appx." refers to the *Appendix in Support of Highland Capital Management, L.P.'s Objection and Response to Objections to Order Denying Motions to Extend Expert Discovery and Discovery Deadlines*, filed concurrently herewith. Citations to the Appendix are notated as follows: Ex. #, Appx. #.

8.      Section 4 of the Note provided:

4.      <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof [i.e., Highland], without notice, demand presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof [i.e., Highland].

*Id*. § 4.

9.      On December 31, 2020, NexPoint failed to make the Annual Installment payment due under the Note in the amount of $1,406,111.92.  Plaintiff commenced an adversary proceeding against NexPoint (the "<u>Adversary Proceeding</u>") by filing a *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [AP Docket No, 1][5] (the "<u>Original Complaint</u>"). (Ex. 2, Appx. 5-32).  In its Original Complaint, Highland asserted claims against NexPoint for (i) breach of contract and (ii) turnover for all accrued and unpaid principal and interest due under the Notes until the date of payment, plus Highland's cost of collection and reasonable attorney's fees (as provided for under each of the Notes).

**B.    <u>NexPoint's Affirmative Defense</u>**

10.      On March 1, 2021, NexPoint filed its *Original Answer* asserting, among other things, that "[p]ursuant to that certain Shared Services Agreement, [Highland] was responsible for making payments on behalf of [Defendant] under the note" such that any "alleged default" was caused by Highland's own negligence and breach of contract (the "<u>Original Defense</u>").  *Defendant's Original Answer* [AP Docket No. 6] (the "<u>Original Answer</u>") ¶¶ 39-41 (Ex. 3, Appx. 39)  On August 9, 2021, NexPoint filed its *First Amended Answer*, which did not substantively alter its Original Defense.  [AP Docket No. 50] (the "<u>Amended Answer</u>") ¶¶ 39-41. (Ex. 4, Appx.

---

[5] Refers to the docket numbers maintained in the Adversary Proceeding, case no. 21-3005.

48)  On September 1, 2021, after Highland amended its Complaint,[6] NexPoint filed its *Answer to Amended Complaint* [AP <mark>Docket No. 64</mark>] (the "<u>Final Answer</u>") (Ex. 5, Appx. 51-64).  The Final Answer did not substantively alter NexPoint's Original Defense.  *See id.* ¶¶ 80-82. (Appx. 62)

**C.    The Shared Services Agreement**

11.    NexPoint and Highland entered into an *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "<u>SSA</u>"). (Ex. 6, Appx. 65-84).  The SSA expressly spelled out Highland's contractual duties.  Article II required Highland to provide "assistance and advice" with respect to certain specified services, including "assistance and advice with respect to back-and middle-office functions including, but not limited to … finance and accounting, payments, operation, book keeping, cash management … accounts payable." *Id.* § 2.02 (Appx. 68-70).  No provision in the SSA authorized, let alone required, Highland to effectuate payments on NexPoint's behalf without receiving direction from an authorized representative of NexPoint.  Article II of the SSA provided that "for the avoidance of doubt   . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ." *Id.* § 2.02 (emphasis added) (Appx. 68-70).

**D.    <u>The Adversary Proceeding is Referred to the Bankruptcy Court for
        Pretrial Proceedings</u>**

12.    In April 2021, each Defendant filed a *Motion to Withdraw the Reference* [*see, e.g.,* AP <mark>Docket No. 19</mark>] (the "<u>Motions to Withdraw</u>") (Ex. 8, Appx. 159-162), seeking to withdraw its respective Adversary Proceeding from the Bankruptcy Court to the District Court.  In July 2021, the Bankruptcy Court issued *Reports and Recommendations* to the District Court, recommending

---

[6] See *Amended Complaint for (i) Breach of Contract, (ii) Turnover of Property, (iii) Fraudulent Transfer, and (iv) Breach of Fiduciary Duty* [AP <mark>Docket No. 63</mark>] (Ex. 7, Appx. 85-158).

that (i) the District Court (a) refer all pre-trial maters to the Bankruptcy Court and (b) grant the Motions to Withdraw, but only at such time as the Bankruptcy Court certifies to the District Court that the actions are trial-ready, and (ii) to the extent a dispositive motion is brought, the Bankruptcy Court issue a report and recommendation to the District Court to adopt or reject. [*See* AP Docket No. 40] (the "R&R").  (Ex. 9, Appx. 163-175).  The District Court subsequently adopted the Bankruptcy Court's R&Rs [Docket No. 14] (the "Order of Reference").

### E.      The Court Enters the Scheduling Order

13.      On September 6, 2021, the Bankruptcy Court entered the Scheduling Order [AP Docket No. 70].  (Ex. 10, Appx. 176-185).   The Scheduling Order provided that "expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021."  *Id.* ¶ 3. (Appx. 178)

### F.      Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any Payments to Highland

14.      On October 19, 2021, Frank Waterhouse ("Mr. Waterhouse"), Highland's former Chief Financial Officer who also served, and continues to serve, as the Treasurer of NexPoint and HCMS, testified during a deposition that NexPoint did not make the Annual Installment payment due on December 31, 2020 because Mr. Dondero had instructed him in December 2020 not to cause any payments to be made to Highland.  Mr. Waterhouse testified that he never followed up with Mr. Dondero or reminded him that the payment was coming due at the end of the month.  (Ex. 11, at 390:4-392:17, Appx. 285).

### G.      Defendant Files the Motion to Modify the Scheduling Order

15.      On October 29, 2021, the deadline for expert disclosures, Defendants filed their

Motion to Extend[7] (Ex. 14, Appx. 1219-1664).  In the Motion to Extend, NexPoint requested an

extension of the discovery deadlines set forth in the Scheduling Order in order to obtain expert

testimony regarding the scope of Highland's alleged duties under the Shared Services Agreement.

Specifically, NexPoint proposed to retain an expert to testify "on the standards and duties of care

under the parties' Shared Services Agreement . . . with respect to Highland's role in NexPoint's

alleged failure to make a December 21, 2020 payment on the Note … specifically, that Highland

was responsible for ensuring that NexPoint made this payment."  *Id.* ¶ 1 (Appx. 1221).  NexPoint

maintained that, while prior to Mr. Waterhouse's deposition, an expert was not needed, in light of

Mr. Waterhouse's testimony, the "situation is much more complicated." Reply ¶¶ 12, 13 [AP

Docket No. 115] (Ex. 15, Appx. 1671-1672).  NexPoint argued that an expert is "necessary" to

testify regarding whether Highland violated an "affirmative duty or obligation" it owed to

NexPoint under Section 6.01 of the Shared Services Agreement to effectuate the payment on behalf

of NexPoint, despite Mr. Dondero's direct instructions to the contrary.  According to NexPoint:

> [T]he question becomes whether Waterhouse or [Highland] 'put their head in the
> sand' in violation of any affirmative duty or obligation they may have had regarding
> the matter, such as; to ask Dondero whether they correctly understood him; to ask
> Dondero whether he meant NexPoint or the Note; to inform Dondero of the
> potential consequences of a default by potentially accelerating a 30-year
> promissory note; or to try to dissuade him from his decision.

Motion to Extend ¶ 13 (Appx. 1224); Reply ¶¶ 12, 13 (Appx. 1671-1672).

16.     NexPoint argued that an expert is "appropriate" and "required" to testify regarding

the scope of Highland's alleged duties under the SSA. *Id.* ¶ 8 (Appx. 1670).  In support thereof,

NexPoint relied on *Streber v. Hunter*, 221 F.3d 701 (5th Cir. 2000), *Geiserman v. MacDonald*,

---

[7] *See also Motion of Highland Capital Management Services, Inc. to Extend Expert Disclosure and Discovery
Deadlines*, filed at Docket No. 91 in Adversary Proceeding 21-03006 (Ex. 12, Appx. 317-767) and *Motion of HCRE
Partners, LLC to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 86 in Adversary Proceeding
21-03007 (Ex. 13, Appx. 768-1218) (collectively with the Motion to Extend, the "Motions to Extend").

893 F.2d 787 (5th Cir. 1990), and *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003),

three professional malpractice cases in which an expert was needed to testify regarding the

standard of care in a particular industry.  *See id.*

17.     Regarding timing, NexPoint maintained that in a response to an interrogatory which

asked Highland to "explain the legal and factual basis" for its argument that Highland had no duty

to effectuate payments on the Note on NexPoint's behalf, Highland did not "include[] in its answer

that Mr. Dondero gave Mr. Waterhouse the alleged instruction."  Reply ¶ 22 (Appx. 1677-1678).

18.     NexPoint argued that Highland would not suffer prejudice in the event the

Scheduling Order was modified, contending that "[i]f [Highland hires a rebuttal expert and prevails

at trial, then it will be entitled to the costs of that expert," and a "trial has not been set."  Reply ¶¶

27-29 (Appx. 1679-80).

19.     Highland objected to the Motions to Extend [AP Docket No. 105] (the "Objection")

(Ex. 16, Appx. 1710-1733), on the ground that Defendants failed to show "good cause" for

modifying the Scheduling Order under Rule 16(b).  Highland maintained that (i) NexPoint's

suggested expert testimony is improper as a matter of law because it amounts to a legal conclusion,

*id.* ¶ 34-38 (Appx. 1724-1725), (ii) NexPoint's explanation for failing to previously identify an

expert was deficient because NexPoint had nine months to retain an expert regarding this very

defense, *id.* ¶ 43-45 (Appx. 1727-1728), (iii) the suggested expert testimony is irrelevant because

(a) the SSA does not impose a duty on Highland to effectuate payments on NexPoint's behalf

without authorization from a NexPoint representative and (b) the issue of whether Highland

otherwise breached any duties contained in the SSA is within the common understanding of a

layperson, and not the type of issue necessitating an expert, *id.* ¶¶ 46-53 (Appx. 1728-1730), and

(iv) allowing expert testimony at this stage would prejudice Highland because (a) Highland would

need to expend significant resources responding to NexPoint's latest theory of its defense through additional discovery and (b) any continuance would not cure such prejudice because it would unnecessarily delay the trial and Highland's potential recovery under the Note, *id.* ¶¶ 54-57 (Appx. 1730-1732).   Highland argued that HCRE's and HCMS's' Motions were equally, if not more, frivolous than NexPoint's since HCMS and HCRE were not even parties to the SSA, the document which supposedly formed the basis of the Motion to Extend. *Id.* ¶ 58 (Appx. 1732).

### H.    The Bankruptcy Court Denies the Motion to Modify

20.    On December 13, 2021, the Bankruptcy Court held an oral argument on the Motions to Extend (the "<u>Hearing</u>").  *See* December 13, 2021 Hearing Transcript.  (the "<u>Transcript</u>") (Ex. 17, Appx. 1734-1772).   At the conclusion of the hearing, the Bankruptcy Court denied the Motions to Extend on the ground that Defendants failed to show "good cause" to modify the Scheduling Order.  *See* Transcript at 35-37 (Appx. 1734-1772).   The Bankruptcy Court's findings are summarized below.

#### 1.    Rule 16(b)

21.    The Bankruptcy Court analyzed the Motions to Extend under Rule 16(b) of the Federal Rules of Civil Procedure, which provides that a scheduling order may only be modified upon a showing of "good cause."  FED. R. CIV. P. 16(b)(4).  As the Bankruptcy Court explained, courts consider four factors in determining whether the movant meets the "good cause" standard: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice."  *Geiserman*, 893 F.2d at 791.   These are the same four factors used to determine whether to exclude expert testimony under Rule 37(c)(1) of the Federal Rules of Civil Procedure. *See Grand Time Corp. v. Watch Factory, Inc.*, 3:08-CV-1770-K, 2009 WL 10678210, at *2 (N.D. Tex. Nov. 18, 2009).  Ultimately, "the good cause standard requires the party seeking relief to

show that the deadlines [could not] reasonably [have been] met despite the diligence of the party

needing the extension." *Binh Hoa Le v. Exeter Fin. Corp.*, 3:15-CV-3839-L, <mark>2019 WL 1436375</mark>,

at *14 (N.D. Tex. Mar. 31, 2019). "Under Rule 16(b), the movant has the burden of showing good

cause to modify a scheduling order." *Grand*, <mark>2009 WL 10678210</mark> at *3. Whether to modify a

scheduling order is within the court's broad discretion. *Geiserman*, <mark>893 F.2d at 790</mark> ("[O]ur court

gives the trial court broad discretion to preserve the integrity and purpose of the pretrial order");

*Reliance Ins. Co. v. La. Land & Expl. Co.*, <mark>110 F.3d 253, 257</mark> (5th Cir. 1997). "[A] trial court's

decision to exclude evidence as a means of enforcing a pretrial order must not be disturbed absent

a clear abuse of discretion." *Geiserman*, <mark>893 F.2d at 790</mark>. At the conclusion of the Hearing, the

Bankruptcy Court found that each of these factors weighed in favor of denying the Motions to

Modify. (Transcript at 35:9-13) (Appx. 1769).

> ### 2.    NexPoint's Explanation for Failing to Previously Identify Expert was Inadequate

22.    The Bankruptcy Court found that Defendants' explanation for failing to previously

identify the expert "lacks merit." The Bankruptcy Court explained that "Defendants have always

asserted as a defense" that "it was the fault of [Highland] that Defendants did default on the

payment of these notes," and "the sudden statement of Frank Waterhouse" is not a "game-changer

that creates some new need for an expert." Transcript at 35:15-23 (Appx. 1769).

> ### 3.    The Expert Testimony is Improper and Unwarranted

23.    The Bankruptcy Court found that the second factor—the importance of the expert

testimony—weighed in favor of denying the Motions to Extend. The Bankruptcy Court explained

that the suggested expert testimony is improper and unwarranted because an "expert cann[ot]

testify about contractual duties and attempt to interpret its provisions," noting "[t]hat is the job of

the Court." Transcript at 36:3-6 (Appx. 1770). The Bankruptcy Court explained that while experts

are often used in "legal malpractice or medical malpractice" cases, such as in *Quijano* and *Streber*—the cases relied on by Defendants—where duties might be needing of elaboration, here, the contract spells out the duties." *Id.* at 36:15-19 (Appx. 1770).  The Bankruptcy Court noted there was nothing "unique" or "exotic" about the Shared Services Agreement, because such agreements are "in the corporate world generally," and "courts see these in all kinds of cases." *Id.* On this basis, the Bankruptcy Court found the professional malpractice cases cited by Defendants inapplicable.  *Id.* at 36:15-19 (Appx. 1770).  Ultimately, the Bankruptcy Court found, expert testimony interpreting the contractual terms of the Shared Services Agreement was not warranted. *Id*. at 36:7-14 (Appx. 1770).

### 4.   Highland Would Suffer Prejudice if the Scheduling Order was Modified

24.     The Bankruptcy Court found that granting the Motions to Extend would prejudice Highland because an extension of the expert deadlines "will be costly, add a layer of expense and delay to this litigation," especially when such expert testimony "would [not] be admissible at trial ultimately."  Transcript at 36:2-24 (Appx. 1770).  On December 22, 2021, the Bankruptcy Court issued its *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*.  [AP Docket No. 138] (the "Order") (Ex. 18, Appx. 1773-1776).

### I.   Defendant Files the Instant Motion

25.     On January 5, 2022, Defendants filed the Motion, seeking this Court's review of the Order pursuant to (i) Federal Rule of Civil Procedure 54(b) (the "Rule 54 Motion"), and alternatively, (ii) Federal Rule of Civil Procedure 72(a) (the "Rule 72 Objection").  *See* Motion ¶¶ 20-21.[8]  Defendants maintain, without any authority, that the "District Court may reconsider, modify, or reverse the Order and grant the Motion *de novo* as it could do with respect to any of its

---

[8] Paragraph cites refer to the *Brief in Support of Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines* [Docket No. 27-2].

own pretrial orders under Rule 54(b)," and that alternatively, review under Rule 72 is appropriate because "the Bankruptcy Court appears to understand that it is acting in the capacity of a magistrate judge." *Id.* ¶¶ 20-21.

26.       In support of the Motion, Defendants rehash the same arguments previously raised and rejected by the Bankruptcy Court, including that: (i) "the Bankruptcy Court failed to take into account [Highland's] failure to fully answer NexPoint's interrogatory," Motion ¶ 43; (ii) expert testimony "on whether [Highland] acted with care" is "potentially required," and "absolutely admissible" at trial, *id.* ¶ 46; and (iii) there is no prejudice in allowing the expert testimony because, "if it prevails at trial," Highland would be reimbursed for any costs incurred in responding to NexPoint's suggested expert. *Id.* ¶ 48.

### III.       <u>ARGUMENT</u>

### A.       <u>The Motion is Procedurally Improper</u>

####       1.       <u>The Rule 54 Motion was Improperly Filed in this Court</u>

27.       The Rule 54 Motion is procedurally improper because it should have been filed in the Bankruptcy Court.

28.       Rule 54(b) motions for reconsideration must be filed in the court which rendered the order subject to reconsideration.  *See Lexington Insurance Company v. ACE American Insurance Co.*, 192 F.Supp.3d 712, 714 (S.D.Tex. 2016) (denying Rule 54(b) motion for reconsideration of its own interlocutory order, noting that Rule 54 allows court to "vacate their own findings"); *Neaville v. Wells Fargo Bank, N.A.*, 3:11-CV-97-P, 2013 WL 12124590, at *2 (N.D.Tex. June 4, 2013) (reviewing Rule 54(b) motion for reconsideration of "its previous Order"); *Caramba, Inc. v. Nationwide Mutual Fire Ins. Co.*, No. H-19-1973, 2021 WL 259388, at *2-3 (S.D.Tex. Jan. 26, 2021) (reviewing Rule 54(b) motion for reconsideration, which asks the Court to "revise its prior ruling," noting that it is within the power of the "rendering district court

12

to afford such relief"); *See Cook v. Flight Services and Systems, Inc.*, NO. 16-15759, <mark>2018 WL 6591919</mark>, at *1 (E.D. La. Dec. 14, 2018) (reviewing Rule 54(b) motion for consideration of "its rulings on two earlier motions"); *Namer v. Scottsdale Insurance Company*, <mark>314 F.R.D. 392, 393</mark> (E.D. La 2016) (reviewing Rule 54(b) motion for reconsideration, "asking that this Court vacate its order").

29.     To the extent Defendants seek reconsideration of the Bankruptcy Court's Order under Rule 54(b), it should have filed its Rule 54 Motion in the Bankruptcy Court.  This Court is not the appropriate venue to determine such motion.  Accordingly, the Rule 54 Motion is procedurally improper, and for this reason alone, the Rule 54 Motion should be denied.

**2.      The Rule 72 Motion is Procedurally Improper Because the Bankruptcy Court is not a Magistrate Judge**

30.     Defendants' Rule 72 Motion is procedurally improper because Rule 72(a) does not apply.  Rule 72(a) provides that a party "may serve and file objections to" a "magistrate judge's" nondispositive matters under 28 U.S.C. § 636(b)(1)(A).  <mark>Fed. R. Civ. P. 72(a)</mark>.  Defendants' unsupported argument for applying rules governing the Federal Magistrates Act is without merit.

31.     In issuing the Order, the Bankruptcy Court was not acting as a magistrate judge. Pursuant to the Order of Reference, the Bankruptcy Court retains jurisdiction to oversee pretrial matters in this Adversary Proceeding until it is trial-ready.  Until that time, the Bankruptcy Court is authorized to enter appropriate orders and judgments, including interlocutory discovery orders, subject to appellate review under <mark>28 U.S.C. § 158</mark>.  *See In re Trinsum Group, Inc.*, <mark>467 B.R. 734, 740</mark> n. 8 (Bankr. S.D.N.Y. 2012) (noting that while in a "noncore" matter under <mark>28 U.S.C. § 157</mark>, "the bankruptcy court must file proposed findings of fact and conclusions of law" on a final order or judgment, "a bankruptcy judge may enter interlocutory orders in all cases; and appellate review of interlocutory orders is discretionary by the district court under 28 U.S.C. § 158(a)(3) and Rule

13

8003."); *In re S.N.A. Nut Co.*, No. 96 C 181, 1996 WL 411290, at *3 (N.D. Ill. July 19, 1996) (until case is "ripe for withdraw" for jury trial, "the bankruptcy court may properly resolve interlocutory pretrial disputes" subject to appellate review under 28 U.S.C. § 158, noting that "[u]nless this court withdraws its reference to the bankruptcy court, it does not sit in [the district court's] original jurisdiction"); *In re M & L Business Mach. Co., Inc.*, 159 B.R. 932, 935 (D. Col. 1993) (noting that case was referred to the bankruptcy court to rule on "all pretrial issues in this and related adversary proceedings," and that "in the meantime, the bankruptcy court retains jurisdiction over pre-trial matters," and that "any disagreement over its rulings must be treated as an appeal subject to [28 U.S.C. § 158]"); *In re THB Corp.*, 94 B.R. 797, 803 (Bankr. D. Mass. 1988) ("A bankruptcy judge may adjudicate interlocutory matters under § 157(c)(1); the statute preserves only "final" orders for entry by the district judge, and its procedure would be unworkable if the district judge had to adjudicate interlocutory matters."); *In re Kennedy*, 48 B.R. 621, 622 (Bankr. D. Ariz. 1985) (noting that under 28 U.S.C. § 157(c), only "final" orders shall to be submitted to the district court, while "bankruptcy interlocutory orders in noncore proceedings need not be submitted to District Court," noting that a "contrary interpretation would require wholesale referral to the District Court of every order concerning discovery, continuances or every other interlocutory order of substantive or procedural import"); *In re Lion Capital Group*, 46 B.R. 850, 854 (Bankr. S.D.N.Y. 1985) ("Congress enabled the district courts to withdraw the reference under § 157(d)," and "sought to involve the district courts only with respect to final orders in referred proceedings and that the bankruptcy courts are to issue interlocutory orders in related cases referred to them," noting that a contrary interpretation "would require wholesale deferral of all interlocutory matters, such as orders regulating discovery and the like, to the district courts thereby swamping district court calendars"); *In re Adelphi Institute, Inc.*, 112 B.R. 534, 539 (S.D.N.Y.

14

1990) (noting that the Bankruptcy Court's role in rendering reports and recommendations to the District Court on dispositive motions pursuant to 28 U.S.C. 157(c)(1) does not prevent the Bankruptcy Court from adjudicating pre-trial interlocutory matters).[9]  In issuing the Order, the Bankruptcy Court was acting within its jurisdictional powers to adjudicate pretrial discovery proceedings under Section 157.

32.     Accordingly, Rule 72(a) is inapplicable and the Bankruptcy Court's Order is subject to ordinary appellate review under 28 U.S.C. 158(a).  *See S.N.A. Nut*, 1996 WL 411290, at *3 (finding that party's "unsupported argument for applying" Rule 72(a) "conclusively lacks merit," noting that "the Federal Magistrates Act governs proceedings before magistrate judges; the Bankruptcy Code governs bankruptcy proceedings.  The Bankruptcy Code permits interlocutory orders to be reviewed only with leave of the district court sitting in its appellate jurisdiction."); *M & L Business*, 159 B.R. at 934 (rejecting party's motion for district court's review of a bankruptcy court's pretrial order under Rule 72(a), noting "the parties appear to be confused as to the proper way to seek review of the bankruptcy court's rulings in those adversary proceedings which I remanded to the bankruptcy court for pretrial purposes," explaining "while I could have referred this proceeding to a magistrate judge for pre-trial pursues … I did not.  Instead I referred it to the bankruptcy court.  Therefore, Rule 72 does not apply.")

33.     The Rule 72 Motion is improper and should be denied on procedural grounds alone.

**B.      <u>The Motion is Without Merit</u>**

34.     In the unlikely event the Court overrules Highland's procedural objections, the Rule 54 Motion and the Rule 72 Motion are each meritless.  Highland addresses each in turn.

---

[9] *See also* 1 *Collier on Bankruptcy* ¶ 3.03 at 3-47 (15th ed. 2009) ("[A] bankruptcy judge may enter interlocutory orders in a matter being tried under the section 157(c)(1) procedure.").

1.    <u>**The Rule 54 Motion is Without Merit**</u>

35.    Rule 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).  "[S]ome courts in the Fifth Circuit have analyzed motions to reconsider interlocutory orders under Rule 54(b)." *Hightower v. Group 1 Automotive, Inc.*, NO. 15-1284, 2016 WL 3430569, at *1 (E.D. La. June 22, 2016).  Reconsideration under Rule 54(b) is "an extraordinary remedy that should be used sparingly" and the motion must "clearly establish" that reconsideration is warranted.  *Id.*; *see also Templet v. Hydro Chem Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004).

36.    Motions for reconsideration under Rule 54(b) are considered under the same standards governing Rule 59(e), which governs motions "to alter or amend a judgment." Fed. R. Civ. P. 59(e); *see Triton Tech of Tex., LLC v. Nintendo of Am., Inc.,* No. 2:10–CV–328, 2012 WL 2036411, at *1 (E.D.Tex. June 6, 2012) ("It is this Court's practice to consider motions to reconsider interlocutory orders under the standard of Federal Rule of Civil Procedure 59(e)."); *T-M Vacuum Products, Inc. v. TAISC, Inc.*, CIV.A. H-07-4108, 2008 WL 2785636, at *2 (S.D. Tex. July 16, 2008) ("A motion seeking reconsideration of a judgment or order [under Rule 54(b)] is generally considered a motion to alter or amend a judgment under Rule 59(e) if it seeks to change the order or judgment issued," and "Rule 59(e)'s legal standards are applied to motions for reconsideration of interlocutory orders."); *Namer v. Scottsdale Insurance Company*, 314 F.R.D. 392, 393 (E.D. La 2016) (same); *eTool Dev., Inc. v. Nat'l Semiconductor Corp.*, 881 F. Supp. 2d 745, 748 (E.D. Tex. 2012) (same).

37.    To justify reconsideration under Rule 59(e), and therefore under Rule 54(b), the movant must show at least one of the following: "1) an intervening change in controlling law; 2)

new evidence not previously available; 3) the need to correct a clear or manifest error of law or fact or to prevent manifest injustice." *United States v. Saldivar*, No. 2:03-CR-182-2, 2014 WL 357313, at *1 (S.D. Tex. Jan. 31, 2014); *see also Triton*, 2012 WL 2036411, at *1; *eTool*, 881 F. Supp. 2d at 748. "A 'manifest error' is not demonstrated by the disappointment of the losing party." Reconsideration is warranted only when the moving party can show the rendering court's "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Namer*, 314 F.R.D. at 395; *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004) ("manifest error" is "one that is plain and indisputable, and that amounts to a complete disregard of the controlling law.").

38.     "Motions for reconsideration should not be used to raise arguments that could, and should, have been made before entry of an order or to re-urge matters that have already been advanced by a party." *Hightower*, 2016 WL 3430569, at *3; *see also DAC Surgical Partners P.A. v. United Healthcare Services, Inc.*, 4:11-CV-1355, 2017 WL 3484507, at *2 (S.D. Tex. Aug. 14, 2017) (Rule 54(b) motions may not be used to "rehash the same arguments  or, without justification, raise new arguments for the first time."); *eTool*, 881 F. Supp. at 748 ("Like a motion under Rule 59(e), a motion to reconsider may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised before the entry of the judgment or order," noting that "district court opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). "Instead, they serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence.'' *Hightower*, 2016 WL 3430569, at *2 (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)); *Caramba, Inc. v. Nationwide Mutual Fire Ins. Co.*, No. H-19-1973, 2021 WL 259388, at *3 (S.D.Tex. Jan. 26, 2021) ("This Court must exercise its broad discretion under Rule 54(b)

sparingly to prevent the unnecessary reexamination of interlocutory orders with the resulting burdens, including expense and delay.").

39.    Defendants fail to demonstrate that the extraordinary remedy of reconsideration of the Order is warranted.  They do not (i) identify any newly discovered evidence; (ii) point to an intervening change in the controlling law; or (iii) demonstrate that the Bankruptcy Court made a "manifest error of law or fact" and that reconsideration is necessary to prevent a "manifest injustice" to Defendants.

40.    Instead, the Motion is a mere rehashing of, and attempt to re-litigate, the same arguments previously raised and rejected in the Bankruptcy Court.  *Compare* Motion to Extend (Appx. 1219-1664) and Reply (Appx. 1665-1709) *with* Motion ¶¶ 23-48.  Such arguments are improper on a motion for reconsideration, and demonstrate, at best, Defendants' disagreement with the Bankruptcy Court's findings.  This is insufficient to show "manifest error" warranting the exceptional remedy of reconsideration.  *See Namer*, 314 F.R.D. at 395 (denying Rule 54(b) motion where, "[f]ar from demonstrating such manifest error, [movant's] motion simply advances arguments he could and should have raised previously," where "this alone is a sufficient basis for refusing [movant's] requested relief," noting that "[w]hile [a party] may disagree with the Court's conclusion, [a] 'manifest error' is not demonstrated by the disappointment of the losing party"); *Daniels v. Bowles*, CIV.A. 3:03-CV-1555-, 2004 WL 1810658, at *2 (N.D. Tex. Aug. 9, 2004) (denying Rule 54(b) motion for reconsideration where it "sets forth no newly discovered evidence, alleges no intervening change in the law, and does not claim clear error or manifest injustice" but only "attempts to distinguish the cases cited by this Court in a second attempt to argue the same points he has alleged in previous pleadings"); *Cook*, 2018 WL 6591919, at *3 (denying Rule 54(b) motion where "the Court finds very few arguments that were not raised in [movant's] earlier"

papers, and where "the memorandum in support of their motion to reconsider is an almost verbatim re-litigation of their earlier arguments."); *Cormier v. Turnkey Cleaning Services, L.L.C.*, 295 F.Supp.3d 717, 725 (E.D. La 2017) (denying Rule 54(b) motion where movant, "without providing anything which was not available prior to this Court's [prior] Order, [] merely reasserts its prior arguments … arguments which were previously considered and rejected by this Court. Although [movant] disagrees with this Court's determination … such disagreement does not present a clear error of law or fact, nor manifest injustice. [Movant's] request for an additional chance to sway the Court is simply not appropriate."); *DAC Surgical*, 2017 WL 3484507, at *2 (denying Rule 54(b) motion where "several of [movant's] arguments have been raised previously and are not appropriately raised in the [motion]").[10]

41.    Accordingly, the Rule 54 Motion is without merit and should be denied.

**2.    The Rule 72 Objection is Without Merit**

42.    The Rule 72 Objection is without merit and should be overruled. Defendants fail to carry their burden of showing the Bankruptcy Court abused its discretion in denying the Motion to Extend.

