PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-3004 |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | Case No. 3:21-cv-00881-X |
| Defendant. | § § § § | |

---

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ........................................................................................ 1

II.    ARGUMENT ................................................................................................................... 3

   A.    Highland is Entitled to Summary Judgment on HCMFA's
      Breach of the Notes ...................................................................................................... 3

   B.    HCMFA Fails to Rebut Highland's Prima Facie Case for Summary Judgment ................ 4

      i.    No Reasonable Jury Could Find the HCMFA Notes Were a "Mistake" ............. 5

      ii.    There is No Genuine Issue of Material Fact that Highland
          Gave Consideration in Exchange for the Notes ................................................. 12

      iii.    There is No Genuine Issue of Material Fact that Mr. Waterhouse
          had Authority to Sign the Notes ....................................................................... 14

      iv.    There is No Genuine Issue of Material Fact that HCMFA is
          the Maker of the Notes .................................................................................... 17

      v.    HCMFA Should Be Estopped From Avoiding Liability on the Notes .............. 22

III.    CONCLUSION ............................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*,
   MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021) ................................. 6, 10

*Alton v. Texas A&M University*,
   168 F.3d 196 (5th Cir. 1999) ....................................................................................... 5

*AXA Art Americas Corporation v. Public Storage*,
   208 F.Supp.3d 820 (S.D.Tex. 2016) .......................................................................... 19

*BCC Merchant Solutions, Inc. v. Jet Pay, LLC*,
   129 F.Supp.3d 440 (N.D.Tex. 2015) ..................................................................... 18, 19

*BMG Music v. Martinez*,
   74 F.3d 87 (5th Cir.1996) ........................................................................................... 6

*BMO Harris Bank NA v. RidgeAire, Inc.*,
   No. 6:12-cv-550, 2013 WL 12151486 (E.D.Tex. Sept. 30, 2013) .................................. 13, 21

City of Alexandria v. Brown,
   740 F.3d 339 (5th Cir. 2014) .................................................................................... 17

*Clark v. America's Favorite Chicken Co.*,
   110 F.3d 295 (5th Cir. 1997) .................................................................................... 10

*Commercial Capital Holding Corp. v. Team Ace Joint Venture*,
   No. CIV. A. 99-3040, 2000 WL 726880 (E.D.La. June 2, 2000) ...................................... 14, 16

*Davis v. Bank of America, N.A.*,
   No. H–13–1306, 2014 WL 1401677 (S.D.Tex. Apr. 10, 2014) ....................................... 15, 16

*DIRECTV, Inc. v. Budden*,
   420 F.3d 521 (5th Cir. 2005) ...................................................................................... 7

*Eason v. Thaler*,
   73 F.3d 1322 (5th Cir. 1996 ...................................................................................... 11

*Epps v. NCNB Texas Nat. Bank*,
   838 F. Supp. 296 (N.D. Tex.) ................................................................................... 20

*Epps v. NCNB Texas*,
   7 F.3d 44 (5th Cir. 1993) ......................................................................................... 20

*Haygood v. De Escabedo*,
   356 S.W.3d 390 (Tex. 2011) ..................................................................................... 10

*In re Hinsley*,
   201 F.3d 638 (5th Cir. 2000) ..................................................................................... 7

*In re Magna Cum Latte, Inc.*,
   07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007) ..................................... 5

*Instone Travel Tech Marine & Offshore v. Int'l Partners, Inc.,*
334 F.3d 423 (5th Cir. 2003) ............................................................... 19

*Kariuki v. Tarango,*
709 F.3d 495 (5th Cir. 2013) ................................................................... 6

*Latimer v. Smithkline & French Laboratories,*
919 F.2d 301 (5th Cir.1990) ................................................................... 5

*Lavergne v. Jefferson County, Tex.,*
164 F.R.D. 441 (E.D. Tex. 1995) ...................................................... 7, 13

*Lockwood International, Inc. v. Wells Fargo Bank, N.A.,*
459 F.Supp.3d 827 (S.D.Tex. 2020) ..................................................... 23

*Looney v. Irvine Sensors Corp.,*
CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ........................ 4, 6, 9

*Lowery v. Bank of Am., N.A.,*
04-12-00729-CV, 2013 WL 5762227 (Tex. App. Oct. 23, 2013) ........................... 16

*Main Street Bank v. Unisen, Inc.,*
No. H-06-3776, 2008 WL 11483415 (S.D.Tex. Feb. 15, 2008) ........................... passim

*Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.,*
817 F.3d 241 (5th Cir. 2016) ............................................................ 22, 23

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.,*
40 F.3d 698 (5th Cir. 1994) ................................................................... 5

*Polland & Cook v. Lehmann,*
832 S.W.2d 729 (Tex. App. 1992) ...................................................... 14, 15

*Pryor v. Everhome Mortg. Co.,*
No. 3:13–CV–2963–D, 2014 WL 5802716 (N.D.Tex. Nov. 7, 2014) ..................... 17

*Resolution Tr. Corp. v. Starkey,*
41 F.3d 1018 (5th Cir. 1995) ................................................................. 4

*Salama v. Western Wind Energy Corp.,*
2013 WL 6079548 No. 4:12–cv–03535 (S.D.Tex. Nov. 19, 2013) ................... 11, 12, 13

*Sanchez v. Dallas/Fort Worth Int'l Airport Bd.,*
438 Fed. Appx. 343 (5th Cir. 2011) .......................................................... 7

*Savitch v. Southwestern Bell Yellow Pages, Inc.,*
2-04-257-cv, 2005, Tex. App. LEXIS 6215
(Tex. App.—Fort Worth Aug. 4, 2005) ..................................................... 21

*Scott v. Harris,*
550 U.S. 372 (2007) ............................................................................ 11

*Smith v. Stericycle, Inc.,*
538 F.Supp.2d 960 (W.D.Tex. 2008) .................................................... 22, 23

*Stable Energy, L.P. v. Newberry,*
999 S.W.2d 538 (Tex. App. 1999) ........................................................... 24

*Suttles v. Thomas Bearden Co.*,
  152 S.W.3d 607 (Tex. App. 2004) ................................................................. 13, 21

*Tiede v. Salazar*,
  518 F. Supp. 3d 955 (W.D. Tex. 2021) ............................................................... 17

*Tyler v. Cedar Hill Independent Sch. Dist.*,
  426 Fed.Appx. 306 (5th Cit. 2011) ...................................................................... 7

*United States v. Lawrence*,
  276 F.3d 193 (5th Cir. 2001) ............................................................................... 6

*United States v. Succession of Siddon*,
  812 F. Supp. 674 (W.D. La. 1993) ..................................................................... 17

*Vega v. Tyson Foods, Inc.*,
  525 F.Supp.3d 759, (N.D.Tex. 2021) ................................................................ 13

*Watkins v. Petro-Search, Inc.*,
  689 F.2d 537 (5th Cir. 1982) ....................................................................... 18, 20

*Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*,
  No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27. 2007) ........................... 6, 9

## HIGHLAND CAPITAL MANAGEMENT, L.P.'S REPLY IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the above-captioned adversary proceeding ("Highland" or "Plaintiff"), hereby files this reply (the "Reply") in support of its *Motion for Partial Summary Judgment in Note Actions* [Docket No. 91] (the "Motion") on its First and Second Causes of Action.  In support of its Motion, Highland states as follows:

## I.    PRELIMINARY STATEMENT[1]

1.      HCMFA cannot rebut Highland's *prima facie* case for summary judgment. The unrefuted evidence proves (i) the existence of the HCMFA Notes, (ii) in favor of Highland, and (iii) that there is a balance currently due and owing thereunder.   There is no genuine dispute of material fact as to any element of Highland's case.

2.      Nevertheless, in its Response, HCMFA attempts to fabricate factual disputes by vaguely asserting that the Notes are a result of Mutual Mistake and should have been treated as "compensation."  HCMFA also attempts to inject ambiguity into the record by arguing that the Notes are somehow unenforceable because they lack "consideration," are "ambiguous" as to whether HCMFA is a "maker," and were executed without "authority."  HCMFA offers no evidence in support of its Affirmative Defenses, other than scraps of Mr. Waterhouse's conclusory and speculative testimony, and an unsubstantiated, self-serving affidavit by Mr. Dondero.   Such conclusory, self-serving affidavits, without more, are insufficient to defeat summary judgment in the face of the admissible, probative, contrary and overwhelming evidence

---

[1] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below.

in the record.  At best, HCMFA's assertions constitute a mere "scintilla" of bald claims which are insufficient to defeat summary judgment.

3.      HCMFA's Mutual Mistake defense fails as a matter of law.  There is no evidence showing that Highland and HCMFA both intended to treat the HCMFA Notes as "compensation."  The undisputed evidence shows the exact opposite.  Both Highland and HCMFA treated the Notes as loans.  At all relevant times, the HCMFA Notes were (i) disclosed as HCMFA's liabilities to third parties, (ii) treated as liabilities in HCMFA's audited financial statements and balance sheets (prepared based on management representation letters signed by Mr. Dondero and Mr. Waterhouse), and (iii) treated as assets in Highland's audited financial statements, balance sheets, books and records, and Bankruptcy Court filings.  Mr. Waterhouse, HCMFA's Treasurer and the individual whose name appears on the Notes, affirmatively stated during an investigation regarding the genesis of the Notes that the Notes were purposely papered as loans.  The Mutual Mistake defense constitutes a fabricated story that is directly contradicted by all documentary evidence.  No reasonable jury could believe it.

4.      HCMFA's assertion that the Notes are unenforceable for "lack of consideration" is equally meritless.  This defense is premised on the same conclusory assertions underlying the Mutual Mistake defense.  The unrefuted documentary evidence establishes that Highland contemporaneously transferred funds equal to the face amount of the Notes to HCMFA in the form of loans in exchange for the Notes.  HCMFA's bare assertions regarding consideration fail to create a genuine dispute of material fact for trial.

5.      HCMFA also attempts to inject ambiguity into the record by arguing that it is unclear whether HCMFA is the "maker" of the Notes.  The Notes, as a matter of law, are unambiguous.  In light of the undisputed factual circumstances surrounding the unambiguous

Notes and their plain terms, there can be no credible issue of fact that HCMFA is the maker of the Notes. HCMFA's argument that the Notes are unenforceable on the ground that Mr. Waterhouse did not have "authority" to bind HCMFA is also entirely unsupported. Based on the undisputed documentary evidence, Mr. Waterhouse, the Treasurer of HCMFA managing HCMFA's accounting and finance, had authority to execute the Notes.

6.       In addition to failing to offer any credible evidence in support of its Affirmative Defenses, HCMFA should be, as a matter of law, estopped from escaping liability under the Notes. HCMFA has acknowledged the Notes for over two-and-a-half years through its actions in the Bankruptcy Case, its representations to the Retail Board, and its own financial documents. After such blatant, extensive, and uninterrupted ratification, HCMFA should not now be able to avoid liability under the Notes. Any such result would be unconscionable.

7.       HCMFA fails to create any genuine dispute of material fact regarding its Affirmative Defenses. In light of the complete absence of evidence in support of HCMFA, and the overwhelming probative evidence in support of Highland, no reasonable jury could return a verdict in favor of HCMFA.

8.       Highland is entitled to summary judgment for HCMFA's breach of the Notes.

## II.   ARGUMENT

### A.   Highland is Entitled to Summary Judgment on HCMFA's Breach of the Notes

9.       Highland has established its *prima facie* case that it is entitled to summary judgment on HCMFA's breach of the Demand Notes. It establishes (i) the Notes in question; (ii) signed by HCMFA; (iii) that Highland was the legal owner and holder thereof, and (iv) that a certain balance is currently due and owing on the Notes. *See* Motion ¶¶ 20, 135 (citing to Klos

Dec. ¶¶ 21-22); *Park Cities Bank v. Lee*, 3:10-CV-1584-K, 2012 WL 833189, at *2 (N.D. Tex.

Mar. 12, 2012) (plaintiff has "established that there is no genuine issue of material fact regarding

its claim for recovery on a promissory note" where it established "the note in question, that the

defendant signed it, that the plaintiff was the legal owner and holder thereof, and that a certain

balance is due and owing on the note"); *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th

Cir. 1995) (holding that where affidavit "describes the date of execution, maker, payee, principal

amount, balance due, amount of accrued interest owed, and the date of default for each of the two

promissory notes," movant "presented a prima facie case of default on the notes"); *Looney v.

Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431, at *2-3 (N.D. Tex. Feb. 15,

2010) (where movant "has attached a copy of the note …  to a sworn affidavit in which he states

that the photocopy is a true and correct copy of the note, that he is the owner and holder of the

note, and that there is a balance due on the note … [movant] has made a prima facie case that he

is entitled to summary judgment on the note").

**B.** **HCMFA Fails to Rebut Highland's *Prima Facie* Case for Summary Judgment**

10.     HCMFA fails to rebut Highland's *prima facie* case for summary judgment

because it fails to meet its burden of showing the "existence of a genuine issue of a material fact

for trial." *See Park Cities*, 2012 WL 833189, at *3.  There is no material dispute that (i) HCMFA

executed, through its treasurer, Mr. Waterhouse, the Notes in favor of Highland; (ii) there is an

outstanding balance on the Notes; and (iii) a demand for payment has been made on HCMFA and

refused.

11.     In an attempt to rebut Highland's *prima facie* case for summary judgment,

HCMFA argues that (i) the HCMFA Notes were a result of "Mutual Mistake," (ii) there was no

consideration exchanged for the Notes, (iii) Mr. Waterhouse did not have authority to sign the

Notes, and (iv) the Notes are "ambiguous" (collectively, the "Affirmative Defenses").   HCMFA fails to come forward with any credible evidence sufficient to create a "genuine" dispute of material fact for trial. *See Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) (to defeat a *prima facie* case for summary judgment, the nonmovant "must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial."); *Alton v. Texas A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999) (a dispute about a material fact is "genuine" only where "the evidence is such that a *reasonable jury* could return a verdict in favor of the nonmoving party."); *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990) (there is no "genuine" issue for trial where there is an "absence of evidence supporting the nonmoving party's case." ); *In re Magna Cum Latte, Inc.*, 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact").

### i.      No Reasonable Jury Could Find the HCMFA Noted Were a "Mistake"

12.      HCMFA's Mutual Mistake defense fails as a matter of law.  HCMFA fails to adduce any evidence showing that HCMFA and Highland had a common intention in executing the Notes and that the Notes do not reflect such intention due to a "shared mistake."

13.      In support of its Mutual Mistake defense, HCMFA argues that the "common mistake" between HCMFA and Highland was that "the Transfers constituted loans rather than compensation." Response ¶ 65.  HCMFA specifically argues that the Notes were the result of a "mutual mistake" because (i) "Mr. Dondero intended the Transfers to compensate HCMFA for the NAV Error, not to be repaid as loans, (ii) Mr. Dondero, the only person with the authority to character the Transfers as loans, never gave that instruction," (iii) Highland "initially

lacked sufficient funds to make the Transfers," (iv) Mr. Dondero personally advanced the funds

to Highland, and (v) the amounts of the two Transfers substantially mirrored the amounts of the

prior two transfers HCMFA made to the Fund on account of the NAV error." Response ¶ 63.

Such conclusory assertions, even if credited, are legally insufficient to constitute the defense of

"mutual mistake."

14.      As briefed in the Motion, "mutual mistake" nullifies an agreement only

where both parties to the agreement have a "common intention," but the written agreement

incorrectly reflects that common intention due to a mutual mistake. *See Whitney Nat. Bank v.*

*Med. Plaza Surgical Center L.L.P.*, No. H-06-1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27.

2007) (citing Texas law); *Looney*, 2010 WL 532431, at *5 (for "mutual mistake" to nullify a

promissory note, the evidence must show that "both parties to the note were acting under the same

misunderstanding of the same material fact"); *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co.,*

*Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) ("When mutual

mistake is alleged, the party seeking relief must show what the parties' true agreement was and

that the instrument incorrectly reflects that agreement because of a mutual mistake").

15.      HCMFA fails to present any evidence in support of its Mutual Mistake

defense, other than the conclusory, self-serving affidavit of Mr. Dondero attached to the

Response. *See* Response ¶ 66 (citing to Dondero affidavit at HCMFA Appx. 1-5).  Such "self-

serving allegations" are not the type of significant "probative evidence required" to defeat

summary judgment, especially "in the face of conflicting probative evidence." *Kariuki v.*

*Tarango*, 709 F.3d 495, 505 (5th Cir. 2013); *see also BMG Music v. Martinez*, 74 F.3d 87, 91

(5th Cir.1996) (affirming for plaintiffs where "the only evidence in support of the defendants'

theory is a conclusory, self-serving statement by the defendant"); *United States v. Lawrence*, 276

F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for recovery of promissory note, where defendant's only evidence to rebut plaintiff's *prima facie* case consisted of "self-serving allegations," which "are not the type of significant probative evidence required to defeat summary judgment" (internal quotation marks and citation omitted)); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005) (affirming summary judgment where defendant's "attempt to create a fact issue … by relying on a conclusory and self-serving affidavit is on unsteady ground"); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000) (affirming summary judgment, and finding that "party's self-serving and unsupported" affidavit regarding her "intent" is "not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud."); *Tyler v. Cedar Hill Indep. Sch. Dist.*, 426 Fed.Appx. 306, 309 (5th Cir. 2011) (affirming summary judgment, where "[a]fter closely reviewing the record … the only document [party] provides to support her claim" is her conclusory, self-serving affidavit, noting "[w]e have repeatedly held that self-serving affidavits, without more, will not defeat a motion for summary judgment."); *Sanchez v. Dallas/Fort Worth Int'l Airport Bd.*, 438 Fed. Appx. 343, 346–47 (5th Cir. 2011) (affirming summary judgment where party attempting to rebut summary judgment relies on "her own self-serving affidavit," noting "a self-serving affidavit, without more evidence, will not defeat summary judgment"); *Lavergne v. Jefferson County, Tex.*, 164 F.R.D. 441, 443 (E.D. Tex. 1995) ("When an affidavit in response to a summary judgment motion contains "nothing more than a recital of unsupported allegations, conclusory in nature," the motion for summary judgment should be granted").

16.    By contrast, the undisputed documentary evidence overwhelmingly demonstrates that Highland and HCMFA both intended the Notes to be treated as loans: (i) Mr. Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA in exchange

for the Notes was being treated as an "intercompany loan," (Ex. 194 at 111:6-112:7, Appx. 3154; Ex. 54, Appx. 870-873; Ex. 56, Appx. 876-877); (ii) the Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets, (Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029); (iii) the Notes were reflected as assets in Highland's books and records, audited financial statements, and bankruptcy filings, (Ex. 34 at 39, Appx. 782); and (iv) HCMFA represented the Notes as "liabilities" to third parties (Ex. 59 at 2, Appx. 885).  Highland's audited financial statements, which reflect the existence of the Notes, expressly rely upon the management representation letters signed by both Mr. Dondero and Mr. Waterhouse, HCMFA's President and Treasurer. (*See* Ex. 33, Appx. 729-740) (Mr. Dondero and Mr. Waterhouse representing to PwC that all "subsequent events" were disclosed); (Ex. 34 at 38-39, Appx. 781-782) (Note 15 to Highland's 2018 audited financial statement disclosing HCMFA Notes as "subsequent events," stating that "over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of 7.4 million").

17.     HCMFA's Mutual Mistake defense is further undermined by HCMFA's own internal investigation into the genesis of the Notes.  After the Adversary Proceeding was commenced, HCMFA purportedly launched an internal "investigation to understand the origin of the" HCMFA Notes. Dennis Sauter, an attorney and NexPoint's general counsel who also does work for Mr. Dondero's other affiliates, led the investigation. (Ex. 193 at 6:3-16, 7:10-13, Appx. 3086, 12:10-13:3, Appx. 3087, 24:18-25:12, Appx. 3090).  Despite having no personal knowledge of any of the underlying facts, Mr. Sauter told Mr. Waterhouse that he made a mistake by signing the HCMFA Notes and had no authority to do so.  Mr. Waterhouse "obviously disagreed" that any mistake was made, telling Mr. Sauter that "we transferred the money, so I executed the notes.

HCMFA didn't have the money to pay GAF, and so we transferred it from HCMLP and I executed

the notes." Mr. Waterhouse *never* admitted to making a mistake. *Id*. at 52:15-59:16, Appx. 3097-

3099. Indeed, Mr. Waterhouse bluntly told Mr. Sauter about the purpose of the HCMFA Notes:

> Q:     So did Mr. Waterhouse tell you that he prepared the notes for some internal
> accounting or other purpose?
>
> A:     Yes.
>
> Q:     And did he tell you what the purpose of the notes was?
>
> A:     Yes.  He said if he transferred money he had to have a note to go with it.

*Id*. at 61:7-24, Appx. 3099; *see also id*. at 56:8-23, Appx. 3098 (Mr. Waterhouse could not describe

"any process.  He said the money was transferred, and so we signed the notes"), 71:4-20, Appx.

3102 (Mr. Waterhouse told Mr. Sauter that he needed a note for HCMFA's auditors to "document

the transfer of funds").   Thus, HCMFA's own findings regarding the origin of the Notes

demonstrate that the Notes were "loans," and not, in any way, shape, or form, the result of a

"mistake."

18.     The Mutual Mistake defense, therefore, fails as a matter of law. *Whitney*,

2007 WL 3145798, at *6 (finding mutual mistake defense "fails as a matter of law" where

assertions were "insufficient to raise a fact issue as to mutual mistake of fact regarding written

agreement where plaintiff "has presented competent evidence" of its own intention regarding the

agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no

document suggests any such intent," and where "the documents are clear" on their face); *Looney*,

2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a

matter of law on "mutual mistake" defense where defendant "does not cite any record evidence

in support of its claim that [parties] were operating under a shared mistake when they executed

the note"); *Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter

of law where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense) (emphasis in original); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").

19.    Mr. Waterhouse's speculative testimony that, in the event he is "personally liable" under the Notes, then the Notes would be a mistake, *see* Response ¶ 66, is equally insufficient to demonstrate a defense of "mutual mistake." *See Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment").

20.    HCMFA's reference to the "collateral source" rule is also entirely irrelevant here. *See* Response ¶ 67 (arguing that such rule "precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else," and therefore, "the fact that HCMFA received insurance proceeds" for the NAV Error would not have precluded it from also receiving proceeds from Highland as compensation, rule) (citing to *Haygood v. De Escabedo*, 356 S.W.3d 390, 394–95 (Tex. 2011)).   The collateral source rule applies to a "tortfeasor's liability."   Here, Highland was never held liable as a tortfeasor for the NAV Error, and therefore, this rule does not even apply.   The fact that HCMFA would have, theoretically, been able to receive a double recovery from a tortfeasor and insurance does not,

alone, create a genuine issue of fact supporting HCMFA's Mutual Mistake defense.  For these same reasons, HCMFA's assertion that "it doesn't matter" whether Highland was "liable to HCMFA for the NAV Error" since "both [Highland] and HCMFA … believed this to be the case," should be summarily rejected.  Again, there is no credible evidence supporting the notion that either Highland *or* HCMFA believed Highland was liable to HCMFA for the NAV Error, or that the loans in exchange for the HCMFA Notes should have been treated as "compensation."

21.     HCMFA's Mutual Mistake defense constitutes a fabricated story blatantly contradicted by the record.  HCMFA's conclusory assertions in support of such a story are insufficient to defeat Highland's *prima facie* case for summary judgment.  *See Salama v. W. Wind Energy Corp.*, 2013 WL 6079548, at *5, No. 4:12–cv–03535 (S.D.Tex. Nov. 19, 2013) ("As the Supreme Court has noted, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment); *Main Street Bank v. Unisen, Inc.*, No. H-06-3776, 2008 WL 11483415, at *7 (S.D.Tex. Feb. 15, 2008) ("The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment").  HCMFA has failed to set forth any facts sufficient to lead a "reasonable jury" to find that the Notes were a result of "mutual mistake."

22.     Accordingly, Highland is entitled to summary judgment on HCMFA's Mutual Mistake defense.

     ii.     <u>There Is No Genuine Issue of Material Fact that Highland Gave</u>
              <u>Consideration in Exchange for the Notes</u>

23.     HCMFA also fails to raise a genuine issue of material fact regarding whether Highland gave consideration in exchange for the Notes.

24.     The defense of failure of consideration defeats summary judgment only if the nonmovant "alleges facts and presents evidence that the consideration in the agreement as not received." *Salama*, 2013 WL 6079548, at *6 (internal quotations omitted); *Main Street Bank*, 2008 WL 11483415, at *7 (same).

25.     HCMFA presents no evidence in support of its contention that there was no consideration for the Notes.   Instead, HCMFA's argument that the Notes are "unenforceable for lack of consideration" is premised on the same conclusory arguments underlying the Mutual Mistake defense. *See* Response ¶ 69 (stating that Highland "did not give anything in exchange for the Notes" since the Transfers were "compensation for the NAV Error.")

26.     Contrary to HCMFA's unsubstantiated assertions, the documentary evidence in the record demonstrably establishes that Highland gave consideration to HCMFA in the form of loans in exchange for the Notes.  *See* May 2 and May 3, 2019 Bank Statements (Ex. 147 at 7, Appx. 2526) (showing transfers of funds to HCMFA on May 2 and May 3, 2019 in amounts equal to face value of the Notes); Notes (Ex. 1 (Exhibit 1), Appx. 9-11) (stating HCMFA will pay Highland certain sums "FOR VALUE RECEIVED"); Klos Dec. ¶¶ 21-22; Emails to Corporate Accounting (Ex. 54, Appx. 870-873; Ex. 56, Appx. 876-877) (stating to "send $2,400 (sic) from HCMLP to HCMFA" as a "new interco loan" and "set up a wire from HCMLP to HCMFA for $5M as a new loan"); DC Sauter Deposition Transcript (Ex. 193 at 56:8-23, Appx. 3093) (Mr. Waterhouse telling Mr. Sauter "the money was transferred, and so we signed the notes").

27.    There is, therefore, no genuine question of material fact regarding whether Highland gave consideration in exchange for the Notes. *See Salama*, 2013 WL 6079548, at *8-9 (granting summary judgment to enforce agreement and rejecting party's argument that there was "failure of consideration" where "there is quite a lot of evidence in the record" supporting consideration, "and "none at all" in support of lack of consideration defense, besides his self-serving and conclusory statement in the affidavit attached to his opposition to this motion," holding there was "no question of fact on that issue"); *BMO Harris Bank NA v. RidgeAire, Inc.*, No. 6:12-cv-550, 2013 WL 12151486, at * (E.D.Tex. Sept. 30, 2013) (finding that defendants have failed to raise a genuine issue of material fact regarding failure of consideration defense where "Defendants allege lack of consideration, but provide no evidence whatsoever to support that claim"); *Main Street Bank*, 2008 WL 11483415, at *7 (finding defendant "fails to establish a genuine issue of material fact that the Agreements fail of consideration where, inter alia, "the Agreements included language stating that [plaintiff] would provide" such consideration, noting "[c]onclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint"); *Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 616 (Tex. App. 2004) (finding a defendant failed to raise a genuine issue of material fact regarding failure of consideration defense because the evidence established defendant received the value of plaintiff's loan, regardless of the source of the funds); *Vega v. Tyson Foods, Inc.*, 525 F.Supp.3d 759, (N.D.Tex. 2021) (finding party's "unsupported and conclusory evidence … is not sufficient to raise a genuine dispute of material fact" based on lack of consideration.); *Lavergne*, 164 F.R.D. at 443 (finding opponent's response "exactly the sort of response …

insufficient to defeat summary judgment," where the affidavit is "conclusory" and "points to no specific facts concerning" allegations).

28.     Accordingly, Highland is entitled to summary judgment on HCMFA's Affirmative Defense of failure of consideration.

### iii.   <u>There is No Genuine Issue of Material Fact that Mr. Waterhouse Had Authority to Sign the Notes</u>

29.     HCMFA also attempts to create a question of fact by maintaining that Mr. Waterhouse did not have "authority" to bind HCMFA to the Notes. *See* Response ¶¶ 51-57.  This conclusory assertion is refuted by the record and is, as a matter of law, without merit.

30.     There can be no credible dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA.  "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess."  *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992).  Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority."  *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, No. CIV. A. 99-3040, 2000 WL 726880, at *5 (E.D.La. June 2, 2000).  The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes.

31.     At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. *See* Incumbency Certificate (Ex. 35, Appx. 789).  As Treasurer, he was authorized to, *inter alia*, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.*  In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Ex. 105 at 25:22-26:3, Appx. 2055-2056).  Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as

Treasurer, and believed he was authorized to sign the HCMFA Notes. *Id.* at 143:24-25, Appx. 2085. To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089. At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089. In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085. The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089. HCMFA's own findings regarding the origin of the Notes further support Mr. Waterhouse's authority to bind HCMFA. As noted *supra* ¶ 17, Mr. Waterhouse affirmatively stated to Mr. Sauter that "money was transferred, and so we signed the notes."

32. Mr. Waterhouse's authority to execute agreements on behalf of HCMFA in his capacity as an officer is further corroborated by the fact that he signed other similar intercompany agreements on behalf of Dondero affiliates. *See* Ex. 3 (Exhibits 3 and 4), Appx. 123-128 (Mr. Waterhouse, as officer of HCMS, executing HCMS Notes on behalf of HCMS); Ex. 205, Appx. 4162-4181 (Mr. Waterhouse signing NexPoint's Shared Services Agreement on behalf of NexPoint in his capacity as "Treasurer").

33. There can be no genuine dispute for a jury regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. *See Davis v. Bank of Am., N.A.*, No. H–13–1306, 2014 WL 1401677, at *3 (S.D.Tex. Apr. 10, 2014) (finding lack of actual authority defense is refuted by record where "the plain language of the" instrument establishes agent's authority); *Polland*, 832 S.W.2d at 738 (agent had actual authority where agent's acts were "within the scope

of his" express authority and were "related to matters over which such authority extends");
*Commercial Capital*, 2000 WL 726880, at *5 (finding "the evidence presented clearly shows that
[agents] were vested with apparent authority" to represent that invoices would be paid by
company where agents held title of project manager, generally approved invoices and checks, and
where principal gave third party "a reasonable belief that [agents] had authority to act on behalf
of [principal]," who relied on such representations in entering into transaction).

34.     HCMFA's assertion that Mr. Waterhouse "does not believe he possessed
authority" since "he testified that only Mr. Dondero could authorize borrowing at the level in
question," Response ¶ 53 (citing Ex. 105 at 270:18-273:9, Appx. 2117), misrepresents the context
of Mr. Waterhouse's testimony.   Mr. Waterhouse testified that in order to cause HCMFA to
become the borrower of the Notes, he would have had to get approval from Mr. Dondero.  *See id.*
at 272:19-24, Appx. 2117.  At no point did Mr. Waterhouse testify that he did not have such
approval, or that, as HCMFA suggests, that he did not believe he possessed authority to execute
the Notes.  As discussed *supra*, Mr. Waterhouse had authority to bind HCMFA to the Notes, and
no one from HCMFA ever told him otherwise.

35.     HCMFA also cites to Mr. Dondero's self-serving affidavit for the
conclusory assertion that Mr. Dondero is "not aware of any corporate documents that would
confer such authorization." Response ¶ 53 (citing Dondero's affidavit at HCMFA Appx. 1).  Such
a scintilla of evidence is not the type sufficient to create a genuine issue of fact regarding Mr.
Waterhouse's authority to sign the HCMFA Notes. *See Lowery v. Bank of Am., N.A.*, 04-12-
00729-CV, 2013 WL 5762227, at *3 (Tex. App. Oct. 23, 2013) (affirming summary judgment
where plaintiff's "scintilla of evidence"  failed to support defense that party was not authorized
to sign promissory note); *Davis*, 2014 WL 1401677, at *3 (rejecting lack of authority defense

where party "has failed to present evidence that raises a genuine issue of material fact regarding the [] agent's authority or lack thereof"); *Pryor v. Everhome Mortg. Co.*, No. 3:13–CV–2963–D, 2014 WL 5802716, at *3 (N.D.Tex. Nov. 7, 2014) (granting summary judgment where party presented evidence that is "insufficient to permit a reasonable jury to find that [agent] was not an authorized signatory").

