UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |
| | ) |
| Debtor. | ) |
| | ) |
| ——————————————— | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03003-sgj |
| | ) |
| Plaintiff, | ) |
| | ) MOTION for SUMMARY JUDGMENT |
| v. | ) and OMNIBUS MOTION to STRIKE |
| | ) |
| JAMES DONDERO, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| ——————————————— | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03004-sgj |
| | ) |
| Plaintiff, | ) |
| | ) MOTION for SUMMARY JUDGMENT |
| v. | ) and OMNIBUS MOTION to STRIKE |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT | ) |
| FUND ADVISORS., L.P., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| ——————————————— | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03005-sgj |
| | ) |
| Plaintiff, | ) |
| | ) MOTION for SUMMARY JUDGMENT |
| v. | ) and OMNIBUS MOTION to STRIKE |
| | ) |
| NEXPOINT ADVISORS, L.P., et al., | ) |
| | ) |
| Defendants. | ) April 20, 2022 |
| | ) Dallas, Texas |
| ——————————————— | ) |

Captions continue on next page;
appearances begin on next page.

Case 21-03004-sgj    Doc 161    Filed 05/03/22    Entered 05/03/22 13:09:17    Desc Main
Case 3:21-cv-00881-X    Document 178-1    Filed 12/09/22    Page 2 of 222    PageID 36859

2

```
In Re:                                    ) Case No. 19-34054-sgj11
                                          )
HIGHLAND CAPITAL MANAGEMENT, L.P.,        )
                                          )
                      Debtor.             )
                                          )
_____       )
                                          )
HIGHLAND CAPITAL MANAGEMENT, L.P.,        ) Adv. Proc. No. 21-03006-sgj
                                          )
                      Plaintiff,          )
                                          )
                                          ) MOTION for SUMMARY JUDGMENT
             v.                           ) and OMNIBUS MOTION to STRIKE
                                          )
HIGHLAND CAPITAL MANAGEMENT               )
SERVICES, INC., et al.,                   )
                                          )
                      Defendants.         )
                                          )
_____       )
                                          )
HIGHLAND CAPITAL MANAGEMENT, L.P.,        ) Adv. Proc. No. 21-03007-sgj
                                          )
                      Plaintiff,          )
                                          )
                                          ) MOTION for SUMMARY JUDGMENT
             v.                           ) and OMNIBUS MOTION to STRIKE
                                          )
HCRE PARTNERS, LLC (N/k/a                 )
NEXPOINT REAL ESTATE PARTNERS,            )
LLC), et al.,                             )
                                          )
                      Defendants.         ) April 20, 2022
_____       ) Dallas, Texas
```

Appearances:

```
For the Plaintiffs      John A. Morris
  (Via WebEx):          Hayley Winograd
                        Pachulski Stang Ziehl & Jones LLP
                        780 Third Avenue, 39th Floor
                        New York, New York  10017-2024

For Defendant           Michael P. Aigen
James Dondero           Deborah Rose Deitsch-Perez
  (Via WebEx):          Stinson, L.L.P.
                        3102 Oak Lawn Avenue, Suite 777
                        Dallas, Texas  75219
```

Appearances continued on next page.

3

Appearances, continued:

For Defendant            Jeremy A. Root
John Dondero             Stinson L.L.P.
(Via WebEx):             230 West McCarty Street
                         Jefferson City, Missouri  65101


For Defendant            Clay M. Taylor
John Dondero             Bonds Ellis Eppich Schafer Jones LLP
 (In courtroom):         420 Throckmorton Street, Suite 1000
                         Fort Worth, Texas  76102


For Defendants           Davor Rukavina
NexPoint and             Julian Preston Vasek
Highland Capital         Munsch, Hardt, Kopf & Harr
Management Fund          500 North Akard Street, Suite 3800
 (Via WebEx):            Dallas, Texas  75201-6659


Digital Court            United States Bankruptcy Court
Reporter:                Michael F. Edmond Sr., Judicial
                          Support Specialist
                         1100 Commerce Street, Room 1254
                         Dallas, Texas  75242


Certified Electronic     Susan Palmer
Transcriber:             Palmer Reporting Services


        Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.

*Plaintiff's Motion to Strike*                                    4

1    <u>Wednesday, April 20, 2022</u>                    <u>9:41 o'clock a.m.</u>

2                      P R O C E E D I N G S

3         THE COURT:  All rise.  The United States Bankruptcy

4    Court for the Northern District of Texas, Dallas Division, is

5    now in session, the Honorable Stacey Jernigan presiding.

6         THE COURT:  Good morning.  Please be seated.

7         All right.  We have a long setting today in the

8    Highland Note adversary proceedings.  We have one lawyer here in

9    the courtroom and many on WebEx.  So let's start by getting

10   appearances.  Who do we have appearing for the plaintiff this

11   morning?

12       (Echoing voices.)

13         THE COURT:  All right.

14         MR. MORRIS:  This is —

15         THE COURT:  Go ahead.

16         MR. MORRIS:  This is —

17       (Echoing voices.)

18         THE COURT:  All right.  Mr. Morris, we're getting an

19   echo from you.  I don't know if you can hear what we hear, but

20   do you have two different —

21       (Echoing voices.)

22         MR. MORRIS:  If I exit, I'll be...

23         THE REPORTER:  He's on twice here.

24         THE COURT:  Okay.  We're showing from our end that you

25   are on twice, that you have two —

*Plaintiff's Motion to Strike*                                              5

1          MR. MORRIS:  Okay, is that better?

2          THE COURT:  Oh, yes.

3          MR. MORRIS:  Perfect, we're all set.

4          THE COURT:  There we go.  Okay, so let's get your

5    appearance on the record.

6          MR. MORRIS:  Anything — that I fixed that problem.

7    Good morning, Your Honor.  John Morris, Pachulski, Stang, Ziehl

8    and Jones for Highland Capital Management.  There are three

9    matters on for today's hearing which I'll discuss more fully

10   after I make my appearance.  I just wanted to note that I will

11   argue the plaintiff's motion to strike and for sanctions.  I'm

12   presuming that we go in this order.

13         My colleague Hayley Winograd will argue the

14   defendant's motion to strike and then I will return to argue

15   plaintiff's motion for partial summary judgment.  So you'll hear

16   from me today on two of the three motions and you'll hear from

17   Ms. Winograd on the third motion.

18         THE COURT:  All right.  Thank you.

19         Now for, I guess, the pleadings call them the

20   agreement or the alleged agreement defendants.  Maybe we have

21   multiple attorneys appearing for them.  So I'll hear — well,

22   first for James Dondero, who do we have appearing?

23         MR. TAYLOR:  Good morning.  Clay Taylor on behalf of

24   Mr. Dondero.  However, arguing the motions that are to be heard

25   today will be the Stinson law firm, and I will defer to them, to

*Plaintiff's Motion to Strike*                                                6

 1    which individuals are going to be arguing which motions.

 2              THE COURT:  Okay.  Thank you.

 3              All right.  Hopefully people could hear.  Mr. Taylor

 4    appeared for Mr. Dondero here in the courtroom, but he said the

 5    Stinson law firm will be making arguments.

 6              So who do we have appearing for which defendants at

 7    the Stinson law firm?

 8              THE REPORTER:  She's on mute, Judge.

 9              THE COURT:  You're on mute.

10              Is that Ms. Deitsch-Perez?

11              THE REPORTER:  Yes.

12              MS. DEITSCH-PEREZ:  Yes, it is.  I'm sorry.  Can you —

13    can you hear me now?

14              THE COURT:  Now I can.  Thank you.

15              MS. DEITSCH-PEREZ:  Okay.  Good morning.  This is

16    Deborah Deitsch-Perez from Stinson and we will be arguing on

17    behalf of Mr. Dondero, on behalf of HCRE and HCMS, although we

18    will briefly also cover, just for the sake of coherence in the

19    argument — the arguments that are being made with respect to the

20    term loan slightly, although that will largely be covered by Mr.

21    Rukavina, who will be arguing on behalf of NexPoint and HCMFA.

22              On our side, I will be arguing the motion for summary

23    judgment.  Mr. Root, Jeremy Root, another of my partners, will

24    be arguing the debtor's motion for contempt and sanctions and to

25    strike.  And Mr. Aigen will be arguing the defendant's motion to

*Plaintiff's Motion to Strike*                                                    7

1   strike the Klos declaration that included evidence for the first

2   time in the debtor's reply brief.

3           THE COURT:  Okay.  Thank you.

4           MS. DEITSCH-PEREZ:  But I will leave Mr. Rukavina to

5   introduce himself.

6           THE COURT:  All right.  Mr. Rukavina, are you out

7   there?

8           MR. RUKAVINA:  Yes, Your Honor.  Good morning.  Davor

9   Rukavina and Julian Vasek.  Can the Court hear me?

10          THE COURT:  Yes.

11          MR. RUKAVINA:  Your Honor, I'll be handling all

12  matters related to HCMFA and all matters related to NexPoint

13  except the joint issue regarding the alleged agreement.

14          I also, Your Honor, would suggest that we not take

15  these matters piecemeal.  I would suggest that debtor present

16  its arguments and evidence on all motions and then the

17  defendants respond at once.  That's how Ms. Deitsch-Perez and I

18  at least have prepared our presentations.

19          THE COURT:  All right.  First, are there any more

20  lawyer appearances?

21          All right.  Well, let's — let's talk about the

22  sequence and time allotments for arguments.  I know there were

23  emails, I think last Thursday, among counsel and my Courtroom

24  Deputy.  And I just assumed we were going to break these up from

25  the emails, but I don't feel strongly about it.

*Plaintiff's Motion to Strike*                                                    8

1        Let me — I'm going to start with Mr. Morris.

2        MR. MORRIS:  If I'm —

3        THE COURT:  Mr. Morris, I mean as plaintiff, it's

4    appropriate to start with you.  What I thought I had signed off

5    on last Thursday afternoon was that each side would have two

6    hours for the motions for summary judgment.  And what I mean,

7    you know, the defendants collectively would have two hours and

8    the plaintiff would have two hours, with plaintiff reserving

9    some of their two hours for rebuttal.  But then I thought we

10   were carving up where the plaintiff's motion to strike, there

11   will be 30 minutes each, and then the defendants' motions to

12   strike, there would be 15 minutes each.  So I kind of have in my

13   brain coming out here that we were going to take it piecemeal,

14   as Mr. Rukavina said.

15        Mr. Morris, what would you like to say about that?

16        MR. MORRIS:  That's exactly my expectation and not

17   only is that the sole communications with the Court, I've never

18   heard of the concept that's being raised now for the first time.

19   Not only was that my understanding, not only was that the

20   presentation that was made to the Court to limit the time for

21   each of the three motions, but I don't understand how you can

22   possibly do this in the way that's being proposed.  I think you

23   need to resolve the two motions to strike before we can get to

24   the summary judgment motions, because the determination on each

25   of those motions is going to impact the scope of the summary

*Plaintiff's Motion to Strike*                                                    9

1   judgment argument.  I just don't see how you can do it all at

2   once.  It will again allow them to inject into the summary

3   judgment motion the very evidence that I'm seeking to exclude.

4   I object.

5            MR. RUKAVINA:  Your Honor, I would respectfully — Mr.

6   Morris is right, that was our understanding, but part of that

7   understanding was that the summary judgment motions would

8   proceed first.  I think that the Court can easily conclude,

9   whether at the beginning or the end or under advisement, that

10  certain evidence ought to be stricken or ought not to be

11  stricken.  Of course we'll proceed however the Court wants to

12  proceed, but I will just respectfully suggest that they should —

13  they should argue all their motions at once and we'll argue all

14  our motions at once.  But, again, however the Court wants to

15  proceed.

16           THE COURT:  Ms. Deitsch-Perez, anything to add on the

17  point?

18           MS. DEITSCH-PEREZ:  I don't.  We're — I understand

19  each — each person's position.  It might be more useful the

20  Court to hear everything together so it's all together in your

21  mind.  I also hear Mr. Morris' point that he had a plan and it

22  would disrupt him to vary from the plan.  So the defendants are

23  prepared to do as Your Honor likes.

24           THE COURT:  Okay.  All right.  Well, I am going to go

25  with the plan that I thought — I thought you all had adopted.  I

*Plaintiff's Motion to Strike*                                    10

1    thought it was just sort of a question of how many minutes for

2    each.  And so what my brain needs to do is hear the motions to

3    strike first.  And, you know, that's going to affect what I'm

4    willing to hear people talk about in the motions for summary

5    judgment and responses.  So, with that, I will hear the

6    plaintiff's motion to strike first.

7          MR. MORRIS:  All right.  Thank you, Your Honor.

8    Before I begin the substance of that particular motion, I would

9    just ask Ms. Canty to put up on the screen one demonstrative

10   exhibit.  I had — I don't know if you've had a chance to see

11   this Your Honor, but about a half an hour before the scheduled

12   time of the hearing, I circulated to Ms. Ellison and to counsel

13   the demonstrative exhibits that I plan on using.  And I think

14   the first one that will just really be helpful for everybody.

15         As Your Honor knows, we submitted yesterday a 22-page

16   agenda for just three motions.  And obviously the complexity and

17   the paper that has undoubtedly burdened us all is necessitated

18   by the fact that there's five separate adversary proceedings,

19   even though they cover a host of related topics.  So what we did

20   for the convenience of the Court and for the convenience of all

21   parties is try to put in one place kind of a list of where our

22   evidence can be found.  And so, in no particular order, I have:

23   The motion for summary judgment; it shows you which docket

24   number in each adversary proceeding our motion can be found; it

25   highlights below that the three places, the three — the three

1    areas of evidence that we have introduced in support of the

2    motion; Mr. Klos' declaration; there is a separate appendix.

3    And then there's the reply appendix, which I will talk about in

4    our motion in a bit.  And, again, you've got all of the docket

5    entries.

6              And I think that it was probably just a mistake that

7    we didn't put the reply appendix in the HCMFA docket, although

8    the reply appendix really doesn't go to HCMFA, so maybe my

9    colleague decided not to file it there because that reply

10   appendix is limited to the Klos declaration, which is the

11   subject of the term note defendants' motion to strike, as well

12   as a stipulation that's independently filed on the docket

13   concerning the admissibility of plaintiff's exhibits.

14             The next item is our motion to strike.  It's got my

15   declaration with Exhibits 1 through 9.  It's got an errata and

16   it can show where the errata is.  And I'll get to that; the

17   errata really is no big deal.  It's that we had highlighted a

18   portion incorrectly.  And then there is a supplemental Exhibit

19   10 that was also filed in connection with the motion to strike,

20   with the plaintiff's motion to strike.

21             And then you've got defendant's motion to strike.  You

22   can see where our opposition and our brief are filed.  Those are

23   the docket numbers.  And below that is our appendix that we

24   filed in opposition to the defendant's motion to strike, and

25   that's Ms. Winograd's declaration.

*Plaintiff's Motion to Strike*                                    12

1        So I point this out, Your Honor.  I guess we can go to

2    each of these items as the motions come up, but I just wanted

3    the Court to know that we are very cognizant of the difficulty

4    of keeping track of where all of the evidence has been lodged.

5    And I hope — I hope that the Court and counsel find this useful

6    because I don't know that I got it perfect, but I tried my best.

7    And I think it accurately reflects all of the places where our —

8    where our evidence is lodged.  So unless the Court has any

9    questions, I'm prepared to proceed on the plaintiff's motion to

10   strike.

11       THE COURT:  All right.  Thank you for this.  If there

12   are no comments about this, I will hear your argument.

13       All right.

14       MR. MORRIS:  All right.  So, Your Honor, I think that

15   the agreement here is that on this first motion, the plaintiff's

16   motion to strike, each side would have 30 minutes.  We're the

17   movant.  I don't expect to use all 30 minutes.  And whatever

18   time remains, I'm going to just clock myself, I'll just reserve

19   for rebuttal.

20       Your Honor, this motion obviously was not brought

21   lightly.  There was a long string of emails that I engaged with

22   with my adversaries before filing the motion.  If we could just

23   put up the dec. that's associated with this motion.  This motion

24   was necessitated, from our view, because the defendants put into

25   the evidentiary record the Pully report.  The Pully report was

*Plaintiff's Motion to Strike*                                            13

1    the subject of a motion that the defendants made that I'll talk

2    about in a moment that was denied.  And HCMFA engaged in

3    extensive discussion about an affirmative defense that they had

4    sought leave to — to plead, and that motion was also denied.

5            And so, as — as the defendants have pointed out, I

6    woke up the next morning and I was really — I was upset and I

7    did write an email and it did say that — I put them on notice

8    about what was happening here because I thought it was

9    completely improper to try to include into the record and to

10   make arguments that had been excluded by a very specific order

11   of the Court.

12           And let's be clear here.  The defendants were asking

13   the Court for permission to do something.  HCMFA filed their

14   motion for leave.  It's lodged at Docket 82 on their docket.

15   And they specific requested, quote:  Leave to amend its answer

16   to expressly deny that the notes were signed.  The UCC appears

17   to require a more express denial of signature.

18           So there was — there was a purpose to the motion.

19   They wanted permission from the Court to do something and they

20   wanted permission from the Court to do something because they

21   knew that they needed it in order to prove, you know, one of

22   their defenses.

23           I just have to point out that if you go back and you

24   look at that pleading, —

25           (Tones.)

*Plaintiff's Motion to Strike*                                    14

1        MR. MORRIS:  — there's like this six — the six steps

2   of assumptions that — that are — that they argue prove that it

3   was all a mistake.  But I just — you know we'll talk about this

4   more on the merits, but this one just jumped out at me.  Mr.

5   Dondero never told Mr. Waterhouse that the transfer was a loan,

6   just that the trans- — just to transfer the funds.  And I have

7   to tell you that statement, the game is over for HCMFA, because

8   Mr. Dondero told Mr. Waterhouse to transfer the funds.  What he

9   didn't tell him, what he didn't tell Mr. Waterhouse, and there

10  will be no dispute about this, is that the transfer was supposed

11  to be compensation.  There will be no evidence that Mr. Dondero

12  told Mr. Waterhouse that the transfer would be compensation.

13  This admission in this motion is the end of the game for HCMFA,

14  and we'll talk about that more in a moment.  But make no

15  mistake, HCMFA came to this Court and they asked for permission.

16       The term note defendants also came to this Court and

17  they asked for permission.  They knew the deadline in the

18  scheduling order had passed or was about to pass.  I think they

19  filed on the day that it was going to pass, and they asked this

20  Court for permission.  And they said:  Please, can you extend

21  the deadline so that I can commission a report and engage in

22  expert discovery.  And, —

23       (Tones.)

24       MR. MORRIS:  — again, no — no dispute, right, this is

25  their pleading.  They requested an extension of the deadline in

*Plaintiff's Motion to Strike*                                        15

1    the scheduling order so that NexPoint could designate a

2    testifying expert on the standards and duties of care under the

3    shared services agreement.  NexPoint wanted to present expert

4    testimony on the question of whether the debtor put their head

5    in the sand, in violation of any affirmative duty or obligation

6    they may have about the matter.  They asked the Court for

7    permission.

8              Twice my client invested a meaningful sum of money to

9    pay my firm to defend these motions.  Your Honor took the time

10   to hear these motions.  We actually had an evidentiary hearing

11   on the motion for leave.  I cross-examined Mr. Sauter for two

12   hours on that.  We had an extensive argument on the motion to

13   extend the expert discovery deadlines and the expert disclosure

14   deadlines.  And following both hearings, the Court entered

15   orders denying the motion.

16             Now from my perspective, the matter was closed.  They

17   could not assert the affirmative defense that they asked the

18   Court to assert because they made a motion and they lost.  Now I

19   understand, I read in their papers it was all out of an

20   abundance of caution:  We don't even think we needed to make it.

21   It's just an element of their case.  Nonsense.

22             The fact of the matter is, Your Honor, if you look at

23   the next slide, go back to the spring of 2021, Mr. Sauter did

24   his investigation, they came to Your Honor with the first motion

25   for leave to amend, and Mr. Sauter swore — a lawyer — Mr. Sauter

*Plaintiff's Motion to Strike*                                      16

1    swore under oath multiple times that Frank Waterhouse signed the

2    notes.  And we've highlighted just a few of them here.

3          Paragraph 22:  The notes were signed by mistake by

4    Waterhouse without authority from HCMFA.  Paragraph 29:

5    Waterhouse was the chief financial officer of both the debtor

6    and HCMFA at the time he signed the notes.  30:  Waterhouse made

7    a mistake in preparing and signing the notes.  32:  HCMFA now

8    believes that it has affirmative defenses to the notes in the

9    nature of mutual mistake, lack of consideration, and no proper

10   authority of Waterhouse to sign the notes.

11         Now, mind you, this declaration is submitted after Mr.

12   Sauter engages in an investigation to determine the origin of

13   the notes.  He interviewed Mr. Waterhouse three times.  And at

14   no time did Mr. Waterhouse say, 'I don't know what you're

15   talking about.  I don't know where these notes came from.'  In

16   fact, we know from the hearing, he said just the opposite.  He

17   told Mr. Sauter, although it's not in his declaration, nor was

18   it in his second declaration, he specifically told Mr. Sauter:

19   The notes were prepared for a very specific purpose; they were

20   prepared because the auditors needed them.  That was the

21   testimony, so the notion that they had always been doing this or

22   that they were just arguing in the alternative, they never

23   argued in the alternative.

24         This statement right here on the screen is the —

25      (Tones.)

*Plaintiff's Motion to Strike*                                        17

1          MR. MORRIS:  — admission by HCMFA that Mr. Waterhouse

2    signed the notes, and we relied on that admission.  Right?  That

3    admission right there, this is their words, not mine.  It's

4    their lawyer, not ours.  It's under oath and it was done for the

5    express purpose of trying to persuade the Court that it should

6    be entitled to amend its pleading, where it had no affirmative

7    defenses previously, to assert this affirmative defense.  That's

8    where we were.

9          As soon as I saw what they did and included the Pully

10   report and included extensive argument about the affirmative

11   defense that why had excluded, I immediately wrote to them.

12   And, let's be clear, there's only two possible things that are

13   going on here, only two possible things:  One, they wanted to

14   make sure that they preserved their — their position for appeal,

15   okay?  No problem with that.

16         The second is that they were trying to get into the

17   record, for appellate purposes, evidence and arguments that had

18   been excluded.  And that's where I drew the line.  They take

19   issue with my decision not to accept their stipulation, but I

20   don't know what lawyer in the world would have accepted their

21   stipulation.  To accept their stipulation would have been to

22   give them what they wanted, and that is not to preserve the

23   issue for appeal but to introduce into evidence for purposes of

24   the record on appeal an expert report that was excluded and an

25   affirmative defense that was excluded.

*Plaintiff's Motion to Strike*                                    18

1            I did make my own offer to kind of test what their

2      motivations were, and it's in the record, it's in that email.

3      And I specifically said:  Look, if your concern is preserving

4      the issue for appeal, I'm happy to stipulate to that.  It wasn't

5      much of a give, Your Honor, to be honest with you.  Why?

6      Because they appealed both orders.  Both orders are subject to

7      appeal, so there can be no argument today that the purpose of

8      including this stuff in the record was to preserve their

9      appellate rights.  The appeals have already been made, so what

10     they're trying to do is get into the record now what Your Honor

11     specifically excluded.

12           What do they say in response to our motion?  It's

13     pretty simple:  It's just a proffer.  Proffers are permitted.

14     Proffers are even permitted in summary judgment motions.  Your

15     Honor, I will stipulate to both.  They should not waste any time

16     trying to convince the Court that proffers are acceptable or

17     that proffers are acceptable in summary judgment motions.  What

18     they should be trying to do, what they can't do, is — is argue

19     that a proffer of evidence and arguments that have previously

20     been excluded by Court order can be entered I opposition to

21     summary judgment.  No case has ever held that.  They don't cite

22     to any case for that, okay.  That's why we made our motion,

23     because we think it's patently unfair for them to put this stuff

24     into the record now.  And I will say that I took —

25           (Tones.)

*Plaintiff's Motion to Strike*       19

1        MR. MORRIS: — the time to read their cases and their

2   cases actually support us, they don't support them.  If you take

3   a look at just two of them, I think the two most important cases

4   are Fusco and Walden (phonetics).  And in both cases, they

5   didn't involve summary judgment.  They involve motions in

6   limine.  And what they basically said is:  Look, if you make a

7   proffer in the context of a motion in limine and the proffer is

8   denied, your issue is preserved.  And, in fact, the Fusco court

9   specifically said:  In many cases the grant of the prior motion

10  in limine — here it was a motion to exclude evidence — would

11  make it improper to call such witnesses without prior

12  permission.  All the proponent could do would be to line up the

13  witnesses at trial and then ask permission.

14        The defendants here didn't ask for permission.  In

15  fact, they did ask for permission and they were told no.  And

16  instead they just put this stuff in the record.  And, no matter

17  what I said, they wouldn't back down.

18        I liken this, Your Honor:  Parent and child.  Bear

19  with me for just a moment.  A child comes to a parent and says,

20  'May I have a cookie?'  And the parent says — the parent says to

21  the child, 'You can have a cookie after dinner.  You can have a

22  cookie during dessert.  That's the time to have a cookie.'  And

23  they sit down for dinner and they have dinner.  Dessert comes.

24  Parent puts the plate of cookies on the table.  The child

25  doesn't eat any.  Two hours later, —

*Plaintiff's Motion to Strike*                                    20

1        (Tones.)

2            MR. MORRIS:  — the parent is putting the child to bed.

3    And the child says, 'May I have a cookie now?'  And the parent

4    says, 'No, the time for having a cookie was at dessert.  You

5    knew what the schedule was.  You knew what the timing was.  You

6    can't have a cookie now.  It's too late.'

7            So child goes to bed.  Parent takes the child to

8    school the next morning.  Parent comes home, goes into the

9    child's room, and there's crumbs everywhere in the bed.  Child

10   comes home.  Parent says, 'I told you you couldn't have a

11   cookie.  What are you doing?'  And the child says, 'You told me

12   I couldn't have a cookie, but you didn't tell me I couldn't have

13   the round thing made of dough with chocolate chips.'  That is

14   exactly what the defendants are saying here.  That's the

15   totality of their response, Your Honor.

16           Their response is that your order denying these

17   motions didn't specifically say that they could proffer

18   evidence.  All they said is that they — I'll leave it to them.

19   I'd like to know what they think the orders meant.  That somehow

20   we went through that whole process and they could just put into

21   evidence and make arguments about matters that this Court said

22   no.  You told them the time for doing all of this has passed.

23   You told them you can't have a cookie, but they ate it anyway.

24           This is substantial prejudice to Highland and it's why

25   — it's why this motion had to be heard before the summary

*Plaintiff's Motion to Strike* 21

1   judgment motion.  They want to argue to you now the Pull report

2   even though they know I didn't have a chance to depose Mr.

3   Pully.  They want to argue their affirmative defense that they

4   didn't raise even though they made the motion and they lost

5   because they know I didn't have a chance to take any discovery

6   on this type of defense because they had said until they made

7   their motion that Mr. Waterhouse signed the notes by mistake

8   authority (phonetic).  That's the case I was trying, until we

9   got this motion.

10          So it would be severely prejudicial, and that's the

11   point.  And the interesting thing is, Your Honor, if we could go

12   to the next slide, I just want to conclude by raising a number

13   of questions that I just don't see — unless they answer these

14   questions, I probably won't even have a rebuttal here.  Okay,

15   how is it that Highland is worse off having won the motion.  If

16   hold didn't oppose the motion, we wouldn't have spent any money,

17   the Court wouldn't have been burdened, and I would have been

18   able to take discovery of Mr. Pully and on the affirmative

19   defense.  Had I argued the motion and lost, at least I would

20   have had the opportunity to take discovery.  And I would have

21   had the opportunity to take discovery of both Mr. Pully and on

22   this defense.  But instead I won the motion, so I'm worse off.

23   And now I'm supposed to deal with the summary judgment argument

24   on evidence and arguments that have been excluded that I haven't

25   taken discovery on it.

*Plaintiff's Motion to Strike* 22

1    I would like to know from the defendants how it is
2 that my position is worse having won the motions.  I'd also like
3 to know how come they don't address prejudice at all.  How come
4 — and it's not like I haven't raised the issue.  If you look at
5 my last email to Mr. Aigen, I had a laundry list of reasons why
6 I thought this was improper.  They didn't respond to that at
7 all.

8    In our motion, we gave a laundry list of reasons why
9 we're prejudiced here.  They didn't — maybe I missed it.  Maybe
10 they'll point out that I missed it.  It's possible.  But I don't
11 recall seeing anything in any of the papers that said why this
12 is proper and why the prejudice to Highland isn't what I say it
13 is.

14    I'd also like to know if the orders don't prohibit a
15 proffer on summary judgment, what exactly do the orders
16 prohibit?  If we didn't move for summary judgment, would the
17 defendants have been permitted to enter the Pully report into
18 evidence and pursue a new defense without having the orders
19 reversed?  Think about that.

20    If we didn't make the motion for summary judgment,
21 where would we be left?  Would they be able to do what they've
22 done now?  How does their position improve because we've made a
23 motion for summary judgment?

24    Number five, if as HCMFA contends it always asserted
25 that Highland didn't sign the notes, — that's a mistake on my

*Plaintiff's Motion to Strike*                                        23

1    part — if it contends that it always asserted that Highland

2    didn't sign the notes and that HCMFA is only challenging an

3    element of Highland's claim, then why did they make the motion?

4    Why did the burden me and my client and the Court with this

5    motion if there was no need for it?

6             There was a need for it, and just look at paragraph 1

7    of their motion.  There was a need for it.  They knew there was

8    a need for it.  They didn't plead in the alternative.  HCMFA

9    will never present a pleading to this Court where they asserted

10   that they didn't sign the note.  In fact, Mr. Sauter's sworn

11   representations to you are the exact opposite.

12            And, finally, I just leave them with this question,

13   because I didn't see it in their brief:  Identify one case

14   anywhere in the United States of America where a court has

15   permitted a party opposing summary judgment to proffer evidence

16   and pursue defenses that were excluded by very explicit,

17   explicit prior Court orders following full hearings on the

18   merits?

19            Unless Your Honor has any questions, — you know, let

20   me just say my goal in life is not to hold lawyers in contempt

21   of court, my goal in life is not to obtain sanctions, my goal in

22   life is to try cases fairly, and this is not fair.  It's just

23   not fair.  It's not consistent with any law.  And it does

24   violate not just the two orders that Your Honor entered but the

25   scheduling order.  And so under Rule 12, under Rule 32, under

1   the rules of contempt that Your Honor is familiar with, the most

2   important thing to me is to keep this stuff out of the record.

3          At some point people have to be held accountable for

4   this kind of conduct, but I leave that to the Court's

5   discretion.  Unless the Court has any questions, I'm going to

6   reserve my 12 minutes for rebuttal.

7          THE COURT:  Okay.  Thank you.

8          All right.  Mr. Rukavina.

9          MR. RUKAVINA:  Your Honor, Ms. Deitsch-Perez will

10  handle half of our response and I'll handle the second half.

11         MR. MORRIS:  Okay.

12         MS. DEITSCH-PEREZ:  It's —

13         MR. RUKAVINA:  I apologize.  No, I apologize.  Not Ms.

14  Deitsch-Perez, her partner.

15         MS. DEITSCH-PEREZ:  Okay.  Mr. Root will argue.

16         THE COURT:  Okay, Mr. Root.

17         MR. ROOT:  Thank you, Your Honor.  This is my first

18  time having the privilege of appearing before you.  Ms.

19  Deitsch-Perez brought me into this case to assist on this motion

20  I think because I am the co-chair of our firm's appellate

21  practice group, and the ways in which arguments are preserved

22  for appeal are important to me professionally and they're

23  important to of course all our firm's clients and I do have a

24  little bit of insight that I have earned from my experience in

25  that area on how these kinds of pitfalls can emerge.

*Plaintiff's Motion to Strike*                                              25

1        I'm going to address in my argument the portion of the

2   motion that's addressed to the Pully report and Mr. Rukavina is

3   going to address the affirmative defense issue.

4        And, with respect to the Pully report, it's a bit

5   curious to me because the nature of the conduct was clear at all

6   times.  It was clear in the filing to the Court.  It was clear

7   in discussions with Mr. Morris as to what was being done.  The

8   Pully report, — let me see if I can get this PowerPoint up —

9   I'll share it with the Court.  I'm not that adept at this and so

10  I hope I've got this right.

11       Can everyone see this?

12       THE COURT:  Yes.

13       MR. ROOT:  Okay, great.  And, you know, one of the

14  things where Mr. Morris began is with the multiplicity of

15  actions here.  There are multiple actions with multiple

16  defendants that are adversary proceedings that are

17  postconfirmation in bankruptcy court.  And, ultimately, the case

18  — the case is against — these defendants are going to be

19  resolved by a jury trial at the district court.  And that's an

20  important distinction to consider as you think through the

21  issues raised by the plaintiff's motion to strike.

22       You know, overall the plaintiff has not proved the

23  defendants or their counsel violated the express terms of any

24  order of this Court.  You know, with respect to the Pully

25  report, there is no burden to the plaintiff or this Court from

*Plaintiff's Motion to Strike*                                          26

1   the use of a proffer.  And the rules that plaintiff relies upon

2   do not authorize their motion to strike, sanctions, or a finding

3   of contempt.

4            Neither the order denying the extension of the expert

5   witness deadline nor their order denying assertion of

6   affirmative defense, the Court should make any ruling on

7   admissibility of evidence at trial or for summary judgment.

8   This Court's order did not expressly bar the defendants from

9   offering the Pully report as a proffer to complete the summary

10  judgment record, which ultimately should this Court make a

11  conclusion adverse to either side, I assume there will be

12  objections to the report and recommendation that go to the

13  district court.  And, ultimately, the dispositive motions are

14  going to be decided by the district court in the end, not this

15  Court.  This Court will make a report and recommendation on the

16  motions that are heard today, but under the divisions of

17  jurisdictions in cases like this, any final decision is subject

18  to review in the district court.  And that's important because

19  the presence or absence of materials or arguments in the summary

20  judgment record will matter to the completeness of the record at

21  the district court.

22           Before I show you the precise conduct with regard to

23  the Pully report that's alleged to be in violation, I want to

24  make sure we all are oriented correctly to the standards in the

25  Fifth Circuit for contempt.  When a lawyer seeks contempt from a

1    court against other lawyers and other parties, it's a very

2    serious thing to do.  And it's only warranted when someone

3    violates an order of a court requiring specific and definite

4    language that person do or refrain from doing an act.  That

5    hasn't happened here.

6              The orders here denied leave to amend the complaint to

7    add a new or a different affirmative defense and they denied the

8    extension of the date for expert designations in the case.  They

9    did not expressly prohibit a proffer for the purposes of

10   preserving the evidence on appeal, which are important purposes.

11             And so let's look at exactly what the defendants did

12   with are Pully report.  There is one footnote and it is present

13   in the appendix and this is it, right here, footnote 76.  It

14   says:  Defendants' position is bolstered by the expert report of

15   Steven J. Pully, which was incorrectly not permitted to be

16   included in the record by the Court.  Defendants submit this

17   proffer to preserve their objection.

18             That's it.  That's the completeness of the reliance

19   upon the Pully report, the argument really to the Pully report.

20   And right here it expressly acknowledges the Court's order and

21   shows the intention of the defendants to respect the Court's

22   order with which they disagree; that we — they have filed an

23   appeal to the district court.  And what plaintiff advised the

24   Court about the appeal in his argument, he did not mention that

25   in his response to the appeal he says the appeal is improper and

*Plaintiff's Motion to Strike*                                           28

1    should not be heard by the district court.  Well, then we're

2    back here in the soup.  Because if that appeal is improper and

3    we need to do something different to preserve our objections to

4    the exclusion of the Pully report, this is exactly what we've

5    done.  We've put it into the record and made this one footnote

6    reference.  And that's the only thing that's been done with

7    respect to the Pully report.

8             And after — after that, Mr. Morris was upset, as he's

9    candidly admitted, and he demanded that the report and the

10   footnote be withdrawn by January 25th or face sanctions.  And,

11   you know, we advised him in our email about this was — we

12   explicitly stated in our response that the expert order was

13   denied and the evidence was being offered as part of an offer of

14   proof.  And we asked him for authority stating that providing

15   such an offer of proof is improper or could be subject to

16   contempt.  He offered no authority, he responded quickly, and he

17   demanded lateral compliance with — with his demands.  Either

18   comply with the demands or you won't, they don't need any

19   further response.

20            Well, we didn't think that was adequate or sufficient

21   exchange of information among counsel on a subject as serious as

22   contempt.  And so the next day we wrote him back and offered

23   extensive authority regarding offers of proof, including the

24   cases he cites to Your Honor.

25            You know, the — as you know, offers of proof are

*Plaintiff's Motion to Strike*                                      29

1   typically used to permit the trial judge to reevaluate his

2   decision in light of the evidence to be offered and to permit

3   the reviewing court to determine to the exclusion of effective

4   and substantial rights of the party offering it.  That's Fortune

5   Auto from the Second Circuit in 1972, "A proffer of evidence may

6   be required if the trial judge is not well aware of the content

7   and purpose of the evidence."  Or the Tenth Circuit in the

8   Fevrick (phonetic) case.  "The court must be well aware of the

9   substance of the evidence and the record must reflect the

10  substance of the evidence," that's the Sheffield (phonetic) case

11  from the Eleventh Circuit.

