Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S**
**ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.      Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.      Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.      Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.      Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.      Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.      Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.      Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.      Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.      Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.      Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.      Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.      Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.      Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.    Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "<u>Demand Letter</u>") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.    Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.    Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "<u>Second Demand Letter</u>") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.    To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.    Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.    Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.    Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.    Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.    Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.    Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.    Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.    Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.    Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.    Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.    Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied.  To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FIRST CLAIM FOR RELIEF
### (against NexPoint)
### (for Breach of Contract)

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### SECOND CLAIM FOR RELIEF
### (against NexPoint)
### (Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

---

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.    Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (Breach of Fiduciary Duty)

71.    Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

75.    Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.    This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.    This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.     To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.     Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.     Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ Davor Rukavina
Davor Rukavina

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email:  drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND
EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as the plaintiff (the "Debtor"), and files this its *Motion to Extend Expert Disclosure and Discovery Deadlines* (the "Motion"), respectfully stating as follows:

## I.    <u>RELIEF REQUESTED</u>

1.    By this Motion, NexPoint requests that the Court extend the deadline, in its *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [docket no. 70] (the "<u>Scheduling Order</u>"), for the designation of experts and service of expert reports, through December 13, 2021, with a corresponding extension of expert discovery.  Specifically, NexPoint finds it appropriate and advisable to designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement (defined below) with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment.  This request is necessitated by recent deposition testimony of key individuals on October 19 and 21, 2021, prior to which NexPoint did not know or reasonably believe that expert testimony on the duties of care would be advisable.

## II.    <u>PROCEDURAL BACKGROUND</u>

2.    The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

3.    By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "<u>Note</u>").  The Note is a 30-year note and provides for an annual payment of principal and interest.  After prior payments, the Debtor asserts that $23,071,195.03 remains due and owing on the Note.

4.    NexPoint has asserted various defenses and affirmative defenses to the Debtor's allegations and causes of action.  This Motion concerns one such affirmative defense only, to the effect that the Debtor, through its employees, caused the alleged underlying default.

5.      On July 28, 2021, the District Court entered an order adopting this Court's report and recommendation and ordering that the reference for this Adversary Proceeding will be withdrawn once this Court certifies this Adversary Proceeding as being trial ready.  As part of the same, the District Court necessarily agreed and ordered that NexPoint has a right to a trial by jury of this Adversary Proceeding.

## III.   FACTS

6.      This Motion is supported by the Declaration of Davor Rukavina, attached hereto as incorporated herein (the "Declaration").

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment.  Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor demanded full and immediate payment.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement") between the Debtor and NexPoint dated January 1, 2018.  The Agreement was in place as of December 31, 2020, although the Debtor terminated it later, in 2021.  Under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services.  NexPoint has alleged that, pursuant to the Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  *See* Declaration at Exhibit C, 337:22-338:8.

9.       NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.  NexPoint has always asserted this as an affirmative defense.  *See* Docket No. 6.  NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.

10.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.  To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement.  Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note.

11.      This changed the potential facts as NexPoint understood them to be from ones where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment.  Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

12.      NexPoint did not know that Waterhouse would provide this testimony.  NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars

on the Shared Services Agreement.  But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.    If Dondero told Waterhouse in early December, 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.  After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.    Accordingly, on October 19, 2021, when NexPoint deposed James Seery, NexPoint asked Mr. Seery about section 6.01 of the Shared Services Agreement, labeled "standard of care," which provides that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims."  Mr. Seery testified that he did not believe that this provision of the Shared Services Agreement obligated the Debtor or Waterhouse to do anything further after Dondero allegedly instructed Waterhouse not to pay on the Note.

15.    At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement.  This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

16.     NexPoint moved as promptly as it could thereafter.  NexPoint decided to retain an expert on October 22, 2021 and began searching for one on that day.  NexPoint located a potential expert, Steven J. Pully, on October 26, 2021, and after conflicts were cleared and terms agreed to, Mr. Pully agreed to serve as NexPoint's expert on October 28, 2021.  NexPoint files this motion just one day later, and less than two weeks after Waterhouse's deposition triggered the issue.

17.     It goes without saying that neither Pully nor any reasonable expert can possibly review the issues, formulate an opinion, and prepare a report one day after they are retained. Among other things, Pully needs to review all underlying documents and deposition transcripts, some of which have yet to be returned by the court reporters.  Accordingly, NexPoint believes that approximately six (6) weeks will be sufficient for Pully to prepare a report.  NexPoint submits that the Debtor should have a period of time to then designate a potential rebuttal expert, and a period of time for expert discovery.  Such a procedure would be fair for all involved and would constitute a minimal delay to what has already been a rapidly advanced case.

## IV.    ARGUMENT AND AUTHORITIES

18.     It is appropriate for an expert to consider the issue of Waterhouse's and the Debtor's duties under the Shared Services Agreement—*i.e.*, "duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims,"—as issues such as "prudent person" and "like capacity and familiar with like aims" are appropriate for expert analysis and will assist the finder of fact, especially a jury.

19.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for good cause," although there is some uncertainty as to whether this standard applies only after a deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.*

*Inc. RRG v. Ford Motor Co.*, <mark>591 F.3d 458, 470</mark> (5th Cir. 2009) ("<mark>Federal Rule of Civil Procedure</mark> <mark>16(b)</mark> governs amendment of pleadings after a scheduling order's deadline to amend has expired").

20.    When the issue concerns an "untimely submission of expert reports," the Fifth Circuit has specified the following for factors as guiding the decision: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, <mark>315 F.3d 533, 536</mark> (5th Cir. 2003). Again, this test applies to a deadline which has already expired. Logically, therefore, a lesser standard should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

21.    Applying these or any factors:

(i)     this Adversary Proceeding is only some nine (9) months old and the parties have moved very quickly, with all discovery almost over;

(ii)    if this Motion is granted, all discovery in this Adversary Proceeding will have been completed by the end of 2021, still less than one (1) year after filing;

(iii)   the reason for the need to extend the deadline is the most logical reason that most frequently appears—that discovery has necessitated some previously unexpected action—which is one of the purposes of discovery;

(iv)    NexPoint's failure to previously designate an expert was due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony, and is not the result of any delay or lack of diligence, as evidenced by the fact that NexPoint did already and timely designate two other experts on other issues (*i.e.* NexPoint did not sit on its responsibility to consider retaining experts);

(v)     the matter is important because the duties of care as specified in the Shared Services Agreement are terms of art necessitating an expert analysis, especially before a jury, and the matter goes to the heart of NexPoint's affirmative defense, and is necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint;

(vi)    there is no prejudice to the Debtor, which will have sufficient time to retain a rebuttal expert and take expert discovery (*i.e.* no witnesses or documents have been lost); and

(vii)   a continuance is easily available to avoid any prejudice to the Debtor—indeed, there is no need for a continuance even as the Adversary Proceeding has yet to be certified as trial ready and it is likely that the District Court will not schedule the Adversary Proceeding for trial for some time.

22.     NexPoint submits that this Motion cannot come as a surprise to the Debtor. NexPoint has asserted its affirmative defense since the beginning. The only difference now is that, instead of a wholesale disregard of any duty to facilitate the Note payment, the issue has evolved to whether the Debtor or Waterhouse had any affirmative duty to act after the alleged instruction from Dondero. As it can be presumed that Waterhouse previously informed the Debtor or its counsel of this alleged instruction (as he apparently informed other employees at the Debtor), the Debtor likely knew what Waterhouse's testimony would be well before NexPoint learned of that testimony. It is reasonable to conclude that the Debtor knew or should have known that the "standard of care" under the Shared Services Agreement would then become a material issue.

23.     Accordingly, "good cause" to amend the Scheduling Order exists, if that higher standard even applies, and approving such amendment will not prejudice the Debtor and will instead serve the interests of justice.

## V.    <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court enter an order: (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting NexPoint such other and further relief as may be proper.

RESPECTFULLY SUBMITTED this 29th day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that, on October 28, 2021, he conferred with counsel for the Debtor, John Morris, and the Debtor opposes the relief requested herein.

/s/ Davor Rukavina
Davor Rukavina

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVOR RUKAVINA

STATE OF TEXAS

COUNTY OF DALLAS

I, Davor Rukavina, hereby state and testify to the following as being true and correct and under penalty of perjury pursuant to the laws of the United States of America:

1.    My name is Davor Rukavina. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise competent to execute this Declaration.

2.    I am an attorney duly licensed to practice law in the State of Texas. I am a shareholder at Munsch Hardt Kopf & Harr, P.C. I am the lead attorney for NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in this Adversary Proceeding.

3.    At issue in this Adversary Proceeding is a 30-year promissory note executed by NexPoint in the original principal amount of $30,746,812.33 (the "Note"), although the Note had been paid down significantly by the time of the filing of this Adversary Proceeding.

4.      Highland Capital Management, L.P. (the "Debtor") alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment. Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated and the Debtor demanded full and immediate payment.

5.      The parties agreed by written stipulation that they would disclose experts and produce expert reports on or before October 29, 2021, and the Court's scheduling order so requires. NexPoint requests an extension of this deadline. The following is the reason why.

6.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Agreement") between the Debtor and NexPoint dated January 1, 2018, a copy of which is attached hereto as Exhibit "A." The Agreement was in place as of December 31, 2020, although the Debtor terminated it later in 2021. NexPoint alleges that, under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds. NexPoint therefore asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.

7.      The foregoing has always been an affirmative defense of NexPoint in this Adversary Proceeding, including in its amended answer filed on September 1, 2021, a copy of which is attached hereto as Exhibit "B."

8.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did I, in connection with this Adversary Proceeding. Waterhouse was the Debtor's chief financial

---

officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.

9.      Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note. A copy of this deposition transcript is attached as Exhibit "C."

10.      This testimony was not expected by me or by NexPoint. I had understood that Dondero instructed Waterhouse to make no further payments on the Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Agreement and because that was what Dondero and Waterhouse had been discussing. I had not understood that Waterhouse would testify that Dondero instructed him to also not pay the Note specifically.

11.      Prior to that deposition, I had never spoken to Waterhouse. Waterhouse presently serves as an officer of NexPoint; however, and unlike every other case I have been involved with, I have not been permitted to discuss with Waterhouse litigation matters. This is because Waterhouse is in litigation with the Debtor on other matters and has separate and independent counsel, Debra Dandeneau and Frances Smith, who would not permit me to speak directly to Waterhouse, which I understood to be a logical and appropriate instruction to protect their client. I did discuss with Ms. Dandeneau what Waterhouse may know about the litigation between the Debtor and my clients, but that primarily focused on defenses that another client of mine, Highland Capital Management Fund Advisors, L.P., has. And I did discuss with Ms. Dandeneau that Dondero told Waterhouse to not make payments, but I understood that to be limited to the Agreement and to not include the Note, since the topic under discussion (as it was told to me)

between Dondero and Waterhouse was the Agreement and overpayments on the Agreement, and not the Note.

12.    In sum, prior to October 19, 2021, I did not know that Waterhouse would testify that Dondero told him to not pay on the Note, and I had no reasonable reason to suspect the same. My surprise is evident from the transcript of that deposition, where I asked Waterhouse multiple times whether he was sure that Dondero told him this—so much so that opposing counsel objected multiple times as "asked and answered," and even objected as having been asked and answered "four time." Exhibit "C" at 390-392.

13.    Assuming that Waterhouse's testimony on this issue will be accepted by a trier of fact, the question is whether, from NexPoint's perspective, Waterhouse had no further duties to review, confirm, investigate, or to discuss the issue with Dondero. In that respect, section 6.01 of the Agreement, labeled "standard of care," states that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

14.    I deposed Jim Seery on October 21, 2021, and asked him various questions about this provision of the Agreement. Mr. Seery testified to the effect that he did not believe that the Agreement obligated the Debtor or Waterhouse to do anything further after Dondero told Waterhouse to not pay the Note (again, assuming that this was true). I do not have a copy of Mr. Seer's deposition yet.

15.    With Mr. Seery testifying that he did not believe that the Agreement required the Debtor or Waterhouse to do anything further if Dondero in fact gave the instruction Waterhouse testified that he did, NexPoint concluded that it needed to retain an expert to review whether the "standard of care" specified in the Agreement compelled the Debtor or Waterhouse to do anything

further after Dondero gave the alleged instruction, such as checking with him to see if they understood him correctly, advising him of the potential serious consequences of a default, trying to dissuade him, or at least asking him once again prior to December 31, 2020 whether the payment should be made.

16.    On October 22, 2021, I began searching for a potential expert. On October 26, 2021, I contacted Steven J. Pully about the potential engagement. After clearing conflicts and coming to an agreement, Mr. Pully agreed to the engagement on October 28, 2021. The engagement letter has yet to be finalized and executed, but I have every confidence that it will and the urgency of the matter necessitates this Declaration at this time. I have been extremely diligent in searching for an finding an expert once NexPoint determined that the retention of an expert was appropriate, which did not occur until the Seery deposition on October 21, 2021.

17.    Even though NexPoint has retained Mr. Pully as of October 28, 2021, it is not possible for Mr. Pully to formulate an opinion and prepare a report by October 29, 2021. Among other things, various deposition transcripts of important witnesses have yet to be received and reviewed by Mr. Pully, and Mr. Pully has yet to review the underlying documents. Assuming no undue delays with respect to deposition transcripts, Mr. Pully should be able to prepare a report by December 13, 2021.

18.    NexPoint therefore seeks an extension of the expert designation and report deadline through December 13, 2021, in order that justice may be done and not for delay or any improper purpose, NexPoint not having designated an expert before due solely to the lack of knowledge that Waterhouse would testify as he did on October 19, 2021 and that Mr. Seery would testify as to his view that the Agreement did not require Waterhouse to do anything thereafter.

I hereby swear under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
DAVOR RUKAVINA

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01  Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:



"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

2

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)      *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)      *Legal/Compliance/Risk Analysis.* Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)      *Tax.* Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)      *Management of Clients and Accounts.* Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)      *Valuation.* Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)      *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)      *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)      *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

      (i)    *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

      (j)    *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

      (k)    *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

      (l)    *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03   Shared Employees.

      (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person", or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

6

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

7

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)   The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)   In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02    <u>Exculpation</u>.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    <u>Indemnification by the Management Company</u>.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to a Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

13

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    Amendments. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    Assignment and Delegation.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 8.02, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this Section 8.02, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of Section 8.02(a) other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; provided that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; provided that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03   Non-Recourse; Non-Petition.

(a)   The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)   Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)   Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)   The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)   The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04    <u>Governing Law</u>.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    <u>Severability</u>. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    <u>No Waiver</u>. The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

      (a)     If to the Management Company:

           NexPoint Advisors, L.P.
           200 Crescent Court
           Suite 700
           Dallas, TX 75201

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

NEXPOINT ADVISORS, L.P.

By: NexPoint Advisors GP, LLC, its General Partner

By: _____
Name: Frank Waterhouse
Title: Treasurer

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By: _____
Name: Frank Waterhouse
Title: Treasurer

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT NEXPOINT ADVISORS, L.P.'S
## <u>ANSWER TO AMENDED COMPLAINT</u>

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

Exhibit B

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.     Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.     Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.     Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.     Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.     Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.    Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.   To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.   To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.    Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.   To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.    Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.   To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.   To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.    To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.   The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.    Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.    Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.    Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied. To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42. Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43. Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

44. Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

45. Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

46. Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

47. Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

48. Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

**SECOND CLAIM FOR RELIEF**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

49. Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.　　This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.　　This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.　　Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

71.　　Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.　　This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.　　This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.　　This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

### SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.　　Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.　　This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.　　This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.      Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.      Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.      To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.      Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.      Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
_____
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ Davor Rukavina
_____
Davor Rukavina

```
 1              WATERHOUSE - 10-19-21

 2          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 3                 DALLAS DIVISION
        -----------------------------
 4   IN RE:

 5                              Chapter 11
     HIGHLAND CAPITAL
 6   MANAGEMENT, L.P.,          CASE NO.
                                19-34054-SGI11
 7
              Debtor.
 8   -----------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
              Plaintiff,
10   vs.                        Adversary
                                Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
     FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
     INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
     NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15              Defendants.
     -----------------------------
16

17         REMOTE VIDEOTAPED DEPOSITION OF

18              FRANK WATERHOUSE

19              October 19, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No: 201195
```

Exhibit C

1                   WATERHOUSE - 10-19-21

2

3

4                    October 19, 2021

5                    9:30 a.m.

6

7

8

9        Remote Deposition of FRANK WATERHOUSE,

10   held before Susan S. Klinger, a Registered

11   Merit Reporter and Certified Realtime Reporter

12   of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              WATERHOUSE - 10-19-21

 2   A P P E A R A N C E S:

 3   (All appearances via Zoom.)

 4   Attorneys for the Reorganized Highland Capital

 5   Management:

 6        John Morris, Esq.

 7        Hayley Winograd, Esq.

 8        PACHULSKI STANG ZIEHL & JONES

 9        780 Third Avenue

10        New York, New York  10017

11   Attorneys for the Witness:

12        Debra Dandeneau, Esq.

13        Michelle Hartmann, Esq.

14        BAKER McKENZIE

15        1900 North Pearl Street

16        Dallas, Texas  75201

17   Attorneys for NexPoint Advisors, LP and

18   Highland Capital Management Fund Advisors,

19   L.P.:

20        Davor Rukavina, Esq.

21        An Nguyen, Esq.

22        MUNSCH HARDT KOPF & HARDD

23        500 North Akard Street

24        Dallas, Texas  75201-6659

25
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 173-37   Filed 04/09/24   Page 65 of 229   PageID 38177

Page 4

```
 1                    WATERHOUSE - 10-19-21

 2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3   and HCMS:

 4         Deborah Deitsch-Perez, Esq.

 5         Michael Aigen, Esq.

 6         STINSON

 7         3102 Oak Lawn Avenue

 8         Dallas, Texas  75219

 9

10   Attorneys for Dugaboy Investment Trust:

11         Warren Horn, Esq.

12         HELLER, DRAPER & HORN

13         650 Poydras Street

14         New Orleans, Louisiana 70130

15

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18         Deborah Newman, Esq.

19         QUINN EMANUEL URQUHART & SULLIVAN

20         51 Madison Avenue

21         New York, New York  10010

22

23   Also Present:

24         Ms. La Asia Canty

25
```

1                   WATERHOUSE - 10-19-21

2                       I N D E X

3

4    WITNESS                                    PAGE

5    FRANK WATERHOUSE

6    EXAMINATION BY MR. MORRIS                    10

7    EXAMINATION BY MR. RUKAVINA                 256

8    EXAMINATION BY MS. DEITSCH-PEREZ            352

9    EXAMINATION BY MR. MORRIS                   377

10   EXAMINATION BY MR. RUKAVINA                 387

11   EXAMINATION BY MS. DEITSCH-PEREZ            393

12

13                  E X H I B I T S

14   No.                                       Page

15   Exhibit 2  NPA et al Amended Complaint     142

16   Exhibit 33 6/3/19 Management                91

17           Representation

18   Exhibit 34 HCMLP Consolidated Financial     94

19           Statements

20   Exhibit 35 HCMFA Incumbency Certificate    151

21   Exhibit 36 Email string re 15(c)           170

22   Exhibit 39 HCMLP Operating Results 2/18    226

23   Exhibit 40 Summary of Assets and           236

24           Liabilities

25   Exhibit 41 12/19 Monthly Operating Report  258

Page 6

```
 1               WATERHOUSE - 10-19-21

 2   Exhibit 45 HCMFA Consolidated Financial     135

 3              Statements

 4   Exhibit 46 NexPoint 2019 Audited            218

 5              Financials

 6

 7   Exhibit A1 Emails 11/25                      328

 8   Exhibit A2 Emails 12/31                      338

 9   Exhibit A6 Emails 1/12                       341

10   Exhibit A7 Promissory Notes                  297

11   Exhibit A9 Email, 8/31                       307

12   Exhibit A10 Acknowledgment from HCMLP        302

13   Exhibit A11 HCMLP Schedule 71A              309

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 173-3   Filed 07/09/24   Page 68 of 229   PageID 38180

Page 7

```
 1           WATERHOUSE - 10-19-21

 2           P R O C E E D I N G S

 3           VIDEOGRAPHER:  Good morning,

 4   Counselors.  My name is Scott Hatch.  I'm a

 5   certified legal videographer in association

 6   with TSG Reporting, Inc.

 7           Due to the severity of COVID-19 and

 8   following the practice of social

 9   distancing, I will not be in the same room

10   with the witness.  Instead, I will record

11   this videotaped deposition remotely.  The

12   reporter, Susan Klinger, also will not be

13   in the same room and will swear the witness

14   remotely.

15           Do all parties stipulate to the

16   validity of this video recording and remote

17   swearing, and that it will be admissible in

18   the courtroom as if it had been taken

19   following Rule 30 of the Federal Rules of

20   Civil Procedures and the state's rules

21   where this case is pending?

22           MR. HORN:  Yes.

23           MS. DANDENEAU:  Yes.

24           MR. MORRIS:  Yes.  John Morris.  I

25   would just try to do a negative notice
```

1              WATERHOUSE - 10-19-21

2    here, as we did yesterday.  If anybody has

3    a problem with what was just stated, can

4    you state your objection now?

5          Okay.  No response, so everybody

6    accepts the stipulation and the instruction

7    that was just given.

8          VIDEOGRAPHER:  Thank you.  This is

9    the start of media labeled Number 1 of the

10   video recorded deposition of Frank

11   Waterhouse In Re: Highland Capital

12   Management, L.P., in the United States

13   Bankruptcy Court for the Northern District

14   of Texas, Dallas Division, Case Number

15   21-03000-SGI.

16         This deposition is being held via

17   video conference with participants

18   appearing remotely due to COVID-19

19   restrictions on Tuesday, October 19th, 2021

20   at approximately 9:32 a.m.  My name is

21   Scott Hatch, legal video specialist with

22   TSG Reporting, Inc. headquartered at 228

23   East 45th Street, New York, New York.  The

24   court reporter is Susan Klinger in

25   association with TSG Reporting.

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 173-3    Filed 09/08/21    Page 70 of 229    PageID 38182

Page 9

 1          WATERHOUSE - 10-19-21

 2          Counsel, please introduce

 3    yourselves.

 4          MR. MORRIS:  John Morris, Pachulski

 5    Stang Ziehl & Jones for the reorganized

 6    Highland Capital Management, L.P., the

 7    plaintiff in these actions.

 8          MS. DANDENEAU:  Deborah Dandeneau

 9    from Baker McKenzie.  My partner, Michelle

10    Hartmann, is also in the room with me,

11    representing Frank Waterhouse individually.

12          MS. DEITSCH-PEREZ:  Deborah

13    Deitsch-Perez from Stinson, LLP,

14    representing Jim Dondero, Nancy Dondero,

15    HCRA, and HCMS.

16          MR. HORN:  Warren Horn with Heller,

17    Draper & Horn in New Orleans representing

18    Dugaboy Investment Trust.

19          MR. RUKAVINA:  Davor Rukavina with

20    Munsch Hardt Kopf & Harr in Dallas

21    representing NexPoint Advisors, LP and

22    Highland Capital Management Fund Advisors,

23    L.P.

24          MR. AIGEN:  Michael Aigen from

25    Stinson, and I represent the same parties

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 75-7    Filed 10/09/24    Page 71 of 229    PageID 38183

Page 10

```
 1                WATERHOUSE - 10-19-21

 2          as Deborah Deitsch-Perez.

