Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 09/09/24   Page 1 of 229   PageID 38342

Page 169

1                    WATERHOUSE - 10-19-21

2    the same time each year?

3         A.    Yes, it is -- it is around the same

4    time every year.

5         Q.    And what -- what time period of the

6    year does the renewal process occur?

7         A.    Approximately the September

8    timeframe.

9         Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12        A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16        Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18        A.    Yes.  Yes.

19        Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22        A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-38   Filed 10/09/39   Page 2 of 229   PageID 38343

Page 170

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    No, I apologize.

 3              Do you have an understanding of

 4    what -- of what 15(c) refers to in the context

 5    of the annual renewal process?

 6        A.    Yes, generally.

 7        Q.    All right.  What is your general

 8    understanding of the term "15(c)" in the

 9    context of the annual renewal process?

10        A.    I -- I think 15(c) is the section

11    that -- that -- you know, that -- that the

12    board has to evaluate every year, the retail

13    board.  They have to, you know, go through,

14    evaluate, and go through that approval process

15    on a yearly basis.

16        Q.    Okay.

17              MR. MORRIS:  Can we put up on the

18        screen Exhibit 36, please.

19              (Exhibit 36 marked.)

20              MR. MORRIS:  I guess let's just

21        start at the bottom so Mr. Waterhouse can

22        see what is here.

23        Q.    You see this begins with an email

24    from Blank Rome to a number of people.

25              MR. MORRIS:  And if we can scroll
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 01/09/24   Page 3 of 229   PageID 38344

Page 171

1              WATERHOUSE - 10-19-21

2         up -- keep going just a little bit.

3         Q.   You will see that there is an email

4    from Lauren Thedford to Thomas Surgent and

5    others where she reports that she was attaching

6    and reproducing below additional 15(c)

7    follow-up questions from the board.

8              Do you see that?

9         A.   Yes.

10        Q.   And do you see Question No. 2 asks

11   whether there are any material outstanding

12   amounts currently payable or due in the future

13   (e.g., notes) to HCMLP by HCMFA or NexPoint

14   Advisors or any other affiliate that provides

15   services to the funds?

16             Do you see that?

17        A.   Yes.

18        Q.   And -- and did you -- do you recall

19   that in -- in October of 2020 the retail boards

20   were asking for that information?

21        A.   I don't recall it, but there --

22   they're obviously asking in this email.

23        Q.   Okay.

24             MR. MORRIS:  Can we scroll up a

25        little bit, please.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 07/09/23   Page 4 of 229   PageID 38345

Page 172

1                    WATERHOUSE - 10-19-21

2          Q.    And then do you see that

3    Ms. Thedford includes you on the email string

4    on Tuesday, October 6th, at 5:52?

5          A.    Yes.

6          Q.    And she asks you and Dave Klos and

7    Kristin Hendrix for advice on that particular

8    Request No. 2 that I have just read; right?

9          A.    Yes.

10         Q.    Okay.  Can you tell me who

11   Ms. Thedford is?

12         A.    She was an attorney that was in the

13   legal group.

14         Q.    At Highland Capital Management,

15   L.P.?

16         A.    I'm -- I'm -- I'm -- I don't

17   remember if she was an employee of Highland or

18   any of the advisors.

19         Q.    Okay.  Do you know if she served as

20   the corporate secretary for both HCMFA and

21   NexPoint?

22         A.    Yes.

23         Q.    And -- okay.

24               Do you know whether Ms. Thedford

25   held any positions in relation to the retail

 1                   WATERHOUSE - 10-19-21

 2   funds as we defined that term?

 3        A.    Yes.

 4        Q.    What is your understanding of the

 5   positions that Ms. Thedford held at the retail

 6   funds?

 7        A.    I -- I recall her being an officer.

 8   I don't recall her title.

 9        Q.    Okay.  Is she still an officer at

10   any of the retail funds today?

11        A.    No.

12        Q.    Do you know when she ceased to be an

13   officer of the retail funds?

14        A.    Approximately.

15        Q.    And when did she approximately cease

16   to be an officer of the retail funds?

17        A.    It was in -- it was in early of

18   2021.

19        Q.    Okay.  Do you know when she became

20   an officer of the retail funds?

21        A.    I don't recall.

22        Q.    To the best of your recollection,

23   was she an officer of the retail funds in

24   October of 2020?

25        A.    I believe so.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-38   Filed 04/09/29   Page 6 of 229   PageID 38347

Page 174

                        WATERHOUSE - 10-19-21

1

2        Q.    Okay.  Do you know what title she

3   held in her capacity as an officer, if any?

4        A.    I told you I don't remember.

5        Q.    Okay.  So she sends this email to

6   you at 5:52 p.m. on October 6th.

7              And if we can scroll up to the

8   response, you responded a minute later with a

9   one-word answer:  Yes.

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and yes is -- yes was in

13  response to the retail board's Question No. 2,

14  right, whether there are any material

15  outstanding amounts currently payable or due in

16  the future?

17       A.    Yes.

18             MR. MORRIS:  And can we scroll up to

19       see what happened next.

20       Q.    So Ms. Thedford writes back to you a

21  few minutes later and she asks whether you

22  could provide the amounts.

23             Do you see that?

24       A.    Yes.

25       Q.    And then you respond further and you

WATERHOUSE - 10-19-21

1

2  refer her to the balance sheet that was

3  provided to the board as part of the 15(c)

4  materials.

5          Do you see that?

6      A.   Yes.

7      Q.   And -- and did the advisors provide

8  to the board certain balance sheets in 2020 in

9  connection with the 15(c) review?

10     A.   Yes, they did.

11     Q.   Okay.  And were the amounts that

12 were outstanding or that were to be due in the

13 future by the advisors to Highland included in

14 the liability section of the balance sheet that

15 was given to the retail board?

16     A.   Yes.  Notes would be reflected as

17 liabilities.

18     Q.   Okay.  And --

19     A.   If I'm understanding your question

20 correctly.

21     Q.   You are.  And -- and -- and those

22 liabilities you -- you were -- you believed

23 were responsive to the retail board's question;

24 correct?

25     A.   Yes.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 01/09/23   Page 8 of 229   PageID 38349

Page 176

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  And then if we can scroll up,

 3   you see Ms. Thedford responds to you

 4   nine minutes later with a draft response.

 5             Do you see that?

 6        A.    Yes.

 7        Q.    And she says that she is taking from

 8   the 6/30 financials certain information about

 9   amounts that were due to HCMLP and affiliates

10   as of June 30th, 2020.

11             Do you see that?

12        A.    I do.

13        Q.    Okay.  And did you believe, as the

14   treasurer of NexPoint and HCMFA and as the CFO

15   of Highland, that the information that

16   Ms. Thedford obtained from the 6/30 financials

17   was accurate and responsive in relation to the

18   retail fund board's question?

19        A.    I just want to make sure I

20   understand the question.

21             Are you saying that the financial

22   information provided to the retail board as

23   part of the 15(c) process, which included

24   financial statements as of June 30th of 2021,

25   did I feel like those were responsive to their
```

Page 177

```
 1                    WATERHOUSE - 10-19-21

 2      questions?

 3           Q.    Yes.

 4           A.    Yes.

 5           Q.    Thank you.

 6                 MS. DEITSCH-PEREZ:  John, it is not

 7           in the chat yet.  Can you just make sure it

 8           gets put in there.

 9                 MR. MORRIS:  Sure.

10                 MS. CANTY:  I put it in there.  I

11           think maybe I just sent it directly, so let

12           me make sure it says to everyone.  But I

13           did put it in there.  I will try again.

14                 MR. MORRIS:  Thank you, La Asia.

15                 MS. DANDENEAU:  What number is it.

16                 MR. MORRIS:  What, the Bates number?

17                 MS. DEITSCH-PEREZ:  No, the --

18           this -- yeah, 36 is not in the chat.

19                 MR. MORRIS:  Okay.  We'll get it.

20                 MS. DANDENEAU:  I think that

21           Ms. Canty just sent it to me originally.

22           Sorry.

23                 MR. MORRIS:  Okay.  We will get it

24           there.

25                 MS. CANTY:  Okay.  It is there now
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8   Exhibit C8   Filed 07/06/23   Page 10 of 229   PageID 38351

Page 178

1                  WATERHOUSE - 10-19-21

2          for everyone.

3                  MS. DEITSCH-PEREZ:  Got it.  Thank

4          you.

5          Q.    Do you recall if the proposed

6    response that Ms. Thedford crafted was

7    delivered to the retail board with the -- with

8    the yellow dates having been completed?

9          A.    I don't know.

10                 MR. MORRIS:  Davor, I'm going to ask

11         that the advisors and -- the advisors of

12         both HCMFA and NexPoint produce to me any

13         report that was given to the retail board

14         concerning the promissory notes at issue,

15         including the obligations under the notes.

16         Q.    Do you know -- do you know if

17   ultimately NexPoint informed the retail board

18   in response to its question that NexPoint owed

19   Highland approximately 23 or $24 million?

20                 MS. DANDENEAU:  Objection to the

21         form.

22         A.    Sorry, are you asking, did NexPoint

23   tell the retail board that it owed Highland?

24         Q.    Let me ask a better question,

25   Mr. Waterhouse.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 07/06/23   Page 11 of 229   PageID 38352

Page 179

 1                    WATERHOUSE - 10-19-21

 2               Did -- do you know if anybody ever

 3    answered the retail board's question that was

 4    Number 2?

 5        A.    I don't -- I can't say for sure.

 6        Q.    Okay.  Do you recall -- I think you

 7    testified earlier that you walked through the

 8    advisors' financials with the retail board;

 9    correct?

10        A.    Yes.

11        Q.    And as part of that process, did you

12    disclose to the retail board the obligations

13    that NexPoint and HCMFA had to Highland under

14    promissory notes?

15        A.    The retail board, as I stated

16    earlier, receives financial information,

17    balance sheet, income statement information

18    from the advisors.  That information is

19    provided to the retail board in connection with

20    the 15(c) process.

21               So any notes between the advisors

22    and the Highland would be -- anything would be

23    detailed in those financial statements.

24        Q.    Do you recall in 2020 ever speaking

25    with the retail board about the advisors'

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-8   Filed 08/06/397   Page 12 of 229   PageID 38353

Page 180

1                    WATERHOUSE - 10-19-21

2    obligations under the notes to Highland?

3                    MS. DANDENEAU:  Objection to form.

4                    MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't recall specifically.

7         Q.    Do you have any general recollection

8    of discussing with the retail board the

9    advisors' obligations to Highland under the

10   notes that they issued?

11                   MS. DANDENEAU:  Object to the form.

12                   MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    I just recall generally just -- it

15   is just -- I present the financial statements,

16   and if they have questions, I answer their

17   questions and walk them through.

18              I don't recall what they asked.  I

19   don't recall where the discussion went.  I

20   don't recall anything of that nature.

21        Q.    Okay.  Do you know if anybody on

22   behalf of HCMF -- HCMFA ever told the retail

23   board that HCMFA had no obligations under the

24   two 2019 notes that you signed?  Withdrawn.

25              Do you know whether anybody on

1         WATERHOUSE - 10-19-21

2    behalf of HCMFA ever told the retail boards

3    that you weren't authorized to sign either of

4    the two 2019 notes?

5              MS. DANDENEAU:  Objection to form.

6         A.    I'm not aware.

7         Q.    Are you aware of anybody on behalf

8    of HCMFA ever telling the retail boards that

9    your execution of the two 2019 notes was a

10   mistake?

11             MS. DANDENEAU:  Objection to form.

12        A.    I'm not aware.

13        Q.    Are you aware of anybody on behalf

14   of HCMFA ever telling the retail boards that

15   HCMFA did not have to pay the amounts reflected

16   in the two notes that you signed in 2019?

17        A.    I'm not aware.

18        Q.    Do you know whether anybody ever

19   told the retail boards -- withdrawn.

20             Do you know whether anybody ever

21   told the retail boards that Highland has

22   commenced a lawsuit to recover on the two notes

23   that you signed in 2019?

24        A.    I'm not aware.

25        Q.    Are you aware of anybody informing

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 167-8   Exhibit C8   Page 14 of 229   Page 14 of 229   PageID 38355

Page 182

1                    WATERHOUSE - 10-19-21

2      the retail boards that Highland has sued to

3      recover on the NexPoint note?

4           A.     I'm not aware.

5           Q.     Do you know whether anybody ever

6      told the retail board that Highland had

7      declared a default with respect to the two

8      HCMFA notes that you signed in 2019?

9           A.     I'm not aware.

10          Q.     Are you aware of anybody ever

11     informing the retail boards that Highland had

12     declared a default under the NexPoint note?

13          A.     I'm not aware.

14          Q.     Are you aware of anybody telling the

15     retail board that Highland made a demand for

16     payment under the 2019 notes that you signed on

17     behalf of HCMFA?

18          A.     I'm not aware.

19          Q.     Let's -- let's see if there is a

20     response to Ms. Thedford's email, if we can

21     scroll up.

22                 Do you see you responded to

23     Ms. Thedford five minutes after she provided

24     the draft response to you?

25          A.     Yes.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 167-38   Filed 03/06/297   Page 15 of 229   PageID 38356

Page 183

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And do you see that Dustin

3   Norris is copied on this email?

4        A.    Yes, he is.

5        Q.    Great.  Do you know whether

6   Mr. Norris held any positions at either of the

7   advisors as of October 6, 2020?

8        A.    I will go back to -- I'm not the

9   legal expert of what appoints you or how or

10   why, but you did see Dustin's name on the

11   incumbency certificate that you produced

12   earlier.

13        Q.    Do you know what his title was in

14   October of 2020?

15              MS. DANDENEAU:  Objection to form.

16        A.    I don't -- I don't recall.

17        Q.    Was he -- did he have a title with

18   each of the advisors, to the best of your

19   recollection?

20        A.    I don't recall.

21        Q.    Do you know why he is included on

22   this email string?

23        A.    I didn't add Dustin.  It looks like

24   Lauren did.  I don't know why she added him or

25   not.  You would have to ask her.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-38   Filed 08/06/23   Page 16 of 229   PageID 38357
Exhibit 38   Page 184 of 397

Page 184

```
 1                    WATERHOUSE - 10-19-21

 2       Q.    Does Mr. Norris play a role in

 3  formulating the advisors' responses to the

 4  questions asked by the retail board in

 5  connection with the 15(c) annual review?

 6             MS. DANDENEAU:  Objection to form.

 7       A.    He -- Dustin Norris is there in the

 8  board meetings.  But -- so he has a role, yes.

 9       Q.    Okay.  And does Mr. Norris hold any

10  positions, to the best of your knowledge, in

11  relation to any of the retail funds?

12       A.    I don't -- I don't believe he does.

13       Q.    How about Mr. Post, do you know

14  whether Mr. Post holds any position in either

15  of the advisors?

16       A.    I mean, he -- he -- yes.

17       Q.    What is your understanding of the

18  positions that Mr. Post holds in relation to

19  the advisors?

20             MS. DANDENEAU:  Objection to form.

21       A.    He is an employee of NexPoint

22  Advisors.  He is also the chief compliance

23  officer for -- for NexPoint.

24       Q.    Who is the chief compliance officer

25  for HCMFA, if you know?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-63   Filed 08/06/24   Page 17 of 229   PageID 38358

Page 185

                        WATERHOUSE - 10-19-21

 1

 2              MS. DANDENEAU:  Objection to form.

 3      A.      That would be Jason as well.

 4      Q.      Okay.  Now, looking at your

 5  response, you noted initially that nothing was

 6  owed under shared services.  Do I have that

 7  right in substance?

 8      A.      Yeah.  I think I'm being responsive

 9  to Lauren's question here, whether any of the

10  shared service invoices are outstanding.

11      Q.      Right.

12      A.      Yes.

13      Q.      And that is because -- and that is

14  because the retail the retail board has asked

15  for the disclosure of all material obligations

16  that were owed to HCMLP either then or in the

17  future; isn't that right?

18              MS. DANDENEAU:  Objection to form.

19      Q.      We can go back down and look.

20      A.      Look, I don't know if that's a

21  material item, I mean, again, but sure.

22      Q.      Okay.  But there were no shared

23  services outstanding; correct?

24              MS. DANDENEAU:  Objection to form.

25      A.      That is what this email seems to

1                    WATERHOUSE - 10-19-21

2    indicate.

3         Q.    And you wouldn't have written it if

4    you didn't believe it to be true at the time;

5    correct?

6         A.    Correct.

7         Q.    And when you referred to shared

8    services outstanding, what you meant there was

9    that neither NexPoint nor HCMFA owed Highland

10   any money under the shared services agreements

11   that they had with Highland as of October 6th,

12   2020; right?

13        A.    I don't know if it is as of October

14   6, 2020 or if it was from -- like through the

15   financials -- through the date of the

16   financials as of June 30.

17        Q.    Okay.  And then you noted that

18   HCMA -- the HCMFA note is a demand note; right?

19        A.    Yes.

20        Q.    And then you referred Ms. Thedford

21   to Kristin Hendrix for the term of the NexPoint

22   note.  Do I have that right?

23        A.    Yes.

24        Q.    And then you refer to that agreement

25   that is referenced in the 2018 audited

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 157-38   Filed 03/06/23   Page 19 of 229   PageID 38360

Page 187

```
 1                WATERHOUSE - 10-19-21

 2   financials about Highland's agreement not to

 3   make demand upon HCMFA until May 2021; correct?

 4        A.     Correct.

 5        Q.     And then -- and then the next thing

 6   you write is that the attorneys think that BK

 7   doesn't change that, but don't know for sure at

 8   the end of the day.

 9               Do you see that sentence?

10        A.     Yes.

11        Q.     Which attorneys were you referring

12   to?

13        A.     I don't remember.

14        Q.     Did you have a conversation with

15   attorneys concerning whether the bankruptcy

16   would change or alter in any way the agreement

17   not to make a demand under the HCMFA note?

18        A.     Look, yeah, I mean, I don't

19   specifically remember, but generally, I mean,

20   it is in this email.  I don't -- I don't -- I

21   don't -- I don't remember who I talked to or,

22   you know, was it inside counsel, outside

23   counsel, but obviously I talked to somebody.

24        Q.     Do you have any recollection --

25        A.     Well, I don't even know if it's --
```

1                  WATERHOUSE - 10-19-21

2    actually, it may not even have been me.  I say

3    the attorneys in, you know, a lot of -- like I

4    talked about the team.

5            It could have been someone on the

6    team, like, hey, we need to run this down, and

7    maybe they talked to attorneys again and

8    relayed that information to me.

9            So I really don't know if I spoke or

10   someone else did or -- or, I mean, and maybe it

11   wasn't even from corporate accounting.  Maybe

12   it was, you know, other -- I'm kind of

13   summarizing, you know, again, so I don't really

14   know -- I can't really say for sure.  I don't

15   remember how I came about of this knowledge.

16       Q.    I appreciate your efforts,

17   Mr. Waterhouse, but I will just tell you that

18   if I ask a question and you don't know the

19   answer or you don't recall, I'm happy to accept

20   that.  I don't -- I don't want you to

21   speculate, so I want to be clear about that.

22   So I appreciate it.

23            Let me just ask you simply:  Do you

24   know what attorneys -- can you identify any of

25   the attorneys who thought that the bankruptcy

```
 1                     WATERHOUSE - 10-19-21

 2     process didn't change the agreement?

 3          A.     I don't recall.

 4          Q.     Okay.  Perfect.

 5                 And then let's look at the last

 6     sentence.  It says, quote:  The response should

 7     include, as I covered in the board meeting,

 8     that both entities have the full faith and

 9     backing from Jim Dondero, and to my knowledge

10     that hasn't changed.

11                 Do you see that?

12          A.     Yes.

13          Q.     Okay.  Prior to October 6th, 2020,

14     had you told the retail board that HCMFA and

15     NexPoint have the full faith and backing from

16     Jim Dondero?

17          A.     Yes.

18          Q.     Do you remember in the context in

19     which you told the retail board that?

20          A.     I mean, generally, yes.

21          Q.     Tell me what you recall.

22          A.     So we were walking through the

23     financials from the advisors; right?  So as I

24     described to you, you have got HCMFA and NPA.

25     And these -- the financials, you know, show
```

```
 1                    WATERHOUSE - 10-19-21

 2     they have liabilities on them that exceed

 3     assets.

 4              So the retail board has asked, okay,

 5     you know, how -- you know, if -- if these

 6     liabilities come due or they're payable, you

 7     know, how does that come about?

 8              And, you know, the response is,

 9     well, the advisors have the -- the full faith

10     and backing from -- from Jim Dondero.

11         Q.    And how did you know that the

12     advisors had the full faith and backing from

13     Jim Dondero?  What was the basis for that

14     statement that you made to the retail board?

15         A.    I talked to Jim about it at some

16     point in the past.

17         Q.    And did you tell Mr. Dondero that

18     you were going to inform the retail board that

19     the advisors had his full faith and backing

20     before you actually told that to the retail

21     board?

22         A.    I don't recall having that

23     conversation.

24         Q.    Do you recall if you ever informed

25     Mr. Dondero that you had disclosed or told the
```

1                    WATERHOUSE - 10-19-21

2    retail board that the advisors had the full

3    faith and backing of Mr. -- Mr. Dondero?

4              MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't recall discussing that with

7    him at the time.

8         Q.    When you told this to the board, was

9    Mr. Dondero participating in the discussion?

10        A.    Not that I recall.

11        Q.    Withdrawn.  Was it not -- withdrawn.

12              Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17        A.    I believe I was at home.

18        Q.    Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22              MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't recall everyone on the call.

25        Q.    Can you identify anybody who was on

1                    WATERHOUSE - 10-19-21

2       the call?

3              A.    Other than the board members?

4              Q.    Yes.

5              A.    Lauren Thedford.  I mean, there

6       are -- there are many -- my section is just one

7       of many sections that are just -- you know, as

8       you can appreciate, this is a long board

9       meeting.

10             I can't recall specifically, really

11      even generally, or who was on when this was

12      discussed.  But Lauren was typically on for the

13      entire time.

14             Q.    I apologize if I asked you this, but

15      do either of Mr. Norris or Mr. Post hold any

16      positions relative to the retail funds?

17             A.    I think you asked me this already,

18      John.

19             Q.    Okay.  I just don't recall.  Can you

20      just refresh my recollection if I did, in fact,

21      ask you the question?

22             A.    I don't believe -- if we can go

23      back.  I don't believe Mr. Norris has a title

24      at the retail funds.  Mr. -- and Mr. Post is

25      the CCO of the advisor, the advisors.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you know if either of them

3   have a position with the retail board -- with

4   the retail funds?

5        A.    I don't believe Mr. Norris has a

6   position with the retail funds.

7        Q.    All right.  What about Mr. Post?

8        A.    Mr. Post is the CCO of the advisors.

9        Q.    Okay.  Does he hold any position --

10       A.    I don't believe so.

11       Q.    -- with the retail funds?

12       A.    I don't believe so.

13       Q.    Okay.

14       A.    I don't know if being the CCO for

15   the advisor conveys something for the retail

16   funds.  Again, I am not -- that is the legal

17   compliance part of it.  I don't know.

18       Q.    Why did you tell the retail board

19   that the advisors have the full faith and

20   backing from Mr. Dondero?

21             MS. DANDENEAU:  Objection to form.

22       A.    It is -- it is -- it is what has

23   been discussed with them prior.

24       Q.    And were you -- were you trying to

25   give them comfort that even though the

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 172-8   Filed 09/06/297   Page 26 of 229   PageID 38367

Page 194

1                    WATERHOUSE - 10-19-21

2     liabilities exceeded the assets that the

3     advisors would still be able to meet their

4     obligations as they become due?

5                    MS. DANDENEAU:  Objection to form.

6                    MS. DEITSCH-PEREZ:  Object form.

7          A.    I -- I can't -- I don't remember

8     specifically the conversation, but generally --

9     you know, generally, yes.  And that is why --

10    but, you know, again, in this email saying, you

11    know, I am sure I qualified it with the retail

12    board, you know, as I said I like -- you know,

13    to my knowledge, that hasn't changed.  But,

14    again, generally -- generally that is what I

15    remember.

16         Q.    Okay.  Do you recall if in the

17    advisors' response to the retail board's

18    question if the response included any statement

19    concerning Mr. Dondero and -- and the full

20    faith and backing that he was giving to the

21    advisors?

22                   MS. DEITSCH-PEREZ:  Object to the

23         form.

24         A.    I don't -- I don't remember

25    specifically what was provided.

                    WATERHOUSE - 10-19-21

1

2        Q.    Okay.

3        A.    And I don't really -- I don't really

4    remember generally either.

5        Q.    Okay.

6              MR. MORRIS:  So -- so, again, I'm

7         just going to ask Mr. Rukavina if your

8         clients can produce as soon as possible the

9         15(c) response, the written response that

10        the advisors made, if any, to the board's

11        Question No. 2.

12             I'm not looking for the whole

13        response, but I certainly want the response

14        to Question No. 2.

15       Q.    Do you have a general understanding

16   as to the amount by which -- withdrawn.

17             Did -- did the assets of --

18   withdrawn.

19             Did the liabilities of HCMFA exceed

20   its assets in 2020?

21             MS. DANDENEAU:  Objection to form.

22             MS. DEITSCH-PEREZ:  Objection, form.

23       A.    I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X   Document 177-8   Filed 09/06/397  Page 28 of 229   PageID 38369
Exhibit 68    Page 196 of 197

Page 196

1                   WATERHOUSE - 10-19-21

2        Q.    Okay.  And did the liabilities of

3   NexPoint exceed its assets in 2020?

4             MS. DEITSCH-PEREZ:  Objection to

5        form.

6        A.    I don't believe so.

7        Q.    Okay.  So -- so it was only one of

8   the two advisors who had liabilities that

9   exceeded the value of the assets.

10            Do I have that right?

11            MS. DEITSCH-PEREZ:  Objection to

12       form.

13            MS. DANDENEAU:  Form.

14       A.    Yes.

15       Q.    And do you know, ballpark, the

16   amount by which the value of HCMFA's

17   liabilities exceeded their assets in 2020?

18            MS. DANDENEAU:  Objection to form.

19       A.    I don't -- I don't recall.

20            MR. MORRIS:  I had specifically

21       requested in discovery the audited

22       financial reports for both advisors and

23       NexPoint.  I think I may have gotten one

24       for NexPoint but I'm still waiting for the

25       balance.  And I'm going to renew my request

1                WATERHOUSE - 10-19-21

2        for those documents too.

3        Q.    Let's go to the next exhibit, which

4   is Number 10.  So I think it is in your stack,

5   Mr. Waterhouse.

6                MR. MORRIS:  And we can take the one

7        down from the screen and put up Number 10

8        for everybody.

9                (Exhibit 10 marked.)

10       Q.    And I don't know if you have ever

11  seen this before, but I'm really putting it up

12  on the screen for purposes of turning to the

13  very last page of the document.

14                So this is a document that we have

15  been -- that we premarked as Exhibit 10.  And

16  we're turning to the last page of the document,

17  which is a document that was filed in the

18  adversary proceeding 21-3004.  And -- no, I

19  apologize, I think we -- right there.  Perfect.

20                And it is page 31 of 31.

21                MR. MORRIS:  I think there may have

22        been some something erroneously stapled to

23        the hard copy that I gave you folks, but

24        I'm looking for page 31 of 31 in the

25        document that begins with the first page of

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 167-38   Filed 01/06/22   Page 30 of 229   PageID 38371
Exhibit C8   Page 198 of 397

Page 198

 1                  WATERHOUSE - 10-19-21

 2          Exhibit 10.

 3          Q.     Do you have that, Mr. Waterhouse?

 4          A.     I don't have it yet.  I'm looking.

 5          Q.     All right.  If you look at the top

 6    right-hand corner, you will see it says page

 7    hopefully something of 31?

 8          A.     Yes, I've got it now.

 9          Q.     Okay.  You have got 31 of 31.  You

10    can take a moment to read that, if you would

11    like.

12          A.     (Reviewing document.)  Okay.

13          Q.     Have you ever seen this before?

14          A.     I don't know if I have seen this

15    specific document, but, you know, I've --

16    I'm -- I'm aware of it.

17          Q.     And is this the document that you

18    had in mind when you sent that email to

19    Ms. Thedford that we just looked at where you

20    said that Highland had agreed not to make a

21    demand upon HCMFA until May 2021?

22          A.     Honestly, I don't -- it wasn't this

23    document.  I mean, it's something like this,

24    yes.  I mean, yes.

25          Q.     Well --

1                    WATERHOUSE - 10-19-21

2          A.     It is something like this, but I

3    don't think it was this specific document.

4          Q.     Well, but this document does say in

5    the last sentence that Highland agreed not to

6    seek -- not to demand payment from HCMFA prior

7    to May 31, 2021; right?

8          A.     Yes.

9          Q.     And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13         A.     Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16         Q.     No.  Let me try again.

17                Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21         A.     I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24         Q.     Okay.  And do you think that the

25   audit is referring to this particular document?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8   Filed 00000397 Page 32 of 229   PageID 38373
Exhibit C8   Page 200 of 397

Page 200

1                    WATERHOUSE - 10-19-21

2         A.     I don't know.

3         Q.     All right.  This document is dated

4    April 15, 2019.  Do you see that?

5         A.     I do.

6         Q.     And do you remember that the audit

7    was completed on June 3rd, 2019?

8         A.     Yes.

9         Q.     And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15        A.     Yes, I remember.

16        Q.     And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20              MS. DANDENEAU:  Objection to form.

21        A.     Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25        Q.     Okay.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 167-8   Filed 01/06/23   Page 33 of 229   PageID 38374

Page 201

```
 1                   WATERHOUSE - 10-19-21

 2        A.    May 31 of 2021, excuse me.

 3        Q.    And this document states the

 4   deferral that you just described; correct?

