Page 456

DONDERO - 10/29/21

1    installment payment that was due at the end of
2    2020; correct?
3         MS. DEITSCH-PEREZ:  Object to – are
4    you still talking – have you left HCRE?
5         MR. MORRIS:  No.  I said what I
6    meant to.  So we can take down the exhibit
7    if that's the part that is confusing you.
8    I appreciate that.
9         MS. DEITSCH-PEREZ:  Okay.
10        Q.   Okay.  NexPoint didn't make the
11   installment payment that was due at the end of
12   2020; correct?
13        MS. DEITSCH-PEREZ:  Object to the
14   form.
15        A.   Yeah.  I mean, I think maybe the
16   right way to describe it is Highland or –
17   yeah, Highland or Frank Waterhouse on behalf of
18   NexPoint didn't make the payment.
19        Q.   Okay.  And HCRE didn't make the
20   installment payment that was due at the end of
21   2020; correct?
22        A.   I don't – I guess – okay, if they
23   missed it too, I – I did not have specific
24   awareness to that, I guess, but if you are

Page 457

DONDERO - 10/29/21

1    suing under it, I guess they did.
2         Q.   Right.  And HCMS didn't make the
3    payment that was due at the end of the year, to
4    the best of your knowledge; correct?
5         MS. DEITSCH-PEREZ:  Object to the
6    form.
7         A.   Yeah.  I mean, what I'd just
8    separate in my notes here is the HCMFA was just
9    not – it wasn't a bona fide note, I guess,
10   is – that is – which I guess is a
11   different – a different conversation.
12        Q.   Yeah.  Do you understand that the
13   question was about HCMS?  Let me restate the
14   question.
15        MS. DEITSCH-PEREZ:  Yes.
16        Q.   HCMS –
17        A.   Oh, I'm sorry.
18        MS. DEITSCH-PEREZ:  John, I'm sorry,
19   it is really hard on the video to
20   distinguish between HCMF and HCMS, so if
21   you could just –
22        A.   How about just say Services for
23   Highland Capital Management Services, just
24   say – instead of S, just say Services.

Page 458

DONDERO - 10/29/21

1    Q.   Sure.  All right.  So from now on, I
2    will try and use the word "Services" and you
3    will know that that means Highland Management
4    Services, Inc.; is that fair?
5         A.   Yes, okay.
6         Q.   Okay.  So Services didn't make the
7    installment payment that was due at year-end;
8    correct?
9         A.   Yes.
10        Q.   Okay.  And I just want to make sure
11   that I have this right.  Is it – is it the
12   corporate obligors' – those three corporate
13   obligors' contention that one of the reasons
14   they didn't make the payments at the end of the
15   year is that they were relying on Highland to
16   make the payment for them?
17        A.   Absolutely.
18        Q.   Okay.
19        A.   It was due course de minimis, and
20   those entities didn't have a single employee or
21   capable financial person other than the people
22   at Highland that were doing the shared services
23   for them.
24        Q.   NexPoint didn't have any employees

Page 459

DONDERO - 10/29/21

1    in December 2020.  Is that your testimony?
2         A.   I was thinking about HCRE and
3    Services had zero employees.  NexPoint had
4    employees but none that were involved in basic
5    accounting functions.
6         Q.   Okay.  And – and there are people,
7    including yourself, who were officers or
8    employees of NexPoint in December 2020;
9    correct?
10        A.   Yes.
11        Q.   And HCRE had officers in December
12   2020, including you; correct?
13        A.   Yes.  Officers, yes.
14        Q.   And Services had officers in
15   December 2020, including you; correct?
16        A.   Yes.
17        Q.   Okay.  I think in summary form, to
18   be fair, I think we have identified one of the
19   defenses for these three corporate obligors.
20        Two of them have the defense of
21   prepayment; right?
22        A.   Yes.
23        Q.   And one of them is NexPoint,
24   NexPoint has the defense of prepayment.

Page 460

DONDERO - 10/29/21

1           DONDERO - 10/29/21
2           Do you have that -- do I have that
3  right?
4       A.  Yes.
5       Q.  Which of the other two, remind me?
6       A.  Services.
7       Q.  Okay.  So NexPoint and Services have
8  the defense of prepayment.  Are there any other
9  reasons that you know of that these three
10  corporate obligors didn't make the annual
11  installment payment that was due at the end of
12  the year?
13          MS. DEITSCH-PEREZ:  Object to the
14      form.
15      A.  Again, they -- they should have been
16  in regular course.  Those payments -- using the
17  word "payment" is almost like an overstatement
18  of the significance or the amount.  If the
19  amounts were small in all cases, they should
20  have been made or they should have been paid,
21  even in the context of contention and even in
22  the context of the larger amounts of money that
23  Highland owed us.
24      Q.  I'm just -- I'm just asking a pretty
25  simple question, sir.  I don't mean to be

Page 461

1           DONDERO - 10/29/21
2  contentious with you.  We have identified one
3  defense that these corporate obligors contends
4  exists; and that is, Highland was supposed to
5  make the payment.  Fair?
6       A.  Yes.
7       Q.  And then we have identified a second
8  defense for NexPoint and HCMS, and that is
9  their defense that they prepaid.
10         Do I have that generally right?
11      A.  Yes.
12      Q.  Can you describe for me any other
13  defenses that these three corporate obligors
14  have for not making the payment that was due at
15  the end of the year?
16         MS. DEITSCH-PEREZ:  Object to the
17      form.
18      A.  I'm thinking.  Not at the moment.
19      Q.  Okay.  Did you instruct anyone in
20  December of 2020 to make the installment
21  payments that were due on December 31st under
22  these three term notes?
23         MS. DEITSCH-PEREZ:  Object to the
24      form, asked and answered.
25      A.  No.

Page 462

1           DONDERO - 10/29/21
2       Q.  Okay.  Did you take any steps to
3  confirm that Highland would make the payments
4  that were due under these three term notes at
5  the end of the year?
6          MS. DEITSCH-PEREZ:  Object to the
7      form.
8       A.  No.  I testified already the first I
9  heard about it was a week or two later.  And I
10  called up Frank and confirmed with him to make
11  sure they got paid and make sure they were back
12  in compliance.
13      Q.  Okay.
14          MR. MORRIS:  I move to strike
15      everything after the word "no."
16      Q.  Do you know whether anybody on
17  behalf of any of the three corporate obligors
18  under the term notes ever directed Highland to
19  make the payments under them at the end of the
20  year?
21          MS. DEITSCH-PEREZ:  Object to the
22      form.
23      A.  Not before the end of the year, no.
24      Q.  Okay.  And do you know whether
25  anybody acting on behalf of any of the three

Page 463

1           DONDERO - 10/29/21
2  corporate obligors under the term notes ever
3  took any steps in December 2020 to make sure
4  that Highland would, in fact, make the payments
5  that were due at year-end?
6          MS. DEITSCH-PEREZ:  Object to the
7      form.
8       A.  No, there was a reliance on
9  Highland.
10      Q.  Okay.  Is it your testimony that
11  Highland was authorized to make the payments
12  under the notes at year-end without being
13  directed by a representative of the three
14  corporate obligors?
15      A.  Yes.  It is my contention that that
16  is how it worked in prior years also.
17      Q.  And so you believe that nobody on
18  behalf of any of the corporate obligors ever
19  authorized or directed Highland to make the
20  payments but that Highland did it without --
21  without direction?
22          MS. DEITSCH-PEREZ:  Object to the
23      form.
24      A.  Yes, typically.  And in 2017 or
25  2018, 2019, for sure.

Page 464

DONDERO - 10/29/21

1
2    Q.   Okay.  We have looked at one -- at
3    one December 3rd letter.  I mean, do you
4    remember that you also received a number of
5    letters on December 3rd demanding payment on
6    certain promissory notes?
7    A.   No.
8    Q.   All right.
9         MR. MORRIS:  Can we call up
10   Exhibit 2, please.  No, I apologize.  Not
11   Exhibit 2, Exhibit 4.
12        (Exhibit 4 marked.)
13        MS. DEITSCH-PEREZ:  Exhibit 4 in the
14   notebook?
15        MR. MORRIS:  Yes, ma'am.
16        Okay.  And now let's -- let's go to
17   the exhibits.  Exhibit 2, Exhibit 3,
18   Exhibit 4, Exhibit 5.
19   Q.   Do you see, sir, that this is a
20   letter addressed to you on behalf of HCRE
21   Partners that is also dated December 3rd, 2020?
22   A.   Yes.
23   Q.   Does that refresh your recollection
24   that you also received notices, demand notices
25   on or around December 3rd, 2020, with respect

Page 465

DONDERO - 10/29/21

1
2    to notes that were held by Highland?
3    A.   No.
4    Q.   Do you recall this letter at all?
5    A.   No, if I -- if I had, I would have
6    made the forgiveness argument or I would have
7    told someone to make the forgiveness argument,
8    but I don't remember this at all.
9    Q.   Okay.  Is it fair to say that
10   neither you nor anyone acting on behalf of
11   yourself, HCMS, or HCRE ever responded to any
12   of the demand letters at the beginning of
13   December 2020?
14        MS. DEITSCH-PEREZ:  Object to the
15   form.
16   A.   Yes, I don't -- I don't know.
17   Q.   You don't have any knowledge of
18   that; is that fair?
19        MS. DEITSCH-PEREZ:  Object to the
20   form.
21   A.   I don't know.
22   Q.   And you don't have any knowledge of
23   anybody responding to any demand letter that
24   was sent to HCMFA; correct?
25        MS. DEITSCH-PEREZ:  Object to the

Page 466

DONDERO - 10/29/21

1
2    form.
3    A.   HCMFA or Services?
4    Q.   HCMFA?
5    A.   I -- I don't know.  I don't have any
6    knowledge.
7         MR. MORRIS:  Can we put up
8    Exhibit 1, please.
9         (Exhibit 1 marked.)
10        MR. MORRIS:  We probably want to go
11   to Exhibit 3 of that document.
12   Q.   This one was sent to Mr. Waterhouse.
13        Do you see that?
14   A.   Yes.
15   Q.   Okay.  And did you become aware on
16   or around December 3rd, 2020, that Highland
17   made demand under the two notes listed in this
18   letter?
19   A.   Yes.  Why would this one go to
20   Frank Waterhouse?
21   Q.   Was he the treasurer -- was he the
22   treasurer of Highland Capital Management Fund
23   Advisors at the time?
24   A.   Right.
25   Q.   So does it make sense that the payee

Page 467

DONDERO - 10/29/21

1
2    on a note might send a demand letter to the
3    treasurer of the maker of the note?
4         MS. DEITSCH-PEREZ:  Object to form.
5    A.   I'm just saying they could have sent
6    the NexPoint letter or the Services letter to
7    him also; right?
8    Q.   I don't -- I think the NexPoint is
9    only a term note; right?  So there is no demand
10   letter.
11   A.   No, I know that.  But whatever --
12   whatever the other one we were just looking at,
13   the Services one could have gone to him, too.
14        Anyway, whatever.  It doesn't
15   matter.  But, no, I don't have a specific
16   recollection of this, if that was your
17   question.
18   Q.   You don't have -- you don't have any
19   recollection of Highland making demand under
20   promissory notes that were issued by you and
21   certain of your affiliates in early December
22   2020.  You don't remember that at all?
23   A.   There was a lot going on then.  And,
24   again, it wasn't something that we either
25   thought was legitimate based on forgiveness or

Page 468

DONDERO - 10/29/21

1  other issues or it wasn't things that we
2  thought were legitimate as part of the overall
3  settlement.
4        You've got to remember we didn't
5  realize Seery betrayed the estate at this
6  point. We thought we were moving towards, you
7  know, resolution or a pot plan.
8     Q. Okay.
9        MR. MORRIS: I move to strike.
10    Q. And please listen carefully to my
11  question.
12        Did you have any knowledge in early
13  December 2020 that Highland made demand for
14  payment under demand notes that were issued by
15  you and certain of your affiliates?
16    A. Same answer.
17    Q. Were you aware or you were not
18  aware?
19    A. Well, no specific knowledge for the
20  reasons articulated in the answer that you --
21  you moved to strike.
22    Q. Okay. So -- so you had -- you had
23  no particularized knowledge of the demands in
24  December 2020; correct?

Page 469

DONDERO - 10/29/21

1    A. Right.
2    Q. Okay. And so it is fair to say that
3  you never directed anybody to respond to these
4  demands because you didn't have knowledge of
5  them; correct?
6    A. Right.
7    Q. Okay. Do you know whether anybody
8  responded on behalf -- on your behalf or any of
9  the corporate obligors' behalf to any of the
10  demand letters that were -- that you now know
11  were sent in early December 2020?
12    A. Well, yes. I mean, I know
13  eventually. I don't know when, but I don't
14  think anybody believes these -- these HVIN
15  notes are legitimate notes.
16        I know the response was more around
17  it being payments for the TerreStar regulatory
18  obligations for all the things that Highland
19  had mucked up in the TerreStar situation.
20    Q. While you were president of that
21  entity; right?
22    A. Yes.
23    Q. Okay. And -- and
24  PricewaterhouseCoopers certainly doesn't think

Page 470

DONDERO - 10/29/21

1  these are frivolous obligations, does it?
2        MS. DEITSCH-PEREZ: Object to the
3  form.
4    A. PricewaterhouseCoopers doesn't --
5    Q. PricewaterhouseCoopers specifically
6  included a disclosure of all of these
7  promissory notes in the audited financial
8  statements; correct?
9        MS. DEITSCH-PEREZ: Object to the
10  form.
11    A. I mean, as they should have with the
12  information they had at the time, but I think
13  what has come out since then is that they -- it
14  was moneys that moved from Highland to HFAM for
15  things that were caused by Highland and people,
16  not me, not even Frank, I think, but other
17  people assumed it was a note and made notes out
18  of it. And that is what PricewaterhouseCoopers
19  put into the financials, but I think what
20  everybody acknowledges is that they were
21  never -- they were never notes.
22    Q. Is there a document that you have
23  ever seen in your life that supports what you
24  just said?

Page 471

DONDERO - 10/29/21

1        MS. DEITSCH-PEREZ: Object to the
2  form.
3    A. Yes.
4    Q. Can you identify that document for
5  me?
6    A. Yeah. It is a -- it is a settlement
7  with the SEC in terms of what they said the
8  breaches were, and why they were finding HFAM,
9  the rationale that they had in the regulatory
10  breaches and in the settlement, and all of the
11  breaches in the settlement were things that
12  Highland did, not that HFAM did.
13        It was all valuation, it was all --
14  it was all services that HFAM had contracted
15  with Highland that were performed deficiently
16  in the eyes of the SEC.
17    Q. Okay. We will -- we will get to
18  that in more detail, but I just would like to
19  know if you believe that any correspondence to
20  the SEC specifically stated that Highland
21  Capital Management, L.P. and not Highland
22  Capital Management Fund Advisors, L.P. was
23  responsible for the TerreStar valuation error.
24    A. The SEC would not have parsed

DONDERO - 10/29/21

1             DONDERO - 10/29/21
2  between the different players in the entities.
3  They would have said what they thought the
4  breaches were overall in their letter, and what
5  would govern the split is the shared services
6  agreement and where were the employees that
7  performed the activities that they cited.
8      Q.  Okay.  We will get to that at a
9  later time.
10         All right.  Let's go back to the
11  oral agreements that you entered into with the
12  Dugaboy trustee.
13      MR. MORRIS:  And let's start by
14  putting back up Exhibit 31, Paragraph 82.
15      MS. JEFFRIES:  I'm sorry, can you
16  repeat that?
17      MR. MORRIS:  Yes.  Exhibit 31,
18  Paragraph 82, yes.
19      Q.  And, again, Mr. Dondero, I think you
20  have testified already that you believe
21  Paragraph 82 generally describes the oral
22  agreement that you entered into with the
23  Dugaboy trustee with respect to the promissory
24  notes that we've described; right?
25      A.  Yes.

1             DONDERO - 10/29/21
2      Q.  And -- and it is -- and that
3  includes the promissory notes that you signed
4  that Highland is suing on as well as the
5  promissory notes that HCRE, HCMS, and NexPoint
6  signed that Highland is suing on; correct?
7      A.  Yes.
8      Q.  Okay.  Do you contend that the oral
9  agreements that you entered into with the
10  Dugaboy trustee modified the parties'
11  rights under the original promissory notes?
12      MS. DEITSCH-PEREZ:  Object to the
13  form.
14      A.  Modify, boy, sounds like a legal
15  term.  It said conditions by which they could
16  be forgiven.
17      Q.  And there were no such conditions in
18  the original notes; right?
19      A.  That is correct.
20      Q.  Okay.  So I'm just asking you from
21  your perspective whether the oral agreements
22  that you entered into with the Dugaboy trustee
23  were intended to modify the parties' rights and
24  obligations under the original promissory
25  notes.

1             DONDERO - 10/29/21
2      MS. DEITSCH-PEREZ:  Object to the
3  form.
4      A.  It was meant to condition the
5  forgiveness.
6      Q.  Did it change --
7      A.  I would like to use those words
8  versus modified the agreement.
9      Q.  Did it -- did it alter the parties'
10  rights and obligations?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.
13      Q.  I'm not trying to play a game with
14  you.  I just --
15      MS. DEITSCH-PEREZ:  That is exactly
16  what you are doing.  Why don't you just ask
17  him --
18      MR. MORRIS:  Please stop talking.
19  Please stop talking.
20      Q.  Mr. Dondero, is it fair to say that
21  the promissory notes that are the subject of
22  your oral agreements with the Dugaboy --
23  Dugaboy trustee set forth the parties' rights
24  and obligations thereunder, both the maker and
25  the payee?

1             DONDERO - 10/29/21
2      MS. DEITSCH-PEREZ:  Can you read
3  that back again.
4      Q.  Is it fair to say that the original
5  promissory notes that are the subject of the
6  oral agreements between you and the Dugaboy --
7  withdrawn.
8         Is it fair to say that the original
9  promissory notes that Highland is suing under
10  set forth the maker and the payees' rights and
11  obligations under those notes?
12      MS. DEITSCH-PEREZ:  Object to the
13  form.  Object to the form.
14      A.  Yeah, I -- again, I want to -- I
15  want to avoid using the term "modification" or
16  implying modification because, again, the notes
17  are soft, and they really just talk about a
18  rate and/or payment or amortizations, but
19  they're soft notes.  Something in the agreement
20  that lays out the conditions for forgiveness
21  aren't necessarily a modification of the note,
22  and I'd like that to be --
23      Q.  Let me --
24      A.  -- my testimony.
25      Q.  Let me ask it this way:  Under each

Page 476

DONDERO - 10/29/21

1  of the demand notes, Highland as the payee had
2  the unfettered right to demand payment at any
3  time; correct?  Did you understand that?
4      MS. DEITSCH-PEREZ:  At the time that
5  the notes were first signed?
6      MR. MORRIS:  Yes, ma'am.
7      A.  Yeah.  I mean, at the -- at the time
8  that they were first put in place, but by the
9  time the demand was made, they had already been
10  subject to the conditions present or the
11  conditions for forgiveness.
12     Q.  Okay.  So this is exactly what I'm
13  trying to get at.  At the time the notes were
14  signed, Highland had the right to make demand
15  for payment at any time; correct?
16     A.  Yes.
17     Q.  And when you entered into the oral
18  agreements with the Dugaboy trustee, Highland's
19  right to make a demand -- pick your word,
20  modified, altered, amended, changed -- it
21  was -- your oral agreement had an impact on
22  Highland's rights under the promissory notes;
23  correct?
24     MS. DEITSCH-PEREZ:  Object to form
25

Page 477

DONDERO - 10/29/21

1  of the question.
2      Q.  You can answer.
3      A.  The conditions subsequent -- the
4  condition precedent -- precedence for
5  forgiveness changed the ability for the demand
6  notes to be demanded.
7      Q.  Okay.  And -- and each of the oral
8  agreements that you entered into with the
9  Dugaboy trustee was related to the loans that
10  were reflected in the promissory notes;
11  correct?
12     A.  Well, it was related to the
13  promissory notes themselves.
14     Q.  Correct.  And the promissory notes
15  reflect notes that were made from the payee to
16  the maker; correct?
17     A.  Yeah.  Most of them were roll-ups
18  from prior.
19     Q.  No.  Those are the term notes.  I'm
20  only talking about the demand notes.
21     A.  Okay.
22     Q.  Okay.  So with respect to the demand
23  notes, the oral agreements that you entered
24  into with the Dugaboy trustee related to the
25

Page 478

DONDERO - 10/29/21

1  loans that were the subject of the promissory
2  notes; correct?
3      A.  Yeah, I -- I -- I am just not
4  understanding the nuance enough to answer that
5  question.
6      Q.  Did the oral agreements relate to
7  the loans that were the subject of the
8  promissory notes?
9      A.  The oral agreements affected the
10  term loans and the demand notes.
11     Q.  Okay.
12     A.  Does that answer your question?
13     Q.  And so -- and so is it fair to say
14  that the oral agreements related to -- to
15  the -- to the -- to the loans that were the
16  subject of the notes?
17     A.  I don't know.
18     Q.  Okay.
19     A.  I'm not -- I'm not sure what you are
20  asking, but I don't know the answer.
21     Q.  Okay.  It is your --
22     MS. DEITSCH-PEREZ:  John, just
23  how -- I just think the witness is lagging
24  a little.  So how much longer do you think
25

Page 479

DONDERO - 10/29/21

1  you have?
2      MR. MORRIS:  Oh, I've got probably
3  four hours, so I don't expect to finish
4  today.  If Mr. Dondero -- if Mr. Dondero
5  wants to stop --
6      Q.  Are you unable to continue right
7  now, Mr. Dondero?
8      A.  Well, if we have four more hours, I
9  would rather do it a day next -- next week, one
10  afternoon.
11     MR. MORRIS:  Okay.  Can we check our
12  calendars before we go off the record?
13     We have a deposition on Tuesday.
14  I'm not available on Monday.  I can make
15  myself free on Wednesday, Thursday, or
16  Friday.  And I think that we should expect,
17  you know, a substantial period of time,
18  perhaps as long as a full day.
19     I mean, with all due respect --
20     MS. DEITSCH-PEREZ:  How do you have
21  a full day?  You have already gone -- you
22  have already gone more than half a day.
23     MR. MORRIS:  Yeah.  And just -- just
24  to be clear -- and I'm happy, you know,
25

Page 480

DONDERO - 10/29/21
1           DONDERO - 10/29/21
2   to – to discuss this with you offline, but
3   I didn't decide that Mr. Dondero would
4   appear in his personal capacity and on
5   behalf of three separate 30(b)(6)
6   witnesses.
7       If you had given me a different
8   witness for each, I would have a total of
9   28 hours.  I don't expect to use anything
10  remotely close to that time, but I am
11  examining four witnesses here and I
12  would – I would appreciate –
13      MS. DEITSCH-PEREZ:  But we also –
14      MR. MORRIS:  I would appreciate it.
15  And, look, you can stop me at any time.  If
16  I haven't finished asking the questions
17  that I believe I'm entitled to, I will, you
18  know, take it to the judge.  I'm just
19  putting you on notice.  I have – I'm on
20  page 27 of a 57-page outline, so...
21      MS. DEITSCH-PEREZ:  Oh, geez.
22      MR. MORRIS:  Yeah, so I do have a
23  fair amount more to cover.  Okay?
24      MS. DEITSCH-PEREZ:  All right.
25      MR. MORRIS:  So Wednesday, Thursday,

Page 481

1           DONDERO - 10/29/21
2   or Friday, Mr. Dondero, I will make myself
3   available at your convenience.
4       THE WITNESS:  I have all day board
5   meetings on Wednesday.
6       MR. MORRIS:  Okay.
7       THE WITNESS:  I could do Thursday
8   afternoon or I can do Friday afternoon.
9   Hold on.
10      MS. DEITSCH-PEREZ:  Let me put this
11  on mute and we will look at our calendars.
12      MR. MORRIS:  Thank you.
13      VIDEOGRAPHER:  Do you want to stay
14  on the record?
15      MR. MORRIS:  Yes, please.
16      THE WITNESS:  Hello.  All right.  I
17  can do Thursday afternoon for four hours.
18  And if we need more time than that we can
19  either do Friday afternoon or sometime
20  the – the week after that, but I have – I
21  have got –
22      MR. MORRIS:  Thank you very much.
23  What time on Thursday works for you,
24  sir?
25      THE WITNESS:  How about 1:00 o'clock

Page 482

1           DONDERO - 10/29/21
2   my time?
3       MR. MORRIS:  Okay.  I appreciate it.
4   Thank you very much.  1:00 o'clock Central,
5   it is, next Thursday for the continuation
6   of this.
7       And hopefully I will finish that
8   day, you know, if we can go without a lot
9   of breaks and the rest of it.  Hopefully I
10  can finish that day.  My intention is to do
11  that.  Okay?
12      THE WITNESS:  Perfect.  Thank you.
13      MS. DEITSCH-PEREZ:  Can – can I get
14  the rough?
15      COURT REPORTER:  Yes.  Yes.
16      MR. MORRIS:  All right.  We can go
17  off the record.
18      MS. DEITSCH-PEREZ:  Thank you.
19      COURT REPORTER:  Thank you.
20      VIDEOGRAPHER:  Off the record, 3:53.
21  (Deposition adjourned at 3:53 p.m.)
22
23
24
25

Page 483

1           DONDERO - 10/29/21
2   _____
3           JAMES DONDERO
4
5   Subscribed and sworn to before me
6   this      day of          2021.
7
8   -------------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 484

```
1          DONDERO - 10/29/21
2          C E R T I F I C A T E
3
4      I, SUSAN S. KLINGER, a certified shorthand
5  reporter within and for the State of Texas, do
6  hereby certify:
7      That JAMES DONDERO, the witness whose
8  deposition is hereinbefore set forth, was duly
9  sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11      I further certify that I am not related to
12  any of the parties to this action by blood or
13  marriage; and that I am in no way interested in
14  the outcome of this matter.
15      IN WITNESS WHEREOF, I have hereunto set my
16  hand this 29th of October, 2021.
17
18      _____
19      Susan S. Klinger, RMR-CRR, CSR
20      Texas CSR# 6531
21
22
23
24
25
```

Page 485

```
1          DONDERO - 10/29/21
2  NAME OF CASE:  In re: Highland Capital
3  DATE OF DEPOSITION:  October 29, 2021
4  NAME OF WITNESS:  James Dondero
5  Reason Codes:
6    1. To clarify the record.
7    2. To conform to the facts.
8    3. To correct transcription errors.
9  Page____Line_____Reason_____
10  From_____to_____
11  Page____Line_____Reason_____
12  From_____to_____
13  Page____Line_____Reason_____
14  From_____to_____
15  Page____Line_____Reason_____
16  From_____to_____
17  Page____Line_____Reason_____
18  From_____to_____
19  Page____Line_____Reason_____
20  From_____to_____
21  Page____Line_____Reason_____
22  From_____to_____
23  Page____Line_____Reason_____
24  From_____to_____
25
```

Appx. 01792

## $

**$100** 294:8

**$14** 392:5

**$150,000** 434:2,14 435:3,9 437:17

**$200** 294:2

**$25** 296:18

**$27** 420:12

**$27.675** 419:17

**$30** 407:22 412:4 413:5,11

**$30.75** 408:18

**$400,000** 437:4

**$50** 296:15

**$600** 298:12

**$75** 294:11

## 0

**03** 402:14

## 1

**1** 288:4 408:12,15 433:21,23,24 466:8,9

**10** 298:13,15 318:3 454:8

**10/29/21** 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1

341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1 396:1 397:1 398:1 399:1 400:1 401:1 402:1 403:1 404:1 405:1 406:1 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1 425:1 426:1 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1 438:1 439:1 440:1 441:1 442:1 443:1 444:1 445:1 446:1 447:1 448:1 449:1 450:1 451:1 452:1 453:1 454:1 455:1 456:1 457:1 458:1 459:1 460:1 461:1 462:1 463:1 464:1 465:1 466:1 467:1 468:1 469:1 470:1 471:1 472:1 473:1 474:1 475:1 476:1 477:1 478:1 479:1 480:1 481:1 482:1

**102** 365:10

**10:21** 288:8

**10:41** 304:6,7

**10:47** 304:7,9

**11:08** 318:7,8

**11:16** 318:8,10

**11th** 310:11 324:4 440:21

**12** 298:13,16

**12-month** 420:12

**12:40** 381:8,9

**12:51** 381:9

**13** 357:19

**14** 391:25

**15** 380:10,11 421:17 431:8

**16** 362:13,16,18,19 391:25

**17** 377:21,22

**1994** 291:10

**1:00** 481:25 482:4

**1:13** 398:19,20

**1:45** 398:18

**1:48** 398:20,22

## 2

**2** 288:4 408:8,10,13, 21 436:3,4,5 464:10, 11,17

**2.1** 409:13

**20** 414:24 421:17

**2008** 292:11 426:21 428:12 429:7

**2010** 307:12

**2014** 420:13 450:23

**2015** 401:21 420:13 450:23

**2017** 408:17,24 410:23 411:8 419:12 447:2,24 449:6,13 450:11 451:3 452:15 455:8 463:24

**2018** 369:15 435:4 436:10 463:25

**2019** 310:11 324:5 369:19 436:22 437:4, 17 463:25

**2020** 291:11 336:25 371:11,15,16 372:15 373:22 374:6,9,21 393:17 394:2,9,16 395:14 397:4,25 415:8 439:8,17 440:16,21 445:22 446:5 456:3,13,22 459:2,9,13,16 461:20 463:3 464:21,25 465:13 466:16 467:22 468:14,25 469:12

**2021** 288:7 357:6 363:17

**21** 337:2

**25** 292:15,16 422:3, 18

**25-year** 293:15

**26** 292:16 422:3,19

**27** 480:20

**28** 480:9

**28th** 435:4

**29** 288:7

**2:13** 398:15

**2:45** 398:18

**2:56** 454:16,17

## 3

**3** 348:11 433:14,15, 18,23 436:3,13 439:15 464:17 466:11

**30(b)(6)** 345:2,10,13 353:14,18 354:7,13 363:3 370:21 376:4, 19 378:3 388:22 391:5 406:5 480:5

**30(b)(6)s** 386:22 387:23

**30-year** 451:10,13,17

**31** 354:22,23 402:9, 13,23 472:14,17

**31st** 408:16,24 410:23 419:12 447:2

449:6,13 450:11 451:3 453:23 455:8 461:21

**35** 292:7 309:13

**37** 323:18

**3:00** 445:8

**3:19** 454:17,19

**3:53** 482:20,21

**3rd** 439:7,17 440:6,16 464:3,5,21,25 466:16

## 4

**4** 393:4 412:23 433:21 436:3 448:3,14,20,23 464:11,12,13,18

**40** 365:2

**47** 345:5,6

**48** 353:11,12

**49** 354:5,6

## 5

**5** 298:11 414:6 439:15 445:25 455:11,14,18 464:18

**50** 405:17 429:24

**57-page** 480:20

## 6

**6** 446:15,16 448:17, 19,22

## 8

**8** 298:13,15

**80** 390:4,7

**81** 390:7 398:12

**82** 357:20,25 390:7 398:12 403:4,6 422:8 423:10 472:14,18,21

**83** 357:18,25 358:19

**84** 359:12,13

**85** 359:21

**86** 359:23 360:13

**88** 360:16 361:14
362:9

---

**9**

**91** 357:21

**94** 291:8 365:2,10,15
370:8

**95** 370:14,15,23
375:22

**96** 370:24 375:22
378:10,17,20 379:14,
24

**97** 380:2

**98** 380:3

**9th** 291:11 374:9

---

**A**

**a.m.** 288:8 304:7
318:8

**ability** 289:25 353:23
477:6

**absolutely** 375:15
458:18

**absolve** 376:20

**accelerate** 414:12

**acceleration** 377:17
412:23 414:13

**accepted** 392:22

**accepting** 377:14

**access** 425:25
431:15,25

**accommodate**
317:25

**accordance** 418:16,
23

**account** 331:3
338:14 372:2

**accountants** 371:5
451:14

**accounting** 299:8,
19 300:4 319:25
324:15 334:12,19
382:23,24 383:9
397:13 410:16,20,25
411:12,15 416:5
418:2 459:6

**accounts** 319:9,12,
17,21 328:19,22
329:2,8

**accrue** 373:12

**accurate** 343:13,15
357:15 364:24
379:10

**accurately** 334:16

**acknowledge** 360:6

**acknowledges**
470:21

**acting** 340:15 371:24
372:12 396:25
442:25 462:25
465:10

**activities** 472:7

**actual** 438:4

**add** 392:4

**additional** 361:16
392:5 426:4

**addressed** 464:20

**adjourn** 290:4

**adjourned** 482:21

**adjust** 291:24 442:10

**administered**
416:11 417:21

**administering** 415:3

**advance** 352:25

**advisor** 308:11,12,
13,14

**advisors** 306:8
322:13 324:4,9
326:2,5 335:20,22
374:20 375:6 466:23
471:23

**affected** 478:10

**affiliate** 298:4,22

299:3,21 300:7
301:3,9 344:12
452:23

**affiliated** 297:16,24
314:22 315:8 325:3,
11,12,17 344:14
426:15

**affiliates** 344:22
413:12,13 426:22
467:21 468:16

**affirmative** 347:7,11,
14 348:8 357:21
358:6,20 359:3,19,24
360:12,25 361:13
362:9 365:11 366:7
370:15,22 375:21
376:9,17 378:11
379:23 380:4 389:13
390:9 391:7 398:11
406:20

**affixed** 434:14 435:7

**afoot** 438:22

**afternoon** 479:11
481:8,17,19

**aggregate** 293:23
295:16 297:25 419:8

**aggregating** 411:10

**agree** 400:8 446:25

**agreed** 301:15 430:5

**agreement** 335:15,
17,24 336:5,6,9,15,
25 337:5,6 356:4
361:22 381:11,20,24
382:13,21 404:16,24
405:3 407:10,12
420:25 421:5 427:20
449:20 472:6,22
474:8 475:19 476:22

**agreements** 335:23
336:2 339:23 375:5
399:8,16 400:10,11,
23 401:4,16 403:7,
11,14,20 404:2,8
405:15 406:21
420:21 422:7,23
423:9 426:15,22
427:3 443:10,20
472:11 473:9,21
474:22 475:6 476:19
477:9,24 478:7,10,15

**ahead** 437:22 441:21

**air** 423:20

**alleged** 360:18

**allowed** 435:7

**alter** 474:9

**altered** 476:21

**alternative** 291:18
361:6 452:2

**amassed** 424:19
425:5 431:8

**amend** 320:19

**amended** 346:18
355:2,20 356:3,5
357:14 362:15,24
364:23 379:9 389:3
402:24 476:21

**amortizations**
475:18

**amount** 293:23
294:12 295:17 298:5,
21 299:3 360:7
385:11 391:21 392:2,
6 393:6 407:22
408:17 417:20
419:16,22 422:13
430:6 435:3 460:18
480:23

**amounts** 333:5
344:21,23 367:12
372:6 377:13 382:6
392:21,25 420:3
424:21 427:4 431:9
448:6 450:17 460:19,
22

**and/or** 334:14 338:6
364:2 365:18 412:2
475:18

**animation** 396:22

**annoyed** 391:22
392:19

**annual** 369:23 377:2
409:16,22 410:8
453:22 460:10

**answers** 345:24
347:16,18 405:25
406:22 407:4 439:4

**anytime** 371:16

**Apologies** 423:24

**apologize** 288:21
295:12 297:21
301:19 332:5 387:17
422:16 423:18 425:8,
18 445:3 448:21
455:4 464:10

**appearance** 445:5

**appearances**
288:17

**appears** 311:7 314:9

**applied** 403:15

**applies** 406:13

**apply** 333:3 368:15
403:21 404:3,9
405:8,9

**appoint** 301:23
302:14 311:3 323:14

**appointed** 301:12,14
302:18 321:6

**approval** 312:4

**approve** 312:11

**approved** 312:19
357:4

**approving** 364:10

**approximate** 408:17

**approximately**
407:22 419:17

**April** 310:11 324:4
450:23

**arbitrary** 290:19

**area** 292:18

**argue** 393:13

**argument** 377:17
386:10 393:8,10
446:13 465:6,7

**articulate** 330:23

**articulated** 421:10
468:21

**aspect** 337:10
363:25 370:11 372:5
379:5

**asserted** 358:20 366:13

**assertion** 379:16 430:3 431:12

**asserts** 359:24 360:16 365:16

**asset** 291:19 298:16 308:10 376:25 412:20 421:14

**assets** 292:4 299:9 330:16 334:14

**assigned** 300:20

**assume** 311:22 342:11 408:25 435:5 438:5

**assumed** 470:18

**assuming** 415:20

**attached** 444:10,18

**attention** 439:21

**attorney** 320:18 321:8

**attorneys** 429:7

**audit** 320:2 334:19 411:3,16 416:6 426:10

**audited** 299:10,25 327:18 340:9 412:11, 17 428:11 429:6 430:7,22 432:6,12 470:8

**auditor** 426:14 427:9

**auditors** 334:17 373:10 411:12 416:7 426:22 427:14 435:14 451:14 454:5

**audits** 327:14 334:11 337:23

**August** 356:4 420:13

**authoritative** 310:20

**authority** 301:22,23 302:13,14 310:5 317:9,13 451:5

**authorize** 371:18 389:7 420:5 436:9

**authorized** 316:12, 18 319:8,11,16,20 328:18,21,25 329:7 363:15 371:25 391:19 434:21 438:2 463:11,19

**authorizing** 364:10

**automated** 438:3

**avoid** 475:15

**aware** 311:18 312:14 314:18,24 315:4 317:7,11 324:18,19, 24 325:5 327:6 330:10 334:4,6 340:10,12 346:16,17 351:13 352:10,19 357:9,11,12 358:5 359:18 364:14,18,21 365:20 367:20 368:4 369:22 370:6 372:12, 19,25 373:2 376:16 378:8 379:17 389:10 390:8 397:21 398:11 402:4 428:13,18 429:13 434:13 435:13,15 437:16,20 439:7 442:2,11 444:8,19,24 453:21 455:17 466:15 468:18,19

**awareness** 320:6,8 321:4 322:10 324:12 325:8 332:16 333:4 344:10,18 352:13 366:19 373:17 401:22,23 456:25

## B

**back** 294:19 304:8 318:9 320:25 336:17 338:17 381:3,13 388:19 392:5,24 397:10,11 398:21 401:5 424:2,10 428:18 429:7 430:3 454:18 462:11 472:10,14 475:3

**background** 324:15 357:4

**bad** 405:7 416:16 417:8

**balance** 293:8 298:9 299:4,22 300:8 301:4,10 326:23 327:3,7 405:18 412:2 413:19 418:4

**balances** 319:24

**ballpark** 295:18

**bank** 319:9,12,17,21 328:18,22,25 329:8 425:2,3

**bankruptcy** 300:6, 15 302:21 315:24,25 366:13 413:14

**barred** 358:21 359:15 360:2,17 365:17 370:16

**base** 298:16

**based** 324:16 398:5 467:25

**basic** 416:19 459:5

**basis** 294:5 344:9

**Bates** 444:20,23

**begin** 289:6,12,18

**beginning** 288:4 355:25 357:5 363:16 465:12

**behalf** 293:4 316:13, 19 349:12 353:23 354:8 363:16 364:11 371:12,24 372:7,13 386:17 387:5 388:12 389:8 394:8,16 396:25 404:10 408:24 409:7 411:17 415:4 418:13 419:20 436:10 437:14 443:2 449:12 451:6 455:7 456:18 462:17,25 463:18 464:20 465:10 469:9,10 480:5

**believes** 469:15

**benefit** 339:4 385:10

**benefiting** 385:9

**benefits** 384:20

**Berghman** 445:7

**betrayed** 468:6

**big** 421:10

**bigger** 393:11

**billion** 292:7

**binder** 346:22 362:19 433:17

**binding** 345:25

**bit** 328:3 337:20 345:11 356:17 407:16

**blocked** 378:13

**blurt** 441:18

**board** 425:2 431:21 481:4

**boilerplate** 410:17 416:4

**bona** 373:8 418:18, 19,20 419:23 421:19 457:10

**Bonds** 363:23 364:4

**bonuses** 322:9 424:24

**book** 309:16

**booklet** 448:25

**books** 298:23 397:19

**borrow** 295:7 420:5

**borrowed** 295:3,8,13 420:2,11 437:3,17 448:6 450:15 452:14

**borrower** 409:15

**bottom** 310:6 323:23

**boy** 336:17 383:13 416:16 417:8 422:9 473:14

**Boyce** 301:15

**breach** 391:15 392:2, 17

**breached** 303:11 304:14 305:3,13,15, 22

**breaches** 471:9,11, 12 472:4

**break** 317:23 318:4, 12 380:15,19,21 398:17 399:4 454:7, 23 455:6

**breaks** 482:9

**Brian** 324:14

**bring** 395:6

**broad** 366:5

**bucks** 377:3,4 391:25 393:12 421:16 430:14

**building** 338:18

**built** 339:5

**bullet** 416:8

**bunch** 309:4

**burden** 327:13

**business** 291:14 308:5 323:4 330:15 342:6 384:17 385:7

## C

**calculating** 334:8

**calculation** 393:2

**calendar** 409:17 454:11

**calendars** 479:13 481:11

**call** 400:16 450:25 464:9

**called** 306:7 322:12 329:18 341:8 345:9 357:21 389:15 402:2 462:10

**calls** 349:24 350:3,9, 17,22 351:2

**capable** 290:7 458:22

**capacities** 325:3

**capacity** 303:5 311:2,19 314:4,7 315:20 331:25 332:9 345:8,9,20,24 351:3 363:3 371:16 378:3 388:22 393:14

399:25 406:5 480:4

**Capital** 288:6 290:23 294:10,15,21 295:4, 6,14,21,23 296:3,9 306:7 311:21 329:18 362:23 405:21 434:15 457:24 466:22 471:22,23

**captured** 308:10 334:16 370:11

**care** 445:20

**carefully** 372:11 468:11

**carried** 298:22 299:4,22 300:8 301:3,10 327:4

**case** 363:25 378:12 383:5

**cases** 460:19

**cash** 383:18 384:13 421:11

**categorized** 292:24

**category** 361:9

**caused** 470:16

**caveat** 427:17 441:21

**ceased** 305:11

**Central** 398:18 482:4

**centralized** 417:22

**certificate** 309:23 310:2,10 311:8 313:13 320:24 323:20 331:20 340:12,20 342:12 398:6 436:25

**certificates** 313:15 342:21

**cetera** 320:2 334:5 367:13 389:24 392:12,15 393:2 433:2

**CFO** 299:24 301:13, 23 302:15,18 303:6 311:12,20 313:7,10, 11,19 314:4 440:3

**chagrin** 345:11

**chance** 331:3 351:6

**change** 341:13,14 362:12 474:6

**changed** 299:17 476:21 477:6

**characterize** 333:12

**characterizing** 409:14

**charged** 299:2 333:21 364:9

**charging** 386:7

**chat** 309:18 355:11

**check** 426:5 479:12

**checks** 319:24

**chief** 303:2 331:23, 25 332:9

**choice** 345:15

**circumstances** 348:7 375:12,21 413:8

**cited** 472:7

**claim** 360:17

**claims** 358:21 359:14,25 365:16 370:16

**clarification** 332:6 378:18 423:8

**clarify** 337:20

**class** 400:14,19 427:21

**clause** 415:9

**clauses** 416:17

**clean** 304:11

**cleaner** 423:6,7

**cleanup** 406:9

**clear** 295:11 304:24, 25 322:2 335:5 417:11 431:4 432:15 479:25

**Cliff** 300:17

**CLO** 338:22 385:5

**close** 434:12,18,19 436:6 480:10

**closed** 360:3

**closely** 410:3 411:23

**collateral** 413:16 417:7

**colleague** 309:12

**collectively** 451:3

**combination** 310:5

**comfortable** 390:13 391:10 398:23

**commenced** 404:5, 11 405:6 433:10

**commencement** 441:7,9 443:4,8,18 455:23

**comment** 306:3 338:18 396:18 432:4

**common** 421:18

**communicate** 318:11 350:4

**communications** 348:7 441:18 442:6

**comp** 361:6,8,16 423:5

**companies** 311:20 314:13 315:7 325:4, 12 344:14 361:21 412:21 421:19,22 431:19

**company** 297:4 314:23 325:17 415:2

**compared** 404:18

**compel** 395:7

**compensation** 322:9 404:16,18 421:8,11,21 422:6,22 423:2,13 424:22 430:16 443:24 446:12

**complaint** 346:18 355:2,20 356:3 358:15 362:15,24 389:3 402:24 408:9,

**CLO** 338:22 385:5

16 433:23 448:15

**complaints** 356:5 407:6

**complete** 290:5 334:13 335:2 343:12, 15 357:14 364:23 379:10 405:16

**completely** 391:3 397:7

**completeness** 327:24

**complex** 401:25

**complexity** 363:24

**compliance** 327:14 371:8 393:3 411:14 462:12

**compliant** 319:25 334:11 418:2

**compliantly** 320:7

**complicated** 386:6

**comport** 303:6

**concede** 433:5

**concern** 333:17 358:6 359:2,18 360:25 361:13 362:8 365:21 370:21 390:9

**concerned** 411:24 453:14

**concerns** 347:6 348:11

**concluding** 328:11

**conclusion** 452:13

**conclusions** 305:18

**condition** 407:11 429:12,16 474:4 477:5

**conditioner** 423:20

**conditions** 413:6,10 473:15,17 475:20 476:11,12 477:4

**confirm** 401:8 462:3

**confirmed** 462:10

**confusing** 456:8

**connection** 294:17 353:7 426:9

**consideration** 360:3

**considered** 315:5 325:24

**consistent** 407:6 419:24

**consolidated** 447:22

**contained** 430:7

**contemporaneously** 442:12

**contend** 420:19 424:5 473:8

**contended** 367:3

**contends** 461:3

**content** 416:8

**contention** 403:13, 19,25 423:17 458:14 460:21 463:15

**contentious** 461:2

**context** 335:11 400:10 460:21,22

**contingent** 427:5

**continuation** 482:5

**continue** 290:4,20 389:22 400:6 479:7

**contracted** 471:15

**control** 297:2 307:6, 19,23 308:2 311:3 315:12,20 322:21 330:5,9 331:7 332:18 333:16 341:24 371:17 388:5 393:15 410:4 429:22 431:19

**controlled** 307:14 323:6 325:13 342:2 374:20 385:15

**controls** 320:2

**convenience** 481:3

**conversation** 457:12

**copy** 355:18 356:21, 22,23 402:20 434:7

448:25

**Cornerstone** 427:19

**corporate** 312:7 320:18 321:7 323:7 330:8 342:3 345:21, 25 354:9 405:10 406:24 407:3,12 458:13 459:20 460:10 461:3,13 462:17 463:2,14,18 469:10

**correct** 290:24 295:4 301:11,24 306:8 313:3 316:5 322:13 325:14 328:15 335:15 337:17 339:24 342:24 351:19 374:6,9 389:18 398:2 402:15 404:12 405:14 412:9, 18 416:3 419:22 420:22 424:7 435:10 436:22 438:18 440:2, 17 442:3 447:6,10,19 449:7 450:6,11,13 451:7,10,22,23 452:4 456:3,13,22 457:5 458:9 459:10,13,16 465:24 468:25 469:6 470:9 473:6,19 476:4,16,24 477:12, 15,17 478:3

**correctly** 320:7 335:12 404:7,22 411:2 414:15

**correspondence** 471:20

**cost** 385:11

**costs** 333:7 334:5 337:21 338:5,8

**counsel** 288:19 289:6,8,9 355:18

**counsel's** 353:25 354:16

**counterparties** 377:2

**couple** 300:14,18 349:19,20 350:2 421:16 428:15 445:3

**court** 288:9 303:14, 21,24 355:25 366:13 374:24 381:17 395:7 396:5,8 482:15,19

**cover** 480:23

**crazy** 415:8

**create** 291:7 330:17, 19 413:15

**created** 307:9,15 322:24 330:11 339:6

**creatures** 365:5

**credit** 291:17 411:4

**creditors** 452:24

**crisis** 292:12

**culpa** 406:16

**cure** 377:15 392:21 393:6

**curing** 377:11,12

**current** 321:14,18 329:5,12 340:25 405:18

**curved** 374:24

**cut-and-paste** 406:17

**D**

**DAF** 339:2,5 385:2,5, 19,22 386:5,18 387:6 388:13

**date** 288:7 310:15 311:10 324:9 325:21 428:24

**dated** 408:16 439:17 464:21

**dates** 369:9,10

**Dave** 352:10

**David** 300:17

**Davor** 317:22,25 445:2

**day** 290:5 336:18 352:16 386:15 410:23 435:12 452:15 479:10,19,22,

23 481:4 482:8,10

**days** 349:19,20

**de** 297:25 298:4,7,17 333:5,7,15 334:7,14 343:21,22 376:24 377:3 391:20 393:20 410:13 411:25 412:2 413:18 417:20 421:13 458:20

**dealing** 372:22

**Deborah** 288:14,18 291:25 303:22 349:17 350:5 351:5 381:4 383:21 388:9 390:18 425:8 428:22 445:5

**debt** 333:6 334:5 421:19 453:10,16

**debtholders** 453:13

**debtor** 367:22 374:21 428:8,10 443:15 444:15

**debts** 297:8,14 315:14,21 316:3,8 318:17,22 326:7,12, 17 327:10 328:7 332:20 333:2,23 340:5 343:6,18 344:6

**December** 371:11, 15 373:21 374:12,17, 21,25 395:14 397:3, 25 439:7,17 440:6, 16,21 445:22 446:5 453:23 459:2,9,12,16 461:20,21 463:3 464:3,5,21,25 465:13 466:16 467:21 468:14,25 469:12

**decide** 385:21 386:16 417:16 480:3

**decided** 297:3 386:8 420:24 451:12

**deciding** 417:25

**decision** 387:5,12, 13,19 388:6,12 429:17

**declared** 368:20

**deed** 416:15

**deemed** 426:16 427:3,12

**deeply** 453:12

**default** 368:21 377:8 391:20 392:20 393:5 412:23

**defendant** 362:23 404:17

**defendants** 289:7

**defense** 347:11,14 358:6,20 359:3,19,24 360:12,25 361:6,13 362:9 365:21 366:2, 7,14 367:5 368:14 370:8,15,22 378:17, 20 379:16,18,23 389:20 391:7 406:20 459:21,25 460:8 461:3,8,9

**defenses** 347:7 348:9 357:22 365:11 375:22 376:9,17 378:11 380:4 389:14 390:9 398:12 443:3 459:20 461:13

**deficiently** 471:16

**definable** 385:10

**define** 298:7,17 317:2 414:21

**defined** 317:18 411:11 419:12 426:23

**defining** 377:14

**definition** 416:23

**definitively** 340:10

**Deitsch-perez** 288:16,18 291:21 292:2 294:3,16,19,24 296:11,23 297:10 301:25 304:16 305:5, 25 309:15 311:5 315:16 317:21 318:5, 24 321:21 324:21 326:8,19 327:20 329:9 331:9 332:11 335:16 337:15 340:6 343:19 344:7 346:3 347:3,21,25 348:5,18 349:23 355:3,7,13

356:20 359:4 361:25 365:4 366:8,17,22 367:6 369:7,25 373:5 376:10,18 379:11 380:13,20,25 381:6 382:15 383:17 384:4, 9,22 385:17,24 386:20 387:8,14,18, 21 388:15 390:14,19, 21 394:3,10,17 395:12,18,22 396:3, 9,21 397:5,9 399:11, 19,21 400:3 401:11, 18 402:13,18 405:11 406:14 409:9,18,25 410:9 411:20 415:14, 25 423:21 425:14,23 426:17 428:5,21,23 429:8 430:25 432:13 433:11,16,19 434:8, 17 438:10 441:3,16 444:8,16 445:24 447:11 448:19,24 449:22 452:10 453:7, 24 455:19 456:4,10, 14 457:6,16,19 460:13 461:16,23 462:6,21 463:6,22 464:13 465:14,19,25 467:4 470:3,10 471:2 473:12 474:2,11,15 475:2,12 476:5,25 478:23 479:21 480:13,21,24 481:10 482:13,18

**delegate** 317:19

**deluded** 375:16

**demand** 333:19 348:12,15 368:15 414:10 439:8,11 440:7,9,17,23 441:6, 11 442:2 443:3 444:4 445:24 447:22 464:24 465:12,23 466:17 467:2,9,19 468:14,15 469:11 476:2,3,10,15,20 477:6,21,23 478:11

**demanded** 445:23 446:6,10 477:7

**demanding** 464:5

**demands** 468:24 469:5

**demonstrate** 424:14

**department** 382:23, 24 383:2 411:12 417:23

**depend** 383:4

**deposed** 352:9,11, 19

**deposition** 288:5,20, 25 289:18,22 290:5 346:21 349:16 350:6, 16 351:8,11,14,18,21 352:4,7,14 353:2,3,8 363:7 376:19 386:23 399:5 400:4 408:12 444:19 454:24 479:14 482:21

**depth** 334:13

**describe** 291:13 332:24 410:12 456:17 461:12

**describes** 403:6 472:21

**describing** 429:3 432:8

**deserve** 344:3

**detail** 334:17 378:14 471:19

**detailed** 344:9

**details** 301:21 337:24 366:4

**di** 333:12

**differentiate** 333:24

**dig** 369:9

**direct** 329:23 337:21 338:7 341:18 371:17

**directed** 462:18 463:13,19 469:4

**direction** 463:21

**directly** 306:21 307:3 314:5,8,13 322:19 330:3

**directors** 431:22

**disagree** 324:11

**disappeared** 294:17

**disclose** 426:14

**disclosed** 412:15 426:21 427:9,13 430:24 432:11 433:3

**disclosure** 427:23 432:7,21,24 441:20 470:7

**discovery** 349:7,13 425:19,21 444:7,13

**discuss** 306:5 401:3 441:10,13 480:2

**discussing** 442:19

**discussion** 444:3

**disrupt** 400:4

**distinguish** 457:21

**diversified** 291:17

**doctrine** 365:17 370:17

**document** 309:12 310:7,21 313:20 317:6 320:18 345:4, 16 355:24 356:9,16, 18 357:5,9,13 363:10,16,20 364:11, 15,19,22 366:12,20 378:6,9 379:6,8 380:17 381:10 388:20 389:2,5,8,11 402:8 435:8 447:18 466:11 470:23 471:5

**documentation** 342:21 431:12,17,24

**documents** 320:19 334:18 348:7 352:24 367:23 370:5 425:11, 22,24,25 438:14

**dog** 387:15,16

**dollar** 386:3

**dollars** 391:22 393:10

**Dondero** 288:1,5,11, 19,22 289:1,15 290:1 291:1,23 292:1,3 293:1 294:1 295:1,3 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1,17,20

304:1,11 305:1,9 306:1 307:1 308:1 309:1,20 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1,11 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1,7 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1,24 355:1,17 356:1,14 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,10 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1,22 384:1,6,7 385:1 386:1 387:1 388:1 389:1 390:1,5, 22 391:1 392:1 393:1 394:1 395:1,13 396:1 397:1 398:1,23 399:1 400:1,9 401:1,8 402:1,23 403:1 404:1,17 405:1 406:1,25 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1,5 425:1,11 426:1,8 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1 438:1 439:1 440:1 441:1,25 442:1 443:1 444:1,13,15 445:1 446:1 447:1 448:1 449:1 450:1 451:1 452:1 453:1 454:1,14 455:1 456:1 457:1 458:1 459:1 460:1 461:1 462:1 463:1

464:1 465:1 466:1 467:1 468:1 469:1 470:1 471:1 472:1,19 473:1 474:1,20 475:1 476:1 477:1 478:1 479:1,5,8 480:1,3 481:1,2 482:1

**Dondero's** 386:23 387:24 401:6 402:16

**double-check** 425:15

**doubt** 324:7 409:11

**dozen** 350:7 422:12 425:6 431:8

**dozens** 293:19,21

**drafted** 410:15

**draw** 452:12

**driven** 454:4

**dropped** 423:20

**DSI** 414:24

**dual** 321:23

**due** 297:24 316:14 327:4 344:13,21 358:22 359:15 360:2 366:15 371:20 372:5, 15 373:3 389:23 391:20 392:25 393:13,17,21 394:2 395:16 397:3 408:2 409:23 440:8 456:2, 12,21 457:4 458:8,20 460:11 461:14,21 462:4 463:5 479:20

**Dugaboy** 306:22 338:6 400:12,16,23 401:9,17 403:8,14,21 404:2 405:4 420:21 421:2,6 422:24 427:20 443:11,20 472:12,23 473:10,22 474:22,23 475:6 476:19 477:10,25

**duly** 288:12

**duplicate** 355:15

**duties** 297:6 303:2, 12 304:14 305:4,13, 15,23 328:12,14

**E**

**earlier** 320:24 324:12 367:18 379:19 406:8 415:10 436:24

**early** 337:2 356:9 374:11,17 467:21 468:13 469:12

**easier** 393:12

**Eastern** 398:16

**effective** 310:11 324:4

**effectively** 338:21 419:7

**effort** 424:13

**efforts** 382:5 424:18

**eight-day** 440:20

**electronic** 438:9,14, 18

**electronically** 439:2,3

**Ellis** 363:23 364:4

**else's** 454:11

**email** 353:9 445:17

**emails** 353:6

**employed** 308:17 319:15 322:2 383:12

**employee** 317:20 320:11 321:15,19,20, 24 329:5,13 340:16 341:2 398:5 422:6,22 458:21

**employees** 371:6 392:11 422:12 458:25 459:4,5,9 472:6

**end** 369:24 371:21 373:3,14 375:3,14 391:16,17 393:17 394:2,8,15 395:17 409:16,23 410:8 411:8 414:24 415:8 447:23 456:2,12,21 457:4 458:15 460:11 461:15 462:5,19,23

**ensure** 393:25

**enter** 452:19

**entered** 336:14 381:24 382:12 399:7, 15 400:22 401:16 403:11,14,20 404:25 405:4 407:10 472:11, 22 473:9,22 476:18 477:9,24

**entering** 400:11

**enterprise** 343:24 388:5

**entire** 431:21

**entities** 306:20 311:15,24 325:7,8 333:4,8 335:7,25 336:4,8,11,20 337:25 338:7 340:10 343:9 345:10 377:7 382:5, 25 384:19 385:16 406:6,24 407:13 423:3 426:15 458:21 472:2

**entities'** 407:4

**entitled** 414:7 480:17

**entity** 291:3 306:7,11 311:4 322:12 329:18 330:9 331:7 333:6 338:2 341:7,10,16 342:9 383:5 385:20 413:19 429:21 469:22

**entity's** 332:20

**entrepreneurial** 382:5

**equal** 360:7 448:7

**equity** 385:6 452:24 453:5

**equity-ish** 453:12

**equivalent** 360:21

**error** 406:17 471:24

**established** 405:15

**estate** 323:5 341:11 342:7 374:3 375:17, 18 385:8 392:12 468:6

**estimate** 290:21 296:8 350:14

**estoppel** 347:17 359:15 370:17

**event** 427:8

**eventually** 368:11 469:14

**evidence** 330:24 418:8

**exact** 406:21

**EXAMINATION** 289:13

**examining** 480:11

**examples** 425:6 431:9

**exceeded** 293:25

**exchange** 337:7 339:12

**execute** 330:21

**executed** 403:16,21 404:3,9 405:9 411:7 455:7

**executive** 316:21 317:18 327:23 413:4, 9

**executives** 325:6 413:20 424:25 425:2 431:10 432:19

**exercise** 302:13

**exhibit** 309:13 323:17 345:5,6 353:11,12 354:4,6, 22,23 357:20 362:13, 16 377:21,22 380:10, 11 402:9,23 408:8, 10,12,15 419:5,9 420:3,7 433:14,15, 18,23,24 436:4,5,13 437:12 439:15 445:25 446:7,15,16 447:18 448:3,8,14, 17,19,20,22 450:5,8, 17 456:7 464:10,11, 12,13,17,18 466:8,9, 11 472:14,17

**exhibits** 433:21 436:3 464:17

**existence** 323:7 330:8 342:3

**exists** 461:4

**expect** 479:4,17 480:9

**expectation** 392:15

**expectations** 303:7

**expected** 338:6 393:20

**expenses** 316:23 338:16

**expert** 292:18

**expertly** 334:21

**experts** 421:24

**extended** 375:8

**extent** 301:8 312:11 313:23 316:7 325:10 332:21 334:6 338:25 361:16 371:2 391:12, 13 396:17 427:13

**eyes** 471:17

---

**F**

**facility** 411:4

**fact** 368:4,7 376:18 387:24 421:9 430:21 463:4

**facts** 348:8 358:5,25 359:17 360:11,24 361:12 362:8 365:20 366:6 368:9 370:6,20 375:12,20 376:8,15 377:11,16 379:17,22 380:3 390:9,15 391:6 398:10

**failed** 318:20 319:5 328:5,12

**failure** 360:2

**fair** 290:20 293:2,14, 18,21,22 296:20 297:4 311:9 312:2,5 313:8,24 325:22 331:8 339:19 342:23 344:4 372:21 392:10 406:25 410:5 411:19

**415**:11,22 427:11 428:3 429:3 432:10 439:6 447:4,7 449:19 451:17,24 452:12 458:5 459:19 461:5 465:9,18 469:3 474:20 475:4,8 478:14 480:23

**fairly** 409:14 422:12

**faith** 360:20

**fallen** 316:9

**falls** 361:9,17

**familiar** 297:7 306:6 315:14 318:17 322:12 329:18 341:7 433:8

**familiarize** 297:14 298:21 315:21 316:2 318:22 326:6,17 327:10 328:7,13 332:19,25 344:5

**familiarizing** 333:22 340:4 343:5

**family** 314:12 321:8

**fast** 381:3

**faster** 361:19

**fault** 295:12 441:24

**favor** 296:3 447:2

**features** 417:8

**fee** 338:9 339:2

**feel** 290:3

**feeling** 289:3,17,21

**fees** 308:11 317:3 386:7

**fide** 373:8 418:18,19, 20 419:23 421:19 457:10

**figure** 429:17

**file** 363:15

**filed** 346:17 355:20, 24 356:2,5 362:14 366:12 374:20 416:15

**filing** 357:5 364:10

**389**:7

**finally** 360:15

**financial** 292:11 299:10,12 300:11 303:2 327:18 331:25 332:9 337:10 382:7 412:8,17 428:11 429:6,15 430:7,19,22 432:6,12 458:22 470:8

**financials** 299:25 300:20 340:9 343:13, 15 411:3 412:11 430:11 431:5,7 432:17,24 433:4 470:20

**financing** 451:25

**financings** 453:2

**find** 434:6

**finding** 471:9

**fine** 341:17 369:13 395:11

**finish** 290:15 340:24 479:4 482:7,10

**finished** 480:16

**firing** 315:5 325:24

**firm** 363:15

**firms** 334:12 389:23

**fits** 454:11

**flip** 436:2

**focus** 292:19 344:3 390:6 430:3

**focusing** 334:8 357:25 413:21 422:16

**follow-up** 388:8

**footnoted** 430:12

**forcing** 290:6

**forgave** 422:4 430:15 432:11

**forgivable** 404:20

**forgive** 421:20 427:3

**forgiven** 422:21

423:4,11 425:4 427:7,13,24 429:11 430:6,24 431:5 432:22,23,25 433:4 473:16

**forgiveness** 361:7 429:4,20 430:4 431:9,22 440:13 443:24 446:13 465:6, 7 467:25 474:5 475:20 476:12 477:6

**forgiving** 424:6,15 429:18 431:13

**form** 294:4 296:24 297:11 306:2 311:6 315:17 318:25 321:22 324:22 326:9, 20 327:20 329:10 331:10 340:7 343:19 344:8 361:25 366:9, 18,23 367:7 370:2 373:6 376:11 379:12 384:23 385:18,25 388:16 390:15 399:12,22 401:12,19 405:12 407:21 409:10,19 410:2,10 411:21 415:15 416:2 426:18 428:6 429:9 431:2 434:17 438:11 441:4 447:12 449:23 452:11 453:8,25 455:20 456:15 457:7 459:18 460:14 461:17,24 462:7,22 463:7,23 465:15,20 466:2 467:4 470:4,11 471:3 473:13 474:3, 12 475:13 476:25

**formal** 335:22,23 336:2 381:18 384:13

**formally** 382:18

**formation** 315:2

**formats** 291:19

**found** 291:6 392:18

**founded** 290:23

**Frank** 299:20 300:20 301:23 302:10 309:7 310:13 312:7 316:9 325:8 327:13 334:2, 22 335:10 336:18 338:4 340:8,14 343:10,11,16 397:24 398:7 415:3 436:16, 21 437:13,25 438:25 441:15 442:16 443:5 456:18 462:10 466:20 470:17

**Frank's** 299:18 300:10,14,25 437:23 438:3

**frauds** 327:25

**fraudulent** 360:17, 19

**free** 479:16

**Friday** 479:17 481:2, 8,19

**friendly** 413:13 417:21

**frivolous** 470:2

**front** 348:2 389:21

**frozen** 302:3

**fulfill** 318:21 319:5 328:5,12

**fulfilled** 302:25

**full** 431:19 479:19,22

**function** 333:25 334:19

**functional** 401:23

**functions** 459:6

**fund** 306:7 317:3,4 466:22 471:23

**funds** 308:6,8,10,16 309:4 312:23 320:19, 20 327:16 336:13

**G**

**gained** 385:11

**game** 474:13

**gather** 424:13

**gave** 382:2 392:20 394:20 395:2,21 413:25 430:13 440:20

**geez** 480:21

**general** 293:7 296:20,25 308:15 312:7 343:20 344:10, 17 364:7 376:24 403:7

**generalize** 384:24

**generally** 297:12 323:3,5 325:15 326:10,12 327:6 329:20 332:21,23,25 344:15 357:7 363:21 364:12,18 373:15 389:6 426:19 461:10 472:21

**give** 331:3 334:25 337:24 342:22 366:6 369:8,10 382:2 394:12,19 395:14 397:16 405:16 440:25 451:12

**giving** 399:25 422:22 423:13

**glad** 351:22

**good** 308:15 312:8 330:23 360:20 382:8 393:3 413:19 423:22

**govern** 472:5

**grace** 414:10 440:20, 25

**grade** 291:17

**green** 289:2

**Gregory** 322:6

**grounds** 312:18

**group** 299:18 300:4, 11,14,21,25 316:10 319:25 334:2,23 335:10 336:19 338:5

**guarantee** 417:8

**guaranteed** 416:16

**guess** 304:20 310:4 312:11 333:3 347:19 375:25 393:7 429:10 437:25 451:18 456:23,25 457:2,10, 11

**gulf** 382:10

**guys** 346:23 432:2

**H**

**haggled** 418:6,9

**half** 350:7 430:14 479:23

**half-hour** 380:19,21 398:17

**hand** 355:16

**handle** 363:23,25 382:24

**Hang** 355:7 402:18 428:21

**happy** 317:25 406:3 479:25

**hard** 355:18 356:22, 23 402:20 416:14 434:6 448:25 457:20

**Harvard** 385:4

**hats** 324:20

**HCMF** 331:24 332:3, 10 339:19,25 457:21

**HCMFA** 306:11,13, 19 307:4,6,8,14,19 308:2,17,18,22 309:2,8 310:10,14, 19,23 311:3 313:20 314:8,17 315:10,13, 20 316:13,18 317:9 318:15,22 320:22 321:9,16,20 322:7 333:10,17 336:23 339:22 404:10,11 405:13 457:9 465:24 466:3,4

**HCMFA's** 308:5 311:12 315:14,21 316:3,8 318:17 319:9,12,17,20 333:12

**HCMLP** 333:11,19 404:21

**HCMS** 288:20 329:17,21,24 330:3, 5,11 331:5,14,18 332:6,9,18 335:11,14 336:16 337:6,13 338:14 339:11,19 340:3,16 341:3 353:14,17,23,24 362:14 363:14 364:11 365:10,15 366:12,25 367:14,25 369:15,18,23 370:21 371:12,17,19,24 372:13,21 375:14 379:19 385:22 403:22,23 405:20,25 433:8,10,24 434:15 435:2,9,18,23 436:10,22 437:3,14, 16 439:8,18,25 440:7,20 441:5,11 442:8 443:2,10,19 445:23 446:9 447:21 451:2 452:7 453:6 457:3,14,17,21 461:8 465:11 473:5

**HCMS'** 340:5 363:3,7 443:2

**HCMS's** 330:8,15 333:2,23 353:18 372:2

**HCRE** 288:20 341:6, 8,16,19,24 342:2,16 343:7,13,15,18 354:8,9,14 378:4,21 381:11,22,23,25 382:13 383:3,5,11,15 384:7 385:9,21 386:3 404:3,5 405:19 406:2 447:21 448:2,5,11,16 449:13 450:9,15,21 451:2 452:7,17,18 453:2,5 455:7 456:5, 20 459:3,12 464:20 465:11 473:5

**HCRE's** 342:6 344:6 377:23

**HCRE-TYPE** 385:20

**head** 292:2 306:4 311:25 317:14,16 325:19 340:23 369:17,21 376:8

**hear** 289:15 303:14, 19 335:11 395:24 396:4,5,7,9,10,11,22

**heard** 303:16 352:20 462:9

**held** 312:17,22 313:5, 18 314:12 320:14,16 325:11,17 465:2

**helped** 339:16

**Hendrix** 352:19

**hereunder** 414:14

**Hey** 380:13

**HFAM** 335:20 470:15 471:9,13,15

**Highland** 288:6 289:9 290:23 291:3, 7,14 292:5,15 293:16,20,25 294:10, 14,21 295:4,6,7,14, 21,23 296:3,9 297:3, 7,9,15,23 298:2,4,10, 20,22,25 299:4,22 300:8 301:3,9 302:12,18,24 303:12 304:14 305:4,12,14, 23 306:7 308:14 311:19,20 313:7,19 314:5,12,23 315:8 319:15 320:12 321:7, 8,15,19 322:8 325:2 327:5 329:5,13,18 335:15 336:11,16,24 337:7,8,12,22 338:2, 10,13 339:3,7,12,13, 16,17,20 341:2 344:13,22 356:2,5 358:15 360:6 362:23 367:2,11,15 371:7, 19,25 372:2,7,13,20 374:6,12,15 375:4,13 376:25 377:8,13,14 381:12,22,25 382:13, 14 383:12,15 384:8, 16 385:23 386:17 387:6 388:12 391:24 392:16 393:16 395:15 397:2 398:4, 5,9 400:14 404:5,11 405:21 408:4 412:2 415:5 419:11,22 420:2,12 421:14 422:4,20 423:12,18 424:6,15 426:21 429:6 430:7,10 431:13 432:11,24

433:10 434:15 435:3, 9,19 437:4,17 439:8 440:4,6,17,19,24 442:2,7 443:2,9,17, 18 445:23 446:6,10 447:2 448:6,12 450:10,16,22 452:3 453:4 456:17,18 457:24 458:4,16,23 460:23 461:4 462:3, 18 463:4,9,11,19,20 465:2 466:16,22 467:19 468:14 469:19 470:15,16 471:13,16,21,22 473:4,6 475:9 476:2, 15

**Highland's** 291:9 298:16 301:13 302:14 303:6 311:12 313:6 327:18 346:18 349:12 354:25 358:14 362:15 370:25 389:3 402:24 403:17,22 412:8,16 426:2,10 432:17 435:14 441:11 476:19,23

**highlighted** 306:4

**highly** 334:10 391:22 417:18,19

**hired** 297:3

**historic** 322:5 431:5, 7

**historically** 454:3

**history** 422:3

**hold** 294:16 329:6 355:14 423:18 481:9

**holders** 400:14,19 427:21

**holding** 392:5

**holds** 314:22 315:7

**honorable** 428:9

**hope** 335:8 348:23 351:24 396:15 445:13

**hour** 454:9,12

**hours** 290:13 349:20,

21 350:19,20 479:4,9 480:9 481:17

**house** 308:7 424:25

**housed** 308:6

**hundred** 391:21

**hundreds** 293:15 312:12

**HVIN** 469:15

---

**I**

**idea** 300:21 331:15 410:15,19 416:7 435:21

**identified** 310:14 324:2 348:16 353:24 459:19 461:2,7

**identifies** 317:8

**identify** 299:6 300:3 313:4,17 314:21 321:14,18 328:10 329:12 331:16 340:25 341:5 342:14 366:6 396:24 422:2, 18 471:5

**illiquid** 361:18

**imagine** 290:12 313:21 319:23 320:3 336:17,21 342:18 367:16,17 383:13

**impact** 476:22

**imperfect** 365:5

**implying** 475:16

**important** 423:15

**importantly** 440:12

**improper** 391:4

**in-person** 350:9,12

**inaccuracy** 378:18

**inaccurate** 357:10 364:15,19 378:9 379:6 389:12

**inaudible** 338:23

**Inc.'s** 362:24

**incentive** 361:18

**incentives** 361:17 421:21

**include** 297:7 318:16 420:24 427:2 432:7

**included** 354:13 412:8,12,16 414:18 415:13 430:10 432:17,19 470:7

**includes** 473:3

**including** 348:15 421:5 459:8,13,16

**inclusive** 350:16

**income** 322:3,4 343:24 386:19 387:7 388:14

**incorporated** 366:2 392:24

**incumbency** 309:23,25 310:10 311:8 313:13,14 320:23 323:19 331:19 340:12,20 342:11,20 398:6 436:25

**incur** 316:12,18

**incurred** 337:22

**indefinitely** 373:12

**independent** 385:19

**indirect** 329:23 341:19

**indirectly** 307:3 322:19 330:3

**individual** 345:8 351:3

**industry** 317:16 404:19,21

**inform** 326:12 443:9

**information** 344:20 378:13 414:25 424:14 427:18 470:13

**informed** 443:2

**initial** 419:15

**inkling** 413:14

**inordinate** 392:6

**insignificant** 424:20

**installment** 369:24 409:16,22 453:22 456:2,12,21 458:8 460:11 461:20

**instruct** 371:10 393:15 442:21 443:9 445:21 446:4 461:19

**instructed** 371:24 372:13 397:2

**instruction** 372:20 397:16

**instructions** 395:15

**intended** 325:20 418:19,20 473:23

**intent** 339:9 377:5,6 414:12

**intention** 418:14 482:10

**intentionally** 304:19

**interacted** 402:4

**intercompany** 422:5,17,20 423:4,11

**interest** 329:24 330:3 341:19,21 400:14 408:2 419:10 440:8 450:9 452:20 453:10

**interests** 306:18 307:4 453:5

**interject** 390:25

**interjecting** 445:4

**interrelated** 423:3

**interrogatory** 426:5

**interrupt** 422:14

**investment** 291:16 330:22 401:9

**investments** 330:21 339:17 342:7 361:19

**investor** 292:21 338:24 385:4

**investors** 330:24 331:2

**invite** 396:19

**involved** 325:9 328:2 339:17 355:21 373:16 386:12 406:10 459:5

**issue** 306:5 332:22 335:7 360:8 399:9,17 400:24 405:5 410:22 423:15 424:10 433:9

**issued** 467:20 468:15

**issues** 333:7 348:16 386:9 468:2

**item** 430:16

**J**

**James** 288:5,11 404:17

**January** 291:10 450:23

**JEFFRIES** 472:15

**Jim** 302:3

**John** 291:21 317:21 335:17 347:21 369:8 376:18 380:13,14 386:20 387:22 390:21 395:23,24 396:3,6 397:5 406:16 445:3,9 457:19 478:23

**Jonathan** 322:6

**judge** 363:22 443:12, 17 480:18

**judgment** 305:17

**July** 420:13 428:18

**jumps** 390:2

**juncture** 355:22

**June** 436:10 437:17

**justification** 347:17 365:18 370:7 389:16, 20

**K**

**keeping** 432:2

**key** 377:16

**kind** 335:3,6 366:5 384:19 414:14 425:3, 11 432:21

**kinds** 327:25

**Klos** 300:17 352:10

**knew** 311:9 313:24 325:20 334:6 336:19 391:23 392:18 439:11 440:11,12,16 442:12,13,17 451:16 454:2

**knowing** 294:5 299:2,21 300:6 301:2 316:7

**knowledge** 300:24 301:6 312:4 323:8 340:13 341:22 349:2, 14 351:16,20 367:22 368:24 373:20 397:15 410:11 420:15 437:8,9 438:6 457:5 465:17,22 466:6 468:13,20,24 469:5

**knowledgeable** 373:16

**Kristin** 352:18

**L**

**L.P.** 288:6 290:24 306:8 311:21 322:13 324:4 471:22,23

**lag** 301:25

**lagging** 478:24

**Lamensdorf** 322:6

**largely** 291:16 308:6 370:10 397:20

**larger** 460:22

**largest** 292:4

**late** 288:22 336:25 356:4 374:6

**Lauren** 320:9

**law** 335:21 389:23

**lawsuit** 403:17,22 404:4,11 433:9

**lawsuits** 399:9,17 400:25 405:5

**lawyer** 390:24 391:4

**lawyers** 312:6 350:23,25 365:5 383:6 406:10

**layers** 401:25

**lays** 475:20

**learn** 367:14,25 440:5

**learned** 312:17 368:6 442:23

**leave** 288:24 370:13 380:9,25

**left** 456:5

**legal** 383:2,7 410:18 473:14

**legitimate** 467:25 468:3 469:16

**lengthy** 356:18

**lens** 421:12

**letter** 412:14 426:24 439:16 441:6,12 442:7,11,13,22 443:3,13,17,25 444:4,6,9,15,17,24 445:16,18 464:3,20 465:4,23 466:18 467:2,6,10 472:4

**letters** 299:25 426:9 464:5 465:12 469:11

**level** 423:2

**levels** 317:20 404:19

**liabilities** 299:9 327:4

**liability** 412:20

**lieu** 361:8,16 416:15

**life** 427:19 470:24

**likelihood** 312:15

**limited** 413:16 417:7 427:18

**limits** 317:12

**lines** 331:4

**liquidity** 339:16

**list** 354:12 418:25 424:19,20 425:10,17, 18,20 426:4

**listed** 354:18 419:5 420:3 425:16 430:17 440:9 445:25 446:6 450:5 466:17

**listen** 372:11 468:11

**listing** 353:4

**lists** 344:20

**litigation** 289:9 356:7 414:19 441:7, 10 443:4,8,18 455:23

**LLC** 341:8,11

**loan** 365:23,25 416:18 421:19 422:5, 18,20 423:11 430:4, 5,15,23 431:9 435:2, 18,24

**loaned** 452:7

**loans** 298:22 299:3, 22 300:7 301:3,9 344:12 371:3,9 404:20 406:11 420:17 422:17 423:4 424:7,16 427:3,12 429:4,11,18,19,24 430:23 431:5,13,21 432:7,11,15,17,18 448:12 450:21 452:19,20,22,23 477:10 478:2,8,11,16

**logical** 377:6,9 391:18 413:20

**long** 301:20 380:18 397:17,18 427:5 434:5 479:19

**longer** 478:25

**looked** 340:19 396:23 431:4 439:10 455:11 464:2

**lot** 291:22 297:23 311:14 416:3 452:14 467:23 482:8

**loud** 414:9

**love** 428:25

**low** 312:15

**lower** 452:14,20

**lunch** 380:19,21 398:17

**Lynn** 363:22 443:12, 17

**M**

**made** 333:19 346:4 367:15,25 368:24 369:3,5,15,18 372:18 387:12,19 388:6,11 392:6 393:25 395:16 397:22 424:13,18 432:19 434:15 439:8 440:6,17 442:2 445:4 460:20 465:6 466:17 468:14 470:18 476:10 477:16

**major-** 307:2

**majority** 307:4 330:2 341:21 400:13,18 427:21

**make** 288:15 305:17, 18 341:14 357:14 358:12 364:23 371:11,13,18,25 372:14,21 375:13 377:16 379:10 387:5 393:7,10,16 394:7,15 395:15 397:2 400:15 409:15 410:8 411:17 429:17 440:21 441:17 445:22 446:5, 9 455:12,25 456:11, 19,20 457:3 458:7, 11,15,17 460:10 461:5,20 462:3,10, 11,19 463:3,4,11,19 465:7 466:25 476:15, 20 479:15 481:2

**maker** 295:22 296:2 414:9 429:21 437:14 467:3 474:24 475:10

477:17

**makers** 451:7,25

**makes** 342:7

**making** 377:13
461:14 467:19

**maliciously** 304:20

**man** 383:22

**manage** 293:4
421:21

**managed** 308:9,16
325:13,18 327:16

**management** 288:6
290:24 292:5,18
294:11,22 295:4,14,
21,23 296:3,10 306:7
308:11 311:21
329:19 362:23
405:22 412:14 426:8,
13,23 431:21 434:15
457:24 458:4 466:22
471:22,23

**manager** 291:19
293:2 309:3 421:14

**managers** 309:5
322:5 421:21

**manages** 330:16

**March** 435:3

**Mark** 306:15 383:11

**marked** 345:4,6
353:12 354:6,23
362:16 377:22
380:11 402:23
408:10 433:15
446:16 464:12 466:9

**market** 339:5 384:16

**marketed** 330:18,20

**marks** 288:3

**masked** 422:9

**material** 332:22
344:2 365:22,24
368:4,7 369:2 412:7,
10 425:7 426:16,23
427:4,12 430:6,9
431:8,9

**Matt** 342:18

**matter** 288:5 293:7
296:20 350:18
467:15

**matters** 302:2

**Mcgraner** 342:18,23

**mea** 406:16

**means** 384:2 395:20
458:4

**meant** 332:3 456:7
474:4

**mechanism** 429:18

**meet** 350:11

**meetings** 350:16,22
351:2 481:5

**members** 425:2

**memorized** 347:23

**memory** 356:13

**mentally** 289:24

**mentioned** 335:10
367:18

**met** 349:17

**Michael** 322:6

**mid** 374:21

**middle** 374:24
404:15

**migration** 364:6

**Mike's** 387:14

**million** 294:2,8,11
296:15,18 298:12
377:3,4 391:25 392:5
393:4,12 405:17
407:22 408:18 412:4
413:5,11 419:17
420:12 421:16
429:24 430:14

**mince** 393:9

**mind** 324:13 392:21

**mine** 434:19

**minimis** 297:25
298:5,17 333:5,7,12,
15 334:7,14 343:21
376:25 377:3 391:21
393:20 410:13

411:25 412:3 413:18
417:20 421:13
458:20

**minimus** 298:7
343:22,23

**minute** 291:24

**minutes** 318:3 370:5
387:10 454:8

**misleading** 390:25

**missed** 425:9 456:24

**missing** 389:20

**mistake** 448:22

**mistaken** 397:10

**Mitts** 324:14

**mixed** 430:15

**modest** 382:6 385:11

**modification** 417:4
475:15,16,21

**modified** 357:14
364:22 379:9 473:10
474:8 476:21

**modify** 473:14,23

**moment** 357:16,25
359:11 364:20 366:4,
10 375:23 379:25
422:2 461:18

**Monday** 479:15

**monetize** 361:18

**money** 292:18,25
293:4 295:3,7,8,13
296:9 331:4 336:24
337:7,16 360:7
382:11 391:21
419:22 420:2,6
421:19 448:6 450:16
452:7,14 460:22

**moneys** 337:19
470:15

**monitor** 288:8

**monthly** 299:13

**months** 428:15

**MORRIS** 288:14
289:5,14 291:25
294:18 295:2 303:18,

22 304:4 305:8
309:11,17 317:24
323:17 337:17 345:3
346:5,8 347:24 348:4
349:25 353:10 354:4,
21 355:5,9 359:6
369:12 372:8 374:4
375:19 376:22
377:20 380:12,16,24
381:4,15 383:19
386:25 387:16 388:3
390:3,17,20 391:3
393:22 396:7 397:7
398:15 401:5 402:9,
15 403:3 405:14
406:18 408:7,11
414:4 423:23,25
425:8,17 426:7 432:3
433:13,18,20 434:9,
24 436:13,19 437:11
439:14 444:12,22
445:12,20 446:2,14,
20 448:17,21 454:13
456:6 462:14 464:9,
15 466:7,10 468:10
472:13,17 474:18
476:7 479:3,12,24
480:14,22,25 481:6,
12,15,22 482:3,16

**mortgages** 452:25

**motion** 374:20,24
395:7

**mouth** 302:5

**move** 322:11 372:8
374:4 375:19 386:24
393:22 432:3 433:7
440:15 462:14
468:10

**moved** 364:3 468:22
470:15

**moving** 302:5 468:7

**mucked** 469:20

**multiple** 311:15,23
320:4,5 324:20
325:5,6,22 375:7,8
406:10

**mute** 395:22,23,24
396:2,14 481:11

**mutual** 308:6,7,9,16
317:3,4 336:12

**myriad** 335:2

**N**

**names** 299:14
342:22 425:19,20
426:4

**Nancy** 288:19 355:14

**narrow** 313:16

**nature** 308:5 323:3
330:15 342:5

**nauseous** 289:4

**necessarily** 413:7
475:21

**necessity** 376:20

**needed** 372:18

**negotiate** 417:13

**negotiated** 418:6,10

**negotiating** 411:23

**negotiation** 416:22
417:2,4

**negotiations** 417:2
451:22

**netting** 392:9,15

**news** 428:14

**Nexbank** 431:18
432:6,18,20

**Nexpoint** 322:11,12,
15,18,21,23 323:6,
10,15 324:3,9,15
326:2,4 327:7,16
328:6,13 329:6,14
335:20 336:23
339:22 341:11 346:2,
17 353:17 381:23
382:8 383:6 384:16
385:8 389:8 391:24
393:15,25 394:8,16
395:16 396:25 397:3,
13,16,22,25 398:8
403:16,17 405:18,25
407:17,21,24 408:4,
9,24 409:8,24 410:5,
7 411:18 419:11,20,
21,25 420:5,11,16
439:12 447:21 451:2
452:7,13,18 453:2,5

455:25 456:11,19 458:25 459:4,9,24,25 460:7 461:8 467:6,8 473:5

**Nexpoint's** 323:4 326:7,12,17,22 327:2,9,10 328:7,14, 18,22,25 329:8 345:20,24 346:14,20 347:2 348:8 349:3,12 388:22 389:2 412:3, 17

**night** 290:10

**nods** 292:2

**nominal** 386:4

**non-payment** 414:11

**non-privileged** 442:6

**nonetheless** 334:15

**normal** 316:22

**note** 306:5 349:3 368:16,18,19,22 369:23 371:12,21 372:2,16 397:3 407:17,21,25 408:16, 23 409:2,6 410:7,15 411:11,18 412:4,15 413:5,6,11,15,18,24 414:18 415:9,13 416:9,12,14,18,24 417:9,14,17 418:4, 17,18 419:4,8,20,23 420:6,20,25 421:5 434:3,14,22 435:14 438:18 440:14,23 446:25 447:5,8,16 448:8 449:12,15 450:3,18 451:12 455:6 457:10 467:2, 3,9 470:18 475:21

**notebook** 355:4 464:14

**notes** 293:12,15,19, 24 294:23 295:22 296:3,22 297:17,25 298:4,12 305:18 327:6 334:5 348:12, 15 353:5 356:6 358:7,8,9,16 359:10

360:8 364:7 367:4 368:15 373:8 376:24 377:12 391:13 399:9, 17 400:24 402:6 403:15,21 404:3,9 405:5,9,10,17 408:3 410:22 411:7 414:23, 25 415:4,18,21,23 416:21 417:12,20,21 418:9,13,16,19,20,25 419:5,12,16 427:24 433:9 439:9 440:9 442:3 443:10,19 445:23,24 446:11,18 447:17,23 448:7 449:4 450:4,10,25 451:3,6,9,16,19,21, 25 452:3,9 453:11, 19,21,23 455:3 457:9 461:22 462:4,18 463:2,12 464:6 465:2 466:17 467:20 468:15 469:16 470:8, 18,22 472:24 473:3, 5,11,18,25 474:21 475:5,9,11,16,19 476:2,6,14,23 477:7, 11,14,15,16,20,21,24 478:3,9,11,17

**notice** 353:14,18 354:7,13 363:7 367:3 375:4 377:8 414:11, 12,13 443:19 480:19

**noticed** 406:15

**notices** 345:2 353:3 414:13 464:24

**notion** 423:16

**notwithstanding** 375:12 379:16

**November** 375:4

**nuance** 478:5

**number** 298:14,21 299:3 362:17,18 408:8,12,13,15 464:4

**numbers** 392:20 425:3

**numerous** 365:25 368:25

**O**

**object** 296:23 297:10 305:25 311:5 315:16 318:24 321:21 326:8, 19 329:9 331:9 340:6 344:7 366:8,17,22 367:6 369:25 373:5 376:10 379:11 384:2, 22 385:17,24 388:15 390:14 399:11,19,21, 22 401:11,18 405:11 409:9,18,25 410:9 411:20 415:14,25 426:17 429:8 430:25 432:13 438:10 441:3, 20 445:11 447:11 449:22 452:10 453:7, 24 455:19 456:5,14 457:6 460:13 461:16, 23 462:6,21 463:6,22 465:14,19,25 467:4 470:3,10 471:2 473:12 474:2,11 475:12,13 476:25

**objected** 312:18

**objecting** 409:12 445:6

**objection** 294:3 324:21 327:20 343:19 347:4 348:25 361:25 387:8 428:5 434:17

**objections** 346:4 348:19 353:25 354:17 383:21

**obligation** 371:20 426:13

**obligations** 294:14, 21 295:20 297:8,15, 23 315:15,22 316:3, 8,12,19 318:17 326:7,13,18 327:3,11 328:8,15 332:20 333:2,11,15,18,23 334:4,13 340:5 343:6,18,22 344:6,12 366:15 367:4 377:2 469:19 470:2 473:24 474:10,24 475:11

**obligors** 356:6

418:13,14 459:20 460:10 461:3,13 462:17 463:2,14,18

**obligors'** 458:13,14 469:10

**obtained** 312:3 374:16 435:18 448:12 450:22

**obtaining** 452:19

**occurred** 368:13

**October** 288:7 374:8

**odd** 422:25

**odds** 413:15

**offense** 432:4

**officer** 303:2 310:4 312:8 320:22 321:16 329:6,14 331:13,17, 25 332:9 340:16 341:3 342:15

**officers** 311:14 459:8,12,14,15

**offline** 480:2

**Okada** 306:15,22

**omission** 406:22

**omitted** 405:25 406:7,12 407:3,5

**operating** 299:13 316:20,23 343:23

**opinion** 447:14

**oral** 336:15 337:4 361:22 399:7,15 400:10,22 401:4,16 403:7,10,13,19,25 404:8 406:20 407:10 420:21 443:10,20 472:11,21 473:8,21 474:22 475:6 476:18, 22 477:8,24 478:7, 10,15

**orchestrate** 314:19, 25

**orchestrated** 327:14

**order** 374:13,16

**ordinary** 372:23

**original** 356:2 407:21 473:11,18,24 475:4,8

**out-of-pocket** 338:8,16

**outline** 480:20

**outstanding** 295:17 407:25 419:10 440:7 447:22 450:9

**overcharged** 391:24

**overlay** 343:20

**overpayment** 392:4

**overstatement** 460:17

**owe** 294:10 296:9 426:3

**owed** 297:8,15 375:14 419:11,22 450:10 460:23

**owing** 327:4 344:21 366:16

**ownership** 306:18 307:4,21,24 317:18 329:24 341:19

**owns** 306:13 322:18

**P**

**p.m.** 381:9 398:20 454:17 482:21

**pages** 435:21

**paid** 338:8 373:13 392:16 418:21,22 460:20 462:11

**paper** 338:22

**paragraph** 357:17 358:19 359:12,13,23 360:13,16 361:14 362:9 365:2,15 370:8,14 378:20 379:14,24 390:4 403:4,6 404:14 407:14 409:13,20 412:23 414:6,7,17 421:10 422:8 423:10 455:11,14,18 472:14, 18,21

**paragraphs** 357:20 365:10 375:22 380:2 390:7,10,16 398:12 416:9

**paraphrase** 394:23

**parsed** 471:25

**part** 334:19 337:4 340:8 358:22 359:15 360:2,18 365:17 370:17 412:10 414:19 418:21 423:4 427:20 443:23 444:2 454:4 456:8 468:3

**participate** 289:24 350:21,25

**particularized** 468:24

**parties** 297:24 339:6 413:14 415:4 418:7

**parties'** 473:10,23 474:9,23

**partly** 389:23 454:4

**partner** 361:6

**Partners** 341:8,11 455:7 464:21

**party** 452:2,6

**passed** 338:5

**passing** 363:22

**past** 296:6 338:20

**patient** 372:10 383:20

**Patrick** 301:15 383:11

**pay** 336:23 337:6 338:7 366:14 367:4 369:23 383:15 384:7 385:22 393:5,12,18, 19 419:7

**payee** 295:24 422:21 466:25 474:25 476:2 477:16

**payees'** 475:10

**paying** 339:2

**payment** 337:13 371:11,19,25 372:14,

21 373:3,11 375:13 391:16,20 393:16,25 394:8,15 395:16 397:2 409:16,23 414:11 439:9 440:7, 21 442:3 453:22 456:2,12,19,21 457:4 458:8,17 460:11,17 461:5,14 464:5 468:15 475:18 476:3, 16

**payments** 369:24 373:18 377:13 410:8 445:22 446:5,10 454:3 458:15 460:16 461:21 462:3,19 463:4,11,20 469:18

**peak** 292:3

**people** 293:5 299:6, 8,15,18 300:10,13,14 303:18 342:19 407:9 416:10,11 421:12 424:23,24 426:15 458:22 459:7 470:16, 18

**people's** 424:21

**perceived** 396:16

**perceives** 396:18

**percent** 298:13,16

**percentage** 306:17

**percentages** 306:23

**Perfect** 402:12 482:12

**performance** 385:9 416:16

**performed** 471:16 472:7

**period** 293:16 307:18,25 330:8 367:20 401:13,15 420:13 421:17 440:20,25 479:18

**periodic** <mark>454:3</mark>

**periods** 304:21

**permissible** 386:22 387:23

**person** 300:4,17,18

311:3 315:12,20 316:24 331:16 332:17 333:16 364:8 371:17,18 373:19 388:5 393:15 396:24 397:15 410:4 443:5 458:22

**personal** 358:8,9 386:23 387:24 480:4

**personally** 297:3 301:7 324:2 327:17 363:19 371:10 393:24 405:6 417:16

**personnel** 372:7

**perspective** 333:13 334:3 377:7 405:17 473:21

**petition** 311:10 324:9 325:21

**Phillips** 364:5

**phone** 350:2,9,17,22 351:2

**phrase** 347:15

**physically** 289:23

**pick** 476:20

**picked** 335:8

**pile** 362:13

**PJ** 434:10

**place** 476:9

**plaintiff** 289:8

**plaintiff's** 355:19 358:21 359:14,25 365:16 370:16

**plan** 468:8

**play** 474:13

**players** 472:2

**pleasure** 381:4

**point** 288:25 290:22 309:8 318:2 320:15 377:19 406:19 427:7, 24 433:5 468:7

**points** 416:9

**policy** 317:6

**portfolio** 308:10,16 309:3,5 322:5 361:21

**portion** 303:16 308:15 351:10

**position** 298:3 311:23 312:16 313:17 314:11,21 320:14 321:7 325:25 329:6 367:9 403:10 407:9

**positions** 297:5 312:22 315:6 316:21 320:17

**possibly** 423:3

**post** 309:17

**pot** 468:8

**potential** 330:23

**practice** 317:17 404:20 423:16,17 424:6,15,22 429:4 430:4 431:13

**practices** 411:13

**precedence** 477:5

**precedent** 429:12,16 477:5

**precipitate** 314:25

**premarked** 309:13

**prepaid** 366:15 391:13 406:11 418:22 461:9

**preparation** 328:2 350:5 353:7

**prepare** 349:16

**prepared** 299:12 334:16 338:3 346:25 347:20 348:6,14,22 349:11 354:17 356:9 363:9 376:6

**preparing** 299:10 320:4 340:9 350:15 363:20

**prepay** 389:17

**prepayment** 366:21 367:5,15,22 368:2, 10,15,24 370:10 378:12,16,20 379:18

459:22,25 460:8

**prepayments** 365:23,25 367:13 369:2,15,19 378:15, 23

**prepays** 389:19 392:24,25

**presence** 384:15

**present** 431:24 476:11

**presentation** 431:4

**presentment** 414:10

**president** 291:10,15 292:6,14 293:16,20, 25 297:6 298:19 302:12,23,24 303:13 304:15,22 305:2,11, 24 308:21 309:6 313:6 315:10 323:12 325:2 326:4 332:17 337:12 338:13 422:3, 19 423:12 469:21

**presidents** 317:18

**pretty** 460:24

**previously** 319:15 408:3

**Price** 337:23

**Pricewaterhouseco opers** 469:25 470:5, 6,19

**primarily** 322:7 339:14 368:18,19 383:10 440:3

**principal** 293:23 295:17 360:7 407:22 408:2 419:10,16 440:8 450:9

**prior** 300:5,15 302:20 307:21 311:10 315:23 324:9 325:20 389:14 391:9 418:25 419:11,16 420:6 423:16,17 424:15 441:6,9 442:10 443:3,7 448:7 450:10 463:16 477:19

**private** 421:18,22

**privileged** 441:18

**problem** 302:7 381:5 384:3 454:13

**proceed** 289:22 291:25 398:25 454:20

**proceeds** 348:20 349:3 420:16 435:23 448:11 450:21

**produced** 367:23 425:13 428:10,17 444:6,12,17 445:18

**product** 451:21

**production** 428:16

**profit** 338:9

**promissory** 293:11, 12,15,19,24 294:23 295:22 296:2,22 408:3,16 411:18 413:11 419:5 434:3, 14,22 446:25 447:17 450:4,18 464:6 467:20 470:8 472:23 473:3,5,11,24 474:21 475:5,9 476:23 477:11,14,15 478:2,9

**proper** 412:11

**properly** 412:12

**proportionate** 424:21

**protections** 413:17

**protest** 414:11,12

**provide** 383:3 386:17 387:6 404:16 421:7

**provided** 337:8 339:11,16,20,21 353:2 385:12 386:4 429:7

**providing** 336:6 422:5

**provision** 382:14 415:12,24 447:8 449:19 455:18

**provisions** 440:14 449:25

**prudent** 413:4

**pulling** 449:2

**purchasing** 317:4

**purpose** 298:8 377:10 401:3 404:15, 24 405:3,8,24 406:7, 23 407:3,9,11 421:4 422:5 423:12 430:22

**purposes** 416:6 422:21 424:25

**pursuant** 356:4

**put** 290:18 309:12,18 320:25 323:17 342:13 345:3 348:2 353:10 354:4,22 355:11 367:2 378:10 379:4 391:20 401:5 408:7 416:5,7,10 418:14 427:18 433:14,22 448:3 466:7 470:20 476:9 481:10

**putting** 343:12,14 354:24 355:10 443:18 472:14 480:19

**Pwc** 412:16

---

### Q

**qualified** 346:3

**quarterly** 299:11

**question** 294:25 295:11,25 302:10 304:10,24 305:21 306:2 332:2 335:18 357:2 358:11 372:11 376:13,22 381:16 383:25 387:2,3 388:2,9,16 391:6,14 393:23 395:6,8,9 397:8 398:7 405:7 417:10 422:15,25 423:7 424:2 441:22 442:15 457:14,15 460:25 467:17 468:12 477:2 478:6, 13

**questions** 335:4,6

346:25 353:22 363:2, 9 375:25 376:3,6,21 378:2 388:21 390:22, 24 480:16

**quick** 317:23 380:14

**quickly** 344:25 345:15 377:12

**quote** 359:25 360:3 365:16 370:16 404:15

---

### R

**raise** 382:10

**rambling** 387:10

**rate** 475:18

**rates** 452:14,20

**rationale** 471:10

**read** 293:8 296:21 358:2,10 361:2 381:15 397:9,10,12 404:22 409:2,11 410:3 413:6,10,24 414:9,15 415:24 424:2,3 430:21 447:5 449:15,18 455:13 475:2

**reading** 310:3 411:23

**ready** 454:20

**real** 323:5 341:11 342:7 385:8 391:14

**realize** 468:6

**reason** 303:10 304:12 305:2,12 318:19 319:4 324:7, 10 328:4,11 391:18 410:25 411:14,15,16 413:20 434:20 436:7 437:6 447:6 452:5 453:3

**reasonable** 392:10 404:18 411:19 413:24

**reasons** 388:16 413:25 458:14 460:9 468:21

**recall** 292:8 298:24 302:17 303:4 310:25 312:20,25 313:21 320:14,21 326:15,16, 21,25 330:11 337:11, 18 355:18 356:2 357:3 363:6 368:23 371:22 373:21 374:11,15,19,23 375:3 407:20,24 409:5 410:6,21 424:9 425:10,21 437:3 446:3 465:4

**receive** 338:14 344:19 435:2

**received** 322:3 337:13 383:16 435:9 464:4,24

**receiving** 386:18 387:7 388:13 425:22 442:14

**recess** 304:7 318:8 381:9 398:20 454:17

**recollect** 442:16

**recollection** 309:14 310:17,21 311:17 324:2,17 338:12 349:6 352:25 355:24 356:8 386:2 411:6 420:10 435:17,22 440:2 442:14,19 443:16 444:14 448:5, 10 450:20 455:5 464:23 467:16,19

**recommended** 301:15

**reconvene** 289:3

**record** 304:3,5,8,11, 25 318:6,9 330:20,25 338:18,22 339:4 381:7,14 382:10 384:15 385:5 397:12 398:19,21 399:24 424:3 454:16,18 479:13 481:14 482:17,20

**records** 298:23 330:17 367:8,12 397:14,19 431:20,25

**recover** 358:16

**redaction** 428:12

**reestablish** 419:8

**refer** 291:2 306:10 322:15 329:21 340:14 341:15 400:9

**referenced** 337:5

**referred** 445:17

**referring** 297:16 371:4

**refine** 330:22

**reflect** 477:16

**reflected** 294:22 295:21 313:20 327:3 334:15 420:6 477:11

**refresh** 309:14 310:17 323:25 339:18 349:5 352:25 355:23 356:8 439:12 455:5 464:23

**refreshed** 331:21 332:16 341:4 342:11, 17 420:14,18

**regard** 386:5 402:5 407:7 443:13,25

**regular** 344:9 373:11 460:16

**regularly** 299:17

**regulatory** 327:15 335:21 411:14 416:6 469:18 471:10

**regulatory-wise** 418:3

**reimbursement** 338:15

**relate** 361:20 375:21 376:8,16 379:23 380:3 398:11 478:7

**related** 323:5 366:6 382:4 390:11 398:4 415:4 477:10,13,25 478:15

**relative** 333:5,7 343:23 376:25 413:18 430:18 453:16

**relevant** 412:3

**reliance** 370:25 372:5 463:8

**relied** 372:22,23 375:13 383:9 393:4,5

**relocate** 430:14

**relocation** 424:24

**rely** 428:2,7,8

**relying** 367:10 371:7 398:8 458:16

**remains** 401:21

**remember** 301:21 307:20,21 308:12,13 309:10 311:14 312:14 320:17 323:2 330:13 358:10 361:5, 8 368:6 375:9 389:14 407:18 409:12 410:25 411:5,22 441:14 443:14,15 464:4 465:8 467:22 468:5

**remembered** 415:9

**remind** 460:5

**remotely** 480:10

**remuneration** 337:10 382:8 384:13 385:14

**render** 388:12

**rendered** 337:14 339:13 384:8 385:23

**renegotiation** 416:20

**rep** 299:25

**repaying** 418:15

**repeat** 294:24 295:25 302:10 387:3 391:8 394:5 399:13 441:22 472:16

**repetitive** 335:9

**rephrase** 295:10 399:13

**report** 314:5,8,13

**reporter** 288:9

303:14,21,24 381:17 396:5,8 482:15,19

**reports** 299:13

**represent** 351:3 353:16

**representation** 412:14 426:9,14,24

**representative** 345:21,25 354:9 378:3 388:22 400:12, 13 463:13

**repudiation** 365:18 370:7

**reputable** 334:12

**request** 317:22 372:25 397:23

**requests** 349:8,13

**required** 369:23 385:22 409:15 410:7 411:11 440:24 453:22 454:2

**resign** 374:5,8

**resolution** 468:8

**resolve** 375:17

**respect** 319:16 325:3 335:7 343:17 348:15, 20 353:24 464:25 472:23 477:23 479:20

**respectful** 351:25

**respective** 451:7

**respond** 441:11 442:8,22 469:4

**responded** 441:6 465:11 469:9

**responding** 465:23

**respons** 328:14

**response** 305:21 425:21 444:3 469:17

**responses** 425:19

**responsibilities** 299:15 318:16,21,23 328:6 398:4

**responsibility** 299:2,20 300:6 301:2 315:13 319:6 326:6 327:9 332:19 333:22 340:4 343:2,5,17 364:9

**responsible** 299:7,8 300:11 316:6 327:18, 21 471:24

**responsive** 422:15

**rest** 290:17 482:9

**restate** 457:14

**restraining** 374:13, 16

**restroom** 317:23 380:15,23

**results** 330:23

**retail** 312:22

**return** 386:19 387:7 388:14 398:17

**revenue** 339:6,20,21

**review** 344:12 346:20 351:7 354:12 389:5 447:13 450:2

**reviewed** 357:4 429:5

**reviewing** 355:19 363:20

**ridiculous** 377:17

**rights** 473:10,23 474:10,23 475:10 476:23

**road** 339:7

**role** 314:2 327:12 343:11 363:19

**roles** 311:15 325:22 373:12

**roll** 337:25

**roll-ups** 477:18

**rollup** 407:25

**room** 309:18 355:11

**rough** 482:14

**roughly** 375:2

**row** 318:3

**RUKAVINA** 445:2,14

**rules** 386:6,7

**run** 319:24 380:22

**running** 324:13

---

**S**

**safe** 445:13

**satisfaction** 371:19 372:14

**satisfied** 373:18 429:13,16

**satisfy** 333:18

**scope** 300:7 301:9 316:7 317:8 387:22 405:15

**screen** 353:19 354:19,25 355:10 381:2 388:20 389:2 401:6 402:7,17,22 433:22,25 434:6

**screw-up** 370:25 371:2,4

**scroll** 434:9

**sec** 291:22 471:8,17, 21,25

**secrecy** 427:23

**secretary** 321:9

**section** 409:14 412:22,25

**secured** 416:13,15 452:25 453:13,16

**Seery** 352:6,8 373:23,24,25 375:16 391:23 392:9 414:24 439:17 468:6

**Seery's** 352:7

**sees** 302:6

**selection** 301:16

**send** 467:2

**senior** 297:5 300:10, 14,17,18 312:8 316:20 325:5 327:23

424:25 431:21 432:19 452:25 453:13,16

**sense** 341:14 392:7 466:25

**sentence** 405:24

**separate** 331:3 333:24 385:20 457:9 480:5

**separately** 430:17

**September** 355:25 356:10 357:6 374:6

**series** 455:3

**serve** 291:9 309:7 323:15 325:21 331:24

**served** 302:24 303:13 304:15 305:24 310:18,23 311:19 313:6 320:22 321:15 324:8,25 325:3 329:13 331:13, 17,22 332:8 341:2 342:15

**server** 426:2

**service** 333:6 334:5 343:22

**serviced** 336:3

**services** 294:11,22 295:4,7,9,14,21,23 296:4,10 329:19 331:20 332:4,14 335:15,17,22,23 336:2,5,7,9,10,15,24 337:7,13 338:4,6,15 339:3,9,12,15,22 340:11,20 362:24 367:11 371:6,7 372:7 375:5 381:11 382:14 383:3,9,16 384:8 385:12,23 386:2,4, 10,18 387:6 388:13 392:6 405:19,21 417:22 433:12 437:14 457:23,24,25 458:3,5,7,23 459:4, 15 460:6,7 466:3 467:6,13 471:15 472:5

**servicing** 413:17

**serving** 311:11 313:25

**set** 291:22 319:23 360:12 365:11 390:9 393:6 398:12 419:9 420:7 447:18 448:7 450:8,17 452:8 455:18 474:23 475:10

**settlement** 444:2 468:4 471:7,11,12

**seven-figure** 425:3

**seven-figure-plus** 431:20

**share** 359:2,17 362:7 368:10,21

**shared** 335:14,17,22, 23 336:2,5,9,10,15, 24 339:3,22 367:11 371:7 375:5 381:11 383:8 392:5 417:22 458:23 472:5

**She'll** 428:22

**sheet** 298:9 299:4,23 300:8 301:10 326:23 327:3,7 412:2 432:16

**sheets** 293:8 301:4 413:19

**shocked** 412:19

**shoot** 290:13

**short** 318:4 380:19, 21 386:11 387:10 397:17 398:16

**shorter** 291:23

**show** 330:23 347:22 406:4 415:17 429:15 431:20

**side** 308:10 450:5

**sides** 413:21

**sign** 299:24 312:12 327:24 408:23 426:8, 13 434:22 436:9 449:12 451:5

**sign-offs** 320:5

**signatories** 319:12 328:18

**signatory** 319:9,16, 20 328:22,25 329:7 438:2

**signature** 310:4,6 323:23 408:20 418:15 434:11,13 435:7 436:5,8,14 437:23 438:4,5,9,14, 18 446:21,22 449:10

**signatures** 320:4

**signed** 293:11,14,18, 24 310:11 358:16 409:3,7,22 410:6,22 412:14 414:18 415:13,23 416:22 417:12 418:12 419:19,21 435:7,12 437:13 438:25 446:25 447:5,9 449:6,16,21 451:2 453:20 455:14 473:3, 6 476:6,15

**significance** 316:25 317:2 460:18

**significant** 382:9 422:13 425:6

**significantly** 391:14

**signing** 413:5 437:24,25 438:22 439:5

**similar** 336:7 339:21 342:12 378:11

**similarly** 336:3

**simple** 348:25 391:6 393:23 395:8,9 400:16 441:23 460:25

**simultaneously** 301:18 311:11 321:20 384:5

**single** 353:9 414:18 428:11 458:21

**sir** 295:11 323:20 324:24 335:18 345:17 346:11 377:24 381:11 387:19 394:14

**396:24** 402:17 408:15 422:14 428:11 429:3 432:5 433:22 434:4,11 436:5 439:22 446:22 449:10 450:13 454:20 460:25 464:19 481:24

**sister** 351:21 361:22 399:8,16,25 400:9,17 401:8 403:12 404:8, 25 431:18

**sit** 300:24 301:7 304:13 318:20 319:4 357:8 445:10

**situation** 469:20

**sixth** 397:6

**skip** 357:24 359:21

**Skyview** 315:2

**small** 372:6 386:4 392:2 393:10,20 430:18 460:19

**soft** 413:15 415:9 416:9,12,18,24 417:8,21 418:17 452:22,23 453:11,19 475:17,19

**sold** 427:22

**solidifying** 411:10

**solvent** 417:19

**sophisticated** 292:21,25 383:22 390:23

**sought** 374:12 451:25

**sounds** 295:5 422:10 473:14

**source** 334:18

**space** 385:8

**speak** 303:23 399:3 453:12 454:22

**speaker** 303:25

**speaking** 301:18 303:15 383:21 384:5

**specific** 320:8 325:7 347:18 348:16

**356:13** 372:24,25 382:7 383:4 385:10, 14 438:6 456:24 467:15 468:20

**specifically** 312:14 316:5 317:7,12 326:14 344:20 349:4 364:17 372:17,18 373:7,15 382:18 393:18,19 412:15 430:12 434:23 435:16 437:5 470:6 471:21

**specifics** 369:16,20 375:25 410:12,13

**speculating** 300:9 430:20

**speculative** 427:6

**spend** 334:7 413:21

**spent** 350:15

**split** 322:9 472:5

**spreadsheet** 368:11 369:10

**stack** 353:2

**staff** 383:8 397:14

**stamped** 444:20,23

**standard** 404:20

**standing** 312:8 393:3

**standpoint** 418:3 421:13

**start** 365:13 424:4 472:13

**started** 307:22 364:4

**starting** 288:22

**stated** 388:17 407:13 419:17 471:21

**statement** 288:15 310:4 406:6,23 407:2 428:12 430:19

**statements** 299:10, 12 300:12 327:15,19, 24 338:4 366:5 412:8,17 429:6,15 430:8,22 432:7,12 470:9

**states** 359:13

**statute** 335:21

**stay** 371:8 394:25 481:13

**steal** 374:2 375:17

**step** 297:21

**steps** 316:2 344:11 393:24 462:2 463:3

**stick** 395:21

**Stinson** 288:18 363:15 364:3,6

**Stoops** 300:17

**stop** 289:2 356:21 441:17 474:18,19 479:6 480:15

**strap** 291:17

**strategy** 330:22

**stream** 339:6,20,21 386:18 387:7 388:13

**strike** 372:8 374:4 375:19 393:22 432:3 440:15 462:14 468:10,22

**strong** 324:15

**struck** 394:13 422:24

**structural** 335:3,6

**structure** 307:21 308:12

**structured** 314:10

**structuring** 312:7 373:9

**struggle** 316:15

**study** 327:7 333:9

**studying** 334:8

**stuff** 327:15 383:14 416:17

**subject** 332:2 347:3 348:18 353:25 354:16 361:21 403:16,22 404:4,10 416:20,22,25 417:3 420:20 429:20 440:13 443:10,19

**systems** 397:14

---

**T**

**taking** 398:7

**talk** 303:8 304:21
305:18 328:3 366:3
414:20 475:17

**talked** 336:22 406:8
407:16 424:9

**talking** 337:16
359:10 383:17 390:5
401:14 421:24
429:23,24 441:14
442:16 443:14,15
456:5 474:18,19
477:21

**tax** 373:9 382:23,24
383:10 416:6

**tax-related** 383:14

**team** 308:16 327:14
340:8,15 343:12,16
417:7

**telling** 400:5 455:13

**temporary** 374:12,
16

**tension** 373:22,24,25

**term** 368:15,18,19,22
369:22 371:3,12,20
372:2,16 397:3
407:17,21,25 410:22
427:6 446:17 447:23
448:8 449:4 450:25
451:3,6,9,10,13,17,
25 452:8 453:21
455:3,6 461:22
462:4,18 463:2 467:9
473:15 475:15
477:20 478:11

**termination** 375:5

**terms** 338:18 373:10
375:16 382:20
384:15 386:7 392:10
403:7 411:18 413:6,
10 416:19 417:13,17
418:16 432:22,25
452:8 471:8

**Terrestar** 469:18,20

**474:21 475:5 476:11
478:2,8,17**

**subordinated**
452:25 453:10,12

**subsequent** 407:11
477:4

**subsequently** 425:4

**subsidiaries** 415:3
417:19

**substance** 318:12
399:4 454:23

**substantial** 479:18

**substituted** 419:4
447:16 450:3

**suggested** 391:19

**suggesting** 396:18

**suing** 457:2 473:4,6
475:9

**summarized** 368:12

**summarizing**
360:19

**summary** 313:15
459:18

**superseded** 419:4
447:17 450:4

**supplemental** 338:9

**supplying** 334:17

**support** 336:10
360:12 370:7 391:7
431:12

**supported** 382:4

**supports** 470:24

**supposed** 289:11
376:5 392:8 395:20
431:16 461:4

**surprise** 410:24
438:17

**surprising** 311:16

**swear** 288:9

**switching** 437:24

**sworn** 288:12

**synergistic** 384:20

**471:24**

**testified** 288:12
351:14 352:16,22
370:9 379:15 441:25
462:8 472:20

**testify** 346:14 348:6,
14,22 349:11 354:8,
17

**testifying** 431:7
444:14

**testimony** 318:3,13
375:11 419:24 459:2
463:10 475:24

**Thedford** 320:9,11
321:14 329:15

**thereof** 310:5 431:22

**thereunder** 474:24

**thing** 324:13 336:12
362:3 389:25 426:2
436:24 452:17

**things** 292:19 304:20
312:10,12 313:11
317:4 322:8 327:25
359:14,25 360:16
373:9 403:6 428:7
435:11 445:3 468:2
469:19 470:16
471:12

**thinking** 340:17
375:16 402:3 459:3
461:18

**thinks** 351:25

**third-party** 330:24

**Thomas** 445:7

**thought** 388:4
413:23 467:25 468:3,
7 472:3

**thousand** 391:22

**thousands** 293:5

**throw** 290:9

**Thursday** 479:16
480:25 481:7,17,23
482:5

**time** 288:7 290:3,19
293:19 298:2 301:20
302:23 303:12

**304:14,22,25 305:6,
23 307:15,18,25
309:8 313:5,18,24
318:7 320:12,15
324:25 326:18
329:14 330:8 334:7
337:12 338:12 341:3
342:16 344:19,20,23
346:21 350:15
353:21,22 358:11
359:9 361:2,3 367:19
378:14 379:2 387:25
389:24 390:13 392:9
393:14 395:4,10
396:17 397:6 398:16
399:23 401:13,15
406:15 411:4 413:5,
9,21 415:6,23,24
416:20 417:3 418:12,
14 419:21 424:12
438:9 439:25 440:11
442:6,14,17,18,20,22
449:21 453:20
454:14,15 466:23
470:13 472:9 476:4,
5,8,10,14,16 479:18
480:10,15 481:18,23
482:2**

**timeframe** 371:14

**times** 338:20 339:15
349:22 350:4,8,11
356:15 375:8 383:23
420:2 421:20 450:16

**title** 308:18,25 313:4
323:10 325:11,16
331:5 342:8

**titled** 362:22

**titles** 311:25 312:3
325:6

**today** 290:13 291:3
294:10 295:17
296:10 298:10
300:25 301:7 303:9
304:21 305:22
308:19 309:2 314:17,
23 318:20 319:5
323:11 328:5 331:5
342:14 345:8,20,24
346:25 348:6 349:11
354:8 357:8 364:15
378:9 379:6 389:11
395:5 401:21 414:20,
22 415:12 445:5

**453:4 454:9 479:5**

**today's** 288:7 289:18
346:21 349:16 350:5
353:7

**told** 392:19 465:7

**top** 306:3 311:25
325:19 340:23
369:17,21

**topic** 347:6 348:11,
17 349:7

**topics** 346:9,10
353:16,17,24 354:13,
18 363:7 376:5
386:22

**total** 350:15 480:8

**track** 330:17,19,25
338:18,22,23 339:4
382:9 384:15 385:5

**tracking** 299:9

**transcript** 351:7
352:3,7

**transfer** 360:17,19

**transferred** 360:6

**transition** 363:22
392:11

**travels** 445:13

**treasurer** 309:8
310:14,18,23 311:4,
12 313:12,19 314:7,
16 316:18 317:9
318:15,21 323:15
324:3,8,17 325:25
327:9 328:6,13
343:10,11 397:24
436:21 439:25
466:21,22 467:3

**treasury** 333:25
416:4 417:22

**treated** 429:11

**trick** 358:14

**trouble** 393:11
394:22

**true** 453:15

**trued** 392:13

**trust** 289:9 401:10

Index: trustee..yells

427:19 443:21

**trustee** 400:13,16,23
401:9,17,21,23 402:5
403:8,15,21 404:2
405:4 420:21 421:2,6
422:24 427:20
443:11 472:12,23
473:10,22 474:23
476:19 477:10,25

**trustees** 402:2

**trusts** 306:23 401:25

**Tuesday** 479:14

**typical** 317:16
421:25

**typically** 463:24

**U**

**UCC** 416:15

**Uh-huh** 450:12

**unable** 290:20 479:7

**unaudited** 299:11

**unaware** 431:6
455:16

**underpaid** 404:18

**understand** 289:20,
25 293:8 296:21
301:8 335:18 345:7,
19,23 354:10 358:13,
17 370:24 378:4
383:25 386:13
388:25 390:22 404:7
409:7,21 415:12
426:12 435:8 447:9
449:20,25 457:13
476:4

**understanding**
299:21 300:7 301:2
306:17 316:7,11
330:14 343:17
347:10,13 403:5
410:6 419:3 426:20
440:24 478:5

**understood** 336:19
382:4,23

**unfetterred** 476:3

**unified** 384:19

**unit** 384:20 400:19

**universe** 311:19

**unrelated** 452:6

**unsecured** 416:18
451:19 453:16

**up-and-comers**
300:19

**V**

**valuation** 471:14,24

**values** 376:25

**variety** 291:19

**verbal** 336:5 381:19,
20

**versa** 308:14

**versus** 438:4 474:8

**vest** 385:4

**vice** 308:14 317:18

**video** 288:4,8 302:2
396:20 457:20

**videotape** 396:17

**view** 334:14 411:24

**viewed** 452:24
453:11

**viewing** 398:3

**virtually** 418:21

**voice** 302:4

**Volume** 288:4

**volunteer** 375:24

**W**

**wait** 355:17

**waiver** 347:17
358:22 414:7

**waives** 414:10

**waiving** 317:3

**walk** 406:3

**walked** 355:15

**wanted** 288:17

**wanting** 392:10

**Waterhouse** 301:12
302:18,25 303:5,11
304:13 305:3,13,22
309:7 310:13,18,24
311:4,11,18 312:17,
21 313:5,18,25
314:12,16,22 315:6
316:17 318:20
319:19 321:11,13
323:14 324:3,8,20
325:2,21,25 327:8
328:5,12,24 329:15
331:13 337:23
351:14,17 397:24
436:17,21 437:13
438:8 439:21,24
456:18 466:12,20

**Waterhouse's**
317:8,12 318:16
351:7

**ways** 335:2

**weather** 288:23

**Wednesday** 479:16
480:25 481:5

**week** 290:5,17
351:17 367:2 462:9
479:10 481:20

**well-capitalized**
417:19

**whatsoever** 325:8

**Wick** 364:5

**window** 423:20

**wires** 320:5

**withdrawn** 307:2
315:11 321:12
324:23 331:23 340:2
341:6 343:3 367:24
403:12 405:2,7 475:7

**withholding** 414:25
432:5

**witnesses** 480:6,11

**word** 327:22 366:21
395:3,4 415:21 458:3
460:17 462:15

476:20

**words** 291:14 297:21
343:25 430:13 474:7

**wore** 324:20

**work** 300:20 322:7
338:4 378:20 382:6
383:11 384:20
410:18 454:10

**worked** 312:6 338:20
383:6 463:16

**working** 320:18
375:17 384:19

**works** 378:17 481:23

**world** 331:17 371:18
396:25 397:15,22

**wrap** 454:12

**written** 335:17 336:2,
4,9 381:19 382:21

**wrong** 402:8

**Y**

**Yankees** 395:4,5

**year** 292:8 299:11
334:11 369:4,24
371:21 373:3,14,19
375:14 391:16,17
395:17 409:17,23
410:8 421:16 422:3
426:10 453:23 457:4
458:16 460:12
461:15 462:5,20,23

**year-end** 372:15
458:8 463:5,12

**years** 291:18 292:15
298:10,11 300:5,15
302:20 311:10
320:17 322:25
330:12 336:22
415:10 422:12,19
463:16

**yell** 396:13,15

**yelled** 396:19

**yelling** 396:11

**yells** 396:2

# EXHIBIT 99

Page 1

1       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2           DALLAS DIVISION

3

   In re:            :
4               : Chapter 11
               : Case No.
5   HIGHLAND CAPITAL MANAGEMENT, : 19-34054-sgj11
   L.P.             :
6        Debtor.   :
   ----------------------------
7               :
   HIGHLAND CAPITAL MANAGEMENT, :
8   L.P.             :
               :
9       Plaintiff,   :
               :
10     vs.         : Adversary
               : Proceeding No.
11   NEXPOINT ADVISORS, L.P.,  : 21-03005-sgj
   JAMES DONDERO, NANCY DONDERO,:
12   AND THE DUGABOY INVESTMENT  :
   TRUST,           :
13               :
        Defendants.  :
14   ----------------------------

15

16

17

18    REMOTE VIDEO DEPOSITION OF JAMES DONDERO

19            VOLUME III

20       Thursday, November 4, 2021

21

22

23

24

25   JOB NO. 202288

Appx. 01812

Page 2

```
1
2
3
4          November 4, 2021
5          1:17 p.m. CDT
6
7
8          Remote video deposition of JAMES
9    DONDERO taken in the above-entitled matter
10   before Suzanne J. Stotz, a Certified Shorthand
11   Reporter, Certified Realtime Reporter,
12   Registered Professional Reporter, and Notary
13   Public of the State of Texas, on Thursday,
14   November 4, 2021, commencing at 1:17 p.m. CDT.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1    A P P E A R A N C E S :
2
3    Attorneys for Highland Capital Management L.P.:
4       (Via videoconference)
        PACHULSKI STANG ZIEHL & JONES
5          780 Third Avenue
6          New York, New York 10017
7    BY:  JOHN MORRIS, ESQ.
8          HAYLEY WINOGRAD, ESQ.
9
10   Attorneys for NexPoint Advisors, L.P.:
11      (Via videoconference)
        MUNSCH HARDT KOPF & HARR
12         500 North Akard Street
           Dallas, Texas 75201
13
14   BY:  THOMAS BERGHMAN, ESQ.
15
16   Attorneys for James Dondero, Nancy Dondero,
       HCRE HCMS:
17
        (Via videoconference)
18      STINSON
           3102 Oak Lawn Avenue
19         Dallas, Texas 75219
20   BY:  DEBORAH DEITSCH-PEREZ, ESQ
21   BY:  MICHAEL AIGEN, ESQ.
22
23
24
25
```

Page 4

```
1    A P P E A R A N C E S (Continued):
2
3    Attorneys for Nancy Dondero:
4       (Via videoconference)
        GREENBERG TRAURIG
5          220 Ross Avenue
           Dallas, Texas 75201
6
7    BY:  DANIEL ELMS, ESQ.
8
9    Attorneys for The Dugaboy Investment Trust:
10      (Via videoconference)
        HELLER, DRAPER, HAYDEN, PATRICK & HORN
11         650 Poydras Street
           New Orleans, Louisiana 70130
12
13
        BY:  DOUGLAS DRAPER, ESQ.
14         MICHAEL LANDIS, ESQ.
15
16   Attorneys for The Litigation Trust:
17      (Via videoconference)
        QUINN EMANUEL URQUHART & SULLIVAN
18         51 Madison Avenue
           New York, New York 10010
19
20
        BY:  ROBERT LOIGMAN, ESQ.
21         DEBORAH NEWMAN, ESQ.
22
23
24
25
```

Page 5

```
1    A P P E A R A N C E S (Continued):
2
3    ALSO PRESENT:
4       (Via Videoconference)
        JACOB ARVOLD, Videographer
5
        (Via Videoconference)
6       LA ASIA CANTY, Legal Assistant
        c/o Pachulski Stang Ziehl & Jones
7
        (Via Videoconference)
8       AARON LAWRENCE, Law Clerk
        c/o Quinn Emanuel Urquhart & Sullivan
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
     I N D E X
 1
 2
 3  EXAMINATION                    Page No.
 4  JAMES DONDERO
 5    BY MR. MORRIS                    10
 6
 7
 8        E X H I B I T S
 9
10  Exhibit
    Name      Description      Page No.
11
    Exhibit   James Dondero Compensation   56
12  68          and Benefits Statement,
              Bates stamped D-CNL003585
13
    Exhibit   James Dondero Compensation   59
14  50          and Benefits Statement,
              Bates stamped D-CNL003587
15
    Exhibit   E-mail correspondence, Bates   95
16  53          stamped D-CNL003768 through
              D-CNL003770
17
    Exhibit   E-mail correspondence, Bates   107
18  54          stamped D-CNL003777 through
              D-CNL003779
19
    Exhibit   E-mail correspondence, Bates   116
20  56          stamped D-CNL003763
21  Exhibit   Promissory Note, Bates         119
    57          stamped D-CNL003764 through
22            D-CNL003765
23
24
25
```

Page 7

```
       I N D E X (Continued)
 1
 2
 3      E X H I B I T S (Continued)
 4
 5  Exhibit
    Name      Description      Page No.
 6
    Exhibit   Highland Capital Management,   123
 7  34          L.P., Consolidated Financial
              Statements and Supplemental
 8            Information, dated December
              31, 2018, Bates stamped
 9            D-CNL000212 through
              D-CNL000257
10
    Exhibit   Memorandum, dated             130
11  59          October 23, 2020, Bates
              stamped HCMFAS 000025
12            through HCMFAS 000031
13  Exhibit   Defendant James Dondero's     163
    24          Objections and Responses to
14            Plaintiff's Requests for
              Admission, Interrogatories,
15            and Requests for Production
16  Exhibit   Defendant NexPoint Advisors,  173
    27          L.P.'s Objections and
17            Responses to Plaintiff's
              Requests for Admission,
18            Interrogatories, and
              Requests for Production
19
20
21
22  (Exhibits attached to transcript.)
23
24
25
```

Page 8

```
                JAMES DONDERO
 1       JAMES DONDERO
 2       THE VIDEOGRAPHER:  Good afternoon.
 3  My name is Jacob Arvold.  I'm a certified
 4  legal videographer in association with
 5  TSG Reporting, Inc.
 6       Due to the severity of COVID-19 and
 7  following the practice of social
 8  distancing, I will not be in the same room
 9  with the witness; instead, I will record
10  this video deposition remotely.
11       The reporter, Suzanne Stotz, also
12  will not be in the same room and will swear
13  the witness remotely.
14       Do all parties stipulate to the
15  validity of video recording and remote
16  swearing and that it will be admissible in
17  the courtroom as if it had been taken
18  following Rule 30 of the Federal Rules of
19  Civil Procedures and the state's rules
20  where this case is pending?
21       MR. MORRIS:  Yes.
22       If anybody objects to that, please
23  speak up.
24       Nobody has spoken up.  So everybody
25  is deemed to have accepted that.
```

Page 9

```
                JAMES DONDERO
 1       JAMES DONDERO
 2       THE VIDEOGRAPHER:  Thank you.
 3       This is the start of Media Number 1,
 4  Volume II [sic] of the video-recorded
 5  deposition of James Dondero in the matter
 6  of In Re:  Highland Capital Management,
 7  L.P., in the United States Bankruptcy Court
 8  for the Northern District of Texas.
 9       This deposition is being held
10  remotely on November 4, 2021, at
11  approximately 1:17 p.m.
12       Counsel, please introduce
13  yourselves.
14       MR. MORRIS:  Everybody is – is on
15  here.  I don't – we can't take the time to
16  do that.  I'm familiar with everybody on
17  here.  Everybody's appeared in this action
18  before, and I'd like to proceed.
19       THE VIDEOGRAPHER:  All right.  The
20  appearances will be on the stenographic
21  record.
22       Will the court reporter please
23  reswear the witness.
24       THE COURT REPORTER:  Could you raise
25  your hand.
```

Page 10

1          JAMES DONDERO
2          THE WITNESS: (Complies with
3      request.)
4      J A M E S   D O N D E R O,
5  having first been duly sworn, was examined and
6  testified as follows:
7          MS. DEITSCH-PEREZ:  I only have one
8      questions.  Who's Robert Loigman?
9          MR. LOIGMAN:  I already stated for
10     the record.  I'm with Quinn Emanuel.  I'm
11     Debbie Newman's partner.
12         MS. DEITSCH-PEREZ:  Okay.  Thank
13     you.
14         MR. MORRIS:  Can we please put up on
15     the screen the document that's been marked
16     Exhibit 31.
17         MS. CANTY:  (Complies with request.)
18             EXAMINATION
19  BY MR. MORRIS:
20     Q.   Mr. Dondero, do you understand that
21  this is a continuation of your deposition from
22  Friday?
23     A.   Yes.
24     Q.   Have you spoken with anybody about
25  your testimony since we concluded the

Page 11

1          JAMES DONDERO
2  deposition on Friday?
3     A.   No.
4     Q.   Nobody in the world?
5     A.   Just my attorney.
6     Q.   And did you speak with your attorney
7  about the substance of the deposition on
8  Friday?  Just --
9          MS. DEITSCH-PEREZ:  I'm going to
10     direct -- I'm going to direct him not to
11     answer.
12  BY MR. MORRIS:
13     Q.   Okay.  I'm just asking you a
14  yes-or-no question.  I'm not asking for the
15  substance of any communications.
16         MS. DEITSCH-PEREZ:  Well, you're --
17     one, I'd have to talk to him to see what he
18     thinks "substance" means.
19         And to the extent that's
20     substantive, you're actually getting at the
21     content potentially of a discussion.  So
22     I'm going to direct him not to answer.
23  BY MR. MORRIS:
24     Q.   Are you going to follow your
25  counsel's advice?

Page 12

1          JAMES DONDERO
2     A.   Yes.
3     Q.   How much time did you spend speaking
4  with your attorney since the conclusion of the
5  last deposition?
6     A.   30 minutes, 40 minutes.
7     Q.   Are you aware that Alan Johnson
8  testified in this case the other day?
9     A.   I don't know who Alan Johnson is.
10  Uh, no.
11     Q.   Okay.  Is it fair to say that you
12  have no knowledge of Mr. Johnson's testimony?
13     A.   I have no knowledge of Mr. Johnson's
14  testimony.
15     Q.   Are you aware that an expert was
16  examined by me earlier in the week in
17  connection with this case?
18     A.   I'm aware there's an expert.  I'm
19  not -- I'm not aware that you've examined,
20  deposed, or whatever you did with him.
21     Q.   Okay.  When did you speak with your
22  counsel for 30 minutes about -- following last
23  Friday's examination?
24     A.   About 40 minutes ago.
25     Q.   Okay.

Page 13

1          JAMES DONDERO
2          MR. MORRIS:  Can we go to
3      paragraph 82 of this document --
4      Q.   -- Mr. Dondero, do you see that this
5  is your answer to the Plaintiff's Amended
6  Complaint.
7     A.   Yes.
8     Q.   And we looked at this the other day;
9  do you remember that?
10     A.   Yes.
11         MR. MORRIS:  Can we can go to page--
12     paragraph 82, please.
13         MS. CANTY:  (Complies with request.)
14  BY MR. MORRIS:
15     Q.   And I just want to table set to make
16  sure we're on the same page.
17         Paragraph 82 describes the
18  agreements that you entered into with Dugaboy
19  consuming the forgiveness of certain Promissory
20  Notes subject to conditions subsequent.
21         Is that a fair overarching overview
22  of the nature of the agreements?
23     A.   Yes.
24     Q.   Okay.  And for the rest of the
25  deposition today, when I use the phrase

JAMES DONDERO

1 JAMES DONDERO
2 "agreements," I'm going to mean the agreements
3 that are referred to in paragraph 82; is that
4 fair?
5 A. Yes, generally. If I have any
6 questions, I'll – I'll ask.
7 Q. Thank you very much.
8 The agreements covered each of the
9 notes that are the subject of the lawsuits that
10 Highland commenced against you, HCRE Services,
11 and NexPoint; is that right?
12 A. The – yes.
13 Q. What are you looking at?
14 A. Just this note sheet that covers all
15 the notes.
16 Q. Oh.
17 MR. MORRIS: Deborah, I would demand
18 that that sheet be produced immediately.
19 MS. DEITSCH-PEREZ: Okay.
20 MR. MORRIS: Okay. And I would ask
21 him to put it away.
22 MS. DEITSCH-PEREZ: No. He's a
23 30(b)(6) witness. He's entitled to have a
24 list of the notes. He sure he is.
25 MR. MORRIS: I'm telling you now –

1 JAMES DONDERO
2 MS. DEITSCH-PEREZ: I'm sorry to say
3 to you.
4 MR. MORRIS: I object. That is – I
5 have never in my life seen a witness –
6 MS. DEITSCH-PEREZ: I have had
7 30(b)(6) witnesses with whole notebooks of
8 information.
9 MR. MORRIS: Okay. So let's just
10 make sure the record is clear.
11 BY MR. MORRIS:
12 Q. Please describe for me what's on
13 that page.
14 A. It's a listing of the Notes payable
15 to Highland, what their original term and
16 amount was, what the term is, and what the loan
17 date was.
18 Q. Okay. I'm going to ask the –
19 MS. DEITSCH-PEREZ: No. I'm going
20 to take a picture, and I'm going to send it
21 to you, okay?
22 MR. MORRIS: Okay. And what we're
23 going to do right now is ask him to put it
24 away, and I'm going to ask him questions
25 solely in his capacity as an individual,

1 JAMES DONDERO
2 okay?
3 Please put it away.
4 THE WITNESS: Isn't that what this
5 deposition is, right? This deposition –
6 MS. DEITSCH-PEREZ: Well, this
7 deposition is both.
8 We're going to take a break for a
9 second. Let me think about that, but
10 I'll –
11 MR. MORRIS: I object. I really
12 object. I really object. I'm glad that
13 this is all on the record. I object.
14 My request is that he put it away
15 and answer questions in his capacity as an
16 individual.
17 I don't know why we need to take a
18 break.
19 MS. DEITSCH-PEREZ: Well, because
20 I'm going to go take a picture of it and
21 send it to you.
22 MR. MORRIS: I don't want you to do
23 that, though.
24 MS. DEITSCH-PEREZ: Why don't you
25 want – okay.

1 JAMES DONDERO
2 MR. MORRIS: We can do that – we
3 can do that when I ask him questions as a
4 30(b)(6) witness.
5 By the way, it's still
6 inappropriate, but –
7 MS. DEITSCH-PEREZ: No, it's not
8 John.
9 MR. MORRIS: Okay.
10 MS. DEITSCH-PEREZ: It's just not.
11 You can say it as much as you want. It
12 doesn't make it inappropriate.
13 And I am going to – I want to think
14 for a minute about whether or not your
15 request to have him not have it in front of
16 him in his individual capacity is
17 appropriate. And I'm not going to make a
18 snap decision. I'm going to talk to my
19 colleagues, and we'll be back on the record
20 in a couple of minutes.
21 MR. MORRIS: I object, but I can't
22 stop you.
23 MS. DEITSCH-PEREZ: Okay.
24 THE VIDEOGRAPHER: Would you like to
25 go off the video record, Counsel?

Page 18

1        JAMES DONDERO
2    MR. MORRIS:  No, no, not at all.
3    THE VIDEOGRAPHER:  Okay.
4    MR. MORRIS:  And just keep the --
5 keep the record going.
6    THE VIDEOGRAPHER:  Yep, will do.
7    MR. MORRIS:  And we're not off the
8 record?
9    THE VIDEOGRAPHER:  Correct.
10    THE COURT REPORTER:  Correct.
11    MS. DEITSCH-PEREZ:  Okay.  We're
12 back on the record.
13    THE VIDEOGRAPHER:  We remained on
14 the record.
15    MS. DEITSCH-PEREZ:  Okay.  And this
16 part -- this -- at this point Mr. Morris
17 only taking Mr. Dondero's deposition in his
18 personal capacity, not as a 30(b)(6)
19 witness.
20    If you want to resume taking his
21 deposition as a 30(b)(6) witness, let me
22 know; and I will tell him to get his list
23 of notes.
24    MR. MORRIS:  So he doesn't have it
25 in front of him right now?

Page 19

1        JAMES DONDERO
2    THE WITNESS:  Correct.
3    MS. DEITSCH-PEREZ:  Correct, he does
4 not.
5    MR. MORRIS:  Okay.  I'm going to
6 proceed; and I would ask, Deborah, that
7 somebody from your office send that to me
8 as soon as possible.  I'm sure it's on an
9 e-mail somewhere and all they have to do is
10 hit send.
11 BY MR. MORRIS:
12    Q.   Mr. Dondero, let's continue.
13    So you don't have that document in
14 front of you right now?
15    A.   Correct.
16    Q.   Okay.  How many agreements did you
17 enter into with Dugaboy?
18    MS. DEITSCH-PEREZ:  You mean with
19 the Dugaboy trustee?
20    We had an agreement that you were
21 going to refer to these as the agreements
22 with the Dugaboy trustee.  So let's stay
23 consistent.
24 BY MR. MORRIS:
25    Q.   Mr. Dondero, how many agreements did

Page 20

1        JAMES DONDERO
2 you enter into with Dugaboy trustee concerning
3 Promissory Notes?
4    A.   Is your question -- is your
5 questions how many Notes were entered into?
6    Q.   No.  How many separate agreements
7 did you enter into?
8    A.   The 2017, '18, and '19 agreements.
9    Q.   Okay.  I didn't ask you what
10 agreements.  I asked how many agreements you
11 entered into with the Dugaboy trustee.
12    MS. DEITSCH-PEREZ:  Asked and
13 answered.
14    THE WITNESS:  Three major ones.
15 BY MR. MORRIS:
16    Q.   Are there any minor ones?
17    A.   Not that I can recall right now.
18    Q.   Okay.  When did you enter into your
19 first major agreement with the Dugaboy trustee?
20    A.   At the end of '17.
21    Q.   Meaning December 2017 or early 2018?
22    A.   Yes.
23    Q.   What Promissory Notes are the
24 subject of the first major agreement that you
25 entered into with the Dugaboy trust-- with

Page 21

1        JAMES DONDERO
2 the Dugaboy trustee?
3    A.   I don't remember which ones
4 specifically.  I remember the amount was more
5 substantial than subsequent years.
6    Q.   Do you know how many Promissory
7 Notes were the subject of your first major
8 agreement with the Dugaboy trustee?
9    A.   No.
10    Q.   Can you identify the maker of any
11 Note that's subject to the first major
12 agreement with the Dugaboy trustee?
13    A.   Not without my list or details.
14    Q.   Can you identify the principal
15 amount of any Promissory Note that was subject
16 to the first agreement that you entered into
17 with the Dugaboy trustee?
18    A.   I know they were -- I know the gross
19 amount.  I know they were some of the term
20 loans, but I don't know the specifics.
21    Q.   Can you tell me the aggregate
22 amount -- withdrawn.
23    Can you tell me the aggregate
24 principal amount of the Notes that are the
25 subject of your first agreement with the

Page 22

```
1           JAMES DONDERO
2  Dugaboy trustee?
3      A.  I – I believe it was 30 – 30 some
4  odd million, 30 – I can't remember the
5  principal and interest, but it's only 30 – 34,
6  35, 36.  It was in that range.
7      Q.  Did your first agreement with the --
8  withdrawn.
9          Can you identify the date of any of
10  the Promissory Notes that are the subject of
11  your first agreement with the Dugaboy trustee?
12      A.  No.
13      Q.  Can you tell me the year that any of
14  the Promissory Notes that are the subject of
15  the -- withdrawn.
16          Can you tell me the year that any of
17  the Promissory Notes were entered into that are
18  the subject of your first agreement with the
19  Dugaboy trustee?
20          MS. DEITSCH-PEREZ:  Asked and
21      answered.
22          THE WITNESS:  No, not off the top of
23      my head.
24  BY MR. MORRIS:
25      Q.  When did you -- did -- when did you
```

Page 23

```
1           JAMES DONDERO
2  enter into the second agreement with the
3  Dugaboy trustee?
4          Was that in December of 2018 or
5  early 2019?
6      A.  Yes.
7      Q.  How many Notes are subject to your
8  second agreement with the Dugaboy trustee?
9      A.  Less than the first, but I don't
10  know how many.
11      Q.  You don't know the number of Notes
12  that are the subject of your second agreement
13  with the Dugaboy trustee; is that right?
14      A.  Correct.
15      Q.  Can you identify the maker of any
16  Notes that are the subject of your second
17  agreement with the Dugaboy trustee?
18      A.  No, I – I – no, I don't remember.
19      Q.  Okay.  So as you sit here right now,
20  you can't identify the maker of any of the
21  Notes that are the subject of the second
22  agreement with the Dugaboy trustee; is that
23  right?
24      A.  Well, it would be one of the three
25  parties or four parties here, me or NexPoint or
```

Page 24

```
1           JAMES DONDERO
2  whatever; but I don't remember --
3      Q.  Okay.
4      A.  -- off the top of my head.
5      Q.  Off the top of your head, can you
6  tell me the original principal amount of any
7  Note that's subject to your second agreement
8  with the Dugaboy trustee?
9      A.  No.  I just – no.
10      Q.  Can you identify the date on which
11  any of the Promissory Notes were executed that
12  were the subject of your second agreement with
13  the Dugaboy trustee?
14      A.  No.
15      Q.  Can you tell me the aggregate
16  principal amount of the Notes that are the
17  subject of your second agreement with the
18  Dugaboy trustee?
19      A.  Yes.  A fraction of the prior year.
20  Less than ten million.
21      Q.  Can you be anymore precise than
22  that?
23      A.  Approximately ten million, I think.
24  Just under.
25      Q.  Okay.  Did you enter into your third
```

Page 25

```
1           JAMES DONDERO
2  agreement with the Dugaboy trustee in December
3  2019 or early 2020?
4      A.  Yes.
5      Q.  That's after the petition date; do I
6  have that right?
7      A.  I – yes.
8      Q.  Did you do it before or after
9  January 9, 2020?
10      A.  Before, I believe.
11      Q.  So while you were still in control
12  of Highland but after the petition date, you
13  entered into your third agreement with the
14  Dugaboy trustee concerning Promissory Notes.
15          Do I have that right?
16      A.  Yes.
17      Q.  Did you ever inform the bankruptcy
18  court of this agreement?
19      A.  No.
20      Q.  Did you ever inform the independent
21  directors of this agreement that you entered
22  into after the petition date?
23      A.  No.
24      Q.  Can you tell me which notes are the
25  subject of your third agreement with the
```

Page 26

JAMES DONDERO

1
2   Dugaboy trustee?
3       A.   No.
4       Q.   Can you identify the maker on any
5   Note that's the subject of your agreement that
6   you entered into after the petition date with
7   the Dugaboy trustee?
8       A.   Not off the top of my head.
9           MS. DEITSCH-PEREZ:  I mean, John, if
10   you would let him look at his list, he
11   could tell you.
12          But if you insist on making this a
13   memory test of 18 or so different things or
14   however many there are, 13, 14, then this
15   is -- it's your deposition.  But if you
16   want more specific details, he could look
17   at the list.
18          MR. MORRIS:  Okay.  That's not even
19   an objection let alone a speaking
20   objection.
21          It is my deposition --
22          MS. DEITSCH-PEREZ:  No.
23          MR. MORRIS:  It is my deposition,
24   and I would appreciate your not making
25   gratuitous comments.

Page 27

JAMES DONDERO

1
2   BY MR. MORRIS:
3       Q.   Mr. Dondero, can you tell me the
4   aggregate value of the Notes that are the
5   subject of the third agreement that you entered
6   into with the Dugaboy trustee after the
7   petition date?
8       A.   I believe it was about a million
9   bucks.
10      Q.   And who were the makers of the Notes
11   that are the subject of the agreement with the
12   Dugaboy trustee that you entered into after the
13   petition date?
14      A.   I don't know.
15      Q.   Without the sheet that you looked at
16   earlier, you have no ability to tell me which
17   notes were the subject of which agreement that
18   you entered into with the Dugaboy trustee,
19   correct?
20          MS. DEITSCH-PEREZ:  Object to the
21   form.
22          THE WITNESS:  If I'm not certain off
23   the top of my head I can remember
24   accurately, I don't want to speculate.
25

Page 28

JAMES DONDERO

1
2   BY MR. MORRIS:
3       Q.   All right.  I don't want you to
4   speculate either.  So I'm going to ask you just
5   broad follow-up questions.
6           Can you identify any Promissory Note
7   that is the subject of any specific agreement
8   that you ever entered into with the Dugaboy
9   trustee without looking at the list?
10          MS. DEITSCH-PEREZ:  Object to the
11   form.  He's already done that to some
12   degree.
13          THE WITNESS:  I believe it covered
14   virtually all of them.  So I don't remember
15   which ones specifically in each year.
16          Generally, it was, I believe, the
17   ones incurred in that year; but I don't
18   remember which entities.  But again, the
19   ultimate result being that the term loans,
20   the demand notes, the things incurred, the
21   things outstanding were part of the
22   agreement.
23   BY MR. MORRIS:
24      Q.   Sir, you never wrote down a list of
25   the notes that are the subject of the

Page 29

JAMES DONDERO

1
2   agreements, correct?
3       A.   Correct.
4       Q.   You never asked anybody to make a
5   list of the notes that were the subject of each
6   of the agreements, correct?
7       A.   Correct.
8       Q.   You're not aware of any document
9   that was created prior to the commencement of
10   these lawsuits that identifies the Notes that
11   are the subject of the agreements, correct?
12      A.   Correct.
13      Q.   Other than the Promissory Notes that
14   are the subject of this lawsuit -- withdrawn.
15          Other than the Promissory Notes that
16   are the subject of these lawsuits, are you
17   aware of any other doc- -- Promissory Notes
18   that are the subject of an agreement with the
19   Dugaboy trustee?
20      A.   I believe there are from time to
21   time, yes.  But I -- I don't know off the top
22   of my head.
23      Q.   Can you identify the maker of any
24   Promissory Note that is the subject of any
25   agreement with the Dugaboy trustee other than

**Appx. 01819**

Page 30

JAMES DONDERO

1
2    the Promissory Notes that are the subject of
3    the pending lawsuits?
4        A.   Not specifically, but I believe
5    there are.
6        Q.   Okay.  Can you identify the
7    principal amount of any Promissory Note that is
8    the subject of an agreement with the Dugaboy
9    trustee that is not part of the pending
10   lawsuits?
11       A.   Not specifically.
12       Q.   Can you tell me the year in which
13   any Promissory Note was ever executed that is
14   the subject of any agreement with the Dugaboy
15   trustee other than the Promissory Notes that
16   are the subject of the pending lawsuits?
17       A.   I believe there were several, and I
18   believe there were numerous ones over the
19   years.
20       Q.   Okay.  And – and are those
21   Promissory Notes subject to one of the three
22   agreements that we've identified or subject to
23   some other agreement with the Dugaboy trustee?
24       A.   Well, they weren't to these related
25   entities.  I – I don't know what the

Page 31

JAMES DONDERO

1
2    agreements were specifically subject to.
3        Q.   Are you the person who entered into
4    the agreement with the Dugaboy trustee
5    concerning the notes that you are describing
6    right now?
7        A.   Yes, I guess.
8        Q.   As the person who entered into the
9    agreement with the Dugaboy trustee concerning
10   Notes that are not the subject of the pending
11   litigation, can you identify anything about
12   those Notes, whether it's the maker, the date,
13   the principal amount, anything at all?
14       A.   Not off the top of my head.
15       Q.   Okay.  What would – what would you
16   have to look at to know?  The chart or
17   something else?
18       A.   No, not this – not this chart.
19   This only has to do with what we thought this
20   deposition was going to be about.
21            It would be the financials of
22   Dugaboy; and then from there, the detail
23   regarding any Notes that it has.
24       Q.   Did you enter into an agreement with
25   the Dugaboy trustee to forgive a Promissory

Page 32

JAMES DONDERO

1
2    Note where Dugaboy is the maker and Highland is
3    the payee?
4        A.   Dugaboy – can you repeat that
5    question one more time?
6        Q.   Sure.  Did you enter into an
7    agreement with the Dugaboy trustee relating to
8    any Promissory Note where Dugaboy is the maker?
9        A.   No, I don't believe so.
10       Q.   Okay.  So you don't have any
11   recollection of ever entering into an agreement
12   with the Dugaboy trustee concerning the
13   potential forgiveness of any Note that was made
14   by Dugaboy, correct?
15       A.   I – I do not believe so.
16       Q.   Okay.  And is there a – is there a
17   document that we could look at that would
18   refresh your recollection?
19       A.   Not beyond the financials of Dugaboy
20   and any relevant Note detail.
21       Q.   And would – is it – is it your
22   testimony that an agreement with Dugaboy would
23   be reflected in the Dugaboy financial
24   statements?
25       A.   No, but the Notes would be.

Page 33

JAMES DONDERO

1
2        Q.   Well, the Dugaboy Notes are
3    reflected in Highland's financial statements.
4            Do you want me to get that?
5        A.   No.  I didn't think that was – I
6    didn't think that was the question you were
7    asking me.
8        Q.   I apologize.  Maybe it was my fault.
9            What would we have to look at in
10   order to refresh your recollection as to
11   whether or not you entered into an agreement
12   with the Dugaboy trustee concerning the
13   potential forgiveness of any Note made by
14   Dugaboy?
15       A.   Other than the ones we're talking
16   about today, right?
17       Q.   We're not talking about – there's
18   no Promissory Note where Dugaboy is the maker
19   that is the subject of any of the pending
20   lawsuits, correct?
21       A.   Correct.
22       Q.   So I'm asking you to identify if you
23   can any Promissory Note that is the subject of
24   any agreement you have ever entered into with
25   the Dugaboy trustee that is not the subject of

Page 34

JAMES DONDERO

1
2  one of the pending lawsuits.
3      Do you understand that that's what
4  I'm trying to get at?
5      MS. DEITSCH-PEREZ:  Asked and
6  answered.
7      THE WITNESS: Yes.
8  BY MR. MORRIS:
9      Q.   Okay.  Can you identify any such
10 Promissory Note?
11     A.   No, not specifically as I sit here
12 today.
13     Q.   Okay.  Other than the promissory --
14 withdrawn.
15         Are you familiar with the term
16 "majority interest" as used in the Highland
17 Limited Partnership Agreement?
18     A.   Yes.
19     Q.   Okay.  Other than the Promissory
20 Notes that are the subject of the pending
21 lawsuits, are you aware of any other Promissory
22 Notes that are the subject of any agreement
23 with the majority interest?
24     MS. DEITSCH-PEREZ:  Object to the
25     form.  Asked and answered.

Page 35

JAMES DONDERO

1
2      THE WITNESS:  The majority interest
3  is controlled by the 75 percent.  It's
4  controlled by Dugaboy.  But the majority
5  interest isn't an entity in and of itself,
6  right?
7  BY MR. MORRIS:
8      Q.   Okay.  Has Dugaboy held the majority
9  interest since the time that Highland was
10 created?
11     A.   No.
12     Q.   Okay.  So -- so then I'm going to
13 ask my question again.
14         Are you aware of any agreement
15 concerning a Promissory Note that is the
16 subject -- withdrawn.
17         Are you aware of any agreement with
18 the majority interest that concerns any
19 Promissory Note where Highland is the payee
20 other than the Notes that are the subject of
21 the pending lawsuit?
22     MS. DEITSCH-PEREZ:  Asked and
23     answered.
24     THE WITNESS:  Not specifically as I
25     sit here today, but I do believe there have

Page 36

JAMES DONDERO

1
2      been numerous notes other than to these
3      entities today where Dugaboy was the maker
4      or recipient or whatever.
5  BY MR. MORRIS:
6      Q.   So you do believe that Dugaboy was
7  the maker of a Promissory Note that's subject
8  to an agreement with the majority interest?
9      MS. DEITSCH-PEREZ:  Object to the
10     form.
11     THE WITNESS:  What I'm saying is I
12     believe Dugaboy had other -- made other
13     Notes and received other Notes from other
14     entities other than Highland.
15 BY MR. MORRIS:
16     Q.   Does that have anything to do with
17 Highland?
18         Maybe I wasn't clear.  I'm using the
19 phrase "majority interest" as that phrase -- I
20 thought we had -- I thought we had an
21 understanding -- as that phrase is used in the
22 Highland Limited Partnership Agreement, right?
23     A.   I thought it was a definition term
24 in the Highland, L.P.
25     Q.   It is, and I just -- I'd like to

Page 37

JAMES DONDERO

1
2  move on if I can, but I just want some clarity
3  here.
4      Is there any agreement between
5  Dugaboy and the majority interest concerning
6  any Promissory Note where Dugaboy is the maker?
7      MS. DEITSCH-PEREZ:  Object to the
8      form.
9      THE WITNESS:  I -- I don't know what
10     you're getting at.  I have a tried to
11     answer it the best I can several different
12     ways.
13         But try it one more time, and I'll
14     try and answer it just specifically yes or
15     no.
16 BY MR. MORRIS:
17     Q.   Okay.  Is Dugaboy the maker on any
18 Promissory Note where Highland is the payee?
19     A.   I don't believe so at this point.
20     Q.   Was Dugaboy ever the maker on a Note
21 where Highland was the payee to the best of
22 your knowledge?
23     A.   I don't -- I just don't know what
24 the actual accounting was or could have or
25 should have been.  But if it prepays a Note,

Page 38

JAMES DONDERO

1
2     instead of prepaying a Note, it could have left
3     it in an existing Note outstanding and then
4     issued a separate Note, right, instead of
5     prepaying, right?
6         So I don't know in the – in the pas
7     past or how exactly they handled prepays
8     consistently over time.  But at the moment, I
9     don't believe there's a loan going from Dugaboy
10    to Highland.
11        But I do believe over the years,
12    there were numerous loans from Dugaboy to other
13    entities other than the ones we're talking
14    about today.
15        MS. DEITSCH-PEREZ:  Okay.  John,
16    we've gone way far afield of the topics for
17    this deposition or anything that you ought
18    to be even asking this individual witness
19    about given what these litigations are.
20    Could we move on, please?
21        MR. MORRIS:  No.  Other than –
22        MS. DEITSCH-PEREZ:  You're spending
23    time on things other than the –
24        MR. MORRIS:  Please stop talking.
25        MS. DEITSCH-PEREZ:  -- action.

Page 39

JAMES DONDERO

1
2         MR. MORRIS:  Please stop talking.
3     BY MR. MORRIS:
4         Q.   Other than the Promissory Notes that
5     are the subject of the lawsuits, are you aware
6     of any other Promissory Notes that are the
7     subject of any agreement that the Dugaboy
8     trustee ever entered into as a representative
9     of the majority of Class A shareholders?
10        MS. DEITSCH-PEREZ:  Asked and
11    answered.  I think we've answered after the
12    sixth time.
13        THE WITNESS:  Not as I sit here
14    today.
15    BY MR. MORRIS:
16        Q.   In paragraph 82 in about the fifth
17    line down, there's a statement that, quote,
18    "Nancy Dondero is representative for a majority
19    of the Class A holders of plaintiff, agree that
20    plaintiff would forgive the Notes."
21        Do you see that?
22        A.   Yes.
23        Q.   The word "plaintiff" as used in your
24    answer refers to Highland Capital Management,
25    L.P., correct?

Page 40

JAMES DONDERO

1
2         A.   I – no – or wait.  Hold on a
3     second.
4         Yes.  I guess, yes.
5         Q.   Okay.  At the time you entered into
6     the agreements, did you understand that
7     Dugaboy, as a majority – as a representative
8     of a majority of the Class A shareholders of
9     the plaintiff was the entity that entered into
10    the agreement on behalf of Highland?
11        A.   Yes.
12        Q.   And your sister Nancy is the trustee
13    of Dugaboy today, correct?
14        A.   Yes.
15        Q.   And Nancy was the trustee of Dugaboy
16    at the time you entered into each of the
17    agreements, correct?
18        A.   Yes.
19        Q.   And you knew that at the time you
20    entered each of the agreements, correct?
21        A.   Yes.
22        Q.   You knew she was acting on behalf of
23    Dugaboy, correct?
24        A.   Yes.
25        Q.   Your understanding at that time that

Page 41

JAMES DONDERO

1
2     you entered into each of the agreements with
3     the Dugaboy trustee was that Dugaboy held the
4     majority of Highland's Class A interest,
5     correct?
6         A.   Yes.
7         Q.   And that's exactly why you contacted
8     Nancy to discuss the topics that ultimately led
9     to the agreements, correct?
10        A.   Yes.
11        Q.   You specifically called Nancy
12    because you wanted her to cause Dugaboy to
13    enter into the agreements with you on behalf of
14    Highland, correct?
15        A.   Yes.
16        Q.   And just as you wanted, Nancy, in
17    fact, caused Dugaboy, as a representative of a
18    majority of the Class A shareholders of
19    plaintiff, to enter into each of the
20    agreements, correct?
21        A.   Yes.
22        Q.   Would you agree with me that the
23    Promissory Notes that are the subject of the
24    agreements were the debtor's property?
25        A.   I think I've stated numerous times

JAMES DONDERO

1
2 due to them as that they would ultimately be
3 compensation; but to be a bona fide Note and to
4 have bona fide deferral at the time that they
5 were issued, they were the debtor's property.
6 And I guess they remained such until satisfied
7 or until the condition as present -- the
8 condition subsequent is either triggered or
9 impossible to be triggered.
10    Q.   Okay.  Is it fair to say that the
11 Promissory Notes that are the subject of the
12 agreements were assets of the debtor at the
13 time you entered into the agreements?
14    A.   Yes.
15    Q.   At the time you entered into the
16 agreements, you understood that Dugaboy was
17 exercising control over the debtor's property,
18 correct?
19        MS. DEITSCH-PEREZ:  Object to the
20    form.
21        MR. MORRIS:  Withdrawn.
22 BY MR. MORRIS:
23    Q.   At the time you entered into the
24 agreements, you understood that the Dugaboy
25 trustee was going to exercise control over the

1        JAMES DONDERO
2 debtor's property, correct?
3        MS. DEITSCH-PEREZ:  Object.  Object
4    to the form.
5        THE WITNESS:  Exercise control?  I
6    understood the trustee had the ability to
7    grant the, whatever you want to call them,
8    conditions subsequent.
9 BY MR. MORRIS:
10    Q.   On that --
11    A.   Yes.
12    Q.   And that was -- by entering into the
13 agreement, would you agree with me, that the
14 Dugaboy trustee exercised control over the
15 Promissory Notes?
16        MS. DEITSCH-PEREZ:  Object to the
17    form.
18        THE WITNESS:  They -- The trustee
19    exercised the rights given to it as a
20    majority of Class A holders.
21 BY MR. MORRIS:
22    Q.   Okay.  And is it your understanding
23 that as part of the right, it altered the
24 characteristics of the Promissory Notes?
25        MS. DEITSCH-PEREZ:  Object to the

1        JAMES DONDERO
2    form.
3        THE WITNESS:  I just want to -- I
4    believe my testimony, I granted the
5    conditions subsequent is my interpretation.
6 BY MR. MORRIS:
7    Q.   Right.  And so that's fine.  But
8 that's -- that's the thing that happened, but
9 I'm just asking you what the impact of that
10 was.
11        When the Dugaboy trustee entered
12 into the agreement, the result was that the
13 terms and conditions of the Promissory Note
14 were altered, correct?
15        MS. DEITSCH-PEREZ:  Object to the
16    form.
17        THE WITNESS:  I don't want to -- I
18    want to say I don't know to that next week.
19 BY MR. MORRIS:
20    Q.   You can't -- okay.  You can't tell
21 me if your agreement with the Dugaboy trustee
22 altered the terms and conditions of the
23 Promissory Notes that were subject to the
24 agreement; you can't tell me that?
25        MS. DEITSCH-PEREZ:  Object to the

1        JAMES DONDERO
2    form.
3        THE WITNESS:  Yeah.  I -- again, it
4    sounds like you're trying to take me
5    towards legal terms of changing terms or
6    modification in a Note or whatever; and
7    I -- I'm not -- I don't have an opinion or
8    the expert to comment on that.
9        I can just say I knew she had the
10    ability to create conditions subsequent.
11 BY MR. MORRIS:
12    Q.   Okay.  So let's take, for example,
13 the Notes that you signed.
14        Those were demand notes, right?
15    A.   Yes.
16    Q.   Okay.  And after you entered into
17 the agreement with the Dugaboy trustee, instead
18 of it being a demand note, it was now a demand
19 note subject to conditions subsequent, correct?
20        MS. DEITSCH-PEREZ:  Object to the
21    form.
22        THE WITNESS:  Yeah, that ultimately
23    they couldn't be demanded until conditions
24    subsequent were met or unable to be met.
25

Page 46

```
1            JAMES DONDERO
2   BY MR. MORRIS:
3        Q.   Okay.  So can you agree with me that
4   that -- that that was a change in the term of
5   the Note?
6            MS. DEITSCH-PEREZ:  Object to the
7        form.
8            THE WITNESS:  Yeah.  See, that's the
9        part I don't want to comment on.  I just
10       want to say I don't know.
11  BY MR. MORRIS:
12       Q.   Okay.  Wasn't that the purpose of
13  entering into the agreements was to change the
14  terms of the each of the Promissory Notes?
15  Wasn't that your intent?
16           MS. DEITSCH-PEREZ:  Object to the
17       form.
18           THE WITNESS:  I'd say the intent was
19       to find and make compensation appropriate
20       for industry standards and Highland in
21       particular.
22  BY MR. MORRIS:
23       Q.   And did you believe that the Notes
24  as originally drafted and signed by you or the
25  representatives of the makers didn't take that
```

Page 47

```
1            JAMES DONDERO
2   into account?
3        A.   I went through this already last
4   time, but the Notes were intentionally loose
5   and, I think, anticipated the ability to adjust
6   the subsequent conditions or other things.
7        Q.   Now, you told me that each of the
8   agreements was entered into between December of
9   one year or -- actually, withdrawn.
10           If we look at paragraph 82, it says
11  that each of the agreements was made, quote,
12  "sometime between the December of the year in
13  which each note was made and February of the
14  following year."
15           Do I have that right?
16       A.   Yes.
17       Q.   Can you identify with any greater
18  specificity when you entered into the first
19  agreement with the Dugaboy trustee referenced
20  in paragraph 82?
21       A.   No.
22       Q.   It's sometime within that 90-day
23  period; does that sound right to you?
24       A.   I believe it was closer to the
25  holidays around the turn of the year, but I
```

Page 48

```
1            JAMES DONDERO
2   don't have specific recollection.
3        Q.   Is that answer the same for all
4   three agreements or only for the first
5   agreement?
6        A.   That would be the same for all
7   three.
8        Q.   So then why -- why does paragraph 82
9   refer to sometime between December of the year
10  in which each note was made and February of the
11  following year if your best recollection is
12  that it happened around the holidays?
13       A.   I don't know.
14       Q.   All right.  But as you sit here
15  right now, is it your testimony that you
16  believe each of the agreements was signed --
17  was more likely signed in December rather than
18  January or February?
19           MS. DEITSCH-PEREZ:  Object to the
20       form.
21           THE WITNESS:  I think signed is a --
22       I'm not -- I'm not testifying that signed,
23       I guess.
24  BY MR. MORRIS:
25       Q.   I apologize.  Maybe that was my
```

Page 49

```
1            JAMES DONDERO
2   mistake.
3            Is it your testimony that each --
4   that you entered each of the agreements with
5   the Dugaboy trustee in December rather than
6   January or February of the years indicated?
7        A.   That's the best of my recollection,
8   but there may have been one year that was
9   towards the wider end of the interval.  I can't
10  remember with more specificity.
11       Q.   Okay.  Do you know of anything that
12  memorialized the date on which you entered into
13  any of the agreements?
14       A.   No, other than -- no, other than --
15  no, other than, you know, other than travel
16  schedule or phone logs or whatever.
17       Q.   All right.  During the discussion
18  that led to the agreements, did you ever
19  provide any information to Nancy or to Dugaboy
20  concerning your compensation?
21       A.   Just -- just verbal.  I mean, she
22  knew it was low, and she knew we had reinvested
23  most everything we make back in the company
24  over the years.  And that was the -- that was,
25  I think, understanding by all involved; and it
```

Page 50

JAMES DONDERO

1
2 should be obvious to anybody who's looked at
3 the numbers even in hindsight.
4        MR. MORRIS:  Okay.  I move to
5    strike.
6 BY MR. MORRIS:
7    Q.   And please listen carefully to my
8 question.
9        During the discussions that led to
10 each of the agreements, did you ever provide
11 any information to your sister or Dugaboy
12 concerning your compensation?
13        MS. DEITSCH-PEREZ:  Asked and
14    answered.
15        THE WITNESS:  Not specifically.
16 BY MR. MORRIS:
17    Q.   Did you provide any general
18 information to your sister or to Dugaboy prior
19 to the entry of any of the three agreements
20 that you entered into with the Dugaboy trustee?
21    A.   I would repeat the answer that was
22 struck two questions ago.
23    Q.   That's the information that you gave
24 to her?
25    A.   Yeah.  It was – again, it was

Page 51

JAMES DONDERO

1
2 verbal, and it was – but an understanding but
3 a clear and obvious understanding.
4    Q.   I want to know exactly what
5 information you gave to your sister and to
6 Dugaboy before entering into any of the three
7 agreements with the Dugaboy trustee?
8    A.   Most of what I had made over the
9 years was rolled back into the business to
10 propel growth and initiatives.  And that my
11 actual compensation was very modest based on
12 industry standards and relevant
13 responsibilities at Highland.
14    Q.   Did you tell her anything else?
15 Withdrawn.
16        Did you tell your – Nancy or
17 Dugaboy anything else beyond what you've now
18 testified to?
19    A.   You know, I think some of what I
20 testified to earlier, that forgiveness of the
21 Notes would be a modest increase in that
22 compensation but still not be in the ZIP code
23 of fair and appropriate compensation and that
24 the value of the Notes in aggregate were de
25 minimus relative to Highland and de minimis

Page 52

JAMES DONDERO

1
2 relative to Dugaboy.
3    Q.   Did you tell her anything else?
4    A.   Anything else would have fallen into
5 the buckets I just described, but I can't
6 remember specifically as I sit here today.
7    Q.   Did you ever tell your sister or
8 Dugaboy that your salary was less than a
9 million dollars?
10    A.   I –
11        MS. DEITSCH-PEREZ:  I mean, just
12    from Highland?
13        THE WITNESS:  Repeat the question
14    again for me, please.
15 BY MR. MORRIS:
16    Q.   Did you ever tell your sister that
17 your salary was less than a million dollars a
18 year?
19    A.   I know my sister was aware that it
20 was very low, and it kind of decreased over
21 time, and I think it was paid by different
22 entities.
23        Whether it was a million or
24 2 million, I can't remember exactly what I
25 would have told her; but it would have been in

Page 53

JAMES DONDERO

1
2 that ZIP code to paint the proper picture that
3 the cash compensation for somebody in my role
4 was well below industry standards.
5    Q.   Do you recall anything else that you
6 shared with your sister concerning your
7 compensation that you haven't testified to?
8    A.   Like I said, it would generally fall
9 into those buckets as I sit here today.
10    Q.   Did your sister or Dugaboy ask you
11 any questions about your compensation before
12 entering into the three agreements that you
13 entered into with the Dugaboy trustee?
14    A.   And, again, it would fall into the
15 buckets I just described.
16    Q.   Can you – can you recall any
17 question that your sister or Dugaboy asked of
18 you concerning your compensation before
19 entering into the agreements?
20        MS. DEITSCH-PEREZ:  Asked answered.
21        THE WITNESS:  Again, I – it would
22    fall into the buckets I just described.
23 BY MR. MORRIS:
24    Q.   Did you provide any documents to
25 your sister or to Dugaboy concerning your

**Appx. 01825**

Page 54

JAMES DONDERO

1
2    compensation before entering into the
3    agreements?
4        A.    No, not that I can recall.
5        Q.    Did your sister or Dugaboy ask you
6    for any documents before entering into -- into
7    any of the agreements?
8        A.    I do not -- I do not believe so.
9        Q.    Do you recall that in the ordinary
10   course of business, Highland prepared a
11   document called a Compensation and Benefits
12   Statement for each of its employees?
13       A.    Yes.
14       Q.    And was that prepared by the Human
15   Resources Group?
16       A.    Yes.
17       Q.    And was Mark Collins the head of the
18   Human Resources Group?
19       A.    No.
20       Q.    Who was the head of the Human
21   Resources Group?
22       A.    Brian Collins.
23       Q.    I apologize to Mr. Collins.  Thank
24   you for the correction.
25             And Mr. Collins and his team were

Page 55

JAMES DONDERO

1
2    responsible for preparing the annual
3    Compensation and Benefits Statements for
4    Highland's employees, correct?
5        A.    Yes.
6        Q.    And did you instruct them to do
7    that?
8        A.    Not specifically.
9        Q.    Okay.
10       A.    They do it every year.  They do it
11   every year as a matter of course, so I guess no
12   is the answer.
13       Q.    Okay.  So in the ordinary course of
14   business, Mr. Collins and his team would
15   prepare Compensation and Benefits Statements
16   for each of Highland's employees on an annual
17   basis, right?
18       A.    Yes.
19       Q.    Okay.
20            MR. MORRIS:  Can we please put up
21   Exhibit 68.
22            MS. CANTY:  (Complies with request.)
23
24
25

Page 56

JAMES DONDERO

1
2            (Whereupon, Exhibit 68, James
3        Dondero Compensation and Benefits
4        Statement, Bates stamped D-CNL003585,
5        marked for identification, as of this
6        date.)
7    BY MR. MORRIS:
8        Q.    Do you see the document that's been
9    premarked as Exhibit 68 that's up on the
10   screen, sir?
11       A.    Yup.
12       Q.    And does this appear to be the form
13   of annual Compensation and Benefits Statement
14   that Mr. Collins and his team prepared on an
15   annual basis for Highland's employees?
16       A.    This looks like the format, yes.
17       Q.    Okay.  And the Compensation and
18   Benefits Statement was intended to set forth
19   the types and the amounts of compensation each
20   employee received each year, correct?
21       A.    Yes, generally.
22       Q.    Okay.  Did you ever disclose any
23   information on this page to Nancy or to
24   Dugaboy?
25       A.    Honestly, I don't think I've ever

Page 57

JAMES DONDERO

1
2    seen my award letters before.
3        Q.    Okay.  So you never -- so then it's
4    a fair to say you never showed this letter to
5    your sister or Dugaboy, correct?
6        A.    Correct.
7        Q.    Okay.  Did you ever disclose to
8    Nancy or to Dugaboy the salary that's reflected
9    on this document?
10       A.    I can't remember specifically beyond
11   what I've already testified.
12       Q.    Did you ever describe for Nancy or
13   for Dugaboy the 2016 deferred compensation
14   award that's reflected on this document?
15       A.    No.  I -- by the way, I think that's
16   only 20 percent vested a year.  I think that's
17   a gross amount.  But no, I never -- I never
18   discussed that with her.
19       Q.    Okay.  Do you see in the
20   compensation award refers to 50,000 restricted
21   stock units of NXRT relating to your 2016
22   performance?
23       A.    Yes.
24       Q.    What is NXRT?
25       A.    That's the REIT that Highland used

1          JAMES DONDERO
2   to own million shares of that series hold at 20
3   that now trade at 70.
4      Q.   And is NexPoint REIT affiliated with
5   NexPoint Advisors, L.P.?
6      A.   Yes.
7      Q.   And do you have an understanding of
8   the nature of the relationship?
9      A.   Yes.
10     Q.   And what's – what's your
11  understanding of the nature of the relationship
12  between NexPoint REIT and NexPoint Advisors,
13  L.P.?
14     A.   It's the external manager of the
15  REIT.
16     Q.   Okay.  Did you ever tell Nancy or
17  Dugaboy that you had received these restricted
18  stock units in 2016?
19     A.   No.  But the vested amount
20  would have probably been about $250,000 worth
21  at that moment.
22     Q.   And did it vest over a couple of
23  years?
24     A.   The first couple of years is vested
25  over five years.  I think now it vests over six

1          JAMES DONDERO
2   or seven years.  I don't remember whether the
3   2016 award was five years, six years, or seven
4   years.
5      Q.   Okay.  We talked earlier about an
6   expert that's been retained on your behalf.
7          Do you remember that?
8      A.   Yes.
9      Q.   Do you recall if you or anybody
10  acting on your behalf ever disclosed to that
11  expert the restricted stock units reflected on
12  this document?
13        MS. DEITSCH-PEREZ:  Object to the
14        form.
15        THE WITNESS:  I don't know.
16        MR. MORRIS:  Let's put up
17  Exhibit 50, please.
18        MS. CANTY:  (Complies with request.)
19        (Whereupon, Exhibit 50, James
20        Dondero Compensation and Benefits
21        Statement, Bates stamped D-CNL003587,
22        marked for identification, as of this
23        date.)
24  BY MR. MORRIS:
25     Q.   Do you see this is your benefits

1          JAMES DONDERO
2   statement for 2017?
3      A.   Yes.
4      Q.   Did you ever disclose any of the
5   information on this page to Nancy or to
6   Dugaboy?
7      A.   No.
8      Q.   Did you ever disclose to Nancy or to
9   Dugaboy that your base salary in 2017 was.
10     2,500,024?
11        MS. DEITSCH-PEREZ:  Object to the
12        form.
13        THE WITNESS:  Not specifically, no,
14        other than the buckets we talked about
15        earlier.
16        Like I said earlier, I'm not sure if
17        I have ever seen these before.  But I also
18        – until it's verified, I don't want to –
19        everybody to assume that the base salary
20        came a hundred percent from Highland or if
21        it was also from some other entity.
22        Because for the purposes of this letter,
23        Brian Collins wouldn't have – we have
24        numerous or several employees that are dual
25        employees.  And whether their base salary

1          JAMES DONDERO
2   came from one or multiple entities, he
3   wouldn't have differentiated in that line.
4          So I don't know whether that amount,
5   that 2.5 million came from Highland or a
6   combination of Highland/NexPoint or some
7   other entities.  I don't know.
8   BY MR. MORRIS:
9      Q.   And who made the decision as to how
10  to allocate the base salary?
11     A.   I don't know.  I – I mean, I don't
12  know how it was split.  But my recollection of
13  my Highland base salary is that it was
14  diminishing over time.
15     Q.   And – and as the president of
16  Highland and as the president of NexPoint, did
17  you have any say as to how your salary was
18  allocated between those two entities?
19     A.   Not that I recall.
20     Q.   Do you have any idea the basis on
21  which your salary was allocated between those
22  two entities?
23     A.   No.
24     Q.   Do you think – do – do you have
25  any understanding that it was allocated based

Page 62

JAMES DONDERO

1
2  on the amount of time you spent working for
3  each of those entities?
4      A.  I have no idea.
5      Q.  If your salary was $500,000 from
6  Highland in 2017 and $2 million to NexPoint,
7  can you -- can you think of any reason why it
8  would be allocated in that way?
9          MS. DEITSCH-PEREZ:  Object to the
10     form.
11         THE WITNESS:  Cash, cash
12     availability.  I -- I don't know.
13  BY MR. MORRIS:
14     Q.  Okay.  Did you devote your full time
15  and attention to Highland Capital Management,
16  L.P.?
17     A.  I spread my time as appropriate
18  across a variety of entities.
19     Q.  Can you identify for me the entities
20  that you spread your time across?
21     A.  Highland, NexPoint, HCMFA, HCRE.
22     Q.  How about Highland Management
23  Services, Inc.?
24     A.  Yes.
25     Q.  Are there any others?

Page 63

JAMES DONDERO

1
2      A.  Yes.
3      Q.  Can you identify any other companies
4  to which you devoted your time and attention?
5      A.  Not off the top of my head.  I'm
6  willing to be refreshed.  But over the years
7  there's been multiple initiatives at Highland
8  that have come and gone and private equity
9  companies that have come and gone and other
10  initiatives that have come and gone.
11     Q.  Do you see the reference to the
12  65,772 restricted stock units of the NexPoint
13  REIT there on this document?
14     A.  Yes.
15     Q.  And was that, to the best of your
16  recollection, the award that you were granted
17  in connection with your 2017 performance?
18     A.  It would have been for -- it would
19  have been the prior awards at -- it would have
20  been for the prior years' awards at NFLP.  And
21  it would have been -- it would have been the
22  same five- or seven-year vesting schedule.
23         MR. MORRIS:  Now I'm looking at my
24     phone, and I don't see, Deborah, any e-mail
25     from your firm.

Page 64

JAMES DONDERO

1
2          MS. DEITSCH-PEREZ:  Yeah.  On a
3  break, I'll take a picture of it and send
4  it to you.
5          Do you want a break now?
6          MR. MORRIS:  I really -- I really
7  don't.  And I don't know why I can't get an
8  e-mail copy rather than a photograph.  It's
9  not going to be -- it's not going to be
10  easy to read, and you know that?
11         MS. DEITSCH-PEREZ:  It'll be
12  perfectly fine.  If you can't, let me know;
13  and then I'll take the time to try and find
14  it.  But the fastest way to get it to you
15  is to take a picture of it.
16  BY MR. MORRIS:
17     Q.  Mr. Dondero, did you ever tell Nancy
18  or Dugaboy that you had received the restricted
19  stock units from the NexPoint REIT as reflected
20  on this page?
21     A.  You're -- you're saying the
22  $1.55-million number that was really 200,000
23  vested or 300,000 vested?
24     Q.  No.  I'm not talking about the
25  value.  I'm just talking about the restricted

Page 65

JAMES DONDERO

1
2  units.
3          Did you ever tell them -- let's keep
4  it -- let's keep it simple, and let's make it
5  really broad.
6          Did you ever tell Nancy or Dugaboy
7  that you received restricted stock units as
8  part of your compensation?
9      A.  I -- I don't remember.
10     Q.  Okay.  Did you ever -- because this
11  will speed it up.
12         Did you ever tell your expert that
13  you received restricted stock units as part of
14  your compensation?
15         MS. DEITSCH-PEREZ:  Object to the
16     form.
17         THE WITNESS:  I don't -- I don't
18     remember.
19  BY MR. MORRIS:
20     Q.  Did you ever direct anyone acting on
21  your behalf to share with your expert that you
22  had received restricted stock units as a form
23  of compensation?
24         MS. DEITSCH-PEREZ:  Object to the
25     form.

Page 66

JAMES DONDERO

1      JAMES DONDERO
2          THE WITNESS:  I not -- I wasn't
3      involved.
4          MR. MORRIS:  All right.  You know,
5      what, Deborah, let's take a break; and why
6      don't you send me that document.
7          It is now 3:28.  Let's come back at
8      3:40 Eastern, and let's please be on time
9      because I'd like to try to finish this
10     today.  Thank you.
11         THE VIDEOGRAPHER:  Off the record at
12     2:28.
13         (Whereupon, a break was taken.)
14         THE VIDEOGRAPHER:  We are back on
15     the record.  The time is 2:43.
16         MR. MORRIS:  I received from counsel
17     a photograph in text message form of the
18     document that Mr. Dondero was referring to
19     at the beginning of the deposition.
20         I'm going to ask for that production
21     -- for the production of that document with
22     a Bates number by the end of the day, and I
23     hope that could be accommodated.
24         MS. DEITSCH-PEREZ:  I'm not sure --
25     John, I'm not sure it will be by the end of

Page 67

JAMES DONDERO

1      the day because I don't know when the
2      people who do the Bates stamping leave.
3      But if it's not today, it will be tomorrow.
4          MR. MORRIS:  All right.  It's 2:44
5      in the afternoon your time.  I hope that
6      your firm has the capability of Bates
7      stamping and producing one page before the
8      close of business.
9          MS. DEITSCH-PEREZ:  Okay.  But I'm
10     not going to get -- John, what difference
11     does it make whether it's tonight or
12     tomorrow?
13         MR. MORRIS:  You know what, I really
14     want to use it in the deposition now, but I
15     can't do that because -- because you're not
16     able -- because you -- because apparently,
17     you can't even promise to do it by the end
18     of the day.
19 BY MR. MORRIS:
20     Q.   Mr. Dondero --
21         MS. DEITSCH-PEREZ:  Could you --
22     could you use it --
23         MR. MORRIS:  I'd like to --
24         MS. DEITSCH-PEREZ:  -- if I sent it

Page 68

JAMES DONDERO

1      to you by e-mail instead.
2          MR. MORRIS:  I'd like to proceed.
3      You can e-mail it to me.  I mean, I
4      asked you to do that an hour ago.
5          MS. DEITSCH-PEREZ:  Well, the
6      easiest way to do it is to send a picture
7      is to text it; but if you give me a minute,
8      I'll figure out how to send it by e-mail.
9      Give me a second.  Let's see.
10         It just takes a second because it
11     goes into my personal e-mail first if it's
12     from my iPhone.  Okay.
13         MR. MORRIS:  Can we proceed?
14         MS. DEITSCH-PEREZ:  Yeah.  Give me a
15     minute and you'll have it.
16         Okay.  You should have it in your
17     e-mail now, John.
18         MR. MORRIS:  Thank you.  All right.
19     I'll let you know when it arrives.
20 BY MR. MORRIS:
21     Q.   Mr. Dondero, the questions now are
22     going to be both in your individual capacity
23     and in your capacity as the 30(b)(6) witness.
24         Do you understand that?

Page 69

JAMES DONDERO

1      A.   Okay.
2      Q.   Okay.
3      A.   It's either -- it's either/or; it's
4      not one?
5      Q.   No.
6      A.   Okay.
7      Q.   You contend that the Notes are
8      subject to the -- withdrawn.
9          You contend that the Notes that are
10     the subject of the agreements would be forgiven
11     upon the fulfillment of certain conditions
12     present, right?
13     A.   Right.
14         MS. DEITSCH-PEREZ:  Object to the
15     form.  He said "subsequent."
16         MR. MORRIS:  I apologize.  Let me
17     restate the question.
18 BY MR. MORRIS:
19     Q.   You contend that the Notes subject
20     to the agreement should be forgiven or would be
21     forgiven upon the fulfillment of certain
22     conditions subsequent, correct?
23     A.   Yes.
24     Q.   And to the best of your knowledge,

Page 70

JAMES DONDERO

1  JAMES DONDERO
2  none of those conditions have occurred as of
3  today, correct?
4      A.   To the best of my knowledge, yes.
5      Q.   Okay.  You're not aware of any facts
6  showing that any of the conditions subsequent
7  have been satisfied, fair?
8      A.   I -- yeah.  I wouldn't know.  You
9  would probably know.  I don't know.
10     Q.   I'm only asking for your knowledge.
11         One of the conditions subsequent was
12  that the Notes would be forgiven if you caused
13  Highland to sell its interest in one of three
14  portfolio companies above cost, right?
15         MS. DEITSCH-PEREZ:  Object to the
16     form.
17         THE WITNESS:  I -- yeah.  I don't
18     know if the noun is me or Highland, but
19     yeah.
20  BY MR. MORRIS:
21     Q.   Okay.  The portfolio companies at
22  issue were MGM, Cornerstone, and Trustway,
23  correct?
24     A.   Yes.
25     Q.   And prior to the petition date, you

Page 71

1  JAMES DONDERO
2  had the authority to sell any of those
3  portfolio companies at any time without having
4  to obtain approval from anyone, correct?
5         MS. DEITSCH-PEREZ:  Object to the
6     form.
7         THE WITNESS:  Yeah.  No, I can't
8     agree with that statement.
9  BY MR. MORRIS:
10     Q.   Why not?
11         Who's approval did you have to get
12  before you could sell any of those portfolio
13  companies?
14     A.   MGM, I was one board member and I
15  think an aggregate.  When I was running
16  Highland, we spoke for 18 percent of the
17  equity.  So I couldn't force the overall sale
18  of the company unilaterally.
19         There was also a shareholder's
20  agreement in place that restricted myself and
21  Anchorage and a couple of the large holders
22  from selling their shares without a disclosure
23  and approval process.  That is one example.
24         With regard to Trustway, I believe I
25  was largely unfettered.

Page 72

1  JAMES DONDERO
2         With regard to Cornerstone, a
3  majority of it -- or not a majority, but a
4  significant minority, I think, was owned by
5  both Restoration and the Old Redeemer Fund.
6     Q.   All right.  Well, let me ask you
7  this:  The conditions subsequent that are
8  embedded in the agreements, did that relate to
9  just Highland's interests in the portfolio
10  companies, or did it relate to interests held
11  by anybody else?
12     A.   It referred to a monetization in
13  creating liquidity around Highland's interests
14  that were large and illiquid portions of
15  Highland's balance sheet.
16     Q.   Okay.  So let me ask the question
17  again.
18         Prior to the petition date, did you
19  have the authority to sell Highland's interests
20  in any of the portfolio companies without
21  having to obtain the authority of anybody else?
22         MS. DEITSCH-PEREZ:  Object to the
23     form.  Asked and answered.
24         THE WITNESS:  Sub- -- subject to my
25     prior answer, I could speak for Highland

Page 73

1  JAMES DONDERO
2     prior to the bankruptcy.
3  BY MR. MORRIS:
4     Q.   Okay.  Before entering into the
5  agreements, did you or anybody acting on your
6  behalf analyze the likelihood that any of the
7  conditions subsequent would occur?
8     A.   Likelihood?  Analyze?  My
9  description of them, which was my understanding
10  of them, but my description of the assets to my
11  sister was -- to the trustee of Dugaboy was
12  that we held them for a long time.  We were
13  working towards monetization, but there wasn't
14  anything imminent regarding any of them in 2017
15  or '18.
16     Q.   Well, but the actual sale is just
17  one part of the condition subsequent, correct?
18         The other part is that it's got to
19  be sold above cost; is that correct?
20     A.   That is right.
21     Q.   Okay.  So at the time you entered
22  into each of your -- each of the three
23  agreements, had you done any analysis to
24  determine whether or not any -- whether
25  Highland's interests in any of the portfolio

Page 74

JAMES DONDERO

1  companies exceeded its cost?
2  A.  No, but I -- yes.  No, I did not.
3  Q.  Did you have any understanding at
4  all as to how the value of Highland's interests
5  in MGM compared to its costs at the time you
6  entered into each of these three agreements?
7  A.  No.  I mean, my understanding was I
8  knew they were substantially higher, but I
9  didn't know how much higher.
10  Q.  Okay.  So is it fair to say that the
11  time -- at the time you entered into each of
12  these agreements, you knew and understood that
13  the value of Highland's interests in MGM was
14  substantially higher than its costs?
15  A.  For MGM, yes.
16  Q.  Okay.  Did you have an understanding
17  of the relationship between value and costs
18  concerning Cornerstone at the time you entered
19  into these agreements?
20  A.  My understanding it was moderately
21  higher, and as Trustway was between substantially
22  and moderately and higher, I believe.
23  Q.  Okay.  So is it fair to say that at
24  the time you entered into each of these


Page 74

JAMES DONDERO

1  companies exceeded its cost?
2  A.  No, but I -- yes.  No, I did not.
3  Q.  Did you have any understanding at
4  all as to how the value of Highland's interests
5  in MGM compared to its costs at the time you
6  entered into each of these three agreements?
7  A.  No.  I mean, my understanding was I
8  knew they were substantially higher, but I
9  didn't know how much higher.
10  Q.  Okay.  So is it fair to say that the
11  time -- at the time you entered into each of
12  these agreements, you knew and understood that
13  the value of Highland's interests in MGM was
14  substantially higher than its costs?
15  A.  For MGM, yes.
16  Q.  Okay.  Did you have an understanding
17  of the relationship between value and costs
18  concerning Cornerstone at the time you entered
19  into these agreements?
20  A.  My understanding it was moderately
21  higher, and as Trustway was between substantially
22  and moderately and higher, I believe.
23  Q.  Okay.  So is it fair to say that at
24  the time you entered into each of these

Page 75

JAMES DONDERO

1  agreements, you believed that the value of
2  Highland's interests in each of the portfolio
3  companies exceeded its costs in varying
4  degrees?
5  A.  Varying degrees.  As a matter of
6  fact, I would adjust.  Cornerstone and
7  Trustway, I believe, were moderately higher
8  than their embedded costs or implied costs.
9  That was my understanding.
10  MGM was somewhat substantially.  But
11  all of them with a fair amount of volatility
12  and a fair amount of illiquidity.
13  Q.  Did you ever give your sister or
14  Dugaboy any information concerning how the
15  value of Highland's interests in any of the
16  portfolio companies compared to Highland's
17  costs before entering into the agreements?
18  A.  Not that I recall.
19  Q.  Do you have any reason to believe
20  that your sister or Dugaboy had any
21  understanding as to the likelihood that the
22  conditions subsequent would be satisfied at the
23  time the Dugaboy trustee entered into the three
24  agreements with you?

Page 76

JAMES DONDERO

1  MS. DEITSCH-PEREZ:  Object to the
2  form.
3  THE WITNESS:  I -- I remember saying
4  it would take a few years at minimum; but
5  other than expressing time, I don't believe
6  I expressed value versus cost or the
7  questions you were asking me previously.
8  BY MR. MORRIS:
9  Q.  Okay.  You never showed Nancy or
10  Dugaboy any of the Promissory Notes prior to
11  entering into any of the agreements, correct?
12  A.  Not that I recall.
13  Q.  And you never sent copies of the
14  Promissory Notes to Nancy or Dugaboy before
15  entering into any of these agreements, correct?
16  A.  Not that I recall.
17  MS. DEITSCH-PEREZ:  Object to the
18  form.
19  John, you've asked these at the last
20  deposition and actually also at the first
21  day of the deposition.
22  MR. MORRIS:  Thank you.  He's here
23  now in his 30(b)(6) capacity.  So please
24  just stop.

Page 77

JAMES DONDERO

1  You can object to the form of the
2  question.  I really don't appreciate it.
3  You should follow the very professional job
4  that your colleague, Michael Aigen, did the
5  other day.
6  BY MR. MORRIS:
7  Q.  Neither Nancy or Dugaboy has ever
8  asked to see copies of any of the Promissory
9  Notes before entering into any of the
10  agreements, correct?
11  MS. DEITSCH-PEREZ:  Object to the
12  form.
13  THE WITNESS:  I don't know.
14  BY MR. MORRIS:
15  Q.  Do you have any reason to believe
16  that Nancy or Dugaboy ever saw a copy of any of
17  the Promissory Notes at issue before entering
18  into the agreements?
19  A.  I don't know.
20  Q.  During your discussions with Nancy
21  and Dugaboy, did you identify the Promissory
22  Notes that were going to be the subject of each
23  agreement?
24  MS. DEITSCH-PEREZ:  Object to the

Appx. 01831

Page 78

JAMES DONDERO

1
2  form.
3      You know, we made an agreement that
4  you were going to refer to Nancy as the
5  Dugaboy trustee.  Please stick to it.
6  Otherwise, I'm going to have to object each
7  time, and I'd rather not.
8      MR. MORRIS:  I have no problem with
9  your objecting to the form of the question.
10  It's the speaking that I really do object
11  to.  And I don't know why you can't control
12  yourself.
13      MS. DEITSCH-PEREZ:  Because I
14  hope that –
15      MR. MORRIS:  Please stop.  Please
16  stop.
17      MS. DEITSCH-PEREZ:  – by telling
18  you this, you will listen.
19      MR. MORRIS:  Okay.  Your discussion
20  and your inability to control yourself is
21  going to cause this deposition to go longer
22  than it needs to, okay?
23      MS. DEITSCH-PEREZ:  No.  It's your
24  repeating questions that's going to do
25  that.

Page 79

JAMES DONDERO

1
2      MR. MORRIS:  You let me know when
3  you're done.
4      MS. DEITSCH-PEREZ:  I'm done.
5  BY MR. MORRIS:
6      Q.   Mr. Dondero, during your discussions
7  with the Dugaboy trustee, did you identify the
8  Promissory Notes that were going to be the
9  subject of each agreement?
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      THE WITNESS:  No, not that I recall.
13  BY MR. MORRIS:
14      Q.   Do you recall – during your
15  discussions with the Dugaboy trustee, did you
16  identify the maker of any of the Notes that
17  were the subject of any of the agreements?
18      A.   You mean Highland as the maker; is
19  that what you're saying?
20      Q.   No.  I'm just asking if during your
21  discussions with the Dugaboy trustee, you ever
22  disclosed the name of the maker of any of the
23  Notes that were subject to the agreements?
24      A.   She – she knew they were Notes due
25  to Highland from various entities.  So I don't

Page 80

JAMES DONDERO

1
2  know what your question is.  Did I identify
3  specifically that they were Notes due to
4  Highland?  I guess the answer to that is yes,
5  but I don't know what you're asking me.
6      Q.   I'm sorry, sir.  I'll take the
7  responsibility for that.
8      I'm asking you if you identified who
9  the maker of the Notes were, not who the payee
10  was.
11      MS. DEITSCH-PEREZ:  You mean the
12  borrowers, John?
13      THE WITNESS:  See, I don't want to
14  get stuck in my underwear on maker/borrower
15  nomenclature.
16      She was aware that they were notes
17  due to Highland from a variety of entities.
18  BY MR. MORRIS:
19      Q.   Okay.  Did you identify any of those
20  entities?
21      A.   I – yeah.  She knew that some were
22  Dugaboy, some were NexPoint for sure, and some
23  were other entities.
24      Q.   So – so there were notes where
25  Dugaboy owed the money or was the obligor or

Page 81

JAMES DONDERO

1
2  was the borrower or was the maker that are
3  subject to agreements that you entered into
4  with the Dugaboy trustee?
5      A.   No.  Wait.  The Dugaboy – the
6  Dugaboy Notes weren't subject to the
7  forgiveness.  It was the other notes that were
8  subject to forgiveness.
9      Q.   So it's really kind of a simple
10  question, and I'm not trying to trick you.
11      If you think back to the
12  conversations that you had with the Dugaboy
13  trustee, did you identify the entity of – did
14  you identify who the borrowers were under the
15  Notes that were going to be subject to the
16  agreements?
17      A.   She knew they were entities – she
18  knew there were other related entities.  She
19  knew NexPoint for sure.  She knew Services.
20      I can't sit here as I remember – as
21  I sit here today and remember whether or not I
22  specifically identified HCRE or not, you know;
23  but she knew they were related entities.
24      Q.   All of the revisions of the
25  agreement are set forth in paragraph 82; is

Page 82

1           JAMES DONDERO
2   that right?
3           We could put it back up on the
4   screen if you'd like.
5           MR. MORRIS:  In fact, why don't we
6   do that.
7           MS. CANTY:  I'm sorry, John.  51 –
8   I mean, 50?
9           MR. MORRIS:  I think it's
10  Exhibit 31, paragraph 82.
11          MS. CANTY:  Oh, okay, 82.  I've got
12  you.
13          MR. MORRIS:  Thank you.
14  BY MR. MORRIS:
15      Q.   Does – Mr. Dondero, other than
16  specifying who the portfolio companies were,
17  does paragraph 82 set forth all of the material
18  terms of each of the agreements?
19      A.   I think it sets forth the conditions
20  subsequent.
21      Q.   Is there any aspect of your
22  agreement – withdrawn.
23          Is there any aspect of your
24  agreements with the Dugaboy trustees that's not
25  described in this paragraph?

Page 83

1           JAMES DONDERO
2       A.   I don't know if it's captured in
3   there, but there was definitely a conversation,
4   discussion that if something like MGM was
5   sold – Anchorage is the largest holder almost
6   a majority in and of themselves.  And if it was
7   bought or taken out at a price that we couldn't
8   control or couldn't agree with and it was lower
9   than cost or – you know, Cornerstone, again,
10  had multiple funds between our ownership and
11  control that if – if things were sold
12  beyond – without my support but sold below
13  cost – and I'm not sure that's captured in
14  that paragraph, but I think that was part of
15  the understanding, also.
16      Q.   Is there any other part of the
17  understanding that's not set forth in
18  paragraph 82, Mr. Dondero?
19      A.   Not that I can think of at this –
20  let me read it one more time, please.
21      Q.   Take your time.
22      A.   I believe that generally covers it.
23      Q.   Was any provision of the agreements
24  the subject of negotiation?
25          MS. DEITSCH-PEREZ:  Object to the

Page 84

1           JAMES DONDERO
2   form.
3           THE WITNESS:  I don't believe it was
4   materially adjusted by any negotiation.  It
5   was just clarified based on discussion is
6   how I would describe it.
7   BY MR. MORRIS:
8       Q.   Is there any provision in the
9   agreements that was included at your sis– – at
10  the Dugaboy trustee's request?
11      A.   Like I said, there was discussion
12  and clarification.  Not specifically that I
13  recall.
14      Q.   Okay.  Did the Dugaboy trustee
15  refuse to include any provision in the
16  agreement that you had proposed?
17      A.   Not that I recall.
18      Q.   Can you identify any provision of
19  the agreements that were the subject of a
20  counterproposal that the Dugaboy trustee made?
21      A.   I remember clarification discussion
22  around, you know, three companies versus two or
23  one.  I remember clarification of monetization
24  being turned to cash versus illiquid.
25          Yeah.  I mean, I remember

Page 85

1           JAMES DONDERO
2   discussion – I remember clarification
3   discussions like that, but I don't remember –
4   it was a long time ago.  I don't remember the
5   details of anything specific like that.
6           It wasn't – it wasn't a
7   contentious, nor should it have been a
8   contentious negotiation.
9       Q.   How long did – do you recall how
10  long each of the conversations lasted that led
11  to the entry of each of the three agreements?
12      A.   I remember the first one being
13  longer than the second two, and then I remember
14  it being spread out periods of time.  So I
15  can't – I can't – I can't put an exact
16  estimate on it.
17      Q.   Okay.  I'm going to shift gears.
18          MR. MORRIS:  We can take that down
19  now, please.
20          MS. CANTY:  (Complies with request.)
21  BY MR. MORRIS:
22      Q.   Do you know of any written agreement
23  pursuant to which HCRE provided services to
24  Highland at any time?
25          MS. DEITSCH-PEREZ:  Object to the

1              JAMES DONDERO
2      form.  Asked and answered.
3          THE WITNESS:  HCRE provided
4      preferred services to.  Well, the
5      participants there in HCRE are, my --
6      myself and McGraner.  And, you know, we
7      both provided significant other services to
8      Highland.
9  BY MR. MORRIS:
10     Q.   Okay.  Is that in writing?  Is there
11 a written agreement?
12          That was my question.
13          Is there a written agreement
14 pursuant to which HCRE ever provided services
15 to Highland?
16     A.   I don't believe so.
17     Q.   Did HCRE ever provide services to
18 Highland?
19     A.   I would incorporate my last two
20 answers.  Not under a written agreement, but I
21 believe myself and McGraner provided a lot of
22 services.
23     Q.   And what services did you and Mr.
24 McGraner provide to Highland?
25     A.   I'd say anything real estate related

1              JAMES DONDERO
2      on the Highland platform McGraner would have
3      input into.
4          And then I think my -- my portfolio
5      management, leadership role in Highland over
6      time is well documented.
7      Q.   And how did you know if you were
8      providing services in your capacity as the
9      president of Highland or in your capacity as an
10     officer or owner of the HCRE at the time you
11     provided the services?
12     A.   Never -- never really thought about
13     parsing it that way.
14     Q.   I appreciate that.
15          Do you know whether Highland Capital
16     Management Services ever provided services to
17     Highland?
18     A.   Yeah.
19          MS. DEITSCH-PEREZ:  Object to the
20     form.  Asked and answered.
21          THE WITNESS:  Yeah.  I would -- not
22     in writing.  I believe the services owners
23     isn't myself and McGraner.  I think it was
24     myself and Okada.
25          And I would say our portfolio and

1              JAMES DONDERO
2      leadership contributions to Highland are
3      well documented.
4  BY MR. MORRIS:
5      Q.   And my question didn't have anything
6  to do with any particular person.  It's just
7  simply whether Highland Capital Management
8  Services ever provided any services to Highland
9  Capital Management, L.P.
10         MS. DEITSCH-PEREZ:  Object to the
11     form.
12         THE WITNESS:  The entities that
13     you're describing or you're asking
14     questions about don't have employees'
15     services in HCRE.  They have ownership
16     individuals that I've described.
17         So I've tried the best I can to
18     answer your question and what the ownership
19     may have done for Highland.
20         But since there's no employee base
21     at either of those two companies, those
22     companies could not have directly provided
23     service to Highland other than, the last
24     thing I would bring up is the track-record
25     concept, you know, in terms of the

1              JAMES DONDERO
2      performance of whatever assets are in some
3      of those start-up entities ends up being a
4      useful track record that then Highland can
5      market.
6  BY MR. MORRIS:
7      Q.   Okay.  How about NexPoint, did
8  NexPoint ever provide services to Highland
9  Capital Management, L.P.?
10     A.   Yes.  The real estate -- yes.  I
11     mean, can I just say yes or --
12     Q.   You could.  That would be really
13     helpful.
14     A.   Okay.  There we go.
15     Q.   Can you describe the circumstances
16 for me?
17         MS. DEITSCH-PEREZ:  Finally, some
18     accord between the witness and the
19     questioner.
20 BY MR. MORRIS:
21     Q.   Can you describe the services for
22 me?
23     A.   NexPoint has a couple of attorneys
24     that are real estate experts.  We have a lot of
25     different attorneys, or we did at Highland.

Page 90

JAMES DONDERO

1      JAMES DONDERO
2  But prior to the bankruptcy, none of the
3  Highland attorneys were experienced in real
4  estate.
5        So anything that required
6  transaction help on the Highland platform
7  regarding real estate, the NexPoint real estate
8  attorneys would help with.
9      Q.  Okay.  Anything else?
10     A.  I'm sure there are others.  That's
11  all I can think of off the top of my head.  I
12  just wanted to give you an example.
13     Q.  I appreciate that.
14        You're aware that Highland has sued
15  HCMFA to collect on two notes that were signed
16  by Frank Waterhouse in 2019 in the aggregate
17  amount of $7.4 million; is that right?
18     A.  Yes.
19     Q.  Okay.  And we actually went through
20  this the other day, so I don't want to belabor
21  it if I don't have.
22        But do you recall that we saw the
23  incumbency certificate which identified
24  Mr. Waterhouse as the treasurer of HCMFA as of
25  April 2019?

Page 91

1      JAMES DONDERO
2      A.  Yes.
3      Q.  Okay.  And do you recall that you
4  signed that incumbency certify in your capacity
5  as president of HCMFA?
6        MS. DEITSCH-PEREZ:  Object to the
7  form.
8        THE WITNESS:  Yes.
9  BY MR. MORRIS:
10     Q.  I want to talk about the first of
11  the two Notes, the $2.4 million Note.
12        Do you recall that in early May
13  2019, Highland transferred $2.4 million to
14  HCMFA?
15     A.  I don't remember a lot of specifics,
16  but I know there were two Notes as you're
17  describing.
18     Q.  Okay.  And there was -- and one of
19  them -- did you authorize the $2.4-million
20  payment?
21     A.  Yes.
22     Q.  And why did you authorize Highland
23  to transfer $2.4 million to HCMFA in early May
24  2019?
25     A.  My answer's the same for both --

Page 92

1  both Notes.  Essentially, it's regarding the
2  terrace start issue that we had with the
3  Fort Worth SEC.
4      Q.  Did you give anyone instructions
5  concerning the transfer of the $2.4 million?
6      A.  I instructed them to make the
7  transfer, or I was involved in the -- involved
8  in approving the transfer.
9      Q.  And who did you instruct to make the
10  transfer of $2.4 million?
11     A.  Yeah.  It would have been Frank.
12     Q.  Do you have a recollection of
13  instructing Frank to transfer $2.4 million?
14     A.  Yeah.  Generally, yes.
15     Q.  Do you have a recollection of what
16  instructions you gave him?
17     A.  It was well-known.  It was a very
18  disruptive -- the whole thing was very
19  disruptive at Highland and HCMFA.  Everybody
20  was aware of it.  The settlement, the
21  negotiations around the settlement, the
22  give-and-take, the amounts changed over time.
23        Everybody was aware of it in senior
24  management, including myself.  And putting the

Page 93

1  JAMES DONDERO
2  money into HCMFA to settle it was something I
3  was aware of and authorized and a critical
4  piece of putting that issue to bed.
5      Q.  Okay.  I'm just asking you if you
6  recall what instructions you gave to
7  Mr. Waterhouse concerning the transfer if you
8  recall?
9      A.  No.  I mean, like I said, I
10  authorized the movement of the money.
11     Q.  Okay.  Were you aware at that time
12  that the transfer of the $2.4 million from
13  Highland to HCMFA was booked as a loan on both
14  Highland and HCMFA's books and records?
15     A.  I was not aware at the time.
16     Q.  Okay.
17        MR. MORRIS:  Can we put up
18  Exhibit 53 please.
19        THE VIDEOGRAPHER:  Counsel, I will
20  need a media break in about five minutes.
21        MR. MORRIS:  Thank you very much.
22  Why don't we take that right now before I
23  begin my examination on this document.  How
24  long do you need?
25        THE VIDEOGRAPHER:  It will just be a

Page 94

JAMES DONDERO

1       JAMES DONDERO
2   minute, but this is the end of Media Number
3   1.
4           MR. MORRIS:  Okay.
5           THE VIDEOGRAPHER:  We are off the
6   record at 3:21.
7           MR. MORRIS:  We are off the record,
8   but don't go anywhere.
9           MS. DEITSCH-PEREZ:  What?
10          MR. MORRIS:  We're not taking a
11  break.
12          THE VIDEOGRAPHER:  Yep.  This will
13  just take a minute.  Please stand by.
14          MR. MORRIS:  Thank you.
15          THE VIDEOGRAPHER:  All right.
16  Suzanne, are you good to go?
17          THE COURT REPORTER:  I'm good.
18          THE VIDEOGRAPHER:  This is the
19  beginning of Media Number 2, Volume II
20  [sic] in the deposition of James Dondero.
21          We are back on the record at 3:22.
22          MR. MORRIS:  All right.  Can we
23  please put up Exhibit 53.
24          MS. CANTY:  Yeah.  Just one second.
25  My computer went haywire.  Give me one

Page 95

1       JAMES DONDERO
2   minute.
3           (Whereupon, Exhibit 53, E-mail
4   correspondence, Bates stamped D-CNL003768
5   through D-CNL003770, marked for
6   identification, as of this date.)
7   BY MR. MORRIS:
8       Q.   Okay.  So Mr. Dondero, do you see
9   what's on the screen here?
10          Mr. Dondero?
11          MR. MORRIS:  Deborah?
12          Apparently Mr. Dondero has left the
13  seat.
14          THE VIDEOGRAPHER:  Would you like to
15  go off record?
16          MR. MORRIS:  No.
17          THE VIDEOGRAPHER:  Okay.  We'll stay
18  on the record.
19          MR. MORRIS:  The video is still
20  rolling, right, sir?
21          THE VIDEOGRAPHER:  Yes, it is.
22          MR. MORRIS:  Thank you.
23          Hi, Michael.  If you're -- if you're
24  able, can you reach out to your partner?
25          MR. AIGEN:  I had texted her.  I

Page 96

1       JAMES DONDERO
2   will try to call her, too; but I did text
3   her a couple of minutes ago.  I will try to
4   reach out again.  Hold on.
5           MS. DEITSCH-PEREZ:  I'm back.  I'm
6   lucky in that the ladies room is directly
7   across from the conference room.
8           Mr. Dondero's down at the other end
9   of the floor, so he will be back shortly.
10          And I just saw your note, John.  The
11  -- the videographer said he needed a break;
12  and you said, okay, then let's take our
13  break now.  So we took a restroom break.
14          MR. MORRIS:  I think everybody on
15  the phone -- and there's a transcript of it
16  -- knows that I specifically said, how long
17  do you need.  He said one minute, and I
18  said don't go anywhere.
19          This is your time, not mine.
20          MS. DEITSCH-PEREZ:  Prior to that,
21  you said, let's take the break now.
22          MR. MORRIS:  Yeah, to allow him to
23  change the tape.  I'm not going to question
24  anybody on the call, but I'm 100 percent
25  certain that they would all tell you -- and

Page 97

1       JAMES DONDERO
2   the record will reflect, I specifically
3   said do not leave.
4           MS. DEITSCH-PEREZ:  Okay.
5   Mr. Dondero is back.
6           You have to turn -- turn the video
7   on.
8           THE WITNESS:  I'm back.
9   BY MR. MORRIS:
10      Q.   All right.  Do you see on the screen
11  there's a document that's been marked as
12  Exhibit 53?
13      A.   Yup.
14      Q.   Do you see there's an e-mail string
15  dated May 2, 2019?
16      A.   Yes.
17      Q.   And do you see that Mr. Waterhouse
18  has -- if you look at the second to the top,
19  Mr. Waterhouse's e-mail is forwarding a
20  spreadsheet to David Klos and Kristin Hendrix
21  that he described as, quote, "The support for
22  the payment to GAF by HCMFA?
23      A.   Yes.
24      Q.   What's GAF?
25      A.   That's the fund itself that owned

Page 98

```
1            JAMES DONDERO
2  the TerreStar investment.  The SEC wanted, I
3  believe, some payment to go to them; but they
4  all, meaning the SEC, and the SEC wanted some
5  payment to go to the fund itself for the
6  benefit of the investors.
7      Q.   Okay.
8          MR. MORRIS:  Can we can to the chart
9      that's attached.
10         MS. CANTY:  (Complies with request.)
11  BY MR. MORRIS:
12     Q.   Have you ever seen this chart
13  before, sir?
14     A.   I don't believe so specifically, but
15  I understand what it is.
16     Q.   And is it your understanding, based
17  on this chart, that the loss to the fund was
18  $6,068,851?
19         MS. DEITSCH-PEREZ:  Object to the
20     form.
21         THE WITNESS:  Yes.
22  BY MR. MORRIS:
23     Q.   And there's -- there's a column
24  there that's lost to fund.
25         Do you see that?
```

Page 99

```
1            JAMES DONDERO
2      A.   Yes.
3      Q.   And is it -- is it consistent with
4  your recollection that the estimated loss of
5  the fund or to the fund was approximately
6  $6 million?
7      A.   Yes.  There is approximately --
8  there's some other small numbers moving around,
9  but yes.
10     Q.   Okay.  And do you recall that HCMFA
11  informed the SEC that HCMFA would make the fund
12  whole by paying it an amount of money equal to
13  the loss?
14     A.   Yes.
15     Q.   And, in fact, HCMFA paid the fund
16  approximately $6 million in connection with the
17  losses sustained as a result of the NAV error,
18  correct?
19     A.   I don't know details like that.
20     Q.   So you're not -- you're not aware of
21  the fact that HCMFA paid to the fund
22  approximately $6 million in May of 2019?
23     A.   Approximately six or approximately
24  seven.  I -- I don't know.  Whatever the
25  agreement was with the SEC to be paid to them
```

Page 100

```
1            JAMES DONDERO
2  or to the fund or whatever, I -- I have all
3  faith and confidence we complied with; but I
4  don't -- I don't know the exact numbers.  I'm
5  not aware of the exact numbers.
6      Q.   Do you understand that this analysis
7  shows how HCMFA was going to finance the
8  payment to the fund as a result of the NAV
9  error?
10         MS. DEITSCH-PEREZ:  Object to the
11     form.
12         THE WITNESS:  I'm sorry.  Could you
13     repeat that question again?
14  BY MR. MORRIS:
15     Q.   Sure.  Do you understand that
16  this -- that this chart here sets forth the
17  manner in which HCMFA is going to fund the
18  payment that it was making to GAF on account of
19  the NAV error?
20     A.   I would call it more of a
21  calculation on where the amounts are coming
22  from.  It doesn't appear to me that this is a
23  funding statement.
24     Q.   Okay.  I appreciate that.
25         So -- so your interpretation of this
```

Page 101

```
1            JAMES DONDERO
2  is that this shows the sources of money that
3  were going to be used to make the payment; is
4  that fair?
5          MS. DEITSCH-PEREZ:  Objection to the
6      form.
7          THE WITNESS:  Yeah.  I think it's a
8      reconciliation between the insurance, some
9      forgiveness of fees, and then additional
10     monies that are necessary.
11  BY MR. MORRIS:
12     Q.   Okay.  And --
13     A.   Yeah.  Go ahead.
14     Q.   Did HCMFA file an insurance claim in
15  connection with the NAV error?
16     A.   I believe they did get -- I believe
17  they did, and I believe they did get paid some
18  insurance.
19     Q.   And -- and if we look at the totals
20  column in the right, did HCMFA receive, to the
21  best of your recollection, approximately
22  $5 million from insurance?
23     A.   Yes.  I think we should work -- I
24  think we should work from that column --
25     Q.   Okay.  So let's --
```

Appx. 01837

JAMES DONDERO

1
2   A.   -- versus the other column, yeah.
3   Q.   I apologize, Mr. Dondero.
4        So if we look at the last column,
5   the total, does that comport with your
6   recollection that HCMFA paid GAF approximately
7   $7.44 million in May of 2019 on account of the
8   NAV error?
9   A.   I think it's more than that, and I
10  think it's also the 375 below that.
11  Q.   Okay.
12  A.   And then I -- yeah, definitely those
13  two numbers in aggregate.  I don't know if it's
14  any others.
15  Q.   Okay.  And did, to the best of your
16  recollection, HCMFA make an insurance claim on
17  which it received almost $5 million as a source
18  of funding for the payment that was due to GAF?
19  A.   Yes.
20  Q.   Are you familiar with that insurance
21  claim?
22  A.   No.
23  Q.   Do you know if the insurance claim
24  made any mention of Highland?
25  A.   I have no idea.  I have no idea.

JAMES DONDERO

1
2   Q.   Okay.  So as a -- as a matter of
3   rough math, would you agree with me that the
4   insurance procedures funded approximately
5   5 million of the $7.8 million that was the
6   total loss?
7        MS. DEITSCH-PEREZ:  Object to the
8        form.
9        THE WITNESS:  This was the amount
10       due to the investors.  I -- I -- my rough
11       recollection is there was another amount
12       that was due the SEC, but I don't remember
13       specifically.
14  BY MR. MORRIS:
15  Q.   Okay.  And do you see in the middle
16  of the page, there's a total additional payment
17  from advisor of approximately $2.4 million?
18  A.   Yes.
19  Q.   And is it your understanding that
20  that is the amount that HCMFA had to come out
21  of pocket in order to fully fund the GAF
22  payment?
23  A.   Yes, but it's clear to me also that
24  there's a forgiveness of management fees, also.
25  Q.   Okay.  But is two point -- but is

JAMES DONDERO

1
2   $2.4 million the amount of money that HCMFA
3   needed in order to fully fund the payment to
4   GAF?
5   A.   And I don't want to mince small
6   numbers; but to the extent that they gave up
7   their management fees also, like that 1939 or
8   the 39 above that -- and I don't know what that
9   47 is above that -- those are management fees
10  that would have paid salaries and expenses at
11  HCMFA also.
12       So to the extent they gave up those
13  items as part of the settlement, then HCMFA
14  would have needed more money than even the 2.4
15  that came from Highland.
16  Q.   Do you know if HCMFA ever informed
17  the SEC that Highland was responsible for the
18  NAV error?
19  A.   I -- I don't know.  We wouldn't have
20  hidden it if they would have asked.  My
21  experience with the SEC is they identify the
22  advisor; and who the advisor picks for vendors
23  the advisor's responsible for.
24       MR. MORRIS:  I move to strike
25       everything after "I don't know."

JAMES DONDERO

1
2   BY MR. MORRIS:
3   Q.   Did you ever direct anyone to inform
4   the SEC that Highland was responsible for the
5   NAV error?
6   A.   No, not that I recall.
7   Q.   Do you know if anybody acting on
8   behalf of HCMFA ever informed the SEC that
9   Highland was responsible for the NAV error?
10  A.   I don't know.
11  Q.   Do you know if HCMFA ever informed
12  GAF that Highland was responsible for the NAV
13  error?
14  A.   Yes.
15  Q.   And is that reflected in writing
16  anywhere?
17  A.   Yes.  Numerous places.
18  Q.   And what writing would that be
19  reflected in?
20  A.   The board minutes.  There were
21  conversations every board meeting for over a
22  year.  The retail board represents GAF.  They
23  were well aware of the subadvisory agreements,
24  and they were well aware that all the staff
25  regarding valuation were housed at Highland;

Page 106

JAMES DONDERO
1
2    all the valuation activities were performed by
3    Highland. And GAF and HCMFA relied on
4    Highland, and it was a material part of board
5    conversations for over a year.
6         MR. MORRIS: Okay. I move to
7         strike.
8    BY MR. MORRIS:
9         Q.   I'm asking you just about writings,
10   sir.
11        Can you identify --
12        A.   No, no, no. I'm not -- I'm not
13   going to -- I'm not going to allow that strike,
14   or I'm not answering anymore questions.
15        Q.   Well, the judge will be the
16   determiner of that. So I'd like you to answer
17   my question.
18        Is there any -- I don't want to know
19   about board meetings.
20        Is there anything in writing that
21   HCMFA provided to GAF that specifically stated
22   that Highland and not HCMFA was responsible for
23   the NAV error?
24        MS. DEITSCH-PEREZ: Asked and
25        answered.

Page 107

JAMES DONDERO
1
2         THE WITNESS: Yes. Numerous board
3    minutes.
4    BY MR. MORRIS:
5         Q.   Okay. And have those board minutes
6    been produced in this litigation?
7         A.   I don't know.
8         Q.   Okay.
9         MR. MORRIS: Let's go to the next
10        exhibit, 54.
11        MS. CANTY: (Complies with request.)
12        (Whereupon, Exhibit 54, E-mail
13        correspondence, Bates stamped D-CNL003777
14        through D-CNL003779, marked for
15        identification, as of this date.)
16   BY MR. MORRIS:
17        Q.   Do you see that on the same day, at
18   the bottom, Mr. Klos sent an e-mail to the
19   Corporate Accounting Group?
20        A.   Yes.
21        Q.   And do you see that he instructed
22   the Corporate Accounting Group to transfer
23   $2.4 million from HCMLT to HCMFA?
24        A.   Yes.
25        Q.   And do you see that he specifically

Page 108

JAMES DONDERO
1
2    informed the Corporate Accounting Group that
3    this transaction was a, quote, "New inter
4    co-loan?
5         A.   Yes.
6         Q.   Do you see that he asked
7    Christian -- Kristin or Hayley to prepare a
8    Promissory Note for discussion?
9         A.   Yes.
10        Q.   Okay. Are you aware in May 2019,
11   Frank Waterhouse was included in the e-mail
12   string identified as Corporate Accounting?
13        A.   I do not have that awareness.
14        Q.   Okay. Do you see at the top
15   Ms. Hendrix -- Ms. Hendrix's response to
16   Mr. Klos's e-mail and attaches a copy of a
17   Promissory Note?
18        A.   Yes.
19        Q.   Okay.
20        MR. MORRIS: Can we just go to the
21        attachment, please.
22        MS. CANTY: (Complies with request.)
23   BY MR. MORRIS:
24        Q.   Do you see that that is a Promissory
25   Note dated May 2, 2019, in the amount of

Page 109

JAMES DONDERO
1
2    $2.4 million that where the maker is Highland
3    Capital Management Fund Advisors, L.P.?
4         A.   Yeah.
5         Q.   Have you ever seen this before?
6         A.   I think in our last deposition.
7         Q.   Okay. Do you recall when you saw it
8    for the first time?
9         A.   Our last deposition.
10        Q.   Do you recall when you learned about
11   the existence of this document for the first
12   time?
13        A.   I believe somehow regarding the
14   litigation.
15        Q.   Okay. So you have no knowledge of
16   this Promissory Note until after the litigation
17   was commenced; do I have that right?
18        A.   Correct.
19        Q.   So you're not aware of Highland
20   having made a demand for payment on this
21   Promissory Note in December of 2020?
22        A.   Not that I recall.
23        Q.   Okay. Putting aside the question of
24   the Promissory Note, do you recall when you
25   first learned that the $2.4 million that you

Page 110

JAMES DONDERO

1
2  instructed to be paid to HCMFA by Highland in
3  May of 2019, do you recall when you first
4  learned that that was booked as a loan?
5      A.   I believe just generally as part of
6  this litigation, not before then.
7      Q.   Are you aware that the Corporate
8  Accounting Group created a daily list of wire
9  transfers that were being made on behalf of
10 Highland and its affiliates?
11     A.   Not – no, not specifically.
12     Q.   Okay.  So since you did not know
13 that the $2.4 million transfer had been booked
14 as a loan, is it fair to say that you never
15 told anybody prior to the commencement of this
16 litigation that the transaction should not have
17 been booked as a loan?
18     A.   I had no conversations either way
19 prior to this litigation regarding the booking
20 of the 2.4 million.
21     Q.   Did you ever take any steps to try
22 to determine how Highland and HCMFA accounted
23 for the $2.4 million that you instructed to be
24 transferred from Highland to HCMFA in early
25 May 2019?

Page 111

JAMES DONDERO

1
2      A.   No.
3      Q.   Did you rely on Mr. Waterhouse to
4  oversee that?
5      A.   Yes.
6      Q.   Okay.  And you did so because he
7  held not only the CFO title at Highland, but he
8  also held the treasurer title at HCMFA,
9  correct?
10         MS. DEITSCH-PEREZ:  Object to the
11     form.
12         THE WITNESS:  I relied on him
13     because generally the accounting function
14     across the organization reported up through
15     him.
16 BY MR. MORRIS:
17     Q.   Let's talk about the $5 million
18 Note.
19         Do you recall that in early
20 May 2019, in fact, the next day, May 3rd,
21 Highland transferred $5 million to HCMFA?
22     A.   I – I don't recall specifically.
23     Q.   Do you recall authorizing the
24 transfer of $5 million from Highland to HCMFA
25 in early May 2019?

Page 112

JAMES DONDERO

1
2      A.   Yes, generally.
3      Q.   Okay.  Why did you authorize
4  Highland to transfer $5 million to HCMFA in
5  early 2019?
6      A.   It was part of the overall
7  resolution of the TerreStar situation.
8      Q.   Do you recall that HCMFA paid
9  something called a consent fee equal to
10 $5 million in early May 2019?
11     A.   Well, like I said, I don't recall
12 the exact amounts or the exact amounts net of
13 insurance; but my recollection it was to
14 resolve that.
15     Q.   Do you know – do you know – did –
16 let's real simple.
17         Did – did HCMFA pay a consent fee
18 in May of 2019?
19     A.   I – I don't recall.
20     Q.   Do you know what a consent fee is?
21     A.   Yes.
22     Q.   What's a consent fee?
23     A.   It's a – a fee to encourage
24 shareholder vote on something or shareholder
25 restitution on something, typically.

Page 113

JAMES DONDERO

1
2      Q.   And did – do you recall if HCMFA
3  ever paid a consent fee in the year 2019?
4      A.   I don't recall.
5      Q.   Would Highland be responsible at all
6  if HCMFA paid a consent fee?
7          MS. DEITSCH-PEREZ:  Object to the
8      form.
9          THE WITNESS:  It could be.  I
10     don't – I don't know or remember the
11     circumstances.
12 BY MR. MORRIS:
13     Q.   Is the payment of a consent fee a
14 voluntary decision by – by HCMFA?  Is that
15 something that –
16         MS. DEITSCH-PEREZ:  Object to the
17     form.
18         MR. MORRIS:  Is that – withdrawn.
19     That's fair.
20 BY MR. MORRIS:
21     Q.   Is the payment of a consent fee
22 required, or is that something that one can
23 exercise discretion in whether or not to make?
24         MS. DEITSCH-PEREZ:  Object to the
25     form.

Page 114

JAMES DONDERO

1
2     THE WITNESS:  My answer would be it
3  depends.
4  BY MR. MORRIS:
5     Q.   Do you recall whether Highland –
6  withdrawn.
7     Do you recall whether HCMFA was
8  required to make -- to make a -- to pay a
9  consent fee at any time in 2019?
10    A.   I don't recall.
11    Q.   Do you recall ever believing that
12 HCMFA paid a consent fee because of something
13 that -- because of a mistake that Highland
14 made?
15    A.   It could be.  I don't know.
16    Q.   I'm just asking if you had a
17 recollection?
18    A.   I don't have a recollection.
19    Q.   Okay.
20    MR. MORRIS:  To the videographer, I
21 think Mr. Dondero's screen has frozen.
22    MS. DEITSCH-PEREZ:  John, your
23 screen is frozen, too.
24    MR. MORRIS:  I'm –
25    MS. DEITSCH-PEREZ:  I'm also -- hang

Page 115

JAMES DONDERO

1
2  on.  I've lost contact.  Give me a minute.
3     THE VIDEOGRAPHER:  Okay.  I'd like
4  us to go off record.  Do you agree?
5     MR. MORRIS:  Yeah, but please don't
6  leave.
7     MS. DEITSCH-PEREZ:  Yes, we agree.
8     THE VIDEOGRAPHER:  All right.  Off
9  the record at 3:53.
10    (Discussion held off the record.)
11    THE VIDEOGRAPHER:  We are back on
12 the record at 3:54.
13 BY MR. MORRIS:
14    Q.   Okay.  Can we put up – no.  Before
15 we do that, Mr. Dondero, can you hear me?
16    We can't hear you.  Are you on mute?
17    Are you on mute?  Can you speak?
18    You're yelling at me now.  Stop
19 yelling at me.
20    THE VIDEOGRAPHER:  I'm seeing is
21 that Mr. Dondero is on mute.
22    (Interruption.)
23    THE VIDEOGRAPHER:  We've got – do
24 you want to go off video record?
25    MR. MORRIS:  No.

Page 116

JAMES DONDERO

1
2     Can somebody help Mr. Dondero and
3  get his audio feed fixed?
4     Thank you, sir.
5     MS. DEITSCH-PEREZ:  Does this make a
6  difference?
7     MR. MORRIS:  It sure does.
8     THE WITNESS:  Hello, hello.
9     THE WITNESS:  Thank you.  All right.
10 Let's try and -- let's try and finish this
11 up.
12 BY MR. MORRIS:
13    Q.   Are you ready, sir?
14    A.   Yes.
15    Q.   Were you aware in May 2019 that the
16 $5-million transfer from Highland to HCMFA was
17 booked as a loan?
18    A.   No.
19    MR. MORRIS:  Can we put up
20 Exhibit 56, please.
21    MS. CANTY:  (Complies with request.)
22    (Whereupon, Exhibit 56, E-mail
23 correspondence, Bates stamped D-CNL003763,
24 marked for identification, as of this
25 date.)

Page 117

JAMES DONDERO

1
2  BY MR. MORRIS:
3     Q.   All right.  Do you see that this is
4  an e-mail from Ms. Hendrix to the Corporate
5  Accounting Group on May 3, 2019?
6     Do you see that, sir?
7     A.   Yes.
8     Q.   And do you see that Ms. Hendrix told
9  corporate accounting to transfer $5 million as
10 a, quote, "new loan," close quote?
11    A.   Yes.
12    Q.   And did you see that Ms. Hendrix also
13 said that she would, quote, "paper the loan,"
14 close quote?
15    A.   Yes.
16    Q.   Okay.  You're aware that from time
17 to time, members of the Corporate Accounting
18 Group used a template for a Promissory Note
19 that had been previously prepared by counsel,
20 correct?
21    MS. DEITSCH-PEREZ:  Object to the
22 form.
23    THE WITNESS:  I – yeah.  I'm aware
24 they have a loan template, yes.
25

Page 118

```
1          JAMES DONDERO
2   BY MR. MORRIS:
3       Q.   Okay.  Do you see there's a
4   parenthetical in the first sentence that says,
5   "(4.4M should be coming in from Jim soon)"?
6       A.   Yes.
7       Q.   Do you know what that refers to?
8       A.   My -- my educated -- boy.  My
9   educted speculation is that Highland didn't
10  have enough cash, so I probably put four into
11  Highland for Highland to send to HCMFA.  That's
12  my educated guess; but otherwise, I don't know
13  specifically.
14      Q.   And do you recall that you had taken
15  out a loan from Highland in the year,
16  and this payment was credited against the
17  principal and interest then due on that Note?
18      A.   I don't have specific awareness.
19  That would make sense.
20      Q.   Okay.
21      A.   Versus -- versus creating a new loan
22  or something.
23      Q.   Okay.
24          MR. MORRIS:  Let's go to Exhibit 57,
25      please.
```

Page 119

```
1          JAMES DONDERO
2       MS. CANTY:  (Complies with request.)
3          (Whereupon, Exhibit 57, Promissory
4   Note, Bates stamped D-CNL003764 through
5   D-CNL003765, marked for identification, as
6   of this date.)
7   BY MR. MORRIS:
8       Q.   In fact, were you aware, sir, that
9   in May 2019, you paid Highland exactly
10  $7.5 million?
11      A.   Not specifically, but it makes sense
12  given the context we're discussing.
13      Q.   Okay.  So the context that we're
14  discussing was HCMFA needed $7.5 million.
15  Highland didn't have it.  So that seven -- you
16  paid $7.5 million to Highland, which was
17  applied against your outstanding note.  And
18  then Highland transferred that money to HCMFA.
19          Does that sound right to you?
20      A.   Generally, yes.
21      Q.   Okay.  So now if we look at this
22  note that's on the screen, do you see this is a
23  Promissory Note for $5 million dated May 3,
24  2019?
25      A.   Yes.
```

Page 120

```
1          JAMES DONDERO
2       Q.   And did you see this for the first
3   time when I showed it to you late last week?
4       A.   Yes.
5       Q.   And did you learn about the loan
6   from Highland to HCMFA for the first time after
7   the litigation was commenced?
8       A.   That's the first time I remember.
9       Q.   And did you learn that Highland and
10  HCMFA had booked the $5-million transfer in May
11  of 2019 as a loan for the first time after the
12  litigation was commenced?
13      A.   That is my recollection.
14      Q.   Okay.  We talked at your first
15  deposition in May about Highland's audited
16  financial statements.
17          I don't know if you have a
18  recollection of that.  Do you?
19      A.   Just generally, yes.
20      Q.   Okay.  I just want to focus on these
21  two notes.
22          For this portion of the deposition,
23  we are questioning you in your individual
24  capacity, and you're only focused on these two
25  notes from HCMFA to Highland, okay?
```

Page 121

```
1          JAMES DONDERO
2       A.   Okay.
3       Q.   Okay.  When did you first learn that
4   these notes were carried as assets on
5   Highland's balance sheet?
6       A.   Like I said, I -- my recollection is
7   that as part of the bankruptcy and part of the
8   litigation.
9       Q.   And so did you learn of it as part
10  of the bankruptcy before the litigation was
11  commenced, or did you learn that these notes
12  were carried as assets after -- only after the
13  litigation was commenced?
14      A.   I believe only after.  Especially,
15  the specificity with regard to the notes, only
16  after the litigation was commenced.
17      Q.   Okay.  When did you learn for the
18  first time that these notes were carried as
19  liabilities on HCMFA's balance sheet?
20  Withdrawn.  No foundation.
21          Are you aware that these notes have
22  been carried as liabilities on HCMFA's balance
23  sheet?
24      A.   I wasn't -- I wasn't -- I wasn't
25  aware prior to the litigation.
```

Appx. 01842

Page 122

```
1            JAMES DONDERO
2     Q.   Okay.  Did you learn after the
3  litigation that these notes had been carried as
4  liabilities on HCMFA's balance sheets?
5     A.   Yes.
6     Q.   Okay.  Did you ever review
7  Highland's audited financial statements?
8     A.   Not with any specificity.
9     Q.   Are you aware that Highland gave
10 these Promissory Notes to PWC as part of the
11 audit process?
12    A.   I would assume they did, but I don't
13 have specific awareness.
14    Q.   Okay.  And why do you assume that
15 they did?
16    A.   As part of complete financials to
17 the extent that they were made by Kristin or
18 whoever, properly or improperly.  Once they
19 existed, they would have been part of a
20 complete audit.
21    Q.   Are you aware that these two
22 Promissory Notes were disclosed in Highland's
23 audited financial statements for the period
24 ending December 31, 2018, as subsequent events?
25    A.   No.
```

Page 123

```
1            JAMES DONDERO
2     Q.   Okay.
3         MR. MORRIS:  Can we put up
4  Exhibit 34, please.
5         MS. CANTY:  (Complies with request.)
6         (Whereupon, Exhibit 34, Highland
7  Capital Management, L.P., Consolidated
8  Financial Statements and Supplemental
9  Information, dated December 31, 2018, Bates
10 stamped D-CNL000212 through D-CNL000257,
11 marked for identification, as of this
12 date.)
13 BY MR. MORRIS:
14    Q.   And turn to -- just if you can see,
15 sir, the first page of this is the December 31,
16 2018, financials.
17        MR. MORRIS:  And if we could go to
18 the second or third page to see
19 PricewaterhouseCoopers' signature.
20        MS. CANTY:  (Complies with request.)
21 BY MR. MORRIS:
22    Q.   And do you see that
23 PricewaterhouseCoopers signed off on the audit
24 on June 3, 2019?
25    A.   Yes.
```

Page 124

```
1            JAMES DONDERO
2     Q.   Okay.
3         MR. MORRIS:  Can we go to page 252
4  of the document?  It's got to be -- let's
5  see the Bates.
6         MS. CANTY:  (Complies with request.)
7         MR. MORRIS:  Yeah.  Right there.
8  Okay.  Scroll just to the page before so we
9  can see the heading.
10        MS. CANTY:  (Complies with request.)
11 BY MR. MORRIS:
12    Q.   Okay.  Do you see that this is the
13 section of the audited financials entitled
14 "Subsequent Events"?
15    A.   Yes.
16    Q.   And is it your understanding that
17 the auditors include in subsequent events
18 material transactions THAT occur between the
19 end of the fiscal period in which had audit has
20 been conducted and the date that the auditors
21 sign off?
22    A.   Yes.
23    Q.   Okay.  So if you look at page 39,
24 the next to the last paragraph, do you see, it
25 says, quote, "Over the course of 2019 through
```

Page 125

```
1            JAMES DONDERO
2  the report date, HCMFA issued Promissory Notes
3  to the partnership in the aggregate amount of
4  $7.4 million?
5     A.   Yes.
6     Q.   Okay.  And are you surprised to see
7  that in the audit report?
8         MS. DEITSCH-PEREZ:  Object to the
9  form.
10        MR. MORRIS:  Withdrawn.
11 BY MR. MORRIS:
12    Q.   Have you seen -- have you seen this
13 entry in the audit report before this moment?
14    A.   No.
15    Q.   Okay.  Are you aware that Highland
16 employees were responsible for drafting the
17 audit report?
18    A.   Responsible for drafting the audit
19 report?  I don't know if that's a fair
20 statement.
21        I think they provide the detail; but
22 my understanding, the audit report is a work
23 product of the accounting firm.  That's my
24 understanding.
25    Q.   Was there a group within Highland
```

Page 126

JAMES DONDERO

1    that was responsible for working with the
2    auditors in the preparation of the audit
3    reports?
4        A.   Yeah, yes.
5        Q.   Do you know what group that was?
6        A.   I believe there's a financial
7    reporting group that reports to Frank that
8    handles this interaction.
9        Q.   Are you familiar -- are you aware of
10   what role Mr. Waterhouse plays, if any, in
11   connection with Highland's annual audit, at
12   least during the time that you were serving as
13   president?
14       A.   I think he -- he coordinates -- I
15   think he has to sign off on many aspects of it,
16   you know, as a C suite executive.  So he's
17   responsible for, you know, completeness,
18   integrity, et cetera.
19           And there's a certain amount of
20   reliance that PWC puts on it; but my
21   understanding is audits for the last bunch of
22   years has been pretty much a hundred percent
23   sampling and verification.
24       Q.   High- --

Page 127

JAMES DONDERO

1        A.   -- PWC.
2        Q.   I apologize, sir.
3            Highland was the sole source of
4    information that's contained in its audit
5    reports, right, to the best of your knowledge?
6        A.   No.  No.  When I -- the last thing I
7    said a minute ago about I believe it was a
8    hundred percent sampling and verification, I
9    think the audit firm ties back to vendors,
10   credit agreements, source documents, et cetera.
11   Highland is not the only source of
12   this information.
13       Q.   You were also responsible for the
14   audit report; is that fair?
15       A.   Yes.
16       Q.   And that's because you signed a
17   management representation letter, correct?
18       A.   Yes.
19       Q.   And do you have an understanding of
20   what management a representation letter is?
21           MS. DEITSCH-PEREZ:  Object to the
22       form.  I think you've asked this in each
23       day of the deposition.
24           MR. MORRIS:  Okay.  Just trying to

Page 128

JAMES DONDERO

1        get some background here.
2            THE WITNESS:  Yes, I have a general
3        understanding.  They very from accounting
4        firm to accounting firm, and they very
5        depending upon the type of audit.  But I
6        have a general understanding of them, yes.
7    BY MR. MORRIS:
8        Q.   Okay.  And you're -- are you aware
9    that HCMFA had its financial statements audited
10   by PWC as well?
11       A.   Yes.
12       Q.   Are you aware that HCMFA disclosed
13   the May 2019 Notes in its own audited financial
14   statements?
15       A.   I assume so.
16       Q.   Have you ever --
17       A.   I don't have specific -- I don't
18   have specific awareness, but it's not reported
19   here but not on HCMFA; so I assume they are,
20   yes.
21       Q.   Okay.  And do you sign Management
22   Representation Letters for HCMFA's audit as you
23   do for Highland?
24       A.   I believe so.

Page 129

JAMES DONDERO

1        Q.   Have you ever told anyone that
2    HCMFA's audited financial statements for the
3    period ending December 31, 2018, inaccurately
4    described the $7.4 million transferred from
5    Highland to HCMFA as loans?
6            MS. DEITSCH-PEREZ:  Object to the
7        form.
8            THE WITNESS:  No, I have not; but I
9        haven't been involved in any of the audit
10       functions for quite some time.
11           I don't think I was involved or
12       signed Management Representation Letters
13       for any period covered by this.
14   BY MR. MORRIS:
15       Q.   Okay.  Let's switch gears.
16           The advisors have annual contracts
17   to manage certain retail funds, correct?
18       A.   Yes.
19       Q.   And the retail funds have a board
20   that decides whether to renew the contracts
21   with the advisors, correct?
22       A.   Yes.
23       Q.   And in connection with the annual
24   renewal, the advisors provide information to

**Appx. 01844**

Page 130

JAMES DONDERO

1
2 the retail board, correct?
3     A.   Yes.
4     Q.   And you've participated in meetings
5 with the retail board concerning the renewal
6 process, correct?
7     A.   Sometimes.
8     Q.   Okay.  Do you recall that in late
9 2020, the advisors provided a written memo to
10 the retail board in connection with the annual
11 15-C review process?
12     A.   No.
13     Q.   Okay.
14         MR. MORRIS:  Can we put up
15 Exhibit 59, please.
16         MS. CANTY:  (Complies with request.)
17         (Whereupon, Exhibit 59, Memorandum,
18         dated October 23, 2020, Bates stamped
19         HCMFAS 000025 through HCMFAS 000031, marked
20         for identification, as of this date.)
21 BY MR. MORRIS:
22     Q.   Do you see that this is a memo dated
23 October 23, 2020?
24     A.   Yes.
25     Q.   Is it fair to describe this memo as

Page 131

JAMES DONDERO

1
2 a memo from the advisors to the retail boards
3 concerning a supplemental 15-C information
4 request?
5     A.   Yes.
6     Q.   Okay.  As always, Mr. Dondero, you
7 can view any portion of this document.  But if
8 we could just scroll down a little bit, I just
9 want to know --
10         MS. DEITSCH-PEREZ:  Do we have a
11 copy of this document?  Is it in your book?
12         MR. MORRIS:  No.
13         MS. DEITSCH-PEREZ:  Okay.  Well,
14 then he can't actually look at it.  He's
15 looking at what's on the screen.
16         MR. MORRIS:  Please.
17 BY MR. MORRIS:
18     Q.   Mr. Dondero, do you understand what
19 I meant?
20         Will you let me know if there's any
21 portion of the document you want to see?
22     A.   Sure.  Can you -- can you just keep
23 scrolling and let me see the next page?
24     Q.   Thank you, sir.
25         MS. CANTY:  (Complies with request.)

Page 132

JAMES DONDERO

1
2         THE WITNESS:  Just stop there for a
3 second.
4         MS. CANTY:  (Complies with request.)
5         THE WITNESS:  Okay.  Keep going.
6         MS. CANTY:  (Complies with request.)
7 BY MR. MORRIS:
8     Q.   Just -- I'm going to ask you
9 questions about Section 2 just so you know, but
10 you're welcome to view any portion of this
11 document as you believe necessary.
12         MS. CANTY:  I also put it in the
13 chat, John.
14         MR. MORRIS:  Thank you.
15         THE WITNESS:  I see it.
16 BY MR. MORRIS:
17     Q.   Okay.  So --
18     A.   Can you go -- let's keep going.
19 Just I'll quickly read the whole thing.
20     Q.   No problem.
21     A.   That's it.  Okay.  Got it.  All
22 right.
23     Q.   Okay.  So now that you've seen the
24 substance of the memo, do you recall if you saw
25 it before today?

Page 133

JAMES DONDERO

1
2     A.   I've never seen it before today.
3     Q.   Okay.  So do you know who's
4 responsible for preparing a memo of this type
5 on behalf of the advisors?
6     A.   Let's go back to the front and see
7 who it's from.
8     Q.   Sure.
9         MS. CANTY:  (Complies with request.)
10 BY MR. MORRIS:
11     Q.   Is that --
12     A.   Yeah.  Now, I -- given what it is,
13 it's something that, I'm sure, comes out of
14 legal and compliance.
15     Q.   And does -- do the advisors have --
16 withdrawn.
17         Did the advisors have their own
18 legal and compliance officers as of October 23,
19 2020?
20     A.   No.
21     Q.   Did they have any -- did anybody
22 serve as the advisors' general counsel as of
23 October 23, 2020?
24     A.   My belief and recollection is the
25 Shared Services Agreements provided the legal

Page 134

JAMES DONDERO

2 and accounting support for all the funds listed
3 in the "to" section here.
4          As I said earlier, NexPoint has a
5 couple accountants -- I mean -- I'm sorry -- a
6 couple lawyers who do real estate transactions
7 stuff.  Their -- their title -- their title
8 meaning DC's counsel, DC Sauter, who's the most
9 senior attorney there, it might be general
10 counsel; but he only does real estate
11 transactions.
12          The legal dependents of NexPoint and
13 HCMFA was on the Shared Services Agreement and
14 the Highland attorneys that performed those
15 Shared Services Agreements.
16     Q.   Okay.  Did anybody acting on behalf
17 of the advisors review and approve this memo
18 before it was sent to the retail funds?
19     A.   I don't know.
20     Q.   Is it your practice as the president
21 of the advisors to have memos sent to the
22 retail board without anybody reviewing and
23 approving the memos on behalf of the advisors?
24          MS. DEITSCH-PEREZ:  Object to the
25     form.

Page 135

JAMES DONDERO

2          THE WITNESS:  I'm not aware of what
3 standard practice was or wasn't; but again,
4 the infrastructure for something like this
5 would have been only at Highland.
6          HCMFA only had portfolio managers
7 and analysts as employees, and NexPoint
8 pretty much only had portfolio managers and
9 analysts as employees.
10          The staff functions were at
11 Highland, and Highland serviced the funds
12 via a Shared Services Agreement that was
13 still in place as of the date of this memo.
14          MR. MORRIS:  Okay.  Can we go down
15 to Section 2, please.
16          MS. CANTY:  (Complies with request.)
17 BY MR. MORRIS:
18     Q.   Looking at Section 2, do you see
19 that there's a question as to whether there are
20 any material amounts currently payable or due
21 in the future EG notes to --
22     A.   Yes.
23     Q.   -- the Highland by HCMFA or
24 NexPoint?
25     A.   Yes.

Page 136

JAMES DONDERO

2     Q.   Okay.  In the 53 or 54 weeks since
3 this memo as was sent, do you know if it has
4 been amended or modified in any way?
5     A.   I believe there was similar memos
6 like this for this year's annual -- for the
7 2021 renewal, but I do not have -- I've not
8 seen those either; and I don't know how this
9 answer would have changed.
10     Q.   Okay.  But at least as of
11 October 23, 2020, this is the response that the
12 advisors gave to the retail board in response
13 to Question Number 2, right?
14          MS. DEITSCH-PEREZ:  Object to the
15     form.
16          THE WITNESS:  As far -- as far as I
17     know, having seen it here for the first
18     time and not knowing whether this was the
19     final or if there were subsequent letters
20     and not knowing what the 2021 letter looks
21     like, on its surface that appears so; but I
22     have no awareness.
23 BY MR. MORRIS:
24     Q.   Okay.  And just I'll represent to
25 you, Mr. Dondero, that I obtained this letter

Page 137

JAMES DONDERO

2 from counsel to the advisors in response to my
3 specific request for the October 2020, 15-C
4 response.  So that's how -- that's how I got it
5 just so you know.
6     A.   Okay.
7     Q.   So -- so were you aware in October
8 of 2020 that NexPoint informed the retail board
9 that as of June 30, 2020, it owed Highland and
10 its affiliates approximately $23.7 million?
11          MS. DEITSCH-PEREZ:  Object to the
12     form.
13          THE WITNESS:  I was not aware.
14 BY MR. MORRIS:
15     Q.   Does that amount comport with your
16 recollection as to what was outstanding on the
17 May 31, 2017, note that NexPoint gave to
18 Highland?
19     A.   I don't have awareness.
20     Q.   Okay.  Did NexPoint -- do you know
21 if NexPoint ever informed the retail board that
22 any -- any portion of that $23.7 million was
23 subject to any of the agreements that you
24 entered into with the Dugaboy trustee?
25     A.   I -- I don't know.

Page 138

JAMES DONDERO

1
2    Q.   Did you ever instruct anybody on
3  behalf of NexPoint to advise the retail board
4  of the existence of the agreements?
5    A.   No, I do not believe so.
6    Q.   Do you know if anybody acting on
7  behalf of NexPoint has ever informed the retail
8  board that NexPoint's outstanding obligation
9  was subject to the agreements that you entered
10  into with the Dugaboy trustee?
11    A.   No.
12    Q.   Did you ever inform the retail
13  boards that any portion of this $23 million was
14  subject to offset?
15    A.   You know what, I -- let me answer
16  that and let me also adjust the last five no
17  answers I just rattled off.
18       I'm thinking in the context of the
19  time period of this letter, which
20  is October of 2020.
21       Again, there would have been similar
22  letters and disclosures like this and
23  additional questions, initial requests for
24  renewal, and then subsequent questions,
25  probably multiple subsequent questions, given

Page 139

JAMES DONDERO

1
2  everything that's going on with the Highland
3  bankruptcy in 2021.
4       And I'm not aware of what those
5  letters contain.  I haven't seen those letters
6  either, but those letters may include quite a
7  bit of disclosure regarding the questions that
8  you're asking me; but I don't know.  But I
9  didn't specifically instruct anybody to tell
10  the board.  I also didn't instruct anybody
11  specifically to not tell the board.
12       So I don't know what was told to the
13  board for the period after October 2020.
14    Q.   Okay.  I appreciate that, and I can
15  only ask you what you know, right?
16       And so what may or may not be in any
17  other report is kind of irrelevant here because
18  you haven't seen those reports, right?
19    A.   Correct.
20    Q.   Okay.  And so you have no basis of
21  knowing one way or the other whether any report
22  delivered to the retail board after October
23  2020 -- 2020 contains anything about the
24  agreements that you entered into with the
25  Dugaboy trustee, correct?

Page 140

JAMES DONDERO

1
2    A.   Right.  I just want to be clear that
3  my answer's saying I did not specifically
4  instruct somebody to tell them.  It doesn't
5  mean they don't know or someone else didn't
6  tell them.
7    Q.   Okay.
8    A.   So that's -- that's a clarification
9  I want to make.
10    Q.   Okay.  No problem.
11       And then -- and then do you see that
12  there's a report to the retail board that HCMFA
13  had approximately $12.3 million outstanding to
14  Highland as of June 30, 2020?
15    A.   Yes.
16    Q.   Okay.  So just the same type of
17  questions.
18       Do you have any knowledge as to how
19  that number was calculated?
20    A.   No.
21    Q.   Do you know if it includes the
22  $7.4 million, which is the aggregate principal
23  amount of the two notes that HCMFA issued to
24  Highland in May of 2019?
25    A.   I don't specifically, but given

Page 141

JAMES DONDERO

1
2  everything we have gone over in the last -- I
3  don't know.  Probably.
4    Q.   Okay.  Do you know whether anybody
5  has informed the retail board on behalf of
6  HCMFA that that $12.3 million was overstated by
7  $7.4 million?
8    A.   I -- I don't know.
9    Q.   Okay.  Do you know whether -- do you
10  know whether anybody acting behalf of HCMFA
11  ever told the retail boards that the
12  $12.3 million was subject to offset of any
13  kind?
14    A.   I don't know, but I can't imagine
15  the October 21 letter didn't address some of
16  those issues because those issues I'm not sure
17  were known at this point in time.
18    Q.   Okay.  If -- and we can look at
19  paragraph 1 if it helps.
20       But my question is whether you're
21  aware of anybody on behalf of HCMFA ever
22  informing the retail board in 2020 that HCMFA
23  had claims against Highland?
24       MS. DEITSCH-PEREZ:  Object to the
25  form.

Page 142

JAMES DONDERO

1           JAMES DONDERO
2           THE WITNESS:  I don't know.
3    BY MR. MORRIS:
4       Q.   Do you know whether anybody acting
5    on behalf of either the advisors informed the
6    retail board at any time in the year 2020 that
7    either advisor had claims against Highland?
8           MS. DEITSCH-PEREZ:  Object to the
9    form.
10          THE WITNESS:  I don't know.
11          MR. MORRIS:  Okay.  We can take that
12   down, please.
13          MS. CANTY:  (Complies with request.)
14   BY MR. MORRIS:
15      Q.   Are you aware that the Court
16   confirmed the Debtor's Fifth Amended Complaint
17   of Reorganization in February of 2021?
18      A.   Generally.
19      Q.   And do you recall that objections to
20   the confirmation of the plan were filed by you
21   and each of the advisors, among others?
22      A.   Yes.
23      Q.   And do you recall that these
24   actions, these lawsuits to collect on the
25   notes, they were commenced before the

Page 143

1    confirmation hearing, right?
2       A.   I – I don't – I don't know.
3       Q.   All right.  I'll represent to you
4    that the lawsuits were commenced on or about
5    January 22, and the confirmation hearing took
6    place, I think, on February 2 and February 3,
7    2021.
8           Does that refresh your recollection
9    at all that the lawsuits were known to you at
10   the time of confirmation?
11          MS. DEITSCH-PEREZ:  Object to the
12   form.
13          THE WITNESS:  Not specifically.  I
14   mean, given the details you just explained,
15   I guess generally.
16   BY MR. MORRIS:
17      Q.   Okay.  I'd like to refer to you
18   NexPoint and HCMFA and HCRE and Services
19   collectively as the defendants for the next set
20   of questions, okay?
21      A.   Okay.
22      Q.   And these questions are in your
23   capacity as an individual and in your 30(b)(6)
24   capacity, okay?

Page 144

1           JAMES DONDERO
2           Is that okay, sir?
3       A.   I'll do the best I can.  If I – if
4    I need clarity or caveats, I'll throw them out
5    there.
6       Q.   Okay.  Now, I do understand you're
7    not a 30(b)(6) witness for HCMFA today.  So
8    let's make that clear.
9           MS. DEITSCH-PEREZ:  Thank you.
10   BY MR. MORRIS:
11      Q.   As to HCMFA, you're just here in
12   your individual capacity as the control person,
13   okay?
14          Prior to confirmation, do you know
15   whether anyone acting on behalf of any of the
16   defendants ever disclosed to the bankruptcy
17   court the terms or the existence of your
18   agreement – agreements with the Dugaboy
19   trustee?
20      A.   I guess generally, I've testified to
21   this already.  There were numerous
22   conversations with Seery, and I know Lynn had
23   conversations.
24      Q.   Sir, I apologize, but I'm going to
25   interrupt because I know you're tired; and I

Page 145

1    want to get this done.  But my question had to
2    do with the disclosure to the bankruptcy court,
3    okay?  Let me just try again.
4           Are you aware, sir, whether any of
5    the defendants disclosed to the bankruptcy
6    court prior to confirmation the existence of
7    the agreements that you entered into with the
8    Dugaboy trustee?
9           MS. DEITSCH-PEREZ:  Object to the
10   form and to interrupting the witness.
11          THE WITNESS:  I'll say yes.
12   BY MR. MORRIS:
13      Q.   Okay.  Did you do that?
14      A.   Yes.
15      Q.   And did you do that as part of your
16   testimony in the hearing, or did you do it
17   through the filing of a pleading?
18          MS. DEITSCH-PEREZ:  Object to the
19   form.
20          THE WITNESS:  I don't – I don't
21   know about pleadings or filings.  I – I
22   don't know.
23   BY MR. MORRIS:
24      Q.   Do you recall what you told the

Page 146

JAMES DONDERO

1       JAMES DONDERO
2  bankruptcy court about the agreements that you
3  entered into with the Dugaboy trustee?
4       A.  No.  I'm not – yes.  No.  I'm
5  not – no, I don't.  I don't want to – I don't
6  want to start talking and have you strike it or
7  object.  So I'll just answer specifically until
8  you get to the question.
9       Q.  Yeah.  So – so again, I'm not
10  trying to trick you.
11       Can you recall when you told the
12  bankruptcy court that you had entered into will
13  the agreements with the Dugaboy trustee?
14       A.  No.
15       Q.  Can you remember the subject matter
16  of any hearing at which you informed the
17  bankruptcy court about the existence of the
18  agreements that you entered into with the
19  Dugaboy trustee?
20       A.  I don't know where or how this works
21  legally.  But every written proposal we put
22  forward as a solution and as a plot plan,
23  always had a zero on all the affiliated notes
24  as being a zero in something that was
25  ultimately likely to be compensation.

Page 147

1       JAMES DONDERO
2       All of those settlement proposals,
3  some were done formally through Seery; some
4  were done indirectly; some of it were – some
5  of them were done to the independent board;
6  some of them were done directly to Clemente.
7  But all of those documented the expectation
8  that the notes were compensation.
9       Q.  Do you believe that any of the
10  documents that you just described were ever
11  presented to the bankruptcy court?
12       A.  Yes.
13       Q.  Okay.  When and in what context were
14  those documents delivered to the bankruptcy
15  court?
16       A.  I believed that the independent
17  board and Seery were representatives of the
18  bankruptcy court in that regard.
19       So I think within a month, two
20  months of the filing, there were proposals made
21  to creditors directly and the independent
22  board; and then subsequently, once Seery became
23  president, to him.
24       And then when Seery proved
25  ineffective regarding settlements, there were

Page 148

1       JAMES DONDERO
2  reach outs – reaches out to creditors directly
3  again and – to Clemente and the committee; but
4  I think the committee already sold all their
5  stuff by that point.
6       I mean, I – listen, I – but I
7  consider those reach-outs and characterizations
8  of the notes as not part of settlement under
9  the estate and that is likely to be
10  compensation notifying the Court generally.
11       Q.  Okay.  Are you aware of any notice
12  that was ever given to Judge Jernigan about the
13  existence of any of the agreements that you
14  entered into with the Dugaboy trustee?
15       A.  I - I don't know.
16       Q.  Okay.  You're not aware of any as
17  you sit here right now; is that fair?
18       A.  Yes.  I'm not aware if any of my
19  reach-outs to the people that I described ever
20  made it to Jernigan.  I don't know.
21       Q.  Okay.
22       A.  I know she asked for updates on the
23  plot plan.  I know she asked for whatever, but
24  I don't know what specificity any of the people
25  I described presented them to her.  So I don't

Page 149

1       JAMES DONDERO
2  know.
3       Q.  And I appreciate what you've said
4  about the proposals that you've made.  But my
5  next question's very specific.
6       Prior to the commencement of
7  litigation, did you or anybody acting on your
8  behalf ever tell Jim Seery or Matt Clemente of
9  your agreements with the Dugaboy trustee?
10       A.  I – I don't know specifically.
11       Q.  Thank you very much.
12       THE COURT REPORTER:  I'm sorry.
13  When you get to a good point, could we just
14  take a quick break?
15       MR. MORRIS:  Yeah.  Why don't we do
16  that, and I hope to try to wrap up.  So
17  it's 5:37.  I mean, I'm going to need
18  probably, you know, another half hour or an
19  hour; but I want to try to finish.  It's
20  5:38.
21       I'm fine with if we just come back
22  at 4:45 Central Time, seven minutes.
23       THE VIDEOGRAPHER:  All right.  We're
24  off record at 4:38.
25       (Whereupon, a break was taken.)

Page 150

```
1              JAMES DONDERO
2         THE VIDEOGRAPHER:  This is the
3    beginning of Media Number 3 in the
4    deposition of James Dondero.  We are back
5    on the record.  The time is 4:45.
6  BY MR. MORRIS:
7    Q.    Just to finish up on the topic we
8  were on when we took the break, Mr. Dondero.
9         Prior to confirmation, do you know
10  which of the defendants ever informed the
11  bankruptcy court that any of the Promissory
12  Notes that are the subject of the lawsuits were
13  unenforceable for any reason?
14         And when I use the phrase
15  "bankruptcy court" here -- you know what, let
16  me ask a different question.
17         Prior to confirmation, do you know
18  if anybody acting on behalf of the defendants
19  ever disclosed to Judge Jernigan that any of
20  the Promissory Notes subject to the lawsuits
21  were unenforceable for any reason?
22         MS. DEITSCH-PEREZ:  Object to the
23    form.
24         THE WITNESS:  I don't know.
25
```

Page 151

```
1              JAMES DONDERO
2  BY MR. MORRIS:
3    Q.    Prior to confirmation, did you
4  direct anybody to inform Judge Jernigan that
5  any of the Promissory Notes were unenforceable
6  for any reason?
7    A.    I don't know.
8    Q.    Okay.  I want to direct your
9  attention to December 2020.
10         Do you recall if you had a
11  conversation with Frank Waterhouse concerning
12  payments that were due to Highland by any of
13  the companies that you directly or indirectly
14  own or control?
15    A.    I'm trying to think.  Generally, we
16  overpaid on shared services, so -- by a
17  significant amount, I believe 14, 15 million
18  bucks.  And then there was a supposed to be an
19  overall transition settlement true-up regarding
20  the employees, the office space, you know,
21  whatever.
22         So the -- yeah, that's -- that's the
23  -- that's my general recollection.
24    Q.    But did you give Mr. Waterhouse any
25  instructions as to whether to pay or not pay
```

Page 152

```
1              JAMES DONDERO
2  any amounts that were due and owing to Highland
3  under any agreement between Highland and any
4  affiliate?
5         MS. DEITSCH-PEREZ:  Object to the
6    form.
7         Are you asking about the Notes or
8    the Shared Services Agreements?
9         MR. MORRIS:  I'm asking about -- I'm
10  asking very broadly any payments.
11         THE WITNESS:  I do remember having
12  conversations not to pay any more shared
13  services.
14         And I hope there weren't anymore
15  payments on shared services.  There --
16  There was never a specific to not pay the
17  notes.
18  BY MR. MORRIS:
19    Q.    So your recollection is that you
20  instructed Mr. Waterhouse not to make any
21  further payments under the shared services, and
22  that's the instruction you gave?
23    A.    Yes.
24    Q.    Did you ever tell anybody in
25  December of 2020 about your conversation with
```

Page 153

```
1              JAMES DONDERO
2  Mr. Waterhouse?
3    A.    Not that I recall.
4    Q.    Do you recall telling anybody other
5  than Mr. Waterhouse in December 2020 that no
6  payment should be made to Highland under the
7  Shared Services Agreement?
8    A.    I do believe there was a team -- I
9  can't remember -- I know Dustin Norris is on
10  that team.  He was aware.  He was aware.  And
11  as a matter of fact, I think -- yeah.  He -- I
12  know he was aware for sure.
13    Q.    Anybody else?
14    A.    There were other people on that
15  team, but I can't remember who was on that team
16  or who was in the room at any time.
17    Q.    Is there anything in writing that
18  you recall that reflects the instruction that
19  you gave to Mr. Waterhouse in December 2020
20  that we're talking about?
21    A.    I believe the back-and-forth and the
22  true-up with Seery on the multiple of things
23  that I was just discussing, you know, right to
24  transition of people, it included no more
25  shared services being paid and a credit for
```

Page 154

JAMES DONDERO

1    JAMES DONDERO
2  overpayment on shared services. And those –
3  those spreadsheets went back and forth, and
4  Seery has copies of them also.
5      Q.   Are you aware of any payments being
6  made by the advisors to Highland after
7  November 30, 2020?
8      A.   Hopefully not on shared services. I
9  believe there were payments on principal and
10 interest on notes.
11     Q.   Were any of those payments that you
12 have in mind made before the end of calendar
13 year 2020 – withdrawn.
14         Were any of those payments that you
15 have in mind made in December 2020?
16     A.   I don't know. I don't know which
17 ones were paid and kept current. I don't know
18 which ones were cured. I don't – I don't
19 remember which ones were which.
20     Q.   Are you aware of any note that was
21 tendered by one of Highland's affiliates on
22 which payment was made in December 2020?
23     A.   I don't know. I don't know when –
24 I don't know which ones were kept current. I
25 don't know which ones were cured in December.

Page 155

1    JAMES DONDERO
2  I don't know which ones were cured in January
3  or February. I don't know.
4      Q.   Is it your testimony that you
5  believe that one or more of Highland affiliates
6  made a payment in December 2020 to cure – as a
7  cure payment?
8      MS. DEITSCH-PEREZ: Object to the
9  form.
10 BY MR. MORRIS:
11     Q.   I just – I'm sorry. I –
12     A.   I – I – okay.
13     Q.   Yeah. I just want to try to get
14 this as cleanly as I can. Did you –
15     A.   I believe –
16     Q.   Go ahead, sir.
17     A.   No. I'll let you go. It's better
18 if you ask me.
19     Q.   Okay. Did you direct anybody to
20 make any payment in December 2020 to Highland
21 on behalf of any affiliate that you owned or
22 controlled?
23     A.   I believe all notes are outstanding
24 and current and in good standing. I don't know
25 when they were cured.

Page 156

1    JAMES DONDERO
2      Q.   Are you just talking about the term
3  notes here or the demand notes as well?
4      A.   All of the above. All of the notes
5  as far as I know.
6      Q.   Are you aware that in December 2020,
7  Highland made a demand for payment under all of
8  the demand notes?
9      A.   And I believe they're all current as
10 far as interest and principal amortization. I
11 believe they've all been cured.
12     Q.   Okay. Can you identify any payment
13 that was made in December 2020 to Highland on
14 behalf of yourself or any entity that you
15 directly or indirectly own or control?
16     A.   I wouldn't have been involved in –
17 I wouldn't have been involved in normal course
18 payments. I know there were – I know for sure
19 there were cure payments in January. I don't
20 know if there were in December.
21     Q.   Okay. And that's – we'll get to
22 January. I'm just trying to finish up
23 December.
24         Are you aware of any payments made
25 in December 2020 –

Page 157

1    JAMES DONDERO
2      MS. DEITSCH-PEREZ: Object to the
3  form.
4  BY MR. MORRIS:
5      Q.   – by you – by you or any entity
6  directly or indirectly owned or control by you
7  to Highland?
8      A.   I don't have awareness.
9      Q.   Do you recall that early in 2021,
10 Highland gave notice of default on the three
11 term notes?
12     A.   I'm aware in – that January – yes,
13 I guess I am aware that Highland declared them
14 in default in January, yes.
15     Q.   And you're aware that in addition to
16 declaring them in default, they gave notice of
17 acceleration?
18     A.   I'm not aware of acceleration. I'm
19 aware of, I guess, default I had heard.
20     Q.   Did you ever see the
21 notice-of-default letters that Highland sent to
22 NexPoint HCRE and services?
23     A.   I don't believe I've seen all of
24 them. I think I've seen one on demand notes.
25 I don't think I've – I don't remember seeing

Page 158

JAMES DONDERO

1
2  any on term loans.
3      Q.   All right.  So as you sit here right
4  now, you don't have a recollection of having
5  seen the default notices that were sent by
6  Highland in January 2021 with respect to the
7  term notes, right?
8      MS. DEITSCH-PEREZ:  Why don't you
9  show him one.
10      THE WITNESS:  I don't recall.  Yeah.
11  I mean, I don't – I don't recall seeing
12  any of them.
13  BY MR. MORRIS:
14      Q.   Okay.  How did you learn that
15  Highland had sent the default notices?
16      A.   I believe it was at a hearing I
17  attended in person from which I called Frank,
18  and I was surprised and annoyed that the
19  relative de minimis amounts hadn't been paid;
20  and I asked him what does it take to cure them
21  or make them current.
22          And then he told me the numbers, and
23  they were small and de minimis; and I told him
24  make sure they get paid and make sure the notes
25  are cured.

Page 159

JAMES DONDERO

1
2      Q.   Did you do anything or say anything
3  else with respect to your – your learning
4  about the declaration of default?
5      A.   No.  It – no.  I don't remember
6  anything else.
7      Q.   Did you ask your – do you know
8  whether anyone acting on behalf of ever reached
9  out to Highland with respect to the payments
10  that were made in January of 2021 as cure
11  payments as you described them?
12      A.   Frank was Highland.
13      Q.   I'm asking –
14      A.   Frank – Frank – Frank was the
15  person I reached out to at Highland.  Who else
16  would I reach out to at Highland?
17      Q.   Did you – did you reach out to
18  anybody else?
19      A.   No.  Just Frank.
20      Q.   Okay.  Did anybody acting on your
21  behalf reach out to anybody else?
22      A.   Not that I know of or not that I
23  thought was necessary.
24      Q.   In January of 2021, did it occur to
25  you to either communicate with or through your

Page 160

JAMES DONDERO

1
2  lawyer, with Mr. Seery, about this?
3      MS. DEITSCH-PEREZ:  Object to the
4  form.
5      THE WITNESS:  No.  I thought Frank
6  was fully empowered.
7  BY MR. MORRIS:
8      Q.   Okay.  Did you ever confirm your
9  understanding about the cure with
10  Mr. Waterhouse in writing?
11      A.   In writing?  No.  I believe it was
12  all in that phone conversation from the Court.
13  I don't – I don't recall anything in writing,
14  but I'll check.
15      Q.   Do you recall sending him an e-mail
16  in which you confirmed with Mr. Waterhouse your
17  understanding that the debtor had agreed that
18  the payments that were being paid would
19  constitute a cure?
20      A.   No, I didn't – no.  At the time I
21  didn't think it was necessary.  It was – the
22  cure amount was calculated by Frank.  It was
23  paid immediately.  It was accepted.  I never –
24  I never thought to memorialize it beyond that.
25      Q.   Okay.  Did you – did you ever ask

Page 161

JAMES DONDERO

1
2  your attorneys to confirm with Pachulski Stang
3  Ziehl & Jones or anybody acting on behalf of
4  the debtor that the payments that were made
5  would be deemed to be cure payments?
6      MS. DEITSCH-PEREZ:  I'm going to not
7  to disclose communications with counsel.
8  BY MR. MORRIS:
9      Q.   Okay.  Do you know whether your
10  lawyers or anybody acting on your behalf ever
11  sought to confirm your understanding that the
12  payments would be deemed to have cured the
13  default under the three term notes?
14      A.   Not that I'm aware of.
15      Q.   Okay.  Is there a written record
16  of your call with Mr. Waterhouse?
17      A.   If it was from my cell phone, I'm
18  sure there's a written record taking place of
19  the call taking place.
20      Q.   Right.  But did you take any notes,
21  or is there anything in writing that
22  memorialized or reflected your conversation
23  with Mr. Waterhouse in January of 2021 about
24  the cure?
25      A.   Not that I'm aware of and not that I

**Appx. 01852**

Page 162

```
1           JAMES DONDERO
2    thought was necessary.
3        Q.   Okay.  Did – did you ever tell
4    Judge Jernigan that you had made cure payments?
5        A.   I didn't know I'm allowed to have
6    ex parte conversations with her, but there's a
7    lot of things I'd like to tell her about this
8    case; but no I did not.
9        Q.   All right.  I'm not talking about
10   ex parte conversations, sir.  Let's take
11   confirmation, for example.
12           Did you or anybody acting on any of
13   the defendants' behalf ever inform
14   Judge Jernigan that Frank Waterhouse had told
15   you that the payments in January 2021 would be
16   deemed to be cure payments?
17       A.   Not that I'm aware of.
18       Q.   Thank you.
19           MR. MORRIS:  Give me one more
20   moment.  In fact, I'm going to ask for just
21   three minutes.  I'm going to check and see
22   how much more I have here.  It won't be
23   long if I have anything.  So let's go off
24   the record.
25           THE VIDEOGRAPHER:  Would you like to
```

Page 163

```
1           JAMES DONDERO
2    go off the record?
3           All right.  We're off record at
4    5:03.
5           (Whereupon, a break was taken.)
6           THE VIDEOGRAPHER:  We are back on
7    the record.  The time is 5:06.
8           MR. MORRIS:  Okay.  Asia, can you
9    please put on the screen Exhibit 24, which
10   are Mr. Dondero's written responses to
11   discovery?
12           MS. CANTY:  (Complies with request.)
13           (Whereupon, Exhibit 24, Defendant
14   James Dondero's Objections and Responses to
15   Plaintiff's Requests for Admission,
16   Interrogatories, and Requests for
17   Production, marked for identification, as
18   of this date.)
19   BY MR. MORRIS:
20       Q.   And Mr. Dondero, I don't know if you
21   have that binder in front of you, but this is
22   one of the documents that will be in there,
23   Number 24.
24       A.   Number 24?
25       Q.   Yes, sir.
```

Page 164

```
1           JAMES DONDERO
2           MS. DEITSCH-PEREZ:  Do you got it?
3           THE WITNESS:  Yes.
4    BY MR. MORRIS:
5        Q.   Have you seen this document before,
6    sir?
7        A.   No.
8        Q.   Let's go to page 15 and see if that
9    refreshes your recollection.
10           Is that your signature?
11       A.   Yes.
12           MS. DEITSCH-PEREZ:  Yeah.  It's late
13   in the day, John.
14           THE WITNESS:  Yes.
15           MR. MORRIS:  That's why I showed him
16   the signature.
17   BY MR. MORRIS:
18       Q.   Does that refresh your recollection
19   that you've seen this before?
20       A.   No.  It refreshes my recollection
21   that I signed it.
22       Q.   Okay.  And –
23       A.   Not that I recall – not that I
24   looked at it in detail in any way.
25       Q.   Okay.  Did you review it before you
```

Page 165

```
1           JAMES DONDERO
2    signed it?
3        A.   I – as I sit here today, I don't
4    remember.  So let's go through whatever
5    questions you have.
6        Q.   Okay.
7           MR. MORRIS:  Go to page 8, please.
8           MS. CANTY:  (Complies with request.)
9    BY MR. MORRIS:
10       Q.   You will see that Interrogatories 3
11   and 4 ask in substance for you to admit that
12   you never disclosed the terms or existence of
13   the agreement to Frank Waterhouse prior to the
14   commencement of the adversary proceeding.
15           Do you see that?
16           MS. DEITSCH-PEREZ:  Wait.  Object to
17   the form.  Those are two different
18   requests.
19           MR. MORRIS:  Okay.  Okay.  I was
20   trying to do this quickly.  We'll do it –
21   we'll do it – we'll do it your way?
22           MS. DEITSCH-PEREZ:  No.  I think you
23   – okay.
24   BY MR. MORRIS:
25       Q.   So let's look at Request for
```

Page 166

JAMES DONDERO

1    JAMES DONDERO
2    Admission Number 3.
3        Do you see that Highland asked you
4    to admit, quote, "that prior to the
5    commencement of the adversary proceeding, you
6    never disclosed the terms of the agreement to
7    Frank Waterhouse," close quote?
8        A.   That's on page 8, Number 3, right?
9        Q.   Correct.  And you denied that,
10   correct?
11       A.   Yes.
12       Q.   Okay.  Did you disclose the terms of
13   the agreement as we've defined that term to
14   Frank Waterhouse prior to the commencement of
15   the adversary proceeding?
16       A.   You know, what I've answered was a
17   long answer earlier that the notes were
18   compensation.  The notes were to be – would be
19   forgiven as part of compensation, shouldn't be
20   included in any settlement.
21           Frank and his group were deeply
22   involved in all the plot plan and settlement,
23   things that went back and forth.  He knew.
24           Now, whether he knew the specifics
25   of the agreement in terms of, whether I ever

Page 167

1    JAMES DONDERO
2    discussed the MGM Cornerstone, Trustway, and
3    the specifics of the agreement with him before,
4    I don't – I don't know.  So...
5        Q.   Do you –
6        A.   I think denying is appropriate, but
7    I'm at not saying Frank knew the specifics of
8    the agreement prior to the commencement of
9    litigation.
10       Q.   Did you tell him that you had an
11   agreement with the Dugaboy trustee?
12       A.   I told him there were mechanisms for
13   forgiving the – or there were – there were
14   mechanisms for the notes being compensation and
15   not being part of any kind of cement or asset
16   to the estate.
17       Q.   Okay.  Do you recall telling him
18   anything else during these conversations?
19       A.   No, I didn't – no.  I didn't feel
20   it necessary to talk to him about the
21   specifics.
22       Q.   Okay.  And do you recall having this
23   discussion in any context other than in
24   connection with the preparation of a settlement
25   proposal?

Page 168

1    JAMES DONDERO
2        A.   There wasn't another reason – there
3    – no, I don't remember any other context.
4        Q.   Okay.
5        A.   But the settlements were regular and
6    ongoing –
7        Q.   Okay.
8        A.   – in our mind, not in the
9    Stonehill's mind.
10       Q.   Okay.  Can you go – can we go to
11   page 9, Request for Admission Number 8?
12       A.   Yes.
13       Q.   Number 8 we asked you to "admit that
14   no document was created prior to the
15   commencement of the adversary proceeding
16   concerning the existence of the agreement."
17           Have I read that right –
18       A.   I'm just reading what's on page 9,
19   admit that prior to the agreement he never
20   disclosed any other creditor.
21       Q.   No, no, no.  I'm sorry.  We're on
22   Number 8.
23           Can you read Number 8 out loud?
24       A.   Number 8, I'm sorry.  Admit that no
25   document was created prior to the commencement

Page 169

1    JAMES DONDERO
2    of the adversary proceeding concerning the
3    existence of the agreement.
4        Q.   All right.  So you've read that.
5    And so my question to you is:  Did you deny
6    that because there are settlement proposals
7    that you created that show zero value for the
8    Promissory Notes at issue?
9        A.   Yes, partly.
10       Q.   Okay.  What other documents were
11   created prior to the commencement of the
12   adversary proceeding that you contend concerned
13   the existence of the agreement?
14       A.   I'm trying to think if the LPA does.
15       Q.   Okay.  Anything else?
16       A.   No.  That would be – that would be
17   it.
18       Q.   Okay.  Request for Admission
19   Number 9, can you identify the creditor that
20   caused you to deny the Request for Admission
21   Number 9?
22       A.   I believe all the creditors via the
23   settlement agreements; but, you know,
24   specifically Clubock, you know, and to the
25   extent Frank is a creditor, Frank.

Page 170

1          JAMES DONDERO
2     Q.   But you just testified a few minutes
3  ago, I thought, that you didn't specifically
4  tell Mr. Waterhouse of the terms of the
5  agreements to him, right?  Did I miss --
6     A.   That's right.  I mean, not the
7  specific terms, correct.
8     Q.   Okay.  So is there any creditor to
9  whom you -- is there any creditor of Highland's
10 to whom you disclosed the existence of the
11 agreements that you entered into with the
12 Dugaboy trustee prior to the commencement of
13 the adversary proceeding?
14        MS. DEITSCH-PEREZ:  Asked and
15     answered.
16        THE WITNESS:  Yeah.  I mean,
17     generally, all the creditors via the
18     settlement.  And then we have lots of
19     one-off conversations with Clubock
20     representing UBS where the notes were
21     described as going to be forgiven
22     compensation, never part of the estate.
23 BY MR. MORRIS:
24     Q.   All right.  I don't -- I don't want
25 to wrestle with you.

Page 171

1          JAMES DONDERO
2     A.   Sure.
3     Q.   I'm going to remind you that when I
4  use the word "agreements," I'm referring
5  specifically to the agreements that were set
6  forth in paragraph 82 of your answer.
7        Do you understand that?
8     A.   Yes.  And so I guess my answer is
9  generally but not specifically.
10    Q.   Okay.  And when you say "generally,"
11 you don't mean that you disclosed the existence
12 or terms of the agreement to any creditor.
13 What you mean is that you told all of the
14 creditors that you believed that the notes
15 should be forgiven as part of compensation.
16        Do I have that right?
17    A.   Well, that they would be forgiven as
18 part of compensation.
19    Q.   Okay.  Subject to that correction,
20 are we on the same page now?
21    A.   Yes.
22    Q.   Okay.  Can we go to page 12,
23 Interrogatory Number 2?
24    A.   This is still in Section 24?
25    Q.   Yes, sir.

Page 172

1          JAMES DONDERO
2        MS. DEITSCH-PEREZ:  Object to the
3     form.
4        THE WITNESS:  24, I'm sorry.
5     Page 2?
6  BY MR. MORRIS:
7     Q.   Page 12.
8     A.   Page 12.  Yes.  Which one?
9     Q.   Number 2.
10    A.   All right.
11    Q.   You didn't identify any email
12 correspondence in response to Interrogatory
13 Number 2; is that correct?
14    A.   I don't have my e-mails.  So we have
15 painfully little from the Highland estate.
16    Q.   Okay.
17    A.   I think at the time we responded, we
18 thought we might get access to things; but we
19 haven't been able to come up with anything.  We
20 have -- we have no access to anything.
21    Q.   Okay.  So as you sit here today, you
22 cannot identify any e-mail correspondence that
23 discusses the existence of the agreement,
24 correct?
25    A.   Not yet, no.

Page 173

1          JAMES DONDERO
2        (Whereupon, Exhibit 27, Defendant
3     NexPoint Advisors, L.P.'s Objections and
4     Responses to Plaintiff's Requests for
5     Admission, Interrogatories, and Requests
6     for Production, marked for identification,
7     as of this date.)
8  BY MR. MORRIS:
9     Q.   Let's go to Exhibit Number 27.
10    A.   Yes.
11    Q.   And if we can go to page 7.
12        MR. MORRIS:  I think -- I don't know
13     who's shuffling paper.
14 BY MR. MORRIS:
15    Q.   But if we're at page 7, we're
16 looking at Interrogatory Number 3.
17        Is the reason for the denial -- and
18 I apologize.  I may be going too quickly
19 because I know we're all anxious to finish, but
20 I do want to represent to you that we're
21 looking at the discovery responses of NexPoint
22 Advisors.
23    A.   Right.
24    Q.   And if we went to page 12, we'd find
25 your signature on that one, okay?  So looking

**Appx. 01855**

Page 174

JAMES DONDERO

1
2  at –
3      A.  Yes.
4      Q.   – Request for Admission Number 3,
5  is your answer the same on behalf of NexPoint
6  Advisors as it was for yourself as to why you
7  denied Request for Admission Number 3?
8      A.  Yes.
9      Q.   Okay.  If we can go to Request for
10 Admission Number 6, that is the same Request
11 for Admission that we talked about with respect
12 to yourself in your individual capacity a
13 moment ago.
14          Is your reason for denying Request
15 for Admission Number 6 the same reason that you
16 gave for yourself?
17     A.  Yes.
18     Q.   And looking at Request for
19 Admissions Number 7 and 8, is the reason that
20 you denied those Requests for Admissions
21 because you told Seery and the committee and
22 Clubock that you wouldn't pay anything for the
23 notes because they were supposed to be forgiven
24 as part of your compensation?
25     A.  And the independent board, yes.

Page 175

JAMES DONDERO

1
2      Q.   Okay.  Is there any other reason
3  that you denied Request for Admissions Number 7
4  and 8?
5      A.  Not that I can think of at this
6  point in time.
7          I don't think the LPA applies much
8  here, but I may be –
9          MR. MORRIS:  All right.  I have no
10 further questions.
11         THE WITNESS:  Wonderful.  Thank you.
12 Have a good evening.
13         MR. MORRIS:  Thank you.  Take care.
14         MS. DEITSCH-PEREZ:  Thank you.
15         MR. MORRIS:  Bye now.
16         THE VIDEOGRAPHER:  All right.  If
17 there are no further questions, this
18 concludes today's deposition.  Volume II
19 [sic] consists of three media.  We are off
20 the record at 5:21 p.m.
21         THE COURT REPORTER:  Everybody is
22 leaving, and I wanted to get everybody's
23 order on the record.
24         MS. DEITSCH-PEREZ:  I'd like the
25 rough.  And then the regular can be

Page 176

JAMES DONDERO

1
2  whenever you get the regular done.  No
3  special rush.
4          THE COURT REPORTER:  Okay.  Thank
5  you.
6          MS. DEITSCH-PEREZ:  You're welcome.
7          THE COURT REPORTER:  Ms. Canty, I
8  think there's a standing order for a daily
9  delivery -- or an immediate delivery for
10 your firm?
11         MS. CANTY:  Yes.
12         THE COURT REPORTER:  Okay.  I just
13 wanted to confirm that.  I'll get that out
14 tonight, then.
15         MS. CANTY:  Okay, thank you.
16         (The witness is excused.)
17         (Deposition of James Dondero
18 concluded at 5:21 p.m. CDT.)
19
20
21
22
23
24
25

Page 177

1          C E R T I F I C A T E
2
3
4          I, SUZANNE J. STOTZ, a Certified
5  Shorthand Reporter, Registered Professional
6  Reporter, Certified Realtime Reporter, and
7  Notary Public in and for the State of Texas, do
8  hereby certify that the foregoing is a true and
9  accurate transcript of the stenographic
10 above-captioned matter.
11
12
13         _____
14         SUZANNE J. STOTZ, CSR, RPR, CRR
15         Texas Certification No. 11942
16
17
18 DATED:  November 4, 2021
19
20
21 NOTE:  THE CERTIFICATE APPENDED TO THIS
22 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23 OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24 DIRECT CONTROL AND/OR DIRECTION OF THE
25 CERTIFYING COURT REPORTER.

Appx. 01856

Page 178

```
1        E R R A T A   S H E E T

2       I have read my testimony in the foregoing

3   transcript and believe it to be true and

4   correct to the best of my knowledge and belief

5   with the following changes:

6   PAGE    LINE      CHANGE

7   _____ _____ _____

8   _____ _____ _____

9   _____ _____ _____

10  _____ _____ _____

11  _____ _____ _____

12  _____ _____ _____

13  _____ _____ _____

14  _____ _____ _____

15  _____ _____ _____

16  _____ _____ _____

17

18  _____ _____

19  WITNESS SIGNATURE          DATE

20

21  Sworn and subscribed to before me this

22  _____ day of _____ , 2021.

23

24  Notary Public of the

25  State of _____.
```

Appx. 01857

## $

**$1.55-million** 64:22

**$12.3** 140:13 141:6, 12

**$2** 62:6

**$2.4** 91:11,13,23 92:6,11,14 93:12 103:17 104:2 107:23 109:2,25 110:13,23

**$2.4-million** 91:19

**$23** 138:13

**$23.7** 137:10,22

**$250,000** 58:20

**$5** 101:22 102:17 111:17,21,24 112:4, 10 117:9 119:23

**$5-million** 116:16 120:10

**$500,000** 62:5

**$6** 99:6,16,22

**$6,068,851** 98:18

**$7.4** 90:17 125:4 129:5 140:22 141:7

**$7.44** 102:7

**$7.5** 119:10,14,16

**$7.8** 103:5

## 0

**000025** 130:19

**000031** 130:19

## 1

**1** 9:3 94:3 141:19

**100** 96:24

**12** 171:22 172:7,8 173:24

**13** 26:14

**14** 26:14 151:17

**15** 151:17 164:8

**15-C** 130:11 131:3 137:3

**17** 20:20

**18** 20:8 26:13 71:16 73:15

**19** 20:8

**1939** 104:7

**1:17** 9:11

## 2

**2** 52:24 94:19 97:15 108:25 132:9 135:15, 18 136:13 143:7 171:23 172:5,9,13

**2,500,024** 60:10

**2.4** 104:14 110:20

**2.5** 61:5

**20** 57:16 58:2

**200,000** 64:22

**2016** 57:13,21 58:18 59:3

**2017** 20:8,21 60:2,9 62:6 63:17 73:14 137:17

**2018** 20:21 23:4 122:24 123:9,16 129:4

**2019** 23:5 25:3 90:16, 25 91:13,24 97:15 99:22 102:7 108:10, 25 110:3,25 111:20, 25 112:5,10,18 113:3 114:9 116:15 117:5 119:9,24 120:11 123:24 124:25 128:14 140:24

**2020** 25:3,9 109:21 130:9,18,23 133:19, 23 136:11 137:3,8,9 138:20 139:13,23 140:14 141:22 142:6 151:9 152:25 153:5, 19 154:7,13,15,22 155:6,20 156:6,13,25

**2021** 9:10 136:7,20 139:3 142:17 143:8 157:9 158:6 159:10, 24 161:23 162:15

**21** 141:15

**22** 143:6

**23** 130:18,23 133:18, 23 136:11

**24** 163:9,13,23,24 171:24 172:4

**252** 124:3

**27** 173:2,9

**2:28** 66:12

**2:43** 66:15

**2:44** 67:5

## 3

**3** 117:5 119:23 123:24 143:7 150:3 165:10 166:2,8 173:16 174:4,7

**30** 8:18 12:6,22 22:3, 4,5 137:9 140:14 154:7

**30(b)(6)** 14:23 15:7 17:4 18:18,21 68:24 76:24 143:24 144:7

**300,000** 64:23

**31** 10:16 82:10 122:24 123:9,15 129:4 137:17

**34** 22:5 123:4,6

**35** 22:6

**36** 22:6

**375** 102:10

**39** 104:8 124:23

**3:21** 94:6

**3:22** 94:21

**3:28** 66:7

**3:40** 66:8

**3:53** 115:9

**3:54** 115:12

**3rd** 111:20

## 4

**4** 9:10 165:11

**4.4M** 118:5

**40** 12:6,24

**47** 104:9

**4:38** 149:24

**4:45** 149:22 150:5

## 5

**5** 103:5

**50** 59:17,19 82:8

**50,000** 57:20

**51** 82:7

**53** 93:18 94:23 95:3 97:12 136:2

**54** 107:10,12 136:2

**56** 116:20,22

**57** 118:24 119:3

**59** 130:15,17

**5:03** 163:4

**5:06** 163:7

**5:21** 175:20 176:18

**5:37** 149:17

**5:38** 149:20

## 6

**6** 174:10,15

**65,772** 63:12

**68** 55:21 56:2,9

## 7

**7** 173:11,15 174:19 175:3

**70** 58:3

**75** 35:3

## 8

**8** 165:7 166:8 168:11, 13,22,23,24 174:19 175:4

**82** 13:3,12,17 14:3 39:16 47:10,20 48:8 81:25 82:10,11,17 83:18 171:6

## 9

**9** 25:9 168:11,18 169:19,21

**90-day** 47:22

## A

**ability** 27:16 43:6 45:10 47:5

**acceleration** 157:17,18

**accepted** 8:25 160:23

**access** 172:18,20

**accommodated** 66:23

**accord** 89:18

**account** 47:2 100:18 102:7

**accountants** 134:5

**accounted** 110:22

**accounting** 37:24 107:19,22 108:2,12 110:8 111:13 117:5, 9,17 125:23 128:4,5 134:2

**accurately** 27:24

**acting** 40:22 59:10 65:20 73:5 105:7 134:16 138:6 141:10 142:4 144:15 149:7 150:18 159:8,20 161:3,10 162:12

**action** 9:17 38:25

**actions** 142:24

**activities** 106:2

**actual** 37:24 51:11 73:16

**addition** 157:15

**additional** 101:9 103:16 138:23

**address** 141:15

**adjust** 47:5 75:7 138:16

**adjusted** 84:4

**admissible** 8:16

**Admission** 163:15 166:2 168:11 169:18, 20 173:5 174:4,7,10, 11,15

**Admissions** 174:19, 20 175:3

**admit** 165:11 166:4 168:13,19,24

**adversary** 165:14 166:5,15 168:15 169:2,12 170:13

**advice** 11:25

**advise** 138:3

**advisor** 103:17 104:22 142:7

**advisor's** 104:23

**advisors** 58:5,12 109:3 129:17,22,25 130:9 131:2 133:5, 15,17 134:17,21,23 136:12 137:2 142:5, 21 154:6 173:3,22 174:6

**advisors'** 133:22

**affiliate** 152:4 155:21

**affiliated** 58:4 146:23

**affiliates** 110:10 137:10 154:21 155:5

**afield** 38:16

**afternoon** 8:2 67:6

**aggregate** 21:21,23 24:15 27:4 51:24 71:15 90:16 102:13 125:3 140:22

**agree** 39:19 41:22 43:13 46:3 71:8 83:8 103:3 115:4,7

**agreed** 160:17

**agreement** 19:20 20:19,24 21:8,12,16, 25 22:7,11,18 23:2,8, 12,17,22 24:7,12,17 25:2,13,18,21,25 26:5 27:5,11,17 28:7, 22 29:18,25 30:8,14, 23 31:4,9,24 32:7,11, 22 33:11,24 34:17,22 35:14,17 36:8,22 37:4 39:7 40:10 43:13 44:12,21,24 45:17 47:19 48:5 69:21 71:20 77:24 78:3 79:9 81:25 82:22 84:16 85:22 86:11,13,20 99:25 134:13 135:12 144:18 152:3 153:7 165:13 166:6,13,25 167:3,8,11 168:16,19 169:3,13 171:12 172:23

**agreements** 13:18, 22 14:2,8 19:16,21, 25 20:6,8,10 29:2,6, 11 30:22 31:2 40:6, 17,20 41:2,9,13,20, 24 42:12,13,16,24 46:13 47:8,11 48:4, 16 49:4,13,18 50:10, 19 51:7 53:12,19 54:3,7 69:11 72:8 73:5,23 74:7,13,20 75:2,18,25 76:12,16 77:11,19 79:17,23 81:3,16 82:18,24 83:23 84:9,19 85:11 105:23 127:11 133:25 134:15 137:23 138:4,9 139:24 144:18 145:8 146:2,13,18 148:13 149:9 152:8 169:23

**afternoon** 170:5,11 171:4,5

**ahead** 101:13 155:16

**Aigen** 77:5 95:25

**Alan** 12:7,9

**allocate** 61:10

**allocated** 61:18,21, 25 62:8

**allowed** 162:5

**altered** 43:23 44:14, 22

**amended** 13:5 136:4 142:16

**amortization** 156:10

**amount** 15:16 21:4, 15,19,22,24 24:6,16 30:7 31:13 57:17 58:19 61:4 62:2 75:12,13 90:17 99:12 103:9,11,20 104:2 108:25 125:3 126:20 137:15 140:23 151:17 160:22

**amounts** 56:19 92:23 100:21 112:12 135:20 152:2 158:19

**analysis** 73:23 100:6

**analysts** 135:7,9

**analyze** 73:6,8

**Anchorage** 71:21 83:5

**annoyed** 158:18

**annual** 55:2,16 56:13,15 126:12 129:17,24 130:10 136:6

**answer's** 91:25 140:3

**answering** 106:14

**answers** 86:20 138:17

**anticipated** 47:5

**anxious** 173:19

**anymore** 24:21 106:14 152:14

**apologize** 33:8 48:25 54:23 69:17 102:3 127:3 144:24 173:18

**apparently** 67:17 95:12

**appearances** 9:20

**appeared** 9:17

**appears** 136:21

**applied** 119:17

**applies** 175:7

**approval** 71:4,11,23

**approve** 134:17

**approving** 92:9 134:23

**approximately** 9:11 24:23 99:5,7,16,22, 23 101:21 102:6 103:4,17 137:10 140:13

**April** 90:25

**arrives** 68:20

**Arvold** 8:3

**Asia** 163:8

**aspect** 82:21,23

**aspects** 126:16

**asset** 167:15

**assets** 42:12 73:10 89:2 121:4,12

**association** 8:4

**assume** 60:19 122:12,14 128:16,20

**attached** 98:9

**attaches** 108:16

**attachment** 108:21

**attention** 62:15 63:4 151:9

**attorney** 11:5,6 12:4 134:9

**attorneys** 89:23,25 90:3,8 134:14 161:2

**audio** 116:3

**audit** 122:11,20 123:23 124:19 125:7, 13,17,18,22 126:3,12 127:5,10,15 128:6,23 129:10

**audited** 120:15 122:7,23 124:13 128:10,14 129:3

**auditors** 124:17,20 126:3

**audits** 126:22

**authority** 71:2 72:19, 21

**authorize** 91:19,22 112:3

**authorized** 93:3,10

**authorizing** 111:23

**availability** 62:12

**award** 57:2,14,20 59:3 63:16

**awards** 63:19,20

**aware** 12:7,15,18,19 29:8,17 34:21 35:14, 17 39:5 52:19 70:5 80:16 90:14 92:21,24 93:3,11,15 99:20 100:5 105:23,24 108:10 109:19 110:7 116:15 117:16,23 119:8 121:21,25 122:9,21 125:15 126:10 128:9,13 135:2 137:7,13 139:4 141:21 142:15 145:5 148:11,16,18 153:10, 12 154:5,20 156:6,24 157:12,13,15,18,19 161:14,25 162:17

**awareness** 108:13 118:18 122:13 128:19 136:22 137:19 157:8

---

**B**

**back** 17:19 18:12 49:23 51:9 66:7,14

Index: back-and-forth..compensation

81:11 82:3 94:21
96:5,9 97:5,8 115:11
127:10 133:6 149:21
150:4 154:3 163:6
166:23

**back-and-forth**
153:21

**background** 128:2

**balance** 72:15 121:5,
19,22 122:4

**bankruptcy** 9:7
25:17 73:2 90:2
121:7,10 139:3
144:16 145:3,6
146:2,12,17 147:11,
14,18 150:11,15

**base** 60:9,19,25
61:10,13 88:20

**based** 51:11 61:25
84:5 98:16

**basis** 55:17 56:15
61:20 139:20

**Bates** 56:4 59:21
66:22 67:3,7 95:4
107:13 116:23 119:4
123:9 124:5 130:18

**bed** 93:4

**begin** 93:23

**beginning** 66:19
94:19 150:3

**behalf** 40:10,22
41:13 59:6,10 65:21
73:6 105:8 110:9
133:5 134:16,23
138:3,7 141:5,10,21
142:5 144:15 149:8
150:18 155:21
156:14 159:8,21
161:3,10 162:13
174:5

**belabor** 90:20

**belief** 133:24

**believed** 75:2 147:16
171:14

**believing** 114:11

**benefit** 98:6

**benefits** 54:11 55:3,
15 56:3,13,18 59:20,
25

**binder** 163:21

**bit** 131:8 139:7

**board** 71:14 105:20,
21,22 106:4,19
107:2,5 129:20
130:2,5,10 134:22
136:12 137:8,21
138:3,8 139:10,11,
13,22 140:12 141:5,
22 142:6 147:5,17,22
174:25

**boards** 131:2 138:13
141:11

**bona** 42:3,4

**book** 131:11

**booked** 93:13 110:4,
13,17 116:17 120:10

**booking** 110:19

**books** 93:14

**borrower** 81:2

**borrowers** 80:12
81:14

**bottom** 107:18

**bought** 83:7

**boy** 118:8

**break** 16:8,18 64:3,5
66:5,13 93:20 94:11
96:11,13,21 149:14,
25 150:8 163:5

**Brian** 54:22 60:23

**bring** 88:24

**broad** 28:5 65:5

**broadly** 152:10

**buckets** 52:5 53:9,
15,22 60:14

**bucks** 27:9 151:18

**bunch** 126:22

**business** 51:9 54:10
55:14 67:9

**Bye** 175:15

---
**C**
---

**calculated** 140:19
160:22

**calculation** 100:21

**calendar** 154:12

**call** 43:7 96:2,24
100:20 161:16,19

**called** 41:11 54:11
112:9 158:17

**Canty** 10:17 13:13
55:22 59:18 82:7,11
85:20 94:24 98:10
107:11 108:22
116:21 119:2 123:5,
20 124:6,10 130:16
131:25 132:4,6,12
133:9 135:16 142:13
163:12 165:8 176:7,
11,15

**capability** 67:7

**capacity** 15:25 16:15
17:16 18:18 68:23,24
76:24 87:8,9 91:4
120:24 143:24,25
144:12 174:12

**Capital** 9:6 39:24
62:15 87:15 88:7,9
89:9 109:3 123:7

**captured** 83:2,13

**care** 175:13

**carefully** 50:7

**carried** 121:4,12,18,
22 122:3

**case** 8:20 12:8,17
162:8

**cash** 53:3 62:11
84:24 118:10

**caused** 41:17 70:12
169:20

**caveats** 144:4

**CDT** 176:18

**cell** 161:17

**cement** 167:15

**Central** 149:22

**certificate** 90:23

**certified** 8:3

**certify** 91:4

**cetera** 126:19 127:11

**CFO** 111:7

**change** 46:4,13
96:23

**changed** 92:23
136:9

**changing** 45:5

**characteristics**
43:24

**characterizations**
148:7

**chart** 31:16,18 98:8,
12,17 100:16

**chat** 132:13

**check** 160:14 162:21

**Christian** 108:7

**circumstances**
89:15 113:11

**Civil** 8:19

**claim** 101:14 102:16,
21,23

**claims** 141:23 142:7

**clarification** 84:12,
21,23 85:2 140:8

**clarified** 84:5

**clarity** 37:2 144:4

**Class** 39:9,19 40:8
41:4,18 43:20

**cleanly** 155:14

**clear** 15:10 36:18
51:3 103:23 140:2
144:8

**Clemente** 147:6
148:3 149:8

**close** 67:9 117:10,14
166:7

**closer** 47:24

**Clubock** 169:24
170:19 174:22

**co-loan** 108:4

**code** 51:22 53:2

**colleague** 77:5

**colleagues** 17:19

**collect** 90:15 142:24

**collectively** 143:20

**Collins** 54:17,22,23,
25 55:14 56:14 60:23

**column** 98:23
101:20,24 102:2,4

**combination** 61:6

**commenced** 14:10
109:17 120:7,12
121:11,13,16 142:25
143:5

**commencement**
29:9 110:15 149:6
165:14 166:5,14
167:8 168:15,25
169:11 170:12

**comment** 45:8 46:9

**comments** 26:25

**committee** 148:3,4
174:21

**communicate**
159:25

**communications**
11:15 161:7

**companies** 63:3,9
70:14,21 71:3,13
72:10,20 74:2 75:4,
17 82:16 84:22
88:21,22 151:13

**company** 49:23
71:18

**compared** 74:6
75:17

**compensation** 42:3
46:19 49:20 50:12
51:11,22,23 53:3,7,
11,18 54:2,11 55:3,
15 56:3,13,17,19
57:13,20 59:20 65:8,
14,23 146:25 147:8

148:10 166:18,19
167:14 170:22
171:15,18 174:24

**Complaint** 13:6
142:16

**complete** 122:16,20

**completeness**
126:18

**compliance** 133:14,
18

**complied** 100:3

**complies** 10:2,17
13:13 55:22 59:18
85:20 98:10 107:11
108:22 116:21 119:2
123:5,20 124:6,10
130:16 131:25 132:4,
6 133:9 135:16
142:13 163:12 165:8

**comport** 102:5
137:15

**computer** 94:25

**concept** 88:25

**concerned** 169:12

**concerns** 35:18

**concluded** 10:25
176:18

**concludes** 175:18

**conclusion** 12:4

**condition** 42:7,8
73:17

**conditions** 13:20
43:8 44:5,13,22
45:10,19,23 47:6
69:12,23 70:2,6,11
72:7 73:7 75:23
82:19

**conducted** 124:20

**conference** 96:7

**confidence** 100:3

**confirm** 160:8 161:2,
11 176:13

**confirmation** 142:20
143:2,6,11 144:14
145:7 150:9,17 151:3

162:11

**confirmed** 142:16
160:16

**connection** 12:17
63:17 99:16 101:15
126:12 129:24
130:10 167:24

**consent** 112:9,17,
20,22 113:3,6,13,21
114:9,12

**consistent** 19:23
99:3

**consistently** 38:8

**consists** 175:19

**Consolidated** 123:7

**constitute** 160:19

**consuming** 13:19

**contact** 115:2

**contacted** 41:7

**contained** 127:5

**contend** 69:8,10,20
169:12

**content** 11:21

**contentious** 85:7,8

**context** 119:12,13
138:18 147:13
167:23 168:3

**continuation** 10:21

**continue** 19:12

**contracts** 129:17,21

**contributions** 88:2

**control** 25:11 42:17,
25 43:5,14 78:11,20
83:8,11 144:12
151:14 156:15 157:6

**controlled** 35:3,4
155:22

**conversation** 83:3
151:11 152:25
160:12 161:22

**conversations**
81:12 85:10 105:21
106:5 110:18 144:22,

23 152:12 162:6,10
167:18 170:19

**coordinates** 126:15

**copies** 76:14 77:9
154:4

**copy** 64:8 77:17
108:16 131:11

**Cornerstone** 70:22
72:2 74:19 75:7 83:9
167:2

**corporate** 107:19,22
108:2,12 110:7
117:4,9,17

**correct** 18:9,10 19:2,
3,15 23:14 27:19
29:2,3,6,7,11,12
32:14 33:20,21 39:25
40:13,17,20,23 41:5,
9,14,20 42:18 43:2
44:14 45:19 55:4
56:20 57:5,6 69:23
70:3,23 71:4 73:17,
19 76:12,16 77:11
99:18 109:18 111:9
117:20 127:18
129:18,22 130:2,6
139:19,25 166:9,10
170:7 172:13,24

**correction** 54:24
171:19

**correspondence**
95:4 107:11 116:23
172:12,22

**cost** 70:14 73:19 74:2
76:7 83:9,13

**costs** 74:6,15,18
75:4,9,18

**counsel** 9:12 12:22
17:25 66:16 93:19
117:19 133:22 134:8,
10 137:2 161:7

**counsel's** 11:25

**counterproposal**
84:20

**couple** 17:20 58:22,
24 71:21 89:23 96:3
134:5,6

**court** 9:7,22,24 18:10

25:18 94:17 142:15
144:17 145:3,7
146:2,12,17 147:11,
15,18 148:10 149:12
150:11,15 160:12
175:21 176:4,7,12

**courtroom** 8:17

**covered** 14:8 28:13
129:14

**covers** 14:14 83:22

**COVID-19** 8:6

**create** 45:10

**created** 29:9 35:10
110:8 168:14,25
169:7,11

**creating** 72:13
118:21

**credit** 127:11 153:25

**credited** 118:16

**creditor** 168:20
169:19,25 170:8,9
171:12

**creditors** 147:21
148:2 169:22 170:17
171:14

**critical** 93:3

**cure** 155:6,7 156:19
158:20 159:10 160:9,
19,22 161:5,24
162:4,16

**cured** 154:18,25
155:2,25 156:11
158:25 161:12

**current** 154:17,24
155:24 156:9 158:21

---

**D**

**D-CNL000212**
123:10

**D-CNL000257**
123:10

**D-CNL003585** 56:4

**D-CNL003587** 59:21

**D-CNL003763**

116:23

**D-CNL003764** 119:4

**D-CNL003765** 119:5

**D-CNL003768** 95:4

**D-CNL003770** 95:5

**D-CNL003777**
107:13

**D-CNL003779**
107:14

**daily** 110:8 176:8

**date** 15:17 22:9 24:10
25:5,12,22 26:6 27:7,
13 31:12 49:12 56:6
59:23 70:25 72:18
95:6 107:15 116:25
119:6 123:12 124:20
125:2 130:20 135:13
138:19 163:18 173:7

**dated** 97:15 108:25
119:23 123:9 130:18,
22

**David** 97:20

**day** 12:8 13:8 66:22
67:2,19 76:22 77:6
90:20 107:17 111:20
127:24 164:13

**DC** 134:8

**DC's** 134:8

**de** 51:24,25 158:19,
23

**Debbie** 10:11

**Deborah** 14:17 19:6
63:24 66:5 95:11

**debtor** 42:12 160:17
161:4

**debtor's** 41:24 42:5,
17 43:2 142:16

**December** 20:21
23:4 25:2 47:8,12
48:9,17 49:5 109:21
122:24 123:9,15
129:4 151:9 152:25
153:5,19 154:15,22,
25 155:6,20 156:6,
13,20,23,25

**decides** 129:21

**decision** 17:18 61:9 113:14

**declaration** 159:4

**declared** 157:13

**declaring** 157:16

**decreased** 52:20

**deemed** 8:25 161:5, 12 162:16

**deeply** 166:21

**default** 157:10,14,16, 19 158:5,15 159:4 161:13

**Defendant** 163:13 173:2

**defendants** 143:20 144:16 145:6 150:10, 18

**defendants'** 162:13

**deferral** 42:4

**deferred** 57:13

**defined** 166:13

**definition** 36:23

**degree** 28:12

**degrees** 75:5,6

**DEITSCH-PEREZ** 10:7,12 11:9,16 14:19,22 15:2,6,19 16:6,19,24 17:7,10, 23 18:11,15 19:3,18 20:12 22:20 26:9,22 27:20 28:10 34:5,24 35:22 36:9 37:7 38:15,22,25 39:10 42:19 43:3,16,25 44:15,25 45:20 46:6, 16 48:19 50:13 52:11 53:20 59:13 60:11 62:9 64:2,11 65:15, 24 66:24 67:10,22,25 68:6,15 69:15 70:15 71:5 72:22 76:2,18 77:12,25 78:13,17,23 79:4,10 80:11 83:25 85:25 87:19 88:10 89:17 91:6 94:9 96:5, 20 97:4 98:19 100:10

101:5 103:7 106:24 111:10 113:7,16,24 114:22,25 115:7 116:5 117:21 125:8 127:22 129:7 131:10, 13 134:24 136:14 137:11 141:24 142:8 143:12 144:9 145:10, 19 150:22 152:5 155:8 157:2 158:8 160:3 161:6 164:2,12 165:16,22 170:14 172:2 175:14,24 176:6

**delivered** 139:22 147:14

**delivery** 176:9

**demand** 14:17 28:20 45:14,18 109:20 156:3,7,8 157:24

**demanded** 45:23

**denial** 173:17

**denied** 166:9 174:7, 20 175:3

**deny** 169:5,20

**denying** 167:6 174:14

**dependents** 134:12

**depending** 128:6

**depends** 114:3

**deposed** 12:20

**deposition** 8:10 9:5, 9 10:21 11:2,7 12:5 13:25 16:5,7 18:17, 21 26:15,21,23 31:20 38:17 66:19 67:15 76:21,22 78:21 94:20 109:6,9 120:15,22 127:24 150:4 175:18 176:17

**describe** 15:12 57:12 84:6 89:15,21 130:25

**describes** 13:17

**describing** 31:5 88:13 91:1

**description** 73:9,10

**detail** 31:22 32:20 125:21 164:24

**details** 21:13 26:16 85:5 99:19 143:15

**determine** 73:24 110:22

**determiner** 106:16

**devote** 62:14

**devoted** 63:4

**difference** 67:11 116:6

**differentiated** 61:3

**diminishing** 61:14

**direct** 11:10,22 65:20 105:3 151:4,8 155:19

**directly** 88:22 96:6 147:6,21 148:2 151:13 156:15 157:6

**directors** 25:21

**disclose** 56:22 57:7 60:4,8 161:7 166:12

**disclosed** 59:10 79:22 122:22 128:13 144:16 145:6 150:19 165:12 166:6 168:20 170:10 171:11

**disclosure** 71:22 139:7 145:3

**disclosures** 138:22

**discovery** 163:11 173:21

**discretion** 113:23

**discuss** 41:8

**discussed** 57:18 167:2

**discusses** 172:23

**discussing** 119:12, 14 153:23

**discussion** 11:21 49:17 78:19 83:4 84:5,11,21 85:2 108:8 115:10 167:23

**discussions** 50:9 77:21 79:6,15,21

85:3

**disruptive** 92:19,20

**distancing** 8:8

**District** 9:8

**doc-** 29:17

**document** 10:15 13:3 19:13 29:8 32:17 54:11 56:8 57:9,14 59:12 63:13 66:6,18,21 93:23 97:11 109:11 124:4 131:7,11,21 132:11 164:5 168:14,25

**documented** 87:6 88:3 147:7

**documents** 53:24 54:6 127:11 147:10, 14 163:22 169:10

**dollars** 52:9,17

**Dondero** 8:1 9:1,5 10:1,20 11:1 12:1 13:1,4 14:1 15:1 16:1 17:1 18:1 19:1,12,25 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1,3 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1, 18 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,3 57:1 58:1 59:1,20 60:1 61:1 62:1 63:1 64:1,17 65:1 66:1,18 67:1,21 68:1,22 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,6 80:1 81:1 82:1,15 83:1,18 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,20 95:1,8, 10,12 96:1 97:1,5 98:1 99:1 100:1 101:1 102:1,3 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1,

15,21 116:1,2 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1,6,18 132:1 133:1 134:1 135:1 136:1,25 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,4,8 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,20 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1,17

**Dondero's** 18:17 96:8 114:21 163:10, 14

**drafted** 46:24

**drafting** 125:16,18

**dual** 60:24

**due** 8:6 42:2 79:24 80:3,17 102:18 103:10,12 118:17 135:20 151:12 152:2

**Dugaboy** 13:18 19:17,19,22 20:2,11, 19,25 21:2,8,12,17 22:2,11,19 23:3,8,13, 17,22 24:8,13,18 25:2,14 26:2,7 27:6, 12,18 28:8 29:19,25 30:8,14,23 31:4,9,22, 25 32:2,4,7,8,12,14, 19,22,23 33:2,12,14, 18,25 35:4,8 36:3,6, 12 37:5,6,17,20 38:9, 12 39:7 40:7,13,15, 23 41:3,12,17 42:16, 24 43:14 44:11,21 45:17 47:19 49:5,19 50:11,18,20 51:6,7, 17 52:2,8 53:10,13, 17,25 54:5 56:24 57:5,8,13 58:17 60:6, 9 64:18 65:6 73:11

75:15,21,24 76:11,15
77:8,17,22 78:5 79:7,
15,21 80:22,25 81:4,
5,6,12 82:24 84:10,
14,20 137:24 138:10
139:25 144:18 145:9
146:3,13,19 148:14
149:9 167:11 170:12

**duly** 10:5

**Dustin** 153:9

— **E** —

**e-mail** 19:9 63:24
64:8 68:2,4,9,12,18
95:3 97:14,19
107:12,18 108:11,16
116:22 117:4 160:15
172:22

**e-mails** 172:14

**earlier** 12:16 27:16
51:20 59:5 60:15,16
118:15 134:4 166:17

**early** 20:21 23:5 25:3
91:12,23 110:24
111:19,25 112:5,10
157:9

**easiest** 68:7

**Eastern** 66:8

**easy** 64:10

**educated** 118:8,12

**educted** 118:9

**either/or** 69:4

**email** 172:11

**Emanuel** 10:10

**embedded** 72:8 75:9

**employee** 56:20
88:20

**employees** 54:12
55:4,16 56:15 60:24,
25 125:16 135:7,9
151:20

**employees'** 88:14

**empowered** 160:6

**encourage** 112:23

**end** 20:20 49:9 66:22,
25 67:18 94:2 96:8
124:19 154:12

**ending** 122:24 129:4

**ends** 89:3

**enter** 19:17 20:2,7,18
23:2 24:25 31:24
32:6 41:13,19

**entered** 13:18 20:5,
11,25 21:16 22:17
25:13,21 26:6 27:5,
12,18 28:8 31:3,8
33:11,24 39:8 40:5,9,
16,20 41:2 42:13,15,
23 44:11 45:16 47:8,
18 49:4,12 50:20
53:13 73:21 74:7,12,
19,25 75:24 81:3
137:24 138:9 139:24
145:8 146:3,12,18
148:14 170:11

**entering** 32:11 43:12
46:13 51:6 53:12,19
54:2,6 73:4 75:18
76:12,16 77:10,18

**entities** 28:18 30:25
36:3,14 38:13 52:22
61:2,7,18,22 62:3,18,
19 79:25 80:17,20,23
81:17,18,23 88:12
89:3

**entitled** 14:23 124:13

**entity** 35:5 40:9
60:21 81:13 156:14
157:5

**entry** 50:19 85:11
125:13

**equal** 99:12 112:9

**equity** 63:8 71:17

**error** 99:17 100:9,19
101:15 102:8 104:18
105:5,9,13 106:23

**Essentially** 92:2

**estate** 86:25 89:10,
24 90:4,7 134:6,10
148:9 167:16 170:22
172:15

**estimate** 85:16

**estimated** 99:4

**evening** 175:12

**events** 122:24
124:14,17

**everybody's** 9:17
175:22

**exact** 85:15 100:4,5
112:12

**examination** 10:18
12:23 93:23

**examined** 10:5
12:16,19

**exceeded** 74:2 75:4

**excused** 176:16

**executed** 24:11
30:13

**executive** 126:17

**exercise** 42:25 43:5
113:23

**exercised** 43:14,19

**exercising** 42:17

**exhibit** 10:16 55:21
56:2,9 59:17,19
82:10 93:18 94:23
95:3 97:12 107:10,12
116:20,22 118:24
119:3 123:4,6
130:15,17 163:9,13
173:2,9

**existed** 122:19

**existence** 109:11
138:4 144:17 145:7
146:17 148:13
165:12 168:16 169:3,
13 170:10 171:11
172:23

**existing** 38:3

**expectation** 147:7

**expenses** 104:10

**experience** 104:21

**experienced** 90:3

**expert** 12:15,18 45:8
59:6,11 65:12,21

**experts** 89:24

**explained** 143:15

**expressed** 76:7

**expressing** 76:6

**extent** 11:19 104:6,
12 122:17 169:25

**external** 58:14

— **F** —

**fact** 41:17 75:7 82:5
99:15,21 111:20
119:8 153:11 162:20

**facts** 70:5

**fair** 12:11 13:21 14:4
42:10 51:23 57:4
70:7 74:11,24 75:12,
13 101:4 110:14
113:19 125:19
127:15 130:25
148:17

**faith** 100:3

**fall** 53:8,14,22

**fallen** 52:4

**familiar** 9:16 34:15
102:20 126:10

**fastest** 64:14

**fault** 33:8

**February** 47:13
48:10,18 49:6 142:17
143:7 155:3

**Federal** 8:18

**fee** 112:9,17,20,22,23
113:3,6,13,21 114:9,
12

**feed** 116:3

**feel** 167:19

**fees** 101:9 103:24
104:7,9

**fide** 42:3,4

**figure** 68:9

**file** 101:14

**filed** 142:20

**filing** 145:18 147:20

**filings** 145:22

**final** 136:19

**Finally** 89:17

**finance** 100:7

**financial** 32:23 33:3
120:16 122:7,23
123:8 126:7 128:10,
14 129:3

**financials** 31:21
32:19 122:16 123:16
124:13

**find** 46:19 64:13
173:24

**fine** 44:7 64:12
149:21

**finish** 66:9 116:10
149:19 150:7 156:22
173:19

**firm** 63:25 67:7
125:23 127:10 128:5
176:10

**fiscal** 124:19

**five-** 63:22

**fixed** 116:3

**floor** 96:9

**focus** 120:20

**focused** 120:24

**follow** 11:24 77:4

**follow-up** 28:5

**force** 71:17

**forgive** 31:25 39:20

**forgiven** 69:11,21,22
70:12 166:19 170:21
171:15,17 174:23

**forgiveness** 13:19
32:13 33:13 51:20
81:7,8 101:9 103:24

**forgiving** 167:13

**form** 27:21 28:11
34:25 36:10 37:8
42:20 43:4,17 44:2,
16 45:2,21 46:7,17

48:20 56:12 59:14
60:12 62:10 65:16,
22,25 66:17 69:16
70:16 71:6 72:23
76:3,19 77:2,13 78:2,
9 79:11 84:2 86:2
87:20 88:11 91:7
98:20 100:11 101:6
103:8 111:11 113:8,
17,25 117:22 125:9
127:23 129:8 134:25
136:15 137:12
141:25 142:9 143:13
145:11,20 150:23
152:6 155:9 157:3
160:4 165:17 172:3

**formally** 147:3

**format** 56:16

**Fort** 92:4

**forward** 146:22

**forwarding** 97:19

**foundation** 121:20

**fraction** 24:19

**Frank** 90:16 92:12,14
108:11 126:8 151:11
158:17 159:12,14,19
160:5,22 162:14
165:13 166:7,14,21
167:7 169:25

**Friday** 10:22 11:2,8

**Friday's** 12:23

**front** 17:15 18:25
19:14 133:6 163:21

**frozen** 114:21,23

**fulfillment** 69:12,22

**full** 62:14

**fully** 103:21 104:3
160:6

**function** 111:13

**functions** 129:11
135:10

**fund** 72:5 97:25 98:5,
17,24 99:5,11,15,21
100:2,8,17 103:21
104:3 109:3

**funded** 103:4

**funding** 100:23
102:18

**funds** 83:10 129:18,
20 134:2,18 135:11

**future** 135:21

### G

**GAF** 97:22,24 100:18
102:6,18 103:21
104:4 105:12,22
106:3,21

**gave** 50:23 51:5
92:17 93:6 104:6,12
122:9 136:12 137:17
152:22 153:19
157:10,16 174:16

**gears** 85:17 129:16

**general** 50:17 128:3,
7 133:22 134:9
151:23

**generally** 14:5 28:16
53:8 56:21 83:22
92:15 110:5 111:13
112:2 119:20 120:19
142:18 143:16
144:20 148:10
151:15 170:17 171:9,
10

**give** 68:8,10,15 75:14
90:12 92:5 94:25
115:2 151:24 162:19

**give-and-take** 92:23

**glad** 16:12

**good** 8:2 94:16,17
149:13 155:24
175:12

**grant** 43:7

**granted** 44:4 63:16

**gratuitous** 26:25

**greater** 47:17

**gross** 21:18 57:17

**group** 54:15,18,21
107:19,22 108:2
110:8 117:5,18
125:25 126:6,8
166:21

**growth** 51:10

**guess** 31:7 40:4 42:6
48:23 55:11 80:4
118:12 143:16
144:20 157:13,19
171:8

### H

**half** 149:18

**hand** 9:25

**handled** 38:7

**handles** 126:9

**hang** 114:25

**happened** 44:8
48:12

**Hayley** 108:7

**haywire** 94:25

**HCMFA** 62:21 90:15,
24 91:5,14,23 92:20
93:2,13 97:22 99:10,
11,15,21 100:7,17
101:14,20 102:6,16
103:20 104:2,11,13,
16 105:8,11 106:3,
21,22 107:23 110:2,
22,24 111:8,21,24
112:4,8,17 113:2,6,
14 114:7,12 116:16
118:11 119:14,18
120:6,10,25 125:2
128:10,13,20 129:6
134:13 135:6,23
140:12,23 141:6,10,
21,22 143:19 144:7,
11

**HCMFA's** 93:14
121:19,22 122:4
128:23 129:3

**HCMFAS** 130:19

**HCMLT** 107:23

**HCRE** 14:10 62:21
81:22 85:23 86:3,5,
14,17 87:10 88:15
143:19 157:22

**head** 22:23 24:4,5
26:8 27:23 29:22
31:14 54:17,20 63:5

90:11

**heading** 124:9

**hear** 115:15,16

**heard** 157:19

**hearing** 143:2,6
145:17 146:16
158:16

**held** 9:9 35:8 41:3
72:10 73:12 111:7,8
115:10

**helpful** 89:13

**helps** 141:19

**Hendrix** 97:20
108:15 117:4,8,12

**Hendrix's** 108:15

**hidden** 104:20

**High-** 126:25

**higher** 74:9,10,15,22,
23 75:8

**Highland** 9:6 14:10
15:15 25:12 32:2
34:16 35:9,19 36:14,
17,22,24 37:18,21
38:10 39:24 40:10
41:14 46:20 51:13,25
52:12 54:10 57:25
60:20 61:5,13,16
62:6,15,21,22 63:7
70:13,18 71:6 72:25
79:18,25 80:4,17
85:24 86:8,15,18,24
87:2,5,9,15,17 88:2,
7,8,19,23 89:4,8,25
90:3,6,14 91:13,22
92:20 93:13,14
102:24 104:15,17
105:4,9,12,25 106:3,
4,22 109:2,19 110:2,
10,22,24 111:7,21,24
112:4 113:5 114:5,13
116:16 118:9,11,15
119:9,15,16,18
120:6,9,25 122:9
123:6 125:15,25
127:4,12 128:24
129:6 134:14 135:5,
11,23 137:9,18 139:2
140:14,24 141:23
142:7 151:12 152:2,3

153:6 154:6 155:5,20
156:7,13 157:7,10,
13,21 158:6,15
159:9,12,15,16 166:3
172:15

**Highland's** 33:3
41:4 55:4,16 56:15
72:9,13,15,19 73:25
74:5,14 75:3,16,17
120:15 121:5 122:7,
22 126:12 154:21
170:9

**Highland/nexpoint**
61:6

**hindsight** 50:3

**hit** 19:10

**hold** 40:2 58:2 96:4

**holder** 83:5

**holders** 39:19 43:20
71:21

**holidays** 47:25 48:12

**Honestly** 56:25

**hope** 66:23 67:6
78:14 149:16 152:14

**hour** 68:5 149:18,19

**housed** 105:25

**Human** 54:14,18,20

**hundred** 60:20
126:23 127:9

### I

**idea** 61:20 62:4
102:25

**identification** 56:5
59:22 95:6 107:15
116:24 119:5 123:11
130:20 163:17 173:6

**identified** 30:22 80:8
81:22 90:23 108:12

**identifies** 29:10

**identify** 21:10,14
22:9 23:15,20 24:10
26:4 28:6 29:23 30:6
31:11 33:22 34:9
47:17 62:19 63:3

77:22 79:7,16 80:2,
19 81:13,14 84:18
104:21 106:11
156:12 169:19
172:11,22

**II** 9:4 94:19 175:18

**illiquid** 72:14 84:24

**illiquidity** 75:13

**imagine** 141:14

**immediately** 14:18
160:23

**imminent** 73:14

**impact** 44:9

**implied** 75:9

**impossible** 42:9

**improperly** 122:18

**inability** 78:20

**inaccurately** 129:4

**inappropriate** 17:6,
12

**include** 84:15 124:17
139:6

**included** 84:9
108:11 153:24
166:20

**includes** 140:21

**including** 92:25

**incorporate** 86:19

**increase** 51:21

**incumbency** 90:23
91:4

**incurred** 28:17,20

**independent** 25:20
147:5,16,21 174:25

**indirectly** 147:4
151:13 156:15 157:6

**individual** 15:25
16:16 17:16 38:18
68:23 120:23 143:24
144:12 174:12

**individuals** 88:16

**industry** 46:20 51:12

53:4

**ineffective** 147:25

**inform** 25:17,20
105:3 138:12 151:4
162:13

**information** 15:8
49:19 50:11,18,23
51:5 56:23 60:5
75:15 123:9 127:5,13
129:25 131:3

**informed** 99:11
104:16 105:8,11
108:2 137:8,21 138:7
141:5 142:5 146:16
150:10

**informing** 141:22

**infrastructure** 135:4

**initial** 138:23

**initiatives** 51:10
63:7,10

**input** 87:3

**insist** 26:12

**instruct** 55:6 92:10
138:2 139:9,10 140:4

**instructed** 92:7
107:21 110:2,23
152:20

**instructing** 92:14

**instruction** 152:22
153:18

**instructions** 92:5,17
93:6 151:25

**insurance** 101:8,14,
18,22 102:16,20,23
103:4 112:13

**integrity** 126:19

**intended** 56:18

**intent** 46:15,18

**intentionally** 47:4

**inter** 108:3

**interaction** 126:9

**interest** 22:5 34:16,
23 35:2,5,9,18 36:8,
19 37:5 41:4 70:13

118:17 154:10
156:10

**interests** 72:9,10,13,
19 73:25 74:5,14
75:3,16

**interpretation** 44:5
100:25

**Interrogatories**
163:16 165:10 173:5

**Interrogatory**
171:23 172:12
173:16

**interrupt** 144:25

**interrupting** 145:11

**Interruption** 115:22

**interval** 49:9

**introduce** 9:12

**investment** 98:2

**investors** 98:6
103:10

**involved** 49:25 66:3
92:8 129:10,12
156:16,17 166:22

**iphone** 68:13

**irrelevant** 139:17

**issue** 70:22 77:18
92:3 93:4 169:8

**issued** 38:4 42:5
125:2 140:23

**issues** 141:16

**items** 104:13

---

## J

**Jacob** 8:3

**James** 8:1 9:1,5 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1

47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1,2 57:1 58:1
59:1,19 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1,20 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1,4 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1,14
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1,17

**January** 25:9 48:18
49:6 143:6 155:2
156:19,22 157:12,14
158:6 159:10,24
161:23 162:15

**Jernigan** 148:12,20
150:19 151:4 162:4,
14

**Jim** 118:5 149:8

**job** 77:4

**John** 17:8 26:9 38:15
66:25 67:11 68:18
76:20 80:12 82:7

96:10 114:22 132:13
164:13

**Johnson** 12:7,9

**Johnson's** 12:12,13

**Jones** 161:3

**judge** 106:15 148:12
150:19 151:4 162:4,
14

**June** 123:24 137:9
140:14

---

## K

**kind** 52:20 81:9
139:17 141:13
167:15

**Klos** 97:20 107:18

**Klos's** 108:16

**knew** 40:19,22 45:9
49:22 74:9,13 79:24
80:21 81:17,18,19,23
166:23,24 167:7

**knowing** 136:18,20
139:21

**knowledge** 12:12,13
37:22 69:25 70:4,10
109:15 127:6 140:18

**Kristin** 97:20 108:7
122:17

---

## L

**L.P.** 9:7 36:24 39:25
58:5,13 62:16 88:9
89:9 109:3 123:7

**L.p.'s** 173:3

**ladies** 96:6

**large** 71:21 72:14

**largely** 71:25

**largest** 83:5

**lasted** 85:10

**late** 120:3 130:8
164:12

**lawsuit** 29:14 35:21

**lawsuits** 14:9 29:10, 16 30:3,10,16 33:20 34:2,21 39:5 142:24 143:5,10 150:12,20

**lawyer** 160:2

**lawyers** 134:6 161:10

**leadership** 87:5 88:2

**learn** 120:5,9 121:3, 9,11,17 122:2 158:14

**learned** 109:10,25 110:4

**learning** 159:3

**leave** 67:3 97:3 115:6

**leaving** 175:22

**led** 41:8 49:18 50:9 85:10

**left** 38:2 95:12

**legal** 8:4 45:5 133:14, 18,25 134:12

**legally** 146:21

**let alone** 26:19

**letter** 57:4 60:22 127:18,21 136:20,25 138:19 141:15

**letters** 57:2 128:23 129:13 136:19 138:22 139:5,6 157:21

**liabilities** 121:19,22 122:4

**life** 15:5

**likelihood** 73:6,8 75:22

**Limited** 34:17 36:22

**liquidity** 72:13

**list** 14:24 18:22 21:13 26:10,17 28:9,24 29:5 110:8

**listed** 134:2

**listen** 50:7 78:18 148:6

**listing** 15:14

**litigation** 31:11 107:6 109:14,16 110:6,16,19 120:7,12 121:8,10,13,16,25 122:3 149:7 167:9

**litigations** 38:19

**loan** 15:16 38:9 93:13 110:4,14,17 116:17 117:10,13,24 118:15, 21 120:5,11

**loans** 21:20 28:19 38:12 129:6 158:2

**logs** 49:16

**Loigman** 10:8,9

**long** 73:12 85:4,9,10 93:24 96:16 162:23 166:17

**longer** 78:21 85:13

**looked** 13:8 27:15 50:2 164:24

**loose** 47:4

**loss** 98:17 99:4,13 103:6

**losses** 99:17

**lost** 98:24 115:2

**lot** 86:21 89:24 91:15 162:7

**lots** 170:18

**loud** 168:23

**low** 49:22 52:20

**lower** 83:8

**LPA** 169:14 175:7

**lucky** 96:6

**Lynn** 144:22

---

### M

**made** 32:13 33:13 36:12 47:11,13 48:10 49:23 51:8 61:9 78:3 84:20 102:24 109:20 110:9 114:14 122:17 147:20 148:20 149:4 153:6 154:6,12,15,22 155:6 156:7,13,24

**materially** 84:4

**math** 103:3

**Matt** 149:8

**matter** 9:5 55:11 75:6 103:2 146:15 153:11

**Mcgraner** 86:6,21,24 87:2,23

**meaning** 20:21 98:4 134:8

**means** 11:18

**meant** 131:19

**mechanisms** 167:12,14

**media** 9:3 93:20 94:2,19 150:3 175:19

**meeting** 105:21

**meetings** 106:19 130:4

**member** 71:14

**members** 117:17

**memo** 130:9,22,25 131:2 132:24 133:4 134:17 135:13 136:3

**Memorandum** 130:17

**memorialize** 160:24

**memorialized** 49:12 161:22

**memory** 26:13

**memos** 134:21,23 136:5

**mention** 102:24

**message** 66:17

**met** 45:24

**MGM** 70:22 71:14 74:6,14,16 75:11 83:4 167:2

**Michael** 77:5 95:23

**middle** 103:15

**million** 22:4 24:20,23 27:8 52:9,17,23,24 58:2 61:5 62:6 90:17

**159:10 161:4 162:4**

**major** 20:14,19,24 21:7,11

**majority** 34:16,23 35:2,4,8,18 36:8,19 37:5 39:9,18 40:7,8 41:4,18 43:20 72:3 83:6

**make** 13:15 15:10 17:12,17 29:4 46:19 65:4 67:12 92:7,10 99:11 101:3 102:16 113:23 114:8 116:5 118:19 140:9 144:8 152:20 155:20 158:21,24

**maker** 21:10 23:15, 20 26:4 29:23 31:12 32:2,8 33:18 36:3,7 37:6,17,20 79:16,18, 22 80:9 81:2 109:2

**maker/borrower** 80:14

**makers** 27:10 46:25

**makes** 119:11

**making** 26:12,24 100:18

**manage** 129:18

**management** 9:6 39:24 62:15,22 87:5, 16 88:7,9 89:9 92:25 103:24 104:7,9 109:3 123:7 127:18,21 128:22 129:13

**manager** 58:14

**managers** 135:6,8

**manner** 100:17

**Mark** 54:17

**marked** 10:15 56:5 59:22 95:5 97:11 107:14 116:24 119:5 123:11 130:19 163:17 173:6

**market** 89:5

**material** 82:17 106:4 124:18 135:20

**91**:11,13,23 92:6,11, 14 93:12 99:6,16,22 101:22 102:7,17 103:5,17 104:2 107:23 109:2,25 110:13,20,23 111:17, 21,24 112:4,10 117:9 119:10,14,16,23 125:4 129:5 137:10, 22 138:13 140:13,22 141:6,7,12 151:17

**mince** 104:5

**mind** 154:12,15 168:8,9

**mine** 96:19

**minimis** 51:25 158:19,23

**minimum** 76:5

**minimus** 51:25

**minor** 20:16

**minority** 72:4

**minute** 17:14 68:8,16 94:2,13 95:2 96:17 115:2 127:8

**minutes** 12:6,22,24 17:20 93:20 96:3 105:20 107:3,5 149:22 162:21 170:2

**mistake** 49:2 114:13

**moderately** 74:21, 23 75:8

**modest** 51:11,21

**modification** 45:6

**modified** 136:4

**moment** 38:8 58:21 125:13 162:20 174:13

**monetization** 72:12 73:13 84:23

**money** 80:25 93:2,10 99:12 101:2 104:2,14 119:18

**monies** 101:10

**month** 147:19

**months** 147:20

**Morris** 8:21 9:14
10:14,19 11:12,23
13:2,11,14 14:17,20,
25 15:4,9,11,22
16:11,22 17:2,9,21
18:2,4,7,16,24 19:5,
11,24 20:15 22:24
26:18,23 27:2 28:2,
23 34:8 35:7 36:5,15
37:16 38:21,24 39:2,
3,15 42:21,22 43:9,
21 44:6,19 45:11
46:2,11,22 48:24
50:4,6,16 52:15
53:23 55:20 56:7
59:16,24 61:8 62:13
63:23 64:6,16 65:19
66:4,16 67:5,14,20,
24 68:3,14,19,21
69:17,19 70:20 71:9
73:3 76:9,23 77:7,15
78:8,15,19 79:2,5,13
80:18 82:5,9,13,14
84:7 85:18,21 86:9
88:4 89:6,20 91:9
93:17,21 94:4,7,10,
14,22 95:7,11,16,19,
22 96:14,22 97:9
98:8,11,22 100:14
101:11 103:14
104:24 105:2 106:6,8
107:4,9,16 108:20,23
111:16 113:12,18,20
114:4,20,24 115:5,
13,25 116:7,9,12,19
117:2 118:2,24 119:7
123:3,13,17,21
124:3,7,11 125:10,11
127:25 128:8 129:15
130:14,21 131:12,16,
17 132:7,14,16
133:10 135:14,17
136:23 137:14 142:3,
11,14 143:17 144:10
145:13,24 149:15
150:6 151:2 152:9,18
155:10 157:4 158:13
160:7 161:8 162:19
163:8,19 164:4,15,17
165:7,9,19,24 170:23
172:6 173:8,12,14
175:9,13,15

**move** 37:2 38:20
50:4 104:24 106:6

**movement** 93:10

**moving** 99:8

**multiple** 61:2 63:7
83:10 138:25 153:22

**mute** 115:16,17,21

**N**

**Nancy** 39:18 40:12,
15 41:8,11,16 49:19
51:16 56:23 57:8,12
58:16 60:5,8 64:17
65:6 76:10,15 77:8,
17,21 78:4

**nature** 13:22 58:8,11

**NAV** 99:17 100:8,19
101:15 102:8 104:18
105:5,9,12 106:23

**needed** 96:11 104:3,
14 119:14

**negotiation** 83:24
84:4 85:8

**negotiations** 92:22

**net** 112:12

**Newman's** 10:11

**Nexpoint** 14:11
23:25 58:4,5,12
61:16 62:6,21 63:12
64:19 80:22 81:19
89:7,8,23 90:7 134:4,
12 135:7,24 137:8,
17,20,21 138:3,7
143:19 157:22 173:3,
21 174:5

**Nexpoint's** 138:8

**NFLP** 63:20

**nomenclature** 80:15

**normal** 156:17

**Norris** 153:9

**Northern** 9:8

**note** 14:14 21:11,15
24:7 26:5 28:6 29:24
30:7,13 32:2,8,13,20
33:13,18,23 34:10
35:15,19 36:7 37:6,
18,20,25 38:2,3,4

42:3 44:13 45:6,18,
19 46:5 47:13 48:10
91:11 96:10 108:8,
17,25 109:16,21,24
111:18 117:18
118:17 119:4,17,22,
23 137:17 154:20

**notebooks** 15:7

**notes** 13:20 14:9,15,
24 15:14 18:23 20:3,
5,23 21:7,24 22:10,
14,17 23:7,11,16,21
24:11,16 25:14,24
27:4,10,17 28:20,25
29:5,10,13,15,17
30:2,15,21 31:5,10,
12,23 32:25 33:2
34:20,22 35:20 36:2,
13 39:4,6,20 41:23
42:11 43:15,24 44:23
45:13,14 46:14,23
47:4 51:21,24 69:8,
10,20 70:12 76:11,15
77:10,18,23 79:8,16,
23,24 80:3,9,16,24
81:6,7,15 90:15
91:11,16 92:2
120:21,25 121:4,11,
15,18,21 122:3,10,22
125:2 128:14 135:21
140:23 142:25
146:23 147:8 148:8
150:12,20 151:5
152:7,17 154:10
155:23 156:3,4,8
157:11,24 158:7,24
161:13,20 166:17,18
167:14 169:8 170:20
171:14 174:23

**notice** 148:11
157:10,16

**notice-of-default**
157:21

**notices** 158:5,15

**notifying** 148:10

**noun** 70:18

**November** 9:10
154:7

**number** 9:3 23:11
64:22 66:22 94:2,19
136:13 140:19 150:3

163:23,24 166:2,8
168:11,13,22,23,24
169:19,21 171:23
172:9,13 173:9,16
174:4,7,10,15,19
175:3

**numbers** 50:3 99:8
100:4,5 102:13 104:6
158:22

**numerous** 30:18
36:2 38:12 41:25
60:24 105:17 107:2
144:21

**NXRT** 57:21,24

**O**

**object** 15:4 16:11,12,
13 17:21 27:20 28:10
34:24 36:9 37:7
42:19 43:3,16,25
44:15,25 45:20 46:6,
16 48:19 59:13 60:11
62:9 65:15,24 69:15
70:15 71:5 72:22
76:2,18 77:2,12,25
78:6,10 79:10 83:25
85:25 87:19 88:10
91:6 98:19 100:10
103:7 111:10 113:7,
16,24 117:21 125:8
127:22 129:7 134:24
136:14 137:11
141:24 142:8 143:12
145:10,19 146:7
150:22 152:5 155:8
157:2 160:3 165:16
172:2

**objecting** 78:9

**objection** 26:19,20
101:5

**objections** 142:19
163:14 173:3

**objects** 8:22

**obligation** 138:8

**obligor** 80:25

**obtain** 71:4 72:21

**obtained** 136:25

**obvious** 50:2 51:3

**occur** 73:7 124:18
159:24

**occurred** 70:2

**October** 130:18,23
133:18,23 136:11
137:3,7 138:20
139:13,22 141:15

**odd** 22:4

**office** 19:7 151:20

**officer** 87:10

**officers** 133:18

**offset** 138:14 141:12

**Okada** 87:24

**one-off** 170:19

**ongoing** 168:6

**opinion** 45:7

**order** 33:10 103:21
104:3 175:23 176:8

**ordinary** 54:9 55:13

**organization** 111:14

**original** 15:15 24:6

**originally** 46:24

**outs** 148:2

**outstanding** 28:21
38:3 119:17 137:16
138:8 140:13 155:23

**overarching** 13:21

**overpaid** 151:16

**overpayment** 154:2

**oversee** 111:4

**overstated** 141:6

**overview** 13:21

**owed** 80:25 137:9

**owing** 152:2

**owned** 72:4 97:25
155:21 157:6

**owner** 87:10

**owners** 87:22

**ownership** 83:10
88:15,18

**P**

**p.m.** 9:11 175:20
176:18

**Pachulski** 161:2

**page--** 13:11

**paid** 52:21 99:15,21,
25 101:17 102:6
104:10 110:2 112:8
113:3,6 114:12
119:9,16 153:25
154:17 158:19,24
160:18,23

**painfully** 172:15

**paint** 53:2

**paper** 117:13 173:13

**paragraph** 13:3,12,
17 14:3 39:16 47:10,
20 48:8 81:25 82:10,
17,25 83:14,18
124:24 141:19 171:6

**parenthetical** 118:4

**parsing** 87:13

**part** 18:16 28:21 30:9
43:23 46:9 65:8,13
73:17,18 83:14,16
104:13 106:4 110:5
112:6 121:7,9
122:10,16,19 145:16
148:8 166:19 167:15
170:22 171:15,18
174:24

**parte** 162:6,10

**participants** 86:5

**participated** 130:4

**parties** 8:14 23:25

**partly** 169:9

**partner** 10:11 95:24

**partnership** 34:17
36:22 125:3

**pas** 38:6

**past** 38:7

**pay** 112:17 114:8
151:25 152:12,16
174:22

**payable** 15:14
135:20

**payee** 32:3 35:19
37:18,21 80:9

**paying** 99:12

**payment** 91:20
97:22 98:3,5 100:8,
18 101:3 102:18
103:16,22 104:3
109:20 113:13,21
118:16 153:6 154:22
155:6,7,20 156:7,12

**payments** 151:12
152:10,15,21 154:5,
9,11,14 156:18,19,24
159:9,11 160:18
161:4,5,12 162:4,15,
16

**pending** 8:20 30:3,9,
16 31:10 33:19 34:2,
20 35:21

**people** 67:3 148:19,
24 153:14,24

**percent** 35:3 57:16
60:20 71:16 96:24
126:23 127:9

**perfectly** 64:12

**performance** 57:22
63:17 89:2

**performed** 106:2
134:14

**period** 47:23 122:23
124:19 129:4,14
138:19 139:13

**periods** 85:14

**person** 31:3,8 88:6
144:12 158:17
159:15

**personal** 18:18
68:12

**petition** 25:5,12,22
26:6 27:7,13 70:25
72:18

**phone** 49:16 63:24

96:15 160:12 161:17

**photograph** 64:8
66:17

**phrase** 13:25 36:19,
21 150:14

**picks** 104:22

**picture** 15:20 16:20
53:2 64:3,15 68:7

**piece** 93:4

**place** 71:20 135:13
143:7 161:18,19

**places** 105:17

**plaintiff** 39:19,20,23
40:9 41:19

**Plaintiff's** 13:5
163:15 173:4

**plan** 142:20 146:22
148:23 166:22

**platform** 87:2 90:6

**plays** 126:11

**pleading** 145:18

**pleadings** 145:22

**plot** 146:22 148:23
166:22

**pocket** 103:21

**point** 18:16 37:19
103:25 141:17 148:5
149:13 175:6

**portfolio** 70:14,21
71:3,12 72:9,20
73:25 75:3,17 82:16
87:4,25 135:6,8

**portion** 120:22
131:7,21 132:10
137:22 138:13

**portions** 72:14

**potential** 32:13
33:13

**potentially** 11:21

**practice** 8:7 134:20
135:3

**precise** 24:21

**preferred** 86:4

**premarked** 56:9

**preparation** 126:3
167:24

**prepare** 55:15 108:7

**prepared** 54:10,14
56:14 117:19

**preparing** 55:2
133:4

**prepaying** 38:2,5

**prepays** 37:25 38:7

**present** 42:7 69:13

**presented** 147:11
148:25

**president** 61:15,16
87:9 91:5 126:14
134:20 147:23

**pretty** 126:23 135:8

**previously** 76:8
117:19

**price** 83:7

**Pricewaterhouseco
opers** 123:23

**Pricewaterhouseco
opers'** 123:19

**principal** 21:14,24
22:5 24:6,16 30:7
31:13 118:17 140:22
154:9 156:10

**prior** 24:19 29:9
50:18 63:19,20 70:25
72:18,25 73:2 76:11
90:2 96:20 110:15,19
121:25 144:14 145:7
149:6 150:9,17 151:3
165:13 166:4,14
167:8 168:14,19,25
169:11 170:12

**private** 63:8

**problem** 78:8 132:20
140:10

**procedures** 8:19
103:4

**proceed** 9:18 19:6
68:3,14

**proceeding** 165:14
166:5,15 168:15
169:2,12 170:13

**process** 71:23
122:11 130:6,11

**produced** 14:18
107:6

**producing** 67:8

**product** 125:23

**production** 66:20,21
163:17 173:6

**professional** 77:4

**promise** 67:18

**promissory** 13:19
20:3,23 21:6,15
22:10,14,17 24:11
25:14 28:6 29:13,15,
17,24 30:2,7,13,15,
21 31:25 32:8 33:18,
23 34:10,13,19,21
35:15,19 36:7 37:6,
18 39:4,6 41:23
42:11 43:15,24
44:13,23 46:14
76:11,15 77:9,18,22
79:8 108:8,17,24
109:16,21,24 117:18
119:3,23 122:10,22
125:2 150:11,20
151:5 169:8

**propel** 51:10

**proper** 53:2

**properly** 122:18

**property** 41:24 42:5,
17 43:2

**proposal** 146:21
167:25

**proposals** 147:2,20
149:4 169:6

**proposed** 84:16

**proved** 147:24

**provide** 49:19 50:10,
17 53:24 86:17,24
89:8 125:21 129:25

**provided** 85:23 86:3,
7,14,21 87:11,16
88:8,22 106:21 130:9

133:25

**providing** 87:8

**provision** 83:23
84:8,15,18

**purpose** 46:12

**purposes** 60:22

**pursuant** 85:23
86:14

**put** 10:14 14:21 15:23
16:3,14 55:20 59:16
82:3 85:15 93:17
94:23 115:14 116:19
118:10 123:3 130:14
132:12 146:21 163:9

**puts** 126:21

**putting** 92:25 93:4
109:23

**PWC** 122:10 126:21
127:2 128:11

---

**Q**

**question** 11:14 20:4
32:5 33:6 35:13 50:8
52:13 53:17 69:18
72:16 77:3 78:9 80:2
81:10 86:12 88:5,18
96:23 100:13 106:17
109:23 135:19
136:13 141:20 145:2
146:8 150:16 169:5

**question's** 149:5

**questioner** 89:19

**questioning** 120:23

**questions** 10:8 14:6
15:24 16:15 17:3
20:5 28:5 50:22
53:11 68:22 76:8
78:24 88:14 106:14
132:9 138:23,24,25
139:7 140:17 143:21,
23 165:5 175:10,17

**quick** 149:14

**quickly** 132:19
165:20 173:18

**Quinn** 10:10

**quote** 39:17 47:11
97:21 108:3 117:10,
13,14 124:25 166:4,7

---

**R**

**raise** 9:24

**range** 22:6

**rattled** 138:17

**reach** 95:24 96:4
148:2 159:16,17,21

**reach-outs** 148:7,19

**reached** 159:8,15

**reaches** 148:2

**read** 64:10 83:20
132:19 168:17,23
169:4

**reading** 168:18

**ready** 116:13

**real** 86:25 89:10,24
90:3,7 112:16 134:6,
10

**reason** 62:7 75:20
77:16 150:13,21
151:6 168:2 173:17
174:14,15,19 175:2

**recall** 20:17 53:5,16
54:4,9 59:9 61:19
75:19 76:13,17
79:12,14 84:13,17
85:9 90:22 91:3,12
93:6,8 99:10 105:6
109:7,10,22,24 110:3
111:19,22,23 112:8,
11,19 113:2,4 114:5,
7,10,11 118:14 130:8
132:24 142:19,23
145:25 146:11
151:10 153:3,4,18
157:9 158:10,11
160:13,15 164:23
167:17,22

**receive** 101:20

**received** 36:13 56:20
58:17 64:18 65:7,13,
22 66:16 102:17

**recipient** 36:4

**recollection** 32:11,
18 33:10 48:2,11
49:7 61:12 63:16
92:13,16 99:4 101:21
102:6,16 103:11
112:13 114:17,18
120:13,18 121:6
133:24 137:16 143:9
151:23 152:19 158:4
164:9,18,20

**reconciliation** 101:8

**record** 8:9 9:21
10:10 15:10 16:13
17:19,25 18:5,8,12,
14 66:11,15 89:4
94:6,7,21 95:15,18
97:2 115:4,9,10,12,
24 149:24 150:5
161:15,18 162:24
163:2,3,7 175:20,23

**recording** 8:15

**records** 93:14

**Redeemer** 72:5

**refer** 19:21 48:9 78:4
143:18

**reference** 63:11

**referenced** 47:19

**referred** 14:3 72:12

**referring** 66:18
171:4

**refers** 39:24 57:20
118:7

**reflect** 97:2

**reflected** 32:23 33:3
57:8,14 59:11 64:19
105:15,19 161:22

**reflects** 153:18

**refresh** 32:18 33:10
143:9 164:18

**refreshed** 63:6

**refreshes** 164:9,20

**refuse** 84:15

**regard** 71:24 72:2
121:15 147:18

**regular** 168:5 175:25
176:2

**reinvested** 49:22

**REIT** 57:25 58:4,12,
15 63:13 64:19

**relate** 72:8,10

**related** 30:24 81:18,
23 86:25

**relating** 32:7 57:21

**relationship** 58:8,11
74:18

**relative** 51:25 52:2
158:19

**relevant** 32:20 51:12

**reliance** 126:21

**relied** 106:3 111:12

**rely** 111:3

**remained** 18:13 42:6

**remember** 13:9
21:3,4 22:4 23:18
24:2 27:23 28:14,18
49:10 52:6,24 57:10
59:2,7 65:9,18 76:4
81:20,21 84:21,23,25
85:2,3,4,12,13 91:15
103:12 113:10 120:8
146:15 152:11 153:9,
15 154:19 157:25
159:5 165:4 168:3

**remind** 171:3

**remote** 8:15

**remotely** 8:10,13
9:10

**renew** 129:21

**renewal** 129:25
130:5 136:7 138:24

**Reorganization**
142:17

**repeat** 32:4 50:21
52:13 100:13

**repeating** 78:24

**report** 125:2,7,13,17,
19,22 127:15 139:17,
21 140:12

**reported** 111:14
128:19

**reporter** 8:11 9:22,
24 18:10 94:17
149:12 175:21 176:4,
7,12

**reporting** 8:5 126:8

**reports** 126:4,8
127:6 139:18

**represent** 136:24
143:4 173:20

**representation**
127:18,21 128:23
129:13

**representative**
39:8,18 40:7 41:17

**representatives**
46:25 147:17

**representing** 170:20

**represents** 105:22

**request** 10:3,17
13:13 16:14 17:15
55:22 59:18 84:10
85:20 98:10 107:11
108:22 116:21 119:2
123:5,20 124:6,10
130:16 131:4,25
132:4,6 133:9 135:16
137:3 142:13 163:12
165:8,25 168:11
169:18,20 174:4,7,9,
10,14,18 175:3

**requests** 138:23
163:15,16 165:18
173:4,5 174:20

**required** 90:5 113:22
114:8

**resolution** 112:7

**resolve** 112:14

**Resources** 54:15,
18,21

**respect** 158:6 159:3,
9 174:11

**responded** 172:17

**response** 108:15
136:11,12 137:2,4
172:12

**responses** 163:10,
14 173:4,21

**responsibilities** 51:13

**responsibility** 80:7

**responsible** 55:2 104:17,23 105:4,9,12 106:22 113:5 125:16, 18 126:2,18 127:14 133:4

**rest** 13:24

**restate** 69:18

**restitution** 112:25

**Restoration** 72:5

**restricted** 57:20 58:17 59:11 63:12 64:18,25 65:7,13,22 71:20

**restroom** 96:13

**result** 28:19 44:12 99:17 100:8

**resume** 18:20

**reswear** 9:23

**retail** 105:22 129:18, 20 130:2,5,10 131:2 134:18,22 136:12 137:8,21 138:3,7,12 139:22 140:12 141:5, 11,22 142:6

**retained** 59:6

**review** 122:6 130:11 134:17 164:25

**reviewing** 134:22

**revisions** 81:24

**rights** 43:19

**Robert** 10:8

**role** 53:3 87:5 126:11

**rolled** 51:9

**rolling** 95:20

**room** 8:8,12 96:6,7 153:16

**rough** 103:3,10 175:25

**Rule** 8:18

**rules** 8:18,19

**running** 71:15

**rush** 176:3

**S**

**salaries** 104:10

**salary** 52:8,17 57:8 60:9,19,25 61:10,13, 17,21 62:5

**sale** 71:17 73:16

**sampling** 126:24 127:9

**satisfied** 42:6 70:7 75:23

**Sauter** 134:8

**schedule** 49:16 63:22

**screen** 10:15 56:10 82:4 95:9 97:10 114:21,23 119:22 131:15 163:9

**scroll** 124:8 131:8

**scrolling** 131:23

**seat** 95:13

**SEC** 92:4 98:2,4 99:11,25 103:12 104:17,21 105:4,8

**section** 124:13 132:9 134:3 135:15,18 171:24

**Seery** 144:22 147:3, 17,22,24 149:8 153:22 154:4 160:2 174:21

**sell** 70:13 71:2,12 72:19

**selling** 71:22

**send** 15:20 16:21 19:7,10 64:3 66:6 68:7,9 118:11

**sending** 160:15

**senior** 92:24 134:9

**sense** 118:19 119:11

**sentence** 118:4

**separate** 20:6 38:4

**series** 58:2

**serve** 133:22

**service** 88:23

**serviced** 135:11

**services** 14:10 62:23 81:19 85:23 86:4,7, 14,17,22,23 87:8,11, 16,22 88:8,15 89:8, 21 133:25 134:13,15 135:12 143:19 151:16 152:8,13,15, 21 153:7,25 154:2,8 157:22

**serving** 126:13

**set** 13:15 56:18 81:25 82:17 83:17 143:20 171:5

**sets** 82:19 100:16

**settle** 93:2

**settlement** 92:21,22 104:13 147:2 148:8 151:19 166:20,22 167:24 169:6,23 170:18

**settlements** 147:25 168:5

**seven-year** 63:22

**severity** 8:6

**share** 65:21

**shared** 53:6 133:25 134:13,15 135:12 151:16 152:8,12,15, 21 153:7,25 154:2,8

**shareholder** 112:24

**shareholder's** 71:19

**shareholders** 39:9 40:8 41:18

**shares** 58:2 71:22

**sheet** 14:14,18 27:15 72:15 121:5,19,23

**sheets** 122:4

**shift** 85:17

**shortly** 96:9

**show** 158:9 169:7

**showed** 57:4 76:10 120:3 164:15

**showing** 70:6

**shows** 100:7 101:2

**shuffling** 173:13

**sic** 9:4 94:20 175:19

**sign** 124:21 126:16 128:22

**signature** 123:19 164:10,16 173:25

**signed** 45:13 46:24 48:16,17,21 92:9,15 91:4 123:23 127:17 129:13 164:21 165:2

**significant** 72:4 86:7 151:17

**similar** 136:5 138:21

**simple** 65:4 81:9 112:16

**simply** 88:7

**sir** 28:24 56:10 80:6 95:20 98:13 106:10 116:4,13 117:6 119:8 123:15 127:3 131:24 144:2,24 145:5 155:16 162:10 163:25 164:6 171:25

**sis-** 84:9

**sister** 40:12 50:11,18 51:5 52:7,16,19 53:6, 10,17,25 54:5 57:5 73:11 75:14,21

**sit** 23:19 34:11 35:25 39:13 48:14 52:6 53:9 81:20,21 148:17 158:3 165:3 172:21

**situation** 112:7

**sixth** 39:12

**small** 99:8 104:5 158:23

**snap** 17:18

**social** 8:7

**sold** 73:19 83:5,11,12 148:4

**sole** 127:4

**solely** 15:25

**solution** 146:22

**sought** 161:11

**sound** 47:23 119:19

**sounds** 45:4

**source** 102:17 127:4, 11,12

**sources** 101:2

**space** 151:20

**speak** 8:23 11:6 12:21 72:25 115:17

**speaking** 12:3 26:19 78:10

**special** 176:3

**specific** 26:16 28:7 48:2 85:5 118:18 122:13 128:18,19 137:3 149:5 152:16 170:7

**specifically** 21:4 28:15 30:4,11 31:2 34:11 35:24 37:14 41:11 50:15 52:6 55:8 57:10 60:13 80:3 81:22 84:12 96:16 97:2 98:14 103:13 106:21 107:25 110:11 111:22 118:13 119:11 139:9,11 140:3,25 143:14 146:7 149:10 169:24 170:3 171:5,9

**specificity** 47:18 49:10 121:15 122:8 148:24

**specifics** 21:20 91:15 166:24 167:3, 7,21

**speculate** 27:24 28:4

**speculation** 118:9

**speed** 65:11

**spend** 12:3

**spending** 38:22

**spent** 62:2

**split** 61:12

**spoke** 71:16

**spoken** 8:24 10:24

**spread** 62:17,20 85:14

**spreadsheet** 97:20

**spreadsheets** 154:3

**staff** 105:24 135:10

**stamped** 56:4 59:21 95:4 107:13 116:23 119:4 123:10 130:18

**stamping** 67:3,8

**stand** 94:13

**standard** 135:3

**standards** 46:20 51:12 53:4

**standing** 155:24 176:8

**Stang** 161:2

**start** 9:3 92:3 146:6

**start-up** 89:3

**state's** 8:19

**stated** 10:9 41:25 106:21

**statement** 39:17 54:12 56:4,13,18 59:21 60:2 71:8 100:23 125:20

**statements** 32:24 33:3 55:3,15 120:16 122:7,23 123:8 128:10,15 129:3

**States** 9:7

**stay** 19:22 95:17

**stenographic** 9:20

**steps** 110:21

**stick** 78:5

**stipulate** 8:14

**stock** 57:21 58:18 59:11 63:12 64:19 65:7,13,22

**Stonehill's** 168:9

**stop** 17:22 38:24 39:2 76:25 78:15,16 115:18 132:2

**Stotz** 8:11

**strike** 50:5 104:24 106:7,13 146:6

**string** 97:14 108:12

**struck** 50:22

**stuck** 80:14

**stuff** 134:7 148:5

**Sub-** 72:24

**subadvisory** 105:23

**subject** 13:20 14:9 20:24 21:7,11,15,25 22:10,14,18 23:7,12, 16,21 24:7,12,17 25:25 26:5 27:5,11, 17 28:7,25 29:5,11, 14,16,18,24 30:2,8, 14,16,21,22 31:2,10 33:19,23,25 34:20,22 35:16,20 36:7 39:5,7 41:23 42:11 44:23 45:19 69:9,11,20 72:24 77:23 79:9,17, 23 81:3,6,8,15 83:24 84:19 137:23 138:9, 14 141:12 146:15 150:12,20 171:19

**subsequent** 13:20 21:5 42:8 43:8 44:5 45:10,19,24 47:6 69:16,23 70:6,11 72:7 73:7,17 75:23 82:20 122:24 124:14, 17 136:19 138:24,25

**subsequently** 147:22

**substance** 11:7,15, 18 132:24 165:11

**substantial** 21:5

**substantially** 74:9,

15,22 75:11

**substantive** 11:20

**sued** 90:14

**suite** 126:17

**supplemental** 123:8 131:3

**support** 83:12 97:21 134:2

**supposed** 151:18 174:23

**surface** 136:21

**surprised** 125:6 158:18

**sustained** 99:17

**Suzanne** 8:11 94:16

**swear** 8:12

**swearing** 8:16

**switch** 129:16

**sworn** 10:5

---

**T**

**table** 13:15

**takes** 68:11

**taking** 18:17,20 94:10 161:18,19

**talk** 11:17 17:18 91:10 111:17 167:20

**talked** 59:5 60:14 120:14 174:11

**talking** 33:15,17 38:13,24 39:2 64:24, 25 146:6 153:20 156:2 162:9

**tape** 96:23

**team** 54:25 55:14 56:14 153:8,10,15

**telling** 14:25 78:17 153:4 167:17

**template** 117:18,24

**ten** 24:20,23

**tendered** 154:21

**term** 15:15,16 21:19 28:19 34:15 36:23 46:4 156:2 157:11 158:2,7 161:13 166:13

**terms** 44:13,22 45:5 46:14 82:18 88:25 144:17 165:12 166:6, 12,25 170:4,7 171:12

**terrace** 92:3

**Terrestar** 98:2 112:7

**test** 26:13

**testified** 10:6 12:8 51:18,20 53:7 57:11 144:20 170:2

**testifying** 48:22

**testimony** 10:25 12:12,14 32:22 44:4 48:15 49:3 145:17 155:4

**Texas** 9:8

**text** 66:17 68:8 96:2

**texted** 95:25

**thing** 44:8 88:24 92:19 127:7 132:19

**things** 26:13 28:20, 21 38:23 47:6 83:11 153:22 162:7 166:23 172:18

**thinking** 138:18

**thinks** 11:18

**thought** 31:19 36:20, 23 87:12 159:23 160:5,24 162:2 170:3 172:18

**throw** 144:4

**ties** 127:10

**time** 9:15 12:3 29:20, 21 32:5 35:9 37:13 38:8,23 39:12 40:5, 16,19,25 42:4,13,15, 23 47:4 52:21 61:14 62:2,14,17,20 63:4 64:13 66:8,15 67:6 71:3 73:12,21 74:6, 12,19,25 75:24 76:6 78:7 83:20,21 85:4,

14,24 87:6,10 92:23 93:11,15 96:19 109:8,12 114:9 117:16,17 120:3,6,8, 11 121:18 126:13 129:11 136:18 138:19 141:17 142:6 143:11 149:22 150:5 153:16 160:20 163:7 172:17 175:6

**times** 41:25

**tired** 144:25

**title** 111:7,8 134:7

**today** 13:25 33:16 34:12 35:25 36:3 38:14 39:14 40:13 52:6 53:9 66:10 67:4 70:3 81:21 132:25 133:2 144:7 165:3 172:21

**today's** 175:18

**told** 47:7 52:25 110:15 117:8 129:2 139:12 141:11 145:25 146:11 158:22,23 162:14 167:12 171:13 174:21

**tomorrow** 67:4,13

**tonight** 67:12 176:14

**top** 22:22 24:4,5 26:8 27:23 29:21 31:14 63:5 90:11 97:18 108:14

**topic** 150:7

**topics** 38:16 41:8

**total** 102:5 103:6,16

**totals** 101:19

**track** 89:4

**track-record** 88:24

**trade** 58:3

**transaction** 90:6 108:3 110:16

**transactions** 124:18 134:6,11

**transcript** 96:15

**transfer** 91:23 92:6, 8,9,11,14 93:7,12 107:22 110:13 111:24 112:4 116:16 117:9 120:10

**transferred** 91:13 110:24 111:21 119:18 129:5

**transfers** 110:9

**transition** 151:19 153:24

**travel** 49:15

**treasurer** 90:24 111:8

**trick** 81:10 146:10

**triggered** 42:8,9

**true-up** 151:19 153:22

**trust-** 20:25

**trustee** 19:19,22 20:2,11,19 21:2,8,12, 17 22:2,11,19 23:3,8, 13,17,22 24:8,13,18 25:2,14 26:2,7 27:6, 12,18 28:9 29:19,25 30:9,15,23 31:4,9,25 32:7,12 33:12,25 39:8 40:12,15 41:3 42:25 43:6,14,18 44:11,21 45:17 47:19 49:5 50:20 51:7 53:13 73:11 75:24 78:5 79:7,15,21 81:4, 13 84:14,20 137:24 138:10 139:25 144:19 145:9 146:3, 13,19 148:14 149:9 167:11 170:12

**trustee's** 84:10

**trustees** 82:24

**Trustway** 70:22 71:24 74:22 75:8 167:2

**TSG** 8:5

**turn** 47:25 97:6 123:14

**turned** 84:24

**type** 128:6 133:4 140:16

**types** 56:19

**typically** 112:25

---

**U**

**UBS** 170:20

**ultimate** 28:19

**ultimately** 41:8 42:2 45:22 146:25

**unable** 45:24

**understand** 10:20 34:3 40:6 68:25 98:15 100:6,15 131:18 144:6 171:7

**understanding** 36:21 40:25 43:22 49:25 51:2,3 58:7,11 61:25 73:9 74:4,8,17, 21 75:10,22 83:15,17 98:16 103:19 124:16 125:22,24 126:22 127:20 128:4,7 160:9,17 161:11

**understood** 42:16, 24 43:6 74:13

**underwear** 80:14

**unenforceable** 150:13,21 151:5

**unfettered** 71:25

**unilaterally** 71:18

**United** 9:7

**units** 57:21 58:18 59:11 63:12 64:19 65:2,7,13,22

**updates** 148:22

---

**V**

**validity** 8:15

**valuation** 105:25 106:2

**variety** 62:18 80:17

**varying** 75:4,6

**vendors** 104:22 127:10

**verbal** 49:21 51:2

**verification** 126:24 127:9

**verified** 60:18

**versus** 76:7 84:22,24 102:2 118:21

**vest** 58:22

**vested** 57:16 58:19, 24 64:23

**vesting** 63:22

**vests** 58:25

**video** 8:10,15 17:25 95:19 97:6 115:24

**video-recorded** 9:4

**view** 131:7 132:10

**virtually** 28:14

**volatility** 75:12

**Volume** 9:4 94:19 175:18

**voluntary** 113:14

**vote** 112:24

---

**W**

**wait** 40:2 81:5 165:16

**wanted** 41:12,16 90:12 98:2,4 175:22 176:13

**Waterhouse** 90:16, 24 93:7 97:17 108:11 111:3 126:11 151:11, 24 152:20 153:2,5,19 160:10,16 161:16,23 162:14 165:13 166:7, 14 170:4

**Waterhouse's** 97:19

**ways** 37:12

**week** 12:16 44:18 120:3

**weeks** 136:2

**well-known** 92:18

**wider** 49:9

**wire** 110:8

**withdrawn** 21:22 22:8,15 29:14 34:14 35:16 42:21 47:9 51:15 69:9 82:22 113:18 114:6 121:20 125:10 133:16 154:13

**witnesses** 15:7

**Wonderful** 175:11

**word** 39:23 171:4

**work** 101:23,24 125:22

**working** 62:2 73:13 126:2

**works** 146:20

**world** 11:4

**worth** 58:20 92:4

**wrap** 149:16

**wrestle** 170:25

**writing** 86:10 87:22 105:15,18 106:20 153:17 160:10,11,13 161:21

**writings** 106:9

**written** 85:22 86:11, 13,20 130:9 146:21 161:15,18 163:10

**wrote** 28:24

---

**Y**

**year** 22:13,16 24:19 28:15,17 30:12 47:9, 12,14,25 48:9,11 49:8 52:18 55:10,11 56:20 57:16 105:22 106:5 113:3 118:15 142:6 154:13

**year's** 136:6

**years** 21:5 30:19 38:11 49:6,24 51:9 58:23,24,25 59:2,3,4 63:6 76:5 126:23

**years'** 63:20

**yelling** 115:18,19

**yes-or-no** 11:14

**Yup** 56:11 97:13

---

**Z**

**Ziehl** 161:3

**ZIP** 51:22 53:2

# EXHIBIT 100

Page 1

1

2          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
3               DALLAS DIVISION

4
   IN RE:
5                             CHAPTER 11
   HIGHLAND CAPITAL
6  MANAGEMENT, L.P.,          CASE NO. 19-34054-SGI11
            Debtor.
7  _____/
   HIGHLAND CAPITAL
8  MANAGEMENT, L.P.,
          Plaintiff,         ADVERSARY PROCEEDING
9       v.                   NO: 21-03000-SGI

10  HIGHLAND CAPITAL
    MANAGEMENT FUND ADVISORS,
11  L.P.; NEXPOINT ADVISORS,
    L.P.; HIGHLAND INCOME
12   FUND; NEXPOINT STRATEGIC
    OPPORTUNITIES FUND;
13   NEXPOINT CAPITAL, INC.;
    AND CLO HOLDCO, LTD.,
14           Defendants.
    _____/

15

16
          REMOTE VIDEOTAPED DEPOSITION
17
              OF
18
          NANCY DONDERO
19
        Monday, October 18, 2021
20

21

22

23

24  Reported by:
    ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25  JOB NO. 201194

Appx. 01874

Page 2

```
1
2
3
4
5        October 18, 2021
6        10:30 a.m. (Central)
7
8     Remote videotaped deposition of
9  NANCY DONDERO, pursuant to Notice Rule
10  30(b)(6) and individually, before
11  Annette Arlequin, a Certified Court
12  Reporter, a Registered Professional
13  Reporter, a Certified Realtime
14  Reporter, and a Realtime Systems
15  Administrator and a Notary Public of
16  the State of New York, New Jersey and
17  Florida.
18
19
20
21
22
23
24
25
```

Page 3

```
1
2  A P P E A R A N C E S:
3
4  PACHULSKI STANG ZIEHL & JONES
5  Attorneys for Debtor
6      150 California Street
7      San Francisco, California 94111
8  BY: JOHN MORRIS, ESQ.
9      - and -
10  PACHULSKI STANG ZIEHL & JONES
11      780 Third Avenue
12      New York, New York 10017
13  BY: HAYLEY WINOGRAD, ESQ.
14      GREGORY DEMO, ESQ.
15
16
17  STINSON
18  Attorneys for Jim Dondero, HCMS, HCRE and NexPoint
19      3102 Oak Lawn Avenue
20      Dallas, Texas 75219
21  BY: DEBORAH DEITSCH-PEREZ, ESQ.
22      MICHAEL AIGEN, ESQ.
23
24
25
```

Page 4

```
1
2  A P P E A R A N C E S(Cont'd.):
3
4  LATHAM & WATKINS
5  Attorneys for UBS Securities LLC and UBS AG London
6      1271 Avenue of the Americas
7      New York, New York  10020
8  BY: SHANNON McLAUGHLIN, ESQ.
9
10  HELLER DRAPER & HORN
11  Attorneys for Dugaboy
12      650 Poydras Street
13      New Orleans, Louisiana  70130
14  BY: DOUGLAS DRAPER, ESQ.
15
16
17  GREENBERG TRAURIG
18  Attorneys for Nancy Dondero
19      2200 Ross Avenue
20      Dallas, Texas  75201
21  BY: DANIEL ELMS, ESQ.
22
23
24
25
```

Page 5

```
1
2  A P P E A R A N C E S(Cont'd.):
3
4
5  MUNSCH HARDT KOPF & HARR
6  Attorneys for Highland Capital Management
7  Fund Advisors, L.P. and NexPoint Advisors L.P.
8      500 N. Akard Street
9      Dallas, Texas 75201
10  BY: DAVOR RUKAVINA, ESQ.
11      THOMAS BERGHMAN, ESQ.
12
13
14  ALSO PRESENT:
15
16  AARON LAWRENCE,  Clerk, Quinn Emanuel
17  LA ASIA CANTY, Paralegal from Pachulski
18  PAIGE MONTGOMERY, Litigation Trust Attorney
19  PATRICK DAUGHERTY (as noted)
20  DEBORAH NEWMAN
21  MANUEL GARCIA, Legal Videographer
22
23
24
25
```

Page 6

1
2      IT IS HEREBY STIPULATED AND
3   AGREED by and between the attorneys for
4   the respective parties herein, that
5   filing and sealing be and the same are
6   hereby waived;
7      IT IS FURTHER STIPULATED AND
8   AGREED that all objections, except as
9   to the form of the question, shall be
10   reserved to the time of the trial;
11      IT IS FURTHER STIPULATED AND
12   AGREED that the within deposition may
13   be sworn to and signed before any
14   officer authorized to administer an
15   oath, with the same force and effect as
16   if signed and sworn to before the
17   Court.
18
19         - o0o -
20
21
22
23
24
25

Page 7

1              N. Dondero
2      THE VIDEOGRAPHER:  Good morning.
3   My name is Manuel Garcia.  I'm a
4   certified legal videographer in
5   association with TSG Reporting, Inc.
6      Due to the severity of COVID-19,
7   and following the practice of social
8   distancing, I will not be in the same
9   room with the witness, but will record
10   the deposition remotely.
11      The reporter, Annette Arlequin,
12   also will not be in the same room and
13   will swear the witness remotely.
14      Do all parties stipulate to the
15   validity of this video recording and
16   remote swearing, and that it will be
17   admissible in the courtroom as if it
18   had been taken following Rule 30 of the
19   Federal Rules of Civil Procedures and
20   the State's rules where this case is
21   pending?
22      MR. MORRIS:  Yes.
23      I would ask if anybody objects,
24   to speak up.  If you don't object, then
25   we're going to go on negative notice

Page 8

1              N. Dondero
2   here.
3      (No response.)
4      MR. MORRIS: Thank you very much.
5      And just to be clear, as I
6   communicated with Debra last evening,
7   the court reporter is not currently in
8   the State of Texas.
9      And I understand that counsel for
10   all defendants in the notes litigation
11   have waived any objection to the fact
12   that the oath is being administered
13   outside of the state.
14      If anybody disagrees or objects
15   to that, please speak up now.
16      Thank you very much.
17      Okay.  You can swear the witness.
18      *      *      *
19   N A N C Y   D O N D E R O,  called as a
20   witness, having been duly sworn by a
21   Notary Public, was examined and
22   testified as follows:
23      THE WITNESS:  Yes.
24   EXAMINATION BY
25   MR. MORRIS:

Page 9

1              N. Dondero
2      Q.  Okay.  Can you please state your
3   name for the record?
4      A.  Nancy Dondero.
5      Q.  And where are you located right
6   now, Ms. Dondero?
7      A.  In the law office of Deborah
8   Deitsch-Perez.
9      Q.  Are you in Dallas?
10      A.  I am.
11      Q.  Is there anybody in the room with
12   you right now?
13      A.  Yes.
14      Q.  Who is in the room with you?
15      A.  Deborah Deitsch-Perez and Dan
16   Elms.
17      Q.  Is there anybody else in the room
18   with you right now?
19      A.  Electronically is Douglas Draper.
20      Q.  Okay.  Thank you very much.
21      Do you have a telephone with you
22   right now?
23      A.  My cellphone?
24      Q.  Yes.
25      A.  Yes.  It's in my purse.

Page 10

N. Dondero

1
2     Q.   Is it turned off?
3     A.   It is -- well, yes, um-hmm.  It's
4  on silent.
5     Q.   Okay.  Thank you very much.
6         My name is John Morris.  I'm an
7  attorney at Patchulski Stang Ziehl & Jones.
8  We represent the reorganized Highland
9  Capital Management LP, and we're here for
10  your deposition today.
11        Do you understand that?
12     A.   I do.
13     Q.   Okay.  Do you understand that
14  this deposition is being videotaped?
15     A.   Yes.
16     Q.   And do you understand that I may
17  seek to use that videotape in a court of
18  law?
19     A.   Yes.
20     Q.   Do you understand that you're not
21  allowed to communicate with anybody
22  concerning the substance of your testimony
23  until the deposition is completed?
24     A.   Yes.
25     Q.   Is there anything that would

Page 11

N. Dondero

1
2  prevent you from answering my questions
3  today?
4     A.   No.
5     Q.   Do you have any problems with
6  your memory?
7     A.   No.
8     Q.   Are you on any drugs or
9  medications that might impair your ability
10  to answer questions today?
11     A.   No.
12     Q.   Have you ever been deposed
13  before?
14     A.   Once, a number of years ago.
15     Q.   Do you recall the subject matter
16  of the testimony or the circumstances in
17  which you gave a deposition?
18     A.   Personal injury.
19     Q.   And were you a witness or were
20  you the plaintiff in that matter?
21     A.   Plaintiff.
22     Q.   Okay.  So let me just give you
23  the general ground rules so that there's --
24  so that this can be efficient.
25        This is a very difficult process

Page 12

N. Dondero

1
2  in normal times.  It's particularly
3  difficult because we're doing this
4  remotely.
5         So it is very important that you
6  allow me to finish my question before you
7  begin your answer.
8         Is that fair?
9     A.   Yes.
10     Q.   And it's very important that I
11  allow you to finish your answers before I
12  begin the next question.
13         And if I fail to do that, will
14  you let me know?
15     A.   I will.
16     Q.   Okay.  If there is anything that
17  I ask you that you don't understand, will
18  you let me know that?
19     A.   Yes.
20     Q.   Okay.  From time to time, we're
21  going to put some documents on the screen.
22  It's not a -- you know, it's not intended
23  to be a test.
24         If you see a document on the
25  screen and you think that you need to see a

Page 13

N. Dondero

1
2  different portion of the document to put
3  what I'm asking you about in context, will
4  you let me know that?
5     A.   Yes.
6     Q.   Okay.  I sent down to your lawyer
7  last week 29 hard copies of certain
8  documents.
9         Do you have those handy?
10     A.   The big binder?
11     Q.   Yes.
12     A.   Yes.
13     Q.   Okay.  All right.  We may refer
14  to those --
15         MR. RUKAVINA:  John, hold up for
16  a second.  This is the Davor Rukavina.
17  I'm one of the attorneys defending two
18  of the defendants.  I just -- we
19  haven't taken appearances, John.  I
20  just want to make sure that the record
21  is clear that Deborah will be
22  objecting, Ms. Deitsch-Perez will be
23  objecting for me so that I don't have
24  you to object.  In other words, when
25  she objects, consider it an objection

Page 14

N. Dondero

1
2  on behalf of my clients NexPoint and
3  HCM Financial Advisors.
4       Is that acceptable, John?
5       MR. MORRIS:  Yes.
6       MR. RUKAVINA:  Thank you.  Then
7  there is no need for me to speak.
8       MR. MORRIS:  Okay.  We'll miss
9  you.
10 BY MR. MORRIS:
11      Q.   If you need a break at any time,
12 will you let me know that?
13      A.   Yes.
14      Q.   Okay.  It's very important that
15 all of your responses to my questions be
16 verbal so that the court reporter can take
17 it down, okay?
18      A.   Okay.
19      Q.   And you do understand that the
20 court reporter is going to record and
21 transcribe every word that you and I say
22 today, okay?
23      A.   Yes.
24      Q.   Okay.  From time to time, a
25 lawyer might object to one of my questions.

Page 15

N. Dondero

1
2  That gives me the opportunity to think
3  about whether or not the answer to the
4  question would be admissible if I didn't
5  correct it.
6       I may ask you to just answer the
7  question because I don't think the
8  objection is going to be sustained.  Just
9  let the lawyers do their thing.  And unless
10 your lawyer directs you not to answer a
11 question, I would ask that you answer every
12 question that I ask, okay?
13      A.   Yes.
14      Q.   Thank you.
15      That's where you need to give the
16 verbal answer.
17      Just to go through a couple of
18 definitions so that I don't have to say
19 full names on certain things throughout the
20 day.
21      If I use the word "Dugaboy," will
22 you understand that I'm referring to The
23 Dugaboy Investment Trust?
24      A.   Yes.
25      Q.   If I use the word "Highland,"

Page 16

N. Dondero

1
2  will you understand that I'm referring only
3  to the entity that was known as Highland
4  Capital Management LP, both before the
5  bankruptcy filing and after the bankruptcy
6  filing?
7       A.   Okay.
8       Q.   If I use the phrase "LP
9  agreement" – withdrawn.
10      Are you familiar with the fourth
11 amended and restated limited partnership
12 agreement of Highland Capital Management
13 LP?
14      A.   Yes.
15      Q.   Okay.  And if I refer to that
16 document as the "LP agreement," will you
17 understand what I'm referring to?
18      A.   Yes.
19      Q.   Do you understand that you're
20 here today both in your individual capacity
21 and in your capacity as the trustee or the
22 30 – what's called the 30(b)(6)
23 representative for Dugaboy?
24      A.   Yes.
25      Q.   And have you done anything to

Page 17

N. Dondero

1
2  prepare for today's deposition?
3       A.   Yes.
4       Q.   Can you tell me what you did to
5  prepare for today's deposition?
6       A.   I met with my attorney.  And I
7  reviewed your big binder.
8       Q.   When did you meet with your
9  attorneys?
10      A.   Yesterday.
11      Q.   Is that the only time that you
12 conferred with your attorneys in
13 preparation for today's deposition?
14      A.   In person, yes.
15      Q.   Okay.  And how long did you meet
16 in person yesterday?
17      A.   Four hours, four and a half
18 hours.
19      Q.   And where did you meet?
20      A.   At Deborah's office.
21      Q.   And was anybody present there
22 other than your attorneys?
23      A.   No.
24      Q.   Was anybody on speakerphone or
25 otherwise communicating during the meeting

Appx. 01878

Page 18

```
1                N. Dondero
2    that was not one of your attorneys?
3        A.   No.
4        Q.   I think you mentioned, or you may
5    have implied, that you communicated with
6    your attorneys in preparation for today's
7    deposition but it wasn't in person.
8            Do I have that right?
9        A.   Correct.
10       Q.   Okay.  Did you speak with them on
11   the phone?
12       A.   Zoom meeting.
13       Q.   And how many Zoom meetings did
14   you have in preparation for today's
15   deposition?
16       A.   Three.
17       Q.   Okay.  And can you tell me when
18   those three Zoom meetings occurred?
19       A.   Wednesday, Thursday, and Friday.
20       Q.   And can you tell me how long each
21   of those meetings took place, each of those
22   Zoom meetings took place?
23       A.   Approximately an hour.
24       Q.   Did anybody other than your
25   attorneys participate in any of those three
```

Page 19

```
1                N. Dondero
2    Zoom meetings?
3        A.   No.
4        Q.   Did you review any documents in
5    preparation for today's deposition other
6    than the documents that I provided?
7        A.   No.
8            MS. DEITSCH-PEREZ:  To be fair, I
9        think we did give her the Dugaboy
10       notice.  I don't remember if it's in
11       your binder.
12           MR. MORRIS:  Deborah, are you
13       referring to the 30(b)(6) notice?
14           MS. DEITSCH-PEREZ:  Yes.
15           MR. MORRIS:  I appreciate that.
16       It was not in the binder.
17   BY MR. MORRIS:
18       Q.   Other than the 30(b)(6) notice
19   that was in the binder and the 29 documents
20   that I provided to you, did you review
21   anything else, Ms. Dondero, in preparation
22   for today's deposition?
23       A.   Not that I'm aware of.
24       Q.   Was your brother present or did
25   your brother participate in any of the four
```

Page 20

```
1                N. Dondero
2    preparation meetings that you described?
3        A.   No.
4        Q.   Since the beginning of the year,
5    since January 1st, 2021, have you
6    communicated with your brother at any time
7    about the promissory notes that are the
8    subject of this litigation?
9        A.   Not that I recall.
10       Q.   You don't recall ever speaking to
11   your brother in 2021 about the promissory
12   notes that are the subject of the
13   litigation.
14           Do I have that right?
15       A.   That's correct.  I do not recall.
16       Q.   Do you recall if you had any
17   conversations with your brother at any time
18   in 2021 about any of the defenses that he
19   is asserting in the litigation?
20       A.   What do you -- can you be more
21   specific?
22       Q.   Are you aware that your brother
23   is a defendant in the lawsuits in which --
24   withdrawn.
25           Are you aware that you are a
```

Page 21

```
1                N. Dondero
2    defendant in certain lawsuits?
3        A.   Yes.
4        Q.   Are you aware that your brother
5    is also a defendant in certain lawsuits?
6        A.   Yes.
7        Q.   Are you aware that your brother
8    has asserted certain defenses to the claims
9    that are being asserted against him in
10   those lawsuits?
11       A.   Yes.
12       Q.   Did you ever discuss with your
13   brother at any time in 2021 any aspect of
14   the defenses that he is asserting in the
15   lawsuits?
16       A.   No.
17       Q.   Did you discuss with your brother
18   at any time in 2021 who would represent you
19   in connection with the lawsuits?
20       A.   No, I don't believe so.
21       Q.   Did you communicate with your --
22   and when I use the word "communication," I
23   want to be clear, I mean any form of
24   communication; either a meeting in public,
25   on the telephone, by email or text.
```

Page 22

N. Dondero

1
2     Do you understand that?
3     A.   Yes.
4     Q.   Okay.  Did you -- and did you
5  understand that when I asked the last few
6  questions about your communications with
7  your brother?
8     A.   Yes, sir.
9     Q.   Okay.  In 2021, had you
10  communicated with your brother at any time
11  about who would represent Dugaboy?
12     A.   Not that I remember.
13     Q.   You're the trustee of Dugaboy.
14        Do I have that right?
15     A.   Yes.
16     Q.   Okay.  And Mr. Draper represents
17  Dugaboy in Highland's bankruptcy case; is
18  that right?
19     A.   Yes, sir.
20     Q.   Your brother and people working
21  for him identified and selected Mr. Draper
22  to serve as Dugaboy's counsel, correct?
23        MS. DEITSCH-PEREZ:  Object to the
24     form.
25     A.   I'm sorry.  Can you ask that

Page 23

N. Dondero

1
2  again?
3     Q.   Sure.
4        Your brother -- you didn't select
5  Mr. Draper to represent Dugaboy; is that
6  right?
7        MS. DEITSCH-PEREZ:  Object to the
8     form.
9     A.   I believe he was referred.
10     Q.   And who was he referred to?
11     A.   Me.
12     Q.   Who referred Mr. Draper to you?
13     A.   I do not remember.
14     Q.   It's your testimony that
15  Mr. Draper was referred to you, and you
16  decided to retain Mr. Draper?
17     A.   I don't -- I don't know.
18     Q.   Do you know who decided to retain
19  Mr. Draper?
20     A.   I do not.
21     Q.   Do you know who identified
22  Mr. Draper as a possible attorney for
23  Dugaboy?
24     A.   I do not know.
25     Q.   Do you know when Mr. Draper was

Page 24

N. Dondero

1
2  retained?
3     A.   No.
4     Q.   Do you recall when you first
5  spoke to Mr. Draper -- withdrawn.
6        Do you recall when you first
7  communicated with Mr. Draper?
8     A.   A couple of months ago.
9     Q.   Would it have been before or
10  after July 1st, 2021?
11     A.   I don't know.
12     Q.   It might have been before; it
13  might have been after.
14        Do I have that right?
15     A.   Correct.
16     Q.   Can you identify any matter that
17  Mr. Draper has handled in the Highland
18  bankruptcy other than his representation of
19  Dugaboy in these notes litigations?
20     A.   I would have to look.  I don't
21  know offhand.
22        MS. DEITSCH-PEREZ:  Yeah, John, I
23     don't -- this isn't a topic on the
24     Dugaboy 30(b)(6).  If you need her to
25     go back and check the engagement -- I

Page 25

N. Dondero

1
2     mean, it's not something that I believe
3     she's been prepared on.  And so I don't
4     think it's fair to have a memory test
5     on the dates of these things.
6        MR. MORRIS:  Okay.  I appreciate
7     that, Deborah.  I'm asking -- so let's
8     clarify and say this was not a 30(b)(6)
9     topic.  It's not something that she
10     should have prepared for.  But I -- she
11     is here in her individual capacity, and
12     I'll stipulate that these particular
13     questions are in her individual
14     capacity.
15        MS. DEITSCH-PEREZ:  Well, but in
16     her individual capacity, it's not the
17     subject of the notes litigation.  And
18     then I would object that it's really
19     beyond the scope.
20        MR. MORRIS:  Okay.  There is no
21     scope because she's here in her
22     individual capacity.  But the objection
23     is noted.  Thank you very much.
24        MS. DEITSCH-PEREZ:  Thank you.
25  BY MR. MORRIS:

Page 26

N. Dondero

1         N. Dondero
2   Q.  Did you ever consider hiring an
3  attorney for Dugaboy other than Mr. Draper?
4   A.  No.
5   Q.  Did you ever spend any time
6  trying to identify an attorney who would
7  represent Dugaboy?
8   A.  No.
9   Q.  The Stinson firm represents you
10  personally in this litigation; is that
11  right?
12   A.  That's incorrect.
13   Q.  Who -- do you know the name of
14  Ms. Deitsch-Perez's law firm?
15   A.  Her law firm is Stinson.
16   Q.  And does that law firm represent
17  you in your individual capacity?
18   A.  Okay.
19   Q.  That's okay.
20   A.  She represents -- okay.  Dan is
21  here representing me personally.
22   Q.  Okay.  And Dan is with the
23  Stinson firm, correct?
24   A.  That's incorrect.
25   Q.  What firm --

Page 27

1         N. Dondero
2   A.  Dan is with Greenberg Traurig.
3   Q.  Ah.  And I appreciate that.
4   A.  Sure.
5   Q.  Is that Dan Elms?
6   A.  Correct.
7   Q.  When did you retain Mr. Elms?
8   A.  Mid to late summer.
9   Q.  How did you identify Mr. Elms as
10  your counsel?
11   A.  He was referred by Deborah.
12   Q.  And Deborah is Deborah
13  Deitsch-Perez, counsel for certain other
14  defendants in this lawsuit; is that right?
15   A.  Correct.
16   Q.  Okay.  Did you consider hiring
17  anybody to represent you in this litigation
18  other than Mr. Elms?
19   A.  No.  I trusted Deborah's
20  referral.
21   Q.  Had you worked with Deborah
22  before she referred Mr. Elms to you?
23   A.  On this matter?  Yes.
24   Q.  On any other matters?
25   A.  No.

Page 28

1         N. Dondero
2   Q.  When did you first communicate
3  with Ms. Deitsch-Perez?
4   A.  Prior to this deposition being
5  scheduled in June.
6   Q.  Was she your counsel at the time?
7   A.  Yes.
8   Q.  When did you retain her?
9   A.  To the best of my recollection,
10  it had to be late April or May of this
11  year.
12   Q.  So Ms. Deitsch-Perez was
13  representing you and your brother at the
14  same time?  Do I have that right?
15   A.  Yes.
16   Q.  Do you have any agreements of any
17  kind with your brother concerning these
18  lawsuits?
19      Withdrawn.  That wasn't a good
20  question.
21      Do you have any agreements or
22  understandings with your brother concerning
23  the defense of these lawsuits?
24   A.  I'm sorry.  I don't understand
25  the question.

Page 29

1         N. Dondero
2   Q.  Have you heard the word
3  "indemnification" before or "indemnity"?
4   A.  Yes.
5   Q.  Okay.  Do you have an
6  understanding of what that means?
7   A.  Generally.
8   Q.  What's your general understanding
9  of the term "indemnity"?
10   A.  That one forgives another
11  person's error.
12   Q.  Okay.  I'm going to try and give
13  you a little bit of a different definition
14  and see if you understand it.
15      Did your brother ever offer to
16  satisfy and pay any judgment that might be
17  entered against you in connection with
18  these litigations?
19   A.  No.
20   Q.  Do you have any agreement of any
21  kind or any understanding that he would be
22  responsible for the outcome of these
23  lawsuits?
24   A.  Only what is written in the trust
25  agreement.

Page 30

N. Dondero

1
2    Q.  Do you know whether the trust
3  agreement protects you in your individual
4  capacity as opposed to your capacity as the
5  trustee of the Dugaboy trust?
6         MS. DEITSCH-PEREZ:  Object to the
7    form.
8    A.  I'm sorry.  Can you reask that
9  question, Mr. Morris?
10   Q.  Sure.
11        Do you know whether the trust
12  agreement indemnifies you in your
13  individual capacity, or is it only in your
14  capacity as the trustee of the Dugaboy
15  trust?
16        MS. DEITSCH-PEREZ:  Object to the
17    form.
18    A.  That's a legal question I don't
19  feel comfortable answering.
20   Q.  All right.  I appreciate that it
21  may have legal implications, but I just
22  want to know what is in your head as a
23  factual matter.
24        Is it your personal
25  understanding, whether it's right or wrong,

Page 31

N. Dondero

1
2  that you are indemnified in your personal
3  capacity under the trust, under the Dugaboy
4  trust?
5         MS. DEITSCH-PEREZ:  Object to the
6    form.
7    A.  I would have to think about that.
8    Q.  Okay.  Did your brother ever
9  offer to pay any costs and expenses that
10  you incur in your personal capacity in
11  connection with this lawsuit?
12    A.  I don't understand.
13    Q.  Okay.  So you're a defendant in
14  your individual capacity in four different
15  lawsuits.
16        Do you understand that?
17    A.  Yes.
18    Q.  And Dugaboy is also a defendant
19  in the same lawsuits, right?
20    A.  Yes.
21    Q.  Okay.  So I'm asking you whether
22  your brother ever offered to pay any costs
23  or expenses that you incur in your
24  individual capacity in connection with
25  these lawsuits?

Page 32

N. Dondero

1
2    A.  No.
3    Q.  Okay.  Greenberg Traurig only
4  represents you in your individual capacity.
5        Do I have that right?
6    A.  Yes.
7    Q.  Okay.  Do you have any agreement
8  with anybody as to who would pay the
9  invoices rendered by Greenberg Traurig?
10    A.  Yes.
11    Q.  And what agreement is that?
12    A.  That Dugaboy will pay Greenberg
13  Traurig's expenses, bills.
14    Q.  Okay.  So pursuant to that
15  agreement, you won't have to pay any legal
16  expenses associated with the defense of
17  these lawsuits in your individual capacity.
18        Do I have that right?
19    A.  Yes, sir.
20    Q.  Okay.  Let's just get some
21  background here.
22        Are you currently employed,
23  ma'am?
24    A.  I am.
25    Q.  By whom?

Page 33

N. Dondero

1
2    A.  Crescent Research Services.
3    Q.  Do you have a direct or indirect
4  ownership in that entity?
5    A.  I do.
6    Q.  And what is the nature of your
7  interest?
8    A.  I own the company.
9    Q.  100 percent; is that fair?
10    A.  Yes.
11    Q.  Okay.  And what is the nature of
12  the business of Crescent Research?
13    A.  It's an investigative firm.
14    Q.  And do you oversee the day-to-day
15  operations of Crescent Research?
16    A.  I do.
17    Q.  And how many employees does
18  Crescent Research have?
19    A.  I have an outside contractor at
20  certain times when the workload demands it.
21  Otherwise, it is just me.
22    Q.  Okay.  And how long have you
23  owned and operated Crescent Research?
24    A.  Since 1997.
25    Q.  Have you owned and operated

Page 34

N. Dondero

1
2 Crescent Research on a continuous basis
3 since 1997 until today?
4     A.   Correct.
5     Q.   Have you had any other employment
6 since 1997 other than the work that you do
7 for Crescent Research?
8     A.   No.
9     Q.   Did you obtain a college degree?
10     A.   I did.
11     Q.   Where did you attend college?
12     A.   Penn State.
13     Q.   And you graduated from Penn
14 State?
15     A.   Correct.
16     Q.   And when was that?
17     A.   1987.
18     Q.   What was your degree in?
19     A.   Hotel restaurant management.
20     Q.   Was it a BA or BS?
21     A.   I believe it's a BS.
22     Q.   Okay.  Do you have any
23 postgraduate degrees?
24     A.   No.
25     Q.   Do you hold any licenses of any

Page 35

N. Dondero

1
2 kind other than your driver's license?
3     A.   I do.
4     Q.   Can you describe for me every
5 license that you hold other than your
6 driver's license?
7     A.   I'm a real estate agent.  I am
8 notary.  I have several professional
9 licenses.  Asset recovery specialist.
10 Those are off the top of my head that I
11 remember.
12     Q.   What is an asset recovery
13 specialist license?
14     A.   It's licensed through -- I don't
15 remember the organization.  You have to --
16 I'm not sure how to answer that,
17 Mr. Morris.
18     Q.   Can you tell me what asset
19 recovery is generally in the context of
20 your license?
21     A.   Certainly.
22          It's finding assets for companies
23 that have gone bankrupt.
24     Q.   So do you typically get hired by
25 an estate fiduciary, a bankruptcy estate

Page 36

N. Dondero

1
2 fiduciary?
3     A.   I haven't done asset recovery in
4 a number of years.
5     Q.   Okay.  As opposed to licenses, do
6 you have any certifications of any kind?
7     A.   Not that I recall.
8     Q.   Can you tell me generally what
9 you did professionally between the time you
10 graduated from Penn State in 1987 and the
11 time you formed and began working for
12 Crescent Research?
13     A.   Immediately out of college, I
14 worked for a company called Royal Schutt.
15 Is an investigative firm.  I built up their
16 background division.  The company closed.
17 I took the background division and opened
18 up a company called Info-Back Services.  I
19 ran that for a number of years in New
20 Jersey.
21          When I moved to Florida, I
22 transferred that company and it became
23 Crescent Research Services.
24          We predominately do preemployment
25 background screening, tenant research, and

Page 37

N. Dondero

1
2 I do a lot of trial prep for various
3 attorneys.
4     Q.   All right.  I think you mentioned
5 three things.  The first was preemployment
6 background.
7          Do I have that right?
8     A.   Yes.
9     Q.   And can you just describe
10 generally what preemployment background
11 pertains to?
12     A.   When people are applying for a
13 job, I do the screening on their
14 application prior to them being hired.
15     Q.   Okay.  And what was the second
16 piece?
17     A.   I do tenant screening as well,
18 which is the equivalent for people renting
19 properties.
20          And the third component would be
21 trial prep.
22     Q.   And what about trial prep?  What
23 does that mean?  Can you help me to
24 understand what investigative services you
25 provide in the area of trial prep?

Page 38

N. Dondero

1
2    A.   Certainly.
3        I work for private attorneys.  I
4    worked for the public defender's office.
5    I've worked to capital murder cases on
6    down.  I look for discrepancies in
7    statements.  I find witnesses, take
8    statements and so forth.  I help the lawyer
9    prepare for trial.
10       Q.   Okay.  You're familiar with a
11   company, the company that we identified
12   earlier, called Highland Capital Management
13   LP?
14       Do I have that right?
15       A.   Yes.
16       Q.   Oh, by the way, did you ever hear
17   of a person named James P. Seery, Jr.?
18       A.   In regards to this case, yes.
19       Q.   Did you ever investigate
20   Mr. Seery?
21       A.   No.
22       Q.   Did you ever investigate any of
23   the independent directors who were
24   appointed at Strand Advisors?
25       A.   Can you tell me who they are?

Page 39

N. Dondero

1
2    Q.   Russell Nelms or John Dubel?
3    A.   No.
4    Q.   Have you undertaken any
5    investigation of any current or former
6    employee of Highland since October 19th,
7    2019?
8    A.   No.
9    Q.   Are you aware that Highland is
10   the company that your brother founded with
11   Mark Okada in the 1990s?
12   A.   Yes.
13   Q.   And you're aware that Highland
14   filed for bankruptcy, correct?
15   A.   Yes.
16   Q.   Do you know when that occurred?
17   A.   October of '19, I believe.
18   Q.   Okay.  I'll tell you it is
19   October 19th, 2019.  And if it's okay with
20   you, I'd like to refer to October 19th,
21   2019, as the petition date.
22       Is that okay?
23   A.   Certainly.
24   Q.   Okay.  When did you find out that
25   Highland filed for bankruptcy?

Page 40

N. Dondero

1
2    A.   It was either the day after --
3    when it appeared in the Dallas Morning
4    News.
5    Q.   So you didn't have any advanced
6    notice that your brother was going to file
7    Highland for bankruptcy; is that right?
8    A.   I did not.
9    Q.   Did you speak to your brother
10   after learning that Highland filed for
11   bankruptcy?
12   A.   I would imagine I called him,
13   sure.
14   Q.   Do you have any recollection of
15   what was said in the phone call that you
16   imagine occurred?
17   A.   No.
18   Q.   Okay.  Do you directly or
19   indirectly own any economic interest in
20   Highland today?
21   A.   No.
22   Q.   Do you understand that if I use
23   the phrase "directly or indirectly," I'm
24   asking whether you own it in your personal
25   name or through a company that you might

Page 41

N. Dondero

1
2    own, such as Crescent Research?
3    A.   Okay.
4    Q.   Do you understand the phrase
5    "directly or indirectly"?
6    A.   No.
7        Can you elaborate, please?
8    Q.   Sure.
9        A direct interest would be an
10   interest that you hold in your own name, in
11   the name of Nancy Dondero.
12       Do you understand that?
13   A.   Okay.
14   Q.   And an indirect interest is an
15   interest that you own through some other
16   vehicle, through some other entity in which
17   you also have an ownership interest.
18       Do you understand that?
19   A.   Okay.
20   Q.   Okay.  So --
21   A.   Yes.  But are you referring to --
22   Q.   Go ahead.
23   A.   I'm just not clear.
24       Do you mean like Highland funds
25   or stock?

Page 42

```
1              N. Dondero
2      Q.  I'm only talking about Highland
3   Capital Management LP.
4      A.  No, I have no interest.
5      Q.  Have you ever directly or
6   indirectly owned any limited partnership
7   interests in Highland?
8      A.  No.
9      Q.  Have you ever directly or
10  indirectly owned any interest of any kind
11  in Highland?
12     A.  No.
13     Q.  Do you directly or indirectly
14  have any claims against Highland that you
15  know of?
16         MS. DEITSCH-PEREZ:  And, again,
17     you are still talking about Nancy
18     Dondero?
19         MR. MORRIS:  Yes, I am.  Thank
20     you.
21     A.  No, sir.
22     Q.  Did you have an understanding of
23  the nature of Highland's business as of the
24  petition date?
25     A.  Generally.
```

Page 43

```
1              N. Dondero
2      Q.  And what did you understand the
3   nature of Highland's business to be as of
4   the petition date?
5      A.  A hedge fund.
6      Q.  Do you have any understanding of
7   what a hedge fund is?
8      A.  Not really.
9      Q.  I appreciate that.
10         By the way, do you know if
11  Crescent Research has any claims against
12  Highland?
13     A.  That's a very good question.
14  There may be -- I think I am creditor for a
15  very little bit of money, but I'm not
16  positive on that, if that was settled.
17     Q.  Do you recall filing any claim
18  against Highland on behalf of Crescent
19  Research?
20     A.  I can't say definitely one way or
21  the other, but...
22     Q.  Okay.  It's a matter of record.
23  I don't mean to test your memory.  It's
24  okay.
25         So other than your understanding
```

Page 44

```
1              N. Dondero
2   that Highland was a hedge fund, do you have
3   any understanding or did you have any
4   understanding as of the petition date
5   regarding the nature of Highland's
6   business?
7      A.  Since the petition date?
8      Q.  As of the petition date.
9      A.  No.
10     Q.  Do you have any -- I apologize.
11     A.  I know obviously it's a financial
12  company, and it has funds and so forth.
13     Q.  Have you learned anything about
14  the nature of Highland's business since the
15  petition date?  Anything additional?
16     A.  No.
17     Q.  Okay.  Do you have an
18  understanding of the industry that Highland
19  operates in or that Highland operated in
20  prior to the petition date?
21     A.  Sure.  Yes.
22     Q.  What industry did you understand
23  Highland to be operating in prior to the
24  petition date?
25     A.  The financial industry.
```

Page 45

```
1              N. Dondero
2      Q.  Were you ever employed by
3   Highland at any time?
4      A.  No.
5      Q.  Did you ever serve as an officer
6   or director of Highland at any time?
7      A.  No.
8      Q.  Have you ever heard of an entity
9   called Strand Advisors Inc.?
10     A.  Yes.
11     Q.  Can we refer to that entity as
12  "Strand"?
13     A.  Yes, sir.
14     Q.  Do you know if Strand has any
15  relationship to Highland?
16     A.  General partner.
17     Q.  Do you recall when you learned
18  that Strand was Highland's general partner?
19     A.  A number of years ago, I believe.
20     Q.  Do you recall how you learned
21  that Strand was Highland's general partner?
22     A.  I do not.
23     Q.  Do you recall if you read it or
24  if somebody told that to you?
25     A.  I do not recall.
```

Page 46

N. Dondero

1
2     Q.   Do you recall the circumstances
3  under which you learned that Strand was
4  Highland's general partner?
5     A.   No, sir.
6     Q.   Have you done anything to try to
7  verify whether Strand was in fact
8  Highland's general partner?
9     A.   No.
10    Q.   Have you ever been employed by
11 Strand?
12    MS. DEITSCH-PEREZ:  Object to the
13    form.
14 BY MR. MORRIS:
15    Q.   You can answer.  That's one of
16 those situations your lawyer can object to
17 preserve the question.  I think the
18 question is fine, so you can answer the
19 question.
20    MS. DEITSCH-PEREZ:  Do you mean
21    technically like hired and worked as a
22    W-2 employee?
23    MR. MORRIS:  Yes.
24    A.   Okay.  And that's a no, a W-2
25 employee.

Page 47

N. Dondero

1
2     Q.   Okay.  Have you ever served as an
3  officer or director of Strand?
4     A.   No, sir.
5     Q.   Have you ever been employed by
6  any entity in which you believed your
7  brother had a direct or indirect ownership
8  interest?
9     A.   No, sir.
10    Q.   Have you ever served as an
11 officer or director for any entity in which
12 you believed your brother had a direct or
13 indirect ownership interest?
14    A.   No, sir.
15    Q.   Has Crescent Research ever
16 provided services to Highland?
17    A.   Yes.
18    Q.   When did Crescent Research first
19 provide services to Highland?
20    A.   It's been a number of years.  The
21 actual beginning, I don't know.
22    Q.   And did you, in your capacity as
23 the owner of Crescent Research, run
24 individualized background checks on
25 prospective employees of Highland?

Page 48

N. Dondero

1
2     A.   Yes.
3     Q.   Okay.  Did Crescent Research
4  provide any services for Highland other
5  than that?
6     A.   No, not that I'm aware of.
7     Q.   Okay.  Have you ever been
8  employed in the financial services
9  industry?
10    A.   No, sir.
11    Q.   Other than as it may relate to
12 this case, do you have any experience
13 making decisions in the area of executive
14 compensation?
15    A.   No.
16    Q.   Do you hold yourself out as an
17 expert in the area of executive
18 compensation?
19    A.   No.
20    Q.   Have you ever taken any classes
21 or courses concerning executive
22 compensation?
23    A.   No.
24    Q.   Have you ever been compensated
25 for services rendered by you in the area of

Page 49

N. Dondero

1
2  executive compensation?
3     A.   No.
4     Q.   Have you ever conferred with
5  anybody who you believed to be an expert in
6  the area of executive compensation?
7     A.   No, sir.
8     Q.   Have you ever prepared any
9  analysis of any kind concerning executive
10 compensation?
11    A.   No, sir.
12    Q.   Have you ever asked anyone to
13 prepare any analysis of any kind in the
14 area of executive compensation?
15    A.   No.
16    Q.   Has anyone ever prepared an
17 analysis for you in the area of executive
18 compensation?
19    A.   I'm sorry, sir.  Can you repeat
20 that question?
21    Q.   Sure.
22       Did anybody ever prepare any
23 analysis for you that covered the topic --
24 any topic concerning executive
25 compensation?

Page 50

N. Dondero

1
2    A.  No.
3    Q.  Do you have any knowledge as to
4  how executives are compensated in the
5  financial industry?
6    A.  Just a general awareness.
7    Q.  And what is the basis, what is
8  the foundation of your general awareness?
9    A.  Obviously the better a company
10  does, probably the more the CEO is paid.
11    Q.  Do you have any understanding of
12  how executives are compensated in the
13  financial industry other than that?
14    A.  No, sir.
15    Q.  All right.  So now I'm going to
16  ask you the same questions in your capacity
17  as the trustee of Dugaboy.
18        Did Dugaboy ever prepare any
19  written analysis concerning executive
20  compensation?
21    A.  No, sir.
22    Q.  Has Dugaboy ever asked anybody to
23  prepare any analysis on any issue
24  concerning executive compensation?
25    A.  No.

Page 51

N. Dondero

1
2    Q.  Have you in your capacity as the
3  trustee of Dugaboy ever prepared any
4  analysis on the issue of executive
5  compensation?
6    A.  No.
7    Q.  Have you ever done any analysis
8  of the compensation that your brother
9  received from Highland over time?
10    A.  Not that I am aware of.
11    Q.  Do you have any information that
12  you can share with me concerning the
13  compensation that you your brother received
14  from Highland at any moment in time?
15    A.  In general terms, sure.
16    Q.  What can you share with me in
17  general terms?
18    A.  I know Jim was not highly paid.
19  I know for the last couple of years, his
20  salary has been roughly less than a
21  million, 500, 700,000, somewhere in that
22  ballpark.
23    Q.  Did you play any role in the
24  setting of his salary?
25    A.  I'm sorry?

Page 52

N. Dondero

1
2    Q.  Did you personally ever play any
3  role in the setting of Mr. Dondero's
4  salary?
5    A.  In the salary that we are talking
6  about, no, I did not.
7    Q.  Thank you.
8        Did Dugaboy play any role in the
9  setting of Mr. Dondero's salary?
10    MS. DEITSCH-PEREZ:  Do you mean
11  setting or approving, John?
12  BY MR. MORRIS:
13    Q.  Let's go with setting first.
14    A.  Okay.  No.
15    Q.  Did Dugaboy play any role in
16  approving Mr. Dondero's salary?
17    A.  It has that right, but I don't
18  believe it did in the salary that he had at
19  the time.
20    Q.  Okay.  I just want to nail this
21  down.
22        To the best of your recollection,
23  Dugaboy never played a role in approving
24  Mr. Dondero's salary.
25        Do I have that right?

Page 53

N. Dondero

1
2    A.  Can you rephrase that so I
3  understand?
4    Q.  Sure.
5        Can you think of any year in
6  which Dugaboy approved of Mr. Dondero's
7  salary from Highland?
8    A.  His actual salary?
9    Q.  Correct.
10    A.  Not — we are not talking about
11  the notes now; you are talking about
12  salary?
13    Q.  Yes.
14    A.  No — yes, okay, not to my
15  recollection.
16    Q.  Do you know what Mr. Dondero's
17  total compensation was in the year 2017?
18    A.  His total compensation, no.
19    Q.  Did you ever ask anybody what his
20  compensation was in the year 2017?
21    A.  Not that I recall.
22    Q.  Do you know what Mr. Dondero's
23  total compensation was in 2018?
24    A.  When you're saying "total," you
25  mean just from Highland or from any entity?

Appx. 01887

Page 54

1          N. Dondero
2     Q.  I'm just talking about Highland.
3     A.  Okay.  Didn't we talk about those
4  numbers?
5     Q.  We talked about salary before.
6     A.  Right.
7     Q.  And now I'm asking you about
8  total compensation.
9        Do you understand that.
10    A.  No, I don't.
11    Q.  Let me try again.  Thank you for
12 letting me know that.  And I encourage you
13 to let me know if you don't understand a
14 question.
15       Do you know what Mr. Dondero's
16 total compensation was from Highland in
17 2017?
18    A.  No, I do not.
19    Q.  Did you ever ask anybody what
20 Mr. Dondero's total compensation from
21 Highland was in 2017?
22    A.  No.  Other than the figures that
23 we are talking about.  Because I'm still
24 not understanding, John.  I'm sorry.
25    Q.  Well, do you understand that

Page 55

1          N. Dondero
2  salary is just one component of
3  Mr. Dondero's compensation?
4     A.  That's correct.
5     Q.  Okay.
6     A.  Um-hmm.  That, I understand.
7     Q.  Okay.  And so do you understand
8  that I'm moving from salary to total
9  compensation, and I'm asking for the value
10 of any benefits he received from Highland
11 when I use the word "compensation"?
12    A.  Okay.  And --
13    Q.  So with that understanding, I'm
14 going to start again.
15       Do you know what Mr. Dondero's
16 total compensation was in 2017?
17    A.  I do not know.
18    Q.  Did you ever ask anybody what
19 Mr. Dondero's total compensation was in
20 2017?
21    A.  No.
22    Q.  Did Dugaboy know what
23 Mr. Dondero's compensation was 2017?
24    A.  I do not believe so.
25    Q.  To the best of your knowledge,

Page 56

1          N. Dondero
2  did anybody on behalf of Dugaboy ever try
3  to ascertain what Mr. Dondero's total
4  compensation was in 2017?
5     A.  To the best of my knowledge, no.
6     Q.  Do you know what Mr. Dondero's
7  total compensation from Highland was in
8  2018?
9     A.  No.
10    Q.  Did you ever ask anybody what
11 Mr. Dondero's total compensation was in
12 2018?
13    A.  I don't believe so.
14    Q.  Did Dugaboy know what
15 Mr. Dondero's total compensation was for
16 2018?
17    A.  I don't think so.
18    Q.  To the best of your knowledge,
19 did anybody ever ask on behalf of Dugaboy
20 what Mr. Dondero's total compensation from
21 Highland was in 2018?
22    A.  I don't recall.  I don't know.
23    Q.  Do you know what Mr. Dondero's
24 total compensation was in 2019?
25    A.  No.

Page 57

1          N. Dondero
2     Q.  Did you ever ask anybody what
3  Mr. Dondero's total compensation was in
4  2019?
5     A.  Not that I remember.
6     Q.  Did Dugaboy know what
7  Mr. Dondero's total compensation from
8  Highland was in 2019?
9     A.  I don't believe so.
10    Q.  Do you know whether Dugaboy ever
11 asked anybody what Mr. Dondero's total
12 compensation was from Highland in 2019?
13    A.  I don't think so.
14       THE WITNESS:  Would it be okay if
15 we take a break?
16       MR. MORRIS:  Just a couple more
17 questions, Deborah.
18       You know what, I apologize.  Of
19 course, of course we can take a break.
20       MR. DRAPER:  John, this is
21 Douglas.  Let me raise an issue with
22 you.
23       MR. MORRIS:  Do you want to do
24 this on the record?
25       MR. DRAPER:  Well, we can do it

Page 58

N. Dondero

1
2    off the record.  But I just noticed on
3    the participants you have Page
4    Montgomery and Deborah Newman, who are
5    not parties to this litigation, and I
6    would request that you ask them to get
7    off the line.
8         MR. MORRIS:  Okay.  I'll take it
9    under advisement, Douglas, but I will
10   point out that there have always been
11   people who have – they actually have
12   an interest in this litigation, so I'm
13   not even going to address that.  They
14   have an interest in the litigation,
15   okay?
16        MR. DRAPER:  John –
17        MR. MORRIS:  Let's go off the
18   record, please.
19        THE VIDEOGRAPHER:  The time is
20   10:30.  We are going off the record.
21        (Recess is taken.)
22        THE VIDEOGRAPHER:  The time is
23   10:51.  Back on the record.
24   BY MR. MORRIS:
25   Q.   Ms. Dondero, can you hear me?

Page 59

N. Dondero

1
2    A.   I can.
3    Q.   Okay.  Did you communicate with
4    anybody during the break about any of the
5    questions that I asked?
6    A.   No.
7    Q.   Did you communicate with anybody
8    on the break regarding any answers you gave
9    to any of the questions that I asked?
10   A.   No.
11   Q.   Did you communicate with anybody
12   on the break about any questions that I
13   might ask in the future?
14   A.   No.
15   Q.   Did you communicate with anybody
16   on the break about any answers you might
17   give in the future?
18   A.   No.
19   Q.   I believe you testified earlier
20   that you learned that your brother received
21   less than a million dollars in salary.
22        Do I have that right?
23   A.   Yes.
24   Q.   Can you tell me when you learned
25   that?

Page 60

N. Dondero

1
2    A.   I don't remember.
3    Q.   Do you remember how you learned
4    it?
5    A.   No.
6    Q.   Did you ever know that your
7    brother received a salary of a million
8    dollars from Highland?
9    A.   A million dollars even?
10   Q.   Yes.
11   A.   No.
12   Q.   Did you ever learn that your
13   brother had his salary increased to
14   two-and-a-half million dollars from
15   Highland?
16   A.   When?
17   Q.   I'm just asking if you ever
18   learned it.
19   A.   Oh, no.
20   Q.   Did you ever learn that somebody
21   made a decision to allocate the
22   two-and-a-half million dollars between and
23   among different entities that your brother
24   owned and controlled?
25   A.   I have no idea.

Page 61

N. Dondero

1
2    Q.   Did you have any conversation at
3    any time with your brother about why he was
4    receiving less than a million dollars from
5    Highland?
6    A.   Why he was?
7    Q.   Yes.
8    A.   No.
9    Q.   Did you ever learn at any time
10   how your brother's salary was established?
11   A.   Not that I recall.
12   Q.   Did you ever learn at any time as
13   to who made the decision to set your
14   brother's salary?
15   A.   Set his salary?  No.
16   Q.   Are you aware your brother has
17   retained experts in this case?
18   A.   I was not aware.
19   Q.   So is it fair to say that you've
20   never spoken with any expert retained by
21   your brother?
22   A.   Not that I'm aware of.
23   Q.   Let's talk about access to
24   financial information.
25        Do you have an understanding of

**Page 62**

1        N. Dondero
2 the term "financial statements"?
3    A. Yes.
4    Q. And what's your understanding of
5 the term "financial statements"?
6    A. Balance sheets, bank statements.
7    Q. Would it include profit and loss
8 statements?
9    A. Certainly.
10    Q. Would it include statements of
11 operations?
12    A. I would imagine, yes.
13    Q. Using a definition of the term
14 financial statements that incorporates each
15 of the items that we just discussed, did
16 you ever review Highland's financial
17 statements prior to the petition date?
18    A. No, I haven't reviewed Highland's
19 financials.
20    Q. Is it fair to say that you never
21 reviewed Highland's balance sheet prior to
22 the petition date?
23    A. That's fair. Correct.
24    Q. Did you ever see Highland's
25 audited financial statements prior to the

**Page 63**

1        N. Dondero
2 petition date?
3    A. Not that I remember, no.
4    Q. Did you ever ask anybody to see
5 Highland's financial statements?
6    A. Not that I recall.
7    Q. Did you ever have access to
8 Highland's financial statements?
9    A. No.
10    Q. Did you know anything about
11 Highland's financial condition prior to the
12 petition date?
13    A. No, I was not aware.
14    Q. Have you ever heard of the term
15 "portfolio company" in relation to
16 Highland?
17    A. I have.
18    Q. Do you have an understanding of
19 the term "portfolio company" as it relates
20 to Highland?
21    A. Yes, generally.
22    Q. What is your general
23 understanding of the term "portfolio
24 company" as it relates to Highland?
25    A. As I understand it, they're

**Page 64**

1        N. Dondero
2 companies owned by Highland under their
3 umbrella.
4    Q. And how did you form that
5 understanding?
6    A. I don't know.
7    Q. Do you recall when you first came
8 to the understanding that you have
9 concerning the term "portfolio company" as
10 it relates to Highland?
11    A. No.
12    Q. Based on your understanding of
13 the term "portfolio company," do you know
14 how many portfolio companies Highland had
15 prior to the petition date?
16    A. Several.
17    Q. Can you give me an approximate
18 number, to the best of your understanding?
19    A. More than – I would imagine more
20 than three.
21    Q. And why do you imagine it's more
22 than three?
23    A. Because I'm aware of three.
24    Q. Are you aware of any others,
25 other than the three that you have in your

**Page 65**

1        N. Dondero
2 head?
3    A. Not off the top of my head, no.
4    Q. Can you identify any of the three
5 portfolio companies that you have in your
6 head?
7    A. Certainly.
8    Q. Okay. Can you please identify
9 them?
10    A. Trussway, Cornerstone, MGM.
11    Q. And you believe that Highland had
12 a – withdrawn.
13      And your understanding was that
14 Highland directly or indirectly owned each
15 of those three companies?
16    A. That was my understanding.
17    Q. And what was the basis for that
18 understanding?
19    A. The basis of that understanding
20 has to do with the forgiveness of the note.
21    Q. So how did you learn that
22 Highland had a direct or indirect economic
23 interest in each of the three portfolio
24 companies that you identified?
25    A. I believe it was from Jim.

Page 66

N. Dondero

1
2     Q.   Do you recall any source of
3   information other than Jim?
4     A.   Not that I recall.
5     Q.   Prior to the petition date, were
6   you aware of the price that Highland paid
7   to acquire its interest in each of the
8   three portfolio companies that you
9   identified?
10    A.   Not that I am aware of.
11    Q.   Did you ever ask for any
12  information concerning the price that
13  Highland paid to acquire its interest in
14  each of the three portfolio companies that
15  you identified?
16    A.   No.
17    Q.   Prior to the petition date, did
18  you have access to any information
19  concerning the value of any of the three
20  portfolio companies that you identified?
21    A.   Not that I am aware of.
22    Q.   Prior to the petition date --
23  well, let's talk about them individually.
24       You referred to MGM.
25       Do I have that right?

Page 67

N. Dondero

1
2     A.   Yes, sir.
3     Q.   And your understanding is that
4   MGM was a Highland portfolio company; is
5   that right?
6     A.   Yes.
7     Q.   Do you have any knowledge about
8   the nature of Highland's interest in MGM?
9     A.   No.
10    Q.   Do you know if Highland owns debt
11  or equity in MGM?
12    A.   I couldn't be sure.
13    Q.   Do you know when Highland
14  acquired its interest in MGM?
15    A.   A number of years ago.
16       MR. MORRIS:  I just want the
17  record to be clear and I want counsel
18  to be clear, these questions that I'm
19  asking now are going to be in
20  Ms. Dondero's capacity as a 30(b)(6)
21  witness for Dugaboy.
22  BY MR. MORRIS:
23    Q.   So I'm going to ask a couple of
24  questions.
25       Again, at any time prior to the

Page 68

N. Dondero

1
2   petition date, did Dugaboy have an
3   understanding of the nature of Highland's
4   interest in MGM?
5     A.   Not that I'm aware of.  Well,
6   wait, I'm sorry.  Can you -- wait.  Ask
7   that again, John.  Say that again.
8     Q.   Sure.
9       At any time prior to the petition
10  date --
11    A.   Right.
12    Q.   -- did Dugaboy have an
13  understanding as to the nature of
14  Highland's interest in MGM?
15    A.   I knew that they had an interest
16  in MGM prior to the petition date.
17    Q.   Okay.  Did you or Dugaboy know
18  the nature of that interest, in what form
19  it held?
20    A.   Not specifically, John.
21    Q.   Did you or Dugaboy make any
22  effort prior to the petition date to learn
23  about the nature and extent of Highland's
24  interest in MGM?
25    A.   Not that I recall.

Page 69

N. Dondero

1
2     Q.   Did you or Dugaboy know what
3   Highland's cost was to acquire its interest
4   in MGM?
5     A.   No.
6     Q.   Did you or Dugaboy ever make any
7   effort to try to determine what Highland's
8   cost was to acquire its interest in MGM?
9     A.   No.
10    Q.   Did you ever ask for any
11  information -- withdrawn.
12       Did you or Dugaboy ever ask
13  anybody for any information concerning
14  Highland's cost to acquire its interest in
15  MGM?
16    A.   No.
17    Q.   Did you or Dugaboy ever obtain
18  any information concerning the value of
19  Highland's interest in MGM?
20    A.   Not that I recall.
21    Q.   Do you recall the value of
22  Highland's interest in MGM as you sit here
23  today?
24       MS. DEITSCH-PEREZ:  Object to the
25  form.

Page 70

N. Dondero

1
2     A.  I'm sorry, John, the question?
3     Q.  Sure.
4          I'm going to ask a different
5   question.  It was a fine objection.
6          Do you recall the value of
7   Highland's interest in MGM at any time
8   prior to the petition date?
9     A.  I do not recall.
10    Q.  Did you or Dugaboy ever know the
11  value of Highland's interest in MGM at any
12  time prior to the petition date?
13    A.  No.
14    Q.  Did you or Dugaboy ever ask for
15  any information concerning the value of
16  Highland's interest in MGM at any time
17  prior to the petition date?
18    A.  Not that I remember.
19    Q.  Prior to the petition date, did
20  you or Dugaboy ever make any determination
21  as to whether the value of Highland's
22  interest in MGM exceeded its cost?
23    A.  I'm sorry.  Can you repeat that,
24  John?
25    Q.  Sure.

Page 71

N. Dondero

1
2          At any time prior to the petition
3   date, did you or Dugaboy ever know whether
4   the value of Highland's interest in MGM
5   exceeded the cost that it paid to acquire
6   that interest?
7     A.  We didn't know.
8     Q.  Did you or Dugaboy ever ask
9   anybody prior to the petition date whether
10  Highland's cost to acquire its interest in
11  MGM was more or less than the value?
12    A.  No, we never made that inquiry.
13    Q.  Now do you know the nature of the
14  MGM business?
15    A.  The movie theater and video
16  library, that type.
17    Q.  Do you know anything else about
18  the nature of MGM's business other than
19  that?
20    A.  No.
21    Q.  At any time prior to the petition
22  date, did you or Dugaboy do any due
23  diligence to try to ascertain the value of
24  MGM?
25    A.  Prior to the petition date?

Page 72

N. Dondero

1
2     Q.  Yes.
3     A.  No.
4     Q.  All right.  I'm going to ask
5   similar questions with respect to
6   Cornerstone.
7          Cornerstone is one of the
8   portfolio companies that you identified
9   earlier, correct?
10    A.  Yes.
11    Q.  And did you learn from Jim that
12  Cornerstone was one of Highland's portfolio
13  companies prior to the petition date?
14    A.  I believe that is correct.
15    Q.  Do you have any other source of
16  information for that other than your
17  brother?
18    A.  Not that I remember.
19    Q.  At any time prior to the petition
20  date, did you or Dugaboy have an
21  understanding as to the nature of
22  Highland's interest in Cornerstone?
23    A.  No.
24    Q.  At any time prior to the petition
25  date, did you or Dugaboy ask anybody what

Page 73

N. Dondero

1
2   the nature of Highland's interest was in
3   Cornerstone?
4     A.  Not that I recall.
5     Q.  Prior to the petition date, did
6   you or Dugaboy make any effort to try to
7   ascertain the nature of Highland's interest
8   in Cornerstone?
9     A.  Not that I remember.
10    Q.  Prior to the petition date, did
11  you or Dugaboy know how much Highland paid
12  to acquire its interest in Cornerstone?
13    A.  No.
14    Q.  Prior to the petition date, did
15  you or Dugaboy ever ask anybody what
16  Highland's cost was to acquire its interest
17  in Cornerstone?
18    A.  Not that I remember.
19    Q.  Prior to the petition date, did
20  you or Dugaboy ever make any effort to try
21  to ascertain how much Highland paid to
22  acquire its interest in Cornerstone?
23    A.  No.
24    Q.  Do you know what Cornerstone --
25  do you know the nature of Cornerstone's

Page 74

N. Dondero

1
2 business?
3    A.  I do not.
4    Q.  Did you ever ask anybody what the
5 nature of Cornerstone's business was?
6    A.  No.
7    Q.  Did you ever make any effort --
8 withdrawn.
9        Did you or Dugaboy ever make any
10 effort to try to determine the nature of
11 Cornerstone's business?
12    A.  Not that I recall.
13    Q.  Did you or Dugaboy know the value
14 of Highland's interest in Cornerstone prior
15 to the petition date?
16    A.  We did not.
17    Q.  Did you or Dugaboy ever ask
18 anybody prior to the petition date what the
19 value of Highland's interest in Cornerstone
20 was?
21    A.  Not that I remember.
22    Q.  Do you remember whether you or
23 Dugaboy made any effort prior to the
24 petition date to try to ascertain the value
25 of Highland's interest in Cornerstone?

Page 75

N. Dondero

1
2    A.  I don't believe so.
3    Q.  Have you heard of a company
4 called Trussway?
5    A.  Yes.
6    Q.  Do you know the nature of
7 Trussway's business?
8    A.  I do not.
9    Q.  Did you ever ask anybody what the
10 nature of Trussway's business was?
11    A.  No, sir.
12    Q.  Did you or Dugaboy make any
13 effort at any time prior to the petition
14 date to try to understand the nature of
15 Trussway's business?
16    A.  I don't believe so.
17    Q.  Did you or Dugaboy make any
18 effort prior to the petition date to
19 understand the financial condition of MGM?
20    A.  Of MGM?  I'm sorry.  I thought we
21 were talking about Trussway.  We're going
22 back to MGM?
23    Q.  We were.  I'm sorry.  It's a new
24 question.  I'm just going to tick the box.
25    A.  Oh, okay.  I'm sorry.  I was a

Page 76

N. Dondero

1
2 little slow on the switch.
3    Q.  That's okay.
4    A.  Can you repeat the question?
5    Q.  Sure.
6        Did you or Dugaboy make any
7 effort prior to the petition date to assess
8 MGM's financial condition?
9    A.  Not that I recall.
10    Q.  Did you or Dugaboy make any
11 effort prior to the petition date to try to
12 understand the financial condition of
13 Cornerstone?
14    A.  Not that I recall.
15    Q.  Did you or Dugaboy prior to the
16 petition date make any effort to try to
17 understand the financial condition of
18 Trussway?
19    A.  No, not that I recall.
20    Q.  Is it your understanding that
21 Trussway was one of the portfolio
22 companies, as you defined it earlier?
23    A.  Yes.
24    Q.  And is that understanding based
25 solely on information that you received

Page 77

N. Dondero

1
2 from your brother?
3    A.  Yes.  Yes.
4    Q.  Okay.  At any time prior to the
5 petition date, did you or Dugaboy have an
6 understanding as to the nature of
7 Highland's interest in Trussway?
8    A.  I don't know.
9    Q.  Do you recall whether you or
10 Dugaboy ever had an understanding prior to
11 the petition date concerning the nature of
12 Highland's interest in Trussway?
13    A.  I don't know.
14    Q.  Do you recall that either you or
15 Dugaboy ever asked anybody what the nature
16 of Highland's interest in Trussway was
17 prior to the petition date?
18    A.  I don't believe so.
19    Q.  Prior to the petition date, did
20 you or Dugaboy make any effort to try to
21 determine the nature of Highland's interest
22 in Trussway?
23    A.  I don't believe so.
24    Q.  Prior to the petition date, did
25 you or Dugaboy know Highland's cost to

Page 78

1           N. Dondero
2 acquire its interest in Trussway?
3     A.  We did not.
4     Q.  Prior to the petition date, did
5 you or Dugaboy ever ask anybody what
6 Highland's cost was to acquire its interest
7 in Trussway?
8     A.  Not that I recall.
9     Q.  Prior to the petition date, did
10 you or Dugaboy make any effort to try to
11 ascertain what Highland's cost was to
12 acquire its interest in Trussway?
13     A.  Not that I remember.
14     Q.  Did you or Dugaboy know the value
15 of Highland's interest in Trussway prior to
16 the petition date?
17     A.  Not that I am aware of.
18     Q.  Prior to the petition date, did
19 you or Dugaboy ever ask anybody what the
20 value of Highland's interest was in
21 Trussway?
22     A.  I don't think so.
23     Q.  Do you know whether you or
24 Dugaboy prior to the petition date made any
25 effort to try to ascertain the value of

Page 79

1           N. Dondero
2 Highland's interest in Trussway?
3     A.  I don't believe so.
4     Q.  Did you or Dugaboy know prior to
5 the petition date whether the value of
6 Highland's interest in Trussway was more or
7 less than its cost?
8     A.  I do not know.
9     Q.  Did you ever ask anybody --
10 withdrawn.
11         Did you or Dugaboy ever ask
12 anybody prior to the petition date whether
13 the value of Highland's interest in
14 Trussway was more or less than its cost?
15     A.  I don't think so.
16     Q.  Did you or Dugaboy make any
17 attempt prior to the petition date to
18 determine whether the value of Highland's
19 interest in Trussway was more or less than
20 its cost?
21     A.  I don't think so.
22     Q.  Okay.  I apologize if I asked
23 these questions already.  I think I may
24 have forgotten them, but I'm just going to
25 ask just those last couple of questions --

Page 80

1           N. Dondero
2     MS. DEITSCH-PEREZ:  All of them.
3 BY MR. MORRIS:
4     Q.  -- related to Cornerstone.
5     A.  Okay.
6     Q.  Did you or Dugaboy know prior to
7 the petition date whether the value of
8 Highland's interest in Cornerstone was more
9 or less than its cost?
10     A.  I don't know if we knew.
11     Q.  Did you or Dugaboy ask anybody
12 prior to the petition date whether the
13 value of Highland's interest in Cornerstone
14 was more or less than its cost?
15     A.  I don't recall.
16     Q.  Do you know whether you or
17 Dugaboy made any effort prior to the
18 petition date to determine whether
19 Highland's -- whether the value of
20 Highland's interest in Cornerstone was more
21 or less than its cost?
22     A.  I don't remember.
23     Q.  Okay.  I'm going to shift gears
24 now to talk about loans.
25     A.  Okay.

Page 81

1           N. Dondero
2     Q.  All right.  You're aware that
3 from time to time, Highland provided loans
4 to certain of its officers and employees,
5 right?
6     A.  I am.
7     Q.  And you're aware that in exchange
8 for the loans from Highland, the officers
9 and employees gave Highland promissory
10 notes?
11     A.  Correct.
12     Q.  Are you aware of any loan that
13 Highland ever gave to an officer or
14 employee where the officer or employee
15 failed to give a promissory note in return?
16     MS. DEITSCH-PEREZ:  Object to the
17 form.
18     A.  John, I'm sorry.  Can you repeat
19 the question, please?
20     Q.  Yeah.
21         I just want to know if you are
22 aware of any instance where Highland gave a
23 loan to an officer or an employee where the
24 officer or employee failed to give Highland
25 a promissory note in exchange?

Page 82

N. Dondero

1 　　　　N. Dondero
2 　　　MS. DEITSCH-PEREZ:  Object to the
3 　form.
4 BY MR. MORRIS:
5 　　Q.　You can answer.
6 　　A.　I am not aware of any.
7 　　Q.　Okay.  Do you have a general
8 understanding of what a promissory note is?
9 　　A.　A promise to pay.
10 　　Q.　Okay.  Is it a promise to pay a
11 sum certain?
12 　　　　MS. DEITSCH-PEREZ:  Object to the
13 　form.
14 　　　　MR. MORRIS:  Withdrawn.
15 BY MR. MORRIS:
16 　　Q.　Do you understand that a
17 promissory note is a promise to pay a
18 specified amount at some point in the
19 future?
20 　　　　MS. DEITSCH-PEREZ:  Object to the
21 　form.
22 BY MR. MORRIS:
23 　　Q.　You can answer.
24 　　A.　That was my understanding, John.
25 　　Q.　Okay.  Prior to the petition

Page 83

N. Dondero

1 date, did you ever see any promissory note
2 that was signed by an officer or employee
3 of Highland?
4 　　A.　I'm not sure.
5 　　Q.　Do you have any recollection --
6 do you have any recollection, as you sit
7 here right now, of having seen a promissory
8 note that was signed by an officer or
9 employee of Highland prior to the petition
10 date?
11 　　　　Withdrawn.  That is not a good
12 question?
13 　　　　Prior to the petition date, did
14 you see any promissory note that was signed
15 by any officer or employee of Highland?
16 　　A.　I don't remember.
17 　　Q.　You don't have any recollection
18 of that; is that fair?
19 　　A.　That's fair.
20 　　Q.　Do you know whether Dugaboy ever
21 saw any promissory note prior to the
22 petition date that had been signed by an
23 officer or employee of Highland?
24 　　A.　I don't know.

Page 84

N. Dondero

1 　　Q.　Prior to the petition date, did
2 you or Dugaboy ever ask to see any
3 promissory note that was executed by an
4 officer or employee of Highland?
5 　　　　MS. DEITSCH-PEREZ:  Object to the
6 　form.
7 　　A.　I don't remember, John.
8 　　Q.　Okay.  Do you know if Highland
9 ever forgave any obligations under any
10 promissory note that was issued by any
11 Highland employee or officer?
12 　　　　MS. DEITSCH-PEREZ:  Objection.
13 　No foundation.
14 　　A.　I am not aware.
15 　　Q.　You're not aware of Highland ever
16 forgiving any loan that it made to any
17 officer or employee.
18 　　　　Do I have that right?
19 　　　　MS. DEITSCH-PEREZ:  Object.  No
20 　foundation.
21 　　A.　I'm not sure, John.  I'm not
22 sure.
23 　　Q.　Does Dugaboy have any knowledge
24 concerning any loan that was given by

Page 85

N. Dondero

1 Highland to any of its officers or
2 employees that was forgiven in whole or in
3 part?
4 　　A.　I don't know.
5 　　Q.　Did you or Dugaboy ever ask
6 anybody prior to the petition date whether
7 Highland had ever forgiven any loan that it
8 made to any officer or employee?
9 　　A.　I don't think so.
10 　　Q.　Did you or Dugaboy make any
11 effort at any time prior to the petition
12 date to determine whether Highland had ever
13 forgiven in whole or in part any loan that
14 it made to any of its officers or
15 employees?
16 　　A.　Did I make any inquiries?  Is
17 that what you're asking?
18 　　Q.　Did you make any effort to try to
19 answer -- to try to figure that out?
20 　　A.　To determine one way or the
21 other?
22 　　Q.　Correct.
23 　　A.　Not that I recall, no.
24 　　Q.　Did anybody ever tell you --

Appx. 01895

N. Dondero

1
2  withdrawn.
3       Did anybody ever give you or
4  Dugaboy any information concerning any loan
5  that Highland ever made to any of its
6  employees or officers that was forgiven in
7  whole or in part?
8       A.  I was aware that that was a
9  common practice at Highland.
10      Q.  Okay.  And how did you become
11 aware of that common practice?
12      A.  In conversations with Jim.
13      Q.  Was there any other source of
14 information concerning that common practice
15 that he described for you -- withdrawn.
16      Did you have any other source of
17 information concerning the common practice
18 that you just mentioned?
19      A.  Did I have any --
20      Q.  Any other source -- yeah.
21      Did you have any other source of
22 information other than your brother
23 concerning the common practice that you
24 just described?
25      A.  I'm not sure if I spoke to other

N. Dondero

1
2  people in addition to Jim.  I don't know.
3       Q.  Can you identify anybody that you
4  recall speaking to concerning the practice
5  that your brother told you that Highland
6  had of forgiving loans to employees and
7  officers?
8       A.  I don't remember who it was at
9  Highland that I have spoken to about that
10 or overheard a conversation.
11      Q.  Do you recall when the
12 conversation took place?
13      A.  No, I don't.
14      Q.  Do you recall where the
15 conversation took place?
16      A.  No, no, I don't.  I believe it
17 was a phone conversation.
18      Q.  Can you identify any person who
19 participated in the phone conversation?
20      A.  Jim was one of the parties.
21      Q.  Do you recall anybody else?
22      A.  I do not.
23      Q.  Do you recall if the conversation
24 took place before or after the petition
25 date?

N. Dondero

1
2       A.  I don't know.
3       Q.  So it might have happened before;
4  it might have happened after.
5       Is that fair?
6       A.  Correct.
7       Q.  Do you remember the substance of
8  the conversation at all?
9       A.  Not in detail.
10      Q.  Can you describe for me
11 everything you recall about the
12 conversation you have in your mind
13 concerning the practice that Highland had
14 of forgiving loans to officers and
15 employees?
16      A.  I am aware that it was common
17 practice, or at least I believed it was
18 common practice at Highland.
19      Q.  Do you have any other information
20 that you can share with me that you learned
21 concerning the practice other than the fact
22 that it existed?
23      A.  Not at this time.
24      Q.  Can you identify a single officer
25 or employee who had a loan forgiven?

N. Dondero

1
2       A.  Not off the top of my head, no.
3       Q.  Did you or Dugaboy ever know the
4  identity of any officer or employee of
5  Highland who had a loan forgiven?
6       MS. DEITSCH-PEREZ:  Object to the
7  form.
8       A.  Again, John, not off the top of
9  my head.
10      Q.  Did you ever see anything in
11 writing that concerned or related to the
12 practice that your brother described for
13 you?
14      A.  Not that I remember, no.
15      Q.  Did you ever ask to see any
16 documents that concerned or related to the
17 practice that your brother described for
18 you?
19      A.  Again, I don't recall, John.
20      Q.  Did Dugaboy ever ask for
21 information concerning Highland's practice
22 of forgiving loans?
23      A.  No, I don't believe so.
24      Q.  Did you or Highland ever know
25 about the number of loans that Highland

Page 90

N. Dondero

1
2   made to employees or officers that Highland
3   forgave?
4       A.   I'm sorry, did me or Highland
5   know?
6       Q.   I apologize.  If that's what I
7   said, I'm mistaken.  Thank you.
8            Did you or Dugaboy -- did you or
9   Dugaboy ever know how many loans were
10  forgiven?
11      A.   A specific number, no.
12      Q.   Did you or Dugaboy know -- ever
13  know the amount, the face amount of the
14  loans that were forgiven?
15      A.   No, not that I recall.
16      Q.   Did you or Dugaboy ever know the
17  year in which Highland ever forgave any
18  loan to any officer or employee?
19      A.   Not that I recall.
20      Q.   Okay.  Do you know Mark Okada?
21      A.   I do.
22      Q.   Have you ever met him?
23      A.   I have.
24      Q.   Okay.  Do you know whether
25  Highland ever gave a loan to Mr. Okada that

Page 91

N. Dondero

1
2   was the subject of a promissory note?
3       A.   Specifically, no.
4       Q.   Did you ever ask anybody whether
5   Highland had ever made a loan to Mr. Okada
6   that was backed by a promissory note?
7       A.   I never asked.
8       Q.   Do you or Dugaboy know whether
9   Highland ever forgave any loan that was
10  ever made to Mr. Okada?
11      A.   I am not aware.
12      Q.   Did you or Dugaboy ever ask
13  anybody whether Highland had ever made a
14  loan to Mr. Okada that Highland forgave?
15      A.   No.
16      Q.   Did you or Dugaboy ever make any
17  effort to ascertain whether Highland had
18  ever forgiven any loan that it had made to
19  Mr. Okada?
20      A.   I'm sorry.  The beginning part of
21  that, John?  Did I --
22      Q.   Sure.
23           Did you or Dugaboy ever make any
24  effort to figure out if Highland had ever
25  forgiven any loan that it had made to

Page 92

N. Dondero

1
2   Mr. Okada?
3       A.   No, sir.
4       Q.   You're aware that Highland loaned
5   money to your brother, correct?
6       A.   Correct.
7       Q.   Do you know how many loans
8   Highland made to your brother?
9       A.   Over what period of time, John?
10      Q.   From the time the company was
11  formed.
12      A.   Okay.  There's more -- I'm not
13  sure how to answer that, John.
14      Q.   Okay.  That's fair.
15      Q.   Can you be more specific with the
16  time frame, please?
17      Q.   You bet.
18           Let's take it for the ten years
19  prior to the petition date.  So let's go
20  back to 2009.
21           From 2009 to 2019 --
22      A.   Okay.
23      Q.   -- do you know how many loans
24  Highland made to your brother?
25      A.   To just Jim or to Jim and his

Page 93

N. Dondero

1
2   entities?
3       Q.   Just to Jim.
4       A.   I don't know a specific number,
5   no.
6       Q.   Did you or Dugaboy ever ask
7   anybody how many loans Highland made to Jim
8   in the ten-year period prior to the
9   petition date?
10      A.   No.  We never asked.
11      Q.   Did you or Dugaboy ever ask
12  anybody how many loans Highland made to Jim
13  during any time period?
14      A.   No, I don't believe so.
15      Q.   Did you or Dugaboy ever make any
16  effort to try to ascertain the number of
17  loans that Highland made to your brother
18  during any particular time period?
19      A.   Not that I recall.
20      Q.   Do you know if your brother ever
21  paid Highland back the principal amount
22  due, plus interest under any loan that he
23  had obtained from Highland?
24      A.   In its entirety?
25      Q.   Yes.

Page 94

N. Dondero

1
2     A.  Or a portion?
3         What are you speaking of?
4     Q.  Let's start with the entirety,
5  and I'll ask the question again.
6         Are you and Dugaboy aware of any
7  loan that your brother obtained from
8  Highland that he paid back in full, plus
9  interest?
10    A.  I am not sure.
11    Q.  Did you or Dugaboy ever ask
12  anybody whether your brother had ever
13  obtained a loan from Highland that he paid
14  back in full, plus interest?
15    A.  I don't think so.
16    Q.  Did you or Dugaboy ever make any
17  effort prior to the petition date to
18  determine whether or not Highland had --
19  withdrawn.
20        Did you and Dugaboy make any
21  effort prior to the petition date to
22  determine whether your brother had ever
23  paid back all principal and interest due on
24  any loan that he had obtained from
25  Highland?

Page 95

N. Dondero

1
2     A.  Not that I recall, John.
3     Q.  Prior to the petition date, did
4  you or Dugaboy ever see any promissory note
5  that your brother signed?
6     A.  I'm not sure.  I don't know.
7     Q.  Prior to the petition date, did
8  you or Dugaboy ever ask anybody to see any
9  promissory note that your brother had
10  signed in favor of Highland?
11    A.  I don't believe we asked.
12    Q.  Prior to the petition date, did
13  you or Dugaboy ever make any effort to try
14  to obtain any promissory note that your
15  brother signed in favor of Highland?
16    A.  No, I don't think so.
17    Q.  Do you know how many promissory
18  notes your brother signed in favor of
19  Highland?
20    A.  Totally?  No.
21    Q.  Okay.  I am going to ask similar
22  questions now regarding the corporate
23  entities.
24        Do you understand that Highland
25  has what are referred to as affiliates?

Page 96

N. Dondero

1
2     A.  Yes.
3     Q.  Okay.  And do you have an
4  understanding of the term "affiliates" as
5  it relates to Highland?
6     A.  Yes.
7     Q.  What's your understanding of the
8  term "affiliates" as it relates to
9  Highland?
10    A.  Companies that are associated
11  with Highland.
12    Q.  And what does it mean to be
13  associated with Highland?
14        MS. DEITSCH-PEREZ:  Object to the
15  form.
16        MR. MORRIS:  Withdrawn.
17  BY MR. MORRIS:
18    Q.  What do you mean when you say
19  that affiliated companies are those that
20  are associated with Highland?
21    A.  They're under the Highland
22  umbrella.
23    Q.  Is it your understanding that
24  affiliated companies are controlled by your
25  brother?

Page 97

N. Dondero

1
2        MS. DEITSCH-PEREZ:  Object to the
3  form.
4     A.  I'm sorry, John?
5        MS. DEITSCH-PEREZ:  There's some
6  noise.  We can hear somebody talking.
7  Someone probably needs to mute.
8        MR. MORRIS:  Give me one second.
9  It might be me.  We'll see.
10        I apologize for that if it was me
11  anyway.
12        Can I have last question read
13  back please.
14        THE REPORTER:  Sure.
15        (Question was read back as
16  follows:
17        "QUESTION:  Is it your
18  understanding that affiliated companies
19  are controlled by your brother?")
20    A.  Yes.
21    Q.  Okay.  And are you aware -- with
22  that understanding of the term if
23  "affiliates," are you aware that from time
24  to time, Highland provided loans to certain
25  of its affiliates?

Page 98

N. Dondero

1
2     A.  I'm not sure.  Of Highland loans?
3  Okay.  I'm not sure, John.
4     Q.  Prior to the petition date, did
5  you or Dugaboy know whether Highland ever
6  made a loan to an affiliate, as you've
7  defined it?
8     A.  Yes, there were loans made.
9     Q.  Okay.  And how did you learn that
10  there were loans made by Highland to its
11  affiliates?
12     A.  Jim and I had discussed the loans
13  that were made.
14         Are we talking about certain
15  ones, John?
16     Q.  I'm just talking generally at the
17  moment.
18         How did you learn whatever
19  information you have, and we'll get into
20  the details, but how did you learn that
21  Highland made loans to affiliates?
22     A.  From Jim.
23     Q.  Okay.  Did you have any source of
24  information other than your brother on the
25  question of whether Highland made loans to

Page 99

N. Dondero

1
2  affiliates?
3     A.  Not that I'm aware of.
4     Q.  Were you and Dugaboy generally
5  aware that when Highland made loans to its
6  affiliates, the affiliates gave Highland
7  promissory notes in return?
8     A.  Yes.
9     Q.  Okay.  And how did you learn
10  that?
11     A.  In conversation.
12     Q.  And would those be conversations
13  that you had with Jim?
14     A.  Correct.
15     Q.  Did you have conversations with
16  anybody else on the topic of whether or not
17  the affiliates gave Highland promissory
18  notes in exchange for loans?
19     A.  Not that I recall.
20     Q.  Prior to the petition date, did
21  you or Dugaboy ever see a promissory note
22  that was signed on behalf of any affiliate?
23     A.  I don't recall.
24     Q.  Prior to the petition date, did
25  you or Dugaboy ever ask anybody to see any

Page 100

N. Dondero

1
2  promissory note that was signed in favor of
3  Highland by one of its affiliates?
4     A.  Not that I recall, John.
5     Q.  Prior to the petition date, did
6  you or Dugaboy make any effort to try to
7  obtain any promissory note that was
8  executed by a Highland affiliate in favor
9  of Highland?
10     A.  I don't believe so.
11     Q.  Do you know if Highland ever
12  forgave any obligations under any
13  promissory note that was signed on behalf
14  of any affiliate?
15     A.  I have no idea.
16     Q.  Did you or Dugaboy ever ask
17  anybody whether Highland had ever forgiven
18  any loan that was given to an affiliate?
19     A.  Did we – I'm sorry, John, can
20  you repeat the question, please?
21     Q.  Yes.
22         Did you or Dugaboy ever ask
23  anybody prior to the petition date whether
24  Highland had ever forgiven in whole or in
25  part any loan that it made to an affiliate?

Page 101

N. Dondero

1
2     A.  No, because it was my assumption
3  that that was common practice.
4     Q.  Okay.  And what was that
5  assumption based on?
6     A.  Conversations that I either had
7  with Jim or overheard.
8     Q.  Okay.  Do you have anything to
9  add about the practice that you haven't
10  already testified to?
11         Withdrawn.
12         Does the practice that you're
13  referring to, is that the same practice
14  that you have identified earlier with
15  respect to loans that were made to officers
16  and employees?
17     A.  That's correct, John.
18     Q.  Okay.  So did you have any source
19  of information other than your brother that
20  you can identify right now concerning the
21  practice of forgiving loans to affiliates?
22     A.  Not at this time.
23     Q.  Can you identify any loan that
24  Highland ever made to an affiliate that was
25  forgiven?

Page 102

N. Dondero

1
2    A.   Not that I recall.
3    Q.   Did you or Dugaboy ever ask
4  anybody to identify any loan that it ever
5  made to an affiliate that was forgiven in
6  whole or in part?
7    A.   Can you restate that, John?
8    Q.   Sure.
9        Did you or Dugaboy ever ask
10  anybody to identify a loan that was made by
11  Highland to an affiliate that was forgiven
12  in whole or in part?
13    A.   Not that I remember.
14    Q.   Can you or Dugaboy identify today
15  any affiliate that obtained a loan from
16  Highland that Highland forgave?
17    A.   Not that I know of.
18    Q.   Did you or Dugaboy ever take any
19  steps to confirm what your brother told you
20  about the practice of forgiving loans?
21    A.   Did we take any steps?
22    Q.   Did you do anything?
23    A.   Not that I am aware of, no.
24    Q.   Did you ever see any document
25  that concerned or related to the practice

Page 103

N. Dondero

1
2  your brother described for you whereby
3  Highland forgave loans to affiliates?
4    A.   I do not recall, John, no.
5    Q.   Did you ever ask to see any
6  documents that reflected the practice your
7  brother described?
8    A.   I never asked.
9    Q.   Give me one second.
10        Have you ever heard of an entity
11  called Highland Capital Management Services
12  Inc.?
13    A.   Yes.
14    Q.   Can we refer to that entity as
15  HCMS?
16        Okay.
17    Q.   Is HCMS an affiliate --
18  withdrawn.
19        Did you and Dugaboy understand
20  that HCMS was an affiliate of Highland's
21  prior to the petition date?
22    A.   Yes.
23    Q.   And how did you come to
24  understand that HCMS was an affiliate of
25  Highland prior to the petition date?

Page 104

N. Dondero

1
2    A.   Because it's another one of Jim's
3  companies.
4    Q.   And how did you learn that that
5  was another one of Jim's companies?
6    A.   I don't remember how I learned
7  it.  It's under the Highland umbrella.
8    Q.   And when you say that it's one of
9  "Jim's companies," what do you mean by
10  that?
11    A.   The beneficial owner.
12    Q.   And how did you learn that your
13  brother was the beneficial owner of HCMS?
14        MS. DEITSCH-PEREZ:  Object to the
15  form.  That's not what she said.  She
16  said he is a beneficiary owner --
17        MR. MORRIS:  You can object to
18  the question.  I appreciate it.
19  BY MR. MORRIS:
20    Q.   And you can answer it.
21        MS. DEITSCH-PEREZ:  Don't
22  misstate what she said, please.
23        MR. MORRIS:  All you do is get to
24  object to the question, please.  Don't
25  coach the witness.

Page 105

N. Dondero

1
2        MS. DEITSCH-PEREZ:  I'm not
3  coaching the witness.
4        You want to have the court
5  reporter read it back.
6  BY MR. MORRIS:
7    Q.   Can you please answer my
8  question, please?
9    A.   How did I learn that Jim was a
10  beneficial owner --
11    Q.   Sure.
12    A.   -- of the company?
13        I would assume from Jim.
14    Q.   Okay.  Do you have any reason to
15  believe your source of information was
16  anybody other than Jim?
17    A.   I don't know, John.
18    Q.   Okay.  Do you know the nature of
19  HCMS's business?
20    A.   No.
21    Q.   Did you or Dugaboy ever ask
22  anybody what the nature of HCMS's business
23  was?
24    A.   No, not that I recall.
25    Q.   Did you or Dugaboy ever make any

Appx. 01900

Page 106

N. Dondero

1              N. Dondero
2    effort to determine what HCMS's business
3    was?
4         A.   Not that I recall.
5         Q.   Did you or Dugaboy ever know --
6    withdrawn.
7              Did you or Dugaboy ever have any
8    information concerning HCMS's financial
9    condition?
10        A.   No, not that I'm aware of.
11        Q.   Did you or Dugaboy ever ask
12   anybody for information concerning HCMS's
13   financial condition?
14        A.   No.
15        Q.   Did you or Dugaboy ever make any
16   independent effort to try to determine what
17   HCMS's financial condition was?
18        A.   Not that I recall.
19        Q.   Do you or Dugaboy know whether
20   any agreements exist between HCMS and
21   Highland other than any promissory notes?
22        A.   I don't know.
23        Q.   Did you or Dugaboy ever ask
24   anybody whether any agreements existed
25   between Highland and HCMS other than

Page 107

1              N. Dondero
2    promissory notes?
3         A.   I don't know.  No, I don't
4    believe so.
5         Q.   I appreciate your patience.  I
6    do.
7         A.   That's okay.
8         Q.   Did you or Dugaboy ever make any
9    effort to try to learn whether any
10   agreements existed between Highland and
11   HCMS other than promissory notes?
12        A.   I don't believe so.
13        Q.   Did you or Dugaboy know prior to
14   the petition date whether Highland ever
15   provided any services to HCMS?
16        A.   I don't know.
17        Q.   Did you or Dugaboy ever ask
18   anybody prior to the petition date whether
19   Highland ever provided any services to
20   HCMS?
21        A.   I don't believe it was asked.
22        Q.   Did you or Dugaboy ever made any
23   effort prior to the petition date to learn
24   whether Highland provided any services to
25   HCMS?

Page 108

1              N. Dondero
2         A.   Not that I am aware of, John.
3         Q.   Do you know if HCMS -- withdrawn.
4              Did you or Dug -- withdrawn.
5              Did you or Dugaboy know prior to
6    the petition date whether HCMS ever
7    rendered any services to Highland?
8         A.   I wouldn't --
9              MS. DEITSCH-PEREZ:  Object to the
10   form.
11        A.   I wouldn't know.
12             MR. MORRIS:  Can I have the
13   question read back?
14             THE REPORTER:  Sure.
15             (Question was read back as
16   follows:
17             "QUESTION:  Did you or Dugaboy
18   know prior to the petition date whether
19   HCMS ever rendered any services to
20   Highland?"
21             "ANSWER:  I wouldn't know.")
22   BY MR. MORRIS:
23        Q.   Did you or Dugaboy ever ask
24   anybody prior to the petition date whether
25   HCMS ever rendered any services to

Page 109

1              N. Dondero
2    Highland?
3         A.   I don't believe so, John.
4         Q.   Did you or Dugaboy make any
5    effort prior to the petition date to
6    determine whether HCMS ever rendered any
7    services to Highland?
8         A.   I don't think so.
9         Q.   Do you know if Highland ever
10   loaned any money to HCMS?
11             MS. DEITSCH-PEREZ:  Asked and
12   answered.
13             MR. MORRIS:  You can answer.
14        A.   Oh, answer it again?
15        Q.   If I asked it, I apologize, but
16   go ahead, yeah.
17             MS. DEITSCH-PEREZ:  I thought you
18   asked about promissory notes.  If I'm
19   wrong, I apologize.
20             MR. MORRIS:  That's okay.
21        A.   Yeah, I'm sorry.  Okay.  So not
22   including any notes?
23        Q.   Yeah, let me ask a different
24   question.  I'm not asking about promissory
25   notes.

Page 110

N. Dondero

1
2     A.   Okay.
3     Q.   I'm asking whether prior to the
4  petition date, you or Dugaboy were aware of
5  any loans that Highland made to HCMS?
6     A.   Okay.  I'm aware of the ones that
7  are in question.
8          Are you speaking of others?
9     Q.   I am asking broadly at this time.
10         Are you generally aware that
11  Highland loaned –
12    A.   Yes.
13    Q.   – money to HCMS prior to the
14  petition date?
15    A.   Yes, I am generally aware.
16    Q.   Okay.  Did you and Dugaboy know
17  how many loans Highland made to HCMS prior
18  to the petition date?
19    A.   Yes, I believe.
20    Q.   And how many loans did Highland
21  make to HCMS prior to the petition date, to
22  the best of your knowledge?
23    A.   At least five.
24    Q.   And are those the loans that are
25  reflected in the five promissory notes that

Page 111

N. Dondero

1
2  are the subject of the lawsuit against
3  HCMS?
4     A.   Correct.
5     Q.   Okay.  Are you aware of any loans
6  that Highland ever made to HCMS that are
7  not subject to the lawsuit?
8     A.   I'm not – I'm not aware, John.
9     Q.   Did you ever ask – withdrawn.
10         Did you or Dugaboy ask at any
11  time whether Highland had ever made any
12  loans to HCMS that weren't reflected in the
13  promissory notes that are the subject of
14  the lawsuits?
15    A.   I don't believe we ever asked.
16    Q.   Do you know who authorized
17  Highland to make the loans to HCMS that
18  you're aware of?
19    A.   Okay.  I'm sorry, once again,
20  John, the question?
21    Q.   Did you or Dugaboy know prior to
22  the petition date who authorized Highland
23  to make the loans to HCMS that are the
24  subject of the promissory notes that you
25  referred to?

Page 112

N. Dondero

1
2     A.   Who authorized?
3     Q.   Yes.
4     A.   I don't know.
5     Q.   Do you recall if you or Dugaboy
6  asked anybody at any time prior to the
7  petition date who authorized Highland to
8  make the loans to HCMS?
9     A.   I don't believe that was asked.
10    Q.   Okay.  Do you have any
11  information as to whether HCMS intended to
12  pay back each of the loans that are the
13  subject of the promissory notes at the time
14  the loans were given to them by Highland?
15         MS. DEITSCH-PEREZ:  Objection.
16  No foundation.
17    A.   John, can you just say the
18  question again, please?
19    Q.   Sure.
20         Did you or Dugaboy have any
21  information prior to the petition date as
22  to whether HCMS intended to repay the loans
23  that are the subject of the promissory
24  notes that you identified?
25    A.   No.

Page 113

N. Dondero

1
2     Q.   Okay.  Did you or Dugaboy ever
3  ask anybody prior to the petition date
4  whether HCMS had intended to repay the
5  loans at the time and times that it
6  obtained them from Highland?
7     A.   Okay, John, can you ask that
8  again?
9     Q.   Sure.
10         Did you or Dugaboy ever ask
11  anybody whether HCMS intended to repay the
12  loans at the time HCMS obtained them from
13  Highland?
14    A.   I don't believe we asked their
15  intent.
16    Q.   Okay.
17         MS. DEITSCH-PEREZ:  Whenever –
18  we've been going about another hour.
19  So whenever is good for you, John.
20         MR. MORRIS:  Okay.  I'm going to
21  finish up this section here.
22  BY MR. MORRIS:
23    Q.   Do you or Dugaboy have any
24  knowledge as to why Highland made the loans
25  to HCMS?

Page 114

N. Dondero

1
2     A.   Only assumptions.
3     Q.   Okay.  I don't want assumptions.
4  I want information.
5     A.   Then I don't -- then I don't
6  know.
7     Q.   Okay.  Do you or Dugaboy ever ask
8  anybody why Highland made the loans to HCMS
9  that are the subject of the promissory
10 notes you referred to?
11    A.   No.
12    Q.   Did you or Dugaboy ever make any
13 effort to try to determine why Highland
14 made the loans to HCMS?
15    A.   No, not that I remember.
16    Q.   Did you or Dugaboy know prior to
17 the petition date what HCMS did with the
18 proceeds of the loans that it obtained from
19 Highland?
20    A.   I don't know, John.
21    Q.   Did you or Dugaboy ever ask
22 anybody at any time prior to the petition
23 date what HCMS did with the proceeds of the
24 loans that it obtained from Highland?
25    A.   No.

Page 115

N. Dondero

1
2     Q.   Did you or Dugaboy ever make any
3  effort to determine what HCMS did with the
4  proceeds of the loans that it obtained from
5  Highland?
6     A.   No.
7     Q.   You're aware that HCMS issued
8  promissory notes in favor of Highland in
9  exchange for the loans, correct?
10    A.   Correct.
11    Q.   Prior to the petition date, did
12 you ever see any promissory note that was
13 issued by HCMS in favor of Highland?
14    A.   Prior to October of '19?
15    Q.   Correct.
16    A.   I don't recall.
17    Q.   Do you recall whether you or
18 Dugaboy asked at any time prior to the
19 petition date to see promissory notes that
20 were executed on behalf of HCMS in favor of
21 Highland?
22    A.   I don't know.
23    Q.   Do you recall whether you or
24 Dugaboy made any effort at any time prior
25 to the petition date to obtain copies of

Page 116

N. Dondero

1
2  promissory notes that were issued by HCMS
3  in favor of Highland?
4     A.   I don't believe so.
5     Q.   Prior to the petition date, were
6  you and Dugaboy aware of the terms of the
7  promissory notes that HCMS issued in favor
8  of Highland?
9          MS. DEITSCH-PEREZ:  Object to the
10    form.
11    A.   Can you be more specific?  Just
12 the terms of the loan, John?
13    Q.   Yes.
14         Did you and Dugaboy know the
15 terms of the loans that were reflected in
16 the promissory notes?
17    A.   I believe so, yes.
18    Q.   Okay.  And who gave you the
19 information regarding the terms of the
20 loans that HCMS obtained from Highland?
21    A.   Jim.
22    Q.   Do you remember anything about
23 the terms of the loans that HCMS obtained
24 from Highland?
25    A.   Regarding -- you mean the term?

Page 117

N. Dondero

1
2  There's 30-year.  There's demand.
3     Q.   You tell me.
4          You described five promissory
5  notes, I think, that were executed by HCMS
6  in favor of Highland, right?
7     A.   That's correct.
8     Q.   Okay.  And I believe you
9  testified that you didn't see those notes
10 prior to the petition date, correct?
11    A.   Right.  Well, yeah, I'm a little
12 vague on the date; but, yes, I don't
13 believe I saw them prior to -- so right,
14 prior to the petition date, correct.
15 Um-hmm.
16    Q.   But did you or Dugaboy --
17 withdrawn.
18         Did you and Dugaboy have an
19 understanding of the terms of the notes
20 prior to the petition date?
21    A.   Yes.  From what I understand, my
22 recollection is several of them were
23 demand, and one was 30-year.
24    Q.   And do you have an understanding
25 of what it means -- of what a demand notice

Page 118

1          N. Dondero
2  is?
3          MS. DEITSCH-PEREZ:  Object to the
4  form.
5      A.  Payable upon demand.
6      Q.  Okay.  So you knew prior to the
7  petition date that certain of the notes
8  issued by HCMS to Highland were demand
9  notes; is that right?
10     A.  Yes.
11     Q.  Okay.
12         MR. MORRIS:  All right.  I'm
13  happy to take a break now.  Hopefully
14  it won't be as long as the last one.
15  But we can go off the record.
16         THE VIDEOGRAPHER:  The time is
17  12:00 p.m.  We are going off the
18  record.
19         (Recess is taken.)
20         (Patrick Daugherty not in
21  attendance at this time.)
22         THE VIDEOGRAPHER:  The time is
23  12:16.  Back on the record.
24  BY MR. MORRIS:
25     Q.  Ms. Dondero, did you communicate

Page 119

1          N. Dondero
2  with anybody during your break regarding
3  any aspect of your testimony?
4      A.  No, sir.
5      Q.  Okay.  Have you ever heard of an
6  entity called HCRE Partners LLC?
7      A.  Yes, sir.
8      Q.  Do you understand that HCRE is an
9  affiliate of Highland?
10     A.  I do.
11     Q.  Okay.  And what was the -- what
12  is the basis of your understanding that
13  HCRE -- withdrawn.  I should have put a
14  time frame on this.
15         Is it your understanding that
16  HCRE was an affiliate of Highland prior to
17  the petition date?
18     A.  Yes, sir.
19     Q.  And what is the basis for your
20  understanding?
21     A.  They were under the Highland
22  umbrella prior to October of '19.
23     Q.  And to the best of your
24  knowledge, does HCRE fit the definition of
25  affiliate that you provided earlier today?

Page 120

1          N. Dondero
2          MS. DEITSCH-PEREZ:  Objection.
3      A.  Yes.
4      Q.  Do you know the nature of HCRE's
5  business?
6      A.  I believe it's real estate.
7      Q.  Do you or Dugaboy have any
8  information about the nature of HCRE's
9  business other than it's real estate?
10     A.  No.
11     Q.  Did you or Dugaboy ever ask
12  anybody what the nature of HCRE's business
13  was?
14     A.  No.
15     Q.  Did you or Dugaboy ever make any
16  effort to ascertain the nature of HCRE's
17  business?
18     A.  Not that I recall.
19     Q.  Did you or Dugaboy know whether
20  HCRE had any agreements with Highland prior
21  to the petition date?
22         MS. DEITSCH-PEREZ:  Object to the
23  form.
24         MR. MORRIS:  Withdrawn.
25  BY MR. MORRIS:

Page 121

1          N. Dondero
2      Q.  Do you or Dugaboy know whether
3  HCRE had any agreements with Highland prior
4  to the petition date other than the
5  promissory notes?
6      A.  Other than the promissory notes,
7  no.
8      Q.  Did you or Dugaboy ever ask
9  anybody at any time prior to the petition
10  date whether HCRE had any agreements with
11  Highland other than the promissory notes?
12     A.  No.
13     Q.  Did you or Dugaboy make any
14  effort prior to the petition date to
15  ascertain whether any agreements existed
16  between Highland and HCRE other than the
17  promissory notes?
18     A.  Not that I recall.
19     Q.  Do you know -- withdrawn.
20         Did you or Dugaboy know prior to
21  the petition date whether HCRE had ever
22  rendered any services to Highland?
23         MS. DEITSCH-PEREZ:  Object to the
24  form.
25     A.  I don't know.

Appx. 01904

Page 122

N. Dondero

1
2      Q.   Did you or Dugaboy ever ask
3   anybody prior to the petition date whether
4   HCRE ever rendered any services to
5   Highland?
6      A.   I don't believe so.
7      Q.   Did you or Dugaboy make any
8   effort to ascertain prior to the petition
9   date whether HCRE ever rendered any
10  services to Highland?
11      MS. DEITSCH-PEREZ:  Object to the
12   form.
13      A.   I'm sorry, John, can you repeat
14   that, please, the question?
15      Q.   Did you or Dugaboy make any
16   effort prior to the petition date to
17   determine whether or not HCRE had ever
18   provided any services to Highland?
19      MS. DEITSCH-PEREZ:  Object to the
20   form.
21      A.   I don't believe so.
22      Q.   Are you aware -- withdrawn.
23      Did you or Dugaboy know prior to
24   the petition date whether Highland had ever
25   loaned any money to HCRE?

Page 123

N. Dondero

1
2      A.   Yes.
3      Q.   And were the loans that you're
4   aware of reflected in promissory notes?
5      A.   Correct.
6      Q.   And are those the promissory
7   notes that are the subject of one of the
8   litigations?
9      A.   Yes, sir.
10      Q.   Are you aware of any loans that
11   Highland ever made to HCRE that are not the
12   subject of one of the promissory notes in
13   the lawsuits?
14      A.   I'm not aware of any.
15      Q.   Did you ever ask anybody whether
16   Highland had ever made any loans to HCRE
17   that were not reflected in the promissory
18   notes that are the subject of the lawsuit?
19      A.   Not that I recall.
20      Q.   Did you or Dugaboy know prior to
21   the petition date who authorized Highland
22   to make the loans to HCRE?
23      MS. DEITSCH-PEREZ:  Object to the
24   form.
25      A.   Sorry, John, could you say the

Page 124

N. Dondero

1
2   question again, please?
3      Q.   Sure.
4      Did you or Dugaboy know prior to
5   the petition date who authorized Highland
6   to make the loans to HCRE?
7      MS. DEITSCH-PEREZ:  Object to the
8   form.
9      A.   I don't know.
10      Q.   Did you or Dugaboy ever ask
11   anybody prior to the petition date who
12   authorized Highland to make the loans to
13   HCRE that are reflected in the promissory
14   notes you referred to?
15      MS. DEITSCH-PEREZ:  Object to the
16   form.
17      A.   No.
18      Q.   Did you or Dugaboy ever make any
19   effort to ascertain who had authorized
20   Highland to make the loans to HCRE that are
21   reflected in the promissory notes you
22   referred to?
23      A.   Not that I recall.
24      Q.   Did you or Dugaboy have any
25   information prior to the petition date as

Page 125

N. Dondero

1
2   to whether HCRE intended to repay the loans
3   that are reflected in the promissory notes
4   at the time the loans were made?
5      MS. DEITSCH-PEREZ:  Object to the
6   form.
7      A.   John, I'm sorry, did I have any
8   information if they intended to pay their
9   loans?
10      Q.   At the time that they obtained
11   the loans, yes.
12      A.   I have no reason to think they
13   wouldn't pay their loans --
14      Q.   Okay.
15      A.   -- at the time they were made,
16   correct.
17      Q.   You're not aware of any facts
18   that suggest that HCRE didn't intend to
19   repay the loans at the time they obtained
20   them, right?
21      A.   Correct.
22      Q.   Prior to the petition date, did
23   you or Dugaboy have any information in
24   regard to the purpose of the loans that
25   Highland gave to HCRE that were reflected

Page 126

N. Dondero

1   in the promissory notes?
2       A.  No, no idea.
3       Q.  Did you or Dugaboy attempt to
4   obtain prior to the petition date any
5   information concerning the purpose of the
6   loans that were made by Highland to HCRE
7   that were reflected in the promissory
8   notes?
9       A.  I don't believe so.
10      Q.  Did you or Dugaboy make any
11  effort to ascertain the purpose of the
12  loans that Highland made to HCRE?
13      A.  I don't believe so.
14      Q.  Did you or Dugaboy know prior to
15  the petition date what HCRE did with the
16  proceeds of the loans that it obtained from
17  Highland in exchange for the promissory
18  notes?
19      A.  We don't know.
20      Q.  Did you or Dugaboy ever ask
21  anybody what HCRE did with the proceeds of
22  the loans that it obtained from Highland in
23  exchanged from the promissory notes?
24      A.  I don't believe we did.

Page 127

N. Dondero

1       Q.  Did you or Dugaboy ever make any
2   effort prior to the petition date to
3   ascertain what HCRE did with the proceeds
4   of the loans that it obtained from Highland
5   that are reflected in the promissory notes?
6       A.  No.
7       Q.  Did you ever see – withdrawn.
8           Did you or Dugaboy ever see prior
9   to the petition – withdrawn.  Not good.
10  Too many questions.
11          Did you or Dugaboy – withdrawn.
12          Prior to the petition date, did
13  you or Dugaboy ever see any promissory note
14  that was executed by HCRE in favor of
15  Highland?
16      A.  Not that I recall.
17      Q.  Prior to the petition date, did
18  you or Dugaboy ever ask anybody to see any
19  promissory note that was issued by HCRE in
20  favor of Highland?
21      A.  Not that I recall.
22      Q.  Prior to the petition date, did
23  you or Dugaboy make any effort to try to
24  obtain any promissory note that was ever

Page 128

N. Dondero

1   executed on behalf of HCRE in favor of
2   Highland?
3       A.  No.
4       Q.  Prior to the petition date, did
5   you and Dugaboy know the terms of any of
6   the promissory notes that were issued by
7   HCRE to Highland?
8       A.  Yes.
9       Q.  And how did you learn of the
10  terms of the notes?
11      A.  From Jim.
12      Q.  And what did Jim tell you about
13  the terms of the notes that were issued by
14  HCRE to Highland?
15      A.  He mentioned the 30-year demand,
16  the dates, the amounts.
17      Q.  Okay.  Did you do – withdrawn.
18          Did you or Dugaboy take any steps
19  to try to corroborate what your brother
20  told you concerning the terms of the notes
21  that were issued by HCRE to Highland?
22      A.  Not that I recall.
23      Q.  Okay.  Did you have any source of
24  information for the terms of the notes

Page 129

N. Dondero

1   other than what your brother gave to you?
2       A.  I don't believe so.
3       Q.  Okay.  Last one.  NexPoint.
4           Are you familiar with an entity
5   called NexPoint Advisors LP?
6       A.  Yes.
7       Q.  Can we refer to that entity as
8   NexPoint?
9       A.  Yes.
10      Q.  Is it your understanding that
11  NexPoint was an affiliate of Highland's
12  prior to the petition date, as you've used
13  the term "affiliate"?
14      A.  Um-hmm.  Yes.
15      Q.  And what's the basis for your
16  understanding that prior to the petition
17  date, NexPoint was an affiliate of
18  Highland?
19      A.  Because Jim is a beneficial
20  owner.
21      Q.  Is it your understanding that Jim
22  is a beneficial owner of all of the
23  defendants in each of the promissory note
24  lawsuits?

**Appx. 01906**

Page 130

1           N. Dondero
2        MS. DEITSCH-PEREZ:  Object to the
3     form.
4        THE WITNESS:  Can I answer?
5     BY MR. MORRIS:
6     Q.  Yes.
7     A.  Yes, that is my belief, John.
8     Q.  Do you have any reason to believe
9  Jim is not a beneficial owner of any
10  corporate defendant in any of the lawsuits?
11     A.  No, I have no reason to believe
12  that.
13     Q.  Prior to the petition date, did
14  you or Dugaboy know the nature of
15  NexPoint's business?
16     A.  I'm not really sure.
17     Q.  Do you know the nature of
18  NexPoint's business today?
19     A.  I'm not sure.
20     Q.  Did you or Dugaboy ever ask
21  anybody at any time what the nature of
22  NexPoint's business was?
23     A.  I don't believe we did.
24     Q.  Did you or Dugaboy make any
25  effort at any time to try to learn what the

Page 131

1           N. Dondero
2  nature of NexPoint's business was?
3     A.  Not that I recall.
4     Q.  Did you or Dugaboy know prior to
5  the petition date whether NexPoint had any
6  agreements with Highland?
7        MS. DEITSCH-PEREZ:  Object to the
8     form.
9        MR. MORRIS:  I apologize.  I'll
10     make the same qualification.
11  BY MR. MORRIS:
12     Q.  Did you and Dugaboy know prior to
13  the petition date whether NexPoint and
14  Highland had any agreements together other
15  than the promissory notes?
16     A.  I'm not aware of any.
17     Q.  Okay.  Did you or Dugaboy ask
18  anybody at any time prior to the petition
19  date whether any agreements existed between
20  NexPoint and Highland other than the
21  promissory notes?
22     A.  No, not that I'm aware of.
23     Q.  Did you or Dugaboy ever make any
24  effort prior to the petition date to
25  determine whether any agreements existed

Page 132

1           N. Dondero
2  between Highland and NexPoint other than
3  the promissory notes?
4     A.  Not that I'm aware of.
5     Q.  Did you or Dugaboy know prior to
6  the petition date whether NexPoint ever
7  rendered any services to Highland?
8        MS. DEITSCH-PEREZ:  Object to the
9     form.
10     A.  I don't know.
11     Q.  Did you or Dugaboy ever ask
12  anybody at any time prior to the petition
13  date whether NexPoint had ever rendered any
14  services to Highland?
15        MS. DEITSCH-PEREZ:  Object to the
16     form.
17     A.  I'm sorry, John.  Can you repeat
18  the question, please?
19     Q.  Sure.
20        Did you and Dugaboy ask anybody
21  at any time prior to the petition date
22  whether NexPoint had ever rendered any
23  services to Highland?
24     A.  Not that I'm aware of.
25     Q.  Did you and Dugaboy make any

Page 133

1           N. Dondero
2  effort prior to the petition date to
3  determine whether or not NexPoint had ever
4  rendered any services to Highland?
5     A.  Not that I'm aware of.
6     Q.  Are you aware that Highland made
7  loans to NexPoint from time to time?
8     A.  I don't know.
9     Q.  Did you ever see any -- do you
10  know whether -- withdrawn.
11        Prior to the petition date, were
12  you and Dugaboy aware of any promissory
13  notes that NexPoint had issued in favor of
14  Highland?
15        MS. DEITSCH-PEREZ:  You mean
16     other than what's at issue here?  Just
17     generally?
18        MR. MORRIS:  I'm starting with
19     the general, yeah.
20     A.  I'm not aware of.
21     Q.  Are you aware of any promissory
22  notes that NexPoint ever issued in favor of
23  Highland?
24     A.  I'm not aware of any.
25     Q.  Do you know whether there are any

Page 134

1          N. Dondero
2   promissory notes that NexPoint issued that
3   are the subject of this lawsuit?
4       A.   Yeah.  John, can we back up a
5   question?
6       Q.   Absolutely.
7       A.   Are you talking about the notes
8   -- yeah, please.
9           Are you talking about the notes,
10  part of this proceeding or are you not?
11      Q.   I'm starting -- that's okay.  Let
12  me --
13      A.   Because obviously there is the
14  NexPoint promissory note that we are
15  talking about.  When I answered the way I
16  did, it was regarding others that I'm not
17  aware of.  I'm aware of the one obviously
18  in this proceeding.
19      Q.   Okay.  Thank you for the --
20      A.   Does that clarify?
21      Q.   It does.  It is helpful.  Thank
22  you very much.
23          Other than the one -- how many
24  NexPoint notes do you understand are the
25  subject of these litigations?

Page 135

1          N. Dondero
2       A.   One.
3       Q.   Okay.  Other than that one note,
4   are you aware of any other promissory notes
5   that NexPoint ever issued in favor of
6   Highland?
7           MS. DEITSCH-PEREZ:  Object to the
8   form.
9       A.   No, I'm not aware of any other.
10      Q.   Did you ask anybody -- withdrawn.
11          Did you or Dugaboy ask anybody
12  prior to the petition date whether NexPoint
13  had issued any other promissory notes in
14  favor of Highland other than the one that's
15  the subject of the lawsuit?
16      A.   I don't believe so.
17      Q.   Did you or Dugaboy know prior to
18  the petition date whether Highland had made
19  any loan to NexPoint other than the loan
20  that's reflected in the promissory note?
21          MS. DEITSCH-PEREZ:  Object to the
22  form.
23      A.   I'm not aware of any.
24      Q.   Do you know how much the
25  promissory -- do you know the principal

Page 136

1          N. Dondero
2   amount of -- withdrawn.
3           Do you know the -- withdrawn.
4           Did you and Dugaboy know the
5   principal amount of NexPoint's promissory
6   note prior to the petition date?
7       A.   Yes.
8       Q.   And how did you learn that?
9       A.   From Jim.
10      Q.   And what did Jim tell you that
11  you can recall?
12      A.   30 million thereabouts, in that
13  neighborhood.
14      Q.   Do you know how many principal
15  was owed as of the petition date?
16      A.   It's paid down by, oh, about a
17  third, so it's somewhere 22, 23 million, I
18  believe, in that ballpark.
19      Q.   Okay.  And how did you learn that
20  NexPoint had paid down the principal to
21  that ballpark?
22      A.   I'm not sure.
23      Q.   Do you recall when you learned
24  that NexPoint had paid down the principal
25  to that ballpark?

Page 137

1          N. Dondero
2       A.   Not exactly.
3       Q.   Okay.  But you are aware that
4   NexPoint paid approximately 7 to 8 million
5   dollars in principal on the note that's the
6   subject of the lawsuit, correct?
7           MS. DEITSCH-PEREZ:  Object to the
8   form.
9       A.   Yes, it was somewhere in that
10  ballpark.  Sure.
11      Q.   Okay.  Did you and Dugaboy know
12  prior to the petition date who authorized
13  Highland to make the loan to NexPoint?
14          MS. DEITSCH-PEREZ:  Object to the
15  form.
16      A.   No, I don't know.
17      Q.   Did you or Dugaboy prior to the
18  petition date ask anybody who had
19  authorized Highland to make the $30 million
20  loan to NexPoint?
21      A.   Not that I recall.
22      Q.   Did you or Dugaboy make any
23  effort prior to the petition date to
24  determine who had authorized Highland to
25  make the $30 million loan to NexPoint?

Page 138

N. Dondero

1          A.  Not that I recall.
2          Q.  Do you have any reason to believe
3    that NexPoint did not intend to pay all
4    principal and interest due under the
5    promissory note at the time that it
6    obtained the loan from Highland?
7          A.  I have no reason to believe they
8    weren't intending to pay.
9          Q.  Did you have any reason to
10   believe -- withdrawn.
11          Do you or Dugaboy have any reason
12   to believe that Highland wasn't not
13   expecting to get repaid all principal and
14   interest due under the loan at the time it
15   made the loan?
16          MS. DEITSCH-PEREZ:  Object to the
17      form.  Actually, can somebody --
18          Annette, could you read that
19      back?  There were a double negative or
20      two.
21          MR. MORRIS:  Okay.  Let me
22      rephrase the question.  That's fine.
23      That's fine.
24   BY MR. MORRIS:

Page 139

N. Dondero

1          Q.  Do you have any reason to believe
2    that Highland didn't intend to get repaid
3    all principal and interest due under the
4    NexPoint note at the time it made the loan?
5          A.  I have no reason to believe that
6    I didn't think that they weren't to get
7    repaid at the time the notes were
8    initiated.
9          Q.  Okay.  Did you or Dugaboy know
10   prior to the petition date what the purpose
11   of the $30 million loan was?
12          A.  I don't know.
13          Q.  Did you or Dugaboy ever ask
14   anybody prior to the petition date what the
15   purpose of the $30 million loan was?
16          A.  I don't believe so.
17          Q.  Did you or Dugaboy make any
18   effort prior to the petition date to
19   ascertain what the purpose of the $30
20   million loan was?
21          A.  I don't believe so.
22          Q.  Do you or Dugaboy -- withdrawn.
23          Did you or Dugaboy know prior to
24   the petition date what NexPoint did with

Page 140

N. Dondero

1    the proceeds of the loan?
2          A.  No, I don't know.
3          Q.  Did you or Dugaboy ever ask
4    anybody prior to the petition date what
5    NexPoint did with the proceeds of the loan?
6          A.  We did not.
7          Q.  Did you or Dugaboy know prior to
8    the petition date that the $30 million loan
9    was a rollup of previously existing loans
10   that Highland had made to NexPoint?
11          MS. DEITSCH-PEREZ:  Object to the
12      form.
13          A.  I was not aware of that.
14          Q.  Are you aware today that the $30
15   million loan was a roll up of previously
16   existing notes?
17          A.  I didn't, no.
18          Q.  Did you ever see the promissory
19   note that was issued by NexPoint in favor
20   of Highland that's the subject of one of
21   these notes -- litigations?
22          A.  I don't remember.  That was in
23   '17, correct, John?
24          Q.  I'm just asking if -- let me ask

Page 141

N. Dondero

1    a different question.
2          A.  Yeah, I don't --
3          Q.  Okay.  Did you or Dugaboy see the
4    promissory note prior to the
5    commencement -- no.
6          Did you or Dugaboy prior to the
7    petition date ever see the promissory note
8    that NexPoint issued in favor of Highland
9    in the principal amount of approximately
10   $30 million?
11          A.  I don't recall.
12          Q.  Do you recall if you or Dugaboy
13   ever asked anybody prior to the petition
14   date to see the $30 million promissory note
15   that NexPoint issued in favor of Highland?
16          A.  I don't believe so.
17          Q.  Did you or Dugaboy make any
18   effort prior to the petition date to obtain
19   a copy of the $30 million promissory note
20   that NexPoint issued in favor of Highland?
21          A.  I don't recall.
22          Q.  Were you and Dugaboy aware at any
23   time prior to the petition date of the
24   terms of the promissory note that NexPoint

Appx. 01909

Page 142

1           N. Dondero
2   issued in favor of Highland?
3       A.  30-year.
4       Q.  It was a 30-year note?
5       A.  Um-hmm.
6       Q.  Do you recall anything else about
7   that note?
8       A.  I believe it was 2017.
9       Q.  Okay.
10      A.  And the amounts we already
11  discussed.
12      Q.  Do you know who determined that
13  the promissory note would be a 30-year
14  term?
15      A.  I do not.
16      Q.  Do you know who on behalf of
17  Highland agreed to accept a 30-year note
18  from NexPoint?
19      MS. DEITSCH-PEREZ:  Object to the
20  form.
21      A.  I don't know, John.
22      Q.  Did you or Dugaboy make an effort
23  at any time prior to the petition date to
24  determine whether or not a 30-year term was
25  appropriate?

Page 143

1           N. Dondero
2       MS. DEITSCH-PEREZ:  Object to the
3   form.
4       A.  No.
5       Q.  Did you or Dugaboy ask anybody at
6   any time prior to the petition date whether
7   a 30-year term was appropriate?
8       MS. DEITSCH-PEREZ:  Object to the
9   form.
10      A.  Not that I recall.
11      Q.  Did you or Dugaboy know prior to
12  the petition date whether the $30 million
13  note was the subject of any negotiation
14  between NexPoint and Highland?
15      MS. DEITSCH-PEREZ:  Object to the
16  form.
17      A.  I didn't know.
18      Q.  Did you or Dugaboy ask anybody at
19  any time prior to the petition date whether
20  the $30 million note was subject to
21  negotiation?
22      A.  Subject to negotiation?  Can you
23  elaborate?  What negotiation?
24      Q.  Are you aware of anybody on
25  behalf of Highland suggesting that the term

Page 144

1           N. Dondero
2   of the note should be something other than
3   30 years?
4       A.  No.  Changing that term, no, I'm
5   not familiar.
6       Q.  Okay.  Let's switch topics and
7   I'll cover this topic and then we can take
8   a lunch break.
9           I'd like to turn now to the
10  limited partnership agreement, the LP
11  agreement as I think we've defined it.  And
12  I'm going to ask my colleague to put up on
13  the screen -- I don't think it's in the
14  binder that I gave you.
15      MS. DEITSCH-PEREZ:  Yes, it is.
16      MR. MORRIS:  Oh, is it?
17      MS. DEITSCH-PEREZ:  It is?
18      MR. MORRIS:  What number is it?
19      MS. DEITSCH-PEREZ:  It is number
20  2, it looks like.
21      MR. MORRIS:  So we'll put it up
22  on the screen and then you can look at
23  the hard copy.
24      MS. DEITSCH-PEREZ:  Okay.  Is
25  there a particular page you want to

Page 145

1           N. Dondero
2   turn to?
3       MR. MORRIS:  Let's just start
4   with this.
5   BY MR. MORRIS:
6       Q.  Do you understand --
7       MS. DEITSCH-PEREZ:  Hang on a
8   minute.  One second.
9           Okay.  We're good.  We've got it.
10  BY MR. MORRIS:
11      Q.  Okay.  Are you looking at the
12  document that is Exhibit 4 that's attached
13  to the document that's been denoted as
14  number 2?
15      MS. DEITSCH-PEREZ:  Yes.
16          Turn to the page before the one
17  that says --
18      THE WITNESS:  Oh, okay.
19      A.  So page 4 of 37?
20      Q.  Yes.
21          (Document review.)
22      A.  Okay.
23      Q.  All right.
24      A.  Okay.  Go ahead.
25      Q.  At the top, do you see it says

Page 146

```
 1              N. Dondero
 2  Document 63-4 in the middle?
 3     A.  Yes, I do.
 4     Q.  And you're at page 2 of 37,
 5  correct?
 6     A.  Correct.
 7     Q.  Okay.  Do you understand that
 8  this is the document we defined earlier as
 9  the LP agreement?
10     A.  Yes, sir.
11     Q.  Have you seen this document
12  before now?
13     A.  Yes.
14     Q.  Do you recall when you saw this
15  document for the first time?
16     A.  Shortly after it was made, when I
17  was trustee.
18     Q.  Okay.  Do you recall the
19  circumstances under which you saw the LP
20  agreement for the first time?
21     A.  No, I don't remember the
22  circumstance.
23     Q.  Do you have a copy of the LP
24  agreement in your personal possession?
25  Like other than right now, did you have it
```

Page 147

```
 1              N. Dondero
 2  before today or before I sent it?
 3     A.  Yes.
 4     Q.  Okay.  Do you recall when you
 5  first obtained a copy of the LP agreement?
 6     A.  The very first time?
 7     Q.  Yeah.
 8     A.  I don't know specifically, John.
 9     Q.  Can we go to the document -- the
10  page that's marked 32 of 37?
11        MS. DEITSCH-PEREZ:  2 of 37?
12        THE WITNESS:  32 of 7 -- 32 of
13  37.
14        MS. DEITSCH-PEREZ:  Thank you.
15        (Document review.)
16  BY MR. MORRIS:
17     Q.  And is that your signature there?
18        MR. MORRIS:  If we can get page
19  32 of 37 up on the screen.
20        (Document review.)
21  BY MR. MORRIS:
22     Q.  And is that your signature there,
23  ma'am?
24     A.  Well, on the paper copy, it is.
25  Oh, there it is.  Yes.
```

Page 148

```
 1              N. Dondero
 2     Q.  Okay.
 3        MR. MORRIS:  And I apologize La
 4  Asia, but can we go now to Section
 5  3.10?
 6        We're going to mark it.  This one
 7  is Exhibit 2.  Don't worry that we are
 8  going out of order.  They're premarked.
 9  So this document we're going to mark as
10  Exhibit 2.
11        (N. Dondero Exhibit 2, Amended
12  Complaint for (1) Breach of Contract,
13  (II) Turnover of Property, (III)
14  Fraudulent Transfer, and (IV) Breach of
15  Fiduciary Duty, marked for
16  identification, as of this date.)
17        MS. DEITSCH-PEREZ:  Did I miss
18  Exhibit 1?
19        MR. MORRIS:  No.
20        MS. DEITSCH-PEREZ:  Okay.
21  BY MR. MORRIS:
22     Q.  Do you see Section 3.10?  Do you
23  have that in front of you?
24     A.  Yes.
25     Q.  Have you seen that provision of
```

Page 149

```
 1              N. Dondero
 2  the LP agreement before?
 3     A.  Yes.
 4     Q.  Do you recall when you first read
 5  or you first saw Section 3.10?
 6     A.  On the day I probably signed it.
 7     Q.  All right.  I don't want you to
 8  speculate.  I want you to search your
 9  memory.
10     A.  Okay.
11     Q.  Do you recall when you saw
12  Section 3.10 for the first time?
13     A.  The first time I saw the
14  document.
15     Q.  Okay.  Do you recall the
16  circumstances under which you reviewed
17  Section 3.10?
18     A.  Prior to signing the document.
19     Q.  Do you see there is a reference
20  in the document in Section 3.10 to majority
21  interest?
22     A.  Yes, sir.
23     Q.  Do you have an understanding of
24  what that term means?
25     A.  Class A shareholders -- limited
```

Page 150

```
 1              N. Dondero
 2  partners.  I apologize.
 3       Q.   And what is the basis for that
 4  understanding?
 5       A.   Because the class A limited
 6  partners is the majority interest.  Holds
 7  -- I'm sorry, holds the majority interest.
 8       Q.   And did you ever discuss that
 9  with anybody at any time?
10       MS. DEITSCH-PEREZ:  And I'm going
11       to direct her to ask exclude any
12       discussions with lawyers.  So other --
13       MR. MORRIS:  Let me rephrase the
14       question.  Let me rephrase the
15       question.
16  BY MR. MORRIS:
17       Q.   Did you ever discuss the
18  definition of majority interest with
19  anybody at any time prior to the petition
20  date?
21       A.   I don't recall.
22       Q.   Do you believe that Dugaboy holds
23  a majority interest, as that term is used
24  in Section 3.10?
25       A.   Yes, I do believe that.
```

Page 151

```
 1              N. Dondero
 2       Q.   And did you believe that prior to
 3  the petition date?
 4       A.   Yes.
 5       Q.   What was the basis for your
 6  belief prior to the petition date that
 7  Dugaboy held a majority interest?
 8       A.   I was told that Dugaboy held the
 9  majority interest.
10       Q.   And who told you that Dugaboy
11  held the majority interest?
12       A.   Melissa Schroth.
13       Q.   Do you recall when Ms. Schroth
14  told you that?
15       A.   Shortly after I became trustee.
16       Q.   And can you tell me who Melissa
17  Schroth is?
18       A.   Melissa is a financial assistant
19  with Jim.
20       Q.   And you communicated with
21  Ms. Schroth on a regular basis prior to the
22  petition date; is that fair?
23       A.   Correct.
24       Q.   Do you know, is Ms. Schroth a
25  lawyer?
```

Page 152

```
 1              N. Dondero
 2       A.   I don't believe so.
 3       Q.   Do you know anything about her
 4  background or expertise?
 5       A.   Accounting, I believe.
 6       Q.   Did you ever do anything to
 7  corroborate what Ms. Schroth told you about
 8  Dugaboy being a majority interest?
 9       A.   I had no reason to disbelieve
10  her.
11       Q.   But you didn't do anything to
12  corroborate that; is that right?
13       A.   I did not, sir.
14       Q.   Did you seek any advice from
15  anybody to ascertain whether what
16  Ms. Schroth told you was accurate?
17       A.   I don't recall.
18       Q.   Okay.  Do you see at the end of
19  Section 3.10, there is a reference to NAV
20  trigger period?
21       A.   Yes.
22       Q.   Do you have an understanding --
23  withdrawn.
24            Did you have an understanding
25  prior to the petition date of what a NAV
```

Page 153

```
 1              N. Dondero
 2  trigger period was?
 3       A.   No.
 4       Q.   Did you ever ask anybody prior to
 5  the petition date what a NAV trigger period
 6  was?
 7       A.   I don't believe so.
 8       Q.   Did you or Dugaboy make any
 9  effort prior to the petition date to
10  ascertain whether a NAV trigger period had
11  occurred?
12       A.   I don't believe so.
13       Q.   Did you or Dugaboy ever know
14  prior to the petition date whether in fact
15  a NAV trigger period had ever occurred?
16       A.   I don't think so.
17       Q.   All right.
18       MR. MORRIS:  I think if it's okay
19       with you guys, now might be a nice time
20       to take a lunch break.
21            I prefer that it not be too
22       extended.  Would it be okay if we came
23       back at the bottom of the hour?
24            THE WITNESS:  1:30, would that be
25       okay?
```

Page 154

```
1           N. Dondero
2      MR. MORRIS:  Yeah, 1:30 Central.
3  Is that good?
4      THE WITNESS:  That would be
5  great.  Thank you.
6      MR. MORRIS:  Thanks so much.
7      THE VIDEOGRAPHER:  The time is
8  12:54.  We're going off the record.
9      (Recess is taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 155

```
1           N. Dondero
2      A F T E R N O O N   S E S S I O N
3      (Time noted:  1:35 p.m.)
4      THE VIDEOGRAPHER:  The time is
5  1:35.  We are back on the record.
6           *       *       *
7  N A N C Y   D O N D E R O,   resumed and
8       testified as follows:
9  EXAMINATION BY (Cont'd.)
10 MR. MORRIS:
11     Q.  Ms. Dondero, are you ready to
12 proceed?
13     A.  I am.
14     MR. MORRIS:  Are you Deborah?
15     MS. DEITSCH-PEREZ:  (Nodding.)
16     MR. MORRIS:  Okay.  Thank you.
17 BY MR. MORRIS:
18     Q.  Can you hear me okay?
19     A.  Yes, sir.
20     Q.  Okay.  I've switched from my
21 phone to my computer.  Somehow it worked.
22 Now I wanted to make sure you can hear me.
23     Ms. Dondero, did you speak to
24 anybody during the break about the
25 substance of your testimony?
```

Page 156

```
1           N. Dondero
2      A.  No, sir.
3      Q.  Did you speak to anybody during
4  the break regarding the substance of this
5  deposition in any way?
6      A.  No, sir.
7      Q.  Okay.  When we left, we had just
8  looked at Section 3.10 of the LP agreement.
9      Do you remember that?
10     A.  Yes.
11     Q.  Is there anything about the LP
12 agreement that you -- withdrawn.
13     Is there anything that you or
14 Dugaboy don't understand about Section 3.10
15 of the LP agreement?
16     MS. DEITSCH-PEREZ:  Object to the
17 form.
18 BY MR. MORRIS:
19     Q.  You can answer.
20     A.  No.
21     Q.  Is there any aspect of Section
22 3.10 that you and Dugaboy thinks is
23 ambiguous?
24     MS. DEITSCH-PEREZ:  Object to the
25 form.
```

Page 157

```
1           N. Dondero
2      A.  No.
3      Q.  Let's switch gears now and let's
4  talk about the oral agreement that's been
5  referred to in this litigation.
6      I'd like to put up on the screen
7  a document that you don't have a hard copy
8  of, or at least I didn't give it to you,
9  and that would be the Amended Complaint
10 that was served by Highland against you and
11 your brother and Dugaboy.
12     MR. MORRIS:  And that document
13 we're marking for purposes of the
14 deposition as Exhibit No. 31.
15     (N. Dondero Exhibit 31, Defendant
16 James Donder's Answer to Amended
17 Complaint, marked for identification,
18 as of this date.)
19     MR. MORRIS:  Can we put that on
20 the screen, please, and turn to
21 paragraph 82?
22     Actually, stop right there.
23 BY MR. MORRIS:
24     Q.  Ms. Dondero, have you ever seen,
25 if we can scroll up -- and, again, this is
```

Page 158

1        N. Dondero
2   consistent with what I explained to you at
3   the beginning of the deposition.
4         I don't mean to rush you.  I
5   think you should take all the time you need
6   to look at this document if you want to,
7   but my first question is simply whether you
8   have ever seen this document before.  And
9   if you need to see more of it, just let me
10  know.
11        (Document review.)
12     A.  Can you scroll to the next page,
13  John, please?
14     Q.  Sure.
15        (Document review.)
16        MS. DEITSCH-PEREZ:  I have a hard
17  copy here I could give the witness.
18        Do you want me to do that?
19        MR. MORRIS:  Sure.
20  BY MR. MORRIS:
21     Q.  And just for clarity,
22  Ms. Dondero, this is the Amended Complaint
23  that Highland served to collect on the
24  notes that were issued by your brother.
25     A.  Okay.

Page 159

1        N. Dondero
2        MS. CANTY:  John, I'm sorry.  31
3   is actually the answer to the Amended
4   Complaint.
5        MR. MORRIS:  I'm sorry.  I
6   apologize that.  Let me restate that.
7        Exhibit 31 is the answer,
8   Mr. Dondero's answer to the Amended
9   Complaint.
10        MS. DEITSCH-PEREZ:  All right.
11  So what are you asking if she has seen?
12  I was going to hand her the complaint.
13        MR. MORRIS:  It's my mistake,
14  Deborah.  If we can go back to – if we
15  can go back to the top.
16        Let me start this over.
17  BY MR. MORRIS:
18     Q.  Do you see, Ms. Dondero, that
19  this is defendant James Dondero's answer to
20  Amended Complaint?
21     A.  Yes, I see that.
22     Q.  Have you ever seen your brother's
23  answer to the Amended Complaint?
24     A.  I don't remember if I've seen
25  this or not.  Deborah just gave me a hard

Page 160

1        N. Dondero
2   copy.  Can I have a quick minute to glance
3   over it?
4     Q.  Sure.  Take your time.  And let
5   me know at the top of it, what the docket
6   number is.
7     A.  Certainly.
8        Docket No. DOC 83 –
9     Q.  Okay.  Perfect.
10     A.  – filed on December 3rd.
11        Is that it?
12     Q.  Yes.  So we are looking at the
13  same thing.
14        MR. MORRIS:  And this document is
15  going to be marked as Exhibit 31.
16     A.  Okay.
17     Q.  All right.  Have you seen this
18  document before?
19     A.  I think so.
20     Q.  Okay.
21        MR. MORRIS:  I'm going to ask, La
22  Asia go to paragraph 82.
23     A.  Okay.
24     Q.  Do you seep paragraph 82 is up on
25  the screen?

Page 161

1        N. Dondero
2     A.  Yes, sir.
3     Q.  So I'm going to read a portion of
4   it to you beginning at the very top, okay?
5        I just want you to follow along
6   with me.
7        Paragraph 82 says in part,
8   "Plaintiff's claims are barred in whole or
9   in part because prior to the demands for
10  payment, plaintiff agreed that it would not
11  collect the notes upon fulfillment of
12  condition subsequent.  Specifically,
13  sometime between December of the year in
14  which each note was made and February the
15  following year, Defendant Nancy Dondero, as
16  representative for a majority of the Class
17  A shareholders of plaintiff agreed that
18  plaintiff would forgive the notes if
19  certain portfolio companies were sold for
20  greater than cost or on a basis outside of
21  defendant James Dondero's control.  The
22  purpose of this agreement was to provide
23  compensation to defendant James Dondero,
24  who was otherwise underpaid compared to
25  reasonable compensation levels in the

Page 162

N. Dondero

1
2    industry through the use of forgivable
3    loans, a practice that was standard at
4    HCMLP and in the industry."
5        Have I read that correctly?
6    A.  Um-hmm, yes.
7    Q.  Okay.  To the best of your
8    knowledge, is the portion of paragraph 82
9    that I just read true and accurate?
10   A.  Yes.  Correct.
11   Q.  Are you aware, as Dugaboy's
12   30(b)(6) witness, that HCRE, HCMS, and
13   NexPoint all make the same allegation in
14   defense?
15   A.  Yes.
16   Q.  So is it your testimony that the
17   statement that I just read from paragraph
18   82 applies to the promissory notes issued
19   by HCRE, HCMS, and NexPoint, and that are
20   the subject of the lawsuits?
21   A.  Yes.
22   Q.  So it's your testimony that you
23   entered into oral agreements with your
24   brother between December and the year each
25   note was made, and February of the

Page 163

N. Dondero

1
2    following year, pursuant to which plaintiff
3    agreed that plaintiff would forgive the
4    notes if certain portfolio companies were
5    sold for greater than cost or on a basis
6    outside of James Dondero's control,
7    correct?
8    A.  That is correct.
9    Q.  Can we refer to each of the oral
10   agreements that you entered into with your
11   brother concerning the promissory notes
12   that are described in paragraph 82 as an
13   agreement and collectively as the
14   agreements?
15   A.  Certainly.
16       MS. DEITSCH-PEREZ:  Okay.  And
17   just, John, just so I don't have to
18   object each time, when you say "you,"
19   you're talking about Dugaboy?
20       MR. MORRIS:  I'm talking about
21   both unless I say otherwise.  But thank
22   you for pointing that out.
23       MS. DEITSCH-PEREZ:  Okay.
24       MR. DRAPER:  John, just so you
25   know, to the extent that -- hold on.

Page 164

N. Dondero

1
2    I'm muted.
3        To the extent Deborah raises an
4    objection for the "you," Nancy, as a
5    trustee, I'm not going to say anything,
6    but my objection is a follow-on for the
7    same thing, for the same reasons.
8        MR. MORRIS:  Okay.  I appreciate
9    that, Douglas.
10       So I'm going to ask the question
11   again.
12   BY MR. MORRIS:
13   Q.  Is it your testimony that you, as
14   the trustee of The Dugaboy Investment
15   Trust, entered into oral agreements with
16   your brother between December and the year
17   each note was made and February of the
18   following year, pursuant to which plaintiff
19   agreed that plaintiff would forgive the
20   notes if certain portfolio companies were
21   sold for greater than cost or on a basis
22   outside of James Dondero's control?
23   A.  That is correct.
24   Q.  Okay.  And can we refer to each
25   of the oral agreements that are the subject

Page 165

N. Dondero

1
2    of paragraph 82 individually as an
3    agreement and collectively as the
4    agreements?
5    A.  Um-hmm.  Yes.
6    Q.  Is that a yes?
7    A.  Yes.  That is a yes.  Sorry.
8    Q.  And do you and Dugaboy understand
9    that the phrase "plaintiff" in paragraph 82
10   refers to Highland?
11   A.  Yes.
12   Q.  And do you and Dugaboy understand
13   that Dugaboy, as the representative of a
14   majority of the Class A shareholders of
15   Highland is the actual entity that entered
16   into the agreements on behalf of Highland?
17   A.  Yes.
18   Q.  And you are the trustee of
19   Dugaboy today, correct?
20   A.  Correct.
21   Q.  And you were the trustee of
22   Dugaboy at the time each of the agreements
23   referred to in paragraph 82 was entered
24   into, correct?
25   A.  Correct.

Appx. 01915

Page 166

N. Dondero

1
2     Q.   And you personally caused Dugaboy
3 to enter into each agreement that is
4 referred to in paragraph 82, correct?
5         MS. DEITSCH-PEREZ:  Object to the
6     form.
7 BY MR. MORRIS:
8     Q.   You can answer.
9         MS. DEITSCH-PEREZ:  I'm sorry,
10    John, can you repeat the question,
11    please?
12 BY MR. MORRIS:
13    Q.   You personally caused Dugaboy to
14 enter into each of the agreements that's
15 referred to in paragraph 82, correct?
16        MS. DEITSCH-PEREZ:  Object to the
17    form.
18    A.   Correct.
19    Q.   What is Dugaboy?
20    A.   The trust, the living
21 maintenance, education, and health trust.
22    Q.   Do you know when it was formed?
23    A.   2010.
24    Q.   Have you been the trustee of the
25 Dugaboy Trust since the time it was

Page 167

N. Dondero

1
2 created?
3     A.   No.
4     Q.   Who preceded you as trustee, to
5 the best of your knowledge?
6     A.   I don't know.
7     Q.   Did you ever ask anybody who
8 preceded you as trustee of The Dugaboy
9 Investment Trust?
10    A.   Did I ever ask who was the
11 trustee prior to --
12    Q.   Yes.
13    A.   I did not.
14    Q.   Okay.  Do you recall when you
15 became the trustee of the Dugaboy Trust?
16    A.   October 2015.
17    Q.   Did somebody appoint you to be
18 trustee of the Dugaboy Trust?
19    A.   By "appoint," do you mean asked
20 me to be?
21    Q.   Okay.  Let me restate the
22 question.
23    A.   Sorry.
24    Q.   Do you know how you became the
25 trustee of the Dugaboy Trust?

Page 168

N. Dondero

1
2     A.   Jim had asked me to.
3     Q.   Did Jim ask you to be the Dugaboy
4 trustee at around the same time that you
5 became the trustee?
6     A.   That's correct.
7     Q.   Prior to accepting Jim's --
8 withdrawn.
9         Did you agree to become the
10 trustee at the Dugaboy Trust in response to
11 Jim's request?
12    A.   Yes, sir.
13    Q.   Okay.  Before you accepted the
14 appointment as trustee of the Dugaboy
15 Trust, did you obtain any information about
16 the purpose of the Dugaboy Trust?
17    A.   Yes.
18    Q.   What information do you recall
19 obtaining before you agreed to serve as the
20 trustee at the Dugaboy Trust?
21    A.   The purpose of the trust is to
22 provide health, education, maintenance,
23 lifestyle for the beneficiaries, who is my
24 brother, for as long as he lives and then
25 his children and subsequent generations.

Page 169

N. Dondero

1
2     Q.   Is your brother the sole
3 beneficiary of the Dugaboy Trust during his
4 lifetime?
5     A.   Yes.
6     Q.   Did you make any independent
7 decisions with respect to the Dugaboy
8 Trust?
9     A.   Of course.
10    Q.   Do you know if the Dugaboy Trust
11 owned an interest in Highland at the time
12 Dugaboy entered into each of the agreements
13 referred to in paragraph 82?
14    A.   Okay.  I'm sorry.  Say that
15 again, John.
16    Q.   Do you know whether Dugaboy owned
17 an interest in Highland at the time each
18 agreement was entered into?
19        MS. DEITSCH-PEREZ:  Other than
20    what she's already testified to?
21    A.   Other than it being a major Class
22 A shareholder, John?  A limited partner.
23    Q.   I'm sorry, it's a little bit of a
24 different question.
25    A.   Okay.

Page 170

1        N. Dondero
2    Q.   You entered into more than one
3  agreement with your brother; is that right?
4    A.   That's correct.
5    Q.   How many agreements did you enter
6  into with him?
7    A.   Okay.  How many notes or how many
8  agreements -- you mean, per -- one per year
9  for three years covering 13 notes.
10   Q.   So there's three annual
11 agreements that you recall?  Do I have that
12 right?
13   A.   Correct.
14   Q.   And was Dugaboy's interest in
15 Highland the same at each moment that you
16 entered into each of the three agreements?
17   A.   I'm sorry?
18   Q.   Do you know whether -- do you
19 know whether Dugaboy's interest in Highland
20 changed at all between the time that you
21 entered into each of the three agreements
22 that you just referred to?
23   A.   I don't know.  I don't think so.
24   Q.   Did you ever ask anybody at any
25 time prior to the petition date if

Page 171

1        N. Dondero
2  Dugaboy's interest in Highland changed at
3  any time during the period in which you
4  were entering into these agreements on
5  behalf of Dugaboy?
6    A.   No.
7        And, John, can I back up for a
8  second?
9    Q.   Sure.
10   A.   Just in answer to one of my
11 questions when I said that I had three
12 conversations with Jim.  That pertained to
13 this procedure.  That's my answer for this
14 scope.
15   Q.   Right.
16   A.   Okay.  Just so we're on the same
17 page.  Okay.  Okay.
18   Q.   And do you recall -- we'll get to
19 it.
20       All right.  So you entered into
21 three agreements.
22       Do I have that right?
23   A.   Correct.
24   Q.   And do you recall when you
25 entered into each one of the three

Page 172

1        N. Dondero
2  agreements?
3    A.   To the best of my recollection,
4  it was around the holidays.
5    Q.   Do you remember the year you
6  entered into the first agreement?
7    A.   It would have been either been
8  the tail end of '17, beginning of '18.
9    Q.   And would the second agreement be
10 the tail of '18, the beginning of '19?
11   A.   Correct, sir.
12   Q.   And would the third one be the
13 tail of '19 and the beginning of '20?
14   A.   Either/or.  Correct.  Um-hmm.
15   Q.   Okay.  And when we say late in
16 each year, is paragraph 82 correct, to the
17 best of your knowledge, that it was either
18 December of the year or the following
19 January or February?
20   A.   Correct.
21   Q.   So it's your recollection that as
22 the trustee of The Dugaboy Investment
23 Trust, you entered into an agreement
24 pursuant to 3.10 of the LP agreement in
25 either December 2019 or January or February

Page 173

1        N. Dondero
2  of 2020?
3    A.   Yes.
4    Q.   Okay.  So you entered into that
5  third agreement after the petition date.
6        Do I have that right?
7    A.   That's correct.
8    Q.   Do you recall that there came a
9  time in January of 2020 when your brother
10 relinquished control of Highland in favor
11 of an independent board?
12   A.   January of '20, yes.  Um-hmm.
13   Q.   Do you recall if the agreement
14 that you entered into in late 2019 or early
15 2020 occurred before or after your brother
16 surrendered control of Highland?
17   A.   I believe it was before.
18   Q.   So sometime in December of 2019
19 or prior to the date in January when your
20 brother surrendered control, you and your
21 brother entered into the third in the
22 series of three oral agreements that are
23 referred to in paragraph 82, correct?
24   A.   Correct.
25   Q.   Okay.  Do you recall what the

Page 174

N. Dondero

1  terms of each of the oral agreements was?
2      A.  They were all the same, the
3  agreements.  Obviously for different notes.
4  But the terms were that the notes would be
5  forgiven if any of the three portfolio
6  companies that we discussed earlier,
7  Trussway, Cornerstone, MGM, would monetize
8  at a higher value, and then the notes would
9  be forgiven and considered deferred
10  compensation.
11     Q.  And when you say a higher value,
12  did you understand at the time you entered
13  into the agreements what higher value
14  meant?
15     A.  Yes.
16     Q.  Okay.  What does higher value
17  mean in the context of the agreements that
18  you entered into with your brother?
19     A.  Higher than the purchase price.
20     Q.  So do I have this correct that if
21  one of the three portfolio companies was
22  sold for a value that exceeded the cost by
23  at least one dollar, then all of the notes
24  that were subject to the agreements would

Page 175

N. Dondero

1  be forgiven?
2      A.  That's correct.
3      Q.  Okay.  Can you identify the
4  promissory notes that were the subject of
5  each of the three agreements?
6      A.  I don't understand by identified,
7  John.  In your book or –
8      Q.  Are you able to list for me the
9  promissory notes –
10     A.  Sure –
11     Q.  Let me finish the question,
12  please.
13         Are you able to list for me the
14  promissory notes that were the subject of
15  each of the three agreements?
16     A.  In 2017, there were four notes:
17  One to NexPoint, two to HCRE, I believe,
18  and one to HCMS.  I don't have specifics,
19  but I believe the four of them originally
20  totaled somewhere near 60 million, in that
21  ballpark, when they were originally set up.
22  That was 2017.
23         MS. DEITSCH-PEREZ:  John, we have
24     a list.

Page 176

N. Dondero

1      Do you want her to do this from
2      memory or do you want her to look –
3      MR. MORRIS:  I don't.  I'm going
4      to try it a different way, Deborah.
5      MS. DEITSCH-PEREZ:  Okay.
6  BY MR. MORRIS:
7      Q.  Is there – did the three oral
8      agreements with your brother –
9      A.  Yes?
10     Q.  – cover all of the promissory
11  notes that are subject of the lawsuits in
12  which are a defendant?
13     A.  Yes.
14     Q.  Do you know if any of the three
15  agreements you entered into with your
16  brother cover any promissory notes that are
17  not the subject of the lawsuits in which
18  you are a defendant?
19         MS. DEITSCH-PEREZ:  Object to the
20     form.
21     A.  I don't believe they do.
22     Q.  Okay.  So to the best of your
23  knowledge, as the person who caused Dugaboy
24  to enter into these agreements on behalf of

Page 177

N. Dondero

1  Highland, you do not believe that your
2  agreements covered any promissory note that
3  is the subject of the lawsuits that have
4  been commenced against you, correct?
5      MS. DEITSCH-PEREZ:  Wait.  Can
6      you – I think you – can you have the
7      court reporter read it back so you can
8      hear it?  Because either I heard it
9      wrong or you misspoke, I think.
10         THE REPORTER:  I can read it
11     back, if you'd like.
12         MR. MORRIS:  Sure.
13         MS. DEITSCH-PEREZ:  Yeah,
14     Annette, can you read it back?
15         THE REPORTER:  Sure.
16         (Question was read back as
17     follows:
18     "QUESTION:  Okay.  So to the best
19     of your knowledge, as the person who
20     caused Dugaboy to enter into these
21     agreements on behalf of Highland, you
22     do not believe that your agreements
23     covered any promissory note that is the
24     subject of the lawsuits that have been

Page 178

1           N. Dondero
2    commenced against you, correct?")
3        MR. MORRIS:  All right.  Let me
4    ask the question again.  Let me ask the
5    question again.
6        MS. DEITSCH-PEREZ:  Okay.
7    BY MR. MORRIS:
8     Q.  Ms. Dondero, as the person who
9    caused Dugaboy to enter into the agreements
10   described in paragraph 82 on behalf of
11   Highland, do you have any reason to believe
12   that those agreements related to any
13   promissory notes that are not the subject
14   of the lawsuits that have been commenced
15   against you and Dugaboy?
16    A.  No.
17    Q.  Okay.
18    A.  I believe they include the notes
19   that we've been referring to, that we've
20   been talking to about all day, John.
21    Q.  Okay.  Did you or Dugaboy ever
22   make a list of the promissory notes that
23   were the subject of each agreement --
24   withdrawn.
25        Prior to the petition date, did

Page 179

1    you or Dugaboy ever make a list of the
2    promissory notes that were the subject of
3    each agreement?
4        MS. DEITSCH-PEREZ:  Object to the
5    form.
6     A.  I don't recall.
7     Q.  You have no recollection of you
8    or Dugaboy ever writing down the promissory
9    notes that were the subject of any of the
10   three oral agreements that Dugaboy entered
11   into with your brother, correct?
12    A.  I don't believe I did.
13    Q.  And you don't believe Dugaboy did
14   either, right?
15        MS. DEITSCH-PEREZ:  Object to the
16   form.
17    A.  Correct.
18    Q.  Are you or Dugaboy aware of
19   anything in writing that identifies --
20   withdrawn.
21        Are you and Dugaboy aware of
22   anything that was written prior to the
23   petition date that identified the
24   promissory notes that were the subject of

Page 180

1           N. Dondero
2    each agreement that was entered into?
3     A.  Am I aware of anything that was
4    written down not by me?
5     Q.  Right.
6     A.  Nothing that I can recall at this
7    time.
8     Q.  How do you know that the
9    promissory notes that are the subject of
10   the lawsuits against you were all subject
11   to the oral agreements that you entered
12   into on behalf of Dugaboy with your
13   brother?
14    A.  Of the 13 notes in total, we
15   discussed 4 and 17; 6 and 18; and 3 in 19,
16   and that's total, if I'm not mistaken, the
17   13 notes in question.
18    Q.  Okay.  Now neither you nor
19   Dugaboy ever saw any of the notes prior to
20   the petition date, correct?
21        MS. DEITSCH-PEREZ:  Object to the
22   form.
23    A.  That's correct.
24    Q.  And neither you nor Dugaboy are
25   aware of any writing that was created prior

Page 181

1           N. Dondero
2    to the petition date that identified the
3    promissory notes that were the subject of
4    the agreements between Dugaboy and your
5    brother, correct?
6     A.  That is correct.
7     Q.  So are you basing your belief
8    that the agreements covered only the
9    promissory notes that are the subject of
10   the lawsuits on your memory or on anything
11   else?
12        MS. DEITSCH-PEREZ:  Object to the
13   form.
14        MR. MORRIS:  Withdrawn.
15   BY MR. MORRIS:
16    Q.  What is the basis for your belief
17   that the agreements covered the promissory
18   notes that are the subject of each -- of
19   the lawsuits against you and Dugaboy?
20    A.  Because I remember what we
21   discussed.
22    Q.  So you have a memory.  You
23   remember that three to four years ago, you
24   can remember the promissory notes that were
25   the subject of your first agreement even

Page 182

N. Dondero

2  though you never saw the notes?  Do I have
3  that right?
4      A.  I remember the amount.  I don't
5  remember all the specifics from that many
6  years ago, John, but I do remember the
7  amount per each year, and I knew that there
8  were 13 in total.
9      Q.  Who identified the notes that
10  would be the subject of the agreements?  Do
11  you recall?
12      A.  In what context who identified
13  them?
14      Q.  Well, the agreement was entered
15  into twin in your capacity as the trustee
16  of Dugaboy and your brother, correct?
17      A.  Correct.
18      Q.  As between you and your brother,
19  did one of you identify the notes that
20  would be the subject of the agreements?
21      A.  Yes, that would be --
22      Q.  And who identified -- okay.  And
23  who was that?
24      A.  Jim.
25      Q.  And during these three

Page 183

N. Dondero

2  conversations, did he describe for you the
3  notes that were going to be the subject of
4  the conversation?
5      A.  Yes.
6      Q.  I apologize.  I withdraw the
7  question.
8          Did your brother describe for you
9  the notes that were going to be the subject
10  of each agreement?
11      A.  Yes.
12      Q.  Do you have any basis for knowing
13  which agreements -- no.  Withdrawn.
14          Do you have any basis for knowing
15  which notes are the subject of the
16  agreements other than what your brother
17  told you in the three -- in the
18  conversations that led to the three
19  agreements?
20      A.  No, I don't believe so.
21      Q.  Did your brother explain to you
22  why he selected these notes that are the
23  subject of the lawsuits for inclusion in
24  the agreements?
25      A.  Not that I recall.

Page 184

N. Dondero

2      MR. MORRIS:  I'd like to put up
3  on the screen a document that's been
4  marked as Exhibit 43.
5      (N. Dondero Exhibit 43,
6  Promissory Note, Bates-stamped
7  D-CNL000550 through 551, marked for
8  identification, as of this date.)
9  BY MR. MORRIS:
10      Q.  And do you see, Ms. Dondero, that
11  this is a promissory note dated January 18,
12  2018, in the amount of $7,900,000?
13      MR. MORRIS:  And if we can scroll
14  to the bottom so we could see the
15  signature.
16  BY MR. MORRIS:
17      Q.  Do you see that that's been
18  signed by your brother?
19      A.  I see that.
20      Q.  Have you ever seen this
21  particular promissory note before?
22      MR. MORRIS:  And we can go back
23  to the top.
24      (Document review.)
25      A.  It doesn't look familiar, John.

Page 185

N. Dondero

2      Q.  This note is not a note that's
3  subject to your agreement with your
4  brother, correct?
5      A.  Correct.
6      Q.  Do you know why?
7      A.  I do not.
8      Q.  And Highland has not sued anybody
9  to collect under this note, to the best of
10  your knowledge, correct?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.
13      A.  I --
14  BY MR. MORRIS:
15      Q.  Withdrawn.
16          Are you aware of any lawsuit that
17  has been commenced by Highland to collect
18  under this note?
19      A.  I am not aware of any.
20      Q.  When you entered into these
21  agreements, did you have any understanding
22  that the agreement would cover all of the
23  notes that were executed by your brother or
24  by other entities under the Highland
25  umbrella?

Page 186

```
1           N. Dondero
2      MS. DEITSCH-PEREZ:  Object to the
3    form.
4      A.  John, can you repeat the
5    question, please?
6      Q.  Sure.
7          At the time that you entered into
8    the agreements, did you have any
9    understanding that the agreements would
10   cover all notes executed by your brother,
11   NexPoint, HCRE and HCMS?
12     A.  Yes.
13     Q.  Okay.  Was it your understanding
14   that all promissory notes would be covered?
15     MS. DEITSCH-PEREZ:  Do you mean
16   all of the ones at issue here or all,
17   like, including --
18     MR. MORRIS:  No.
19     MS. DEITSCH-PEREZ:  Object to the
20   form.
21     MR. MORRIS:  I thought I was
22   clear, but I'll try it one more time.
23     MS. DEITSCH-PEREZ:  Please.
24   BY MR. MORRIS:
25     Q.  Was it your understanding that
```

Page 187

```
1    when you entered into each of these
2    agreements, that the agreements would cover
3    every promissory note that was executed by
4    your brother, by NexPoint, by HCMS, and by
5    HCRE, irrespective of whether it wound up
6    being part of the lawsuit?
7      A.  My understanding for the
8    agreement I had with Jim is just for these
9    13 notes.
10     Q.  Okay.  So there may be other
11   notes that Jim or NexPoint or HCRE or HCMS,
12   there may be other notes that they
13   executed, but if there are, they were not
14   the subject of any of your agreements with
15   your brother, correct?
16     MS. DEITSCH-PEREZ:  Object to the
17   form.
18         You mean any of the agreements
19   that she's been testifying here today?
20     MR. MORRIS:  Yes.  We've defined
21   agreements, so unless there is a
22   question, unless somebody wants to
23   revisit the definition, we've defined
24   it.
```

Page 188

```
1           N. Dondero
2      MS. DEITSCH-PEREZ:  Okay.  Got
3    it.  No.
4      A.  Um-hmm.
5      Q.  When you say "um-hmm," what could
6    you mean?
7      A.  I'm sorry, John.  The
8    conversation got me away from the question.
9    I'm sorry.  I'm sorry.
10     MS. DEITSCH-PEREZ:  It's my
11   fault.
12     THE WITNESS:  I'm sorry.
13     A.  Go ahead, John.
14     MR. MORRIS:  Can I have the last
15   question read back, please.
16     THE REPORTER:  Sure.
17     (Question was read back as
18   follows:
19     "QUESTION:  Okay.  So there may
20   be other notes that Jim or NexPoint or
21   HCRE or HCMS, there may be other notes
22   that they executed, but if there are,
23   they were not the subject of any of
24   your agreements with your brother,
25   correct?")
```

Page 189

```
1           N. Dondero
2      A.  Correct.
3      Q.  Okay.
4      A.  I'm only speaking for these 13.
5      Q.  Okay.  Do you recall whose idea
6    it was to enter into each of the
7    agreements?
8      A.  It was Jim's suggestion.
9      Q.  Okay.  And did he call you to
10   make the suggestion?
11     A.  Yes.  At least one, if not two of
12   the agreements were verbal or at least
13   started verbally.  And one I remember was
14   in person.
15     Q.  Okay.  Did you ever have any
16   concerns that your brother might have a
17   conflict of interest since he controlled
18   both the borrower and the lender under each
19   of these transactions?
20     MS. DEITSCH-PEREZ:  Object to the
21   form.
22     A.  No.
23     Q.  Did it ever occur to you that
24   your brother might have a conflict of
25   interest since he controlled both the
```

**Appx. 01921**

Page 190

```
1              N. Dondero
2   borrower and the lender in each of these
3   transactions?
4         MS. DEITSCH-PEREZ:  Object to the
5   form.
6      A.  I'm sorry, I thought I answered.
7   No.
8      Q.  Yeah, the first question was
9   whether you had any concerns.  And the
10  second question was did it ever occur to
11  you.
12         Did you understand that?
13     A.  I did.
14         It didn't occur to me, and I
15  didn't have any concern.
16     Q.  Okay.  And I think you just
17  mentioned that your recollection is that
18  two of the agreements were reached on the
19  telephone, and one was reached in person;
20  is that right?
21     A.  That's correct.
22     Q.  Okay.  The agreement that was
23  reached in person, where were you?
24     A.  Florida.
25     Q.  Where at?
```

Page 191

```
1              N. Dondero
2      A.  My house in Vero Beach.
3      Q.  Was anybody else present during
4   this discussion?
5      A.  Jim's kids, underage.  My father,
6   who's elderly.  Family.
7      Q.  Do you have any reason to believe
8   that anybody was aware of the substance of
9   the discussion that you had with your
10  brother concerning the agreement?
11     A.  No.
12     Q.  The two other conversations that
13  you had on the phone, do you recall whether
14  any person participated in those
15  discussions other than your brother and
16  yourself?
17     A.  No one else participated.
18     Q.  Out of the three agreements that
19  you entered into, do you recall whether it
20  was the first, second, or third that was
21  entered into during a face-to-face meeting?
22     A.  To the best of my recollection,
23  it would have been the end of '18,
24  beginning of '19.
25     Q.  Were there any conversations --
```

Page 192

```
1              N. Dondero
2   withdrawn.
3         So there were three agreements;
4   is that correct?
5      A.  Through this discussion?
6      Q.  Yes.
7      A.  There are three agreements, yes.
8      Q.  And all three agreements are oral
9   agreements, correct?
10     A.  They're all oral.  One in person
11  and two on the phone, yes.
12     Q.  Okay.  Were there any
13  communications concerning the scope or term
14  or terms of the proposed agreement that
15  took place before the day on which the
16  agreements were entered into?
17        MS. DEITSCH-PEREZ:  Object to the
18  form.
19  BY MR. MORRIS:
20     Q.  I just want to know if there were
21  any conversations or communications that
22  occurred prior to the entry of the three
23  agreements.
24     A.  There could have been, John.
25     Q.  I know there could have been.
```

Page 193

```
1              N. Dondero
2   I'm asking what you remember.
3      A.  I don't -- at this time, I don't
4   know.
5      Q.  Okay.  Do you have any reason to
6   believe, as you sit here right now, that
7   there were any communications that occurred
8   prior to the three days in which you
9   entered into the three oral agreements?
10     A.  There could have been.
11     Q.  I appreciate that.  I'm asking if
12  you have any recollection of any such
13  communications.
14     A.  I'm not sure at this time, John.
15     Q.  Were any of the oral agreements
16  ever the subject of negotiation?
17     A.  I don't understand what you're
18  asking.
19     Q.  Why don't you tell me what the
20  conversations were that led to each of the
21  agreements to the best that you can recall.
22     A.  The conversations with my brother
23  that took place towards the end of each of
24  the years that we're discussing, they
25  started as general conversations about
```

Page 194

N. Dondero

1        N. Dondero
2   business, about work.  And Jim would bring
3   up the loans that were done earlier in the
4   year.
5        He had stated in the conversation
6   that he thought he was undercompensated for
7   the work that he does and the time that he
8   puts in.  And he wanted those loans to be
9   forgiven if any of the three portfolio
10  companies that we talked about monetized at
11  a higher value.
12       Q.  And you agreed with that?
13       A.  Well, it was -- yes, I did agree
14  with that proposal.  I thought it was a
15  win-win for everybody.
16       Q.  Did you ever propose any
17  alternative to the proposal that your
18  brother made that you just described?
19       A.  I did not.
20       Q.  Can you identify any provision of
21  any of the agreements that you negotiated
22  with your brother?
23       A.  I didn't negotiate, but Jim had
24  concern, and rightfully so, that he would
25  put in the work and the time and the effort

Page 195

N. Dondero

1   to increase the value of any of those
2   portfolio companies and that factors that
3   you mention you beyond his control might
4   cause them to be sold at a value under the
5   price that was paid for them and this deal
6   would not happen.
7        So hence, that part of the deal
8   came up, but I don't know if I'd consider
9   it a negotiation.
10       MR. MORRIS:  Okay.  I'm going to
11  move to strike.
12  BY MR. MORRIS:
13       Q.  And I'm just going to ask you if
14  you can identify any provision of any of
15  the agreements that you recall being the
16  subject of negotiation?
17       A.  I don't recall any part being a
18  negotiation.
19       Q.  Who identified the portfolio
20  companies that were the subject of each
21  agreement?
22       A.  Jim.
23       Q.  Did you ask your brother why he
24  selected those companies?

Page 196

N. Dondero

1        N. Dondero
2        A.  No.
3        Q.  Do you know why your brother
4   selected those companies?
5        A.  I do not.
6        Q.  Did you ever suggest that
7   different portfolio companies should be
8   used?
9        A.  I did not.
10       Q.  Did you ask him if Highland had
11  any other portfolio companies?
12       A.  I don't know.
13       Q.  And your brother is the person
14  who proposed that all of the notes would be
15  forgiven if all of the three portfolio
16  companies was sold for greater than cost;
17  is that right?
18       A.  That's correct.
19       Q.  Do you know whether your brother
20  had a duty to maximize value at the time
21  that you entered into the agreements with
22  him?
23       A.  I don't know.
24       Q.  Did you ever ask anybody prior to
25  entering into any of the agreements whether

Page 197

N. Dondero

1   your brother already had a duty to maximize
2   value?
3        A.  I did not.
4        Q.  Did you ever make a
5   counterproposal to the term of the
6   agreement that said all of the notes would
7   be forgiven if one of the portfolio
8   companies was sold for greater than cost?
9        A.  I'm sorry, John.  Once again, the
10  question, please?
11       Q.  Sure.
12       Did you or Dugaboy ever make a
13  counterproposal to the provision in the
14  agreements that all of the notes would be
15  forgiven if one of the portfolio companies
16  was sold above cost?
17       A.  Wasn't that his proposal?  Jim's
18  proposal?
19       Q.  It was his proposal.  I think
20  you've testified to that.  And I'm asking
21  you if you or Dugaboy ever made a
22  counterproposal with respect to that
23  particular provision?
24       A.  No.

Page 198

N. Dondero

1
2      Q.   Did you ever consider requiring a
3   higher threshold other than having a sale
4   above cost for the triggering of the
5   condition subsequent?
6      A.   No.
7      Q.   Was there any part of your
8   brother's proposal that you rejected?
9      A.   No.
10      Q.   Was there any part of your
11   brother's proposal that Dugaboy rejected?
12      A.   No.
13      Q.   Is there any aspect of any of the
14   agreements that incorporates a proposal or
15   idea that you or Dugaboy made?
16          MS. DEITSCH-PEREZ:  Object to the
17      form.
18      A.   No.
19      Q.   Now do you recall that paragraph
20   82 also provides that all of the notes
21   would be forgiven if any of the portfolio
22   companies was sold on a basis out of Jim
23   Dondero's control?
24      A.   Yes.
25      Q.   Whose idea was it to include that

Page 199

N. Dondero

1
2   provision in the agreement?
3      A.   I thought I already stated that.
4   That Jim had concerns.  That was Jim's
5   proposal.
6      Q.   Okay.  Did you or Dugaboy reject
7   that proposal?
8      A.   We did not.
9      Q.   Did you push back on that
10   proposal at all?
11      A.   No.
12      Q.   Did either you or Dugaboy make
13   any counterproposal to that aspect of the
14   agreement?
15      A.   No.
16      Q.   Do you understand that James
17   Seery is in control of the portfolio
18   companies subject to the agreement?
19          MS. DEITSCH-PEREZ:  Object to the
20      form.
21      A.   I didn't know that.
22      Q.   Are you aware that your brother
23   no longer controls the portfolio companies
24   that were the subject of the agreement?
25      A.   Yes.

Page 200

N. Dondero

1
2      Q.   So you're aware that somebody
3   other than your brother may sell Highland's
4   interest in the portfolio companies; is
5   that right?
6      A.   Correct.
7      Q.   So under the agreements that you
8   caused Dugaboy to enter into on behalf of
9   Highland, all of the notes that were
10   subject to the agreements will be forgiven
11   at the moment somebody other than your
12   brother sells one of the portfolio
13   companies.
14          Do I have that right?
15      A.   I'm sorry, John.  Once again?
16      Q.   Okay.  I just want to understand,
17   you know, the import of the agreements that
18   you've described.  So let me try again.
19          Under the agreements that you
20   caused Dugaboy to enter into on behalf of
21   Highland, all of the notes that are subject
22   to the agreements will be forgiven the
23   moment that any of those three portfolio
24   companies are sold.
25          Do I have that right?

Page 201

N. Dondero

1
2      A.   Correct, you have that right.
3      Q.   Why did you agree, as the trustee
4   of Dugaboy, that all of the notes subject
5   to the agreements would be forgiven if any
6   of the subject portfolio companies was sold
7   on a basis outside of your brother's
8   control?
9      A.   I agreed to that provision of the
10   agreement because -- and I believe I stated
11   this -- Jim had concerns about doing the
12   work and the effort and putting the time in
13   to build up any one of those three
14   portfolio companies and then having
15   somebody outside of his control sell it for
16   less than a monetized value that would
17   allow the notes to be forgiven.
18      Q.   But there's no component of the
19   agreement that will avoid the forgiveness
20   of the notes depending on the price at
21   which the assets were sold, correct?
22      A.   John, there's no provision of the
23   agreement what?
24      Q.   If somebody were to sell the
25   portfolio assets for a substantial price

Page 202

```
1           N. Dondero
2  above cost –
3      A.  Above cost?
4      Q.  Above cost.
5         – would the notes still be
6  forgiven?
7      A.  Yes, of course.
8      Q.  And if the portfolio companies
9  are sold at a price substantially below
10 cost, will the notes still be forgiven?
11     A.  They will if they're sold by
12 somebody that's not my brother, that's not
13 Jim.
14     Q.  Okay.
15     A.  If somebody comes in or – who
16 did you say, that gentleman that now has
17 control of them, if he decides to sell them
18 below cost, the notes are still forgiven.
19     Q.  And if he decides to sell them
20 above cost, the notes are forgiven, right?
21     A.  That is correct, but Highland
22 would benefit.
23     Q.  How does Highland benefit because
24 some third party sells the assets?
25     A.  Okay.  That's not what I said.
```

Page 203

```
1           N. Dondero
2         But to answer your question, they
3  wouldn't – if it got sold for less than
4  the value of them, then Highland wouldn't
5  benefit.  But that wouldn't be in Jim's
6  control.
7      Q.  Did you expect Highland to
8  benefit if the portfolio companies were
9  sold on a basis outside of Mr. Dondero's
10 control?
11     A.  I have no idea, John.
12     Q.  Did you have any idea – did you
13 or Dugaboy have any idea when you entered
14 into the agreement if Highland would
15 benefit from the sale of the portfolio
16 companies on a basis outside of
17 Mr. Dondero's control?
18     A.  I wouldn't know that.
19     Q.  Okay.  Now if Jim sold one of
20 those portfolio companies for a dollar
21 above cost, all of the notes would have
22 been forgiven, correct?
23     A.  Correct.
24     Q.  And did he have the ability to
25 sell any of the portfolio companies at the
```

Page 204

```
1           N. Dondero
2  time you entered into the agreements?
3         MS. DEITSCH-PEREZ:  Object to the
4  form.
5         MR. MORRIS:  Withdrawn.
6  BY MR. MORRIS:
7      Q.  Did you and Dugaboy understand
8  that Mr. Dondero had the ability to sell
9  any of the portfolio companies at the time
10 you entered into the agreements?
11     A.  Yes.
12     Q.  Okay.  If your brother –
13     A.  That was my understanding.
14     Q.  Okay.  And if your brother sold
15 one of those portfolio companies for a
16 dollar above cost, what benefit would
17 Highland receive if the consequence of that
18 was the forgiveness of more than $60
19 million in principal amount of promissory
20 notes?
21        MS. DEITSCH-PEREZ:  Object to the
22 form.
23     A.  John?
24     Q.  Yes?
25     A.  Oh.
```

Page 205

```
1           N. Dondero
2      Q.  You can answer.
3      A.  That hasn't happened in a
4  hypothetical.  I don't have an opinion on
5  that.
6      Q.  Well, you entered into the
7  agreements, did you not?
8      A.  I did.
9      Q.  And you agreed on behalf of
10 Dugaboy on behalf of the plaintiff that if
11 Jim sold one of the portfolio companies at
12 a dollar above cost, all of the notes would
13 be forgiven, correct?
14     A.  I entered into the agreement for
15 Dugaboy that if, you're right, any of the
16 portfolio companies monetized higher,
17 right, the notes would be forgiven.  But –
18 and I thought about your scenario, but I
19 also thought about it could be $100
20 million.  We don't know.  This is all
21 hypothetical.
22     Q.  It's actually not hypothetical
23 because the term of your agreement was that
24 he could have sold any of the three
25 portfolio companies at a dollar above cost
```

Page 206

```
1              N. Dondero
2   and received in return the forgiveness of
3   all of these notes, right?
4       A.  Correct.
5       Q.  Okay.  As the trustee of Dugaboy
6   who entered into the agreement on behalf of
7   Highland, what benefit would there be to
8   Highland if the portfolio companies were
9   sold at any price less than the aggregate
10  principal amount of the notes?
11      A.  Less than?
12      Q.  Let's say it was sold for $50
13  million above cost, then Highland would
14  have had to forgiven more than $60 million
15  of notes, correct?
16      A.  Correct.
17      Q.  How would Highland benefit by
18  having an asset sold $50 million above cost
19  where the consequence was that they would
20  forgive more than $50 million of money that
21  was owed to it?
22      A.  Well, I looked at it differently,
23  John.  And I thought it benefitted Highland
24  at the time because money didn't come out
25  of Highland's balance sheets to increase
```

Page 207

```
1              N. Dondero
2   Jim's salary.  They received interest in
3   payment on the loans.  We don't know when
4   and if the trigger is going to come into
5   play that the loans would be forgiven.
6   Even as we sit here today, 20-plus million
7   has been paid on the loan.
8       Q.  Can you explain why your brother
9   is making payments on demand notes after
10  entering into the agreements with you?
11      A.  It's my limited understanding
12  that he's made payments when whatever
13  entity needs money.
14      Q.  And what is the basis for that
15  understanding?
16      A.  Common sense.  I don't know,
17  John.
18          THE WITNESS:  And I hate to do
19      this, but I know when you -- can you
20      come to a place of a break in the near
21      future whenever is convenient in your
22      questions there, please?
23          MR. MORRIS:  Sure.
24  BY MR. MORRIS:
25      Q.  What is the basis for saying that
```

Page 208

```
1              N. Dondero
2   your brother paid back loans at times that
3   Highland needed the money -- withdrawn.
4           Is it your testimony that your
5   brother made payments against the loans
6   after entering into the agreements with you
7   because Highland needed the money?
8       A.  That's my belief, John.
9       Q.  Okay.  And what is the basis for
10  that belief?
11      A.  I don't have one except I know
12  how my brother works.
13      Q.  Do you know that your brother
14  caused the borrowers under the promissory
15  notes to make payments against those notes
16  after entering into the agreements with
17  you?
18      A.  I do not.
19      Q.  Did you ever ask anybody?
20      A.  I did not.
21      Q.  And I think we covered this
22  earlier, but I just want to try and cover
23  it quickly before we take the break.
24          At the time you entered into each
25  of the agreements, neither you nor Dugaboy
```

Page 209

```
1              N. Dondero
2   had any understanding of the nature of
3   Highland's interest in each of the
4   portfolio companies, correct?
5       A.  That would be correct, yes.
6       Q.  And at the time the three
7   agreements were entered into, neither you
8   nor Dugaboy had any understanding as to
9   Highland's cost for acquiring its interest
10  in each of the three portfolio companies,
11  correct?
12      A.  Yes, that is correct.
13      Q.  And at the time each of these
14  three agreements were entered into, neither
15  you nor Dugaboy had any information as to
16  the value of Highland's interest in any of
17  the portfolio companies, correct?
18          MS. DEITSCH-PEREZ:  Object to the
19      form.
20          MR. MORRIS:  You can answer.
21      A.  I'm sorry, John, can you repeat
22  the question, please?
23      Q.  At the time that you entered into
24  each of these three agreements, neither you
25  nor Dugaboy had any information concerning
```

Page 210

```
1           N. Dondero
2  the value of Highland's interest in the
3  three portfolio companies, correct?
4        MS. DEITSCH-PEREZ:  Object to the
5  form.
6     A.  That's correct, John.
7     Q.  And at the time that you entered
8  into these three agreements, neither you
9  nor Dugaboy knew whether the value of
10 Highland's interest in the three portfolio
11 companies was more or less than the cost of
12 acquisition, correct?
13    A.  That's correct.
14       MR. MORRIS:  We can take that
15 break now if you'd like.
16       MR. DRAPER:  John, this is
17 Douglas.
18       How much more do you think you
19 have?
20       THE VIDEOGRAPHER:  The time is
21 2:41.  We are going off the record.
22       (Recess is taken.)
23       THE VIDEOGRAPHER:  The time is
24 2:57.  We are back on the record.
25       MR. MORRIS:  Can we put back up
```

Page 211

```
1           N. Dondero
2  paragraph 82 from Mr. Dondero's answer
3  to the Amended Complaint?
4        (Document review.)
5  BY MR. MORRIS:
6     Q.  Ms. Dondero, can you hear me?
7     A.  Yes.
8     Q.  Okay.  Do you see in the middle
9  of paragraph 82 it talks about the purpose
10 of the agreement?
11    A.  Um-hmm.
12    Q.  And do you see where it says that
13 Jim Dondero, quote, "was otherwise
14 underpaid compared to reasonable
15 compensation levels in the industry"?
16    A.  I see that.
17    Q.  At the time that you caused
18 Dugaboy to enter into the three agreements
19 on behalf of Highland, did you believe that
20 James Dondero was underpaid compared to
21 reasonable compensation levels in the
22 industry?
23    A.  Yes, I believed what he told me.
24    Q.  Okay.  Did you have any basis for
25 believing that he was underpaid compared to
```

Page 212

```
1           N. Dondero
2  reasonable compensation levels in the
3  industry other than what your brother told
4  you?
5     A.  No.
6     Q.  Okay.  Did Dugaboy have any basis
7  for believing that your brother was
8  underpaid compared to reasonable
9  compensation levels in the industry other
10 than what your brother said?
11    A.  Not that I'm aware of.
12    Q.  Prior to entering into each of
13 these three agreements, did you or Dugaboy
14 make any effort to ascertain whether your
15 brother was underpaid compared to
16 reasonable compensation levels in the
17 industry?
18    A.  Not that I remember.
19    Q.  At the time that you entered into
20 these agreements, neither you nor Dugaboy
21 knew the total compensation package that
22 Mr. Dondero received from Highland in any
23 calendar year, correct?
24    A.  John, can you ask that question
25 again, please?
```

Page 213

```
1           N. Dondero
2     Q.  Yes.  I'd be happy to.
3        At the time that you caused
4  Dugaboy to enter into each of the three
5  agreements that you've described, neither
6  you nor Dugaboy made any effort to
7  determine your brother was underpaid
8  compared to reasonable compensation levels
9  in the industry, correct?
10    A.  That's correct.
11    Q.  And at the time that you caused
12 Dugaboy to enter into the agreements,
13 neither you nor Dugaboy knew how much
14 compensation your brother received from
15 Highland in any particular year, correct?
16       MS. DEITSCH-PEREZ:  You mean the
17 exact number?
18       MR. MORRIS:  I mean general
19 number.  Any number.
20    A.  Okay.  I think we spoke about
21 this earlier.  I had a general number on
22 salary.
23    Q.  Correct.
24       And now I'm asking about total
25 compensation, including deferred
```

Page 214

1          N. Dondero
2   compensation, including any profit sharing,
3   including any distributions, total
4   compensation, right?
5          Do you see that this is referring
6   not to salary but to compensation?
7      A.  I do.
8      Q.  Okay.
9      A.  And I would not have known that.
10     Q.  Okay.  So let me ask the question
11  again just to make sure it's clear.
12         At the time that you caused
13  Dugaboy to enter into each of these three
14  agreements, neither you nor Dugaboy knew
15  what Mr. Dondero's compensation was from
16  Highland for any particular year, correct?
17     A.  Correct.
18     Q.  And at the time that you caused
19  Dugaboy to enter into the three agreements,
20  neither you nor Dugaboy ever asked anybody
21  what Mr. Dondero's compensation was from
22  Highland for any particular year, correct?
23     A.  Correct.
24     Q.  And at the time you caused
25  Dugaboy to enter into these three

Page 215

1          N. Dondero
2   agreements, neither you nor Dugaboy made
3   any effort to try to ascertain what
4   Mr. Dondero's compensation from Highland
5   was in any particular year, correct?
6      A.  That's correct.
7      Q.  Okay.  Did you or Dugaboy ever
8   conduct any analysis of what reasonable
9   compensation levels in the industry were?
10     A.  Not that I recall.
11     Q.  Did Mr. Dondero ever tell you
12  what he thought reasonable compensation
13  levels were in the industry?
14     A.  John, I vaguely remember him
15  throwing out examples of other people in
16  his position and the astronomical money
17  that they make.  I just don't remember
18  their names or the companies.
19     Q.  Okay.  Did you or Dugaboy make
20  any effort at any time prior to entering
21  into the three agreements to determine what
22  reasonable compensation levels were in the
23  industry?
24     A.  No.
25     Q.  Did you or Dugaboy reach any

Page 216

1          N. Dondero
2   conclusions prior to entering into the
3   agreements as to whether Mr. Dondero was
4   underpaid compared to reasonable
5   compensation levels in the industry?
6      A.  The first part of that, John?
7   The first part of your question?
8      Q.  Did you or Dugaboy reach any
9   conclusions prior to entering into the
10  three agreements as to whether your brother
11  in fact was underpaid compared to
12  reasonable compensation levels in the
13  industry?
14     A.  Yes, I came to the conclusion
15  that he was based on what he told me.
16     Q.  Okay.  And you had no other
17  information upon which you relied to reach
18  your conclusion that he was underpaid
19  except for the information that your
20  brother provided to you, correct?
21     A.  That's correct.
22     Q.  Okay.  And other than -- okay.
23         MR. MORRIS:  We can take that
24     down.  Thank you.
25  BY MR. MORRIS:

Page 217

1          N. Dondero
2      Q.  Ms. Dondero, do you know if the
3   terms of any of the agreements were ever
4   reduced to writing?
5      A.  I didn't put them in writing.
6   That's all I can speak to.
7      Q.  Have you ever seen the terms of
8   any of the agreements in writing?
9      A.  I have not.
10     Q.  Did anyone ever tell you that the
11  terms of the agreements were written down
12  anywhere?
13     A.  Not that I recall.
14     Q.  Did you or Dugaboy ever ask
15  anyone if the terms of the agreements were
16  written down anywhere?
17     A.  Not that I remember.
18     Q.  Did you believe that these
19  agreements were important at the time that
20  you caused Dugaboy to enter into them?
21     A.  Yes.
22     Q.  Why did you think that these
23  agreements were important?
24     A.  I think I thought they were
25  important because they gave Highland the

Page 218

N. Dondero

1
2  chance to motivate and get Jim -- or give
3  Jim an extra incentive to make the
4  portfolio companies into something really
5  magnanimous, which would have been great
6  for Highland and Jim.
7      Q.   When you entered into the
8  agreements, did you intend that they would
9  be binding on Highland?
10     A.   That was my belief, yes.
11     Q.   Did it ever occur to you that you
12 might want to write down the terms of these
13 important agreements?
14     A.   Honestly, it didn't come to mind,
15 no.
16     Q.   Did you ever tell anybody in the
17 world prior to the petition date that you
18 had entered into these three agreements
19 with your brother?
20     A.   Besides Melissa, who knew, I
21 don't remember anyone else offhand that I
22 would have discussed them with.
23     Q.   How did Melissa know?
24     A.   Pardon?
25     Q.   Are you referring to Melissa

Page 219

N. Dondero

1
2  Schroth?
3      A.   Correct.
4      Q.   Why do you think that she knew?
5      A.   I have a vague memory of
6  discussing it with her.
7      Q.   What do you remember about that
8  vague memory?
9      A.   It was in regards to Dugaboy.
10 She is one of my main contact people, and I
11 think it was maybe a recap conversation.
12     Q.   And what did she say?
13     A.   She just listened, made a note, I
14 assume, made a mental note.
15     Q.   Do you recall, did this occur in
16 a telephone conversation?
17     A.   Yes, I believe it did.
18     Q.   Okay.  Do you recall when that
19 conversation took place?
20     A.   I do not.
21     Q.   Do you recall if it was before or
22 after the petition date?
23     A.   I do not.
24     Q.   Did she ask any questions?
25     A.   Not that I recall.

Page 220

N. Dondero

1
2      Q.   Did you tell her which notes were
3  the subject of the agreements?
4      A.   The conversation was not that
5  detailed.
6      Q.   Well, if she didn't ask any
7  questions and she didn't say anything that
8  you recall in response, can you recall
9  everything you said to Ms. Schroth during
10 this conversation?
11     A.   I don't remember, John, the
12 specifics.
13     Q.   Do you remember anything about
14 the conversation at all?
15     A.   I just remember them coming up in
16 conversation.
17     Q.   You remember what coming up?
18     A.   The forgiveness of the loan.
19     Q.   Did she indicate to you that she
20 knew about it already?
21     A.   I don't remember.
22     Q.   Did she express any surprise at
23 what you told her?
24     A.   No, but I do remember her saying
25 it was the great motivator.

Page 221

N. Dondero

1
2      Q.   And you don't think your brother
3  was otherwise motivated to sell one of
4  three assets at a dollar above cost,
5  correct?
6      A.   I never said --
7          MS. DEITSCH-PEREZ:  Object to the
8  form.
9      A.   I didn't say that.
10     Q.   Well, but that's what the
11 agreement permitted, correct, that the
12 notes would be forgiven if he sold an asset
13 at a dollar above cost, right?
14         MS. DEITSCH-PEREZ:  Object to the
15 form.
16     A.   John, at the time I entered into
17 the agreement, I believe that they would be
18 a motivator, an increased motivator.
19         You met my brother, right?  You
20 know he's motivated.
21     Q.   It never would have occurred to
22 me that he needed more motivation, but
23 maybe that's just my view.
24     A.   It's increased motivation when
25 there's money on the line.

Page 222

N. Dondero

1   Q.   But how does it motivate him when
2   he can recover the benefits of the
3   agreement regardless of how much above cost
4   the asset is sold?
5       A.   Okay.  I'm sorry, John, one more
6   time, please, the question?
7       Q.   How does it motivate him when he
8   will reap the benefits of the agreement if
9   he sells -- withdrawn.
10      How does he get motivated under
11  an agreement whereby he will get the
12  benefit of the forgiveness of over $60
13  million of notes without regard to how much
14  above cost he sells one of three assets?
15      A.   Okay.  John, when I entered into
16  these, he was still at the helm of
17  Highland.
18      Q.   Correct.
19      A.   So if he would have monetized
20  them at a really high value, he would have
21  benefitted from his interest, beneficial
22  interest in Highland.
23      Q.   Under the terms of the agreement,
24  are you able to identify how Mr. Dondero

Page 223

N. Dondero

1   would have been motivated whether --
2   withdrawn.
3       It doesn't matter under the
4   agreements that you entered into on behalf
5   of Dugaboy how much above cost the assets
6   are sold before Mr. Dondero could reap the
7   benefits of the agreement, correct?
8       A.   Correct.
9       Q.   And you could have, but you
10  didn't, demand that the notes would be
11  forgiven only if he sold the assets at --
12  I'm just going to pick a number -- 50
13  percent more than cost, right?
14      A.   Anything is possible.
15      Q.   But you didn't -- anything is
16  possible, but the fact is that neither you
17  nor Dugaboy made any proposal that would
18  tie the benefits that Mr. Dondero wanted to
19  the amount of gain that was to be recovered
20  on behalf of Highland, correct?
21      A.   Correct.  I didn't look at it the
22  way you are, correct.
23      Q.   And so when you speak of
24  motivation under the terms of the agreement

Page 224

N. Dondero

1   that you entered into on behalf of
2   Highland, Mr. Dondero would be indifferent
3   whether the asset was sold at 1 percent
4   above cost, at 10 percent above cost, more
5   than the face amount of the promissory
6   note, right?  There's no relationship
7   between the gain to Highland and the
8   benefit to Mr. Dondero, correct?
9       A.   You mean now when he's not at the
10  helm of Highland, John?
11      Q.   No, I mean -- no.  Let me try
12  again.
13      At the moment you entered into
14  the agreement --
15      A.   Right.
16      Q.   -- if a subsequent event
17  occurred, you and your brother knew that he
18  would receive more than $6 million in value
19  through the forgiveness of the notes,
20  correct?
21      A.   Correct.
22      Q.   But at the time that you entered
23  into the agreements, neither you nor your
24  brother knew what the economic benefit to

Page 225

N. Dondero

1   Highland would be because the asset hadn't
2   been sold yet, correct?
3       A.   Correct.
4       Q.   And it wasn't in the hands of a
5   third party, correct?
6       A.   Correct.
7       Q.   Okay.  And I think you may have
8   testified to this earlier.  If you did, I
9   apologize.  But do you know the aggregate
10  amount that's due under each of the notes
11  that are subject to the agreements that you
12  entered into on behalf of Dugaboy?
13      A.   As of today's value or --
14      Q.   Let's start with today's value.
15      A.   Okay.  The amount owed I believe
16  per the lawsuit for all of them is just
17  north of 50 million.
18      Q.   And were you aware at the time
19  you entered into the agreements, the
20  aggregate principal amount that was still
21  due on the notes that were subject to the
22  agreement?
23      A.   When I entered into the three
24  agreements?

Page 226

N. Dondero

1
2    Q.   Yes.
3    A.   The total for '17, '18, and '19
4    combined was in the ballpark of 72 million,
5    I believe.
6    Q.   And the difference between the
7    principal amount that was due at the time
8    that you entered into the agreements and
9    the principal amount that's due today is
10   the payments that were made in the
11   intervening period.
12   Do I have that right?
13   A.   I'm assuming payments and
14   interest, sir, yes.
15   Q.   Okay.  If the assets are sold
16   now, what benefit will Highland receive
17   relative to the forgiveness of the notes?
18   MS. DEITSCH-PEREZ:  Object to the
19   form.
20   BY MR. MORRIS:
21   Q.   The assets are now in the hands
22   of a third party, right?
23   A.   Um-hmm.  Correct.
24   Q.   Okay.  And is it your
25   understanding that if a third party sells

Page 227

N. Dondero

1
2    the assets that irrespective of the price
3    at which it sold, the moment it's sold, the
4    notes will be forgiven?
5    A.   That is my understanding.
6    Q.   So that if a third party were to
7    sell the asset -- withdrawn.
8    So at the time that you entered
9    into the agreements on behalf of Dugaboy,
10   neither you nor Dugaboy had any
11   understanding of what Highland's economic
12   recovery would be if a third party sold any
13   of the portfolio companies, correct?
14   A.   I wouldn't have known the future.
15   That is correct.
16   Q.   Did you and Dugaboy -- withdrawn.
17   Did you and Dugaboy believe at
18   the time that you entered into the
19   agreements that Highland received
20   reasonably equivalent value in exchange for
21   the agreements?
22   MS. DEITSCH-PEREZ:  Object to the
23   form.
24   A.   John, I repeat, I thought at the
25   time I entered into the agreement, there

Page 228

N. Dondero

1
2    was a -- that it was a good deal for both
3    Jim and Highland, a win-win situation.  I
4    think we discussed this already.
5    Q.   Okay.  But you didn't know the
6    price at which Mr. Dondero would sell the
7    asset that was subject to the condition
8    subsequent, correct?
9    A.   John, correct, but I know my
10   brother, and he's a financial guru, and I
11   trusted in the fact that he would make them
12   into something great.
13   Q.   Okay.  But neither you nor
14   Dugaboy could predict whether Highland
15   would receive from the sale of the assets
16   more or less than the principal and
17   interest due under the notes, correct?
18   A.   You are correct; I could not
19   predict what would happen.
20   Q.   Okay.  Did Mr. Dondero express
21   any reason to you why he thought the notes
22   should be forgiven if the assets were sold
23   by somebody other than himself?
24   A.   Okay.  I'm sorry, John.  Again?
25   Q.   Did Mr. Dondero give you any

Page 229

N. Dondero

1
2    reason as to why he believed he was
3    entitled to the forgiveness of the notes
4    simply because the assets were sold by
5    somebody other than himself?
6    A.   I believe we touched on this
7    already, but I will repeat it.
8    His concern was that he put the
9    time and effort and energy into the three
10   portfolio companies and then some element
11   beyond his control could come in and sell
12   them at a loss after he had done all the
13   work.  And if we didn't have that provision
14   in, his notes wouldn't be forgiven.
15   Q.   Did you ask him why he was
16   concerned that some element beyond his
17   control were to intervene to prevent him
18   from selling the assets?
19   A.   I did not.
20   Q.   Did you ask him why that was even
21   a possibility at the time that you entered
22   into these three agreements?
23   A.   I did not.  But knowing my
24   brother, he looks at all sides of every
25   situation.

N. Dondero

Q. Okay. The notes that were issued by HCMS, HCRE, and NexPoint, can we refer to those for the next set of questions as the corporate notes?

A. Okay.

MS. DEITSCH-PEREZ: Can you read that back?

MR. MORRIS: Sure.

BY MR. MORRIS:

Q. Can we call the notes that were executed on behalf of HCMS, HCRE, and NexPoint as the corporate notes?

MS. DEITSCH-PEREZ: You're including HCMFA in this?

MR. MORRIS: No, I never said that.

MS. DEITSCH-PEREZ: I thought you did. That's why I said -- I think you misspoke, but can you ask the question again.

MR. MORRIS: I don't think so. I don't think so, but I'll say it for a third time.

BY MR. MORRIS:

N. Dondero

Q. Can we call the notes executed on behalf of HCMS, HCRE, and NexPoint as the corporate notes?

MS. DEITSCH-PEREZ: Okay. Thank you. I think I was hearing S as F. Sorry.

BY MR. MORRIS:

Q. Is that okay, Ms. Dondero?

A. Yes, that's fine. Thank you.

Q. Okay. And under the agreements, were the corporate notes to be forgiven as compensation to your brother or as compensation to the corporate obligors, the corporate borrowers?

A. Deferred compensation for Jim.

Q. So let me get this right.

HCMS, HCRE, and NexPoint each borrow money from Highland and give Highland promissory notes in return.

Do I have that right?

A. I'm sorry, John. Just one more time, the question, please?

Q. Each of HCMS, HCRE, and NexPoint borrowed money from Highland and gave

N. Dondero

promissory notes in return, correct?

A. Yes. That's my understanding.

Q. And under the agreement that you entered into on behalf of Dugaboy, those corporate notes would be forgiven as compensation to your brother upon the condition -- upon the fulfillment of conditions subsequent, correct?

A. That is correct.

Q. So that the forgiveness of the corporate notes was, in your mind, the same thing as giving compensation to your brother, correct?

MS. DEITSCH-PEREZ: Object to the form.

A. They would be considered deferred compensation.

Q. And they would be considered compensation to your brother, not compensation to the borrowers under each of the corporate notes, correct?

A. That's how I understood it, yes.

Q. Okay. So in your mind, when you entered into these agreements, it didn't

N. Dondero

matter whether the notes were executed by your brother or any of these three corporate obligors; the cancellation of the notes would be a direct benefit for compensation purposes only to your brother, correct?

MS. DEITSCH-PEREZ: Object to the form.

THE WITNESS: Do I still answer?

BY MR. MORRIS:

Q. Yes.

A. Yes, John, that's how I understood it.

Q. Thank you.

A. Certainly.

Q. Now the compensation that was the subject of these agreements, that wasn't to compensate him for past services, was it?

MS. DEITSCH-PEREZ: Object to the form.

MR. MORRIS: Withdrawn.

BY MR. MORRIS:

Q. The compensation that was subject to the agreement was for services that

Page 234

```
1                N. Dondero
2   would be rendered in the future, correct?
3        MS. DEITSCH-PEREZ:  Object to the
4   form.
5   BY MR. MORRIS:
6     Q.  You can answer.
7     A.  Well, in the future from what
8   date?
9     Q.  From the date that the agreements
10  were entered into.
11    A.  Correct.  Yes.  From the date,
12  yes.
13    Q.  The agreement was that the notes
14  would be forgiven based on a condition
15  subsequent, right?
16    A.  Yes.  So a future date from when
17  we entered them, um-hmm.
18    Q.  So something had to happen in the
19  future in order for your brother to get the
20  benefit of the bargain, right?
21    A.  Correct.
22    Q.  Because if it was compensation
23  for services rendered in the past, you just
24  give him the money, right?
25    A.  So true.
```

Page 235

```
1                N. Dondero
2        MS. DEITSCH-PEREZ:  Object to the
3   form.
4   BY MR. MORRIS:
5     Q.  Let me ask another question, a
6   different question, Ms. Dondero, and just
7   try to finish this up.
8        Pursuant to the agreement that
9   you entered into on behalf of Dugaboy, the
10  notes would only be forgiven if some future
11  event occurred, correct?
12    A.  Right, the monetization of one of
13  the three portfolio companies, correct.
14  Um-hmm.
15    Q.  The forgiveness of the notes was
16  not for services rendered in the past,
17  correct?
18        MS. DEITSCH-PEREZ:  Object to the
19  form.
20    A.  That is correct.
21    Q.  Okay.  Do you know if Dugaboy
22  ever issued any promissory notes in favor
23  of Highland?
24    A.  I know there are loans between
25  Dugaboy and Highland.
```

Page 236

```
1                N. Dondero
2     Q.  And do you know who made the loan
3   and who received the loan or loans?
4     A.  I believe Dugaboy was the
5   borrower.  The loan with Highland, it was
6   in 2017.  And if my memory serves me right,
7   it was 23, 24 million.
8        Again, going by memory, John,
9   because I really wasn't prepared for this
10  line of questioning, but I believe there is
11  an earlier loan between the two of them.
12    Q.  And did you – I apologize.  I
13  didn't mean to step on your words.
14        Are you finished?
15    A.  Oh, no.  I am.  Thank you.
16    Q.  Okay.  Were you the trustee of
17  the Dugaboy Trust at the time the loans you
18  just described were obtained from Highland?
19    A.  The one that I mentioned that I
20  remembered the – I believe it's close to
21  or around 24 million, in May of '17, I was
22  obviously.  I became trustee in October of
23  '15.
24        The other one, I'm not positive
25  on, John, the date and the amount.  I just
```

Page 237

```
1                N. Dondero
2   know of another one.
3     Q.  Now the Dugaboy trust is, I think
4   as you've described it, a trust for
5   education and health and lifestyle
6   purposes, right?
7     A.  And maintenance, correct.
8     Q.  Do you know why Dugaboy needed to
9   borrow 23 to 24 million dollars from
10  Highland in 2017?
11    A.  I'd be speculating.  I don't know
12  for sure, but I believe it was for real
13  estate.
14    Q.  And did you – do you recall
15  executing any documents on behalf of
16  Dugaboy in connection with the loan that it
17  obtained from Highland?
18    A.  Not that I recall, John, right
19  now.
20    Q.  Do you know who authorized
21  Highland – withdrawn.
22        Did you ever have any
23  conversations with anybody at any time
24  concerning Dugaboy's 23 to 24 million
25  dollar loan that it obtained from Highland
```

Appx. 01933

Page 238

```
1            N. Dondero
2   in around 2017?
3        MS. DEITSCH-PEREZ:  I'm going to
4   object.  This is neither one of the
5   Dugaboy topics and it's beyond the --
6   it doesn't pertain to the four
7   adversary proceedings.  So it's not
8   fair to ask the witness about things
9   she's not had the occasion to refresh
10  herself on.
11       MR. MORRIS:  Okay.
12       MR. DRAPER:  John, I let this go
13  on behalf of Dugaboy a little bit just
14  for background information, but now
15  we're sort of bordering on specifics of
16  a transaction that is --
17       MR. MORRIS:  I am -- go ahead,
18  Douglas.  I'm sorry.
19       MR. DRAPER:  -- that is not in
20  dispute in this litigation.  It is not
21  within your 30(b)(6) designation.  And
22  so it's fundamentally unfair to put
23  this witness through a memory test for
24  no purpose whatsoever that servers
25  nothing to do with this litigation.
```

Page 239

```
1            N. Dondero
2        MR. MORRIS:  Okay.  Number one, I
3   agree that it's not a 30(b)(6) topic.
4        Number two, I agree that I'm not
5   asking her these questions in her
6   capacity as the Dugaboy trustee.  I'm
7   asking them in her individual capacity.
8   So I don't think you have any grounds
9   to object any longer, Mr. Draper.
10       And number three, I think all of
11  this goes to credibility.  And it goes
12  to everything we've been talking about
13  today.
14       And so I'm going to continue to
15  ask my questions.  And if at any time
16  you want to direct the witness not to
17  answer, you know, we'll deal with it.
18  Okay?
19       MR. DRAPER:  Okay.  So if I
20  understand what you just said, just so
21  the record is clear, this is not
22  30(b)(6) questions to the witness.  In
23  fact, these are questions to the
24  witness in her individual capacity and
25  will not serve as a 30(b)(6) answer on
```

Page 240

```
1            N. Dondero
2   batch of Dugaboy, correct?
3        MR. MORRIS:  I thought I was
4   quite clear, but, yes, Douglas, that is
5   correct.
6        MR. DRAPER:  Great.  Thank you.
7        MR. MORRIS:  Yep.
8   BY MR. MORRIS:
9    Q.  Okay.  So Ms. Dondero, do you
10  recall any conversations you ever had at
11  any time concerning the 23 or 24 million
12  dollars that Dugaboy borrowed from
13  Highland?
14   A.  Not at this time.
15   Q.  Okay.  You mentioned that you
16  believed that the money was used for the
17  acquisition of real estate.
18       Do I have that right?
19       MS. DEITSCH-PEREZ:  Object to the
20  form.
21   A.  Yes.
22   Q.  And was that for the acquisition
23  of Jim's house in Colorado?
24   A.  I don't know.
25   Q.  Do you know if your brother
```

Page 241

```
1            N. Dondero
2   acquired a house in Colorado in or around
3   2017?
4    A.  I know he acquired a house in
5   Colorado.  The time frame, I'm not certain
6   of.
7    Q.  Do you know that he paid more
8   than $20 million for a house in Colorado?
9    A.  No.
10   Q.  Was the loan that Dugaboy
11  obtained from Highland subject to any of
12  the three agreements that you entered into
13  as the trustee of Dugaboy?
14   A.  Any of the three agreements we've
15  been discussing?
16   Q.  Yes.
17   A.  No.
18   Q.  Did you ever ask Jim why the
19  Dugaboy note wasn't included in the
20  agreements?
21   A.  I did not.
22   Q.  But you knew Dugaboy note existed
23  at the time you entered into the
24  agreements, correct?
25       MS. DEITSCH-PEREZ:  Object to the
```

Page 242

1          N. Dondero
2      form.
3      A.   At the time I entered into the
4   agreements, I don't know, John.
5      Q.   So at the time you entered into
6   these three agreements, you don't recall
7   whether you knew that Dugaboy had obtained
8   a 23 to 24 million dollar loan from
9   Highland.
10          Do I have that right?
11      A.   I don't know as I sit here now.
12   What I knew then, I don't remember.
13      Q.   But you do remember the specific
14   identity of each promissory note that was
15   the subject of each of these three
16   agreements, correct?
17      A.   When I refreshed my memory, sure.
18      Q.   Do you know if Dugaboy ever
19   entered into any agreement on behalf of
20   Highland other than the three oral
21   agreements that you described today?
22      A.   Dugaboy has entered into a lot of
23   agreements with Highland.
24      Q.   All right.  Let me restate the
25   question.

Page 243

1          N. Dondero
2      Did Dugaboy ever, ever -- ever,
3   ever.  Let me try again.
4      Did Dugaboy ever enter into any
5   agreements pursuant to Section 3.10 of the
6   LP agreement other than the three
7   agreements that you've mentioned today?
8      A.   Oh --
9      MS. DEITSCH-PEREZ:  Were there
10   any before these, John?  Before?
11      MR. MORRIS:  I don't care if it's
12   before or after.  So let me ask again.
13   BY MR. MORRIS:
14      Q.   As the trustee of Dugaboy, are
15   you aware of any agreement Dugaboy has ever
16   entered into pursuant to Section 3.10 of
17   the LP agreement other than the three
18   agreements that you have described today?
19      A.   Not that I'm aware of,
20   compensation.
21      Q.   Can we put up your discovery
22   responses, which I think is document No. 25
23   in your pile.
24      MS. DEITSCH-PEREZ:  The notebook.
25      MR. ELMS:  25.

Page 244

1          N. Dondero
2      THE WITNESS:  What is it?
3      MR. ELMS:  Tab 25.
4      THE WITNESS:  Tab 25.  Okay.
5      (Document review.)
6   BY MR. MORRIS:
7      Q.   Have you seen this document
8   before, ma'am?
9      A.   Just one second.  I'm getting
10   there.
11      Q.   Sure.  Take your time.
12      A.   Okay.
13      (Document review.)
14      A.   Yes.  Yes, I believe I have.
15      Q.   Can you turn to page 15?
16      (Witness complies.)
17      Q.   Is that your signature?
18      A.   It is.
19      Q.   And did you review this document
20   before you signed it?
21      A.   I did.
22      Q.   Did you have an opportunity to
23   consult with counsel before you signed it?
24      A.   I did.
25      Q.   Did you in fact consult with

Page 245

1          N. Dondero
2   counsel before signing it?
3      A.   I did.
4      Q.   And you reviewed this document in
5   connection with your preparation for
6   today's deposition, correct?
7      A.   Correct.
8      Q.   As you sit here now, do you know
9   of anything in the objections and responses
10   that is wrong or inaccurate?
11      (Document review.)
12      A.   I don't see anything, John.  I
13   don't believe so.
14      Q.   As you sit here right now, do you
15   have any reason to amend these objections
16   and responses to make them more complete or
17   more precise?
18      A.   Not at this time.
19      Q.   Can you turn to page 9, please?
20      (Witness complies.)
21      Q.   Do you see in request for
22   admissions No. 7 and 8, you were asked to
23   admit, and I'm going to summarize, that no
24   document was created prior to the
25   commencement of the adversary proceeding

Page 246

1          N. Dondero
2   that reflects -- let's just take them one
3   at a time.  Let me withdraw that.
4          Looking at No. 7, do you see that
5   you denied having sufficient knowledge or
6   information to admit or deny the request?
7      A.  Yes.
8      Q.  Okay.  Would you agree that as
9   you sit here right now, you are not aware
10  of any document that was created prior to
11  the commencement of the adversary
12  proceeding that reflects or memorializes
13  the terms of the agreement?
14     A.  Yes.
15     Q.  Okay.  And turning to No. 8, do
16  you see for that one, you also responded by
17  saying you lack sufficient information to
18  admit or deny the request?
19     A.  Yes, I do.
20     Q.  Would you agree with me that it
21  would be fair to say that as you sit here
22  today, you are not aware of any document
23  that was created prior to the commencement
24  of the adversary proceeding concerning the
25  existence of the agreement?

Page 247

1          N. Dondero
2      A.  That's correct; I'm not aware of
3   any.
4      Q.  Okay.  Can we go to Interrogatory
5   No. 5?
6          MS. DEITSCH-PEREZ:  So page 12 to
7   13.  No, no, where you were.  We were
8   in Tab 25.
9          THE WITNESS:  Tab 25.  What page
10  now?
11         MR. ELMS:  Page 13.
12         MS. DEITSCH-PEREZ:  Page 13.  The
13  number is on page 12, but then --
14         MR. ELMS:  He's asking you at the
15  very top there.
16         THE WITNESS:  Oh.
17         (Document review.)
18  BY MR. MORRIS:
19     Q.  And do you see that Interrogatory
20  No. 5 asked you to identify every document
21  and communication you reviewed in
22  connection with your decision to enter into
23  the agreement?
24     A.  Yes.
25     Q.  Okay.  And you said that you

Page 248

1          N. Dondero
2   either reviewed or discussed with your
3   brother the LP agreement and the Dugaboy
4   Trust documents.
5          Do you see that?
6      A.  Yes.
7      Q.  Do you have any recollection of
8   actually reviewing the LP agreement before
9   entering into any of the agreements that
10  you've described?
11     A.  I don't recall.
12     Q.  You may or you may not, but do
13  you have a recollection of discussing it
14  with your brother?
15     A.  I don't recall, John.
16     Q.  Do you recall reviewing Section
17  3.1 before you entered into any of the
18  three agreements?
19     A.  I don't know when that review
20  took place.
21     Q.  Do you recall whether the review
22  took place in connection with your entry on
23  behalf of Dugaboy into any of the three
24  agreements?
25     A.  I don't know the time frame,

Page 249

1          N. Dondero
2   John.
3      Q.  Did you confer with anybody --
4   withdrawn.
5          Did you or Dugaboy confer with
6   anybody other than your brother before you
7   caused Dugaboy to enter into the three
8   agreements?
9      A.  No, not that I'm aware of.
10     Q.  Did you or Dugaboy seek any legal
11  advice before entering into any of the
12  three agreements?
13     A.  No.
14     Q.  Do you have any recollection of
15  actually reviewing the Dugaboy Trust
16  documents before entering into any of the
17  three agreements?
18     A.  I have reviewed the trust
19  documents, John.  I don't know what time
20  frame.
21     Q.  Okay.  I appreciate that.
22     A.  Sure.
23     Q.  I'm sorry, did I cut you off?
24     A.  Oh, no.  I'm sorry.  I was just
25  answering you.  Thank you.

Page 250

N. Dondero

1        N. Dondero
2    Q.   Okay.  So take a look at
3    Interrogatory No. 6 below.
4        Do you see that?
5    A.   Yes.
6    Q.   And your response was, "Other
7    than generally approving compensation,
8    including the agreements at issue in this
9    notes proceeding, none."
10       Do you see that?
11   A.   I do.
12   Q.   What does "Other than generally
13   approving compensation" refer to?
14   A.   Well, "Other than generally..."
15       I'm assuming it means the
16   forgiveness of the loan, "Other than
17   generally approving compensation."
18   Q.   Okay.  So let's look at the
19   Interrogatory.  This Interrogatory
20   specifically says that "Other than the
21   agreement" --
22   A.   Okay.
23   Q.   -- "identify every agreement you
24   ever entered into as a representative of a
25   majority of Class A shareholders of

Page 251

1        N. Dondero
2    plaintiff."
3        Do you see that?
4    A.   I do.
5    Q.   Are you aware of any agreement
6    that you ever entered into as a
7    representative of a majority of Class A
8    shareholders of plaintiff other than the
9    agreements that you've identified?
10   A.   No.
11   Q.   Okay.  And were you, in your
12   capacity as the trustee of Dugaboy --
13   withdrawn.
14       Did you, in your capacity as
15   trustee of Dugaboy, approve compensation
16   for any affiliate of Strand other than the
17   three agreements that you entered into that
18   you've described today?
19   A.   Not that I'm aware of.
20   Q.   Okay.  So generally approving
21   compensation, does that have any meaning at
22   all other than the three agreements that
23   you entered into that you've described
24   today?
25   A.   No.

Page 252

1        N. Dondero
2        MR. MORRIS:  Can we put up --
3        withdrawn.  Hold on.
4    BY MR. MORRIS:
5    Q.   Before we take this down, did
6    Dugaboy provide -- withdrawn.
7        Did Dugaboy approve any
8    compensation for Jim Dondero other than the
9    three agreements that you've described
10   today?
11   A.   I do not believe so since I've
12   been trustee.
13       MR. MORRIS:  Can we put up
14   Exhibit No. 26, please, which would
15   have been Dugaboy's discovery
16   responses?
17       (N. Dondero Exhibit 26, Defendant
18   the Dugaboy Investment Trust's
19   Objections and Responses to Plaintiff's
20   Request for Admission, Interrogatories,
21   and Requests for Production, marked for
22   identification, as of this date.)
23   BY MR. MORRIS:
24   Q.   And that was No. 26 in the
25   binder.

Page 253

1        N. Dondero
2    A.   Okay.  Um-hmm.
3    Q.   Have you seen this document
4    before?
5    A.   I believe so, yes.
6    Q.   And can you turn to page 14?
7    A.   Yes.
8    Q.   Is that your signature?
9    A.   It is.
10   Q.   And did you review this document
11   before you signed it?
12   A.   I did.
13   Q.   And did you have an opportunity
14   to consult with counsel before you signed
15   it?
16   A.   I did.
17   Q.   And did you in fact consult with
18   counsel before you signed it?
19   A.   I did.
20   Q.   As you sit here right now, in
21   your capacity as the trustee of the Dugaboy
22   Trust, do you know of anything in the
23   objections and responses that is wrong or
24   inaccurate?
25       (Document review.)

Page 254

N. Dondero

1
2      A.  I don't see anything that needs
3  to be changed.
4      Q.  As you sit here right now, as the
5  trustee of the Dugaboy Trust, do you have
6  any reason to amend your objections or
7  responses to make them more complete or
8  more precise?
9      A.  I have no reason at this time,
10  John.
11      Q.  Okay.  I think I have kind of the
12  same questions that I just asked you about
13  your discovery responses, but let's see.
14          Can we turn to page 8, which
15  again has responses to request for
16  admission No. 7 and 8?
17      A.  Okay.
18      Q.  And if you take a look request
19  for admission No. 7 and the response, can
20  you just read the that to yourself and tell
21  me when you're finished?
22          (Witness complies.)
23      A.  I'm done.
24      Q.  Okay.  Would your response be
25  accurate as follows:  Dugaboy is not aware

Page 255

N. Dondero

1
2  of any document that was created prior to
3  the commencement of the adversary
4  proceeding that reflects or memorializes
5  the terms of the agreement?
6      A.  That is correct.
7      Q.  Okay.  Moving to request for
8  admission No. 8, the same thing, can you
9  just read the request and the response to
10  yourself and let me know when you're
11  finished?
12          (Witness complies.)
13      A.  I'm done, John.
14      Q.  Okay.  Would it be fair to
15  interpret your response as follows:
16  Dugaboy is not aware of any document that
17  was created prior to the commencement of
18  the adversary proceeding concerning the
19  existence of the agreement?
20      A.  Correct.
21      Q.  Okay.  And let's go to
22  Interrogatory No. 5.
23          Are your answers in your capacity
24  as -- and if you want me to go through it
25  again, I'm happy to do it, but I just need

Page 256

N. Dondero

1
2  to know in the first instance, is there any
3  difference -- will your answers concerning
4  Interrogatory No. 5 be any different in
5  your capacity as the Dugaboy trustee than
6  they were in your individual capacity?
7      A.  Let me read it, John.
8      Q.  Take your time.
9          (Document review.)
10      A.  It's the same as the one earlier.
11      Q.  Okay.  And finally, let's just
12  look at Interrogatory No. 6.  Please take a
13  look at that and the response and let me
14  know if your answers in your capacity as
15  the trustee of the Dugaboy Trust would
16  differ in any way from the answers that you
17  gave pertaining to Interrogatory No. 6 in
18  your individual capacity.
19      A.  No, it's the same.
20      Q.  Okay.
21          MR. MORRIS:  So the time right
22  now is 4:57 Eastern, I guess 3:57 your
23  time.  I'm done with my outline, but I
24  just want to check my notes to see if I
25  have anything left.

Page 257

N. Dondero

1
2      Douglas, you'll be happy to know
3  that I do expect to finish well in
4  advance of 4:30 Central time.  So why
5  don't we just take a break and we'll
6  come back at, I guess, 4:10 Central
7  time?
8      THE WITNESS:  Okay.
9      THE VIDEOGRAPHER:  The time is
10  3:57.  We are going off the record.
11      (Recess is taken.)
12      THE VIDEOGRAPHER:  The time is
13  12:15.  We are back on the record.
14      MR. MORRIS:  This is John Morris.
15  I have no further questions of this
16  witness at this time.
17      Does anybody else have any
18  questions?
19      MS. DEITSCH-PEREZ:  Reserve for
20  trial.
21      MR. MORRIS:  So are we in
22  agreement that we can close the record
23  right now?
24      MR. DRAPER:  Yes.
25      MR. MORRIS:  Thank you very much

Page 258

```
1            N. Dondero
2     everybody.  Ms. Dondero, thank you.
3         THE VIDEOGRAPHER:  The time is
4     4:16.  This concludes today's
5     deposition, Monday, October 18, 2021.
6         (Time noted:  4:16 p.m.)
7
8     _____.
9         NANCY DONDERO
10
11
12    Subscribed and sworn to before me
13    this   day of       2021.
14
15    _____
16
17
18
19
20
21
22
23
24
25
```

Page 259

```
1
2         C E R T I F I C A T E
3
4    STATE OF FLORIDA      )
5              :  ss.
6    COUNTY OF PALM BEACH   )
7
8         I, ANNETTE ARLEQUIN, a Notary
9    Public within and for the State of New
10   York, do hereby certify:
11       That NANCY DONDERO, whose
12   deposition is hereinbefore set forth,
13   was duly sworn by me, and that the
14   transcript of such depositions is a
15   true record of the testimony given by
16   such witness.
17       I further certify that I am not
18   related to any of the parties to this
19   action by blood or marriage; and that I
20   am in no way interested in the outcome
21   of this matter.
22       IN WITNESS WHEREOF, I have hereunto
23   set my hand this 18th day of October, 2021.
24   _____
25       ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA
```

Page 260

```
1
2         I N D E X
3
4    WITNESS                PAGE
5
6    NANCY DONDERO
7       BY MR. MORRIS         8
8
9
10      I N D E X  O F  E X H I B I T S
11   DESCRIPTION              PAGE
12
     N. Dondero Exhibit 2, Amended      148
13   Complaint for (1) Breach of
     Contract, (II) Turnover of
14   Property, (III) Fraudulent
     Transfer, and (IV) Breach of
15   Fiduciary Duty
16
     N. Dondero Exhibit 31, Defendant    157
17   James Donder's Answer to Amended
     Complaint
18
19   N. Dondero Exhibit 43, Promissory    184
     Note, Bates-stamped D-CNL000550
20   through 551
21
     N. Dondero Exhibit 26, Defendant    252
22   the Dugaboy Investment Trust's
     Objections and Responses to
23   Plaintiff's Request for
     Admission, Interrogatories, and
24   Requests for Production
25
```

Page 261

```
1
2       ERRATA SHEET FOR THE TRANSCRIPT OF:
3    CASE NAME:  IN RE: HIGHLAND CAPITAL MANAGEMENT
4    DATE:     OCTOBER 18, 2021
5    DEPONENT:  NANCY DONDERO
6    Pg.  Ln.   Now Reads   Should Read   Reason
7    __  __  _____  _____  _____
8    __  __  _____  _____  _____
9    __  __  _____  _____  _____
10   __  __  _____  _____  _____
11   __  __  _____  _____  _____
12   __  __  _____  _____  _____
13   __  __  _____  _____  _____
14   __  __  _____  _____  _____
15   __  __  _____  _____  _____
16   __  __  _____  _____  _____
17
18        _____
19        NANCY DONDERO
20   SUBSCRIBED AND SWORN BEFORE ME
21   THIS____DAY OF_____ 2021.
22
23   _____
24   (Notary Public)
25   MY COMMISSION EXPIRES:_____
```

**$**

**$100** 205:19

**$20** 241:8

**$30** 137:19,25 139:12,16,20 140:9, 15 141:11,15,20 143:12,20

**$50** 206:12,18,20

**$6** 224:19

**$60** 204:18 206:14 222:13

**$7,900,000** 184:12

**(**

**(1)** 148:12

**1**

**1** 148:18 224:4

**10** 224:5

**100** 33:9

**10:30** 58:20

**10:51** 58:23

**12** 247:6,13

**12:00** 118:17

**12:15** 257:13

**12:16** 118:23

**12:54** 154:8

**13** 170:9 180:14,17 182:8 187:10 189:4 247:7,11,12

**14** 253:6

**15** 236:23 244:15

**17** 140:24 172:8 180:15 226:3 236:21

**18** 172:8,10 180:15 184:11 191:23 226:3 258:5

**19** 39:17 115:14 119:22 172:10,13

180:15 191:24 226:3

**1987** 34:17 36:10

**1990s** 39:11

**1997** 33:24 34:3,6

**19th** 39:6,19,20

**1:30** 153:24 154:2

**1:35** 155:3,5

**1st** 20:5 24:10

**2**

**2** 144:20 145:14 146:4 147:11 148:7,10,11

**20** 172:13 173:12

**20-plus** 207:6

**2009** 92:20,21

**2010** 166:23

**2015** 167:16

**2017** 53:17,20 54:17, 21 55:16,20,23 56:4 142:8 175:17,23 236:6 237:10 238:2 241:3

**2018** 53:23 56:8,12, 16,21 184:12

**2019** 39:7,19,21 56:24 57:4,8,12 92:21 172:25 173:14, 18

**2020** 173:2,9,15

**2021** 20:5,11,18 21:13,18 22:9 24:10 258:5,13

**22** 136:17

**23** 136:17 236:7 237:9,24 240:11 242:8

**24** 236:7,21 237:9,24 240:11 242:8

**25** 243:22,25 244:3,4 247:8,9

**26** 252:14,17,24

**29** 13:7 19:19

**2:41** 210:21

**2:57** 210:24

**3**

**3** 180:15

**3.1** 248:17

**3.10** 148:5,22 149:5, 12,17,20 150:24 152:19 156:8,14,22 172:24 243:5,16

**30** 7:18 16:22 136:12 144:3

**30(b)(6)** 16:22 19:13, 18 24:24 25:8 67:20 162:12 238:21 239:3, 22,25

**30-year** 117:2,23 128:16 142:3,4,13, 17,24 143:7

**31** 157:14,15 159:2,7 160:15

**32** 147:10,12,19

**37** 145:19 146:4 147:10,11,13,19

**3:57** 256:22 257:10

**3rd** 160:10

**4**

**4** 145:12,19 180:15

**43** 184:4,5

**4:10** 257:6

**4:16** 258:4,6

**4:30** 257:4

**4:57** 256:22

**5**

**5** 247:5,20 255:22 256:4

**50** 223:13 225:18

**500** 51:21

**551** 184:7

**6**

**6** 180:15 250:3 256:12,17

**60** 175:21

**63-4** 146:2

**7**

**7** 137:4 147:12 245:22 246:4 254:16,19

**700,000** 51:21

**72** 226:4

**8**

**8** 137:4 245:22 246:15 254:14,16 255:8

**82** 157:21 160:22,24 161:7 162:8,18 163:12 165:2,9,23 166:4,15 169:13 172:16 173:23 178:10 198:20 211:2, 9

**83** 160:8

**9**

**9** 245:19

**A**

**ability** 11:9 203:24 204:8

**Absolutely** 134:6

**accept** 142:17

**acceptable** 14:4

**accepted** 168:13

**accepting** 168:7

**access** 61:23 63:7 66:18

**Accounting** 152:5

**accurate** 152:16 162:9 254:25

**acquire** 66:7,13 69:3, 8,14 71:5,10 73:12, 16,22 78:2,6,12

**acquired** 67:14 241:2,4

**acquiring** 209:9

**acquisition** 210:12 240:17,22

**actual** 47:21 53:8 165:15

**add** 101:9

**addition** 87:2

**additional** 44:15

**address** 58:13

**administer** 6:14

**administered** 8:12

**admissible** 7:17 15:4

**admission** 252:20 254:16,19 255:8

**admissions** 245:22

**admit** 245:23 246:6, 18

**advance** 257:4

**advanced** 40:5

**adversary** 238:7 245:25 246:11,24 255:3,18

**advice** 152:14 249:11

**advisement** 58:9

**Advisors** 14:3 38:24 45:9 129:6

**affiliate** 98:6 99:22 100:8,14,18,25 101:24 102:5,11,15 103:17,20,24 119:9, 16,25 129:12,14,18 251:16

**affiliated** 96:19,24 97:18

**affiliates** 95:25 96:4, 8 97:23,25 98:11,21 99:2,6,17 100:3 101:21 103:3

**agent** 35:7

**aggregate** 206:9 225:10,21

**agree** 168:9 194:13 201:3 239:3,4 246:8, 20

**agreed** 6:3,8,12 142:17 161:10,17 163:3 164:19 168:19 194:12 201:9 205:9

**agreement** 16:9,12, 16 29:20,25 30:3,12 32:7,11,15 144:10,11 146:9,20,24 147:5 149:2 156:8,12,15 157:4 161:22 163:13 165:3 166:3 169:18 170:3 172:6,9,23,24 173:5,13 178:23 179:4 180:2 181:25 182:14 183:10 185:3, 22 187:9 190:22 191:10 192:14 195:22 197:7 199:2, 14,18,24 201:10,19, 23 203:14 205:14,23 206:6 211:10 221:11, 17 222:4,9,12,24 223:8,25 224:15 225:23 227:25 232:4 233:25 234:13 235:8 242:19 243:6,15,17 246:13,25 247:23 248:3,8 250:21,23 251:5 255:5,19 257:22

**agreements** 28:16, 21 106:20,24 107:10 120:20 121:3,10,15 131:6,14,19,25 162:23 163:10,14 164:15,25 165:4,16, 22 166:14 169:12 170:5,8,11,16,21 171:4,21 172:2 173:22 174:2,4,14, 18,25 175:6,16 176:9,16,25 177:3, 22,23 178:9,12

179:11 180:11 181:4, 8,17 182:10,20 183:13,16,19,24 185:21 186:8,9 187:3,15,19,22 188:24 189:7,12 190:18 191:18 192:3, 7,8,9,16,23 193:9,15, 21 194:21 195:16 196:21,25 197:15 198:14 200:7,10,17, 19,22 201:5 204:2,10 205:7 207:10 208:6, 16,25 209:7,14,24 210:8 211:18 212:13, 20 213:5,12 214:14, 19 215:2,21 216:3,10 217:3,8,11,15,19,23 218:8,13,18 220:3 223:5 224:24 225:12, 20,25 226:8 227:9, 19,21 229:22 231:11 232:25 233:18 234:9 241:12,14,20,24 242:4,6,16,21,23 243:5,7,18 248:9,18, 24 249:8,12,17 250:8 251:9,17,22 252:9

**ahead** 41:22 109:16 145:24 188:13 238:17

**allegation** 162:13

**allocate** 60:21

**allowed** 10:21

**alternative** 194:17

**ambiguous** 156:23

**amend** 245:15 254:6

**amended** 16:11 148:11 157:9,16 158:22 159:3,8,20,23 211:3

**amount** 82:18 90:13 93:21 136:2,5 141:10 182:4,7 184:12 204:19 206:10 223:20 224:6 225:11, 16,21 226:7,9 236:25

**amounts** 128:17 142:10

**analysis** 49:9,13,17,

23 50:19,23 51:4,7 215:8

**Annette** 7:11 138:19 177:15

**annual** 170:10

**answering** 11:2 30:19 249:25

**answers** 12:11 59:8, 16 255:23 256:3,14, 16

**apologize** 44:10 57:18 79:22 90:6 97:10 109:15,19 131:9 148:3 150:2 159:6 183:6 225:10 236:12

**appearances** 13:19

**appeared** 40:3

**application** 37:14

**applies** 162:18

**applying** 37:12

**appoint** 167:17,19

**appointed** 38:24

**appointment** 168:14

**approve** 251:15 252:7

**approved** 53:6

**approving** 52:11,16, 23 250:7,13,17 251:20

**approximate** 64:17

**approximately** 18:23 137:4 141:10

**April** 28:10

**area** 37:25 48:13,17, 25 49:6,14,17

**Arlequin** 7:11

**ascertain** 56:3 71:23 73:7,21 74:24 78:11, 25 91:17 93:16 120:16 121:15 122:8 124:19 126:12 127:4 139:20 152:15 153:10 212:14 215:3

**Asia** 148:4 160:22

**aspect** 21:13 119:3 156:21 198:13 199:13

**asserted** 21:8,9

**asserting** 20:19 21:14

**assess** 76:7

**asset** 35:9,12,18 36:3 206:18 221:12 222:5 224:4 225:2 227:7 228:7

**assets** 35:22 201:21, 25 202:24 221:4 222:15 223:6,12 226:15,21 227:2 228:15,22 229:4,18

**assistant** 151:18

**association** 7:5

**assume** 105:13 219:14

**assuming** 226:13 250:15

**assumption** 101:2,5

**assumptions** 114:2, 3

**astronomical** 215:16

**attached** 145:12

**attempt** 79:17 126:4

**attend** 34:11

**attendance** 118:21

**attorney** 10:7 17:6 23:22 26:3,6

**attorneys** 6:3 13:17 17:9,12,22 18:2,6,25 37:3 38:3

**audited** 62:25

**authorized** 6:14 111:16,22 112:2,7 123:21 124:5,12,19 137:12,19,24 237:20

**avoid** 201:19

**aware** 19:23 20:22, 25 21:4,7 39:9,13 48:6 51:10 61:16,18, 22 63:13 64:23,24 66:6,10,21 68:5 78:17 81:2,7,12,22 82:6 84:15,16 86:8, 11 88:16 91:11 92:4 94:6 97:21,23 99:3,5 102:23 106:10 108:2 110:4,6,10,15 111:5, 8,18 115:7 116:6 122:22 123:4,10,14 125:17 131:16,22 132:4,24 133:5,6,12, 20,21,24 134:17 135:4,9,23 137:3 140:14,15 141:23 143:24 162:11 179:19,22 180:3,25 185:16,19 191:8 199:22 200:2 212:11 225:19 243:15,19 246:9,22 247:2 249:9 251:5,19 254:25 255:16

**awareness** 50:6,8

---

**B**

**BA** 34:20

**back** 24:25 58:23 75:22 92:20 93:21 94:8,14,23 97:13,15 105:5 108:13,15 112:12 118:23 134:4 138:20 153:23 155:5 159:14,15 171:7 177:8,12,15,17 184:22 188:15,17 199:9 208:2 210:24, 25 230:8 257:6,13

**backed** 91:6

**background** 32:21 36:16,17,25 37:6,10 47:24 152:4 238:14

**balance** 62:6,21 206:25

**ballpark** 51:22 136:18,21,25 137:10 175:22 226:4

**bank** 62:6

**bankrupt** 35:23

**bankruptcy** 16:5
22:17 24:18 35:25
39:14,25 40:7,11

**bargain** 234:20

**barred** 161:8

**based** 64:12 76:24
101:5 216:15 234:14

**basing** 181:7

**basis** 34:2 50:7
65:17,19 119:12,19
129:16 150:3 151:5,
21 161:20 163:5
164:21 181:16
183:12,14 198:22
201:7 203:9,16
207:14,25 208:9
211:24 212:6

**batch** 240:2

**Bates-stamped**
184:6

**Beach** 191:2

**began** 36:11

**begin** 12:7,12

**beginning** 20:4
47:21 91:20 158:3
161:4 172:8,10,13
191:24

**behalf** 14:2 43:18
56:2,19 99:22 100:13
115:20 128:2 142:16
143:25 165:16 171:5
176:25 177:22
178:10 180:12 200:8,
20 205:9,10 206:6
211:19 223:5,21
224:2 225:13 227:9
230:12 231:3 232:5
235:9 237:15 238:13
242:19 248:23

**belief** 130:7 151:6
181:7,16 208:8,10
218:10

**believed** 47:6,12
49:5 88:17 211:23
229:2 240:16

**believing** 211:25
212:7

**beneficial** 104:11,13
105:10 129:20,23
130:9 222:22

**beneficiaries**
168:23

**beneficiary** 104:16
169:3

**benefit** 202:22,23
203:5,8,15 204:16
206:7,17 222:13
224:9,25 226:16
233:5 234:20

**benefits** 55:10
222:3,9 223:8,19

**benefitted** 206:23
222:22

**bet** 92:17

**big** 13:10 17:7

**bills** 32:13

**binder** 13:10 17:7
19:11,16,19 144:14
252:25

**binding** 218:9

**bit** 29:13 43:15
169:23 238:13

**board** 173:11

**book** 175:8

**bordering** 238:15

**borrow** 231:19 237:9

**borrowed** 231:25
240:12

**borrower** 189:18
190:2 236:5

**borrowers** 208:14
231:15 232:21

**bottom** 153:23
184:14

**box** 75:24

**Breach** 148:12,14

**break** 14:11 57:15,19
59:4,8,12,16 118:13
119:2 144:8 153:20

155:24 156:4 207:20
208:23 210:15 257:5

**bring** 194:2

**broadly** 110:9

**brother** 19:24,25
20:6,11,17,22 21:4,7,
13,17 22:7,10,20
23:4 28:13,17,22
29:15 31:8,22 39:10
40:6,9 47:7,12 51:8,
13 59:20 60:7,13,23
61:3,16,21 72:17
77:2 86:22 87:5
89:12,17 92:5,8,24
93:17,20 94:7,12,22
95:5,9,15,18 96:25
97:19 98:24 101:19
102:19 103:2,7
104:13 128:20 129:2
157:11 158:24
162:24 163:11
164:16 168:24 169:2
170:3 173:9,15,20,21
174:19 176:9,17
179:12 180:13 181:5
182:16,18 183:8,16,
21 184:18 185:4,23
186:10 187:5,16
188:24 189:16,24
191:10,15 193:22
194:18,22 195:24
196:3,13,19 197:2
199:22 200:3,12
202:12 204:12,14
207:8 208:2,5,12,13
212:3,7,10,15 213:7,
14 216:10,20 218:19
221:2,19 224:18,25
228:10 229:24
231:13 232:7,14,20
233:3,6 234:19
240:25 248:3,14
249:6

**brother's** 61:10,14
159:22 198:8,11
201:7

**BS** 34:20,21

**build** 201:13

**built** 36:15

**business** 33:12
42:23 43:3 44:6,14
71:14,18 74:2,5,11

75:7,10,15 105:19,22
106:2 120:5,9,12,17
130:15,18,22 131:2
194:2

---

**C**

**calendar** 212:23

**call** 40:15 189:9
230:11 231:2

**called** 8:19 16:22
36:14,18 38:12 40:12
45:9 75:4 103:11
119:6 129:6

**cancellation** 233:4

**CANTY** 159:2

**capacity** 16:20,21
25:11,14,16,22 26:17
30:4,13,14 31:3,10,
14,24 32:4,17 47:22
50:16 51:2 67:20
182:15 239:6,7,24
251:12,14 253:21
255:23 256:5,6,14,18

**capital** 10:9 16:4,12
38:5,12 42:3 103:11

**care** 243:11

**case** 7:20 22:17
38:18 48:12 61:17

**cases** 38:5

**caused** 166:2,13
176:24 177:21 178:9
200:8,20 208:14
211:17 213:3,11
214:12,18,24 217:20
249:7

**cellphone** 9:23

**Central** 154:2 257:4,
6

**CEO** 50:10

**certifications** 36:6

**certified** 7:4

**chance** 218:2

**changed** 170:20
171:2 254:3

**Changing** 144:4

**check** 24:25 256:24

**checks** 47:24

**children** 168:25

**circumstance**
146:22

**circumstances**
11:16 46:2 146:19
149:16

**Civil** 7:19

**claim** 43:17

**claims** 21:8 42:14
43:11 161:8

**clarify** 25:8 134:20

**clarity** 158:21

**class** 149:25 150:5
161:16 165:14
169:21 250:25 251:7

**classes** 48:20

**clear** 8:5 13:21 21:23
41:23 67:17,18
186:22 214:11
239:21 240:4

**clients** 14:2

**close** 236:20 257:22

**closed** 36:16

**coach** 104:25

**coaching** 105:3

**colleague** 144:12

**collect** 158:23
161:11 185:9,17

**collectively** 163:13
165:3

**college** 34:9,11
36:13

**Colorado** 240:23
241:2,5,8

**combined** 226:4

**comfortable** 30:19

**commenced** 177:5
178:2,14 185:17

**commencement** 141:6 245:25 246:11, 23 255:3,17

**common** 86:9,11,14, 17,23 88:16,18 101:3 207:16

**communicate** 10:21 21:21 28:2 59:3,7,11, 15 118:25

**communicated** 8:6 18:5 20:6 22:10 24:7 151:20

**communicating** 17:25

**communication** 21:22,24 247:21

**communications** 22:6 192:13,21 193:7,13

**companies** 35:22 64:2,14 65:5,15,24 66:8,14,20 72:8,13 76:22 96:10,19,24 97:18 104:3,5,9 161:19 163:4 164:20 174:7,22 194:10 195:3,21,25 196:4,7, 11,16 197:9,16 198:22 199:18,23 200:4,13,24 201:6,14 202:8 203:8,16,20,25 204:9,15 205:11,16, 25 206:8 209:4,10,17 210:3,11 215:18 218:4 227:13 229:10 235:13

**company** 33:8 36:14,16,18,22 38:11 39:10 40:25 44:12 50:9 63:15,19,24 64:9,13 67:4 75:3 92:10 105:12

**compared** 161:24 211:14,20,25 212:8, 15 213:8 216:4,11

**compensate** 233:19

**compensated** 48:24 50:4,12

**compensation** 48:14,18,22 49:2,6,

10,14,18,25 50:20,24 51:5,8,13 53:17,18, 20,23 54:8,16,20 55:3,9,11,16,19,23 56:4,7,11,15,20,24 57:3,7,12 161:23,25 174:11 211:15,21 212:2,9,16,21 213:8, 14,25 214:2,4,6,15, 21 215:4,9,12,22 216:5,12 231:13,14, 16 232:7,13,18,20,21 233:6,17,24 234:22 243:20 250:7,13,17 251:15,21 252:8

**complaint** 148:12 157:9,17 158:22 159:4,9,12,20,23 211:3

**complete** 245:16 254:7

**completed** 10:23

**complies** 244:16 245:20 254:22 255:12

**component** 37:20 55:2 201:18

**computer** 155:21

**concern** 190:15 194:24 229:8

**concerned** 89:11,16 102:25 229:16

**concerns** 189:16 190:9 199:4 201:11

**concludes** 258:4

**conclusion** 216:14, 18

**conclusions** 216:2, 9

**condition** 63:11 75:19 76:8,12,17 106:9,13,17 161:12 198:5 228:7 232:8 234:14

**conditions** 232:9

**conduct** 215:8

**confer** 249:3,5

**conferred** 17:12 49:4

**confirm** 102:19

**conflict** 189:17,24

**connection** 21:19 29:17 31:11,24 237:16 245:5 247:22 248:22

**consequence** 204:17 206:19

**considered** 174:10 232:17,19

**consistent** 158:2

**consult** 244:23,25 253:14,17

**Cont'd** 155:9

**contact** 219:10

**context** 13:3 35:19 174:18 182:12

**continue** 239:14

**continuous** 34:2

**Contract** 148:12

**contractor** 33:19

**control** 161:21 163:6 164:22 173:10,16,20 195:4 198:23 199:17 201:8,15 202:17 203:6,10,17 229:11, 17

**controlled** 60:24 96:24 97:19 189:17, 25

**controls** 199:23

**convenient** 207:21

**conversation** 61:2 87:10,12,15,17,19,23 88:8,12 99:11 183:4 188:8 194:5 219:11, 16,19 220:4,10,14,16

**conversations** 20:17 86:12 99:12,15 101:6 171:12 183:2, 18 191:12,25 192:21 193:20,22,25 237:23 240:10

**copies** 13:7 115:25

**copy** 141:20 144:23 146:23 147:5,24 157:7 158:17 160:2

**Cornerstone** 65:10 72:6,7,12,22 73:3,8, 12,17,22,24 74:14, 19,25 76:13 80:4,8, 13,20 174:8

**Cornerstone's** 73:25 74:5,11

**corporate** 95:22 130:10 230:5,13 231:4,12,14,15 232:6,12,22 233:4

**correct** 15:5 18:9 20:15 22:22 24:15 26:23 27:6,11 34:4, 15 39:14 53:9 55:4 62:23 72:9,14 81:11 85:23 88:6 92:5,6 99:14 101:17 111:4 115:9,10,15 117:7, 10,14 123:5 125:16, 21 137:6 140:24 146:5,6 151:23 162:10 163:7,8 164:23 165:19,20,24, 25 166:4,15,18 168:6 170:4,13 171:23 172:11,14,16,20 173:7,23,24 174:21 175:3 177:5 178:2 179:12,18 180:20,23 181:5,6 182:16,17 185:4,5,10 187:16 188:25 189:2 190:21 192:4,9 196:18 200:6 201:2,21 202:21 203:22,23 205:13 206:4,15,16 209:4,5, 11,12,17 210:3,6,12, 13 212:23 213:9,10, 15,23 214:16,17,22, 23 215:5,6 216:20,21 219:3 221:5,11 222:19 223:8,9,21, 22,23 224:9,21,22 225:3,4,6,7 226:23 227:13,15 228:8,9, 17,18 232:2,9,10,14, 22 233:7 234:2,11,21 235:11,13,17,20

237:7 240:2,5 241:24 242:16 245:6,7 247:2 255:6,20

**correctly** 162:5

**corroborate** 128:20 152:7,12

**cost** 69:3,8,14 70:22 71:5,10 73:16 77:25 78:6,11 79:7,14,20 80:9,14,21 161:20 163:5 164:21 174:23 196:16 197:9,17 198:4 202:2,3,4,10, 18,20 203:21 204:16 205:12,25 206:13,18 209:9 210:11 221:4, 13 222:4,15 223:6,14 224:5

**costs** 31:9,22

**counsel** 8:9 22:22 27:10,13 28:6 67:17 244:23 245:2 253:14, 18

**counterproposal** 197:6,14,23 199:13

**couple** 15:17 24:8 51:19 57:16 67:23 79:25

**courses** 48:21

**court** 6:17 8:7 10:17 14:16,20 105:4 177:8

**courtroom** 7:17

**cover** 144:7 176:11, 17 185:22 186:10 187:3 208:22

**covered** 49:23 177:3,24 181:8,17 186:14 208:21

**covering** 170:9

**COVID-19** 7:6

**created** 167:2 180:25 245:24 246:10,23 255:2,17

**credibility** 239:11

**creditor** 43:14

**Crescent** 33:2,12,15, 18,23 34:2,7 36:12,

23 41:2 43:11,18
47:15,18,23 48:3

**current** 39:5

**cut** 249:23

---

**D**

---

**D-CNL000550** 184:7

**Dallas** 9:9 40:3

**Dan** 9:15 26:20,22
27:2,5

**date** 39:21 42:24 43:4
44:4,7,8,15,20,24
62:17,22 63:2,12
64:15 66:5,17,22
68:2,10,16,22 70:8,
12,17,19 71:3,9,22,
25 72:13,20,25 73:5,
10,14,19 74:15,18,24
75:14,18 76:7,11,16
77:5,11,17,19,24
78:4,9,16,18,24 79:5,
12,17 80:7,12,18
83:2,11,14,23 84:2
85:7,13 87:25 92:19
93:9 94:17,21 95:3,7,
12 98:4 99:20,24
100:5,23 103:21,25
107:14,18,23 108:6,
18,24 109:5 110:4,
14,18,21 111:22
112:7,21 113:3
114:17,23 115:11,19,
25 116:5 117:10,12,
14,20 118:7 119:17
120:21 121:4,10,14,
21 122:3,9,16,24
123:21 124:5,11,25
125:22 126:5,16
127:3,13,18,23 128:5
129:13,18 130:13
131:5,13,19,24
132:6,13,21 133:2,11
135:12,18 136:6,15
137:12,18,23 139:11,
15,19,25 140:5,9
141:8,15,19,24
142:23 143:6,12,19
148:16 150:20 151:3,
6,22 152:25 153:5,9,
14 157:18 170:25
173:5,19 178:25
179:24 180:20 181:2

184:8 218:17 219:22
234:8,9,11,16 236:25
252:22

**dated** 184:11

**dates** 25:5 128:17

**Daugherty** 118:20

**Davor** 13:16

**day** 15:20 40:2 149:6
178:20 192:15
258:13

**day-to-day** 33:14

**days** 193:8

**deal** 195:6,8 228:2
239:17

**Deborah** 9:7,15
13:21 19:12 25:7
27:11,12,21 57:17
58:4 155:14 159:14,
25 164:3 176:5

**Deborah's** 17:20
27:19

**Debra** 8:6

**debt** 67:10

**December** 160:10
161:13 162:24
164:16 172:18,25
173:18

**decided** 23:16,18

**decides** 202:17,19

**decision** 60:21 61:13
247:22

**decisions** 48:13
169:7

**defendant** 20:23
21:2,5 31:13,18
130:10 157:15
159:19 161:15,21,23
176:13,19 252:17

**defendants** 8:10
13:18 27:14 129:24

**defender's** 38:4

**defending** 13:17

**defense** 28:23 32:16
162:14

**defenses** 20:18
21:8,14

**deferred** 174:10
213:25 231:16
232:17

**defined** 76:22 98:7
144:11 146:8 187:21,
24

**definition** 29:13
62:13 119:24 150:18
187:24

**definitions** 15:18

**degree** 34:9,18

**degrees** 34:23

**Deitsch-perez** 9:8,
15 13:22 19:8,14
22:23 23:7 24:22
25:15,24 27:13 28:3,
12 30:6,16 31:5
42:16 46:12,20 52:10
69:24 80:2 81:16
82:2,12,20 84:6,13,
20 89:6 96:14 97:2,5
104:14,21 105:2
108:9 109:11,17
112:15 113:17 116:9
118:3 120:2,22
121:23 122:11,19
123:23 124:7,15
125:5 130:2 131:7
132:8,15 133:15
135:7,21 137:7,14
138:17 140:12
142:19 143:2,8,15
144:15,17,19,24
145:7,15 147:11,14
148:17,20 150:10
155:15 156:16,24
158:16 159:10
163:16,23 166:5,9,16
169:19 175:24 176:6,
20 177:6,14 178:6
179:5,16 180:21
181:12 185:11 186:2,
15,19,23 187:17
188:2,10 189:20
190:4 192:17 198:16
199:19 204:3,21
209:18 210:4 213:16
221:7,14 226:18
227:22 230:7,14,18
231:5 232:15 233:8,

20 234:3 235:2,18
238:3 240:19 241:25
243:9,24 247:6,12
257:19

**Deitsch-perez's**
26:14

**demand** 117:2,23,25
118:5,8 128:16 207:9
223:11

**demands** 33:20
161:9

**denied** 246:5

**denoted** 145:13

**deny** 246:6,18

**depending** 201:20

**deposed** 11:12

**deposition** 6:12 7:10
10:10,14,23 11:17
17:2,5,13 18:7,15
19:5,22 28:4 156:5
157:14 158:3 245:6
258:5

**describe** 35:4 37:9
88:10 183:2,8

**designation** 238:21

**detail** 88:9

**detailed** 220:5

**details** 98:20

**determination**
70:20

**determine** 69:7
74:10 77:21 79:18
80:18 85:13,21
94:18,22 106:2,16
109:6 114:13 115:3
122:17 131:25 133:3
137:24 142:24 213:7
215:21

**determined** 142:12

**differ** 256:16

**difference** 226:6
256:3

**differently** 206:22

**difficult** 11:25 12:3

**diligence** 71:23

**direct** 33:3 41:9 47:7,
12 65:22 150:11
233:5 239:16

**directly** 40:18,23
41:5 42:5,9,13 65:14

**director** 45:6 47:3,11

**directors** 38:23

**directs** 15:10

**disagrees** 8:14

**disbelieve** 152:9

**discovery** 243:21
252:15 254:13

**discrepancies** 38:6

**discuss** 21:12,17
150:8,17

**discussed** 62:15
98:12 142:11 174:7
180:15 181:21
218:22 228:4 248:2

**discussing** 193:24
219:6 241:15 248:13

**discussion** 191:4,9
192:5

**discussions** 150:12
191:15

**dispute** 238:20

**distancing** 7:8

**distributions** 214:3

**division** 36:16,17

**DOC** 160:8

**docket** 160:5,8

**document** 12:24
13:2 16:16 102:24
145:12,13,21 146:2,
8,11,15 147:9,15,20
148:9 149:14,18,20
157:7,12 158:6,8,11,
15 160:14,18 184:3,
24 211:4 243:22
244:5,7,13,19 245:4,
11,24 246:10,22
247:17,20 253:3,10,
25 255:2,16 256:9

**documents** 12:21 13:8 19:4,6,19 89:16 103:6 237:15 248:4 249:16,19

**dollar** 174:24 203:20 204:16 205:12,25 221:4,13 237:25 242:8

**dollars** 59:21 60:8,9, 14,22 61:4 137:5 237:9 240:12

**Donder's** 157:16

**Dondero** 7:1 8:1 9:1, 4,6 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1,21 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1,11 42:1,18 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1, 25 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1,25 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1,11 149:1 150:1 151:1

152:1 153:1 154:1 155:1,11,23 156:1 157:1,15,24 158:1,22 159:1,18 160:1 161:1,15,23 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,8 179:1 180:1 181:1 182:1 183:1 184:1,5,10 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1,8 205:1 206:1 207:1 208:1 209:1 210:1 211:1,6,13,20 212:1,22 213:1 214:1 215:1,11 216:1,3 217:1,2 218:1 219:1 220:1 221:1 222:1,25 223:1,7,19 224:1,3,9 225:1 226:1 227:1 228:1,6,20,25 229:1 230:1 231:1,9 232:1 233:1 234:1 235:1,6 236:1 237:1 238:1 239:1 240:1,9 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1,8,17 253:1 254:1 255:1 256:1 257:1 258:1,2, 9

**Dondero's** 52:3,9, 16,24 53:6,16,22 54:15,20 55:3,15,19, 23 56:3,6,11,15,20, 23 57:3,7,11 67:20 159:8,19 161:21 163:6 164:22 198:23 203:9,17 211:2 214:15,21 215:4

**double** 138:20

**Douglas** 9:19 57:21 58:9 164:9 210:17 238:18 240:4 257:2

**Draper** 9:19 22:16,21 23:5,12,15,16,19,22, 25 24:5,7,17 26:3 57:20,25 58:16 163:24 210:16 238:12,19 239:9,19 240:6 257:24

**driver's** 35:2,6

**drugs** 11:8

**Dubel** 39:2

**due** 7:6 71:22 93:22 94:23 138:5,15 139:4 225:11,22 226:7,9 228:17

**Dug** 108:4

**Dugaboy** 15:21,23 16:23 19:9 22:11,13, 17 23:5,23 24:19,24 26:3,7 30:5,14 31:3, 18 32:12 50:17,18,22 51:3 52:8,15,23 53:6 55:22 56:2,14,19 57:6,10 67:21 68:2, 12,17,21 69:2,6,12, 17 70:10,14,20 71:3, 8,22 72:20,25 73:6, 11,15,20 74:9,13,17, 23 75:12,17 76:6,10, 15 77:5,10,15,20,25 78:5,10,14,19,24 79:4,11,16 80:6,11, 17 83:21 84:3,24 85:6,11 86:4 89:3,20 90:8,9,12,16 91:8,12, 16,23 93:6,11,15 94:6,11,16,20 95:4,8, 13 98:5 99:4,21,25 100:6,16,22 102:3,9, 14,18 103:19 105:21, 25 106:5,7,11,15,19, 23 107:8,13,17,22 108:5,17,23 109:4 110:4,16 111:10,21 112:5,20 113:2,10,23 114:7,12,16,21 115:2,18,24 116:6,14 117:16,18 120:7,11, 15,19 121:2,8,13,20 122:2,7,15,23 123:20 124:4,10,18,24 125:23 126:4,11,15, 21 127:2,9,12,14,19, 24 128:6,19 130:14,

20,24 131:4,12,17,23 132:5,11,20,25 133:12 135:11,17 136:4 137:11,17,22 138:12 139:10,14,18, 23,24 140:4,8 141:4, 7,13,18,23 142:22 143:5,11,18 150:22 151:7,8,10 152:8 153:8,13 156:14,22 157:11 163:19 164:14 165:8,12,13, 19,22 166:2,13,19,25 167:8,15,18,25 168:3,10,14,16,20 169:3,7,10,12,16 171:5 172:22 176:24 177:21 178:9,15,21 179:2,9,11,14,19,22 180:12,19,24 181:4, 19 182:16 197:13,22 198:11,15 199:6,12 200:8,20 201:4 203:13 204:7 205:10, 15 206:5 208:25 209:8,15,25 210:9 211:18 212:6,13,20 213:4,6,12,13 214:13,14,19,20,25 215:2,7,19,25 216:8 217:14,20 219:9 223:6,18 225:13 227:9,10,16,17 228:14 232:5 235:9, 21,25 236:4,17 237:3,8,16 238:5,13 239:6 240:2,12 241:10,13,19,22 242:7,18,22 243:2,4, 14,15 248:3,23 249:5,7,10,15 251:12,15 252:6,7,18 253:21 254:5,25 255:16 256:5,15

**Dugaboy's** 22:22 162:11 170:14,19 171:2 237:24 252:15

**duly** 8:20

**duty** 148:15 196:20 197:2

---

**E**

**earlier** 38:12 59:19

72:9 76:22 101:14 119:25 146:8 174:7 194:3 208:22 213:21 225:9 236:11 256:10

**early** 173:14

**Eastern** 256:22

**economic** 40:19 65:22 224:25 227:11

**education** 166:21 168:22 237:5

**effect** 6:15

**efficient** 11:24

**effort** 68:22 69:7 73:6,20 74:7,10,23 75:13,18 76:7,11,16 77:20 78:10,25 80:17 85:12,19 91:17,24 93:16 94:17,21 95:13 100:6 106:2,16 107:9,23 109:5 114:13 115:3,24 120:16 121:14 122:8, 16 124:19 126:12 127:3,24 130:25 131:24 133:2 137:23 139:19 141:19 142:22 153:9 194:25 201:12 212:14 213:6 215:3,20 229:9

**Either/or** 172:14

**elaborate** 41:7 143:23

**elderly** 191:6

**Electronically** 9:19

**element** 229:10,16

**Elms** 9:16 27:5,7,9, 18,22 243:25 244:3 247:11,14

**email** 21:25

**employed** 32:22 45:2 46:10 47:5 48:8

**employee** 39:6 46:22,25 81:14,23,24 83:3,10,16,24 84:5, 12,18 85:9 88:25 89:4 90:18

**employees** 33:17

47:25 81:4,9 85:3,16
86:6 87:6 88:15 90:2
101:16

**employment** 34:5

**encourage** 54:12

**end** 152:18 172:8
191:23 193:23

**energy** 229:9

**engagement** 24:25

**enter** 166:3,14 170:5
176:25 177:21 178:9
189:6 200:8,20
211:18 213:4,12
214:13,19,25 217:20
243:4 247:22 249:7

**entered** 29:17
162:23 163:10
164:15 165:15,23
169:12,18 170:2,16,
21 171:20,25 172:6,
23 173:4,14,21
174:13,19 176:16
179:11 180:2,11
182:14 185:20 186:7
187:2 191:19,21
192:16 193:9 196:21
203:13 204:2,10
205:6,14 206:6
208:24 209:7,14,23
210:7 212:19 218:7,
18 221:16 222:16
223:5 224:2,14,23
225:13,20,24 226:8
227:8,18,25 229:21
232:5,25 234:10,17
235:9 241:12,23
242:3,5,19,22 243:16
248:17 250:24 251:6,
17,23

**entering** 171:4
196:25 207:10 208:6,
16 212:12 215:20
216:2,9 248:9
249:11,16

**entirety** 93:24 94:4

**entities** 60:23 93:2
95:23 185:24

**entitled** 229:3

**entity** 16:3 33:4
41:16 45:8,11 47:6,

11 53:25 103:10,14
119:6 129:5,8 165:15
207:13

**entry** 192:22 248:22

**equity** 67:11

**equivalent** 37:18
227:20

**error** 29:11

**established** 61:10

**estate** 35:7,25 120:6,
9 237:13 240:17

**evening** 8:6

**event** 224:17 235:11

**exact** 213:17

**EXAMINATION** 8:24
155:9

**examined** 8:21

**examples** 215:15

**exceeded** 70:22 71:5
174:23

**exchange** 81:7,25
99:18 115:9 126:18
227:20

**exchanged** 126:24

**exclude** 150:11

**executed** 84:4 100:8
115:20 117:5 127:15
128:2 185:23 186:10
187:4,14 188:22
230:12 231:2 233:2

**executing** 237:15

**executive** 48:13,17,
21 49:2,6,9,14,17,24
50:19,24 51:4

**executives** 50:4,12

**Exhibit** 145:12
148:7,10,11,18
157:14,15 159:7
160:15 184:4,5
252:14,17

**exist** 106:20

**existed** 88:22 106:24
107:10 121:15
131:19,25 241:22

**existence** 246:25
255:19

**existing** 140:10,17

**expect** 203:7 257:3

**expecting** 138:14

**expenses** 31:9,23
32:13,16

**experience** 48:12

**expert** 48:17 49:5
61:20

**expertise** 152:4

**experts** 61:17

**explain** 183:21 207:8

**explained** 158:2

**express** 220:22
228:20

**extended** 153:22

**extent** 68:23 163:25
164:3

**extra** 218:3

---

**F**

**face** 90:13 224:6

**face-to-face** 191:21

**fact** 8:11 46:7 88:21
153:14 216:11
223:17 228:11
239:23 244:25
253:17

**factors** 195:3

**facts** 125:17

**factual** 30:23

**fail** 12:13

**failed** 81:15,24

**fair** 12:8 19:8 25:4
33:9 61:19 62:20,23
83:19,20 88:5 92:14
151:22 238:8 246:21
255:14

**familiar** 16:10 38:10
129:5 144:5 184:25

**Family** 191:6

**father** 191:5

**fault** 188:11

**favor** 95:10,15,18
100:2,8 115:8,13,20
116:3,7 117:6
127:15,21 128:2
133:13,22 135:5,14
140:20 141:9,16,21
142:2 173:10 235:22

**February** 161:14
162:25 164:17
172:19,25

**Federal** 7:19

**feel** 30:19

**fiduciary** 35:25 36:2
148:15

**figure** 85:20 91:24

**figures** 54:22

**file** 40:6

**filed** 39:14,25 40:10
160:10

**filing** 6:5 16:5,6
43:17

**finally** 256:11

**financial** 14:3 44:11,
25 48:8 50:5,13
61:24 62:2,5,14,16,
25 63:5,8,11 75:19
76:8,12,17 106:8,13,
17 151:18 228:10

**financials** 62:19

**find** 38:7 39:24

**finding** 35:22

**fine** 46:18 70:5
138:23,24 231:10

**finish** 12:6,11 113:21
175:12 235:7 257:3

**finished** 236:14
254:21 255:11

**firm** 26:9,14,15,16,
23,25 33:13 36:15

**fit** 119:24

**Florida** 36:21 190:24

**follow** 161:5

**follow-on** 164:6

**force** 6:15

**forgave** 84:10 90:3,
17 91:9,14 100:12
102:16 103:3

**forgivable** 162:2

**forgive** 161:18 163:3
164:19 206:20

**forgiven** 85:3,8,14
86:6 88:25 89:5
90:10,14 91:18,25
100:17,24 101:25
102:5,11 174:6,10
175:2 194:9 196:15
197:8,16 198:21
200:10,22 201:5,17
202:6,10,18,20
203:22 205:13,17
206:14 207:5 221:12
223:12 227:4 228:22
229:14 231:12 232:6
234:14 235:10

**forgiveness** 65:20
201:19 204:18 206:2
220:18 222:13
224:20 226:17 229:3
232:11 235:15
250:16

**forgives** 29:10

**forgiving** 84:17 87:6
88:14 89:22 101:21
102:20

**forgotten** 79:24

**form** 6:9 21:23 22:24
23:8 30:7,17 31:6
46:13 64:4 68:18
69:25 81:17 82:3,13,
21 84:7 89:7 96:15
97:3 104:15 108:10
116:10 118:4 120:23
121:24 122:12,20
123:24 124:8,16
125:6 130:3 131:8
132:9,16 135:8,22
137:8,15 138:18
140:13 142:20 143:3,
9,16 156:17,25
166:6,17 176:21

Index: formed..holds

179:6,17 180:22
181:13 185:12 186:3,
20 187:18 189:21
190:5 192:18 198:17
199:20 204:4,22
209:19 210:5 221:8,
15 226:19 227:23
232:16 233:9,21
234:4 235:3,19
240:20 242:2

**formed** 36:11 92:11
166:22

**foundation** 50:8
84:14,21 112:16

**founded** 39:10

**fourth** 16:10

**frame** 92:16 119:14
241:5 248:25 249:20

**Fraudulent** 148:14

**Friday** 18:19

**front** 148:23

**fulfillment** 161:11
232:8

**full** 15:19 94:8,14

**fund** 43:5,7 44:2

**fundamentally**
238:22

**funds** 41:24 44:12

**future** 59:13,17
82:19 207:21 227:14
234:2,7,16,19 235:10

_____

**G**

**gain** 223:20 224:8

**Garcia** 7:3

**gave** 11:17 59:8 81:9,
13,22 90:25 99:6,17
116:18 125:25 129:2
144:14 159:25
217:25 231:25
256:17

**gears** 80:23 157:3

**general** 11:23 29:8
45:16,18,21 46:4,8
50:6,8 51:15,17

63:22 82:7 133:19
193:25 213:18,21

**generally** 29:7 35:19
36:8 37:10 42:25
63:21 98:16 99:4
110:10,15 133:17
250:7,12,14,17
251:20

**generations** 168:25

**gentleman** 202:16

**give** 11:22 15:15 19:9
29:12 59:17 64:17
81:15,24 86:3 97:8
103:9 157:8 158:17
218:2 228:25 231:19
234:24

**giving** 232:13

**glance** 160:2

**good** 7:2 28:19 43:13
83:12 113:19 127:10
145:9 154:3 228:2

**graduated** 34:13
36:10

**great** 154:5 218:5
220:25 228:12 240:6

**greater** 161:20 163:5
164:21 196:16 197:9

**Greenberg** 27:2
32:3,9,12

**ground** 11:23

**grounds** 239:8

**guess** 256:22 257:6

**guru** 228:10

**guys** 153:19

_____

**H**

**half** 17:17

**hand** 159:12

**handled** 24:17

**hands** 225:5 226:21

**handy** 13:9

**Hang** 145:7

**happen** 195:7 228:19
234:18

**happened** 88:3,4
205:3

**happy** 118:13 213:2
255:25 257:2

**hard** 13:7 144:23
157:7 158:16 159:25

**hate** 207:18

**HCM** 14:3

**HCMFA** 230:15

**HCMLP** 162:4

**HCMS** 103:15,17,20,
24 104:13 106:20,25
107:11,15,20,25
108:3,6,19,25 109:6,
10 110:5,13,17,21
111:3,6,12,17,23
112:8,11,22 113:4,
11,12,25 114:8,14,
17,23 115:3,7,13,20
116:2,7,20,23 117:5
118:8 162:12,19
175:19 186:11 187:5,
12 188:21 230:3,12
231:3,18,24

**HCMS's** 105:19,22
106:2,8,12,17

**HCRE** 119:6,8,13,16,
24 120:20 121:3,10,
16,21 122:4,9,17,25
123:11,16,22 124:6,
13,20 125:2,18,25
126:7,13,16,22
127:4,15,20 128:2,8,
15,22 162:12,19
175:18 186:11 187:6,
12 188:21 230:3,12
231:3,18,24

**HCRE's** 120:4,8,12,
16

**head** 30:22 35:10
65:2,3,6 89:2,9

**health** 166:21 168:22
237:5

**hear** 38:16 58:25
97:6 155:18,22 177:9
211:6

**heard** 29:2 45:8
63:14 75:3 103:10
119:5 177:9

**hearing** 231:6

**hedge** 43:5,7 44:2

**held** 68:19 151:7,8,11

**helm** 222:17 224:11

**helpful** 134:21

**high** 222:21

**higher** 174:9,12,14,
17,20 194:11 198:3
205:16

**Highland** 10:8 15:25
16:3,12 24:17 38:12
39:6,9,13,25 40:7,10,
20 41:24 42:2,7,11,
14 43:12,18 44:2,18,
19,23 45:3,6,15
47:16,19,25 48:4
51:9,14 53:7,25 54:2,
16,21 55:10 56:7,21
57:8,12 60:8,15 61:5
63:16,20,24 64:2,10,
14 65:11,14,22 66:6,
13 67:4,10,13 73:11,
21 81:3,8,9,13,22,24
83:4,10,16,24 84:5,9,
12,16 85:2,8,13 86:5,
9 87:5,9 88:13,18
89:5,24,25 90:2,4,17,
25 91:5,9,13,14,17,
24 92:4,8,24 93:7,12,
17,21,23 94:8,13,18,
25 95:10,15,19,24
96:5,9,11,13,20,21
97:24 98:2,5,10,21,
25 99:5,6,17 100:3,8,
9,11,17,24 101:24
102:11,16 103:3,11,
25 104:7 106:21,25
107:10,14,19,24
108:7,20 109:2,7,9
110:5,11,17,20
111:6,11,17,22
112:7,14 113:6,13,24
114:8,13,19,24
115:5,8,13,21 116:3,
8,20,24 117:6 118:8
119:9,16,21 120:20
121:3,11,16,22
122:5,10,18,24
123:11,16,21 124:5,

12,20 125:25 126:7,
13,18,23 127:5,16,21
128:3,8,15,22 129:19
131:6,14,20 132:2,7,
14,23 133:4,6,14,23
135:6,14,18 137:13,
19,24 138:7,13 139:3
140:11,21 141:9,16,
21 142:2,17 143:14,
25 157:10 158:23
165:10,15,16 169:11,
17 170:15,19 171:2
173:10,16 177:2,22
178:11 185:8,17,24
196:10 200:9,21
202:21,23 203:4,7,14
204:17 206:7,8,13,
17,23 208:3,7 211:19
212:22 213:15
214:16,22 215:4
217:25 218:6,9
222:18,23 223:21
224:3,8,11 225:2
226:16 227:19 228:3,
14 231:19,20,25
235:23,25 236:5,18
237:10,17,21,25
240:13 241:11 242:9,
20,23

**Highland's** 22:17
42:23 43:3 44:5,14
45:18,21 46:4,8
62:16,18,21,24 63:5,
8,11 67:8 68:3,14,23
69:3,7,14,19,22 70:7,
11,16,21 71:4,10
72:12,22 73:2,7,16
74:14,19,25 77:7,12,
16,21,25 78:6,11,15,
20 79:2,6,13,18 80:8,
13,19,20 89:21
103:20 129:12 200:3
206:25 209:3,9,16
210:2,10 227:11

**highly** 51:18

**hired** 35:24 37:14
46:21

**hiring** 26:2 27:16

**hold** 13:15 34:25
35:5 41:10 48:16
163:25 252:3

**holds** 150:6,7,22

**holidays** 172:4

**Honestly** 218:14

**Hotel** 34:19

**hour** 18:23 113:18 153:23

**hours** 17:17,18

**house** 191:2 240:23 241:2,4,8

**hypothetical** 205:4, 21,22

**I**

**idea** 60:25 100:15 126:3 189:5 198:15, 25 203:11,12,13

**identification** 148:16 157:17 184:8 252:22

**identified** 22:21 23:21 38:11 65:24 66:9,15,20 72:8 101:14 112:24 175:7 179:24 181:2 182:9, 12,22 195:20 251:9

**identifies** 179:20

**identify** 24:16 26:6 27:9 65:4,8 87:3,18 88:24 101:20,23 102:4,10,14 175:4 182:19 194:20 195:15 222:25 247:20 250:23

**identity** 89:4 242:14

**II** 148:13

**III** 148:13

**imagine** 40:12,16 62:12 64:19,21

**Immediately** 36:13

**impair** 11:9

**implications** 30:21

**implied** 18:5

**import** 200:17

**important** 12:5,10 14:14 217:19,23,25

218:13

**inaccurate** 245:10 253:24

**incentive** 218:3

**include** 62:7,10 178:18 198:25

**included** 241:19

**including** 109:22 186:17 213:25 214:2, 3 230:15 250:8

**inclusion** 183:23

**incorporates** 62:14 198:14

**incorrect** 26:12,24

**increase** 195:2 206:25

**increased** 60:13 221:18,24

**incur** 31:10,23

**indemnification** 29:3

**indemnified** 31:2

**indemnifies** 30:12

**indemnity** 29:3,9

**independent** 38:23 106:16 169:6 173:11

**indifferent** 224:3

**indirect** 33:3 41:14 47:7,13 65:22

**indirectly** 40:19,23 41:5 42:6,10,13 65:14

**individual** 16:20 25:11,13,16,22 26:17 30:3,13 31:14,24 32:4,17 239:7,24 256:6,18

**individualized** 47:24

**individually** 66:23 165:2

**industry** 44:18,22,25 48:9 50:5,13 162:2,4 211:15,22 212:3,9,17

213:9 215:9,13,23 216:5,13

**Info-back** 36:18

**information** 51:11 61:24 66:3,12,18 69:11,13,18 70:15 72:16 76:25 86:4,14, 17,22 88:19 89:21 98:19,24 101:19 105:15 106:8,12 112:11,21 114:4 116:19 120:8 124:25 125:8,23 126:6 128:25 168:15,18 209:15,25 216:17,19 238:14 246:6,17

**initiated** 139:9

**injury** 11:18

**inquiries** 85:17

**inquiry** 71:12

**instance** 81:22 256:2

**intend** 125:18 138:4 139:3 218:8

**intended** 12:22 112:11,22 113:4,11 125:2,8

**intending** 138:9

**intent** 113:15

**interest** 33:7 40:19 41:9,10,14,15,17 42:4,10 47:8,13 58:12,14 65:23 66:7, 13 67:8,14 68:4,14, 15,18,24 69:3,8,14, 19,22 70:7,11,16,22 71:4,6,10 72:22 73:2, 7,12,16,22 74:14,19, 25 77:7,12,16,21 78:2,6,12,15,20 79:2, 6,13,19 80:8,13,20 93:22 94:9,14,23 138:5,15 139:4 149:21 150:6,7,18,23 151:7,9,11 152:8 169:11,17 170:14,19 171:2 189:17,25 200:4 207:2 209:3,9, 16 210:2,10 222:22, 23 226:14 228:17

**interests** 42:7

**interpret** 255:15

**Interrogatories** 252:20

**Interrogatory** 247:4, 19 250:3,19 255:22 256:4,12,17

**intervene** 229:17

**intervening** 226:11

**investigate** 38:19,22

**investigation** 39:5

**investigative** 33:13 36:15 37:24

**Investment** 15:23 164:14 167:9 172:22 252:18

**invoices** 32:9

**irrespective** 187:6 227:2

**issue** 50:23 51:4 57:21 133:16 186:16 250:8

**issued** 84:11 115:7, 13 116:2,7 118:8 127:20 128:7,14,22 133:13,22 134:2 135:5,13 140:20 141:9,16,21 142:2 158:24 162:18 230:2 235:22

**items** 62:15

**IV** 148:14

**J**

**James** 38:17 157:16 159:19 161:21,23 163:6 164:22 199:16 211:20

**January** 20:5 172:19,25 173:9,12, 19 184:11

**Jersey** 36:20

**Jim** 51:18 65:25 66:3 72:11 86:12 87:2,20 92:25 93:3,7,12

98:12,22 99:13 101:7 105:9,13,16 116:21 128:12,13 129:20,22 130:9 136:9,10 151:19 168:2,3 171:12 182:24 187:9, 12 188:20 194:2,23 195:23 198:22 199:4 201:11 202:13 203:19 205:11 211:13 218:2,3,6 228:3 231:16 241:18 252:8

**Jim's** 104:2,5,9 168:7,11 189:8 191:5 197:18 199:4 203:5 207:2 240:23

**job** 37:13

**John** 10:6 13:15,19 14:4 24:22 39:2 52:11 54:24 57:20 58:16 68:7,20 70:2, 24 81:18 82:24 84:8, 22 89:8,19 91:21 92:9,13 95:2 97:4 98:3,15 100:4,19 101:17 102:7 103:4 105:17 108:2 109:3 111:8,20 112:17 113:7,19 114:20 116:12 122:13 123:25 125:7 130:7 132:17 134:4 142:24 142:21 147:8 158:13 159:2 163:17,24 166:10 169:15,22 171:7 175:8,24 178:20 182:6 184:25 186:4 188:7,13 192:24 193:14 197:10 200:15 201:22 203:11 204:23 206:23 207:17 208:8 209:21 210:6,16 212:24 215:14 216:6 220:11 221:16 222:6,16 224:11 227:24 228:9, 24 231:22 233:13 236:8,25 237:18 238:12 242:4 243:10 245:12 248:15 249:2, 19 254:10 255:13 256:7 257:14

**Jones** 10:7

**Jr** 38:17

**judgment** 29:16

**July** 24:10

**June** 28:5

## K

**kids** 191:5

**kind** 28:17 29:21 35:2
36:6 42:10 49:9,13
254:11

**knew** 68:15 80:10
118:6 182:7 210:9
212:21 213:13
214:14 218:20 219:4
220:20 224:18,25
241:22 242:7,12

**knowing** 183:12,14
229:23

**knowledge** 50:3
55:25 56:5,18 67:7
84:24 110:22 113:24
119:24 162:8 167:5
172:17 176:24
177:20 185:10 246:5

## L

**La** 148:3 160:21

**lack** 246:17

**late** 27:8 28:10
172:15 173:14

**law** 9:7 10:18 26:14,
15,16

**lawsuit** 27:14 31:11
111:2,7 123:18 134:3
135:15 137:6 185:16
187:7 225:17

**lawsuits** 20:23 21:2,
5,10,15,19 28:18,23
29:23 31:15,19,25
32:17 111:14 123:13
129:25 130:10
162:20 176:12,18
177:4,25 178:14
180:10 181:10,19
183:23

**lawyer** 13:6 14:25
15:10 38:8 46:16
151:25

**lawyers** 15:9 150:12

**learn** 60:12,20 61:9,
12 65:21 68:22 72:11
98:9,18,20 99:9
104:4,12 105:9
107:9,23 128:10
130:25 136:8,19

**learning** 40:10

**led** 183:18 193:20

**left** 156:7 256:25

**legal** 7:4 30:18,21
32:15 249:10

**lender** 189:18 190:2

**letting** 54:12

**levels** 161:25 211:15,
21 212:2,9,16 213:8
215:9,13,22 216:5,12

**library** 71:16

**license** 35:2,5,6,13,
20

**licensed** 35:14

**licenses** 34:25 35:9
36:5

**lifestyle** 168:23
237:5

**lifetime** 169:4

**limited** 16:11 42:6
144:10 149:25 150:5
169:22 207:11

**list** 175:9,14,25
178:22 179:2

**listened** 219:13

**litigation** 8:10 20:8,
13,19 25:17 26:10
27:17 58:5,12,14
157:5 238:20,25

**litigations** 24:19
29:18 123:8 134:25

140:22

**lives** 168:24

**living** 166:20

**LLC** 119:6

**loan** 81:12,23 84:17,
25 85:8,14 86:4
88:25 89:5 90:18,25
91:5,9,14,18,25
93:22 94:7,13,24
98:6 100:18,25
101:23 102:4,10,15
116:12 135:19
137:13,20,25 138:7,
15,16 139:5,12,16,21
140:2,6,9,16 207:7
220:18 236:2,3,5,11
237:16,25 241:10
242:8 250:16

**loaned** 92:4 109:10
110:11 122:25

**loans** 80:24 81:3,8
87:6 88:14 89:22,25
90:9,14 92:7,23 93:7,
12,17 97:24 98:2,8,
10,12,21,25 99:5,18
101:15,21 102:20
103:3 110:5,17,20,24
111:5,12,17,23
112:8,12,14,22
113:5,12,24 114:8,
14,18,24 115:4,9
116:15,20,23 123:3,
10,16,22 124:6,12,20
125:2,4,9,11,13,19,
24 126:7,13,17,23
127:5 133:7 140:10
162:3 194:3,8 207:3,
5 208:2,5 235:24
236:3,17

**located** 9:5

**long** 17:15 18:20
33:22 118:14 168:24

**longer** 199:23 239:9

**looked** 156:8 206:22

**loss** 62:7 229:12

**lot** 37:2 242:22

**LP** 10:9 16:4,8,13,16
38:13 42:3 129:6
144:10 146:9,19,23

147:5 149:2 156:8,
11,15 172:24 243:6,
17 248:3,8

**lunch** 144:8 153:20

## M

**made** 60:21 61:13
71:12 74:23 78:24
80:17 84:17 85:9,15
86:5 90:2 91:5,10,13,
18,25 92:8,24 93:7,
12,17 98:6,8,10,13,
21,25 99:5 100:25
101:15,24 102:5,10
107:22 110:5,17
111:6,11 113:24
114:8,14 115:24
123:11,16 125:4,15
126:7,13 133:6
135:18 138:16 139:5
140:11 146:16
161:14 162:25
164:17 194:18
197:22 198:15
207:12 208:5 213:6
215:2 219:13,14
223:18 226:10 236:2

**magnanimous**
218:5

**main** 219:10

**maintenance**
166:21 168:22 237:7

**major** 169:21

**majority** 149:20
150:6,7,18,23 151:7,
9,11 152:8 161:16
165:14 250:25 251:7

**make** 13:20 68:21
69:6 70:20 73:6,20
74:7,9 75:12,17 76:6,
10,16 77:20 78:10
79:16 85:11,17,19
91:16,23 93:15
94:16,20 95:13 100:6
105:25 106:15 107:8
109:4 110:21 111:17,
23 112:8 114:12
115:2 120:15 121:13
122:7,15 123:22
124:6,12,18,20
126:11 127:2,24

130:24 131:10,23
132:25 137:13,19,22,
25 139:18 141:18
142:22 153:8 155:22
162:13 169:6 178:22
179:2 189:10 197:5,
13 199:12 208:15
212:14 214:11
215:17,19 218:3
228:11 245:16 254:7

**making** 48:13 207:9

**management** 10:9
16:4,12 34:19 38:12
42:3 103:11

**Manuel** 7:3

**mark** 39:11 90:20
148:6,9

**marked** 147:10
148:15 157:17
160:15 184:4,7
252:21

**marking** 157:13

**matter** 11:15,20
24:16 27:23 30:23
43:22 223:4 233:2

**matters** 27:24

**maximize** 196:20
197:2

**meaning** 251:21

**means** 29:6 117:25
149:24 250:15

**meant** 174:15

**medications** 11:9

**meet** 17:8,15,19

**meeting** 17:25 18:12
21:24 191:21

**meetings** 18:13,18,
21,22 19:2 20:2

**Melissa** 151:12,16,
18 218:20,23,25

**memorialize**
246:12 255:4

**memory** 11:6 25:4
43:23 149:9 176:3
181:10,22 219:5,8
236:6,8 238:23

242:17

**mental** 219:14

**mention** 195:4

**mentioned** 18:4 37:4 86:18 128:16 190:17 236:19 240:15 243:7

**met** 17:6 90:22 221:19

**MGM** 65:10 66:24 67:4,8,11,14 68:4,14, 16,24 69:4,8,15,19, 22 70:7,11,16,22 71:4,11,14,24 75:19, 20,22 174:8

**MGM's** 71:18 76:8

**Mid** 27:8

**middle** 146:2 211:8

**million** 51:21 59:21 60:7,9,14,22 61:4 136:12,17 137:4,19, 25 139:12,16,21 140:9,16 141:11,15, 20 143:12,20 175:21 204:19 205:20 206:13,14,18,20 207:6 222:14 224:19 225:18 226:4 236:7, 21 237:9,24 240:11 241:8 242:8

**mind** 88:12 218:14 232:12,24

**minute** 145:8 160:2

**misspoke** 177:10 230:20

**misstate** 104:22

**mistake** 159:13

**mistaken** 90:7 180:16

**moment** 51:14 98:17 170:15 200:11,23 224:14 227:3

**Monday** 258:5

**monetization** 235:12

**monetize** 174:8

**monetized** 194:10 201:16 205:16 222:20

**money** 43:15 92:5 109:10 110:13 122:25 206:20,24 207:13 208:3,7 215:16 221:25 231:19,25 234:24 240:16

**Montgomery** 58:4

**months** 24:8

**morning** 7:2 40:3

**Morris** 7:22 8:4,25 10:6 14:5,8,10 19:12, 15,17 25:6,20,25 30:9 35:17 42:19 46:14,23 52:12 57:16,23 58:8,17,24 67:16,22 80:3 82:4, 14,15,22 96:16,17 97:8 104:17,19,23 105:6 108:12,22 109:13,20 113:20,22 118:12,24 120:24,25 130:5 131:9,11 133:18 138:22,25 144:16,18,21 145:3, 5,10 147:16,18,21 148:3,19,21 150:13, 16 153:18 154:2,6 155:10,14,16,17 156:18 157:12,19,23 158:19,20 159:5,13, 17 160:14,21 163:20 164:8,12 166:7,12 176:4,7 177:13 178:3,7 181:14,15 184:2,9,13,16,22 185:14 186:18,21,24 187:21 188:14 192:19 195:11,13 204:5,6 207:23,24 209:20 210:14,25 211:5 213:18 216:23, 25 226:20 230:9,10, 16,22,25 231:8 233:11,22,23 234:5 235:4 238:11,17 239:2 240:3,7,8 243:11,13 244:6 247:18 252:2,4,13,23 256:21 257:14,21,25

**motivate** 218:2 222:2,8

**motivated** 221:3,20 222:11 223:2

**motivation** 221:22, 24 223:25

**motivator** 220:25 221:18

**move** 195:12

**moved** 36:21

**movie** 71:15

**moving** 55:8 255:7

**murder** 38:5

**mute** 97:7

**muted** 164:2

---

**N**

**N** 148:11 157:15 184:5 252:17

**nail** 52:20

**named** 38:17

**names** 15:19 215:18

**Nancy** 9:4 41:11 42:17 161:15 164:4 258:9

**nature** 33:6,11 42:23 43:3 44:5,14 67:8 68:3,13,18,23 71:13, 18 72:21 73:2,7,25 74:5,10 75:6,10,14 77:6,11,15,21 105:18,22 120:4,8, 12,16 130:14,17,21 131:2 209:2

**NAV** 152:19,25 153:5,10,15

**needed** 208:3,7 221:22 237:8

**negative** 7:25 138:20

**negotiate** 194:23

**negotiated** 194:21

**negotiation** 143:13, 21,22,23 193:16

195:10,17,19

**neighborhood** 136:13

**Nelms** 39:2

**Newman** 58:4

**News** 40:4

**Nexpoint** 14:2 129:4, 6,9,12,18 131:5,13, 20 132:2,6,13,22 133:3,7,13,22 134:2, 14,24 135:5,12,19 136:20,24 137:4,13, 20,25 138:4 139:5,25 140:6,11,20 141:9, 16,21,25 142:18 143:14 162:13,19 175:18 186:11 187:5, 12 188:20 230:3,13 231:3,18,24

**Nexpoint's** 130:15, 18,22 131:2 136:5

**nice** 153:19

**Nodding** 155:15

**noise** 97:6

**normal** 12:2

**north** 225:18

**notary** 8:21 35:8

**note** 65:20 81:15,25 82:8,17 83:2,9,15,22 84:4,11 91:2,6 95:4, 9,14 99:21 100:2,7, 13 115:12 127:14,20, 25 129:24 134:14 135:3,20 136:6 137:5 138:6 139:5 140:20 141:5,8,15,20,25 142:4,7,13,17 143:13,20 144:2 161:14 162:25 164:17 177:3,24 184:6,11,21 185:2,9, 18 187:4 219:13,14 224:7 241:19,22 242:14

**notebook** 243:24

**noted** 25:23 155:3 258:6

**notes** 8:10 20:7,12 24:19 25:17 53:11 81:10 95:18 99:7,18 106:21 107:2,11 109:18,22,25 110:25 111:13,24 112:13,24 114:10 115:8,19 116:2,7,16 117:5,9, 19 118:7,9 121:5,6, 11,17 123:4,7,12,18 124:14,21 125:3 126:2,9,19,24 127:6 128:7,11,14,21,25 131:15,21 132:3 133:13,22 134:2,7,9, 24 135:4,13 139:8 140:17,22 158:24 161:11,18 162:18 163:4,11 164:20 170:7,9 174:4,5,9,24 175:5,10,15,17 176:12,17 178:13,18, 22 179:3,10,25 180:9,14,17,19 181:3,9,18,24 182:2, 9,19 183:3,9,15,22 185:23 186:10,14 187:10,12,13 188:20, 21 196:14 197:7,15 198:20 200:9,21 201:4,17,20 202:5, 10,18,20 203:21 204:20 205:12,17 206:3,10,15 207:9 208:15 220:2 221:12 222:14 223:11 224:20 225:11,22 226:17 227:4 228:17, 21 229:3,14 230:2,5, 11,13 231:2,4,12,20 232:2,6,12,22 233:2, 5 234:13 235:10,15, 22 250:9 256:24

**notice** 7:25 19:10,13, 18 40:6 117:25

**noticed** 58:2

**number** 11:14 36:4, 19 45:19 47:20 64:18 67:15 89:25 90:11 93:4,16 144:18,19 145:14 160:6 213:17, 19,21 223:13 239:2, 4,10 247:13

**numbers** 54:4

**O**

**oath** 6:15 8:12

**object** 7:24 13:24
14:25 22:23 23:7
25:18 30:6,16 31:5
46:12,16 69:24 81:16
82:2,12,20 84:6,20
89:6 96:14 97:2
104:14,17,24 108:9
116:9 118:3 120:22
121:23 122:11,19
123:23 124:7,15
125:5 130:2 131:7
132:8,15 135:7,21
137:7,14 138:17
140:12 142:19 143:2,
8,15 156:16,24
163:18 166:5,16
176:20 179:5,16
180:21 181:12
185:11 186:2,19
187:17 189:20 190:4
192:17 198:16
199:19 204:3,21
209:18 210:4 221:7,
14 226:18 227:22
232:15 233:8,20
234:3 235:2,18 238:4
239:9 240:19 241:25

**objecting** 13:22,23

**objection** 8:11 13:25
15:8 25:22 70:5
84:13 112:15 120:2
164:4,6

**objections** 6:8
245:9,15 252:19
253:23 254:6

**objects** 7:23 8:14
13:25

**obligations** 84:10
100:12

**obligors** 231:14
233:4

**obtain** 34:9 69:17
95:14 100:7 115:25
126:5 127:25 141:19
168:15

**obtained** 93:23 94:7,
13,24 102:15 113:6,
12 114:18,24 115:4
116:20,23 125:10,19
126:17,23 127:5
138:7 147:5 236:18
237:17,25 241:11
242:7

**obtaining** 168:19

**occasion** 238:9

**occur** 189:23 190:10,
14 218:11 219:15

**occurred** 18:18
39:16 40:16 153:11,
15 173:15 192:22
193:7 221:21 224:18
235:11

**October** 39:6,17,19,
20 115:14 119:22
167:16 236:22 258:5

**offer** 29:15 31:9

**offered** 31:22

**offhand** 24:21
218:21

**office** 9:7 17:20 38:4

**officer** 6:14 45:5
47:3,11 81:13,14,23,
24 83:3,9,16,24 84:5,
12,18 85:9 88:24
89:4 90:18

**officers** 81:4,8 85:2,
15 86:6 87:7 88:14
90:2 101:15

**Okada** 39:11 90:20,
25 91:5,10,14,19
92:2

**opened** 36:17

**operated** 33:23,25
44:19

**operates** 44:19

**operating** 44:23

**operations** 33:15
62:11

**opinion** 205:4

**opportunity** 15:2
244:22 253:13

**opposed** 30:4 36:5

**oral** 157:4 162:23
163:9 164:15,25
173:22 174:2 176:8
179:11 180:11 192:8,
10 193:9,15 242:20

**order** 148:8 234:19

**organization** 35:15

**originally** 175:20,22

**outcome** 29:22

**outline** 256:23

**overheard** 87:10
101:7

**oversee** 33:14

**owed** 136:15 206:21
225:16

**owned** 33:23,25
42:6,10 60:24 64:2
65:14 169:11,16

**owner** 47:23 104:11,
13,16 105:10 129:21,
23 130:9

**ownership** 33:4
41:17 47:7,13

**owns** 67:10

**P**

**p.m.** 118:17 155:3
258:6

**package** 212:21

**paid** 50:10 51:18
66:6,13 71:5 73:11,
21 93:21 94:8,13,23
136:16,20,24 137:4
195:6 207:7 208:2
241:7

**paper** 147:24

**paragraph** 157:21
160:22,24 161:7
162:8,17 163:12
165:2,9,23 166:4,15
169:13 172:16
173:23 178:10
198:19 211:2,9

**Pardon** 218:24

**part** 85:4,14 86:7
91:20 100:25 102:6,
12 134:10 161:7,9
187:7 195:8,18
198:7,10 216:6,7

**participants** 58:3

**participate** 18:25
19:25

**participated** 87:19
191:14,17

**parties** 6:4 7:14 58:5
87:20

**partner** 45:16,18,21
46:4,8 169:22

**partners** 119:6
150:2,6

**partnership** 16:11
42:6 144:10

**party** 202:24 225:6
226:22,25 227:6,12

**past** 233:19 234:23
235:16

**Patchulski** 10:7

**patience** 107:5

**patrick** 118:20

**pay** 29:16 31:9,22
32:8,12,15 82:9,10,
17 112:12 125:8,13
138:4,9

**Payable** 118:5

**payment** 161:10
207:3

**payments** 207:9,12
208:5,15 226:10,13

**pending** 7:21

**Penn** 34:12,13 36:10

**people** 22:20 37:12,
18 58:11 87:2 215:15
219:10

**percent** 33:9 223:14
224:4,5

**Perfect** 160:9

**period** 92:9 93:8,13,
18 152:20 153:2,5,
10,15 171:3 226:11

**permitted** 221:11

**person** 17:14,16
18:7 38:17 87:18
176:24 177:20 178:8
189:14 190:19,23
191:14 192:10
196:13

**person's** 29:11

**personal** 11:18
30:24 31:2,10 40:24
146:24

**personally** 26:10,21
52:2 166:2,13

**pertain** 238:6

**pertained** 171:12

**pertaining** 256:17

**pertains** 37:11

**petition** 39:21 42:24
43:4 44:4,7,8,15,20,
24 62:17,22 63:2,12
64:15 66:5,17,22
68:2,9,16,22 70:8,12,
17,19 71:2,9,21,25
72:13,19,24 73:5,10,
14,19 74:15,18,24
75:13,18 76:7,11,16
77:5,11,17,19,24
78:4,9,16,18,24 79:5,
12,17 80:7,12,18
82:25 83:10,14,23
84:2 85:7,12 87:24
92:19 93:9 94:17,21
95:3,7,12 98:4 99:20,
24 100:5,23 103:21,
25 107:14,18,23
108:6,18,24 109:5
110:4,14,18,21
111:22 112:7,21
113:3 114:17,22
115:11,19,25 116:5
117:10,14,20 118:7
119:17 120:21 121:4,
9,14,21 122:3,8,16,
24 123:21 124:5,11,
25 125:22 126:5,16
127:3,10,13,18,23
128:5 129:13,17
130:13 131:5,13,18,

24 132:6,12,21 133:2,11 135:12,18 136:6,15 137:12,18,23 139:11,15,19,25 140:5,9 141:8,14,19,24 142:23 143:6,12,19 150:19 151:3,6,22 152:25 153:5,9,14 170:25 173:5 178:25 179:24 180:20 181:2 218:17 219:22

**phone** 18:11 40:15 87:17,19 155:21 191:13 192:11

**phrase** 16:8 40:23 41:4 165:9

**pick** 223:13

**piece** 37:16

**pile** 243:23

**place** 18:21,22 87:12,15,24 192:15 193:23 207:20 219:19 248:20,22

**plaintiff** 11:20,21 161:10,17,18 163:2,3 164:18,19 165:9 205:10 251:2,8

**Plaintiff's** 161:8 252:19

**play** 51:23 52:2,8,15 207:5

**played** 52:23

**point** 58:10 82:18

**pointing** 163:22

**portfolio** 63:15,19,23 64:9,13,14 65:5,23 66:8,14,20 67:4 72:8,12 76:21 161:19 163:4 164:20 174:6,22 194:9 195:3,20 196:7,11,15 197:8,16 198:21 199:17,23 200:4,12,23 201:6,14,25 202:8 203:8,15,20,25 204:9,15 205:11,16,25 206:8 209:4,10,17 210:3,10 218:4 227:13 229:10 235:13

**portion** 13:2 94:2 161:3 162:8

**position** 215:16

**positive** 43:16 236:24

**possession** 146:24

**possibility** 229:21

**postgraduate** 34:23

**practice** 7:7 86:9,11,14,17,23 87:4 88:13,17,18,21 89:12,17,21 101:3,9,12,13,21 102:20,25 103:6 162:3

**preceded** 167:4,8

**precise** 245:17 254:8

**predict** 228:14,19

**predominately** 36:24

**preemployment** 36:24 37:5,10

**prefer** 153:21

**premarked** 148:8

**prep** 37:2,21,22,25

**preparation** 17:13 18:6,14 19:5,21 20:2 245:5

**prepare** 17:2,5 38:9 49:13,22 50:18,23

**prepared** 25:3,10 49:8,16 51:3 236:9

**present** 17:21 19:24 191:3

**preserve** 46:17

**prevent** 11:2 229:17

**previously** 140:10,16

**price** 66:6,12 174:20 195:6 201:20,25 202:9 206:9 227:2 228:6

**principal** 93:21 94:23 135:25 136:5,14,20,24 137:5

138:5,14 139:4 141:10 204:19 206:10 225:21 226:7,9 228:16

**prior** 28:4 37:14 44:20,23 62:17,21,25 63:11 64:15 66:5,17,22 67:25 68:9,16,22 70:8,12,17,19 71:2,9,21,25 72:13,19,24 73:5,10,14,19 74:14,18,23 75:13,18 76:7,11,15 77:4,10,17,19,24 78:4,9,15,18,24 79:4,12,17 80:6,12,17 82:25 83:10,14,22 84:2 85:7,12 92:19 93:8 94:17,21 95:3,7,12 98:4 99:20,24 100:5,23 103:21,25 107:13,18,23 108:5,18,24 109:5 110:3,13,17,21 111:21 112:6,21 113:3 114:16,22 115:11,14,18,24 116:5 117:10,13,14,20 118:6 119:16,22 120:20 121:3,9,14,20 122:3,8,16,23 123:20 124:4,11,25 125:22 126:5,15 127:3,9,13,18,23 128:5 129:13,17 130:13 131:4,12,18,24 132:5,12,21 133:2,11 135:12,17 136:6 137:12,17,23 139:11,15,19,24 140:5,8 141:5,7,14,19,24 142:23 143:6,11,19 149:18 150:19 151:2,6,21 152:25 153:4,9,14 161:9 167:11 168:7 170:25 173:19 178:25 179:23 180:19,25 192:22 193:8 196:24 212:12 215:20 216:2,9 218:17 245:24 246:10,23 255:2,17

**private** 38:3

**problems** 11:5

**procedure** 171:13

**Procedures** 7:19

**proceed** 155:12

**proceeding** 134:10,18 245:25 246:12,24 250:9 255:4,18

**proceedings** 238:7

**proceeds** 114:18,23 115:4 126:17,22 127:4 140:2,6

**process** 11:25

**Production** 252:21

**professional** 35:8

**professionally** 36:9

**profit** 62:7 214:2

**promise** 82:9,10,17

**promissory** 20:7,11 81:9,15,25 82:8,17 83:2,8,15,22 84:4,11 91:2,6 95:4,9,14,17 99:7,17,21 100:2,7,13 106:21 107:2,11 109:18,24 110:25 111:13,24 112:13,23 114:9 115:8,12,19 116:2,7,16 117:4 121:5,6,11,17 123:4,6,12,17 124:13,21 125:3 126:2,8,18,24 127:6,14,20,25 128:7 129:24 131:15,21 132:3 133:12,21 134:2,14 135:4,13,20,25 136:5 138:6 140:19 141:5,8,15,20,25 142:13 162:18 163:11 175:5,10,15 176:11,17 177:3,24 178:13,22 179:3,9,25 180:9 181:3,9,17,24 184:6,11,21 186:14 187:4 204:19 208:14 224:6 231:20 232:2 235:22 242:14

**properties** 37:19

**Property** 148:13

**proposal** 194:14,17 197:18,19,20 198:8,11,14 199:5,7,10 223:18

**propose** 194:16

**proposed** 192:14 196:14

**prospective** 47:25

**protects** 30:3

**provide** 37:25 47:19 48:4 161:22 168:22 252:6

**provided** 19:6,20 47:16 81:3 97:24 107:15,19,24 119:25 122:18 216:20

**provision** 148:25 194:20 195:15 197:14,24 199:2 201:9,22 229:13

**public** 8:21 21:24 38:4

**purchase** 174:20

**purpose** 125:24 126:6,12 139:11,16,20 161:22 168:16,21 211:9 238:24

**purposes** 157:13 233:6 237:6

**purse** 9:25

**pursuant** 32:14 163:2 164:18 172:24 235:8 243:5,16

**push** 199:9

**put** 12:21 13:2 119:13 144:12,21 157:6,19 184:2 194:25 210:25 217:5 229:8 238:22 243:21 252:2,13

**puts** 194:8

**putting** 201:12

---

**Q**

**qualification** 131:10

**question** 6:9 12:6,12 15:4,7,11,12 28:20,25 30:9,18 43:13 46:17,18,19 49:20 54:14 70:2,5 75:24

76:4 81:19 83:13
94:5 97:12,15,17
98:25 100:20 104:18,
24 105:8 108:13,15,
17 109:24 110:7
111:20 112:18
122:14 124:2 132:18
134:5 138:23 141:2
150:14,15 158:7
164:10 166:10
167:22 169:24
175:12 177:17,19
178:4,5 180:17 183:7
186:5 187:23 188:8,
15,17,19 190:8,10
197:11 203:2 209:22
212:24 214:10 216:7
222:7 230:20 231:23
235:5,6 242:25

**questioning** 236:10

**questions** 11:2,10
14:15,25 22:6 25:13
50:16 57:17 59:5,9,
12 67:18,24 72:5
79:23,25 95:22
127:11 171:11
207:22 219:24 220:7
230:4 239:5,15,22,23
254:12 257:15,18

**quick** 160:2

**quickly** 208:23

**quote** 211:13

---

### R

**raise** 57:21

**raises** 164:3

**ran** 36:19

**reach** 215:25 216:8,
17

**reached** 190:18,19,
23

**read** 45:23 97:12,15
105:5 108:13,15
138:19 149:4 161:3
162:5,9,17 177:8,11,
15,17 188:15,17
230:7 254:20 255:9
256:7

**ready** 155:11

**real** 35:7 120:6,9
237:12 240:17

**reap** 222:9 223:7

**reask** 30:8

**reason** 105:14
125:12 130:8,11
138:3,8,10,12 139:2,
6 152:9 178:11 191:7
193:5 228:21 229:2
245:15 254:6,9

**reasonable** 161:25
211:14,21 212:2,8,16
213:8 215:8,12,22
216:4,12

**reasons** 164:7

**recall** 11:15 20:9,10,
15,16 24:4,6 36:7
43:17 45:17,20,23,25
46:2 53:21 56:22
61:11 63:6 64:7 66:2,
4 68:25 69:20,21
70:6,9 73:4 74:12
76:9,14,19 77:9,14
78:8 80:15 85:24
87:4,11,14,21,23
88:11 89:19 90:15,19
93:19 95:2 99:19,23
100:4 102:2 103:4
105:24 106:4,18
112:5 115:16,17,23
120:18 121:18
123:19 124:23
127:17,22 128:23
131:3 136:11,23
137:21 138:2 141:12,
13,22 142:6 143:10
146:14,18 147:4
149:4,11,15 150:21
151:13 152:17
167:14 168:18
170:11 171:18,24
173:8,13,25 179:7
180:6 182:11 183:25
189:5 191:13,19
193:21 195:16,18
198:19 215:10
217:13 219:15,18,21,
25 220:8 237:14,18
240:10 242:6 248:11,
15,16,21

**recap** 219:11

**receive** 204:17
224:19 226:16
228:15

**received** 51:9,13
55:10 59:20 60:7
76:25 206:2 207:2
212:22 213:14
227:19 236:3

**receiving** 61:4

**recess** 58:21 118:19
154:9 210:22 257:11

**recollection** 28:9
40:14 52:22 53:15
83:6,7,18 117:22
172:3,21 179:8
190:17 191:22
193:12 248:7,13
249:14

**record** 7:9 9:3 13:20
14:20 43:22 57:24
58:2,18,20,23 67:17
118:15,18,23 154:8
155:5 210:21,24
239:21 257:10,13,22

**recording** 7:15

**recover** 222:3

**recovered** 223:20

**recovery** 35:9,12,19
36:3 227:12

**reduced** 217:4

**refer** 13:13 16:15
39:20 45:11 103:14
129:8 163:9 164:24
230:3 250:13

**reference** 149:19
152:19

**referral** 27:20

**referred** 23:9,10,12,
15 27:11,22 66:24
95:25 111:25 114:10
124:14,22 157:5
165:23 166:4,15
169:13 170:22
173:23

**referring** 15:22 16:2,
17 19:13 41:21
101:13 178:19 214:5

218:25

**refers** 165:10

**reflected** 103:6
110:25 111:12
116:15 123:4,17
124:13,21 125:3,25
126:8 127:6 135:20

**reflects** 246:2,12
255:4

**refresh** 238:9

**refreshed** 242:17

**regard** 125:24
222:14

**regular** 151:21

**reject** 199:6

**rejected** 198:8,11

**relate** 48:11

**related** 80:4 89:11,16
102:25 178:12

**relates** 63:19,24
64:10 96:5,8

**relation** 63:15

**relationship** 45:15
224:7

**relative** 226:17

**relied** 216:17

**relinquished** 173:10

**remember** 19:10
22:12 23:13 35:11,15
57:5 60:2,3 63:3
70:18 72:18 73:9,18
74:21,22 78:13 80:22
83:17 84:8 87:8 88:7
89:14 102:13 104:6
114:15 116:22
140:23 146:21 156:9
159:24 172:5 181:20,
23,24 182:4,5,6
189:13 193:2 212:18
215:14,17 217:17
218:21 219:7 220:11,
13,15,17,21,24
242:12,13

**remembered** 236:20

**remote** 7:16

**remotely** 7:10,13
12:4

**rendered** 32:9 48:25
108:7,19,25 109:6
121:22 122:4,9
132:7,13,22 133:4
234:2,23 235:16

**renting** 37:18

**reorganized** 10:8

**repaid** 138:14 139:3,
8

**repay** 112:22 113:4,
11 125:2,19

**repeat** 49:19 70:23
76:4 81:18 100:20
122:13 132:17
166:10 186:4 209:21
227:24 229:7

**rephrase** 53:2
138:23 150:13,14

**reporter** 7:11 8:7
14:16,20 97:14 105:5
108:14 177:8,11,16
188:16

**Reporting** 7:5

**represent** 10:8 21:18
22:11 23:5 26:7,16
27:17

**representation**
24:18

**representative**
16:23 161:16 165:13
250:24 251:7

**representing** 26:21
28:13

**represents** 22:16
26:9,20 32:4

**request** 58:6 168:11
245:21 246:6,18
252:20 254:15,18
255:7,9

**Requests** 252:21

**requiring** 198:2

**research** 33:2,12,15,
18,23 34:2,7 36:12,
23,25 41:2 43:11,19
47:15,18,23 48:3

Index: Reserve..stated

**Reserve** 257:19

**reserved** 6:10

**respect** 72:5 101:15
169:7 197:23

**respective** 6:4

**responded** 246:16

**response** 8:3 168:10
220:8 250:6 254:19,
24 255:9,15 256:13

**responses** 14:15
243:22 245:9,16
252:16,19 253:23
254:7,13,15

**responsible** 29:22

**restate** 102:7 159:6
167:21 242:24

**restated** 16:11

**restaurant** 34:19

**resumed** 155:7

**retain** 23:16,18 27:7
28:8

**retained** 24:2 61:17,
20

**return** 81:15 99:7
206:2 231:20 232:2

**review** 19:4,20 62:16
145:21 147:15,20
158:11,15 184:24
211:4 244:5,13,19
245:11 247:17
248:19,21 253:10,25
256:9

**reviewed** 17:7 62:18,
21 149:16 245:4
247:21 248:2 249:18

**reviewing** 248:8,16
249:15

**revisit** 187:24

**rightfully** 194:24

**role** 51:23 52:3,8,15,
23

**roll** 140:16

**rollup** 140:10

**room** 7:9,12 9:11,14,
17

**roughly** 51:20

**Royal** 36:14

**Rukavina** 13:15,16
14:6

**Rule** 7:18

**rules** 7:19,20 11:23

**run** 47:23

**rush** 158:4

**Russell** 39:2

———————

**S**

**salary** 51:20,24 52:4,
5,9,16,18,24 53:7,8,
12 54:5 55:2,8 59:21
60:7,13 61:10,14,15
207:2 213:22 214:6

**sale** 198:3 203:15
228:15

**satisfy** 29:16

**scenario** 205:18

**scheduled** 28:5

**Schroth** 151:12,13,
17,21,24 152:7,16
219:2 220:9

**Schutt** 36:14

**scope** 25:19,21
171:14 192:13

**screen** 12:21,25
144:13,22 147:19
157:6,20 160:25
184:3

**screening** 36:25
37:13,17

**scroll** 157:25 158:12
184:13

**sealing** 6:5

**search** 149:8

**section** 113:21
148:4,22 149:5,12,
17,20 150:24 152:19
156:8,14,21 243:5,16

248:16

**seek** 10:17 152:14
249:10

**seep** 160:24

**Seery** 38:17,20
199:17

**select** 23:4

**selected** 22:21
183:22 195:25 196:4

**sell** 200:3 201:15,24
202:17,19 203:25
204:8 221:3 227:7
228:6 229:11

**selling** 229:18

**sells** 200:12 202:24
222:10,15 226:25

**sense** 207:16

**series** 173:22

**serve** 22:22 45:5
168:19 239:25

**served** 47:2,10
157:10 158:23

**servers** 238:24

**serves** 236:6

**services** 33:2 36:18,
23 37:24 47:16,19
48:4,8,25 103:11
107:15,19,24 108:7,
19,25 109:7 121:22
122:4,10,18 132:7,
14,23 133:4 233:19,
25 234:23 235:16

**set** 61:13,15 175:22
230:4

**setting** 51:24 52:3,9,
11,13

**settled** 43:16

**severity** 7:6

**share** 51:12,16 88:20

**shareholder** 169:22

**shareholders**
149:25 161:17
165:14 250:25 251:8

**sharing** 214:2

**sheet** 62:21

**sheets** 62:6 206:25

**shift** 80:23

**Shortly** 146:16
151:15

**sides** 229:24

**signature** 147:17,22
184:15 244:17 253:8

**signed** 6:13,16 83:3,
9,15,23 95:5,10,15,
18 99:22 100:2,13
149:6 184:18 244:20,
23 253:11,14,18

**signing** 149:18 245:2

**silent** 10:4

**similar** 72:5 95:21

**simply** 158:7 229:4

**single** 88:24

**sir** 22:8,19 32:19
42:21 45:13 46:5
47:4,9,14 48:10 49:7,
11,19 50:14,21 67:2
75:11 92:3 119:4,7,
18 123:9 146:10
149:22 152:13
155:19 156:2,6 161:2
168:12 172:11
226:14

**sit** 69:22 83:7 193:6
207:6 242:11 245:8,
14 246:9,21 253:20
254:4

**situation** 228:3
229:25

**situations** 46:16

**slow** 76:2

**social** 7:7

**sold** 161:19 163:5
164:21 174:23 195:5
196:16 197:9,17
198:22 200:24 201:6,
21 202:9,11 203:3,9,
19 204:14 205:11,24
206:9,12,18 221:12
222:5 223:7,12 224:4

225:3 226:15 227:3,
12 228:22 229:4

**sole** 169:2

**solely** 76:25

**sort** 238:15

**source** 66:2 72:15
86:13,16,20,21 98:23
101:18 105:15
128:24

**speak** 7:24 8:15 14:7
18:10 40:9 155:23
156:3 217:6 223:24

**speakerphone**
17:24

**speaking** 20:10 87:4
94:3 110:8 189:4

**specialist** 35:9,13

**specific** 20:21 90:11
92:15 93:4 116:11
242:13

**specifically** 68:20
91:3 147:8 161:12
250:20

**specifics** 175:19
182:5 220:12 238:15

**speculate** 149:8

**speculating** 237:11

**spend** 26:5

**spoke** 24:5 86:25
213:20

**spoken** 61:20 87:9

**standard** 162:3

**Stang** 10:7

**start** 55:14 94:4
145:3 159:16 225:15

**started** 189:13
193:25

**starting** 133:18
134:11

**state** 8:8,13 9:2
34:12,14 36:10

**State's** 7:20

**stated** 194:5 199:3

201:10

**statement** 162:17

**statements** 38:7,8
62:2,5,6,8,10,14,17,
25 63:5,8

**step** 236:13

**steps** 102:19,21
128:19

**Stinson** 26:9,15,23

**stipulate** 7:14 25:12

**STIPULATED** 6:2,7,
11

**stock** 41:25

**stop** 157:22

**Strand** 38:24 45:9,
12,14,18,21 46:3,7,
11 47:3 251:16

**strike** 195:12

**subject** 11:15 20:8,
12 25:17 91:2 111:2,
7,13,24 112:13,23
114:9 123:7,12,18
134:3,25 135:15
137:6 140:21 143:13,
20,22 162:20 164:25
174:25 175:5,15
176:12,18 177:4,25
178:13,23 179:3,10,
25 180:9,10 181:3,9,
18,25 182:10,20
183:3,9,15,23 185:3
187:15 188:23
193:16 195:17,21
199:18,24 200:10,21
201:4,6 220:3
225:12,22 228:7
233:18,24 241:11
242:15

**Subscribed** 258:12

**subsequent** 161:12
168:25 198:5 224:17
228:8 232:9 234:15

**substance** 10:22
88:7 155:25 156:4
191:8

**substantial** 201:25

**substantially** 202:9

**sued** 185:8

**sufficient** 246:5,17

**suggest** 125:18
196:6

**suggesting** 143:25

**suggestion** 189:8,
10

**sum** 82:11

**summarize** 245:23

**summer** 27:8

**surprise** 220:22

**surrendered**
173:16,20

**sustained** 15:8

**swear** 7:13 8:17

**swearing** 7:16

**switch** 76:2 144:6
157:3

**switched** 155:20

**sworn** 6:13,16 8:20
258:12

---

**T**

**Tab** 244:3,4 247:8,9

**tail** 172:8,10,13

**talk** 54:3 61:23 66:23
80:24 157:4

**talked** 54:5 194:10

**talking** 42:2,17 52:5
53:10,11 54:2,23
75:21 97:6 98:14,16
134:7,9,15 163:19,20
178:20 239:12

**talks** 211:9

**technically** 46:21

**telephone** 9:21
21:25 190:19 219:16

**ten** 92:18

**ten-year** 93:8

**tenant** 36:25 37:17

**term** 29:9 62:2,5,13
63:14,19,23 64:9,13
96:4,8 97:22 116:25
129:14 142:14,24
143:7,25 144:4
149:24 150:23
192:13 197:6 205:23

**terms** 51:15,17
116:6,12,15,19,23
117:19 128:6,11,14,
21,25 141:25 174:2,5
192:14 217:3,7,11,15
218:12 222:24
223:25 246:13 255:5

**test** 12:23 25:4 43:23
238:23

**testified** 8:22 59:19
101:10 117:9 155:8
169:20 197:21 225:9

**testifying** 187:20

**testimony** 10:22
11:16 23:14 119:3
155:25 162:16,22
164:13 208:4

**Texas** 8:8

**text** 21:25

**theater** 71:15

**thereabouts** 136:12

**thing** 15:9 160:13
164:7 232:13 255:8

**things** 15:19 25:5
37:5 238:8

**thinks** 156:22

**thought** 75:20
109:17 186:21 190:6
194:6,14 199:3
205:18,19 206:23
215:12 217:24
227:24 228:21
230:18 240:3

**threshold** 198:3

**throwing** 215:15

**Thursday** 18:19

**tick** 75:24

**tie** 223:19

**time** 6:10 12:20

14:11,24 17:11 20:6,
17 21:13,18 22:10
26:5 28:6,14 36:9,11
45:3,6 51:9,14 52:19
58:19,22 61:3,9,12
67:25 68:9 70:7,12,
16 71:2,21 72:19,24
75:13 77:4 81:3
85:12 88:23 92:9,10,
16 93:13,18 97:23,24
101:22 110:9 111:11
112:6,13 113:5,12
114:22 115:18,24
118:16,21,22 119:14
121:9 125:4,10,15,19
130:21,25 131:18
132:12,21 133:7
138:6,15 139:5,8
141:24 142:23 143:6,
19 146:15,20 147:6
149:12,13 150:9,19
153:19 154:7 155:3,4
158:5 160:4 163:18
165:22 166:25 168:4
169:11,17 170:20,25
171:3 173:9 174:13
180:7 186:7,22
193:3,14 194:7,25
196:20 201:12 204:2,
9 206:24 208:24
209:6,13,23 210:7,
20,23 211:17 212:19
213:3,11 214:12,18,
24 215:20 217:19
221:16 222:7 224:23
225:19 226:7 227:8,
18,25 229:9,21
230:24 231:23
236:17 237:23
239:15 240:11,14
241:5,23 242:3,5
244:11 245:18 246:3
248:25 249:19 254:9
256:8,21,23 257:4,7,
9,12,16 258:3,6

**times** 12:2 33:20
113:5 208:2

**today** 10:10 11:3,10
14:22 16:20 34:3
40:20 69:23 102:14
119:25 130:18
140:15 147:2 165:19
187:20 207:6 226:9
239:13 242:21 243:7,
18 246:22 251:18,24

252:10

**today's** 17:2,5,13
18:6,14 19:5,22
225:14,15 245:6
258:4

**told** 45:24 87:5
102:19 128:21 151:8,
10,14 152:7,16
183:17 211:23 212:3
216:15 220:23

**top** 35:10 65:3 89:2,8
145:25 159:15 160:5
161:4 184:23 247:15

**topic** 24:23 25:9
49:23,24 99:16 144:7
239:3

**topics** 144:6 238:5

**total** 53:17,18,23,24
54:8,16,20 55:8,16,
19 56:3,7,11,15,20,
24 57:3,7,11 180:14,
16 182:8 212:21
213:24 214:3 226:3

**totaled** 175:21

**Totally** 95:20

**touched** 229:6

**transaction** 238:16

**transactions** 189:19
190:3

**transcribe** 14:21

**Transfer** 148:14

**transferred** 36:22

**Traurig** 27:2 32:3,9

**Traurig's** 32:13

**trial** 6:10 37:2,21,22,
25 38:9 257:20

**trigger** 152:20 153:2,
5,10,15 207:4

**triggering** 198:4

**true** 162:9 234:25

**Trussway** 65:10
75:4,21 76:18,21
77:7,12,16,22 78:2,7,
12,15,21 79:2,6,14,
19 174:8

---

**Trussway's** 75:7,10, 15

**trust** 15:23 29:24 30:2,5,11,15 31:3,4 164:15 166:20,21,25 167:9,15,18,25 168:10,15,16,20,21 169:3,8,10 172:23 236:17 237:3,4 248:4 249:15,18 253:22 254:5 256:15

**Trust's** 252:18

**trusted** 27:19 228:11

**trustee** 16:21 22:13 30:5,14 50:17 51:3 146:17 151:15 164:5, 14 165:18,21 166:24 167:4,8,11,15,18,25 168:4,5,10,14,20 172:22 182:15 201:3 206:5 236:16,22 239:6 241:13 243:14 251:12,15 252:12 253:21 254:5 256:5, 15

**TSG** 7:5

**turn** 144:9 145:2,16 157:20 244:15 245:19 253:6 254:14

**turned** 10:2

**turning** 246:15

**Turnover** 148:13

**twin** 182:15

**two-and-a-half** 60:14,22

**type** 71:16

**typically** 35:24

---

**U**

**um-hmm** 10:3 55:6 117:15 129:15 142:5 162:6 165:5 172:14 173:12 188:4,5 211:11 226:23 234:17 235:14 253:2

**umbrella** 64:3 96:22 104:7 119:22 185:25

**underage** 191:5

**undercompensated** 194:6

**underpaid** 161:24 211:14,20,25 212:8, 15 213:7 216:4,11,18

**understand** 8:9 10:11,13,16,20 12:17 14:19 15:22 16:2,17, 19 22:2,5 28:24 29:14 31:12,16 37:24 40:22 41:4,12,18 43:2 44:22 53:3 54:9, 13,25 55:6,7 63:25 75:14,19 76:12,17 82:16 95:24 103:19, 24 117:21 119:8 134:24 145:6 146:7 156:14 165:8,12 174:13 175:7 190:12 193:17 199:16 200:16 204:7 239:20

**understanding** 29:6,8,21 30:25 42:22 43:6,25 44:3,4, 18 50:11 54:24 55:13 61:25 62:4 63:18,23 64:5,8,12,18 65:13, 16,18,19 67:3 68:3, 13 72:21 76:20,24 77:6,10 82:8,24 96:4, 7,23 97:18,22 117:19,24 119:12,15, 20 129:11,17,22 149:23 150:4 152:22, 24 185:21 186:9,13, 25 187:8 204:13 207:11,15 209:2,8 226:25 227:5,11 232:3

**understandings** 28:22

**understood** 232:23 233:14

**undertaken** 39:4

**unfair** 238:22

---

**V**

**vague** 117:12 219:5, 8

**vaguely** 215:14

**validity** 7:15

**vehicle** 41:16

**verbal** 14:16 15:16 189:12

**verbally** 189:13

**verify** 46:7

**Vero** 191:2

**video** 7:15 71:15

**videotape** 10:17

**view** 221:23

---

**W**

**W-2** 46:22,24

**wait** 68:6 177:6

**waived** 6:6 8:11

**wanted** 155:22 194:8 223:19

**Wednesday** 18:19

**week** 13:7

**whatsoever** 238:24

**win-win** 194:15 228:3

**withdraw** 183:6 246:3

**withdrawn** 16:9 20:24 24:5 28:19 65:12 69:11 74:8 79:10 82:14 83:12 86:2,15 94:19 96:16 101:11 103:18 106:6 108:3,4 111:9 117:17 119:13 120:24 121:19 122:22 127:8, 10,12 128:18 133:10 135:10 136:2,3 138:11 139:23 152:23 156:12 168:8 178:24 179:21 181:14 183:13 185:15 192:2 204:5 208:3 222:10 223:3 227:7,16 233:22 237:21 249:4 251:13 252:3,6

---

**witnesses** 38:7

**word** 14:21 15:21,25 21:22 29:2 55:11

**words** 13:24 236:13

**work** 34:6 38:3 194:2,7,25 201:12 229:13

**worked** 27:21 36:14 38:4,5 46:21 155:21

**working** 22:20 36:11

**workload** 33:20

**works** 208:12

**world** 218:17

**worry** 148:7

**wound** 187:6

**write** 218:12

**writing** 89:11 179:9, 20 180:25 217:4,5,8

**written** 29:24 50:19 179:23 180:4 217:11, 16

**wrong** 30:25 109:19 177:10 245:10 253:23

---

**Y**

**year** 20:4 28:11 53:5, 17,20 90:17 161:13, 15 162:24 163:2 164:16,18 170:8 172:5,16,18 182:7 194:4 212:23 213:15 214:16,22 215:5

**years** 11:14 36:4,19 45:19 47:20 51:19 67:15 92:18 144:3 170:9 181:23 182:6 193:24

**yesterday** 17:10,16

---

**Z**

**Ziehl** 10:7

**Zoom** 18:12,13,18,22 19:2

# EXHIBIT 101

Page 1

1

2      IN THE UNITED STATES BANKRUPTCY COURT

3      FOR THE NORTHERN DISTRICT OF TEXAS

4         DALLAS DIVISION

5       Case No. 2021-1193

6  --------------------------------x

7  In Re:             Chapter 11

8  HIGHLAND CAPITAL MANAGEMENT, L.P.  Case No.

9          Debtor,    19-34054-sqj11

10  --------------------------------x

11  HIGHLAND CAPITAL MANAGEMENT, L.P.,

12         Plaintiff,    Adversary

13    -vs-           Proceeding No.

14  NEXPOINT ADVISORS, L.P., JAMES    21-03005-sgj11

15  DONDERO, NANCY DONDERO, and the

16  DUGABOY INVESTMENT TRUST,

17         Defendants.

18  --------------------------------x

19   REMOTE VIDEOTAPED DEPOSITION OF ALAN JOHNSON

20     Tuesday, November 2, 2021

21

22  Reported by:

23  Amy A. Rivera, CSR, RPR, CLR

24  JOB NO. 202068

25

Appx. 01958

Page 2

1
2            November 2, 2021
3              9:02 a.m.
4
5          REMOTE videotaped deposition of ALAN
6   JOHNSON held pursuant to Notice, before Amy A.
7   Rivera, Certified Shorthand Reporter, Registered
8   Professional Reporter, Certified LiveNote Reporter,
9   and a Notary Public of the States of New York, New
10  Jersey and Delaware.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2   R E M O T E   A P P E A R A N C E S:
3   PACHULSKI STANG ZIEHL & JONES
4   Attorneys for Highland Capital Management, L.P.
5      780 Third Avenue
6      New York, NY 10017
7   BY:  JOHN MORRIS, ESQ.
8        HAYLEY WINOGRAD, ESQ.
9
10  STINSON
11  Attorneys for James Dondero, HCRE, HCMS
12     3102 Oak Lawn Avenue
13     Dallas, TX 75219
14  BY:  MICHAEL AIGEN, ESQ.
15       DEBORAH DEITSCH-PEREZ, ESQ.
16
17  GREENBERG TRAURIG
18  Attorneys for Nancy Dondero
19     2200 Ross Avenue
20     Dallas, TX 75201
21  BY:  DANIEL ELMS, ESQ.
22
23
24
25

Page 4

1
2   ALSO PRESENT:
3     Michael Landis
4     Deborah Newman
5     Michael Perniciaro
6     La Asia Canty
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1           ALAN JOHNSON
2           COURT REPORTER:  Good morning,
3   Counsel.
4       My name is Amy Rivera.  I am a
5   certified court reporter in association with
6   TSG Reporting, Inc.
7       Due to the severity of the COVID-19
8   and following the practice of social
9   distancing, I will not be in the same room
10  with the witness but will record this
11  deposition remotely and will swear the
12  witness remotely.
13      Do all parties stipulate to the
14  validity of the remote recording and remote
15  swearing and that it will be admissible in
16  the courtroom as if it had been taken
17  following Rule 30 and other rules of the
18  Federal Rules of Civil Procedures and the
19  state's rules where this case is pending?
20      MR. MORRIS:  John Morris, Pachulski
21  Stang Ziehl & Jones, for Highland Capital
22  Management, L.P.
23      We stipulate.
24      MR. AIGEN:  Michael Aigen from
25  Stinson.

**Page 6**

ALAN JOHNSON

```
1                 ALAN JOHNSON
2          And I'm here with Deborah
3   Deitsch-Perez.
4          And we also stipulate.
5          MR. ELMS:  Daniel Elms, Greenberg
6   Traurig, on behalf of Nancy Dondero.
7          We stipulate.
8   A L A N   J O H N S O N, having been duly sworn
9   by the Notary Public, testified as follows:
10         MR. MORRIS:  Thank you.
11  EXAMINATION
12     Q.   Good morning, Mr. Johnson.
13          Can you hear me?
14     A.   Yes, you're very clear.
15     Q.   Okay.
16          My name is John Morris.  I'm an
17  attorney at Pachulski Stang Ziehl & Jones, and we
18  represent Highland Capital Management.
19          We're here today for your deposition.
20          Do you understand that?
21     A.   Yes.
22     Q.   And do I understand correctly that
23  you've been engaged to provide expert testimony in
24  this matter?
25     A.   Yes.
```

**Page 7**

ALAN JOHNSON

```
1                 ALAN JOHNSON
2      Q.   Do you have a general understanding of
3   the nature of the litigation in which your expert
4   testimony is being offered?
5      A.   At a high level, I do, yes.
6      Q.   Can you tell me what your general
7   understanding at a high level is in the pending
8   litigation?
9      A.   The litigation involves loans for
10  Mr. Dondero that were taken out during -- over a
11  period of years.
12          Late in 2018 and '19, the loans were
13  consolidated and modified to put in place
14  acceleration features, if -- if the specific
15  transactions occurred, so that at least -- there's
16  a lot of litigation, but as I understand what I'm
17  involved is these loans that accumulated over a
18  period of years, the practices of loans, and I'm
19  also opining on his market compensation over the
20  period 2013 through 2019.
21     Q.   Do you know who the obligors are under
22  the loans you've just mentioned?
23     A.   Obligors?  Could you explain -- give
24  me more detail what you're looking for?
25     Q.   Sure.
```

**Page 8**

ALAN JOHNSON

```
1                 ALAN JOHNSON
2          Do you know who own -- who the loan
3   was made to -- withdrawn.
4          Do you know who the loan -- I think
5   you used the word, plural, "loans," so let me ask,
6   using your word, if I have that correctly, do you
7   know who Highland made the loans to that are the
8   subject of the litigation?
9      A.   I'm not clear, no.
10     Q.   Okay.
11          You don't have an understanding as you
12  sit here today as to who the loans Highland made
13  to that are the subject of the litigation.
14          Do I have that right?
15     A.   If I understand it, the loans
16  criss-crossed differently to different entities,
17  so I'm not exactly sure how all that was
18  structured.
19     Q.   Okay.
20          You've been deposed before, right?
21     A.   Yes.
22     Q.   Okay.
23          And you've served as an expert before,
24  right?
25     A.   Yes.
```

**Page 9**

ALAN JOHNSON

```
1                 ALAN JOHNSON
2      Q.   In fact, you've been retained by my
3   firm to provide expert services in the area of
4   executive compensation.  Is that right?
5      A.   Yes.  Yes, I have.
6          MR. MORRIS:  Mr. Kornfeld sends his
7   best regards.
8          THE WITNESS:  Thank you.
9          MR. MORRIS:  You bet.
10     Q.   So I don't know if you've given remote
11  depositions before, but just very, very
12  preliminarily, since you are an experienced
13  witness, we'll be looking at a number of documents
14  today, and if I put something up on the screen and
15  you believe that you need to see more of the
16  document, will you let me know that?
17     A.   Sure.
18     Q.   Where are you sitting right now?
19     A.   My home in New Jersey.
20     Q.   Okay.
21          Do you have any documents in front of
22  you right now?
23     A.   No.
24     Q.   Do you have a telephone?
25     A.   Yes, I do.
```

Page 10

ALAN JOHNSON

1
2    Q.   Is it on right now?
3    A.   Yes.  It is my cell phone.
4    Q.   Could I trouble you to just turn it
5    off?
6         You know what, if you're not
7    comfortable for personal reasons, could I ask you
8    not to look at your phone unless it rings and it's
9    your child or spouse?
10   A.   Let me put it out of arm's reach and
11   put it upside down, how's that?
12   Q.   That's fair.  That's fair.
13        I've taken a look at your report that
14   you prepared back in May.  Based on that report,
15   do I have it correct that you've spent your entire
16   career as an executive compensation consultant?
17   A.   Yes, that is correct.
18   Q.   And you've had your own executive
19   compensation consulting firm since the early '90s.
20   Is that right?
21   A.   Yes.
22   Q.   And your firm specializes in
23   compensation consulting for the financial services
24   industry, correct?
25   A.   Yes.

Page 11

ALAN JOHNSON

1
2    Q.   You've advised major asset management
3    and investment firms on issues concerning
4    executive compensation.  Is that right?
5    A.   Yes.
6    Q.   You've advised hedge funds and other
7    alternative firms on issues concerning executive
8    compensation, correct?
9    A.   Yes.
10   Q.   According to your report, did I read
11   this correctly that your firm's clients include
12   many of the world's most significant financial
13   institutions?
14   A.   Yes, they do – it does.
15   Q.   Have you personally ever been retained
16   by a board of directors to provide advice
17   concerning executive compensation?
18   A.   Many times.
19   Q.   Can you give me a rough number?  Is it
20   more than 20?
21   A.   Board of directors?  More than 20.
22   Q.   More than 50?
23   A.   I don't know.  It may – it's a lot.
24   Q.   Is it fair to say it's somewhere
25   between 20 and 50 and it could even be more?

Page 12

ALAN JOHNSON

1
2    A.   Probably more than 50.
3    Q.   Have you ever been retained by a
4    compensation committee of a board of directors to
5    provide advice?
6    A.   Yes.
7    Q.   And if I separate that from boards of
8    directors generally, is that also a number that
9    measures in the dozens?
10   A.   At least.
11   Q.   Other than boards of directors and
12   compensation committees of boards of directors,
13   can you identify generally any other decision
14   makers that you've been retained by to give advice
15   on areas of executive compensation?
16   A.   We – we get involved from time to
17   time with business owners.  That might be a
18   private equity firm or hedge fund looking at their
19   portfolio companies.
20        We also do a lot of project work.  So
21   that would involve working with senior leaders of
22   different financial services firms to look at
23   either their whole compensation program or the
24   programs for particular units.
25        We also from time to time get involved

Page 13

ALAN JOHNSON

1
2    with some of the major consulting firms where
3    they – we provide advice to them as they work
4    with their clients on financial services
5    compensation.
6    Q.   Okay.
7         And what is it that you sell?  Can you
8    describe for me, if you were giving a sales pitch,
9    why a board or a compensation committee should
10   hire you?
11   A.   Well, we have a lot of experience in
12   the space across financial services.  So we have a
13   large home-field advantage of knowledge,
14   experiences.  We know the nuances of what goes on
15   in the industry.  That's part of the sales pitch.
16        We also are good consultants.  We –
17   we listen.  We are experts at looking at
18   information and data and all that.
19        And at the end of the sales pitch, I
20   usually say, We also have big scans, so we're used
21   to dealing with difficult people.
22        So many of the people in financial
23   services are opinionated and, at times, difficult,
24   so a lot of experience across cycles.  We're
25   comfortable giving clients difficult news, and

Page 14

ALAN JOHNSON

2 we're good at what we do.

3    Q.   And is it fair to say you have

4 expertise in the area of executive compensation?

5    A.   Absolutely.

6    Q.   And is it fair to say that part of

7 that expertise is knowing the marketplace?

8    A.   Absolutely.

9    Q.   And is part of that expertise knowing

10 or being familiar with the current trends in the

11 marketplace?

12    A.   Yes, absolutely.

13    Q.   And would you say that you have a

14 really good understanding of how to structure

15 compensation plans that are appropriate to the

16 clients that you serve?

17    A.   Yes.

18    Q.   And one of the things that we're here

19 to discuss today is the concept of forgivable

20 loans.

21       Do you understand that?

22    A.   Yes.

23    Q.   And your client is James Dondero.

24       Do I have that right?

25    A.   I was retained by Stinson, but they

Page 15

ALAN JOHNSON

2 represent him, yes.

3    Q.   Okay.  We'll talk about that just a

4 bit more.

5       I'm going to read from your report.

6 If you want me to put it up on the screen, I'm

7 happy, but I want to focus just on one sentence of

8 your report that says that you understand from

9 Mr. Dondero that "The 2018 loans that are the

10 subject of this suit were modified by agreement in

11 late 2018 or early 2019 under which the loans

12 would be forgiven upon the sale at over cost of

13 substantially all of any three portfolio companies

14 held in the Highland platform."

15       Do you remember that?

16    A.   Yes.

17    Q.   Would you like to see it so you can

18 see the context?

19    A.   I think I understand it.

20    Q.   Okay.  So that's the sentence that I

21 want to focus on.

22       Is the agreement that you described

23 the only agreement that you're aware of pertaining

24 to Highland and Mr. Dondero and the forgiveness of

25 loans or do you understand there's more than one

Page 16

ALAN JOHNSON

2 agreement?

3    A.   When I discussed it with Mr. Dondero,

4 I believed there was a single agreement, but that

5 I'm not sure of.  I think that's the -- what I got

6 out of him.

7    Q.   Okay.

8       You haven't been informed that more

9 than one agreement exists.

10       Do I have that right?

11    A.   I don't believe so.

12    Q.   Okay.

13       Do you know how many loans are the

14 subject of the agreement?

15    A.   There were -- they were consolidated,

16 I believe, in late '18 or '19.  Originally, there

17 were a lot more.  I think they're down to a

18 couple, if I recall.

19    Q.   Is it relevant to your analysis to

20 know the number of loans that are the subject of

21 the agreement?

22    A.   I don't think so.

23    Q.   Do you know the aggregate value of the

24 loans that are the subject of the agreement that

25 you referred to in your report?

Page 17

ALAN JOHNSON

2    A.   I think the total of the loans is

3 somewhere in the 40 to $50 million range, if

4 that -- I think that's what I read.

5    Q.   And where did you read that?

6    A.   I think in all the documents, when I

7 tried to parse out the -- all the loans, I think

8 it totaled to something like 40 to $50 million, if

9 I recall.

10    Q.   And can you describe the document that

11 you're referring to?

12    A.   There were a bunch of loan agreements

13 in all the different materials.  I don't recall

14 where I saw them.

15    Q.   Okay.

16       Is the value of the -- is the

17 aggregate value of the loans relevant to your

18 analysis?

19    A.   No.

20    Q.   Do you know anything about the loans

21 that are the subject of the agreement other than

22 what you've written in your report?

23    A.   Subsequent to the report, I've seen

24 some of the documentation of the loans, so I've

25 seen some amounts and the period of the loans, the

Page 18

ALAN JOHNSON

1
2 interest rates and so forth.
3    Q.    When did you see that documentation?
4    A.    In the last week or so, prior to this
5 deposition.
6    Q.    Have you amended your report?
7    A.    I have not.
8    Q.    So are any of the conclusions altered
9 at all by any of the documents you've seen
10 recently?
11    A.    No.
12    Q.    And now that I am aware that you've
13 seen certain loan documentation, I'll ask you
14 again if you can identify any obligor under any of
15 the loans other than Mr. Dondero?
16    A.    I'm sorry.  I just didn't pay that
17 much attention.  I was looking – I don't
18 remember.
19    Q.    Do you recall if the loans were demand
20 loans or term loans?
21    A.    The ones I recall were – they were
22 for a very long period of time, I think 30 years.
23 They were – they were 30-year term loan.
24    Q.    And do you recall how many 30-year
25 term loans you saw?

Page 19

ALAN JOHNSON

1
2    A.    I recall at least a couple.
3    Q.    Did you see any demand loans?
4    A.    I don't recall seeing any.
5    Q.    Have you ever seen any written
6 agreement covering the forgiveness of any loans
7 that Highland extended to Mr. Dondero?
8    A.    I have not.
9    Q.    Have you ever seen any written
10 agreement covering the forgiveness of any loans
11 that Highland extended to any corporate affiliate?
12    A.    I have not.
13    Q.    Have you ever seen any written
14 agreement covering the forgiveness of any loans
15 that Highland had ever extended to any person or
16 entity in the world?
17    A.    I have not.
18    Q.    Have you seen any documents that
19 describe the existence or terms of any forgiveness
20 agreement between Highland and Mr. Dondero?
21    A.    I have not.
22    Q.    Have you seen any documents that
23 describe the existence or terms of any forgiveness
24 agreement between Highland and any corporate
25 affiliate?

Page 20

ALAN JOHNSON

1
2    A.    I have not.
3    Q.    Have you seen any documents that
4 describe the existence or terms of any forgiveness
5 agreement between Highland and any person or
6 entity in the world?
7    A.    I have not.
8    Q.    So is it fair to say that you have not
9 seen any documentary evidence of any loan
10 forgiveness agreement between Highland and anybody
11 in the world?
12    A.    I have not seen any documents, that's
13 right.
14    Q.    Okay.
15        The agreement that Mr. Dondero
16 described for you, do you understand that that is
17 an oral agreement?
18    A.    I don't think he said to me it was an
19 oral agreement.  He described it to me.  I
20 don't – I don't think he – I don't remember if
21 he characterized it as an oral agreement, but he
22 described how – he described how – in his
23 opinion, how the agreement worked.
24        I don't – I don't recall if he
25 mentioned it was just verbal or it was written.  I

Page 21

ALAN JOHNSON

1
2 don't – that, I don't recall.
3    Q.    Did you ask Mr. Dondero or any of his
4 attorneys if there was a written agreement?
5    A.    I don't recall if that came up.  It
6 may very well have, I don't remember whether we –
7 whether there was an agreement or not.  I just
8 don't recall.
9    Q.    Did you or anybody working on your
10 behalf ever ask Mr. Dondero or anybody working on
11 his behalf if there were any documents that
12 reflect the existence or terms of any forgiveness
13 agreement that Highland ever entered into?
14    A.    When I talked to executives at
15 Highland, we asked – or former executives about
16 loans, we talked about documentation.
17        They just didn't have any
18 documentation of the loans they had had.  They
19 described the fact that several of them had been
20 forgiven.  The documentation had existed at one
21 time, but they don't – they didn't keep it or
22 didn't have it available.
23        So we talked about that, but...
24    Q.    You're not offering any opinion as to
25 whether an agreement actually exists pertaining to

**Appx. 01963**

Page 22

ALAN JOHNSON

1
2 the forgiveness of any loans that Highland
3 extended to Mr. Dondero or his affiliates, are
4 you?
5     A.   I am not.
6     Q.   You're not offering any opinion as to
7 the terms of any alleged agreement between
8 Mr. Dondero and Highland concerning the
9 forgiveness of loans, are you?
10     A.   I am not.
11     Q.   You're not offering any opinions on
12 the reasonableness of any of the terms of any
13 alleged agreement between Mr. Dondero and Highland
14 concerning the forgiveness of loans, are you?
15     A.   I am not.
16     Q.   You've been informed that this
17 modification was intended to provide Mr. Dondero
18 with additional compensation based on the
19 satisfaction of what we've been calling "certain
20 conditions subsequent." Is that fair?
21     A.   As I understood it, the loans
22 existed -- I don't know.  I don't know if that's a
23 fair characterization.
24         I think the loans were modified --
25 that, I'd have to really think about, because the

Page 23

ALAN JOHNSON

1
2 loans themselves may have been already
3 compensation.
4         I guess these would have actualized
5 the compensation, so it certainly -- if these
6 loans were modified with the performance
7 characteristic, it would have turned it in from
8 perhaps deferred compensation into actual
9 compensation.
10         So it would have changed the
11 characteristics of it, but I'm not sure it created
12 compensation.  There may have already been
13 compensation in these loans in the first place.
14     Q.   Is it fair to say that you're
15 speculating on that?
16     A.   There's some speculation there, yes.
17     Q.   Do you have any knowledge as to the
18 intent of the parties when they entered into the
19 modification agreement on the topic of
20 forgiveness?
21     A.   Mr. Dondero described it as to reward
22 him for actualizing -- I guess there were three
23 portfolio investments, and if they were -- if a
24 transaction occurred at more than the mark price,
25 that was to reward him for having one of those

Page 24

ALAN JOHNSON

1
2 transactions occur.
3     Q.   Okay.  So it was supposed to -- your
4 understanding from Mr. Dondero was that the
5 agreement was intended to reward him if he
6 achieved some level of performance in the future.
7         Do I have that right?
8     A.   Yes.
9     Q.   Okay.
10         Do you know what the purpose of any of
11 the loans that are the subject of the forgiveness
12 agreement was?
13     A.   Mr. Dondero described the -- the loans
14 as a way to invest in the business rather than
15 paying out compensation.  He described it, I
16 think, as delayed gratification, that these funds
17 then would be invested in the business rather than
18 being paid out to him as -- as current
19 compensation.
20     Q.   Do you know what the -- what the
21 obligors under the various loans did with the
22 proceeds that they received from Highland?
23     A.   Mr. Dondero described it as the
24 proceeds would be reinvested in the business.
25     Q.   Do you have any source of information

Page 25

ALAN JOHNSON

1
2 as to the intent of the forgiveness agreement
3 other than what Mr. Dondero told you?
4     A.   No.
5     Q.   Do you have any source of information
6 other than Mr. Dondero as to the purpose of each
7 of the loans that are the subject of the
8 forgiveness agreement?
9     A.   Just going back to the prior comment,
10 that he had described the general practice that
11 the loans were to give him the ability to reinvest
12 in the business, but not -- not -- that was in the
13 totality, not loan by loan.
14     Q.   All right.
15         But your sole source of information
16 regarding that topic is Mr. Dondero.
17         Do I have that right?
18     A.   It was -- when I interviewed the other
19 Highland -- former Highland executives, they also
20 described the general practice of that as well,
21 that going back a long time, they were familiar
22 with that idea of delaying it and reinvesting in
23 the business.
24         So that went back aways, but most of
25 it is Mr. Dondero.

Page 26

ALAN JOHNSON

1
2      Q.   Did they tell you anything concerning
3   the intent of the loans other than what you've
4   just described?
5      A.   They described their individual
6   circumstances around why the loans were made to
7   them and the circumstances, but the intent of the
8   loan itself, no.  It just – some comments from
9   them and Mr. Dondero.
10     Q.   Okay.  I apologize, I probably wasn't
11  clear here.  I am only talking about the loans
12  that are the subject of the forgiveness agreement
13  that's – that's part of the lawsuit.  I'm not
14  talking about any loans to any prior employees.
15          So I think – I think we may have been
16  talking past each other, so let me try again.
17          With respect to the purpose of each of
18  the loans that are the subject of the pending
19  lawsuit, do you have any source of information
20  regarding their purpose other than Mr. Dondero?
21     A.   I do not.
22     Q.   Okay.
23          Do you have any source of information
24  other than Mr. Dondero concerning what the
25  obligors of each of the loans that's subject to

Page 27

ALAN JOHNSON

1   the lawsuit did with the proceeds?
2      A.   Just a description from Mr. Dondero
3   about the purpose of the – what the loans would
4   be used for.
5      Q.   Okay.
6          So your understanding from Mr. Dondero
7   was that the purpose of the forgiveness agreement
8   that he entered into in late 2018 or early 2019
9   was to incentivize him to perform in the future,
10  correct?
11     A.   Yes.
12     Q.   And, in fact, your understanding is
13  that under the modification agreement, the loans
14  will only be forgiven if some future event occurs,
15  correct?
16     A.   Yes.
17     Q.   The loan was not intended to provide
18  him for compensation for services previously
19  rendered.  Is that fair?
20     A.   No.  As I – as I mentioned earlier,
21  my speculation was that the – the loans were,
22  using his words, delayed gratification.  He paid
23  himself and others less than the market wage and
24  used loans as a form of compensation in the past.

Page 28

ALAN JOHNSON

1
2      Q.   Well, if the assets subject to the
3   agreement are not sold above cost, Mr. Dondero
4   will never get any gratification.  Is that
5   correct?
6      A.   Yes.
7          MR. AIGEN:  Objection, form.
8      Q.   I think you said that you have
9   experience giving advice concerning forgivable
10  loans.
11          Do I have that right?
12     A.   Yes.
13     Q.   And have you ever given advice on how
14  to structure forgivable loans as part of executive
15  compensation?
16     A.   Yes.
17     Q.   Can you please describe your
18  experience in that area?
19     A.   From time to time, clients or we come
20  up with using loans as a vehicle to incent and
21  motivate executives and senior professionals.  So
22  we'll get involved in the magnitude of the loans,
23  the terms, interest rates, you know, if there's
24  performance attached to it, what the performance
25  would be defined as.

Page 29

ALAN JOHNSON

1
2          So it would be around sizing,
3   magnitudes, the terms, you know, of how the loans
4   would work.
5      Q.   When giving advice – you know, I want
6   to, if I can use, a phrase here during the
7   deposition of "decision maker."
8          If I use the word – the phrase
9   "decision maker," will you understand that I mean
10  the person who is acting on behalf of the employer
11  to make the decision – to actually make the
12  decision as to whether or not to forgive a loan?
13     A.   Okay.
14     Q.   Somebody has to act on behalf of the
15  company – you would agree, based on your
16  expertise, that somebody has to make the decision
17  on behalf of the company whether or not to forgive
18  loans.  Is that fair?
19     A.   Well, it could be a committee like a
20  board or a comp committee or others, but there
21  needs to be somebody or person that decides.
22     Q.   Okay.
23          So whether it's a board of directors
24  or a special committee or a compensation committee
25  or a CEO, if he or she is dealing with other

**Appx. 01965**

Page 30

ALAN JOHNSON

1
2 employees, I'm going to use the phrase "decision
3 maker" to refer to that person or body who is
4 making the decision on behalf of the employer to
5 forgive a loan as part of executive compensation.
6 Is that fair?
7    A.  Sure. Okay.
8    Q.  Okay.
9        And you've given advice to decision
10 makers using the definition that I've just
11 described, correct?
12    A.  Yes.
13    Q.  Okay.
14        When you give advice to decision
15 makers who are considering whether to forgive
16 loans as part of executive compensation, do you
17 advise them to obtain any information before
18 making that decision?
19    A.  You want them to be informed.  Maybe
20 they already have adequate information about
21 circumstances, but you would certainly want them
22 to be informed before they made a -- certainly, a
23 final decision.
24    Q.  And if you were giving expert advice
25 to a decision maker, what areas would you tell

Page 31

ALAN JOHNSON

1
2 them that they ought to be informed on before they
3 enter into a forgiveness?
4    A.  Make sure I understand the question,
5 you're talking about before they do the agreement
6 itself, not the forgiveness of it but structuring
7 the agreement?
8    Q.  No.  I apologize.  I'm not talking
9 about the underlying loan.  I'm talking about the
10 decision to enter into an agreement pursuant to
11 which, you know, loans would be forgiven, what
12 information should they have before they're --
13 that kind of an agreement?
14    A.  Fair enough.
15        They should understand the -- the
16 magnitude of the accomplishment that would be
17 attached to the -- to the loans.
18        They should have a basic understanding
19 of the magnitude of the loans, the magnitude of
20 the events that they're incenting or rewarding, if
21 it is -- is there some proportionality between the
22 success and the amount of loan forgiveness?
23        They should have some idea of the
24 probability of these accomplishments happening.
25 Is it highly unlikely or very likely to happen?

Page 32

ALAN JOHNSON

1
2        So I think they should have some
3 understanding of the proportionality.  They should
4 have some understanding of difficulty.  And is it
5 a -- is it fair to forgive these loan if these
6 events occur?
7    Q.  Let's talk about some information.
8        In your opinion, should the decision
9 maker be knowledgeable about the executive's
10 compensation history before entering into an
11 agreement concerning the forgiveness of any loans?
12    A.  The decision maker should have a
13 general understanding of the pay history of the
14 individual, the context of the company, the
15 situation.  It should -- it would be one of the
16 factors that you should -- you should certainly be
17 aware of.
18    Q.  And why do you believe that a decision
19 maker should be knowledgeable about the
20 executive's pay history before she, he or it
21 agrees to forgive loans?
22    A.  I think in the real world, you want to
23 understand the context.  Has this executive been
24 very well paid or poorly paid in the past?  What
25 is that individual's perspective on his or she's

Page 33

ALAN JOHNSON

1
2 pay history?  I think that's relevant.
3        You know, is the forgiveness of the
4 loan significant enough to motivate the behaviors
5 that you're trying to do?  If that individual --
6 if this is a trivial amount, then it won't have
7 much of an impact.  If it's overwhelming, maybe it
8 will lead to behaviors that are not good, take too
9 much risk or whatever.
10        So, yes, you should be aware of the
11 pay history, but also, the business context, how
12 important is it for these events to happen?  Is
13 this -- is this very significant in the company's
14 future?
15        So yes, you should be aware.
16    Q.  Can you think of any circumstances
17 where it would be appropriate for a decision maker
18 to agree to forgive loans as part of an
19 executive's compensation without having an
20 understanding of the executive's compensation
21 history?
22    A.  Well, you -- sometimes, you have new
23 executives, so you wouldn't -- you wouldn't have
24 any pay history to be aware of.  And some -- many
25 of our clients, the pay history is somewhat murky

Page 34

ALAN JOHNSON

1    or complicated, so it would not be ideal, but it
2    certainly has happened.
3        Q.   So -- so it happens, you think -- the
4    circumstances you can think of are for new
5    employees or for people with murky compensation
6    histories.
7        Do I have that right?
8        A.   I think that would usually be the
9    circumstances where you would at least have some
10   good, general understanding of somebody's pay
11   history.
12       Q.   Would you recommend that the decision
13   maker seek information concerning the executive's
14   compensation history before agreeing to forgive
15   any loans?
16       A.   I -- generally, advice, I would want
17   to know that.  So yes, I would suggest they find
18   that out, if it's feasible or -- but yes, that
19   would be one of the things I would probably
20   suggest.
21       Q.   Would you ever advise a decision maker
22   to forgive loans without having an understanding
23   of the executive's compensation history?
24       A.   I probably would not suggest that you

Page 35

ALAN JOHNSON

1    forgive the loans without having some knowledge of
2    that.  It's possible to get it.
3        Q.   Would you ever advise a decision maker
4    to forgive loans as part of executive compensation
5    without ever asking anybody for information
6    relating to the executive's compensation history?
7        A.   I would not recommend that usually.
8        Q.   Okay.  Let's talk about the entity's
9    financial condition.
10       In your opinion, is the entity's
11   financial condition relevant for a decision maker
12   to consider before entering into a loan
13   forgiveness program?
14       A.   I think the financial condition is
15   certainly relevant, and as I mentioned earlier,
16   the significance of the events that you're trying
17   to motivate.
18       So yes, I think you want to know both.
19   You'd want to know your financial condition and
20   you want to know the significance of the events
21   that you're trying to -- to reward.
22       Q.   And why do you believe in your expert
23   opinion that the decision maker should have an
24   understanding of the entity's financial condition

Page 36

ALAN JOHNSON

1    before agreeing to forgive loans?
2        A.   Well, I think you'd want to know just
3    would the forgiveness of these loans be
4    significant to the financial condition of the
5    company.  It may be significant to the individual
6    but be trivial to the overall organization, so I
7    think you'd want to know are these loans
8    significant in terms of the financial condition of
9    the company.
10       Q.   Can you think of any circumstance
11   where it would be appropriate for a decision maker
12   to agree to forgive loans as part of executive
13   compensation without having an understanding of
14   the entity's financial condition?
15       A.   No.  I don't think that would be
16   ideal.  I think you would certainly -- you would
17   want to know the condition of the business.
18       Q.   Okay.  I'm not asking you what's
19   ideal.
20       Can you ever -- can you fathom any
21   scenario where it would be appropriate for a
22   decision maker to agree to forgive loans without
23   having an understanding of the employer's
24   financial condition?

Page 37

ALAN JOHNSON

1    A.   Well, I think if there's a chaotic
2    financial situation, say the financial crisis or
3    others where it's very difficult or impossible to
4    get a clear understanding of the financial
5    condition of the business or it's in dispute
6    where -- what the condition is.
7        So that can exist, and I think in
8    those situations you'd need to make a decision.
9    Maybe forgiving the loans is appropriate even
10   though you may not have a clear idea of the
11   financial condition.
12       So it's not ideal, but I've had
13   clients, you know, where the financial condition
14   was uncertain and different people had different
15   opinions, but you still had to make a decision.
16       So that's why I used the word "ideal."
17   It would be ideal to have it, but sometimes you
18   just don't have that -- you don't have that
19   clarity.
20       Q.   Do you have any reason to believe that
21   during the seven-year period -- withdrawn.
22       Can you think of a circumstance where
23   it would be appropriate for a decision maker to
24   enter into a loan forgiveness program as part of

**Appx. 01967**

Page 38

ALAN JOHNSON

1
2  executive compensation without even asking for
3  information relating to a company's financial
4  condition?
5      A.  Well, I don't -- if they already had a
6  good familiarity, they perhaps often don't need to
7  ask, but if they weren't clear, then they should
8  ask.
9      Q.  Okay.
10      Is it fair to say that you would never
11  advise a decision maker to enter into a forgivable
12  loan program as part of executive compensation
13  without having an understanding of the entity's
14  financial condition?
15      A.  Well, I think -- as I said earlier, I
16  think there are situations where you just can't
17  know what the condition is.  If -- if -- I think
18  the decision maker should try to understand the
19  condition of the business to the best of their
20  ability, but if that's not possible, they still
21  may have to make a decision on loans or other --
22  other compensation elements.
23      Q.  Let's say it is possible to understand
24  the entity's financial condition.  In a
25  hypothetical world, if you could understand the

Page 39

ALAN JOHNSON

1
2  entity's financial condition and it wasn't subject
3  to dispute at that moment in time, would you be
4  able to -- would you ever advise the decision
5  maker to enter into the loan forgiveness program
6  without attempting to gain an understanding of
7  that very financial condition?
8      A.  No.  I would suggest to the client
9  that they try to understand that condition.
10      Q.  And if there was information
11  available, would you always advise your client to
12  try to obtain that information concerning the
13  entity's financial condition before entering into
14  an agreement to forgive loans as part of executive
15  compensation?
16      A.  I think you would almost always or
17  often try to do that.  I don't -- again, there are
18  practicalities of time frames and getting the data
19  and so forth might enter into it, but yes, I think
20  the -- the general thesis is, if you're going to
21  make forgivable loans, you should try to have an
22  understanding of the condition of the business.
23      Q.  Okay.  Let's drill down on that just a
24  little bit and talk specifically about financial
25  statements.

Page 40

ALAN JOHNSON

1
2      When I use the phrase "financial
3  statements," I'm thinking of your traditional
4  package in an audit report, the balance sheet,
5  statement of operations, cash flow, P&L
6  statements.
7      You're familiar with that type of
8  document, right?
9      A.  Yes.
10      Q.  Okay.
11      In your opinion, should a decision
12  maker review and understand the financial
13  statements of the -- of the employer before
14  agreeing to enter into a loan forgiveness program?
15      A.  They should -- they should have a
16  basic understanding of financial statements, yes.
17      Q.  And that's the advice that you would
18  always give to a decision maker, correct?
19      A.  Yes.
20      Q.  And why would you give that advice?
21      A.  Well, I think that you would want --
22  as part of making forgivable loans or any
23  compensation, you would want to have a basic
24  knowledge of the financial condition of the
25  business.

Page 41

ALAN JOHNSON

1
2      Q.  Can you think of any circumstance
3  where it would be appropriate for a decision maker
4  to agree to forgive loans as part of an executive
5  compensation package without having a basic
6  knowledge of the financial condition of the
7  employer?
8      A.  Well, I think, as I said earlier, if
9  it's -- if it's just not possible to do that, you
10  just can't -- it's chaotic enough or it's just
11  very difficult to figure out the condition of the
12  business, then you still have to make decisions,
13  but you should strive to have an understanding
14  before you make these decisions.
15      Q.  Can you think of any circumstance
16  where a decision maker should enter into a loan
17  forgiveness program without asking to see the
18  financial statements of the employer?
19      A.  Well, if someone already has a good
20  understanding, you may not need to supplement
21  that, but if you don't have a clear understanding,
22  you should have -- you should try to obtain that.
23      Q.  Is it fair to say you would never
24  advise a decision maker to agree to forgive loans
25  as part of executive compensation without

**Appx. 01968**

Page 42

ALAN JOHNSON

1
2  understanding the entity's financial statements,
3  including its profit and loss and its balance
4  sheet?
5      A.  As I said earlier, you would try to
6  have that understanding if it's possible,
7  absolutely.
8      Q.  Okay.
9          Under the modification agreement
10  that's described in your report, the 2018 loans
11  are to be forgiven upon the sale of certain assets
12  above cost.
13          Do I have that right?
14      A.  Yes.
15      Q.  And so is it fair to call that kind of
16  a contingency, the forgiveness is contingent upon
17  a future event?
18      A.  Yes.
19      Q.  And the future event here, or the
20  "subsequent event" as we call it sometimes, is the
21  sale of one of three assets above cost.
22          Do I have that right?
23      A.  Yes.
24      Q.  I think you said this earlier, but
25  just to make sure, before agreeing to provide

Page 43

ALAN JOHNSON

1
2  compensation through forgivable loans, would you
3  advise the decision maker under this scenario to
4  make an assessment of the likelihood that the
5  condition subsequent would occur?
6      A.  You would want to have that basic
7  understanding.  It's difficult to forecast, but
8  yes, you would want to look at the magnitude of
9  the forgivable -- the amount of loans being
10  forgiven and the significance of these
11  accomplishments along with the probability of it
12  actually happening.
13          So you would want at least a high
14  level to have some either understanding or feel
15  for the magnitude of the loans, the significance
16  of the accomplishments and their likelihood of it
17  happening.
18      Q.  And if we -- if we applied those
19  thoughts to this case, would you recommend or
20  advise the decision maker that he or she obtain
21  information about the cost of each of the three
22  assets that are subject to the conditions
23  subsequent?
24      A.  Yeah, you would want to understand the
25  significance of these transactions, the proceeds,

Page 44

ALAN JOHNSON

1
2  the -- have an understanding of how significant
3  these amounts are to the -- to the company.
4      Q.  And would you also advise your client,
5  who's the decision maker in this hypothetical,
6  that he or she or it should obtain information
7  about the value of those assets as of the date of
8  the agreement?
9      A.  You should have a basic understanding
10  of the value of these assets, where they're marked
11  on the books, around the time you do the
12  agreement.
13      Q.  Why do you believe that the decision
14  maker should have at the time of the agreement
15  information enabling him, her or it to make an
16  assessment as to the likelihood that the condition
17  subsequent will occur?
18      A.  Well, I think if you're trying to
19  motivate someone or reward someone, you have to
20  have some idea, is it likely to happen?  Is it
21  impossible?  Is it certainty?
22          Again, I think that's part of the
23  calculus is to reward someone for achieving
24  something that may be difficult with a significant
25  payout but it's not impossible.

Page 45

ALAN JOHNSON

1
2          So I think as you design either loans
3  or more commonly, comp program, you've got to
4  assess the difficulty and importance of these
5  things happening.
6      Q.  Can you think of any circumstances
7  where it would be appropriate for a decision maker
8  to enter into an agreement to forgive loans based
9  on some future event without having an
10  understanding of the likelihood that that future
11  event will occur?
12      A.  Well, usually, when we do these
13  things, there's a great deal of judgment and
14  subjectivity in that.
15          So I think it is not generally
16  quantifiable, whether you use the word "gut
17  feeling" or "impression" or the difficulty of
18  these things happening.  Often, it's -- it's quite
19  a subjective assessment, how difficult these
20  things are, so you want to try to have an
21  understanding, but it can be frustrating.  It can
22  be quite subjective about whether -- the
23  likelihood or the difficulty of these things
24  happening.
25      Q.  Well, let's just say hypothetically

Page 46

ALAN JOHNSON

2  that I'm going to enter into an agreement that is
3  going to permit me to -- withdraw.
4        So let's say hypothetically I'm an
5  employee and I've borrowed a hundred dollars from
6  my employer, and my employer says to me, I'm going
7  to forgive that hundred dollars if you sell any of
8  three assets above cost.  On the date that we
9  entered into the agreement, each of the assets has
10  cost me $5 and each of the assets is worth $100,
11  so 20 times the cost on the date of the agreement.
12        Do you think that's information that
13  the decision maker should know before agreeing to
14  forgive the $100 loan?
15     A.   I think he should understand the value
16  the asset that is -- in your hypothetical, he
17  should have an understanding of that and how
18  significant in your hypothetical selling that
19  would be to the business.
20        Maybe that the proceeds of one of them
21  is really significant in terms of the -- turning
22  the business around or providing liquidity or
23  other types of things, he should have some idea of
24  if one of those three assets are sold, what does
25  that do to the firm and its future.

Page 47

ALAN JOHNSON

2     Q.   And is it fair to say that with the
3  information about value and cost, the assessment
4  as to whether or not the future event is likely to
5  occur is not purely subjective and it's not purely
6  based on a gut feeling, is that fair, if you have
7  that information?
8     A.   It's hard.  It's a lot closer to a gut
9  feeling, subjective than objective.  But it's hard
10  to -- your ability to actually sell something,
11  when, to who, at what price, can be quite -- is
12  often quite subjective.
13        So you may have -- depending on
14  circumstances, you may have good information of
15  likelihood, but oftentimes, you really don't.
16     Q.   Would you -- would you always advise
17  the decision maker under this hypothetical to try
18  to obtain as much information as he, she, or it
19  can on the issues of cost and value of the three
20  assets at issue?
21     A.   I would -- I would tell clients to try
22  to understand that as best they could.
23     Q.   Can you think of any circumstance
24  where it would be appropriate for a decision maker
25  to enter into a loan forgiveness agreement without

Page 48

ALAN JOHNSON

2  even asking for that information?
3     A.   Well, in circumstances where they
4  already thought they had a good understanding,
5  they didn't probably need to ask, but you should
6  try to have a good understanding.
7        Again, as I said, the significance of
8  these assets and whether -- if they're sold, for
9  example, what that impact would be on the
10  business.
11     Q.   I think one of the things you've done
12  in your report is to provide your assessment of
13  compensation paid to comparable executives.
14        Is that fair to describe at least a
15  portion of your report?
16     A.   Yes.
17     Q.   Okay.
18        In your opinion, is the amount and
19  form of compensation paid to comparable executives
20  relevant to a decision maker's determination of
21  whether or not to enter into a forgiveness program
22  as part of executive compensation?
23     A.   As I said earlier, that would be one
24  of the things you would want to have -- you would
25  want to have a general understanding of, the pay

Page 49

ALAN JOHNSON

2  history and the context of the situation.
3     Q.   Okay.
4        In fact, this is what you sell.  Isn't
5  that right, one of the things you sell?
6     A.   To make sure I understand the
7  question, what am I selling here?
8     Q.   One of the things you sell is your
9  knowledge, expertise and experience about how
10  comparable executives are compensated in the
11  financial services industry, right?
12     A.   Yes.
13     Q.   And so is it fair to say that you
14  believe the decision maker should have an
15  understanding as to how comparable executives are
16  compensated before agreeing to enter into an
17  executive loan program -- loan forgiveness
18  program?
19     A.   I think more it would be about the
20  individual's pay history.  I think how other
21  people in the industry is probably of less
22  importance on that narrow issue.
23        I think you'd want to know how has
24  Mary or Jim been paid in the past on that issue
25  rather -- I think that would be more important

Page 50

ALAN JOHNSON

2  than how other executives in the industry had been
3  paid.
4      Q.   Well, let's say hypothetically that in
5  the industry, very senior founding executives get
6  paid on the average of $6 million a year.
7      A.   Okay.
8      Q.   And the executive at issue has
9  received $6 million a year for at least, let's
10  say, 7 years, just to say hypothetically.
11         If a decision maker wanted to forgive
12  loans of $50 million, do you understand the
13  decision maker should know, is that what other
14  people doing this job are getting?  Are they
15  getting that kind of money?
16         Don't you think they should know that
17  before entering into the agreement?
18      A.   Yes, I think you would want to know
19  the magnitude, in your example of $50 million, how
20  does that stack up to the compensation of the
21  executive and how other people in the industry
22  would have been paid?
23         So yes, you would want to -- in your
24  hypothetical, the $50 million, you would want to
25  have some idea of how that -- the magnitude of

Page 51

ALAN JOHNSON

2  that money.
3      Q.   Right.
4         A decision maker should try to take
5  steps to avoid overpaying.  Is that fair?
6      A.   A decision maker should try to both
7  make sure you don't under or overpay.  You should
8  try to get it right and fair, whatever that means.
9      Q.   And one of the ways to get it right or
10  fair is to try to have an understanding as to how
11  comparable executives are compensated in the same
12  industry.  Is that fair?
13      A.   That's one of the factors you would
14  want to consider, absolutely.
15      Q.   And you would recommend and advise
16  your decision makers that they should attempt to
17  gain an understanding of how comparable executives
18  are paid before entering into a loan forgiveness
19  program.  Is that fair?
20      A.   They should try to be -- whether they
21  have it immediately or they should try to have an
22  understanding -- if they don't already, they
23  should try to have an understanding how does this
24  in your hypothetical $50 million relate to, not
25  only the executive, but how other people are paid.

Page 52

ALAN JOHNSON

2      Q.   Okay.  Let's say hypothetically the
3  decision maker has no prior knowledge as to how
4  comparable executives are paid in the industry,
5  would you recommend that such a decision maker
6  hire somebody like yourself?
7      A.   They could hire someone like us or
8  they could talk to their attorneys or they could
9  do their own research or talk to the HR
10  department.  You could get it from many sources.
11         But if someone were to ask me out of
12  the blue, I would say, yeah, you should have an
13  understanding, how does -- how does the amount
14  you're going to forgive stack up to the industry
15  you're in?  Is it a small amount, large amount?
16         You should have some idea of the
17  relative magnitude of the amount in question.
18      Q.   Is it fair to say that you would never
19  advise a decision maker who has no knowledge of
20  how comparable executives are paid to enter into a
21  loan forgiveness program without at least
22  attempting to understand how the -- how the
23  competition pays their employees?
24      A.   Well, the caveat of -- the answer --
25  the broad answer would be, yes, but the caveat

Page 53

ALAN JOHNSON

2  would be how significant the loans were.
3         If the loans were relatively small, it
4  probably wouldn't be required.  The larger the
5  loans, generally, you would say -- you would want
6  to have a better understanding of pay practices in
7  the industry.
8      Q.   Okay.
9         Let's say hypothetically the people
10  who are involved in the discussions concerning the
11  forgiveness of the loans are the CEO and an
12  outside director.  Okay?
13         Are you with me so far?
14      A.   Yes.  I'm sorry.
15      Q.   And let's -- let's assume that the
16  outside director has no experience in the
17  financial services industry.  Let's assume that
18  the outside director has never worked for the
19  company.  Let's assume that the outside director
20  doesn't have access to the company's financial
21  statements.  Okay?
22         With that hypothetical, would you
23  advise the decision maker to utilize a source of
24  information other than the CEO himself before
25  entering into the agreement?

Appx. 01971

Page 54

ALAN JOHNSON

1
2       A.   In your hypothetical, as a director
3   with fiduciary duties, you should try to have an
4   understanding of the magnitude of what you're
5   being asked to do, and you should try to have
6   independent verification in one way or the other,
7   is what being proposed, whether it be a loan or
8   any other business decision, is this reasonable?
9   You should try to have an understanding, yes.
10       Q.   Would you ever advise the decision
11   maker in the circumstances that I've described in
12   this hypothetical to rely solely on the CEO as the
13   source of all information that would be considered
14   before entering into the forgiveness program?
15       A.   Well, that would be very unusual.  I
16   think it really would depend on the circumstances.
17           If the circumstance -- I can have
18   other hypotheticals where it -- there could be a
19   chaotic situation.  It could be the -- it was an
20   extremist situation where you need to make a rapid
21   decision and so forth.
22           But in more typical situations, yes,
23   you should try to get independent advice from, you
24   know, others or your own research to found it.  If
25   you have to make an immediate decision, you know,

Page 55

ALAN JOHNSON

1
2   you got to do what you got to do.
3       Q.   Let's take it out of the hypothetical.
4           Have you ever advised a client to
5   enter into a loan forgiveness program without
6   having obtained any information from any source
7   other than the executive or the employee who's the
8   beneficiary under the agreement?
9       A.   I have not advised a client that way,
10   no.
11       Q.   Would you ever advise a client to do
12   that?
13       A.   Again, assuming it was a significant
14   amount of money, no, I would not advise a client
15   to do that.
16       Q.   Can you think of any -- I guess you've
17   already described if it's an extremist or a
18   chaotic situation.
19           Are those the only two situations that
20   you can conjure up in your head where it might be
21   appropriate for a decision maker to rely solely on
22   the beneficiary of the agreement before entering
23   into the loan forgiveness program?
24       A.   I think with the caveat I mentioned
25   earlier, if the amounts were small, you know, not

Page 56

ALAN JOHNSON

1
2   particularly meaningful, but if it's a meaningful
3   amount, you would try to get information.
4       Q.   What if the amount constituted --
5   withdrawn.
6           Is it your understanding that the
7   modification agreement pursuant to which certain
8   loans will be forgiven in the future upon the
9   occurrence of certain conditions subsequent, is it
10   your understanding that that agreement applies not
11   only to loans that were given to Mr. Dondero, but
12   to loans to affiliated companies that Mr. Dondero
13   either directly or indirectly owns and controls?
14       A.   My understanding from Mr. Dondero was
15   all the loans.  That came from him.
16       Q.   And how do you define "from him"?
17       A.   In the conversation -- the
18   conversations I had with him.
19       Q.   I just want to know, is it just the
20   loans that Highland gave to him as an individual
21   human being or does it also cover loans that
22   Highland made to entities that are directly or
23   indirectly owned or controlled by him?
24       A.   It was my understanding from him that
25   it was all of the loans.

Page 57

ALAN JOHNSON

1
2       Q.   So do you believe that the decision
3   maker should have a knowledge and understanding
4   about all of the loans before entering into a
5   forgiveness program?
6       A.   The decision maker should know the
7   magnitude of the loans to be forgiven.
8       Q.   Do you think the decision maker should
9   be familiar with the terms of each of the loans
10   that are subject to the forgiveness agreement?
11       A.   I think the decision maker should have
12   a general understanding of the terms of the loans,
13   yes.
14       Q.   Do you think the decision maker should
15   have an understanding as to why the loans were
16   originally obtained?
17       A.   I think that's -- it would be ideal to
18   do that.  I think it's probably less importance.
19       Q.   Would you advise the decision maker to
20   obtain copies of the promissory notes?
21       A.   I would want the decision maker to be
22   generally familiar with the loans.  I don't -- I
23   don't know if they necessarily have to read each
24   of the promissory notes, but I think they should
25   have a general familiarity, what the loans are,

Page 58

ALAN JOHNSON

1
2 the magnitudes, the broad terms, the interest
3 rates and the basic features.
4     Q.    And if the decision maker weren't a
5 sophisticated party, would you advise the decision
6 maker to obtain advice concerning the nature,
7 extent and structure of the loans that were under
8 consideration for forgiveness?
9     A.    I think the decision maker should have
10 an understanding of the loan – what they're
11 forgiving, what the terms or – you know, you
12 should have an understanding of the structure of
13 the loans you're forgiving.
14     Q.    Could you contemplate any situation
15 where a decision maker should enter into a
16 forgiveness of loans without having an
17 understanding of the scope and structure of the
18 loans themselves?
19     A.    No.  I think – I think – as I said,
20 I think the decision maker should have a general
21 understanding of the loans, the amounts, the terms
22 at least – at least at reasonably high level.
23     Q.    Would you always advise your client to
24 understand the nature and extent of each of the
25 loans that was under consideration for forgiveness

Page 59

ALAN JOHNSON

1
2 before actually agreeing to forgive those loans?
3     A.    If there are a lot of loans, I – it
4 may not be practical.
5         I think you'd want to have a general
6 idea of the term, the amount, the interest rates.
7 The exact provisions of each loan is probably less
8 important.  To have some understanding of how much
9 is being at stake, when would they in general have
10 been paid, what the interest rate would be.
11         I think the ins and outs of each loan
12 would probably be of less importance.
13     Q.    Do you think it would be important for
14 the decision maker to know, let's just say
15 hypothetically, as to whether the loans under
16 consideration were demand loans or whether they
17 were 30-year term notes?
18     A.    Yeah, I think you would want to know
19 that.  You would want to know – that would be one
20 of the things you would want to know.
21     Q.    And why would you want to know that?
22     A.    I think if you're trying to design a
23 plan, you'd want to have some idea of the urgency
24 of the – of the loans.
25         You mentioned a 30-year term, it

Page 60

ALAN JOHNSON

1
2 perhaps is less urgent than a demand note, so I
3 think if you're trying to incent someone to
4 achieve something, you want to have some idea of
5 the urgency of these loans that are outstanding.
6     Q.    Can you think of any circumstance
7 where it would be appropriate for a decision maker
8 to agree to forgive loans without having an
9 understanding as to the number, value and
10 structure of the loans that are to be forgiven?
11     A.    The number of loans is probably of
12 less importance, as I said earlier.  I think you'd
13 want to know the rough magnitude of what we're
14 forgiving, and I think you would want to know the
15 basic structure of the loans.
16     Q.    I appreciate that, but can you think
17 of any circumstance where the decision maker
18 should agree to forgive loans without knowing the
19 structure and aggregate value the loans being
20 forgiven?
21     A.    No.  I think – I think the decision
22 maker should have a general understanding of the
23 dollar amounts and the structure of the loans to
24 be forgiven.
25     Q.    And you would never advise a client to

Page 61

ALAN JOHNSON

1
2 forgive loans without knowing the dollar amount
3 and the structure of the loans themselves,
4 correct?
5     A.    That would not be my advice, no.
6     Q.    Okay.
7         Do you believe that a decision maker
8 who's considering entering into a loan forgiveness
9 program as part of executive compensation has a
10 duty to try to negotiate the best terms possible
11 for the company?
12     A.    I think the decision maker has to have
13 reasonable terms and a fair agreement.  I don't
14 think they have an obligation to necessarily
15 strike the best possible deal.  They've got to
16 balance a number of factors, but the deal should
17 clearly be fair to the company.
18     Q.    And why do you believe that a decision
19 maker should make sure that the agreement is fair
20 to the company before entering into it?
21     A.    Well, I think the – the decision
22 maker has a responsibility to be fair to the
23 shareholders and the other parties at the company,
24 and the agreement should be fair to – to the
25 company – the interest of the company.

Page 62

ALAN JOHNSON

1
2    If they're in the position of making
3    that decision and they're representing the
4    company, the decision should be fair.
5        Q.    And how – how would you advise a
6    decision maker to make sure that the agreement was
7    fair before he, she, or it entered into it?
8        A.    Well, if we're talking about loans, as
9    I said earlier, you want to know the rough
10   magnitude of the loans and the terms.  You'd want
11   to know the achievement of these goals, how
12   significant are they for the success of the
13   company, and try to balance that, and the
14   probabilities and other things.
15       But you'd want to balance that in a
16   fair way where you felt that the – if it's a
17   loan, the forgiveness of these loans is – is
18   fairly rewarded by the achievement of these goals.
19       Q.    And so in order to assess the
20   fairness, you testified earlier that you would
21   always advise the decision maker to the extent
22   possible to obtain information concerning the
23   executive's compensation history, correct?
24       A.    You would want to know that if they
25   didn't know it already.  You would want to have

Page 63

ALAN JOHNSON

1
2    them have some idea of the individual's pay
3    history.  That would be one of the things you'd
4    want to know.
5        Q.    And in order to assess the fairness of
6    the transaction before entering into it, you would
7    always recommend to the extent possible that the
8    decision maker understand the financial condition
9    of the employer, correct?
10       A.    You would want the decision maker to
11   understand, as best they could in the
12   circumstances, the condition, you know, of the
13   company at that time.
14       Q.    And in order to assess the fairness of
15   the transaction before you enter into it, you
16   would always advise the decision maker to the
17   extent possible to obtain and understand the
18   employer's financial statements.  Is that fair?
19       A.    As part of that, if they didn't
20   already have an understanding – that's really
21   part of the financial condition of the company –
22   you'd want them to have a general understanding of
23   the financial position of the company, you know,
24   when the loan agreement was made.
25       Q.    And in order to assess the fairness of

Page 64

ALAN JOHNSON

1
2    the transaction before entering into it – give me
3    one second, please.  Sorry.
4        Before entering the – in order to
5    assess the transaction – withdrawn.
6        In order to assess the fairness of a
7    transaction before entering into it, you would
8    always advise the decision maker to obtain
9    information so that he, she, or it, could assess
10   the likelihood of any future, subsequent events
11   for which the forgiveness is contingent.  Is that
12   fair?
13       A.    The best you can, you want to at least
14   have an impression of the difficulty or likelihood
15   of these events being achieved.
16       As I said earlier, that often is quite
17   subjective.  You have an impression, but you at
18   least want to have some impression as best you can
19   of the likelihood and importance of these things
20   happening.
21       Q.    And – and in order to assess the
22   fairness of the transaction before entering into
23   it, you would always recommend that the decision
24   maker seek and obtain as much information as
25   possible about how comparable executives are paid.

Page 65

ALAN JOHNSON

1
2    Is that fair?
3        A.    As part of making this, I think you
4    would want to have some idea of the magnitude of
5    the loan being forgiven and how does that stack up
6    with the pay of other people in the industry, the
7    context of those decisions.
8        Q.    And in order to determine the fairness
9    of the loan before – withdrawn.
10       In order to determine the fairness of
11   a forgiveness agreement before entering into it,
12   you would always advise the decision maker to have
13   at least an understanding as to the aggregate
14   value and the structure of the loans that are to
15   be forgiven, correct?
16       A.    Yes, you would want to have that
17   knowledge.
18       Q.    Okay.
19       So let's go back to the hypothetical
20   where you have the CEO and an outside director
21   who's not familiar with the industry and doesn't
22   have access to financial statements or any
23   information about comparable executives.
24       In that hypothetical, if the executive
25   were to go to the outside director and make a

Page 66

ALAN JOHNSON

1
2  proposal regarding loan forgiveness, would you
3  advise that decision maker to try to negotiate
4  with the executive?
5      A.   Well, it depends on what the terms are
6  being proposed.  It may on its – its face be a
7  fair deal and you don't need to negotiate.  If
8  the – if the term – if the director believes the
9  terms are not as being proposed fair, yes, they
10  should negotiate and try to get an agreement that
11  is at least fair from the standpoint of the
12  company.
13      Q.   Well, in my hypothetical, assume that
14  the decision maker, the director, doesn't have any
15  information concerning the executive's
16  compensation history, doesn't have an
17  understanding of the entity's financial condition,
18  hasn't obtained or reviewed the entity's financial
19  statements, hasn't spoken to anybody other than
20  the CEO himself, has no experience in the
21  industry, has no expertise in the area of
22  executive compensation, would you advise that
23  particular decision maker to enter into the
24  agreement that's first proposed by the CEO without
25  negotiation?

Page 67

ALAN JOHNSON

1
2      A.   Well, I think even before negotiation,
3  in your hypothetical, someone who knows nothing
4  should get informed before they make any decision.
5  So that probably comes first.
6          You know, once they got better
7  informed, they could decide on whether they need
8  to negotiate or the offer on its face is fair, but
9  if they know nothing, they should get informed
10  before they agree to any decision.
11      Q.   Based on your knowledge and experience
12  and expertise in the industry, can you conjure up
13  a scenario where a decision maker who knows
14  nothing but nevertheless enters into a forgiveness
15  program has fulfilled his, her, or its duties to
16  the company?
17          MR. AIGEN:  Objection, form.
18      A.   I'm sorry, could you repeat the
19  question?  I lost my train of thought.
20      Q.   Sure.
21          Let's assume the decision maker knows
22  nothing.  In your opinion, can that decision maker
23  ever fulfill his, her, or its duty by entering
24  into a loan forgiveness program with the CEO?
25          MR. AIGEN:  Objection, form.

Page 68

ALAN JOHNSON

1
2      A.   Well, I think the director could get
3  lucky where the proposal was imminently fair and
4  you – you put it in place, but certainly, you're
5  at risk of agreeing to something that's not fair.
6  But a director or a company could get lucky in
7  that the proposal was – was fair on its face,
8  so...
9      Q.   Would you ever advise a client to –
10  who was a decision maker who knew nothing to enter
11  into the agreement and hope that he, she, or it
12  got lucky?
13      A.   I do not advise clients to try to get
14  lucky, no.
15      Q.   Have you ever heard of a decision
16  maker – withdrawn.
17          In your 30 years' experience, have you
18  ever heard of a decision maker entering into a
19  loan forgiveness program with knowledge of the
20  executive's employment history, the employer's
21  financial condition, without an understanding of
22  the financial statements, with no knowledge of
23  comparable executives, have you ever heard of
24  anybody like that ever entering into a loan
25  forgiveness program?

Page 69

ALAN JOHNSON

1
2      A.   I don't recall that – that situation,
3  no.
4      Q.   You'd agree with me it's not common in
5  the industry, is it?
6      A.   The facts that you've laid out would
7  not be common, no.
8      Q.   If you were advising a decision maker
9  who was contemplating entering into a loan
10  forgiveness program as part of executive
11  compensation, would you advise that decision maker
12  to make sure that the agreement is in writing?
13      A.   Yes.  Yes, I would.
14      Q.   And why would you do that?
15      A.   We – you want there to be no
16  misunderstandings.  I think many of these
17  agreements are complicated and you – people's
18  memory are fallible, so we often advise clients to
19  put many agreements in writing just so there's no
20  misunderstandings, everybody understands what the
21  terms are.
22      Q.   Can you think of any exception to the
23  advice you would give with respect to making sure
24  that forgiveness agreements are in writing?
25          Can you think of any scenario where

**Appx. 01975**

Page 70

ALAN JOHNSON

1    you would advise the decision maker, don't put
2    that in writing?
3        A.  No.  No, we wouldn't advise that.
4    Although unfortunately, many of our clients don't
5    put things in writing, but that would not be our
6    advice.
7        Q.  How about a hypothetical where the
8    agreement to forgive loans encompassed more than a
9    dozen loans, would you also recommend that there
10   be a written record of the identity of the loans
11   that were the subject of the agreement?
12       A.  If there were a dozen meaningful
13   loans, we would recommend that you have a catalog
14   of what the loans are talking about, absolutely.
15       Q.  Can you think of any scenario where it
16   would be appropriate to enter into an agreement
17   for the forgiveness of a dozen or more loans
18   without having any written record of it?
19       A.  As I said earlier, we would recommend
20   that all of these agreements be put in writing.
21       Q.  As an expert on executive
22   compensation, have you ever advised the decision
23   maker to enter into an oral agreement concerning
24   forgivable loans?

Page 71

ALAN JOHNSON

1        A.  I -- I would never -- we always -- I
2    would always want to have it in writing.
3        Q.  So let's go back to my hypothetical
4    where you have an agreement between a CEO and an
5    outside director.  If you were advising the
6    outside director, would you tell him or her that
7    your advice is to make sure that somebody in the
8    organization other than the CEO knows about the
9    terms in existence of the loan forgiveness
10   program?
11       A.  I would tell the outside director that
12   other people should be informed.
13           Other directors, the -- yes, I would
14   want other people -- I would -- if I were asked, I
15   would -- I would suggest or recommend that other
16   people be informed.
17       Q.  And why would you make -- why would
18   you give that advice?
19       A.  You would want -- at just an
20   operational level, you would want to make sure
21   that your finance department was aware that certain
22   payments might stop or in preparing the financial
23   statements or -- or other just operational issues,
24   so, again, there's no misunderstanding as you put

Page 72

ALAN JOHNSON

1    your financial statements together or just
2    operationalize these loans.
3        Q.  In your -- in your experience, do
4    companies that enter into loan forgiveness
5    programs customarily include reference to the
6    agreements in their financial statements or in
7    their books and records?
8        A.  It's a mixed practice.  Some people do
9    and some people don't, particularly private firms.
10       Q.  Have you ever heard of a situation
11   where the decision maker and the executive enter
12   into a loan forgiveness program and never tell
13   anybody about the terms or existence of the
14   program until after litigation is commenced?
15       A.  I don't know if I can -- sitting here
16   if I can recall a loan forgiveness program.
17           I can -- there's certainly other
18   facets of compensation where things weren't
19   documented and there's all kinds of disputes, but
20   I can't sitting here think of another loan
21   forgiveness program.
22       Q.  Okay.  I appreciate that.  My question
23   is just a little bit different.
24           Can you recall any instance in your

Page 73

ALAN JOHNSON

1    career where you've heard about a decision maker
2    who entered into a loan forgiveness program with
3    an employee but never told anybody in the world
4    about that until after litigation was commenced?
5        A.  I can't recall any sitting here.
6        Q.  Okay.  And you would never recommend
7    that a decision maker keep to him or herself the
8    entry into any agreement concerning the
9    forgiveness of loans?
10       A.  I think, again, we would -- I would
11   always recommend things be in writing with the
12   caveat if it was a small or trivial amount,
13   perhaps it wasn't needed.
14       Q.  In your opinion are the loans at issue
15   in this case small or trivial?
16       A.  No.
17           MR. MORRIS:  Okay.  We've been going
18   an hour and a half.  I really appreciate
19   your patience, sir.
20           Can we take just a 10-minute break and
21   come back at 10:40 eastern?  It's actually a
22   13-minute break.
23           THE WITNESS:  Okay.
24           MR. MORRIS:  Okay.  Thank you very

Appx. 01976

Page 74

ALAN JOHNSON

1     much.
2          (Recess taken from 10:27 a.m. until
3     10:40 a.m.)
4     BY MR. MORRIS:
5          Q.   Mr. Johnson, did you speak with
6     anybody during the break about your testimony
7     today?
8          A.   No.
9          Q.   Did you communicate with anybody in
10    writing about your testimony today during the
11    break?
12         A.   No.
13         Q.   Do you recall when you were –
14    withdrawn.  I apologize.
15         Are you – were you engaged in this
16    case or was your firm engaged in this case or is
17    it one in the same?
18         I just want to make sure I get it
19    right.
20         A.   I was engaged as an expert witness as
21    part of my firm.
22         Q.   Okay.
23         Do you recall when you were engaged in
24    this case?
25

Page 75

ALAN JOHNSON

1          A.   Maybe March or April of this year.
2          Q.   Do you have an engagement letter?
3          A.   We did, yes.
4          Q.   Okay.
5          And would that engagement letter
6     reflect the date upon which you were engaged in
7     this matter?
8          A.   Yes, it would.
9          Q.   Okay.
10         Did you ever review any of the
11    pleadings in this case, any of the complaints?
12         A.   I just don't – I don't recall.
13         Q.   Did you have any familiarity with
14    Highland Capital Management, L.P. or any of its
15    affiliates prior to your engagement in this case?
16         A.   I don't believe so.
17         Q.   Did you have any familiarity with
18    James Dondero prior to being retained in this
19    case?
20         A.   I don't believe so.
21         Q.   I think you said that you were
22    retained by the Stinson firm.
23         Do I have that right?
24         A.   Yes.
25

Page 76

ALAN JOHNSON

1          Q.   And had you done work for the Stinson
2     firm prior to this case?
3          A.   I don't believe so.
4          Q.   You have been retained by my firm
5     before.  Is that right?
6          A.   Yes.
7          Q.   Is that just one occasion?
8          A.   No, several times.
9          Q.   Oh, okay.  Well, it's nice to meet you
10    because we've never worked together, right, just
11    for the record?
12         A.   Yes.
13         Q.   All right.  We're going to put your
14    expert report up on the screen.  I forgot what
15    number we have premarked it, but let's take a look
16    at it.
17         MS. CANTY:  Sixty-two, John.
18         MR. MORRIS:  Thank you very much.
19         (Exhibit 62, expert report, was marked
20    for identification at this time.)
21    BY MR. MORRIS:
22         Q.   So your report, Mr. Johnson, is up on
23    the screen.  It's been premarked as Exhibit 62 for
24    our purposes.
25

Page 77

ALAN JOHNSON

1          MR. MORRIS:  And can we go to page 16,
2     please.
3          Q.   And if we go to the bottom of the
4     page, is that your signature, sir?
5          A.   Yes.
6          Q.   And did you sign this on or about
7     May 28, 2021?
8          A.   That's right.
9          Q.   You haven't amended this report since
10    May.  Is that right?
11         A.   That's right.
12         Q.   Okay.
13         And there's no modification to any of
14    your opinions that are set forth in this report,
15    correct?
16         A.   That's correct.
17         Q.   Okay.
18         MR. MORRIS:  Can we go to page 25,
19    please.
20         Q.   And do you see that there's a list
21    here of documents reviewed?
22         A.   Yes.
23         Q.   And I'm embarrassed to say, but I've
24    actually looked at all the documents.
25

Page 78

ALAN JOHNSON

1
2         Is it -- is it fair to characterize
3    the documents that you reviewed as either
4    tax-related information, financial statements from
5    NexPoint or Highland Capital Management Fund
6    Advisors or certain agreements between and among
7    the parties?
8         A.    I think it's certainly that.  There
9    may be other things, but certainly, those were
10   included in there, yes.
11        Q.    Can you identify any other type of
12   document that you recall reviewing prior to the
13   preparation of this report other than tax-related
14   information, financial statements for NexPoint and
15   HCMFA and certain agreements between and among the
16   parties?
17        A.    You had asked about the pleadings, and
18   I just don't recall, but with that -- with that
19   caveat, I think that's accurate.
20        Q.    Okay.
21              And to the best of your knowledge,
22   does this page identify every document that you
23   were provided with prior to the preparation of
24   your report?
25        A.    Yes, I believe so.

Page 79

ALAN JOHNSON

1
2         Q.    Okay.
3               You're not aware of any documents that
4    you received that aren't disclosed on this page,
5    right?
6         A.    Not that I'm aware of.
7         Q.    Okay.
8               Has anybody provided you with any
9    documents between May 28th and today that relate
10   to the subject matter of your report?
11        A.    I'm sorry, I didn't catch the last
12   bit.
13        Q.    Has anyone provided you any documents
14   between May 28th, 2021 and today that concern or
15   relate to any aspect of your report?
16        A.    I'm not sure how to answer the
17   question.  I received other documents, so I'm not
18   sure what you're trying to get at.
19        Q.    What other documents do you recall
20   receiving since May 28th, 2021 that concern your
21   report.
22        A.    I think I mentioned I reviewed some of
23   the loan documentation on the loans.  I've seen
24   the financial statements for Highland Capital
25   Management.  I've -- those two I recall.

Page 80

ALAN JOHNSON

1
2         Q.    Okay.
3               Do you remember for what years the
4    financial statements were for Highland?
5         A.    If I recall, they were 2014, I
6    believe, through -- it's either '14 or '15 through
7    '19, I believe.
8         Q.    And reviewing these documents didn't
9    cause you to amend or modify your opinions in any
10   way, correct?
11        A.    No.
12        Q.    Okay.  I'm just going to ask you a
13   series of questions to see if you're familiar with
14   any of the following categories of documents.
15              You mentioned that you saw some loan
16   documents.
17              Do I have that right?
18        A.    Yes.
19        Q.    Would the loan documents that you have
20   in mind be promissory notes?
21        A.    I'm not sure what the definition of a
22   "promissory note" is.
23        Q.    Are you familiar with promissory notes
24   generally?
25        A.    I'm familiar with notes, but I'm not

Page 81

ALAN JOHNSON

1
2    sure of the legal meaning of what a promissory
3    note is.
4         Q.    I think you mentioned that certain of
5    the loan documents that you saw referenced what
6    I'll characterize as a roll-up of existing loans.
7               Do I have that right?
8         A.    I saw that described, yes.
9         Q.    And was that -- was there a schedule
10   to the document entitled, I think, either
11   Exhibit A or Schedule A that listed various loans,
12   including the principal amount and the interest
13   that was outstanding as of the date of the
14   document?
15        A.    I've seen schedules like that, yes.
16        Q.    Okay.
17              Other than -- other than the documents
18   with the schedules that -- that you've just
19   acknowledged seeing, do you recall seeing any
20   other loan documents prior to today's deposition?
21        A.    If it's not on the list that we're
22   looking at, I don't recall anything else.
23        Q.    Do you know where you got these
24   documents -- withdrawn.
25              Who gave you these documents?

Page 82

ALAN JOHNSON

2    A.    They're from the Stinson law firm.

3    Q.    And do you recall when the Stinson law

4  firm gave you these documents?

5    A.    And "these documents" refer to prior

6  to writing the report or recently?

7    Q.    I apologize.  Great question.

8          I'm only asking about the loan

9  documents and the financial statements that you

10  have testified to having received after the date

11  of this report.

12    A.    I've received it from the law firm

13  within the last week.

14    Q.    Did you -- did you ask them for

15  documents or did they give to you of their

16  own accord?

17    A.    I had asked them from documents prior

18  to writing my report, and then I think we asked

19  for documents getting ready for this deposition.

20    Q.    And what they gave you in response to

21  your request were the loan documents with the

22  schedule listing certain principal and interest

23  due on the loans as well as, to the best of your

24  recollection, financial statements for HCM, L.P.

25  for around 2014 or '15 through around 2019.  Is

Page 83

ALAN JOHNSON

2  that right?

3    A.    Yes.

4    Q.    Okay.

5          At no time since the report was signed

6  by you back in May has Mr. Dondero or anyone

7  acting on his behalf given you any documents that

8  describe the terms or existence of any loan

9  forgiveness agreement, correct?

10    A.    I had a conversation with Mr. Dondero

11  about the loan forgiveness program at Next Bank,

12  but I had that conversation with him.

13    Q.    But has anybody given you since

14  May 28, 2021 any documents that reflect the terms

15  or existence of the loan forgiveness program

16  that's referred to in your expert report?

17    A.    No.

18    Q.    Did the Stinson firm give you

19  Highland's audited financial statements for 2008,

20  '9, '10, '11, '12, or '13?

21    A.    Now -- now you're testing me, and I'm

22  just not sure.  They provided them to me, and I'm

23  just not sure.

24    Q.    Okay.

25          Are you aware that

Page 84

ALAN JOHNSON

2  PricewaterhouseCoopers was Highland's outside

3  auditors?

4    A.    I remember seeing PwC, yes.

5    Q.    Are you aware that PwC gave a

6  deposition in this case after the date you had

7  authored your report?

8    A.    I was not aware of that.

9    Q.    So is it fair to say that you've never

10  seen PricewaterhouseCoopers' deposition

11  transcript?

12    A.    I have not.

13    Q.    And is it fair to say that you have no

14  knowledge about what, if anything,

15  PricewaterhouseCoopers testified to in this case?

16    A.    I do not know.

17    Q.    Have you ever heard of a Dugaboy

18  Investment Trust?

19    A.    Dugaboy?  I don't believe so.

20    Q.    So is it fair to say you have no

21  knowledge as to whether or not the Dugaboy

22  Investment Trust testified in this case?

23    A.    I have no knowledge.

24    Q.    So it's fair to say that you've never

25  seen a deposition transcript relating to any

Page 85

ALAN JOHNSON

2  testimony given on behalf of the Dugaboy

3  Investment Trust, correct?

4    A.    I have not.

5    Q.    Have you ever heard of Frank

6  Waterhouse?

7    A.    I don't believe so.

8    Q.    I'll try and refresh your

9  recollection.

10          Do you know whether Mr. Waterhouse

11  served as Highland Capital Management, L.P.'s

12  chief financial officer for the five-plus years

13  prior to the petition date?

14    A.    Now I think you've refreshed my

15  memory.  I think I've seen the name, yes.

16    Q.    Do you know if -- have you ever seen a

17  deposition transcript of any testimony

18  Mr. Waterhouse has given in this case?

19    A.    I have not.

20    Q.    Do you know whether Mr. Dondero has

21  testified in this case?

22    A.    I -- I've seen some deposition

23  testimony for Mr. Dondero.

24    Q.    And when did you see the deposition

25  testimony?

Page 86

ALAN JOHNSON

2     A.   Within the last week.

3     Q.   Do you know if he testified – do you

4  know when the deposition was?

5     A.   I don't recall.

6     Q.   Do you recall – did you actually see

7  a transcript?

8     A.   I saw the transcript, yes.

9     Q.   Did you see one transcript or more

10  than one transcript?

11     A.   Just one.

12     Q.   And do you know if that deposition

13  took place in May or did that deposition take

14  place more recently?

15     A.   I – I don't know.

16     Q.   Were you given – were you provided a

17  copy of the entire transcript?

18     A.   I received an excerpt – I'm not sure.

19  I focused on an excerpt, but I'm not sure if I

20  received the whole transcript.

21     Q.   And were you directed to that

22  particular excerpt that you looked at?

23     A.   Yes.

24     Q.   And who directed you to that excerpt?

25     A.   The Stinson law firm.

Page 87

ALAN JOHNSON

2     Q.   And did the Stinson law firm direct

3  you to any portion of the transcript other than

4  that excerpt?

5     A.   No.

6     Q.   And how – how long was the excerpt?

7  Was it a few lines or a few pages or –

8     A.   A few pages.

9     Q.   Okay.

10         And can you recall generally what the

11  excerpt was that was provided to you by the

12  Stinson law firm?

13     A.   It revolved around the loans.

14     Q.   And do you remember the substance of

15  the excerpt, like what about the loans were you

16  being directed to review?

17     A.   It was Mr. Dondero's testimony around

18  the constructing of these forgivable loans.  It

19  was – that was – that was the – those were the

20  pages.

21     Q.   Do you recall the page numbers

22  perhaps?

23     A.   Actually, I do.  One was 143.

24     Q.   Okay.  Any others?

25     A.   I read before that and after that, but

Page 88

ALAN JOHNSON

2  I think that was – that was – for some reason, I

3  recall that number.

4     Q.   Have you received – withdrawn.

5         Other than the loan documents and

6  financial statements you've described as well as

7  the excerpt from Mr. Dondero's deposition, have

8  you received any information concerning

9  Mr. Dondero's compensation that was produced by

10  Highland after May 28, 2021?

11     A.   I recall there was a – an excel file

12  that had some additional things on compensation.

13  Yeah, I think there was an excel file that broke

14  out, you know, different elements of compensation.

15     Q.   When did you receive that?

16     A.   Sometime in October.

17     Q.   Did you receive anything in October

18  other than the Excel file that you've just

19  described and the loan documents and financial

20  statements and excerpt from Mr. Dondero's

21  transcript?

22     A.   Not that I recall.

23     Q.   Do you recall anything about the Excel

24  file?

25     A.   It had different elements of pay.  It

Page 89

ALAN JOHNSON

2  had some of the different legal entities.

3         I think that I – I think that's all I

4  remember.

5     Q.   Did that Excel file cause you to

6  change in any way any of the opinions that are set

7  forth in your report?

8     A.   No.

9     Q.   Did Mr. Dondero's deposition

10  transcript excerpt cause to you change, modify, or

11  amend in any way any of the opinions set forth in

12  your report?

13     A.   No.

14     Q.   Other than the Excel file, did you

15  receive any other documents that Highland has

16  produced in this matter since the date you

17  executed your expert report on May 28, 2021?

18     A.   No.

19         MR. MORRIS:  If we can go to page 5 of

20  the report, we still have it up on the

21  screen here.

22     Q.   Do you see where it says, "Facts and

23  Data Considered"?

24     A.   Yes.

25     Q.   Okay.

Page 90

ALAN JOHNSON

```
1              ALAN JOHNSON
2         In the first sentence, you wrote, "in
3   preparing this report, I've considered certain
4   documents provided to me, interviews with
5   Mr. Dondero, and former Highland or affiliate
6   employees."
7         Do you see that?
8    A.   Yes.
9    Q.   When did you interview Mr. Dondero?
10   A.   Probably early May, early May of this
11  year.
12   Q.   Is that the only time you've
13  communicated with him directly concerning this
14  case?
15   A.   I think I mentioned earlier I talked
16  to him about the Next Bank – in the last week
17  about the Next Bank loans, and then I talked to
18  him prior to this report.
19        I think those are the only times.
20   Q.   And did you speak with him on the
21  phone?  Did you meet with him in person or some
22  other form of communication?
23   A.   Didn't – it was not in person.  It
24  was either a phone call or Zoom.  I don't recall.
25   Q.   Do you recall how many phone calls or
```

Page 91

```
1              ALAN JOHNSON
2   Zoom calls you had with Mr. Dondero for the
3   purpose of interviewing him, as stated in the
4   first sentence of the Facts and Data Considered?
5    A.   Prior to this report, I think I talked
6   to him three times, I believe.
7    Q.   And was anybody – did anybody
8   participate in those Zoom or telephone calls
9   besides you and Mr. Dondero?
10   A.   There would have been someone from the
11  Stinson law firm and likely my colleague,
12  Mr. Perniciaro, would have been on the call as
13  well.
14   Q.   Do you know approximately what the
15  total time you spent speaking with Mr. Dondero was
16  before you prepared this report?
17        Was it an hour or three hours?
18   A.   Probably an hour and a half.
19   Q.   So about 90 minutes.
20        Do you recall – did you ask to
21  interview him or did the Stinson firm suggest that
22  you should speak with him?
23   A.   I suggested talking to him.
24   Q.   Okay.
25        Do you recall what he told you during
```

Page 92

```
1              ALAN JOHNSON
2   this interview?
3    A.   We talked about his duties,
4   responsibilities, went into what he – what he was
5   involved in going back in time to the current, his
6   duties, how he ran the firm.  So we spent a fair
7   amount of time talking about that.
8         Talked about the different – these
9   loans and the purpose of the loans, his philosophy
10  around the loans.
11        I think those were the two broad –
12  the two broad categories.
13   Q.   Did he describe for you in any way the
14  agreement that was entered into in late 2018,
15  early 2019 relating to the forgiveness of the
16  loans?
17   A.   Yes.  Yes, he did.
18   Q.   What did he tell you about that?
19   A.   He said that the – the structure to
20  reward him for a successful transaction with one
21  of these three portfolio investments, that was the
22  purpose, that loans had been used in the company
23  in the past, that the loans were – had always
24  intended to be forgiven, and this was simply
25  codifying and structured the intent of the loans
```

Page 93

```
1              ALAN JOHNSON
2   all along.
3    Q.   Did he identify who the decision maker
4   was who acted on behalf of the company?
5    A.   He – I don't believe that came up.  I
6   don't recall hearing that.
7    Q.   Did you ask him any questions that
8   you – your gut told you he wasn't able to answer
9   completely?
10   A.   No.  I thought he was candid.  I
11  thought he was straightforward.  I didn't – the
12  questioning that I had with him, I didn't find –
13  he answered the questions I had about both his
14  role and the – how these loans were intended to
15  operate.
16   Q.   Did he tell you that under the
17  agreement he entered into with the decision maker,
18  the loans would be forgiven if the assets were
19  sold not by him but by a third party?
20   A.   I don't – I don't recall that, no.
21   Q.   It doesn't say that in your report,
22  does it?
23   A.   It does not.
24   Q.   And you don't recall him specifically
25  telling you that one of the terms of the agreement
```

Page 94

ALAN JOHNSON

1
2  was that all of the loans subject to the agreement
3  would be forgiven if any of the three assets were
4  sold by a third party.  Is that fair?
5      A.   We didn't get into that, no.
6      Q.   And he didn't tell you that, correct?
7      A.   No.
8      Q.   Do your opinions rely on anything that
9  Mr. Dondero told you?
10     A.   Certainly, the – his role was in –
11  my opinion on what his role was, which formed the
12  compensation thing, is influenced by what he said
13  about this role.  So yes, it impacted that, you
14  know, part of the report.
15     Q.   Okay.
16          So other than his role and his duties
17  and responsibilities, is there anything else that
18  Mr. Dondero told you during the interview that you
19  have relied upon in formulating your opinions?
20     A.   I don't believe so.
21     Q.   How many former Highland or affiliate
22  employees did you interview?
23     A.   I interviewed four.
24     Q.   Do you recall the names of any of
25  them?

Page 95

ALAN JOHNSON

1
2      A.   Adkins, Hurley, Lawlor, and Cote.
3      Q.   When did you interview those
4  individuals?
5      A.   Probably early May of this year.
6      Q.   Do you have any notes from those
7  interviews?
8      A.   I do not.
9      Q.   Do you know if your colleague has any
10  notes from those interviews?
11     A.   I don't think so.
12     Q.   Do you know if there's any written
13  record at all of the interviews you conducted with
14  those former Highland or affiliate employees?
15     A.   I don't believe so.
16     Q.   Did you speak to them all at one time
17  or did you speak to them individually?
18     A.   Individually over a few days.
19     Q.   Let's take them one at a time.
20          Mr. Adkins, do you recall the
21  substance of what Mr. Adkins told you?
22     A.   The substance of the four interviews
23  were very similar.  They described his role.  They
24  described their experiences with loans.  So the –
25  the comments from the four were very similar.

Page 96

ALAN JOHNSON

1
2      Q.   So I apologize, I wasn't writing fast
3  enough.
4      A.   I'm sorry –
5      Q.   I have Adkins –
6      A.   – I apologize.
7      Q.   I have Mr. Adkins, Mr. Lawlor, and who
8  were the other two?
9      A.   Mr. Hurley and Mr. Cote.
10          I believe those are the names.
11     Q.   Did any of them tell you – withdrawn.
12          Did all of them tell you that they had
13  obtained loans from Highland which were
14  subsequently forgiven in whole or in part?
15     A.   I believe so.
16     Q.   Did any of them tell you how much
17  money was forgiven?
18     A.   We talked about that, yes.  They
19  described the amounts.
20     Q.   Okay.
21          What amounts do you recall being
22  described as having been forgiven by Highland?
23     A.   It was in the hundreds of thousands.
24     Q.   Did any of them tell you that they had
25  ever had a loan from Highland that was forgiven in

Page 97

ALAN JOHNSON

1
2  an amount equal to or more than $500,000?
3      A.   They were a little sketchy on the
4  exact amounts, but my impression, they ranged
5  from, say, a quarter million to maybe $500,000 or
6  a little more.  That – that was their
7  recollections.
8      Q.   Did – did you learn from these four
9  interviews when the last of these loans was
10  forgiven?
11     A.   Probably 8 or 10 years ago.
12     Q.   Did anybody – withdrawn.
13          Did any of the four of them inform you
14  that Highland had forgiven any loans to any
15  officer or employee in the last 8 to 10 years?
16     A.   I don't recall them saying that, no.
17     Q.   Did you – do you recall asking them
18  when was the last loan that Highland ever forgave?
19     A.   I don't believe I asked that question.
20     Q.   And as you sit here right now, you
21  have no knowledge as to when the last loan that
22  Highland gave that was forgiven in whole or in
23  part, correct?
24     A.   I don't have that knowledge, no.
25     Q.   Other than the loans that were

Appx. 01982

Page 98

ALAN JOHNSON

2  described for you by these four individuals, can
3  you identify any other loan that Highland has ever
4  forgiven?
5      A.   I don't have any other knowledge, no.
6      Q.   Did any of these four individuals give
7  you any documents relating to any aspect of your
8  report?
9      A.   No.
10     Q.   Did any of them give you any documents
11  that would substantiate the information that they
12  provided to you during the interview?
13     A.   They didn't provide any documents, no.
14     Q.   Did you ask them if they had any
15  documents to substantiate what you were told?
16     A.   Yes.  Yes, I did.
17     Q.   And they told you that they didn't
18  have any.
19        Do I have that right?
20     A.   Yes, that's right.
21     Q.   I think you testified that you do not
22  know who the decision maker was who entered into
23  the agreement with Mr. Dondero in late 2018 or
24  early 2019 with respect to the forgiveness of the
25  loans.

Page 99

ALAN JOHNSON

2        Do I have that right?
3      A.   When I interviewed Mr. Dondero, I did
4  not -- that didn't come up.
5      Q.   So I'm going to represent to you that
6  it's in the pleading that Mr. Dondero entered into
7  the agreement with his sister Nancy, who was the
8  trustee of the Dugaboy Investment Trust who
9  purportedly holds a majority of Highland's
10  interests.
11        Is that new information for you?
12     A.   Yes, it is.
13     Q.   Have you ever heard of Nancy Dondero
14  before?
15     A.   I had heard her name just because
16  there's attorneys representing her.  That's all
17  I -- that's all I know.
18     Q.   You weren't aware until I just told
19  you that she's the person who entered into the
20  agreement with Mr. Dondero concerning --
21        withdrawn.
22        You didn't know until I just told you
23  that Nancy Dondero, as the trustee for the Dugaboy
24  Investment Trust, as the holder of a majority of
25  interests of Highland, is the person who entered

Page 100

ALAN JOHNSON

2  into the agreement with Mr. Dondero?
3      A.   If your assertion is true, then I --
4  then I -- I did not know that.
5      Q.   Okay.
6        And is it fair to say then that you
7  don't know that she was deposed in this case?
8      A.   I don't believe I knew that, no.
9      Q.   And is it fair to say that you've
10  never seen her deposition transcript, if one
11  exists?
12     A.   I have not seen it.
13     Q.   Did you ever ask to speak with the
14  decision maker?
15     A.   No, I did not.
16     Q.   And is that because -- why -- why
17  didn't you ask to speak with the decision maker?
18     A.   My assignment here was to talk about
19  practice, you know, in the industry of using loans
20  and other things.  It was not to -- I was not
21  asked to assess these particular loans.
22        So if the assignment had been to -- to
23  assess the reasonableness or fairness, then I
24  certainly would have done other things, but that
25  was not the assignment here.

Page 101

ALAN JOHNSON

2      Q.   Okay.
3        And can you -- can you be as specific
4  as you can as to what the assignment was?
5      A.   Well, in addition to coming up with a
6  market compensation, in the report, I said the
7  assignment was to talk about the practice and --
8  of using loans and forgivable loans and, you know,
9  financial services firms, but it was not to assess
10  the reasonableness of -- the specific
11  reasonableness of this particular transaction.
12     Q.   Okay.
13        And you're not offering any opinion as
14  to the reasonableness of the agreement that
15  Mr. Dondero entered into with the Dugaboy
16  Investment Trust concerning the forgiveness of any
17  loans.  Is that fair?
18     A.   I'm not -- I'm not putting that forth,
19  no.
20     Q.   And you're not offering any opinions
21  as to whether or not such an agreement exists,
22  correct?
23     A.   No, I am not.
24     Q.   You're not offering any opinions as to
25  whether or not it would have been appropriate for

Appx. 01983

Page 102

ALAN JOHNSON

1
2  the company to enter into a loan forgiveness
3  program under the facts and circumstances that
4  existed at the time, correct?
5      A.  That's right.
6      Q.  And you're not offering any opinion
7  that the loan forgiveness program that Mr. Dondero
8  entered into is consistent with industry
9  standards, are you?
10     A.  No, I'm not.
11     Q.  Okay.
12         What you are doing is you're -- you're
13  making an assessment of what comparable executives
14  earn in the industry.  Is that fair?
15     A.  That's part of it, and then the
16  second, as I mentioned, just the use of such loans
17  within the industry and, you know, within
18  Highland.
19     Q.  Okay.
20         But you're not offering any opinion as
21  to whether or not -- withdrawn.
22         We'll keep going.
23         You have no information about what
24  diligence, if any, the decision maker conducted
25  prior to entering into the agreement with

Page 103

ALAN JOHNSON

1
2  Mr. Dondero in late 2018 or early 2019, correct?
3      A.  I do not.
4      Q.  And you're not offering any opinion as
5  to whether or not the diligence that was done by
6  that person was sufficient, correct?
7      A.  I'm not making that opinion, no.
8      Q.  And you don't have any information
9  about the skill set or the experience of the
10  decision maker, fair?
11     A.  I do not.
12     Q.  And you're not offering any opinion as
13  to the skill set or the experience of the decision
14  maker who entered into this alleged agreement on
15  behalf of Highland, correct?
16     A.  I am not.
17         MR. MORRIS:  Let's go to page 3 of
18     your report, please.
19         So this is the introduction, right?
20  So this is the very first substantive page
21  of the report, is that right?
22     A.  Yes.
23     Q.  Okay.
24         If you take a look near the end of the
25  first paragraph, there's a sentence that reads,

Page 104

ALAN JOHNSON

1
2  "Throughout this period, he received loans in lieu
3  of additional current compensation."
4      Do you see that?
5      A.  Yes.
6      Q.  Have I read that correctly?
7      A.  Yes.
8      Q.  Why did you include that sentence in
9  your report?
10     A.  I -- Mr. Dondero described these loans
11  as -- as a practice of, in lieu of paying
12  compensation, these loans were -- these loans were
13  made.
14     Q.  What information were you given that
15  you relied upon in order to make the statement
16  that I just read into the record?
17     A.  Well, I interviewed Mr. Dondero, and
18  then I talked to the four prior Highland
19  executives.
20     Q.  Now, you told me that the four prior
21  Highland executives described for you certain
22  loans that they had received that had been
23  forgiven in whole or in part by Highland.
24     Do I have that right?
25     A.  Yes.

Page 105

ALAN JOHNSON

1
2      Q.  Did any of them give you any
3  information to support the statement that
4  throughout this period Mr. Dondero received loans
5  in lieu of additional current compensation or is
6  that information that came exclusively from
7  Mr. Dondero?
8      A.  They described a practice at the
9  company of using these loans as a -- a form of
10  deferred pay, so they described it -- it was not
11  only them, but it applied to others, and then when
12  I interviewed Mr. Dondero, his testimony -- his
13  comments to me were consistent with that.
14     Q.  Okay.
15         Did any of the four former employees
16  specifically tell you that Mr. Dondero had ever
17  received loans in lieu of additional current
18  compensation or did they just describe a general
19  practice that applied to others?
20     A.  I think they were describing the
21  general practice.
22     Q.  Okay.
23         So did anybody other than Mr. Dondero
24  tell you that "Throughout this period, he received
25  loans in lieu of additional current compensation"?

Appx. 01984