David Klos - October 27, 2021

**13**

1  question.
2      THE WITNESS:  I provided many of the same
3  services for NexPoint Advisors that I provided for
4  Highland, similar types of services.
5      Q.  (BY MR. RUKAVINA)  And briefly about Highland
6  Capital Management Fund Advisors, LP, HCMFA, did you
7  ever have like an official title or role with that
8  entity, to your knowledge?
9      A.  Again, not that I can remember.
10      Q.  Not to your knowledge, the controller ever of
11  that entity?
12      A.  I'm not certain whether I was or not.
13      Q.  But you provided services to that entity as
14  part of your role at Highland pursuant to shared
15  services?
16      A.  Similar to NexPoint as I described.
17      Q.  When you were controller of Highland, was
18  that an officer-level position at Highland?
19      A.  No.
20      Q.  When did you become the chief financial
21  officer of Highland?
22      A.  Chief financial officer?
23      Q.  Uh-huh.
24      A.  2021, March.
25      Q.  After Mr. Waterhouse was gone?

**14**

1      A.  Yes.
2      Q.  And I'm going to ask you a little bit about
3  your compensation today at Highland.
4      You don't have to give me specific numbers
5  unless I ask you, please, but I take it you have a base
6  compensation?
7      A.  Yes, I have a base.
8      Q.  Do you have any bonus structure compensation?
9      A.  Yes, I have a bonus.
10      Q.  And what is that bonus number or whether it's
11  paid out based upon or contingent upon?
12      MR. MORRIS:  Objection to the form of the
13  question.
14      THE WITNESS:  As I understand, it's based on
15  my offer letter.
16      Q.  (BY MR. RUKAVINA)  On your what?
17      A.  My letter for extending an offer.
18      Q.  Tell me, what is your -- without having to
19  use express numbers, what is your bonus compensation?
20  When is it paid, et cetera?
21      A.  Yeah, so it's not too dissimilar from the
22  prior Highland plan that has semiannual installments
23  payable.  And there's a, kind of an end of plan
24  bonus when -- I don't remember the specifics on exactly
25  what triggers that, but it's back-ended in the plan.

**15**

1      Q.  Do you have an expectation as to when the
2  winding down and monetization of Highland and its
3  assets will be complete?
4      A.  That's very hard to speculate, especially
5  given the amount of litigation that's going on because
6  I don't know when that's going to play out and that's a
7  material asset.
8      Q.  Have you discussed with Mr. Seery how long
9  that might be?
10      A.  Not that I can specifically remember.
11      Q.  Do you believe it will be at least probably
12  two years, from today?
13      A.  I don't know.
14      Q.  This bonus compensation, does it or any
15  amount of it depend on how well Highland or the
16  claimant trust, how well they do vis-a-vis collecting
17  money from creditors?
18      A.  Not that I can think of.  I'd have to
19  probably go back and look and understand the back-end
20  piece to say definitively.
21      Q.  And back-end piece, does that mean whenever
22  the winding down is completed?
23      A.  Yeah, like I said, I'm not exactly -- I'm not
24  completely facile with the exact timing, if it's
25  completed 100 percent or 80 percent, what kind of

**16**

1  qualitative considerations go into that.  But
2  substantially completed.
3      Q.  Sitting here today, do you think or believe
4  that any portion of your compensation over the next
5  however long it takes to wind down Highland depends on
6  how much Highland recovers from the litigation
7  regarding promissory notes?
8      A.  I really take exception to that question
9  because the insinuation is that it's going to somehow
10  change my answers here, and it's absolutely not.
11      How litigation, it may or may not affect my
12  ultimate compensation, but that's not going to affect
13  one iota of the answers I give you today or at any
14  time, whether I'm on or off the record.
15      Q.  Fair enough.  So you're going to testify
16  today truthfully regardless of your compensation.  I
17  got you; right?  Correct?
18      A.  I didn't follow what you just asked me.
19      Q.  You're going to testify today truthfully
20  regardless of how these events may or may not affect
21  your compensation; right?
22      A.  It's such a loaded question I can't even
23  begin to answer that.
24      Q.  So sitting here today -- I want to ask you
25  the same question I did before, and your answer to me

David Klos - October 27, 2021

**17**

1  was that you took exception to the insinuation. Now
2  I'd like you to answer my question.
3       Which is, sitting here today, do you believe
4  that any part of your compensation in the future,
5  however long it takes to wind down Highland, is going
6  to depend on how well Highland does in these
7  litigations concerning the notes?
8       A. I believe my ultimate compensation will
9  depend on how long this process takes, which I don't
10  know, and ultimate recoveries to trust beneficiaries
11  under the plan.
12       And so I do expect that it will vary, but I
13  would reiterate my earlier comment.
14       Q. So sitting here today, you understand that if
15  the trust beneficiaries recover more, then you might be
16  compensated more?
17       A. That's possible.
18       Q. Well, sir, I'm not trying to be a smart ass,
19  but --
20       MR. MORRIS: Actually, you're coming awfully
21  close, just to be clear, so be careful, because I'm
22  offended as well. But continue.
23       MR. RUKAVINA: I'm entitled to ask the man
24  about his compensation.
25       MR. MORRIS: Right. And your clients have

**18**

1  $75 million, hard dollars at stake in this litigation,
2  so we should never believe anything that he says? Is
3  that where we are now?
4       Q. (BY MR. RUKAVINA) Sir, again, what is your
5  bonus compensation as it relates to how well the
6  claimant trust does? Do you remember or not?
7       A. I don't know that that's even something that
8  I could know at this point.
9       Q. In preparing for this deposition, I take it
10  you spoke to legal counsel, and I'm not entitled to
11  know that and I'm not asking that.
12       But did you talk to anyone else?
13       A. I've spoken in general terms to Mr. Seery.
14       Q. Okay. Anyone else?
15       A. I've spoken, again in general terms, to
16  Kristin Hendrix.
17       Q. Anyone else?
18       A. Not that I can think of.
19       Q. Now, I understand you spoke to Ms. Hendrix
20  when legal counsel was present; right?
21       A. Yes.
22       Q. So let's exclude that conversation.
23       Did you have any conversations with
24  Ms. Hendrix regarding this deposition or this
25  litigation at which counsel was not present?

**19**

1       A. Not in any substance.
2       Q. And when do you recall you might have had
3  those discussions with her?
4       A. I'm not even sure.
5       Q. Would it have been recently or like 9,
6  10 months ago?
7       A. No, it would have been recently.
8       Q. And with Mr. Seery, when did you have a
9  general conversation with Mr. Seery?
10       A. I've had, you know, one or more general
11  conversations with Mr. Seery. It's my understanding
12  that he was the 30(b)(6) witness, and he had questions
13  in preparation for his role in that.
14       Q. So that would have been before last Thursday
15  that you talked to him? I'll represent to you that
16  that's when his deposition was.
17       A. Yeah, if I'm accepting that representation,
18  yes, prior to.
19       Q. Other than that conversation with respect to
20  him preparing for the 30(b)(6), did you have a
21  discussion with him about this litigation as it might
22  relate to your deposition?
23       A. I don't believe so in terms of relating to
24  this deposition. We've talked at length about the
25  notes more generally.

**20**

1       Q. And we'll go through that I'm sure.
2       So other than the conversations with
3  Ms. Hendrix and Mr. Seery and, of course, with counsel
4  that I'm not entitled to know about, did you discuss
5  this deposition or what you might be asked today with
6  anyone else?
7       A. No.
8       Q. Okay. Did you read all or any portions of
9  the deposition of Frank Waterhouse?
10       A. Certainly didn't read all of it. I have a
11  general understanding of the topics that were -- that's
12  a bad way to frame it.
13       I have a general understanding of a few
14  points that were covered in his deposition.
15       Q. Were you provided -- were you provided the
16  exact pages of any of his deposition?
17       MR. MORRIS: Objection. Direct him not to
18  answer.
19       MR. RUKAVINA: You're going to direct him not
20  to answer whether he read --
21       MR. MORRIS: If you're asking him whether I
22  directed him to particular --
23       MR. RUKAVINA: I didn't ask that.
24       MR. MORRIS: Rephrase your question.
25       Q. (BY MR. RUKAVINA) Did you read any pages

David Klos - October 27, 2021

---

**21**

1  from Mr. Waterhouse's deposition?
2      MR. MORRIS:  Objection.  Asked and answered.
3      You can answer again.
4      THE WITNESS:  I don't recall -- I don't
5  recall reading it.
6      Q.  (BY MR. RUKAVINA)  So were you provided a
7  summary of his deposition?
8      A.  I have had discussions with Mr. Morris in
9  preparation for this deposition.
10     Q.  That's fine.  And we can stop there.
11         Did you read or -- did you read the whole or
12  any portion of Mr. Seery's deposition?
13     A.  No, I don't believe I -- no, I don't believe
14  so.
15     Q.  Is it the same answer, that whatever you
16  discussed would have been through counsel?
17     A.  Yes.
18     Q.  Did you see any of the videotape of either
19  Mr. Waterhouse's or Mr. Seery's deposition?
20     A.  No.
21     Q.  So let's talk about the NexPoint
22  $30.7 million note.
23         You're familiar with that note; right?
24     MR. MORRIS:  Objection to the form of the
25  question.

---

**22**

1      THE WITNESS:  Before I answer that, I'd like
2  to see the note.
3      Q.  (BY MR. RUKAVINA)  It's in here.  I'm looking
4  for the exhibit number.  It's in here somewhere.
5      A.  Yes, I'm familiar with this note.
6      Q.  Are you familiar with anything having to do
7  with the negotiation or execution of this note?
8      MR. MORRIS:  Objection to the form of the
9  question.
10     THE WITNESS:  Can you repeat.
11     Q.  (BY MR. RUKAVINA)  Yes.  Let me rephrase it.
12         Did you have anything to do, back on or about
13  May 31, 2017, with the negotiation or execution of this
14  promissory note?
15     MR. MORRIS:  Objection to the form of the
16  question.
17     THE WITNESS:  Nothing with respect to the
18  negotiation --
19     Q.  (BY MR. RUKAVINA)  I'm sorry.
20     A.  In terms of the execution, I believe I
21  coordinated with internal counsel, who drafted the
22  note, and I can't remember -- I can't recall one way or
23  the other if I assisted in actually physically
24  receiving signatures.  I just don't remember.
25     Q.  Do you remember who that internal counsel

---

**23**

1  was?
2      A.  Yeah, it was Lauren Thedford, who is Highland
3  in-house counsel.
4      Q.  She's a lawyer?
5      A.  Yes.
6      Q.  Do you recall from that -- strike that.
7         Did you know on or about May 31, 2017 what
8  the purpose or reason behind Exhibit 13, this
9  promissory note, was?
10     MR. MORRIS:  Objection to the form of the
11  question.
12     THE WITNESS:  The purpose was to take
13  existing notes, which I believe were exclusively demand
14  notes, I'm not a hundred percent certain on that, and
15  roll them into a single note that would have a 30-year
16  amortization period.
17     Q.  (BY MR. RUKAVINA)  Do you know why that was
18  done?
19     A.  I believe it was done probably for a number
20  of reasons, one of which was to ensure some level of
21  cash flow back to Highland, when I say Highland,
22  Highland Capital Management, LP, on an annual basis.
23     Q.  Was that a concern at Highland Capital
24  Management, that it wasn't getting any level of cash
25  flow back?

---

**24**

1      A.  It wasn't a concern of mine.  I don't know if
2  it was a concern of others.
3      Q.  Do you recall whether any auditor ever raised
4  that concern?
5      A.  The auditors did raise that in conjunction
6  with the audit that was concluding around this time.
7  So yes, they did raise it, you know, probably in the
8  May of 2017 time frame.
9      Q.  Do you know who decided that it would be a
10  30-year term note?  By that I mean 30 years.
11     A.  Jim Dondero.
12     Q.  Do you know if he decided that in connection
13  with discussions with anybody or, to your knowledge, he
14  just decided?
15     A.  As far as I know he just decided it.  I
16  believe there was a draft at one point that was for
17  20 years, and he wanted to do 30.
18     Q.  So this note is executed in May 31, 2017.
19  Did you have any further role prior to, let's say,
20  December 1, 2020 with respect to anything to do with
21  this promissory note?
22     A.  Sorry, tell me the date again.
23     Q.  From execution of the note until December 1,
24  2020?
25     A.  And the question was?

---

David Klos - October 27, 2021

25

1    Q.  Did you have any role in that time frame with
2  respect to this promissory note on behalf of Highland?
3        MR. MORRIS:  Objection to the form of the
4  question.
5        THE WITNESS:  I don't know how to answer
6  that, it's such an open-ended question.  I just don't
7  know how to respond to that.
8    Q.  (BY MR. RUKAVINA)  If payments were made on
9  this note, would you have any duty to record or credit
10  those payments?
11        MR. MORRIS:  Objection to the form of the
12  question.
13        THE WITNESS:  I wouldn't have personally in
14  my role, but my team would have been involved in the
15  recording of those.
16    Q.  (BY MR. RUKAVINA)  And when payments were due
17  on this note, did you personally have any role with
18  respect to doing anything to facilitate those payments?
19    A.  When payments were due did I have anything --
20  yes.
21    Q.  What was your role?
22    A.  So my role, as part of the corporate team,
23  part of our role is managing cash at the various
24  entities.  So I was involved in weekly cash meetings,
25  where things like upcoming, whether it's an obligation

26

1  or a receipt, would be put on people's radars.
2        And we would, in connection with the 30-year
3  notes such as this one from NexPoint, we would either
4  confer with Jim or -- certainly Jim.  Also likely his
5  accountant.
6        In terms of teeing them up to make sure that
7  they were prepared from a cash flow statement to make
8  the payment.
9    Q.  What do you mean by his accountant?
10    A.  Melissa Schroth.
11    Q.  What do you mean by his?  That's a new name
12  to me.  Who is Melissa Schroth?
13    A.  I find it hard to believe that she's a new
14  name to you.  But I think her title was executive
15  accountant, and she was the keeper of Jim's -- many of
16  Jim's trusts and personal entities.
17    Q.  Was she a Highland employee?
18    A.  She was.  And when I say Highland, I should
19  be clear, Highland Capital Management, LP.
20    Q.  So when you say Jim's accountant, she was
21  still a debtor employee, just that she handled
22  primarily Jim's personal matters?
23    A.  She was still a Highland Capital Management,
24  LP employee but she did Jim's personal matters.
25    Q.  Did you have any role at either Highland

27

1  Capital Management or NexPoint Advisors as to a
2  decision as to whether any prepayments on this note
3  would ever be made?
4        MR. MORRIS:  Objection to the form of the
5  question.
6        THE WITNESS:  Can you repeat.
7    Q.  (BY MR. RUKAVINA)  Let's start from scratch.
8        Do you have any memory of any payments being
9  made on this note, Exhibit 13, prior to their scheduled
10  dates of payment?
11    A.  There were payments on -- and to be clear,
12  we're talking about the original 30.7- NexPoint
13  promissory note?  There were payments that I recall
14  happening throughout 2019 on this note.
15    Q.  And we can look at Exhibit 14.
16        MR. MORRIS:  What number?
17        MR. RUKAVINA:  14, 1-4.
18    Q.  (BY MR. RUKAVINA)  And those are only
19  numbered because Ms. Hendrix, they were used for her
20  deposition.
21    A.  Sure.  Just trying to keep these in order, I
22  apologize.  Got it.
23    Q.  Do you recognize Exhibit 14?
24    A.  Generally.  I can't say that I can verify
25  that this is completely accurate.  But it looks

28

1  familiar to a loan amortization schedule.
2    Q.  Would it have been maintained by Highland?
3    A.  Yes.
4    Q.  And I'll tell you that no one has yet to
5  authenticate this with a hundred percent precision, so
6  I'm not asking you to ratify these numbers, but let's
7  assume that they are what they are.
8        This does purport to show on the second page
9  a number of transfers in 2019, which goes along with
10  your recent answer.
11        Do you see those, sir?
12    A.  I do.
13    Q.  In particular, 750,000, then 1.3 million,
14  300,000, 2.1 million, 630,000, 1.3 million.
15        You see all those, sir?
16    A.  Yes, I see every one.
17    Q.  Do you have any memory, without going into
18  those transfers of those dates to the dollar, do you
19  have any memory that those transfers were made?
20    A.  Yes.  Again, not a specific recollection of
21  where I was at the time, but yes, I know that these
22  transfers were made.
23    Q.  Do you know why they were made in those
24  amounts and on those dates?
25    A.  No, not without speculating.

David Klos - October 27, 2021

**29**

1    Q.  What would be your speculation if you were to
2  speculate?
3    A.  My speculation would be that it would be for
4  liquidity needs at HCMLP, Highland Capital Management,
5  LP, needing liquidity to operate.  Again, that's
6  speculation.  I don't know for a fact that that's true,
7  but that's what I would assume.
8    Q.  Who would have made those decisions in 2019
9  to transfer those funds?
10    MR. MORRIS:  Objection to the form of the
11  question.
12    THE WITNESS:  Yeah, it would have been either
13  Frank or Jim.  I can't say with certainty, but one of
14  the two.  When I say Jim, I should be clear,
15  Mr. Dondero.
16    Q.  (BY MR. RUKAVINA)  Between January and
17  July 2019, do you have any recollection that there was
18  any particular liquidity issue or need at Highland
19  Capital Management?
20    A.  Yeah, Highland was dealing with liquidity
21  problems throughout 2019.  Maybe not every single day
22  of the year, but we were continuously needing to bridge
23  liquidity.
24    Q.  And you joined Highland in 2009.  From that
25  point in time, 2009, through 2019, was there any

**30**

1  practice at the enterprise of those businesses to
2  transfer funds between each other on a basis of when
3  one needed it and one had it?
4    A.  Yes, that was a fairly, generally speaking,
5  that was a fairly common practice, of using different
6  entities within the overall structure to bridge
7  liquidity.
8    Q.  Would that have been Mr. Dondero who, in the
9  final analysis, would have made those decisions?
10    A.  Maybe not a hundred percent, but I'd say
11  the -- if not a hundred percent, certainly most.
12    Q.  And who else might have participated,
13  Mr. Waterhouse?
14    A.  Potentially Mr. Waterhouse.  And the reason I
15  hedge on that a little bit is I don't think Frank would
16  have made any of these decisions on his own either.
17  But I may have heard them from Frank via Jim.
18    Q.  So in those same years, were you ever asked
19  by Mr. Dondero or Mr. Waterhouse as to whether funds
20  should be transferred from one entity to another for
21  liquidity purposes?
22    A.  Can you ask that again, please.
23    Q.  Yes.  Trying to understand, were you part of
24  those discussions as to whether these transfers should
25  be made, or did you just learn that a decision to make

**31**

1  them had been made and you executed them?
2    A.  Both, depending on the circumstances.
3    Q.  So sometimes you would be brought into a
4  discussion?
5    A.  Yes.
6    Q.  And can you think of any particular example?
7    A.  Of when I was brought into the discussion of
8  whether to transfer?  I can't think of an individual
9  example but we met quite regularly with Jim on cash.
10    So to the extent that either he needed cash
11  on one of his entities, he might let us know that.  Or
12  to the extent that Highland needed cash, we might let
13  him know that and ask for basically his assistance in
14  helping us to meet our own cash needs.
15    Q.  And did he usually find a way to facilitate
16  the cash need either at one of his entities or at
17  Highland?
18    A.  I suppose until October 16 of 2019.
19    Q.  Yes.  Prior to bankruptcy, do you recall any
20  instance where one entity wasn't able to transfer funds
21  to another for liquidity purposes?
22    A.  I can't think of a specific situation.  But
23  I'm sure there were situations where -- you know, cash
24  was always something that was being juggled, so I don't
25  know that necessarily liquidity could be met the same

**32**

1  day.
2    But eventually we were able to manage through
3  those situations, you know, oftentimes through some of
4  these loans.
5    Q.  In instances that you may remember when
6  Highland Capital Management needed liquidity, do you
7  know how Mr. Dondero decided from which other entity to
8  transfer the cash?
9    A.  I can't step into his brain and think about
10  his decision-making process, but if I was going to
11  oversimplify it I would speculate that it would be
12  based on who has cash in that moment.
13    Q.  Would he ask you or someone on your team who
14  had cash?
15    A.  At times, depending on which entity we're
16  talking about.  Because my team certainly didn't have
17  responsibility for every single entity in the
18  enterprise, but we did have responsibility for some.
19    Q.  And if your team -- so -- strike that.
20    So over the general -- talking about
21  generally now, over those 10 years when there were
22  these intercompany transfers for liquidity purposes,
23  how were they booked by the debtor, by Highland Capital
24  Management?
25    MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

33

1  question.
2        THE WITNESS:  Help me on the direction.  So
3  this is money that Highland is receiving or money that
4  Highland is sending?
5        Q.  (BY MR. RUKAVINA)  Sending out.
6        A.  Sending out.  So this is -- in the scenario
7  that you're describing, this money that Highland is
8  sending out to meet some other corporate obligor's
9  liquidity needs?
10       Q.  Yes, sir.
11       A.  So those would be booked as a loan.  I
12  would -- I need to hedge a little bit because I'm not
13  a hundred percent certain, but I would say if not
14  exclusively via loans close to exclusively.
15       Q.  And would they -- strike that.
16           Would they usually be papered up with a
17  promissory note?
18       A.  Yes.
19       Q.  Now, why was that the general course during
20  10 years?  Was there a policy and procedure in place,
21  or would Dondero say book it as a loan, or was that
22  just the right thing to do from an accounting
23  perspective?
24       MR. MORRIS:  Objection to the form of the
25  question.

34

1        THE WITNESS:  At the end of the day it's at
2  the direction of Jim Dondero, so I can't tell you
3  exactly why he wanted it to be done that way.  But that
4  was certainly the practice of how it was done in those
5  situations.
6        Q.  (BY MR. RUKAVINA)  To your knowledge, did Jim
7  Dondero ever tell you or anyone else that when Highland
8  is transferring funds to one of his affiliated entities
9  that it should always be booked as a loan?
10       A.  So remembering 10 years' worth of
11  conversations, I can't remember a specific instance
12  where he would have said, always book every single
13  transaction I direct you to do as a loan.  However,
14  that was the practice.
15       Q.  Different question.
16           Do you remember that in each instance, and
17  again, that might be unfair over 10 years, but do you
18  remember in each instance when Mr. Dondero said
19  transfer money from Highland to this other entity for
20  liquidity needs that he said book it as a loan?
21       MR. MORRIS:  Objection to the form of the
22  question.
23       THE WITNESS:  I can't recall with any
24  specificity what he may or may not have specifically
25  said so long ago.

35

1        Q.  (BY MR. RUKAVINA)  To your knowledge, was
2  there any written policy or procedure in place at
3  Highland Capital Management with respect to how
4  transfers from Highland to an affiliated entity should
5  be booked or treated?
6        A.  No written policy or procedure that I'm aware
7  of.
8        Q.  Is it fair to say that by May 2019, the
9  corporate accounting group had handled so many of these
10  transfers that it believed that if Highland was
11  transferring funds to another affiliated entity, it's
12  probably a loan?
13       MR. MORRIS:  Objection to the form of the
14  question.
15       THE WITNESS:  Yeah, I don't know that I can
16  answer that in terms of the corporate accounting team.
17  That just feels way too broad.
18           It was certainly the practice that when
19  somebody needed liquidity and it was appropriate from an
20  accounting perspective, that's how it would be booked.
21           And there was no reason to doubt that that was
22  the appropriate way to do it, particularly with
23  direction from either Frank or Jim.
24       Q.  (BY MR. RUKAVINA)  Is it your testimony that
25  in each instance that happened, that either Frank or

36

1  Jim said, this is a loan, the "this" being the transfer
2  from Highland to an affiliated entity for liquidity
3  purposes?
4        MR. MORRIS:  Objection to the form of the
5  question.
6        THE WITNESS:  I can't recall with that level
7  of specificity if those words came out of Jim's mouth.
8  But with 0 percent doubt in my mind, every single one
9  of those loans was done with the authority of Jim or
10  Frank, or both.
11       Q.  (BY MR. RUKAVINA)  So going back to this
12  Exhibit 14, now I'm going to ask you about these
13  payments coming in.
14           Assuming that these payments were actually
15  made in 2019 --
16           And I think, John, you sent me this morning,
17  or maybe last night, some bank statements?
18       MR. MORRIS:  I actually sent all of the
19  backup for all payments made, I think, under the notes
20  at issue a week or two ago.
21       Q.  (BY MR. RUKAVINA)  How would -- so assuming
22  that these payments in 2019 that NexPoint made didn't
23  technically have to be made at that point in time, how
24  would Highland have booked these payments?
25       A.  So I can't tell the column headers, so you'll

David Klos - October 27, 2021

37

1  have to excuse me if I flip them.
2      Q.  They'll be on the first page.  Rip the page
3  off if you need to.
4      A.  First one is interest, second one is
5  principal.  On the far right is the actual amount of
6  the payment.  So, for example, March 29, 750,000.
7          And the -- the column that has the negative
8  411,000 is the application of interest and the 338- is
9  the application of principal.
10     Q.  So again, if Highland -- strike that.
11         If NexPoint made a payment that was not
12 technically due at that point in time, it would be
13 recorded as payments on principal and interest?
14     A.  It would be recorded as it's reflected in the
15 schedule.  So there's an application of interest and an
16 application of principal.
17     Q.  So based on your understanding and
18 experience, if that payment wasn't due at that time,
19 would it have been a prepayment by NexPoint?
20         MR. MORRIS:  Objection to the form of the
21 question.
22         THE WITNESS:  Yeah, I'm not sure that it's a
23 prepayment or not.  It's certainly a payment.  It's
24 certainly voluntary.  It's not spelled out under the
25 schedule.  I don't know that it's a per se, capital P,

38

1  prepayment.  I'm just not certain.
2      Q.  (BY MR. RUKAVINA)  Well, maybe without
3  respect to these specific transfers.
4          Generally, generally, if one of the Dondero
5  affiliates made a payment that wasn't scheduled, how
6  would the debtor have accounted for that payment?
7      A.  It would have recorded the payment as a
8  reduction to either or both outstanding accrued
9  interest or principal.
10     Q.  You wouldn't call those prepayments?
11     A.  I don't know the definition of prepayment.
12 It's a payment.  It's off schedule, but I don't know
13 whether it's a per se prepayment.
14     Q.  Would that be something in your experience
15 that we would look at the promissory note to maybe
16 determine?
17         MR. MORRIS:  Objection to the form of the
18 question.
19         THE WITNESS:  I don't know.
20     Q.  (BY MR. RUKAVINA)  Well, remember, I'm asking
21 you the same question just in different ways.
22         Who decides at the debtor, or how does the
23 debtor decide, if an unscheduled payment is made, how
24 to apply it?
25         MR. MORRIS:  Objection to the form of the

39

1  question.
2      Q.  (BY MR. RUKAVINA)  And his objection is
3  valid.  And just to give you a little bit of a fine
4  point, does someone look at the promissory note to
5  decide that?  Or is there some other rule or procedure
6  that someone looks at?
7          MR. MORRIS:  Objection to the form of the
8  question.
9          THE WITNESS:  So the person -- I don't know
10 that I can specifically name a person because the role
11 probably changed over time.
12         But either our corporate accountant, or the
13 corporate accountant's boss, which was Kristin Hendrix
14 for years, would have been responsible for recording and
15 tracking those payments.
16         So some combination of the corporate
17 accountant and Kristin would have applied those
18 payments, and that rolls up through my and Frank's
19 review ultimately.
20     Q.  (BY MR. RUKAVINA)  So if I can round off this
21 discussion, I think you told me a few minutes ago that
22 in each instance that Highland was transferring money
23 out to an affiliate.
24         Whether or not you remember Dondero or
25 Waterhouse saying it's a loan, it would have been a

40

1  loan because that's how it always was and it was always
2  authorized.  Generally correct?
3          MR. MORRIS:  Objection to the form of the
4  question.
5          THE WITNESS:  There were a few "always" and
6  "generallys" in there.  And like I said, when it came
7  to liquidity needs, my recollection is that these would
8  be handled via loans.
9      Q.  (BY MR. RUKAVINA)  And in reverse, if a
10 Dondero entity made a payment prior to a scheduled
11 payment on a note, generally there would be credit
12 against principal and/or interest provided on that
13 note?
14         MR. MORRIS:  Objection to the form of the
15 question.
16         THE WITNESS:  Generally speaking, yes, if the
17 payment was for payment on the note.
18     Q.  (BY MR. RUKAVINA)  Well, that goes back to my
19 question.
20         Do you know how these payments on Exhibit 14
21 in 2019 were determined to be payments on these notes,
22 as opposed to a transfer from NexPoint to Highland for
23 some other reason?
24     A.  What other reason would it be, if I can be so
25 bold.

David Klos - October 27, 2021

**41**

1    Q.  Can you think of any other reason in 2019?
2    A.  Well, Highland had -- Highland had shared
3 services and intercompany agreements with NexPoint, at
4 this time.
5        But these were not payments that could
6 possibly be confused with those payments.  These are
7 off cycle, they're larger amounts, and there's nothing
8 that they could be other than payments against the
9 loan.
10   Q.  So I asked you before, and I think you said
11 that you were speculating with respect to these
12 payments, that Highland needed money at that time.
13       Do you recall in 2019 any discussions with
14 anyone, Dondero or Waterhouse, to the effect that
15 NexPoint has excess cash so maybe NexPoint should
16 transfer some money to Highland?
17       MR. MORRIS:  Objection.  Asked and answered.
18       THE WITNESS:  Do I still answer?
19   Q.  (BY MR. RUKAVINA)  Yes.
20       MR. MORRIS:  Yes.
21       THE WITNESS:  And sorry, I got lost there.
22   Q.  (BY MR. RUKAVINA)  Yes.  So my predicate was
23 you testified before that you were assuming that these
24 payments were because of a cash need at Highland;
25 right?

**42**

1    A.  Correct.
2    Q.  So with that predicate my question is, do you
3 recall discussing with Dondero or Waterhouse or with
4 anyone as to why NexPoint would be transferring money
5 to Highland at that time?
6    A.  Yes, I would have had conversations with
7 Mr. Dondero or Mr. Waterhouse.
8    Q.  And do you remember specifically in 2019 why
9 these transfers were made from NexPoint as opposed to
10 some other Dondero entity?
11   A.  Not with specificity, but certainly NexPoint
12 was generating cash at that time, and had the ability
13 to assist with Highland's liquidity.
14   Q.  So sitting here today, you've told me
15 generally and logically that you have no specific
16 memory why between January 2019 and August 2019, any of
17 these payments on Exhibit 14 were made by NexPoint?
18   A.  I have no specific memory, but I would say
19 with certainty that most or all of this was driven by
20 Highland HCMLP liquidity needs.
21   Q.  And most or all of this would have been
22 Highland in the first instance going to NexPoint and
23 saying, hey, can you send us some cash?
24       MR. MORRIS:  Objection to the form of the
25 question.

**43**

1        THE WITNESS:  Yeah, the premise of that,
2 given that Mr. Dondero is in control of both sides,
3 it's a faulty premise.
4    Q.  (BY MR. RUKAVINA)  But you told me not that
5 long ago that in these weekly cash meetings that it
6 would be your team at Highland who would go to
7 Mr. Dondero and say Highland has a liquidity issue.
8        So wouldn't that liquidity issue have
9 originated with the Highland team?
10   A.  Mr. Dondero is the president of Highland.
11 He's the president of NexPoint.  We're employees of
12 Highland.  We're also shared services providers for
13 NexPoint.
14       The waters are very muddy in terms of who is
15 wearing what hat in that conversation.
16   Q.  But Mr. Dondero doesn't know that Highland
17 has a liquidity issue unless someone from the corporate
18 accounting group tells him, does he?
19       MR. MORRIS:  Objection to the form of the
20 question.  I hope that's not the case.
21       THE WITNESS:  He has the ability to know what
22 our cash position is at any given time, at that time.
23   Q.  (BY MR. RUKAVINA)  So why would you have
24 these weekly cash meetings with Mr. Waterhouse and
25 sometimes Mr. Dondero?

**44**

1    A.  So these were cash forecasts, looking at
2 outlook.  I can tell you almost without exception,
3 maybe -- with maybe without exception, be speculating,
4 but those forecasts would be showing negative numbers
5 at Highland, virtually nonstop.
6        And so it was important, my opinion, but it
7 was probably important to Frank to make sure that he
8 was getting in front of Jim to make sure that those
9 needs were being addressed timely.
10   Q.  So I've asked that question.  I want to ask
11 you a different question.
12       For any of these payments between
13 January 2019 and August 2019 reflected on Exhibit 14,
14 do you have any personal knowledge as to whether they
15 were intended to be prepayments or not?
16       MR. MORRIS:  Objection to the form of the
17 question.
18       THE WITNESS:  I don't know whether they were
19 intended to be prepayments at that time.
20   Q.  (BY MR. RUKAVINA)  Sitting here today, seeing
21 this document as a CPA and as a sophisticated person,
22 do you read this Exhibit 14 to indicate that those
23 payments were booked as prepayments?
24       MR. MORRIS:  Objection to the form of the
25 question.

David Klos - October 27, 2021

**45**

1    THE WITNESS:  Again, the term "prepayments"
2  is the one I'm struggling with.  I can ascertain that
3  there are payments and they're off schedule.  But I
4  don't know that I can ascertain that they're
5  prepayments.
6    Q.  (BY MR. RUKAVINA)  Well, if a borrower makes
7  a payment that's ahead of schedule, how would that
8  generally be accounted for?
9    MR. MORRIS:  Objection to the form of the
10  question.
11    THE WITNESS:  It would be accounted for as a
12  reduction of principal or interest or some combination
13  of the two.
14    Q.  (BY MR. RUKAVINA)  Which would relieve the
15  borrower of having to make that at some point in the
16  future; right?
17    MR. MORRIS:  Objection to the form of the
18  question.
19    THE WITNESS:  No.  The borrower still owes
20  the money.  This is showing 23-point -- pick a date.
21  May 31, 23.034-.  That there's significant obligations
22  that are still outstanding.
23    Q.  (BY MR. RUKAVINA)  So on June 4, 2019 -- I'm
24  sorry, on June 19, 2019, the borrower made a
25  $2.1 million payment.  That's what this shows; correct?

**46**

1    A.  I see that.
2    Q.  You're not saying that the borrower would
3  ever have to make that same $2.1 million payment again,
4  are you?
5    A.  No.  What I'm saying is, based on that 2.1-
6  payment -- and this is reading this cold.
7    But based on that 2.1- payment, 66,000 was
8  applied to interest, which left zero accrued interest
9  outstanding.  2.03- applied to principal, which left
10  24.7- and change still outstanding.
11    Q.  Well, I'm going to ask you about the
12  promissory note then, Exhibit 13, in particular
13  Section 3, where it says prepayment allowed.
14    And the first sentence says, may or -- pardon
15  me, maker may prepay in whole or in part the unpaid
16  principal or accrued interest of this note.
17    Do you see that, sir?
18    A.  Yes, I see that.
19    Q.  In your experience, can someone prepay
20  accrued interest?
21    MR. MORRIS:  Objection to the form of the
22  question.
23    THE WITNESS:  The document reads, maker may
24  prepay in whole or in part the unpaid principal or
25  accrued interest of this note.  So I read that to say

**47**

1  that the maker may pay outstanding accrued interest, or
2  unpaid principal.
3    Q.  (BY MR. RUKAVINA)  But my question is, as I
4  understand accrued interest, it means interest that has
5  already occurred or accrued as of the date, like
6  today's date; right?
7    A.  Uh-huh.
8    MR. MORRIS:  Objection to the form of the
9  question.
10    Q.  (BY MR. RUKAVINA)  Do you agree with that?
11    Do you agree with that?  Accrued interest
12  means interest that has already come due, that has
13  actually happened because interest happens over time.
14    A.  Accrued interest --
15    MR. MORRIS:  Objection to the form of the
16  question.
17    Q.  (BY MR. RUKAVINA)  Why don't you start.  Why
18  don't you define for me accrued interest.
19    A.  Sure.  Accrued interest would be outstanding
20  and unpaid interest that -- sorry, it's hard to define
21  it without using the term.  But it's interest that's
22  accumulated in respect of a principal amount through a
23  given date.
24    Q.  So how do you prepay accrued interest?
25    A.  How do you prepay accrued interest.  Again,

**48**

1  that's a little bit of a mental jumble.
2    Q.  Exactly.
3    A.  Well, what I'm...
4    Q.  To me one pays accrued interest.  But this
5  note says you can prepay accrued interest.  So I'm just
6  seeing whether you as a CPA, CFO and controller for
7  years agrees that one can prepay accrued interest?
8    MR. MORRIS:  Objection to the form of the
9  question.
10    THE WITNESS:  Frankly, I don't know if it's
11  possible.  That's not how I'm seeing it applied here,
12  based on the quick review of Exhibit 14.
13    Q.  (BY MR. RUKAVINA)  Well, the next sentence
14  says, any payments on this note shall be applied first
15  to unpaid accrued interest hereon, and then to unpaid
16  principal hereof.
17    Do you see that, sir?
18    A.  I see that.
19    Q.  Do you have any understanding based either on
20  your personal knowledge or in your expertise as a CPA
21  and a CFO as to what that sentence means?
22    MR. MORRIS:  Objection to the form of the
23  question.
24    THE WITNESS:  The way that I would read that
25  would be that for a payment, for example, pick a date,

David Klos - October 27, 2021

---

**49**

1  Exhibit 14 again, the $2.1 million payment on or about
2  June 19. I see that a payment was made.
3        And it was -- it appears that there was
4  accrued and unpaid interest at that time of 66,000. And
5  so the first 66,000 was applied to outstanding accrued
6  interest, to bring the balance to zero.
7        And the difference between that 66,000 and the
8  2.1 million was applied to principal.
9    Q.  (BY MR. RUKAVINA)  Do you believe, whether
10  from personal knowledge from this note, Exhibit 13, or
11  your experience at Highland or as a CPA, that one can
12  say that interest, accrued interest will be due on a
13  future date, it will accrue by that date, but I'm going
14  to pay it earlier as of that date?
15       MR. MORRIS:  Objection to the form of the
16  question.
17       THE WITNESS:  If I can rephrase back to you
18  just so I make sure I'm understanding the question.
19  You're saying could someone say, I would like to prepay
20  interest into the future.  It hasn't accrued yet, but
21  it will be accrued by end of year.
22       And I would like to be prepaid effectively
23  with respect to that interest, and then have the
24  remainder used to pay down principal.
25       The question is, can someone do that?

---

**50**

1    Q.  (BY MR. RUKAVINA)  Yes.
2        MR. MORRIS:  I object to the question.
3        THE WITNESS:  I suppose it's possible, but
4  that certainly wasn't the practice if that makes sense.
5    Q.  (BY MR. RUKAVINA)  That does make sense.  I'm
6  still struggling, and again, I'm not trying to be a
7  smart aleck. I'm still struggling with the first
8  sentence of paragraph 3, that maker may prepay accrued
9  interest.
10       And it sounds like to me like you don't
11  necessarily have a definitive answer as to what that
12  might have meant either.
13       MR. MORRIS:  Objection to the form of the
14  question.
15       THE WITNESS:  I think the document speaks for
16  itself in that sentence.
17    Q.  (BY MR. RUKAVINA)  But have you seen
18  something like this, to your recollection, in other
19  Highland promissory notes?
20    A.  Something like what?
21    Q.  Prepaying accrued interest.
22    A.  Yes, I have seen that.
23    Q.  What's your memory?  Where have you seen
24  that?
25    A.  I can't remember a specific note, but I

---

**51**

1  believe that has been done in a specific circumstance.
2    Q.  So at least at Highland, you would believe
3  that that phrase, prepaying accrued interest, had some
4  established meaning at Highland?
5        MR. MORRIS:  Objection to the form of the
6  question.
7        THE WITNESS:  No, I don't agree with that.
8    Q.  (BY MR. RUKAVINA)  Okay.  You understand, of
9  course, that it's Highland's position that with respect
10  to this note, a payment was due on December 31 of 2020
11  that wasn't made; correct?
12    A.  Yes, it's my understanding -- if I can state
13  it back just so I make sure I'm getting it correctly.
14  It's my understanding that there was a payment due on
15  December 31, 2020, that wasn't made timely, yes.
16    Q.  Okay.  Do you know why that payment wasn't
17  made timely?
18    A.  By recollection, because Mr. Dondero had
19  directed people not to process payments from Highland
20  affiliates to Highland.
21    Q.  When did you learn of that?
22    A.  Early December 2020.
23    Q.  How did you learn of that?
24    A.  I don't specifically remember the
25  conversation, but I know I had conversations with both

---

**52**

1  Kristin and Frank.  I can't remember if those were
2  individual or collective, but we understood that to be
3  the marching orders.
4    Q.  Did you hear Mr. Dondero say anything like
5  that?
6    A.  I did not.
7    Q.  Did Mr. Waterhouse tell you that Mr. Dondero
8  said something like that to him?
9    A.  Yes.
10    Q.  Okay.  Separately, do you remember whether
11  Ms. Hendrix told you that Mr. Waterhouse told her that,
12  or would it have been kind of at the same meeting?
13    A.  I don't remember specifically.  It would have
14  been all around the same time.
15    Q.  And to the best of your recollection, what
16  words -- strike that.
17       To the best of your recollection, did
18  Mr. Waterhouse include a reference to promissory notes
19  and the Advisors when he said that Dondero told him not
20  to make payments?
21       MR. MORRIS:  Objection to the form of the
22  question.
23       THE WITNESS:  I don't remember the specific
24  words that Mr. Waterhouse used.  My clear impression
25  was that it was a very global instruction.

---

David Klos - October 27, 2021

---

**53**

1          And I should clarify also that, you know, at
2 this time, I think as we covered in my background.
3          At this point I had assumed the chief
4 accounting officer role, so I wasn't necessarily in
5 the -- in as much of the chain of command as I had been
6 previously to taking that role, where that sort of thing
7 might have come from Frank, to me, to Kristin.
8          By this time, Frank and Kristin were
9 communicating and I was sometimes in the loop, sometimes
10 not.
11     Q.  (BY MR. RUKAVINA)  Did Mr. Waterhouse tell
12 you why Dondero had told him that?
13     A.  I don't remember with any specificity.
14 However, my perception at the time was that at this
15 time the relationship between Mr. Dondero and Mr. Seery
16 was hopelessly broken, and that this was Jim Dondero,
17 you know, gearing up for a fight in the future.
18     Q.  Prior to December of 2020, had you prepared a
19 report showing potential overpayments that NexPoint and
20 HCMFA had made on account of shared services and
21 payroll reimbursement?
22         MR. MORRIS:  Objection to the form of the
23 question.
24         You can answer.
25         THE WITNESS:  I know the analysis that you're

---

**54**

1 talking about.  I would not characterize it the way
2 that you characterized it.
3     Q.  (BY MR. RUKAVINA)  And we'll talk about this
4 more in November, so I really don't want to go into any
5 detail, unless you feel the need to.
6         But, so you did not prepare that analysis?
7         MR. MORRIS:  Objection to the form of the
8 question.
9         THE WITNESS:  I prepared an analysis that
10 differed from how you described it.
11     Q.  (BY MR. RUKAVINA)  How would you describe it,
12 in a nutshell?
13     A.  I would describe it as I was asked to refresh
14 a spreadsheet using certain assumptions, based on the
15 direction of Frank Waterhouse, and I updated and I sent
16 him an email.
17     Q.  Do you have any understanding that that
18 analysis was then shared with Mr. Dondero by
19 Mr. Waterhouse?
20     A.  I know that now.  I didn't know that at the
21 time.
22     Q.  Do you have any understanding -- strike that.
23         Did you have any understanding that as of
24 early December 2020 the reason why Mr. Dondero said
25 what he said to Mr. Waterhouse was because that

---

**55**

1 analysis, right or wrong, suggested that the Advisors
2 had made large overpayments?
3         MR. MORRIS:  Objection to the form of the
4 question.
5         THE WITNESS:  No, that's incorrect.
6     Q.  (BY MR. RUKAVINA)  Why is that incorrect?
7     A.  Because by recollection, to the best of my
8 recollection, that analysis didn't occur until after
9 Dondero had told Frank no more payments.
10     Q.  Is that the only reason why you might suspect
11 that what I just said was incorrect?
12         MR. MORRIS:  Objection to the form of the
13 question.
14         THE WITNESS:  Yeah, I don't know how to
15 answer that.
16     Q.  (BY MR. RUKAVINA)  I'm going back, when I
17 asked you, did Waterhouse tell you why Dondero gave the
18 direction, you said no.
19         MR. MORRIS:  Objection to the form of the
20 question.
21         THE WITNESS:  Sorry, I'm not sure.  If I
22 could have the question asked again, I'd be happy to
23 answer.
24     Q.  (BY MR. RUKAVINA)  I'll ask it again.
25         Mr. Waterhouse tells you that Mr. Dondero

---

**56**

1 basically said no more payments; right?
2     A.  Yes.
3     Q.  And, but he did not tell you why Mr. Dondero
4 said that?
5     A.  Not that I can recall.
6     Q.  So he might have?
7     A.  He might have.  I don't specifically
8 remember.
9     Q.  Do you recall asking him or anyone else why
10 Dondero would have said that?
11         MR. MORRIS:  Objection.  Asked and answered.
12         THE WITNESS:  I don't recall specifically
13 asking.
14     Q.  (BY MR. RUKAVINA)  Do you recall telling
15 Mr. Seery that Dondero said anything like that?
16     A.  At what point in time?
17     Q.  Prior to December 31, 2020.
18     A.  No, I did not.  I did not say that to
19 Mr. Seery.
20     Q.  In your mind was there any present
21 understanding or concern that NexPoint therefore
22 wouldn't make a scheduled December 31, 2020, payment?
23     A.  Was there any concern that they wouldn't?
24     Q.  Yeah.
25     A.  I would never use the word "concern."  At

---

David Klos - October 27, 2021

57

1 that point I wasn't even on the team anymore, so I hate
2 to say it's other people's problem, but I had my hands
3 full with plenty of other things. It wasn't something
4 I was thinking about.
5     Q.  Do you remember here today that prior to
6 December 31, 2020, you believed that NexPoint would not
7 make the scheduled payment?
8         MR. MORRIS:  Objection to the form of the
9 question.
10        THE WITNESS:  I had no idea whether NexPoint
11 was going to make the payment.
12     Q.  (BY MR. RUKAVINA)  Were you asked prior to
13 December 31, 2020 by Mr. Seery or anyone else as to
14 whether NexPoint was going to make that payment?
15     A.  Was I asked by Mr. Seery?  Not that I can
16 remember.
17     Q.  Prior to December 31, 2020, do you recall any
18 discussion with Mr. Seery about the NexPoint note?
19        MR. MORRIS:  I'm sorry, can I have the
20 question again.
21     Q.  (BY MR. RUKAVINA)  Prior to December 31,
22 2020, do you recall any discussion that you had with
23 Mr. Seery about this NexPoint note?
24     A.  Not that I can remember.  If there was, it
25 would have been in a cash meeting, but I don't remember

58

1 at all.
2     Q.  So it might have been some detail as part of
3 a larger discussion, but you don't remember any
4 specific discussion just around this note?
5     A.  No.
6     Q.  When did you learn or how did you learn that
7 the December 31 payment had not been made?
8     A.  I'm not sure, but certainly after
9 December 31.
10     Q.  Do you recall if it was before or after
11 January 7?
12     A.  I think it was after.
13     Q.  The default letter from Highland is in here,
14 if you need to see it.  I'm just telling you it's the
15 January 7.
16        Do you recall having any role with respect to
17 drafting the default letter that went out to NexPoint
18 after the failed payment?
19     A.  No, none that I can remember.
20     Q.  How do you recall learning that the note had
21 been called by Highland?
22     A.  I honestly don't remember.  I think after the
23 fact.  I couldn't tell you how far after the fact.
24     Q.  Are you aware that on or about July -- I'm
25 sorry, January 14, 2021 NexPoint made a $1.4 million

59

1 and change payment?
2     A.  Yeah, I'm aware that that payment happened.
3     Q.  When did you become aware of that payment?
4     A.  I think after it happened.
5     Q.  Can you tell us, was it days, weeks, months
6 later?
7     A.  It was that day.  And if I can expand, I
8 recall getting an email, seeing a large inflow to
9 Highland, to MLP because I was on an email distribution
10 list that had those payments.
11        And I think I emailed or called Kristin and
12 asked her, is this the NexPoint note, because it was a
13 large amount of money.  And she said yes.
14     Q.  Did she tell you anything more about that
15 payment, when it had been made, why, who authorized it?
16     A.  I had that information of when it had been
17 sent. I had a wire confirm.
18     Q.  Only important thing to you is where did that
19 money come from?
20     A.  It wasn't important to me.  It was more
21 curiosity.
22     Q.  Did you have any discussions with anyone on
23 or about that time, January 14, 2021, as to why
24 NexPoint made that payment?
25     A.  Not that I can remember.

60

1     Q.  Did you have any discussion with anybody on
2 or about that time, January 14, 2021, as to how HCMLP
3 should account for that payment?
4     A.  No.
5     Q.  Did you have any discussion with Mr. Seery at
6 all about whether that payment should or shouldn't
7 reinstate the note?
8     A.  No discussion that I can remember.
9     Q.  Is it fair to say that any of those
10 considerations would have been at that point in time
11 above your paygrade?
12        MR. MORRIS:  Objection to the form of the
13 question.
14        THE WITNESS:  Yeah, paygrade, I don't know
15 how to respond to that.  Like I said before, I wasn't
16 on the team at that point.  I wouldn't have been
17 involved in that determination regardless of my
18 compensation.
19     Q.  (BY MR. RUKAVINA)  So you know and you
20 remember that in early December 2020 Frank Waterhouse
21 told you that Dondero had directed no more payments by
22 the Advisors.  And you know that a payment was made on
23 January 14.
24        And that's pretty much the extent of your
25 knowledge about the missed December 31 payment?

David Klos - October 27, 2021

**61**

1    MR. MORRIS: Objection to the form of the
2 question.
3    THE WITNESS: Yeah, it's a very broad
4 question. In general terms, yes.
5    Q. (BY MR. RUKAVINA) Well, I'm not asking what
6 you learned since then.
7    I'm asking that as of, let's say, January 15,
8 2021 that would have been the extent of what you would
9 have known?
10    A. Correct. And if I can just restate and make
11 sure I understand what I'm saying.
12    It would have been my understanding that we
13 had had an instruction -- when I say "we," Kristin and
14 Frank and by default the whole corporate team -- not to
15 make payments from these affiliated entities.
16    To my knowledge, none of those payments had
17 occurred since that point. And then on or about
18 January 14, such a payment was made and I found out
19 about that by seeing a wire confirm.
20    Q. Well, you mentioned a couple times that you,
21 in December 2020, you weren't part of that group
22 anymore. So do you have any understanding as to why
23 Mr. Waterhouse would have told you in particular, you
24 being Mr. Klos, about that instruction from Dondero?
25    A. Sure. I still was participating in cash

**62**

1 meetings, even if it was almost in a nominal role,
2 because of some of my history that I had. So I was
3 still participating in those meetings.
4    I've worked closely with Kristin for a long
5 time, so I may have caught up with her informally. But
6 as far as day-to-day duties, I wasn't part of that team
7 anymore.
8    Q. And is it your, did I understand you
9 correctly, is it your testimony that Mr. Waterhouse
10 informed the whole accounting group there, the
11 corporate accounting group, of Mr. Dondero's
12 instruction?
13    A. I don't know specifically who he told, if he
14 told every single member of the team, but he certainly
15 told Kristin and Kristin was the head of the team.
16    Q. And you don't recall anyone, after you heard
17 about that instruction, raising any concern to the
18 effect that NexPoint is going to default and be in
19 trouble if that payment isn't made?
20    A. I don't remember any discussion to that
21 effect.
22    Q. Do you remember anyone suggesting that they
23 ought to try to dissuade Mr. Dondero from that
24 direction?
25    A. Not that I can remember.

**63**

1    Q. Do you remember any discussion at that
2 approximate point in time for your cash meetings or
3 anything else as to whether NexPoint had made any
4 prepayments on the promissory note?
5    MR. MORRIS: Objection to the form of the
6 question.
7    THE WITNESS: Yeah, it's very hard to -- by
8 the way, I've said yeah a few times. I want to make
9 clear that that's just --
10    Q. (BY MR. RUKAVINA) That's not a yes?
11    A. I apologize for that.
12    Q. Understood. Yeah means, it's not a yes.
13    MR. MORRIS: It's a pause; it's an um.
14    Q. (BY MR. RUKAVINA) Germans call it flavoring
15 particle.
16    A. Sorry, I got lost there. If you can ask
17 again.
18    Q. Yeah. Do you recall in November or
19 December 2020 in your weekly meetings or anything else,
20 any discussion whatsoever concerning whether NexPoint
21 had made any prepayments on its note?
22    A. No discussions of whether or not there had
23 been a prepayment that I can remember, no.
24    Q. To the best of your knowledge sitting here
25 today -- strike that.

**64**

1    For my next question, again we're assuming
2 that Exhibit 14 is what it appears to be.
3    A. Sure, sure.
4    Q. So with that qualification, to the best of
5 your knowledge, other than what's on Exhibit 14, can
6 you think of any other record or source or document
7 that would address whether any unscheduled payments by
8 NexPoint would or wouldn't be prepayments on the note?
9    MR. MORRIS: Objection to the form of the
10 question.
11    THE WITNESS: Again, with the struggle of the
12 prepayment, this is the document that I would expect to
13 explain how the payment was applied.
14    Q. (BY MR. RUKAVINA) But you yourself did not
15 play any role in deciding how the payment would be
16 applied?
17    A. I'd hesitate to say no role, because the team
18 ultimately rolls up to me.
19    Q. You personally?
20    A. Me personally, I wouldn't have prepared these
21 schedules.
22    Q. Or decided, you personally, as Mr. Klos, how
23 any unscheduled payments should be accounted for by
24 Highland?
25    A. Correct, not without some -- some

David Klos - October 27, 2021

**65**

1 authoritative direction on how they should be applied.
2     Q.   And that authoritative direction would have
3 come from Mr. Waterhouse or Mr. Dondero?
4     A.   That's what I would expect.
5     Q.   Could it have come from anyone else that you
6 can think of here today?
7     A.   Not that I can think of.
8     Q.   Now we're going to switch gears and I think
9 we're going to stop discussing the NexPoint note, and
10 we're going to focus on the HCMFA two promissory notes.
11     A.   Sure.
12     Q.   So we're going to go back in time to
13 May 2019; okay?
14     A.   Sure.
15     Q.   And is it fair to say by -- that by May 2019
16 there were at least dozens if not hundreds of instances
17 of intercompany loans in the years leading up there
18 from Highland to one of the other entities?
19         MR. MORRIS:  Objection to the form of the
20 question.
21         THE WITNESS:  From Highland to one of the
22 other entities.  Can you help with other entities.
23     Q.   (BY MR. RUKAVINA)  Advisors, the trusts, any
24 of the Dondero entities?
25         MR. MORRIS:  Objection to the form of the

**66**

1 question.
2         THE WITNESS:  Yes, there would have been many
3 loans over the years.
4     Q.   (BY MR. RUKAVINA)  And do I understand that
5 most, if not all, of those loans should have been
6 papered up with a written promissory note?
7         MR. MORRIS:  Objection to the form of the
8 question.
9         THE WITNESS:  Should have been.  To the
10 extent that they were for a promissory note, then yes.
11     Q.   (BY MR. RUKAVINA)  So in the May 2019 time
12 frame, was there a regular pattern or course or
13 procedure in place as to how a promissory note would be
14 physically prepared and presented for approval?
15         MR. MORRIS:  Objection to the form of the
16 question.
17         THE WITNESS:  Yeah, when you say a process,
18 can you please clarify that for me.
19     Q.   (BY MR. RUKAVINA)  Sure.  Let's look at these
20 two promissory notes and maybe that will help frame the
21 question.  And I apologize for not having them right
22 here.
23     A.   It might be --
24         MR. MORRIS:  1 and 2.
25         MR. RUKAVINA:  Yes.

**67**

1     Q.   (BY MR. RUKAVINA)  Are you familiar with
2 Exhibits 1 and 2, sir?
3     A.   Yes, I am.
4     Q.   Do you remember them from back -- strike
5 that.
6         Did you have any role, to your knowledge,
7 with the preparation of Exhibits 1 and/or 2?
8     A.   With the preparation of the documents?
9     Q.   Yeah.
10     A.   No.
11     Q.   But you did have some role with these
12 promissory notes?
13     A.   Yes.
14     Q.   And I'm trying to find that email as well.
15 There's an email here from you.  I'll have it in a
16 moment.  That will help frame the question.
17         MR. MORRIS:  Exhibit 3.
18     Q.   (BY MR. RUKAVINA)  Do you recall that email,
19 sir?
20     A.   Not specifically, but it's right in front of
21 me.  I'm certain that I wrote this email.
22     Q.   You have no reason to deny or reject its
23 authenticity?
24     A.   I have no reason to reject it or question it.
25     Q.   Just give me a second.  I don't understand

**68**

1 what's going on with my exhibits.  I just don't
2 understand this.
3         (Off the record.)
4     Q.   (BY MR. RUKAVINA)  You have Exhibit 3 in
5 front of you?
6     A.   I do.
7     Q.   And it says, please send 2.4 million from
8 HCMLP to HCMFA.  This is a new interco.
9         Meaning intercompany; right?
10     A.   Correct.
11     Q.   This is a new intercompany loan.
12         Who told you that this was an intercompany
13 loan?
14     A.   Either Frank or Jim.  I would suspect Frank.
15     Q.   Do you have any present memory of him telling
16 you that with respect to this particular loan?
17     A.   I don't have a specific recollection, but
18 with a hundred percent certainty he or Jim would have
19 directed that.
20     Q.   Would they have directed the payment, or
21 would they have directed that it be papered as a loan,
22 or both?
23     A.   Both.
24     Q.   So in each instance -- well, let's take a
25 step back.

David Klos - October 27, 2021

---

**69**

1      So certainly either Jim or Frank directed you
2 to transfer the $2.4 million; correct?
3      A.  Either Jim or Frank would have directed, yes.
4 There's 0 percent chance I would have sent this email
5 if I didn't feel a hundred percent confident that this
6 was authorized in the way that I described in the
7 email.
8      Q.  But can you also say with certainty that
9 either Dondero or Waterhouse also told you that this
10 transfer is an intercompany loan?
11      A.  With a hundred percent certainty, yes.  I
12 can't say that necessarily with respect to Dondero,
13 because I don't remember if I would have talked to him
14 specifically about it.  But, yes, this would have been
15 clear that it's a loan.
16      Q.  You say clear.  Did someone tell you that
17 it's a loan, or are you just, because of the prior
18 10 years of course and conduct, logically deciding that
19 it has to be a loan?
20      MR. MORRIS:  Objection to the form of the
21 question.
22      THE WITNESS:  So this is -- this is not just
23 a situation of past practice.  I would have known with
24 certainty that this was a loan and that's what was
25 authorized.

---

**70**

1      Q.  (BY MR. RUKAVINA)  How would you have known
2 with certainty that it was a loan?
3      A.  I'll say in part because of past practice,
4 but also because of the nature of what the money was
5 going to be used for, and the background behind it.
6      Q.  So you knew that nature and that background?
7      A.  The nature and background of the 2.4 million,
8 yes.
9      Q.  So you've told me that in part -- I asked you
10 how did you know it was a loan.  You said in part past
11 practices, in part you knew the nature.  Anything else?
12      A.  I'm certain that given that I wrote this
13 email, which Frank is on, that I would have had a
14 conversation with Frank about what this was.
15      Q.  Was Jim Dondero in the corporate accounting
16 email?
17      A.  No, he wasn't.
18      Q.  So what is your understanding as to what this
19 $2.4 million was for?
20      A.  This related to -- well, to separate the
21 transaction, the 2.4- itself relates to a promissory
22 note.  That's what was executed.
23      HCMFA's use of the 2.4 million was to
24 reimburse a fund that it managed called Highland Global
25 Allocation Fund for a NAV error that had occurred

---

**71**

1 within that fund.
2      Q.  Who made that NAV error?
3      MR. MORRIS:  Objection to the form of the
4 question.
5      THE WITNESS:  Yeah, it's hard to answer that.
6 So the Highland Capital Management Fund Advisors is the
7 advisor to the fund, so they're the responsible party
8 for making the fund whole in the instances of NAV
9 errors.
10      Q.  (BY MR. RUKAVINA)  And did HCMFA contract out
11 with Highland for valuation services?
12      MR. MORRIS:  Objection to the form of the
13 question.
14      THE WITNESS:  I don't specifically remember
15 if they contracted for valuation services, but if you
16 tell me that they did, I'll take that at face value.
17 So yes, HCMFA utilized HCMLP for valuation services.
18      Q.  (BY MR. RUKAVINA)  Do you have any memory of
19 what human being or beings made that NAV error?
20      MR. MORRIS:  Objection to the form of the
21 question.
22      THE WITNESS:  It's -- in respect to people,
23 not particularly.  In respect to parties, Houlihan
24 Lokey was the service provider that performed the
25 valuation that resulted in the NAV error.

---

**72**

1      And as I described before, the valuation
2 function was housed at HCMLP by HCMLP employees
3 supporting that through, among other people, front
4 office, compliance, other parts of the organization as
5 well.
6      Q.  (BY MR. RUKAVINA)  So it was your
7 understanding that Highland was loaning $2.4 million to
8 HCMFA for HCMFA to compensate that fund?
9      A.  Yes.
10      Q.  Did you have any understanding that Highland
11 might have been, instead of loaning that money,
12 actually paying that money to HCMFA to compensate HCMFA
13 for Highland's valuation error?
14      A.  First, not Highland's valuation error.  But
15 second, no, there's no way that that would have been
16 what that payment was for.
17      Q.  Why can you say that there's no way that that
18 would have been what that payment was for?
19      A.  First, this wasn't the first NAV error that
20 ever occurred.  There had been other NAV errors.  There
21 were other NAV errors with respect to this valuation
22 that pertain to NexPoint Advisors.
23      There was no reimbursement from HCMLP to
24 NexPoint or HCMFA, regardless of any individual being
25 identified as the person.  That had just never occurred

---

David Klos - October 27, 2021

73

1  to my knowledge.
2         Second, the amount was to meet the liquidity
3  need of HCMFA.  It wasn't to -- it wasn't to
4  dollar-for-dollar make up for the NAV error.  It was
5  that's how much money HCMFA needed.
6         Third, it was definitely Dondero's practice
7  and preference to have expenses at HCMFA for tax
8  purposes.  So if this was compensation, he would
9  ultimately not really be benefiting from the deduction
10 so.
11        That would have been a strong preference of
12 his against having it be compensation.
13        So it would have been excruciatingly clear
14 that this was a loan for liquidity for HCMFA to make
15 the fund whole, just like it had in the past NAV
16 errors.
17    Q.  How did you know that HCMFA needed
18 $2.4 million for liquidity?
19    A.  At that point I was still part of the
20 corporate team, so I had a good sense of how much cash
21 HCMFA would have had at any given moment.  And at that
22 given moment it would not have had -- I'd be shocked if
23 it had even 2.4-.
24        Probably would have had probably between
25 a million and 2 million if I had to speculate.

74

1    Q.  Okay.  So you've given the reasons why this
2  was clearly a loan.
3         But you never heard Mr. Dondero say that this
4  was a loan, did you?
5    A.  I don't remember.  It's possible I did, but I
6  don't specifically remember.
7    Q.  Okay.  What about the $5 million loan on the
8  day after?  What was that $5 million for?
9    A.  That was similar but different.  So again,
10 HCMFA needed liquidity.  This time this was for --
11 related to that same fund.
12        So Highland Global Allocation Fund had
13 converted from an open-end fund, mutual fund, to a
14 closed-end mutual fund.
15        And pursuant to that conversion there was a,
16 I believe it was called a consent fee, for any
17 investors of that fund who consented to the conversion,
18 that they would receive a 3 percent fee payable by the
19 investment advisor.
20        And so at this time the bill came due on that
21 because the conversion had been completed, and the
22 accounting for how much that 3 percent was going to be
23 was complete.
24        HCMFA sure as hell didn't have 5 million
25 bucks.  Excuse my language.  Highland needed to pay

75

1  HCMFA for the liquidity.  HCMFA made the payment to the
2  fund.  It wasn't dollar for dollar.  I think it was
3  like 5,019,000, or some such number.
4         But 5 million was the number that would allow
5  it to make that payment effectively to the investors of
6  Global Allocation Fund.
7    Q.  Do you have any understanding as to why
8  Highland, as opposed to some other entity, was
9  transferring $7.4 million?
10    A.  Highland as opposed to some other entity?
11    Q.  Uh-huh.
12    A.  Because Highland had the money.
13    Q.  But I think we've established earlier that in
14 the first seven months of 2019, Highland was having
15 constant liquidity issues?
16    A.  It was.
17    Q.  And that's part of the reason that NexPoint
18 was making unscheduled payments on its note; right?
19    A.  That's part of the reason NexPoint was making
20 unscheduled payments on its note, yes.
21    Q.  So your recollection is that HCMFA needed
22 $2.4 million for liquidity purposes and about
23 $5 million for the consent fee.  And Highland
24 transferred those funds because Highland had the funds?
25    A.  Yes.  And I should clarify that Highland only

76

1  had the funds because Mr. Dondero repaid personal notes
2  to HCMLP on the same days.
3         So he paid 2.4 million on May 2, which
4  Highland turned around and reloaned.  And he paid 4.4-
5  on May 3, and Highland sent out 5-, so there's a
6  $600,000 difference.  And my recollection, he paid the
7  other 600,000 via note repayment within a few days.
8    Q.  So this would have been part of some broader
9  transaction in Mr. Dondero's mind?
10    A.  I would not characterize it that way.
11    Q.  You established that HCMFA needed money.  You
12 established that Highland temporarily had money because
13 Dondero provided it with money.
14        But you still don't know, sir, as a fact as
15 to whether that transfer was a loan or some other
16 payment from HCMFA -- I'm sorry from HCM, from debtor
17 to HCMFA?
18        MR. MORRIS:  Objection to the form of the
19 question.  Asked and answered a million times.  It's in
20 the documents you're showing him.
21        THE WITNESS:  It was a loan.
22        MR. MORRIS:  Come on, Davor.  With all due
23 respect, it's in the document.  It's on the document.
24    Q.  (BY MR. RUKAVINA)  I'm being courteous and
25 respectful to you and I'd ask the same in return; okay?

David Klos - October 27, 2021

**77**

1    A.  Absolutely.  I apologize if I haven't been.

2    Q.  Mr. Dondero, would you agree, was the only

3  person that had the authority at the debtor to

4  authorize a transfer of 2.4- and then $5 million?

5    A.  At the debtor?

6    MR. MORRIS:  Objection to the form of the

7  question.

8    Q.  (BY MR. RUKAVINA)  Yes, at the debtor.

9    A.  No.

10    Q.  Who else could have transferred 2.4 million

11  or $5 million?

12    A.  Those are two different questions.  But if

13  you're asking who had the authority, certainly Frank

14  did as well.

15    Q.  So Frank had the authority.  Perhaps my

16  question was inartful.

17    Do you believe that Mr. Waterhouse would have

18  decided to transfer $2.4 million or $5 million without

19  Mr. Dondero's approval?

20    MR. MORRIS:  Objection to the form of the

21  question.

22    THE WITNESS:  Generally speaking, no, but I

23  don't know exactly what the form of the approval.  But

24  he certainly wouldn't have done that on his own without

25  discussing with Dondero.

**78**

1    Q.  (BY MR. RUKAVINA)  Do you believe that

2  Mr. Waterhouse had the ability on behalf of the debtor

3  to loan $5 million without Mr. Dondero's approval?

4    MR. MORRIS:  Objection to the form of the

5  question.

6    THE WITNESS:  I think he had the technical

7  authority to.  However, I don't believe in practice

8  that he ever would.

9    Q.  (BY MR. RUKAVINA)  Same question, $2.4

10  million?

11    A.  Same answer.

12    Q.  We've established that you never really had a

13  direct employment or types of a role for NexPoint --

14  I'm sorry, for HCMFA; right?

15    A.  Again --

16    Q.  To the best of your recollection?

17    A.  Best of my recollection I can't remember how

18  the titles transferred over or whatever, but I don't

19  believe I did.

20    Q.  Do you know whether Mr. Waterhouse in 2019

21  had the authority, without Mr. Dondero's approval, to

22  borrow $7.4 million on behalf of HCMFA?

23    MR. MORRIS:  Objection to the form of the

24  question.

25    THE WITNESS:  He had the authority to enter

**79**

1  into the note on behalf of HCMFA, yes.

2    Q.  (BY MR. RUKAVINA)  Was that something that he

3  would have done without Mr. Dondero's approval to your

4  understanding and practice at that time?

5    MR. MORRIS:  Objection to the form of the

6  question.

7    THE WITNESS:  Same answer that I gave before

8  with respect to Highland.

9    Q.  (BY MR. RUKAVINA)  So here's where I'm going

10  with all this.

11    Mr. Dondero's position, and tomorrow his

12  testimony will be, that he caused the $7.4 million to

13  be transferred not as a loan to HCMFA, but to

14  compensate HCMFA for various things including that NAV

15  error.

16    Other than perhaps you think he's lying,

17  would you have any knowledge, hearsay, document,

18  anything, to contradict Mr. Dondero's position?

19    MR. MORRIS:  Objection to the form of the

20  question.

21    THE WITNESS:  Yes.  I would point to the fact

22  that as it pertains to the $5 million note, if we're

23  separating issues, there's no other possibility of what

24  that money could be other than either a loan or equity.

25    It's not compensation.  Highland is under --

**80**

1  HCMLP has absolutely zero obligation in respect to that

2  consent fee.  So when Highland sends $5 million to HCMFA

3  there's nothing else that it can be.  That's Point 1.

4    Point 2, we're right in the middle of an audit

5  at this point.  Jim signs rep letters at this point.

6  He's being provided balance sheets throughout 2019 that

7  indicate the loans that Highland has on its books.

8    Balance sheets are being prepared in respect

9  of annual approvals for 15(c) for retail funds in the

10  fall.  Schedules are being created for bankruptcy after

11  we file in October.

12    Nobody says this is a mistake.  Frank is on

13  all of these emails.  Frank never questions it.

14    There's absolutely no evidence from that point

15  in time to whenever this defense got raised that would

16  indicate that anybody said that these weren't exactly

17  what they say they are.

18    Q.  (BY MR. RUKAVINA)  Are you aware that in

19  February or March 2019 some $5.2 million was paid from

20  insurance that HCMFA had to the fund for the NAV error?

21    A.  The amount sounds unfamiliar, but I'm aware

22  that insurance proceeds were paid from HCMFA to the

23  fund.

24    Q.  And do you think that it's impossible for a

25  sane, rational person to conclude that HCMFA had a

David Klos - October 27, 2021

**81**

1 claim against the debtor related to that NAV error?
2      MR. MORRIS:  Objection to the form of the
3 question.
4      THE WITNESS:  If it did, I don't know how
5 that's not insurance fraud for basically double
6 collecting insurance proceeds and then collecting it
7 again.
8      Q.  (BY MR. RUKAVINA)  So you believe, sir, that
9 if insurance pays a claim you have no more right to go
10 against a person who caused the fault?
11      MR. MORRIS:  Objection to the form of the
12 question.
13      THE WITNESS:  We can speak specifically here.
14 This is about a NAV error that an insurance company
15 reimbursed HCMFA for, which it then turned around and
16 paid for the fund.
17      So if it went to collect that same, let's use
18 round numbers, $5 million from Highland that it's
19 already collected from insurance, that sounds
20 inappropriate to me.
21      Q.  (BY MR. RUKAVINA)  Okay.  But you don't know
22 whether that's allowed in Texas law or not, do you?
23      MR. MORRIS:  Objection to the form of the
24 question.
25      THE WITNESS:  No, I don't know whether it's

**82**

1 allowed under Texas law.
2      Q.  (BY MR. RUKAVINA)  So you don't know that if
3 you're hit by someone on the street and your medical
4 insurance pays your bills, you don't know that he still
5 has to pay you for the same bills?
6      MR. MORRIS:  Objection to the form of the
7 question.  I hope I don't miss my plane.
8      Q.  (BY MR. RUKAVINA)  You don't know that under
9 Texas law if someone hits you with their car and causes
10 you medical bills and your medical insurance pays those
11 bills, that you can still sue them for the same
12 damages?
13      MR. MORRIS:  Objection to the form of the
14 question.
15      THE WITNESS:  I'm not familiar at any level
16 of specificity with Texas law.
17      Q.  (BY MR. RUKAVINA)  Again, it just sounds
18 wrong to you that you could go after someone after
19 insurance pays, but you don't know legally one way or
20 the other?
21      A.  Correct.  I'm not a lawyer or expert in Texas
22 law.  It feels wrong, yes.
23      Q.  Okay.  Going back to this email of yours,
24 Exhibit 3, do you recall whether there was a similar
25 email with respect to the $5 million note?

**83**

1      A.  Yes, I am.  I believe Kristin sent that one.
2      Q.  Kristin sent that one?
3      A.  I believe so.
4      Q.  To whom?
5      A.  Likely the same distribution group, but
6 that's speculation.
7      Q.  Did you see such an email in the last week or
8 two?
9      A.  I'm not certain, but probably.  I have seen
10 email communication on or around May 3, but I don't
11 know specifically who all was on the email.  I'm going
12 off what I would expect to see.
13      MR. MORRIS:  If you're really interested,
14 it's right here.  It was produced to you with
15 Bates 3763.  And if you'd like to question the witness.
16      MR. RUKAVINA:  When was it produced?
17      MR. MORRIS:  I can't tell you.  It's part of
18 the same package.
19      Q.  (BY MR. RUKAVINA)  So going back to this
20 Exhibit 3, sir, why did you ask Kristin, can you or
21 Hayley please prep a note for execution?  Why them?
22      Remember, I was asking about what the course
23 or procedure was at that point in time.
24      A.  Yeah, so nomenclature, procedure, process.
25      I would say the informal process for these

**84**

1 types of loans, they were frequent in nature, would be
2 for someone on the corporate accounting team to prepare
3 a note and have it executed.
4      Q.  Okay.  That was the standard course back
5 then?
6      A.  Again, I don't know what standard course
7 means.  That was fairly typical.
8      Q.  Why would you not have asked someone in the
9 Highland legal department to prepare a note?
10      A.  Because this was a legally reviewed document
11 as far as the form of the agreement.  It's a one-page,
12 two-paragraph form that had been used for a long time.
13      So the only thing that would change with
14 respect to these notes would be the date, the amount,
15 likely the rate.  I can't think of anything else
16 offhand that would have changed from note to note.
17      Q.  After you asked Ms. Hendrix to prepare this
18 note, did you have any further role with respect to the
19 papering, preparation, or execution of that note?
20      A.  Not that I can remember.
21      Q.  Would you have had any role in having either
22 or both of the notes actually signed electronically or
23 by ink by Mr. Waterhouse?
24      A.  Likely not, no.
25      Q.  Do you know who decided to have

David Klos - October 27, 2021

---

**85**

1 Mr. Waterhouse as opposed to Mr. Dondero sign these two
2 promissory notes?
3     A.  I don't.
4     Q.  On the $5 million note, do you remember if
5 you had any role with respect to its physical papering
6 or execution?
7     A.  Not that I recall.
8     Q.  To the best of your memory, your role would
9 have been done by instructing your team, hey, here is
10 these new loans, go paper it up; is that accurate?
11     A.  On the upfront side.  I suppose my role would
12 have also included on the back end making sure that the
13 actual payment had occurred.  But that would have been
14 doing that realtime, seeing the funds went out, and
15 that, most importantly, that the consent fee had been
16 paid from HCMFA to the transfer agent.
17     Q.  How did you or anyone on your team know -- so
18 obviously, you know it's a $2.4 million loan because
19 that's what Waterhouse or Dondero told you; right?
20         How did you know it was a $2.4 million loan?
21     MR. MORRIS:  Objection.  Asked and answered.
22         THE WITNESS:  I knew that the NAV error was
23 2 million, I think it was 398,000, somewhere in that
24 ballpark.  And that 2.4- had been authorized for that
25 purpose.

---

**86**

1     Q.  (BY MR. RUKAVINA)  Do you know who decided
2 what the interest rate in this note would be, or that
3 it would be a demand note as opposed to a term note?
4     A.  I don't specifically know who made that
5 decision.  However, the common practice for fund
6 advisors was to put -- was for the rate to equal the, I
7 forget if it was the short-term or long-term AFR.
8         And for the note to be demand, that was just
9 the standard -- that was the standard.
10     Q.  And I think I asked this, but just if I
11 didn't.
12         For either or both of these two notes, the
13 2.4- and $5 million note, did you have any role with
14 respect to Mr. Waterhouse signing them?
15     A.  No, not that I can remember.  I don't think I
16 did.
17     Q.  And you don't remember doing anything to get
18 his signatures?
19     A.  Not that I recall.
20     Q.  Nor would that have been something that you
21 would expect that you would have a role with?
22     A.  Certainly not in this instance.  Maybe to the
23 extent that nobody else was around and it was time
24 sensitive, but that wouldn't have been the case with
25 these, I don't believe.

---

**87**

1     Q.  Did you have any understanding in early May
2 of 2019 as to whether HCMFA was solvent or insolvent?
3     MR. MORRIS:  Objection to the form of the
4 question.
5     THE WITNESS:  Whether HCMFA was solvent or
6 insolvent?  I'm not a solvency expert, so I don't know
7 that I could even attempt to answer that.
8     Q.  (BY MR. RUKAVINA)  Did you have an
9 understanding as far as HCMFA goes on May 2, 2019, that
10 its liabilities exceeded its assets?
11     A.  I don't remember specifically where it stood
12 on assets versus liabilities.
13     Q.  Do you have any memory that by May 2, 2019,
14 the debtor had taken a couple prior demand notes from
15 HCMFA and made them not collectible prior to May 31,
16 2021?
17     A.  I know what you're referring to.  I wouldn't
18 characterize it that way.
19     Q.  How would you characterize it?
20     A.  I recall that there was a financial support
21 acknowledgement, I think it was the name of the
22 acknowledgment.
23         That described -- I can't remember if it
24 described those two notes specifically or just referred
25 to them, that there would not be collection sought on

---

**88**

1 those until May 31 of 2021.
2     Q.  Do you remember why that document was done?
3     A.  My recollection, and it could have been done
4 for other reasons, but my recollection of it was that
5 it was primarily audit-driven.
6         For the auditors to be comfortable that these
7 notes weren't going to be just called and FA not have
8 the ability to pay them right away.
9     Q.  Because it's true in April or May of 2019
10 HCMFA didn't have the ability to pay those notes;
11 correct?
12     A.  It didn't have enough cash to pay those.
13     Q.  And I think you mentioned before that in
14 May 2019 the auditors at the Highland level were
15 talking about rolling up prior demand notes into term
16 notes so the debtor would at least get some regular
17 cash flow; correct?
18     MR. MORRIS:  Objection to the form of the
19 question.
20     THE WITNESS:  No.
21     Q.  (BY MR. RUKAVINA)  So you recall that -- I'm
22 sorry, that was 2017.  I was wrong; right?
23     A.  Correct.
24     Q.  So I guess here is my question, and I'm
25 struggling to understand this.

---

David Klos - October 27, 2021

**89**

1      So why would Highland be loaning an
2  additional $7.4 million in early May of 2019 to HCMFA
3  when HCMFA already was then unable to repay its debts
4  to Highland?
5      MR. MORRIS: Objection to the form of the
6  question.
7      THE WITNESS: Yeah, I kind of reject the
8  premise of the question, and these are all controlled
9  by Jim. And it's completely within his power at any
10  point in time to make any payment on any of the loans,
11  depending on where priorities sit.
12      So the idea that HCMFA -- that Highland would
13  be doing a credit analysis on HCMFA, determining that it
14  was unable to make that payment and, therefore, this is
15  a bad note, is a completely foreign, preposterous
16  concept at that time.
17      Q. (BY MR. RUKAVINA) And in May of 2019 isn't
18  it also, sir, the case that Mr. Dondero could have,
19  right or wrong, agree or disagree, said, that 7.4- is
20  going to compensate HCMFA for the NAV error as opposed
21  to being a loan?
22      A. No.
23      Q. That's not possible?
24      A. No.
25      Q. And why is that not possible?

**90**

1      A. As we discussed, the 5-, there's absolutely
2  no construct where that can be compensation for an NAV
3  error. It's not a NAV error. It's a consent fee.
4  Highland has absolutely no responsibility for that.
5      Highland also has no responsibility for the
6  2.4-, but if you want to assume that it did, that's
7  completely not the practice. It was Jim's preference
8  to do these via loans, and that's how it was booked.
9      Q. You're saying on the one hand Mr. Dondero can
10  absolutely control that one entity make a loan to
11  another, irrespective of credit worthiness, but he
12  can't decide that a transfer is compensation as opposed
13  to a loan?
14      MR. MORRIS: Objection to the form of the
15  question. Argumentative.
16      THE WITNESS: If he wants to call
17  $7.4 million compensation to himself or to HCMFA, I
18  just don't know how he does that. This is me being an
19  accountant. I don't know how that's possible.
20      If he wants to pay himself a $7.4 million
21  bonus from HCMFA, fine, he has the power to do that. If
22  he wants Highland to inject 7.4 million of equity into
23  HCMFA, he has the power to do that.
24      But sending the 7.4 million and calling it
25  something else, I don't know how he could do that.

**91**

1      Q. (BY MR. RUKAVINA) So it had to have been a
2  loan; correct?
3      MR. MORRIS: Objection to the form of the
4  question.
5      THE WITNESS: In these instances I know it to
6  have been a loan.
7      Q. (BY MR. RUKAVINA) Because of what
8  Mr. Waterhouse told you?
9      MR. MORRIS: Objection to the form of the
10  question. Asked and answered.
11      THE WITNESS: Yeah, it was my understanding
12  that these were loans.
13      Q. (BY MR. RUKAVINA) You know these 7.4- to be
14  loans even though you never heard Mr. Dondero say that
15  to you?
16      A. Yes, although to be fair, I don't know
17  whether I ever heard Mr. Dondero. It's possible he did
18  say it.
19      MR. MORRIS: Objection. Withdrawn.
20      Q. (BY MR. RUKAVINA) You have no memory on that
21  or before May 4, 2019 you heard Mr. Dondero say that
22  the $2.4 million transfer and/or the $5 million
23  transfer to HCMFA were loans?
24      A. I have no specific recollection, but such a
25  conversation is just off the reservation impossible.

**92**

1  That there's no way -- there's no way -- there's no way
2  that it would have been described that way and there's
3  a hundred percent that it's loan.
4      Q. Do you have any memory discussing prior --
5      MR. MORRIS: Objection. Asked and answered.
6  He's answered this a thousand times.
7      Q. (BY MR. RUKAVINA) Do you have any memory on
8  or before May 2, 2019 discussing the $2.4 million
9  transfer with Mr. Dondero at all?
10      A. I do recall, I don't remember the time, but I
11  do remember discussing the NAV error in general terms
12  and the potential magnitude of that. I don't remember
13  specifically when that occurred.
14      Q. At least in your discussion with Mr. Dondero,
15  the $2.4 million loan or note was somehow linked to the
16  NAV error?
17      A. Linked to the NAV error is strong. It
18  related to the NAV error from the standpoint that
19  that's what Highland was loaning HCMFA the money for,
20  because HCMFA couldn't otherwise make the payment
21  itself.
22      Q. You just said Highland was loaning the money
23  for. Are you remembering now Mr. Dondero saying that
24  or are you just extrapolating?
25      A. No, I'm explaining rationally what the

David Klos - October 27, 2021

---

**93**

1 situation was.
2    Q.  Do you remember on or before May 3, 2019
3 discussing the $5 million transfer with Mr. Dondero?
4    A.  Again, in general terms.  I couldn't tell you
5 a time period, but this was something that, between
6 Frank and I, we had put on Jim's radar that this would
7 be a cash need in the future.  I couldn't specify
8 specifically when that happened.
9    Q.  Okay.  You have no present memory of
10 discussing that issue with Mr. Dondero on or before
11 May 3, 2019?  It must have happened but you have no
12 memory?
13    MR. MORRIS:  Objection to the form of the
14 question.
15    THE WITNESS:  We discussed that there would
16 be a consent fee payable from HCMFA.  We would have
17 discussed -- and again, I don't remember where I was,
18 what day it was, the specifics around the conversation.
19    But I know that we had conversations
20 pertaining to cash, because this was a large need for --
21 cash need for HCMFA to satisfy this, and this was an
22 important payment.
23    And neither HCMFA nor Highland had the
24 wherewithal to make that payment.  The only way that
25 those could make the payment was by Jim Dondero repaying

---

**94**

1 loans that he owed to HCMLP.  So we absolutely discussed
2 that with Jim Dondero.
3    Q.  (BY MR. RUKAVINA)  And with respect to
4 everything that we just talked about and your
5 recollection, you still don't remember Mr. Dondero
6 saying to you or Mr. Waterhouse one way or the other
7 that one or both of these transfers were loans?
8    MR. MORRIS:  Objection to the form of the
9 question.  Asked and answered.
10    THE WITNESS:  Yeah, again --
11    Q.  (BY MR. RUKAVINA)  Just yes or no.  This is a
12 yes-or-no question.
13    MR. MORRIS:  Let him answer the question.
14    MR. RUKAVINA:  If he'll answer the question
15 I'll stop asking him --
16    MR. MORRIS:  He's allowed --
17    Q.  (BY MR. RUKAVINA)  The answer [verbatim] is,
18 do you remember --
19    A.  I don't remember Jim's exact words two and a
20 half years ago in respect to authorizing these
21 payments.  So to answer your question, no, I don't
22 specifically remember him saying these are loans.
23    But every other fact around this tells me
24 that we did have that conversation and that was the
25 conclusion and that was the direction.

---

**95**

1    Q.  So it's possible that Mr. Dondero told no one
2 that these were loans but because y'all have been doing
3 it this way for 10 years, that everyone, all of you
4 CPAs, understood that it had to be a loan?
5    MR. MORRIS:  Objection to the form of the
6 question.
7    Q.  (BY MR. RUKAVINA)  My question is, is that
8 possible?
9    A.  I really don't think it's possible.  I
10 suppose people say anything is possible.  Again, two
11 and a half years ago, I'm certain that that was the
12 intent at the time and I'm sure it was communicated as
13 such.  I just don't have a specific recollection.
14    MR. RUKAVINA:  Thank you.
15    I'll pass the witness.
16    MR. MORRIS:  Michael, do you have any
17 questions?
18    MR. AIGEN:  I do.  I assume you want me to
19 start now to do my best to be done at 5:00?
20    MR. MORRIS:  Yes, please.
21    EXAMINATION
22    Q.  (BY MR. AIGEN)  Good afternoon, Mr. Klos.  My
23 name is Michael Aigen with the Stinson law firm.  I
24 represent Mr. Dondero, HCMS, and HCRE.
25    How are you today?

---

**96**

1    A.  I'm very good, thank you.
2    Q.  First topic I wanted to ask you about is the
3 defense raised by some of the defendants related to an
4 oral agreement and condition subsequent.
5    So my question for you generally is, are you
6 aware that some of the defendants in these proceedings
7 have raised a defense that there was a subsequent oral
8 agreement allowing notes to be potentially forgiven if
9 certain events occur?
10    A.  Yeah, I'm generally aware of the defenses
11 sitting here today.
12    Q.  And how are you generally aware of this
13 defense?
14    A.  I don't know with specificity.  Potentially
15 through just document flow on the bankruptcy side,
16 potentially with conversations internally or with
17 counsel.  But I generally understand them to have been
18 raised, the defenses that is.
19    Q.  And I don't want to get into conversations
20 with counsel.  I'm not allowed to do that.
21    Let me ask you, have you had any
22 conversations with anyone other than counsel about this
23 subsequent oral agreement defense?
24    A.  I have had general conversations with
25 Mr. Seery about it.  And other than that, nothing

---

David Klos - October 27, 2021

97

1 substantive.
2     Q.  And what did you discuss about this with
3 Mr. Seery?
4     A.  I've discussed with him, I hate to phrase it
5 this way, the ridiculousness of the defense.  Under
6 oath.  I've discussed my general understanding of what
7 is being asserted as a defense.
8         Which is that there was some sort of an oral
9 agreement between Jim and his sister at some point in
10 the past pertaining to forgiveness of certain
11 promissory notes that was conditional upon Highland
12 monetizing any of three PE assets for any amount above
13 cost.
14     Q.  And is it fair to say that prior to these
15 lawsuits being brought, you weren't aware of any oral
16 agreements related to the promissory notes related to
17 potential forgiveness?
18     A.  That's correct.  Not that I can remember, and
19 I think I would remember.
20     Q.  And other than your conversations with
21 Mr. Seery and counsel, you haven't had any
22 conversations with anyone else about these alleged oral
23 agreements; is that fair to say?
24     A.  I'm not sure I understand the question.
25     Q.  You told me you may have had questions with

98

1 counsel about these oral agreements defense, and you
2 told me about conversations with Mr. Seery, so I'm
3 trying to close that topic.
4         Was there anyone else you had any
5 conversations with about this alleged oral agreement?
6     A.  Like I said before, nothing of substance.
7 I've probably mentioned it in passing to other
8 employees, this is what I understand is being asserted
9 in this, but nothing of substance.
10     Q.  Do you have any personal knowledge as to
11 whether Mr. Dondero or Ms. Dondero entered into any
12 type of oral agreement prior to the bankruptcy?
13     A.  No, not other than what's been pled, or
14 whatever the terminology is.
15     Q.  I want to talk a little bit about, you
16 touched on earlier, you gave some testimony about how
17 in -- there were certain term loans that had payments
18 due in December or on or about December 31, 2020.
19         Do you remember talking about that?
20     A.  Yeah, generally.
21     Q.  And I don't know if you're specifically
22 referring to these loans, but is it also your
23 understanding that HCMS and HCRE also had payments that
24 were due on December 31, 2020?
25     A.  Yes.

99

1     Q.  Is it fair to say that if those payments were
2 to be made, it would have been Ms. Hendrix that would
3 have gone and effectuated those payments?
4         MR. MORRIS:  Objection to the form of the
5 question.
6         THE WITNESS:  Can you remind me the entities
7 again.
8     Q.  (BY MR. AIGEN)  Sorry.  HCMS and HCRE
9 Partners.
10     A.  HCMS, yes.  HCRE, I'm not sure, maybe.
11     Q.  Why might it have been different?
12     A.  I just don't recall who had the, you know,
13 kind of bank access to effectuate that payment.  I
14 think Kristin did but I'm not certain.
15     Q.  It wouldn't have been you; is that fair to
16 say?
17     A.  Correct.  It would not have been me.
18     Q.  And if Ms. Hendrix testified that the
19 instruction she received in December 2020 about not
20 making payments related only to the Advisors and not to
21 HMS or HCRE, would you have any reason to disagree with
22 her?
23         MR. MORRIS:  Objection to the form of the
24 question.
25         THE WITNESS:  Yeah, I was struggling with

100

1 that question.  There was a lot to it.  If you don't
2 mind.
3     Q.  (BY MR. AIGEN)  Okay.  I'll repeat it.  Maybe
4 that will help.
5         MR. MORRIS:  Why don't you ask him about his
6 knowledge, instead of Kristin's.  You had her as a
7 witness.
8         I'll continue to object.  I don't know why
9 you're asking him about her knowledge.
10         MR. AIGEN:  Do you want to keep coaching him?
11         MR. MORRIS:  No, I'm trying to coach you.
12         MR. AIGEN:  Oh, thanks.  That's good.
13 Appreciate if you stop coaching your witness.
14     Q.  (BY MR. AIGEN)  If Ms. Hendrix testified that
15 the instructions she received in December 2020
16 regarding not making any more payments related only to
17 the Advisors and not to HMS or HCRE, would you have any
18 reason to disagree with her?
19         MR. MORRIS:  Objection to the form of the
20 question.
21         THE WITNESS:  I have no reason to question
22 Kristin's testimony.  I'm sure she gave truthful
23 testimony.
24     Q.  (BY MR. AIGEN)  Are you aware of or not of
25 whether Ms. Hendrix was told by Mr. Waterhouse not to

David Klos - October 27, 2021

---

101

1  make payments from certain entities in December of
2  2020?
3        MR. MORRIS:  Objection to the form of the
4  question.
5        THE WITNESS:  Yeah, I'm aware, and I think I
6  spoke to that earlier of the instruction that had come
7  down from Dondero through Frank to Kristin, and I was
8  certainly aware of it.
9        And I'm -- and I think I spoke to the fact
10 that, you know, certainly hearing it from a person who,
11 as I said before, wasn't really on the team at that
12 point, it was certainly my understanding that that was a
13 global instruction at the time.
14       Q.  (BY MR. AIGEN)  And I want to get into what
15 was actually said and what you remember, so let me ask
16 you this.
17       This instruction that came down started from
18 Jim and went to Frank.  Is that your understanding?
19       A.  That's my understanding.
20       Q.  You weren't there during that discussion I
21 assume; is that correct?
22       A.  Correct, I was not.
23       Q.  And then Frank gave an instruction to
24 Kristin; is that your recollection?
25       MR. MORRIS:  Objection to the form of the

---

102

1  question.
2        THE WITNESS:  Yeah, it's my understanding
3  that Frank informed Kristin of that instruction.
4        Q.  (BY MR. AIGEN)  Were you there when Frank
5  provided this instruction to Kristin?
6        A.  I don't believe I was.
7        Q.  Then can I ask, how did you become aware that
8  Frank had given this instruction to Kristin?
9        A.  Through subsequent conversations with Frank
10 and Kristin.  As I said before, I don't recall if it
11 was the three of us or me and Frank or me and Kristin.
12 But subsequent conversations.
13       Q.  Are we talking about conversations back in
14 2020 or after the bankruptcy?
15       MR. MORRIS:  Objection to the form of the
16 question.
17       THE WITNESS:  During 2020, December of 2020.
18       Q.  (BY MR. AIGEN)  Sitting here today, can you
19 say with a hundred percent certainty that the
20 instruction related to all of the entities as opposed
21 to just Advisors?
22       A.  So as you pointed out, I was not party to the
23 direction, so I have no way of knowing with any sort of
24 specificity what the direction actually was.  I just
25 know how it was conveyed to me and how I understood it.

---

103

1        Q.  When you say it was conveyed to you, are you
2  talking about subsequent discussions that you had with
3  Ms. Hendrix and Mr. Waterhouse after they talked to
4  each other?
5        A.  Yes.
6        Q.  Sitting here today, can you tell me for sure
7  that one of them told you that this instruction related
8  to all of the entities, as opposed to just the
9  Advisors?
10       A.  No, I can't say that with certainty, but I
11 think that that was the case.  But, again, I can't say
12 with certainty.
13       Q.  Would you defer to Mr. Waterhouse and
14 Ms. Hendrix over what the specific instructions were?
15       MR. MORRIS:  Objection to the form of the
16 question.
17       THE WITNESS:  Like I said, I wasn't part of
18 the conversation, so I would defer to people who
19 received the directions more directly.
20       Q.  (BY MR. AIGEN)  And you're not aware of
21 anything in writing or anything that reflects these
22 instructions on whether to pay or not to pay certain
23 payments in December of 2020?
24       A.  No, I'm not aware of anything in writing.
25       Q.  And let's change topics for a second here.

---

104

1        I want to throw out a term.  Are you familiar
2  with the term "NAV ratio trigger period" as it was used
3  in --
4        A.  In a very, very general sense, yes.
5        Q.  And in a general sense what does that term
6  mean to you?
7        A.  It's a term I recognize from the limited
8  partnership agreement of HCMLP.  It's a defined term in
9  that agreement.
10       Q.  To your knowledge, was the NAV ratio trigger
11 period ever reached or triggered prior to the Highland
12 bankruptcy?
13       A.  I don't know the definition, so I don't know
14 based on the definition whether it had or hadn't.
15       Q.  Sitting here today, though, it's not your
16 belief, based on your experience, that it was
17 triggered; is that fair to say?
18       MR. MORRIS:  Objection to the form of the
19 question.
20       THE WITNESS:  I don't know the consequence of
21 being in a trigger period, I guess is what -- how I'm
22 trying to answer your question.
23       Q.  (BY MR. AIGEN)  Have you ever had any
24 conversations with Nancy Dondero?
25       A.  Yes.

---

David Klos - October 27, 2021

---

105

1    Q.  Generally, how many and what was the
2  reasoning?
3    A.  Probably less than five.  I think maybe only
4  one or two that I can really remember.
5    Q.  At a high level what were those conversations
6  about?
7    A.  From my recollection of my conversations with
8  her, they pertained to the DRIP, which is a dividend
9  reinvestment program that I helped.
10   Q.  And approximately when were these
11  conversations?
12   A.  I don't know.  Sometime between 2017 and
13  probably 2019.  I couldn't tell you with any
14  specificity.  These were very informal.
15   Q.  Fair to say that you've never had any
16  conversations with Nancy Dondero about any of the loans
17  at issue in this case?
18   A.  No, no, no, I've never had a conversation
19  with her like that.
20   Q.  And fair to say that you've never had any
21  conversations with Nancy Dondero about compensation for
22  Jim or any other officers at Highland?
23   A.  Correct.
24     MR. AIGEN:  Why don't we go off the record
25  for two minutes.  I think I'm either done or about

---

106

1  done.
2     (Off the record.)
3    Q.  (BY MR. AIGEN)  You understand you're still
4  under oath?
5    A.  Yes.
6    Q.  Are you aware of any loans that Highland has
7  made to any employees or officers that were forgiven in
8  all or in part?
9    A.  Yes.
10   Q.  Can you tell me who?
11   A.  I don't know that this will be a complete
12  list, but there were a few employees in the kind of
13  late aughts, maybe 2010, 2011 frame.
14   Q.  Do you know the names?
15   A.  One was Jack Yang.  Another, I'm not sure if
16  it was forgiven or not, that's why I'm hesitating, but
17  it was Tim Lawler.  I think his was forgiven in part or
18  in full, but I'm not a hundred percent certain.
19   Q.  And any other individuals that received loans
20  that were forgiven in part that you're aware of?
21   A.  Not that I recall, but there could be others.
22  Some of this is very, very old.
23   Q.  Changing topics here a little bit, I'm going
24  to combine two entities to try to speed this up.  If
25  you need to separate, that's fine.

---

107

1        Can you just generally explain to me what
2  services Highland Capital Management provided for
3  HCMS and HCRE?
4    A.  For HCMS -- I do need to separate these a
5  little bit.  For HCMS, really full-service accounting,
6  tax, treasury, cash payments.  I said tax.  Valuation.
7  Nothing personnel-wise because they didn't have any
8  employees.
9        That's all I can think of right off the top
10  of my head, but I could be missing some.
11   Q.  And what about HCRE?  How is that different?
12   A.  Similar, except different types of assets.
13  So more real estate, so less heavy.
14        Maybe not necessarily differences in terms of
15  the types of services, but services would have, I'd
16  say, more cash activity, more variety of investments,
17  which triggers different types of activities going on
18  at those entities.
19        But similar in terms of tax operations,
20  making payments.  HCRE didn't have employees, so no
21  payroll.  So these would be the broad areas that I
22  would think about.
23   Q.  And you mentioned making payments.  Would one
24  of those services that Highland provided for these two
25  entities include making loan payments on the term loans

---

108

1  like the term loans at issue in these proceedings?
2     MR. MORRIS:  Objection to the form of the
3  question.
4     THE WITNESS:  I think I mentioned before, I
5  couldn't remember whether or not Kristin was authorized
6  to make payments with respect to HCRE.  I think she
7  probably was, but I don't know that with certainty.
8        But, you know, for services, certainly Kristin
9  and her team would be responsible for making those
10  payments, subject to the proper authorization.
11   Q.  (BY MR. AIGEN)  And I'm sorry if I asked this
12  before.  If it wasn't Kristin for HCRE, do you have an
13  idea who it would have been?
14   A.  If not Kristin, it would have been Melissa
15  Schroth.
16   Q.  And how were those responsibilities split up?
17  What entities was Melissa Schroth responsible for?
18   A.  Generally speaking, Melissa was more
19  responsible for entities that were really, like -- I'm
20  going to use this in the most general sense, like Jim
21  entities, Jim's trusts, Jim personally.
22        And for HCRE it was kind of in the middle.
23  When it started out it kind of was more Jim world and
24  then over time it got more complex.
25        And as entities got more complex over time

---

David Klos - October 27, 2021

---

**109**

1  they tend to get transitioned from Melissa to corporate
2  accounting.  And when they got really complex over to
3  another group of fund accountants.
4        So this is one that was, at its beginning,
5  Melissa was the, called primary accountant.  And at
6  some point in time that transitioned to the corporate
7  accounting team.  I can't remember when the cash
8  process kind of cut over.
9        Q.  Is there a list somewhere saying Melissa is
10  responsible for these, Kristin for the others, or is it
11  just more of a pattern or matter of practice?
12        A.  More of a matter of practice.  If you're
13  responsible for an entity, you're responsible.  If
14  you're not, then you're not.
15        MR. AIGEN:  That's all the questions I have.
16  Thank you for your time.
17        THE WITNESS:  Thank you.
18              EXAMINATION
19        Q.  (BY MR. MORRIS)  Just a few, Mr. Klos.  Let's
20  pick up where Mr. Aigen left off.
21        To the best of your knowledge, did HCMS have
22  a shared services agreement with Highland?
23        A.  No, it didn't that I'm aware of.
24        Q.  But you described certain services that HCMLP
25  provided to HCMS; is that right?

---

**110**

1        A.  Yes.
2        Q.  Do you know whether HCMFA ever compensated --
3  do you know whether HCMS ever compensated HCMLP for any
4  of those services that HCMLP provided?
5        A.  No, it didn't.
6        Q.  You mentioned HCRE.  To the best of your
7  knowledge, did HCRE have a shared services agreement
8  with Highland Capital Management, LP?
9        A.  No, it didn't.
10        Q.  Did HCRE provide the services that --
11  withdrawn.
12        Did HCMLP provide the services to HCRE that
13  you just described?
14        A.  Yes.
15        Q.  Did HCRE ever compensate HCMLP for any of the
16  services that HCMLP provided?
17        A.  No.
18        Q.  Okay.  Mr. Rukavina asked you some questions
19  about payments that were made on the NexPoint loan in
20  the first half of 2019.
21        Do you remember that?
22        A.  Yes, generally.
23        Q.  Okay.  Notwithstanding those payments, did
24  your group continue to carry on its books and records
25  NexPoint's obligation to make the installment payment

---

**111**

1  that was due at the end of the year?
2        A.  Yes, we continued to track it through our
3  interest schedules and through cash.
4        Q.  So in the debtor's books and records is there
5  any evidence that the payments that were made in early
6  2019 were intended to relieve NexPoint's obligation to
7  make the installment payment due at the end of the
8  year?
9        MR. RUKAVINA:  Objection.  Best evidence.
10        THE WITNESS:  No, I don't believe so.
11        Q.  (BY MR. MORRIS)  Did you have a conversation
12  with anybody at any time in the year 2019 about whether
13  the payments made earlier in the year on behalf of
14  NexPoint would eliminate or suspend its obligation --
15  withdrawn.
16        Did you have any conversation with anybody --
17  I think I screwed up the dates.  Going to have to start
18  over.
19        Let me ask better questions.
20        You looked with Mr. Rukavina at certain
21  payments that were made in early 2019 with respect to
22  the NexPoint note.
23        Do I have that right?
24        A.  Yes.
25        Q.  Notwithstanding those payments, did NexPoint

---

**112**

1  make the installment payment that was due at the end of
2  2019?
3        MR. RUKAVINA:  Objection.  Calls for a legal
4  conclusion.
5        THE WITNESS:  It did make the payment that
6  was due at the end of 2019.
7        Q.  (BY MR. MORRIS)  And the payment that it made
8  at the end of 2019, was that the annual installment
9  payment that was called for in the note itself?
10        MR. RUKAVINA:  Objection.  Legal conclusion.
11        THE WITNESS:  Yes, it was a payment pursuant
12  to the note.
13        Q.  (BY MR. MORRIS)  Did anybody ever tell you at
14  any time prior to the commencement of this lawsuit that
15  any prior payment by or on behalf of NexPoint relieved
16  it of any obligation to pay the installment payment due
17  at the end of 2020?
18        A.  No.
19        Q.  And did in fact -- is it your understanding
20  that Mr. Dondero specifically authorized Highland to
21  effectuate a payment on NexPoint's behalf in mid
22  January 2021?
23        A.  I don't have specific knowledge, but I know
24  that to have occurred.
25        Q.  Okay.  Did anybody ever tell you in 2021 --

---

David Klos - October 27, 2021

---

113

1  withdrawn.
2      Did anybody tell you in December 2020 or
3  December -- or January 2021 that NexPoint didn't have
4  to make the installment payment at year end 2020
5  because of some prior prepayment?
6      A.  No.
7      Q.  Can you think of any reason -- withdrawn.
8      Did you ever hear Mr. Dondero -- withdrawn.
9      Did you ever see anything in writing where
10 NexPoint ever contended, prior to February 1, 2021,
11 that it had no obligation to make the payment due at
12 the end of 2020 because of some prepayment issue?
13     A.  No, not that I remember.
14     Q.  Can you think of any reason why Mr. Dondero
15 would have authorized a payment by NexPoint to HCMLP on
16 account of the note in January of 2021 if he actually
17 believed at that time that no obligation was due
18 because of a prior prepayment?
19         MR. RUKAVINA:  Objection.  Speculation, lacks
20 foundation.
21         THE WITNESS:  No.
22     Q.  (BY MR. MORRIS)  Does it make any sense to
23 you as an accountant that you would pay a seven-figure
24 sum of money that you didn't think was due and owing?
25     A.  No, that does not make sense to me.

---

114

1      Q.  Can you get Exhibit 13, please.
2      A.  Got it.
3      Q.  You were asked some questions about
4  paragraph 3.
5      Do you see that?
6      A.  Yes.
7      Q.  Does paragraph 3 mention annual installment
8  payments at all?
9      A.  No, I'm not seeing it.
10     Q.  Does paragraph 3 state in any way that a
11 prepayment as described in that paragraph would relieve
12 the maker of the obligation to make annual installment
13 payments?
14     A.  No.
15     Q.  Can you turn to the next page and look at
16 paragraph 5.
17     Are you familiar with that paragraph at all?
18     A.  No.  I mean, I've seen it before, but this
19 is, as I said before, this is a provision that probably
20 would have been in most, if not all, of these types of
21 notes.
22     Q.  Can you get Exhibit 3, please.  This is your
23 email dated May 2, 2019.
24     Do I have that right?
25     A.  Yes.

---

115

1      Q.  And you sent it to the corporate accounting
2  email group; is that right?
3      A.  I did.
4      Q.  And to the best of your recollection, was
5  Mr. Waterhouse included in that email group?
6      A.  Yes, absolutely.
7      Q.  And did you instruct the corporate accounting
8  team to transfer $2.4 million from HCMLP to HCMFA on
9  May 2, 2019?
10     A.  Yes, specifically Blair, but yes, for the
11 team as well.
12     Q.  The whole team was aware of this?
13     A.  The whole team is on the email, and I'm
14 sending to Blair, who is the AP person, to please set
15 up the payment.
16     Q.  Is it fair to say that you're being
17 completely transparent here by including the entire
18 corporate accounting group on this email?
19     A.  Yes.
20     Q.  And did you tell the entire corporate
21 accounting group that this transaction would be a,
22 quote, new interco loan?
23     A.  Yes, that's what the email says.
24     Q.  Do you have any reason to believe that
25 Mr. Waterhouse didn't get this?

---

116

1      A.  No, he got this.
2      Q.  And did Mr. Waterhouse tell you at any time
3  in the history of the world that this $2.4 million
4  should not have been booked as a loan?
5      A.  No.
6      Q.  Did Mr. Dondero tell you at any moment in the
7  history of the world that this transaction should not
8  have been booked as a loan?
9      A.  No.
10     Q.  You mentioned that there was an audit that
11 followed shortly thereafter?
12     A.  Yes.
13     Q.  Are you familiar with the debtor's audited
14 financial statements for the period ending 2018?
15     A.  Yes, generally.  Not total recall, but yes.
16     Q.  Are you aware that this loan was included as
17 a subsequent event in the debtor's audited financial
18 statements?
19     A.  Yes.
20         MR. RUKAVINA:  Objection.  Best evidence.
21     Q.  (BY MR. MORRIS)  Did Mr. Dondero or
22 Mr. Waterhouse or anybody ever tell you that the debtor
23 should not have included this $2.4 million loan in its
24 audited financial statements?
25         MR. RUKAVINA:  Objection.  Best evidence.

---

David Klos - October 27, 2021

117

1      THE WITNESS:  No.
2      Q.  (BY MR. MORRIS)  Okay.  And the next day
3   there was another loan; right?
4      A.  Yes.
5      Q.  I'm going to show you here a document that's
6   been produced.
7      MR. RUKAVINA:  Would you email it to me and I
8   can print it out for the court reporter.
9      MR. MORRIS:  You want to come over here and
10  look --
11     MR. RUKAVINA:  I know it.  I'm just thinking
12  that we can append it to the record right now.
13     MR. MORRIS:  It's eight pages, so it's part
14  of a whole production.
15     MR. RUKAVINA:  But it's just one email?
16     MR. MORRIS:  Just one email that I'm talking
17  about.  So we're looking at Bates stamp D-CNL003763.
18     And I'll email it to you when we're done here.
19  And you're welcome to come over here if you'd like to
20  see it.
21     Q.  (BY MR. MORRIS)  Mr. Klos, can you take a
22  look at the email that I have on my screen.
23     A.  Yes.
24     Q.  And do you see that it's an email from
25  Kristin Hendrix to the corporate accounting group on

118

1   Friday, May 3?
2      A.  Yes.
3      Q.  And were you also included in the corporate
4   accounting email string?
5      A.  Yes.
6      Q.  Can you read the email out loud, please.
7      A.  It says, Blair, please set up a wire from
8   HCMLP to HCMFA for 5 million as a new loan,
9   parentheses, 4.4 million should be coming in from Jim
10  soon.  Hayley, please add this to your loan tracker.  I
11  will paper the loan.
12     Q.  So based on that email, did you understand on
13  May 3 that HCMLP was going to loan $5 million to HCMFA?
14     A.  Yes, HCMFA.
15     Q.  And did you understand that Kristin
16  specifically told the corporate accounting group that
17  she would take responsibility for papering the loan?
18     A.  Yes, that's what she says.
19     Q.  Do you recall whether Mr. Waterhouse ever
20  objected to any aspect of Kristin's email?
21     A.  He didn't.
22     Q.  Do you recall in the history of the world
23  whether Mr. Waterhouse ever told you that this
24  $5 million transaction should not have been booked as a
25  loan?

119

1      A.  No.
2      Q.  Did anybody in the history of the world ever
3   raise a question to you as to whether or not Kristin
4   was authorized to paper the loan, as she describes it
5   in this particular email?
6      A.  No.
7      Q.  Do you know if this $5 million loan was also
8   included in the debtor's audited financial statements?
9      MR. RUKAVINA:  Objection.  Best evidence.
10     THE WITNESS:  Yes.  Again, subsequent event.
11     Q.  (BY MR. MORRIS)  Okay.  And did anybody in
12  the history of the world ever tell you that Highland
13  should not have included as a subsequent event in its
14  2018 audited financial statement this $5 million loan?
15     A.  No.
16     MR. RUKAVINA:  Objection.  Best evidence.
17     THE WITNESS:  No.
18     Q.  (BY MR. MORRIS)  Do you know if HCMFA had its
19  financial statements audited?
20     A.  It did.
21     Q.  And are you generally familiar with those
22  financial statements?
23     A.  Yes.
24     Q.  Are you aware that these two loans totaling
25  $7.4 million were included in HCMFA's audited financial

120

1   statements as a subsequent event for the period ended
2   December 31, 2018?
3      A.  Yes.
4      MR. RUKAVINA:  Objection.  Best evidence.
5      Q.  (BY MR. MORRIS)  Did anybody in the history
6   of the world ever tell you that HCMFA should not have
7   included as a subsequent event the borrowing of the
8   money reflected in these loans?
9      MR. RUKAVINA:  Objection.  Best evidence.
10     THE WITNESS:  No, no one said that.
11     Q.  (BY MR. MORRIS)  Do you know if HCMFA
12  included these loans as a liability on its balance
13  sheet?
14     A.  It did.
15     MR. RUKAVINA:  Objection.  Move to strike.
16  Best evidence.
17     Q.  (BY MR. MORRIS)  Did anyone in the history of
18  the world ever tell you that HCMFA should not have
19  included these loans as a liability on its balance
20  sheet?
21     MR. RUKAVINA:  Objection.  Best evidence.
22     THE WITNESS:  No.
23     Q.  (BY MR. MORRIS)  Okay.  Do you recall that in
24  October of 2020 HCMFA and NexPoint made a report to the
25  retail board?

David Klos - October 27, 2021

121

1    A.  Yes.
2    Q.  And are you aware that that's part of the
3 annual review process?
4    A.  Yes, it's the 15(c) process.
5    Q.  By the way, as we're talking about these
6 issues, did Mr. Waterhouse have -- was he an officer of
7 HCMFA in 2019 and 2020?
8    A.  Yes.
9    Q.  And what's your understanding as to the
10 office he held?
11    A.  Treasurer, I believe.
12    Q.  And do you know if Mr. Dondero held an
13 officer position with respect to each of the Advisors?
14    A.  He did.
15    Q.  What position did he hold?
16    A.  I don't recall with certainty, but I believe
17 president.
18    Q.  As officers of those two entities, do you
19 have any knowledge as to whether they participated in
20 the communications with the retail board in the fall of
21 2020?
22    A.  I believe Jim and Frank both did.
23    Q.  And do you know whether the retail board
24 asked the Advisors for a report on all obligations due
25 and owing to HCMLP and affiliates?

122

1    A.  They asked for financials, I believe as of
2 6/30 as part of that process.
3    Q.  And are you aware as to whether or not the
4 financials that were provided to the retail board
5 included, among other things, the $7.4 million in notes
6 that were -- that we're talking about here?
7    A.  Yes, those financials would have included
8 those amounts as liabilities to HCMLP.
9    Q.  Did Mr. Dondero or Mr. Waterhouse ever tell
10 you or anybody to your knowledge that the Advisors
11 should not have told the retail boards that they were
12 obligated to pay under those two notes?
13    A.  No.
14    Q.  Let's talk about loan forgiveness for a
15 moment.
16        How long have you been with the company?
17    A.  March of 2009.
18    Q.  At any time since you've been employed by
19 Highland, has Highland ever forgiven a promissory note
20 that it held where the maker was a corporate affiliate?
21    A.  Not that I can recall.
22    Q.  Have you ever heard prior -- has anybody ever
23 told you that before you joined the company, Highland
24 had ever forgiven in whole or in part any note that it
25 held where the maker was a corporate affiliate?

123

1    A.  Not that I'm aware of.
2    Q.  You referred to a couple of loans that were
3 given to individuals earlier.
4        Do you remember that?
5    A.  Yes.
6    Q.  What's the biggest loan that you can recall
7 Highland ever forgiving?
8    A.  The largest one that I can remember was
9 a half-million dollars, 500,000.
10    Q.  So you have no knowledge of any loan ever
11 being forgiven where the principal amount forgiven
12 exceeded $500,000; is that right?
13    A.  Not that I'm aware of.
14    Q.  And when is the last loan that Highland
15 forgave in whole or in part to one of its officers or
16 employees that you can recall?
17    A.  I don't know a specific year, but it would
18 have been in the 2010, 2011 time frame.  Maybe 2012,
19 but I suspect '10 or '11.
20    Q.  So is it fair to say to the best of your
21 recollection and knowledge that Highland did not
22 forgive a single loan made to an officer or employee
23 for at least seven years prior to the petition date?
24    A.  There's none that I can think of.
25    Q.  Let's just turn our attention to

124

1 December 2020.
2        Do you recall that you testified at length
3 about your understanding of the conversations with
4 Mr. Waterhouse and Ms. Hendrix?
5        Do you remember that?
6    A.  Yes.
7    Q.  Okay.  Are you aware of any instruction ever
8 made by Mr. Dondero or Mr. Waterhouse in November or
9 December 2020 in order to make the payments that were
10 due under the three term notes -- withdrawn.
11        There were three term notes that were due --
12 withdrawn.
13        There are three term notes at issue in this
14 case.  Do you understand that?
15    A.  Yeah, that's my understanding.
16    Q.  And one of them was issued by NexBank; is
17 that right?
18    A.  NexPoint Advisors.
19    Q.  Thank you for the clarification.
20        One was by HCRE?
21    A.  Correct.
22    Q.  And one was from HCMS; do I have that right?
23    A.  Yes.
24    Q.  And all three of those notes were executed as
25 of May 31, 2017; right?

David Klos - October 27, 2021

125

1     A. Yeah, that was the effective date on all
2   three.
3     Q. And they all rolled up previously outstanding
4   notes that were due and payable to Highland.
5        Do I have that right?
6     A. Correct. To the best of my recollection.
7     Q. So we'll refer to those notes as the term
8   notes. Is that okay?
9     A. Sure.
10    Q. Do you have any knowledge that Mr. Dondero or
11  Mr. Waterhouse ever instructed HCMLP to make the
12  installment payments that were due at the end of 2020
13  with respect to any of those term notes?
14    A. No, I don't believe they provided that
15  instruction to make those payments.
16       MR. RUKAVINA: Objection. Move to strike.
17  Lacks foundation.
18       MR. MORRIS: I'm asking him if he ever heard.
19       MR. RUKAVINA: But he answered a different
20  question. He answered a different question.
21    Q. (BY MR. MORRIS) Did you ever see anything in
22  writing where either Mr. Dondero or Mr. Waterhouse
23  directed HCMLP to make the annual installment payments
24  that were due at the end of 2020 with respect to any of
25  the term notes?

126

1     A. No.
2     Q. Okay. But to the best of your recollection,
3   in the 13-week forecast, those forecasts included the
4   installment payments that were due at the end of the
5   year; is that right?
6     A. They did.
7     Q. Did anybody ever tell you prior to
8   February 1, 2021, that your group had made a mistake by
9   not making the payment -- any of the payments that were
10  due under the term notes at the end of 2020?
11    A. Not that I'm aware of.
12    Q. Did anybody tell you prior to February 1,
13  2021, that the makers of the term notes expected
14  Highland to effectuate the payments that were due at
15  the end of the year without approval by Mr. Waterhouse
16  or Mr. Dondero?
17    A. No.
18    Q. Have you seen any protest in writing prior to
19  the commencement of the litigation by any of the makers
20  of the notes about a failure on the part of HCMLP to
21  perform its duties and make that payment at the end of
22  the year?
23    A. No.
24       MR. MORRIS: I have no further questions.
25       MR. RUKAVINA: I have five minutes.

127

1        FURTHER EXAMINATION
2     Q. (BY MR. RUKAVINA) Go to Exhibit 16, please,
3   1-6.
4     A. Sure.
5     Q. Sir, this is an email string regarding that
6   Rule 15(c) that you were talking about. I'm just going
7   to ask you about the top email, but you're welcome to
8   read the whole.
9     A. Uh-huh.
10    Q. You're copied on Mr. Waterhouse's email there
11  October 6, 2020; right?
12    A. Yes, I'm on the email.
13    Q. And Mr. Waterhouse writes, the HCMFA note is
14  a demand note. You would have read that; right?
15    A. Yes.
16    Q. Did you ever correct Mr. Waterhouse when he
17  says the HCMFA note, as opposed to notes?
18    A. No, that's not something I would have
19  corrected from Frank.
20    Q. Do you recall right now that you might have,
21  when you read this, realized that he made a mistake?
22    A. It would have been such a de minimus,
23  inconsequential mistake that I don't know that I would
24  have addressed it.
25    Q. What about two sentences over, there was an

128

1   agreement between HCMLP and HCMFA the earliest they
2   could demand is May 2021.
3        Did you ever write to him and say that too
4   was a mistake?
5     A. I didn't write to him.
6     Q. Did you realize back then when you read it
7   that he had made a mistake?
8     A. I'm not certain.
9     Q. Did you -- and I'm not suggesting that you
10  should have. You're a busy man. But did you attach
11  any significance outside of the ordinary to this email
12  exchange?
13       MR. MORRIS: Objection to the form of the
14  question.
15       THE WITNESS: I struggle with how to answer
16  that. I saw that this note was in response to retail
17  15(c) follow-up on the Advisors.
18       At this point my role was different, where I
19  was dealing with really the retail funds primarily. So
20  the fact that I'm even on this email is somewhat
21  incidental.
22    Q. (BY MR. RUKAVINA) But surely on October 6,
23  2020 you knew that there were four HCMFA demand notes,
24  didn't you?
25    A. I'm sure I would have had access to that

David Klos - October 27, 2021

**129**

1 information. I'm not sure that I was keeping track of
2 how many were outstanding at any given point in time.
3     Q. And surely on October 6, 2020 you knew that
4 only two of them couldn't be demanded by May of 2021,
5 didn't you?
6     A. Again, I don't know that I was even really
7 thinking about these notes at that time.
8     Q. Even though you were preparing weekly cash
9 forecasts for Mr. Seery?
10     A. I wasn't preparing a weekly cash forecast for
11 Mr. Seery.
12     Q. Going to Exhibit 13, please. Mr. Morris
13 asked you a couple questions about this.
14     A. I'm sorry, 13?
15     Q. Yes, sir. And again, that paragraph 3 that
16 talks about prepayment.
17        Can you find anything in here, sir, that says
18 that a prepayment does not relieve the maker of any
19 regularly scheduled payment?
20     A. Sorry, that's a lot to comprehend. If you
21 could ask again.
22     Q. Is there any provision that you can see here
23 that's to the effect that a prepayment will not relieve
24 the maker of any regularly scheduled payment?
25     A. I don't see that specific provision. I just

**130**

1 read it for what is on the page.
2     Q. Isn't it, sir, in your experience the case
3 that a promissory note, if it intended not to relieve
4 the borrower of regularly scheduled payments would say
5 that a prepayment does not relieve the borrower of
6 regularly scheduled payments?
7        MR. MORRIS: Objection to the form of the
8 question.
9        THE WITNESS: That's a legal question. I
10 can't -- I don't know the answer.
11     Q. (BY MR. RUKAVINA) Do you remember seeing
12 promissory notes that say something like that?
13     A. Not that I can recall.
14     Q. You'd be surprised if that's what promissory
15 notes say?
16        MR. MORRIS: Objection to the form of the
17 question.
18        THE WITNESS: I don't know.
19     Q. (BY MR. RUKAVINA) And Mr. Morris asked you
20 about this. I'm trying to burn through this so the man
21 can make his plane.
22        Section 2.1 talks about 30 equal annual
23 payments, annual installments.
24        You see that?
25     A. Yes, I see that.

**131**

1     Q. And Mr. Morris asked you whether you see
2 anything in here that says that a prepayment relieves
3 an annual installment.
4        Do you remember that question?
5        MR. MORRIS: Objection. That's not what I
6 asked.
7        THE WITNESS: I don't remember that question.
8     Q. (BY MR. RUKAVINA) Reading Section 2.1 and 3
9 together, what would a prepayment apply to other than
10 an annual installment? Do you have a view on that?
11        MR. MORRIS: Objection to the form of the
12 question.
13        THE WITNESS: Again, I struggle with
14 prepayment. But as I read Section 3, it would be
15 applied first to unpaid accrued interest and then to
16 unpaid principal.
17     Q. (BY MR. RUKAVINA) Have you ever in your
18 personal life prepaid a promissory note before -- have
19 you ever in your personal life prepaid a promissory
20 note prior to its maturity?
21        MR. MORRIS: Objection to the form of the
22 question.
23        THE WITNESS: I don't know.
24     Q. (BY MR. RUKAVINA) Sitting here today, with
25 your CPA, your MBA and you're a CFO of a large entity,

**132**

1 you don't understand what a prepayment means?
2        MR. MORRIS: Objection. Argumentative.
3        I direct you not to answer.
4        You're going to have ask a different question.
5 That's an argumentative question and it's insulting.
6        MR. RUKAVINA: What's the privilege on which
7 you're directing him not to answer?
8        MR. MORRIS: I just said it's argumentative.
9        MR. RUKAVINA: I'm trying to let you get to
10 your flight.
11        MR. MORRIS: Ask a proper question. Don't
12 make this about me.
13     Q. (BY MR. RUKAVINA) You were going to answer
14 my question, sir?
15        MR. MORRIS: No, I'm directing him not to
16 answer.
17        MR. RUKAVINA: Then we'll end this deposition
18 with a motion to compel.
19        MR. MORRIS: Okay. You do that.
20        MR. RUKAVINA: I'm making a motion to compel.
21 We'll call the judge as soon as we land in New York
22 tomorrow.
23        MR. MORRIS: You have to read the whole
24 question. You can ask the question without the
25 verbiage; right?

David Klos - October 27, 2021

**133**

1      MR. RUKAVINA:  And I asked you on the basis
2  of what privilege are you instructing your --
3      MR. MORRIS:  Argumentative.
4      MR. RUKAVINA:  That's not a privilege.
5      MR. MORRIS:  Sir, you can rephrase your
6  question and end this right now by not being insulting
7  to my client.
8      Q.  (BY MR. RUKAVINA)  I was not trying to be
9  insulting, sir.
10      I'm asking you again, you do not, sitting
11  here today, have an understanding of what the word
12  "prepayment" for a promissory note means?
13      MR. MORRIS:  Objection to the form of the
14  question.
15      You can answer that one.
16      THE WITNESS:  In the context that you're
17  asking the question --
18      Q.  (BY MR. RUKAVINA)  No, I'm not asking any
19  context.  Sitting here today, do you have an
20  understanding of what the word "prepayment" means when
21  it comes to a borrower/lender relationship?
22      MR. MORRIS:  Objection to the form of the
23  question.
24      THE WITNESS:  Yes, I have a general
25  understanding.

**134**

1      Q.  (BY MR. RUKAVINA)  What is your
2  understanding?
3      A.  That -- you can look at the note.
4      Q.  I'm not asking about the note.  We got to go
5  step by step.
6      What is your general understanding as to what
7  a prepayment means?
8      MR. MORRIS:  Objection to the form of the
9  question.
10      THE WITNESS:  It depends on the context and
11  it's going to depend on what the note says about
12  prepayments.  So I have a hard time answering that
13  question.
14      Q.  (BY MR. RUKAVINA)  So you would agree with me
15  that you have to look at the note before you can answer
16  that question?
17      MR. MORRIS:  Objection to the form of the
18  question.
19      THE WITNESS:  I would want to look at the
20  note before I answer the question, because prepayment
21  is a term that can be used as a defined term or in a
22  casual sense, and those two can sometimes get confused
23  and misconstrued.
24      Q.  (BY MR. RUKAVINA)  Would you agree with me
25  that in any and all circumstances a prepayment is a

**135**

1  payment made prior to the time that it's due?
2      MR. MORRIS:  Objection to the form of the
3  question.
4      THE WITNESS:  Yes, in the most general sense
5  a prepayment, the prefix "pre" indicates that it's
6  before some other event.  So from that standpoint,
7  prepayment means it was to some extent paid early.
8      MR. RUKAVINA:  Thank you.
9      Pass the witness.
10      MR. MORRIS:  No further questions.
11      Michael?
12      MR. AIGEN:  No questions.
13      THE REPORTER:  Mr. Morris, do you want a copy
14  of the transcript?
15      MR. MORRIS:  I sure do.
16      THE REPORTER:  Mr. Aigen, do you want a copy
17  of the transcript?
18      MR. AIGEN:  Yes, we would also like a copy.
19      MR. MORRIS:  Yeah, and I'd like that rush.
20      (Whereupon, the deposition adjourned at
21      5:14 P.M.)
22      --oOo--
23      I declare under penalty of perjury that the
24  foregoing is true and correct.  Subscribed at
25  _____, Texas, this ____ day  of

**136**

1  _____, 2021.
2
3
4  _____
5  DAVID KLOS
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

David Klos - October 27, 2021

**137**

1          CERTIFICATE OF REPORTER
2          I, BRANDON D. COMBS, a Certified Shorthand
3    Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell the
5    truth, the whole truth, and nothing but the truth in the
6    within-entitled cause;
7          That said deposition was taken in shorthand by
8    me, a disinterested person, at the time and place
9    therein stated, and that the testimony of the said
10   witness was thereafter reduced to typewriting, by
11   computer, under my direction and supervision;
12         That before completion of the deposition,
13   review of the transcript was not requested.  If
14   requested, any changes made by the deponent (and
15   provided to the reporter) during the period allowed are
16   appended hereto.
17         I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22         **DATED:** November 1, 2021
23
24         _____
25         Brandon Combs, Certified Shorthand

**138**

1    State of Texas
     Dickman Davenport, Inc. Cert 312
2    4228 North Central Expressway
     Suite 101, Dallas, TX 75206
3    (214) 855-5100   (800) 445-9548
     Email: info@dickmandavenport.com
4    www.dickmandavenport.com
     My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

David Klos - October 27, 2021

| **A** | | | | |
|---|---|---|---|---|

**ability** 42:12 43:21 78:2 88:8 88:10
**able** 31:20 32:2
**above-styled** 1:21
**absolutely** 12:4 16:10 77:1 80:1 80:14 90:1,4,10 94:1 115:6
**accepting** 19:17
**access** 99:13 128:25
**account** 53:20 60:3 113:16
**accountant** 26:5 26:9,15,20 39:12,17 90:19 109:5 113:23
**accountant's** 39:13
**accountants** 109:3
**accounted** 38:6 45:8,11 64:23
**accounting** 4:16 6:5,5,11,11 7:14,17,21 8:23 9:3,5,5,9,15,23 10:12 33:22 35:9,16,20 43:18 53:4 62:10,11 70:15 74:22 84:2 107:5 109:2,7 115:1,7,18,21 117:25 118:4 118:16
**accrue** 49:13
**accrued** 38:8 46:8,16,20,25 47:1,4,5,11,14 47:18,19,24,25 48:4,5,7,15

49:4,5,12,20,21 50:8,21 51:3 131:15
**accumulated** 47:22
**accurate** 27:25 85:10
**acknowledgment** 87:21,22
**act** 11:5
**activities** 107:17
**activity** 107:16
**actual** 37:5 85:13
**add** 118:10
**additional** 89:2
**address** 64:7
**addressed** 44:9 127:24
**adjourned** 135:20
**advisor** 9:24 71:7 74:19
**advisor-type** 6:7
**advisors** 1:10 12:14,15,17 13:3,6 27:1 52:19 55:1 60:22 65:23 71:6 72:22 86:6 99:20 100:17 102:21 103:9 121:13,24 122:10 124:18 128:17
**affect** 16:11,12 16:20
**affiliate** 39:23 122:20,25
**affiliated** 10:21 34:8 35:4,11 36:2 61:15
**affiliates** 38:5 51:20 121:25
**AFR** 86:7
**afternoon** 95:22

**agent** 85:16
**ago** 19:6 34:25 36:20 39:21 43:5 94:20 95:11
**agree** 8:11 47:10 47:11 51:7 77:2 89:19 134:14 134:24
**agreement** 12:23 84:11 96:4,8,23 97:9 98:5,12 104:8,9 109:22 110:7 128:1
**agreements** 41:3 97:16,23 98:1
**agrees** 48:7
**ahead** 45:7
**Aigen** 2:18 3:4 95:18,22,23 99:8 100:3,10 100:12,14,24 101:14 102:4 102:18 103:20 104:23 105:24 106:3 108:11 109:15,20 135:12,16,18
**Akard** 1:24 2:4
**aleck** 50:7
**alleged** 97:22 98:5
**Allocation** 70:25 74:12 75:6
**allow** 75:4
**allowed** 46:13 81:22 82:1 94:16 96:20 137:15
**allowing** 96:8
**amortization** 23:16 28:1
**amount** 15:5,15 37:5 47:22 59:13 73:2

80:21 84:14 97:12 123:11
**amounts** 28:24 41:7 122:8
**analysis** 30:9 53:25 54:6,9,18 55:1,8 89:13
**analyst** 5:17,25
**and/or** 40:12 67:7 91:22
**annual** 23:22 80:9 112:8 114:7,12 121:3 125:23 130:22 130:23 131:3 131:10
**answer** 16:23,25 17:2 20:18,20 21:3,15 22:1 25:5 28:10 35:16 41:18 50:11 53:24 55:15,23 71:5 78:11 79:7 87:7 94:13,14,17,21 104:22 128:15 130:10 132:3,7 132:13,16 133:15 134:15 134:20
**answered** 21:2 41:17 56:11 76:19 85:21 91:10 92:5,6 94:9 125:19,20
**answering** 134:12
**answers** 9:18 16:10,13
**anybody** 24:13 60:1 80:16 111:12,16 112:13,25 113:2 116:22 119:2,11 120:5

122:10,22 126:7,12
**anymore** 57:1 61:22 62:7
**AP** 115:14
**apologize** 9:21 27:22 63:11 66:21 77:1
**apparatus** 12:9
**APPEARANC...** 2:1
**appeared** 2:5,12 2:19
**appears** 49:3 64:2
**append** 117:12
**appended** 137:16
**application** 37:8 37:9,15,16
**applied** 39:17 46:8,9 48:11,14 49:5,8 64:13,16 65:1 131:15
**apply** 38:24 131:9
**Appreciate** 100:13
**appropriate** 35:19,22
**approval** 66:14 77:19,23 78:3 78:21 79:3 126:15
**approvals** 80:9
**approximate** 6:1 63:2
**approximately** 5:9 105:10
**April** 7:13,22 11:16,21 88:9
**areas** 107:21
**argumentative** 90:15 132:2,5,8 133:3
**art** 8:1 9:3 10:12

David Klos - October 27, 2021

ascertain 45:2,4
asked 16:18 20:5
  21:2 30:18
  41:10,17 44:10
  54:13 55:17,22
  56:11 57:12,15
  59:12 70:9
  76:19 84:8,17
  85:21 86:10
  91:10 92:5 94:9
  108:11 110:18
  114:3 121:24
  122:1 129:13
  130:19 131:1,6
  133:1
asking 18:11
  20:21 28:6
  38:20 56:9,13
  61:5,7 77:13
  83:22 94:15
  100:9 125:18
  133:10,17,18
  134:4
aspect 118:20
ass 17:18
asserted 97:7
  98:8
asset 15:7
assets 15:3 87:10
  87:12 97:12
  107:12
assist 42:13
assistance 31:13
assistant 6:24 7:4
  7:7,10 8:8
assisted 22:23
assume 28:7 29:7
  90:6 95:18
  101:21
assumed 7:14
  53:3
assuming 36:14
  36:21 41:23
  64:1
assumptions

54:14
attach 128:10
attempt 87:7
attention 123:25
attorney 2:5,12
  2:18 137:18
audit 9:25 24:6
  80:4 116:10
audit-driven
  88:5
audited 116:13
  116:17,24
  119:8,14,19,25
auditor 24:3
auditors 24:5
  88:6,14
aughts 106:13
August 42:16
  44:13
authenticate 28:5
authenticity
  67:23
authoritative
  65:1,2
authority 36:9
  77:3,13,15 78:7
  78:21,25
authorization
  108:10
authorize 77:4
authorized 40:2
  59:15 69:6,25
  85:24 108:5
  112:20 113:15
  119:4
authorizing
  94:20
Avenue 2:11,17
aware 35:6 58:24
  59:2,3 80:18,21
  96:6,10,12
  97:15 100:24
  101:5,8 102:7
  103:20,24
  106:6,20

109:23 115:12
116:16 119:24
121:2 122:3
123:1,13 124:7
126:11
awfully 17:20

_____

**B**

back 6:14 15:19
  22:12 23:21,25
  36:11 40:18
  49:17 51:13
  55:16 65:12
  67:4 68:25
  82:23 83:19
  84:4 85:12
  102:13 128:6
back-end 15:19
  15:21
back-ended
  14:25
background 4:13
  53:2 70:5,6,7
backup 36:19
bad 20:12 89:15
balance 49:6
  80:6,8 120:12
  120:19
ballpark 85:24
bank 36:17 99:13
bankruptcy 1:1
  31:19 80:10
  96:15 98:12
  102:14 104:12
base 14:5,7
based 14:11,14
  32:12 37:17
  46:5,7 48:12,19
  54:14 104:14
  104:16 118:12
basically 6:3
  31:13 56:1 81:5
basis 23:22 30:2
  133:1
Bates 83:15

117:17
began 5:11
beginning 109:4
behalf 2:6,13,20
  12:24 25:2 78:2
  78:22 79:1
  111:13 112:15
  112:21
beings 71:19
belief 104:16
believe 6:23
  15:11 16:3 17:3
  17:8 18:2 19:23
  21:13,13 22:20
  23:13,19 24:16
  26:13 49:9 51:1
  51:2 74:16
  77:17 78:1,7,19
  81:8 83:1,3
  86:25 102:6
  111:10 115:24
  121:11,16,22
  122:1 125:14
believed 35:10
  57:6 113:17
beneficiaries
  17:10,15
benefiting 73:9
best 5:25 8:3
  52:15,17 55:7
  63:24 64:4
  78:16,17 85:8
  95:19 109:21
  110:6 111:9
  115:4 116:20
  116:25 119:9
  119:16 120:4,9
  120:16,21
  123:20 125:6
  126:2
better 111:19
biggest 123:6
bill 74:20
bills 82:4,5,10,11
birth 4:9

bit 7:9 12:12 14:2
  30:15 33:12
  39:3 48:1 98:15
  106:23 107:5
Blair 115:10,14
  118:7
board 120:25
  121:20,23
  122:4
boards 122:11
bold 40:25
bonus 14:8,9,10
  14:19,24 15:14
  18:5 90:21
book 33:21 34:12
  34:20
booked 32:23
  33:11 34:9 35:5
  35:20 36:24
  44:23 90:8
  116:4,8 118:24
books 80:7
  110:24 111:4
borrow 78:22
borrower 45:6,15
  45:19,24 46:2
  130:4,5
borrower/lender
  133:21
borrowing 120:7
boss 39:13
Boston 4:15 5:8
  5:10
brain 32:9
Brandon 1:22
  137:2,25
break 7:6
bridge 29:22
  30:6
briefly 13:5
bring 49:6
broad 9:22 35:17
  61:3 107:21
broader 76:8
broken 53:16

David Klos - October 27, 2021

brokers 10:17
brought 6:4,14
  31:3,7 97:15
bucks 74:25
budgeting 6:8
burn 130:20
businesses 30:1
busy 11:15,19
  128:10

**C**
call 6:4 11:11,13
  38:10 63:14
  90:16 132:21
called 9:24 58:21
  59:11 70:24
  74:16 88:7
  109:5 112:9
calling 90:24
Calls 112:3
capital 1:6,9 5:11
  6:6 8:4 13:6
  23:22,23 26:19
  26:23 27:1 29:4
  29:19 32:6,23
  35:3 37:25 71:6
  107:2 110:8
car 82:9
career 11:20
careful 17:21
carry 110:24
case 43:20 86:24
  89:18 103:11
  105:17 124:14
  130:2
cash 9:25 23:21
  23:24 25:23,24
  26:7 31:9,10,12
  31:14,16,23
  32:8,12,14
  41:15,24 42:12
  42:23 43:5,22
  43:24 44:1
  57:25 61:25
  63:2 73:20

88:12,17 93:7
  93:20,21 107:6
  107:16 109:7
  111:3 129:8,10
casual 134:22
caught 62:5
cause 1:21 137:6
  137:20
caused 79:12
  81:10
causes 82:9
Central 138:2
Cert 138:1
certain 5:17
  11:13 12:21,21
  13:12 23:14
  33:13 38:1
  54:14 67:21
  70:12 83:9
  95:11 96:9
  97:10 98:17
  99:14 101:1
  103:22 106:18
  109:24 111:20
  128:8
certainly 6:18
  9:17 12:3 20:10
  26:4 30:11
  32:16 34:4
  35:18 37:23,24
  42:11 50:4 58:8
  62:14 69:1
  77:13,24 86:22
  101:8,10,12
  108:8
certainty 29:13
  42:19 68:18
  69:8,11,24 70:2
  102:19 103:10
  103:12 108:7
  121:16
CERTIFICATE
  137:1
Certified 137:2
  137:25

certify 137:3,17
cetera 6:1 14:20
CFO 5:21,25
  8:18 48:6,21
  131:25
chain 53:5
chance 69:4
change 8:8 16:10
  46:10 59:1
  84:13 103:25
changed 6:18
  39:11 84:16
changes 7:1
  137:14
Changing 106:23
characterize 54:1
  76:10 87:18,19
characterized
  54:2
charge 6:15 10:3
chief 7:13,17,21
  8:23,23 9:3
  10:12 13:20,22
  53:3
circumstance
  51:1
circumstances
  31:2 134:25
claim 81:1,9
claimant 15:16
  18:6
clarification
  124:19
clarify 11:3 12:8
  53:1 66:18
  75:25
clear 17:21 26:19
  27:11 29:14
  52:24 63:9
  69:15,16 73:13
clearly 74:2
client 133:7
clients 17:25
Cliff 7:23
close 17:21 33:14

98:3
closed-end 74:14
closely 62:4
coach 100:11
coaching 100:10
  100:13
cold 46:6
collect 81:17
collected 81:19
collectible 87:15
collecting 15:16
  81:6,6
collection 87:25
collective 52:2
college 4:15 5:6
column 36:25
  37:7
combination
  39:16 45:12
combine 106:24
Combs 1:22
  137:2,25
come 47:12 53:7
  59:19 65:3,5
  76:22 101:6
  117:9,19
comes 133:21
comfortable 88:6
coming 17:20
  36:13 118:9
command 53:5
commencement
  112:14 126:19
comment 17:13
commission
  138:4
common 30:5
  86:5
communicated
  95:12
communicating
  53:9
communication
  83:10
communications

121:20
company 81:14
  122:16,23
compel 132:18,20
compensate 72:8
  72:12 79:14
  89:20 110:15
compensated
  17:16 110:2,3
compensation
  14:3,6,8,19
  15:14 16:4,12
  16:16,21 17:4,8
  17:24 18:5
  60:18 73:8,12
  79:25 90:2,12
  90:17 105:21
complete 15:3
  74:23 106:11
completed 15:22
  15:25 16:2
  74:21
completely 15:24
  27:25 89:9,15
  90:7 115:17
completion
  137:12
complex 108:24
  108:25 109:2
compliance 6:8
  72:4
comprehend
  129:20
computer 137:11
computerized
  1:24
concept 89:16
concern 23:23
  24:1,2,4 56:21
  56:23,25 62:17
concerning 17:7
  63:20
conclude 80:25
concluding 24:6
conclusion 94:25

David Klos - October 27, 2021

112:4,10
**condition** 96:4
**conditional** 97:11
**conduct** 69:18
**confer** 26:4
**confident** 69:5
**confirm** 59:17
   61:19
**confused** 41:6
   134:22
**confusion** 11:6
**conjunction** 24:5
**connection** 24:12
   26:2
**consent** 74:16
   75:23 80:2
   85:15 90:3
   93:16
**consented** 74:17
**consequence**
   104:20
**considerations**
   16:1 60:10
**constant** 75:15
**construct** 90:2
**consultancy** 11:9
   11:11
**contended**
   113:10
**context** 133:16
   133:19 134:10
**contingent** 14:11
**continue** 17:22
   100:8 110:24
**continued** 111:2
**continuously**
   6:17 29:22
**contract** 71:10
**contracted** 71:15
**contradict** 79:18
**control** 43:2
   90:10
**controlled** 89:8
**controller** 6:24
   6:25 7:4,4,8,8

7:10,10 8:4,8,9
   8:12,15 9:11
   10:10,12 12:19
   13:10,17 48:6
**conversation**
   18:22 19:9,19
   43:15 51:25
   70:14 91:25
   93:18 94:24
   103:18 105:18
   111:11,16
**conversations**
   18:23 19:11
   20:2 34:11 42:6
   51:25 93:19
   96:16,19,22,24
   97:20,22 98:2,5
   102:9,12,13
   104:24 105:5,7
   105:11,16,21
   124:3
**conversion** 74:15
   74:17,21
**converted** 74:13
**conveyed** 102:25
   103:1
**coordinated**
   22:21
**copied** 127:10
**copy** 135:13,16
   135:18
**corporate** 6:5,15
   9:9,15 25:22
   33:8 35:9,16
   39:12,13,16
   43:17 61:14
   62:11 70:15
   73:20 84:2
   109:1,6 115:1,7
   115:18,20
   117:25 118:3
   118:16 122:20
   122:25
**correct** 5:22,23
   8:19,21 9:20

16:17 40:2 42:1
   45:25 51:11
   61:10 64:25
   68:10 69:2
   82:21 88:11,17
   88:23 91:2
   97:18 99:17
   101:21,22
   105:23 124:21
   125:6 127:16
   135:24
**corrected** 127:19
**correctly** 5:16
   51:13 62:9
**cost** 97:13
**counsel** 2:6,13,19
   18:10,20,25
   20:3 21:16
   22:21,25 23:3
   96:17,20,22
   97:21 98:1
   137:17
**couple** 61:20
   87:14 123:2
   129:13
**course** 20:3 33:19
   51:9 66:12
   69:18 83:22
   84:4,6
**court** 1:1 117:8
**courteous** 76:24
**covered** 20:14
   53:2
**CPA** 4:19,22
   44:21 48:6,20
   49:11 131:25
**CPAs** 95:4
**created** 80:10
**credit** 6:8 25:9
   40:11 89:13
   90:11
**creditors** 15:17
**CSR** 1:23
**curiosity** 59:21
**current** 4:25

**cut** 109:8
**cycle** 41:7

_____

**D**

**D** 1:22 137:2
**D-CNL003763**
   117:17
**Dallas** 1:3,25 2:4
   2:18 4:12 5:10
   138:2
**damages** 82:12
**date** 4:9 8:6
   24:22 45:20
   47:5,6,23 48:25
   49:13,13,14
   84:14 123:23
   125:1
**dated** 114:23
   137:22
**dates** 27:10 28:18
   28:24 111:17
**Davenport** 138:1
**David** 1:14,18
   4:1,6 136:5
**Davor** 2:5 76:22
**day** 29:21 32:1
   34:1 59:7 74:8
   93:18 117:2
   135:25
**day-to-day** 9:17
   62:6
**days** 59:5 76:2,7
**de** 127:22
**dealing** 29:20
   128:19
**debtor** 26:21
   32:23 38:6,22
   38:23 76:16
   77:3,5,8 78:2
   81:1 87:14
   88:16 116:22
**debtor's** 111:4
   116:13,17
   119:8
**debts** 89:3

**December** 24:20
   24:23 51:10,15
   51:22 53:18
   54:24 56:17,22
   57:6,13,17,21
   58:7,9 60:20,25
   61:21 63:19
   98:18,18,24
   99:19 100:15
   101:1 102:17
   103:23 113:2,3
   120:2 124:1,9
**decide** 38:23 39:5
   90:12
**decided** 24:9,12
   24:14,15 32:7
   64:22 77:18
   84:25 86:1
**decides** 38:22
**deciding** 64:15
   69:18
**decision** 27:2
   30:25 86:5
**decision-making**
   32:10
**decisions** 29:8
   30:9,16
**declare** 135:23
**deduction** 73:9
**default** 58:13,17
   61:14 62:18
**defendants** 1:11
   1:20 2:6,20
   96:3,6
**defense** 80:15
   96:3,7,13,23
   97:5,7 98:1
**defenses** 96:10
   96:18
**defer** 103:13,18
**define** 47:18,20
**defined** 104:8
   134:21
**definitely** 6:21
   7:12 73:6

David Klos - October 27, 2021

**definition** 38:11
104:13,14
**definitive** 50:11
**definitively** 15:20
**degree** 4:16
**degrees** 4:14
**Deloitte** 5:8,8
**demand** 23:13
86:3,8 87:14
88:15 127:14
128:2,23
**demanded** 129:4
**deny** 67:22
**department** 9:7
84:9
**depend** 15:15
17:6,9 134:11
**depending** 31:2
32:15 89:11
**depends** 16:5
134:10
**deponent** 137:14
**deposition** 1:13
1:18 18:9,24
19:16,22,24
20:5,9,14,16
21:1,7,9,12,19
27:20 132:17
135:20 137:4,7
137:12,19
**describe** 8:2
54:11,13
**described** 13:16
54:10 69:6 72:1
87:23,24 92:2
109:24 110:13
114:11
**describes** 119:4
**describing** 33:7
**detail** 54:5 58:2
**determination**
60:17
**determine** 38:16
**determined**
40:21

**determining**
89:13
**Dickman** 138:1
**differed** 54:10
**difference** 49:7
76:6
**differences**
107:14
**different** 30:5
34:15 38:21
44:11 74:9
77:12 99:11
107:11,12,17
125:19,20
128:18 132:4
**direct** 9:15 20:17
20:19 34:13
78:13 132:3
**directed** 20:22
51:19 60:21
68:19,20,21
69:1,3 125:23
**directing** 132:7
132:15
**direction** 33:2
34:2 35:23
54:15 55:18
62:24 65:1,2
94:25 102:23
102:24 137:11
**directions** 103:19
**directly** 103:19
**disagree** 89:19
99:21 100:18
**disciplinary** 5:3
**disciplined** 5:2
**discuss** 20:4 97:2
**discussed** 15:8
21:16 90:1
93:15,17 94:1
97:4,6
**discussing** 42:3
65:9 77:25 92:4
92:8,11 93:3,10
**discussion** 19:21

31:4,7 39:21
57:18,22 58:3,4
60:1,5,8 62:20
63:1,20 92:14
101:20
**discussions** 19:3
21:8 24:13
30:24 41:13
59:22 63:22
103:2
**disinterested**
137:8
**dissimilar** 14:21
**dissuade** 62:23
**distinct** 10:10
**distribution** 59:9
83:5
**DISTRICT** 1:2
**dividend** 105:8
**DIVISION** 1:3
**document** 44:21
46:23 50:15
64:6,12 76:23
76:23 79:17
84:10 88:2
96:15 117:5
**documents** 67:8
76:20
**doing** 6:5,11 9:24
25:18 85:14
86:17 89:13
95:2
**dollar** 28:18 75:2
75:2
**dollar-for-dollar**
73:4
**dollars** 18:1
123:9
**Dondero** 2:20
24:11 29:15
30:8,19 32:7
33:21 34:2,7,18
38:4 39:24
40:10 41:14
42:3,7,10 43:2

43:7,10,16,25
51:18 52:4,7,19
53:12,15,16
54:18,24 55:9
55:17,25 56:3
56:10,15 60:21
61:24 62:23
65:3,24 69:9,12
70:15 74:3 76:1
76:13 77:2,25
85:1,19 89:18
90:9 91:14,17
91:21 92:9,14
92:23 93:3,10
93:25 94:2,5
95:1,24 98:11
98:11 101:7
104:24 105:16
105:21 112:20
113:8,14 116:6
116:21 121:12
122:9 124:8
125:10,22
126:16
**Dondero's** 62:11
73:6 76:9 77:19
78:3,21 79:3,11
79:18
**double** 81:5
**doubt** 35:21 36:8
**dozens** 65:16
**draft** 24:16
**drafted** 22:21
**drafting** 58:17
**DRIP** 105:8
**driven** 42:19
**drukavina@m...**
2:7
**due** 25:16,19
37:12,18 47:12
49:12 51:10,14
74:20 76:22
98:18,24 111:1
111:7 112:1,6
112:16 113:11

113:17,24
121:24 124:10
124:11 125:4
125:12,24
126:4,10,14
135:1
**duly** 1:19 4:2
137:4
**duties** 9:12 62:6
126:21
**duty** 25:9

---
**E**

**earlier** 17:13
49:14 75:13
98:16 101:6
111:13 123:3
**earliest** 128:1
**early** 51:22 54:24
60:20 87:1 89:2
111:5,21 135:7
**educational** 4:13
**effect** 41:14
62:18,21
129:23
**effective** 125:1
**effectively** 49:22
75:5
**effectuate** 99:13
112:21 126:14
**effectuated** 99:3
**eight** 117:13
**either** 21:18 26:3
26:25 29:12
30:16 31:10,16
35:23,25 38:8
39:12 48:19
50:12 68:14
69:1,3,9 79:24
84:21 86:12
105:25 125:22
137:18
**electronically**
84:22
**eliminate** 111:14

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| **email** 2:7,14,22 | **entitled** 17:23 | **exactly** 5:18 | **expect** 17:12 | 91:16 97:14,23 |
| 54:16 59:8,9 | 18:10 20:4 | 14:24 15:23 | 64:12 65:4 | 99:1,15 104:17 |
| 67:14,15,18,21 | **entity** 12:20 13:8 | 34:3 48:2 77:23 | 83:12 86:21 | 105:15,20 |
| 69:4,7 70:13,16 | 13:11,13 30:20 | 80:16 | **expectation** 15:1 | 115:16 123:20 |
| 82:23,25 83:7 | 31:20 32:7,15 | **Examination** 3:3 | **expected** 126:13 | **fairly** 9:22 30:4,5 |
| 83:10,11 | 32:17 34:19 | 3:4,5,6 4:3 | **expenses** 73:7 | 84:7 |
| 114:23 115:2,5 | 35:4,11 36:2 | 95:21 109:18 | **experience** 5:5 | **fall** 80:10 121:20 |
| 115:13,18,23 | 40:10 42:10 | 127:1 | 37:18 38:14 | **familiar** 21:23 |
| 117:7,15,16,18 | 75:8,10 90:10 | **example** 31:6,9 | 46:19 49:11 | 22:5,6 28:1 |
| 117:22,24 | 109:13 131:25 | 37:6 48:25 | 104:16 130:2 | 67:1 82:15 |
| 118:4,6,12,20 | **equal** 86:6 | **exceeded** 87:10 | **expert** 82:21 87:6 | 104:1 114:17 |
| 119:5 127:5,7 | 130:22 | 123:12 | **expertise** 48:20 | 116:13 119:21 |
| 127:10,12 | **equity** 79:24 | **exception** 16:8 | **expires** 138:4 | **far** 5:1 24:15 |
| 128:11,20 | 90:22 | 17:1 44:2,3 | **explain** 8:22 | 37:5 58:23 62:6 |
| 138:3 | **error** 70:25 71:2 | **excess** 41:15 | 64:13 107:1 | 84:11 87:9 |
| **emailed** 59:11 | 71:19,25 72:13 | **exchange** 128:12 | **explaining** 92:25 | **fault** 81:10 |
| **emails** 80:13 | 72:14,19 73:4 | **exclude** 18:22 | **explore** 12:12 | **faulty** 43:3 |
| **employed** 122:18 | 79:15 80:20 | **exclusively** 23:13 | **express** 14:19 | **February** 80:19 |
| **employee** 12:23 | 81:1,14 85:22 | 33:14,14 | **Expressway** | 113:10 126:8 |
| 26:17,21,24 | 89:20 90:3,3 | **excruciatingly** | 138:2 | 126:12 |
| 123:22 | 92:11,16,17,18 | 73:13 | **extended** 7:12 | **fee** 74:16,18 |
| **employees** 43:11 | **errors** 71:9 72:20 | **excuse** 37:1 74:25 | **extending** 14:17 | 75:23 80:2 |
| 72:2 98:8 106:7 | 72:21 73:16 | **executed** 24:18 | **extent** 31:10,12 | 85:15 90:3 |
| 106:12 107:8 | **especially** 15:4 | 31:1 70:22 84:3 | 60:24 61:8 | 93:16 |
| 107:20 123:16 | **established** 51:4 | 124:24 | 66:10 86:23 | **feel** 54:5 69:5 |
| **employment** | 75:13 76:11,12 | **execution** 22:7,13 | 135:7 | **feels** 35:17 82:22 |
| 78:13 | 78:12 | 22:20 24:23 | **extrapolating** | **fight** 53:17 |
| **ended** 120:1 | **estate** 107:13 | 83:21 84:19 | 92:24 | **file** 80:11 |
| **ensure** 23:20 | **estimate** 11:22 | 85:6 | | **final** 30:9 |
| **enter** 78:25 | **et** 6:1 14:20 | **executive** 26:14 | **F** | **financial** 8:23 |
| **entered** 98:11 | **event** 116:17 | **exhibit** 22:4 23:8 | **FA** 88:7 | 13:20,22 87:20 |
| **enterprise** 30:1 | 119:10,13 | 27:9,15,23 | **face** 71:16 | 116:14,17,24 |
| 32:18 | 120:1,7 135:6 | 36:12 40:20 | **facile** 15:24 | 119:8,14,19,22 |
| **entire** 12:9 | 137:19 | 42:17 44:13,22 | **facilitate** 25:18 | 119:25 |
| 115:17,20 | **events** 16:20 96:9 | 46:12 48:12 | 31:15 | **financials** 122:1 |
| **entities** 6:7 25:24 | **eventually** 32:2 | 49:1,10 64:2,5 | **facility** 6:8 | 122:4,7 |
| 26:16 30:6 | **evidence** 80:14 | 67:17 68:4 | **fact** 29:6 58:23 | **find** 26:13 31:15 |
| 31:11,16 34:8 | 111:5,9 116:20 | 82:24 83:20 | 58:23 76:14 | 67:14 129:17 |
| 61:15 65:18,22 | 116:25 119:9 | 114:1,22 127:2 | 79:21 94:23 | **fine** 21:10 39:3 |
| 65:22,24 99:6 | 119:16 120:4,9 | 129:12 | 101:9 112:19 | 90:21 106:25 |
| 101:1 102:20 | 120:16,21 | **exhibits** 3:10 | 128:20 | **FINRA** 4:21 |
| 103:8 106:24 | **evolved** 6:18,21 | 67:2,7 68:1 | **failed** 58:18 | **firm** 95:23 |
| 107:18,25 | **exact** 7:5,11 | **existing** 7:13 | **failure** 126:20 | **first** 4:2 37:2,4 |
| 108:17,19,21 | 15:24 20:16 | 23:13 | **fair** 16:15 35:8 | 42:22 46:14 |
| 108:25 121:18 | 94:19 | **expand** 59:7 | 60:9 65:15 | 48:14 49:5 50:7 |

David Klos - October 27, 2021

72:14,19,19
75:14 96:2
110:20 131:15
**five** 105:3 126:25
**flag** 10:4
**flavoring** 63:14
**flight** 132:10
**flip** 37:1
**flipped** 9:20
**Floor** 1:25 2:11
**flow** 23:21,25
26:7 88:17
96:15
**focus** 8:14 65:10
**focused** 6:7
**follow** 16:18
**follow-up** 128:17
**followed** 116:11
**follows** 4:2
**forecast** 126:3
129:10
**forecasting** 6:8
**forecasts** 9:24
44:1,4 126:3
129:9
**foregoing** 135:24
137:4
**foreign** 89:15
**forgave** 123:15
**forget** 86:7
**forgetting** 9:8
**forgive** 123:22
**forgiven** 96:8
106:7,16,17,20
122:19,24
123:11,11
**forgiveness** 97:10
97:17 122:14
**forgiving** 123:7
**form** 6:16 8:25
11:17,24 12:25
14:12 21:24
22:8,15 23:10
25:3,11 27:4
29:10 32:25

33:24 34:21
35:13 36:4
37:20 38:17,25
39:7 40:3,14
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22
49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 57:8
60:12 61:1 63:5
64:9 65:19,25
66:7,15 69:20
71:3,12,20
76:18 77:6,20
77:23 78:4,23
79:5,19 81:2,11
81:23 82:6,13
84:11,12 87:3
88:18 89:5
90:14 91:3,9
93:13 94:8 95:5
99:4,23 100:19
101:3,25
102:15 103:15
104:18 108:2
128:13 130:7
130:16 131:11
131:21 133:13
133:22 134:8
134:17 135:2
**found** 61:18
**foundation**
113:20 125:17
**four** 6:13 128:23
**frame** 4:24 7:11
7:12 8:10,14,24
12:6 20:12 24:8
25:1 66:12,20
67:16 106:13
123:18
**Frank** 8:17 11:1
20:9 29:13

30:15,17 35:23
35:25 36:10
44:7 52:1 53:7
53:8 54:15 55:9
60:20 61:14
68:14,14 69:1,3
70:13,14 77:13
77:15 80:12,13
93:6 101:7,18
101:23 102:3,4
102:8,9,11
121:22 127:19
**Frank's** 39:18
**Frankly** 48:10
**fraud** 81:5
**frequent** 84:1
**Friday** 118:1
**front** 10:17 44:8
67:20 68:5 72:3
**full** 57:3 106:18
**full-service** 107:5
**full-time** 12:3
**function** 72:2
**fund** 1:9 6:11,11
9:5,5 13:6
70:24,25 71:1,6
71:7,8 72:8
73:15 74:11,12
74:13,13,14,17
75:2,6 80:20,23
81:16 86:5
109:3
**funds** 10:21,22
12:13 29:9 30:2
30:19 31:20
34:8 35:11
75:24,24 76:1
80:9 85:14
128:19
**further** 3:6 24:19
84:18 126:24
127:1 135:10
137:17
**future** 17:4 45:16
49:13,20 53:17

93:7

---

**G**

**gearing** 53:17
**gears** 65:8
**general** 18:13,15
19:9,10 20:11
20:13 32:20
33:19 61:4
92:11 93:4
96:24 97:6
104:4,5 108:20
133:24 134:6
135:4
**generally** 19:25
27:24 30:4
32:21 38:4,4
40:2,11,16
42:15 45:8
77:22 96:5,10
96:12,17 98:20
105:1 107:1
108:18 110:22
116:15 119:21
**generallys** 40:6
**generating** 42:12
**Germans** 63:14
**getting** 10:4
23:24 44:8
51:13 59:8
**give** 5:21,24 14:4
16:13 39:3
67:25
**given** 15:5 43:2
43:22 47:23
70:12 73:21,22
74:1 102:8
123:3 129:2
**global** 52:25
70:24 74:12
75:6 101:13
**go** 15:19 16:1
20:1 43:6 54:4
65:12 81:9
82:18 85:10

105:24 127:2
134:4
**goes** 28:9 40:18
87:9
**going** 14:2 15:5,6
16:9,12,15,19
17:5 20:19
28:17 32:10
36:11,12 42:22
46:11 49:13
55:16 57:11,14
62:18 65:8,9,10
65:12 68:1 70:5
74:22 79:9
82:23 83:11,19
88:7 89:20
106:23 107:17
108:20 111:17
117:5 118:13
127:6 129:12
132:4,13
134:11
**good** 73:20 95:22
96:1 100:12
**grad** 5:7
**graduate** 4:14,15
**group** 5:19 6:11
6:16 9:9,14,15
9:21 10:7,9,14
10:15,24 11:7
35:9 43:18
61:21 62:10,11
83:5 109:3
110:24 115:2,5
115:18,21
117:25 118:16
126:8
**groups** 6:19,20
**guess** 8:8 88:24
104:21

---

**H**

**half** 5:9 94:20
95:11 110:20
**half-million**

David Klos - October 27, 2021

123:9
hand 90:9
handled 11:9
   26:21 35:9 40:8
handles 11:7
hands 57:2
happened 35:25
   47:13 59:2,4
   93:8,11
happening 27:14
happens 47:13
happy 55:22
hard 15:4 18:1
   26:13 47:20
   63:7 71:5
   134:12
harder 11:13
HARDT 2:3
HARR 2:3
hat 43:15
hate 57:1 97:4
Hayley 83:21
   118:10
HCM 76:16
HCMFA 13:6
   53:20 65:10
   68:8 71:10,17
   72:8,8,12,12,24
   73:3,5,7,14,17
   73:21 74:10,24
   75:1,1,21 76:11
   76:16,17 78:14
   78:22 79:1,13
   79:14 80:2,20
   80:22,25 81:15
   85:16 87:2,5,9
   87:15 88:10
   89:2,3,12,13,20
   90:17,21,23
   91:23 92:19,20
   93:16,21,23
   110:2 115:8
   118:8,13,14
   119:18 120:6
   120:11,18,24

121:7 127:13
127:17 128:1
128:23
HCMFA's 70:23
   119:25
HCMLP 10:21
   29:4 42:20 60:2
   68:8 71:17 72:2
   72:2,23 76:2
   80:1 94:1 104:8
   109:24 110:3,4
   110:12,15,16
   113:15 115:8
   118:8,13
   121:25 122:8
   125:11,23
   126:20 128:1
HCMS 2:20
   95:24 98:23
   99:8,10 107:3,4
   107:5 109:21
   109:25 110:3
   124:22
HCRE 2:20
   95:24 98:23
   99:8,10,21
   100:17 107:3
   107:11,20
   108:6,12,22
   110:6,7,10,12
   110:15 124:20
he'll 94:14
head 62:15
   107:10
headers 36:25
hear 52:4 113:8
heard 30:17
   62:16 74:3
   91:14,17,21
   122:22 125:18
hearing 101:10
hearsay 79:17
heavy 107:13
hedge 6:11 30:15
   33:12

held 6:16 10:20
   121:10,12
   122:20,25
hell 74:24
help 33:2 65:22
   66:20 67:16
   100:4
helped 105:9
helping 31:14
Hendrix 9:16
   18:16,19,24
   20:3 27:19
   39:13 52:11
   84:17 99:2,18
   100:14,25
   103:3,14
   117:25 124:4
hereof 48:16
hereon 48:15
hereto 137:16
hesitate 64:17
hesitating 106:16
hey 42:23 85:9
hierarchy 10:25
high 105:5
Highland 1:6,9
   5:11,12,14,22
   6:6 7:25 8:4,12
   8:16 10:14,18
   10:20 11:23
   12:6,8,9,23
   13:4,5,14,17,18
   13:21 14:3,22
   15:2,15 16:5,6
   17:5,6 23:2,21
   23:21,22,23
   25:2 26:17,18
   26:19,23,25
   28:2 29:4,18,20
   29:24 31:12,17
   32:6,23 33:3,4
   33:7 34:7,19
   35:3,4,10 36:2
   36:24 37:10
   39:22 40:22

41:2,2,12,16,24
42:5,20,22 43:6
43:7,9,10,12,16
44:5 49:11
50:19 51:2,4,19
51:20 58:13,21
59:9 64:24
65:18,21 70:24
71:6,11 72:7,10
74:12,25 75:8
75:10,12,14,23
75:24,25 76:4,5
76:12 79:8,25
80:2,7 81:18
84:9 88:14 89:1
89:4,12 90:4,5
90:22 92:19,22
93:23 97:11
104:11 105:22
106:6 107:2,24
109:22 110:8
112:20 119:12
122:19,19,23
123:7,14,21
125:4 126:14
Highland's 42:13
51:9 72:13,14
history 62:2
116:3,7 118:22
119:2,12 120:5
120:17
hit 82:3
hits 82:9
HMS 99:21
100:17
hold 4:18 121:15
honestly 58:22
hope 43:20 82:7
hopelessly 53:16
Houlihan 71:23
hours 11:22 12:6
12:7,10
housed 72:2
human 71:19
hundred 23:14

28:5 30:10,11
33:13 68:18
69:5,11 92:3
102:19 106:18
hundreds 65:16

---

**I**

idea 7:24 57:10
89:12 108:13
identified 72:25
illiquid 11:13
important 44:6,7
59:18,20 93:22
importantly
85:15
impossible 80:24
91:25
impression 52:24
in-house 23:3
inappropriate
81:20
inartful 77:16
incidental 128:21
include 52:18
107:25
included 85:12
115:5 116:16
116:23 118:3
119:8,13,25
120:7,12,19
122:5,7 126:3
including 79:14
115:17
inconsequential
127:23
incorrect 55:5,6
55:11
INDEX 3:1
indicate 44:22
80:7,16
indicates 135:5
individual 31:8
52:2 72:24
individuals
106:19 123:3

David Klos - October 27, 2021

inflow 59:8
info@dickman...
138:3
informal 83:25
105:14
informally 62:5
information
59:16 129:1
informed 62:10
102:3
inject 90:22
ink 84:23
insinuation 16:9
17:1
insolvent 87:2,6
installment
110:25 111:7
112:1,8,16
113:4 114:7,12
125:12,23
126:4 131:3,10
installments
14:22 130:23
instance 1:20
31:20 34:11,16
34:18 35:25
39:22 42:22
68:24 86:22
instances 32:5
65:16 71:8 91:5
institutional 9:5
instruct 115:7
instructed
125:11
instructing 85:9
133:2
instruction 52:25
61:13,24 62:12
62:17 99:19
101:6,13,17,23
102:3,5,8,20
103:7 124:7
125:15
instructions
100:15 103:14

103:22
insulting 132:5
133:6,9
insurance 80:20
80:22 81:5,6,9
81:14,19 82:4
82:10,19
intended 44:15
44:19 111:6
130:3
intent 95:12
interco 68:8
115:22
intercompany
32:22 41:3
65:17 68:9,11
68:12 69:10
interest 37:4,8,13
37:15 38:9
40:12 45:12
46:8,8,16,20,25
47:1,4,4,11,12
47:13,14,18,19
47:20,21,24,25
48:4,5,7,15
49:4,6,12,12,20
49:23 50:9,21
51:3 86:2 111:3
131:15
interested 83:13
137:19
internal 22:21,25
internally 96:16
investment 74:19
investments
107:16
investors 74:17
75:5
involved 10:7
25:14,24 60:17
iota 16:13
irrespective
90:11
issue 29:18 36:20
43:7,8,17 93:10

105:17 108:1
113:12 124:13
issued 124:16
issues 75:15
79:23 121:6

J
Jack 106:15
January 29:16
42:16 44:13
58:11,15,25
59:23 60:2,23
61:7,18 112:22
113:3,16
Jim 2:20 24:11
26:4,4 29:13,14
30:17 31:9 34:2
34:6 35:23 36:1
36:9 44:8 53:16
68:14,18 69:1,3
70:15 80:5 89:9
93:25 94:2 97:9
101:18 105:22
108:20,21,23
118:9 121:22
Jim's 26:15,16,20
26:22,24 36:7
90:7 93:6 94:19
108:21
jmorris@pszjl...
2:14
John 2:12 36:16
joined 5:14 29:24
122:23
JONES 2:10
judge 132:21
juggled 31:24
July 29:17 58:24
jumble 48:1
June 11:21 45:23
45:24 49:2

K
K-l-o-s 4:7,8
keep 27:21

100:10
keeper 26:15
keeping 129:1
kind 10:25 14:23
15:25 52:12
89:7 99:13
106:12 108:22
108:23 109:8
Klos 1:14,18 4:1
4:6 61:24 64:22
95:22 109:19
117:21 136:5
knew 70:6,11
85:22 128:23
129:3
know 4:19 5:1
9:22,23 10:19
11:11 12:7,19
15:6,13 17:10
18:7,8,11 19:10
20:4 23:7,17
24:1,7,9,12,15
25:5,7 28:21,23
29:6 31:11,13
31:23,25 32:3,7
35:15 37:25
38:11,12,19
39:9 40:20
43:16,21 44:18
45:4 48:10
51:16,25 53:1
53:17,25 54:20
54:20 55:14
60:14,19,22
62:13 70:10
73:17 76:14
77:23 78:20
81:4,21,25 82:2
82:4,8,19 83:11
84:6,25 85:17
85:18,20 86:1,4
87:6,17 90:18
90:19,25 91:5
91:13,16 93:19
96:14 98:21

99:12 100:8
101:10 102:25
104:13,13,20
105:12 106:11
106:14 108:7,8
110:2,3 112:23
117:11 119:7
119:18 120:11
121:12,23
123:17 127:23
129:6 130:10
130:18 131:23
knowing 102:23
knowledge 7:24
13:8,10 24:13
34:6 35:1 44:14
48:20 49:10
60:25 61:16
63:24 64:5 67:6
73:1 79:17
98:10 100:6,9
104:10 109:21
110:7 112:23
121:19 122:10
123:10,21
125:10
known 61:9
69:23 70:1
KOPF 2:3
Kristin 9:16
18:16 39:13,17
52:1 53:7,8
59:11 61:13
62:4,15,15 83:1
83:2,20 99:14
101:7,24 102:3
102:5,8,10,11
108:5,8,12,14
109:10 117:25
118:15 119:3
Kristin's 100:6
100:22 118:20

L
L.P 1:6,10

David Klos - October 27, 2021

**lacks** 113:19
125:17
**land** 132:21
**language** 74:25
**large** 55:2 59:8
59:13 93:20
131:25
**larger** 41:7 58:3
**largest** 123:8
**late** 106:13
**launching** 10:3
**Lauren** 23:2
**law** 2:5,12,19
81:22 82:1,9,16
82:22 95:23
**Lawler** 106:17
**Lawn** 2:17
**lawsuit** 112:14
**lawsuits** 97:15
**lawyer** 23:4
82:21
**leading** 65:17
**learn** 30:25 51:21
51:23 58:6,6
**learned** 61:6
**learning** 58:20
**left** 7:14,20 46:8
46:9 109:20
**legal** 18:10,20
84:9 112:3,10
130:9
**legally** 82:19
84:10
**length** 19:24
124:2
**let's** 8:14 12:12
18:22 21:21
24:19 27:7 28:6
61:7 66:19
68:24 81:17
103:25 109:19
122:14 123:25
**letter** 14:15,17
58:13,17
**letters** 80:5

**level** 23:20,24
36:6 82:15
88:14 105:5
**liabilities** 87:10
87:12 122:8
**liability** 120:12
120:19
**liaison** 10:15
11:5
**liberally** 12:8
**license** 4:20,22
107:5
**licenses** 4:18
**life** 131:18,19
**limited** 104:7
**lines** 5:18
**linked** 92:15,17
**liquidity** 29:4,5
29:18,20,23
30:7,21 31:21
31:25 32:6,22
33:9 34:20
35:19 36:2 40:7
42:13,20 43:7,8
43:17 73:2,14
73:18 74:10
75:1,15,22
**list** 59:10 106:12
109:9
**litigation** 15:5
16:6,11 18:1,25
19:21 126:19
**litigations** 17:7
**little** 9:2 12:12
14:2 30:15
33:12 39:3 48:1
98:15 106:23
107:5
**live** 4:11,12
**LLP** 2:17
**loaded** 16:22
**loan** 9:6 28:1
33:11,21 34:9
34:13,20 35:12
36:1 39:25 40:1
41:9 68:11,13

68:16,21 69:10
69:15,17,19,24
70:2,10 73:14
74:2,4,7 76:15
76:21 78:3
79:13,24 85:18
85:20 89:21
90:10,13 91:2,6
92:3,15 95:4
107:25 110:19
115:22 116:4,8
116:16,23
117:3 118:8,10
118:11,13,17
118:25 119:4,7
119:14 122:14
123:6,10,14,22
**loaning** 72:7,11
89:1 92:19,22
**loans** 32:4 33:14
36:9 40:8 65:17
66:3,5 80:7
84:1 85:10
89:10 90:8
91:12,14,23
94:1,7,22 95:2
98:17,22
105:16 106:6
106:19 107:25
108:1 119:24
120:8,12,19
123:2
**logically** 42:15
69:18
**Lokey** 71:24
**long** 15:8 16:5
17:5,9 34:25
43:5 62:4 84:12
122:16
**long-term** 86:7
**look** 15:19 27:15
38:15 39:4
66:19 114:15
117:10,22
134:3,15,19

**looked** 111:20
**looking** 22:3 44:1
117:17
**looks** 27:25 39:6
**loop** 53:9
**lost** 41:21 63:16
**lot** 100:1 129:20
**loud** 118:6
**LP** 6:6 8:5 12:14
12:15,17 13:6
23:22 26:19,24
29:5 110:8
**lying** 79:16

**M**

**machine** 1:24
**magnitude** 92:12
**maintained** 28:2
**maker** 46:15,23
47:1 50:8
114:12 122:20
122:25 129:18
129:24
**makers** 126:13
126:19
**making** 71:8
75:18,19 85:12
99:20 100:16
107:20,23,25
108:9 126:9
132:20
**man** 17:23
128:10 130:20
**manage** 32:2
**managed** 10:21
10:21 70:24
**Management** 1:6
1:9 5:12 6:6 8:5
13:6 23:22,24
26:19,23 27:1
29:4,19 32:6,24
35:3 71:6 107:2
110:8
**manager** 7:2,3
**managing** 9:25

25:23
**March** 5:12,14
6:3 13:24 37:6
80:19 122:17
**marching** 52:3
**marked** 3:10
**Master's** 4:16
**material** 15:7
**matter** 109:11,12
**matters** 26:22,24
**maturity** 131:20
**MBA** 4:17
131:25
**mean** 9:18 15:21
24:10 26:9,11
104:6 114:18
**meaning** 51:4
68:9
**means** 47:4,12
48:21 63:12
84:7 132:1
133:12,20
134:7 135:7
**meant** 50:12
**medical** 82:3,10
82:10
**meet** 31:14 33:8
73:2
**meeting** 52:12
57:25
**meetings** 25:24
43:5,24 62:1,3
63:2,19
**Melissa** 26:10,12
108:14,17,18
109:1,5,9
**member** 62:14
**members** 10:17
**memory** 27:8
28:17,19 42:16
42:18 50:23
68:15 71:18
85:8 87:13
91:20 92:4,7
93:9,12

David Klos - October 27, 2021

mental 48:1
mention 10:6
  114:7
mentioned 12:13
  61:20 88:13
  98:7 107:23
  108:4 110:6
  116:10
met 31:9,25
Michael 2:18
  95:16,23
  135:11
michael.aigen...
  2:22
mid 112:21
middle 6:10 80:4
  108:22
million 18:1
  21:22 28:13,14
  28:14 45:25
  46:3 49:1,8
  58:25 68:7 69:2
  70:7,19,23 72:7
  73:18,25,25
  74:7,8,24 75:4
  75:9,22,23 76:3
  76:19 77:4,10
  77:11,18,18
  78:3,10,22
  79:12,22 80:2
  80:19 81:18
  82:25 85:4,18
  85:20,23 86:13
  89:2 90:17,20
  90:22,24 91:22
  91:22 92:8,15
  93:3 115:8
  116:3,23 118:8
  118:9,13,24
  119:7,14,25
  122:5
mind 36:8 56:20
  76:9 100:2
mine 24:1
minimus 127:22

minutes 39:21
  105:25 126:25
misconstrued
  134:23
missed 60:25
missing 107:10
mistake 80:12
  126:8 127:21
  127:23 128:4,7
MLP 59:9
moment 32:12
  67:16 73:21,22
  116:6 122:15
monetization
  15:2
monetizing 97:12
money 15:17
  33:3,3,7 34:19
  39:22 41:12,16
  42:4 45:20
  59:13,19 70:4
  72:11,12 73:5
  75:12 76:11,12
  76:13 79:24
  92:19,22
  113:24 120:8
month 11:22 12:6
months 6:13 19:6
  59:5 75:14
morning 36:16
Morris 2:12 3:5
  8:25 11:17,24
  12:25 14:12
  17:20,25 20:17
  20:21,24 21:2,8
  21:24 22:8,15
  23:10 25:3,11
  27:4,16 29:10
  32:25 33:24
  34:21 35:13
  36:4,18 37:20
  38:17,25 39:7
  40:3,14 41:17
  41:20 42:24
  43:19 44:16,24

45:9,17 46:21
  47:8,15 48:8,22
  49:15 50:2,13
  51:5 52:21
  53:22 54:7 55:3
  55:12,19 56:11
  57:8,19 60:12
  61:1 63:5,13
  64:9 65:19,25
  66:7,15,24
  67:17 69:20
  71:3,12,20
  76:18,22 77:6
  77:20 78:4,23
  79:5,19 81:2,11
  81:23 82:6,13
  83:13,17 85:21
  87:3 88:18 89:5
  90:14 91:3,9,19
  92:5 93:13 94:8
  94:13,16 95:5
  95:16,20 99:4
  99:23 100:5,11
  100:19 101:3
  101:25 102:15
  103:15 104:18
  108:2 109:19
  111:11 112:7
  112:13 113:22
  116:21 117:2,9
  117:13,16,21
  119:11,18
  120:5,11,17,23
  125:18,21
  126:24 128:13
  129:12 130:7
  130:16,19
  131:1,5,11,21
  132:2,8,11,15
  132:19,23
  133:3,5,13,22
  134:8,17 135:2
  135:10,13,15
  135:19
motion 132:18,20

mouth 36:7
Move 120:15
  125:16
moved 6:10
muddy 43:14
MUNSCH 2:3
mutual 74:13,14

_____

N
name 4:4 26:11
  26:14 39:10
  87:21 95:23
names 106:14
Nancy 104:24
  105:16,21
nature 10:1 70:4
  70:6,7,11 84:1
NAV 70:25 71:2
  71:8,19,25
  72:19,20,21
  73:4,15 79:14
  80:20 81:1,14
  85:22 89:20
  90:2,3 92:11,16
  92:17,18 104:2
  104:10
necessarily 31:25
  50:11 53:4
  69:12 107:14
need 29:18 31:16
  33:12 37:3
  41:24 54:5
  58:14 73:3 93:7
  93:20,21
  106:25 107:4
needed 30:3
  31:10,12 32:6
  35:19 41:12
  73:5,17 74:10
  74:25 75:21
  76:11
needing 29:5,22
needs 29:4 31:14
  33:9 34:20 40:7
  42:20 44:9

negative 37:7
  44:4
negotiation 22:7
  22:13,18
neither 93:23
never 18:2 56:25
  72:25 74:3
  78:12 80:13
  91:14 105:15
  105:18,20
new 2:11 7:16
  26:11,13 68:8
  68:11 85:10
  115:22 118:8
  132:21
NexBank 124:16
NexPoint 10:4
  12:13,14,14,17
  12:24 13:3,16
  21:21 26:3 27:1
  27:12 36:22
  37:11,19 40:22
  41:3,15,15 42:4
  42:9,11,17,22
  43:11,13 53:19
  56:21 57:6,10
  57:14,18,23
  58:17,25 59:12
  59:24 62:18
  63:3,20 64:8
  65:9 72:22,24
  75:17,19 78:13
  110:19 111:14
  111:22,25
  112:15 113:3
  113:10,15
  120:24 124:18
NexPoint's
  110:25 111:6
  112:21
night 36:17
nomenclature
  83:24
nominal 62:1
nonstop 44:5

David Klos - October 27, 2021

**North** 1:24 2:3 138:2
**NORTHERN** 1:2
**note** 21:22,23 22:2,5,7,14,22 23:9,15 24:10 24:18,21,23 25:2,9,17 27:2 27:9,13,14 33:17 38:15 39:4 40:11,13 40:17 46:12,16 46:25 48:5,14 49:10 50:25 51:10 57:18,23 58:4,20 59:12 60:7 63:4,21 64:8 65:9 66:6 66:10,13 70:22 75:18,20 76:7 79:1,22 82:25 83:21 84:3,9,16 84:16,18,24 85:4 86:2,3,3,8 86:13 89:15 92:15 111:22 112:9,12 113:16 122:19 122:24 127:13 127:14,17 128:16 130:3 131:18,20 133:12 134:3,4 134:11,15,20
**notes** 16:7 17:7 19:25 23:13,14 26:3 36:19 40:21 50:19 52:18 65:10 66:20 67:12 76:1 84:14,22 85:2 86:12 87:14,24 88:7 88:10,15,16 96:8 97:11,16

114:21 122:5 122:12 124:10 124:11,13,24 125:4,7,8,13,25 126:10,13,20 127:17 128:23 129:7 130:12 130:15
**Notwithstanding** 110:23 111:25
**November** 54:4 63:18 124:8 137:22
**number** 12:2,10 14:10 22:4 23:19 27:16 28:9 75:3,4
**numbered** 1:21 27:19
**numbers** 14:4,19 28:6 44:4 81:18
**nutshell** 54:12
**NY** 2:11

_____
**O**

**o0o--** 1:4
**Oak** 2:17
**oath** 97:6 106:4
**object** 50:2 100:8
**objected** 118:20
**objection** 8:25 11:17,24 12:25 14:12 20:17 21:2,24 22:8,15 23:10 25:3,11 27:4 29:10 32:25 33:24 34:21 35:13 36:4 37:20 38:17,25 39:2,7 40:3,14 41:17 42:24 43:19 44:16,24 45:9 45:17 46:21 47:8,15 48:8,22

49:15 50:13 51:5 52:21 53:22 54:7 55:3 55:12,19 56:11 57:8 60:12 61:1 63:5 64:9 65:19 65:25 66:7,15 69:20 71:3,12 71:20 76:18 77:6,20 78:4,23 79:5,19 81:2,11 81:23 82:6,13 85:21 87:3 88:18 89:5 90:14 91:3,9,19 92:5 93:13 94:8 95:5 99:4,23 100:19 101:3 101:25 102:15 103:15 104:18 108:2 111:9 112:3,10 113:19 116:20 116:25 119:9 119:16 120:4,9 120:15,21 125:16 128:13 130:7,16 131:5 131:11,21 132:2 133:13 133:22 134:8 134:17 135:2
**obligated** 122:12
**obligation** 25:25 80:1 110:25 111:6,14 112:16 113:11 113:17 114:12
**obligations** 45:21 121:24
**obligor's** 33:8
**obviously** 85:18
**occur** 55:8 96:9
**occurred** 47:5 61:17 70:25

72:20,25 85:13 92:13 112:24
**October** 1:15,21 31:18 80:11 120:24 127:11 128:22 129:3
**offended** 17:22
**offer** 14:15,17
**offhand** 84:16
**office** 5:10,10 10:17 72:4 121:10
**officer** 7:14,17,22 8:23,24 9:3 10:13 13:21,22 53:4 121:6,13 123:22
**officer-level** 7:25 13:18
**officers** 105:22 106:7 121:18 123:15
**official** 12:16 13:7
**oftentimes** 32:3
**Oh** 100:12
**okay** 18:14 20:8 51:8,16 52:10 65:13 74:1,7 76:25 81:21 82:23 84:4 93:9 100:3 110:18 110:23 112:25 117:2 119:11 120:23 124:7 125:8 126:2 132:19
**old** 106:22
**one-page** 84:11
**oOo--** 135:22
**open-end** 74:13
**open-ended** 25:6
**operate** 29:5
**operations** 9:6 107:19

**opinion** 44:6
**opposed** 40:22 42:9 75:8,10 85:1 86:3 89:20 90:12 102:20 103:8 127:17
**oral** 96:4,7,23 97:8,15,22 98:1 98:5,12
**order** 27:21 124:9
**orders** 52:3
**ordinary** 128:11
**organization** 72:4
**original** 27:12
**originated** 43:9
**ought** 62:23
**outlook** 44:2
**outside** 11:9 128:11
**outstanding** 38:8 45:22 46:9,10 47:1,19 49:5 125:3 129:2
**overall** 10:10 30:6
**overpayments** 53:19 55:2
**oversaw** 9:17
**overseeing** 9:14 9:14,21
**oversight** 6:20 9:4,8
**oversimplify** 32:11
**owed** 94:1
**owes** 45:19
**owing** 113:24 121:25

_____
**P**

**P** 37:25
**P.M** 1:22,22 135:21

David Klos - October 27, 2021

**PACHULSKI**
2:10
**package** 83:18
**page** 3:2 28:8
37:2,2 114:15
130:1
**pages** 20:16,25
117:13
**paid** 14:11,20
76:3,4,6 80:19
80:22 81:16
85:16 135:7
**paper** 85:10
118:11 119:4
**papered** 33:16
66:6 68:21
**papering** 84:19
85:5 118:17
**paragraph** 50:8
114:4,7,10,11
114:16,17
129:15
**pardon** 46:14
**parentheses**
118:9
**part** 13:14 17:4
25:22,23 30:23
46:15,24 58:2
61:21 62:6 70:3
70:9,10,11
73:19 75:17,19
76:8 83:17
103:17 106:8
106:17,20
117:13 121:2
122:2,24
123:15 126:20
**participated**
30:12 121:19
**participating**
61:25 62:3
**particle** 63:15
**particular** 20:22
28:13 29:18
31:6 46:12

61:23 68:16
119:5
**particularly**
35:22 71:23
**parties** 71:23
137:18,21
**Partners** 2:21
99:9
**partnership**
104:8
**parts** 72:4
**party** 71:7
102:22
**pass** 95:15 135:9
**passing** 98:7
**pattern** 66:12
109:11
**pause** 7:7,16
63:13
**pay** 47:1 49:14
49:24 74:25
82:5 88:8,10,12
90:20 103:22
103:22 112:16
113:23 122:12
**payable** 14:23
74:18 93:16
125:4
**paygrade** 60:11
60:14
**paying** 72:12
**payment** 26:8
27:10 37:6,11
37:18,23 38:5,6
38:7,12,23
40:10,11,17,17
45:7,25 46:3,6
46:7 48:25 49:1
49:2 51:10,14
51:16 56:22
57:7,11,14 58:7
58:18 59:1,2,3
59:15,24 60:3,6
60:22,25 61:18
62:19 64:13,15

68:20 72:16,18
75:1,5 76:16
85:13 89:10,14
92:20 93:22,24
93:25 99:13
110:25 111:7
112:1,5,7,9,11
112:15,16,21
113:4,11,15
115:15 126:9
126:21 129:19
129:24 135:1
**payments** 25:8
25:10,16,18,19
27:8,11,13
36:13,14,19,22
36:24 37:13
39:15,18 40:20
40:21 41:5,6,8
41:12,24 42:17
44:12,23 45:3
48:14 51:19
52:20 55:9 56:1
59:10 60:21
61:15,16 64:7
64:23 75:18,20
94:21 98:17,23
99:1,3,20
100:16 101:1
103:23 107:6
107:20,23,25
108:6,10
110:19,23
111:5,13,21,25
114:8,13 124:9
125:12,15,23
126:4,9,14
130:4,6,23
**payroll** 10:1
53:21 107:21
**pays** 48:4 81:9
82:4,10,19
**PC** 2:3
**PE** 97:12
**penalty** 135:23

**people** 51:19
71:22 72:3
95:10 103:18
**people's** 26:1
57:2
**percent** 15:25,25
23:14 28:5
30:10,11 33:13
36:8 68:18 69:4
69:5,11 74:18
74:22 92:3
102:19 106:18
**perception** 53:14
**perform** 126:21
**performed** 71:24
**performing** 9:25
**period** 23:16
93:5 104:2,11
104:21 116:14
120:1 137:15
**perjury** 135:23
**person** 7:19,20
7:21 9:17,18
39:9,10 44:21
72:25 77:3
80:25 81:10
101:10 115:14
137:8
**personal** 26:16
26:22,24 44:14
48:20 49:10
76:1 98:10
131:18,19
**personally** 25:13
25:17 64:19,20
64:22 108:21
**personnel-wise**
107:7
**perspective**
33:23 35:20
**pertain** 72:22
**pertained** 105:8
**pertaining** 93:20
97:10
**pertains** 79:22

**petition** 123:23
**phrase** 51:3 97:4
**physical** 85:5
**physically** 22:23
66:14
**pick** 45:20 48:25
109:20
**piece** 15:20,21
**pin** 8:6
**place** 33:20 35:2
66:13 137:8
**Plaintiff** 1:7 2:13
**plan** 14:22,23,25
17:11
**plane** 82:7
130:21
**platform** 10:20
12:10
**play** 15:6 64:15
**please** 4:5 5:5
14:5 30:22
66:18 68:7
83:21 95:20
114:1,22
115:14 118:6,7
118:10 127:2
129:12
**pled** 98:13
**plenty** 57:3
**point** 6:10,14 7:2
7:3,3,4 9:13
18:8 24:16
29:25 36:23
37:12 39:4
45:15 53:3
56:16 57:1
60:10,16 61:17
63:2 73:19
79:21 80:3,4,5
80:5,14 83:23
89:10 97:9
101:12 109:6
128:18 129:2
**pointed** 102:22
**points** 7:6 20:14

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| **policy** 33:20 35:2 35:6 | 84:2,9,17 | 128:19 | **process** 17:9 | 43:12 |

policy 33:20 35:2
35:6
portion 16:4
21:12
portions 20:8
position 7:25
13:18 43:22
51:9 79:11,18
121:13,15
possibility 79:23
possible 17:17
48:11 50:3 74:5
89:23,25 90:19
91:17 95:1,8,9
95:10
possibly 41:6
potential 53:19
92:12 97:17
potentially 30:14
96:8,14,16
power 89:9 90:21
90:23
practice 30:1,5
34:4,14 35:18
50:4 69:23 70:3
73:6 78:7 79:4
86:5 90:7
109:11,12
practices 70:11
pre 135:5
precision 28:5
predicate 41:22
42:2
preference 73:7
73:11 90:7
prefix 135:5
premise 43:1,3
89:8
prep 83:21
prepaid 49:22
131:18,19
preparation
19:13 21:9 67:7
67:8 84:19
prepare 54:6

84:2,9,17
prepared 26:7
53:18 54:9
64:20 66:14
80:8
preparing 18:9
19:20 129:8,10
prepay 46:15,19
46:24 47:24,25
48:5,7 49:19
50:8
prepaying 50:21
51:3
prepayment
37:19,23 38:1
38:11,13 46:13
63:23 64:12
113:5,12,18
114:11 129:16
129:18,23
130:5 131:2,9
131:14 132:1
133:12,20
134:7,20,25
135:5,7
prepayments
27:2 38:10
44:15,19,23
45:1,5 63:4,21
64:8 134:12
preposterous
89:15
present 18:20,25
56:20 68:15
93:9
presented 66:14
president 43:10
43:11 121:17
pretty 11:15
60:24
previously 53:6
125:3
pricing 10:16,16
primarily 6:7
26:22 88:5

128:19
primary 9:15
109:5
principal 37:5,9
37:13,16 38:9
40:12 45:12
46:9,16,24 47:2
47:22 48:16
49:8,24 123:11
131:16
print 117:8
prior 14:22 19:18
24:19 27:9
31:19 40:10
53:18 56:17
57:5,12,17,21
69:17 87:14,15
88:15 92:4
97:14 98:12
104:11 112:14
112:15 113:5
113:10,18
122:22 123:23
126:7,12,18
131:20 135:1
priorities 89:11
privilege 132:6
133:2,4
probably 4:24
6:12 8:9 9:7
15:11,19 23:19
24:7 35:12
39:11 44:7
73:24,24 83:9
98:7 105:3,13
108:7 114:19
problem 57:2
problems 29:21
procedure 33:20
35:2,6 39:5
66:13 83:23,24
proceedings 5:3
96:6 108:1
proceeds 80:22
81:6

process 17:9
32:10 51:19
66:17 83:24,25
109:8 121:3,4
122:2
processing 10:1
produced 1:18
83:14,16 117:6
production
117:14
professional 4:18
program 105:9
progression 5:24
promissory 16:7
22:14 23:9
24:21 25:2
27:13 33:17
38:15 39:4
46:12 50:19
52:18 63:4
65:10 66:6,10
66:13,20 67:12
70:21 85:2
97:11,16
122:19 130:3
130:12,14
131:18,19
133:12
promoted 6:1
proper 108:10
132:11
protest 126:18
provide 110:10
110:12
provided 13:2,3
13:13 20:15,15
21:6 40:12
76:13 80:6
102:5 107:2,24
109:25 110:4
110:16 122:4
125:14 137:15
provider 11:12
71:24
providers 10:16

43:12
providing 12:24
provision 114:19
129:22,25
public 10:3
purport 28:8
purpose 23:8,12
85:25
purposes 30:21
31:21 32:22
36:3 73:8 75:22
pursuant 12:22
13:14 74:15
112:11
put 6:15 10:2
26:1 86:6 93:6

------

**Q**

qualification
64:4
qualitative 16:1
question 9:1
11:18,25 13:1
14:13 16:8,22
16:25 17:2
20:24 21:25
22:9,16 23:11
24:25 25:4,6,12
27:5 29:11 33:1
33:25 34:15,22
35:14 36:5
37:21 38:18,21
39:1,8 40:4,15
40:19 42:2,25
43:20 44:10,11
44:17,25 45:10
45:18 46:22
47:3,9,16 48:9
48:23 49:16,18
49:25 50:2,14
51:6 52:22
53:23 54:8 55:4
55:13,20,22
57:9,20 60:13
61:2,4 63:6

David Klos - October 27, 2021

64:1,10 65:20
66:1,8,16,21
67:16,24 69:21
71:4,13,21
76:19 77:7,16
77:21 78:5,9,24
79:6,20 81:3,12
81:24 82:7,14
83:15 87:4
88:19,24 89:6,8
90:15 91:4,10
93:14 94:9,12
94:13,14,21
95:6,7 96:5
97:24 99:5,24
100:1,20,21
101:4 102:1,16
103:16 104:19
104:22 108:3
119:3 125:20
125:20 128:14
130:8,9,17
131:4,7,12,22
132:4,5,11,14
132:24,24
133:6,14,17,23
134:9,13,16,18
134:20 135:3
**questions** 19:12
77:12 80:13
95:17 97:25
109:15 110:18
111:19 114:3
126:24 129:13
135:10,12
**quick** 48:12
**quite** 7:9 31:9
**quote** 115:22

**———— R ————**
**radar** 93:6
**radars** 26:1
**raise** 24:5,7
119:3
**raised** 24:3 80:15

96:3,7,18
**raising** 62:17
**rate** 84:15 86:2,6
**ratify** 28:6
**ratio** 104:2,10
**rational** 80:25
**rationally** 92:25
**reached** 104:11
**read** 20:8,10,20
20:25 21:11,11
44:22 46:25
48:24 118:6
127:8,14,21
128:6 130:1
131:14 132:23
**reading** 21:5
46:6 131:8
**reads** 46:23
**real** 107:13
**realize** 128:6
**realized** 127:21
**really** 6:12 9:16
10:15 16:8 54:4
73:9 78:12
83:13 95:9
101:11 105:4
107:5 108:19
109:2 128:19
129:6
**realtime** 85:14
**reason** 23:8
30:14 35:21
40:23,24 41:1
54:24 55:10
67:22,24 75:17
75:19 99:21
100:18,21
113:7,14
115:24
**reasoning** 105:2
**reasons** 23:20
74:1 88:4
**recall** 4:23 19:2
21:4,5 22:22
23:6 24:3 27:13

31:19 34:23
36:6 41:13 42:3
56:5,9,12,14
57:17,22 58:10
58:16,20 59:8
62:16 63:18
67:18 82:24
85:7 86:19
87:20 88:21
92:10 99:12
102:10 106:21
116:15 118:19
118:22 120:23
121:16 122:21
123:6,16 124:2
127:20 130:13
**receipt** 26:1
**receive** 74:18
**received** 99:19
100:15 103:19
106:19
**receiving** 22:24
33:3
**recognize** 27:23
104:7
**recollection** 5:25
8:3 28:20 29:17
40:7 50:18
51:18 52:15,17
55:7,8 68:17
75:21 76:6
78:16,17 88:3,4
91:24 94:5
95:13 101:24
105:7 115:4
123:21 125:6
126:2
**record** 4:5 16:14
25:9 64:6 68:3
105:24 106:2
117:12
**recorded** 37:13
37:14 38:7
**recording** 25:15
39:14

**records** 110:24
111:4
**recover** 17:15
**recoveries** 17:10
**recovers** 16:6
**reduced** 137:10
**reduction** 38:8
45:12
**refer** 125:7
**reference** 52:18
**referred** 87:24
123:2
**referring** 87:17
98:22
**reflected** 37:14
44:13 120:8
**reflects** 103:21
**refresh** 54:13
**regarding** 16:7
18:24 100:16
127:5
**regardless** 16:16
16:20 60:17
72:24
**regular** 66:12
88:16
**regularly** 31:9
129:19,24
130:4,6
**reimburse** 70:24
**reimbursed**
81:15
**reimbursement**
53:21 72:23
**reinstate** 60:7
**reinvestment**
105:9
**reiterate** 17:13
**REITs** 10:3
**reject** 67:22,24
89:7
**relate** 19:22
**related** 70:20
74:11 81:1
92:18 96:3

97:16,16 99:20
100:16 102:20
103:7 137:20
**relates** 18:5
70:21
**relating** 19:23
**relationship**
53:15 133:21
**relevant** 5:5
**relieve** 45:14
111:6 114:11
129:18,23
130:3,5
**relieved** 112:15
**relieves** 131:2
**reloaned** 76:4
**remainder** 49:24
**remember** 5:16
7:5 12:1,18
13:9 14:24
15:10 18:6
22:22,24,25
32:5 34:11,16
34:18 38:20
39:24 42:8
50:25 51:24
52:1,10,13,23
53:13 56:8 57:5
57:16,24,25
58:3,19,22
59:25 60:8,20
62:20,22,25
63:1,23 67:4
69:13 71:14
74:5,6 78:17
83:22 84:20
85:4 86:15,17
87:11,23 88:2
92:10,11,12
93:2,17 94:5,18
94:19,22 97:18
97:19 98:19
101:15 105:4
108:5 109:7
110:21 113:13

David Klos - October 27, 2021

123:4,8 124:5
  130:11 131:4,7
**remembering**
  34:10 92:23
**remind** 99:6
**rep** 80:5
**repaid** 76:1
**repay** 89:3
**repaying** 93:25
**repayment** 76:7
**repeat** 22:10 27:6
  100:3
**rephrase** 20:24
  22:11 49:17
  133:5
**report** 8:15 9:16
  10:23 53:19
  120:24 121:24
**reported** 1:23
**reporter** 117:8
  135:13,16
  137:1,3,15
**represent** 19:15
  95:24
**representation**
  19:17
**represented** 2:4
  2:11,18
**requested** 137:13
  137:14
**reservation**
  91:25
**respect** 19:19
  22:17 24:20
  25:2,18 35:3
  38:3 41:11
  47:22 49:23
  51:9 58:16
  68:16 69:12
  71:22,23 72:21
  76:23 79:8 80:1
  80:8 82:25
  84:14,18 85:5
  86:14 94:3,20
  108:6 111:21

121:13 125:13
  125:24
**respectful** 76:25
**respond** 25:7
  60:15
**response** 128:16
**responsibilities**
  7:15 8:7 9:22
  108:16
**responsibility**
  32:17,18 90:4,5
  118:17
**responsible** 11:4
  39:14 71:7
  108:9,17,19
  109:10,13,13
**restate** 61:10
**resulted** 71:25
**retail** 9:4 80:9
  120:25 121:20
  121:23 122:4
  122:11 128:16
  128:19
**return** 76:25
**reverse** 40:9
**review** 39:19
  48:12 121:3
  137:13
**reviewed** 84:10
**ridiculousness**
  97:5
**right** 16:17,21
  17:25 18:20
  21:23 33:22
  37:5 41:25
  45:16 47:6 55:1
  56:1 66:21
  67:20 68:9
  75:18 78:14
  80:4 81:9 83:14
  85:19 88:8,22
  89:19 107:9
  109:25 111:23
  114:24 115:2
  117:3,12

123:12 124:17
  124:22,25
  125:5 126:5
  127:11,14,20
  132:25 133:6
**Rip** 37:2
**role** 5:15 6:2,12
  6:16,18,21 8:22
  9:4,11 11:5
  12:16 13:7,14
  19:13 24:19
  25:1,14,17,21
  25:22,23 26:25
  39:10 53:4,6
  58:16 62:1
  64:15,17 67:6
  67:11 78:13
  84:18,21 85:5,8
  85:11 86:13,21
  128:18
**roll** 23:15
**rolled** 125:3
**rolling** 88:15
**rolls** 39:18 64:18
**roughly** 6:9
**round** 39:20
  81:18
**RPR** 1:23
**Rukavina** 2:5 3:3
  3:6 4:4 9:10
  11:21 12:3 13:5
  14:16 17:23
  18:4 20:19,23
  20:25 21:6 22:3
  22:11,19 23:17
  25:8,16 27:7,17
  27:18 29:16
  33:5 34:6 35:1
  35:24 36:11,21
  38:2,20 39:2,20
  40:9,18 41:19
  41:22 43:4,23
  44:20 45:6,14
  45:23 47:3,10
  47:17 48:13

49:2 50:1,5,17
  51:8 53:11 54:3
  54:11 55:6,16
  55:24 56:14
  57:12,21 60:19
  61:5 63:10,14
  64:14 65:23
  66:4,11,19,25
  67:1,18 68:4
  70:1 71:10,18
  72:6 76:24 77:8
  78:1,9 79:2,9
  80:18 81:8,21
  82:2,8,17 83:16
  83:19 86:1 87:8
  88:21 89:17
  91:1,7,13,20
  92:7 94:3,11,14
  94:17 95:7,14
  110:18 111:9
  111:20 112:3
  112:10 113:19
  116:20,25
  117:7,11,15
  119:9,16 120:4
  120:9,15,21
  125:16,19
  126:25 127:2
  128:22 130:11
  130:19 131:8
  131:17,24
  132:6,9,13,17
  132:20 133:1,4
  133:8,18 134:1
  134:14,24
  135:8
**rule** 39:5 127:6
**rush** 135:19

---
**S**
---
**sane** 80:25
**satisfy** 93:21
**saw** 128:16
**saying** 39:25
  42:23 46:2,5

49:19 61:11
  90:9 92:23 94:6
  94:22 109:9
**says** 18:2 46:13
  46:14 48:5,14
  68:7 80:12
  115:23 118:7
  118:18 127:17
  129:17 131:2
  134:11
**scenario** 33:6
**schedule** 28:1
  37:15,25 38:12
  45:3,7
**scheduled** 27:9
  38:5 40:10
  56:22 57:7
  129:19,24
  130:4,6
**schedules** 64:21
  80:10 111:3
**school** 4:15 5:7
**Schroth** 26:10,12
  108:15,17
**Science** 4:16
**scratch** 27:7
**screen** 117:22
**screwed** 111:==17==
**se** 37:==25== 38:13
**second** 28:8 37:4
  67:25 72:15
  73:2 103:25
**Section** 46:13
  130:22 131:8
  131:14
**securities** 10:20
  11:14
**see** 21:18 22:2
  28:11,15,16
  46:1,17,18
  48:17,18 49:2
  58:14 83:7,12
  113:9 114:5
  117:20,24
  125:21 129:22

David Klos - October 27, 2021

129:25 130:24
130:25 131:1
seeing 44:20 48:6
48:11 59:8
61:19 85:14
114:9 130:11
seen 50:17,22,23
83:9 114:18
126:18
Seery 15:8 18:13
19:8,9,11 20:3
53:15 56:15,19
57:13,15,18,23
60:5 96:25 97:3
97:21 98:2
129:9,11
Seery's 21:12,19
semiannual
14:22
send 42:23 68:7
sending 33:4,5,6
33:8 90:24
115:14
sends 80:2
senior 5:17 7:3
sense 50:4,5
73:20 104:4,5
108:20 113:22
113:25 134:22
135:4
sensitive 86:24
sent 36:16,18
54:15 59:17
69:4 76:5 83:1
83:2 115:1
sentence 46:14
48:13,21 50:8
50:16
sentences 127:25
separate 10:25
11:7 70:20
106:25 107:4
Separately 52:10
separating 79:23
Series 4:20

service 11:12
71:24
services 10:17
12:23,24 13:3,4
13:13,15 41:3
43:12 53:20
71:11,15,17
107:2,15,15,24
108:8 109:22
109:24 110:4,7
110:10,12,16
set 115:14 118:7
settlement 9:6
seven 75:14
123:23
seven-figure
113:23
shape 6:16
shared 12:22
13:14 41:2
43:12 53:20
54:18 109:22
110:7
sheet 120:13,20
sheets 80:6,8
shocked 73:22
short 6:12
short-term 86:7
shorthand 1:24
137:2,7,25
shortly 116:11
show 28:8 117:5
showing 44:4
45:20 53:19
76:20
shows 45:25
side 85:11 96:15
sides 43:2
sign 85:1
signatures 22:24
86:18
signed 84:22
significance
128:11
significant 12:2

12:10 45:21
signing 86:14
signs 80:5
similar 8:7 13:4
13:16 74:9
82:24 107:12
107:19
single 23:15
29:21 32:17
34:12 36:8
62:14 123:22
sir 4:4 17:18 18:4
28:11,15 33:10
46:17 48:17
67:2,19 76:14
81:8 83:20
89:18 127:5
129:15,17
130:2 132:14
133:5,9
sister 97:9
sit 89:11
sitting 16:3,24
17:3,14 42:14
44:20 63:24
96:11 102:18
103:6 104:15
131:24 133:10
133:19
situation 31:22
69:23 93:1
situations 31:23
32:3 34:5
smart 17:18 50:7
SMU 4:15,17
solvency 87:6
solvent 87:2,5
somebody 35:19
somewhat 128:20
soon 118:10
132:21
sophisticated
44:21
sorry 9:20 22:19
24:22 41:21

45:24 47:20
55:21 57:19
58:25 63:16
76:16 78:14
88:22 99:8
108:11 129:14
129:20
sort 53:6 97:8
102:23
sought 87:25
sounds 50:10
80:21 81:19
82:17
source 64:6
speak 81:13
speaking 30:4
40:16 77:22
108:18
speaks 50:15
specific 8:6 14:4
28:20 31:22
34:11 38:3
42:15,18 50:25
51:1 52:23 58:4
68:17 91:24
95:13 103:14
112:23 123:17
129:25
specifically 4:23
15:10 34:24
39:10 42:8
51:24 52:13
56:7,12 62:13
67:20 69:14
71:14 74:6
81:13 83:11
86:4 87:11,24
92:13 93:8
94:22 98:21
112:20 115:10
118:16
specificity 34:24
36:7 42:11
53:13 82:16
96:14 102:24

105:14
specifics 14:24
93:18
specify 93:7
speculate 15:4
29:2 32:11
73:25
speculating
28:25 41:11
44:3
speculation 29:1
29:3,6 83:6
113:19
speed 106:24
spelled 37:24
split 108:16
spoke 18:10,19
101:6,9
spoken 18:13,15
spreadsheet
54:14
stake 18:1
stamp 117:17
standard 84:4,6
86:9,9
standpoint 92:18
135:6
STANG 2:10
start 27:7 47:17
95:19 111:17
started 5:7 10:5
101:17 108:23
starting 5:6
state 1:23 4:4,19
51:12 114:10
138:1
stated 137:9
statement 26:7
119:14
statements 36:17
116:14,18,24
119:8,19,22
120:1
STATES 1:1
step 32:9 68:25

David Klos - October 27, 2021

134:5,5
Stinson 2:17
 95:23
stood 87:11
Stoops 7:23
stop 21:10 65:9
 94:15 100:13
street 1:25 2:4
 10:17 82:3
strike 23:6 32:19
 33:15 37:10
 52:16 54:22
 63:25 67:4
 120:15 125:16
string 118:4
 127:5
strong 73:11
 92:17
structure 14:8
 30:6
struggle 64:11
 128:15 131:13
struggling 45:2
 50:6,7 88:25
 99:25
subject 108:10
Subscribed
 135:24
subsequent 96:4
 96:7,23 102:9
 102:12 103:2
 116:17 119:10
 119:13 120:1,7
substance 19:1
 98:6,9
substantially
 16:2
substantive 97:1
sue 82:11
suggested 55:1
suggesting 62:22
 128:9
Suite 2:4,17
 138:2
sum 113:24

summary 21:7
supervision
 137:11
support 87:20
supporting 12:9
 72:3
suppose 31:18
 50:3 85:11
 95:10
sure 5:7 6:2 19:4
 20:1 26:6 27:21
 31:23 37:22
 44:7,8 47:19
 49:18 51:13
 55:21 58:8
 61:11,25 64:3,3
 65:11,14 66:19
 74:24 85:12
 95:12 97:24
 99:10 100:22
 103:6 106:15
 125:9 127:4
 128:25 129:1
 135:15
surely 128:22
 129:3
surprised 130:14
suspect 55:10
 68:14 123:19
suspend 111:14
switch 65:8
sworn 1:19 4:2
 137:4

_____
          T
take 12:22 14:5
 16:8 18:9 23:12
 68:24 71:16
 117:21 118:17
taken 1:20 87:14
 137:7
takes 16:5 17:5,9
talk 12:14 18:12
 21:21 54:3
 98:15 122:14

talked 19:15,24
 69:13 94:4
 103:3
talking 27:12
 32:16,20 54:1
 88:15 98:19
 102:13 103:2
 117:16 121:5
 122:6 127:6
talks 129:16
 130:22
tax 73:7 107:6,6
 107:19
team 6:5,15 10:5
 11:3 25:14,22
 32:13,16,19
 35:16 43:6,9
 57:1 60:16
 61:14 62:6,14
 62:15 64:17
 73:20 84:2 85:9
 85:17 101:11
 108:9 109:7
 115:8,11,12,13
technical 78:6
technically 4:20
 36:23 37:12
teeing 26:6
tell 7:11 14:18
 24:22 28:4 34:2
 34:7 36:25 44:2
 52:7 53:11
 55:17 56:3
 58:23 59:5,14
 69:16 71:16
 83:17 93:4
 103:6 105:13
 106:10 112:13
 112:25 113:2
 115:20 116:2,6
 116:22 119:12
 120:6,18 122:9
 126:7,12 137:4
telling 56:14
 58:14 68:15

tells 43:18 55:25
 94:23
temporarily
 76:12
tend 109:1
term 7:16 8:1 9:3
 24:10 45:1
 47:21 86:3
 88:15 98:17
 104:1,2,5,7,8
 107:25 108:1
 124:10,11,13
 125:7,13,25
 126:10,13
 134:21,21
terminology
 98:14
terms 6:19 9:23
 10:11 18:13,15
 19:23 22:20
 26:6 35:16
 43:14 61:4
 92:11 93:4
 107:14,19
testified 4:2
 41:23 99:18
 100:14 124:2
testify 16:15,19
testimony 35:24
 62:9 79:12
 98:16 100:22
 100:23 137:9
Texas 1:2,23,25
 4:19 81:22 82:1
 82:9,16,21
 135:25 138:1
thank 95:14 96:1
 109:16,17
 124:19 135:8
thanks 100:12
Thedford 23:2
thereto 137:21
thing 33:22 53:6
 59:18 84:13
things 10:1 25:25

57:3 79:14
 122:5
think 6:9 7:2
 15:18 16:3
 18:18 26:14
 30:15 31:6,8,22
 32:9 36:16,19
 39:21 41:1,10
 50:15 53:2
 58:12,22 59:4
 59:11 64:6 65:6
 65:7,8 75:2,13
 78:6 79:16
 80:24 84:15
 85:23 86:10,15
 87:21 88:13
 95:9 97:19
 99:14 101:5,9
 103:11 105:3
 105:25 106:17
 107:9,22 108:4
 108:6 111:17
 113:7,14,24
 123:24
thinking 57:4
 117:11 129:7
Third 2:10 73:6
third-party
 10:16 11:12
thousand 92:6
threatened 5:2
three 5:9 6:12
 97:12 102:11
 124:10,11,13
 124:24 125:2
throw 104:1
Thursday 19:14
Tim 106:17
time 4:24 5:15
 6:21,23 7:9,11
 7:12,15 8:10,14
 8:24 10:2,4
 12:6,10 16:14
 24:6,8 25:1
 28:21 29:25

David Klos - October 27, 2021

36:23 37:12,18
39:11 41:4,12
42:5,12 43:22
43:22 44:19
47:13 49:4
52:14 53:2,8,14
53:15 54:21
56:16 59:23
60:2,10 62:5
63:2 65:12
66:11 74:10,20
79:4 80:15
83:23 84:12
86:23 89:10,16
92:10 93:5
95:12 101:13
108:24,25
109:6,16
111:12 112:14
113:17 116:2
122:18 123:18
129:2,7 134:12
135:1 137:8
**timely** 44:9 51:15
51:17
**times** 7:5 32:15
61:20 63:8
76:19 92:6
**timing** 15:24
**title** 5:15,16 6:22
7:1 10:9,11
12:16 13:7
26:14
**titles** 10:11 78:18
**today** 5:21 14:3
15:12 16:3,13
16:16,19,24
17:3,14 20:5
42:14 44:20
57:5 63:25 65:6
95:25 96:11
102:18 103:6
104:15 131:24
133:11,19
**today's** 47:6

**told** 39:21 42:14
43:4 52:11,11
52:19 53:12
55:9 60:21
61:23 62:13,14
62:15 68:12
69:9 70:9 85:19
91:8 95:1 97:25
98:2 100:25
103:7 118:16
118:23 122:11
122:23
**tomorrow** 79:11
132:22
**top** 107:9 127:7
**topic** 96:2 98:3
**topics** 20:11
103:25 106:23
**total** 116:15
**totaling** 119:24
**touched** 98:16
**track** 111:2 129:1
**tracker** 118:10
**tracking** 39:15
**transaction**
34:13 70:21
76:9 115:21
116:7 118:24
**transcript** 135:14
135:17 137:13
**transfer** 29:9
30:2 31:8,20
32:8 34:19 36:1
40:22 41:16
69:2,10 76:15
77:4,18 85:16
90:12 91:22,23
92:9 93:3 115:8
**transferred**
30:20 75:24
77:10 78:18
79:13
**transferring** 34:8
35:11 39:22
42:4 75:9

**transfers** 28:9,18
28:19,22 30:24
32:22 35:4,10
38:3 42:9 94:7
**transitioned**
109:1,6
**transparent**
115:17
**Treasurer**
121:11
**treasury** 9:6
107:6
**treated** 35:5
**trigger** 104:2,10
104:21
**triggered** 104:11
104:17
**triggers** 14:25
107:17
**trouble** 62:19
**true** 29:6 88:9
135:24
**trust** 15:16 17:10
17:15 18:6
**trusts** 26:16
65:23 108:21
**truth** 137:5,5,5
**truthful** 100:22
**truthfully** 16:16
16:19
**try** 62:23 106:24
**trying** 17:18
27:21 30:23
50:6 67:14 98:3
100:11 104:22
130:20 132:9
133:8
**turn** 114:15
123:25
**turned** 76:4
81:15
**two** 9:7 15:12
29:14 36:20
45:13 65:10
66:20 77:12

83:8 85:1 86:12
87:24 94:19
95:10 105:4,25
106:24 107:24
119:24 121:18
122:12 127:25
129:4 134:22
**two-paragraph**
84:12
**TX** 2:4,18 138:2
**type** 98:12
**types** 13:4 78:13
84:1 107:12,15
107:17 114:20
**typewriting**
137:10
**typical** 84:7

─────────
**U**
**Uh-huh** 7:18
13:23 47:7
75:11 127:9
**ultimate** 16:12
17:8,10
**ultimately** 11:4
39:19 64:18
73:9
**um** 63:13
**unable** 89:3,14
**undergrad** 4:15
**Undergraduate**
4:14
**understand**
14:14 15:19
17:14 18:19
30:23 47:4 51:8
61:11 62:8 66:4
67:25 68:2
88:25 96:17
97:24 98:8
106:3 118:12
118:15 124:14
132:1
**understanding**
19:11 20:11,13

37:17 48:19
49:18 51:12,14
54:17,22,23
56:21 61:12,22
70:18 72:7,10
75:7 79:4 87:1
87:9 91:11 97:6
98:23 101:12
101:18,19
102:2 112:19
121:9 124:3,15
133:11,20,25
134:2,6
**understood** 52:2
63:12 95:4
102:25
**unfair** 34:17
**unfamiliar** 80:21
**UNITED** 1:1
**unpaid** 46:15,24
47:2,20 48:15
48:15 49:4
131:15,16
**unscheduled**
38:23 64:7,23
75:18,20
**upcoming** 25:25
**updated** 54:15
**upfront** 85:11
**use** 14:19 56:25
70:23 81:17
108:20
**usually** 31:15
33:16
**utilized** 71:17

─────────
**V**
**valid** 39:3
**valuation** 5:17,19
5:24 6:2,15
9:14 10:7,9,14
10:15,24 11:3,7
11:12 71:11,15
71:17,25 72:1
72:13,14,21

David Klos - October 27, 2021

107:6
valuations 11:4
value 11:14
 71:16
valuing 10:19
variety 107:16
various 25:23
 79:14
vary 17:12
verbatim 94:17
verbiage 132:25
verify 27:24
versus 87:12
videoconference
 1:19 2:6,13,19
videotape 21:18
view 131:10
virtually 44:5
vis-a-vis 15:16
voluntary 37:24
vs 1:8

**W**
want 16:24 44:10
 54:4 63:8 90:6
 95:18 96:19
 98:15 100:10
 101:14 104:1
 117:9 134:19
 135:13,16
wanted 24:17
 34:3 96:2
wants 90:16,20
 90:22
wasn't 23:24
 24:1 31:20
 37:18 38:5 50:4
 51:11,15,16
 53:4 57:1,3
 59:20 60:15
 62:6 70:17
 72:19 73:3,3
 75:2 101:11
 103:17 108:12
 129:10

**Waterhouse** 8:17
 11:1 13:25 20:9
 30:13,14,19
 39:25 41:14
 42:3,7 43:24
 52:7,11,18,24
 53:11 54:15,19
 54:25 55:17,25
 60:20 61:23
 62:9 65:3 69:9
 77:17 78:2,20
 84:23 85:1,19
 86:14 91:8 94:6
 100:25 103:3
 103:13 115:5
 115:25 116:2
 116:22 118:19
 118:23 121:6
 122:9 124:4,8
 125:11,22
 126:15 127:13
 127:16
**Waterhouse's**
 21:1,19 127:10
waters 43:14
way 6:16 20:12
 22:22 31:15
 34:3 35:17,22
 48:24 54:1 63:8
 69:6 72:15,17
 76:10 82:19
 87:18 92:1,1,1
 92:2 93:24 94:6
 95:3 97:5
 102:23 114:10
 121:5 137:19
ways 38:21
we'll 20:1 54:3
 125:7 132:17
 132:21
we're 12:8 27:12
 32:15 43:11,12
 64:1 65:8,9,10
 65:12 79:22
 80:4 117:17,18

121:5 122:6
we've 19:24
 75:13 78:12
wearing 43:15
week 36:20 83:7
weekly 25:24
 43:5,24 63:19
 129:8,10
weeks 59:5
welcome 117:19
 127:7
went 4:14 58:17
 81:17 85:14
 101:18
weren't 61:21
 80:16 88:7
 97:15 101:20
whatsoever
 63:20
wherewithal
 93:24
wind 16:5 17:5
winding 15:2,22
wire 59:17 61:19
 118:7
withdrawn 91:19
 110:11 111:15
 113:1,7,8
 124:10,12
within-entitled
 137:6
witness 1:19 9:2
 11:19 12:1 13:2
 14:14 19:12
 21:4 22:1,10,17
 23:12 25:5,13
 27:6 29:12 33:2
 34:1,23 35:15
 36:6 37:22
 38:19 39:9 40:5
 40:16 41:18,21
 43:1,21 44:18
 45:1,11,19
 46:23 48:10,24
 49:17 50:3,15

51:7 52:23
53:25 54:9 55:5
55:14,21 56:12
57:10 60:14
61:3 63:7 64:11
65:21 66:2,9,17
69:22 71:5,14
71:22 76:21
77:22 78:6,25
79:7,21 81:4,13
81:25 82:15
83:15 85:22
87:5 88:20 89:7
90:16 91:5,11
93:15 94:10
95:15 99:6,25
100:7,13,21
101:5 102:2,17
103:17 104:20
108:4 109:17
111:10 112:5
112:11 113:21
117:1 119:10
119:17 120:10
120:22 128:15
130:9,18 131:7
131:13,23
133:16,24
134:10,19
135:4,9 137:3
137:10
word 56:25
 133:11,20
words 10:24 36:7
 52:16,24 94:19
work 5:5 10:19
worked 5:8 11:22
 62:4
working 5:7,11
 12:5
world 108:23
 116:3,7 118:22
 119:2,12 120:6
 120:18
worth 34:10

worthiness 90:11
wouldn't 25:13
 38:10 43:8
 56:22,23 60:16
 64:8,20 77:24
 86:24 87:17
 99:15
write 128:3,5
writes 127:13
writing 103:21
 103:24 113:9
 125:22 126:18
written 35:2,6
 66:6
wrong 55:1 82:18
 82:22 88:22
 89:19
wrote 67:21
 70:12
www.dickman...
 138:4

**X**

**Y**
y'all 95:2
Yang 106:15
yeah 6:23 8:2
 14:21 15:23
 19:17 23:2
 29:12,20 35:15
 37:22 43:1
 55:14 56:24
 59:2 60:14 61:3
 63:7,8,12,18
 66:17 67:9 71:5
 83:24 89:7
 91:11 94:10
 96:10 98:20
 99:25 101:5
 102:2 124:15
 125:1 135:19
year 6:1 9:25
 29:22 49:21
 111:1,8,12,13

David Klos - October 27, 2021

113:4 123:17
126:5,15,22
**years** 5:9 6:17
15:12 24:10,17
30:18 32:21
33:20 34:17
39:14 48:7
65:17 66:3
69:18 94:20
95:3,11 123:23
**years'** 34:10
**yes-or-no** 94:12
**York** 2:11 132:21

**Z**

**zero** 46:8 49:6
80:1
**ZIEHL** 2:10

**0**

**0** 36:8 69:4
**08** 4:24
**09** 4:24

**1**

**1** 8:11 24:20,23
66:24 67:2,7
80:3 113:10
126:8,12
137:22
**1-31-23** 138:4
**1-4** 27:17
**1-6** 127:3
**1.3** 28:13,14
**1.4** 58:25
**10** 19:6 32:21
33:20 34:10,17
69:18 95:3
123:19
**100** 15:25
**10017-2024** 2:11
**101** 138:2
**109** 3:5
**11** 123:19
**127** 3:6
**13** 23:8 27:9

46:12 49:10
114:1 129:12
129:14
**13-week** 126:3
**14** 27:15,17,23
36:12 40:20
42:17 44:13,22
48:12 49:1
58:25 59:23
60:2,23 61:18
64:2,5
**15** 61:7
**15(c)** 80:9 121:4
127:6 128:17
**16** 8:9 31:18
127:2
**17** 8:10
**18** 8:10
**19** 8:24 45:24
49:2
**1982** 4:10

**2**

**2** 66:24 67:2,7
73:25 76:3 80:4
85:23 87:9,13
92:8 114:23
115:9
**2.03-** 46:9
**2.1** 28:14 45:25
46:3 49:1,8
130:22 131:8
**2.1-** 46:5,7
**2.4** 68:7 69:2
70:7,19,23 72:7
73:18 75:22
76:3 77:10,18
78:9 85:18,20
91:22 92:8,15
115:8 116:3,23
**2.4-** 70:21 73:23
77:4 85:24
86:13 90:6
**2:30** 1:22
**20** 8:24 24:17

**200** 12:6
**2009** 5:12,15 6:3
6:3 29:24,25
122:17
**2010** 6:9 106:13
123:18
**2011** 6:10,21
106:13 123:18
**2012** 123:18
**2017** 6:22 22:13
23:7 24:8,18
88:22 105:12
124:25
**2018** 116:14
119:14 120:2
**2019** 8:11,14 9:10
9:13 10:6 11:10
11:16,21 27:14
28:9 29:8,17,21
29:25 31:18
35:8 36:15,22
40:21 41:1,13
42:8,16,16
44:13,13 45:23
45:24 65:13,15
66:11 75:14
78:20 80:6,19
87:2,9,13 88:9
88:14 89:2,17
91:21 92:8 93:2
93:11 105:13
110:20 111:6
111:12,21
112:2,6,8
114:23 115:9
121:7
**2020** 7:13,22
24:20,24 51:10
51:15,22 53:18
54:24 56:17,22
57:6,13,17,22
60:20 61:21
63:19 98:18,24
99:19 100:15
101:2 102:14

102:17,17
103:23 112:17
113:2,4,12
120:24 121:7
121:21 124:1,9
125:12,24
126:10 127:11
128:23 129:3
**2021** 1:15,21
13:24 58:25
59:23 60:2 61:8
87:16 88:1
112:22,25
113:3,10,16
126:8,13 128:2
129:4 136:1
137:22
**21-03004-sgj** 1:8
**214** 138:3
**23-point** 45:20
**23.034-** 45:21
**24.7-** 46:10
**27** 1:15,21 4:20
**29** 37:6

**3**

**3** 46:13 50:8
67:17 68:4
74:18,22 76:5
82:24 83:10,20
93:2,11 114:4,7
114:10,22
118:1,13
129:15 131:8
131:14
**30** 24:10,17
130:22
**30-year** 23:15
24:10 26:2
**30(b)(6)** 19:12,20
**30.7** 21:22
**30.7-** 27:12
**300,000** 28:14
**31** 22:13 23:7
24:18 45:21

51:10,15 56:17
56:22 57:6,13
57:17,21 58:7,9
60:25 87:15
88:1 98:18,24
120:2 124:25
**3102** 2:17
**312** 138:1
**338-** 37:8
**34th** 2:11
**3763** 83:15
**3800** 2:4
**38th** 1:25
**398,000** 85:23

**4**

**4** 3:3 45:23 91:21
**4.4** 118:9
**4.4-** 76:4
**411,000** 37:8
**4228** 138:2
**445-9548** 138:3

**5**

**5** 74:7,8,24 75:4
75:23 77:4,11
77:18 78:3
79:22 80:2
81:18 82:25
85:4 86:13
91:22 93:3
114:16 118:8
118:13,24
119:7,14
**5-** 76:5 90:1
**5,019,000** 75:3
**5.2** 80:19
**5:00** 95:19
**5:14** 1:22 135:21
**500** 1:24 2:3
**500,000** 123:9,12

**6**

**6** 4:10 127:11
128:22 129:3
**6/30** 122:2

David Klos - October 27, 2021

**600,000** 76:6,7
**630,000** 28:14
**66,000** 46:7 49:4
  49:5,7

---
**7**
**7** 58:11,15
**7.4** 75:9 78:22
  79:12 89:2
  90:17,20,22,24
  119:25 122:5
**7.4-** 89:19 91:13
**75** 18:1
**750,000** 28:13
  37:6
**75201** 2:4
**75206** 138:2
**75219** 2:18
**777** 2:17
**780** 2:10

---
**8**
**80** 15:25
**800** 138:3
**855-5100** 138:3

---
**9**
**9** 19:5
**95** 3:4

# EXHIBIT 196

Appx. 03239

Case 21-03003-sgj Doc 11-17 Filed 03/30/21   Entered 03/30/21 11:24:52   Page 2 of 2

**December 2019 Due From Affiliates**

| | | |
|---|---|---:|
| 14585 DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | $ | 57,963,118 |
| 14532 DUE FROM NEXPOINT ADVISORS | | 23,034,644 |
| 14750 LONG TERM NOTES RECEIVABLE | | 18,286,268 |
| 14531 DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | | 10,413,540 |
| 14533 DUE FROM HCRE PARTNERS | | 10,192,686 |
| 14565 DUE FROM OTHER - TAX LOANS | | 9,946,805 |
| 14530 DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | | 7,543,781 |
| 14590 DUE FROM OTHER AFFILIATE | | 5,088,256 |
| 14595 DUE FROM HIGHLAND CAPITAL KOREA | | 3,132,278 |
| 14140 SHARED SVCS FEE RECVBL - PYXIS | | 298,283 |
| 14010 CASH INTEREST RECEIVABLE | | 285,626 |
| 14580 DUE FROM NEXBANK | | 60,000 |
| **Total Due From Affiliates** | $ | **146,245,285** |

# EXHIBIT 197

Case 21-03003-sgj Doc 11-19 Filed 03/30/21   Entered 03/30/21 11:24:52   Page 2 of 2

**September 2020 Due From Affiliates**

| | | |
|---|---|---:|
| 14585 DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | $ | 57,963,118 |
| 14532 DUE FROM NEXPOINT ADVISORS | | 23,610,195 |
| 14750 LONG TERM NOTES RECEIVABLE | | 18,286,268 |
| 14531 DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | | 10,635,564 |
| 14533 DUE FROM HCRE PARTNERS | | 10,436,597 |
| 14565 DUE FROM OTHER - TAX LOANS | | 8,929,625 |
| 14530 DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | | 7,518,692 |
| 14590 DUE FROM OTHER AFFILIATE | | 5,088,256 |
| 14595 DUE FROM HIGHLAND CAPITAL KOREA | | 3,832,358 |
| 14536 DUE FROM SELECT | | 3,000,000 |
| 14010 CASH INTEREST RECEIVABLE | | 2,718,375 |
| 14140 SHARED SVCS FEE RECVBL - PYXIS | | 308,093 |
| 14137 SHARED SVCS FEE RECVBL - OSLI | | 122,000 |
| 14580 DUE FROM NEXBANK | | 60,000 |
| 14148 SHARED SVCS FEE RECVBL - RAND ADVISORS | | 40,182 |
| 14142 SHARED SVCS FEE RECVBL - HCLOH | | 24,592 |
| 14535 DUE FROM HERA | | 10,676 |
| **Total Due From Affiliates** | $ | **152,584,592** |

# EXHIBIT 198

Appx. 03243

Case 21-03003-sgj Doc 11-21 Filed 03/30/21   Entered 03/30/21 11:24:52   Page 2 of 2

**January 2021 Due From Affiliates**

| | | |
|---|---|---:|
| 14585-DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | $ | 59,480,100 |
| 14532-DUE FROM NEXPOINT ADVISORS | | 23,034,644 |
| 14750-LONG TERM NOTES RECEIVABLE | | 18,286,268 |
| 14531-DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | | 10,635,564 |
| 14533-DUE FROM HCRE PARTNERS | | 10,604,952 |
| 14565-DUE FROM OTHER - TAX LOANS | | 8,929,625 |
| 14530-DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | | 7,518,692 |
| 14536-DUE FROM SELECT | | 4,818,153 |
| 14595-DUE FROM HIGHLAND CAPITAL KOREA | | 3,832,358 |
| 14590-DUE FROM OTHER AFFILIATE | | 2,651,256 |
| 14010-CASH INTEREST RECEIVABLE | | 1,111,875 |
| 14140-SHARED SVCS FEE RECVBL - PYXIS | | 894,280 |
| 14146-SHARED SVCS FEE RECVBL - NEXPOINT | | 336,000 |
| 14149-SHARED SVCS FEE RECVBL - NREA | | 160,000 |
| 14137-SHARED SVCS FEE RECVBL - OSLI | | 122,000 |
| 14580-DUE FROM NEXBANK | | 80,000 |
| 14142-SHARED SVCS FEE RECVBL - HCLOH | | 31,179 |
| 14535-DUE FROM HERA | | 10,676 |
| **Total Due From Affiliates** | $ | 152,537,622 |

# EXHIBIT 199

Appx. 03245

**Loan Summary**

| HCMLP to HCMSI (GL 14530) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCMSI Restructure | 5/31/2017 | 6,572,061 |
| HCMSI #46 | 3/26/2018 | 158,777 |
| HCMSI #47 | 6/25/2018 | 212,403 |
| HCMSI #48 | 5/29/2019 | 409,586 |
| HCMSI #49 | 6/26/2019 | 153,565 |
| BW Salary Recievable | 12/31/2019 | 12,301 |
| | Sub-total | 7,518,692 |
| Total HCMSI Debt to HCM Outstanding | | 7,518,692 |
| Total HCMSI Debt per GL | | 7,518,692 |
| | Reconciled Total | 7,518,692 |
| | Unreconciled Difference | - |

| HCMLP to HCMFA (GL 14531) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCMFA #2 | 2/26/2014 | 2,092,825 |
| HCMFA #5 | 2/26/2016 | 965,395 |
| HCMFA #6 | 5/2/2019 | 2,457,517 |
| HCMFA #7 | 5/3/2019 | 5,119,827 |
| | Sub-total | 10,635,564 |
| Total HCMFA Debt to HCM Outstanding | | 10,635,564 |
| Total HCMFA Debt per GL | | 10,635,564 |
| | Reconciled Total | 10,635,564.44 |
| | Unreconciled Difference | - |

| HCMLP to NexPoint Advisors (GL 14532) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| NexPoint Restructure | 5/31/2017 | 23,034,644 |
| | Sub-total | 23,034,644 |
| Total NexPoint Debt to HCM Outstanding | | 23,034,644 |
| Total NexPoint Debt per GL | | 23,034,644 |
| | Reconciled Total | 23,034,644 |
| | Unreconciled Difference | 0.00 |

| HCMLP to HCRE (GL 14533) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCRE #9 | 11/27/2013 | - |
| HCRE Restructure | 5/31/2017 | 5,829,776 |
| HCRE #10 | 10/12/2017 | 3,149,919 |
| HCRE #11 | 10/15/2017 | 874,978 |
| HCRE #12 | 9/25/2019 | 750,279 |
| | Sub-total | 10,604,952 |
| Total HCRE Debt to HCM Outstanding | | 10,604,952 |
| Total HCRE Debt per GL | | 10,604,952 |
| | Reconciling Items Compound Interest | - |
| | Reconciled Total | 10,604,951.61 |
| | Unreconciled Difference | 0.01 |

| HCMLP Partner Tax Loans (GL 14565) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| Dondero #4 | 2/2/2018 | 3,687,270 |
| Dondero #5 | 8/1/2018 | 2,619,929 |
| Dondero #6 | 8/13/2018 | 2,622,426 |
| | Sub-total | 8,929,625 |
| Total Partner Debt to HCM Outstanding | | 8,929,625 |
| Total Partner Debt per GL | | 8,929,625 |
| Reconciling Items | | |
| | Reconciled Total | 8,929,624.74 |
| | Unreconciled Difference | - |

| Get Good Loan (GL 14750) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| Dugaboy Restructure | 5/31/2017 | 18,286,268 |
| | Sub-total | 18,286,268 |
| Total Partner Debt to HCM Outstanding | | 18,286,268 |
| Total Partner Debt per GL | | 18,286,268 |
| Reconciling Items | | |
| | Reconciled Total | 18,286,268.16 |
| | Unreconciled Difference | - |

Appx. 03246

# EXHIBIT 200

**NPA $30.7M**

| | | |
|---|---|---|
| **Closing Date** | | 5/31/2017 |
| **Total Commitment** | $ | 30,746,812 |
| **Rate** | | 6.000% |
| **Maturity:** | | 12/31/2047 |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal | Total Paid |
|---|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | $      30,746,812 | |
| 6/30/2017 | 151,628.12 | | 151,628.12 | 30,746,812.33 | | 30,746,812.33 | |
| 7/31/2017 | 156,682.39 | | 308,310.50 | 30,746,812.33 | | 30,746,812.33 | |
| 8/31/2017 | 156,682.39 | | 464,992.89 | 30,746,812.33 | | 30,746,812.33 | |
| 9/30/2017 | 151,628.12 | | 616,621.00 | 30,746,812.33 | | 30,746,812.33 | |
| 10/20/2017 | 101,085.41 | (717,706.41) | - | 30,746,812.33 | (82,293.59) | 30,664,518.74 | (800,000.00) |
| 10/31/2017 | 55,448.17 | | 55,448.17 | 30,664,518.74 | | 30,664,518.74 | |
| 11/30/2017 | 151,222.28 | | 206,670.46 | 30,664,518.74 | | 30,664,518.74 | |
| 12/5/2017 | 25,203.71 | (358,904.83) | (127,030.67) | 30,664,518.74 | (942,600.16) | 29,721,918.58 | (1,301,504.99) |
| 12/31/2017 | 127,030.67 | | (0.00) | 29,721,918.58 | | 29,721,918.58 | |
| 1/31/2018 | 151,459.64 | | 151,459.64 | 29,721,918.58 | | 29,721,918.58 | |
| 2/28/2018 | 136,802.26 | | 288,261.90 | 29,721,918.58 | | 29,721,918.58 | |
| 3/31/2018 | 151,459.64 | | 439,721.54 | 29,721,918.58 | | 29,721,918.58 | |
| 4/10/2018 | 48,857.95 | (439,721.54) | 48,857.95 | 29,721,918.58 | | 29,721,918.58 | (439,721.54) |
| 4/30/2018 | 97,715.90 | | 146,573.85 | 29,721,918.58 | | 29,721,918.58 | |
| 5/1/2018 | 4,885.79 | (146,573.85) | 4,885.79 | 29,721,918.58 | | 29,721,918.58 | (146,573.85) |
| 5/9/2018 | 39,086.36 | (879,927.65) | (835,955.50) | 29,721,918.58 | | 29,721,918.58 | (879,927.65) |
| 5/31/2018 | 107,487.49 | | (728,468.01) | 29,721,918.58 | | 29,721,918.58 | |
| 6/30/2018 | 146,573.85 | | (581,894.17) | 29,721,918.58 | | 29,721,918.58 | |
| 7/31/2018 | 151,459.64 | | (430,434.53) | 29,721,918.58 | | 29,721,918.58 | |
| 8/31/2018 | 151,459.64 | | (278,974.89) | 29,721,918.58 | | 29,721,918.58 | |
| 9/5/2018 | 24,428.97 | (254,545.91) | (254,545.91) | 29,721,918.58 | (280,765.40) | 29,441,153.18 | (280,765.40) |
| 9/21/2018 | 77,434.27 | (177,111.65) | (177,111.65) | 29,441,153.18 | (1,023,750.00) | 28,417,403.18 | (1,023,750.00) |
| 9/30/2018 | 42,042.19 | | (135,069.46) | 28,417,403.18 | | 28,417,403.18 | |
| 10/31/2018 | 144,811.97 | | 9,742.51 | 28,417,403.18 | | 28,417,403.18 | |
| 11/30/2018 | 140,140.62 | | 149,883.13 | 28,417,403.18 | | 28,417,403.18 | |
| 12/18/2018 | 84,084.37 | (294,695.10) | (60,727.60) | 28,417,403.18 | | 28,417,403.18 | (294,695.10) |
| 12/31/2018 | 60,727.60 | | (0.00) | 28,417,403.18 | | 28,417,403.18 | |

CONFIDENTIAL

D-NNL-029141

**Appx. 03248**

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1/31/2019 | 144,811.97 | | 144,811.97 | 28,417,403.18 | | 28,417,403.18 | |
| 2/28/2019 | 130,797.91 | | 275,609.88 | 28,417,403.18 | | 28,417,403.18 | |
| 3/29/2019 | 135,469.26 | (411,079.15) | (0.00) | 28,417,403.18 | (338,920.85) | 28,078,482.33 | (750,000.00) |
| 3/31/2019 | 9,231.28 | | 9,231.28 | 28,078,482.33 | | 28,078,482.33 | |
| 4/16/2019 | 73,850.25 | (83,081.53) | 0.00 | 28,078,482.33 | (1,216,918.47) | 26,861,563.86 | (1,300,000.00) |
| 4/30/2019 | 61,818.39 | | 61,818.40 | 26,861,563.86 | | 26,861,563.86 | |
| 5/31/2019 | 136,883.59 | (198,701.98) | 0.00 | 26,861,563.86 | 198,701.98 | 27,060,265.84 | - |
| 6/4/2019 | 17,793.05 | (17,793.05) | 0.00 | 27,060,265.84 | (282,206.95) | 26,778,058.89 | (300,000.00) |
| 6/19/2019 | 66,028.09 | (66,028.10) | 0.00 | 26,778,058.89 | (2,033,971.90) | 24,744,086.99 | (2,100,000.00) |
| 6/30/2019 | 44,742.73 | | 44,742.73 | 24,744,086.99 | | 24,744,086.99 | |
| 7/9/2019 | 36,607.69 | (81,350.42) | (0.00) | 24,744,086.99 | (548,649.58) | 24,195,437.41 | (630,000.00) |
| 7/31/2019 | 87,501.31 | | 87,501.31 | 24,195,437.41 | | 24,195,437.41 | |
| 8/13/2019 | 51,705.32 | (139,206.62) | 0.00 | 24,195,437.41 | (1,160,793.38) | 23,034,644.03 | (1,300,000.00) |
| 8/31/2019 | 68,157.30 | | 68,157.31 | 23,034,644.03 | | 23,034,644.03 | |
| 9/30/2019 | 113,595.50 | | 181,752.81 | 23,034,644.03 | | 23,034,644.03 | |
| 10/15/2019 | 56,797.75 | | 238,550.56 | 23,034,644.03 | | 23,034,644.03 | |
| 10/31/2019 | 60,584.27 | | 299,134.83 | 23,034,644.03 | | 23,034,644.03 | |
| 11/30/2019 | 113,595.50 | | 412,730.34 | 23,034,644.03 | | 23,034,644.03 | |
| 12/30/2019 | 113,595.50 | -530,112.36 | (3,786.52) | 23,034,644.03 | | 23,034,644.03 | (530,112.36) |
| 12/31/2019 | 3,786.52 | | 0.00 | 23,034,644.03 | | 23,034,644.03 | |
| 1/31/2020 | 117,382.02 | | 117,382.02 | 23,034,644.03 | | 23,034,644.03 | |
| 2/29/2020 | 109,808.99 | | 227,191.01 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2020 | 117,382.02 | | 344,573.03 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2020 | 113,595.50 | | 458,168.54 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2020 | 117,382.02 | (575,550.56) | (0.00) | 23,034,644.03 | 575,550.56 | 23,610,194.59 | |
| 6/30/2020 | 116,433.84 | | 116,433.83 | 23,610,194.59 | | 23,610,194.59 | |
| 7/31/2020 | 120,314.96 | | 236,748.80 | 23,610,194.59 | | 23,610,194.59 | |
| 8/31/2020 | 120,314.96 | | 357,063.76 | 23,610,194.59 | | 23,610,194.59 | |
| 9/30/2020 | 116,433.84 | | 473,497.60 | 23,610,194.59 | | 23,610,194.59 | |
| 10/31/2020 | 120,314.96 | | 593,812.56 | 23,610,194.59 | | 23,610,194.59 | |
| 11/30/2020 | 116,433.84 | | 710,246.40 | 23,610,194.59 | | 23,610,194.59 | |
| 12/31/2020 | 120,314.96 | | 830,561.36 | 23,610,194.59 | | 23,610,194.59 | |
| 1/14/2021 | 54,335.79 | (830,561.36) | 54,335.79 | 23,610,194.59 | (575,550.56) | 23,034,644.03 | (1,406,111.92) |
| 1/31/2021 | 64,370.79 | | 118,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 2/28/2021 | 106,022.47 | | 224,729.05 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2021 | 117,382.02 | | 342,111.07 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2021 | 113,595.50 | | 455,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2021 | 117,382.02 | | 573,088.60 | 23,034,644.03 | | 23,034,644.03 | |

CONFIDENTIAL

D-NNL-029142

**Appx. 03249**

| | | | |
|---|---|---|---|
| 6/30/2021 | 113,595.50 | 686,684.10 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2021 | 117,382.02 | 804,066.13 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2021 | 117,382.02 | 921,448.15 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2021 | 113,595.50 | 1,035,043.65 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2021 | 117,382.02 | 1,152,425.67 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2021 | 113,595.50 | 1,266,021.18 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2021 | 117,382.02 | 1,383,403.20 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2022 | 117,382.02 | 1,500,785.22 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2022 | 106,022.47 | 1,606,807.69 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2022 | 117,382.02 | 1,724,189.72 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2022 | 113,595.50 | 1,837,785.22 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2022 | 117,382.02 | 1,955,167.24 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2022 | 113,595.50 | 2,068,762.75 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2022 | 117,382.02 | 2,186,144.77 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2022 | 117,382.02 | 2,303,526.79 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2022 | 113,595.50 | 2,417,122.29 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2022 | 117,382.02 | 2,534,504.32 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2022 | 113,595.50 | 2,648,099.82 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2022 | 117,382.02 | 2,765,481.84 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2023 | 117,382.02 | 2,882,863.86 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2023 | 106,022.47 | 2,988,886.34 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2023 | 117,382.02 | 3,106,268.36 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2023 | 113,595.50 | 3,219,863.86 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2023 | 117,382.02 | 3,337,245.88 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2023 | 113,595.50 | 3,450,841.39 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2023 | 117,382.02 | 3,568,223.41 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2023 | 117,382.02 | 3,685,605.43 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2023 | 113,595.50 | 3,799,200.94 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2023 | 117,382.02 | 3,916,582.96 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2023 | 113,595.50 | 4,030,178.46 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2023 | 117,382.02 | 4,147,560.48 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2024 | 117,382.02 | 4,264,942.51 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2024 | 109,808.99 | 4,374,751.49 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2024 | 117,382.02 | 4,492,133.52 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2024 | 113,595.50 | 4,605,729.02 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2024 | 117,382.02 | 4,723,111.04 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2024 | 113,595.50 | 4,836,706.55 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2024 | 117,382.02 | 4,954,088.57 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

D-NNL-029143

**Appx. 03250**

| | | | | |
|---|---|---|---|---|
| 8/31/2024 | 117,382.02 | 5,071,470.59 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2024 | 113,595.50 | 5,185,066.10 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2024 | 117,382.02 | 5,302,448.12 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2024 | 113,595.50 | 5,416,043.62 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2024 | 117,382.02 | 5,533,425.64 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2025 | 117,382.02 | 5,650,807.67 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2025 | 106,022.47 | 5,756,830.14 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2025 | 117,382.02 | 5,874,212.16 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2025 | 113,595.50 | 5,987,807.66 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2025 | 117,382.02 | 6,105,189.68 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2025 | 113,595.50 | 6,218,785.19 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2025 | 117,382.02 | 6,336,167.21 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2025 | 117,382.02 | 6,453,549.23 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2025 | 113,595.50 | 6,567,144.74 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2025 | 117,382.02 | 6,684,526.76 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2025 | 113,595.50 | 6,798,122.26 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2025 | 117,382.02 | 6,915,504.29 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2026 | 117,382.02 | 7,032,886.31 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2026 | 106,022.47 | 7,138,908.78 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2026 | 117,382.02 | 7,256,290.80 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2026 | 113,595.50 | 7,369,886.31 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2026 | 117,382.02 | 7,487,268.33 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2026 | 113,595.50 | 7,600,863.83 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2026 | 117,382.02 | 7,718,245.85 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2026 | 117,382.02 | 7,835,627.87 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2026 | 113,595.50 | 7,949,223.38 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2026 | 117,382.02 | 8,066,605.40 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2026 | 113,595.50 | 8,180,200.91 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2026 | 117,382.02 | 8,297,582.93 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2027 | 117,382.02 | 8,414,964.95 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2027 | 106,022.47 | 8,520,987.42 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2027 | 117,382.02 | 8,638,369.44 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2027 | 113,595.50 | 8,751,964.95 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2027 | 117,382.02 | 8,869,346.97 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2027 | 113,595.50 | 8,982,942.47 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2027 | 117,382.02 | 9,100,324.50 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2027 | 117,382.02 | 9,217,706.52 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2027 | 113,595.50 | 9,331,302.02 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 10/31/2027 | 117,382.02 | 9,448,684.04 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2027 | 113,595.50 | 9,562,279.55 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2027 | 117,382.02 | 9,679,661.57 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2028 | 117,382.02 | 9,797,043.59 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2028 | 109,808.99 | 9,906,852.58 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2028 | 117,382.02 | 10,024,234.60 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2028 | 113,595.50 | 10,137,830.11 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2028 | 117,382.02 | 10,255,212.13 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2028 | 113,595.50 | 10,368,807.63 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2028 | 117,382.02 | 10,486,189.65 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2028 | 117,382.02 | 10,603,571.68 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2028 | 113,595.50 | 10,717,167.18 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2028 | 117,382.02 | 10,834,549.20 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2028 | 113,595.50 | 10,948,144.71 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2028 | 117,382.02 | 11,065,526.73 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2029 | 117,382.02 | 11,182,908.75 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2029 | 106,022.47 | 11,288,931.22 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2029 | 117,382.02 | 11,406,313.24 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2029 | 113,595.50 | 11,519,908.75 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2029 | 117,382.02 | 11,637,290.77 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2029 | 113,595.50 | 11,750,886.27 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2029 | 117,382.02 | 11,868,268.30 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2029 | 117,382.02 | 11,985,650.32 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2029 | 113,595.50 | 12,099,245.82 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2029 | 117,382.02 | 12,216,627.84 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2029 | 113,595.50 | 12,330,223.35 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2029 | 117,382.02 | 12,447,605.37 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2030 | 117,382.02 | 12,564,987.39 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2030 | 106,022.47 | 12,671,009.86 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2030 | 117,382.02 | 12,788,391.89 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2030 | 113,595.50 | 12,901,987.39 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2030 | 117,382.02 | 13,019,369.41 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2030 | 113,595.50 | 13,132,964.92 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2030 | 117,382.02 | 13,250,346.94 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2030 | 117,382.02 | 13,367,728.96 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2030 | 113,595.50 | 13,481,324.46 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2030 | 117,382.02 | 13,598,706.49 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2030 | 113,595.50 | 13,712,301.99 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

D-NNL-029145

**Appx. 03252**

| | | | |
|---|---|---|---|
| 12/31/2030 | 117,382.02 | 13,829,684.01 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2031 | 117,382.02 | 13,947,066.03 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2031 | 106,022.47 | 14,053,088.51 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2031 | 117,382.02 | 14,170,470.53 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2031 | 113,595.50 | 14,284,066.03 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2031 | 117,382.02 | 14,401,448.05 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2031 | 113,595.50 | 14,515,043.56 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2031 | 117,382.02 | 14,632,425.58 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2031 | 117,382.02 | 14,749,807.60 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2031 | 113,595.50 | 14,863,403.11 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2031 | 117,382.02 | 14,980,785.13 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2031 | 113,595.50 | 15,094,380.63 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2031 | 117,382.02 | 15,211,762.65 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2032 | 117,382.02 | 15,329,144.68 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2032 | 109,808.99 | 15,438,953.66 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2032 | 117,382.02 | 15,556,335.69 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2032 | 113,595.50 | 15,669,931.19 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2032 | 117,382.02 | 15,787,313.21 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2032 | 113,595.50 | 15,900,908.72 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2032 | 117,382.02 | 16,018,290.74 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2032 | 117,382.02 | 16,135,672.76 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2032 | 113,595.50 | 16,249,268.27 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2032 | 117,382.02 | 16,366,650.29 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2032 | 113,595.50 | 16,480,245.79 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2032 | 117,382.02 | 16,597,627.81 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2033 | 117,382.02 | 16,715,009.84 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2033 | 106,022.47 | 16,821,032.31 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2033 | 117,382.02 | 16,938,414.33 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2033 | 113,595.50 | 17,052,009.83 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2033 | 117,382.02 | 17,169,391.85 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2033 | 113,595.50 | 17,282,987.36 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2033 | 117,382.02 | 17,400,369.38 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2033 | 117,382.02 | 17,517,751.40 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2033 | 113,595.50 | 17,631,346.91 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2033 | 117,382.02 | 17,748,728.93 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2033 | 113,595.50 | 17,862,324.43 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2033 | 117,382.02 | 17,979,706.46 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2034 | 117,382.02 | 18,097,088.48 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

D-NNL-029146

**Appx. 03253**

| | | | |
|---|---|---|---|
| 2/28/2034 | 106,022.47 | 18,203,110.95 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2034 | 117,382.02 | 18,320,492.97 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2034 | 113,595.50 | 18,434,088.47 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2034 | 117,382.02 | 18,551,470.50 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2034 | 113,595.50 | 18,665,066.00 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2034 | 117,382.02 | 18,782,448.02 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2034 | 117,382.02 | 18,899,830.04 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2034 | 113,595.50 | 19,013,425.55 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2034 | 117,382.02 | 19,130,807.57 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2034 | 113,595.50 | 19,244,403.08 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2034 | 117,382.02 | 19,361,785.10 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2035 | 117,382.02 | 19,479,167.12 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2035 | 106,022.47 | 19,585,189.59 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2035 | 117,382.02 | 19,702,571.61 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2035 | 113,595.50 | 19,816,167.12 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2035 | 117,382.02 | 19,933,549.14 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2035 | 113,595.50 | 20,047,144.64 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2035 | 117,382.02 | 20,164,526.67 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2035 | 117,382.02 | 20,281,908.69 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2035 | 113,595.50 | 20,395,504.19 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2035 | 117,382.02 | 20,512,886.21 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2035 | 113,595.50 | 20,626,481.72 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2035 | 117,382.02 | 20,743,863.74 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2036 | 117,382.02 | 20,861,245.76 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2036 | 109,808.99 | 20,971,054.75 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2036 | 117,382.02 | 21,088,436.77 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2036 | 113,595.50 | 21,202,032.28 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2036 | 117,382.02 | 21,319,414.30 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2036 | 113,595.50 | 21,433,009.80 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2036 | 117,382.02 | 21,550,391.82 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2036 | 117,382.02 | 21,667,773.85 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2036 | 113,595.50 | 21,781,369.35 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2036 | 117,382.02 | 21,898,751.37 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2036 | 113,595.50 | 22,012,346.88 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2036 | 117,382.02 | 22,129,728.90 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2037 | 117,382.02 | 22,247,110.92 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2037 | 106,022.47 | 22,353,133.39 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2037 | 117,382.02 | 22,470,515.41 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 4/30/2037 | 113,595.50 | 22,584,110.92 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2037 | 117,382.02 | 22,701,492.94 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2037 | 113,595.50 | 22,815,088.44 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2037 | 117,382.02 | 22,932,470.47 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2037 | 117,382.02 | 23,049,852.49 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2037 | 113,595.50 | 23,163,447.99 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2037 | 117,382.02 | 23,280,830.01 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2037 | 113,595.50 | 23,394,425.52 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2037 | 117,382.02 | 23,511,807.54 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2038 | 117,382.02 | 23,629,189.56 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2038 | 106,022.47 | 23,735,212.03 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2038 | 117,382.02 | 23,852,594.06 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2038 | 113,595.50 | 23,966,189.56 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2038 | 117,382.02 | 24,083,571.58 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2038 | 113,595.50 | 24,197,167.09 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2038 | 117,382.02 | 24,314,549.11 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2038 | 117,382.02 | 24,431,931.13 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2038 | 113,595.50 | 24,545,526.63 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2038 | 117,382.02 | 24,662,908.66 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2038 | 113,595.50 | 24,776,504.16 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2038 | 117,382.02 | 24,893,886.18 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2039 | 117,382.02 | 25,011,268.20 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2039 | 106,022.47 | 25,117,290.68 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2039 | 117,382.02 | 25,234,672.70 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2039 | 113,595.50 | 25,348,268.20 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2039 | 117,382.02 | 25,465,650.22 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2039 | 113,595.50 | 25,579,245.73 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2039 | 117,382.02 | 25,696,627.75 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2039 | 117,382.02 | 25,814,009.77 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2039 | 113,595.50 | 25,927,605.28 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2039 | 117,382.02 | 26,044,987.30 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2039 | 113,595.50 | 26,158,582.80 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2039 | 117,382.02 | 26,275,964.82 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2040 | 117,382.02 | 26,393,346.85 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2040 | 109,808.99 | 26,503,155.83 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2040 | 117,382.02 | 26,620,537.86 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2040 | 113,595.50 | 26,734,133.36 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2040 | 117,382.02 | 26,851,515.38 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 6/30/2040 | 113,595.50 | 26,965,110.89 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2040 | 117,382.02 | 27,082,492.91 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2040 | 117,382.02 | 27,199,874.93 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2040 | 113,595.50 | 27,313,470.44 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2040 | 117,382.02 | 27,430,852.46 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2040 | 113,595.50 | 27,544,447.96 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2040 | 117,382.02 | 27,661,829.98 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2041 | 117,382.02 | 27,779,212.01 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2041 | 106,022.47 | 27,885,234.48 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2041 | 117,382.02 | 28,002,616.50 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2041 | 113,595.50 | 28,116,212.00 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2041 | 117,382.02 | 28,233,594.02 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2041 | 113,595.50 | 28,347,189.53 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2041 | 117,382.02 | 28,464,571.55 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2041 | 117,382.02 | 28,581,953.57 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2041 | 113,595.50 | 28,695,549.08 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2041 | 117,382.02 | 28,812,931.10 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2041 | 113,595.50 | 28,926,526.60 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2041 | 117,382.02 | 29,043,908.63 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2042 | 117,382.02 | 29,161,290.65 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2042 | 106,022.47 | 29,267,313.12 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2042 | 117,382.02 | 29,384,695.14 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2042 | 113,595.50 | 29,498,290.64 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2042 | 117,382.02 | 29,615,672.67 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2042 | 113,595.50 | 29,729,268.17 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2042 | 117,382.02 | 29,846,650.19 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2042 | 117,382.02 | 29,964,032.21 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2042 | 113,595.50 | 30,077,627.72 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2042 | 117,382.02 | 30,195,009.74 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2042 | 113,595.50 | 30,308,605.25 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2042 | 117,382.02 | 30,425,987.27 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2043 | 117,382.02 | 30,543,369.29 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2043 | 106,022.47 | 30,649,391.76 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2043 | 117,382.02 | 30,766,773.78 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2043 | 113,595.50 | 30,880,369.29 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2043 | 117,382.02 | 30,997,751.31 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2043 | 113,595.50 | 31,111,346.81 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2043 | 117,382.02 | 31,228,728.84 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 8/31/2043 | 117,382.02 | 31,346,110.86 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2043 | 113,595.50 | 31,459,706.36 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2043 | 117,382.02 | 31,577,088.38 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2043 | 113,595.50 | 31,690,683.89 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2043 | 117,382.02 | 31,808,065.91 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2044 | 117,382.02 | 31,925,447.93 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2044 | 109,808.99 | 32,035,256.92 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2044 | 117,382.02 | 32,152,638.94 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2044 | 113,595.50 | 32,266,234.45 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2044 | 117,382.02 | 32,383,616.47 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2044 | 113,595.50 | 32,497,211.97 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2044 | 117,382.02 | 32,614,593.99 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2044 | 117,382.02 | 32,731,976.02 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2044 | 113,595.50 | 32,845,571.52 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2044 | 117,382.02 | 32,962,953.54 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2044 | 113,595.50 | 33,076,549.05 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2044 | 117,382.02 | 33,193,931.07 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2045 | 117,382.02 | 33,311,313.09 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2045 | 106,022.47 | 33,417,335.56 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2045 | 117,382.02 | 33,534,717.58 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2045 | 113,595.50 | 33,648,313.09 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2045 | 117,382.02 | 33,765,695.11 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2045 | 113,595.50 | 33,879,290.61 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2045 | 117,382.02 | 33,996,672.64 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2045 | 117,382.02 | 34,114,054.66 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2045 | 113,595.50 | 34,227,650.16 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2045 | 117,382.02 | 34,345,032.18 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2045 | 113,595.50 | 34,458,627.69 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2045 | 117,382.02 | 34,576,009.71 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2046 | 117,382.02 | 34,693,391.73 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2046 | 106,022.47 | 34,799,414.20 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2046 | 117,382.02 | 34,916,796.23 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2046 | 113,595.50 | 35,030,391.73 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2046 | 117,382.02 | 35,147,773.75 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2046 | 113,595.50 | 35,261,369.26 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2046 | 117,382.02 | 35,378,751.28 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2046 | 117,382.02 | 35,496,133.30 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2046 | 113,595.50 | 35,609,728.80 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

D-NNL-029150

**Appx. 03257**

| | | | | |
|---|---|---|---|---|
| 10/31/2046 | 117,382.02 | 35,727,110.83 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2046 | 113,595.50 | 35,840,706.33 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2046 | 117,382.02 | 35,958,088.35 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2047 | 117,382.02 | 36,075,470.37 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2047 | 106,022.47 | 36,181,492.85 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2047 | 117,382.02 | 36,298,874.87 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2047 | 113,595.50 | 36,412,470.37 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2047 | 117,382.02 | 36,529,852.39 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2047 | 113,595.50 | 36,643,447.90 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2047 | 117,382.02 | 36,760,829.92 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2047 | 117,382.02 | 36,878,211.94 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2047 | 113,595.50 | 36,991,807.45 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2047 | 117,382.02 | 37,109,189.47 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

# EXHIBIT 201

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | § | |
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

The above-captioned debtor and debtor-in-possession (the "Debtor") files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing, but not directing, the Debtor, or its relying adviser, as appropriate, to cause the distribution of assets, in the ordinary course of its business, to certain Related Entities that have invested in Dynamic, AROF, and RCP (each as defined below).  In support of this Motion, the Debtor respectfully states as follows:

**Jurisdiction and Venue**

1.      The United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Motion are sections 105(a) and 363 of the Bankruptcy Code.

**Summary of Relief Requested**

4.      In this Motion, the Debtor, through its Independent Board (defined below), seeks this Court's authorization, indeed its direction, to meet its obligations to the funds managed by the Debtor.  These obligations exist under contract and according to applicable law.  In the ordinary course of its business, the Debtor is routinely called upon to liquidate or wind down the assets held by the funds under its direct or indirect management and then to distribute the proceeds of such liquidations to the investors in the funds.  Normally, these obligations – that is to liquidate and distribute – are neither disputed nor controversial.

5.      And yet, because of the history of this case, one of these duties – that is the duty to distribute – is now contested.  The Committee (defined below) has voiced no objection to

the liquidation of the assets subject to this Motion, but it does object to certain of the distributions. The Committee says that any distributions to James Dondero, Mark Okada, or any entities related to them should be withheld.  The Debtor understands the reasons for the Committee's objection, but not the legal basis for it.

6.      Everyone would agree that the Independent Board must act in accordance with the law in fulfilling its obligations to the Debtor's estate.  That means dealing with creditors in the manner prescribed by Bankruptcy Code.  The Independent Board takes its obligations under the Bankruptcy Code seriously.  But, the Independent Board takes just as seriously its obligations to the funds managed by the Debtor.  The Debtor is no more free to unilaterally change the obligations it has to those funds under their operative documents and applicable law – especially considering that many of the investors in those funds are complete strangers to this case – than it is to unilaterally modify its obligations to creditors under the Bankruptcy Code.  This is so even if some creditors view some of the Debtor's investors as suspicious or unworthy.

7.      The Debtor asks this Court to affirm that in the absence of specific injunctive relief entered by this Court or any other court of appropriate jurisdiction, the Debtor must fulfill its obligations under contract and according to applicable law.

**Background**

8.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

3

10.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].[2]

11.     On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

12.     The Settlement Order approved, among other things, certain operating and reporting protocols [Docket Nos. 354, 466] (as amended, the "Protocols"), which, in certain circumstances, require the Debtor to seek the approval of its Chief Restructuring Officer[3] and/or the Committee prior to engaging in "Transactions" (as defined in the Protocols).

13.     In connection with the Settlement Order, an independent board of directors was appointed on January 9, 2020, at the Debtor's general partner, Strand Advisors, Inc. (the "Independent Board")

14.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the docket maintained by this Court.

[3] The Debtor's retention of Development Specialists, Inc. as the Debtor's Chief Restructuring Officer (the "CRO") was approved by this Court on January 10, 2020 [Docket No. 342].

4

**Background to the Relief Requested**

**A.      The Debtor's Business Generally**

15.      On October 29, 2019, the Debtor filed that certain *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76] (the "Precautionary Motion").  As described in the Precautionary Motion, the Debtor, as a registered investment adviser, provides in the ordinary course of its business, investment management services to its clients, which include, among others, hedge funds and private equity style funds.

16.      Hedge funds and private equity style funds are types of pooled investment vehicles in which third-party investors subscribe for equity interests.  These funds are governed by a board of directors or general partner, depending on the corporate form of the fund entity, and retain an investment manager pursuant to an investment management agreement to oversee their investments.  The fund itself, and the relationship of the investors in the fund, is governed by a contractual governing document (e.g., a limited partnership agreement or articles of association), and the board of directors or the general partner, as applicable – as well as the investment manager – have fiduciary obligations to the fund entity.  Further, while the investment manager may have investment discretion under the investment management agreement, the investment manager is also required to comply with the terms of the fund's contractual governing documents, including the investment management agreement, and the investment manager has fiduciary and other obligations imposed on the investment manager by applicable law, including, the Advisers Act. These types of funds are also often organized as two-tiered structures with a single "master" fund that trades and holds the fund's investment portfolio and multiple "feeder funds" that invest in the master fund.

DOCS_NY:40032.1 36027/002

17.     Investors in a hedge fund generally can redeem their interests in the fund on periodic redemption dates.  Redemptions occur in the ordinary course for all hedge funds, and hedge funds manage their liquidity on an ongoing basis, by selling assets to satisfy these investor redemptions in the ordinary course.  Similarly, upon a determination by a hedge fund's governing body that the fund should be liquidated, the fund sells its remaining portfolio holdings in an orderly manner and distributes the proceeds to its investors.  Common reasons for a hedge fund to liquidate include, among other things, the fund no longer being viable as a result of significant investor redemptions.

18.     Private equity style funds, on the other hand, generally have a set term after which they are required to liquidate and distribute their assets to their investors (although they may under certain circumstances be wound down prior to the expiration of their term).  Further, investors in private equity style funds are generally not permitted to redeem their interests or withdraw their capital from the fund.  The term of a private equity style fund may, subject to the fund's governing documents, be extendable.

**B.      Distributions from Dynamic, AROF, and RCP**

*Dynamic Distribution and AROF Distribution*

19.     The Debtor manages (a) Highland Dynamic Income Fund, L.P., a Delaware limited partnership, (b) Highland Dynamic Income Fund, Ltd., a Cayman Islands exempted company, and (c) Highland Dynamic Income Master Fund, L.P., a Cayman Islands exempted limited partnership (collectively, "Dynamic").  Dynamic consists of three entities: a "master fund" (which is a Cayman exempted limited partnership) owned by two "feeder funds" (one being a Delaware limited partnership and the other being a Cayman Islands exempted company).[4]  The

---

[4] The documents governing Dynamic are (i) the Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., dated April 1, 2018; (ii) the Amended and Restated Memorandum and Articles of

master funds and the Delaware feeder funds are managed by their applicable general partner, which in each case is a wholly-owned affiliate of the Debtor. The Cayman feeder fund is governed by a board consisting of an employee of the Debtor. The Debtor's direct relationship with each of the three Dynamic entities is governed by an investment management agreement under which the Debtor serves as investment adviser to such entities. Accordingly, Dynamic is an investment advisory client of the Debtor. An organizational chart for Dynamic is attached hereto as **Exhibit B**.

20.     Highland Capital Management Latin America, L.P. ("<u>HCM Latin America</u>"), which is an indirect wholly owned subsidiary of the Debtor that is registered as a relying adviser of the Debtor, manages (a) Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership, (b) Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company, and (c) Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (collectively, "<u>AROF</u>"). The Debtor has entered into a services agreement pursuant to which the Debtor provides certain back- and middle-office services and administrative, infrastructure and other services to HCM Latin America. AROF consists of three entities: a "master fund" (which is a Cayman exempted limited partnership) owned by two "feeder funds" (one being a Delaware limited partnership and the other being a Cayman Islands exempted company).[5] The master fund and the Delaware feeder fund are

---

Association of Highland Dynamic Income Fund, Ltd., adopted on 8 May 2018; (iii) the Second Amended and Restated Exempted Limited Partnership Agreement of Highland Dynamic Income Master Fund, L.P., dated April 1, 2018; and (iv) the Investment Management Agreement, dated March 28, 2013, by and among Dynamic, Highland Dynamic Income Fund GP, LLC (f/k/a Highland Capital Loan GP, LLC) and the Debtor; (v) the Confidential Private Placement Memorandum of Highland Dynamic Income Fund, L.P., dated April 2018; and (vi) the Confidential Private Offering Memorandum of Highland Dynamic Income Fund, Ltd., dated April 2018 ((i) – (vi) collectively, the "<u>Dynamic Fund Documents</u>"). True and accurate copies of the Dynamic Fund Documents are attached hereto as **Exhibit C**.

[5] The documents governing AROF are (i) the Amended and Restated Limited Partnership Agreement of Highland Argentina Regional Opportunity Fund, L.P., dated November 1, 2017; (ii) the Amended and Restated Memorandum and Articles of Association of Highland Argentina Regional Opportunity Fund, Ltd., adopted on 8 November 2017; (iii) the Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina Regional

7

managed by their applicable general partner, which in each case is a wholly-owned affiliate of the Debtor. The Cayman feeder fund is managed by an independent board of Cayman-based directors unaffiliated with the Debtor. HCM Latin America's relationship with each of the three AROF entities is governed by an investment management agreement under which HCM Latin America serves as investment adviser to such entities. Accordingly, AROF is an investment advisory client of HCM Latin America. An organizational chart for AROF is attached hereto as **Exhibit D**.

21.     Each of Dynamic and AROF received significant redemption requests from limited partners both before and after the Petition Date. Following those requests – and as disclosed in the Precautionary Motion – each of Dynamic and AROF began winding down. These funds' governing bodies (general partner and board of directors), as well as the Debtor, concluded that Dynamic and AROF were no longer viable following such redemptions and therefore should be liquidated in an orderly manner.

22.     Further, the Debtor believed (and continues to believe) that its fiduciary and contractual obligations to Dynamic and AROF mandated an orderly liquidation and distribution of assets to investors given that such funds were no longer viable. When a significant redemption request is made, a fund typically is required to liquidate its assets to satisfy the redemption request, which in turn both decreases the total assets available to satisfy later redemption requests and may result in a fund's costs being allocated disproportionately to the remaining investors. An orderly liquidation helps ensure that all investors are treated in the same manner, bear the same costs, and

---

Opportunity Master Fund, L.P., dated November 1, 2017, as amended; (iv) the Amended and Restated Investment Management Agreement, dated November 1, 2017, by and among AROF, Highland Argentina Regional Opportunity Fund GP, LLC, and HCM Latin America; (v) the Confidential Private Placement Memorandum of Highland Argentina Regional Opportunity Fund, L.P., dated March 2019, as supplemented; and (vi) the Offering Memorandum of Highland Argentina Regional Opportunity Fund, Ltd., dated March 2019, as supplemented ((i) – (vi) collectively, the "AROF Fund Documents"). True and accurate copies of the AROF Fund Documents are attached hereto as **Exhibit E**.

DOCS_NY:40032.1 36027/002

receive distributions on a pro rata basis. Otherwise, liquidation costs and proceeds could adversely impact some investors (likely the investors that have not submitted a redemption or withdrawal request).

23.     The Debtor disclosed the proposed liquidation of Dynamic and AROF to the Committee, and the Committee did not object.

24.     As such, since the Petition Date, the Debtor has taken steps to liquidate the investments held by Dynamic and AROF and is seeking to distribute the cash to those funds' respective investors/redeemers in accordance with the documents governing the funds.[6] Distribution of the cash to investors/redeemers is a necessary step in liquidating the funds; Dynamic and AROF cannot close unless all assets have been distributed in accordance with the Dynamic Fund Documents and the AROF Fund Documents, respectively.

25.     On January 24, 2020, the Debtor notified the Committee that it intended to distribute (i) approximately $35 million in cash to investors/redeemers in Dynamic (the "Dynamic Distribution") and (ii) approximately $22 million in cash to investors/redeemers in AROF (the "AROF Distribution"). In that notice, the Debtor disclosed that:

- (i) CLO Holdco, Ltd. ("CLOH"),[7] (ii) Mark Okada,[8] and (iii) Highland Dynamic Income Fund GP, LLC (the "Dynamic GP")[9] are investors in Dynamic[10] and that (a)

---

[6] In the case of AROF, all redemptions were suspended and the Fund was placed in liquidation. In the case of Dynamic, all investors were subject to compulsory redemptions and the fund was placed in liquidation.

[7] The limited partnership interests in Dynamic held by CLOH were originally held by the Debtor. The Debtor transferred those interests to The Get Good Nonexempt Trust ("Get Good") on December 28, 2016, in exchange for 97.6835% of Get Good's interest in a promissory note in original principal amount of approximately $24 million issued by The Dugaboy Investment Trust. Get Good subsequently transferred its interests in Dynamic to the Highland Dallas Foundation, Inc., which transferred those interests to CLOH. The Dugaboy Investment Trust has been paying amounts due under the $24 million note, and the current principal amount is approximately $17.5 million.

[8] Mr. Okada is an investor in the Debtor and has an interest in the Debtor's Class A limited partnership interests. Mr. Okada resigned from his position with the Debtor prior to the Petition Date.

[9] The Dynamic GP is wholly owned by the Debtor.

[10] The Debtor is also a limited partner in Dynamic and will receive its applicable share of the Dynamic Distribution.

DOCS_NY:40032.1 36027/002

CLOH's share of the Dynamic Distribution was $872,194.00; (b) Mr. Okada's share was $4,176,774.74; and (c) the Dynamic GP's share was $137,182.03; and

- CLOH is an investor in AROF, and its share of the AROF Distribution was $1,516,354.38.

The Debtor further disclosed that it intended to distribute to CLOH, Mr. Okada, and the Dynamic GP their pro rata share of the Distributions in the same manner as distributions were being made to other investors.

### *RCP Distribution*

26.     In the ordinary course of its business, the Debtor also manages (a) Highland Restoration Capital Partners, L.P., a Delaware limited partnership, (b) Highland Restoration Capital Partners Offshore, L.P., a Cayman exempted limited partnership, and (c) Highland Restoration Capital Partners Master, L.P., a Delaware limited partnership (collectively, "RCP"). RCP consists of a "parallel" fund structure that invests side-by-side in the same investments on a proportional basis.  The domestic side consists of a Delaware limited partnership, and the parallel Cayman side consists of a Cayman exempted limited partnership that feeds into a separate Delaware limited partnership.  Each fund is managed by the same general partner, which is a wholly owned subsidiary of the Debtor.  The Debtor's direct relationship with each of the three RCP entities, like its relationship with Dynamic, is governed by an investment management agreement under which the Debtor serves as investment adviser to such entities.  Accordingly, RCP is an investment advisory client of the Debtor.  An organizational chart for RCP is attached hereto as **Exhibit F**.

27.     RCP is a private equity style fund, and, as a private equity fund, RCP has a set term after which it is required to liquidate and distribute its assets to its investors.  Investors are not permitted to withdraw their capital from the fund.  In this case, RCP had an original term of ten years (the "Term") with the potential to extend the Term for two additional one year periods

10

if RCP's independent advisory board (the "Advisory Board")[11] consented to such extensions. RCP's initial ten-year term expired in April 2018.  The Advisory Board agreed to extend the term for one additional year to April 2019.  However, following that one year extension, the Advisory Board did not consent to an additional one-year extension, and instead allowed RCP to continue month-to-month with the Advisory Board reserving the right to approve each additional monthly extension.  As a condition to receiving these monthly extensions, the Debtor agreed to waive its management fees.

28.     The Advisory Board has not granted any additional extensions of the Term since November 2019.  Because RCP is past its Term, RCP has gone into orderly liquidation under the terms of its governing documents.[12]  As a result of that liquidation, RCP has substantial assets to distribute to its limited partners (the "RCP Distribution," and together with the Dynamic Distribution and the AROF Distribution, the "Distributions").

29.     The RCP Distribution comes from RCP's sale of 1,700,000 shares of common stock in MGM Holdings, Inc. ("MGM"), which trade was disclosed to the Committee on February 7, 2020 (the "MGM Sale").  The MGM Sale generated $123.25 million in proceeds, all of which is subject to distribution to RCP's limited partners, including the Debtor, which will receive approximately $18.5 million from the MGM Sale proceeds.

---

[11] None of the Advisory Board members are affiliated with or related in any way to the Debtor, James Dondero, or Mark Okada.

[12] The documents governing RCP are (i) Second Amended and Restated Agreement of Limited Partnership of Highland Restoration Capital Partners Offshore, L.P. dated April 18, 2008; (ii) the Limited Partnership Agreement of Highland Restoration Capital Partners, L.P., dated April 18, 2008; (iii) Amended and Restated Agreement of Limited Partnership of Highland Restoration Capital Partners Master, L.P., dated April 18, 2008; and (iv) the Investment Management Agreement, dated November 15, 2007, by and among Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Partners Master, L.P., each parallel vehicle that may be formed from time to time, Highland Restoration Capital Partners GP, LLC, and Highland Capital Management, L.P. ((i) – (iv) collectively, the "RCP Fund Documents").  True and accurate copies of the RCP Fund Documents are attached hereto as **Exhibit G**.

11

30.     The MGM Sale was originally part of a much larger liquidating transaction that was being discussed last November 2019, long before the appointment of the Independent Board.  In late November 2019, the Debtor requested the Committee's authorization to proceed first with the larger transactions and then solely the MGM Sale, but the Committee rejected both of these transactions.

31.     After the appointment of the Independent Board, the Debtor asked the Independent Board to re-assess the larger transaction, and while the Independent Board was reviewing the transaction, the Independent Board determined that the MGM Sale had been agreed to in November 2019 but had not yet closed.  Subsequently, the Independent Board spent substantial time and resources considering the Debtor's fiduciary duties to the investors in RCP and the benefits and risks of the transaction, the Independent Board ultimately decided not to proceed with the larger transaction.  However, the Independent Board determined to close the MGM Sale in accordance with its terms, and the Independent Board notified the Committee on February 7, 2020, of its intention to close the MGM Sale and followed with a presentation to the full Committee on February 14, 2020, and with the Committee's consent, the MGM Sale closed on February 24, 2020.

32.     Also on February 7, 2020, the Debtor notified the Committee that it intended to distribute the RCP Distribution as soon as practicable following their receipt by RCP of such liquidation proceeds.  The Debtor also disclosed that Highland Capital Management Services, Inc. ("HCM Services"),[13] would receive a share of the RCP Distribution of approximately $2.1 million in the same manner as all other limited partners in RCP.[14]  HCM

---

[13] HCM Services received its interests in RCP from the Debtor over eleven years ago.  Additional materials will be provided concerning HCM Services' ownership interest.

[14] The Debtor is also a limited partner in RCP and would receive approximately $18.5 million from the RCP Distribution.

Services is owned 75% by James Dondero and 25% by Mark Okada, and HCM Services is considered a "Related Entity"[15] under the Protocols.

**_The Committee's Objections to the Distributions_**

33.    On January 30, 2020, the Debtor, through counsel, received notice that the Committee objected to Dynamic and AROF making distributions to the Related Entity investors under the Protocols unless the Debtor satisfied three demands:  (1) no part of the foregoing distributions are to be made to any Related Entities; (2) Dynamic and AROF must provide an unredacted list of all their investors; and (3) the Debtor must make demand for payment on all demand notes held by the Debtor.  The Committee also requested information regarding how CLOH obtained its limited partnership interest in Dynamic.[16]  The Committee has not objected to either Dynamic or AROF making distributions to non-Related Entity Investors.

34.    On February 14, 2020, the Debtor, through counsel, also received notice that the Committee objected to RCP making distributions to HCM Services, as a Related Entity. The Committee has not objected to RCP making distributions to its non-Related Entity investors.

35.    Under the applicable governing documents, the rights and obligations of Related Entity investors in Dynamic, AROF, RCP, and the Debtor's other managed investment

---

[15] A "Related Entity," as defined in the Protocols, means "collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld)."

[16] *See* note 7, *supra*.

13

vehicles as applicable, are the same as those of other investors in the applicable funds. Further, at this time, the Debtor is not aware of any claims that Dynamic, AROF, or RCP have against their Related Entity investors. However, the Debtor understands that the Committee has started its investigation with respect to claims against the Related Entities but does not believe that there is cause to delay otherwise payable distributions to Related Entities until the Committee has completed its review. As such, and as discussed at greater length below, the Debtor believes that failing to provide such parties their pro rata share of the Distributions based upon the potential that the Debtor (not Dynamic, AROF, or RCP) might assert claims against the Related Entities at some point in the future could potentially subject the Debtor, as well as the applicable fund, to claims for, among other things, breach of contract and breach of fiduciary duty under applicable state law, federal law, and Cayman law.

36.     Consequently, the Debtor is filing this Motion and seeking an order from this Court authorizing the Debtor to cause Distributions to be made to the Related Entity investors in Dynamic, AROF, and RCP (collectively, the "Funds").

**Relief Requested**

37.     By this Motion, the Debtor seeks the entry of an order authorizing, but not directing: (i) the Dynamic Distribution to the Related Entity investors in Dynamic, in accordance with the Dynamic Fund Documents, (ii) the AROF Distribution to the Related Entity investors in AROF in accordance with the AROF Fund Documents, and (iii) the RCP Distribution to the Related Entity investors in RCP in accordance with the RCP Fund Documents.

14

**Basis for the Relief Requested**

A.    **The Governing Documents for the Funds Do Not Give Discretion Regarding Fund Distributions**

        38.    Each Fund is a distinct legal entity with its own property rights in its own assets.  Further, each entity in each Fund is governed by its own set of governing documents, which govern how distributions are to be made to investors in the applicable Fund.  As set forth below, because certain of the Related Entities have invested through the Cayman entities and others have invested through the Delaware entities, only certain documents apply to each Related Entity investors.  The Related Entities and their applicable funds are set forth below:

**Dynamic**

| Related Entity | Applicable Entity |
|---|---|
| CLOH | Dynamic Master Fund & Dynamic Domestic Feeder Fund |
| Mark Okada | Dynamic Master Fund & Dynamic Domestic Feeder Fund |
| Dynamic GP | Dynamic Master Fund & Dynamic Domestic Feeder Fund |

**AROF**

| Related Entity | Applicable Entity |
|---|---|
| CLOH | AROF Master Fund & AROF Cayman Feeder Fund |

**RCP**

| | |
|---|---|
| HCM Services | RCP Domestic Fund |

        39.    Because the Dynamic and AROF funds are structured as "master/feeder" funds, investors invest by subscribing for limited partnership interests or shares in the feeder funds; however, the feeder funds do not own interests in underlying portfolio investments.  Those investments are held by the master funds, and the feeder funds are the master fund's limited partners.  As such, the master fund is the entity that receives the proceeds from any investment and then distributes those proceeds to its limited partners – the feeder funds – pursuant to the master fund's governing documents.  The feeder funds in turn distribute those proceeds to their limited

partners or shareholders – the third-party investors – pursuant to the feeder fund's governing documents. As, and by way of example, if an investor is invested in a Delaware feeder fund, the documents governing its distributions are the documents governing both the master fund and the documents governing the Delaware feeder fund. The documents governing the Cayman fund are, in these circumstances, generally immaterial.

40.     RCP is structured as a "parallel fund." This structure is similar to the master/feeder structure discussed above. RCP has a master fund incorporated in Delaware; however, the RCP master fund only has one limited partner – the Cayman fund. The domestic RCP fund invests in the same portfolio investments as the RCP master fund but is not a limited partner of the RCP master fund. Instead, the RCP domestic fund is a standalone entity, which owns its own assets, receives the proceeds of those assets directly, and distributes those proceeds directly to its limited partners. The RCP domestic fund does not rely on distributions from the RCP master fund, and, consequently, for purposes of distributions to investors in the RCP domestic fund, the documents governing the RCP master fund and RCP Cayman fund are largely immaterial.

41.     The relevant documents are discussed below. Because of their similarities, the Dynamic Fund Documents and Argentina Fund Documents are addressed together.

### *Dynamic Fund Documents and AROF Fund Documents*

42.     **The Dynamic and AROF Master Fund**. Because on November 15, 2019, and November 20, 2019, respectively, the general partners of the Dynamic and AROF master funds elected to terminate Dynamic and AROF, respectively, Dynamic and AROF entered wind up as of those respective dates.[17] Upon such dates, the general partners of Dynamic and AROF became

---

[17] Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina Regional Opportunity Master Fund, L.P., dated 1 November 2017 § 6.1(a); Second Amended and Restated Exempted Limited Partnership

obligated to "promptly liquidate the business and administrative affairs of the Partnership to the extent feasible."[18]   Section 6.2 of each of the Dynamic and AROF master fund partnership agreements also provides that the limited partners in the master funds, i.e. their feeder funds, "shall… be paid liquidating distributions" after applicable debts are repaid.[19]  Such funds' general partners, therefore, have an obligation to promptly liquidate their assets and distribute the proceeds to such funds' limited partners – their respective feeder funds.  Generally, the failure to distribute such proceeds could give rise to a claim for breach of contract under Cayman law.[20]

43.    **The Dynamic and AROF Domestic Feeder Fund**. Again because each of Dynamic and AROF are in wind up, they are required to "promptly liquidate" their business and affairs, and their investors, including the Related Entity investors – CLOH, Mr. Okada, and Dynamic GP – are required to "be paid liquidating distributions. . . *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts."[21]   Section 6.2 of the applicable documents, however, does *not* state that the Debtor can withhold any individual investor's pro rata distribution.[22]   Consequently, the Debtor believes it is obligated, under its

---

Agreement of Highland Dynamic Income Master Fund, L.P., dated 1 April 2018 § 6.1(a); Exempted Limited Partnership Law (2018 Revision) § 36(10)(d).

[18] Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina Regional Opportunity Master Fund, L.P., dated 1 November 2017 § 6.2; Second Amended and Restated Exempted Limited Partnership Agreement of Highland Dynamic Income Master Fund, L.P., dated 1 April 2018 § 6.2.

[19] *Id.*

[20] Section 6.2 of each fund's partnership agreement provides that distributions to the feeder funds only need to be made to the "extent feasible."  The Debtor believes that this exception does not apply here as distributions are "feasible" if authorized by this Court and that such exception cannot be relied on to excuse the relevant master funds from distributing proceeds to their feeder funds.

[21] Amended and Restated Limited Partnership Agreement of Highland Argentina Regional Opportunity Fund, L.P., § 6.2(a)(iii); Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., § 6.2(a)(iii)

[22] In a separate section of the applicable limited partnership agreements unrelated to liquidation, there is a provision requiring that Dynamic and AROF refrain from making a distribution "if such distribution would violate. . . applicable law."  (Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., § 3.13(b); Amended and Restated Limited Partnership Agreement of Highland Argentina Regional Opportunity Fund, L.P., § 3.12(b).)  There is currently no "applicable law" prohibiting the distributions.  The Debtor still has the right to make the distributions if authorized by this Court.

contractual and fiduciary duties, to petition this Court for authority to make distributions to the Related Entity investors.

44.     **The Dynamic and AROF Cayman Feeder Fund**.  There are no Related Entity investors in the Dynamic Cayman feeder fund and, therefore, the documents governing the Dynamic Cayman feeder fund are not relevant with respect to any distributions to Related Entities investors.

45.     CLOH is invested in the AROF Cayman feeder fund.  That fund suspended all rights of its shareholders to redeem (as well as all redemption payments) on October 30, 2019, to enable an orderly realization of assets following receipt of very significant redemption requests. While the directors of the AROF Cayman feeder fund have discretion with respect to the imposition (and the lifting) of the suspension of redemptions, that discretion must, as a matter of Cayman law, be exercised for a proper purpose in the best interests of the company and consistent with the directors' fiduciary duties and fund documents.  The assets of AROF have been liquidated, and there is no longer a reason to suspend redemptions.[23]  Furthermore, since CLOH – the Related Party investor in the AROF Cayman feeder fund – has not yet been redeemed, it is eligible (as a member of a particular class and/or series of issued shares) to be paid distributions under the fund's articles of association.[24]  Therefore, the Debtor believes that, if the suspension of redemptions is

---

[23] It may be argued that the suspension was automatically justified by the like suspension of withdrawals by the AROF master fund on October 30, 2019 (Offering Memorandum of Highland Argentina Regional Opportunity Fund, Ltd., at p. 75.), but it is also arguable that that condition fell away with the termination of the AROF master fund on November 15, 2019. Further, it may be arguable that under section 12.5 of the AROF feeder articles of association the directors might be entitled to withhold redemption amounts payable to the Related Parties if required by U.S. law, but it may equally be arguable that that provision applies only to tax withholdings.

[24] Amended and Restated Memorandum and Articles of Association of Highland Argentina Regional Opportunity Fund, Ltd. § 45.1. In the interests of full disclosure, such distributions to shareholders of a particular class and/or series are in the "absolute discretion" of the board of Cayman-based directors and, further, directors can hold distributions due to a particular member in abeyance in a separate account if such distributions "cannot be paid" to a particular member, though they will retain their status as a debt owed to that member. For these purposes, it might be arguable that a distribution "cannot be paid" if its payment is prohibited by applicable law or by an order of a court of competent

18

maintained and distributions are not paid to CLOH, there may be claims that the continuance of the suspension of redemptions and failure to pay distributions constitutes a breach of the AROF Cayman feeder fund's articles of association and of the Cayman directors' fiduciary duties. The Cayman-based directors are independent of the Debtor and are not required to take the Debtor's direction, and if the AROF Cayman feeder fund receives assets from its master fund, the Debtor has no control over how the Cayman directors will treat those assets, including whether the Cayman directors will cause those assets to be distributed to CLOH as a Related Entity investor. As such, the Debtor is asking this Court to authorize distributions to the Related Entity investor in AROF to protect the Debtor from any liability based on the Cayman directors' actions or inactions.

### *RCP Fund Documents*

46.    **The RCP Domestic Fund.**  As set forth above, the RCP domestic fund has the same general partner as the other RCP funds but holds its own investments in parallel with such funds. Further, distributions to investors in the RCP domestic fund are governed a limited partnership agreement specific to the domestic fund. The RCP domestic fund's distributions are not contingent on distributions from the RCP master fund. Under the documents governing the RCP domestic fund, the general partner is required to distribute assets proportionally based on each investor's funded commitments as of the date of distribution, and the documents do not provide that a distribution can be made to one investor but not another.[25] Because the RCP domestic fund governing documents do not allow the general partner to select which investors are to receive a distribution, the Debtor believes that it is not permitted under those documents to make distributions to some but not all of the investors and that if the Debtor were to make a distribution

---

jurisdiction. (Amended and Restated Memorandum and Articles of Association of Highland Argentina Regional Opportunity Fund, Ltd., Art. 45.1; 45.7.)

[25] Limited Partnership Agreement of Highland Restoration Capital Partners, L.P, § 3.3(a); *see also* § 3.2 (requiring short term investment gains to be allocated proportionally to investors).

to a subset of investors only, it may be exposed to liability.  Accordingly, the Debtor is seeking authority to make Distributions to the Related Entity investors as part of a liquidating distribution made to all investors on a pro rata basis.

47.    **The RCP Master Fund & RCP Cayman Fund.**  There are no Related Entity investors in in RCP's Cayman fund and, therefore, the documents governing the RCP master fund and the RCP Cayman fund are not currently relevant with respect to any distributions to Related Entities.

### *Potential Fiduciary and Common Law Obligations*

48.    The obligations of the Funds' domestic governing entities (general partners and directors) are also governed by Delaware fiduciary duties.  Under the laws of the State of Delaware, a general partner to a limited partnership owes duties of good faith, fairness and loyalty to its limited partners.  *Boxer v. Husky Oil*, 329 A.2d 995, 997 (1981).  Pursuant to Delaware law, subject to certain limitations, a general partner can limit its fiduciary duties by contract.  Specifically, 6 Del. C. § 17-1101(d), allows for a general partner to expand, restrict or even eliminate its fiduciary duties, so long as the general partner's duties of fair dealing and good faith are unaffected.  The governing documents for the Delaware-domiciled Funds do not include a waiver or disclaimer of fiduciary duties that generally apply to general partners.[26]

49.    Further, the conduct and activities of the Debtor and HCM Latin America as investment manager to the Funds are governed by the Advisers Act and the relevant investment management agreements.  An investment adviser (such as the Debtor and HCM Latin America),

---

[26] The only language that acts as a waiver of fiduciary duties is very narrow and does not apply to general fiduciary duties under state law or securities law.  Specifically, there is a disclaimer of the general partner's status as a fiduciary under the Employee Retirement Income Security Act of 1974 and language that limits the general partner's liability for breach of fiduciary duty in connection with the use of "soft dollars" generated from brokerage transactions.  There are also typical "standard of care" and indemnity provisions that limit liability of the general partner, but these do not specifically address or provide a waiver of fiduciary duties.

DOCS_NY:40032.1 36027/002

in managing client accounts (such as those of the Fund) or otherwise providing investment advice, is subject to fiduciary duties. The Supreme Court has held that Section 206 of the Advisers Act imposes fiduciary duties on an investment adviser by operation of law. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 US 180, 191 (1963). Under Section 206 of the Advisers Act, an investment adviser has a fiduciary duty of loyalty. This duty, among other things, requires that an investment adviser, as is the Debtor, ensure that it does not benefit one client (such as a Fund) to the disadvantage of another or to itself.[27] Relatedly, an investment adviser to pooled investment vehicles, such as the Funds, must comply with Advisers Act Rule 206(4)-8. Advisers Act Rule 206(4)-8 prohibits investment advisers from defrauding investors in pooled investment vehicles they advise.[28] Rule 206(4)-8 extends, in part, the Debtor's fiduciary obligations to the investors in such Funds.

50. As set forth above, the Committee has objected to distributions being made to Related Entity investors because the Committee believes that the Debtor and its estate may have claims against such Related Entities. Although the Debtor understands that the Committee has commenced its investigation into potential claims against Related Entities, no claims against such Related Entities have been articulated and no allegations have been made that any of Dynamic, AROF, or RCP have claims against the Related Entities or that there is any other reason to treat the respective distributions to those investors differently than those being made to non-Related Entity investors.

51. Accordingly, absent an express ability to withhold or offset distributions on a non-pro rata basis, the failure to make distributions otherwise due to the Related Entity investors

---

[27] *Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation*, Release No. IA-4889 (Apr. 18, 2018).

[28] *Rule 206(4)-8; Prohibition of Fraud By Advisers to Certain Pooled Investment Vehicles*, Advisers Act Rel. No. 2628 (Aug. 3, 2007).

could be a potential violation of (i) the Funds' governing documents, (ii) Delaware and/or Cayman fiduciary law, and (iii) the Advisers Act (to the extent the Debtor, HCM Latin America, or any affiliate of the Debtor has a role in causing such distributions to be withheld).   Moreover, the potential for a violation of the Advisers Act, Rule 206(4)-8 and the Delaware fiduciary duties is substantially greater if such delay has the intention of, or results in, favorable treatment to the Debtor or any of its affiliates in a manner that was not expressly contemplated at the time of investment.  Because of those fiduciary obligations, the Debtor believes that it has a duty to seek this Court's authority to cause each of Dynamic, AROF, and RCP to make distributions to each such Fund's Related Entity investors in accordance with the applicable Fund's governing documents.

**B.** **Section 363(c)(1) of the Bankruptcy Code Authorizes the Debtor to Make the Distributions**

52.    The Debtor believes that, but for the Protocols, Court approval of the Distributions to the Related Entities would not be required for the Funds to make distributions to their investors.  However, even if Court approval were required, making the Distributions to the Related Entities is an ordinary course transaction authorized under section 363(c)(1).  Specifically, section 363(c)(1) provides:

> [i]f the business of the debtor is authorized to be operated under section. . . 1108. . . of this title. . . the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  As such, a debtor may engage in postpetition actions if the debtor is authorized to operate its business under section 1108 and such transactions are "in the ordinary course of business."

22

53.     An activity is "ordinary course" if it satisfies both the "horizontal test" and the "vertical test."  *See, e.g., Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd.* (*In re Denton Cty. Elec. Coop.*), 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002); *see also In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).  The vertical test looks to "whether the transaction subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit."  *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013).  The horizontal test considers "whether the transaction was of the sort commonly undertaken by companies in the industry."  *Id.*  Here, both the vertical test and horizontal test are satisfied.

54.     First, the vertical test is satisfied.  The Distributions will be made in accordance with the applicable Fund's governing documents, which govern the making of all distributions to investors, including Related Entity investors.  The Distributions will thus be consistent with the types of distributions routinely made to investors in the Funds prior to the Petition Date.  Because the Debtor is engaging in the same conduct postpetition as it did prepetition, the Debtor's creditors are incurring no additional risk from the Distributions.  In fact, the risks to the Debtor's creditors may very well increase if the Distributions are not made as the Funds' investors may, as discussed above, have various claims against both the Funds and the Debtor, as the investment manager.

55.     Second, the horizontal test is satisfied.  The Debtor is an investment manager.  Investment managers manage hedge funds, private equity funds, and other investment vehicles, which funds by definition distribute the proceeds of their investments to investors.  Assuming the Debtor has any role in the Distributions, the Debtor and the Funds are simply attempting to do postpetition what was done prepetition and to distribute investment gains and losses to the Funds' investors.  A fund that sequesters gains and refuses to distribute profits would

23

be more than an anomaly; it would arguably be a fraud.  Consequently, the horizontal test is satisfied as making the Distributions is entirely consistent with the operation of investment managers and hedge funds throughout the industry.

**C.**      **Making the Distributions is a Sound Exercise of the Debtors' Business Judgment.**

56.      Although the Debtor believes that the Distributions are ordinary course pursuant to section 363(c)(1), and that, but for the Protocols, this Court's approval of the Distributions to the Related Entities would not be required.  However, even if Court approval were required, the Debtor submits that the Distributions also satisfy section 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code authorizes a debtor-in-possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.  It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so.  *See, e.g., ASARCO, Inc. v. Elliott Management. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (*quoting In re Continental Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex. 2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Building Group, Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

57.      Here, making Distributions to the Related Entities is in the exercise of the Debtor's sound business judgment.  As an initial matter, and as set forth above, Dynamic, AROF, and RCP are in liquidation because the Debtor (or, in the case of AROF, the Debtor's relying adviser) has determined, in its business judgment, that continuing the existence of those funds in the face of substantial redemptions, on the one hand, and the expiration of the Term, on the other,

24

is not practicable and not in the interest of those funds or their investors.  In addition, failing to liquidate those funds in an orderly manner could result in some investors being disadvantaged.  In order to liquidate, Dynamic, AROF, and RCP, by definition, must sell their assets, which sales generate cash.  Under their relevant governing documents, that cash is to be distributed to investors in those Funds, and returning that cash to investors is how the Funds actually liquidate; the Funds cannot wind-down without distributing their assets to their investors.  Further, the failure to distribute cash in accordance with the Fund Documents to all investors, including Related Entities, could subject the Debtor to claims for breach of contract and fiduciary duty.  As such, the decision to liquidate Dynamic, AROF, and RCP is in the sound business judgment of the Debtor as is the distribution of the cash received as a result of that liquidation.  Making the Distribution is the necessary and logical corollary to liquidating these funds and squarely within the Debtor's business judgment; they cannot be wound down without making the Distribution to all investors, including Related Entities.

### No Prior Request

58.    No previous request for the relief sought in this Motion has been made to this, or any other, Court.

### Notice

59.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy

DOCS_NY:40032.1 36027/002

**Appx. 03284**

Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court (a) grant the Motion, (b) enter an order, substantially in the form attached hereto as **Exhibit A**, and (c) grant such other relief as is just and proper.

*[Remainder of Page Intentionally Blank]*

26

Dated:  February 24, 2020.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pcszjlaw.com
            mlitvak@pszjlaw.com
            gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and*
*Debtor-in-Possession*

27

**<u>EXHIBIT A</u>**

**Proposed Order**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § Related to Docket No. _____ |

### ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"

Having considered the *Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* (the "Motion")[2] filed by the Debtor seeking entry of an order authorizing, but not directing, the Debtor to cause the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Appx. 03288

distribution of assets in the ordinary course of its business to certain Related Entities that have invested in Dynamic, AROF, and RCP, as more fully set forth in the Motion, and having heard the statements in support of the relief requested in the Motion at a hearing before this Court (the "Hearing"), the Court finds that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) the Motion involves a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) venue of the Bankruptcy Case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; (v) the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no further or additional notice need be provided; and (vi) the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein.  Accordingly, **IT IS HEREBY ORDERED THAT**:

1.       The Motion is **GRANTED** as set forth herein.

2.       The Debtor is authorized, but not directed, to distribute or to cause the distribution of:

   a.       the Dynamic Distribution to the Related Entity investors in Dynamic, in accordance with the Dynamic Fund Documents,

   b.       the AROF Distribution to the Related Entity investors in AROF in accordance with the AROF Fund Documents, and

   c.       the RCP Distribution to the Related Entity investors in RCP in accordance with the RCP Fund Documents.

3.       Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

DOCS_NY:40220.3 36027/002

**Appx. 03289**

    4.    The Court shall retain jurisdiction over all matters arising from or related to

the interpretation and implementation of this Order.

### ### END OF ORDER ###

DOCS_NY:40220.3 36027/002

**Appx. 03290**

Case 19-34054-sgj11 Doc 474-2 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 1 of 2

# EXHIBIT "B"

# Highland Dynamic Income Fund



Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 1 of 324

# EXHIBIT "C"

Appx. 03293

**HIGHLAND DYNAMIC INCOME FUND, L.P.**

**A Delaware Limited Partnership**

**Amended and Restated Limited Partnership Agreement**

**April 1, 2018**

203481783 v16

**Appx. 03294**

## NOTICE

NEITHER HIGHLAND DYNAMIC INCOME FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES. THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND DYNAMIC INCOME FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT.

Appx. 03295

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ...................................................................................................1
Article II ORGANIZATION.............................................................................................8
    2.1    Continuation of Limited Partnership ...................................................8
    2.2    Name of Partnership ..........................................................................9
    2.3    Principal Office; Registered Office...................................................9
    2.4    Term of Partnership...........................................................................9
    2.5    Object and Powers of Partnership.....................................................9
    2.6    Liability of Partners ........................................................................10
    2.7    Actions by Partnership ....................................................................11
    2.8    Reliance by Third Parties ................................................................11
    2.9    UCC Status of Limited Partner Interests .........................................11
    2.10   Series of Interests ...........................................................................11
Article III CAPITAL.......................................................................................................12
    3.1    Contributions to Capital..................................................................12
    3.2    Rights of Partners in Capital ...........................................................12
    3.3    Capital Accounts .............................................................................13
    3.4    Allocation of Net Profit and Net Loss .............................................13
    3.5    Allocation of Management Fees, Withholding Taxes and Certain Other
            Expenditures ...................................................................................14
    3.6    Reserves; Adjustments for Certain Future Events ...........................15
    3.7    Performance Allocation ...................................................................15
    3.8    Limited Participation Investments ...................................................16
    3.9    Allocation to Avoid Capital Account Deficits .................................16
    3.10   Allocations for Income Tax Purposes .............................................16
    3.11   Curative Allocations .......................................................................19
    3.12   Individual Partners' Tax Treatment .................................................19
    3.13   Distributions....................................................................................19
Article IV MANAGEMENT ............................................................................................20
    4.1    Duties and Powers of the General Partner .......................................20
    4.2    Expenses .........................................................................................21
    4.3    Rights of Limited Partners ..............................................................24
    4.4    Other Activities of Partners.............................................................24
    4.5    Duty of Care; Indemnification ........................................................26
    4.6    Advisory Committee........................................................................27
    4.7    Pricing Committee ..........................................................................28
Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ...................................29
    5.1    Admission of Limited Partners ........................................................29
    5.2    Admission of Additional General Partners.......................................29
    5.3    Transfer of Interests of Limited Partners .........................................29
    5.4    Transfer of Interest of the General Partner ......................................32
    5.5    Withdrawal of Interests of Partners .................................................32

ii

Article VI DISSOLUTION AND LIQUIDATION ........................................................................36
    6.1    Dissolution of Partnership ..............................................................................36
    6.2    Liquidation of Assets .....................................................................................36

Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS ...........................37
    7.1    Accounting and Reports .................................................................................37
    7.2    Certain Tax Matters .......................................................................................38
    7.3    Valuation of Partnership Assets and Interests ..............................................39
    7.4    Determinations by the General Partner ..........................................................40
    7.5    Books and Records .........................................................................................40
    7.6    Confidentiality ...............................................................................................40

Article VIII GENERAL PROVISIONS .....................................................................................42
    8.1    Amendment of Partnership Agreement ..........................................................42
    8.2    Special Power-of-Attorney .............................................................................44
    8.3    Notices ...........................................................................................................45
    8.4    Agreement Binding Upon Successors and Assigns; Delegation .....................45
    8.5    Governing Law ...............................................................................................46
    8.6    Not for Benefit of Creditors ...........................................................................46
    8.7    Consents and Voting .......................................................................................46
    8.8    Merger and Consolidation ..............................................................................46
    8.9    Interpretation of Partnership Accounting Systems and Terminology ...............47
    8.10   Miscellaneous ................................................................................................47
    8.11   BHCA Subject Persons ..................................................................................47
    8.12   RIC Limited Partners .....................................................................................48
    8.13   Bad Actor Limited Partners ...........................................................................48
    8.14   Survival .........................................................................................................49
    8.15   Entire Agreement ...........................................................................................49

Appx. 03297

THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Highland Dynamic Income Fund, L.P. is dated effective as of April 1, 2018 by and among Highland Dynamic Income Fund GP, LLC, the Limited Partners, and those Persons who are hereafter admitted as additional Limited Partners in accordance with this Agreement.  This Agreement amends and restates in its entirety the Limited Partnership Agreement of the Partnership dated March 28, 2013 (the "***Prior Agreement***").

---

## Article I
## DEFINITIONS

---

For purposes of this Agreement:

"***Act***" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as in effect on the date hereof and as amended from time to time, or any successor law.

"***Administrator***" means such Person as the General Partner may designate from time to time, in its sole discretion, to serve as administrator to the Partnership.

"***Advisory Committee***" has the meaning set forth in Section 4.6.

"***Affiliate***" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person.  For these purposes, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"***Affiliated Investors***" means the Investment Manager, the General Partner and their respective Affiliates, Principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes.

"***Agreement***" means this Amended and Restated Limited Partnership Agreement, as amended from time to time.

"***Authorized Representative***" has the meaning set forth in Section 7.6(a).

"***Bad Actor Limited Partner***" means a Limited Partner that (a) would cause the disqualification of the Partnership from using Rule 506 under the Securities Act due to the operation of paragraph (d) thereof (or its successor) if such Limited Partner were to beneficially own 20% or more of the outstanding voting interests of all of the Partners (excluding any other Interests that are Non-Voting Interests) or (b) the General Partner determines is likely to become subject to a conviction, order, judgment or finding that would be likely to cause the disqualification described in clause (a).

1

"**BBA**" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"**BBA Effective Period**" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in the BBA.

"**BHCA**" means the Bank Holding Company Act of 1956, as amended.

"**BHCA Subject Person**" means any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"**Business Day**" means any day or days on which banks are open for business in the city of New York, NY and/or such other place or places as the General Partner may determine.

"**Capital Account**" has the meaning set forth in Section 3.3(a).

"**Certificate**" means the Certificate of Limited Partnership of the Partnership referred to in Section 2.1(b).

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"**Designated Individual**" has the meaning set forth in Section 7.2(a).

"**Election Notice**" has the meaning set forth in Section 8.11(c).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Partner**" means a Limited Partner which is (a) an employee benefit plan subject to the fiduciary provisions of ERISA, (b) a "plan" subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the entity, or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA or any regulation promulgated thereunder.

"**FATCA**" means Sections 1471 through 1474 of the Code, as amended, and any Regulations thereunder or official interpretations or other official guidance thereof, including any successor Regulations or interpretations, and any intergovernmental agreement and any regulations with respect thereto or official interpretations or other official guidance thereof implementing the foregoing.

"**Fiscal Period**" means each period that starts at the opening of business on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day

2

Appx. 03299

immediately following the last day of the preceding Fiscal Period, and that ends at the close of business on the earliest of the following dates:

(a)      the last day of a calendar month;

(b)      any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)      the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)      any other date which the General Partner selects.

"*Fiscal Year*" means the period commencing on the Commencement Date and ending on December 31 of the year of commencement, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect another fiscal year; *provided* that any such other fiscal year shall be permissible for U.S. federal income tax purposes.  In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "*Fiscal Year*" means the portion of the calendar year ending on the date on which the Partnership is terminated.

"*GAAP*" means generally accepted accounting principles in the United States.

"*General Partner*" means Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"*Indemnified Person*" means each of the General Partner, the Investment Manager, any member, shareholder, partner, manager, director, officer, employee or agent of, or any person who controls, the General Partner, each of the respective affiliates of the foregoing, members of the Advisory Committee or the Pricing Committee, their respective affiliates, or any of the legal representatives of any of the foregoing.

"*Interest*" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"*Investment Company Act*" means the U.S. Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

"*Investment Management Agreement*" means the investment management agreement by and among the Investment Manager, the General Partner, the Partnership, the Master Fund and the Offshore Fund.

3

"*Investment Manager*" means Highland Capital Management, L.P., a Delaware limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"*Investments*" means investments in securities or other financial or intangible investment instruments, contracts or products, whether made directly by the Partnership or through the Master Fund, as described in the Partnership's offering memorandum.

"*Limited Participation Investment*" means an Investment which, as determined by the General Partner, is suitable for some but not all of the Partners, or of which certain Partners should receive a reduced participation, for legal, tax, regulatory or other bona fide reasons.

"*Limited Participation Sub-Accounts*" means memorandum accounts to be maintained in the accounting records of the Partnership on a Partner-by-Partner basis with respect to each particular Limited Participation Investment to reflect the entitlement of each Partner (other than a Partner who does not have any credit balance in its Capital Account at the time of the establishment of the Limited Participation Sub-Account that is unrelated to a pre-existing Limited Participation Sub-Account) to allocations and distributions attributable to Master Fund transactions involving such Limited Participation Investments.

"*Limited Partner*" means any Person admitted to the Partnership as a limited partner, until the entire Interest of such Person has been withdrawn pursuant to Section 5.5 or a substitute Limited Partner or Limited Partners are admitted with respect to such Person's entire Interest.

"*Majority of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners.

"*Management Fee*" means the management fee, as defined in the Master Fund Partnership Agreement, payable by the Master Fund to the Investment Manager pursuant to the Investment Management Agreement.

"*Master Fund*" means Highland Dynamic Income Master Fund, L.P., a collective investment vehicle formed as an exempted limited partnership under the laws of the Cayman Islands in which the Partnership and the Offshore Fund place their assets and conduct their investment and trading activities.

"*Master Fund Partnership Agreement*" means the amended and restated agreement of limited partnership of the Master Fund, as the same may be amended or restated from time to time in accordance with the terms thereof.

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

"*Negative Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the Withdrawal Date, but such Partner

4

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 118 of 200   PageID 42311
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 10 of
324

shall cease to be a Negative Basis Partner at such time as it shall have received allocations pursuant to Section 3.10(d) equal to such Partner's Negative Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Net Assets*" means the total value, as determined by the General Partner or its delegate(s) in accordance with Section 7.3, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6).  Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal Period but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period and after giving effect to Management Fee charges (borne indirectly at the Master Fund level) and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

(a)       any Performance Allocation (borne indirectly at the Master Fund level) as of the date on which such determination is made;

(b)       any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c)       withholding or other taxes (including any amounts under any BBA provision), expenses of processing withdrawals and other items payable, any increases or decreases in any reserves or other amounts recorded pursuant to Section 3.6 and any increases or decreases in the value of any Limited Participation Investments during the Fiscal Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"*Net Loss*" means any amount by which the Net Assets as of the first day of a Fiscal Period exceed the Net Assets as of the last day of the same Fiscal Period.

"*Net Profit*" means any amount by which the Net Assets as of the last day of a Fiscal Period exceed the Net Assets as of the first day of the same Fiscal Period.

"*Nonaffiliated Limited Partners*" means Limited Partners that are not affiliates or employees of the Investment Manager.

"*Non-Voting Interests*" means an Interest, the holder of which is not entitled to vote, consent or withhold consent with respect to any Partnership matter (including, but not limited to, mergers, sales of substantially all assets or consolidations of the Partnership), except as otherwise expressly provided in this Agreement.

5

"***Offshore Fund***" means Highland Dynamic Income Fund, Ltd., a Cayman Islands exempted company.

"***Other Account***" means any assets or investment of the General Partner, or any assets managed by the General Partner or any Affiliate of the General Partner for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"***Other Agreement***" has the meaning set forth in Section 8.12.

"***Partner***" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "***Partners***" means the General Partner and all of the Limited Partners.

"***Partnership***" means the limited partnership formed pursuant to this Agreement.

"***Partnership Minimum Gain***" has the meaning set forth in Regulations Section 1.704-2(b)(2) and (d).

"***Partnership Percentage***" means a percentage established for each Partner on the Partnership's books as of the first day of each Fiscal Period.  The Partnership Percentage of a Partner for a Fiscal Period shall be determined by dividing the amount of such Partner's Capital Account as of the beginning of the Fiscal Period (after crediting all capital contributions to such Capital Account which are effective as of such date, net of all deductions, including Management Fees borne at the Master Fund level) by the sum of the Capital Accounts of all of the Partners as of the beginning of the Fiscal Period (after crediting all capital contributions to the Partnership which are effective as of such date, net of all deductions, including Management Fees borne at the Master Fund level).  The sum of the Partnership Percentages of all Capital Accounts for each Fiscal Period shall equal 100%.

"***Performance Allocation***" means the performance allocation, as defined in the Master Fund Partnership Agreement, allocated to the General Partner pursuant to the Master Fund Partnership Agreement.

"***Person***" means any individual, partnership, corporation, limited liability company, trust, or other entity.

"***Plan Assets***" means assets of the Partnership that are considered to be assets of an ERISA Partner, pursuant to Section 3(42) of ERISA or otherwise.

"***Positive Basis***" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death).

6

"*Positive Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the Withdrawal Date, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.10(c) equal to such Partner's Positive Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Pricing Committee*" has the meaning set forth in Section 4.7.

"*Principals*" means James D. Dondero and Mark K. Okada.

"*Prior Agreement*" has the meaning set forth in the preamble hereto.

"*Regulations*" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"*Regulatory Allocations*" has the meaning set forth in Section 3.11.

"*Revocation Notice*" has the meaning set forth in Section 8.11(c).

"*RIC Limited Partner*" means a Limited Partner that is registered as an investment company under the Investment Company Act.

"*Schedule of Partners*" means a schedule to be maintained by the General Partner containing the following information with respect to each Partner: (a) name; (b) address; (c) date of admission; (d) amount and date of all capital contributions and withdrawals; and (e) the amount and date of any permitted Transfers.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended from time to time.

"*Series*" means a designated series of Interests established in accordance with this Agreement and having such terms as the General Partner determines.

"*Tax Matters Partner*" has the meaning set forth in Section 7.2(a).

"*Transfer*" means any direct or indirect sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

"*Withdrawal Date*" has the meaning set forth in Section 5.5(a).

"*Withdrawal Gate*" has the meaning set forth in 5.5(d).

"*Withdrawal Notice*" has the meaning set forth in Section 5.5(a).

Appx. 03304

_____

**Article II**
**ORGANIZATION**

_____

**2.1**   **Continuation of Limited Partnership**

(a)   The General Partner and the Limited Partners hereby agree to continue the Partnership as a limited partnership under and pursuant to the Act and this Agreement.

(b)   The General Partner has executed and filed with the Secretary of State of the State of Delaware an Amended Certificate of Limited Partnership of the Partnership (the "*Certificate*"), and shall execute, acknowledge and file with the Secretary of State of the State of Delaware any further amendments thereto as may be required by the Act, and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership.   The General Partner shall cause any required amendment to the Certificate to be filed promptly following the event requiring such amendment. All amendments may be signed by the General Partner (as required by the Act) and may be signed either personally or by an attorney-in-fact.

(c)   The parties hereto agree to operate the Partnership as a limited partnership pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Limited Partners and the General Partner shall be as provided in the Act for limited partners and the general partner except as provided herein.

(d)   The General Partner may change the domicile of the Partnership to another state, country or other jurisdiction where advisable due to legal, tax or other considerations; *provided* that no such change of domicile would reasonably be expected to have a material adverse effect on the Limited Partners.

(e)   The parties acknowledge that they intend that the Partnership be taxed in the United States as a partnership and not as an association taxable as a corporation for U.S. federal income tax purposes.   No election may be made to treat the Partnership as other than a partnership for U.S. federal income tax purposes.   Each Partner agrees not to treat, on any income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

8

Appx. 03305

**2.2**   **Name of Partnership**

(a)   The name of the Partnership is Highland Dynamic Income Fund, L.P. or such other name as the General Partner may hereafter adopt, subject to causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware in accordance with the Act. The Partnership commenced operations in 2013 as Highland Capital Loan Fund, L.P., and pursuant to Section 2.1(b), the General Partner filed an amended Certificate with the Secretary of State of the State of Delaware to affect the change of name.   The General Partner will send a notice of any change of name to the Limited Partners.   All business of the Partnership will be conducted under such name or under such other name as the General Partner deems appropriate.

(b)   The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's termination or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3**   **Principal Office; Registered Office**

(a)   The Partnership shall have its principal office at such location as the General Partner shall designate from time to time.

(b)   The Partnership shall have its registered office at c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, unless a different registered office or agent is designated from time to time by the General Partner.

**2.4**   **Term of Partnership**

The term of the Partnership commenced on the date on which the Certificate was filed with the office of the Secretary of State of the State of Delaware and will continue until dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1).  The legal existence of the Partnership as a separate legal entity shall continue until the cancellation of the Certificate.

**2.5**   **Object and Powers of Partnership**

(a)   The Partnership is formed solely for the object and purpose of indirectly investing in Investments by subscribing for and holding a limited partner interest in, and investing all of its investible assets in, the Master Fund.  The Partnership is a directed feeder fund for the Limited Partners with respect to the Master Fund.  Notwithstanding any other provision of this Agreement, the Partnership shall perform no other business and shall not make directly any Investments as such Investments will be made by the Master Fund.

Appx. 03306

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 123 of 200   PageID 42316
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 15 of
324

(b)    Notwithstanding any other provision of this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may execute, deliver and perform any agreement with any Limited Partner or prospective Limited Partner without any further act, vote or approval of any Partner.   The General Partner is hereby authorized to enter into the agreements described in the preceding sentence on behalf of the Partnership, but such authorization should not be deemed a restriction on the power of the General Partner to enter into other agreements on behalf of the Partnership.   In furtherance of this purpose, the Partnership shall have all powers necessary, suitable or convenient for the accomplishment of the aforesaid purpose, subject to the limitations and restrictions set forth herein alone or with others, as principal or agent.

(c)    Each Limited Partner hereby acknowledges that the Partnership is not expected to qualify as an "operating company" for purposes of ERISA, and the assets of the Partnership may therefore constitute Plan Assets of ERISA Partners; and that the Partnership is therefore intended to be structured as a directed feeder fund through which the Limited Partners may participate in an investment in the Master Fund and with respect to which the General Partner is not, except as expressly provided under the terms of this Agreement, intended to have any discretionary authority or control with respect to the investment of the assets of the Partnership.   Each Limited Partner (i) shall by making a capital contribution to the Partnership with respect to the Partnership's underlying interests in the Master Fund, be deemed to direct the General Partner to invest the amount of such capital contribution in the Master Fund and (ii) acknowledges that during any period when the underlying interests of the Partnership in the Master Fund are deemed to constitute Plan Assets, the General Partner will act as a custodian with respect to the assets of such Limited Partner, but is not intended to be a fiduciary with respect to the assets of such Limited Partner for purposes of ERISA, the Code or any applicable similar law.   No provision of this Agreement shall create any obligation of the general partner of the Master Fund and the general partner of the Master Fund will not have any fiduciary obligations to any person, under ERISA or otherwise, pursuant to this Agreement.   Any action or determination of the general partner of the Master Fund referenced herein shall only regard such action or determination made by the general partner of the Master Fund solely in their capacity as the general partner thereof.

**2.6    Liability of Partners**

In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act.

Appx. 03307

**2.7      Actions by Partnership**

The Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects as set forth in Section 2.5 above.

**2.8      Reliance by Third Parties**

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

**2.9      UCC Status of Limited Partner Interests**

(a)      For purposes of the grant, pledge, attachment or perfection of a security interest in an Interest or otherwise, the Interests shall be deemed to be "securities" within the meaning of Section 8-102(a)(15) and as provided by Section 8-103(c) of the Uniform Commercial Code as in effect from time to time in the State of Delaware or analogous provisions in the Uniform Commercial Code in effect in any other jurisdiction.

(b)      Any Interest may be evidenced by a certificate of partnership interest issued by the Partnership in such form as the General Partner may approve.  Every certificate representing an Interest shall bear a legend substantially in the following form:

"For the purposes of Section 8-103 of the Uniform Commercial Code of the United States of America in effect in any relevant jurisdiction, the certificates representing an interest in the Limited Partnership shall constitute "securities" within the meaning of Section 8-102 and Section 8-103 of the Uniform Commercial Code."

**2.10      Series of Interests**

The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different Series of Interests in the Partnership with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such Series; provided that such Series would not reasonably be expected to have a material adverse effect on the existing Limited Partners.  The terms and rights of such Series may be set forth in the Partnership's offering memorandum, supplement thereto or a "side letter" or other agreement, which the General Partner may incorporate by reference.  The General Partner, in its sole discretion, shall choose which Limited Partners may join a Series.   Although the Partnership may offer more than one Series of Interests, the Partnership is not a Delaware series limited partnership and the assets and liabilities of the Partnership are not segregated by Series.

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 125 of 200   PageID 42318
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 17 of
324

---

**Article III
CAPITAL**

---

**3.1    Contributions to Capital**

(a)    The minimum required initial capital contribution of each Limited Partner to the Partnership shall be $1,000,000, or such lesser amount as the General Partner may permit.  The General Partner may change the required minimum initial contribution amount at any time.

(b)    The Partnership may accept additional contributions at such times as the General Partner may permit, but no Limited Partner shall be obligated to make any additional capital contribution to the Partnership, subject to the provisions of Section 3.5 and any contrary provision of the Act.

(c)    The General Partner or an Affiliate has made a capital contribution to the Partnership as set forth in the Schedule of Partners.  Except as required by the Act, the General Partner shall not be required to make any additional capital contributions to the Partnership.  The General Partner may, however, make capital contributions to the Partnership in such amounts and at such times as it may determine.  The General Partner or any of its Affiliates shall have the right at any time to make additional capital contributions as a Limited Partner or General Partner.  If the General Partner or any of its Affiliates or Affiliated Investors makes a capital contribution as a Limited Partner, the General Partner will have authority to waive or reduce the Management Fee or the Performance Allocation with respect to such Limited Partner.

(d)    The Partnership may enter into placement agent agreements providing compensation to unaffiliated third parties to assist in obtaining subscriptions for Interests, but such placement agent fees will not affect the subscription amount and will not be collected by or from the Partnership.  Placement agents may be paid a portion of the Management Fee attributable to the investors solicited by such placement agents thereby reducing the compensation received by the Investment Manager.  Placement agents may be indemnified by the Partnership.

(e)    Except as otherwise permitted by the General Partner (i) initial or additional capital contributions by each Partner shall be payable in cash and in one installment, and (ii) initial contributions shall be due as of the date of admission of such Person as a Limited Partner of the Partnership.

**3.2    Rights of Partners in Capital**

(a)    No Partner shall be entitled to interest on its capital contributions to the Partnership.  For the avoidance of doubt, interest income, if any, earned on

12

subscription amounts remitted to the Partnership prior to the date an Interest is issued to a Partner will be payable to the Partnership and not applied toward the purchase of an Interest.

(b)    No Partner shall have the right to the return of any capital contribution to the Partnership except (i) upon withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1.  The entitlement to any such return shall be limited to the value of the Capital Account of the Partner.  The General Partner shall not be liable for the return of any such amounts.

**3.3    Capital Accounts**

(a)    The Partnership maintains a separate capital account (each a "***Capital Account***") on the books and records of the Partnership for each Partner.  The General Partner may, in its discretion, maintain separate memorandum sub-accounts related to a Capital Account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting or to otherwise give effect to the provisions of this Agreement, and, if so determined by the General Partner, with each memorandum sub-account being maintained as if it were the Capital Account of a separate Partner for all purposes of this Agreement unless the context requires otherwise.  References herein to a "Capital Account" shall be deemed to refer to such a capital memorandum sub-account where the context admits.  Each Capital Account must reflect the aggregate sum of the balances of memorandum sub-accounts in such Partner's Capital Account.

(b)    Each Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to the Partnership.

(c)    Each Capital Account shall be increased by the amount of any cash and the net value of any property constituting additional contributions to such Partner's Capital Account permitted pursuant to Section 3.1.

(d)    Each Capital Account shall be reduced by the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.5 or 6.3, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(f).

(e)    Each Capital Account (including any corresponding capital sub-accounts) shall be adjusted to reflect allocations and other changes in the value of such Capital Account in the manner specified in the remaining provisions of this Article III.

**3.4    Allocation of Net Profit and Net Loss**

(a)    Subject to the remaining provisions of this Article III, as of the last day of each Fiscal Period, any Net Profit or Net Loss for such Fiscal Period shall be separately allocated among and credited to or debited against the Capital Accounts of the

13

**Appx. 03310**

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 127 of 200   PageID 42320
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 19 of
324

Partners in proportion to their respective Partnership Percentages for such Fiscal Period.

(b)     Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses for a Fiscal Period that are not allocable to specific Investments of the Master Fund, including short term interest income, receipt of any withdrawal charges by the Partnership, and audit, administration and legal expenses, shall be credited to or debited against the Capital Accounts of the Partners *pro rata* in accordance with their Partnership Percentages for such Fiscal Period.

(c)     Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses that relate to a Limited Participation Investment shall be allocated exclusively to Partners who, as the General Partner determines, are eligible to participate in such Limited Participation Investment on a *pro rata* basis based on their relative participation in such Investment.

**3.5     Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures**

(a)     The Partnership shall bear its allocable portion of the Management Fees in accordance with the Master Fund Partnership Agreement.  The Management Fees borne by the Partnership shall be allocated to the Capital Accounts of the relevant Limited Partners subject to the Management Fee, and such Capital Accounts shall be subject to the corresponding adjustments.  The Management Fee shall be charged at the Master Fund level through the use of capital sub-accounts in the Master Fund that correspond to the Capital Accounts in the Partnership.

(b)     Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or FATCA withholding), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required.  If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement.   Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Fiscal Period during which the Partnership so withholds, pays or incurs such obligation.   If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership within 10 business days after notification and demand by the

Appx. 03311

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 128 of 200   PageID 42321
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 20 of
324

General Partner in the amount of such excess.  The General Partner is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax. Each Limited Partner agrees to repay to the Partnership and the General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)      Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be charged only to the relevant Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments.  Such charges shall be debited from the relevant Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

**3.6      Reserves; Adjustments for Certain Future Events**

(a)      The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets including Limited Participation Investments and proportionately against the Capital Accounts for contingent liabilities or probable losses, such reserves to be in the amounts which the General Partner deems necessary or appropriate.  The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate.  The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be charged or credited, as the General Partner deems appropriate, to the Capital Accounts of those parties that were Partners at the time when such reserve was created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties that were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established by the General Partner.

(b)      If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately charged or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period.

**3.7      Performance Allocation**

The Partnership bears its allocable portion of the Performance Allocation in accordance with the Master Fund Partnership Agreement.  The Performance Allocation borne by the Partnership shall be specially allocated to the Capital Accounts of the relevant Limited Partners,

and such Capital Accounts shall be subject to the corresponding adjustments.   The Performance Allocation shall be debited at the Master Fund level.

**3.8    Limited Participation Investments**

Whenever the Partnership indirectly makes a Limited Participation Investment through the Master Fund, a Limited Participation Sub-Account shall be established for each Partner participating in such Limited Participation Investment to reflect such Partner's *pro rata* share of all allocations and distributions attributable to transactions involving such Limited Participation Investment (and any related follow-on Investment, unless the General Partner determines to treat such follow-on Investment as a new Limited Participation Investment).   Thereafter, all credits and debits relating to such Limited Participation Investment (including those specifically referred to herein) shall be allocated among the Limited Participation Sub-Accounts for such Limited Participation Investment on a *pro rata* basis in accordance with each Partner's interest in such Limited Participation Investment.   Expenses that relate to a Limited Participation Investment shall be allocated exclusively among the Limited Participation Sub-Accounts for such Limited Participation Investment on a *pro rata* basis in accordance with each Partner's interest in such Limited Participation Investment.

**3.9    Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner.   Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.9 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.9 not previously recovered.

**3.10    Allocations for Income Tax Purposes**

Notwithstanding anything to the contrary in this Agreement:

(a)    <u>Income Tax Allocations</u>.  Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year will be allocated among the Partners in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years.   To this end, the Partnership will establish and maintain records which shall show the extent to which the Capital Account of each Partner will, as of the last day of each Fiscal Year, comprise amounts that have not been reflected in the taxable income of such Partner.   To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts.   Foreign

16

tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations.  All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b)    Basis Adjustments.  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations; *provided* that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)    Positive Basis Allocations.  If the Partnership realizes gains or items of gross income (including short term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.5, the General Partner may elect:  (i) to allocate such gains or items of gross income among such Positive Basis Partners, *pro rata* in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; *provided*, *however*, that if, following such Fiscal Year, the Partnership realizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Positive Basis Partner an amount of such gains or items of gross income equal to the amount, if any, by which its Positive Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence.

(d)    Negative Basis Allocations.  If the Partnership realizes net losses or items of gross loss or deduction (including short term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or

17

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 131 of 200   PageID 42324
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 23 of
324

more Negative Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.5, the General Partner may elect: (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Partners, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; *provided, however*, that if, following such Fiscal Year, the Partnership realizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.10(d).

(e)     Qualified Income Offset. In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; *provided* that an allocation pursuant to this Section 3.10(e) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.9(e) were not in this Agreement. This Section 3.10(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and shall be interpreted consistently therewith.

(f)     Minimum Gain Chargeback. Notwithstanding any other provision of this Section 3.10, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, the Partners will be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of any such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Sections 1.704-2(f) and (g). This Section 3.10(f) is intended to comply with the minimum gain chargeback requirement in such sections of the Regulations and must be interpreted consistently therewith.

(g)     Gross Income Allocation. In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount

18

such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 3.10(g) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.10(e) and this Section 3.10(g) were not in this Agreement.

(h)    <u>Section 704(b) Compliance</u>.  The allocations provided in this Section 3.10 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

**3.11    Curative Allocations**

The allocations set forth in Sections 3.10(b), (e), (f) and (g) (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations.  It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.11.  Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

**3.12    Individual Partners' Tax Treatment**

Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

**3.13    Distributions**

(a)    The amount and timing of any distributions from the Partnership shall be determined by the General Partner.  Distributions will generally be made in proportion to the Capital Account balances of the Partners at the beginning of the Fiscal Period when made; *provided* that distributions related to Limited Participation Investments will be made based on the proportionate interests of the Capital Accounts participating in such Investments.   Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 133 of 200   PageID 42326
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 25 of
324

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner on any account of its Interest if such distribution would violate Section 17-607 of the Act or other applicable law.

————————

**Article IV
MANAGEMENT**

————————

**4.1     Duties and Powers of the General Partner**

(a)     Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for managing and administering the affairs of the Partnership (other than any investment or trading activities, which are entered into at the Master Fund level and managed by the Investment Manager), and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership.

(b)     The General Partner shall have the right, without the notification to or consent of any Limited Partner or other Person, to make adjustments to the structure of the Partnership in order to address applicable structural, ownership, legal, or regulatory issues, or to improve overall tax efficiency; *provided* that no such adjustment would cause any material adverse consequences to the Limited Partners.

(c)     Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner shall have full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1, including, without in any manner limiting the generality of the foregoing, (i) contracts, agreements, undertakings and transactions with any Partner or with any other Person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (ii) agreements with each Limited Partner in connection with its purchase of an Interest, including a subscription agreement wherein such Limited Partner agrees to be bound by the terms of this Agreement, (iii) any agreements to induce any Person to purchase an Interest and (iv) the Investment Management Agreement delegating to the Investment Manager certain of the powers and authority vested by this Agreement in the General Partner as the General Partner and the Investment Manager may agree from time to time, each without any further act, approval or vote of any Person.

20

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 134 of 200   PageID 42327
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 26 of
324

(d)     The General Partner may terminate or replace the Investment Manager in accordance with the terms of the Investment Management Agreement. The General Partner may delegate to any other Person any power and authority vested in the General Partner pursuant to this Agreement that is not otherwise delegated to the Investment Manager.

(e)     Every power vested in the General Partner pursuant to this Agreement shall be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein. No provision of this Agreement shall be construed to require the General Partner to violate the Act or any other law, regulation or rule of any self-regulatory organization.

(f)     Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Limited Partners, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards. Unless otherwise expressly stated, for purposes of this Section 4.1(g), the General Partner shall be deemed to be permitted or required to make all decisions hereunder in its sole discretion.

(g)     If requested by the General Partner, each Limited Partner shall deliver to the General Partner: (i) an affidavit in form satisfactory to the General Partner that the applicable Limited Partner (and its partners, shareholders, members, and/or beneficial owners, and/or controlling persons, as the case may be) is not subject to withholding under the provisions of any United States federal, state, local or non-U.S. laws; (ii) any certificate that the General Partner may reasonably request with respect to any such laws; (iii) any other form or instrument reasonably requested by the General Partner relating to such Limited Partner's status under such laws; and/or (iv) any information or documentation prescribed under FATCA or as may be necessary for the Partnership to comply with its obligations, or to avoid withholding, under FATCA or any other automatic exchange of information agreement or arrangement, including, without limitation, the Organisation for Economic Cooperation and Development's Common Reporting Standard. In the event that a Limited Partner fails or is unable to deliver to the General Partner an affidavit described in Section 4.1(g), the General Partner may withhold amounts from such Partner in accordance with Section 3.5(b).

**4.2     Expenses**

(a)     Subject to Section 4.2(f), each of the General Partner and the Investment Manager pays all of its own operating and overhead costs without reimbursement by the Partnership (except liability insurance and items described in Section

4.2(b)(iv)).  The Partnership will not have its own separate employees or officers, and it will not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead expenses of the General Partner or the Investment Manager.

(b)     The Partnership, and not the General Partner or the Investment Manager, will pay, or reimburse the General Partner and the Investment Manager for, all other costs, fees and expenses arising in connection with the Partnership's operations, including, without duplication, its *pro rata* share of the Master Fund's expenses.  Such expenses payable by the Partnership include the following:

(i)     the Partnership's *pro rata* share of all investment-related expenses (including those related to identifying and evaluating contemplated investments, whether or not such contemplated investments are actually made), including, but not limited to, brokerage commissions and other transaction costs, expenses related to short sales, clearing and settlement charges, expenses related to proxies, underwriting and private placements, custodial fees, transfer agent fees, bank service fees, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, consulting and any other professional fees or compensation (including investment banking expenses) relating to particular investments or contemplated investments, appraisal fees and expenses, investment-related travel and lodging expenses and research-related expenses (including, without limitation, news and quotation equipment and services), fees to third-party providers of risk-monitoring services, investment and trading-related computer hardware and software, including, without limitation, trade order management software (i.e., software used to route trade orders);

(ii)    accounting (including accounting software), audit and tax preparation expenses;

(iii)   costs and expenses associated with reporting and providing information to existing and prospective investors;

(iv)    any legal fees and costs (including indemnification expenses, regulatory costs and settlement costs) arising in connection with any litigation or regulatory investigation instituted against the Partnership, the General Partner, the Investment Manager or any of their respective affiliates in their capacity as such, subject to Section 4.5;

(v)     except as otherwise provided in Section 3.5, any withholding, transfer or other taxes imposed or assessed upon, or payable by, the Partnership (including interest and penalties);

**Appx. 03319**

    (vi)    costs of any meeting of the Partners (or of obtaining the consent of the Partners in lieu of meeting);

    (vii)    expenses related to the Advisory Committee and the Pricing Committee;

    (viii)    premiums for directors' and officers' liability insurance (if any) and any other insurance benefiting the Partnership;

    (ix)    Management Fees;

    (x)    administrative expenses (including, without limitation, the fees and expenses of the Administrator in relation to its services provided pursuant to the administration agreement);

    (xi)    fees relating to valuing the Partnership's assets;

    (xii)    expenses related to the maintenance of the Partnership's registered office;

    (xiii)    corporate licensing expenses;

    (xiv)    extraordinary expenses; and

    (xv)    any costs or expenses of winding up and liquidating the Partnership.

    (xvi)    a *pro rata* portion of similar costs and expenses with respect to the Master Fund.

(c)    Expenses generally will be borne *pro rata* by the Partners in accordance with their respective Capital Account balances; *provided* that expenses may be specially allocated among the Partners as follows:

    (i)    with respect to expenses related to Investments (other than Limited Participation Investments), *pro rata* in accordance with their respective Capital Account balances exclusive of the value of any Limited Participation Sub-Account; and

    (ii)    as provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6, 3.8 and 5.5.

(d)    Each of the General Partner and the Investment Manager, as appropriate, shall be entitled to reimbursement from the Partnership for any of the expenses paid by it on behalf of the Partnership pursuant to Section 4.2(b); *provided* that the General Partner may absorb any or all of such expenses incurred on behalf of the Partnership. The Investment Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Partnership, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and the Partnership shall not have any liability therefor;

23

*provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Partnership hereunder, and the Partnership shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(e)     If the General Partner or the Investment Manager, as appropriate, shall incur any of the expenses referred to in Section 4.2(b) for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, will allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)     Each of the General Partner and the Investment Manager is entitled to use "soft dollars" generated by the Master Fund to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the General Partner or the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended, or is otherwise reasonably related to the investment decision-making process, or to cover certain Partnership expenses described in Section 4.2(b).  Use of "soft dollars" by the General Partner or the Investment Manager as described herein shall not constitute a breach by the either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

**4.3     Rights of Limited Partners**

        The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.   Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

**4.4     Other Activities of Partners**

(a)     The General Partner shall not be required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine in good faith to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)     Each Partner agrees that any other Partner, and any partner, director, officer, shareholder, member, Affiliate or employee of any other Partner, may engage in or

Appx. 03321

possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Partnership.  Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Partners or their respective partners, directors, officers, shareholders, members, Affiliates or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners and their respective partners, directors, officers, shareholders, members, Affiliates and employees are hereby authorized to engage in activities contemplated by this Section 4.4(b) with, or to purchase, sell or otherwise deal or invest in Investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Partnership, without the consent or approval of the Partnership or any other Partner.   The Partners expressly agree that no other Partner shall have any rights in or to such other activities, or any profits derived therefrom.

(c)     The General Partner and its Affiliates shall allocate investment opportunities to the Partnership and any Other Account fairly and equitably over time. Notwithstanding the foregoing, the General Partner is under no obligation to accord exclusivity or priority to the Partnership in the event of limited investment opportunities.  This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations:  (i) whether the risk-return profile of the proposed Investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific Investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed Investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed Investment; and (vi) the need to re-size risk in the account's portfolio.  The General Partner has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable.  Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the General Partner may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d)     The Principals of the General Partner, as well as the employees and officers thereof and of organizations affiliated with the General Partner, may buy and sell securities

25

for their own account or the account of others, but may not buy securities from or sell securities to the Partnership (such prohibition does not extend to the purchase or sale of Interests) unless appropriate approval of the Advisory Committee is obtained and such purchase or sale is in compliance with the applicable provisions of the Advisers Act or such purchase or sale is otherwise in compliance with the applicable provisions of the Advisers Act.

(e)     Each Partner hereto hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.4.

(f)     The General Partner and its Affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Partnership or that are targeted primarily to investors for which the Partnership is not designed to be a suitable investment vehicle. The General Partner and its Affiliates also reserve the right to establish and provide management or advisory services pursuant to separate Other Accounts for significant investors, whether or not such accounts have the same investment program as the Partnership.

## 4.5    Duty of Care; Indemnification

(a)     None of the Indemnified Persons will be liable to the Partnership or any Limited Partner or any other person for mistakes of judgment or for action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Partnership, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above. No Indemnified Person shall be liable to the Partnership or any Limited Partner or any other person for any amount in excess of the amount of Management Fees received by the Investment Manager, to the extent permitted under applicable law. In addition, in no event shall any Indemnified Person be liable for any special, indirect, exemplary, consequential or punitive losses or damages. An Indemnified Person may consult with counsel and accountants in respect of the Partnership's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above. The foregoing provisions, however, shall not be construed so as to provide for the exculpation of an Indemnified Person of any liability (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the abovementioned provisions to the fullest extent permitted by law.

Appx. 03323

(b)     The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all loss, cost or expense suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability, damage loss, cost or expense resulted from a mistake of judgment on the part of an Indemnified Person or from action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or from the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Person, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above.   The Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct.  In the event that such an advance is made by the Partnership, the Indemnified Person will agree to reimburse the Partnership to the extent that it is finally determined that it was not entitled to indemnification in respect thereof.

(c)     Notwithstanding any of the foregoing, the provisions of this Section 4.5 do not provide for the indemnification of any Indemnified Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(d)     Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Person, the Partnership (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence, bad faith or willful misconduct of any Indemnified Person.

(e)     The above-mentioned Indemnified Persons are also indemnified by each Limited Partner for any amounts of tax withheld or required to be withheld with respect to that Limited Partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the Limited Partner's Capital Account is insufficient to fully compensate the General Partner the Investment Manager for such costs.

**4.6     Advisory Committee**

(a)     The General Partner and/or the Investment Manager may appoint a committee (the "***Advisory Committee***") composed of one or more individuals selected by the General Partner and/or the Investment Manager from time to time, none of whom is affiliated with the General Partner or the Investment Manager.

(b)    The General Partner and/or the Investment Manager may in its/their discretion seek the approval of the Advisory Committee or establish any other reasonable mechanism in connection with (i) approvals that are or would be required under the Investment Advisers Act of 1940, as amended (including Section 206(3)), or (ii) any other matter deemed appropriate by the General Partner and/or the Investment Manager.    Each Limited Partner agrees that, except as otherwise specifically provided herein and to the extent permitted by applicable law, the approval of a majority of the members of the Advisory Committee at such time is binding upon the Partnership and each Partner with respect to any approval sought under this Section 4.6(b).

(c)    Subject to the foregoing, any recommendations of or actions taken by the Advisory Committee are advisory only and the General Partner and the Investment Manager are not required or otherwise bound to act in accordance with any such recommendations or actions.

(d)    As determined by the General Partner and/or the Investment Manager, meetings of the Advisory Committee may be held in person or by telephone.    Approval of the Advisory Committee is deemed to have been given if given by a majority of those members present at a meeting or by a majority of all members of the Advisory Committee if given pursuant to a written consent without a meeting.

(e)    The Partnership agrees to reimburse members of the Advisory Committee for their reasonable out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**4.7    Pricing Committee**

The General Partner and/or the Investment Manager shall appoint a committee (a "***Pricing Committee***") whose quorum consists of at least a majority of the following individuals:    the Chief Financial Officer of the Investment Manager, the Chief Compliance Officer of the Investment Manager and one or more traders of the Investment Manager.    The Pricing Committee meets on at least a monthly basis to review, confirm and agree on all pricing information established by the Investment Manager in respect of the Partnership's assets that are fair valued.    The final pricing or valuation of such Partnership assets shall require the approval of a majority in number of the members of the Pricing Committee constituting a quorum as of a relevant valuation date. In lieu of meeting, the Pricing Committee may take action by written consent signed by a majority of the committee members.    The Pricing Committee may, at the Partnership's expense, engage third-party experts and consultants to provide services in connection with any determination to be made by the Pricing Committee.    The General Partner and/or the Investment Manager may replace members of the Pricing Committee or change the composition of the Pricing Committee, in their sole discretion.

Appx. 03325

————————

**Article V**
**ADMISSIONS, TRANSFERS AND WITHDRAWALS**

————————

**5.1     Admission of Limited Partners**

The General Partner may, on the first Business Day of each calendar month, or at such other times as the General Partner may determine, without advance notice to or consent from the Limited Partners, admit to the Partnership any Person who shall execute this Agreement or any other writing evidencing the intent of such Person to become a Limited Partner.  Such admission shall be effective when the General Partner enters the name of such Person on the Schedule of Partners and does not require the consent or approval of any other Partner.  The General Partner shall have the authority to reject subscriptions for Limited Partner Interests in whole or in part.

**5.2     Admission of Additional General Partners**

(a)     Except as provided in Section 5.2(b), the General Partner may admit one or more Persons as additional general partners to the Partnership.  No additional general partner shall be added unless such additional general partner agrees to be bound by all of the terms of this Agreement or if adding such additional general partner would have any of the effects described in clauses (i) through (iv) of Section 5.3(c) (except as specifically set forth therein).

(b)     Any Person to whom the General Partner has transferred its general partner interest in accordance with Section 5.4 will be admitted to the Partnership as a substitute General Partner without the consent of the Limited Partners.

**5.3     Transfer of Interests of Limited Partners**

(a)     Each Limited Partner agrees with all other Partners that it shall not make or attempt to make any Transfer of its Interest which will violate this Section 5.3.   In the event of any attempted Transfer of any Limited Partner's Interest in violation of the provisions of this Section 5.3, without limiting any other rights of the Partnership, the General Partner shall have the right to require the withdrawal of such Limited Partner's Interest from the Partnership as provided by Section 5.5(j).

(b)     No Transfer of any Limited Partner's Interest, whether voluntary or involuntary, shall be valid or effective, and no transferee shall become a substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be granted, withheld or conditioned for any reason by the General Partner.  In the event of any Transfer, all of the conditions of the remainder of this Section 5.3 must also be satisfied.

(c)     Without limiting the General Partner's discretion pursuant to the preceding paragraph, the General Partner expects to withhold consent to any Transfer of any

29

Limited Partner's Interest, whether voluntary or involuntary, if the General Partner has reason to believe that such Transfer may:

(i) require registration of any Interest under any securities laws of the United States of America, any state thereof or any other jurisdiction;

(ii) subject the Partnership or the General Partner to a requirement to register, or to additional disclosure or other requirements, under any securities or commodities laws of the United States of America, any state thereof or any other jurisdiction;

(iii) cause the Partnership to be treated as a "publicly traded partnership" for U.S. federal income tax purposes under Section 7704(b) of the Code or cause the Partnership not to qualify for one of the safe harbors under Section 1.7704 1(e), (f), (g), (h) or (j) of the Regulations;

(iv) result in the Partnership being considered an investment company within the meaning of the Investment Company Act;

(v) result in violation of any anti-money laundering rules or regulations applicable to the Partnership, the Investment Manager or the General Partner;

(vi) violate or be inconsistent with any representation or warranty made by the transferring Limited Partner at the time the Limited Partner subscribed to purchase an Interest; or

(vii) cause all or any portion of the assets of the Master Fund to constitute Plan Assets of any ERISA Partner for purposes of ERISA or to be subject to the provisions of ERISA to substantially the same extent as if owned directly by an ERISA Partner.

The transferring Limited Partner, or its legal representative, must give the General Partner written notice before making any voluntary Transfer and after any involuntary Transfer and must provide sufficient information to allow legal counsel acting for the Partnership to make the determination that the proposed Transfer would not result in any of the consequences referred to in clauses (i) through (vi) above.  If an assignment, Transfer or disposition occurs by reason of the death of a Limited Partner or assignee, the notice may be given by the duly authorized representative of the estate of the Limited Partner or assignee.  The notice must be supported by proof of legal authority and valid assignment acceptable to the General Partner.

(d) In the event any Transfer permitted by this Section 5.3 shall result in multiple ownership of any Limited Partner's Interest, the General Partner may require one or more trustees or nominees to be designated to represent a portion of or the entire Interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement, and for the purpose of

30

exercising the rights which the transferor as a Limited Partner had pursuant to the provisions of this Agreement.

(e)    Subsequent to receipt of the consent of the General Partner (which consent may be withheld by the General Partner), an authorized transferee shall be entitled to the allocations and distributions attributable to the Interest transferred to such transferee and to transfer such Interest in accordance with the terms of this Agreement; *provided*, *however*, that such transferee shall not be entitled to the other rights of a Limited Partner as a result of such Transfer until it becomes a substituted Limited Partner.  No transferee may become a substituted Limited Partner without the consent of the General Partner (which consent may be withheld for any reason or no reason by the General Partner).  If the General Partner withholds consent to such substitution, a transferee will not have any of the rights of a Limited Partner, except that the transferee will be entitled, unless prohibited by law, to receive that share of capital or profits and to have the right of withdrawal to which its transferor would have been entitled and will be subject to the other terms of this Agreement.  A transferring Limited Partner will remain liable to the Partnership as provided under applicable law and this Agreement regardless of whether its transferee becomes a substituted Limited Partner.   Notwithstanding the above, the Partnership and the General Partner shall incur no liability for allocations and distributions made in good faith to the transferring Limited Partner until a written instrument of transfer has been received by the Partnership and recorded on its books and the effective date of the Transfer has passed.

(f)    Any other provision of this Agreement to the contrary notwithstanding, a transferee shall be bound by the provisions hereof.  Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner may require the transferring Limited Partner to execute and acknowledge an instrument of Transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement.  A transferee shall become a substituted Limited Partner and shall succeed to the portion of the transferor's Capital Account relating to the Interest transferred effective upon the satisfaction of all of the conditions for such Transfer contained in this Section 5.3.

(g)    In the event of a Transfer or in the event of a distribution of assets of the Partnership to any Partner, the Partnership may, but shall not be required to, file an election under Section 754 of the Code and in accordance with the applicable Regulations, to cause the basis of the Partnership's assets to be adjusted for U.S. federal income tax purposes as provided by Section 734 or 743 of the Code and shall make any mandatory adjustments to the basis of the Partnership's assets as required by Section 734 or 743 of the Code.  If the Partnership does not file an election under Section 754 in connection with a Transfer and if the transferring Limited Partner is a Negative Basis Partner, the General Partner may elect to allocate to the transferring Limited Partner pursuant to Section 3.10(d) net losses or items of loss and deduction realized by the Partnership for the Fiscal Year in which the Transfer

31

occurs as if the transferring Limited Partner were withdrawing from the Partnership pursuant to Section 5.5.

(h)     In the event of a Transfer at any time other than the end of a Fiscal Year, items of income, gain, loss, deduction or credit recognized by the Partnership for U.S. federal income tax purposes will be allocated between the transferring parties, as determined by the General Partner, using any permissible method under Code Section 706(d) and the Regulations thereunder.   The transferring parties agree to reimburse the General Partner and the Partnership for any incidental accounting fees and other expenses incurred by the General Partner and the Partnership in making allocations pursuant to this Section 5.3(h).

**5.4     Transfer of Interest of the General Partner**

The General Partner may not Transfer its Interest as a General Partner in the Partnership other than (a) to one or more of its direct or indirect beneficial owners or their Affiliates, (b) pursuant to a transaction not deemed to involve an assignment of its investment management obligations within the meaning of the Investment Advisers Act of 1940, as amended, or (c) with the approval of a Majority of Limited Partners.  By executing this Agreement, each Limited Partner shall be deemed to have consented to any such Transfer made in accordance with this Section 5.4.

**5.5     Withdrawal of Interests of Partners**

(a)     Except as provided in this Section 5.5, a Limited Partner may voluntarily withdraw all or part of its Capital Account effective as of the last Business Day of each calendar quarter and/or such other days as the General Partner may determine in its sole discretion (such date, a "***Withdrawal Date***") upon not less than 45 calendar days' prior written notice ("***Withdrawal Notice***") to the General Partner.  Any notice of withdrawal shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner.   The General Partner may waive the notice requirements of this Section 5.5(a).   Notwithstanding anything herein to the contrary, the General Partner may agree with certain Limited Partners to provide for different withdrawal terms and notice periods.

(b)     For the purposes of this Section 5.5 (and as described in Section 3.3(a)), each capital contribution shall be accounted for using a separate sub-account, and, in the case of a Limited Partner for which more than one sub-account is maintained, the withdrawals of the balance of any such sub-accounts shall be processed on a "first-in, first-out" basis based upon the date on which each capital contribution was made, unless otherwise agreed between the General Partner and such Limited Partner.  Each sub-account related to a contribution of capital from a Limited Partner will be treated as if it were the separate Capital Account of a separate Partner for the purposes of applying the withdrawal provisions of this Section 5.5.

(c)     Any Withdrawal Notice shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner.   For the avoidance of doubt, if a Limited

Appx. 03329

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 146 of 200   PageID 42339
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 38 of
324

Partner notifies the General Partner of its intent to withdraw and later chooses not to withdraw (with the General Partner's consent), any transaction costs incurred by the Partnership or the General Partner in connection therewith may, in the discretion of the General Partner, be charged to such withdrawing Limited Partner.  The General Partner may refuse to honor any Limited Partner's request for a full or partial withdrawal if such request is not accompanied by such additional information as the General Partner may reasonably require.

(d)     If, for any Withdrawal Date, (i) Limited Partners submit withdrawal notices that, when combined, are in excess of 25% of the Partnership's net asset value, or (ii) withdrawal requests are received by the Master Fund from any or all feeder vehicles in the Master Fund in excess of 25% of the Master Fund's net asset value, then the General Partner may determine, in its sole discretion, to reduce all such requests proportionately (based on the net asset value of each Limited Partner's Interest) so that the aggregate amount of such withdrawals does not exceed 25% of the Partnership's net asset value or such greater amount if the General Partner so determines (such restriction is referred to herein as the "*Withdrawal Gate*").  If withdrawals are subject to the Withdrawal Gate, withdrawal requests are carried over to the next Withdrawal Date (and, if not fully satisfied as of that date because of the Withdrawal Gate, then as of the next, and, if necessary, successive Withdrawal Dates), except to the extent Limited Partners rescind their withdrawal request(s).   Any remaining amount of a withdrawal request that is not satisfied due to the Withdrawal Gate (i) remains at risk as per other amounts invested in the Partnership and subject to the applicable Management Fee, if any, until such amount is finally and fully withdrawn, (ii) is considered requested as of the next Withdrawal Date without further action by the withdrawing Limited Partner, (iii) is not entitled to priority over withdrawal requests on any subsequent Withdrawal Date, and (iv) remains subject to further application of the Withdrawal Gate on subsequent Withdrawal Dates.   Notwithstanding anything herein to the contrary, the General Partner may waive the application of the Withdrawal Gate with respect to certain Limited Partners.

(e)     Except as otherwise provided herein, payment of the estimated amount due will generally be made within 30 Business Days of the Withdrawal Date, *provided* that (i) the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership or the remaining Partners and (ii) in the event that a distribution from a Capital Account to a withdrawing Limited Partner during a Fiscal Year would reduce the balance of the Capital Account below 10% of the Capital Account's balance as of the beginning of such Fiscal Year, excess requested amounts will be held back and distributed, without interest thereon, within 30 Business Days following completion of the audit of the Partnership's financial statements for such Fiscal Year.   Amounts withdrawn by a Limited Partner will not earn interest for the period from the effective Withdrawal Date through the settlement date.

(f)     The General Partner may deduct from any withdrawal proceeds due to any Limited Partner pursuant to this Section 5.5 an amount representing the Partnership's actual

Appx. 03330

or estimated expenses, as determined by the General Partner in good faith, associated with processing the withdrawal. Any such withdrawal deduction will be retained by the Partnership for the benefit of the remaining Partners.

(g)     Upon receipt by the Partnership of a Limited Partner's Withdrawal Notice, the General Partner will have the discretion to manage the Partnership's assets in a manner that would provide for cash being available to satisfy such Limited Partner's withdrawal request, but the General Partner shall be under no obligation to effect sales of Partnership assets if the General Partner determines that such transactions might be detrimental to the interest of the other Partners or that such transactions are not reasonably practicable. The General Partner may effect withdrawal payments (i) in cash, (ii) in kind, by transfer of marketable or non-marketable Investments received from the Master Fund to the Limited Partner, the value of which, as determined in accordance with Section 7.3, would satisfy the Limited Partner's request for withdrawal, or (iii) in any combination of the foregoing.

(h)     The General Partner may postpone or suspend (a) the calculation of the net asset value of the Partnership (and the applicable valuation date); (b) the issuance of Interests, (c) the withdrawal by Limited Partners (and the applicable Withdrawal Date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and Withdrawal Dates are not postponed) if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any stock exchange or over-the-counter market on which the Master Fund's Investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of Investments by the Partnership, or the determination of the value of the assets of the Partnership, would not be reasonably practicable or would be seriously prejudicial to the non-redeeming partners; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Partnership's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Partnership cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any Investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange; (v) automatically upon termination of the Partnership as described in Section 6.1, or (vi) automatically upon any suspension of withdrawals by the Master Fund.

(i)     The General Partner will promptly notify each Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any suspension of withdrawals or suspension of the payment of withdrawal proceeds pursuant to Section 5.5(h). Any remaining amount of a withdrawal request that is not satisfied due to such a suspension remains at risk as per other amounts invested in the Partnership and subject to the

applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners will not be given any priority with respect to the withdrawal of Interests after the cause for such suspension or limitation ceases to exist. The General Partner may in its sole discretion, however, permit such Limited Partners to withdraw their withdrawal requests to the extent that the relevant Withdrawal Date has not yet passed. For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant Withdrawal Date and the remittance of such payment proceeds, affected Limited Partners shall not have any right to withdraw their withdrawal requests. Upon the reasonable determination by the General Partner that conditions leading to suspension no longer apply, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated, and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first Withdrawal Date following the removal of the suspension, subject to the foregoing restrictions on withdrawals. For the avoidance of doubt, the terms of Section 5.5(h) and this Section 5.5(i) shall not affect the discretion of the General Partner to compel the withdrawal of the Interest of any Limited Partner pursuant to Section 5.5(j).

(j)     The General Partner may, upon not less than five days' prior written notice (or immediately if the General Partner determines its sole discretion that such Limited Partner's continued participation in the Partnership may cause the Partnership, the Master Fund, the General Partner or the Investment Manager to violate any applicable law), require any Limited Partner's Interest to be withdrawn in part or in its entirety from the Partnership and for the Limited Partner to cease to be a Limited Partner of the Partnership (in the case of a withdrawal of a Limited Partner's Interest in its entirety) pursuant to this Section 5.5(j). The amount due to any such Partner required to withdraw from the Partnership shall be equal to the value of such Partner's Capital Account as of the Withdrawal Date determined by the General Partner, net of any deductions imposed pursuant to Section 5.5(f).

(k)     The right of any Partner to withdraw or receive distributions pursuant to the provisions of this Section 5.5 is subject to all Capital Account allocations and adjustments contemplated by this Agreement and to the provision by the General Partner for all Partnership liabilities and for reserves for contingencies provided in Section 3.6. Notwithstanding anything to the contrary herein, the General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the General Partner and whether or not incurred directly or indirectly), which could reduce the amount of a distribution upon a Limited Partner's withdrawal.

(l)     With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Partnership or have any other rights as a Partner

35

(in the case of a complete withdrawal) after the applicable Withdrawal Date except as provided in Section 3.6.  For the avoidance of doubt, none of the Partnership, the General Partner or the Investment Manager will be liable to a Limited Partner for interest on the proceeds of any withdrawal.

(m)    The Interest of a Limited Partner may not be withdrawn from the Partnership prior to its dissolution except as provided in this Section 5.5.

_____

**Article VI**
**DISSOLUTION AND LIQUIDATION**

_____

**6.1    Dissolution of Partnership**

(a)    The Partnership shall be dissolved upon the first to occur of the following dates:

(i)    any date on which the General Partner shall elect in writing to dissolve the Partnership;

(ii)    the occurrence of any other event causing (A) the General Partner (or a successor to its business) to cease to be the general partner of the Partnership or (B) the dissolution of the Partnership under the Act; or

(b)    The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.  Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.  Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

**6.2    Liquidation of Assets**

(a)    Upon dissolution of the Partnership, the General Partner shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority of Limited Partners shall liquidate the business and administrative affairs of the Partnership.  Net Profit and Net Loss and any balances in Limited Participation Sub-Accounts during the Fiscal Periods, which includes the period of liquidation, shall be allocated pursuant to Article III.  The proceeds from liquidation shall be divided in the following manner, subject to the Act:

(i)    the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith),

36

up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)    such debts as are owing to the Partners as Partners are next paid; and

(iii)    the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)    Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; *provided*, *however*, that if any in kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit, Net Loss or Limited Participation Sub-Accounts for the Fiscal Period ending on the date of such distribution.

————————

## Article VII
## ACCOUNTING AND VALUATION; BOOKS AND RECORDS

————————

**7.1    Accounting and Reports**

(a)    The Partnership may adopt for tax accounting purposes any accounting method that the General Partner shall decide is in the best interests of the Partnership and that is permissible for U.S. federal income tax purposes.

(b)    As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of such period to be made by a firm of independent accountants selected by the General Partner. Within 120 days of the end of each year (or as soon as practicable thereafter), but subject to Section 7.5, the General Partner shall furnish to each Limited Partner a copy of the set of audited financial statements prepared in accordance with GAAP, with such adjustments thereto as the General Partner determines appropriate, including a statement of profit and loss for such Fiscal Year and an unaudited status of each such Partner's holdings in the Partnership at such time. The General Partner may elect not to reserve certain amounts that may be required by GAAP and not to provide certain portfolio disclosure required by GAAP to investors and may capitalize and amortize certain of its organizational

Appx. 03334

expenses in deviation from GAAP.  Such deviations from GAAP may result in a qualified opinion rendered on the financial statements of the Partnership.

(c)     As soon as practicable after the end of each fiscal month, but subject to Section 7.5, the General Partner shall arrange for the preparation and delivery to each Limited Partner of unaudited monthly statements of the estimated net asset value of the Partnership, monthly performance and portfolio reports.

(d)     As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

## 7.2    Certain Tax Matters

(a)     By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "***Tax Matters Partner***"), or, in each case, under any similar state or local law, and, if the "partnership representative" is an entity, the General Partner shall have the exclusive authority to appoint and designate the individual through whom such partnership representative will act for all purposes under subchapter C of chapter 63 of the Code and, if applicable, any similar state or local law (the "***Designated Individual***"). All references to the Tax Matters Partner herein shall include the Designated Individual, unless the context requires otherwise.  The Tax Matters Partner shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner.  The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period.  The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b)     The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

38

(c)     Each Limited Partner further agrees that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d)     The General Partner may in its sole discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws.

(e)     To the fullest extent permitted by law, each Limited Partner agrees to (i) provide such cooperation and assistance, including executing and filing forms or other statements and providing information about the Limited Partner, as is reasonably requested by the Tax Matters Partner, to enable the Partnership to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Partner was admitted to the Partnership, (ii) amend the Limited Partner's tax returns and pay any resulting taxes, interest and penalties in connection with the Partnership's electing under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from the Partnership's electing under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Partnership, the Tax Matters Partner and any other individual designated to interact with tax authorities on behalf of the Partnership from and against any liability with respect to the Limited Partner's share of any tax deficiency (including any interest and penalties associated therewith) paid or payable by the Partnership that is (a) allocable to such Limited Partner (as reasonably determined by the General Partner in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Partner was a Partner in the Partnership or (b) attributable (as reasonably determined by the General Partner) to the failure of such Limited Partner to cooperate with or provide any such forms, statements, or other information as requested by the Tax Matters Partner pursuant to clause (i) above.

(f)     The obligations and covenants of the Limited Partners set forth in Sections 3.5 and 7.2 hereof shall apply jointly and severally to each Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and shall survive such Limited Partner's ceasing to be a Partner in the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

**7.3     Valuation of Partnership Assets and Interests**

(a)     The Partnership's assets are valued as of the close of each Fiscal Period and on any other date selected by the General Partner in its sole discretion in accordance with the valuation of the Master Fund's assets.  The Partnership shall utilize the Master Fund's valuations for all purposes in connection with the Partnership.

Appx. 03336

(b)      The value of the assets of the Partnership and the net worth of the Partnership as a whole determined pursuant to this Section 7.3 are conclusive and binding on all of the Partners and all parties claiming through or under them.

## 7.4      Determinations by the General Partner

(a)      All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)      The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or sub-account as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

## 7.5      Books and Records

(a)      The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the Partnership.  The General Partner shall afford to the Partnership's independent auditors reasonable access to such documents during customary business hours and shall permit the Partnership's auditors to make copies thereof or extracts therefrom at the expense of the Partnership.

(b)      The General Partner shall establish such standards as it deems appropriate regarding the access of Limited Partners to the books and records of the Partnership and shall not be obliged to permit access by a Limited Partner to the name or address of any other Limited Partner.

## 7.6      Confidentiality

(a)      Each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns) or disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to

Appx. 03337

any Investment (other than disclosure to such Limited Partner's directors, employees, agents, advisors, or representatives responsible for matters relating to the Partnership or to any other Person approved in writing by the General Partner (each such Person being hereinafter referred to as an "*Authorized Representative*")); *provided* that (i) such Limited Partner and its Authorized Representatives may make such disclosure to the extent that (A) the information to be disclosed is publicly available at the time of proposed disclosure by such Limited Partner or Authorized Representative, (B) the information otherwise is or becomes legally available to such Limited Partner other than through disclosure by the Partnership or the General Partner, or (C) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; *provided* that such governmental agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) such Limited Partner and its Authorized Representatives may make such disclosure to its beneficial owners to the extent required under the terms of its arrangements with such beneficial owners; and (iii) each Limited Partner will be permitted, after written notice to the General Partner, to correct any false or misleading information which becomes public concerning such Limited Partner's relationship to the Partnership or the General Partner. Prior to making any disclosure required by law, each Limited Partner shall use its best efforts to notify the General Partner of such disclosure. Prior to any disclosure to any Authorized Representative or beneficial owner, each Limited Partner shall advise such Authorized Representative or beneficial owner of the obligations set forth in this Section 7.6(a) and each such Authorized Representative or beneficial owner shall agree to be bound by such obligations.

(b)     The General Partner shall have the right to keep confidential from the Limited Partners, for such period of time as the General Partner deems reasonable, any information, including the identity of the Partners or information regarding the Partners or Investments, which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

(c)     Subject to applicable legal, fiscal and regulatory considerations, the General Partner shall use reasonable efforts to keep confidential any information relating to a Limited Partner obtained by the General Partner in connection with or arising out of the Partnership which the Limited Partner requests be kept confidential.

(d)     Notwithstanding the provisions of this Section 7.6, Partners (and their employees, representatives and other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and its transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to such Person by, or on behalf of the Partnership. For this purpose, "tax treatment" is the purported or claimed U.S. federal income tax treatment of a transaction and "tax structure" is limited to any fact that may be

41

relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction.  For this purpose, the names of the Partnership, the Partners, their affiliates, the names of their partners, members or equity holders and the representatives, agents and tax advisors of any of the foregoing are not items of tax structure.

(e)     The General Partner may disclose to prospective investors such information relating to the Partnership or the Investments as it believes in good faith will benefit the Partnership and facilitate investment in the Partnership by such prospective investors.

(f)     The Investment Manager and a Person acting as a service provider to the Partnership shall have the right to access all information belonging to the Partnership.

_____

**Article VIII**
**GENERAL PROVISIONS**

_____

**8.1     Amendment of Partnership Agreement**

(a)     Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, with the written consent of (i) the General Partner and (ii) the consent of a Majority of Limited Partners (which approval may be obtained by negative consent affording the Limited Partners 30 calendar days to object).

(b)     Notwithstanding anything in this Section 8.1 to the contrary, any amendment to Section 2.5 requires the prior written consent of ERISA Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all ERISA Partners.

(c)     Any amendment that would:

(i)     increase the obligation of a Partner to make any contribution to the capital of the Partnership;

(ii)     reduce the Capital Account of a Partner other than in accordance with Article III;

(iii)     adversely alter any Partner's rights with respect to the allocation of Net Profit or Net Loss or with respect to distributions and withdrawals; or

(iv)     change the respective liabilities of the General Partner and the Limited Partners;

42

**Appx. 03339**

may only be made if the prior written consent of each Partner adversely affected thereby is obtained.

(d)      Notwithstanding paragraphs (a) and (c) of this Section 8.1, this Agreement may be amended by the General Partner without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Partnership as of a date determined by the General Partner that is not less than 45 calendar days after the General Partner has furnished written notice of such amendment to each affected Limited Partner and that is prior to the effective date of the amendment.   The admission and withdrawal of Limited Partners will not require notice or disclosure to, or the approval of, the other Limited Partners.

(e)      The General Partner may at any time without the consent of the other Partners:

(i)      add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

(ii)     cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

(iii)    change the name of the Partnership;

(iv)     make any changes required by governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners, *provided*, *however*, that no such amendment may be made unless such change (A) is for the benefit of, or not adverse to, the interests of Limited Partners, (B) does not affect the right of the General Partner to manage and control the Partnership's business, (C) does not affect the allocation of profits and losses among the Partners and (D) does not affect the limited liability of the Limited Partners;

(v)      amend this Agreement to reflect a change in the identity of the General Partner which has been made in accordance with this Agreement;

(vi)     amend this Agreement (other than with respect to the matters set forth in Section 8.1(c)) to effect compliance with any applicable laws, regulations or administrative actions, or to reflect any change made in accordance with Section 4.1(b);

(vii)    subject to Section 8.1(c), amend this Agreement to reflect the creation, and terms, of any new Series of Limited Partner Interests in the Partnership;

(viii)   effect any other amendment which would not, in the good faith judgment of the General Partner, adversely affect any of the existing Limited Partners; and

Appx. 03340

  (ix)  restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(f)  The General Partner shall have the authority to agree with a Limited Partner to waive or modify the application of any provision of this Agreement with respect to such Limited Partner without notifying or obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights as a Limited Partner pursuant to this Agreement would be materially and adversely changed by such waiver or modification). Any such waiver or modification may be evidenced by a "side letter" or other document, and the form thereof shall not impair its binding effect as if incorporated in this Agreement.

**8.2**  **Special Power-of-Attorney**

(a)  Each Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns), with full power of substitution, the true and lawful representative and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish:

  (i)  an amendment to this Agreement that complies with the provisions of this Agreement (including the provisions of Section 8.1);

  (ii)  the Certificate and any amendment thereof required because this Agreement is amended, including an amendment to effectuate any change in the membership of the Partnership or in the capital contributions of the Partners;

  (iii)  any financing statement or other filing or document required or permitted to perfect the security interests contemplated by any provision hereof; and

  (iv)  all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the State of Delaware, or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership, adjust the structure of the Partnership in accordance with Sections 4.1(b) or 8.8, or to effect the dissolution or termination of the Partnership.

(b)  Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without that Limited Partner's consent. If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner

Appx. 03341

contemplated by this Agreement, each Limited Partner agrees that, notwithstanding any objection which such Limited Partner may assert with respect to such action, the General Partner in its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action to be lawfully taken or omitted.  Each Partner is fully aware that each other Partner relies on the effectiveness of this special power-of-attorney with a view to the orderly administration of the affairs of the Partnership.   This power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the General Partner and as such:

(i)     is irrevocable and continues in full force and effect notwithstanding the subsequent death or incapacity of any party granting this power-of-attorney, regardless of whether the Partnership or the General Partner has had notice thereof; and

(ii)     survives the delivery of an assignment by a Limited Partner of the whole or any portion of such Limited Partner's Interest, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this power-of-attorney given by the assignor survives the delivery of such agreement for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

**8.3     Notices**

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner.   Notices shall be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.

**8.4     Agreement Binding Upon Successors and Assigns; Delegation**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Sections 4.1(d), 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections shall be void.

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 159 of 200   PageID 42352
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 51 of
324

**8.5     Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction.  The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in Dallas, Texas.  Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the Schedule of Partners maintained by the General Partner.

**8.6     Not for Benefit of Creditors**

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership.  Except for the rights of the Indemnified Persons hereunder, this Agreement is not intended for the benefit of non-Partner creditors and no rights are granted to non-Partner creditors under this Agreement.

**8.7     Consents and Voting**

(a)     Except as provided in Section 5.4, Limited Partners do not have any right to vote for the admission or removal of any General Partner and, except for the right to vote on certain amendments proposed by the General Partner, have no other voting rights.  Upon the request of any Limited Partner, including pursuant to Section 8.11 hereof, the General Partner may designate an Interest as a Non-Voting Interest, in which case the Limited Partner shall not have the right to vote on any matter including amendments.

(b)     Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and a copy thereof shall be filed and kept with the books of the Partnership. (For the avoidance of doubt, an amendment made pursuant to Section 8.1(d) or pursuant to negative consent under Section 8.1(a) shall not require any affirmative written response by any Limited Partner who is not electing to withdraw from the Partnership.)

**8.8     Merger and Consolidation**

(a)     The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an agreement of merger or consolidation which has been approved in the manner contemplated by Section 17-211(b) of the Act.

(b)     Notwithstanding anything to the contrary contained elsewhere in this Agreement, an agreement of merger or consolidation approved in accordance with Section 17-211(b) of the Act may, to the extent permitted by Section 17-211(g) of the Act, (i) effect any amendment to this Agreement, (ii) effect the adoption of a new limited partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the limited

46

partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) shall be the limited partnership agreement of the surviving or resulting limited partnership.

**8.9     Interpretation of Partnership Accounting Systems and Terminology**

In the event that the Partnership employs an accounting system which is different from the accounting system of the General Partner or whose terminology does not conform precisely to the terminology in this Agreement, the General Partner shall have the authority to interpret such accounting system and/or terminology in a manner which it, in its sole discretion, determines to be consistent with the objectives of this Agreement.

**8.10    Miscellaneous**

(a)    The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.   Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)    This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c)    If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.   Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**8.11    BHCA Subject Persons**

Notwithstanding any other provision of this Agreement to the contrary:

(a)    Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has an Partnership Percentage in excess of 4.9 percent of the aggregate Partnership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold an Partnership Percentage of only 4.9 percent of the aggregate Partnership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 8.11 on all such Limited Partners), and such Partnership Percentage in excess of said 4.9 percent shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages; *provided* that this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of this Agreement

47

up to the full amount of its Partnership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partner's Interest. The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; *provided*, *however*, that the foregoing voting restriction shall not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no Person acquires more than 2% of the Partnership's outstanding Interests; or (iv) in a single transaction to a third party who acquires at least a majority of the Partnership's outstanding Interests without regard to the Transfer of such Interests.

(b)     Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice, and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law. Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages.

(c)     A Limited Partner that is a BHCA Subject Person and that elects to be subject to Section 8.11(a) and (b) shall notify the General Partner thereof (an "***Election Notice***") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to Section 8.11(a) and (b) until 30 calendar days after such Limited Partner notifies the General Partner that it elects no longer to be subject to Section 8.11(a) and (b) (a "***Revocation Notice***"), which period may be reduced by the General Partner.

**8.12     RIC Limited Partners**

An Interest of a RIC Limited Partner does not entitle the RIC Limited Partner to vote or consent with respect to any Partnership matter unless the RIC Limited Partner's vote or consent with respect to its Interest would not be considered to be "voting securities" as defined under Section 2(a)(42) of the Investment Company Act. Except as provided in this Section 8.12, an Interest held by a RIC Limited Partner as a Non-Voting Interest is identical in all regards to all other Interests held by Limited Partners.

**8.13     Bad Actor Limited Partners**

Under Rule 506(d) under the Securities Act, the Partnership may be banned from selling Interests under Rule 506 if a Limited Partner beneficially owning 20% or more of the Partnership's voting securities engages in a "bad act" set forth in Rule 506. Accordingly, each Limited Partner agrees that the General Partner may deem the portion of any Bad Actor Limited Partner's Interest to be, or convert any Bad Actor Limited Partner's Interest into, a Non-Voting Interest (except for

48

the purposes of voting on any amendment to this Agreement that would materially and adversely change the Bad Actor Limited Partner's rights and preferences as a Limited Partner other than pursuant to an amendment under Section 8.1(d)) to the extent that the General Partner determines that such portion is in excess of 19.99% of the outstanding aggregate voting Interests of all Partners excluding any Interests that are Non-Voting Interests.

**8.14   Survival**

The obligations and covenants of the Limited Partners set forth in Sections 3.5 and 3.13 hereof shall apply jointly and severally to each Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and will survive such Partner's ceasing to be a partner of the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

**8.15   Entire Agreement**

The parties acknowledge and agree that, subject to Section 8.1(f), the General Partner without the approval of any other Partner may enter into a written agreement on behalf of the Partnership with any Limited Partner affecting the terms hereof in order to meet certain requirements of the Limited Partner (each an "***Other Agreement***"), and the terms of such Other Agreement shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement.  This Agreement and each Other Agreement constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements and understandings pertaining thereto.

[Signature Page Follows]

Appx. 03346

The parties hereto have executed this Agreement as of the day and year first above written.

General Partner:

On behalf of itself and as attorney-in-fact for the Limited Partners:

HIGHLAND DYNAMIC INCOME FUND GP, LLC
By:  Highland Capital Management, L.P., its sole member
By:  Strand Advisors, Inc., its general partner

By: _____
Name:   Trey Parker
Title:    Assistant Secretary

*Signature Page to the Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P.*

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 164 of 200   PageID 42357
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 56 of
324

Registrar of Companies
Government Administration Building
133 Elgin Avenue
George Town
Grand Cayman

**Highland Loan Fund, Ltd. (ROC #275693)** (the "**Company**")

**TAKE NOTICE** that by written resolution of the shareholders of the Company dated 8th May 2018, the following special resolution was passed:

**THAT** the name of the Company is changed from **Highland Loan Fund, Ltd.** to **Highland Dynamic Income Fund Ltd.** .

**THAT** the Memorandum and Articles of Association of the Company currently in effect be amended and restated by the deletion in their entirety and the substitution in their place of the Amended and Restated Memorandum and Articles of Association annexed hereto.

Allema Ramoon
Corporate Administrator
for and on behalf of
Maples Corporate Services Limited

Dated this 9th day of May 2018

*Filed: 09-May-2018 11:17 EST*
*Auth Code: B3231866091B*

**Appx. 03348**

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**


**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**


**OF**


**HIGHLAND DYNAMIC INCOME FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION OF THE SUBSCRIBER DATED 8 MAY 2018)**



**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

**HIGHLAND DYNAMIC INCOME FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION OF THE SUBSCRIBER DATED 8 MAY 2018)**

1    The name of the Company is **Highland Dynamic Income Fund, Ltd.**.

2    The Registered Office of the Company shall be at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, or at such other place within the Cayman Islands as the Directors may decide.

3    The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the laws of the Cayman Islands.

4    The liability of each Member is limited to the amount unpaid on such Member's Shares.

5    The share capital of the Company is US$50,000 divided into 100 Management Shares of US$1.00 par value each and 4,990,000 Participating Shares of US$0.01 par value each.

6    The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7    Capitalised terms that are not defined in this Memorandum of Association bear the respective meanings given to them in the Articles of Association of the Company.



*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03350**

THE COMPANIES LAW (2016 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES


AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

HIGHLAND DYNAMIC INCOME FUND, LTD.

**(AS ADOPTED BY SPECIAL RESOLUTION OF THE SUBSCRIBER DATED 8 MAY 2018)**


**1      Interpretation**

1.1      In these Articles, Table A in the First Schedule to the Statute does not apply and unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| "**Administrator**" | means the person, firm or corporation appointed and from time to time acting as administrator of the Company. |
| "**Articles**" | means these articles of association of the Company. |
| "**Auditor**" | means the person (if any) for the time being performing the duties of auditor of the Company. |
| "**Business Day**" | means any day normally treated as a business day in such places and/or on such markets as the Directors may from time to time determine. |
| "**Cayman Islands**" | means the British Overseas Territory of the Cayman Islands. |
| "**Class**" | means a separate class of Participating Share (and includes any sub-class of any such class). |
| "**Company**" | means the above-named Company. |
| "**Directors**" | means the directors for the time being of the Company. |
| "**Dollars**" or "**US$**" | refers to the currency of the United States. |
| "**Electronic Record**" | has the same meaning as in the Electronic Transactions Law. |
| "**Electronic Transactions Law**" | means the Electronic Transactions Law (2003 Revision) of the Cayman Islands. |
| "**Eligible Investor**" | means a person eligible to hold Participating Shares, as determined from time to time by the Directors. |

| | |
|---|---|
| **"Investment Manager"** | means the person, firm or corporation appointed and for the time being acting as the investment manager of the Company. |
| **"Management Share"** | means a voting non participating Share in the capital of the Company of US$1.00 par value designated as a Management Share and having the rights provided for in these Articles. |
| **"Member"** | means each person whose name is, from time to time and for the time being, entered in the Register of Members as the holder of one or more Shares. |
| **"Memorandum"** | means the memorandum of association of the Company. |
| **"Net Asset Value"** | means the value of the assets less the liabilities of the Company, or of a Separate Account (as the context may require), calculated in accordance with these Articles. |
| **"Net Asset Value per Participating Share"** | means the amount determined in accordance with these Articles as being the Net Asset Value per Participating Share of a particular Class and/or Series. |
| **"Offering Memorandum"** | means an offering memorandum relating to Participating Shares of any Class and/or Series as amended or supplemented from time to time subject to and in accordance with these Articles. |
| **"Ordinary Resolution"** | means a resolution passed by a simple majority of the votes of such Members as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting, and includes a unanimous written resolution. |
| **"Participating Share"** | means a participating redeemable Share in the capital of the Company of US$0.01 par value and having the rights provided for in these Articles. Participating Shares may be divided into Classes in the discretion of the Directors in accordance with the provisions of these Articles and each Class may be further divided into different Series of Participating Shares and the term "Participating Share" shall include all such Classes and Series of Participating Share. |
| **"Redemption Date"** | means, in relation to any Class and/or Series of Participating Shares, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time, upon which a Member is entitled to require the redemption of Participating Shares of that Class and/or Series. |
| **"Redemption Fee"** | means such fee (if any) payable by a Member to the Company on a redemption of Participating Shares, as the same may be determined by the Directors and disclosed to the Member at the time of its subscription for such Participating Shares. |
| **"Redemption Notice"** | means a notice in a form approved by the Directors by which a holder |

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03352**

of Participating Shares is entitled to require the Company to redeem its Participating Shares.

**"Redemption Price"**  means the price determined in accordance with these Articles at which redeemable Participating Shares of the relevant Class and/or Series may be redeemed.

**"Register of Members**  means the register of Members, which shall be maintained in accordance with the Statute and includes (except where otherwise stated) any branch or duplicate Register of Members.

**"Registered Office"**  means the registered office for the time being of the Company.

**"Sales Charge"**  means such sales charge (if any) determined by the Directors as being payable by a subscriber on a subscription for Participating Shares of any Class and/or Series.

**"Seal"**  means the common seal of the Company and includes every duplicate seal.

**"Separate Account"**  means a separate internal account of the Company which the Directors may establish and cause to be maintained in accordance with these Articles.

**"Series"**  means a separate series of Participating Share (and includes any sub-series of any such series).

**"Share"** and **"Shares"**  means a share or shares of any class or series in the Company, including a Management Share or a Participating Share, as well as any fraction of a Share.

**"Share Rights"**  means, with respect to the Participating Shares of any Class or Series in issue, the class rights for the time being applicable to such Participating Shares or other terms of offer for the time being applicable to such Participating Shares whether set out in the Offering Memorandum, any subscription agreement or otherwise (including any representations, warranties or other disclosure relating to the offer or holding of such Participating Shares).

**"Special Resolution"**  has the same meaning as in the Statute and includes a unanimous written resolution.

**"Statute"**  means the Companies Law (2012 Revision) of the Cayman Islands.

**"Subscriber"**  means the subscriber to the Memorandum.

**"Subscription Date"**  means, in relation to Participating Shares of any Class and/or Series, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time upon which a person may subscribe for Participating Shares of that Class and/or

Series.

| | |
|---|---|
| **"Subscription Price"** | means the price determined in accordance with these Articles at which Participating Shares of the relevant Class and/or Series may be subscribed. |
| **"Suspension"** | means a determination by the Directors to postpone or suspend (i) the calculation of the Net Asset Value of Participating Shares of any one or more Classes and/or Series (and the applicable Valuation Date) (a **"Calculation Suspension"**); (ii) the issue of Participating Shares of any one or more Classes and/or Series (and the applicable Subscription Date) (an **"Issue Suspension"**); (iii) the redemption by Members (in whole or in part) of Participating Shares of any one or more Classes and/or Series (and the applicable Redemption Date) (a **"Redemption Suspension"**); and/or (iv) the payment (in whole or in part) of any redemption proceeds (even if Valuation Dates and Redemption Dates are not postponed) (a **"Payment Suspension"**). |
| **"Transfer"** | means, in respect of any Share, any sale, assignment, exchange, transfer, pledge, encumbrance or other disposition of that Share, and **"Transferred"** shall be construed accordingly. |
| **"Treasury Share"** | means a Share held in the name of the Company as a treasury share in accordance with the Statute. |
| **"Valuation Date"** | means, in relation to each Class and/or Series of Participating Shares, the day or days determined from time to time by the Directors to be the day or days on which the Net Asset Value per Participating Share of that Class and/or Series is calculated. |
| **"Valuation Point"** | means, with respect to any Class and/or Series, the time or times on the Valuation Date of such Class and/or Series at which the Directors determine that the Net Asset Value per Participating Share of that Class and/or Series shall be calculated. |

1.2     In these Articles:

(a)     the singular number includes the plural number and vice versa;

(b)     the masculine gender includes the feminine gender;

(c)     persons includes corporations;

(d)     "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)     "shall" shall be construed as imperative and "may" shall be construed as permissive;

(f)     references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03354**

(g)     any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(h)     the term "and/or" is used herein to mean both "and" as well as "or."  The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others.  "Or" shall not be interpreted to be exclusive, and "and" shall not be interpreted to require the conjunctive — in each case, unless the context otherwise requires;

(i)     any reference to the powers of the Directors shall include, when the context admits, the service providers or any other person to whom the Directors may delegate their powers;

(j)     any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(k)     any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Law;

(l)     sections 8 and 19(3) of the Electronic Transactions Law shall not apply; and

(m)     headings are inserted for reference only and shall be ignored in construing these Articles.

## 2     Commencement of Business

2.1     The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

2.2     The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and operation of the Company, including the expenses of registration and the initial offering of Participating Shares.

## 3     Service Providers

3.1     The Directors may appoint any person, firm or corporation to act as a service provider to the Company (whether in general or in respect of any Class and/or Series of Shares) and may entrust to and confer upon any such service providers any of the functions, duties, powers and discretions exercisable by them as Directors, upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit. Without limiting the generality of the foregoing, such service providers may include managers, investment advisers, administrators, registrars, transfer agents, custodians and prime brokers.

3.2     Without prejudice to the generality of the preceding Article, the Directors may appoint any person, firm or corporation to act as the Investment Manager with respect to the assets of the Company (whether in general or in respect of any Class and/or Series of Shares).  The Directors may entrust to and confer upon the Investment Manager any of the functions, duties, powers and discretions exercisable by them as Directors upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit.



Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 172 of 200   PageID 42365
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 64 of
324

**4**       **Rights attaching to Shares**

4.1     The Management Shares shall have the following rights:

    (a)     as to voting: the holder of a Management Share shall (in respect of such Management Share) have the right to receive notice of, attend at and vote as a Member at any general meeting of the Company; and

    (b)     as to capital: a Management Share shall confer upon the holder the right in a winding up to repayment of capital as provided in these Articles but shall confer no other right to participate in the profits or assets of the Company; and

    (c)     as to income: no dividends shall be payable on the Management Shares.

4.2     The Participating Shares shall have the following rights:

    (a)     as to voting: the holder of a Participating Share shall not (in respect of such Participating Share) have the right to receive notice of, attend at or vote as a Member at any general meeting of the Company, but may vote at a separate Class meeting convened in accordance with these Articles; and

    (b)     as to capital: a Participating Share shall confer upon the holder thereof the right in a winding up to participate in the surplus assets of the Company by reference to the Separate Account attributable to the relevant Class or Series of Participating Shares as provided in these Articles; and

    (c)     as to income: the Participating Shares shall confer on the holders thereof the right to receive dividends as provided in these Articles.

**5**       **Share Capital**

5.1     Subject to these Articles, the Directors may allot, issue, grant options or warrants over, or otherwise dispose of Shares in separate classes and/or series with different terms, preferences, privileges or special rights including, without limitation, with respect to investment strategy and/or policy, participation in assets, profits and losses of the Company, voting, fees charged (including management, performance and incentive fees), redemption privileges, allocation of costs and expenses (including, without limitation, the costs and expenses incurred in any hedging activities and any profits and losses arising therefrom) as they think proper.  Subject to the Statute, these Articles and any applicable subscription agreement, any Share Rights (other than those set out in these Articles or set out in a Special Resolution) may be varied by either the Directors or by Ordinary Resolution.  Notwithstanding the foregoing, the Subscriber shall have the power to:

    (a)     issue one Share to itself;

    (b)     transfer that Share by an instrument of transfer to any person; and

    (c)     update the Register of Members in respect of the issue and transfer of that Share.

5.2     On or before the allotment of any Participating Share the Directors shall resolve the Class and/or Series to which such Participating Share shall be classified and may, prior to the issue of any Participating Share, reclassify such Participating Share.  Each Class and/or Series shall be

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

specifically identified.  Subject to the Statute and these Articles, the Directors may at any time re-name any Participating Share.

5.3  Notwithstanding the currency in which the par value of the Participating Shares is denominated, the Directors may specify any currency as the currency in which the Subscription Price, Redemption Price and Net Asset Value of Participating Shares of a Class and/or Series is calculated.

5.4  The Company shall not issue Shares to bearer.

5.5  Fractional Shares may be issued.

5.6  Unless the Directors determine otherwise, Shares shall only be issued as fully paid-up.

5.7  Unless the Directors determine otherwise No right of pre-emption or first refusal shall attach to any Shares.

## 6  Allotment and Issue of Participating Shares

6.1  The Directors may from time to time allot and issue Participating Shares of any Class and/or Series.  The Directors may, in their discretion, refuse to allot and issue any Participating Shares, and shall not issue any Participating Shares to or for the account of an investor who is not an Eligible Investor.  If the Directors have declared a Calculation Suspension or Issue Suspension, no Participating Shares of that Class or Series (as appropriate) shall be issued until the relevant Suspension has ended.

6.2  The Directors shall determine the Subscription Price at the time of issue of the first issue of Participating Shares of any Class and/or Series.  Thereafter, the Directors may allot and issue Participating Shares of the same Class and/or Series on any Subscription Date provided that such additional Participating Shares are issued at a Subscription Price equal to not less than the Net Asset Value per Participating Share of such Class and/or Series calculated on the relevant Subscription Date (or if the Subscription Date is not also a Valuation Date then on the immediately preceding Valuation Date).

6.3  The Directors may add to the Subscription Price per Participating Share (before making any rounding adjustment) an amount which they consider to be an appropriate allowance to reflect fiscal and purchase charges which would be incurred for the account of the Company in investing an amount equal to the Subscription Price.  The Directors may also add, in their discretion, a Sales Charge and/or an amount equal to any stamp duty and any other governmental taxes or charges payable by the Company with respect to the issue of such Participating Shares.

6.4  An applicant for Participating Shares shall pay for such Participating Shares in such currencies, in such manner, at such time, in such place and to such person acting on behalf of the Company as the Directors may from time to time determine.

6.5  Subject to the terms of any subscription agreement, an application for Participating Shares shall be irrevocable by an applicant for Participating Shares once it has been received by the Company.  Participating Shares shall be treated as having been issued with effect from the relevant Subscription Date notwithstanding that the subscriber for those Participating Shares may not be entered in the Register of Members until after the Subscription Date.



www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 174 of 200   PageID 42367
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 66 of
324

6.6     Participating Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case; likewise the Directors may from time to time prescribe an amount as the minimum subscription amount.

6.7     The Directors may resolve to accept non-cash assets in satisfaction (in whole or in part) of the Subscription Price.

6.8     The Directors may require an applicant for Participating Shares to pay to the Company for the benefit of any selling agent such selling commissions or such organisational charges as may have been disclosed to such applicant.  The Directors may differentiate between applicants as to the amount of such selling commissions or such organisational charges.

6.9     The Company may, in so far as the Statute permits, pay a commission to any person in consideration of that person subscribing or agreeing to subscribe whether absolutely or conditionally for any Participating Shares.  Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Participating Shares.  The Company may also on any issue of Participating Shares pay such brokerage as may be lawful.

## 7      Separate Accounts

7.1     The Directors shall have the power to establish and maintain, with respect to Participating Shares of any Class and/or Series, a Separate Account, to record (purely as an internal accounting matter) the allocation, on a differentiated basis, of the assets and liabilities of the Company to the holders of Participating Shares of any such Class and/or a Series in a manner consistent with the methodology set forth in the Offering Memorandum and the rights otherwise attaching to the Participating Shares.

7.2     The proceeds from the issue of Participating Shares of any Class and/or Series shall be applied in the books of the Company to the Separate Account established for Participating Shares of that Class and/or Series.  The assets and liabilities and income and expenditure attributable to that Separate Account shall be applied to such Separate Account and, subject to the provisions of these Articles, to no other Separate Account.  In the event that the assets of a Separate Account referable to any Class and/or Series are exhausted, any and all unsatisfied claims which any Members or former Members referable to that Class and/or Series have against the Company shall be extinguished.  The Members or former Members referable to a Class and/or Series shall have no recourse against the assets of any other Separate Account established by the Company.

7.3     Where any asset is derived from another asset (whether cash or otherwise), such derivative asset shall be applied in the books of the Company to the same Separate Account as the asset from which it was derived, and on each revaluation of an asset the increase or diminution in value shall be applied to the same Separate Account and, subject to the provisions of these Articles, to no other Separate Account.

7.4     In the case of any asset or liability of the Company which the Directors do not consider is attributable to a particular Separate Account, the Directors shall have discretion to determine the basis upon which any such asset or liability shall be allocated between or among Separate Accounts.

7.5     The Directors may, in the books of the Company, allocate assets and liabilities to and from Separate Accounts if, as a result of a creditor proceeding against certain of the assets of the



www.verify.gov.ky File#: 275693

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03358**

Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne if applied under the foregoing Articles.

7.6    The Directors may from time to time transfer, allocate or exchange an asset or liability from one Separate Account to another Separate Account provided that at the time of such transfer, allocation or exchange the Directors form the opinion (in good faith) that the value in money or money's worth of each such asset or liability transferred, allocated or exchanged is not significantly less or more than the value in money or money's worth (referred to in these Articles as "proper value") received by the Separate Account from which such asset or liability is transferred, allocated or exchanged except only as is otherwise provided by these Articles.

## 8    Determination of Net Asset Value

8.1    The Net Asset Value and Net Asset Value per Participating Share of each Class and/or Series shall be determined by or on behalf of the Directors as at the relevant Valuation Point on each relevant Valuation Date.

8.2    In calculating the Net Asset Value and the Net Asset Value per Participating Share, the Directors shall apply such generally accepted accounting principles as they may determine.

8.3    The assets and liabilities of the Company shall be valued in accordance with such policies as the Directors may determine.  Absent bad faith or manifest error, any valuation made pursuant to these Articles shall be binding on all persons.

8.4    Unless otherwise determined by the Directors in any resolution creating a Class and/or Series of Participating Shares or as otherwise disclosed in any Offering Memorandum, the Net Asset Value per Participating Share of each Class (or Series) shall be determined by allocating *pro rata* the Net Asset Value, as at the relevant Valuation Point, of the Company and/or of the relevant Separate Account among each Class and/or Series, adjusting the amount so calculated to reflect any fees, costs, foreign exchange items or other assets or liabilities which are properly attributable to a specific Class and/or Series and then by dividing the resultant amount by the number of Participating Shares of such Class and/or Series then in issue.

8.5    The Directors may determine that the Net Asset Value of any Class and/or Series shall be definitively determined on the basis of estimates and that such determination shall not be modified to reflect final valuations.

8.6    Any expense or liability may be amortised over such period as the Directors may determine.

8.7    The Directors may establish such reserves as they deem reasonably necessary for Company expenses and any other contingent Company assets or liabilities, and may, upon the reversal or release of such reserves, apply any monies resulting therefrom in such manner as they may, in their absolute discretion, determine.

8.8    Net Asset Value per Participating Share shall be rounded to the nearest cent or such other amount as the Directors may determine and the benefit of any such roundings may be retained by the Company.

8.9    The Directors may cause the Company to issue new Participating Shares at par or to compulsorily redeem at par such number of Participating Shares as they consider necessary to address, in such manner as they consider equitable, any prior miscalculation of Net Asset Value

or Net Asset Value per Participating Share.  The Company shall not be required to pay to the holder the redemption proceeds of any such compulsorily redeemed Participating Shares, which proceeds shall be retained by the Company.

## 9  Suspensions

9.1   The Directors may, from time to time, in the circumstances disclosed in the Offering Memorandum, declare a Suspension with respect to any one or more Classes and/or Series of Participating Shares.

9.2   The Directors shall promptly notify all affected Members of any such Suspension and shall promptly notify such Members upon termination of such Suspension.

## 10  Transfer of Shares

10.1   Subject to Article 5.1, Shares may not be Transferred without the prior written approval of the Directors (which may be withheld for any or no reason) provided that the Directors may waive this requirement to the extent that they deem appropriate in connection with the listing of any Class or Series of Share on a stock exchange.

10.2   The Directors shall not register any Transfer of any Share to any person who is, in the opinion of the Directors, not an Eligible Investor.

10.3   Any proposed transferee shall provide to the Directors such information and documents as the Directors may request, including, without limitation, such documents or information as the Directors deem necessary or desirable:

(a)   to enable the Directors to determine that the proposed transferee is an Eligible Investor; and

(b)   to enable the Company to comply with all applicable laws, including anti-money laundering laws.

10.4   The instrument of Transfer of any Share shall be in writing and shall be executed by or on behalf of the transferor (and, if the Directors so require, signed by or on behalf of the transferee). The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

## 11  Transmission of Shares

11.1   If a Member dies, the survivor or survivors (where the Member was a joint holder) or his or her legal personal representatives (where the Member was a sole holder) shall be the only persons recognised by the Company as having any title to the Member's interest in the Company.  The death of any Member shall not operate to relieve, waive or reduce any liabilities attaching to the Member's Shares at the time of death and such liabilities shall continue to bind any survivor or survivors, or any personal representative, as the case may be.

11.2   Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is an Eligible Investor may, upon delivery to the Directors of such evidence as may from time to time be required by them of:

(a)     such person's entitlement to such Shares; and/or

(b)     such person's status as an Eligible Investor,

elect, either to become the holder of such Share or to have such Share Transferred to another Eligible Investor nominated by such person. If such person elects to become the holder of such Share, such person shall give notice in writing to the Directors to that effect, but the Directors shall, in either case, have the same right to decline registration of such person as a holder of such Share as they would have had in the case of a Transfer of the Share by that Member before his or her death or bankruptcy, or liquidation or dissolution, as the case may be.

11.3    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is not an Eligible Investor shall not be registered as the holder of such Share and shall promptly Transfer such Share to an Eligible Investor in accordance with these Articles.

11.4    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by Transfer), and who is an Eligible Investor, shall be entitled to the same dividends and other advantages to which such person would be entitled if such person were the registered holder of such Share. However, the person shall not, before becoming a Member in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him become the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## 12     Redemption of Shares

12.1    Subject to any provisions relating to a specific Class and/or Series as set out in the Offering Memorandum or these Articles or in any resolution constituting a Class and/or Series or otherwise forming part of the special rights of such Participating Shares, a Member may require the redemption of all or any of such Member's Participating Shares by serving a Redemption Notice on the Company. Unless timely receipt is waived by the Directors in a particular case, a Redemption Notice shall be required to be received on or before a Redemption Date with respect to such Participating Shares (or such number of days prior to such Redemption Date as may be determined by the Directors). Any Member redeeming Participating Shares shall submit to the Directors the share certificate (if any) issued in respect of those Participating Shares. The Company shall redeem such Participating Shares at the Redemption Price, being an amount equal to the Net Asset Value per Participating Share of the relevant Class and/or Series calculated on the relevant Redemption Date (or if the Redemption Date is not a Valuation Date then on the immediately preceding Valuation Date) subject to any deductions, holdbacks or adjustments provided for in these Articles and/or the Offering Memorandum.

12.2    The Directors may deduct any Redemption Fee from the Redemption Price. The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and



sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

12.3    A Member may not withdraw a Redemption Notice once submitted to the Company unless (a) the Directors shall have declared a Calculation Suspension or Redemption Suspension or (b) the Directors determine (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part).  If a relevant Suspension has been declared by the Directors, the right of a Member to have its Participating Shares redeemed shall be suspended and during the period of Suspension the Member may withdraw its Redemption Notice.  Any withdrawal of the Redemption Notice shall be made in writing and shall only be effective if actually received by the Company before the termination of the period of the Redemption Suspension or Calculation Suspension, as applicable.  If the Redemption Notice is not withdrawn, any Participating Shares the redemption of which has been suspended shall be redeemed once the relevant Suspension has ended at the Redemption Price for Participating Shares of the relevant Class and/or Series calculated on the next Redemption Date following the end of the relevant Suspension.

12.4    The Directors may impose a gate the effect of which is to limit the redemptions of Participating Shares of any Class and/or Series or to limit the redemptions of Participating Shares held by any Member or Members as of any Redemption Date to such extent and in such manner as is disclosed in the Offering Memorandum.  If the Directors determine to limit redemptions, the Directors may determine the manner in which such gated redemption requests will be dealt with on any subsequent Redemption Date.

12.5    If the Company is required by the laws of any relevant jurisdiction to make a withholding from any redemption monies payable to the holder of Participating Shares the amount of such withholding shall be deducted from the redemption monies otherwise payable to such person.

12.6    No redemption of part of a Member's holding of Participating Shares of any one Class and/or Series may be made if, as a result thereof, such Member would hold fewer Participating Shares of such Class and/or Series than such minimum number or value of Participating Shares of such Class and/or Series as may from time to time be specified (either generally or in any particular case or cases) by the Directors.  If such partial redemption would reduce such Member's holding of Participating Shares to less than such minimum holding, the Directors may, in their discretion, elect to compulsorily redeem all of such Member's Participating Shares.

12.7    The Company may, in the absolute discretion of the Directors, refuse to make a redemption payment to a Member if the Directors suspect or are advised that the payment of any redemption proceeds to such Member may result in a breach or violation of any anti-money laundering law by any person in any relevant jurisdiction, or if such refusal is necessary to ensure the compliance by the Company, its Directors, the Administrator or any other service provider of the Company with any anti-money laundering law in any relevant jurisdiction.

12.8    Any amount payable to a Member for the redemption of Participating Shares shall be paid in such currency or currencies as the Directors may determine.  Subject to any Payment Suspension, the Company shall remit redemption proceeds (net of the costs of remittance) by cheque or wire transfer within such period or periods as the Directors shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period or periods as the Directors shall determine.  In the absence of directions as to payment the Company may remit redemption proceeds by cheque to the address of the Member appearing on the Register of Members or by wire transfer to such account as the Directors deem

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03362**

appropriate in the circumstances.  The Company shall not be liable for any loss resulting from this procedure.

12.9    On any redemption of Participating Shares the Directors shall have the power to satisfy (in whole or in part) the Redemption Price (and any other sums payable on redemption as provided in these Articles) owing on the redemption of such Participating Shares by dividing *in specie* the whole or any part of the assets of the Company (including, without limitation, shares, debentures, or securities of any other company whether or not held by the Company on the Redemption Date in question) and either (i) distributing such assets directly to the redeeming shareholder, and/or (ii) distributing or allocating such assets to a liquidating account or other similar mechanism to be managed and/or liquidated at the discretion of the Directors.

12.10   Participating Shares shall be treated as having been redeemed with effect from the relevant Redemption Date irrespective of whether or not a Member has been removed from the Register of Members or the Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Date, Members in their capacity as such will not be entitled to or be capable of exercising any rights arising under these Articles with respect to Participating Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Company) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Date but not yet paid (in each case with respect to the Participating Shares being redeemed). Such Members will be treated as creditors of the Company with respect to the Redemption Price and will rank accordingly in the priority of the Company's creditors.

12.11   Once a Participating Share is redeemed it shall be available for re issue and, until re issue, shall form part of the authorised and unissued share capital of the Company.

12.12   Upon the written request of a Member or prospective Member in a form acceptable to the Directors, the Company may, in the discretion of the Directors, accept a standing redemption request from such Member or prospective Member pursuant to which the Company shall agree (without assuming any liability for failing to do so) to use its commercially reasonable efforts to redeem such Member's Participating Shares to the extent necessary to ensure that such Member does not own over a specified percentage of the outstanding Participating Shares of the Company or any Class and/or Series thereof; such percentage to be the percentage identified by such Member or prospective Member in such written request as being the percentage which such Member's or prospective Member's ownership cannot exceed without material risk of such Member or prospective Member being in violation of applicable law or regulation.  Any such written request may be revoked by notice in writing to the Company from the affected Member.

12.13   No amendment to these Articles made after a Redemption Date shall affect a Member with respect to Participating Shares of that Member which have been redeemed, or are being treated as redeemed, on or prior to that Redemption Date.

12.14   Unless otherwise provided in the Offering Memorandum, unremitted redemption proceeds shall not bear interest against the Company and redeemed Participating Shares shall not participate in the profits and losses of the Company with effect from the relevant Redemption Date.

## 13    Compulsory Redemption

13.1    The Directors may cause the Company to redeem any or all of the Participating Shares held by any person at the appropriate Redemption Price in the circumstances disclosed in the Offering

*www.verify.gov.ky File#: 275693*

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03363**

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 180 of 200   PageID 42373
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 72 of
324

Memorandum.  If the Directors determine compulsorily to redeem any Participating Shares under this Article they shall give the holder of the Participating Shares such notice of the redemption as they shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period as the Directors shall determine.

13.2   The Directors may cause a compulsory redemption during any period for which a Redemption Suspension has been declared.

13.3   Without prejudice to the generality of the foregoing, the Company may (without notice) compulsorily redeem the Participating Shares of any Member and, on behalf of such Member, apply the proceeds of redemption in paying for new Participating Shares to give effect to any exchange, conversion or roll-up policy disclosed to Members pursuant to which Participating Shares of one Class or Series (the "**Old Shares**") may, at the option of the Company, be exchanged for Participating Shares of another Class or Series (the "**New Shares**") by means of the redemption of the Old Shares and the immediate re-subscription of the redemption proceeds in paying up the New Shares.

## 14   Purchase and Surrender of Shares

14.1   Subject to the provisions of the Statute and without prejudice to these Articles, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.

14.2   The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

14.3   The Directors may accept the surrender for no consideration of any fully paid Share.

## 15   Treasury Shares

15.1   The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

15.2   The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

## 16   Variation of Share Rights

16.1   Subject to the Statute and these Articles, all or any of the Share Rights applicable to any Class or Series of Participating Shares in issue (unless otherwise provided by the terms of issue of those Participating Shares) may (whether or not the Company is being wound up) be varied without the consent of the holders of the issued Participating Shares of that Class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation may be made only with the prior consent in writing of the holders of not less than two-thirds by Net Asset Value of such Participating Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Participating Shares.  For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of such Participating Shares.  To any such meeting all the provisions of these Articles as to general meetings shall *mutatis mutandis* apply, but so that any holder of a Participating Share present in person or by proxy may demand

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03364**

a poll, and the quorum for any such meeting shall be Members holding not less than twenty per cent. By Net Asset Value of the issued Participating Shares of the relevant Class or Series.  At any Class meeting, the voting rights attributable to each Participating Share shall be calculated by reference to the Net Asset Value per Participating Share (calculated as at the most recent Valuation Date) and not on the basis of one Participating Share, one vote.

16.2   For the purposes of a Class consent, the Directors may treat two or more or all the Classes or Series of Participating Shares as forming one Class or Series if the Directors consider that such Classes or Series would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes or Series.

16.3   Where the Shares of any Class or Series (the "**First Class**") rank, or will on issue rank, pari passu with the Shares of another Class or Series (the "**Second Class**") with respect to participation in the same pool of profits or assets of the Company on a winding up, the rights of the First Class shall be deemed to be varied by any variation of or creation of rights in the Second Class (including on initial issue) which gives the Second Class priority over the First Class on a winding up of the Company.

16.4   In relation to any Class or Series consent required pursuant to Article 16.1, the Directors in their discretion may invoke the following procedure (the "**Negative Consent Procedure**").   The Directors shall provide written notice of the proposed variation (the "**Proposal**") to the Members of the affected Class or Series and shall specify a deadline (the "**Redemption Request Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such Members may submit a written request for redemption of some or all of their Participating Shares of the affected Class and/or Series on the Redemption Date (the "**Specified Redemption Date**") specified by the Directors in such notice.   The terms of the Proposal shall be such that its specified effective date (the "**Effective Date**") shall not be on or prior to the Specified Redemption Date.  Such notice shall further provide that the holders of any Participating Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "**Affected Shares**") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "Negative Consent Shares").  In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under Article 16.1 with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favour of the Proposal on the Effective Date.

16.5   Subject to the foregoing Articles, the Share Rights applicable to any Class or Series of Shares in issue shall (unless otherwise expressly provided by the conditions of issue of such Shares) be deemed not to be varied by:

(a)   the creation, allotment or issue of further Shares ranking pari passu therewith and which may be issued with the benefit of the terms referred to below;

(b)   the purchase or redemption of any Shares;

(c)   the exercise of the powers to allocate assets and charge liabilities to the various Separate Accounts or any of them and to transfer the same to and from the various Separate Accounts or any of them, as provided for in these Articles;

(d)   any reduction or waiver of any fees (including early redemption, management or performance fees) chargeable or allocable to any Class or Series of Shares;

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

(e)     any reduction or waiver of any redemption notice, gate or lock-up period applicable to any Class or Series of Shares; or

(f)     any variation or waiver contemplated by or provided for in the Offering Memorandum applicable to the relevant Class and/or Series.

**17      Variation of Terms**

The Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a Member to waive or modify the terms applicable to such Member's subscription for Participating Shares (including those relating to management and performance fees and redemption terms) without obtaining the consent of any other Member; provided that such waiver or modification does not amount to a variation of the rights attaching to the Participating Shares of such other Members.

**18      Certificates for Shares**

18.1    A Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates representing Shares, if any, shall be in such form as the Directors may determine.  Share certificates shall be signed by one or more Directors or another person authorised by the Directors. The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical process.  All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate.  All certificates surrendered to the Company for transfer shall be cancelled and, subject to these Articles, no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

18.2    The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

18.3    If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) on delivery up of the old certificate.

**19      Register of Members**

19.1    The Company shall maintain or cause to be maintained the Register of Members.

19.2    The Directors may determine that the Company shall maintain one or more branch registers of Members in accordance with the Statute. The Directors may also determine which register of Members shall constitute the principal register and which shall constitute the branch register or registers, and to vary such determination from time to time.

**20      Closing Register of Members and Fixing Record Date**

20.1    For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any dividend, or in order to make a determination of Members for any other proper purpose, the Directors may



Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 183 of 200   PageID 42376
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 75 of
324

provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed thirty days.

20.2   In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any dividend or in order to make a determination of Members for any other proper purpose.

20.3   If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such dividend is passed, as the case may be, shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## 21    Non Recognition of Trusts

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the registered holder.

## 22    Lien on Shares

22.1   The Company shall have a first and paramount lien on all Shares (whether fully paid-up or not) registered in the name of a Member (whether solely or jointly with others) for all debts, liabilities or engagements to or with the Company (whether presently payable or not) by such Member or such Member's estate, either alone or jointly with any other person, whether a Member or not, but the Directors may at any time declare any Share to be wholly or in part exempt from the provisions of this Article.  The registration of a Transfer of any such Share shall operate as a waiver of the Company's lien thereon.  The Company's lien on a Share shall also extend to any amount payable in respect of that Share.

22.2   The Company may sell, in such manner as the Directors think fit, any Shares on which the Company has a lien, if a sum in respect of which the lien exists is presently payable, and is not paid within fourteen clear days after notice has been given to the holder of the Shares, or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the Shares may be sold.

22.3   To give effect to any such sale the Directors may authorise any person to execute an instrument of Transfer of the Shares sold to, or in accordance with the directions of, the purchaser.  The purchaser or such purchaser's nominee shall be registered as the holder of the Shares comprised in any such Transfer, and the purchaser shall not be bound to see to the application of the purchase money, nor shall the purchaser's title to the Shares be affected by any irregularity or invalidity in the sale or the exercise of the Company's power of sale under these Articles.

22.4   The net proceeds of such sale after payment of costs, shall be applied in payment of such part of the amount in respect of which the lien exists as is presently payable and any balance shall



(subject to a like lien for sums not presently payable as existed upon the Shares before the sale) be paid to the person entitled to the Shares at the date of the sale.

**23    Amendments of Memorandum and Articles and Alteration of Capital**

23.1    The Company may, by Ordinary Resolution:

(a)    increase its share capital by such sum and with such rights, priorities and privileges annexed thereto, as the resolution shall prescribe;

(b)    consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c)    by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum; and

(d)    cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

23.2    All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of these Articles with reference to liens, Transfer, transmission and otherwise as the Shares in the original share capital.

23.3    Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution the Company may, by Special Resolution:

(a)    change its name;

(b)    alter or add to these Articles;

(c)    alter or add to the Memorandum with respect to any objects, powers or other matters specified therein; and

(d)    reduce its share capital or any capital redemption reserve fund.

**24    Registered Office**

Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.  The Company may, in addition to its Registered Office, maintain such other offices or places of business as the Directors determine.

**25    General Meetings**

25.1    All general meetings other than annual general meetings shall be called extraordinary general meetings.  The Directors may call general meetings.

25.2    The Company may but shall not be obliged to hold a general meeting in each year as its annual general meeting, and shall specify the meeting as such in the notice calling it.  Any annual general meeting shall be held at such time and place as the Directors shall determine.



25.3    The Directors shall, on a Members' requisition, forthwith proceed to convene an extraordinary general meeting of the Company.  A Members' requisition is a requisition of Members of the Company holding at the date of deposit of the requisition not less than ten per cent. in Net Asset Value of the Shares as at that date which carry the right to vote at general meetings of the Company.

25.4    The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more requisitionists.

25.5    If the Directors do not, within twenty-one days from the date of the deposit of the requisition, duly proceed to convene a general meeting to be held within a further twenty-one days, the requisitionists, or any of them representing more than one-half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three months after the expiration of the first above-mentioned twenty-one days.

25.6    A general meeting convened as aforesaid by requisitionists shall be convened in the same manner, as nearly as possible, as that in which general meetings are to be convened by Directors.

## 26    Notice of General Meetings

26.1    At least five Business Days' notice shall be given of any general meeting.  Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day on which the meeting is to be held and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a)    in the case of an annual general meeting, by all the Members entitled to attend and vote thereat; and

(b)    in the case of an extraordinary general meeting, by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than ninety five per cent. in Net Asset Value of the Shares giving that right.

26.2    The accidental omission to give notice of a general meeting to, or the non receipt of notice of a meeting by, any person entitled to receive notice thereof shall not invalidate the proceedings of that meeting.

## 27    Proceedings at General Meetings

27.1    No business shall be transacted at any general meeting unless a quorum is present. A quorum shall be one or more Members (present in person, by proxy or authorised corporate representative, as the case may be) entitled to attend and vote and representing not less than twenty per cent. in Net Asset Value of all of the Shares in issue and carrying the right to vote at the meeting.

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03369**

27.2    A person may, with the consent of the Directors, participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other.  Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

27.3    A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations or other non-natural persons, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

27.4    If a quorum is not present within half an hour from the time appointed for the meeting or if during such a meeting a quorum ceases to be present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other day, time or such other place as the Directors may determine, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

27.5    The chairman, if any, of the board of Directors shall preside as chairman at every general meeting of the Company, or if there is no such chairman, or if the chairman shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

27.6    If no Director is willing to act as chairman, or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the Members present shall choose one of their number to be chairman of the meeting.

27.7    The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.  When a general meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting.  Otherwise it shall not be necessary to give any such notice.

27.8    A resolution put to the vote of a meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman or any Member present in person or by proxy (or in the case of a non-natural person, by its duly authorised representative or by proxy) demands a poll.

27.9    Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority, an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

27.10   The demand for a poll may be withdrawn.

27.11   Except on a poll demanded on the election of a chairman or on a question of adjournment, a poll shall be taken as the chairman directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.



27.12   A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time as the chairman of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

27.13   In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall not be entitled to a second or casting vote.

## 28    Votes of Members

28.1    Subject to any rights or restrictions attached to any Shares, on a show of hands every Member holding Shares carrying the right to vote on the matter in question who (being an individual) is present in person or by proxy or (if a corporation or other non-natural person) is present by its duly authorised representative or by proxy, shall have one vote and on a poll the voting rights attributable to each Share carrying the right to vote on the matter in question shall be calculated by reference to the Net Asset Value per Share (calculated as at the most recent Valuation Date) and not on the basis of one Share, one vote.

28.2    In the case of joint holders of record, the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders. Seniority among joint holders shall be determined by the order in which the names of the holders stand in the Register of Members.

28.3    A Member of unsound mind, or in respect of whom an order has been made by any court or authority having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by the Member's committee, receiver, curator bonis, or other similar person appointed on such Member's behalf by that court or authority and any such committee, receiver, curator bonis or other similar person may vote by proxy.

28.4    No person shall be entitled to vote at any general meeting unless such person is registered as a Member on the record date for such meeting, nor unless all calls or other monies then payable by such person in respect of such Shares have been paid.

28.5    No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is purported to be given or tendered and every vote not disallowed at the meeting shall be valid.  Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.

28.6    On a poll or on a show of hands votes may be cast either personally or by proxy. A Member may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Member appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands.

28.7    A Member holding more than one Share need not cast the votes in respect of its Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain (any such abstentions to count neither for nor against the resolution) from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing it, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which such proxy is appointed either for or against a resolution and/or abstain from voting.



**29      Proxies**

29.1    The instrument appointing a proxy shall be in writing, be executed under the hand of the appointor or of such appointor's attorney duly authorised in writing or, if the appointor is a corporation or other non-natural person, under the hand of an officer or other person duly authorised for that purpose.  A proxy need not be a Member of the Company.

29.2    The Directors may, in the notice convening any meeting or adjourned meeting, or in an instrument of proxy sent out by the Company, specify the place and the time (being not later than the time for holding the meeting or adjourned meeting to which the proxy relates) at which the instrument appointing a proxy shall be deposited.  In the absence of any such direction from the Directors in the notice convening any meeting or adjourned meeting, the instrument appointing a proxy shall be deposited at the Registered Office not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

29.3    The chairman may in any event, at the chairman's discretion, declare that an instrument of proxy shall be deemed to have been duly deposited.  An instrument of proxy that is not deposited in the manner permitted and which has not been declared to have been duly deposited by the chairman, shall be invalid.

29.4    The instrument appointing a proxy may be in any usual or common form and may be incorporated within any subscription agreement or other document signed by or on behalf of the Member.  An instrument appointing a proxy may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked.  An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

29.5    Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the Transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or Transfer was received by the Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

**30      Corporate Members**

Any corporation or other non-natural person which is a Member of the Company may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any Class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as the corporation could exercise if it were an individual Member.

**31      Shares Beneficially Owned by the Company**

Shares of the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.



www.verify.gov.ky File#: 275693

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03372**

**32      Directors**

There shall be a board of Directors consisting of not less than one person (exclusive of alternate Directors) provided however that the Company may from time to time by Ordinary Resolution increase or reduce the limits in the number of Directors.  The first Directors of the Company shall be determined in writing by, or appointed by a resolution of, the Subscriber.

**33      Powers of Directors**

33.1    Subject to the provisions of the Statute, the Memorandum and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company.  No alteration of the Memorandum or these Articles and no such direction shall invalidate any prior act of the Directors which would have been valid if that alteration had not been made or that direction had not been given.  A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

33.2    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

33.3    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.  Notwithstanding the foregoing, the Directors shall not exercise the powers specified in this Article in breach of any limits or restrictions specified in the Offering Memorandum.

**34      Appointment and Removal of Directors**

34.1    The Company may, by Ordinary Resolution, appoint any person to be a Director and may, by Ordinary Resolution, remove any Director.

34.2    The Directors may appoint any person to be a Director, either to fill a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with these Articles as the maximum number of Directors.

**35      Vacation of Office of Director**

The office of a Director shall be vacated if:

(a)      the Director gives notice in writing to the Company that such Director resigns the office of Director;

(b)      the Director is absent (without being represented by proxy or an alternate Director appointed by such Director) from three consecutive meetings of the board of Directors without special leave of absence from the Directors, and they pass a resolution that such Director has by reason of such absence vacated office;

(c)      the Director dies, becomes bankrupt or makes any arrangement or composition with such Director's creditors generally;

(d)      the Director is or becomes of unsound mind;

(e)      the Director ceases to be a Director by virtue of, or is prohibited from being a Director by, an order made pursuant to any law or regulation binding on the Company; or

(f)      all the other Directors of the Company (being not less than two in number) resolve that such Director should be removed as a Director.

## 36      Proceedings of Directors

36.1    The quorum for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two if there are two or more Directors, and shall be one if there is only one Director.  A person who holds office as an alternate Director shall, if such person's appointor is not present, be counted in the quorum.  A Director who also acts as an alternate Director shall, if such Director's appointor is not present, count twice towards the quorum.

36.2    Subject to the provisions of these Articles, the Directors may regulate their proceedings as they think fit.  Questions arising at any meeting shall be decided by a majority of votes.  In the case of an equality of votes, the chairman shall not have a second or casting vote.  A Director who is also an alternate Director shall be entitled in the absence of such Director's appointor to a separate vote on behalf of such Director's appointor in addition to such Director's own vote.

36.3    A person may participate in a meeting of the Directors or committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting.  Unless otherwise determined by the Directors, the meeting shall be deemed to be held at the place where the chairman is located at the start of the meeting.

36.4    A resolution in writing (in one or more counterparts) signed by all the Directors or all the members of a committee of Directors (an alternate Director being entitled to sign such a resolution on behalf of such alternate Director's appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held.

36.5    A Director or alternate Director may, or other officer of the Company at the direction of a Director or alternate Director may call a meeting of the Directors by at least two days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held.

36.6    The continuing Directors may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

36.7    The Directors may elect a chairman of their board and determine the period for which the chairman is to hold office; but if no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

36.8   All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

36.9   A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by such Director.  The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

## 37   Presumption of Assent

A Director who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless the Director's dissent shall be entered in the minutes of the meeting or unless the Director shall file such Director's written dissent from such action with the person acting as the chairman or secretary of the meeting before the close or adjournment thereof or shall forward such dissent by personal delivery, courier or registered post to such person immediately after the close or adjournment of the meeting.  Such right to dissent shall not apply to a Director who voted in favour of such action.

## 38   Directors' Interests

38.1   A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with such Director's office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

38.2   A Director may act alone or by such Director's firm in a professional capacity for the Company and the Director or such Director's firm shall be entitled to remuneration for professional services as if such Director were not a Director or alternate Director.

38.3   A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by such Director or alternate Director as a director or officer of, or from such Director or alternate Director's interest in, such other company.

38.4   No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relationship thereby established.  A Director (or such Director's alternate Director in such Director's absence) shall be at liberty to vote in respect of any contract or transaction in which such Director is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by such Director at or prior to such Director's consideration and any vote thereon.



*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**25**

**Appx. 03375**

38.5   A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which such Director has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## 39   Minutes

The Directors shall cause minutes to be made in books kept for the purpose of all appointments of officers made by the Directors, all proceedings at meetings of the Company or the holders of any Class of Shares and of the Directors, and of committees of Directors including the names of the Directors or alternate Directors present at each meeting.

## 40   Delegation of Directors' Powers

40.1   The Directors may delegate any of their powers to any committee consisting of one or more Directors or such other persons as the Directors may designate. They may also delegate to any managing director or any Director holding any other executive office such of their powers as they consider desirable to be exercised by such managing director or any Director provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if such managing director ceases to be a Director.  Any such appointment may be made subject to any conditions the Directors may impose, and either collaterally with or to the exclusion of their own powers, and may be revoked or altered.  Subject to any such conditions, the proceedings of a committee of Directors shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

40.2   The Directors may establish any committees, local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees or local boards.  Any such appointment may be made either collaterally with or to the exclusion of the Directors' powers, shall be subject to any conditions the Directors may impose, and may be revoked or altered.  Subject to any such conditions, the proceedings of any such committee, local board or agency shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

40.3   The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised person to delegate all or any of the powers, authorities and discretions vested in such attorney or authorised person.

40.4   The Directors may appoint such officers as they consider necessary on such terms, at such remuneration (if any) and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors may think fit.  Unless otherwise specified in the terms of such officer's appointment an officer may be removed by resolution of the Directors or Members.



*www.verify.gov.ky File#: 275693*

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03376**

**41      Alternate Directors**

41.1    Any Director (other than an alternate Director) may by written notice to the Company appoint any other Director, or any other person willing to act, to be an alternate Director and by written notice to the Company may remove from office an alternate Director so appointed by the Director.

41.2    An alternate Director shall be entitled to receive notice of all meetings of Directors and of meetings of committees of Directors of which such alternate Director's appointor is a member, to attend and vote at every such meeting at which the Director appointing such alternate Director is not personally present, and generally to perform all the functions of such alternate Director's appointor as a Director in such Director's absence.

41.3    An alternate Director shall cease to be an alternate Director if such alternate Director's appointor ceases to be a Director.

41.4    Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

41.5    Subject to the provisions of the Articles, an alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for such alternate Director's own acts and defaults and shall not be deemed to be the agent of the Director appointing such alternate Director.

**42      No Minimum Shareholding for Directors**

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director shall not be required to hold Shares.

**43      Remuneration of Directors**

43.1    The remuneration to be paid to the Directors, if any, shall be such remuneration as the Directors shall determine.  The Directors shall also be entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors, or general meetings of the Company, or separate meetings of the holders of any Class of Shares or debentures of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors, or a combination partly of one such method and partly the other.

43.2    The Directors may by resolution approve additional remuneration to any Director for any services other than such Director's ordinary routine work as a Director.  Any fees paid to a Director who is also counsel to the Company, or otherwise serves it in a professional capacity, shall be in addition to such Director's remuneration as a Director.

**44      Seal**

The Company may, if the Directors so determine, have a Seal, which shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors.  Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person authorised by the Directors for the purpose.



Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 194 of 200   PageID 42387
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 86 of
324

**45      Dividends, Distributions and Reserves**

45.1    Subject to the Statute, these Articles, and the special rights attaching to Participating Shares of any Class and/or Series, the Directors may, in their absolute discretion, declare dividends and distributions on Participating Shares of any Class and/or Series in issue and authorise payment of the dividends or distributions out of the relevant Separate Account in respect of such Participating Shares.  No dividend or distribution shall be paid except out of the realised or unrealised profits of the Company, or out of the share premium account attributable to Participating Shares of the Class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by the Statute.

45.2    Except as otherwise provided by the rights attached to Participating Shares, or as otherwise determined by the Directors, all dividends and distributions in respect of Participating Shares of a particular Class and/or Series shall be declared and paid according to the Net Asset Value of the Participating Shares of the Class and/or Series that a Member holds. If any Participating Share is issued on terms providing that it shall rank for dividend or distribution as from a particular date, that Participating Share shall rank for dividend or distribution accordingly.

45.3    The Directors may deduct and withhold from any dividend or distribution otherwise payable to any Member all sums of money (if any) then payable by it to the Company on account of calls or otherwise or any monies which the Company is obliged by law to pay to any taxing or other authority.

45.4    Under no circumstances may the assets (or the income derived from such assets) attributed to a Separate Account in respect of any Class and/or Series be used to pay a dividend in respect of a Separate Account that is attributed to any other Class and/or Series.

45.5    The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures or securities of any other company or in any one or more of such ways and, where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

45.6    Any dividend, distribution, interest or other monies payable in cash in respect of Participating Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct.  Every such cheque or warrant shall (unless the Directors in their sole discretion otherwise determine) be made payable to the order of the person to whom it is sent.  Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the Participating Share held by them as joint holders.

45.7    Any dividend or distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date of declaration of such dividend or distribution may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the dividend or distribution shall remain as a debt due to the Member.  Any dividend or distribution which remains

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03378**

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 195 of 200   PageID 42388
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 87 of
324

unclaimed after a period of six years from the date of declaration of such dividend or distribution shall be forfeited and shall revert to the Company.

45.8    No dividend or distribution shall bear interest against the Company.

**46      Capitalisation**

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members of any Class and/or Series in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued Participating Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid.  In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Participating Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned). The Directors may authorise any person to enter into an agreement with the Company, on behalf of all of the Members interested, providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

**47      Books of Account**

47.1    The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company.  Such books of account must be retained for a minimum period of five years from the date on which they are prepared.  Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

47.2    The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute, or authorised by the Directors or by the Company in general meeting.

47.3    The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

**48      Audit**

48.1    The Directors may appoint an Auditor of the Company who shall hold office on such terms as the Directors determine.

48.2    Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03379**

the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

48.3   Any Auditors of the Company shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

## 49   Notices

49.1   Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to the Member or to the address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member).  Any notice, if posted from one country to another, is to be sent airmail.

49.2   Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier.  Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in the Cayman Islands) following the day on which the notice was posted.  Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted.  Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

49.3   A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

49.4   Notice of every general meeting shall be given in the manner authorised by these Articles to every person shown as holding Shares carrying an entitlement to receive such notice in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of such person being a legal personal representative or a trustee in bankruptcy of a Member where the Member but for such Member's death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.



## 50   Winding Up

50.1   If the Company shall be wound up the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as such liquidator thinks fit.   The liquidator shall in relation to the assets available for distribution among the Members make in the books of the Company such transfers thereof to and from Separate Accounts as may be necessary in order that the effective burden of such creditors' claims may be shared among the holders of Participating Shares of different Classes and/or Series in such proportions as the liquidator in such liquidator's absolute discretion may think equitable.

50.2   Subject to the special rights attaching to Participating Shares of any Class or Series, the balance shall then be applied in the following priority:

(a)   first, to the holders of Management Shares, an amount equal to the par value of such Management Shares; and

(b)   second, the balance shall be paid to the holders of Participating Shares in proportion to the Net Asset Value of Participating Shares held, subject to a deduction from those Participating Shares in respect of which there are monies due, of all monies due to the Company for unpaid calls, or otherwise.

50.3   If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution or resolutions passed by the holders of Participating Shares (whether as a whole or at separate Class meetings), divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of property of different kinds, and may for such purposes set such value as the liquidator deems fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members.   The liquidator may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares or other property in respect of which there is a liability.

## 51   Indemnity and Insurance

51.1   Every Director and officer of the Company (which for the avoidance of doubt, shall not include any Auditor), together with every former Director and former officer of the Company (each an "**Indemnified Person**") shall be indemnified out of the assets of the Company against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud or wilful default.   No Indemnified Person shall be liable to the Company for any loss or damage incurred by the Company as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud or wilful default of such Indemnified Person.   No person shall be found to have committed actual fraud or wilful default under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

51.2   The Company shall advance to each Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defence of any action, suit, proceeding

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03381**

Case 3:21-cv-00881-X   Document 178-7   Filed 01/09/24   Page 198 of 200   PageID 42391
Case 19-34054-sgj11 Doc 474-3 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 90 of
324

investigation involving such Indemnified Person for which indemnity will or could be sought.  In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to the Company if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article.  If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Company (without interest) by the Indemnified Person.

51.3    The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

51.4    Pursuant to the foregoing provisions, the Company may enter into a service or other agreement with any Director (or any entity providing one or more persons to the Company to act as Directors) upon such terms and conditions (including as to indemnification and exculpation) as the Directors shall, in their absolute discretion, determine.  Any such indemnification and exculpation provisions may be specified to a standard equal to or more favourable (but not less favourable) to the Company than any standard specified in these Articles.

## 52    Disclosure

If required to do so under the laws of any jurisdiction to which the Company, the Investment Manager, the Administrator or any other service provider is subject, or in compliance with the rules of any stock exchange upon which the Company's Shares are listed, or to ensure the compliance by any person with any anti-money laundering law in any relevant jurisdiction, any Director, Officer, the Investment Manager, the Administrator or Auditor of the Company shall be entitled to release or disclose any information in its possession regarding the affairs of the Company or a Member including, without limitation, any information contained in the Register of Members or subscription documentation of the Company relating to any Member.

## 53    Financial Year

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

## 54    Transfer by way of Continuation

The Company shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

## 55    Mergers and Consolidations

The Company shall, with the approval of a Special Resolution, have the power to merge or consolidate with one or more constituent companies (as defined in the Statute), upon such terms as the Directors may determine.



32

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

www.verify.gov.ky File#: 275693

**Appx. 03382**

# HIGHLAND DYNAMIC INCOME MASTER FUND, L.P.

*A Cayman Islands Exempted Limited Partnership*

**Second Amended and Restated Exempted Limited Partnership Agreement**

**April 1, 2018**

203398308 v14

**Appx. 03383**

## NOTICE

NEITHER HIGHLAND DYNAMIC INCOME MASTER FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES.  THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND DYNAMIC INCOME MASTER FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT.

**Appx. 03384**