1      The last point I will address on the release, Your Honor,

2   is who is being released and why and what does the evidence

3   show.  The Debtor release extends to release parties which

4   include the independent directors, Strand, for actions after

5   January 9th, Jim Seery as the CEO and CRO, the Committee,

6   members of the Committee, professionals, and employees.

7      You have heard Mr. Seery's testimony that the Debtor does

8   not believe that any claims against the parties that are

9   proposed to be released actually exist.  You have heard Mr.

10  Seery's testimony that he worked closely with the employees

11  and believes that not only have they all been instrumental in

12  getting the Debtor to the -- be on the cusp of plan

13  confirmation, but that also Mr. Seery is not aware of any

14  claims against them.

15      Moreover, as Mr. Seery testified, the release for the

16  employees is only conditional.  He testified that the

17  employees are required to assist in the monetization of assets

18  and the resolution of claims, and if they do not like -- if

19  they do not lose their release, then any Debtor claims are

20  tolled, such that could be pursued by the Litigation Trustee

21  at a future time.

22      Lastly, I'm sure that the Dondero entities will argue that

23  someone needs to investigate claims against Mr. Seery for

24  mismanagement or for, God forbid, having failed to file the

25  2015.3 statements.  Such claims are part of the continuing

1    harassment of Mr. Seery that the Dondero entities have

2    embarked on after it was apparent that nobody would support

3    their plan.

4         There is no evidence of any claims that exist, Your Honor.

5    In fact, the Committee and its professionals have watched the

6    Debtor through this case like a hawk.  They have not been

7    afraid to challenge the Debtor's actions in general and Mr.

8    Seery's in particular.  FTI has worked on a daily basis with

9    DSI and the company, had access to information.  When COVID

10   was happening, they were looking at trades going on on a daily

11   basis.

12        So if the Committee, whose members hold approximately $200

13   million of claims against the estate, are okay with the

14   release against the independent directors and Mr. Seery, that

15   should provide the Court with comfort to approve the releases

16   as part of the plan.

17        In summary, Your Honor, the Debtor release is entirely

18   appropriate and does not affect the release of third-party

19   claims that have not yet arisen.

20        Next, Your Honor, I want to go to the discharge.  There's

21   been objections to the discharge.  Dugaboy and NexPoint have

22   objected that the Debtor receiving a discharge under the plan

23   -- argue a debtor is liquidating.  The objection is not well

24   taken based upon Mr. Seery's testimony regarding what it is

25   the Claimant Trust and the Reorganized Debtor plan to do after

1  the effective date, as compared to what the limitations of a

2  discharge are under 1141(d)(3).

3     Your Honor, Article 9 of the -- 9(b) of the plan provides

4  that as -- except as otherwise expressly provided in the plan

5  or the confirmation order, upon the effective date, the Debtor

6  and its estate will be discharged or released under and to the

7  fullest extent provided under 1141(d)(A) [sic] and other

8  applicable provisions of the Bankruptcy Court.  Bankruptcy

9  Code.

10     Section 1141(d)(3) provides an exception to the discharge,

11  and I'd like to have that section put up for Your Honor at

12  this point.  Ms. Canty?

13     As this -- as the section reflects, and as the Fifth

14  Circuit has ruled in the *TH-New Orleans Limited Partnership*

15  case cited in our materials, in order to deny the debtor a

16  discharge under 1141(d)(3), three things must be true:  (1)

17  the plan provides for the liquidation of all or substantially

18  all of the property in the estate; (2) the debtor does not

19  engage in business after consummation of the plan; and (3) the

20  debtor would be denied a discharge under 727(a) of this title

21  if the case was converted to Chapter 7.  Here, only C applies.

22     With respect to A, Your Honor, while the plan does project

23  that it will take approximately two years to monetize the

24  Debtor's assets for fair value, the Debtor is just not

25  liquidating within the meaning of Section A.

1    As Mr. Seery testified, during the post-confirmation

2  period, post-effective date period, the Debtor will continue

3  to manage its funds and conduct the same type of business it

4  conducted prior to the effective date.  It'll manage the CLOs.

5  It'll manage Multi-Strat.  It'll manage Restoration Capital.

6  It'll manage the Select Fund, and it'll manage the Korea Fund.

7    The Bankruptcy Court for the Southern District of New

8  York's 2000 opinion in *Enron*, cited in our materials, is on

9  point.  There, the Court found that a debtor liquidating its

10  assets over an indefinite period of time that is likely to

11  take years is not liquidating within the meaning of Section

12  1141(b)(3)(A), justifying a denial of discharge.

13    But even if we failed A, based upon Mr. Seery's testimony,

14  we would not fail B.  The Debtor will be continuing to do what

15  it has done during the case, as it did before, as I said,

16  managing its business.  B says the debtor does not engage in

17  the business after management.  So while Mr. Seery testified

18  that it would take approximately two years, it could take

19  more, it could take less, and there is no requirement to

20  liquidate assets over a period of time.

21    Accordingly, Your Honor, the Debtor is conducting the type

22  of business contemplated by Section B so as not to just deny a

23  discharge.

24    As the Fifth Circuit said in the *TH-New Orleans* case, the

25  court granted a discharge there because it was likely that the

1   debtor would be liquidating its assets and conducting business

2   (indecipherable) years following a confirmation date.  And

3   this result makes sense, Your Honor, because the Debtor will

4   need the discharge and the tenant injunctions, which I'll get

5   to in a moment, in order to prevent interference with the

6   Debtor's ability to implement the terms of the plan and make

7   distributions to creditors.

8       I would now like, Your Honor, to turn to the exculpation

9   provisions, which there's been -- there's been a lot of

10  briefing on it, and I know Your Honor is very aware of the

11  exculpation provisions and the *Pacific Lumber* case.  And

12  several parties have objected to the exculpation contained in

13  the plan, based primarily on the Fifth Circuit ruling in

14  *Pacific Lumber*.

15      The exculpation provision, which is not dissimilar to what

16  is found in many plans around the country, including in plans

17  confirmed in bankruptcy courts in the Fifth Circuit, acts to

18  exculpate the exculpated parties for negligent-only acts as it

19  contains the standard carve-outs for gross negligence,

20  intentional conduct, and willful misconduct.

21      I do want to bring to the Court's attention a deletion we

22  made to the parties protected by the exculpation in the plan

23  and now -- were filed on February 1st.  The definition of

24  exculpated parties included, before February 1, not only the

25  Debtor but its direct and indirect majority-owned subsidiaries

112

1  and the managed funds.  In the plan amendment, we have deleted

2  the Debtor's direct and indirect majority-owned subsidiaries

3  and managed funds from the definition and are not seeking

4  exculpation for those entities.

5      But before, Your Honor, I address *Pacific Lumber* and why

6  the Debtor believes it does not preclude the Court from

7  approving the exculpation in this case, I do want to focus on

8  something that the Objectors conveniently ignore from their

9  argument.

10     As I mentioned in my opening argument, Your Honor, the

11 independent directors were appointed pursuant to the Court's

12 order on January 9, 2020.  They have resolved many issues

13 between the Debtor and the Committee, and avoided the

14 appointment of a Chapter 11 trustee.

15     The January 9th order was specifically approved by Mr.

16 Dondero, who was in control of the Debtor at the time, and I

17 believe the transcripts that are admitted into evidence will

18 demonstrate that he was fully behind the approval of the

19 January 9th order.

20     In addition to appointing the independent directors into

21 what was sure to be a contentiously litigious case, the

22 January 9th order set the standard of care for the independent

23 directors, and specifically exculpated them from negligence.

24     You have heard Mr. Seery and Mr. Dubel testify that they

25 had input into what the order said and would have not agreed

113

1    to be appointed as independent directors if it did not include

2    Paragraph 10, as well as the provisions regarding

3    indemnification and D&O insurance.

4         I would like to put a demonstrative on the screen, which

5    is actually Paragraph 10 of that order.  Your Honor, Paragraph

6    10, there's two concepts embedded here.  First, it requires

7    any parties wishing to sue the independent directors or their

8    agents to first seek such approval from the Bankruptcy Court.

9    Secondly, and importantly for purposes of the independent

10   directors and their agents, who would include the employees,

11   it set the standard of care for them during the Chapter 11 and

12   entitled them to exculpation for negligence.  Paragraph 10

13   says the Court will only permit a suit to go forward if such

14   claim represents a colorable claim for willful misconduct or

15   gross negligence.

16        And Your Honor, Paragraph 10 does not expire by its terms.

17        By not including negligence in the definition of what a

18   colorable claim might be, the Court has already exculpated the

19   independent directors and their agents, which include the

20   employees acting at their direction.

21        And because the independent directors and their agents are

22   exculpated under Paragraph 10, Strand needs to be exculpated

23   as well for actions occurring after January 9th.  This is

24   because a suit against Strand for conduct after the

25   independent board was appointed is effectively a suit against

114

1    the independent directors, who were the only people in control

2    of Strand at that time.

3        After the effective date, Mr. Dondero will regain control

4    of Strand, as the independent directors will be discharged.

5    And for parties able to sue Strand essentially for negligence

6    for conduct conducted by the independent directors after

7    January 9th, Strand will then be able to seek indemnification

8    from the Debtor under the Debtor's partnership agreement

9    because the partnership agreement does provide the general

10   partner is entitled to indemnification.

11       Accordingly, an exculpation for Strand is really the

12   functional equivalent of an exculpation for the independent

13   directors and the Debtor.

14       The January 9th order was not appealed, and an objection

15   to exculpation at this point as it relates to the independent

16   directors, their agents, and Strand is a collateral attack on

17   this order.  So, Your Honor, Your Honor does not even need to

18   get to the thorny issues addressed by *Pacific Lumber*.

19       However, even in the absence of the January 9th order,

20   exculpation of the independent directors and their employees,

21   as well as the other exculpated parties, is not prohibited by

22   *Pacific Lumber*.  In *Pacific Lumber*, the Fifth Circuit reversed

23   a bankruptcy court order confirming a plan because the

24   exculpation provision was too broad and included parties that

25   the Fifth Circuit thought could not be exculpated under

 1  Section 524(e) of the Code.

 2      A close look at the issue before the Court, Your Honor,

 3  the reasoning for the Court's ruling and why certain parties

 4  like Committee and its members were entitled to exculpation,

 5  reflects that this case does not prevent the Court from

 6  approving exculpation of this case.

 7      A careful read of the underlying briefs and opinions in

 8  *Pacific Lumber* reveals that the concern that the Appellants

 9  had in that case was the application of exculpation to non-

10  fiduciary sponsors.  There were two competing plans in the

11  case.  The first was filed by the indenture trustee.  The

12  second was filed by the debtor's parent and lender, and was

13  deemed -- called the Marathon Plan.  The Court confirmed the

14  Marathon Plan, and the indenture trustee appealed, and the

15  indenture trustee argued that the plan sponsors could not be

16  exculpated.

17      After determining that the appeal of the exculpation

18  provisions were not equitably moot, the Fifth Circuit

19  determined that exculpation was not authorized under 524(e) of

20  the Code because that section provides a discharge of the

21  debtor does not affect the liability of any other entity on

22  such debt.

23      However, and here's the important part, Your Honor:  The

24  Fifth Circuit did not say that all exculpations are prohibited

25  under the Code and authorized the exculpation of the Committee

1   and its members.  And why did the Court do that?  Because it

2   looked at the Committee's qualified immunity under 1103 and

3   also reasoned that Committee members are essentially

4   disinterested volunteers that should be entitled to

5   exculpation on negligence.

6       The Court also cited approvingly *Colliers* for the

7   proposition that if Committee members were not exculpated for

8   negligence and subject to suit by people who are unhappy with

9   them, they just would not serve.

10      Accordingly, the Fifth Circuit based its willingness to

11  exculpate Committee members on the strong public policy that

12  supports exculpation for those parties under those

13  circumstances.  And against this backdrop, Your Honor, there

14  are several reasons why the Court should authorize exculpation

15  in this case, notwithstanding *Pacific Lumber*.

16      First, Your Honor, the independent directors in this case

17  are analogous -- much more analogous to the Committee members

18  that the Fifth Circuit ruled were entitled to than the

19  incumbent officer and directors.

20      Your Honor has the following facts before the Court, based

21  upon the testimony of Mr. Seery and Mr. Dubel and other

22  evidence in the record.  The independent board members were

23  not part of the Highland enterprise before the Court appointed

24  them on January 9th.  The Court appointed the independent

25  directors in lieu of a Chapter 11 trustee to address what the

1  Court perceived as the serious conflicts of interest and

2  fiduciary duty concerns with current management, as identified

3  by the Committee.

4      The independent directors would not have agreed to accept

5  their role without indemnification, insurance, exculpation,

6  and the gatekeeper function provided by the January 9th order.

7      And Mr. Dubel testified regarding the significant

8  experience he has as an independent director during his 30-

9  plus years in the restructuring community, including several

10 engagements as an independent director in Chapter 11 cases.

11 And he testified that independent directors have become

12 commonplace in complex restructurings over the last several

13 years and have been appointed in many cases, including high-

14 profile cases.  We've cited to just a few of those cases in

15 our brief, but we could go on and on.

16     Mr. Dubel testified that the independent directors are a

17 critical tool in proper corporate governance and restoring

18 creditor confidence in management in modern-day

19 restructurings, and he testified that, based upon his

20 experience, independent directors expect to be indemnified by

21 the company, expect to obtain directors and officers

22 insurance, and expect to be exculpated from claims of

23 negligence when they agree to be appointed.

24     He further testified that if independent directors cannot

25 be assured that they will be exculpated for simple negligence,

118

1  he believes they will be unwilling to serve in contentious

2  cases like the one we have here, which will have a material

3  adverse effect on the Chapter 11 restructuring process as we

4  know it.

5      Based upon the foregoing testimony, Your Honor, which is

6  uncontroverted, the Court should have no problem finding that

7  the independent directors are much more analogous to the

8  Committee members in *Pacific Lumber* who the Fifth Circuit said

9  could be exculpated.

10     The facts, these facts also distinguish this case from the

11 *Dropbox v. Thru* case which Your Honor decided and which was

12 reversed on this issue by the District Court.  In neither

13 *Pacific Lumber* or *Thru* was there an argument that the policy

14 reasons that supported exculpation of Committee members also

15 supported the exculpation of the parties sought to be

16 exculpated.

17     Moreover, Your Honor, the independent directors in this

18 case were pointed as essentially as substitute for a Chapter

19 11 trustee.  There was a Chapter 11 trustee motion filed a few

20 days before, I believe, and the Court, in approving this, said

21 that you -- better than a Chapter 11 trustee.  And Chapter 11

22 Trustees are entitled to qualified immunity.  So, while, yes,

23 the independent directors aren't truly Chapter 11 trustees,

24 they are analogous.

25     Second, Your Honor, while there is language in *Pacific*

119

1  *Lumber* that says that the directors and officers of the debtor

2  are not entitled to exculpation, the issue before the Court

3  really on appeal was the plan sponsors and whether they were.

4  So I would argue that any discussion of the exculpation not

5  being available for directors and officers in the Fifth

6  Circuit opinion in *Palco* is actually dicta.

7      Third, Your Honor, as I discussed before, the *Pacific

8  Lumber* decision was based solely on 524(e) of the Bankruptcy

9  Code, which only says that the discharge of a claim against

10  the debtor does not affect the discharge of a third party.

11  However, the Debtor is not relying on 524(e) as the basis of

12  their exculpation.  As we outline in our brief, Your Honor, we

13  believe that the exculpation is appropriate under Section 105

14  and 1123(b)(6) as a means -- part of an implementation of the

15  plan.

16      Importantly, Your Honor, as other courts hostile to third-

17  party releases have determined, exculpation only sets a

18  standard of care for parties and is not an effort to relieve

19  fiduciaries of liability.

20      Other courts that have aligned with the Fifth Circuit and

21  rejected third-party releases, like the Ninth Circuit, have

22  recently determined exculpation has nothing to do with 524(e).

23  In *In re Blixseth*, a Ninth Circuit case decided at the end of

24  2020 cited in our materials, they examined several of their

25  circuit cases that had strongly prohibited non-consensual

120

1    third-party releases under 524(e).  But again, the Court

2    concluded that 524(e) only prohibits third parties from being

3    released from liability of a prepetition claim for which the

4    debtor receives a discharge.  The Court reasoned that the

5    exculpation clause, however, protects parties from negligence

6    claims relating to matters that occurred during the Chapter 11

7    case and has nothing to do with 524(e).

8        The Ninth Circuit, which along with the Fifth Circuit has

9    been notorious for prohibiting third-party releases, issued

10   its ruling against this backdrop and said that exculpations

11   are appropriate.

12       Your Honor, the Objectors made a point yesterday of

13   pointing out that Strand, as the Debtor's general partner, is

14   liable for the debts under applicable law.  To the extent they

15   intend to argue that the exculpation is seeking to discharge

16   any such prepetition liability, they would be wrong.  The

17   exculpation only applies to postpetition matters.  And to the

18   extent they argue that the exculpation seeks to discharge

19   Strand's potential postpetition liability, for the reasons I

20   discussed, a claim against Strand will essentially be a claim

21   against the Debtor because the Debtor will be obligated to

22   indemnify them.

23       Accordingly, Your Honor, we submit that if this matter

24   goes up to appeal to the Fifth Circuit, which it may very well

25   do, that the Fifth Circuit may very well come out the same way

121

1    as the Ninth Circuit and start relaxing the standard or

2    otherwise provide that the independent directors are much more

3    like Committee members.

4         Lastly, Your Honor, if the Court does confirm the plan,

5    which we certainly hope it will do, it will have made a

6    finding that the plan has been proposed in good faith, and in

7    doing so, the Court essentially finds that the independent

8    directors and their agents have acted appropriately and

9    consistent with their fiduciary duties, and it makes --

10   exculpation for negligence naturally flows from that finding.

11        Your Honor, I would now like to go to the injunction

12   provisions, and my argument is that the injunction provisions

13   as amended are appropriate.

14             THE COURT:  Can I stop you?

15             MR. POMERANTZ:  We received several of -- yes.

16             THE COURT:  I want to just recap a couple of things I

17   think I heard you say.  You're not asking this Court, you say,

18   to go contrary to *Pacific Lumber* per se.  You have thrown out

19   there the possibility that *Pacific Lumber* mistakenly relied on

20   524(e) in rejecting exculpations of plan sponsors.  You're

21   saying, eh, as a technical matter, I think they were wrong in

22   focusing on that statute because that statute seems to deal

23   with prepetition liability.  Okay?  Its actual wording, 524(e)

24   states, discharge of a debt of a debtor does not affect the

25   liability of any other entity on such debts.

122

1      And reading between the lines, I think you're saying --

2  well, maybe this isn't what you're saying, but here's what I

3  inferred -- "debt" is defined in 101(12) to mean liability on

4  a claim, and then "claim" is defined in 101(5) of the

5  Bankruptcy Code as meaning right to payment.  It doesn't say

6  as of the petition date, but I think if you look at, then,

7  Section 502 of the Bankruptcy Code that addresses claims and

8  interests, clearly, it seems to be referring to the

9  prepetition time period, you know, claims and interest as of

10  the petition date.  And then -- that's 502.  And then 503

11  speaks of, for the most part, postpetition administrative

12  expenses.

13      So that was my rambling way of saying I'm understanding

14  you to say, eh, as a technical matter, we think the Fifth

15  Circuit was wrong to focus on 524(e) because when you're

16  talking about exculpation you're talking about postpetition

17  liability, not prepetition liability.  And 524(e) is talking

18  more about prepetition liability.

19      But I think what I also hear you saying is, at bottom,

20  *Pacific Lumber* was sort of a policy-driven holding where, you

21  know, we're worried about no one would ever sign up for being

22  on an unsecured creditors' committee if they could be exposed

23  to lawsuits.  They're fiduciaries, we think, for policy

24  reasons.  Exculpation is appropriate for this one group.  And

25  you're saying, well, they didn't have an independent board

123

1    that they were considering.  They were just considering non-

2    fiduciary plan sponsors.  And so the rationale presented by

3    *Pacific Lumber* applies equally here, and just they didn't make

4    a holding in this factual context.

5        Have I recapped what you're saying?

6            MR. POMERANTZ:  Your Honor, that's generally --

7    generally correct, with a couple of nuances.  So, yes, first,

8    I think, on a policy basis, Your Honor -- again, putting aside

9    the January 9th order, because we don't see --

10           THE COURT:  Right.  Right.

11           MR. POMERANTZ:  -- Your Honor even needs to get to

12   this issue.

13           THE COURT:  I understand.

14           MR. POMERANTZ:  But if Your Honor does get to this

15   issue, we think, as a first point, Your Honor could be totally

16   consistent with *Pacific Lumber* because there's policy reasons

17   and there was not a categorical rejection of exculpation.

18   Okay.  So if there was a categorical rejection, then it

19   wouldn't have been okay for committee members.  Okay.

20       Second argument, yes, we don't think -- we think it's part

21   of dicta.  It's not part of the holding.  We understand that

22   other courts may have not agreed, maybe your *Thru* case, which

23   Your Honor was appealed on.

24       But the third issue, our argument is all they looked at

25   was 524(e).  They said 523 -- 4(e) does not authorize it.

124

1   They did not say 524(e) prohibits it.

2       We think there's other provisions in the Code.  And then

3   when you basically add in the analysis that Your Honor

4   provided, which we agree with, and what 524 was -- to do,

5   524(e) just says that discharge doesn't affect.  It doesn't

6   say that under another provision of the Code or for another

7   reason you are authorized to give an exculpation.  I think

8   it's a nuance and it's a difference there.

9       And my point of bringing up the *Blixseth* case -- which, of

10  course, is Ninth Circuit and it's not binding on Your Honor,

11  it's not binding on the Fifth Circuit -- is to say, when that

12  was presented to them, they saw the distinction that 524(e)

13  has nothing to do with an exculpation.  And while, yes, the

14  Fifth Circuit hasn't ruled on that, and if the Fifth -- if

15  that argument is made to the Fifth Circuit, we don't know how

16  they would rule, I think that, based upon their analysis --

17  which, again, Your Honor, is no more than a page and a half of

18  their opinion, right, of a long, lengthy opinion on the

19  confirmation issues.  So I think, Your Honor, with the Fifth

20  Circuit, there is a good chance that based upon the developing

21  case law of exculpation, based upon the sister circuit in

22  *Blixseth* making that distinction, that there is a very good

23  chance that the Fifth Circuit would change.

24      But look, I recognize that argument requires Your Honor to

25  say, okay, this is outside and -- and what *Pacific Lumber* did

125

1  or didn't do.  But I think, Your Honor, there's several

2  potential reasons, there's several potential arguments that

3  you can get to the same place.

4          THE COURT:  Okay.  Thank you.

5          MR. POMERANTZ:  Okay.  If I may just get another

6  glass of -- sip of water before my time starts?

7          THE COURT:  Okay.

8          MR. POMERANTZ:  Okay, Your Honor.  We're now turning

9  to the injunction provision.  The Debtor received several

10 objections to the injunction provisions in -- I think I have

11 it right now -- Article 9(f) to the plan.  And we've modified

12 Article 9(f) to address certain of those concerns, and we

13 believe that, as modified, that the injunction provision

14 implements and enforces the plan's discharge, release, and

15 exculpation provisions to prevent parties from pursuing claims

16 in interest that are addressed by the plan and otherwise

17 interfering with consummation and implementation of the plan.

18     I'd like to put up the first paragraph of the injunction

19 on the screen now.

20     Okay, Your Honor.  The first paragraph, all it does is

21 prohibits the enjoined parties from taking action to interfere

22 with consummation or implementation of the plan.  I suspect a

23 sentence like that is probably in hundreds of plans in the

24 Fifth Circuit and elsewhere.

25     Initially, to address a concern that it applied to too

126

1  many parties, the Debtor added a definition in the revised

2  plan that defines "enjoined parties," which I'd like to now

3  put that definition up on the screen.