43.    Title 28 U.S.C. § 636(b)(1)(A) allows a district court to reconsider a magistrate judge's pretrial order under Fed. R. Civ. P. 72(a) only "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.'" *Hamilton v. First American Title Ins. Co.*, No. 3:07–CV–1442–G, 2010 WL 791421, at *2 (N.D.Tex. Mar. 8, 2020) (quoting 28 U.S.C. § 636(b)(1)(A)); *see also Jenkins v. Robotec, Inc.*, No. 1:09cv150HSO-JMR, 2009 WL 5166252, at *1 (S.D.Miss. Dec. 29, 2009); *Seabulk Towing, Inc. v. Oceangrafia S.A. de C.V.*, 01-3791, 2002

---

[10] *See also Lexington*, 192 F.Supp.3d at 715; *Hightower*, 2016 WL 3430569, at *3-4; *Neaville*, 2013 WL 12124590, at *2.

WL 398771, at *2 (E.D. La. Mar. 12, 2002).  An "abuse of discretion standard governs review of

that vast area of choice that remains to the [magistrate judge] who has properly applied the law to

the fact findings that are not clearly erroneous." *Nerium SkinCare, Inc. v. Nerium Int'l, LLC*, 3:16-

CV-1217-B, 2017 WL 9934881, at *1 (N.D. Tex. Feb. 6, 2017).  "Rule 72(a)'s framework for

review is 'highly deferential.'" *Id.*

44.     "A magistrate judge's discretionary decisions will be reversed only for an abuse of

discretion-*i.e.,* when the district court 'has a definite and firm conviction that the court below

committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant

factors.'" *Hamilton* 2010 WL 791421, at *3 (quoting *Dell Computer Corporation v. Rodriguez,*

390 F.3d 377, 385 n. 14 (5th Cir.2004)); *Seabulk*, 2002 WL 398771, at *2 ("28 U.S.C. §

636(b)(1)(A) specifically requires the district court to apply a "clearly erroneous" standard when

reviewing a magistrate judge's ruling on a non-dispositive, pretrial motion such as a discovery

motion.").  "A party who seeks to overturn a magistrate judge's order disposing of a discovery

matter shoulders a heavy burden." *Hamilton*, 2010 WL 791421, at *4; *see also Winfun v. Daimler*

*Chrysler Corporation,* 255 Fed. Appx. 772, 773 (5th Cir.2007) ("The District Court has broad

discretion in discovery matters … we reverse discovery rulings only in 'unusual' and 'exceptional'

cases."); *Sanders v. Shell Oil Co.*, 678 F.2d 614, 618 (5th Cir. 1982) ("A trial court enjoys wide

discretion in determining the scope and effect of discovery ... [i]t is, in fact, unusual to find an

abuse of discretion in discovery matters."); *Scott v. Monsanto Co.*, 868 F.2d 786, 792 (5th Cir.

1989) ("[D]iscovery orders ... are rarely reversed for an abuse of discretion."); *Nerium*, 2017 WL

9934881, at *1 ("[W]hen discovery matters are involved, as here, the objecting party's burden is

especially heavy.").  "For a plaintiff to prevail, she must show, not that the magistrate judge could

have exercised his discretion and ruled in her favor, but rather that she is entitled to a ruling in her

20

favor as a matter of law." *Jenkins*, 2009 WL 5166252, at *1.

45.     Defendants fails to carry their heavy burden of showing that the Bankruptcy Court

abused its discretion in denying the Motion to Extend the Scheduling Order.

46.     As discussed *supra*, the Rule 72 Objection is a verbatim rehashing of the arguments

considered by the Bankruptcy Court. *Compare* (i) Motion to Extend (Appx. 1219-1664) and (ii)

Reply (Appx. 1665-1709) *with* Motion ¶¶ 41-48; *see also* Transcript at 35:20-37:2 (Appx. 1769-

1771).  Defendants' restatement of its same conclusory arguments fails to demonstrate an abuse

of discretion.  *See Hamilton*, 2010 WL 791421, at *4 (denying Rule 72 objections, noting that

party "has failed to carry the heavy burden of showing that [judge] abused his discretion" where

party's "objections to [] order simply rehash the arguments [party] raised in its" original response);

*Minnis v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, CV 13-00005-BAJ-

RLB, 2014 WL 12811456, at *2 (M.D. La. Aug. 15, 2014) (denying Rule 72(a) objections to

discovery order where "the Defendant has merely managed to rehash  the same arguments

originally set forth in the motion to compel," noting that "a repetitive presentation of

arguments does not convince the Court that a different conclusion should be reached."); *Nerium*,

2017 WL 9934881, at *2 (denying Rule 72(a) objections to discovery order where "having

considered the objections , the record evidence, and the applicable law," the judge's order "fully

considered each of Plaintiffs' arguments.")

47.     Nevertheless, Highland addresses each of Defendants' objections.

48.     First, Defendants fail to demonstrate that the Bankruptcy Court "clearly erred" in

finding that Defendants' explanation for its untimely expert deficient. *See* Motion ¶¶ 41-43.  As

the Bankruptcy Court explained, Defendants have "always asserted as a defense" that "it was the

fault of [Highland]" that they defaulted on its Note, and Mr. Waterhouse's deposition did not

suddenly trigger expert testimony.  Transcript at 35:15-23 (Appx. 1769).  This finding was within

the bounds of the Bankruptcy Court's broad discretion.  *See Reliance*, 110 F.3d at 257 (affirming

lower court's denial of party's request to supplement expert report where "[movant] asked for an

opportunity to avoid the deadline for its expert report merely because the deposition of its expert

witness did not go well," noting that "[d]istrict judges have the power to control their dockets by

refusing to give ineffective litigants a second chance to develop their case"); *Geiserman*, 893 F.2d

at 792 (party failed to provide a "valid reason that would justify excusing him from the deadlines

imposed by the lower court," noting "[t]he claimed importance of expert testimony underscores

the need for [party] to have timely designated his expert witness," and "[t]he importance of such

proposed testimony cannot singularly override the enforcement of local rules and scheduling

orders"); *Binh Hoa*, 2019 WL 1436375 at \*20 ("vague and conclusory statements regarding the

need for additional information or facts do not adequately explain [party's] failure to meet the

expert deadline in the Scheduling Order").

   49.    Defendants' contention that the Bankruptcy Court "did not take into account"

Highland's answer to the interrogatory is belied by the record, and in any event, is insufficient to

rise to the rare level of abuse of discretion.[11]  Again, in reaching its findings, the Bankruptcy Court

considered all of the arguments and evidence set forth by Defendants (and Highland).  *See*

Transcript 5-25 (Appx. 1739-1759).  Such findings were consistent with the Bankruptcy Court's

broad discretion under Rule 16(b).  *See Hamilton*, 2010 WL 791421, at \*4 (overruling Rule 72

objections where court's "decision was informed and aided by the parties' presentation of

argument at a hearing held on this issue" and "his decision … was both consistent with the liberal

---

[11] NexPoint's complaint about Highland's interrogatory answer is ironic since, at the time the interrogatory was served,
(i) Mr. Dondero and Mr. Waterhouse had **no** affiliation with Highland, but (ii) Mr. Dondero controlled all of the
Defendants with Mr. Waterhouse serving as their Treasurer.  If anyone should have known about the conversation
between Mr. Dondero and Mr. Waterhouse at the time Highland served the interrogatory, it was Defendants.

DOCS_NY:44982.7 36027/003

approach to discovery of the Federal Rules of Civil procedure and comfortably within the bounds

of his discretion"); *Resolution Tr. Corp. v. Sands*, 151 F.R.D. 616, 619 (N.D. Tex. 1993)

(overruling Rule 72 objections, and characterizing the possibility that different judges "would

approach a similar issue differently" as "the essence of the exercise of discretion," noting that

"[o]nce again, this is an abuse of discretion argument parading as assertions of legal and factual

error … No abuse of discretion has been shown."); *Hirsch v. Ushealth Advisors, LLC*, 4:18-CV-

00245-P, 2020 WL 1271374, at *3 (N.D. Tex. Mar. 12, 2020) (overruling objection that "assert[ed]

the same basic arguments as before" and where defendants' assertions "that the Magistrate Judge

failed to consider evidence [are] premised entirely on the fact that Defendants disagree with the

outcome of the Discovery Order.")   Accordingly, Defendants' objection to the Order on such

grounds should be overruled.

50.    Defendants' argument that expert testimony "on whether [Highland] acted with

care" is "potentially required," and "absolutely admissible" at trial, Motion ¶ 46, is equally

unavailing.  The Bankruptcy Court properly exercised its discretion under Rule 16(b) in finding

Defendants' suggested expert testimony both improper and irrelevant.  As noted *supra*, Defendants

sought to have their expert improperly testify regarding Highland's "duties of care under the

parties' [SSA]" and whether "Highland was responsible" under the SSA for "ensuring that

NexPoint made" its Annual Installment payment under its Note.  Motion to Extend ¶¶ 1, 8 (Appx.

1221-1222); Reply ¶ 1 (Appx. 1667) (seeking expert testimony regarding whether "[Highland]

was obligated to do next under the contractual standard of care").  The Bankruptcy Court correctly

applied the law in holding these were improper subjects for an expert because they amount to legal

questions within the province of the Court.  *See* Transcript at 36:3-6 (Appx. 1770).  *See Panhandle

Adver., LLC v. United Rentals Realty, LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901, at *5 (N.D.

Tex. Feb. 12, 2021) (excluding expert testimony "as to his opinions regarding the legal duties Defendant owed Plaintiff under the lease at issue" because "opinions on the duties owed by the defendants and whether they fulfilled those duties were legal conclusions and not the proper subject for expert testimony"); *Flax v. Quitman County Hosp., LLC*, 2:09-CV-101-M-D, 2011 WL 3585870, at *5 (N.D. Miss. Aug. 16, 2011) (prohibiting expert testimony "on the issue of *law* of whether a duty of care was owed").[12]

51.    As the Bankruptcy Court found, the cases Defendants relied on in support of their contention that expert testimony on the standard of care is "required"—*Quijano*, *Streber*, and *Geiserman*—are inapplicable to the present facts.  Those cases involved professional malpractice, in which an expert was needed to testify regarding the standard of care in an industry.  *See Quijano*, 325 F.3d at 567 (expert testimony required in medical malpractice case); *Streber*, 221 F.3d at 724 (expert testimony required in medical malpractice case).  Here, by contrast, Defendants do not seek to have an expert testify regarding the standard of care in a particular industry.  Rather, Defendants seek to have their expert testify regarding the scope of Highland's contractual duties under the SSA—a garden variety device used throughout the corporate world—and ultimately whether Highland fulfilled its obligations thereunder, *i.e.*, whether Highland breached.[13]  Nor does this case involve professional malpractice.  The Bankruptcy Court, therefore, properly exercised its discretion in finding the suggested expert testimony improper and unwarranted.

52.    To the extent Defendants sought to retain an expert to "opine on whether [Highland's] failure comported with the standard of care actually set forth in the contract," Motion

---

[12] *Hanspard v. Otis Elevator Co.*, CIV.A. 05-1292, 2007 WL 839994, at *2 (W.D. La. Jan. 12, 2007) (prohibiting expert testimony "as to the scope of [party's] contractual duties" constitutes a legal conclusion); *Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 706 (E.D. Tex. 2006) (expert testimony improper "as to the duties" owed by parties because "they amount to conclusions of law").

[13] Indeed, in separate context, James Dondero himself acknowledged the commonality of such "shared service" devices. *See* Case No. 21-1590, Docket No. 16 at 38.

¶ 45, such expert testimony is likewise improper.  The question of whether Highland breached any

contractual obligations is an issue for the trier of fact to decide and is not the proper subject for

expert testimony.  *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) ("Whether [party] breached

their fiduciary duties is an issue for the trier of fact to decide. It is not for [the expert] to tell the

trier of fact what to decide").  Defendants' objection that the Bankruptcy Court erred "as a matter

of law," Motion ¶¶ 44-46, should be overruled.  *Resolution*, 151 F.R.D. at 619 (overruling Rule 72

objection that magistrate judge's order was "contrary to law or clearly erroneous" where party's

arguments "do not so plainly mandate the production of expert testimony as to warrant reversal of

the magistrate judge's ruling.").

53.     Defendants' conclusory statement that "increased fees and expenses" incurred by

Highland in connection with responding to an expert at this stage is "not legally cognizable

prejudice," Motion ¶ 48, is insufficient to show any abuse of discretion.  Again, the Bankruptcy

Court rejected all these arguments at the Hearing.  The Rule 72 Objection demonstrates nothing

more than a disagreement with the Bankruptcy Court's findings.  Such disagreement does not

come close to showing any abuse of discretion.  *Minnis*, 2014 WL 12811456, at *2 (denying Rule

72(a) objection where "Defendant has not rebutted any of the legal authorities that the [judge]

found relevant to this case, nor has it presented any additional facts that would necessitate

consideration of other possible authorities in reaching a decision."); *Hirsch*, 2020 WL 1271374, at

*3 (overruling "conclusory" objection to discovery order).  Defendants have failed to carry their

burden of showing that the Bankruptcy Court's rulings were "clearly erroneous or contrary to law."

54.     The Rule 72 Objection should be overruled.

## CONCLUSION

Highland respectfully requests that the Court (i) deny the Motion and (ii) grant such other

and further relief as the Court deems just and proper.

Dated:  January 31, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:      MHayward@HaywardFirm.com
            ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

26

# EXHIBIT 7

```
                     IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION

                                    )   Case No. 19-34054-sgj-11
   In Re:                           )   Chapter 11
                                    )
   HIGHLAND CAPITAL                  )   Dallas, Texas
   MANAGEMENT, L.P.,                 )   Monday, January 10, 2022
                                    )   9:30 a.m. Docket
            Debtor.                  )
   ─────────────────────────────────)
                                    )
   HIGHLAND CAPITAL                  )   Adversary Proceeding 21-3004-sgj
   MANAGEMENT, L.P.,                 )
                                    )
            Plaintiff,               )
                                    )
   v.                               )   DEFENDANT'S SECOND MOTION TO
                                    )   AMEND ANSWER [82]
   HIGHLAND CAPITAL MANAGEMENT )
   FUND ADVISORS, L.P.,              )
                                    )
            Defendant.               )
   ─────────────────────────────────)

                         TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                     UNITED STATES BANKRUPTCY JUDGE.

   WEBEX APPEARANCES:

   For the Debtor-Plaintiff:   John A. Morris
                               PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
                               (212) 561-7700

   For the Defendant:          Davor Rukavina
                               Julian Preston Vasek
                               MUNSCH HARDT KOPF & HARR, P.C.
                               500 N. Akard Street, Suite 3800
                               Dallas, TX  75201-6659
                               (214) 855-7587

   Recorded by:                Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
                               (214) 753-2062
```

2

Transcribed by:          Kathy Rehling
                         311 Paradise Cove
                         Shady Shores, TX  76208
                         (972) 786-3063

Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 187-7   Filed 01/09/24   Page 124 of 276   PageID 36520

3

1              DALLAS, TEXAS - JANUARY 10, 2022 - 10:19 A.M.

2              THE COURT:  I will now take appearances in the

3     Highland Capital Management versus HCMFA adversary.  This is

4     Adversary 21-3004.  We have Defendant's Second Motion to Amend

5     Answer.  Who do we have appearing for the Defendant?

6              MR. RUKAVINA:  Your Honor, good morning.  Davor

7     Rukavina and Julian Vasek for the Defendant.

8              THE COURT:  Good morning.  Who do we have appearing

9     for Highland?

10             MR. MORRIS:  Good morning, Your Honor.  This is John

11    Morris from Pachulski Stang Ziehl & Jones for Highland

12    Capital, for the Reorganized Debtor Highland Capital

13    Management, LP.

14             THE COURT:  All right.  Thank you.  I know we have

15    many observers.  Is there anyone else who wanted to appear?

16        (No response.)

17             THE COURT:  All right.  Well, we had lots of paper

18    filed on this matter.  Mr. Rukavina, how did you want to

19    proceed?

20             MR. RUKAVINA:  Your Honor, I'd like to give an

21    opening.  Well, I'd like to give my argumentation.  There is a

22    disagreement.  I understand Mr. Morris would like to call D.C.

23    Sauter as a witness.  It's my position that that's not

24    possible under the Local Rules.  But perhaps the Court wants

25    to rule on that matter first, because that would then affect

1 | the manner of presentation.

2 |       THE COURT:  Okay.  So you say it's not allowed under

3 | Local Rules for the Debtor to call a witness?  What Local Rule

4 | do you mean?

5 |       MR. RUKAVINA:  Yes, Your Honor.  I'm referring to

6 | the Local Rule 7007(g), which talks about that a party who

7 | relies on exhibits, evidence, et cetera, does so through an

8 | appendix.  In fact, the Debtor filed its appendix.  I filed my

9 | appendix.

10 |     And I think certainly the Court has discretion, but I

11 | think in twenty years of practicing before this Court, unless

12 | it's a sanctions issue or unless it's a preliminary injunction

13 | issue, it's been my understanding that motions are always

14 | adjudicated based on the appendices.

15 |     And I believe that Your Honor has indicated or even stated

16 | that the District Court rules should applies to this

17 | proceeding, and the District Court rules, I think, are even

18 | clearer, because they provide that there is not even a hearing

19 | on the motion.  But, and they again require that any evidence

20 | in support or opposition to a motion be by a declaration or by

21 | deposition transcripts, again, in an appendix.

22 |     So I really have nothing more to add than that.  It's just

23 | a matter of Local Rules.  Mr. Sauter is available should the

24 | Court require him to be cross-examined.  And I'll -- I'll just

25 | rely on Rule 7007(g).

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 187-7    Filed 06/08/24    Page 126 of 276    PageID 36522

5

1            MR. MORRIS:  If I may, Your Honor?

2            THE COURT:  Yes.  I'm pulling it up, since I don't

3   have every Local Rule memorized.  So, appendix requirement.

4   Isn't this just a rule whenever you have -- do an appendix,

5   here are the requirements?  I don't know.  What did you --

6            MR. RUKAVINA:  Well, Your Honor, --

7            THE COURT:  Go ahead.

8            MR. RUKAVINA:  It says a party who relies on

9   documentary or nondocumentary evidence to support or oppose a

10  motion shall include such evidence in an appendix.  I've

11  always taken that to mean that -- we don't have many hearings

12  with live testimony, with cross-examination, on pure motion

13  practice, especially procedural motion practice.

14      But I don't have a case for you.  I don't have, you know,

15  this isn't -- this isn't a U.S. Supreme Court matter.  This is

16  just a matter of local practice.

17            MR. MORRIS:  May I be heard, Your Honor?

18            THE COURT:  Okay.  Mr. Morris, go ahead.

19            MR. MORRIS:  Just briefly.  It's exactly why I raised

20  this issue last week.  I raised it with Mr. Rukavina.  He told

21  me his position.  He's never given me any authority that says

22  I can't do this.

23      We wrote to the Court.  We copied him.  The Court told the

24  parties last Thursday that it's the Court's practice to allow

25  litigants to cross-examine witnesses who put forth

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 79-27   Filed 01/09/24   Page 127 of 276   PageID 36523
Exhibit 27   Page 17 of 245

6

1    declarations.  Mr. Sauter has put forth a substantive

2    declaration.  This is not an attorney's declaration that

3    attaches documents.  It's testimony.  And that testimony is

4    going to be put in the record to support a motion, and

5    Highland respectfully requests the opportunity to cross-

6    examine Mr. Sauter on his statements.

7              THE COURT:  Okay.  I remember the question coming to

8    me through the courtroom deputy last week, and so I understand

9    she communicated an answer.  This should be no surprise.  I

10   mean, we generally allow the opportunity for cross-examination

11   wherever there's a declarant submitting evidence.  And, I

12   mean, I see the rule you're talking about, Mr. Rukavina, but I

13   don't think there should have been any doubt because of the

14   communication through my courtroom deputy that I was going to

15   allow cross-examination for any declarant.

16       And, frankly, I mean, this is a pretty important motion.

17   You know, for crying out loud, it was an 800-page-plus

18   appendix, I think, with all the documentation.  I think that

19   was yours, Mr. Rukavina.  So the ruling is we will allow

20   cross-examination of Mr. Sauter.

21       All right.  Mr. Rukavina?

22             MR. RUKAVINA:  Then, Your Honor, then I'll propose --

23   I propose that I just give you my argumentation based on Mr.

24   Sauter's declaration as his direct testimony, and then, of

25   course, Mr. Morris will cross-examine him.  I don't know that

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 179-7   Filed 03/08/24   Page 128 of 276   PageID 36524

7

1   we need an opening, evidence, then closing.

2          MR. MORRIS:  I'd like the opportunity to make a brief

3   opening, Your Honor.

4          THE COURT:  Okay.  I'll --

5          MR. MORRIS:  If Mr. Rukavina doesn't want to do that,

6   that's fine.

7          THE COURT:  I'll allow opening statements.  Again, I

8   think this is a pretty big deal.  So I'll allow it if you want

9   to make an opening statement.

10         MR. RUKAVINA:  Okay, Your Honor.  Thank you.

11         OPENING STATEMENT ON BEHALF OF THE DEFENDANT

12         MR. RUKAVINA:  So, as the Court is certainly aware,

13  this is our second motion to amend our answer.  The amended

14  answer would more specifically and expressly deny that Mr.

15  Waterhouse signed the two promissory notes at issue in this

16  lawsuit.

17     I don't think that we've had a contested hearing in this

18  adversary, Your Honor, although it is one of the note cases.

19  So I think it would help the Court just to give you a very

20  quick summary of what the issues in this adversary are.

21     We, the Defendant, deny that they are -- that there are

22  valid promissory notes here.  This isn't an issue where we

23  have the potential forgivable promissory notes.  This isn't an

24  issue where we have other defenses like in the other cases.

25  Here, our defense -- really, our only defense -- goes to the

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 79-27   Filed 09/08/45   Page 129 of 276   PageID 36525

8

1   core of whether there are enforceable contractual promises

2   here.

3       In May of 2019, it is true that the Debtor transferred

4   $7.4 million to HCMFA.  That is not disputed.  What is

5   disputed is whether that transfer was for compensation to

6   HCMFA or whether it was to be a loan to be repaid.

7       That defense has already been pled.  We're not here today

8   to try that defense.  We're not here to prove that defense.

9   But it is important context because how and why Mr. Waterhouse

10  would have or did sign these promissory notes goes to the core

11  of this mistake.

12      What the evidence is is that Mr. Dondero told Mr.

13  Waterhouse to transfer $7.4 million.  Mr. Dondero, in his

14  mind, was doing that because the Debtor caused a misstate

15  which cost $7.4 million of liability for HCMFA.  Mr. Dondero

16  never told Mr. Waterhouse to paper it up as a loan.  Mr.

17  Waterhouse doesn't remember being told to paper it up as a

18  loan.  Mr. Waterhouse told his team to transfer the funds.

19  That team then implemented its standard operating procedure,

20  which is that when it sees intercompany transfers going back

21  and forth it papers them as loans.

22      Mr. Waterhouse confirmed that only Mr. Dondero would have

23  had authority to create this loan.

24      In any event, Mr. Vasek, if you'll please share the

25  promissory note with the Court, one of them, Your Honor will

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 130 of 276   PageID 36526

9

1   see what these notes look like.  And, again, I'm not here

2   today to try the underlying merits, but it's important to see

3   that everything regarding these notes is a mistake, really.

4        So here's one of these two promissory notes.  And

5   obviously, HCMFA is defined as the maker here, but Mr. Vasek,

6   if you'll scroll to the second page, you'll see, Your Honor,

7   that the note is signed by Frank Waterhouse.  And he's not

8   signing it as a CFO.  He's not signing it as a treasurer.  And

9   I know that Your Honor has extensive experience, both as a

10  judge and in private practice, with promissory notes and

11  corporate obligations.  The UCC is very clear.  When someone

12  signs a note like this, he is signing it in order to be

13  jointly and severally liable with the maker.

14       So immediately here, when this case was filed, we saw

15  something that you don't have in the other cases, you have

16  something that's very strange, you have maker Frank

17  Waterhouse.  Clearly, it was not the intent of the parties

18  that Frank Waterhouse would be personally liable for $7.4

19  million.  But it just shows how the mistakes kept happening.

20       So, Mr. Vasek, if you'll please share with the Court my

21  request for production.

22       Your Honor, what Mr. Vasek is going to show you is my May

23  28, 2021 request for production.  It's my second request for

24  production.

25       And if you'll scroll down, Mr. Vasek, I believe it's

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 131 of 276   PageID 36527

10

1    Request #2.

2         Okay.  Your Honor -- oh, I'm sorry, it's Request #9.  Your

3    Honor can see I'm requesting all Microsoft Word copies of the

4    notes, including metadata.

5         So, again, the manner in which the note is signed

6    certainly -- certainly raised our eyebrows.  It certainly made

7    us think.  And we did what we are supposed to do.  We

8    requested through discovery the originals and metadata so that

9    we can see what happened.  Because Your Honor will see, and

10   I'm sure Mr. Sauter will testify about it, by this time Mr.

11   Sauter had asked Mr. Waterhouse, what are these notes?  Did

12   you sign these notes?  And Mr. Waterhouse told Mr. Sauter,

13   well, it looks like my signature so I must have signed them.

14   So, so as of this time in May, we still did not have any real

15   reason to say that Mr. Waterhouse didn't sign the notes except

16   we had a reasonable suspicion based on the way that the notes

17   are signed that something happened here.

18        Mr. Vasek, if you'll please share the Debtor's response to

19   the RFP.  And if you'll scroll down to the answer to RFP #9.

20        So, Your Honor, this is in July now.  I'm sorry, this is

21   in June.  And the Debtor makes a limited objection to Request

22   #9.  But the Debtor basically says it'll conduct a reasonable

23   search for and produce documents responsive to this request.

24        You can pull that down.

25        So, so I did not file a motion to compel.  There was no

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 12/09/24    Page 132 of 276    PageID 36528

11

1   need to file a motion to compel.  The Debtor's objection based

2   on metadata was limited.  And I expected that the Debtor would

3   produce the originals of the notes.

4       It didn't.  It didn't.  It did, in late July, produce some

5   Word documents that had all metadata scrubbed.  It was not

6   obvious what those were.  The Debtor is now saying that those

7   were the originals of the notes.  But that was not my

8   understanding.  There were not -- there was no metadata.  And

9   it wasn't the Debtor's understanding.  And I'll show you why

10  the Debtor also believed that it did not produce the originals

11  of the notes.

12      If you'll pull up the October 15th email, Mr. Vasek.

13      So, remember, Judge, we just stopped in late June when the

14  Debtor answers my RFPs.  Here we are now in mid-October.

15  We're about to go into two weeks of depositions.  Your Honor

16  knows who Ms. Deitsch-Perez is.  She's my co-counsel.

17      Scroll down a little bit, Julian, please, to my -- to Ms.

18  Deitsch-Perez's email.  So, stop right there.

19      So, Judge, this is a long email string.  The Court can

20  certainly look over it if it needs to.  The only relevant

21  portions are these top two emails, where Ms. Perez says, John,

22  please have Debtor produce the Word versions of all the notes

23  at issue.  We have searched and it does not appear that they

24  were produced.  Can you do that today?  Thanks.

25      And if you'll scroll up, Mr. Vasek, Mr. Morris writes

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 01/09/24   Page 133 of 276   PageID 36529

12

 1    back, I'll look into it, Deborah.

 2         You can -- you can close this document.

 3         And, again, this is important because we're about to

 4    depose Mr. Waterhouse.  Ms. Perez, Deitsch-Perez and I, we're

 5    waiting for the notes.  We're waiting for the metadata.  I'm

 6    starting to think, well, they can't find the notes, there are

 7    no notes.  But we go forward.

 8         And if you'll pull up the next -- the transcript, Mr.

 9    Vasek.

10         So now, Your Honor, we are on October the 19th, 2021.  Now

11    we are deposing Mr. Waterhouse.  Mr. Waterhouse, recall, is

12    the person that purportedly signed these notes.  Mr.

13    Waterhouse is the key witness.  Only he and Mr. Dondero know

14    what was said.  And Ms. Deitsch-Perez, you can see here, she

15    asks on the record, John, I also asked you for the Word

16    versions of these notes so we can look at the properties and

17    you have not provided them.  Are you intending to?  Mr. Morris

18    answers, No.

19         So this is October 19th now.  This is during the

20    Waterhouse deposition.

21         You can close this document, Mr. Vasek, and pull up the

22    October 23rd email.

23         Now, after this, after this deposition, Mr. Morris and I

24    talk and we continue to negotiate.  And ultimately Mr. Morris

25    and I reach an agreement.  Mr. Morris wanted certain documents

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 01/09/24   Page 134 of 276   PageID 36530

13

1    of my clients that I'm sure he'll go through today.  They're

2    what we, I guess, call Rule 15(c).  Not Civil Practice Rules,

3    but SEC Rule 15(c)'s.  And I wanted these notes.  So, so this

4    is an October 23rd email.

5         Scroll down, Mr. Vasek.  Please scroll down some more.

6         And, again, the Court can read all this.  A lot of this

7    deals with ordinary discovery issues.

8         Stop right there.  Scroll down.  You have to scroll up

9    now.  Okay.  Stop right there.

10        Okay.  So this is Mr. Morris writing to me:  We also

11   expect to produce you the Word versions of each of the notes

12   in advance of the depositions.