36.     HCMFA's unsubstantiated, conclusory statements in support of their assertion that the Notes were executed without authority cannot defeat Highland's *prima facie* case for summary judgment. *See United States v. Succession of Siddon*, 812 F. Supp. 674, 675 (W.D. La. 1993) (granting summary judgment on promissory note, noting "[m]ere conclusory rebuttals by the nonmoving party will not defeat a motion for summary judgment"); *Tiede v. Salazar*, 518 F. Supp. 3d 955, 965 (W.D. Tex. 2021) (granting summary judgment, noting that "allegations are insufficient to defeat summary judgment if they are nothing more than 'conclusory allegations, 'unsubstantiated assertions,' or constitute 'only a scintilla of evidence'"); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014) (affirming summary judgment, noting that a genuine issue of fact does not exist "if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

37.     Accordingly, Highland is entitled to summary judgment on HCMFA's Affirmative Defense regarding Mr. Waterhouse's authority to bind HCMFA to the Notes.

### iv.     There Is No Genuine Issue of Material Fact That HCMFA Is the Maker of the Notes

38.     HCMFA's attempt to inject ambiguity into the record by arguing that the Notes are unclear regarding HCMFA's status as "maker" fails for this same reason. *See* Response ¶¶ 58-62. HCMFA argues that there is "ambiguity as to whether Mr. Waterhouse intended to sign

the Notes at all" because "the signatures on the Notes do not unambiguously identify HCMFA as

the maker." *Id.* ¶ 62.  The HCMFA Notes are unambiguous as a matter of law.

39.    "Whether a contract is ambiguous is a question of law for the court to

decide by looking at the contract as a whole in light of the circumstances present when the contract

was entered into."  *BCC Merchant Solutions, Inc. v. Jet Pay, LLC*, 129 F.Supp.3d 440, 466

(N.D.Tex. 2015) (internal quotations omitted); *see also Watkins v. Petro-Search, Inc.*, 689 F.2d

537, 538 (5th Cir. 1982) ("[W]hen a question relating to the construction of a contract or its

ambiguity is presented, the court is to take the wording of the contract in the light of the

surrounding circumstances, in order to ascertain the meaning that would be attached to the

wording by a reasonably intelligent person acquainted with all operative usages and knowing all

the circumstances prior to and contemporaneous with the making of the integration").  "If, in the

light of the surrounding circumstances, the language of the contract appears to be capable of only

a single meaning, the court can then confine itself to the writing."  *Watkins*, 689 F.2d at 538

(internal quotations omitted).

40.    A contract is unambiguous and will be enforced as written where it is

"susceptible to only one reasonable construction." *BCC Merchant*, 129 F.Supp.3d at 466.  "[A]

cardinal rule of contract interpretation under Texas law is that the entire writing must be

examined" and "no single provision taken alone [may be given controlling effect." *Id.* (citing

Texas law) (internal quotations omitted).  Texas courts consider the entire writing "to harmonize

and effectuate all provisions such that none are rendered meaningless." *Id.*  "An ambiguity is not

created simply because the parties advance conflicting interpretations of the contract … Rather,

an ambiguity exists only where such conflicting interpretations are 'reasonable.'" *Id.* (internal

quotations and citations omitted); *see also AXA Art Americas Corp. v. Public Storage*, 208

F.Supp.3d 820, 828 (S.D.Tex. 2016) ("Ambiguity arises only when the applicable of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of … two meanings is the proper one") (internal quotations omitted); *Instone Travel Tech Marine & Offshore v. Int'l Partners, Inc.*, 334 F.3d 423, 431 (5th Cir. 2003) (A "contract is not ambiguous because it suffers from mere 'uncertainty or lack of clarity,'" noting "[t]he failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists."). "Where the language is clear and definite, the contract is not ambiguous, and a court must apply the plain language as a matter of law." *Main Street Bank*, 2008 WL 11483415, at *4.

41.    There is no ambiguity regarding HCMFA's liability under the Notes.  The plain language of the Notes unequivocally identifies HCMFA as "***Maker***." *See* Ex. 1 (Exhibit 1) Appx. 9-11; Ex. 1 (Exhibit 2), Appx. 12-15 (emphasis in original).  Mr. Waterhouse, HCMFA's treasurer, signed the Notes on behalf of HCMFA as the "**MAKER.**" *See id.*  HCMFA's suggestion that the signature line makes it unclear whether "Mr. Waterhouse intended to bind HCMFA instead of himself," Response ¶ 61, is not, as a matter of law, not a "reasonable interpretation" that could create ambiguity.  *See AXA*, 208 F.Supp.3d at 828 (finding contract unambiguous as a matter of law where party's "interpretation is not reasonable in light of the [] agreement as a whole); *BCC*, 129 F.Supp.3d at 466 (finding no ambiguity in agreement based on its "plain" and "unequivocal" language, noting that party's "proffered interpretation" "does not reasonably account for the surrounding language" of agreement, would render such language "meaningless," and is "not reasonable under Texas law); *Instone*, 334 F.3d at 431 ("when properly confined to the four corners of the document … [defendant's] interpretation" is not "reasonable" because it "unambiguous holds [defendant] responsible" thereunder).

42.     The Notes are unambiguous especially in light of their surrounding circumstances, including that, *inter alia*: (i) HCMFA knew, through its Treasurer, *i.e.*, Mr. Waterhouse, that the HCMFA Notes were treated as intercompany loans the day they were executed; (Ex. 54, Appx. 870-873; Ex. 56, Appx. 876-877); (ii) the Notes were disclosed as liabilities on HCMFA's balance sheets and audited financial statements at all relevant times (Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029; and (iii) the Notes were represented as liabilities of HCMFA to third parties (Ex. 59 at 2, Appx. 885). Based on the unambiguous Notes and their undisputed surrounding circumstances, there is no reasonable interpretation that HCMFA is not bound under the Notes. *See Epps v. NCNB Tex.Nat'l Bank*, 838 F. Supp. 296 (N.D. Tex.), *aff'd sub nom. Epps v. NCNB Tex.*, 7 F.3d 44 (5th Cir. 1993) ("[A]pplying the undisputed facts to the unambiguous terms of the contract," the contract is not ambiguous); *Watkins*, 689 F.2d at 540 ("[T]he express language of the agreement-in the light of this circumstance (known to both parties who confected the agreement) and of others surrounding the agreement-in our opinion is susceptible with regard to the issue before us of only one reasonable (and thus unambiguous) meaning.").

43.     For all these same reasons, HCMFA's application of Section 3.402(b)(2) of the Texas Business and Commercial Code does not support its defense. Section 3.402(b) provides, in pertinent part:

> [A] representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity, or (ii) the represented person is not identified in the instrument.

Tex. Bus. & Comm. Code § 3.402(b)(2). As discussed above, there is no credible evidence in the record that HCMFA "was not intended to be liable" on the Notes. The Notes also unambiguously

show that they were executed on behalf of HCMFA.  There is thus no reasonable basis in support of HCMFA's argument Mr. Waterhouse, and not HCMFA, would be liable under the Notes. Section 3.402(b)(2) is, therefore, entirely irrelevant to the present facts.  HCMFA's cite to *Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005, Tex. App. LEXIS 6215, *15-16 (Tex. App.—Fort Worth Aug. 4, 2005) is equally inapplicable.  There, the court found that an agent's signature did not unambiguously show that it was made on behalf of a principal where the promissory note "did not identify" the principal, and the name of the principal "is not mentioned anywhere in the promissory note." *Id.*  Here, by contrast, HCMFA is explicitly disclosed as the "Maker" of the Notes.

44.    HCMFA fails to raise a genuine issue of material fact sufficient to rebut Highland's *prima facie* case for breach of the Notes. *See BMO*, 2013 WL 12151486, at *2 (granting summary judgment where plaintiff "has established a prima facie case for breach of promissory notes wile Defendants have failed to raise a genuine issue of material fact as to any element of that case"); *Suttles*, 152 S.W.3d at 616 (affirming summary judgment for breach of promissory note where appellants' "vague statements" an summary judgment evidence did not "raise a material issue of fact concerning" affirmative defenses); *Park Cities*, 2012 WL 833189, at *3 (granting summary judgment for breach of promissory note where defendants filed to show the existence of genuine issue of fact for trial where they "failed to present any evidence contesting liability on the promissory note"); *Main Street*, 2008 WL 11483415, at *4 (granting summary judgment for breach of promissory note where plaintiff "establishes each element of its breach of contract claim" and defendant "fails to establish a genuine issue of material fact"); *Malin*, 817 F.3d at 250 (rejecting defendant's attempt to "inject ambiguity into the summary judgment record," where the "unrefuted summary judgment" shows defendant ratified the

agreement, noting that if defendant "had evidence to create an issue of fact to preclude summary judgment, it would have supplied it.")

45.     Accordingly, Highland is entitled to summary judgment on HCMFA's Affirmative Defense regarding ambiguity.

### v.     HCMFA Should Be Estopped from Avoiding Liability on the Notes

46.     HCMFA's attempt to escape liability under the Notes is improper as a matter of law.  Under Texas law, "if a party acts in a manner that recognizes the validity of a contract with full knowledge of the material terms of the contract, the party has ratified the contract and may not later withdraw its ratification and seek to avoid the contract." *Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*, 817 F.3d 241, 250 (5th Cir. 2016) (citing Texas law).   "Ratification may be manifested in several ways: (i) by intentionally accepting benefits under the contract; (ii) by remaining silent or acquiescing in the contract for a period of time after [they have] the opportunity to avoid it; and (iii) by recognizing [the] validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it. *See id.* at n. 45; *Smith v. Stericycle, Inc.*, 538 F.Supp.2d 960, 968 (W.D.Tex. 2008) ("Ratification may be inferred by a party's course of conduct and need not be shown by express word or deed").  In other words, "any act inconsistent with an intent to avoid a contract has the effect of ratifying the contract," and precluding avoidance of such contract. *Smith*, 538 F. Supp. 2d at 968.

47.     HCMFA cannot, as a matter of law, avoid the Notes through any of their Affirmative Defenses.  The unrefuted summary judgment evidence establishes that HCMFA ratified the notes because it: (i) received the value of the loans in exchange for the Notes, (*see* Ex. 147), and (ii) has remained silent on the validity of the Notes since their inception—for two-and-a-half years until this Adversary Proceeding—including by not raising any of the Affirmative Defenses in connection with the Plan objections, (*see* Ex. 207 at 223:22-224:14, Appx. 4701-

4702). HCMFA has also affirmatively acknowledged the validity of the Notes by, *inter alia*, (i) representing to third parties, namely, the Retail Board, that the Notes were liabilities of HCMFA, (*see* Ex. 59 at 2, Appx. 885), and never informing anyone that there was an error in such letter to the Retail Board, (*see* Ex. 192 at 125:18-127:2, Appx. 3045-3046), (ii) carrying the Notes as liabilities on its balance sheet and audited financial statements, (*see* Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3), (d) never disputing Highland's MORs, which included the Notes as debts due and owing by HCMFA, (*see* Ex. 41, Appx. 816-825; Ex. 42, Appx. 826-835; Ex. 88, Appx. 1475-1486; Ex. 89, Appx. 1487-1496; Ex. 196, Appx. 3239-3240; Ex. 198., Appx. 3243-3244), and (e) never correcting Highland's audited financial statements, which were prepared based on management representation letters signed by Mr. Dondero and Mr. Waterhouse, (*see* Ex. 30, Appx. 605-641; Ex. 34, Appx. 741-787). HCMFA also never disputed the validity of the Notes after it received the Demand Letters, which expressly identified HCMFA as the "Maker" of the Notes. *See* Ex. 1 (Exhibit 3), Appx. 16-19.

48.    HCMFA, therefore, cannot now escape liability on the Notes. *See Malin*, 817 F.3d at 250 (affirming summary judgment on enforcement of agreement where the "unrefuted summary judgment" shows that defendant entered into subject agreement, received value for agreement, and received notice of such agreement through various emails and receipts, noting that issue of "agency relationship" is irrelevant to ratification); *Lockwood Int'l, Inc. v. Wells Fargo Bank, N.A.*, 459 F.Supp.3d 827, 832 (S.D.Tex. 2020) (finding that "even giving party the benefit of the doubt on his [defense]," party waived any defense to enforcement of contract because "once he ratified its terms … he waived his right to raise it"); *Smith*, 538 F. Supp. 2d at 968 ("[b]ased on the undisputed evidence, [defendant] ratified the [] Agreement. It recognized it as valid, performed under it, and cannot now seek to void it"); *Stable Energy, L.P. v. Newberry*,

999 S.W.2d 538 (Tex. App. 1999) (affirming trial court's finding that appellants "were estopped from denying they were bound by it" where they ratified the agreement, noting "it would be unconscionable to permit [appellants] to deny that they are bound by the [] Agreement after" such ratification).  For this additional reason, HCMFA's Affirmative Defenses fail as a matter of law.

## III.   CONCLUSION

WHEREFORE, Highland respectfully requests that the Court (i) grant its Motion, (ii) hold HCMFA liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, and (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated:  February 7, 2022   **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
   jmorris@pszjlaw.com
   gdemo@pszjlaw.com
   hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
   ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3004-sgj |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3005-sgj |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-00881-X |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC., JAMES DONDERO,
NANCY DONDERO, AND THE DUGABOY
INVESTMENT TRUST,

                Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-3006-sgj

Case No. 3:21-cv-00881-X

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                Plaintiff,

vs.

HCRE PARTNERS, LLC (n/k/a NexPoint
Real Estate Partners, LLC), JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

                Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-3007-sgj

Case No. 3:21-cv-00881-X

---

**ERRATA TO**
**DECLARATION OF JOHN A. MORRIS IN SUPPORT OF PLAINTIFF'S OMNIBUS**
**MOTION (A) TO STRIKE CERTAIN DOCUMENTS AND ARGUMENTS FROM THE**
**RECORD, (B) FOR SANCTIONS, AND (C) FOR AN ORDER OF CONTEMPT**

Highland Capital Management, L.P., the plaintiff in the above-captioned adversary proceedings (the "Adversary Proceedings") and the reorganized debtor ("Highland" or the "Plaintiff"), hereby submits this errata (the "Errata") to **Exhibit 1** attached to the *Declaration of John A. Morris in Support of Plaintiff's Omnibus Motion (a) to Strike Certain Documents and Arguments from the Record, (b) for Sanctions, and (c) for an Order of Contempt* (the "Declaration") and respectfully states as follows:

1.      In Exhibit 1 attached to the Declaration, Highland inadvertently redacted footnote 79.  The correct redaction should be to footnote 76.

2.      Accordingly, Exhibit 1 shall be deemed superseded and replaced with amended Exhibit 1 ("**Amended Exhibit 1**"), attached hereto as **Exhibit A,** which redacts footnote 76.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:44154.1 36027/003

Dated:  February 18, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
Email:  MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

2

# EXHIBIT A

# EXHIBIT 1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

the HCRE Term Note pursuant to the respective oral SSAs are genuine issues of material fact.[76]

Moreover, as discussed in greater detail below, Plaintiff failed to remind HCMS of prepayments

that had been made that relieved it of the obligation to make any additional payment in 2020.

### E. Prepayment on the Term Notes

#### 1. NexPoint's Prepayments

29.     NexPoint asserts the affirmative defense of prepayment on the NexPoint Note,

which relieved NexPoint of any obligation to make any additional payment in 2020.  Thus, the

NexPoint Note was not in default when no payment was made on December 31, 2020.  NexPoint

demonstrates *infra* that there is evidence supporting this affirmative defense and summary

judgment denying this affirmative defense is inappropriate as a matter of law.

30.     There is no dispute of fact that, between March and August of 2019, the following

payments were made on the NexPoint Note (collectively, the "NexPoint Prepayments"): (i)

$750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June

4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi)

$1,300,000.00 on August 13, 2019.[77]  These payments totaled $6,380,000.00 in 2019.[78]  The

normal December, 2019 payment of principal and interest on the Note would have been

$2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

31.     None of the aforementioned payments were scheduled payments or payments on

arrears.[79]  Rather, they were prepayments since the Plaintiff needed money and asked NexPoint to

transfer it funds for liquidity purposes, which NexPoint did.[80] These transfers were intended by

---

[77] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249.
[78] *Id.*
[79] *Id.*
[80] Def. Ex. 1, J Dondero Dec., ¶ 42, Def. Appx. 21.

15

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S OBJECTION TO PLAINTIFF'S
MOTION TO STRIKE, FOR SANCTIONS, AND FOR CONTEMPT**

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. iii

I.    SUMMARY ....................................................................................................................1

II.   BACKGROUND .............................................................................................................2

      A.    THE ADVERSARY PROCEEDING ..............................................................................2

      B.    DEBTOR REFUSES TO PRODUCE EVIDENCE THAT WATERHOUSE
            DID NOT SIGN THE NOTES UNTIL AFTER WATERHOUSE IS DEPOSED ......................4

      C.    HCMFA FILES SECOND MOTION TO AMEND ANSWER ...........................................7

      D.    THE DEBTOR'S MSJ ...............................................................................................9

III.  ARGUMENTS AND AUTHORITIES ............................................................................11

      A.    NO GROUNDS TO STRIKE EVIDENCE OR DEFENSE ...............................................11

      B.    NO CONTEMPT AS A MATTER OF LAW .................................................................16

      C.    BANKRUPTCY COURT LACKS JURISDICTION OVER CONTEMPT ............................20

IV.   PRAYER ......................................................................................................................21

CERTIFICATE OF SERVICE ............................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Follenfant v. Rogers*, 359 F.2d 30 (5th Cir. 1966) ..........................................................12

*Ingraham v. United States*, 808 F.2d 1075 (5th Cir. 1987) ...........................................15

*In re Highland Capital Management LP*, 2021 Bankr. LEXIS 2074
   (Bankr. N.D. Tex. August 3, 2021) ..........................................................................17

*In re Skinner*, 917 F.2d 444 (10th Cir. 1990) ...............................................................21

*John H. Carney & Assocs. v. State Farm Lloyds*, 376 F. Supp. 2d 697
   (N.D. Tex. 2005) ........................................................................................................13

*Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313 (5th Cir. 2016) ...............................12

*Kaye v. Lone Star Fund (V), L.P.*, 453 B.R. 645 (N.D. Tex. 2011) ...............................13

*Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802
   (N.D. Tex. Jan. 10, 2011) ..........................................................................................12

*Orix Fin. Servs. v. Thunder Ridge Energy Inc.*, 2005 U.S. Dist. LEXIS 41889
   (S.D.N.Y. 2005) .........................................................................................................14

*Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678
   (W.D. Tex. Sept. 29, 2011) ........................................................................................12

*Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex. 1996) ......................................13

*Travelhost Inc. v. Blandford*, 68 F.3d 958 (5th Cir. 1995) ...........................................16

*Watt v. Butler*, 457 Fed. Appx. 856 (11th Cir. 2012) ...................................................14

## Statutes and Rules

28 U.S.C. § 636 ..............................................................................................................21

TEX. BUS. & COMM. CODE ANN. § 1.206 ........................................................................13

TEX. BUS. & COMM. CODE ANN. § 3.308 ..................................................................12, 13

FED. R. CIV. P. 8 .......................................................................................................13, 14

FED. R. CIV. P. 11 ...........................................................................................................12

FED. R. CIV. P. 12 ................................................................................................20

FED. R. CIV. P. 37 ................................................................................................20

TEX. R. CIV. P. 93 ................................................................................................12

**DEFENDANT'S OBJECTION TO PLAINTIFF'S
<u>MOTION TO STRIKE, FOR SANCTIONS, AND FOR CONTEMPT</u>**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>" or the "<u>Defendant</u>"), the defendant in the above styled and numbered adversary proceeding (the "<u>Adversary Proceeding</u>") commenced by Highland Capital Management, L.P. (the "<u>Debtor</u>"), and files this its *Objection* to the *Plaintiff's Omnibus Motion (a) to Strike Certain Documents and Arguments from the Record, (b) for Sanctions, and (c) for an Order of Contempt* (the "<u>Motion</u>"), respectfully stating as follows:

## I.    <u>SUMMARY</u>

1.      It is the Debtor who alleged that HCMFA signed the Notes as an element of the Debtor's cause of action, even though the Debtor knows that this is not true (and presented questionable evidence in support of this allegation). All that HCMFA did was to cite to evidence negating this element of the Plaintiff's claim. Most if not all of that evidence was the Plaintiff's *own* summary judgment evidence. The Court's order denying HCMFA leave to amend its answer does not change this. For many months, HCMFA has been denying that it executed the Notes. HCMFA did not concede that amending its answer was necessary, and this Court did not so find when it denied that motion. That is a live issue, but, even so, all that HCMFA did was to negate the Plaintiff's own element; not present any evidence of any element of any affirmative defense that required separate pleading. There is nothing to strike because the District Court, as part of the summary judgment proceedings, will determine whether citing to such evidence was appropriate and whether HCMFA was barred from making its argument, and this Court can make a report and recommendation on that issue. If the District Court agrees with the Debtor, then it will simply

ignore HCMFA's argument, but in no event can this Court decide for the District Court what it will hear or what may be presented to the jury.

2.      With respect to sanctions and contempt, the Motion is groundless and is designed to harass HCMFA and its counsel.  There is no order of this or any other court that HCMFA violated.  Despite the Debtor's misrepresentation of what this Court's order says, never did this Court prohibit HCMFA from negating an element of the Debtor's claim or presenting any arguments or evidence in support.  This Court denied a motion for leave to amend an answer and nothing more, and even then this Court did not determine that arguing that Waterhouse did not sign the Notes even required additional pleading.  And again, all that HCMFA did was to cite to evidence to demonstrate that the Debtor's evidence and representation on the question of signing the Notes was in material dispute, if not outright false.  Doing so cannot be contemptuous, as the purpose of the civil justice system is to seek the truth, as opposed to the Debtor's gamesmanship.

## II.      BACKGROUND

### A.      THE ADVERSARY PROCEEDING

3.      This Adversary Proceeding concerns two promissory notes (the "Notes") allegedly issued by HCMFA in favor of the Debtor, totaling approximately $7.4 million: one is for $5 million, and one is for $2.4 million.  The Notes are allegedly signed by Frank Waterhouse ("Waterhouse"), the former chief financial officer of the Debtor and the then (and present) treasurer of HCMFA.

4.      HCMFA sought to withdraw the reference of this Adversary Proceeding due to the presence of jury rights and non-core issues.  By its report and recommendation entered on July 8, 2021, this Court recommended that the District Court withdraw the reference of this Adversary Proceeding at the time that this Court certifies this Adversary Proceeding as trial-ready, concluding that this Adversary Proceeding was a non-core proceeding and that HCMFA had jury rights.  *See*

Docket No. 50. On September 14, 2021, the District Court accepted the report and recommendation, ordering that the reference will be withdrawn when the Adversary Proceeding is trial-ready. *See* Civil Action No. 3:21-cv-00881-X (District Court Docket).

5.     HCMFA had argued that the reference should be withdrawn immediately, including to avoid confusion and because no order of the Bankruptcy Court can decide for the District Court what evidence it or its jury will see:

- "Rather than having all pretrial decisions subject to *de novo* District Court review, it makes more sense to have the District Court make those decisions in the first instance . . . While the Defendant acknowledges the customary practice in this District that the District Court orders a withdrawal of the reference only when the case is certified as being trial ready, with the Bankruptcy Court handling pretrial matters as a magistrate, because of the jury rights involved and for the other reasons cited above, the Defendant submits that the better result for all litigants and both courts in this instance is for the District Court to immediately withdraw the reference, including over all pretrial matters." *Brief in Support of Defendant's Motion to Withdraw the Reference*, Docket No. 21, p. 12, ¶¶ 30-31.

- "Because the Bankruptcy Court cannot decide a dispositive motion, and because most if not all pretrial matters will govern the jury trial that only the District Court can conduct, the reference should be withdrawn immediately for judicial efficiency and to ensure that the District Court will make all pretrial decisions governing its trial." *Defendant's Reply In Support of Motion to Withdraw the Reference*, Docket No. 30, p. 8, ¶ 13.

- "So, Your Honor should recommend the withdrawal of the reference for my clients because I believe that it's clear we have a jury right. I believe that the reference should be withdrawn immediately. This Court has more than enough going on in this case. There is no crossover discovery here. And if we're going to go to a jury, then it really ought to be the District Court, that's the expert on jury trials, or its magistrate judge, that's the expert on jury trials, deciding pretrial and prejudgment matters, most of which will have to do probably with what the quality of evidence and what evidence there will be that can be even presented to the jury. Transcript of May 25, 2021 Status Conference, Docket No. 39 (15:14-24).

- "Withdrawing the reference now promotes judicial economy, as it will enable this Court to have the familiarity necessary to make key trial determinations on the more complex evidentiary and expert issues that arise in a jury trial. Moreover, because the trial of this Adversary Proceeding will be to a jury, this Court should not risk the Bankruptcy Court's determination of pretrial mattes, such as motions in limine, tying in any way this Court's hands. Simply put, while the Bankruptcy Court is certainly an expert on bankruptcy law and practice, this Adversary Proceeding does not involve the bankruptcy laws, and the Bankruptcy Court is certainly no expert on jury trials and jury practice. Or, if this Court will necessarily review *de novo* all pretrial orders entered by the Bankruptcy Court as this

Court prepares for trial, it would be a gross waste of the Bankruptcy Court's resources, this Court's resources, and the parties' resources to prepare, review, and contest any such orders." *Defendant's Limited Objection to Report and Recommendation*, Dist. Ct. <mark>Docket No. 5, p. 5,</mark> ¶ 12.

6.    Both this Court and District Court disagreed with this argument, thus setting up in some respects the problems faced by HCMFA in defending itself, as discussed below.  HCMFA therefore references the foregoing only to note that any procedural uncertainties and issues caused by the delayed withdrawal of the reference are not of its making, and are not its preference.  Rather, it was the Debtor who argued that the reference should be withdrawn at a later date.

**B.    Debtor Refuses to Produce Evidence that Waterhouse Did Not Sign the Notes Until After Waterhouse is Deposed**

7.    On May 22, 2021, HCMFA filed its first motion to amend its answer to assert affirmative defenses.  *See* <mark>Docket No. 32</mark>.  That motion was not opposed by the Debtor, and the Bankruptcy Court granted that motion.  *See* <mark>Docket No. 46</mark>.

8.    HCMFA filed its first amended answer on July 6, 2021.  *See* <mark>Docket No. 48</mark>.  By that answer, HCMFA expressly denied that it executed the Notes.  *Compare* <mark>Docket No. 1</mark> (complaint) at ¶¶ 14 and 15, *with* <mark>Docket No. 48 at</mark> ¶¶ 14 and 15.  Nevertheless, since May 22, 2021, the Debtor knew that HCMFA was denying that it had executed the Notes.

9.    In the meantime, on May 28, 2021, HCMFA served its first requests for production to the Debtor.  One of those requests requested "[a]ll Microsoft Word copies of the Notes, including Metada." Rule 15 App. at 819.[1]  The Debtor responded to this request as follows:

> The Debtor objects to Request for Production No. 9 to the extent the term "metadata" is vague. Subject to the General Objections and this specific objection, the Debtor will conduct a reasonable search for, and produce, documents responsive to this Request.

---

[1]    As used herein, "Rule 15 App." means the *Defendant's Appendix In Support of Second Motion for Leave to Amend Answer*, filed in this Adversary Proceeding at <mark>Docket No. 86</mark>, which appendix is hereby incorporated in support of this Motion.

Rule 15 App. at 825.

10.     The Debtor did not refuse to produce these documents in writing, it did not state that "metadata" is vague—how could it be for any sophisticated litigant with capable litigation counsel?—and it said that it would search for, and produce, responsive documents.  HCMFA took the Debtor at its word and expected a production or, if none was coming, that the Debtor did not have responsive documents.

11.     The parties deposed Waterhouse—the person who purportedly signed the Notes—on October 19, 2021.  As of that date, the Debtor had yet to produce the originals with metadata of the Notes.  During that deposition, defence counsel asked counsel for the Debtor to produce the originals of the Notes with metadata, which the Debtor <u>refused</u> to produce.[2]  Nevertheless, Waterhouse testified that the signatures on the Notes appear to be electronic signatures and not his original signatures.  *See* Rule 15 App. 348-52; 372-73.

12.     The Debtor finally produced the Notes in original format with metadata on October 25, 2021.  *See* Rule 15 App. 815 (¶ 5).  That production for the first time definitively showed that, not only did Waterhouse not sign the Notes, but Kristin Hendrix ("<u>Hendrix</u>"), a senior accountant for the Debtor, prepared the Notes and affixed pictures of Waterhouse's signature to the Notes, the same as counsel does below using the same picture as Hendrix, simply copied and pasted from what the Debtor produced:

---

[2]     "John, I also asked you for the Word versions of these notes so we could look at the properties, and you have not provided them. Are you intending to?

MR. MORRIS: No."

Rule 15 App. 198 (146:12-17).

---

**MAKER:**

_____

FRANK WATERHOUSE

13.     Thus, on October 25, 2021, it became clear that Waterhouse did not himself sign the Notes.  This would have been known far sooner had the Debtor complied with its basic discovery obligations—to produce the very Notes on which it seeks millions of dollars in recovery in their original format and with metadata.

14.     That is not the end of the analysis, because it is possible that Waterhouse authorized Hendrix to sign the Notes for him.  Both Waterhouse and Hendrix testified about this possibility. Waterhouse testified that, at the time of the Notes, he rarely signed documents electronically, any such documents would have had to have been approved by "legal," he sometimes authorized his administrative assistant (who was not Hendrix) to sign documents electronically, and, when he did so, there would be an e-mail trail or confirmation of such authorization.  *See* Rule 15 Motion App. at 344-48, 350-52, 372-73.

15.     On October 27, 2021, Hendrix testified that it was routine for "accounting" to prepare notes without approval from "legal," that she prepared the Notes, and that she affixed pictures of Waterhouse's signatures on the Notes.  *See* Rule 15 App. 466-69, 491, 494-95, 497-99. Hendrix had no memory of being authorized by Waterhouse to sign the Notes for him and it is obvious from her testimony that she just assumed she had that authority.  *See* Rule 15 Motion App. 497-99  ("In past practice he has always approved using his e-signature to execute documents"). No e-mail between Waterhouse and Hendrix whereby he approved her using his electronic signature has been produced.  *See* Rule 15 App. 815 (¶ 6).  And, she would not have, and did not,

even show the Notes to Waterhouse after she purported to sign his name to them.  *See* Rule 15 Motion App. 499.

16.     The third person of relevance to whether the Notes were signed is David Klos ("Klos"), Hendrix's boss, who asked her to prepare at least one of the Notes.  His testimony is provided in detail below where HCMFA will demonstrate that the Debtor presented a sham affidavit from Klos in support of its MSJ.

## C.    HCMFA Files Second Motion to Amend Answer

17.     Thus, in late October, *after* the Debtor produced the originals of the Notes with metadata, it became clear that Hendrix, not Waterhouse, prepared the Notes and signed them using a picture of his signature.  In light of this clear new evidence, on November 30, 2021, HCMFA filed its second motion for leave to amend its answer [docket no. 82] (the "Rule 15 Motion").  The purpose of the Rule 15 Motion was to more specifically deny that Waterhouse signed the Notes (recalling that, earlier, HCMFA denied that it "executed" the Notes) so as to avoid any dispute over unfair surprise of prejudice.  HCMFA did not concede that this was an affirmative defense or that leave to deny an element of the Debtor's claim was required—as stated in paragraph 1 of that motion.  *See* Docket No. 82 at ¶ 1  ("HCMFA does not concede that this relief is required, as it has already denied that it signed the notes").  Rather, as HCMFA explained, the Texas U.C.C. "appears to require a more express denial of signature."  *See id*.  Hence the reason for the motion.

18.     The Debtor objected to the second motion to amend and the Court held a hearing on January 10, 2022.  Amazingly, in response to the clear evidence that the Debtor defaulted on its discovery obligation to produce the originals of the Notes with metadata, the Debtor argued that it was incumbent upon HCMFA to file a motion to compel the Debtor to produce the documents:

> No motion to compel, no follow up in the month of July.  No motion to compel, no follow up in the month of August.  And mind you, this is at a time that Mr. Rukavina

has told you that they knew -- they thought that there might be a problem with the notes.

So they sit on their hands in July. They sit on their hands in August. They sit on their hands in September. They sit on their hands in the first two weeks of October. And within ten days of the follow up request, we produced the documents.