12         And the Fifth Circuit, again in Maquay (phonetic),

13  "The proponent must show the substance of the proposed evidence

14  and make known to the court for whatever reasons the evidence is

15  offered."  And on and on.  Ample authority that this is exactly

16  what we should be doing, particularly here where this summary

17  judgment record is going to go to the district court on appeal,

18  or there — and if that happens, the district court needs to have

19  a complete record.  And the complete record, from our

20  perspective, should include the Pully report.

21         We acknowledge the Court's prior ruling with respect

22  to the Pully report.  We acknowledged it in the filing that the

23  plaintiff says is contemptuous and before that all of this

24  authority supports the decision that we made to include it in

25  the record in the minimal way that we've done.

*Plaintiff's Motion to Strike*                                          30

1          But we did more.  We offered to stipulate, and here is

2    an excerpt, the first excerpt from the stipulation, we offered

3    to stipulate the bankruptcy court may disregard the Pully

4    material in the opposition and consideration the opposition as

5    if it did not contain any references to the Pully material until

6    and also the deadline order is modified to allow the Pully

7    report to be used by defendants.

8          That solves entirely his prejudice concerns with

9    respect to the Pully report.  Enter the stipulation, we file it

10   with this Court, the Court disregards the Pully report, and we

11   move on.  And we have completed our record for appeal.

12         And that was the other thing that we asked for in the

13   stipulation:  Can we please agree that we preserved our

14   objections, that we properly preserved any objections that we

15   may have to the expert deadline order and that we properly

16   preserved any objection to the exclusion of the Pully report.

17   That's what we're — that's what we're after.  That was our goal

18   throughout.

19         In response to this stipulation, the plaintiff says:

20   Oh, if your issue is preserving the issue for appeal, I'd

21   consider a stipulation.  And if you're truly concerned with

22   reserving your right, I'll consider a stipulation.

23         But we sent him a stipulation that we thought was

24   appropriate and complete and necessary.  And that should have

25   been the end of the matter.  And we sent it to him the same day,

*Plaintiff's Motion to Strike*                                        31

1    we said, you know, this is an offer of proof, please let us know

2    if you have comments on the stipulation, and let's move forward.

3    No prejudice, no consideration of the Pully report.  Our

4    objections are preserved.

5           And he says this is havoc, and endless questions, and

6    we are insisting on ignoring Your Honor's orders.  That is just

7    not true.  Throughout this correspondence we acknowledge this

8    Court's order.  And we're doing what we believe to be necessary

9    to preserve the objections.

10          And it's the plaintiff's motion that's created this

11   needless burden this morning.  It manufactures expenses for

12   which to seek sanctions.  We offered to stipulate, as you've

13   seen, that the Court could disregard the Pully report.  And even

14   in the absence of a stipulation, the Court may disregard the

15   proffer and say, 'I'm not including it.  You've — my order was

16   the Pully report was untimely.'  And there's just no authority

17   anywhere to impose sanctions arising from circumstances like

18   this.

19          I'm not going to into how the proffer was appropriate.

20   In fact, Mr. Morris has admitted that the proffer is an

21   appropriate way to do this.  He just doesn't believe that's what

22   we're doing.  Well, the evidence is to contrary.  That's all we

23   were doing.  The Fusco (phonetic) case, which he relies upon,

24   does not support their position.  An adequate and complete

25   pretrial proffer will preserve the record.

*Plaintiff's Motion to Strike*                                    32

1          In this case, with the multiplicity of matters, where

2    the Pully report was only informally injected into one of them,

3    in order to make sure the district court had a complete record,

4    we included the Pully report in the appendix.  That's what we

5    did.  That's why we did it.  And, you know, anything otherwise

6    is just contrary to the evidence and the facts.

7          Rule 37 just addresses failures to make disclosures or

8    cooperate in discovery; those matters are not at issue here.

9    And we acknowledge this Court's order and are willing to abide

10   by it and have offered to stipulate in a way that is clear and

11   would remove all prejudice from the defendants.

12         And if this Court were to strike the record, we — it

13   would needlessly complicate the record on appeal.  I have dealt

14   with this situation where in an appellate context a motion to

15   strike below is granted and the evidence that was stricken was

16   sought to be, you know, advanced as part of the argument about

17   the motion to strike, and often my adversaries will say, no, you

18   can't include that stricken evidence in the appendix because the

19   district court struck the evidence and, therefore, it shouldn't

20   be part of the record on appeal.  We're trying to avoid those

21   kinds of fights.  There are enough disputes in this matter.  And

22   the easiest and best way to do this is to deny the motion for

23   sanctions and move forward to the merits.

24         The Pully report merely completes the record.  And at

25   this point I'm going to pass, unless the Court has questions, to

*Plaintiff's Motion to Strike*                                                    33

1    Mr. Rukavina to address the affirmative defense issues.

2          THE COURT:  Okay.  Here — here is my question and it

3    goes to Mr. Morris' point that he's worse off for having won the

4    motion to extend time to file the Pully report.  So let me give

5    you a hypo and you tell me if I'm wrong in thinking this is a

6    scenario that could play out.  So —

7          MR. ROOT:  Sure.

8          THE COURT:  — let's assume I deny the motion to

9    strike, okay, and it gets in the record for the limited purpose

10   of, you know, preserving it for appeal.  And let's also assume I

11   end up making a report and recommendation to the district court

12   that it grant the motion for a partial summary judgment.

13          And, then meanwhile, while that's sitting out there on

14   the district judge's bench or desk, the district court reverses

15   my earlier decision to extend the deadline — I should have

16   extended, I should have let the Pully report come in.  Then the

17   district court later gets off its desk my report and

18   recommendation, and it considers the Pully report, okay, because

19   it's reversed my earlier decision.  Isn't it true that the

20   plaintiff never would have gotten its chance to take discovery

21   and maybe present refuting evidence on the motion for summary

22   judgment?

23          MR. ROOT:  Yes.  So in the hypothetical, Judge

24   Jernigan, I think it's really where — where I know that

25   plaintiff will have their opportunity is in the context of the

*Plaintiff's Motion to Strike*                                    34

1   briefing around the objections to a recommendation on summary

2   judgment.  I am confident Mr. Morris would advise the district

3   court, 'If you are going to consider the Pully report, I need an

4   opportunity to take more evidence,' which could happen.  If the

5   district court — you know if the district court concludes Your

6   Honor was incorrect on the extension of the deadline with

7   respect to this report, I don't want to prejudge what will need

8   to happen next, but a natural thing to happen next would be to

9   provide Mr. Morris an opportunity to take a deposition of Mr.

10  Pully and develop any kind of rebuttal evidence that he thought

11  was necessary.

12          I don't know what all that's — you know, I don't — I

13  don't know what path that's going to take.  I can't prejudge, I

14  don't know.  And where we are right now is, is it possible the

15  district court relies on the Pully report and the summary

16  judgment record?  Hypothetically, yes.  But I just know, from

17  even my short time on the case, that Mr. Morris will object

18  strenuously to that.  And — and, from our side, we would not

19  object to Mr. Morris taking discovery — taking expert discovery

20  on the Pully report.  Where we are right now, the Pully report

21  shouldn't be considered, we acknowledge that.  That's Your

22  Honor's order which we disagree with but respect.  But in order

23  to complete the record on this summary judgment motion, we have

24  included it.  In the event that as this case progresses and the

25  various appeals progress, allow for it to be considered.  And

*Plaintiff's Motion to Strike*                                        35

1    whether and when that happens and the circumstances and

2    opportunities that will generate for Mr. Morris are as yet

3    unknown.

4              THE COURT:  All right.

5              MR. ROOT:  But that's where we are.  And I don't think

6    he's worse off from us including it in the record because we

7    have admitted to the Court and to him that it need not be

8    considered as part of the summary judgment in this proceeding in

9    front of Your Honor.

10             MS. DEITSCH-PEREZ:  And, Your Honor, if it helps, we

11   would represent that if Mr. Morris — if the district court did

12   as Your Honor hypothesized, we would not object to Mr. Morris

13   taking Mr. Pully's deposition and we would not object if Mr.

14   Morris thereafter said we need to get a rebuttal expert, and

15   then we would take rebuttal expert's deposition, and it would

16   all be included, so we would stand by that.  Thank you.

17             THE COURT:  All right.  Mr. Rukavina.

18             MR. RUKAVINA:  Thank you, Your Honor.

19             Mr. Vasek, if you will please pull up my PowerPoint.

20             So the facts and circumstances of the failure to sign

21   is a little bit different.

22             Mr. Vasek, the first page, please.  Scroll down now to

23   the next page and the next page.

24             So the time line here, Your Honor, is important.  And

25   I know that the Court prepares her own time line, so we can

*Plaintiff's Motion to Strike*                                                    36

1    ignore the top half.  That goes to the merits.

2            But on January 22nd, Highland filed its complaint.

3    Marc 1, we answer.  May 22, we file a motion for leave to assert

4    a mutual mistake and that Mr. Waterhouse was not authorized to

5    sign the notes.  Now that's important because the Court granted

6    that motion for leave, and we ended up on July 6 filing our

7    amended answer.  Your Honor has that amended answer at Docket

8    48.  Twice in there, we expressly state the defendant did not

9    authorize Waterhouse to sign the notes or to bind the defendant.

10           So — so that's — so that was our live pleading, that

11   the defendant did not authorize Waterhouse to sign the note.

12   This is — this is important because now we have to

13   cross-reference to the UCC.  And, Your Honor, we briefed the

14   UCC, it's on page 11 of my opposition brief.  And the UCC says:

15   If the validity of a signature is denied in the pleading, the

16   burden of establishing validity is on the person claiming

17   validity, but the signature is presumed to be authentic.

18           So this now put me in a very interesting position, and

19   there is no case law on this.  We clearly denied the validity of

20   the signature.  We said Waterhouse wasn't authorized, he wasn't

21   our representative.  He didn't have any authority to sign it.

22   But we did not deny the fact of his signature because, as Mr.

23   Morris pointed out our prior investigation, Mr. Sauter asked Mr.

24   Waterhouse and Mr. Waterhouse just flippantly said, 'Well, if

25   it's got my signature, it's my signature.'

*Plaintiff's Motion to Strike*                                    37

1           So — so going back to the time line, on May 28th we

2     serve our requests for production and on June the 28th, Highland

3     responds.

4           Mr. Vasek, if you will please pull up the — the

5     appropriate RFP.

6           So you see, Your Honor, there on number 9 we ask for

7     all Microsoft Word copies of the notes, including meta data.  So

8     the debtor first objects to the term meta data as vague, which I

9     find inconceivable that a trial lawyer wouldn't know what that

10    means, but then it says:  Subject to the objection, to debtor

11    will conduct a reasonable search for and produce responsive

12    documents.

13          So that's the response that I get.  And I'm now led to

14    believe from this response that they're going to look for the

15    originals and they'll produce the originals, maybe not meta

16    data, but they will produce the originals.

17          If we go back to the time line, Mr. Vasek, please.

18          Months go by, Your Honor, and the debtor does not

19    produce the originals.  I ask about it a couple of times and I

20    get no real response.  On October the 19th, as we are deposing

21    Mr. Waterhouse, the man who purportedly signed the notes, Ms.

22    Deitsch-Perez expressly asked Mr. Morris, "Are you going to

23    produce the originals," and he says no, doesn't give any

24    response or reasoning.  He says no.

25          After that, Mr. Morris and I have a few discussions

*Plaintiff's Motion to Strike*                    38

1   and the debtor does agree to produce the originals.  They're

2   produced on October the 25th, right before I depose Ms. Hendrix

3   (phonetic).  At that point in time, it became clear that Mr.

4   Waterhouse did not sign the notes.  That is a fact.  Ms. Hendrix

5   took copied images, JPGs of his signature and she affixed them

6   to the notes.  Maybe Mr. Waterhouse authorized it, maybe he

7   didn't, there's conflicting evidence on that, but the simple

8   fact is that Mr. Waterhouse did not sign those notes.

9          We promptly file our second motion to amend and this

10  Court denies the second motion to amend.  I will admit that I

11  was surprised that the Court seemed not to take any issue with

12  the discovery gains or at least what I thought was a discovery

13  gain, especially when Mr. Morris' response was, 'Well, Mr.

14  Rukavina, you could have issued a new — should have moved to

15  compel me.'  But the Court denied the motion.

16         Go to the next slide, please.  And go to the next

17  slide, please.  And go to the next slide, please.  And go to the

18  next slide.  And to the next slide.

19         Okay.  So — so where are we now?  We know as a fact

20  that Waterhouse did not sign the notes.  We know that — that we

21  would have known this earlier had the debtor produced the

22  originals.

23         I'd also like to remind Your Honor respectfully that

24  when we were discussing reference withdrawal, I argued both

25  before this Court and the district court that the reference

*Plaintiff's Motion to Strike*                                          39

1    should be withdrawn immediately to avoid a bifurcated

2    proceeding, to avoid a procedurally-confusing proceeding where I

3    really have two courts now addressing the same issues.

4              When we filed the second motion to admit, we did not

5    admit that leave was necessary.  In fact, we expressly pointed

6    out that the UCC is confusing and we filed a second motion for

7    leave out of an abundance of caution.  Also very important, no

8    court has ruled whether the failure to sign is an affirmative

9    defense or not.  This Court did not address that issue or rule

10   on it when it denied my Rule 15 motion and the district court

11   hasn't ruled on it.  And, honestly, there is no case law on

12   that.  But we do know that Texas law permits the general denial,

13   so I believe that the correct way to harmonize is that the

14   failure to sign is not an affirmative defense, but it needs to

15   be denied or, rather, the validity needs to be denied in that

16   UCC section that we mentioned.

17             So now we have the summary judgment motion.  We have

18   no definitive ruling on whether my defense is an affirmative

19   defense or not.  And — and in my response, I expressly state, I

20   expressly referenced this Court's prior denial of the Rule 15

21   motion.  I'm not trying to hide it.  In the meantime, on or

22   about January the 23rd, we filed not an appeal with Judge Starr

23   but a motion to reconsider, because, pursuant to the rules

24   governing magistrates, which this Court has said she's acting as

25   a magistrate, you have 14 days to move the district court to

*Plaintiff's Motion to Strike* 40

1   reconsider.  So that's all that we did.

2          But I think most importantly, Highland itself in its

3   motion raised the signature issue.  This is from their own

4   brief.  Highland states that Highland must establish that the

5   nonmovant signed the note.  Highland raised that issue.  And

6   Highland introduced evidence, which I submit is false evidence,

7   that my client signed the notes.  It's in our brief, but

8   Highland's — Highland's motion and brief state that the demand

9   notes are valid, signed by HCMFA, and they reference Mr. Klos'

10  declaration.  Mr. Klos' declaration begins with, "This

11  declaration is based on my personal knowledge."

12          Next slide, please, Mr. Vasek.

13          But at deposition, Mr. Klos said, "I asked Ms. Hendrix

14  to prepare a note."  I asked him, "Did you have anything more to

15  do with papering, preparation, or execution," and he says, "Not

16  that I can remember."

17          I ask him, "Would you have had any role in either or

18  both of the notes actually being signed by ink or

19  electronically," he says, "Likely not, no."

20          So where is his personal knowledge from?  So, Your

21  Honor, the facts here — this is an unfortunate motion, it's

22  unfortunate that I'm facing contempt for the first time ever in

23  my life because all I told was the truth, that Mr. Waterhouse

24  didn't sign the note.  Highland seeks contempt over something

25  that it — that is its fault because it did not timely produce

*Plaintiff's Motion to Strike* 41

1   documents.  Highland seeks contempt over something that it

2   raised in its motion for summary judgment, based on what I

3   suggest is false or misleading evidence.  And Highland seeks

4   contempt when all I'm trying to do is preserve my client's

5   rights before the district court, because what has to be

6   remembered is that my only remedy after this Court issues a

7   report and recommendation is to object.  I cannot introduce new

8   facts.  I cannot file a motion for de novo — or, I'm sorry — a

9   motion to reopen the record.  All I can do object.  So if I do

10  not respond to something that Highland raises, then my client is

11  prejudiced.  Yet we have absolute facts that Mr. Waterhouse

12  didn't sign the notes.

13          Go to the next slide, please.

14          So, in conclusion, Your Honor, on the contempt issue,

15  as a matter of law, no order prohibited me from making this

16  argument or presenting any evidence.  The denial of the Rule 15

17  motion was just that, a denial of the motion.  There is no

18  specific order requiring my client or me to perform or refrain

19  from performing in a particular way.  Nor did I violate the

20  spirit of that order.  It is absolutely easy and cheap for this

21  Court to now report and recommend that this was an affirmative

22  defense that was waived by the failure to timely assert it.

23  This does not require complicated briefing.  This Court can

24  recommend how it wants to go the district court.  There's no

25  prejudice.

*Plaintiff's Motion to Strike*                                         42

1          Mr. Morris' representations about discovery, it's

2    patently false.  Mr. Waterhouse was deposed.  Ms. Hendrix were

3    deposed.  We all asked them questions on these issues.  There is

4    no need to redepose them again, but if they want to redepose

5    them again, fine, I'll pay for it.  So there's no — there is no

6    prejudice by a lack of discovery.  And, again, they caused this

7    issue by not producing the original notes.

8          Rule 12 and 37 don't apply, just as Mr. Root stated.

9    I also submit that the Court does not have core jurisdiction

10   over contempt.  And I believe Your Honor should not strike these

11   arguments and strike this evidence because the Court cannot

12   decide what the district court gets to hear and gets to

13   consider.  That is a constitutional problem.  All that this

14   Court can do is report and recommend.  And if the Court finds it

15   appropriate to report and recommend that this defense should not

16   be considered because it's an affirmative defense that was

17   waived, then that is Your Honor's decision, but I will still

18   then have my right to raise the issue and argue it in front of

19   the district court, which will ultimately decide these issues.

20         So, Your Honor, I think respectfully in the last 20

21   years or so, our practice has become much more bitter — you can

22   close this, Mr. Vasek — it's become much more adversarial, and

23   there is just no need for it, in what is a cold promissory note

24   case, we gave — we offered stipulations, we offered to preserve

25   everyone's rights, and I cannot believe that I am now looking at

*Plaintiff's Motion to Strike*                                          43

1    contempt, as is my client, because all that we did was to tell

2    the truth in response to Highland's own allegation.  Thank you.

3          THE COURT:  All right.  Rebuttal, Mr. Morris.  You've

4    got 12 minutes.

5          MR. MORRIS:  I do.  Let me just take a moment to set

6    my clock.

7          Interestingly, Your Honor, I don't believe that they

8    answered any of the questions that I posed, but I'm going to

9    respond nevertheless.

10         Mr. Root, nice to meet you.  Welcome to Highland.

11         I just want to respond to a couple of comments that he

12   made.  He raised the issue of a jury trial.  Obviously that's

13   irrelevant here.  This is a motion for summary judgment.  Your

14   Honor is going to make a report and recommendation.  It's going

15   to go to the district court and the district court is going to

16   decide the issue.  So this is not about a jury trial, this is

17   about a bench trial, until we get to the jury.

18         Number two, you know both he and Mr. Rukavina dance

19   around your orders and what the motions were about.  They're

20   telling you that you didn't tell them that they couldn't have

21   that round thing made of dough with chocolate chips, you just

22   told them that they couldn't have a cookie.  I don't get it.

23   For the life of me, I don't get it.

24         With all due respect to Mr. Root, we know well how

25   serious contempt motions are.

*Plaintiff's Motion to Strike*                                    44

1      (Tones.)

2          MR. MORRIS:  We've had a couple of them here.  We

3    briefed them extensively.  The Court is intimately familiar with

4    the standards for contempt.  There was an order, they knew about

5    the order, and they breached it.  It's really not more

6    complicated than that.

7          He tries to minimize, Mr. Root tried to minimize what

8    they've done here, but it goes back to what I said in the

9    beginning, and that is there could only be two reasons for doing

10   this.  One is because you wanted to preserve the appellate right

11   and the other is to sneak this into evidence for purposes of the

12   record.  And he basically admitted that's what they're trying to

13   do.  He pointed to footnote 76, he put it up on the screen.  And

14   he said, 'Gosh, all we did was say, you know, there's something

15   on there.  We didn't even make any arguments.'  They don't care

16   about you, Your Honor.  They don't care about this proceeding.

17   Their eyes are on Judge Starr in the district court, and what

18   they want to be able to do is get this into the record now so

19   they can make their arguments then, and that's the prejudice.

20         The notion that somehow they're graciously willing to

21   give me the opportunity to do discovery later on, that was what

22   their motion was about.  Their motion was to extend an order of

23   this Court to allow them to participate in expert discovery.

24   They made their motion and they lost, and now they say the

25   remedy is to just do what they were told they can't do.  Round

*Plaintiff's Motion to Strike* 45

1    thing made of dough with chocolate chips, but then a cookie.

2             The stipulation.  Mr. Root spent a lot of time on the

3    stipulation.  Again, I would have been perfectly fine, and I'm

4    willing to do it right now, if they withdraw the Pully report —

5    and let me be clear — if they withdraw the Pully report and the

6    arguments related to the barred defense, I will stipulate right

7    now on the record that those issues are preserved for appeal,

8    because they presented them to Your Honor, they asked Your Honor

9    to do something, they made a motion, they asked Your Honor,

10   'Please make a ruling,' now they say it's somehow

11   unconstitutional.  Nobody forced them to do it, what they chose

12   to do.  And Your Honor entered rulings.  And now somehow,

13   because I wouldn't agree to do what they couldn't get you to

14   allow them to do, I'm the bad guy.  Again, my offer remains:  If

15   the issue is preservation of appeal, withdraw the Pully report,

16   withdraw the affirmative defense, and I stipulate those issues

17   are preserved for appeal.  They are already subject of appeal.

18   There's a mention of it's not an appeal, it's a motion for

19   reconsideration.  In my life I've never heard of a motion for

20   reconsideration being made in any court other than the court

21   that issued the order.  But, be that as it may, it is what it

22   is.  That's Mr. Root.

23             Mr. Rukavina spent most of his time arguing yet again

24   the merits.  He said that Mr. — Mr. Waterhouse flippantly said

25   that he signed the notes.  I don't want to spend too much time

*Plaintiff's Motion to Strike*                                                46

1   on the merits, Your Honor, but remember Mr. Sauter's

2   cross-examination on this very motion.  Mr. Waterhouse didn't

3   flippantly say anything.  What he did is he told Mr. Sauter in

4   very clear and unequivocal terms that he knew about the notes

5   and that the notes were prepared for a very specific purpose.

6   That's not flippant.  It wasn't disclosed to you, but it

7   certainly wasn't flippant on Mr. Waterhouse's side.

8           And remember, because Mr. Waterhouse has never denied

9   the existence of the notes, I don't know why they're pressuring

10  Mr. Waterhouse like this.  It's sad to me.  But they are

11  destroying the man.  And why are they destroying the man?

12  Because if they're right and this note was somehow done without

13  Frank's authority, then — then Mr. Waterhouse and Mr. Dondero,

14  by the way, made enormous and grievous mistakes in their

15  representations to the auditors in the dozens of filings in this

16  bankruptcy case that the creditors committee relied upon.  Mr.

17  Waterhouse prepared every single monthly operating report.  So

18  Mr. Waterhouse didn't just make a mistake with respect to these

19  notes, he made dozens of mistakes.  I — they're putting the guy

20  under — under the bus.  That's on them.

21          Mr. Rukavina says that he served a discovery request

22  and we said we'd produce it and that he asked about it a couple

23  of times, the record is clear Mr. Rukavina remained silent for

24  many, many months.  Never followed up.  And while I admit that

25  upon receiving the first follow-up request in the later half of

*Plaintiff's Motion to Strike*                                              47

1   October about this matter, I said no.  The fact is I produced it

2   within 10 days.  I produced everything within 10 days of the

3   follow-up request.  It is not the first time in litigation and

4   it's certainly not the first time in this case that follow-up

5   document productions occurred.  Within 10 days of the follow-up

6   request, they had everything they wanted.

7          Of course they never answer why they didn't do the

8   investigation in May of 2019, when Mr. Dondero was fully in

9   control, and then the notes are actually described in the

10  audited financial statements, but we'll save that for a bit.

11         And Mr. Rukavina complains that there's two courts.

12  Woe is me.  Happens every single day.  There's magistrate

13  judges, there's — there's reports and recommendations.  Your

14  Honor knows better than I do, better than anybody on this — on

15  this hearing how these matters work.  There is nothing unusual

16  about it.  They made a motion, they lost, and now they're

17  ignoring it.  And for those reasons, Your Honor, we know that

18  this — the Pully report should be stricken, they should not have

19  an opportunity to make arguments in the district court.  What

20  they should be able to do and what I will stipulate that they

21  can do is appeal the order.

22         And they can appeal the order.  I mean I don't know if

23  the time has passed, frankly, so I don't — I don't want to open

24  the door to something that may have already been closed.  But

25  the fact of the matter is they should go to Judge Starr and they

*Plaintiff's Motion to Strike*                                        48

1   should explain to Judge Starr why you got it wrong.  They

2   shouldn't be allowed to make me sit in an absolutely worst place

3   than I would have been had I not opposed the motion or had I

4   lost, because that is where we are.  And I don't care how

5   gratuitous they are in saying, 'You could take discovery.'  I

6   had that option last fall and they didn't want to do it.  They

7   can't force it on me now.

8          Unless Your Honor has any questions, I've got nothing

9   further.

10          THE COURT:  Just one.  Just refresh my memory.  I have

11  the memory of a very lengthy hearing on the Rule 15 motion to

12  amend.  And I guess it was the same day the motion to extend

13  time to add Pully as an expert.  Mr. Sauter testified — was it

14  Mr. Sauter?  I'm thinking —

15          MR. MORRIS:  It was — it was Mr. Sauter.  I'm sorry to

16  interrupt, Your Honor, but just to be clear.

17          THE COURT:  Yeah.

18          MR. MORRIS:  Mr. Sauter is the attorney who —

19          THE COURT:  Right.

20          MR. MORRIS:  — submitted the declaration in connection

21  with the first motion for leave to amend.

22          THE COURT:  Okay.

23          MR. MORRIS:  The attorney who submitted the

24  declaration in support of the second motion for leave to amend.

25  And I did cross-examine him at length about, among other things,

*Plaintiff's Motion to Strike*                                    49

1    his conversations with Mr. Waterhouse —

2             THE COURT:  Waterhouse.

3             MR. MORRIS:  — where I brought out that Mr. Waterhouse

4    specifically told him why the notes were prepared.

5             THE COURT:  Okay.  But that's what I thought I

6    remember —

7             MR. ROOT:  Just to —

8             THE COURT:  — but what I wanted to clarify, Waterhouse

9    was not a witness that day.  He —

10            MR. MORRIS:  Correct.

11            THE COURT:  — he didn't submit a declaration at any

12   time in connection with this litigation, correct?

13            MR. MORRIS:  The only statement that we have from Mr.

14   Waterhouse is the singular deposition.

15            THE COURT:  Okay.  All right.  Was someone else

16   wanting to respond —

17            MR. ROOT:  And, just to be clear, —

18            THE COURT:  Um-hum.

19            MR. ROOT:  — and, just to be clear, Your Honor, at the

20   — I believe the transcript on the motion to extend the expert

21   discovery deadline, and there were no witnesses at that hearing,

22   it was a separate hearing.

23            THE COURT:  Okay.

24            MR. RUKAVINA:  Yeah, agreed.  Mr. Root is correct,

25   Your Honor, the hearings were maybe a month apart.

*Plaintiff's Motion to Strike*                                    50

1          THE COURT:  Okay.

2          MR. RUKAVINA:  And I just want to refresh Your Honor's

3    memory, if I may refresh Your Honor's memory that at the

4    beginning of the Rule 15 hearing I had argued that under the

5    Local Rules that live testimony was inappropriate and that we

6    were limited to our respective appendices, Your Honor overruled

7    that objection.  Otherwise Mr. Waterhouse would have been

8    subpoenaed to be there.

9          MR. MORRIS:  Your Honor, I —

10          THE COURT:  Say again.

11          MR. MORRIS:  — I just —

12          THE COURT:  You — you did not want witnesses —

13          MR. MORRIS:  — just —

14          THE COURT:  I said, yes, witnesses were allowed.  And

15    then you say you would have subpoenaed him if you knew how I was

16    going to rule; is that what I just heard?

17          MR. RUKAVINA:  No, Your Honor.  No, Your Honor, that's

18    — that's — I didn't know how Your Honor was going to rule.  We

19    have the transcript if the Court questions my memory.  I had

20    argued that under the Local Rules and our practices, when you

21    have an adversary proceeding in the motion, that you are

22    limited, both sides are limited to the evidence in their

23    appendices.  Mr. Morris disagreed with that.  He had subpoenaed

24    Mr. Sauter.  And the Court said, no, you're allowed to call

25    witnesses at this hearing.

*Plaintiff's Motion to Strike*                                    51

1          What I'm telling Your Honor is if I had known that it

2    was going to be a live hearing with live witnesses, instead of

3    relying on what I thought was the Local Rule, then we would have

4    subpoenaed Mr. Waterhouse.  He was not there because we're

5    trying to hide him or anyone is trying to him.

6          MR. MORRIS:  Your Honor, just to be very clear as to

7    what happened, I didn't — I served a subpoena on the person who

8    submitted a declaration in support of the motion.  I didn't call

9    any other witnesses, okay, so and I think that that was the

10   substance of Your Honor's ruling, was that if you — if you want

11   to submit a declaration, you have to put — you know when

12   somebody wants to cross-examine, you have to be able to do that.

13   And that's all I did.

14         THE COURT:  Okay.  All right.  Well, I'm going to

15   grant the motion to strike, but I am going to deny a request to

16   issue a contempt order or to impose any sanctions.  I find the

17   latter somewhat of a close call, I will tell you all.  But if

18   it's a close call on something as serious as contempt or

19   sanctions, I think the better exercise of discretion is not to

20   order contempt or sanctions.  And let me be clear about a couple

21   of things.

22         I feel like what we have had here has sounded a whole

23   lot like the defendants rearguing motions that I've earlier

24   denied.  You know as I recall, and it's been a few weeks, with

25   regard to the Steven Pully report, you know I had no doubt about

*Plaintiff's Motion to Strike*                                    52

1   his stellar credentials or anything like that, I simply thought

2   not only was it too late in the game but this was not a proper

3   subject matter for expert testimony as I understood the nature

4   of what he was potentially going to be added for.  And I do

5   agree very much with Mr. Morris' argument that he's worse off

6   than had he not won the motion earlier, because it will be there

7   in the record and maybe he won't end up having a chance to

8   depose or put on his own refuting evidence.

9           You know I gave one hypo, and the defendant lawyer

10   said, oh, we would agree, you know, to reopen discovery or

11   whatnot.  You know I'm also worried about a district court staff

12   who has stacks and stacks of papers who, just like I and my

13   staff, sometimes have troubling keeping up with what's in the

14   record and what's not.  You know they may look at it

15   inadvertently in the scenario that they deny the motion for

16   reconsideration that has been filed by the defendant.  So this

17   must be stricken.

18           And then with regard to the new defense that was

19   attempted of Waterhouse did not personally, physically sign the

20   notes, again I feel like we've had a reargument of my Court's

21   denial of the Rule 15 motion to amend here today, but let me be

22   clear.  You know we always say context matters.  And when this

23   Court denied the Rule 15 motion, you know more often than not

24   certainly this Court gives leave to amend in a Rule 15 context,

25   but the Court did not view this as any run-of-the-mill Rule 15

*Plaintiff's Motion to Strike*                                                53

1    motion.  We had, here's the context:  Notes that I think in the

2    aggregate two HCMFA notes that were 7.6, $7.7 million that were

3    executed or not on May 2nd and May 3rd, 2019, just five months

4    before the bankruptcy.  It seemed, I'll be blunt, not remotely

5    credible what was being urged here at the eleventh hour, or

6    many, many months into the litigation, that an individual who

7    was CFO of Highland and I guess treasurer, I think that was his

8    title, with HCMFA, that he had not from the get-go, when he was

9    totally accessible to the defendants for many months, because he

10   now works in the Skyview new startup of former Highland

11   employees, it just seemed inconceivable that this late in the

12   game suddenly there was a new-found 'Oh, he didn't sign the

13   notes,' it just did not seem remotely true to the Court, based

14   on what was put before me at that hearing.  So I was not going

15   to allow a late-in-the-game Rule 15 amendment when I absolutely

16   did not find the evidence credible to support the motion.

17          So I am going to grant the motion to strike any

18   references to this defense of Waterhouse did not actually just

19   sign the notes.  So, again, I'm denying any sanctions.  I'm

20   going to take the defendants at their word that they were

21   somehow needing to do this to preserve the record on appeal but

22   they've got other ways of preserving and I'm not letting this in

23   the record.

24          Mr. Morris, I am going to ask you to upload an order

25   that needs to be specific.  I mean I know it's easy to carve out

*Plaintiff's Motion to Strike*                                     54

1    the Pully report, but as far as any and all references to the

2    Waterhouse-did-not-sign-the-notes defense, I would prefer for

3    you to sift through and put in the order where those are so the

4    record is just —

5            MR. MORRIS:  Your Honor, if I may, we've already done

6    that, and I think attached to my declaration in support of the

7    motion to strike, which —

8            THE COURT:  Okay.

9            MR. MORRIS:  — just as one example, could be found at

10   the HCMFA Docket 131.  We already highlighted the portions of

11   the pleadings that we thought ought to be stricken as amended by

12   the errata that was —

13           THE COURT:  Oh, that's —

14           MR. MORRIS:  — filed at Docket 141.

15           THE COURT:  That's —

16           MR. MORRIS:  That's what the errata is, because I made

17   a mistake, so we corrected that.

18           THE COURT:  Okay.

19           MR. MORRIS:  But what I'd like to do with the

20   permission of the Court is simply attach those pleadings to the

21   order and deem their pleadings amended to strike the language

22   that — that I've already put into the record in support of the

23   motion.

24           THE COURT:  Okay.  That will work for me mechanically.

25           All right.  Well, let's figure out —

*Plaintiff's Motion to Strike*                                                55

1          MR. RUKAVINA:  Your Honor, may I — Your Honor, I have

2    an important question.

3          THE COURT:  Okay, go ahead.

4          MR. RUKAVINA:  So I understand that I will — I

5    understand that will not be allowed to reference that defense

6    today.  I'm obviously willing to respect and follow the Court's

7    instruction.

8          I want to make it clear that the Court is not trying

9    to prevent me from — from arguing anything that has to do with

10   that in front of Judge Starr.

11         THE COURT:  I don't know what — what you mean.  Are

12   you — well, what do you mean?  I mean there's either going to be

13   a trial in front of him or not.  I doubt he's very likely to

14   give another oral argument on this, but is that what you're

15   talking about, in the unlikely event he gives a second oral

16   argument on this?

17         MR. RUKAVINA:  Your Honor, we have not had oral

18   argument in front of Judge Starr.  My only concern is that —

19   that if the Court reports and recommends that the MSJ be

20   granted, I believe that I should have the ability before another

21   court to say you should not grant — you should not — you should

22   not go with Judge Jernigan's report and recommendation in part

23   because I was prohibited from raising this defense.

24         Again, I just want to make sure that — that an order

25   commanding me not to say something applies before this Court but

*Plaintiff's Motion to Strike*                                           56

1    the Court is not trying to prohibit me from — from, in front of

2    any other court, raising whatever defense might be at the court

3    appropriate.

4            MR. MORRIS:  If I may, Your Honor?

5            THE COURT:  You may.  I guess I'm thinking through the

6    most likely scenario, —

7            MR. MORRIS:  Insert, yes, —

8            THE COURT:  — that the most likely scenario, I guess,

9    is if I make a report and recommendation, grant partial summary

10   judgment, and then there's a time period and the local district

11   court rules where a party can object to the report and

12   recommendation, Mr. Rukavina wants to say, 'I object and one of

13   the reasons I object is the Court didn't consider this

14   argument,' and he wants to know he won't somehow be sanctioned

15   or prohibited by my ruling from making that argument.

16           Am I — am I getting that correctly — correct, Mr.

17   Rukavina?

18           MR. RUKAVINA:  That's exactly — that's exactly —

19   that's exactly correct, Your Honor.  Because, again, I'm going

20   to take contempt very seriously.

21           MR. MORRIS:  And, to be clear from my perspective,

22   Your Honor, I fully expect the defendants, whether it's through

23   an appeal of the prior orders or this particular order or

24   through an objection to your report and recommendations, to try

25   to persuade the district court that your decisions on these

*Plaintiff's Motion to Strike*                                                    57

1    matters was incorrect.  What I would not expect them to do is to

2    simply put the Pully report and make this argument as part — as

3    part of their merits-based objection.  Because there are orders

4    of the Court right now, so I want to be very clear about this,

5    there will be four different orders of the Court.  There will be

6    a scheduling order.  There will be the orders denying the motion

7    for leave to amend, the motion to put in the Pully report.