 3                MS. NEWMAN:  This is Deborah Newman

 4          from Quinn Emanuel.  We represent the

 5          litigation -- Marc Kirschner as the trustee

 6          for the litigation SunTrust.

 7                MR. MORRIS:  I think that is

 8          everybody.

 9                VIDEOGRAPHER:  Thank you.  Will the

10          court reporter please swear in the witness.

11                FRANK WATERHOUSE,

12     having been first duly sworn, testified as

13     follows:

14                      EXAMINATION

15     BY MR. MORRIS:

16          Q.    Please state your name for the

17     record.

18          A.    My name is Frank Waterhouse.

19          Q.    Good morning, Mr. Waterhouse.  I'm

20     John Morris, as you know, from Pachulski Stang

21     Ziehl & Jones.  You understand that my firm and

22     I represent Highland Capital Management, L.P.;

23     is that right?

24          A.    Yes.

25          Q.    Okay.  And do you understand that
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 75-37   Page 11/05/397   Page 72 of 229   PageID 38184

Page 11

```
 1                    WATERHOUSE - 10-19-21

 2    we're here today for your deposition in your

 3    individual capacity?

 4         A.    Yes.

 5         Q.    Did you review and -- did you

 6    receive and review a subpoena that Highland

 7    Capital Management, L.P., served upon you?

 8         A.    Yes.

 9         Q.    You have been deposed before; right?

10         A.    Yes.

11         Q.    How many times have you been

12    deposed?

13         A.    About three or four times.

14         Q.    Okay.  And I defended you in one

15    deposition; isn't that right?

16         A.    That is correct.

17         Q.    So the general ground rules for this

18    deposition are largely the same as the

19    depositions you have given before.  And that is

20    I will ask you a series of questions, and it is

21    important that you allow me to finish my

22    question before you begin your answer; is that

23    fair?

24         A.    Yes.

25         Q.    And it is important that I allow you
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-37   Filed 02/09/24   Page 73 of 229   PageID 38185

Page 12

```
 1                    WATERHOUSE - 10-19-21

 2    to finish your answers before I begin a

 3    question, but if I fail to do that, will you

 4    let me know?

 5          A.    I can certainly do that.

 6          Q.    Okay.  Do you understand that this

 7    deposition is being videotaped?

 8          A.    Yes.

 9          Q.    You understand that I may seek to

10    use portions of the videotape in a court of

11    law?

12          A.    I did not know that, until you just

13    said that.

14          Q.    Okay.  And you are aware of that now

15    before the deposition begins substantively; is

16    that right?

17          A.    Yes.

18          Q.    So unlike I think the other

19    depositions that you have given, this one is

20    being given remotely.  So that presents some

21    unique challenges, at least as compared to a

22    deposition that is taken in-person.

23                From time to time we're going to put

24    documents up on the screen, Mr. Waterhouse.

25    And it is important that I give you the
```

1                    WATERHOUSE - 10-19-21

2    opportunity to review any portion of the

3    document that you think you need in order to

4    fully and completely answer the question.

5              So I would ask you to let me know if

6    there is a portion of a document that you need

7    to see in order to fully and completely answer

8    the question.  Can you do that for me?

9         A.    Yes.

10              MS. DANDENEAU:  Mr. Morris, I would

11         just note that we do have hard copies of

12         the documents that you sent, so if you can

13         just refer to the exhibit number as

14         reflected in the documents that you sent,

15         Mr. Waterhouse will be able to look at the

16         hard copies of those documents.

17              MR. MORRIS:  I appreciate that,

18         and -- and I will encourage him to do so.

19         There will be other documents that we did

20         not send to you that we'll be using today

21         though.

22         Q.    Okay.  With that as background, if

23    there is anything that I ask you, sir, that you

24    don't understand, will you let me know?

25         A.    Yes.

Page 14

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  Are you currently employed?

 3        A.    Yes.

 4        Q.    By whom?

 5        A.    The Skyview Group.

 6        Q.    When did you become employed by the

 7   Skyview Group?

 8        A.    I believe March 1st of 2021.

 9        Q.    Do you have a title at Skyview?

10        A.    Yes.

11        Q.    What is your title?

12        A.    My title is chief financial officer.

13        Q.    Do you report to anybody in your

14   role as CFO?

15        A.    I don't, no.

16        Q.    No.  Is there a president or a CEO

17   of Skyview?

18        A.    Yes.

19        Q.    Who is that?

20        A.    That is Scott Ellington.

21        Q.    But you don't report to

22   Mr. Ellington; is that right?

23        A.    I don't think so.

24        Q.    Does Skyview Group --

25              MS. DANDENEAU:  Excuse me, we --
```

Page 15

```
 1                  WATERHOUSE - 10-19-21

 2       A.    I -- I -- I might.  I just -- I

 3  don't recall.

 4       Q.    Okay.  Does Skyview Group provide

 5  any services to any entity directly or

 6  indirectly owned or controlled by Jim Dondero?

 7       A.    Yes.

 8       Q.    Can you name -- is that pursuant to

 9  written contracts?

10       A.    Yes.

11       Q.    And do you know how many contracts

12  exist?

13       A.    Approximately six or so.

14       Q.    And is the Skyview Group made up of

15  individuals who were formerly employees of

16  Highland Capital Management, L.P.?

17       A.    No.

18       Q.    Do you know how many -- how many --

19  how many employees does Skyview have?

20       A.    Approximately 35.

21       Q.    And can you tell me how many of

22  those 35 are former officers, directors, or

23  employees of Highland Capital Management, L.P.?

24       A.    I don't know the exact number.

25       Q.    Is it more than 20?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 75-37   Page 16 of 39   Page 77 of 229   PageID 38189

Page 16

 1                    WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    Is it more than 30?

 4       A.    I don't know.

 5       Q.    Can you tell me what portion of

 6  Skyview -- Skyview's revenue is derived from

 7  entities that are directly or indirectly owned

 8  or controlled by Jim Dondero?

 9              MS. DANDENEAU:  Mr. Morris, I mean,

10         you called Mr. Waterhouse here individually

11         for purposes of his testimony in connection

12         with the noticed litigation.  I have given

13         you some leeway to ask him some background

14         information about Skyview Group, but this

15         is not a substitute for a deposition in

16         connection with any other pending disputes

17         that exist.  And -- and we agreed to accept

18         the subpoena on the basis of he -- this is

19         testimony that he is giving in connection

20         with the noticed litigation.

21              I really think that you are now

22         going a little bit far afield from the

23         purpose of this deposition.

24              MR. MORRIS:  Okay.  It is -- I'm not

25         intending to use these -- the answers to

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 75-17   Filed 01/09/24   Page 78 of 229   PageID 38190

Page 17

```
 1                    WATERHOUSE - 10-19-21

 2          these questions for any purpose other than

 3          this litigation.  I think you understand

 4          fully why I'm asking the questions, and I

 5          just have a couple more, if you will bear

 6          with me.

 7               MS. DANDENEAU:  Okay.

 8               MS. DEITSCH-PEREZ:  Can we have an

 9          agreement that an objection by one is an

10          objection for any other party here?

11               MR. MORRIS:  Sure.  I would -- I

12          would encourage that, sure.

13               MS. DEITSCH-PEREZ:  Thank you.

14               MR. MORRIS:  It can't be sustained

15          or overruled more than one time, so...

16          Q.   Mr. Waterhouse, can you answer my

17     question, please.

18               MS. DANDENEAU:  Do you want to

19          repeat it, Mr. Morris, for his benefit?

20               MR. MORRIS:  Sure.

21          Q.   Can you -- can you tell me the

22     approximate portion of Skyview's revenue that

23     is derived from entities that are directly or

24     indirectly owned or controlled by Mr. Dondero?

25          A.   I don't know the exact number.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 75-17   Filed 01/09/24   Page 79 of 229   PageID 38191

Page 18

1                    WATERHOUSE - 10-19-21

2        Q.    Is it more than 75 percent?

3        A.    Yes.

4        Q.    Is it more than 90 percent?

5        A.    I don't know.

6        Q.    Okay.  Can I refer to Highland

7   Capital Management, L.P., as Highland?

8        A.    Yes.

9        Q.    All right.  And you previously

10  served as Highland's CFO; correct?

11       A.    Yes.

12       Q.    When did you join Highland?

13       A.    I don't recall the exact date.

14       Q.    Can you tell me what year?

15       A.    2006.

16       Q.    When did you -- in what year did you

17  become Highland's CFO?

18       A.    I don't recall the exact date.

19       Q.    I'm not asking you for the exact

20  date.  I'm asking you if you recall the year in

21  which you were appointed CFO.

22       A.    I don't recall the exact year.

23       Q.    Can you tell me which years it is

24  possible that you were appointed to CFO of

25  Highland?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 75-37   Filed 09/09/22   Page 80 of 229   PageID 38192

Page 19

 1                   WATERHOUSE - 10-19-21

 2        A.    2011 or 2012.

 3        Q.    Did you serve as Highland's CFO on a

 4   continuous basis from in or around 2011 or 2012

 5   until early 2021?

 6        A.    Yes.

 7        Q.    During that entire time you reported

 8   directly to Jim Dondero; correct?

 9        A.    I -- I don't know.

10        Q.    Is there anybody else you reported

11   to -- withdrawn.

12              Did you report to Mr. Dondero for

13   some portion of the time that you served as

14   CFO?

15        A.    Yes.

16        Q.    Is there a portion of time that you

17   don't recall who you reported to?

18        A.    Yes.

19        Q.    What portion of time do you have in

20   your mind when you can't recall who you

21   reported to?

22        A.    From the 2011 to -- for

23   approximately a year or two.

24        Q.    Okay.  So is it fair to say that you

25   reported to Mr. Dondero in your capacity as CFO

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 75-37    Page 2009/297    Page 81 of 229    PageID 38193

Page 20

```
 1                 WATERHOUSE - 10-19-21

 2    from at least 2014 until the time you left

 3    Highland?

 4                 MS. DANDENEAU:  Objection to form.

 5        A.    I don't want to speculate the exact

 6    or what year that changed or -- so I would like

 7    to stick with my testimony.

 8        Q.    Can you recall when you began

 9    reporting to Mr. Dondero?

10        A.    I don't recall.

11        Q.    Can you -- can you give me an

12    estimate of what year you think you might have

13    began reporting to Mr. Dondero?

14        A.    I will go back to my prior

15    testimony.

16        Q.    Okay.  There is no -- you have no

17    ability to tell me when you began reporting to

18    Mr. Dondero.

19                 Do I have that right?

20                 MS. DANDENEAU:  Objection to form.

21        A.    I don't recall.

22        Q.    Okay.  Do you recall who you might

23    have reported to before you began reporting to

24    Mr. Dondero?

25        A.    Yes.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-37   Filed 01/09/24   Page 82 of 229   PageID 38194

Page 21

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Who might you have reported to in

 3   your capacity as CFO before you started

 4   reporting to Mr. Dondero?

 5        A.    That would have been Patrick Boyce.

 6        Q.    Are you aware that Highland filed

 7   for bankruptcy on October 19th, 2019?

 8        A.    Yes.

 9        Q.    And we refer to that as the petition

10   date?

11        A.    Yes.

12        Q.    Okay.  Do you hold any professional

13   licenses, sir?

14        A.    Yes.

15        Q.    Can you tell me what professional

16   licenses you hold?

17        A.    I'm a certified public accountant.

18        Q.    Okay.  Anything else?

19        A.    No.

20        Q.    Do you have any other professional

21   licenses or certificates?

22        A.    When you say "professional license,"

23   that is not education?

24        Q.    Tell me -- sure.  Anything other

25   than a driver's license.
```

1          WATERHOUSE - 10-19-21

2               Do you have any other license or

3     certificate or certification?

4          A.   Are you asking, like, where I went

5     to school and the --

6          Q.   I am not.  I am not.  I didn't say

7     education.  I didn't ask about degrees.

8               Do you know what a license is?

9          A.   Well, yeah, I mean, a license is

10    something you get after you receive a certain

11    level of proficiency.

12         Q.   Do you have any licenses or

13    certifications other than your CPA?

14               MS. DANDENEAU:  Objection, form.

15               I assume you mean professional

16          licenses, Mr. Morris; correct?

17         Q.   Can you answer my question, sir?

18         A.   Mr. Morris, I'm thinking.  I

19    don't -- I don't think I have any others.

20         Q.   Are you familiar with an entity

21    called Highland Capital Management Fund

22    Advisors?

23         A.   Yes.

24         Q.   Were you ever -- can we refer to

25    that entity as HCMFA?

1              WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    Were you ever employed by HCMFA?

4        A.    Not that I recall.

5        Q.    Were you ever -- did you ever hold

6   the title of an officer or director of HCMFA?

7        A.    Yes.

8        Q.    What title did you hold?

9        A.    Treasurer.

10       Q.    When did you become the treasurer of

11   HCMFA?

12       A.    I don't recall.

13       Q.    Can you tell me the year?

14       A.    I don't -- I don't know the year.

15       Q.    Can you approximate the year in

16   which you became the treasurer of HCMFA?

17       A.    I don't know.

18       Q.    Can you tell me if it was before or

19   after 2016?

20       A.    I don't recall.

21       Q.    Are you still the -- do you know if

22   you're still the treasurer of HCMFA today?

23       A.    Today, I am the acting treasurer for

24   HCMFA.

25       Q.    Is there a distinction between

Page 24

1                 WATERHOUSE - 10-19-21

2    treasurer and acting treasurer?

3         A.    I said "acting treasurer" as I am an

4    employee of Skyview, as you previously

5    stated -- or asked.

6         Q.    But you are the treasurer of HCMFA

7    today; correct?

8         A.    I am -- I am the acting treasurer

9    for HCMFA.

10        Q.    How did you become the treasurer of

11   HCMFA?

12        A.    Are you asking how I became the

13   treasurer of HCMFA today?

14        Q.    How did you become appointed to

15   serve as the treasurer of HCMFA?

16        A.    Well, in -- in -- in what time

17   capacity?

18        Q.    The first time that you were

19   appointed.

20        A.    First time.  I believe I was asked

21   to serve as treasurer for HCMFA the first time.

22        Q.    By who?  Who asked you to do that?

23        A.    I don't recall.

24        Q.    Is there anything that would refresh

25   your recollection as to who appointed you as

WATERHOUSE - 10-19-21

1

2    the treasurer of CF- -- HCMFA for the first

3    time?

4         A.    I don't -- I mean, there would be

5    some documents, some legal documents.  I don't

6    know where those are.

7         Q.    How many times have you been

8    appointed the treasurer of HCMFA?

9         A.    I don't know.

10        Q.    Was it more than once?

11        A.    I don't know.

12        Q.    Can you tell me any period of time

13   since 2016 that you did not hold the title of

14   treasurer of HCMFA?

15              MS. DANDENEAU:  Objection to form.

16        A.    I don't recall.

17        Q.    What are your duties and

18   responsibilities as the treasurer of HCMFA?

19        A.    My duties are to do the best job

20   that I can as the -- as an accountant and

21   finance guy.

22        Q.    What specific duties and

23   responsibilities do you have as the treasurer

24   of HCMFA?

25        A.    My duties are to do the best job

1                    WATERHOUSE - 10-19-21

2    that I can as the accounting and finance person

3    for HCMFA.

4         Q.    As the accounting and finance person

5    for HCMFA, do you have any particular areas of

6    responsibility?

7         A.    Yeah, it is to manage the accounting

8    and finance function for HCMFA.

9         Q.    Would that include -- do you have

10   responsibility for overseeing HCMFA's annual

11   audit?

12        A.    Can I please elaborate on my prior

13   question?

14        Q.    Of course.  You -- you are giving

15   answers.  I'm asking questions.

16        A.    Okay.  Yes, so the -- it -- like I

17   said, it is to manage the accounting finance

18   aspect, but I am, as we discussed, the

19   treasurer.  That is -- being treasurer is what

20   gives me that -- that management function.

21        Q.    Does anybody report to you in your

22   capacity as treasurer of HCMFA?

23        A.    I don't believe so.

24        Q.    Does HCMFA have a chief financial

25   officer?

Page 27

```
 1              WATERHOUSE - 10-19-21

 2      A.    I don't -- I don't know.

 3      Q.    You don't know?

 4            You're the treasurer of HCMFA but

 5  you don't know if HCMFA has a chief financial

 6  officer.

 7            Do I have that right?

 8      A.    That's right.

 9      Q.    Okay.  Have you heard of a company

10  called NexPoint Advisors?

11      A.    Yes.

12      Q.    We will refer to that as NexPoint.

13  Okay?

14      A.    Okay.

15      Q.    Were you ever employed by NexPoint?

16      A.    I don't recall.

17      Q.    Did you ever hold any title with

18  respect to the entity known as NexPoint?

19      A.    Yes.

20      Q.    What titles have you held in

21  relation to NexPoint?

22      A.    Treasurer.  I think it was only

23  treasurer.

24      Q.    Can you tell me the approximate year

25  you became the treasurer of NexPoint?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-17   Page 2809/297   Page 89 of 229   PageID 38201

Page 28

1                      WATERHOUSE - 10-19-21

2          A.      I don't know.

3          Q.      Are you still the treasurer of

4    NexPoint today?

5          A.      I am the acting treasurer for

6    NexPoint.

7          Q.      When did your title change from

8    treasurer to acting treasurer?

9          A.      I don't know.

10         Q.      Did your duties and responsibilities

11   change at all when your title was changed from

12   treasurer to acting treasurer?

13         A.      I don't -- I don't believe so.

14         Q.      Why did --

15         A.      I still manage the finance and

16   accounting function for NexPoint.

17         Q.      Why did your title change from

18   treasurer to acting treasurer?

19         A.      I don't -- I'm using the term

20   "acting treasurer" as I'm a Skyview employee.

21   I don't -- I don't know -- again, I am a -- as

22   I am the Skyview employee.

23         Q.      Okay.

24         A.      And we -- we provide officer

25   services.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-17   Filed 09/09/24   Page 90 of 229   PageID 38202

Page 29

```
 1                    WATERHOUSE - 10-19-21
 2        Q.    And you serve as an officer of
 3   HCMFA; correct?
 4        A.    I think we went over that with my
 5   testimony.  Yes, I'm the acting treasurer for
 6   HCMFA.
 7        Q.    And you are an officer of NexPoint;
 8   correct?
 9        A.    I think -- I am the acting treasurer
10   for NexPoint Advisors.
11        Q.    And -- and who appointed you acting
12   treasurer of NexPoint Advisors?
13        A.    I don't recall specifically.
14        Q.    Do you have any recollection of who
15   might have appointed you the treasurer of
16   NexPoint?
17        A.    I mean, it -- it -- I don't recall
18   exactly who it was.
19        Q.    Who were the possibilities?
20              MS. DEITSCH-PEREZ:  Object to the
21        form.
22        Q.    You can answer.
23        A.    Someone in the legal group for
24   NexPoint.  The other officers as well.
25        Q.    Have you heard of a company called
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 75-37   Filed 01/09/24   Page 91 of 229   PageID 38203

Page 30

 1                   WATERHOUSE - 10-19-21

 2   Highland Capital Management Services, Inc.?

 3        A.    Yes.

 4        Q.    We will refer to that as HCMS.

 5   Okay?

 6        A.    HCMS.  Okay.

 7        Q.    Were you ever employed by HCMS?

 8        A.    No.

 9        Q.    Have you ever held any titles in

10   relation to HCMF -- I apologize -- HCMS?

11        A.    Yes.

12        Q.    What titles have you held in

13   relation to HCMS?

14        A.    Treasurer and acting treasurer.

15        Q.    When did you first become treasurer

16   or acting treasurer of HCMS?

17        A.    I don't recall the exact dates.

18        Q.    Can you recall -- can you

19   approximate the year that you became the

20   treasurer of HCMS?

21        A.    I don't -- I don't know.

22        Q.    Are you still the treasurer of HCMS

23   today?

24        A.    I am the acting treasurer for HCMS.

25        Q.    And are your duties and

Page 31

```
 1                    WATERHOUSE - 10-19-21

 2   responsibilities as the acting treasurer for

 3   HCMS and the acting treasurer for NexPoint the

 4   same as your duties and responsibilities in

 5   your role as the acting treasurer of HCMFA?

 6        A.    More or less.

 7        Q.    Have you ever heard of a company

 8   called HCRE Partners, LLC?

 9        A.    Yes.

10        Q.    And do you understand that that

11   entity is now known today as NexPoint Real

12   Estate Partners?

13        A.    I did not know that.

14        Q.    All right.  Can we refer to HCRE

15   Partners as HCRE?

16             MS. DANDENEAU:  Objection to form.

17             Did you mean NexPoint Real Estate

18        Partners, Mr. Morris?

19             MR. MORRIS:  No.

20             MS. DANDENEAU:  Oh.

21             MR. MORRIS:  He said he wasn't

22        familiar that it was succeeded by that

23        entity.  So --

24             MS. DANDENEAU:  Okay.

25             MR. MORRIS:  -- let's go with what
```

Page 32

1                  WATERHOUSE - 10-19-21

2          the witness knows.

3          Q.    You're familiar with an entity

4     called HCRE Partners, LLC; correct?

5          A.    Yes.

6          Q.    Okay.  So that is the entity that we

7     will refer to as HCRE.  If you're aware of any

8     successor, that is great.  If not, let's just

9     define it as such.