 5        A.    It does.

 6        Q.    And this document states the

 7   deferral that was described in the audited

 8   financial statements that we looked at before;

 9   correct?

10        A.    It does.

11              MR. MORRIS:  Okay.  Can we scroll

12        down just a little bit to see who signed on

13        behalf of the acknowledgment there.

14        Q.    Okay.  So Mr. Dondero signed this

15   document on behalf of both HCMFA and Highland;

16   do you see that?

17        A.    I do.

18        Q.    Okay.  Did you discuss this document

19   or the -- withdrawn.

20              Did you discuss the concept of the

21   deferral with Mr. Dondero in the spring of

22   2019?

23        A.    I think I testified I don't recall.

24        Q.    Okay.  Do you know whose idea it was

25   to issue the acknowledgment in this form?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8   Filed 02/06/23   Page 34 of 229   PageID 38375

Page 202

```
 1                   WATERHOUSE - 10-19-21

 2       A.    I don't recall.

 3             MR. MORRIS:  Can we scroll back up

 4       to the document, please.

 5       Q.    Do you see in the beginning it says,

 6   reference is made to certain outstanding

 7   amounts loaned from Highland to HCMFA for

 8   funding ongoing operations.

 9             Do you see that?

10       A.    Yes.

11       Q.    And were you aware as the CFO of

12   Highland and as the treasurer of HCMFA that as

13   of April 15, 2019, Highland had made certain

14   loans to HCMFA to fund HCMFA's ongoing

15   operations?

16       A.    Yes.

17       Q.    And were you aware that those loans

18   were payable on demand and remained outstanding

19   as of December 31st, 2018?

20       A.    Yes.

21       Q.    And were you aware that those

22   amounts were payable on demand, and they

23   remained outstanding as of April 15, 2019?

24             MS. DEITSCH-PEREZ:  Object to the

25       form.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 02/06/397   Page 35 of 229   PageID 38376

Page 203

1              WATERHOUSE - 10-19-21

2        A.    Well, this -- this document dated

3    April 15, 2019 says they have been deferred to

4    May 31, 2021.

5        Q.    Right.  But I'm just sticking to the

6    first paragraph where they refer to the

7    outstanding amounts.  And in the end it says

8    the -- it remained outstanding on December

9    31st, 2018, and I think you told me that you

10   understood that, and then I'm just trying to

11   capture the last piece of it.

12             Did you understand that there were

13   amounts outstanding from the loan that Highland

14   made to HCMFA to fund ongoing operations as of

15   April 15th, 2019?

16       A.    Yes.

17       Q.    Thank you.  Let's look at the next

18   sentence.  HCMFA expects that it may be unable

19   to repay such amounts should they become due

20   for the period commencing today and continuing

21   through May 31st, 2021.

22             Do you see that?

23             MS. DANDENEAU:  Objection to form.

24       A.    I do.

25       Q.    As the CFO -- withdrawn.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-38   Filed 04/06/22   Page 36 of 229   PageID 38377
Exhibit C8   Page 204 of 397

Page 204

```
 1                WATERHOUSE - 10-19-21

 2                As the treasurer of HCMFA, did you

 3    believe that -- do you believe that statement

 4    was true and accurate at the time it was

 5    rendered?

 6         A.    I mean, it -- it -- the answer to

 7    that is I really didn't have any -- I didn't

 8    have an opinion really.

 9         Q.    Did you do anything to educate

10    yourself in April of 2019 on the issue of

11    whether HCMFA could repay the amounts that it

12    owed to Highland should they become due?

13         A.    I don't believe so.

14         Q.    Did you at any time form any

15    opinions as to HCMFA's ability to repay all

16    amounts due to Highland should they become due?

17         A.    Not really.  I guess I don't...

18         Q.    Well, you told the retail board that

19    HCMFA's liabilities exceeded their assets in

20    2020; correct?

21         A.    Yes.

22         Q.    Based on the work that you did to

23    prepare for the retail board, did you form any

24    view as to whether HCMFA would be unable to

25    repay the amounts that it owed to Highland
```

```
 1                    WATERHOUSE - 10-19-21

 2    should they become due?

 3              MS. DANDENEAU:  Objection to form.

 4         A.    I mean, I -- when you look at that,

 5    to answer you, completely, you know, again,

 6    if -- the response I gave the retail board was,

 7    you know, the -- the advice -- HCMFA advisors

 8    have the -- have the full faith and backing of

 9    Jim Dondero.  So I didn't form an opinion of

10    whether the advisor could pay it or not.

11         Q.    Did you form any view as to whether

12    the advisors could repay the amounts that it

13    owed to Highland should they become due without

14    the full faith and backing of Mr. Dondero?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Form.

17         A.    I mean, if you -- if you -- if you

18    take that last statement out, I mean, it would

19    be difficult for HCMFA to pay back demand notes

20    at that time.

21         Q.    And it was precisely for that reason

22    that you told the retail board that -- that the

23    retail -- that the advisors had the full faith

24    and backing of Mr. Dondero; correct?

25              MS. DANDENEAU:  Objection to form.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 167-8   Filed 00/06/397   Page 38 of 229   PageID 38379

Page 206

```
 1                    WATERHOUSE - 10-19-21

 2          A.    I mean, yes, as the mouthpiece, I

 3   was relaying information.

 4          Q.    Okay.  And you relayed that

 5   information with the knowledge and approval of

 6   Mr. Dondero; correct?

 7                MS. DEITSCH-PEREZ:  Object to the

 8          form.

 9          A.    As I stated in the email, I don't

10   believe, and I think I testified I don't

11   believe I had conversations with Mr. Dondero at

12   the time of that board meeting.

13          Q.    Did you tell the retail board that

14   the advisors had the full faith and backing of

15   Mr. Dondero without Mr. Dondero's prior

16   approval?

17          A.    Yeah, I -- I -- yes, I'm -- like I

18   said, I think I testified earlier, I'm sure I

19   qualified it as well.

20          Q.    What do you mean by that?

21                MS. DANDENEAU:  Objection to form.

22          A.    Again -- again, like I said in the

23   email, it has the full faith and backing of Jim

24   Dondero unless that has changed.

25          Q.    Actually that is not what you said,
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 137-8   Filed 02/06/23   Page 39 of 229   PageID 38380
Exhibit C8   Page 207 of 397

Page 207

1                    WATERHOUSE - 10-19-21

2    so let's put the email back up.

3         A.    It is -- it is -- it is in the

4    email.

5         Q.    Let's put the email back up.  You

6    didn't say unless it has changed.  You said you

7    believe it hasn't changed; right?

8         A.    Okay.  And to my knowledge that

9    hasn't changed, that is what it says.

10        Q.    That's right.

11        A.    But, again, I mean, that is -- I

12   don't know everything.  And I'm not in every

13   conversation.  I'm not -- to presume that I am,

14   is -- and you have to put myself -- as you

15   started this out, Mr. Morris, I was at home in

16   October of 2020 with COVID -- or, you know,

17   under these COVID times that we described is

18   very difficult.

19              We have all been working at home for

20   really the first time ever, undergoing

21   processes, procedures, control environments

22   that have been untested, and there is poor

23   communication.

24              So I am relaying, as I'm telling you

25   now, what is in the email.  And unless

```
 1                    WATERHOUSE - 10-19-21

 2    something has changed -- to my knowledge, it

 3    hasn't changed, but it could have changed.

 4         Q.    When you say that the advisors have

 5    the full faith and backing from Mr. Dondero,

 6    did you intend to convey that, to the extent

 7    the advisors were unable to satisfy their

 8    obligations as they become due, Mr. Dondero

 9    would do it for them?

10              MS. DANDENEAU:  Object to the form.

11              MS. DEITSCH-PEREZ:  Object to the

12         form.

13              And, John, we have given you a lot

14         of leeway here but this does not seem

15         relevant to this case.  You seem sort of

16         taking a complete sort of diversion into

17         the allegations and the complaint just

18         filed on Friday, and so I would ask you to

19         move on because --

20              MR. MORRIS:  And I will tell you --

21         I will tell you that I have never read that

22         complaint cover-to-cover.  I have nothing

23         to do with the prosecution of those claims.

24         And this issue that we're talking about

25         right now is related solely to the
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 157-8   Filed 09/06/23   Page 41 of 229   PageID 38382

Page 209

 1                  WATERHOUSE - 10-19-21

 2         promissory notes that your clients refuse

 3         to pay.

 4              So I'm going to continue to ask my

 5         questions, and I would ask the court

 6         reporter to read back my last question.

 7                      (Record read.)

 8              MS. DEITSCH-PEREZ:  And then I

 9         believe there were objections to form.

10         Q.   You can answer the question.

11         A.   Yes.

12         Q.   Thank you very much, sir.

13              MR. MORRIS:  Can we go back to the

14         other document, please?

15         Q.   Mr. Waterhouse, do you know if this

16    document was ever shared with the retail board?

17         A.   I don't recall.

18         Q.   Did you ever share it with the

19    retail board?

20         A.   I don't recall.

21         Q.   Did you ever tell the retail board

22    about the substance of this document?

23         A.   I don't recall.

24         Q.   Did you ever tell the retail board

25    that Highland had agreed not to make a demand

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 07-8   Filed 01/06/297 Page 42 of 229   PageID 38383

Page 210

```
 1                    WATERHOUSE - 10-19-21

 2    against HCMFA until May 2021?

 3         A.    I don't recall.

 4         Q.    Do you know whether anybody on

 5    behalf of the advisors ever informed the retail

 6    board that Highland had agreed on April 15,

 7    2019, not to make a demand against HCMFA under

 8    the promissory notes?

 9         A.    I don't recall.

10         Q.    Did you instruct Ms. Thedford or

11    anybody else responding to the retail board's

12    15(c) inquiry to disclose this document?

13         A.    Did I instruct Ms. Thedford or

14    anyone else to -- to -- to produce this, to

15    disclose this document?  Is that what you -- I

16    just want to make sure.

17         Q.    Uh-huh.

18         A.    Yeah, I don't -- I don't recall.

19         Q.    Did you instruct anybody to inform

20    the retail board, in response to their question

21    as part of the 15(c) process, to -- to tell the

22    retail board about Highland's agreement not to

23    make a demand until 2021?

24              MS. DANDENEAU:  Objection to form.

25         A.    I don't recall.
```

 1                    WATERHOUSE - 10-19-21

 2           Q.    Did you ever inform PwC that HCMFA's

 3    liabilities exceeded its assets?

 4                 MS. DANDENEAU:   Object to the form.

 5           A.    I don't -- I don't think I told

 6    them.  I mean, they -- they audited the

 7    financial statements.

 8           Q.    Did -- do you know if anybody on

 9    behalf of Highland ever informed

10    PricewaterhouseCoopers that HCMFA may be unable

11    to repay amounts owing to Highland, should they

12    become due?

13                 MS. DANDENEAU:   Objection to form.

14           A.    Yes.  Again, I think I testified

15    earlier that -- that this was communicated to

16    the auditors.

17           Q.    Ideally --

18           A.    I don't know who exactly did that.

19    I don't recall doing it, but, yeah, it was --

20    it was communicated.  And that is why -- I

21    mean, there is a disclosure in the financial

22    statements; right?

23           Q.    There is, and that disclosure

24    relates to the last sentence of this document;

25    correct?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8   Filed 01/06/22   Page 44 of 229   PageID 38385
Exhibit C8   Page 212 of 397

Page 212

1                    WATERHOUSE - 10-19-21

2          A.    Yes.

3          Q.    Do you recall looking in the

4    document and seeing anything that was disclosed

5    with respect to the sentence above that?

6          A.    No.

7          Q.    Do you know whether anybody on

8    behalf of Highland ever informed

9    PricewaterhouseCoopers that HCMFA expects that

10   it may be unable to repay amounts due and owing

11   to Highland should they become due?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  I think that is the third time.

14         A.    I don't recall.  Again, as I said,

15   we -- all of this was given to the auditors.

16         Q.    Do you know if Highland received

17   anything of value in exchange for its agreement

18   not to demand payment on amounts owed by HCMFA

19   prior to May 31st, 2021?

20              MS. DEITSCH-PEREZ:  Object to the

21         form.  That is the second time.

22              MS. DANDENEAU:  Object to the form.

23         A.    I have answered this question.

24              MR. RUKAVINA:  Hold on.  Object to

25         legal conclusion.  Go ahead.

```
1                   WATERHOUSE - 10-19-21

2         A.    I have answered this question

3    before.

4         Q.    And the answer was no?

5         A.    I'm not aware.

6         Q.    Now, this acknowledgment can't

7    possibly apply to the two notes that you signed

8    on behalf of HCMFA because those notes were

9    signed on May 2nd and May 3rd, 2019; is that

10   right?

11              MS. DANDENEAU:  Objection to form.

12        A.    Unless there is a drafting error.

13        Q.    Okay.  Are you aware of a drafting

14   error?

15        A.    I'm not aware.  I didn't -- I wasn't

16   part of -- I didn't sign this note or this

17   acknowledgment.  I didn't draft it.

18        Q.    But you do see it is dated April 15,

19   2019; right?

20        A.    Yes.

21        Q.    And this was a document that was

22   actually included by the advisors in a pleading

23   they filed with the Court; right?

24              MR. RUKAVINA:  Well, I don't know

25         that so I object to form.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8   Filed 01/07/22   Page 46 of 229   PageID 38387
Exhibit C8   Page 214 of 397

Page 214

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  Let's go to the first page of

 3   the document and just confirm that.

 4             MR. AIGEN:  Mr. Morris, I just note

 5        that you already said there was some error

 6        with the document that is listed as

 7        exhibit --

 8             MR. MORRIS:  No.  No, no, no.

 9             MS. DEITSCH-PEREZ:  Oh, okay.

10             MR. MORRIS:  What I said is that

11        there is a few pages that were mistakenly

12        stapled to the end of the document.

13             MS. DEITSCH-PEREZ:  Okay.

14             MR. MORRIS:  There is no problem

15        with this document.

16             MS. DEITSCH-PEREZ:  And just so

17        we're clear that the document -- the pages

18        that start with defendant's amended answer

19        are not intended to be part of this

20        document?

21             MR. MORRIS:  That's correct.

22             MS. DEITSCH-PEREZ:  And that the --

23        but it is your representation that the rest

24        of the document is -- is -- is correct

25        because we don't -- we don't have any way
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 188-8   Filed 01/06/23   Page 47 of 229   PageID 38388
Exhibit 38   Page 216 of 397

Page 215

```
 1                  WATERHOUSE - 10-19-21

 2        of verifying that, we're just --

 3              MR. MORRIS:  You do, actually.  You

 4        could just go to Docket No. 21-3004.

 5              MS. DEITSCH-PEREZ:  If you want to

 6        stop this deposition so we can go and pull

 7        that document up, we're happy to do it.  So

 8        I am just asking you for your

 9        representation.

10              MR. MORRIS:  Sure.  I gave that.

11              MS. DEITSCH-PEREZ:  Okay.

12        Q.    So do you see that this is a

13   document that was actually filed with the Court

14   by Highland Capital Management Fund Advisors?

15        A.    No.  I get with the first page in

16   the section.  Maybe I'm looking at the wrong

17   thing.  It says, Highland Capital Management.

18        Q.    Don't worry about it.  Don't worry

19   about it.

20        A.    Maybe I went back -- okay.

21              MR. MORRIS:  All right.  Can we put

22        up on the screen Exhibit 2.

23              (Exhibit 2 marked.)

24              MR. MORRIS:  I think it is

25        Exhibit 1.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 173-8   Filed 01/09/23   Page 48 of 229   PageID 38389
Exhibit C8   Page 216 of 397

Page 216

```
 1                  WATERHOUSE - 10-19-21

 2               MS. DANDENEAU:  I'm sorry, John, did

 3       you say Exhibit 2 or Exhibit 1?

 4               MR. MORRIS:  It is Exhibit 2 in the

 5       binders so it is premarked Exhibit 2.  And

 6       now I'm asking -- right there -- going to

 7       Exhibit 1 to the document that was marked

 8       as Exhibit 2.

 9               MS. DANDENEAU:  Got it.  In the

10       binder there is no --

11               MS. DEITSCH-PEREZ:  There is no

12       Exhibit 1.

13               MR. MORRIS:  All right.  So look at

14       the one on the screen.

15       Q.    Do you see, Mr. Waterhouse, that

16  this is a promissory note dated May 31st, 2017,

17  in the approximate amount of $30.7 million?

18       A.    Yes.

19       Q.    And do you see that the maker of the

20  note is NexPoint?

21       A.    Yes.

22       Q.    And that Highland is the payee; is

23  that right?

24       A.    Yes.

25       Q.    Okay.  And do you see in Paragraph 2
```

1              WATERHOUSE - 10-19-21

2    this is an annual installment note?

3         A.    Can you scroll down.

4         Q.    Sure.

5              MR. MORRIS:  Can we scroll down --

6         yeah, there you go.

7         A.    Right there, yeah.  Yes.

8              MR. MORRIS:  And can we scroll down

9         to the signature line.

10        Q.    And do you recognize that as

11   Mr. Dondero's signature?

12        A.    Yes.

13        Q.    And is this the promissory note that

14   we talked about earlier where NexPoint had made

15   certain payments in the aggregate amount of

16   about 6 to $7 million against principal and

17   interest?

18        A.    I don't recall discussing the

19   aggregate principal amounts of 6 to $7 million,

20   but -- so I don't -- I don't recall that prior

21   discussion with those amounts.

22        Q.    All right.  Let's take a look.

23   NexPoint always included this promissory note

24   as a liability on its audited financial

25   statements; right?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 01/09/24   Page 50 of 229   PageID 38391

Page 218

```
 1                 WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And NexPoint had its financial

 4   statements audited; isn't that correct?

 5        A.    Yes.

 6        Q.    And was the process of NexPoint's

 7   audit similar to the process you described

 8   earlier for Highland and HCMFA?

 9        A.    Yes, it is similar.

10        Q.    Okay.

11              MR. MORRIS:  Can we put up

12        NexPoint's audited financials and let

13        everybody know what exhibit number it is,

14        La Asia?

15              MS. CANTY:  It is going to be

16        Exhibit 46.

17              (Exhibit 46 marked.)

18        Q.    And do you see, sir, that we've put

19   up NexPoint Advisors' consolidated financial

20   statements and supplemental information for the

21   period ending December 31st, 2019?

22        A.    Yes.

23        Q.    Did you participate in the process

24   whereby these audited financial statements were

25   issued?
```

1                    WATERHOUSE - 10-19-21

2          A.    I didn't participate directly, as

3    I've described before, about the -- the team

4    performing the audit.

5          Q.    Do you recall when the audit of

6    NexPoint's financial statements for the period

7    ending December 31st, 2019 was completed?

8          A.    Yes.

9          Q.    And when do you recall it being

10   completed?

11         A.    In January of 2021.

12         Q.    Do you know why the 2019 audit

13   report wasn't completed until January of 2021?

14         A.    Yes.

15         Q.    Why was the NexPoint audit report

16   for the period ending 12/31/19 not completed

17   until January 2021?

18         A.    Because we had to deal with working

19   from home from -- with COVID, and on top of all

20   of our daily responsibilities and job duties

21   at -- at providing -- at Highland providing

22   services to NexPoint, we had to do all of this

23   extra work for a bankruptcy that was filed in

24   October of 2019.

25               MR. MORRIS:  Can we go to the

```
 1                WATERHOUSE - 10-19-21

 2        balance sheet on page 3?  Okay.  Stop right

 3        there.

 4        Q.    Do you see under the liabilities

 5   section, the last item is note payable to

 6   affiliate?

 7        A.    Yes.

 8        Q.    And is that the note that we just

 9   looked at?

10             MS. DANDENEAU:  Objection to form.

11        Q.    Withdrawn.

12             Is that the approximately

13   $30 million note that we just looked at that

14   was dated from 2017?

15             MS. DANDENEAU:  Objection to form.

16        A.    I believe no.

17        Q.    Okay.  You're not aware of any other

18   note that was outstanding from NexPoint to

19   Highland as of the end of the year 2019, other

20   than that one $30 million note; right?

21        A.    I don't recall.

22        Q.    And as of the end of 2019, the

23   principal amount that was due on the note was

24   approximately $23 million; right?

25             MS. DEITSCH-PEREZ:  Object to the
```

```
 1                    WATERHOUSE - 10-19-21

 2         form.

 3         A.     Approximately.

 4         Q.     And does that refresh your

 5   recollection that between the time the note was

 6   executed and the end of 2019, that NexPoint had

 7   paid down approximately $7 million?

 8         A.     Yes.  If we are just doing the math,

 9   yes.

10         Q.     Okay.  Did NexPoint complete its

11   audit from 2020?

12         A.     Sorry, you kind of broke up.  Do

13   NexPoint complete?

14         Q.     The audit of its financial

15   statements for the period ending December 31st,

16   2020?

17         A.     No.

18         Q.     No, it's not complete?

19         A.     No, it is not complete.

20         Q.     Did HCMFA complete its audit for the

21   year ending December 31st, 2020?

22         A.     No.

23                MR. MORRIS:  Can we go to page 15,

24         please, the paragraph at the bottom.

25         Q.     Do you see that NexPoint has
```

1                    WATERHOUSE - 10-19-21

2     included under notes payable to Highland a

3     reference to the amounts that were outstanding

4     as of the year-end 2019 under the note that we

5     looked at just a moment ago?

6          A.    Yes.  Are you talking about the

7     second paragraph?

8          Q.    I'm actually talking about first

9     paragraph.  Do you understand that the first

10    paragraph is a reference to the 2017 note, and

11    the amounts that were -- the principal amount

12    that was outstanding as of the end of 2019?

13              MS. DANDENEAU:  Objection to form.

14         John, do you mean the first paragraph of

15         that page?

16              MR. MORRIS:  No, the first paragraph

17         under notes payable to Highland.

18         A.    Yeah, I see the paragraph, and

19    again, this is what I answered earlier.  I

20    believe so, just because I don't -- again, this

21    is a number in a balance sheet, and without

22    matching it up and seeing the detail with the

23    schedule like I kind of talked about for

24    Highland's financial statements, it is a little

25    bit more difficult to tie everything in

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-38   Filed 02/20/397   Page 55 of 229   PageID 38396

Page 223

1                    WATERHOUSE - 10-19-21

2      perfectly together.

3           Q.    Okay.  But you're not aware of any

4      note that was outstanding at the end of 2019

5      from NexPoint to Highland other than whatever

6      principal was still due and owing under the

7      $30 million note issued in 2017; correct?

8           A.    Well, it -- I don't -- there is

9      reference in the second paragraph.  I don't --

10     I don't -- I don't recall what that is

11     referring to, so I don't -- I don't know.

12          Q.    Well, if you listen carefully to my

13     question, right, I'm asking about notes that

14     were outstanding at the end of 2019, and if we

15     look at the paragraph you just referred to, it

16     says that during the year there were new notes

17     issued totaling $1.5 million, but by the end of

18     the year, no principal or interest was

19     outstanding on the notes.

20               Do you see that?

21          A.    Oh, I do, yes.

22          Q.    So does that refresh your

23     recollection that there were no notes

24     outstanding from NexPoint to Highland other

25     than the principal remaining under the original

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 167-3   Filed 02/06/297   Page 56 of 229   PageID 38397

Page 224

1                    WATERHOUSE - 10-19-21

2    $30 million 2017 note that we looked at a

3    moment ago?

4         A.    Well, we're at the bottom of the

5    page.  Is there anything on page 16?

6         Q.    That is a fair question, sure.  That

7    is it.

8         A.    Okay.  So it appears that that is

9    the only note that is detailed in the notes in

10   the financial statement.

11        Q.    And you don't have any memory of any

12   other note other than the 2017 note, right,

13   being outstanding as of the end of the year?

14        A.    I deal with thousands of

15   transactions every year.  I don't really have a

16   very specific memory for what exactly was

17   outstanding.

18              MR. MORRIS:  Why don't we take a

19         break now.  We've been going for a little

20         while.  It's 3:26.  Let's come back at

21         3:40.

22              VIDEOGRAPHER:  We're going off the

23         record at 3:26 p.m.

24         (Recess taken 3:26 p.m. to 3:39 p.m.)

25              VIDEOGRAPHER:  We are going back on

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8   Filed 02/06/24   Page 57 of 229   PageID 38398

Page 225

1          WATERHOUSE - 10-19-21

2          the record at 3:39 p.m.

3          Q.    All right.  Mr. Waterhouse, we -- I

4    don't think we have a lot more here.

5               To the best of your knowledge and

6    recollection, were all affiliate loans and all

7    loans made to Mr. Dondero recorded on

8    Highland's books and records as assets of

9    Highland?

10              MS. DANDENEAU:  Object to the form,

11         asked and answered.

12         A.    To my knowledge, yes.

13         Q.    Okay.  Can you recall any loan to

14   any affiliate or Mr. Dondero that was not

15   recorded on Highland's books and records as an

16   asset?

17         A.    Like during my time as CFO?  I don't

18   recall.

19         Q.    How about after the time that you

20   were CFO?  Did you recall that there was a loan

21   by Highland to an affiliate or to Mr. Dondero

22   that hadn't been previously recorded on

23   Highland's books as an asset?

24              MS. DANDENEAU:  Objection to form.

25         A.    I guess I don't understand the

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 37-8   Filed 02/06/397   Page 58 of 229   PageID 38399

Page 226

1           WATERHOUSE - 10-19-21

2     question.  I left Highland as of -- I'm not

3     aware of -- I left Highland in February --

4     probably the last day of February of 2021.