4      The changes -- it's a little hard to read there, but you

5  have it in the -- oh, there you go.  The changes made clear

6  that only parties who have a relationship to this case, either

7  holding a claim or interest, having appeared in the case, be a

8  -- or be a party in interest, Jim Dondero, or related entity,

9  or related person of the foregoing are covered.  The claim

10  objectors argue that the word "implementation and

11  consummation" is vague, or vague and unclear.  Your Honor,

12  these terms are both defined in the Bankruptcy Code and under

13  the case law, and they're, as I said, common features of many

14  plans.

15      Section 1123(a)(5) of the Code provides that a plan shall

16  provide for its implementation, and identifies a list of items

17  that the plan can include.  Article 4 of our plan is defined

18  as "Means of Implementation of This Plan," and describes the

19  various corporate steps required to implement the provisions

20  of the plan, including canceling equity interests, creation of

21  new general partners and a limited part of the Reorganized

22  Debtor, the restatement of the limited partnership agreement,

23  and the establishment of the various trusts.

24      Paragraph 1 rightly and appropriately enjoins efforts to

25  interfere with these steps.

127

1      Nor is the term "consummation of the plan" vague.

2   "Consummation" also is a commonly-used term and has been

3   defined by the Fifth Circuit and the Code.  1102 -- 1101(2)

4   defines "Substantial Consummation" to be the transfer of

5   assets to be transferred under the plan, the assumption by the

6   debtor of the management of all the property dealt with by the

7   plan, and the commencement of distributions under the plan.

8      Section 1142 gives the Court authority to direct a party

9   to perform any act necessary for consummation of a plan.  And

10   as the Fifth Circuit, in *United States Brass Corp.*, which is

11   said in our material, states, said the Bankruptcy Court had

12   post-confirmation jurisdiction to enforce the unperformed

13   terms of a plan with respect to a matter that could affect the

14   parties' post-confirmation rights because the plan had not

15   been fully consummated.

16      And Your Honor just wrote on this issue last year in the

17   *Senior* -- the *Texas* -- the *TXMS Real Estate v. Senior Care*

18   case, and you cited to *U.S. Brass* to find that, in that case,

19   post-confirmation jurisdiction existed to resolve a dispute

20   relating to an assumed contract because the matter related to

21   interpretation, implementation, and execution of the plan.

22      Accordingly, Your Honor, neither implementation or

23   consummation are vague, and the first paragraph of the

24   injunction is necessary and appropriate to enforce the

25   Debtor's discharge.

128

1      As I said before, I will leave it to Mr. Kharasch to

2   address specifically the concerns that the Advisor and the

3   Funds have with the injunction.

4      The second and third paragraphs of the injunction, Your

5   Honor, certain parties have objected to them on the ground

6   that they constitute an improper release of the independent

7   directors as well as the release of claims against the

8   Reorganized Debtor, the Claimant Trust, and the Litigation

9   Sub-Trust, entities that will not have come into existence

10  until after the effective date.

11     We believe we have addressed these concerns by

12  modifications to the second and third paragraphs of the

13  injunction, which I would now like to put the second and third

14  paragraphs on the screen.

15     (Pause.)

16        MR. POMERANTZ:  As that is happening, Your Honor, I

17  will -- there we go.

18     We believe that the changes that were made to these

19  paragraphs should address the Objectors' concerns.

20     First, as with the first paragraph, we have created a

21  defined term of "Enjoined Parties" who are subject to the

22  injunction which is narrower than all persons, I believe, or

23  all entities that was included in the prior plan.  So we've

24  narrowed that.

25     "Enjoined Parties" are generally defined, as I mentioned

129

1   before, as entities involved in this case or related to Jim

2   Dondero, or have appeared in this case.

3       Second, we have removed independent directors from these

4   paragraphs to address the concern that the injunction was a

5   disguised third-party release.

6       Third, we have removed the Reorganized Debtor and the

7   Claimant Trust from the second paragraph and moved them to the

8   third paragraph.  We did this to make clear that the

9   Reorganized Debtor and Claimant Trust were only getting the

10  benefit of the injunction as the successors to the Debtor.  As

11  the Reorganized Debtor and the Claimant Trust receives the

12  property from the Debtor free and clear of all claims and

13  interests and equity holders under 1141(c), they are entitled

14  to the benefit of the injunction.

15      Fourth, we have addressed the concern that the injunction

16  improperly affected set-off rights.  We added language to make

17  clear that the injunction would only affect the parties' set-

18  off of an obligation owed to the Debtor to the extent that

19  that was permissible under 553 and 1141 of the Bankruptcy

20  Code.

21      In other words, we are punting the issue for another day,

22  and there's nothing in the plan that gives the Debtor any more

23  set-off rights than it otherwise has under the Bankruptcy

24  Code.

25      Lastly, Your Honor, certain Objectors have argued that the

130

1   injunction somehow prevents them from enforcing the rights

2   they have under the plan or the confirmation order.  We don't

3   really understand this concern, as the language leading into

4   the second paragraph of the injunction says, except as

5   expressly provided in the plan, the confirmation order, or a

6   separate order of the Bankruptcy Court.

7       With these modifications, Your Honor, the provisions do

8   nothing more than implement 1123(b)(6) and 1141 by preventing

9   parties from taking actions to interfere with the Debtor's

10  plan.

11      The Court has also heard testimony from Mr. Seery

12  regarding the importance of the injunction to implementation

13  of the plan.  He testified that he intends to monetize assets

14  in a way that will maximize value.  And to effectively do

15  that, he has testified that the Claimant Trust needs to be

16  able to pursue its objectives without interference and

17  continued harassment from Mr. Dondero and his related

18  entities.

19      In fact, Mr. Seery testified that if the Claimant Trust

20  were subject to interference by Mr. Dondero, it would take him

21  more time to monetize assets, they would be monetized for less

22  money, and creditors would be harmed.

23      If Your Honor doesn't have any questions for me on the

24  injunction provisions, I'd like to turn to the last part of

25  the injunction, which is really the gatekeeper provision.

1        THE COURT:  All right.  You may.

2        MR. POMERANTZ:  Your Honor, the last paragraph in

3   Article 9(f) is really not an injunction but is rather a

4   gatekeeper provision.  And as originally drafted, it'd do two

5   things:  first, it'd require that before any entity, which is

6   defined very broadly, could file an action against a protected

7   party relating to certain specified matters, the entity would

8   have to seek a determination from this Court that the claim

9   represented are colorable claim of bad faith, criminal

10  conduct, willful misconduct, fraud, or gross negligence.  The

11  specified matters to which the gatekeeper provision would

12  apply included the Chapter 11 case, negotiations regarding the

13  plan, the administration of the plan, the property to be

14  distributed under the plan, the wind-down of the Debtor's

15  business, the administration of the Claimant Trust, or

16  transactions related to the foregoing.

17       Subject to certain exceptions for Dondero-related parties,

18  protected parties were defined to include the Debtor, its

19  successors and assigns, indirect and direct, majority-owned

20  subsidiaries and managed funds, employees, Strand, Reorganized

21  Debtor, the independent directors, the Committee and its

22  members, the Claimant Trust, the Claimant Trustee, the

23  Litigation Trust, the Litigation Sub-Trustee, the members of

24  the Oversight Committee, retained professionals, the CEO and

25  CRO, and persons related to the foregoing.  Essentially,

132

1    parties related to the pre-effective-date administration of

2    the estate or the post-confirmation implementation of the

3    plan.

4        Second, the gatekeeper provision as originally presented

5    gave the Bankruptcy Court exclusive jurisdiction to adjudicate

6    any cause of action that it determined would pass through the

7    gate.  The gatekeeper provision, Your Honor, is not a release

8    in any way.  Rather, it permits enjoined parties who believe

9    they have a claim against the protected parties to pursue such

10   a claim, provided they first make a showing that the claim is

11   colorable to the Bankruptcy Court.

12       Several parties, Your Honor, objected to the Bankruptcy

13   Court having exclusive jurisdiction to adjudicate the claims

14   that pass through the gate.  The Debtor believes that the

15   Bankruptcy Court would ultimately have jurisdiction of any of

16   those claims that pass through the gate.  However, the Debtor

17   did, upon reflection, appreciate the concern that if the Court

18   agreed to that now, it would essentially be determining its

19   jurisdiction before a claim was filed.

20       Accordingly, in the January 22nd plan, Your Honor, we

21   amended the provision to provide that the Bankruptcy Court

22   will only have jurisdiction over such claims to the extent it

23   was legally permissible to do so, essentially deferring the

24   issue to a later time.

25       And as Your Honor, I believe, in one of cases called the

133

1   *Icing on the Cake*, the retention and jurisdiction provisions

2   in the plan only are to the extent under applicable law and

3   are quite broad and include the things that we would have the

4   Court -- have jurisdiction for the Court, otherwise

5   determined.

6       The Court made some other changes to the gatekeeper

7   provision, and I would like to place the amended gatekeeper

8   provision on the screen right now.  In addition to the change

9   I mentioned, the Debtor made the following changes:  the

10  provision is limited now to apply only to enjoined parties,

11  rather than any entity.  Than any entity.  Much narrower.  The

12  provision added the administration of the Litigation Sub-Trust

13  to the matters to which the provision would apply.  The

14  provision makes clear now that any claim, including

15  negligence, is a claim that could be sought and pursued

16  through the gatekeeper function.  And the provision made some

17  other syntax changes.

18      We believe, Your Honor, with these changes, we believe

19  that the gatekeeper provision is within the Court's

20  jurisdiction and it's appropriate to include under the plan.

21      But certain parties have argued that the Court does not

22  have the authority, the jurisdictional authority to perform

23  the gatekeeper function, separate and apart from whether it

24  has jurisdiction to adjudicate the claims that pass through

25  the gate.

134

1     Your Honor, we submit that these arguments represent a

2  fundamental misunderstanding of Bankruptcy Court jurisdiction

3  and the Court's authority to make sure the Debtor is free of

4  interference in carrying out the plan which I'll get to in a

5  couple moments.

6     As a preliminary matter, Your Honor, it is important for

7  the Court to remember that Paragraph 10 of the January 9 order

8  already contains a gatekeeper provision as it relates to the

9  independent directors and their agents.  And as I mentioned on

10 a couple of occasions, that order is not going away, it

11 doesn't expire by its terms, and it cannot be collaterally

12 attacked in this forum.

13    The Debtor does acknowledge, though, that the gatekeeper

14 provision in the plan is broader in terms of the people it

15 protects and it applies to post-confirmation matters.

16    Before I address the Court's authority to approve the

17 gatekeeper provision, I want to summarize the evidence that it

18 has heard from Mr. Seery and Mr. Tauber regarding why the

19 gatekeeper is so important a provision to the success of the

20 plan.

21    Although the Court is all too familiar with the history of

22 litigation initiated by and filed against Mr. Dondero and his

23 related affiliates, Mr. Seery spent some time on the stand

24 testifying about the litigation so the Court would have a

25 complete record for this hearing.  He testified that prior to

135

the petition date, the Debtor faced years of litigation from
Mr. Terry and Acis that led to the *Acis* bankruptcy case, which
Your Honor has said many times it's still in your mind.  Years
of litigation with the Redeemer Committee which precipitated
the filing of a bankruptcy case and resulted in an award very
critical of the Debtor's conduct.  Years of litigation with
UBS.  Years of litigation with Patrick Daugherty.  And we
placed all the dockets for all these matters before the Court.

     Also, during the bankruptcy and after the Committee
essentially rejected the Debtor's pot plan proposal and
indicated -- and the Debtor indicated it would be terminating
the shared service agreements with Mr. Dondero and his related
entities, the Debtor was the subject of harassment from Mr.
Dondero and related entities which resulted in the temporary
restraining order against him, a preliminary injunction
against him, a contempt motion, which Your Honor is scheduled
to hear Friday, a motion by the Debtor's controlled -- by the
Dondero-controlled investors and funds in CLO managed --
managed by the Debtor, which the Court referred to that motion
as being frivolous and a waste of the Court's time.  Multiple
plan objections, most of which are focused on allowing the
Debtors to continue their litigation crusade against the
Debtor and its successors post-confirmation.  An objection to
the Debtor approval of the Acis order and a subsequent appeal.
An objection to the HarbourVest settlement and subsequent

1   appeal.  A complaint and injunction against the Advisors and

2   the Funds to prevent them from violating Paragraph 9 of the

3   January 9th order.  And a temporary restraining order against

4   those parties, which was by consent.

5       Mr. Dondero's counsel tends to argue that he is the victim

6   here and that the litigation is being commenced against him

7   and -- instead of by him.  That response does not even deserve

8   a response, Your Honor.  It is disingenuous.

9       Mr. Tauber testified that he was part of the team at Aon

10  that sourced coverage for the independent directors after

11  their appointment in January 2020 and that he has over 20

12  years of underwriting experience.  He testified that at Aon he

13  builds bespoke insurance programs which are not cookie-cutter

14  programs for his clients, with an emphasis on D&O and E&O.

15  And he was asked by the independent board to obtain D&O and

16  E&O insurance after the board's appointment on January 9th.

17      Based upon the process Aon conducted in reaching out to

18  insurance carriers, Mr. Tauber testified that Aon was only

19  able to obtain D&O insurance based upon the inclusion of

20  Paragraph 10 of the January 9 order, the gatekeeper provision.

21  I know Mr. Taylor said that that was spoon-fed to the

22  insurers, but Mr. Tauber's testimony is they knew about Mr.

23  Dondero and they knew about his litigation tactics, so it is

24  not a good inference to be made from the testimony that they

25  would not have required something.  They probably would have

137

1  just said no.

2      Aon has now been -- Mr. Tauber testified that Aon has now

3  been asked to obtain D&O coverage for the Claimant Trustee,

4  the Litigation Trustee, the Oversight Committee, the members,

5  the Claimant Trust, and the Litigation Sub-Trust.  He

6  testified that he and Aon have approached the insurance

7  carriers that they believe might be interested in underwriting

8  coverage.

9      And no, he hasn't approached every D&O and E&O carrier out

10 there, and there may be, just like an investment banker

11 doesn't have to approach everyone.  They are experts in the

12 field, and he testified they approached the people they

13 thought would likely be willing or interested and potentially

14 be willing to extend coverage.  And as a result of Aon's

15 efforts, Mr. Tauber has determined that there's a continued

16 resistance to provide any coverage that does not contain an

17 exclusion for actions relating to Mr. Dondero or his related

18 entities.  And he further believes that all carriers that will

19 -- that have discussed a willingness to provide coverage will

20 only do so if there is a gatekeeper provision, and only one

21 carrier will agree to provide coverage without a Dondero

22 exclusion.

23      Mr. Tauber testified that he believes that any ultimate

24 policy will provide that if at any time the gatekeeper

25 provision is not in place, either the carrier will not cover

138

1    any actions related to Mr. Dondero or his affiliates or that

2    the coverage will be vacated or voided.

3        Based upon the foregoing record, Your Honor, which is

4    uncontroverted, there's ample justification on a factual basis

5    for approval of the gatekeeper provision.

6        I will now turn to the Court's authority to approve the

7    gatekeeper provision.

8        There are three alternative bases upon which the Court can

9    approve the gatekeeper provision.  First, several provisions

10   of the Bankruptcy Code give broad authority to approve a

11   provision like the gatekeeper provision.

12       Second, the Court can analogize to the Barton Doctrine the

13   facts and circumstances in this case and authorize the Court

14   to act as a gatekeeper to prevent frivolous litigation from

15   being filed against court-appointed officers and directors and

16   those that will lead the post-confirmation monetization of the

17   estate's assets.

18       And third, Your Honor, the Court can find that Mr. Dondero

19   and his entities are vexatious litigants, and use the

20   gatekeeper provision as a sanction to prevent the filing of

21   baseless litigation designed merely to harass those in charge

22   of the estate post-confirmation.

23       So, Bankruptcy Court authority.  Your Honor, there are

24   several provisions in the Bankruptcy Code which we rely on to

25   support the Court's authority.  First, Section 1123(a)(5)

1    permits the plan to approve adequate means of implementation,

2    and contains a long, non-exclusive list.  Mr. Seery's

3    testimony is uncontroverted that a gatekeeper provision is

4    necessary for the adequate implementation of the plan.

5        Second, Your Honor, 1123(b)(6) authorizes a plan to

6    include any appropriate provision in a plan not inconsistent

7    with any other provision in this Code.  There are not any

8    provisions and none have been cited by the Objectors that

9    would prohibit a gatekeeper provision.  Section 1141

10   effectively holds that the terms of a plan bind the debtor and

11   its creditors and vest property in a reorganized debtor, free

12   and clear of the interests of third parties.

13       If nothing else, Your Honor, the spirit of 1141 allows the

14   Court to prevent, in appropriate cases, vexatious litigation

15   by unhappy creditors and parties in interest from torpedoing

16   the plan.

17       1142(b), Your Honor, provides that the confirmation --

18   that, after confirmation, the Court may direct any parties to

19   perform any act necessary for the consummation of the plan,

20   and requiring the party to seek court-approval before filing

21   an action is certainly an act.

22       And lastly, Your Honor, Section 105 allows the Court to

23   enter orders necessary to order other things, enforce orders

24   of the Court like the confirmation order, and prevent an abuse

25   of process which would certainly occur if baseless litigation

140

1  were filed against the parties in charge of the Reorganized

2  Debtor and the trust vehicles entrusted with carrying out the

3  plan.

4      Your Honor, gatekeepers are not a novel concept and have

5  been approved by courts in appropriate circumstances.  In the

6  *Madoff* cases, the Court has been the gatekeeper post-

7  confirmation to determine whether investor claims are

8  derivative or direct claims.

9      In *General Motors*, the Court has been the gatekeeper post-

10  confirmation to determine whether product liability claims are

11  proper claims against the reorganized debtor.

12      Closer to home, Judge Lynn, Mr. Dondero's counsel,

13  approved a gatekeeper provision, arguably even more far-

14  reaching than the provision here, in the *Pilgrim's Pride* case.

15  In that case, Judge Lynn held that *Pacific Lumber* prevented

16  him -- prevented the Court from approving the exculpation

17  provision in the plan.  However, he did hold that it was

18  appropriate for the Court to ensure that debtor

19  representatives are not improperly pursued for their good-

20  faith actions by requiring that any actions against the debtor

21  or its representatives, and further, on the performance of

22  their obligations as debtor-in-possession, be heard

23  exclusively before the Bankruptcy Court.

24      And *Pilgrim's Pride* is not the only case in this district

25  to include a gatekeeper provision, as Judge Houser approved

1   one in the *CHC Group* in 2016, which is cited in our materials.

2        The theme in all these cases, Your Honor, is that there

3   are circumstances where it is necessary and appropriate for

4   the Bankruptcy Court to act as a gatekeeper as a means of

5   reducing litigation that could interfere with a confirmed plan

6   and that a Court has the authority to approve such provisions.

7        The Objectors argue that the Bankruptcy Court does not

8   have jurisdiction to approve that provision.  The Debtor

9   understands the argument as it related to the prior provision,

10  which gave the Court exclusive jurisdiction over any claim it

11  found colorable, and we've amended the plan to address that

12  issue.  The jurisdiction to deal with those claims could be

13  left to a later day.

14       But to the extent the Objectors still pursue the

15  jurisdiction argument in light of the current provision,

16  they're really conflating two very different things:  the

17  ability to determine whether a claim is colorable and the

18  ability to adjudicate that claim if the Court determines it's

19  colorable.

20       None of the authorities cited by the Objectors hold that

21  the Court is without jurisdiction to approve a gatekeeper

22  provision like the one here.  So, rather, what they do is they

23  try to -- they argue, based upon the *Craig's Stores* case,

24  which is narrower than other circuits of post-confirmation

25  jurisdiction in the Bankruptcy Court, and argue that the

142

1  gatekeeper provision doesn't fall within that.  But that --

2  such reliance is misplaced, Your Honor.

3      *Craig* held that the Bankruptcy Court did not have

4  jurisdiction to adjudicate a post-confirmation dispute over a

5  private-label credit card agreement between the debtor and the

6  bank.  In declining to find jurisdiction, the Fifth Circuit

7  remarked that there was no antagonism or claim pending between

8  the parties as of the reorganization and no facts or law

9  deriving from the reorganization or the plan was necessary to

10  the claim asserted by the debtor.

11      However, in so ruling, Your Honor, the Fifth Circuit did

12  reason that post-confirmation jurisdiction in the Bankruptcy

13  Court continues to exist for matters pertaining to

14  implementation and execution of the plan.  Requiring parties

15  to seek Bankruptcy Court determination the claim is colorable

16  before embarking on litigation that will impact

17  indemnification rights and affect distributions to creditors

18  is not an expansion of jurisdiction and fits well within the

19  *Craig* reasoning.

20      Unlike the credit card agreement dispute in *Craig*, Mr.

21  Dondero and his entities have demonstrated tremendous

22  antagonism towards the Debtor.  And while the Debtor's plan

23  may be confirmed, further litigation has been threatened by

24  Mr. Dondero.  It's in the pleadings.  That's one of the

25  reasons Mr. Dondero says his plan is better.  It'll avoid

143

1   tremendous amount of litigation.

2       After *Craig*, the Fifth Circuit again examined the

3   bankruptcy court's post-confirmation jurisdiction in the

4   *Stoneridge* case in 2005.  In that case, the Fifth Circuit

5   ruled that a bankruptcy court has post-confirmation

6   jurisdiction to resolve a dispute between two nondebtors that

7   could trigger indemnification claims against a liquidating

8   trust formed as a result of a confirmed plan.

9       And lastly, as I mentioned Your Honor's decision before,

10  the *TXMS Real Estate* case, I think just a couple of months

11  ago, it stands for the proposition that post-confirmation

12  jurisdiction exists for matters bearing on the implementation,

13  interpretation, and execution of a plan.  In that case, Your

14  Honor ruled that Your Honor had jurisdiction to resolve a

15  post-confirmation dispute between a liquidating trust formed

16  under a plan and a landlord, the result of which could

17  significantly and adversely affect the value of the

18  liquidating trust and monies available for unsecured

19  creditors.

20      And you have heard Mr. Seery testify that litigation will

21  have an adverse effect on the ability to make distributions to

22  creditors.

23      So, Your Honor, under these authorities, the Court

24  undoubtedly would have jurisdiction to act as the gatekeeper

25  for the litigation.

144

1       There's also an independent basis for the gatekeeper

2   provision, Your Honor, the Barton Doctrine, which the Court is

3   very familiar from your opinion in the *In re Ondova* case in

4   2017 and which provides that before a suit may be brought

5   against a trustee, leave of Court is required.  In *Ondova*, the

6   Court reviewed the history of the doctrine in connection with

7   litigation brought by a highly-litigious debtor against a

8   trustee and his professionals.  This Court noted that there

9   are several important policies followed by the doctrine,

10  including a concern for the overall integrity of the

11  bankruptcy process and the threat of trustees being distracted

12  from or intimidated from doing their jobs.  And Your Honor's

13  language still:  For example, losers in the bankruptcy process

14  might turn to other courts to try to become winners there by

15  alleging the trustee did a negligent job.

16      Your Honor, this is precisely what the Debtor is trying to

17  prevent here, Mr. Dondero and his entities from putting the

18  bad experience before Your Honor in this case behind it and

19  going to try to find better luck in a more hospitable court.

20      Your Honor, the Barton Doctrine originally only applied to

21  receivers, and over the course of time has been extended to

22  apply to various court-appointed fiduciaries, as we have cited

23  in our materials:  trustees, debtors-in-possession, officers

24  and directors, employees, and attorneys representing the

25  debtor.