13        And here, the depositions we're talking about are those of

14   Mr. Klos and Ms. Hendrix.

15        Please let us know whether we'll challenge the

16   authenticity, et cetera.  Highland has a potential expert, if

17   needed, et cetera.  And then you'll see Mr. Morris continues:

18   Davor, based on Highland's willingness to produce the Word

19   versions of the notes, please confirm that HCMFA and NexPoint

20   will produce those -- those 15(c) response.

21        So, again, this -- this is -- this is reflective of our

22   October 23rd agreement to produce these documents to each

23   other, remembering that I requested these notes in May.  And,

24   really, I don't understand why the Debtor would have not

25   produced those right away with all metadata.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Exhibit 7   Page 150 of 145   Page 135 of 276   PageID 36531

14

1    And then Mr. Vasek, if you'll please pull up the October

2    26th email.

3    And this, Your Honor -- and Mr. Morris, almost immediately

4    after that, on October the 25th, sends me an email, copying my

5    associate, with -- with the promissory notes.  But Mr. -- I

6    think that Mr. Morris's email system, just like mine, it

7    automatically scrubs metadata from attachments until you --

8    unless you tell it not to.

9    So if you'll scroll up, Mr. Vasek, so this is October the

10   25th.  Mr. Morris sends it.  My associate tells him, We still

11   don't have the metadata.  Please check.

12   Keep scrolling up.

13   And Mr. Morris says, in transit, he will respond.  And he

14   did respond.  He sent, on October the 26th, the promissory

15   notes in Word with all metadata intact.  So Mr. Morris did

16   what he said he would, he got it to us, and we had the

17   originals for the Klos, and far more importantly, the Hendrix

18   deposition.

19   You can close that, Mr. Vasek, please.  And pull up one of

20   the notes.

21   So now Mr. Vasek, Your Honor, is going to pull up for you

22   one of the promissory notes in its original Word.  And you

23   will see hopefully why this is of importance to me.  Only when

24   we got this did we see that these notes are electronically

25   signed.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 01/09/24   Page 136 of 276   PageID 36532

15

1    Go ahead and show Her Honor how -- how you can move it

2    around.

3    You see, Your Honor?  So these are not even electronically

4    signed in the way that there's all these sophisticated systems

5    that have identification and receipts for when you've signed.

6    This is a picture of Mr. Waterhouse's signature that was

7    affixed to this promissory note.

8    More importantly -- if you'll go the metadata, Mr. Vasek

9    -- and I'm sure Your Honor knows what metadata is.  But now,

10   now we see, for the first time, we see that, in fact, this

11   document was created by Strasburger by a lawyer there named

12   Mr. Forsay (phonetic).  I don't know how to pronounce that; I

13   apologize.  But that Ms. Kristin Hendrix actually modified

14   this document and created the document and printed the

15   document on May 3rd and May 2nd, 2019.  In fact, she never

16   printed this document.  She just closed it onto the system,

17   affixing Mr. Waterhouse's picture of his -- of his signature.

18   So this is what spurred the motion.

19   You can close this now, Mr. Vasek.

20   So now we know for a fact, Your Honor, that Mr. Waterhouse

21   didn't sign these notes.  That's a fact.  The only question

22   is, did he authorize Ms. Hendrix to sign the notes for him?

23   And here, the evidence is contradictory.  Mr. Waterhouse --

24   you have it in my brief; I can walk you through the appendix

25   -- Mr. Waterhouse says that in May 2019, May 2019, he very

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 01/09/24   Page 137 of 276   PageID 36533

16

1    rarely authorized anyone to sign anything for him

2    electronically and that it would have been his administrative

3    assistant.  He testified that he would not have signed notes

4    like this unless they were approved by the Debtor's legal

5    department with a little piece of paper on the front and a

6    stamp that said, Approved by blah-blah-blah.  And he -- he

7    testified that if he were to authorize someone to sign a

8    document for him electronically, that he would have done so by

9    an email.

10       Ms. Hendrix testified the opposite.  Ms. Hendrix testified

11   that in May 2019 she was or Mr. Waterhouse was signing almost

12   everything electronically.  She testified that these notes

13   would have been created by her or someone in her department,

14   not by the Debtor's legal department.  And she testified that,

15   well, she would not have signed the notes for Mr. Waterhouse

16   if he had not authorized her to.  But neither she nor Mr.

17   Waterhouse could remember any such authorization.  Neither she

18   nor Mr. Waterhouse have any email communication to that

19   effect.  And the Debtor has not produced any emails such as

20   Mr. Waterhouse said would exist had he authorized this

21   electronic signature.

22       So it appears that Ms. Hendrix deduced or concluded that

23   she was authorized to sign Mr. Waterhouse's name because Mr.

24   Waterhouse, as part of many people in the accounting group,

25   was copied on emails by which she created these notes.  In

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 138 of 276   PageID 36534

17

1    other words, she's told, transfer money from the Debtor to

2    HCMFA.  She does that.  Mr. Klos tells her -- Mr. Klos was her

3    boss then -- prepare notes, because that's standard operating

4    procedure.  And then when she prepares the notes, she

5    circulates them and copies Mr. Waterhouse.  And that's it.

6    From that, she believes that she was authorized to sign his

7    name.

8        Those are questions for the jury.  Those are questions for

9    the jury as to whether there is an estoppel issue, whether Ms.

10   Hendrix was right to conclude that she was authorized, whether

11   Mr. Waterhouse, through a course of conduct and pattern, had

12   authorized her.  I will just say that I analogize it in my

13   mind with our Local Rules and our practices and procedures.  I

14   frequently sign proposed orders for other lawyers, as they do

15   for me, with approval, and we are required to keep an email or

16   fax proof of that.

17       So, where this leaves us is that there is no question Mr.

18   Waterhouse didn't sign the notes.  There is a question as to

19   whether he authorized Ms. Hendrix to sign the notes.  That's a

20   question for the jury.  If in fact he did not sign the notes,

21   there is a material defense under the Uniform Commercial Code

22   that strips the notes of their prima facie validity.

23       We have denied in our prior answer that we signed the

24   notes.  That is potentially ambiguous.  We deny that we've

25   signed the notes because Mr. Waterhouse didn't sign them in a

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 139 of 276   PageID 36535

18

1  representative capacity.  We now want to more clearly assert

2  that, in fact, the notes were not signed at all, because

3  that's how we read the UCC requirement here.

4      Your Honor, this is a Rule 15 motion.  This is not a Rule

5  16 motion.  Leave should be freely given unless there's a

6  substantial reason not to.  There has been no undue delay.

7  Your Honor can see very clearly that it was not until late

8  October that the notes were produced with metadata.  It was

9  not until Mr. Waterhouse was deposed on October 19th that he

10  first raised the issue of, well, it looks like that's my

11  electronic signature.  These signatures are too perfect to be

12  made by me.  I think he used the word chicken scratch for his

13  writing.

14      So there is no undue delay.  I requested these very early

15  in this lawsuit.  For whatever reason, they were not produced

16  until late.

17      There is no futility, Your Honor.  The Debtor seeks to try

18  the actual merits of the defense.  As I've briefed, the Fifth

19  Circuit is very clear.  On a Rule 15 motion, you apply a

20  reverse 12(b)(6) analysis.  The Court does not look at the

21  merits.  The only question is, is the person seeking to amend

22  its answer asserting an affirmative defense that has a basis

23  in law?  It's a 12(b)(6) standard, and we have demonstrated

24  both legally that failure to sign a note is a defense and

25  we've demonstrated factually, to the extent that factual

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 02/09/22    Page 140 of 276    PageID 36536

19

1   demonstration is even required, that there is substantial

2   evidence, although it's disputed, admittedly, that the Debtor

3   -- I'm sorry, that HCMFA did not sign these notes nor

4   authorize their signature.  So there is no futility issue,

5   Your Honor.

6       There's no bad faith.  There's no dilatory -- there's no

7   -- nothing like that.  This is not going to delay any trial.

8   If they want more discovery, they can have it.  But Waterhouse

9   and Klos and Hendrix have been deposed about these very, very

10  issues.  And they were deposed at length.  This is -- but

11  ultimately, whenever trial is going to be, whenever the MSJ

12  rulings are going to be, none of this should have to delay any

13  of that, unless the Debtor wants to delay it.

14      And, again, if the Debtor wants more discovery -- it's

15  suggested it wants discovery of D.C. Sauter and James Dondero

16  and others -- it can have it.  But I'm telling you that only

17  Hendrix, who prepared these notes, only Klos, who instructed

18  her to prepare these notes, and only Waterhouse, who allegedly

19  signed them or authorized them to be signed, are relevant, and

20  they have been deposed at length.  And by the way, Your

21  Honor, Klos and Hendrix are still employed by the Debtor.  The

22  Debtor doesn't need to depose them to get whatever additional

23  information it may need.  And Your Honor, so there is no undue

24  prejudice.

25      And Your Honor, finally, there have not been repeated

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 01/09/24   Page 141 of 276   PageID 36537

20

1  failures to cure prior omissions.  Yes, this is our second

2  motion, that is true, but we did not have any cause or

3  reasonable cause to seek such relief before the end of

4  October.

5      And Your Honor, I think that we are entitled to a little

6  bit of understanding here, that it was not until several

7  months after we were sued that we were even allowed to talk to

8  our CFO about this lawsuit.  Your Honor has in the record

9  communications from Mr. Seery forbidding Mr. Waterhouse or us

10 -- perfectly rationally so; I'm not here to criticize Mr.

11 Seery -- but he forbade Mr. Waterhouse from discussing these

12 matters with us, and it was not until Mr. Waterhouse was

13 terminated, which would have been in March of this year, and

14 it wasn't until sometime later that we were actually able to

15 talk to our CFO and the person who purportedly signed these

16 notes.

17     So the fact that this is our second motion to amend really

18 should not bear any weight to these issues, especially under

19 the facts of this case.

20     Your Honor, that is both my opening, I guess, and my

21 closing.  I have -- I have nothing more except to, I guess,

22 address any issues that Mr. Morris raises.  And I'll rest,

23 really, on our appendices and my argumentation.

24         THE COURT:  Well, I'll ask you this question, since

25 you said that was your opening and closing:  I almost always

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 02/09/22   Page 142 of 276   PageID 36538

21

1   create a timeline in situations like this.  And you said it

2   was several months before your client could talk to Mr.

3   Waterhouse.  And my timeline shows that December 3, 2020,

4   Highland made a demand on these notes.  And then January 22,

5   2021, this adversary was filed to collect on the notes.  And

6   then in February, I don't have the exact date, sometime in

7   February Waterhouse was terminated from the Debtor.  And then

8   he said in his 400-page deposition that I read yesterday

9   afternoon March 1st was when he started with Skyview, which

10  obviously serves in the same role that Highland did as far as

11  shared services for HCMFA.

12      So my point is it wasn't really several months, right?  It

13  was just about a month --

14          MR. RUKAVINA:  Well, I think, Your Honor, --

15          THE COURT:  The original answer was filed on March

16  1st, I guess the same day Mr. Waterhouse started with his

17  employment.  And so it wasn't really months before your client

18  had access to Mr. Waterhouse, correct?

19          MR. RUKAVINA:  I think -- I think Your Honor is

20  correct on a technical reading of that, but Your Honor has to

21  take into context Mr. Sauter's declaration and the facts here

22  that on March 1 all of these employees were being

23  transitioned.  Mr. Waterhouse was the CFO.  He had a thousand

24  and one things going on, as did my clients, the Advisors here.

25  And yes, of course, having a lawsuit for $7.4 million filed

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 02/30/7245   Page 143 of 276   PageID 36539

22

1    against you is important, and we took it seriously.  We didn't

2    -- we didn't fail to file an answer.  But it's not like this

3    lawsuit was first and foremost on Mr. Waterhouse's mind.

4        Mr. Sauter took a little bit of time before he got Mr.

5    Waterhouse's attention.  So I would say it was, according to

6    his declaration, would have probably been early April, if

7    memory serves -- I don't have it right in front of me --

8    before he was able to discuss the matters with Mr. Waterhouse,

9    which is why I said it was several months before we were able

10   to really talk to him.

11           THE COURT:  Okay.  Mr. Morris, your opening

12   statement?

13           OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

14           MR. MORRIS:  Good morning, Your Honor.  John Morris;

15   Pachulski Stang Ziehl & Jones; for the Reorganized Debtor.

16       Before I get to my prepared remarks, I do want to follow

17   up on the observation you just -- Your Honor just made with

18   respect to timeline.  Mr. Rukavina showed the document request

19   that set forth a demand that the Debtor produce the metadata.

20   And if you look at the last exhibit in the Movant's appendix,

21   you will find Highland's response.  And as he showed you,

22   Highland objected to the phrase metadata as vague.  And that

23   was back in June.

24       No motion to compel, no follow up in the month of July.

25   No motion to compel, no follow up in the month of August.  And

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 04/09/24    Page 144 of 276    PageID 36540

23

1    mind you, this is at a time that Mr. Rukavina has told you

2    that they knew -- they thought that there might be a problem

3    with the notes.

4        So they sit on their hands in July.  They sit on their

5    hands in August.  They sit on their hands in September.  They

6    sit on their hands in the first two weeks of October.  And

7    within ten days of the follow up request, we produced the

8    documents.

9        I think it's very important for the Court to consider the

10   almost hundred-day delay between the time the Defendant was

11   specifically told that the Debtor objected to the production

12   of metadata and the time they followed up.

13       I'd also like to put into context the notes in their

14   entirety.  These notes were created at a time -- and there is

15   no dispute about this -- that Mr. Dondero controlled both the

16   borrower and the lender.  He controlled both Highland as well

17   as the maker of the note.  There is no dispute about that.

18   This is not an arm's-length negotiation.  This is not a deal

19   between two strangers.  These are all people wearing multiple

20   hats, doing multiple things, at the same time, as Mr. Rukavina

21   just said, in the ordinary course of business.

22       And I think it's really important, when Your Honor hears

23   the technicalities that Mr. Rukavina is raising, to put them

24   in the context of who these people are.  Because as we've

25   cited in our brief, Mr. Dondero has signed notes on behalf of

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 02/07/24   Page 145 of 276   PageID 36541

24

1   Mr. Rukavina's clients in exactly the same way.  So is Mr.

2   Dondero now personally liable?  It's ridiculous.

3       There's also evidence in the record, unobjected to, there

4   are notes in other litigations that have Mr. Waterhouse's

5   electronic signature.  Silence from that Defendant.  Right?

6   These are all people who were working together under the same

7   roof for the same master.  I think the context is very

8   important.

9       Let me spend a moment on the elephant that is not in the

10  room.  You do not have any evidence in the form of testimony

11  or a declaration from anybody with personal knowledge.  Where

12  is Mr. Dondero's declaration?  Where is Mr. Waterhouse's

13  declaration?  He is still the treasurer of the Movant.  Where

14  is Dustin Norris?  Dustin Norris is the executive vice

15  president of the Movant.  Instead, we have two lawyers'

16  declarations, two people who have absolutely no personal

17  knowledge of any of the underlying facts.

18      You have a substantive investigation conducted by D.C.

19  Sauter.  Mr. Sauter has no official relationship to the

20  Movant.  He is not the general counsel.  He is not employed by

21  them.  He never has been.  He simply is the general counsel of

22  NexPoint.  And because the Movant is an affiliate of Mr.

23  Dondero's, he was told, do this.  And he's doing it.  And this

24  is what he did.

25      And we're going to spend a lot of time with Mr. Sauter on

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 02/09/45   Page 146 of 276   PageID 36542

25

1    what Mr. Waterhouse told him last spring that neither he nor

2    HCMFA told this Court.  And he missed the opportunity in the

3    spring and he missed the opportunity again when he submitted a

4    second declaration.  And what Mr. Waterhouse told Mr. Sauter

5    that he declined to share with you proves that this is just

6    nonsense.

7         There are three issues that we're going to address today,

8    two specifically with Mr. Sauter:  undue delay and futility.

9    And the evidence that we have put into the record goes to both

10   issues.  And I'd like to begin just to show you a couple of

11   documents, Your Honor.  And the first one would be Exhibit 7,

12   if we can put that on the screen.  And scroll down, please.

13        This is the genesis, Your Honor.  I think -- wants to

14   know, where did the notes come from?  This is the first note

15   that's created.  It was created on May 2, 2019.  There's no

16   dispute about that.  Nor is there any dispute that Highland

17   transferred to HCMFA $2.4 million on that day.  And this is an

18   email from David Klos to Corporate Accounting.  There will

19   never be a dispute that the corporate accounting group email

20   included Frank Waterhouse.

21        And Mr. Klos's email, look at the subject:  HCMLP to HCMFA

22   Loan.  And he instructs a member of his group to send $2.4

23   million from Highland to HCMFA.  And he says, "This is a new

24   interco loan."  And he asks Ms. Hendrix or another member of

25   the group to prepare a note for execution.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 02/09/22   Page 147 of 276   PageID 36543

26

1       Mr. Water -- there is no dispute again.  These are just

2  undisputed facts, Your Honor.  Mr. Waterhouse is the treasurer

3  of HCMFA at the same time he's the CFO of Highland.  He wears

4  at least those two hats.  Those are the only two hats we have

5  to talk about today.  He's included on this email because he's

6  in the corporate accounting group.  And I agree with Mr.

7  Rukavina:  We don't have to resolve today what the discussion

8  between any of these people were, because we know it is an

9  undisputed fact that Frank Waterhouse and therefore HCMFA was

10 told on May 2, 2019 that this $2.4 million transfer was being

11 treated as a loan and that the accounting group was going to

12 prepare it.

13      Can we go to the next exhibit, please?  Number 8?

14      This is the next day.  This is the $5 million loan.  And

15 here's another email, this one from Ms. Hendrix.  She again

16 sends it to the corporate accounting group.  Again, Mr.

17 Waterhouse and therefore HCMFA are told by Ms. Hendrix that

18 there was going to be a new $5 million loan and that she

19 specifically says, I will paper the loan.  HCMFA knew on May

20 3, 2019 that Kristin Hendrix was going to prepare a promissory

21 note to support the transfer of $5 million from Highland to

22 HCMFA.  There is no dispute about any of these facts.

23      If Mr. Waterhouse had any question as to what she or Mr.

24 Klos were doing at this moment in time, if he believed that he

25 hadn't given the instruction, that was his moment to speak up.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 02/09/24   Page 148 of 276   PageID 36544

27

1    Well, that was his first in dozens and dozens of moments to

2    speak up.  But he didn't.

3        Where is the evidence that Mr. Waterhouse -- because this

4    is all out in the open now.  He's still the treasurer of

5    HCMFA.  Where's the declaration from Mr. Waterhouse saying, I

6    didn't see that email?  It never occurred to me what they were

7    doing.  It'll -- there will never be that evidence, Your

8    Honor.

9        So this is just -- this is the beginning.  And, again,

10   this -- these emails, these two documents alone establish both

11   undue delay, because here you're on notice that those pesky

12   Highland accounting folks are running amok here and doing

13   something they shouldn't be doing.  That's what we're told.

14   They shouldn't have -- this was all a grave mistake.  HCMFA

15   knows it.  And you know what they do in less than 30 days?

16   They report these notes in their audited financial statements.

17   I don't want to go through all of my evidence right now, but

18   this is just such incredible evidence.

19       If we can go to the next document, which is the Highland

20   audited financial statements, Exhibit 3.  And this is dated

21   June 3, 2019.  It is literally one month after the notes are

22   executed.  And if we can just flip to Page 39, please.

23       Page 39, you may have seen this referenced in our papers,

24   Your Honor, is the Subsequent Events section.  I apologize.

25   If we could go just to the top of the section so the Court can

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 09/09/24   Page 149 of 276   PageID 36545

28

1   see the section of the financial statements.  Yeah.  Thank

2   you.

3       So, Section 15 is Subsequent Events.  And continued on to

4   the next page, it says, "Over the course of 2019 through the

5   report date, HCMFA issued promissory notes to the partnership

6   in the aggregate amount of $7.4 million."  And it notes the

7   interest rate.

8       So this notion of mutual mistake, it's contradicted by the

9   plain and unambiguous words of Highland's audited financial

10  statements.  And Mr. Sauter is going to confirm what the Court

11  probably already knows and that Mr. Waterhouse is responsible

12  for the oversight of the completion of the audit.

13      But it wasn't just Highland who disclosed the existence of

14  these notes.  HCMFA did it itself.

15      Can we go to Exhibit 6?

16      Now, Your Honor, Exhibit 6 was filed under seal.  We're

17  only going to put up the one piece of Exhibit 6 that relates

18  to the notes.  So on the screen now is the mirror image of the

19  Subsequent Events section, and this is -- Exhibit 6.  This is

20  HCMFA's notes.  Again, this audited financial statements, both

21  audited financial statements are audited by

22  PricewaterhouseCoopers at a time when Mr. Dondero is in

23  control of both entities, at a time when Mr. Waterhouse is

24  serving as both the chief financial officer of Highland as

25  well as the treasurer of HCMFA, and HCMFA's audited financial

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 03/09/23    Page 150 of 276    PageID 36546

29

1    statements also show the recording of these promissory notes.

2        HCMFA knew that the notes existed, and therefore could

3    have and should have began to investigate if they thought

4    those notes were mistakenly created.  But they did nothing.

5    There will never be any evidence to explain why HCMFA included

6    the notes in their audited financial statements and did

7    nothing.  There will never be an explanation for that.

8        There is so much more, Your Honor, that's set forth in our

9    papers.  I'll just summarize that Mr. Waterhouse, wearing both

10   hats, prepared dozens of monthly operating reports that he

11   filed with this Court in which these notes were included as an

12   asset of Highland's bankruptcy estate, that all creditors

13   relied upon those monthly operating reports.  The evidence is

14   going to be in the record now that Mr. Dondero was told

15   multiple times that HCMFA owed Highland over $10 million.  I

16   don't have to get into the details here, Your Honor, because

17   we know from the audited financial statements that the only

18   other obligations to Highland were the $5 plus million in

19   other notes.  The only way you get over $10 million is with

20   these notes.

21       Mr. Dondero -- there will never be any evidence that Mr.

22   Dondero said, hey, how come there's $10 million of notes

23   there?  I thought there was only five.  There will never be

24   any evidence that any of the officers of HCMFA said, hey, how

25   come we're reporting to the Retail Board that there's almost

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 151 of 276   PageID 36547

30

1    $12 million in obligations to Highland?  I thought there was

2    only $5 million of notes.

3        They actually did that, Your Honor.  The Retail Board is a

4    critical piece of evidence here because, as Mr. Norris has

5    testified, it is the reason for the Advisors' existence.

6    These advisory agreements between the Advisors and the retail

7    funds are the reasons the Advisors exist.  And they're subject

8    to annual review.  And the Retail Board specifically asked the

9    Advisors, how much do you owe on notes?

10       And this has nothing to do with Highland employees at this

11   point.  The only people involved in this are HCMFA officers.

12   It's Lauren Thedford, who's the secretary of HCMFA, and it's

13   Frank Waterhouse, who's the treasurer of HCMFA.  And you've

14   got Mr. Norris who's copied on the email, and he's the

15   executive vice president.  And you've got Justin Post, who is

16   the chief compliance officer.  And they're all working --

17   they're Highland employees, including Klos and Kristin

18   Hendrix, frankly, who are copied on this stuff, but they say

19   nothing.  This is the Advisors' own officers who are relying

20   on HCMFA's own balance sheet to report to the Retail Board, in

21   response to their specific question, that these notes are

22   valid obligations.  And they're going to come to court to you

23   today and say they don't think they were signed properly?

24   Seriously?  It's not right.

25       There is no gotcha moment, Your Honor.  HCMFA has known

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 03/09/23    Page 152 of 276    PageID 36548

31

1    for years of the existence of these notes.  Mr. Rukavina may

2    be doing his investigation in October.  I don't know why it

3    wasn't done in May 2019.  I don't know why it wasn't done in

4    June 2019 when the audited financial statements are prepared.

5    I don't know why it's not done in October, November, December

6    of 2019, postpetition, when Mr. Dondero's entities are filing

7    documents with the Bankruptcy Court signed by Mr. Waterhouse

8    that say, these are valid notes.  Why aren't they

9    investigating?  They're not.  They're telling you and all of

10   the interested parties and all of the stakeholders these notes

11   are there.

12       It's not good faith, Your Honor.  It's bad faith.  And

13   what's worse, and we'll get to it in just a moment, is D.C.

14   Sauter.  Mr. Waterhouse told him exactly why the notes were

15   prepared.  He told it to him three different ways.  And he

16   didn't tell the Court that when he filed his first declaration

17   and he didn't tell the Court that when he filed his second

18   declaration.  Instead, what he actually told the Court is that

19   Frank Waterhouse knows little, if -- little, if anything,

20   about these notes.  And that's just not true.

21       So let's call Mr. Sauter, let's put his declaration into

22   evidence, and let's see what he has to say about what Mr.

23   Waterhouse actually told him that he never disclosed to the

24   Court.

25           THE COURT:  All right.  We'll go to the evidence now.

1   And as I understand, HCMFA is resting on the declaration for

2   the direct testimony.  So, Mr. Sauter, I need you to turn on

3   your audio and video so I can swear you in and we'll allow

4   cross-examination.  Could you say, "Testing, one, two,"

5   please?

6            MR. SAUTER:  Testing, one, two.

7            THE COURT:  All right.  Are others picking up the

8   video?  I don't see it yet, but my device is slower.

9            MR. RUKAVINA:  Yes, Your Honor.  I see Mr. Sauter.

10           THE COURT:  Okay.  All right.  Could you say

11  "Testing, one, two" one more time, Mr. Sauter?

12           MR. SAUTER:  Testing, one, two.

13           THE COURT:  All right.  Please raise your right hand.

14  Do you solemnly swear or affirm that the declaration as well

15  as the testimony you give today was and will be the truth, the

16  whole truth, and nothing but the truth, so help you God?  If

17  so, say, "I do."

18           THE WITNESS:  I do.

19           THE COURT:  All right.  Thank you.  Mr. Morris, you

20  may proceed.

21                    CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q    Good morning, Mr. Sauter.  Can you hear me okay?

24  A    Yes, sir.

25  Q    Okay.  You're an attorney admitted to practice law in the

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 03/09/45    Page 154 of 276    PageID 36550
Exhibit 27    Page 34 of 145

Sauter - Cross                        33

 1   State of Texas, correct?

 2   A    Yes, sir.

 3   Q    And you've held your license for about 20 years; is that

 4   right?

 5   A    Yes, sir.

 6   Q    And from 2014 through February 2020, you were affiliated

 7   with the law firm of Wick Phillips, correct?

 8   A    Yes, sir.

 9   Q    And while at Wick Phillips, you provided legal services to

10   NexPoint Advisors and its wholly-owned subsidiaries, correct?

11   A    Yes, sir.

12   Q    And in February 2020, you left Wick Phillips to become

13   NexPoint's general counsel of real estate, correct?

14   A    Not exactly.  I was hired at NexPoint.  I didn't become

15   general counsel until some point in 2021.  I think April,

16   probably.

17   Q    Okay.  I apologize.  But I -- this is difficulty, but I

18   appreciate the clarification, but my question was you became

19   the general counsel of real estate when you first joined

20   NexPoint; is that right?

21   A    That's correct.

22   Q    Okay.  And it wasn't until April or May 2021 that you were

23   promoted to general counsel at NexPoint, correct?

24   A    I was appointed general counsel in April or May, yes.

25   Q    Okay.  And you hold that position today, correct?

Sauter - Cross                           34

1    A    That's correct.

2    Q    And you submitted a declaration in support of Highland

3    Capital Management Fund Advisors' motion for leave to amend

4    their answer in this matter, correct?

5    A    Yes, sir.

6    Q    Okay.

7             MR. MORRIS:  Can we put on the screen Docket #83,

8    which is Exhibit 1, Mr. Sauter's declaration?

9    BY MR. MORRIS:

10   Q    If you'll recall, Mr. Sauter, when we did this in your

11   declaration, if at any time there's anything you need to see

12   in the document, will you let me know that?

13   A    I will.

14   Q    Okay.  And do you understand that this is the declaration

15   that you filed at the end of November in support of HCMFA's

16   motion for leave to amend its answer?

17   A    If that's what you say.  I would need to see the date, but

18   --

19   Q    Okay.

20   A    -- I'll take your --

21   Q    Can you see up top?

22   A    Yes.  Yes, sir.  That looks accurate.

23   Q    Okay.  Who wrote this document?

24             MR. RUKAVINA:  Objection, Your Honor.  It's attorney-

25   client privilege.

 1          THE COURT:  Attorney-client privilege?

 2   BY MR. MORRIS:

 3   Q    Did you write this document, sir?

 4          THE COURT:  Okay.  You can rephrase the question, Mr.

 5   Morris.

 6   BY MR. MORRIS:

 7   Q    Did you write this document, sir?

 8   A    I worked with my attorneys in drafting the document.

 9   Q    Can you tell me which portions you wrote?

10   A    I can't recall exactly which portions I wrote.

11   Q    Can you recall any aspect of this document that reflects

12   your personal edits?

13   A    I did review and edit the document.  I don't recall

14   exactly which portion.

15   Q    Okay.  Did you receive a draft of the document in the

16   first instance?

17   A    Yes, I believe I did.

18   Q    And how many -- how many drafts of this document were

19   created before you signed your name to it?

20   A    I don't know.

21   Q    Was it more than two?

22   A    I don't recall.  I would think it's probably one.

23   Q    Okay.

24   A    After my review.

25   Q    Okay.  So you got the document, you provided some

Sauter - Cross                        36

1    comments, and then you have the final version.  Do I have that

2    right?  To the best of your recollection?

3    A    That's my recollection.  Yes, sir.

4    Q    Okay.  Can you identify any issue on which you provided

5    substantive comments to your declaration?

6    A    I don't recall what those substantive comments were at

7    this time.

8    Q    Okay.  In Paragraph 2 --

9         MR. MORRIS:  If we can go down to Paragraph 2.

10   BY MR. MORRIS:

11   Q    Do you see it says, "I am in-house counsel for both HCMFA

12   and NexPoint, and have been since at least January 1, 2001

13   [sic].  Do you see that?