Transcript January 10, 2022 at 22:24-23:8.

19.     So much for the Debtor's obligation to comply with discovery, so much for *Dondi*, and so much for the farcical argument that anything about "metadata" is vague.  Not only was the Debtor still required to produce what it understood the request sought, but the Debtor had no problem understanding what "metadata" meant when it finally did produce the originals with metadata, conveniently *after* HCMFA deposed Waterhouse.  No—the Debtor did not produce these originals because it knew that Waterhouse did not sign the Notes and that it was Hendrix who instead affixed a picture of his signature to the Notes, and the Debtor wanted to keep this a secret as long as it could in hopes that HCMFA would miss the issue.

20.     The Court did not inquire of the Debtor why it did not timely produce the originals with metadata, much less chastise the Debtor for its discovery games.  Instead, the Court denied the Rule 15 Motion by its *Order Denying Defendant's Second Motion for Leave to Amend Answer* [docket no. 123] (the "Denial Order") entered on January 14, 2022.  HCMFA has sought review of the Denial Order before the District Court.

21.     The operative portion of the Denial Order simply states as follows:

The Motion is **DENIED**.

22.     Nowhere does the Denial Order find that leave to amend the answer was required to assert that Waterhouse did not sign the Notes.  Nowhere does the Denial Order prohibit HCMFA from ever raising this argument again.  Nowhere does the Denial Order prohibit HCMFA from

---

presenting any evidence on this issue in response to the Debtor's summary judgment motion or anything else.

## D.  THE DEBTOR'S MSJ

23.    On December 17, 2021, the Debtor filed its motion for summary judgment and, more importantly, its brief in support thereof, seeking summary judgment on its breach of contract claims for the Notes [Docket No. 91 and 93] (the "MSJ").  In the MSJ, the Debtor described the elements of its cause of action as follows:

> To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note.

See Docket No. 95 (brief in support of MSJ) at ¶ 132 (emphasis added).

24.    It is the Debtor, therefore, that expressly raised the issue of whether Waterhouse signed the Notes.

25.    As evidence in support of its argument that HCMFA signed the Notes, the Debtor submitted two things.  First, the Debtor submitted the Declaration of David Klos [Docket No. 92] (the "Klos Declaration").  See Docket No. 95 at ¶ 135.  Second, the Debtor submitted an appendix in general support of the MSJ.  Docket No. 94.  That appendix included the deposition testimony of Waterhouse, Hendrix, and Klos.

26.    In its response to the MSJ, HCMFA argued and presented its evidence to defeat the "signature" element of the Debtor's cause of action by demonstrating the existence of a genuine issue of disputed, material fact regarding whether HCMFA even executed the Notes—as HCMFA was defending the Notes since May, 2021.  More precisely, HCMFA demonstrated that Waterhouse did not sign the Notes and that there is no evidence that he authorized Hendrix to sign

them for him.  In the process, HCMFA did not seek to hide the fact of the Denial Order from the

District Court, expressly stating as follows:

> The Bankruptcy Court denied HCMFA's motion to amend its Answer to more
> affirmatively plead that the Notes were not signed, but HCMFA expressly argued
> that such amendment was not necessary and that HCMFA's prior Answer
> sufficiently placed the Debtor on notice under applicable law that HCMFA denied
> signing the Notes. . .
>
> Out of an abundance of caution, HCMFA is filing an objection with the District
> Court to the Bankruptcy Court's order, seeking the District Court's review of that
> order. To the extent necessary, HCMFA incorporates its motion to amend and its
> objection to the Bankruptcy Court's denial of that motion in this Brief, and reserves
> all rights with respect to the same.
>
> For the avoidance of doubt, any confusion over whether HCMFA needed to amend
> its Answer results from differences between the Texas Rules of Civil Procedure
> and the Federal Rules of Civil Procedure. The Texas Rules require specific denials
> in certain instances because the Texas Rules permit general denials. Tex. R. Civ. P.
> 92. The Federal Rules, on the other hand, require specific denials nearly all the
> time, including here. Fed. R. Civ. P. 8(b)(1)(B).

Docket No. 127 at pp. 25-26 n. 23.

27.      And, the evidence used by HCMFA to demonstrate that Waterhouse did not sign

the Notes comes from the deposition testimony of Waterhouse, Hendrix, and Klos—all deposition

transcripts contained in the Debtor's own summary judgment appendix.

28.      Setting aside the issue that the Debtor caused this situation by not complying with

its discovery obligations, it is elemental that HCMFA must present its arguments and evidence in

opposition to the MSJ, or risk waiver.  New motions for summary judgment and responses and

appendices will not be filed before the District Court.  Rather, the District Court will review the

current proceedings once this Court issues its report and recommendation.  HCMFA presented its

arguments and its evidence, it informed the District Court of the fact of the Denial Order, and it

preserved its rights once the District Court considers all of these proceedings.  Had HCMFA not

raised this defense and presented its evidence, the Debtor would certainly have argued that

HCMFA would have waived this critical defense and issue, since the District Court's review on summary judgment is to review *de novo* the Bankruptcy Court's report and recommendation and not to permit new arguments and evidence not presented to the Bankruptcy Court.

### III.      ARGUMENTS AND AUTHORITIES

#### A.      NO GROUNDS TO STRIKE EVIDENCE OR DEFENSE

29.      The Debtor seeks to strike uncontroverted evidence that tends to negate an element of its claim, and apparently the related arguments, raised by HCMFA in response to summary judgment for the proposition that Waterhouse did not sign the Notes.  As for striking HCMFA's evidence, it was the Debtor's own evidence since HCMFA cited to the Debtor's evidence in demonstrating that Waterhouse did not sign the Notes.  HCMFA does not know how the Court would strike the Debtor's own evidence.  Rather, it appears that what the Debtor really seeks is an order striking any argument by HCMFA that Waterhouse did not sign the Notes.  But demonstrating that HCMFA signed the Notes is an element of the Debtor's own cause of action, as expressly pled by the Debtor in the MSJ.  And, HCMFA has denied that it executed the Notes.  So, all that HCMFA did was to counter the Debtor's own allegation.

30.      The fundamental question is whether HCMFA adequately denied its signature on the Notes.  When HCMFA filed the Rule 15 Motion, it made it clear that, in filing that motion, HCMFA was proceeding out of an abundance of caution and without conceding that the amendment was necessary.  As HCMFA explained, the Texas Uniform Commercial Code appears to require an express denial of signature, but that does not answer the question of whether the existing denial was adequate.  The U.C.C. provides:

> In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument are admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized unless the action is to enforce the liability

of the purported signer and the signer is dead or incompetent at the time of trial of
the issue of validity of the signature.

Tex. Bus. & Comm. Code Ann. §  3.308(a).  Further uncertainty arises from Tex. R. Civ. P. 93,

which requires a verified denial of a signature.  However, that rule does not apply in Federal Court

*Follenfant v. Rogers*, 359 F.2d 30, 31-2 (5th Cir. 1966); *Ramirez v. Bexar County*, 2011 U.S. Dist.

LEXIS 111678, *16 (W.D. Tex. Sept. 29, 2011); *Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011

U.S. Dist. LEXIS 171802, *5 n.7 (N.D. Tex. Jan. 10, 2011); *see* Fed. R. Civ. P. 11(a).

31.    Here, there are two issues: the question of whether Waterhouse actually signed the

Notes, and whether HCMFA signed the Notes.  At the time of the answer, the Debtor had not

produced the originals of the Notes, so HCMFA did not know that Hendrix signed them

electronically.  HCMFA therefore did not expressly and affirmatively allege that Waterhouse did

not sign the Notes.  But it did deny the only allegation in the Complaint regarding execution,

*compare* Docket No. 1 (complaint) at ¶¶ 14 and 15 *with* Docket No. 48 at ¶¶ 14 and 15, and it

denied that the signature was valid: "The Defendant did not authorize Waterhouse to sign the Notes

or to bind the Defendant in any way to the Note."  Docket No. 48, p. 7, ¶ 43.  The statute requires

the express denial of the "authority to make" the signature, which HCMFA unquestionably

denied.[3]  Therefore, "the validity of a signature is denied" in the answer and the Debtor must prove

the fact of the signature, albeit with the statutory presumption of validity.  The U.C.C. also defines

"presumed" as follows:

> Whenever this title creates a "presumption" with respect to a fact, or provides that
> a fact is "presumed," the trier of fact must find the existence of the fact unless and
> until evidence is introduced that supports a finding of its nonexistence.

---

[3]    To the extent the Debtor points to allegations in the answer that Waterhouse "signed" the notes, "[r]ule 8 of
the Federal Rules of Civil Procedure permits the alternative pleading of inconsistent claims and defenses …."
*Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313, 317 (5th Cir. 2016).

TEX. BUS. & COMM. CODE at § 1.206.  There is a presumption that Waterhouse signed the Notes

even though HCMFA denied executing the Notes, but that presumption can be overcome and, if

overcome, the Debtor bears the burden of proving signature: "the burden of establishing validity

is on the person claiming validity."  *Id*. at §  3.308(a).

32.    Leave to amend might have been required if HCMFA were raising a new

affirmative defense, but it was not.  Rule 8 lists various affirmative defenses, and the failure to

sign a document is not one of them.  FED. R. CIV. P. 8(c).  An affirmative defense is more generally

defined as follows:

> An affirmative defense by definition does not seek affirmative relief. When one
> pleads an affirmative defense, he or she sets forth facts or arguments which, if true,
> will defeat a plaintiff's claim, even though all matters alleged by the plaintiff in a
> complaint or petition are true.

*John H. Carney & Assocs. v. State Farm Lloyds*, 376 F. Supp. 2d 697, 703 (N.D. Tex. 2005).

Likewise under Texas law: "[a]n affirmative defense does not seek to defend by merely denying

the plaintiff's claims, but rather seeks to establish an independent reason why the plaintiff should

not recover."  *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 212 (Tex. 1996).

33.    Here, as the Debtor admits, it must prove that HCMFA signed the Notes as an

element of its cause of action.  The Debtor has a presumption aiding that inquiry, but the burden

is always on the Debtor.  Because the Debtor must prove the signature requirement as an element

of its claim, the defense is not one "which, if true, will defeat a plaintiff's claim, even though all

matters alleged by the plaintiff in a complaint or petition are true."  Viewed differently, "an

affirmative defense is a defense that the defendant bears the burden of proving."  *Kaye v. Lone

Star Fund (V), L.P.*, 453 B.R. 645, 679 (N.D. Tex. 2011) (internal quotation omitted).  Here, by

statute the signature is presumed, HCMFA must overcome that presumption, and, if HCMFA

overcomes that presumption, the Debtor bears the burden of proving that Waterhouse signed the

Notes: "[i]f the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity."  The trustee in a preference claim, for example, has the benefit of a presumption that the debtor was insolvent within the 90 days prior to the filing the petition, but, if that presumption is rebutted, the burden is still the trustee's to prove insolvency.  This is no different.

34.      As federal case law generally confirms, "[n]egation of a presumption is different from an affirmative defense."  *Watt v. Butler*, 457 Fed. Appx. 856, 861 n. 2 (11th Cir. 2012).  *See also Orix Fin. Servs. v. Thunder Ridge Energy Inc.*, 2005 U.S. Dist. LEXIS 41889 *37-39 (S.D.N.Y. 2005) (rejecting argument that non-execution of document is an affirmative defense despite rebuttable presumption of execution: "the non-execution of a guaranty is not an affirmative defense under Fed. R. Civ. P. 8(c).  Rather, allegations of non-execution merely controvert an essential element of plaintiff's prima facie case -- due execution of the guaranties in question").

35.      HCMFA has located no reported opinion that directly addressed the question of whether the denial of a signature on a promissory note is an affirmative defense or not, although the *Orix Fin. Serves.* case cited above is on point and presents persuasive authority.  That is why HCMFA filed the Rule 15 Motion, because it wanted to raise the issue and ensure that it was not prejudicing itself.  But, as HCMFA did not admit that the defense was an affirmative defense, and as this Court did not so find, the question still remains whether the existing denial is adequate.  It should be the District Court, however, that makes that decision, which it can easily make in the context of the MSJ: if the District Court finds that the defense was not timely pled, then it can simply ignore it without the need to strike anything, and if the District Court concludes otherwise, then there is no issue at all.

36.      And, even with an affirmative defense, "where an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise technical failure to comply with

Rule 8(c) is not fatal." *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987). Here, the defense cannot possibly come as any surprise, much less an unfair one, for the Debtor, who has known all along that it was Hendrix who affixed Waterhouse's signature to the Notes yet refused to produce that information in discovery until much later.

37.     The appropriate course, therefore, is not to strike anything. Rather, the appropriate course is to determine, as part of the summary judgment proceeding, whether HCMFA adequately challenged the signature in its live answer and is entitled to point out uncontroverted facts that negate an element of the Debtor's cause of action. This Court can provide its report and recommendation to the District Court on that issue, either as part of the MSJ or as part of the present Motion. The District Court should therefore decide the ultimate issues as part of deciding the MSJ, with the benefit of this Court's report and recommendation. To stress, in no event can or should this Court decide the adequacy of HCMFA's answer, as that would be a substantive ruling that would decide for the District Court what arguments and evidence the jury could see—something that would create a serious Constitutional issue as to this Court's jurisdiction and authority.[4]

38.     Moreover, the Denial Order is presently on review before the District Court.[5] If the District Court agrees with HCMFA's objection to the Denial Order, then there can be nothing

---

[4]     Indeed, the Debtor defends against HCMFA's objection to the Denial Order by arguing, in part, that the District Court cannot review that order except on appeal. Under that argument, this would mean that this Court would decide for the District Court what issues, arguments, and facts the jury will hear. And, HCMFA would only be permitted to appeal pretrial orders as part of a final judgment, thus appealing pretrial orders to the District Court then while appealing the judgment to the Fifth Circuit—a procedural and Constitutional quagmire that is surely to embroil the parties in years of complicated appeals and briefing, which is exactly the opposite of what the Debtor says it wants.

[5]     The Debtor criticizes HCMFA for seeking review of the Denial Order from the District Court. Such criticism is unfounded and seeks solely to color this Court against HCMFA. It was HCMFA that urged both courts to withdraw the reference immediately and not to have a bifurcated proceeding, partially in order to avoid confusion and the type of inter-court practice that now exists. Whether under Rule 41 or as part of the District Court's ability to review all non-final orders under Rule 54(b), HCMFA has every right to seek the District Court's review of the Denial Order and such review should not be held against HCMFA.

to strike while, if the District Court disagrees with that objection, then it will be the District Court, either at summary judgment or as the parties prepare for trial, that will decide what the effect of such a denial will be.

## B.   NO CONTEMPT AS A MATTER OF LAW

39.     HCMFA and its counsel take their obligation to comply with the Court's orders seriously, and they take the matter of contempt very seriously.  They have not violated any order of the Court.  HCMFA has acted to protect and preserve its rights and arguments in a situation not of its making, where on the one hand it has the right to a trial by jury before the District Court, while on the other both this Court and the District Court have agreed that pretrial matters should be handled by this Court.  This places HCMFA in a difficult situation of having to defend itself against dispositive pleadings when the District Court has yet to decide, on a final basis, this Court's pretrial orders.  HCMFA has acted respectfully, acknowledging this Court's pretrial orders and taking proper steps to seek review of those pretrial orders, while still defending itself against the Debtor's claims based on the facts.  Had HCMFA not pointed out those facts and arguments in its MSJ response, the Debtor would certainly have argued waiver, and this Court and the District Court could easily have agreed with that argument.  And, as will be shown below, the Debtor relied on a sham affidavit in its MSJ.  In any event, and HCMFA and its counsel's good faith aside, there is no possible contempt as a matter of law.

40.     "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."  *Travelhost Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995).  Thus, as the Court has concluded, "the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence, (1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply

with the court's order." *In re Highland Capital Management LP*, 2021 Bankr. LEXIS 2074 at *31 (Bankr. N.D. Tex. August 3, 2021). And, while a court need not anticipate every action that could be taken in response to its order, "[t]o support a contempt finding in the context of an order alleged to have been violated, the order must delineate 'definite and specific' mandates that the defendants violated." *Id*.

41.     The Denial Order simply denied HCMFA leave to amend its answer. It did not prohibit HCMFA from asserting that Waterhouse did not sign the Notes. It did not command HCMFA to do or not to do anything. It did not even find that the defense was an affirmative defense that was waived. Certainly it is not a "definite and specific order" that commands performance. There may be consequences flowing from that order, such as alleged denial of an affirmative defense as untimely or waived, but that is not contempt.

42.     Yet, the Debtor makes the following patently incorrect statement in support of contempt: ". . . the [denial order] expressly prohibited HCMFA from asserting the Barred Defense . . ." *See* Docket No. 162 at ¶ 38 (emphasis added). Again, the Denial Order provides that "[t]he Motion is DENIED." That is not a prohibition, and certainly not an express prohibition, against HCMFA raising its defense or doing or refraining from doing anything. The Debtor simply, and obviously, misrepresents the terms of the Denial Order.

43.     Equally as importantly, the evidence that HCMFA used to demonstrate that Waterhouse did not sign the Notes was actually offered into evidence by the Debtor itself in its MSJ. *See* Docket No. 94 at p. 9 (Waterhouse deposition); p. 13 (Hendrix deposition); and p. 13 (Klos deposition). Is the Debtor suggesting that it can be contempt to point to evidence that the Debtor itself offered and admitted into the MSJ Proceedings? It is the Debtor that alleged, in its MSJ, that HCMFA "signed" the Notes. It is the Debtor that had to prove this as an express element of its cause of action, as it itself informed the Bankruptcy Court. All that HCMFA did was to

demonstrate, at a minimum, that genuine issues of material fact precluded summary judgment on this element—exactly as it is permitted to do and required to do under Rule 56. The Denial Order in no way addressed that issue or prohibited any discussion of the defense or the presentation of evidence in support of that evidence—and the Debtor's own evidence at that. There is no possible contempt.

44.     In this respect, it should also be noted that the Debtor could have, but did not, rely on the above U.C.C. presumption of the validity of the signatures on the Notes in support of its MSJ. Instead, the Debtor affirmatively argued and represented that HCMFA signed the Notes. Whatever else may be said about Waterhouse's authority to bind HCMFA or Hendrix's authority to sign Waterhouse's signature, it is a fact that Waterhouse did not sign the Notes—Hendrix did, using an electronic picture of Waterhouse's signature. What the Court should also understand is that HCMFA cited to this contrary evidence partially because the Debtor presented a sham affidavit in support of its argument that HCMFA signed the Notes. In its MSJ, the Debtor expressly states that "[t]o prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish . . . (ii) that the non-movant signed the note . . ." Docket No. 95, p. 40, ¶ 132. The Debtor then alleges:

> The HCMFA Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 21-22, Exs. G, H), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09, (Klos Dec. ¶ 40).

Docket No. 95, p. 41, ¶ 135. (emphasis added).

---

45.    Klos begins his declaration by stating "[t]his Declaration is based on my personal knowledge." Docket No. 92 at ¶ 1.  However, this statement contradicts Klos's sworn deposition testimony, the hallmark of a sham affidavit.

46.    Klos does not have "personal knowledge" that HCMFA "executed" the Notes. Rather, as he testified at his deposition, he asked Hendrix to prepare the Notes.  Rule 15 App. 736-37 (83:19-84-24).  And:

> Q. After you asked Ms. Hendrix to prepare this note, did you have any further role with respect to the papering, preparation, or execution of that note?
>
> A. Not that I can remember.
>
> Q. Would you have had any role in having either or both of the notes actually signed electronically or by ink by Mr. Waterhouse?
>
> A. Likely not, no.
>
> \*        \*        \*
>
> Q. On the $5 million note, do you remember if you had any role with respect to its physical papering or execution?
>
> A. Not that I recall.
>
> Q. To the best of your memory, your role would have been done by instructing your team, hey, here is these new loans, go paper it up; is that accurate?
>
> A. On the upfront side. I suppose my role would have also included on the back end making sure that the actual payment had occurred. But that would have been doing that realtime, seeing the funds went out, and that, most importantly, that the consent fee had been paid from HCMFA to the transfer agent.

*Id*. 736-38 (83:19-85:16).

47.    Klos has no personal knowledge that HCMA "executed" the Notes.  His role ended after he asked an assistant to prepare the Notes.  He was not involved, or at least does not remember being involved, with anything after asking Hendrix to prepare the $2.4 million note, and does not remember having anything to do with the papering or execution of the $5 million note at all.  For

him to state that he had personal knowledge that HCMFA "executed" the Notes contradicts his sworn deposition testimony. Equally as remarkable, the Debtor did not present a similar declaration from Hendrix, who *does* have personal knowledge of the execution of the Notes, as she drafted them and then affixed Waterhouse's signatures to them, but that would not have been beneficial to the Debtor since that would only prove that Waterhouse did not sign the Notes and that he did not authorize Hendrix to sign the Notes for him.

48.     With respect to the Debtor's allegations that HCMFA and its attorneys violated Rule 12 and Rule 37, the Debtor states that, under Rule 12(f), the Bankruptcy Court may strike an insufficient defense from a pleading. But, that the Bankruptcy Court may do so, does not mean— and cannot possibly mean—that HCMFA violated Rule 12. Under Rule 37, a court can redress violations of discovery orders. That has nothing to do with whether HCMFA may raise an argument and present evidence in support of the argument. One might expect the Debtor to argue waiver for failure to plead, which the District Court can decide in connection with deciding the MSJ, but not that the defense should be barred because HCMFA committed a discovery violation. Never mind the fact that the Debtor violated its discovery obligations by refusing to produce the Notes in their original format with metadata. The Debtor's allegations that HCMFA violated Rules 12 and 37, therefore, are baseless and absurd.

## C.   BANKRUPTCY COURT LACKS JURISDICTION OVER CONTEMPT

49.     This is a non-core proceeding over which this Court may or may not be acting as a magistrate judge (although this Court has previously stated that it is serving as a magistrate).[6] This Court therefore lacks core jurisdiction to find contempt or to issue sanctions for contempt. The Court has core jurisdiction to enforce an order of contempt where this Court has core jurisdiction

---

[6]     *See Memorandum Opinion and Order Denying Arbitration Request and Related Relief*, Docket No. 110 in Adversary No. 21-3005, p. 2 n.1, p. 3 n.5.

over the underlying order.  *See, e.g., In re Skinner*, 917 F.2d 444, 448 (10th Cir. 1990).  Since the Denial Order is not a core proceeding, any contempt of that order is likewise a non-core proceeding.  And, if this Court is acting as a magistrate, then federal statute requires that the Court provide a report and recommendation of the alleged contempt to the District Court (since this Court is not proceeding to enter a final judgment with the consent of the parties).  *See* 28 U.S.C. § 636(e)(6)(B).

50.    Therefore, HCMFA objects to this Court's entry of any final order of contempt against itself or its counsel and requests instead that this Court provide the District Court with a report and recommendation on that issue.

## IV.    <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, HCMFA respectfully requests that the Court enter an order (i) denying the Motion; (ii) alternatively, providing a report and recommendation to the District Court if the Court is inclined to grant the Motion; and (iii) granting HCMFA such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this the 28th day of February, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: <u>/s/ Davor Rukavina</u>
　　　Davor Rukavina
　　　State Bar No. 24030781
　　　Julian P. Vasek.
　　　State Bar No. 24070790
　　　500 N. Akard Street, Suite 3800
　　　Dallas, Texas 75202-2790
　　　Telephone: (214) 855-7500
　　　Facsimile: (214) 978-4375
　　　Email:  drukavina@munsch.com
　　　Email: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on February 28, 2022, a true and correct copy of the foregoing document, including any exhibit(s) thereto, was served on counsel for the Debtor via the Court's CM/ECF system.

By: /s/ Davor Rukavina
      Davor Rukavina

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:    MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

------------------------------------------------------------

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-3004 |
| vs. | § § | |
| | § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | |
| Defendant. | § § § | |

------------------------------------------------------------

---------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,           §
                                             §
                    Plaintiff,               §        Adv. Proc. No. 21-3005
                                             §
vs.                                          §
                                             §
NEXPOINT ADVISORS, L.P., JAMES               §        Case No. 3:21-cv-00881-X
DONDERO, NANCY DONDERO, AND                  §
THE DUGABOY INVESTMENT TRUST,                §
                                             §
                                             §
                    Defendants.              §
---------------------------------------------------------
HIGHLAND CAPITAL MANAGEMENT, L.P.,           §
                                             §
                    Plaintiff,               §        Adv. Proc. No. 21-3006
                                             §
vs.                                          §
                                             §
HIGHLAND CAPITAL MANAGEMENT                  §        Case No. 3:21-cv-00881-X
SERVICES, INC., JAMES DONDERO,               §
NANCY DONDERO, AND THE DUGABOY               §
INVESTMENT TRUST,                            §
                                             §
                    Defendants.              §
---------------------------------------------------------
HIGHLAND CAPITAL MANAGEMENT, L.P.,           §
                                             §
                                             §        Adv. Proc. No. 21-3007
                    Plaintiff,               §
                                             §
vs.                                          §
                                             §        Case No. 3:21-cv-00881-X
HCRE PARTNERS, LLC (n/k/a NexPoint           §
Real Estate Partners, LLC), JAMES            §
DONDERO, NANCY DONDERO, AND                  §
THE DUGABOY INVESTMENT TRUST,                §
                                             §
                    Defendants.              §
---------------------------------------------------------

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT ............................................................................................................... 3

   A.   The Pully Report Should be Stricken from the Record ........................................ 3

      1.   The Discovery Orders Preclude Defendants from Offering the Pully Report ........... 3

      2.   Including the Pully Report as an "Offer of Proof" in the Summary Judgment Record is Improper .................................................................. 5

   B.   The Term Note Defendants are in Contempt of the Expert Order ......................... 8

   C.   HCMFA's Barred Defense Should be Stricken from the Summary Judgment Record .................................................................................... 10

   D.   HCMFA is in Contempt of the Second Motion for Leave Order ........................ 11

   E.   The Bankruptcy Court has Jurisdiction to Issue Sanctions............................... 12

DOCS_NY:45320.7 36027/003

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
228 F.3d 574 (5th Cir. 2000) ............................................................................. 9

*Barrett v. Atlantic Richfield Co.*,
95 F.3d 375 (5th Cir. 1996) .............................................................................. 5

*Fortunato v. Ford Motor Co.*,
464 F.2d 962 (2d Cir. 1972) ............................................................................. 6

*Fusco v. Gen. Motors Corp.*,
*11 F.3d 259 (1st Cir. 1993)* ............................................................................ 2

*Geiserman v. MacDonald*,
893 F.2d 787 (5th Cir. 1990) ........................................................................... 4

*Germano v. International Profit Ass'n, Inc.*,
544 F.3d 798 (7th Cir. 2008) ....................................................................... 6, 7

*In re Adelphi Institute, Inc.*,
112 B.R. 534 (S.D.N.Y. 1990) ........................................................................ 13

*In re Kennedy*,
48 B.R. 621 (Bankr. D. Ariz. 1985) ................................................................ 13

*In re Lion Capital Group*,
46 B.R. 850 (Bankr. S.D.N.Y. 1985) .............................................................. 13

*In re McLean Indus., Inc.*,
68 B.R. 690 (Bankr. S.D.N.Y. 1986) .............................................................. 13

*In re THB Corp.*,
94 B.R. 797 (Bankr. D. Mass. 1988) .............................................................. 12

*LabMD, Inc. v. Tiversa Holding Corp.*,
No. 15-92, 2020 WL 1428935 (W.D. Pa. March 24, 2020) ........................... passim

*Matter of Baum*,
606 F.2d 592 (5th Cir. 1979) ...................................................................... 9, 10

*N.L.R.B. v. Trailways, Inc.*,
729 F.2d 1013 (5th Cir. 1984) .......................................................................... 9

*Orix Fin. Servs. v. Thunder Ridge Energy, Inc.*,
2005 U.S. Dist. LEXIS 41889 (S.D.N.Y. Dec. 29, 2005) ............................... 11

ii

*Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*,
    177 F.3d 380, (5th Cir. 1999) ......................................................... 10

*S.E.C. v. Euro Sec. Fund*,
    No. 98 Civ. 7347(DLC), 2009 WL 2709316 (S.D.N.Y. Aug. 27, 2009) ................................ 5

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
    685 F.3d 486 (5th Cir. 2012) ........................................................... 5

*Sprint Solutions, Inc. v. Taylor*,
    No. 3:14–CV–4124–M (BF), 2015 WL 4100059 (N.D.Tex. Jul. 6, 2015) ............................... 5

*Utica Mutual Insurance Company v. Munich Reinsurance America, Inc.*,
    7 F.4th 50 (2d. Cir. 2021) ............................................................. 7

*Watt v. Butler*,
    457 Fed. Appx. 856, 861 (11th Cir. 2012).............................................. 11

*Williams v. Manitowoc Cranes*,
    *LLC*, 1:14CV383-HSO-JCG, 2016 WL 7666158 (S.D. Miss. Jan. 12, 2016)............................ 10

*York v. Toone*,
    2018 WL 8619800 (W.D. Tex. Dec. 10, 2018) ........................................... 7

**STATUTES**

28 U.S.C. § 157(c) ........................................................................ 13

**RULES**

Fed. R. Civ. P. 16 ........................................................................ 5

Fed. R. Civ. P. 16(f)(1) .................................................................. 5

Fed. R. Civ. P. 37(b)(2)(A) .............................................................. 5

Fed. R. Civ. P. 43 ....................................................................... 6

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF ITS OMNIBUS MOTION (A) TO STRIKE CERTAIN DOCUMENTS AND ARGUMENTS FROM THE RECORD, (B) FOR SANCTIONS, AND (C) FOR AN ORDER OF CONTEMPT**

Highland Capital Management, L.P. ("<u>Highland</u>" or "<u>Plaintiff</u>"), the reorganized debtor in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>") and plaintiff in the above-referenced adversary proceedings (collectively, the "<u>Notes Actions</u>"), hereby files this reply (the "<u>Reply</u>") in response to (1) *Defendants' Response in Opposition to Plaintiff's Omnibus Motion (a) to Strike Certain Documents and Arguments from the Record, (b) for Sanctions, and (c) for an Order of Contempt* filed by the Term Note Defendants [Adv. Pro. No. 21-03005, Docket No. 180; Adv. Proc. No. 21-03006, Docket No. 182; Adv. Proc. No. 21-03007, Docket No. 177] (the "<u>Expert Opp.</u>"), and (2) *Defendant's Objection to Plaintiff's Motion to Strike, for Sanctions, and for Contempt* filed by HCMFA [Adv. Pro. No. 21-03004, Docket No. 145] (the "<u>Defense Opp.</u>").[1]

## PRELIMINARY STATEMENT

1.      The Motion should be granted in all respects.  Defendants' inclusion of the Pully Report and the Barred Defense in the summary judgment record (a) violates this Court's Orders which expressly prohibit the inclusion of such evidence and arguments, and (b) prejudices Plaintiff by conducting surprise litigation and not giving Plaintiff an opportunity to take discovery on such issues or adequately respond thereto.

2.      Nevertheless, Defendants attempt to justify their Wrongful Conduct by insisting that, *inter alia*, (a) the Discovery Orders do not explicitly prohibit the Pully Report or the Barred Defense in opposition to summary judgment, (b) the inclusion of the Pully Report in the summary judgment record is "necessary" to preserve the issue for appeal, despite the Court's clear directive

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in the *Brief in Support of Plaintiff's Omnibus Motion (a) to Strike Certain Documents and Arguments from the Records, (b) for Sanctions, and (c) for an Order of Contempt.  See* Adv. Pro. No. 21-03005, Docket No. 162.

otherwise, and (c) including the evidence as a purported "offer of proof" somehow insulates Defendants from sanctions. Defendants' arguments are unavailing.

3.      Defendants cite no authority (and Plaintiff is aware of none) that permits a party to submit evidence and arguments in opposition to summary judgment that was previously excluded by court order.[2] If countenanced, Defendants' Wrongful Conduct will effectively render each of the Orders null and void (and the time and expense leading up to their entry completely unnecessary and wasteful). Defendants' Wrongful Conduct will also result in substantial prejudice to Plaintiff, a fact Defendants completely ignore.