8    There will be the order on this.  These are orders of the Court.

9    You don't just pretend that they don't exist and just present

10   the same evidence and the same arguments to the district court.

11   What I think you do is you would either appeal these orders or,

12   at a minimum, and I'm not giving advice here and I'm not

13   consenting to anything, but I would think the approach would be

14   to either appeal the relevant orders or to — or to object to the

15   — to the report and recommendation.  This is if Your Honor

16   recommends that the motion be granted in any respect and say

17   that, you know, the motion — the Court — the district court

18   shouldn't accept the bankruptcy court's recommendation because

19   they improperly excluded evidence.  So if that's all they're

20   trying to do, they shouldn't expect any concern from me, but if

21   they try to introduce the Pully report, you know, for

22   substantive purposes or try to — without having these orders

23   overturned, that's when — that's when they will need a —

24          MR. RUKAVINA:  No, Mr. — Mr. Morris is completely

25   correct, Your Honor.  Of course we're not just going to willy

*Plaintiff's Motion to Strike*                                        58

1   nilly tell the district court, you know, consider these things

2   regardless of what Judge Jernigan ordered.  I just want to make

3   sure that by going to the district court and saying, 'Here's an

4   order that I would like you to reconsider or reverse,' that I am

5   not by raising the defense violating this Court's order.  And I

6   — just, again, I'm — I've got to protect myself, I've got to

7   respect the Court, I've got to protect my client.

8              THE COURT:  Okay.

9              MR. RUKAVINA:  I just want to make sure that I don't

10  run afoul of that —

11             THE COURT:  I think we're all on the same page here,

12  and that being that certainly you can appeal the order I entered

13  today, you can continue to pursue your motion for

14  reconsideration that's already on file in the district court,

15  and you can argue — in the scenario I grant the motion for

16  partial summary judgment — and let me rephrase that.  I don't

17  grant it.  There would be a scenario where I might make a report

18  and recommendation to the district court that it grant it.  In

19  that scenario, you can follow the district court rules and

20  object to that report and argue among your complaints I should

21  have considered the Pully report — without attaching it — and I

22  should have allowed this defense of Frank Waterhouse did not

23  physically sign.  You can make that argument, but, again, that

24  would be in the context of either an appeal of today's order or

25  an objection to a possible report and recommendation of this

*Defendants' Motion to Strike* 59

1   Court.  Okay?

2          All right.  So it's 11:08 according to my clock.  I

3   had allocated 30 minutes for the defendant's motion to strike.

4   Can we — you know, it's 15 minutes each side — can we get

5   through that before we take a break?  Is everyone good?

6          All right.

7          MR. AIGEN:  Yes, Your Honor.

8          THE COURT:  Well, who will take the lead, Mr. Root?

9          MR. AIGEN:  No, I will, Your Honor.

10         THE COURT:  Okay.

11         MR. AIGEN:  Mr. Aigen.

12         THE COURT:  You may proceed —

13         MR. AIGEN:  Are you ready for me to proceed?

14         THE COURT:  Yes, please.

15         MR. AIGEN:  Thank you, Your Honor.

16         As I said, Michael Aigen from Stinson, representing

17  the defendants.  And what I will be doing today is arguing

18  defendants' motion to strike, specifically I'll be arguing that

19  the Court must strike plaintiff's supplemental appendix from the

20  record because it was filed in violation of the rules.

21         As you know, back in December plaintiff filed its

22  motion for summary judgment.  And its summary judgment,

23  plaintiff sought summary judgment on defendants' prepayment

24  defenses, which were asserted by two defendants, NexPoint and

25  HCMS.  We then filed our response.  In our response, we pointed

*Defendants' Motion to Strike*                                             60

1   out that plaintiff forgot, for whatever reason, to include any

2   evidence or any arguments with respect to HCMS' prepayment

3   defense, as opposed to NexPoint, which was actually briefed by

4   plaintiff.

5          So then in February of this year, plaintiff filed its

6   reply.  Along with its reply, it filed an additional appendix

7   continuing new summary judgment evidence.  What this new summary

8   judgment evidence included was a declaration from Mr. Klos,

9   which was two pages of new testimony from him attempting to

10  address, for the first time, HCMS' prepayment defense.

11         Now nowhere in the reply did plaintiff even attempt to

12  explain why it didn't include this testimony in its original

13  motion or why it should be allowed to introduce new evidence in

14  violation of the rules.  I conferred with counsel for plaintiff

15  about this and gave them an opportunity to either withdraw the

16  Klos declaration or explain why this new evidence in the reply

17  was appropriate.  In response, rather than withdrawing it or

18  even providing any legal authority, the only answer I got was

19  the reply declaration was a classic reply.  I'm not really sure

20  what that means, but respectfully it doesn't really matter at

21  this point.

22         As you're well aware, the Northern District of Texas,

23  as does throughout the Fifth Circuit, unambiguously prohibits

24  summary judgment movant from introducing new evidence in its

25  reply.  This is not a controversial legal proposition and it's

*Defendants' Motion to Strike*                                                      61

1    not only not disputed by plaintiff but this general rule is

2    stated in all of the cases that plaintiff put in its brief.  And

3    this makes sense.  It's designed in order to avoid prejudice,

4    like we'd have here where we'd have no opportunity to contest or

5    address evidence filed on part of a summary judgment.  The

6    Racetrack Petroleum (phonetic) case we cited is just like our

7    case, where the district court considered this exact issue,

8    defendant filed a summary judgment reply and submitted new

9    evidence with it, and the plaintiff sought to strike it, and the

10   district court struck it as new evidence.

11          And, to make matters worse here, plaintiff still

12   hasn't even bothered to file a motion for leave or sought leave

13   in any way here.  Instead, their argument is plaintiff suggests

14   that the new Klos declaration is somehow proper because the HCMS

15   prepayment defense was made for the first time in the summary

16   judgment response.  This is in their response at paragraph 20.

17          Two points here.  Initially, that simply is not true.

18   As we explained in detail in our reply, we confirmed to counsel

19   that the prepayment defense was part of our justification

20   defense.  And, as a result, our corporate rep was questioned at

21   length on this defense by plaintiff.  In other words, plaintiff

22   is not going to be able to sit here and seriously argue today

23   that it was not aware that HCMS was asserting its prepayment

24   defense when plaintiff filed its summary judgment, after it

25   specifically deposed our witness on this exact defense.

*Defendants' Motion to Strike*                                                62

1          Plaintiff's only specific complaints about our

2     client's testimony related to defense is that our corporate rep

3     didn't memorize the exact dates on when these specific payments

4     were made, something that easily could have been resolved if

5     plaintiff's attorney showed the witness the relevant documents

6     as was suggested to him, but they didn't bother to do it, so

7     they didn't get the information they wanted.  That's their only

8     complaint about the questions they asked regarding this defense.

9          In other words, this wasn't a new defense that we

10    raised for the first time in our summary judgment response.

11    That's not the case.  Plaintiff knew about this defense and took

12    discovery on it, but didn't like our answers.  The simple fact

13    is plaintiff either forgot to address HCMS' prepayment defense

14    in its judgment or made some tactical decision to withhold it.

15    They included HCMS in its headings related to the prepayment

16    defense along with NexPoint, but they only address NexPoint.

17    Not sure why, but clearly a mistake was made.

18          More importantly, none of this really matters.  Even

19    if this was a new defense, the law is clear:  New evidence is

20    not allowed in the summary judgment reply.  We detail in our

21    brief, as we talk about in our reply brief, none of the

22    unpublished cases cited by plaintiff say that new evidence is

23    allowed to be submitted in reply briefs.  In fact, those cases

24    recognize the opposite.

25          For example, we have the Lynch case that was cited by

1    plaintiff.  In that case, the court did allow additional

2    evidence but for a very specific reason.  In that case, the new

3    evidence was deposition testimony as obtained — or that was

4    obtained as a result of the other party's request to delay the

5    summary judgment hearing and take this additional discovery.

6    That's obviously not the case here.

7         And these cases, like they cite, like the Banda

8    (phonetic) case cited by plaintiff, actually say that a summary

9    judgment movant may not file a reply brief appendix without

10   first obtaining leave of court.  They could have filed a motion

11   for leave.  They chose not to do it for whatever reason.

12        Additionally, I point out that these few unpublished

13   cases cited by plaintiff, such as the Murray (phonetic) case and

14   the Banda case, only allow new evidence in what the courts call

15   very limited circumstances, where the new evidence was not part

16   of a new argument.  And that's important here because that's

17   clearly not the case here.

18        This is not a situation, Your Honor, where plaintiff

19   is clarifying or even supplementing arguments made in its

20   original motion for summary judgment briefing related to HCMS'

21   prepayment defense.  That's not the case here.  Plaintiff never

22   made any argument related to HMS and its prepayment defense in

23   its original briefing.  This is a completely new argument that

24   they're making for the first time in reply, making the

25   unpublished cases they cited very different than our case.  This

*Defendants' Motion to Strike*                                              64

1    is a simple issue for the Court.  Defendants' request that the

2    Court strike the appendix containing new evidence from the

3    record because it was found in violation of the rules.  To hold

4    otherwise, Your Honor, would be rewarding plaintiff for its

5    failure to follow the rules and either seek leave or file the

6    evidence in the original motion like it was supposed to.

7              Thank you, Your Honor.

8              THE COURT:  All right.  Is this going to be Ms.

9    Winograd's argument?

10             MR. MORRIS:  You're on mute.

11             MS. WINOGRAD:  Good morning, Your Honor.  My name is

12   Hayley Winograd, at Pachulski, Stang, Ziehl and Jones,

13   representing Highland Capital Management, L.P.  May it please

14   the Court?

15             THE COURT:  Yes, you may proceed.

16             MS. WINOGRAD:  I agree with opposing counsel.  This is

17   a very straightforward issue, Your Honor.  There is nothing

18   complicated about it.

19             The second Klos declaration is properly — is properly

20   included with the reply because it serves the sole purpose to

21   rebut argument and evidence raised by HCMS for the first time in

22   its response brief.  Fifth Circuit law is clear that when a

23   nonmovant raises evidence or argument for the first time in its

24   response to summary judgment, the movant is entitled to address

25   and rebut that argument in its reply.  That's exactly what

*Defendants' Motion to Strike* 65

1    happened here.

2         Highland did not learn of but facts underlying HCMS'

3    prepayment defense until HCMS filed it response to summary

4    judgment.  I want to briefly summarize the time line for the

5    Court.

6         HCMS never actually pled its prepayment defense.  On

7    October 29th of 2021, when counsel deposed Mr. Dondero as HCMS'

8    30(b)(6), Mr. Dondero was unable to identify any substantive

9    allegations underlying HCMS' prepayment defense.  And, most

10   importantly, he did not identify the HCMS amortization schedule.

11        The first time HCMS identified the amortization

12   schedule was in its response to summary judgment.  That opened

13   the door to Highland addressing and rebutting the HCMS

14   prepayment defense premised on the amortization schedule.

15   Highland included the second Klos declaration in its reply for

16   the purpose of addressing and rebutting the prepayment defense

17   premised on the amortization schedule.  This is not the type of

18   new evidence or new legal theory contemplated under Local Rule

19   56.7 because it does not constitute new argument.  It is

20   rebuttal argument.  It is precisely the type of reply evidence

21   permitted under Fifth Circuit law.

22        I don't want to bog the Court down with case law, but

23   I do want to flag one case particularly on point and that is

24   Lynch v. Union Pacific Railroad.  It's a Northern District of

25   Texas case cited in our papers and discussed by Mr. Aigen.

*Defendants' Motion to Strike*                                               66

1          The Court denied the nonmovants' motion to strike

2     evidence attached to the movant's reply in support of summary

3     judgment, noting that evidence was specifically directed at and

4     responsive to arguments and evidence relied on the nonmovant in

5     their response.  Noting this is not a situation in which new

6     issues were raised for the first time in a reply, the Court held

7     that to hold otherwise would allow the nonmovant an unfair

8     advantage, using a gotcha procedural approach.  Here too the

9     evidence attached to Highland's reply in support of summary

10    judgment is specifically directed at and responsive to evidence

11    and argument — arguments raised for the first time in HCMS'

12    response to summary judgment.

13         In suggesting that there is somehow a blanket

14    prohibition on attaching evidence to a reply in any and all

15    circumstances in summary judgment, defendants ignore the law.

16    But defendants must agree with the law on some level, because

17    they attach an appendix to their reply in support of their

18    motion to strike Highland's reply appendix.  And they did so for

19    the simple and proper purpose of rebutting an argument Highland

20    made in its response to defendants' motion to strike.  And it's

21    not a reply in support of summary judgment, but it's the same

22    concept.

23         The notion that Highland somehow forgot to address the

24    HCMS prepayment defense in its motion for summary judgment is

25    belied by the record.  Two defendants assert the prepayment

*Defendants' Motion to Strike* 67

1  defense, NexPoint and HCMS.  Highland was able to adequately

2  address NexPoint's prepayment defense in its motion for summary

3  judgment because Highland was aware that in support of that

4  defense, NexPoint was specifically relying on the NexPoint

5  amortization schedule.

6          The NexPoint amortization schedule was referenced

7  extensively throughout counsel's depositions of Klos, Seery, and

8  Hendrix.  The same is not true with HCMS.  HCMS never identified

9  the amortization schedule until it filed its response to summary

10  judgment.

11          Defendant also implies and argues in its papers that

12  counsel's vague reference to digging out the spreadsheet during

13  a seven-hour deposition was somehow enough to put Highland on

14  notice that HCMS was relying on its amortization schedule and

15  that we took discovery and that we were actually in possession

16  of this document.  We were in possession of a lot of documents,

17  but it was our job to conduct a fishing expedition in order to

18  figure out what specific document counsel may have been

19  referring to during his deposition.  If Highland was aware that

20  HCMS was specifically relying on the HCMS amortization schedule

21  in connection with its prepayment defense, it would have

22  addressed this defense in its motion for summary judgment but

23  the same way it able to do with NexPoint.

24          Highland's inclusion of the Klos declaration in its

25  reply to summary judgment serves the singular purpose of

*Defendants' Motion to Strike*                                                68

1    addressing and rebutting argument and evidence raised for the

2    first time in HCMS' response to summary judgment in connection

3    with it prepayment defense.  And, in doing so, it serves to

4    close the door on this issue and aid the Court in determining

5    whether, based on all of the evidence before it, there is a

6    genuine issue with material fact regarding the merit of the HCMS

7    prepayment defense.

8            Again, this is not the type of new evidence

9    contemplated under Local Rule 56.7 because it constitutes

10   rebuttal argument.  It serves to rebut argument raised by HCMS

11   in its response to summary judgment.  For these reasons,

12   defendants' motion to strike the reply appendix should be

13   denied.  Thank you.

14           THE COURT:  All right.  Mr. Aigen, your rebuttal.

15           MR. AIGEN:  Yes, Your Honor.  Accepting plaintiff's

16   counsel's argument would mean that any party could sit on their

17   hands, stick their head in the sand, not ask questions about a

18   particular defense, and then have the privilege of putting in

19   all their defenses in a reply and just skip putting it in the

20   motion.  They keep saying this was addressed in the first time

21   for summary judgment, but then also concede and admit and agree

22   with me that they questioned our corporate rep on this exact

23   defense.  It clearly was not a defense we asserted for the first

24   time in summary judgment, when they questioned our witness on

25   it.

*Defendants' Motion to Strike*                                          69

1        They talk about this amortization schedule and tell

2   you we should have identified it, but yet we don't hear a

3   response to when our witness said, 'I don't have the dates

4   memorized,' and our counsel said, 'Why don't you use a document

5   to refresh them,' we don't hear a response as to why counsel

6   didn't say, 'Hey, that's a good idea.  Where is that document,

7   what is that document?'  They just said, 'Nope, I'm fine, stuck

8   their head in the sand and preceded to play a game of Gotcha.

9   That's not how this works.

10        They knew about this defense.  They took discovery on

11  it.  They filed a summary judgment.  And, respectfully, is —

12  there was a date.  The heading says HCMS and NexPoint.  The

13  section and the briefing under it don't even mention HCMS.  If

14  they were relying on the fact that they knew nothing about this

15  defense which was asserted, they would have wrote that in their

16  brief.  If they didn't know HCMS was asserting a prepayment

17  defense, they wouldn't have included them in the caption.

18        They made a mistake.  They want to run from it.

19  That's not proper here.  They have to follow the same rules we

20  do.  They could have filed a motion for relief.  They didn't

21  bother.  Maybe they just didn't want to delay any of these

22  proceedings, I don't know.  They talk about this being classic

23  evidence.  The only case that they've mentioned now is the Lynch

24  case.  And I will reemphasize what I talked before, in Lynch the

25  only case they have brought to you now in this argument that

*Defendants' Motion to Strike*                                           70

1    they think supports them, the additional discovery, the

2    additional evidence was submitted were depositions taken after

3    the summary judgment was filed.  So of course the Court let that

4    in.  The other party requested that discovery and, according,

5    said these are very limited circumstances and you need to go

6    file a motion for relief.

7              I will repeat, Your Honor.  If this is allowed, any

8    party could stick their head in the sand, not ask questions, and

9    all of a sudden they didn't know the answers, so they could wait

10   till the summary judgment reply, put in evidence, and not be

11   able to get I it rebutted.

12             And I think it's important — the Klos declaration,

13   what it talks about in paragraphs 3 and 4.  It talks about the

14   payment was made applied at Mr. Dondero's direction to ensure

15   that the note had no interest outstanding.

16             And, in paragraph 4, it talks about that Mr. Dondero's

17   direction to make the payments conclusively establishes that

18   HCMS knew that all interest due as of December 31st was required

19   to be paid, notwithstanding a prior prepayment.

20             What this means is that Mr. Klos is testifying to

21   directions allegedly made by Mr. Dondero regarding the payment.

22   The reasons that Mr. Klos believes that such payments were made

23   and what he thinks HCMS knew and didn't know, without providing

24   — so, basically, he's testifying on the state and mind of intent

25   of a client, stuff he's never testified to before, without

*Defendants' Motion to Strike* 71

1   giving us the chance to rebut it.  And their reason for thinking

2   they get to do this is they didn't bother asking questions on a

3   defense we asserted, even after it was suggested to them, 'Hey,

4   let's use documents,' and now they have the nerve to come up

5   here and say, oh, well, we — you know, although they produced

6   the document to us, we have too many documents.  How were we

7   supposed to know what document they were going to use even

8   though counsel in the middle of the deposition said, hey, maybe

9   we should use documents to get the answers to this.  And they

10  said, no, we don't feel like it.

11          That's not allowed, Your Honor.  They're here today

12  saying we need to abide by the black letter of every rule.  They

13  need to do the same thing.  Thank you, Your Honor.

14          THE COURT:  A couple of questions.  Do you disagree

15  that this defense was never pleaded?

16          MR. AIGEN:  We pled it as part of justification.  And

17  we made it clear prior to the deposition, just in case, we told

18  counsel, and in correspondence this is recorded, that our

19  prepayment defense was part of justification.  And they then

20  proceeded to take our deposition on that defense.  They had no

21  issues with that.  And if, for some reason, they're taking the

22  position today that this is all based on something we needed to

23  plead and didn't, then that's a proper basis for summary

24  judgment.  It's not a proper basis for violating a completely

25  different rule about what you could stick in a reply brief.  So

*Defendants' Motion to Strike*                                                     72

1    we did plead it, we called it justification —

2          THE COURT:  So elaborate.  So elaborate.  I don't have

3    it in front of me, but I don't know if I need it right in front

4    of me, what was the exact wording of your justification defense?

5          MR. AIGEN:  In the actual answer, which I don't have

6    in front of me, we called it justification, and there wasn't

7    details on it.  And then to make it clear before the corporate

8    rep deposition, because he was testifying on our defenses, we

9    sent a letter saying that similar — and this is in the record, I

10   don't have it right in front of me, but it's part of this where

11   we said to them, hey, this includes the prepayment defense, just

12   like NexPoint.

13         THE COURT:  Okay.

14         MR. AIGEN:  And, again, Your Honor, —

15         THE COURT:  Go ahead.

16         MR. AIGEN:  Sorry.  I was going to say even if what

17   they're trying to argue is we can't bring a defense today

18   because it wasn't pled properly in our answer — which I disagree

19   with — but even if they're saying that, the proper recourse was

20   then to move for summary judgment on that defense, which they

21   knew of, and try to strike it, not to violate the other

22   different rules of their choosing by putting additional evidence

23   in a reply brief.  You don't get to pick and choose which rules

24   you want to violate because you think someone else violated a

25   different rule.  You have to go to court to seek leave to get

*Defendants' Motion to Strike*                                         73

1    the relief you want.

2              THE COURT:   Okay.   What about if you could squarely

3    address the argument that it's — it's rebuttal evidence, it's

4    not new evidence because the amortization scheduled was included

5    in the response?

6              MR. AIGEN:   It's not — that's a good question, Your

7    Honor.   The amortization schedule is our evidence.   What their

8    evidence is, is Mr. Klos coming in and interpreting it and

9    telling you why Mr. Dondero made certain payments, without any

10   discussion of how he knows that.   So the amortization schedule

11   is in the record.   We put it in.   They — we produced it to them.

12   They have it, they had it all along.   The new evidence that

13   we're objecting to is Mr. Klos coming in and providing his

14   subjective interpretation as to what HMS knew and thought and

15   believed when it made payments in accordance with that schedule.

16   That's the reason they want to get the Klos declaration in, not

17   to prove payments were made or not made in the amortization

18   schedule.

19             THE COURT:   You don't think that's rebuttal evidence?

20   You don't think that's rebuttal evidence, rebutting the —

21             MR. AIGEN:   Everything in a reply — yeah, everything

22   in a reply is being used to rebut things we stick in a response.

23   That doesn't change the law that you can't stick new evidence in

24   to do that.   The rules and the law and the cases say you can

25   make rebuttal arguments, you can't stick rebuttal evidence in.

*Defendants' Motion to Strike*                                                74

1    You have to seek motions for leave.  In the very limited

2    situations where courts did allow additional evidence, like we

3    said, all the cases they cite say no new evidence in reply, but

4    let me look at these very exceptional circumstances here.

5              So rebuttal arguments, yes.  Rebuttal evidence, no.

6    And the exceptional circumstances, as I said, the case they rely

7    on is the Lynch case where the discovery and the new evidence

8    they were fighting over was taken after the summary judgment at

9    the request of my side, so of course it made sense for it to

10   come in.  So, yes, they're using it to rebut, but they're using

11   it as rebuttal evidence, which is improper, not rebuttal

12   argument, which would be proper.

13             THE COURT:  Okay.  All right.  I think now is a good

14   time for a break.  I'm going to go deliberate on this a few

15   minutes.  The question is do we want it to be a short 15-minute

16   break or maybe a 30-minute lunch break.  Any — because we're

17   going to have a long, I think, four hours to go here.

18             MR. MORRIS:  To the extent my voice carries any weight

19   at all, Your Honor, my preference would be to take the longer

20   break and then just sit for the summary judgment argument.

21             THE COURT:  Okay.  Votes?

22             MS. DEITSCH-PEREZ:  If I could weigh in, just for the

23   purposes of making sure we're all able to pay attention when

24   we're arguing, I would just ask that if Mr. Morris is going to

25   go on for two hours, that we at least have a break before, you

*Defendants' Motion to Strike*                                           75

1    know, a restroom break before we start up again.

2              THE COURT:  Okay, that makes sense.

3              MR. MORRIS:  No problem with that.  Yeah.

4              THE COURT:  Any — any other views?

5              All right.  Well, let's go ahead and take a 30-minute

6    break.  We'll come back and I'll give a ruling on this motion to

7    strike and then we'll hear Mr. Morris' motion for summary

8    judgment.  And then we'll take another break, you know, a

9    15-minute or so break.  And then I'll hear the defendants'

10   responses.  All right, we'll see you at 12:02.

11             COURT SECURITY OFFICER:  All rise.

12             MR. RUKAVINA:  Thank you, Your Honor.

13             MS. DEITSCH-PEREZ:  Thank you, Your Honor.

14        (Luncheon recess taken from 11:33 a.m. to 12:21 p.m.)

15             COURT SECURITY OFFICER:  All rise.

16             THE COURT:  All right.  Please be seated.

17             I apologize for the wait.  Spent a little more time

18   drilling down on the pending motion to strike than I thought I

19   would need to.

20             We have everyone here it looks like that we need.

21             I have one last question before I give a ruling on the

22   motion to strike the supplemental David Klos declaration.  Is

23   there a stipulation that is somehow relevant to this analysis?

24   I saw in the papers a dangling reference to 'We have the

25   stipulation.'  I think it was — I can't remember if it was an

*Defendants' Motion to Strike* 76

1    attachment, an email attachment to the motion to strike.  I

2    think that's where it was, where there was —

3            MS. WINOGRAD:  Yes, Your Honor.

4            THE COURT:  Go ahead.

5            MS. WINOGRAD:  I can answer that.

6            THE COURT:  Okay.

7            MS. WINOGRAD:  Highland and NexPoint stipulated that

8    NexPoint has a prepayment defense, and you can different that at

9    Adversary Proceeding 21-3005, at Docket Number 146.  And this

10   was filed on January 2nd of 2022.  I don't think there has been

11   a stipulation, though, that HCMS had the prepayment defense.

12           THE COURT:  Okay.  I'm slow to pull that up.  Okay.

13   Which — which adversary?

14           MS. WINOGRAD:  So that's 21-3005 and that's the

15   NexPoint proceeding.

16           THE COURT:  Okay.  And, again, what docket entry

17   number?  146?  146, January 2nd.

18           MS. WINOGRAD:  And this also describes that NexPoint

19   was using as its supporting documentation the amortization

20   schedule.

21           THE COURT:  Um-hum.  Okay.  And, again, the — your

22   argument is this is significant because there was no similar

23   document in connection with the HCMS and that —

24           MS. WINOGRAD:  Exactly.  So —

25           THE COURT:  Go ahead.

*Defendants' Motion to Strike*                                                                 77

1        MR. AIGEN:  Well, no, Your Honor, that argument was

2    never made in the papers.  And I if they did, we would have

3    shown that it was produced to them, as they admitted they had

4    them.  They had the document.  They're not saying they never got

5    the document —

6        THE COURT:  Well, no, they admit they had the

7    document.  I've read in the pleading, it was footnote 8 of their

8    response to this motion to strike that they had it, they

9    produced it on June 9th, before HCMS ever answered.  So I guess

10   what I'm getting at — and, again, I asked her, so she's

11   answering.  You know, this is like —

12       MS. WINOGRAD:  But —

13       THE COURT:  — I wondered back in chambers, as I was

14   reading the pleadings and thinking through this, was there a

15   stipulation that might shed light on this in some sort for me

16   because it — it was referenced in your motion to strike, I

17   think, where you reached out and asked them to withdraw this.

18   And, as I recall, Mr. Morris said no.  And we have the

19   stipulation.  And so I was left dangling which stipulation did

20   that mean.

21       MR. AIGEN:  Your Honor, I may be mistaken, but I think

22   that stipulation was part of an email.  And the reason it was

23   part of the record was the other part of that email was Ms.

24   Deitsch-Perez and making sure the other side was aware that

25   prepayment was part of her justification defense.  And that's

*Defendants' Motion to Strike*                                           78

1    why that email was in there.  I think that also happened to be

2    connected to the email you're talking about with a stipulation.

3    So it certainly — as I — our answer was it wouldn't be relevant

4    but that, I think, is why it was in the record, because it was

5    part of the full email chain with the other part of it.

6              MS. WINOGRAD:  And, Your Honor, if I may be heard,

7    because I believe you asked me a question before counsel

8    interrupted me, —

9              THE COURT:  Go ahead.

10             MS. WINOGRAD:  — trying to get some clarity on our

11   argument.  And I would like to note that you nailed the precise

12   argument.  The argument is while we were on notice as of the end

13   of October of 2021 that HCMS was also asserting a prepayment

14   defense, we were not on notice of the supporting documentation

15   underlying that defense as it pertains to HCMS, the way we were

16   with NexPoint.  We knew NexPoint was using the amortization

17   schedule.  That is — that is the specific document that is

18   central to our argument.  We did not know that HCMS was using

19   this specific document.  That is why we had our reply include

20   the Klos declaration as a rebuttal argument to the HCMS

21   prepayment defense that we learned was premised also on an

22   amortization schedule that was raised — and that was raised for

23   the first time in their response brief that HCMS had never

24   previously introduced or identified the amortization schedule

25   the way that NexPoint did.  And that is why we were able to

*Defendants' Motion to Strike*                                    79

1    address NexPoint's prepayment argument in our initial motion and

2    we weren't with HCMS.

3                  MR. AIGEN:  And, Your Honor, as we put in our motion,

4    Ms. Deitsch-Perez during the deposition, when they tried to make

5    it a memory test, said, 'Hey, why don't you use the schedules

6    that show the payments,' and the answer from counsel was, 'No,

7    thank you.  I'll do it my way.'

8                  So I don't know what else they needed other than us

9    introducing exhibits and putting on our own case during our own

10   corporate rep deposition.  They took the deposition, they asked

11   the questions.  They didn't say what documents, or anything.

12   But counsel still said, our counsel, our side, said, 'Hey, why

13   don't you use the documents,' and their answer was literally,

14   'No, thank you.'

15                 MS. WINOGRAD:  But —

16                 MR. AIGEN:  Not, 'I'll get back to it later'; 'Hey,

17   tell me what documents'; 'They didn't serve discovery; what are

18   you relying on?'  We offered it to them, and they said no thank

19   you.  They're sticking their head in their sand, and they don't

20   get rewarded for that, Your Honor.

21                 MS. WINOGRAD:  It's — the burden is on the defendants

22   to prove each element of their affirmative defense.  When we

23   asked from the belt their prepayment defense, they could not

24   provide us with any allegations in support of that defense,

25   including in pertinent part the amortization schedule they are

*Plaintiff's Motion for Partial Summary Judgment*                    80

1   now relying on.  It is not our burden to tell them what

2   documents they are relying on.

3           THE COURT:  Okay.

4           MR. AIGEN:  Your Honor, I don't know what can't — what

5   didn't provide.  Counsel said, 'Hey, use the documents.'  and

6   they said, 'No, thank you.'

7           THE COURT:  All right.

8           MR. AIGEN:  Well, you can use the documents that shows

9   payments.  They wanted to make a memory test.

10          THE COURT:  I've heard enough.

11          Well, thank you all for your arguments.  I know a lot

12  of ink was spilled on this issue and, like I said earlier this

13  morning, this is not a terribly easy contested matter.  But I am

14  going to grant the motion to strike.  I guess what matters to me

15  more than anything else is that the amortization schedule for

16  HCMS was not a surprise to the plaintiff, in fact they are the

17  ones who apparently initially produced it, again according to

18  this footnote, on June 9th, 2021.  So I am going to stick to the

19  normal rule that we don't attach evidence to a reply absent a

20  motion for leave and the Court having a contested hearing on

21  that.

22          So I will ask Mr. Aigen to upload an order on that

23  motion.

24          All right.  Well, at long last, it's 12:30.  We'll now

25  turn to the motion of Highland for partial summary judgment on

*Plaintiff's Motion for Partial Summary Judgment*                    81

1    each of these different notes.

2             Mr. Morris, you may proceed.

3             MR. MORRIS:  Thank you, Your Honor.  John Morris,

4    Pachulski, Stang, Ziehl and Jones, for Highland Capital

5    Management, L.P.

6             I want to begin, Your Honor, by thanking you and your

7    staff for the work that's been done on this.  This should have

8    been a simple collection — collection action on some unambiguous

9    promissory notes, but the record is obviously quite voluminous.

10   And I've spend the last, you know, year plus kind of playing

11   whack the mole and trying to figure out where the defense is

12   going to shift.  Every time I find evidence to rebut an

13   assertion or a contention, a new one arises, a new defense

14   arises, a new twist on the defense arises.

15            And it's been — it's been challenging, but I don't

16   think that all of the maneuvers mount to a hill of beans,

17   frankly.  I think that the presentation that we made in our

18   motion and in our reply, Your Honor, I'm certain that you've —

19   you've spent some time with that.  I'm a hundred percent

20   confident that my team and I have fairly cited to the

21   evidentiary record.  There is actually very little argument, I

22   think, that we make in our papers.  It is more a presentation of

23   what we believe are the undisputed facts.

24            And, again, I appreciate you — this has been —

25        (Tones.)

*Plaintiff's Motion for Partial Summary Judgment*                    82

 1          MR. MORRIS:  — a lot of work for everybody, and let's

 2   just — let's just get on with this now.

 3          And so I'd ask Ms. Canty if she could put up the slide

 4   deck that I circulated to the Court and to counsel prior to the

 5   beginning of this matter.  And if we could just go to the next

 6   slide.

 7          I want to begin, Your Honor, where I think I ought to,

 8   and that is the law.  And I don't presume to tell the Court what

 9   the law is.  The law on summary judgment, I'm sure, is well

10   known to the Court, but with those kind of cautionary remarks, I

11   would just like to go through the legal standards which,

12   consistent with my practice, I try to footnote everything so the

13   Court can see exactly where it's coming from, so you can see the

14   paragraphs of our brief that the following comes from.  And I

15   don't think there's any dispute about the standards, so let me

16   just go through it quickly.

17          Obviously under Rule 56(d), the standard is that there

18   be no genuine dispute of a material fact, right.  And so what

19   does "genuine" mean?  A dispute about a material fact is genuine

20   if the evidence is such that a reasonable jury could return a

21   verdict in favor of the nonmoving party.  That's — that's the

22   standard, right.  It's not is there a — you know, it's not a

23   criminal case, I don't have to prove beyond reasonable doubt.  I

24   don't have to prove, you know, any standard other than this one.

25          I don't have to prove that there's no disputes of

*Plaintiff's Motion for Partial Summary Judgment*                83

1    fact.  Obviously, you know, if I said today is Wednesday, the

2    defendants would probably say, no, it's not, it's the day after

3    Tuesday, or it's the day before Thursday.  This is — you know,

4    this is the nature of this particular case.  But let's be clear.

5    A dispute about a material fact is genuine only if the evidence

6    is such that a reasonable could return a verdict in favor of the

7    nonmoving party.

8            I think it can meet its burden in one of two weeks.

9    It can demonstrate an absence of evidence, supporting the

10   nonmoving party's claims or, in this case, defenses; or it can

11   succeed by proving the absence of a genuine issue of disputed

12   material fact.

13           The defendants have to show here, more than some

14   metaphysical doubt as to the material facts.  They can't satisfy

15   their burden by relying on conclusory allegations or

16   unsubstantiated assertions are only a scintilla of evidence.

17   The Fifth Circuit has held where critical evidence is so weak or

18   tenuous on an essential fact that it could not support a

19   judgment in favor of the nonmovant or where it is so

20   overwhelming that it mandates judgment in favor of the movant,

21   summary judgment is appropriate.

22           And if we go to the next slide, here is the thing,

23   Your Honor, in all that paper you have, the part that consumes

24   the least amount is our claims, our claims for breach of the

25   demand notes and breach of the term notes.  And why is that?

*Plaintiff's Motion for Partial Summary Judgment*                    84

1    Because there is no way to contest it with the exception of

2    HCMFA.   And I know Mr. Rukavina has passionately attempted to

3    argue that they're not liable under the notes, but in the

4    evidence that we cited to in our motion, in Mr. Dondero's

5    declaration he really admits — although I don't know what Soft

6    Note is, that's just my own lack of knowledge I guess — I don't

7    think that it matters that it was unsecured, right, I don't

8    think any of that matters, but the essential elements are met.

9    There are, with the exception of HCMFA, everybody agrees that

10   they signed the notes, everybody agrees that they received the

11   money, everybody agrees that the notes were given in exchange,

12   and everybody agrees that they didn't pay in December 2020.   And

13   so what we put on the screen, which we take from the first Klos

14   declaration, as to which there was no objection, the damages

15   that arose, you know, unpaid principal and interest as of the

16   date of the motion.   And obviously this will have to be updated

17   if this Court either recommends and the district court grants

18   or, you know, whenever we get a judgment, if we ever get a

19   judgment this will have to be updated, but we present on this

20   slide the damages as of the motion date for the demand notes.

21          And if we can go to the next slide, we've got the

22   damages under the term notes.   And then we're entitled to cost

23   of collection.   Whether it's a demand note or whether it's a

24   term note, they both unambiguously provide that if we have to go

25   to bankruptcy court or otherwise seek to collect, you know,

*Plaintiff's Motion for Partial Summary Judgment*                                    85

1    engage counsel, we're entitled to our costs of collection.

2    We've put in a lot of evidence about those costs, but we can't —

3    you know, we're like a dog chasing our tail here, those costs

4    continue to increase at this moment.

5            And so we specifically noted in our motion at

6    footnotes 31 and 32, I believe, that we reserve the right, that

7    we wanted an opportunity to come in and litigate, you know, the

8    issue of costs.  And, in fact, that's exactly what Rule 54(d)(2)

9    provides.

10           So if a judgment is entered, we'll have that

11   opportunity.  And the only thing that we ask the Court to find

12   here, if the Court finds that we're entitled to any portion of

13   the motion for summary judgment or, you know, if you're going to

14   make that recommendation, that you also make the recommendation

15   that Highland is entitled to its costs and fees pursuant to the

16   plain and unambiguous terms of the notes.