10               Have you ever been employed by HCRE

11    or any entity that you know to have succeeded

12    HCRE?

13         A.    No.

14         Q.    Did you ever serve as an officer or

15    director of HCRE or any successor?

16         A.    Not that I recall.

17         Q.    Okay.  Can we refer to NexPoint and

18    HCMFA as the advisors?

19         A.    Yes.

20         Q.    In general, the advisors provided

21    investment advisory services to certain retail

22    funds; correct?

23         A.    Yes.

24         Q.    And we will refer to the retail

25    funds that are served by the advisors

Page 33

1                    WATERHOUSE - 10-19-21

2   collectively as the retail funds; is that okay?

3        A.    Okay.

4        Q.    Each of the retail funds is governed

5   by a board; correct?

6        A.    Yes.

7        Q.    And do you know the people who serve

8   on the boards of the retail funds?

9             MS. DANDENEAU:  Objection to form.

10       A.    I don't know all of them.

11       Q.    Do you know whether the same people

12  serve on the board of each of the retail funds

13  as we've defined that term?

14       A.    Which -- so when you say "retail

15  funds" -- again, I want to be -- what retail

16  funds are you referring to, because there are

17  -- there are several distinctions?

18            What retail funds are you using when

19  you refer to them?

20       Q.    That is why -- that is why I tried

21  to define the terms.  So let me do it again.

22            Retail funds for the purposes of

23  this deposition means any retail fund to which

24  either of the advisors provides advisory

25  services.  Okay?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-7   Page 84 of 397   Page 95 of 229   PageID 38207

Page 34

                    WATERHOUSE - 10-19-21
1
2        A.    Okay.
3        Q.    Okay.  So do you know whether the
4  same people serve on the board of each of the
5  retail funds?
6        A.    I don't know.
7        Q.    Were you ever employed by any of the
8  retail funds?
9        A.    No.
10       Q.    No?
11       A.    No.
12       Q.    Okay.  Do you have any title with
13 respect to any of the retail funds?
14       A.    Yes.
15       Q.    What titles do you hold --
16 withdrawn.
17             Do you have the same titles with
18 respect to all of the retail funds or do
19 they -- or just something else?
20             MS. DANDENEAU:  Objection to form.
21       Q.    Withdrawn.
22             Do you have the same title with
23 respect to each of the retail funds?
24       A.    No.
25       Q.    Tell me which title you have with

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-17   Filed 03/09/23   Page 96 of 229   PageID 38208

Page 35

```
 1                  WATERHOUSE - 10-19-21

 2    respect to each retail fund.

 3              Actually, let's do it a different

 4    way.  I withdraw the question.

 5              Can you give me one title you have

 6    in relation to any retail fund?

 7         A.   Yes.

 8         Q.   What title -- what title can you

 9    give me?

10         A.   Principal executive officer.

11         Q.   Do you serve as principal executive

12    officer for each of the retail funds?

13         A.   No.

14         Q.   Can you identify for me the retail

15    funds in which you serve as the principal

16    executive officer?

17         A.   Yes.  Highland Funds 1, Highland

18    Funds 2, Highland Income Fund, Highland Global

19    Allocation Fund.

20         Q.   I'm sorry, you said "Global

21    Allocation Fund"?

22         A.   Yes.

23              VIDEOGRAPHER:  Excuse me,

24         Mr. Morris.  This is the videographer.  I'm

25         concerned about the lighting in the
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-17   Page 36 of 397   Page 97 of 229   PageID 38209

Page 36

1                  WATERHOUSE - 10-19-21

2        witness' camera.

3                  Do you want to go off the record and

4        make some adjustments?

5                  MR. MORRIS:  Sure, but just for this

6        purpose.  I don't want to take a break.  We

7        just started.

8                  MS. DANDENEAU:  Yeah, that is fine.

9        That is fine.  We're going to put you on

10        mute.

11                  MR. MORRIS:  All right.

12                  MS. DANDENEAU:  I'm going to try to

13        open up some of the shades.

14                  VIDEOGRAPHER:  We're going off the

15        record at 10:08 a.m.

16        (Recess taken 10:08 a.m. to 10:11 a.m.)

17                  VIDEOGRAPHER:  We are back on the

18        record at 10:11 a.m.

19        Q.    Mr. Waterhouse, when did you become

20    the principal executive officer of the four

21    retail funds that you just identified?

22        A.    I don't recall.

23        Q.    Do you recall the approximate year

24    that you became the principal executive officer

25    of the four funds?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-17   Filed 07/09/24   Page 98 of 229   PageID 38210

Page 37

1                    WATERHOUSE - 10-19-21

2        A.    2021.

3        Q.    Did you ever hold any title with

4   respect to any of the four funds you have just

5   identified other than principal executive

6   officer?

7        A.    I don't recall.

8        Q.    Is it possible that you held a

9   position or a title with the four funds you

10  just identified prior to 2021?

11       A.    Yes.

12       Q.    But you don't recall if you did or

13  not; do I have that right?

14       A.    No.  You -- I thought you asked, did

15  I hold other titles.

16       Q.    Did you hold any title at the four

17  retail funds for which you now serve as

18  principal executive officer at any time prior

19  to 2021?

20       A.    Yes.

21       Q.    What titles did you hold?

22       A.    I don't recall all the titles.

23       Q.    Do you recall any of the titles?

24       A.    Yes.

25       Q.    What titles do you recall holding at

Page 38

1                    WATERHOUSE - 10-19-21

2    those four retail funds before 2021?

3         A.    Principal executive officer.

4         Q.    Were you the principal executive

5    officer of the four retail funds that you have

6    identified?

7         A.    Sorry, could you repeat the

8    question?

9         Q.    Were you the principal executive

10   officer for each of the four retail funds that

11   you have identified?

12        A.    Yes.

13        Q.    When did you become the principal

14   executive -- withdrawn.

15              Can you give me the approximate year

16   that you became the principal executive officer

17   for each of the four retail funds you've

18   identified?

19        A.    I don't recall.

20        Q.    What are your duties and

21   responsibilities as the principal executive

22   officer of these four retail funds?

23        A.    It is to manage the finance and

24   accounting positions.

25        Q.    So at the same time you serve as the

```
 1                  WATERHOUSE - 10-19-21
 2    treasurer of the advisors, you also serve as
 3    the principal executive officer of these four
 4    retail funds; correct?
 5         A.   Yes.
 6         Q.   Did you ever hold any title with
 7    respect to any other retail fund?
 8         A.   Not that I recall.
 9         Q.   During the period that you served as
10    Highland's CFO, from time to time Highland
11    loaned money to certain of its officers and
12    employees; correct?
13         A.   Yes.
14         Q.   During the period that you served as
15    Highland's CFO, from time to time Highland
16    loaned money to certain --
17         A.   Let me -- let me retract that,
18    sorry, that -- you asked during the time I was
19    CFO, Highland loaned moneys to employees.  I
20    don't -- I don't recall that during my tenure
21    of CFO.
22         Q.   You have no recollection during the
23    time that you were the CFO of Highland of
24    Highland ever loaning any money to any officer
25    or director of Highland?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 04/06/397   Page 101 of 229   PageID 38213

Page 40

                        WATERHOUSE - 10-19-21

1

2        A.    I don't recall during my tenure of

3   Highland or my -- as CFO of Highland -- yeah,

4   if there are any loans as CFO of Highland.

5        Q.    I'm just talking about officers and

6   employees right now.  You have no recollection

7   of Highland ever making a loan to any of its

8   officers or employees during the time that you

9   served as CFO.  Do I have that right?

10            MS. DANDENEAU:  Objection to form.

11       A.    So I thought you were saying

12  officers and employees as CFO, right, so there

13  were -- I mean, okay, yes.

14       Q.    I would ask you to listen carefully

15  to my question.  If I -- if I'm not clear, let

16  me know, but I'm really trying to be as clear

17  as I can.

18       A.    I'm listening as carefully as I can,

19  and you are asking very specific questions in a

20  timeline.  And I'm trying to answer your

21  questions as specifically as I can, and I

22  apologize if -- if I'm going back.  I am -- you

23  are asking very specific questions.  Thank you.

24       Q.    During the period that you served as

25  Highland's CFO, from time to time Highland

Page 41

                    WATERHOUSE - 10-19-21

1

2    loaned money to certain corporate affiliates;

3    correct?

4              MS. DANDENEAU:  Objection to form.

5         A.    What are corporate affiliates?

6         Q.    How about the ones that are in

7    Highland's audited financial statements under

8    the section entitled Loans to Affiliates.  Why

9    don't we start with those.  Do you have any

10   understanding of what the phrase "affiliates"

11   means?

12             MS. DANDENEAU:  Objection to form.

13        A.    I understand what affiliates are,

14   yet affiliates can have different meanings in

15   different contexts, so...

16        Q.    Why don't you -- why don't you tell

17   me what your understanding of the term

18   "affiliate" is in relation to Highland Capital

19   Management, L.P.

20        A.    Is that a -- it depends on the

21   context.

22        Q.    How about the context of making

23   loans?

24             MS. DANDENEAU:  Objection to form.

25        A.    I didn't make the determination of

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 04/06/23   Page 103 of 229   PageID 38215

Page 42

```
 1                    WATERHOUSE - 10-19-21
 2    who an affiliate was or is at the time those --
 3    I didn't -- that wasn't my job to make a
 4    determination of who an affiliate is.
 5         Q.    All right.  So as the CFO of
 6    Highland, do you have any ability right now to
 7    tell me which companies that were directly or
 8    indirectly owned and/or controlled by
 9    Mr. Dondero in whole or in part received loans
10    from Highland Capital Management, L.P.?
11              MS. DANDENEAU:  Objection to form.
12              MS. DEITSCH-PEREZ:  Objection, form.
13         A.    Yes.
14         Q.    Okay.  Identify every entity that
15    you can think of that was directly or
16    indirectly owned and/or controlled by
17    Mr. Dondero in whole or in part that received a
18    loan from Highland Capital Management, L.P.
19              MR. RUKAVINA:  Objection, legal
20         conclusion.
21         A.    NexPoint Advisors, Highland Capital
22    Management Fund Advisors, HCM Services,
23    Dugaboy.  Sorry, I don't think -- Dugaboy
24    doesn't fit that definition.  You said owned
25    and controlled.  I don't think that that
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document Exhibit BC    Filed 04/30/397    Page 104 of 229    PageID 38216

Page 43

1                    WATERHOUSE - 10-19-21

2    definition --

3         Q.    I said owned and/or controlled.

4         A.    I don't -- again, I'm not -- I'm not

5    the legal expert.  I don't think it controls --

6    he controls Dugaboy, so again, I'm not the

7    legal person.

8         Q.    I'm not asking you for a legal

9    conclusion, sir.  I'm asking you for your

10   knowledge, okay, as the CFO -- the former CFO

11   of Highland Capital Management, other than

12   NexPoint, HCMFA, and HCMF -- HCMS, can you

13   think of any other entities that were owned

14   and/or controlled directly or indirectly in

15   whole or in part by Jim Dondero who received a

16   loan from Highland Capital Management, L.P.?

17             MS. DANDENEAU:  Objection to form.

18        A.    HCRE.

19        Q.    Any others?

20        A.    That is -- that is all I can think

21   of.

22        Q.    And you're aware that from time to

23   time while you were the CFO, Highland loaned

24   money to Jim Dondero; correct?

25        A.    Yes.

Page 44

1                    WATERHOUSE - 10-19-21

2       Q.    Okay.  Can we refer to the four

3    entities that you just named and Mr. Dondero as

4    the affiliates?

5       A.    So that would be Jim Dondero,

6    NexPoint Advisors, Highland Capital Management

7    Fund Advisors, and HCRE.

8       Q.    And HCMS?

9       A.    And HCMS, okay.

10       Q.    And can we refer to the loans that

11    were given to each of those affiliates as the

12    affiliate loans?

13       A.    Yes.

14       Q.    And is it fair to say that each of

15    the affiliates were the borrowers under the

16    affiliate loans as we're defining the term?

17             MR. RUKAVINA:  Objection, legal

18       conclusion.

19       A.    The borrowers are whoever were on

20    the notes.  I don't -- I don't know.  I'm not

21    the legal person.

22       Q.    But you --

23       A.    I don't know.

24       Q.    You do know, as Highland's former

25    CFO, that each of the affiliates that you have

```
1              WATERHOUSE - 10-19-21
2    identified tendered notes to Highland; correct?
3              MR. RUKAVINA:  Hey, John, will you
4         just give me a running objection to legal
5         conclusion to HCM --
6              MR. MORRIS:  No.  No, if you want to
7         object --
8              MR. RUKAVINA:  I will object every
9         time.  Object to legal conclusion.
10             MR. MORRIS:  That is fine.
11   A.     Sorry, can you repeat the question?
12   Q.     Are you aware that each of the --
13   that each of the affiliates, as we have defined
14   the term, gave to Highland a promissory note in
15   exchange for the loans?
16             MR. RUKAVINA:  Objection to the
17        extent that calls for a legal conclusion.
18   A.     I don't.
19   Q.     No, you don't know that?
20   A.     No, they didn't -- you said they
21   exchanged a promissory note for a loan.  I
22   don't -- I don't understand that question, so I
23   said no.
24   Q.     At the time of the bankruptcy
25   filing, did Highland have in its possession
```

Page 46

1                    WATERHOUSE - 10-19-21

2    promissory notes that were signed by each of

3    the affiliates?

4         A.    Yes.

5         Q.    To the best of your knowledge,

6    during the time that you served as Highland's

7    CFO, did Highland disclose to its outside

8    auditors all of the loans that were made to

9    affiliates?

10              MR. RUKAVINA:  Objection, that calls

11         for a legal conclusion.

12              MS. DEITSCH-PEREZ:  I also couldn't

13         hear you, John, because there was some

14         garbling on -- on the -- on the call.

15              MR. MORRIS:  Folks, I've got to tell

16         you this is not going well, and I'm

17         reserving my right --

18              MS. DANDENEAU:  John, it was just

19         the end of that question.  It was just the

20         end of that question.  I couldn't hear it

21         either.  Sorry, if you could repeat it,

22         please.

23              MR. MORRIS:  That is less than an

24         hour into this, but folks are trying to run

25         out the clock, and so I'm just going to

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit 37   Filed 04/06/23   Page 108 of 229   PageID 38220

Page 47

```
 1                WATERHOUSE - 10-19-21

 2        state that now.

 3                MS. DANDENEAU:  You know, and,

 4        Mr. Morris, I really object to that.  I

 5        mean --

 6                MR. MORRIS:  Okay.

 7                MS. DANDENEAU:  -- Mr. Waterhouse

 8        just told you he's trying to listen to your

 9        questions and answer them carefully, and

10        you have no basis for saying that.

11                MR. MORRIS:  Okay.

12                MS. DANDENEAU:  This does not --

13        this is not an experienced witness, so he's

14        trying to do the best he can.

15        Q.    Mr. Waterhouse, during the time that

16    you served as Highland's CFO, did Highland

17    disclose to its outside auditors all of the

18    loans that it made to each of the affiliates

19    that you have identified?

20                MR. RUKAVINA:  Objection, legal

21        conclusion.

22        A.    Yes.

23        Q.    To the best of your knowledge, while

24    you were Highland's CFO, were all of the

25    affiliate loans described in Highland's audited
```

Page 48

```
 1                   WATERHOUSE - 10-19-21

 2     financial statements?

 3               MR. RUKAVINA:  Objection, legal

 4          conclusion.

 5     A.    When an audit was performed, any

 6     loans that were made by Highland to the

 7     affiliates were disclosed to auditors.

 8     Q.    Are you aware of any loan that was

 9     made to any affiliate that was not disclosed to

10     the auditors?

11     A.    I'm not aware.

12     Q.    To the best of your knowledge, did

13     each of the affiliates who were --

14     (inaudible) -- loaned from Highland execute a

15     promissory note in connection with that loan?

16               MR. RUKAVINA:  Objection, legal

17          conclusion.

18     A.    Sorry, you -- halfway through the

19     question it got muffled.

20               Can you repeat that again?

21     Q.    To the best of your knowledge, did

22     every affiliate execute a promissory note in

23     connection with each loan that it obtained from

24     Highland?

25               MR. RUKAVINA:  Objection, legal
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document Exhibit C    Filed 04/06/37    Page 110 of 229    PageID 38222

Page 49

1                    WATERHOUSE - 10-19-21

2          conclusion.

3          A.    Yes.

4          Q.    You are not aware of any loan that

5    any affiliate ever obtained from Highland where

6    the affiliate did not give a promissory note in

7    return; is that fair?

8          A.    Yes, I'm not aware.

9          Q.    And to the best of your knowledge,

10   did Highland loan to each affiliate an amount

11   of money equal to the principal amount of each

12   promissory note?

13                MR. RUKAVINA:    Objection, legal

14         conclusion.

15         A.    Yes.

16         Q.    During the time that you served as

17   CFO, did Highland ever loan money to

18   Mark Okada?

19         A.    I -- I don't recall.

20         Q.    Did you ever see any promissory

21   notes executed by Mark Okada?

22         A.    I don't recall.

23         Q.    Do you know if Highland ever forgave

24   any loan that it ever made to Mr. Okada?

25         A.    I don't recall.

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 173-37    Filed 01/09/23    Page 111 of 229    PageID 38223

Page 50

```
 1                    WATERHOUSE - 10-19-21

 2       Q.    Do you recall if Mr. Okada paid back

 3   all principal and interest due and owing under

 4   any loan he obtained from Highland?

 5             MS. DEITSCH-PEREZ:  Objection to

 6        form.

 7             MS. DANDENEAU:  Objection to form.

 8       A.    I don't recall.

 9       Q.    Do you recall whether -- during your

10   time as CFO, whether Highland ever loaned money

11   to Jim Dondero?

12       A.    Yes.

13       Q.    To the best of your knowledge, did

14   Mr. Dondero sign and deliver to Highland a

15   promissory note in connection with each loan

16   that he obtained from Highland?

17       A.    If you are referring to the

18   promissory notes that, you know, part of

19   Highland's records, yes.

20       Q.    Okay.  You're not aware of any loan

21   that Mr. Dondero took from Highland that wasn't

22   backed up by -- by a promissory note with a

23   face -- with a principal amount equal to the

24   amount of the loan; correct?

25       A.    Am I aware that Jim Dondero took a
```

Page 51

1          WATERHOUSE - 10-19-21

2  loan?

3      Q.     Without giving a -- let me ask a

4  better question.  I'm sorry, Mr. Waterhouse.

5          Are you aware of any loan that

6  Mr. Dondero obtained from Highland where he

7  didn't give a promissory note in return?

8      A.     I'm not aware.

9      Q.     During the time that you served as

10  Highland's CFO, did Highland ever forgive any

11  loans, in whole or in part, that it made to

12  Mr. Dondero?

13      A.     Not that I'm aware.

14      Q.     At the time that you served as

15  Highland's CFO, did Highland ever forgive any

16  loan, in whole or in part, that it made to any

17  affiliate as we've defined the term today?

18      A.     Not that I'm aware.

19      Q.     During the time that you served as

20  Highland's CFO, did Highland ever forgive, in

21  whole or in part, any loan that it ever made to

22  any officer or employee?

23      A.     Highland forgave loans to officers

24  and employees.  It may not have been at the

25  time when my title was CFO.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 05/06/397   Page 113 of 229   PageID 38225

Page 52

1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  And so I appreciate the

3    distinction.

4                 Is it fair to say that, to the best

5    of your knowledge, Highland did not forgive a

6    loan that it made to an officer or employee

7    after 2013?

8                 MS. DANDENEAU:  Objection to form.

9          A.    I don't recall.

10         Q.    To the best of your knowledge, did

11   Highland disclose to its auditors every

12   instance where it forgave, in whole or in part,

13   a loan that it had made to one of its officers

14   or employees?

15         A.    No.

16         Q.    Can you think of -- can you -- can

17   you identify any loan to an officer or employee

18   that was forgiven by Highland, in whole or in

19   part, that was not disclosed to Highland's

20   outside auditors?

21         A.    Look, I don't recall all of the

22   loans and the loan forgiveness.  I just know as

23   part of the audit process there is a

24   materiality concept.

25                So if there were loans to employees

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 05/30/97   Page 114 of 229   PageID 38226

Page 53

1                    WATERHOUSE - 10-19-21

2    that were of -- you know, that were deemed

3    immaterial, those items may not have been

4    disclosed by the team to the auditors.

5         Q.    I appreciate that.

6               Do you have an understanding as to

7    what the level of materiality was?

8         A.    I don't recall.

9         Q.    As the CFO of Highland, to the best

10   of your knowledge, did Highland disclose to its

11   outside auditors every loan that was forgiven,

12   in whole or in part, that was material as that

13   term was defined by the outside auditors?

14        A.    Yes.

15        Q.    And do you recall where -- do you

16   recall where the definition of materiality can

17   be found for -- for this particular purpose?

18               MS. DANDENEAU:  Objection to form.

19        A.    No.  You -- I don't determine

20   materiality.

21        Q.    Okay.  I'm just asking you if you

22   can help me understand where it is, but I think

23   we will find it in a few minutes.