5           Q.    Okay.

6           A.    I'm not -- I'm not aware of any --

7     I'm not aware of anything past that date.

8           Q.    Okay.  While you were the CFO at

9     Highland, did Highland prepare in the ordinary

10    course of business a document that reported

11    operating results on a monthly basis?

12          A.    Yes.

13          Q.    And are you generally familiar with

14    the monthly operating reports?

15          A.    Yeah.  You are referring to the

16    reports that we filed to the Court every month?

17          Q.    I apologize, I'm not.  I'm taking

18    you back to the pre-petition period.  There was

19    a report that I have seen that I'm going to

20    show you, but I'm just asking for your

21    knowledge.

22                MR. MORRIS:  Let's put it up on the

23          screen, Exhibit 39.

24                (Exhibit 39 marked.)

25          Q.    Do you see this is a document that

1                    WATERHOUSE - 10-19-21

2    is called operating results?

3         A.    Yeah, that's the title of it.

4         Q.    Okay.  And was a report of operating

5    results prepared by Highland on a monthly basis

6    during the time that you served as CFO?

7         A.    No.

8         Q.    Are you familiar with a document of

9    this type?  And we can certainly look at the

10   next page or two to refresh your recollection.

11        A.    I'm just looking at the title.  I

12   don't really -- again, as I discussed before, I

13   don't have any records or documents or emails

14   or appointments or anything that I was able to

15   use prior to -- prior to this deposition, so

16   I'm doing the best I can.

17        Q.    Okay.  You don't need to apologize.

18   I'm just asking you if you are familiar with

19   the document called Operating Results that was

20   prepared on a monthly basis at Highland?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        Q.    If you're not, you're not.

24        A.    I don't believe this was prepared on

25   a monthly basis.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 167-8   Filed 12/06/397 Page 60 of 229   PageID 38401

Page 228

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you see that this one

 3   is -- is dated February 2018?

 4        A.    Yes.

 5        Q.    Do you have -- do you believe --

 6   have you ever seen a document that was

 7   purporting to report operating results for

 8   Highland?

 9              MS. DANDENEAU:  Objection to form.

10        A.    Yes.

11        Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15        A.    I believe it was -- it was prepared

16   on an annual basis.

17        Q.    Okay.

18              MR. MORRIS:  Can we look at the next

19        page.

20        Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23              And it is dated February 2018.

24        A.    Yes.

25        Q.    Do you recall that there was a
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 117-68   Filed 02/06/397   Page 61 of 229   PageID 38402

Page 229

1                    WATERHOUSE - 10-19-21

2      report that Highland prepared that identified

3      significant items impacting the balance sheet?

4           A.    A report that was prepared.

5           Q.    Let me ask a better question:  Did

6      Highland prepare reports to the best of your

7      recollection that identified significant items

8      that impacted its balance sheet?

9           A.    Well, so Highland prepared a -- a

10     monthly close package.  And maybe I'm

11     getting -- and -- and maybe change names at one

12     time or maybe I'm just -- again, just

13     misremembering -- but in that, yes, there is a

14     page that would detail just changes in -- you

15     know, just changes month over month on the

16     balance sheet.

17          Q.    Okay.  And maybe it is my fault.

18     Maybe I didn't know the proper name for it.

19     But let's use the phrase "monthly close

20     package."

21               Did Highland prepare a monthly close

22     package in the ordinary course of business

23     during the time that you served as CFO?

24               MS. DANDENEAU:  Objection to form.

25          A.    Yes.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-38   Filed 03/06/397   Page 62 of 229   PageID 38403

Page 230

                      WATERHOUSE - 10-19-21

1

2        Q.     And did the monthly close package

3   that Highland prepared include information

4   concerning significant items that impacted

5   Highland's balance sheet?

6        A.     Yes, it had a page like that is --

7   that is on the screen that detailed items

8   like -- of that nature.

9        Q.     And do you know who -- was there

10  anybody at Highland who was responsible for

11  overseeing the preparation of the monthly

12  reporting package?

13       A.     That would have been -- again, it

14  varies over time during my tenure as CFO.

15  It -- it varied over -- over time, but -- but

16  typically a -- a corporate accounting manager.

17       Q.     And who were the corporate

18  accounting managers during your tenure as CFO?

19       A.     It would have been Dave Klos and

20  Kristin Hendrix.

21       Q.     And did the corporate accounting

22  manager deliver to you drafts of the monthly

23  close package before it was finalized?

24       A.     Sometimes.

25       Q.     Was that the practice even if there

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 157-38   Filed 03/06/23   Page 63 of 229   PageID 38404

Page 231

1                    WATERHOUSE - 10-19-21

2    were exceptions to the practice?

3         A.    The practice meaning that they

4    sometimes lured them to me?

5         Q.    That that was the expectation even

6    if circumstances prevented that from happening

7    from time to time.

8                    MS. DEITSCH-PEREZ:  Object to the

9         form.

10        A.    I -- I would say it started out that

11   way but over the years it -- it was not

12   enforced.

13        Q.    Okay.  So you were -- you reviewed

14   and approved monthly -- monthly reporting

15   packages for a certain period of time and then

16   over time you stopped doing that.

17                    Do I have that right?

18                    MS. DANDENEAU:  Objection to form.

19        A.    Yes, I mean, if you're talking about

20   a formal meeting where we sit down and go

21   through and approve it.  I would say that was

22   standard practice a decade -- you know, early

23   on.  And as time went on that -- that -- that

24   practice wasn't followed.

25        Q.    Okay.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-38   Filed 03/06/297   Page 64 of 229   PageID 38405

Page 232

 1                   WATERHOUSE - 10-19-21

 2        A.    And, quite frankly, I don't even

 3   know if these were -- these were sent to me

 4   even in any capacity.

 5        Q.    What was the purpose of preparing

 6   the monthly reporting package -- withdrawn.

 7              What was the purpose of preparing

 8   the monthly close package?

 9              MS. DEITSCH-PEREZ:  Object to the

10        form.

11        A.    The -- the original purpose was so

12   that it would just -- it would be a report that

13   was reviewed monthly with senior management.

14        Q.    Who was included in the idea of

15   senior management?

16        A.    You know, I think originally when

17   this was conceived that would have been like

18   Jim Dondero and Mark Okada.

19        Q.    Were monthly reporting -- withdrawn.

20              Were monthly close packages prepared

21   to the best of your knowledge until the time

22   you left Highland?

23        A.    To my knowledge -- I don't know,

24   actually.  I mean, to my knowledge, I believe

25   it was being -- that was still being done.  I

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8   Filed 02/06/23   Page 65 of 229   PageID 38406

Page 233

1                   WATERHOUSE - 10-19-21

2    don't know because, again, I wasn't reviewing

3    them.  I hadn't reviewed a close package for --

4    for a long time.  But I believe the standard

5    practice that was still being carried out.

6         Q.    Did you ever have any discussions

7    with the debtor's independent board concerning

8    any promissory notes that were issued by any of

9    the affiliates or Mr. Dondero?

10        A.    I can't -- I can't -- I can't recall

11   specifically.

12        Q.    Did you speak with the independent

13   board from time to time?

14        A.    Yes, from -- from -- from time to

15   time I had discussions with the independent

16   board members, you know, either -- either, you

17   know, by themselves or wholly, you know, as --

18   as a -- as a combined work.

19        Q.    Okay.  Before we talk about

20   Mr. Seery, do you recall ever having a

21   conversation with Mr. Nelms or Mr. Dubel

22   concerning any promissory note that was

23   rendered by one of the affiliates or

24   Mr. Dondero to Highland?

25        A.    I don't recall any conversations

1                WATERHOUSE - 10-19-21

2    specifically.

3         Q.    Do you know if the topic was ever

4    discussed, even if you don't remember it

5    specifically?

6                MS. DANDENEAU:  Objection to form.

7         A.    It -- it -- it may have.  I don't

8    know.  I don't recall.

9         Q.    Do you recall ever discussing any

10   promissory note issued by any of the affiliates

11   or Mr. Dondero with James Seery?

12        A.    I don't -- I don't recall

13   specifically.

14        Q.    Do you recall generally ever

15   discussing the topic of promissory notes issued

16   by any of the affiliates or Mr. Dondero to

17   Highland with Mr. Seery?

18        A.    Nothing -- nothing is really jumping

19   out at me.

20        Q.    Do you recall if you ever told

21   Mr. Seery that any of the affiliates or

22   Mr. Dondero didn't have an obligation to pay

23   all amounts due and owing under their notes?

24        A.    I don't recall having that

25   conversation.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 157-8   Filed 03/16/23   Page 67 of 229   PageID 38408
Exhibit C8   Page 235 of 397

Page 235

1                     WATERHOUSE - 10-19-21

2          Q.     Did you ever tell Mr. Seery that you

3    had any reason to believe that the amounts

4    reflected in the notes issued by the affiliates

5    and Mr. Dondero were invalid for any reason?

6          A.     I don't -- I don't recall.

7          Q.     Did you tell Mr. Dondero -- did you

8    tell Mr. Seery that you thought the promissory

9    notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12         A.     I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19         Q.     Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23              MS. DANDENEAU:  Objection to form.

24         A.     Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-63 Filed 06/16/397 Page 68 of 229   PageID 38409

Page 236

1                  WATERHOUSE - 10-19-21

2    anything that -- that said I have concerns over

3    these notes?

4         Q.    No.  Let me try again.  Maybe it was

5    my question.

6              Did you ever give Mr. Seery any

7    information concerning any of the notes that

8    were issued by any of the affiliates or

9    Mr. Dondero?

10              MS. DANDENEAU:  Objection to form.

11        A.    I don't recall if I did or not.  I

12    don't -- I don't remember.  I mean, you have my

13    emails.  You may have asked.  Again, I don't --

14    I don't know.

15              MR. MORRIS:  Can we put up the

16         document that has been premarked as Exhibit

17         39?

18              MS. DANDENEAU:  John, that is this

19         document, isn't it?

20              MR. MORRIS:  Oh, yeah, it might be,

21         as a matter of fact.  Let's go to Number

22         40.

23              (Exhibit 40 marked.)

24         Q.    During the bankruptcy,

25    Mr. Waterhouse, did you prepare documents that

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 178-38   Filed 03/06/23   Page 69 of 229   PageID 38410
Exhibit 38   Page 237 of 397

Page 237

```
 1                    WATERHOUSE - 10-19-21

 2      were filed with the bankruptcy court?

 3           A.    I didn't -- I didn't prepare them

 4      personally.

 5           Q.    Did people prepare them under your

 6      direction?

 7           A.    Yes.  There were members of the team

 8      that prepared them, and they worked in -- you

 9      know, there were members of DSI that were

10      involved in the process as well.

11           Q.    To the best of your knowledge, did

12      DSI rely on the employees of Highland for the

13      information that they used to prepare the

14      bankruptcy filings?

15           A.    Yes.  The books and records were

16      with the Highland personnel.

17           Q.    Okay.  And do you see on the screen

18      here, there is a document that we have marked

19      as Exhibit 40 that is -- that is titled Summary

20      of Assets and Liabilities?

21           A.    Uh-huh.

22           Q.    Okay.  And do you recall reviewing

23      any summary of assets and liabilities before it

24      was filed with the bankruptcy court?

25           A.    Yes, I recall reviewing this at a
```

Page 238

1                   WATERHOUSE - 10-19-21

2    high level.

3         Q.     And did you believe that it was

4    accurate at the time it was filed?

5         A.     I didn't have any other reason to

6    believe otherwise.

7         Q.     Okay.  Do you see that the total

8    value of all properties listed in Part 1 is

9    approximately $410 million?

10              MS. DEITSCH-PEREZ:  Objection to

11         form.

12         A.     Yes, it is in 1c.

13         Q.     Yes.

14         A.     Yes, I see that.

15         Q.     Okay.  If we go to the second page,

16   now I think I may just have excerpts here, just

17   so everybody is clear, but if we scroll down to

18   the second page, you will see that there is

19   a -- a little further.  There you go.  You will

20   see there is a reference to Item 71, notes

21   receivable.

22              Do you see that?

23         A.     I do.

24         Q.     And that was a reference to the

25   notes receivable from the affiliates and

1                    WATERHOUSE - 10-19-21

2     Mr. Dondero, among others; is that right?

3                    MS. DANDENEAU:  Objection to form.

4         A.    Yes.  The affiliate notes and the

5     Dondero notes were in this amount, but they

6     weren't -- again, like you said, and among

7     others.

8         Q.    Okay.  We will look at the

9     specificity because I'm not playing gaming

10    here, but do you know if the $150 million of

11    notes receivable was included within the

12    $410 million of total value of the debtor's

13    assets?

14                    MS. DANDENEAU:  Objection to form.

15        A.    I -- I -- I believe so.

16        Q.    Right.  And so is it fair to say

17    that as of the date this document was prepared,

18    the notes receivable were more than one-third

19    of the value of the debtor's assets?

20                    MS. DEITSCH-PEREZ:  Object to the

21         form.

22                    MS. DANDENEAU:  Object to the form.

23        A.    Again, if you are just taking the

24    math, 150 divided by whatever the $400 million

25    number is above, then yes, you get there.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-38   Filed 04/06/397   Page 72 of 229   PageID 38413

Page 240

1                  WATERHOUSE - 10-19-21

2        Q.    Okay.

3        A.    You know, but as of the time of this

4   filing, that is what was put in this filing,

5   right, but, you know, I mean, numbers --

6   numbers change, facts and circumstances change.

7        Q.    But as the CFO of Highland, the

8   debtor in bankruptcy, did you believe that this

9   number accurately reflected the total amount

10  due under the notes receivable?

11       A.    That is what we had in our books and

12  records.

13       Q.    Okay.  And did you believe as the

14  CFO that the books and records accurately

15  reported the then value of the debtor's assets?

16            MS. DANDENEAU:  Objection to form.

17       A.    We didn't -- as part of this filing,

18  there was no fair value measurement or

19  anything.  These were just accounting entries

20  for the promissory notes.  There is no analysis

21  for impairment or fair market value adjustments

22  or anything of that nature.  This is purely

23  taking numbers and putting them in our form.

24       Q.    Did you do any impairment analysis

25  at any time while you were employed by

1              WATERHOUSE - 10-19-21

2    Highland?

3         A.    Yes, we did do impairment analysis

4    on -- on assets.

5         Q.    Okay.  Did you ever do an impairment

6    analysis on any of the promissory notes that

7    were given to Highland by any of the affiliates

8    or Mr. Dondero?

9         A.    Not that I recall.

10        Q.    Under what circumstances do you

11   prepare impairment analyses?

12        A.    As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19              As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.    Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?

1              WATERHOUSE - 10-19-21

2        A.    The audited financials -- yes,

3   audited financial statements are prepared in

4   accordance with GAAP.

5        Q.    Do you recall whether any of

6   Highland or HCMFA or NexPoint ever made a fair

7   market value adjustment to any of the notes

8   issued by any of the affiliates or Mr. Dondero

9   to Highland?

10       A.    I do not recall that happening, but

11  the -- it is because under -- under GAAP,

12  the -- the treatment of liabilities is

13  different than assets.

14       Q.    Okay.  So then let's just focus on

15  Highland's audited financial statements.

16             The last audited financial

17  statements were for the period ending December

18  31st, 2018; correct?

19       A.    That is my understanding.

20       Q.    And you had -- you had an obligation

21  to disclose anything to PricewaterhouseCoopers

22  concerning any subsequent events between the

23  end of 2018 and June 3rd, 2019; correct?

24             MS. DANDENEAU:  Objection to form.

25             MS. DEITSCH-PEREZ:  Form.

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 107-38    Filed 04/20/23    Page 75 of 229    PageID 38416

Page 243

1              WATERHOUSE - 10-19-21

2        A.    Correct.

3        Q.    Okay.  To the best of your

4   knowledge, as Highland's CFO, did Highland ever

5   make any fair market value adjustments to any

6   of the promissory notes that were carried on

7   its balance sheet and that were issued by any

8   of the affiliates or Mr. Dondero?

9        A.    I think I answered that question

10  earlier.  I don't recall doing that for any of

11  the -- those -- those notes.  So it would have

12  included the audit for the -- for the 2018

13  period.

14       Q.    Okay.

15            MR. MORRIS:  Can we go to the next

16       page.

17       Q.    Do you see this is a note a list of

18  notes receivable?  Do you see that?

19       A.    Yes, I do.

20       Q.    And do you see that this ties into

21  the page that we were just looking?

22       A.    I'm sorry, can we go back to the

23  prior page?  I mean, it was at 150,331,222.  It

24  was on the prior page.  Next page.  Yes, it

25  agrees.

 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  So now let's look at that

 3   schedule.  So this was the face amount of all

 4   of the promissory notes that Highland held at

 5   the time this document was filed with the

 6   bankruptcy court; right?

 7        A.    Yes.

 8        Q.    There is a footnote there that says,

 9   doubtful or uncollectible accounts are

10   evaluated at year-end.

11              Do you see that?

12        A.    I do.

13        Q.    Okay.  And is it fair to say that as

14   of the year-end 2018, the year before this,

15   that to the extent any of these notes were

16   outstanding at that time, they weren't deemed

17   to be doubtful or uncollectible?

18        A.    Yeah.  For the 2018 audit, there

19   weren't any -- there weren't any adjustments to

20   fair value.

21        Q.    Okay.  And during the bankruptcy, do

22   you recall that Highland subsequently reserved

23   for the Hunter Mountain Investment Trust note?

24        A.    Yes.

25        Q.    Why did Highland -- were you

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8  Filed 04/06/22  Page 77 of 229  PageID 38418
Exhibit C8   Page 245 of 397

Page 245

1                 WATERHOUSE - 10-19-21

2     involved in the decision to reserve the Hunter

3     Mountain Investment Trust note?

4          A.    I was not.

5          Q.    Do you know why Highland decided to

6     reserve for the Hunter Mountain Investment

7     Trust note?

8          A.    I don't know yet decision was made.

9     I believe it was made by someone at DSI.

10         Q.    Okay.  I'm just asking if you know

11    why.

12              Did you ever ask anyone why they

13    reserved for that particular note?

14         A.    I don't recall.

15         Q.    Do you know whether the debtor

16    reserved for any other note on this list during

17    the bankruptcy?

18         A.    Again, I don't recall.  I wasn't

19    part of any process of -- again, like any fair

20    value adjustments or anything to that degree.

21    Like I said, a lot of that was done by DSI and

22    it was kind of out of our court.

23         Q.    Okay.  Do you know if any note

24    receivable on this list was ever deemed by the

25    debtor to be doubtful or uncollectible?

1                   WATERHOUSE - 10-19-21

2          A.    I don't -- I don't have a

3    recollection of every filing, so I don't know.

4          Q.    Did you ever have a discussion with

5    anybody at any time about whether any of the

6    notes receivable on this list should be deemed

7    to be doubtful or uncollectible?

8          A.    No.  As I previously stated, we were

9    told we didn't have to keep GAAP financials.

10   We weren't having -- you know, there is no

11   underlying audits being performed, so I mean,

12   it wasn't something I worried about.

13              MR. MORRIS:  I move to strike.

14         Q.    Did you ever have a conversation

15   with anybody about any of the notes receivable

16   and whether they should be deemed to be

17   doubtful or uncollectible?  Did you have the

18   conversation, yes or no?

19              MS. DANDENEAU:  Objection to form.

20         A.    I don't recall.

21         Q.    Do you recall ever telling anybody

22   that you believed any of the notes receivable

23   on this list should be doubtful -- should be

24   deemed to be doubtful or uncollectible?

25              MS. DANDENEAU:  Objection to form.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 187-68   Filed 04/06/397   Page 79 of 229   PageID 38420

Page 247

1                    WATERHOUSE - 10-19-21

2         A.    I don't recall.  I mean, it may have

3    happened, you know, again, when we initially

4    getting DSI up to speed and going through

5    financials, it may have happened, but I don't

6    recall specifically.

7         Q.    While you were the CFO of Highland

8    during the time that the company was in

9    bankruptcy, did you have any reason to believe

10   that any of the notes receivable on this list

11   other than Hunter Mountain Investment Trust

12   should have been characterized as doubtful or

13   uncollectible?

14              MS. DANDENEAU:  Objection to form.

15              MS. DEITSCH-PEREZ:  Form.

16        A.    I didn't know.  I didn't form an

17   opinion.  Bankruptcy was new to me.  It still

18   is new to me, even after going through this.

19   So I really didn't know what to expect nor

20   really -- you know, I didn't know.

21              MR. MORRIS:  I move to strike.

22        Q.    During the period of Highland's

23   bankruptcy when you were serving as CFO, did

24   you have any reason to believe any of the notes

25   on this list were doubtful or uncollectible?

```
 1                 WATERHOUSE - 10-19-21

 2                 MS. DEITSCH-PEREZ:  This is like the

 3          fifth time you've asked it.  Object to the

 4          form.

 5                 MR. MORRIS:  I'm moving to strike,

 6          if you haven't noticed, because he's not

 7          answering the question.

 8                 MS. DEITSCH-PEREZ:  He was answering

 9          the question, you just didn't like it, like

10          the answer.

11                 MR. MORRIS:  Good Lord.

12     Q.    Go ahead, Mr. Waterhouse.

13     A.    Again, I don't -- we brought up a

14     myriad of issues at the start of the bankruptcy

15     case.  I don't recall if this was one of them,

16     but, again, there are a lot of things we

17     couldn't change.  Even, you know, I was told

18     status quo, blah, blah, blah, right, there is a

19     stay, you can't -- you know, I don't recall

20     specifically, but that doesn't mean it didn't

21     happen.

22                 MR. MORRIS:  I move to strike.

23     Q.    During the time that Highland was in

24     bankruptcy and you served as CFO, did you have

25     any reason to believe that any of the notes
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 04/06/23   Page 81 of 229   PageID 38422

Page 249

```
 1                    WATERHOUSE - 10-19-21

 2    receivable on this list were doubtful or

 3    uncollectible?

 4               MS. DEITSCH-PEREZ:  Object to the

 5          form.

 6          A.    Potentially.

 7          Q.    Did you ever tell anybody that?

 8          A.    As I just stated like five times,

 9    yes, we -- at the beginning after filing and we

10    were getting DSI and others up to speed, you

11    know, we had a myriad of discussions of a lot

12    of things and this was likely one of them.  I

13    don't -- but I don't recall specifically we

14    talked --

15          Q.    I don't want to know -- I don't want

16    to know what was --

17               MS. DEITSCH-PEREZ:  Wait, wait.

18          Excuse me.  Mr. Morris, you did not let him

19          finish his answer.

20          A.    I spoke -- we had -- we were

21    bringing Fred Karesa and Brad Sharp (phonetic)

22    up to speed on all of these items, contracts,

23    and investments and going through -- we had

24    hours and hours and hours of discussion.  And

25    then not only do I have to repeat this not
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 103-8   Filed 05/06/22   Page 82 of 229   PageID 38423
Exhibit C8   Page 250 of 397

Page 250

1              WATERHOUSE - 10-19-21

2    once, twice, three, four times with -- you

3    know, I mean, we -- I don't -- I don't remember

4    the sum culmination of all these discussions.

5    They all kind of blend together.

6              MR. MORRIS:  Okay.  I move to strike

7         and I will try one more time.

8         Q.   Did you ever tell anybody at DSI

9    that you believed any of the notes receivable

10   on this list were doubtful or uncollectible?

11             MS. DANDENEAU:  Object to form.

12        A.   Potentially.

13        Q.   Potentially you told them or

14   potentially they were doubtful or

15   uncollectible?

16        A.   Potentially I told them that we

17   needed to look at the value of these -- of

18   these assets.

19        Q.   Okay.  Did you -- okay.  It is

20   potential that you told them and it is

21   potentially that you didn't; right?

22             MS. DANDENEAU:  Objection to form.

23        A.   I've gone through that.  I don't

24   recall specifically.

25        Q.   So you should just -- I don't want

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-8   Filed 01/06/23   Page 83 of 229   PageID 38424

Page 251

1                    WATERHOUSE - 10-19-21

2      to tell what you to do.  Do you have --

3                    MS. DANDENEAU:  Good.

4          Q.    Other than -- other than telling

5      them that they should look at the values, do

6      you have any recollection whatsoever of ever

7      having told anybody at DSI that any of the

8      notes receivable on this page were doubtful or

9      uncollectible?

10                   MS. DEITSCH-PEREZ:  Object to the

11         form.

12                   MS. DANDENEAU:  Objection.

13         A.    I recall having general discussions

14     about everything on our balance sheet which

15     would have included these -- these notes

16     receivable.

17         Q.    Okay.

18         A.    I don't recall specifically where

19     those discussions delved into.

20         Q.    Do you recall any discussion at all

21     on the topic of whether any of these notes on

22     this list were doubtful or uncollectible?

23                   MR. AIGEN:  Mr. Morris, how on earth

24         is that question different from the

25         question that you just asked for the last

1          WATERHOUSE - 10-19-21

2    five times?  I mean, really I thought you

3    were -- (overspeak.)

4          MR. MORRIS:  Because he never

5    answered it.

6          MS. DEITSCH-PEREZ:  Are you

7    listening to him?

8          MR. MORRIS:  You know --

9          MS. DEITSCH-PEREZ:  He basically

10   said that he had a conversation with DSI

11   that went over all of this stuff and that

12   conversation could have included the notes

13   but he doesn't recall specifically.

14         What more do you want him -- to ask

15   of him?

16         MR. MORRIS:  I want him -- I would

17   love him to say -- I would like him to

18   testify to the truth, and that is he has no

19   recollection.

20         MS. DEITSCH-PEREZ:  Well, the truth

21   as you would like to see it, but -- but he

22   is testifying truthfully.  And I -- and, by

23   the way, I move to strike that comment --

24         MR. MORRIS:  Okay.

25         MS. DEITSCH-PEREZ:  -- because it

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-38   Filed 05/06/397   Page 85 of 229   PageID 38426

Page 253

WATERHOUSE - 10-19-21

1

2       suggests that he has not testified

3       truthfully.

4             MR. MORRIS:  I will ask my question

5       again.  And if at any time you want to

6       direct him not to answer, that is your

7       prerogative.

8       Q.    Mr. Waterhouse, do you have any

9    recollection at all of ever telling anybody

10   from DSI that any of these notes were doubtful

11   or uncollectible?

12            MS. DANDENEAU:  Object to form.

13      A.    I don't remember specifically.

14      Q.    Do you remember generally that

15   specific topic?

16      A.    We generally talked about assets,

17   values.  If -- we had discussions of that and

18   collectability in nature.  I mean, of Highland,

19   the funds, the CLOs, the entire complex.  We

20   had discussions like that, which is, you know,

21   as you look at a billion dollar consolidated

22   balance sheet.

23            So I generally remember -- this is

24   billions of dollars, including these assets --

25   having discussions of this -- of this type.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-38   Filed 05/06/24   Page 86 of 229   PageID 38427

Page 254

1                    WATERHOUSE - 10-19-21

2          Q.    Do you believe that an affiliate

3    loan on this list was doubtful or

4    uncollectible?  Would you have told that to

5    DSI?

6                    MS. DANDENEAU:  Objection to form.

7                    MS. DEITSCH-PEREZ:  Object to form.

8          A.    If we had, like -- again, if we --

9    if -- if we weren't preparing financial

10   statements in accordance with GAAP, and -- you

11   know, if DSI at that point -- they were --

12   again, I was new to bankruptcy.

13                  The CRO is -- we are delegating

14   everything to the CRO.  All the decisionmaking.

15   Remember -- remember when you and I went into

16   Delaware Court and we were saying DSI basically

17   does everything, remember this, Mr. Morris?