1       And I expect the Objectors to argue that there is a

2   statutory exception to the Barton Doctrine under 28 U.S.C. 959

3   and it does not apply to acts or transactions in carrying out

4   business conducted with a property.  The exception, Your

5   Honor, is very narrow and was meant to apply for things like

6   slip-and-fall cases.  In fact, the Eleventh Circuit in the

7   *Carter v. Rodgers* case, 220 F.3d 1249 in 2000, held that

8   Section 11 -- 28 U.S.C. 959(a) does not apply to suits against

9   trustees for administering or liquidating the bankruptcy

10  estate.

11      The Objectors also argue that the gatekeeper provision

12  violates *Stern v. Marshal*.  However, as the Court acknowledged

13  in *Ondova*, the Fifth Circuit in *Villegas v. Schmidt* has

14  recognized that the Barton Doctrine remains viable post-*Stern*

15  *v. Marshal*.  The Fifth Circuit reasoned that while Barton

16  Doctrine is jurisdictional in that a court does not have

17  jurisdiction of an action if preapproval has not been

18  obtained, it does not implicate the extent of a bankruptcy

19  court's jurisdiction to adjudicate the underlying claim,

20  precisely the distinction we're making here.  The bankruptcy

21  court would be the gatekeeper for deciding whether the claim

22  passes through the gate, and then after will decide if it has

23  jurisdiction to rule on the underlying claim.

24      And this is important especially in a case like this, Your

25  Honor, where Your Honor has had extensive experience with the

146

1   parties and is in the best position to determine whether the

2   claims are valid or attempted to be used as harassment.

3        The Objectors will complain about the open-ended nature of

4   the gatekeeper provision, whether it will or won't apply after

5   the case is closed or a final decree is issued, and the unfair

6   burden of their rights.

7        Your Honor has a previous reported opinion where basically

8   jurisdiction does extend after a case is closed or a final

9   decree is entered, so that issue is a red herring.

10       As Your Honor is well aware, it's a decade-long -- a

11  decade of litigation against the Dondero-controlled entities

12  that caused the Highland bankruptcy.  And the Court is very

13  well aware of the litigation that occurred in *Acis*, very well

14  aware of the litigation that's occurred here that I mentioned

15  a few minutes ago.  Your Honor, it is not over, you'll be

16  presiding over the contempt hearing.

17       And if the Court needs yet another ground to approve the

18  gatekeeper provision, the Debtor submits that the procedure is

19  an appropriate sanction for Dondero's vexatious litigation

20  activities.  We cited the *In re Carroll* case in the Fifth

21  Circuit of 2017 that held that a bankruptcy court has the

22  authority to enjoin a litigant from filing any pleading in any

23  action without the prior authority from the bankruptcy court.

24       And in affirming the decision of the bankruptcy court, the

25  Fifth Circuit commented on the reasons the bankruptcy court

147

1  gave for its ruling.  After recounting the bad faith of

2  appellants, the bankruptcy court determined that the Carrolls'

3  true motives were to harass the trustee and thereby delay the

4  proper administration of the estate, in the hope that they

5  would be able to retain their assets or make pursuit of the

6  assets so unappealing that the trustee would be compelled to

7  settle on terms favorable to appellants.

8      Sounds familiar, Your Honor.  The same can certainly be

9  said about what Mr. Dondero is doing in this case.

10      And to make a showing that a party is vexatious litigant,

11  the Court must find that the party has a history of vexatious

12  and harassing litigation, whether the party has a good faith

13  -- the litigation or has filed it as a means to harass, the

14  burden to the Court and other parties, and the adequacy of

15  alternative sanctions.

16      And as Your Honor is well aware from all the litigation,

17  Your Honor is well, well able to make the finding required for

18  the vexatious litigation finding.

19      But here, we don't ask for the drastic sanction of

20  enjoining from any further filings.  Rather, we just ask for a

21  less-severe sanction, requiring Mr. Dondero and his entities

22  to first make a showing that he has a colorable claim.

23      The Fifth Circuit in *Baum v. Blue Moon*, 2007, did exactly

24  that.  In *Baum*, the district court barred a vexatious litigant

25  from initiating litigation without first obtaining the

148

1   approval of the district court.  Ultimately, the matter

2   reached the Fifth Circuit after the district court had

3   modified the pre-filing injunction to limit it to a certain

4   case, and then broadened it again based upon continued bad

5   faith conduct.

6       On appeal, the Fifth Circuit, citing several prior cases,

7   noted that a district court has the authority to impose a pre-

8   filing injunction to defer vexatious, abusive, and harassing

9   litigation.

10      And for those reasons, Your Honor, the Debtor asks the

11  Court to overrule any objections to the gatekeeper provision.

12      Your Honor, I was just going to then go to the plan

13  modification provisions, but I wanted to stop and see if you

14  had any questions at this point.

15          THE COURT:  I do not.  Let's give him a time

16  estimate, Nate.  About how --

17          THE CLERK:  Twenty.

18          MR. POMERANTZ:  I have another five or six minutes, I

19  think, based upon --

20          THE COURT:  Okay.

21          MR. POMERANTZ:  And then I'll be ready to turn it

22  over to --

23          THE COURT:  Okay.

24          MR. POMERANTZ:  -- to Mr. Kharasch.

25          THE COURT:  All right.  Yes.  You've got -- you've

149

1   done an hour and 33 minutes.  So you have about, I guess, 37

2   minutes left.  Okay.  Go ahead.

3           MR. POMERANTZ:  Thank you, Your Honor.

4       I would like to address the modifications of the plan that

5   were contained in our January 22nd plan and the additional

6   changes filed on February 1, several of which I have referred.

7       As a preliminary matter, Your Honor, under 1127(b), the

8   Debtor can modify a plan at any time prior to confirmation if

9   -- and not require resolicitation if there's no adverse change

10  in the treatment of claim or interest of any equity holder.

11      With that background, I won't go through the changes we

12  made that I've already discussed, but I will point out a

13  couple, Your Honor, that I would like to point out now.  We

14  have modified the plan with respect to conditions of the

15  effective date in Article 8.  First, a condition to the

16  effective date will now be entry of a final order confirming a

17  plan, as opposed just to entry of order.  And final order is

18  defined as the exhaustion of all appeals.

19      In addition, the ability to obtain directors and officers

20  insurance coverage on terms acceptable to the Debtor, the

21  Committee, the Claimant Trustee, the Claimant Trustee

22  Oversight Board, and the Litigation Trustee is now a condition

23  to the effective date.

24      The Court heard testimony today and has experienced

25  firsthand the litigiousness of Mr. Dondero and his related

1  entities.  And the Court heard testimony from Mr. Tauber and

2  Aon that the D&O insurance will not be available post-

3  effective date without assurances that the gatekeeper

4  provision will be in effect for the duration of the policy and

5  any run-off period.

6      Mr. Tauber further testified that he expected the final

7  terms from the insurance carrier to provide that if the

8  confirmation order was reversed on appeal and the gatekeeper

9  was removed, it would void -- it would either void the

10  directors and officers coverage or it'd result in a Dondero

11  exclusion.

12      Mr. Dondero and his entities are no strangers to the

13  appellate process, as Your Honor knows.  They appealed several

14  of your orders, and continue the tack in this case, having

15  appealed the Acis and the HarbourVest orders and the

16  preliminary injunction.  It would not surprise the Debtor if

17  Mr. Dondero and his entities appealed your confirmation order,

18  if Your Honor decides to confirm the plan.

19      The Debtor is confident that it will prevail on any appeal

20  in the confirmation order, as we believe the Debtor has made a

21  compelling case for confirmation.

22      The Debtor also believes a compelling case exists that if

23  the plan went effective without a stay pending appeal, that

24  the appeal would be equitably moot, but we understand we are

25  facing headwinds from the courts, bankruptcy court have

151

1    addressed that issue before.

2         However, given the effect a reversal would have on the

3    availability of insurance coverage, the Claimant Trustee, the

4    Claimant Oversight Committee, and the Litigation Trustee are

5    just not willing to take that risk.

6         We are hopeful that Mr. Dondero and his entities will

7    recognize that any appeal is futile and step aside and let the

8    plan proceed and become effective.

9         If Mr. Dondero and his related entities do appeal the

10   confirmation order, preventing it from becoming final and

11   preventing the effective date from the occurring, the Debtor

12   intends to work closely with the Committee to ratchet down

13   costs substantially and proceed to operate and monetize assets

14   as appropriate until an order becomes final.

15        None of these modifications adversely affect the treatment

16   of claims or interests under the plan, Your Honor, and for

17   those reasons, Your Honor, we request that the Court approve

18   those modifications.

19        And with that, I would like to turn the podium over to Mr.

20   Kharasch to briefly address the remaining CLO objections.

21             THE COURT:  All right.  Mr. Kharasch?

22             CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23             MR. KHARASCH:  Good afternoon, Your Honor.  I'll be

24   as brief as possible.  I know we're under a deadline.

25        As you've heard yesterday, you've heard before in other

152

1   proceedings, Your Honor, the CLO Objecting Parties, the so-
2   called investors, do have rights under the CLO management
3   agreements and indentures, including contractual rights to
4   terminate the management agreements under certain
5   circumstances.

6       What they complain about today, Your Honor, is that the
7   injunction language in the plan, including the language
8   preventing actions to interfere with the implementation and
9   consummation of the plan, is so broad and ambiguous that their
10  rights are or may be improperly impacted, especially any
11  rights to remove the manager for acts of malfeasance.

12      But the Debtor is primarily relying, Your Honor, not so
13  much on the plan injunctions but on the clear provisions of
14  the January 9 order, to which Mr. Dondero consented and which
15  provides that Mr. Dondero shall not cause any of his related
16  entities to terminate any agreements with the Debtor.

17      Yes, that is a broad provision, but it is very clear, and
18  it does not even allow the CLO Objecting Parties to come to
19  court under a gatekeeper-type provision.  But that is what Mr.
20  Dondero consented to on behalf of himself and his related
21  entities.

22      Important to note, Your Honor, we are not here today to
23  litigate who is and who is not a related entity.  That will be
24  left for another day.  However, Your Honor, we have considered
25  these issues, including last night and this morning, and we

153

1    are going to propose -- well, we will modify our plan through

2    a provision in the confirmation order to provide the

3    following:  Notwithstanding anything in the plan or the

4    January 9 order, the CLO Objecting Parties will not be

5    precluded from exercising their contractual or statutory

6    rights in the CLOs based on negligence, malfeasance, or any

7    wrongdoing, but before exercising such rights shall come to

8    this Court to determine whether those rights are colorable and

9    to also determine whether they are a related entity.  If the

10   Court has jurisdiction, the Court can determine the underlying

11   colorable rights or claims.

12       This does not impact the separate settlement we have with

13   CLO Holdco, Your Honor.

14       We think that such modification addresses some of the

15   concerns raised yesterday by the objecting parties by

16   providing more clarity as to what the plan is doing and not

17   doing with respect to the plan and the January 9 order, and we

18   think it is also a fair resolution of some legitimate

19   concerns.

20       So, with that, Your Honor, we think that, with that

21   clarification that we did not have to make but are willing to

22   make, that this should fully satisfy the CLO Objecting Parties

23   with regard to their objections to the injunction and the

24   gatekeeper.

25       Thank you, Your Honor.

154

1          THE COURT:  All right.  Mr. Clemente?

2     CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

3          MR. CLEMENTE:  Yes, Your Honor.  And I actually am

4  going to be brief.  Mr. Pomerantz's discussion, obviously, was

5  very, very thorough, so I'm able to cut out a lot of stuff.

6     Thank you, Your Honor.  Matt Clemente, Sidley Austin, on

7  behalf of the Committee.

8     The plan, Your Honor, meets the confirmation standards and

9  should be confirmed.  Mr. Pomerantz covered a lot of ground,

10  and I will endeavor not to repeat that, but there are a few

11  points that I think the Committee wishes to emphasize.

12     Your Honor, since I first appeared in front of you, I have

13  maintained consistently that no plan can or should be

14  confirmed without the consent of the Committee.  Your Honor,

15  in her wisdom, understood this immediately, as it was obvious

16  -- it was the obvious conclusion, given the makeup of the

17  creditor body, the asset pool, and the impetus for the filing

18  of the case.

19     Unfortunately, not everyone came to this conclusion so

20  easily, and it took much hard-fought negotiations as well as a

21  defeated disclosure statement, among other things, and

22  tireless dedication and commitment by each individual

23  Committee member to drive for a value-maximizing plan that is

24  in the best interests of its constituencies and for us to get

25  to where we are today.

155

1       And where we are today, Your Honor, is at confirmation for

2  a plan that the Committee unanimously supports, which was the

3  inevitable outcome for this case from the very beginning.

4       I've also said, Your Honor, that context is critical in

5  this case.  It has been from the beginning, and it remains so

6  now.  Mr. Draper, interestingly, began his comments yesterday

7  by saying that even a serial killer is entitled to *Miranda*

8  rights.  While I will admit that at times the rhetoric in this

9  case has been heated, I have never certainly likened Mr.

10  Dondero to a serial killer.  But the record shows, and Mr.

11  Dondero's own words and actions show, that he is, in fact, a

12  serial litigator who has no hesitation at all to take any

13  position in an attempt to leverage an outcome that suits his

14  self-interest.  And he has no hesitation at all to use his

15  many tentacles in a similar fashion.

16       That is a very important context in which the Court should

17  view the remaining objections of the Dondero tentacles and

18  weigh confirmation of the Debtor's plan.

19       Against this context of a serial litigator, Your Honor, we

20  have a plan supported by each member of the Official Committee

21  of Unsecured Creditors, accepted by two classes of claims,

22  Class 2 and Class 7, and holders of almost one hundred percent

23  in amount of non-insider claims in Class 8.

24       The parties that have voted against the plan are either

25  employees who are not receiving distributions under the plan

1   or are insiders or parties related to Mr. Dondero.

2       The overwhelming number and amount of creditors who are

3   receiving distributions under this plan, therefore, have

4   accepted the plan.  The true creditors and economic parties in

5   interest have spoken, they have spoken loudly, and they have

6   spoken in favor of confirming the plan.

7       Your Honor, I'm not going to address the technical

8   requirements, as Mr. Pomerantz did that.  So I'm going to skip

9   over my remarks in that regard, except I do want to emphasize

10  the remarks regarding the gatekeeper, exculpation, and

11  injunction provisions as they're of critical importance to the

12  plan.

13      The testimony has shown and the proceedings of this case

14  has shown, again, Mr. Dondero is a serial litigator with a

15  stated goal of causing destruction and delay through

16  litigation.

17      The testimony has further shown that none of the

18  independent board members would have signed onto the role

19  without the gatekeeper and injunction provisions and the

20  indemnity from the Debtor.

21      Therefore, it follows that such provisions are necessary

22  to entice parties to serve in the Claimant Trustee and other

23  roles under the plan, which, as I remarked in my opening

24  comments, are integral to providing the structure that the

25  creditors believe is necessary to unlocking the value and

157

1    unlocking themselves from the Dondero web.

2         Regarding the exculpation and injunction provisions

3    specifically, Your Honor, the Court will recall that the

4    Committee raised objections to them in connection with the

5    first disclosure statement hearing.  In response, the Debtor

6    narrowed the provisions, and the Committee believes they

7    comply with the Fifth Circuit precedent, as Mr. Pomerantz ably

8    walked Your Honor through.

9         And to be clear, Your Honor, not only does the Committee

10   believe the exculpation and injunction provisions comply with

11   Fifth Circuit law, the Committee does not believe the estate

12   is harmed by such provisions, as the Committee does not

13   believe there are any cognizable claims that could or should

14   be raised that would otherwise be affected by the exculpation

15   or injunction, and, frankly, with respect to the release that

16   Mr. Pomerantz walked Your Honor through with respect to the

17   directors and the officers.

18        Regarding the gatekeeper, Your Honor, Your Honor

19   presciently approved it in her January 9th order, and the

20   developments since then only serve as further justification

21   for including it in the plan and confirmation order.  Mr.

22   Dondero is a serial and vexatious litigator, and the

23   instruments put in place under the plan to maximize value for

24   the creditors and to oversee that value-maximizing process

25   must be protected, and the gatekeeper function serves that

158

1    protection while also, importantly, as Mr. Pomerantz pointed

2    out, providing Mr. Dondero with a forum to advance any

3    legitimate claims he and his tentacles may have.

4        In short, Your Honor, the gatekeeper provision is

5    necessary to the implementation to the plan, is fair under the

6    circumstances of the case, and is therefore within this

7    Court's authority, and it is appropriate to approve.

8        Your Honor, in sum, it has been a long road to get here

9    today, but we are finally here.  And we are here, Your Honor,

10   I believe in large part as a result of the tireless efforts of

11   the individual members of my Committee, and for that I thank

12   them.

13       The Committee fully supports and unanimously supports

14   confirmation of the plan.  As demonstrated by the evidence,

15   the plan meets all the requirements of the Bankruptcy Code.

16   The Committee believes the plan is in the best interests of

17   its constituencies.  And therefore the Committee, along with

18   two classes of creditors and the overwhelming amount of

19   creditors in terms of dollars, urge you to confirm the plan.

20       That's all I have, Your Honor, but I'm happy to answer any

21   questions you may have for me.

22           THE COURT:  Okay.  Not at this time.

23       Nate, how much time --

24       (Clerk advises.)

25           THE COURT:  Twenty-five minutes remaining?  All

159

1   right.  Just so you know, you've got a collective Debtor's

2   counsel/Committee's counsel 25 minutes remaining for any

3   rebuttal, if you choose to make it.

4        Let's take a five-minute break, and then we'll hear the

5   Objectors' closing arguments.  Okay.

6             THE CLERK:  All rise.

7        (A recess ensued from 2:00 p.m. until 2:06 p.m.)

8             THE COURT:  All right.  Please be seated.  We're

9   going back on the record in Highland.  We're ready to hear the

10  Objectors' closing arguments.  Who wants to go first?

11            MR. DRAPER:  Your Honor, this -- this is Douglas

12  Draper.  I get the joy of going first.

13            THE COURT:  Okay.

14   CLOSING ARGUMENT ON BEHALF OF THE GET GOOD AND DUGABOY TRUSTS

15            MR. DRAPER:  We've heard a great deal of testimony

16  about the Debtor's belief that the circumstances in this case

17  warrant an exception to existing Fifth Circuit case law, the

18  Bankruptcy Code, and Court's post-confirmation jurisdiction.

19       I would not be standing here today objecting to the plan

20  if the Debtor didn't attempt to extend, move past and beyond

21  the Barton Doctrine, move beyond 1141, move beyond *Pacific*

22  *Lumber*.  In fact, I think I heard an argument that *Pacific*

23  *Lumber* is not applicable and this Court should disregard Fifth

24  Circuit case law.

25       Let's start with the exculpation provision.  And the focus

160

1  of this case has been, and what we've heard over the last few

2  days, is about the independent directors.  I understand there

3  was an order entered earlier, the order stands, and the order

4  is applicable in this case.  It cuts off, however, when we

5  have a Reorganized Debtor, because these independent directors

6  are no longer independent directors.  It cuts off when we have

7  a new general partner.

8      And so the protections that were afforded by that order do

9  not need to be afforded to the new officers and new directors

10 of the new general partner.  And in fact, the protections that

11 they're entitled to are completely different than the

12 protections that were entitled -- that are covered by the

13 order that the Court has looked at.

14     Let's first focus on, however, the exculpation provision.

15 And I wanted to ask the Court to look at the exculpated

16 parties.  Have to be very careful and very interest -- and

17 focus solely on the independent directors.  But if you look at

18 the parties covered by exculpation provision, it includes the

19 professionals retained by the Debtor.  My reading of *Pacific*

20 *Lumber* is that neither the Creditors' Committee counsel nor

21 the Debtor can be covered by an exculpation provision.  This

22 in and of itself makes the plan non-confirmable.  This

23 exculpation provision is unwarranted and unnecessary.

24     Two, --

25         THE COURT:  Well, let's drill down on that.

```
 1              MR. DRAPER:  -- we have --

 2              THE COURT:  Let's drill down on that.  Mr. Pomerantz

 3    says that this wasn't what they considered one way or another

 4    by Pacific Lumber.  Debtor, debtor professionals.  Okay?  Do

 5    you disagree with that?

 6              MR. DRAPER:  I disagree with that.  Pacific Lumber

 7    said you could only have releases and exculpations for the

 8    Creditors' Committee members.  And the rationale behind that

 9    was that those people volunteered to be part and parcel of the

10    bankruptcy process, that those parties did not get paid.

11    Here, we have two professionals who both volunteered and are

12    being paid, and are not entitled to an exculpation under

13    Pacific Lumber.  They're not entitled to a --

14              THE COURT:  Okay.  So you say Pacific --

15              MR. DRAPER:  -- release.  Now, ultimately, they --

16              THE COURT:  -- Pacific Lumber categorically rejected

17    all exculpations except to Creditors' Committee and its

18    members.  That's your --

19              MR. DRAPER:  I agree.  That's --

20              THE COURT:  -- interpretation of Pacific Lumber?

21              MR. DRAPER:  Yes.

22              THE COURT:  Okay.  All right.  So you just absolutely

23    disagree, one by one, with every one of the arguments, that it

24    was really -- the only thing before the Fifth Circuit was plan

25    sponsors, okay?  A plan proponent that I think was like a
```

162

1   competitor previously of the debtor, and I think a large

2   creditor or secured creditor.  I think those were the two plan

3   proponents.

4        So you disagree -- I'm going to, obviously, go back and

5   line-by-line pour through *Pacific Lumber*, but you disagree

6   with Mr. Pomerantz's notion that, look, it was really a page

7   and a half or two of a multipage opinion where the Fifth

8   Circuit said, no, I don't think 524(e) is authority to give

9   exculpation from postpetition liability for negligence as to

10  these two plan sponsors.  And I guess it was also -- I don't

11  know.  They say, Pachulski's briefing says it was really only

12  looking at these two plan sponsors and the Committee and its

13  members on appeal, you know, going through the briefing, and

14  in such, you can see that these were all that was presented

15  and addressed by the Fifth Circuit.  You disagree with that?

16        MR. DRAPER:  Look, I know the facts of *Pacific Lumber*

17  and they -- I know what the posture of the case was.  However,

18  the literal language by the opinion in it, it transcends just

19  a dispute in the case.  And I think the U.S. Trustee's

20  position that this exculpation provision is correct as a

21  matter of law support -- is further evidence of the fact that

22  the U.S. Trustee, as watchdog of this process, and *Pacific*

23  *Lumber* say this cannot be done, period, end of story.

24        THE COURT:  Okay.  So you, at bottom, just totally

25  disagree with Mr. Pomerantz?  You say *Pacific Lumber* is

163

1    actually a very broad holding, and I guess, if such, there's a

2    conflict among the Circuits, right?

3             MR. DRAPER:  Well, that's okay.

4             THE COURT:  So, --

5             MR. DRAPER:  I mean, quite frankly, *Pacific Lumber* is

6    binding on you.

7             THE COURT:  Understood.

8             MR. DRAPER:  There may be a conflict in the Circuits,

9    and ultimately the Supreme Court may make a decision and

10   decide who's right and who's wrong.

11       But for purposes of today and for purposes of this

12   exculpation provision and for purposes of this confirmation,

13   *Pacific Lumber* is the applicable law.

14            THE COURT:  Okay.  Well, again, this is a hugely

15   important issue, although in many ways I don't understand why

16   it is, because we're just talking about postpetition acts and

17   negligence, okay?  You know, many might say it's much ado

18   about nothing, but it's front and center of your objection.

19   So I guess I'm just thinking through, if the Fifth Circuit was

20   presented these exact facts and was presented with the

21   argument, you know, the *Blixseth* case says 524(e) has nothing

22   to do with exculpation because exculpation is a postpetition

23   concept, and it's just talking about standard liability --

24   these people aren't going to be liable for negligence; they

25   can be liable for anything and everything else -- if presented

164

1   with that *Blixseth* case, you know, there are several arguments

2   that Mr. Pomerantz has made why, if you accept that 524(e)

3   might not apply here, let's look at the reasoning, the little

4   bit of reasoning we had of *Pacific Lumber*, that it was really

5   a policy rationale, right?  These independent fiduciaries,

6   strangers to the company and case, they'd never want to do

7   this if they knew they were vulnerable for getting sued for

8   negligence.  Mr. Pomerantz's argument is that these

9   independent board members are exactly analogous to a

10   Committee, more than prepetition officers and directors.  What

11   do you have to say about that policy argument?