14   A    Yes, sir.

15   Q    Have I read that accurately?

16   A    Yes, sir.

17   Q    That's not really a true statement, is it?

18   A    I -- I wouldn't have said it if I didn't agree with it.

19   Q    You're not the general counsel of HCMFA, are you?

20   A    I am not the general counsel of HCMFA.

21   Q    In fact, you don't have any official role with HCMFA;

22   isn't that correct?

23   A    I do not have any title with HCMFA.

24   Q    You're not an employee of HCMFA, correct?

25   A    That is correct.

1    Q    And you never have been, right?

2    A    That is correct.

3    Q    You're not an officer of HCMFA, correct?

4    A    That is correct.

5    Q    And you never have been; isn't that right?

6    A    That is correct.

7    Q    You're not compensated by HCMFA, correct?

8    A    That is correct.

9    Q    And you never have been; isn't that right?

10   A    Yes, sir.

11   Q    Instead, you just perform work for HCMFA from time to

12   time, as requested.  Isn't that right?

13   A    That is correct.

14   Q    And that's because HCMFA is affiliated with Mr. Dondero,

15   correct?

16   A    I suppose that's part of the reason.

17   Q    Even though you're not employed -- withdrawn.  Even though

18   you're employed by NexPoint, you perform legal services for

19   other entities affiliated with Mr. Dondero whenever called

20   upon, even though you have no formal role.  Correct?

21   A    That's correct.

22   Q    And that's all you're doing here, correct?

23   A    That's correct.

24   Q    And you admit that for all intents and purposes Mr.

25   Dondero is the controlling person at both NexPoint and HCMFA,

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 03/09/45    Page 159 of 276    PageID 36555

Sauter - Cross                                      38

 1  correct?

 2  A    That's correct.

 3  Q    You're aware that about a year ago Highland commenced an

 4  action against HCMFA to recover under two promissory notes

 5  bearing Mr. Waterhouse's signature?

 6  A    That's correct.

 7  Q    Okay.  You have no personal knowledge about the origin of

 8  those promissory notes, correct?

 9  A    I do not.

10  Q    You have no personal -- you had no personal involvement in

11  the TerreStar matters referred to in your declarations,

12  correct?

13  A    I did not.

14  Q    And that's because you were working at Wick Phillips at

15  the time, right?

16  A    That's correct.

17  Q    And even though you had no formal affiliation with HCMFA

18  and no knowledge about any of the facts, you were asked to

19  investigate the origin of the notes that are the subject of

20  the lawsuits, correct?

21  A    That's correct.

22  Q    Who asked you to do that?

23  A    Outside counsel asked me to do an investigation and figure

24  out where the notes came from and what they were for.

25  Q    Is there any particular reason that you know of that

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 04/09/24   Page 160 of 276   PageID 36556
Exhibit 27   Page 4009 145

Sauter - Cross                          39

 1  outside counsel didn't make those inquiries?

 2          MR. RUKAVINA:  Your Honor, I object to the extent

 3  that calls for the attorney-client privilege.  I don't know if

 4  Mr. Sauter can answer that without invading the privilege.

 5          THE COURT:  Mr. Sauter, no communications revealed

 6  between you and your lawyer.  If you can answer without doing

 7  that.

 8          THE WITNESS:  I don't know.

 9  BY MR. MORRIS:

10  Q   Okay.  After completing your investigation, you submitted

11  a declaration in support of HCMFA's first motion for leave to

12  amend, correct?

13  A   Yes, sir.

14  Q   Okay.  And your second declaration that you submitted in

15  support of this motion contains a fair portion of what was in

16  the first declaration; do I have that right?

17  A   I believe so.

18  Q   Okay.  Let's look at your first declaration, if we could.

19          MR. MORRIS:  It's -- yeah, there you go.  Exhibit 15.

20  And so if we could scroll down a little bit, perhaps, to the

21  date.

22  BY MR. MORRIS:

23  Q   Oh, actually, you can see at the top.  Do you see it's

24  from May 2021?

25  A   Yes, sir.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 161 of 276   PageID 36557
Exhibit 7   Page 4097145

Sauter - Cross                        40

1   Q    Okay.  And is that around the time that you signed your

2   declaration?

3   A    I believe so.

4   Q    And your declaration set forth the factual basis for

5   HCMFA's motion for leave to amend its answer, correct?

6   A    Yes, sir.

7   Q    And your declaration describes two phases of your

8   investigation, correct?

9   A    I don't recall.

10   Q    Well, the first phase took place between the time the

11   complaint was filed and March 1, 2021, when HCMFA filed its

12   first original answer, right?

13   A    That's correct.

14   Q    Okay.  And during that first phase, you spoke with Mr.

15   Dondero, correct?

16   A    Yes.

17   Q    And Mr. Dondero told you that he couldn't recall the

18   genesis of the notes, correct?

19   A    That's my recollection.  Yes, sir.

20   Q    But he didn't say anything to you that caused you to

21   believe he was unaware of the notes, right?

22   A    Not that I recall.

23   Q    In fact, when you spoke to him, Mr. Dondero had high-level

24   details concerning the notes.  Isn't that right?

25   A    I mean, I think he generally knew what the notes were

1    about, yes.

2    Q    And so it's not like he -- it's not like he told you he

3    never heard of the notes?  He knew what they were about,

4    right?

5    A    He was aware of the notes.

6    Q    Okay.  And he suggested that you speak with Mr.

7    Waterhouse.  Do I have that correct?

8    A    That's correct.

9    Q    And you did that as part of the second phase of your

10   investigation, correct?

11   A    Yes, sir.

12   Q    We'll get to that shortly.  But your declaration --

13           MR. MORRIS:  If we can go to Paragraph 13, please.

14   Okay.

15   BY MR. MORRIS:

16   Q    The second sentence of Paragraph 13 says, "I had no

17   knowledge of them since I had not been employed by HCMFA, and

18   the few employees of HCMFA had no knowledge of the notes."

19   Have I read that correctly?

20   A    Yes, sir.

21   Q    And the people that you're referring to there specifically

22   are Dustin Norris and Jason Post, right?

23   A    They actually were not employees of HCMFA.  It would have

24   been Joe Sowin.  Joe was not aware of the notes.  And I can't

25   recall whether I spoke with any other HCMFA employees, but I

1  did speak with Mr. Norris and Mr. Post about the notes as

2  well.

3  Q    Okay.  And when you used the phrase the employees at that

4  time you were referring to Norris and Post, correct?

5  A    I'm sorry.  Can you restate that question?

6  Q    Well, you knew Mr. Norris was a vice president of HCMFA;

7  isn't that right?

8  A    I believe he was, yes.

9  Q    Yeah.  And until he recently left, Mr. Post, to the best

10  of your knowledge, was the chief compliance officer for both

11  NexPoint and HCMFA, correct?

12  A    Yes, sir.

13  Q    Okay.  And those two gentlemen told you at that time

14  during Phase I that they didn't know the origin of the notes,

15  correct?

16  A    That's correct.

17  Q    So, because everybody associated with HCMFA at that time

18  told you you were -- they were unaware of the notes, HCMFA

19  served and filed an answer to the complaint that contained no

20  affirmative defenses; isn't that right?

21  A    I don't recall what the -- the answer said, but if you say

22  there were no affirmative defenses, I'll take your word for

23  it.

24  Q    Okay.  I don't want you to take my word for it.  Let's

25  take your word for it.

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 04/09/24    Page 164 of 276    PageID 36560

Sauter - Cross                                    43

1              MR. MORRIS:  Can we go to Paragraph 18, please?

2   BY MR. MORRIS:

3   Q    Do you see you wrote in your declaration, or somebody

4   wrote in your declaration, "That original answer did not

5   contain any affirmative defenses because, as explained above,

6   no one at HCMFA knew any of the facts that might give rise to

7   an affirmative defense."

8        That's what you wrote, right?

9   A    Okay.  Yes, you are correct.  There were no affirmative

10  defenses asserted in our answer.

11  Q    All right.  And all of that changed in mid-April 2001

12  [sic]; isn't that right?

13  A    Yes, sir.

14  Q    And that's because Mr. Waterhouse and other former

15  employees of Highland had migrated over to Skyview so you had

16  access to them, correct?

17  A    That's correct.

18  Q    So Mr. Seery's instructions about not speaking to

19  Highland's employees in ways that were inimical to Highland's

20  interests and the Court's TRO were no longer impediments to

21  your ability to speak with Mr. Waterhouse, correct?

22  A    Yes and no.  But for the most part, I would agree with

23  that.

24  Q    You could ask them anything in the world you wanted at

25  that time.  Is that fair?

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 04/08/24    Page 165 of 276    PageID 36561

Sauter - Cross                                44

 1  A    That's not entirely fair.

 2  Q    Yeah.  Is there anything about the notes that you thought

 3  you couldn't ask them?

 4  A    Um, I suppose not.  I guess the better question is whether

 5  they would be willing to answer.

 6  Q    I -- okay.  Is there any question that Mr. Waterhouse ever

 7  refused to answer?

 8  A    I think he's referred me to his outside counsel when I've

 9  asked him questions from time to time.

10  Q    Okay.  But that never occurred during the period when you

11  were doing your investigation, correct?

12  A    I think there may have been some hesitancy from Mr.

13  Waterhouse early on, and I think once he showed that hesitancy

14  -- I try to be respectful of his concerns.

15          MR. MORRIS:  Your Honor, I apologize for this, but my

16  transcript is in another room.  Can we just -- can you just

17  give me thirty seconds, please?

18          THE COURT:  Certainly.  Do you literally need thirty

19  seconds, or do we need to take a five-minute break?

20          MR. MORRIS:  Hopefully less than thirty.

21      (Pause.)

22          MR. MORRIS:  Okay.  Can you scroll down to Paragraph

23  19, please?  Okay.

24  BY MR. MORRIS:

25  Q    So, the last sentence of Paragraph 19, you wrote, "Thus,

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 04/09/24    Page 166 of 276    PageID 36562
Exhibit 7    Page 4609 of 145

Sauter - Cross                                        45

1    as of March 2021, I was able to communicate with most former

2    Debtor employees and to access the books and records of

3    Highland -- of HCMFA without fear of violating any court

4    order."

5        Have I read that correctly?

6    A    Yes, sir.

7    Q    And there's nothing in your declaration -- there's nothing

8    in either declaration that suggests you were impeded in any

9    way in speaking to Mr. Waterhouse during your investigation in

10   the spring.  Correct?

11   A    I would say that I wasn't impeded by the court order.

12   That's correct.  And, yes, I -- I don't recall anything

13   specific in either declaration that mentions any impediment to

14   my discussions with Mr. Waterhouse.

15   Q    There's nothing general in either of your declarations

16   either; isn't that correct?

17   A    Yes, sir.  I don't think there is.

18   Q    Okay.  So you didn't think that it was important to tell

19   the Court that there was anything that you were unable to

20   learn from Mr. Waterhouse, correct?

21   A    That's fair.

22   Q    Okay.  And so, with access to Mr. Waterhouse and the other

23   employees and HCMFA's books and records, you conducted the

24   second phase of your investigation, correct?

25   A    Yes, sir.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 04/09/24   Page 167 of 276   PageID 36563

Sauter - Cross                            46

1  Q    And during the second phase, you reviewed certain

2  documents relating to the TerreStar NAV error, correct?

3  A    Eventually, yes.

4  Q    And specifically, you reviewed three to five documents

5  that included a memo that was submitted to the board of the

6  retail fund as well as maybe some communications with the SEC,

7  correct?

8  A    Yes, sir.

9  Q    And those are the only documents that you were directed to

10  review, correct?

11  A    That's correct.

12  Q    And none of those documents stated that Highland was

13  responsible for the NAV error, correct?

14  A    That's correct.

15  Q    During the two-phased investigation that you conducted,

16  you never saw a document that stated that Highland Capital

17  Management, LP was responsible for the TerreStar NAV error,

18  correct?

19         MR. RUKAVINA:  Your Honor, I'll object.  This is

20  irrelevant.  The only relevance to this motion today is any

21  alleged delay in us asserting the defense that Mr. Waterhouse

22  did not sign the notes.  Counsel here is trying to try the

23  underlying merits, which we are not here to do today.  It's

24  inappropriate.  And frankly, it's trial by ambush.  The only

25  issue that Mr. Sauter is presenting evidence on today is that

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 04/08/24    Page 168 of 276    PageID 36564

Sauter - Cross                          47

1   in April or May Mr. Waterhouse told him that he signed the

2   notes.  That should be the only topic of legitimate

3   questioning.

4           THE COURT:  I overrule.

5           MR. MORRIS:  If I may, Your Honor?

6           THE COURT:  I overrule.

7           MR. MORRIS:  Oh.  Okay.

8   BY MR. MORRIS:

9   Q    So, my question, Mr. Sauter, is that during your two-

10  phased investigation you never saw any document that stated

11  that HCMLP was responsible for the TerreStar NAV error,

12  correct?

13  A    That's correct.  I never saw a document signed by HCMLP

14  that said, we are responsible.

15  Q    And so, notwithstanding your review of the first

16  declaration, you didn't tell the Court that there were no

17  documents that corroborated your conclusion that the payment

18  was supposed to be made on account of Highland's culpability

19  in connection with the NAV error, correct?

20          MR. RUKAVINA:  Your Honor, objection.  That's --

21  that's argumentative and that's not a fair question.  Why

22  would he tell the Court something like that?  It's an

23  argumentative question, not a question of fact.

24          THE COURT:  Mr. Morris?

25          MR. MORRIS:  Your Honor?

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 04/09/24    Page 169 of 276    PageID 36565

Sauter - Cross                    48

1          THE COURT:  Go ahead.  Response?

2          MR. MORRIS:  Yeah.  I would say that -- I would say

3  that we have a declaration on the screen, most of which is

4  mimicked in the current declaration on this motion, that

5  discusses in detail his investigation, his review of

6  documents, and his conclusion that the notes were -- were

7  prepared by mistake because the transfer of funds was supposed

8  to be made for the purpose of compensating HCMFA for

9  Highland's error.  This goes to everything from futility to

10 credibility.

11         THE COURT:  Okay.  I overrule the objection.

12 BY MR. MORRIS:

13 Q    You never disclosed to the Court that there were no

14 documents that supported your conclusion that the notes were

15 prepared by mistake because the payments were supposed to be a

16 form of compensation, correct?

17 A    I don't agree with that statement.

18 Q    Can you show me where in your declaration there's a

19 reference to any documents that support your conclusion that

20 the payment was intended to be compensation and not a loan?

21 A    Say that again, please.

22 Q    We can scroll through your declaration -- withdrawn.  Let

23 me start over, Mr. Sauter.  The question is whether you ever

24 told the Court that your investigation didn't uncover any

25 documentary -- any document -- withdrawn.  The question is

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 05/09/24   Page 170 of 276   PageID 36566

Sauter - Cross                              49

1    whether, during -- you ever disclosed to the Court whether

2    there was ever any documentary evidence that corroborated your

3    conclusion that the payment was intended as compensation and

4    not a loan.

5    A    I'm sorry, I'm having trouble because I think you're

6    asking me to affirmatively state a negative.  And if I can

7    expand, I'll tell you why I'm having trouble.  If you don't

8    want me to expand, then I won't.

9    Q    I appreciate that, Mr. Sauter, and I don't want you to

10   expand.  The only question is whether you need to review more

11   of your declaration than is on the screen.  The only question

12   is whether you ever told the Court that there were no

13   documents that corroborated your conclusion.

14   A    You're asking me to tell you whether there's anything in

15   my declaration that says there's no evidence to support my

16   conclusion, and I'm telling you I would not say that.

17   Q    Okay.  And that's not my question, so I'm sure that it's

18   my fault, Mr. Sauter, and I apologize.

19        Are you aware of anything in your declaration that

20   discloses to the Court that there is no document, that you

21   uncovered no document that stated that Highland Capital

22   Management was responsible for the TerreStar NAV error?

23   A    The only way I can answer it is -- is to answer the

24   question you asked me before, which is I am not aware of any

25   document where HCMLP said, I am responsible for the NAV error.

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 05/09/24    Page 171 of 276    PageID 36567
Exhibit 7    Page 109 of 145

Sauter - Cross                                    50

1    Q    Okay.  I appreciate that.  And in fact, that was true

2    during the investigation and it's true today, eight months

3    later, correct?

4    A    Correct.

5    Q    Okay.  During the second phase of your investigation, you

6    spoke with Mr. Waterhouse, right?

7    A    Yes, sir.

8    Q    And you knew that Mr. Waterhouse was the chief financial

9    officer or the treasurer of HCMFA, correct?

10   A    Yes, sir.

11   Q    And you spoke with a gentleman named Will Mabry.  Do I

12   have that right?

13   A    Yes, sir.

14   Q    And you spoke again with Mr. Norris and Mr. Post.

15   Correct?

16   A    Yes, sir.

17   Q    And based on those discussions and your review of the

18   three to five documents, you concluded "The notes were signed

19   by Mr. Waterhouse" -- withdrawn.

20          MR. MORRIS:  Can we go to Paragraph 22?

21   BY MR. MORRIS:

22   Q    You concluded that "The notes were signed by mistake by

23   Waterhouse and without authority from HCMFA."  That was your

24   conclusion based on your investigation, correct?

25   A    That's correct.

1              MR. MORRIS:  And if we can go to Paragraph 30.

2    BY MR. MORRIS:

3    Q    You also wrote in your declaration, towards the bottom,

4    "It therefore appears that Waterhouse prepared the notes for

5    some internal accounting or other purpose."

6         Did I read that correctly?

7    A    Yes, sir.

8    Q    And that was also part of the conclusions that you reached

9    after conducting this investigation, right?

10   A    Yes, sir.

11   Q    And you interviewed Mr. Waterhouse three times, correct?

12   A    I spoke with him three times, yes.

13   Q    And two of those interviews were face-to-face and one was

14   on the phone, correct?

15   A    Yes, sir.

16   Q    And nobody else participated in those discussions,

17   correct?

18   A    Correct.

19   Q    And you don't recall taking any notes of those interviews,

20   correct?

21   A    I don't.

22   Q    And you don't recall sending any emails summarizing your

23   discussions with Mr. Waterhouse, correct?

24   A    I would not have sent those to Mr. Waterhouse.  I may have

25   sent something to my counsel.

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 05/30/24    Page 173 of 276    PageID 36569
Exhibit 27    Page 53 of 145

                                Sauter - Cross                                52

1    Q    Okay.

2    A    But I don't recall them.

3    Q    You don't recall taking -- you don't recall sending any

4    emails to anybody summarizing your discussions with Mr.

5    Waterhouse, correct?

6    A    I don't.

7    Q    Okay.  You don't recall actually showing the promissory

8    notes to Mr. Waterhouse, do you?

9    A    I don't recall.  You're correct.

10    Q    Okay.  But you had the notes with you at the time, right?

11    A    I don't know if I had the notes with me at the time.  I

12    may have.

13    Q    You certainly had access to them; is that fair?

14    A    That's fair.

15    Q    Nothing prevented you from showing the notes to Mr.

16    Waterhouse, right?

17    A    No, sir.

18    Q    You never asked Mr. Waterhouse to confirm his signature on

19    the notes, right?

20    A    I never presented him with the notes and asked him to

21    confirm that those signatures were his.

22    Q    Okay.  But if you had, he may have told you right then and

23    there that that was his electronic signature, correct?

24              MR. RUKAVINA:  Objection.

25              THE WITNESS:  I actually --

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 05/09/22    Page 174 of 276    PageID 36570

Sauter - Cross                              53

1          MR. RUKAVINA:  Objection, Your Honor.  Speculation.

2          THE COURT:  Overruled.

3          THE WITNESS:  I actually asked him whether he signed

4    them and whether they were electronic signatures, and he

5    indicated that he would not have used an electronic signature

6    at that time, so if they were signed they were his signature.

7    BY MR. MORRIS:

8    Q    But you didn't show him the notes to let him make the

9    determination as to whether or not the signature was his ink

10   signature or whether it was an electronic signature?  He

11   didn't have that opportunity, correct?

12   A    I don't recall doing that.

13   Q    Okay.  And there's no -- but there's no reason you

14   couldn't have done that back in April or May, correct?

15   A    I suppose you're correct, yes.

16   Q    Okay.

17          MR. MORRIS:  Can we flip to the first declaration and

18   go to Paragraph 23?

19   BY MR. MORRIS:

20   Q    Okay.  So, in the middle of this Paragraph 23, it says --

21   it's referring to Mr. Waterhouse.  Do you see that?

22   A    Yes, sir.

23   Q    And you write, "Although he did not remember many, if any,

24   of the facts concerning -- of the facts and circumstances

25   concerning the HCMFA notes," -- do you see that there?

1   A    Yes, sir.

2   Q    That's not accurate, is it?

3   A    It's -- it's accurate.

4   Q    Mr. Waterhouse remembered a lot about the notes, didn't

5   he?

6   A    I suppose that's your opinion.  He didn't have a good

7   recollection of the notes and seemed to be guessing at what

8   had happened and why they were executed.

9   Q    All right.  Let's spend some time looking at what Mr.

10  Waterhouse told you.  Even though you did not show him the

11  promissory notes that are at issue, Mr. Waterhouse made it

12  perfectly clear to you that he was fully familiar with the

13  notes, correct?

14  A    Actually, in the previous sentence, it says the signatures

15  on the notes looked like they were his, so that would indicate

16  that I did show him copies of the notes and he indicated that

17  those were his signatures.

18  Q    That's what it says in this declaration.  That's not what

19  it said in your first declaration, correct?

20  A    I think --

21          MR. RUKAVINA:  That's argumentative.  That's a false

22  logical argument, and it's argument.  It's not a question.  He

23  can -- he can make these arguments in his closing.  Why would

24  Mr. Sauter in his first declaration go through every single

25  thing that he did or didn't do?

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 05/09/23   Page 176 of 276   PageID 36572
Exhibit 27   Page 560 of 745

Sauter - Cross                          55

 1              MR. MORRIS:  Your Honor, I'll just ask him --

 2              THE COURT:  Response?

 3              MR. MORRIS:  I'll just ask him the -- yeah.  I'll

 4   just ask him the question again.

 5   BY MR. MORRIS:

 6   Q    At the time of your deposition, you had no recollection of

 7   ever showing the promissory notes to Mr. Waterhouse, correct?

 8   A    I -- it's correct that I don't recall whether I showed him

 9   the notes.

10   Q    Okay.  That's all I needed.  Who wrote this declaration?

11   Did you write this declaration?

12   A    Isn't -- isn't this the first declaration?

13   Q    No.  This is the second one.  Who wrote the second

14   declaration?

15   A    It would have been the same process.

16   Q    Where it was presented to you in the initial draft?

17   A    Yes, sir.

18   Q    And how many -- how many drafts do you recall this one

19   going through?  One or more than one?

20   A    One, maybe two.  I don't recall exactly.

21   Q    Can you recall any substantive point in your declaration

22   that you provided a comment on?

23   A    I -- I did provide substantive comments.  I don't recall

24   exactly what they were.

25   Q    Can you identify one?

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 05/09/24   Page 177 of 276   PageID 36573
Exhibit 27    Page 5709 of 745

Sauter - Cross                              56

 1   A    I really -- I don't recall.

 2   Q    Okay.  So even though you did not -- you have no

 3   recollection of showing the promissory notes to Mr.

 4   Waterhouse, Mr. Waterhouse made it perfectly clear to you that

 5   he was fully aware of the notes, correct?

 6             MR. RUKAVINA:  Objection, Your Honor.  That assumes

 7   facts not in evidence.

 8             THE COURT:  Overruled.

 9             THE WITNESS:  Would you repeat the question, Mr.

10   Morris?

11   BY MR. MORRIS:

12   Q    Even though you did not show Mr. -- withdrawn.  Even

13   though you have no recollection of showing Mr. Waterhouse the

14   notes, he made it clear to you that he knew exactly what you

15   were talking about when you referred to the notes, correct?

16   A    Yes, sir.

17   Q    The notes were not a surprise to him, right?

18   A    No, sir.

19   Q    Mr. Waterhouse never told you that he was unaware of the

20   existence of the notes, correct?

21   A    No, sir.

22   Q    You knew when you signed both of your declarations that

23   Mr. Waterhouse was HCMFA's CEO and/or treasurer at the time

24   his signature was put on the notes, correct?

25   A    Yes, sir.

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 05/09/24    Page 178 of 276    PageID 36574

Sauter - Cross                                    57

 1  Q    Now, notwithstanding your conclusions in your first

 2  declaration, Mr. Waterhouse never admitted to signing the

 3  notes by mistake, correct?

 4  A    Meaning he never said that he signed the notes by mistake?

 5  Q    Correct.  He never told you that, right?

 6  A    Correct.

 7  Q    And that's why there's no reference in either of your

 8  declarations to Mr. Waterhouse admitting that he signed the

 9  notes by mistake, correct?

10  A    That's right.

11  Q    There's nothing in either of your declarations that

12  suggests Mr. Waterhouse didn't sign or authorize the signing

13  of his signature on the notes, correct?

14  A    I don't think that that's accurate.

15  Q    Mr. Waterhouse did not ever tell you that he's sure he

16  didn't authorize the signing of the notes on his behalf,

17  correct?

18  A    He did not.

19  Q    And the declaration never says that Mr. Waterhouse

20  admitted to having his signature affixed without authority,

21  correct?

22  A    He never said that to me.

23  Q    Now, you specifically asked Mr. Waterhouse, who approved

24  the notes and what was the process?  Correct?

25  A    I did.

Sauter - Cross                              58

 1    Q    And this is something that you asked him way back in April

 2    or May, right?

 3    A    That's correct.

 4    Q    And Mr. Waterhouse was very clear to you back in April or

 5    May that he couldn't describe the process.  Correct?

 6    A    That's correct.  Correct.

 7    Q    But he also told you, "The money was transferred, so we

 8    signed the notes."  Correct?

 9    A    I don't -- I don't know if those were his exact words, but

10    yes, conceptually, that was his statement.

11    Q    And that's how you personally recall his statement,

12    correct?

13    A    Yes.  I personally recall that he said if the money was

14    transferred there had to be a note to document the transfer of

15    funds.

16    Q    You didn't put that in your declaration, correct?

17    A    I -- I don't know that I did, but I don't know that I

18    didn't.  I don't have my declaration committed to memory.

19    Q    I'm sure if it's in there Mr. Rukavina will point it out.

20         So you knew back before HCMFA first sought leave to amend

21    its complaint that Mr. Waterhouse couldn't describe the

22    process by which the notes were created, correct?

23    A    That's correct.

24    Q    And even though you had no personal knowledge of the

25    circumstances surrounding the creation of the notes, you're

1   the only person in the world that you know of that told Mr.

2   Waterhouse he made a mistake in signing the notes.  Correct?

3   A    I'm sorry.  Say that again?

4   Q    Even though you have no personal knowledge of any of the

5   facts or circumstances surrounding the creation of the notes,

6   you told Mr. Waterhouse that he made a mistake when his

7   signature was put on them.  Correct?

8   A    I -- I don't think I ever said to Mr. Waterhouse, you made

9   a mistake.  I certainly asked him that question.

10  Q    Well, you recall during your investigation you told Mr.

11  Waterhouse that he made a mistake, correct?

12  A    I -- I asked him whether he made a mistake and whether it

13  had gone through legal and ethical (garbled) analysis.

14        MR. MORRIS:  Can we call up Mr. Sauter's deposition

15  transcript?  I'm sorry, La Asia, I forget what the deposition

16  -- what the exhibit number is.  And go to Page 57.  I'm sorry.

17  Page 56 at the bottom.

18  BY MR. MORRIS:

19  Q    Mr. Sauter, were you asked these questions and did you

20  give these answers, starting on Page 56, Line 24:

21        "Q    Okay.  But did you tell him that he made a

22        mistake?

23        "A    I think I implied it.

24        "Q    Do you have a recollection of actually telling

25        him that he made a mistake?

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 181 of 276   PageID 36577

Sauter - Cross                                    60

1        "A    That would be my recollection.    Obviously, he

2        disagrees with me."

3        Were you asked those questions and did you give those

4    answers in your deposition?

5    A    Yes, sir.

6    Q    Okay.  And you concluded that Mr. Waterhouse made a

7    mistake, even though you have no personal knowledge of

8    anything that happened in connection with the TerreStar

9    valuation issue.  Correct?

10   A    That's correct.

11   Q    And you concluded that Mr. Waterhouse made a mistake, even

12   though you were not involved in any of the decisions that were

13   made in connection with the TerreStar valuation issue,

14   correct?

15   A    I was not involved in the decisions.  That's -- that's

16   correct.

17   Q    And you concluded that Mr. Waterhouse made a mistake even

18   though you weren't involved and had no responsibility for

19   formulating HCMFA's response to the SEC, correct?

20   A    That's correct.

21   Q    And you concluded that Mr. Waterhouse made a mistake even

22   though you had no responsibility or involvement in the

23   decision as to how HCMFA was going to fund the NAV losses,

24   correct?

25   A    That's correct.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 06/20/24   Page 182 of 276   PageID 36578

Sauter - Cross                                    61

1   Q   And you concluded that Mr. Waterhouse made a mistake even

2   though you had no responsibility or involvement in formulating

3   HCMFA's report to GAF, the fund, the Global Allocation Fund.

4   Correct?

5   A   That's correct.

6   Q   And, again, despite not having any of that personal

7   knowledge, you told Mr. Waterhouse or you implied that he made

8   a mistake in executing the notes, correct?

9   A   That's correct.

10  Q   And Mr. Waterhouse obviously disagreed with you.  Correct?

11  A   That's correct.

12  Q   But you didn't inform the Court last spring that you

13  interviewed Mr. Waterhouse, the treasurer of HCMFA, the person

14  whose signature appears on the notes, you didn't tell the

15  Court that Mr. Waterhouse disagreed with your conclusion,

16  correct?

17  A   That was -- that would have been supposition on my part,

18  but no, I did not.

19  Q   What would be supposition?

20  A   Stating that Mr. Waterhouse disagrees with my conclusions.

21  Q   He obviously disagreed with your conclusions, correct?

22  Those are your words, correct?

23  A   I believe he disagreed with my conclusions, yes.

24  Q   But you didn't tell the Court that back in the spring, did

25  you?