4.      Defendants' "offer to stipulate that this Court could disregard the evidence, as it was presented solely for the purpose of protecting it on appeal" is not credible. This Court is already authorized to weigh and consider evidence and does not need Defendants' permission to do so. Moreover, the issues were already preserved for appeal when the underlying motions were denied. If there was any doubt about that, (i) Defendants have already appealed both Orders to the District Court (albeit improperly), and (ii) Plaintiff offered to stipulate that the issues were preserved for appeal.[3]

5.      This Court should decline Defendants' invitation to create new law by enabling (a) the Term Note Defendants to include the Pully Report in the evidentiary record, and (b) HCMFA

---

[2] Before filing the Motion, Plaintiff asked Defendants to provide a citation "to any case where a court has relied on a proffer of evidence that it previously excluded to determine a summary judgment motion." *See Declaration of John A. Morris in Support of Plaintiff's Omnibus Motion (a) to Strike Certain Documents and Arguments from the Record, (b) for Sanctions, and (c) for an Order of Contempt*, Adv. Pro. No. 21-03005, Docket No. 163 ("*Morris Dec.*"), Ex. 9 at 2. Defendants failed to cite any such case in response or in its opposition to the Motion.

[3] Morris Dec. Ex. 9 at 2 ("If your issue is preserving the issue for appeal, I would consider a stipulation – although, given that the evidence and arguments subject to the proffer were already the subject of motions and orders . . . which ha[ve] already been presented to the District Court for review, I don't understand the concern or the necessity. Indeed, as you note, "[w]here the "pretrial proffer is adequate and *evidence is excluded unconditionally by a pretrial order,*" then "the proponent *has preserved the issue for appeal* and (other circumstances being unchanged) need not bring the witness to court and proffer the evidence again at trial." *Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 262–63 (1st Cir. 1993) (emphasis added)").

to pursue the Barred Defense in opposition to summary judgment under the guise of "proffers" in violation of orders prohibiting precisely this conduct.

6.       In blatant disregard of the Orders, and despite having already appealed the Orders to the District Court, Defendants insist on jamming the Pully Report and the Barred Defense into the summary judgment record so that they can be considered by the District Court in the summary judgment context. Defendants' disagreement with the Orders gives them no license to ignore them, particularly at Plaintiff's expense. The District Court will decide the appeals of the Orders in due course. In the meantime, the Motion should be granted.

## ARGUMENT

### A.    The Pully Report Should Be Stricken from the Record

#### 1.    The Discovery Orders Preclude Defendants from Offering the Pully Report

7.       By including and relying on the Pully Report in their opposition to summary judgment, the Term Note Defendants plainly violated the Scheduling and Expert Orders. The following facts undisputed:

- Pursuant to the Scheduling Order, expert opinions were required to be disclosed by October 29, 2021 (the "Disclosure Deadline");

- The Term Note Defendants did not disclose any expert opinions by the Disclosure Deadline;

- Pursuant to the Scheduling Order, experts were to be made available for deposition by November 8, 2021 (the "Deposition Deadline" and together with the Disclosure Deadline, the "Expert Deadlines");

- The Term Note Defendants did not make Mr. Pully available for deposition by the Deposition Deadline;

- The Term Note Defendants moved to amend the Scheduling Order to extend the Expert Deadlines so they could commission and offer expert opinions (*i.e.*, the Pully Report) and engage in expert discovery;

- After briefing and extensive oral argument, the Court denied the Expert Motion and issued the Expert Order;

- The Term Note Defendants appealed the Expert Order to the District Court; and

- Plaintiff relied on the Scheduling Order and Expert Order and took no expert discovery.

8.    Based on these undisputed facts, the Term Note Defendants' inclusion of the Pully Report clearly violates the Scheduling and Expert Orders, and should be stricken from the summary judgment record. *See LabMD, Inc. v. Tiversa Holding Corp.*, No. 15-92, 2020 WL 1428935, at *7 (W.D. Pa. March 24, 2020) (striking expert report attached to opposition to summary judgment where "its submission plainly violates the Court's clear directive," explaining that party chose to "conduct litigation by surprise.  If the Court were to permit [party] to rely on the [expert report], it would unfairly prejudice [opponent], which reasonably relied upon the Court's ruling regarding expert discovery and had no prior notice of [expert opinion]"); *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990) (affirming court's exclusion of proposed expert testimony "in order to enforce its discovery order" where expert was precluded from testifying pursuant to discovery order, noting "since the court ruled that [party] could not offer expert testimony at trial, he cannot use that expert witness's affidavit to oppose summary judgment").

9.    The Term Note Defendants' contentions are meritless.  For example, the Term Note Defendants contend that the Expert Order "only denied Defendants' Motion to Extend," and "in no way, either explicitly or implicitly, barred or excluded the inclusion of the Pully Report, or any other evidence as an offer of proof." [Expert Opp ¶ 20].  Such argument ignores the Court's explicit findings in support of the Expert Order[4] and of its express purpose.

---

[4] In issuing the Expert Order, the Court observed, among other things, that "an expert can[not] testify about contractual duties and attempt to interpret its provisions. That is the job of the Court, and I think it is improper subject matter for an expert."  *See* Morris Exhibit 10 at 35:24-36:10, attached to the *Supplemental Declaration of Plaintiff's Reply in*

4

10.     The Term Note Defendants' argument that Rule 37 is not "implicated" and that sanctions are not an available remedy [*see* Expert Opp. ¶¶ 18, 23] is contrary to long-standing Fifth Circuit precedent holding that courts have broad discretion to impose sanctions for violations of pretrial and discovery orders.  *See Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012) (noting that it is "well within the court's discretion to use sanctions as a tool to deter future abuse of discovery" under Rule 37); *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996) (affirming court's striking of expert testimony under Fed. R. Civ. P. 16[5] and 37 for failing to comply with scheduling order and disclosing expert testimony after deadlines had passed); *Sprint Solutions, Inc. v. Taylor*, No. 3:14–CV–4124–M (BF), 2015 WL 4100059, at *2 (N.D. Tex. Jul. 6, 2015) (recommending that court strike pleadings as sanction under Fed. R. Civ. P. 16(f)(1) and Fed. R. Civ. P. 37(b)(2)(A) for party's failure to comply with pretrial order), *Report and Recommendation* adopted, 2016 WL 446669, (N.D. Tex., Jan. 08, 2016).[6]

### 2.     Including the Pully Report as an "Offer of Proof" in the Summary Judgment Record Is Improper

11.     For these same reasons, the Term Note Defendants' argument that the Pully Report can properly be included as an "offer of proof" is without merit.   The Term Note Defendants contend that the inclusion of the Pully Report "was arguably necessary to preserve Defendants' right to have the District Court review the evidence that they would have submitted in opposition

---

*Further Support of Its Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt.*

[5] Federal Rule of Civil Procedure 16(f) provides that the "court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney … fails to obey a scheduling or other pretrial order." FED. R. CIV. P. 16(f)(1).

[6]  *See also S.E.C. v. Euro Sec. Fund*, No. 98 Civ. 7347(DLC), 2009 WL 2709316, at * (S.D.N.Y. Aug. 27, 2009) (granting motion to strike pleading under Rule 16(f) for party's failure to comply with pretrial order, noting "Rule 16(f) explicitly permits sanctions under Federal Rule of Civil Procedure 37(b)(2)(A)(ii)-(iv), which authorizes the court to 'prohibit[] the disobedient party from supporting or opposing designated claims or defenses' or 'strik[e] pleadings in whole or in part'").

to the Motion for Summary Judgment had the Bankruptcy Court not entered the Expert Report."
[Expert Opp. ¶ 20]. The Term Note Defendants misstate the law—and ignore the fact that their
objection to the Expert Order was already preserved for appeal.

12. Under Fed. R. Civ. P. 43, an offer of proof is required only where "the significance
of the excluded evidence is not obvious or where it is not clear what the testimony of the witness
would have been or that he was even qualified to give any testimony at all." *Fortunato v. Ford
Motor Co.*, 464 F.2d 962, 967 (2d Cir. 1972). Where the "pretrial proffer is adequate and *evidence
is excluded unconditionally by a pretrial order,"* then "the proponent *has preserved the issue for
appeal* and (other circumstances being unchanged) need not bring the witness to court and proffer
the evidence again at trial." *Fusco*, 11 F.3d at 262–63 (emphasis added).

13. Here, the Term Note Defendants made their "proffer" when they filed their Expert
Motion.[7] Therefore, the issue is already preserved for appeal. *See Germano v. Int'l Profit Ass'n,
Inc.*, 544 F.3d 798, 801 (7th Cir. 2008) (finding party's evidentiary objection sufficiently preserved
for appeal, noting [Fed. R. Evid. 103(a)] relieves a party from the need to reiterate its objection or
offer of proof repeatedly"); *LabMD*, 2020 WL 1428935, at *8 (rejecting evidence attached to
summary judgment opposition as "offer of proof" where pretrial order precluded admission of
such evidence, noting that "once the court rules definitively on the record—either before or at
trial—a party need not renew an objection or offer of proof to reserve a claim of error for appeal").

---

[7] *See Expert Motion* ¶ 1 (seeking to "designate a testifying expert on the standards and duties of care under the parties'
Shared Services Agreement [] with respect to Highland's role in NexPoint's alleged failure [sic] to make a December
21 [sic], 2020 payment on the Note []; specifically, that Highland was responsible for ensuring that NexPoint made
this payment"), ¶ 15 (seeking to retain an expert to opine "on the 'standard of care' provided for in the Shared Services
Agreement"); *see also Highland Capital Management Services, Inc.'s Motion to Extend Expert Disclosure and
Discovery Deadlines*, Adv. Pro. No. 21-03006, Docket No. 91 ¶ 1 (incorporating "the NexPoint Motion as if fully set
forth" therein); *HCRE Partners, LLC's Motion to Extend Expert Disclosure and Discovery Deadlines*, Adv. Pro. No.
21-03007, Docket No. 86 ¶ 1 (same).

14.     The Term Note Defendants' argument that they are permitted to submit the Pully Report as an "offer of proof," notwithstanding the Court's explicit directive not to include such Report, is baseless.  *See LabMD*, 2020 WL 1428935, at *8 (striking testimony attached to opposition to summary judgment where "the court expressly prohibited [party] from relying upon" such testimony, and rejecting party's argument that it had to submit such testimony as an "offer of proof" as "baseless," explaining that the court "is informed of, and thoroughly considered, the parties' arguments" in light of its order denying the proposed testimony, and in light of the party's motion for reconsideration on such order).

15.     Further, the Term Note Defendants' contention that the Motion should be denied because "offers of proof are proper at the summary judgment stage" is irrelevant here.  Expert Opp. ¶ 19.  Again, such contention ignores the Court's Orders explicitly precluding the inclusion of the Pully Report.  The cases Defendants rely on are equally misplaced because ***none involve a court accepting evidence as an "offer of proof" after issuing an order excluding that same evidence***.  *See, e.g.*, *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50 (2d Cir. 2021) (holding that appellant preserved an issue for appeal by submitting evidence that was ***not*** precluded by a prior court order); *Germano*, 544 F.3d 798 (same); *York v. Toone*, 2018 WL 8619800, at *1 (W.D. Tex. Dec. 10, 2018) (same).

16.     Based on the record and the clear and unambiguous terms of the Orders, there is no credible justification for the Term Note Defendants' submission of the Pully Report.  By including such Report, the Term Note Defendants did not even attempt to comply with the Expert Order. Instead, they submitted nearly 25 pages of excluded evidence in the summary judgment record and made arguments relying on such prohibited evidence. *See* Adv. Proc. No. 21-3005, Docket No. 157 at App. 211-235.  The only explanation for such inclusion is that the Term Note Defendants

want the Court to consider the prohibited evidence when deciding on summary judgment. *See LabMD*, 2020 WL 1428935, at *8 ("[I]t is clear that [party's] submission goes far beyond the limited purpose of preserving the record for appeal and is intended to impermissibly influence this Court's ruling on summary judgment," noting that party "did not endeavor to comply with the []Order," and instead submitted hundreds of pages of "unsolicited materials based on entirely on the precluded evidence").

## B.    **The Term Note Defendants Are in Contempt of the Expert Order**

17.    The Term Note Defendants are in contempt of the Expert Order.  As discussed *supra*, the Expert Order expressly denied the Term Note Defendants' request to procure and produce expert opinions concerning Plaintiff's alleged duties under the Shared Services Agreement and engage in related expert discovery.

18.    The Term Note Defendants contend that "nothing in the Scheduling Order or Expert Order specifically or definitively precludes offers of proof," and that the "Expert Order does not even mention offers of proof."  Expert Opp. ¶ 27.  This is pure sophistry.  The Term Note Defendants understand the meaning of the Expert Order because it was issued in response to their own motion.[8]  The Term Note Defendants' clear understanding of the Order's prohibitions was highlighted at the time they violated such Order in their summary judgment pleading.  *See* Adv. Proc. 21-3005 at 15 n. 76 (stating "Defendants' position is bolstered by the Expert Report of Steven

---

[8] Notably, the Term Notes Defendants do ***not*** contend on appeal that the Expert Order was ambiguous or that they did not understand it.  Instead, they (a) assert that "in denying NexPoint leave to extend the expert disclosure and discovery deadlines, the Order is clearly erroneous and contrary to law and should, therefore, be reconsidered and reversed by the District Court" (*see Brief in Support of Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, Case 3:21-cv-00880-X, Docket No. 22 ¶1), and (b) contend that the Bankruptcy Court lacked authority to issue the Order (*see Reply Brief in Support of Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, Case 3:21-cv-00881-X, Docket No. 41).

J. Pully … **which was incorrectly not permitted to be included in the record by the Court**")
(emphasis added).

19.     The Term Note Defendants asked for permission to extend the Deadlines so they
could obtain and offer expert opinions and that request was denied.  If Plaintiff never moved for
summary judgment, the Term Note Defendants would be precluded from offering the Pully Report
into evidence at a trial on the merits **unless** the Expert Order was overturned on appeal.  That has
not happened, and the Term Note Defendants offer no explanation for why the Expert Order is not
"law of the case" and why that Order has no preclusive effect.  The Term Note Defendants' attempt
to dodge the plain meaning of the Expert Order by dressing the Pully Report up as an "offer of
proof" should be rejected by the Court.[9]  *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d
574, 578 (5th Cir. 2000) (affirming finding of civil contempt where the order was "sufficiently
clear in what conduct [it] mandate and prohibited," noting "[t]he [] Court need not anticipate every
action to be taken in response to its order, nor spell out in detail the means in which its order must
be effectuated").

20.     The Term Note Defendants' case cites are inapposite.  In *Matter of Baum*, 606 F.2d
592 (5th Cir. 1979), the court reversed an order of contempt against an attorney for taking a
deposition of a defendant after the bankruptcy court issued an order setting aside the deposition
notice to that defendant and another defendant in an action with six total defendants.  In finding
that the attorney did not violate a "specific and unequivocal order of the bankruptcy court," the
court explained that the "order vacating the notice of deposition was not addressed specifically to"

---

[9] Even assuming *arguendo* that the Term Note Defendants' violation of the Expert Order was not willful, a finding of
contempt is still warranted. *See Am. Airlines*, 228 F.3d at 578 ("The contemptuous actions need not be willful so long
as the contemnor actually failed to comply with the court's order"); *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017
(5th Cir. 1984) (finding party in civil contempt, noting that "[s]ince this is a proceeding in civil, not criminal, contempt,
the only issue is the Company's actual compliance with this Court's orders; any absence of willfulness is irrelevant").

9

the attorney and "did not explicitly direct that the deposition not take place." *Id.* at 583.  The court further noted that "given the possible uncertainly concerning the effect of an order issued on the motion of only two of the six defendants to the action, it cannot be said that the taking of the deposition constituted a clear affront to the court's authority."  *Id.*  Unlike in *Baum*, the Expert Order here was crystal clear in prohibiting the Pully Report, and there was no uncertainty as to the Order's intended effect.[10]

## C.    HCMFA's Barred Defense Should Be Stricken from the Summary Judgment Record

21.    HCMFA's Barred Defense should be stricken from HCMFA's summary judgment pleading.  In asserting the Barred Defense in opposition to Plaintiff's summary judgment motion, HCMFA violated the Second Motion for Leave Order which prohibited HCMFA from asserting such Defense.  When moving for summary judgment, Plaintiff reasonably relied upon the Court's ruling prohibiting HCMFA's assertion of the Barred Defense.  Thus, the inclusion of the Barred Defense prejudices Plaintiff because Plaintiff took no discovery on the Barred Defense and cannot fully address the Barred Defense at this stage.[11]  *See LabMD*, 2020 WL 1428935, at *8 (party "chose to disregard the Court's clear directive and conduct litigation by surprise," noting that if such conduct is permitted, "it would unfairly prejudice [opposing party], which reasonably relied

---

[10] In *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, (5th Cir. 1999), the court affirmed the lower court's decision not to hold a party in civil contempt where the language of a settlement order did not bar the party's conduct.  Here, by contrast, the Expert Order unequivocally prohibited the Term Note Defendants' use of expert testimony in support of their affirmative defense. *Williams v. Manitowoc Cranes, LLC*, 1:14CV383-HSO-JCG, 2016 WL 7666158 (S.D. Miss. Jan. 12, 2016) is equally distinguishable from the present facts.  There, the court found that sanctions were not warranted against defendants for taking two months to produce certain documents where the discovery order "did not set forth a date certain to" produce such documents.  2016 WL 7666158, at *4.  The court explained that plaintiff's motion for sanctions "focuses on the timing and sequence of discovery, which has been produced, rather than any failure by defendant to comply with the [order]." *Id.*  Here, the Term Note Defendants blatantly failed to comply with the clear directive of the Expert Order's, namely, not to engage in expert discovery.

[11] While Plaintiff has taken no discovery, it is worth noting that the Barred Defense is facially absurd given that (i) Mr. Waterhouse contemporaneously knew of the issuance of the HCMFA Notes and their purpose, (ii) HCMFA should be estopped from denying that the HCMFA Notes are binding given that, among other things, they appeared in HCMFA's audited financial statements and were carried as liabilities on its balance sheet, and (iii) if HCMFA was ever permitted leave to amend, Plaintiff would simply assert a cause of action for unjust enrichment.

10

upon the Court's ruling" regarding such conduct and "had no prior notice of" such argument).

HCMFA fails to even address such prejudice to Plaintiff, other than through its conclusory

statement that there is no "unfair surprise" by asserting the Barred Defense.  Defense Opp. ¶ 36.

In fact, HCMFA's brief in response to Plaintiff's Motion is nothing more than a third iteration of

briefing on the underlying merits of the Barred Defense (the first being the Second Motion for

Leave and the second being the motion for reconsideration), rather than a substantive response on

the issues presented by the instant Motion. *See id*. ¶¶ 1-33.

22.    HCMFA also argues that the Barred Defense should not be stricken because it

supposedly does not constitute a "new affirmative defense," and instead constitutes the "negation

of a presumption" or allegations of "non-execution."  *See* Defense Opp. ¶¶ 33-36.  This argument

suggests that HCMFA's Second Motion for Leave was a request for an advisory opinion and is

offensive.  *See* Second Motion for Leave ¶ 1.  Plaintiff (and the Court) spent considerable time

opposing HCMFA's Second Motion for Leave, and HCMFA should not be permitted to ignore the

Second Motion for Leave Order simply because it does not like the result.[12]

**D.    HCMFA Is in Contempt of the Second Motion for Leave Order**

23.    HCMFA contends that it is not in contempt of the Second Motion for Leave Order

because the Order "simply denied HCMFA leave to amend its answer. It did not prohibit HCMFA

from asserting that Waterhouse did not sign the Notes." Defense Opp. ¶ 41.  HCMFA's argument

disregards the clear directive under the Second Motion for Leave Order and the Court's bench

---

[12] HCMFA's case cites in support of its argument that the Barred Defense is not a new affirmative defense are inapplicable.  In *Watt v. Butler*, the court noted in a footnote that evidence supporting the negation of the presumption of copying in a copyright infringement suit is not an affirmative defense. 457 Fed. Appx. 856, 861 fn. 2 (11th Cir. 2012).  In *Orix Financial. Services v. Thunder Ridge Energy, Inc.*, 2005 U.S. Dist. LEXIS 41889, at *37 (S.D.N.Y. Dec. 29, 2005), a case involving New York Law, the issue regarding a party's claim of non-execution was whether the party waived such a defense by not pleading it prior to summary judgment.  Here, by contrast, the Barred Defense was explicitly precluded by a court order based on a number of factors, including that Plaintiff would be prejudiced by such Defense.   HCMFA otherwise offers no credible support for the inclusion of the Barred Defense.

11

findings during the hearing on the Second Motion for Leave to Amend. *See Second Motion for Leave Order (expressly denying HCMFA's Second Motion for Leave to assert the Barred Defense);* Morris Ex. 7 (denying HCMFA's request to assert the Barred Defense, finding that under Rule 15, there has been undue delay, futility of the "amendment," and prejudice to Plaintiff, explaining that "it's just way too late to make an argument that should have been apparent many months ago if in fact it's a legitimate argument," and that HCMFA offers no evidentiary support for its "evolving theory of the case"). In light of the Court's clear and unequivocal directive prohibiting HCMFA from asserting the Barred Defense, HCMFA's attempt to inject ambiguity into the Second Motion for Leave Order should be summarily rejected by the Court. HCMFA's inclusion of the Barred Defense in its opposition to summary judgment is a blatant disregard of the Court's Order.

## E.   The Bankruptcy Court Has Jurisdiction to Issue Sanctions

24.    Defendants' conclusory argument that the Court lacks jurisdiction to issue contempt is premised on the faulty argument that the Court "may or may not be acting as a magistrate judge," and therefore, lacks core jurisdiction over the underlying Discovery Orders. *See* Expert Opp. ¶ 29; Defense Opp. ¶¶ 49-50. This argument is without merit.

25.    In issuing the Discovery Orders, the Bankruptcy Court was not acting as a magistrate judge. Section 157 authorizes bankruptcy courts to adjudicate pretrial matters until the case is trial-ready. Thus, pursuant to the Order of Reference,[13] the Bankruptcy Court retains jurisdiction to enter pretrial interlocutory orders, such as the Discovery Orders, in these adversary proceedings until the case is trial-ready. *See In re THB Corp.*, 94 B.R. 797, 803 (Bankr. D. Mass. 1988) ("A bankruptcy judge may adjudicate interlocutory matters under § 157(c)(1); the statute

---

[13] *See* Case No. 21-881 at Docket No. 14.

preserves only "final" orders for entry by the district judge, and its procedure would be unworkable if the district judge had to adjudicate interlocutory matters"); *In re Kennedy*, 48 B.R. 621, 622 (Bankr. D. Ariz. 1985) (noting that under 28 U.S.C. § 157(c), only "final" orders shall to be submitted to the district court, while "bankruptcy interlocutory orders in noncore proceedings need not be submitted to District Court," noting that a "contrary interpretation would require wholesale referral to the District Court of every order concerning discovery, continuances or every other interlocutory order of substantive or procedural import"); *In re Lion Capital Group*, 46 B.R. 850, 854 (Bankr. S.D.N.Y. 1985) ("Congress enabled the district courts to withdraw the reference under § 157(d)," and "sought to involve the district courts only with respect to final orders in referred proceedings and that the bankruptcy courts are to issue interlocutory orders in related cases referred to them," noting that a contrary interpretation "would require wholesale deferral of all interlocutory matters, such as orders regulating discovery and the like, to the district courts thereby swamping district court calendars"); *In re Adelphi Inst., Inc.*, 112 B.R. 534, 539 (S.D.N.Y. 1990) (noting that the Bankruptcy Court's role in rendering reports and recommendations to the District Court on dipositive motions pursuant to 28 U.S.C. 157(c)(1) does not prevent the Bankruptcy Court from adjudicating pre-trial interlocutory matters).

26.    The Court has the power to issue sanctions, including a finding of contempt, for violation of its own lawful orders.  *See In re McLean Indus., Inc.*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("All courts, whether created pursuant to Article I or Article III, have inherent contempt power to enforce compliance with their lawful orders. The duty of any court to hear and resolve legal disputes carries with it the power to enforce the order").  Accordingly, the Court has jurisdiction to issue a finding of contempt for the Term Note Defendants' violation of its own lawful Discovery Orders.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order: (i) striking the Barred Defense from HCMFA's opposition to summary judgment; (ii) striking the Pully Report from the Term Note Defendants' Appendix; and (iii) finding the Term Note Defendants, HCMFA, and their counsel in civil contempt of the applicable Orders.

Dated:  March 14, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
            ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

15

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:    MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-3004 |
| vs. | § § | |
| | § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | |
| Defendant. | § § § | |

---

| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3005 |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Case No. 3:21-cv-00881-X |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3006 |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | Case No. 3:21-cv-00881-X |
| SERVICES, INC., JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | Adv. Proc. No. 21-3007 |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-00881-X |
| HCRE PARTNERS, LLC (n/k/a NexPoint | § | |
| Real Estate Partners, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

**SUPPLEMENTAL DECLARATION OF JOHN A. MORRIS
IN SUPPORT OF PLAINTIFF'S OMNIBUS MOTION (A) TO
STRIKE CERTAIN DOCUMENTS AND ARGUMENTS FROM THE
RECORD, (B) FOR SANCTIONS, AND (C) FOR AN ORDER OF CONTEMPT**

I, John A. Morris, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

1.     I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to Highland Capital Management, L.P., the reorganized debtor in the above-captioned chapter 11 case and plaintiff in the above-referenced adversary proceedings, and I submit this Supplemental Declaration in support of *Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt* (the "Motion"). I submit this Supplemental Declaration based on my personal knowledge and review of the documents listed below.

2.     Attached as **Exhibit 10** is a true and correct copy of the transcript of the hearing held on December 13, 2021 **(Adv. Pro. Nos. 21-3005, 21-3006, and 21-3007)**.

Dated: March 14, 2022.

/s/ John A. Morris
John A. Morris

# EXHIBIT 10

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 19-34054-sgj-11**<br>Chapter 11 |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P., | Dallas, Texas<br>Monday, December 13, 2021<br>10:30 a.m. Docket |
| Debtor. | |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P., | **Adversary Proceeding 21-3005-sgj** |
| Plaintiff, | MOTION TO EXTEND EXPERT<br>DISCLOSURE AND DISCOVERY<br>DEADLINES |
| v. | |
| NEXPOINT ADVISORS, L.P.,<br>et al., | |
| Defendants. | |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P., | **Adversary Proceeding 21-3006-sgj** |
| Plaintiff, | MOTION TO EXTEND EXPERT<br>DISCLOSURE AND DISCOVERY<br>DEADLINES |
| v. | |
| HIGHLAND CAPITAL<br>MANAGEMENT SERVICES, INC.,<br>et al., | |
| Defendants. | |

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-100   Filed 01/09/24   Page 90 of 185   PageID 36762

2

```
 1
 2  HIGHLAND CAPITAL            )   Adversary Proceeding 21-3007-sgj
    MANAGEMENT, L.P.,           )
 3                              )   MOTION TO EXTEND EXPERT
            Plaintiff,          )   DISCLOSURE AND DISCOVERY
 4                              )   DEADLINES
    v.                          )
 5                              )
    HCRE PARTNERS, LLC          )
 6  (n/k/a NEXPOINT REAL        )
    ESTATE PARTNERS, LLC),      )
 7                              )
            Defendant.          )
 8  _____ )

 9                   TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10               UNITED STATES BANKRUPTCY JUDGE.

11  WEBEX APPEARANCES:

12  For the Debtor-Plaintiffs:   Hayley Winograd
                                 PACHULSKI STANG ZIEHL & JONES, LLP
13                               780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
14                               (212) 561-7700

15  For NexPoint Advisors,       Davor Rukavina
    LP:                          Julian Preston Vasek
16                               MUNSCH HARDT KOPF & HARR, P.C
                                 500 N. Akard Street, Suite 3800
17                               Dallas, TX  75201-6659
                                 (214) 855-7587
18
    For HCMS and HCRE:           Michael P. Aigen
19                               Deborah Rose Deitsch-Perez
                                 STINSON LEONARD STREET
20                               3102 Oak Lawn Avenue, Suite 777
                                 Dallas, TX  75219
21                               (214) 560-2201

22  Recorded by:                 Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
23                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
24                               (214) 753-2062

25
```

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 175-10   Filed 04/06/23   Page 91 of 185   PageID 36763

3

1   Transcribed by:              Kathy Rehling
2                               311 Paradise Cove
                                Shady Shores, TX   76208
3                               (972) 786-3063
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-110   Filed 01/09/24   Page 92 of 185   PageID 36764
Exhibit 110   Page 509 of 739

4

1          DALLAS, TEXAS - DECEMBER 13, 2021 - 10:55 A.M.

2          THE COURT:  I will now take up the Highland three

3    motions to extend expert deadlines.  So let me get appearances

4    from lawyers.  First, who do we have appearing for the Debtor

5    this morning?

6          MS. WINOGRAD:  Good morning, Your Honor.  My name is

7    Hayley Winograd of Pachulski Stang Ziehl & Jones appearing on

8    behalf of Highland.

9          THE COURT:  Okay.  Good morning.  For NexPoint

10   Advisors, who do we have appearing?

11         MR. RUKAVINA:  Your Honor, good morning.  Davor

12   Rukavina and Julian Vasek.

13         THE COURT:  Good morning.  All right.  For HCMS and

14   NPRE, who do we have appearing?

15       (No response.)

16         THE COURT:  Okay.  Maybe I should say these names in

17   full.

18         MS. DEITSCH-PEREZ:  I apologize, Your Honor.  This is

19   Deborah Deitsch-Perez.  I believe Michael Aigen will be

20   appearing for HCRE and HCMS.  And I wonder if he's having

21   technical difficulties.  I saw him on the line a few minutes

22   ago.  I'm going to go off and call to make sure that there

23   isn't a problem.

24         THE COURT:  Okay.

25         MR. RUKAVINA:  But Your Honor, I'll be handling the

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 175-10   Filed 06/09/23   Page 93 of 185   PageID 36765
Exhibit 10   Page 100 of 239

5

1   bulk of the arguments, and Mr. Aigen will cover a much smaller

2   amount.

3           THE COURT:  Okay.  Well, we'll --

4           MR. AIGEN:  Your Honor, this is Michael Aigen.  Are

5   you able to hear me now?

6           THE COURT:  I can hear you now.

7           MR. AIGEN:  I apologize.  Michael Aigen for HCMS and

8   HCRE.

9           THE COURT:  All right.  I presume those are our only

10  formal appearances, but is there anyone else who wished to

11  appear?

12      (No response.)

13          THE COURT:  All right.  Well, Mr. Rukavina, I'll hear

14  your argument.

15          MR. RUKAVINA:  Thank you, Your Honor.

16      I'm sure that the Court has read our papers, and by this

17  motion we seek to extend the expert deadline so that we can

18  retain Steven Pully as our expert on the standard of care.

19  Mr. Pully is on the video.  I can see him right now.  So, good

20  morning, Mr. Pully.

21      And Your Honor, I'd like for you to be aware that Friday

22  evening I did file on the docket Mr. Pully's report.

23  Obviously, the Court hasn't granted this motion, but I wanted

24  the Court to know that we moved as rapidly as possible, and

25  Mr. Pully has now finalized his report.  So there's no future

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-100   Filed 10/04/23   Page 94 of 185   PageID 36766

6

1   need for additional time on my end if the Court grants this

2   motion.

3       Your Honor, before I get to the actual merits of this

4   motion, I feel it important to address a hearing that occurred

5   a few weeks ago that I was not present at because this motion

6   was discussed briefly at the end.  This was a hearing held on

7   Ms. Deitsch-Perez's motion to dismiss and compel arbitration.

8       And Mr. Vasek, if you could please pull up the transcript

9   of that and scroll down to near the end where this motion is

10  discussed.

11      Your Honor will maybe recall that we have the transcript

12  where Ms. Deitsch-Perez mentioned as a scheduling matter that

13  this motion had been filed.  And the Court says, What on earth

14  does that have to do with this litigation?  I don't mean to be

15  flippant and laugh, but what on earth does that have to do

16  with notes?

17      And if we scroll down some more, Your Honor, Ms. Deitsch-

18  Perez was attempting to explain to the Court the purpose of

19  this motion, and the Court notes that, It sounds like you're

20  talking about an affirmative defense that hasn't been

21  articulated yet.

22      And if we scroll down some more, Ms. Deitsch-Perez

23  attempts to tell the Court that, in fact, this is an

24  affirmative defense that has always been asserted.