17           If we can go to the next page.  This is just a summary

18   of the various defenses.  Just to try to make it easy so the

19   Court has a score card, there is, you know, four or five

20   principal defenses, different defendants assert different

21   defenses, so we have just kind of laid it out here so the Court

22   has an understanding, right.  And the reason that HCMFA doesn't

23   claim the oral argument subsequent — condition subsequent defend

24   is because they claim that the note should never have been

25   signed, it was a mistake and without authority.  So they can't —

*Plaintiff's Motion for Partial Summary Judgment*                    86

1   I guess they could have pleaded in the alternative, but they

2   didn't.  And so you've got — you know you've got some

3   differences, right?  The failure to perform under the shared

4   services agreement.  That would be inconsistent with HCMFA's

5   defense, and I don't even think Mr. Dondero contends that he had

6   a shared services agreement.  And no defendant except for

7   NexPoint or HCMS contends that they prepaid.

8            So that's kind of a summary of the allegations.  And I

9   want to start with the first one, the oral agreement, the

10  condition subsequent.  If we can go to the next slide.  I'm sure

11  Your Honor has heard the saying, you know, people don't like to

12  see how the sausage is made and there's a reason for that.  And

13  the reason is it's usually pretty ugly.  But what we set out

14  very clearly in our moving papers, which I think was completely

15  ignored by the defendants is how the allegations concerning this

16  alleged agreement that Mr. Dondero or agreements that Mr.

17  Dondero entered into with his sister materially changed over

18  time.

19           And I think that that's critical, because if you go

20  back to the legal standard, Your Honor, of course you know one

21  of the things you'll have to consider in issuing your report and

22  recommendations is whether a reasonable jury is going to buy

23  this defense.  Are there enough disputed facts that would enable

24  a jury to say, yeah, this defense makes sense to me.  This is

25  totally credible.

1        I'm not asking you to make credibility findings on

2   witnesses, right.  You haven't seen any witnesses to do that.

3   You're just reading paper, but — but these are the undisputed

4   facts.  There are — everything I'm about to say is undisputed.

5        These actions were commenced in January of 2021.  And

6   in Mr. Dondero's initial answer on March 3rd, again citations to

7   the footnote here, Mr. Dondero asserted that Highland was not

8   entitled to recover on the notes and that their claims should

9   be, quote, barred, because it was previously agreed that

10  plaintiff would not collect on the notes.  So that was his

11  position:  You can't collect because there is an agreement that

12  you wouldn't collect.  Okay.

13        What's really — what's really notable here, and I'll

14  talk about this more in a moment, is that none of the other

15  three corporate defendants, NexPoint, HCMS, HCRA, who now assert

16  the exact same defense, none of them put that in their initial

17  answer.  And why is that significant, Your Honor?  Because Mr.

18  Dondero is the source of this affirmative defense that he put

19  into his defense.  Why wasn't it put into any of the corporate

20  defendants' defenses initially?  And obviously that's a question

21  that I would ask Mr. Dondero if we were actually in front of a

22  jury:  How do you explain the fact that you forgot to assert

23  this defense on behalf of all of these corporate defendants?

24        So we proceed.  We served some discovery.  We asked

25  Mr. Dondero in light of this defense admit that you didn't pay

*Plaintiff's Motion for Partial Summary Judgment*                    88

1    any taxes on the money that the plaintiff agreed not to collect.

2    And realizing that he didn't pay taxes, right, this is

3    undisputed facts, he answered — he amended his answer at the

4    last second, I think he was within the time period where he

5    could still unilaterally amend his answer, to add the magic

6    words:  Upon fulfillment of conditions subsequent.  So now

7    instead of an agreement in the past that was already in place

8    for forgiveness, now it was going to be dependent on some future

9    event.

10            Ten days later, because this is an adversary

11    proceeding and you have to comply with Rule 26, Mr. Dondero

12    makes his initial disclosures under Rule 26.  And this is not

13    some, you know, happenstance kind of presentation.  Mr. Dondero

14    took the time to identify 15, quote, individuals likely to have

15    discoverable information.  But his sister wasn't on it.  So if

16    we ever get to a jury, he's going to have to explain to a jury

17    why he forgot in his long list of more than a dozen individuals,

18    which I think includes me, by the way, he thought to include me,

19    but he didn't include his sister, the person with whom he

20    entered these agreements.  And, remember, Your Honor, we got

21    this in our — I think it's in our reply.  If you look at Mr.

22    Johnson, Mr. Dondero's expert, his analysis of Mr. Dondero's

23    compensation, he was only paid $500,000 a year for the three

24    years during which all of these notes were entered, for a total

25    of about a million five or a million seven, and we're talking

*Plaintiff's Motion for Partial Summary Judgment*                    89

1    about the forgiveness of $70 million of notes, right.  Can you

2    imagine sitting in front of a jury and saying what would you do

3    — and we're going to talk about this in a moment — if you made

4    $50,000 a year and somebody said there's a way to get two

5    million.  Well, that's the position that Mr. Dondero found

6    himself in.  And yet on April 15th, he forgot his sister.  He's

7    going to have to explain that to the jury.

8            But it gets better, because — or better for us,

9    anyway.  This is the sausage being made, Your Honor.  This is

10   what I meant about whacking the mole.  So now on December — on

11   April 26th, he answers some additional discovery requests.  And

12   we ask him specifically:  Who entered the agreement on behalf of

13   the debtor.  Who entered the agreement on behalf of Highland.

14           Again, you can look at Exhibit 82, page 4, Answer to

15   Interrogatory Number 1, these are just undisputed facts that Mr.

16   Dondero said, quote:  The agreements were entered into on behalf

17   of the debtor by James Dondero, subsequent to the time each note

18   was executed.  He did.  That's his story.  This is in response

19   to interrogatories.  I believe they're sworn.  But whether they

20   are or they aren't, the fact remains that as of April 26th, he

21   took responsibility and said he entered the inter- — into the

22   agreements by himself.

23           He was also asked now more specifically, not just to

24   disclose who had information, who he thought had information

25   about the case, we served him an interrogatory that says:  Tell

*Plaintiff's Motion for Partial Summary Judgment*                    90

1    us everybody who knows about the alleged agreements.  Tell us

2    everybody.  And, again, he identifies five people, none of whom

3    have any relevant evidence, by the way.  Right, they're not —

4    they weren't deposed, they're not — there's nothing in the

5    record about the people who he actually identified.  But, again,

6    kind of a glaring omission.  Who has actual knowledge of the

7    alleged agreement, not Nancy.  Not in this interrogatory

8    response.  Sausages being made.

9           They make a motion to compel, Your Honor.  I don't

10   know if you recall, but they made a motion to compel to require

11   Jim Seery to testify, I think, about the history of the

12   forgiveness of loans.  And we opposed the motion.  And we had an

13   oral argument.  And, if my colleague Ms. Canty can put up on the

14   screen the transcript of the hearing, just a portion of it, so

15   this is the hearing.  The hearing occurs on May 20th.  And if we

16   can go to page 23, towards the bottom, you're going — my

17   response to this, Your Honor.

18          So I say, quote, let's look at what the defenses are,

19   and why we feel like it's a burden to even entertain these

20   concepts, his first answer, Your Honor, said that the notes were

21   forgiven based on an agreement.  So we asked him in an

22   interrogatory or a request to admit, I forget which, shows us

23   your tax returns, that you paid the taxes.  Of course he didn't

24   pay the taxes because of course the note wasn't forgiven.  So

25   instead he amends his answers, he amends the affirmative defense

*Plaintiff's Motion for Partial Summary Judgment*                    91

1    to add the words:  Pursuant to a condition subsequent.

2           Okay, he didn't say that the first time.  The first

3    time it was:  It was forgiven.  And now it's not forgiven.  But

4    it's basically deferred until a condition subsequent.  So he's

5    not even contending, if you look at his amended answer, he's not

6    even contending that it was forgiven.  He's simply saying that

7    the obligation to repay has been deferred pursuant to an oral

8    agreement, under which he does not have to pay, until the debtor

9    completes the liquidation of his assets.  Basically, if you read

10   it, that's what it says, and that's how we got here.

11          Keep scrolling, please.

12          I continue.  I don't know if you picked up on it, Your

13   Honor, but in response to an interrogatory, when we said, "Who

14   made the agreement on behalf of the debtor," Mr. Dondero said

15   that he did.  Okay, this isn't an oral agreement unless he was

16   talking to himself.  This is something that happened, according

17   to him, in his head, that somehow he, as the maker of the note,

18   had a discussion with himself in his capacity as the chief

19   executive officer of the debtor, and the two of them, in his

20   head, agreed that he wouldn't have to pay.  Initially wouldn't

21   have to pay at all and now apparently doesn't have to pay until

22   the debtor completes its sale of assets.  This is what the

23   defense is here.

24          Please continue.

25          So let's be very, very clear about it.  It's not an

1    oral agreement, it's something that he's making up in his head

2    that he didn't make up the first time, that he changed the

3    second time, and that he, that he can't describe at all.  One of

4    the interrogatories said, "When did this take place," he didn't

5    answer that part of the interrogatory.  He wasn't — he hasn't

6    told us.

7              So you could take this down.

8              This is where we are on May 20th.  We've had one big —

9    we've had one substantive changed of the defense from 'They told

10   me I wouldn't have to pay' to 'They told me I wouldn't have to

11   pay based on condition subsequent.'  We've had Rule 26

12   disclosures, no Nancy.  We've had interrogatory response, 'Tell

13   us who has knowledge of the alleged agreement,' no Nancy.  We

14   have an interrogatory response where Mr. Dondero says that he

15   made the agreement.  And so we have this hearing on the 20th and

16   it's got to be a little humiliating, right.  Everybody's got to

17   know this isn't going well.  And so what happens?  He goes back

18   to the office, he meets with his lawyers, and the next week they

19   amended Rule 26 responses, they amend their discovery responses

20   to add Nancy Dondero, and Mr. Dondero testifies on May 28th.

21   This is all record, it's part of Mr. Dondero's transcript.

22             This is how the sausage is made, Your Honor.  You

23   thought that this defense was probably like, yeah, this has been

24   the defense.  It hasn't been the defense, it has changed.  How

25   is Mr. Dondero and Nancy Dondero going to stand up in front of a

*Plaintiff's Motion for Partial Summary Judgment*                    93

1    jury and explain this?  Because here is one last fact.  Some

2    time after May 28th, after all of this happened, after they come

3    up with the Nancy Dondero story, right, his sister, that's when

4    NexPoint, HCMS, and HCRE adopt the same defense.  And that, in

5    conjunction with the withdrawal of the reference, I don't have

6    to remind Your Honor this is what's happening in June of 2021,

7    where we finally just say, fine, withdraw the reference subject

8    to the report and recommendation until — until the cases are

9    trial ready, let's consolidate for discovery purposes, and we

10   proceed from there because now four of the five defendants are

11   adopting the same defense.  That's how the sausage is made, Your

12   Honor.  It's not pretty.  But as you consider how to fashion

13   your report and recommendation, the debtor urges you to take

14   into account the changing nature of the story and the fact that

15   Mr. Dondero three times forgot his sister and said, 'I entered

16   the agreement on behalf of the debtor.'  And it's only after

17   that humiliating presentation on May 20th that they come up with

18   the new Nancy Dondero defense.  That's when it happens, that's

19   the time line.

20           Let's go to the next slide, please.

21           Mr. Dondero is also going to have to explain on behalf

22   of himself and NexPoint and HCRE and HCMS why he always acted

23   against his own self-interest.  Because, as I said, according to

24   Mr. Dondero's expert, he only earned $1.7 million over the three

25   years during which $70 million of notes became subject to these

1    agreements, approximately 40 times his compensation.  He's going

2    to have to explain to the jury the following seven, he's going

3    to have to provide an explanation for the following seven

4    undisputed facts.  Right, they don't address any of these, but

5    he's going to have to explain every single one.  And we ask the

6    Court to consider what's a jury likely to think when they get

7    questions about this.

8            Mr. Dondero and Mrs. Dondero are going to have to

9    explain why they didn't tell anybody about the alleged

10   agreements.  And for this purpose, for this very limited purpose

11   I'll just limit it at the time they were executed, at the time

12   they allegedly were entered into.  There's no facts, there will

13   never be any facts.  It's contradicted by their discovery

14   responses if they try to claim now that they told no one about

15   any of these alleged agreements at the time they were entered.

16   Nancy Dondero was clear that she never told anybody in the

17   history of the world prior to the commencement of this lawsuit

18   about this.  And Mr. Dondero says only, claims only that he told

19   Frank Waterhouse, but the evidence speaks for itself.  He never

20   told Frank Waterhouse, he never used the word agreement, he

21   never used the word Nancy, he never used the word Dugaboy, he

22   never used condition subsequent, he never talked about

23   forgiveness.  He just said, hey, that's part of my compensation.

24   And he said it in the context of settlement discussions, right,

25   negotiations.  We've heard that word recently.

1      How come you didn't tell anybody, Mr. Dondero?

2   Wouldn't it have been in your interest to do that.  How come you

3   didn't tell PWC?  Wouldn't it have been in your interests to

4   tell your auditors, 'Hey, I've got these agreements.  You may

5   not want to — you may not want to value the note at a hundred

6   percent because there's a really good chance they might be

7   forgiven.'  But he never told PWC, even though disclosure was

8   unambiguously required, facts not in dispute, and I'll talk

9   about that more for just a moment shortly.  No dispute that

10  there's no writing that exists that memorialized the terms of

11  the alleged agreements.  How does somebody enter into an

12  agreement for the forgiveness of 40 times your compensation and

13  not send a confirmatory email, not have your board adopt

14  resolutions approving it, not summarize your terms somewhere so

15  that you have a definitive writing so that nobody forgets

16  because there's dozens of promissory notes that are allegedly

17  subject to these myriad agreements?  Didn't put anything in

18  writing.

19      How is he going to explain to the jury that under his

20  watch Highland time and time and time again filed monthly

21  operating reports and schedules of assets that included all of

22  these notes at a hundred percent, right, disclosures made to

23  this Court, no dispute that Frank Waterhouse prepared him, his

24  signature is on them, sometimes electronic, by the way, you

25  know, there's a heresy against electronic signature, but if you

1    look at his signature, it's plainly electronic most if not all

2    the time.  Even in October and November and December, when Jim

3    Dondero was fully in control of the enterprise, all of these

4    notes are disclosed as assets of the estate.  How is he going to

5    explain that to the jury?

6          And the interesting thing, Your Honor, is if you look

7    — I don't remember the exhibit number and I hate to burden the

8    Court, but if you look at some of the monthly operating reports

9    where they discuss — I think it's the operating reports and not

10   the schedules — at the value of the notes, there is actually a

11   footnote that puts the world on notice that the Hunter Mountain

12   note is likely not collectable.  So all of Highland's creditors

13   at least one notice that Hunter Mountain may not be collectable,

14   but there's no disclosure of any kind about these alleged

15   agreements even though it would have been in Mr. Dondero's

16   self-interest to put it in there.

17         We made demands — it's in the record — we made demands

18   for a full payment under the demand notes on December 3rd, 2020.

19   Wouldn't it have been in Mr. Dondero's self-interest to say,

20   'Wait, wait, wait, what are you talking about, I had these

21   agreements with my sister.  Let me tell you about them.'  Right?

22   It would have been in his interest to do that at that time, but

23   he didn't.  He didn't say anything.

24         We had a confirmation hearing.  And Mr. Dondero and

25   the advisors and Dugaboy, and I can't remember how many entities

*Plaintiff's Motion for Partial Summary Judgment*                    97

1    filed their objections to confirmation.  And they come up with

2    every single argument, absolute priority rule, 2015.3.  I mean

3    they come up with every single argument.  I've skipped number 6.

4    I'll come back to that in a second — actually, no, it is number

5    6.  They come up with every single argument.  And you know the

6    one argument that they don't come up with, kind of weird, those

7    notes that your projections show are assumed to be collected in

8    2021, there's no objection that that projection is unreasonable.

9    There's no objection that that projection is unreliable.

10   There's no statement that Highland has it all wrong.  It's

11   assumption letter C to the projections to the — that were

12   attached as part of, I think, the disclosure statement.  And

13   then they were amended on the eve of trial, because by that time

14   we had already commenced the lawsuits.  So they were amended on

15   the eve of trial to add the term notes.

16          We get to confirmation hearing.  Mr. Dondero's lawyer

17   very diligently cross-examines Mr. Seery.  There's questions

18   about the notes.  There is oral argument about the notes.

19   Wouldn't that have been a good time to say, 'Hey, wait a minute,

20   I've got this agreement with my sister.'

21          None of this ever happened.  And I think this is just

22   such devastating facts, Your Honor, on slide 6 because they

23   ignore it all because they can't dispute any of it, they just

24   can't.  And you're going to have to put yourself in the position

25   of a juror, you're going to ask a jury, are you going to

*Plaintiff's Motion for Partial Summary Judgment*                    98

1    recommend to Judge Starr that he seek a jury so that they can

2    have me cross-examine Mr. Dondero and Ms. Dondero about why they

3    failed to act in their own self-interest on all these occasions.

4    I think that would be a waste of time to pursue.

5              Can we go to the next slide, please?

6              So I mentioned that Mr. Dondero had the obligation to

7    disclose this alleged agreement or the alleged agreements with

8    his sister.  He's a CPA.  You know if he was a compliant

9    executive or if he was part of a compliant organization, he

10   would have stood by the representations that he made to PWC in

11   connection with the audit for the period ending December 18th,

12   2018, but he did not.  He made no disclosure of these agreements

13   with his sister.  And what his singular defense to his failure

14   to disclose is:  They weren't material.

15             Mr. Dondero should no better.  If he was really

16   compliant, he would know that he doesn't decide what's material,

17   the auditors decide what's material.  And the audit letter that

18   he signed, that's Exhibit 33, specifically said materiality is

19   $1.7 million.

20             In our moving papers, Your Honor, we cited to probably

21   five or six different representations that Mr. Dondero and Mr.

22   Waterhouse made to PWC.  I'm only going to focus on two here,

23   but I'm not — I don't want to take the time to repeat everything

24   that's in our brief.  I'm just highlighting a few things here.

25             Number 11, representation.  Number 11 that Mr. Dondero

*Plaintiff's Motion for Partial Summary Judgment*                    99

1   made, receivables recorded in the consolidated financial

2   statements represent bonafide claims against the debtors for

3   transactions, right, so that's one.

4          But 36 is just the killer:  We have disclosed to you

5   the identity of the partnerships, related parties, and all the

6   related party relationships, and transactions of which are

7   aware.  And the interesting thing about this is, Your Honor,

8   related party transactions are so critical to an auditor's work

9   that it's not even subject to the materiality level.

10          If you take a look at Exhibit 33, on the first page

11  where it discusses materiality, it makes it clear that

12  materiality only applies to those representations where the

13  phrase is used.  The phrase materiality is not even used for

14  related party transactions.  If Mr. Dondero and his sister

15  entered into agreement for $25, according to Representation

16  Number 36 that would have to be disclosed.  There is no

17  disclosure.  Mr. Dondero was a CPA.  Mr. Waterhouse is a CPA.

18  They made these representations to the auditors.  And if these

19  agreements actually exist, then their financial statements,

20  their audited financial statements are materially misleading.

21  It's one or the other.  I think it's the former myself, but

22  that's for you to decide as the judge.

23          You know we made an argument in our papers, in our

24  moving papers and we made the argument again in reply that there

25  is no basis under the partnership agreement for Dugaboy to act

*Plaintiff's Motion for Partial Summary Judgment*                    100

1    in the way that Mr. Dondero contends that he did.  And I don't

2    want to spend a lot of time on it, Your Honor.  You have the

3    partnership agreement.  It's Section 3.  It is a 100-percent

4    legal issue, but we do not believe that Dugaboy even had the

5    authority to do what they now contend it did.  And we hope that

6    — I didn't prepare a slide on that — but we hope that Your Honor

7    will look at that if the Court deems it necessary, because

8    that's an issue that we raised and that we're raising again.

9              Let's go to the next slide.

10             So even if you think that perhaps jury should hear

11   this story, should hear how the sausage was made, should hear

12   Mr. Dondero explain why seven different occasions he failed to

13   act in his own self-interest, the undisputed evidence shows that

14   the alleged agreements would nevertheless be unenforceable due

15   to a complete lack of consideration.  Your Honor, if you've read

16   the papers you know that there's two ways under the alleged

17   agreement that the condition could be met.  One is if certain

18   portfolio companies were sold for greater than cost.  So if Mr.

19   Dondero was in control and certain portfolio companies were sold

20   for greater than cost, $70 million of notes would magically be

21   forgiven.

22             This contingency doesn't apply because Mr. Dondero

23   hasn't sold any of the portfolio companies.  And we did note in

24   our motion papers that he sold a substantial portion of MGM, one

25   of the three so-called portfolio companies, back in November

*Plaintiff's Motion for Partial Summary Judgment*                101

1    2019, not to suggest that he would have been entitled to

2    forgiveness as a result but to point out, and I could have added

3    it to the prior slide, that would be opportunity number 8, when

4    Mr. Dondero was specifically engaged in the transaction that

5    took Court time, that involved discussions and negotiations with

6    the creditors committee, that might have been another

7    opportunity for him to say, 'You know what, if I sell more of

8    this, I'm out, and you guys — all those notes are going to be

9    forgiven,' but he didn't take advantage of that then either.

10            But here's the deal, Mr. Dondero and Nancy say, fee,

11   the consideration that was given in exchange for this condition

12   subsequent agreement is that it would cause the, quote, utmost

13   focus and attention for Mr. Dondero.  It would incentivize him,

14   I think —

15       (The Court's audio volume greatly decreased at 1:00 p.m.:)

16            THE COURT:  Mr. Morris, if you can hear me, you're

17   frozen.

18            Are anyone else experiencing the same thing?

19       (The Court and staff confer.)

20            THE COURT:  (Tapping microphone.)  Uh-oh.  Okay.  If

21   any lawyers out there can hear me, would you speak up?  (Tapping

22   microphone.)  (Conferring with staff.)

23            Power the microphone up here.

24            I don't know if they can see me.  Whoops, everything

25   just went off.

1      THE LAW CLERK:  I think our whole system went out.  I

2  think they logged me out of it.

3      THE REPORTER:  Hey, I need you up here real quick.

4  Our system just went down again.  Okay.

5     (Back on the record at 1:10 p.m.)

6      THE COURT:  Hey, this is Judge Jernigan.

7      MR. MORRIS:  Yes, I can, Your Honor.

8      THE COURT:  All right.  Maybe we're up and running

9  again.

10      MR. MORRIS:  How much time have I spent?  I don't know

11  if the Court is keeping track.

12      THE COURT:  About 34 minutes.

13      All right.  So we lost you, we — you were —

14      MR. MORRIS:  Okay, I know where —

15      THE COURT:  — talking about the contingency, the sale

16  contingency that won't happen.

17      MR. MORRIS:  Right.

18      THE COURT:  And then I think you were about to talk

19  about the third-party contingency.

20      We've got an IT person in here —

21      MR. MORRIS:  Right.

22      THE COURT:  — so if we have other problems, hopefully

23  we can quickly nip in the bud.

24      All right.  You may proceed.

25      MR. MORRIS:  Okay.  Thank you, Your Honor.

*Plaintiff's Motion for Partial Summary Judgment*                    103

1          So, look, Mr. Dondero and his sister tried to say that

2     the consideration Highland was going to get was that he would

3     incentivize, that he would work particularly hard, that he would

4     be motivated, but here is the thing.  The evidence, the

5     uncontroverted, indisputable evidence is that Mr. Dondero

6     testified very clearly that on the day each of the agreements

7     was entered into, the portfolio companies were already either

8     substantially or at least moderately higher than cost, meaning

9     that there was nothing to incent.

10         They also claim, the other piece of it is that somehow

11    Highland benefitted because they didn't have to pay salary.  I

12    don't see how that makes sense, as we argued in our papers, they

13    still have to part with the capital.  And what Highland was

14    actually deprived of was the opportunity to charge that payment

15    as an expense in order to reduce income.  It allowed Mr. Dondero

16    to defer the payment of taxes, but it harmed, actually harmed

17    Highland because Highland had to pay the money, whether it was

18    compensation or in form of the loan, they still are out the 70

19    million — they're still out the capital that they lent to Mr.

20    Dondero.

21         But here is the thing, none of it matters because that

22    contingency doesn't apply.  The one that would apply, if these

23    alleged agreements actually existed, which we do not believe the

24    evidence supports, it would apply because the portfolio

25    companies are now going to be sold by, you know, Mr. Seery or

*Plaintiff's Motion for Partial Summary Judgment*                    104

1    whatever successor may come along some day, not that I'm

2    anticipating that.  But it's not going to be sold by Mr.

3    Dondero; that's what we do know.

4           You know we have cited the evidence in the record, we

5    have cited the deposition testimony.  I asked Ms. Dondero, who

6    entered, allegedly entered into the agreement on behalf of the

7    debtor, what's in it for Highland, what does Highland get if Mr.

8    Seery sells the assets instead of Mr. Dondero, because Mr. Seery

9    is not motivated to do this, right, he's not getting the pile of

10   money at the end, and her answer —

11      (Tones.)

12          MR. MORRIS:  — and so we don't think there is any

13   basis.  We think the whole thing is manufactured.  I'll use the

14   small f fraud.  We think that the evidence shows how the sausage

15   was made.  There is no explanation for any of these undisputed

16   facts, but even if there were there is absolutely no

17   consideration paid to the debtor.

18          Let's move onto HCMFA's defense.  HCMFA, as we talked

19   about earlier, contends that the notes were issued by mistake

20   and without authority.  I'll remind the Court of undisputed

21   facts that I think HCMFA sometimes either ignores or forgets,

22   and that is Frank Waterhouse was an officer of HCMFA.  Frank

23   Waterhouse was the treasurer.  Frank Waterhouse's responsibility

24   as the treasurer was among the responsibilities, and there is no

25   dispute, I think Mr. Norris testified to this, it's in our

*Plaintiff's Motion for Partial Summary Judgment*                    105

1    papers, was accounting and finance.  He was a fiduciary.  No

2    dispute about any of these things.

3            And we're here on this slide to show the Court the

4    emails, the contemporaneous emails, because we rely on evidence

5    to support our position, and the contemporaneous evidence from

6    May 2nd and May 3rd, the day that these notes were executed,

7    shows exactly what was happening.  And this is not a surprise to

8    Mr. Waterhouse, right.  The reason that he's not surprised is

9    because he's participating in all of this.  And he's

10   participating in all of this, how do we know that, because again

11   no dispute, these emails are sent to corporate accounting.

12   Corporate accounting is an email string that includes Mr.

13   Waterhouse.  No dispute about that.

14           Now I will tell you, Your Honor, that if we ever got

15   to a jury, we'd put Ms. Hendrix on the stand.  Ms. Hendrix and

16   Mr. Klos would both testify, I think they did in their

17   depositions, that they would never make transactions of this

18   type without the approval of Mr. Dondero or Mr. Waterhouse, that

19   Mr. Waterhouse gave the instructions.  But do not have to go

20   that far.  You don't have to resolve what the nature of the

21   instruction was because these documents —

22       (Tones.)

23           MR. MORRIS:  — that Frank Waterhouse, the fiduciary,

24   the treasurer, the officer, the man responsible for accounting

25   and finance was told contemporaneously that these transfers were

*Plaintiff's Motion for Partial Summary Judgment*                106

1  going to be booked as loans and that the accounting department

2  was going to prepare the notes.  This is what he's told.  It's

3  why he — it's why in none of that long deposition, in none of

4  Mr. Sauter's declarations is there anything where Frank

5  Waterhouse says, 'I had no idea.'  That's what a mutual mistake

6  would be.  That's not the contention.  There's no evidence to

7  support that.

8           If we can go to the next slide.

9           Thirty days later, exactly 30 days later Mr. Dondero

10  and Mr. Waterhouse sign their management representation letters,

11  not just for Highland but for HCMFA.  And not only did

12  Highland's audited financial statements include a disclosure

13  about these two notes that were created in May, but HCMFA's own

14  audited financial statements make the same disclosure, and

15  that's up on the screen, Your Honor.  It's Exhibit 45.

16           THE COURT:  Okay.

17           MR. MORRIS:  And they'll say, oh, but Highland,

18  Highland employees prepared it.  At what point does that refrain

19  become completely untenable?  I thought it did like months ago,

20  but for them to say that now when only Mr. Waterhouse and Mr.

21  Dondero signed management representation letters did they do any

22  due diligence, how are they going to explain to a jury that Dave

23  Klos and Kristen Hendrix somehow securely conspired to stick

24  into these pesky, little audited financial statements this

25  disclosure?  How is a compliant company and a compliant

*Plaintiff's Motion for Partial Summary Judgment*                                107

1   executive going to stand before a jury and say that he didn't

2   read this, that he didn't know?  I don't think so.

3            Let's go to the next slide, please.

4            THE COURT:  All right.

5            MR. MORRIS:  The evidence that Mr. —

6            THE COURT:  I — I no longer have on my screen your

7   slides.  I have a hard copy, but is it just me or everyone —

8            MR. MORRIS:  Okay.  It seems to be up on my screen,

9   for whatever that's worth.

10           Ms. Deitsch-Perez, Mr. Rukavina, do you — I mean you

11  guys have hard copies too.

12           MS. DEITSCH-PEREZ:  It's up on the screen.  Maybe

13  what —

14           MR. RUKAVINA:  Yeah, I see it.  I see it too.

15           MS. DEITSCH-PEREZ:  Maybe pull it down put it back up

16  again for the Judge.

17           MR. MORRIS:  Okay, we can try that.

18           La Asia, can you do that, please?

19           THE COURT:  Okay, I got it now.

20           MR. MORRIS:  Okay.  So we're on slide 11.  And, again,

21  we're talking about HCMFA's allegation that the notes were

22  signed by mistake or without authority or, you know, whatever

23  the defense is.  But the evidence that Mr. Waterhouse is fully

24  engaged is overwhelming.  And what the Court would have to find

25  is that some reasonable jury somewhere is going to accept Mr.

*Plaintiff's Motion for Partial Summary Judgment*                    108

 1    Waterhouse's testimony on the following points.  And remember
 2    back on the motion to strike, I pointed out to step one in
 3    HCMFA's motion for leave to amend because it said that Mr.
 4    Waterhouse wasn't told to treat the transfers as a loan, he was
 5    only told to make the transfer.  Well, that cuts against him.
 6    It doesn't cut for them.  And it cuts against them because there
 7    is no dispute, there will be no evidence that Mr. Waterhouse was
 8    instructed to treat the transfers as compensation.  So Mr.
 9    Dondero has nobody to blame but himself because he didn't make
10    it clear to Mr. Waterhouse.  And Mr. Waterhouse did what Mr.
11    Waterhouse does:  He is the financial officer, he is the
12    fiduciary for HCMFA and for Highland.  He is in charge of
13    accounting and finance.  And he was told to transfer money.
14    That's all he was told.  So there can't be a mutual mistake if
15    Mr. Waterhouse was never told 'Transfer the money as
16    compensation.'  There will be no evidence that Mr. Waterhouse
17    was confused, that he — he heard the direction to treat it as
18    compensation and it was mistakenly treated as a loan.  There
19    will be no evidence that Mr. Dondero gave a specific instruction
20    to treat this as a loan.
21           And it's in our papers.  I don't have it on the
22    screen, Your Honor.  If you look at the contemporaneous
23    documentation that the advisors prepared and sent to their
24    clients, it was the advisors and Houlihan Lokey who did the
25    evaluation.  There is not even a document that supports the

*Plaintiff's Motion for Partial Summary Judgment*                    109

1    notion that Highland was at fault.  You have a lot of testimony

2    about it.  You have a lot of conclusory allegations.  I don't

3    think there is a single document that you're going to see where

4    somebody said that Highland is at fault.

5            The books and records, right, if we can go to the next

6    bullet point, that's what we just saw.  Not the next slide, stay

7    on slide 11.  That's what we just saw, the second bullet point

8    refers to the two emails that we saw that were sent to Mr.

9    Waterhouse.  Again, we think if we got to a jury, the evidence

10   is going to show that Mr. Klos and Ms. Hendrix are very able and

11   — and decent employees and they followed the rules, and they're

12   going to testify that this is what Mr. Waterhouse told them to

13   do.  But, again, they don't have to reach that far.  We saw the

14   emails.

15           I want to point the Court to just two other pieces of

16   evidence that I didn't put up on the slide, but if you take a

17   look at Exhibit 53, Your Honor, perhaps when this is over you

18   will see Mr. Waterhouse participating in the discussions on May

19   2nd about the $2.4 million and that the payment has to come from

20   HCMFA.  And then if you look at Exhibit 85, which is another one

21   of Mr. Dondero's written responses to the discovery, and the

22   important point here is I hear Mr. Rukavina saying it has to go

23   through Legal, it has to go through Legal, it has to go through

24   Legal.  Well, that's not what Mr. Dondero says.

25           Okay, we asked Mr. Dondero to, in Interrogatory Number

*Plaintiff's Motion for Partial Summary Judgment*                    110

1    2, and this is at Exhibit 85, to identify, among other things,

2    the person who drafted the note.  And he responded, and I'm

3    quoting:  Dondero does not know who specifically drafted the

4    notes.  However, he believes they were drafted by an individual

5    in either the Highland Legal or Finance Department.  So it's not

6    crazy to Mr. Dondero that somebody in the Finance Department

7    would draft the notes, right, it's just not.  The fact is that

8    Mr. Waterhouse knew the notes were prepared because the

9    transfers were booked as liabilities on HCMFA's books and

10   records.

11         Is Mr. Waterhouse going to be able to explain to the

12   jury either that he didn't know this or that he did it by

13   mistake?  Right.  And this whole notion of mistake — well, we'll

14   get to it in a moment.

15         So the transfers are booked on HCMFA's balance sheet

16   as liabilities.  Mr. Waterhouse and Mr. Dondero signed

17   management representations, and the notes appear as a subsequent

18   event in the audited financials for the period ending December

19   31st, 2018.  Relying on those very books and records, and this

20   is in our papers, the advisors, not Highland, this is Mr.

21   Waterhouse, this is Ms. Stedford (phonetic), Mr. Norris is on

22   here, I think Mr. Sauter, I don't have the emails in front of me

23   but they're well cited in our papers, they take the HCMFA books

24   and records and they send it to the retail board.  Right, so

25   HCMFA actually relied on the books and records to report to the

*Plaintiff's Motion for Partial Summary Judgment*                    111

1    retail board as to what they owed Highland, and it included

2    these notes.

3            I think step six of Mr. — I tell you I could go

4    through Mr. Rukavina's six-step process and deal with all of it,

5    but — but I think his — I think his last step is that there were

6    notes on the books for $6 million, and these notes are about $7

7    million, so people can be confused.  I think the phrase he used

8    was people would naturally assume that they were the same thing.

9    I'd like to be in front of a jury and ask the jury if they would

10   have any trouble distinguishing between $6 million and $7

11   million.  I think a jury of ordinary citizens might say that

12   million dollars would make a difference.  But be that as it may,

13   here is the important thing, Your Honor.  In every single

14   disclosure after these notes are signed, it's not $6 million or

15   $7 million, it's always eight figures, it's $10 or more.  It's

16   $10 million or more to the retail board.  It's $10 million or

17   more in every single monthly operating report.  It's $10 million

18   or more in the schedules.  There is no way to confuse 6,- and

19   7,-, even if that was reasonable, because that never occurred.

20   The number was always 10 million or 12 million.  So that's just

21   another specious argument as opposed to facts.  It's just

22   argument.  And we know the Court will distinguish argument from

23   facts.

24           Mr. Waterhouse is the person who prepared HCMLP's

25   monthly operating reports and schedules that included the HCMFA

*Plaintiff's Motion for Partial Summary Judgment*                    112

1    notes as assets.  How is he going to explain to a jury how he

2    did that two dozen times?  And, by the way, what position does

3    that leave him in having prepared them and signed them and filed

4    them with the Court.  Now they're false, even though the entire

5    bankruptcy estate relied on the accuracy of those reports.  Not

6    a material error, if they're to be believed.

7            Then of course you have Mr. Sauter's investigation,

8    right?  He comes in in the spring of 2021, completely

9    unfettered.  Mr. Waterhouse is no longer employed by Highland.

10   There's no lawyer telling Mr. Waterhouse he can't speak.  They

11   meet three times.  Three times.  And Mr. Waterhouse refuses to

12   accept responsibility for this.  He refuses to say that he made

13   a mistake.  Mr. Sauter, who has no personal knowledge, we've

14   heard this story before, comes in after the fact with no

15   personal knowledge and announces that Frank made a mistake, but

16   that's not what Frank said.

17           If you look — if you look at the transcript, if you

18   look at the transcript of Mr. Norris, right, I got him to admit

19   and then I got Mr. Sauter to admit based on that transcript that

20   Mr. Waterhouse was crystal clear, he knew exactly why the notes

21   were created.  He knew exactly why the notes were created.  I

22   don't know how they're going to explain that to a jury.