24               You are aware that Highland has

25   commenced lawsuits against each of the

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 05/06/22   Page 115 of 229   PageID 38227

Page 54

```
1                    WATERHOUSE - 10-19-21

2    affiliates, as we've defined the term, to

3    collect under certain promissory notes; is that

4    right?

5         A.    Yes.

6         Q.    And are you familiar with the notes

7    that are issue -- at issue in the lawsuits?

8              MS. DANDENEAU:  Objection to form.

9         A.    Generally familiar.

10        Q.    Can we refer to the lawsuits that

11   Highland has commenced against the affiliates

12   collectively as the lawsuits?

13        A.    Yes.  And, again, the affiliates are

14   NexPoint, HCMFA, HCMS, and HCRE.

15        Q.    And Mr. Dondero?

16        A.    Okay.  See, that is a new -- and now

17   Mr. Dondero is included in your affiliate

18   definition.

19        Q.    I just --

20        A.    I thought affiliates -- I thought

21   affiliates were just the four prior entities,

22   so I just want to be clear.

23        Q.    I appreciate that.  So let's --

24   let's keep them separate and let's refer to the

25   four corporate entities as the affiliates, and
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document Exhibit 37    Filed 05/06/21    Page 116 of 229    PageID 38228

Page 55

1                    WATERHOUSE - 10-19-21

2    Mr. Dondero we will call Mr. Dondero.  Okay?

3         A.    Okay.  Thank you.  As you can see,

4    Mr. Morris, there is a lot of entities -- a lot

5    here.  I just want to be clear.

6         Q.    Okay.  Now, the affiliates of

7    Mr. Dondero signed promissory notes that are

8    not subject to the lawsuit.

9              Do you understand that?

10             MS. DANDENEAU:  Objection to form.

11        A.    The affiliates and Mr. Dondero

12   signed --

13        Q.    You know what?  I will skip it.

14   That is okay.  Okay.

15             From time to time while you were

16   Highland's CFO, payments were applied against

17   principal and interests that were due under the

18   notes that were tendered by the affiliates and

19   Mr. Dondero; correct?

20             MR. RUKAVINA:  Objection to the

21        extent that calls for a legal conclusion.

22        A.    Yes.

23        Q.    Did Highland have a process where --

24   whereby payments would be applied against

25   principal and interest against the notes that

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/23   Page 117 of 229   PageID 38229

Page 56

1                     WATERHOUSE - 10-19-21

2     were given by the affiliates and Mr. Dondero?

3          A.     Yes.

4          Q.     Can you describe the process for me?

5          A.     The process, payment should be

6     applied as laid out in the -- in the promissory

7     note.

8          Q.     From time to time were payments made

9     that were not required under the promissory

10    notes?

11                 MS. DANDENEAU:  Objection to form.

12         A.     Yes.

13         Q.     Who was responsible for deciding

14    when and how much the payments would be made

15    with respect to each of the notes that were

16    issued by the affiliates and Mr. Dondero?

17         A.     Who was responsible for deciding how

18    much was paid prior to the due date?

19         Q.     Yes.

20         A.     I don't know.

21         Q.     Did you approve of each payment that

22    was made against principal and interest on the

23    notes that were given by the affiliates and

24    Mr. Dondero?

25                 MS. DANDENEAU:  Objection to form.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 05/06/24   Page 118 of 229   PageID 38230

Page 57

```
 1                WATERHOUSE - 10-19-21

 2         A.    Did I approve the payments?  I

 3   approve -- I approve -- if there was cash -- if

 4   there was cash being repaid on a note payment,

 5   yes, I approved in the general sense of being

 6   made aware of the payment and the amount.

 7         Q.    And are you the person who

 8   authorized Highland's employees to effectuate

 9   those payments?

10         A.    Yes.

11         Q.    When you gave the instruction to

12   effectuate the payment, did you obtain

13   Mr. Dondero's prior approval?

14         A.    I mean, it -- I mean, it -- it

15   depends.

16         Q.    Can you think of any instance where

17   you directed Highland's employees to make a

18   payment of principal or interest against any

19   note that was tendered by an affiliate or

20   Mr. Dondero that Mr. Dondero did not approve of

21   in advance?

22         A.    I can't recall specifically.

23         Q.    Can you identify -- withdrawn.

24               Did Mr. Dondero ever tell you that a

25   payment that was made against principal and
```

Page 58

```
 1                 WATERHOUSE - 10-19-21

 2    interest due under one of the notes that was

 3    tendered by an affiliate or himself should not

 4    have been made?

 5         A.    Yes.

 6         Q.    Can you identify the payment for me?

 7         A.    It would be for -- for NexPoint

 8    Advisors.

 9         Q.    Okay.  And when did Mr. Dondero tell

10    you that a payment that you had initiated on

11    behalf of NexPoint should not have been made?

12         A.    I wasn't initiating payment.  It was

13    in the context of the -- I think you used this

14    term, "the advisors," so NexPoint Advisors and

15    Highland Capital Management Fund Advisors had

16    overpaid on certain agreements with Highland

17    Capital Management, L.P.  And as a part of that

18    process, the advisors -- what I was told at the

19    time were in talks and negotiations and

20    discussions with Highland Capital Management,

21    L.P., on offsets in relation to those

22    overpayments.

23         Q.    When did this conversation take

24    place?

25                MS. DANDENEAU:  Objection to form.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 05/06/97   Page 120 of 229   PageID 38232

Page 59

                    WATERHOUSE - 10-19-21

1

2        A.     I don't recall specifically.

3        Q.     Do you recall what year it was?

4        A.     Yes.

5        Q.     What year did the conversation with

6    Mr. Dondero take place that you just described?

7        A.     2020.

8        Q.     Okay.  Do you remember if it was

9    December 2020?

10       A.     It -- it -- I don't -- I don't

11   recall what month specifically, but it would

12   have been November or December.

13       Q.     And we're talking here about a

14   payment of principal and/or interest that was

15   due -- withdrawn.

16              We're talking here about a payment

17   of principal and interest that was applied

18   against NexPoint's note; correct?

19              MS. DANDENEAU:  Objection to form.

20       A.     I don't recall what that payment

21   consisted of.

22       Q.     Is it possible that the payment you

23   have in mind related to the shared services

24   agreement?

25              MS. DANDENEAU:  Objection to form.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 06/06/97   Page 121 of 229   PageID 38233

Page 60

```
 1                  WATERHOUSE - 10-19-21

 2       A.    No.

 3       Q.    Are you certain that the payment --

 4  that the payment that you have in mind related

 5  to the promissory note that NexPoint issued in

 6  favor of Highland?

 7             MS. DANDENEAU:  Objection to form.

 8       A.    Yes.

 9       Q.    Okay.  Other than that one payment,

10  can you identify any other instance where

11  Mr. Dondero told you that a payment should not

12  have been applied against principal and

13  interest under any promissory note tendered by

14  any affiliate or Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Objection to

17       form.

18       A.    Not that I recall.

19       Q.    Thank you very much.

20             Do you know if Mr. Dondero approved

21  in advance of each loan made to each affiliate

22  and himself during the time that you were the

23  CFO?

24             MS. DEITSCH-PEREZ:  Object to the

25       form.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/23   Page 122 of 229   PageID 38234

Page 61

1                    WATERHOUSE - 10-19-21

2        A.    Yes, generally.

3        Q.    Can you identify any loan that was

4   ever made to an affiliate or to Mr. Dondero

5   that Mr. Dondero did not approve of in advance?

6        A.    Other than the ones that are in

7   dispute, I'm not aware.

8        Q.    Do you believe that Mr. Dondero did

9   not approve of each of the loans that are in

10  dispute in advance of the time that the loan

11  was made?

12            MS. DANDENEAU:  Objection to form.

13       A.    Given what is in the dispute, you

14  know, and -- and -- and the way things might --

15  yeah, I mean...

16       Q.    I am not asking about the dispute,

17  and it was probably my mistake to follow you

18  there.

19            Were you aware of every loan made by

20  Highland to each of its affiliates and

21  Mr. Dondero while you were the CFO at the time

22  each loan was made?

23       A.    Was I aware of every loan, yes.

24       Q.    Okay.  And if you put yourself back

25  in time, do you recall that any of the loans

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-32   Filed 06/20/23   Page 123 of 229   PageID 38235

Page 62

1                    WATERHOUSE - 10-19-21

2    that were made to one of the affiliates or

3    Mr. Dondero during the time that you were the

4    CFO was made without Mr. Dondero's prior

5    knowledge and approval?

6         A.    Not that I recall.

7         Q.    Thank you.  In fact, do you -- as

8    the CFO, would you have allowed Highland to

9    loan money to an affiliate or to Mr. Dondero

10   without obtaining Mr. Dondero's prior approval?

11              MS. DANDENEAU:  Objection to form.

12        A.    I can't -- there was so many times

13   over the years, I can't speak for every single

14   one, but generally, yes, I -- I spoke to him.

15        Q.    You -- you never -- you never --

16   withdrawn.  I will just take that.

17              Can you recall any payment that was

18   ever made against principal and interest on a

19   note that was issued in favor of Highland by an

20   affiliate or Mr. Dondero that you personally

21   did not know about in advance?

22        A.    There are so many through the years,

23   I don't -- I don't -- I don't recall every

24   single one.

25        Q.    Okay.  Can you identify any payment

Page 63

1            WATERHOUSE - 10-19-21

2    that was made against principal and interest on

3    any note tendered by any affiliate or

4    Mr. Dondero that you didn't know about in

5    advance?

6        A.    I don't recall.

7        Q.    Other than Mr. Dondero -- withdrawn.

8            Did anybody at Highland have the

9    authority to make a payment against principal

10   and interest due under a loan given to the

11   affiliates and Mr. Dondero without your

12   knowledge and approval?

13           MS. DANDENEAU:  Objection to form.

14       A.    Sorry, there was -- to make a

15   payment on an affiliate loan, what you are

16   saying would it require my knowledge and

17   approval, yes.

18       Q.    Okay.  I appreciate that.  Thank

19   you.

20           Did anybody at Highland have the

21   authority, to the best of your knowledge, to

22   effectuate a loan to an affiliate without

23   Mr. Dondero's prior knowledge and approval?

24           MS. DANDENEAU:  Objection to form.

25       A.    I can't speak for all, but

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 06/09/23   Page 125 of 229   PageID 38237

Page 64

```
 1                 WATERHOUSE - 10-19-21
 2   generally, yes.
 3         Q.    Did you personally communicate with
 4   Mr. Dondero to let him know each time a payment
 5   of principal or interest was being made against
 6   any note that was tendered by an affiliate or
 7   Mr. Dondero to Highland?
 8         A.    I don't -- are you saying, did I let
 9   Mr. Dondero know if a payment was made on any
10   affiliate or loan to Mr. Dondero?  I mean,
11   not -- not every -- no.
12         Q.    Let me ask it this way:  Did you
13   have a practice of informing Mr. Dondero when
14   payments were made against principal and
15   interest on any note that was tendered by an
16   affiliate or Mr. Dondero?
17               MS. DEITSCH-PEREZ:  Objection to
18         form.
19               MS. DANDENEAU:  Objection to form.
20         A.    No, I did not.
21         Q.    Did Mr. Dondero ever tell you that a
22   payment of principal or interest had been made
23   against a note that was tendered by an
24   affiliate or himself that he had been unaware
25   of?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 126 of 229   PageID 38238

Page 65

```
 1                   WATERHOUSE - 10-19-21

 2        A.    Not that I recall.

 3        Q.    Are you aware that Mr. Dondero and

 4   the affiliates -- withdrawn.

 5              Are you aware that Mr. Dondero

 6   NexPoint, HCRE, and HCMS all contend that they

 7   do not have to pay on any of the notes they

 8   issued because they are subject to an oral

 9   agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12              MS. DANDENEAU:  Objection to form.

13        A.    I didn't -- I didn't -- I didn't

14   know that it was all notes.

15        Q.    Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19              MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    Yes.

22        Q.    Do you have any understanding as to

23   the terms of that agreement?

24        A.    Yes.

25        Q.    What is your understanding of the
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 06/06/19   Page 127 of 229   PageID 38239

Page 66

```
1              WATERHOUSE - 10-19-21

2    terms of the agreement?

3         A.    That there were certain milestones

4    that had to be reached.

5         Q.    Do you have any understanding of the

6    terms of the agreement between Mr. Dondero and

7    Nancy Dondero concerning any of the notes

8    issued by the affiliates or Mr. Dondero other

9    than that there have to be milestones reached?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12        A.    There are milestones, I found out

13   yesterday, or there was some --

14              MS. DANDENEAU:  Okay.  I'm just

15         going to object to the extent that you

16         learned anything in conversations with

17         counsel, please don't reveal -- that is

18         privileged, and don't reveal any privileged

19         communications.

20              THE WITNESS:  Okay.

21        A.    So I'm not aware of anything else.

22        Q.    Do you know what the milestones

23   were?

24              MS. DANDENEAU:  Objection to form.

25        A.    I don't.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 06/06/397   Page 128 of 229   PageID 38240

Page 67

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Do you know anything about -- do you

 3   know what promissory notes the agreement

 4   covered?

 5        A.    I don't.

 6        Q.    Do you know if -- if Jim and Nancy

 7   Dondero entered into one agreement or more than

 8   one agreement?

 9             MS. DEITSCH-PEREZ:  Object to the

10        form.

11        A.    I don't know.

12        Q.    Do you know if the agreement is in

13   writing?

14        A.    I don't know.

15        Q.    How did you learn of the existence

16   of the agreement?

17             MS. DANDENEAU:  Objection to form.

18        Again --

19        A.    I don't -- I don't recall who told

20   me.

21        Q.    You have no recollection of who told

22   you about this agreement between Jim and Nancy

23   Dondero?

24             MS. DEITSCH-PEREZ:  Object to the

25        form.
```

```
 1                 WATERHOUSE - 10-19-21

 2        A.    I don't recall.

 3        Q.    Do you recall how you learned of the

 4   agreement?

 5              Was it in a meeting?  Was it in a

 6   phone call?  Was it in an email?

 7        A.    I don't recall.

 8        Q.    Do you recall when you learned of

 9   the agreement?

10        A.    Not specifically.

11        Q.    Do you recall what year you learned

12   of the agreement?

13        A.    In -- look, I mean, there are so

14   many notes.  I may be getting -- I believe it

15   was 2020.

16        Q.    All right.  I'm not asking about

17   notes, sir.  I'm asking about the agreement

18   that you testified you knew about between Jim

19   and Don- -- Nancy Dondero.  Okay.

20              Do you understand my question now?

21   Should I ask my question again?

22        A.    Yeah, sure.  Go ahead.

23        Q.    I'm going to use the word

24   "agreement" to refer to the agreement that

25   Mr. Dondero and Nancy Dondero entered into
```

Page 69

1                    WATERHOUSE - 10-19-21

2    where you understood that certain milestones

3    had to be reached.  Okay?

4         A.    Uh-huh.

5              MS. DANDENEAU:  Objection.

6              MS. DEITSCH-PEREZ:  Object to the

7         form.

8              MR. MORRIS:  Just defining a term,

9         what is the objection.

10             MS. DEITSCH-PEREZ:  The objection --

11             MR. MORRIS:  I will move on.  I will

12        move on.

13             MS. DEITSCH-PEREZ:  John --

14        Q.    Sir, are you okay with that

15   definition of agreement?

16        A.    Okay.

17        Q.    Okay.  So you don't recall who --

18   who informed you of the existence of the

19   agreement; is that right?

20        A.    I don't recall.

21        Q.    You don't recall who told you the

22   terms of the agreement.

23             Do I have that right?

24        A.    Correct.

25        Q.    And you don't recall if you learned

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/22   Page 131 of 229   PageID 38243

Page 70

```
 1                 WATERHOUSE - 10-19-21

 2     about the agreement in a meeting, through an

 3     email, or through a phone call.

 4               Do I have that right?

 5        A.    I don't recall.

 6        Q.    Can you tell me when you learned of

 7     the agreement?

 8        A.    I don't -- I don't -- I don't

 9     remember specifically.

10        Q.    Can you tell me if you learned of

11     the agreement before or after the petition

12     date?

13        A.    It would have been -- it would have

14     been after.

15        Q.    Can you tell me if you learned of

16     the agreement before or after January 9th,

17     2020?

18        A.    It would have been after.

19        Q.    Can you tell me if you learned of

20     the agreement before or after you left Highland

21     Capital Management in February of 2021?

22        A.    I don't -- I don't -- I don't know.

23        Q.    It is possible that you learned of

24     it while you were a Highland employee.

25               Do I have that right?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/23   Page 132 of 229   PageID 38244

Page 71

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I don't remember the -- I mean, it

 3   was sometime in 2021.  I don't remember when.

 4        Q.    All right.  So to the best of your

 5   recollection, it was in 2021 but you don't

 6   recall if it was before or after you ceased to

 7   be a Highland employee.

 8              Do I have that right?

 9        A.    Yeah, I mean, it was -- it was

10   likely after I was -- after I left Highland

11   because, if I put myself back into the last

12   days of -- of 2021, it was -- you know, the

13   communications with Mr. Dondero were -- were --

14   were -- there weren't as many communications

15   because of the circumstances.

16        Q.    And so based on that you believe

17   that it is most likely that you learned of this

18   agreement sometime after you left Highland

19   employment?

20        A.    I wouldn't use the term "most

21   likely."  I don't recall specifically.  I don't

22   recall.

23        Q.    Do you recall ever telling Jim Seery

24   about this agreement?

25        A.    No, I don't -- I didn't tell
```

```
 1                WATERHOUSE - 10-19-21
 2   Jim Seery.
 3        Q.    Did you tell anybody at DSI about
 4   this agreement?
 5        A.    No.
 6        Q.    Did you tell any of Highland's
 7   independent directors about this agreement?
 8        A.    No.
 9        Q.    Did you tell anybody at Pachulski
10   Stang Ziehl & Jones about this agreement?
11        A.    No.
12        Q.    Did you tell any employee of
13   Highland about this agreement?
14        A.    No.
15              MS. DANDENEAU:  Mr. Morris, it has
16        been an hour and a half.  Is this a good
17        time for a break?
18              MR. MORRIS:  Sure.
19        Q.    Mr. Waterhouse, I will just remind
20   you that during the break please don't speak
21   with anybody about the deposition, the
22   substance of your testimony or anything else
23   concerning the deposition.  Okay?
24        A.    Yes.
25              MR. MORRIS:  So it is 11:02.  We're
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37 Filed 07/30/24 Page 134 of 229   PageID 38246

Page 73

```
 1                  WATERHOUSE - 10-19-21

 2       at 11:02 your time.  Let's come back, I

 3       guess, at 15 -- at 11:15 your time.

 4                  VIDEOGRAPHER:  We're going off the

 5       record at 11:02 a.m.

 6       (Recess taken 11:02 a.m. to 11:20 a.m.)

 7                  VIDEOGRAPHER:  We are back on the

 8       record at 11:20 a.m.

 9       Q.    Mr. Waterhouse, did you speak with

10   anybody during the break about this deposition?

11       A.    No.

12                  MS. DANDENEAU:  Other than -- other

13       than his counsel.

14       Q.    Did you speak to your counsel about

15   the substance of your deposition today?

16       A.    No, I didn't bring it up.

17       Q.    I didn't ask you if you brought it

18   up.  I asked you if you had any conversation

19   with your lawyer about the substance of your

20   deposition.

21                  MS. DANDENEAU:  Yes, he did.

22       Q.    Can you tell me what the -- you

23   discussed?

24                  MS. DANDENEAU:  No, I object to

25       that.  He's not going to answer.  That is a
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-32   Filed 01/09/23   Page 135 of 229   PageID 38247

Page 74

1           WATERHOUSE - 10-19-21

2    privileged conversation.

3           MR. MORRIS:  So I just want to make

4    sure that I understand.  During the break

5    you spoke with your client about the

6    substance of this deposition; is that

7    right?

8           MS. DANDENEAU:  Yes, John.

9           MR. MORRIS:  And you refuse -- you

10   refuse to let your client tell me what was

11   discussed; is that right?

12          MS. DANDENEAU:  That's correct.

13          MR. MORRIS:  You know, I had given

14   the instruction prior to the break not to

15   speak with counsel.  I would have

16   appreciated --

17          MS. DANDENEAU:  No, you didn't --

18   actually, that is not true, Mr. Morris.

19   You said not to speak with anyone.  We

20   never have interpreted that to mean

21   conversations with counsel.  That's never

22   been -- I have never, ever heard that

23   instruction.

24          MR. MORRIS:  Okay.  We will -- we

25   will -- we will deal with it when and if we

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document Exhibit C    Filed 07/30/24    Page 136 of 229    PageID 38248

Page 75

                    WATERHOUSE - 10-19-21

1

2         have to.

3         Q.    Mr. Waterhouse, after learning about

4    the agreement, did you ask anybody if the

5    agreement was reflected in a writing?

6              MS. DANDENEAU:  Objection to form.

7    A.    No.

8         Q.    Did you ask anybody if the terms of

9    the agreement were memorialized anywhere?

10             MS. DANDENEAU:  Objection to form.

11             MR. MORRIS:  What is the --

12   A.    No.

13             MS. DANDENEAU:  Well, because you

14        keep talking about this agreement and I --

15        I -- I think, Mr. Morris, that is really

16        not clear what you mean by "the agreement."

17        And maybe you can just go back and restate

18        what that is.

19             MR. MORRIS:  Okay.  Your client has

20        agreed with me twice on the definition, but

21        I will try one more time.

22        Q.    Mr. Waterhouse, do you understand

23   that when I use the term "agreement," I'm

24   referring to the agreement between Jim and

25   Nancy Dondero concerning certain promissory

```
 1                    WATERHOUSE - 10-19-21
 2    notes where you learned that one of the terms
 3    of the agreement was milestones reached?
 4         A.    Okay.
 5         Q.    And did you understand that that was
 6    the -- the agreement that we were referring to
 7    every time we used the word "agreement" in this
 8    deposition?
 9         A.    I don't know anything about this
10    agreement.  So, look, I do -- it -- I don't
11    know whether --
12         Q.    Let's -- let's try this again.
13         A.    Yeah.  Look, I don't know what this
14    agreement relates.
15              MS. DEITSCH-PEREZ:  John, John --
16         Q.    Let me try --
17              MS. DEITSCH-PEREZ:  John, please let
18         the witness finish.
19              MR. MORRIS:  Please stop.  Please
20         stop.  Please stop talking.
21              MS. DEITSCH-PEREZ:  No, you stop.
22         Let the witness --
23              MR. MORRIS:  Stop talking.
24              MS. DEITSCH-PEREZ:  -- finish -- you
25         interrupted him.
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-37    Filed 07/06/23    Page 138 of 229    PageID 38250