18                  You were my counsel at the time, and

19   basically we're running everything through DSI.

20   That was what this was like in the early part.

21                  Everything was communicated through

22   DSI.  So DSI says this.  DSI says that.  That

23   is what we're doing, and we're pointing out

24   things to them.

25                  Now, they decide what direction this

1                    WATERHOUSE - 10-19-21

2    goes.

3         Q.    Did you point out that any of

4    these --

5         A.    I don't recall specifically.

6         Q.    Okay.  At any time that you served

7    as Highland's CFO, did you ever point out to

8    DSI that any of these loans were doubtful or

9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13        A.    If you're asking me if I had a

14   conversation with DSI, if any of these loans

15   were doubtful or uncollectible, I don't recall

16   specifically.

17        Q.    Do you recall that the debtor filed

18   on the docket monthly operating reports?

19        A.    Yes.

20        Q.    You prepared those personally,

21   didn't you?

22              MS. DEITSCH-PEREZ:  Objection to

23         form.

24        A.    I didn't personally prepare them,

25   the team did with DSI.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Filed 01/09/24   Page 88 of 229   PageID 38429

Page 256

```
 1                      WATERHOUSE - 10-19-21

 2          Q.    But you signed them; correct?

 3          A.    My signature is on the MORs.

 4          Q.    And you signed them as the preparer

 5    of the document; correct?

 6          A.    Yes, I did this pursuant to DSI's

 7    instructions.

 8          Q.    Okay.  You wouldn't have signed the

 9    document if you didn't believe it to be

10    accurate; correct?

11          A.    If I had reason to believe it

12    wasn't, presumably I wouldn't have signed it.

13          Q.    Okay.  And do you have any reason to

14    believe right now that any monthly operating

15    report that has your signature on it was

16    inaccurate in any way?

17                MS. DEITSCH-PEREZ:  Object to the

18          form.

19          A.    My understanding of the monthly

20    operating reports is we were filing them in

21    accordance with the standards set by the Court.

22    It wasn't -- you know, again, I don't -- you

23    know, it wasn't GAAP.  It wasn't these other

24    standards, so I testified I didn't have

25    experience in this.  The CRO was running the
```

1                    WATERHOUSE - 10-19-21

2    show.  I followed their advice.

3         Q.    But you assured yourself that

4    everything in the report was accurate before

5    you signed them; correct?

6              MS. DANDENEAU:  Objection to form.

7         A.    I trusted the guidance from the CRO

8    and their team and their experience and their

9    guidance for doing this for many, many, many

10   years to -- to -- to categorize and put things

11   in ways on the form.

12              You know, my team had -- had not

13   filled out these forms before and needed all of

14   this guidance.  I'm not an expert in this.  I

15   have oversight of it.  I signed the form.  DSI

16   told me to.

17        Q.    And you and your team are the source

18   of the information that DSI used to create the

19   reports; correct?

20              MS. DANDENEAU:  Objection to form.

21        A.    The books and records reside with

22   the -- with -- with the corporate accounting

23   team.

24        Q.    Okay.  And the corporate accounting

25   team was the corporate accounting team that was

1                    WATERHOUSE - 10-19-21

2     under your direction; correct?

3          A.    Yes.

4          Q.    So -- so your team was responsible

5     for maintaining Highland's books and records;

6     correct?

7          A.    I'm sorry, my team was responsible?

8          Q.    Correct.

9          A.    Yes.  They -- they -- they were

10    the -- the -- the general ledger of Highland,

11    that responsibility was with the corporate

12    accounting team.

13         Q.    The corporate accounting group

14    reported to you; correct?

15         A.    Yes.

16               MR. MORRIS:  Can we put up 41,

17         please.

18               (Exhibit 41 marked.)

19         Q.    All right.  You will see that this

20    is a report that is dated January 31st, 2020,

21    but it is for the month ending December 2019.

22               Do you see that?

23         A.    I do.

24         Q.    And you signed this report in your

25    capacity as the chief financial officer of

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 107-8   Filed 05/06/397   Page 91 of 229   PageID 38432

Page 259

```
 1                  WATERHOUSE - 10-19-21

 2    Highland; correct?

 3         A.    Yes.

 4         Q.    And you're the preparer -- you're

 5    identified as the preparer of the report;

 6    correct?

 7         A.    That is correct.

 8         Q.    Do you recall participating in the

 9    preparation of monthly operating reports?

10         A.    As I testified earlier, it was put

11    together, you know, with the team.  The team

12    worked with DSI to put these monthly operating

13    reports together.  We had no experience at this

14    time of the monthly operating reports or things

15    of this nature.

16               MR. MORRIS:  Can you turn to the

17         next page, please.

18         Q.    Do you see a line item under assets

19    due from affiliates?

20         A.    Yes, I do.

21         Q.    Okay.  And to the best of your

22    knowledge and understanding, as the person who

23    is identified as the preparer of this report,

24    does that line item include the affiliate loans

25    that we've been talking about?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-28   Exhibit C8   Page 260 of 397   Page 92 of 229   PageID 38433

Page 260

1                   WATERHOUSE - 10-19-21

2         A.    Again, I would have to see, just

3    like we did with the financial statements of

4    Highland and NexPoint, I would have to see a

5    detailed build, but, you know, if you look at

6    the other line items, you know, the only other

7    place it could be would be in -- in other

8    assets.

9         Q.    Okay.  And as a matter of

10   arithmetic, is it fair to say that is the value

11   of the assets due from affiliates was more than

12   25 percent of the value of Highland's total

13   assets as of 12/31/2019?

14              MS. DANDENEAU:  Objection to form.

15        A.    I'm really not doing the mental math

16   right now, so I've been going at this depo for

17   hours, so I'm really not -- you know --

18        Q.    All right.  No problem.

19        A.    -- these are millions of dollars.

20        Q.    Let's look at the Footnote 1,

21   please.  Do you see there is a reference to the

22   Hunter Mountain note?

23        A.    Yes, I see that in Footnote 1.

24        Q.    Okay.  And that's the reserve that

25   was taken against that note?

1              WATERHOUSE - 10-19-21

2        A.    Yes, that is what this indicates.

3        Q.    Okay.  And were you aware that the

4   reserve was being taken on that it was?

5        A.    I was -- I was aware, yeah, at some

6   point, yes.

7        Q.    Okay.  And are you aware of any

8   reserve being taken with respect to any other

9   note that was issued in favor of Highland?

10       A.    Again, as I testified, we didn't go

11  through an analysis on -- on -- on the other

12  notes.

13       Q.    Can we turn --

14       A.    I believe -- I believe it says that

15  in Footnote 1, fair value has not been

16  determined with respect to any of the notes.

17             So this footnote -- footnotes, look,

18  there has been no determination.

19       Q.    Okay.  The determination was made in

20  the audited financial statements just six

21  months earlier; right?  We saw that earlier?

22       A.    That was as of 12/31/18.  I mean,

23  things -- circumstances -- there's a bank --

24  circumstances change, things change -- things

25  change over time, you know, facts and

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 107-38    Filed 02/20/23    Page 94 of 229    PageID 38435

Page 262

1                  WATERHOUSE - 10-19-21

2     circumstances change.  Again, you have to do an

3     analysis.

4          Q.    Okay.  And you do recall that in

5     Highland's 2018 financial statement, all of the

6     notes issued by affiliates and Mr. Dondero that

7     were due at year-end had a fair value equal to

8     the carrying value; correct?  We looked at

9     that?

10         A.    Yes.  That was in the -- in the

11    disclosure for the -- for the affiliate notes,

12    yes.

13         Q.    And -- and you were obligated to

14    share with PwC any subsequent events between

15    the end of 2018 and the date that you signed

16    your management representation letter on June

17    3rd, 2019; correct?

18              MS. DEITSCH-PEREZ:  Object to the

19         form.

20         A.    Yes.  I -- I -- I signed the

21    management, you know, my signature is in the

22    management representation letter -- I hope I'm

23    answering your question -- that is dated in

24    June with the representations made in that

25    management representation letter.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 167-38   Filed 06/30/397 Page 95 of 229   PageID 38436

Page 263

1                WATERHOUSE - 10-19-21

2       Q.    Okay.  And there was nothing that

3  caused PricewaterhouseCoopers to include in

4  subsequent events any adjustment to the

5  conclusion that the fair value of the affiliate

6  notes and the notes issued by Mr. Dondero

7  equaled the carrying value; correct?

8                MS. DANDENEAU:  Objection to the

9        form.

10      A.    That is correct.  That is what was

11  in the -- in the -- in the footnotes.

12      Q.    Okay.  So are you aware of anything

13  that occurred between June 3rd, 2019 and

14  December 31st, 2019 that would have caused the

15  fair value of the notes to differ from the

16  carrying value?

17      A.    Yeah.  Highland filed for

18  bankruptcy, things changed -- I mean, there was

19  a bankruptcy filed in October of -- of -- of

20  2019, right, the petition date that we've

21  described earlier.

22                I mean, I had a -- I guess looking

23  back naively, I thought we were going to get an

24  audit from PwC for year-ended 2019, and when we

25  had discussions with PwC, they were like, are

1                    WATERHOUSE - 10-19-21

2   you crazy, we're not auditing this.  Values

3   change, all these things change, bankruptcy

4   changes the entire scenario.  I mean -- and

5   they're like, we're not -- we're not touching

6   this.

7               And so, you know, I was like, okay,

8   sorry, I get it, okay, no an audit.

9               I mean, it is -- you know, and --

10  you know, and we weren't preparing GAAP

11  financial statements.

12              Again, I didn't know what we were

13  doing in relation to our financial statements,

14  but these were the discussions I was having at

15  the time.  And yeah, I mean, filing bankruptcy

16  from what I got from outside auditors and

17  others involved changed things dramatically.

18       Q.    Okay.  Highland wasn't the obligor

19  under any of the notes that we're talking

20  about; correct?

21       A.    No.

22       Q.    So --

23       A.    That's right.

24       Q.    So can you identify any fact that

25  would cause the fair value to deviate from the

1                    WATERHOUSE - 10-19-21

2    carrying value during the seven-month period

3    between June 3rd and the end of the year, 2019?

4              MS. DANDENEAU:  Objection to form.

5         A.    No.  I mean, I'm putting myself back

6    at that time, right.  Hindsight is 2020, but we

7    didn't do an analysis, but we would have done a

8    fulsome analysis and looked at all of the facts

9    and circumstances at the time, but asset values

10   change.  You know, there could have been a

11   market crash in hindsight in 2020, which --

12   which affected entities' abilities.

13             There could have been all of these

14   things, right, that -- that happen.  It is --

15   it is easy to look back in hindsight, but when

16   you are looking at this in -- in realtime, the

17   analysis is different, and again, we didn't do

18   an analysis.

19        Q.    Okay.  You didn't do an analysis.

20             Do I have that right?

21        A.    I don't -- I don't recall doing one

22   or maybe -- you know, I don't recall doing one.

23             MR. MORRIS:  Okay.  I'm going to

24        take a break.  I may be done, so the time

25        now is -- is 4:30 your time.  Let's just

```
 1                    WATERHOUSE - 10-19-21

 2        take a short break until 4:40 your time.

 3               MS. DANDENEAU:  Okay.

 4               VIDEOGRAPHER:  We're going off the

 5        record, 4:31 p.m.

 6        (Recess taken 4:31 p.m. to 4:43 p.m.)

 7               VIDEOGRAPHER:  We are back on the

 8        record at 4:43 p.m.

 9               MR. MORRIS:  I have no further

10        questions.

11               MR. RUKAVINA:  Okay.

12        Mr. Waterhouse, I will go next.

13                      EXAMINATION

14   BY MR. RUKAVINA:

15        Q.   Sir, my name is Davor Rukavina.  I'm

16        the lawyer for --

17               MR. MORRIS:  Hey, Davor, just before

18        you begin, I just want to put on the record

19        Highland's objection to documents that were

20        produced to me 10 minutes before the

21        deposition began.

22               MR. RUKAVINA:  What the basis of

23        your objection?

24               MR. MORRIS:  That they were due

25        quite some time ago, and the fact that you
```

 1                  WATERHOUSE - 10-19-21

 2          had -- I just think it's appropriate to --

 3          to dump documents on somebody 10 minutes

 4          before the deposition.  I just think

 5          that's --

 6                  MR. RUKAVINA:  Well, these are

 7          documents Highland produced.  I'm not aware

 8          of any rule I have to give you advance

 9          documents when I know for the record that

10          other than the exhibits that you sent to us

11          last week, most of the exhibits you used

12          today you did not provide to me prior to

13          this deposition.

14                  MR. MORRIS:  No, but the documents

15          were produced by me in -- in litigation,

16          right?

17                  MR. RUKAVINA:  I'm going to use

18          primarily, John, the documents that you

19          produced to me today, but you may.

20                  MR. MORRIS:  Primarily.  I've got --

21          I've got my objection.  You have got your

22          response.  Proceed.

23          Q.    Mr. Waterhouse, again, I represent

24     the advisors, HCMFA and NexPoint Advisors.

25                  Do you understand that?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-18   Filed 06/09/23   Page 100 of 229   PageID 38441

Page 268

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    You and I have never met or talked

 4   before today, have we?

 5        A.    No, I have -- I have heard your

 6   voice on calls before.

 7        Q.    Okay.

 8              MR. RUKAVINA:  Madam Court Reporter,

 9        I will use a few exhibits today.  My

10        associate, Mr. Nguyen, will find some way

11        to get them to you.  I don't know how to do

12        that, but it looks like you guys do.

13              I am going to use numbers as well.

14        But to differentiate them from Mr. Morris

15        we're going to mark mine with the prefix A

16        for advisors.

17              Do you understand?

18              COURT REPORTER:  Yes.

19              MR. RUKAVINA:  Okay.  Perfect.

20        Q.    Okay.  So, Mr. Waterhouse, let's

21   start with those two HCMFA notes that you were

22   asked about, one for 5 million and one for

23   2.4 million.

24              Do you recall those notes?

25        A.    Yes.
```

Page 269

1                    WATERHOUSE - 10-19-21

2        Q.    Were you ever the CFO of HCMFA?

3        A.    I don't recall.

4        Q.    So to the best of your recollection,

5    you were still an officer of HCMFA in 2019,

6    just that your title was treasurer?

7              MR. MORRIS:  Object to the form of

8        the question.  There is no leading here.

9        He works for your client.

10             MS. DANDENEAU:  That is not -- that

11       is not true.

12             MR. MORRIS:  He's the treasurer --

13       he is the treasurer of your client.  I

14       don't -- I'm going to object every time you

15       try to lead, so...

16             MR. RUKAVINA:  Totally fine to

17       object.

18             MR. MORRIS:  Okay.

19       Q.    Please answer my question,

20   Mr. Waterhouse.

21       A.    I'm sorry, could you repeat?  There

22   was...

23       Q.    Yes.  You were -- you testified

24   earlier that in 2019 you were an officer of

25   HCMFA; correct?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 270 of 297Page 102 of 229   PageID 38443

Page 270

1                  WATERHOUSE - 10-19-21

2        A.    Yes, I testified that I was the

3   treasurer and I didn't know if that incumbency

4   certificate, you know, was one that appointed

5   me as a treasurer, but yes.

6        Q.    I'm just trying to confirm that

7   sitting here today, to the best of your

8   recollection, at that time you were -- your

9   title was treasurer.  It was not chief

10  financial officer.

11       A.    I don't recall that being my title.

12       Q.    Okay.  And in May of 2019, however,

13  I think you testified you were the chief

14  financial officer of the debtor; correct?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    Yes, I was -- yes.

18       Q.    Okay.  As such, in May of 2019, did

19  you have the authority, to your understanding,

20  to unilaterally loan $5 million or $2.4 million

21  to anyone on behalf of the debtor?

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.    Sorry, can you repeat that?

25       Q.    Yes.  So in your capacity as the

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 103 of 229   PageID 38444

Page 271

                    WATERHOUSE - 10-19-21

1

2    chief financial officer of the debtor, Highland

3    Capital Management, L.P., in May of 2019, did

4    you believe that you unilaterally, just Frank

5    Waterhouse, had the authority to loan on behalf

6    of the debtor to anyone $5 million and

7    $2.4 million?

8              MR. MORRIS:  Objection to the form

9         of the question.

10   A.    No.

11   Q.    Is it because loans of that amount

12   would have had to be approved by someone else?

13   A.    Yes.

14   Q.    Who in '20 -- in May of 2019, if

15   Highland wanted to loan 5 million or

16   $2.4 million to someone, what would have been

17   the internal approval procedure?

18             MR. MORRIS:  Objection to the form

19        of the question.

20   A.    If -- if we had loans of that nature

21   that needed to be made due to their size, we

22   would have gotten approval from the -- the

23   president of Highland.

24   Q.    And who that was individual?

25   A.    It was James Dondero.

```
1                    WATERHOUSE - 10-19-21

2         Q.    Okay.  Now, I'm going to ask you a

3    similar question but for a different entity.

4              In May of 2019, as the treasurer of

5    HCMFA, did you believe that you unilaterally

6    had the ability to cause HCMFA to become the

7    borrower of a $5 million loan and a

8    $2.4 million loan?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    No.

12        Q.    What would -- what would the

13   approval have taken place -- strike that.

14             What would the approval process have

15   been like in May of 2019 at HCMFA for HCMFA to

16   take out a $7.4 million loan?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    The process would have been similar

20   to what we just discussed on -- for Highland to

21   make a loan to others.  So, again, you know,

22   we -- we would have -- either myself or someone

23   on the team would have discussed this with

24   the -- the president and owner of -- of HCMFA.

25        Q.    And who was that individual?
```

```
 1                    WATERHOUSE - 10-19-21

 2        A.     That was James -- Jim Dondero.

 3        Q.     So do I understand that in May of

 4   2019, on behalf of both the lender, Highland,

 5   and the borrower, HCMFA, Mr. Dondero would have

 6   had to approve $7.4 million in loans?

 7               MR. MORRIS:  Objection to the form

 8        of the question.

 9        A.     Yes.

10        Q.     You mentioned when Mr. Morris was

11   asking you the NAV error, N-A-V error, with

12   respect to TerreStar, without writing us a

13   novel, unless you feel like you have to, can

14   you summarize what that NAV error was?  What

15   happened?

16        A.     There was a -- in the Highland

17   Global Allocation Fund, it owned at the time an

18   equity interest in a company called TerreStar.

19   And TerreStar is -- at the time was a private

20   company, and it may still be today.  Again, I'm

21   putting myself back then as a private company.

22               We had -- sorry, I don't mean we --

23   the fund and the advisor used Houlihan Lokey

24   to -- to value that investment.  And during

25   that time there was some trades that were
```

Page 274

1                    WATERHOUSE - 10-19-21

2       executed at market levels that were much lower

3       than the Houlihan Lokey model.

4                    And based on information and

5       discussions with the portfolio managers and,

6       you know, principals that were very familiar

7       with TerreStar, it was determined that those

8       trades were non-orderly and they were not

9       considered in the valuation as consulted with

10      Houlihan Lokey and PricewaterhouseCoopers at

11      the time.

12                   Subsequent to a -- I can't remember

13      the exact circumstances of why the SEC got

14      involved.  I think it was due to this -- this

15      investment became a material position in the

16      fund.  It triggered an SEC, kind of, inquiry.

17      And as part of that inquiry, they questioned

18      the valuation methodology.  "They" meaning the

19      SEC.

20                   And at the culmination of that

21      process -- this is all summarized -- the value

22      that was -- that ultimately had to be used in

23      the fund's NAV was different than -- materially

24      different than what the original valuation at

25      Houlihan Lokey provided.

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 77-13    Filed 07/09/24    Page 107 of 229    PageID 38448

Page 275

1                    WATERHOUSE - 10-19-21

2              And given that there was this fund

3    was, as we discussed -- I don't know if we

4    discussed it, but it was an open-ended fund

5    that was going -- that was converting to a

6    close-end fund.

7              Due to the fact that it was an

8    open-ended fund, you had to recalculate NAV and

9    see what the impact was on people -- on

10   investors coming in and out of the fund and if

11   there is a detrimental impact and to calculate

12   what that -- what that impact was and if there

13   was any amounts owed to the fund pursuant to

14   the error.

15        Q.    Were you personally involved

16   internally at either Highland or HCMFA with

17   these investigations and discussions with the

18   SEC?

19        A.    I was.

20        Q.    Which other key people or senior

21   people at Highland were involved, to your

22   recollection?

23        A.    Myself, Thomas Surgent, David Klos,

24   Lauren Thedford, Jason Post.

25        Q.    Mr. Dondero, was he --

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-13   Page 27 of 2397   Page 108 of 229   PageID 38449

Page 276

1                    WATERHOUSE - 10-19-21

2          A.    I believe Cliff Stoops.  I'm trying

3    to think.  And maybe that is -- that is -- that

4    is -- that is all kind I can recall at the

5    moment.

6          Q.    Do you recall whether it was

7    determined that the fund suffered losses as a

8    result of this error?

9          A.    The -- the fund -- the -- the --

10   because the open-ended nature of the fund,

11   there were losses that were attributable to

12   investors.  Meaning they -- they would have

13   redeemed and got a less money or -- or they

14   subscribed in and maybe because they didn't get

15   enough shares and then they later sold and then

16   they were harmed in that fashion.

17                And there is -- there is -- there

18   were very -- there were very detailed

19   calculations and, you know, all these different

20   scenarios that we had to -- I'm sorry, I keep

21   saying "we" -- that the individuals involved

22   had to calculate and quantify.

23         Q.    Well, do you recall whether HCMFA

24   admitted certain fault and liability for this

25   error?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-33   Filed 01/09/24   Page 109 of 229   PageID 38450

Page 277

1                   WATERHOUSE - 10-19-21

2          A.    I don't recall specifically.

3          Q.    Do you recall whether HCMFA caused

4    any funds to be paid to the investors and the

5    fund the subject of the NAV error?

6          A.    Yes.

7          Q.    Do you recall the approximate amount

8    of funds, moneys paid to the investors and the

9    fund?

10         A.    It was -- it was approximately

11   $7 million.

12         Q.    If I was to suggest 7.8 million,

13   would that ring more true or are you sticking

14   with your original answer?

15         A.    It was -- it was approximately 7 --

16   7 to $8 million.  Again, I don't remember the

17   exact number, but it was in that ballpark.

18         Q.    So regardless of whether HCMFA

19   accepted fault or liability, it caused some

20   $7 million or more to be paid out to affected

21   investors in the fund?

22               MR. MORRIS:  Objection to the form

23         of the question.

24         A.    And I want to make sure I'm

25   understanding your question because there is a

1              WATERHOUSE - 10-19-21

2    lot of different entities that are going on to

3    my head.

4              I think what you are saying is based

5    on this error, shareholders were harmed by this

6    approximately $7.8 million -- by approximately

7    $7.8 million.  Is that what you are asking?

8         Q.    Yes, sir.

9         A.    Yes, that was -- again, I don't have

10   the exact numbers.  If I take -- it was -- it

11   was in that ballpark, and there is a detail

12   calculation and write-up that could, that --

13   that exists someplace.

14        Q.    Now, at that time, at the time that

15   the NAV error occurred, was there a contract in

16   place between HCMFA and the debtor pursuant to

17   which the debtor was providing services to

18   HCMFA?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    Yes.

22        Q.    Was that contract generally called a

23   shared services agreement?