12          MR. DRAPER:  Well, I think there's a huge distinction

13   between the members of a Creditors' Committee who are

14   volunteers and are not paid versus a paid independent

15   director.  And more importantly, I think there's a huge

16   difference between a member of a Creditors' Committee who's

17   not paid and counsel for a Debtor and counsel for a Creditors'

18   Committee.

19          THE COURT:  Okay.

20          MR. DRAPER:  Look, you have -- you've --

21          THE COURT:  So, at bottom, it was all about

22   compensation to the Fifth Circuit?

23          MR. DRAPER:  Well, no.  The Fifth Circuit policy

24   decision was we want to protect a party who wants to serve and

25   do their civic duty to serve on a Creditors' Committee for no

165

1   compensation.  I agree with that.  I think it's a laudable

2   policy decision.  I think it makes sense.

3       However, the Fifth Circuit in its language basically said,

4   nobody else gets it.  It didn't say, look, you know, if there

5   are circumstances that are different, we may look at it

6   differently.  The language is absolute in the opinion.  And

7   that's what I think is binding and I think that's what the

8   case stands for.

9       And look, just so the Court is very clear, when Pachulski

10  files its fee application and the Court grants the fee

11  application, any claim against them is res judicata.  So, in

12  fact, they do have -- they do have protection.  They do have

13  the ability to get out from under.  The Court -- they're just

14  not -- they just can't get out from under through an

15  exculpation provision.  And the same goes for Mr. Clemente and

16  his firm.

17              THE COURT:  Which, --

18              MR. DRAPER:  And the same goes for DSI.

19              THE COURT:  Which, by the way, that's one reason I

20  think sometimes this is much ado about nothing.  It goes both

21  ways.  The Debtor professionals, the Committee professionals,

22  estate professionals, they're going to get cleared on the day

23  any fee app is approved, right?  I mean, there's Fifth Circuit

24  law that says --

25              MR. DRAPER:  I -- I --

166

1          THE COURT:  -- says that's res judicata as to any

2    future claims.

3       But I guess I'm really trying to understand, you know, at

4    bottom, I feel like the Fifth Circuit was making a holding

5    based on policy more than any directly applicable Code

6    provision.

7       I mean, it's been said, for example, that Committee

8    members, they're entitled to exculpation because of, what,

9    1103, some people argue, 1103, which subsection, (c)?  That's

10   been quoted as giving, quote, qualified immunity to

11   Committees.  But it doesn't really say that, right?  It's just

12   something you infer.

13          MR. DRAPER:  No.  Look, what I think, if you really

14   want to put the two concepts together, I think what the Fifth

15   Circuit, when they told lawyers and professionals that you

16   can't get an exculpation, was very mindful of the fact that

17   you can get released once your fee app is approved.  So, as a

18   policy, they didn't need to do it in a exculpation provision.

19   There was another methodology in which it could be done.

20          THE COURT:  Uh-huh.

21          MR. DRAPER:  And so that's -- you have to look at it

22   as holistic and not just focus on the exculpation provision.

23   Because, in fact, they recognize and they -- I'm sure they

24   knew their existing case law on res judicata, and that's why

25   they read it out.

167

1       So, honestly, there's no reason for Pachulski to be in

2   here.  There's no reason for Mr. Clemente to be in here.

3   There's no reason for the professionals employed by the Debtor

4   to be in here.  They have an exit not by virtue of the plan.

5           THE COURT:  But so then it boils down to the

6   independent directors and Strand post January 9th?

7           MR. DRAPER:  It boils down somewhat to them, but

8   quite frankly, there are two parts to this.  One is you have

9   an order that's in place.  I am not asking the Court to

10  overturn the order.  And quite frankly, this provision could

11  have been written to the effect that the order that was in

12  place on -- that's been presented to the Court is applicable

13  and applied.

14      However, let's parse that down.  Let's look at Mr. Seery.

15  The order that's in place solely protects the independent

16  directors acting in their capacities as independent directors.

17  If somebody's acting as -- and if you want to liken it to a

18  trustee, their protection is afforded by the Barton Doctrine,

19  and that's how the protection arises.

20      What's going on here is they're extending the provisions,

21  first of all, of the Court's order, and number two, of the

22  Barton Doctrine, which are -- which cannot be -- which should

23  not be extended.  The law limits what protections you have and

24  what protections you don't have.  And we, as lawyers -- look,

25  I'll give you the best example.  Think of all the times you

168

1   had somebody write in the concept of superpriority in a cash
2   collateral order.  And how many times have you had a lawyer
3   rewrite the concept of the issue as to diminution in value?
4   The Code says diminution in value, and quite frankly, a cash
5   collateral order should just say if, to the extent there's
6   diminution in value, just apply the Code section.  It's
7   written there.  Smart people put it in, and Congress approved
8   it.  And once you start getting beyond that, those things
9   should be limited.
10      And what we have are lawyers trying to extend out by
11  definitions things that the Code limits by its reach.  That
12  goes for post-confirmation jurisdiction.  That goes for the
13  injunction.  That goes for the so-called gatekeeper provision.
14      And so, again, I would not be here if, in fact, they had
15  said, we have an injunction to the full extent allowed by the
16  Bankruptcy Code and *Pacific Lumber*.  We have an exculpation
17  provision that's allowed by virtue of the Court's order.  We
18  have the full extent and full reach of the Barton Doctrine.
19  Those are legitimate.  Once you start expanding upon that,
20  you're reaching into matters that are not authorized and not
21  allowed.
22      And then you get into 105 territory, which is always very
23  dangerous.  And that's really what's going on here.  And
24  that's the tenor of my argument and what I'm trying to say.
25  The Code gives protections.  It is not for us to extend the

169

1   protections.  It's not for us to enlarge them, even under a,

2   gee, the other party's litigious.

3       And so that's -- let's take *Craig's Store*.  Attempted to

4   limit its reach.  *Craig's Store* says once you have a confirmed

5   plan, any dispute between the parties, for -- let's take an

6   executory contract.  If there's a breach of the executory

7   contract, that's a matter to be handled aft... by another

8   court.  It's not a matter to be handled by this Court.  This

9   Court lets the parties out.

10      And in this case, it's even worse, because you basically

11  have a new general partner coming in, you have an assumption

12  of various executory contracts, and you have a -- Strand is no

13  longer present.

14      If you adopted Mr. Seery's argument, anybody who appeals a

15  decision, questions what he does or how he does it, is a

16  vexatious litigator.  That's not the case.  And the fact that

17  we are appealing a decision is a right that we have.  It

18  shouldn't be limited, and it shouldn't be held against us.

19  Courts can rule against us.  That's fine.

20      And so that's really what the focus is here and that's why

21  I gave the opening that I had.  We are willing to be bound by

22  applicable law.  And quite frankly, the concept that the

23  exigencies of a case allow a court to change what applicable

24  law is is problematic.  I gave the criminal example as a

25  reason.  And the reason was that, in certain instances, the

170

1    application of law may allow a criminal to go free.  It's a

2    problem with our system and how we work, but that's what the

3    law does, and it is absolute in its application.

4        Let me address the so-called gatekeeper provision.  The

5    gatekeeper provision, in a certain sense, is recognized in the

6    Barton Doctrine.  It's jurisdictional, and it says, to the

7    extent you're going to litigate with somebody who served

8    during the bankruptcy, who was a trustee, then you have to

9    come to the bankruptcy court and pass through a gate.  It

10   doesn't say you have to pass through a gate for a reorganized

11   debtor who does something after a plan is confirmed and going

12   forward.  And so that's -- there's a distinction.

13       And if you look at Judge Summerhays' decision, which I

14   will be happy to send to the Court, in *WRT* involving -- it's

15   kind of (indecipherable) and Mr. Pauker, where, in that case,

16   the trustee, the litigation trustee, spent more litigating

17   than it had in recoveries, and Baker Hughes filed suit.  Judge

18   Summerhays said, look, the Barton Doctrine only applies to a

19   certain extent.  It is limited once you get into post-

20   confirmation matters and related-to jurisdiction.

21       And so, again, the Barton Doctrine is what it stands for.

22   We agree with it, we recognize it, and it should be applied.

23   The Barton Doctrine, however, should not be extended, should

24   not go past its reach, and should not go past the grant of

25   jurisdiction for this Court.

1      And so you have in here, though they have -- they have

2   tried to hide it in a limited fashion, this gatekeeper

3   provision.  The gatekeeper provision, as currently written,

4   covers post-confirmation claims that somebody has to come

5   before this Court to the extent there's a breach of a

6   contract.  That's not proper, and it's not covered by your

7   post-confirmation jurisdiction.  To the extent there's an

8   interpretation of an existing contract and an interpretation

9   of the order, you do have authority, and I don't question

10   that.

11         THE COURT:  But address Mr. Pomerantz's statement

12   that there's a difference between saying you have to go to the

13   bankruptcy court and make an argument, we have a colorable

14   claim that we would like to pursue, and having that

15   jurisdictional step required.  There's a difference between

16   that and the bankruptcy court adjudicating the claim.

17         MR. DRAPER:  Well, there are two parts to that.

18   Number one is there's an injunction in place from an action

19   taken post-confirmation against property of the estate.  We

20   all agree at that, correct?  And we believe that the

21   injunction applies to post-confirmation action against

22   property of the pre-confirmation estate.  We all agree to

23   that.

24      However, if in fact there's a breach of a contract

25   postpetition that the parties have a dispute about, that

172

1   contract is now no longer under your purview once the contract

2   has been assumed.  And so they shouldn't have to make a

3   colorable claim to you that a breach of the contract has

4   occurred.  That should be the determining factor for another

5   court.

6       That's, in essence, what *Craig's Store* says.  Your

7   jurisdiction and the jurisdiction of a bankruptcy court is

8   limited.  It's limited by *Stern vs. Marshall*.  It's limited by

9   your ability to render findings of fact and conclusions of law

10  versus render a final decision.  That decision has been made

11  not by us, it's been made by Congress and it's been made by

12  the United States Constitution.

13          THE COURT:  All right.  And I think we all agree with

14  you regarding the holding of *Craig's Stores* and some of the

15  other post-confirmation bankruptcy subject matter jurisdiction

16  holdings.  But Mr. Pomerantz is arguing that this gatekeeping

17  function is warranted by, among other things, you know, there

18  was a district court holding, *Baum v. Blue Moon*, or a Fifth

19  Circuit case, that upheld a district court having the ability

20  to impose pre-filing injunctions in the context of a vexatious

21  litigator.  So, you know, that's a strong analogy he makes to

22  what's sought here.  What is your response to that?

23          MR. DRAPER:  My response to that is a district court

24  can do that.  A district court has jurisdiction to make that

25  decision.  And quite frankly, a district court can sanction a

173

1   vexatious litigator under Rule 11.

2        So, in fact -- again, you have to bifurcate your power

3   versus the power that a district court has.  And that

4   gatekeeper provision is allowed by a district court because

5   they had authority over the case.  You may not have authority

6   over being the gatekeeper for a post-confirmation matter that

7   you had no jurisdiction over to start with.

8             THE COURT:  Okay.

9             MR. DRAPER:  That, that's the distinction between

10   here.  That's -- what's going on here is they are -- they are

11   mashing together a whole load of concepts under the vexatious

12   litigator and the anti-Dondero function that fundamentally

13   abrogate the distinction between what your jurisdiction is

14   pre-confirmation versus your jurisdiction post-confirmation.

15   And that --

16             THE COURT:  Do you think --

17             MR. DRAPER:  -- is sacrosanct.

18             THE COURT:  Do you think Judge Lynn got it wrong in

19   *Pilgrim's Pride*?  Do you think Judge Houser got it wrong in

20   *CHC*?  Or do you think this situation is different?

21             MR. DRAPER:  There are two parts to that.  I have

22   told Judge Lynn, since I have been working with him, that I

23   think *Pilgrim's Pride* is wrongfully decided.  However, having

24   said that, *Pilgrim's Pride* and those cases dealt with claims

25   against the -- the channeling injunction affected actions

174

1  during the bankruptcy.  It did not serve as a post-
2  jurisdictional grant of jurisdiction to the bankruptcy court.
3  It did not pose as an ability -- as a limitation on a post-
4  confirmation litigator or a post-effective date litigator to
5  address a wrong done to them by an independent director of a
6  general partner.
7      In a sense, Judge Lynn's determination, and Judge Houser,
8  is consistent somewhat with the Barton Doctrine.  Now, do I
9  agree that they're right?  No.  But I understand the decision
10  and I understand the context in which it was rendered and I
11  don't have a huge problem with it.
12      So, again, let's parse what we're trying to do here.
13  Number one, we are -- we have to bifurcate post-confirmation
14  jurisdiction or post-effective date jurisdiction and what you
15  can do as a post-effective date arbiter versus what you could
16  do pre-effective date and pre-effective date claims.  And
17  again, that's the problem with what's written here.  It is
18  designed one hundred percent to expand your post-effective
19  date jurisdiction through both the gatekeeper provision and
20  the jurisdictional grant that's here from your pre-effective
21  date capability, your pre-effective date jurisdiction, and
22  your pre-effective date ability to either curb a claim or not
23  to curb a claim.  And that, that's the issue.
24      And again, let's start talking about the independent
25  directors.  I recognize, again, that there's an order there.

175

1   But if Mr. Seery -- let's take Mr. Seery -- is acting as a

2   director of Strand but is also an accountant for the Debtor

3   and makes a mistake, he would be sued in his capacity as the

4   accountant for the Debtor, not as an independent director of

5   Strand.  That distinction needs to be made.

6       What we are doing here under this plan, and what's been

7   argued by Mr. Pomerantz, is too broad a brush.  It needs to be

8   cut back.  The Court needs to take a very hard look at what's

9   being presented here.

10      And again, the Court's order is very clear.  And this is

11  binding.  I recognize that.  But the protection they got was

12  serving as an independent director.  The protection they

13  didn't get was -- let's take Mr. Seery, if Mr. Seery was

14  serving as an accountant and blew a tax return.  Those are

15  distinctions that warrant analysis and warrant looking at

16  here.  And again, it is too broad a brush that's touted here,

17  and that is why this plan on its face is not confirmable with

18  respect to both the post-confirmation jurisdiction, the

19  gatekeeper provision, the exculpation provisions.

20      And so let me address a few other things, just to address

21  them.  Number one, the argument has been made with respect to

22  the creditors and the resolicitation issue and that creditors

23  could have come in looking, seen, followed the case, and

24  basically calculated and made the same calculation that the

25  Debtor made when they filed this and put forth the new plan

176

1    analysis versus liquidation analysis.  And then they've also
2    made the argument, well, nobody came and complained.  Well,
3    two parts to that.
4        Number one, as you know, a disclosure statement needs to
5    be on its face and should not require a creditor to go back in
6    and monitor the record -- and quite frankly, in this record,
7    there are thousands of pages -- and do the calculation
8    himself.  This was incumbent upon the Debtor to possibly
9    resolicit when these material changes took place.
10       Number two, the recalculation has not been subject to the
11   entire creditor body seeing it.  And anybody who wanted to
12   call them would have had to have seen the document they filed
13   on February 1st and made a telephone call basically
14   contemporaneous with seeing it.
15       Those are two things.  The argument that they didn't call
16   me is just nonsensical.  There's nobody -- you, you are
17   sitting here -- and I've had a number of battles over the
18   years with Judge (indecipherable), who was -- who -- and her
19   view was, I'm here to protect the little guy who's not --
20   didn't hire counsel, who's not represented by Mr. Clemente and
21   his huge clients who have voted in favor of the plan.  It's
22   the little person, *i.e.*, the employees who would vote against
23   a plan that they so -- so desperately tried to get out from
24   under.
25            THE COURT:  Well, --

177

1           MR. DRAPER:  It's really a function --

2           THE COURT:  -- Mr. Pomerantz argues it's not as

3    though there was a materially adverse change in treatment; it

4    was the disbursement estimate.  And doesn't every Chapter 11

5    plan -- most Chapter 11 plans, not every -- they make an

6    estimate.  I mean, and it's, frankly, it's very often a big

7    range of recovery, right, a big range of recovery, because we

8    don't know what the allowed claims are going to compute to at

9    the end of the day.  There's obviously liquidation of assets.

10   We don't know.  Isn't this sort of like every -- not, again,

11   not every other plan, but most other plans -- where there's a

12   big range of possible estimated distributions?  I mean, this

13   wasn't a change in treatment, right?

14          MR. DRAPER:  Well, let me address that.  There are

15   two parts to that.  Most plans I see that contain some sort of

16   analysis have a range.  This one doesn't have a range.  What

17   they've done is they've buried in a footnote or assumption

18   that these numbers may change.  So had they said, look, your

19   recovery can go from 60 cents to 85 cents, God bless, they

20   probably would have been right.

21       Number two, which is more problematic to me, to be honest

22   with you, is the fact that, number one, the operating expenses

23   have increased over a hundred percent.  And number two, the

24   Debtor has made a determination post-disclosure statement and

25   pre-hearing that they're going to change their model of

178

1  business.

2      The original disclosure statement said we're not going to

3  get into the managing CLO part of the business and we're going

4  to let these contracts go.  However, at some point along the

5  way, they made a change.  I don't know to this day, because I

6  was never furnished the backup to the expense side.  I

7  understand what they said why they didn't give me the asset

8  side, but the expense side, they should have given me, and I

9  did ask for.

10      But, you know, what we have now is a more fundamental

11  problem with the execution of the plan and the expectation

12  that creditors -- what they're going to get, because, in fact,

13  the expense items have doubled.

14      I think creditors were entitled to know that, rather than

15  it having been sprung upon everybody, when I got it the day

16  before a deposition.  And so those are things that I think

17  warranted a change in solicitation.  Now, the result may have

18  been the same.  I don't know.  More people may have voted

19  against the plan.  More people may have opted in from Class 8

20  to Class 7, I mean, based upon that information.  That

21  information was not provided to them.

22      And so I look at two -- three things.  One is a range

23  could have been given, and they probably would have been a

24  whole lot better off.  Two, you have a material change in

25  expenses.  And three, you have a material change in business

179

1   model.  Three things that occurred between November and this

2   confirmation hearing.  Three things that were not known by the

3   creditor body and not told to them.

4           THE COURT:  Mr. Draper, I --

5           MR. DRAPER:  Now, it may have been told --

6           THE COURT:  I don't want to belabor this any more

7   than I think we need to, but I've got a Creditors' Committee

8   with very sophisticated professionals, very sophisticated

9   members.  They're fiduciaries to this constituency.  You know,

10  you mentioned the little guy.  I'm not quite sure who is the

11  little guy in this case.  I think it's a case of all big guys.

12  But, I mean, they're fine with what's happened here.

13  Meanwhile, you -- I mean, clarify your standing here for

14  Dugaboy and Get Good.  I mean, --

15          MR. DRAPER:  I have --

16          THE COURT:  -- I know you have standing.  Mr.

17  Pomerantz did not say you don't have standing.  But in

18  pointing out the economic interests here, I think he said your

19  clients only have asserted a postpetition administrative

20  expense.  Is that correct?

21          MR. DRAPER:  No.  I have a post -- I have an -- I

22  have a claim that's been objected to.  I don't think my

23  economic --

24          THE COURT:  A claim of what amount?

25          MR. DRAPER:  I think it's $10 million.  But Mr.

1   Pomerantz is right, it requires a looking through the --

2   through the entity that I had a loan relationship with.

3       I recognize all of those things.  I don't think that's

4   relevant to whether my argument is correct or incorrect.  I

5   have standing to do it.  I don't think whether my claim is 50

6   cents or $50 million should change the Court's view of whether

7   the claim is good or bad.

8           THE COURT:  Well, I do want to understand, though.

9   Okay.  So you have not asserted an administrative expense,

10  correct?

11          MR. DRAPER:  No.  There's been an administrative

12  expense that's been asserted, --

13          THE COURT:  For what?

14          MR. DRAPER:  -- but that --

15          THE COURT:  For what?

16          MR. DRAPER:  I don't have the number in front of me,

17  Your Honor.  I don't -- I don't have those numbers --

18          THE COURT:  Okay.  Well, then, --

19          MR. DRAPER:  -- in front of me.  I have asserted --

20          THE COURT:  -- what is the concept?  What is the

21  basis for it?

22          MR. DRAPER:  It deals with -- Mr. Pomerantz is

23  absolutely right as to how he's articulated it.

24          THE COURT:  I can't remember what he said.

25          MR. DRAPER:  It deals with -- it deals with a

1   transaction that's unrelated to the Debtor that deals with

2   Multi-Strat.  I agree with that.

3          THE COURT:  Okay.  So I remember him saying piercing

4   the corporate veil.  Your trusts -- both of them, one of them,

5   I don't know -- engaged in a transaction with Multi-Strat that

6   you say --

7          MR. DRAPER:  No, that --

8          THE COURT:  -- gave -- okay.  Well, you say Multi-

9   Strat is liable and the Debtor is also liable?

10          MR. DRAPER:  No.  Let me make two things.  The

11   administrative claim deals with a Multi-Strat transaction that

12   took place during the bankruptcy.  My unsecured claim deals

13   with a transaction that took place prior to the bankruptcy,

14   where we lent money to another entity that then funneled money

15   out into the Debtor.  We're -- our contention is that the

16   Debtor is liable for that loan.

17          THE COURT:  All right.  So both the administrative

18   expense as well as the prepetition claim require veil-piercing

19   to establish liability of the Debtor?

20          MR. DRAPER:  Or single business enterprise.  I don't

21   necessarily have to veil-pierce.

22          THE COURT:  Okay.  I'm not even sure that single

23   business enterprise is completely available anymore in Texas,

24   by the Texas legislature doing different things, assuming

25   Texas law applies.  I don't know, maybe Delaware does.  But I

182

1    -- sorry.  Just let me let that sink in a little bit.  You're

2    -- okay.  Okay.  Let me let it --

3            MR. DRAPER:  Your Honor, I --

4            THE COURT:  -- sink in a little bit.

5            MR. DRAPER:  Okay.

6            THE COURT:  These trusts -- of which Mr. Dondero is

7    the beneficiary ultimately, right?

8            MR. DRAPER:  Yes.  Well, and to --

9            THE COURT:  So, your --

10           MR. DRAPER:  Again, I have not gone up --

11           THE COURT:  The beneficiary of your client --

12           MR. DRAPER:  Mr. Dondero is --

13           THE COURT:  The beneficiary of your client is

14   ultimately hoping to succeed on the administrative expense and

15   the claim on the basis that you should disregard the

16   separateness of Highland and these other entities?

17           MR. DRAPER:  Well, let's take the --

18           THE COURT:  When he's resisted that --

19           MR. DRAPER:  -- unsecured claim.  The --

20           THE COURT:  -- in multiple pieces of litigation?

21   Right?  I'm sorry.  I'm just trying to let this sink in.

22   Okay.  If you could elaborate.  I'm sorry.  I'm talking too

23   much.  You answer me.

24           MR. DRAPER:  Okay.  What we are saying is that, in

25   essence, the party we lent the money to was a conduit for the

183

1  Debtor.

2          THE COURT:  Okay.  And who was that entity that

3  either --

4          MR. DRAPER:  Highland Select.

5          THE COURT:  -- Dugaboy or Get Good lent money to?

6          MR. DRAPER:  The Get Good claim is completely

7  different.  The Get Good claim is written as a tax claim.

8  Honestly, I haven't taken a hard look at it.  I will, once we

9  get through this, and it may be withdrawn.  The Dugaboy claim

10 is a claim that arises through a conduit loan.