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 06/30/24    Page 183 of 276    PageID 36579

Sauter - Cross                                    62

 1  A    No, sir, I did not.

 2  Q    And Mr. Waterhouse didn't just disagree with you, did he?

 3  A    I'm sorry?

 4  Q    Mr. Waterhouse didn't just disagree with the notion that a

 5  mistake was made, correct?  He actually told you exactly why

 6  the notes were created.  Isn't that right?

 7  A    I -- I don't agree with that.

 8  Q    During these private interviews that you had with Mr.

 9  Waterhouse, Mr. Waterhouse told you exactly why he believed

10  the notes were created, correct?

11  A    He told me why he believed the notes were created, yes.

12  Q    And so he did, in fact, remember the facts and

13  circumstances concerning the notes, correct?

14  A    I would stand by my earlier comment that he told me why he

15  believed the notes were signed.  I don't know that his memory

16  of the events is crystal clear.

17  Q    But it certainly was his belief, right?

18  A    Yes, sir.  I would agree with that.

19  Q    And he's the person whose signature appears on the notes,

20  correct?

21  A    Yes, sir.

22  Q    And he was the treasurer of HCMFA at the time the notes

23  were created, correct?

24  A    He was.

25  Q    Mr. Waterhouse specifically told you, "We transferred the

Sauter - Cross                                    63

1    money so I executed the notes.  HCMFA didn't have the money to

2    pay GAF and so we transferred it from HCMLP and I executed the

3    notes."  That's what he told you, correct?

4    A    Something along those lines, yes.

5    Q    That's exactly what he told you, right?

6    A    I don't know that that's verbatim, but yes, that's my

7    recollection of what he said.

8    Q    And Mr. Waterhouse went even further in describing the

9    facts and circumstances concerning the notes, including an

10   explanation to you of why the notes were prepared.  Correct?

11   A    Could you expand on that?

12   Q    Sure.  Mr. Waterhouse specifically told you that the notes

13   were prepared for accounting purposes, right?

14   A    That was one of the reasons, yes.

15   Q    Uh-huh.  And he told you -- it's your specific

16   understanding that both HCMFA and Highland disclosed the

17   existence of the notes to their respective outside auditors

18   within thirty days of their execution, correct?

19   A    Yes, sir.

20   Q    In fact, it's your understanding that the notes were

21   prepared for the audit, correct?

22   A    I -- no, I don't know for certain that they were prepared

23   for the audit.  But I don't disagree that they were disclosed

24   to the auditors.

25            MR. MORRIS:  Can we go to Page 71, please?

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 05/09/24    Page 185 of 276    PageID 36581
Exhibit 27    Page 65 of 145

                                Sauter - Cross                          64

1        Your Honor, there's an objection that Mr. Rukavina lodged

2    that I would ask the Court to rule on before I examine Mr.

3    Sauter once we put it up on the screen.  So, it's Page 71,

4    Lines 4 through 9.  Yes.

5                THE COURT:  Okay.  Overrule the objection.

6    BY MR. MORRIS:

7    Q    It's your understanding that the notes were prepared for

8    the audit, correct?

9    A    In reading my testimony, yes, I think that's -- that's

10   part of the reason that they were prepared.

11   Q    Okay.  And -- but you never told the Court that, right?

12   You never told the Court of your understanding as to the

13   purpose of the preparation of the notes?

14   A    I don't believe I mentioned the audit in my declaration.

15   No, sir.

16   Q    You didn't mention to the Court in either declaration that

17   it was your understanding that the notes were prepared for the

18   audit, correct?

19   A    I don't think I mentioned the audits in my declarations.

20   That's -- that's correct.

21   Q    Okay.  Now, the preparation of the audit, that is right in

22   Mr. Waterhouse's wheelhouse, correct?

23   A    Yes, sir.

24   Q    You know that Mr. Waterhouse is responsible for overseeing

25   the preparation of HCMFA's audited financial statements,

Sauter - Cross                                    65

1    correct?

2    A    Yes, sir.

3    Q    And Mr. Waterhouse, the person responsible for the audit,

4    the person whose name appears on the notes, the person who was

5    the treasurer of HCMFA at the time, he specifically told you,

6    quote, if the money was transferred, he had to have a note to

7    go with it.  Correct?

8    A    Yes.  That's what he told me.

9    Q    And the money was transferred, correct?

10   A    That's my understanding.

11   Q    You don't -- you have no reason to believe -- in fact, Mr.

12   Rukavina, if you heard in his opening, acknowledged that the

13   money was transferred, correct?

14   A    Yeah.  I have no reason to deny that.

15   Q    But you did not inform the Court that the person whose

16   signature appears on the notes explained to you the purpose

17   and origin of them, correct?

18   A    I believe I did have some explanation for the purpose and

19   origin as it was conveyed to me by Mr. Waterhouse.

20   Q    Well, you told the Court in your declaration that's on

21   file right now that Mr. Waterhouse, "did not remember many, if

22   any, of the facts and circumstances concerning the HCMFA

23   notes."  Isn't that right?

24   A    I believe that's -- that's in my declaration.  Yes, sir.

25   Q    Okay.  And you signed that declaration and you filed it

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 06/09/14    Page 187 of 276    PageID 36583

Sauter - Cross                                    66

 1    with the Court, even though you knew that the notes were

 2    prepared in connection with the audit, correct?

 3    A    I believe that's one of the reasons the notes were

 4    prepared.  Yes, sir.

 5    Q    There are other statements in your declarations that Mr.

 6    Waterhouse also specifically disagreed with, correct?

 7    A    I don't know that I've ever spoken with Mr. Waterhouse

 8    regarding my declaration.

 9    Q    Okay.

10         MR. MORRIS:  If we can go back to the first

11    declaration, Paragraph 30.

12    BY MR. MORRIS:

13    Q    Okay.  Do you see the third point, towards the end of the

14    paragraph?  It says, "It therefore appears that Waterhouse

15    prepared the notes for some internal accounting or other

16    purpose."  Do you see that?

17    A    Yes, sir.

18    Q    And you raised that issue with Mr. Waterhouse, correct?

19    A    I'm sorry.  We discussed that the notes were prepared

20    because, as I said, the money was transferred and so Mr.

21    Waterhouse was of the opinion, if the money is transferred,

22    there had to be a note.

23    Q    Okay.  And then the second point that you make, --

24         MR. MORRIS:  If we could just go up a little bit.

25    BY MR. MORRIS:

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Page 188 of 276   PageID 36584
Exhibit 27   Page 0800 of 745

Sauter - Cross                              67

1  Q    It says, "Second, it appears that Mr. Waterhouse assumed

2  incorrectly that the funds being paid by the Debtor were a

3  loan to HCMFA."  Did I read that part correctly?

4  A    You did.

5  Q    And you specifically raised that issue that I just raised

6  with Mr. Waterhouse.  Isn't that right?

7  A    I did.

8  Q    And Mr. Waterhouse would not agree that he made any

9  mistaken assumption, correct?

10 A    That's correct.

11 Q    Mr. Waterhouse refused to admit that he incorrectly

12 assumed that the funds being paid by the Debtor were a loan to

13 HCMFA.  Isn't that right?

14 A    I'm sorry, could you say that one more time?

15 Q    Mr. Waterhouse refused to admit that he made an incorrect

16 assumption concerning the funds being paid by the Debtor to

17 HCMFA.

18 A    Yes, sir.  That's correct.

19 Q    Okay.  And you didn't tell that to the Court in May

20 either, correct?

21 A    I did not.

22 Q    Let's talk about some things that you didn't cover during

23 your investigation that led you to conclude that Mr.

24 Waterhouse signed the notes by mistake and without authority.

25 You never asked Mr. Waterhouse how Highland treated the notes

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 01/09/24   Page 189 of 276   PageID 36585
                              Exhibit 27   Page 69 of 145

                              Sauter - Cross                           68

1   on its books and records, correct?

2   A    That's correct.

3   Q    So when you concluded that the notes were signed based on

4   a mutual mistake, you were unaware that Highland carried the

5   notes at all times as assets on its balance sheet, correct?

6   A    That's correct.

7   Q    You never asked Mr. Waterhouse how HCMFA treated the notes

8   in its books and records, correct?

9   A    That's correct.

10  Q    So when you concluded that the notes were signed based on

11  a mutual mistake, you did not know that HCMFA carried those

12  notes at all times as liabilities on its balance sheet,

13  correct?

14  A    That's correct.

15  Q    We've talked about the audited financial statements, but

16  you never reviewed those as part of your investigation,

17  correct?

18  A    That's correct.

19  Q    So when you concluded that the notes were mistakenly

20  signed, you were unaware that HCMFA had disclosed the

21  existence of the notes in its own audited financial

22  statements, correct?

23  A    That's correct.

24  Q    But you know that now, right?

25  A    I do know that now.

Sauter - Cross                                    69

1    Q    And you can't tell me whether HCMFA made yet another

2    mistake by including the notes in its audited financial

3    statements, correct?

4    A    I'm sorry.  You said yet another mistake?

5    Q    Yeah.  You can't tell me that the inclusion of the notes

6    in the audited financial statements was a mistake.  Isn't that

7    right?

8    A    That -- that's correct.  That's not a decision that I

9    make.

10   Q    And you would agree that your assertion that the notion

11   that the notes were signed by mistake is contradicted by

12   HCMFA's own audited financial statements, correct?

13   A    I would agree that -- that the notes are shown on the

14   audited financial statements without any qualification.

15   Q    All right.  Let's talk about some other things that -- now

16   that you did know last spring, in addition to the stuff we

17   talked about.  In your first declaration, --

18             MR. MORRIS:  If we could go to the first declaration,

19   Paragraph 27.

20   BY MR. MORRIS:

21   Q    You told the Court that HCMFA accepted responsibility for

22   the NAV error and paid approximately $5.2 million on February

23   15, 2019.  Correct?

24   A    Yes, sir.

25   Q    But the money used to pay the Global Allocation Fund

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 01/09/24    Page 191 of 276    PageID 36587
Exhibit 27    Page 109 of 145

Sauter - Cross                                    70

1    didn't come from Highland, did it?

2    A    I don't know that.

3    Q    Well, the money came from insurance proceeds and HCMFA's

4    funding of their deductible, correct?

5    A    I believe that that's what's indicated in the memo that

6    I've read.

7    Q    And you read that memo before you submitted your first

8    declaration; isn't that right?

9    A    Yes, sir.  I believe so.

10   Q    And that memo -- and we'll look at it in a moment -- that

11   memo specifically discloses HCMFA's receipt of approximately

12   $5 million of insurance proceeds in connection with the NAV

13   error, correct?

14   A    Yes, sir.

15   Q    But you didn't tell the Court that you had a document in

16   your possession that showed that HCMFA received $5 million in

17   connection with the NAV error, did you?

18   A    I did not.

19   Q    Instead, you speculated that Highland may have tapped into

20   its insurance.  Isn't that right?

21   A    Yeah, I -- the fact of the matter is I don't know much

22   about the settlement of the insurance claim.

23   Q    Well, but before signing your declaration, you reviewed a

24   document that specifically described how the NAV losses were

25   being financed by HCMFA; isn't that right?

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 07/20/23    Page 192 of 276    PageID 36588
Exhibit 7    Page 7209/145

                              Sauter - Cross                          71

 1   A    I don't know that I would say financed, but yes, the NAV

 2   losses were being paid by HCMFA to Global Allocation Fund.

 3   Yes, sir.

 4   Q    Okay.

 5            MR. MORRIS:  Can we put up Exhibit 31?

 6   BY MR. MORRIS:

 7   Q    All right.  This is a memo from HCMFA to the board of the

 8   Highland Global Allocation Fund dated May 28, 2019.  Do you

 9   see that?

10   A    Yes, sir.

11   Q    And what's the memo entitled?

12   A    Resolution of the Fund's Net Asset Value Error.

13   Q    Okay.  And this is one of the three to five memos that you

14   reviewed before signing your first declaration, correct?

15   A    Yes, sir.

16   Q    And this memo -- in this memo, HCMFA is describing for the

17   board the resolution of the NAV error, correct?

18   A    Yes, sir.

19   Q    Okay.

20            MR. MORRIS:  Before we get to the insurance issue,

21   can we just scroll down to the second paragraph?  Okay.

22   BY MR. MORRIS:

23   Q    And let me know if I'm reading this correctly.  The second

24   paragraph of the memo that HCMFA sent to the board of the

25   Highland Global Allocation Fund says, "The Advisor and

Sauter - Cross                        72

1    Houlihan Lokey, an independent third-party expert valuation

2    consultant approved by the board, initially determined that

3    the March transactions were non-orderly and should be given

4    zero weighting for purposes of determining fair value.  As

5    reflected in the consultation, the Advisor ultimately

6    determined that both March transactions should be classified

7    as orderly.  The fair valuation methodology adopted, as

8    addressed in the consultation, weights inputs -- weights

9    inputs and does not reflect last sales transaction pricing

10   exclusively in determining fair value.  The orderly

11   determination and adoption of the weighted fair value

12   methodology -- fair value -- fair valuation methodology

13   resulted in NAV errors in the Fund."  And they define that as

14   the NAV error.

15        Have I read that correctly?

16   A    Yes, sir.

17   Q    Okay.  Highland Capital Management, LP is not mentioned in

18   that paragraph, correct?

19   A    No, sir.

20   Q    In fact, there is nothing anywhere in this memo that tells

21   the board that Highland is responsible for the NAV error.

22   Correct?

23   A    That's correct.

24   Q    But Houlihan Lokey is mentioned, correct?

25   A    Yes.  Because Houlihan is -- was retained or authorized to

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 07/09/24   Page 194 of 276   PageID 36590

Exhibit 7   Page 7409 of 7445

Sauter - Cross                                        73

 1  be retained in connection with valuation services by the

 2  board.

 3  Q   Okay.  They're a third-party valuation firm, right?

 4  A   That's correct.

 5  Q   And they were approved by the board, as you just

 6  mentioned, correct?

 7  A   Yes, sir.

 8  Q   And it's your understanding that Houlihan Lokey did the

 9  valuation of TerreStar, correct?

10  A   I think Houlihan Lokey would have had input on TerreStar

11  valuation, but they would have done so in conjunction with the

12  valuation team at Highland.

13  Q   It's your understanding that Houlihan Lokey did the

14  valuation of TerreStar, correct?

15  A   No, sir.  I think Houlihan Lokey would have worked in

16  conjunction with the valuation team at Highland to prepare the

17  valuation.

18  Q   Okay.

19         MR. MORRIS:  Can we go to Page 87 of Mr. Sauter's

20  transcript, please?

21         THE COURT:  Mr. Morris, after you're through with

22  this subject matter, we're going to have to take a break.  How

23  much more do you have on this particular line of questioning?

24         MR. MORRIS:  I would -- just a moment.  And I don't

25  think I have more than ten minutes after that.  But I'm happy

Sauter - Cross                              74

 1  to take a break, Your Honor.

 2          THE COURT:  Okay.  Let's take a ten-minute break.

 3  And I'll let you all know, I have a 1:30 matter, and it's

 4  about ten after 12:00 now.  So we need to be thinking about --

 5  when we come back, I need to know about how much more we need

 6  collectively, okay?

 7          MR. MORRIS:  Yes, Your Honor.

 8          THE CLERK:  All rise.

 9      (A recess ensued from 12:05 p.m. until 12:15 p.m.)

10          THE CLERK:  All rise.

11          THE COURT:  All right.  Please be seated.  All right.

12  We're back on the record in Highland.  Mr. Morris, you may

13  proceed with your questions of Mr. Sauter.  Mr. Sauter, you're

14  still under oath.

15          MR. MORRIS:  All right.  And in response to your

16  question, Your Honor, I don't think I'll have more than about

17  ten or twelve minutes.  And I don't expect to need more than

18  five or ten minutes in my closing.

19          THE COURT:  Okay.

20  BY MR. MORRIS:

21  Q   Mr. Sauter, if you could take a look, please, at Page 87,

22  Lines 2 through 9.  Were you asked these questions and did you

23  give these answers:

24      "Q   Okay.  Who's Houlihan Lokey?  Do you know who

25      Houlihan Lokey is?

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 06/08/24   Page 196 of 276   PageID 36592
Exhibit 27   Page 7609 of 7745

Sauter - Cross                          75

1       "A   It's a third-party valuation firm.

2       "Q   Do they have a good reputation?

3       "A   Yes.

4       "Q   And did they do the valuation of TerreStar?

5       "A   That's my understanding.

6       Did you give those answers to those questions, sir?

7    A   Yes, sir.

8    Q   Okay.  And you don't know if anyone's ever suggested that

9    Houlihan Lokey was responsible for the valuation error,

10   correct?

11   A   I don't know whether anybody ever suggested that or not.

12   Q   And that's because -- and that's because you never asked.

13   Fair?

14   A   I suppose that's fair.

15   Q   Okay.

16          MR. MORRIS:  Now, if we could go back to Exhibit 31,

17   please, that second paragraph.

18   BY MR. MORRIS:

19   Q   You would agree with me that the second paragraph, to the

20   best of your knowledge -- withdrawn.  You would agree with me

21   that in the second paragraph HCMFA accurately defined NAV

22   error for the GAF board, correct?

23   A   Based upon my understanding of the NAV error, yes, I would

24   say that is correct.

25   Q   In fact, at the time of your deposition, you had no reason

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 07/09/24   Page 197 of 276   PageID 36593
Exhibit 27   Page 709 of 745

Sauter - Cross                              76

1   to believe that HCMFA had inaccurately defined NAV error for

2   the GAF board, correct?

3   A   That's correct.

4   Q   But when you signed your first declaration, you didn't use

5   HCMFA's definition of NAV error, did you?

6   A   I don't recall.  I mean, if you could show me, I think

7   that would help me.

8   Q   Sure.

9        MR. MORRIS:  Can we put back the first declaration

10   and go to Paragraph 25?

11   BY MR. MORRIS:

12   Q   In Paragraph 25, you define NAV error as, "The Debtor made

13   a mistake in calculating the NAV."

14        Have I read that correctly?

15   A   You did.

16   Q   That's pretty different than the way HCMFA described the

17   NAV error in its memo to the GAF board, correct?

18   A   I think we're talking about two different things.  But

19   yes, I would agree that they are different --

20   Q   And you knew --

21   A   -- definitions.

22   Q   And you knew when you signed this declaration that HCMFA

23   had defined NAV error in the manner set forth in its

24   memorandum to the GAF board, correct?

25   A   I suppose so.  But, again, I think we're talking about two

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 07/08/24    Page 198 of 276    PageID 36594
Exhibit 27    Page 080 of 145

Sauter - Cross                          77

 1  different things.

 2  Q    Okay.  You didn't use HCMFA's definition of NAV error in

 3  your declaration, correct?

 4  A    I don't believe I described the nature of the NAV error.

 5  No, I did not.

 6  Q    And you didn't -- you didn't make the Court aware of

 7  HCMFA's definition of NAV error at the time you submitted this

 8  declaration, correct?

 9  A    I did not.

10  Q    All right.  Let's go back to the insurance issue and the

11  source of funding.  You wrote in Paragraph 27 of your

12  declaration that the first payment was made in February 2019,

13  correct?

14          MR. MORRIS:  We can go back.  Yeah.  Right there at

15  the bottom.

16          THE WITNESS:  Yes.  Based upon the records that were

17  available to me, yes, I think that's accurate.

18  BY MR. MORRIS:

19  Q    And that was -- that was just over $5 million, right?

20  A    Correct.

21  Q    All right.  Now let's go back to the memo to the board

22  that you had in your possession at the time you signed your

23  declaration.  And if we could look at the second page.  This

24  second page is entitled, NAV Error Breakdown and Make Whole

25  Payments.  Do you see that?

Sauter - Cross                              78

1    A    Yes, sir.

2    Q    And you understand that the first row shows that the total

3    estimated net loss resulting from the NAV error was

4    approximately $7.44 million, correct?

5    A    Yes, sir.

6    Q    And you understood that the chart depicts the sources that

7    were going to be called upon to fund the $7.44 million payment

8    from HCMFA to the GAF, correct?

9    A    Yes.  That's what it purports to state.

10   Q    And you understood before you signed your declaration that

11   the GAF board was told in this chart that about $5 million of

12   the total loss was being funded through HCMFA's insurance,

13   correct?

14   A    I don't know whose insurance it was, but yes, it states

15   that there's $4.939 million in insurance proceeds.

16   Q    Did you ask anybody whose insurance proceeds those were?

17   A    I don't recall.

18   Q    But this also says that the deductible was paid by the

19   Advisor, correct?

20   A    That's what it says.  Yes, sir.

21   Q    Okay.  Does that lead you to conclude that it's the

22   Advisor's insurance?  If they were paying the deductible?

23   A    Not necessarily.

24   Q    Okay.  But despite having a document that showed $5

25   million coming from insurance, you didn't ask anybody about

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 08/09/21    Page 200 of 276    PageID 36596
Exhibit 27    Page 80 of 145

Sauter - Cross                                        79

1  whose insurance policy that was being tapped, right?

2  A    At the time, I did not.  No, sir.

3  Q    And you never disclosed to the Court, either last spring

4  or in connection with this motion, that there were insurance

5  proceeds of $5 million that were used to pay about two-thirds

6  of the total net loss for the NAV error, correct?

7  A    No, sir.

8  Q    You have no reason to believe that the source of the

9  funding of the $7.44 million was anything other than what's on

10 this page, correct?

11 A    No, sir, I don't -- I wouldn't know beyond what's on this

12 page.

13 Q    Okay.  And this memo was dated at the end of May 2019; is

14 that right?

15 A    I'll take your word for it, or you can show me, but --

16 Q    Yeah.  No problem, Mr. Sauter.

17        MR. MORRIS:  Let's go back to the top.

18 BY MR. MORRIS:

19 Q    Okay.  Do you see it's May 28, 2019?

20 A    Yes, sir.

21 Q    And that's --

22 A    I agree.  Yes.

23 Q    And that's weeks after Highland's transfer of the $7.4

24 million, correct?

25 A    Yes, sir, I believe so.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 01/09/24   Page 201 of 276   PageID 36597

Sauter - Cross                          80

1  Q    Okay.  But there's nothing in this report to the board

2  that discloses that Highland made any payment towards the

3  funding of the net losses arising from the NAV error, correct?

4  A    No, nothing in this document indicates that Highland paid

5  for the net losses, the NAV error.

6  Q    And you don't know if HCMFA ever returned the insurance

7  proceeds to the carrier after receiving the $7.4 million from

8  Highland, correct?

9  A    I do not.

10  Q    And that's because you never asked, correct?

11  A    That -- correct.

12  Q    Okay.  Now, after completing your investigation last

13  spring, you learned that on May 3, 2019 HCMFA needed another

14  $5 million for a matter completely unrelated to the NAV error.

15  Correct?

16  A    I'm sorry.  Say that again?

17  Q    After your investigation was completed, you learned that

18  on May 3, 2019 HCMFA needed $5 million for a purpose

19  completely unrelated to the NAV error, correct?

20  A    I can't specify the date, but yes, I did learn that there

21  was a need for additional -- additional funding.

22  Q    And in fact, Mr. Norris told you that Highland transferred

23  $5 million on May 3, 2019 because HCMFA needed that money to

24  pay what is known as a consent fee.  Correct?

25  A    Again, I'm not sure about the exact dates, but yes, that's

 1  correct.

 2  Q    Your declaration -- neither of your declarations disclose

 3  anything about the $5 million consent fee that Mr. Norris told

 4  you about, correct?

 5  A    No, sir.

 6  Q    Neither of your declarations discloses that Mr. Norris

 7  specifically told you that the $5 million transferred by

 8  Highland on May 3rd was to enable HCMFA to pay a consent fee,

 9  correct?

10  A    I don't know that Mr. Norris ever said that to me.

11  Q    Well, -- (pause).

12          MR. MORRIS:  Can we go to Page 104 of Mr. Sauter's

13  transcript, please?

14  BY MR. MORRIS:

15  Q    I'm going to read from Page 104, Line 19, through Page

16  105, Line 6.  Sir, were you asked these questions and did you

17  give these answers:

18      "Q    During  your  discussions  as  part  of  your

19      investigation with Mr. Norris and Mr. Post and Mr.

20      Dondero and Mr. Waterhouse, did anybody tell you why

21      Highland paid HCMFA $5 million on May 3, 2019?

22      "A    Yes.

23      "Q    And why did -- what did they tell you?

24      "A    It was a payment for a consent fee.

25      "Q    All right.  Okay.  Who told you that?

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 08/30/24    Page 203 of 276    PageID 36599
Exhibit 7    Page 83 of 145

Sauter - Cross                                82

1        "A    Mr. Norris."

2        Did you give those questions -- answers to my questions,

3    sir?

4    A    You read it correctly.

5    Q    Okay.  But you never told the Bankruptcy Court what Mr.

6    Norris told you about the -- about the May 3, 2019 payment,

7    correct?

8    A    No, sir.

9    Q    Before preparing your declaration, you spent time

10   reviewing the Debtor's bankruptcy filings, correct?

11   A    Yes, sir.

12   Q    And it's your understanding that the documents on the

13   docket are publicly available; is that right?

14   A    Yes, sir.

15   Q    And based on the documents on the docket, you were aware

16   that throughout the bankruptcy case the Debtor disclosed the

17   HCMFA promissory notes as assets of the bankruptcy estate,

18   correct?

19   A    Yes, sir.

20   Q    And you'll agree that Highland's view of the notes is

21   reflected in its audited financial statements, its books and

22   records, and its court filings, correct?

23   A    Yes, sir.

24   Q    One other thing you learned during your investigation is

25   that Mr. Waterhouse expressly told you that he did not prepare

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Filed 08/09/24    Page 204 of 276    PageID 36600
Exhibit 27    Page 8409 of 145

Sauter - Cross                                    83

1   the notes, correct?

2   A    That's correct.  He said he would not have prepared the

3   notes.

4   Q    So you didn't need metadata to know that Mr. Waterhouse

5   didn't prepare the notes because you knew that last spring,

6   correct?

7   A    I wouldn't necessarily agree with that statement.

8   Q    Well, the metadata may show you who prepared the notes,

9   but you didn't need the metadata to know that it wasn't Mr.

10  Waterhouse, correct?

11  A    That is correct.

12  Q    And Mr. Waterhouse also specifically told you that no

13  formal process was followed to create the notes, correct?

14  A    That's not accurate.  Or at least not entirely accurate.

15  Q    Mr. Waterhouse told you, in response to your question, he

16  couldn't -- he couldn't describe any process that was filed --

17  followed in creating the notes.  Correct?

18  A    He couldn't recall specifically what happened, but he told

19  me what he thought would have happened --

20  Q    Um, --

21  A    -- in the creation of the notes.

22  Q    During your conversations with Mr. Waterhouse, he also

23  told you that the legal department was not involved, correct?

24  A    That's not accurate.

25  Q    Okay.

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 08/09/24    Page 205 of 276    PageID 36601

Sauter - Cross                          84

1              MR. MORRIS:  Can we put up on the screen, please, Mr.

2     Sauter's testimony from Page 63?

3     BY MR. MORRIS:

4     Q    I'm reading from Line 12 through -- let's just go to Line

5     3 at Page 64 for the moment.

6          "Q    What's  the  basis  for  your  statement  that  it

7          appeared the Debtor had no intention that there would

8          be notes or that there would be a loan transaction?

9          "A    If   you're   talking   about   a   $7.4   million

10         obligation, I would assume there would be a process

11         internally on who was responsible for the payment of

12         the  fees  for  the  --  or  the  expenses  for  the  NAV

13         error.    Based   on   my   discussions   with   Frank

14         Waterhouse,   there   was   no   process   or   the   legal

15         department was not involved in making a determination

16         as to whether there should be notes.  It was merely a

17         ministerial  act  that  Accounting  performed  when  they

18         transferred the funds to pay GAF."

19         Have I read that correctly?

20    A    Yes, sir.

21    Q    So you knew, based on your interviews with Mr. Waterhouse

22    last April and May, that Mr. Waterhouse couldn't describe any

23    process for the creation of the notes, correct?

24    A    I think you're asking a separate question.  So I can't say

25    yes or no to that answer without expanding upon it.

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-27    Page 9001445    Page 206 of 276    PageID 36602

Sauter - Cross                                    85

1  Q    Okay.  Mr. Waterhouse didn't describe for you any process

2  that was followed for the creation of the notes, correct?

3  A    Again, he couldn't tell me the exact process that

4  occurred, but he told me what he thought would have occurred.

5  Q    Okay.  And during your private conversations with Mr.

6  Waterhouse, he also told you that the legal department was not

7  involved, correct?

8  A    That's not accurate.

9  Q    Did he tell you that the legal department was involved?

10  A    His statement to me was that if the notes were drafted,

11  they would have been drafted by the legal department.

12  Q    So when he told you that, did you ever talk to anybody?

13  Did you talk to Mr. Leventon or Mr. Ellington or any of the

14  other lawyers who had migrated?  Did you follow up with them,

15  --

16  A    Yes, sir.

17  Q    -- ask them -- to ask them what they did?

18  A    Yes, sir.

19  Q    How come you don't mention that anywhere in any of your

20  declarations?

21  A    Because that didn't give me any clarity to what -- what

22  transpired with the notes.

23  Q    It's not -- sir, as you sit here right now, you don't know

24  whether the legal department is involved in all of the notes

25  that are signed by Mr. Dondero and his affiliates; isn't that

1    right?

2    A    In a note of this size, I would fully expect the legal

3    department to have reviewed and approved a note of -- of this

4    nature.

5    Q    And that's just your opinion; isn't that right?

6    A    Yes.  Based upon having worked at NexPoint for the last

7    three years, yes, sir.

8    Q    Yeah.  It's your testimony -- but you cannot tell me, as

9    the general counsel of NexPoint, that the law department or

10    the legal department is involved in every note that's executed

11    by one of Highland's affiliates, correct?

12    A    I can't say definitively one way or another.  That's

13    correct.