25      And the Court notes there in her dialogue with Ms.

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 06/06/23   Page 95 of 185   PageID 36767
Exhibit 10   Page 80 of 39

7

1  Deitsch-Perez that, I'm just letting you know you have a very

2  uphill battle convincing me that experts regarding shared

3  services agreements would be germane.

4      And the Court goes on to say that it has heard a lot about

5  shared services agreements during the past few years,

6  including experts on the witness stand in the *Acis* case.  And

7  the Court notes that, Under the pleadings as now in the

8  record, I just can't imagine why experts on shared services

9  agreements are going to be relevant evidence.

10      I think, Mr. Vasek, you can pull that down.

11      And I point this out only because, again, I know that the

12  Court has prepared for this hearing, but this is an

13  affirmative defense that has always been pled from the

14  beginning.  It does not involve the interpretation of the

15  contract.  We're not talking about the shared services

16  agreement.  We're not talking about the contract.  And recall,

17  Your Honor, that both Your Honor and the District Courts have

18  agreed that jury rights do attach here.  So the question

19  really is not the Court's familiarity with shared services

20  agreements but whether expert testimony will be relevant to

21  help the jury.

22      So, what is that expert evidence, Your Honor, and how did

23  this arise?  NexPoint is the obligor, the maker on a $30

24  million note -- I'm using round numbers -- and that note had

25  been paid down to some $24 million.

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-80    Filed 10/06/23    Page 96 of 185    PageID 36768
Exhibit 80    Page 96 of 39

8

1    The note purports to require a payment every year on

2    December the 31st.  And in the year 2020, although we argued

3    that the payment was prepaid, that payment was not made

4    timely.  It was made a couple weeks later, when Mr. Dondero

5    realized what had happened.

6    Our version, NexPoint's version of why this payment did

7    not happen has until recently been that the Debtor dropped the

8    ball.  Under the shared services agreement, and as Mr. Dondero

9    and Mr. Frank Waterhouse, the Debtor's former CFO, confirmed,

10   the Debtor was for years responsible to facilitate the annual

11   payment.  The Debtor didn't pay from its own funds.  It would

12   pay it from our funds.  But that was both in the contract and

13   that was the practice.  Again, Mr. Waterhouse -- and Your

14   Honor has seen in my papers and in his transcript -- confirmed

15   that it was reasonable for NexPoint to rely on the Debtor to

16   ensure that this payment would be made.

17   So Mr. Vasek, if we can pull up the shared services

18   agreement here.

19   I know that the Court likes to look at contracts, so I

20   will briefly take Your Honor through some of the pertinent

21   provisions, because this relates to directly to Mr. Pully.

22   And Mr. Vasek, if you'll please scroll down to the

23   definitions of Covered Person.

24   And Your Honor can read it for herself.  This is just a

25   definitional that we need as we go forward.   But Covered

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 175-30    Filed 01/09/23    Page 97 of 185    PageID 36769

9

1    Person means the staff and services provider.  That is

2    Highland.  That is the Debtor.  And it includes managers,

3    members, employees, et cetera.  Well, that would be Mr. Frank

4    Waterhouse.  Mr. Waterhouse at that time was the Debtor' chief

5    financial officer, and he was also an officer of NexPoint.  So

6    he, like many people here, wore two hats.

7        Mr. David Klos at that time was the controller for

8    Highland, and Ms. Kristin Hendrix was a senior accountant at

9    Highland.  Both Mr. Klos and Ms. Hendrix were providing the

10   services we're going to discuss.

11       If you'll scroll down, Mr. Vasek.

12       The next provision, Your Honor, relates to what services

13   were being provided.

14       Scroll up just a -- just a tad.

15       So you'll see under Section 2.02 the parties are now

16   agreeing here's the services that Highland will be provided.

17   And it's important to note, Your Honor, that at this time this

18   agreement was in place.  This agreement was terminated I want

19   to say at the end of February this year.  But in December and

20   November of 2020, this agreement was in place.

21       And if the Court looks at the services being provided, the

22   first one there is assistance and advice.  That word "advice"

23   is important.  Assistance and advice with respect to various

24   things.  And you see down there those things include finance

25   and accounting, payments, bookkeeping, cash management, cash

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-30   Filed 11/09/23   Page 98 of 185   PageID 36770

10

1   forecasting, accounts payable, et cetera.

2        Keep scrolling down, Mr. Vasek.  Obviously, as the Court

3   very well knows, the Debtor was also providing legal services.

4        And if you keep scrolling down, Mr. Vasek, to the next

5   page, there you go, to K and L.

6        These are more catch-all.  So if the language of what I

7   just showed you is not express or specific enough, here you

8   have these catch-alls, such as advice on all things ancillary

9   or incidental to the foregoing and advice relating to other

10  back- and middle-office services in connection with the day-

11  to-day business.

12       So, again, we're not here today, we're not asking the

13  Court to decide, nor do I think that it would be this Court to

14  decide, whether the Debtor had a duty to facilitate the

15  December payment.  I'm just pointing out that we have, I think

16  anyone would agree, at least a *prima facie* colorable argument

17  that the Debtor would have such duty.

18       And just to address an issue that the Debtor raised, Mr.

19  Vasek, if you'll scroll down to 6.01, and then if you'll zoom

20  in.

21       Here, now, Your Honor, is the language that is of

22  relevance, the direct relevance.  So we've seen that Covered

23  Person is defined, and we have seen that -- and we can now see

24  that this agreement requires Covered Person -- that includes

25  the Debtor; that includes Mr. Waterhouse; that includes Mr.

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 17-10   Filed 12/29/23   Page 99 of 185   PageID 36771

11

1    Klos -- to discharge its duties under this agreement.  We've

2    seen that there's certainly a colorable argument that the

3    duties under this agreement include facilitating payments and

4    advice with payments and accounts payable and the like, and

5    that the Debtor has to discharge its duties with the care,

6    skill, prudence, and diligence under the circumstances then

7    prevailing that a prudent person acting in a like capacity and

8    familiar with such matters would use in the conduct of an

9    enterprise of a like character and with like aims.

10       That, Your Honor, is what we need the expert on.  Not to

11   tell the jury what this contract says, not to tell the jury

12   that the Debtor had a duty, but to look at, under the facts,

13   did the Debtor's performance or lack thereof -- and I'll tell

14   you why that's important in a moment -- did that performance

15   or lack thereof comport with this standard of care?

16       This is a matter for an expert.  The average juror, the

17   average layperson, myself, I would not know what the care,

18   skill, prudence, and diligence of a reasonable prudent person

19   in this situation would be.  I can theorize on that.  I can

20   opine on that.  I'm not an expert on that.  This is a matter

21   for an expert, the same as with medical malpractice, legal

22   malpractice, breach of fiduciary duty.

23       While we're on this agreement, just to address another

24   argument that the Debtor makes, the Debtor says that this

25   agreement exculpates negligence.

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10 Filed 01/09/24   Page 100 of 185   PageID 36772
Exhibit 10   Page 109 of 249

12

1          Mr. Vasek, if you'll please scroll down to the

2     exculpation.

3          And there is an exculpation provision.  But if Your Honor

4     -- and it does exculpate negligence.  It doesn't exculpate

5     gross negligence, et cetera.  But it talks about that only

6     acts or omissions -- it's Romanette (i) -- acts or omissions

7     arising out of or in connection with the conduct of the

8     business of the management company that is exculpated.  Again,

9     we're not here today to decide what this means, but the

10     business of NexPoint is not note-making; the business of

11     NexPoint is advising thousands of investors and funds with

12     respect to a billion dollars of investments.

13          It is -- the Debtor does have an argument, and either the

14     Court or the jury will have to decide whether this exculpation

15     provision applies.  And then if -- and you can remove this,

16     Mr. Vasek -- the Debtor likewise says that the agreement's

17     indemnification provision prohibits this argument.  We pointed

18     out in our briefing, Your Honor, that, in fact,

19     indemnification under Texas law does not apply to the parties

20     to the contract.  It applies to claims made by third parties.

21     But, again, that's an argument that the Debtor has.

22          So we have this contract in place.  Late November/early

23     December rolls around, and both Mr. Dondero and Mr. Waterhouse

24     testify that they had a meeting.  What was said at that

25     meeting is in dispute.

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-110   Filed 11/04/24   Page 101 of 185   PageID 36773

13

1    Mr. Dondero believes that he told Mr. Waterhouse, stop

2  paying on the shared services agreement.  It's NexPoint's

3  position -- Your Honor knows we filed an administrative claim

4  -- it's NexPoint's position that it had overpaid millions of

5  dollars under the shared services agreement, in part because

6  many of the employees of the Debtor that we were supposed to

7  be paying our respective share of weren't there anymore.  So

8  Mr. Dondero says to Mr. Waterhouse, stop paying on this shared

9  services agreement.

10    Those are the facts as we knew them going into late

11  October.  Based on that fact, and based on the fact that the

12  Debtor did not facilitate the payment, we've always asserted

13  as an affirmative defense that our lender, who is also our

14  lawyer, who's also our accountant, who's also our treasury

15  management people, and who have always facilitated these

16  payments in the past, dropped the ball.  They committed simple

17  negligence, they dropped the ball, thereby causing the alleged

18  default.

19    We did not need an expert opinion on that at that time.

20  You've seen in my reply briefing, Your Honor, that, in fact,

21  the Fifth Circuit holds in multiple instances that when it's

22  simply a matter of missing a deadline -- a lawyer missing

23  limitations, if you will -- expert testimony is not required,

24  and in fact may be inappropriate because a lay person can

25  figure out that, a lay juror can figure out that, well, if you

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 11/04/23   Page 102 of 185   PageID 36774

14

1   just simply didn't do something, whether that's -- whether

2   that comports with the standard of care or not.

3        On October the 19th of this year, the Debtor and we

4   deposed Mr. Waterhouse.  And Mr. Waterhouse had a different

5   testimony.  He had a different recollection of that meeting.

6   Mr. Waterhouse said that Mr. Dondero told him in late November

7   or early December, don't make this NexPoint payment.  In other

8   words, that Mr. Dondero expressly said the payment that's

9   coming up for NexPoint, do not make this payment.

10       That was news to us.  I was so surprised by that testimony

11  that I actually asked Mr. Waterhouse that question four times.

12  And opposing counsel actually got angry at me, kept saying,

13  how many times are you going to keep asking this question?  I

14  was surprised.

15       I was not able to talk to Mr. Waterhouse meaningfully

16  before that.  Mr. Waterhouse has attorneys, Mr. Waterhouse is

17  in litigation with the Debtor, and those attorneys require

18  that I not communicate with him directly, I communicate only

19  through them.  I never took up the chance to ask them about

20  this meeting because the only information that I had and that

21  my client had was that there was no such instruction.  The

22  Debtor may or may not have been surprised as well.

23       Mr. Vasek, if you'll please pull up discovery.

24       Your Honor, we're sharing with you now certain of the

25  discovery in this case -- in particular, the Debtor's

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 01/09/24   Page 103 of 185   PageID 36775

15

1    responses.

2         And if you'll go to Interrogatory No. 1, Mr. Vasek.

3         So, Your Honor obviously can read this.  But I ask the

4    Debtor, if it contends that it was not responsible for making

5    payments under the note on NexPoint's behalf, please explain

6    the legal and factual basis for such contention.  I asked for

7    a factual basis as well.  And Your Honor can see in the

8    response that the Debtor objects, the Debtor says that it was

9    not required to make the payment, but nowhere here does the

10   Debtor say that it had received an instruction not to make the

11   payment.

12        Pardon me, Your Honor.

13        This was, I believe, from May or June.  In any event, it

14   was early in this litigation.  Nowhere here am I put on any

15   kind of notice that it's the Debtor's position that it

16   received an instruction not to make the payment.

17        If we scroll down to Request for Production, I believe

18   it's No. 1, Mr. Vasek.

19        Here, we -- I ask for all communications pursuant to which

20   the Debtor was advised or instructed not to make the payment

21   or to cause the payment to be made.  And the Debtor's answer

22   includes the following:  Any communications responsive to

23   Request for Production No. 1 were verbal.

24        Okay.  I had to await depositions.  That's fine.  I had

25   asked in an interrogatory, I didn't get a factual response,

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-110    Filed 01/09/24    Page 104 of 185    PageID 36776

16

1    and then I'm now being told that any communications were

2    verbal.

3        Now, the Debtor may not have known about Mr. Waterhouse's

4    instruction, it may not have, in which case I don't think it's

5    fair to accuse NexPoint or its counsel of dropping the ball.

6    Or the Debtor may have known of the instruction, in which case

7    the Debtor should have answered Interrogatory No. 1 factually

8    by saying, oh, wait, not only were we not required to make the

9    payment, et cetera, et cetera, but we received an instruction

10   from your boss, NexPoint, not to make the payment.

11       You can remove that.

12       So, here we go into October 19th.  We depose Mr.

13   Waterhouse.  We now see that, in fact, I guess it's -- I

14   forget who -- who the author is, but the plot has thickened.

15   The situation is now much more complicated.  Whereas

16   previously we argued that the Debtor had dropped the ball, the

17   question now is, okay, if in fact the jury believes that Mr.

18   Dondero went to Mr. Waterhouse and said, don't make this

19   payment, did that discharge the Debtor's duties as specified

20   by the contract or not?

21       It's our belief that it did not.  It's our belief that Mr.

22   Waterhouse should have, at a minimum, asked Mr. Dondero after

23   that, did I get you right, Jim?  Did I understand correctly?

24   Did you mean not to make this payment?  It's our belief that

25   the Debtor -- our legal advisers, our accountants, people that

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 170-10    Filed 11/09/23    Page 105 of 185    PageID 36777

17

1    are supposed to advise us -- should have called back and said,

2    Jim, you know that if you don't make this payment you're going

3    to have a note accelerated and it's going to be $24 million.

4    They should have advised Mr. Dondero of the potential

5    consequences, especially given their clear conflict of

6    interest.

7        At the same time, they're our lender to the tune of $24

8    million, and they're providing us all this assistance and

9    advice that we're paying millions and millions of dollars for.

10       And then also, if Mr. Dondero gave such an instruction,

11   did the Debtor have some duty to try to dissuade him by

12   saying, Jim, you're being a hothead, this is a very serious

13   matter, it's only $1.4 million, make the payment?  In fact, we

14   did make the payment in January, after this issue was learned

15   about.  But the Debtor didn't do any of those things.

16       So, again, the question now is, did the Debtor's lack of

17   any subsequent follow-up -- putting its head in the sand, so

18   to speak -- did that comport with the duties as specified,

19   what would a reasonable person discharging his or her duties

20   under the facts and circumstances in that industry then in

21   place, what should or would have such a reasonable person

22   done?  That's where Mr. Pully comes in.

23       I deposed Mr. Seery a few days after this deposition and I

24   asked him about this, and Mr. Seery said that no, in his view,

25   Mr. Waterhouse acted perfectly appropriately, that Mr.

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 170-10   Filed 11/04/23   Page 106 of 185   PageID 36778

18

1   Waterhouse had no duty to seek clarification or explain the

2   ramifications or anything else.  And it was clear to me that

3   Mr. Seery is going to testify to that effect.

4        So at that point in time, now that we knew Mr.

5   Waterhouse's testimony, we decided that it is not only

6   advisable but perhaps necessary to retain an expert.  And we

7   moved very quickly.  I have had the fortune of working with

8   Mr. Pully before, so I knew him.  I was able to rapidly retain

9   him because of our prior familiarity with each other.  Mr.

10  Pully reviewed all the transcripts.  He reviewed the

11  discovery.  He prepared a full and final report.  So, from

12  beginning to end, we were done in maybe five weeks, maybe six

13  weeks.

14       And we're not proposing, Your Honor, that the Debtor

15  doesn't have whatever time it needs to prepare a rebuttal.

16  We're not proposing that the Debtor can't depose Mr. Seery

17  [sic].  Of course it can.

18       So where this adversary proceeding now is is that

19  discovery is over.  The Debtor will be filing by December the

20  17th a motion for summary judgment.  Your Honor will recall

21  that Your Honor approved a scheduling order on that.  And

22  there will be hearings before this Court on summary judgment,

23  and perhaps opposing counsel can remind me, but it's going to

24  be in late January, or I'm going by memory here, maybe early

25  February.

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 12/20/23   Page 107 of 185   PageID 36779

19

1    So that is, Your Honor, what happened.  That is how it

2  happened.  It's the truth.  It's -- there's no laying behind

3  the log here.  There's no litigation decisions that are now

4  backfiring and we're trying to get out of them.  What happened

5  here is exactly what should happen in a lawsuit like this,

6  where discovery has illuminated various issues and now we have

7  to deal with the consequences of that discovery as we prepare

8  for trial.

9    October the 29th was the date in the scheduling order to

10 disclose experts and provide their reports.  Mr. Pully

11 couldn't even hypothetically do that in time since I had

12 retained him a few days before that.  But we moved very

13 quickly to file this motion, to file it before the deadline

14 actually expired, in hopes, again, of not -- not only of

15 showing Your Honor that we moved diligently and rapidly when

16 this issue unfolded, but also that we didn't need *nunc pro*

17 *tunc* relief.

18   So, Rule 16 does apply.  The good cause requirement does

19 apply.  But this is not some talismanic super-high burden to

20 meet.  Yes, there's a burden.  Yes, I must demonstrate to Your

21 Honor why leave based on good cause is required.  But we're

22 not trying to unscramble the eggs, and we're not seeking

23 something extraordinary or exotic here.

24   The Fifth Circuit has specified the four factors that the

25 Court should look at.  In the Fifth Circuit cases that we've

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 01/09/24   Page 108 of 185   PageID 36780

20

1    seen and that we've briefed, the deadline had already expired

2    and the people were seeking *nunc pro tunc* relief.  I don't

3    think we have that high of a burden here, but even if we do,

4    we've analyzed those four factors.

5        And the first factor is the explanation for the lateness.

6    Again, did NexPoint act diligently?  Did NexPoint hide behind

7    the log?  Is there some litigation strategy here that has

8    backfired?  None of that, Your Honor, is present.  There's

9    been no delay.  We deposed, pursuant to agreed deposition

10   schedules, we deposed all of the main witnesses in October.

11   When we deposed Mr. Waterhouse, this issue arose.  We moved as

12   rapidly as we could thereafter.  And you've seen, Your Honor,

13   in the interrogatory answer, that if the Debtor knew about

14   this instruction, then, really, the Debtor should have

15   answered its interrogatory to say, we got an instruction not

16   to pay and that's why we didn't pay.

17       Maybe the Debtor -- maybe the Debtor didn't know that.

18   But when we deposed Mr. Klos and Ms. Hendrix, who are still

19   employees of the Debtor, they testified that they heard Mr.

20   Waterhouse tell them that in late November last year.  So they

21   -- they testified that in late November last year Frank

22   Waterhouse told them, Jim Dondero told me, don't make this

23   payment.

24       So, even if the Debtor didn't know what Mr. Waterhouse

25   would testify to, Mr. Klos and Ms. Henderson [sic] did.

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 12/29/49    Page 109 of 185    PageID 36781

21

1        Again, I am not pointing the fingers here at the Debtor.

2   I'm not saying that their answer to Interrogatory No. 1 was

3   manipulative, that it was calculated to deceive.  I'm not

4   suggesting that.  I'm just suggesting that, had the Debtor

5   given a more fulsome answer, we would have immediately

6   investigated and immediately retained an expert back in May or

7   June of this year.

8        The next element, or the next factor, rather, is the

9   importance of this extension.  And Your Honor, we have quoted

10  at length Fifth Circuit opinions that say that when the

11  standard of care is involved, expert opinion is appropriate

12  and may be required.

13       It goes back to, again, if the Debtor just dropped the

14  ball and didn't facilitate the payment, that's easy.  That

15  doesn't need an expert.  But if the Debtor was instructed by

16  Mr. Dondero not to make the payment and there was a month left

17  before the payment was to be made, did the standard of care as

18  specified in the contract require the Debtor to do something

19  that it failed to do?

20       So we are talking about the standard of care.  That is

21  appropriate expert testimony.  It may be required.  And it is

22  not something that I can argue to a lay juror just based on a

23  deadline being missed.

24       So, yes, this -- the relief we're seeking is important,

25  especially given the jury nature of this trial.

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 12/30/24   Page 110 of 185   PageID 36782

22

1      The third factor is the potential prejudice.  So, the

2   Debtor says, well, this will increase costs.  Yes, it will.

3   But costs alone is not the legally -- the legal standard here.

4   Every litigation has costs.  Every litigation has burdens.

5   And if the Debtor prevails in this lawsuit, they will claim

6   attorneys' fees and costs.  They're entitled to that under the

7   note and under Texas law.

8      So there will be an incremental cost for the Debtor to

9   retain an expert, but that would have been present as of

10   October the 29th anyway.

11      Remember, I filed this motion on the deadline.  We're

12   seeking six weeks of delay here.  This is not late-stage

13   litigation where all the facts are known, all the witnesses

14   have been deposed, everyone's ready for trial, and suddenly a

15   party seeks to increase its opponent's litigation costs here

16   with a last-second expert.  This is not that case.

17      So, there is no prejudice, at least not in the legally

18   relevant way by way of costs, nor is there any prejudice by

19   delay.  And this also ties into the fourth factor, which

20   discusses a continuance.  There is no prejudice here because

21   we're not trial-set.  We don't know when we're going to be

22   trial-set.

23      Even if the Court denies summary judgment in whole or in

24   part at the end of January or early February -- which I don't

25   think that's very realistic because I think the Court is going

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 12/09/24    Page 111 of 185    PageID 36783

23

1    to want to think about it some, the Court is going to want to

2    prepare a report and recommendation -- this is not going to be

3    a straightforward summary judgment proceeding.

4         What is also out there is that the Debtor has filed a

5    motion to consolidate all these note cases in front of one

6    District Court judge.  That's going to have to be reviewed by

7    the District Court judges and ruled on.

8         So we are months, months away from being trial-ready, and

9    then we don't know how long it's going to be before we're up

10   for a week or two long jury trial.  No one knows that.  That

11   is plenty of time for the Debtor to get a rebuttal expert.

12   It's plenty of time for the Debtor to depose Mr. Pully.  It's

13   plenty of time for everything to come to play so that this

14   case will be certified trial-ready, irrespective of whether

15   there's an expert or not.  This is not going to delay the

16   process.  We're not seeking to delay the process.

17        Nor are we seeking to derail the summary judgment

18   proceedings.  If the Debtor wants to retain an expert for

19   summary judgment proceedings, that just proves that there is a

20   question of fact here that precludes summary judgment.

21        But as far as continuance or trial-setting, that's just

22   not present here.

23        And I've quoted Your Honor at length a District Court's

24   opinion from the Eastern District of Texas that talks about

25   prejudice, that talks about costs.  And that judge basically

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 12/20/23    Page 112 of 185    PageID 36784

24

1    said, look, when it's -- when it's an affirmative defense that

2    you've known that since the beginning, which the Debtor has

3    known here since the beginning, then, really, it's not a last-

4    second tactic.  It's not real prejudice.  Yeah.  Yeah, there's

5    a delay.  Yeah, there's an increased cost.  But the plaintiff

6    is now trying to fundamentally change this lawsuit, to

7    fundamentally interject something new here.  The plaintiff

8    just needs some more time.  And the question is, should the

9    plaintiff have more time?

10        Your Honor, those are the factors.  We have -- we have the

11    exhibits.  We have the record prepared.  It's a part of the

12    motion and the Debtor's response.  And Your Honor, we ask that

13    the Court grant this motion -- again, reminding the Court that

14    this does relate to an affirmative defense that's been around

15    since the beginning.  It does relate to one that was -- only

16    -- only really became the subject of expert testimony in late

17    October.  And it's only because discovery in this case worked

18    as it should.  No one laid behind the log.  No one made a

19    calculated decision that has backfired.  No one delayed

20    anything or was less than diligent.

21        Under these circumstances, Your Honor, because the point

22    of a trial in front of a jury is to get to the truth and it's

23    to enable the jury to have what it needs to make a true, full,

24    and informed decision, we believe that good cause exists, and

25    we'd ask -- NexPoint would ask that the Court grant this

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 12/06/23   Page 113 of 185   PageID 36785

25

1    motion.

2              THE COURT:  All right.  Thank you.

3        I'll ask Mr. Aigen, does he have anything he wants to

4    supplement with?

5              MR. AIGEN:  Yes, Your Honor.  I can make a very quick

6    argument here.

7        As you know, HCMS and HCRE have filed a joinder, asking

8    for the same relief.  The only thing I want to quickly point

9    out is that the only difference between our clients and Mr.

10   Rukavina's client is the lack of a written services agreement.

11   But I would point out, as the evidence we submitted in our

12   briefing shows, the undisputed testimony is that there was an

13   oral agreement to provide these services, that the Debtor did

14   provide these same exact services that they provided from --

15   for NexPoint to HCMS and HCRE, that they had done this for

16   years, and this included making loan payments.

17       So I just wanted to point that out, and I think what this

18   means is that, for the same reasons that Mr. Rukavina asked

19   for this relief, we believe we are entitled to the same

20   relief.  And I won't bother to go through all the same

21   arguments that Mr. Rukavina just made to the Court.  So that's

22   all I have, Your Honor.

23             THE COURT:  All right.  Thank you.  Ms. Winograd?

24             MS. WINOGRAD:  May it please the Court?

25             THE COURT:  You may proceed.

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 12/16/23    Page 114 of 185    PageID 36786

26

1          MS. WINOGRAD:  Your Honor, the motion should be

2    denied because there is no good cause for modifying the

3    scheduling order.  The motion is untimely.  The expert

4    testimony Defendants seek to gather is both improper and

5    irrelevant.  And if the motion is granted, Highland will be

6    prejudiced.

7          This is -- this adversary -- adversary proceeding is a

8    garden-variety collection action on a simple note, it has been

9    going on for roughly a year, and it continues to get delayed

10   due to unnecessary and costly motion practice.  Defendants'

11   latest motion is not only another delay tactic, but it is also

12   completely unsupported.

13         And before I tell you why it is unsupported, I want to

14   take a step back and just summarize the context of Defendants'

15   motion.  Defendants have always and continue to assert the

16   same affirmative defense, which is that their default under

17   the note was the result of Highland's negligence under the

18   shared services agreement.  It is Defendants' position that

19   before Mr. Waterhouse's deposition an expert was not needed to

20   testify regarding Highland's duties under the shared services

21   agreement.

22         Mr. Waterhouse then testified that Mr. Dondero gave him

23   instruction not to make a payment under the note.  It is now

24   Defendants' contention that, solely in light of this

25   testimony, all of a sudden an expert is needed to testify

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-110   Filed 12/16/24   Page 115 of 185   PageID 36787

Exhibit 110   Page 2890249

27

1  regarding whether Highland owed an affirmative duty under that

2  same shared services agreement to ask Mr. Dondero if he

3  understood the implications of his instruction, and if so, if

4  Highland breached such a purported duty.

5       First of all, Your Honor, based on the clear terms of the

6  shared services agreement, there is no affirmative duty for

7  Highland to ask Mr. Dondero if he understood the implications

8  of his own instruction.

9       Moreover, Your Honor, the question of what Highland's

10 duties are is a legal issue reserved for the Court, and the

11 issue of whether Highland breached -- and Highland submits

12 there was no such breach -- but that issue is reserved for the

13 jury.

14      Your Honor, if expert testimony wasn't needed before, it

15 is not needed now.

16      This Court entered a scheduling order in September of

17 2021.  Under Rule 16(b) of the Federal Rules of Civil

18 Procedure, an existing scheduling order can only be modified

19 upon a showing of good cause.  The purpose of Rule 16 is for

20 the Court to prevent unforeseeable and never-ending litigation

21 expenditures.

22      So the critical question before Your Honor today is

23 whether there is good cause to modify the scheduling order.

24 And Highland submits there is not.

25      Courts consider four general factors to determine whether

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 12/16/24   Page 116 of 185   PageID 36788

28

1    there's good cause.  It's the party's explanation for failing

2    to previously identify the witness.  It's the importance of

3    the witness's testimony.  And it's the prejudice to the other

4    side in allowing the testimony.  All of these factors weigh in

5    favor of denying the motion.

6        Regarding the first factor, Defendants' explanation for

7    failing to previously identify the witness is entirely without

8    merit.  Again, NexPoint first raised its affirmative defense

9    that its default under the note was the result of Highland's

10   own negligence back in March of 2021.  In other words,

11   NexPoint had nine months to retain an expert to testify

12   regarding Highland's duties for nine months.

13       NexPoint seeks to create -- to distinguish between these

14   notions of Highland somehow, quote, dropping the ball versus

15   Highland not asking Mr. Dondero if he understood the

16   implications of his own instruction.  Defendants cite no

17   authority in support of the notion that one of these factual

18   circumstances would somehow require an expert but that the

19   other would not.

20       What this comes down to, Your Honor, is that Defendants

21   are using this testimony as an excuse to muddy the water, to

22   muddy the waters as to the critical issues in this case and as

23   a latch-ditch attempt to bolster their defense.

24       I don't want to bog you down with case law that's already

25   cited in our brief, but I want to flag a particularly on-point

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 01/09/24    Page 117 of 185    PageID 36789

29

1    case, and that is *Reliance*, 110 F.3d at 257.  The Fifth

2    Circuit affirmed the lower court's denial of a party's motion

3    to modify the scheduling order when that -- when a deposition

4    didn't go well, specifically holding District Courts have the

5    power to control their dockets by refusing to give ineffective

6    litigants a second chance to develop their case.

7        The suggested expert testimony also is improper as a

8    matter of law.  It is well-settled law in the Fifth Circuit

9    that an expert cannot testify regarding the scope of a party's

10   contractual duties under an agreement and whether that party

11   fulfilled such duties.  And that is exactly what NexPoint and

12   Defendants are trying to do here.  It is trying to have its

13   expert interpret the terms of a shared services agreement and

14   testify regarding Highland's duties thereunder and ultimately

15   whether it thinks Highland breached those duties.

16       This is an improper subject for expert testimony and

17   precisely the type of expert testimony that the Northern

18   District of Texas rejected in *Panhandle* and which the Fifth

19   Circuit affirmed the rejection of in *Askanase*, two cases cited

20   in our papers.

21       Even if the suggested expert testimony were proper, which

22   it is not, it is also irrelevant.  In order to be relevant,

23   expert testimony must assist the trier of fact understand a

24   complex or distinct issue in a case.  Here, the critical issue

25   for Defendants is whether they can prove that their default

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 01/09/24    Page 118 of 185    PageID 36790

30

1    under the note was the result of Highland's negligence.  This

2    issue is well within the common understanding of a lay person.

3        Again, this is a garden-variety collection action.  All of

4    the cases NexPoint cites in its papers in support of the

5    notion that expert testimony is required, all of those cases

6    involve professional malpractice cases, whether legal or

7    medical.  And in those cases, an expert was required to

8    testify regarding the general standard of care in a particular

9    industry.

10        Here, NexPoint doesn't seek to have an expert testify

11    regarding the general standard of care in a particular

12    industry.  That is not an issue in this case.  And this

13    certainly is not a professional malpractice case.

14        NexPoint seeks to have its expert opine as to the scope of

15    Highland's legal duties in a shared services agreement and

16    ultimately whether Highland breached the purported duties,

17    which, again, we submit it did not.

18        The other case NexPoint cites to, *In re Schooler,* that

19    case also doesn't support Defendants' position, and in fact

20    supports Highland's position.  In that case, the Fifth Circuit

21    noted, and I quote, Expert testimony is not needed in many, if

22    not most, cases.

23        I also want to briefly address NexPoint's argument raised

24    for the first time in its reply that Highland was also acting

25    as an attorney to Defendants during this time.  As a

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 01/09/24    Page 119 of 185    PageID 36791
Exhibit 10    Page 122 of 189

31

1    procedural matter, this argument is entirely improper because

2    it is not proper to raise an argument for the first time in a

3    reply.

4         And on the merits, again, this is not a professional

5    malpractice case.  So for these reasons alone, such a

6    contention should be summarily disregarded by the Court.

7         Finally, Your Honor, Highland would suffer prejudice if

8    the motion is granted because it would be forced to expend

9    significant and costly resources responding to the testimony

10   in the form of retaining a rebuttal expert, taking and

11   defending additional depositions, and engaging in more motion

12   practice.  This would be a waste of resources for both parties

13   and for the Court because this testimony isn't ultimately

14   going to be needed at trial.