23           Let's move to the next slide, a couple of other — the

24   special arguments, Mr. Waterhouse was not authorized to sign the

25   HCMFA notes.  Let me get this right, Your Honor.  He was an

*Plaintiff's Motion for Partial Summary Judgment*                    113

1    officer of HCMFA.  He was the treasurer of HCMFA.  He was a

2    fiduciary.  He was the person responsible for accounting and

3    finance, and they say he wasn't authorized.  Other than the

4    words out of Mr. Dondero's mouth, what evidence is there to

5    support that?  Not only is there no evidence to support it, but

6    it is directly contradicted by everything we heard last week.

7            Mr. Dondero — Mr. Waterhouse signed agreement after

8    agreement after agreement on behalf of not only HCMFA but on

9    behalf of Highland.  He signed shared services agreements, one

10   of which is in evidence in this case.  He signed subadvisory

11   agreements.  He signed payroll reimbursement agreements,

12   agreements that Mr. — that not only did Mr. Waterhouse sign but

13   that HCMFA is somehow trying to collect money on.  How is it?

14   Where is the evidence that says Frank Waterhouse is — and I

15   don't have to remind the Court that Mr. Dondero didn't know

16   anything about anything — where is the evidence in the record

17   that shows that Mr. Waterhouse could sign all of those

18   agreements but he couldn't sign these promissory notes?  Those

19   agreements, by the way, that required HCMFA and NexPoint to pay

20   a multiple of the promissory notes at issue, so it can't be the

21   amount.  I mean there's no evidence of any kind, frankly, that

22   his wings were clipped by Mr. Dondero.

23            He also signed other notes, so it can't be he's not

24   allowed to sign a promissory note because there are other notes

25   in this case that Mr. Waterhouse signed that they don't dispute

*Plaintiff's Motion for Partial Summary Judgment*                    114

1    his ability to sign.  So we think the whole idea and apparent

2    authority, I mean there is no evidence for the notion and it's

3    contradicted by the evidence.

4            They also say, ah-ha, ah-ha, Mr. Waterhouse's title or

5    — or the HCMFA name at the bottom isn't clearly articulated.

6    Again, Your Honor, they are grasping at straws.  The undisputed

7    facts, if you look at the notes that Mr. — that have Mr.

8    Waterhouse's signature, and I'll leave it that way, because

9    that's all I think we have to prove is that his signature is on

10   it, he is an officer and that he was — that he had at least

11   apparent authority to enter into these agreements, that he knew

12   about them, that it's not a surprise to him, he doesn't contend

13   that he didn't know what was happening, right.  None of that is

14   going to be in the record here.

15           So they say, ah, ah, Mr. Waterhouse, it just says

16   maker.  But here's the thing, if you look at the notes, Your

17   Honor, obviously maker is a defined term.  The definition of

18   maker is HCMFA.  Mr. Waterhouse's electronic signature is used

19   for other notes in the same way without dispute.  Mr. Dondero,

20   as we just looked at, on Exhibit 85 has admitted that Highland's

21   Accounting group is authorized to prepare notes, right,

22   otherwise he wouldn't have submitted that interrogatory

23   response.  Based on the audited financials, the books and

24   records, the statements to the retail board, the uninterrupted

25   string of bankruptcy filings prepared and signed by Mr.

*Plaintiff's Motion for Partial Summary Judgment*                    115

1   Waterhouse, I mean I don't think there is any basis for the

2   argument, but it's they should be estopped today from coming in

3   and denying the enforceability of these notes.

4           Let's move to the next defense, is breach of shared

5   services.  You know somehow HCMS and HCRE have gobbed onto this

6   defense.  There is no shared services agreement in the record.

7   There is no shared service agreements in the record.  There is

8   no competent evidence that shows that is shared services

9   agreement exists.  I think if Your Honor were to look at the

10  record and look at my examination of Mr. Dondero, because I

11  asked him about this, he said, you know, they — they — the

12  consideration that Highland received is like a reputational

13  benefit, or something like that.  I mean it's just — it's a

14  bunch of nonsense.  And there is no evidence in the record that

15  there is a shared services agreement.

16          There is one for NexPoint, no doubt about it.  Article

17  2 sets forth very clearly what Highland's duties and

18  responsibilities are.  And if you just look at the evidence, not

19  argument, if you just look at the document, I think every single

20  entry begins with the word "Assist" or "Assistance" or "Advice,"

21  or something like that with respect to certain services.  To

22  this day, HCMFA — I mean, I'm sorry — the term note defendants

23  have failed to identify any particular provision of the shared

24  services agreement that not only authorized but obligated

25  Highland to make payments on their behalf without any

*Plaintiff's Motion for Partial Summary Judgment*                            116

 1   instruction or direction of any kind by them.  According to

 2   them, Highland really could have done just about anything to pay

 3   any obligation that they felt was due and owing by them.  I

 4   think it's a ridiculous reading of the agreements.  And I'll

 5   wait to hear if counsel actually identifies a provision in the

 6   NexPoint shared services agreements that they believe not only

 7   authorized but obligated Highland to make these payments.

 8         If there were any doubt, Your Honor, Section 2.02 of

 9   the NexPoint shared services agreement specifically says that

10   for the avoidance of doubt, Highland shall not provide any

11   advice or perform any duties on behalf of NexPoint other than

12   the back and middle of the services contemplated herein.  Okay,

13   so if it's not in the agreement, they're prohibited from doing

14   it.  Highland followed these provisions in practice throughout

15   the bankruptcy case.  Don't take my word for it, take the

16   defendants' evidence.

17         Can we please put up Exhibits D and E.  So these are

18   exhibits that are attached, I think, to Mr. Aigen's declaration.

19   And if we could just start at the first — the first email.  You

20   will see that it's dated — no, up at — either way, that's fine.

21   Just give me one minute and stop scrolling.

22         So here is an email that was originated by Ms.

23   Hendrix.  And this was the practice.  And, you know, we heard

24   about this last week.  Ms. Hendrix would write to Mr. Waterhouse

25   and she would say, "Here are all the payments that I'm going to

*Plaintiff's Motion for Partial Summary Judgment*                    117

1    make.  Is it okay."  And Frank Waterhouse would literally have

2    to approve it.  So — so let's scroll up.  This is, "Okay to

3    release," she asks.

4            Frank Waterhouse says okay.  That's December 23rd.

5    Let's just scroll up and see a few more.  Keep going.  Keep

6    going.  So here's another one.  "Okay to send."  Right, Kristen

7    Hendrix asking for permission to make payments on behalf of

8    HCMFA, HCMS, right, all of the nondebtor entities wanting

9    permission.  Frank says okay.

10           Keep going.  This is December 1st.  "Okay to release,"

11   she asks Mr. Waterhouse.  Ms. Hendrix doing her job.  Mr.

12   Waterhouse doing his job.  Okay.  Right, so their contention

13   that Highland was not only authorized but obligated to make

14   these payments is belied not only by the contractual language

15   but by the undisputed evidence that they have put into the

16   record that shows that Kristen Hendrix always sought Frank's

17   approval before making these payments.  That's — that's the

18   facts, and this is December 2020, but there's more.  Of course

19   there's more, because there is no dispute that Highland was ever

20   instructed or directed to make these payments at the end of

21   2020.  In fact, the evidence is crystal clear, that no payment

22   was made because of Mr. Dondero's direction, right.

23           The Court doesn't have to resolve the debate between,

24   you know, Mr. — you know, Mr. Waterhouse and Mr. — it wasn't

25   made because he said so.  And here is the funny thing.  We have

*Plaintiff's Motion for Partial Summary Judgment*                    118

1   put it in our reply papers, Your Honor, it's Highland actually

2   believed that it had not only the authority but the obligation

3   to make payments on behalf of these entities.  Highland surely

4   would have paid itself on all the demand notes, right?  Is there

5   any reason why it wouldn't have paid itself on December 10th,

6   when Mr. Dondero failed to respond to all of the demand letters?

7   Right, HCMS has all these demand notes.  HCRE has all these

8   demand notes.  Why didn't Highland just pay itself?

9           Can you imagine what Mr. Dondero had done if he woke

10  up on the morning of December 11th and he found out that

11  Highland had helped itself to all of these nondebtor affiliates'

12  cash because he didn't respond to the demand letters?  How is he

13  going to explain to that jury?  He's going to tell the jury

14  that's what he wanted to happen, that's what he expected to

15  happen.  It can't just be with the term notes.  It's got to be

16  either they had the ability to do it or they didn't.  Clearly

17  Highland and Mr. Seery didn't think they had the ability,

18  because if they did, they would have.  Right?  Why wouldn't

19  they?  There is no defense that should be put before the jury on

20  shared services.

21          Let's go to prepayment defense.  There is no dispute

22  the terms of the notes are absolutely unambiguous.  They

23  required the maker to make an annual installment payment at the

24  end of the year of accrued and unpaid interest, and

25  one-thirtieth, I believe, of the principal.

*Plaintiff's Motion for Partial Summary Judgment*                    119

1              The term notes also provided that the parties could

2      renegotiate.  I think it's paragraph 3, although forgive me if I

3      get that wrong.  And it said the maker may prepay in whole or in

4      part the unpaid principal or accrued interest on the notes.  Any

5      payment of the interest shall be applied for unpaid accrued

6      interest thereon, and then to unpaid principal here.  This is

7      it.  Clear and unambiguous.  So the parties could agree to do

8      something differently.

9              And, you know, Mr. Klos in his first declaration

10     addresses the NexPoint issue.  And, frankly, it's done at the

11     same theory, so no harm, no foul, I guess.

12             And just look at the amortization schedule, Your

13     Honor.  There is not a single month where interest doesn't

14     accrue.  The last payment made by these entities, these

15     so-called prepayments, was back in 2019, right.  Just look at —

16     we just encourage the Court to look at the amortization schedule

17     and ask itself why, based on the contractual language, they

18     could have ever suspected that interest was no longer going to

19     accrue because it was prepaid and eliminated in 2019 and 2020.

20     In fact, you'll see on the amortization schedule in 2019, even

21     though there is enormous payments that are made at the beginning

22     of the year, the term note defendants are still required to make

23     the interest payment that's due at the end of the year, right.

24     They're treated as having prepaid the principal, but interest

25     continued to accrue.  Interest always accrues.  And so even

*Plaintiff's Motion for Partial Summary Judgment*                    120

1    under Mr. Dondero's watch, in December 2019, the term note

2    defendants, they do what they're supposed to do, and they make

3    the payments.

4            And the fact that payments were due at the end of 2020

5    wasn't a surprise to anybody.  It's not like somebody can

6    credibly come in and say, oh, gee, we didn't know that these

7    payments were due.  And how do we know that, Your Honor?

8    Because Highland prepared 13-week forecasts.  They were prepared

9    under Mr. Waterhouse's direction.  We've put one example before

10   the Court.  I think it's Klos Exhibit C.  And if you look at his

11   — and this is, you know, the first unobjected to declaration,

12   declaration paragraph 13, Exhibit C.  And he explains that all

13   of the payments that were due at the end of 2020 were fully

14   incorporated into the 13-week forecast.  So, again, you know,

15   poor Mr. Waterhouse is going to have to explain to adjacent why

16   that he was completely unaware that these payments were due.

17   It's not going to be good.

18           So that's the prepayment defense.

19           And just quickly, Your Honor, ambiguity.  You know

20   Your Honor can look at the evidence in the record on this point.

21   We have cited all the places in Mr. Dondero's deposition where

22   he refused to engage on the topic, insisting that he wasn't a

23   lawyer.  You know, in fact, Mr. Dondero stated pretty explicitly

24   that he didn't read any of the notes before he signed them, so

25   I'm not sure how the ambiguity now can possibly be a credible

*Plaintiff's Motion for Partial Summary Judgment*                    121

1    defense because it's not ambiguity that he was even aware of at

2    the time he signed all of the notes except for the handful of

3    notes that Mr. Waterhouse signed.  We don't think there is any

4    ambiguity.  They haven't pointed to anything meaningful.

5              There is partial performance.  You know it's partial

6    performance, Mr. Dondero has admitted to partial performance in

7    response to an interrogatory.  And of course in our reply brief,

8    we show that the defendants paid, I think, $40 million back on

9    these notes and other notes prior to the petition date.  So

10   you've got performance.  You know there's just not much more to

11   say on this.  So unless the Court has any questions, at this

12   point I think I've used approximately an hour and five or an

13   hour and 10 minutes.  Can I just get confirmation of that?  And

14   then I'll rest and save the downs for rebuttal.

15             THE COURT:  All right.  Nate, can you confirm?

16        (The Law Clerk confirms off record.)

17             THE COURT:  Okay.  Nate says an hour and five minutes.

18             All right, we'll take a 10-minute break and come back

19   and hear from the defendants.

20             COURT SECURITY OFFICER:  All rise.

21        (Recess taken from 1:40 to 1:51 p.m.)

22             COURT SECURITY OFFICER:  All rise.

23             THE COURT:  Please be seated.  All right, we're back

24   either/or in the Highland note adversaries.  I'll hear from the

25   defendants at this time.

*Plaintiff's Motion for Partial Summary Judgment*                    122

1          All right, can you all hear me?

2          MS. DEITSCH-PEREZ:  Yes, Your Honor, I can hear you.

3          MR. ROOT:  Yes, Your Honor.

4          THE COURT:  Very good.  You may proceed, Ms.

5    Deitsch-Perez.

6          MS. DEITSCH-PEREZ:  Okay.  And I'm going to ask Mr.

7    Aigen to pull up our PowerPoint.  I was not aware that Mr.

8    Morris was going to provide them in advance to the Court and the

9    parties, so we have not — we will look at our PowerPoint to make

10   sure all of the notes and comments are out and circulate to them

11   — circulate them to everyone for their records after the

12   argument and after we've made sure to scrub them of our notes, —

13         THE COURT:  All right.

14         MS. DEITSCH-PEREZ:  — our internal notes.  Thank you.

15         THE COURT:  Um-hum.

16         MS. DEITSCH-PEREZ:  Okay.  And if — we have a couple

17   of hitter slides, please.  Mike can go to page 3, start on page

18   3.

19         And if you step back here and think about what we just

20   heard, it sounded a lot like a jury argument.  It sounded like

21   an opening statement at trial, because that's — that's what it

22   really was, that the debtor doesn't believe Mr. Dondero or

23   anyone related to him or even associated with him, and is

24   counting on the Court feeling the same way.  And I think that

25   situation has emboldened lawyers who surely know better to make

*Plaintiff's Motion for Partial Summary Judgment*                    123

1    a motion for summary judgment on the grounds that the

2    defendants' witnesses and evidence are less credible, less

3    credible than the plaintiff's evidence; and that the inferences

4    to be drawn from the evidence that plaintiff proffers are better

5    than the — and stronger than the inference — inferences from the

6    evidence that the defendants' witnesses bring forward.  And

7    those kinds of things are the very factors that bear on whether

8    you win or lose at trial.

9              And if we were hearing about this, about some other

10   set of lawyers in some other case, we'd probably all laugh and

11   say what are they doing, that's a waste of everybody's time to

12   move for summary judgment on which side is more credible than

13   the other, because that's classically an issue for trial, not

14   for a summary judgment motion.  So let's see, let's look at the

15   arguments that the defendants make and the evidence and the case

16   and what plaintiff argues about it.

17             So one thing that the defendants argue is that the

18   agreements don't exist; but, in fact, Jim Dondero and Nancy

19   Dondero, both sides testified that they exist.  They identify

20   the essential terms.

21             The debtor makes a big deal about the agreement

22   supposedly being secret; we'll see how they weren't.

23             The debtor makes a big deal about the absence of

24   notice of possible forgiveness on the financial statements.

25   That's not a basis for summary judgment.  Might be an

*Plaintiff's Motion for Partial Summary Judgment*                    124

1    impeachment point at trial, not summary judgment.

2                The debtor talks about voluntary payments, we'll

3    address that.  That's not a basis for summary judgment.

4                We heard Mr. Morris talk about the fact that Jim

5    didn't demand forgiveness when there was a relatively small

6    stock sale that was — that was basically forced.  He didn't make

7    a demand maybe he could have made; that's not a basis for

8    summary judgment.

9                Whether or not Nancy Dondero looked at the notes when

10   she entered into agreement, that's maybe — maybe an impeachment

11   point at trial, not a basis for summary judgment.

12               And there's evidence that agreements to forgive loans

13   as part of compensation on the occurrence of future events like

14   performance was a practice at Highland and related companies.

15               Defendants also talk about whether the agreements are

16   definite.  Not much — we'll see the cases, not much is required

17   for agreements to be sufficiently definite to preclude summary

18   judgment.

19               And — and the argument that Mr. — that the plaintiff

20   makes that the agreements are not supporting by a meeting of the

21   mind — a meeting of the minds, that's really the same thing as

22   arguing that there's no agreement.  And those are inherently

23   fact issues.  And there are actually cases on that.  And you

24   will see there was a complete absence of authority in Mr.

25   Morris' presentation.

1          So let's go on to the next slide.

2          Okay.  We'll discuss the argument about consideration.

3   Conspicuously absent from Mr. Morris' presentation was the

4   second form of consideration that existed for the agreements,

5   which was that Mr. Dondero could have taken more compensation.

6   These agreements were made at comp time, and he was sitting back

7   and looking over his compensation and saying should I take more,

8   I could take more, I would take more.  But instead he got this

9   agreement.  That's compensation.

10          There's a half-hearted argument in the briefs, not

11  much made of it today by the plaintiff, that Nancy Dondero was

12  incompetent.  You will hear from the defendants the law on what

13  constitutes someone who is incompetent to make a contract.  And

14  plaintiff hasn't put in anything in support to show that Ms.

15  Dondero was drunk or a minor or otherwise legally incompetent to

16  make agreements.

17          And then you'll hear somewhat from me and more from

18  Mr. Rukavina that Highland was responsible for making the loan

19  payments under the shared services agreement.  The plaintiff

20  doesn't deny that there was a written shared services agreement

21  for NexPoint.  And then says, well, there's no shared services

22  agreement for HCRE and HCMS, as if it were the law that the

23  agreements couldn't be oral or implied over a course of conduct.

24  And that's a very unlawyerly suggestion.  Of course we all know

25  that the agreement need not be in writing and could even be

*Plaintiff's Motion for Partial Summary Judgment*                              126

1    implied from a course of conduct.  And the same thing about the

2    prepayment argument.  All Your Honor has to do is look at the

3    amortization tables and see how much was paid on these loans.

4    Huge amounts.  And so is it fair to say they were in default at

5    that time when, A, Highland could have/should have paid them,

6    and so much had already been paid.

7                So let's go on now to the specifics.

8                Okay.  Now before we go further, there's actually some

9    background that's helpful to understanding how — how we actually

10   got in this position.  And to understand how these notes and

11   then the agreements for potential forgiveness came about, as I

12   think Mr. Morris and the Court both said, context is important.

13   This Court has often said that, well, Mr. Dondero hasn't come to

14   grips with Highland being in bankruptcy.  And that's an

15   interesting thought, because it recognizes that until this

16   bankruptcy, Jim Dondero was the heart and soul of Highland.

17               He and Mr. Okada (phonetic) built it up from very

18   little.  And it was something really important to Dallas.  It

19   was a financial powerhouse plunk down in the middle of the

20   country.  Not in New York or L.A., where people expected those

21   kinds of companies to be.  It grew to employ hundreds and it

22   owned portfolio companies that employed thousands.  It survived

23   the financial crisis that wiped out much bigger firms.  And

24   understanding its culture is important to this case, because it

25   was a culture of compensation based on performance.  This was a

*Plaintiff's Motion for Partial Summary Judgment*                    127

1    culture of compensation based on hard work.  It was a culture of

2    growing the business rather than living large.

3            I remember hearing about Highland in the — you know,

4    many years ago where people — outside vendors griping and maybe

5    even some inhouse people griping that — that they had to fly

6    coach because Mr. Dondero flew coach, because he was — he was

7    putting the company first over his own interests.  And so even

8    his distractors acknowledged that Mr. Dondero works tirelessly.

9    And, more importantly, he took ownership and responsibility.

10   And because he was the largest owner, that played a part in how

11   he interacted with the company.

12           So not to get too far ahead of the program, for

13   example, the debtor claims that Mr. Dondero — the fact that Mr.

14   Dondero made payments on notes that were unnecessary, because of

15   the potential forgiveness based on the agreement, that must mean

16   that the agreement didn't exist.  But they're missing the point.

17   That's because — that's assuming that Mr. Dondero would only do

18   what was good for himself and not for the company.  Instead, if

19   Highland did cash, he'd make payments on those demand loans even

20   though if they weren't demanded payment wasn't due.  The same

21   thing about the terms loans.  There was only a certain amount

22   due each year.  But you saw that much more than that was

23   occasionally paid.  And, A, they didn't have to — on the demand

24   notes, they didn't have to be paid because they were subject to

25   the forgiveness, but he still board — caused them to be paid, or

*Plaintiff's Motion for Partial Summary Judgment*                128

1  the ones that were his own, he paid them down.  Why?  Because he

2  wanted to make sure the enterprise was successful.

3           So when you hear Mr. Morris say, well, how does Mr. —

4  how is Mr. Dondero going to explain that he didn't act in his

5  own self-interest, that's the answer.  That's the answer.  He —

6  he did things he wasn't required to do to make sure that

7  Highland was okay.  And if it needed the money, he paid it down.

8  So that is in evidence that the agreement didn't exist.  It's

9  evidence that he was putting Highland first.

10          And it's also important to remember that at all

11 relevant times the loans here were modest in relation to the

12 overall value of Highland.  If this bankruptcy hadn't been beset

13 by all of the contentiousness that the Court and Mr. Morris have

14 acknowledged by creditors with very personal agendas, by the

15 sharp animosity between the various constituents, by claims

16 trading that maybe skewed the economic interests here, Mr.

17 Dondero expected that he was going to be able to put together a

18 plan that would enable Highland to stay in business, that would

19 pay off all the creditors and move forward.

20          And so when you look at all of the — the argument that

21 Mr. Morris made about sausage-making and why in this sort of

22 really crisis period of the plan being propounded, negotiations

23 over whether it would be the pot plan or the creditors' plan, or

24 something else, and litigation starting up, and Mr. Morris says,

25 'Oh, look, they kept changing their story.  They kept adding

*Plaintiff's Motion for Partial Summary Judgment*                    129

1    things and amending things.'  Well, of course there was quite a

2    bit of chaos.  And so did everything get done perfectly?  Not at

3    all.  But that's an argument to be made to the jury.  Should

4    they have known everything on day one and put it all on the

5    first pleading?  Well, Mr. Morris can argue that, but the

6    defendants will point out the incredible pressure that everybody

7    was under on what was the real focus at the time, which was

8    trying to salvage Highland and trying to have it be a continuing

9    entity and having to have these competing plans.  And the

10   litigation was the by least of it.  And so that's the

11   explanation on the sausage-making.

12           And any lawyer who tells you they haven't amended

13   their interrogatory answers or forgotten a witness or forgotten

14   a document and had to put it in later isn't — really isn't —

15   isn't a litigator or is maybe a baby lawyer or just hasn't been

16   working enough, because it happens to all of us and it

17   particularly happens when there are a whole lot of cooks in the

18   kitchen, shall we say.  And we'll talk a little bit more about

19   that as we go along.

20           So you also know, I mean the debtor knows and Your

21   Honor knows from presiding over this case that Mr. Dondero did

22   not take the kind of huge bonuses out of Highland that we read

23   about in the newspapers.  And we also know that he really was

24   focused on making people perform to get their money.

25           And so, given all of that, how can plaintiff feign

*Plaintiff's Motion for Partial Summary Judgment*                              130

1    surprise that Mr. Dondero would set himself a challenge, a

2    hurdle, to gain forgiveness of that — of the notes?  It just —

3    it really defies belief.

4            And I understand that lawyers put on a show for a jury

5    and that's what Mr. Morris will have to do here, but when you

6    talk about something that's not remotely credible, it's not

7    remotely credible that Highland did not expect that Mr. Dondero

8    would plan that he would try to have tax-efficient compensation

9    and that he would plan that if things would happen that would —

10   would result in — in large — potentially really large payments

11   like we've seen with MGM, that he would be able to benefit from

12   that, along with Highland.

13           So, given all of that, we're not — we're not asking

14   the Court to grant summary judgment for the defendants.  We

15   recognize that the debtor disputes the facts alleged by the

16   defendants and that there are facts that need to be decided by a

17   fact finder, and here it's going to be a jury.  But by the

18   debtor seeking summary judgment and asking this Court to find

19   facts is just as presumptuous as if the defendants had made the

20   same request.  And if the Court granted summary judgment for the

21   defendants, we — we concede it would get reversed.  And it is no

22   different that if the Court granted summary judgment on what are

23   hotly disputed issues if it granted summary judgment for the

24   plaintiff.  And — and we're going to show you the law, which the

25   plaintiff didn't show you.

1    So, Mike, if you could go on to the next slide.

2    Okay.  We heard Mr. Morris say almost for the first

3    time today that the — that the agreement at issue here wasn't

4    authorized by the LPA.  And I have to tell you there is — Mr.

5    Morris contended that's an argument they're making.  It's not in

6    the — you can — you can shake the motion for summary judgment

7    and squeeze it like a sponge, that argument won't come out of

8    there.  The sole argument is there is — and I think I tied it

9    somewhere later in this slide show — they say something like and

10   it wasn't authorized.  There's no case law, no argument, no

11   nothing.  There is a sentence.

12   So in contrast to that sentence, look at the LPA

13   itself.  The LPA gives Dugaboy the right to approve compensation

14   for the GPA of the GP and the affiliates of the general partner.

15   And there is a provision about compensation.  And you have to

16   parse through the agreement.  You have to look at what the

17   various words in the section mean.  So you have to go look at

18   "affiliate," and you will see that that would related to Mr.

19   Dondero.  You have to look at "majority interest," and you can

20   see, if you turn to the page that describes it, that that's

21   Dugaboy.  And if you go to Exhibit A, that also reflects that

22   the majority interest is Dugaboy.  And then if you go look at

23   the Dugaboy trust documents, you will see that as of — starting

24   as of 2015, Nancy Dondero is the Dugaboy trustee and, therefore,

25   the individual entitled to approve the compensation.  That was

*Plaintiff's Motion for Partial Summary Judgment*                    132

1  in the LPA, going back to 2015.  I think it was in there before

2  that.  That's — that's Highland's operating agreement.  If they

3  didn't want that, that shouldn't have been the operating

4  agreement.  But that is the agreement.

5          And if we go on now, it defies belief that the debtor

6  says there's no evidence, because there is evidence.  Mr.

7  Dondero testified and Ms. Dondero testified about the agreements

8  and what they were.  And we'll look at that as we go along.  And

9  the agreement was that the notes would be forgiven if Trustway

10 Cornerstone or MGM sold at above — at or above cost.  Mr. Morris

11 made some somewhat confusing assertion that that part of the

12 agreement didn't apply here because it wouldn't be Mr. Dondero

13 doing the selling.  There is nothing in the agreement as

14 described that says that.  But putting that aside, there is no

15 argument in the motion for summary judgment that supports what

16 Mr. Morris said in today and in a footnote that the indisputable

17 fact is that Ms. Dondero did not have the authority to bind

18 Highland.  What we just saw on the prior slide is exactly why

19 Ms. Dondero was the person who could do that.

20          So let's go on to the next slide.

21          Okay.  So, again as I said, both Nancy and Jim

22 testified to the agreement.  And in Texas, and I'll show you the

23 cases in a minute, even if you had a he said/she said dispute,

24 where one side on a contract — on a contract said, 'I made that

25 contract,' and on the other side the other person said, 'No, I

*Plaintiff's Motion for Partial Summary Judgment*                    133

1    didn't make that contract,' the testimony of the one person is

2    actually enough to preclude summary judgment.  And the reason

3    for that is that the Court is not entitled to evaluate the

4    credibility of the witnesses and the relative weight of the

5    evidence.  And there's also no requirement that the contract be

6    in writing.

7           What the debtor points to are facts that the jury

8    might consider in deciding whether there was or wasn't a

9    contract.  They might be convinced, they might not be convinced.

10          Let's go on.

11          Okay.  So now let's look at the applicable law,

12   something that the debtor did not do with you.  We have the In

13   re Palms case.  Now that was an actual trial where the court is

14   a the trier of fact on a proof of claim.  And one party said

15   there was an oral contract and the owner denied it.  The

16   architect said there was a contracted design.  The owner said,

17   no, there is not.  And the court held that whether there was a

18   meeting of the minds is a question of fact.  And even if there

19   was a missing term, that would not be dispositive.  So when the

20   debtor says here, 'Oh, not — you know, Mr. Dondero didn't recite

21   every term in his deposition,' that's not dispositive for a few

22   reasons.  One, that's only talking about what he could remember

23   at the time.  But, two, we're at summary judgment, we're not

24   even at the point of trial.  And this case says it's an issue of

25   fact.

*Plaintiff's Motion for Partial Summary Judgment* 134

1    And then Fisher versus Blue Cor- — Cross (phonetic)

2  applies the Palms case in a summary judgment and again

3  reiterates that whether or not there is a meeting of minds,

4  that's something for a jury to decide.

5    Bucsany (phonetic) is even closer.  There there is a

6  written construction contract that required change orders and

7  for amendments to be in writing.  Think of that as the parallel

8  to the note.  And then after that there was an oral contract for

9  additional work.  And the owner contended that the notion that

10 there was an oral contract was inconsistent with the written

11 contract and that must mean there was no oral agreement or that

12 it was unenforceable.  And the fact-finder found that an oral

13 contract for additional work is something a jury could find.

14    Senta Alsud (phonetic), another case that's helpful

15 here.  There there was a party that made a loan and also put a

16 downpayment towards a transaction.  And the party that wanted to

17 be repaid and wanted the refund of the downpayment moved for

18 summary judgment.  And there was, like here, conflicting

19 testimony on whether or not there were conditions on repayment,

20 because that's what at issue here, whether there are conditions

21 to repayment, and there were also issues of a similar issue

22 there on the — on whether or not the downpayment had to be

23 refunded, and the court denied summary judgment because

24 conflicting testimony creates a genuine issue of material

25 disputed fact for trial.  And — and that's — that's what we have

*Plaintiff's Motion for Partial Summary Judgment*                                    135

1    here.

2              THE COURT:  Let me — let me ask you —

3              MS. DEITSCH-PEREZ:  Now —

4              THE COURT:  — let me ask you a question, because until

5    you got to this case I was going to ask you do you have any

6    cases where an oral agreement was grounds to avert summary

7    judgment on a suit on a note because, as we all know, you know

8    we said it before, suits on promissory notes are, I think,

9    widely regarded as the simplest kind of lawsuits.  There are

10   typically, and they — you know the Fifth Circuit has said they

11   are grist for summary judgment.  So I was going to ask you do

12   you have any cases where an oral agreement that was alleged to

13   exist to be a defense to repayment was accepted as grounds to

14   avert summary judgment.  So —

15             MS. DEITSCH-PEREZ:  Yeah.  And — and that's why we

16   gave you these cases.  They're not going to be a lot —

17             THE COURT:  Well, as best I can tell, none of these

18   cases except maybe Alsud involved a promissory note.  Okay,

19   they're contracts.

20             MS. DEITSCH-PEREZ:  Yeah.

21             THE COURT:  But this one, was it a suit on a

22   promissory note, essentially, that oral amendments —

23             MS. DEITSCH-PEREZ:  I mean there was —

24             THE COURT:  — were argued and the court said, okay,

25   we'll go to trial?

1    MS. DEITSCH-PEREZ:  Well, it was — it was a case in

2  which there was a loan.  And one side said you have to pay it

3  back and the other said, no, there were some conditions on it

4  that were oral.  And so it went to trial.  And, I apologize, I

5  don't know what happened at trial.  But the fact that there

6  aren't many cases like that, Your Honor, is because, you're

7  right, often — often promissory notes are simpler cases, but

8  this is most assuredly not a simple case.  And so — I mean this

9  is — you know the notion that you can have an oral agreement, I

10  think laymen are confused by that and there's a prejudice, I

11  think, that people — people think that if it's not in writing,

12  oh, boy, maybe it didn't happen, but particularly in Texas we

13  know — we know that's not true, that oral agreements even for

14  big amounts can be binding.  You remember Joe Jamal (phonetic)

15  taught us all that.

16    But even more specifically in a he said/she said

17  dispute, the testimony of one side is enough.  And so if we take

18  all the hyperbole and emotion out of this and maybe make this

19  something that seems simpler, let's say I agree to sell my

20  $10,000 car to Mr. Aigen, if he writes — if he wins 10 motions

21  over the next five years.  And I don't tell anyone and he

22  doesn't tell anyone.  Well, the fact that we didn't tell anyone

23  about this doesn't mean there's no agreement.  It's not even

24  evidence that there is no agreement.

25    Now let's say I also do a financial statement and I

*Plaintiff's Motion for Partial Summary Judgment*                    137

1    list my car as being worth $10,000.  Is that evidence on which a

2    creditor of mine could get summary judgment that there was no

3    agreement, so they could go and grab the car?  Of course not, we

4    wouldn't think so —

5             THE COURT:  I guess — I guess what I'm trying to get

6    to here is context matters, this isn't any old contract.  This

7    is — you know we start with the prima facie case, that this is —

8    these are promissory notes.  It's not a typical —

9             MS. DEITSCH-PEREZ:  And it —

10            THE COURT:  — it's not just any old breach of contract

11   suit, it's a suit on a note where, you know, is there a note,

12   did the nonmoving party sign the note, is the movant the legal

13   owner or holder of it.  And, you know, here's the balance due.

14   And that's considered under the law a prima facie case.  Well,

15   you know, again I'm trying to get at do we have any developed

16   law that you can use an oral agreement to defend against this

17   very basic kind of transaction in society.  I hate to get

18   melodramatic —

19            MS. DEITSCH-PEREZ:  Yes, of course —

20            THE COURT:  — I hate to get melodramatic and talk

21   about the slippery slope, but it kind of feels like commerce

22   would come to a screeching halt if every defendant could come in

23   and say, you know, I had an oral agreement with the banker, or

24   whoever, that the note as written —

25            MS. DEITSCH-PEREZ:  But — but that was —

*Plaintiff's Motion for Partial Summary Judgment*                                138

1          THE COURT:  — the note as written was not going to be

2     binder.  I mean we would never have such —

3          MS. DEITSCH-PEREZ:  But there are doctrines, there are

4     legal doctrines that deal with that, and that's why this is such

5     a complex case.  I mean that's where a lot of the lender

6     liability were about and were people able to prove a subsequent

7     agreement, and that's allowed.  I mean parol — parol evidence is

8     only barred in certain circumstances.  Even the debtor doesn't

9     argue that that applies here.

10          So I think we are in open territory where the question

11     is will the trier of fact believe that there was an agreement.

12     And we're going to show you the things — you know, the debtor

13     showed you things to make it appear as though there was an

14     agreement and to convince you there wasn't an agreement, and to

15     say that Mr. Dondero is incredible, and I'm going to go through

16     this now and show you the reasons why you should think it

17     happened and why it made sense and why he did certain things and

18     why the companies did certain things.  But those are facts that

19     a jury should listen to and say they either believe it or they

20     don't.  And that was the case in many of these lender liability

21     cases where somebody said, 'Wait a minute, the — the bank told

22     me that if I went and I did x, y, and z, they weren't going to

23     call my loan.'  And we all know that — that a lot of those cases

24     succeeded because subsequent agreements did occur.

25          THE COURT:  Okay.  Well, I — this is a subject near

*Plaintiff's Motion for Partial Summary Judgment*                                139

1    and dear to my heart.  I just wrote a 140-something-page opinion

2    on lender liability and I know it's darn hard win with

3    liability.

4              MS. DEITSCH-PEREZ:  Um-hum.

5              THE COURT:  You usually just kind of look at the

6    agreements —

7              MS. DEITSCH-PEREZ:  I know, and — and — and I

8    understand that.  And I think that's because of the prejudice

9    that, boy it's in writing, you know, you should be stuck with

10   the writing.

11             But we also all know that in reality, things happen.

12   And so some of those lender liabilities cases were real and

13   people really got hurt when the lender didn't, you know, — made

14   an agreement and then wasn't going to live up to it.  And the

15   same thing here, Mr. Dondero could have taken more compensation.

16   It's not — I'm not sure I understand what Mr. Morris was talking

17   about when he was saying the consideration was just that he was

18   going to try harder and that he got the loan.  The consideration

19   was the fact that each comp period and each end of year,

20   January, February, he could have — he could have asked and

21   gotten a whomping, big, fat cashed check then.  He could have

22   taken more compensation.  And instead of taking more

23   compensation at the time, he said, you know what, I'm going to

24   take it on the come, I'm going to get this agreement to make my

25   loans potentially forgivable if good things happen, instead of

*Plaintiff's Motion for Partial Summary Judgment*                                140

1   taking cash out now.

2          He could have had unconditional cash as his

3   compensation.  And instead, he took these agreements.  And so

4   now the debtor wants to take it because and, you know, after he

5   forewent taking his compensation, they're going to say, 'Ha, you

6   can't have your other compensation either.'

7          And it's not like this was a sure thing.  Mr. Morris

8   talks about the portfolio companies being in the money at any

9   given moment.  Well, we all know that that's not a sure thing.

10  Look at 2008.  Look at the huge drop in the market when COVID

11  happened.  Look at what's even happening now with the Ukraine.