Page 77

```
 1                  WATERHOUSE - 10-19-21

 2               MR. MORRIS:  You know what, you

 3        guys, this is really wrong.  It is really,

 4        really wrong.  Okay?

 5               I had the witness agree not once,

 6        but twice to the definition of agreement.

 7        Okay?  I'm going to try and do it a third

 8        time.

 9               MS. DANDENEAU:  No, but, please,

10        John, really --

11               MR. MORRIS:  No, please stop

12        talking.  Please.  It is my deposition.

13        Object to questions.

14               MS. DANDENEAU:  No, but also you

15        instructed him that -- that if you were

16        going -- if you were interrupting him, that

17        he should remind you that you're

18        interrupting him and -- and --

19               MR. MORRIS:  Let him do that.  Let

20        him do that.

21               MS. DANDENEAU:  Okay.  Well, you --

22               MR. MORRIS:  Please stop talking.

23        A.    Okay.  I don't know any of the

24    details of these agreements.  I don't know

25    anything about them.  I heard -- someone -- I
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit BC   Filed 01/00/39007   Page 139 of 229   PageID 38251

Page 78

                    WATERHOUSE - 10-19-21

1      don't know who, I don't know when, as you

2

3      asked, sometime in '21, someone told me about

4      this -- or I don't honestly know -- I don't

5      even recall exactly how I was made aware of

6      this, but I was.  I don't know -- I don't know

7      any of these details, and I'm getting -- again,

8      there is, you know, I -- I -- I had a passing

9      conversation with -- with Jim at some point

10     on -- on some -- on the executive comp, and I'm

11     getting confused of what is what, because

12     again, I don't know any of these details.

13          Q.    Okay.  Let me try again,

14     Mr. Waterhouse, and I apologize.

15               Are you aware of any agreement

16     between Jim Dondero and Nancy Dondero

17     concerning any promissory note that was given

18     to Highland by any affiliate or Mr. Dondero?

19               MS. DEITSCH-PEREZ:  Object to the

20          form.

21          A.    I've heard of an agreement.  That

22     is -- that is -- I mean, if you are using aware

23     as heard, sure.

24          Q.    And you understand that one of the

25     terms of the agreement is that it was based on

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/23   Page 140 of 229   PageID 38252

Page 79

                         WATERHOUSE - 10-19-21

1

2    milestones that had to be reached; is that

3    right?

4              MS. DANDENEAU:  Objection to form.

5         A.   That was one of the words that was

6    used when I heard about it, yes.

7         Q.   And when you heard about this

8    agreement that had a term in it concerning

9    milestones reached, did you ask the person who

10   was telling you about the agreement whether or

11   not it was in writing?

12        A.   I did not.

13        Q.   Did you ask any questions at all?

14             MS. DANDENEAU:  Objection to form.

15        A.   Not that I recall.

16        Q.   But do you understand that going

17   forward, we're going to refer to the agreement

18   as the agreement that you just described that

19   you were --

20             MS. DANDENEAU:  Object to the form.

21        A.   Yes.

22        Q.   Okay.  You don't have any personal

23   knowledge concerning the terms of the

24   agreement; correct?

25             MS. DEITSCH-PEREZ:  Object to the

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 37   Filed 08/06/97   Page 141 of 229   PageID 38253

Page 80

1                   WATERHOUSE - 10-19-21

2          form.

3          Q.    You can answer.

4          A.    I don't -- I heard about the

5     agreement.  I don't know anything -- I heard

6     there was an agreement.  That is -- again, as I

7     testified before -- I said before, heard about

8     it, don't know the details.  I believe it was

9     sometime this year.

10         Q.    Do you have any personal knowledge

11    about the terms of the agreement, sir?

12              MS. DANDENEAU:  Objection to form.

13         A.    Other than what I have previously

14    discussed, I don't -- I don't know.

15         Q.    Did -- did Mr. Dondero tell you

16    about the existence of the agreement?

17         A.    I don't recall.

18         Q.    Do you recall the source of your

19    information when you learned about the

20    agreement?

21         A.    No, I don't -- I don't recall.  I

22    don't remember.  I just -- I heard about it

23    generally.  I don't remember -- I don't

24    remember who, how, if, how.  I don't remember.

25         Q.    You know, Mr. Waterhouse, I just

```
1                  WATERHOUSE - 10-19-21

2    want to be clear that I never would have asked

3    you to appear at this deposition if your name

4    hadn't been included in responses to discovery

5    as to somebody with knowledge about the -- who

6    was told about the existence of the agreement.

7                  That is what prompted me do this,

8    and I really do feel compelled to tell you that

9    I otherwise would never have called you as a

10   witness.  So I regret that you're being put

11   through this today.  I had no intention of

12   burdening you or taking your time, but that is

13   the reason that we issued the subpoena is

14   because certain of the defendants identified

15   you as somebody --

16                  MS. DEITSCH-PEREZ:  Mr. Morris, you

17        are here to ask questions, not to have --

18                  MR. MORRIS:  I feel badly for the

19        guy.  I really do.

20                  MS. DEITSCH-PEREZ:  I'm sure you do.

21                  MR. MORRIS:  I do.  Stop.

22                  MS. DEITSCH-PEREZ:  You stop.

23                  MR. MORRIS:  I'm allowed.

24                  MS. DEITSCH-PEREZ:  No, you're not

25        allowed to have a chat with the witness.
```

Page 82

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  Well, I hope that you

 3   appreciate what I'm saying here,

 4   Mr. Waterhouse.

 5              MS. DANDENEAU:  All right.  Let's go

 6        ahead and ask questions, and again, you're

 7        entitled to probe his -- his knowledge

 8        of -- whatever knowledge he has about

 9        this -- this agreement and --

10              MR. MORRIS:  That is what I'm doing.

11              MS. DANDENEAU:  -- he will answer

12        the questions to the best that he can.

13              MR. MORRIS:  That is what I'm doing.

14        Q.    Mr. Waterhouse, I take it you do not

15   know which promissory notes issued by which

16   affiliates or Mr. Dondero are the subject of

17   this agreement; do I have that right?

18        A.    Yes, I don't -- I don't know.

19        Q.    Do you know of any way to determine

20   which promissory notes issued by the affiliates

21   and Mr. Dondero are the subject of this

22   agreement other than asking Jim or Nancy

23   Dondero?

24              MS. DANDENEAU:  Objection to form.

25        A.    I don't know.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 08/30/97   Page 144 of 229   PageID 38256

Page 83

```
                        WATERHOUSE - 10-19-21

 1

 2         Q.    Did you ever make --

 3         A.    I don't know anything about these

 4   agreements.

 5         Q.    Did you ever make any effort to

 6   determine which promissory notes are subject to

 7   this agreement?

 8         A.    No.

 9         Q.    Did you ever ask anybody which

10   promissory notes are subject to this agreement?

11         A.    No.

12         Q.    Do you know if there is a list

13   anywhere of the promissory notes that are

14   subject to this agreement?

15         A.    I'm not aware.

16         Q.    Have you ever seen the terms of the

17   agreement written down anywhere?

18         A.    No.

19         Q.    Have you ever asked anybody whether

20   the terms of the agreement were written down

21   anywhere?

22         A.    I have not.

23         Q.    Did learning about the agreement

24   cause you to do anything in response?

25               MS. DANDENEAU:  Objection to form.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 173-37   Filed 01/09/23   Page 145 of 229   PageID 38257
Exhibit 37   Page 84 of 297

Page 84

```
 1                 WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did anybody ever describe to you the

 4   nature of the milestones that you referred to

 5   earlier?

 6        A.    No, I don't -- I don't have any

 7   details of this.

 8        Q.    That is fine.

 9              PricewaterhouseCoopers served as

10   Highland's outside auditors prior to the

11   petition date; correct?

12        A.    Yes.

13        Q.    You refer to PricewaterhouseCoopers

14   as PwC?

15        A.    Yes.

16        Q.    PricewaterhouseCoopers audited

17   Highland's financial statements on an annual

18   basis; correct?

19        A.    During my -- during my time as -- as

20   CFO, yes, PricewaterhouseCoopers was the

21   auditor.

22        Q.    Do you know why Highland had its

23   annual financial statements audited each year?

24        A.    Generally.

25        Q.    Tell me your general understanding
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 08/06/397   Page 146 of 229   PageID 38258

Page 85

1                    WATERHOUSE - 10-19-21

2    as to the reason why Highland had its annual

3    financial statements audited each year.

4         A.    From -- from time to time, they were

5    used -- or asked for, as part of diligence or

6    transactions or -- or things of that nature.

7         Q.    And were they given to third parties

8    for purposes of diligence or transactions from

9    time to time?

10        A.    As far as I'm aware, yes.

11        Q.    And was it your understanding as the

12   CFO that the third parties who received the

13   financial statements in diligence or

14   transactions was going to rely on those?

15              MS. DANDENEAU:  Objection to form.

16        A.    I don't know -- I don't know gen --

17   I don't know specifically what they were going

18   to rely on.  You know, we would get requests

19   for audited financial statements.  I don't know

20   what they were relying on.

21        Q.    And --

22        A.    You would have to ask them.

23        Q.    Did you personally play a role in

24   PwC's annual audit and the conduct of the

25   audit?

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection to form.

3     A.    During my tenure as CFO, I played a

4  very minimal role.

5     Q.    What was the minimal role that you

6  played?

7     A.    You know, again, it was -- it was to

8  check in with the team, to make sure that, you

9  know, audit -- the deadlines were being hit,

10 information was being presented to the auditors

11 in a -- in a timely fashion, but, you know,

12 other than that, it was a very capable team

13 that are still current employees of Highland

14 and, you know, they -- they conducted 99

15 percent of -- look, I don't want to give

16 percentages.  I mean, this is -- but I -- I --

17 I played a minimal role towards the end.

18          Before during my earlier years as

19 CFO, I did more, and then as time went on, I

20 did less in it.

21     Q.    Okay.  Was there a person at

22 Highland who was responsible for overseeing

23 Highland's participation in PwC's audit during

24 the time that you were the CFO?

25     A.    Yeah.  I mean, there was -- there

Page 87

1                  WATERHOUSE - 10-19-21

2    was a -- there was a point -- it varies.  It

3    varies by year, in function, in time and, you

4    know, depending on the request, but yes, I

5    mean, there is -- there is -- there is

6    generally a point person of communication.

7          Q.    And who was the point person from

8    2016 until the time you left Highland?

9          A.    I don't -- I don't know

10   specifically, but it would have been, you

11   know -- you know, someone on the corporate

12   accounting team.

13         Q.    And was there a head of the

14   corporate accounting team?

15         A.    Yes, so -- yes.

16         Q.    Who was the head of corporate

17   accounting for the five years prior to the time

18   you left Highland?

19         A.    I don't -- if you're asking from

20   2016 on, I don't -- it was Dave Klos, but,

21   again, there was -- there was changes to the

22   team and the reporting structure.  I don't

23   remember exactly when that happened during --

24   you know, over the last -- since 2016.

25         Q.    Did the folks who participated and

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 08/06/24   Page 149 of 229   PageID 38261

Page 88

```
 1                WATERHOUSE - 10-19-21

 2    ran the audit all report to you, directly or

 3    indirectly?

 4        A.    Yes.

 5        Q.    And did you have any responsibility

 6    for making sure that the audit report was

 7    accurate before it was finalized?

 8        A.    Yeah.  I mean, you know, that --

 9    that is -- my responsibility to the auditors

10    was -- again, is -- and the CFO is to -- we are

11    providing accurate financial statements; right?

12              And -- and -- and as part of any

13    audit, we disclose all relevant information as

14    part of any audit.

15        Q.    Okay.  And as the CFO, did you take

16    steps to make sure that the audit report was

17    accurate?

18        A.    I mean, I would say in a general

19    sense, yes.  But, again, I mean, I had a

20    very -- I had a very capable and competent

21    team.  I wasn't managing them.

22              You know, part of what I do is I let

23    the team -- I want managers to grow.  I want

24    managers to have rope.  And that is -- you

25    know, I'm not a stand-behind-you type of guy.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 08/06/23   Page 150 of 229   PageID 38262

Page 89

```
 1                    WATERHOUSE - 10-19-21

 2    If you -- if you talk to my team members, I'm

 3    not micromanaging people.  I want people to

 4    learn and grow in their function so they can go

 5    on and do bigger and better things with their

 6    careers.

 7                    And so, yes, generally I was

 8    responsible for it, but I wanted the team to

 9    learn and grow and be responsible for the bulk

10    of the audit.

11         Q.    Did you personally review each audit

12    report before it was finalized to satisfy

13    yourself that it was accurate?

14         A.    I don't -- I don't recall, you know,

15    for every single -- we're talking 2016, there

16    would have been three years, 2016 to '17, '18.

17    I don't -- we're -- we're going back

18    five years-plus.  I don't -- you know, I don't

19    recall.

20         Q.    Did you have a practice that you

21    employed to make sure that you were satisfied

22    that Highland's audit reports were true and

23    accurate to the best of your knowledge?

24         A.    I mean, our -- the practice was set

25    up with our -- the -- the practice to put
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 09/06/23   Page 151 of 229   PageID 38263

Page 90

1                WATERHOUSE - 10-19-21

2    together accurate audited or accurate financial

3    statements is to your control environment.

4              So, you know, the -- so the practice

5    was to maintain a stable control environment

6    which then the output is -- is accurate

7    financial statements.

8              So -- so, you know, if I was

9    comfortable that the control environment was

10   operating, then, you know, that would dictate

11   how I would -- you know, what I might or might

12   not do in a given year.

13       Q.    Okay.  Do you recall ever being

14   uncomfortable with the control environment

15   during the period that you served as CFO?

16       A.    Yeah.  I mean, look, yes, there are

17   times -- you know, nothing is perfect.  So

18   there were -- there were times when, yes, you

19   know -- there are times I learned I was

20   uncomfortable with the control environment, and

21   that is part of the management of the process

22   and having, you know -- and -- and working

23   through whatever obstacles present themselves.

24       Q.    Okay.  Were you ever uncomfortable

25   with the control process as it related to

Page 91

1                    WATERHOUSE - 10-19-21

2    reporting and disclosures of loans to

3    affiliates and Mr. Dondero?

4            MS. DANDENEAU:  Objection to form.

5    A.    I don't -- I don't recall --

6    Q.    So you don't recall --

7    A.    -- the --

8            MS. DANDENEAU:  Mr. Morris --

9    A.    I don't recall being uncomfortable.

10   But, again, we're going back several years.  I

11   don't -- you know, the practice in an audit is

12   to disclose all information to the auditors.

13   And I don't -- I don't recall.

14   Q.    As part of the process of the audit,

15   did you sign what is sometimes referred to as a

16   management representation letter?

17   A.    Yes.

18           MR. MORRIS:  Can we put up on the

19       screen a document that we have premarked as

20       Exhibit 33.

21           (Exhibit 33 marked.)

22           MS. DANDENEAU:  Mr. Morris, that is

23       not in the binder; correct?

24           MR. MORRIS:  Correct.

25   Q.    So you will see, Mr. Waterhouse,

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 153 of 229   PageID 38265

Page 92

                    WATERHOUSE - 10-19-21

1

2    this is a letter dated June 3rd.  And if we

3    could go to the signature page.

4              And do you see that you and

5    Mr. Dondero signed this document?

6        A.    Yes.

7        Q.    That is your signature; right?

8        A.    Yes.

9              MR. MORRIS:  Okay.  Can you go back

10       to the top.

11             MS. DANDENEAU:  Mr. Morris, can you

12       have somebody post this in the chat so that

13       we have can have a copy of this, please.

14             MR. MORRIS:  Yeah, sure.  Asia, can

15       you do that, please.

16       Q.    Okay.  Do you see at the bottom of

17   the second paragraph there is a reference to

18   materiality?

19       A.    Yes.

20       Q.    Okay.  It says, Materiality used for

21   purposes of these representations is

22   $1.7 million.

23             Do you see that?

24       A.    I do.

25       Q.    And did PwC set that level of

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 09/30/97   Page 154 of 229   PageID 38266

Page 93

1                 WATERHOUSE - 10-19-21

2    materiality?

3         A.    Yes.

4         Q.    And for purposes of the audit, did

5    PwC set the level of materiality each year?

6         A.    Yes.

7         Q.    Did that number change over time?

8         A.    I'm not aware of what materiality is

9    every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20              If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/23   Page 155 of 229   PageID 38267

Page 94

```
 1                  WATERHOUSE - 10-19-21

 2    materiality that PwC established?

 3              MS. DANDENEAU:  Objection to form.

 4         A.    So, again, during my tenure as CFO,

 5    and -- Highland -- it was -- it is required to

 6    disclose any affiliate loans that are in excess

 7    of materiality.

 8              Now, the forgiveness of those loans

 9    may or may not -- I mean, since materiality

10    fluctuates every year, a -- you know, if a loan

11    was forgiven, it may or may not, you know --

12    and, look, I would want to consult the guidance

13    around this.

14              It is not something we do -- you

15    know, it is not -- you know, GAAP can be and

16    disclosures can be very specialized so, again,

17    we want to consult the guidance.  But we would

18    see if and what would need to be disclosed if

19    it were deemed immaterial.

20         Q.    Did you and Mr. Dondero sign

21    management representation letters of this type

22    in each year in which you served as Highland's

23    CFO?

24         A.    I -- I -- I will speak for myself.

25    I signed them.  There may have been others that
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 173-32   Filed 01/09/24   Page 156 of 229   PageID 38268

Page 95

```
1              WATERHOUSE - 10-19-21
2     signed as well.  I don't -- I don't recall.
3          Q.    But to the best of your knowledge,
4     you, personally, signed a management
5     representation letter in connection with
6     Highland's audit each year that you served as
7     the CFO; correct?
8          A.    I would say generally speaking,
9     Mr. Morris.  I don't recall for every single
10    year, you know, generally, but I would want to
11    refer to all the rep letters and see who signed
12    them.
13         Q.    Do you recall Highland having its
14    financial statements audited in any year during
15    the period that you were a CFO where you didn't
16    sign the management representation letter?
17         A.    I don't recall.  But, John, we're
18    going back five, six, seven, eight, nine,
19    decade.  I don't -- I don't remember.
20         Q.    I don't want to go back that many
21    decades, but I'm just asking you if you recall
22    that there was you didn't sign it?
23         A.    I -- I -- I don't, but my memory
24    is -- again, I -- I -- I can't tell you what I
25    did in 2012.  I mean, I think generally, yes,
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document Exhibit C   Filed 09/08/23   Page 157 of 229   PageID 38269

Page 96

```
 1                  WATERHOUSE - 10-19-21

 2    but I don't -- I don't know for sure, and I

 3    would want to rely on the document.

 4          Q.    Let me ask the question a little bit

 5    differently then.

 6                 Do you have any reason to believe

 7    that Highland had its annual financial audit

 8    and you did not sign a management

 9    representation letter in connection with that

10    audit?

11                 MS. DANDENEAU:  Objection to form.

12          A.    I don't believe it would, but,

13    again, I would want to -- I don't recall and I

14    would want to confirm it to -- to make, you

15    know, an affirmative -- to give an affirmative

16    answer.

17          Q.    Do you know whether PwC required

18    management to sign management representation

19    letters?

20                 MS. DANDENEAU:  Objection to form.

21          A.    Yes.  I mean, it -- management

22    representation letters are signed by

23    management.

24          Q.    Okay.  And do you know -- do you

25    have any understanding as to why PwC requires
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-32   Filed 01/09/24   Page 158 of 229   PageID 38270

Page 97

```
1                    WATERHOUSE - 10-19-21

2    management to sign management representation

3    letters?

4              MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't know why PwC's -- what PwC's

7    specific practice is.  I know generally what

8    management representation letters are.

9         Q.    Okay.  Do you personally -- I'm not

10   asking about PwC.  I'm asking for you -- I'm

11   asking about you, do you have an understanding

12   as to why the auditor asks for management

13   representation letters?

14        A.    Okay.  So you're asking me in my

15   personal capacity, yes, I have a general

16   understanding of why.

17        Q.    Can you give me the general

18   understanding that you have as to why

19   management representation letters are required?

20        A.    They are -- they are required to --

21   they are -- they are one of the items required

22   in an audit to help verify completeness.

23        Q.    Do you have any -- any other

24   understanding as to why management

25   representation letters are required?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 176-37   Filed 01/09/24   Page 159 of 229   PageID 38271
Exhibit 37   Page 98 of 397

Page 98

1                    WATERHOUSE - 10-19-21

2         A.     That is -- that is -- other than

3    what I said, it is -- it is -- it is required

4    so -- to ensure that the -- you know, there

5    is -- there is completeness in what is being

6    audited.

7         Q.     Did you -- did you have a practice

8    whereby you and Mr. Dondero conferred about the

9    management representation letters before you

10   signed them?

11        A.     No.

12        Q.     Did you have a practice --

13   withdrawn.

14               Do you see just the next sentence

15   after the materiality, there is a sentence that

16   states:  We confirm, to the best of our

17   knowledge and belief, as of June 3rd, 2019, the

18   date of your report, the following

19   representations made to you during your audit.

20               Do you see that sentence?

21        A.     Yes.

22        Q.     Okay.  Did you understand when you

23   signed this letter that you were confirming the

24   representations that followed?

25        A.     When I signed this management

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 09/06/23   Page 160 of 229   PageID 38272

Page 99

```
1                WATERHOUSE - 10-19-21

2   letter -- representation letter, yes.

3         Q.    Okay.  Did you discuss this letter

4   with Mr. Dondero before you signed it?

5         A.    I don't recall.

6         Q.    Do you recall if Mr. Dondero asked

7   you any questions before he signed the letter?

8         A.    I don't recall.

9         Q.    Do you recall if you asked

10  Mr. Dondero any questions before you signed

11  this letter?

12        A.    I don't recall.

13        Q.    Is it fair to say that Mr. Dondero

14  did not disclose to you the existence of the

15  agreement that we have -- as we've defined that

16  term prior to the time you signed this letter?

17              MS. DANDENEAU:  Objection to form.

18        A.    I don't think I understand the

19  question.  So, again, you are saying, did

20  Mr. Dondero not disclose to me the existence of

21  this letter?

22        Q.    No, I apologize.

23              Did Mr. Dondero disclose to you the

24  existence of the agreement prior to the time

25  you signed this letter on June 3rd, 2019?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Page 1009 of 2397 Page 161 of 229   PageID 38273

Page 100

1                  WATERHOUSE - 10-19-21

2          A.    The agreement -- the agreement that

3     we talked about earlier?

4          Q.    Correct.

5          A.    Look, as I said earlier, the first

6     time I heard of this agreement was sometime

7     this year.

8          Q.    Okay.  Can we turn -- let's just

9     look at a couple of items on the list.  If we

10    can go to page 33416.  Do you see in Number 35

11    it talks about the proper recording or

12    disclosure in the financial statements of ND

13    relationships and transactions with related

14    parties.

15               Do you see that?

16         A.    I do.

17         Q.    As the CFO, do you have any

18    understanding as to whether Dugaboy is a

19    related party?