24        A.    It was generally called that, but

25   there were -- there were -- I mean, it -- it --

Page 279

```
 1                  WATERHOUSE - 10-19-21

 2   it depends on who you talk to, but yes,

 3   generally, there were -- there are multiple

 4   agreements.

 5        Q.    Pursuant to one or more of those

 6   agreements, was the debtor providing certain

 7   services to HCMFA?

 8            MR. MORRIS:  Objection to the form

 9        of the question.

10        A.    Yes.

11        Q.    And can you at a very high level

12   summarize in 2018 and 2019 what those services

13   were?

14        A.    Yes, there was a -- yes.

15        Q.    Okay.  Please -- please go -- go

16   through a short summary.

17        A.    There was a -- a cost reimbursement

18   agreement between Highland Capital Management

19   Fund Advisors and Highland Capital Management,

20   L.P.  That agreement was for what we referred

21   to as front office services, so investment

22   management, things of that nature.

23            There was I think what most people

24   refer to as the shared services agreement that

25   was -- that agreement was between Highland
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-13   Page 280 of 297 Page 112 of 229   PageID 38453

Page 280

 1              WATERHOUSE - 10-19-21

 2    Capital Management Fund Advisors and Highland

 3    Capital Management for back office services.

 4         Q.    And can you summarize what you mean

 5    by back office services?

 6         A.    Those services were for accounting,

 7    finance, tax, valuation, HR, IT, you know,

 8    legal compliance, things of -- things of those

 9    nature -- or things of that nature, excuse me.

10         Q.    So in the spring of 2019, do you

11    recall whether HCMFA took the position that it

12    was actually Highland that caused the NAV error

13    to occur pursuant to the valuation services

14    that Highland was providing?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    I do not recall.

18         Q.    Did you ever have any discussions

19    with anyone, Jim Dondero or anyone in the first

20    half of 2019 as to whether Highland, the

21    debtor, that is, had any liability to HCMFA

22    related to the NAV error?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I do not recall.

Page 281

1                    WATERHOUSE - 10-19-21

2        Q.    And then you mentioned that the fund

3   was being closed and some compensation related

4   to that.  Can you -- can you elaborate?  What

5   were you referring to?

6        A.    Right.  So the advisor, pursuant to

7   board approval, put a proposal in front of the

8   shareholders of the Highland Global Allocation

9   Fund to convert it from an open-ended fund to a

10  closed-end fund.

11             So an open-ended fund, when

12  shareholders subscribe to the fund or redeem

13  into the fund, they do it at NAV.

14             When it is -- when you have a

15  closed-end fund, closed-end funds are -- are

16  publicly-traded, like on the New York Stock

17  Exchange, exchanges like that, and -- and

18  shareholders or investors, they're not --

19  they're -- they're not subscribing and

20  redeeming with the fund.  They are like shares

21  of Apple.

22             Those shares of the Highland Global

23  Allocation Fund trade on an exchange, and that

24  is how you, you know, that is how, you know,

25  you become an equity owner in the fund or you

1                    WATERHOUSE - 10-19-21

2     sell your shares and you are no longer an

3     equity owner.

4                    As part of that proposal, the

5     advisor told shareholders if you -- if you vote

6     for this proposal to -- to convert it from an

7     open-ended fund to a closed-end fund, we will

8     pay you some amounts of money.  I forgot -- a

9     certain number of points.  I think it was

10    like -- it was like two to three points or

11    something -- something like that.

12         Q.    Okay.  You mentioned when Mr. Morris

13    was asking you, going back to those two

14    promissory notes, you will recall the 5 million

15    and 2.4 million, you mentioned something to the

16    effect that Mr. Dondero told -- told you to pay

17    some moneys out of Highland.  Do you remember

18    that discussion with Mr. Morris?

19         A.    I do.

20         Q.    So, to the best of your

21    recollection, did you have a discussion with

22    Mr. Dondero about making some payments in May

23    of 2019 out of Highland?

24         A.    I recall, as I testified earlier,

25    that I had a conversation with Mr. Dondero

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 289 of 497 Page 115 of 229   PageID 38456

Page 283

1                    WATERHOUSE - 10-19-21

2    for -- for these amounts attributable to -- it

3    was either the error -- you know, the error,

4    and in that conversation he said, go get the

5    money from Highland.  I believe that is what I

6    testified earlier, and that -- that is my

7    recollection.

8         Q.    Do you recall if that was an

9    in-person meeting or some other mode for the

10   meeting?

11        A.    I -- I -- I recall that being

12   in-person.

13        Q.    Do you recall if anyone else was

14   present, or was it just you and Mr. Dondero?

15        A.    I recall just he and I.

16        Q.    And the moneys that he told you to

17   find from -- or get from Highland, was that in

18   the amount of $5 million and $2.4 million?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I believe so, but I would have to go

22   back and look and see when those moneys were

23   actually paid into the -- into the fund and,

24   you know, when those transfers were done.  If

25   they were all done around that same time, then

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 283 of 397   Page 116 of 229   PageID 38457

Page 284

1           WATERHOUSE - 10-19-21

2   yes, I would say it was -- it was all related

3   to that.

4           Q.    Did Mr. Dondero tell you that those

5   funds would be a loan from Highland to HCMFA?

6           A.    I don't recall.

7                 MR. MORRIS:  Objection to the form

8           of the question.

9           Q.    Now, and forgive me, I'm probably

10  the only non-American born here, but I speak

11  reasonably well in English.  I don't recall,

12  does that mean you don't remember or does that

13  mean it didn't happen?

14                MR. MORRIS:  Objection to the form

15          of the question.

16          A.    It -- it means I don't -- I don't

17  remember.

18          Q.    Did Mr. Dondero tell you to have

19  those two promissory notes prepared?

20          A.    I don't recall.

21          Q.    When you -- again, when you say, I

22  don't recall today, that means that sitting

23  here today, you just don't remember one way or

24  the other.  Is that accurate?

25          A.    Yes.

Page 285

1                    WATERHOUSE - 10-19-21

2          Q.     Is it possible that you, having

3     heard what Mr. Dondero said and seeing funds

4     being transferred, assumed that that would be a

5     loan without him actually telling you that

6     would be a loan?

7                    MR. MORRIS:  Objection to the form

8          of the question.

9          A.     Sorry, I want to make sure -- did I

10    ask the amounts that were transferred that I --

11    that -- that I assumed that that was a loan?

12         Q.     Well, let me -- let me take -- let

13    me try again.

14                 So you have established already that

15    there were quite a number of promissory notes

16    back and forth -- I'm sorry, quite a number of

17    promissory notes with affiliated companies and

18    individuals owing Highland money; right?

19         A.     Yes.

20         Q.     And you have established that there

21    were many transactions and transfers going back

22    and forth over the years; right?

23                 MS. DANDENEAU:  Objection to form.

24         A.     In -- yes, in my capacity as CFO and

25    my employment, yes, that is -- yes.

Page 286

1                    WATERHOUSE - 10-19-21

2        Q.    And that's part of the reason why

3    you just can't remember some of the details

4    today because this -- this happened years ago,

5    and there were a number of transactions.  Is

6    that accurate?

7              MS. DANDENEAU:  Objection to the

8         form.

9              MR. MORRIS:  Objection to the form

10        of the question.

11       A.    I mean, I deal with thousands of --

12   of -- of -- of transactions, you know, whether

13   it has -- the processing of transactions, you

14   know, if it has got, you know, more -- more

15   zeros, you know, behind it than others.

16             When you look at thousands of

17   transactions over the years for funds and

18   advisors and -- and, you know, financial

19   statements, I mean, it is -- it is very hard

20   going back in -- in -- in my -- you know,

21   14-ish year career at -- at Highland to

22   remember a lot of those details, especially

23   when I don't have any records or books or

24   anything like that, and -- and going back many

25   years.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 173-13   Exhibit 13   Page 2809 of 2497 Page 119 of 229   PageID 38460

Page 287

                    WATERHOUSE - 10-19-21

1

2       Q.    And that is fine.  That -- that --

3  that is why I asked the question.

4             Is it possible in May of 2019 when

5  Mr. Dondero told you to transfer the funds from

6  Highland, you just assumed on your own that

7  those would be loans without him actually

8  telling you that those would be loans?

9             MR. MORRIS:  Objection to the form

10      of the question.

11      A.    I don't know.

12      Q.    I'm sorry, you --

13      A.    I said I don't know.

14      Q.    Okay.  Well, as the -- as the CFO

15  for Highland, if you saw $7.4 million going

16  out, you would feel some responsibility to

17  account for that, wouldn't you?

18             MR. MORRIS:  Objection to the form

19      of the question.

20      A.    Yes.

21      Q.    Is it fair to say that those would

22  be in the range large enough to rise up to your

23  level?

24             MR. MORRIS:  Objection to the form

25      of the question.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 2809 of 2497   Page 120 of 229   PageID 38461

Page 288

```
 1                 WATERHOUSE - 10-19-21

 2        A.    If -- I don't know if I understand

 3   your question.  Those amounts would arise to my

 4   level where I would be involved or...

 5        Q.    You would want to know what a

 6   transfer for that amount, $7.4 million, was all

 7   about, as the CFO of Highland, wouldn't you?

 8              MR. MORRIS:  Objection to the form

 9        of the question.

10        A.    Yes, I make it -- I mean, I -- I

11   review all sorts of payments, I mean, even

12   smaller dollar payments on a periodic basis,

13   you know, to -- to -- to understand and to make

14   sure that we are paying things in a -- you

15   know, in -- in -- in an informed way.  And, you

16   know -- and we're -- and we're paying things

17   pursuant to vendor contracts and things like

18   that.

19        Q.    So as part of that, is it possible

20   that seeing $7.4 million go out you would have

21   promissory notes made in order to keep a paper

22   trail, assuming that those were loans, when

23   perhaps they were never intended to be loans by

24   Mr. Dondero?

25              MR. MORRIS:  Objection to the form
```

Page 289

1                    WATERHOUSE - 10-19-21

2         of the question.

3         A.    I don't know.  As I testified

4    earlier, I had conversations with Mr. Dondero

5    about -- about the -- the -- the moneys that

6    were needed for the NAV error.  And I recall

7    him saying go get it from Highland -- or get it

8    from Highland.

9         Q.    Well, why did you sign those

10   promissory notes and why didn't you have him

11   sign them?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  I don't know.

15        Q.    You mentioned earlier that you

16   typically don't sign promissory notes.  Am I

17   remembering your testimony correctly?

18              I mean, promissory notes on behalf

19   of the entities.  Not yourself, obviously.

20        A.    Yes, that is what I said earlier.

21        Q.    Do you recall any other promissory

22   notes in the million-plus range that you had

23   ever signed before on behalf of any entity?

24        A.    There is -- there has been a lot of

25   transactions over the years.  I don't -- I

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-38   Page 290 of 397   Page 122 of 229   PageID 38463

Page 290

```
 1                WATERHOUSE - 10-19-21

 2   don't -- I don't recall generally.  I don't --

 3   I don't recall.

 4        Q.    So -- but to the best of your

 5   recollection, it was on your initiative,

 6   following your discussion with Mr. Dondero,

 7   that you had someone draft those two promissory

 8   notes; is that correct?

 9             MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes, we would have -- the team, as I

12   stated earlier, we don't draft promissory

13   notes.  "The team" meaning the accounting and

14   finance team.

15             So the team would have worked with

16   the legal group at Highland to draft any notes.

17        Q.    Do you believe or do you have any

18   recollection as to whether you would have done

19   that pursuant to an email or telephone call or

20   in-person meeting?

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Are you asking if I would have -- if

24   those notes would have been drafted pursuant to

25   an email or phone call?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-33   Filed 09/09/24   Page 123 of 229   PageID 38464

Page 291

                        WATERHOUSE - 10-19-21

1

2      Q.    Strike that.

3            Do you recall whether you sent an

4   email to anyone asking them to draft those two

5   promissory notes?

6      A.    I don't recall because, again,

7   once -- I would have instructed -- likely

8   instructed the team to -- to work with the

9   legal group to draft these documents.

10           I -- I -- I -- yeah, I didn't -- I

11  mean, that is more an operational-type

12  procedure.  So, you know, a manager or a

13  controller or working with legal.  You know,

14  they -- they can certainly handle that task to

15  get that -- you know, to request that from

16  legal.

17     Q.    And who on your team do you think

18  you would have asked to do that?

19           MR. MORRIS:  Objection --

20     Q.    Who would have been the logical

21  person or people, if you don't remember their

22  name today?

23           MR. MORRIS:  Objection to the form

24      of the question.

25     A.    It -- it -- there is only two

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Filed 09/29/23   Page 124 of 229   PageID 38465

Page 292

1                    WATERHOUSE - 10-19-21

2    managers of the group.  That would have been

3    Dave Klos or Kristin Hendrix.

4            Dave was the -- one of his duties

5    was managing the valuation team, and so he was

6    intimately involved with this process.  So, you

7    know...

8        Q.    Okay.

9        A.    I don't recall specifically but, I

10   mean, my general -- you know, I -- I -- I

11   likely would have talked to Dave first about it

12   versus someone like Kristin who hadn't been

13   intimately involved.

14       Q.    And -- and do you have a view as to

15   whether it is most likely that you would have

16   done that by email or in-person or how would

17   you believe you would have communicated that to

18   Mr. Klos?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    I likely would have done that in

22   person.  Again, if things of this nature

23   that -- again, you have to put ourselves back

24   to, we have been working on this very stressful

25   project for many, many months.  And once the

1                    WATERHOUSE - 10-19-21

2   go-ahead was to -- you know, we see the light

3   at the end of the tunnel with wrapping this up

4   and making shareholders whole -- sorry to say

5   "we" -- you know, the -- so the folks that are

6   involved in it.

7            I like to talk to people

8   face-to-face and -- and -- and go to -- and go

9   to their desk, because that shows if I'm going

10  to their desk that -- that is something that I

11  want done, you know.

12       Q.    And do you remember, Mr. Waterhouse,

13  getting those two promissory notes in paper

14  format or by email before they were executed?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I don't recall.

18       Q.    For whatever was the ordinary course

19  back then in May 2019, would you expect to have

20  received them only on paper or would you have

21  expected to have received them in Word document

22  or PDF document by email?

23            MR. MORRIS:  Objection to the form

24       of the question.

25       A.    I -- I didn't sign -- I signed very

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 294 of 397   Page 126 of 229   PageID 38467

Page 294

```
 1                WATERHOUSE - 10-19-21

 2   few documents via email.  I can't say that it

 3   never happened, but people either stopped by my

 4   office and physically walked in documents for

 5   signature that we discussed face-to-face.

 6                Or documents were -- if -- if --

 7   if -- if -- let's say I wasn't there or I

 8   wasn't available, documents were dropped off.

 9   I had -- I had some in- and outboxes in front

10   of my -- my office there at the Crescent.

11                Documents would be dropped off for

12   signature.  There would be a cover sheet that

13   would be -- have been applied to those

14   documents detailing, you know, who dropped it

15   off, the purpose, why, what time.

16                And then, you know, as I stated, I

17   don't draft documents and I always go to the

18   legal group and the compliance group to make

19   sure that they're in the loop.  And there is

20   a -- a box or section that says, Has legal

21   reviewed or approved, or something to that

22   nature.

23                Again, I don't -- I don't have

24   access to that cover sheet anymore, but it

25   was -- it was something to that effect.
```

1          WATERHOUSE - 10-19-21

2          And my assistant, you know, if she

3  was there, she would review that -- you know,

4  whatever was being dropped off.  And if that

5  has legal, you know, reviewed or -- reviewed or

6  approved it, if that wasn't -- if that stuff

7  hadn't been done, it was like she would just

8  tell them like, go -- go -- go to the legal

9  group, because --

10     Q.    Let me -- let me pause --

11           MS. DANDENEAU:  Let him finish.

12           MR. MORRIS:  Thank you.  Go ahead.

13     A.    I take -- go to the legal group

14  because that -- that was my -- you know, I

15  didn't -- I didn't review anything that -- that

16  they weren't -- you know, or there wasn't some

17  representation made to me that they had

18  reviewed, approved in some capacity.

19          Again, my -- my -- my goal, as CFO,

20  is to provide transparency and make sure that

21  groups like compliance and other things -- and

22  the other group in legal are -- are in -- you

23  know, their -- they're made aware of

24  transactions of -- you know, that are crossing

25  my desk.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-13   Page 296 of 397   Page 128 of 229   PageID 38469

Page 296

```
1                     WATERHOUSE - 10-19-21

2                Because I'm not in every

3    conversation.  They're not in every

4    conversation -- meaning legal compliance -- and

5    I just want to make sure that -- that everyone

6    is in sync to, you know, to -- to the extent

7    possible.

8         Q.    So if we summarize, you don't

9    specifically remember signing these two notes,

10   but most likely it would have been that they

11   would have presented -- been presented to you

12   physically on paper?

13               MR. MORRIS:  Objection to the form

14        of the question.

15        A.    They would -- they would have been

16   presented physically on paper most likely or

17   someone would have left it.  But, I mean,

18   again, I don't -- I don't recall.

19        Q.    I understand.  Understand.

20               When you signed -- when you signed

21   documents, when you personally signed

22   documents, did you typically use a ink pen or

23   did you use a stamp?

24        A.    No, I -- I -- I use a -- an -- an

25   ink pen.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 176-13   Filed 09/08/23   Page 129 of 229   PageID 38470

Page 297

1              WATERHOUSE - 10-19-21

2      Q.    Do you know -- was there a file at

3   Highland kept anywhere with ink-signed

4   originals of a promissory notes in general or

5   these two promissory notes specifically?

6              MR. MORRIS:  Objection to the form

7        of the question.

8      A.    Sorry, I just want to make sure I

9   understand your question.  Are you saying is

10  there a file somewhere that has ink-signed

11  originals of these two promissory notes?

12     Q.    Yes.

13     A.    I would -- I would assume they're

14  some place.  I mean --

15     Q.    Well, was there a -- was there a

16  place where Highland generally kept originals

17  of promissory notes owed to it?

18     A.    I wouldn't -- no.

19              MR. RUKAVINA:  Mr. Nguyen, would you

20  please pull up my A7, alpha 7.

21     Q.    These are the two promissory notes,

22  Mr. Waterhouse.

23              (Exhibit A7 marked.)

24     Q.    And please -- Mr. Waterhouse, please

25  command my associate to scroll down as you need

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-18   Page 299 of 397 Page 130 of 229   PageID 38471

Page 298

1           WATERHOUSE - 10-19-21

2    to, but I want you to take a very close look at

3    your two signatures here and tell me whether

4    you believe, in fact, that you ink signed them

5    or whether you --

6                MS. DANDENEAU:  Mr. Rukavina,

7          Mr. Waterhouse has the copies.

8                MR. RUKAVINA:  Perfect.  Then you

9          can take this down, Mr. Nguyen.

10       A.    These -- these -- these signatures

11   are identical, now that I stare at them, and I

12   mean, they are so close -- I mean, they're

13   identical that, I mean, even with my chicken

14   scratch signature, I don't know if I can -- you

15   know, I do this 100 times, could I do that

16   as -- as precisely as I see between the two

17   notes.

18       Q.    Well, that is why I ask.

19   Mr. Waterhouse, now that you have examined

20   them, does it seem like it is more likely that

21   you actually electronically signed these?

22                MR. MORRIS:  Objection to the form

23          of the question.

24       A.    Is -- I don't -- I don't recall

25   specifically.  As I said before, my assistant

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 299 of 497 Page 131 of 229   PageID 38472

Page 299

 1                    WATERHOUSE - 10-19-21

 2    did have a -- an electronic signature, and that

 3    was used from time to time.  It wasn't as

 4    common practice back in 2019.  It definitely

 5    was more common practice when we had to work

 6    from home and remotely for COVID because it

 7    that made it almost impossible to, right,

 8    provide wet signatures since we're all working

 9    from home remotely.

10         Q.    Well, going just for these two

11    promissory notes, Mr. Waterhouse, in light of

12    your inability to remember any details, are you

13    sure you actually signed either or both of

14    those notes?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't recall specifically

17    signing -- actually physically signing these

18    notes.  As I said before, I don't recall doing

19    that.  This -- this looks like my signature,

20    but yet these two signatures are identical.

21         Q.    So you don't recall physically

22    signing them, and I take it you don't recall

23    electronically signing them either?

24         A.    I don't recall.  You know, Highland

25    has all my emails.  If that occurred, you know,

```
 1                  WATERHOUSE - 10-19-21
 2    you know, I don't have any of these records is
 3    what I'm saying.  I don't have any of those
 4    records.
 5         Q.    That is why I'm asking you these
 6    questions in great detail because I don't have
 7    those emails.  I'm trying to -- I'm hoping that
 8    you will give me some names or some details so
 9    I can go look for more emails, but again, you
10    don't remember any -- any individual, other
11    than Mr. Dondero that we've discussed, you
12    don't remember any individual with whom you
13    discussed these promissory notes prior to their
14    execution?
15              MR. MORRIS:  Objection to the form
16         of the question.
17         A.    I don't recall discussing it with
18    anybody else.
19         Q.    Okay.
20         A.    I mean, prior --
21         Q.    I understand.
22         A.    You know, there was no one else --
23    there was no one else in that meeting that I
24    recall with Mr. Dondero.
25         Q.    Now, when you established that by
```

1                    WATERHOUSE - 10-19-21

2    May of 2019 --

3         A.    And -- and from what I recall, and

4    the reason why I was by myself is -- is, you

5    know, I don't -- I don't want to speculate, I'm

6    sorry.

7         Q.    Okay.  We have established that by

8    May of 2019, in your view, the liabilities of

9    HCMFA exceeded its assets; correct?

10        A.    Yeah.  I mean, again, I don't have

11   financial statements in front of me, but I

12   think, if I recall, we'd have to go through the

13   testimony with Mr. Morris, I believe that was

14   the case.

15        Q.    In fact, you will recall that in

16   April of 2019, Mr. Dondero signed a document

17   that extended the demand feature of two prior

18   notes to May 31, 2019.  Do you recall that?

19             MS. DEITSCH-PEREZ:  I think you

20        might -- maybe have the court reporter read

21        that back.  You might have misspoke.

22             (Record read.)

23             MR. RUKAVINA:  And I did misspeak.

24        Q.    I meant to say to May 31, 2021.  Do

25   you recall that, sir?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77-38   Page 302 of 297 Page 134 of 229   PageID 38475

Page 302

WATERHOUSE - 10-19-21

 1                 MR. MORRIS:  Objection to the form

 2      of the question.

 3      A.    Yes.

 4                 MR. RUKAVINA:  And, Mr. Nguyen, just

 5      so that the record is clear, will you please

 6      pull up my Exhibit Alpha 10, A10.

 7                 (Exhibit A10 marked.)

 8      Q.    You don't have this one in front of

 9      you, Mr. Waterhouse?  This is the one that

10      Mr. Morris used earlier.  Do you see that

11      document, sir?

12      A.    Yes, I do.

13      Q.    And this is what you were testifying

14      about before when Mr. Morris was asking you.

15      Do you remember that?

16      A.    Yes.

17      Q.    So here is my question for you,

18      Mr. Waterhouse:  As the chief financial officer

19      of Highland, was it prudent for Highland less

20      than three weeks later to be lending

21      $7.2 million to an insolvent entity that

22      couldn't even then pay its debts back to

23      Highland?

24                 MS. DANDENEAU:  Objection to form.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Page 309 of 397Page 135 of 229   PageID 38476

Page 303

1              WATERHOUSE - 10-19-21

2              MR. MORRIS:  Objection to the form

3      of the question.

4      A.    Sorry, I just want to make sure --

5   are you asking me, did you say, was it prudent

6   for Highland to loan $7.4 million to HCMFA a

7   few weeks after this document was executed?

8      Q.    Yes, and at a time when HCMFA's

9   liabilities exceeded its assets.

10             MR. MORRIS:  Objection to the form

11      of the question.

12      A.    I don't -- it is odd.  I don't know.

13             MR. RUKAVINA:  You can take this

14   exhibit down, Mr. Nguyen.

15      Q.    Do you recall asking anyone,

16   Mr. Dondero or -- or anyone outside as to

17   whether Highland ought to be lending

18   $7.4 million to HCMF regarding HCMF's

19   creditworthiness?

20             MR. MORRIS:  Objection to the form

21      of the question.

22      A.    I don't recall.

23      Q.    Did you receive personally any of

24   that $7.4 million?

25      A.    No.

```
 1                  WATERHOUSE - 10-19-21

 2       Q.    Did you even --

 3             MR. MORRIS:  I didn't hear that

 4       question, sir.

 5             MR. RUKAVINA:  The one that he

 6       answered, John, or my new one?

 7             MR. MORRIS:  No, no, your question,

 8       Davor.

 9             MR. RUKAVINA:  I had asked him

10       whether he received any of the

11       $7.4 million.  He said no.

12             MR. MORRIS:  Yeah.  I thought there

13       was a question after that.  Maybe I was

14       mistaken.  I apologize.

15             MR. RUKAVINA:  I had started a new

16       question, so here, let me start the new

17       question again.

18       Q.    Did you personally receive any

19  direct benefit from those two notes for

20  $7.4 million?

21       A.    No.

22       Q.    Did you ever personally consider

23  yourself obligated to repay either or both of

24  those notes?

25       A.    No.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-13   Page 305 of 497 Page 137 of 229   PageID 38478

Page 305

1                   WATERHOUSE - 10-19-21

2                   MR. RUKAVINA:  Pull up those notes

3     again, Mr. Nguyen.

4          Q.    You can have them in front of you,

5     Exhibit 7, Mr. Waterhouse, whatever is easier

6     for you.  If you go to your signature page, my

7     question to you is, why did you not include

8     your title as treasurer by your name, Frank

9     Waterhouse?

10                  MS. DANDENEAU:  Objection to form.

11         A.    I didn't -- I didn't draft this

12    document.

13         Q.    So you relied on whoever drafted it

14    to draft it correctly?

15         A.    Yes.

16         Q.    Okay.  But back then when you signed

17    this, did it ever cross your mind that you were

18    the maker on these notes?

19         A.    No.

20         Q.    Back then when you signed this

21    document, did it ever cross your mind that you

22    could be a co-obligor on these notes?

23         A.    No.  I didn't receive $7.4 million,

24    I mean...

25         Q.    But can you say that HCMFA received

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-38   Page 3009 of 2497   Page 138 of 229   PageID 38479

Page 306

WATERHOUSE - 10-19-21

1    $7.4 million?

3    A.    I would have to go back and look and

4    check in, you know, the -- the financial

5    records and the bank statements.

6         MR. RUKAVINA:  You can take this

7    exhibit down, Mr. Nguyen.

8    Q.    Mr. Waterhouse, I'm not trying to be

9    a smart-ass, but if the law says that because

10   of the way that you signed this promissory

11   note, if that is what the law says, that that

12   made you personally -- personally liable, then

13   you would agree with me that that was never

14   your intent?

15        MR. MORRIS:  Objection to the form

16        of the question.

17   A.    That was never -- I wouldn't sign a

18   note and not get consideration in return.

19   Q.    So putting all other issues aside,

20   if the law -- if the law says that you were

21   liable for those notes because of how you

22   signed them, then would you agree with me that

23   these notes are a mistake?

24        MR. MORRIS:  Objection to the form

25        of the question.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-38   Page 307 of 397   Page 139 of 229   PageID 38480

Page 307

1                    WATERHOUSE - 10-19-21

2                    MS. DANDENEAU:  Objection to the

3         form.

4         A.    Yes.

5         Q.    So do you agree with me that it's

6    odd -- I think that is the word you used --

7    that Highland would be loaning $7.4 million a

8    few weeks after that extension to an entity

9    whose liabilities exceeded its assets, and you

10   would agree with me that it was never your

11   intention to be in any way liable for these two

12   promissory notes; correct?

13                   MR. MORRIS:  Objection to the form

14        of the question.

15        A.    Sorry, you -- you asked a lot there.

16                   MR. RUKAVINA:  I will strike it and

17   I will move on.

18                   Let's go to -- pull up Exhibit 9,

19   please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20   9, A9.

21                   (Exhibit A9 marked.)

22        Q.    Sir, take a moment to look at this,

23   but this is an email, and you will see attached

24   July 31, 2020 affiliate notes.

25                   Do you see that attachment?

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    Okay.  And do you see an entry for

4    Highland Capital Management Fund Advisors?

5             MR. MORRIS:  I'm sorry, hold on.

6        Where are you looking?

7             MR. RUKAVINA:  Last page, John.

8             MR. MORRIS:  Is it the page on the

9        screen?

10            MR. RUKAVINA:  Oh, I'm sorry.

11       Mr. Nguyen just did it.  Yes, the last page

12       there.

13            MR. MORRIS:  Thank you.

14       Q.    Do you see an entry there for HCMFA?

15       A.    Yes.

16       Q.    About $10.5 million.

17            Do you see that?

18       A.    I do.

19       Q.    And, now, do you have any

20   explanation for why if HCMFA owed $7.4 million,

21   plus the 5.3 million that had been extended,

22   why that amount was only 10.5 million?

23       A.    I don't know.  Okay.

24            MR. RUKAVINA:  Close this one and

25       pull up, Mr. Nguyen, the schedules,

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Page 309 of 497 Page 141 of 229   PageID 38482

Page 309

 1                    WATERHOUSE - 10-19-21

 2         schedule of assets.  What exhibit is this

 3         of ours, Mr. Nguyen?

 4                   MR. NGUYEN:  This is A11.

 5                   MR. RUKAVINA:  Oh, this will be A11.

 6                   (Exhibit A11 marked.)

 7         Q.    You don't have this in front of you,

 8    Mr. Waterhouse?

 9         A.    Okay.

10         Q.    This is what Mr. Morris used

11    earlier.  Do you remember looking at this with

12    Mr. Morris?

13         A.    Yes.

14                   MR. RUKAVINA:  You might have to

15         zoom in a little.  Okay.

16         Q.    Now, I see Affiliate Note A, B, and

17    C.

18               Do you have any recollection as to

19    why the names of the affiliates are omitted?

20         A.    I don't.  I testified earlier that,

21    you know, the team worked with DSI in providing

22    these.  I -- I don't -- I don't know.

23         Q.    Can we deduce -- is it logical to

24    deduce that Affiliate Note A would be NexPoint

25    given its size of $24.5 million?

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 171-38    Page 31 of 2497    Page 142 of 229    PageID 38483

Page 310

 1                    WATERHOUSE - 10-19-21

 2                    MR. MORRIS:  Objection to the form

 3         of the question.

 4         A.    I mean, it -- it is a -- it is -- it

 5    is approximate.

 6         Q.    Well, can we -- can we deduce -- or,

 7    I'm sorry, strike that.

 8                    Can you, sitting here today,

 9    logically conclude that Affiliate Note B or C

10    represents HCMFA?

11                    MR. MORRIS:  Objection to the form

12         of the question.

13         A.    I don't know.  I don't know.  I

14    can't.

15         Q.    Okay.  As of the petition date, we

16    have established that HCMFA, under promissory

17    notes, owed $7.4 million and $5.3 million to

18    the debtor; correct?

19                    MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Okay.  And by my reckoning, that

23    would be somewhere approaching $13 million.

24                    MR. MORRIS:  Objection to the form

25         of the question.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-13   Page 143 of 229   PageID 38484
Exhibit 13   Page 310 of 397

Page 311

 1                   WATERHOUSE - 10-19-21

 2        Q.     It would be $12.7 million.  Is that

 3   generally correct?

 4        A.     Sorry, the amounts were 7.4, 5.3.

 5        Q.     Yes.

 6        A.     Okay.  Yeah, that -- that -- I can

 7   do that math, yes.

 8        Q.     Do you have any explanation or any

 9   understanding of why there is no similar entry

10   listed here on the schedule of assets filed

11   with the bankruptcy court?

12             MR. MORRIS:  Objection to the form

13        of the question.