11         THE COURT:  Okay.  But to which entity?

12         MR. DRAPER:  Highland Select.

13         THE COURT:  Okay.  All right.  Well, continue with

14 your argument.  I'll get my flow chart out and --

15         MR. DRAPER:  Well, let me -- again, I think I've made

16 the points that I needed to make.  I think I've done it in a

17 sense that you -- what I think the Court needs to do is take a

18 very hard look at the jurisdictional extension that's being

19 granted here.  I think the exculpation provision, in and of

20 itself, just by the mere inclusion of Pachulski and the

21 Debtor's professionals and the Committee professionals, is

22 just unconfirmable.  It has to be stricken.

23     And I think the injunction and the juris... the gatekeeper

24 provision are not allowed by applicable law.  If this plan

25 merely said, we will enforce the Barton Doctrine, we will

184

1   abide -- and this order the Court has entered stands, the

2   injunction that's provided and the rights that we have under

3   1141 stand, nobody would be objecting.  That's why the U.S.

4   Trustee has objected, because of the expansive nature of what

5   the -- what's been done in this plan.

6        And with that, I'll turn it over to Mr. Taylor or Davor.

7             THE COURT:  All right.  Who's next?

8             MR. RUKAVINA:  Your Honor, Davor Rukavina.  Can you

9   hear me?

10            THE COURT:  I can.

11     CLOSING ARGUMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12            MR. RUKAVINA:  Your Honor, thank you.  I'll try not

13  to repeat the arguments from Mr. Draper, but I do want to

14  point out a couple bigger-picture issues, I think.

15       One, the issue today is not Mr. Dondero, what he has been

16  alleged to have done, what he is alleged to do in the future.

17  The Debtor has gone out of its way to create the impression

18  that we're all tentacles, we're vexatious litigants, we're

19  frivolous litigants.  The issue today is whether this plan is

20  confirmable under 1129(a) and 1129(b).  And I think that that

21  has to be the focus.

22       Nor is the issue, I think, today any motivation behind my

23  objection or Mr. Draper's or anything else.

24       And I do take issue that my motivation or my client's

25  motivation has some ulterior motive for a competing plan or

185

1  burning down the house or anything like that.  It's very, very

2  simple.  My clients do not want $140 million of their money

3  and their investors' money, to whom they owe fiduciary duties,

4  to be managed by a liquidating debtor under new management

5  without proper staffing and with an obvious conflict of

6  interest in the form of Mr. Seery wearing two hats.

7      I respect very much that Mr. Seery wants to monetize

8  estate assets for the benefit of the estate creditors.  That's

9  his job.  That's incompatible with his job under the Advisers

10  Act and, as he said, to maximize value to my clients and over

11  a billion dollars of investments in these CLOs.

12      That should not be, Your Honor, a controversial

13  proposition.  I should not be described as a tentacle or

14  vexatious because my clients don't want their money managed by

15  someone that they, in effect, did not contract with.  I may be

16  -- I may lose that argument.  The CLOs have obviously

17  consented to the assumption.  But my argument should not be

18  controversial.  It should not be painted with a broad brush of

19  somehow being done in bad faith by Mr. Dondero.

20      And in fact, Mr. Seery has admitted that the Debtor and he

21  are fiduciaries to us.  The fact that today they call us

22  things like tentacles and serial litigants and vexatious

23  litigants -- we all know what a vexatious litigant is.  We've

24  all dealt with those.  The fact that our fiduciary would call

25  us that just reconfirms that it should have no business

186

1  managing our or other people's money.

2      And then for what?  Mr. Seery has basically said that the

3  Debtor will make some $8.5 million in revenue from these

4  contracts, net out $4 million of expenses.  That's net profit

5  of $4.5 million.  But then they have to pay $3.5 million for

6  D&O insurance and $525,000 in cure claims.  But it's the

7  Debtor's business decision, not ours.

8      Your Honor, the second issue is the cram-down of Class 8.

9  There are two problems here:  the disparate treatment between

10  Class 7 and Class 8, which also raises classification, and

11  then the absolute priority rule.  Class 7 is a convenience

12  class claim -- is a convenience claim, Your Honor, with a $1

13  million threshold.  Objectively, that is not for

14  administrative convenience, as the Code allows.  And the only

15  evidence as to how that million dollars was arrived at was,

16  oh, it was a negotiation of the Committee.

17      There is no evidence justifying administrative

18  convenience.  Therefore, there is no evidence justifying

19  separate classification.  And on cram-down, the treatment has

20  to be fair and equitable, which *per se* it is not if there is

21  unfair discrimination.  And there is unfair discrimination,

22  because Class 8 will be paid less.

23      On the absolute priority rule, Your Honor, I think that

24  it's very simple.  I think that the Code is very clear that

25  equity cannot retain anything -- I'm sorry, equity cannot

187

1   retain any property or be given any property.  Property is the

2   key word in 1129(b), not value.  It doesn't matter that this

3   property may not have any value, although Mr. Seery said that

4   it might.  What matters is whether these unvested contingent

5   interests in the trust are property.  And Your Honor, they are

6   property.  They have to be property.  They are trust

7   interests.

8       So the absolute priority rule is violated on its face.

9   There is no evidence that unsecured creditors in Class 8 will

10  receive hundred-cent dollars.  The only evidence is that

11  they'll receive 71 cents.  Mr. Seery said there's a potential

12  upside from litigation.  He never quantified that upside.  And

13  there is zero evidence that Class 8 creditors are likely to be

14  paid hundred-cent dollars.  So, again, you have the absolute

15  priority rule issue.

16      And this construct where, okay, well, equity won't be in

17  the money unless everyone higher above is paid in full, that

18  is just a way to try to get around the dictate of the absolute

19  priority rule.  If that logic flies, then the next time I have

20  a hotel client or a Chapter 11 debtor-in-possession client

21  where my equity wants to retain ownership, I'll just create

22  something like, well, here's a trust, creditors own the trust,

23  I won't distribute any money to equity, and equity can just

24  stay in control.

25      The point again is that this is property and it's being

188

1   received on account of prepetition equity.

2       And there's also the control issue.  The absolute priority

3   rule, the Supreme Court is clear that control of the post-

4   confirmation equity is also subject to the absolute priority

5   rule.  Here you have the same prepetition management

6   postpetition controlling the Debtor and the assets.

7       Your Honor, the Rule 2015.3 issue, someone's going to say

8   that it's trivial.  Someone's going to accuse me of pulling

9   out nothing to make something.  Your Honor, it's not trivial.

10  That's part of the problem in this case, that this Debtor owns

11  other entities that own assets, and there's been precious

12  little window given into that during the case, during this

13  confirmation hearing, and in the disclosure statement.

14      Rule 2015.3 is mandatory.  It's a shall.  I respect very

15  much Mr. Seery's explanation that there was a lot going on

16  with the COVID and with everything and that it just fell

17  through the cracks.  That's an honest explanation.  But the

18  Rule has not been complied with.  And 1107(a) requires that

19  the debtor-in-possession comply with a trustee's duties under

20  704(a)(8).  Those duties include filing reports required by

21  the Rules.

22      So we have an 1129(a)(3) problem, Your Honor, because this

23  plan proponent has not complied with Chapter 11 and Title 11.

24  I'll leave it at that, because I suspect, again, someone will

25  accuse me of being trivial on that.  It is not trivial.  It is

189

1    a very important rule.

2        On the releases and exculpations, Your Honor, I'm not

3    going to try -- I'm not going to hopefully repeat Mr. Draper.

4    But there's a couple of huge things here with this exculpation

5    that takes it outside of any possible universe of *Pacific*

6    *Lumber*.

7        First, you have a nondebtor entity that is being

8    exculpated.  I understand the proposition that, during a

9    bankruptcy case, the professionals of a bankruptcy case might

10   be afforded some protection.  I understand that proposition.

11   But here you have Strand and its board that's a nondebtor.

12       The other thing you have that takes this outside of any

13   plausible case law is that the Debtor is exculpated from

14   business decisions, including post-confirmation.  I understand

15   that professionals in a case make decisions, and

16   professionals, at the end of the case, especially if the Court

17   is making findings about a plan's good faith, that

18   professionals making decisions on how to administer an estate

19   ought to have some protection.

20       That does not hold true for whether a debtor and its

21   professionals should have protection for how they manage their

22   business.  GM cannot be exculpated for having manufactured a

23   defective product and sold it during its bankruptcy case.

24       Here, I asked Mr. Seery whether this language in these

25   provisions, talking about whether the administration of the

190

1    estate and the implementation of the plan includes the

2    Debtor's management of those contracts and funds.  He said

3    yes.  He said yes.  So if you look at the exculpation

4    provision, it is not limited in time.  It affects, Your Honor,

5    I'm quoting, it affects the implementation of the plan.

6    That's going forward.

7         So you are exculpating the Debtor and its professionals

8    from business decisions, including post-confirmation, from

9    negligence.  Well, isn't negligence the number one protection

10   that people that have invested a billion dollars with the

11   Debtor have?  It's cold comfort to hear, well, you can come

12   after us for gross negligence or theft.  I get that.  What

13   about negligence?  Isn't that what professionals do?  Isn't

14   that why professionals have insurance, liability insurance?

15   It's called professional negligence for malpractice.

16        So this exculpation, let there be no mistake -- I heard

17   Your Honor's view and discussion -- this is a different

18   universe, both in space and in time.

19        And we don't have to worry about *Pacific Lumber* too much

20   because we have the *Dropbox* opinion in *Thru, Inc.*  We have

21   that opinion.  Whether it's sound law or not, I don't wear the

22   robe.  But the exculpation provision in that case was

23   virtually identical.  And Your Honor, that's a 2018 U.S. Dist.

24   LEXIS 179769.  In that opinion, Judge Fish -- I don't think

25   anyone could say that Judge Fish was not a very experienced

191

1    district court judge -- Judge Fish found that the exculpation

2    violated Fifth Circuit precedent.  That exculpation covered

3    the debtor's attorneys, the debtor, the very people that Mr.

4    Pomerantz is now saying, well, maybe the Fifth Circuit would

5    allow an exculpation for.

6          THE COURT:  Well, I think he is relying heavily on

7    the analogy of independent directors to Creditors' Committee

8    members, saying that's a different animal, if you will, than

9    prepetition officers and directors.  And he thinks, given the

10   little bit of policy analysis put out there by the Fifth

11   Circuit, they might agree that that's analogous and worthy of

12   an exculpation.

13         MR. RUKAVINA:  And they might.  And they might.  And

14   again, I usually do debtor cases.  You know that.  I'd love to

15   be exculpated.

16         THE COURT:  But --

17         MR. RUKAVINA:  And I think, again, I do -- I do --

18         THE COURT:  -- I really want people to give me their

19   best argument of why, you know, that's just flat wrong.  And

20   Mr. Draper just said it's, you know, there's a categorical --

21         MR. RUKAVINA:  Yeah.

22         THE COURT:  -- rejection of exculpations except for

23   Committee members and Committee in *Pacific Lumber*.  And I'm

24   scratching my head on that one.  And partly the reason I am,

25   while 524(e) was thrown out there, the fact is there's nothing

192

1   explicitly in the Bankruptcy Code, right, that explicitly

2   permits exculpation to a Committee or Committee members.

3   There's just sort of this notion, you know, allegedly embodied

4   in 1103(c), or maybe there are cases you want to cite to me,

5   that they're fiduciaries, they're voluntary fiduciaries, they

6   ought to have qualified immunity.

7       And again, I see it as more of a policy rationale the

8   Fifth Circuit gave than pointing to a certain statute.  So if

9   it's really a policy rationale, then I think the analogy given

10   here to a newly-appointed independent board is pretty darn

11   good.

12      So tell me why I'm all wrong, why Mr. Pomerantz is all

13   wrong.

14          MR. RUKAVINA:  I am not going to tell you that you're

15   all wrong.  I'm not going to tell Mr. Pomerantz that he's all

16   wrong.  Although I am, I guess, a Dondero tentacle, I am not a

17   Mr. Draper tentacle, and I happen to disagree with him.

18   That's my right.  I respect the man very much.  I thought he

19   did a very honorable and ethical job explaining his position

20   to Your Honor.  I believe that the Fifth Circuit would approve

21   exculpations for postpetition pre-confirmation matters taken

22   by estate fiduciaries.  I do believe that they would.  And I

23   do believe that that should be the case.

24      But again, I'm telling you that this one is different.

25   It's -- Mr. Pomerantz is misdirecting you.  The estate

193

1   professionals manage the estate.  The Debtor manages its

2   business.  It goes out into the world and it manages business.

3   And as Your Honor knows, under that 1969 Supreme Court case,

4   of course I blanked, and under 28 U.S. 959, a debtor must

5   comply, when it's out there, with all applicable law.

6        So if the Debtor -- and I'm making this up, okay?  I am

7   making this up.  I'm not alleging anything.  But if the

8   Debtor, through actionable neglect, lost $500 million of its

9   clients' or its investor clients' money, I'm telling you that

10  under no theory can that be exculpated, and I'm telling you

11  that that's what this provision does.

12       The estate and the Debtor can release their claims.  It

13  happens all the time.  Whatever -- whatever claims the estate

14  may have against professionals, those can be released.  It's a

15  9019.  I'm not complaining about that.  Although I do think

16  that it's premature in this case, because we don't know

17  whether there's any liability for the $100 million that Mr.

18  Seery told you Mr. Dondero lost.  But in no event can business

19  -- business --

20            THE COURT:  I don't understand what you just said.

21            MR. RUKAVINA:  Your Honor, I --

22            THE COURT:  Mr. Dondero is not released --

23            MR. RUKAVINA:  -- went through Mr. Seery's --

24            THE COURT:  -- by the estate.

25            MR. RUKAVINA:  I understand.  I understand.  But we

194

1   all have to also understand that a board of directors and

2   officers can be liable, breaches of fiduciary duty by not

3   properly managing an employee.  So I'm not suggesting -- I

4   mean, I know that there's been an examiner motion filed.  I'm

5   not suggesting that we have a mini-trial.  I'm not suggesting

6   there's actionable conduct.  What I'm telling you is that the

7   evidence shows that there's a large postpetition loss.  And

8   it's premature to prevent third parties that might have claims

9   from bringing those.

10      And then I think -- I'm not sure that Your Honor

11   understood my point.  Let me try to make it again.  This

12   exculpation is not limited in time.  This exculpation is

13   expressly not limited in time and applies to the

14   administration of the plan post-confirmation.  I don't think

15   under any theory would the Fifth Circuit or any court at the

16   appellate level allow an exculpation for purely post-

17   reorganization post-bankruptcy matters.  I have nothing more

18   to tell Your Honor on exculpation.

19          THE COURT:  Well, again, I -- perhaps I go down some

20   roads I really don't need to go down here, but I'm not sure I

21   read it the way you did.  I thought we were just talking about

22   pre -- postpetition, pre-confirmation.  Or pre-effective date.

23          MR. RUKAVINA:  Your Honor, Page --

24          THE COURT:  The --

25          MR. RUKAVINA:  Page 48 of the plan, Section C,

195

1   Exculpation.  Romanette (iv).  The implementation of the plan.

2   And I -- and that's -- that's part of why I asked Mr. Seery

3   that yesterday.  Does the implementation of the plan, in his

4   understanding, include the Reorganized Debtor's management and

5   wind-down of the Funds, and he said yes.

6          THE COURT:  Okay.

7          MR. RUKAVINA:  So that's right there in black and

8   white.

9     It also includes the administration of the Chapter 11

10  case.  If that is defined broadly, as Mr. Seery wants it to

11  be, to define business decisions, then that also exceeds any

12  permissible exculpation.

13    So, again, I'm telling Your Honor, with due respect to you

14  and to Mr. Pomerantz, that the focus of Your Honor's

15  questioning is wrong.  The focus of Your Honor's questioning

16  should be on exculpation from what?  From business -- *i.e.*, GM

17  manufacturing and selling the car -- or from management of the

18  bankruptcy case?  Management of the bankruptcy case?  Okay.

19  Postpetition pre-confirmation managing business, never okay.

20    Your Honor, on the channeling -- and let me add, I think

21  it's very clear, there is no Barton Doctrine here.  This is

22  not a Chapter 11 trustee.  The Barton Doctrine does not

23  extend to debtors-in-possession.  And I can cite you to a

24  recent case, *In re Zaman*, 2020 Bankr. LEXIS 2361, that

25  confirms that the Barton Doctrine does not apply to a debtor-

196

1   in-possession.

2        I want to --

3                THE COURT:  Remind me of that --

4                MR. RUKAVINA:  -- discuss, Your Honor, the --

5                THE COURT:  Remind me of the facts of that case.  I

6   feel like I read it, but -- or saw it in the advance sheets,

7   maybe.

8                MR. RUKAVINA:  I honestly do not recall.  I read it a

9   few days ago, and since then, I hope Your Honor can

10  appreciate, I've been up very late trying to negotiate

11  something good in this case.

12               THE COURT:  I'd like to know --

13               MR. RUKAVINA:  So, I mean, I have the case in front

14  of me.

15               THE COURT:  I'd like to know about a holding that

16  says Barton Doctrine can't be applied in a Chapter 11 post-

17  confirmation context, if that's --

18               MR. RUKAVINA:  Well, I have it --

19               THE COURT:  -- indeed the holding.

20               MR. RUKAVINA:  I have it right in front of me here,

21  Your Honor, and I can certainly -- all I know is that this

22  case held that -- it rejected the notion that the Barton

23  Doctrine applies to a debtor-in-possession.

24               THE COURT:  Okay.

25               MR. RUKAVINA:  And maybe --

1          THE COURT:  That --

2          MR. RUKAVINA:  There it is, right there.

3          THE COURT:  What judge?

4          MR. RUKAVINA:  Your Honor, it is the Southern

5     District of Florida, and it is the Honorable -- Your Honor, it

6     is the Honorable Mindy Mora.

7          THE COURT:  Okay.

8          MR. RUKAVINA:  M-O-R-A.

9          THE COURT:  Okay.

10         MR. RUKAVINA:  I have not had the pleasure of being

11    in front of that judge.

12         Your Honor, let me discuss the channeling injunction.

13    This is the big one for me.  This is the big one.  And I think

14    we have to begin -- and it's the big one, as I'll get to,

15    because Your Honor knows that the CLO management agreements

16    give my clients certain rights, and this injunction would

17    prevent those rights from being exercised post-confirmation.

18    It's not dissimilar from the PI hearing that we're in the

19    middle of in an adversary.

20         But I begin my analysis, again, with 28 U.S.C. 959.  Your

21    Honor, that -- the first sentence of that statute makes it

22    very clear that when it comes to carrying on a business, a

23    debtor-in-possession may be sued without leave of the court

24    appointing them.

25         So the first thing that this channel -- gatekeeper,

198

1    channeling, I don't mean to miscall it -- the first thing that

2    this gatekeeping injunction does is it stands directly

3    opposite to 28 U.S.C. 959.

4        28 U.S.C. 959 also says that jury rights must be

5    preserved.  As I'll argue in a moment, this injunction also

6    affects those rights.

7        In addition to 959, we have the fundamental issue of post-

8    confirmation jurisdiction.  As Mr. Draper said, here, this

9    channeling injunction applies to post-confirmation matters.

10   Similar to my answer to you on exculpation, I can see there

11   being a place for a channeling injunction during the pendency

12   of a case or for claims that might have arisen during the

13   pendency of a case.  I cannot see that, and I don't know of

14   any court that, at least at a circuit level, that would agree

15   that this can apply post-confirmation.

16       It is, again, the equivalent of GM manufacturing a car

17   post-confirmation and having to go to bankruptcy court because

18   someone's wanting to sue it for product negligence or

19   liability.  It's unthinkable.  The reason why a debtor exits

20   bankruptcy is to go back out into the community.  It's no

21   longer under the protection of the bankruptcy court.  That's

22   what the media calls Chapter 11, it calls it the protection of

23   the court.  There's no such protection post-reorganization.

24   So, --

25               THE COURT:  Is that really analogous, Mr. Rukavina?

199

1   Let's get real.  Is this really analogous --

2            MR. RUKAVINA:  It is.

3            THE COURT:  -- to GM --

4            MR. RUKAVINA:  It is.

5            THE COURT:  -- manufacturing thousands of cars?

6            MR. RUKAVINA:  It absolutely is analogous.  Because

7   this Debtor is going to assume these contracts and it is going

8   to go out there and it is going to make daily decisions

9   affecting a billion dollars of other people's money.  Each of

10  those decisions hopefully will be done correctly and make

11  everyone a lot of money, but each of those decisions is the

12  potential for claims and causes of action.

13     So it is analogous, Your Honor.  They want my clients and

14  others to come to you for purely post-confirmation matters.

15  The Court will not have that jurisdiction.  There will be no

16  bankruptcy estate, nor can the Court's limited jurisdiction to

17  ensure the implementation of the plan go to and affect a post-

18  confirmation business decision.

19     That's the distinction.  The Debtor's post-confirmation

20  business is not the implementation of a plan.  As Mr. Draper

21  said, there's a new entity.  There's a new general partner.

22  There's a new structure.  Go out there and do business,

23  Debtor.  That's what they're telling you.  They're telling you

24  this is not a liquidation because they're going to be in

25  business.  Okay.  Well, the consequence of that is that

1   there's no post-confirmation jurisdiction.

2      Now, Mr. Pomerantz says, and I think you asked Mr. Draper,

3   well, the jurisdiction to adjudicate whether something is

4   colorable is different from the jurisdiction to adjudicate the

5   underlying matter.  Your Honor, I don't understand that

6   argument, and I don't see a distinction.  If the Court has no

7   jurisdiction to decide the underlying matter, then how can the

8   Court have any jurisdiction to pass on any aspect of that

9   underlying matter?

10      And whether something is colorable is a fundamental issue

11   in every matter.  That's the thing that courts look at in a

12   12(b)(6), in a Rule 11 issue, in a 1927 issue.  So they're

13   going to come -- or someone is going to have to come to Your

14   Honor and present evidence and law that something is

15   colorable.  Let's say that we've said there's a breach of

16   contract.  Aren't we going to have to show you, here's the

17   contract, here's the language, here's the facts giving rise to

18   the breach, here's the elements?  And Your Honor is going to

19   have to pass on that.  And if Your Honor decides that

20   something is not colorable, then there ain't no step two.

21      And if Your Honor decides that something is colorable,

22   then isn't that going to be binding on the future proceeding?

23   And if it's going to be binding on the future proceeding, then

24   of course you're exercising jurisdiction to adjudicate an

25   aspect of that lawsuit.

201

1      I don't think that that -- I don't know I can be clearer

2   than that, Your Honor, unless the Debtor has some other

3   understanding of what a colorable claim or cause of action is

4   that I'm misunderstanding.

5      And Your Honor, I would ask, when Your Honor is in

6   chambers, to look at one of these CLO management agreements.

7   I'm sure Your Honor has already.  I just pulled one out of the

8   Debtor's exhibits, Exhibit J as in Jason.  And Section 14, 14

9   talks about termination for cause.  Most of these contracts

10  are for cause.  So, Your Honor, cause includes willfully

11  breaching the agreement or violating the law, cause includes

12  fraud, cause includes a criminal matter, such as indictment.

13     So let's imagine, Your Honor, that I come to you a year

14  from now and I say, I would like to terminate this agreement

15  because I don't want the Debtor managing my $140 million

16  because of one of these causes.  What am I going to argue to

17  Your Honor?  I'm going to argue to Your Honor that those

18  causes exist.  And Your Honor is going to have to pass on

19  that.

20     And if Your Honor says they don't exist, again, I'm done.

21  I just got an effective final ruling from a federal judge that

22  my claim is without merit.  I'm done.  Your Honor has decided

23  the matter effectively, legally, and finally.