14    Q    Okay.  Thank you very much.

15            MR. MORRIS:  Your Honor, I have no further questions.

16            THE COURT:  All right.  Redirect?

17            MR. RUKAVINA:  Yes.

18        Mr. Vasek, please pull up Mr. Waterhouse's deposition

19    transcript.  Go to Page 145.  Do you want to zoom in a little

20    bit, Julian?  Scroll down to the bottom.  Okay.

21                        REDIRECT EXAMINATION

22    BY MR. RUKAVINA:

23    Q    Now, Mr. Sauter, you are familiar with Mr. Waterhouse's

24    deposition transcript?

25    A    Actually, I've never read it.

Sauter - Redirect                87

1   Q    Okay.  Well, then this might be interesting to you.  So,

2   at the bottom here on 25, I start asking, "Did you ask someone

3   to draft" --

4              MR. RUKAVINA:  Please scroll down.

5   BY MR. RUKAVINA:

6   Q    -- "draft notes?"  And Mr. Waterhouse answers, "I don't

7   specifically ask people to draft notes, really.  I mean,

8   again, you know, the legal group at Highland is responsible

9   and has always been responsible for drafting promissory

10  notes."

11       So did you -- did you not know that that's how Mr.

12  Waterhouse testified until today?

13             MR. MORRIS:  Objection to the form of the question,

14  Your Honor.  He just said that he hasn't read the transcript.

15             THE COURT:  Sustained.

16             MR. MORRIS:  If Mr. --

17             MR. RUKAVINA:  Okay.

18             MR. MORRIS:  If Mr. --

19  BY MR. RUKAVINA:

20  Q    Well, does what Mr. Waterhouse testified to in this

21  transcript that you haven't read comport almost exactly with

22  what he told you in April or May of that year?

23  A    Yes.  That's exactly what he told me, is he would not have

24  signed a promissory note if it had not been prepared and

25  signed off by Legal.

Sauter - Redirect                    88

1   Q    Okay.

2          MR. RUKAVINA:  And scroll down a little bit more,

3   Julian, please.

4   BY MR. RUKAVINA:

5   Q    So, so I ask --

6          MR. RUKAVINA:  Sure.  We'll go to 22.  So I'm asked

7   to re-ask the question, Your Honor.  And I ask the question of

8   Mr. Waterhouse:  "Sure, Mr. Waterhouse.  Based on the practice

9   that you have described in your understanding, do you believe

10  that these notes would have been drafted by someone in the

11  legal department?"  And there's an objection from my co-

12  counsel, which I'll withdraw.  And Mr. Waterhouse answers yes.

13  BY MR. RUKAVINA:

14  Q    Does that also, Mr. Sauter, comport with what Mr.

15  Waterhouse told you when you interviewed him in April or May?

16         MR. MORRIS:  Objection to the form of the question,

17  Your Honor.  He hasn't seen the transcript.  Mr. Rukavina is

18  free to make this argument in his closing, but he shouldn't be

19  crossing his own witness with testimony that his witness has

20  never seen.  He's free to make the argument.  I'm not trying

21  to preclude him from making the argument.  But what I don't

22  want is an evidentiary record created by a witness with no

23  knowledge.

24         MR. RUKAVINA:  Your Honor, this transcript is in the

25  record from both of us.  And Mr. Morris was given great leeway

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 09/08/23   Page 210 of 276   PageID 36606
Exhibit 27   Page 90 of 145

Sauter - Redirect                    89

1   to take this witness through all kinds of questions,

2   insinuating that this witness was wrong or that he was

3   fabricating issues.  And I think it's perfectly legitimate for

4   me to present him with the actual person's testimony and ask

5   whether that testimony comports with what that person told Mr.

6   Waterhouse earlier in the year.

7           THE COURT:  I overrule the objection.

8   BY MR. RUKAVINA:

9   Q   Mr. Sauter, you just saw Mr. Waterhouse's answer.  Does

10  that answer comport with what Mr. Waterhouse told you last

11  spring about these notes?

12  A   Yes, it does.

13  Q   Okay.  So when you talked in your declarations about Mr.

14  Waterhouse's expectation that things would have gone through

15  Legal, that wasn't just supposition or, I'm sorry, speculation

16  on your part, was it?

17  A   No.  That's -- that's what he told me would have happened,

18  although he again indicated that he doesn't have any specific

19  recollection of the drafting of the notes or any emails --

20          MR. MORRIS:  Your Honor, I renew my objection.  Why

21  isn't the witness here?  He is an officer of HCMFA.  Why isn't

22  he here?  I didn't -- I would have had an opportunity now to

23  cross-examine him on these new issues.

24          THE COURT:  Okay.

25          MR. RUKAVINA:  Your Honor, he's not here because --

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 09/09/24   Page 211 of 276   PageID 36607
Exhibit 7   Page 91 of 145

Sauter - Redirect                              90

 1          MR. MORRIS:  So I'm objecting based on the best

 2    evidence rule.

 3          MR. RUKAVINA:  He's not here, Your Honor, because

 4    we're not trying the merits of the underlying lawsuit.  We're

 5    trying the sole question of why we took ten months to assert

 6    this defense.  That's why I objected earlier when Mr. Morris

 7    took this witness on a two-hour trip down cross-examination on

 8    irrelevant facts.

 9          THE COURT:  Okay.

10          MR. RUKAVINA:  And I think he's opened the door --

11          THE COURT:  I overrule the objection.  Continue.

12          MR. RUKAVINA:  Thank you.

13    BY MR. RUKAVINA:

14    Q    Do you recall my question, sir?

15    A    I'm sorry.  Could you repeat it?

16    Q    Actually, I think you were just answering the question

17    when Mr. Morris objected.

18          MR. RUKAVINA:  Mr. Vasek, go to Page -- oh, hold on a

19    sec, Mr. Vasek.

20    BY MR. RUKAVINA:

21    Q    Mr. Sauter, when you spoke to Mr. Waterhouse in April or

22    May, did you ask him whether he signed these notes?

23    A    I did.

24    Q    And what did he say?

25    A    He said, if my signature's on it, I would have signed it,

1   because at the time I was not using electronic signatures.

2   Q    Okay.  Thank you.

3   A    And he was unequivocal on that.

4   Q    Okay.

5        MR. RUKAVINA:  Go to Page 139, please, Mr. Vasek.

6   BY MR. RUKAVINA:

7   Q    Did you discuss with Mr. Waterhouse whether he would have

8   been -- strike that.  Did you discuss with Mr. Waterhouse who

9   in the organization would have had the authority to bind

10  anyone on notes of this size?

11  A    I did.

12  Q    Okay.  How did he respond?

13  A    He said that he would not have signed any promissory notes

14  unless they'd been signed off by Legal and signed off by Mr.

15  Dondero.

16  Q    Okay.  Now, when Mr. Morris was asking you some questions,

17  he asked you about whether you ever told Mr. Waterhouse that

18  he had made a mistake.  I think the implication was that, who

19  are you after the fact to tell him that he made a mistake?

20  So, so we'll look very quickly here on Page 139.  I'm asking

21  Mr. Waterhouse, I apologize if I asked you this already, but

22  has anyone ever told you at any time that you were not

23  authorized to sign the promissory notes that are the subject

24  of the sentence we're looking at?  And you see his answer is,

25  Not that I recall.

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 09/30/24    Page 213 of 276    PageID 36609
Exhibit 27    Page 309 of 145

Sauter - Redirect                    92

 1            MR. RUKAVINA:  Yeah.  And scroll down a little bit.

 2    And Your Honor can read it for herself, but it goes on:  Let

 3    me ask the question again.  Did anybody ever tell you at any

 4    time that you made a mistake?

 5        Scroll down a little bit.

 6        Not that I recall.

 7        And I apologize, Your Honor.  That was not me asking those

 8    questions.  That was Mr. Morris asking those questions.

 9    BY MR. RUKAVINA:

10    Q    So does that refresh your memory, Mr. Sauter, as to

11    whether you actually ever told Mr. Waterhouse that he made a

12    mistake?

13    A    Yeah.  I -- apparently, I never stated to Mr. Waterhouse

14    that -- that he made a mistake in executing the notes.

15    Q    Can you think of any reason why you -- why you would have

16    told him that?

17    A    No.  I -- I wouldn't.

18    Q    Okay.

19            MR. RUKAVINA:  Go to Page 317, please, Julian.

20    Scroll down a little bit.

21        Your Honor, actually, we will pull this down.  I'll argue

22    it at closing.  Go ahead, Mr. Vasek, pull that down, just to

23    hurry this up.  Okay.  Mr. Vasek, please pull up that SEC

24    memorandum.

25    BY MR. RUKAVINA:

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-7    Filed 09/06/24    Page 214 of 276    PageID 36610

Sauter - Redirect                                    93

1  Q   Mr. Sauter, are you familiar with this memorandum to the

2  SEC --

3              THE COURT:  Can you say for the record what we're

4  looking at, what exhibit?

5              MR. RUKAVINA:  Your Honor, yes.  I have not

6  introduced this one into evidence yet, so I want him to

7  authenticate it first.

8              THE COURT:  Okay.

9  BY MR. RUKAVINA:

10 Q   Are you familiar with this document, Mr. Sauter?

11 A   I am.

12 Q   Okay.  Is this a document that you relied on in giving Her

13 Honor your first and your second declarations?

14 A   Yes.  It's one of the documents I reviewed.

15 Q   Okay.

16             MR. RUKAVINA:  Your Honor, I'd move to admit this

17 document.  I have not filed an exhibit list because, again,

18 we're proceeding with appendices, so I don't know how to

19 describe it.  Maybe Rebuttal A.

20             THE COURT:  Is it on the docket attached to your

21 appendix?

22             MR. RUKAVINA:  No, Your Honor.  We'll have to --

23 we'll have to upload it or file it after this hearing.

24             THE COURT:  Well, okay.  I first ask, do we have an

25 objection to this because it wasn't disclosed?

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 17-7   Filed 09/09/24   Page 215 of 276   PageID 36611

Sauter - Redirect                          94

1          MR. MORRIS:  I do, for that very reason.  I don't --

2     I don't understand -- I don't -- I don't understand what's

3     happening.  It's his witness.  It's his motion.  He put forth

4     his evidence.  I don't know --

5          MR. RUKAVINA:  Your Honor, all that I can say is

6     that, again, this motion relates to whether Mr. Waterhouse

7     signed these notes.  Mr. Morris took this witness through

8     question upon question about this NAV error.  Mr. Morris did

9     not present -- just as he accuses this witness of not giving

10    the Court all the relevant information -- he has not presented

11    the Court with this relevant information, which is a document

12    where the Debtor's own employees, the Debtor's employees, are

13    saying we are responsible for this NAV error.  So I think that

14    it is a proper rebuttal.  It's -- I know it's weird to offer

15    an exhibit to rebut my own witness, but this is being done in

16    response to what Mr. Morris was asking him about earlier

17    today.

18         THE COURT:  All right.  Well, if it really indicates

19    what you --

20         MR. MORRIS:  Go ahead.

21         THE COURT:  -- say it indicates, then I guess it

22    would be rebuttal evidence.  So, --

23         MR. MORRIS:  Go right ahead, Your Honor.  No -- no

24    objection.

25         THE COURT:  Okay.  It'll be admitted.  And I guess we

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 09/09/24   Page 216 of 276   PageID 36612
Exhibit 7   Page 96 of 145

Sauter - Redirect                          95

 1    need to call this -- we're going to call it HCMFA's R-1 for

 2    Rebuttal 1.  Okay.  File it on the docket that way.

 3            MR. RUKAVINA:  Thank you, Your Honor.

 4        (HCMFA's Rebuttal Exhibit 1 is received into evidence.)

 5            THE COURT:  Go ahead.

 6            MR. RUKAVINA:  Scroll down a little bit, Julian,

 7    please.  Okay.  Stop there.

 8    BY MR. RUKAVINA:

 9    Q    So you see, Mr. Sauter, where it says the Advisor

10    representatives, Thomas Surgent, Frank Waterhouse, Jason Post,

11    and Lauren Thedford?  Do you see that?

12    A    Yes, sir.

13    Q    Whose employees were those at that time?

14    A    They were all employees of Highland Capital Management,

15    LP.

16    Q    Okay.

17            MR. RUKAVINA:  Scroll down a little bit more, please.

18    Do you see -- stop there.

19    BY MR. RUKAVINA:

20    Q    Do you see where NAV error is defined?

21    A    Yes, sir.

22    Q    Okay.  So obviously it speaks for itself, but define --

23    tell the Judge how you understood NAV error to be defined when

24    you were undertaking your investigation and when you were

25    preparing your declarations.

Sauter - Redirect                          96

1    A    In preparing my declaration, I was simply referring to the

2    mistake that occurred.  The NAV error resulted from some

3    trades that occurred that I would call, you know, outside of

4    the ordinary course of business or -- or not necessarily at

5    arm's length, and so they were determined to be, quote, non-

6    orderly.

7        I think when the SEC became involved, they made a

8    determination that they believed that the excluded trades were

9    orderly and should have been included in the calculation of

10   the NAV, which ultimately resulted in the NAV error.

11   Q    And is it fair to -- or, did the valuation of the

12   underlying fund have -- or its assets have any role in that?

13   A    No.  It would have been Houlihan Lokey and then the

14   valuation committee and I think the individuals listed above

15   and maybe a few others were on the valuation committee, but

16   it's my understanding that all of the employees on the

17   valuation committee were Highland Capital Management

18   employees.

19   Q    Okay.

20        MR. RUKAVINA:  Mr. Vasek, please pull up the shared

21   services agreement.

22        Your Honor, this agreement is in the record as part of Mr.

23   Sauter's declaration.  This is the HCMFA shared services

24   agreement.

25   BY MR. RUKAVINA:

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-27   Filed 09/08/23   Page 218 of 276   PageID 36614

Sauter - Redirect                    97

 1  Q    Are you familiar with this document?

 2  A    Yes, sir.

 3  Q    Okay.  And is this a document that you would have

 4  consulted as well in reaching your conclusion?

 5  A    Yes, sir.

 6  Q    Okay.

 7         MR. RUKAVINA:  And if you'll scroll to the bottom two

 8  pages, Mr. Vasek.

 9         Your Honor, this is Annex A.  This shows the services that

10  the Debtor was to be providing.

11         Zoom in a little bit.

12  BY MR. RUKAVINA:

13  Q    Do you see Compliance, General Compliance?  Do you see

14  that, sir?

15  A    Yes, sir.

16         MR. RUKAVINA:  And scroll down, Mr. Vasek.  The top

17  of the next page.

18  BY MR. RUKAVINA:

19  Q    Do you see Valuation Committee?  Do you see that, Mr.

20  Sauter?

21  A    Yes, sir.  Yes, sir.

22  Q    Were compliance and valuation committee, as part of your

23  understanding and investigation, did those services have

24  anything to do with the NAV error?

25  A    Yes, it does.  The Valuation Committee was primarily

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 09/09/24   Page 219 of 276   PageID 36615

Sauter - Redirect                                    98

1   responsible for setting the valuation, with the input of

2   Houlihan Lokey, and that's what ultimately resulted in the NAV

3   error.

4   Q    Did you discuss this NAV error with Mr. Dondero?

5   A    I'm sure I did at some point.

6   Q    Okay.  Well, did you -- did you discuss with Mr. Dondero

7   why he told Mr. Waterhouse to transfer $7.4 million to HCMFA?

8   A    I did, after the fact, after discussing it with Mr.

9   Waterhouse.

10  Q    Okay.  And did -- what did Mr. Dondero tell you?

11  A    I mean, generally speaking, you know, he wouldn't have

12  been involved in the determination of the NAV error.  And, you

13  know, I don't know that he recalled any authorization to

14  execute notes from HCMFA to HCMLP in connection with the --

15  with the NAV error.

16  Q    But did he tell you that this was intended by him to be a

17  loan?

18  A    I don't know that he ever said that.

19  Q    Did he indicate to you any surprise that this was carried

20  as a loan?

21  A    I don't know that he would have indicated any surprise.  I

22  think he relied upon Accounting and Legal to make these

23  determinations and provide input to him.

24  Q    Okay.

25              MR. RUKAVINA:  Mr. Vasek, if you'll pull up, please,

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Exhibit 29   Page 100 of 145   Page 220 of 276   PageID 36616

                          Sauter - Redirect                          99

1   the Debtor's -- in the Debtor's appendix, it's Exhibit 59.

2   Zoom in, please.  All right.

3   BY MR. RUKAVINA:

4   Q    Are you familiar with this document?

5   A    Yes, sir.

6   Q    And what is this document?

7   A    It's a memo from what I call the Advisors and the broker-

8   dealer to the retail funds, the boards of the retail funds.

9           MR. RUKAVINA:  Mr. Vasek, can you go to the second

10  page, Question 2, where it says, Response?  Okay.

11  BY MR. RUKAVINA:

12  Q    So, in the middle there, Mr. Sauter, it says the earliest

13  the note between HCMLP and HCMFA could come due is in May

14  2021.  Did I read that correctly?

15  A    Yes.  Yes, sir.

16          MR. MORRIS:  Objection to the form of the question.

17  Have we established any foundation that Mr. Sauter saw this

18  memo in connection with his review of the -- with -- in

19  connection with his investigation?

20          THE COURT:  I don't think we have.  So, --

21          MR. RUKAVINA:  Well, Your Honor, this exhibit --

22          MR. MORRIS:  So I object, Your Honor.

23          THE COURT:  Sustained.

24          MR. RUKAVINA:  Again, Your Honor, I apologize.  This

25  is an exhibit introduced by the Debtor in its appendix.  Is

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 179   Exhibit 29   Page 110 of 145   Page 221 of 276   PageID 36617

Sauter - Redirect                    100

1   the Court telling me that every exhibit in the appendix has to

2   be individually offered and admitted as though it was a trial?

3        THE COURT:  Well, I don't know if it was foundation

4   or a personal knowledge objection that was being asserted.

5   Mr. Morris, maybe I was hearing something you weren't saying.

6        MR. MORRIS:  Yeah, no, it -- it was both.  I mean,

7   Mr. Rukavina is right.  We -- we have offered this document

8   into evidence.  But there is no -- there is no personal

9   knowledge.  Let him, if he can, let him testify that he's ever

10  seen this before.

11       You know, these are leading questions.  I haven't been

12  objecting.

13       Again, Mr. Rukavina can make whatever arguments he wants,

14  but I'm very wary about just spoon-feeding them to a witness

15  when there's been absolutely no -- and you'll hear this on my

16  recross, when there's been no foundation established that this

17  witness has any knowledge about this document.

18       THE COURT:  Okay.  Well, I sustained -- Mr. Rukavina,

19  you're going to have to establish some personal knowledge on

20  the part of the witness before you start questioning him about

21  it.

22  BY MR. RUKAVINA:

23  Q   Well, let me ask you this, Mr. Sauter.  Obviously, it's

24  our position today that Mr. Waterhouse didn't sign these

25  notes, correct?

1   A    Yes, sir.

2   Q    Before we filed this motion, had you seen this document?

3   A    I -- I have seen this document.  I can't say for certain

4   when I first saw it.

5   Q    Do you recall whether -- whether this is one of those

6   documents that you would have reviewed in concluding that

7   perhaps Mr. Waterhouse didn't sign the notes?

8   A    I don't recall that.

9   Q    Okay.

10          MR. RUKAVINA:  Well, let's -- let's try a different

11  exhibit here, Julian.  It'll be the Debtor's Exhibit 36.

12  Scroll down a little bit.  Zoom in.

13  BY MR. RUKAVINA:

14  Q    Have you seen this email exchange?  I know you're not on

15  it, but have you seen this email exchange in the course of

16  this litigation?

17  A    I -- I don't recall specifically seeing this, the email

18  communication.  No, I don't.

19  Q    Okay.

20          MR. RUKAVINA:  Very well, then, Your Honor.  I'll

21  move on and I'll just argue these matters at closing.

22          MR. MORRIS:  Just very short recross, Your Honor.

23          THE COURT:  All right.

24          MR. RUKAVINA:  Oh, I'm not -- I'm not done.

25          THE COURT:  Oh, he hasn't passed the witness.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 103 of 145   Page 223 of 276   PageID 36619

Sauter - Redirect                              102

1            MR. MORRIS:  Oh, I apologize.

2            MR. RUKAVINA:  Just -- just this exhibit, Your Honor.

3            THE COURT:  Okay.

4            MR. RUKAVINA:  In light of the Court's --

5            THE COURT:  Just for my staff and my planning

6    purposes, how much longer do we think this is going to go?

7    This was a one-hour time estimate, and we're now three hours

8    or so into this.  How much longer?  Because I have a 1:30

9    docket and other things this afternoon, including a conference

10   call at 3:00 and -- et cetera, et cetera.

11           MR. RUKAVINA:  I'm almost done, Your Honor, with this

12   witness.  And as I mentioned, I have no other evidence other

13   than what's in my appendix.

14           THE COURT:  Okay.  I'll take "almost done" to being

15   ten minutes or so.

16           MR. RUKAVINA:  Yeah.  I'll beat that, Your Honor.

17     Mr. Vasek, please pull up the Sauter -- Mr. Sauter's

18   deposition.  Go to Page 63.

19           MR. MORRIS:  Your Honor, I don't understand.  He's

20   going to cross his own witness with his own transcript when

21   he's -- is he impeaching him?

22           MR. RUKAVINA:  No.  No.  You would not let him answer

23   a question, and I want to ask him to answer the question.

24           MR. MORRIS:  Well, why don't you just ask him the

25   question?

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 104 of 145   Page 224 of 276   PageID 36620

Sauter - Redirect                          103

1          MR. RUKAVINA:  Please pull up Mr. Sauter's deposition

2    to Page 63.

3          THE COURT:  Oh, --

4          MR. MORRIS:  I object.

5          THE COURT:  -- okay.  Well, I object.  I sustained

6    the objection.  You can use, you know, prior inconsistent

7    statements in a depo or, you know, or a depo to refresh, but

8    you've got the live witness here, so what are we doing?

9    BY MR. RUKAVINA:

10   Q    Do you recall, Mr. Sauter, Mr. Morris just a little bit

11   about taking you through your deposition testimony where he

12   was asking you about whether Mr. Waterhouse told you that the

13   note would have to go through Legal or not?

14   A    I do.

15   Q    Okay.  And I believe you testified something like there

16   were two different things that were being discussed there.

17   A    Correct.

18   Q    Okay.  I would like to give it up -- put up the document

19   so you can read it, but we can't do that, so explain why Mr.

20   Morris was wrong in implying that Mr. Waterhouse was telling

21   you about the promissory notes.

22          MR. MORRIS:  Objection to the form of the question.

23          MR. RUKAVINA:  Well, again, Your Honor, I can't -- I

24   can't present -- he was just asked about this testimony, he

25   said I have an explanation but it's not a yes or no answer,

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 77-29   Page 105 of 145   Page 225 of 276   PageID 36621

Sauter - Redirect                                    104

 1  and I want -- I have the right --

 2           THE COURT:  Okay.  Overruled.  He can answer.

 3           THE WITNESS:  Thank you, Your Honor.  There were two

 4  issues with the notes.  Mr. Waterhouse was adamant that the

 5  notes had been prepared by Legal.  I worked with Tim Cournoyer

 6  and Lauren Thedford.  They're both good lawyers, and they

 7  would not have prepared a note that listed Mr. Waterhouse

 8  individually as the maker on the note.  It's an incorrect

 9  signature block, and I just didn't believe that they would

10  have done that.

11      But the real issue was whether there was any actual

12  determination of who was responsible for the payment of the

13  NAV error to the GAF, and I asked specifically whether there

14  was a process that involved Mr. Surgent, Mr. Waterhouse, Mr.

15  Dondero, and Mr. Cournoyer in determining who was responsible

16  for that -- that payment.

17      And so those were the two issues.  Mr. Waterhouse was

18  adamant that it had gone through Legal.  So, yes, he did say

19  it had gone through Legal.  But he did not ever say that there

20  was any process in making a determination as to who was

21  responsible for the NAV error vis-à-vis Highland Capital

22  Management and Highland Capital Management Fund Advisors.

23           MR. RUKAVINA:  And Mr. Vasek, will you please pull up

24  Page 162 from the Debtor's appendix?  It's Appendix 162.

25  There it is.  Zoom in a little bit.

 1  BY MR. RUKAVINA:

 2  Q   Mr. Sauter, you were asked about this email before, the

 3  one from Mr. Klos.  And do you see, sir, where it says:  This

 4  is a new interco loan.  Kristin, can you or Hailey please prep

 5  a note for execution?

 6      Do you see that, sir?

 7              MR. MORRIS:  Object --

 8              THE WITNESS:  I do.

 9              MR. MORRIS:  -- to the form of the question, Your

10  Honor.  I did not examine this witness with this document.  I

11  used it in my opening, but I certainly did not examine this

12  witness with this document.

13              THE COURT:  Wait, wait.  What is the objection?  I do

14  remember this exhibit and him being asked questions.

15              THE WITNESS:  Correct.

16              THE COURT:  What are you saying?

17              MR. MORRIS:  I'm just saying Mr. Rukavina's lead-in,

18  I mean, --

19              MR. RUKAVINA:  I might be wrong.  I might be wrong.

20              MR. MORRIS:  I used -- I used this document in my

21  opening, Your Honor, but this contradicts everything Mr.

22  Sauter has ever said in his life about these matters, and I

23  don't recall ever cross-examining him with this document.

24              THE COURT:  Okay.

25              MR. MORRIS:  If he's ever seen it before, he can --

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 175-29    Page 107 of 145    Page 227 of 276    PageID 36623

Sauter - Redirect                              106

  1  he can testify, but --

  2              THE COURT:  Okay.

  3              MR. MORRIS:  But I don't think there's any

  4  foundation.

  5              THE COURT:  I don't remember specifically whether it

  6  was your opening or in questioning; I just remember seeing it

  7  here on my screen.  So if you could rephrase the question.

  8              MR. RUKAVINA:  Sure.  No, my only first -- first,

  9  just to set up the question, I just asked the witness whether

 10  he just read the same thing that I did.  I can't imagine that

 11  being objectionable.

 12  BY MR. RUKAVINA:

 13  Q    Now, Mr. Sauter, my question is, as a transactional lawyer

 14  of over twenty years, what does prepare a note for execution,

 15  what does execution mean?

 16              MR. MORRIS:  Objection to the form of the question.

 17  He's not here as an expert.  He -- there's no foundation that

 18  he ever saw this document.  If he had, I think it would be

 19  even worse for him --

 20              THE COURT:  Okay.  Sustained.

 21              MR. MORRIS:  -- than it is right now.

 22              THE COURT:  Sustained.

 23              MR. RUKAVINA:  Okay.  I'll pass the witness, Your

 24  Honor.  Thank you.

 25              THE COURT:  Recross?

1            MR. MORRIS:  Just a couple of very brief questions.

2            THE COURT:  Okay.

3                         RECROSS-EXAMINATION

4   BY MR. MORRIS:

5   Q    Mr. Sauter, you made reference to the shared services

6   agreement before, right?

7   A    Yes, sir.

8   Q    You didn't describe that as one of the documents you ever

9   reviewed in your deposition, correct?

10  A    Perhaps I didn't, but I've reviewed it a number of times.

11  Q    And you didn't review it in connection with your

12  investigation, correct?

13  A    I actually reviewed it extensively from January until

14  March with the transition of shared services.

15  Q    There's no argument in your first declaration that relates

16  to the shared services agreement, correct?

17  A    I -- no, I did not mention --

18           MR. RUKAVINA:  Objection, Your Honor.  Let's put up

19  the -- let's put up the document.  I don't remember it being

20  in there.  I don't remember it being attached as an exhibit.

21           MR. MORRIS:  All right.  I stand corrected.

22           THE COURT:  Okay.

23           MR. MORRIS:  I'll move on.  Um, --

24           THE COURT:  Do we want to pull it up, or no?

25           MR. MORRIS:  No, we'll pass.  I'll take Mr.

 1   Rukavina's word for it.

 2   BY MR. MORRIS:

 3   Q    But when you -- when you testified in your deposition, you

 4   weren't able to recall having ever looked at that, correct?

 5   A    I don't know that I was asked that question.  I'm a

 6   hundred percent certain that I probably reviewed it --

 7   Q    Okay.

 8   A    -- a dozen times --

 9   Q    And --

10   A    -- before that declaration.

11   Q    And I think you testified that you don't recall, you --

12   based on what Mr. Waterhouse said, you now want to retract

13   your testimony that you told Mr. Waterhouse he made a mistake,

14   correct?

15   A    I think my initial statement was it was implied, and I

16   think eventually I said that, yes, I probably said something

17   to him that it was a mistake.

18   Q    Okay.  So Mr. Waterhouse's transcript didn't refresh your

19   recollection at all?  That's what you truly believe, correct?

20   A    Truly believe what, sir?

21   Q    That he made a mistake.  Correct?

22   A    I do.  Yes.

23   Q    And whether implicitly or explicitly, you conveyed that

24   message to Mr. Waterhouse, correct?

25   A    That was my view, yes.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 110 of 145   Page 230 of 276   PageID 36626

Sauter - Recross                                    109

1   Q    And it's certainly what you said in your declaration

2   multiple times, correct?

3   A    What's that?

4   Q    That he made a mistake.

5   A    Correct.

6   Q    And you said in your declaration multiple times that he

7   signed the notes, correct?

8   A    Correct.

9   Q    Okay.

10        MR. MORRIS:  I have no further questions, Your Honor.

11        THE COURT:  All right.  Thank you, Mr. Sauter.  That

12   concludes your testimony.

13        THE WITNESS:  Thank you, Your Honor.

14     (The witness is excused.)

15        THE COURT:  What evidence do you all want to have in

16   the record here?

17        MR. RUKAVINA:  Well, Your Honor, again, in reliance

18   on the Local Rules, I filed an appendix.  I think Your Honor

19   mentioned it's an extensive appendix.  It has -- I filed a

20   redacted version, but it's not redacted much.  It has the

21   declaration of Mr. Sauter, which has the shared services

22   agreements, an email from Mr. Seery forbidding communications

23   with the Debtor's employees.  It has the depositions of Mr.