15        It is improper because it opines as to the ultimate legal

16   issues in this case that are reserved for the Court and then

17   for the jury.  And it is also irrelevant because all of the

18   issues in this case are well within the common understanding

19   of a lay person.

20        I also want to note that HCRE and HCMS's motions asking

21   for the same relief are equally if not more frivolous than

22   NexPoint's because HCMS and HCRE aren't even parties to the

23   shared services agreement.  To the extent HCMS and HCRE are

24   asking an expert to testify regarding Highland's alleged

25   duties under an oral agreement, the terms of which are

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 03/30/22   Page 120 of 185   PageID 36792

32

1    unknown, such a contention is frivolous on its face.

2         But even if such an alleged oral agreement exists, which

3    it does not, this does not change the Rule 16(b) analysis.

4    The Defendants fail to show good cause for modifying the

5    scheduling order.

6         In brief, Your Honor, this motion is simply a delay

7    tactic, the expert testimony is improper, and the motion

8    should be denied.  Thank you.

9              THE COURT:  Thank you.

10        All right.  Movants get the last word.  Mr. Rukavina,

11   anything further?

12             MR. RUKAVINA:  Yes, Your Honor.  Most of what

13   opposing counsel says is the topic of a *Daubert* issue.  We're

14   not seeking to prejudice *Daubert* today, and they have every

15   ability in the future to argue that Mr. Pully's testimony

16   should not be admissible.

17        Second, this is not a garden-variety case.  It is not.  It

18   is a case where, again, our lender was also our officer, was

19   providing all kinds of payment services, accounting services,

20   and legal services.  It may not be unique, it may not have

21   never happened before, but it is not a garden-variety.

22        I do take issue with the notion that there has been any

23   delay in this case.  That is not correct.  I just looked at

24   the docket again to refresh my memory.  We had a contested

25   hearing on my motion to withdraw the reference that the Debtor

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 12/07/23    Page 121 of 185    PageID 36793
Exhibit 10    Page 120 of 184

33

1    objected to, arguing that 542 was a core matter.  Your Honor

2    rejected that argument, and Your Honor agreed with me, as did

3    the District Court, that the reference will be withdrawn when

4    this trial -- when this case is certified trial-ready.

5        So the notion that there has been delay, intentional delay

6    by us, that this is a matter of delay, is absolutely wrong.

7    In fact, this lawsuit has gone on quickly.  It's been handled

8    professionally.  Both sides have been cooperative, giving each

9    other various accommodations.  And I am proud, I think, of how

10   every lawyer has handled themselves in this lawsuit.  To

11   suggest delay or intentional delay is wrong.

12       On the law, Your Honor, *In re Schooler*, I heard counsel

13   argue that it's just illogical and wrong to argue that an

14   expert wasn't required in one situation but now is.  But

15   that's *In re Schooler*, the Fifth Circuit, Your Honor, 725 F.3d

16   498, that I quote at length from.  That's one where the

17   trustee dropped the ball, a Chapter 7 trustee failed to give

18   property of the estate.  And that's the one where the Fifth

19   Circuit does say, Accordingly, we have explained that, as a

20   general rule, expert testimony is not needed in many, if not

21   most, cases.  And then the Fifth Circuit says that, It

22   requires no technical or expert knowledge to recognize that

23   she -- the trustee -- affirmatively should have undertaken

24   some form of action to acquire for the bankruptcy estate the

25   assets to which it was entitled.

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 13/06/23   Page 122 of 185   PageID 36794

34

1          But, again, this is not that case.  This was that case

2    before Mr. Waterhouse testified, and now it's not.  This is

3    not a case anymore where the debtor simply dropped the ball,

4    as did that trustee, or as does the doctor who amputates the

5    wrong leg, or as does the lawyer who misses a limitations

6    deadline.  This is now a case where, if the jury believes Mr.

7    Waterhouse, the plot has thickened.

8          And finally, Your Honor, again, I'm not here to point

9    fingers, but look at the Debtor's response to Interrogatory

10   No. 1.  All that the Debtor needed to say six or seven months

11   ago to avoid this delay is that, oh, wait, we received an

12   instruction not to pay.  It would have taken ten words, one

13   sentence, by the Debtor to fully answer an interrogatory and

14   this motion would not have been necessary.

15         Thank you.

16              THE COURT:  All right.  Mr. Aigen, anything further

17   from you?

18              MR. AIGEN:  No, nothing further, Your Honor.  We just

19   join in Mr. Rukavina's reply points.

20              THE COURT:  All right.  As I understand it, the

21   deadline was October 29th for disclosure of experts, and the

22   record shows that at 5:22 p.m. on October 29th the Defendants

23   -- let me double-check that.  That was actually the

24   declaration of Mr. Rukavina.  No, 5:22 p.m. on the deadline,

25   the motion of the Defendant to extend the expert disclosure

Case 21-03004-sgj    Doc 148-1    Filed 03/14/22    Entered 03/14/22 18:52:45    Desc
Case 3:21-cv-00881-X    Document 177-10    Filed 06/06/22    Page 123 of 185    PageID 36795

35

1    and discovery deadlines was filed.

2       The legal authority that governs here is Rule 16(b).  As

3    everyone has acknowledged, it provides that deadlines in

4    scheduling orders may be modified for good cause.  I think the

5    standard does apply here.  While I guess a lot of the cases

6    analyze it in terms of a request after a deadline has expired,

7    I think a motion on the day of the deadline at 5:22 p.m. is

8    going to be governed by Rule 16(b).

9       So, as the parties have argued to the Court, the Fifth

10    Circuit has specified four factors in guiding a decision in

11    this situation:  the explanation for failure to timely move

12    for leave to amend; the importance of the amendment; potential

13    prejudice in allowing the amendment; and availability of a

14    continuance to cure such prejudice.

15       Here, as I think everyone readily acknowledges, these

16    Defendants have always asserted as a defense that the Debtor

17    dropped the ball, I think was one phrase used.  That, in any

18    event, it was the fault of the Debtor that the Defendants did

19    default on the payment of these notes.  I do not think the

20    sudden statement of Frank Waterhouse suddenly is a game-

21    changer that creates some new need for an expert.  So,

22    therefore, looking at the factors, I don't think the

23    explanation here to extend the deadlines has merit.

24       Moreover, as far as the importance of the amendment,

25    Factor No. 2, I think it is appropriate to look at the big

1    picture here a little bit, even though we're not in a *Daubert*

2    situation, and look at what the expert is argued to be needed

3    for.  And I do not think an expert can testify about

4    contractual duties and attempt to interpret its provisions.

5    That is the job of the Court, and I think it is improper

6    subject matter for an expert.

7        I don't buy into any notion that this is terribly unique

8    territory or exotic.  I mean, it was a contract.  Shared

9    services agreements are not all that unique, shall we say?

10   It's not a device that is used solely in the investment

11   advisor fund world.  It's in the corporate world generally.

12   Courts see these in all kinds of cases.  So, again, I don't

13   think contract interpretation needs an expert here or should

14   have an expert here.

15       And just because experts are sometimes -- often, I should

16   say -- appropriate in legal malpractice or medical malpractice

17   or other kinds of tort cases where duties might be needing of

18   elaboration, here, the contract spells out the duties, and I

19   just don't think any of those cases argued are applicable.

20       Prejudice, I do think there is potential prejudice in

21   allowing an extension of this deadline.  It will be costly,

22   add a layer of expense and delay to this litigation, when I

23   don't think it would be admissible at trial ultimately.

24       So the motions are denied.

25       Ms. Winograd, could you please prepare a form of order?

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 01/09/24   Page 125 of 185   PageID 36797

37

1    It can be a simple form of order.  Run it by opposing counsel

2    before you upload it, please.  All right?

3              MS. WINOGRAD:  Yes, Your Honor.

4              THE COURT:  Thank you.  We're adjourned.

5              MS. WINOGRAD:  Thank you.

6              THE CLERK:  All rise.

7         (Proceedings concluded at 11:47 a.m.)

8                          --oOo--

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23     **/s/ Kathy Rehling**                        **12/13/2021**

24   _____      _____
     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

Case 21-03004-sgj   Doc 148-1   Filed 03/14/22   Entered 03/14/22 18:52:45   Desc
Case 3:21-cv-00881-X   Document 177-10   Filed 01/09/24   Page 126 of 185   PageID 36798

38

INDEX

PROCEEDINGS                                                          4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                              34

END OF PROCEEDINGS                                                   37

INDEX                                                                38

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03004-sgj |
| vs. | § § | Case No. 3:21-cv-881 |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | |
| Defendant. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03082-sgj |
| vs. | § § | Case No. 3:22-cv-789 |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS LP, | § § § | |
| Defendant. | § § § | |

## ORDER CONSOLIDATING CASES

Pursuant to Federal Rule of Civil Procedure 42(a) and *Lester v. Exxon Mobil Corp.*, 879 F.3d 582, 592 (5th Cir. 2018), the Court *sua sponte* orders consolidation of *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors LP*, No. 3:22-cv-789 under lead case, *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, No. 3:21-cv-881. Both cases are already assigned to the Court. The Court finds that the interests of judicial efficiency are best served by consolidation of all Note Cases under Case No. 3:21-cv-881, and 3:22-cv-789 is another (specifically, the tenth Note Case) in this district arising from the Highland bankruptcy proceedings. The other nine Note Cases have already been consolidated under 3:21-cv-881 by prior order of the Court.

1

**IT IS HEREBY ORDERED THAT**:

1.   The Note Case, 3:22-cv-789, is consolidated under the lead Note Case, No. 3:21-cv-881 for all purposes other than that Case No. 3:21-cv-881-X may be tried separately (or that the determination of whether such case shall be tried separately is deferred until after all summary judgement motions are heard and decided), to be heard by the undersigned.

2.   All future filings related to all Note Cases shall be filed on the docket for No. 3:21-cv-881.

**IT IS SO ORDERED** this 20th day of April, 2022.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

**GENERAL:**  Use this form to order audio or transcript of proceedings.  Complete a separate order form for each case number and/or date.  Audio will be produced on a CD. Audio cost is $32 per (day/tape). Payment and delivery of transcript is between the ordering party and the assigned transcriber. <span style="color:red">Payment for audio CD must be received in advance before CD is produced.</span>

**SUBMIT ORDER FORM:**

|  |  |
|---|---|
| | Dallas & Wichita Falls: dal_transcript@txnb.uscourts.gov |
| | Fort Worth:        ftw_transcript@txnb.uscourts.gov |
| | West Texas:      lub_transcript@txnb.uscourts.gov |

**ITEM 1:**                         Specifies whether the order is for a copy of the audio from the proceeding or an official order of the transcript. Denote order with an "X" in the correct field.

**ITEMS 2-13:**                  These items should always be complete. Only one case number, case name, and date of proceeding may be listed per order.

**ITEM 14:**                       Specifies the type of case. Denote order with an "X" in the correct field.

**ITEM 15:**

| | |
|---|---|
| Ordinary ($3.65 per page) | A transcript to be delivered within thirty (30) calendar days after the receipt of an order request. |
| Expedited – 14 Day ($4.25 per page) | A transcript to be delivered within fourteen (14) calendar days after receipt of an order request. |
| Expedited – 7 Day ($4.85 per page) | A transcript to be delivered within seven (7) calendar days after receipt of an order request. |
| Expedited – 3 Day ($5.45 per page) | A transcript to be delivered within three (3) calendar days after receipt of an order request. |
| Daily ($6.05 per page) | A transcript to be delivered following the adjournment and prior to the normal opening hour of the court on the following day whether nor not it actually is a court day. |
| Hourly ($7.25 per page) | A transcript of proceedings ordered under unusual circumstances to be delivered within two (2) hours of receiving an order request. |

**ITEM 16:** Place an "X" in the correct field for each portion requested. Be sure that the description is accurately and clearly written to facilitate processing. For example, list full names of witness testimony to be included.

**ITEM 17-18:**  Sign and date in this space to certify that you will pay all charges for the order.

**Shaded area reserved for the court's use.**

BTXN 191 (rev. 11/20)

# AUDIO / TRANSCRIPT ORDER

| 1. ORDER REQUEST: <br> ☐ DUPLICATE OF AUDIO CD Recordings Only ☐ TRANSCRIPT | 2. DATE OF ORDER: | FOR COURT USE ONLY <br> DUE DATE: |
|---|---|---|
| 3. NAME: | 4. PHONE NUMBER: | 5. EMAIL ADDRESS: |

| 6. MAILING ADDRESS: | 7. CITY: | 8. STATE: | 9. ZIP CODE: |
|---|---|---|---|

| 10. CASE NUMBER: | 11. CASE NAME: | 12. JUDICIAL OFFICIAL: | 13. DATE OF PROCEEDING: <br> FROM:    /    / |
|---|---|---|---|

| 14. ORDER FOR: | ☐ APPEAL | ☐ BANKRUPTCY | ☐ OTHER |
|---|---|---|---|

**15. ORDER:**

| | ORDINARY | 7 DAY EXPEDITED | DAILY | HOURLY |
|---|---|---|---|---|
| A. | ☐ | ☐ | ☐ | ☐ |

| | 14 DAY EXPEDITED | 3 DAY EXPEDITED |
|---|---|---|
| | ☐ | ☐ |

**16. AUDIO/TRANSCRIPT REQUESTED  Specify portion(s) and date(s) of proceeding(s):**

| PORTION(S) | PORTION(S) |
|---|---|
| ☐ ENTIRE HEARING | ☐ TESTIMONY (Specify Witness) |
| ☐ OPENING STATEMENT (Plaintiff) | |
| ☐ OPENING STATEMENT (Defendant) | |
| ☐ CLOSING ARGUMENT (Plaintiff) | ☐ VOIR DIRE |
| ☐ CLOSING ARGUMENT (Defendant) | ☐ OTHER (Specify) |
| ☐ COURT RULING ONLY | |

| CERTIFICATION <br><br> By signing 17. & 18, I certify that I will pay all charges (deposit plus additional as specified by the assigned transcriber). | 17. SIGNATURE: |
|---|---|
| | 18. DATE: |

| COURT USE ONLY | |
|---|---|
| A.  PROCESSED BY: | B.  TRANSCRIPT TO BE PREPARED BY: |
| PHONE NUMBER: | ADDRESS: |
| EMAIL ADDRESS: | TELEPHONE: <br> EMAIL ADDRESS: |

| C. PARTY RECEIVED AUDIO: | DATE: | BY: | $32 FEE PAID: |
|---|---|---|---|

**DISTRIBUTION:**          COURT COPY          ORDER RECEIPT          ORDER COPY



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 26, 2022**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-----------------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                          Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.,

                          Defendant.

-----------------------------------------------------------------------

§
§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-03004-sgj

Case No. 3:21-cv-00881-X

---

| | §  | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03005-sgj |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Case No. 3:21-cv-00881-X |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

| | §  | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03006-sgj |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | Case No. 3:21-cv-00881-X |
| SERVICES, INC., JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

| | §  | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | Adv. Proc. No. 21-03007-sgj |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-00881-X |
| HCRE PARTNERS, LLC (n/k/a NexPoint | § | |
| Real Estate Partners, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S OMNIBUS MOTION (A) TO STRIKE CERTAIN DOCUMENTS AND ARGUMENTS FROM THE RECORD, (B) FOR SANCTIONS, AND (C) FOR AN ORDER OF CONTEMPT

This matter having come before the Court on *Plaintiff's Omnibus Motion (A) to Strike*

*Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of*

*Contempt* [Docket No. 161] (the "Motion")[1] filed by Highland Capital Management, L.P., the

reorganized debtor in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff

(the "Plaintiff") in the above-captioned Adversary Proceedings; and this Court having considered

(a) the Motion; (b) the arguments and law cited in the *Brief in Support of Plaintiff's Omnibus Motion*

*(A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an*

*Order of Contempt* [Docket No. 162] ("Plaintiff's Brief");[2] (c) the *Declaration of John A. Morris*

*in Support of Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the*

*Record, (B) for Sanctions, and (C) for an Order of Contempt* and the exhibits annexed thereto

[Docket No. 163] ("Morris Declaration");[3] (d) the *Errata to the Declaration of John A. Morris in*

*Support of Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the*

*Record, (B) for Sanctions, and (C) for an Order of Contempt* and the exhibits annexed thereto

[Docket No. 174] ("Morris Errata");[4] (e) the arguments and law cited in *Defendants' Response in*

*Opposition to Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the*

*Record, (B) for Sanctions, and (C) for an Order of Contempt* [Docket No. 180] ("Defendants'

Brief");[5] (f) *Defendant's Objection to Plaintiff's Motion to Strike, for Sanctions, and for Contempt*

---

[1] The Motion and related documents referred to herein were filed in each of the above-referenced adversary proceedings (collectively, the "Adversary Proceedings"). For convenience purposes, docket citations in the text of this Order shall be to the docket maintained in Adv. Pro. No. 21-03005. For the sake of completeness, corresponding citations to the dockets maintained in the other Adversary Proceedings shall be footnoted. The Motion was also filed in Adv. Pro. No. 21-03004 at Docket No. 129; in Adv. Pro. No. 21-03006 at Docket No. 162; and in Adv. Pro. No. 21-03007 at Docket No. 157.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in Plaintiff's Brief. Plaintiff's Brief was also filed in Adv. Pro. No. 21-03004 at Docket No. 130; in Adv. Pro. No. 21-03006 at Docket No. 163; and in Adv. Pro. No. 21-03007 at Docket No. 158.

[3] The Morris Declaration was also filed in Adv. Pro. No. 21-03004 at Docket No. 131; in Adv. Pro. No. 21-03006 at Docket No. 164; and in Adv. Pro. No. 21-03007 at Docket No. 159.

[4] The Morris Errata was also filed in Adv. Pro. No. 21-03004 at Docket No. 141; in Adv. Pro. No. 21-03006 at Docket No. 175; and in Adv. Pro. No. 21-03007 at Docket No. 170.

[5] Defendants' Brief was also filed in Adv. Pro. No. 21-03006 at Docket No. 182; and in Adv. Pro. No. 21-03007 at Docket No. 177.

filed by defendant Highland Capital Management Advisors, L.P. in Adv. Pro. No. 21-03004 at

Docket No. 145; (g) the *Appendix in Support of Defendants' Response in Opposition to Plaintiff's*

*Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for*

*Sanctions, and (C) for an Order of Contempt* [Docket No. 181] ("Defendants' Appendix");[6] (h) the

arguments and law cited in the *Plaintiff's Reply in Further Support of Its Omnibus Motion (A) to*

*Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order*

*of Contempt* [Docket No. 183] ("Plaintiff's Reply");[7] (i) the *Supplemental Declaration of John A.*

*Morris in Support of Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments*

*from the Record, (B) for Sanctions, and (C) for an Order of Contempt* and the exhibits annexed

thereto [Docket No. 184] ("Morris Supplement");[8] the arguments made on behalf of the parties

during the hearing held on April 20, 2022 (the "Hearing"); and this Court having jurisdiction over

this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this

proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1409; and this Court

having found that the Plaintiff's notice of the Motion and opportunity for a hearing on the Motion

was appropriate and that no other notice need be provided; and upon all of the proceedings had

before this Court; and after due deliberation and sufficient cause appearing therefor and for the

reasons set forth in the record during the Hearing on this Motion, it is **HEREBY ORDERED**

**THAT**:

---

[6] Defendants' Appendix was also filed in Adv. Pro. No. 21-03006 at Docket No. 182; and in Adv. Pro. No. 21-03007 at Docket No. 177.

[7] Plaintiff's Reply was also filed in Adv. Pro. No. 21-03004 at Docket No. 147; in Adv. Pro. No. 21-03006 at Docket No. 185; and in Adv. Pro. No. 21-03007 at Docket No. 180.

[8] The Morris Supplement was also filed in Adv. Pro. No. 21-03004 at Docket No. 148; in Adv. Pro. No. 21-03006 at Docket No. 186; and in Adv. Pro. No. 21-03007 at Docket No. 181.

1.      The Motion is **GRANTED** only to the extent set forth in paragraphs 2 through 4 below.

2.      Footnote 76 (the "Stricken Footnote") shall be deemed stricken from *Defendants' Memorandum of Law in Response to Plaintiff's Motion for Summary Judgment* [Docket No. 156] ("Defendants' Summary Judgment Opposition"),[9] as set forth in the Morris Errata, Exhibit A, a copy of which is attached hereto as **Exhibit A**; for the avoidance of doubt, if Defendants' Summary Judgment Opposition is presented to the District Court, it shall not contain the Stricken Footnote ***except*** in connection with any motion for reconsideration or appeal of this Order and/or the Expert Order.

3.      The Pully Report shall be deemed stricken from the *Appendix in Support of Defendants' Memorandum of Law in Response to Plaintiff's Motion for Summary Judgment* [Docket No. 157] ("Defendants' Summary Judgment Appendix")[10] and shall ***not*** be included in any record for any purpose ***except*** in connection with any motion for reconsideration or appeal of this Order and/or the Expert Order.

4.      The portions of *Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment* [Adv. Pro. No. 21-03004, Docket No. 127] filed by HCMFA ("HCMFA's Summary Judgment Opposition") that concern the Barred Defense (as specifically set forth in Morris Declaration Exhibit 2, a copy of which is attached hereto as **Exhibit B** (the "Stricken Argument")) shall be deemed stricken from HCMFA's Summary Judgment Opposition; for the avoidance of

---

[9] The Motion was not filed against James Dondero presumably because his personal defenses do not concern, relate to, or rely upon the Pully Report. Nevertheless, because Mr. Dondero adopted in full Defendants' Summary Judgment Opposition (including the inclusion of the Stricken Footnote) and Defendants' Summary Judgment Appendix (including the Pully Report), this Order is extended to Mr. Dondero for the sake of completeness and to avoid any ambiguity. Defendants' Summary Judgment Opposition was also filed in Adv. Pro. No. 21-03003 at Docket No. 154; in Adv. Pro. No. 21-03006 at Docket No. 157; and in Adv. Pro. No. 21-03007 at Docket No. 152.

[10] Defendants' Summary Judgment Appendix was also filed in Adv. Pro. No. 21-03003 at Docket No. 155; in Adv. Pro. No. 21-03006 at Docket No. 158; and in Adv. Pro. No. 21-03007 at Docket No. 153.

DOCS_NY:45618.2 36027/003

doubt, if HCMFA's Summary Judgment Opposition is presented to the District Court, it shall ***not***

contain the Stricken Argument ***except*** in connection with any motion for reconsideration or appeal

of this Order and/or the Second Motion for Leave Order.

5.      Except as set forth above, the Motion (including the request for the imposition of

sanctions and contempt orders) is **DENIED**.

###End of Order###

DOCS_NY:45618.2 36027/003

# EXHIBIT A

# EXHIBIT 1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero,**
**Highland Capital Management Services, Inc. and**
**NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and**
**Highland Capital Management Fund Advisors, L.P.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

the HCRE Term Note pursuant to the respective oral SSAs are genuine issues of material fact.[76]

Moreover, as discussed in greater detail below, Plaintiff failed to remind HCMS of prepayments

that had been made that relieved it of the obligation to make any additional payment in 2020.

     **E.**      **Prepayment on the Term Notes**

          **1.**      **NexPoint's Prepayments**

    29.    NexPoint asserts the affirmative defense of prepayment on the NexPoint Note,

which relieved NexPoint of any obligation to make any additional payment in 2020. Thus, the

NexPoint Note was not in default when no payment was made on December 31, 2020. NexPoint

demonstrates *infra* that there is evidence supporting this affirmative defense and summary

judgment denying this affirmative defense is inappropriate as a matter of law.

    30.    There is no dispute of fact that, between March and August of 2019, the following

payments were made on the NexPoint Note (collectively, the "NexPoint Prepayments"): (i)

$750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June

4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi)

$1,300,000.00 on August 13, 2019.[77] These payments totaled $6,380,000.00 in 2019.[78] The

normal December, 2019 payment of principal and interest on the Note would have been

$2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

    31.    None of the aforementioned payments were scheduled payments or payments on

arrears.[79] Rather, they were prepayments since the Plaintiff needed money and asked NexPoint to

transfer it funds for liquidity purposes, which NexPoint did.[80] These transfers were intended by

---

■ ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

[77] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249.
[78] *Id.*
[79] *Id.*
[80] Def. Ex. 1, J Dondero Dec., ¶ 42, Def. Appx. 21.

# **EXHIBIT B**

# EXHIBIT 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Davor Rukavina, Esq.
State Bar No. 24030781
Julian P. Vasek, Esq.
State Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard St., Ste. 3800
Dallas, TX 75201
Tel: 214-855-7500
Fax: 214-855-7584

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

I. SUMMARY ....................................................................................................1

II. BACKGROUND .............................................................................................2

    A. THE DEBTOR CAUSED HCMFA TO INCUR SUBSTANTIAL LOSSES ...........................2

    B. THE PERSON IN CHARGE OF BOTH THE DEBTOR AND HCMFA DIRECTED
    THE DEBTOR TO COMPENSATE HCMFA FOR ITS LOSS, NOT TO MAKE LOANS ......4

    C. THE DEBTOR'S ACCOUNTING STAFF MISTAKENLY BOOKED THE TRANSFERS
    AS LOANS ON BEHALF OF BOTH THE DEBTOR AND HCMFA ................................6

    D. DESPITE THE DEBTOR'S MISTAKE, HCMFA NEVER ACTUALLY SIGNED
    THE NOTES ..................................................................................................14

III. SUMMARY JUDGMENT STANDARD ........................................................23

IV. ARGUMENT AND AUTHORITIES ..............................................................24

    A. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
    WHETHER HCMFA SIGNED THE NOTES ........................................................25

        i. Waterhouse did not Actually Sign the Notes ...............................................26

        ii. Even if Waterhouse Signed the Notes, He Did Not Have Authority .........27

        iii. Even if Waterhouse Signed the Notes and had Authority,
        the Notes are Ambiguous ...........................................................................31

    B. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE
    NOTES WERE THE RESULT OF A MUTUAL MISTAKE .......................................33

    C. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE
    DEBTOR GAVE CONSIDERATION IN EXCHANGE FOR THE NOTES ....................36

    D. TURNOVER IS NOT AN APPROPRIATE REMEDY UNDER THESE CIRCUMSTANCES ...36

V. CONCLUSION .............................................................................................36

CERTIFICATE OF SERVICE ............................................................................38

# TABLE OF AUTHORITIES

## Cases

*Allen v. Berrey*, 645 S.W.2d 550 (Tex. App.—San Antonio 1982)................................33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .........................................24

*Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*, 2017 Bankr. LEXIS 3191 (Bankr. N.D. Tex. Sept. 21, 2017)................................23

*Brown v. White's Ferry, Inc.*, 280 F.R.D. 238 (D. Md. 2012)...................................10

*Capobianco v. City of N.Y.*, 422 F.3d 47 (2d Cir. 2005)..........................................10

*Childers v. Pumping Systems, Inc.*, 968 F.2d 565 (5th Cir. 1992)..............................31

*Claimant ID 100218776 v. BP Expl. & Prod.*, 712 Fed. Appx. 372 (5th Cir. 2017)...................29

*DeClaire v. G&B McIntosh Family Ltd. P.ship*, 260 S.W.3d 34 (Tex. App.—Houston [1st] 2008) ..................................................34

*Follenfant v. Rogers*, 359 F.2d 30 (5th Cir. 1966)..................................................26

*Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007) ......................................................30

*Garza v. Villarreal*, 345 S.W.3d 473 (Tex. App.—San Antonio 2011) ........................33, 36

*Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010) ...................30

*Gross v. GGNSC Southaven, LLC*, 817 F.3d 169 (5th Cir. 2016) ...............................16

*Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011) ......................................35

*In re Fang Operators*, 158 B.R. 643 (Bankr. N.D. Tex. 1993) ...............................36

*IRA Res., Inc. v. Griego*, 221 S.W. 3d 592 (Tex. 2007) .......................................28

*Jones v. Anderson*, 721 Fed. Appx. 333 (5th Cir. 2018)........................................25

*Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313 (5th Cir. 2016)............................25

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930 (N.D. Tex. April 13, 2015)............28, 30

*Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170 (4th Cir. 1998)...........................10

*Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802
(N.D. Tex. Jan. 10, 2011)...............................................................................26

*Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678 (W.D. Tex. Sept. 29, 2011)...............26

*Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018 (5th Cir. 1995)......................................24

*Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431 (Colo. App. 1982) ............................31

*Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37 (Tex. App.—Dallas 2003) ..........................36

*S. Mansukhlal & Co v. Husein*, 14-04-00018-cv, 2004 Tex. App. LEXIS 8097
(Tex. App.—Houston [14th] Sept. 2, 2004) ......................................................32

*Satelco, Inc. v. North Amer. Publishers, Inc. (In re Satelco, inc.)*, 58 B.R. 781
(Bankr. N.D. Tex. 1986) ...........................................................................36

*Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005,
Tex. App. LEXIS 6215 (Tex. App.—Fort Worth Aug. 4, 2005).......................................31

*Silverio v. Silverio*, 625 S.W.3d 680 (Tex. App.—El Paso 2021) ................................25, 27

*Smith-Gilbard v. Perry*, 332 S.W.3d 709 (Tex. App.—Dallas 2011).....................................33

*Strickland v. Coleman*, 824 S.W.2d 188 (Tex. App.—Houston [1st] 1991) ...........................24, 25

*Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607 (Tex. App—Houston [1st] 2004) ......................36

## **Statutes**

TEX. BUS. & COMM. CODE § 1.201 ........................................................................28

TEX. BUS. & COMM. CODE § 3.305 ........................................................................24

TEX. BUS. & COMM. CODE § 3.308 .....................................................................25, 27

TEX. BUS. & COMM. CODE § 3.402 .....................................................................27, 31

TEX. BUS. & COMM. CODE § 3.403 ........................................................................27

## **Rules**

Fed. R. Civ. P. 8 ......................................................................................26

Fed. R. Civ. P. 11 ............................................................................................................26

Tex. R. Civ. P. 92 ............................................................................................................26

Tex. R. Civ. P. 93 ............................................................................................................26

TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Highland Capital Management Fund Advisors, L.P. ("HCMFA"),
defendant in the above-captioned adversary proceeding (the "Adversary"), and files this its brief
in opposition to *Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*
(Dkt. No. 91, the "Motion"), filed by plaintiff Highland Capital Management, L.P. (the "Debtor"),
in support of which HCMFA would respectfully show the Court as follows:

## I.   SUMMARY

1.      The notes represent a mutual mistake: the $7.4 million the Debtor transferred to
HCMFA was compensation for damage the Debtor caused to HCMFA by the Debtor's own
negligence and fault; it was not as a loan. Mr. Waterhouse never even signed the Notes or
authorized anyone to affix his electronic signature. Even if he did, HCMFA itself never authorized
Mr. Waterhouse to execute the notes, and he did not have apparent authority to bind HCMFA in
light of the fact that he was also an officer of the Debtor.

2.      This led to the natural progression of one mistake after another—each by the
Debtor's employees.  First, those employees caused the underlying liability to a fund HCMFA
manages, pursuant to which HCMFA paid out $7.4 million to third parties.  Second, when Mr.
Dondero directed the Debtor to transfer $7.4 million to HCMFA as compensation, the Debtor's
employees assumed, without instruction or authority from HCMFA or the Debtor, that the transfers
represented intercompany loans.  Third, those employees papered up the transfers as loans, without
authority or approval.  Fourth, those employees affixed Mr. Waterhouse's electronic signature to
the notes, again without authority or approval.  Fifth, those employees then carried the notes as
liabilities on HCMFA's books and records, and as assets on the Debtor's books and records—even
then with substantial confusion and ambiguity.  Sixth, because HCMFA executed two prior notes

to the Debtor in similar amounts, someone reviewing either sets of books and records could, and did, easily confuse the unauthorized mistaken notes for the two valid notes.

3.      All of the foregoing presents numerous legal defenses to the Notes under Texas law.  And all of the foregoing has extensive, if not compelling, evidentiary support.  Thus, genuine issues of material fact exist as to whether the notes are even valid and collectible in the first place, and whether they represent a mutual mistake, such that summary judgment is inappropriate and should be denied.  It will be for the jury to decide these questions of fact and the witnesses' credibility.