12  The fact that in any given moment the portfolio companies were

13  in the money doesn't mean that there was no consideration,

14  because that — the consideration is the fact is — that Jim could

15  have taken sure cash, and he didn't.  He decided to wait for his

16  reward and now the debtor wants to take it away.

17         And did he do it perfectly, would it have been safer,

18  better, more careful, more prudent to have written them down, to

19  put it in the financial statements to say this, that, or the

20  other, — I'm getting ahead of myself — but, yeah, sure, maybe it

21  would have been, but he — but it was also the case that until

22  the contingency occurred, they were straightforward notes, and

23  so they got put in the books as straightforward notes.

24         And in the PWC deposition, Mr. Morris suggests without

25  actually showing you anything, that — that the PWC folks would

1    have wanted to know about the forgiveness condition.

2            And I will grant you, you know, with a little cute

3    questioning he got the PWC accountant to say that, but not 10

4    minutes later, when Mr. Aigen cross-examined him, he said, 'Oh,

5    I didn't understand the question.  I meant that if the

6    forgiveness event occurred, I would want to know about that, not

7    if there was some future potential possibility of the notes

8    being forgiven.'

9            Now was that a bad judgment call on Mr. Waterhouse's

10   and Mr. Dondero's part, to not say to the accountants then,

11   'Gee, there is this agreement.  What should we do, should we

12   write it down or not?'  yeah, maybe.  I mean we wouldn't be here

13   if they had made this clearer.  But that doesn't mean that the

14   agreement doesn't exist.  And it also doesn't mean that it isn't

15   — it isn't enforceable.

16           You know the debtor argues, 'Oh, my God, there's no

17   disinterested party witness.'  I mean that's even sillier,

18   because in most contract cases, think about who the witnesses

19   are.  The witnesses are the interested parties, they're the

20   people to the contract or who say there isn't a contract.  It's

21   almost always the interested parties that are the witnesses.

22           I think I've gotten a lot of off track, but I can — I

23   can get myself back on.  So give me a minute, I will tell Mr.

24   Aigen what slide to go to.

25           Okay, why don't we go to 12.  And if we come across

1    things I've already covered, I will go really quickly over them.

2          So I mean I'm not going to read all of these to you,

3    but, Your Honor, in the briefs you will see — and I don't think

4    that the debtor seriously disputes that at least Mr. Dondero and

5    Nancy Dondero testified as to the existence of the agreement.

6    And we'll send you the PowerPoint and you'll have the — the aid

7    memoirs on where that is.

8          And if you go on to 13 and 14, these were — there are

9    here the parallel declaration testimony for Nancy.  And if you

10   go to — I think that's on 13, 14 have the declaration testimony.

11   And if we go on to 15, okay, the debtor made a fuss and said,

12   'Oh, there are some that they said that Mr. Dondero didn't

13   really know about the notes.'  And — but you have to look at

14   what the question really was.  He says, he asked, "I'm asking" —

15   this is Mr. Morris asking Mr. Dondero — "I'm asking if during

16   your discussions with the Dugaboy trustee you ever disclosed the

17   name of the maker of any of the notes that were subject to the

18   agreements."

19         And Mr. Dondero answers, "She knew that the notes due

20   to — that she knew they were notes due to Highland from various

21   entities, so I don't know what your question is, but identify

22   specifically that there were notes due to Highland?  I guess the

23   answer to that is yes, but I don't know what you're asking me."

24         It's clear in that little snippet that in the briefing

25   the debtor tries to make much of it's clear he got confused by

*Plaintiff's Motion for Partial Summary Judgment*                    143

1    the word maker.  He didn't — you know, maker, payee, he wasn't —

2    and then Mr. Morris never made the question-clear, so it went

3    nowhere, and now the debtor says, 'Ah, he didn't even know who

4    was on what side of the notes.  That's just clearly not true.

5              And I have to tell you, even myself, you know, when

6    someone says mortgagor and mortgagee to me, it takes me a

7    minute, I have to — or maker, I have to think for a minute which

8    one is that.  I'm not a real estate lawyers, I don't use those

9    words all along.  And we shouldn't be deciding things as

10   important as this based on — on kind of gotcha — gotcha

11   deposition questioning.  If anything, what it shows is Mr.

12   Morris wasn't listening to the — to the answer to the question.

13             So if we go on to 16 now.

14             Another tactic that the debtor takes is tries to

15   create a summary judgment issue by saying Nancy and Jim disagree

16   about the notes are subject to the agreements, that the

17   deposition testimony doesn't show that, and then Mr. Dondero

18   specifically says in his declaration that he did discuss and

19   identify the notes that were subject to the agreement to Nancy.

20   So that's also not — not a reason to grant summary judgment.

21             We go on to 17.

22             Okay.  Another thing that — that the plaintiff does is

23   it makes a big deal about the fact that Mr. Dondero couldn't

24   list which note was on which date for how much, to suggest that

25   the agreements must not have taken place.  But that's clearly an

*Plaintiff's Motion for Partial Summary Judgment*                    144

1    attack on Jim's credibility, which is improper at this point.

2    And that takes us back to that Alsud case that you looked at

3    before, Your Honor.  And it's important to look at what it

4    actually say is, which is to determine whether a genuine dispute

5    exists such that the case must be submitted to a jury, courts

6    must, not might or maybe, courts must consider all of the

7    evidence in the light most favorable to the nonmoving party,

8    that is, Mr. Dondero and the companies, draw all reasonable

9    inferences in light of the nonmoving party, refuse to make

10   credibility determinations, or weigh the relative strength of

11   the evidence.  And that's — think about how many times you heard

12   Mr. Morris say something wasn't credible or that the plaintiff's

13   evidence was stronger or more voluminous than the defendants'.

14          The plaintiff is asking you to do the very thing the

15   courts say that the law prevents you from doing.  You can't —

16   you can't say, ew, I find — I find the plaintiff's arguments

17   more credible here, I find Mr. Klos' declaration as more

18   credible than Mr. Dondero's testimony.  That's not the purpose

19   of the Court on a motion for summary judgment, and that's true

20   whether this is a bankruptcy court or a district court.  The

21   plaintiff, the debtor here is trying to lead you astray and I

22   just ask that you not be dragged along this road —

23          THE COURT:  Let me ask you —

24          MS. DEITSCH-PEREZ:  — and —

25          THE COURT:  — to address head on I think a more

*Plaintiff's Motion for Partial Summary Judgment*                    145

1   nuanced argument that Mr. Morris is making.  He says, 'I'm not

2   asking the Court to make a credibility assessment,' that he is

3   saying this, quoting Fifth Circuit law, he says I'm supposed to

4   focus on is there a dispute about a genuine material fact,

5   stressing the word "genuine material fact."  And he cites Fifth

6   Circuit law that says if a reasonable jury could not possibly

7   return a verdict in favor of the nonmoving party, then that's

8   not a genuine dispute of material fact.  What is your response

9   to that?

10          MS. DEITSCH-PEREZ:  The response is that can't mean

11  that the — that the movant can say, 'Well, look at all of this

12  evidence and look at all of that evidence, and this evidence is

13  more credible than that evidence.'  That's what Mr. Morris did.

14  He may put that law up on a slide, but what he actually did was

15  he pointed out various situations and said, 'Boy, someone

16  looking at that would think Mr. Dondero's going to have a hard

17  time explaining it.'  That is the epitome of saying it's not

18  credible, that one side is more credible than the other.  And

19  just by saying, 'Boy, this is hard to explain,' doesn't make it

20  not genuine.

21          There's a little bit of word play here.  I mean the

22  debtor is still asking you to make a credibility determination,

23  that you should look at all of this evidence and say, 'Hmm, do

24  you think it happened or didn't you think it happened,' in the

25  face of testimony that it happened.  There are two parties in

*Plaintiff's Motion for Partial Summary Judgment*                    146

1    the conversation about this agreement and both of them say it

2    happened.  You don't really have a choice but to say this has to

3    go to a fact-finder.

4              THE COURT:  All right.  Well, I may —

5              MS. DEITSCH-PEREZ:  Because Your Honor is not the fact

6    finder —

7              THE COURT:  — I may — I'm going to ask you another

8    question.  I'm going to ask you another question.  There's also

9    plenty of case authority that says if — if the only thing that

10   seems to create a material fact dispute are affidavits with

11   conclusory, self-serving statements, then that's not enough,

12   okay.  So —

13             MS. DEITSCH-PEREZ:  But that's not what —

14             THE COURT:  I think what I hear you saying is —

15             MS. DEITSCH-PEREZ:  — that's not what this is.

16             THE COURT:  — when — you know, when I've got any

17   testimony, I've got put it to a jury.  But yet there is a nuance

18   there that courts sometimes recognize, right?

19             MS. DEITSCH-PEREZ:  I think those cases are ones where

20   you have bet — where all you have a declaration that is after

21   the fact.  It's not where you have deposition testimony that

22   establishes the disputed issue.  Sometimes you'll have an

23   instance where parties will — will not give testimony on

24   whatever the issue is.  And then afterwards, when it's pointed

25   out in a motion, they will either contradict themselves or they

*Plaintiff's Motion for Partial Summary Judgment*                    147

1    will say something that's never said before in a declaration,

2    and that's where you have those cases.

3              It's not — it's not where you have deposition

4    testimony that is — that does — that puts — that creates a live

5    issue.  I mean this Court is just not entitled to sit here and

6    say, 'I just — I don't believe Jim Dondero and I don't believe

7    Nancy Dondero.'  And — and that would be wrong.  That would be

8    taking something on which they have — there is a right to a jury

9    trial away from them.  I don't know how to say it.

10             And, not only that, it's not like that is the only

11   evidence, because there is the evidence of the — of the expert

12   that indicates that Mr. Dondero was under compensated.  There is

13   the evidence of the tax expert who explains that if you want to

14   have tax-efficient compensation, you would have a bonafide note

15   and you would have to make it subject to a condition subsequent,

16   because otherwise Mr. Morris is right.  If it had been a

17   different kind of agreement, if it was searched, that the note

18   was going to be forgiven, then there would be taxes owed on it

19   right away.

20             So if you look at those things, it's not just Mr.

21   Dondero's testimony and Nancy Dondero's testimony, it's

22   extraneous factors that also allow you to — allow not you —

23   allow a fact finder to find that, yes, that is how he was — how

24   he wanted to structure his compensation and that Highland, which

25   — you know for most of the time period, he was the largest

1  shareholder and he was its CEO.  He had ever reason to ask them

2  and Highland had every reason to agree to let him structure his

3  compensation thus, because otherwise he just would have taken

4  out more money.

5          I mean there are a lot of private equity funds where

6  the owners take all the money out at the end of the year and

7  they basically start fresh the next year.  That's not what —

8  what Highland did.  He was building, you know, what Your Honor

9  has called this giant web, but he was building this big empire,

10  and that required leaving some money in there to be able to do

11  things with.  And so he didn't take out every last penny that he

12  could take out.  But he shouldn't be punished now for that.

13          He should be allowed to put it to a jury and have them

14  say, yeah, we believe you did this, or, no, we don't.  But,

15  seriously, given what everybody has said about — about Mr.

16  Dondero and about how he wanted to make money, is there really

17  any doubt that he would — he would construct a plan by which he

18  had the chance to have these loans forgiven?  I mean seriously,

19  nobody really thinks that he made these loans thinking there was

20  no chance that they wouldn't have to be paid back.  Of course he

21  said up a plan where he would have the potential for

22  tax-efficient compensation.  I mean to think that — I mean I

23  don't believe Mr. Morris thinks, I don't think the debtor

24  thinks, I don't think Your Honor thinks that he was making — he

25  was taking these loans that he thought for sure weren't going to

*Plaintiff's Motion for Partial Summary Judgment*                    149

1    have to be paid back.  He was doing something where he thought

2    he would have the ability to turn them — or to have be turned

3    into compensation if — if Highland succeeded in the way that he

4    hoped it would.

5              THE COURT:  Anyway, —

6              MS. DEITSCH-PEREZ:  And I ask you to think about that

7    when you think about whether it's credible —

8              THE COURT:  We're — I am thinking about it.  We have

9    16 notes that were talking about in this litigation.

10             MS. DEITSCH-PEREZ:  Um-hum.

11             THE COURT:  It's roughly $70 million worth of notes.

12             MS. DEITSCH-PEREZ:  Um-hum.

13             THE COURT:  And it all — well, let's see.  There was

14   one November 2013 note, but with that one exception, they are

15   all within two and a half years of the bankruptcy, 2017, 2018,

16   2009 [sic], so $70 million of notes, mostly in the two and a

17   half years before Highland is in bankruptcy.  And, again, you

18   know, context matters, Highland's hurdling towards bankruptcy or

19   the zone of insolvency at some point — well, anyway, I don't

20   know if that's in summary judgment evidence, —

21             MS. DEITSCH-PEREZ:  I — it's not, right —

22             THE COURT:  — evidence —

23             MS. DEITSCH-PEREZ:  It's not, Your Honor, exactly —

24             THE COURT:  — in this case.  But the point is $70

25   million of notes, all —

*Plaintiff's Motion for Partial Summary Judgment* 150

1    MS. DEITSCH-PEREZ:  Your Honor, that's —

2    THE COURT:  Let me complete my thought.

3    MS. DEITSCH-PEREZ:  I know.

4    THE COURT:  It's taking me a lot to get it out —

5    MS. DEITSCH-PEREZ:  Well, I apologize.

6    THE COURT:  But 70 million of notes, 16 notes, all but

7    one is within two and a half years before the bankruptcy is

8    filed.  And the defense is, the defense that requires this to go

9    to a jury in — in your client's estimation is there was

10   basically a secret oral agreement between Dondero and his

11   sister, who had no management role at all with any of these

12   entities, but was the trustee of his family trust, which is the

13   majority owner of Highland, there was a secret, oral agreement

14   that these don't have to be repaid.  And never was this

15   agreement — never was this agreement disclosed to the other

16   officers of Highland or these makers.  And, in fact, they never

17   showed up, the oral agreement never showed up in a footnote or

18   anywhere on — on audited financial statements or bankruptcy

19   schedules that are signed under penalty of perjury, or monthly

20   operating reports that are filed under penalty of perjury, nor

21   in any objection to the disclosure statement or plan when

22   objections were made about feasibility.

23   So that — I mean, again, I'm just trying to assess

24   does this need to go to a jury.  That's what Judge Starr is

25   going to want to know.  Did I correctly encapsulate your —

*Plaintiff's Motion for Partial Summary Judgment*                    151

1          MS. DEITSCH-PEREZ:  And —

2          THE COURT:  — your defense?

3          No.  Okay, what —

4          MS. DEITSCH-PEREZ:  No, because — no.  And the reason

5    the answer is no, because you — there was an important sort of

6    assumption buried in there.  You said that these notes would be

7    forgiven.  And the — and the fact is it was not the — the

8    agreement was not that the notes would be forgiven, —

9          THE COURT:  They might be, they might be.

10         MS. DEITSCH-PEREZ:  — they would only — exactly.

11   Exactly.  And so, for better or worse, they didn't think it — I

12   mean Mr. Dondero testified he didn't — for that reason didn't

13   think it was material because they might be, they might not be

14   until the condition was triggered.  They were just — they were

15   just notes.  And so could he have been wrong in that assessment?

16   Yeah, I mean maybe a cons- — a more conservative person would

17   have said, 'Ew, you know, this could be forgiven.'  But he

18   didn't.  But that doesn't mean summary judgment should be

19   granted against him.  It means that's a fact that the fact

20   finder is going to consider in whether or not they think this

21   happened.  You have to balance that against do you really think

22   he didn't make a plan where he had the potential for more

23   compensation?  That doesn't sound very much like Mr. Dondero.

24   So it's not quite as cut and dry as Your Honor posited.

25             It's also not true that it was secret, because while

*Plaintiff's Motion for Partial Summary Judgment*                152

1    it was not a fulsome disclosure, Mr. Dondero, before this all

2    became an issue, did tell Mr. Waterhouse that, 'Wait a minute,

3    these might end up being compensation.'  Now did he sit down and

4    tell him chapter and verse?  No, but it's undisputed, nobody's

5    challenged the fact that he did tell that to Mr. Waterhouse.

6    And that is evidence of the agreement and that he also told —

7         THE COURT:  So that where is that — where is that

8    evidence?  Where is that evidence?  When —

9         MS. DEITSCH-PEREZ:  It — it —

10        THE COURT:  And how did he tell Mr. Waterhouse?

11        MS. DEITSCH-PEREZ:  There — there — he — there is

12   testimony from Mr. Dondero, and in our next break I'll find the

13   page and line number and the appendix.  There is testimony from

14   Mr. Dondero that he told Mr. Waterhouse that the agreements were

15   potential compensation, you know.  And — and you heard Mr.

16   Morris concede that during his opening, but we'll get you the

17   actual page and line.  And then Mr. Waterhouse —

18        THE COURT:  But it's just testimony.  It's just

19   testimony from Mr. Dondero.

20        MS. DEITSCH-PEREZ:  And then you also have Mr.

21   Waterhouse saying that, yes, Jim said something to him in the

22   context of when they were discussing putting up a competing

23   plan, that he shouldn't be counting the notes as money that was

24   due to Highland because they were potentially going to be

25   compensation and they should take that into account in doing the

*Plaintiff's Motion for Partial Summary Judgment*                     153

1    pot plan.

2            So that's something before we were in this litigation

3    fight that indicates there was some kind — something out there

4    that might have converted these notes into something less than

5    straightforward, plain vanilla pay your money notes.

6            And then on top of that, and I will concede this is

7    after litigation started, but really before anybody started

8    digging in to investigate the lawsuits and to find out all the

9    facts.  When the debtor said something overt about counting on

10   the money, Judge Lynn wrote to — I think Pomerantz, not Mr.

11   Morris, Mr. Pomerantz and said, 'Wait a minute.  Those are

12   potentially compensation, so don't go selling those notes

13   without telling somebody.'

14           So it's not true that these were completely secret.

15   It is the disclosure what —

16           THE COURT:  Uh-oh.  We're frozen.  We're frozen.  Can

17   anyone hear me?

18       (Off the record from 2:47 to 2:52 p.m.)

19           THE COURT:  Okay, is everyone back on, Mr. Morris, Mr.

20   Rukavina?

21           MR. RUKAVINA:  Yes, Your Honor.  It's —

22           MR. MORRIS:  Yes, Your Honor.

23           MR. RUKAVINA:  We all — we all can hear each other

24   perfectly.  Sometimes the Court, we can't hear you perfectly.

25   So I suggest that the problem is on the Court's end.

*Plaintiff's Motion for Partial Summary Judgment*                    154

1           THE COURT:  Okay, okay.  We've got the IT guy coming

2    back up here.  I'm going to have him just sit through the rest

3    of this, but for now, Ms. Perez, you can continue.

4           Just a minute.

5           Harold, can you stay, because they're saying it's at

6    our end because when we freeze, they can all hear each other but

7    not us.

8           Okay, so we got an IT guy.

9           Ms. Perez, you can continue.  Let's see, where were

10   you.

11          MS. DEITSCH-PEREZ:  I think actually we — we were

12   talking about the fact that the agreement wasn't really secret,

13   that there had been some heads-up to Mr. Waterhouse and from

14   Judge Lynn to Jeff Pomerantz.  And, in fact, you had asked what

15   — where was the testimony about telling Mr. Waterhouse.

16          And, Mike, if you go to slide 18, I think we quote —

17   we quote at least Jim's there.  So there was a little bit of it

18   there.  And we can also get you the Waterhouse page and line

19   numbers also.

20          So I'm going to jump ahead because in the course of

21   answering your questions, I did cover some of this, so we can go

22   past 18.  And then 19, this is the letter from — that I just

23   talked about.  And let's go on to 20.

24          THE COURT:  Okay.  I'm not seeing the slides, so the

25   same thing —

*Plaintiff's Motion for Partial Summary Judgment*                    155

1          MS. DEITSCH-PEREZ:  You're not seeing the slides?

2          THE COURT:  — same thing happened earlier today when

3     we had to reconnect.

4          MS. DEITSCH-PEREZ:  Mike, would you stop sharing and

5     then reshare?

6          THE COURT:  Okay, got it.

7          MR. AIGEN:  We're okay.

8          MS. DEITSCH-PEREZ:  Okay.  And so, you know, another

9     thing that the debtor points out is, gee, there was a time

10    period when a little bit of MGM stock was sold and Mr. Dondero

11    did not immediately jump up and down and say, 'Okay, you better

12    forgive my loans,' and therefore the fact that he didn't do that

13    must mean there was no agreement, there were no agreements.  No,

14    all it meant was that Mr. Dondero was trying to maximize the

15    prospects for reorganization.  And, as Mr. Morris is found of

16    saying, no good deed goes unpunished because now it's being

17    raised as a defense or a counter to — to the defendants'

18    defense.

19          So if we go on to slide 21, again there's some fuss

20    about whether Nancy looked at the notes at the time she was

21    entering into the agreement.  You know, that's the kind of thing

22    that maybe Mr. Morris could fool a jury that that's meaningful.

23    But that would actually be a good reason for a motion in limine,

24    not summary judgment to — to knock it out.

25          The same thing about the focus on the fact that it's a

*Plaintiff's Motion for Partial Summary Judgment*                                      156

1   verbal agreement.  I mean maybe that ought to be limined out of

2   a jury trial or at least the amount of argument on it limited

3   because lawyers tend to play on the prejudices of nonlawyers

4   that contracts must be in writing or that certain formalities,

5   like showing her the notes, must be met when they're not

6   requirements at all.

7            So let's go on to slide 22.

8            Again here are some extrinsic evidence that tends to

9   support the notion that there was an agreement.  The debtor

10  says, well, there's no history of forgiving loans as

11  compensation, but in fact that's not true.  Mr. Seery admitted

12  that they had found some.  Now it wasn't widespread, it wasn't

13  all the time, but there is evidence that other executives had

14  loan — had regular straight-up, bonafide loans that were

15  subsequently made forgivable based on — based on how they did.

16  And here is a little bit of the testimony of Mr. Dondero

17  battered (phonetic) and in his deposition.  There's more.

18           So not only plaintiff is wrong that there was no prior

19  practice, even if there wasn't one, that wouldn't be summary

20  judgment evidence that this agreement didn't take place, but the

21  fact that there were other people who got such agreements is

22  evidence, so again summary judgment.  It supports the existence

23  — it supports the existence of an agreement.

24           And this also takes us back to what I was talking to

25  you about earlier that doesn't it seem more likely to you than

*Plaintiff's Motion for Partial Summary Judgment*                157

1    not that Mr. Dondero would — would take the advice of someone

2    like Professor McGovern (phonetic) on how to have compensation

3    that was tax efficient, which is you borrow some money and then

4    you could either later take more money as part of your

5    compensation or you make the loan forgivable if you succeeded in

6    something.  And the latter is tax efficient.  Taking, just

7    taking the money is not tax efficient.  Is there anyone here who

8    would doubt that Mr. Dondero would take the tax-efficient way?

9              Let's go to the next slide.

10             MR. RUKAVINA:  Hey, Ms. Deitsch-Perez, I must

11   interrupt you, —

12             MS. DEITSCH-PEREZ:  Yeah.

13             MR. RUKAVINA:  —, please.  I need to take over.  And

14   if I have any time left over, I will yield it, but you've had 70

15   minutes by my clock.

16             MS. DEITSCH-PEREZ:  I do apologize and part of that

17   was in answering questions.  If you give me just one minute, I

18   will look to see if there is anything that absolutely must be

19   said and then —

20             MR. RUKAVINA:  Thank you.

21             MS. DEITSCH-PEREZ:  — I will yield the field.

22             Yeah, I do want to go quickly to slide 27, okay.

23   Maybe it's 28.  Okay.

24             There was confusion in Mr. Morris' argument about

25   consideration.  We are not arguing that the sole consideration

*Plaintiff's Motion for Partial Summary Judgment*                    158

1   was that Mr. Dondero work harder.  He could have and would have

2   taken more compensation, which he was entitled to do, because if

3   you look back at the LPA, even — you know, he could have taken

4   $5 million a year or even more if there was no NAM (phonetic)

5   trigger, and the debtor does claim there was a NAM trigger

6   period.  He could have taken much more compensation if he had

7   not gotten this agreement, so there is no lack-of-consideration

8   argument.

9           And I will — I would urge you, we'll send you these

10  slides, just look at what we have to say about competence.

11  There is no serious argument that Nancy was not competent to

12  enter into an agreement.  Lack of competence means something

13  like you were drunk or you were mentally ill or otherwise

14  incapable of entering into the agreement.

15          And I mean if a client tasked me with — with

16  negotiating an agreement on — you know, that involved particle

17  physics and to get all the components that are needed to build

18  some equipment, and I did a crappy job at it because I knew

19  nothing about the subject matter, no one would seriously argue

20  that you could not enforce the contract because the party tasked

21  with negotiating, you know, wasn't the ideal person to do it.

22  That's not what lack of competent — competence means.

23          And I will now leave for Mr. Rukavina to please cover

24  the issues with respect to Highland should have been taking care

25  of the payments and the prepayment arguments.  And if I have

*Plaintiff's Motion for Partial Summary Judgment*                159

1    more time later, I will take it.  Thank you very much, Your

2    Honor.

3              THE COURT:  All right.  Thank you.

4              Mr. Rukavina.

5              MR. RUKAVINA:  Thank you, Your Honor.

6              I think first the Court is under the assumption that

7    these were all notes for $70 million in the couple of years

8    before bankruptcy.  That is not correct.

9              So, Mr. Vasek, please pull up the NexPoint note and go

10   to the last page.

11             So this is the NexPoint note, Your Honor, almost half

12   of the amount.  And you will see this is from 2014 and 2015.

13   This is our old note.

14             Go to the very top, Mr. Vasek.

15             And at the very top it says that this note is in

16   substitution for and supersedes the prior note.  So the monies

17   were extended in 2014 and 2015.  HCMS likewise goes back to

18   2015.  I don't have it to share right now.  And HCRE goes back

19   to 2014.  I don't have that to share right now either.

20             You can remove that, Mr. Vasek.

21             But I think everyone here knows that in 2014 and 2015

22   Highland was doing very, very well, certainly much better than

23   in 2019.  So I just wanted to correct the Court's review that

24   the monies were actually transferred from Highland in 2019 or

25   so, and 2018.  HCMFA, that is true, but it is not for the other

*Plaintiff's Motion for Partial Summary Judgment*                    160

1    notes.

2              Mr. Vasek, if you will please pull up my deck.

3              So — so, first, Your Honor, let me address the

4    prepayment affirmative defense, and this is an affirmative

5    defense.  And I want to focus on NexPoint, which is my client.

6    But I think Ms. Deitsch-Perez's clients have identical issues.

7              So first we have to look at the language of the note.

8    And it clearly says that the maker may prepay in whole or in

9    part the unpaid principal — everyone knows what that means — and

10   then it says, "or accrued interest of this note."  I don't

11   understand how one prepays accrued interest.  Accrued interest

12   means that it's already happened and you're paying it, but the

13   note says accrued — prepay accrued interest.  The Court must

14   construe the instrument to give that meaning.

15             And here you see I have a quote from Mr. Seery when I

16   asked him this at his deposition.  He says:  Interest accrues on

17   this note.  How you prepay it is you send the money before the

18   accrual date.

19             So that makes sense.  So you want to prepay future

20   interest, basically.  That's what prepaying accrued interest

21   means.

22             But look at the second sentence of this provision.  It

23   says:  Any payment on this note shall be applied first to unpaid

24   accrued interest and then to unpaid principal hereof.  So we

25   have here immediately an ambiguity.  So I'm allowed to prepay

*Plaintiff's Motion for Partial Summary Judgment*                              161

1    future interest, but the second sentence says that any payment

2    first goes to accrued interest, meaning present, historical

3    interest, and into unpaid principal.  So how can a prepayment

4    ever go towards future interest?  So again we submit that there

5    is an ambiguity in this provision.

6              Go to the next slide.

7              But clearly what my client had done before, was it did

8    prepay future interest.  This is the actual course of conduct

9    between the parties.  This is the ledger that is in the debtor's

10   appendix.  I can certainly give you the citation.  And we — Ms.

11   Hendrix at her deposition walked us through it.  So this is

12   NexPoint right now.

13             So you see on the left there is a column that says,

14   "Interest accrual," that's how much interest is accrued at any

15   given point in time.  "Interest paid" and "Accrued interest."

16   So I want to take Your Honor to near the bottom, May 9th, 2018.

17   On May 9th, 2018, NexPoint made a $879,000 and change payment.

18   And look at how the debtor applied that.  Even though there was

19   only $39,000 of accrued interest pending, the balance did not go

20   to the principal.  The balance went to future interest.  You see

21   that there is a negative entry of $835,000 interest.  And then

22   as time goes on, — I don't have the rest of it right now, I can

23   certainly pull it up — as time goes on, if Your Honor looks at

24   this, you will see that basically the prepayment of that future

25   interest basically took care of many months of future interest.

*Plaintiff's Motion for Partial Summary Judgment*                    162

1      This also happened on December 5th, 2017, when there

2  was a prepayment of future interest of $127,000, and on December

3  18th, when there was a prepayment of future interest of $60,000

4  and more.  So — and obviously we know that the Court can look at

5  the parties' course of conduct whether the contract is ambiguous

6  or not.  The contract does have to be ambiguous for the Court to

7  look at the course of conduct to understand how the parties

8  understood and applied this change.

9      Again, all this is more fully set forth in our brief.

10  And if the Court needs me to pull up the full payment ledger, I

11  certainly can.  But the only point of this exercise is to show

12  you that the debtor and NexPoint historically understood the

13  note to allow the prepayment of future interest, not just

14  principal and not just accrued interest.

15      Next slide, please.

16      So what we have is between March and August of 2019,

17  NexPoint made $6.38 million on its note, and the other

18  defendants — again, what I'm saying, Your Honor, goes for the

19  other defendants.  I'm using NexPoint because, well, it's my

20  client and it's — one example is better than more [sic].

21      But that $6.38 million were not due.  Rather, after

22  using it, a portion of that to pay for future interest and

23  principal, a credit, if you will — I'm going to call it a credit

24  — of $4.1 million remained.  Now when — when NexPoint was making

25  these payments in 2019, Mr. Dondero very clearly testified that

1    these were intended to be prepayments.  So as happened, and as

2    you will see, Ms. Hendrix confirms, as did everyone else, as

3    what happened, as Highland needed liquidity, as Highland needed

4    cash, some of these term defendants would prepay.  Mr.

5    Waterhouse would call Mr. Dondero and say, 'We need cash,' and

6    Mr. Dondero would say, 'Okay, how much,' and then it would be

7    and it should have been recorded as a prepayment.  So Mr.

8    Dondero clearly talks about how when NexPoint made these

9    payments, and this is in his declaration, Your Honor, and it's

10   in his deposition, he expected that these were prepayments.

11            Next slide, please.

12            Now the Court may not necessarily believe that Mr.

13   Dondero is the most credible person.  I would disagree with

14   that.  And of course we're not here today on credibility

15   determinations.  But this is Ms. Hendrix.  Ms. Hendrix is still

16   with the debtor.  She was at that time the debtor's senior

17   accountant and she is now the debtor's controller.  She

18   certainly is going to be credible and she certainly has no

19   reason to try to wriggle out of any promissory note.

20            So I ask her does she have any understanding as to why

21   in 2019 NexPoint was making these large payments.  And he she

22   goes on to testify that, without looking at all the emails,

23   Highland would have needed cash, so this was one way to get the

24   cash to the debtor.

25            I ask, "So this is kind of like what we discussed in

*Plaintiff's Motion for Partial Summary Judgment*                164

1    the beginning, that Mr. Dondero on a cash-needed basis would

2    just transfer money between entities?

3             "Yes.

4             "Do you have any memory in the first half of 2019

5    whether Highland had any particular need for cash money?"

6             She says, "We always had a need."

7             Then I ask her, "If NexPoint — if NexPoint was

8    transferring money back to Highland on this note, because

9    Highland needed the money, wouldn't those have been recorded as

10   prepayments by the debtor?"

11            Mr. Morris objects to form.  "You can discuss that."

12            But she says, "Yes."  So she confirms that if NexPoint

13   was making large unscheduled payments on its promissory note,

14   they would have been recorded as prepayments.

15            Now why is that important?

16            Next slide, please.

17            So recall, Your Honor, that at the end of 2019,

18   NexPoint, there was what I call a credit of $4.1 million.

19   NexPoint had prepaid $4.1 million.  Our argument is that that

20   was enough to prepay all of the accrued and unpaid interest and

21   principal due in the year 2020.  So recall the issue is that

22   NexPoint did not make the 2020 payment on or before December 31,

23   as the debtor alleges is required.

24            NexPoint did make payments.  And NexPoint had an

25   unallocated, unapplied $4.1 million — again what I call —

*Plaintiff's Motion for Partial Summary Judgment*                    165

1    credit, which Mr. Dondero and Ms. Hendrix both state should have

2    been a prepayment.  Very importantly, these notes do not have

3    language that say that a prepayment does not relieve the maker

4    of any scheduled payments.  Most notes that we have, that we

5    have seen, at least in bankruptcy, where there is the ability to

6    prepay, the note also says that making a prepayment does not

7    relieve you of scheduled payments.

8            So we believe that it is equitable, appropriate, and

9    fair, in compliance with Texas law, and the intent of the

10   parties that those 2019 overpayments, credits, prepayments are

11   left there for future application against future obligations.

12   We know that all reasonable inferences must be drawn in the

13   nonmovant's favor.  And we know from Texas case law, we quote

14   this and we discuss this, that when neither party clearly

15   applies a prepayment against an obligation, so Mr. Dondero knew

16   that there were prepayments, but he did not say those better

17   relieve me of my December 31, 2020 payment, and Ms. Hendrix knew

18   that they were prepayments, but she didn't say those are going

19   to or those are not going to relieve your debt.  So when we have

20   something like this, where neither party clearly applies the

21   prepayment to any obligation, then it is up to the law and the

22   equities of the case to make a proper application of that

23   payment.

24           And, importantly, under Texas law, Texas Supreme Court

25   law, that such a presumed legal equitable application should be

*Plaintiff's Motion for Partial Summary Judgment*                     166

1   done in the manner that would be most beneficial to the debtor.

2   So it's just logic.  It's not — there's nothing magical about

3   it.  My client overpaid by $4.1 million in 2019.  That was

4   intended to be a prepayment.  The debtor asked for that money

5   because the debtor needed that money.  The debtor got the

6   benefit of that money.  And the most logical, best, most

7   equitable way to apply that is against the next scheduled

8   payments.  That's what happened before.  There is no language

9   that says you have to make scheduled payments.

10             Now we believe there are no real disputes of fact on

11  anything I've just shown you.  Yes, perhaps the trier of fact

12  can apply the prepayments differently.  The trier of fact can

13  say, 'Well, we're going to apply them to principal.'  But the

14  law clearly allows the trier of fact to decide, based on the

15  equities, where the prepayments should be applied.  And because

16  that is a question of fact, Your Honor, it is outside the scope

17  of summary judgment.  The Court should, therefore, deny summary

18  judgment on the prepayment defense, allow these facts to be

19  presented to a jury.  And the jury, based on all the facts that

20  it hears, will decide whether the default Texas law that the

21  payments should be applied as most beneficial to NexPoint should

22  be followed or, for some other reason, it shouldn't.

23             Next slide, please.

24             The next defense, which is probably an affirmative

25  defense, concerns the fact that we contracted with Highland to

*Plaintiff's Motion for Partial Summary Judgment*                    167

1    monitor and take care of our payables for us.  So you heard Mr.

2    Morris talk about the shared services agreement.  You heard him

3    talk about Section 2.  I heard him say something that I don't —

4    I don't know if I heard him right, which he said something like

5    'We're just pulling this out of thin air,' but the NexPoint

6    shared services agreement clearly says that NexPoint shall

7    provide assistance and advice, not just assistance, Your Honor,

8    but advice, with respect to back-office and middle-office

9    functions, which clearly contemplates payables, and then it

10   says, "including but not limited to payments, accounts

11   payables," and other things, like cash management, finance,

12   bookkeeping.

13          Then it says, "assistance and advice on all things

14   ancillary or incidental," incidental "to the foregoing."  And

15   then it also says "other assistance and advice relating to such

16   other back- and middle-office services in connection with the

17   day-to-day businesses," et cetera.

18          So NexPoint — and, again, Ms. — Ms. Deitsch-Perez

19   might talk about a couple of the other ones that didn't have

20   written service agreements, but NexPoint had a written service

21   agreement where we contracted with the debtor to monitor and

22   take care of and advise us with our payment responsibilities —

23   next slide — that's black and white in the contract, Your Honor.

24          But we asked Mr. Waterhouse whether these services

25   would have included making sure that NexPoint would pay under

*Plaintiff's Motion for Partial Summary Judgment*                    168

1    long-term obligation notes.  I asked, "Was it reasonable for

2    NexPoint to expect debtor employees to ensure that NexPoint

3    timely paid its obligations?"  There's a couple of objections to

4    form.

5            But Mr. Waterhouse says, "Yes, we did that.  We did

6    that generally.  Again, I don't remember specifically.  But,

7    generally, yes, you know, we did that."