20         A.    I don't recall.

21         Q.    Do you know whether any of the

22    affiliates are related parties?

23         A.    If -- if it was NexPoint, HCMFA,

24    HCMS, HCRE, yeah, if -- if that is the

25    affiliate definition, and there.  In ASC 850 --

Page 101

```
1              WATERHOUSE - 10-19-21

2    again, I mean, I haven't looked at ASC 850 in

3    quite some time, but, you know, if -- if there

4    is a control language, you know, ASC 850, would

5    that -- that section in GAAP would -- would

6    pick up and define what are related parties.

7              So, you know, like I said, if -- one

8    of the four entities I just described, if -- if

9    they are in that control definition of ASC 850,

10   they would be picked up in 35D.

11        Q.   Do you -- do you have any reason to

12   believe that they would be picked up in that

13   definition, based on your knowledge and

14   experience?

15        A.   I -- I believe that entities

16   controlled under GAAP are -- are affiliates.

17        Q.   Okay.  Would Mr. Dondero also

18   qualify as a related party for purposes of

19   Section 35D, to the best of your knowledge?

20        A.   Yeah, I don't -- I don't know.  I

21   would think -- I would have to read the code

22   section to see if someone personally -- is it

23   talking about related parties.  So, look, if

24   your own in control, yeah, I mean, I would have

25   to read the section.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 163 of 229   PageID 38275

Page 102

```
 1                WATERHOUSE - 10-19-21

 2        Q.    To the best of your knowledge, was

 3   the existence of the agreement ever disclosed

 4   to PwC?

 5        A.    I'm not -- I'm not aware.

 6        Q.    Do you recall if the agreement was

 7   ever disclosed in Highland's audited financial

 8   statements?

 9        A.    I don't -- I don't remember if it

10   was in every Highland's audited financial

11   statements during my tenure.  We would have to

12   read the financial statements to see what was

13   disclosed, but I'm not -- I mean, as I sit here

14   today, I'm not aware.

15        Q.    That is all I'm asking for.

16        A.    I'm not aware.

17        Q.    Can we go to the next page, please,

18   and look at 36.  36 says, we have disclosed to

19   you the identity of the partnership's related

20   party relationships and all the related party

21   relationships and transactions of which we are

22   aware.

23              Do you see that?

24        A.    Yes.

25        Q.    To the best of your knowledge, as of
```

Page 103

                        WATERHOUSE - 10-19-21

1

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6         A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11        Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15        A.    Yes.

16        Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19        A.    Yes.

20        Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24        A.    It is -- it is -- it is just -- it

25   is a typical audit request.

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-37    Filed 01/09/24    Page 165 of 229    PageID 38277

Page 104

1                    WATERHOUSE - 10-19-21

2          Q.    And do you understand -- do you have

3    an understanding that PwC wanted to know that

4    as of the date of the audit whether any

5    material changes had occurred since the end of

6    the fiscal year, using the definition of

7    materiality that is in this particular

8    management representation letter?

9          A.    It -- it is -- it is -- it is a --

10   it is as described.  It is just a poorly worded

11   question, so it is hard for me to say yes.

12         Q.    If I asked you this, I apologize,

13   but did you ever learn when the agreement was

14   entered into?

15         A.    I don't -- I don't -- like I said

16   before, I don't know or have any details of the

17   agreement.

18         Q.    Okay.  Did you ever ask anybody when

19   the agreement was entered into?

20         A.    I did not.

21         Q.    Let's look at the audited financial

22   statements.  We will put up on the screen a

23   document that has been premarked as Exhibit 34.

24              (Exhibit 34 marked.)

25              MS. DANDENEAU:  And again, if Ms. La

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-17   Page 105 of 2497   Page 166 of 229   PageID 38278

Page 105

                        WATERHOUSE - 10-19-21

1

2          Canty could please put that in the chat

3          room, that would be great.

4                    MR. MORRIS:  I will assure you we

5          will put every document in the chat room.

6          Q.    Now, I'm just going to ask you

7     questions that are related to the provisions of

8     this report that concern the affiliate loans,

9     but again, Mr. Waterhouse, if there is any part

10    of the document that you need to see or that

11    you think you might need to see in order to

12    refresh your recollection to answer any of my

13    questions, will you let me know that?

14         A.    Yes.

15         Q.    Because this is a pretty lengthy

16    document, but do you see that the cover page

17    here is the Highland consolidated financial

18    statements for the period ending December 31st,

19    2018?

20         A.    Yes.

21         Q.    If we can go to -- I think it is the

22    next one, looking for PwC's signature line.

23                   MS. CANTY:  I'm sorry, John, did you

24    say something?

25                   MR. MORRIS:  Yes, can we turn the

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-37   Filed 01/09/24   Page 167 of 229   PageID 38279

Page 106

                        WATERHOUSE - 10-19-21

1

2        page.  I think it is 215.  Yes, stop right

3        there, just above -- I'm sorry, I want to

4        see just the date of the report.

5        Q.    Okay.  Do you see at the bottom of

6    that page there, Mr. Waterhouse,

7    PricewaterhouseCoopers has signed this audit

8    report?

9        A.    Yes, I see their signature.

10       Q.    Okay.  And it is the dated same day

11   as your management representation letter; is

12   that right?

13       A.    It is -- yes, it is the same day.

14       Q.    Was that the practice to sign the

15   management representation letter on the same

16   day that the audit report was signed?

17       A.    Yes, that is typical in every audit.

18       Q.    Can we just scroll down to the

19   balance sheet on the next page.

20            Do you see that there is a line

21   there that says, Notes and Other Amounts Due

22   from Affiliates?

23       A.    Yes.

24       Q.    Does that line, to the best of your

25   knowledge, include the amounts that were due

                    WATERHOUSE - 10-19-21

1    under the affiliate under the notes signed by

2    the affiliates and Mr. Dondero?

3         MR. RUKAVINA:  Objection to the

4         extent that calls for a legal conclusion.

5    A.    I mean, I would want to see the

6    detail and the build to this $173,398,000, but,

7    yes, I mean, if -- if -- given what we

8    discussed before, you know, it -- it should

9    capture that.

10    Q.    And -- and while you were the CFO of

11    Highland, were all notes held by Highland that

12    were issued by an affiliate or Mr. Dondero

13    carried as assets on Highland's balance sheets?

14         MS. DANDENEAU:  Objection to form.

15         MS. DEITSCH-PEREZ:  Object to form.

16    A.    I don't -- I don't know how else

17    they would be carried.

18    Q.    Okay.  Can you think of any -- are

19    you aware of any promissory note issued by an

20    affiliate or Mr. Dondero that was not carried

21    on Highland's audited financial balance sheets?

22    A.    I'm -- I'm -- I'm not aware.

23    Q.    Okay.  Are you aware of any category

24    of asset on Highland's balance sheet in which

Page 108

1                  WATERHOUSE - 10-19-21

2    any of the promissory notes issued by an

3    affiliate or Mr. Dondero would have been

4    included?

5             MS. DANDENEAU:  Objection to form.

6        A.    Sorry, am I aware of any asset of an

7    affiliate being included --

8        Q.    That -- let me -- let me try again.

9             Do you see there is a number of

10   different assets that are described on this

11   balance sheet?

12       A.    Yes.

13       Q.    One of the assets that is described

14   is Notes and Other Amounts Due from Affiliates;

15   right?

16       A.    Yes.

17       Q.    And it is reasonable to conclude

18   that the notes from the affiliates and

19   Mr. Dondero are included in that line item;

20   right?

21       A.    Yes, based on this description.

22   Again, I would want to see a build of this to

23   100 percent confirm, but based on the

24   description, the asset description, it is -- it

25   is likely.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-7   Page 110 of 2397   Page 170 of 229   PageID 38282

Page 109

1                    WATERHOUSE - 10-19-21

2              Now, does that mean absolute?  I

3    don't know.

4         Q.    Do you have any reason to believe

5    that the promissory notes would have been

6    carried on the balance sheet in a category

7    other than Notes and Other Amounts Due from

8    Affiliates?

9         A.    If they were deemed -- no.  If they

10   were deemed an affiliate, you know, under GAAP,

11   they should be carried in that line.

12   Otherwise, it would go into another line.

13        Q.    Okay.  And do you see the total

14   asset base as of December 31st, 2018, was

15   approximately $1.04 billion?

16        A.    Yes.

17        Q.    Is my math correct that the Notes

18   and Other Amounts Due from Affiliates

19   constituted approximately 17 percent of

20   Highland's assets as of the end of 2018?

21        A.    Well, so how are you defining

22   Highland?

23        Q.    Highland Capital Management, L.P.,

24   the entity that this audit is subject to -- or

25   the subject of.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 171 of 229   PageID 38283

Page 110

1                    WATERHOUSE - 10-19-21

2        A.    On a consolidated or unconsolidated

3   basis?

4        Q.    I'm looking at the balance sheet.

5   It is a consolidated balance sheet.  Okay?

6              Does the Notes and Other Amounts Due

7   from Affiliates constitute approximately

8   17 percent of the total assets of Highland

9   Capital Management, L.P., on a consolidated

10  basis?

11             MS. DANDENEAU:  Objection to form.

12       A.    I don't have a calculator in front

13  of me but I will take your math, if you are

14  taking the 173 divided by the billion.

15       Q.    Okay.

16       A.    If that is accurate, yes.  But,

17  again, on a consolidated basis.

18       Q.    And on an unconsolidated basis the

19  percentage would be higher; correct?

20       A.    I -- no.  I don't know.

21       Q.    Well, okay.  That is fair.

22             MR. MORRIS:  Can we turn to

23       page 241, please.

24       Q.    Do you see that this is a section of

25  the audit report that is entitled Notes and

Page 111

```
 1                WATERHOUSE - 10-19-21
 2   Other Amounts Due from Affiliates?
 3        A.    Sorry, I can't see the -- the --
 4        Q.    It is at the top.
 5        A.    Notes and Other Amounts Due from
 6   Affiliates, yes, I see that.  I don't -- I
 7   don't have a page number, but I'm on a page
 8   that says at the top:  Notes and Other Amounts
 9   Due from Affiliates.
10        Q.    Okay.  And that is the same title of
11   the line item on the balance sheet that we just
12   looked at; right?  Notes and Other Amounts Due
13   from Affiliates?
14        A.    Yes.
15        Q.    And is it your understanding, based
16   on your experience and knowledge as the CFO,
17   that this is the section of the narrative that
18   ties into the line item that we just looked at?
19        A.    Yes.
20        Q.    And is this section of the audit
21   report intended to describe and disclose all of
22   the material facts concerning the Notes and
23   Other Amounts Due from Affiliates?
24              MS. DANDENEAU:  Objection, form.
25        A.    This -- these notes -- these notes
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-17   Filed 01/09/24   Page 173 of 229   PageID 38285

Page 112

1          WATERHOUSE - 10-19-21

2    of the financial statements are -- the purpose

3    is to disclose any material items in relation

4    to that balance sheet line item.

5          Q.    Okay.  And all of the information,

6    to the best of your knowledge, that is set

7    forth in this section of the audit report was

8    provided by Highland; correct?

9          A.    Yes, it would have been provided by

10   the corporate accounting team.

11         Q.    Okay.  And the corporate accounting

12   team, did that team report to you in the

13   organizational structure?

14         A.    Yes.

15         Q.    And did you have any concerns about

16   the controls that were in place to make sure

17   that the information provided with respect to

18   Notes and Other Amounts Due from Affiliates was

19   accurate and complete?

20              MS. DANDENEAU:  Objection to form.

21         A.    Not that I recall.

22         Q.    Okay.  Do you recall ever being

23   concerned that any portion of the Notes and

24   Other Amounts Due from Affiliates in any audit

25   report was inaccurate, incomplete, or not

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-37   Filed 01/09/24   Page 174 of 229   PageID 38286

Page 113

1                    WATERHOUSE - 10-19-21

2    reliable?

3         A.    I didn't -- I had concerns about,

4    you know, like I talked about before, of there

5    were -- there were potentially issues in the

6    control environment.  But as far as it relates

7    to the audited financial statements, any -- the

8    team would work with the auditors to disclose

9    all -- all notes in Highland's possession.

10                 And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15        Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20                 MS. DANDENEAU:  Objection to form.

21        A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25                 Again, I wasn't anywhere chose to

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-37    Filed 01/09/24    Page 175 of 229    PageID 38287

Page 114

                    WATERHOUSE - 10-19-21

1

2   being the point person of this audit.  And I

3   can't recall, you know, when -- you know, I

4   don't even know if I was ever the point person

5   during my tenure as CFO.

6            I don't know if PwC had any concerns

7   when they were performing those audit

8   procedures.  They may have and they may have --

9   and it may not have been communicated to me.  I

10  don't know.

11           MR. MORRIS:  All right.  I move to

12       strike.

13       Q.    And I'm going to ask you to listen

14  carefully to my question.

15           Did you -- do you recall ever having

16  a conversation with anybody at any time

17  concerning the accuracy of the reporting

18  provided in the audited financial statement on

19  the topic of Notes and Other Amounts Due?

20           MS. DANDENEAU:  Objection to form.

21       A.    I don't recall for this, but that

22  doesn't mean that it didn't exist.

23       Q.    Okay.  But you have no reason to

24  believe, as you sit here right now, that you

25  ever discussed with anybody concerns over the

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Page 01/09/23497 Page 176 of 229   PageID 38288

Page 115

```
 1                    WATERHOUSE - 10-19-21

 2     accuracy of the section of the audit reports

 3     called Notes and Other Amounts Due from

 4     Affiliates; correct?

 5               MS. DANDENEAU:  Object to the form.

 6               MS. DEITSCH-PEREZ:  Objection to

 7         form.

 8         A.    I don't recall having any

 9     conversations.  But, again, I mean, this is --

10     this is two years ago.

11         Q.    I'm just asking for your

12     recollection, sir.

13         A.    Yes.

14         Q.    If you don't recall, this will --

15         A.    Yeah.

16         Q.    (Overspeak) -- if you don't

17     recall --

18         A.    Yeah, I don't -- I don't recall.

19         Q.    Do you know who was responsible for

20     drafting the audit report?

21         A.    Are you asking the actual Highland

22     employee responsible?  I mean, it was

23     Highland's responsibility, so, I mean, that

24     is --

25         Q.    Right.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 177 of 229   PageID 38289

Page 116

                    WATERHOUSE - 10-19-21

1

2        A.     -- Highland's responsibility.

3   Highland's responsibility.

4        Q.     Who, at Highland, was responsible

5   for drafting this section of the audit report?

6        A.     I -- I don't know the answer to

7   that.  Again, there was a team who worked on

8   this.  And I don't know, you know, whether it

9   was the staff or the manager.

10            Again, this is where I let the teams

11  manage.  And, you know, there may be a

12  corporate accountant who worked on this.  I

13  just -- you know, I wasn't part of that process

14  to give that person experience.  I don't know.

15       Q.     Do you recall having any

16  communications with anybody at any time

17  concerning this section of the report?

18       A.     Yeah, I don't recall.

19       Q.     Do you recall whether you ever told

20  anybody at any time that any aspect of this

21  section of the report was inaccurate or

22  incomplete?

23       A.     I don't recall.

24       Q.     As you sit here today, do you have

25  any reason to believe that this section of the

```
 1                    WATERHOUSE - 10-19-21

 2   audit report is incomplete or inaccurate in any

 3   way?

 4             And I'm happy to give you a moment

 5   to -- to look at it, if you would like.

 6             MS. DANDENEAU:  Objection to form.

 7             MS. DEITSCH-PEREZ:  Same.

 8        A.   I mean, I would have to look at -- I

 9   would have to look at the bill to the note

10   schedule to make sure I know you presented me

11   with materiality, but again, there might be a

12   note as of 12/31/18 that somehow was -- was

13   under materiality not disclosed.  I don't -- I

14   don't know.  I would need more information.

15        Q.   Okay.  But without more information,

16   you have no reason to believe anything this

17   section is inaccurate; correct?

18             MS. DANDENEAU:  Objection to form.

19        A.   I don't.  I mean, you know, this was

20   part of the audit.

21        Q.   Thank you.  Now, you will see if we

22   could scroll just a little bit more that each

23   of the first five paragraphs concerns

24   specifically the four affiliates that we've

25   been discussing and Mr. Dondero.
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-37    Filed 01/09/23    Page 179 of 229    PageID 38291

Page 118

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  If we could go the

 3         other way, La Asia.  We don't need Okada.

 4         We're going to have to thread the needle.

 5         Okay.  Good, perfect.

 6         Q.    Do you see those five paragraphs

 7    certain the four affiliates and Mr. Dondero as

 8    we've been referring to today?

 9         A.    Yes.

10         Q.    Okay.  And do you see at the end of

11    every paragraph it states, quote:  A fair value

12    of a partnership's outstanding notes receivable

13    approximates the carrying value of the notes

14    receivable?

15         A.    Yes, I see that.

16         Q.    Do you have an understanding of what

17    that means?

18         A.    Yes.

19         Q.    What is your understanding of that

20    sentence?

21         A.    It is the -- again, the -- the fair

22    value, right, which is -- which is what the --

23    what Highland could sell that asset for.  This

24    statement is comparing the fair value of the

25    notes to the carrying value, so the carrying
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 180 of 229   PageID 38292

Page 119

1              WATERHOUSE - 10-19-21

2  value is the line item that you showed me

3  earlier that is in Notes and Other Amounts Due

4  from Affiliates.

5       Q.   Okay.  Is another way to say this is

6  that the fair market value of the notes equals

7  the principal amount and -- withdrawn.

8            Is the fair way to interpret this

9  that the fair market value of the notes equals

10  all remaining unpaid principal and interest due

11  under the notes?

12            MS. DANDENEAU:  Object to the form.

13            MS. DEITSCH-PEREZ:  Objection, form.

14       A.   I don't know the answer to that,

15  because I don't recall where -- where any --

16  where -- in what line item was the interest

17  component reported.

18       Q.   All right.  Well, if we look in this

19  audit report, you will see in the middle of the

20  first paragraph, for example, it states that as

21  of December 31st, 2018, total interest and

22  principal due on outstanding promissory notes

23  was approximately $5.3 million.

24            Do you see that?

25       A.   I do.

Page 120

                        WATERHOUSE - 10-19-21

1

2        Q.     Is that the carrying value or the

3   fair value?

4        A.     That would be the carrying value --

5        Q.     And is the last --

6        A.     -- in my opinion.

7        Q.     Okay.  And it is in your opinion as

8   the chief financial officer of Highland during

9   the period of time that you described; right?

10   It is an educated opinion?

11       A.     I'm reading this at face value.  I'm

12   taking that as that is carrying value.

13       Q.     Okay.  And does the last sentence

14   say that the carrying value is roughly

15   approximate to the fair market value?

16              MS. DANDENEAU:  Objection to form.

17              MS. DEITSCH-PEREZ:  Objection, form.

18       A.     Again, this note to the financial

19   statement is specific to notes and other

20   amounts due from affiliates.

21       Q.     Correct.

22       A.     If the interest component is

23   reported elsewhere on the balance sheet, you

24   know, it -- it -- it could be off.  Again, I

25   don't have the detail.  I don't know, but yes,

1          WATERHOUSE - 10-19-21

2     look, I mean, if you -- I mean, if you are

3     saying the 5.3 million is in the notes and

4     other amounts due from affiliates, then the

5     last statement is saying the fair value

6     approximates 5.3 million.  That is what that

7     last sentence is saying.

8          Q.    Do you see in the middle of the

9     first paragraph -- not in the middle, the next

10    to last sentence there is a statement that the

11    partnership will not demand payment on amounts

12    that exceed HCMFA's excess cash availability

13    prior to May 31st, 2021.

14              Do you see that?

15         A.    I do.

16         Q.    Do you know when Highland agreed not

17    to demand payment as described in that

18    sentence?

19         A.    I don't know specifically.

20         Q.    Do you know why Highland agreed not

21    to demand payment on HCMFA's notes until May

22    2021?

23         A.    Yes.

24         Q.    Why was that decision made?

25         A.    You know, well, it -- it -- that

Page 122

1                    WATERHOUSE - 10-19-21

2    decision was made as to not put HCMFA into a

3    position where it didn't have sufficient assets

4    to pay for the demand note.

5         Q.    And at the time the agreement was

6    entered into, pursuant to which the partnership

7    wouldn't demand payment, did HCMFA have

8    insufficient assets to satisfy the notes if a

9    demand had been made?

10              MS. DANDENEAU:  Objection to form.

11        A.    I don't have HCMFA's financial

12   statements in front of me as of 12/31/18.

13        Q.    Was there a concern that HCMFA would

14   be unable to satisfy its demands under the

15   notes if demand was made?

16              MS. DANDENEAU:  Objection to form.

17        A.    Well, there is -- I don't recall --

18   I mean, there is something, right, in place to

19   basically not demand payment until May 31, 2021

20   as detailed here.

21        Q.    And who made the decision to enter

22   into -- who made the decision on behalf of

23   Highland not to demand payment until May 31st,

24   2021?

25        A.    I'm trying to remember.  I don't

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-7   Filed 01/09/24   Page 184 of 229   PageID 38296

Page 123

```
 1              WATERHOUSE - 10-19-21

 2    remember exactly -- I don't remember if it was

 3    myself or -- or Jim Dondero who -- who -- there

 4    was -- there was something signed, from what I

 5    recall, that -- that -- that backed up this

 6    line item in the -- in the notes I'm -- look,

 7    I'm, I'm --

 8         Q.    We will get to that.

 9         A.    You --

10         Q.    I'm just --

11         A.    You have -- I mean --

12         Q.    We're going to give that to you.

13    I'm going to give that to you.

14         A.    You -- you -- you have all the

15    documents.  I don't have the documents, and

16    that is what makes it so hard.  I don't have

17    any documents to prepare for this deposition;

18    right?  You have all -- I don't -- I don't -- I

19    don't remember, but, you know, again, it would

20    probably be myself or Jim.

21         Q.    Do you know if Highland received

22    anything in return for its agreement not to

23    make a demand for two years?

24         A.    I don't -- I don't think it referred

25    anything.
```

Page 124

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    And did you and Mr. Dondero discuss

 3   HCMFA's ability to satisfy the notes if a

 4   demand was made at the time this agreement was

 5   entered into?