14        A.     I don't know.  We have to look at

15   the supporting schedules, like I talked about

16   other -- presumably there is -- there is a

17   build to the schedule that would provide the

18   detail.

19        Q.     Well, that was going to be my next

20   question.  You anticipated it.

21             MR. RUKAVINA:  You can -- you can

22        take this down, Mr. Nguyen.

23        Q.     Do you believe that whenever you and

24   your team provided the underlying data to the

25   financial advisor that the actual names of the

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 1-38  Page 312 of 497  Page 144 of 229   PageID 38485

Page 312

1                    WATERHOUSE - 10-19-21

2    affiliates for Affiliate Note A, B, and C would

3    have been listed there?

4         A.    Are you asking we provided the names

5    to the financial advisor?  I don't -- I don't

6    understand who the financial advisor is.

7         Q.    I'm sorry, DSI.

8              Let me ask the question this way,

9    Mr. Waterhouse.

10              Whenever you provided information

11   about the affiliate notes to DSI, do you

12   believe that you would have included the actual

13   names of the affiliates, you or your team, or

14   that you would have done the Affiliate Note A,

15   Note B, Note C?

16              MR. MORRIS:  Objection to the form

17        of the question.

18              MS. DANDENEAU:  Objection to the

19        form.

20        A.    We -- like I testified earlier, when

21   we were -- we gave everything to -- to DSI.  We

22   were giving all of our records, all of our

23   files, everything to DSI.  We weren't redacting

24   information or saying, hey, here is a note,

25   here is Affiliate Note A or B.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-18   Page 3109 of 2497 Page 145 of 229   PageID 38486

Page 313

```
1                    WATERHOUSE - 10-19-21

2               I mean, it was -- our job and our

3    focus -- and I testified in court back in 2019;

4    right -- was -- was to be transparent and, you

5    know, get DSI up to speed on -- on the matters

6    at Highland.  So I can't see us redacting at

7    that point.

8               MR. RUKAVINA:  Mr. Nguyen, will you

9          please pull up Mr. Morris' Exhibit 36.

10         Just the very first page, the very top

11         email.  You might zoom in a little bit.

12         Q.    Now, you recall being asked about

13   this by Mr. Morris?

14         A.    Yes, I do.

15         Q.    And you wrote:  The HCMFA note is a

16   demand note.

17              You wrote that; right?

18         A.    Yes.

19         Q.    And, in fact, weren't there by that

20   point in time several notes?

21         A.    Yes, there were.  Again, I don't --

22   I don't remember everything specifically.  I

23   mean --

24         Q.    I understand.  I understand.

25              So this is an example where -- where
```

```
 1                    WATERHOUSE - 10-19-21
 2    you might have made a mistake by referring to a
 3    singular instead of a plural; right?
 4         A.    Yes.
 5         Q.    Okay.  And you -- you wrote -- a
 6    couple of sentences later, you wrote:  There
 7    was an agreement between HCMLP and HCMFA the
 8    earliest they could demand is May 2021.
 9              You wrote that; right?
10         A.    Yes.
11         Q.    But I think you -- you agreed with
12    Mr. Morris that that can't possibly apply to
13    the May 2019 notes, can it?
14              MR. MORRIS:  Objection to the form
15         of the question.  That is not what he
16         testified to.
17         Q.    Let me ask -- let me ask a different
18    question.
19              Sitting here today -- or if you can
20    answer me from your memory on October 6,
21    2020 -- did the April acknowledgment that
22    extended the maturity date apply to the
23    May 2019 notes also?
24         A.    I don't recall specifically.
25         Q.    Well, you recall that the notes that
```

1                    WATERHOUSE - 10-19-21

2     you signed were demand notes; right?

3          A.    Yes.

4          Q.    Do you find it logical, based on

5     your experience, that had they intended to have

6     a different or a set maturity date, you would

7     have instructed that that set maturity date be

8     included instead of a demand feature?

9               MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Sorry, just want to make sure I

12    understand.  You are saying that -- that the

13    $5 million note, the $2.4 million note, if

14    those were supposed to be a term note, that I

15    would have made sure that those were a term

16    note?

17         Q.    I'm saying -- I'm saying,

18    Mr. Waterhouse, that on May the 2nd and May the

19    3rd, 2019, if you intended that those two

20    promissory notes could not be called until May

21    2021, would you have included such language in

22    those two promissory notes?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I guess -- I'm sorry, I don't recall

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 31 of 397   Page 148 of 229   PageID 38489

Page 316

```
 1                 WATERHOUSE - 10-19-21

 2   putting language in those May notes.  I don't

 3   remember what language you are referring to.

 4        Q.    Well, let's read this again.

 5              There was an agreement between HCMLP

 6   and HCMFA the earliest they could demand is May

 7   2021.

 8              Do you recall that agreement?

 9        A.    Yes, that was the agreement we

10   looked at earlier; correct?

11        Q.    Okay.  Yes.

12              Do you -- do you understand now that

13   that agreement that we looked at earlier also

14   applied to the May 2019 notes that you signed?

15        A.    I don't -- I don't know.

16        Q.    But as of October 6, 2020, you're

17   writing that there is one demand note and

18   you're categorizing that demand note as not

19   being demandable on May 2021; correct?

20        A.    Yes.

21        Q.    And you know now that you made at

22   least one mistake in this email; correct?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    Yes.
```

 1                 WATERHOUSE - 10-19-21

 2                 MR. RUKAVINA:  You can pull this

 3        down, Mr. Nguyen.

 4        Q.    So, Mr. Waterhouse, you don't

 5   remember Mr. Dondero telling you to make these

 6   loans or not.  HCMLP was loaning $7.4 million

 7   to someone that their assets were less than

 8   their liabilities.

 9            We don't see on the July list of

10   notes, where there is $12.7 million of notes,

11   we don't see that on the bankruptcy schedules,

12   and we have this Exhibit 36 where you are

13   confused.

14            Are you prepared to tell me, sir,

15   today that you might have made a mistake in

16   executing those two promissory notes?

17            MR. MORRIS:  Objection to the form

18        of the question.

19        A.    I -- I don't know.

20        Q.    And if it turns out that you're

21   personally liable for those promissory notes,

22   it would certainly be a mistake, wouldn't it?

23            MS. DANDENEAU:  Objection to the

24        form.

25            MR. MORRIS:  Join.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-18   Page 150 of 229   PageID 38491

Page 318

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    If Mr. Dondero testifies that he

4    never told you to make these loans, would you

5    disagree with his testimony?

6              MR. MORRIS:  Objection to the form

7         of the question.

8        A.    Like I testified earlier with my

9    conversation with Mr. Dondero, all I recall is

10   he said, get the money from Highland.

11       Q.    And if Mr. Dondero testifies that

12   he, in consultation with other senior personnel

13   at Highland, decided that Highland needed to

14   pay HCMFA $7.4 million as compensation for the

15   NAV error and not a loan, would you have any

16   reason to disagree with Mr. Dondero?

17             MR. MORRIS:  Objection to the form

18        of the question.

19       A.    If that was -- if that was his

20   intent, yes, it would -- I would --

21       Q.    Do you have any reason to disagree

22   with him?

23             MR. MORRIS:  Objection to the form

24        of the question.

25       A.    If that was his intent, I don't

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-18   Page 151 of 229   PageID 38492

Page 319

1                    WATERHOUSE - 10-19-21

2     know.  I don't know how I disagree with that.

3          Q.    And just to confirm, you don't

4     remember ever asking Mr. Dondero whether you

5     should have two promissory notes prepared?

6          A.    No.

7          Q.    And you don't remember discussing

8     with Mr. Dondero what the terms of those two

9     promissory notes should be?

10         A.    I don't recall -- I testified all I

11    recall is he said, get the money from Highland.

12    I don't -- the -- the terms of the note, I

13    don't recall ever having a discussion around

14    the terms of the note, but since I don't draft

15    the notes, that -- there could have been a

16    conversation with other people later.

17         Q.    Do you have any memory of whether

18    after the notes were drafted, but before you

19    signed them, that you communicated with

20    Mr. Dondero in any way to just confirm or -- or

21    get his blessing or ratification to signing

22    those notes?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I don't recall.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-13   Page 320 of 397 Page 152 of 229   PageID 38493

Page 320

```
1                    WATERHOUSE - 10-19-21

2        Q.    Again, the only thing you remember,

3   sitting here today, was Mr. Dondero said, get

4   the money from Highland, and that is it, that

5   is all you remember?

6             MR. MORRIS:  Objection to the form

7        of the question.

8        A.    I testified to that several times.

9   This was over two years ago.  A lot has

10  happened.  That is all I recall.

11       Q.    And help me here.  I'm not very

12  technologically astute.  When you -- and I -- I

13  recognize that you do it rarely, but when you

14  sign a document electronically, do you believe

15  that there is an electronic record of you

16  having authorized or signed a document

17  electronically?

18            MR. MORRIS:  Objection to the form

19       of the question.

20       A.    I -- I don't know the tech answer to

21  that, but, you know, since I don't have -- I

22  don't ever attach my signature block

23  electronically, my assistant would have done

24  that, and if that is done over email like we

25  did several times -- you know, multiple,
```

```
 1                    WATERHOUSE - 10-19-21
 2    multiple times over COVID, she would attach my
 3    signature block and then email it out to
 4    whatever party.
 5         Q.    What was your assistant's name in
 6    May 2019?
 7         A.    It was Naomi Chisum.
 8         Q.    Is she the only one?  I'm sorry, was
 9    she your only assistant that would have maybe
10    facilitated logistically something like you
11    just described?
12         A.    You know, she was out on maternity
13    leave at some point.  I don't -- I don't recall
14    those dates where she was out for maternity
15    leave.  There was -- there were folks backing
16    her up.  I don't recall specifically who
17    those -- who those, you know, administrative
18    assistants were, and I don't recall
19    specifically if she was out during this time on
20    maternity leave.
21              I do know that that she was out for
22    a period of time, or who knows, or she could
23    have been on vacation that day or, you know, I
24    don't know.
25         Q.    Switching gears now, the two
```

Page 322

1                  WATERHOUSE - 10-19-21

2    complaints that have been filed that is against

3    HCMFA and NexPoint, did you see any drafts of

4    those complaints before they were filed?

5              MR. MORRIS:  Objection to the form

6         of the question, and to the extent that you

7         had any communications with counsel or you

8         were shown drafts of the complaints by

9         counsel while you were employed by

10        Highland, I direct you not to answer.

11       A.    I -- I reviewed documents yesterday

12   with counsel here.  I believe that is the first

13   time I have ever seen those.

14       Q.    Okay.  Did you ever discuss with

15   Mr. Seery these two lawsuits before or after

16   they were filed?

17       A.    I don't recall.

18       Q.    Were you ever interviewed by legal

19   counsel, to your knowledge, about these

20   promissory notes before the complaints were

21   filed?  Without going into what was said, were

22   you ever interviewed by legal counsel?

23              MR. MORRIS:  Objection to the form

24        of the question.

25       A.    I don't recall.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 71-13   Page 3209/2497   Page 155 of 229   PageID 38496

Page 323

```
 1                    WATERHOUSE - 10-19-21

 2         Q.    Obviously with COVID, it changed,

 3   but -- but before COVID, did you used to meet

 4   with Mr. Seery from time to time in-person?

 5         A.    Yeah, I mean, so before COVID -- so

 6   we're talking kind of late March, early April,

 7   right, there was about -- I don't remember the

 8   specific date when the board for Highland was

 9   appointed.  I believe it was around February of

10   2020, so maybe there was a month-and-a-half,

11   two-month window where we were meeting

12   in-person or, you know, like we were actually

13   in the office, excuse me, we were in the

14   office.

15              And, you know, when they were first

16   appointed, the board members and Mr. Seery

17   were -- were definitely down here more

18   in-person.

19         Q.    Did you ever see Mr. Seery taking

20   written notes of -- of his meetings with you or

21   others?

22         A.    I don't recall.

23         Q.    Do you recall on any Zoom or video

24   conference with Mr. Seery, seeing him take

25   notes, written notes?
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-33   Page 324 of 397 Page 156 of 229   PageID 38497

Page 324

```
 1                  WATERHOUSE - 10-19-21

 2        A.    The Zoom calls we had, I don't

 3   recall having seen video or, you know, or if it

 4   was on Zoom, I just remember it being -- well,

 5   no, you know what, there were some -- you know,

 6   I take that back.

 7              So there were -- there were some

 8   times that I did remember seeing Mr. Seery

 9   on -- on some of the Zoom calls.

10        Q.    Well, let me --

11        A.    I don't -- sorry, I'm thinking.  I'm

12   thinking -- I'm going back.  I'm trying to

13   process this.

14        Q.    I can make it much quicker,

15   Mr. Waterhouse.  I have heard -- I have heard

16   that Mr. Seery is a copious note taker.

17              Do you have any knowledge about

18   that?

19        A.    No.

20        Q.    Okay.  Switching gears yet again,

21   and this will be last theme.  Do you need a

22   restroom break, or are you good to go for

23   another half an hour?

24              MS. DEITSCH-PEREZ:  I need a

25        restroom break.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Exhibit 13   Page 325 of 397   Page 157 of 229   PageID 38498

Page 325

```
 1                WATERHOUSE - 10-19-21

 2             MR. RUKAVINA:  Can we make it five

 3        minutes?

 4             THE WITNESS:  Five minutes would be

 5        great.

 6             VIDEOGRAPHER:  We're going off the

 7        record at 5:53 p.m.

 8        (Recess taken 5:53 p.m. to 5:59 p.m.)

 9             VIDEOGRAPHER:  We are back on the

10        record at 5:59 p.m.

11        Q.    Mr. Waterhouse, I had asked you

12   earlier about contracts between HCMFA and the

13   debtor, and now I'm going to talk about

14   contracts between the debtor and NexPoint

15   Advisors.  Okay?

16        A.    Okay.

17        Q.    Now, were there contracts similar to

18   the ones with HCMFA that NexPoint had in the

19   nature of employee reimbursement and shared

20   services?

21        A.    Yes, they -- NexPoint Advisors and

22   Highland Capital Management Fund Advisors had

23   cost reimbursement and shared services

24   agreements with Highland Capital Management,

25   L.P.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 320 of 397 Page 158 of 229   PageID 38499

Page 326

1          WATERHOUSE - 10-19-21

2       Q.    And was that shared services

3   agreement, to the best of your understanding,

4   in place as of December 31, 2020?

5       A.    It was -- it was terminated at some

6   point, and I remember the contracts had

7   different termination dates, but I think the --

8   the date of termination was January 31st of

9   2021, after the termination was put in.

10            So yeah, it would be in place at the

11   end of the year of December -- it would be in

12   place at December 31st, 2020.

13       Q.    And pursuant to that agreement as of

14   December 31st, 2020, was the debtor providing

15   what you would describe as back office services

16   to NexPoint?

17       A.    Yes.

18       Q.    Would those have included accounting

19   services?

20       A.    Yes.

21       Q.    And as part of those accounting

22   services, would the debtor have assisted

23   NexPoint with paying its bills?

24            MR. MORRIS:   Objection to the form

25       of the question.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-18   Page 3209/2497Page 159 of 229   PageID 38500

Page 327

 1                     WATERHOUSE - 10-19-21

 2          A.     Yes.

 3          Q.     So let's break that up.  You were a

 4     treasurer of NexPoint as well in December of

 5     2020?

 6                 MR. MORRIS:  Objection to the form

 7          of the question.

 8          A.     Yes.

 9          Q.     Okay.  And in December of 2020, did

10     NexPoint have its own bank accounts?

11          A.     Yes.

12          Q.     And did it use those bank accounts

13     to pay various of its obligations?

14          A.     Yes.

15          Q.     Did employees of the debtor have the

16     ability to cause transfers to be made from

17     those bank accounts on behalf of NexPoint?

18          A.     Yes.

19          Q.     And is that one of services that the

20     debtor provided NexPoint, basically ensuring

21     that accounts payable and other obligations

22     would be paid?

23          A.     Yes.

24                 MR. MORRIS:  Objection to the form

25          of the question.

Page 328

1                    WATERHOUSE - 10-19-21

2        Q.    You answered yes?

3        A.    Yes.

4        Q.    And the payments, though, whose

5   funds would they be made from?

6        A.    From the bank account of NexPoint

7   Advisors.  If they were NexPoint advisor

8   obligations, it would be made from NexPoint

9   Advisors' bank account.

10       Q.    So let's pull up Exhibit Alpha 1.

11  You should have that -- it is my Tab 1 or my

12  Exhibit 1.

13             (Exhibit A1 marked.)

14       Q.    So this is a -- this is a series of

15  emails, Mr. Waterhouse.  Let's look at the

16  first page here, November 25, 2020, between

17  Kristin Hendrix and yourself.

18             Do you see that, sir?

19       A.    I do.

20       Q.    And do you see where Ms. Hendrix

21  writes:  NPA.

22             Do you know what NPA stood for?

23       A.    Yes.

24       Q.    And what does it stand for?

25       A.    NexPoint Advisors.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-13   Page 329 of 497   Page 161 of 229   PageID 38502

Page 329

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    And was that how you-all internally

 3   at Highland refer to NexPoint Advisors, L.P.?

 4        A.    I mean, yes, amongst other things.

 5        Q.    And she writes at the bottom of her

 6   email:  Okay to release?

 7              Do you see that?

 8        A.    Yes, I do.

 9        Q.    So what --

10              MR. MORRIS:  Hold on one second.

11              Okay.  Go ahead.

12              MR. RUKAVINA:  Yeah.

13        Q.    So what is -- what is Ms. Hendrix

14   here on November 25 asking of you?

15        A.    She is asking me -- so she -- these

16   are -- these are payments -- typically we would

17   do an accounts payable run every week at the

18   end of every Friday.  But looking at this date,

19   it is Wednesday, November 25th, which means, to

20   me, it is likely Thanksgiving weekend.

21              So this is the day before

22   Thanksgiving, so this is the last kind of --

23   kind of day before the holidays and vacation

24   and things of that nature.  So it is

25   effectively the Friday of that week.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-18   Page 330 of 497 Page 162 of 229   PageID 38503

Page 330

```
 1                    WATERHOUSE - 10-19-21

 2              So she is -- she is putting in all

 3    the payments for the week because we batch

 4    payments weekly.  And these are the payments

 5    that go out that week, and she is informing me

 6    of the payments and -- you know, again, at the

 7    bottom of the email, she is asking for my okay

 8    to -- to release these payments in the wire

 9    system.

10         Q.    So these would be accounts payable

11    of NexPoint?

12         A.    I mean, it would be accounts payable

13    for all of these entities listed on this email.

14         Q.    And who was Ms. Hendrix employed by

15    in November and December of 2020?

16         A.    Highland Capital Management.

17         Q.    Okay.  So -- so part of the services

18    that NexPoint had contracted with was for

19    Highland to ensure that NexPoint timely paid

20    its accounts payable; is that accurate?

21              MR. MORRIS:  Objection to the form

22         of the question.  You have got to be

23         kidding me.

24         Q.    Is that accurate?

25         A.    Yes.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77-13   Page 163 of 229   PageID 38504

Page 331

```
1                    WATERHOUSE - 10-19-21

2        Q.    And did NexPoint rely on employees

3   of the debtor to ensure that NexPoint's

4   accounts payable were timely paid?

5             MR. MORRIS:  Objection to the form

6        of the question.

7        A.    Yes.

8             MR. RUKAVINA:  Let's flip to the

9        next page, Mr. Nguyen, if you will please

10        scroll to the next page.

11        Q.    So this is an email similar to the

12   prior one, November 30th.

13             Do you see where it says, NPA HCMFA,

14   USD $325,000 one-day loan?

15             Do you see that, sir?

16        A.    I do.

17        Q.    Do you have any memory of what that

18   was?

19        A.    I don't recall what that -- what

20   that payment was for.

21        Q.    Did it sometimes occur that one

22   advisor would, on very short-terms, make loans

23   to another advisor?

24        A.    Yes.  This -- this -- this occurred

25   from -- from -- from time to time.  It actually
```

Page 332

1                      WATERHOUSE - 10-19-21

2    looking at -- I'm -- I'm looking at the date of

3    this email.  It is November 30th.  It is the

4    last day of the month.

5                      HCMFA has obligations it needs to

6    pay to its broker-dealer, which is HCFD.  And

7    it likely was short funds to make those

8    obligations under that -- under its agreement,

9    and so it provided a one-day loan because on

10   the next business day on 12/1 -- or the next

11   business day in December, it would receive

12   management fees from the underlying funds that

13   it managed and it would be able to pay back

14   that loan to NexPoint Advisors.

15        Q.    So -- so here Ms. Hendrix was

16   seeking your approval to transfer $325,000 from

17   NexPoint to HCMFA for a one-day loan; is that

18   correct?

19        A.    That is correct.

20        Q.    Let's flip to the next page, sir.

21              MR. RUKAVINA:  And, Mr. Nguyen, if

22        you will please scroll down.

23        Q.    Now we have as an entry for

24   $325,000, 11/30 loan payment.

25              Do you see that, sir?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 173-33   Page 3339 of 3497   Page 165 of 229   PageID 38506

Page 333

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And that is probably the loan that

4   was approved on the prior page?

5        A.    Yes, most likely.

6        Q.    So is it also true, sir, that in

7   addition to accounts payable debtor employees

8   would be assisting NexPoint with respect to

9   paying back its debt?

10            MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I mean, yes, for loans of this

13  nature, yes.

14       Q.    Well, what about long term loans?

15  Was it reasonable for NexPoint to expect debtor

16  employees to ensure that NexPoint timely paid

17  its obligations under long-term notes?

18            MR. MORRIS:  Objection to the form

19       of the question.

20            MS. DANDENEAU:  Objection to form.

21       A.    I mean, that is one of the things

22  that the Highland personnel did provide to the

23  advisors.  Yes, we would -- we would -- over

24  the years, yes, we -- we -- we -- we did do

25  that generally.  Again, I don't remember

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-18   Page 3309/2497   Page 166 of 229   PageID 38507

Page 334

```
1                   WATERHOUSE - 10-19-21

2    specifically but, yes, generally we -- you

3    know, we did do that.

4         Q.    So do you recall -- and we can pull

5    it up, if need be -- that under the NexPoint

6    note that Mr. Morris asked you about earlier,

7    the one for more than $30 million, that

8    NexPoint was obligated to make an annual

9    payment of principal and interest?

10              MR. MORRIS:   Objection to the form

11        of the question.

12        A.    Yes, it was -- yes, it -- it was an

13   amortizing note.   It was -- you know, from what

14   we reviewed earlier, it was payable by

15   December 31st of each year.   So -- but are --

16   are you asking me --

17        Q.    I'm just asking you, sir, if you

18   recall the note.

19        A.    Yes, the $30 million note, yes, we

20   reviewed it earlier, yes.

21        Q.    And do you recall Mr. Morris had you

22   go through the fact that NexPoint had made

23   payments in years prior to 2020 on that note?

24        A.    I do.

25        Q.    And do you believe that employees of
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 335 of 497   Page 167 of 229   PageID 38508

Page 335

WATERHOUSE - 10-19-21

1  the debtor would have played any role in

2  NexPoint having made those prior payments?

3        MR. MORRIS:  Objection to the form

4     of the question.

5  A.    Yes.

6  Q.    And what role in years prior to 2020

7  would employees of the debtor have had with

8  respect to NexPoint making that annual payment?

9  A.    We -- we -- we would have -- I keep

10 saying "we."  The team would have calculated

11 any amounts due under that loan and other

12 loans, as -- as standard course.

13        We would -- since we provided

14 treasury services to the advisors, we would

15 inform the -- the -- the -- we informed

16 Mr. Dondero of any cash obligations that are

17 forthcoming, whether we do cash projections.

18        If, you know, any of these payments

19 would have -- or, you know, the sum total of

20 all of these payments, including any note

21 payments, if there were any cash shortfalls, we

22 would have informed Mr. Dondero of any cash

23 shortfalls.  We could adequately plan, you

24 know, in instances like that.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-18   Page 336 of 497   Page 168 of 229   PageID 38509

Page 336

1                    WATERHOUSE - 10-19-21

2                    Or, sorry, we -- I say "we" -- I

3   keep saying "we" -- I keep wearing my -- again,

4   my -- my treasurer hat.

5                    But, yes, it is to -- it is to

6   inform Mr. Dondero of the obligations of the

7   advisors in terms of cash and obligations that

8   are -- are upcoming and that -- and that are --

9   are scheduled to be paid.

10       Q.    And would those obligations that are

11  upcoming and scheduled to be paid prior to 2020

12  have incurred the annual payment on that

13  NexPoint $30 million note?

14                   MS. DANDENEAU:  Objection to form.

15                   MS. DEITSCH-PEREZ:  Davor, I think

16            you misspoke.  You might want to just

17            repeat the question.

18       Q.    Okay.  Let me repeat the question,

19  sir.

20                   Prior to 2020, those services that

21  you just described, would that -- on behalf of

22  the debtor, would that have included NexPoint's

23  payments on the $30 million note?

24       A.    Yes.

25       Q.    So someone at the debtor in treasury

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77-13   Page 3309 of 2497 Page 169 of 229   PageID 38510

Page 337

1                    WATERHOUSE - 10-19-21

2    or accounting would have sent some schedule or

3    a reminder that a payment would be coming due

4    in the future.  Is that generally the practice?

5         A.    Yes, we would -- you know, again, I

6    didn't -- I didn't micromanage the teams, but

7    we had a -- a corporate accounting calendar

8    that we use as kind of a tickler file to keep

9    track of payments.

10              I actually, you know, don't know how

11   actively they're using that in -- in prior to

12   2020, but it was actively used at some point.

13              We did look at NexPoint cash

14   periodically and cash for the other advisors as

15   well and payments.  You know, we -- payments

16   like this would have appeared in our cash

17   projections, in the advisor's cash projections.

18              And, again, as like I said earlier,

19   they would have appeared there, so there would

20   be time to plan for making any of these

21   payments.

22        Q.    And based on your experience, would

23   it have been reasonable for NexPoint to rely on

24   the debtors' employees to inform NexPoint of an

25   upcoming payment due on the $30 million

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-33   Page 3309/2397 Page 170 of 229   PageID 38511

Page 338

                    WATERHOUSE - 10-19-21

1    promissory note?

2            MR. MORRIS:  Objection to form of

3        the question.

4            MS. DANDENEAU:  Objection to form.

5        A.    Yes.  Yes, they did.  I mean, but I

6    mean, but I don't think these -- these notes

7    were any secret to anybody.

8        Q.    I understand, and I'm not suggesting

9    otherwise.

10            MR. RUKAVINA:  Please pull up Alpha

11    2, Mr. Nguyen.

12            (Exhibit A2 marked.)

13        Q.    Now, this document is similar to the

14    ones we've seen before as of December 31, 2020,

15    and I don't see under NTA anything there for

16    paying the promissory note to Highland.

17            Do you see anything like that?

18        A.    I do not.

19            MR. RUKAVINA:  You can pull that --

20    that exhibit down, Mr. Nguyen.

21        Q.    You are aware, of course, by now

22    that, in fact, NexPoint failed to make the

23    payment due December 31, 2020, are you not?

24        A.    I am aware, and yes, I do understand


                    WATERHOUSE - 10-19-21

1    promissory note?

2            MR. MORRIS:  Objection to form of

3        the question.

4            MS. DANDENEAU:  Objection to form.

5        A.    Yes.  Yes, they did.  I mean, but I

6    mean, but I don't think these -- these notes

7    were any secret to anybody.

8        Q.    I understand, and I'm not suggesting

9    otherwise.

10            MR. RUKAVINA:  Please pull up Alpha

11    2, Mr. Nguyen.

12            (Exhibit A2 marked.)

13        Q.    Now, this document is similar to the

14    ones we've seen before as of December 31, 2020,

15    and I don't see under NTA anything there for

16    paying the promissory note to Highland.

17            Do you see anything like that?

18        A.    I do not.

19            MR. RUKAVINA:  You can pull that --

20    that exhibit down, Mr. Nguyen.

21        Q.    You are aware, of course, by now

22    that, in fact, NexPoint failed to make the

23    payment due December 31, 2020, are you not?

24        A.    I am aware, and yes, I do understand

Page 339

```
 1                    WATERHOUSE - 10-19-21

 2   it.