24     That's why, when Mr. Pomerantz says that the jurisdiction

25  to adjudicate the colorableness of a claim is different from

202

 1   adjudicating that claim, it's not correct.  They're part of

 2   the same thing, Your Honor.

 3        We strenuously object to that injunction, we think it's

 4   unprecedented, and we strenuously object to that injunction

 5   because we are not Mr. Dondero.

 6        I understand the January 9th order.  I'll let Mr.

 7   Dondero's counsel talk about why that was never intended to be

 8   a perpetual order.  I'll let Mr. Dondero's counsel argue as to

 9   why the extension of that order *ad infinitum* in the plan is

10   illegal.

11        But even if Mr. Dondero is enjoined in perpetuity from

12   causing the related parties to terminate these agreements,

13   Your Honor, the related parties themselves are not subject to

14   that injunction.  That's why you have the preliminary

15   injunction proceeding impending in front of you on ridiculous

16   allegations of tortious interference.

17        So whether the Court enjoins Mr. Dondero or not in

18   perpetuity is a separate matter.  The question is, as you've

19   heard, at least my retail clients, they have boards.  Those

20   boards are the final decision-makers.  Mr. Dondero is not on

21   those boards.

22        In other words, it is wrong to conclude *a priori* that

23   anything that my clients do has to be at the direction of Mr.

24   Dondero.  There is no evidence of that.  The evidence is to

25   the contrary.

203

1       Yes, a couple of my clients, the Advisors are controlled

2   by Mr. Dondero.  Mr. Norris testified to that.  You'll not

3   find Mr. Norris anywhere testifying in that transcript that

4   Your Honor allowed into evidence that the funds, my retail

5   fund clients are controlled by Mr. Dondero.  You won't find

6   that evidence.  There was no evidence yesterday or today that

7   Mr. Dondero controls those retail funds.  The only evidence is

8   that they have independent boards.

9       So I ask the Court to see that it's a little bit of a

10  sleight of hand by the Debtor.  If I am to be enjoined or if I

11  am to have to come to Your Honor in the future as a vexatious

12  litigant or a tentacle or a frivolous litigant, whatever else

13  I've been called today, then let it be because of something

14  that I've done or failed to do, something that my client has

15  done to warrant such a serious remedy, not something that Mr.

16  Dondero is alleged to have done.

17      And what have my clients done, Your Honor?  What have we

18  done to be called vexatious litigants and serial litigants?

19  We've done nothing in this case, pretty much, until December

20  16th, when we filed a motion that was a poor motion,

21  unfortunately, the Court found it to be frivolous, and the

22  Court read us the riot act.

23      We refused, on December 22nd, we, my clients' employees,

24  to execute two trades that Mr. Dondero wanted us to execute.

25  We had no obligation to execute them.  We knew nothing about

204

1    them.  And Mr. Seery -- I'm sorry.  Not Mr. Dondero, that Mr.

2    Seery wanted to execute.  And Mr. Seery closed those

3    transactions that same day.  And then a professional lawyer at

4    K&L Gates, a seasoned bankruptcy lawyer, sent three letters to

5    a seasoned professional lawyer at Pachulski, and the letters

6    were basically ignored.

7         Okay.  Those are the things that we've done.  Other than

8    that, we've defended ourselves against a TRO, we've defended

9    ourselves against a preliminary injunction, we will continue

10   to defend ourselves against a preliminary injunction, and we

11   defend ourselves against this plan because it takes away our

12   rights.  Is that vexatious litigation?  Is that, other than

13   the frivolous motion, is that frivolous litigation?

14        And we heard you loud and clear when you read us the riot

15   act on December 16th.  And I will challenge any of these

16   colleagues here today to point me to something that we have

17   filed since then that is in any way, shape, or form arguably

18   meritless.

19        So where is the evidence that my retail funds are

20   tentacles or vexatious litigants or anything else?  There is

21   no evidence, Your Honor, and the Debtor is doing its best to

22   give you smoke and mirrors to just make that mental jump from

23   Mr. Dondero to my clients, effectively an alter ego, without a

24   trial on alter ego.

25        Once these contracts are assumed, the Debtor must live

205

 1   with their consequences.  It's as simple as that.  Your Honor

 2   has so held.  Your Honor has so held forcefully in the *Texas*

 3   *Ballpark* case.  And the Court, I submit respectfully, cannot

 4   excise by an injunction a provision of a contract.

 5        Also, this injunction will -- is a permanent injunction.

 6   We know from *Zale* and other cases the Fifth Circuit does

 7   permit certain limited plan injunctions that are temporary in

 8   hundred-cent plans.  This is a permanent one.  It doesn't even

 9   pretend to be a temporary one.

10        It's also a permanent one because the Debtor knows and I

11   think the Debtor is banking on me being unable to get relief

12   in the Fifth Circuit before Mr. Seery is finished liquidating

13   these CLOs.

14        So what we are talking about today is effectively excising

15   valuable and important negotiated provisions of these

16   contracts, provisions that, although my clients are not

17   counterparties to these contracts, you've heard from at least

18   three of them we do control the requisite vote, the voting

19   percentages, to cause a termination, to remove the Debtor, or

20   to seek to enforce the Debtor's obligations under those

21   contracts.

22        And again, Your Honor, it's very simple.  Where those

23   contracts require cause, there either is cause or is not

24   cause.  If there is not cause, the Debtor has its remedies.

25   If there is cause, I'll have my remedies.  But it's not for

206

1  this Court post-confirmation to be making that determination.

2  That's not my decision.  That's Congress's decision.

3     So, Your Honor, for those reasons, we object, and we

4  continue to object, and we'd ask that the Court not confirm

5  this plan because it is patently unconfirmable.  Or if the

6  Court does confirm the plan, that it excise those provisions

7  of the releases, exculpations, and injunction that I just

8  mentioned as being not in line with the Fifth Circuit or

9  Supreme Court precedent.

10    Thank you.

11         THE COURT:  All right.  Can I -- I meant to ask Mr.

12  Draper this.  Can we all agree that we do not have third-party

13  releases *per se* in this plan?  Can we all agree on that?

14         MR. DRAPER:  I don't know.  I have to look at that.

15  I think what you have are exculpations and channeling

16  injunctions for third parties who have not paid for those

17  channeling injunctions or those exculpations.

18         THE COURT:  All right.

19         MR. RUKAVINA:  Your Honor, was that question -- was

20  that question solely to Mr. Draper?

21         THE COURT:  Well, no, it was to all of you.  I

22  thought we could all agree that we don't have third party

23  releases *per se*.  Okay.  There was --

24         MR. RUKAVINA:  Your Honor, we --

25         THE COURT:  -- a little bit of glossing over that in

207

 1    some of the briefing, I can't remember whose.  But we have

 2    Debtor releases, we have --

 3              MR. RUKAVINA:  Yes.

 4              THE COURT:  -- exculpations that deal with

 5    postpetition negligence only, we have injunctions, which I

 6    guess the Debtor would say merely serve to implement the plan

 7    provisions and are commonplace, but Mr. Draper would say maybe

 8    are tantamount to third-party releases.  Is that --

 9              MR. RUKAVINA:  Your Honor, I don't think --

10              THE COURT:  -- where we are?

11              MR. RUKAVINA:  -- there's any question -- I don't

12    think there's any question that the exculpation is a third-

13    party release, and that that's also what Judge Fish held in

14    the *Dropbox* case.  It says that none of the exculpated parties

15    shall have any liability on any claim.  So, --

16              THE COURT:  All right.

17              MR. RUKAVINA:  -- that necessarily --

18              THE COURT:  I get what you're saying, but I just

19    think, in common bankruptcy lingo, most people regard a third-

20    party release as when third parties are releasing -- third

21    parties meaning, for example, creditors, interest holders --

22    are releasing officers and directors and other third parties

23    for anything and everything.

24        Exculpation, I get it, it's worded in a passive voice, but

25    it is third parties releasing third parties, but for a narrow

1   thing, postpetition conduct that is negligent.  Okay.  So I

2   think -- while there's technically something like a third-

3   party release there, it's not in bankruptcy lingo what we call

4   a third-party release.  It's an exculpation means no liability

5   of the exculpated parties for postpetition conduct that's

6   negligent.  So I -- anyway, I think we all agree that, I mean,

7   can we all agree there aren't any *per se* third-party releases

8   as that term is typically used in bankruptcy parlance?

9         MR. RUKAVINA:   I apologize, Your Honor, and I'm not

10   trying to try your patience, but I cannot agree to that.

11   Whatever claims my client, a nondebtor, has against Strand, a

12   nondebtor, are gone.  Whether it's a release or exculpations,

13   they're gone.  So I apologize, I cannot agree to that, Your

14   Honor.

15         MR. DRAPER:  Your Honor, this is Douglas Draper.  I

16   can't agree, either.  I think it's definitional.  And quite

17   frankly, I think I'm looking at the functional effect of

18   what's here, and they appear to be third-party releases.

19         THE COURT:  Okay.  All right.  Who is making the

20   argument for Mr. Dondero?

21         MR. TAYLOR:  Your Honor, Clay Taylor appearing on

22   behalf of Mr. Dondero.

23         THE COURT:  Okay.

24       CLOSING ARGUMENT ON BEHALF OF JAMES D. DONDERO

25         MR. TAYLOR:  Your Honor, first of all, as this Court

209

1  is well aware, this Court sits, as a bankruptcy court, as a

2  court of equity.  It has many different tools available to it.

3  One of those, of course, is denying confirmation of this plan

4  because of the laws that we have discussed today and that we

5  believe the evidence has shown, and I won't go into those.  Of

6  course, of course, Your Honor could confirm that plan.  Yet

7  another tool available to this Court is it can take it under

8  advisement.

9      To the extent that this Court decides to confirm this plan

10  and decides to confirm it today, it certainly takes a lot of

11  options off the table for all parties.  There are ongoing

12  discussions, I'm not going to go into any of the particulars

13  of those discussions, but a ruling on confirmation today would

14  effectively end that, because, absent, then, an order vacating

15  confirmation, there's a lot of eggs that can't become

16  unscrambled after a confirmation order is entered.

17      So we would respectfully ask that, to the extent that the

18  Court is even considering confirmation, we don't believe it to

19  be appropriate, but at least take it under advisement for 30

20  days, or at least, in the very alternative, that it announce

21  some date which it is going to give a ruling, so that we kind

22  of know when that is going to come down, to see if any

23  positive ongoing discussions can result in more of a global

24  resolution that all parties can agree upon.

25      Addressing more the merits of the case, Your Honor, Mr.

210

1   Dondero does indeed object to the nondebtor releases, the
2   exculpations, the injunction.  I believe those have been
3   covered rather extensively in the prior argument, so I wasn't
4   going to go into those here because they've been addressed.
5   Of course, I will endeavor to answer any questions that Your
6   Honor may have on those.
7        I will say I think Your Honor asked for everybody's best
8   shot as to why this is different for a Committee member versus
9   the independent trustees here.  I will say my best shot is,
10  first of all, *Pacific Lumber* says what it says.  I believe Mr.
11  Pomerantz has indicated their position that that language is
12  dicta and therefore not binding upon this Court.  I
13  respectfully disagree with that.  But to the extent, more
14  directly answering Your Honor's question, to me, the
15  difference is clear.  Chapter 7 trustees are a creature of
16  statute.  So are Chapter 11 trustees.  And -- as are members
17  of a Committee that are seated pursuant to the Bankruptcy
18  Code.  Those are all creatures of statute.  And the
19  independent board of trustees, while there are certainly --
20  there are some analogies that can be made, undoubtedly, but
21  they are not a creature of statute.  There is no provision for
22  them under the Bankruptcy Code.  And therefore I don't believe
23  that they should and can receive the same protections under
24  *Pacific Lumber*.
25       And so hopefully that -- that is my best shot at

1   answering, directly answering the question that Your Honor

2   posed.

3           THE COURT:  Okay.

4           MR. DRAPER:  Mr. Dondero also has issue with the

5   overbroad continuing jurisdiction of this Court.  I believe

6   Mr. Rukavina has stated that rather succinctly, too.  Merely

7   ruling upon whatever claim is colorable or not certainly has

8   definite impacts.  If this Court has jurisdiction to do that

9   when it otherwise wouldn't have jurisdiction, it enacts an

10  expansion, a potentially impermissible expansion of this

11  Court's jurisdiction.  And for that reason, the plan should --

12  confirmation should be denied.

13      Getting into the particulars of 1129, Your Honor, there is

14  problems under 1129(a)(2).  Those are the solicitation

15  problems.  Let's just kind of look at what the evidence

16  showed.  On November 28th, there was a disclosure statement,

17  it was published to all creditors, and it said, under this

18  plan, you're going to get 87 cents.  It wasn't a range.  Now,

19  there was some assumptions that went in there, but they said,

20  under a liquidation of all these assets, you're going to get

21  62 cents.

22      The Debtors came back approximately two months later, on

23  January 28th, and said, oh, wait, we missed the boat here, and

24  actually, under the plan, you're going to get 61 cents.  And

25  under a liquidation, though, you'd only get 48.

212

1        Well, the problem is, already, two months later, they've

2    already told you they missed the boat on what the liquidation

3    analysis was just two months ago.  And two months ago, they

4    told you under a liquidation you'd get 62 cents, and now we're

5    telling you you're going to get less.  That's at least some

6    very good evidence that the best interests of the creditors

7    isn't being met, and potentially a liquidation is much better.

8        They then came back, potentially maybe realizing that

9    problem, also because some new information came in with the

10   employees, and also with UBS, which adjusted the overall

11   general unsecured claims pool, and said, well, under the plan

12   you're going to get 71 cents, and under a liquidation you're

13   going to get 55 cents.

14       In between those iterations from November to February,

15   they found $67 million more in assets.  So Mr. Seery testified

16   he believed some of that's as to market increases in values,

17   and some (garbling) investment, market -- securities.  And

18   some were just in these private equity investments.

19       There are indeed some rollups behind all of these numbers.

20   I do understand why they wouldn't want to make some of these

21   numbers public, because they might not be able to get --

22   create the upside for any particular asset class that they're

23   seeking to monetize.

24       However, we and others, including Mr. Draper, asked for

25   those rollups to be provided, and we certainly could have

213

1    taken those under seal or a confidentiality agreement, could

2    have also put those before this Court under seal and the

3    Debtor could have put those rollups before this Court under

4    seal.  It elected not to do so.

5        So, rather, what you have is the naked assumptions of this

6    is what we think we can monetize the assets, or we're not

7    going to tell you what it is, but trust me, Creditors, and

8    cool, we found $67 million worth of value in the past two

9    months, so therefore we're going to beat the liquidation

10   analysis that we previously told you just two months ago.

11       They also acknowledge that, in those two months, that

12   there was going to be about $26 million in increased costs

13   from their November analysis to their February analysis.  And

14   they included that in their projections.

15       Finally, they acknowledged, in those two months, that we

16   had previously estimated -- and they even have it in their

17   assumptions in November liquidation and plan analysis -- that

18   UBS, HarbourVest, and I believe it was Acis, were all going to

19   be valued at zero dollars, and that's what the claims were

20   going to be.  Well, they kind of missed the boat on those, and

21   they missed it by a lot.  They -- it increased all the claims

22   in the pool from $195 million to $273 million, or sorry, I

23   don't -- look at that again, but it was an increase of $95

24   million.  I'm sorry, 190 -- the claims pool increased from

25   $194 million to -- I'm sorry, Your Honor, I have too many

214

1    papers in front of me -- on November, the claims pool was 176

2    and it increased by February 1st to 273.  Therefore,

3    approximately $95, almost $100 million worth of claims that

4    they weren't anticipating that actually came in.

5        That tells you about the quality of the assumptions that

6    went into the analysis to begin with.  They missed it by 50

7    percent on what the overall claims pool was going to be.

8    That's significant.  It's material.

9        There is a lot of other assumptions that could go into

10   this document, and one of those assumptions are how much are

11   we going to be able to monetize these assets for?  One other

12   assumption is, well, how much is it going to cost during the

13   two-year life of this wind-down?  Another assumption is going

14   to be, are we actually going to be able to wind down in two

15   years?  Because if we're not, well, guess what, all those

16   costs are going to go up.  Another assumption is, well, how

17   much are those fee claims going to be over the two-year

18   period?  Again, if it goes over two years, they're going to be

19   significantly higher.  Moreover, you might have just missed

20   what the burn rate is.

21       So I think it's rather telling that the assumptions made

22   of -- all the way back of over two -- of only two months ago

23   were off by $100 million, and therefore it skewed all of the

24   plan-versus-liquidation analysis all over the board.

25       That's the only evidence that the Debtor has put forth as

215

1    to why it's in the best interest of the creditors.  And quite

2    frankly, we don't believe they have met their burden.  And it

3    is their burden to prove to Your Honor that the plan is better

4    than what a Chapter 7 trustee will -- can do.

5        What the evidence does show, as far as what the plan would

6    do as compared to a hypothetical Chapter 7 trustee, is that we

7    know for sure that the Claimant Trust base fee, just over the

8    two years, is going to be $3.6 million.

9        (Interruption.)

10            MR. TAYLOR:  I'm sorry.

11            THE COURT:  Someone needs to put their device on

12   mute.  I don't know who that was.

13            MR. TAYLOR:  Oh, I'm sorry.  I thought you said

14   something, Your Honor.

15            THE COURT:  No.

16            MR. TAYLOR:  So what we do know is the Claimant

17   Trustee base fee is going to be $3.6 million.  What we don't

18   know and what was not put into evidence because they are still

19   negotiating it is there's going to be a bonus fee on top of

20   that that's going to be paid to Mr. Seery.  Is that $2

21   million?  Is that $4 million?  Is that $10 million?  Well, we

22   don't know.  We can't perform that analysis as compared to

23   what a hypothetical Chapter 7 trustee could be.  Nor can Your

24   Honor, based upon the evidence presented.

25        And quite frankly, I don't see how one could ever conclude

216

1  -- and there are some other unknowns that we're about to go

2  over, including the Litigation Trust base fee and there are

3  collection fees, contingency fees.  Those are also to be

4  negotiated.  To be negotiated and unknown.  You can't perform

5  the analysis.  The Debtor couldn't perform the analysis

6  because those are to be negotiated, so you can't tell whether

7  a Chapter -- hypothetical Chapter 7 trustee might come out

8  better because he's not going to incur all these costs.  We

9  know that they're going to incur D&O costs.

10         THE COURT:  Let me interject right now.

11         MR. TAYLOR:  Sure.

12         THE COURT:  Again, I'm going to go back to

13  understanding who your client is arguing for.  Okay?  Again,

14  as we've said before, Mr. Pomerantz did not technically say no

15  standing, but he thought it was important to point out the

16  economic interests that our Objectors either have or don't

17  have.  Okay?

18     So I'm looking through my notes to see exactly what the

19  Dondero economic interest is.  I have something written in my

20  notes, but I'm going to let you tell me.  Tell me what his

21  economic interests are with regard to this Debtor, this

22  reorganization.

23         MR. TAYLOR:  Your Honor, I believe he has been placed

24  into Class 9, Subordinated Claims.  So to the extent that

25  there is recovery available to Class 9, he can recover on

217

1    those claims.

2              THE COURT:  But what proof of claim --

3              MR. TAYLOR:  We also have --

4              THE COURT:  What proof of claim does he have pending

5    at this juncture?

6              MR. TAYLOR:  Your Honor, I would have to go back and

7    look.  I don't have the proofs of claim register in front of

8    me.  And I'm sorry, if I tried to speculate, I would be doing

9    a disservice to my client and this Court by trying to

10   speculate.  I did not prepare those proofs of claim.  People

11   in my firm did.  But I would be merely speculating if I tried

12   to give you an answer off the spot.  And I apologize.  I'm

13   happy to submit a post-confirmation hearing letter --

14             THE COURT:  No, no, no.

15             MR. TAYLOR:  -- as to that.

16             THE COURT:  I'm not going to allow one more piece of

17   paper in connection with confirmation.  I thought you would be

18   able to answer that.

19             MR. TAYLOR:  I'm sorry.  I just don't want to lie to

20   Your Honor.

21             THE COURT:  What about his -- what would be an

22   indirect equity interest?

23             MR. TAYLOR:  Well, again, there are a lot of people

24   that know this org chart a lot better than me.  This is me

25   going on hearsay myself.  But I understand he also owns a lot

218

1  of indirect interests in subsidiaries, some of which are

2  majority, some of which are minority, and some of which he

3  owns maybe directly, some of which through other entities.  So

4  the way in which these assets could be monetized at the sub-

5  debtor level could certainly impact his economic rights and

6  could impact him greatly.  For instance, if the --

7          THE COURT:  I really wanted an exact answer.

8          MR. TAYLOR:  Mr. Seery --

9          THE COURT:  I really wanted an exact answer, not just

10  he has an indirect interest in, you know, some of the 2,000 --

11  I'm not going to say tentacles, but --

12      I'm going to interrupt briefly, because I really want to

13  nail down the answer as best I can.  Mr. Pomerantz, can you

14  just remind me of what your answer was or statement was

15  regarding Mr. Dondero, individually, his economic stake in all

16  this?

17          MR. POMERANTZ:  He has an indemnification claim

18  that's been objected to, --

19          THE COURT:  That's the one and only --

20          MR. POMERANTZ:  -- although it's not before --

21          THE COURT:  That's the one and only pending proof of

22  claim, right?

23          MR. POMERANTZ:  That's my understanding.  And while

24  it's not before the Court, we could all imagine whether Mr.

25  Dondero's going to be entitled to indemnification.

219

1     He has an interest in Strand, which is the general

2     partner.

3              THE COURT:  Right.

4              MR. POMERANTZ:  And Strand owns a quarter-percent --

5     a quarter of one percent of the equity.  I believe that is all

6     of Mr. Dondero's economic interest in the Debtor.

7              THE COURT:  Okay.  So, again, I'm just trying to, you

8     know, understand who he's looking out for, for lack of a

9     better way of saying it, Mr. Taylor, in making these

10    arguments.

11             MR. TAYLOR:  So, there is also, and this is -- I'm

12    not involved in what are these going to be filed collection

13    suits, or some of which have been filed, some of which have

14    not been filed, none of which I believe the answer date has

15    been -- has passed or come to be yet.

16             But he is also a defendant in collection suits on these

17    notes, as you are undoubtedly aware.

18             THE COURT:  Okay.  He's a defendant in adversary

19    proceedings.  Okay?  That makes him a party in interest to --

20    well, I keep -- that makes him have standing to make an

21    1129(a)(7) argument?  That's why I'm going down this trail.

22    Because you've spent the last five minutes talking about, you

23    know, creditors could do better in a Chapter 7 liquidation.

24    I'm not sure he has standing to make that argument, so I'm

25    wanting you to address that squarely.

1          MR. TAYLOR:  Your Honor, I believe he has economic

2  interests up and down the capital structure.  And I cannot

3  describe to you, without wildly speculating and potentially

4  lying to this Court, which I'm not going to do, without some

5  time to have looked at that, because I was -- I was not

6  involved in the proofs of claim and I am not his accountant.

7  So I could not do that without wildly speculating, so I just

8  -- I would like to more directly answer your question, Your

9  Honor.  I am not trying to avoid the question.  But I can't

10  honestly answer your question with true facts as we sit here

11  right now.

12          THE COURT:  All right.  But do you agree or disagree

13  with me that only parties -- the only parties that really can

14  make an 1129(a)(7) argument are holders of claims or interests

15  in impaired classes?

16          MR. TAYLOR:  Your Honor, I believe that Mr. Dondero

17  has standing to do so by virtue of claims for indemnification

18  --

19          THE COURT:  Okay.

20          MR. TAYLOR:  -- if these -- if these -- if this

21  Debtor (indecipherable) able to meet its obligations to

22  indemnify him.  And some of those are significant claims that

23  are being brought against him that could total millions, if

24  not tens of millions of dollars, just in defense costs alone,

25  that I do believe give some standing.