24   Waterhouse, Hendrix, and Klos.  And it has my declaration

25   authenticating certain documents.

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-29    Page 11 of 145    Page 231 of 276    PageID 36627

110

1      Then I filed a supplemental declaration on Friday in my

2    reply authenticating certain other documents.

3      I believe that those are part of the record under our

4    Local Rules as being in the appendix, but if they're not then

5    I guess I'll move for their admission.

6           THE COURT:  All right.  Let's talk about where on the

7    docket they appear.

8           MR. RUKAVINA:  Okay.  Mr. Vasek might have to help me

9    here.  The redacted appendix -- you see, I don't have an ECF

10   number on the top for some reason.  Sometimes that happens

11   when I'm downloading documents.  Mr. Vasek, maybe you can

12   quickly tell the Court what docket my appendix is at.

13           THE COURT:  Okay.

14           MR. VASEK:  Sure.  It's 87.

15           THE COURT:  86 or 87.  The unredacted is 87.  Okay.

16   This --

17           MR. VASEK:  87.

18           THE COURT:  Say again?

19           MR. VASEK:  Yes, Your Honor.  87.

20           THE COURT:  Okay.  Mr. Morris?

21           MR. RUKAVINA:  That's right.  I'm remembering now,

22   Your Honor -- yeah.  I'm remembering now, Your Honor, that Mr.

23   Morris and I agreed I could file it publicly in unredacted

24   form, so it's 87.  And then my supplemental declaration is at

25   112/1.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 112 of 145   Page 232 of 276   PageID 36628

111

1           THE COURT:  Okay.  Is there any objection to that

2    being in the record, Mr. Morris?

3           MR. MORRIS:  Yes, Your Honor.  I move to strike from

4    Mr. Sauter's declaration Paragraphs 6 through 10 and 22 to 31

5    as lacking any basis in personal knowledge.  Highland

6    otherwise has no objection to the admission into evidence of

7    the balance of the Movant's exhibits.

8           THE COURT:  Okay.  So --

9           MR. RUKAVINA:  Your Honor, I'll --

10          THE COURT:  -- all those 800-plus pages attached, you

11   have no objection to?

12          MR. MORRIS:  Only -- only if they are described in

13   one of the -- I mean, I can do it that way, Your Honor, if

14   you'll just give me a moment.  But, again, we've got -- we've

15   got a witness here who has no personal knowledge of the shared

16   services agreement he's --

17          MR. RUKAVINA:  John, can you repeat for me the

18   paragraphs that you mentioned you're objecting to?

19          MR. MORRIS:  Yes.  6 through 10 and 22 to 31.

20      (Pause.)

21          MR. RUKAVINA:  Is the Court prepared for my response?

22          THE COURT:  I'm prepared.  I'm looking at it.

23          MR. RUKAVINA:  I don't think that 6 through 10

24   matter.  The rest does matter because it goes exactly to Mr.

25   Sauter's investigation and the reason for why this motion was

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 175-29    Exhibit 29    Page 113 of 145    Page 233 of 276    PageID 36629

112

1  not filed until it was filed.

2       So I think that, again, that these are -- these -- this --

3  he doesn't need -- what are we talking about here?  Are we

4  talking about the underlying facts, that he does not have

5  personal knowledge of?  That's true.  These are not offered

6  for the truth of the underlying facts.  Or are we talking

7  about his investigation and hence the reason why this motion

8  wasn't filed back in April or May?  He does have personal

9  knowledge of that.  He does have personal knowledge of what he

10 relied on.

11          THE COURT:  Okay.  I overrule the objection.  I think

12 this goes to weight, not admissibility.  So, --

13          MR. MORRIS:  All right.  I --

14          THE COURT:  -- everything is admitted.

15          MR. MORRIS:  Just to preserve my record real quick,

16 Your Honor?

17          THE COURT:  Okay.

18          MR. MORRIS:  I'm sorry.  Like, Paragraph 24 is a

19 paraphrase of deposition testimony.  Paragraph 26 is a

20 paraphrasing of deposition testimony.  It has nothing to do

21 with the investigation.  And Highland objects to the inclusion

22 of that stuff in the record.

23          THE COURT:  Okay.  Again, I think this goes to --

24          MR. RUKAVINA:  I don't --

25          THE COURT:  -- weight.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 119 of 445   Page 234 of 276   PageID 36630

113

```
1              MR. RUKAVINA:  I don't see --

2              THE COURT:  I admit it.

3              MR. RUKAVINA:  Okay.

4              THE COURT:  I admit it.  Okay.  What else am I going

5     to put in the record here?

6              MR. MORRIS:  I think -- I think, subject to that

7     objection -- is the Movant withdrawing Paragraphs 6 through

8     10?

9              MR. RUKAVINA:  That's fine.

10             MR. MORRIS:  Okay.

11             THE COURT:  Okay.  Well, --

12             MR. MORRIS:  And my -- my --

13             THE COURT:  -- then that is excluded.

14             MR. MORRIS:  -- other objection will be overruled?

15             THE COURT:  I think the only exhibits referenced were

16    the shared services agreements, right, in that bundle of

17    paragraphs?

18             MR. MORRIS:  Yes.

19             THE COURT:  Okay.

20        (Defendant's exhibits contained in Dockets 87 and 112/1

21    are received into evidence as specified.)

22             THE COURT:  So, --

23             MR. MORRIS:  And then, Your Honor -- I'm sorry.

24             THE COURT:  -- as far as Debtor's exhibits?

25             MR. MORRIS:  They appear on Docket #111 as amended by
```

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 75-29   Page 115 of 145   Page 235 of 276   PageID 36631

114

1   113.  They were noted on the witness and exhibit list as

2   Exhibits 1 through 31, although they can also be found on the

3   appendixes at Exhibit 109 -- at Docket #109.  And the Debtor

4   would respectfully move into evidence all 31 exhibits

5   appearing on those three docket entries.

6              THE COURT:  Any objection?

7              MR. RUKAVINA:  Your Honor, so long as it's clear that

8   we're not agreeing that these are admissible at trial and that

9   they're limited to this hearing, no objection.

10             THE COURT:  All right.

11             MR. MORRIS:  As long as it goes both ways, I'm good

12  with that, Your Honor.

13             MR. RUKAVINA:  Yeah.  That's fine.

14             THE COURT:  With that proviso, --

15             MR. RUKAVINA:  I understand.

16             THE COURT:  -- they're admitted.

17     (Plaintiff's Exhibits 1 through 31 are received into

18  evidence.)

19             THE COURT:  All right.  Closing arguments?

20              CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

21             MR. RUKAVINA:  I'll be very brief, Your Honor, again.

22  We're here on whether Waterhouse signed the note.  We're not

23  here on whether the underlying NAV error occurred.  We're not

24  here on whether that's what the money was for.  We're here on

25  whether Waterhouse signed the note.  He did not.  He did not

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Filed 11/09/21   Page 236 of 276   PageID 36632

115

1  sign the notes and we did not learn that until October the

2  26th of this year.

3      The question of whether the notes were authorized to be

4  signed, guess what, that's all Debtor employees.  They messed

5  it up.  And now the Debtor wants to blame my client because

6  its own employees can't have a clear trail of where a note is

7  authorized to be signed.

8      So what does the Debtor do?  It calls my in-house counsel

9  and spends an hour and a half trying to character-assassinate

10  him, when, again, the only issue is whether Waterhouse signed

11  these notes, which he did not.

12      There was no undue delay.  The defense is valid under the

13  law, so it's not futile.  The Court cannot try the underlying

14  facts.  It's a 12(b)(6) standard.  There is no dilatory or bad

15  faith motive.

16      This is a Rule 15 motion.  Relief should be freely granted

17  unless there is substantial reason not to grant it.  The

18  Debtor has given you no substantial reason to deny this

19  motion.  The only reason the Debtor gives you to deny this

20  motion, Your Honor, is its view that our defense has no merit,

21  that the mistake, the mutual mistake defense has no merit.

22  And that cannot be tried in the context of this motion.

23      The only other thing that I've heard today, Your Honor,

24  that has any weight under Rule 15 is Mr. Morris's statement

25  that, well, I objected to your request for this promissory

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Filed 11/09/21   Page 237 of 276   PageID 36633

116

1   note.  I objected to it; therefore, you know, you sat -- I

2   think he said exactly that I sat on my hands and did nothing,

3   and I think he took you through June and July and August and

4   September.

5        But look at that objection, Your Honor.  His objection is

6   as follows:  The Debtor objects to the extent the term

7   metadata is vague.  Subject to the general objections and this

8   objection, the Debtor will conduct a reasonable search for and

9   produce documents responsive to this request.

10       The Debtor never says we're not going to produce that.

11  The Debtor never says the term metadata is vague.  The Debtor

12  says that, to the extent it's vague, we object.  That's

13  gamesmanship, Your Honor.  Don't let them get away with such

14  gamesmanship.

15       If I came here with a motion to compel a day after I got

16  served with this, Your Honor would laugh me out of court and

17  Your Honor would sanction me, because Your Honor would say,

18  well, it's just a form objection to the extent something is

19  vague.  And Mr. Morris would come in here and say, oh, whoa,

20  whoa, whoa, whoa, whoa, Davor is completely wrong, of course

21  we're going to -- we're just preserving our rights.  We're

22  going to -- we're going to produce this promissory note.

23       Don't let them get away with that after-the-fact

24  gamesmanship.  That's not a valid objection.  They said they

25  would produce the note with metadata, and they did, in late

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 177-29    Page 118 of 145    Page 238 of 276    PageID 36634

117

1    October.  And that's their fault and their fault alone.

2        Your Honor, there is no substantial reason to deny this

3    motion, the one and half hours of cross-examination of my in-

4    house counsel notwithstanding.  We ask that you grant this

5    motion.  Thank you.

6            THE COURT:  All right.  Let me ask you a couple of

7    questions that go to the undue delay factor that courts are

8    supposed to consider in this context.  I'm looking at May 22,

9    2021, when HCMFA filed its first motion for leave to amend

10   answer.  And on May 22nd, Paragraph 1 of that motion states,

11   "Now that the Defendant has access to former employees of the

12   Plaintiff and to various books and records, the Defendant has

13   learned that the notes were unauthorized, represent a mutual

14   mistake, and were never intended as debt, but rather that the

15   Plaintiff was compensating the Defendant for the Plaintiff's

16   own liability to the Defendant for causing a serious valuation

17   error."  And then, "Accordingly, we seek leave to assert this

18   affirmative defense," et cetera, et cetera.

19       Paragraph 14 states, "Waterhouse was not authorized to

20   execute the notes on behalf of the Defendant and he was not

21   authorized to lend funds by the Plaintiff."

22       And then we have Paragraph 22, similar:  It appears that

23   what happened is that Waterhouse, either for some internal

24   accounting purpose or because funds were flowing from the

25   Plaintiff to the Defendant, believed that some document was

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-7   Page 119 of 145   Page 239 of 276   PageID 36635

118

1    necessary or that what was being funded was a loan, so he

2    unilaterally and in mistake prepared and signed the notes.  In

3    short, Waterhouse made a mistake.  There was no loan.  There

4    was no return consideration for the loan.  And the notes, if

5    anything, are mutual mistakes.  Void.

6        Paragraph 29 says, Waterhouse was CFO of both Debtor and

7    HCMFA at the time he signed the notes.

8        Okay.  So the Court grants leave to HCMFA to file the

9    amended answer.  The Court ruled on July 2, 2021.  The amended

10   answer was filed July 6, 2021.  And the amended answer that

11   was filed on July 6, 2021, Paragraph 43:  At this time, Frank

12   Waterhouse was the chief financial officer to both the

13   Plaintiff and the Defendant.  Waterhouse signed the two

14   promissory notes.  He did not sign the notes in any

15   representative capacity for the Defendant.  The Defendant did

16   not authorize Waterhouse to sign the notes or to bind the

17   Defendant in any way to the note.  Waterhouse made a mistake,

18   da, da, da, in signing the notes.

19       I guess what I'm getting at is I'm seeing that, as early

20   as May, this theory of the case, if you will, had evolved, and

21   it seems like a heck of a long time, five months later, to

22   say, oh, everything we said, yeah, except he didn't even sign

23   the notes.  That feels like what we have here.

24           MR. RUKAVINA:  Well, Your Honor, respectfully, I

25   disagree.  I disagree entirely.  Because whether he physically

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 120 of 145   Page 240 of 276   PageID 36636

119

1    signed the note or whether he was authorized to sign the note

2    are two different things.  We've always said he's not

3    authorized to sign the note.  We've always said that.  And

4    that's going to be perhaps a question of fact.  But that's

5    separate from whether he actually signed the note or

6    authorized Ms. Hendrix to sign the note.  That was not learned

7    until late October.  That is a separate defense under the UCC.

8    And, again, that's -- that flows from him telling Mr. Sauter

9    -- basically; I'm paraphrasing -- well, if it's got my

10   signature, I must have signed it.

11        Not until we saw that these were electronically signed and

12   not until we saw that Ms. Hendrix signed them in late October

13   did we realize that not only was there a mistake all around,

14   but the notes weren't even signed, which makes all the more

15   sense because there was a mistake all around.  Even that

16   smoking gun email from Mr. Morris where Mr. Waterhouse is

17   copied that he referenced in his argument, it says, prepare

18   the notes for execution.  Well, they were not -- they were not

19   executed.

20        So, respectfully, Your Honor, it is wrong to suggest that

21   we knew or should have known about this failure-to-sign

22   argument in May.  That's separate from whether he was

23   authorized to sign.

24             THE COURT:  All right.  My last question is this.

25   Well, maybe it's my last question.  I'm troubled we don't have

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 120 of 145   Page 241 of 276   PageID 36637

120

1   Mr. Waterhouse here today.  As I said in the beginning, this

2   is a very serious motion.  And if it's not obvious, the reason

3   why I say it's a very serious motion is basically what you're

4   telling me is that HCMFA and Mr. Waterhouse and maybe Debtor

5   officers and directors -- I think it all boils down to Mr.

6   Waterhouse, really -- they either lied or made a mistake in

7   about 42 filed documents, including audited financial

8   statements, the 15(c) report, and the monthly operating

9   reports.  I mean, that's about as serious as it gets, right?

10  And Mr. Waterhouse isn't here to say, look, Judge, here's what

11  happened, to the best of my memory.  Here's what happened.

12  Why isn't he here?

13          MR. RUKAVINA:  Your Honor, that's two questions and

14  two answers.  He's not here because, again, I had understood

15  and the practice was always that we don't have live testimony

16  on motions.  If the Court believes that his testimony for

17  whatever reason is necessary, I'll subpoena him.

18          THE COURT:  You don't have a declaration.  You had

19  800 pages worth of testimony --

20          MR. RUKAVINA:  But Your Honor, I had his --

21          THE COURT:  -- and documents.

22          MR. RUKAVINA:  I had his deposition.  I had his eight

23  hours of deposition.  What would be better than his deposition

24  cross-examining under oath in which he -- again, and let's --

25  let me make it clear.  I am not alleging that he or anyone

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 122 of 145   Page 242 of 276   PageID 36638

121

1  lied.  I am not alleging that Debtor representatives lied.  I

2  thought I made it very clear in my motion that all of these

3  mistakes are the result of an initial good faith mistake, a

4  good faith assumption.  So, so I think it's very -- and

5  recall, it's in my motion, --

6          THE COURT:  But --

7          MR. RUKAVINA:  -- recall, Your Honor, --

8          THE COURT:  -- the mistake has resulted in dozens of

9  erroneous reports to stakeholders.

10          MR. RUKAVINA:  That may be.  That may be.  You know,

11  but that is -- that is something that the jury will decide

12  whether it's erroneous or not.

13          THE COURT:  Well, it may go beyond a jury trial just

14  in this adversary, right?  It's pretty serious stuff.

15          MR. RUKAVINA:  It -- it is pretty serious stuff, Your

16  Honor.  The fact -- but, again, I think -- I think all of us

17  -- and I'm being -- please understand, I'm being very

18  respectful and humble here.  I think all of us are going far

19  farther than the narrow actual issue before the Court right

20  now, which is whether Frank Waterhouse signed these notes.

21  All of these issues of mistake, all of these other issues, we

22  don't have evidence on today because we're not trying that

23  today.  I'm sure Mr. Waterhouse, Ms. Hendrix, Mr. Klos, they

24  all acted in good faith.  I am sure.  And as Mr. Klos and as

25  Ms. Hendrix confirmed, over the years they would get hundreds

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 123 of 145   Page 243 of 276   PageID 36639

122

1    of these notes, hundreds of these transfers.  And it was a

2    standard practice to paper them up as a promissory note.  And

3    then of course they'd be carried on books and records as

4    promissory notes.

5         The people that made the initial error, by assumption --

6    not by bad faith; by assumption, or misassumption -- would

7    carry it as an asset on the books and records.  But only Mr.

8    Dondero and perhaps only Mr. Waterhouse know or could have

9    known what the actual purpose of the $7.4 million transfers

10   was.

11        And recall, Your Honor, there were two other promissory

12   notes at about the same time in very similar amounts.  Those

13   promissory notes are valid.  They are valid.  But that, that's

14   why I wanted to walk you through -- it's actually been

15   admitted into evidence now -- Mr. Waterhouse's own emails and

16   Mr. Waterhouse's own Rule 15(c) statement -- it's in my reply

17   brief, Your Honor -- when Mr. Waterhouse refers to these notes

18   as the note and where he says -- Your Honor, it's -- this is

19   his language -- the HCMFA note is a demand note.  There was an

20   agreement between HCMLP and HCMFA the earliest they could

21   demand is May 2021.

22        I say that because again it's clear that everyone was

23   confused about this.  How can the CFO be talking about one

24   note that's not collectable until May 2021, how can he be

25   talking about that unless he truly didn't know about these

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 124 of 145   Page 244 of 276   PageID 36640

123

1    notes and was confused about them?  In good faith?  Because

2    his employees, his -- what's the polite word?  His subservient

3    employees created these notes based on a mistaken assumption

4    and never gave the notes to him to sign.  He never signed

5    them.  And when he or Mr. Dondero would see financials

6    disclosing promissory notes payable by HCML -- HCMFA to HCMLP,

7    they would assume that it's those prior notes that had been

8    extended.

9              THE COURT:  Okay.  Well, --

10             MR. RUKAVINA:  That -- that's -- that's how all this

11   -- Mr. Waterhouse is not lying about not having signed these

12   notes.  Because we have that.  He didn't sign them, the notes.

13   Mr. Waterhouse is not lying, nor is Ms. Hendrix lying, about

14   whether he authorized her to sign these notes for him.  No one

15   is lying to the Court.  The fact is he didn't sign the notes

16   and the fact is the Debtor has no evidence that he authorized

17   --

18             THE COURT:  He didn't -- he didn't ink-sign the

19   notes.  But we have --

20             MR. RUKAVINA:  Right.

21             THE COURT:  -- a dispute, you will acknowledge, about

22   authority.

23             MR. RUKAVINA:  Absolutely.  That is a -- that is a

24   legitimate bona fide dispute, where I understand that there is

25   evidence against me on that.  There's also evidence for me on

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 125 of 145   Page 245 of 276   PageID 36641

124

1   that.

2           THE COURT:  All right.  Mr. Morris, your closing?

3           CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

4           MR. MORRIS:  Your Honor, I think this discussion just

5   highlights the absurdity of all of this.  Mr. Rukavina keeps

6   ignoring the overwhelming evidence here of undue delay,

7   futility, and prejudice.  These notes were described for the

8   treasurer of HCMFA at the moment they were created.  He was

9   told they were being created by the accounting department, he

10   was told that the transactions were being booked as a loan,

11   and he didn't say boo.

12       A month later, they're on HCMFA's audited financial

13   statements.  That is the -- the undue delay clock started on

14   May 2nd and May 3rd, 2019.  How do you have $7.5 million of

15   notes sitting on your balance sheet and nobody asks a

16   question?  Mr. Rukavina says, oh, they thought they were the

17   old notes.  Not possible.  It's an assumption that he's

18   making.  There's no evidence to support it.  And it makes

19   absolutely no sense.

20       How do we know that?  Because those prior notes were $5

21   million.  So how come every single time HCMFA's obligations

22   reported to Highland are more than $10 million?  Where's the

23   evidence to explain that?  They do it to the Retail Board.

24   Mr. Dondero is personally told multiple times during the case,

25   when he's trying -- with his pot plan, it's more than $10

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 126 of 145   Page 246 of 276   PageID 36642

125

1   million.  And you're right, Mr. Waterhouse signed monthly

2   operating reports both before and after Mr. Dondero ceded

3   control that had more than $10 million of assets.

4        For them now to try to run away from that, to try to get

5   to a jury to believe it, is a waste of everybody's time and a

6   waste of everybody's money.  They could have conducted this

7   investigation two and half years ago.  They could have

8   conducted this investigation in June of '19.  They could have

9   conducted the investigation when they were preparing their

10   schedules and their monthly operating reports at the

11   commencement of the case.  They could have conducted this

12   investigation in the fall of 2020 when the Retail Board asks

13   the question, tell me all of the notes that you own.  And the

14   officers of HCMFA tell them it's more than $10 million.  How

15   are you confusing the old notes when you're telling your

16   patron that there's $12 million of notes outstanding, and they

17   tell this Bankruptcy Court dozens of times and they tell

18   stakeholders dozens of times?

19        This is not right, Your Honor.  It's both undue delay --

20   every single time they sign another document, every single

21   time they tell their auditors, every single time they put it

22   on their balance sheet, every single time they tell the Retail

23   Board is an opportunity to say, hey, wait a minute, why are

24   these notes there?  And they never do it.

25        It doesn't even start with Mr. Sauter.  All of this

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 270 of 445   Page 247 of 276   PageID 36643

126

1   happens before Mr. Sauter ever has anything to do with this.

2   Where was the leadership?

3       Mr. Rukavina has the audacity to blame the Debtor's

4   employees?  I have news for him.  The Debtor's employees were

5   under the direction and control of Mr. Dondero and Mr.

6   Waterhouse at all times when this happened.  At all times.

7       This is gaslighting, Your Honor.  It is really not right.

8   The prejudice would be overwhelming.  Mr. Rukavina says I have

9   the transcript.  I didn't know what he was doing.  I didn't

10  know he was trying to create some new record of a defense that

11  had never been pleaded.  That transcript, I would -- I would

12  welcome the opportunity, and I'm going to have it, we can

13  revisit these issues in the context of the existing defenses,

14  but they shouldn't be -- how many bites at the apple can they

15  get?  How many times do they get to try to make it right?

16  They're now trying to convince the Court that they should have

17  the opportunity to do exactly the opposite of what Mr. Sauter

18  found.  He wrote in his declaration that he filed under oath

19  with this Court that Mr. Waterhouse signed the notes and that

20  he did so on mistake, and now he wants to say he didn't sign

21  the notes.  He never put it in front of Mr. Waterhouse.

22      And all of this is really just -- it's just irrelevant,

23  because the one -- the most important evidence that the Court

24  should consider today, the most important evidence that the

25  Court should consider is that Mr. Waterhouse told Mr. Sauter

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 128 of 145   Page 248 of 276   PageID 36644

127

1    multiple times why the notes were created.

2         So we can sit here and talk about metadata if you want,

3    but Mr. Sauter knew, he just didn't tell the Court, he knew in

4    April and May that Mr. Waterhouse told him multiple times that

5    he needed the notes to paper the transfer.  There's no dispute

6    the transfer was made.  He told Mr. Sauter multiple times he

7    needed the notes for the auditors.  There's no dispute about

8    why Mr. Waterhouse -- why he knows the notes were created.

9    It's undisputed.

10        And I just want to finish with this notion that somehow,

11   somehow this is my fault.  It's offensive.  When somebody

12   sends me a document request and I send an objection, you need

13   to follow up.  I'm not -- I don't care what you think.  You

14   wouldn't -- Mr. Rukavina wouldn't have gotten sanctioned if he

15   made a motion, unless he did it without meet-and-conferring.

16   But you know what happened?  When they finally got around to

17   asking for the stuff, not in -- not in May, not in June, not

18   in July, not in August, not in September, but within ten days

19   of his asking I produced them.

20        The one piece of evidence that's missing from this whole

21   frolic and detour is one follow up between May and October:

22   Hey, I haven't gotten the metadata.  Or, hey, you objected,

23   you said the metadata was vague, what do you mean by that?

24   Can we meet and confer?

25        They dropped the ball, Your Honor, and my client shouldn't

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 129 of 145   Page 249 of 276   PageID 36645

128

 1 | have to pay the price for their negligence.

 2 |     I have nothing further.

 3 |         THE COURT:  I want to ask another question about

 4 | prejudice.  You know, that's another factor courts are

 5 | supposed to consider.  I know there's this dispute about

 6 | motion for summary judgment, was it filed before or after this

 7 | motion to amend answer?  And I know the obvious answer you're

 8 | going to tell me is we're ready to go forward on our motion

 9 | for summary judgment.  If you grant leave to amend, you know,

10 | maybe we're going to have to take new discovery, slow down

11 | that train.

12 |     Let me ask you something more -- well, it's nagging at me.

13 | I don't know if I want to say it's troubling.  If HCMFA's

14 | theory of the case is correct that these notes were not

15 | supposed to be created, this was not supposed to be a loan,

16 | this was a transfer intended to compensate HCMFA for the

17 | losses it incurred that were Highland's fault, blah, blah,

18 | blah, okay, this happened in May 2019.  The bankruptcy was

19 | October 2019.  To me, that's a -- it's a bombshell morphing of

20 | the case, because if that is the reality, then it sets things

21 | up for the Plaintiff to argue, well, that was an insider

22 | preference, then.  Right?  I don't know.  Am I going down the

23 | wrong trail?  It seems like the obvious way this would morph.

24 | Except, I guess, the 546 deadline for that ran October 19,

25 | 2021, which, by the way, is when all of this all kind of came

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 130 of 145   Page 250 of 276   PageID 36646

129

1   out that we went to.  And then to say he didn't sign it, null

2   and void notes.

3       Anyway, am I going down a crazy trail here?  I guess I'm

4   thinking prejudice to the Debtor.  The Debtor has been

5   deprived of the opportunity to assert a preference -- what

6   would seem like an obvious insider preference cause of action

7   if this theory of the case is true.  Am I all wet on that?

8           MR. RUKAVINA:  Your Honor, I'm not going to say those

9   words.  I'm going to say that Your Honor is wrong because the

10  Debtor knew about this defense since May.

11      Now, the primary defense here is that the payment was

12  compensation.  Whether Waterhouse signed the notes or not

13  doesn't matter to that defense.  That defense has been around

14  since May.  Or if I'm -- if I'm wrong, I apologize.  It's

15  whenever I filed the motion to amend.  We just looked that

16  that motion, and I don't have it in front of me right now.

17           THE COURT:  May 22nd.

18           MR. RUKAVINA:  My memory was -- May 22nd.  Since May

19  22nd, the Debtor has known -- and recall the other cases where

20  other Defendants said, well, the notes were forgivable.  And

21  I'm not involved with that, so my knowledge might be a little

22  bit off.  But as I understand it, the Court said, okay, well,

23  I'm going to grant you leave to state that the notes are

24  forgivable, but I'm going to grant the Plaintiff leave to

25  assert a 548.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 130 of 145   Page 251 of 276   PageID 36647

130

1    As soon -- as soon as I filed this motion here, the Debtor

2    knew that, if I'm right, then these notes are illegitimate and

3    the $7.4 million in transfers was compensation to a creditor.

4    The Debtor could have likewise said, Judge, as part of giving

5    Mr. Rukavina leave, give us leave to assert an insider

6    preference, and the Court would have certainly granted it.

7    So, and honestly, the thought had not crossed my mind, I

8    doubt it crossed the Debtor's mind, about the potential 546(e)

9    and the 547(b) issues until the Court mentioned them.

10    So I do think that the Court is -- and I don't know,

11    again, what being all wet means, but I think the Court is

12    being a little bit over-paranoid in thinking that somehow the

13    Defendant here delayed to let limitations run.  That was

14    absolutely not the case.

15            MR. MORRIS:  If I may, Your Honor?

16            THE COURT:  You may.

17            MR. MORRIS:  Just briefly.  This is going to be *part*

18    *deux*.  Right?  We had litigations for six months, and then we

19    were presented with the condition subsequent defense that all

20    of the obligors instead of HCMFA asserted, and therefore we

21    had to amend our complaint to add new causes of action and we

22    had another three month delay.

23    If they're permitted to do this, we will again have to

24    amend our pleading to assert breach of fiduciary duty causes

25    of action against Mr. Dondero and Mr. Waterhouse, at a

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 132 of 145   Page 252 of 276   PageID 36648

131

1   minimum.  Okay?  This is going to open up yet another can of

2   worms.

3        And there is no basis for it.  I do not understand how

4   HCMFA has the audacity to run away from notes that they

5   carried on their own balance sheet, that they reported to

6   their own auditors, that they told the Retail Board that they

7   owed, that their treasurer signed and certified to this Court

8   that they were valid obligations for the benefit of the

9   Debtor.  I don't understand how they have the audacity to even

10  do this.

11           MR. RUKAVINA:  But Your Honor, Your Honor, what Mr.

12  Morris says again goes to the merits of a defense that's been

13  on file since May.  If the Court grants the current motion,

14  it's not going to slow down summary judgment proceedings.

15  Whether the note was signed or not does not change the

16  question of whether the note is valid or not, of whether there

17  was a mutual mistake or not.

18       So it's not going to slow down the MSJ proceedings.  And,

19  again, the Debtor has had since May to amend its complaint to

20  assert breach of fiduciary duty, to assert insider preference,

21  to assert whatever it wants.  Frankly, the Debtor could have

22  sued Mr. Waterhouse, having signed the note.  It hasn't.

23       Mr. Morris is arguing that this motion is this qualitative

24  difference in this case.  It's not.  The qualitative

25  difference was when we asserted our primary affirmative

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 133 of 145   Page 253 of 276   PageID 36649

132

1 || defense in May.  And since then, the Debtor has done nothing.

2 ||          MR. MORRIS:  I have nothing further, Your Honor.