## II.      BACKGROUND

### A.      THE DEBTOR CAUSED HCMFA TO INCUR SUBSTANTIAL LOSSES

4.      HCMFA is a registered advisor that advises third-party funds as to their investments.  HCMFA Appx 2.[1]  At all relevant times, including from 2018 to present, HCMFA served as advisor to Highland Global Allocation Fund (the "Fund").  HCMFA Appx 2.  At issue are two transactions involving equity interests in TerreStar Corporation ("TerreStar") that took place in March 2018 (the "March Transactions").  HCMFA Appx 2.  In particular, an error occurred concerning the net asset value ("NAV") that was assigned to the TerreStar interests in connection with the March Transactions (the "NAV Error").  HCMFA Appx 2.  The NAV Error is described in more detail in that certain April 7, 2019 *Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error in the Fund* (the "NAV Memo").  HCMFA Appx 2, 7-17.

5.      During this time period, however, HCMFA did not perform its own valuation

---

[1]      "HCMFA Appx." refers to the *Defendant's Appendix in Opposition to Plaintiff's Motion for Summary Judgment*, which is being filed contemporaneously herewith.

services.  HCMFA Appx 3; Debtor Appx. 03042.[2]  Instead, HCMFA outsourced these and many

other services to the Debtor, and the Debtor performed such services on HCMFA's behalf pursuant

to that certain *Second Amended and Restated Shared Services Agreement* (the "SSA").  HCMFA

Appx 3, 18-30; Debtor Appx. 03042.  Indeed, all of the "Adviser Representatives" involved in the

NAV Error—Thomas Surgent, Frank Waterhouse, Jason Post, and Lauren Thedford—were

employees of the Debtor, not HCMFA.  HCMFA Appx 3, 7.  The Fund's board of directors was

well aware of the relationship between the Debtor and HCMFA, was well aware that the Debtor

housed all valuation staff, and was well aware the Debtor performed all valuation activities.

HCMFA Appx 3; Debtor Appx. 03047.  The Fund and HCMFA relied on the Debtor to perform

these services, and the NAV Error, including the Debtor's involvement and responsibility, were

material aspects of board conversations for over a year.  HCMFA Appx 3.

6.     As described in more detail in the May 28, 2019 *Memo regarding Resolution of the

Fund's Net Asset Value Error*, Debtor Appx. 02978, HCMFA ultimately made the Fund whole

through a $5,186,496 payment from HCMFA on February 15, 2019 and a $2,398,842 payment

from HCMFA on May 2, 2019.

7.     James Dondero, the President of both the Debtor and HCMFA, was fully aware of

these issues at the time.  HCMFA Appx 1, 3.  Mr. Dondero believed and understood that the Debtor

was liable to HCMFA for causing or failing to prevent the NAV Error.  HCMFA Appx 3.

8.     The Debtor tries to deflect responsibility for the NAV Error to Houlihan Lokey.

But during his rule 12(b)(6) deposition, HCMFA's corporate representative explained the Debtor's

responsibility vis-à-vis Houlihan Lokey:

---

[2]      "Debtor Appx." refers to the Debtor's *Appendix in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions* (Dkt. No. 94).

Q.      Okay.    Well, the defense—HCMFA's defense is that Highland is responsible for the TerreStar valuation issue, correct?

A.      Yes.

Q.      And there's no question that Houlihan Lokey provided services in connection with that valuation, correct?

A.      Correct.

Q.      But HCMFA has not undertaken any analysis or investigation, to the best of your knowledge, to try to determine if Houlihan Lokey was the responsible party; fair?

A.      We don't know if there is a contract or not.  At this point, we're talking about the defense of Highland's responsibility.  There's no question they were responsible for the valuations.  They were outsource provider to the valuation committee.  Every individual working and coordinating with Houlihan Lokey was an HCMFA [sic[3]] employee.  All the data and information that was provided to them came from HCMLP.  There's no question that Highland was responsible for the NAV Error.  No one ever questioned that.  That was always known.  It was all the employees that were involved.

Debtor Appx. 03043; Debtor Appx. 03053 (similar testimony).

9.      Regardless of whether Houlihan Lokey or the Debtor was the primary party responsible for the NAV Error and resulting losses, the facts remain that the Debtor caused the losses, HCMFA accepted responsibility to the Fund and paid out compensation, and Mr. Dondero reasonably believed that the Debtor was liable to HCMFA for those losses.  He acted accordingly, and the Debtor has not sued to avoid those actions.

**B.      THE PERSON IN CHARGE OF BOTH THE DEBTOR AND HCMFA DIRECTED THE DEBTOR TO COMPENSATE HCMFA FOR ITS LOSS, NOT TO MAKE LOANS**

10.      Accordingly, on May 2, 2019, Mr. Dondero—who, again, was the President of both the Debtor and HCMFA—directed the Debtor to transfer $2.4 million to HCMFA.  On May 3,

---

[3]      This reference to HCMFA instead of HCMLP is plainly a typographical error.  Two pages later, Mr. Norris testified, "Again, all employees working with Houlihan Lokey were the HCMLP employees."  Debtor Appx. 03043.  A few pages later, he testified, "But I would say every single person that interacted with the SEC, I believe, were HCMLP employees."  Debtor Appx. 03045; *see also* Debtor Appx. 03048.

2019, Mr. Dondero directed the Debtor to transfer another $5 million to HCMFA (collectively, the "Transfers"). HCMFA Appx 3. The amounts of these Transfers mirror the amounts HCMFA paid the Fund.

11. The purpose of the Transfers was for the Debtor to compensate HCMFA for the damages HCMFA paid in connection with the NAV Error. HCMFA Appx 3-4; Debtor Appx. 03048. It was appropriate for the Debtor to compensate HCMFA because the Debtor's employees caused or failed to prevent the NAV Error and because of the Debtor's duties under the SSA. HCMFA Appx 4. As Mr. Dondero testified during his deposition on November 4, 2021, transferring these funds from the Debtor to HCMFA to settle the fallout from the NAV Error was "a critical piece of putting the issue to bed." HCMFA Appx 4; Debtor Appx. 01835.

12. Specifically, Mr. Dondero instructed Frank Waterhouse, the Debtor's Chief Financial Officer and HCMFA's Treasurer—to make the Transfers. HCMFA Appx 4. He never instructed or suggested to Mr. Waterhouse that the Transfers were loans nor to book them that way. HCMFA Appx 4. Mr. Waterhouse never asked Mr. Dondero whether the Transfers were loans or should be drawn up as such. HCMFA Appx 4; Debtor Appx. 02129 (319:3-6). Indeed, Mr. Dondero never said anything to cause Mr. Waterhouse to reach such an understanding. HCMFA Appx 4. Mr. Waterhouse testified more than once, in fact, that he does not recall Mr. Dondero instructing him to book the Transfers as loans. Debtor Appx. 02085 (145:3), 02120 (284:4-6). Mr. Dondero simply told Mr. Waterhouse to "go get the money from Highland." Debtor Appx. 02120 (283:4-5), 02129 (318:8-10). At the same time, however, Mr. Waterhouse confirmed his understanding from his discussion with Mr. Dondero that the transfers were related to the NAV Error and resulting losses to HCMFA. Debtor Appx. 02085 (145:3-12); 02117-18.

13. Nor did anyone else at the Debtor or HCMFA follow up with Mr. Dondero to ask whether the transfers were loans, and no one either at HCMFA or the Debtor presented Mr.

Dondero with promissory notes to sign or otherwise presented Mr. Dondero with any document to approve the Notes. HCMFA Appx 4. Nor has the Debtor identified any such evidence. At the amounts of $5 million and $2.4 million, however, internal policies and procedures would have required the Notes to go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA, and ultimately through Mr. Dondero for his approval, neither of which happened. HCMFA Appx 4.

## C. THE DEBTOR'S ACCOUNTING STAFF MISTAKENLY BOOKED THE TRANSFERS AS LOANS ON BEHALF OF BOTH THE DEBTOR AND HCMFA

14. As noted above, the Notes should have gone through the Debtor' legal department for preparation, approval, and execution. *E.g.*, Debtor Appx. 02122 (291:3-16); 02122-23 (293:18 - 296:7).[4] In additional to legal, Mr. Waterhouse would have expected Mr. Dondero to approve Notes of this size, as his approval was necessary. Debtor App. 02117. Mr. Waterhouse acknowledged he lacked the requisite authority. *Id.* But none of that happened. The Notes did not go through the Debtor's legal department at all; they were prepared and signed by a mid-level Debtor employee in the accounting department, who was not an employee of HCMFA, as detailed below. Mr. Dondero was unaware of the Notes and never even saw them until just before this litigation commenced. HCMFA Appx. 5.

15. Unbeknownst to Mr. Dondero, HCMFA's accounting staff—who were also employees of the Debtor acting under the SSA—erroneously booked the Transfers as loans and erroneously papered promissory notes to reflect their incorrect understanding of the Transfers. HCMFA Appx 5. Likewise, these same individuals erroneously caused the Debtor and HCMFA

---

[4]     Mr. Morris waived his objection to this question by insisting that the witness complete his answer. Debtor Appx. 02123 (295:12). In any event, the question was not objectionable. To the extent the Debtor asserts a more specific objection, HCMFA reserves the right to respond. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

to reflect these transfers as loans on various financial statements and disclosures. HCMFA Appx 5. But Mr. Dondero, the individual ultimately in charge of both entities, was not aware of these errors until this litigation commenced. HCMFA Appx 5. Nor could Mr. Waterhouse "recall specifically what amounts of money were moved when, for what purpose." Debtor Appx. 02081 (126:5-7).

16. HCMFA's corporate representative likewise testified that HCMFA was unaware of the Notes until the Debtor made its demand because it outsourced finance and corporate accounting functions to the Debtor. Debtor Appx. 03024 (38:3-9), 03025 (42:23-43:3), 03028 (55:12-18). At the same time, HCMFA was unaware of the errors on its financial statements, again because it outsourced finance and corporate accounting functions to the Debtor. Debtor Appx. 03030 (64:15-65:3).

17. Prior to the Debtor's demand to pay these Notes until shortly before this litigation commenced, no one at the Debtor or HCMFA informed Mr. Dondero of the Notes. HCMFA Appx 5. To the extent that he saw any books and records or other financial documents of the Debtor or HCMFA beforehand, he would not have noticed the Notes so as to raise an issue. HCMFA Appx 5. Before the Notes in question, HCMFA issued two other promissory notes to the Debtor, in similar amounts, the dates of collection on which were extended through May, 2021. HCMFA Appx 5, 42, 45. Thus, if Mr. Dondero saw any such records or documents, he would have naturally assumed that any reference to promissory notes referred to these prior two notes, not the Notes in question. HCMFA Appx 5.

18. The Debtor points to documents like the October 23, 2020 *Memo Regarding Supplemental 15(c) Information Request* (the "15(c) Memo") as evidence that HCMFA was aware of the Notes. Debtor Appx. 00884. Yet this document, and underlying e-mail communications culminating in the execution of this document, demonstrate the opposite.

19.    The document states that "$12,286,000 remains outstanding to HCMLP from HCMFA. . .   The earliest the Note between HCMLP and HCMFA could come due is in May, 2021."  Debtor Appx. 00885.  Logically, and certainly for purposes of summary judgment, this statement cannot refer to the Notes, as: (i) the Notes are plural, not singular; (ii) they are for materially less than $12 million; and (iii) they are demand notes subject to demand at any time. Debtor Appx. 00010-15.  In his e-mail leading up to the document, Mr. Waterhouse, who allegedly signed the Notes and who surely would have a memory of the Notes if in fact he signed them, wrote: "The HCMFA note is a demand note. . .  There was an agreement between HCMLP and HCMFA the earliest they could demand is May 2021."  Debtor Appx. 00791.  Yet the Notes are not a "note," and there was no collection delay until May, 2021, thus demonstrating that Mr. Waterhouse was not referring to, nor admitting the existence of, the Notes.

20.    As HCMFA's corporate representative explained, "[h]e [Mr. Waterhouse] himself seems to be confused here, because as we found out through discovery and in the testimony of what has come out, there was an agreement—that was a separate agreement.  That wasn't related to the notes at issue in this case."  Debtor Appx. 03034 (81:5-10).[5]  Nor could it have been related. Mr. Waterhouse used the singular when there are multiple notes at issue.  Additionally, HCMFA's corporate representative explained that the numbers do not add up:

> Q.    As HCMFA's 30(b)(6) witness today, have you done anything to determine whether or not the $12.286 million number includes the principal amount of the notes?
>
> A.    Looking at it, we can't tell.  Because it doesn't line up exactly with those notes.  There were other notes that had been recorded in the books for several years before.  And if you add those two together, it doesn't add up.  So it's not clear.

---

[5]    The Court should deny Mr. Morris's motion to strike.  The answer was responsive to the question he asked, even if he did not like the answer.  When asked if Mr. Morris accurately summarized his testimony, the witness was entitled to clarify his testimony.

Debtor Appx. 03034 (79:5-14). Indeed, the Debtor also sued HCMFA to collect on the other two

notes, copies of which are included in HCMFA's appendix. HCMFA Appx. 31-64.

21.     To be clear, Mr. Dondero's intent, both as the person who controlled HCMFA and

the person who controlled the Debtor, was for these Transfers ($5 million and $2.4 million) to

constitute compensation from the Debtor to HCMFA for the NAV Error, not loans. HCMFA Appx

5. But, as Waterhouse informed Mr. Dondero in early May 2019, the Debtor did not have sufficient

funds to make these Transfers. HCMFA Appx 5. Thus, Mr. Dondero personally paid most if not

all of the $7.4 million into the Debtor at or around the same time to enable the Debtor to make the

Transfers to HCMFA, again under the belief and understanding that the Debtor would use these

funds to compensate HCMFA for the NAV Error, not to make a loan. HCMFA Appx 5.

22.     Still, the Debtor's employees, acting for both the Debtor and HCMFA, erroneously

booked the Transfers as loans. But the Debtor's own evidence—specifically, the deposition of

David Klos—demonstrates how this mistake occurred and why it is not surprising. Mr. Klos was

the Debtor's controller, Debtor Appx. 03183 (6:22-25), and he instructed Debtor employee Kristin

Hendrix to prepare the Notes. Debtor Appx. 03198 (68:4-13). Mr. Klos discussed how funds

would be transferred from one affiliated entity to another as needed for liquidity:

> And you joined Highland in 2009. From that point in time, 2009, through 2019, was there any practice at the enterprise of those businesses to transfer funds between each other on a basis of when one needed it and one had it?
>
> A.      Yes, that was a fairly, generally speaking, that was a fairly common practice, of using different entities within the overall structure to bridge liquidity.

Debtor Appx. 03189 (29:24-30:7). Klos also testified as to the standard practice that, where the

Debtor was transferring funds out, the transfer would be booked as a loan:

> So over the general—talking about generally now, over those 10 years when there were these intercompany transfers for liquidity purposes, how were they booked by the debtor, by Highland Capital Management?

MR. MORRIS: Objection to the form of the question.[6]

THE WITNESS: Help me on the direction. So this is money that Highland is receiving or money that Highland is sending?

Q. (BY MR. RUKAVINA) Sending out.

A. Sending out. So this is—in the scenario that you're describing, this money that Highland is sending out to meet some other corporate obligor's liquidity needs?

Q. Yes, sir.

A. So those would be booked as a loan. I would—I need to hedge a little bit because I'm not a hundred percent certain, but I would say if not exclusively via loans close to exclusively.

Q. And would they—strike that. Would they usually be papered up with a promissory note?

A. Yes.

Q. Now, why was that the general course during 10 years? Was there a policy and procedure in place, or would Dondero say book it as a loan, or was that just the right thing to do from an accounting perspective?

MR. MORRIS: Objection to the form of the question.[7]

THE WITNESS: At the end of the day it's at the direction of Jim Dondero, so I can't tell you exactly why he wanted it to be done that way. But that was certainly the practice of how it was done in those situations.

Debtor Appx. 03189-90 (32:20-34:5).

23. Thus Mr. Klos believed that the underlying transfers were loans, in part because he believed that Mr. Waterhouse would have told him that (but could not recall for certain), and in

---

[6] The Debtor has waived Mr. Morris's objections. "[A] party waives any objection to the admissibility of evidence on summary judgment by offering that evidence in support of its own motion. *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012) (citing *Capobianco v. City of N.Y.*, 422 F.3d 47, 55 (2d Cir. 2005); *Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998)). In any event, it is unclear what Mr. Morris's objection is, and HCMFA reserves the right to respond if and when the Debtor raises a specific objection. If the objection is foundation, Mr. Rukavina laid the requisite predicate. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[7] The Debtor has waived this objection. *Supra*, note 4. It is also unclear what the objection is, so HCMFA reserves the right to respond to a specific objection if and when the Debtor makes one. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

part because of past practice. Debtor Appx. 03199 (69:1-70:14). Mr. Klos described the usual

course at the Debtor with respect to papering intercompany loans:

> Q. (BY MR. RUKAVINA) So going back to this Exhibit 3, sir, why did you
> ask Kristin, can you or Hayley please prep a note for execution? Why them?
> Remember, I was asking about what the course or procedure was at that point in
> time.
>
> A. Yeah, so nomenclature, procedure, process. I would say the informal
> process for these types of loans, they were frequent in nature, would be for someone
> on the corporate accounting team to prepare a note and have it executed.
>
> Q. Okay. That was the standard course back then?
>
> A. Again, I don't know what standard course means. That was fairly typical.
>
> Q. Why would you not have asked someone in the Highland legal department
> to prepare a note?
>
> A. Because this was a legally reviewed document as far as the form of the
> agreement. It's a one-page, two-paragraph form that had been used for a long time.
> So the only thing that would change with respect to these notes would be the date,
> the amount, likely the rate. I can't think of anything else offhand that would have
> changed from note to note.
>
> Q. After you asked Ms. Hendrix to prepare this note, did you have any further
> role with respect to the papering, preparation, or execution of that note?
>
> A. Not that I can remember.
>
> Q. Would you have had any role in having either or both of the notes actually
> signed electronically or by ink by Mr. Waterhouse?
>
> A. Likely not, no.

Debtor Appx. 03202 (83:19-84:24).

24. Ms. Hendrix, the Debtor's senior accountant and not an employee of HCMFA,

likewise testified to the usual course when intercompany transfers occurred:

> Typically anytime specifically Jim Dondero would need to move money between
> related parties, he would pay down -- when I say him, he would have us in corporate
> accounting move money around, pay off notes, reissue new notes somewhere else.
> So a way to move money around between his entities.

Debtor Appx. 03132 (21:10-16). Stated differently, at that time "it's all one big happy family, and whoever needed cash, the cash moved around." *Id.* 472 (23:3-6).

25. The point is a simple one: when the Debtor's accountants saw large transfers from the Debtor to an affiliate, in this case HCMFA, they *assumed* the transfers were loans and, pursuant to their historical practice, they papered the transfers up as loans. But, as non HCMFA employees, they of course had no authority or ability to bind HCMFA on any promissory notes.

26. Thus began the papering up of the Transfers as loans, based on these assumptions. At the same time, both Mr. Waterhouse and Mr. Dondero confirmed that internal policies and procedures would have required the Debtor's legal department, also providing legal services to HCMFA under the SSA, to review and approve the Notes: "The internal policies and procedures at the Debtor and HCMFA, as well as ordinary practice, required that loans in amounts such as $5 million and $2.4 million would go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA …." HCMFA Appx. 4. Mr. Waterhouse likewise testified that "the team [accounting] would have worked with the legal group at Highland to draft any notes." Debtor Appx. 02122 (290:15-16).[8] In fact, Mr. Waterhouse would have expected there to be a representation, represented by a box or section on a cover document, that "legal" has reviewed or approved the document before he would sign it. Debtor Appx. 02123 (294:16-22).[9]

---

[8] The Debtor has waived Mr. Morris's objection. *Supra*, note 4. In any event, the question was not objectionable, and Mr. Waterhouse gave the same answer in response to another question not much later. Debtor App. 02122 (291:3). "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[9] The Debtor has waived Mr. Morris's objection. *Supra*, note 4. In any event, the question was not objectionable, and Mr. Morris waived his objection by insisting that the witness complete his answer. Debtor Appx. 02123 (295:12). "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

27.     This was not done here. Ms. Hendrix, who prepared and signed the Notes, testified that she did not run the Notes through the legal department. Debtor Appx. 03138 (46:18-24). In fact, and contrary to Mr. Waterhouse's testimony, she testified that it was not standard practice for the legal department to prepare and approve intercompany notes, but that this was handled instead by the accounting department using a prior template approved by the legal department. Debtor Appx. 03131 (18:1-19:13; 20:1-5).[10]

28.     Thus, Mr. Waterhouse instructed Mr. Klos to make the Transfers from the Debtor to HCMFA. Debtor Appx. 00871; 03134-35 (32:13-33:4). Mr. Waterhouse never instructed Mr. Klos to paper the Transfers as loans; at least neither one of them remembered or was able to identify any such conversation or instruction. Debtor Appx. 03199 (69:11-15); *see* Debtor Appx. 02122 (290:4-293:11). Mr. Klos, understanding that the Transfers were loans—but again, without any authority or instruction to make them loans—then instructed Ms. Hendrix to paper the Transfers as loans. Debtor Appx. 00871; 03134-35 (32:13-33:4). It was then Ms. Hendrix who actually prepared the Notes. Debtor Appx. 03137 (42:15-43:20).

29.     Again, the point is simple: when professional accountants at the Debtor saw funds flowing from the Debtor to an affiliate, such as HCMFA, they *assumed* that the funds were a loan and papered it as such, as this is how it had been done for many years on many occasions. But that is not how Mr. Dondero, the person in charge of both entities—intended it to be done here, and no one asked him. HCMFA Appx. 4. That Mr. Waterhouse, as part of the accounting group, was copied on the e-mails whereby Mr. Klos instructed Ms. Hendrix to paper the Transfers as loans does not change this result. At most, it is evidence that Mr. Waterhouse also understood the

---

[10]     The Debtor has waived Mr. Morris's objection. *Supra*, note 4. In any event, the question was not objectionable, and Ms. Hendrix is competent to testify regarding the ordinary practice at the Debtor given her 17 years of employment. Debtor Appx. 03129. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Transfers to be loans, but: (i) Mr. Dondero never instructed that they be loans; (ii) Mr. Waterhouse lacked any authority to make them loans; and (iii) at best, he *assumed*, as did the others, that the Transfers were loans.

### D. DESPITE THE DEBTOR'S MISTAKE, HCMFA NEVER ACTUALLY SIGNED THE NOTES

30.     Despite the fact that the Notes exist, at least nominally, Mr. Waterhouse does not specifically recall signing the Notes. Debtor Appx. 02084 (141:4-7). In fact, Mr. Waterhouse did not typically sign promissory notes. Debtor Appx. 02085 (144:10-12). Mr. Waterhouse did not draft the Notes and does not recall asking anyone to draft the Notes. Debtor Appx. 02085-86 (145:23-146:7). According to Mr. Waterhouse, "the legal group at Highland is responsible and has always been responsible for drafting promissory notes." *Id.* He reiterated, "The team knows to—I mean, we don't draft documents. We're not lawyers. We're not attorneys." It is not what I do or accountants do." Debtor Appx. 02086 (147:19-22). But the Debtor has not cited any documents or communications from within the legal department related to the Notes and, as noted above, Ms. Hendrix confirmed that she did not go through the legal department in preparing the Notes.

31.     Upon examining the two notes side by side, Mr. Waterhouse realized that he could not have signed the notes:

A.     These—these—these signatures are identical, now that I stare at them, and I mean, they are so close—I mean, they're identical that, I mean, even with my chicken scratch signature, I don't know if I can—you know, I do this 100 times, could I do that as—as precisely as I see between the two notes.

Q.     Well, that is why I ask. Mr. Waterhouse, now that you have examined them, does it seem like it is more likely that you actually electronically signed these?

MR. MORRIS: Objection to the form of the question.[11]

---

[11] The Debtor has waived this objection. *Supra*, note 4. Furthermore, it is not clear exactly what the objection is, and HCMFA reserves the right to respond if an when the Debtor asserts one. If the question is leading, there is no complete prohibition against leading questions, and, in any event, the witness was being cross

A.      Is—I don't—I don't recall specifically.  As I said before, my assistant did have a—an electronic signature, and that was used from time to time.  It wasn't as common practice back in 2019.  It definitely was more common practice when we had to work from home and remotely for COVID because it that made it almost impossible to, right, provide wet signatures since we're all working from home remotely.

Q.      Well, going just for these two promissory notes, Mr. Waterhouse, in light of your inability to remember any details, are you sure you actually signed wither or both of these notes?

MS. DANDENEAU:  Objection to form.

A.      I don't recall specifically signing—actually physically signing these notes.  As I said before, I don't recall doing that.  This—this looks like my signature, but yet these two signatures are identical.

Q.      So you don't recall physically signing them, and I take it you don't recall electronically signing them either?

A.      I don't recall.  You know, Highland has all my emails.  If that occurred, you know, you know, I don't have any of these records is what I'm saying.  I don't have any of those records.

Debtor Appx. 02124 (298:10-300:4).  The Debtor has never produced an email, and HCMFA is not aware of one, in which Mr. Waterhouse authorized anyone to affix his electronic signature to the Notes.

32.      Mr. Waterhouse later elaborated on the process he used in the rare circumstance when he signed documents electronically:

Q.      And help me here.  I'm not very technologically astute.  When you—and I—I recognize that you do it rarely, but when you sign a document electronically, do you believe that there is an electronic record of you having authorized or signed a document electronically?

MR. MORRIS: Objection to the form of the question.[12]

---

examined.  *See* Fed. R. Evid. 611(c).  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[12]  The Debtor waived this objection.  *Supra*, note 4.  Furthermore, it is not clear what the basis of the objection is, and HCMFA reserves the right to respond if and when the Debtor asserts one.  The question is about the witness's belief, which is a legitimate inquiry.  "Form" objections are also invalid under the Federal Rules as

A.    I—I don't know the tech answer to that, but, you know, since I don't have—I don't ever attach my signature block electronically, my assistant would have done that, and if that is done over email like we did several times—you know, multiple, multiple times over COVID, she would attach my signature block and then email it out to whatever party.

Q.    What was your assistant's name in May 2019.

A.    It was Naomi Chisum.

Debtor Appx. 02129 (320:11-321:7). The Debtor has not included any emails in its appendix with

Ms. Chisum meeting this description.

33.    During his deposition, Mr. Waterhouse also testified that he did not have authority

to borrow at this level as HCMFA's treasurer, nor to lend at this level as the Debtor's CFO:

Q.    Yes. So in your capacity as the chief financial officer of the debtor, Highland Capital Management, L.P., in May of 2019, did you believe that you unilaterally, just Frank Waterhouse, had the authority to loan on behalf of the debtor to anyone $5 million and $2.4 million?

MR. MORRIS: Objection to the form of the question. [13]

A.    No.

Q.    Is it because loans of that amount would have had to be approved by someone else?

A.    Yes.

Q.    Who in '20—in May of 2019, if Highland wanted to loan 5 million or $2.4 million to someone, what would have been the internal approval procedure?

MR. MORRIS: Objection to the form of the question. [14]

---

they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[13]    The Debtor waived Mr. Morris's objections. *Supra*, note 4. In any event, Mr. Waterhouse is competent to testify about his own authority or lack thereof. *See Gross v. GGNSC Southaven, LLC*, 817 F.3d 169, 179 (5th Cir. 2016) ("holding agent was competent to testify about the scope of his own agency). Indeed, Mr. Morris opened the door by asking nearly identical questions earlier in the same deposition. *E.g.* Debtor Appx. 02089. For purposes of summary judgment however, the Court must accept as true the testimony most favorable to HCMFA. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[14]    *Supra*, note 4. Furthermore, Mr. Waterhouse, as the Debtor's Chief Financial Officer, it qualified to testify about the Debtor's procedures for extending credit. "Form" objections are also invalid under the Federal

A.    If—if we had loans of that nature that needed to be made due to their size, we would have gotten approval from the president of Highland.

Q.    And who was that individual?

A.    It was James Dondero.

Q.    Okay. Now I'm going to ask you a similar question but for a different entity.

In May of 2019, as the treasurer of HCMFA, did you believe that you unilaterally had the ability to cause HCMFA to become the borrower of a $5 million loan and a $2.4 million loan?

MR. MORRIS: Objection to the form of the question.[15]

A.    No.

Q.    What would—what would the approval have taken place—strike that.

What would the approval process been like in May of 2019 at HCMFA for HCMFA to take out a $7.4 million loan?

MR. MORRIS: Objection to the form of the question.[16]

A.    The process would have been similar to what we just discussed in—for Highland to make a loan to others. So, again, you know, we—we would have— either myself or someone on the team would have discussed this with the—the president and owners of—of HCMFA.

Q.    And who was that individual?

A.    That was James—Jim Dondero.

Q.    So do I understand that in May of 2019, on behalf of both the lender, Highland, and the borrower, HCMFA, Mr. Dondero would have had to approve $7.4 million in loans?

MR. MORRIS: Objection to the form of the question.[17]

---

Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[15]    *Supra*, note 4. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[16]    *Supra*, note 4. Furthermore, Mr. Waterhouse, as HCMFA's Treasurer, is qualified to testify about HCMFA's procedures for incurring debt. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[17]    *Supra*, note 4. Furthermore, this question is not objectionable. It accurately summarizes Mr. Waterhouse's immediately antecedent testimony. "Form" objections are also invalid under the Federal Rules as they fail

A.    Yes.

Debtor Appx. 02117 (270:25-273:9).  HCMFA's corporate representative confirmed that Mr. Waterhouse alone did not have authority to execute the notes.  Debtor Appx. 03062 (192:4-21).

34.    Another witness's testimony confirms that Mr. Waterhouse never signed the Notes. In May, 2019, Kristin Hendrix was the senior accounting manager at the Debtor.  Debtor Appx. 03129 (12:4-16).  At that time, she reported to David Klos, who reported to Mr. Waterhouse. Debtor Appx. 03129-30 (12:25-13:9).  While Ms. Hendrix never drafted a promissory note from scratch, in May 2019 part of her job was taking a form note and revising it.  Debtor Appx. 03131 (17:5-11).  Contrary to Mr. Waterhouse's testimony, Ms. Hendrix testified that the corporate accounting group at the Debtor, not the legal group, was responsible for updating draft promissory notes so as to create new ones—*i.e.* the Debtor's own witnesses can't get their story straight. Debtor Appx. 03131 (17:20-25).  As Ms. Hendrix testified:

> Our typical practice is if we have a loan with certain affiliates that it's a demand note. We have a template that we have used for years that was created by either our internal legal team or an outside law firm, I'm not sure which.  The typical practice is always updating a few things on that template, getting it executed, and filing it in our audit folders.

Debtor Appx. 03131 (18:18-25).  The corporate accounting group, she claimed, not the legal group, did this "updating."  Debtor Appx. 03131 (19:1-13; 20:1-5).  And Ms. Hendrix confirmed the general purpose of the intercompany notes:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down—when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

Debtor Appx. 03132 (21:10-16).  In other words, at that time "it's all one big happy family, and whoever needed cash, the cash moved around."  Debtor Appx. 03132 (23:3-6).

---

to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

35.     In May 2019, Mr. Klos sent one or two e-mails to Ms. Hendrix—emails on which Mr. Waterhouse but not Mr. Dondero or the legal department were copied—informing her that there were new intercompany loans, asking her to prepare notes for execution. Debtor Appx. 03134-35 (32:13-33:4). In her mind, this instruction comported with the general practice:

> So is it fair to say that typically, obviously not every time, but typically your corporate accounting group when it would see intercompany transfers in large amounts would believe that they were loans?

> MR. MORRIS: Objection to the form of the question.[18]

> THE WITNESS: Typically they were loans. There's not really another way to get money from one entity to another. And if they were papered as a loan, that means we were told to set it up that way.

Debtor Appx. 03135 (35:5-15). That is "how it was for 14 or 15 years." Debtor Appx. 03135 (36:7-9).

36.     Ms. Hendrix thought that the $2.4 million Note was "related to a TerreStar NAV error" and the $5 million Note was for the "consent fee." Debtor Appx. 03136 (38:17-39:5). It was never "told to [her] directly" that the funds were a loan, but she [subject to objection[19]] "assum[ed] that based on many instances of intercompany transfers in the 14 years prior." Debtor Appx. 03136 (40:20-25).

37.     Ms. Hendrix confirmed that she prepared the Notes from Word documents originally created by outside counsel. Debtor Appx. 03137 (42:15-43:20). However, Ms. Hendrix

---

[18]    The Debtor has waived objections to Ms. Hendrix's testimony by including it in the Debtor's summary judgment evidence. *Supra*, note 4. In any event, it is not clear what the Debtor's objection is, as the question is not objectionable. HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one. If the objection is foundation, Ms. Hendrix has worked in the Debtor's corporate accounting department for 17 years, holds an MBA from SMU, and is a certified public accountant. Debtor Appx. 03129. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[19]    The Debtor has waived its objection. *Supra*, note 4. Furthermore, the question did not mischaracterize Ms. Hendrix's testimony, as she answered unequivocally, "Correct." Debtor Appx. 03137. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

had no memory of papering the Notes. Debtor Appx. 03138 (45:21-46:1). It would have been her practice not to consult the legal group in preparing the Notes. Debtor Appx. 03138 (46:12-24). Ms. Hendrix confirmed that, to sign Mr. Waterhouse's name to the Notes, she used an electronic picture of his signature, which she then affixed to the Word documents, just like this:

Debtor Appx. 03137-38 (43:6-48:18).

38. On the question of whether Mr. Waterhouse authorized Ms. Hendrix to affix his signature to the Notes, Ms. Hendrix testified "I don't have exact specific memory." Debtor Appx. 03138 (48:10-15). Again, she appears to have assumed that Mr. Waterhouse must have approved the Notes and, therefore, approved her using his signature:

> He was fine with using his e-signature, and what is on these documents was that exact e-signature.

> \* \* \*

> But he would have had to approve this loan in the dollar amount, the day. He would have been the one directing us to create these loans. In past practice he has always approved using his e-signature to execute documents.

Debtor Appx. 03138 (48:4-18). When pressed about *how* Mr. Waterhouse would have authorized her to use his electronic signature, Ms. Hendrix testified as follows [subject to objection[20]]:

> I would assume that, as I've stated previously, these directions were coming directly from him to paper a loan. These changes that are made are only to the dollar amount. Interest rate is pulled right off the IRS website. That is his approval to paper a loan and in fact execute or approve the loan.

---

[20] The Debtor has waived this objection. *Supra*, note 4. Furthermore, the question is not objectionable. Ms. Hendrix testified that Mr. Waterhouse "would have had to approve this loan", and the next question was, "How would he have approved Exhibits 4 and 5? By that, I mean by email or memorandum? How would he have approved it in May of 2019?" Debtor Appx. 01318. HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Debtor Appx. 03138-39 (48:24-49:5).

39.    Then, when asked [subject to objection[21]] "after his e-signature was used either on these notes or other documents in May of 2019, would you have brought the documents back to him for any kind of verification," Ms. Hendrix testified:

> Probably not. These are all very standard. We've papered hundreds of loans. So I think he trusted that we can handle updating a date and a dollar amount on these loan templates.

Debtor Appx. 03139 (50:1-9).

40.    Ms. Hendrix also testified [subject to objection[22]], differently from Mr. Waterhouse, that "[p]robably at this time, 99 percent of the stuff my team got his signature on was his e-signature." Debtor Appx. 03139 (49:12-16). And, the following exchange is significant:

> Q.    (BY MR. RUKAVINA) Do you know or believe, or your recent review of documents, did it reveal an email from Mr. Waterhouse to you specifically authorizing his e-signature on Exhibits 4 and/or 5?
>
> A.    Not that I recall seeing, no.
>
> Q.    Sitting here today, do you have any memory of Mr. Waterhouse orally or otherwise specifically authorizing you to affix his e-signature to Exhibits 4 and/or 5?
>
> A.    Specifically on these loans, no, I don't recall those conversations. But, again, our practice has always been we have this discussion, he's under the understanding that we're going to paper the loans, he's always comfortable with using his e-signature. This is not something me or my team would have done without that authority and approval from him.

---

[21] The Debtor has waived this objection. *Supra*, note 4. In any event, this question is not objectionable. Ms. Hendrix's testimony clearly demonstrates that she electronically affixed Mr. Waterhouse's signature to the Notes. Debtor Appx. 03137-38 (43:6-48:18). HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[22] The Debtor has waived this objection. *Supra*, note 4. Furthermore, the question is not objectionable. Ms. Hendrix testified that she regularly prepares notes, Debtor Appx. 03131 (20:1-8), and has worked in the Debtor's corporate accounting department for 17 years. Debtor Appx. 03129 (11:14). She would be familiar with Mr. Waterhouse's practices. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Debtor Appx. 03139 (50:15-25).

41.     But there is no evidence that Ms. Hendrix ever showed the Notes to Waterhouse after preparing them:

> Q.     Sitting here today, do you have any memory of giving Mr. Waterhouse these two promissory notes after they were prepared?
>
> A.     I specifically don't remember walking into his office and providing it to him, but he could have found it on our shared drive if he wanted to.
>
> Q.     Do you have any memory or in your recent review of documents did you see any email to the effect of you sending either or both of these promissory notes to Mr. Waterhouse after they were papered up?
>
> A.     I don't have any specific recollection, again, but he had access to look at them.
>
> Q.     On the shared drive?
>
> A.     Yes.

Debtor Appx. 03140 (54:4-17).  Scanning in the Notes and then saving them to the system hardly amounts to showing or giving them to the man who allegedly signed them.

42.     In fact, the Debtor's summary judgment evidence demonstrates that Ms. Hendrix did not even show the executed Notes to Mr. Waterhouse, much less ask for authority to affix his electronic signatures to the Notes.  While the Debtor points out that Mr. Waterhouse was copied on Mr. Klos' instruction to Ms. Hendrix to prepare the Notes, when she did prepare them, that same e-mail chain confirms that she did not copy Mr. Waterhouse—only Hayley Eliason and Blair Roeber.  Debtor Appx. 00871.  That same e-mail chain also confirmed that Ms. Hendrix was not authorized to sign the Notes for Mr. Waterhouse.  Mr. Klos' instruction to her was to "prep[are] a note *for execution*."  Debtor Appx. 00871 (emphasis added).  Clearly, the execution was to follow, but that execution did not occur, at least not with authority from Mr. Waterhouse or anyone else.

43.     Ms. Hendrix *assumed* that the transfers were loans and *assumed* that Mr. Waterhouse authorized her to affix his signature to the Notes because she *assumed* that he

approved of the Notes. But her testimony directly conflicts with his: whereas he testified that he rarely used electronic signatures in May 2019, would have sent an e-mail authorizing the same, and would have expected the legal department to approve a note prior to his signature, she testified that he routinely did this at that time pursuant to some generalized authority and that the accounting department routinely papered notes.

44.     The fact remains that, notwithstanding her subjective assumptions, Ms. Hendrix created erroneous notes (as they appear to make Mr. Waterhouse the "maker" and, as discussed below, make him jointly and severally liable), and she was not authorized—at least there is no evidence that she was authorized—to affix images of Mr. Waterhouse's signature to the Notes. Or, if there was some generalized authority that she believed Mr. Waterhouse gave her, then the condition precedent—that the legal department approve the Notes—was not satisfied. Either way, there is no evidence whatsoever she had authority to affix his signature.

### III.   SUMMARY JUDGMENT STANDARD

45.     Implicitly recognizing there is contradictory evidence, the Debtor hangs its hat on the "reasonable jury" standard. But a reasonable jury can find for a party whenever there is more than a mere scintilla of evidence. *See Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*, 2017 Bankr. LEXIS 3191, *3 (Bankr. N.D. Tex. Sept. 21, 2017) ("To dispute a material fact, a plaintiff must offer more than a mere scintilla of evidence such that a 'reasonable jury could not return a verdict' for the plaintiff."). Here, HCMFA cites the testimony of five individuals in support of its defenses (Mr. Dondero, Mr. Waterhouse, Mr. Klos, Ms. Hendrix, and HCMFA's corporate representative). The Debtor cannot credibly argue that amounts to nothing, particularly in light of this directive from the United States Supreme Court:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citations omitted). Based on the voluminous evidence HCMFA cites in this brief, which the Court must accept as true, and with respect to which the Court must draw all reasonable inferences in favor of HCMFA, there are genuine issues of material fact the preclude summary judgment, so the Court should deny the Motion.

## IV.    ARGUMENT AND AUTHORITIES

46.    As a general proposition, HCMFA does not entirely dispute the Debtor's assertion that, "[t]o prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note." Motion ¶ 132 (citing *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995)). But there is more to it than that. A promissory note is a contract, and an action on a promissory note is still "subject to all defenses available in an action on a simple contract." *Strickland v. Coleman*, 824 S.W.2d 188, 191-92 (Tex. App.—Houston [1st] 1991); TEX. BUS. & COMM. CODE § 3.305(a)(2) ("the right to enforce the obligation of a party to pay an instrument is subject to … a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract"). "Therefore, evidence is admissible that tends to prove a defense to the action on the promissory note, such as want or failure of consideration, non-performance of a condition precedent, non-delivery, delivery for a special purpose, fraud in the

inducement, or other defenses which would be available in an action on a simple contract."

*Strickland v. Coleman*, 824 S.W.2d at 192.

## A. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER HCMFA SIGNED THE NOTES

47.     The Debtor bears the burden to prove HCMFA signed the Notes because "[t]he validity of the signature on the note must be proved by the person claiming validity if validity is denied in the pleadings." *Silverio v. Silverio*, 625 S.W.3d 680, 685 (Tex. App.—El Paso 2021); TEX. BUS. & COMM. CODE § 3.308(a).  HCMFA denied that it signed the Note in the pleadings. The only allegations in the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (Dkt. No. 1, the "Complaint") regarding HCMFA's signature are paragraphs 14 and 15:

> 14. Specifically, on May 2, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note"). A true and correct copy of HCMFA's First Note is attached hereto as Exhibit 1.

> 15. On May 3, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "Notes"). A true and correct copy of HCMFA's Second Note is attached hereto as Exhibit 2.

Complaint ¶¶ 14, 15.  HCMFA expressly denied these allegations in its *Defendant's Amended Answer* (Dkt. No. 48, the "Answer") ("14.  The Defendant denies ¶ 14 of the Complaint.  15.  The Defendant denies ¶ 15 of the Complaint.").[23]

---

[23]     The Bankruptcy Court denied HCMFA's motion to amend its Answer to more affirmatively plead that the Notes were not signed, but HCMFA expressly argued that such amendment was not necessary and that HCMFA's prior Answer sufficiently placed the Debtor on notice under applicable law that HCMFA denied signing the Notes.  Any allegedly contradictory allegations in the Answer notwithstanding, "[r]ule 8 of the Federal Rules of Civil Procedure permits the alternative pleading of inconsistent claims and defenses …." *Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313, 317 (5th Cir. 2016).  And it is axiomatic that unsworn pleadings do not constitute competent summary judgment evidence. *E.g. Jones v. Anderson*, 721 Fed. Appx. 333, 334-35 (5th Cir. 2018).  By denying the only allegation in the Complaint regarding execution, the Answer put the Debtor to its proof on this element of its case.  Out of an abundance of caution, HCMFA is filing an objection with the District Court to the Bankruptcy Court's order, seeking the District Court's review

48.     The Debtor has failed to meet its burden of proof, and there is a genuine issue of material fact as to whether HCMFA signed the Notes, for three independent reasons, any one of which provides grounds to deny the Motion: (i) there is a genuine issue of material fact as to whether Mr. Waterhouse signed the Notes at all; (ii) even if he signed them, there is a genuine issue of material fact as to whether he had the requisite authority; and (iii) even if he had authority, the Notes are ambiguous.  For any one of these reasons, the Court should deny the Motion.

**i.     Waterhouse did not Actually Sign the Notes**

49.     The facts set out above demonstrate that Mr. Waterhouse did not actually sign the Notes—of that there can be no legitimate dispute.  In particular, the evidence conclusively demonstrates that Ms. Hendrix electronically affixed an image of Mr. Waterhouse's signature in Microsoft Word.  Debtor Appx. 03137-38 (43:6-48:18).  She herself acknowledged that her actions required Mr. Waterhouse's approval.  *Id.*  But there is no evidence Mr. Waterhouse gave her his authorization—none whatsoever.  On the contrary, Mr. Waterhouse testified that any such authorization would have been by e-mail to his administrative assistant (Debtor Appx. 02129 (320:11-321:7).  But the Debtor produced no such e-mail and Ms. Hendrix was not Mr. Waterhouse's administrative assistant.  *See id.*  Mr. Waterhouse also testified that he rarely, if at

---

of that order.  To the extent necessary, HCMFA incorporates its motion to amend and its objection to the Bankruptcy Court's denial of that motion in this Brief, and reserves all rights with respect to the same.

For the avoidance of doubt, any confusion over whether HCMFA needed to amend its Answer results from differences between the Texas Rules of Civil Procedure and the Federal Rules of Civil Procedure.  The Texas Rules require specific denials in certain instances because the Texas Rules permit general denials.  Tex. R. Civ. P. 92.  The Federal Rules, on the other hand, require specific denials nearly all the time, including here.  Fed. R. Civ. P. 8(b)(1)(B).  To the extent the Debtor attempts to argue the denial needed to be verified under Tex. R. Civ. P. 93 or relies on any other Texas procedural theory, those rules do not apply in federal court.  *See Follenfant v. Rogers*, 359 F.2d 30, 31-2 (5th Cir. 1966) (Texas rule 93 "COULD NOT have any effect on the present case, since state rules of practice are not applicable to, or binding on, trials in federal courts.  In matters of pleading, federal courts are not governed by the state practice, but by the Federal Rules of Civil Procedure."); *Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678, *16 (W.D. Tex. Sept. 29, 2011); *Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802, *5 n.7 (N.D. Tex. Jan. 10, 2011); *see* Fed. R. Civ. P. 11(a) ("Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit.").

---

all, electronically signed documents in May, 2019.  Debtor Appx. 02124 (298:10-300:14).  But Mr. Waterhouse did not remember authorizing anyone to use his electronic signature.  *See id*.  Nor has the Debtor offered any evidence that Mr. Waterhouse ever laid eyes on the Notes electronically signed by him.  On the contrary, the evidence is that Mr. Hendrix e-mailed the executed Notes to two other Debtor employees but, for some inexplicable reason, <u>not</u> Mr. Waterhouse.  Debtor Appx. 00871.

50.     The Debtor must prove that HCMFA signed the Notes.  HCMFA denied signing the Notes in its Answer, so the Debtor bears the burden to prove HCMFA signed them.  *Silverio*, 625 S.W.3d at 685; Tex. Bus. & Comm. Code § 3.308(a).  There can be no question that Mr. Waterhouse did not personally sign the Notes.  The only question is whether he authorized Ms. Hendrix to sign the Notes electronically for him.  But the Debtor offers no evidence on this critical fact.  Even if there were some circumstantial evidence from the Debtor on this fact, HCMFA has demonstrated that there is a genuine issue of disputed fact as to whether Mr. Waterhouse ever authorized Ms. Hendrix to sign the Notes electronically for him.

### ii.     <u>Even if Waterhouse Signed the Notes, He Did Not Have Authority</u>

51.     Even if there were not a genuine issue of material fact about whether Mr. Waterhouse signed the Notes, there is a genuine issue as to whether he had authority to sign them.  General contract law governs whether Mr. Waterhouse's signature binds HCMFA.  *See* Tex. Bus. & Comm. Code § 3.402(a) ("If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract.").  Under the UCC as well, "an unauthorized signature is ineffective …."  Tex. Bus. & Comm. Code § 3.403.

52.     "'Unauthorized signature' means a signature made without actual, implied, or
apparent authority." Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 1.201(b)(41).  But "Texas law does not presume
agency, and the party who alleges it has the burden of proving it."  *IRA Res., Inc. v. Griego*, 221
S.W. 3d 592, 597 (Tex. 2007).  The District Court has summarized the concept of actual authority
as follows:

> "Actual authority usually denotes the authority a principal (1) intentionally confers
> upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by
> want of due care allows the agent to believe he possesses." *United Residential
> Props., L.P. v. Theis*, 378 S.W.3d 552, 564 (Tex. App. 2012, no pet.) (citation and
> internal quotation marks omitted). "'Actual authority is created through written or
> spoken words or conduct of the principal communicated to the agent.'" *Id.*
> (quoting *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549-50
> (Tex. App. 2003, no pet.)). The existence of an agency relationship based on actual
> authority "may be implied from the conduct of the parties or from the facts and
> circumstances surrounding the transaction in question[, but] cannot be based
> merely on the words or deeds of the agent." *CNOOC Se. Asia Ltd. v. Paladin Res.
> (SUNDA) Ltd.*, 222 S.W.3d 889, 899 (Tex. App. 2007, pet. denied) (citing *Walker
> Ins. Servs.*, 108 S.W.3d at 550).

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930, *26-28 (N.D. Tex. April 13, 2015).

53.     The Debtor has failed to meet its burden to prove Mr. Waterhouse had actual
authority to execute the Notes.  Based on the rule that the agent's deeds are insufficient evidence,
the fact that Mr. Waterhouse allegedly signed the Notes is irrelevant.  Certainly Mr. Waterhouse
does not believe he possessed authority.  He testified that only Mr. Dondero could authorize
borrowing at the level in question.  Debtor Appx. 02117 (270:18-273:9).  As for whether HCMFA
intentionally conferred authority on Mr. Waterhouse, again his testimony is conclusive—it did not.
*Id.*  Likewise, HCMFA's president testified that Mr. Waterhouse did not have authority to sign the
Notes and that he was unaware of any corporate documents that would confer such authorization.
HCMFA Appx. 1-2, 4.

54.     The only allegedly contrary evidence the Debtor submits to meet its burden is an
Incumbency Certificate that says Mr. Waterhouse is the Treasurer of Strand Advisors XVI, Inc.,

HCMFA's general partner. Debtor Appx. 00789.[24] While it says Mr. Waterhouse is authorized to execute agreements on behalf of the General Partner, it does not unambiguously give him the same level of authority for the partnership. Instead, to the extent it confers any rights at all, it merely authorizes him "to give any party on behalf of the Partnership all notices, orders, directions, or instructions …." *Id.* But this does not unambiguously include executing agreements or borrowing money on the partnership's behalf. "The negative implication canon, *expressio unius*, which dictates that 'specification of the one implies the exclusion of the other,' further buttresses that conclusion." *Claimant ID 100218776 v. BP Expl. & Prod.*, 712 Fed. Appx. 372, 376 (5th Cir. 2017) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93-100 (2012)). Perhaps more to the point, the incumbency certificate does not actually confer any rights, and the Debtor has not offered any documents that do. Based on the Debtor's own evidence, there is a genuine issue of material fact as to whether Mr. Waterhouse had actual authority to sign the Notes.

55. The District Court also provided a thorough summary of the concept of apparent authority:

> Apparent authority "is based on the doctrine of estoppel, and one seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise." *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981) (citing *Sw. Title Ins. Co. v. Northland Building Corp.*, 552 S.W.2d 425, 428 (Tex. 1977); *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778-79 (Tex. 1974); *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422, 427 (Tex. 1953)). To determine an agent's apparent authority, the court examines the conduct of the principal and the reasonableness of the third party's assumptions regarding the agency's authority. *Gaines*, 235 S.W.3d. at 183. "[O]nly the conduct of the principal is relevant." *Id.* at 182 (citing *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) (per curiam)); *see also United Residential Props.*, 378 S.W.3d at 564 ("Apparent authority is based on estoppel, and only the conduct of

---

[24] To the extent the Debtor attempts to argue Mr. Dondero is not competent to testify regarding Mr. Waterhouse's authority, then the Debtor must concede that this incumbency certificate is likewise incompetent for this purpose. After all, it is simply a signed statement by Mr. Dondero.

the principal in leading a third party to believe that the agent has authority may be considered." (citations and internal quotation marks omitted)). "Declarations of the alleged agent, without more, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183-84 (citing *Sw. Title Ins. Co.*, 552 S.W.2d at 428); *see also Huynh*, 180 S.W.3d at 623 ("Only the conduct of the principal may be considered; representations made by the agent of his authority have no effect.").

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930 at *26-28.

56.     The key to apparent authority is "the reasonableness of the third party's assumptions regarding the agency's authority." First of all, there is no evidence that anyone with control over the Debtor or HCMFA actually believed Mr. Waterhouse had authority. But even if they did, that belief would not have been reasonable. At the time the Debtor demanded payment and filed this lawsuit, Mr. Waterhouse was still the Debtor's CFO. Debtor Appx. 00008 (complaint dated Jan. 22, 2021); 02053 (new employment began March 1, 2021); 02054 (served as Debtor's CFO until early 2021). At all relevant times, he was on both sides of this alleged transaction. And when "there is a dual agent, operating with the consent and knowledge of both principals, the agent's knowledge is imputed to its principals." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924 (Tex. 2010). Yet neither of the principals here consented, as Mr. Waterhouse did not have authority from either the Debtor or HCMFA to execute the Notes and both he and the principals involved knew that. There can be no apparent authority when the other party to the transaction expressly knows that the agent lacks actual authority. *See, e.g., Gaines v. Kelly*, 235 S.W.3d 179, 183-84 (Tex. 2007).

57.     There is therefore a genuine issue of material fact as to whether Waterhouse had authority to sign the Notes, so the Court should deny the Motion.

### iii. Even if Waterhouse Signed the Notes and had Authority, the Notes are Ambiguous

58.     When an "agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury." *Childers v. Pumping Systems, Inc.*, 968 F.2d 565, 569 (5th Cir. 1992); *see Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431, 433 (Colo. App. 1982) ("Because no ambiguity exists concerning the Reichardts' status as makers on this note, the trial court was correct in entering summary judgment in favor of the Bank."). Here, because of the way Mr. Waterhouse allegedly signed the Notes, the identity of the maker is ambiguous.

59.     Under the following statute, Mr. Waterhouse is potentially liable in his individual capacity, even assuming he had authority to act for HCMFA:

> If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:
>
> (1)     If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.
>
> (2)     Subject to Subsection (c), the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity, or (ii) the represented person is not identified in the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.

TEX. BUS. & COMM. CODE § 3.402(b).

60.     In *Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005, Tex. App. LEXIS 6215, *15-16 (Tex. App.—Fort Worth Aug. 4, 2005), the Court evaluated the following signature:

/s/ AAA Auto Glass

/s/ Jackie Holland Secretary & Treasurer

AAA Auto Glass Company

But the Court found the signature ambiguous under § 3.402(b)(1) as to Ms. Holland's individual liability versus the liability of SSH, Inc., whose name was not mentioned. *Id.* at *16.

61.    Mr. Waterhouse's signature on the Notes presents a similar conundrum:

**MAKER:**



FRANK WATERHOUSE

Debtor Appx. 00011, 00015. There is no indication from the signature itself that Mr. Waterhouse intended to bind HCMFA instead of himself.

62.    "Comment 2 to [section 3.402] is also instructive; it provides that an agent is not liable under subsection (b)(1) 'if the form of the signature unambiguously shows that it is made on behalf on an identified represented person (for example, 'P, by A, Treasurer').'" *S. Mansukhlal & Co v. Husein*, 14-04-00018-cv, 2004 Tex. App. LEXIS 8097, *7 (Tex. App.—Houston [14th] Sept. 2, 2004). The signatures on the Notes do not unambiguously identify HCMFA as the maker, so Mr. Waterhouse is potentially liable in his individual capacity. He testified, however, that he did not intend to be liable and that signing the Notes in his individual capacity was a mistake. Debtor Appx. 02126 (306:19-307:4).[25] This results in an ambiguity as to whether Mr. Waterhouse

---

[25]    The Debtor has waived Mr. Morris's objections. *Supra*, note 4. Even if not, the questions are not objectionable. Mr. Waterhouse is competent to testify regarding his own intent and whether he personally made a mistake, particularly when the issue is his own personal liability. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

intended to sign the Notes at all. Accordingly, there is a genuine issue of material fact that precludes summary judgment.

**B.** **THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE NOTES WERE THE RESULT OF A MUTUAL MISTAKE**

63.     If the Notes were properly executed, then they are a result of a mutual mistake. As detailed above, Mr. Dondero intended the Transfers to compensate HCMFA for the NAV Error, not to be repaid as loans. Mr. Dondero, the only person with the authority to characterize the Transfers as loans, never gave that instruction. Lower level Debtor employees simply assumed the Transfers were loans, and Mr. Waterhouse perhaps shared this assumption, but that does not matter. Mr. Dondero was the individual who initiated the Transfers; he was the only person with authority to characterize the Transfers as loans for both the Debtor and HCMFA; and he was the very person injecting money into the Debtor to enable the Debtor to make the Transfers in the first place. At all times, he intended and understood that the Transfers were compensation for damages, not loans.

64.     "A mutual mistake is one common to all parties, wherein each labors under the same misconception respecting a material fact …." *Garza v. Villarreal*, 345 S.W.3d 473, 483 (Tex. App.—San Antonio 2011) (citing *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App.—San Antonio 1982)). "In order for the defense of mutual mistake to be sustained, there must be fact issues raised to show that all the parties to a contract were acting under the same understanding of the same material fact." *Id.* Put slightly differently, "[a] mutual mistake of fact occurs when the parties to an agreement have a common intention, but the written contract does not reflect the intention of the parties due to a mutual mistake." *Smith-Gilbard v. Perry*, 332 S.W.3d 709, 713 (Tex. App.—Dallas 2011). "When a party alleges that, by reason of a mutual mistake, an agreement does not express the real intentions of the parties, extrinsic evidence is admissible to

show the real agreement." *Id.*; *DeClaire v. G&B McIntosh Family Ltd. P.ship*, <mark>260 S.W.3d 34, 47</mark> (Tex. App.—Houston [1st] 2008) ("The parol evidence rule does not bar extrinsic proof of mutual mistake.").

65.    The Debtor's recitation of the law on mutual mistake does not materially differ. But the Debtor's argument misconceives what the Debtor's own evidence actually means under the law.   The common mistake was that the Transfers constituted a loan rather than compensation—if Mr. Waterhouse ever understood the Transfers to be loans and if he executed the Notes then, as an officer of both the Debtor and HCMFA, his mistake would be "mutual" to both of his principals.  The fact that both the Debtor and HCMFA listed the Notes on their financial statements shows that the mistake was mutual.  Debtor Appx. 00782, 00840.  The fact that the same individuals—employees of the Debtor—handled both the Debtor's and HCMFA's accounting shows that the mistake was mutual.  HCMFA Appx. 5; Debtor Appx. 03025 (42:17-21, 43:8-23).  The fact that Debtor employees prepared a memo to HCMFA's board which included the Notes show that the mistake was mutual.  It also explains why no one noticed the mistake sooner.  Mr. Waterhouse even testified that he did not always read audited financials—he relied on his accounting team for that.  Debtor Appx. 02071 (86:3-89:19).  He also testified that he was not always comfortable with the control environment.  Debtor Appx. 02077 (112:22-113:14).

66.    The natural consequence of these facts is that lower-level Debtor employees repeated the mistake in financial documents and disclosures more than once.  The repetition itself does not necessarily indicate the Transfers were loans.  And there is plenty of evidence they were not.  The Debtor initially lacked sufficient funds to make the Transfers.  HCMFA Appx. 3.  Mr. Dondero therefore personally advanced funds to the Debtor.  HCMFA Appx. 3.  As both the Debtor's and HCMFA's President, he intended the Transfers as compensation, not loans.  HCMFA

Appx. 5.  As a matter of fact, the amounts of the two Transfers substantially mirrored the amounts of the prior two transfers HCMFA made to the Fund on account of the NAV error.  *See* HCMFA Appx. 3.  Finally, Mr. Waterhouse himself—an officer of both parties—admitted the Note is a mistake in light of the fact that his signature makes him personally liable, discussed above.  Debtor Appx. 02126 (306:19-307:4).

67.     The fact that HCMFA received insurance proceeds does not change the analysis.  In Texas, the "collateral source" rule is an exception to the general principle that a plaintiff is limited to single recovery for a particular injury.  "Long a part of the common law of Texas and other jurisdictions, the rule precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else — a collateral source.  Thus, for example, insurance payments to or for a plaintiff are not credited to damages awarded against the defendant."  *Haygood v. De Escabedo*, 356 S.W.3d 390, 394–95 (Tex. 2011).  There is a genuine issue of material fact as to whether the Notes resulted from a mutual mistake, so the Court should deny the Motion.

68.     The Court need not, and should not, address the issue of whether the Debtor was liable to HCMFA for the NAV Error.  It doesn't matter.  Both the Debtor and HCMFA, through their mutual agent and control person, Mr. Dondero, believed this to be the case.  That is all that matters.  The Debtor did not plead avoidance of that arrangement.  Nor does the potential that HCMFA carried the Notes on its books and records lead to the conclusion that the Notes are valid—at best, this is evidence loosely supporting the Debtor's arguments, but then, if anything, it only demonstrates a genuine issue of disputed, material fact.  The Court need only consider Mr. Waterhouse's statements, prior to the litigation, that there was one note from HCMFA to the Debtor, which cannot be collected through May, 2021, to demonstrate confusion on behalf of HCMFA, at a minimum, or a lack of awareness of the Notes at all.

## C. There is a Genuine Issue of Material Fact as to Whether the Debtor Gave Consideration in Exchange for the Notes

69.     "'Consideration consists of either a benefit to the promisor or a detriment to the promisee.'" *Garza v. Villarreal*, 345 S.W.3d at 483 (quoting *Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 41 (Tex. App.—Dallas 2003)).  "A contract lacking in consideration is unenforceable." *Garza v. Villarreal*, 345 S.W.3d at 483.  "Under common law, as long as something of real and legally cognizable value is given in exchange for a promise to pay under a promissory note, the note is supported by adequate consideration." *Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 614 (Tex. App—Houston [1st] 2004).  But here, the Debtor did not give *anything* in exchange for the Notes.  The Transfers were compensation for the NAV Error, not loans, and the Debtor has not identified any other consideration.  Accordingly, there is a genuine issue of material fact as to whether the Notes are unenforceable for lack of consideration.

## D. Turnover is not an Appropriate Remedy Under These Circumstances

70.     The Debtor's cause of action for turnover under section 542 is improper.  This Court has "held that actions to collect prepetition accounts receivable which are based on state law contract principles do not constitute turnover actions under § 157(b)(2)(E) without a final judgment from a court of competent jurisdiction or another binding determination of liability." *In re Fang Operators*, 158 B.R. 643, 645 (Bankr. N.D. Tex. 1993) (referring to *Satelco, Inc. v. North Amer. Publishers, Inc. (In re Satelco, Inc.)*, 58 B.R. 781 (Bankr. N.D. Tex. 1986)).  The Debtor has asserted a breach of contract claim attempting to collect a disputed debt under state law.  Accordingly, section 542 does not apply.

## V.     CONCLUSION

71.     The Debtor's conduct caused HCMFA to suffer approximately $7.4 million in damages.  Shortly thereafter, the Debtor paid HCMFA $7.4 million.  But then the Debtor's

employees made a simple mistake. Based on historical practice, they booked the payments as loans instead of compensation. One of them even purported to issue promissory notes, which the Debtor now seeks to collect if the face of overwhelmingly contradictory evidence. The same Debtor employee even affixed a corporate officer's signature without his permission, when he himself admits he lacked authority to incur $7.4 million in debt. Naturally, she and others then repeated the mistake again and again in financial disclosures. But it was a mistake nonetheless. Each of the foregoing is supported by credible and admissible summary judgment evidence.

72. For these reasons, there are genuine issues of material fact that preclude summary judgment on (a) whether HCMFA signed the notes and whether Mr. Waterhouse was authorized to sign them if he in fact did; (b) whether the notes were the result of a mutual mistake; and (c) whether the notes lacked consideration. All of these are issues for the jury. Furthermore, the turnover statute is inapplicable as a matter of law. The Court should therefore deny the Motion.

RESPECTFULLY SUBMITTED this 19th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    State Bar No. 24030781
    Julian P. Vasek, Esq.
    State Bar No. 24070790
    500 N. Akard St., Ste. 3800
    Dallas, TX 75201
    Tel: 214-855-7500
    Fax: 214-855-7584
    E-mail: drukavina@munsch.com
    E-mail: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on January 19, 2022, a true and correct copy of this document, along with all exhibits, if any, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina

Davor Rukavina