8            And then I says, "Roles — what role in years prior to

9    2020 would employees of the debtor have had with respect to

10   NexPoint making that annual payment?"

11           Now he answers without objection, "We would.  Since we

12   provided treasury services to the advisors, we would inform" —

13   blah-blah-blah — "we informed Mr. Dondero of any cash

14   obligations that are forthcoming.  We do cash projections.  But,

15   yes, it is to inform Mr. Dondero of the obligations of the

16   advisors in terms of cash and obligations that are — are

17   upcoming and that are — are scheduled to be paid."

18           Next slide.

19           Then I ask and, again without objection, he answers.

20   "I asked prior to the 2020 would those services have included

21   NexPoint's payments on the $30 million loan?"  He says, "Yes."

22           And then I ask, "And based on your experience, would

23   it have been reasonable for NexPoint to rely on the debtor's

24   employees to inform NexPoint of an upcoming payment due on the

25   $30 million promissory note."  That's the December 31, 2020

*Plaintiff's Motion for Partial Summary Judgment*                    169

1    payment.

2           Again there's a couple form objections that I don't

3    understand the basis for it.  This is the debtor's CFO.  This is

4    my treasurer.  This is a man that worked in shared services

5    certainly knew what would have been reasonable, and he says,

6    "Yes.  Yes, they did."  But then of course he adds, "Those notes

7    weren't a secret to anyone."

8           Let me also correct something that Mr. Morris

9    mentioned.  Mr. Morris said at that no one Social Security any

10   provision that Highland is supposed to pay these notes.  It's a

11   play on words, Your Honor.  Of course Highland doesn't pay on

12   our notes.  As the summary judgment record shows, as Mr.

13   Waterhouse, as Mr. Klos, as Ms. Hendrix all testified, it's in

14   their depositions, it's in my brief, Highland would pay advisor

15   bills from advisor funds.  Highland had access and control over

16   advisor accounts and Highland would make those payments.

17          Mr. Morris also referenced those emails where Ms.

18   Hendrix would ask Mr. Waterhouse for approval to make payables.

19   That's exactly what happened.  That happened on at least a

20   weekly basis.  But Mr. Waterhouse was wearing his CFO of

21   Highland hat when the a happened.  Ms. Hendrix was not an

22   advisor  employee.  Ms. Hendrix, pursuant to shared services,

23   was asking Mr. Waterhouse, pursuant to shared services, whether

24   the following bills and obligations of the advisor should be

25   paid.  So let's be clear on that.   we are not arguing that

Case 21-03004-sgj    Doc 161    Filed 05/03/22    Entered 05/03/22 13:09:17    Desc Main
Case 3:21-cv-00881-X    Document 178-1    Filed 11/09/04222    Page 170 of 222    PageID 37027

*Plaintiff's Motion for Partial Summary Judgment*                    170

1    somehow Highland had to use its money to pay our obligation, not

2    at all.  Just that Highland had to assist and advise us.

3                Next slide, please.

4                Now we come to the question of fact.  The underlying —

5    well, I apologize.  Who is it — Julian, I see, viewing "Julian

6    Vasek" right over my title.  What is this?  Who is testifying

7    right here?

8                THE COURT:  Hendrix.

9                MR. RUKAVINA:  Is this — is this Hendrix?  Hendrix.

10   Thank you.

11               MS. DEITSCH-PEREZ:  Hendrix.

12               MR. RUKAVINA:  And I apologize, Your Honor.  I just —

13   I don't know why I can't read it.

14               Just to round out the discussion, not only — if the

15   Court questions Mr. Waterhouse's sincerity, again, you can't

16   question Ms. Hendrix's sincerity.

17               Ms. Hendrix, again I ask her there at the bottom, "As

18   part of that in December 2020, would it have been employees of

19   the debtor that would have scheduled potential payment subject

20   to approval by NexPoint, NexPoint's future obligations as they

21   were coming due, she says, "Yes, only with approval."

22               And then I ask, "And would that have included

23   NexPoint's obligations on the promissory note to Highland."  And

24   she says, "Yes," again without objection.

25               So we're on the next slide.

*Plaintiff's Motion for Partial Summary Judgment*                 171

1          And Mr. Dondero confirms the same, but you can go to

2     the next slide.  So we have again Mr. Dondero, Mr. Waterhouse,

3     and Ms. Hendrix all discussing how the advisors would rely on

4     Highland to schedule and advise with these payments, and how

5     that was one of the services contracted out to Highland.

6          Now here is the dispute of fact, one that the Court

7     obviously cannot resolve.  In late November or early December

8     2020, Mr. Dondero learns of alleged overpayments under shared

9     services, and he tells Mr. Waterhouse stop payments.  Mr.

10    Dondero said, testified, he said stop payments just on shared

11    services and payroll reimbursement.  Mr. Waterhouse testifies,

12    no, no, Mr. Waterhouse said — Mr. Dondero said stop all

13    payments.

14         So if the jury believes Mr. Dondero, that he did not

15    say stop payments on the notes, then Highland's fault is

16    obvious.  Likewise, if the jury believed Mr. Waterhouse, then

17    Highland's fault is still obvious because, as Mr. Waterhouse

18    confirmed, after he got that instruction from Dondero, he did

19    nothing.  He did nothing.  He literally put his head in the sand

20    and did nothing.

21         Well, I'm sorry, but the CFO and treasurer, someone

22    who that is contracted out to provide these services, needed to

23    take some action, such as ensure if he understood Mr. Dondero

24    correctly, try to advise Mr. Dondero of the consequences, and

25    try to convince Mr. Dondero otherwise.  Would Mr. Dondero and

*Plaintiff's Motion for Partial Summary Judgment*                    172

1    NexPoint really for a million dollars, especially because it had

2    been prepaid, wanted to default on what was at that time — I

3    forget how much — a 23,-, $24 million note?  Of c- — Your Honor

4    mentioned it this morning.  When the Court denied our Rule 16

5    motion to extend the expert deadline for Pully, the Court found

6    that expert testimony was not needed to decide this standard of

7    care.  A reasonable jury can conclude that Highland was at

8    fault, whether it's Waterhouse's or Dondero's testimony.  And

9    here is why.

10              Next slide, please.

11              The shared services agreement, Your Honor, there it is

12   in the middle, standard of care, it expressly provides that

13   Highland will fulfill its duties with the care, skill, prudence,

14   and diligence under the circumstances then prevailing that a

15   prudent person acting in like capacity, et cetera, et cetera, we

16   discussed this at the Rule 16 hearing.

17              So we know that the Court cannot — first of all, we

18   know that there is language in the shared services agreements

19   requiring Highland to assist and advise NexPoint with its

20   payment obligations.  We know that Dondero, Waterhouse, and

21   Hendrix all testified that that included ensuring that NexPoint

22   was advised of its upcoming note payment.

23              We don't know whether Dondero or Waterhouse, which one

24   the jury will before, we can't — the can't decide that.  And the

25   Court also can't decide whether this black-and-white standard of

*Plaintiff's Motion for Partial Summary Judgment*                    173

1    care was satisfied.  But the Court did rule that that does not

2    require expert testimony, that that is within the average

3    juror's ability to decide.  And although I am seeking a

4    reconsideration of that order, I don't have that

5    reconsideration, so right now this Court's order stands that I

6    do not need expert testimony to prove up that that standard of

7    care was violated.

8            And we know from the United States Supreme Court that

9    on summary judgment the Court cannot decide whether a standard

10   of care was violated or not.  But, again, there is a standard of

11   care and there is a service contracted for.

12           Next slide, please.

13           And that means that under Texas law, Your Honor, that

14   one whose negligence caused a delay in performance of a

15   contract, that delay is excused.  We have cited case after can

16   for that proposition.  I'm not going to read them to you, but

17   it's also common sense.

18           If I contract with someone to do something for me and

19   they mess up, they fail, they can't then take advantage of my

20   resulting delay, when I have been paying them and relying on

21   them to make sure that I do it right.  That, Your Honor, is the

22   Highland fault affirmative defense.

23           Next slide.

24           And, again, that defense is factually intensive.

25   There are disputed facts, but it is a valid defense under Texas

*Plaintiff's Motion for Partial Summary Judgment* 174

1    law.

2          The final one, and I will be very brief on this, Your

3    Honor, the record is clear, a couple of weeks after the default,

4    the defendants, NexPoint, we actually made the payments.  What

5    happened was Dondero called Waterhouse, Waterhouse said, 'Well,

6    you didn't make the payments.'  Dondero said, 'Make the

7    payments.'  So now we have — we have questions of fact.

8          Mr. Dondero has given sworn testimony that when he

9    made those payments, it was his understanding that they would

10   cure the prior defaults.  Now at this time Mr. Waterhouse was

11   still the CFO of the debtor.  He certainly had the ability to

12   speak at least with apparent authority for the debtor.  At this

13   time — so go to the next slide, please — at this time Mr.

14   Waterhouse did not advise Mr. Dondero that the payments would

15   not cure.

16         Now in truth and in fairness, Mr. Waterhouse — no one

17   remembers whether Mr. Waterhouse said the payments will cure.  I

18   don't have any evidence of that.  I'm not arguing that Mr.

19   Waterhouse told Dondero, 'Make these payments and your defaults

20   are cured and the notes unaccelerated.'  The point is, going

21   back to the standard of care, Your Honor, under shared services,

22   Mr. Waterhouse did not advise Mr. Dondero that making these

23   payments will not or might not or Mr. Seery might decide not

24   cure your defaults.  That is exactly what the CFO and treasurer,

25   a Highland employee, under contract to provide us with advice

*Plaintiff's Motion for Partial Summary Judgment*                    175

1    regarding our payments should have said.  That is an omission by

2    him.  So he basically induced Mr. Dondero to have these payments

3    made.  Mr. Dondero believed that they would cure the — the

4    defaults.  And Highland kept the money.  That's again common

5    sense.

6              Would Mr. Dondero have really said, 'Make millions of

7    dollars of payments,' after we had been defaulted and

8    accelerated if he did not believe that it would not cure and

9    unaccelerate the notes?  But that is a question of fact.

10   Whether Mr. Dondero's expectation was reasonable is a question

11   of fact.  Whether Mr. Dondero is telling the truth is a question

12   of fact.  Whether Mr. Waterhouse is telling the truth, it's a

13   question of fact.  And that's all that matters for purposes of

14   summary judgment.

15             Is that the last slide, Julian?

16             So those — that rounds off, Your Honor, our discussion

17   — you can close this, Julian — that rounds off our discussion

18   the note, the terminal defendants.  Now let's move to HCMFA.

19   And I want to try to be brief on this one because I understand

20   that I'm not going to permitted to argue the signature issue,

21   which would have otherwise consumed a lot of time.

22             Please pull up the HCMFA one, Julian.

23             MR. VASEK:  Just a moment.

24             MR. RUKAVINA:  So go to the next slide, please.

25             So the defense here, Your Honor, is mutual mistake.

*Plaintiff's Motion for Partial Summary Judgment*                 176

1   We have two promissory notes, May 2nd of $2.4 million, May 3rd

2   of $5 million.   And — and the core of the mistake is that these

3   — these were transfers that happened from Highland to HCMFA, but

4   that they were never intended or authorized to be loans, were

5   instead compensation.   And we're going to go through that in

6   quite some detail.

7               Next slide, please.

8               So this is back to that time line I shared with you

9   earlier.   The bottom half now really won't matter.   It related

10  to the signature issue that has been precluded.

11              So we have the shared services agreement from 2013.

12  It's a little bit different than the NexPoint one I just

13  discussed.   This is a separate HCMFA one, but we'll get to that.

14  And in 2018, there is a valuation error regarding an asset

15  called TerreStar.   And it's all in the record.   Your Honor has

16  the post error memo, Your Honor has the memo to the SEC.   There

17  was a mistake made that caused millions of dollars in damages to

18  one or more funds.

19              HCMFA contracted valuation services to Highland,

20  pursuant to the shared services agreement.   That's one of those

21  middle-office things you've heard about.   So ultimately what

22  happened was that HCMFA, pursuant to a compromise that involved

23  the SEC and the insurance carrier, paid just over — or just

24  under $5.2 million as compensation to the funds.   And then on

25  May 2nd, it paid an additional just under $2.4 million.   There

*Plaintiff's Motion for Partial Summary Judgment*                    177

1   is a contradictory evidence, which again the Court can't

2   resolve.  Mr. Dondero, Mr. Waterhouse believed that $2.4 million

3   to be compensation.  And that's also in the post-error memo that

4   we have that we can walk through.  Whereas, Mr. Klos and Ms.

5   Hendrix remembered that $2.4 million to be a consent fee, a fee

6   payable to the holders of various funds to convert them from

7   open to closed funds — or maybe I'm inverting that.

8           So now we have the two promissory notes, we have the

9   two payments on account of the NAV (phonetic) error.  Then

10  Highland calls the notes.  These were demand notes.  Highland

11  files the complaint.  We first answer with no affirmative

12  defenses.  After filing a motion for leave, we assert the

13  affirmative defense of mutual mistake.  And, very importantly, I

14  walked you through it this morning, I can well, you through it

15  again, we assert in multiple places that we did not execute the

16  notes and that Mr. Waterhouse did not have authority on behalf

17  of NexPoint to execute the notes —

18      (Very brief garbled audio.)

19          MR. RUKAVINA:  — signature.  I'm not talking about the

20  signature now.  I'm talking about that NexPoint did not execute

21  the notes and that Mr. Waterhouse wasn't authorized.

22          Next slide, please.

23          So this is — this is a new record.  Mr. Dondero

24  testified and gave an affidavit, and it's always been

25  consistent, that he was very angry about these mistakes.  They

*Plaintiff's Motion for Partial Summary Judgment*                178

1    cost a lot of money.  Yes, the insurance paid for five point

2    something, but it was very embarrassing.  It caused a huge

3    amount of internal problems.  Everyone in the complex knew about

4    this because you don't make errors like this, no.  So Mr.

5    Waterhouse — I'm sorry — Mr. Dondero said in his own mind that

6    Highland needs to compensate HCMFA, because it HCMFA that was on

7    the hook.  So that's in the record.

8            Now by itself, the Court might not find that credible,

9    although the Court can't make that determination.  I'll give you

10   other indicia of credibility.  What — what both Dondero and

11   Waterhouse testified to clearly and unambiguously is that only

12   Mr. Dondero could authorize Highland or HCMFA to make or take

13   loans on that size at that time.  Only Mr. Dondero.

14           Mr. Morris talked about apparent authority because Mr.

15   Waterhouse is the treasurer of HCMFA.  Normally he'd be right,

16   that a CFO or treasurer can go out there and presume to have

17   authority to enter into loans of this size.  That does not apply

18   when he wears both hats.  When an agent is common to two

19   principles, the agent's knowledge is imputed to both.  Both

20   principals know what the agent knows.  If the agent knows that

21   he can't authorize this on the one, that applies on the other

22   one as well.

23           And we have briefed this at length.  There is no point

24   in my hammering on that.  But the fact that Mr. Waterhouse was

25   an agent for both means he can't have no apparent authority.

*Plaintiff's Motion for Partial Summary Judgment*                    179

1    Apparent authority is, again, what someone outside reasonably

2    assumes you'd have.  All that he could have was actual authority

3    and he could not have actual authority on his own to take or

4    make loans of this size.

5             So what happens, what both Dondero and Waterhouse

6    testified to is Dondero tells Waterhouse to transfer $7.4

7    million from Highland to HCMFA.  Dondero did not say these are

8    loans.  Dondero did not tell Waterhouse why these transfers were

9    happening, except that they were related to TerreStar.

10            Waterhouse did not ask if they were loans, and he does

11   not recall being told that they were loans.  What he remembers

12   is Dondero saying, 'Go get the money from Highland.'  But, again

13   importantly, to bolster the credibility of Mr. Dondero, not that

14   it needs credibility, what Mr. Waterhouse remembers is that

15   these transfers were related to the NAV error.  Were.  Nothing

16   at all about a liquidity need on the part of HCMFA.  No

17   evidence, no one has said nothing in the record that, wait,

18   HCMFA needs liquidity, so let's transfer funds to HCMFA by way

19   of a loan.

20            All of them remember, Waterhouse, Klos, and Hendrix,

21   that it was related to the NAV error.  Again, the NAV error,

22   where Highland caused this liability for HCMFA.  That bolsters

23   Mr. Dondero's subjective intent that this transfer be

24   compensation for the harm that Highland caused.

25            Now as Mr. Waterhouse testified at length, these notes

*Plaintiff's Motion for Partial Summary Judgment*                    180

1    should have gone through the Legal Department.  They did not.

2    Instead Waterhouse tells Mr. Klos, at that time the controller,

3    to transfer the funds.  That's all he tells him, 'Transfer the

4    funds.'  Mr. Klos, and he testified at length about this,

5    testifies about how based on prior practice he, a prudent

6    accountant, a prudent controller, would paper up intercompany

7    transfers as loans or payments on loans — well, not he, but that

8    would be the practice.

9            Mr. Klos doesn't ask, 'Are these loans therefore,' he

10   assumes that they're loans because that's the prior practice.

11   He then instructs Ms. Hendrix, the senior accountant, to go

12   paper them up, and his role is done.  Now it is true that on one

13   of those two emails instructing that the loans — that the

14   transfers be papered up, he does copy Mr. Waterhouse.  He does.

15   And the debtor argues, well, Mr. Waterhouse should have hit the

16   panic button and said these are not loans.  Well, that's some

17   evidence of something.  That's some evidence that perhaps Mr.

18   Waterhouse thought that they were loans.  But it's just evidence

19   of that.  It is not — it is not the magic bullet here.  The

20   point again is Mr. Klos testified very clearly that he assumed,

21   based on prior practice, that these were loans.  And then Ms.

22   Hendrix likewise testified very clearly that based on prior

23   practice and Mr. Klos' instructions these were loans, and she

24   papered them up as loans.  It didn't go through Legal, she

25   papered them up as loans.  She never showed the notes to Mr.

*Plaintiff's Motion for Partial Summary Judgment*                    181

1    Waterhouse, she never brought the end notes to Mr. Waterhouse.

2    That was it.  Mr. Waterhouse told Klos to transfer it.  Klos

3    told Hendrix to paper it up as loans.  And that was it.

4            Next slide, please.

5            Now there is a lot of other circumstantial evidence

6    here that I think a jury should and will consider.  And I agree

7    completely with Ms. Deitsch-Perez, Mr. Morris' argument is the

8    best evidence of why the Court cannot grant summary judgment

9    because it kept talking about jury and reasonable jury, and he

10   was making opening arguments.  But look at the other

11   circumstantial evidence.

12           There is two notes, two transfers, and two payments by

13   HCMFA for the harm caused.  If there is a need for liquidity,

14   why have two notes and two transfers?  Highland was bleeding

15   cash at that time.  Mr. Dondero — this is in the record —

16   personally put in money into Highland so that Highland could

17   make these transfers to HCMFA.  Why would he have done that

18   unless it was for compensation.  If HCMFA needed funding for

19   some reason, why wouldn't he have just put money into HCMFA?

20   Why have Highland do it?

21           The promissory notes are in amounts very, very similar

22   to the actual payouts because of the error, 5 million versus 5.2

23   million, 2.4 million versus just under that.  In fact, the 2.4

24   million is done on the very same day as the note.  Again

25   Waterhouse remembers that this was related to the NAV error.

*Plaintiff's Motion for Partial Summary Judgment*                                    182

1    There is no mention by anyone in their depositions, the debtor

2    hasn't presented any because there is none, that there was a

3    need at HCMFA at that time to transfer money such that this

4    would be a loan.  Again, Ms. Hendrix remembers that this was

5    related to the NAV error and the consent fee, so there is a

6    question of fact there.  The — the shared services provides for

7    the valuation.  Again, this was logical when I put in here it

8    passes the smell test.

9            If Mr. Morris asking the Court to conclude that no

10   reasonable juror could conclude that this is true, I — not only

11   do I respectfully disagree, I utterly disagree.  The Court might

12   not find it credible.  Mr. Morris might find it incredible, but

13   all that we need to defeat summary judgment are genuine issues

14   of dispute fact.  These are all genuine issues.

15           No one is arguing that some space alien came down here

16   and fabricated these promissory notes.  That would not be a

17   genuine issue.  And, again, nothing went through Legal, nothing

18   was papered up through Legal, nothing was shown to Waterhouse

19   afterwards.

20           Now the big counter argument is, well, how could Mr.

21   Waterhouse carry these on the books for months and months, how

22   do he file MORs.  This is all just a lie, Judge.  This is an ex

23   poste facto lie.  Again, questions of fact.  But let's look at

24   Mr. Waterhouse's understanding after the fact.

25           The email, Julian.  So — slow down a little bit more.

*Plaintiff's Motion for Partial Summary Judgment*                    183

1      So — so Your Honor has this, we've addressed it.  What

2   is being discussed here is the retail boards are asking of the

3   advisor, HCMFA, amongst other things, are any amounts currently

4   payable or due to the debtor by HCMFA.  What you see then from

5   Lauren Fedtherd (phonetic), and she's copying various people

6   whose names you've gotten to know, she talks about HCMFA, due to

7   HCMLP of June 30th, 2022, 12 million and change, per the top.

8      Look at how Mr. Waterhouse responds.  The man who

9   signed these notes allegedly a little over a year earlier, he's

10  going off memory here, he says the HCMFA note is a demand note.

11  There was an agreement between HCMLP the earliest they could

12  demand is May 2021.  That's completely wrong.  And why is it

13  wrong?  Because there are four HCMFA notes, Your Honor.  There

14  were two prior notes — we have briefed this.  We have given you

15  copies.  The debtor has sued HCMFA for these two prior notes —

16  where the maturity was extended to May 2021, which is the why

17  the debtor only filed suit on those notes after that maturity

18  passed.

19     So again here is the CFO, who Mr. Morris has told you,

20  and the Court, I heard the Court say should have known better,

21  calling the HCMFA note a note instead of promissory notes, and

22  saying that the earliest it could be demanded is May 2021.

23     Close this and pull up the Rule 15(c), Julian.

24     We're going to look at just the top of this Rule

25  15(c), Your Honor, because it contains highly confidential,

*Plaintiff's Motion for Partial Summary Judgment*                    184

1    proprietary information, but this is the report that Mr. Morris

2    told you that HCMFA sent to the retail boards where they concede

3    and admit that they owed this money.

4            Scroll down, Julian.  Keep scrolling.  Keep scrolling,

5    please.  Okay.

6            So there are any material amounts currently payable or

7    due.  So here again, now this is the whole Legal and Accounting

8    Department at Highland, Ms. Fedtherd, Mr. Klos, Ms. Hendrix, Mr.

9    Waterhouse.  You saw them all on that email.  None of them

10   remembered, oh, wait, oh, wait, these notes have not been

11   extended to May 2021; oh, wait, there's more than one note.

12   Again, it talks about the note between HCMLP and HCMFA and it

13   talks about coming due in May 2021.  Again, that's not correct.

14           And the debtor has never explained why the numbers

15   don't add up.  Why does it say that HCMLP — I'm sorry, where is

16   it here — the twelve million two hundred and eighty-six

17   thousand, Your Honor.  So there were the two notes are the

18   question here for 7.4 million and there were two other notes

19   which — it's in my brief, I forget right now, but the total

20   amount is quite a bit higher than $12.286 million.

21           No one has ever tried to explain to Your Honor why

22   these professional people, if they believe and know of the

23   existence of four notes, can't do simple math and add up four

24   principal amounts owing — you can close this.  The point of me

25   saying that, Your Honor, is it's very easy in hindsight for Mr.

*Plaintiff's Motion for Partial Summary Judgment*                    185

1    Morris to argue and for, frankly, the Court to assume that Mr.

2    Waterhouse and his team did know about these notes, that they

3    were always reported in the bankruptcy and that this is just us

4    trying to weasel out of a lawful debt after the fact.  That is

5    not correct, Your Honor.  That is not correct because, as I've

6    shown you, that's just a small sampling of our evidence.

7         These two notes are different.  These two notes are

8    different and they're different because the amounts are very

9    similar to the prior HCMFA notes.  These two notes are different

10   because there were two prior HCMFA notes.  Everyone knew that

11   there were two prior HCMFA notes.  Everyone would have recalled

12   that and they would have put it in financials.  They would have

13   put it on Rule 15(c)s.  They would have put it on the bankruptcy

14   schedules.  That does not mean that they knew about these two

15   notes, that they knew that there were in fact four notes.

16   People were confused.  They were confused for many reasons

17   because this had to do with TerreStar, it had to do with the

18   same numbers as was paid out to TerreStar.

19        And the jury, a reasonable jury can conclude that all

20   these people that are now telling you that Mr. Waterhouse should

21   have been perfect and Ms. Hendrix should have been perfect and

22   Mr. Klos should have been perfect and Ms. Fedtherd should have

23   been perfect, that they made a simple mistake.  And that mistake

24   was that these promissory notes were never intended to be debt.

25   Mr. Waterhouse didn't register them as such in his mind.  And

*Plaintiff's Motion for Partial Summary Judgment*                    186

1    that's why you see mistake after mistake of how they're carried.

2                 And, finally, yes, there are repeated instances of the

3    debt from HCMFA being recorded, but it's also all debtor

4    employees.  Of course Ms. Hendrix, who prepared the notes,

5    assuming that they were loans, would have recorded that.  Of

6    course Mr. Klos, who told her to do that, assuming that they

7    were loans, would have recorded that.  That's evidence of

8    nothing.  That's not evidence that there was a mutual mistake.

9    That's evidence that the people who caused the mistake did so in

10   good faith and didn't defraud anyone.

11                And the final point is the debtor makes a big deal

12   about how my client received $5.1 million from the insurance

13   company to pay part of the liability for this error.  We have

14   briefed out in some detail the collateral source rule in Texas.

15   That rule allows you to have a double recovery.  That rules says

16   you can recover from an insurance company and from the

17   tortfeasor without any kind of problem.  And it exists and it's

18   existed for over a hundred years because people can go out there

19   and pay for insurance and are responsible, not insurance pays,

20   that should not be relieving the tortfeasor of its liability.

21   So that's a red herring.

22                And, really, if Highland believes that we did

23   something wrong with the insurance carrier, then it can go and

24   talk to the insurance carrier.

25                Fact, Your Honor, there was a NAV error.  Fact, it

*Plaintiff's Motion for Partial Summary Judgment*                    187

1  caused my client to pay over $7.4 million in damages.  Fact,

2  there is two transfers of about that amount.  Arguable fact, Mr.

3  Dondero instructed that this be compensation.  Arguable fact,

4  Mr. Waterhouse knew about it.

5          Now pull up my PowerPoint, Your Honor — Julian.

6          My final point, Your Honor, my time is almost up.

7  This is now the authority.  This is a very important point.

8          Go down, please.

9          Okay.  So — so let's talk about the authority now.  We

10  — I mentioned earlier the UCC.  Here, Your Honor, I have quoted

11  the relevant portion.  It's the Texas version, 3.308(a):  In an

12  action with respect to an instrument, the authenticity and

13  authority to make — that's clear — and authority to make each

14  signature on the instrument are admitted unless specifically

15  denied in the pleadings.

16          If the validity of a signature is denied in the

17  pleadings, the burden of establishing validity is on the person

18  claiming validity.

19          I'm not talking about the Waterhouse signature, Your

20  Honor, now.  I'm talking about just the authority.  In our first

21  amended answer, as I walked you through before, we expressly

22  denied, specifically denied that Waterhouse had the authority to

23  make the promissory note on behalf of HCMFA.  Because that's

24  denied in the pleadings, the burden of establishing validity is

25  on the person claiming validity, HCMFA.  There is zero evidence

*Plaintiff's Motion for Partial Summary Judgment*                    188

1    before Your Honor from the debtor that Mr. Waterhouse was

2    authorized by the debtor or by HCMFA to execute these notes.

3    Certainly Klos and Hendrix weren't.  Those were lower-level

4    employees, those were not officers.  There's no argument that

5    they were.

6            The burden is on Highland to prove that Waterhouse had

7    actual and/or apparent authority to sign these notes.  There is

8    nothing in the record to prove that, Your Honor, because again

9    the mere fact that this being an officer doesn't matter.  And

10   both Dondero and Waterhouse testified that Waterhouse did not

11   have that authority.  So for that reason, if no other reason,

12   Your Honor, the Court cannot recommend granting summary judgment

13   because there is a fatal flaw of evidence on the part of the

14   debtor.

15           Again the debtor assumes, 'Well, he is the officer, he

16   can do it.'  Uh-uh, because he's wearing both hats.  Thank you,

17   Your Honor.

18           THE COURT:  All right.  Thank you.

19           All right.

20           MR. MORRIS:  Your Honor, may I — may I request just a

21   very brief break before I give my rebuttal, which I don't expect

22   to last the whole 55 minutes that I have?

23           THE COURT:  I need a break as well —

24           MR. RUKAVINA:  May we make it 10 minutes, Your Honor?

25           THE COURT:  We'll make it 10 minutes right.

*Plaintiff's Motion for Partial Summary Judgment*                          189

1              COURT SECURITY OFFICER:  All rise.

2              MR. MORRIS:  So we'll come back at the top of the

3   hour?

4              THE COURT:  We'll — yeah, it's 3:48, let's just make

5   it four o'clock we'll come back.

6         (Recess taken.)

7              COURT SECURITY OFFICER:  All rise.

8              THE COURT:  All right.  Please be seated.

9              We are back on the record in the Highland note

10  adversaries.

11             Mr. Morris, do we have you?

12             Looks like I'm on mute.  Am I on mute?

13             All right.  Hello.  I was muted apparently.  We're

14  back on the record in the Highland note adversaries.

15             Mr. Morris, are you ready for your rebuttal?

16             MR. MORRIS:  I think so.

17             Ms. Canty, are you all set?

18             MS. CANTY:  I am.

19             MR. MORRIS:  Okay.  So good afternoon, Your Honor.

20  John Morris, Pachulski, Stang, Ziehl and Jones, for Highland

21  Capital Management, L.P.  I understand I have 55 minutes for my

22  rebuttal.  I'm hopeful not to take so long.

23             I want to begin my rebuttal where I began with my

24  opening argument since I guess I was accused several times of

25  not citing to the law, so I thought I'd cite to the law again.

*Plaintiff's Motion for Partial Summary Judgment*                                    190

1          We're entitled to summary judgment if there is no

2    genuine dispute of a material fact.  A dispute about a material

3    fact is genuine only if the evidence is such that a reasonable

4    jury could return a verdict in favor of the nonmoving party.

5    And that's why I referred to the jury, not because I was making

6    a closing argument, but because that is merely what the legal

7    standard is.

8          We can meet our burden by demonstrating either an

9    absence of evidence to support the nonmoving party's claims, or

10   in this case defenses, or by showing that there is an absence of

11   genuine issues of material fact.

12         The defendants here have to do more than create some

13   metaphysical doubt as to material facts.  They can't satisfy

14   their burden by relying on conclusory allegations,

15   unsubstantiated assertions, or a scintilla of evidence.

16   Critical — where critical evidence is so weak or tenuous on an

17   essential fact that it couldn't support a judgment in favor of

18   the nonmovants or where it is so overwhelming that it mandates

19   judgment in favor of the movant, summary judgment is

20   appropriate.  We believe that we easily meet that standard,

21   notwithstanding all the moles that I'm going to try and whack

22   now, as this is what I do for a living now.  I whack moles.  So

23   I'm just going to begin with some of the assertions that were

24   made by the first lawyer who spoke.

25         So it's not in any particular order because it's kind

*Plaintiff's Motion for Partial Summary Judgment*                    191

1   of hard to do that on a 10-minute break.  But you know they make

2   the assertion again that there was a practice of forgiving

3   loans.  Your Honor, it's actually not a material point.  I don't

4   believe that whether or not it was a practice is material to

5   this analysis, but they put it into their answer, and that is

6   why we have pursued it.

7            I think the documentary evidence speaks for itself.

8   Mr. Dondero as well as somebody else, I forget, testified that

9   if a loan was forgiven, it should be recorded in the financial

10  statements.  We have put forth I think the 10 or 11 years of

11  financial statements that existed prior to the bankruptcy

12  filing, and what they show is that no loan was forgiven for at

13  least seven or eight years.  We're not saying that no loan was

14  ever forgiven in the history of the world, but what we're saying

15  is when you don't do something for seven or eight years, kind of

16  hard to call it a practice.

17           And what makes it even more interesting, Your Honor,

18  not to spend too much time on a point that I don't even think is

19  material, but I just — I've got to whack the mole, no loan was

20  ever forgiven for Mr. Dondero than $500,000.

21           And I'd like to put up on the screen, Ms. Canty, I

22  think Exhibit 24, because it's important, because this is where

23  credibility starts to come in.

24           And I'm not talking about the credibility of the

25  witnesses, I'm talking about the credibility of the lawyers.

*Plaintiff's Motion for Partial Summary Judgment* 192

1   Because in their reply they said Highland conceded that Mr.

2   Dondero had a loan forgiven.  And they reach that conclusion

3   because we carefully wrote in our moving papers that Mr.

4   Johnson, Mr. Dondero's expert, testified that he was not aware

5   of any loan prior to 2008, because we only put the financial

6   statements up to 2008, we didn't put any earlier statements, so

7   when we write, there's no evidence that Mr. Dondero received a

8   forgivable loan prior to 2008, we're just trying to be careful

9   and show what the evidence is.  And they turn that around and

10  they say, see, Highland has conceded that Mr. Dondero received a

11  forgivable loan prior to 2008.

12          Let's see what Mr. Dondero said in response to these

13  interrogatories.  If we could go — keep going, because I think

14  this is — this is so important.  It goes to the credibility of

15  the presentation here.  This is called whack a mole.  So keep

16  going.  Cross my fingers and hope it's 24.  Keep going.  It's 24

17  — I'm sorry.  It's Request for Admission Number 15.  It's page

18  11.  Keep going.  No, it's right there.

19          So they say Highland conceded that Mr. Dondero

20  received a forgivable loan.  It's interesting, when we asked Mr.

21  Dondero to admit that Highland never gave him a loan that was

22  actually forgiven, he admitted it.

23          We asked him did Highland ever give — to admit that

24  Highland never gave Mr. Okada a loan that was ever forgiven, he

25  admitted it.  We asked him "to admit that Highland never gave a

*Plaintiff's Motion for Partial Summary Judgment*                    193

1    loan to any entity, directly or indirectly, owned or controlled

2    by you that was actually forgiven," he admitted it.

3            Okay.  So those are the undisputed facts, to the

4    extent the Court is at all interested about the so-called

5    practice, Your Honor can decide whether or not it constitutes a

6    practice.  The facts are the facts.  The facts are no loan was

7    ever given to Mr. Dondero that was forgiven.  The fact is that

8    no loan was ever given to one of his entities that was ever

9    forgiven.  The fact is that no loan was ever given to anybody

10   that was ever forgiven since probably 2010.

11           Nancy Dondero's competence, I really didn't want to

12   address the issue because I thought we had — you can take that

13   down — we had covered it pretty extensively in our briefing, and

14   I had no interest in embarrassing Ms. Dondero, but I hope and

15   assume that Your Honor has read the transcript.  I'm not talking

16   — Highland is not saying that she was drunk.  Highland is not

17   saying that she is not mentally capable of living, right.  We're

18   not using Competency with a big C, we're using competency as a

19   small c because they're going to have to put her in front of a

20   jury.  And, again, the standard is, is there any way a

21   reasonable jury is really going to buy the story?

22           The evidence speaks for itself, her testimony speaks

23   for itself.  I may be a mediocre litigator, but of this somebody

24   asked me to create a tax structure for the maximization or the

25   minimization of taxes, I would not be competent to do that.  I

Case 21-03004-sgj   Doc 161   Filed 05/03/22   Entered 05/03/22 13:09:17   Desc Main
Case 3:21-cv-00881-X   Document 177-31   Filed 01/09/24   Page 194 of 222   PageID 37051

*Plaintiff's Motion for Partial Summary Judgment*          194

1  may be a mediocre litigator, but I wouldn't be competent to do

2  that.

3          I don't believe, based on the testimony, again not a

4  credibility finding, based on facts, on the facts that she asked

5  no questions, on the fact that she didn't negotiate, on the fact

6  that she never saw the notes, on the fact that she couldn't

7  identify the makers of the notes, on the fact that she asked no

8  questions about the very terms of the agreement.  The agreement

9  was he would get the bonus if the assets were above cost.  She

10 asked no questions.

11         Had she asked questions she would have learned they're

12 already in the money, substantially above.  That's what we mean

13 by competence.  and it's just something that the Court should

14 consider as to whether or not a reasonable jury could ever

15 credit that testimony.

16         You know, Ms. Deitsch-Perez spent a lot of time

17 telling Your Honor how benevolent Mr. Dondero is.  Absolutely no

18 evidence in the record to support that.  She spent a lot of time

19 telling you how much he could have taken in compensation but he

20 didn't because — he took $70 million in the three years before

21 the bankruptcy.  He took it in the form of a loan, but he took

22 $70 million and he doesn't want to pay it back.  That is the

23 undisputed fact.  He took it and the entities that he owns and

24 controls took it.  They took the money and they don't want to

25 give it back.

*Plaintiff's Motion for Partial Summary Judgment*                195

1    And the only reason he took it in the form of a loan,

2    — she said it — tax maximization, because he didn't want to pay

3    income taxes on it.  He took the money and he thought he would

4    never have to pay it back, because that's Jim Dondero.  Not a

5    benevolent man.  He took $70 million.

6    I went through that whole slide where I said there

7    were seven or eight opportunities for him to act in his own

8    self-interest, and the only rebuttal I got was:  Mr. Dondero put

9    the company ahead of his own self-interest.  It actually would

10   have been in the company's interest as well as his own if he had

11   disclosed the agreements to anybody when they were entered into.

12   If he had disclosed them to the auditors, if he had disclosed

13   them to this Court, if he had disclosed them to the creditors,

14   if he had disclosed them at confirmation, if he had disclosed

15   them in response to the projections, if he had disclosed them in

16   response to the demand letters.  His failure to do that isn't

17   some magnanimous act of — of, you know, benevolence, acting out

18   of self-interest.  That was literally the rebuttal, that it was

19   a sacrifice and he — he — that he didn't disclose it.  I don't

20   get it.  No reasonable jury, right, you're going to put this to

21   a jury?  Didn't act in his own interest and didn't act in

22   Highland's interest.

23   Highland's creditors would have been much better off

24   if Mr. Dondero had actually disclosed, if he was compliant, if

25   he was a compliant officer, if he was part of a compliant

*Plaintiff's Motion for Partial Summary Judgment*                              196

1   company, he wouldn't have allowed monthly operating reports to

2   be filed that, according to him, falsely claimed that Highland

3   actually had notes of the value that they were disclosed at.

4              The sausage-making.  Undisputed facts.  Undisputed

5   facts how it developed.  Yes, I agree with Ms. Deitsch-Perez,

6   everybody overlooks things.  I do.  It's why we didn't produce

7   that — that thing, because nobody followed up and we didn't

8   think about it and you do a million things, and those things do

9   happen, but how can you possibly explain that you sat down to

10  create a list of people who have knowledge and information about

11  this case and you come up with 15 people and you forget your

12  sister who is the principal witness in the case?  How do you

13  respond to an interrogatory that says, "Please identify all the

14  people who have knowledge about the alleged agreement," and you

15  forget your sister?  That's not an oversight.

16             I think the two excuses that we got were they were too

17  busy doing things and there were too many cooks in the room.

18  Does a jury really need to consider that?  Okay, take it — take

19  the totality, take this in totality.

20             You asked Ms. Deitsch-Perez, and I — just to go back

21  to the law, you're right, what I did, Your Honor, is because I'm

22  confident that the Court is very familiar with the standards for

23  summary judgment, I highlighted the standards because I think

24  it's important to put in context the argument that we're making

25  here today, what I didn't do is go through cases because there's

*Plaintiff's Motion for Partial Summary Judgment*                197

1    no case like this, and Ms. Deitsch-Perez effectively not only

2    agreed with that, but you asked her a much broader question, are

3    you aware of any case where a court allowed a maker to rely on

4    an oral agreement to get out of from under an unambiguous

5    promissory note, and she bobbed and she weaved, but I didn't

6    hear an answer, Your Honor.  Maybe you did, I did not hear an

7    answer.

8            Certainly no case that I'm aware of where parties to

9    an oral agreement are siblings, where they've got just the

10   mountain evidence, right, that's — that's part of what the Fifth

11   Circuit says look to, is there a mountain of evidence.  The

12   mountain of evidence that no agreement exists is just absolutely

13   overwhelming.  There is not one scintilla of evidence, frankly,

14   other than the words out of Jim and Nancy's mouth that supports

15   this theory.

16           I want to talk for a second about — about PWC.  The

17   assertion was made again to minimize the undisputed fact.  The

18   undisputed fact is that Mr. Dondero did not disclose the

19   agreement to PWC.  The undisputed fact is that paragraph 36 of

20   the representations required Mr. Dondero to disclose whether

21   material or not as decided by PWC that the agreements existed

22   because they were related-party agreements.  And what Your Honor

23   was told was, ah, maybe it's a bad judgment call not to disclose

24   it.  Maybe in hindsight, he should have done it.

25           He's a CPA.  These are management representation

*Plaintiff's Motion for Partial Summary Judgment*                    198

1    letters.  The representation was unambiguous.  Mr. Dondero

2    breached his representation and the audited financial statements

3    are false and misleading as a result, okay.  It's not a question

4    of bad judgment.  What it goes to is it shows no agreement

5    existed because if an agreement existed, it wouldn't have been

6    good judgment to tell PWC.  It would have been required.  And a

7    compliant executive and a compliant company would have disclosed

8    it to their auditors.

9            The Jim and Nancy show on — on this agreement, again

10   not a scintilla of evidence other than what that case said,

11   self-serving conclusory allegations.  You know, the fact of the

12   matter is Jim Dondero couldn't identify the notes if he tried.

13           And I do want to take this opportunity, Your Honor, we

14   haven't discussed this, maybe I should wait for this, but

15   Exhibit 3C, I've — I've got a few objections to their exhibits,

16   just three actually, and then one proposal.  But one of them

17   goes to this list of the promissory notes.  And if Your Honor

18   read Mr. Dondero's testimony from his deposition, he couldn't

19   identify the notes that were subject to the agreement without

20   this cheat sheet, which is Defendants' Exhibit 3C, and it was

21   prepared by lawyers for litigation.  And it should absolutely

22   not be admitted into evidence.

23           He couldn't identify the notes that were the subject

24   of the — of the alleged agreements.  And this is critical,

25   because it is an absolute critical term of the agreement, to

*Plaintiff's Motion for Partial Summary Judgment*                199

1   identify what notes do they apply to.  And the reason that it's

2   critical, Your Honor, is because there were a whole host of

3   other notes that aren't part of this litigation.  We know there

4   were two other HCMFA notes, because we're suing on them.  And we

5   know that there were other notes of Jim Dondero that he paid off

6   in the interim, right.  And that's why they're not part of this

7   litigation, but the evidence is well in the record.

8          And so it's not a situation where you could say, look,

9   we had 10 notes, you sued on 10 notes, so of course the 10 notes

10  are the subject of the litigation and it's the subject of the

11  agreements, because those are the only notes.  You can't do that

12  here.  There's lots of other notes.  So if he can't specifically

13  identify, because they didn't write it down, it's all undisputed

14  facts, didn't write anything down, didn't create a list of

15  notes, nothing.  I think he's missing a critical term in the

16  agreement and I think that's another reason why this thing

17  shouldn't — you shouldn't burden a jury with this fraud — with

18  this story.

19         Again, nothing corroborates their story.  Ms.

20  Deitsch-Perez referred to her experts.  Respectfully, the tax

21  law expert is irrelevant.  I would stipulate you don't pay taxes

22  until you have income.  That's what he says.  It's not — it's

23  not terribly sophisticated, it's not at all — contested at all,

24  frankly.

25         The important one is Mr. Johnson, and why is Mr.

*Plaintiff's Motion for Partial Summary Judgment*                          200

1    Johnson so very critical to this case?  Because it blows

2    everything Ms. Deitsch-Perez said away.  And how does it do

3    that?  Because by Mr. Johnson's calculation going back seven

4    years, Mr. Dondero was only under — only under compensated,

5    taking his analysis in full, by $20 million.  It was by $1.7

6    million for the three years prior to the petition date, but he

7    went back seven years, and it's in the record.  I asked him how

8    did you come up with seven years, is that subjective.  Yes.

9    Could have been five years, then the number would have been

10   smaller.  Could have been 10 years, then the number could have

11   been bigger.

12           But just take his analysis at face value.  There is no

13   rhyme or reason why he picked seven years, but take seven years.

14   Mr. Dondero was under compensated by $20 million.  Why is he

15   entering into agreements for $70 million?  Benevolent?  I don't

16   think so.  He helps our case.  And the fact is the evidence is

17   undisputed.  If you look at Mr. Johnson's deposition, Mr.

18   Dondero failed to disclose to Mr. Johnson tens of millions of

19   dollars that he got in additional deferred compensation.  No

20   dispute about it.

21           So if you took Mr. Johnson's $20 million and you took

22   into account the compensation that Mr. Dondero failed to share

23   with his expert, that number comes closer to 10,-, maybe even

24   less.  Over seven years, based on Mr. Johnson's analysis, that's

25   what he was under compensated for.

*Plaintiff's Motion for Partial Summary Judgment*                    201

1          This may be my favorite of all.  They attempt to

2    dispute our assertion that Mr. — that, you know, there was never

3    any disclosure of the agreement, and they point to two examples.

4    I'm just going to read for a moment, Your Honor, it's page 11

5    from our reply brief that was filed in Adversary Proceeding

6    21-03003, at Docket 159, and we address this very briefly.  With

7    two irrelevant exceptions, defendants do not dispute that

8    neither Mr. Dondero nor his sister ever told anybody about the

9    existence or terms of the alleged agreements.  And I have a

10   citation here:  Compare our motion at paragraph 28 with the

11   opposition at a couple of places.

12          And I'm going to address now the two exceptions that

13   Ms. Deitsch-Perez focused on.  The two exceptions are irrelevant

14   because they are vague, self-serving statements insufficient to

15   create a genuine dispute of material fact.  The first one I cite

16   to is Mike Lynn's (phonetic) letter that she referred to.  We

17   also object to that exhibit only to the extent that it's being

18   offered for the truth of the matter asserted.  But with that, we

19   would encourage the Court to read that letter.  That's a letter

20   that was sent after we commenced the lawsuit.  It doesn't use

21   the word — it doesn't use the word agreement, forgiveness,

22   contingency, condition subsequent, Nancy, or Dugaboy.  It merely

23   expressed Mr. Dondero's, quote, views that the notes were

24   compensation.

25          And then there's Mr. Waterhouse.  Even accepting Mr.

1    Dondero's statements as true, Mr. Dondero's spoke to Mr.

2    Waterhouse only in the context of settlement discussions, and he

3    failed again to say the words agreement, forgiveness,

4    contingency, condition subsequent, Nancy, or Dugaboy.  Given Mr.

5    Dondero's own words, his assertion that he, quote, did not

6    discuss every detail of the agreements with Mr. Waterhouse is to

7    be quite charitable.  An extraordinary under statements.  He

8    admittedly did not discuss any detail of the alleged agreement

9    with him, and we cite to the record there.  So that can be found

10   on page 11 of our reply brief.  That is the entirety of the

11   disclosures that they're relying upon.

12           Mr. Rukavina, he first addressed the issue of prepays.

13   We don't dispute that there were prepayments.  He kept citing

14   Ms. Hendrix and Mr. Klos' admission that there were prepayments.

15   I don't dispute that there's prepayments.  The question becomes

16   what is the agreement of the parties and what did they actually

17   do.  I mean I think at the end of the day the agreement of the

18   parties carries it, but let's look at both, okay.

19           We encourage you, we urge you, Your Honor, because I

20   can't — I can't whack, I can't do every single thing right here,

21   but please look carefully at the language Mr. Rukavina suggested

22   that there is an ambiguity.  This is the first I've ever heard

23   of that.  The fact of the matter is the provision in the term

24   notes couldn't be clearer:  The parties could renegotiate and

25   the — and the maker could repay.  And it says very clearly:  If

*Plaintiff's Motion for Partial Summary Judgment*                   203

1   you prepay — may have said repay — I meant prepay — if you

2   prepay, the parties' agreement says exactly how that is going to

3   be treated.  You prepay and then the money gets applied to

4   outstanding, accrued but unpaid interest, and then the balance

5   goes to principal.  It's really like any other loan that I know

6   of, but I'm not here to testify.

7           So think about that, Your Honor:  Interest accrues

8   every single day.  The amortization schedule shows that interest

9   is charged every single month, for whatever reason, and I don't

10  think the Court needs to weigh why did they prepay.  Who needed

11  the money?  Did Mr. Dondero do this, did somebody else do this?

12          Just look at the plain and unambiguous terms of the

13  agreement, and then look at the amortization schedules.  I think

14  Mr. Klos' declaration will be particularly helpful because he

15  rebuts everything that Mr. Rukavina tried to argue in order to

16  attempt to create an addition — a genuine issue of disputed

17  fact.

18          But I would ask Ms. Canty to put up on the screen the

19  entirety of the NexPoint amortization schedule, because Mr.

20  Rukavina focused on the very first point and then conveniently

21  said, 'I don't want to go through the rest of it,' and there is

22  a reason for that, because if you read Mr. Klos' declaration

23  he's going to tell you that in May 2018, they did exactly what

24  they're contending to now, right?  So you can see in May 2018,

25  they make a very large payment, and the payment is, in fact,

*Plaintiff's Motion for Partial Summary Judgment*                         204

1    interest continues to accrue.  That's the interest-accrual line,

2    right?

3              Then if you just scroll down very slowly, please.

4              Okay.  You will see — you will see that at the end of

5    the year, if you add up the $149,000 plus the $84,000, you know,

6    they paid — they paid $200,000, and it got applied to

7    outstanding — here's a prepay of 13 days.  So that at the end of

8    the year, you get to zero.

9              Keep going.

10             So notwithstanding the fact that they've paid millions

11   and millions of dollars during 2018, exactly what the agreement

12   says, they apply it — except for that May 18 application, Mr.

13   Rukavina is right to point that out, but he's wrong to ignore

14   the rest of it.  So — too fast, go back to the top — and you can

15   see every single time, Your Honor, if you add up the 275,- that

16   was the interest that was due on 2/28, plus the 135,-, the

17   interest that was accrued at the end of March, if you add those

18   two together, it will equal the 411,-.  And if you add the

19   411,-, and then the balance is paid to principal.  That's Your

20   $750,000.  Interest continues to accrue for the balance of

21   March.  And then you get to April.

22             I'm not going to debate about why the payment was made

23   or what was intended.  What we know is that they paid $1.3

24   million.  What did they do?  They applied that to the

25   outstanding interest, $9,000 plus $73,000 equals $83,000, and

*Plaintiff's Motion for Partial Summary Judgment*                    205

1   the balance went to principal, period, full stop.  Interest

2   continues to accrue.  They continue to do the same thing.  They

3   continue to do the same thing.

4           I need not go through every one of these , Your Honor,

5   but here you are, you have now in 2019, you've paid seven

6   fifty-one three two one, so that's, what, about four four,

7   that's about $6 million.  And, lo and behold, notwithstanding

8   the payment of all of that, right on August 13th, they make

9   their last prepayment of the year, interest continues to accrue

10  such that at the end of the year, on November 30th there was

11  $412,000, on — in December there was another $113,000, so they

12  pay the 530,-, and again there's one day of interest.  I guess

13  this is their gotcha moment.  They prepaid, see they prepaid one

14  day.  They got them to the end of the year to zero.  Every

15  single time in 2019, they do exactly what the contract says,

16  they receive a prepayment, they apply it to outstanding

17  interest.  Outstanding, accrued but unpaid.  Mr. Rukavina didn't

18  seem to understand how there could possibly be accrued but

19  unpaid interest on prepayment because you're paying the interest

20  that exists as of the date of the payment.  It's really not

21  complicated.

22          2020, made another payment, applied in exactly the

23  same way.  I don't know why he's doing this.  It doesn't really

24  matter.  It's applied exactly as the unambiguous terms of the

25  term notes provide:  412,000 plus the 113,-, right, it leaves

*Plaintiff's Motion for Partial Summary Judgment*                                206

1   you with 530,-.  Again, it took you to the end of the year.

2            And it goes on.  And the same thing is true.  You

3   know, nobody's made the argument, nobody's put up the — the

4   amortization schedule for HCMS, but the same thing is true.  You

5   know, at the end of 2019, notwithstanding the payment of all the

6   millions of dollars, they still had to pay the interest that was

7   due.  That's the same interest that was due at the end of 2020.

8   It's the exact same thing.  The terms of the term notes are

9   clear and unambiguous as to what happens when there is a

10  prepayment, the parties could do something different, as Mr.

11  Klos testified in his deposition — in his declaration, there was

12  the one instance where they did something different, but they

13  didn't do anything different at any other time.  And all of

14  these payments, were on the 13-week forecast.  So that takes

15  care of prepayment, I believe.  The language is unambiguous and

16  the practice was also pretty darn clear.

17           I heard a lot of references to equity.  I don't get

18  it.  The parties' contract governs here.  This is — I understand

19  that the bankruptcy court is considered a court of equity here,

20  but there is no equity here.  The equity is making sure that

21  Highland recovers the assets that under Jim Dondero's watch were

22  reported to its creditors as being valid assets of the estate.

23  That's the equitable piece that the Court should take into

24  account if it's considered equity at all.

25           Let's go to the next.  The next argument was the

*Plaintiff's Motion for Partial Summary Judgment*                                      207

1    shared services agreement.  You can take that down.

2              You know, God bless him.  He put up — he put up the

3    shared services agreement.  The shared services agreement, he

4    focused on assistance and advice, and said it even includes

5    accounts payable.  We don't dispute, we don't dispute that

6    Highland's accounting department effectuated payments.  The one

7    thing that Mr. Rukavina didn't do that they've never done, that

8    they will never be able to do is show you where in the agreement

9    Highland had not just the authority but the actual obligation to

10   make these payments.  It doesn't say it.  And I think that is

11   the end of the inquiry.  I believe that the Court can rule as a

12   matter of law that this —

13         (Voices on audio.)

14              THE COURT:  Who was that?

15              THE REPORTER:  That's someone calling in, Judge.

16              THE COURT:  You don't know who the caller —

17              MS. DEITSCH-PEREZ:  Somebody is unmuted and there's

18   noise in the background.

19              THE COURT:  Okay.

20              THE REPORTER:  It's a number, I've muted them.

21              THE COURT:  It's a — we've muted them.  It's a number,

22   we don't know who that was.

23              All right.  Go ahead, Mr. Morris.  I'm sorry.

24              MR. MORRIS:  So — so you can rule as a matter of law,

25   Your Honor, I believe very quickly and very easily that there is

*Plaintiff's Motion for Partial Summary Judgment*                    208

1    no obligation, right, that Highland wasn't authorized, let alone

2    obligated to make these payments on behalf of third parties.

3          To the extent the Court needs it, the — I will

4    stipulate that Highland assisted in effectuating payments that

5    were approved by Jim Dondero or Frank Waterhouse.  Again,

6    Exhibits 3D and 3F — 3D and 3E are a litany of December 2020

7    emails from Kristen Hendrix to Frank Waterhouse that says:

8    Please, sir, do you approve these payments before I make them.

9          So there's no question from the documentary evidence

10   that Kristen Hendrix always believed that she needed Frank's

11   approval to effectuate these payments.  And of course there's

12   the 13-week forecast, so nobody — right, you've heard so much

13   testimony about 13-week forecasts, there's no dispute that

14   13-week forecasts were prepared.  There's no dispute.  It's, you

15   know, in our papers, it's in Mr. Klos' declaration that these

16   forecasts fully disclosed the interest payments that were due at

17   year-end.  You know it is what it is.

18         You know what, can we put up Exhibit 3E, just to

19   emphasize the point for just a moment, because Mr. Rukavina, I

20   think, suggested, oh, you know, Mr. Waterhouse was wearing his

21   Highland hat when he got these emails.  I don't know — it's

22   argument, right, and the Court needs to distinguish argument

23   from facts.

24         Here is the fact.  Here is December 31st.  Jim Seery

25   is the one who approved payments on behalf of Highland.  Jim

1    Seery did not approve payments on behalf of the advisors or

2    HCMFA or HCRE.  That was Frank Waterhouse's responsibility.  Not

3    in his capacity as Highland's CEO, because if that was true you

4    wouldn't need Jim Seery, right?  Approved by Seery.  Mr. Seery

5    is approving everything.  So final nail in that coffin.

6            Cure, — you can take that down now — cure, I heard

7    argument, you know, cure that now somehow Mr. Waterhouse, who

8    can't do anything for the advisors is somehow going to be the

9    person to bind Highland to a cure.  Again, Your Honor, I would

10   just urge the Court to look at the four corners of the parties'

11   agreement as reflected in the term note.  There is no right to

12   cure, right.  There just isn't, period, full stop.

13           I think — I think the record is clear, Mr. Dondero

14   heard on the 14th that Highland was going to seek to collect

15   these notes, and he panicked.  And he called up and he screamed

16   at Frank Waterhouse, in the record, he said make the damn

17   payments, and he did.  Pardon my language.  And he did.  There's

18   no evidence of cure.  There's nothing in their answer that ever

19   suggested that.  It's not a defense.

20           You would have heard about that at confirmation,

21   because these payments are made in mid-January.  If he had cured

22   this, right, remember the undisputed facts are that:  We amended

23   our projections to say we're going to collect on the term notes

24   in 2021, because we had just commenced these lawsuits.  These

25   lawsuits were commenced on January 21st.  If Mr. Dondero

*Plaintiff's Motion for Partial Summary Judgment*                    210

1    actually believed at the time that Frank Waterhouse somehow

2    bound the debtor to this cure, what better time to raise that

3    than at confirmation.  His silence, what reasonable jury is

4    going to buy that.  What reasonable jury is going to believe

5    that he believed that he cured, and he just forgot to tell you,

6    Your Honor, at confirmation about that.  I don't think any

7    reasonable jury will do that.

8            Let's be clear, let's move on to HCMFA.  It's kind of

9    cute.  But, you know, the notion that Mr. Dondero authorized the

10   transfers as — with compensation is an issue that came up for

11   the very first time in opposition to the motion for summary

12   judgment.  If you review Mr. Dondero's transcript, if you review

13   Mr. Waterhouse's transcript, and if you look at our motion for

14   summary judgment which summarizes that — those facts, you will

15   see that the undisputed evidence until we got Mr. Dondero's

16   declaration in opposition to summary judgment, Mr. Dondero told,

17   and this is how I started the day, Mr. Dondero told Mr.

18   Waterhouse to make the transfer.  He didn't tell it should be a

19   loan, but he didn't tell them it should be compensation.

20           And, you know, don't take my word for it, Your Honor.

21   Go back and read HCMFA's motion, their second motion for leave

22   to amend, and look at Step 1 of Mr. Rukavina's parade of

23   horribles, how assumptions came to be snowballed, I think he

24   used the word.  Look at Step 1.  Mr. Rukavina, when he wrote

25   back, didn't say anything about Mr. Dondero giving an

*Plaintiff's Motion for Partial Summary Judgment*                     211

1    instruction to make the transfer as compensation.  He simply

2    says:  Mr. Dondero didn't say to make it a loan, he said make it

3    a transfer.

4             And so, again, in opposition to summary judgment,

5    violating the cardinal rule, throwing out unsupported,

6    uncorroborated, conclusory statements.  Not permissible.  He

7    didn't have the authority, like by what?  By what?  Is there —

8    is there a document that clipped his wings?  Because that's not

9    what Mr. — that's not what Mr. Waterhouse told Mr. Sauter during

10   the interview.  He didn't say, 'I don't know.  I don't know

11   where that came from.  I never would have authorized that,'

12   right?  This is the changing story whack a mole that I've been

13   dealing with for 15 months now.

14            You should — you should take seriously what Mr.

15   Waterhouse told Mr. Sauter in the spring of 2021.  That is

16   probably the most credible piece of evidence that exists as to

17   Frank Waterhouse's views on all of this.  I encourage the Court

18   to read carefully my examination of Mr. Norris, who was the

19   30(b)(6) witness, I believe, and then — and then the examination

20   of Mr. Sauter at the motion, because the one thing that's

21   crystal clear is Frank Waterhouse knew exactly what these notes

22   were, he knew exactly when they were created, and he knew

23   exactly why they were created.  All of this stuff about the he

24   said/she said, the rest of it, he's the person whose name

25   appears on the notes.  He's the officer.  He's the fiduciary.

*Plaintiff's Motion for Partial Summary Judgment* 212

1   And, you know what, he's still there.  So Frank Waterhouse, who

2   consistently engages in the parade of horribles, that his

3   employer alleges, right?  That — I mean you're the ones who keep

4   coming after Frank, right?  Frank signed this or his signatures

5   appear without authority.  They're the ones who keep coming

6   after Frank.  And yet he's still employed.  Another kind of

7   interesting issue.

8            The NAV error, Your Honor, I understand that they

9   think they're entitled to windfall, but I just want to read from

10  Exhibit 182, which is the contemporaneous memo that the advisor

11  sent to their client relating to the NAV error to make sure that

12  it's clear, and you can read this.  It's Exhibit 182.  All about

13  the NAV error.

14           "The advisor and Houlihan Lokey, an independent,

15  third-party expert valuation consultant, approved by the board"

16  — that would be the retail board — "initially determined that

17  the March transaction were, quote, nonorderly, close quote, and

18  should be given, quote, zero weight, and close quote, for

19  purposes of determining fair value."

20           That's who made the determination, the advisor and

21  Houlihan Lokey.  It doesn't say anything about Highland.

22           "As reflected in the consultation, the advisor" —

23  meaning HCMFA — "ultimately determined that both March

24  transactions should be classified as orderly."  So they're

25  changing it from nonorderly to orderly.  "The fair" — and then

*Plaintiff's Motion for Partial Summary Judgment*                    213

1    it continues, quote:  The fair valuation methodology adopted, as

2    addressed in the consultation, weights inputs and doesn't

3    reflect last-sales transaction pricing exclusively in

4    determining fair value.  The orderly determination, — in other

5    words, the determination made by the advisor and adoption of the

6    fair-weighted — the weighted fair valuation methodology resulted

7    in NAV errors in the fund.  And that's what's the fund, is the

8    NAV error.

9            So this is — this is contemporaneous, documentary,

10   undisputed evidence that the advisors told their client that it

11   made a mistake.  There is not — they talk about the letter to

12   the SEC.  They just say stuff.  This is whack a mole.  They

13   didn't present a single document to you, a single

14   contemporaneous document that says Highland made the mistake.

15   They tell the SEC, they tell their client, they tell their

16   insurance carrier that they made the mistake.

17           Undisputed facts.

18           I don't really have much more, Your Honor.  I would

19   just ask the Court to seriously consider the evidence, to

20   seriously consider the legal standard, and to do justice in

21   preparing its report and recommendations.  If Your Honor has no

22   questions, I've completed my presentation.

23           THE COURT:  All right.  Thank you.

24           Let me ask a couple of things.  First, we don't have

25   anything else under advisement in Highland right now.  I know we

*Plaintiff's Motion for Partial Summary Judgment*                     214

1    have closing arguments next week in the —

2            MR. MORRIS:  I'm sorry.  The question is whether the

3    Court has any other matters that are under advisement right now?

4            THE COURT:  Yeah.  I don't think we do.  I mean we — I

5    mean we've done all our reports and recommendations that have

6    been on our —

7            MR. MORRIS:  Yeah.

8            THE COURT:  — list.  And I've got closing arguments

9    next week one day, I forget which date, maybe Wednesday,

10   Wednesday of next week in the —

11           MR. MORRIS:  It is Wednesday.

12           THE COURT:  — in the big —

13           MR. MORRIS:  Um-hum.

14           THE COURT:  — in the big adversary.

15           So — so let me think through this.  Are there any —

16   are there any looming deadlines, deadlines of any sort in these

17   note adversary proceedings?  You know, obviously you're not —

18   you don't have a trial date out in the future in Judge Starr's

19   court, because I'll certify when it's trial ready if it needs to

20   go to trial.  Anything, any deadlines?

21           MR. MORRIS:  Nothing that I'm aware of, Your Honor.  I

22   think that's exactly right, that we're here finishing summary

23   judgment, and I think the next thing to happen is for you to

24   enter the orders on the two motions that were argued earlier

25   today where Your Honor issued bench rulings and to get the

Case 21-03004-sgj    Doc 161    Filed 05/03/22    Entered 05/03/22 13:09:17    Desc Main
Case 3:21-cv-00881-X    Document 177-81    Filed 12/16/24    Page 215 of 222    PageID 37072

*Plaintiff's Motion for Partial Summary Judgment*                    215

1    report and recommendation on summary judgment to Judge Starr and

2    then we'll take it from there.

3             THE COURT:  Okay.  And —

4             MS. DEITSCH-PEREZ:  And, Your Honor, were you asking

5    just about the note cases?  I just —

6             THE COURT:  Well, —

7             MS. DEITSCH-PEREZ:  These note — the note cases that

8    are the subject of this motion or about all matters in

9    bankruptcy —

10            THE COURT:  I was — I was thinking of all matters.

11   I'm just trying to think about —

12            MS. DEITSCH-PEREZ:  There are —

13            THE COURT:  — how quickly I'm going to get you — get a

14   report and recommendation out.  And I just, number one, wanted

15   to know if I did have anything else in my queue ahead of this,

16   and the answer is I don't in all of the Highland matters.

17            But then the second thing I was getting at was

18   deadlines.  For example, okay, if — let's say hypothetically I

19   were to deny motion for summary judgment, then you've got a

20   whole — you've got at that point a very complex set of adversary

21   proceedings, right, because you've got avoidance actions and all

22   kinds of alternative theories, plaintiff, that you would be

23   arguing, correct?

24            MR. MORRIS:  I think —

25            MS. DEITSCH-PEREZ:  Those are all —

*Plaintiff's Motion for Partial Summary Judgment*                    216

1          MR. MORRIS:  — procedurally, Your Honor, right, you

2    don't — I think we all agree, you don't decide this motion.  You

3    give a report and recommendation to the judge, to Judge Starr.

4    And Judge Starr — I'll be honest with you, I don't know if we

5    have an opportunity to object or not, but let's assume we do.

6          THE COURT:  Well, —

7          MR. MORRIS:  At some point Judge Starr will decide

8    whether or not to grant the motion —

9          THE COURT:  No, —

10         MR. MORRIS:  — and if — and if he denies the motion,

11   then we'll proceed to a jury trial on all claims.

12         THE COURT:  That's what — I'm getting at the other

13   claims.  You know, it —

14         MS. DEITSCH-PEREZ:  The other — to other claims, Your

15   Honor, —

16         THE COURT:  Let's — just a minute, just a minute, just

17   a minute.

18         I'm just thinking through this.  If summary judgment

19   were to be denied on these Counts 1 and 2 by Judge Starr, and he

20   said, no, this needs to go to a jury, then there are a bunch of

21   other claims that basically —

22         MR. MORRIS:  Correct.

23         THE COURT:  — plaintiff — plaintiff fallback claims,

24   right?  Avoidance actions and whatnot, right?

25         MR. MORRIS:  And breach of —

*Plaintiff's Motion for Partial Summary Judgment*                217

1          MS. DEITSCH-PEREZ:  That's what —

2          MR. MORRIS:  — fiduciary duty, that's correct, Your

3   Honor.

4          MS. DEITSCH-PEREZ:  Except, Your Honor, —

5          THE COURT:  Um-hum.

6          MS. DEITSCH-PEREZ:  — and if I could please clarify

7   the record because Mr. Morris is incorrect that those are just

8   sitting there, those — the motion to dismiss those claims and

9   the motion to compel arbitration of those claims is currently

10  sitting before Judge Starr, and he — and the parties agreed

11  that those would be stayed until Your Honor had made the report

12  and recommendation, and Judge Starr had ruled upon it.

13         THE COURT:  Okay.

14         MS. DEITSCH-PEREZ:  So that's other claims are not

15  simply sitting in the bankruptcy court, if you want to think of

16  them as placed somewhere.  They are currently up at the district

17  court.

18         THE COURT:  No, I didn't think they were at the

19  bankruptcy court.  I just couldn't remember —

20         MS. DEITSCH-PEREZ:  Okay.

21         THE COURT:  I guess what I'm getting at, you know,

22  have you all held up on doing discovery on those other claims,

23  waiting to get a ruling on Counts 1 or 2, or anything like that?

24         MR. MORRIS:  I'll be honest with you, I don't remember

25  off the top of my head, Your Honor.

*Plaintiff's Motion for Partial Summary Judgment*                    218

1          THE COURT:  Okay.  All right.

2          MR. MORRIS:  I don't think so.  I don't think so.

3          THE COURT:  All right.

4          MR. MORRIS:  I don't think — I don't think for these

5   purposes — well, I'll just leave it at that.  I don't know the

6   answer off the top of my head, and I don't want to commit myself

7   to something if I'm not certain.

8          THE COURT:  Okay.  All right.  Well, don't read

9   anything into my questions.  I'm just — I'm wanting to get a

10  report and recommendation to Judge Starr as soon as possible and

11  I was just kind of wanting to know what all hangs —

12         MR. MORRIS:  Sure.

13         THE COURT:  — in the balance if, you know, I were to

14  take a few weeks to get this out.  It sets in motion maybe a

15  chain of events.  Here's what I'm going to do, in a normal case

16  I would say these things with the hopes that maybe it might

17  encourage settlement.  Forgive me for saying in a normal case.

18  This is not normal.  There's been nothing about Highland that's

19  been normal.  But I'm going to do — I'm going to say right now

20  what I would say in any other case.

21         I am likely to grant summary judgment here against all

22  the note defendants expect I'm not sure about HCMFA.  I need to

23  drill down a little bit more on what the summary judgment

24  evidence is, but you know here's what I've got in front of me.

25  I've got, with the exception of HCMFA, I've got all the other

*Plaintiff's Motion for Partial Summary Judgment*                    219

1    defendants admitting to the debtor's prima facie case, okay.

2    But what I have is essentially a defense of an oral agreement.

3    Yes, I know that under Texas law oral agreements are sometimes

4    enforceable, but I think context matters.  And in the context of

5    promissory notes where all of the essential elements have been

6    admitted to, there's a note on movant, sign the note.  Movant's

7    the legal owner or holder of it, and a balance is due.  When

8    you've got all of that, you know you better have something very,

9    very significant to create a fact issue for a jury.  And here,

10   again, I've got an oral agreement that has morphed from Highland

11   agreed it wouldn't collect on the notes to Highland agreed it

12   wouldn't collect on the notes if certain condition subsequent

13   happened.  It's morphed from it was an agreement that Dondero

14   made with himself to many months later it was presented as an

15   agreement between Mr. Dondero and his sister, who happened to

16   not be an officer or director or representative of any sort of

17   Highland or these note makers.  And all of this against many

18   months of Rule 26 disclosures that never mentioned Ms. Dondero

19   as a potential fact witness.  So we have four out of the five

20   defendants eventually adopting this argument.

21           So again I, as I probably hinted at during oral

22   arguments, I see there being a nuance here between saying it's a

23   credibility issue for a jury.  Credibility of the witness, a

24   jury is entitled to look at credibility questions.  There's a

25   nuance between that and a situation of defenses are put out that

*Plaintiff's Motion for Partial Summary Judgment*                    220

1    create fact issues, but the fact issues just don't seem genuine.

2    And, you know, as we've said, no reasonable — genuine means no —

3    if it's not genuine, that means no reasonable jury could adopt

4    the argument.  So I'm very disturbed at both the fact that we've

5    had a morphing defense.  And I know, I know it happens in

6    litigation as discovery is undertaken, but that's not what we've

7    had here.

8            And I'm very disturbed that we have had disclosure

9    after disclosure after disclosure after disclosure where these

10   notes were disclosed and nothing was said about, well, there's a

11   significant contingency so that they might not be collectable.

12   We went through those all today:  The audited financial

13   statements; the schedules in the bankruptcy; the MORs in the

14   bankruptcy; a disclosure statement; a plan that very

15   significantly had as a feature attempts to collect on these

16   notes; objections by some of the note defendants to the

17   feasibility of the plan without mentioning, oh, but the notes

18   aren't going to be collectable.

19           I have to find — Mr. Morris, you mentioned somewhere

20   in the record that there was a disclosure that the Hunter

21   Mountain note was uncollectible.  I've never followed exactly

22   where that was.  But I just don't understand, frankly, what's

23   going on here.  I mean these seem like very dangerous defenses

24   that have been forged here.

25           I guess no one's worried about materially misleading

*Plaintiff's Motion for Partial Summary Judgment*                221

1    audited financial statements.  I don't know who saw these

2    financial statements.  You know maybe they think that there's no

3    one who could complain about materially misleading financial

4    statements.  Maybe they aren't worried about documents signed

5    under penalty of perjury in the bankruptcy case, having been

6    erroneous or materially misleading.  But, anyway, I'm kind of

7    doing a soliloquy up here, I guess, but again, you know, in a

8    normal case I would be telling people this is how I'm inclined

9    to rule and people would either settle or not, motivated by what

10   might be coming down the pike.

11           I promise you I will give a very thorough report and

12   recommendation to Judge Starr so that he will understand the

13   basis for my ruling and he will either accept it or reject it.

14           And, again, I've told you with HCMFA, you know, we

15   sort have a unique situation out there with this compensation

16   argument, we may have some genuine issues of disputed facts on

17   that one, but I'm not sure.  I'm just letting you know that's

18   the one that I find most perplexing.

19           All right.  Is there anything further before we call

20   it quits today?

21       (The recording ends at 5:00 o'clock p.m.)

22                            —o0o—

23

24

25

```
State of California          )
                             )      SS.
County of Stanislaus         )
```

       I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

       I further certify that I am not a party to nor in any way interested in the outcome of this matter.

       I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

```
Susan Palmer
Palmer Reporting Services
P.O. Box 4082
Modesto, California  95352
(209) 915-3065

Dated April 29, 2022
```