 6             MS. DANDENEAU:  Objection to form.

 7        A.    I don't -- I don't -- I don't recall

 8   having a specific conversation, if I did, or --

 9   or David Klos.

10        Q.    Okay.  I'm just asking if you recall

11   any conversations that you had.

12        A.    I don't recall.

13        Q.    Okay.  Do you know why Highland

14   loaned the money to HCMFA that is the subject

15   of the notes described in this paragraph?

16        A.    I don't remember specifically why

17   5.3 million was loaned.  I mean, I -- it would

18   have to be put in the context.

19        Q.    Do you have any recollection at all

20   as to why Highland ever loaned any money to

21   HCMFA?

22        A.    Yes.

23             MS. DANDENEAU:  Objection to form.

24        Q.    What do you remember about that?

25        A.    There was a Highland Global
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17 Exhibit C   Page 125 of 2497 Page 186 of 229   PageID 38298

Page 125

                    WATERHOUSE - 10-19-21

1

2    Allocation Fund, which was a -- a fund managed

3    by Highland Capital Management Fund Advisors.

4    There was a -- we -- I'm just telling you,

5    there was -- there was -- there was a -- a

6    ultimately a NAV error found in this fund while

7    it was an open-ended fund and, you know, there

8    were amounts owed by the advisor in -- in

9    relation to that NAV error.

10             There were also, for the same fund,

11   that same fund was ongoing an

12   open-end-to-close-end conversion, and as part

13   of that proposal, shareholders who voted for

14   the conversion received compensation from the

15   advisor.

16       Q.    All right.  Now, the events that

17   you're describing occurred in the spring of

18   2019; right?

19       A.    These started back -- I think, I

20   mean --

21       Q.    I apologize.

22       A.    -- that -- I mean, the answer to

23   that is no.

24       Q.    I apologize, the loans that were

25   made in connection with the events that you're

```
1                    WATERHOUSE - 10-19-21

2    describing occurred in May 2019; right?

3              MR. RUKAVINA:  Objection to the

4         extent that calls for a legal conclusion.

5         A.   I don't recall specifically what

6    amounts of money were moved when, for what

7    purpose.

8         Q.   Okay.  Fair enough.  Going to the

9    next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13        A.   This is for NexPoint Advisors?

14        Q.   Yes.

15        A.   I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18        Q.   Do you know why?

19        A.   But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21        Q.   Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24        A.   Yes.

25        Q.   Why did High -- why do you recall --
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 188 of 229   PageID 38300

Page 127

1                    WATERHOUSE - 10-19-21

2      what is the reason you recall Highland lending

3      money to NexPoint?

4           A.    I mean, I was just -- I just -- I

5      just recall.  I mean, I just -- I don't

6      remember why.

7           Q.    I understand.  And I'm asking you if

8      you recall --

9           A.    Oh, why -- I thought you say --

10     NexPoint Advisors was launching a fund which

11     is -- I believe that the legal name is NexPoint

12     Capital, Inc.  And it -- it provided a

13     co-invest into that fund.

14                And, from what I remember, the --

15     the -- that NexPoint borrowed money from

16     Highland at the time to make that co-invest.

17          Q.    So this was an investment that

18     NexPoint was required to make; is that right?

19                MS. DANDENEAU:  Objection to form.

20          A.    I don't know if it was required to

21     make, I don't recall that, or if it just made

22     it.

23          Q.    Okay.  But your recollection is that

24     NexPoint made an investment and they borrowed

25     money from Highland to finance the investment.

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-37    Filed 01/09/24    Page 189 of 229    PageID 38301

Page 128

WATERHOUSE - 10-19-21

1

2          Do I have that right?

3     A.    Yes.

4     Q.    How about HCRE?  Do you know why

5   HCRE borrowed money from Highland?

6     A.    I don't remember specifically.

7     Q.    Do you remember generally?

8     A.    Generally, yeah -- I mean, yes.

9     Q.    Can you tell me your general

10  recollection as to why Highland loaned money to

11  HCRE?

12    A.    For -- for -- for investment

13  purposes.

14    Q.    So HCRE made the investment and it

15  obtained a loan, or loans, from Highland in

16  order to finance that investment or those

17  investments.

18          Do I have that right?

19    A.    I mean, I -- you know, generally.

20    Q.    Okay.  How about Highland Management

21  Services, Inc.?

22          Do you have any recollection as to

23  why HCMS borrowed money from Highland?

24    A.    Generally.

25    Q.    What is your general recollection as

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 190 of 229   PageID 38302
Exhibit 37   Page 1299/2497

Page 129

                        WATERHOUSE - 10-19-21

1   to why HCMS borrowed money from Highland?

2

3        A.    For -- for investment purposes.

4        Q.    So it is the same thing, HCMS wanted

5   to make investments and it borrowed money from

6   Highland in order to finance those investments;

7   is that right?

8        A.    I mean, yes, generally.  I mean, I

9   can't -- I don't -- on the services, there --

10  there are several loans in these schedules.

11  You know, I can't remember why every single one

12  of these were made, but I would say, yeah, I

13  mean, generally.

14       Q.    Okay.  I appreciate that.

15            MR. MORRIS:  Let's go to the page

16       with Bates No. 251.  La Asia, are you

17       there?

18            MS. CANTY:  Sorry, John.  It went

19       out for a minute.  Can you say that again.

20       I don't know what is going on.

21            MR. MORRIS:  The page with Bates

22       No. 251, can we go to that.

23            MS. CANTY:  Yes, sorry.

24            MR. MORRIS:  Keep going to the

25       bottom.  Yeah, there you go.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77-37   Page 1309 of 2497   Page 191 of 229   PageID 38303

Page 130

```
 1                  WATERHOUSE - 10-19-21

 2         Q.    Do you see, Mr. Waterhouse, that

 3    there is a section there called Subsequent

 4    Events?

 5         A.    I do.

 6         Q.    And does this relate to the last

 7    sentence above the signature line on the

 8    management representation letter that we talked

 9    about earlier where you made the representation

10    that you disclosed subsequent events?

11         A.    I mean, it relates to it, but not in

12    its entirety.

13         Q.    Okay.

14              MR. MORRIS:  If we can scroll up to

15         capture the entirety of this section right

16         here.

17         Q.    And what do you mean by that, sir?

18              MR. MORRIS:  Yeah, right there.

19         Perfect.

20         A.    There are -- there are different

21    subsequent events in -- under GAAP.  So there

22    are -- and -- and -- so what we see in the

23    notes to the financial statements are one type

24    of subevent.

25         Q.    Okay.  And -- and would the type of
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77-37   Page 130 of 2497Page 192 of 229   PageID 38304

Page 131

1                    WATERHOUSE - 10-19-21

2    subsequent event relating to affiliate loans be

3    captured in this section if they were -- if

4    they were made after the end of the fiscal year

5    and prior to the issuance of the audit report?

6         A.    Yes, if they were deemed material or

7    disclosable.

8         Q.    Okay.  I appreciate that.

9              Do you see the next to the last

10   entry there?  It says, Over the course of 2019

11   through the report date, HCMFA issued

12   promissory notes to the partnership in the

13   aggregate amount of $7.4 million?

14        A.    Yes.

15        Q.    And does that refresh your

16   recollection that those are the notes that

17   related to the NAV error that you mentioned

18   earlier?

19        A.    I don't -- I don't remember the

20   exact.  Again, there are -- I mentioned two

21   line items; right?

22        Q.    Yes.

23        A.    I mean, it was the GAAP conversion

24   process plus the -- the NAV error.  I don't

25   have the details.  I don't recall specifically

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17   Page 193 of 229   PageID 38305
Exhibit C   Page 132 of 297

Page 132

1                    WATERHOUSE - 10-19-21

2     if -- you know, what -- if that 7.4 million was

3     solely attributable to the NAV error.

4          Q.    Okay.  But there is no question that

5     Highland told PricewaterhouseCoopers that over

6     the course of 2019 HCMFA issued promissory

7     notes to the partnership in the aggregate

8     amount of $7.4 million; correct?

9          A.    In the course of the audit, we would

10    have produced all promissory notes in our

11    possession, including the ones that are

12    detailed here.

13         Q.    Do you recall that you signed the

14    two promissory notes that are referenced in

15    that provision?

16              MS. DANDENEAU:  Objection to form.

17         A.    I didn't recall initially but I've

18    been reminded.

19         Q.    Okay.  And -- and do you recall that

20    those notes are dated May 2nd and May 3rd,

21    2019?

22         A.    Yes.

23         Q.    So that was just a month before the

24    audit was completed; correct?

25         A.    Yes.  I think we had a June 3rd

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-7   Page 1399/2497Page 194 of 229   PageID 38306

Page 133

```
1                    WATERHOUSE - 10-19-21

2   date, right, if -- if my memory serves me

3   right.

4        Q.    Yes, I will represent to you that

5   your memory is accurate in that regard.

6              Did anybody ever instruct you as the

7   CFO to correct this statement that we're

8   looking at in subsequent events?

9        A.    So let me understand.  You're saying

10  when I was CFO at Highland Capital did anyone

11  ever ask me to correct the -- over the course

12  of 2019 through the report date HCMFA issued

13  promissory notes, this statement?

14       Q.    Right.

15       A.    Not that I'm aware.

16       Q.    While you were the CFO of Highland,

17  did anybody ever tell you that that sentence

18  was wrong?

19       A.    Not that I'm aware.

20       Q.    Highland -- withdrawn.

21              HCMFA disclosed these notes in its

22  own audited financial statements; right?

23              MR. RUKAVINA:  Objection, form.

24       A.    I assume that these would be

25  material -- if these are material financial
```

```
 1              WATERHOUSE - 10-19-21

 2   statements, yes, they -- they -- they should be

 3   and they were likely disclosed.

 4       Q.    Now, there is no statement

 5   concerning the 2019 notes about the forbearance

 6   that we looked at in the affiliated note

 7   section of the report; right?

 8            MS. DANDENEAU:  Objection to form.

 9       Q.    I'll withdraw.  That was bad.

10            Do you recall when we were looking

11   at the paragraph concerning HCMFA earlier it

12   had that disclosure about the agreement whereby

13   Highland wouldn't ask for demand on the -- on

14   the HCMFA notes?

15       A.    Yes.

16       Q.    That forbearance disclosure is not

17   made with respect to the 2019 notes; right?

18       A.    Not -- look, not that I can recall,

19   unless -- unless it was done at a subsequent

20   day.

21       Q.    Right.  And it is not in the

22   subsequent event section that we're looking at

23   right now where the 2019 notes are described;

24   right?

25       A.    Right.  But this is through
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77-37   Page 01659/2497 Page 196 of 229   PageID 38308

Page 135

```
 1                 WATERHOUSE - 10-19-21

 2  June 3rd.  It could have been done on June 4th.

 3  I don't -- I don't -- I don't recall.

 4        Q.    Okay.

 5              MR. MORRIS:  Can we put up on the

 6        screen the HCMFA audit report.  And while

 7        we're --

 8              MS. DANDENEAU:  What exhibit is

 9        this?

10              MR. MORRIS:  La Asia, what number is

11        that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14        as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17        in the chat.

18              MS. DANDENEAU:  Thank you.

19        Q.    Okay.  All right.  Do you see that

20  this is the consolidated financial statements

21  for HCMFA for the period ending 12/31/18?

22        A.    Yes.

23        Q.    As the treasurer of HCMFA at the

24  time, did you have to sign a management

25  representation letter similar to the one that
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 197 of 229   PageID 38309

Page 136

```
1                   WATERHOUSE - 10-19-21

2    we looked at earlier for Highland?

3         A.    I would imagine I would have been

4    asked to.  I don't recall if I did.

5         Q.    Do you recall ever being asked by an

6    auditor to sign a management representation

7    letter and then not doing it?

8         A.    No.

9               MR. MORRIS:  Can we just scroll down

10         again.  I just want to see the date of the

11         document.

12        A.    I mean, let me -- you know, there

13   are different versions to management

14   representation letters I will qualify.

15              Yes, there are certain -- from time

16   to time auditors can make representations

17   that -- in the rep letter that is being

18   proposed that are inaccurate or out of scope or

19   things like that and they've asked for

20   signature.

21              In that context, yes.  I mean, you

22   know -- I mean, if I have been asked to sign

23   and make those representations and those

24   representations are invalid, yes, I would not,

25   I mean, I -- I wouldn't sign that.
```

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Okay.  PricewaterhouseCoopers served

 3   as HCMFA's outside auditors as well; correct?

 4        A.    Yes.

 5        Q.    Do you see that this audit report is

 6   signed on June 3rd, 2019, just like the

 7   Highland audit report?

 8        A.    That is correct.

 9        Q.    And did the process of -- of

10   preparing HCMFA's audit report, was that the

11   same process that Highland followed when it did

12   its audit report at this time?

13        A.    I mean, it is a different entity.

14   There are different assets.  You know, it --

15   it -- it is -- as you saw, Highland's

16   financials are on a consolidated basis.  This

17   is different, so it is under the same control

18   environment and team.

19        Q.    Okay.  I appreciate that.  So the

20   same control environment and team participated

21   in the preparation of the audit for Highland

22   and for HCMFA at around the same time; correct?

23        A.    Yes.

24              MR. MORRIS:  Can we go to page 17 of

25        the report.  I don't have the Bates number.
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-7    Page 1309/2497Page 199 of 229    PageID 38311

Page 138

```
 1                    WATERHOUSE - 10-19-21

 2          Q.     Okay.  Do you see that just like

 3    Highland's audited financial report, HCMFA's

 4    audited financial report also has a section

 5    related to subsequent events?

 6          A.     Yes.

 7          Q.     And am I reading this correctly that

 8    just as Highland had done, HCMFA disclosed in

 9    its audited financial report a subsequent event

10    that related to the issuance of promissory

11    notes to Highland in the aggregate amount of

12    $7.4 million in 2019?

13          A.     That is what I see in the report.

14          Q.     And you were the treasurer of HCMFA

15    at the time; right?

16          A.     Yes, to the best of my knowledge.

17          Q.     And did anybody ever tell you prior

18    to the time of the issuance of this audit

19    report that that sentence relating to HCMFA's

20    2019 notes was inaccurate or wrong in any way?

21          A.     Not that I recall.

22          Q.     As you sit here right now, has

23    anybody ever told you that that sentence is

24    inaccurate or wrong in any way?

25          A.     Not that I recall.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77-37   Page 200 of 229   PageID 38312

Page 139

1              WATERHOUSE - 10-19-21

2        Q.    I apologize if I asked you this

3   already, but has anybody ever told you at any

4   time that you are not authorized to sign the

5   promissory notes that are the subject of the

6   sentence we're looking at?

7        A.    Not that I recall.

8        Q.    Did anybody ever tell you at any

9   time that you had made a mistake when you

10   signed the promissory notes that are the

11   subject of this sentence?

12       A.    Say that again.  Did anyone ever say

13   that I made a mistake?

14       Q.    Let me ask the question again.

15             Did anybody ever tell you at any

16   time that you made a mistake when you signed

17   the two promissory notes in Highland's favor on

18   behalf of HCMFA in 2019?

19       A.    Not that I recall.

20             MR. MORRIS:  Let's just look at the

21        promissory notes quickly.  Can we please

22        put up Document Number 1, and so this is in

23        the pile that y'all have.  We'll just go

24        for a few more minutes and we can take our

25        lunch break.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 201 of 229   PageID 38313

Page 140

                    WATERHOUSE - 10-19-21

1

2      Q.    All right.  So I don't know if you

3   have seen this before, sir.  Do you see that

4   this is a complaint against HCMFA?

5      A.    Yes, I am looking at it on the

6   screen.

7      Q.    Okay.  And have you ever seen this

8   document before?

9      A.    I went through some of these

10  documents with my counsel here yesterday.

11           MR. MORRIS:  All right.  Can we go

12      to Exhibit 1 of this document.

13      Q.    Do you see Exhibit 1 is a

14  $2.4 million promissory note back in 2019?

15      A.    Yeah, I found it in the book.  Yes,

16  I have it here in front of me.

17      Q.    And this is a demand note, right, if

18  you look at Paragraph 2?

19      A.    Yes.

20      Q.    And this is a note where the maker

21  is HCMFA, and Highland is the payee; right?

22      A.    Yes.

23           MR. MORRIS:  And if we can scroll

24      down, can we just see Mr. Waterhouse's

25      signature.

1                     WATERHOUSE - 10-19-21

2          Q.    Is that your signature, sir?

3          A.    Yes, it is.

4          Q.    And did you sign this document on or

5     around May 2nd, 2019?

6          A.    I don't recall specifically signing

7     this, but this is my signature.

8          Q.    Okay.  And do you recall that

9     Highland transferred $2.4 million to HCMFA at

10    or around the time you signed this document?

11         A.    I don't recall specifically.  I

12    would want to, as I sit here today, go back and

13    confirm that, but again, presumably that --

14    that -- that did happen.

15         Q.    You wouldn't have signed this

16    document if you didn't believe that HCMFA

17    either received or was going to receive

18    $2.4 million from Highland; is that fair?

19         A.    I mean, it -- if -- if -- if there

20    wasn't a transfer of value, yeah, I mean, you

21    know, I would have no reason to -- to sign a

22    note.

23         Q.    And -- and Highland wouldn't have

24    given this note to PricewaterhouseCoopers if --

25    withdrawn.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 203 of 229   PageID 38315

Page 142

1                    WATERHOUSE - 10-19-21

2              HCMFA wouldn't have given this note

3    to PricewaterhouseCoopers if it hadn't received

4    the principal value of -- of the note in the

5    form of a loan; correct?

6              MR. RUKAVINA:  Objection, legal

7          conclusion, speculation and form.

8        A.    Again, we -- what we provided to PwC

9    were, as part of the audit, any promissory

10   notes executed and outstanding.  You know, as a

11   part of the audit, they, you know, they -- they

12   have copies of all the bank statements,

13   things -- things of that sort.

14             MR. MORRIS:  Okay.  Can we go to

15         Exhibit 2.

16             (Exhibit 2 marked.)

17       Q.    Do you see that this is a promissory

18   note dated May 3rd, 2019 in the amount of

19   $5 million?

20       A.    Yes.

21       Q.    Do you believe this is also a demand

22   note if you look at Paragraph 2?

23       A.    Yes.

24       Q.    And do you see that HCMFA is the

25   maker, and Highland is the payee?

```
1                    WATERHOUSE - 10-19-21

2         A.    Yes.

3         Q.    And if we go to the bottom, can we

4    just confirm that that is your signature?

5         A.    Yes.

6         Q.    And together these notes are the

7    notes that are referred to both in Highland and

8    HCMFA's audited financial reports in the

9    subsequent event sections; correct?

10              MS. DANDENEAU:  Objection to form.

11        A.    They -- they -- they totaled

12   $7.4 million, so presumably, yes.

13        Q.    Okay.  And you were authorized to

14   sign these two notes; correct?

15              MR. RUKAVINA:  Objection, legal

16        conclusion.

17        A.    Yeah.  I mean, I'm -- I was the

18   officer of -- of HCMFA.  You know, I -- I'm not

19   the legal expert on -- on what that -- what

20   that confers to me or what it doesn't.  I mean,

21   that is my signature on the notes.

22        Q.    And you believed you were authorized

23   to sign the notes; is that fair?

24        A.    I signed a lot of documents in my

25   capacity, just because it is operational in
```

Page 144

```
 1                    WATERHOUSE - 10-19-21
 2    nature.  So, you know, to me this was just
 3    another document, to be perfectly honest.
 4         Q.    Sir, would you have signed
 5    promissory notes with the principal amount of
 6    $7.4 million if you didn't believe you were
 7    authorized to do so?
 8              MS. DANDENEAU:  Objection to form.
 9         Q.    Are you frozen?
10         A.    No.  I'm just -- you know, it is --
11    you know, again, I typically don't sign
12    promissory notes, and I don't recall why I
13    signed these, but -- you know, but I did.
14         Q.    All right.  So listen carefully to
15    my question.  Would you have ever signed
16    promissory notes with a face amount of
17    $7.4 million without believing that you were
18    authorized to do so?
19         A.    No.  I mean, I'm -- I'm putting my
20    signature on there, so no.
21         Q.    Okay.  And would you have signed two
22    promissory notes obligating HCMFA to pay
23    Highland $7.4 million without Mr. Dondero's
24    prior knowledge and approval?
25              MS. DEITSCH-PEREZ:  Object to the
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Page 1459/2497Page 206 of 229   PageID 38318

Page 145

1                    WATERHOUSE - 10-19-21

2         form.

3         A.    You know, from -- from what I recall

4    around these notes, you know, I don't recall

5    specifically Mr. -- Mr. Dondero saying to -- to

6    make this a loan.

7              So my conversation with Mr. Dondero

8    around the culmination of the NAV error as

9    related to TerreStar which was a -- a -- I

10   think it was a year and a half process.  I

11   don't know, it was a multi-month process, very

12   laborious, very difficult.

13             When we got to the end, I had a

14   conversation with Mr. Dondero on where to, you

15   know, basically get the funds to reimburse the

16   fund, and I recall him saying, get the money

17   from Highland.

18        Q.    And so he told you to get the money

19   from Highland; is that right?

20        A.    That is what I recall -- in my

21   conversation with him, that is -- that is what

22   I can recall.

23        Q.    Do you know who drafted these notes?

24        A.    I don't.

25        Q.    Did you ask somebody to draft the

Page 146

1                    WATERHOUSE - 10-19-21

2    notes?

3         A.    I didn't ask -- I don't specifically

4    ask people to draft notes really.  I mean,

5    again, you know, the legal group at Highland is

6    responsible and has always been responsible for

7    drafting promissory notes.

8         Q.    So based on your -- based on the

9    practice, you believe that somebody from the

10   Highland's legal department would have drafted

11   these notes.  Do I have that right?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.  John, I also asked you for the Word

14        versions of these notes so we could look at

15        the properties, and you have not provided

16        them.  Are you intending to?

17             MR. MORRIS:  No.

18        Q.    Can you answer my question, sir?

19        A.    Again, I --

20             MS. DANDENEAU:  Do you want him to

21        repeat it?

22        A.    Yeah, why don't you repeat it?

23        Q.    Sure.  Mr. Waterhouse, based on the

24   practice that you have described in your

25   understanding, do you believe that these notes

```
 1                    WATERHOUSE - 10-19-21

 2   would have been drafted by somebody in the

 3   legal department?

 4            MS. DEITSCH-PEREZ:  Object to the

 5        form.

 6        A.    Yes.

 7        Q.    Okay.  And do you know who would

 8   have instructed -- do you have any knowledge as

 9   to who would have instructed the legal

10   department to draft these notes?

11            MS. DEITSCH-PEREZ:  Object to the

12        form.

13        A.    It was whoever was working -- I

14   mean, it was likely someone on the team.  I

15   mean, I don't remember exactly on every note or

16   every document, but, again, a lot of these

17   things of this nature -- they're operational in

18   nature -- were handled by the team.

19            The team knows to -- I mean, we

20   don't draft documents.  We're not lawyers.

21   We're not attorneys.  It is not what I do or

22   accountants do.

23            So they are always instructed to go

24   and -- and go to the legal team to get

25   documents like this drafted.  Also, when you go
```

Page 148

                    WATERHOUSE - 10-19-21

1
2    to the legal team, the -- you know, we always
3    loop in compliance.  And compliance -- when you
4    go to the legal team, compliance is part of
5    legal team.  They're made aware of -- of -- of
6    these types of transactions.
7         Q.    And do you believe that you had
8    the -- withdrawn.
9              Did you ever tell Mr. Dondero --
10   (inaudible) -- did you see those?
11        A.    Sorry.
12             MS. DEITSCH-PEREZ:  I did not hear
13        the end of that question.
14        Q.    Did you ever tell Mr. Dondero that
15   you signed these two notes?
16        A.    I don't recall ever -- no, I don't
17   recall having a conversation with him.
18        Q.    Did you ever discuss these two notes
19   with him at any time?
20        A.    The conversation, I recall, was what
21   I described earlier.  And that is the only time
22   I recall ever discussing this.
23        Q.    Okay.  But the corporate accounting
24   group had a copy of this -- of these two notes.
25   And pursuant to the audit process, the

Page 149

1                    WATERHOUSE - 10-19-21

2    corporate accounting group gave the two notes

3    to PricewaterhouseCoopers in connection with

4    the audit; correct?

5                    MS. DANDENEAU:  Objection to form.

6          A.    Yes.  I mean, that is -- yeah, I

7    mean, they -- unless the legal team can also

8    retain copies of items like this.  I mean, I

9    don't know everything that they would retain as

10   well.

11                   The legal team would also, if they

12   had documents as part of audits, turn that over

13   to the auditors as well.  So it could have been

14   the corporate accounting team.  It could be

15   someone on the legal team.

16         Q.    All right.  So you didn't -- you

17   didn't draft this note; right?

18         A.    I -- I -- I did not.

19         Q.    But somebody at Highland did; is

20   that fair?

21                   MS. DEITSCH-PEREZ:  Object to the

22         form.

23         A.    I don't know.  I mean, we can go to

24   the legal team.  I don't -- I'm not sitting

25   behind someone in legal.  Maybe they went to

Page 150

                       WATERHOUSE - 10-19-21

1

2    outside counsel.  I have no idea.

3         Q.    Did you have any reason to believe

4    you weren't authorized to sign this note,

5    either of these two notes?

6         A.    I think I have already answered that

7    question.

8         Q.    Okay.  You didn't give these notes

9    to PricewaterhouseCoopers; correct?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall giving these to

12   PricewaterhouseCoopers.

13        Q.    And in the practice that you have

14   described, somebody in the corporate accounting

15   group would have given these two notes to

16   PricewaterhouseCoopers; correct?

17             MS. DANDENEAU:  Objection to form.

18        A.    I think I've answered that.  I said

19   either the corporate accounting team or maybe

20   the legal team.

21             MR. MORRIS:  Okay.  Why don't we

22        take our lunch break here.

23             VIDEOGRAPHER:  We're going off the

24        record at 1:04 p.m.

25        (Recess taken 1:04 p.m. to 1:49 p.m.)

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 171-7    Page 1509/2397 Page 212 of 229    PageID 38324

Page 151

```
 1                WATERHOUSE - 10-19-21

 2                VIDEOGRAPHER:  We are back on the

 3       record at 1:49 p.m.

 4       Q.    Mr. Waterhouse, did you speak with

 5  anybody during the break about the substance of

 6  this deposition?

 7       A.    I spoke to -- to Deb and Michelle.

 8       Q.    About the substance of the

 9  deposition?

10       A.    Yes.

11       Q.    Can you tell me what you talked

12  about?

13                MS. DANDENEAU:  No.  We object on

14       the basis of privilege.

15       Q.    Okay.  You are going to follow your

16  counsel's objection here?

17       A.    Yes.

18       Q.    Okay.

19                MR. MORRIS:  Can we put up on the

20       screen Exhibit 35.

21                (Exhibit 35 marked.)

22       Q.    Are you able to see that document,

23  sir?

24       A.    Yes.

25       Q.    Have you ever seen an incumbency
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77 Filed 01/09/24   Page 213 of 229   PageID 38325
Exhibit C   Page 152 of 2497

Page 152

1                    WATERHOUSE - 10-19-21

2      certificate before?

3            A.    I have.

4            Q.    Do you have a general understanding

5      of what an incumbency certificate is?

6            A.    I have a general understanding.

7            Q.    What is your general understanding?

8            A.    You know, those -- my general

9      understanding is that the incumbency

10     certificate basically lists folks that can --

11     are like authorized signers.

12           Q.    Okay.  And do you see that this is

13     an incumbency certificate for Highland Capital

14     Management Fund Advisors, L.P.?

15           A.    Yes.

16           Q.    Okay.  And if we could scroll down

17     just a little bit, do you see that it's dated

18     effective as of April 11th, 2019?

19           A.    Yes, I see that.

20           Q.    Okay.  And is that your signature in

21     the middle of the signature block?

22           A.    Yes, it is.

23           Q.    And by signing it, did you accept

24     appointment as the treasurer of HCMFA effective

25     as of April 11th, 2019?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Filed 01/09/24   Page 214 of 229   PageID 38326

Page 153

```
 1                  WATERHOUSE - 10-19-21
 2        A.     Again, I'm not the legal -- I don't
 3   know if this makes me the treasurer or the
 4   appointment.  I don't know -- I don't know
 5   that, so I don't -- I don't know if that
 6   document -- again, I think -- again, I'm not
 7   the legal expert.  I think isn't there --
 8   aren't there other legal documents that detail
 9   who the officers are that could be incorporated
10   or things like that?  Again, I don't want to
11   play armchair attorney here.
12        Q.     I'm not asking you for a legal
13   conclusion.  I'm asking you for your knowledge
14   and understanding.  When you signed this
15   document, did you understand that you were
16   accepting an appointment as the treasurer of
17   HCMFA?
18                MS. DANDENEAU:  Objection to form.
19                MS. DEITSCH-PEREZ:  Objection, form.
20        A.     Again, I don't think this -- that
21   wasn't my understanding.  I don't think this
22   makes -- this document makes me the treasurer.
23        Q.     What do you think this document --
24   why did you sign this document?
25                MS. DEITSCH-PEREZ:  Objection to
```

Page 154

1                  WATERHOUSE - 10-19-21

2          form.

3                  MR. MORRIS:  You're objecting to the

4          form of the question when I asked him why

5          did you sign the document?  What is the

6          basis for the objection?

7                  MS. DEITSCH-PEREZ:  Because, John, I

8          think that it does call for a legal

9          conclusion other than -- with him saying

10         because somebody told me to sign this

11         document.  But if you want to go there,

12         that is fine.

13                 MR. MORRIS:  Okay.

14                 MS. DANDENEAU:  I don't think --

15         he's already said he's not a lawyer.

16                 MR. MORRIS:  I'll allow the witness

17         to answer this question.

18         Q.    Why did you sign this document, sir?

19         A.    I mean, our -- our legal group would

20    bring by these incumbency certificates from

21    time to time.  I have no idea why they're being

22    updated, and I was asked to sign.

23         Q.    Did you ask anybody, what is this

24    document?

25         A.    No.

Page 155

1                    WATERHOUSE - 10-19-21

2        Q.     Did anybody tell you why they needed

3   you to sign the document?

4        A.     Not that I can recall.

5        Q.     You testified earlier that you

6   understood that you served as the acting

7   treasurer for HCMFA; correct?

8        A.     Yes.

9        Q.     How did you become the acting

10  treasurer of HCMFA?

11               MS. DANDENEAU:  Objection to form.

12       A.     I don't -- I don't know the legal --

13  I don't know the legal mechanic of how I became

14  the acting treasurer.

15       Q.     I'm not asking for the legal

16  mechanic.  I'm asking you as the person who

17  is --

18               MS. DANDENEAU:  John, you said --

19               MR. MORRIS:  Stop.

20               MS. DANDENEAU:  -- how did you

21        become the treasurer.  That is --

22               MR. MORRIS:  Please stop.

23               MS. DANDENEAU:  That is a legal

24        question.

25               MR. MORRIS:  I am not asking any

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77   Exhibit 7   Filed 01/09/24   Page 217 of 229   PageID 38329

Page 156

```
 1                    WATERHOUSE - 10-19-21

 2         legal questions, to be clear.  I'm asking

 3         for this witness' understanding as to how

 4         he became the acting treasurer of HCMFA.

 5         If he doesn't know, he can say he doesn't

 6         know, but this legal stuff is nonsense, and

 7         I really object to it.

 8         Q.    Sir, I'm asking you a very simple

 9    question.

10              MS. DANDENEAU:  Argumentative.

11         Q.    You testified -- you testified that

12    you became the acting treasurer of HCM --

13    HCMFA; correct?

14         A.    Yes.

15         Q.    How did that happen?

16              MS. DANDENEAU:  Again, object to

17         form.

18              MR. MORRIS:  I can't wait to do this

19         in a courtroom.  Good God.

20         Q.    Go ahead, sir.

21         A.    I don't know the exact process of

22    how that happened.

23         Q.    Do you have any idea whether signing

24    this document was part of the process?

25              MR. MORRIS:  You know what --
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-17    Filed 01/09/24    Page 218 of 229    PageID 38330

Page 157

```
 1            WATERHOUSE - 10-19-21

 2            MS. DANDENEAU:  Objection.

 3            MR. MORRIS:  -- withdrawn.  You guys

 4    want to do this, I can't wait.  I can't

 5    wait.  This is the craziest stuff ever.

 6            MS. DANDENEAU:  John, he said he's

 7    not a lawyer, and you are asking him for a

 8    legal conclusion, and he says he doesn't

 9    know, and you persist.

10            MR. MORRIS:  Okay.

11            MS. DANDENEAU:  So you can ask these

12    questions --

13            MR. MORRIS:  Did anyone -- please

14    stop talking.

15            MS. DANDENEAU:  -- at another

16    point -- no, no, no, I'm entitled to talk,

17    too; right?  If you're going to make these

18    accusations as if we're trying to stonewall

19    you, this is not the witness to ask that

20    question.

21            MR. MORRIS:  I can't -- I can't

22    wait -- I can't wait to do this in a

23    courtroom.  I will just leave it at that.

24            MS. DANDENEAU:  That's right, I'm

25    sure you can't.
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-7    Page 1589/2497    Page 219 of 229    PageID 38331

Page 158

```
1                    WATERHOUSE - 10-19-21

2        Q.    Did anyone ever tell you, sir, that

3   even though you were the acting treasurer of

4   HCMFA, that you were not authorized to sign the

5   two promissory notes that we looked at before

6   lunch?

7        A.    I'm not sure I understand the

8   question.  I wasn't -- I mean, I'm -- I'm the

9   current acting treasurer.

10       Q.    Did anybody ever tell you at any

11  time that even though you were the acting

12  treasurer of HCMFA, that you were not

13  authorized to sign the two promissory notes

14  that we looked at before lunch?

15             MS. DANDENEAU:  Objection to form.

16       A.    Not that I recall.

17       Q.    Did anybody ever tell you at any

18  time that you were not authorized to sign the

19  two promissory notes that we looked at before

20  lunch?

21       A.    Not that I recall.

22       Q.    Did anybody ever tell you at any

23  time that you should not have signed the two

24  promissory notes that we looked at before

25  lunch?
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-37    Page 159 of 397    Page 220 of 229    PageID 38332

Page 159

```
 1                   WATERHOUSE - 10-19-21

 2        A.    Not that I recall.

 3        Q.    Did you ever tell anybody at any

 4   time that you weren't authorized to sign the

 5   two promissory notes that we looked at before

 6   lunch?

 7        A.    Not that I recall.

 8        Q.    Did you ever tell anybody at any

 9   time that you made a mistake when you signed

10   the two promissory notes that we looked at

11   before lunch?

12        A.    Not that I recall.

13        Q.    As you sit here right now, do you

14   have any reason to believe that you were not

15   authorized to sign the two documents that we

16   looked at before lunch?

17              MS. DANDENEAU:  Objection to form.

18        A.    If -- if this is the -- the valid

19   incumbency certificate, I mean, this does --

20   this does detail who the signers are.

21        Q.    Okay.  And looking at that document,

22   does that give you comfort that you were

23   authorized to sign the two promissory notes

24   that we looked at before lunch?

25              MS. DEITSCH-PEREZ:  Object to the
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 171-37    Page 160 of 297 Page 221 of 229    PageID 38333

Page 160

```
 1                   WATERHOUSE - 10-19-21

 2          form.

 3                   MS. DANDENEAU:  Objection, form.

 4          A.    Yes.

 5          Q.    As of October 20th -- withdrawn.

 6                   I'm trying to take your mind back to

 7    a year ago, October 2020.  Do you recall at

 8    that time that the boards of the retail funds

 9    were making inquiries about obligations that

10    were owed by the advisors to Highland in

11    connection with their 15(c) review?

12                   MS. DANDENEAU:  Objection to form.

13          A.    I don't -- I don't recall.

14          Q.    As of October 2020, you had no

15    reason to believe you weren't authorized to

16    sign the two promissory notes that we just

17    looked at; correct?

18                   MS. DANDENEAU:  Objection, form.

19                   MS. DEITSCH-PEREZ:  Objection to

20          form.

21          A.    I didn't think about it in October

22    of 2020, but I mean --

23          Q.    Did you have any reason to believe

24    at that time that you weren't authorized to

25    sign the two notes that we just looked at?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Page 160 of 247Page 222 of 229   PageID 38334

Page 161

WATERHOUSE - 10-19-21

1

2          A.     Not that I'm aware, no.

3          Q.     Did you have any reason to believe a

4     year ago that you made a mistake when you

5     signed those two notes?

6          A.     Not that I'm aware.

7          Q.     A year ago you believed that HCMFA

8     owed Highland the unpaid principal amounts that

9     were due under those two notes; correct?

10          A.     They're -- they're promissory notes

11     that were -- as you presented, that were --

12     that were executed.  Whether they're valid or

13     if there's other reasons, I didn't -- I don't

14     know.

15          Q.     I'm not asking you whether they're

16     valid or not.  I'm asking you for your state of

17     mind.  A year ago you believed that HCMFA

18     was -- was obligated to pay the unpaid

19     principal amount under the two notes that you

20     signed; correct?

21          A.     Yeah, I'm -- I'm -- yes.

22          Q.     Thank you.  Are you aware -- you're

23     aware that -- that in 2017, NexPoint issued a

24     note in favor of Highland in the approximate

25     amount of $30 million; correct?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-37   Page 1629 of 2497 Page 223 of 229   PageID 38335

Page 162

1                  WATERHOUSE - 10-19-21

2        A.    I'm -- I'm -- I'm generally aware.

3        Q.    Okay.  And are you generally aware

4   that from time to time, after the note was

5   issued by NexPoint, that moneys were applied to

6   principal and interest that were due under the

7   NexPoint note?

8        A.    Yes, I'm generally aware.

9        Q.    Okay.  And did anybody ever tell you

10  that the payments that were made against the

11  NexPoint notes were made by mistake?

12       A.    Yes.

13       Q.    And is it the one payment that we

14  talked about earlier today?

15       A.    We talked about a lot of things

16  today.  What payment are we talking about?

17       Q.    Okay.  Who told you that any payment

18  made against the NexPoint note was made by

19  mistake?

20       A.    D.C. Sauter.

21       Q.    When did Mr. Sauter tell you that?

22       A.    I don't -- I don't remember

23  specifically.

24       Q.    Do you remember what payments --

25       A.    Sometime -- sometime this year.

Page 163

                        WATERHOUSE - 10-19-21

1

2        Q.      Sometime in 2021?

3        A.      Yes.

4        Q.      Do you remember what payment he was

5    referring to?

6        A.      It was the -- the payment made in

7    January of 2021 or -- yeah, January of -- of

8    this -- January of 2021.

9        Q.      Okay.  So did anybody ever tell you

10   at any time that any payment that was made

11   against principal --

12       A.      And -- and -- and -- hold on, and it

13   may have been other -- again, it may have been

14   that payment or -- or there may have been what

15   he was explaining, a misapplication of prior

16   payments as well.

17       Q.      Can you -- can you give me any

18   specificity -- withdrawn.

19               Withdrawn.  Can you tell me

20   everything that Mr. Sauter told you about --

21   about errors in relation to payments made

22   against principal and interest due under the

23   NexPoint note?

24               MS. DANDENEAU:  Can I just --

25               MR. RUKAVINA:  Hold on.  Hold on.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177   Exhibit C   Page 1649 of 2497   Page 225 of 229   PageID 38337

Page 164

1                    WATERHOUSE - 10-19-21

2        I'm going to object here, and I'm going to

3        instruct the witness not to answer

4        depending on the discussion that you had --

5        Mr. Waterhouse, I'm the lawyer for

6        NexPoint, and as everyone here knows, D.C.

7        Sauter is in-house counsel.

8              So if you and Mr. Sauter were having

9        a factual discussion and him preparing his

10       affidavit, et cetera, then go ahead and

11       answer that.  But if you were having a

12       discussion as to our legal strategy in this

13       lawsuit, or anything having to do with

14       that, then do not answer that.

15             And if you need to talk to either

16       your counsel or me about that, then we need

17       to have that discussion now.

18       A.    Okay.  Yeah, I don't -- I don't

19   really know how to make that distinction, so

20   maybe I need to talk to counsel before I

21   answer, or if I can answer.

22       Q.    Let me just ask you this question:

23   Did -- did you have any conversation with

24   Mr. Sauter about any payment of principal and

25   interest prior to the time that you left

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-17   Page 1659/2497 Page 226 of 229   PageID 38338

Page 165

1              WATERHOUSE - 10-19-21

2   Highland's employment, or did it happen after

3   you left Highland's employment?

4        A.    I don't -- I don't recall if -- I

5   don't recall.  I mean, it was sometime in 2021.

6   I don't remember if it was before or after I

7   was let go from Highland.

8        Q.    Okay.  So -- so nobody told you

9   prior to 2021 that any error or mistake was

10  made in the application of payments against

11  principal and interest due on the NexPoint

12  note.  Do I have that right?

13       A.    Yeah, I don't -- I don't recall this

14  being in 2020.

15       Q.    Okay.  And it didn't happen in 2019;

16  correct?

17       A.    I don't recall that happened.

18       Q.    And it didn't happen in 2018;

19  correct?

20       A.    I don't -- I don't recall that

21  happening.

22       Q.    And it didn't happen in 2017;

23  correct?

24       A.    I don't recall.

25       Q.    But -- but you believe the

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 177-37    Page 1669/2497Page 227 of 229    PageID 38339

Page 166

```
 1                    WATERHOUSE - 10-19-21

 2   conversation took place in 2021.  You just

 3   don't remember if it was before or after you

 4   left Highland's employment.  Do I have that

 5   right?

 6        A.    It was sometime this year.  I

 7   don't -- I don't remember.

 8        Q.    Okay.  Did you report this

 9   conversation to Mr. Seery at any point?

10        A.    I don't believe so.

11        Q.    Did you report this conversation to

12   anybody at DSI at any time?

13        A.    I don't recall.

14        Q.    Do you have -- you don't have a

15   recollection of ever doing that; correct?

16        A.    Yeah, that's right.  I don't recall

17   doing that.

18        Q.    Do you recall telling anybody at

19   Pachulski Stang about the conversation you

20   recall with Mr. Sauter?

21        A.    No, I don't -- I don't recall.

22        Q.    Did you tell any of the independent

23   board members about your conversation with

24   Mr. Sauter?

25        A.    I don't recall.
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 67-37    Page 1679/2497Page 228 of 229    PageID 38340

Page 167

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Did you tell any of the employees at

 3   Highland before you left Highland's employment

 4   about this call that you had with Mr. Sauter?

 5              MS. DANDENEAU:  Objection to form.

 6        A.    No, I don't -- no, I don't recall.

 7        Q.    NexPoint -- to the best of your

 8   knowledge, did NexPoint ever file a proof of

 9   claim against Highland to try to recover moneys

10   that were mistakenly paid against the principal

11   and interest due under the note?

12        A.    Okay.  Hold on.  You are saying did

13   NexPoint Advisors file a proof of claim to

14   Highland for errors related to payments under

15   the NexPoint note to Highland?

16        Q.    Correct.

17        A.    I'm -- I'm -- I'm not -- I'm not

18   aware.

19        Q.    Are you aware --

20        A.    I'm not the legal person here, I

21   don't know.

22        Q.    I'm just asking for your knowledge,

23   sir.

24        A.    Yeah, I don't know.  I'm not aware.

25        Q.    Are you aware of any claim of any
```

Page 168

1                    WATERHOUSE - 10-19-21

2    kind that NexPoint has ever made to try to

3    recover the amounts that it contends were -- or

4    that Mr. Sauter contend were mistakenly applied

5    against principal and interest due under the

6    NexPoint note?

7         A.    I'm not aware.

8              MS. DANDENEAU:  Objection to form.

9         Q.    Okay.  The advisors' agreements with

10   the retail funds are subject to annual renewal;

11   correct?

12        A.    Yes.

13        Q.    And do you participate in the

14   renewal process each year?

15        A.    Yes.

16        Q.    What role do you play in the renewal

17   process?

18        A.    I'm -- I'm asked by the retail board

19   to walk-through the advisors financials.

20        Q.    And do you do that in the context of

21   a board meeting?

22        A.    Yes, it is -- yes, it is typically

23   done in a board meeting.

24        Q.    And do you recall the time --

25   does -- does the renewal process happen around