 3        Q.    Were you aware that Highland

 4   accelerated that $30 million promissory note?

 5        A.    I am aware.

 6        Q.    Were you aware of that acceleration

 7   at the time that it occurred?

 8        A.    I don't remember specifically.

 9        Q.    Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13        A.    Did anyone ask me what Highland

14   should do about the missed payment?

15        Q.    Yes, before acceleration.

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20             MS. DANDENEAU:  Why don't you just

21        repeat the question, Mr. Rukavina.

22        Q.    Let me try again, Mr. Waterhouse,

23   let me try again.

24             I am saying you're the CFO of

25   someone, in this case, Highland, and the
```

```
 1                    WATERHOUSE - 10-19-21

 2    borrower failed to make the required payment.

 3    Are you with me so far?

 4         A.    I am.

 5         Q.    Did anyone then ask you, what should

 6    we do with respect to our rights against the

 7    borrower that missed the payment?

 8         A.    Not that I recall.

 9         Q.    Did you play a role in the decision

10    to accelerate that $30 million promissory note?

11         A.    I did not.

12         Q.    Do you recall whether Mr. Seery ever

13    asked you before the acceleration as to whether

14    he should accelerate the note?

15         A.    I don't recall.

16         Q.    And you don't recall when you

17    learned of the acceleration itself?

18              MR. MORRIS:  Objection to the form

19         of that question.

20         A.    It was -- it was sometime in

21    early -- in early 2021.  I don't remember

22    specifically.

23         Q.    But do you recall whether it was

24    after the acceleration had already been

25    transmitted?
```

```
                                                        Page 341
 1                  WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to the

 3         form of the question.

 4         A.    I don't recall.

 5         Q.    Do you recall in early to mid

 6    January of 2021, after the default, discussing

 7    the default with Mr. Dondero?

 8         A.    I do recall discussing with

 9    Mr. Dondero after December 31, 2020?

10         Q.    Yes, the fact of the default.

11         A.    I don't recall.

12              MR. RUKAVINA:  Let's pull up my

13    Exhibit 6, Alpha 6.

14              (Exhibit A6 marked.)

15              MR. RUKAVINA:  And, Mr. Nguyen, if

16         you will please scroll down.

17         Q.    This email chain begins with you

18    writing to Ms. Hendrix on January the 12th:

19    NexPoint note to HCMLP.

20              Do you see that, sir?

21         A.    I do.

22         Q.    Were you discussing this same

23    $30 million note we're talking about right now

24    with Ms. Hendrix?

25         A.    Yes.
```

Page 342

1                 WATERHOUSE - 10-19-21

2       Q.    Okay.  Do you recall what prompted

3  you to send that email to her?

4       A.    Yes, I had -- I had a conversation

5  with Jim.

6       Q.    Okay.  And what -- what did you

7  discuss with Jim that led to this email chain?

8       A.    He -- he called me and he said he

9  wanted to make payment on the NexPoint note,

10 and I didn't -- I didn't know the -- the amount

11 offhand, so I reached out to Kristin and got

12 the details and relayed that to him.

13      Q.    And you see you sent that email to

14 her at 11:15 a.m.  Does that help you remember

15 when you had this discussion with Mr. Dondero?

16 In other words, was it that morning or the day

17 before, or can you -- can you --

18      A.    No, it was -- it was that morning.

19      Q.    And do you recall how you had that

20 conversation with him?

21            MR. MORRIS:  Objection to the form

22      of the question.

23      Q.    By telephone, by email, in-person?

24      A.    Yeah, he -- he called me.  I was at

25 home.  We were working from home here in

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-33   Page 349 of 497Page 175 of 229   PageID 38516

Page 343

1                    WATERHOUSE - 10-19-21

2    December of 2020.  He called me from home.  He

3    said he was in court.  He wanted to -- he asked

4    about, you know, making payment on the note and

5    the amount, and so I didn't have those numbers

6    in front of me, so I said I would get back to

7    him.  I wanted all the details, so here is

8    this -- so I reached out to Kristin.

9         Q.    And then she gave you that

10   $1,406,000 figure?

11              MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.    Yes.  Yeah, she -- the $1,406,112.

14        Q.    And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.    Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.    Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.    Yes, they did.

22        Q.    Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25              When you conveyed the number to

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Filed 04/09/23   Page 176 of 229   PageID 38517

Page 344

```
 1                   WATERHOUSE - 10-19-21

 2     Mr. Dondero, was -- was it also on January

 3     12th?

 4          A.    Sorry, when I conveyed the

 5     $1.4 million number?

 6          Q.    Yes.

 7          A.    Yes, yes, it was that -- it was --

 8          Q.    So you had --

 9          A.    It was that point.

10          Q.    Well, to the best of your

11     recollection, you had a conference with

12     Mr. Dondero by the telephone in the morning,

13     and then another conference with him by

14     telephone after 11:40 a.m. that morning?

15          A.    Yeah, I can't remember -- yeah, it

16     was either that morning or it could have been,

17     you know, early afternoon, but again, I

18     remember calling him back, relaying this

19     information to him, and he said, okay, pay --

20     you know, make -- make this payment.

21          Q.    And during either of those two

22     calls, did you tell Mr. Dondero anything to the

23     effect that making those -- I'm sorry, making

24     that payment would not de-accelerate the

25     promissory note?
```

Page 345

1                   WATERHOUSE - 10-19-21

2          A.    No.

3          Q.    Did you tell him anything to the

4    effect that making that payment would not cure

5    the default?

6          A.    No.

7          Q.    Did you discuss that in any way with

8    him?

9          A.    No, I did not.

10         Q.    Did he say why he wanted to have

11   that $1.4 million payment made?

12               MR. MORRIS:  Objection to the form

13         of the question.

14         A.    He -- he -- he didn't go into

15   specifics.

16         Q.    Did he say anything to you to the

17   effect that if NexPoint makes that payment,

18   then the note will be de-accelerated?

19               MR. MORRIS:  Objection to the form

20         of the question.

21         A.    I don't recall.

22               MR. RUKAVINA:  You can put this one

23         down, Mr. Nguyen.

24         Q.    And, again, when you say you don't

25   recall, you mean you don't remember right now

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-18   Page 346 of 497   Page 178 of 229   PageID 38519

Page 346

1                    WATERHOUSE - 10-19-21

2    either way; correct?

3         A.    Yeah, I don't remember.  I don't

4    remember us discussing that.

5         Q.    Now -- and we're almost done, I

6    promise.  I'm just going to -- I don't know how

7    to ask this question, so I'm just going to try

8    to do my best.

9              Prior to the default on December 31,

10   2020, did Mr. Seery ever tell you any words to

11   the effect that you or someone at Highland

12   should ensure that NexPoint doesn't make its

13   payment?

14        A.    No.

15        Q.    Did you have any hint or any belief

16   that anyone at NexPoint -- I'm sorry, strike

17   that.

18              Did you have any reason to believe

19   that anyone with Highland was actively trying

20   to get NexPoint to make that default by not

21   paying on December 31?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Are you asking, did any Highland

25   employees actively work to make -- to

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 17-13    Page 3409 of 2497 Page 179 of 229    PageID 38520

Page 347

```
 1                WATERHOUSE - 10-19-21

 2    somehow --

 3         Q.    Yes.  Let me take a step back.  Let

 4    me take a step back.

 5              So you are aware now that as a

 6    result of that default, what was still some

 7    25-year note was accelerated and became

 8    immediately due.  You are aware of that now;

 9    right?

10         A.    Yes.

11         Q.    And can you see how someone at

12    Highland might actually have been pleased with

13    that development?

14              MR. MORRIS:  Objection to the form.

15         Q.    Not that they were --- not that they

16    were pleased, but you can see how someone at

17    Highland might have been pleased with that

18    development?

19              MR. MORRIS:  Objection to the form

20         of the question.

21              MS. DANDENEAU:  Object to form.

22         A.    I don't know how they would have

23    reacted to that.

24         Q.    Okay.  But you're not -- you're not

25    aware of any instructions or any actions being
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-33   Page 349 of 497 Page 180 of 229   PageID 38521

Page 348

                    WATERHOUSE - 10-19-21

1

2    given or taken at Highland by Mr. Seery, the

3    independent board, DSI, that -- that would have

4    basically led Highland to ensure that NexPoint

5    would fail to make that payment?

6         A.    I'm not aware.

7         Q.    In other words, there wasn't a trick

8    or a settlement; right?

9              MS. DEITSCH-PEREZ:  Objection to

10        form.

11             MS. DANDENEAU:  Object to form.

12             MR. MORRIS:  Object to form.

13        A.    I'm not aware.

14             Look, I'm not aware.  I'm not in

15    every conversation.  I mean, and I'm just --

16    again, I'm sitting at home.  It is the end of

17    the year.  Again, I'm not aware.

18        Q.    That is a perfectly legitimate

19    answer.  I don't know why -- why you think

20    otherwise.

21             Okay.  Just give me one second to

22    compose my thoughts.

23             MS. DEITSCH-PEREZ:  While you're

24        taking your one second, why don't we take

25        three minutes.  I will be right back.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-18   Page 349 of 497   Page 181 of 229   PageID 38522

Page 349

```
 1                WATERHOUSE - 10-19-21

 2                VIDEOGRAPHER:  Do we want to go off

 3        the record?

 4                MR. RUKAVINA:  Yes.

 5                VIDEOGRAPHER:  All right.  We're

 6        going off the record at 6:27 p.m.

 7        (Recess taken 6:27 p.m. to 6:30 p.m.)

 8                VIDEOGRAPHER:  We are back on the

 9        record at 6:30 p.m.

10                MR. HORN:  Is Deb back?

11                MS. DANDENEAU:  Are you asking about

12        me?  I'm here.

13                MR. HORN:  Oh, okay.  I don't see

14        you, sorry.

15        Q.   Actually, yeah, Mr. Waterhouse, so

16     when you had --

17                MS. DANDENEAU:  Are you asking about

18        Deb Dandeneau or Deborah?  I mean, there

19        are a lot -- as we talked about, a lot of

20        Debs.  I'm here.

21                MS. DEITSCH-PEREZ:  I'm here.

22                MR. HORN:  Yes, I was asking about

23        DDP.

24                MS. DEITSCH-PEREZ:  Oh, DDP is here.

25                MR. HORN:  Okay.  Here we go.  I'm
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-38   Page 350 of 397 Page 182 of 229   PageID 38523

Page 350

1              WATERHOUSE - 10-19-21

2         going back on mute.

3              MS. DANDENEAU:  Get the right

4         nomenclature.

5         Q.    Mr. Waterhouse, on January 12th,

6    2021, when you had those talks with Mr. Dondero

7    about the $1.4 million payment, did you have a

8    communication or a conversation with Mr. Seery

9    about that payment after January 12th, 2021?

10        A.    I don't recall.

11        Q.    Well, in response to Mr. Dondero

12   reaching out to you, do you recall on that day,

13   January 12th, talking to Mr. Seery or anyone at

14   Highland other than the email chain we just saw

15   about Mr. Dondero's call with you?

16        A.    Did I talk to -- I spoke with

17   Kristin -- I don't know if I spoke to her.  I

18   likely spoke to Kristin Hendrix because we had

19   to get the wire on NexPoint's behalf to make

20   the payment to Highland.

21        Q.    So it is true, then, that -- that

22   employees of the debtor did actually cause that

23   payment to be made when it was made after

24   January 12th?

25        A.    Yes, I mean, we -- we -- as I

Page 351

```
 1                    WATERHOUSE - 10-19-21

 2    testified earlier, we provided that accounting

 3    finance treasury function as -- under the

 4    shared services agreement.  And so once I

 5    got the -- I talked to Jim, got the approval to

 6    make this payment, we have to then make the

 7    payment, or the team does, and so the payment

 8    was made.

 9         Q.    Okay.  But -- okay.  And -- and

10    sitting here right now, after Jim called you,

11    you don't remember talking to anyone other than

12    the -- the couple of people you mentioned,

13    talking to anyone about something to the effect

14    that, hey, Jim wants to make this payment now?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    I don't -- I don't recall.

18         Q.    And does that include legal counsel?

19              Without going into any detail, on

20    January 12th or before that payment was made,

21    did you consult with legal counsel about

22    anything having to do with the $1.4 million

23    payment?

24         A.    I don't recall.

25         Q.    Okay.  Thank you, sir, for your
```

```
1                   WATERHOUSE - 10-19-21

2    time.

3             MR. RUKAVINA:  Pass the witness.

4             MR. MORRIS:  I just have a few

5        questions, if I may.

6             MS. DEITSCH-PEREZ:  Don't you go at

7        the end?

8             MR. MORRIS:  Oh, I apologize.  He is

9        your witness.  I'm surprised you want to

10       ask him questions, but go right ahead.

11            MS. DEITSCH-PEREZ:  Just have a

12       couple of things.

13            MR. RUKAVINA:  And I will just

14       object to that, that he's our witness.

15       That's not --

16            MR. MORRIS:  I'm not talking to you.

17       I'm not talking to you.

18            MS. DANDENEAU:  Also, Mr. Morris, it

19       is -- it is --

20            MS. DEITSCH-PEREZ:  He is not my

21       witness.  He's been subpoenaed by you.

22       Okay?

23            That is no offense, Mr. Waterhouse,

24       I'm -- I'm not -- okay.  Anyway.

25                   EXAMINATION
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 170-18   Page 185 of 229   PageID 38526

Page 353

```
 1                    WATERHOUSE - 10-19-21

 2   BY MS. DEITSCH-PEREZ:

 3        Q.    Good evening.  I'm very sorry to be

 4   going last and I know you have had a long and

 5   taxing day, so I thank you for indulging me.

 6              The kinds of services that you

 7   describe that the -- that Highland provided for

 8   NexPoint, did Highland also provide similar

 9   services to that to HCRE and HCMS?

10        A.    Yes.

11              MR. MORRIS:  Objection to the form

12        of the question.

13        Q.    What kind of services did Highland

14   provide to HCRE and HCMS?

15              MR. MORRIS:  Objection to the form

16        of the question.

17              MS. DEITSCH-PEREZ:  What is your

18        objection, John?

19              MR. MORRIS:  It is vague and

20        ambiguous.  Unlike the advisors and

21        NexPoint, they actually had shared services

22        agreements.

23              MS. DEITSCH-PEREZ:  I got -- I

24        understand your objection.  That is fine.

25        Q.    Let's take them one at a time.
```

1          WATERHOUSE - 10-19-21

2          What kinds of services did Highland

3    provide to HCRE?

4          MR. MORRIS:  Objection to the form

5      of the question.

6      A.    HCMS, Highland employees provided

7    accounting services, treasury management

8    services, potentially legal services.  I

9    don't -- but I wouldn't have been directly

10   involved in that.  But as far as the teams that

11   I manage, it was accounting, treasury, things

12   of that nature.

13     Q.    Okay.  And that was for HCM, LLP --

14     A.    And -- and, sorry, it would also be

15   any asset valuation if needed as well.

16     Q.    Okay.  We went back and forth on

17   each other and I apologize, so just to clarify.

18          You were talking about the services

19   that Highland Capital Management provided to

20   HCMS; is that right?

21     A.    HCMS.  So, again, yes.  And

22   accounting, treasury, valuation, and also tax

23   services too.

24     Q.    Okay.

25     A.    Tax services.  Look, I'm expanding

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-33   Page 356 of 497 Page 187 of 229   PageID 38528

Page 355

```
1                   WATERHOUSE - 10-19-21

2    this, their HR services as well.

3         Q.    Okay.  And did that include bill

4    paying?

5              MR. MORRIS:  Objection to the form

6         of the question.

7         Q.    Did the services that HCM provided

8    to HCMS include bill paying?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes.

12        Q.    And did the services that HCMLP

13   provided to HCMS include scheduling upcoming

14   bills?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    And did HCMLP regularly pay -- cause

19   to be paid the payments on loans HCMS had from

20   HCMLP?

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Yes.

24        Q.    Typically -- if there is a

25   typically, how far in advance of due dates did
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 356 of 397   Page 188 of 229   PageID 38529

Page 356

WATERHOUSE - 10-19-21

1    HCMLP cause HCMS to pay its bills?

2            MR. MORRIS:  Objection to the form

3        of the question.

4    A.    I mean, it -- it -- it depend -- it

5    depended on the nature of the payment and the

6    vendor, but, you know, if there were -- if

7    there were larger scheduled payments, you know,

8    I would like to give at least 30 days notice.

9            And that is -- that is kind of my

10   rule of thumb so no one is surprised.

11   Q.    Okay.  And was it generally HCMLP's

12   practice to timely pay HCMS' bills?

13           MR. MORRIS:  Objection to the form

14       of the question.

15   A.    It -- it -- it -- that depended on

16   the nature of the payment.

17   Q.    Okay.  And can you explain what you

18   mean by that?

19   A.    Yeah, I mean if -- if it was -- I

20   mean -- if there was some professional fees

21   that weren't -- you know, they were due but

22   they weren't urgent, those fees may not be paid

23   as timely as others that have a due date or --

24   or things like that.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 175-18   Page 359 of 497 Page 189 of 229   PageID 38530

Page 357

```
 1                  WATERHOUSE - 10-19-21
 2       Q.    Okay.  Are loan payments the kinds
 3   of thing that HCMLP would pay on time because
 4   of potential consequences of not paying on
 5   time?
 6              MR. MORRIS:  Objection to the form
 7       of the question.
 8       A.    Yes.  As I testified earlier, we
 9   would want to give, you know, notice on -- on
10   -- on larger payments and -- and things of that
11   nature so we didn't miss due dates.
12       Q.    Okay.  And over the course of time,
13   did HCMLP generally pay HCMS' loan payments in
14   a timely fashion?
15              MR. MORRIS:  Objection to the form
16       of the question.
17       A.    I can't remember specifically, but
18   generally, yes.
19       Q.    Okay.  Now, did HCMLP provide
20   similar services to HCRE that you have
21   described it provided to HCMS?
22              MR. MORRIS:  Objection to the form
23       of the question.
24       A.    Yes, but I don't think it -- it
25   provided -- I don't think it provided HR
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Filed 05/09/24   Page 190 of 229   PageID 38531
Exhibit 13   Page 359 of 397

Page 358

1                     WATERHOUSE - 10-19-21

2    services.

3         Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5         A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9         Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the

1                   WATERHOUSE - 10-19-21

2    loan payment that was due from HCMS to HCMLP in

3    December of 2020?

4                MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I don't believe that payment --

7    payment was made.

8         Q.    Okay.  And when HCMLP caused HCMS in

9    the past to make loan payments, whose money did

10   it use to make those payments?

11               MR. MORRIS:  Objection to the form

12        of the question.

13        A.    It was the -- the money in HCMS's

14   operating account would be made to that --

15   those moneys would be used to make payment to

16   Highland Capital Management.

17        Q.    Okay.  And Highland -- is it correct

18   that Highland Capital Management personnel had

19   the access to HCMS's accounts to be able to

20   cause such payments to be made?

21        A.    Yes, Highland personnel had access

22   to those accounts.

23        Q.    Okay.  And so now for HCRE, whose

24   money was used when HCMLP caused HCRE

25   payments -- loan payments to Highland to be

Page 360

1          WATERHOUSE - 10-19-21

2   made?

3               MR. MORRIS:  Objection to the form

4        of the question.

5        A.    It was -- it was cash in HCRE's bank

6   account that would be used to make payments to

7   Highland Capital Management.

8        Q.    Okay.  And so did Highland Capital

9   Management have access to HCRE's funds in order

10  to be able to make such payments?

11              MR. MORRIS:  Objection to the form

12       of the question.

13       A.    Personnel at Highland Capital

14  Management had access to HCRE's bank account to

15  effectuate the payments.

16       Q.    Okay.  And was the payment due from

17  HCRE to HCMLP due in December of 2020 made?

18       A.    It --

19       Q.    In December of 2020.

20       A.    It was not.

21       Q.    Okay.  And was there money in HCRE's

22  account that would have enabled the payment to

23  be made had HCM personnel attempted to make the

24  payment?

25              MR. MORRIS:  Objection to the form

Page 361

1              WATERHOUSE - 10-19-21

2         of the question.

3         A.    I -- I don't recall.

4         Q.    Do you have any reason to believe

5    that either HCRE or HCMS simply didn't have the

6    funds on hand to make the December 2020

7    payments?

8         A.    I don't know.

9         Q.    I guess I'm asking, do you have any

10   reason to believe that they didn't have the

11   funds?

12        A.    We managed cash for so many

13   different entities and funds, and I don't

14   recall, you know, where the cash position was

15   for HCRE and HCMS at 12/31/2020.

16        Q.    Okay.

17        A.    I just don't recall, and I don't --

18   and I don't remember what the loan payment

19   obligations were from HCRE to Highland, and

20   from HCMS to Highland.  I don't recall.  I

21   don't recall, I mean...

22        Q.    Let me come at it a different way.

23   Were the -- were the payments that would

24   otherwise have been due in December of 2020

25   made in January of 2021 for HCMS and HCRE?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 362 of 497  Page 194 of 229   PageID 38535

Page 362

                    WATERHOUSE - 10-19-21

1

2        A.    I believe the HCRE payment was made

3   in January of 2021.  I don't recall any

4   payments being made from HCMS to Highland.

5        Q.    If it -- how is it the HCRE payment

6   came to be made?  Why did you make it -- why

7   did HCM make the payment in January of 2021?

8        A.    Jim -- Jim called me and instructed

9   me to -- to make the payment on behalf of HCRE,

10  Jim Dondero -- Jim Dondero.

11       Q.    Did he seem upset that -- that the

12  payment had not been made?

13       A.    Yeah.  On the note that was, you

14  know, that was the term note, yes, he -- he was

15  displeased that the -- that the payment had not

16  been made by year-end.

17       Q.    Okay.  And did you make the -- cause

18  the payment to be made as -- as requested?

19       A.    Yes.

20       Q.    And did anyone else from HCM

21  participate with you in causing the payment to

22  be made to -- on the HCRE loan?

23       A.    Yes.  It would have been Kristin

24  Hendrix.  I -- again, I don't -- as I testified

25  earlier, I'm not an officer of HCRE.  I don't

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-13   Page 360 of 497  Page 195 of 229   PageID 38536

Page 363

                    WATERHOUSE - 10-19-21

1    believe I'm an authorized signer.  So I

2    can't -- other personnel have to make payment

3    from HCRE to -- to -- to -- to Highland.

4         Q.    Okay.  And in the conversation

5    that -- that you had with Mr. Dondero when he

6    requested the payment to be made, did you say

7    to him words to the effect, Jim, this loan is

8    going to stay in default, what are you making

9    the payment for, anything like that?

10        A.    No.

11        Q.    In fact, did you have the impression

12   from him that he thought that the loan would

13   be -- the default would be cured by making the

14   payment?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Did I get the impression from Jim

18   Dondero that the loan would be cured if the

19   payment from HCRE --

20        Q.    Yeah, if that is what he thought.

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.    I didn't get any impression from him

24   on that at the time.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 364 of 2497Page 196 of 229   PageID 38537

Page 364

                    WATERHOUSE - 10-19-21

1

2       Q.    Do you know whether there was an

3  HCMS term loan that had a payment due in

4  December of 2020?

5       A.    I don't recall.

6       Q.    Okay.  And so the reason you don't

7  recall whether or not there was a payment in

8  January of 2021 is because you just don't

9  remember whether there was such a loan at all?

10            MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I don't remember.  There is -- there

13  is so many notes, and I mean, demands, and I

14  don't -- I don't remember.  It's a lot to keep

15  track in your head.

16       Q.    I understand, and -- and I hear your

17  frustration when you have explained that the

18  debtor has your documents and you don't, and so

19  I fully appreciate it, and this is no knock on

20  you.  It's a knock on somebody else on this

21  call.

22            MR. MORRIS:  I move to strike.  That

23       was pretty obnoxious, but go ahead.

24       Q.    Okay.  But so, Mr. Waterhouse, if --

25  if a payment on the HCMS loan was made in

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 173-3   Page 3659/2497 Page 197 of 229   PageID 38538

Page 365

```
 1                   WATERHOUSE - 10-19-21

 2    January of 2021, do you think it was part of

 3    the same conversation where Jim Dondero said,

 4    hey, why didn't that get paid, please make

 5    that -- get that payment done?

 6              MR. MORRIS:  I object to the form of

 7         the question.

 8         A.    Yes.  Likely it would have been -- I

 9    mean, again, I don't recall a payment being

10    made, but, you know, again, I don't remember

11    everything.

12         Q.    Okay.  Did -- at the time you were

13    communicating with Kristin Hendrix about the

14    payment being made, whichever payments were

15    made in January, did she say anything to you

16    about the payments not curing the loan

17    defaults?

18         A.    No.

19         Q.    Okay.  All right.  So I'm going to

20    take you back to very early in the deposition

21    when Mr. Morris was asking you about the --

22    the -- the -- the agreement with respect to

23    the -- the forgiveness element of the loans, so

24    that is just to orient you.

25              Do you remember that there was a
```

Page 366

1                    WATERHOUSE - 10-19-21

2    time that you and Mr. Dondero were

3    communicating about potential means of

4    resolving the Highland bankruptcy by what was

5    colloquially referred to as a pot plan?

6          A.    Yes.

7          Q.    Okay.  And can you tell me generally

8    when that was?

9          A.    Like mid -- mid 2020, sometime in

10   2020, mid 2020.

11         Q.    Okay.  And did the process of trying

12   to figure out what the numbers should be

13   involve looking at what one should pay for the

14   Highland assets?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes.

18         Q.    Okay.  And did there come a time

19   when you were proposing some potential numbers

20   and Mr. Dondero said something to you like,

21   well, why are you including payment for the

22   related party notes, those, you know, were

23   likely to be forgiven as part of my deferred

24   executive compensation?

25              MR. MORRIS:  Objection to the form

1              WATERHOUSE - 10-19-21

2        of the question.

3        A.    Yes, we did have that conversation.

4        Q.    Okay.  Was that conversation in

5   connection with trying to figure out the right

6   numbers for a pot plan?

7        A.    Yeah.  I mean, it was -- it was -- I

8   mean, Jim -- Jim would ask for, you know,

9   most -- most recent asset values, you know, for

10  Highland, and -- and myself and the team

11  provided those to him, so it was in that

12  context.

13       Q.    Okay.  And does that refresh your

14  recollection that these communications were in

15  2020 rather than 2021?

16            MR. MORRIS:  Objection to the form

17       of the question.

18       A.    The -- the -- the executive

19  compensation discussions were definitely in

20  2020.

21       Q.    Okay.  Now, did you ever make

22  proposals that took into account Jim's comment

23  that the notes were likely to end up forgiven

24  as part of his compensation?

25            MR. MORRIS:  Objection to the form

```
 1                WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes, we -- the team and myself put

 4   together, you know, asset summaries of Highland

 5   at various times for all the assets of

 6   Highland, and not including the notes.

 7        Q.    Okay.  And were those presentations

 8   communicated to -- to Mr. Seery?

 9        A.    No.  Well, look, I didn't tell -- I

10   didn't tell Mr. Seery.  I don't know what

11   Mr. Dondero did with the information.

12        Q.    Okay.

13        A.    I did not have conversations with

14   Mr. Seery.

15        Q.    Okay.  Do you know who saw the

16   presentations that you put together that didn't

17   include the value of the related party notes?

18        A.    We're talking presentations -- these

19   are -- these are Excel spreadsheets?

20        Q.    Uh-huh.

21        A.    I don't know who -- these were given

22   to -- to Jim Dondero.  I don't know what was

23   done with them after that.

24        Q.    Okay.  You also mentioned earlier

25   that sometime during your tenure at Highland
```

Page 369

1                    WATERHOUSE - 10-19-21

2    you knew of the practice of giving forgivable

3    loans to executives.

4              MR. MORRIS:  Objection to the form

5         of the question.

6         Q.    Can you -- can you tell me what you

7    recall about that practice?

8              MR. MORRIS:  Objection to the form

9         of the question.

10        A.    Yes, so there were -- there were --

11   during my tenure at Highland, there were loans

12   or -- given to employees that were later

13   forgiven at a future date and time.

14        Q.    Okay.  And when the loans were

15   given, did the notes, to your recollection, say

16   anything about the potential forgiveness term?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    When you say "did the notes," did

20   the promissory notes detail the forgiveness?

21        Q.    Yes.

22        A.    Not that I recall.

23        Q.    And until such time as whatever was

24   to trigger the forgiveness occurred, were the

25   notes bona fide notes as far as you were

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-18   Page 370 of 2497Page 202 of 229   PageID 38543

Page 370

 1                  WATERHOUSE - 10-19-21

 2    concerned?

 3                  MR. MORRIS:  Objection to the form

 4          of the question.

 5          A.    Yes, similar to -- yes.

 6          Q.    Okay.  You were going to say similar

 7    to what?

 8          A.    Mr. Morris earlier today showed

 9    notes of the financial statements about various

10    affiliate loans.  I -- I -- I do recall these

11    notes because I -- at that time personally

12    worked on the -- the financial statements of

13    Highland.  That was, you know, in my role as a

14    corporate accountant.

15                  And there were -- those loans

16    were -- to the partners were detailed in the

17    notes to the financial statements, similar to

18    what we went through earlier today in the prior

19    testimony about what we saw with Highland

20    and -- and -- and the -- and HCMFA.

21          Q.    Is it fair to say that on Highland's

22    balance sheet there were any number of assets

23    that the value of which could be affected by

24    subsequent events?

25                  MR. MORRIS:  Objection to the form

Page 371

1                    WATERHOUSE - 10-19-21

2         of the question.

3         A.    Yes.  I mean, yes, that -- there

4    are.  And that is -- yes.

5         Q.    Okay.  And is it typical accounting

6    practice that until there is some certainty

7    about those potential future events, that asset

8    value listed on -- on the books doesn't take

9    into account those potential future events?

10                   MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yeah, if those -- yes.  If -- if

13   those future events, you know, at the time of

14   issuance are not known or knowable, like I

15   discussed earlier with, like, market practice,

16   asset dislocation, or, you know, I mean, things

17   like that, you -- I mean, it -- it could affect

18   its fair value --

19        Q.    Okay.

20        A.    -- in the future.

21        Q.    And am I correct you wouldn't feel

22   compelled to footnote in every possible change

23   in -- in an asset when those possibilities are

24   still remote?

25                   MR. MORRIS:  Objection to the form

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 171-13    Page 372 of 397Page 204 of 229    PageID 38545

Page 372

```
 1                  WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    The accounting standard is you have

 4   to estimate to the best -- you know, to -- to

 5   the best of your ability, the fair value of an

 6   asset as of the balance sheet date under --

 7   under GAAP.

 8        Q.    Did -- strike that.

 9              Okay.  Give me a minute.  I'm

10   close -- I'm close to done.  Let me just go off

11   and look at my notes for a second.  So take two

12   minutes.

13              VIDEOGRAPHER:  We're going off the

14        record at 7:02 p.m.

15        (Recess taken 7:02 p.m. to 7:03 p.m.)

16              VIDEOGRAPHER:  We are back on the

17        record at 7:03 p.m.

18        Q.    Mr. Waterhouse, is it generally your

19   understanding that people you work with now

20   have been asking the debtor for full and

21   unfettered access to their own former files?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes, I am -- I am generally aware.

25        Q.    Okay.  And do you think you could
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-33   Page 37 of 2397Page 205 of 229   PageID 38546

Page 373

```
1                    WATERHOUSE - 10-19-21

2     have been better prepared for this deposition

3     if the debtor had complied with those requests?

4              MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I -- I -- I most certainly -- yes.

7     I mean, again, these are multiple years,

8     multiple years ago, lots and lots of

9     transactions.

10             You know, we asked about NAV errors

11    and, you know, things like that and these

12    are -- it would make this process a lot more --

13    a lot easier and if we had -- if we had access

14    to that.

15        Q.    Okay.  And has the debtor -- is the

16    debtor suing you right now?

17        A.    Yes.

18        Q.    And is the debtor trying to renege

19    on deals that it had previously made with you?

20             MR. MORRIS:  Objection to the form

21        of the question.

22        A.    Sorry, I need to -- it is my

23    understanding that the litigation trust is

24    suing me.  And not being a lawyer, I don't

25    know -- is that the debtor?
```

Case 21-03005-sgj    Doc 86-4    Filed 10/29/21    Entered 10/29/21 17:22:38    Desc
Case 3:21-cv-00881-X    Document 171-18    Page 3749 of 2497 Page 206 of 229    PageID 38547

Page 374

1                    WATERHOUSE - 10-19-21

2                    Is that -- I don't know the

3    relationship.  So, again, I'm not the lawyers.

4    I've said many times.  But my understanding is

5    the litigation trust is suing me.  I could be

6    wrong there.  I don't know.

7         Q.    Okay.  I understand.

8                    Someone with some connection to the

9    Highland debtor has brought a claim against

10   you; is that fair?

11                  MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Yes.

14        Q.    Okay.  And is there also some motion

15   practice in the bankruptcy where the debtor or

16   someone associated with the debtor is

17   attempting to undo something that was

18   previously resolved with you?

19        A.    Yes.

20        Q.    And so in one action somebody is

21   associated with the debtors trying to --

22   threatening you with trying to take money from

23   you, and then in the other -- and trying to --

24   and in the other they are threatening not to

25   pay you things that had previously been agreed;

Page 375

1                    WATERHOUSE - 10-19-21

2      is that correct?

3                    MR. MORRIS:  Objection to the form

4           of the question.

5           A.    I want to be -- yes, I -- there

6      is -- I'm being sued, again, on -- on something

7      that was agreed to with Mr. Seery and myself.

8      I don't -- I don't -- I don't own that claim.

9           Q.    Okay.

10          A.    To be transparent, I don't own that

11     claim.  So it is not my personal property.

12          Q.    Okay.

13          A.    And -- and being the nonlawyer, I

14     don't know how I can get sued for something

15     that I don't owe or, like, I don't own

16     anything.  I'm not the lawyer.  But, I mean, if

17     that is -- if I'm understanding the facts

18     correctly.

19          Q.    Okay.  And the lawsuit that was

20     filed that names you, that was just filed

21     this -- this past week; is that right?

22                    MS. DANDENEAU:  Ms. Deitsch-Perez, I

23          do want to interrupt at this point because

24          just as I told Mr. Morris, that this is a

25          deposition about the noticed litigation.

```
 1                    WATERHOUSE - 10-19-21

 2              I really don't want to go -- go

 3         afield --

 4              MS. DEITSCH-PEREZ:  Yeah.

 5              MS. DANDENEAU:  -- and open up a

 6         whole new line of inquiry about the lawsuit

 7         or the -- the motion and the bankruptcy

 8         court.  We will be here all night.

 9              MS. DEITSCH-PEREZ:  And I

10         understand.

11    Q.    My -- my point is:  Do you feel

12   like -- like there is some effort by these

13   parties related to the debtor to intimidate

14   you -- not that you -- I'm not saying you are

15   or you aren't.

16              But do you feel like there is some

17   effort to intimidate you and maybe an effort to

18   deter you from being as prepared as you might

19   be in this deposition?

20              MR. MORRIS:  Objection to the form

21         of the question.

22    A.    I was -- I was surprised by the

23   lawsuit, by me being named, because, again, I

24   don't own the asset and things like that.

25   Yeah, I just -- I want to move forward with my
```

1                    WATERHOUSE - 10-19-21

2      life at Skyview.

3                    MS. DEITSCH-PEREZ:  Thank you.

4                    THE WITNESS:  Thank you.

5                       FURTHER EXAMINATION

6      BY MR. MORRIS:

7           Q.    If I may, I just have a few

8      questions.

9                    Mr. Waterhouse, we saw a number of

10     documents that Mr. Rukavina put up on the

11     screen where Ms. Hendrix would send you a

12     schedule of payments that were due on behalf of

13     certain Highland affiliates.

14                   Do you remember that?

15          A.    Yes.

16          Q.    And in each instance she asked for

17     your approval to make the payments; is that

18     right?

19          A.    Yes, she did.

20          Q.    And was that the -- was that the

21     practice in the second half of 2020 whereby

22     Ms. Hendrix would prepare a list of payments

23     that were due on behalf of Highland associates

24     and ask for approval?

25          A.    Yes.

Page 378

1                    WATERHOUSE - 10-19-21

2          Q.    And I think you said that there was

3    a -- a --

4          A.    It was -- I think I testified to

5    this earlier when we talked about procedures

6    and policy, you know, again, I want to be

7    informed of -- of -- of -- of -- of any

8    payments that are going out.  I want to be made

9    aware of these payments, and that was just a

10   general policy, not just for 2020.

11         Q.    Okay.  So it went beyond 2020?

12         A.    Yes.

13         Q.    Is that right?

14         A.    Yes.

15         Q.    Okay.  And the corporate accounting

16   group would prepare a calendar that would set

17   forth all of the payments that were anticipated

18   in the -- in the three weeks ahead; is that

19   right?

20         A.    I -- like I testified earlier, we

21   had a corporate calendar that was set up, you

22   know, to -- to provide reminders or, you know,

23   of anything of any nature, whether it is

24   payments or -- or financial statements or, you

25   know, whatever it is, you know, to meet

1                    WATERHOUSE - 10-19-21

2    deadlines.

3              I don't know how, as I testified

4    earlier, how much they were using that

5    calendar.

6         Q.    Okay.  But -- but you did get notice

7    and a request to approve the payments that were

8    coming due on behalf of Highland's affiliates.

9    Do I have that right?

10              MS. DANDENEAU:  Objection to form.

11        A.    I mean, generally, yes.  I mean, you

12   know, as we saw with these emails, generally, I

13   mean, did that encompass everything, no.

14        Q.    Okay.  Do you know why the

15   payment -- do you know why there was no payment

16   made by NexPoint at the end of 2020?

17        A.    Yes.  There was -- there was -- we

18   talked about these agreements between the

19   advisors and Highland, the shared services and

20   the cost reimbursement agreement.

21              And in late 2020, there were

22   overpayments, large overpayments that had been

23   made over the years on these agreements, and it

24   was my understanding that the advisors were --

25   were talking with -- like Jim Seery and others

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-18   Page 3809 of 2497 Page 212 of 229   PageID 38553

Page 380

```
 1                WATERHOUSE - 10-19-21

 2   to offset any obligations that the advisors

 3   owed to Highland as offset to the overpayments

 4   on these agreements.

 5        Q.    Okay.  Did you participate in any of

 6   those conversations?

 7        A.    I did not.

 8        Q.    Okay.  Do you know -- do you recall

 9   that the -- at the end of November, the debtor

10   did notice to the advisors of their intent to

11   terminate the shared services agreements?

12        A.    Like I testified earlier, there

13   was -- the agreements weren't identical, from

14   what I recall, and there is one that had a

15   longer notice period, which I think had a

16   60-day notice period.  I don't recall which one

17   that was, so not all of them were -- notice

18   hadn't been given as of November 30th, for all

19   of the agreements.

20        Q.    Upon the receipt of the -- the

21   termination notices that you recall, do you

22   know if the advisors decided at that point not

23   to make any further payments of any kind to

24   Highland?

25                MR. RUKAVINA:  Objection, form.
```

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 77-18   Exhibit 18   Page 3809/2497 Page 213 of 229   PageID 38554

Page 381

1            WATERHOUSE - 10-19-21

2        A.    No.  The advisors -- the advisors

3    had stopped making payments prior to that

4    notice.

5        Q.    Okay.  And how do you know that the

6    advisors stopped making -- making payments

7    prior to the notice?

8        A.    I had -- I had a conversation

9    with -- with Jim Dondero.

10       Q.    And did Mr. Dondero tell you that

11   the advisors would no longer make payments to

12   Highland?

13            MS. DEITSCH-PEREZ:  Object to the

14       form.

15       A.    Yes, he -- he -- again, he said

16   they -- they -- the advisors have overpaid on

17   these agreements, to not make any future

18   payments, and that there needs to be offsets,

19   and they're working on getting offsets to these

20   overpayment.

21       Q.    Do you know if anybody ever

22   instructed Highland's employees to make the

23   payment that was due by NexPoint at the end of

24   the year?

25       A.    Did anyone instruct Highland's

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 17-13   Page 382 of 397   Page 214 of 229   PageID 38555

Page 382

```
 1                    WATERHOUSE - 10-19-21
 2   employees to make that payment?
 3        Q.    Correct.
 4        A.    Anyone -- not that I'm aware.
 5        Q.    Were any of Highland's employees
 6   authorized to make the payments on behalf of
 7   its affiliates -- withdrawn.
 8              Was any of Highland's employees
 9   authorized to effectuate the payment on behalf
10   of NexPoint that was due at the end of the year
11   without getting approval from either you or
12   Mr. Dondero?
13        A.    They had the -- they had the ability
14   to make the payment, but they didn't -- you
15   know, that -- that payment needed to be
16   approved.
17        Q.    Okay.  And it needed to be approved
18   by you or Mr. Dondero; is that right?
19        A.    I mean, I'm not going to make the
20   unilateral decision.
21        Q.    Is that a decision that you
22   understood had to be made by Mr. Dondero?
23        A.    Yes.  Sitting back in December of
24   2020, the -- that -- there was this off --
25   offset negotiation that -- that was happening,
```

1                 WATERHOUSE - 10-19-21

2    so I mean, until those negotiations were

3    resolved, you know, there wasn't any

4    payments -- there weren't any payments.

5         Q.    And -- and there were no payments

6    until the negotiations were resolved because

7    that was the directive that you received from

8    Mr. Dondero; correct?

9         A.    I don't think he said -- I mean, I

10   think -- yeah, I mean -- I'm trying to recall

11   the conversation.  It was -- you know, there

12   is -- there is these negotiations.  There's --

13   there needs to be these offsets.  They're

14   talking with the debtor.  So, you know, until

15   this is resolved, right, I mean, depending on

16   how, whatever that resolution was, were we to

17   take any action.

18        Q.    Okay.  How about with respect to

19   HCMS, did HCMS have a term payment due at the

20   end of the year?

21        A.    Again, I don't -- I don't recall.

22        Q.    Okay.  You discussed briefly two

23   payments that were made in January of 2021, one

24   on behalf of NexPoint, and one on behalf of

25   HCMS.  Do I have that right?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 3849/2497 Page 216 of 229   PageID 38557

Page 384

1                    WATERHOUSE - 10-19-21

2          A.    No.  The two payments I recall were

3    NexPoint and HCRE.

4          Q.    Okay.  And those two payments --

5    thank you for the correction.  And those two

6    payments were made because Mr. Dondero

7    authorized those payments to be made; correct?

8          A.    Yes.

9          Q.    And they hadn't been made before

10   that because Mr. Dondero had not authorized

11   them to be made?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.

14         A.    Yes, because of these negotiations.

15         Q.    Okay.  Just a couple of more

16   questions.

17              Did anybody, to the best of your

18   knowledge, on behalf of HCMFA, ever tell the

19   SEC that HCMLP was responsible for the mistakes

20   that were made on the TerreStar valuation?

21         A.    Did anyone from Highland on HCMFA's

22   behalf tell the SEC that Highland -- that

23   Highland was responsible for there -- I just

24   want to make sure --

25         Q.    It was a little bit different, so

1              WATERHOUSE - 10-19-21

2    let me try again.

3         A.    These are very long questions, John.

4    I'm not trying to be --

5         Q.    That is good.  Do you know whether

6    anybody -- do you know whether anybody on

7    behalf of HCMS -- HCMFA ever told the SEC that

8    Highland was the responsible party for the

9    TerreStar valuation error?

10        A.    Not that I'm aware.

11        Q.    Okay.  Did anybody on behalf of

12   the -- on behalf of HCMFA ever tell the retail

13   board that Highland was responsible for the

14   TerreStar valuation error?

15        A.    Not that I'm aware.

16        Q.    Do you know if HCMFA made an

17   insurance claim with respect to the damages

18   that were incurred in relation to the TerreStar

19   valuation error?

20        A.    Yes.

21        Q.    And do you know why they made that

22   insurance claim?

23        A.    Because there was an error.  I

24   mean --

25        Q.    Was the insured's claim made -- was

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 386 of 397 Page 218 of 229   PageID 38559

Page 386

1                    WATERHOUSE - 10-19-21

2    the insurance claim made under HCMFA's policy?

3         A.    Yes.

4         Q.    Did HCMFA at any time prior to the

5    petition date -- withdrawn.

6              You were asked a couple of questions

7    where -- where you said that Mr. Dondero told

8    you that he was ascribing zero value to the

9    notes as part of a pot plan because he believed

10   that the notes were part of executive

11   compensation.

12             Do I have that right?

13             MS. DEITSCH-PEREZ:  Object to the

14        form.

15        A.    Yes.

16        Q.    Okay.  Have you ever heard that

17   before the time that Mr. Dondero told you that

18   in the conversation about the pot plan?

19        A.    Had I heard that prior to my

20   conversation with Mr. Dondero?

21        Q.    Yes.

22        A.    No, I had not heard that prior.

23        Q.    Okay.  And that was in the context

24   of his formulation of the settlement proposal;

25   is that right?

Page 387

```
1                   WATERHOUSE - 10-19-21

2        A.    I mean, generally, yes.  You know,

3   we were asked to provide asset values, right,

4   and he was having settlement discussions.

5   Again, I don't know who those went to

6   ultimately.  I don't recall.

7             MR. MORRIS:  I have no further

8        questions.  Thank you very much for your

9        patience.  I apologize for the late hour.

10             MS. DEITSCH-PEREZ:  John, you stay

11        on about your email when --

12             MR. RUKAVINA:  Hold on, I'm not

13        done.

14             MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15        still has questions.  Sorry.  I was going

16        to say both John and Davor, could you stay

17        on afterwards just to talk about the

18        requests.

19                   FURTHER EXAMINATION

20   BY MR. RUKAVINA:

21        Q.    Mr. Waterhouse, you were just now

22   testifying about a discussion you had with

23   Mr. Dondero where he said something like no

24   more payments.

25             Do you remember that testimony?
```

 1                WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Okay.  And was that late November or

 4   early December of 2020?

 5        A.    It was, I would say, first or second

 6   week of November.

 7        Q.    Okay.  Do you recall whether --

 8   whenever you had that discussion, whether

 9   Mr. Dondero had already been fired by the

10   debtor?

11        A.    Yes, I -- I believe he was not an

12   employee of the debtor anymore at that time.

13        Q.    And when you were discussing this

14   with Mr. Dondero and he said no more payments,

15   you were discussing the two shared services

16   agreements and employee reimbursement

17   agreements we testified -- you testified about

18   before; is that correct?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    That is correct.

22        Q.    And had your office or you -- and we

23   will talk at a future deposition about the

24   administrative claim.

25              But had -- by that time that you

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-13   Page 38996/2497Page 221 of 229   PageID 38562

Page 389

```
 1                WATERHOUSE - 10-19-21

 2   talked to Mr. Dondero, had your office or you

 3   done any estimate of what the alleged

 4   overpayments were?

 5                MR. MORRIS:  Objection to the form

 6        of the question.

 7        A.    Yes, we had -- there was a -- there

 8   was a detailed analysis that was put together

 9   by David Klos at the time.

10        Q.    And do you recall just generally

11   what the total amount for both advisors of the

12   overpayments was?

13        A.    It was in excess of $10 million.

14        Q.    Was it in excess of $14 million?

15                MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I -- I remember it was an

18   eight-figure number.  I don't remember

19   specifically.

20        Q.    Okay.  And did you convey that

21   number to Mr. Dondero when you had that

22   conversation?

23        A.    Yes.

24        Q.    What was his reaction?

25        A.    I mean, he wasn't happy.
```

1                    WATERHOUSE - 10-19-21

2          Q.     Is it fair to say he was upset?

3          A.     Yes.

4          Q.     Did Mr. Dondero ever expressly tell

5     you to not have NexPoint make the required

6     December 31, 2020, payment?

7          A.     Yes, I recall him saying don't make

8     the payment because it was being negotiated, as

9     I discussed with Mr. Morris, this offset

10    concept.  So there were obligations due by the

11    advisors to Highland, they should be offset

12    that -- you know, those obligations should be

13    offset by this -- by this overpayment.

14         Q.     And when did he tell you that?

15         A.     I would say -- I would say around --

16    probably December -- December-ish.

17         Q.     Early December, late December?

18         A.     I don't recall with as much

19    specificity as -- as -- as -- as stopping the

20    shared services payments, because we had

21    actually made one shared services payment in

22    November.  So that is why I need to remember

23    that one more clearly.  I don't remember where

24    exactly in December that conversation occurred.

25         Q.     Did Mr. Dondero expressly use the

1                   WATERHOUSE - 10-19-21

2    word "NexPoint" when he was saying don't make

3    these payments?

4                   MR. MORRIS:  Objection to the form

5          of the question, asked and answered.

6          A.    Yeah, we were -- we were discussing

7    advisor obligations.  So it was -- you know, it

8    was just obligations from the advisors.

9                   And -- and he specifically talked

10   about the NexPoint payment as well.

11         Q.    Okay.  And it is your testimony that

12   he expressly told you not to make that NexPoint

13   December 31 payment?

14                  MR. MORRIS:  Objection, asked and

15         answered twice.

16         A.    Yes, he -- he did, during that

17   conversation.

18         Q.    And did you ever follow up with him

19   after that about whether NexPoint should or

20   shouldn't make that payment?

21         A.    I did not.

22         Q.    Did you ever, on or about

23   December 31, 2020, remind him and say, hey,

24   this payment is due, what shall I -- what

25   should I do?

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 177-38   Page 392 of 397 Page 224 of 229   PageID 38565

Page 392

1                    WATERHOUSE - 10-19-21

2        A.    I did not.

3        Q.    So sitting here today, you -- you

4    remember distinctly that Dondero in December of

5    2020 expressly told you not to have NexPoint

6    make that payment?

7              MR. MORRIS:  Objection, asked and

8         answered three times.

9        A.    Yes.

10        Q.    Can you say categorically it wasn't

11    just some general discussion where he told you

12    not to make payments?

13              MR. MORRIS:  Objection, asked and

14         answer four times.

15              MR. HORN:  Four times now.  Go for

16         five.

17        A.    Yes.

18        Q.    Did you tell Mr. Seery that?

19        A.    I don't believe I did.  I don't

20    recall.

21        Q.    And was this an in-person discussion

22    or telephone or email?  Do you remember?

23        A.    This was a phone -- a phone

24    conversation.

25        Q.    Okay.  Would you have a record of --

Page 393

1                    WATERHOUSE - 10-19-21

2    on your cell phone of when that conversation

3    might have taken place?

4               I'm sorry, strike that.

5               Was that by cell phone?

6       A.    I believe -- yes, because we -- I

7    was at home.  I mean, I don't have a landline.

8    All I have is my cell phone.

9       Q.    Do you know whether your cell phone

10   still has records of conversations from

11   December 2020 on it?

12      A.    My call log doesn't go back that

13   far.

14      Q.    Okay.  Thank you.

15              MR. RUKAVINA:  I will pass the

16   witness.

17              MS. DEITSCH-PEREZ:  Just a couple

18      quick questions.

19                    FURTHER EXAMINATION

20   BY MS. DEITSCH-PEREZ:

21      Q.    With respect to HCRE and HCMS, am I

22   correct there was -- there was no direction not

23   to pay those loan payments?

24              MR. MORRIS:  Objection to the form

25      of the question.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 394 of 497 Page 226 of 229   PageID 38567

Page 394

1                     WATERHOUSE - 10-19-21

2        A.    Yes, I don't recall having

3   conversations about, you know, those -- those

4   entities.

5        Q.    And, in fact, what was the tone that

6   Mr. Dondero had when he talked to you about the

7   fact that HCRE and HCMS payments hadn't been

8   made when he found out that they hadn't been

9   paid?

10             MS. DANDENEAU:  Objection to form.

11             MR. MORRIS:  Objection to form.

12       Q.    What was the tone he took with you?

13       A.    Oh, it was -- it was -- it was -- it

14   was very negative.  I mean, I think he cursed

15   at me and he doesn't usually curse.

16       Q.    Okay.  And in your mind, is that

17   consistent with the fact that he was surprised

18   that those payments hadn't been made?

19             MR. MORRIS:  Objection to the form

20       of the question.

21       A.    Yes.

22       Q.    Okay.  Thank you.

23             MR. MORRIS:  I have nothing further.

24       Thank you so much, Mr. Waterhouse.

25             MR. HORN:  I have no questions.

Case 21-03005-sgj   Doc 86-4   Filed 10/29/21   Entered 10/29/21 17:22:38   Desc
Case 3:21-cv-00881-X   Document 171-13   Page 395 of 497 Page 227 of 229   PageID 38568

Page 395

```
 1                  WATERHOUSE - 10-19-21

 2         Thank you, Mr. Waterhouse.  We appreciate

 3         your time.  I am logging off the discussion

 4         and I will talk to y'all tomorrow.

 5              MR. MORRIS:  Super.

 6              VIDEOGRAPHER:  If there are no

 7         further questions, this ends the

 8         deposition -- excuse me.  This ends the

 9         deposition, and we are going off the record

10         at 7:30 p.m.

11         (Deposition concluded at 7:30 p.m.)

12

13                    _____

14                    FRANK WATERHOUSE

15

16    Subscribed and sworn to before me

17    this     day of            2021.

18

19    ---------------------------------

20

21

22

23

24

25
```

1                WATERHOUSE - 10-19-21

2                C E R T I F I C A T E

3

4        I, SUSAN S. KLINGER, a certified shorthand

5    reporter within and for the State of Texas, do

6    hereby certify:

7        That FRANK WATERHOUSE, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11       I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15       IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18   _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25

```
 1                WATERHOUSE - 10-19-21

 2   NAME OF CASE:  In re:  Highland Capital

 3   DATE OF DEPOSITION:  October 19, 2021

 4   NAME OF WITNESS:  Frank Waterhouse

 5   Reason Codes:

 6        1.  To clarify the record.

 7        2.  To conform to the facts.

 8        3.  To correct transcription errors.

 9   Page____Line_____Reason_____

10   From_____to_____

11   Page____Line_____Reason_____

12   From_____to_____

13   Page____Line_____Reason_____

14   From_____to_____

15   Page____Line_____Reason_____

16   From_____to_____

17   Page____Line_____Reason_____

18   From_____to_____

19   Page____Line_____Reason_____

20   From_____to_____

21   Page____Line_____Reason_____

22   From_____to_____

23   Page____Line_____Reason_____

24   From_____to_____

25
```