221

1          THE COURT:  Okay.  So, assuming you're right, you

2     think the evidence does not show this is better than a Chapter

3     7 liquidation where we would have a stranger trustee come in

4     and just, yeah, I guess, cold-turkey liquidate it all.

5          MR. TAYLOR:  Your Honor, I do believe that the

6     evidence shows that the Debtor hasn't met its burden as to

7     this.  A Chapter 7 trustee doesn't necessarily have to

8     liquidate immediately.  It can run these -- these assets.  I

9     mean, Mr. Seery is going to do it with ten people.  At one

10    time, just two months ago, he said he was going to do it with

11    three people.  A Chapter 7 trustee could certainly have a

12    limited runway, or even an extended runway, if it so asked for

13    it, to liquate these Debtors.

14         Moreover, there would be at least the requirements that

15    the Chapter 7 trustee would request the sale, tell creditors

16    about it.  And, as many courts have said, the competitive

17    bidding process is the best way to make sure that you ensure

18    the highest and best offer that you can get.

19         Mr. Seery has not committed to providing notice of sales

20    to creditors and other parties in interest, potentially

21    bringing them in as bidders.  They -- he could name a stalking

22    horse, but he has not indicated any desire to do so.  A

23    Chapter 7 trustee would endeavor to do so.

24         So I do believe that there are some advantages.  And

25    you've heard no testimony that they've performed any analysis

222

1    or conducted any interviews with any Chapter 7 trustees as to

2    whether or not this was possible or not.  They just made the

3    naked assumption that they would do work based upon what they

4    said was their experience.  And Mr. Seery's deposition, when

5    it was taken and noticed as a 30(b)(6) deposition, and I

6    believe it has been entered into evidence here, he said the

7    last time he dealt with a Chapter 7 trustee was 11 or 13 years

8    ago, and it was the *Lehman* case, and that was the -- a SIPC

9    trustee.  So --

10            THE COURT:  Well, --

11            MR. TAYLOR:  -- that's the last time he had any

12   experience with it.

13            THE COURT:  -- again, I don't mean to belabor this

14   point, just like I didn't mean to belabor a few others.  But,

15   you know, there is a mechanism, yes, in Chapter 7, Section

16   704, for a trustee to seek court authority to operate a

17   business.  But it's not a statute that contemplates long-term

18   operation.  Okay?  It's just, oh, we've got a little bit of --

19   you know, we have some assets here that really require a

20   short-term operation here.

21       If it's long-term, then you convert to Chapter 11.  Okay?

22   It's just a temporary tool, Section 704.  Right?  Would you

23   agree with me?

24            MR. TAYLOR:  That's typically how it has been used.

25            THE COURT:  Okay.

223

```
 1          MR. TAYLOR:  But that's not to say that it's limited
 2   in time by the statute itself.  It doesn't say that it can't
 3   go for one year or two years.  That can be a short wind-down
 4   period.
 5          THE COURT:  But hasn't your client's argument been
 6   this past several weeks that Mr. Seery is moving too fast,
 7   he's wanting to sell things and he needs to hold them longer?
 8   I mean, these two argument seem inconsistent to me.
 9          MR. TAYLOR:  So, just because a Chapter 7 trustee has
10   been appointed doesn't mean that he has to sell them any
11   faster than Mr. Seery.
12      I think what the -- the problem with the process that has
13   been going on with Mr. Seery, my client's problem with it, is
14   not necessarily the timing but the process that Mr. Seery is
15   going through with these sales.  Provide notice, allow more
16   bidders to come in, make sure that he's getting the highest
17   and best price.  And if that happens to be Mr. Dondero who
18   offers the highest and best price, great.  And if Mr. Dondero
19   gets outbid by somebody, well, that's all the more better for
20   the estate.
21          THE COURT:  Okay.  Continue your argument.
22          MR. TAYLOR:  I believe we covered a lot of it, Your
23   Honor, and the plan analysis is all based upon their
24   assumptions that there's $257 million worth of value.  Again,
25   there's no rollup provided as to how that asset allocation is
```

224

1    broken out, but they consist of a couple of items.

2        First, there's the notes; and second, there's the assets.

3    The notes are either long-term or demand notes.  Those long-

4    term notes, Mr. Seery will tell you some have been validly

5    accelerated and therefore are now due and payable.  I think

6    there's arguments to the contrary.  But those long-term notes

7    probably have some both time value of money and collection

8    costs.  And then, of course, you have to discount them by

9    collectability issues, too.

10       I don't believe any analysis went into it, or at least the

11   Court was not provided any data or analysis as to what

12   discounts were applied to those notes.  And, therefore, I

13   don't think that this Court can make any determination that

14   the best interests of the creditors have been met.

15       As far as the assets that are to be monetized, again,

16   there's two sub-buckets of those assets.  There's securities

17   that are to be sold.  Some of those are semi-public securities

18   that have markets.  Those are somewhat more readily

19   ascertained.  The others are holdings in private equity

20   companies, and sometimes holdings in companies that own other

21   companies.

22       There's no evidence of the value -- empirical evidence of

23   the value of those companies, nor of the assumptions that went

24   into as to when they should be sold, how much they'd be sold

25   for.

225

1      Again, I do realize the sensitive nature of such

2   information, but that could have been placed under seal.  And

3   without that information, I don't believe that the Court can

4   conduct the due diligence it's necessary to say the best

5   interest of the creditors have been met.

6      To sum up, Your Honor -- oh, I'm sorry.  One other point

7   that I did want to talk about before I summed up is, you know,

8   Mr. Pomerantz and I were listening to a different record or I

9   was totally confused as to the testimony that was put forth

10  regarding the directors and officers.  I believe the testimony

11  in the record is extremely clear that the Debtor made no

12  effort to go out and find out if it could obtain directors and

13  officers insurance without a gatekeeping injunction or a

14  channeling injunction, whatever you want to call it.  I

15  believe that his testimony was extremely clear.  He didn't

16  shop it.  He doesn't know.  And that's what the record is

17  before this Court.

18     To the extent that the Debtor wants to rely upon we can't

19  get Debtor -- or, directors and officers insurance because

20  without this gatekeeping function we just can't get it, I

21  believe the record just wholly does not support that.  The

22  testimony was at least extremely clear, as how I heard it.

23  Your Honor will have to review the record herself, but I don't

24  believe that there was much argument about it.

25     I'm sure -- as I stated in the beginning, Your Honor, this

226

1   is a court of equity.  It could deny confirmation, as I

2   believe Your Honor should, based upon the flaws in the plan.

3       If Your Honor finds that the plan as written is

4   impermissible because of any of the exculpation or the

5   gatekeeping functions that they're asking, the testimony is

6   equally clear that the independent directors would not serve

7   in -- as officers of the Reorganized Debtor.  Any plan that is

8   put forth by the Debtor has to tell the people who are going

9   to be officers going forward.  And with that naked testimony

10  before the Court, that it's simply not feasible, and I don't

11  think it is one of the possible -- where the Court can come

12  back and say, well, I can't confirm this plan as written, but

13  if you change it and rewrite it to get rid of the certain

14  offensive parts of the exculpation or the gatekeeping

15  functions, then we can confirm this plan.  And I think the

16  evidence before this Court is it's not feasible because none

17  of the directors will serve in that capacity, and therefore

18  this plan should be dead on arrival if Your Honor agrees the

19  proposed provisions do not meet *Pacific Lumber*.

20      We would ask the Court to deny confirmation, but in the

21  alternative, to at least take this under advisement.  Give us

22  a time frame -- we'd ask for 30 days -- but give us a time

23  frame of when the Court is going to rule, to allow the

24  positive conversations to move forward.

25      To that end, Your Honor, there is, indeed, a hearing on

227

1   the extension of a temporary injunction and contempt that is

2   scheduled for Friday.  I understand that the parties, at least

3   the joint parties, will not -- will agree to, I'm sorry, will

4   agree to the extension of the temporary injunction until such

5   time as the Court can rule on confirmation.  I do see that

6   there could be a lot of harm done at the Friday hearing.  We

7   would ask that the Court additionally continue that hearing on

8   that motion and on the injunction, and contempt, until such

9   time as confirmation has been ruled upon.  It will be both

10  efficient and allow discussions to continue regarding

11  potential global resolution.

12       And so that is the end of my argument, Your Honor.

13          THE COURT:  All right.  Thank you.  All right.  Mr.

14  Pomerantz, do you have any rebuttal?

15       REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

16          MR. POMERANTZ:  Yes, I do, Your Honor.  I want to

17  address a couple of comments that Mr. Taylor made towards the

18  end.  First of all -- and, actually, the beginning.

19       We think Your Honor should rule on confirmation.  Ruling

20  on confirmation and having an entered confirmation order are

21  two separate things.  We understand that a new offer was made.

22  Whether that's acceptable to the Committee -- I actually think

23  it will enhance the ability of the parties to see if they

24  could reach a deal if there's (audio gap) that Your Honor is

25  going to confirm the plan.

228

1       Again, doesn't mean a confirmation order has to be

2   entered, but I think, based upon my personal experience in

3   negotiating with Mr. Dondero, that your clear communication to

4   the parties that, unless something happens, you will enter a

5   confirmation order, I think will change things.  Okay?

6   Without getting into settlement discussions, things have

7   changed over the last several days, and we wish you would have

8   -- wish things would have happened sooner.  But we totally

9   disagree that Your Honor should hold your ruling for 30 days

10  or any other period of time.

11      Part of the reason I think they are making that argument

12  is because they have an examiner motion and they recognize

13  that, upon confirmation, the examiner motion is moot.  So I

14  think there's strategic reasons as well.

15      We don't think there should be a continuance of the TRO

16  hearing and of the contempt hearing.  As Your Honor recalls,

17  the contempt motion was specifically set for this time to give

18  Mr. Dondero enough time to prepare.  Your Honor was sensitive

19  to his due process concerns.  We set the TRO, the preliminary

20  injunction hearing against the Advisors and the Funds, we set

21  that, again, knowing that it would be after confirmation.

22      So we do not agree that either should be continued.

23  Again, we think the more direct, unequivocal answers Your

24  Honor can give to the parties, the better off we'll be.

25      I guess -- Mr. Taylor and I do agree that the record was

229

1  clear.  I guess we just disagree on the clarity of it.  I

2  heard Mr. Tauber testify that when he went out to people, to

3  insurance carriers, after he and Aon were engaged, they all

4  talked about a Dondero exclusion.  Okay?  They weren't

5  convinced into a gatekeeper provision because it was provided

6  as part of the normal materials you would provide in a

7  bankruptcy court and trying to get D&O liability in the

8  context of a bankruptcy case.  Mr. Tauber's testimony was

9  pretty clear, that carriers wanted to have a Dondero

10  exclusion.  And, in fact, the only reason we were able to get

11  any coverage was because of the gatekeeper.

12      So, yes, the record was clear.  We just disagree.

13      I'd like to go back to Mr. Draper's comments going -- and

14  a couple of things, obviously, overlap.  I guess one of the

15  things here, it's great that everyone is coming in here as

16  different interests and different parties or whatnot.  But as

17  I mentioned, Your Honor, at the outset, and I've repeated a

18  few times, these are all -- the only people we have not been

19  able to resolve issues with are the Dondero parties and the

20  related parties.  And I recall the tentacles.  Mr. Davor

21  questioned that.  Mr. Clemente, his comments.  But the fact of

22  the matter is, Your Honor, Your Honor has heard testimony.

23  Your Honor has had hearings.  Mr. Rukavina represents the

24  Advisors and the Funds.  Your Honor has never seen the

25  independent board member testify in this case to demonstrate

230

1   how these entities are really different.  So while Mr.

2   Rukavina does -- you know, tries his best, and I think he has

3   limited stuff to work with, but I give him credit for doing

4   the best he can, these are all Dondero-related entities and

5   Your Honor has seen that.

6       So, Your Honor, going to the resolicitation argument, it

7   actually has taken up a lot more time than the argument is

8   worth, for one very simple reason.  As I said in my argument,

9   and as Mr. Taylor and Mr. Draper totally ignored, there were

10   17 creditors who voted yes, 17 creditors who were apparently

11   misled, that Mr. Draper is looking out for the little guy and

12   Mr. Taylor is fumbling over his reason for why that's

13   important to Dondero.  And of those 17 creditors that voted

14   yes, Your Honor, they were either the employees related to

15   HarbourVest, UBS, Redeemer, or Acis, except for two.  And you

16   know the other two?  One was Contrarian, a claim buyer, who,

17   yeah, elected to be in Class 7, and the other was an employee

18   with a dollar claim.

19       So the whole argument that there should be a

20   resolicitation is preposterous, Your Honor.  But to go to some

21   of the specifics in what they argued, we didn't require

22   creditors to monitor recovery.  The footnote -- as I

23   indicated, the UBS 3018 was in the disclosure statement that

24   went out.  It didn't make it to the projections.  It was

25   clearly -- and they characterize it, I think Mr. Draper

231

1    characterized it as buried in the document.  There is a

2    section that every disclosure statement is required to have

3    called Risk Factors.  This disclosure statement had that.  And

4    in the disclosure statement, it talked about the amount of

5    claims being a risk factor.

6         Mr. Draper also said that the Debtor totally changed its

7    business model from the first to the second analysis.  That is

8    incorrect.  The Debtor was always going to manage funds.  Yes,

9    did they add the CLOs?  But before, they were going to manage

10   Multi-Strat, they were going to manage Restoration Capital,

11   they were going to oversee Korea, they were going to be doing

12   the management of the funds.  So there wasn't a big change in

13   the business model, Your Honor.

14        Mr. Taylor, on the solicitation issue, says we found $67

15   million in assets.  You know, that's a disingenuous statement.

16   I think over $20 million was found because his client and

17   related entities didn't make a payment on notes and they got

18   accelerated.  So while before we would have had to wait over

19   time if they were paid, it's not surprising that Mr. Dondero

20   and his related entities just failed to basically pay the

21   notes.

22        So that was, I think, over $20 million.  And then there

23   was the HCLOF asset.  That was acquired in the HarbourVest

24   settlement.  And then there was basically an increase in some

25   value to some assets.

1    So there wasn't anything mysterious here.  There wasn't

2    anything that the Debtor was trying to hide.  There weren't

3    any found assets.  It was based upon different circumstances.

4         Mr. Taylor complains about the lack of rollup of assets,

5    the lack of evidence on the best interests of creditors test.

6    Your Honor, you've had extensive testimony from Mr. Seery

7    about what would happen in a Chapter 7 and what would happen

8    in a Chapter 11.  And you know why we didn't provide the

9    information to Mr. Taylor and his client on what the rollup of

10   the assets would be, and do you know why he wants them?  He

11   wants to know what the assets are so he can try to bid.

12        And there also was the allegation that the failure to

13   allow them to bid means we're going to get less in a Chapter

14   11 than a 7.  Two comments to that, Your Honor.  Number one,

15   if that was the case, a debtor would never be able to satisfy

16   the best interests of creditors test.  If the existence of a

17   public process *de facto* meant you would get more value than

18   outside, you would never be able to satisfy that.  And, quite

19   honestly, that's just not the law, Your Honor.

20        You have an Oversight Committee with over $200 million of

21   creditors who are going to watch Mr. Seery like a hawk, like

22   they have watched him during the case.  And the concern that

23   somehow, because these assets are not put into full view to

24   sell, that they will get less value, it's just not -- it's not

25   supported by the evidence at all, Your Honor.  And Mr. Seery

233

1  will make the determination.  If it makes sense to notice up

2  and provide Mr. Dondero with notice, he will.  If he doesn't,

3  he won't.

4      Your Honor, going -- oh, and then the last comment on the

5  -- that I'll make on the resolicitation and the liquidation

6  analysis is Mr. Taylor chides us and we've been criticized for

7  not disclosing more about the HarbourVest and the UBS

8  settlements and that we were off substantially.  Your Honor,

9  you've heard testimony that we were in pending litigation with

10  HarbourVest and UBS at the time.  What kind of litigant would

11  we be if we came in and said, you know, Your Honor, you know,

12  Creditors, we think the UBS claim is going to be allowed at

13  $60 million and we think the HarbourVest claim is going to be

14  allowed at $30 million?  Would that really have benefited

15  creditors and this estate, to basically, after we took the

16  position, hard negotiations and hard pleadings that we

17  prepared, and in some cases filed, that we didn't have any

18  liability?  It would have made no sense, and it would have

19  been a dereliction of our duty to actually come out and say

20  what the claims -- the claims were, or what we thought they

21  could be settled for.

22      Your Honor, going back to Mr. Draper's comments.  He

23  started with the exculpation.  First he made a comment that I

24  don't think he intended what he said, but he said that the

25  exculpation order, the January 9th order, cuts off when the

234

1    independent directors go away.  I think what he meant to say

2    is that since the three people are not going to be independent

3    directors anymore, that basically any actions going forward by

4    any of those three are not covered.  But let's be clear.  The

5    January 9th order is in effect, and if at some point in the

6    future somebody has a claim against those three gentleman, or

7    their agents, for what they did as independent directors or

8    their agents, that order will apply.

9        Your Honor, we next had a discussion, or Mr. Draper and

10   you had a discussion on professionals.  I'm aware of the Fifth

11   Circuit law that says res judicata, fee applications.  I think

12   that only applies to claims that the Debtor and estate would

13   have.  It doesn't really apply to an exculpation.  But there's

14   Texas state law that I identified in our brief and we cited to

15   that limits third parties' ability to go after professionals.

16       But the bottom line is the Fifth Circuit, in *Pacific*

17   *Lumber*, didn't deal with professionals.  Your Honor was

18   correct in pushing both Mr. Taylor and Mr. Rukavina.  What

19   really that was was a policy case.  And professionals have

20   nothing to do with 524(e).  So the *Palco* and the *Pacific*

21   *Lumber* reference and explanation of 524(e) doesn't have

22   anything to do with professionals.  And we would submit, Your

23   Honor, that an exculpation, especially in a case like this, is

24   important for professionals.

25       I understand Your Honor's comments that maybe it's much

235

1  ado about nothing, but I'm not really sure it's much ado about

2  nothing when we have Mr. Dondero and his affiliates who,

3  notwithstanding their efforts to just claim that all they are

4  doing is trying to get a fair shake, Your Honor knows better.

5  Your Honor knows better from the years you've been litigating

6  with them, and we know better and the Debtor knows better from

7  what the independent directors have been dealing with.

8         THE COURT:  Let me ask you this, though.  I came into

9  the hearing with the impression we were just talking about

10  postpetition pre-confirmation, or pre-effective date maybe I

11  should say, was the expanse of time covered by exculpation.

12  And Mr. Rukavina said no, no, no, go back, look at, I don't

13  know, Subsection 4 of something.  It is a post-confirmation

14  concept.  What is your response to that?

15         MR. POMERANTZ:  I believe it's implementation.  And,

16  again, --

17         THE COURT:  Implementation?  Yes.

18         MR. POMERANTZ:  -- I think Mr. Rukavina -- right.  I

19  think Mr. Rukavina and Mr. Taylor and Mr. Draper have done a

20  great job trying to muddy the issues.  They talk about our

21  sleight of hand and how we're trying to do things that are way

22  beyond the bankruptcy court's jurisdiction.  We are not.  I

23  think they are trying -- what they have done throughout the

24  case is throw up enough mud.  And here's, here's the answer to

25  that question, Your Honor.  Implementation.  Okay?  We know

236

1   what implementation means.  The plan says implementation is

2   cancelation of the equity interests, creation of new general

3   partners, restatement of the limited partners, establishment

4   of the Claimant Trust and Litigation Sub-Trust.  That's the

5   implementation.

6       We are not trying to get exculpation for post-confirmation

7   activity.  Actually, my partner, Mr. Kharasch, in specifically

8   addressing Mr. Rukavina's concern, said, look, if you have a

9   problem with cause, if you have a problem, want to exercise

10  your rights, we're only asking you to come back to the Court.

11  We are not stopping you.

12      So the whole argument that the exculpation is really broad

13  and is not really -- does not really cover just the plan, the

14  approved plan, I think is a red herring.  Implementation is

15  implementation in the context of the plan.

16      And also Mr. Rukavina tries to argue that, well, it's

17  administration, it's not really you acting any operation of

18  business.  I just don't think there's any support in the case

19  law.  Your Honor has overseen this case, overseen this

20  Debtor's activities, overseen the independent directors'

21  activities, overseen Strand's activities, overseen the

22  employees' activities.  And those activities have been

23  (indecipherable) administration of the case.  And his attempt

24  to create a different category for, well, it's not

25  administration, it's operation and so it doesn't apply, I just

237

1   think is wrong.

2       Your Honor made a couple of comments about what was

3   *Pacific Lumber* doing.  It was a policy decision.  If there was

4   a bright-line rule, then nobody would be entitled to

5   exculpation.  The very fact that the Fifth Circuit said that

6   Committee members are different made -- makes it clear it was

7   -- it was policy.

8       And Mr. Taylor's comments that, well, their creation of

9   statute, Chapter 11 trustees and Committee members, that's not

10  what basically the case said.  If you look at the citation to

11  touters in the case, it was we want people to volunteer and

12  who are needed for the process.  Committee members are needed

13  for the process.  We don't want to discourage them from coming

14  in.  And the only testimony you have on the independent

15  directors is from Mr. Dubel, and he testified the importance

16  of independent directors to modern-day Chapter 11 practice,

17  the importance of exculpation, indemnification, and D&O

18  insurance.  And his testimony:  uncontroverted.  The Objectors

19  could have brought in someone to say something different, but

20  the only testimony before Your Honor is, if Your Honor does

21  not approve exculpations in cases like this, you will not get

22  independent directors and it will have an adverse effect on

23  the Chapter 11 process.

24      So, while I appreciate all the Objectors trying to say

25  bright line, trying to say *Pacific Lumber*, that is the gut

238

1  reaction, right?  That's -- it's easy to say.  But Your Honor

2  will know better, from reading the cases, that's not what

3  *Pacific Lumber* says.  And for the several reasons I gave, it's

4  the reason why *Pacific Lumber* does not govern the decision in

5  this case.

6      Your Honor, Mr. Draper then started to talk about *Craig*.

7  And everyone cites *Craig* as this, you know, limiting

8  jurisdiction.  Now, we acknowledge that *Craig* and the Fifth

9  Circuit has a more limited post-confirmation jurisdiction

10  approach than the other Circuits, but it's not nonexistent.

11  And just because the Debtor is going out post-confirmation and

12  acting does not mean that the conduct that they are engaging

13  in is not -- and disputes that arise, doesn't come within the

14  Court's jurisdiction.  If that was the case, and I think Your

15  Honor recognized this, in your case it was the *TXMS* case,

16  while it's limited, more limited after confirmation, and I

17  think you even, in the case -- or, in one case of yours, said

18  that even after the case is closed there could be

19  jurisdiction.  So their just trying to argue *Craig* is just --

20  is just too much.

21      Going out of the gatekeeper, Mr. Draper tried to say we

22  are *Barton*, and that's it, and *Barton* has its limitations, et

23  cetera.  First of all, with respect to *Barton*, it is not

24  limited and doesn't include debtors-in-possession.  We have

25  cited cases in our materials where it has been applied to

239

1  debtors-in-possession.

2      So, you know, look, maybe this is a provision -- this is a

3  proposition like many in bankruptcy, you could find a

4  bankruptcy court to agree with a proposition, but there's

5  cases all over the place on that.  There's cases applying to

6  post-confirmation.  The trend has been to expand *Barton*.  But

7  the beauty of it is, Your Honor, you don't have to rely on

8  *Barton*.  *Barton* was one of our arguments.  We gave *Barton* as,

9  you know, somewhat of an analogy but somehow applying because

10  in the -- because the independent directors were like the

11  trustees.

12      But we recognize it may be going farther than *Barton* has

13  previously gone.  But the case law is clear, it is being

14  extended.  But we -- I gave you several provisions of the

15  Bankruptcy Code that authorized you to enter a gatekeeper

16  order.  None of the Objectors objected on any of those

17  grounds.  They didn't say the statutes that I cited.  And it

18  wasn't only 105, I know bankruptcy practitioners love to cite

19  105, but there were three or four others that I mentioned, and

20  they're in our brief.  There's no case that they cited that

21  said that there is no authority on the gatekeeper.

22      But what was the argument that was raised?  And I think

23  Mr. Rukavina raised it, saying, you know, look, I don't

24  understand the argument of no jurisdiction, of jurisdiction

25  for a gatekeeper but no jurisdiction for underlying cause of

240

1   action.  Well, Mr. Rukavina should read and Your Honor should

2   read, when you're considering the plan, the case, the *Villegas*

3   case in the Fifth Circuit as it dealt with *Stern*.  That was

4   particularly a case.  Does *Barton* -- is *Barton* impacted from

5   *Stern*?  By *Stern*?  And *Stern*, we know, limits the bankruptcy

6   court's jurisdiction.  But, no, the Fifth Circuit said, in

7   that case, no.  Even though the bankruptcy court's

8   jurisdiction is limited to hear the claim, there is nothing

9   inconsistent with that and allowing the bankruptcy court to

10  act as a gatekeeper.

11      So Mr. Rukavina's argument that, well, he'll present to

12  you that there's cause and you'll find there's no cause and

13  then he will be without a remedy by someone that had

14  jurisdiction, that really sounds good but it just doesn't

15  withstand analytic scrutiny.  There is a distinction.  They

16  are glossing over the distinction.  They don't like the

17  distinction.

18      And why is that distinction -- and why is it important in

19  this case?  Again, we're not talking about garden-variety

20  people who are just involved with a debtor and will get caught

21  up in a bankruptcy.  We narrowly tailored the gatekeeper to

22  enjoined parties.  Enjoined parties are the people before Your

23  Honor, some of the people that have made the Debtor's life

24  miserable over the last few months.

25      We have every interest and desire, as does the Committee,

241

1   to go out post-confirmation and monetize these assets.  But we

2   see the clouds on the horizon.  We see all the pleadings that

3   have been filed by the Objectors saying how, if there's no

4   deal, there will be an unending amount of costs and appeals.

5   It's, you know, the point, not too subtle.  It wasn't lost on

6   us.

7       Your Honor, going to Mr. Rukavina's arguments on Class 8

8   cram down, again, it's really a hard argument to understand,

9   but first I want to make a point.  He sort of mentioned -- and

10  I'm not sure if he intends to preserve this on appeal, but it

11  was not objected to and I'll ask for a ruling on it, Your

12  Honor -- he said that there was inappropriate separate

13  classification.  That was not raised in any of the objections.

14  We don't think it was properly before the Court.  We

15  understand there's a component of that in unfair

16  discrimination in connection with a cram down, but there is no

17  objection, there was no filed objection, to the separate

18  classification of the deficiency claims and the Class 8

19  unsecured claims.

20      And if you look at the voting, you realize it wasn't done

21  for gerrymandering, because if you put both claims together,

22  both classes together, you would have had one class that voted

23  yes.

24      So I don't believe the separate classification under the

25  1129 standards is appropriate for Your Honor to consider,

242

1  other than in connection with the cram down.

2      Now, Mr. Rukavina complains that the only way the

3  convenience class was decided was by way of negotiation.  Your

4  Honor, how else do provisions like that get decided?  And who

5  was the negotiation between?  It was between the Committee.

6  And one of the benefits of a Committee process, and I

7  represent a lot of Committees, you put people in a Committee

8  that have diverse interests and they can come up with an

9  appropriate result.  And here you have that.  You had one

10 creditor who was a convenience creditor.  You have three other

11 creditors who would lose liquidity if convenience payments are

12 made.

13     Do you think that UBS, Acis and Redeemer, do you think

14 they had a desire just to pay people off?  No.  It was part of

15 a collaborative process.  So to say that there was no basis

16 and no testimony on the appropriateness to have -- and how the

17 convenience class was put together just would be wrong.

18     And with respect to the absolute priority rule, Your

19 Honor, again, there's a missing link here, okay?  These are

20 contingent interests.  They are property.  No doubt they are

21 property.  But if I did not allow those creditors or those

22 equity to have a contingent interest, the argument would have

23 been made that the plan violates the absolute priority rule.

24 And I said that in my argument.  And why would it have

25 violated the absolute priority rule?  Because there's a

243

1   potential that creditors could get over a hundred cents on the

2   dollar, plus interest.  So it's a game of gotcha, right?

3       And why do they really care?  Mr. Dugaboy said in his --

4   Mr. Draper said in his brief that Dugaboy cares because they

5   may have wanted to buy the interest.  Well, I'm sure they can

6   go to Hunter Mountain, you know, Mr. Dondero's left hand can

7   go to his right hand, and I'm sure he'd be happy to sell the

8   contingent interests.

9       And with respect to the argument that Mr. Rukavina made

10  about control, equity be in control, yeah, control is a right.

11  No doubt.  You've got -- if you're giving control to the post-

12  confirmation Debtor, that could be a right and implicate the

13  absolute priority rule.  But what is the control here?  Equity

14  is not given any rights.  Your Honor heard how the post-

15  confirmation entity is structured.  It's going to be Mr.

16  Seery, overseen by an Oversight Board.  So I really don't

17  understand the concept of control.  There just is no violation

18  of the absolute priority rule.

19      Your Honor, Mr. Rukavina then took us to task for 2000 --

20  or, for not filing the 2015.3 statement.  And if you take his

21  argument to the logical conclusion -- well, we didn't file it,

22  we didn't comply with that Rule, so we're not in compliance

23  with the Bankruptcy Code, so we can never basically get our

24  plan confirmed, right, because it's a violation and we didn't

25  file and seek an extension.

244

1     That's just a preposterous argument, Your Honor.  Mr.

2  Seery poignantly told the Court, in the rush of things that

3  were going on, it wasn't filed.  Did Mr. Rukavina, before

4  yesterday, having Mr. Dubel on the stand, did he ever ask

5  where is our 2015.3 report?  He probably didn't ask it because

6  the answer -- when I told him the reason why it wasn't filed

7  before January 9 was because I don't think Mr. Dondero wanted

8  it filed, and I think that's why, as Mr. Seery testified, we

9  were having a challenging time getting that information from

10  the in-house -- in-house.

11     But, yes, should it have been filed?  Yes.  But if that is

12  all they could point to through the course of the case that

13  Mr. Seery or Mr. -- or the rest of the board did wrong, you

14  know, I think that just demonstrates they did a fine job.

15          THE COURT:  All right.

16          MR. POMERANTZ:  Your Honor?

17          THE COURT:  You've got four minutes left.

18          MR. POMERANTZ:  Oh.  Okay.  Your Honor, going to Mr.

19  Rukavina and the Strand argument that it's a nondebtor entity,

20  as I explained in my argument, the Strand -- Strand needs to

21  get exculpation or else that's a backdoor way to the Debtor.

22  Forget about the independent directors, it's a backdoor way to

23  the Debtor.  Because Mr. Dondero will be in control.  If

24  Strand is sued for post-January 9th activities, he will assert

25  an administrative claim.  And one thing from *Pacific Lumber* is

245

1   clear, the Debtor is entitled to an exculpation as part of the
2   injunction and the -- and the discharge.
3       Your Honor, Mr. Kharasch adequately addressed Mr.
4   Rukavina's comments with the gatekeeper and the gatekeeper
5   problem.  We are not seeking to stop his clients, however
6   related they may be, from exercising their rights.  We are
7   seeking a process that will not embroil the Debtor in
8   litigation going forward.  There is no problem with Your Honor
9   acting as the gatekeeper to do so.  And to the extent that
10  they are bound by the January 9th order is not really an issue
11  for today.  That'll be an issue at the temporary -- the
12  temporary -- at the preliminary injunction hearing.
13      I -- just one minute, Your Honor.
14      (Pause.)
15          MR. POMERANTZ:  Your Honor, I think I covered a lot.
16  If there's anything that any of the Objectors have mentioned
17  that I failed to respond to, I'd be happy to answer questions
18  Your Honor has.
19          THE COURT:  All right.  I guess there's, what, about
20  two minutes left, if Mr. Clemente had anything.
21      Mr. Clemente, have you drifted off?  I doubt it.  But
22  anything else from you, Mr. Clemente?
23          MR. TAYLOR:  Your Honor, I show him talking -- this
24  is Clay Taylor -- but no one's hearing him.
25          THE COURT:  Okay.  Mr. Clemente, we are not hearing

246

1    you, or I'm not seeing you.  Make sure you're not on mute.

2              THE CLERK:  He's not on mute, Judge.

3              THE COURT:  He's not on mute?  So we must have a

4    bandwidth issue or something else.

5         All right.  Mr. Clemente, still not hearing or seeing you.

6    We'll give him another 30 seconds.

7              THE CLERK:  He's coming up.

8              THE COURT:  He's coming up?  Ah, I see his name now.

9              MR. CLEMENTE:  Your Honor, can you hear me?

10             THE COURT:  I can hear you now.

11             MR. CLEMENTE:  Okay, Your Honor.  I don't know what

12   happened.  I just switched another camera, so you may not be

13   able to see me, but can you hear me?  I'll be very quick.

14             THE COURT:  Okay.  I can hear you.

15             MR. CLEMENTE:  Can you hear me?

16             THE COURT:  Yes.

17             MR. CLEMENTE:  Okay.  Thank you, Your Honor.

18   CLOSING ARGUMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

19             MR. CLEMENTE:  Two things I want to say.  First, just

20   on Class 8, I think what's important, as my comments

21   emphasized earlier, the structure of Class 8.  We must

22   remember what it is.  It's really designed so that Class 8

23   holders receive their pro rata share of what's left after

24   prior claims are paid.  That's really what Class 8 creditors

25   voted on.  That's what the disclosure provided.  They did not

247

1   vote on receiving a specific dollar or a specific recovery

2   percentage.

3       And regarding the projections and estimates, Your Honor,

4   we're talking about large litigation claims that were asserted

5   and then settled.  And given the nature of these assets, the

6   values fluctuate.  It's perfectly expected, Your Honor, and

7   indeed disclosed, that there could be wide swings in the

8   amount of claims.  That does not lead to the conclusion that

9   the plan needs to be resolicited.

10      And then, finally, Your Honor, again, Mr. Pomerantz

11  adequately addressed all the points, as he did with his

12  earlier presentation, so I'm not going to touch on them, but I

13  did want to respond to one thing that Mr. Taylor said.  And I,

14  of course, agree with Mr. Pomerantz.  The Committee believes

15  there's no reason for you to delay a ruling and would in fact

16  urge you to rule as soon as Your Honor is ready to rule.

17  Confirmation of the plan, to the extent that there are

18  conversations occurring, is not going to prevent those

19  conversations from taking place, and they can continue after

20  the plan is confirmed.  There's simply nothing inherent in

21  Your Honor confirming the plan that would prevent those

22  conversations from occurring or would ultimately prevent

23  parties from pivoting to a deal on the off-chance that one

24  should be reached.

25      So I just wanted to emphasize, Your Honor, again, Your

248

1 Honor is going to rule when Your Honor rules, but the
2 Committee would urge you to rule, and certainly the idea that
3 there may or may not be discussions with Mr. Dondero should
4 not at all in any way lead you to the conclusion that you
5 shouldn't rule or that those conversations cannot continue
6 after plan confirmation.
7      Thank you, Your Honor.  Unless you have questions for me.
8 And my apologies with the technology.
9          THE COURT:  No problem.  All right.  Here's what I'm
10 going to do.  We can see you now, Mr. Clemente.
11          MR. CLEMENTE:  Oh.  I'm sorry, Your Honor.  I
12 switched to another camera again because it wasn't working.
13 So, I apologize.
14          THE COURT:  All right.  I am going to call you back
15 Monday.  What day of the week will that be?  Is that -- I
16 mean, Monday, what date, I should say.  That'll be the 8th,
17 right?  I am going to call you back Monday, this coming
18 Monday, February 8th, at 9:30 Central time, and I am going to
19 give you my ruling.  It will be a detailed oral bench ruling.
20 And I'm not going to leave you hanging on the edge of your
21 seat over the next few days.  I will tell you I'm inclined to
22 confirm this plan.  I think it meets all of the requirements
23 of 1129 and 1123 and 1122.
24      The thing that I am going to spend some time thinking
25 about between now and Monday morning is, no surprise, the

249

1    propriety of the exculpations, the propriety of the plan

2    injunctions, the propriety of the gatekeeper provisions.  I

3    certainly am duty-bound to go back and reread *Pacific Lumber*,

4    to go back and read *Thru, Inc.*, and to really think hard about

5    what is happening here.

6        So, I'm pretty much down, I think, to just those three

7    issues here.  I'll talk to my law clerk.  He may remind me of

8    something else that I'm not articulating right now.  But I

9    think I'm just down to those issues.  Okay?  So it's not going

10   to be a mystery very long.  We will come back Monday, 9:30.

11   My courtroom deputy will post on the docket the WebEx

12   connection instructions as usual, and we'll go from there.

13   Now, --

14           MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

15   Pomerantz.  I have a question, and it's going to sound odd

16   coming from someone on the West Coast, but I was wondering if

17   you could do it earlier.  And the only reason I say that is,

18   the night before, I have to call in to see if I'm on jury duty

19   on Monday, and it would be helpful to me -- I assume your

20   reading the ruling would be within a half hour, 45 minutes.

21   That if you started at 9:00, if that was possible, I could

22   then get in a car, and if I'm actually called to jury duty, I

23   can get there.  Of course, I don't know if I will be called,

24   but I'd hate to miss it.

25           THE COURT:  Okay.  Well, I don't want to make you

250

 1   miss jury duty.  Okay.  We will do 9:00 o'clock.

 2              MR. POMERANTZ:  Thank you, Your Honor.

 3              THE COURT:  Hopefully no one will be, you know, hung

 4   over from watching the Super Bowl.  Personally, I don't like

 5   Tom Brady, so I may be boycotting the Super Bowl.  But maybe

 6   I'll watch it.  Maybe I'll -- I'll watch it.  So we'll do it

 7   9:00 o'clock.  So 9:00 o'clock next Monday.

 8          Now, let's talk about next the currently-set hearing this

 9   Friday, February 5th, on the injunction and contempt of court

10   motion as to Mr. Dondero and the other entities.  I want to

11   continue that, and here is what I am struggling with.  The

12   only day I have next week is Friday, the 12th, and I would

13   rather not use that date because I'm pretty jam-packed Monday

14   through Thursday, unless stuff has been settled that I haven't

15   become aware of.  So let me ask two things.  First, when is

16   the examiner motion set?  I'm just wondering if there's a

17   block of time we have coming up that --

18              MR. POMERANTZ:  I believe that's March 2nd, Your

19   Honor, so that's not for another month.

20              THE COURT:  Oh, that's not for another month?  All

21   right.

22          Traci, are you on the line?  I want to ask you --

23              THE CLERK:  Yes, I am.

24              THE COURT:  What about the following week?  I know

25   Monday, the 15th, is a federal holiday, but do we have

251

```
 1   availability for -- I fear a full day is going to be needed
 2   for continuing this Friday setting.
 3           THE CLERK:  Wednesday, February 17th, is available.
 4           THE COURT:  We've got all day on Wednesday, February
 5   17th?
 6           THE CLERK:  Yes.
 7           THE COURT:  All right.  What about that?  I think I
 8   heard Mr. Rukavina, I think he's the one who threw it out
 9   there -- or maybe it was Mr. Taylor; I'm getting mixed up --
10   the possibility that they would agree to a continuation of the
11   preliminary injunction through -- well, I think you said
12   through confirmation.  Until the Court enters a confirmation
13   order.  And if I were to rule and approve confirmation Monday,
14   then we're talking about an order that might be entered sooner
15   than the 17th.  So, do you all have any --
16           MR. RUKAVINA:  Your Honor?
17           THE COURT:  -- mutually-agreeable suggestions?  If
18   not, I'm just going to set it the 12th and I'll, you know, I'm
19   killing myself, but I'll --
20           MR. TAYLOR:  Your Honor?
21           MR. RUKAVINA:  No, Your Honor.  I think Your Honor is
22   wise to do what's she's proposing.  The agreed TRO against my
23   clients expires on the 15th of February.
24           THE COURT:  Uh-huh.
25           MR. RUKAVINA:  We can easily move that back a week or
```

252

1   a sufficient amount of time so that there's no prejudice by

2   going on the 17th, if that would be acceptable to the Debtor,

3   and then we can just pick a date that's sufficiently after the

4   PI hearing so that there's protection for everyone.

5           THE COURT:  All right.  Mr. Taylor, do you agree?

6           MR. TAYLOR:  Yes, Your Honor.  That is acceptable to

7   Mr. Dondero.

8           THE COURT:  Okay.

9           MR. TAYLOR:  We can also push it back.  Can you hear

10  me?

11          THE COURT:  Yes, I can.  Uh-huh.

12          MR. TAYLOR:  Okay.

13          THE COURT:  All right.

14          MR. POMERANTZ:  I just want to make -- I just want to

15  make sure Mr. Morris, John Morris, is on, since he's taking

16  the lead in those matters.  I don't see his picture.

17          MR. MORRIS:  I am, Jeff, and I appreciate that.  I'm

18  available, Your Honor.  We were supposed to take the

19  depositions of Mr. Leventon and Mr. Ellington tomorrow.  I

20  don't know if their counsel is on the phone.  But given Your

21  Honor's decision to adjourn the hearing from Friday, I would

22  respectfully request at this time that counsel for those two

23  individuals work with me to find a date next week in order to

24  take those depositions.

25          THE COURT:  All right.  That's --

253

1           MS. DANDENEAU:  Debra Dandeneau from --

2           THE COURT:  Go ahead.

3           MS. DANDENEAU:  This is Debra Dandeneau from Baker

4    McKenzie.  We agree, and we're happy to work with you on a

5    rescheduled time.

6           MR. MORRIS:  Thank you very much.

7           THE COURT:  All right.  All right.  So, someone had

8    filed a motion to continue Friday's hearing.  I think it was

9    your firm, Mr. Taylor.  I already had a motion pending for a

10   few days now.  So I'm going to direct you to upload an order,

11   Mr. Taylor, or someone at your firm, continuing the hearing to

12   the 17th at 9:30, with language in there that your -- the

13   injunction is continuing at least through that date.  And,

14   again, it's a continuance of the motion for contempt as well

15   as the setting on the preliminary injunction.  And, of course,

16   run that by Mr. Morris and Mr. Rukavina.

17          MR. TAYLOR:  Sure.  Your Honor, this is -- I'm not

18   handling the injunction hearing, or at least I don't think I

19   am.  But just so that I'm clear, should maybe the injunction

20   continue through the next day or something, so depending on

21   how Your Honor rules, there's not a rush to try and get an

22   order to you?

23          MR. RUKAVINA:  Your Honor, I think that Mr. Morris

24   and I can work this out.  Mr. Taylor is not involved in that

25   adversary, that's true, but Mr. Morris and I will be able to

254

1  very quickly enter a proposed agreed order that extends that

2  TRO for some period of time.

3           THE COURT:  Okay.

4           MR. RUKAVINA:  I'm not going to be difficult.

5           THE COURT:  Okay.  So we'll shift to you and Mr.

6  Morris to be the scriveners.  I just -- I suggested that

7  because I thought there was a motion to link the order to that

8  had been filed by Bonds Ellis.  I may be --

9           MR. MORRIS:  There was, Your Honor.  There was an

10  emergency motion to continue.  We filed an opposition, and

11  Your Honor has not yet ruled on that motion.  You're exactly

12  right.

13          THE COURT:  Okay.  All right.

14          MR. TAYLOR:  Your Honor, this is Clay Taylor.  I will

15  make sure the right people confer with Davor and John, and

16  we'll get -- we'll link it to that motion, because that makes

17  sense, to have something to link it to.

18          THE COURT:  Okay.  Yes.  And it can be a two-

19  paragraph order, I would think.

20      All right.  And then so I'm going to see you Monday at

21  9:00 o'clock Central time with the ruling.

22      Please, don't anyone file anymore paper.  I threw that out

23  earlier today.  I've got all the paper I need.  And I will see

24  you Monday at 9:00 o'clock.  Okay?  We're adjourned.

25          MR. POMERANTZ:  Thank you, Your Honor.

255

1          THE CLERK:  All rise.

2          MR. MORRIS:  Thank you, Your Honor.

3       (Proceedings concluded at 4:34 p.m.)

4                      --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21     I certify that the foregoing is a correct transcript from
       the electronic sound recording of the proceedings in the
22     above-entitled matter.

23     **/s/ Kathy Rehling**                    **02/05/2021**

24     _____    _____
       Kathy Rehling, CETD-444                      Date
25     Certified Electronic Court Transcriber

256

```
                                  INDEX
1
   PROCEEDINGS                                                 4
2
   WITNESSES
3
   Debtor's Witnesses
4
   Marc Tauber
5  - Direct Examination by Mr. Morris                         25
6  - Cross-Examination by Mr. Rukavina                        34
   - Cross-Examination by Mr. Taylor                          36
7  - Redirect Examination by Mr. Morris                       41

8  Certain Funds and Advisors' Witnesses

9  James P. Seery
   - Direct Examination by Mr. Rukavina                       45
10 - Cross-Examination by Mr. Morris                          49
   - Redirect Examination by Mr. Rukavina                     50
11
   Robert Jason Post
12 - Direct Examination by Mr. Rukavina                       51
   - Cross-Examination by Mr. Morris                          56
13 - Redirect Examination by Mr. Rukavina                     62
   - Recross-Examination by Mr. Morris                        63
14
15 EXHIBITS

16 Debtor's Docket 1887 - Leatham Declaration   Received   6
   Debtor's Exhibit B, Docket 1822              Received   8
17 Debtor's Exhibit 6R, Docket Entry 1822       Received   9
   Debtor's Exhibits 6S and 6T, Docket Entry 1822 Received 12
18 Debtor's Exhibit 6U, Docket Entry 1822       Received  13
   Debtor's Exhibits D and E, Docket Entry 1822 Received  15
19 Debtor's Exhibits 4D, 4E, and 4G, Docket 1822 Received 17
20 Debtor's Exhibit 5T, Docket 1822            Withdrawn 17
   Debtor's Exhibit 10A                         Received  22
21 Debtor's Omnibus Reply to Plan Objections,   Received  23
      Docket 1807
22 Debtor's Exhibit 7O (Abridged)               Received  44

23 Certain Funds and Advisors' Exhibit 2,       Received  53
      Docket Entry 1863
24
   Dondero's Exhibits 6 through 12 and          Received  66
25    15 through 17
```

257

```
 1                            INDEX
                             Page 2
 2
 3   EXHIBITS, cont'd.

 4   Judicial Notice to be Taken of Docket 1887,           6
        Patrick Leatham Declaration
 5
     Judicial Notice to be Taken of Docket 247,           45
 6      Schedules

 7   CLOSING ARGUMENTS

 8   - By Mr. Pomerantz                                    73
     - By Mr. Kharasch                                    151
 9   - By Mr. Clemente                                    154
     - By Mr. Draper                                      159
10   - By Mr. Rukavina                                    184
     - By Mr. Taylor                                      208
11   - By Mr. Pomerantz                                   227
     - By Mr. Clemente                                    246
12
13   RULINGS

14   Confirmation Hearing [1808] - Taken Under Advisement  248

15   Agreed Motion to (1) Assume Non-Residential Real Property  248
     Lease with Crescent TC Investors, LP upon Confirmation of
16   Plan and (II) Extend Assumption Deadline [1624] - Taken
     Under Advisement
17
18   END OF PROCEEDINGS                                    255

19   INDEX                                             256-257

20

21

22

23

24

25
```