3 ||          THE COURT:  Let me ask you one last question.  I

4 || think this really is the last one, Mr. Rukavina.  Whether I

5 || allow the amendment or not, even under the existing amended

6 || answer, the fact-finder is going to have to get into details

7 || about the shared services agreement, correct?

8 ||          MR. RUKAVINA:  I believe so.  Yes, Your Honor.

9 ||          THE COURT:  So here's something else nagging at me.

10 || Back when I did the Report and Recommendation to the District

11 || Court on the Motion to Withdraw the Reference -- which I

12 || notice from the docket they still have not -- the District

13 || Court still has not ruled on.  Correct?  Is anyone seeing it?

14 || I'm not seeing it.

15 ||          MR. MORRIS:  Your Honor, I think all four -- I think

16 || four out of the five have been signed and approved.  I think

17 || the only one that has not is the one that was originally in

18 || the adversary with Mr. Dondero.

19 ||          THE COURT:  Really?

20 ||          MR. RUKAVINA:  Your Honor, I think Mr. Morse is

21 || right.  For some reason, the District Court's orders in some

22 || of these adversaries have not been filed on the bankruptcy

23 || docket.  I don't understand why, but I've had to go to the

24 || District Court docket to see the orders.

25 ||          THE COURT:  Okay.  Well, I'm just getting a little

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 134 of 145   Page 254 of 276   PageID 36650

133

1   bugged that it was represented to me in the motion to withdraw

2   the reference, which I accepted and put in my report, that not

3   only did the note litigation not have anything to do with the

4   proofs of claim or any claims asserted by HCMFA, but "The

5   proofs of claim involve two wholly separate nonintegrated

6   agreements."  That is, the shared service agreement and sub

7   advisory agreement.  Any consideration of the notes is

8   irrelevant to proofs of claim.  They'd already been

9   disallowed.  Here, the Plaintiff's claims arise under a

10  promissory note.  The Defendant's disallowed claims arose

11  under separate contracts having nothing to do with the notes.

12  The two sets of claims share no common set of facts, and

13  resolution of one is not necessary legally, factually, or

14  logically to the resolution of the other.

15      Anyway, what my monologue up here is aiming at:  I made a

16  representation, HCMFA made a representation that the basis for

17  our claims that we filed in the Bankruptcy Court are these

18  shared services agreements, they have nothing to do with

19  notes, they're not inextricably intertwined, which, you know,

20  you have to find that for there to be constitutional authority

21  to adjudicate a matter.

22      This is kind of not the case, right?  As the case has

23  evolved, we actually have -- I mean, I don't know.  I don't

24  know when the administrative expense claim is set for trial,

25  but it kind of feels like we're going to get all wrapped up

Case 21-03004-sgj    Doc 131-7    Filed 02/07/22    Entered 02/07/22 20:19:31    Desc
Case 3:21-cv-00881-X    Document 175-29    Page 135 of 145    Exhibit 29    Page 255 of 276    PageID 36651

134

1    into performance and interpretations under those agreements,

2    just like apparently we are now under the new theory of the

3    case.

4         What do you have to say to that?

5         MR. RUKAVINA:  Your Honor, I think, respectfully,

6    Your Honor is wrong.  This is not a new theory of the case.

7    This theory of the case was around since May 22nd.  The Court

8    entered its Report and Recommendation on July the 8th.  The

9    Debtor didn't point out at that time the matter that Your

10   Honor is now thinking should have mattered, and it doesn't

11   matter, because the fact of the shared services agreement is

12   --

13        THE COURT:  Well, I'm just, I'm going to split hairs

14   with you on the dates.  I had the hearing on the motion to

15   withdraw the reference May 25th.  Okay?  So I was looking at

16   the original answer at that point in time.  And then,

17   actually, you had filed the motion to amend the answer three

18   days before that hearing, on May 22nd, but I didn't have a

19   hearing on that until July, and I think it was agreed at that

20   point.

21        So, my point is, at the point in time that I was thinking

22   about this, hearing the lawyers' arguments, and I think I even

23   announced orally my ruling, and then we just papered it up

24   with the Report and Recommendation, the case hadn't really

25   evolved.  And I'm just wondering if that is a problem now.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 136 of 145   Page 256 of 276   PageID 36652

135

1              MR. RUKAVINA:  Your Honor, I don't -- I don't think

2     it's a problem.  If the Debtor wants to try to change those

3     orders, it can.  But let me remind Your Honor that under the

4     -- the claim that my client has under the shared services

5     agreement and the claim that the Debtor has going back, which

6     are set for trial reasonably soon, are purely postpetition

7     matters for postpetition amounts.  Anything that has to do

8     with the shared services agreement as relates to this

9     adversary proceeding would have related to prepetition

10    actions.

11         Nor is my client seeking a claim under the -- a

12    prepetition claim, a general unsecured claim, against the

13    Debtor for having caused the TerreStar NAV error.

14         So I don't agree with Your Honor that the facts here are

15    inextricably intertwined.  There's a promissory note, and the

16    only question is, was the promissory note intended to be a

17    loan or was it intended to be compensation?

18         And yes, the fact-finder will have to understand the

19    existence of the shared services agreement, but the fact-

20    finder will not be asked to construe the shared services

21    agreement.  It won't be asked to quantify any monies under the

22    shared services agreement.  Again, the only question will be

23    what was the intent, a loan or a compensation?

24         That is not a core matter, especially because all this

25    happened prepetition.

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Filed 01/09/24   Page 257 of 276   PageID 36653

136

1          MR. MORRIS:  If I may, briefly, Your Honor?

2          THE COURT:  Okay.

3          MR. MORRIS:  The notion that this is not a new theory

4   of the case is mindboggling.  If it weren't, there would be no

5   need for a motion.

6      The issue that was presented and that we were prepared to

7   try is whether or not these were loans or compensation.  Now

8   we're told that somehow the debt -- the -- HCMFA isn't going

9   to be obligated.  Well, let me tell you, if they took our

10  money and Mr. Waterhouse and Mr. Dondero want to take the

11  stand and swear that all of this was a gross mistake and that

12  the two of them, when they were in control, filed dozens of

13  documents with the Court that were wrong, that they should

14  have investigated and they didn't, it will require us to

15  assert new claims for breach of fiduciary duty.

16     I do not know how the person in control of an enterprise

17  and the treasurer and the CFO of a debtor in bankruptcy, I

18  don't know how they can in good faith at this point assert

19  that they -- that the notes are not binding on their company.

20  I just don't know how they can do that.  It is an entirely new

21  theory of the case.  It will require not just discovery but an

22  amendment of our complaint, because we will go after Mr.

23  Waterhouse, we will go after Mr. Dondero with new claims.  And

24  that's part of the prejudice that would result.

25          THE COURT:  All right.  Well, let me say right off

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 139 of 145   Page 258 of 276   PageID 36654

137

1   the bat that this went a lot longer than any hearing I have

2   ever had on a Rule 15 motion to amend.

3        My law clerk warned me last Thursday, oh, this is a little

4   bit more involved than maybe you were anticipating, which

5   means I ended up spending a great part of my weekend, among

6   other things, looking at the deposition of Frank Waterhouse,

7   which Mr. Sauter had not reviewed.  That alone was 400 pages.

8   That was my Sunday afternoon activity.  So that sounds like

9   whining.  I suppose it is, a little bit.  But my point is this

10  is not your garden-variety motion to amend under Rule 15

11  because never have I had a hearing on such a motion that went

12  on for four hours and that each side submitted 800 pages of

13  evidence.  But such is life in this unique case of Highland, I

14  suppose.

15       As I've said a couple of times today, I do consider this a

16  very serious matter, which I suppose is one reason why I

17  indulged so much evidence and argument.  Because, again, as I

18  interpret the arguments and what's been presented in the

19  record, the proposed second amended answer would essentially

20  mean HCMFA is arguing that Frank Waterhouse and perhaps others

21  within both the Highland and HCMFA organization either lied or

22  made a $7.4 million mistake in dozens of reports to interested

23  stakeholders.

24       Again, we have monthly operating reports, signed at least

25  electronically, purportedly, by Frank Waterhouse.  We have the

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 139 of 145   Page 259 of 276   PageID 36655

138

1    15(c) reports.  We have audited financial statements.  Okay.

2    So that's why I say this is really serious and this was worth

3    indulging a lot of evidence and argument, because, wow, this

4    is really a bombshell.  You're saying all of this information

5    that certain individuals floated out there, allowed to be

6    floated out there, had reason to know was floating out there,

7    was erroneous.

8         Shocking to me, but I heard what I heard.  And what I

9    heard was somewhat surprising.  They didn't have Mr.

10   Waterhouse coming in here saying, as treasurer of HCMFA -- of

11   course, the pleadings at one time said he was CFO -- CFO of

12   Debtor and treasurer of HCMFA, I realize now I, you know, I

13   made a huge mistake.  We didn't have him falling on his sword

14   saying that.  And in fact, in the 400-page deposition that I

15   spent all Sunday afternoon reading, he's -- I would say the

16   closest he comes to being supportive of this theory that HCMFA

17   is now asserting is "I don't recall," "I don't recall," "I

18   think it would have been this way," "I think this," "I think

19   probably that."  But he basically -- again, sophisticated

20   individual, CFO of a billion-dollar company, treasurer of

21   HCMFA, you know, a lot of -- I had a lot of documents that

22   were put in front of me on any daily basis.  I just can't

23   recall.

24        The person, the so-called subordinate who would have been

25   responsible, I think it's agreed, for obtaining Frank

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 140 of 145   Page 260 of 276   PageID 36656

139

1   Waterhouse's authorization to sign the document, she appears,

2   according to what I saw in the appendix, to be a CPA, who was

3   an accounting major, you know, not a first-year administrative

4   assistant.

5        So these are, again, disturbing things to have presented

6   to me, especially when no documents have been shown to me to

7   support the new theory of the case.  So, well, I guess you can

8   argue about responsive documents, but I certainly don't have

9   anything in the nature of a compromise and settlement

10  agreement, we agree Highland is liable for this and is

11  therefore compensating, reimbursing HCMFA.  We don't have

12  anything of that nature.

13       So, anyway, I think I've made it very clear that I'm very

14  disturbed about the evolving theory of the case.  But the

15  issue before me, of course, is Rule 15.  And what does the

16  case law say about Rule 15?  We all know very well that the

17  Court "should freely give leave when justice so requires."

18  And Rule 15 "evinces a bias in favor of granting leave to

19  amend."

20       The five considerations that the Fifth Circuit has

21  outlined in making this evaluation under Rule 15 is, is there

22  undue delay?  Is there bad faith or dilatory motive?  Is there

23  a repeated failure to cure deficiencies by previous

24  amendments, undue prejudice to the opposing parties, and

25  futility of the amendment?

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 14109 of 145   Page 261 of 276   PageID 36657

140

1     I cannot help but conclude there is unreasonable, undue

2     delay when I look at this timeline.  It's a long timeline.

3     But, again, we have a transaction -- transactions, plural --

4     the notes that were or were not authorized to be signed by Mr.

5     Waterhouse.  They were executed May 2nd and May 3rd, or they

6     were purportedly executed May 2nd and May 3rd, 2019.  Not

7     forever ago, about five months before the Highland bankruptcy.

8     We had Highland making demand on the notes December 3,

9     2020, saying, pay up by December 11, 2020.  It didn't happen.

10    January 22, 2021 was when the adversary was filed to collect

11    on the notes.

12    At some point in February, Mr. Waterhouse and numerous

13    other Highland employees ended their employment or were

14    terminated with Highland.  And so, as far as I can tell, even

15    under the terms of prior injunctions of this Court at that

16    point, very shortly after the complaint was filed, HCMFA was

17    free to talk to Mr. Waterhouse as much as they wanted.  But in

18    any event, he testified, Mr. Waterhouse, in his deposition

19    that March 1, 2021 he began working at Skyview with the former

20    Highland employees who now were providing services to HCMFA,

21    and that was the same day as the original answer was filed.

22    And then May 22, 2021, HCMFA files its motion to amend its

23    answer with this evolving theory of the case, that these notes

24    were not supposed to be created, a loan was not intended, and

25    questioning irregularities, I think was the word used, with

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 77-29   Page 142 of 145   Page 262 of 276   PageID 36658

141

1    regard to Mr. Waterhouse's signature.  And, again, it was not

2    until it looks like October 28th HCMFA told Debtor it will

3    assert a defense of non-signature.  And then November 30,

4    2021, the second motion to amend answer was filed.

5         I'm being clear for the Court of Appeals which is no doubt

6    going to look at this one day.  I've spent hours looking at

7    this.  Okay?  Again, not a garden-variety motion to amend

8    under Rule 15.  I read a 400-page deposition of Frank

9    Waterhouse.  I looked at other items in each 800-page

10   appendix.  And under the totality of what has been submitted

11   here, I find undue delay.  It is an evolving theory of the

12   case, and I'm not a hundred percent clear on why, when these

13   notes, copies of the notes were attached to the original

14   complaint filed on January 22nd.  I mean, the Defendant would

15   have been on notice day one, here are the documents that we're

16   suing under, and yet ten months later they want to argue for

17   the first time he didn't actually sign them.  And, again, I

18   guess they're saying he didn't ink-sign them.  There still

19   would remain a question, which was raised in the previous

20   amended answer, as far as his authority.

21        So undue delay.  I do find prejudice.  We're many, many,

22   many, many, many months down the road in what started over a

23   year ago, making a demand under these notes.  I've got motions

24   for summary judgment teed up.

25        You know, I'm a little bit troubled, as I said, that I did

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 175-29   Page 143 of 145   Page 263 of 276   PageID 36659

142

1    a Report and Recommendation to the District Court based on a

2    simpler lawsuit, and maybe even under the first amended answer

3    I should be looking at this a little differently.

4         And again, I'm just, I'm thinking out loud on that.  I

5    have an old opinion that may or may not be relevant, but it

6    was in a case called *Margaux Ventures* and it dealt with the

7    ability to raise a preference defensively if a preference

8    recipient is making a claim against the estate, and even if

9    the bar date, the 546 bar date has passed for affirmatively

10   filing a preference action.  I think that was even an insider

11   preference in *Margaux Ventures*.  The Plaintiff can still argue

12   defensively preference liability.  And what I can't remember

13   for sure is, in *Margaux Ventures*, if it was an administrative

14   expense claim that the preference target was asserting, or was

15   it a prepetition claim.  It might make more sense if it was a

16   prepetition claim.

17        But anyway, all this to say I'm mentioning this because it

18   factors into the undue delay and the prejudice.  I mean, the

19   lawsuit is just going to keep morphing.  I've already heard

20   that it would morph into a breach of fiduciary duty against

21   Mr. Waterhouse and others, but I think it could morph in other

22   ways.  And I've got to go back and look at that *Margaux*

23   *Ventures* case to see if I think this is intertwining -- well,

24   anyway, I don't need to go back and look because I'm denying

25   the motion.  But it's just, it's just way too late to make an

Case 21-03004-sgj   Doc 131-7   Filed 02/07/22   Entered 02/07/22 20:19:31   Desc
Case 3:21-cv-00881-X   Document 177-29   Page 1404 of 145 Page 264 of 276   PageID 36660

143

1  argument that should have been apparent many months ago if in

2  fact it's a legitimate argument.

3      And I guess the last thing I want to say is having a

4  witness today that is the general counsel for NexPoint,

5  another entity -- not HCMFA, not the Debtor -- someone who

6  didn't have personal knowledge that was contemporaneous with

7  the actions involved, someone who just after the fact for

8  NexPoint goes back and looks at the evidence, this has been a

9  significant factor here for me today.  The witness just seems

10 like someone who could not make a compelling case regarding

11 the bona fides, shall we say, of the amendment, which in my

12 mind links to the futility of the amendment.

13     All right.  Mr. Morris, please upload an order.  And we

14 are adjourned.  And for the people on WebEx who are here for

15 the 1:30 hearing, we need a short break.  I'll be back in ten

16 minutes.

17          THE CLERK:  All rise.

18          MR. MORRIS:  Thank you very much.

19      (Proceedings concluded at 2:01 p.m.)

20                  --oOo--

21              CERTIFICATE

22     I certify that the foregoing is a correct transcript from the
   electronic sound recording of the proceedings in the above-entitled matter.

23
    /s/ Kathy Rehling                          01/13/2022
24
   _____        _____
25
   Kathy Rehling, CETD-444                     Date
   Certified Electronic Court Transcriber

144

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Rukavina                                              7
- By Mr. Morris                                              22

WITNESSES

Defendant/Movant's Witnesses

Dennis C. "D.C." Sauter, Jr.
- Direct Testimony by Declaration                           32
- Cross-Examination by Mr. Morris                           32
- Redirect Examination by Mr. Rukavina                      86
- Recross-Examination by Mr. Morris                        107

EXHIBITS

HCMFA's Rebuttal Exhibit 1                      Received  94
Defendant's Exhibits (Dockets 87, 112/1)       Received 113
Plaintiff's Exhibits 1 through 31              Received 114
   (Dockets 111, 113)

CLOSING ARGUMENTS

- By Mr. Rukavina                                          114
- By Mr. Morris                                            124

RULINGS                                                     136

END OF PROCEEDINGS                                          143

INDEX                                                       144

# EXHIBIT 8



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 14, 2022**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-3004-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**ORDER DENYING**
**DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER**

This matter having come before the Court on the *Defendant's Second Motion for Leave to Amend Answer and Brief in Support Thereof* [Docket No. 82] (the "Motion") filed by Highland Capital Management Fund Advisors, L.P. ("HCMFA"); and this Court having considered (i) the Motion; (ii) *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* [Docket Nos. 83 and 87] ("Defendant's Appendix")[2]; (iii) *Highland Capital Management, L.P.'s Response in Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 107]; (iv) *Highland Capital Management, L.P.'s Memorandum of Law in Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 108]; (v) the *Appendix in Support of Highland Capital Management, L.P.'s Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 109] ("Highland's Appendix"); (vi) *Defendant's Reply in Support of Its Second Motion for Leave to Amend Answer* [Docket No. 112]; and (vii) the testimonial and documentary evidence admitted at, and the arguments made during, the January 10, 2022 hearing (the "Hearing")[3] on the Motion, including assessing the credibility of Mr. Sauter; and after due deliberation on all of the foregoing, and for the reasons set forth in the record of the Hearing on the Motion, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      The Motion is **DENIED**.

---

[2] At the January 10, 2022 hearing on the Motion, the Court admitted into evidence HCMFA's rebuttal exhibit identified as exhibit no. HCMFA-R1 ("Exhibit HCMFA-R1"). Exhibit HCMFA-R1 appears at docket no. 118 and is deemed to be included in Defendant's Appendix for purposes of any appeal that may be taken of this Order.

[3] On January 6, 2022, Highland Capital Management, L.P. ("Highland") filed a witness and exhibit list that (a) included as exhibits all documents that were included in Highland's Appendix, and (b) identified Dennis C. Sauter, Jr. ("Mr. Sauter"), as a witness to be examined at the Hearing. [Docket No. 111] (the "W&E List"). On January 10, 2022, Highland amended its witness and exhibit list to include one document (identified as Exhibit 31) not included in Highland's Appendix ("Exhibit 31"). [Docket No. 113]. During the Hearing, the Court admitted Exhibit 31 into evidence without objection, and Exhibit 31 deemed to be included in Highland's Appendix for purposes of any appeal that may be taken of this Order.

2. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

# EXHIBIT 9

**From:** John A. Morris
**Sent:** Wednesday, January 26, 2022 4:37 PM
**To:** 'Aigen, Michael P.' <michael.aigen@stinson.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

Michael,

As a courtesy, I will present just some of the myriad problems presented by your insistence on including an expert report and defense that the Court has precluded you from making:

1. Why should any court – whether the bankruptcy court or an appellate court -- consider evidence that has been excluded by court order?
2. And if you don't intend the Court to consider the evidence and defense, why proffer it?
3. Why should the record include evidence that has been excluded?  I have never seen that before.  Judge Jernigan has excluded numerous exhibits throughout this bankruptcy and then files a statement showing the evidence that was admitted.  Only admitted evidence is part of the record.
4. I don't have my own expert to counter yours.  How  do I address that?  How can a court consider your expert report when I did not have a chance to obtain my own?
5. I haven't taken discovery on the Barred Defense.  How do I fairly address the defense?  I just argue in a vaacum?
6. Am I supposed to address evidence and a defense that have been barred?
7. You've "incorporated by reference" a 21page brief filed in the District Court (violating the page limits).  Am I supposed to respond to that brief, too?

We are not dealing with the havoc and endless questions your insistence on ignoring the orders is creating.

We'll file our motion and you can respond however you wish.

Regards,

John

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Wednesday, January 26, 2022 4:11 PM
**To:** John A. Morris <jmorris@pszjlaw.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

John, as the brief indicates and as I have indicated to you, the Pully Report is part of an offer of proof.  Therefore, we cannot remove it from the filing or it will not be in the record as part of an offer of proof.  I think we can both agree that the Judge can be trusted to not rely on evidence she has excluded.  If you think there is no necessity for preserving the issue, there is also no harm in having it in the record as a proffer.  This is covered by the proposed stipulation that we sent to you. If you are willing to enter into the stipulation but have comments on it, please let us know what comments you have.
Michael

**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201 \ Bio

STINSON.COM

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, January 26, 2022 3:41 AM
**To:** Aigen, Michael P. <michael.aigen@stinson.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

Michael,

If your issue is preserving the issue for appeal, I would consider a stipulation – although, given that the evidence and arguments subject to the proffer were already the subject of motions and orders, one of which has already been presented to the District Court for review, I don't understand the concern or the necessity.  Indeed, as you note, "[w]here the "pretrial proffer is adequate and *evidence is excluded unconditionally by a pretrial order,*" then "the proponent *has preserved the issue for appeal* and (other circumstances being unchanged) need not bring the witness to court and proffer the evidence again at trial."  Fusco v. Gen. Motors Corp., 11 F.3d 259, 262–63 (1st Cir. 1993) (emphasis added).

Since the issues have already been litigated and determined by pretrial order, they have been preserved for appeal.

Not only have the issues already been preserved for appellate review, but proffers are plainly improper on a motion for summary judgment.  Rule 56 provides that a "party may object that the material cited to support or dispute a fact cannot be presented in form that would be admissible in evidence."  Unless and until the Expert Order is overturned, the Tully Report is not admissible evidence because the Court has already made that determination in response to the motion you filed.  The same is true with respect to the Barred Defense (see Mr. Sauter's declaration and the related arguments).

If you want to play "find a case," please provide a cite to any case in which a court has relied upon a proffer of evidence that it previously excluded to determine a summary judgment motion.  If you have such a case, I'll surely reconsider.

The Tully Report cannot be part of the record on this motion, and HCMLP should not be required to respond to evidence and a defense that the Court has already ruled cannot be pursued.

As I said, if Defendants are truly concerned with reserving whatever rights they think they have (which, again, is unnecessary in light of the very cases you cite), I will consider a stipulation.  But the demands remain.

If Defendants are interested in complying with the demands and working on a stipulation, let me know by 5:00 pm Central today with a written commitment to withdraw the Tully Report and to amend the opposition papers are originally demanded.  Otherwise, Plaintiff reserves all rights at law and in equity to address these issues in a time and manner of its choosing.

Regards,

John

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Tuesday, January 25, 2022 5:30 PM
**To:** John A. Morris <jmorris@pszjlaw.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

John,

As we indicated yesterday and as we indicated in our summary judgment response, our inclusion of the Pully Report in our response was an offer of proof intended to preserve our ability to object to and appeal the Bankruptcy Court's consideration of Plaintiff's Summary Judgement Motion without consideration of the Pully Material (as defined in the Stipulation), as well as to preserve our ability to appeal the denial of the Expert Deadline Motion (lest Debtor argue it is moot or otherwise infirm because of a grant of a motion for summary judgment).

As you know, offers of proof are typically used (i) to permit the trial judge "to reevaluate his decision in light of the actual evidence to be offered" and (ii) "to permit the reviewing court to determine if the exclusion affected the substantial rights of the party offering it." Fortunato v. Ford Motor Co., 464 F.2d 962, 967 (2d Cir. 1972). A proffer of evidence may be required if the trial judge is not "well aware of the content and purpose of the evidence." Frederick v. Swift Transp. Co., 616 F.3d 1074, 1083 (10th Cir. 2010). The court must be "well aware of the substance of the evidence," and the record must "reflect[] the substance of the evidence." United States v. Sheffield, 992 F.2d 1164, 1169–70 (11th Cir. 1993). The proponent of excluded evidence must show "the substance of the proposed evidence" and "make known to the court for what reasons the evidence is offered." McQuaig v. McCoy, 806 F.2d 1298, 1301–02 (5th Cir. 1987). Where the "pretrial proffer is adequate and evidence is excluded unconditionally by a pretrial order," then "the proponent has preserved the issue for appeal and (other circumstances being unchanged) need not bring the witness to court and proffer the evidence again at trial." Fusco v. Gen. Motors Corp., 11 F.3d 259, 262–63 (1st Cir. 1993); see also Walden v. Georgia-Pac. Corp., 126 F.3d 506, 517, 519 (3d Cir. 1997). Offers of proof are also used at summary judgment. Utica Mutual Insurance Company v. Munich Reinsurance America, Inc., 7 F.4th 50, 64 (2d Cir. 2021); Germano v. International Profit Ass'n, Inc., 544 F.3d 798, 801 (7th Cir. 2008); York v. Toone, 2018 WL 8619800, at *1 (W.D. Tex. Dec. 10, 2018).

Based on this, we don't understand how making an offer of proof (not in front of a jury, where harm occurs because of the inability of jurors to unhear something they should not have heard) can violate an order excluding evidence (even assuming the Court's order could be so construed, which it cannot be) because that is the exact reason that offers of proof are allowed, and indeed, often required. In an effort to resolve this without court intervention, however, we have drafted the attached stipulation, which should alleviate your expressed concerns about the Pully Report being used at summary judgment but still allows us to properly preserve our appellate rights. Please let me know if it is acceptable. If you are willing to do so, my understanding is that Davor will contact you about negotiating a similar stipulation or resolution with respect to the HCMFA Motion to Amend.

Additionally, we once again request that you provide us with any case law or authority that would support your position that making an offer of proof with respect to evidence not yet admitted but likely to be excluded because of a prior procedural motion is improper and would subject us to sanctions or contempt. Without making a proffer in connection with a summary judgment motion or trial, as the case may be, a court has not been given the context in which to evaluate proposed evidence. Absent some authority for your position, any motion that you file would be improper and frivolous. We have found no such authority and you have provided none. The Court's prior contempt orders were issued in entirely different circumstances. There is no definitive order that making a proffer violates. If you proceed to file your motion, we intend to file a Rule 11 motion.

Thank you,
Michael

**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201 \ Bio

**STINSON.COM**

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, January 24, 2022 5:01 PM
**To:** Aigen, Michael P. <michael.aigen@stinson.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>;
Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd
<hwinograd@pszjlaw.com>
**Subject:** RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

Michael:

The legal standard for civil contempt can be found in two other contempt orders issued by the bankruptcy court in the
Highland case, Docket No. 2660 at 22-23 and Adv. Pro. 20-03190, Docket No. 191 at 39-41.

Here, the Court entered Orders prohibiting Defendants from (a) pursuing expert testimony concerning the shared services
agreement and (b) arguing the Barred Defense.  Nevertheless, with full knowledge of the Orders, the Defendants did the very
things the Court said they could not.  I'm not sure I can think of a better definition of contempt.

To be clear, we do not need any further response.  Defendants will either comply with Plaintiff's demands or they won't.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]
**Sent:** Monday, January 24, 2022 5:21 PM
**To:** John A. Morris <jmorris@pszjlaw.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

John:

Thank you for your email. We will get back to you by tomorrow, as requested, with our response. As you know, we explicitly stated in our Response that the Expert Order was denied and that the evidence was being offered as part of an offer of proof. Do you have any authority stating that providing such an offer of proof is improper, let along something that could be subject to a contempt finding? If so, please provide us with such authority so we can adequately respond to your email.

Thanks,
Michael


**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201 \ Bio

**STINSON.COM**
This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information.  If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Saturday, January 22, 2022 7:17 AM
**To:** Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT


**External Email – Use Caution**

Counsel:

We are reviewing the Defendants' opposition papers to Plaintiff's motion for partial summary judgment and write to address two issues that, if not promptly addressed, will result in Plaintiff filing a motion to hold you, your firms, and your clients in contempt of Court for violating multiple Court orders.

First, Defendants have included in their appendix the expert report of Mr. Tully, dated December 10, 2021 and filed as Appendix Exhibit F (the "Tully Report").  The inclusion of the Tully Report violates the Bankruptcy Court's *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, entered on December 22, 2021, in Adv. Pro. 21-03005 at Docket No. 138 (the "Expert Order"), in response to motions filed by NexPoint, HCMS, and HCRE.  The inclusion of the Tully Report in Defendants' appendix also violates the *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* (*see, e.g.*, Adv. Pro. 21-03004 at Docket No. 67) which required, among other things, that expert disclosures be completed by October 29, 2021 (the "Discovery Order").

Second, in its brief, HCMFA contends, among other things, that "HCMFA never actually signed the notes." HCMFA moved for leave to amend its answer to assert this exact defense (the "Barred Defense"), but the motion was denied in the Court's *Order Denying Defendant's Second Motion for Leave to Amend Answer*, entered on January 14, 2022, in Adv. Pro. 21-03004, at Docket No. 123 (the "Answer Order" and together with the Expert Order and the Discovery Order, the "Orders"). We believe HCMFA's assertion of the defense plainly violates the Answer Order.

Plaintiff demands that Defendants take all steps to (a) withdraw the Tully Report from its Appendix, and (b) remove all references to, and all arguments derived from, the Tully Report and the Barred Defense by 5:00 p.m. on Tuesday, January 25, 2022.

Defendants' failure to timely comply with these demands will result in a motion to hold you, your firms, and your clients in contempt of Court for knowing and intentional violations of the Orders.

Plaintiff reserves, and does not waive, all of its rights at law and in equity with respect to these matters.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn